# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF ARIZONA,<br>STATE OF CONNECTICUT,<br>STATE OF HAWAII,<br>STATE OF IDAHO,<br>STATE OF ILLINOIS,<br>STATE OF IOWA,<br>STATE OF MARYLAND,<br>STATE OF MICHIGAN,<br>STATE OF MISSOURI,<br>STATE OF MONTANA,<br>STATE OF NEBRASKA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF OHIO,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF UTAH, and<br>STATE OF VERMONT,<br><br>          Plaintiffs,<br><br>      v.<br><br>AMERICAN EXPRESS COMPANY,<br>AMERICAN EXPRESS TRAVEL<br>RELATED SERVICES COMPANY, INC.,<br>MASTERCARD INTERNATIONAL<br>INCORPORATED, and<br>VISA INC.<br><br>         Defendants. | Civil Action No.<br>CV-10-4496 (NGG)(RER) |

## AMENDED COMPLAINT FOR EQUITABLE RELIEF
## FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

-1-

The United States of America, by its attorneys acting under the direction of the Attorney General; the State of Arizona, by its Attorney General Terry Goddard; the State of Connecticut, by its Attorney General Richard Blumenthal; the State of Hawaii, by its Acting Attorney General Russell A. Suzuki; the State of Idaho, by its Attorney General Lawrence G. Wasden; the State of Illinois, by its Attorney General Lisa Madigan; the State of Iowa, by its Attorney General Thomas J. Miller; the State of Maryland, by its Attorney General Douglas F. Gansler; the State of Michigan, by its Attorney General Michael A. Cox; the State of Missouri, by its Attorney General Chris Koster; the State of Montana, by its Attorney General Steve Bullock; the State of Nebraska, by its Attorney General Jon Bruning; the State of New Hampshire, by its Attorney General Michael A. Delaney; the State of Ohio, by its Attorney General Richard Cordray; the State of Rhode Island, by its Attorney General Patrick C. Lynch; the State of Tennessee, by its Attorney General Robert E. Cooper, Jr.; the State of Texas, by its Attorney General Greg Abbott; the State of Utah, by its Attorney General Mark L. Shurtleff; and the State of Vermont, by its Attorney General William H. Sorrell (collectively, "Plaintiffs"), bring this civil antitrust action against Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "American Express"), MasterCard International Incorporated ("MasterCard"), and Visa Inc. ("Visa") (collectively, "Defendants") to obtain equitable relief to prevent and remedy violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs allege:

## I.  INTRODUCTION

1.      Defendants operate the three largest credit and charge card transaction networks in the United States.  In 2009, a substantial amount of interstate commerce – over $1.6 trillion in transaction volume – flowed through Defendants' networks.  Every time a consumer uses one of Defendants' credit or charge cards to pay for a purchase from a merchant, the merchant must pay a fee, often called a "card acceptance fee,"  "merchant discount fee," or "swipe fee."  In 2009 alone, Defendants and their affiliated banks collected more than $35 billion in such fees from U.S. merchants.  Defendants' fees are a significant cost for merchants that accept Defendants' cards, and merchants pass these costs on to all consumers through higher retail prices.

2.      Plaintiffs bring this action to prevent Defendants from imposing on merchants certain rules, policies, and practices ("Merchant Restraints") that insulate Defendants from competition.  The Merchant Restraints impede merchants from promoting or encouraging the use of a competing credit or charge card with lower card acceptance fees.  Each Defendant's vertical Merchant Restraints are directly aimed at restraining horizontal interbrand competition.

3.      Each Defendant has suppressed competition with rival networks at the "point of sale," where merchants interact directly with customers, by disrupting the ordinary give and take of the marketplace.  Most consumers who use credit or charge cards carry more than one. Defendants' Merchant Restraints, however, prevent merchants from offering their customers a discount or benefit for using a network credit card that is less costly to the merchant.  Merchants cannot reward their customers based on the customer's card choice.  Merchants cannot even suggest that their customers use a less costly alternative card by posting a sign stating "we prefer"

another card or by disclosing a card's acceptance fee.  In short, Defendants' Merchant Restraints prohibit merchants from fostering competition among credit card networks at the point of sale.

4.     By incorporating and enforcing its Merchant Restraints in agreements with merchants, each Defendant has violated and continues to violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.  DEFENDANTS

5.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.  Defendant American Express Travel Related Services Company, Inc., a wholly owned subsidiary of American Express Company, is a Delaware corporation, with its principal place of business in New York, New York.  It is the principal operating subsidiary of American Express Company.  In 2009, cardholders used American Express credit and charge cards for purchases totaling $419.8 billion.

6.     Defendant MasterCard is a Delaware corporation with its principal place of business in Purchase, New York.  In 2009, cardholders used MasterCard credit and charge cards for purchases totaling $476.9 billion.

7.     Defendant Visa is a Delaware corporation with its principal place of business in San Francisco, California.  Visa has offices, transacts business, and is found in New York.  In 2009, cardholders used Visa credit and charge cards for purchases totaling $764.2 billion.

### III.  JURISDICTION AND VENUE

8.      Plaintiff United States of America brings this action pursuant to Section 4 of the

Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and

restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs Arizona, Connecticut,

Hawaii, Idaho, Illinois, Iowa, Maryland, Michigan, Missouri, Montana, Nebraska, New Hampshire,

Ohio, Rhode Island, Tennessee, Texas, Utah and Vermont, by and through their respective

Attorneys General, bring this action in their respective sovereign capacities and as parens patriae

on behalf of the citizens, general welfare, and economy of their respective States under their

statutory, equitable and/or common law powers, and pursuant to Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent Defendants from violating Section 1 of the Sherman Act.

9.      This Court has subject-matter jurisdiction over this action under Section 4 of the

Sherman Act, 15 U.S.C. § 4.

10.      This Court has personal jurisdiction over each Defendant and venue is proper in this

District under 15 U.S.C. § 22 because each Defendant transacts business and/or is found within

this District.  Defendants' credit and charge cards are and have been used for billions of dollars of

purchases in this District.

### IV.  TRADE AND COMMERCE

11.      Defendants operate credit and charge card networks in the United States, and sell

products and services in the flow of interstate commerce.  Defendants' products and services

-5-

involve a substantial amount of interstate commerce.  In 2009, credit and charge card transaction volume on Defendants' networks in the United States exceeded $1.6 trillion.

## V.  INDUSTRY BACKGROUND

12.     General purpose credit and charge cards ("General Purpose Cards") are payment devices that a consumer can use to make purchases from a wide variety of merchants without accessing or reserving the consumer's funds at the time of the purchase.  There are two principal types of General Purpose Cards:

   a.     credit cards, which usually permit the cardholder to pay either (i) all charges within a set period after a monthly bill is rendered, or (ii) only a portion of the charges within that time and pay the remainder in monthly installments, including interest; and

   b.     charge cards, which require the cardholder to pay all charges within a set period after a monthly bill is rendered.

13.     General Purpose Cards include cards for personal use (issued to individuals for their personal use), cards for small business (issued to individuals for use with a small business), and commercial and corporate cards (issued to individuals, organizations, and businesses for business use).

14.     General Purpose Cards do not include cards that can be used at only one merchant (such as department store cards) or cards that access funds on deposit in a checking or savings

account or on the card itself (such as signature debit cards, PIN debit cards, prepaid cards, or gift cards).

15.     In Visa and MasterCard transactions, the "card acceptance fee" or "merchant discount fee" that a merchant pays has three principal components:  the interchange fee, the assessment fee, and the acquiring fee.  To comply with the Visa and MasterCard rules, the merchant's bank (called the "acquiring bank"), which manages the merchant's relationship with Visa and MasterCard, must withhold the full card acceptance fee from the amount it pays the merchant for each transaction, meaning the merchant receives less than the retail price it charges to the consumer.

16.     The largest component of the card acceptance fee is the interchange fee, which is received by the Visa or MasterCard "issuing bank" (or "issuer") that issues the card used by the customer.  The interchange fee typically is set as a percentage of the underlying transaction price. Visa and MasterCard set interchange fees and have raised them significantly over time.

17.     Visa and MasterCard themselves keep a part of the fee paid by merchants (the "assessment fee").

18.     Finally, the acquiring bank keeps one component of the card acceptance fee, the acquiring fee, for its services.

19.     American Express issues most of its General Purpose Cards to cardholders directly, combining issuer and network functions with respect to those General Purpose Cards.  American Express generally provides network services directly to merchants as well.  Some American Express cards are issued through agreements with issuing banks, in which case American Express

operates only as a network.  For all purposes relevant to this Complaint, such bank-issued cards function substantially the same as those issued by American Express directly, and American Express imposes the same Merchant Restraints for acceptance of its bank-issued cards.

20.    Like the Visa and MasterCard networks, American Express' network imposes a fee on the merchant for each transaction.  Like Visa and MasterCard, American Express' card acceptance fee typically is set as a percentage of the transaction price.  For example, American Express imposes a card acceptance fee of 3% for some transactions.  In such transactions, merchants would receive $97 on a $100 retail transaction.  American Express would extract the remaining $3 from the transaction.  The cost borne by merchants for customers' use of American Express General Purpose Cards is often substantially higher than the cost of customers' use of competing networks' General Purpose Cards.  Any other General Purpose Card selected by the customer from the options in his or her wallet – such as a Discover, MasterCard, or Visa General Purpose Card – generally would be less costly to the merchant.

21.    Merchants charge higher retail prices to customers to cover the cost of paying these fees to Defendants.

## VI.  RESTRAINTS ON COMPETITION

22.    Each Defendant has instituted its own set of Merchant Restraints prohibiting or restricting a merchant that accepts that Defendant's General Purpose Card from encouraging its customers to use any other network's card at the point of sale.  Defendants' Merchant Restraints impose a competitive straitjacket on merchants, restricting decisions by them to offer discounts,

benefits, and choices to customers that many merchants would otherwise be free to offer.

23. Each Defendant applies its Merchant Restraints through agreements with merchants or with merchants' acquiring banks. Each Defendant's set of vertically imposed restrictions independently restrains competition among networks. Each Defendant's Merchant Restraints violate Section 1 of the Sherman Act apart from the existence of the other two Defendants' Merchant Restraints.

24. Visa and MasterCard include their Merchant Restraints in contracts with acquiring banks. Through these contracts, Visa and MasterCard require acquiring banks to obtain agreement from merchants to abide by Visa's and MasterCard's rules, including the Merchant Restraints. Visa and MasterCard require their acquiring banks to penalize merchants that do not adhere to the Merchant Restraints. American Express includes its Merchant Restraints in its contracts with merchants that accept its cards. In circumstances where American Express contracts with the merchant's acquiring bank, American Express requires the acquiring bank to ensure the merchant complies with the Merchant Restraints.

25. Merchants must accept the Merchant Restraints in order to accept Defendants' cards. Merchants clearly understand and expressly agree that they must comply with the Merchant Restraints. Defendants actively monitor and vigorously enforce the Merchant Restraints.

26. Visa's Merchant Restraints prohibit a merchant from offering a discount at the point of sale to a consumer who chooses to use an American Express, Discover, or MasterCard General Purpose Card instead of a Visa General Purpose Card. Visa's rules do not allow discounts for other payment cards that generally require a signature at the point of sale, unless such discounts are

-9-

equally available for Visa transactions. Visa International Operating Regulations at 445 (April 1, 2010) (Discount Offer – U.S. Region 5.2.D.2).

27. Similarly, MasterCard's Merchant Restraints prohibit a merchant from "engag[ing] in any acceptance practice that discriminates against or discourages the use of a [MasterCard] Card in favor of any other acceptance brand." MasterCard Rule 5.11.1 (May 12, 2010). This means that merchants cannot offer a discount, or any other benefit, to persuade consumers to use an American Express, Discover, or Visa General Purpose Card instead of a MasterCard General Purpose Card. *Id.* MasterCard does not allow merchants to favor competing card brands. *Id.*

28. American Express' point-of-sale rules on merchants restrict competition more than the rules of its rival networks. American Express' Merchant Restraints are described in its "Merchant Reference Guide–US" (April 2010), Section 3.2. The language in Section 3.2 is inserted in identical or substantially similar form in most of American Express' contracts with merchants. In many agreements, the Guide is expressly incorporated by reference. The Merchant Restraints described in Section 3.2 impose the following restrictions on merchants that accept American Express:

> Merchants must not[1]:
>
> –indicate or imply that they prefer, directly or indirectly, any Other Payment Products over [American Express'] Card,
>
> –try to dissuade Cardmembers from using the Card,
>
> –criticize . . . the Card or any of [American Express'] services or programs,

---

[1] In October 2010, American Express amended Section 3.2 to add the introductory phrase "Except as expressly permitted by applicable law" preceding "Merchants must not."

-10-

–try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (*e.g.*, payment by check),

–impose any restrictions, conditions, [or] disadvantages . . . when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks, . . . or

–promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes [American Express'] Card.

Merchants may offer discounts from their regular prices for payments in cash or by ACH funds transfer or check, provided that they clearly disclose the terms of the offer (including the regular and discounted prices) to customers and that any discount offered applies equally to Cardmembers and holders of Other Payment Products.[2]

Whenever payment methods are communicated to customers, or when customers ask what payments are accepted, the Merchant must indicate their acceptance of the Card and display [American Express'] Marks according to [American Express'] guidelines and as prominently and in the same manner as any Other Payment Products.

---

[2]     In October 2010, American Express amended this paragraph of 3.2 to state: "Merchants may offer discounts or in-kind incentives from their regular prices for payments in cash, ACH funds transfer, check, debit card or credit/charge card, provided that (to the extent required by applicable law): (i) they clearly and conspicuously disclose the terms of the discount or in-kind incentive to their customers, (ii) the discount or in-kind incentive is offered to all of their prospective customers, and (iii) the discount or in-kind incentive does not differentiate on the basis of issuer or, except as expressly permitted by applicable state statute, payment card network (e.g., Visa, MasterCard, Discover, JCB, American Express).  The offering of discounts or in-kind incentives in compliance with the terms of this paragraph will not constitute a violation of the provisions set forth above in this section 3.2."

29.     The American Express Merchant Reference Guide–US defines the term "Other Payment Products" used in Section 3.2 as "[a]ny charge, credit, debit, stored value or smart cards, account access devices, or other payment cards, services, or products other than the [American Express] Card."

30.     Defendants' rules and practices described in paragraphs 26-29 constitute the Merchant Restraints challenged in this action because and to the extent that they deter or obstruct merchants from freely promoting interbrand competition by offering customers discounts, other benefits, or information to encourage the customer to use a General Purpose Card or payment method other than that Defendant's General Purpose Card.

31.     Defendants' Merchant Restraints thus forbid, among other things, the following types of actions a merchant could otherwise use at the point of sale to foster competition on price and terms among sellers of network services:

> –promoting a less expensive General Purpose Card brand more actively than any other General Purpose Card brand;
>
> –offering customers a discount or benefit for use of a General Purpose Card brand that costs less to the merchant;
>
> –asking customers at the point of sale if they would consider using another General Purpose Card brand in their wallets;
>
> –posting a sign encouraging use of, or expressing preference for, a General Purpose Card brand that is less expensive for the merchant;
>
> –posting the signs or logos of General Purpose Card brands that cost less to the merchant more prominently than signs or logos of more costly General Purpose Card brands; or
>
> –posting truthful information comparing the relative costs of different General Purpose Card brands.

32.     Federal law mandates that networks permit merchants to offer discounts for cash transactions.  Additionally, the new Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, by adding section 920 to the Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq*., now forbids networks from prohibiting merchants from offering a discount for an entire payment method category, such as a discount for use of any debit card.  All General Purpose Card networks operate under these laws.  This Complaint does not seek relief relating to these two types of discounting.

## VII.  RELEVANT MARKETS

### A.  Product Markets

33.     Defendants participate in two distinct product markets in the United States relevant to this Complaint:  the General Purpose Card network services market, and the General Purpose Card network services market for merchants in travel and entertainment ("T&E") businesses.

#### 1.  General Purpose Card Network Services

34.     General Purpose Card network services involve the processing of General Purpose Card transactions across a network.  General Purpose Card networks provide infrastructure and mechanisms enabling merchants to obtain authorization for, settle, and clear transactions for their customers who pay with General Purpose Cards.  Merchant acceptance of General Purpose Cards is defined and controlled at the network level, and prices to merchants are established directly or indirectly by the networks.  A relevant product market for this case is the provision of General Purpose Card network services to merchants.

35.     American Express, Discover, MasterCard, and Visa compete as sellers of these network services to merchants in the United States.

36.     Visa and MasterCard provide network services indirectly to merchants through the merchants' acquiring banks.  American Express generally sells its network services directly to merchants.

37.     Merchants accept General Purpose Cards because many consumers strongly prefer to use General Purpose Cards over other means of payment.  Millions of consumers prefer General Purpose Cards because they provide a combination of convenience, widespread acceptance, security, and deferred payment options that are not effectively replicated by other payment methods.

38.     Each Defendant provides network services only for the use of its own General Purpose Cards, not for any other network's General Purpose Cards.  Merchants that accept General Purpose Cards must purchase network services.  Merchants cannot reasonably replace General Purpose Card network services with other services or reduce usage of these network services, even if such network services are substantially more expensive for merchants relative to services that enable other payment methods.  Even a large increase in network fees would not provide a meaningful financial incentive for merchants to abandon acceptance of General Purpose Cards.  Although other services that enable payment exist outside this relevant market, none of these services is a reasonable substitute for General Purpose Card network services from the perspective of merchants.

39.     Competition from other payment methods in the geographic market identified below would not be sufficient to prevent a hypothetical monopolist of General Purpose Card network

-14-

services from profitably maintaining supracompetitive prices and terms for network services provided to merchants over a sustained period of time.  Nor would competition from other payment methods prevent a hypothetical monopolist in the General Purpose Card network services market from imposing anticompetitive conditions on merchants in that market.

40.    In addition to selling General Purpose Card network services to merchants, Defendants provide separate network services to a different group of customers:  issuers, which provide General Purpose Cards to cardholders.  Questions of market power and harm are distinct for the two separate customer groups.  Sellers of General Purpose Card network services to merchants could exercise market power over merchants even in circumstances in which they could not exercise market power over issuers.  Any benefits received by issuers are not necessarily shared with merchants, and would not offset anticompetitive harm imposed by networks on merchants.

### 2. Travel and Entertainment Market

41.    Within the relevant market of General Purpose Card network services, there is another relevant market – a price discrimination market – consisting of General Purpose Card network services provided to merchants in travel and entertainment businesses.  Specifically, merchants selling goods and services to customers primarily for travel and entertainment (for example, air travel, lodging, and rental cars) are exposed to price discrimination.

42.    Price discrimination occurs when a seller charges different customers (or groups of customers) different prices for the same services, when those different prices are not based on different costs of serving those customers.  General Purpose Card networks set fees for network services to some merchants separately from fees to other merchants.  Setting a lower fee for one group has little to no effect on a network's ability to set a higher fee for other groups.

43.     Competition from other payment methods in the geographic market identified below would not be sufficient to prevent a hypothetical monopolist in the market for General Purpose Card network services for T&E merchants from either profitably maintaining supracompetitive prices and terms for network services to T&E merchants over a sustained period of time or imposing anticompetitive conditions on T&E merchants in that market.  A hypothetical monopolist could price discriminate profitably against T&E merchants even if other merchants were paying lower prices for network services.

44.     Each Defendant can identify whether a merchant participates in the T&E sector, and establishes merchant pricing by segment or category.  Each Defendant, for example, has one set of prices for airline merchants and a different set of prices for supermarket merchants.  American Express has separate price schedules for Airlines, Lodging, Car Rentals, and Travel Agents. American Express has an agreement with each merchant customer, and each agreement contains the price American Express charges that merchant.  Visa and MasterCard can and do identify T&E merchants through their relationships with the merchants' acquiring banks.

45.     Defendants charge merchants in the T&E sector higher fees than they charge most other merchants.  Moreover, American Express charges T&E merchants higher fees than competing networks charge T&E merchants.  The high fees to T&E merchants are not based on Defendants' higher costs of serving their T&E merchants.  Each Defendant can charge T&E merchants high fees because those merchants are even less able to substitute away to other networks than other merchants.  For example, American Express imposed a substantial fee increase on major airline merchants in 2008 without losing any major airline merchant customers, even though its fees already were higher than those of other General Purpose Card networks.  A

-16-

substantial differential in card acceptance fees exists between General Purpose Card network services for merchants in T&E businesses and merchants in other businesses.

46.     Each Defendant's price discrimination against T&E merchants is persistent and systematic. American Express, for example, has successfully maintained higher profit margins for T&E customers than for other merchant categories.

47.     Arbitrage, or indirect purchasing by T&E merchants of Defendants' network services from other merchants to avoid price discrimination, is impossible. For example, merchants can buy network services for transactions using American Express General Purpose Cards only from American Express, and one merchant cannot resell American Express network services to another merchant. T&E merchants have no realistic ability to avoid Defendants' high fees.

48.     T&E merchants constitute a distinct customer group that cannot easily substitute away from the card network their customers want to use for travel and entertainment purchases. T&E merchants (such as airline, hotel, and rental car merchants) depend on business travelers as a significant source of revenues. Business travelers often are required or encouraged by their employers to use corporate cards of a particular network to qualify for reimbursement from their employers. Customers typically make larger purchases from T&E merchants than from merchants in many other industries. They also often purchase from T&E merchants through the Internet. T&E merchants thus rely more on General Purpose Cards than many other merchants and are even less willing and able than other merchants to substitute from General Purpose Cards to alternative payment methods in response to high network prices. In short, T&E merchants have particularly high inelasticity of demand for General Purpose Card network services.

-17-

49.     Network industry participants recognize T&E merchants as a distinct market for network services.  For many years, for example, American Express has had a T&E Industries Business Unit.  Indeed, the principal operating subsidiary of American Express Company is the American Express Travel Related Services Company, Inc.

50.     Accordingly, a distinct, additional relevant market exists for General Purpose Card network services to T&E merchants.


## B. Geographic Market

51.     The United States is the relevant geographic market for both the sale of General Purpose Card network services to all merchants and the sale of such services to T&E merchants.

52.     Each Defendant treats the United States as a separate geographic market, as demonstrated in part by each Defendant's separate rules governing merchant acceptance in the United States and its separate pricing of network services to merchants in the United States. Defendants can easily identify the location of a merchant outlet.  Arbitrage, or indirect purchasing by U.S. merchants of Defendants' network services from merchants located outside of the United States, is impossible.

53.     The vast majority of General Purpose Card transactions with merchants located in the United States are made using General Purpose Cards issued in the United States.  Almost all General Purpose Cards issued in the United States are issued under the American Express, Discover, MasterCard, and Visa networks.  Other networks have limited competitive significance for U.S. merchants, as reflected in their negligible share of sales to U.S. merchants.

54.     A hypothetical monopolist of General Purpose Card network services or General Purpose Card network services to T&E merchants could profitably maintain supracompetitive prices for network services provided to merchants in the United States over a sustained period of time and could impose anticompetitive conditions on merchants in the United States even if merchants located outside the United States paid competitive prices for network services.

## VIII.  MARKET POWER

55.     Visa, MasterCard, and American Express each possess market power in the General Purpose Card network services market.  The Second Circuit previously held that MasterCard and Visa each has market power in a General Purpose Card network services market.  *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 238-39 (2d Cir. 2003).  American Express also possesses market power in the General Purpose Card network services market.

56.     Merchant acceptance of Defendants' General Purpose Cards is widespread. Merchants accounting for a substantial amount of General Purpose Card purchase volume in the United States accept all three Defendants' General Purpose Cards.

57.     Merchants choose payment networks to accommodate the preferred payment brands of their customers.  Some customers strongly prefer a particular brand and in some cases carry only one General Purpose Card brand.  For example, in August 2009, 16% of American Express cardholders used only American Express and no other major General Purpose Cards.  Such high cardholder insistence on using American Express gives American Express market power over merchants.

-19-

58.     Merchants also consider whether their competitors accept a network's General Purpose Card and, if so, feel additional pressure to accept that network's card.  Indeed, many merchants must accept all Defendants' General Purpose Cards to remain competitive with other merchants.

59.     Despite technological advances that have decreased costs associated with General Purpose Card transactions over recent decades, Visa and MasterCard have increased the fees they charge merchants without losing sufficient merchants to make the price increases unprofitable.

60.     American Express has for many years maintained the highest card acceptance fees among networks, including Visa and MasterCard.  In recent years, American Express has increasingly been able to resist merchant pressure to reduce its card acceptance fees.  American Express CEO Ken Chenault explained in 2009:

> At a time when many companies have had to cut or discount their prices and fees, we've been able to hold our own . . . . We're not lowering prices to get or keep customers or merchants. We continue to sign new merchants at existing discount rate levels . . . . This is significantly different from the position we were in during the downturn of the early 1990's.  At that time our card and merchant pricing was under enormous pressure, and we did have to reduce fees.

American Express has increased the fees it charges many merchants without losing sufficient merchants to make the price increases unprofitable.

61.     Notwithstanding these high fees, merchants continue to accept Defendants' General Purpose Cards because they would face serious economic consequences if they ceased to accept any one of the three Defendants' General Purpose Cards.  Unlike customers in most markets for goods and services, merchants cannot buy fewer services from one Defendant's network and buy

-20-

more services from a competing network at the point of sale, even in the face of higher fees imposed by that network or lower fees offered by competing networks.  A merchant's efforts to reduce its purchases of one network's services by encouraging its customers to choose another network's General Purpose Card would violate Defendants' Merchant Restraints.  Thus, a merchant may resist a Defendant's high card acceptance fees only by no longer accepting that Defendant's cards.  This all-or-nothing choice severely constrains merchants, because dropping any one of the Defendants' General Purpose Cards could alienate customers and lead to significant lost sales.  The Merchant Restraints leave merchants less able to avoid Defendants' supracompetitive prices than they otherwise would be.

62.    Defendants' ability to discriminate in the prices they charge different types of merchants, unexplained by cost differences, also reflects their market power.  For example, American Express targets specific merchant segments for differential pricing based on those merchants' ability to pay and their inability to refuse to accept American Express, a practice American Express calls "value recapture."  American Express generally charges higher fees to merchants that rely more on General Purpose Cards for their business, such as T&E merchants, than it charges merchants that traditionally rely less on American Express.

63.    This direct evidence of Defendants' market power is consistent with their market share of General Purpose Card transaction volume.  American Express, MasterCard, and Visa each has significant market shares in the highly concentrated General Purpose Card network services market.  In 2009, the three Defendants together had approximately 94% of the dollar volume of U.S. issued General Purpose Cards.  According to Nilson data, Visa's share was approximately 43%, while MasterCard had a 27% share, and American Express had a 24% share.  Each of these

market shares is consistent with market power in a market with high concentration and other

particular characteristics of the General Purpose Cards network services market. For example, the

Second Circuit held that MasterCard had market power with a market share of 26%. *U.S. v. Visa*

*U.S.A., Inc.*, 344 F.3d at 239-40. In subsequent litigation, American Express itself alleged that

MasterCard "exercised market power in the network services market" when MasterCard's "share

was approximately 26%," quite similar to American Express' share in the market for General

Purpose Card network services to merchants today.

64.    Defendants' acceptance among merchants is widespread. Visa and MasterCard are

accepted at over 8.2 million merchant locations in the U.S. In 2009, American Express was

accepted at 4.9 million merchant locations in the U.S., or about 60% as many as accept Visa and

MasterCard. In recent years, American Express has expanded its acceptance at many "everyday

spend" merchants, adding, for example, McDonalds (2004), Safeway (2004), Food Lion (2007)

and Dollar Tree (2010). Today, many of the merchants that do not accept American Express are

small and do not account for significant transaction volume. Indeed, American Express has stated

that "as of the end of 2009, our merchant network in the United States accommodated more than

90% of our Cardmembers' general-purpose charge and credit card spending."

65.    Among large U.S. retailers that account for a substantial amount of U.S. transaction

volume, acceptance of all three Defendants' General Purpose Cards is widespread. For example,

95 of the largest 100 U.S. retailers accept all Defendants' General Purpose Cards. And in many

major merchant segments, Defendants' acceptance is nearly universal. All major airlines, for

instance, accept all three Defendants' General Purpose Cards.

66.     Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  These barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, who achieved these necessities early in the history of the industry, obtained substantial early mover advantages over prospective subsequent entrants. Successful subsequent entry would be difficult and expensive.  In the presence of these barriers, the only successful market entrant since the 1960s has been Discover.  Even so, Discover's market share historically has been, and remains, very small.  In 2009, Discover's market share based on dollar volume of purchases placed on General Purpose Cards was approximately 6%.

67.     Defendants' Merchant Restraints heighten these barriers to competitors' expansion and entry.  Merchants' inability to encourage their customers to use less costly General Purpose Card networks makes it even harder for existing or potential competitors to threaten Defendants' market power.

68.     Each Defendant also has market power in the T&E market for General Purpose Card network services.  Among Defendants, American Express' market power in the T&E market is the most substantial.  American Express' share of transaction volume in this market is approximately 37%, while Visa's share is approximately 36% and MasterCard's share is approximately 24%.  American Express is the market leader among networks in airline, lodging, and rental car merchant segments, capturing nearly $100 billion in transaction volume.  American Express' average card acceptance fee for these three merchant segments was 12% higher than its

average fee for all other merchant segments in 2009.  American Express' costs in those segments

are not proportionally higher than costs in most other segments; in many instances, they are lower.

T&E merchant acceptance of American Express is extensive.  American Express is the designated

card for more business travelers than any other network's card.  In fact, American Express

accounts for 70% of all expenditures made with corporate cards, which consist largely of T&E

merchant purchases.  Most merchants in the T&E market have not declined to accept American

Express' cards or its Merchant Restraints even when American Express has imposed card

acceptance fees that are substantially higher than those set by other General Purpose Card brands,

despite these merchants' strong desire not to accept those prices and restraints.  Visa and

MasterCard also price discriminate successfully against T&E merchants.  For all of these reasons,

each Defendant has market power in the T&E market.


## IX.  HARM TO COMPETITION

69.     Each Defendants' vertical Merchant Restraints are directly aimed at restraining

horizontal interbrand competition.  Each Defendant's Merchant Restraints harm competition by:

> (1) harming the competitive process and disrupting the proper
> functioning of the price-setting mechanism of a free market;
>
> (2) restraining merchants from encouraging or pressing each
> Defendant to compete over card acceptance fees;
>
> (3) insulating each Defendant from competition from rival networks
> that would otherwise encourage merchants to favor use of those
> networks' cards;
>
> (4) inhibiting other networks from competing on price at merchants
> that accept each Defendant's General Purpose Cards;

(5) restraining merchants from promoting payment methods other than each Defendant's General Purpose Cards;

(6) restraining merchants from competing for customers with discounts, promotions, or other forms of lower prices and other benefits enabled by customers' use of a lower cost General Purpose Card or other payment method;

(7) causing increased prices in the form of higher merchant card acceptance fees;

(8) causing increased retail prices for goods and services paid generally by customers;

(9) reducing output of lower-cost payment methods;

(10) stifling innovation in network services and card offerings that would emerge if competitors were forced to compete for merchant business at the point of sale; and

(11) denying consumers information about the relative costs of each Defendant's General Purpose Card usage compared to other card usage that would cause more consumers to choose lower-cost payment methods.

70.     Defendants' Merchant Restraints substantially reduce price and non-price competition for merchant use of network services and interfere with price setting at the merchant point of sale.  Without the Merchant Restraints, and faced with Defendants' high card acceptance fees, many merchants would encourage customers to use cards offered by the lowest-cost network.  Without the Merchant Restraints, each Defendant would compete more vigorously.  By imposing the Merchant Restraints, Defendants have insulated themselves from competition with each other and with any other network competitor at the merchant point of sale.  The Merchant Restraints reduce incentives for Defendants to offer merchants lower-priced network services that would benefit consumers, because merchants cannot encourage customers to use the less expensive

options without violating Defendants' Merchant Restraints. Each Defendant thus can maintain high prices for its network services with confidence that no competitor will take away significant transaction volume through competition in the form of merchant discounts or benefits to consumers to use lower cost payment options. Each Defendant's price for network services to merchants is higher than it would be without the Merchant Restraints.

71.     Although other payment methods are not in the product markets relevant to this action, there is some, more attenuated competition between General Purpose Cards and other payment methods. Defendants' Merchant Restraints also restrict the competition that exists and otherwise would emerge from these other payment methods.

72.     Because Defendants' Merchant Restraints obstruct merchants from encouraging customers to use less costly payment methods, merchants bear higher costs and their customers face higher retail prices. If a merchant cannot reduce its costs by encouraging cheaper payment methods or by encouraging competition among networks, the merchant will charge higher prices generally to its customers. A customer who pays with lower-cost methods of payment pays more than he or she would if Defendants did not prevent merchants from encouraging network competition at the point of sale. For example, because American Express General Purpose Cards typically are held by more affluent buyers, less affluent purchasers using non-premium General Purpose Cards, debit cards, cash, and checks effectively subsidize part of the cost of expensive American Express card benefits and rewards.

73.     The fees Defendants impose on General Purpose Card transactions are largely not visible to consumers. The Merchant Restraints forbid merchants even from telling consumers simple factual information about what merchants have to pay when consumers use General

-26-

Purpose Cards.  This information could help merchants to encourage customers to choose more cost-effective payment methods.  For example, those customers who prefer American Express services and value them at a competitive price could continue to choose them, but others would not be forced to subsidize this choice by paying higher prices.

74.     Authorities in other countries have taken actions to reduce or eliminate similar Merchant Restraints.  In foreign jurisdictions where Defendants' Merchant Restraints have been relaxed, merchants have taken advantage of their ability to encourage customers to use less expensive General Purpose Cards or other payment methods.

75.     In short, Defendants' Merchant Restraints remove tools that merchants in a competitive marketplace would use to negotiate lower card acceptance fees, to reduce their costs of doing business, to empower their customers with information to make choices about payment methods, to encourage customers to choose a low-cost payment method, and to keep retail prices lower for their customers.  As a result, merchants, consumers, and competition itself are harmed.


## X.  VIOLATION ALLEGED

76.     Each Defendant's Merchant Restraints constitute agreements that unreasonably restrain competition in the market for General Purpose Card network services to merchants, and in the market for General Purpose Card network services to T&E merchants, in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

77.     These agreements have had and will continue to have anticompetitive effects by protecting Defendants from competition over the cost of card acceptance to merchants, and restraining merchants from encouraging customers to use lower-cost payment methods.

Defendants' restraints unlawfully insulate Defendants' card acceptance fees from competition, increase costs of payment acceptance to merchants, increase prices, reduce output, harm the competitive process, raise barriers to entry and expansion, and retard innovation.

78.    These agreements are not reasonably necessary to accomplish any of Defendants' allegedly procompetitive goals.  Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Defendants would be able reasonably to achieve any procompetitive goals.


## XI.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that final judgment be entered against each Defendant declaring, ordering, and adjudging that:

a.    The aforesaid agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.    Each Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    Each Defendant eliminate and cease enforcing all Merchant Restraints and be prohibited from otherwise acting to restrain trade unreasonably;

      d.     Each Defendant fund and undertake programs to inform merchants of

merchants' rights to encourage customers to use any payment method they choose; and

      e.     The United States be awarded its costs of this action and such other relief as

may be appropriate and as the Court may deem just and proper, and the States be awarded their

costs in this action, reasonable attorneys' fees, and such other relief as may be appropriate and as

the Court may deem proper.

Dated:   December 21, 2010

**FOR PLAINTIFF**
**THE UNITED STATES OF AMERICA**


s/Christine A. Varney
CHRISTINE A. VARNEY
Assistant Attorney General

  .

s/Patricia A. Brink
PATRICIA A. BRINK
Director of Operations


s/John Read
JOHN READ
Chief, Litigation III Section
DAVID KULLY
Assistant Chief, Litigation III Section

s/Craig W. Conrath
CRAIG W. CONRATH
Attorney for the United States of America
U.S. Department of Justice
Antitrust Division, Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 307-0468

**STATE OF ARIZONA**
Terry Goddard
Attorney General


s/Nancy M. Bonnell
Nancy M. Bonnell (AZ Bar# 016382)
Antitrust Unit Chief
Consumer Protection and Advocacy Section
Office of the Arizona Attorney General
1275 West Washington
Phoenix, Arizona 85007
Telephone: (602) 542-7728
Fax: (602) 542-9088
nancy.bonnell@azag.gov



**STATE OF CONNECTICUT**

Richard Blumenthal
Attorney General


s/Michael E. Cole
Michael E. Cole
        Chief, Antitrust Department
Rachel O. Davis
Assistant Attorneys General
Antitrust Department
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5040
Fax: (860) 808-5033

**ATTORNEY GENERAL OF THE
STATE OF HAWAII**

Russell A. Suzuki
Acting Attorney General of Hawaii


s/Rodney I. Kimura
Deborah Day Emerson
Rodney I. Kimura
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
(808) 586-1205 (fax)


**LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO**


s/Brett T. DeLange
Brett T. DeLange (ISB No. 3628)
Deputy Attorney General
Consumer Protection Division
Office of the Attorney General
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone:     (208) 334-4114
FAX:           (208) 334-4151
brett.delange@ag.idaho.gov

**ATTORNEY GENERAL OF THE
STATE OF ILLINOIS**

Lisa Madigan
Attorney General of Illinois


s/Robert W. Pratt
Robert W. Pratt
Chief, Antitrust Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, Illinois 60601
(312) 814-3722
(312) 814-4209 (fax)


**STATE OF IOWA**
Thomas J. Miller
Attorney General of Iowa


s/Layne M. Lindebak
Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
Phone: 515 281-7054
Fax: 515 281-4902
Email: Layne.Lindebak@iowa.gov

**DOUGLAS F. GANSLER**
**MARYLAND ATTORNEY GENERAL**


s/Gary Honick
Ellen S. Cooper
Assistant Attorney General
Chief, Antitrust Division
Gary Honick
Assistant Attorney General
Office of the Attorney General
Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland 21202
Tel. # (410) 576-6470
Fax # (410) 576-7830


**STATE OF MICHIGAN**
**MICHAEL A. COX**
Attorney General


s/D.J. Pascoe
D.J. Pascoe (P54041)
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
Securities, Antitrust, and Business Section
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, Michigan 48933
Telephone: (517) 373-1160
Fax: (517) 335-6755
pascoedl@michigan.gov

-33-

**STATE OF MISSOURI**
**CHRIS KOSTER**
Attorney General

s/Anne E. Schneider
ANNE E. SCHNEIDER
Assistant Attorney General/Antitrust Counsel
ANDREW M. HARTNETT
Assistant Attorney General

P.O. Box 899
Jefferson City, MO 65102
Tel: (573) 751-7445
Tel: (573) 751-2041 (facsimile)
E-Mail: Anne.Schneider@ago.mo.gov


**ATTORNEY GENERAL**
**OF THE STATE OF MONTANA**

Steve Bullock
Attorney General of Montana


s/Chuck Munson
Chuck Munson
Assistant Attorney General
Office of the Montana Attorney General
215 N. Sanders
Helena, MT 59601
(406) 444-2026
(406) 444-3549

**ATTORNEY GENERAL OF THE
STATE OF NEBRASKA**

Jon Bruning
Attorney General of Nebraska


s/Leslie C. Levy
Leslie C. Levy (NE Bar# 20673)
Chief, Consumer Protection/Antitrust Division
Office of the Nebraska Attorney General
2115 State Capitol Building
Lincoln NE 68509
(402) 471-2811
(402) 471-2957 (fax)


**ATTORNEY GENERAL OF THE
STATE OF NEW HAMPSHIRE**

Michael A. Delaney
Attorney General of New Hampshire


s/David A. Rienzo

David A. Rienzo (NH Bar# 13860)
Assistant Attorney General, Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
33 Capitol Street
Concord, New Hampshire 03301
(603) 271-7987
(603) 223-6239 (fax)

**ATTORNEY GENERAL OF THE
STATE OF OHIO**

Richard Cordray
Attorney General of Ohio

Jennifer L. Pratt
Section Chief, Antitrust Section


s/Mitchell L. Gentile
Mitchell L. Gentile
Principal Attorney, Antitrust Section
Patrick E. O'Shaughnessy
Senior Assistant Attorney General, Antitrust Section
Office of the Ohio Attorney General
150 E. Gay Street, 23rd Floor
Columbus, Ohio 43215
(614) 466-4328
(614) 995-0266 (fax)


**ATTORNEY GENERAL OF THE
STATE OF RHODE ISLAND**

Patrick C. Lynch
Attorney General
By His Attorney


s/Edmund F. Murray, Jr.
Edmund F. Murray, Jr. (RI Bar #3096)
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02906
(401) 274-4400
(401) 222-2995 (fax)

**STATE OF TENNESSEE**
**ROBERT E. COOPER, JR.**
Attorney General and Reporter


s/Victor J. Domen, Jr.
Victor J. Domen, Jr. (BPR# 015803)
Senior Counsel
Office of the Tennessee Attorney General
425 Fifth Avenue North
Nashville, Tennessee 37202
(615) 532-5732
(615) 532-2910 (fax)
Vic.Domen@ag.tn.gov


**GREG ABBOTT**
**ATTORNEY GENERAL OF TEXAS**

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

JOHN T. PRUD'HOMME
Assistant Attorney General
Chief, Antitrust Division

s/Kim Van Winkle
KIM VAN WINKLE
Assistant Attorney General
State Bar No. 24003104

BRET FULKERSON
State Bar No. 24032209

Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711-2548
512/463-1266 (Telephone)
512/320-0975 (Facsimile)

-37-

**ATTORNEY GENERAL OF THE
STATE OF UTAH**

Mark L. Shurtleff
Attorney General of Utah


s/Ronald J. Ockey
Ronald J. Ockey (Utah State Bar #2441)
David N. Sonnenreich (Utah State Bar #4917)
Assistant Attorney General
Office of the Attorney General of Utah
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84111
(801) 366-0359
(801) 366-0315 (fax)
rockey@utah.gov (email)


**STATE OF VERMONT**

**WILLIAM H. SORRELL
ATTORNEY GENERAL**


s/William H. Sorrell
Sarah E.B. London
Assistant Attorney General
Public Protection Division
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609-1001
ph. (802) 828-5479
fax. (802) 828-2154
slondon@atg.state.vt.us