UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, et al.,
    Plaintiffs

       v.

AMERICAN EXPRESS CO., et al.,
    Defendants

No. 10-CV-04496 (NGG) (RER)

PUBLIC VERSION

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

December 6, 2013

## Table of Contents

Table of Authorities ......................................................................................................... ii

Abbreviations .................................................................................................................. v

Introduction .................................................................................................................... 1

Statement of Facts .......................................................................................................... 2

Summary Judgment Standard ........................................................................................ 6

Argument ........................................................................................................................ 6

I.      The Actual Adverse Effects of Amex's Merchant Restraints on Competition Make a
        Separate Inquiry into Market Power Unnecessary ............................................... 8

        A.      Courts Do Not Require Proof That the Defendant Possesses Market Power
                Where Its Conduct Actually Affects Competition Adversely. ................... 8

        B.      Amex's Merchant Restraints Actually Harm Competition.................... 10

II.     Applying *Visa*'s Analysis to This Case Shows That Amex Possesses Market Power. .... 11

        A.      *Visa* Shows How To Analyze a Card Network's Market Power. ......... 11

        B.      Substantial Evidence Demonstrates That Amex Possesses Market Power. ......... 13

                1.      Amex's Market Share Has Been Held Sufficient To Establish Market
                        Power in the Payments Industry. ....................................... 14

                2.      Merchants Accept Amex Cards Because of Customer Insistence. .......... 16

                        a.      Amex's Documents and Testimony Show That Cardholder
                                Insistence Generates Market Power Over Merchants.............. 17

                        b.      Amex's Arguments on Cardholder Insistence Are Wrong. ......... 18

                        c.      Neither Amex's Merchant Acceptance Nor Its Merchant
                                Negotiations Suggest a Lack of Market Power............. 21

                3.      Merchants Have Continued To Accept Amex Cards Despite Price
                        Increases............................................................ 22

                4.      Other Evidence Indicates That Amex Has Market Power. .............. 24

Conclusion ..................................................................................................................... 25

**<u>Table of Authorities</u>**

<u>**Cases**</u>

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)...................................................................................9

*ASCAP v. Showtime/The Movie Channel, Inc.*,
    912 F.2d 563 (2d Cir. 1990)...............................................................................14

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
    651 F.2d 122 (2d Cir. 1981) ...............................................................................15

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
    996 F.2d 537 (2d Cir. 1993)..................................................................................7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)............................................................................................14

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) ..............................................................................22

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992)............................................................................................15

*Energex Lighting Corp. v. N. Am. Philips Lighting Corp.*,
    No. 83-CIV-3929, 1990 WL 83528 (S.D.N.Y. June 12, 1990)..................................15

*Expressions Hair Design v. Schneiderman*,
    No. 13-CV-3775, 2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013)...................................6

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)................................................................. 1, 7, 8-9, 10

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004).............................................................. *passim*

*Grappone, Inc. v. Subaru of New England, Inc.*,
    858 F.2d 792 (1st Cir. 1988)...............................................................................19

*Hayden Publ'g Co., Inc. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir. 1984)..................................................................................14

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989)..............................................................................14

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006).................................................................................24

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ...............................................15, 16

*In re Visa Check/MasterMoney Antitrust Litig.*,
   No. 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ................................15

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995)...............................................7, 8, 11, 15

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................8-9

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951)................................................................24

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)................................................................10

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978)...........................................................10, 13

*NCAA v. Bd. of Regents*,
   468 U.S. 85 (1984)................................................................13

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007)....................................................21-22

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) .....................................................10

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)......................................................10

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998)......................................................9-10

*Town Sound & Custom Tops, Inc. v. Chrysler Motor Corp.*,
   No. 90-1547 1991 WL 149249 (3d Cir. Aug. 9, 1991) ................................19

*Town Sound & Custom Tops, Inc. v. Chrysler Motor Corp.*,
   959 F.2d 468 (3d Cir. 1992) (en banc).............................................19

*United States v. American Express Co.*,
  No. 10-CV-4496, 2011 WL 2974094 (E.D.N.Y. July 20, 2011)...................................5

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995) ................................................................... 18-19

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...................................................................18, 20, 24

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)............................................... *passim*

*United States v. Visa U.S.A., Inc.*,
  183 F. Supp. 2d 613 (S.D.N.Y. 2001).......................................................18

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003)............................................................... *passim*

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ...................................................................6

*Williams v. Woodhull Med. & Mental Health Ctr.*,
  891 F. Supp. 2d 301 (E.D.N.Y. 2012) ...................................................................6

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)...................................................................6

## **Other Authorities**

15 U.S.C. § 1 ...................................................................1, 5

Fed. R. Civ. P. 56(a) ...................................................................6

iv

## <u>Abbreviations</u>

| | |
|---|---|
| Amex | Defendants American Express Company and American Express Travel Related Services Company, Inc. |
| Amex Br. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment |
| Amex Facts | Defendants' Statement of Material Undisputed Facts in Support of Their Motion for Summary Judgment |
| Facts | Plaintiffs' Rule 56.1 Counter-Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment |
| Plaintiffs | Plaintiffs United States of America and the States of Arizona, Connecticut, Idaho, Illinois, Iowa, Maryland, Michigan, Missouri, Montana, Nebraska, New Hampshire, Ohio, Rhode Island, Tennessee, Texas, Utah, and Vermont |

**Introduction**

Millions of merchants pay Amex, MasterCard, Visa, and Discover over $40 billion annually to allow customers to make purchases using those networks' cards.  Consumers (even those who pay with cash or check) ultimately bear those costs as higher retail prices.  On average, Amex charges merchants the highest prices of any card network.  Competition among card networks for more merchant business ought to keep high prices in check, but Amex imposes contractual provisions – the Merchant Restraints – blocking that sort of competition.  The Merchant Restraints prevent merchants from encouraging customers to use less expensive cards and even from giving customers truthful information about card-acceptance costs.   Because the Merchant Restraints obstruct lower prices from Amex's competitors and thus insulate Amex from the ordinary give and take of competition, they violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

Ignoring the heart of Plaintiffs' claim, Amex's motion for summary judgment argues that Plaintiffs have a threshold obligation to prove that Amex has market power.  But a plaintiff need not prove market power – that is, the "potential for genuine adverse effects on competition" – when it can show that the defendant's conduct causes "actual detrimental effects" on competition.  *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).  Here, Plaintiffs meet that standard easily because Amex's Merchant Restraints plainly obstruct competition among the card networks to attract greater merchant business with lower prices.

Moreover, Amex is simply wrong to claim that Plaintiffs cannot prove market power.  Providing a roadmap for analyzing market power in the payments industry, the courts in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), concentrated on three types of market power evidence, and both concluded, based on all

of the evidence together, that MasterCard and Visa each possessed market power.  As in *Visa*, the evidence here establishes that (1) Amex has a large market share; (2) merchants accept Amex cards because cardholders strongly insist on paying with them; and (3) Amex has raised prices without significant merchant attrition.  Plaintiffs' expert economist analyzed all of that evidence (and more) in a manner consistent with *Visa* and concluded that Amex possesses market power.  Amex hired other economists to dispute that conclusion, but this battle of the experts cannot be resolved before trial.

Amex seeks to mask these disagreements by arguing that no type of evidence, by itself, proves that it has market power.  But *Visa* shows that market power evidence cannot be assessed piecemeal.  And Amex's attacks on each type of evidence in isolation depend on ignoring material facts, misreading cases, and mischaracterizing the views of Plaintiffs' expert economist.

## Statement of Facts

Merchants spend over $40 billion annually on the network services that allow them to accept Amex, MasterCard, Visa, and Discover general purpose credit and charge cards.  Facts ¶ 289.  Amex charges different prices for its network services to merchants in different industries.  Facts ¶¶ 290-91.  On average, merchants pay more to accept Amex cards than to accept other networks' cards, Facts ¶¶ 292-95, even though merchants generally do not believe that they receive any better service from Amex than from the other networks, Facts ¶¶ 296-308.  Merchants pass the high costs of Amex acceptance onto all of their customers, including those who use other forms of payment.  Facts ¶¶ 460-72.

Merchants accept Amex cards because many consumers prefer to pay with Amex.  Facts ¶ 478.  Indeed, consumers use Amex cards for about 26% of their general purpose credit and charge card spending, making Amex the second-largest network in the United States (behind

Visa, and ahead of MasterCard).  Facts ¶¶ 309-10.  Of the 100 largest U.S. retailers, only one

accepts general purpose credit and charge cards, but not Amex cards.  Facts ¶ 316.  Amex

cardholders can make more than 90% of their general purpose credit and charge card purchases

at merchants that accept Amex cards.  Facts ¶ 318.

      Some Amex cardholders so strongly prefer to use Amex cards that they will go elsewhere

if a merchant does not accept Amex.  Amex refers to those cardholders as "insistent."  Facts

¶¶ 481-83.  Merchants accept Amex to avoid losing out on sales to these insistent cardholders.

Facts ¶¶ 477-79.  Hundreds of merchants have submitted declarations to this Court stating that

they cannot realistically drop American Express.  Facts ¶ 480.  Amex reinforces merchants' fears

by telling them that they will lose sales if they do not accept Amex cards.  Facts ¶¶ 501-09.

██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

Amex's high prices to merchants create incentives for merchants to encourage Amex cardholders to pay with generally less expensive Visa, MasterCard, or Discover credit cards. Facts ¶¶ 426-27.  But merchants cannot act on those incentives because the Merchant Restraints prevent them from encouraging or taking advantage of competition among card networks.  The Merchant Restraints prohibit merchants from (1) offering their customers discounts or other incentives to pay with a non-Amex card; (2) expressing a preference that their customers pay with a non-Amex card; (3) displaying logos of other card brands more prominently than they display the Amex logo; and even (4) providing consumers with truthful information about the relative costs of competing cards.  Facts ¶¶ 340-42, 361-63, 366-72, 373-79.  Thus, the Merchant Restraints undermine the card networks' incentives to lower prices or otherwise compete to make their cards more attractive to merchants.  Facts ¶¶ 428-33, 444-48.

If not for the Merchant Restraints, Amex-accepting merchants likely would use discounts, in-kind incentives, and other tools to encourage customers to use less costly cards. Facts ¶¶ 380-90.  For example, a car rental company could upgrade customers using lower-cost cards, and an airline could do a "hundred billion things" to improve the travel experience for customers using preferred cards.  Facts ¶¶ 383, 390.  Over time, merchants' efforts to engender competition among networks likely would push networks to reduce prices (and/or improve quality) as a way to avoid losing charge volume to rivals.  Facts ¶¶ 428-33, 444-48.  In the absence of the Merchant Restraints, even the possibility that merchants would encourage customers to pay with another network's cards likely would pressure each network to reduce merchants' costs of accepting its cards.  Facts ¶¶ 434-40.  Even one of Amex's economists recognizes that, "[i]f merchants had unfettered freedom to steer customers at the point of sale, it is likely that they would encourage customers to use the card that has the lowest merchant

4

discount fee" and that such steering "might force Amex to charge a lower merchant discount fee."  Facts ¶ 441.

Without Amex's interference, other card networks likely would compete harder for merchant charge volume.  Discover once offered merchants much lower prices than other card networks so they would encourage customers to use Discover cards, but the Merchant Restraints (and then-similar Visa and MasterCard rules) prevented merchants from doing so and forced Discover to abandon its low-price strategy.  Facts ¶¶ 418-23.  Beginning in the early 1990s, Visa distributed materials that merchants could use to encourage customers to pay with Visa instead of higher-cost Amex cards.  Facts ¶¶ 345-47.  When this "We Prefer Visa" campaign succeeded at Amex's expense, Amex tightened its Merchant Restraints to prohibit merchants from expressing a preference for non-Amex cards.  Facts ¶¶ 349, 358.  MasterCard and Discover also used preference campaigns with merchants until Amex threatened to cancel its contracts with participating merchants.  Facts ¶¶ 351-53.  Today, MasterCard is "eager to obtain a preference from merchants" and "may provide financial incentives to a merchant for showing such preference," but Amex's Merchant Restraints limit the ability to do so.  Facts ¶ 359.

Because of these anticompetitive effects, Plaintiffs challenged Amex's Merchant Restraints – and similar rules adopted by MasterCard and Visa – as unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  MasterCard and Visa abandoned their rules to settle the Plaintiffs' claims against them, and this Court found that settlement to be in the public interest.  *See United States v. American Express Co.*, No. 10-CV-4496, 2011 WL 2974094 (E.D.N.Y. July 20, 2011).  Amex's Merchant Restraints remain the last impediment to increased competition among networks for merchant business.

## Summary Judgment Standard

"No special burden is imposed on a plaintiff opposing summary judgment in an antitrust case." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001). Accordingly, to get summary judgment, Amex must "show[] that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Williams v. Woodhull Med. & Mental Health Ctr.*, 891 F. Supp. 2d 301, 310-11 (E.D.N.Y. 2012) (Garaufis, J.). The "trial court should not weigh the evidence or determine the truth of any matter, but should instead draw all inferences from the facts in the light most favorable to [the plaintiff]." *Virgin*, 257 F.3d at 262.

## Argument

Amex's Merchant Restraints will be judged under the rule of reason. The rule of reason involves a "fact-intensive analysis"[1] in which "the factfinder must engage in a careful weighing of the competitive effects of the agreement – both pro and con – to determine if the effects of the challenged restraint tend to promote or destroy competition." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).

Rule-of-reason analysis proceeds in three steps. First, "plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market."[2] *Id.* at 506 (internal quotation marks omitted). Second, when

---

[1] *See Expressions Hair Design v. Schneiderman*, No. 13-CV-3775, 2013 WL 5477607, at *13 (S.D.N.Y. Oct. 3, 2013); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 327 n.26 (3d Cir. 2012).

[2] The relevant market "provides the context against which to measure the competitive effects of an agreement." *Geneva Pharms.*, 386 F.3d at 496. Accordingly, Plaintiffs will prove at trial that the Merchant Restraints harm competition in: (1) the market for general purpose credit and charge card network services to U.S. merchants; and (2) within that market, the price discrimination market (or sub-market) for general purpose credit and charge card network services to U.S. travel-and-entertainment merchants. As it must, Amex "assum[es]" for purposes

6

"the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement." *Id.* Third, if "defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means." *Id.*; *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).

Amex's motion implicates only the first step, and Plaintiffs have two ways to take that step. One way would allow Plaintiffs to prove directly that Amex's Merchant Restraints have actual adverse effects on competition. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("*IFD*"). Amex not only ignores the substantial evidence that its Merchant Restraints have such effects, it never even acknowledges that a Section 1 claim does not require separate proof of market power. *See infra* Part I.

The second way for Plaintiffs to carry their burden in the rule of reason's first step would require proof that Amex has market power plus "other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market." *K.M.B. Warehouse*, 61 F.3d at 129. Amex does not dispute that there are "grounds to believe" that its Merchant Restraints harm competition and argues only that Plaintiffs cannot prove that it has market power. *See* Amex Br. 1. But following the roadmap described in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), Plaintiffs in fact have amassed extensive evidence of Amex's market power. *See infra* Part II.

---

of its motion that Plaintiffs' market definitions are correct. Amex Br. 11; *cf. Geneva Pharms.*, 386 F.3d at 495-500 (reversing district court's grant of summary judgment where parties disputed market definition).

7

I.      **The Actual Adverse Effects of Amex's Merchant Restraints on Competition Make a Separate Inquiry into Market Power Unnecessary.**

      A.      **Courts Do Not Require Proof That the Defendant Possesses Market Power Where Its Conduct Actually Affects Competition Adversely.**

"If plaintiff can demonstrate an actual adverse effect on competition . . ., there is no need to show market power in addition." *Geneva Pharms.*, 386 F.3d at 509; *see also K.M.B. Warehouse*, 61 F.3d at 129 ("If a plaintiff can show an actual adverse effect on competition . . . we do not require a further showing of market power."). Amex never acknowledges that Plaintiffs may prevail without separate proof of market power, much less attempts to show that there are no genuine disputes of material fact as to whether its Merchant Restraints have actual adverse effects on competition. These failures by themselves demonstrate that summary judgment should be denied.

The Supreme Court has explained that proof of market power is not always needed because it is "but a 'surrogate for detrimental effects.'" *IFD*, 476 U.S. at 461. In *IFD*, the FTC concluded that the Federation (a group of dentists) violated Section 1 when it adopted a "work rule" prohibiting its members from competing over whether to submit x-rays requested by dental insurers. *Id.* at 451. On appeal, the Federation argued that the FTC had erred by not precisely defining the market or showing that the Federation possessed market power. Rejecting that argument, the Court held that, "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition," the FTC's finding that the work rule had "actual, sustained adverse effects on competition" was "legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *Id.* at 460-61.[3]

---

[3] Amex relies exclusively on *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), to support its argument that this Court "would need to determine whether Amex has

*IFD* also illustrates what constitutes proof of an actual adverse effect on competition. The Federation challenged the legal sufficiency of the FTC's effects evidence, arguing that the FTC had not found that the work rule led to higher prices.  The Supreme Court rejected that argument and focused instead on how the rule harmed the competitive process itself.  The Court held that the rule was "likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices."  *Id.* at 461-62.  The Court observed that the Federation's rule "impeded the ordinary give and take of the market place" and concluded that the Federation was "not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand."  *Id.* at 459 (internal quotation marks omitted), 462; *see also Geneva Pharms.*, 386 F.3d at 489 (emphasizing that the "antitrust laws . . . safeguard consumers by protecting the competitive process").

These principles apply in all Section 1 cases, including those challenging vertical restraints.[4]  For instance, when a plaintiff claimed that its competitor's vertical contract to purchase real property violated Section 1, the Second Circuit recognized that the plaintiff had "two independent means by which to satisfy the adverse-effect requirement" in the first step of the rule of reason:  (1) showing "an actual adverse effect on competition"; or (2) "[a]lternatively, . . . establishing that [the defendant] had sufficient market power to cause an adverse effect on

---

antitrust market power within a relevant market."  Amex Br. 10.  *Leegin*, however, says only that "market power is a further, significant consideration" in the rule-of-reason inquiry, *Leegin*, 551 U.S. at 885-86, and did not address, much less overrule, *IFD*.

[4] Amex's contracts with merchants, which include the Merchant Restraints, are vertical agreements because Amex and the merchants operate "at different levels of the market structure."  *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (internal quotation marks omitted).  Horizontal agreements involve "competitors at the same level of the market structure."  *Id.*

9

competition." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998); *see also*

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016-21 (6th Cir. 1999) (reversing summary

judgment on monopolization claim, "despite the lack of reasonable and detailed market

analysis," because plaintiffs submitted evidence that defendants' policies excluded a firm that

competed using a different business model); *Geneva Pharms.*, 386 F.3d at 509.

### B.    Amex's Merchant Restraints Actually Harm Competition.

The Merchant Restraints harm competition by:

- Reducing the incentives of Amex and other networks to compete for preferred merchant treatment, Facts ¶¶ 428-33, 444-48; *cf. Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (Sotomayor, J.) (including allegations that a restraint "reduced competitive incentives" within discussion of actual adverse effects on competition);

- Blocking Discover, MasterCard, and Visa from competing, as they have in the past, including by offering merchants lower prices to attract charge volume and supporting merchant preference for their cards, Facts ¶¶ 345-53, 418-23;

- Preventing merchants from using discounts, in-kind incentives, and other tools to encourage customers to pay with cards that cost them less (or using the possibility of such encouragement to obtain concessions from networks), Facts ¶¶ 340-42, 361-63, 373-79;

- Forbidding merchants from giving consumers truthful information about credit card prices, Facts ¶¶ 366-72; *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992) (recognizing that "it is clear as an economic matter" that "inform[ing] the public of the . . . prices of products and services . . . performs an indispensable role in the allocation of resources") (internal quotation marks omitted); and

- Eliminating the potential for merchants to pass savings from reduced card acceptance costs onto all of their customers in the form of lower prices, Facts ¶¶ 460-72.

In short, the Merchant Restraints are plainly anticompetitive because they "disrupt the proper

functioning of the price-setting mechanism of the market." *IFD*, 476 U.S. at 461.[5]  And the

Merchant Restraints have those actual adverse effects on competition throughout the market

---

[5] *Cf. Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) ("Price is the central nervous system of the economy . . . .") (internal quotation marks omitted).

because the vast majority of merchants accept Amex and all Amex-accepting merchants are bound by some version of the Merchant Restraints.  Facts ¶¶ 317-18, 340-44, 391-400.  The evidence of these competitive harms will fully satisfy Plaintiffs' trial burden under the rule of reason's first step.  At this stage of the case, Amex's motion may be denied for ignoring the evidence entirely.

## II.    Applying *Visa*'s Analysis to This Case Shows That Amex Possesses Market Power.

Ignoring *IFD* and its progeny, Amex argues that Plaintiffs must "prove that Amex has antitrust market power" and that they "cannot do so."[6]  But the courts in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ("*Visa*"), conducted a market-power analysis in this industry, and applying their reasoning here confirms that there is substantial evidence of Amex's market power.[7]

### A.    *Visa* Shows How To Analyze a Card Network's Market Power.

*Visa* provides a roadmap for analyzing a card network's market power.  The district court found that both Visa and MasterCard had "market power in the general purpose card network services market, whether measured jointly or *separately*," *Visa*, 163 F. Supp. 2d at 342 (emphasis added), and the Second Circuit agreed, *Visa*, 344 F.3d at 239.  Both courts pointed to three types of evidence:  (1) high market share; (2) cardholder insistence; and (3) continued merchant acceptance despite price increases.  The courts did not analyze each type of evidence

---

[6] *Compare* Amex Br. 1 *with Geneva Pharms.*, 386 F.3d at 509 (recognizing that Second Circuit has "not required proof of market power in § 1 cases"); *K.M.B. Warehouse*, 61 F.3d at 129 ("This court has not made a showing of market power a prerequisite for recovery in all § 1 cases.").

[7] Amex defines market power as "the power to control prices or exclude competition," *see* Amex Br. 11-12, and courts also have defined market power as the "capacity to inhibit competition market-wide," *K.M.B. Warehouse*, 61 F.3d at 129.  Either way, Amex clearly possesses market power because it can impose Merchant Restraints that plainly inhibit, or exclude, price competition among card networks across most of the market.  *See supra* Part I.B.

11

separately, but instead concluded that each card network possessed market power based on the totality of the evidence.  *See Visa*, 163 F. Supp. 2d at 340-41; *Visa*, 344 F.3d at 239-40.

Rather than follow *Visa*'s roadmap, Amex wrongly asserts that the United States "inexplicably reversed course by suing Amex."  Amex Br. 1-2.  It claims that the government's current position is "directly contrary" to its supposed "admissions in the early 2000s that Amex lacked market power at a 20% share of GPCC volume and that Amex needed at least a 25% share in order to be competitively significant."  *Id.* at 12.  Amex's accusations are groundless.

First, contrary to Amex's claim, the United States did not argue in *Visa* that Amex then lacked market power; Amex's market power was not at issue in that case.

Second, Amex mischaracterizes the United States's position in *Visa* as an "admission" that "Amex needed at least a 25% share in order to be competitively significant."  Amex Br. 12. In fact, the United States cited testimony of a Citibank executive that a share of between 20% and 25% was necessary for Citibank to launch a successful new network.  Amex Facts ¶ 48. Amex's current 26% share exceeds even the top of that range, and its share has been at least 19.5% every year since 1996 and at least 23% every year since 2006.  Facts ¶¶ 309, 312-13. Moreover, as Amex recognizes, the *Visa* suit sought to remove impediments to competition from Discover (which had a 6% share), as well as Amex, so it is clear that the United States did not believe that a card network needed a 25% share to compete.  *See* Amex Facts ¶¶ 41-42, 44, 52.

Third, although Amex benefited from the United States's efforts in *Visa*, Amex confuses its self-interest with the public interest when it argues that the government's "very goal" in *Visa* was to provide it with "at least 5% additional share."  Amex Br. 1.  As here, the goal was to protect competition, not any particular competitor.  Facts ¶ 571.  In *Visa*, Amex cheered efforts to open up competition for cardholders (because Amex thought its rewards and service to

cardholders created a competitive advantage).  But here, Amex complains about efforts to open

up competition for merchants (because Amex's high prices to merchants are a competitive

disadvantage).  Antitrust law does not allow Amex to pick and choose how its rivals compete.[8]

Amex also unsuccessfully tries to distinguish *Visa* on factual grounds.  First, Amex says

that, in *Visa*, there were horizontal agreements among MasterCard's bank members, while this

case challenges Amex's vertical agreements with merchants.  Amex Br. 18-19.  The horizontal

agreement among MasterCard's members allowed the *Visa* courts to aggregate each bank's

MasterCard volume in calculating MasterCard's collective 26% share, but the absence of

horizontal agreement in this case is irrelevant because Amex has a 26% share by itself.  Facts

¶ 309.  Second, Amex cites statements discussing the "collective" power of MasterCard and

Visa.  Amex Br. 19.  Both *Visa* courts held, however, that MasterCard had market power

"separately" from Visa.  *See Visa*, 163 F. Supp. 2d at 341; *Visa*, 344 F.3d at 239.  Third, Amex

points out that there was evidence that the *Visa* defendants harmed competition.  Amex Br. 19

(discussing "exclusion").  Here, too, there is evidence that Amex's Merchant Restraints actually

harm competition.  *See supra* Part I.B.

### B.    Substantial Evidence Demonstrates That Amex Possesses Market Power.

Plaintiffs' expert economist – Professor Michael L. Katz, who was also the United

States's expert in *Visa* – considered the kinds of evidence on which *Visa* relied and other

evidence, and he concluded that Amex possesses market power.  Facts ¶¶ 536, 544-46, 550, 553-

---

[8] *See NCAA v. Bd. of Regents*, 468 U.S. 85, 116-17 (1984) ("By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.  The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.") (internal quotation marks and alteration omitted); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (describing a defendant's attempt to "impose [its] views of the costs and benefits of competition on the entire marketplace" as "nothing less than a frontal assault on the basic policy of the Sherman Act").

56, 558.  Relying on its own experts, Amex disagrees.  But rather than acknowledge this genuine

dispute of material fact,[9] Amex argues that, because no single type of evidence by itself proves

market power, market power cannot be proven at all.  That piecemeal approach flies in the face

of *Visa*'s integrated market-power analysis.  *See also H.L. Hayden Co. of N.Y., Inc. v. Siemens

Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989) (recognizing that courts "must accord

plaintiffs 'the full benefit of their proof without tightly compartmentalizing the various factual

components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union

Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Moreover, Amex's arguments about each

type of evidence ignore material facts, misread precedent, and mischaracterize Professor Katz's

views.

      **1.**      **Amex's Market Share Has Been Held Sufficient To Establish Market Power in the Payments Industry.**

     In concluding that MasterCard and Visa each possessed market power, the *Visa* district

court emphasized their "large market shares in a highly concentrated network market with only

four significant competitors."  *Visa*, 163 F. Supp. 2d at 341.  The Second Circuit affirmed that

finding.  *See Visa*, 344 F.3d at 240.  MasterCard's market share then stood at approximately

26%, *id.*, the same as Amex's share today, Facts ¶ 309.

     Amex dismisses *Visa* as the "*only* case in this circuit . . . in which a firm with similar

share has been found to have antitrust market power."  Amex. Br. 18.  But that would hardly be

grounds for disregarding the most factually similar case, and courts in this circuit have refused to

---

[9] Whether Amex has market power is a question of fact, not law.  *See ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569-70 (2d Cir. 1990); *cf. Geneva Pharms.*, 386 F.3d at 502 (holding that "it is a question for the jury whether [the defendant] had monopoly power in the clathrate market"); *Hayden Publ'g Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 (2d Cir. 1984) ("Thus, even if we assume that the district court was correct in finding . . . the relevant market . . ., there remained a factual dispute about [the defendant's] power in this market.").

grant summary judgment when presented with similar shares.[10]  Moreover, Amex's contention

that "'firms with market shares of less than 30% are *presumptively* incapable of exercising

market power'" is at odds with the Second Circuit's rejection of market-share presumptions in

monopolization cases, where even greater market power is required than in Section 1 cases.[11]

And tellingly, when Amex asserted an antitrust claim against MasterCard (which it ultimately

settled for $1.8 billion), it argued that MasterCard's market share (under 29% at the time) was

"sufficient to establish its . . . possession of market power" and even criticized MasterCard for

"offer[ing] absolutely no basis to depart from" *Visa*'s reasoning.  Facts ¶¶ 568, 570.

Amex also overlooks that a defendant's "capacity to inhibit competition market-wide"

depends not just on its market share, but also on the "nature of defendant's behavior" and the

"structure of the interbrand market."  *See K.M.B. Warehouse*, 61 F.3d at 129.  An important

feature of the relevant market here is that Amex operates a two-sided platform linking

cardholders and merchants.  In that role, Amex serves as a "gatekeeper" to cardholders

---

[10] *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 562 F. Supp.
2d 392, 400 (E.D.N.Y. 2008) (Gleeson, J.) (adopting Magistrate Judge Orenstein's reasoning that
"a finding that [a defendant's] market share is less than 30 percent would not, in any event,
foreclose the possibility that [plaintiffs] may succeed on their Section 2 claims"); *Energex
Lighting Corp. v. N. Am. Philips Lighting Corp.*, No. 83-CIV-3929, 1990 WL 83528, at *4
(S.D.N.Y. June 12, 1990) (refusing to "conclude at this time that there is no genuine issue on
whether defendants had monopoly power" when "Defendants do not dispute that they had 25%
of the purported GLM segment market when the alleged anti-competitive practice occurred"); *cf.
In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568, at *4
(E.D.N.Y. Apr. 1, 2003) (Gleeson, J.) (denying part of plaintiffs' summary judgment motion
concerning MasterCard's market power when "MasterCard's share of the credit and charge card
services market . . . fluctuated from between 26 to 28 percent . . . and its share of the credit card
market alone has varied from 33 to 36 percent").

[11] *Compare* Amex Br. 12 *with Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651
F.2d 122, 129 (2d Cir. 1981) (explaining that, "when the evidence presents a fair jury issue of
monopoly power, the jury should not be told that it must find monopoly power lacking below a
specified share or existing above a specified share"); *see also Eastman Kodak Co. v. Image
Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of
course, something greater than market power under § 1.").

accounting for 26% of general purpose credit and charge card spending.  Facts ¶¶ 309, 477.

Because millions of merchants want access to those cardholders, Amex has been able to impose

the Merchant Restraints and insulate itself from competing against other card networks for more

of those merchants' business.  Thus, Amex's Merchant Restraints impact not only 26% of credit

card spending, but all credit card spending at every merchant that accepts Amex.  Facts ¶¶ 317-

18, 340-44, 391-400.  No network can gain share by cutting its prices to merchants, so no

network does so.[12]

        In any event, Amex's 34% share of the market for general purpose credit and charge card

network services to U.S. travel-and-entertainment merchants exceeds Amex's asserted market-

share threshold.  Facts ¶ 311.  Amex considers that market "artificial[]," *see* Amex Br. 12 n.5,

but assumes – as it must – that it is correct for purposes of its motion, *see supra* note 2.

## 2.        Merchants Accept Amex Cards Because of Customer Insistence.

        As additional evidence of the card networks' market power, the *Visa* district court

explained that merchants "cannot refuse to accept Visa and MasterCard even in the face of

significant price increases because the cards are such preferred payment methods that customers

would choose not to shop at merchants who do not accept them."  *Visa*, 163 F. Supp. 2d at 340.

The Second Circuit agreed.  *See Visa*, 344 F.3d at 240.

        Similarly here, merchants accept Amex cards because their "insistent" customers strongly

prefer to pay that way, and if the merchants did not accept Amex, they would lose sales from

those customers to competitors that do accept Amex.  Facts ¶¶ 478-79, 481-82.  Amex

---

[12] Unlike *Visa*, none of the cases that Amex cites to support its claimed market-share threshold
involved two-sided platforms.  *See* Amex Br. 12-13 & n.6; *cf. In re Payment Card Interchange
Fee and Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 402 (E.D.N.Y. 2008)
(Gleeson, J.) ("Where the structure of the market as a whole prevents a customer's ability to
purchase lower-priced alternatives to the defendant's product, however, a defendant's market
share may be less probative of its monopoly power.").

acknowledges that insistent cardholders allow it to charge merchants high prices, and Professor Katz explained that such insistence helps generate market power for Amex.  Facts ¶¶ 477, 484-86.

> **a.**  **Amex's Documents and Testimony Show That Cardholder Insistence Generates Market Power Over Merchants.**

Although Amex argues that "DOJ has created [the] 'insistence' theory of market power," Amex Br. 13, the concept and terminology come from Amex itself.  Dating back to the 1990s, tens of thousands of Amex business documents use the word "insistence."  Facts ¶ 487.  Nearly two years before this case was filed, Amex's attorneys contended that Amex's "comparatively higher insistence levels" made its cards especially valuable to merchants.  Facts ¶ 488.

Amex has made "insistence" a pillar of its business strategy.  Facts ¶ 484.  Amex refers to cardholder insistence when explaining its business to investors.  Facts ¶¶ 485-86.



Amex strives to build cardholder insistence.  Its Membership Rewards program increases insistence by rewarding cardholders who use their Amex cards more, Facts ¶ 489, even as the Merchant Restraints prohibit merchants from rewarding cardholders who use their Amex cards less.  Similarly, Amex understands that its corporate cardholders are highly insistent; one Amex survey found that ▮▮% of companies have adopted policies requiring or strongly encouraging their employees to place business expenses on Amex cards.  Facts ¶¶ 490-92.  ▮▮▮▮



³

### b.  Amex's Arguments on Cardholder Insistence Are Wrong.

Amex tries to deflect the evidence that cardholder insistence generates market power by recasting "insistence" as "loyalty" and claiming that it "has to earn the loyalty of its cardmembers every day," Amex Br. 15, implying that it should not be found to have violated the antitrust laws because it competes to build cardholder insistence.  But how hard Amex works to maintain its market power is beside the point.[14]  The antitrust laws do not impede Amex from trying to gain sales by attracting cardholders with rewards, but they do not allow Amex to obstruct other card networks from trying to gain sales by attracting merchants with lower prices.

Amex relies on *United States v. Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995), to argue that a firm's highly insistent customers do not compel a finding that the firm possesses market power, Amex Br. 14-15, but Amex misconstrues *Kodak*'s fact-bound holding.  Kodak sought

---

[13] Corporate-cardholder insistence is strong evidence of Amex's power over travel-and-entertainment merchants because business travelers are especially important to those merchants. *See* Facts ¶¶ 494-96.  In *Visa*, the district court nevertheless refused to carve corporate cards out of the remedy because MasterCard and Visa had "failed to demonstrate that barriers to entry exist which prevent banks from issuing corporate or small business cards."  *United States v. Visa U.S.A., Inc.*, 183 F. Supp. 2d 613, 616 (S.D.N.Y. 2001).  In emphasizing that ruling, Amex overstates its relevance to this case.  *See* Amex Br. 11 n.4.  First, the *Visa* remedy opinion addressed the absence of barriers preventing banks from issuing corporate cards to cardholders. The court's liability opinion separately analyzed barriers to new card networks selling network services to merchants and found those barriers "significant."  *See Visa*, 163 F. Supp. 2d at 341-42.  Second, the passage of time shows that the difficulty of supplanting Amex's position in corporate cards has been greater than anticipated.  Amex's share of corporate card was more than 70% in 2010.  Facts ¶ 315.

[14] When Microsoft similarly tried to use its product's "popularity" to sidestep antitrust liability, the D.C. Circuit held that, even if Microsoft "gained its initial dominance in the operating system market competitively – through superior foresight or quality," the source of Microsoft's market power was beside the point because plaintiffs challenged "Microsoft's efforts to maintain [its] position through means other than competition on the merits."  *United States v. Microsoft Corp.*, 253 F.3d 34, 56 (D.C. Cir. 2001).

termination of an old antitrust decree, saying that it no longer possessed market power over the sale of film. After a nine-day evidentiary hearing, the district court determined that the geographic scope of the relevant market was worldwide, found that Kodak lacked market power in that market, and terminated the decree. *See Kodak*, 63 F.3d at 99.

The Second Circuit did not hold that customer preference cannot be used to prove market power. Rather, it addressed whether the district court "abused its discretion in defining the geographic market for film as a world-wide one." *Id.* at 109. Although surveys showed a "strong preference of United States customers for Kodak film," other evidence indicated that customers were "price sensitive." *Id.* at 108. In light of the conflicting evidence, the Second Circuit "[could] not say that the district court erred" in defining a worldwide market, *id.*, but it also recognized that "another fact-finder might have weighed the evidence differently," *id.* at 109.

Moreover, customer preference plays a different role in this case than in *Kodak*. Plaintiffs here contend that the strong preferences of one group of customers (cardholders) generate market power over a different group of customers (merchants). In *Kodak*, there was no such differentiation, so that case could not provide any guidance for how customer preferences generate market power in this industry.[15]

Amex's argument that it "has to earn the loyalty of its cardmembers every day" also implies that competition for *cardholders* ought to preclude a finding that Amex possesses market

_____

[15] The other cases that Amex cites provide even less support for its position. *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 797 (1st Cir. 1988), says only that evidence of consumer preferences, standing "alone," would not suggest market power, but Plaintiffs here have not relied exclusively on such evidence. Amex quotes a similar statement from a Third Circuit panel opinion, but the en banc Third Circuit vacated the panel's opinion and did not make the same point in its own opinion. *See* Amex Br. 14 (quoting *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, No. 90-1547, 1991 WL 149249 (3d Cir. Aug. 9, 1991), *vacated*, 959 F.2d 468 (1992) (en banc)). Moreover, Amex pulls its quotations from the passages in *Grappone* and *Town Sound* rejecting attempts by the plaintiffs in those cases to prove market power in a single-brand market. Plaintiffs in this case do not allege that Amex is a market unto itself.

19

power over *merchants*.  Amex Br. 15.  But the *Visa* district court explained that "fierce[] . . . issuer-level competition . . . does not take the place of competition at the network level."  *Visa*, 163 F. Supp. 2d at 330.  Although Amex wrenches Professor Katz's testimony out of context to make it appear as though he embraces its argument,[16] he "certainly believe[s] that firms could have different degrees of market power" over merchants and cardholders.  Facts ¶ 537.  And Amex itself agrees that "issuer-level competition" does not prevent card networks from "exercising power in the general purpose card network services market."  Facts ¶¶ 566-67.

Amex errs in saying that "'insistence' cannot be the source of Amex's alleged antitrust market power" because "'insistence' levels have not changed meaningfully" since *Visa* and Amex was a "victim" in that case.  *See* Amex. Br. 17.  As compared to the time of *Visa*, 50% more consumers who own a general purpose credit and charge card today own only an Amex card, and 70% more concentrate all of their general purpose credit and charge card spending on Amex.  *See* Amex Facts ¶¶ 253, 256.  Moreover, Amex's argument – once a victim, never a perpetrator – makes no sense.

Amex also claims that, because it is not "charging merchants many multiples" of its actual prices, it "does not have the power to 'control' merchant discount fees."  Amex Br. 17.  But "a price lower than the short-term profit-maximizing price is not inconsistent with possession . . . of monopoly power."  *See United States v. Microsoft Corp.*, 253 F.3d 34, 57 (D.C. Cir. 2001).  And contrary to Amex's claim that Professor Katz "has no explanation for why Amex has not raised its merchant discount fees," Amex Br. 17, Professor Katz explained that (a) Amex already charges prices above the competitive level and that it would be rational for

---

[16] In the part of Professor Katz's deposition from which Amex combines part of a question and part of an answer into a single statement attributed to him (Amex Br. 16 (citing Amex Facts ¶ 237)), he was explaining that merely possessing market power is not illegal.  Facts ¶ 538.

Amex not to charge merchants even more because "it cannot be completely certain of what considerations drive a merchant's acceptance decision," Facts ¶ 551; and (b) ███████████ ███████████████████████████████████████████████████████████

Finally, Amex recognizes that Professor Katz has presented a cogent explanation for why Amex has greater market power than Discover:  because market power depends on both the insistence of a network's cardholders and the network's share of a merchant's charge volume. Amex Br. 17-18.[17]  Amex criticizes that logic as applied to supermarkets and drug stores, *id.* at 18, but that dispute will have to be resolved at trial.

       c.       **Neither Amex's Merchant Acceptance Nor Its Merchant Negotiations Suggest a Lack of Market Power.**

Amex suggests that it lacks market power over merchants because "millions of merchants in the U.S. have decided not to accept Amex even though they accept Visa, MasterCard and Discover." Amex Br. 2.  But merchants that do not accept Amex cards tend to be small.  Facts ¶ 319.  Only one of the 100 largest U.S. retailers accepts some general purpose credit and charge cards, but not Amex cards.  Facts ¶ 316.  And as Amex told investors, Amex cardholders can make more than 90% of their general purpose credit and charge card purchases at merchants that accept Amex cards.  Facts ¶ 318.

Some merchants do not accept Amex cards because Amex chooses to charge prices that it knows those merchants will not pay.  Facts ¶¶ 326-27, 330, 451-52. ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

That is a classic strategy for a firm with market power.  Facts ¶ 325; *see Port Dock & Stone*

---

[17] Contrary to Amex's implication, Professor Katz did not invent this explanation.  He grounded his analysis on Amex documents explaining how it uses insistence to craft merchant pricing strategies.  Facts ¶ 498.

*Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) ("The danger to customers

from monopolization . . . is the danger that the monopolist will raise prices and restrict

output.").[18]

      Amex also contends that it "routinely negotiates the terms of card acceptance with its

largest merchants," suggesting that a firm with market power would never negotiate in that way.

*See* Amex Br. 8.  But even monopolists negotiate.[19] ██████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████  And Amex's examples of contracts with customized Merchant Restraints show that

merchants actually receive very little freedom to encourage their customers to pay with other

general purpose credit and charge cards.  Facts ¶ 391. ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

      **3.**        **Merchants Have Continued To Accept Amex Cards Despite Price Increases.**

      To support its finding that Visa and MasterCard separately possessed market power, the

*Visa* district court relied on evidence that those networks "raised . . . rates charged to merchants a

---

[18] Amex notes that, in *Visa*, DOJ stated that, "[w]ithout ubiquitous merchant acceptance of its cards, a card network cannot compete fully and effectively with Visa and MasterCard."  Amex Br. 19 (citing Amex Facts ¶ 49).  But that statement summarized the importance of merchant acceptance for a network to "compete fully and effectively" for partnerships with banks.

[19] *See, e.g.*, *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006) ("Enterprise customers . . . did not purchase on-line or by telephone, nor did they pay prices established in advance by Microsoft.  The prices that Enterprise customers paid were negotiated and, as a consequence, were both discounted and unique to each transaction.").

number of times, without losing a single merchant customer as a result." *Visa*, 163 F. Supp. 2d

at 340. The Second Circuit approved the district court's reasoning. *See Visa*, 344 F.3d at 240.



Professor Katz explained that "the value recapture initiative provides evidence of American

Express's market power," taking into account that Amex is a two-sided platform linking

cardholders and merchants. Facts ¶¶ 535, 546.

One of Amex's economists has proposed a different way of incorporating two-sided

considerations – something Amex calls a "two-sided price"

Facts ¶¶ 524-31; Amex Facts ¶ 216.

*See* Amex Br. 20, 23-25. Amex even claims that Professor Katz "concedes that he has not done

a meaningful analysis." *Id.* at 24. But in the passages that Amex quotes, Professor Katz was

identifying problems with how Amex's economist attempted to calculate a "two-sided price," not

conceding that the Amex economist got it "right." Facts ¶¶ 541-43. This battle of the experts

cannot be resolved without a trial.

Further, courts have assessed market power in two-sided industries for decades, but no court has focused on a "two-sided price."[20]  The *Visa* courts treated increases in merchant-side prices ("interchange fees") as evidence that each defendant card network possessed market power.  *See Visa*, 163 F. Supp. 2d at 340; *Visa*, 344 F.3d at 240.  And even though the parties in *Visa* "presented fully" arguments about two-sided platforms, Facts ¶ 565, neither the district court nor the Second Circuit discussed "two-sided prices."  Nor did Amex supply a "two-sided price" analysis in its billion-dollar lawsuit against MasterCard and Visa.  Facts ¶¶ 569-70.

### 4.  Other Evidence Indicates That Amex Has Market Power.

Professor Katz identified three additional types of evidence indicating that Amex possesses market power.

First, Amex price discriminates against certain merchants.  Facts ¶ 553; *cf. Visa*, 163 F. Supp. 2d at 340 ("Defendants' ability to price discriminate . . . illustrates their market power.").[21]  Despite admitting that the amount "that a merchant will pay to Amex generally differs depending upon the merchant industry," Amex argues that such differentials are not relevant and that Professor Katz should have analyzed "two-sided prices" instead of merchant discount rates.  *See* Amex Br. 22, 23 n.9.  But Professor Katz incorporated two-sidedness into his price-discrimination analysis by considering whether Amex faced different costs (including

---

[20] *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 54-58 (D.C. Cir. 2001) (software application developers and users); *Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951) (newspaper readers and advertisers).

[21] Amex quotes a Supreme Court case stating that price discrimination "occurs in fully competitive markets."  But Amex conspicuously omits the Court's recognition in the same sentence that "price discrimination may provide evidence of market power."  *Compare* Amex Br. 22 *with Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 44-45 (2006).

different cardholder rewards costs) in serving different merchant segments.  Facts ¶ 553(a).  Only a trial can resolve this dispute.[22]

Second, Amex charges merchants higher prices than MasterCard and Visa (firms that it says have market power).  Facts ¶¶ 292-95, 550.  Contrary to Amex's claim that Professor Katz failed to perform a two-sided analysis of Amex's premium pricing, *see* Amex Br. 20-21, his assessment considered both the merchant and cardholder sides by controlling for card mix (that is, by comparing merchant-side prices for cards with similar cardholder rewards).  Facts ¶ 540.  Although quality differences may explain price differentials, the evidence that Amex cites about its service to *cardholders* (*see* Amex Br. 21 (citing Amex Facts ¶¶ 68-70, 174-79)) says nothing about whether *merchants* pay more to accept Amex because they believe that Amex provides them higher quality network services.  Other evidence shows that Amex provides merchants no better (and often worse) service than its rivals.  Facts ¶¶ 296-308.[23]

Third, entry barriers prevent new firms from eroding Amex's market power.  Facts ¶ 558.  *Visa* found "significant barriers to entry into the general purpose card network services market," *Visa*, 163 F. Supp. 2d at 341, and Amex recognizes that barriers remain high, Facts ¶ 560.

## Conclusion

Amex's motion for summary judgment should be denied.

---

[22] Additionally, Amex argues that its price discrimination cannot be evidence of market power because Discover also price discriminates.  Amex Br. 23.  MasterCard made a similar argument in *Visa*, Facts ¶ 572, but the district court nevertheless saw MasterCard's price discrimination as evidence of market power, *see Visa*, 163 F. Supp. 2d at 340-41.

[23] Amex also asserts that, if premium pricing alone was enough to establish market power, then Discover would have market power, too.  But on 96% of Discover volume, merchants pay Discover a price in between the price that they would pay MasterCard or Visa.  Facts ¶ 552.  Amex, on the other hand, charges merchants higher prices on average than both MasterCard and Visa.  Facts ¶¶ 292-95.

Dated:  December 6, 2013                    Respectfully submitted,

                                            **U.S. DEPARTMENT OF JUSTICE**


                                            /s/Craig W. Conrath_____
                                            Craig W. Conrath
                                            (craig.conrath@usdoj.gov)
                                            Andrew J. Ewalt
                                            (andrew.ewalt@usdoj.gov)
                                            U.S. Department of Justice, Antitrust Division
                                            450 Fifth Street, NW, Suite 4000
                                            Washington, DC 20530
                                            Tel:  (202) 532-4560
                                            Fax:  (202) 307-9952

                                            *Counsel for Plaintiff United States of America*


                                            **OFFICE OF THE ATTORNEY GENERAL**
                                            **State of Ohio**


                                            /s/Mitchell L. Gentile_____
                                            Mitchell L. Gentile
                                            (mitchell.gentile@ohioattorneygeneral.gov)
                                            Office of the Ohio Attorney General
                                            150 East Gay Street, 23rd Floor
                                            Columbus, OH 43215
                                            Tel:  (614) 466-4328
                                            Fax:  (614) 995-0266

                                            *Counsel for State of Ohio and on behalf of all*
                                            *Plaintiff States*