UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA, et al.,

                Plaintiffs,

        -against-

AMERICAN EXPRESS CO., et al.,

                Defendants.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CV-4496 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

      The United States of America and the attorneys general of seventeen states have sued

Defendants American Express Company and American Express Travel Related Services

Company, Inc. (collectively "Amex"), alleging anti-competitive behavior in violation of

Section 1 of the Sherman Antitrust Act. (Am. Compl. (Dkt. 57).)  In particular, Plaintiffs allege

that Defendants' so-called "anti-steering" provisions violate Section 1 because they prevent

merchants who accept Amex payment cards from steering customers to alternative card brands,

such as Visa, MasterCard, or Discover. (Id.) This, they argue, reduces competition for payment

card services at the merchant level and enables Amex to charge merchants higher prices for these

services than it could in a competitive market. (Id.) On September 26, 2013, Defendants moved

for summary judgment on Plaintiffs' claim. (Not. of Defs. Mot. for Summ. J. (Dkt. 281).) The

court DENIES Defendants' motion for summary judgment because genuine issues of material

fact remain in dispute.[1]

---

[1] This Memorandum and Order refers to sealed entries on the docket and to certain information contained in those
entries. To the extent that it makes public any information previously available only under seal, the court considers
doing so necessary to explain its reasons for denying Defendants' motion. The court anticipates that this
information will almost certainly become the subject of public testimony at trial.

## I.    FACTS

### A. The Credit and Charge Card Industry

There are four major issuers of credit and charge cards[2] in the United States: Visa, MasterCard, Amex, and Discover.  (Pls. Rule 56.1 Counter-Stmt. of Material Facts in Opp'n to Defs. Mot. in Favor of Summ. J. ("Pls. 56.1") (Dkt. 296-1) ¶ 287.)  Amex first entered the payment card industry in 1958, with a charge card for use at travel and entertainment providers. (Mem. in Supp. of Defs. Mot. for Summ J. ("Defs. Mem.") (Dkt. 282-1) at 5.)  Its main competitors at the time were Diners Club and Carte Blanche, which both specialized in the same market.  (Id.)

Meanwhile, banks began to offer payment cards that not only allowed customers to charge items to be paid at the end of the month, but also provided revolving lines of credit.  Their efforts eventually created two non-profit joint ventures run by consortiums of banks, Visa and MasterCard.  (Defs. Stmt. of Material Undisputed Facts in Supp. of their Mot. for Summ. J. ("Defs. 56.1") (Dkt. 282-2) ¶ 13.)  They were managed by boards of directors elected by the member banks.  (Id. ¶ 14.)  They also had exclusivity agreements that mandated that banks not issue competititors' cards, including Amex cards.  (Id. ¶¶ 14-15.)

Amex first began offering credit cards in the late 1980s, seeking to challenge the two joint ventures in the general purpose credit and charge card market.  (Defs. Mem. at 6.)  It was joined in this effort by Discover, which in 1985 was the last entrant into the general purpose credit and charge card market.  (Pls. 56.1 ¶ 418.)  While Amex positioned itself as a premium brand, Discover sought to grow its network by offering lower fees to merchants.  (Id. ¶¶ 418-419.)

---

[2] Credit cards offer consumers a revolving line of credit.  Charge card purchases must be paid at the end of every billing cycle.  For the purposes of this motion, all parties have agreed to treat debit cards as belonging to a separate market.

Although the exclusivity rules that once governed the banks have now been lifted as the result of a lawsuit, most still issue either Visa or MasterCard credit cards. (Defs. 56.1 ¶¶ 71, 80-81.)

### A. How Amex Credit and Charge Cards Work

Although they disagree over its implications, the parties agree that the market for general purpose credit and charge cards is two-sided. Defendants sell their services to both merchants and cardmembers in order to allow these two groups of customers to interact with each other. (Defs. 56.1 ¶¶ 3-9; Pls. 56.1 ¶¶ 3-9.) This case concerns one side of that market: card acceptance by merchants.

For the majority of their cards, Defendants market and issue credit and charge cards directly to cardmembers. These customers include individuals and businesses. (Expert Report of Ann Schmitt, Ex. 24 to Hamer Decl. ("Schmitt Rep.") (Dkt. 295-1) ¶ 66-68.) Amex bears the risk of fraud or default, collects payments from customers for the transactions it facilitates, and also collects various fees, such as interest on an unpaid balance and an annual fee. (Schmitt Rep. ¶ 62.)

Defendants state that they offer rewards to keep current customers and attract new ones. (Id.) The rewards are redeemable for a wide variety of goods and services, for which Amex then pays. (Defs. 56.1 ¶¶ 170, 175, 188.) They assert that rewards can be significant enough that cardmembers may in fact pay a "negative price" for purchases made with Amex cards. (Id. ¶ 176.) Amex states that it maintains a reserve with which to pay for redemption of these rewards, which typically do not expire. (Id. ¶ 191.) Amex keeps a database of all rewards liabilities and asserts that the database demonstrates that its liabilities increased significantly between 2002 and

3

2010. (Id. ¶ 202.) Defendants explain that corporate cardmembers can also receive rebates for their Amex card spending. (Id. ¶ 209-10.)

Defendants also contract with merchants to enable them to accept payment with Amex cards. These contracts dictate all facets of the Amex-merchant relationship, including the manner in which a merchant may display the Amex logo, treatment of Amex cards in relation to other cards of the same or different brand and to other payment methods, and the price of accepting Amex cards. (Schmitt Rep. ¶ 63.)

To provide these services to cardmembers and merchants, Defendants operate a platform for processing card transactions. Plaintiff's expert explains that processing has three steps: authorization, clearing, and settlement. (Id. ¶ 64.) Authorization happens when a merchant sells a good or service to a customer. In most cases this step takes place electronically—the merchant's terminal (where customers swipe their cards) sends information about the transaction to Defendants. Defendants then check this information against their customer database and send a response indicating whether they will reimburse the merchant. (Id.) If the payment is approved, the cardmember and merchant complete their transaction, and the merchant uses the terminal to inform Defendants that it has done so. (Id.) Defendants then "clear" their records regarding the transaction and "settle" it by transferring funds to the merchant's bank account. (Id.) Third-party payment processors provide the hardware that connects Amex and other card providers to merchants. (Id. ¶ 65.)

This model differs from the one used by Visa and MasterCard, which do not issue their own cards. Their cards are instead issued by individual banks, which then become responsible for authorizing transactions, managing billing and credit, and taking on the risk of fraud or

4

default. (Id. ¶ 78.) Defendants also allow banks to issue Amex-branded cards to cardmembers, but this is far less common. (Id. at ¶ 65.)

### B. Amex's Merchant Fees

Defendants charge merchants various fees in exchange for providing payment processing services. These fees include fixed monthly fees, and per-transaction fees that may be composed of a fixed "transaction" fee and a "merchant discount fee." (Defs. 56.1 ¶¶ 137-38.) Amex's "merchant discount fee" is equal to the dollar value of the transaction multiplied by a percentage discount rate. (Id. ¶ 134.) Merchants typically pay the same per-transaction price for bank-issued Amex cards as they would for Amex-issued cards. (Id. ¶ 79.) Amex has compared their merchant discount fee to those charged by Visa and MasterCard, adjusting for charge volume and type of card product. (Id. ¶ 153.) With these adjustments, Amex's average merchant discount fee is 3% greater than MasterCard's and 8% greater than Visa's. (Id. ¶ 155.) Plaintiffs agree that Amex is more expensive for merchants to accept—that is a principle element of their suit. (Pls. 56.1 ¶ 155.)

Defendants aver that Amex negotiates directly with merchants, offering incentive payments or fee reductions; Visa and MasterCard do not negotiate these matters. (Defs. 56.1 ¶¶ 145, 147.) Amex offers various concessions to merchants including lower discount fees and exceptions to their anti-steering provisions. (Defs. Mem. at 8-9.) Plaintiffs counter that Amex only negotiates with the largest merchants. (Pls. 56.1 ¶ 145.) They also point out that Amex charges different discount rates to merchants in different industries, a point Defendants do not dispute. (Id. ¶¶ 290-291; Defs. Reply to Pls. Rule 56.1 Counter-Stmt. of Material Facts in Opp'n to Defs. Mot. for Summ. J. ("Defs. Resp. to Pls. 56.1") (Dkt. 313-2) ¶ 291.)

5

Defendants state that their higher fees can be explained because they have pursued "a differentiated product strategy that focuses upon delivering premium value to both merchants and cardmembers." (Defs. Mem. at 6.) Because they issue almost all of their own cards, Defendants claim that they are able to collect market data and offer targeted advertising opportunities to merchants. (Id. at 6-7; Defs. 56.1 ¶¶ 88-96.) These advertising opportunities are designed to help merchants acquire and retain cardmembers as customers. (Defs. Mem. at 6.) Defendants also offer cardmember rewards and benefits that they argue are superior to those of other credit card companies. (Defs. Mem. at 7.) These elements, they contend, lead to higher spending by cardmembers at various merchants. (Id.) Plaintiffs argue that Amex's capabilities are not unique (Pls. 56.1 ¶ 87) and that existing benefits to merchants provide no justification for the anti-steering rules. (Id. ¶ 89.)

### C. Amex's Anti-Steering Rules

The major credit card companies have a history of using merchant preference campaigns in order to draw business away from competitors. (Defs. 56.1 ¶ 36 (discussing "we prefer Visa" campaign); Pls. 56.1 ¶¶ 36, 349-53 (discussing preference campaigns by Visa, Discover, MasterCard, and Amex).) Partially in response to these campaigns, Amex implemented the anti-steering rules, which limit the ability of merchants to "steer" customers toward the use of another card. (Pls. 56.1 ¶ 358 (citing Dep. of Stephen McCurdy (Amex VP of strategy for merchant services).)

The challenged rules are contained in section 3.2 of Defendants' standard Merchant Reference Guide, which is their standard contract with merchants, and state that merchants:

must not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card,

6

- try to dissuade cardmembers from using the card,
- criticize or mischaracterize the Card or any of our services or programs,
- try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment . . . ,
- impose any restrictions, conditions, disadvantages or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for electronic funds transfer, cash, and checks,
- engage in activities that harm our business or the American Express Brand (or both), or
- promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card[.]

(Defs. 56.1 ¶ 225.) Providing information about cost of acceptance or trying to persuade customers to prefer one non-Amex payment card over another non-Amex card is also prohibited. (Pls. 56.1 ¶¶ 372, 375-378.)

### D. Procedural History

Plaintiffs brought suit on October 4, 2010, alleging that Visa, MasterCard, and Amex's anti-steering rules violate Section 1 of the Sherman Act. MasterCard and Visa promptly settled on July 20, 2011. (Final J. (Dkt. 143).) Defendants have continued to litigate.

On September 26, 2013, Defendants moved for summary judgment on all of Plaintiffs' claims. (Not. of Defs. Mot. for Summ. J. (Dkt. 281).) Plaintiffs filed their opposition to Defendants' motion on December 6, 2013. (Mot. for Leave to Electronically File Under Seal Pls. Mem. of Law in Opp'n to Defs. Mot for Summ. J. (Dkt. 294).) Defendants replied on January 9, 2014. (Reply (Dkt. 308-1).) Plaintiffs asked for, and were granted permission to file a sur-reply, which they did on February 12, 2014. (Mem. in Opp'n re Not. of Mot. for Summ. J. (Sealed Version Dkt. 320) (Public Version Dkt. 321).) On March 19, 2014, the court heard oral arguments on the motion. (Mar. 20, 2014, Min. Entry.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden to make this showing rests upon the party moving for summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]pecific facts" grounded in testimony or other admissible evidence create a genuine issue. Id. "[M]ere allegations or denials" of the adverse party's pleadings, id., "assertions that are conclusory," Patterson v. Cnty. of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004), or "conjecture[] or speculation" from the non-movant, Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), do not.

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323 (citation omitted).

## III.   DISCUSSION

All parties agree that Amex's anti-steering rules constitute a vertical agreement between Defendants and participating merchants.  To determine whether an alleged vertical restraint on trade violates Section 1of the Sherman Act, courts use a rule of reason analysis.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86 (2007).  This most searching form of antitrust analysis involves a context-specific inquiry into the relevant market and a defendant's effect on that market.  Plaintiffs have an initial burden of demonstrating that Defendants' behavior adversely affected competition.  See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 506-07 (2d Cir. 2004).  Should they meet this burden, it would fall to Defendants to demonstrate the pro-competitive effects of the anti-steering rules.  If they do so, the burden would then shift back to Plaintiffs to show that any "legitimate competitive benefits" could be had through less restrictive means.  Id. at 507 (citing Capitol Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc., 996 F.3d. 537, 543 (2d Cir. 1993)).

At this stage in the proceedings, both sides emphasize the first prong of the test. Defendants argue that Plaintiffs cannot meet their initial burden because Plaintiffs are required to prove market power in the relevant market, and they cannot do so due to Amex's low market share.  (Defs. Mem. at 1-2.)  However, the law of this Circuit is not so rigid.  Market power is an alternative method by which a plaintiff may establish a Section 1 violation if unable to prove that the challenged conduct has an actual adverse effect on competition.  See K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995).  Should Plaintiffs attempt to prove their case by showing market power, they also have more modes of proof available to them than simply relying on market share as a determinant.  Because material facts related to the

9

actual adverse effects of the anti-steering rules and to Defendants' market power remain in dispute, summary judgment is inappropriate.

### A. The Relevant Market

To determine whether an antitrust violation has occurred the court must first define the scope of the relevant market. This "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). For the purposes of summary judgment, both Plaintiffs and Defendants agree that the relevant market is the market for "general purpose credit and charge card" services in the United States. (Am. Compl. ¶ 14, 34; Defs. Mem. at 10.)

Plaintiffs also allege the existence of a Travel and Entertainment ("T&E") submarket within the market for credit and charge card payment services. Plaintiffs argue that this market is separate because T&E merchants are subject to price discrimination by Amex. (Am. Compl. ¶ 41.) These merchants are less able to refuse to accept Amex payment cards and Defendants accordingly charge them higher discount fees. (Id. ¶ 45.) T&E merchants are said to be less able to refuse because they depend on business travelers for a significant portion of their revenues and business travelers often have to use a specific card in order to obtain reimbursement. (Id. ¶ 48.) Expenditure with Amex cards accounts for 70% of spending on corporate cards. (Id.) Plaintiffs also argue that these merchants are more reliant on credit or charge cards because customers typically make large purchases and often through the internet, and that these merchants are therefore in a particularly poor position if they want to refuse to accept any major brand of card. (Id.) Within the T&E submarket, Amex's fees are allegedly 12% higher than those of rival networks. (Id. ¶ 68.)

## B.  Obligation to Prove Market Power

Defendants' motion for summary judgment is almost entirely predicated on their assertion that Plaintiffs must prove market power in order to make out a Section 1 claim.  Market power is the ability to raise price significantly above the competitive level "without losing all of one's business." K.M.B. Warehouse, 61 F.3d at 129 (quoting Graphic Prod. Distrib., Inc. v. ITEK Corp., 717 F.2d 1560, 1570 (11th Cir. 1983)).  Defendants argue that, under the Supreme Court's ruling in Leegin, the rule of reason framework requires Plaintiffs to prove that Defendants have market power in order to establish a Section 1 violation.  (Defs. Mem. at 10-11; Reply at 2.)  Plaintiffs read Leegin more narrowly, insisting that they may demonstrate a Section 1 violation in two ways: by either (1) proving that Defendants have market power, or (2) proving that the challenged rules have had actual detrimental effects on competition.  (Pls. Opp'n at 8; Pls. Sur-Reply Mem. of Law in Further Opp'n to Defs. Mot. for Summ. J. (Dkt. 320) at 8.)  In doing so, they rely on the Supreme Court's formulation in F.T.C. v. Indiana Federation of Dentists. 476 U.S. 447 (1986).  There, the Court reasoned that "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." Id. 460–61.

In Leegin, the Supreme Court held that vertical price restraints were subject to rule-of-reason analysis, overturning earlier precedent that applied a per se rule to resale price maintenance.  551 U.S. at 888-89.  The Court reasoned that not all such restraints harm competition, so they must be evaluated in light of the specific industry and vertical relationship at issue in a given case. Id. at 897-99.  The Court recognized that market power is "a further,

11

significant consideration," but it stopped short of requiring plaintiffs to prove a defendant's market power in order to establish liability. Id. at 886-87.

On remand, the Fifth Circuit went further, holding that "[t]o allege vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power." PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 615 F.3d 412, 418-19 (5th Cir. 2010). Even before Leegin, some other Circuits had made market power a virtual requirement in vertical restraint cases. See, e.g., 42nd Parallel N. v. E St. Denim Co., 286 F.3d 401, 404-05 (7th Cir. 2002); Assam Drug Co., Inc. v. Miller Brewing Co., Inc., 798 F.2d 311, 315-17 (8th Cir. 1986) (collecting cases).

The Second Circuit is not one of them.  It has consistently held that market power is not a requirement under the rule of reason if a plaintiff can prove actual adverse effect on competition. See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 509 (2d Cir. 2004) (citing Ind. Fed'n of Dentists, 476 U.S. at 460-66; K.M.B. Warehouse Distribs., 61 F.3d at 128-29; see also Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001) ("In this Circuit, a threshold showing of market share is not a prerequisite for bringing a Section 1 claim."); Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001); Top Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998).  Instead, this Circuit has suggested that actual adverse effect on competition may in some instances demonstrate market power.  Todd, 275 F.3d at 206 (then-Judge Sotomayor stating that actual adverse effect "arguably is more direct evidence of market power than calculations of elusive market share figures.").  Even after Leegin, the Second Circuit is not alone in adhering to the Indiana Federation of Dentists formulations.  See Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1336 (11th Cir. 2010) ("Under rule of reason analysis, a plaintiff may show either actual or potential harm to competition.") (citing Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996)); see also Valuepest.com of Charlotte,

Inc. v. Bayer Corp., 561 F.3d 282, 287 (4th Cir. 2009) (adopting the view that Leegin established

a rule-of-reason test for vertical restraints, under which courts should consider market power

along with other factors).

The court declines to declare a new rule in this case. Plaintiffs may carry their initial

burden by proving actual adverse effects directly and are not limited to establishing market

power, as Defendants argue. See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,

No. 13-CV-1111 (JSR), 2013 WL 6311202, at *4 (S.D.N.Y. Dec. 5, 2013) (continuing to use

two-option framework); Habitat, Ltd. v. Art of Muse, Inc., No. 07-CV-2883 (DRH), 2009

WL 803380, at *5 (E.D.N.Y. Mar. 25, 2009) (same). The question then becomes whether, if the

court considers all material facts in the light most favorable to Plaintiffs, they have made a

sufficient showing to suggest that they may be able to prove either that the anti-steering rules

have actual adverse effect on competition or that Defendants have market power.

### C. Actual Adverse Effect

Plaintiffs argue that they will be able to demonstrate actual adverse effect on competition

based on Amex's higher merchant fees (Pls. 56.1 ¶¶ 292-295), and the inability of merchants to

influence those fees. Plaintiffs assert that the anti-steering rules leave merchants unable to

provide information about the cost of various cards, let alone incentives to use a different card, to

customers. This essentially eliminates incentives for the various credit and charge card brands to

compete on price to merchants. (Pls. Opp'n at 10.) Plaintiffs cite evidence of the world before

the anti-steering rules, when card brands engaged in merchant preference campaigns. They

describe a variety of promotions that merchants could use to induce customers to use different

payment forms or different brands of payment card. (Pls. 56.1 ¶ 382.) The possibility of

benefiting from these promotions, and the fear of being left out, would cause payment card

13

brands to compete for preferential treatment from merchants by lowering their prices. (Pls. Opp'n at 4.) If the credit card companies lower their prices, Plaintiffs argue, merchants may also lower the price of consumer goods. (Id. at 10.)

1. Preference Programs

Plaintiffs point to credit card preference programs that were prevalent in the 1990s, before American Express resorted to tighter restrictions on merchants. (Pls. Opp'n at 5.) For example, Visa used a campaign in which it encouraged merchants to put up signs saying "We Prefer Visa." (Pls. 56.1 ¶ 345.) In courting merchants for this campaign, Visa highlighted the higher cost of accepting Amex and that company's slower processing times. (Id. ¶ 346.) Visa's preference program brought some success and was soon copied by Discover, which launched a "We Prefer Discover" campaign with Universal Studios. (Id. ¶¶ 345-351.) MasterCard ran a similar campaign with major league baseball teams, the Professional Golfers Association of America, Pinehurst Resorts, and Travelocity. (Id. ¶¶ 352-353.) In response, American Express launched its own preference campaigns, offering a discount fee reduction to some merchants to discourage their participation in others' campaigns and eventually developed the anti-steering rules. (Id. ¶¶ 354-358.)

Plaintiffs argue that competition among payment card brands through preference campaigns would begin again if these anti-steering rules were lifted. (Id. ¶ 359.) In particular, they cite the deposition of MasterCard's Vice President of Travel and Entertainment Industries, who states that, in the absence of Amex's anti-steering rules, her company would engage in preference campaigns with merchants. (Id. ¶¶ 359-360.) Plaintiffs also offer various examples of other promotions that merchants could run to direct customers towards using lower cost credit and charge cards, eventually driving down prices across the industry. (Id. ¶ 363.)

14

Defendants' primary response to Plaintiffs' evidence is that it is irrelevant because Plaintiffs lack market power. (E.g., Defs. Resp. to Pls. 56.1 ¶¶ 351-360.) They also generally "dispute Plaintiffs' contentions regarding the effect of steering on competition." (Id. ¶ 359.) Defendants note that merchants can already run all sorts of promotions to induce customers to use a payment form other than a credit or charge card, including debit cards. (E.g., id. ¶ 362-363.) Although that argument would be relevant if the market definition in this case included other payment forms, for the purpose of summary judgment, it does not.

2. Value Recapture

In 2005, Defendants started the "value recapture" program, allegedly designed to raise the discount rates paid by merchants. (Pls. Opp'n at 3.) Defendants continued the program until 2011. (Id.) The program targeted specific industries for increased discount rates. (Pls. 56.1 ¶ 510.) Based on their reading of Amex's internal documents, Plaintiffs assert that Amex sought to control the decline in its discount rate that occurred as Amex moved to alter the "mix" of cardmember "spend," away from the travel and entertainment industries, which typically tolerate high discount rates to other areas, such as retail, where rates are lower. (Id. ¶ 518.) Plaintiffs allege that between 2006 and 2009, Amex's "value recapture" program raised the discount rate for merchants representing 65% of its U.S. charge volume, generating an additional $1.3 billion in profit. (Id. ¶ 520.) Further, Plaintiffs note that Defendants scaled back the program after this suit was filed. (Pls. Opp'n at 3.) Defendants respond by arguing the Plaintiffs have taken the wrong approach to calculating the price of Amex's services to merchants and that Defendants' calculations show no price increases. (Defs. Mem. at 20-21; Reply at 9.) They also contend that their higher merchant discount rate reflects superior network services. (Defs. Mem. at 6.)

15

The court finds that Plaintiffs have demonstrated that there is an actual dispute of material fact regarding whether the anti-steering rules have had an actual adverse effect on competition. Even if the court ultimately decides that Amex lacks market power, Plaintiffs' evidence regarding preference programs and price is relevant to the inquiry because it contributes to the court's understanding of actual adverse effect.

### D. Market Power

Although not required to do so, Plaintiffs assert that they can prove that Amex had and exercised market power in the relevant market. "Market power is the ability: '(1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion.'" Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F. Supp. 2d 50, 73 (S.D.N.Y. 2003) (citing AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999)). Defendants respond that proof of market power rests on market share in the relevant market, which is far below what would normally be considered necessary to prove market power. (Defs. Mem. at 12.) Plaintiffs counter that market share is not the only indicator of market power, citing the peculiar nature of the credit card industry and the discussions of the Southern District and Second Circuit in a prior case discussing the same market. (Pl. Opp'n at 11); see United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 336-38 (S.D.N.Y. 2001), modified, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir. 2003).

In that case, the United States sued Visa and MasterCard, arguing that their board structures and rules for issuing banks violated Section 1 of the Sherman Act. After a bench trial, the Southern District concluded that the structures of Visa and MasterCard's boards did not harm competition. Id. at 378-79. However, the court held that the rules for issuing banks that

16

precluded banks that issued Visa or MasterCard payment cards from issuing cards by any other company violated Section 1. Id. at 379. The court found individual violations on the part of both companies, despite MasterCard having only 26% market share, because market share had to be considered in the context of the significant barriers to entry existing in "a highly concentrated market with only four competitors." Id. at 341-342. The court also noted that market power could be evidenced by a defendant's actual conduct, id. at 340, and considered actual price increases and output restrictions, id. at 340, 342. The court also took into account customer insistence on using certain payment cards, noting that such insistence allowed differential pricing. Id. at 341.

The Second Circuit largely ratified the district court's approach. It agreed that Visa and MasterCard had market power both jointly and separately, despite MasterCard's comparatively low market share. See United States v. Visa U.S.A., Inc., 344 F.3d 229, 239 (2d Cir. 2003). And it noted, consistent with Todd and K.M.B. Warehouse, that market power can either be demonstrated through specific conduct or presumed if a defendant holds a large enough market share. Id. The court also looked to what it termed "customer preference," which it agreed could prevent merchants from refusing to accept Visa or MasterCard, even in the face of significant price increases, as well as to evidence of those price increases. Id. at 240.

Defendants correctly point out that the instant case involves accusations of vertical restraints of trade, but Visa was about horizontal restraints. (See Defs. Mem. at 19.) Nevertheless, Visa still provides useful guidance for the limited purpose of understanding how a court might determine market power in this particular two-sided market.

17

For the purposes of this motion, the basic facts relating to Amex's market share are not in dispute.[3] But the factors that the court may consider relevant to market power extend beyond market share—notably to Plaintiffs' customer insistence theory and to questions regarding the price of accepting Amex cards. Facts relating to these issues remain in dispute.

1. Insistence

Plaintiffs argue that so-called customer "insistence" amplifies Amex's market power because it restricts merchant ability to discontinue accepting Amex cards and paying the attendant fees. Amex defines insistence as the percentage of customers who would refuse to shop at a merchant refusing to accept Amex cards. (Pls. 56.1 ¶ 481.) It estimates this number to be 38% of cardmembers. (Id.) Plaintiffs allege that, because merchants are prohibited from negotiating with cardmembers under the anti-steering rules, cardmembers have nearly complete control over how much of Defendants' service the merchants will purchase. (Pls. 56.1. ¶¶ 484-487.) As a result, they argue, cardmember insistence is an integral component of Defendants' market power. (Pls. Opp'n at 16.)

Plaintiffs further argue that Defendants recognize the power that insistence gives them in pricing their processing services for merchants. They treat this recognition as evidence that insistence contributes to market power. (Id. at 17.) They point to the deposition of Edward Gilligan, Amex's Vice-Chairman, who noted that high rates of insistence allowed Amex to charge "a premium discount rate." (Pls. 56.1 ¶ 484.) Amex's surveys seeking to quantify

---

[3] Plaintiffs note that, in 2012, Amex accounted for 26.4% of general purpose credit and charge card volume. (Pls. 56.1 ¶ 309.) This volume would put it in second place among card issuers, behind Visa, which has 44.1% of purchase volume, and ahead of MasterCard and Discover, with 24% and 5.5% respectively. (Pls. 56.1 ¶ 310.) Amex had similar market share in other recent years, and somewhat lower market share in the early 2000s and mid-to-late 1990s. (Id. ¶¶ 312-313.) For the purposes of this motion, Defendants do not dispute these figures. (Defs. Resp. to Pls. 56.1 ¶¶ 309-313.) The parties also put forward other measures of market share. For instance, Plaintiffs report that Amex cards were accepted by 80% of U.S. merchants in 2010. (Pls. 56.1 ¶ 317.) But Defendants point out that in 2009, Amex cards were accepted at only 60% as many merchants as accept Visa and MasterCard. (Defs. 56.1 ¶ 24.) Amex also has the smallest number of credit and charge cards in circulation. (Id. ¶ 19.)

customer insistence also form part of the basis on which it sets its price. (Id. ¶¶ 497(a), 498-499.) Plaintiffs state that Amex emphasizes insistence in its negotiations with merchants and provide specific examples of businesses including large grocery store chains, national pharmacy chains, a cruise line, and major airlines, with whom Amex has used insistence to argue for acceptance of its card and maintenance of its discount rate. (Id. ¶¶ 501-509.) Plaintiffs further allege that Defendants increase insistence by essentially "paying cardmembers to use their cards more" through its rewards programs. (Id. ¶ 489.) Corporate cardmembers are among the most insistent, and so merchants that serve those customers are the least able to negotiate with Amex to reduce their payments. (Id. ¶ 494.)

Defendants counter that "insistence" is, at bottom, merely brand loyalty. Defendants point out that brand loyalty, even of the type that results in undeniably high market share, does not equate to market power. (Defs. Mem. at 14.) Indeed, Defendants maintain that they cannot have market power because they must earn cardmember loyalty by offering better services and rewards. (Defs. Mem. at 15-16.) They also point out that very few consumers carry only Amex cards. (Summ. J. Oral Arg. Tr. 15:16-18, Mar. 19, 2014.) In this vein, Defendants cite United States v. Eastman Kodak, in which the Second Circuit upheld the district court's ruling that Kodak did not possess market power in the worldwide market for film as a result of strong consumer loyalty. 63 F.3d 95, 108 (2d Cir. 1995). Even though customer loyalty gave Kodak a 67% market share in the United States, the Circuit declined to define a more limited, U.S.-only market, even though the U.S. Government contended it had evidence of differential pricing. Id. at 105. Defendants also cite tying cases for the proposition that brand loyalty is not sufficient to establish market power. (Defs. Mem. at 14 (citing Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 90-1547, 1991 WL 149249 (3d Cir. Aug. 9, 1991) on reargument, 959 F.2d 468

19

(3d Cir. 1992); Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 799 (1st Cir. 1988)).) However, these examples have limited applicability to the present case.

As Defendants and Plaintiffs both acknowledge, merchants make the choice to accept Amex cards largely based on what they think their customers will do. (Defs. 56.1 ¶ 5; Pls. 56.1 ¶ 5.) Brand loyalty on behalf of cardmembers is thus relevant to this discussion, but, because it is loyalty on the consumer side of the two-sided market, it proves much less. The Second Circuit's primary reason for finding that brand loyalty did not translate to market power in Kodak was that consumers were price sensitive, and could easily purchase film from one of the company's competitors. 63 F.3d at 108. This analysis has limited application here because merchants do not choose how much of Amex's services they purchase, nor, for that matter, do they determine how much they will purchase from Amex's competitors. (See Pls. 56.1 ¶¶ 323-325; see also Pls. Opp'n at 20 (arguing that one form of competition cannot be substituted for another).)

Although the significance of cardmember insistence is an issue for trial, the court is not convinced that it may be dismissed as merely brand loyalty or that cases involving consumer loyalty in a one-sided market can apply directly to the instant case.

2.  Price Increases

Insistence, Plaintiffs argue, allowed Defendants to implement the "value recapture" program of incremental price increases discussed above. (Pls. 56.1 ¶¶ 530-35, 546.) They allege that the success of this program demonstrates Defendants' market power. (Pls. Opp'n at 3.) However, Plaintiffs and Defendants disagree about how to calculate price in the relevant market. In particular, Defendants argue that two-sided price should take into account expenses associated with rewards offered to consumers. (Defs. Mem. at 20-21; Reply at 9.) Their calculations show

a slight decrease, rather than an increase, in price from the early 2000s through 2010 or 2011. (Defs. Mem. at 23-24; Defs. 56.1 ¶ 221.) Defendants assert that their expenses for cardmember rewards increased substantially during the time period covered by the "value recapture" program. (Defs. 56.1 ¶¶ 203-07.) Finally, they argue that Plaintiffs fail to show that Amex charges a higher two-sided price than its competitors. (Id. at 21.) The disagreement between Plaintiffs and Defendants over how to calculate price in this two-sided market raises an issue of material fact that must be decided at trial.

### 3. Price Discrimination

Plaintiffs also assert that Defendants' market power is illustrated by their ability to price discriminate by charging different discount rates to merchants in different industries. (See Pls. 56.1 ¶ 290.) Plaintiffs' allegations of price discrimination are also integral to the viability of their alleged Travel and Entertainment submarket—which is subject to higher prices purportedly created by especially strong customer insistence in that industry. (Id. ¶ 500.)

However, Defendants sensibly caution that price discrimination does not always demonstrate market power and that the Supreme Court has recognized a shift away from treating price discrimination as evidence of non-competitive market conditions. (Defs. Mem. at 22 (citing Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 44-45 (2006).) One can make a strong argument that in this and other industries with high up-front costs and low marginal costs, such as the airline industry or the software industry, price discrimination can coexist with a high degree of competition. See Ill. Tool Works, 547 U.S. at 45 (price discrimination occurs in fully competitive markets); William J. Baumol, Daniel G. Swanson, The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria of Market Power, 70 Antitrust L.J. 661, 674-76, 682-83 (2003). Despite these concerns, the court need not decide

now whether or not price discrimination in this instance reflects a lack of competition. This dispute, too, reflects a dispute of material fact to be resolved after trial.

*     *     *

Although market share is an important part of determining whether Defendants have market power, it is not the only component. The court may also consider factors such as cardmember insistence, price increases, and price discrimination. Moreover, Plaintiffs allege a possible submarket in which Defendants would have significant market share. This allegation and issues related to how to characterize insistence, whether Amex raised its prices, and whether price discrimination reflects marker power, are all subject to disputes of fact appropriate for resolution at trial. As a result, summary judgment is inappropriate with regard to Defendants' market power.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is DENIED. Defendant's reading of <u>Leegin</u> asks the court to go against clearly stated Second Circuit law allowing an antitrust plaintiff the option of proving either actual adverse effect or market power, without any indication from the Supreme Court or Second Circuit that it must do so. The court declines this invitation. The remaining issues, including whether Plaintiffs may ultimately succeed in proving that Defendants' anti-steering rules have actual adverse effect on competition and whether Defendants have market power, raise questions of material fact. Summary judgment is thus inappropriate.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     May 7, 2014

NICHOLAS G. GARAUFIS
United States District Judge

22