UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

Defendants.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**10-CV-4496 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pursuant to the court's pretrial scheduling order, on March 26, 2014, the parties to the this action filed seven motions in limine seeking to exclude various evidence pursuant to Federal Rules of Evidence 402, 403, and 702. Specifically, the United States of America and state attorneys general ("Plaintiffs") move to exclude the following evidence expected to be proffered by Defendants American Express Company and American Express Travel Related Services Company, Inc. ("American Express" or "Amex"): (1) the regressions and associated analysis offered by Dr. Janusz Ordover (Dkt. 325); (2) the results of Amex's U.S. Core Survey or testimony based thereon (Dkt. 327); (3) evidence relating to putative free-riding on merchant analytics and other expenditures by Amex (Dkt. 331); (4) survey data relied upon by Dr. Kevin Keller (Dkt. 333); (5) Dr. George Hay's rate of return analysis and opinions based thereon (Dkt 336); and (6) the market definition analysis offered by Drs. George Hay and B. Douglas Bernheim (Dkt. 338.) For its part, American Express moves to exclude the opinions and testimony of Plaintiffs' expert Ann Schmitt. (Dkt. 329.)

For the reasons set forth below, Plaintiffs motions are DENIED in their entirety and a decision on Defendants' motion is RESERVED.

## I.    LEGAL STANDARD

### A.    Motions in Limine

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (citations and internal quotation marks omitted). "When evidence is challenged on an in limine motion, it should only be precluded when it is 'clearly inadmissible on all possible grounds.'" S.E.C. v. Tourre, 950 F. Supp. 2d 666, 675-76 (S.D.N.Y. 2013) (citation omitted). Rulings on such motions are necessarily preliminary, however, and the determinations contained herein may be "subject to change as the case unfolds." Luce v. United States, 469 U.S. 38, 41 (1984); see Tourre, 950 F. Supp. 2d at 676; Highland Capital Mgmt. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).

### B.    **Daubert** Motions

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony, providing that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also id. Advisory Comm. Note (2011) (noting the 2011 Amendments to Rule 702 were purely stylistic). The court is charged with "the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert v.</u>

<u>Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993). To determine the reliability of proffered

testimony, "the district court should consider the indicia of reliability identified in Rule 702,"

<u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32, 48 (2d Cir. 2004), along with other factors, including

those identified in <u>Daubert</u>: (1) whether the theory or technique can be (and has been) tested; (2)

whether the theory or technique has been subjected to peer review or publication; (3) in the case

of a particular scientific technique, the known or potential rate of error and the existence and

maintenance of standards controlling the technique's operation; and (4) "general acceptance."

<u>Daubert</u>, 509 U.S. at 593-94.

 The above factors are neither exclusive nor dispositive, <u>id</u>. at 594-95, and do not

necessarily apply to every expert or every case, <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S.

137, 139 (1999). Yet to justify the "wide latitude" afforded expert witnesses "to offer opinions,

including those that are not based on firsthand knowledge or observation," <u>Daubert</u>, 509 U.S. at

592, Rule 702 requires the court to act as a gatekeeper and ensure "that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field."

<u>Kumho Tire Co.</u>, 526 U.S. at 152. The district court has "the same broad latitude when it

decides *how* to determine reliability as it enjoys in respect to its ultimate reliability

determination." <u>Id.</u> at 142.

 The burden of demonstrating that an expert's testimony is admissible rests with the

proponent of that testimony. <u>See</u> <u>Daubert</u>, 509 U.S. at 592; Fed. R. Evid. 702 Advisory Comm.

Note (2000). The Second Circuit's standard for admissibility of expert testimony is "especially

broad," <u>Clarke v. LR Sys.</u>, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002) (collecting cases), and the

rejection of expert testimony is "the exception rather than the rule," id. (quoting Fed. R. Evid. 702 Advisory Comm. Note (2000)). "Since Rule 702 embodies a liberal standard of admissibility for expert opinions, Nimely v. City of New York, 414 F.3d 381, 395-96 (2d Cir. 2005), the assumption the court starts with is that a well-qualified expert's testimony is admissible," In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). The court nonetheless serves an important "gatekeeping" role. Nimely, 414 F.3d at 395.

Disputes as to the strength of an expert's credentials, faults in the use of a methodology, or lack of textual authority for an opinion go to "the weight, and not the admissibility" of an expert's testimony. McCollock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995); see also Latino Officers Ass'n v. City of New York, No. 99-CV-9568 (LAK), 2003 WL 21638165, at *2 (S.D.N.Y. July 14, 2003) (finding that argument relating to expert's reliance on incorrect assumptions goes to weight of evidence, not admissibility); Blue Cross & Blue Shield, Inc. v. Philip Morris, Inc., 141 F. Supp. 2d 320, 324 (E.D.N.Y. 2001) (opposing counsel has wide latitude on cross-examination to "probe the [expert] witness's qualifications, experience and sincerity; weaknesses in the opinion's basis, the sufficiency of assumptions, as well as the strength of the opinion" (internal quotation marks and citation omitted)). Moreover, the Daubert "dynamic is slightly altered in a bench trial" as there is little risk that the factfinder will be "bamboozled" by technical evidence of questionable merit. Joseph S. v. Hogan, No. 06-CV-1042, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011); see also Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc., No. 09-CV-5935 (MEA), 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) ("When the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may 'have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." (citation omitted));

4

<u>Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC</u>, No. 07-CV-5804
(GEL), 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in
prospect, resolving <u>Daubert</u> questions at a pretrial stage is generally less efficient than simply
hearing the evidence . . . .").

## II.    PLAINTIFFS' MOTIONS IN LIMINE

### A.    Regressions and Related Analysis Conducted by Dr. Janusz Ordover

Plaintiffs first move to exclude the regression analyses[1] conducted by Defendants' expert
Dr. Janusz Ordover, including any related testimony or opinions, as they do not meet accepted
econometric standards and thus are unreliable. (Pls. Mem. of Law in Supp. of Ordover Mot.
("Ordover Mot.") (Dkt. 326-1) at 1, 3-4.) By these regressions, Dr. Ordover purports to show a
positive causal relationship between the proportion of merchants that accept Amex cards and the
share of cardholders' total spending that is done with their Amex card(s) (i.e., the "share of the
wallet"); or, in other words, that Amex's credit and charge card business is subject to network
effects. (Defs. Mem. of Law in Opp'n to Ordover Mot. ("Ordover Opp'n") (Dkt. 353-1) at 2; <u>see
also</u> Sur-Rebuttal Expert Report of Janusz A. Ordover, dated July 3, 2013[2] ("Ordover III") ¶¶ 30,
48, 56, 141-159.) For the reasons set forth below, Plaintiffs' motion is denied.

---

[1]   Multiple regression analysis is a commonly used "statistical tool for understanding the relationship between two
or more variables." <u>In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.</u>, 256 F.R.D. 82, 95 (D.
Conn. 2009) (quoting Daniel L. Rubinfeld, <u>Reference Guide on Multiple Regression</u> 181 (Federal Judicial Center,
2d ed. 2000)). This approach enables "social scientists to determine the influence that various independent,
predetermined factors (so-called 'independent variables') have on an observed phenomenon (the so-called
'dependent variable')." <u>Ottaviani v. State Univ. of N.Y.</u>, 875 F.2d 365, 366-67 (2d Cir. 1989); <u>see</u> <u>Bonton v. City
of New York</u>, No. 03-CV-0833 (SAS), 2004 WL 2453603 (S.D.N.Y. Nov. 3, 2004) ("A multiple regression
analysis is a statistical tool for determining the effect of two or more explanatory variables on a variable to be
explained, called the dependent variable.").

[2]   Relevant excerpts are appended to the Declaration of Eric Brenner in Opp'n to the Ordover Mot., dated April 17,
2014, as Exhibit 2. (Dkt. 353-4.)

Plaintiffs urge the court to exclude Dr. Ordover's regressions on the grounds that his analysis was based on inappropriate variables, or "weak instruments" in econometric terms,[3] and thus deviated from standard practices in his field. (Ordover Mot. at 1, 3-4.) This flaw, Plaintiffs argue, is readily demonstrable using a metric known as an "F-statistic," which is used to "help[] the researcher avoid basing inference on unreliable statistics." (Id. at 3 (quoting William H. Greene, Econometric Analysis 250 (7th ed. 2012)).) They note that an F-statistic of 10 or less signals a potential problem with weak instruments and an F-statistic of 5 or less is "a sign that the instrumental variable estimator can be severely biased" which could lead to inaccurate conclusions. (Id.) Dr. Michael L. Katz, Plaintiffs' rebuttal expert, calculated the F-statistics for Dr. Ordover's regressions for the years 2009 and 2010 and found that "almost all of Dr. Ordover's regression failed the F statistic test." (Id.; see also Supp'l Report of Michael L. Katz, dated Aug. 19, 2013[4] ("Katz IV") ¶¶ 14-15 & tbl.3.) Because these results indicate the presence of "weak instruments," and because Dr. Ordover did not make appropriate corrections to the data set relied upon, Plaintiffs contend the expert did not reliably apply standard econometric practices in executing the regressions and that any testimony based thereon should be excluded as unreliable under Rule 702. (See Ordover Mot. at 4.)

Defendants oppose the motion, arguing that Dr. Ordover's regressions were reliably executed and that his findings are properly admitted under Rule 702. (Ordover Opp'n at 2-3.) They note that even if Plaintiffs' concerns regarding F-statistics were valid, Dr. Ordover

---

[3] To deal with the issue that "Amex's share of merchants and Amex's share of local consumers' spending are jointly determined"—or, put differently, that the two dependent variables in Ordover's regressions affect one another—Dr. Ordover also used an "instrumental variable" or "IV" approach in his regressions. (Ordover III ¶ 149.) The use of appropriate variables in an IV regression enabled Dr. Ordover to "isolate the effects of spend share on merchant share and vice versa." (Id.; Ordover Mot. at 4.) However, an instrument is appropriate only if it "directly influences only one of the dependent variables of interest." (Id.)

[4] Relevant excerpts are appended to the Declaration of Joseph P. Vardner in Supp. of the Ordover Mot. ("Pls. Ordover Decl."), filed March 26, 2014, as Exhibit 5 (Dkt. 326-3).

obtained similar results in other regressions not subject to this criticism and that his analyses yielded "at least one strong F-statistic in every specification, every year, and every equation in his regressions." (Id.) In any case, Amex argues, Plaintiff's concerns regarding the relative strength or weakness of the instruments relied upon by Dr. Ordover go to the probative weight the court ultimately will afford his findings, not their admissibility. (Ordover Opp'n at 3, 8-9.)

The court agrees with American Express. Plaintiffs do not, and indeed cannot, contend that multiple regression analysis is not itself a well-established and reliable econometric methodology frequently relied upon by federal courts under Rule 702. See, e.g., Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (collecting cases for proposition that regression analysis is "well-established as reliable" and has been accepted by numerous courts as "'a mainstream tool in economic study'" (citation omitted)). They instead challenge the reliability and predictive value of Dr. Ordover's specific regressions by claiming that he chose instruments that are "not sufficiently strong." (Ordover Opp'n at 3.) Yet as the Supreme Court has explained, such flaws normally "affect the analysis' probativeness, not its admissibility." Bazemore v. Friday, 478 U.S. 385, 400 (1986). There may, however, "be some regressions so incomplete as to be inadmissible as irrelevant." Id. at 400 n.10 (1986); see also Bickerstaff v. Vassar Coll., 196 F.3d 435, 449 (2d Cir. 1999); Floyd v. City of New York, 861 F. Supp. 2d 274, 289 (S.D.N.Y. 2012) ("The question, then, is whether [the expert's regression] analysis is so incomplete as to be irrelevant or so misleading as to be unhelpful to the [factfinder]."). That is not the case here.

The F-statistics calculated by Dr. Katz, which comprise the sole support for Plaintiffs' motion, do not establish that Dr. Ordover's methodological choices were so unsound or flawed as to render his analysis fundamentally unreliable. See In re Vitamin C Antitrust Litig., No. 06-

7

MD-1738 (BMC), 2012 WL 6675117, at *9 (E.D.N.Y. Dec. 21, 2012). Plaintiffs do not cite any authority to support exclusion of the regressions on the basis of F-statistics alone (Ordover Opp'n at 3), and indeed acknowledge that there exists no econometric rule dictating what particular F-statistic values demonstrate the use of weak instruments or what values necessarily render an analysis unreliable. (Ordover Mot. at 3-4 (noting that an F-statistic of 5 or less "is a sign that the instrumental variable *can* be severely biased," not that it *is* biased (emphasis added)); see also Pls. Ordover Decl., Ex. 2 (Ordover Dep. Tr., Aug. 2, 2013) at 885:5-894:4 (discussing implications of low F-statistics and Dr. Ordover's confidence that the regressions are econometrically sound).) Indeed, Plaintiffs' own expert has acknowledged that "there exists no bright-line standard to differentiate strong from weak instruments." (Katz VI ¶ 15.) To the extent Plaintiffs reference the "typical[]" F-statistic signposts of $F < 10$ and $F < 5$ as signaling a problem with Dr. Ordover's regressions, it is also clear that their critique does not implicate all 36 of the regressions at issue in their motion:[5] Dr. Katz's calculations show that 12 regressions had an $F$ value above 10, 23 had $F$ values above 5, and that an $F$ value of 10 or greater was obtained for nearly every specification, equation, and year analyzed. (See Katz IV at tbl.3.)

Even if the court were to accept Plaintiffs' F-statistic argument on its face, such concerns go to the probative weight of the regressions and not their admissibility under Rule 702. See In re Elec. Books Antitrust Litig., No. 11-MD-2293 (DLC), 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) ("'A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method' does not itself require exclusion . . . ." (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir.2002))). At worst, according to Dr. Katz, the low F-statistics calculated for Dr. Ordover's regressions "cast serious doubt on the results of [Dr.

---

[5] In full, Dr. Ordover conducted 42 regressions in preparing his Sur-Rebuttal Report (Ordover III at 85; Ordover Opp'n at 7 n.4), but Dr. Katz did not calculate F-statistics for Ordover's "unweighted" baseline specification (id.)

Ordover's] study." (Katz IV ¶ 15.) To the extent the F-statistics calculated by Dr. Katz indicate the use of "problematic" instruments or instruments that may be susceptible to bias (see id.; Ordover Mot. at 3-4), these concerns are more appropriately explored through "[v]igorous cross-examination" and the "presentation of contrary evidence," rather than the severe remedy of exclusion. Daubert, 509 U.S. at 596 (denoting the "traditional and appropriate means of attacking shaky but admissible evidence"). Should Plaintiffs wish to impugn the reliability of Dr. Ordover's regressions or associated testimony by, for example, challenging his justifications for choosing particular instruments (see Ordover III ¶¶ 150-151, 153-154) or the thoroughness of the "robustness check" he applied in preparing his analyses (see id. ¶ 152; Ordover Opp'n at 2), they will have adequate opportunity to do so at trial.

On the basis of F-statistics alone, however, the court does not find that Dr. Ordover's analysis is plagued by the type of overt flaws that would render the regressions so unsound as to be irrelevant and unhelpful to the court in considering the issues before it in this case. Accordingly, the motion is DENIED.

**B.      U.S. Core Survey Data & Related Opinions of Dr. Ordover**

Plaintiffs additionally move the court to exclude data derived from the U.S. Core Survey conducted by American Express, as well as the related opinions of Dr. Ordover, on the grounds that Defendants' expert was provided only partial results from the survey and thus failed to consider the full set of available data in forming his opinions. (Pls. Mem. of Law in Supp. of Mot. to Exclude, or Alternatively to Require Production of, Evidence Concerning Omitted Amex Survey Data ("Core Survey Mot.") (Dkt. 334-1) at 1, 4-6.) Should the court decline to exclude this evidence, Plaintiffs alternatively request that the court direct Amex to produce the missing results and permit its admission under Federal Rule of Evidence 106. (Id. at 1, 6-7.) For the reasons set forth below, the motion is denied in both respects.

9

The U.S. Core Survey was undertaken on Amex's behalf by a third-party vendor between July 2012 and January 2013. (See Decl. of Joseph P. Vardner in Supp. of Core Survey Mot., Ex. 2 ("U.S. Core Survey Results") (Dkt. 334-3) at 1.) In the relevant sections of the survey, Amex cardholders and non-cardholders alike were asked a series of questions relating to merchant acceptance of various cards and their resulting opinions of those merchants. (Id., Ex. 1 ("U.S. Core Survey Questionnaire") at 28.) Specifically, Question E1 asked cardholders whether in the last six months they had encountered either merchants who did not accept their cards or who employed various steering practices (i.e., minimum purchase amounts, surcharges, verbal preferences for different cards, or spending caps). (Id.; see also Core Survey Mot. at 1-2.) If respondents answered in the affirmative, Question E2 then asked how the non-acceptance or steering practices they encountered affected their opinions of those merchants. (U.S. Core Survey Questionnaire at 29.) While the survey results are cited in Dr. Ordover's initial and sur-rebuttal reports, as discussed below, he testified at his deposition that he did not request that Amex conduct the survey, have any input regarding its design, or approve its contents. (Decl. of Eric Brenner in Opp'n to Core Survey Mot. ("Defs. Core Survey Decl."), Ex. 1 (Ordover Dep. Tr., Aug. 2, 2013) (Dkt. 357-3) at 952:4-21.)

Plaintiffs contend that the results of the U.S. Core Survey, including any related conclusions or opinions, should be excluded under Rule 702 and Daubert because Dr. Ordover was not provided with the full set of survey results and thus did not consider "highly relevant evidence" in forming his opinions. (Core Survey Mot. at 4-6.) Specifically, the survey results produced by Amex in discovery and provided to Dr. Ordover contained aggregate data for the non-acceptance response in Question 1E and the merchant opinion responses for Question E2, but did not contain any data for Question 1E's steering-related responses. (U.S. Core Survey

Results at 13-14; see also Core Survey Mot. at 2-3 & n.2.) Asserting that "steering issues are at the heart of this case," Plaintiffs argue that because Dr. Ordover had received the questionnaire used in the survey and thus knew it inquired into steering-related issues, he ignored highly pertinent data in forming his opinions and therefore did not exercise "'the same level of intellectual rigor that characterizes the practice of an expert in the field.'" (Id. (quoting Amorgianos, 303 F. 3d at 265-66); see also id. (accusing Amex of providing "cherry-picked partial results from the survey to Dr. Ordover"). American Express opposes the motion, maintaining that it provided Dr. Ordover with all data it received from its vendor (which it acknowledges did not include the steering data), that the data cited by Dr. Ordover related only to non-acceptance and did not concern steering, and that in any case Plaintiffs' critiques go to the weight of the evidence and may be explored on cross-examination. (Defs. Mem. of Law in Opp'n to Core Survey Mot. ("Core Survey Opp'n") (Dkt. 357-1) at 5-6.)

In the court's view, Plaintiffs' objections to the U.S. Core Survey and related opinions are insufficient to warrant exclusion under Rule 702 and Daubert. At the outset, Plaintiffs offer no meaningful argument as to why the partial set of results produced by Amex and cited in Dr. Ordover's reports should be deemed inadmissible. According to American Express, it conducted the U.S. Core Survey in the ordinary course of business and the results it received from its vendor—which was the same document it provided to Dr. Ordover—constituted a business record. (See Core Survey Opp'n at 4-5; May 8, 2013, Ltr. (Dkt. 268-1) at 1 (opposing motion to compel same data).) Plaintiffs give the court no cause to question either Amex's characterization of this document or Dr. Ordover's testimony that he had no involvement whatsoever in the design or execution of the survey. (Ordover Dep. Tr., Aug. 2, 2013, at 952:4-21.)

Plaintiffs' arguments concerning the related opinions of Dr. Ordover similarly do not justify exclusion. First, Dr. Ordover's reliance on the U.S. Core Survey is exceedingly limited; he cites the non-acceptance data for Question E1 as support for the general proposition that Amex cards are subject to lower merchant acceptance rates when compared to Visa cards.[6] (Defs. Core Survey Decl., Ex. 2 (Expert Report of Janusz A. Ordover, dated Apr. 2, 2013 ("Ordover I")) (Dkt. 357-4) ¶ 37 ("In 2012, 54% of surveyed Amex cardmembers had been in a situation during the prior 6 months where the merchant did not accept Amex, more than five times the percentage of non-Amex cardholders who experienced non-acceptance of Visa."); see also id. ¶ 51 (citing same statistics); Ordover III[7] at ¶ 62 (citing same statistics).) The steering responses in Question IE, therefore, do not appear to have any bearing on either the data relied upon by Dr. Ordover or the conclusion he drew from those non-acceptance rates. Further, Dr. Ordover cannot be said to have willfully "turn[ed] a blind eye to highly relevant evidence" (Core Survey Mot. at 5) as the missing survey data was not in the discovery record and was neither reviewed nor considered by Dr. Ordover; he could not have known whether or not that data was inconvenient, contradictory, or otherwise material to the relevant conclusions. Cf. In re Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 425-26 (S.D.N.Y. 2005) (excluding expert opinions on the grounds that the witnesses ignored information they *knew* to be contrary to their conclusion).

Put simply, the court declines to exclude Dr. Ordover's opinions based on what the omitted survey data *might* have shown about steering practices, particularly where it would not

---

[6] Though not mentioned by Plaintiffs, Dr. Ordover also cites the U.S. Core Survey for the proposition that Amex cardholders who frequently use their cards responded that they would be more loyal to a merchant if that merchant accepts American Express cards. (Ordover I at ¶ 46; see also Core Survey Opp'n at 3 n.2.) However, the data relied upon by Dr. Ordover in this regard is derived from Section B of the survey and thus has no relation to the steering issues raised in Section E.

[7] Relevant excerpts of Ordover III are appended to the Defs. Core Survey Decl. as Exhibit 3.

have affected the information actually relied upon by the expert.[8] To the extent Plaintiffs wish to question the reliability of the study itself, the sufficiency of the evidence underlying Dr. Ordover's opinions, or whether the expert believes the missing data would have been useful in forming his conclusions, Plaintiffs have themselves acknowledged that this may be accomplished during cross-examination of the expert at trial. (Oral Arg. Tr., May 14, 2013 (Dkt. 269) at 11:14-12:6; see also Core Survey Opp'n at 5-6.)

In the alternative, Plaintiffs' request that the court direct Amex to produce the missing survey data and permit its admission into evidence pursuant to Rule 106. (Core Survey Mot. at 6-7.) This is not the first time Plaintiffs have sought to compel production of this data, however. On May 7, 2013, Plaintiffs filed a motion to compel the full set of results for the U.S. Core Survey before Magistrate Judge Ramon E. Reyes, Jr., accusing Amex of intentionally withholding the omitted data from Plaintiffs and "cherry-pick[ing] certain results for its expert." (Mot. to Compel (Dkt. 267).) Judge Reyes denied the motion on May 14, 2013, holding that Amex's discovery obligations under Federal Rule of Civil Procedure 26 did not require production of information that was not put before the expert and thus was not considered. (Oral Arg. Tr., May 14, 2013, at 12:7-10, 15:14-21 (relying on In re Google Adwords Litig., No. C08-03367 (JW), 2010 WL 5185738, at *4-5 (S.D. Cal. Dec. 8, 2010)).) Plaintiffs chose not to move for reconsideration of Judge Reyes' ruling before this court. The instant motion, therefore, is little more than an attempt to relitigate the same issue Judge Reyes already decided in Amex's favor, and it is rejected as such. Even if this were not the case, the court concurs in Judge Reyes' finding that Rule 26 does not require production of data that was neither received nor considered

---

[8] In addition to the steering data for Question E1, Plaintiffs also recite numerous other questions in the U.S. Core Survey for which data was not produced during discovery or given to Dr. Ordover. (Core Survey Mot. at 3.) For the same reasons set forth in this section, however, the court finds that this criticism goes to the weight of the evidence and is better addressed through cross-examination than in a motion in limine.

by Dr. Ordover and that is unrelated to the conclusion for which the U.S. Core Survey results were used.[9]

Accordingly, Plaintiffs' motion to exclude the U.S. Core Survey and Dr. Ordover's related opinions, including the alternative request to compel production of the omitted survey data, is DENIED.

### C. Evidence of Putative Free-Riding on Merchant Analytics and Certain Other Expenditures by Amex

Plaintiffs also move to exclude any testimony relating to Defendants' anticipated pro-competitive justification that the restraints at issue are necessary to prevent free-riding by merchants and other card networks on Amex's expenditures on its merchant analytics, rewards programs, and other cardholder services. (Pls. Mem. of Law in Supp. of Mot. to Exclude Testimony Relating to Putative Free-Riding ("Free-Riding Mot.") (Dkt. 332-1) at 1.) They argue that these particular types of free-riding are legally and factually impossible, and thus that any related testimony offered by Defendants is irrelevant and inadmissible under Federal Rules of Evidence 401 and 402. (Id. at 3-7.) For their part, Defendants counter that their economic experts have considered the arguments raised in Plaintiffs' motion and concluded that the services at issue are indeed subject to free-riding. (Defs. Mem. of Law in Opp'n to Free-Riding Mot. ("Free-Riding Opp'n") (Dkt. 354-1).)

---

[9] See Thieriot v. Jaspan Schlesinger Hoffman LLP, No. 07-CV-5315 (TCP), 2011 WL 4543308, *3-4 (E.D.N.Y. Sept. 29, 2011) (concluding that Rule 26(a)(2)(B) requires disclosure of "information that was relied upon [by the expert] in forming their opinions, as well as 'information that was not relied upon, but was *considered* by the expert.'" (emphasis added) (citation omitted)); Ordon v. Karpie, 223 F.R.D. 33, 35 (D. Conn. 2004) (noting Rule 26(a)(2)(B) requires disclosure of "what the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions" expressed (internal quotation marks and citation omitted)). (See also Core Survey Mot. (acknowledging "Dr. Ordover did not receive the missing survey data" and thus did not consider any data beyond that provided in the results spreadsheet produced by Amex); Ordover Dep. Tr., Aug. 2, 2013 at 945:16-948:21.) Additionally, to the extent Plaintiffs rely on Federal Rule of Evidence 106, that is a rule of admissibility and does not operate to expand the scope of a party's discovery obligations. See Clark v. United States, No. 13-490C (VJW), 2014 WL 128614, at *2 (Fed. Cl. Jan. 6, 2014) (rejecting contention that Rule 106 may be used as a discovery tool to compel production of evidence); Abbot Labs. V. Andrx Pharms., Inc., No. 05-CV-1490, 2006 WL 2092377, at *8 (N.D. Ill. July 25, 2006).

The court declines Plaintiffs' invitation to determine the merits of one of Defendants' key defenses on the eve of trial, even if that invitation extends only to certain types of free-riding. Had Plaintiffs wished to foreclose these particular lines of argument prior to trial—of which they were admittedly aware (see Free-Riding Mot. at 2)—they could have pursued partial summary judgment at the appropriate time. Additionally, the standard for relevance under Rule 401, upon which this motion is predicated, is "not high." United States v. Southland Corp., 760 F.2d 1366, 1375 (2d Cir.1985); Kansas City Fire & Marine Ins. Co. v. Long Island Power Auth., No. 05-CV-4944 (AKT), 2007 WL 7034284, at *9 (E.D.N.Y. Nov. 23, 2007); see Fed. R. Evid. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and the "fact is of consequence in determining the action"). Given the evident disagreement among the parties as to whether free-riding on Amex's expenditures on merchant analytics, rewards programs, and other services is possible and whether it justifies the anti-steering restraints (see Free-Riding Opp'n at 9-17), the court cannot conclude at this stage that the testimony to be proffered by Defendants will have no tendency to prove the existence of this particular pro-competitive justification and thus declines to find that the evidence is irrelevant at this stage. See Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc., No. 01-CV-3796 (PJL), 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005) ("Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."); Banushi v. Palmer, No. 08-CV-2937 (KAM), 2011 WL 13894, at *1 (E.D.N.Y. Jan. 4, 2011) (same).

Further, as this case will proceed to a bench trial, the court will have the benefit of considering the relevance of the disputed testimony in the context of the full evidentiary record. Should it decide at that time that Defendants' free-riding evidence is irrelevant as either a legal

or factual matter, it is fully capable of disregarding the evidence at that time. See Luce v. United States, 469 U.S. 38, 41-42 (1984) (noting that a court's decision on a motion in limine may be revisited at trial and is "subject to change when the case unfolds"); Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 424 (S.D.N.Y. 2004); see also Commerce Funding Corp., 2004 WL 1970144, at *5 ("While standards for admissible evidence are not 'out the window entirely' in a bench trial, 'all doubts at a bench trial should be resolved in favor of admissibility.'" (citations omitted)). Plaintiffs' motion to exclude testimony relating to putative free-riding therefore is DENIED.

### D. Litigation Survey Conducted by Dr. Kevin Lane Keller

Plaintiffs next move to exclude the litigation survey conducted by Dr. Kevin Keller (the "Keller Survey"), which is offered as support for his conclusion that steering by only a few merchants will cause "brand damage" to American Express and ultimately harm both Amex cardholders and competition in the relevant market. (Pls. Mem. of Law in Supp. of Mot. to Exclude Litigation Survey ("Keller Survey Mot.") (Dkt. 334-1) at 1; Rebuttal Expert Report of Kevin Lane Keller, Ph.D., dated May 20, 2013[10] ("Keller Report") at ¶¶ 20, 124-136.) They contend that the Keller Survey is fatally flawed in various respects and appears designed to guarantee results consistent with Amex's litigation positions. For the reasons set forth below, Plaintiffs' motion is denied.

The Keller Survey was administered over the internet to a representative sample of 1,361 self-identified Amex cardholders in May 2013. (Keller Report ¶¶ 126, 128.) Respondents were asked to imagine that at some point in the future they planned to buy goods from 10 merchants, each of whom displayed the logos/symbols for Visa, MasterCard, Discover, and American

---

[10] Relevant excerpts are appended to the Declaration of Joseph P. Vardner in Supp. of the Keller Survey Mot. ("Pls. Keller Decl."), dated March 26, 2014, as Exhibit 1. (Dkt. 334-3.)

Express. (Id. ¶ 131.) The survey sample was then divided into 5 groups: 2 groups were presented with a scenario amounting to "monetary steering," 2 were exposed to "non-monetary steering," and a control group that was told they were able use their Amex card at all 10 merchants. (Id. ¶¶ 125, 131.) With regard to monetary steering, respondents were told that either 3 or 6 of the 10 merchants would indicate that "their purchase would cost 1% more if they used American Express" than if they used any other card. (Id. at ¶ 131; see also id., App'x B at 17-18.) In the non-monetary steering prompt, respondents learned that at checkout either 3 or 6 of the 10 merchants would verbally indicate a preference for another card over American Express because American Express costs their business more than other cards to accept. (Id. ¶ 131; see also id., App'x B at 18-19.) The survey then asked the cardholders how these experiences affected their overall impression of the Amex brand and how likely they were to use their American Express cards at other merchants in the future. (Id. ¶ 132.)

Plaintiffs contend that several of the assumptions and methodological choices made by Dr. Keller in designing the survey undermine its relevance and reliability to such a degree that it should be excluded under Rules 403 and 702. First, Plaintiffs argue that the assumptions underlying the Keller Survey fail to approximate actual market conditions should the anti-steering restraints cease to exist. They fault the types and levels of steering included in the survey, noting that (1) the 30% and 60% steering scenarios used by Dr. Keller overestimate the likely rates of steering that would exist without the anti-steering restraints, (2) the inclusion of a 1% surcharge as the example of monetary steering was improper because surcharging is not at issue in this litigation, and (3) that the survey implausibly assumes that Amex cardholders would be "surprised" by a surcharge at checkout. (See Keller Survey Mot. at 4-7.) They additionally maintain that the survey universe was overbroad because it included all Amex cardholders,

including those who rarely or never used their cards (see id. 7-9), and that the survey results were

further distorted because Dr. Keller did not include a "Don't Know" or "No Opinion" response

to closed-end questions (see id. 9-10.)  Finally, Plaintiffs contend that the "absurd" results

viewed in the control group—i.e., 19% of the control group reportedly had a more favorable

opinion of Amex and 20% was more likely to use Amex in the future—evidenced the flaws in

the survey.  (See id. at 10-12.)  Dr. Keller attributed these results to the fact that cardholders

likely did not expect their Amex cards to be accepted at 10 of 10 merchants, but Plaintiffs

contend the results demonstrate the presence of "demand effects," meaning that the respondents

were able to discern the sponsor of the study and gave answers they though the sponsor would

want. (See id.)

As a practical matter, there is "'no such thing as a perfect survey.  The nature of the beast

is that it is a sample, albeit a scientifically constructed one.'"  THOIP v. The Walt Disney Co.,

690 F.Supp.2d 218, 230 (S.D.N.Y. 2010) (citation omitted).  Accordingly, errors in a survey's

methodology—such as those alleged here—generally bear upon the probative weight to be

afforded to the survey, rather than its admissibility.  See Schering Corp. v. Pfizer Inc., 189 F.3d

218, 228 (2d Cir.1999); POM Wonderful LLC v. Organic Juice USA, Inc., 769 F. Supp. 2d 188,

197 (S.D.N.Y. 2011) ("When evaluating survey evidence, errors in a survey's methodology

usually go to the weight accorded to its conclusions rather than its admissibility.").  In

exceptional cases, however, the proffered survey may be "so flawed as to be completely

unhelpful to the trier of fact" and "its probative value is substantially outweighed by its

prejudicial effect."[11]  Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558,

---

[11] In weighing the reliability of the Keller Survey, Plaintiffs urge the court to examine the following factors: whether "(1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for

563 (S.D.N.Y. 2007) (internal quotation marks and citations omitted); see also Schering, 189 F.3d at 228 ("[E]rrors in methodology thus properly go only to the weight of the evidence—subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing."); On Site Energy Co. v. MTU Onsite Energy Corp., No. 10-CV-1671 (JS), 2012 WL 2952424, at *3 (E.D.N.Y. July 19, 2012) (recognizing that "courts may exclude survey evidence if it is patently unreliable or unhelpful").

Here, whether viewed individually or cumulatively, the alleged flaws identified by Plaintiffs do not warrant excluding the Keller Survey under either Rule 403 or Rule 702. For instance, Plaintiffs fault Dr. Keller's assumptions concerning the nature and frequency of steering that would occur in the absence of the anti-steering restraints; yet, unlike the trademark infringement cases relied upon by Plaintiffs, the Keller Survey necessarily required the expert to approximate market conditions in a hypothetical but-for world. (See Keller Report ¶ 124; Defs. Mem. of Law in Opp'n to Keller Survey Mot. ("Keller Survey Opp'n") (Dkt. 350-1) at 4-6 & n.10.) That Dr. Keller may have overestimated the rate of steering that would exist without Amex's contractual restraints (Keller Survey Mot. at 6-7) or underestimated consumer awareness of such steering (id. at 5-6) implicates hotly contested issues in this case and are best addressed on cross-examination and through the presentation of contrary expert testimony. See On Site Energy, 2012 WL 2952424, at *3 ("District courts may exclude survey evidence if it is patently unreliable or unhelpful, but cross-examination is often the appropriate way to raise criticisms of

---

which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured." (Keller Survey Mot. at 2-3 (quoting Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203 (DRH), 2005 WL 2371958, at *5-6 (E.D.N.Y. Sept. 27, 2005)).) See also Manual for Complex Litigation, Fourth § 11.493 (outlining similar factors). While not discussed explicitly herein, the court bears these factors in mind in denying Plaintiffs' motion and will do so when analyzing the weight to be afforded these types of surveys at trial. See Lifeguard Licensing Corp. v. Gogo Sports, Inc., No. 10-CV-9075 (PAC), 2013 WL 4400520, at *6 (S.D.N.Y. Aug. 15, 2013) (noting these criteria "are typically used by courts to analyze the weight to be accorded to a survey, not its admissibility." (quoting Friesland Brands, B.V. v. Vietnam Nat'l Milk Co., 221 F. Supp. 2d 457, 460 n.1 (S.D.N.Y. 2002))); see also Schering, 189 F.3d at 225.

the survey's methods." (citations omitted); POM Wonderful, 769 F. Supp. 2d at 197. (See also

Sur-Rebuttal Report of Gary T. Ford, Ph.D.[12] ("Ford Sur-Rebuttal Report") at ¶¶ 26-88

(critiquing survey methodology used in Keller Survey).) Nor can the court conclude at this stage

that Dr. Keller's decision to include a surcharge scenario deprives his study of any probative

value; it is at least plausible that a surcharge on one good and a discount on all other goods could

be viewed as two sides of the same coin.[13] (See Pls. Keller Decl. (Keller Dep. Tr., Aug. 11,

2013) at 105:20-106:12 (asserting that monetary steering prompt was written to be neutral).) See

also Expressions Hair Design v. Schneiderman, 975 F. Supp. 2d 430, 436 (S.D.N.Y. 2013)

(asserting that "[i]n terms of their immediate economic consequences, surcharges and discounts

are merely different labels for the same thing" in enjoining enforcement of New York's no-

surcharge statute). Plaintiffs remaining criticisms of the Keller Survey, even if valid, are also

insufficient to warrant exclusion under either Rule 403 or Rule 702.[14]

As such, the court finds inadequate cause in Plaintiffs' motion to justify excluding the

Keller Survey from evidence. See Victoria's Secret, 2009 WL 959775, at *11 n.9 ("A survey is

only inadmissible if its flaws destroy all of its relevance."); POM Wonderful, 769 F. Supp. 2d at

200-01 (noting that courts in this circuit routinely admit flawed survey evidence provided it is

---

[12] Relevant excerpts are appended to the Declaration of Joseph P. Vardner in Supp. of the Keller Survey Mot., dated March 26, 2014, as Exhibit 2. (Dkt. 334-3.)

[13] The court further notes that Dr. Keller's study was undertaken in anticipation of both the Government Plaintiffs' case and the various cases brought by the Individual Merchant Plaintiffs, which do implicate surcharging. See generally Case No. 11-MD-2221 (NGG) (E.D.N.Y.).

[14] For example, Plaintiffs' contention that Dr. Keller's survey universe is overbroad because it includes less active or inactive Amex cardholders goes to the weight to be afforded to the survey, not its admissibility. (Keller Survey Mot. at 7-9.) See On Site Energy, 2012 WL 2952424, at *3 (finding challenge that "respondent universe was too broad" went to the survey's weight). Despite Plaintiffs' insistence that "the appropriate universe can only be purchasers that *actively* use their Amex card" (id. (emphasis added)), Dr. Keller's decision to include all Amex cardholders in the survey universe is plausibly justifiable as all Amex cardholders, regardless of their frequency of use, would be exposed to steering but for the restraints at issue. The court is similarly unwilling to exclude the Keller Survey based upon Plaintiffs' contention that the control group produced "absurd" results. Dr. Keller's proposed explanation for the improved opinions of Amex cardholders who were able to use their cards at 10 of 10 merchants appears to be quite plausible. (See Keller Report at n.253; Keller Dep. Tr. at 139:25-142:7.)

not "devoid of all probative value"); Lifeguard Licensing, 2013 WL 4400520, at *6 (finding survey admissible even if "although several of [the] objections might cast doubt on the weight a fact-finder would afford the survey"). Additionally, because this case will proceed as a bench trial the risk of confusion or prejudice resulting from the Keller Survey is minimal. The court is fully capable determining the reliability and probative value of the survey after hearing all relevant testimony. See Bic Corp. v. Far E. Source Corp., 23 F. App'x 36, 38-39 (2d Cir. 2001) (summary order) (affirming district court's decision to admit potentially flawed survey evidence, especially in a bench trial as the "trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis"). The motion accordingly is DENIED.

### E.    Dr. George Hay's Rate of Return Analysis & Related Opinions

Plaintiffs move to exclude Dr. George Hay's rate of return analysis on the grounds that he applied economic rather than accounting principles in calculating Amex's rate of return, and that he did so in an unreliable manner.[15] (Pls. Mem. of Law in Supp. of Mot. to Exclude Dr. George Hay's Rate of Return Analysis ("Rate Mot.") (Dkt. 337-1) at 1-2.) By this analysis, Dr. Hay concluded that Amex's economic rate of return on its U.S. card business was not supra-competitive and, thus, that Amex lacked market power. (Rebuttal Expert Report of George A. Hay, dated May 20, 2013[16] ("Hay Report") ¶¶ 10-11.) For the following reasons, the motion is denied.

Though Plaintiffs generally question the utility of rate of return analyses when determining market power (see Rate Mot. at 4-6), their motion to exclude Dr. Hay's analysis

---

[15] Plaintiffs make no argument that Dr. Hay is unqualified to analyze Amex's economic rate of return, but rather that Defendants should have offered an accounting rate of return and that Dr. Hay, who is an economist and not an accountant, is unqualified to analyze such a model. (Id. at 2.) Because the court declines to decide at this stage whether economic or accounting principles yield a more reliable and probative result for antitrust purposes, it need not address Plaintiffs' contention that Dr. Hay is unqualified to calculate the accounting rate of return.

[16] Relevant excerpts are appended to the Corrected Decl. of Joseph P. Vadner in Supp. of the Rate Mot. ("Vardner Rate Decl."), dated April 1, 2014, as Exhibit 2. (Dkt. 343-2.)

hinges on a contention that his economic rate of return calculation fails to meet <u>Daubert</u>'s standards for reliability and general acceptance because he did not employ certain accounting principles in conducting his analysis.[17] Specifically, they contend that the economic model used by Dr. Hay should be excluded as unreliable because it is selective in the portions of Amex's portfolio it includes and because it is at odds with Amex's own methods of calculating its returns. (<u>See</u> Rate Mot. at 1-2.) They also suggest that the analysis is unreliable because Dr. Hay's calculations do not cover all of Amex's U.S. card business, but rather rely on certain segments thereof. (<u>Id.</u> at 7.) Moreover, Plaintiffs argue, Dr. Hay's model is not representative of Amex's cardholder population because he only analyzes anticipated returns on "incremental" or new cardholders acquired from 2010 to 2012, which is a fraction of Amex's actual cardholder base. (<u>Id.</u> at 8.)

In response, Defendants note that the economic rate of return Dr. Hay calculated is a better reflection of reality than an accounting rate of return, and that Plaintiffs' methodological complaints go to weight and not admissibility. (Rate Opp'n at 2, 9-10.) They argue that Dr. Hay's analysis is actually more accurate because he selected only financial data directly related to Amex's U.S. card business and excluded card portfolios from 2006-2009 because the recession made those years unrepresentative and would have unduly lowered the final rate of return. (<u>Id.</u> at 12-13.)

Because Plaintiffs' arguments ultimately go the weight that the court should afford Dr. Hay's analysis and related opinions, and not to their admissibility, the motion is denied. At the

---

[17] As explained by Dr. Hay, the different results seen in Amex's accounting rate of return and in his economic rate— which are cited as evidence of the latter's unreliability by Plaintiffs (Rate Mot. at 9-11)—are likely attributable to how certain types of expenditures are treated in accounting statements (Hay Report ¶ 95.) For example, under accounting principles, upfront spending to acquire customers is treated as a loss at the time the expenditure is made instead of as an investment. (<u>Id.</u> ¶ 96.) When calculating economic returns, however, expenditures intended to create a revenue stream are depreciated over the life of the investment. (<u>Id.</u> ¶ 97.)

outset, although Plaintiffs are correct that some courts have been skeptical of the use of rates of return to demonstrate market power, those concerns have often been leveled against the types of accounting rates of return they themselves favor. Bailey v. Allgas, Inc., 284 F.3d 1237, 1252 (11th Cir. 2002) (nothing that rate of return data from an accountant was "more a reflection of various accounting conventions than true economic profit . . . ."); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995) (rate of return measurements may "reflect accounting conventions more than they do real profits (or losses), as an economist would understand these terms, . . . .") (citation omitted). Indeed, the literature cited by Plaintiffs appears to suggest that an economic rate of return, such as that calculated by Dr. Hay, is actually a more reliable metric than accounting principles would yield.[18] While there may be other reasons to discount rate of return analyses in general, which may be explored through cross-examination or the presentation of contrary expert evidence, at this stage the court is unwilling to exclude Dr. Hay's analysis simply because he calculated an economic rate of return rather than an accounting return.

Moreover, to the extent Plaintiffs challenge the assumptions underlying Dr. Hay's calculations, the court does not find that these concerns amount to the type of egregious error that might otherwise warrant wholesale exclusion of his analysis. See Amorgianos, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.") This is particularly true as Dr. Hay offers a plausible justification for each of his methodological decisions (see, e.g., Hay Report ¶¶ 112-114 (describing expenditures included in model), 119-121 (outlining adjustments

---

[18] See Vardner Rate Decl., Ex. 5 (Franklin M. Fisher & John J. McGowan, On the Misuse of Accounting Rates of Return to Infer Monopoly Profits, 73 Am. Econ. Rev. 82 (1983)); id., Ex. 7 (Jeffrey M. Perloff, Larry S. Karp, Amos Golan, Estimating Market Power and Strategies 15 (noting that calculating rate of return is difficult and that capital is not usually valued appropriately because accounting, rather than economic, definitions are used)).

made to Amex's data); 128 n.196 (describing rationale for excluding data from 2006-2009)), which Plaintiffs will have an opportunity to challenge using the "traditional and appropriate [tools for] attacking shaky but admissible evidence," Daubert, 509 U.S. at 596. Of course, if after hearing all related testimony the court determines that these choices were poorly made or are otherwise arbitrary, the court will afford Dr. Hay's analysis less weight or exclude it outright.

Finally, Plaintiffs note that if Dr. Hay's testimony is admitted they will be forced to call an accountant, Dr. Mark Zmijewski, to explain why accounting rate of return is the proper metric. (See Rate Mot. at 2) This outcome is preferable from the court's perspective. With the benefit of expert testimony favoring both types of analysis, the court will be in a better position to decide which model is more reliable and thus warrants greater probative weight. Accordingly, Plaintiffs' motion to exclude Dr. Hay's rate of return analysis and related opinions is DENIED.

### F. Drs. George Hay's & B. Douglas Bernheim's Market Definition Analysis

Plaintiffs also challenge the market definition analyses contained in the reports of Drs. Hay and B. Douglas Bernheim because they include debit cards along with credit and charge cards in the relevant market. (Pls. Mem. of Law in Supp. of Mot. to Exclude Dr. George Hay's and Dr. B. Douglas Bernheim's Unreliable Market Definition Analysis ("Market Def. Mot.") (Dkt. 339-1) at 7; see also Hay Report[19] ¶¶ 61-65.) For the reasons set forth below, Plaintiffs' motion to exclude these market definition analyses as irrelevant under Rule 402 or unhelpful to the trier of fact under Rule 702 is denied.

The expert reports of both Drs. Hay and Bernheim contain analyses suggesting that the appropriate antitrust market in this case includes debit cards in addition to credit and charge cards. (See Hay Report ¶¶ 40-60; Rebuttal Report of B. Douglas Bernheim ("Bernheim

---

[19] Relevant excerpts are appended to the Declaration of Jesse M. Weiss in Supp. of Market Def. Mot., dated April 17, 2014, as Exhibit A. (Dkt. 352-3.)

Report"), dated May 20, 2013[20] (Dkt. 339-2) ¶¶ 67-69, 122-132.) In an effort to justify this inclusive market definition, Dr. Hay draws on a variety of sources, including surveys of consumer behavior, in arguing that there has been significant growth in the use of debit cards and that the use of revolving consumer credit has been declining. (See Hay Report ¶¶ 40-60.) Similarly, Dr. Bernheim's report discusses changes in the economic literature, survey data, and the information provided by certain Individual Merchant Plaintiffs. (See Bernheim Report ¶¶ 67-69, 122-132.)

Plaintiffs accuse Defendants of a "flip-flop" on market definition pointing out that in previous cases, Amex was content with a definition limited to credit and charge cards. (See Market Def. Mot. at 1-2, 4-6.) Plaintiffs also contend that the analysis Defendants' experts provide is unreliable because the economists focus on whether consumers would switch from credit to debit, not whether merchants would do so. (Id. at 2, 5, 9-10.) They additionally claim that the manner in which Defendants' experts analyzed this "switching" is flawed because they sampled only a small number of consumer loyalty card databases from four supermarkets and four drugstores. (Id. at 7.) Specifically, they note that the economic analyses underlying the experts' proposed market definition is flawed because it analyzed only loyalty card databases from a few unrepresentative merchants. (Id. at 7.) Even within that subset, however, Plaintiffs insist that Drs. Hay and Bernheim reach unreasonable conclusions based on the purported "switching" data. (Id. at 7-9.) Finally, Plaintiffs argue that Drs. Hay and Bernheim should have used the hypothetical monopolist, or SSNIP, test from the Horizontal Merger Guidelines in order to determine the scope of the market. (Id. at 3, 6, 8, 10.)

---

[20] Relevant excerpts are appended to the Declaration of Joseph P. Vardner in Opp'n to Market Def. Mot., dated March 26, as Exhibit 7. (Dkt. 339-3.)

American Express maintains that Plaintiffs' motion is effectively an improper request for summary judgment on the issue of market definition, and should be denied on that basis alone. (Defs. Mem. of Law in Opp'n to Market Def. Mot. ("Market Def. Opp'n") (Dkt. 352-1) at 7.) They argue that Amex has amassed considerable evidence that consumers now substitute debit for Amex cards, and that the relevant antitrust market should include both forms of payment. (Id. at 2.) On the merits of Plaintiffs' criticisms, Defendants maintain that Drs. Hay's and Bernheim's focus on consumer demand and substitution was necessary because consumer demand drives merchant demand, and point out that both experts did consider debit/credit substitution at the merchant level as well. (Id. at 4-5.) They also argue that the hypothetical monopolist test is less useful in cases involving vertical restraints (id. at 11), and that their experts have addressed the potential limitations of their data in their reports (id. at 13.)

At this stage, the court is unwilling to bar testimony favoring Defendants' preferred market definition on relevance grounds, particularly given how critical the issue may be to their defense in this case. See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213 (2d Cir. 2009) (finding district court should not have barred testimony "critical to [the] defense on the issue of causation.") As Amex rightly notes, refusing to hear Defendants' evidence on this issue would be tantamount to granting partial summary judgment for Plaintiffs. Experts and courts may reasonably disagree over how to define the payment card market. See Renata B. Hesse & Joshua H. Soven, Defining Relevant Product Markets in Electronic Payment Network Antitrust Cases, 73 Antitrust L.J. 709, 712 (2006). Roughly a decade ago, the district court and Second Circuit in United States v. Visa, a case that addressed issuers and not merchants, chose to limit the relevant market to credit and charge cards. See 163 F. Supp. 2d 322, 336 (S.D.N.Y. 2001), aff'd 344 F.3d 229, 239 (2d Cir. 2003). A court in this district also

choose a narrower market when considering Section 2 claims related to debit interchange fees. See In re Visa Check/Mastermoney Antitrust Litig., No. 96-CV-5238 (JG), 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003). Other courts have made contrary findings. See Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc., 596 F. Supp. 1231, 1258 (S.D. Fla. 1984), aff'd, 779 F.2d 592 (11th Cir. 1986).

Despite Plaintiffs' claims, Amex's experts' opinions regarding market definition are neither overtly speculative nor irrelevant. In support of their inclusive market definition, Drs. Hay and Bernheim rely on both new literature suggesting that debit cards have become a substitute for credit and consumer survey data suggesting the same. Although they had few direct measures of merchant acceptance at their disposal, they have a wealth of data on cardholder perceptions. Since customer choices may well affect merchants' willingness to accept a given form of payment, considering those choices is a plausible means for predicting merchants' willingness to substitute different forms of payment. See Jonathan B. Baker, Market Definition: An Analytical Overview, 74 Antitrust L.J. 129, 141 (2007) (buyer substitution patterns may be inferred from the conduct of industry participants). Additionally, customer survey data is a well-recognized source of information on this issue. Id. at 140.

Put simply, the court is unwilling to foreclose this line of argument on a motion in limine. Given the reasoning and authority relied upon by Amex's experts, it is at least conceivable that market conditions and customer behavior may have changed since the United States v. Visa decisions such that the relevant antitrust market could now be different. Moreover, even Plaintiffs' strongest critique, which concerns the loyalty card data obtained from Individual Merchant Plaintiffs (Market Def. Mot. at 7), is insufficient to warrant exclusion and is more

appropriately raised on cross-examination. For these reasons, Plaintiffs' motion concerning Drs. Hay's and Bernheim's market definition analyses is DENIED.

## III. DEFENDANTS' MOTION IN LIMINE

For their part, Defendants ask the court to exclude the report and related testimony of Ms. Ann Schmitt, arguing that she lacks relevant expertise and that her opinions are not supported by sufficient data or reliable methods. (Defs. Mem. of Law in Supp. of Mot. to Exclude Evidence, Opinions, and Testimony of Ann Schmitt ("Schmitt Mot.") (Dkt. 330-1) at 2.) For the reasons that follow, the court reserves decision on Defendants' motion.

Ms. Schmitt is a consultant working in the financial services and payment card industries. Her report draws together a number of different sources to provide a general background on the history and structure of the payment card industry, as well as on Amex's place in that industry. (See Expert Report of Ann Schmitt, dated April 2, 2013[21] ("Schmitt Report") (Dkt. 335-2) §§ II-III, V.) The report also offers Ms. Schmitt's opinions on merchant perspectives on the credit card industry, their reasons for accepting American Express, and how merchants are likely to act if given the freedom to steer their customers toward or away from certain cards. (See id. § IV.) Though Ms. Schmitt repeatedly refers to her own work with merchants in this section, her conclusions regarding merchant attitudes also appear to rely heavily on the deposition testimony of merchants taken in this case. (See, e.g., id. ¶¶ 106-130.) Additionally, Ms. Schmitt reviewed over one hundred customized merchant contracts produced in this case, summarizing and tabulating the relevant provisions. (See id. ¶ 89 & n.80; id., App'x 4; Brenner Schmitt Decl., Ex. 3 (Sur-Rebuttal Report of Ann Schmitt, dated July 3, 2013) (Dkt. 335-4) ¶¶ 4, 9-10 (discussing

---

[21] Relevant excerpts are appended to the Declaration of Eric Brenner in Supp. of the Schmitt Mot. ("Defs. Schmitt Decl."), dated March 26, 2014, as Exhibit 1. (Dkt. 335-1.)

her review of 40 contracts in her initial report as well as the 125 contracts cited by Dr. Bernheim).)

Defendants challenge Ms. Schmitt's report as "impressionistic" and lacking in rigor, noting that she offers very general views regarding merchant attitudes and that she did not address steering separately from differential surcharging. (Schmitt Mot. at 9-10.) Defendants also contend that much of Ms. Schmitt's report and anticipated testimony simply repeat the views of those merchants for whom she has worked, and thus become conduits for the admission of hearsay unrelated to her expertise. (Id. at 12-13.) Defendants further object to Ms. Schmitt's summary of Amex contracts, noting that she has no personal knowledge of their negotiation and is not qualified to interpret the contractual language. (Id. at 14.) Finally, they argue that Ms. Schmitt lacks expertise in the specific issues in this case and thus should not be permitted to discuss general background information relating to the payments industry. (Id. at 15.)

Opposing the instant motion, Plaintiffs insist that Ms. Schmitt's industry experience is valuable; she has worked for banks that issue payment cards and has consulted for merchants regarding their payment card acceptance choices. (Pls. Mem. of Law in Opp'n to Schmitt Mot. ("Schmitt Opp'n") (Dkt. 346-1) at 2, 6, 9.) Plaintiffs assert that the Second Circuit's standard for allowing non-scientific expert testimony is permissive and that experts are allowed for the purpose of summarizing and presenting facts. (Id. at 7-9, 11-13, 23.) They additionally aver that Ms. Schmitt's report assists the court by summarizing vast amounts of record information in a more easily digestible form and that such summary is explicitly permitted by Federal Rule of Evidence 1006. (Id. at 17-20.)

The court first addresses Defendants' insistence that Ms. Schmitt lacks the qualifications necessary to testify as an expert witness under Rule 702. An expert's qualifications must be

"based on any one or more of the qualities listed in Rule 702—knowledge, skill, experience, training or education." Arista Records LLC v. Lime Grp. LLC, No. 06-CV-5936 (KMW), 2011 WL 1674796 at *2 (S.D.N.Y. May 2, 2011) (citing Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)). An industry expert may be qualified by means of his or her particular experience. See, e.g., SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 132-33 (2d Cir. 2006) (holding insurance industry expert was qualified on the basis of thirty years' experience in various roles); United States v. Mulder, 273 F.3d 91, 101-02 (2d Cir. 2001) (holding labor coalition expert is qualified on the basis of experience). That experience need not match the issue in the case exactly, as long as it bears close enough relation to it. In re Zyprexa Products Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("[T]he court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 80 (2d Cir.1997))). However, like all experts, witnesses qualified on the basis of their experience may only provide evidence about that which is within their expertise.

Here, it appears that Ms. Schmitt is likely qualified to offer testimony concerning the general structure and background information offered in Sections II, III, and V of her initial report. In addition to her long tenure as a financial services executive working in and around the credit card and payment systems industries, she has spent the last five years working as a consultant to retailers, merchants, and billers. (See Schmitt Report, Ex. A (curriculum vitae).) Whether Ms. Schmitt's client engagements or other experience qualify her to testify to merchant attitudes and contracting practices, however, is much less clear.[22] Specifically, Defendants question the expert's ability to reliably and helpfully testify to merchant perspectives concerning

---

[22] In her deposition, Ms. Schmitt explained her client engagements, most of which do not have to do with steering. Her experience is limited to advising a client on how to steer towards a store card. (Defs. Schmitt Decl., Ex. 2 (Schmitt Dep. Tr., July 18, 2013) (Dkt. 335-3) at 177:25-200:16.)

Amex and the credit card industry generally, or to predict how merchants would likely alter their practices in the absence of the contractual restraints at issue in this case. (Schmitt Mot. at 17-18; see Schmitt Report § IV.) However, the court cannot render a decision on this issue based on the parties' submissions alone. Rather than conduct a pretrial <u>Daubert</u> hearing to explore Ms. Schmitt's qualifications and their relevance to the opinions she intends to offer, the court instead reserves decision on the motion in anticipation of the parties' and the court's opportunity to voir dire the witness at trial.

The court similarly reserves decision on whether Ms. Schmitt's extensive reliance on deposition testimony and other record evidence, including summaries thereof, is permissible. An expert witnesses may provide summary testimony "to prove the content of voluminous writings" when appropriate under Federal Rule of Evidence 1006. See <u>Fagiola v. Nat'l Gypsum Co. AC & S., Inc.</u>, 906 F.2d 53, 57 (2d Cir. 1990); <u>United States v. Cadet</u>, No. 08-CR-458 (NGG), 2009 WL 2959606, at *4-5 (E.D.N.Y. Sept. 11, 2009), <u>aff'd</u>, 664 F.3d 27 (2d Cir. 2011). Moreover, the summary offered may reference a sampling of the underlying evidence, such as the sample of merchant contracts examined by Ms. Schmitt, as long as the expert clearly and accurately describes the sample's selection and use. See <u>Linde v. Arab Bank, PLC</u>, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013). As such, the court will not exclude summary testimony offered by Ms. Schmitt in her reports or on the witness stand provided it references evidence properly admitted at trial and otherwise comports with Rule 1006. To the extent Defendants disagree with Ms. Schmitt's summary testimony, for example of the merchant contracts she reviewed (<u>see</u> Schmitt Mot. at 5, 14-15), they may cross-examine her about the methodology applied or offer their own summary of the relevant provisions. The court is capable of determining the accuracy and reliability of such summaries and affording them appropriate probative weight.

That being said, the court wishes to underline the significant difference between an expert's presentation of a summary of record evidence and narrative testimony based on such evidence. Ms. Schmitt's apparent use of record evidence to construct a factual narrative for this case, including her conclusions concerning merchant preferences, is problematic. See Highland Capital Mgmt, 379 F. Supp. 2d at 469 (warning that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."). Although experts may rely on hearsay or other inadmissible evidence if experts in their field reasonably rely on such evidence in forming their opinions, see Fed. R. Evid. 703, it is inappropriate for experts to testify as "mere conduits for others' hearsay." Island Intellectual Prop. LLC v. Deutsche Bank AG, No. 09-CV-2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (citing Wantanabe Realty Corp. v. City of New York, No. 01-CV-10137 (LAK), 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004), aff'd, 159 F. App'x 235 (2d Cir. 2005)); see also United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008) (noting that expert witnesses may not be allowed to "simply 'repeat[] hearsay evidence without applying any expertise whatsoever'" (citation omitted)); Scott v. City of New York, 591 F. Supp. 2d 554, 563 (S.D.N.Y. 2008).

Although the court reserves decision on the entirety of Defendants' motion in anticipation of its opportunity to voir dire the witness, Plaintiffs are cautioned that the court is disinclined to allow Ms. Schmitt to simply rehash record evidence (i.e., third-party deposition transcripts) about which she has no personal knowledge and to which she does not apply any particular expertise in forming an opinion.[23] See Highland Capital Mgmt, 379 F. Supp. 2d at 469; Island

---

[23] Nor may Ms. Schmitt's testimony be used as a means to evade the court's direction that the parties must present their witnesses live, rather than submit hours of out-of-court deposition testimony. (Tr. of May 16, 2014, Status Conf. at 5:10-19.) As the trier of fact, the court requires the opportunity to assess the credibility of the witnesses

Intellectual Prop., 2012 WL 526722, at *2. This is particularly true where it concerns Ms. Schmitt's opinions on merchant attitudes, motivations, or likely behavior in the event the anti-steering restraints are lifted. In such instances, the more appropriate witnesses are likely the merchants themselves. Efficiency concerns must not be permitted to override the integrity of the evidence to be presented at trial.

For the foregoing reasons, the court RESERVES decision both as to Ms. Schmitt's qualifications and as to which portions of her reports and anticipated testimony reflect knowledge or opinions derived from her capacity as an industry expert or permissible summary evidence, and which portions do not meet either criterion. Wechsler v. Hunt Health Sys., Ltd., 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003) ("A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").

---

and to question them first-hand. Ms. Schmitt's report and testimony must not become a back-door through which non-live testimony may be introduced.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motions in limine are DENIED and a decision on Defendants' motion is RESERVED until the court and parties have had an opportunity to voir dire Ms. Schmitt concerning her qualifications and their relevance to the opinions to be offered at trial.

SO ORDERED.

Dated: Brooklyn, New York
      June 24, 2014

s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge