UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *et al.*,
              Plaintiffs

      v.

AMERICAN EXPRESS CO. *et al.*,
              Defendants

No. 10-CV-04496 (NGG) (RER)
ECF Case

PUBLIC VERSION

---

## DEFENDANTS' PRETRIAL MEMORANDUM

Evan R. Chesler
Stuart W. Gold
Peter T. Barbur
Kevin J. Orsini
CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
     New York, NY 10019
       (212) 474-1000

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
BOIES, SCHILLER & FLEXNER LLP
   575 Lexington Avenue
     New York, NY 10022
       (212) 446-2300

*Attorneys for Defendants*

June 20, 2014

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 15

**I.    AMERICAN EXPRESS.** ........................................................................... 15

**II.   THE NON-DISCRIMINATION PROVISIONS.** ..................................... 17

ARGUMENT ....................................................................................................... 20

**I.    THE GOVERNMENT CANNOT PROVE ITS ALLEGED ANTITRUST MARKETS.** ................................................................... 21

    A.     Background on Market Definition Concerning Payment Cards. ........................... 22

    B.     The Relevant Market Includes Debit Cards. ........................................ 25

        1.     The Data and Documents of Market Participants Compel A Finding That Debit is in the Market. ........................... 26

        2.     The Government's Flawed SSNIP Test Proves Nothing. ........................... 34

    C.     The Government's Attempt to Define a Separate T&E Market Fails. ................. 37

**II.   AMERICAN EXPRESS DOES NOT HAVE THE SUBSTANTIAL MARKET POWER THAT A FIRM WOULD NEED TO HARM COMPETITION THROUGH NON-DISCRIMINATION PROVISIONS.** ............... 43

    A.     The Market Share Evidence Is Inconsistent With a Finding of Market Power. ........................... 45

        1.     American Express's Market Share Undermines Any Finding of Market Power. ........................... 45

        2.     American Express's Share History Undermines Any Finding of Market Power. ........................... 49

    B.     There is No Evidence of Supracompetitive Prices, Much Less Any Control Over Price. ........................... 53

        1.     There is No Evidence that American Express's Prices are Above Competitive Levels. ........................... 54

i

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

2.    The Continued Decline in American Express's Prices Belies Any Notion That It Can Control Price.................................................................59

3.    American Express Does Not Earn Supracompetitive Profits. ..................65

4.    Value Recapture is Not Evidence of Market Power .................................67

C.    Cardmember Insistence is Not a Source or Evidence of Antitrust Market Power In This Case. ...................................................................................70

III.    **THE GOVERNMENT CANNOT PROVE THAT THE NON-DISCRIMINATION PROVISIONS HARM COMPETITION.** ................................77

A.    The Non-Discrimination Provisions Have Not Caused Anticompetitive Effects. ....................................................................................................85

1.    The Non-Discrimination Provisions Have Not Enabled American Express to Charge Supracompetitive Prices. ..............................................85

2.    The Non-Discrimination Provisions Are Integral to American Express's Ability to Pursue its Differentiated Business Model to the Benefit of Consumers, Merchants and Overall Competition...............86

a.    The Importance of the Point-of-Sale Experience to American Express's Differentiated Business Model. ...................86

b.    Merchant Discrimination Would Impair American Express's Ability to Offer a Differentiated Product. ...................91

c.    Loss of American Express As a Differentiated Competitor As a Result of the Removal of the Non-Discrimination Provisions Would Be Detrimental to Consumers, Merchants and Overall Competition.............................................95

d.    The Government's Remaining Arguments of Competitive Harm Fail. ...................................................................................98

B.    The Non-Discrimination Provisions Allow American Express to Achieve Substantial Efficiencies and Competitive Benefits............................................104

C.    The Government Cannot Establish Less Restrictive Alternatives to the Competitive Benefits Achieved by the Non-Discrimination Provisions. ...........108

CONCLUSION....................................................................................................113

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 229 (2d Cir. 1999)....................71

AD/SAT v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999) ...................................22

Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n, 633 F. Supp. 201 (N.D. Ill. 1986)........................................................................................106

American Express Travel Related Servs. Co. v. Visa U.S.A. Inc., et al., No. 04-cv-8967 (S.D.N.Y.) .......................................................................................25, 40

Arkansas Carpenters Health & Welfare Fund v. Bayer AG, 604 F.3d 98 (2d Cir. 2010) ..........109

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994) ...........................................................79

Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406 (7th Cir. 1995) ...........................................................................................59

Board of Trade v. United States, 246 U.S. 231 (1918)...................................................78

Brantley v. NBC Universal, Inc., 675 F.3d 1192 (9th Cir. 2012)............................80, 83, 87, 104

Brown Shoe Co. v. United States, 370 U.S. 294 (1962)..................................................30

CDC Tech., Inc. v. IDEXX Labs., Inc., 186 F.3d 74 (2d Cir. 1999)....................................79

City of New York v. Grp. Health Inc., 649 F.3d 151 (2d Cir. 2011)...................................21

Comcast Cable Commc'ns, LLC v. F.C.C., 717 F.3d 982 (D.C. Cir. 2013)...........................77

Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F. Supp. 2d 50 (S.D.N.Y. 2003) .....................................................................................45, 51, 59

Con'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977) ...........................................106

E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23 (2d Cir. 2006) ............................78

E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435 (4th Cir. 2011) ................25

Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240 (2d Cir. 1997) ..........................................................................................79

Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc., 26 F. Supp. 2d 606 (S.D.N.Y. 1998) .....................................................................................100

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Geneva Pharm. Tech. Corp. v. Barr Labs, Inc., 386 F.3d 485 (2d Cir. 2004) ...................... passim

Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560 (11th Cir. 1983) ............................110

H.L. Hayden Co. of New York, Inc. v. Siemens Medical Syst., 672 F. Supp. 724
    (S.D.N.Y. 1987), aff'd, 879 F.2d 1005 (2d Cir. 1989) ..........................................................105

In re Iams Co. Litig., No. C-3-90-014, 1992 WL 1258515 (S.D. Ohio July 23, 1992)...........57, 70

In re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403 (S.D.N.Y. 2005)............57, 65, 70

Kartell v. Blue Shield of Massachusetts, Inc., 749 F.2d 922 (1st Cir. 1984) ...............................81

KMB Warehouse Distrib., Inc. v. Walker Mfg. Co., 61 F. 3d 123 (2d Cir. 1995).......................81

Konik v. Champlain Valley Physicians Hosp., 733 F.2d 1007 (2d Cir. 1984)...........................105

Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007) .................................... passim

Major League Baseball Props., Inc. v. Salvino, Inc., 420 F. Supp. 2d 212 (S.D.N.Y.
    2005), aff'd 542 F.3d 290 (2d Cir. 2008) ..............................................................................105

Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290 (2d Cir. 2008)....................108

Monsanto Co. v. Spray Rite Serv. Corp., 465 U.S. 752 (1984)...................................................112

Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of Rhode Island, 883
    F.2d 1101 (1st Cir. 1989)........................................................................................................80

Park v. Thomson Corp., No. 05 Civ. 2931 (WHP), 2007 WL 119461 (S.D.N.Y. Jan. 11,
    2007) .......................................................................................................................................30

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997)...........................105

Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86 (6th Cir. 1989).......................................81

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001)................................................................25, 44

U.S. v. Visa, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir. 2003) ..... passim

Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62
    (E.D.N.Y. 2006)......................................................................................................................79

United States v. Colgate & Co., 250 U.S. 300 (1919) ...............................................................112

Valuepest.com of Charlotte, Inc. v. Bayer Corp., 561 F.3d 282 (4th Cir. 2009).........................77

Xerox Corp. v. Media Sciences, Inc., 660 F. Supp. 2d 535 (S.D.N.Y. 2009) ..............................59

**HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER**

Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "American Express") respectfully submit this Pretrial Memorandum pursuant to the Pretrial Scheduling Order.[1]

## PRELIMINARY STATEMENT

This Government enforcement action challenges the very core of American Express's brand promise:  the promise to its Cardmembers that when they attempt to use their American Express Card to purchase goods or services, merchants that have agreed to accept the Card will not discriminate against that Cardmember's choice of payment.  This is known as welcome acceptance, and it is fundamental to a brand premised on service and a high-quality consumer experience.  The Government's effort to undermine this critical point of sale experience is fundamentally misguided.

As the Government itself recognized in its successful lawsuit against the dominant Visa and MasterCard duopoly in the late 1990s and early 2000s, overall competition— and in particular, consumer choice and welfare—is enhanced when American Express is able to offer a differentiated product that drives consumer innovation and competition for overall share of consumer spending on general purpose cards.   The evidence at trial will demonstrate that precisely that type of competition has characterized the marketplace in recent years.  The evidence will also demonstrate that without the Non-Discrimination Provisions, American Express's ability over time to make the investments that enable this differentiation and innovation will be significantly impaired.  As a result, the marketplace dominated by Visa and MasterCard will tip to Visa and MasterCard even more than it has already and consumers (along with merchants) will ultimately pay the price.

---

[1] All Exhibits are annexed to the Declaration of Kevin J. Orsini in Support of Defendants' Pretrial Memorandum, dated June 20, 2014.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

The market facts are stark.  There are more than 1 billion cards in force in the United States bearing the Visa or MasterCard network logo.  There are fewer than 55 million American Express Cards.  Visa and MasterCard are accepted everywhere that plastic is accepted; there are 3 million merchant locations (representing hundreds of millions of dollars in charge volume) that accept Visa, MasterCard and Discover but that do not accept American Express. American Express has only recently recovered its share of credit and charge card spend from the late 1980s, after a decade of decline and stagnation followed by a decade of slow growth.  (See Attachment 1.)  That slow growth was fueled by the investment of billions of dollars in products and services for Cardmembers and merchants in the face of vigorous competition.  When debit cards are included—as they must be, given their emergence as a competitive force—American Express's share has been steadily declining for two decades and is now approximately 15%. (See Attachment 2.)

In addition—and of great significance given the Government's focus in this case on the claim that American Express's merchant discount rates are above competitive levels as a result of the Non-Discrimination Provisions—the merchant discount rate premium that American Express once earned for its differentiated product has effectively evaporated.   As the evidence will show at trial, there are many Visa and MasterCard products for which merchants pay a higher discount fee than they pay for American Express Cards.  For others, the higher merchant discount rate charged by American Express is attributable to quality differentiation.  American Express's mix-adjusted discount rate premium, which the Court discussed in the Summary Judgment Order and is the only way to conduct an apples-to-apples comparison, had by the end of 2011 shrunk to only 3 basis points (.03%) over MasterCard and only 8 basis points (.08%) over Visa.  Current data demonstrate that even those tiny mix-adjusted premiums have

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

disappeared because of the intense competition for share of consumer spend that currently exists among payment card networks.

Visa and MasterCard are creatures of the thousands of banks that until recently directly owned and controlled them.  Those banks have existing relationships with consumers through checking accounts, mortgages and consumer loans.  They have tens of thousands of branches through which they interact with their customers on a regular basis.  They leverage these relationships to issue hundreds of millions of debit and credit cards.  They also have existing financial relationships with large corporations, which they leverage for corporate card distribution deals and co-brand partnership agreements.  They provide businesses large and small with a broad array of loans, credit lines, treasury support and other banking services.  The result is that nearly every American Express Cardmember carries and uses at least one Visa or MasterCard product—and often more than one—in his or her wallet.  The reverse is not true: most Visa and MasterCard cardholders do not have an American Express Card.  American Express cannot compete on the basis of ubiquity and it is not a "must carry" utility like Visa and MasterCard.  Since consumers do not <u>have</u> to carry American Express Cards in order to make purchases with payment methods besides cash and checks, American Express can compete only if consumers <u>want</u> to acquire and use American Express Cards.  Moreover, American Express can convince consumers to acquire and use their American Express Card only if there are merchants where it is accepted; and it can convince merchants to accept American Express Cards only if there are consumers who actually present the Cards for payment.

That interdependence of Cardmember and merchant acceptance is a key feature of this marketplace.  When a consumer presents the American Express Card at the point of sale, that choice represents the culmination of billions of dollars in investments in the development and

3

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

enhancement of that product that led the consumer to select it after weighing the relative costs and benefits of each of his or her other payment options. Unlike Visa and MasterCard, the decision whether to acquire an American Express Card is made by a customer who already has a competing card. The customer's decision is not whether they need a charge or credit card, but whether they want another card in addition to the Visa or MasterCard they already have. If, after deciding to use American Express, the merchant devalues that choice by discriminating against the Card, American Express's charge volume will decrease and its ability to continue making the investments that allow it to win the battle for consumer choice—that is, competition itself—will be seriously at risk.

This is not idle speculation. It is borne out by the facts and experiences of the marketplace in the late 1980s and early 1990s. In 1987, American Express launched the Optima card, its first credit card product. Around that time, it also began a process, which would ultimately take nearly two decades of lowering prices, to convince merchants in industries other than the traditional travel and entertainment industries to accept its Card. American Express started that process because it realized that it could not survive without acceptance in the so-called everyday spend categories (e.g., retailers, supermarkets and pharmacies). Consumers were increasingly demanding cards they could use not only to pay for their hotel room, but also to purchase toothpaste at the Duane Reade next store. American Express's strategy was ultimately proven correct when Diner's Club and Carte Blanche—two networks that did not undertake a similar expansion—dwindled into irrelevance. As a result of these investments, in the 1980s, American Express's share of consumer spend on plastic began to climb, reaching nearly 25% by 1990.

4

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Visa and MasterCard took notice, and perceived a competitive challenge to their duopolistic control of the marketplace. They responded in a variety of ways, with Visa in particular determining that American Express's premium business model could not withstand attack from the bank-owned dominant networks. So Visa adopted the Exclusionary Rules that were at issue in U.S. v. Visa, locking American Express out of the bank relationships at exactly the time American Express was trying to grow its business by working with bank partners. MasterCard followed suit in 1996. Today, years after the Government prevailed in the prior suit, American Express continues to feel the lasting effects of Visa and MasterCard's exclusionary conduct.

Visa's other response to American Express's success in the 1980s was particularly telling. It recognized that American Express's business model, premised on the consistent delivery of a high-quality consumer experience and a premium level of service, was especially vulnerable to campaigns designed to degrade Cardmembers' experiences at, and expectations about, the point of sale. It was at the point of sale—with the merchant and Cardmember interacting but American Express not present—that the American Express model was most at risk. And so Visa initiated the "We Prefer" campaigns. The evidence will demonstrate—through the admissions of the Government's own expert—that these campaigns were a classic example of a dominant firm trying to tear down consumer views of a smaller competitor and further tip the marketplace in its favor. While the Government will portray this as competition on the merits, it was, in fact, the centerpiece of a long-term strategy to eliminate the most effective competitive constraint on what would otherwise be the unbridled market power of the dominant networks.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

A combination of these and other marketplace factors led to a decline in American Express's share of more than five percentage points in just three years (24.7% in 1990 to 20.9% in 1993)—notwithstanding the fact that American Express already had Non-Discrimination Provisions in place and had worked hard to differentiate its product.  By the mid-1990s, American Express was facing a crisis.  Its share was declining.  Some of its merchants were openly hostile to the notion of card acceptance, including in the famous "Boston Fee Party" in which a group of merchants in Boston openly attacked American Express and its then-existing merchant discount fees.  The Optima card, its initial foray into credit cards, had failed.  In 1996, Kenneth Chenault, the Company's new Vice-Chairman, issued a call to arms.  He recognized that the Company had to increase its investments in Cardmembers and merchants (including by lowering discount rates).  But most importantly, it could only risk those investments if it could protect the Company's most valuable asset—its brand—at the moment of truth:  the point-of-sale experience, where American Express was not present.  Continued reliance on the Non-Discrimination Provisions was therefore critical to protecting American Express's enormous investments in quality, service and brand association that have stimulated interbrand competition to the benefit of merchants and consumers alike.

The relief sought by the Government is unprecedented and severe:  despite this history, they want to <u>force</u> American Express to do business with merchants that actively try to convince American Express Cardmembers not to use the Card.  They literally want American Express to have no choice but to deal with the merchant who, every time an American Express Card is presented, says, "No, I don't like that card; please swipe a different one."  But while the Government seeks to preclude American Express from paying a merchant not to discriminate

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

<u>against</u> American Express, it will allow Visa and MasterCard to pay merchants to discriminate <u>in favor of</u> their own cards.[2]

   This incoherent approach represents nothing short of an assault on the American Express business model, which has for years enabled it to compete against the much more ubiquitous Visa and MasterCard networks, to the benefit of consumers.  It is no consolation that the Government would, judging from the Visa and MasterCard settlement, apparently allow American Express to pay merchants to discriminate in favor of their own cards.  The Government ignores the fact that, even if it wanted to engage in such a practice, American Express would face a huge disadvantage to the dominant networks when it comes to trying to pay merchants to steer:  virtually every consumer has either a Visa or MasterCard; a comparative few have an American Express Card.

   The Government also ignores the obvious ramifications that steering against American Express will have:  for a brand that is premised on service and a quality experience, consistently sending the message to American Express Cardmembers that merchants do not like the Card will have a profound impact on the willingness of Cardmembers to continue to use the Card and on the desire of prospective Cardmembers to obtain the Card.  The data and history confirm that American Express's ability to compete against the dominant card providers will be hurt by such practices.  Indeed, the Government is counting on it:  they want merchants to steer because they think it will work.  They think it will drive down merchant discount fees.  But they ignore the fact that with lower Cardmember usage and lower merchant discount revenue,

---

  [2] <u>Compare</u> DX5826 (Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc., Dkt. No. 143) § IV.B.3 (allowing Visa and MasterCard to enter into agreements with merchants whereby merchants agree to steer to one of Visa or MasterCard <u>and</u> not to steer to competing networks) <u>with</u> § IV.A.1-8 (prohibiting Visa and MasterCard from entering into agreements with merchants where merchants would agree not to steer to competing networks).

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

American Express could not continue to make the investments it makes today to benefit consumers and merchants alike.  After all, American Express only recoups those investments when the Card is actually used.  With fewer investments, there will be less competition and less innovation.  Consumers will not benefit.  They will suffer.

In its first case against Visa and MasterCard a decade ago, the Government embraced the fact that a less competitive American Express is worse for consumer welfare precisely because American Express has been a leader in quality and innovation.  It touted American Express's premium business model in that lawsuit as procompetitive.  It has now forgotten that lesson from the 1990s, and asserts the opposite:  that a more commoditized market will be better for competition and consumer welfare.  They are as wrong about this as they where when they boldly claimed in 2010 that their consent decrees with Visa and MasterCard, which permitted discrimination against those brands, would lead to immediate benefits at the more than 3 million locations that do not accept American Express.  They predicted lower merchant discount fees at those merchants and lower consumer prices.  Neither has happened.  Visa's and MasterCard's merchant discount fees have in fact gone up.

For these reasons, and as set forth further below, the evidence that will be offered at trial will support findings that American Express lacks antitrust market power, however the market is defined, and that the Non-Discrimination Provisions enhance, rather than hinder, long term competition and consumer welfare.

Market Definition:  The Government's theory of market definition is stuck in 2007, when it began the investigation that led to this lawsuit.  It has been rendered obsolete by subsequent market forces.  In 2007, debit was only beginning to emerge as a competitive force to credit and charge.  Since then, debit usage at merchants has exploded.  Today, many consumers

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

view debit and credit cards as reasonably interchangeable products.   And, as the evidence will show, in this two-sided market it is consumer views about the substitutability of these products that bears upon merchant demand to accept them:  a merchant accepts a payment card only if its customers want to use it.  The strength of the demand for the merchant to accept a particular type of card (e.g., credit) depends upon the likelihood that consumers will switch to another card (e.g., debit) if the first type is not accepted.  The evidence will show that consumers not only will switch to debit from credit, but they already do every day.  That is why the internal documents of all four credit card networks conclude that debit cards are a competitive force that is taking share of consumer spend from credit cards.  That is why, for example, American Express designed its newest credit card product, the EveryDay Card, specifically to persuade debit-using consumers to switch to an American Express credit card.  And that is why merchants point to debit card pricing in negotiating merchant discount rates with American Express.  Notwithstanding the Government's backward-looking perspective, debit is within the relevant product market.

That leaves only the Government's T&E market allegations.  But that theory was dead on arrival.  As noted above, no network has ever been able to survive by focusing only on one segment of merchants.  That is because acceptance among all categories of merchants is critically interdependent and is necessary for a network to be viable.  Therefore, it defies economic logic and evidence to define a so-called "price discrimination market" limited to one subset of merchants as the Government asks the Court to do here.

Market Power:  It is an unassailable proposition of law (and economics) that a firm without significant market power cannot possibly harm competition through the use of a vertical restraint.  The Court recognized this principle in its Summary Judgment Order.  If, by a preponderance of the evidence, the Government cannot demonstrate that American Express

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

possesses significant market power (by either path articulated in the Court's Summary Judgment Order), the Government cannot prevail.  The evidence will not support a finding of such market power.

American Express simply is not a "must carry" card that can "impose" its rules on merchants.  It is not a utility like Visa and MasterCard on either side of the market—any argument to the contrary is directly refuted by the undisputed fact that American Express Cards are accepted by millions fewer merchants than are Visa and MasterCard, and is carried by at least one hundred million fewer consumers than are Visa and MasterCard.  And because American Express is not a utility, it has to prove its value to both consumers and merchants every day.  For merchants, as the Government stresses, a big component of that value is the incremental spend that American Express is able to deliver as a result of its investments and efforts in targeted marketing, business building initiatives, rewards and other Cardmember services.  The Government argues from this that because merchants make more money when they choose to accept the Card than they would if they chose not to, American Express must have antitrust market power.  But law and logic belie that theory.

It is true that merchants make the decision to accept American Express because they believe that they will gain more from acceptance (through incremental spend and profit) than they pay for acceptance.  But that does not equate to American Express having antitrust market power (even if one assumes, contrary to the evidence, that American Express even has a mixed-adjusted discount rate premium today).  Every day, merchants, other businesses and consumers choose to purchase products and services from firms that are higher priced than other alternatives.  They choose to do so because they have concluded that the higher price tag on those products and services is outweighed by the value received from them compared with less

10

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

expensive competing products and services.  It is untenable to contend, as the Government does

here, that a willingness to pay more in order to get more is compelling evidence of antitrust

market power.

        Moreover, as the Court noted in the Summary Judgment Order, American Express

competes in a two-sided market.  (Summ. J. Mem. & Order, Dkt. No. 369 ("SJ Order"), at 3.)

Merchants are on one side of this market and consumers are on the other.  (Id.)  Each transaction

on a payment card necessarily involves both sides—it involves one merchant, and one

consumer—so the total amount received by American Express for completing the transaction

(the "two-sided price") is the sum of the charges and payments on both sides of the market

resulting from those transactions.  As a result, a key question in examining market power is not

whether American Express's price on one side of that market is above competitive levels, but

instead whether American Express's two-sided price is above competitive levels.  It is not.  That

price has been in constant decline over the past decade.  The evidence will establish that

American Express is not earning supracompetitive returns, further confirming that its two-sided

price is not above competitive levels.  And, even viewing only one-half of the relevant price—

the one-sided merchant discount fee that the Government emphasizes—American Express's rates

on a mix-adjusted basis do not exceed its competitors' rates and have also been in decline.

        That leaves the so-called "insistence" of the American Express Cardmembers—an

expression of loyalty and choice that is the product of American Express's continual

investments.  The Government claims that consumers' willingness to use the Card because of the

benefits and services created by these investments confers antitrust market power on American

Express.  But that insistence is anything but durable.  American Express does not have a lock on

any customer.  Instead, American Express must constantly compete to get its cards in the wallets

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

of consumers and keep them there, and invest billions to move that card to the front of those wallets to be used for purchases.  That is why, as the Government's expert has conceded, insistence disappears when American Express stops investing in consumer benefits.  That lack of durability is key to explaining why, in this case in particular, "insistence" of Cardmembers does not confer market power on American Express.  Instead, any Cardmember loyalty is a product of hard work, innovation and a dedication to excellence that is evidence of vigorous competition that directly and undeniably enhances consumer welfare.  These procompetitive activities require the significant investments that preclude American Express from earning anything resembling supracompetitive profits.  That American Express is constantly competing away its margins in the unceasing battle for transaction volume shows that it does not have the market power to engage in supracompetitive pricing, much less the far more substantial degree of market power that both parties agree is required to be able to "impose" on merchants vertical restraints that harm competition.

        <u>Competitive Effects</u>:  The Government's theory on this element is as simple as it is wrong.  According to the Government, the Non-Discrimination Provisions are anticompetitive because, by their very terms, they prevent "steering" at the point of sale.  According to the Government, if merchants could steer (and networks could pay them to steer), that would open up a new form of price competition.  The Government postulates that this must mean that the Non-Discrimination Provisions are harming competition.  In other words, because the provisions exist, and because some merchants would like to engage in conduct that is impermissible under the provisions, they must be anticompetitive.  Of course, every vertical restraint, by definition, limits some expression of competition.  That is their very nature.  But that is not the standard for anticompetitive effects; otherwise all vertical restraints would be unlawful per se.  Instead, it is

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

well established that vertical restraints are generally procompetitive, and courts routinely uphold restraints that are far more restrictive than the Non-Discrimination Provisions, including resale price restraints and exclusive dealing arrangements.

To overcome the presumption of legality that attaches to vertical agreements such as the Non-Discrimination Provisions, the Government must establish that <u>overall</u> competition for share of consumer spend is, on the whole, worse today with the provisions than it would be over the long term without them. And it is here that the Government's competitive effects case fails. The snapshot in time which the Government presents is what it claims will happen on Day 1 of the but-for world on just one side of the market. It claims that the snapshot of that one moment in time shows that American Express's merchant discount rates (and the rates of all networks) will fall, absent the Non-Discrimination Provisions. It claims this will benefit merchants, and that consumers will benefit when merchants pass those savings on to consumers, even though there is absolutely no evidence to prove this and ample experience to the contrary.

But this myopic focus on only merchant discount rates misses the point. While it is true that the contract provisions at issue in this case are present on one side of the two-sided market (the merchant side), <u>they necessarily and directly affect competition on the other side</u>. That is because the competition that exists on both sides of the market is all about the same dynamic:  competition for share of merchant charge volume, which is the competition at issue in this case. (Pls'. Mem. of Law in Opp. to Defs.' Mot. for Summ. J., Dkt. No. 320 ("SJ Opp'n"), at 5 (arguing that "[w]ithout Amex's interference, other card networks likely would compete harder for merchant charge volume").)

Of course, "competition for share of merchant charge volume" is just another way of saying competition for share of consumer spend (referred to by all participants in the industry

13

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

as "share of wallet").  As the Government acknowledges, share of charge volume at merchants is

driven by consumer choices about which card to use for a particular transaction.  That

competition is already vigorous, with issuers and networks competing directly and intensely for

share of charge volume through the benefits and services they advertise and offer to their

cardholders (including rewards, services, purchase protections and the scope of merchant

acceptance networks).  The Government wants to move the locus of that intense competition to

the point of sale through merchant discrimination, with the view that if merchants could

increasingly pressure consumers to pick one form of payment over another, that would add to the

existing competition for share of charge volume.  But it is not enough for the Government to

simply say that adding one form of competition must, by definition, enhance competition.  The

Court has to consider how the proposed addition of competition through discrimination will

impact the competition that already occurs.

    The evidence will demonstrate that such merchant-driven discrimination will not

enhance competition for share of consumer spend.  More than 80% of the merchant discount

revenue American Express earns is used to invest in the benefits, services and rewards provided

to its Cardmembers.  Those are the benefits that enable American Express to compete with the

dominant networks.  Protecting American Express's ability to compete by offering these benefits

is not simply about protecting American Express.  Indeed, it is not even about protecting

American Express Cardmembers.  Instead, as the Government emphasized in its prior lawsuit

against Visa and MasterCard, protecting American Express's competitive vitality is critical to

protecting overall competition and all consumers that use any form of plastic.  The evidence is

overwhelming that by competing with a differentiated model built on benefits, service and

14

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

rewards, American Express has driven the other networks and issuing banks to compete harder by offering their own benefits, services and rewards to their own customers.

Without the promise of welcome acceptance, American Express's incentive and ability to invest in and drive this vigorous competition will be impaired. And a less competitively significant American Express presents a less viable competitive constraint on the dominant Visa/MasterCard duopoly. There is, therefore, an inexorable link between what happens with merchant discount rates and what happens with competition for Cardmembers through rewards and other services. At some point after the Government's snapshot scenario, as American Express's vitality is diminished with rising discrimination and falling discount rates, the existing highly differentiated product market will move towards commoditization and will tip ever further towards the already dominant duopoly. Consumer benefits will be reduced, and in the long-term Visa and MasterCard will have even more market power over prices than they do today. The only direction for prices then to go will be up.

## BACKGROUND

## I.    AMERICAN EXPRESS.

American Express entered the payment card industry in 1958, offering charge cards primarily for use at travel and entertainment ("T&E") providers such as airlines, hotels and fine-dining establishments. (SJ Order at 2.) In its first two decades, American Express's payment card business competed primarily for charge volume in so-called T&E industries against other networks with a similar focus, such as Diners Club and Carte Blanche. (Id.) Meanwhile, Visa and MasterCard entered the market as joint ventures run by consortiums of banks. (Id.) Utilizing their member banks' depository relationships with consumers, the Visa and MasterCard systems quickly became the card of utility for the vast majority of card-carrying consumers. Just 10 years after their launch, Visa and MasterCard had more than three times the

15

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

annual charge volume of American Express and more than 100 million cardholders.  By 1989, there were "116 million Visa cardholders versus 22 million American Express cardholders" and "80 percent" of consumers "with an American Express card also ha[d] a bank card in their wallet".[3]  After more than 50 years of issuing Cards, American Express only has approximately 37 million Cardmembers, compared to over 182 million for Visa and MasterCard.[4]

Throughout the 1970s and 1980s, while Visa and MasterCard spread like wildfire with a model focused on "everyday usage" with most issuer revenue earned from charging cardholders finance fees on revolving balances, American Express continued to focus largely on serving T&E industries and providing premium products to service-conscious consumers.  Over time, however, it became clear to American Express that focusing on T&E industries was a path to irrelevance.  American Express realized that consumers want a general purpose card they can use for most of their spending needs and have little interest in carrying separate cards for different types of transactions.  American Express undertook a concerted effort to broaden its coverage while maintaining the differentiated, premium quality and brand image that had come to define its payment services.  (See SJ Order at 2.)  It successfully did so by competing intensely, cutting merchant discount rates, expanding merchant acceptance and improving the quality of its products and services for merchants and Cardmembers alike.

American Express has continued to pursue a differentiated product strategy that focuses on delivering the highest levels of service and quality to merchants and Cardmembers— its "community of members".  (See, e.g., DX6901 at 550-51.)  American Express invest billions of dollars a year directly into its card issuing business, where it is then re-invested in programs

---

[3] See DX7423 at 881 (Visa U.S.A. Inc., Meeting of the Board of Directors, June 5-6, 1989).

[4] See DX6576 at 10 (Nilson Report, February 2014).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

such as rewards, purchase protection, fraud protection and world-class customer service that are designed to attract and retain Cardmembers and then incent them to spend more at Card-accepting merchants.  For merchants who choose to accept the Card, these efforts have the effect of attracting high-spending American Express Cardmembers to their stores and increasing demand for their products and services.  Indeed, in 2013, the average transaction size on an American Express Card was $142.01.  That is more than twice the average transaction size on Visa ($50.88), MasterCard ($55.73) or Discover ($62.39) cards.[5]  Even looking just at credit cards, American Express's average transaction size is still more than one and a half times larger than that of Visa ($88.10) or MasterCard ($91.92).[6]  Through its efforts and investments on both sides of the market, American Express has built a brand that today is one of the most valuable in the world and is associated with honesty, integrity, quality and an enhanced payments experience.  Merchants who agree by contract to accept the Card derive significant benefits from the brand equity that American Express has developed and the profitable transactions of American Express Cardmembers.

## II.     THE NON-DISCRIMINATION PROVISIONS.

American Express has utilized Non-Discrimination Provisions in its merchant agreements since it first launched a payment card in the late 1950s.[7]  It is worth pausing to stress

---

[5] See DX 6576 (Nilson Report, February 2014) at 8.

[6] Id. at 10.

[7] See, e.g., DX6172 at 2 (American Express card acceptance agreement dated April 1959, providing, inter alia, that the merchant agrees "that the prices (including shipping or other charges) charged to holders of our credit cards will not be greater than those charged to your other customers"); DX0020 at 696 (American Express card acceptance agreement dated August 1977, providing, inter alia, that the merchant agrees "not to promote sales under agreements with other credit card issuers more extensively, in any of your Establishments, than you shall promote sales under this agreement").

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

that throughout the birth and growth of the intensely competitive credit and charge card business, American Express's merchant agreements contained Non-Discrimination Provisions.  Although the Non-Discrimination Provisions have evolved over time—including in response to Visa's We Prefer Visa campaign in the 1990s—they have always been aimed at achieving the same basic procompetitive goal:  protecting Cardmembers from point-of-sale opportunism by merchants and protecting welcome acceptance and the premium service experience that is the cornerstone of American Express's model.[8]  Ironically, and as the evidence will show, it was that very premium model that the Government lauded when it brought its suit against Visa and MasterCard's Exclusionary Rules but now attacks as anticompetitive.

Under the standard-form Non-Discrimination Provisions, merchants agree not to discriminate against American Express Cardmembers as compared to customers who pay with other payment forms (orally, with signage or through certain forms of differential pricing) or engage in other conduct that harms the Cardmember's experience using the Card or denigrates the American Express brand.   As a litigation tactic, the Government has focused and will focus only on specific types of conduct that the Non-Discrimination Provisions prevent, including offering targeted discounts only to American Express Cardmembers to encourage them to use another payment form.  As described below, that discriminatory conduct will directly influence Cardmember perceptions of the American Express brand and their desire to continue to use the Card, thereby diminishing American Express's competitive position.  The same is true with

---

[8] See, e.g., DX6172 at 193 (testifying before Congress in 1970, American Express's then-assistant general counsel explained that the basic purpose of the Non-Discrimination Provisions is to "protect[] the cardholder").

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

respect to the so-called "truthful" pricing disclosures, which will be anything but truthful.[9]  Thus, even if those were the only forms of conduct at issue, the Government still could not carry its burden.

But those are not the only forms of conduct at issue.  The Non-Discrimination Provisions also protect against, for example, a merchant agreeing to accept the Card and then every time the Card is presented for payment saying:

- "Choosing Visa would be a much better decision for you and for us."

- "We encourage responsible forms of payment.  Please use your Visa card instead of American Express."

- "You must carry another card.  Everyone does.  Can you use that instead?"

- "We think Amex charges too much.  Please don't use it."

- "We prefer Visa.  Please give me a different card."

The Non-Discrimination Provisions do <u>not</u> prevent merchants from providing discounts to all customers who pay with cash or all customers who pay with debit.  (SJ Order at 7.)  The Non-Discrimination Provisions also generally permit merchants to encourage the use of any store card (a payment card that can only be used at one merchant) or cobranded card (payment cards that can be used at all merchants that accept a particular network but bear the logo and/or name of a particular merchant, such as a Target Visa Card).  (<u>Id.</u>; Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Dkt. No. 281 ("Defs.' SJ Br.") at 9.)

Many of American Express's largest merchants have negotiated a range of exceptions to the standard Non-Discrimination Provisions.  American Express agrees to such exceptions where they are important to the merchant and, based on its experience in the industry,

---

[9] As explained further below (<u>see</u> <u>infra</u> p. 99), the complexity of Visa's and MasterCard's interchange pricing tables makes an accurate description of their pricing at the point of sale practically impossible.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

American Express has determined that the particular exception will not significantly disrupt the point-of-sale experience that is critical to its differentiated brand value and business model.  For example, many large American Express-accepting merchants have "Official Card" partnerships with other networks whereby they advertise that the other network is the merchant's "Official Card" and display signage for that network's cards that is more prominent than the merchant's American Express signage.  Non-Discrimination Provisions with these exceptions permit such promotional activity, but continue to prohibit the merchants from engaging in conduct that will negatively impact consumers' views about the value and utility of the American Express network—for example, while a merchant could advertise "Visa is our Official Card", merchants agree not to make statements such as, "Visa is our Official Card because it is better for us than American Express", or "we accept American Express because we have to, but Visa is our Official Card", or simply "We Prefer Visa".  That distinction is not arbitrary.  It is based on American Express's extensive experience with the disproportionate harm from the use of preference statements by Visa in the early 1990s.

Smaller merchants, by contrast, generally have a standard form of the Non-Discrimination Provision in their acceptance agreements because transaction costs preclude American Express from negotiating individualized provisions with each of them.  However, there are literally millions of small (and some not-so-small) merchants who have made the decision not to accept American Express Cards, and any such merchant who would prefer to engage in forms of steering prohibited by the standard-form Non-Discrimination Provisions can clearly choose not to accept, as millions of other merchants have.

**ARGUMENT**

Because the Non-Discrimination Provisions are vertical agreements, the Government's Section 1 claim will be analyzed under the rule of reason.  "This most searching

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

form of antitrust analysis involves a context-specific inquiry into the relevant market and a defendant's effect on that market". (SJ Order at 9.) In the Summary Judgment Order, the Court set forth the standard for the Government's threshold burden of proof under the rule of reason. As the Court indicated, the Government must first define and prove a relevant antitrust market. (SJ Order at 10.) In addition, the Government must prove either (i) that American Express has antitrust market power in the relevant market <u>and</u> that there exist other grounds to believe that the Non-Discrimination Provisions harm overall competition market-wide or (ii) that American Express's Non-Discrimination Provisions have caused an <u>actual</u> adverse effect on overall competition in the relevant market, which could only occur if American Express has antitrust market power. (SJ Order at 9.) As set forth below, the Government will be unable to satisfy this threshold burden at trial.[10]

## I.   THE GOVERNMENT CANNOT PROVE ITS ALLEGED ANTITRUST MARKETS.

To satisfy its threshold burden of proof, the Government must first prove the existence of the relevant antitrust markets alleged in its Complaint. (<u>See</u> SJ Order at 10 ("To determine whether an antitrust violation has occurred the court must first define the scope of the relevant market")); <u>City of New York v. Grp. Health Inc.</u>, 649 F.3d 151, 155 (2d Cir. 2011). "As a general rule, products constitute part of a single product market if they are 'reasonably interchangeable by consumers for the same purposes,' such that there is high cross-elasticity of demand for the products." <u>Xerox Corp. v. Media Scis., Inc.</u>, 660 F. Supp. 2d 535, 543 (S.D.N.Y. 2009) (quoting <u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 395 (1956)). Also "relevant to the delineation of a relevant product market is cross-elasticity of <u>supply</u>"

---

[10] American Express continues to reserve its right to appeal the Summary Judgment Order and to argue on appeal that a direct showing of market power is a required element of the Government's claim under the rule of reason.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

because even where there are no demand substitutes for a product, a firm cannot profitably

charge supracompetitive prices if other suppliers can easily enter the market or expand their

current output to produce adequate substitutes at a reasonable price.  AD/SAT v. Associated

Press, 181 F.3d 216, 227 (2d Cir. 1999) (emphasis added); accord IIB Phillip E. Areeda et al.,

Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 423 (3d ed. 2007).

        The Government alleges and will attempt to prove at trial the existence of two

relevant markets:  (i) general purpose credit and charge card network services provided to all

merchants and (ii) general purpose credit and charge card network services provided to

merchants in travel and entertainment ("T&E") businesses—in each case excluding debit cards

and other payment forms.  As discussed below, the evidence does not support either of the

Government's alleged markets.  In fact, the narrowest market that is sustainable given the record

evidence is the market for general purpose credit, charge and debit cards that can be used by

consumers at any merchant in the United States.[11]

    A.    **Background on Market Definition Concerning Payment Cards.**

        As the Court stated in the Summary Judgment Order, the relevant market in this

case is what is known as a two-sided market, that is, a market in which payment card platforms

"sell their services to both merchants and cardmembers in order to allow these two groups of

customers to interact with each other".  (SJ Order at 3.)  This economic reality has significant

implications for each element of the Government's claim.  As it relates to market definition, the

key implication of the two-sided nature of this market is that the Court needs to look at consumer

views about the substitutability of various types of payment cards to determine what products fall

within the relevant market.  That is because merchant demand for a particular type of payment

---

[11] This market excludes payment cards that can only be used at one merchant, which are typically referred to as store cards or private label cards.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

card is driven by consumer demand to use that card.  If no consumers desire to use a particular

type of card, the merchant has no reason to accept it.  Similarly, if consumers are willing to

switch between Card A (say a credit card) and Card B (say a debit card) if Card A is not

accepted, the merchant's desire to accept Card A is weaker.  As a result, the merchant will be

more resistant to price increases for Card A.

   This concept is not in dispute.  Indeed, it has already been adopted by the

Southern District of New York and the Second Circuit.  In U.S. v. Visa, Judge Jones held that

"[s]ince the merchants' demand for general purpose cards is derived from consumers' demand to

use these cards, their attitudes also reflect consumer attitudes." 163 F. Supp. 2d 322, 337

(S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir. 2003).  The Government's expert in both this case

and U.S. v. Visa is Professor Michael Katz.  He too agrees, having concluded that "merchants'

demand for credit and charge card networks services is largely derived from consumers'

demand" such that " in order to understand merchants' demand for card acceptance services, it is

important to understand consumers' demand for card-issuance services".[12]  (DX6466 (Expert

Report of Michael L. Katz ("Katz I") ¶ 90.)  As they will testify at trial, each of American

Express's economists agrees.  That is why, as Professor Katz has testified:

---

[12] See also Exhibit 1 (Katz Dep.) at 60:16-24 ("[T]he demand by the merchants depends on the demands of the consumers on the other side.  So the focus on substitution in this matter is really on both sides.  You want to understand how consumers substitute among various payment instruments and then understand the implications of that for how merchants view different payment instruments as substitutes.").

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

> [W]e've spent a fair amount of time, as have the experts retained by American
> Express, discussing how consumers use credit and debit cards and how they view
> them and the extent to which consumers switch and the extent to which merchants
> perceive that consumers are willing to switch.  So all of that information is
> relevant to answering the question of how many people view them as close
> substitutes.

(Exhibit 1 (Katz Dep.) at 104:13-22.)

   At the outset, we note that Professor Katz and the Government have argued that

the relevant market is limited to "network services to merchants".  To the extent that is meant to

encompass a market that includes all of the products and services that American Express

provides to merchants and consumers alike as a fully integrated platform, then there is agreement

between the parties since American Express is in fact a fully integrated platform and does in fact

provide such products and services on both sides of the market.  To the extent it is instead meant

to limit the alleged relevant market to just the physical "moving of electrons" across a payment

network—to the exclusion of everything else that American Express does to run its card business

and compete for transaction volume—then that argument makes no sense.  American Express

does not sell just the moving of electrons, it sells an integrated product simultaneously to

merchants on the one hand and consumers on the other.  There is no "network services" price

that merchants or consumers pay for American Express's payment services—which is precisely

why the Government looks at American Express's merchant discount rate, not a "network

service fee", when purporting to analyze American Express's alleged pricing power in its attempt

to define a separate market for T&E network services.

   Indeed, since the entire purpose of a market definition analysis is to allow for a

"context-specific inquiry into" the alleged effects of American Express's conduct (SJ Order at 9),

it makes no sense to define the market to include only a product that American Express does not

24

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

actually sell.  The backbone of the Government's market power allegations is that American Express can exercise market power on the merchant side of this two-sided market because of the activity it engages in on the consumer side, including all of the payments it makes to consumer and corporate Cardmembers purportedly in exchange for their insistence; that activity, which is fundamental to the Government's market power theory, does not consist of moving electrons, and American Express, of course, does not gain "insistence" from moving electrons.  In short, the Government's argument that the Court should look only at a "network services" market is fundamentally incoherent, as it is inconsistent with both the facts and the Government's own theories.

B.    **The Relevant Market Includes Debit Cards.**

As previewed in its Motion in Limine to Exclude Dr. George Hay's and Dr. B. Douglas Bernheim's Market Definition Analysis ("Debit Mot."), the Government will rely heavily on Judge Jones's decision in U.S. v. Visa and testimony by one of American Express's economic experts, Dr. George Hay, in American Express v. Visa, as support for the exclusion of debit from the relevant market.  (Debit Mot. at 1.)  However, those conclusions, just like the Government's views, are outdated, and relying on them here is rear-view-mirror litigation.  A relevant market must be defined based on current market evidence and existing commercial realities.  See Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 446 (4th Cir. 2011).[13]  Over a decade has elapsed

_____

[13] The Government itself recognized this principle in U.S. v. Visa.  At the time of that case, the most recent precedent involving the payment card industry had defined the relevant market to include all forms of payment (including cash and check).  That precedent did not stop the Government from arguing for a different market definition based on more current information in Visa.  As the Government argued on appeal to the Second Circuit, "[b]ecause market definition is a deeply fact-intensive inquiry . . . . that another district court made different findings based on a different trial record compiled by a different plaintiff 17 years ago is immaterial to the record

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

since <u>U.S. v. Visa</u>, and over seven years have elapsed since <u>American Express v. Visa</u>.  Since

2007, the payments industry has undergone profound change that has fundamentally altered the

competitive significance of debit cards relative to credit and charge cards, and there is a wealth

of data on current consumer substitution that was not available—because it did not exist—at the

time of the <u>Visa</u> litigations.  The record evidence will demonstrate that debit cards, credit cards

and charge cards compete in the same relevant antitrust market <u>today</u>.

<div style="text-align:center">1. <u>The Data and Documents of Market Participants Compel A Finding That Debit is in the Market.</u></div>

To begin, there is substantial market data and other evidence documenting the

evolution of debit into a significant competitor to credit and charge cards in recent years.  (Opp'n

to Debit Mot. at 1, 8-9.)  Among other things, the data show that debit usage has exploded, with

its share of purchase volume growing approximately <u>270%</u> since 2000 (<u>see</u> Figure 1) and its

share of plastic spend steadily increasing to the point where it is now nearly <u>50% of all</u>

<u>transactions on plastic cards</u>.[14]

---

in this case and does not provide a basis to question the court's findings here".  (DX1191 at 42 n.35.)

[14] <u>See</u> DX6501 (Rebuttal Report of Douglas B. Bernheim ("Bernheim II")) ¶¶ 90-93, Fig. 9.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

**Figure 1**



**Shares of Consumer Payment Volumes (2000-2011)**
(Source: DX6503 (Hay II) at 22, Fig. 1)

This dramatic growth can be seen across card networks and merchant industries, including industries that comprise the Government's alleged T&E market.  (See Table 1 & Table 2.)

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**



The Government and Professor Katz claim that the substantial growth in debit has come at the expense of checks and has not translated into competitive pressure on credit and charge card products.  Analyses conducted in the ordinary course by card networks themselves directly refute that assertion.  For example, a market analysis conducted by MasterCard in 2009 concluded that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ (DX4628 at 148-50 (emphasis added).)  Similarly, a 2009 Visa study ██████████████████████████████████████████ ███████████████████████████████████████████████ (DX4583 at 092.)  A 2010 market analysis conducted by Discover noted ████████████ ████████████████████████████████████████████████████

28

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

████████████████████████████████████████████████████████

(DX5376 at 057.)

        Numerous internal American Express documents reflect similar conclusions regarding the growing cannibalization of credit and charge cards by debit cards and the significant competitive threat that debit now poses to credit and charge cards.  (See, e.g., DX4431 at 617, 646 (2009 American Express market analysis finding that ███████████ █████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ DX5218 at 564-65 (2010 American Express market analysis noting "**[t]he growing threat of debit to credit**" and concluding that American Express ████████████████████████); DX5426 at 366 (2010 American Express market analysis concluding that ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ DX7417 at 126, 138 (March 2010 board presentation discussing ████████████████████████████████ ████████████████████████████████); DX7416 at 242 (March 2010 internal memorandum noting ███████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████.)  These ordinary-course documents stand in stark contrast to the much older business documents produced by the networks in U.S. v. Visa, which, as Judge Jones pointed out in support of her market definition

29

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

ruling, reflected the networks' observations at that time of a <u>lack</u> of "cannibalization of credit by debit". <u>Visa</u>, 163 F. Supp. 2d at 337 n.8; <u>see also</u> <u>Park v. Thomson Corp.</u>, No. 05 Civ. 2931 (WHP), 2007 WL 119461, at *5 (S.D.N.Y. Jan. 11, 2007) ("[I]ndustry recognition is a relevant consideration when determining whether two products are indeed interchangeable.") (citing <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962)).[15]

The rapid growth in debit usage coincides with the decline of the functional differences that distinguished debit and credit at the time of the <u>Visa</u> litigations. In its Complaint in this case, the Government cited convenience, acceptance, security and deferred payment as the key characteristics that allegedly distinguish credit and debit cards in the minds of consumers. (Am. Compl., Dkt. No. 57, ¶ 37.) Similar metrics were cited by Judge Jones in <u>U.S. v. Visa</u>, 163 F. Supp. 2d at 337. Professor Katz clung to those same alleged distinctions in his opening report, copying nearly verbatim the relevant paragraphs he offered in his expert report in <u>U.S. v. Visa</u> <u>more than 14 years ago.</u>[16] But the available data show that these characteristics no longer meaningfully distinguish credit from debit in the minds of consumers. For example, data from a 2009 survey conducted by the Federal Reserve Bank of Boston show that a significant majority of consumers <u>disagree</u> with the Government on the materiality of the differences between credit and debit with respect to convenience, security and acceptance. (<u>See</u> Opp'n to Debit Mot. at 9

---

[15] American Express's concerns about the cannibalization of American Express credit and charge volume by debit are also reflected in the terms of American Express's more recent agreements with its cobrand partners. For example, the evidence will show that,

[16] <u>Compare</u> (DX6466 (Katz I) ¶¶ 90-101 <u>with</u> DX0697 (Expert Report of Michael L. Katz, <u>U.S. v. Visa</u>) ¶¶ 55-65, 68.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

(discussing the Survey of Consumer Payment Choice, which shows that most consumers now view debit cards as equal to or better than GPCC cards in terms of security (84%), acceptance (82%) and convenience (85%).)  That same survey found that consumers are more likely to switch between credit and debit when they perceive the costs of one to be higher than the costs of the other.  (Id.)  Of course, none of this highly probative data on interchangeability and consumers' cost sensitivity was available to the courts or the parties in either of the Visa litigations.

The evidence also shows that debit acceptance by merchants has grown dramatically—it is now accepted more widely than American Express—and that many debit cards are now accorded security features that are very similar to the liability policies for credit and charge cards.  (See DX6501 (Bernheim II) ¶¶ 99-100.)  The final metric cited by the Government—deferred payment—also does not support excluding debit from the relevant market.  Many debit cards come with deferred-payment options today.  Charge cards do as well, but as a general matter only for a brief period and, therefore, are in this respect very similar to debit cards.  Moreover, the majority of credit card users today are "transactors" rather than "revolvers" (that is, they do not take advantage of the deferred payment credit facilities and instead pay their balance each month), so for those consumers the absence of a revolving facility on debit cards would be meaningless.  (See id. ¶¶ 101-106.)

The Government will also argue that consumers generally do not use credit and debit for similar purchases at the same merchant.  Again, the record evidence will demonstrate otherwise.  For example, the analysis conducted by American Express's experts of the transaction-level data produced from the loyalty-card databases of the Individual Merchant Plaintiffs in MDL-2221 directly refutes the Government's subjective compartmentalization

31

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

hypothesis by demonstrating frequent switching between American Express cards and debit cards by the <u>same</u> consumers at the <u>same</u> merchants for <u>similarly sized</u> transactions. (Opp'n to Debit Mot. at 14.) That analysis shows that in the majority of the Individual Merchant Plaintiffs whose loyalty data was analyzed, such switching from American Express cards to debit cards was <u>more</u> likely than such switching from American Express cards to all other general purpose credit and charge cards (all of which are included in the Government's alleged relevant market) combined. (DX6501 (Bernheim II) ¶ 697, Fig. 106.)[17] Thus, the data show that consumers switch with more frequency between products the Government claims are <u>outside</u> the market than between products it concedes are <u>within</u> the market. It is for this very reason that American Express's newest credit card product, the American Express EveryDay Card, is designed to take transaction volume away from debit by persuading consumers to switch from debit to an American Express Card in exactly the types of transactions in which the Government insists that consumers "compartmentalize" to debit.[18]

_____

[17] As it did in its Debit Motion, the Government will attempt to undermine the significance of these findings by claiming that there is no evidence that the observed switching was done in response to changes in price. At trial, Professor Bernheim will demonstrate that these criticisms are baseless. For example, as he explained, the fact that consumers are frequently switching from debit to credit in response to relatively minor changes in conditions itself speaks volumes about their willingness to switch between debit and credit in response to a direct increase in price: "When you have variations in conditions that give rise to consumer switching, and you have reason to believe that those changes in conditions are relatively minor, then it follows directly from economist principles that consumers will be similarly responsive to relatively small changes in prices. . . . [And] what we're seeing here is responses that people make to the relatively minor variations in the conditions that they're encountering when they shop for basically the same things at the same place at points in time that are nearly adjacent." (Opp'n to Debit Mot. at 13 n.2.)

[18] See DX7405 at 909 (describing design target of the EveryDay Card as customers who are ███████████████████████████); DX7410 at 152 (consumer focus group study during the development of the EveryDay Card finding that the Card ████████████████████████████ ███████████); DX7411 at 488 (American Express's internal marketing documents for the EveryDay Card include the "sound bite", "With Debit, all you get is a receipt").

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

There is also substantial evidence that merchants <u>perceive</u> that their customers have grown increasingly more willing to switch between debit cards and GPCC cards. ███

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████[20]

Finally, the evidence will show that many merchants in recent years have used the blended rate the merchant pays for Visa and MasterCard credit and debit as a point of comparison with American Express's rates in negotiations with American Express.  For example, a 2009 internal American Express deck noted that ████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

██████████████  (DX4884 at 190.)  Similarly, in 2012, Jetro Cash & Carry, a wholesale grocery supplier, requested a rate reduction from American Express in light of the fact that Jetro paid a lower blended debit/credit rate for Visa and MasterCard, and even threatened to discontinue acceptance of American Express cards if it did not receive the requested reduction.  Ultimately, American Express acquiesced.[20]  In fact, the evidence will demonstrate that many

_____

[19] ████████████████████████████████████████████████

███████████████  (<u>See</u> DX5183 at 335.)

[20] See also DX5369 at 344 (American Express email noting that ████████████████

████████████████████████████████████████); DX5571 at

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

merchants—including large, sophisticated merchants—do not even distinguish how many of their transactions are credit versus debit, often because their acquirers bill them in a way that blends together debit and credit purchases on the Visa and MasterCard networks.  It is the blended credit/debit price—not credit prices alone—that are exerting competitive pressure on American Express.

2.    The Government's Flawed SSNIP Test Proves Nothing.

In the face of this and other record evidence, the Government will cite to Professor Katz's alleged SSNIP tests.  We describe them as "alleged" SSNIP tests because they are not real SSNIP tests.[21]  The point of a SSNIP test is to add some measure of mathematical certainty to the evaluation of the contours of the relevant market.  It therefore requires not only data about the price to which the small but significant increase is to be applied, but also data reflecting the extent to which purchasers will respond to that increase in price (i.e., what percentage of sales would be lost in response to a small but significant price increase by the hypothetical monopolist).  If the data demonstrate a strong enough response from purchasers to make the price increase unprofitable, then the SSNIP test suggests that the alleged market is too narrow and additional substitutes (i.e., the products to which the purchasers are switching in response to the price increase) must be included.

The problem for Professor Katz with respect to this issue is that he never attempts—and by his own admission does not have the data—to calculate what the actual loss would be for the hypothetical monopolist if it imposed a small but significant increase in price on

---

403 (American Express email noting, ███████████████████████████████
███████████████████████████████████████████████

[21] SSNIP is an acronym that stands for "small but significant non-transitory increase in price".

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

merchants.  (Id.)  Instead, his conclusion that a hypothetical monopolist of credit and charge cards would be able to profitably implement a small price increase on merchants is based solely on his own intuition that it would be "implausible" that the monopolist would lose so much charge volume in response to the increase as to render it unprofitable.  (See DX6466 (Katz I) ¶¶ 162, 171, 191.)  This "plausibility" is a qualitative judgment; it is not the quantitative measure that is used for a true SSNIP test.  Thus, Professor Katz's alleged SSNIP test does not quantitatively confirm his subjective analysis, it merely restates it.  And, as discussed above, the record evidence will show that consumers and merchants view credit and debit as reasonably interchangeable substitutes.

There is an additional flaw in Professor Katz's SSNIP test.  In conducting his test, Professor Katz looks only at whether merchants would respond to a small increase in price by cancelling credit card acceptance; he does not even attempt to analyze the "plausibility" of the hypothetical monopolist's losing charge volume (short of cancelling) as a result of merchants' offering discounts to debit (as currently permitted) or by applying a surcharge to credit and charge card transactions, but not debit card transactions (as contemplated by the proposed class action settlement subject to final approval proceedings before the Court).[22]  For these reasons and others that will be addressed at trial, Professor Katz's hypothetical monopolist test is unpersuasive.[23]

---

[22]Joint Pretrial Submission, Dkt. No. 362, at 14-17.  Because three of the four credit card networks (representing nearly 75% of credit and charge card spending and more than 90% of credit and charge cards in circulation) currently permit such differential surcharging vis-à-vis debit—and American Express has a proposal in place to join those networks—it would be unreasonable to assume that a hypothetical monopolist would not similarly permit such differential surcharging, regardless of what happens with American Express's settlement.

[23] The suggestion that debit merchant discount rates cannot constrain credit and charge cards merchant discount rates because consumers do not observe changes to merchant discount rates is

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Professor Katz will also attempt to show that his exclusion of debit from the relevant market is supported by events following the enactment of the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which capped the interchange fees charged by large issuers for debit transactions and provided merchants the right to offer discounts to customers for using debit cards.  Professor Katz's reliance on the Durbin Amendment is misplaced.  For example, a premise of Professor Katz's Durbin analysis is that the cost of debit decreased for most merchants (resulting in an effective increase in the relative cost of credit and charge cards).  According to Professor Katz, merchants did not respond to that effective cost increase by steering from credit and charge to debit or dropping credit and charge cards entirely.  That premise, however, is false.  As Professor Bernheim will demonstrate, for many merchants, debit rates either stayed the same or <u>increased</u> following the enactment of Durbin.  There are a variety of reasons for that, including because not all issuers are subject to the regulations and because interchange is only one component of the all-in fees that merchants pay for debit acceptance, and when debit interchange was regulated, other unregulated fees increased.  In fact, Professor Bernheim's analysis shows that, contrary to Professor Katz's assumptions, the average rate that merchants pay for debit was essentially flat between the years preceding Durbin and the years following its implementation.

---

a red herring.  First, as noted above, as a result of the Durbin Amendment merchants can price debit transactions differentially to credit transactions via discounts.  Second, this argument misses the point.  It does not matter if the consumer sees the price difference.  What matters is whether the merchant believes enough consumers will switch to debit if it drops credit and charge cards or prices purchases made by debit cards differently from purchases made by credit and charge cards.  That question depends entirely on consumer substitution patterns which, as described above, demonstrate that debit is in the relevant market.

36

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

C.      **The Government's Attempt to Define a Separate T&E Market Fails.**

The Government's alleged T&E market is nothing more than an improper attempt to inflate American Express's market share and avoid the indisputable fact that, even by the Government's flawed measures, American Express merchant discount fees are below those charged by its competitors in several merchant categories, and American Express's aggregate merchant discount fees have been in a prolonged and steady state of decline for more than two decades.

No court addressing this industry has defined such a narrow market limited to the use of general purpose credit and charge cards at a subset of merchants, and it makes no sense to do so here.  A **general purpose** payment card network simply cannot survive serving only a subset of merchant industries—it must be available for use **generally** by being accepted at a wide variety of merchants.  History has proven this.  For years, American Express focused primarily on so-called T&E merchants, and it competed with networks such as Diner's Club and Carte Blanche that had a similar focus.  This business model proved unsustainable, and American Express focused its energies on expanding into everyday-spend merchant industries to avoid spiraling into competitive irrelevance just as Visa and MasterCard were expanding their penetration in T&E industries.  By contrast, Diners and Carte Blanche have disappeared as meaningful competitors <u>because</u> they failed to compete for business at non-T&E merchants.

The fate of the T&E networks is an illustration of the interrelationships between merchant categories known as spillover effects or network effects.  Network effects in the payment card industry occur when the decision by one group of merchants to accept or not accept a network's cards impacts the value that other merchants receive from accepting the card. This is caused by the impact that the first merchants' decision has on the number of consumers who carry and prefer using the network's card.  The more merchants that take the card, the more

37

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

consumers will see the card as something useful to carry.  And as more consumers carry a card, more merchants will want to take the card.  This is why scale (or ubiquity) is so critically important in the industry, as Professor Katz himself explained in his testimony in U.S. v. Visa:

> "**Network effects are a form of increasing returns to scale and thus create benefits to size that make it difficult for small systems to compete effectively**.  MasterCard and Visa executives have identified the fact that American Express has a smaller acceptance network than of the two associations as a significant source of competitive disadvantage for American Express."

DX0697 (Expert Report of Michael L. Katz, U.S. v. Visa) ¶ 41.

Network effects can be positive.  For example, American Express found that by expanding into non-T&E categories, the value it was able to deliver to T&E merchants was significantly enhanced.  Network effects can also be negative.  For example, if a major airline such as Delta decided to no longer accept American Express, it would have a profound impact on American Express's charge volume not just at Delta but at numerous other merchants as consumer and corporate Cardmembers decided to no longer carry or use American Express for their general purpose spending.[24]  Professor Katz has described this possibility, defining negative spillover (or network effects) as a situation in which "a network, say, lost so many cardholders that then there were merchants who thought the network wasn't relevant, so they stopped carrying it.  And that led other cardholders then to say, well, I'm not going to take the card anymore".  (Katz Dep. at 26:5-20.)  As a result, it simply makes no sense to carve off a subset of

---

[24] See, e.g., DX2036 at 011 (2004 analysis estimating the positive spillover charge volume at other supermarkets and other industries that signing Wal-Mart and Target had generated ███████ ███████████████████████████ and also estimating the loss of spend at and acceptance by other merchants that would result from losing them as accepting merchants); DX3974 at 281 ███████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

merchant categories and label it a separate antitrust market when spillover effects inextricably link all merchant categories and no network could survive serving only a subset of merchant categories.[25]

Professor Katz has claimed that these spillover effects are not empirically significant, do not impact American Express's pricing decisions, and therefore do not affect the propriety of carving off a submarket confined to so-called T&E merchants. But the painful lessons learned by Carte Blanche and Diner's Club refute the contention that spillover effects are not empirically significant, and there are numerous American Express business documents that demonstrate American Express's recognition that spillover effects are critical to its business and pricing strategies.[26] Indeed, its competitors have chosen to act aggressively on this. Evidence of significant spillover effects can be seen in Visa's "And They Don't Take American Express" and

---

[25] In a widely-cited article on market definition analysis, a former Chief Economist at the Department of Justice Antitrust Division underscored the importance of taking such effects into account when defining antitrust markets in two-sided industries. He noted:

> "If one does mistakenly focus on rent to only a particular type of retail store, one must recognize the two-sided nature of the market in which feedback effects occur in other retail stores in the mall. An increase in the percent of sales charged as rent to the bookstore could lead to higher book prices and fewer customers to the bookstore and, thereby, to all other stores in the mall. The fall in mall customers leads to a decline in sales in other retail stores and a decline in rents from these stores. Failure to understand this feedback effect could lead one to overestimate the profitability to the mall owner of raising rents to the bookstore and, thereby, lead one to define markets too narrowly and overestimate market power."

DX3390 (Dennis W. Carlton, Market Definition:  Use and Abuse, Competition Pol'y Int'l, Spring 2007) at 26 n.46.

[26] See, e.g., DX2036 at '011 (2004 analysis estimating the impact of losing either Wal-Mart or Target as an accepting merchant on coverage and spending at other merchants); DX4007 at 932 (2008 presentation summarizing the results of Amex's analysis of the effect of the signing of Carrefour, a supermarket in France, and finding that signing Carrefour "resulted in a spend spill-over" at other merchants).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

"We Prefer" campaigns, the very purpose of which was to impact consumers' perceptions of American Express coverage—and thus their willingness to use American Express Cards—not just at the handful of restaurants and resorts featured in the advertisements but at merchants more broadly.[27]  That is also exactly why MasterCard runs advertisements using the tagline "For everything else, there's MasterCard" and television commercials bragging that they are accepted in "twice as many places" as American Express, and why Visa's tagline is "Everywhere You Want to Be".  Both recognize that the American Express coverage gap impacts consumer perceptions of the utility of the American Express Card and is a weakness that they can exploit to increase their share of merchant charge volume.

American Express will also offer the regression analysis conducted by Professor Janusz Ordover to study the presence and degree of any link between merchant acceptance of American Express and cardholder spending using an American Express Card.  Using both American Express and publicly available data from 2005, 2009 and 2010, Professor Ordover analyzed American Express acceptance and spending patterns in approximately 200 market areas around the United States and found a positive relationship between the two.[28]  Specifically, Professor Ordover found that a 1 percentage point decrease in the proportion of merchants accepting American Express decreases American Express's share of cardholder spending by 0.4-1.7 percentage points, and a 1 percentage point decrease in American Express's share of cardholder spending decreases the proportion of merchants accepting American Express by 0.3-

---

[27] See, e.g., DX0229; DX0419.

[28] The 2005 data used in Professor Ordover's analysis was first used by Professor Willig in his analysis in the Exclusionary Rules case against Visa and MasterCard, American Express Travel Related Services Co. v. Visa U.S.A. Inc., et al., No. 1:04-cv-8967 (S.D.N.Y.).  Professor Ordover updated and expanded this analysis using data from 2009 and 2010, the most recent years for which a complete set of data was available.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

1.0 percentage points.  These results provide empirical evidence of the significant network effects faced by American Express, showing that the concerns about network effects reflected in American Express business documents are real and material.

Professor Katz—retained by the Government, which has the burden of proof in this case—never conducted any such analysis.  Instead, he supports his conclusion that spillover effects are economically insignificant by mischaracterizing the record.  For example, he claims that American Express did not take spillover effects into account when determining merchant fees in connection with its "value recapture" initiatives,[29] citing testimony from Jack Funda, an American Express senior pricing executive.  (See DX6540 (Sur-Rebuttal Report of Michael L. Katz ("Katz III")) ¶ 147 & n.244 ("Amex's senior pricing executive, Jack Funda, acknowledged that [American Express's] value recapture analyses did not include any calculation of the 'loss of the utility of the network to our Cardmembers when we lose merchants that were previously accepting merchants.'")  In fact, in the cited testimony, Mr. Funda explained that the math reflected in American Express's value recapture documents did not reflect spillover only because it "is very difficult to quantify", but he made clear—just as Professor Carlton explained in his widely-cited article (see supra note 25)—that "it's a core factor that is easily overlooked when you look at these sorts of ratios".  (Exhibit 2 (Funda Dep.) at 254:14-256:9.)  Consistent with Mr. Funda's deposition testimony, American Express pricing witnesses will testify at trial that spillover is critical to American Express pricing decisions and serves as a significant competitive constraint on American Express's merchant fees in all industries.

---

[29] As discussed in more detail below, value recapture was an undertaking by American Express, beginning in the mid-2000s, to re-align its merchant discount fees in certain industries as to which American Express delivered the most value and incurred the most costs in doing so, following a decade during which American Express's fees mostly stayed constant in the affected industries while Visa and MasterCard's fees increased significantly.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Professor Katz will also offer a SSNIP test in support of the Government's alleged T&E market.  This test suffers from the same problems as his broader SSNIP test, as well as a host of others that will be demonstrated by American Express's experts.  Professor Katz's— and the Government's—reliance on alleged price discrimination also cannot overcome the lesson that history teaches us about the absence of a so-called T&E market.  It is true that American Express generally charges, on average, a higher discount fee to T&E merchants such as airlines and hotels than it charges non-T&E merchants such as grocery and drug stores.  But price discrimination exists only where fee differentials across different groups of purchasers are not justified by cost differences.  (See, e.g., Exhibit 1 (Katz Dep.) at 178:22-179:3.)  Professor Katz has not conducted an analysis that supports a conclusion that such cost differences are absent here.  In contrast, Professor Bernheim has concluded and will demonstrate at trial that American Express does in fact incur significantly more costs in serving T&E merchants than it incurs in serving non-T&E merchants.  He will also show that, along with the substantial joint costs American Express incurs in serving all merchant categories, the difference between the profit margins that American Express earns at T&E merchants and the profit margins it earns at non-T&E merchants are at most miniscule, and likely non-existent.[30]

---

[30] Moreover, as the Court noted in its Summary Judgment Order, there is a "strong argument that in this and other industries with high up-front costs and low marginal costs . . . price discrimination can coexist with a high degree of competition".  (SJ Order at 21.)  Thus, even if (contrary to the data) American Express engaged in price discrimination against T&E merchants, it would not demonstrate an ability to exercise market power over those merchants and thus could not justify defining a separate T&E antitrust sub-market.

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

## II. AMERICAN EXPRESS DOES NOT HAVE THE SUBSTANTIAL MARKET POWER THAT A FIRM WOULD NEED TO HARM COMPETITION THROUGH NON-DISCRIMINATION PROVISIONS.

It is a bedrock principle of antitrust law and economics that a firm cannot harm competition through a vertical agreement unless it has substantial market power. The Government and Professor Katz endorse this principle. For example, in his reports, Professor Katz notes that "[s]ome practices are legal when utilized by a firm lacking market power, and illegal when utilized by a firm with substantial market power" (DX6507 (Rebuttal Report of Michael L. Katz ("Katz II")) ¶ 23 n.23), and, at his deposition, Professor Katz testified that, in this case, a network would have to possess a particularly substantial degree of market power to be able to harm competition through vertical practices. (See Katz Dep. at 236:19-237:6 ("[I]n the two-sided market" a firm could even "have the power to set price above the competitive level" yet at the same time "lack market power to engage in various forms of anticompetitive conduct").) Indeed, the Government's entire case turns on the premise that American Express can "impose" anticompetitive restraints on merchants who have no choice but to accept American Express because of its purported antitrust market power. (See SJ Opp'n at 1; see also Summ. J. Hr'g Tr., Mar. 19, 2014 ("SJ Hr'g Tr.") at 21:24-22:2 ("Merchants would like to be free to tell [their customers] what [cheaper forms of payment] are and maybe to ask them to use a different method, but they don't have that option because Amex won't let them.") (emphasis added); id. at 35 ("All these restraints that Amex imposes work to disrupt the way a market would normally work.") (emphasis added).)

The issue at the summary judgment stage was not whether the Government can prevail if the evidence establishes that American Express lacks antitrust market power. As the

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Court's order recognizes, the Government plainly cannot.[31]  Instead, the issue was whether the Government has to prove directly that American Express has antitrust market power as a separate element of its rule of reason claim (i.e., the traditional approach) or whether it can instead satisfy its threshold burden using the theoretical approach—discussed in the case law but never actually applied by any court to find a Section 1 violation in a vertical case—of proving actual adverse effects on competition in the relevant market.  The Court held that either approach could work, but in all events the law is clear that if American Express lacks market power, the Government cannot win this case.  (See SJ Order at 9.)

At trial, the evidence will not support a finding that American Express has the market power necessary to harm competition through vertical agreements.  As the Court has explained, antitrust market power is the power to "price substantially above the competitive level" and "persist in doing so for a significant period without erosion by new entry or expansion".  (Id. at 16 (internal quotation marks omitted).)  Market share is an important consideration in assessing whether a firm has market power, but not the only component.  (Id. at 22.)  The other factors relevant to the assessment of market power in this case are whether American Express's price levels and history reflect market power, whether the alleged price discrimination reflects market power and whether Cardmember desire to use the Card (referred to as "insistence") is a source or evidence of market power.  Each is discussed below.

---

[31] As the Court noted, evidence of "actual adverse effect 'arguably is more direct evidence of market power than calculations of elusive market share figures'" since a firm cannot cause such effects if it lacks market power.  (SJ Order at 12 (quoting Todd, 275 F.3d at 206).)

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

A.     **The Market Share Evidence Is Inconsistent With a Finding of Market Power.**

    1.     American Express's Market Share Undermines Any Finding of Market Power.

There is a presumption in this Circuit that a firm with less than 30% market share is incapable of exercising antitrust market power.  (Defs.' SJ Br. at 12; Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp., 262 F. Supp. 2d 50, 74-75 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power.") (emphasis added).  To be sure, this is a presumption, not a dispositive screen.  Thus, the law in this Circuit does not compel a finding that a firm with less than that share necessarily lacks market power.  However, this presumption establishes that if a firm is below the 30% threshold, the Court can only find the ability to harm competition if there is strong countervailing evidence that rebuts the presumption.

American Express's share is well below this level, so the presumption applies.  In the relevant market of general purpose credit, charge and debit cards, American Express's current share of consumer spend is approximately 15%.  No court in this circuit has ever found that a firm with anything approximating this market share had the ability to harm competition.  Even if the Court were to conclude that the relevant market excludes debit cards, American Express's share is just over 26%.  The only case in this circuit in which a market participant with that low of a share has been found to have the power necessary to harm competition was U.S. v. Visa, but any comparison of American Express to MasterCard in that case fails for the reasons set forth below.

As the Court noted in the Summary Judgment Order, on a number of other relevant metrics American Express's share is even lower.  (SJ Order at 18 n.3.)  American Express's share of cards in circulation lags behind all the major credit card platforms, whether

45

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

debit is included (in which case American Express has about a 5% share, <u>see</u> Figure 2 below) or

excluded (in which case American Express has about a 10% share, <u>see</u> Figure 3 below).



American Express also has by far the smallest share of merchant coverage out of

the four primary networks.  (<u>See</u> Figure 4.)  Contrary to the Government's claim, merchants that

do not accept American Express are not all small; they include, among others, Progressive

Insurance, one of the largest providers of car insurance in the country, and Sam's Club, a major

warehouse chain owned by Walmart.



**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

The existence of three million merchants that accept plastic and that make the choice every day that they do not need to accept American Express directly refutes the claim that American Express is a "must carry" card.[32]  The evidence will also show that the coverage gap is a major concern for American Express and a significant source of competitive disadvantage that American Express has continually sought to address by cutting prices and trying to improve its value proposition and relevance with smaller merchants.  American Express witnesses will explain how the negative effects of the coverage gap are amplified as a result of its effects on consumers' perceptions of coverage.  As the court in U.S. v. Visa explained it:  "Merchant acceptance, and the consumer perception of merchant acceptance, is vital to a network for obvious reasons. . . .  Increased merchant acceptance—and increased perception of merchant acceptance—can lead to an increase in card issuance and transaction volume."  See 163 F. Supp. 2d at 387-88; see also id. at 387-89 (noting that Discover "still suffers from a perception gap (based on its lower acceptance in the past) that places it at a competitive disadvantage because consumers are embarrassed when their card is rejected and do not try to use it again").[33]

---

[32] The Government's arguments to the contrary are untenable.  For example, the Government's claim that American Express has not lowered prices to attract holdouts because doing so would force American Express to lower prices to all of its existing merchants and American Express would rather live with the coverage gap to avoid that outcome (i.e., American Express could not profitably price discriminate) is entirely inconsistent with the Government's separate argument that American Express has substantial market power precisely because it can price discriminate.  In addition, the evidence will show that American Express's merchant coverage gap is not the result of American Express's purported unwillingness to lower price but rather is the product of merchant perception and relevance—many merchants assume American Express is more expensive than Visa and MasterCard even in sectors where American Express's fees are at or below those of Visa and MasterCard, and many merchants simply do not see a sufficient number of American Express customers come through their doors to justify acceptance in their view.

[33] The events surrounding American Express's acquisition of a portfolio of corporate card accounts from General Electric's GE Money subsidiary underscore these issues and directly refute the Government's claim that the coverage gap is the result of American Express's own choices.  The evidence will show that almost immediately after American Express acquired the

47

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Faced with this presumption, the Government will continue arguing that because MasterCard was found to have market power at 26% share in U.S. v. Visa, the presumption that American Express lacks market power at this same share (which measures share in a market that does not exist) does not apply.  But American Express's share cannot be compared to MasterCard's at the time of U.S. v. Visa.  The Government already rejected that comparison as a "red herring".  (Defs'. SJ Br. at 18.)  Visa involved horizontal agreements, not vertical ones.  (SJ Order at 17.)  MasterCard dwarfed American Express then and continues to dwarf American Express today in share of cards and merchant coverage.  (Id. at 18 n.3.)  As the Government argued in Visa, MasterCard had market power because it was intertwined with Visa—both networks were structured as non-profits, jointly owned and controlled by thousands of common banks that provided significant support to the merchant and consumer relationships which American Express lacks.  (Defs.' SJ Br. at 19.)  Finally, in Visa, there was direct evidence of actual exclusion.  Prior to the litigation, not a single bank in the U.S. broke with the associations to issue a card on the American Express or Discover networks.  See Visa, 163 F. Supp. 2d at 400.

---

GE Money portfolio, numerous corporations that had accounts in the portfolio started cancelling their corporate cards, citing American Express's lower coverage as a primary reason.  (See, e.g., DX4050 at 729 ("Most top GE clients have cited merchant coverage as a key concern.  Near parity coverage is critical to (1) convincing clients to stay, and (2) realizing ▮▮▮ in spend."); DX4057 at 754 ("Each of the top clients that we have visited already has cited merchant coverage as their top concern with migrating to an Amex program.").)  To attempt to address the coverage issue and stem the tide of attrition, American Express tried to narrow its coverage gap with a variety of low-fee and zero-fee pricing experiments that should have succeeded if there were any validity to the Government's claim that the gap is all about pricing.  (See DX4366 (Small Merchant Pricing Test – GE Money (2009)).)  However, that is not what happened; rather, as an American Express pricing executive reported:  "It seems clear that price is not the problem standing in the way of a profitable business here . . . but relevance (CMs showing up and wanting to use the card) is".  (See DX4811 at 739 (emphasis added); see also DX2806 at 300 ("Among rejectors, CM demand is the overwhelming reason for declining the Flat Fee offer.  In fact, even when Amex was perceived cheaper than Visa, it was still widely rejected.").)

48

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

There is absolutely no such evidence here relating to American Express's position in the marketplace.

> 2.    American Express's Share History Undermines Any Finding of Market Power.

The evidence will also show that American Express lacked antitrust market power at the time of U.S. v. Visa and, since then, has continually declined in share (with debit included) and grown only slightly (if debit is excluded) notwithstanding billions of dollars of investments in both Cardmember and merchant services (and, as discussed below, declining prices).  This evidence of increased competitive pressure, declining price and improving quality is fundamentally inconsistent with the notion that American Express has acquired antitrust market power since U.S. v. Visa—when it indisputably lacked such power.  It also directly refutes the Government's claim that American Express enjoys antitrust market power today and has exercised that power to price above competitive levels and harm competition in the industry.

That American Express lacked antitrust market power in the late 1990s and early 2000s is beyond debate.  In just the three-year span from 1990 to 1993, American Express's share of credit and charge card purchase volume dropped sharply from 24.7% to 20.9%.  It languished there for the next decade.  During this time, American Express faced cancellations by influential restaurants in Boston and across the country as part of the Boston Fee Party,[34] was under constant attack from Visa and MasterCard and was the victim of the exercise of antitrust market power by those networks through the imposition of the Exclusionary Rules.  American

---

[34] The Boston Fee Party was an event in Boston in 1991 in which a group of restaurants banded together to protest American Express's merchant fees and the way in which it was dealing with its merchants.  The most lasting image of that event was a picture that ran in the Boston Herald, and was subsequently picked up by the Wall Street Journal and Boston Globe, of one restaurateur—Steve DiFillippo—driving a butcher knife through an American Express Card.  Many of those merchants cancelled American Express acceptance, and the media attention was intense.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Express business documents and testimony will confirm what its share history makes evident—American Express was in dire straits.  A presentation Mr. Chenault gave in 1996 underscores the precariousness of American Express's market position.  (See DX0319.)  In that presentation, Mr. Chenault highlighted the steady decline in American Express's market share and the need to compete more aggressively and innovatively to avoid spiraling into competitive insignificance:

> "I'll tell you what's not debatable.  **We are behind and we are going to have to grow market share substantially** in terms of charge volume and share of outstandings.  **This is the game we are in for the Card business.  We must become more relevant in the marketplace by becoming more relevant in our customers' lives.**"

(Id. at 998 (emphasis added).)  Notably, during this entire time American Express had Non-Discrimination Provisions and they did nothing to protect it against this share loss, evidencing the fact that those provisions do not shield American Express from competition for share of merchant charge volume as the Government claims.

**Figure 5**

**American Express's purchase volume share for general purpose credit and charge cards**
**(Source: DX6501 (Bernheim II) at 17, Fig. 1)**



**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Such rapid and sustained share loss is inconsistent with the notion that American Express had market power at that time, see, e.g., Commercial Data Servers, 262 F. Supp. 2d at 74-75, and it is dispositive when viewed in the context in which it occurred. That is why the Government had no choice but to concede American Express's lack of market power in U.S. v. Visa. (See Defs.' SJ Br. at 5 (citing Visa filings in which the Government and Professor Katz described American Express as having "significantly limited" "competitive vitality" and "weaken[ed] . . . card output, merchant acceptance, and overall ability to offer competitive general purpose cards").)[35]

The question, then, is at what point between the early 2000s and now did American Express suddenly gain the power to harm competition? What changed that gave it such power? The answer is nothing has changed. American Express still does not have antitrust market power. Indeed, the key metric that the Government cites as the basis for American Express's market power—insistence—**did not meaningfully change during this time period**.[36] American Express's alleged "control" over corporate card spend, discussed below, also did not change. Its coverage gap, as compared to the other networks, did not close. Its number of cards

---

[35] As discussed in American Express's summary judgment papers, the Government's attempt to deny the obvious implications of its and Professor Katz's many admissions in Visa regarding American Express's tenuous market position are unavailing. (Defs.' SJ Reply Br. at 6.)

[36] For example, one metric the Government focuses on is "single-homing in ownership", that is, the number of Cardmembers that carry only American Express. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

in circulation barely increased.  Its prices decreased as the quality of its payment services

improved dramatically and, as a result, its profit margins have been consistently under downward

pressure.  Its Non-Discrimination Provisions did not become any more restrictive.

That leaves only the changes in share.  But other measures of share show that on

key metrics American Express's share has not improved relative to its competitors—e.g., it still

ranks last in cards in force and merchant coverage.  When debit is included, as it must be,

American Express's share of purchase volume steadily declined.  Even if the Court excludes

debit, the share history still will not support a finding that American Express gained market

power at some time over the past decade.  That is because American Express's slow growth in

credit and charge card share of purchase volume was the result of billions of dollars in

investments, innovation and quality improvement to merchants and Cardmembers alike, all

during a period when, as discussed below, American Express's net price was also steadily

decreasing.  The evidence will show that these quality improvements have been a key element of

American Express's efforts to increase its relevance in the market, and continue today.

Examples include:

- American Express has enhanced its ability to leverage its closed-loop data capabilities to create innovative targeted marketing campaigns, business insights reports and post-campaign analyses that are designed to help merchants attract sales, improve their marketing and grow their businesses.

- American Express has continually expanded and improved its card product offerings, including several new cobrand cards.

- American Express has continually invested in Cardmember service, providing Cardmembers with various forms of purchase protection, travel-related insurance and other premium services that are designed to make the purchase experience more secure and enjoyable.

- American Express's rewards programs have grown more innovative and generous.

52

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

- American Express has vastly improved its services for small businesses. For example, in 2010, American Express created Small Business Saturday to encourage U.S. shoppers to support small businesses on the Saturday after Thanksgiving. In 2012, the National Federation of Independent Businesses estimated that Americans spent five and a half billion dollars at small merchants on Small Business Saturday, and American Express invested about $30-35 million that year to make that happen.

The results of these investments are industry-leading merchant and Cardmember benefits and quality of service. Starting in 2007 and in every year since, American Express has been ranked number one in overall customer satisfaction in the U.S. by J.D. Power & Associates, and in 2013, J.D. Power & Associates ranked American Express's rewards programs highest among major credit card issuers. American Express's rivals have noticed these quality improvements and responded by improving the benefits and services that they offer to their consumers and merchants. (See, e.g., DX3839 at 295 (2008 MasterCard presentation noting that



; DX5111 at 913 (2010 Visa presentation noting that

.)

In sum, American Express lacked anything resembling antitrust market power as of 2000. It has spent the ensuing 14 years investing billions annually in quality and service improvements and, as discussed below, lowering price. That experience provides direct evidence that this marketplace is already vigorously competitive and is inconsistent with the conclusion that American Express possesses antitrust market power today.

B. **There is No Evidence of Supracompetitive Prices, Much Less Any Control Over Price.**

As the Court noted in the Summary Judgment Order, the Government's case is largely premised on the proposition that American Express's Non-Discrimination Provisions

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

have allowed it to charge a premium price that is well above the competitive level.  (See SJ

Order at 13.)  The evidence will show that this premise is simply not true.

        1.       There is No Evidence that American Express's Prices are Above
               Competitive Levels.

There are at least three problems with the Government's argument that American

Express charges supracompetitive prices:  (1) there is no evidence that the price that actually

matters in this case—the two-sided price—is above the competitive levels, particularly given the

steady decline in that price; (2) the alleged merchant discount fee premium upon which the

Government anchors its case (which addresses only one side of the market) has now effectively

disappeared; and (3) any premium merely reflects the differentiated nature of the American

Express product.

First, there is no dispute that the price that must be assessed in this case in order to

determine whether American Express has market power is the net two-sided price.  As Professor

Katz explicitly recognizes in his reports and testified at his deposition, the two-sided price has to

be taken into account when analyzing market power and failure to do so can lead to

"unwarranted conclusions".  (DX6466 (Katz I) ¶ 325 ("For example, if competition drives

platforms to set prices that lose money serving one side of the market in order to attract users on

the other side, an analyst looking solely at the latter side might overestimate the platforms'

profits."); id. ¶ 326 ("[M]y [market power] analysis does not misinterpret a 'high' price on one

side of the market coupled with a 'low' price on the other side.  My assessment of market power

relies on the effects of an increase in the overall price level.").)

Although the parties' experts agree that the right price to consider is the two-sided

price, as the Court noted in its Summary Judgment Order, there is disagreement over how to

calculate that price.  (SJ Order at 21.)  American Express's economic expert, Professor

54

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Bernheim, calculates the two-sided price as the sum of the charges and payments to the single merchant and single consumer on both sides of a transaction.  Thus, under Professor Bernheim's calculation, the rewards liability that the network incurs on the consumer side is subtracted from the merchant fee collected on the merchant side.  This makes sense, because, with each transaction, American Express <u>automatically</u> incurs both rewards liability and earns a merchant fee; to focus attention on one of these payments while entirely ignoring the other is arbitrary and improper.

The Government has claimed American Express invented the measure of the two-sided price for the purposes of this litigation.  (<u>See</u> SJ Hr'g Tr. at 61:18-22 ("One of Amex's experts went out and said, I'm going to create something that I call a two-sided price. . . . He invented it.  It was a made-for-litigation price.".)  In fact, the two-sided price comes directly from the Antitrust Division of the Department of Justice.  The then-sitting head of the Antitrust Division, former Assistant Attorney General William F. Baxter, described this exact concept when he wrote, in 1983:

> "Rather than considering the demands of *P* [a purchaser, or consumer] and *M* [a merchant], define one unit of product to consist of the bundle of transactional services that banks must supply jointly to *P* and *M* in order to facility the execution of one exchange of goods or services between *P* and *M*.  Under this interpretation, **the supply price of the product is the sum of the individual charges to *P* and to *M*.**  Furthermore, the demand for that product is a joint demand of *P* and of *M*:  in combination they must make a payment of that magnitude to the banks to induce the necessary supply, but independently **neither *P* nor *M* necessarily confronts any particular price as one he must pay in order to have his demand fulfilled."**

(DX0044 (William F. Baxter, <u>Bank Interchange of Transactional Paper:  Legal and Economic Perspectives</u>, <u>J. of Law & Econ.</u>, Oct. 1983)  at 545 (emphasis added).)  This mode of analysis continues to be endorsed by Antitrust Division economists.  (<u>See, e.g.</u>, DX2945 (Eric Emch & T.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Scott Thompson, <u>Market Definition and Market Power in Payment Card Networks</u>, <u>Review of Network Economics</u>, Mar. 2006) at 54 (article co-authored by DOJ economist stating that the two-sided price is "the most direct analog to the single price charged by a hypothetical monopolist in a conventional one-sided market").

In any event, the Government and Professor Katz have indicated that they intend to argue that rewards-related costs can be ignored when calculating a two-sided price.  (<u>See</u> Pls.' Rule 56.1 Counter-Statement of Material Facts in Opp. to Defs. Mot. for Summ. J., Dkt. No. 296 ("Pls.' 56.1 Counter-Statement"), ¶ 207 (arguing that a "cost increase for American Express [is] . . . not a price decrease for consumers" and is not relevant to calculating American Express's two-sided price).)  According to Professor Katz, the cardholder component of the two-sided price should be measured by the <u>value</u> of the benefits that are delivered to the cardholder, regardless of the <u>costs</u> the platform incurs to deliver those benefits.  (<u>See</u> <u>id.</u>)  As will be shown at trial, this claim makes no sense and is contrary to basic economic and legal principles of market power. <u>See</u> <u>Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.</u>, 386 F.3d 485, 500 (2d Cir. 2004).[37]  The claim also is starkly inconsistent with other parts of Professor Katz's analyses; for example, in connection with his SSNIP test, Professor Katz purports to have "consider[ed] a net, two-sided price" by subtracting "[t]he <u>costs of rewards and other benefits</u>" from the discount fee the network receives for each transaction completed on the network's payment cards.  (DX6540 (Katz III) ¶ 50 (emphasis added).)

However, this dispute should not overshadow the key point:  regardless of how one measures the details of the two-sided price, Professor Katz has not conducted any analysis to

---

[37] It also defies common sense:  if two people pay the same price to obtain two seats on a particular flight, the <u>cost</u> to each is the same even if one is flying to a dreaded commitment and the other is going on his honeymoon.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

show that American Express's two-sided price is above competitive levels. He has not identified what the competitive price is, and he claims that the data that is necessary to do that analysis do not even exist. But difficulty in obtaining the right answer is not a substitute for having to do it. Indeed, the law is clear that a price is only supracompetitive if it allows the firm to earn a supracompetitive profit—that is, if it allows the firm to extract above competitive rents. Geneva Pharm., 386 F.3d at 500 (requiring evidence of "abnormally high price-cost margin" to sustain market power allegations); In re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403, 422 (S.D.N.Y. 2005) (explaining that a plaintiff must "accurately measure price and all appropriate costs" and cannot rely on an argument that the defendant is "simply pricing a product above marginal cost when that price differential can be explained by the existence of economic realities entirely separate from the existence of market power, for instance, the presence of high fixed costs"); see also In re Iams Co. Litig., No. C-3-90-014, 1992 WL 1258515, at *4 (S.D. Ohio July 23, 1992) (explaining that a price increase instituted as part of an industry-wide reaction to an increase in costs was not evidence of defendants' ability to control prices). Professor Katz has conducted no analysis to conclude whether, and to what extent, American Express is earning such supracompetitive profits. As discussed below, American Express's expert has conducted this analysis and concluded that American Express is earning a competitive—not a supracompetitive—rate of return.

   Moreover, as also described below, the analysis conducted by Professor Bernheim of the trend in American Express's two-sided price refutes any notion that this price is above the competitive levels. From the early 2000s—when it is undeniable that American Express lacked antitrust market power—until today, there has been a continuous decrease in American Express's two-sided price, across all merchants as well as in the so-called T&E industries, even during

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

value recapture.  During that same time period, there is no evidence whatsoever that American Express's costs have decreased.  The upshot is that there was no way that American Express was earning supracompetitive profits in the early 2000s, and there is no way it is earning such profits today.  Its two-sided price cannot, therefore, be shown to be above competitive levels.

Second, the Government's claim that American Express's merchant discount fee premium (on one side of the two-sided market) reflects antitrust market power is invalid.  There are many transactions on the Visa and MasterCard networks for which merchants are charged a higher discount fee than for American Express transactions.  Moreover, American Express witnesses will testify that, as a result of the intensifying competition in the industry, American Express's average premium adjusted for card mix has decreased from **.08%** (over Visa) and **.03%** (over MasterCard) in 2010 to **0% today**—in other words, on average, American Express no longer has any meaningful mix-adjusted premium.  As explained in American Express's summary judgment papers, the mix-adjusted analysis is the appropriate way to analyze American Express's fees vis-à-vis its competitors' fees because it is the only way to get an apples-to-apples comparison.  (SJ Order at 5 (citing Defs.' 56.1 Statement ¶ 155).)[38]  Professor Bernheim will also present analyses showing that, even when not adjusting for mix, American Express does not systematically charge a premium for millions of merchants.  (See DX6501 (Bernheim II) ¶¶ 481-92.)  Professor Katz does not contest these analyses; he instead states that the results are "not a

---

[38] American Express's mix-adjusted analysis is a competitive rate analysis that American Express uses in the ordinary course of business to compare its merchant discount rates with its estimates of the merchant discount rates charged by Visa and MasterCard in various merchant segments.  Visa and MasterCard charge different merchant discount rates for different card products, and so this analysis allows for a more direct comparison of American Express's merchant discount fees with its competitors because it estimates how much merchants in each merchant segment would pay for Visa and MasterCard acceptance if those merchants saw the same charge volume on the same "mix" of card products for Visa and MasterCard as they see for American Express.  (Defs.' 56.1 Statement ¶ 153.)

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

surprise".  (DX6540 (Katz III) ¶ 434.)  That is a fatal concession to his insistence-based theory of market power, which predicts (contrary to reality) that American Express can, should (and does) charge substantial premiums in all merchant categories.

Third, even when American Express did enjoy a mix-adjusted premium, and to the extent American Express enjoys a premium today over any competitive product, that premium simply reflects the premium quality of American Express's products and services, not antitrust market power.  See also Xerox Corp. v. Media Sciences, Inc., 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009) ("'Competitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product.  Therefore, a reasonable finder of fact cannot infer monopoly power just from higher prices.") (internal quotation marks and citation omitted); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[W]hen dealing with a heterogeneous product or service, such as the full range of medical care, a reasonable finder of fact cannot infer monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide—and it is always treacherous to try to infer monopoly power from a high rate of return.").)  Professor Katz has admitted that a premium may not by itself establish market power because "one of the things that premiums don't have for example, is the underlying costs" incurred by the card network relative to competing cards networks.  (Katz Dep. at 263:21-264:2.)

> 2.  The Continued Decline in American Express's Prices Belies Any Notion That It Can Control Price.

As with the market share trends, the trends in American Express's pricing experience belie any semblance of market power.  At trial, the evidence will demonstrate that American Express's prices have declined steadily since the time of U.S. v. Visa.  That is not consistent with a control over price standard.  See Commercial Data Servers, 262 F. Supp. 2d at

59

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

73-74 (holding that a decline in prices for IBM computers was "entirely inconsistent with the exercise of market power by IBM").

      <u>First</u>, American Express's average two-sided price has fallen precipitously in the last decade.  As noted above, Professor Bernheim's calculation of the two-sided price reflects payments to and from both merchants and consumers for the average transaction, calculated using internal American Express price/cost data.  As indicated in the Figure 6 below, from 2002 through 2010, the price (what Professor Bernheim calls the average economic price of American Express's payment services) fell from 2.05% to 1.5%—a decline of 55 basis points, or nearly **27% over eight years**:



Figure 6

American Express's economic price of payment services has declined significantly since the ruling in <u>U.S. v. Visa</u>
(Source: DX6563 (Errata to Bernheim) at 7, Fig.6)

      Rather than refute this analysis of declining prices, the Government—which has the burden of proof—will argue that the analysis is impossible to do because of data issues and accounting changes to one of the financial systems that Professor Bernheim relies upon for his analyses.  Professor Bernheim and American Express finance witnesses will demonstrate that these criticisms are invalid and that Professor Bernheim's analyses properly take account of and

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

correct for these changes. The Government will also argue that the value to consumers of the American Express rewards program has not increased since the early 2000s, so the two-sided price could not possibly have decreased. As noted above, the right metric is cost, not value. Costs are incurred by the seller, value exists in the eye of the beholder. But, beyond that, the evidence will show that the value of American Express's rewards has increased. American Express witnesses will testify about the numerous improvements that American Express has made to its rewards programs over the last several years, including by increasing rewards redemption options with innovative programs such as Pay with Points and Shop with Points,[39] more than doubling the redemption partners available through Membership Rewards (including partners who provide premium services and products at higher redemption prices to American Express),[40] and spending billions on rewards-related marketing and customer service. The net result of these innovations has been to increase the overall cost to American Express of providing these Cardmember benefits.

Second, the evidence will show that even if viewed only as a one-sided price—the net merchant discount fee—American Express's prices have declined. Like just about any other large company, American Express has processes in place to try to maintain pricing consistency. At American Express, this takes the form of standard discount rate tables that vary based on

---

[39] See, e.g., DX 3791 at 461 (American Express presentation describing growth in popularity of Pay with Points, which American Express created in response to Cardmember demand for a simpler redemption process); DX 5126 at 360 (American Express presentation describing eGift card program, which enables "MR Enrollees to redeem points for electronic Gift Cards delivered via email in 3 hours or less, in addition to the physical Gift Cards currently available"); DX4428 at 309 (2009 study showing ███████████████████████████████████████████████ ████); DX4778 at 562 (2009 Membership Rewards study noting ██████████████████████████████████████████████████████████████████████████ DX4829 (2009 study showing same).).

[40] For a list of 2001 partners, see DX6664 at 215. For a list of 2008 partners, see DX4338 at 834.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

merchant industry and charge volume.  Although American Express tries to keep as many merchants priced according to the table rate as possible, it is compelled to negotiate significant concessions—both on price and other terms relevant to its multi-faceted relationships with merchants—that can take the form of, among other things, signing bonuses, marketing funds and rebates.  All of these payments offset the table discount rate, and determine each merchant's net discount rate.

Examples of the financial concessions that American Express has made to its merchants include:

- In 2004, American Express paid Safeway a ███████ signing bonus to secure acceptance of American Express at all Safeway stores.  (DX 2035 at 093.)

- American Express paid ███████ to Walgreen over a three-year period beginning in 2005.  (DX 2314.)

- American Express paid a ███████ renewal bonus to Publix in 2004.  (DX 1921 at 160.)

- American Express provided a ███████ marketing fund to Hyatt Hotels in 2011.  (DX 5504 at 687.)

- American Express paid Delta more than ███████ to pre-purchase frequent flier miles in an effort to keep Delta as both a merchant and cobrand partner and help Delta emerge from bankruptcy.  (DX 4333 at 820-21.)

American Express also routinely makes rate concessions to merchants.  For example, American Express has agreed to categorize a merchant as belonging to a different industry with a lower table rate, to waive certain fees or stagger their introduction over time and to waive fees for one merchant that are paid by others.  American Express has also agreed to provide merchants with automatic rate decreases when their American Express charge volumes reach a certain threshold.  As Professor Bernheim will explain and the accompanying Figure 7 reflects, his analysis of American Express data demonstrates that American Express's net

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

merchant discount rate—like its two-sided price—has declined steadily since the <u>U.S. v. Visa</u> case:

**Figure 7**



**American Express's net merchant discount rates has declined since the early 2000s**
(Source: DX6563 (Errata to Bernheim) at 10, Fig. 9)

Those data also demonstrate that between 2002 and 2010, ████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████ (DX6501 (Bernheim II) ¶ 29.)

Professor Katz will argue that it was improper for Professor Bernheim to incorporate co-brand remuneration payments that American Express has made to merchants with which American Express offers a co-brand card into his analysis. (Pls.' 56.1 Counter-Statement ¶ 139.) Although these payments add up to **<u>hundreds of millions of dollars</u>** in

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

financial concessions by American Express to its merchant co-brand partners in the last several years alone,[41] Professor Katz has taken the position that they have no relevance to the Government's allegation that American Express can control its merchant prices.  The evidence does not support such a narrow view.  Both American Express and its co-brand partners view their co-brand and acceptance relationships as inextricably interrelated and, like Professor Bernheim, consider American Express's co-brand payments as an offset to the merchant discount fee.[42]

        The Government will also try to undermine Professor Bernheim's trend analysis by arguing that the decrease in American Express's two-sided price (as well as its one-sided net merchant discount rate) is the result of its expanding acceptance to "Everyday Spend" merchants, such as supermarkets and drug stores, who receive lower merchant discount rates.  (Pls.' 56.1 Counter-Statement ¶ 76.)   From that, the Government argues that the overall decline in American Express's merchant discount fees is somehow irrelevant to this case.  However, this argument ignores the underlying fact that American Express was compelled to give these merchants lower discount rates precisely because it does not have control over prices.  These merchants refused to accept American Express cards unless American Express reduced its fees

---

[41] Examples include ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
(DX 4913 at 937).

[42] See, e.g., DX4791 at 582 (internal American Express deck indicating ███████████████
████████████████████████████████████ ); DX5469 at 327 (internal American Express email noting that ████████ 
██████████ ); DX5278 at 021 (email to Ken Chenault noting: ████████ 
████████████████████████████████████████████████████████████████
████████████████████ ).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

and, in many cases, paid these merchants millions of dollars in signing bonuses.  And the market that the Government alleges that includes these merchants is a market that includes <u>all</u> merchants.  The question is what has happened to average prices across that entire market.  That is particularly true because many of the costs that American Express incurs in providing Cardmember and merchant benefits—like rewards points—are incurred regardless of where the specific transaction occurs.[43]  As more Cardmembers spend at merchants with lower merchant discount fees, American Express earns less money to invest in those benefits and services and its margins are reduced.  There is no legal or economic justification to focus only on those merchants who saw increased merchant discount rates and ignore those that saw decreased discount rates, which is exactly the cherry-picking approach advocated by the Government.

> 3.      American Express Does Not Earn Supracompetitive Profits.

The pricing evidence and trends discussed in the preceding section are inconsistent with the Government's claim that American Express has the power to harm competition since it cannot control its own declining price and since that price is not above the price of its competitors.

In addition, even if American Express's prices were "high", that still would not prove the existence of market power.  That is because high prices are evidence of market power only when they lead to an "abnormally high price-cost margin".  <u>Geneva Pharms</u>., 386 F.3d at 500; <u>In re Wireless Tel. Servs. Antitrust Litig</u>., 385 F. Supp. 2d 403, 422 (S.D.N.Y. 2005) (explaining that a plaintiff must "accurately measure price and all appropriate costs" and cannot

---

[43] Indeed, in some cases American Express incurs <u>even more</u> costs at "Everyday Spend" merchants by offering additional rewards for consumers who transact at those merchants.  For example, American Express offers consumers 1% cash back for most purchases made on its Blue Cash Everyday card, but increases that amount to 3% cash back for purchases made at supermarkets.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

rely on an argument that the defendant is "simply pricing a product above marginal cost when that price differential can be explained by the existence of economic realities entirely separate from the existence of market power, for instance, the presence of high fixed costs."). Accordingly, the Government cannot point solely to American Express's merchant discount rate to conclude that it is charging supracompetitive prices.

At trial, one of American Express's economic experts, Professor George Hay, the Edward Cornell Professor of Law and Professor of Economics at Cornell University and former chief economist of the Antitrust Division of the United States Department of Justice, will present an economic returns analysis that demonstrates that American Express is not earning supracompetitive profits on its U.S. card business.[44] Professor Hay will explain that a firm facing competition will earn, on average, an economic rate of return comparable to the "cost of capital" required for its business, which is the rate of return demanded by investors for extending capital to the firm. In contrast, if a firm earns supracompetitive profits, its economic rate of return will exceed its cost of capital. Relying primarily on financial data from American Express's internal Investment Optimization (IO) System as well as its profit and loss statements, Professor Hay will demonstrate that American Express does not earn supracompetitive profits; it instead earns an economic rate of return comparable to the cost of capital required for its business. Specifically, Professor Hay will testify that American Express's overall economic rate of return on its U.S. card business has averaged approximately ███, compared to its cost of capital of about ███.

In response to Professor Hay's analysis, the Government will proffer the expert opinion of Professor Zmijewski. Professor Zmijewski is likely to repeat the argument the

---

[44] The U.S. card business Professor Hay analyzed includes the U.S. consumer, small business and commercial card segments.

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

Government made in its motion in limine that an antitrust profitability analysis should be based on ordinary course calculations of accounting profitability. As explained in American Express's opposition to the Government's Motion in Limine to Exclude Dr. George Hay's Rate of Return Analysis, there is no merit to this argument. Indeed, there is substantial economic literature that explains why accounting returns do not account for the economic reality of all of a firm's revenues and cost streams and are not a reliable measure of economic profitability. There is overwhelming authority supporting Professor Hay's decision to calculate economic returns rather than accounting returns to measure whether American Express in fact is earning supracompetitive profits. (See Defs.' Opp'n to Pls.' Rate of Return Mot. in Lim. at 4, 7.) Professor Hay's analysis showing that American Express does not earn supracompetitive profits—and that, in fact, American Express is earning a rate of return about equal to its cost of capital—is consistent with and explained by the evidence that American Express has to constantly compete, spend and innovate to convince consumers to carry and prefer to use American Express cards and to convince merchants to continue to accept them and promote them through, for example, cobrand and marketing partnerships.

4.    Value Recapture is Not Evidence of Market Power

Aside from its arguments about price discrimination—which do not merit further discussion here—the only remaining piece of pricing evidence the Government will cite is the so-called Value Recapture program. The Government argues that since American Express raised its merchant discount fees to a subset of its merchants during the 2000s, it must have market power even though its overall prices—both its two-sided price and its net merchant discount fee—were declining. In other words, to support the assertion of market power, the Government cherry-picks those merchants who received merchant discount rate increases—after years of flat or declining rates—and ignores the steadily decreasing trend in American Express merchant

67

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

discount rates. In any event, even with respect to those merchants who agreed to increased merchant fees, the evidence will show that Value Recapture was not an exercise of antitrust market power at all but rather a reaction to increasing Visa and MasterCard fees and a shrinking premium, the combined effect of which endangered American Express's ability to deliver a differentiated, premium product to Cardmembers and merchants. The evidence will also show that these merchant discount fee increases were accompanied by even further increases in American Express's spending on rewards and other services designed to maximize the value of its payments platform. Thus, value recapture reflects an increase to some merchants as a result of—and to support—increases in costs and in response to competitors' price increases.

In the late 1990s and early 2000s, American Express's average discount fee declined more than 8 basis points. This decline was caused by, among other things, American Express's need to reduce discount rates and give other financial concessions to expand into everyday spend industries, negotiated rate reductions with large merchants and a shift in Cardmember spend from high discount rate industries to lower discount rate industries. Meanwhile, as noted above, American Express was responding to Mr. Chenault's call to arms to become more relevant in its customers' lives by innovating and investing in quality and differentiation. While American Express was cutting prices and investing more in its card business, Visa and MasterCard had been steadily increasing their merchant fees. As a result, by 2007, American Express's premium had shrunk by over 20 basis points. (See DX 3619 at 795 (2008 American Express presentation noting that "V/MC have introduced new interchange categories which effectively increase their net effective discount rate—AXP premium is down to ~21-24 bps").)

68

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

As its witnesses will explain, American Express realized that its shrinking premium during this time period hindered its ability to invest in differentiation and quality improvement and therefore posed a threat to its efforts to continue to develop even more benefits for Cardmembers and merchants (and thereby drive innovation and competition).  (See, e.g., DX4666 at 707 (2009 value recapture analysis concluding that declining premiums are "impeding [American Express's] ability to invest in differentiated Cardmember value").)  To reverse this trend, and in response to its competitors' pricing, American Express undertook an effort to identify those industries where it was offering the most value but had not increased prices for a number of years to reflect that increased value and the increased costs associated with providing that value.  Value Recapture was American Express's years-long effort to implement this strategy to retain the equilibrium between price and value that is essential to American Express's continued ability to deliver premium, differentiated value to consumers and merchants.  In many instances, this was the first merchant discount fee increase that American Express had asked for in over ten years.

Notably, and as stated above, while American Express's discount rate increased in certain industry segments, American Express invested increasing amounts on rewards and other Cardmember benefits and increased a variety of payments to merchants and expenditures on merchant-side initiatives, resulting in its average two-sided price decreasing substantially during the Value Recapture period.  (Supra at 60; DX 4500; DX 3875 at 390.)  American Express also decreased its (one-sided) average net merchant discount fee during this period, and several of American Express's largest merchant customers saw rate decreases over the course of value recapture.  (Supra at 63.)  As is widely recognized by courts and economists, and as Professor Katz has conceded, where increased prices are accompanied—or preceded—by increased costs,

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

the price increase is not evidence of market power.  (DX6466 (Katz I) ¶ 325.)  That is because an increased price offset by increased costs does not establish an abnormally high price-cost margin.  <u>See, e.g.</u>, <u>Geneva Pharms.</u>, 386 F.3d at 500; <u>In re Wireless Tel. Servs. Antitrust Litig.</u>, 385 F. Supp. 2d at 422; <u>In re Iams Co. Litig.</u>, No. C-3-90-014, 1992 WL 1258515, at *4 (S.D. Ohio July 23, 1992).

   The evidence will also show that, for many merchants, the headline discount rate that was increased through value recapture was offset at least in part by lump sum payments and other financial concessions that American Express had to give merchants in order to retain them.  (<u>See, e.g.</u>, DX4927 at 834 (showing Amex agreed to pay American Airlines a ████████ cash bonus in connection with value recapture); DX7491 at 149 (discussing ████████ in concessions provided by American Express to Hertz in connection with value recapture).)  In other words, while American Express was able to persuade certain of its merchants that increased merchant discount rates were worth paying, it did so by demonstrating its existing value to merchants, adding new value and negotiating those increases heavily while making other concessions.

   C. **<u>Cardmember Insistence is Not a Source or Evidence of Antitrust Market Power In This Case.</u>**

   In its Summary Judgment Order, the Court declined to rule as a matter of law that insistence "may be dismissed as merely brand loyalty", holding instead that "the significance of cardmember insistence is an issue for trial".  (SJ Order at 20.)  As will be shown at trial, the Government's insistence theory is fundamentally unsound.

   <u>First</u>, American Express must continually compete for insistence with generous rewards and other benefits or else it will disappear.  This is critically important.  It is because insistence is ephemeral that American Express has had to continually decrease price and improve quality to recover its share loss over the last decade.  The law is clear that market power must

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

derive from a durable source because, if the source is not durable, the firm in question cannot raise price above competitive levels and earn supracompetitive economic returns without that price (and those margins) being eroded by entry or expansion.  (See SJ Order at 16 (explaining that market power is the ability to "persist" in pricing substantially above competitive levels "for a significant period without erosion by new entry or expansion") (internal quotation marks omitted; emphasis added); DX7494 (II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (3d ed. 2013)) ¶ 501) ("Market power need not trouble the antitrust authorities unless it is both substantial in magnitude and durable.") See also AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 229 (2d Cir. 1999) ("[T]ransitory power may be safely ignored by antitrust law.  The social costs of antitrust intervention (including its error potential) are likely to exceed the gains when market forces themselves would bring the defendant's power to an end fairly quickly.") (internal quotation marks omitted).

American Express Cardmember insistence is decidedly not durable, and that economic reality has resulted in American Express constantly facing competitive pressure and having to respond to it with constant investment and innovation.  There is no lock-in over "insistent" Cardmembers that would allow American Express to slow down its investments and increase its economic profits above competitive levels without swiftly suffering the consequences.  As Professor Katz conceded, there are no barriers to entry for other networks and their issuers to provide similar benefits to consumers, and insistent American Express Cardmembers today can, and often do, turn into insistent Visa, MasterCard or Discover cardholders tomorrow if they perceive that they can get a better deal from one of those networks.  Indeed, there are now a multitude of MasterCard and Visa products that offer very rich rewards

71

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

and services.  The very existence of those products has been driven by American Express's innovation and the success of its model in chipping away at the merchant charge volume that runs through those dominant networks.  In the same vein, Professor Katz conceded, and the evidence will firmly establish, that American Express "routinely pays its consumer and corporate cardholders to use its cards" (Katz Dep. at 210:15-18), and if American Express were to cease competing and investing at the same level it would see its insistence and share levels decline dramatically.  If, by contrast, insistence were durable, American Express would be able to maintain it while competing with less intensity (e.g., by not spending billions annually in order to consistently deliver industry-leading rewards and other Cardmember benefits and service), and it could pocket the savings so as to raise its margins above competitive levels.  But that is not the case here.

Indeed, market data that will be presented by Professor Bernheim demonstrate that American Express Cardmembers frequently switch from American Express to other payment cards, and that this constant "churn" occurs even among American Express's most loyal Cardmember base (i.e., those who concentrate their spend on American Express in a given calendar quarter).  (Defs.' SJ Br. at 15-16.)  Thus, if American Express were to attempt to raise its two-sided price above competitive levels—for example, by reducing Cardmember benefits below competitive levels or increasing its merchant discount fee without passing a significant portion of the increase on to consumers such that merchants would see value in paying the increased discount rate—any so-called insistence would quickly dissolve as American Express would very swiftly see substantial declines in its Cardmembers' preferences to use the Card,

72

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

charge volume and share as Cardmembers shifted to rival networks and issuers (as a result of decreased benefits, lower merchant coverage or both).[45]

Second, the evidence will show that the Government has grossly mischaracterized the nature of American Express Cardmember insistence and the degree to which insistence impacts American Express's merchant negotiations.  The Government seeks to treat insistence as a scientific measure of the profits a merchant would lose if it decided not to accept American Express cards.  In reality, as American Express and its merchant partners fully recognize, American Express employs the concept of insistence as a negotiating tool; merchants routinely challenge it and, through the give and take, the merchant agreement terms are negotiated.

In fact, most Cardmembers choose where, what and how much to purchase based on a variety of factors, including but not limited to whether the merchant accepts American Express.  That reality is reflected in the insistence documents themselves; for example, a presentation by American Express to Southwest Airlines defines "insistent cardmembers" as Cardmembers who "would choose an airline that accepts American Express over one that does not, **all else being equal**".  (DX7493 at 271 (emphasis added).)  The "all else being equal" caveat limits the significance of insistence to the outcome of American Express's merchant negotiations since it is rare that "all else" is equal as between two airline carriers (or two merchants in any industry segment)—there will always be differences, whether with respect to departure and arrival times, ticket prices, baggage policies, leg room, mileage programs or a host

---

[45] The Government significantly overstates the role of so-called "mandation" policies as they relate to Corporate Card insistence levels.  The evidence will show that very few companies actually "mandate" spend on Corporate Cards.  In addition, American Express can only get companies to distribute its Corporate Cards by competing vigorously for those relationships against other issuers, many of whom already have a built-in competitive advantage in marketing their corporate cards because of preexisting banking relationships.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

of other factors, which in varying degrees may be material to "insistent" Cardmembers and affect their purchasing decisions.

The Government's mischaracterization of the significance of insistence is also evident from the logically impossible results that Professor Katz's insistence formula predicts. For example, American Express does not set its discount fees anywhere near the level at which it could set them if insistence were a valid measure of American Express's pricing power over merchants. Indeed, according to the data cited in Professor Katz's reports, Professor Katz's insistence theory establishes that American Express could be charging premiums to merchants in the alleged T&E submarket that are **400% to 1,550%** higher than the premiums Professor Katz calculates that American Express actually charges in those T&E industries today.[46] That means, according to Professor Katz, that while American Express can "control" price, it is leaving billions of dollars on the negotiating table each and every year.

Professor Katz's insistence formula also predicts that <u>every</u> network should be able to charge a premium regardless of its size—even a network with one insistent Cardmember should be able to charge a premium according to the model—and that <u>every</u> network can charge a premium vis-à-vis <u>every other</u> network, which is, of course, a logical impossibility. Professor Katz does not and cannot deny that his formula predicts these absurd results but has suggested that they do not overturn the validity of his model because "other factors" come into play.

---

[46] The reports submitted by Dr. Katz provide the maximum merchant discount fee premiums, by merchant industry segment, that, according to Dr. Katz, economically rational merchants should have been willing to pay given the insistence data derived from American Express's cardmember surveys and American Express's internal estimates of the merchant's profit margins. For example, according to Table 22 of Dr. Katz's report (DX6466), American Express should have been able to charge car rental merchants (and an economically rational car rental merchant should have been willing to pay) a merchant discount fee premium of up to 390 basis points over Visa and MasterCard for American Express acceptance in 2010. In reality, of course, American Express does not and could not charge such substantial premiums.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

However, Professor Katz does not specify what "other factors" could possibly explain these anomalies or how they influence market realities, and his response only underscores that his insistence formula is unreliable as a basis for establishing market power.

Third, the Government's insistence theory looks only at the purported consequences of non-acceptance on the merchant and does not give any consideration to the consequences that a merchant's non-acceptance decision has on American Express. That non-acceptance decision would cause American Express to lose charge volume in two different ways. As an initial matter, if a merchant cancels American Express, American Express stands to lose very significant charge volume from customers who are more loyal to that merchant than American Express, and therefore stay at that merchant and spend on a different Card. Even in the industries with the highest so-called insistence levels that Professor Katz focuses upon, American Express would lose more business than it would retain. After all, while many consumers are loyal to American Express because of its investments in quality and service, many more will also be loyal to the merchant, particularly when it comes to large airlines, hotels and rental car companies, where the Governments claims American Express has the most significant antitrust market power.

Moreover, as discussed above, the impact of a large merchant cancelling American Express acceptance would be even more profound to American Express's card business because of spillover effects. The resulting network effects would extend to all aspects of American Express's card business, including its ability to compete for co-brand partners, issuing partners and corporate card clients. For example, the consequences resulting from Continental Airlines' decision to cancel its participation in American Express's MR program in 2011 is particularly instructive. Although Continental continued to accept American Express

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

after cancelling its MR partnership, American Express estimated that the loss of the relationship, by itself, caused American Express to lose an estimated ███████████ in charge volume in just <u>one calendar year</u>.  (DX6402 at 799.)  That is from losing only Membership Rewards participation and lounge access; imagine the loss to American Express from losing acceptance at a major airline.  The evidence will show that this economic reality is not lost on merchants and that they have used it to their advantage in negotiations with American Express.  Insistence is a two-way street.  The Government is only looking at one side of it.  That is a serious error that leads the Government to seriously understate the merchant's leverage over American Express and grossly overstate American Express's leverage over the merchant.

<p style="text-align:center">*     *     *     *     *</p>

The Government will be unable to sustain its burden to prove that American Express has the power to control price and harm competition.  The Government's claim to the contrary is further belied by comparing the basis for its claim that American Express has such power to the reality of Discover, a network with only 6% share of credit and charge card spend and about 3% of credit, charge and debit card spend.

- ███████████████████████████████ (Defs.' SJ Br. at 22 (citing Defs.' 56.1 Statement ¶¶ 160-61).)

- ███████████████████████ (Defs.' SJ Br. at 22 (citing Defs.' 56.1 Statement ¶ 166).)

- █████████████████████████████████ (Defs.' 56.1 Statement ¶¶ 162-64.)

- Like American Express, Discover has very loyal cardholders.  Indeed, Discover's levels of cardholder loyalty are not meaningfully different than American Express's and, in fact, Discover has won the category for most loyal credit card users 17 years in a row.  (Amex SJ Br. at 17 (citing Defs.' 56.1 Statement ¶¶ 260-64).)

<p style="text-align:center">76</p>

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

- Merchants have testified in depositions (and will testify at trial) that they accept Discover for the same reasons they accept American Express:  in order to give their customers who prefer to use Discover more choice on payment options and to honor their preferred choice of payment form.

Nevertheless, Professor Katz has conceded that Discover does not have sufficient market power to cause anticompetitive effects.  (DX6540 (Katz III) ¶ 358.)  Such a concession, of course, is necessary.  No one could credibly argue that Discover has the power to harm competition given its competitive position.  But other than American Express's share—which alone is plainly insufficient under applicable law—the Government cannot offer a sufficient explanation as to why the conclusion should be any different for American Express.

## III.    THE GOVERNMENT CANNOT PROVE THAT THE NON-DISCRIMINATION PROVISIONS HARM COMPETITION.

The Non-Discrimination Provisions are a vertical restraint.  Vertical restraints are commonly utilized in commercial contracts and are considered generally procompetitive.  See, e.g., Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 890 (2007); Valuepest.com of Charlotte, Inc. v. Bayer Corp., 561 F.3d 282, 287 (4th Cir. 2009) ("[V]ertical pricing agreements, while sometimes anticompetitive, can often have procompetitive effects."); Comcast Cable Commc'ns, LLC v. F.C.C., 717 F.3d 982, 990 (D.C. Cir. 2013) ("[V]ertical contracts are common and accepted practices in the American economy . . . .").  Indeed, non-discrimination provisions are not unique to American Express; they are commonly utilized by a variety of firms in two-sided industries, and in contexts where the likelihood of competitive harm is non-existent.[47]  American Express itself has utilized Non-Discrimination Provisions in its merchant

---

[47] For example, PayPal and Expedia utilize non-discrimination provisions in some of their commercial contracts, as do a number of state universities in their contracts with merchants who accept their student ID cards for payments.  (See, e.g., DX2866; DX7231.)  Discover also has non-discrimination provisions in its merchant agreements yet no one can plausibly claim that Discover has the degree of market power that both sides agree is needed in order for a firm to be able to harm overall competition through vertical agreements.

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

agreements for decades, including during time periods when it indisputably lacked antitrust market power, such as in 1959 when it was a new entrant with almost no market relevance; in the early 1990s when its share fell precipitously and then stagnated for decades; and during U.S. v. Visa when it was found to be a victim of antitrust market power whose own competitive vitality had been constrained.

In seeking to invalidate these vertical restraints under the rule of reason, the Government faces a high burden. That burden cannot be satisfied simply by showing that the vertical restraint has the effect of restricting some form of competition; indeed, all vertical restraints have such effects. See, e.g., E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 29 (2d Cir. 2006) (noting that defendant's vertical agreement, "like any commercial agreement, restrains trade", and dismissing Section 1 claims for failure to show anticompetitive effects beyond the restraint itself). The Supreme Court first recognized this common sense principle in a case brought by the Government nearly 100 years ago. See Board of Trade v. United States, 246 U.S. 231, 238 (1918) (holding with respect to vertical restraints that "[t]o bind, to restrain, is of their very essence"). As a result, the argument the Government presented at summary judgment—that the Non-Discrimination Provisions on their face limit steering—does nothing to advance the ball. That will always be true of every vertical restraint. For the same reason, the anecdotal evidence that some merchants may want to engage in discrimination that is not permitted by the Non-Discrimination Provisions cannot establish an anticompetitive effect. That is no different than saying the vertical restraint actually restrains a particular actor from acting in a particular way. Again, that will be true in every vertical restraint case. See id.

The Government has also stated a number of times that the Non-Discrimination Provisions are problematic because American Express is trying to "choose how [its] competitors

78

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

compete". (See SJ Hr'g Tr. at 21:18-19.) But that is just another way of saying that a vertical restraint is anticompetitive if it restrains horizontal competition. That is also incorrect. Professor Katz has acknowledged that, as a matter of economics, "a vertical restraint is not necessarily anticompetitive simply because it restricts some forms of horizontal competition". (See Katz Dep. at 419:6-420:14.)

The law is in accord. One obvious example is an exclusive dealing arrangement, which is akin to—but far more restrictive than—a Non-Discrimination Provision. Numerous courts have rejected challenges to exclusive dealing arrangements as violations of the antitrust laws. See, e.g., CDC Tech., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999); Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244 (2d Cir. 1997); Balaklaw v. Lovell, 14 F.3d 793, 799 (2d Cir. 1994); Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62, 73 (E.D.N.Y. 2006). Indeed, in this very lawsuit, the Government has made clear through its Court-approved settlements with Visa and MasterCard that it does not challenge exclusive dealing arrangements in this industry.[48] Furthermore, Department of Justice policy states that "exclusive-dealing arrangements that foreclose **less than thirty percent** of existing customers or effective distribution should not be illegal".[49] This point bears emphasis: the Government has explicitly conceded that allowing Visa and MasterCard—and American Express regardless of the outcome of this lawsuit—to

---

[48] See DX5826 (Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc., Dkt. No. 143) § B.1 (allowing Visa and MasterCard to "enforc[e] existing agreements or enter[] into agreements pursuant to which a Merchant selects General Purpose Cards bearing [the Visa or MasterCard] Brand as the only General Purpose Cards the Merchant will accept as payment for goods and services").

[49] See Exhibit 4 (U.S. Department of Justice, Competition and Monopoly: Single Firm Conduct Under Section 2 of the Sherman Act (2008) at Chapter 8, available at http://www.justice.gov/atr/public/reports/236681.pdf).

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

contract with merchants for exclusive acceptance is procompetitive, and per Department of Justice policy any network could foreclose its competitors from accessing merchants responsible for up to **thirty percent of charge volume** (i.e., more than American Express's entire share of credit and charge card spend) without harming competition or running afoul of the antitrust laws. Yet it claims through this lawsuit that American Express cannot take the far less restrictive step of getting its merchants to contractually agree to refrain from discriminating against the American Express brand—those same merchants, of course, are still able to accept cards issued by American Express's competitors, which would not be possible under the exclusive dealing restraints that Visa and MasterCard are free to enter into under the decree.  These positions are irreconcilable.

Most-favored nation clauses ("MFNs"), which are similar to non-discrimination provisions, provide another example.  Those too have repeatedly been upheld as lawful by courts despite the fact that they directly limit "how competitors do business", as MFNs can reduce the incentives for competitors to receive better prices.  See, e.g., Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of Rhode Island, 883 F.2d 1101, 1110 (1st Cir. 1989).  And, since Leegin, vertical price restraints have also generally been considered lawful even though they completely eliminate forms of intrabrand price competition and, by extension, impact interbrand price and quality competition.  See, e.g., Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1202 (9th Cir. 2012) ("Even vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumer prices . . . are not unlawful absent a showing of actual anticompetitive effect." ) (internal citations omitted).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Similarly, appellate courts have uniformly upheld vertical agreements that prohibit surcharging where a firm is purchasing services on specified terms on behalf of a group of buyers.  For example, in Kartell v. Blue Shield of Massachusetts, Inc., 749 F.2d 922 (1st Cir. 1984), the First Circuit held that a ban on "balance billing", which prevented physicians from surcharging their Blue Shield-insured patients to recover unreimbursed charges over and above whatever fee Blue Shield determined to be the "usual and customary charge" for the services performed, was procompetitive because "Blue Shield's activities here are *like* those of a buyer" of medical services that negotiated a favorable price for its subscribers that did not include the banned surcharges.  Id. at 923-24, 926; see also Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 90 (6th Cir. 1989) (card network standing in the shoes of truckers could negotiate favorable price terms with truck stops on truckers' behalf and "limit the differential between the prices quoted to its customers and the prices quoted to customers paying cash").

The law thus establishes that for a vertical restraint to be found anticompetitive under the rule of reason, it must be shown that the restraint has the actual effect of harming overall competition in the market and therefore the welfare of consumers.  See KMB Warehouse Distrib., Inc. v. Walker Mfg. Co., 61 F. 3d 123, 128 (2d Cir. 1995) ("The overarching standard [under the rule of reason] is whether defendants' actions diminish overall competition, and hence consumer welfare." (emphasis added)).  Thus, the analysis cannot be restricted to what the restraint restrains, but must also take into consideration what it enables in order to determine its net effect on overall competition.  For example, in Leegin, the Supreme Court explained that a vertical price restraint might eliminate intrabrand price competition altogether yet also enable other forms of competitive behavior and therefore not result in harm to overall competition.  551 U.S. at 890 ("A single manufacturer's use of vertical price restraints tends to eliminate intrabrand

81

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

price competition; this in turn encourages retailers to invest in tangible or intangible services or promotional efforts that aid the manufacturer's position as against rival manufacturers.").

This is a burden that the Government cannot carry.  Today, <u>with the Non-Discrimination Provisions in place</u>, competition for merchant charge volume among general purpose payment card platforms is vigorous and occurs through a variety of different channels. Platforms compete by offering incentives directly to consumers in the form of rewards, cash back payments and other generous benefits; by offering incentives to corporations to encourage their employees to use a particular brand of corporate card; by securing merchant partnerships, such as cobrand relationships, official card partnerships and marketing partnerships; by competing for bank issuers; and by expanding merchant coverage, which, because of network and spillover effects, increases the value of the platform to consumers, leading to increased charge volume on the platform's cards.

The evidence will also show that, <u>with the Non-Discrimination Provisions in place</u>, American Express has had to compete intensely to achieve and sustain its market position through these channels—for example, the Non-Discrimination Provisions did not prevent American Express from experiencing significant share loss and stagnation in the 1990s; they did not prevent American Express from being the victim of the exercise of market power by the dominant networks at the time of <u>U.S. v. Visa</u>; they did not prevent Mr. Chenault from concluding that American Express was "behind" and was "going to have to grow market share substantially", and challenging the card business to become more relevant in its customers' lives by innovating and investing in quality and differentiation; and they have not prevented American Express from having to spend billions of dollars each year to compete effectively in a variety of

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

channels on both sides of the market.  In fact, they have been necessary to enable and protect those investments.

The crux of the Government's claim is that elimination of the Non-Discrimination Provisions will open up a different channel of competition—competition for point-of sale steering—in response to which American Express and rival networks would lower their merchant discount rates, resulting in cost savings for the merchant, and benefits to consumers in the form of lower retail prices.  From there, the Government simply asserts without any basis that, because discount fees will be lower, competition and consumers will be better off.  The logic underlying this claim—low fees necessarily equates to better competitive conditions in the overall market—has been explicitly rejected by the courts.  See, e.g., Leegin, 551 U.S. at 890; Brantley, 675 F.3d at 1202 ("Even vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumer prices . . . are not unlawful absent a showing of actual anticompetitive effect." ) (internal citations omitted).

Professor Katz, testifying in another case, has also rejected this logic, noting, correctly, that it is particularly invalid in a two-sided market where both sides are inextricably interrelated:

> "It also is **impossible to calculate any harm to consumers from changes in [discount] rates without considering both sides of the market**.  Because the fundamental nature of the market in which [payment cards] operate is that the two sides are interrelated, it is incorrect to think that **the effects of [discount] fees on consumer welfare can be understood by looking solely at the merchant side of the market**."

(DX7183 (Expert Report of Michael L. Katz, U.S. v. First Data) ¶ 156 (emphasis added).)

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Similarly, testifying in <u>Visa</u>, Professor Katz warned that a competitive effects analysis that narrowly focuses on merchant discount fees, ignoring other dimensions of competition and quality, "provides an **incomplete, and thus misleading, picture of economic effects**" because "**[m]erchant and consumer welfare must be measured in terms of the total package of benefits that they receive, not just the merchant discount**".  (DX0733 at 198.)[50]

Professor Katz has failed to heed his own warnings.  Neither he nor the Government has even attempted to model the likely impact of the removal of the Non-Discrimination Provisions on overall competition, and they offer no serious analysis of how the other channels in which competition takes place today would fare in a world without the Non-Discrimination Provisions.  Rather, the entirety of their analysis focuses on the short-term impact of the Non-Discrimination Provisions on only one side of the two-sided market, and beyond that they offer nothing more than hand-waving and speculation.  As discussed below, the evidence— including economic analysis by Professor Katz himself—will directly refute the Government's and Professor Katz's unfounded speculation about the state of overall competition in their but-for world.  It will show that without the Non-Discrimination Provisions, the channels through which competition is expressed today will be less competitive, resulting in a reduction in overall competition and lower consumer welfare; and it will show that even competition for point-of-sale steering will stagnate in the long run because the field of competition in that channel is inherently tilted to Visa and MasterCard, and it will tip even further in their favor if the Non-Discrimination Provisions are eliminated.

---

[50] Similarly, also in <u>U.S. v. Visa</u>, Professor Katz testified that "**just looking at prices is incomplete**. . . . [O]ne needs to take into account the qualities of what is being offered". (DX0745 at 4068:8-4069:1.)

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

A.   **The Non-Discrimination Provisions Have Not Caused Anticompetitive Effects.**

1.   The Non-Discrimination Provisions Have Not Enabled American Express to Charge Supracompetitive Prices.

As discussed above with respect to market power, the evidence refutes the notion that American Express can (or does) charge supracompetitive prices.  However one measures the price, the evidence simply is not there.  There is no evidence that American Express can control its two-sided price, or that it is above competitive levels.  Instead, that price has been declining steadily over the past decade.  Nor is there any evidence of supracompetitive merchant discount rates.  Any discount fee premium American Express has enjoyed has been a reflection of its premium, differentiated product.  American Express still has that premium, differentiated product, when compared to the average product offered on the competitive networks, it just has not been able to sustain a higher discount rate for it.  That alone demonstrates that the Non-Discrimination Provisions have not shielded American Express from competition in a way that permits it to price above competitive levels.

The following sections demonstrate that American Express's investments to offer a high-quality consumer experience and premium level of service drive competition among issuers and networks for merchant charge volume and consumer spending decisions.  The inter-brand competition that the Government purports to seek already exists in abundance.  There is competition on both price and quality today, and as discussed below striking the Non-Discrimination Provisions will significantly reduce the competition on quality and, in the long run, result in even less price competition than exists today.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

> 2.   The Non-Discrimination Provisions Are Integral to American Express's Ability to Pursue its Differentiated Business Model to the Benefit of Consumers, Merchants and Overall Competition.
>
> a.   The Importance of the Point-of-Sale Experience to American Express's Differentiated Business Model.

As the market data summarized above makes clear, American Express has always been, and remains today, a discretionary card.  Visa and MasterCard, by contrast, are ubiquitous on both sides of the market and function as payment utilities.  American Express's differentiated business strategy reflects these realities:  because Visa and MasterCard are a fixture in the vast majority of wallets in the U.S. and American Express is not, American Express can only compete for share of spend by giving consumers a distinctive reason to want to carry and prefer to use an American Express card despite the fact that, in the vast majority of cases, the consumer <u>already</u> has a Visa or MasterCard card in his or her wallet.

American Express has successfully differentiated itself on the Cardmember side by catering to service-conscious consumers and focusing on delivering the highest levels of convenience and service.[51]  A fundamental principle in that differentiated strategy is the recognition that the consumer has a choice in whether to obtain, carry and use American Express for her general purpose spending needs.  Core to that model is the promise to the consumer that if she does choose American Express, she will have a secure, safe and enjoyable payments experience at the point-of-sale.  American Express invests billions of dollars a year in products

---

[51] <u>See, e.g.</u>, DX2003 at 7 (American Express Partnership and Brand Overview presentation for MBNA, discussing the "American Express Brand Promise", including" Customer Commitment", "Extraordinary service when need" and "Making Customers feel respected and special through unsurpassed service, expertise and integrity"); DX6763 at 4-6 (American Express Brand Overview presentation, discussing brand promise and efforts to "Focus brand delivery on areas of competitive differentiation", including delivering "World-class service, Personal Recognition").

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

and services designed specifically to deliver on this core promise because of its centrality to American Express's differentiated model.[52]

Welcome acceptance at the point of sale is critical to American Express's ability to deliver on its differentiated brand promise.  Away from the point of sale, American Express can directly oversee and control the quality of its interactions with its Cardmembers around issues like billing and customer service, and the evidence will show that American Express devotes substantial resources to ensure that those interactions and services are consistent with the American Express brand promise of the highest levels of service and quality.  (See, e.g., DX5414 at 4 ("The promise we make to our customers:  World-Class Service, Personal Recognition").) However, American Express cannot be present at the crucial moment at the point of sale when the Cardmember actually uses the Card and therefore must rely on the merchant to comply with its contractual commitment to continue to uphold the high levels of quality and service on which American Express's brand and service proposition are premised.  The point of sale is the most important moment in the transaction process because the whole point of having a payment card is to purchase goods and services.  Virtually every service that American Express delivers—from rewards, to fraud protection to customer call centers—is ultimately directed at improving the point-of-sale experience and minimizing any disruption surrounding that experience.

Because the point-of-sale is the "moment of truth" in the transaction process and a positive point-of-sale experience goes to the very definition of the differentiated product that American Express provides, there is no conduct more damaging to American Express's brand

---

[52] See, e.g., DX6796 at 2-3 (showing over ███████ budget for Cardmember services such as Car Rental Loss & Damage, Purchase Protection, Extended Warranty, Global Assistance, Roadside Assistance, ID Theft Assistance and Airport Lounge Access in 2010); DX5385 at 31 (2010 American Express presentation showing over ██████ of investments in American Express's World Services division, which is responsible for American Express customer call centers).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

value than discrimination at the point of sale against American Express cards.  Whether through preferencing, monetary steering or other signaling from the merchant, discrimination tells the customer, at that critical moment, that American Express Cards are less welcome or desired than the cards of other networks.  As American Express witnesses will explain, point-of-sale discrimination is the antithesis of everything American Express strives to achieve through its substantial investments and innovations in its award-winning Cardmember services.  The evidence will show that because American Express is a discretionary card—and not a utility like Visa and MasterCard—many Cardmembers respond to the inconvenience, hassle and, in some contexts, embarrassment caused by discriminatory treatment at the point of sale by choosing not to use American Express both for the transaction in question and for subsequent transactions.  (See, e.g., DX3974 at 290, 316 (2008 American Express study ███████████████████████ ███████████████████████████████████ DX4104 at 200 (2008 American Express study ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████).

The Visa preference campaigns of the early 1990s clearly demonstrate the strong impact of discrimination on American Express's ability to differentiate itself on the basis of customer service and convenience.  The Government paints a misleading picture of the events surrounding "We Prefer Visa", labeling it pure "network competition", claiming that American Express could have competed for merchant preference on a level playing field with Visa and denying that the campaigns had harmful effects on American Express's network.  The contemporaneous documents and sworn testimony of those who were there simply do not support these assertions.

88

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

<u>First</u>, the evidence contradicts the Government's claim that Visa was engaged in purely competitive behavior.  For example, there is evidence that Visa threatened merchants with price increases unless they participated in "We Prefer" campaigns (<u>see, e.g.</u>, DX0586 at 095 (1999 speech by Discover's CEO, David Nelms, stating that "major merchants" had told Discover that "they were informed that their rates were being increased by more than 20 basis points, but if they displayed 'we prefer VISA' signs and took other actions, the amount of the increase would be reduced")) and that at least one major retailer (Walmart) perceived "Visa's preferred program . . . 'as blackmail'" (DX7424 at 628).

<u>Second</u>, American Express documents reflect the imbalance of power between Visa and MasterCard on the one hand and American Express on the other, and the reality that American Express simply did not have the scale or power to fight back.  In other words, the evidence will show that the "We Prefer Visa" experience demonstrates very clearly that the field of competition for point-of-sale preference is inherently tilted to Visa and that channeling competition into that form will result in less competitive outcomes than the status quo.  For example, in a 1998 internal memorandum to Ken Chenault, John Hayes (an American Express trial witness who will testify about this document and the events surrounding it) noted that Visa had the unrivaled scale and power to undertake "a disciplined, concentrated attempt . . . to **surround us with a 'VISA preferred world'**".  (DX7492 at 1 (emphasis added).)

<u>Third</u>, the contemporaneous documents illustrate the damage caused by the "We Prefer" campaigns to the value of American Express's network in the eyes of its Cardmembers. For example, one American Express study found that many Cardmembers assumed that preferencing merchants did not accept American Express at all, leading to decreased charge volume not just at the preferencing merchants but also merchants who had every intention of

89

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

warmly welcoming American Express Cardmembers.  (*See, e.g.*, DX0419 at 398 (1997 Amex study showing that 21% of Cardmembers "would use another payment method when faced with we prefer message"); DX1792 at 001 (reporting that "Visa preference messages appear to negatively affect [Cardmembers'] perceptions of Amex coverage").) Visa continues to remember these lessons, and in Australia has spoken of  creating a ████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████ )

      This case is fundamentally about the Government's view that competition will somehow be enhanced, and consumers will somehow benefit, if American Express cannot rely on contractual commitments from its merchants that they will refrain from actions targeted at disrupting the very point-of-sale experience that is so critical to American Express's brand promise.  The Government points to certain forms of steering that it claims are less disparaging to the American Express brand than others—such as discounts or disclosures about relative pricing—but those arguments miss the point, and demonstrate a fundamental misunderstanding about how this industry functions.

      Simply put, it is nearly impossible for merchants to steer meaningfully against Visa and MasterCard because those are the cards that everyone has.  Even most debit cards are issued under one of those two brands.  As the evidence will show, the "We Prefer Visa" experience demonstrated that American Express lacks the scale and resources to compete for preference on a level playing field with Visa—a fact that Visa recognized and emphasized in the planning stages of those campaigns.  American Express does not have the resources of tens of thousands of bank members or anywhere near the number of Visa or MasterCard-branded cards in consumers' hands to be able to compete effectively with an orchestrated campaign.  Without

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

the Non-Discrimination Provisions, discrimination will continue to be targeted directly at

American Express and used to fundamentally undermine its ability to make current

Cardmembers—and future prospects—want to use the American Express Card.  And again, this

does not in any sense mean that inter-brand competition among the networks is not alive and

well.  One need only watch the ads on prime-time TV or online extolling the virtues of various

products to see it.

> b.      Merchant Discrimination Would Impair American Express's
>         Ability to Offer a Differentiated Product.

The entire thrust of the Government's case is that merchants would use

discrimination to drive down discount rates, resulting in substantial rate cutting by the payment

platforms and leading to an equilibrium of significantly reduced discount rates.  The evidence

will show that, if the Government's predictions proved accurate, American Express will be

forced to drastically cut back on the Cardmember services and programs that drive its

differentiated model.  It is a basic tenet of two-sided markets that effects on one side of the

market will have offsetting effects on the other side.

American Express's differentiated model—and the competition it drives— is

fueled in large part by the discount revenue American Express earns on each transaction.

American Express invests that revenue into developing and funding the various rewards, benefits

and services that directly benefit its Cardmembers.  Merchants also benefit from those

investments because they enhance Cardmember demand for the merchant's goods and result in

Cardmembers spending more of their dollars at American Express-accepting merchants.

American Express also invests that revenue into running its network and funding direct merchant

benefits like fraud reduction programs, merchant financing, targeted marketing and data

analytics, all of which help merchants build more successful and profitable businesses.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Reductions in discount revenue would, therefore, require reductions in these welfare enhancing investments.

This principle is more than just economic theory.  In Australia, the Reserve Bank has regulated Visa and MasterCard interchange to a weighted average of just 50 basis points (i.e., 0.5%).  This reduction placed significant downward pressure on American Express's merchant fees.  The net result has been decreased services to cardholders, devalued rewards programs, increased annual fees and increased interest rates for credit card balances.[53]  This effect has also been observed in the United States, with banks reducing rewards on debit products as debit interchange has been reduced by regulation.

Permitting discrimination would also undermine American Express's ability to attract the cobrand partners that have become fundamental to its business model.  Currently, over ▮▮▮ of American Express's consumer charge volume is from transactions on cards that are issued by American Express and cobranded with its major partners, in particular Delta, Starwood, JetBlue and Costco.  Much of that charge volume is from merchants other than the cobrand partner, that is to say it comes from use of the cobranded card at other merchants for all types of goods and services.  If American Express loses the ability to offer a premium product to these cobrand partners then, as the evidence will show, the existing, vigorous competition  to acquire and maintain these partnerships will decline.

---

[53] See, e.g., DX5604 at 289 (showing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); DX5398 at 992-93 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DX6913 at 676, 682-83 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DX3994 at 35-36 (U.S. Government Accountability Office report stating that in response to the RBA regulations, "cardholders [in Australia] have experienced a decline in the value of credit card reward points for most cards and an increase in annual and other consumer credit card fees").  Professor Hay has also analyzed American Express's economic returns on its Australia business and determined, and will demonstrate at trial, that American Express has significantly reduced investments in its Australia card business following the RBA reforms and that American Express's economic returns in Australia are below its cost of capital.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Putting aside the direct economic ramifications, discrimination against American Express will erect another formidable barrier to continuing these partnerships and earning new ones.  Why would a major merchant like American Express's current partners, each of which thrives on brand image, associate themselves with a brand that is subject to denigration through merchant preference campaigns, point-of-sale discrimination and increased perceptions by Cardmembers that their cards are not accepted and valued?  The answer is easy.  They would not.  That is why American Express expanded its coverage dramatically in the former Northwest Airlines hubs to keep the Delta cobrand business following its merger with Northwest.[54]  In Australia, American Express similarly had to commit to certain acceptance levels and to keep differential surcharging below a certain threshold in order to win a critical cobrand deal with a retailer named David Jones (which is much like Saks or Bloomingdales).[55]  American Express was able to make those commitments to David Jones in large part because, as discussed below, it is permitted in Australia to contract with merchants not to discriminate against the Card—exactly what the Government says American Express should not be allowed to do here.

The same dynamics apply to American Express's competition for GNS bank issuers.  The entire purpose of U.S. v. Visa was to enable those partnerships in order to give consumers more differentiated options and thereby increase competition and consumer welfare.  (See, e.g., DX0733 at ¶ 373 (Professor Katz testifying in Visa that consumer benefits from differentiation would be greater by permitting American Express to partner with bank issuers); DX0765 at ¶ 410 (the Government stating the same in its Post-Trial Proposed Findings of Fact in Visa).)  Because all of the major banks in the United States already issue Visa and/or MasterCard

---

[54] See, e.g., DX4152 at 430.

[55] See, e.g., DX6603.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

cards, American Express has to give the GNS bank partners a reason to want to issue the American Express Card (just like it has to give the Cardmembers a reason to want to get and use the Card). Without the economics American Express is able to offer today, that simply will not happen. The same is true with respect to welcome acceptance: unless American Express can assure a GNS partner of non-discrimination, why would the bank choose American Express over the payment utilities of Visa and MasterCard? It would not do so. Each of American Express's contracts with its GNS partners requires certain coverage levels to ensure that the bank's customers can feel confident they can actually use the card. The evidence is also available on the face of the settlements reached by Visa and MasterCard both in this case and in MDL 1720 before Judge Gleeson. In each settlement, Visa and MasterCard agreed to permit brand-level steering, but insisted on being able to continue to prevent steering by card issuers. That is because no bank wants to have a competitive disadvantage vis-à-vis other major banks. Any bank that goes with American Express would already be in the minority since American Express has a handful of bank partners in the United States, whereas Visa and MasterCard have more than 10,000. It makes no sense for a bank, such as Citibank, to offer American Express cards and subject them to steering when that risk is far lower for the cards issued on the dominant networks that sit in every consumer's pocket and are issued by Citibank itself in vast numbers as well as by all of Citibank's competitors. A bank will only want to offer American Express cards if American Express continues to deliver a high-quality customer experience and premium level of service, and this depends critically on the Non-Discrimination Provisions.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

        c.     <u>Loss of American Express As a Differentiated Competitor As a Result of the Removal of the Non-Discrimination Provisions Would Be Detrimental to Consumers, Merchants and Overall Competition.</u>

The Government's response to the evidence that discrimination will impair American Express's ability to offer the innovated products and services it offers today is, in essence, "good". Their one-dimensional goal in this case is to reduce the merchant discount rate and start a race to the bottom, which will lead to commoditization or, perhaps, a world in which American Express serves a small slice of the consumer population with a highly differentiated "niche" product that only a few view as worth the price of steering. But that view ignores all of the benefits to consumer choice and quality that come from product differentiation, and ironically represents a willful blindness to the very positions that motivated the prior efforts by the Government to improve competition and consumer welfare in this industry.

In <u>U.S. v. Visa</u>, the Government and Professor Katz stressed the importance of American Express's differentiated business model as a competitive check on Visa and MasterCard and explicitly recognized the need for American Express to remain a viable differentiated competitor for the market to function competitively. (<u>See, e.g.</u>, DX0733 ¶ 355 ("A second lesson is that the associations will be driven to compete more vigorously if American Express and NOVUS are stronger competitors. In other countries, American Express issuing agreements with member banks have spurred the associations to improve their services. For example, in mid- to late 1995, Visa International considered several initiatives to meet the growing competitive threat posed by American Express, including issuance agreements between American Express and several banks around the world.").) Simply put, the entire point of the <u>Visa</u> litigation was that having American Express (and, to a lesser extent, Discover) around to compete with Visa and MasterCard for bank issuers—explicitly on the basis of service quality—

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

would spur a new wave of competition that the Visa and MasterCard issuers had no demonstrated desire to engage in when limited to the dominant duopoly.

And that is exactly what has happened since that case. The products, services, features and choices available to U.S. consumers prior to U.S. v. Visa pale in comparison to those in existence today. (See, e.g., DX7122 at 1 ███████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

██████████████ The intense competition between the networks and their issuing banks for share of merchant charge volume that one can see each and every day with all of the television ads touting rewards and services barely existed in the 1990s.   Visa and MasterCard and the banks that owned them were focused on tearing down consumer perceptions of the utility of the American Express card.  They were not focused on actually providing products that directly benefits their cardholders until they were driven to compete in this manner by American Express.

The Government had it right 15 years ago when it concluded that a more competitive American Express would benefit consumers and competition.  The 10,000 banks that owned and controlled Visa and MasterCard were also in competition with each other, but they

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

never innovated to the level that American Express did.  They never pioneered rewards and services.  Unlike American Express, credit cards are not the overwhelming majority of their business.  They needed American Express, a company focused entirely on serving its customers—merchants and Cardmembers alike—to drive that innovation.  The Government has apparently forgotten what it correctly recognized in <u>Visa</u>, and if it were to prevail in this case it would undo the gains that consumers have enjoyed over the past decade.

The Government has also ignored the writing of its own expert.  Those writings further demonstrates the importance of American Express's differentiated business model to the competitive vitality of the payment card industry.  As Professor Katz has written, markets like this that are subject to network effects are "**especially prone to 'tipping,'** which is the tendency of one system to pull away from its rivals in popularity once it has gained an initial edge".  (DX0229 at 105-06.)  In <u>U.S. v. Visa</u>, Professor Katz identified the payment card industry as one that is prone to tipping effects.  (DX0733 at ¶ 313 (stating that "[t]he value of multi-issuance for strengthening competition and preventing a downward spiral [resulting in tipping] should be even greater for American Express and Discover/NOVUS").)  Economic analysis of network markets, including analysis by Professor Katz in his academic work, stresses the importance of product differentiation to preventing market tipping.  As Professor Katz has written, **product differentiation "tend[]s to limit tipping and sustain multiple networks**", and smaller networks can pursue differentiation and limit tipping by "**catering to consumers who care more about product attributes than network size**".  (DX0229 at 106.)[56]

---

[56] Discover's limited commercial success illustrates the validity of these principles and the importance of successful differentiation to the competitive strength of a smaller network. Unlike American Express, Discover has pursued a strategy focused on achieving merchant acceptance on par with Visa and MasterCard's by generally setting its merchant fees in line with Visa and MasterCard's fees.  Discover also has pursued a "lend-centric" model, similar to Visa and

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Professor Katz's writings on tipping underscore the fallacy of the Government's short-run focus on merchant discount fees, without any serious consideration of the long-run consequences of the market intervention it seeks to achieve through this lawsuit.  While merchant discount fees may go down in the short-run if the Non-Discrimination Provisions were removed, the inability of American Express to pursue differentiation would cause the market to tip even further to Visa and MasterCard.  When that happens, Visa and MasterCard, the firms with true dominance, will have little incentive to innovate and no meaningful check on prices. The result, in the long run, would harm everyone except for those dominant networks and their banks.

> d.    The Government's Remaining Arguments of Competitive Harm Fail.

The discussion above demonstrates the flaw in the Government's competitive effects theory:  it only makes sense when viewed as a snapshot of day 1 of the but-for world, when there will be a new expression of competition on the basis of merchant discrimination, but ignores that the ending of the movie is reduced welfare for merchants and consumers alike.  The few responses to this reality that the Government can be expected to offer at trial are insufficient.

First, there is no evidence supporting the Government's claim that a reduction in merchant discount fees as a result of discrimination will lead to reduced consumer prices—either in the short run or long run.  The evidence points to the more common sense conclusion that merchants will pocket most of the savings at the same time that the reduced discount revenue leads directly to reduced Cardmember benefits.  As the U.S. Government Accountability Office

---

MasterCard's, focused predominantly on issuance to non-premium cardholders and earning revenue through finance charges that become due when cardholders do not pay their full balance. Yet, despite achieving ubiquity on the merchant side of the market through its copy-cat model, Discover has struggled to grow its share of charge volume and has not been a source of significant competitive pressure on the dominant networks.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

has noted, in Australia, after nearly a decade of lowered merchant discount fees, there is no evidence that any of those savings have been shared with consumers.  (See DX7202 at 2 ("Since Australia's regulators acted in 2003, total merchant discount fees paid by merchants have declined, but no conclusive evidence exists that lower interchange fees led merchants to reduce retail prices for goods; further, some costs for card users, such as annual and other fees, have increased.").)  The same is true with respect to the savings some merchants saw following the regulation of debit interchange under the Durbin amendment; there is no evidence they passed any of those savings to consumers.  In addition, merchants today have two mechanisms to share savings with consumers:  they can offer cash discounts and they can offer debit discounts.  Very few avail themselves of this ability to pass savings on to consumers.  The notion that they will pass any savings for reduced discount rates to consumers (which ignores the long term consequences of higher prices from commoditization and tipping to the dominant duopoly) is pure speculation untethered from real life experiences.[57]

        Second, the Government's theory that consumers would benefit from knowing one aspect of the merchant's cost base—the cost of credit card acceptance—is without merit.  The biggest problem with this argument is that it requires an assumption—that merchants could truthfully disclose price to consumers in a way that is understandable and does not mislead them—that is entirely unfounded.  The pricing structures used by Visa and MasterCard are exceedingly complex and can and do vary significantly by the card product presented.  In fact, Visa has more than 70 different interchange rate categories and MasterCard has more than 240, and that does not even begin to account for the various other fees, such as acquirer fees and

_____

[57] Moreover, even if merchants were to pass some of the cost savings from lower merchant discount fees on to consumers, the assumption that merchant fees would remain "lower" in the long run is not well founded given the likelihood of commoditization and market tipping.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

network fees, that most merchants pay for each Visa or MasterCard transaction. (See DX 7295

(MasterCard); DX7296 (Visa).) Many merchants have testified that, because of this complexity,

they cannot understand or accurately assess what they pay for Visa and MasterCard. Instead,

even the Government's purported payments industry expert conceded at her deposition that "a

merchant wouldn't know precisely" at the point of sale what rewards category a particular Visa

or MasterCard card would fall in, and "therefore what that card transaction might cost".

(Schmitt Dep. at 410:20-411:8.)

        Indeed, although American Express typically does <u>not</u> charge a premium to

smaller merchants, American Express witnesses will testify that small merchants routinely (but

incorrectly) assume that they pay more to American Express than to Visa and MasterCard

because of the complexity of Visa and MasterCard's pricing structure. (See, e.g., DX3750

(noting that small merchants are "less inclined to 'do the math' on bankcard pricing/fees" and

just assume, contrary to fact, that those fees are lower than American Express's).) The

Government also ignores the fact that limitations on a merchant's ability to disclose the rates it

pays for American Express acceptance are governed primarily by the confidentiality clause in its

acceptance agreement, which has not been challenged and which benefits both American

Express and merchants by encouraging and facilitating American Express's ability to negotiate

custom pricing terms with individual merchants. See, e.g., Encyclopedia Brown Prods., Ltd. v.

Home Box Office, Inc., 26 F. Supp. 2d 606, 609 (S.D.N.Y. 1998) (agreeing that "public access"

to negotiated rates "would impede the cable operator defendants' ability effectively to bargain

with suppliers of cable programming other than HBO"). Any doubt about the competitive

sensitivity of the rates that merchants negotiate with American Express have been dispelled by

the Government's concession that such rates are appropriately redacted from the public record in

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

this trial and the submissions of more than a dozen major merchants that include sworn

declarations about the harm that disclosure of those terms will cause to their competitive

position.[58]

         <u>Third</u>, the Government has used Discover as a stalking horse for competition in

this case, claiming that absent the Non-Discrimination Provisions, Discover will be able to

expand its share by pursuing a low-cost-to-merchant strategy. The evidence does not support

this claim either. At his deposition, Professor Katz conceded that his predictions regarding the

likelihood of Discover succeeding today with such an approach is based on speculation.[59] As

Professor Katz admits, there are no barriers preventing Discover from replicating American

Express's strategy of increasing insistence and share by directly offering consumers generous



[58] See, e.g.,

[59] (Exhibit 1 (Katz Dep.) at 518:7-18 ("Q. Although you say you have a belief that Discover would be more successful in getting merchants to steer away from Visa and MasterCard and toward them in the but-for world, that's just your view of it. You don't have any empirical data to prove that, do you? A. I'm not sure what you would consider to be empirical data to prove it given that we're talking about a but-for world which, of necessity, is a hypothetical world. So that's right. I don't have a case where it happened.").)

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

rewards and other valuable services.  In fact, there is no evidence that American Express's Non-Discrimination Provisions had any impact on Discover's attempts to pursue a low-fee strategy either.  At the time Discover attempted to pursue that strategy, Visa and MasterCard—which dominate the market—also had non-discrimination provisions.

Discover also has not pursued a low-fee strategy at any of the 3 million merchant locations that accept Visa and MasterCard but not American Express and thus are no longer subject to Non-Discrimination Provisions as a result of the consent decree that Visa and MasterCard entered into to settle this action with the Government.  Notably, it has been more than three years since Visa and MasterCard's Non-Discrimination Provisions were lifted.  When the Government filed this lawsuit and announced the settlement with Visa and MasterCard, it claimed that there would be immediate benefits at the millions of merchants that did not accept American Express based upon its claim of increased network competition at those merchants.  That prediction—like those the Government now makes to support this case—was wrong.

There is no evidence that Discover has ever attempted to shift volume from Visa or MasterCard through a low-fee campaign at these merchants representing as much as $380 billion in volume.  The evidence will show that the most plausible explanation for why Discover has not pursued this strategy is because it does not believe that trying to convince merchants to steer away from Visa and MasterCard would be a successful strategy given the number of consumers that carry and "single-home" (i.e., own or use only Visa or MasterCard) on Visa and MasterCard relative to Discover.  Thus, any gains that Discover might make in the Government's but-for world by paying for point-of-sale discrimination would come only at the expense of American Express, which would do nothing to increase the competitive pressure on the dominant networks nor improve the overall level of competition in the marketplace.  On the other side, the

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

most reasonable assumption that can be drawn from the lack of MasterCard or Visa steering campaigns in those 3 million merchants is that they:  (1) continue not to be designed and motivated to attack one another; and (2) have concluded that attacking Discover is not worth the trouble given its paltry share.  The real world experience at these 3 million non-American Express merchants is compelling evidence that the Government's conjured but-for world is contrary to the evidence.  And this further confirms that discrimination will put American Express in the cross-hairs of the dominant duopoly to the detriment of consumers and competition.

        <u>Fourth</u>, the Government may point to evidence from Australia to argue that American Express's prediction of competitive harm and market commoditization in the face of discrimination rings hollow.  But, as Professor Katz has acknowledged, "Because it is another country, Australia's experience needs to be used cautiously as a basis for predicting what would happen in the United States."  (DX6466 (Katz I) ¶ 445.)  In fact, Australia is more like the world that currently exists in the United States than the but-for world sought by the Government.  While differential surcharging is permitted there, that is not at issue in this case and, in any event, American Express is permitted to contract with merchants not to engage in that conduct or other forms of discrimination, just like it does today in the United States with the Non-Discrimination Provisions.  Finally, the evidence will also show that American Express has been forced to <u>reduce</u> its overall investments in its card business in Australia—to the detriment of Australian consumers—the evidence will also show that American Express's competitive

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

position in Australia has been aided by dynamics that are not replicable in the United States and that, even with those distinctions, American Express's core Australian business is challenged.[60]

> B.   **The Non-Discrimination Provisions Allow American Express to Achieve Substantial Efficiencies and Competitive Benefits.**

Under the rule of reason, if the plaintiff satisfies its initial burden of proving actual adverse effects on competition as a whole, "the burden shifts to the defendants to offer evidence of the procompetitive effects of their agreements". Geneva Pharm., 386 F.3d at 506-07.  Here, because the Government cannot satisfy its initial burden of proving overall harm to competition, the burden does not shift, and the Government's case fails.  But even if the burden were to shift at any point in the analysis, American Express would satisfy its burden given the substantial evidence of the overall procompetitive nature of the Non-Discrimination Provisions, discussed above.  As noted above, even a vertical restraint that completely eliminates a form of horizontal price competition is deemed procompetitive if its net result is to shift the locus of where competition occurs and enhances it in the relevant market.  Thus, in Leegin, the Supreme Court recognized that while vertical price restraints might "eliminate intrabrand price competition", they might still improve overall competition for the products in question by facilitating retailers' ability to make "invest[ments] in tangible or intangible services".  See Leegin, 551 U.S. at 890; Brantley, 675 F.3d at 1202.

In addition, the evidence will show that many of the efficiencies and competitive benefits that courts have identified as established offsetting procompetitive justifications under

---

[60] The Government may also point to analyses conducted by an internal taskforce that American Express created in 2010 to consider potential responses to the Durbin Amendment, which, at the time, was being drafted and debated in the legislature but had not yet been enacted.  (DX6466 (Katz I) ¶ 382.)  Professor Katz may argue that these analyses support his claim because they suggest that American Express considered mitigating the harm that it anticipated might result from Durbin-related steering by entering partnerships with influential merchants or targeting increased rewards at certain Cardmembers.  However, the evidence will demonstrate that any such argument is unfounded.

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

the rule of reason apply here.  For example, courts have upheld vertical restraints used by firms to protect their brand image and ensure consistent product quality.  See, e.g., Major League Baseball Props., Inc. v. Salvino, Inc., 420 F. Supp. 2d 212, 220 (S.D.N.Y. 2005), aff'd 542 F.3d 290 (2d Cir. 2008) (noting "several procompetitive justifications" for vertical restraints, including "the efficiencies of enforcement, quality control and coordinated promotion, design, sales and marketing support"); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 440-41 (3d Cir. 1997) ("Courts and legal commentators have long recognized that franchise tying contracts are an essential and important aspect of the franchise form of business organization because they reduce agency costs and prevent franchisees from free-riding— offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product while benefitting from the quality control efforts of other actors in the franchise system."); H.L. Hayden Co. of New York, Inc. v. Siemens Med. Syst., 672 F. Supp. 724, 734 (S.D.N.Y. 1987), aff'd, 879 F.2d 1005 (2d Cir. 1989) (identifying as a valid business justification "a desire to prevent erosion of its marketing strategy, a desire to protect its reputation in the market, and a desire to guard against the pernicious effects of 'free riding'"). Here, the Non-Discrimination Provisions efficiently serve the procompetitive goal of protecting American Express's differentiated brand value from point-of-sale denigration and ensuring consistency in the quality of the American Express point-of-sale experience.

It is also well established that firms may rely on vertical restraints to prevent free-riding on procompetitive investments.  See, e.g., Leegin, 551 U.S. at 891 (absent vertical restraints, services "that enhance interbrand competition might be underprovided" because "discounting retailers can free ride" on firms "who furnish services and then capture some of the increased demand those services generate"); Konik v. Champlain Valley Physicians Hosp., 733

105

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

F.2d 1007, 1014 (2d Cir. 1984) ("[A]ntitrust analysis takes into account that some arrangements may be necessary in order to remedy 'market imperfections such as the so-called 'free-rider' effect.'" (quoting Con'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55 (1977)); Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n, 633 F. Supp. 201, 219-20 (N.D. Ill. 1986) ("[T]he . . . Rules [preventing steering] are not impermissible restrictions on interbrand free riding" but rather facilitate "interbrand competition to offer better services and more attractive products" by preventing such free-riding on the networks' reputations and promotional efforts through steering).  The evidence will show that American Express relies on the Non-Discrimination Provisions as the most efficient way to prevent merchants from steering and thereby free-riding on the billions of dollars it invests annually in its consumer and merchant services, which have stimulated competition in the industry to the benefit of merchants and consumers.  (See generally Defs.' Opp'n to Pls.' Motion in Limine to Exclude Testimony Relating to Putative Free-Riding on Merchant Analytics and Certain Other Expenditures, Dkt. No. 354 ("Opp'n to Free-Riding Mot.").)

American Express's substantial investments in its closed-loop data capabilities, rewards programs, customer service and other Cardmember services have allowed American Express to cultivate valuable brand equity and strong relationships with its Cardmembers. Merchants who contract to accept American Express derive substantial benefits from these investments.  American Express only gets compensated for making those investments when the Card is actually used and the merchant pays the merchant discount fee.  By signaling to its customers that it accepts American Express, a merchant also signals to American Express Cardmembers that they can enjoy these benefits by transacting at the merchant with their American Express Cards.  By affiliating with the American Express brand, merchants also can

106

signal to consumers their commitment to high levels of customer service and quality.  These signals—which exist as a result of American Express's substantial efforts and investments in its Cardmember services—have the effect of attracting high-spending Cardmembers into the merchant's stores with enhanced demand for the merchant's products and services.  American Express's targeted marketing efforts have the same effect.[61]

If, after drawing the Cardmember into its store as a result of these signals (or in connection with a co-American Express marketing campaign), the merchant steers the Cardmember to another network's card, American Express does not receive any compensation for the investments that helped deliver the Cardmember to the merchant.  By definition, the merchant in this case will have free-ridden on American Express's investments—that is, it will have benefitted from those investments without paying anything for them.  Indeed, such a scenario would be akin to the classic case of free-riding, where a premium-brand manufacturer provides financial support to a merchant to provide a more attractive showroom to attract customers to its store, but, once the customer is in the store, the merchant then persuades him or her to purchase another manufacturer's products instead.  (Opp'n to Free-Riding Mot. at 8.)

As it did in its Free-Riding Motion, the Government will argue that certain categories of investments that American Express makes in its card business are not susceptible to free-riding because American Express purportedly can charge fixed fees for them or does not incur liability for them unless an American Express card is used to complete the transaction.

---

[61] See, e.g.,

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

(Pls.' Mem. of Law in Support of Mot. in Limine to Exclude Testimony Relating to Putative Free-Riding on Merchant Analytics and Certain Other Expenditures, Dkt. No. 332 ("Free-Riding Mot.", at 5-7.)  As discussed in American Express's opposition to the Government's Free-Riding Motion, these arguments are both legally and factually unfounded.  Contrary to the Government's claim, the law does not require American Express to adopt a different pricing structure to avoid free-riding if it would be sub-optimal to do so, and the evidence will show that the fixed-fee pricing structure the Government seeks to impose on American Express would significantly reduce the value of its analytics-based services.  (Opp'n to Free-Riding Mot. at 12.) The evidence will also show that there are numerous value-enhancing expenditures related to American Express's rewards programs and other Cardmember services that American Express incurs irrespective of whether a Cardmember uses her American Express Card for a particular transaction or is steered to use another card.  (Id. at 14-15.)  These procompetitive expenditures are unquestionably subject to merchant free-riding, and American Express is entitled to rely on the Non-Discrimination Provisions to protect them.  Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 305, 334 (2d Cir. 2008).  Thus, the evidence will demonstrate that the Non-Discrimination Provisions are critical to American Express's ability to prevent such free-riding, which would otherwise lessen American Express's incentives to invest in the differentiated products and services that drive value to consumers and merchants and make the payment card marketplace vigorously competitive.

      C.      **The Government Cannot Establish Less Restrictive Alternatives to the Competitive Benefits Achieved by the Non-Discrimination Provisions.**

      Under the rule of reason, once the defendant offers proof that the restraint at issue has procompetitive effects, "the burden shifts back to plaintiff, who must prove that any legitimate competitive effects could have been achieved through less restrictive alternatives".

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

Arkansas Carpenters Health & Welfare Fund v. Bayer AG, 604 F.3d 98, 104 (2d Cir. 2010).

Here, the Government cannot show that the substantial competitive benefits provided by the

Non-Discrimination Provisions could be achieved through less restrictive alternatives.

        At the outset, it is important to note that vigorous inter-brand competition among

the networks, including price competition (e.g., cash back programs) already exists.  Moreover,

as described above, the Non-Discrimination Provisions are already narrowly targeted to prevent

only the forms of steering that damage the point-of-sale experience by challenging consumers'

perception of American Express welcome acceptance and devaluing their desire to use the

American Express card in pernicious ways.  Many merchants have negotiated Non-

Discrimination Provisions that allow them to endorse another network's card as its "Official

Card", which communicates a positive statement about one network rather than a negative

statement designed to tear down consumers' expectations about the value of another.  (See, e.g.,

DX7490 at 746 (noting that by contrast to "Official Card" programs, preference statements give

"a pre-emptive, exclusionary slant with the 'Prefers' hook").)  The Non-Discrimination

Provisions permit merchants to promote co-branded cards issued on another network, to promote

store cards and to engage in a variety of other promotions that do not have the damaging effects

of the forms of steering targeted by the Non-Discrimination Provisions.  (See, e.g., DX4351 at

348 (allowing Dell to engage in limited-duration promotions with other networks); DX3345 at

315 (allowing Starwood to engage in promotions and marketing programs with other networks

"so long as a preference is not stated or published").)  Based on decades of experience, American

Express has learned that this conduct does not have the effect of denigrating the American

Express brand and promise of welcome acceptance like the forms of discrimination at issue in

this case, and it has designed its Non-Discrimination Provisions—and for many merchants

HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

modified them—to make them as least restrictive as possible consistent with their procompetitive

purpose.  The Non-Discrimination Provisions also do not prevent many of the ad campaigns that

Visa ran in the 1990s, including having non-accepting merchants state a preference and having

city convention and visitor bureaus and municipalities which do not accept the card state

preferences to the extent they are not misleading.

None of the purported "less restrictive alternatives" for which the Government

may argue at trial could possibly achieve the procompetitive benefits that American Express

realizes through its use of the Non-Discrimination Provisions.  For example, the Government has

argued that its consent decree with Visa and MasterCard, which allows those networks to

individually negotiate agreements that limit a merchant's ability to steer away from their cards

during promotions whereby the merchant simultaneously agrees to steer toward their cards, is a

less restrictive alternative that could protect American Express's investments in its marketing

and promotional activity.  The Government does not even attempt to show that this "alternative"

would be efficient in practice—for example, the transaction costs associated with "individually

negotiating" non-steering agreements with the thousands of small businesses that American

Express promotes through Small Business Saturday alone would be astronomical.  See, e.g.,

Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560, 1576 n.30 (11th Cir. 1983) (less

restrictive alternatives must be "economically feasible" alternatives); Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust Principles and Their Application

¶ 1760 (2013) ("[A] usable less restrictive alternative must be both practicable and effective in

fact. Business practice often proceeds by trial and error, and many alternatives that seem

practicable on paper prove not to be so in practice.")  Nor does the Government deny that, under

this proposal—or any of the other "less restrictive" proposals it has identified—the vast majority

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

of American Express-accepting merchants would still be free to undermine the point-of-sale experience that is essential to the very definition of American Express's differentiated platform.

The proposals the Government may offer at trial—while perhaps "less restrictive" than the Non-Discrimination Provisions in the sense that they would permit far more point-of-sale discrimination against American Express Cards than the Non-Discrimination Provisions presently allow—would not effectively mitigate the damage to American Express's network and the broader harms to competition that would result if the Non-Discrimination Provisions were removed.  Indeed, the Government's inability to identify actual alternatives to the Non-Discrimination Provisions only confirms that the Non-Discrimination Provisions are indispensable to American Express's ability to compete effectively as a differentiated platform, and therefore indispensable to the overall competitive vitality of the industry.

<center>*          *          *          *          *</center>

In sum, the Government's extreme and unprecedented assault on American Express's business model is contrary to basic antitrust principles.  The Government seeks a world in which American Express is forced to do business with merchants that actively discriminate against its products and denigrate its brand.  That is clear from the manner in which its expert performed his analysis,[62] and from the settlement it reached with Visa and MasterCard.[63]  That will not promote competition.  It will destroy American Express's brand and

---

[62] See Exhibit 1 (Katz Dep.) 408:4-13 ("Q:  At what point is American Express no longer free to choose not to do business with merchants [who steer customers away from American Express]?  A:  "So let's go back to what my testimony is about, which is to say, I compared the actual world with the but-for world.  The but-for world I Used in the baseline comparison, American Express would not be able to do this at all.").

[63] See DX5826 (Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc., Dkt. No. 143) §§ II.15 & IV (prohibiting Visa or MasterCard from "adopting any bylaw, standard, guideline or practice applicable to Merchants" that would prevent steering).

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

its ability to invest, and it will harm consumers by restricting meaningful choice in the payment cards market. In the Government's preferred world, merchants could enjoy all the benefits of accepting American Express, including by posting the American Express sticker on the door, only to tell American Express Cardmembers at the point of sale that, in fact, they would prefer if the Cardmember used another brand of payment card. This infringement on American Express's ability to choose <u>not</u> to do business with merchants who will harm its brand is contrary to decades of antitrust jurisprudence that recognizes that a firm has the "right to deal, or refuse to deal, with whomever it likes, as long as it does so independently". <u>See</u> <u>Monsanto Co. v. Spray Rite Serv. Corp.</u>, 465 U.S. 752, 761 (1984); <u>see also</u> <u>United States v. Colgate & Co.</u>, 250 U.S. 300, 306-07 (1919).

      The Government's assumption that American Express lacks this right underscores the true goal of this lawsuit: to tie American Express's hands so they cannot market a differentiated product, and thereby to transform what is today a dynamic, competitive, welfare-enhancing payment card industry into a commoditized market dominated by two giants unconstrained by the industry's central competitive force. This is what the real but-for world looks like: American Express is legally prohibited from protecting its brand and offering a differentiated product by assuring its Cardmembers of welcome acceptance, while the already dominant duopoly of Visa and MasterCard are freely able to use their power in this market to persuade merchants to <u>steer toward</u> their cards and <u>away</u> from American Express's. In this world, American Express is a marginal player in a market with limited competition, which will tip inexorably to Visa and MasterCard, with the end result that consumers and merchants will pay more for less. Fifteen years ago, this was the world the Government sought to avoid when it sought to enhance consumer welfare by stimulating interbrand competition driven by what it

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

then acknowledged was American Express's ability to provide a differentiated product.  The result when the Government prevailed then was the vigorous competition we see today.  The result here, if the Government prevails now, will just be higher prices and lower quality.

## CONCLUSION

For the foregoing reasons, and in light of the evidence that will be presented at trial, American Express will respectfully request that this Court enter judgment for American Express at the conclusion of the trial scheduled to begin on July 7, 2014.

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

June 20, 2014

<div style="margin-left:40%">

Respectfully submitted,

/s/ Evan R. Chesler
_____

Evan R. Chesler
(echesler@cravath.com)
Stuart W. Gold
(sgold@cravath.com)
Peter T. Barbur
(pbarbur@cravath.com)
Kevin J. Orsini
(korsini@cravath.com)
Members of the Firm

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000


Donald L. Flexner
(dflexner@bsfllp.com)
Philip C. Korologos
(pkorologos@bsfllp.com)
Eric J. Brenner
(ebrenner@bsfllp.com)

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300


*Counsel for Defendants American Express
Company and American Express Travel
Related Services Company, Inc.*

</div>

114

**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

**Attachment A**

**American Express's purchase volume share for general purpose credit and charge cards 1990-2012**

**(Source:  DX6501 (Bernheim II) at 17, Fig. 1)**



**HIGHLY CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER**

**Attachment B**
**American Express's  purchase volume share for GPCC, debit, and prepaid**
**1990-2012**
**(Source:  DX6501 (Bernheim II) at 38, Fig. 7)**



Amex's purchase volume share for general purpose credit, charge, debit, and prepaid cards