4666

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                             :

UNITED STATES OF AMERICA    :10-CV-4496 (NGG)(RER)
STATES OF ARIZONA,          :
CONNECTICUT, IDAHO, ILLINOIS,  :
IOWA, MARYLAND, MICHIGAN,    :
MISSOURI, MONTANA, NEBRASKA,  :United States Courthouse
NEW HAMPSHIRE, OHIO, RHODE   :Brooklyn, New York
ISLAND, TENNESSEE, TEXAS,    :
UTAH, AND VERMONT,         :
                            :Monday, August 4, 2014
        Plaintiffs,    :9:00 a.m.
                            :
                            :
     -against-       :
                            :
                            :

AMERICAN EXPRESS COMPANY, ET  :
AL.,                          :
                            :
        Defendants.    :
                            :
                            :
- - - - - - - - - - - - - - - X

REDACTED TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:  ANTITRUST DIVISION, LITIGATION III
U.S.A.            U.S. DEPARTMENT OF JUSTICE
                450 Fifth Street NW
                Suite 4000
                Washington, DC 20001
            BY:  CRAIG W. CONRATH, ESQ.
                MARK H. HAMER, ESQ.
                ETHAN GLASS, ESQ.
                JOHN READ, ESQ.
                SUSAN MUSSER, ESQ.
                KATE MITCHELL-TOMBRAS, ESQ.
                MIKE BONANNO, ESQ.
                LISA SCANLON, ESQ.

4667

```
For the Plaintiff:      BRET L. FULKERSON
State of Texas          Assistant Attorney General
                        300 West 15th Street
                        Austin, Texas 78711-2548


State of Missouri:   ANNE E. SCHNEIDER
                     Assistant Attorney General
                     Supreme Court Building
                     Post Office Box 899
                     Jefferson City, MO 65102


State of Ohio:       MITCH GENTILE
                     Assistant Attorney General
                     Ohio Attorney General's Office


For the Defendant:   CRAVATH, SWAINE & MOORE LLP
American Express         Worldwide Plaza
Company                  825 Eighth Avenue
                         New York, New York 10019
                     BY:  EVAN R. CHESLER, ESQ.
                          KEVIN J. ORSINI, ESQ.
                          PETER T. BARBUR, ESQ.
                          STUART W. GOLD, ESQ.


                     BOIES, SCHILLER & FLEXNER LLP
                         575 Lexington Avenue
                         New York, New York 10022
                     BY:  PHILIP C. KOROLOGOS, ESQ.
                          ERIC BRENNER, ESQ.
                          MATTHEW S. TRIPOLITSIOTIS, ESQ.
                          DONALD L. FLEXNER, ESQ.
                          JAMES COVE, ESQ.

Court Reporter:      SHERRY J. BRYANT, RMR, CRR
                     225 Cadman Plaza East
                     Brooklyn, New York 11201
                     718-613-2636
                     sbryant102@verizon.net


Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.
```

PROCEEDINGS                                    4668

1          COURTROOM DEPUTY:  Case on trial.  Please, Counsel,

2     state your appearances, please.

3          MR. CONRATH:  Good morning, Your Honor.  Craig

4     Conrath for the United States.

5          THE COURT:  Good morning.

6          MR. FULKERSON:  Good morning, Your Honor.  Bret

7     Fulkerson for the State of Texas.

8          THE COURT:  Oh, you're new.  You're from Texas?

9          MR. FULKERSON:  Yes, Your Honor.

10          THE COURT:  From Austin?

11          MR. FULKERSON:  Yes.

12          THE COURT:  Welcome.

13          MR. FULKERSON:  Thank you.

14          MR. CHESLER:  Good morning, Your Honor.  Evan

15     Chesler for American Express.

16          MR. FLEXNER:  Good morning, Your Honor.  Donald

17     Flexner for American Express.

18          THE COURT:  Good morning.  I have a law clerk

19     starting in January from UT Austin.  So we reach out to the

20     middle sometimes.

21          Well, welcome, everybody.  I've been getting your

22     correspondence, and I appreciate it.  I think what we ought to

23     do, just briefly, is talk about our plans for the week and

24     also this issue about these 200 documents.

25          I have two applications to seal the courtroom.

PROCEEDINGS                           4669

1   Perhaps we can discuss that first.

2         Mr. Orsini?

3         MR. ORSINI:  Good morning, Your Honor.  Kevin Orsini

4   for American Express.

5         Those are letters that I believe Mr. Gold sent in.

6   He's not in court this morning.  But they both touch upon the

7   same issue.  The one witness is a woman named Pam Codispoti

8   from American Express.  She is going to testify entirely, or

9   almost entirely, about some co-brand negotiations and co-brand

10  relationships.  And the other witness is an individual from

11  Delta who was managing the Delta side of the co-brand

12  relationship with American Express.

13        As Your Honor will recall, the co-brands were an

14  item of particular sensitivity during the confidentiality

15  motions.  The government had stipulated even in the first

16  instance with us and the third parties to keep that type of

17  information confidential.  And since the examinations will

18  cover entirely those issues, hence the application to seal.

19        THE COURT:  Okay.  And how long do you all expect to

20  have Ms. Codispoti on the witness stand?

21        MR. ORSINI:  So the most recent estimate that

22  Mr. Gold gave me this morning was about an hour and a half to

23  two hours --

24        THE COURT:  Okay.

25        MR. ORSINI:  -- at the longest.

---

.

PROCEEDINGS                                    4671

1          MR. CONRATH:  We also for the same reasons have no

2     objection to sealing for Delta.

3          THE COURT:  Then, that's what we'll do.  I'll try to

4     focus that on Wednesday and seal the courtroom for the

5     testimony for good cause shown.  All right?  It's approved.

6          MR. ORSINI:  Thank you, Your Honor.

7          THE COURT:  Okay.  And then -- and who are the

8     witnesses for today?

9          MR. ORSINI:  Today, Your Honor, the first witness is

10    William Glenn, who is currently not an American Express

11    employee.  He's running the business travel joint venture that

12    was created a few weeks ago, but had been an American Express

13    employee for a little over a decade and was the head of the

14    merchant business.  On the organizational chart that Your

15    Honor has, his name isn't there, but he essentially was in the

16    same role that Anre Williams currently fills.

17         THE COURT:  So he was president of Global Merchant

18    Services?

19         MR. ORSINI:  That is correct, Your Honor.

20         THE COURT:  And Mr. Bright reported to him?

21         MR. ORSINI:  Mr. Bright at that time -- Mr. Bright

22    will correct me.  I think at that time Mr. Bright was working

23    in the corporate card portion of the business.  Do I have that

24    wrong?

25         MR. BRIGHT:  You have that wrong.

SHERRY BRYANT, RMR CRR

PROCEEDINGS                                4672

1          MR. ORSINI:  I have that wrong.

2          MR. BRIGHT:  I was working for Josh Silverman at the

3    time, just a few months ago.

4          THE COURT:  Josh Silverman, yes.  We've met

5    Mr. Silverman.

6          MR. ORSINI:  On the consumer side of the business.

7          THE COURT:  Okay.  Well...

8          MR. ORSINI:  Then the second witness, Your Honor, is

9    John Hayes, who is the American Express chief marketing

10   officer.  He's up towards the top of the org chart.

11         THE COURT:  And he reports to Mr. Chenault?

12         MR. ORSINI:  That is correct, Your Honor.

13         THE COURT:  Well, thank you very much.  All right.

14   And that should take the day today, you think?

15         MR. ORSINI:  I expect so, Your Honor.  I expect my

16   examination of Mr. Glenn will be in the range of two to two

17   and a half hours, and then Mr. Hayes roughly the same this

18   afternoon.

19         THE COURT:  Okay.  Thank you.  Well, that gives us

20   at least an idea of what's going to be happening here this

21   week, which brings us to the question of the 200 exhibits.

22   Did you see the letter from Mr. Chesler?

23         MR. CONRATH:  Your Honor, that arrived quite late

24   last night, and I was not in the office, I have to confess.

25         THE COURT:  Say that?  You were not where?

1          MR. CONRATH:  In the office.

2          THE COURT:  When?

3          MR. CONRATH:  Late last night.

4          THE COURT:  You were not?

5          MR. CONRATH:  No.  Shocking.  Very disturbing.  Can

6    I suggest that we just put this over for another day, Your

7    Honor -- this has lingered for a while -- and let us see if

8    there's a response we have to the letter and be prepared to

9    talk about it?

10          THE COURT:  Right.  Because I've been -- what I've

11   done is I've blocked out Labor Day weekend so that you can

12   bring witnesses in to authenticate these documents.  And I'm

13   in New York on Labor Day weekend, so I assume everybody is in

14   town.  And, therefore, you all will be here with me if it

15   becomes necessary to do so.

16          MR. CONRATH:  Very well, Your Honor.

17          THE COURT:  So, having said that, perhaps there's

18   some solution to the problem --

19          MR. CONRATH:  We'll work it out.

20          THE COURT:  -- which will help us work it out, short

21   of extra days during a holiday weekend.

22          MR. CONRATH:  Very well.  Thank you, Your Honor.

23          THE COURT:  But also --

24          MR. CONRATH:  We do love New York.

25          THE COURT:  I'll allow you to reopen your case to

GLENN - DIRECT / ORSINI                           4674

1   bring in fact witnesses so that I have the -- I understand the

2   context of all these documents if it becomes absolutely

3   necessary.  And that would also be on Labor Day weekend.

4           MR. CONRATH:  Very well.  Thank you, Your Honor.

5           THE COURT:  Okay?  There you go.  So let's get

6   started.

7           MR. ORSINI:  Your Honor, American Express calls

8   William Glenn.

9           (Witness sworn.)

10          COURTROOM DEPUTY:  Please have a seat.

11          THE WITNESS:  Thank you.

12          COURTROOM DEPUTY:  Please state and spell your full

13  name for the record.

14          THE WITNESS:  William H. Glenn.

15          COURTROOM DEPUTY:  Spell your last name.

16          THE WITNESS:  G-l-e-n-n.

17          THE COURT:  You may inquire.

18          MR. ORSINI:  If I may approach, Your Honor, with the

19  witness book?

20          THE COURT:  You may.

21          MR. ORSINI:  Your Honor, my team is ahead of both of

22  us this morning.  They've asked if we could switch the feed

23  over.

24          THE COURT:  Sure.

25          **W I L L I A M   G L E N N**,

GLENN - DIRECT / ORSINI                    4675

1           called by the Defense, having been first duly sworn,

2    was examined and testified as follows:

3    DIRECT EXAMINATION

4    BY MR. ORSINI:

5    Q    Good morning, Mr. Glenn.

6    A    Good morning.

7    Q    Mr. Glenn, by whom are you currently employed?

8    A    American Express Global Business Travel.

9    Q    And can you give us a brief description of your position

10   at American Express Global Business Travel and what American

11   Express Global Business Travel is?

12   A    I'm the president/CEO.  And the American Express Global

13   Business Travel is new -- is a new JV effective --

14           THE COURT:  JV?  You have to speak in -- acronyms

15   don't work, at least at the beginning of your testimony.

16   Later on, the sky is the limit.

17           THE WITNESS:  Sorry, Your Honor.

18           THE COURT:  JV?  That's junior varsity?

19           THE WITNESS:  Joint venture.

20           THE COURT:  Go on.

21   A    It's a joint venture between American Express and a group

22   of investors.

23   Q    And what is the business of this joint venture?

24   A    Corporate business travel.

25   Q    Roughly, how many employees are there worldwide in this

GLENN - DIRECT / ORSINI                    4676

1   joint venture?

2   A    Roughly, 14,000.

3   Q    The global business travel business that this joint

4   venture engaged in, was that previously a business unit of

5   American Express?

6   A    Yes, it was.

7   Q    Until it was spun off recently?

8   A    Correct.

9   Q    And what is American Express's role in the management of

10  the joint venture as it exists today?

11  A    American Express has a 50 percent stake in the business.

12  And there's no real management.  They have four board seats.

13  Q    And just generally, what is the nature of the Global

14  Business Travel Services that this joint venture provides?

15  A    So we provide travel services to corporations for their

16  employees to travel.

17  Q    Okay.  Now, prior to becoming president and CEO of the

18  Global Business Travel joint venture, by whom were you

19  employed?

20  A    American Express.

21  Q    And for how long were you employed at American Express?

22  A    Almost 12 years.

23  Q    Okay.  We'll come back to your time at American Express

24  in a minute, but I want to go back in time first.  Let's start

25  with your educational experience.  Where did you get your

GLENN - DIRECT / ORSINI                    4677

1   degrees?

2   A    Lehigh University.

3   Q    Undergraduate?

4   A    It was undergraduate and then an MBA.

5   Q    Okay.  And after you graduated from Lehigh with the MBA,

6   what was your first job?

7   A    I was a sales rep for Proctor & Gamble.

8   Q    Okay.  And what were you selling?

9   A    Crest toothpaste, Norwich aspirin, Pepto Bismol, Scope.

10  Q    And then -- we don't need to go in every step, but,

11  roughly, through the time you came to American Express, what

12  were your various jobs?

13  A    I was -- the last job I had at Proctor & Gamble was a

14  district sales manager.  And then I went to work for Pepsi.

15  Q    And what did you do with Pepsi?

16  A    I had a couple of roles.  I was a -- I was in sales, and

17  then I was in marketing, and then bottling operations in

18  New Jersey, and then eventually I ran the food service

19  division.

20  Q    What was the food service division?

21  A    Selling soda to fast-food restaurants or restaurants and

22  vending machines.

23  Q    Okay.  Now, you joined American Express in, roughly,

24  2002; is that right?

25  A    September of 2002.

1  Q    And what was your first position when you joined American
2  Express?
3  A    I ran the -- it was then Establishment Services, the
4  merchant business for the U.S. and Canada.
5  Q    And how long did you have that responsibility?
6  A    Roughly, three years.  Roughly, three or -- three to four
7  years.
8  Q    To whom did you report?
9  A    At that time, I reported to Dave House.
10  Q    And what was Dave House's position?
11  A    He was the -- I think he was the group president for
12  Traveler's Checks, Global Network Services, and Global
13  Merchant Services.
14  Q    And to whom did Mr. House report?
15  A    Ken Chenault.
16  Q    And what was your next position at American Express?
17  A    Following that, I was still running the U.S. and Canadian
18  Establishment Services Business and also took responsibility
19  for pricing and operations and marketing globally for the
20  Merchant Business Establishment Services.
21  Q    Do you recall, roughly, when that was?
22  A    Sometime during 2005.
23  Q    When you took on those additional responsibilities you
24  just described, did you also have Global Merchant Services
25  responsibilities?

GLENN - DIRECT / ORSINI                    4679

1   A    Well, I had -- I had Merchant Services responsibilities

2   for pricing, operations and marketing and the day-to-day

3   client management and sales responsibilities for just U.S. and

4   Canada.

5   Q    Okay.  So during that time period, others had day-to-day

6   responsibilities for the management of merchant relationships

7   outside of the United States and Canada?

8   A    Correct.

9   Q    And when did you come to have responsibility for that

10  day-to-day management on a global basis for the American

11  Express accepting merchants?

12  A    I think sometime in 2007.

13  Q    And how long did you hold that position?

14  A    Until late 2000 -- December, I think, of 2011.

15  Q    When you were in that position, to whom did you report?

16  A    Ed Gilligan.

17  Q    And what was Ed Gilligan's position during that time?

18  A    Group president and then I think vice-chairman.

19  Q    Mr. Gilligan was reporting to Mr. Chenault during that

20  time period?

21  A    Yes.

22  Q    We're going to come back to your time in Global Merchant

23  Services, and it's going to be the focus of testimony today,

24  but I just want to close out the loop with respect to your

25  time at American Express.  When you left Global Merchant

GLENN - DIRECT / ORSINI                          4680

1   Services, what was your next position?

2   A    I was given responsibility for global business travel and

3   global commercial payments, so corporate payments business.

4   Q    So corporate cards?

5   A    Corporate cards, yes.

6   Q    The JV that's been created, the joint venture that's been

7   created, that only took the business travel piece; correct?

8   The corporate card piece is still managed within American

9   Express?

10  A    Yes, it is.

11  Q    So when we go back to the time when you were in Global

12  Merchant Services, what were your general responsibilities?

13  A    Well, throughout, it was first the U.S. and Canada, and

14  then globally to acquire more merchants and retain those

15  merchants that we've acquired, to provide marketing and --

16  marketing support for them, operational support for them.

17  Q    And how large was the organization, at least in the

18  United States?  You don't have to give precise numbers, but

19  general numbers.

20  A    A couple of -- well, in the U.S.?

21  Q    In the United States, yes.

22  A    A couple of thousand people.

23  Q    And what were the various roles that those people in the

24  organization fulfilled?  Just categories.

25  A    Sure.  So we have sales -- a proprietary sales

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4681

1    organization that were employees of American Express.  A

2    proprietary client management organization, again, employed by

3    American Express, and the client management organization was

4    to call on our customers, our merchants.

5              We had a network development organization that

6    serviced those customers and made sure that the transactions

7    went back and forth, a marketing organization that was

8    responsible for leading the marketing programs that we ran

9    with merchants.

10   Q    You used the term "proprietary sales force."  Is there a

11   distinction between the sales force that was proprietary sales

12   force and other sales forces that were working on behalf of

13   American Express?

14   A    Yes.  So the -- again, the proprietary sales force was an

15   organization fully employed by American Express to go out

16   and -- in both client management and sales to acquire new --

17   more -- new merchants.  We also had a third party -- third

18   parties that worked on behalf to acquire smaller merchants,

19   but they were acquiring them for us.  We owned the contract,

20   set the pricing, but they were a third-party organization.

21   And we had folks who managed that -- those third-party

22   organizations.

23   Q    And were there merchant size breaks that would determine

24   whether a merchant was the focus of the proprietary sales

25   force versus the external sales force?

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4682

1  A    Yes.  So -- I don't remember the exact dollar -- dollar

2  number of what the potential was, but smaller merchants were

3  acquired by these third parties for us.

4  Q    The Court heard testimony earlier in this trial from Tom

5  Pojero.  Tom Pojero was in your group during the time you were

6  running merchant services?

7  A    Yes, he was.

8  Q    Okay.  And the Court also heard testimony from Shane

9  Berry and from Joseph Quagliata.  Were they also in your group

10  at the time that you were running merchant services?

11  A    At different points in time, yes.

12  Q    Now, you mentioned pricing as one of the areas of

13  responsibility that you had.  When you had responsibilities

14  related to pricing, what generally were those

15  responsibilities?

16  A    Well, it was responsibility for the strategy, for doing

17  the analytics, to set the tables that we have for various

18  industries and size of customers within those industries, and

19  to make some decisions about how we went to market with the

20  pricing.

21  Q    And the pricing we're talking about right now, that's the

22  merchant pricing?

23  A    Yes.

24  Q    What other organizations within Global Merchant Services

25  had a role with respect to pricing policy?

SHERRY BRYANT, RMR CRR

1    A    We had a pricing team that reported directly to me.

2    Q    Were there others who were involved in the pricing

3    aspect?

4    A    Well, the -- in terms of pricing decisions or --

5    Q    In terms of pricing decisions or pricing policy, either

6    generally related to tables or specific merchant negotiations.

7    A    The pricing tables in terms of -- pricing tables were set

8    by the -- by the pricing organization reporting to me.  But in

9    terms of the ultimate decision, what actions we took, we had

10   the marketing team involved, the client management team

11   involved, the acquisition teams involved -- actually, the

12   servicing teams as well, because we wanted to make sure that

13   questions or comments or feedback from the merchants, we had

14   all channels covered.

15   Q    When you say servicing teams, what do you mean by that?

16   A    Folks who would answer the phones when the merchants

17   called in about operational issues or just general issues.

18            THE COURT:  Could you go over -- I assume you

19   will -- what types of pricing components we're talking about

20   here, you know, discount rate and anything else having to do

21   with pricing?  In other words, what's the whole scope of the

22   pricing picture?

23            MR. ORSINI:  Absolutely, Your Honor.  That's exactly

24   where I was going.

25            THE COURT:  Sorry about that.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4684

1          MR. ORSINI:  And if I wasn't, that's exactly where
2    I'm going.
3    Q    So we talked about the merchant discount rate tables.
4    A    Yes.
5    Q    That's one component of merchant pricing; correct?
6    A    Yes.
7    Q    And how were those -- strike that.
8          The discount rate tables differ by a variety of
9    different characteristics of the merchant; is that correct?
10   A    Yes, they do.
11   Q    And what types of characteristics drive what table they
12   fit on and where in the table they fit?
13   A    The -- so as it relates to discount rate and --
14   Q    Let's stick with discount rate for now.
15   A    The tables are set principally by industry, by size of
16   merchant within those industries.
17   Q    So as a merchant grows in size, what impact does that
18   have upon the discount rate that they pay for American
19   Express?
20   A    The tables reduce -- I mean, the discount rate reduces as
21   they meet different thresholds for volume.
22   Q    Okay.  And as a general matter, why does American Express
23   use discount rate tables?
24   A    I wasn't there when they were established, but it is part
25   of our business model.  And I think principally we talk about

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4685

1   pricing integrity, that -- and transparency.  And so the

2   tables allow us the way to communicate how we price, which is

3   on the value we provide, the cost that we incur, and what the

4   competitive environment is.

5   Q    Okay.  You mentioned pricing integrity.  Why was that

6   something that American Express was focused on?

7   A    We believe we -- you know, we communicate and price on

8   those three elements, price, cost and competition -- I mean,

9   value of cost and competition, and that it's really important

10  for us to go to market and talk to merchants about that this

11  table exists for the industry so that we have what we call

12  pricing integrity.

13  Q    I'll come back in a few minutes to the tables themselves,

14  but I want to get all the other components out there, if

15  that's okay, first.

16           You're familiar with the term "net discount rate" or

17  "net effective rate"; correct?

18  A    I am.

19  Q    And what does that term mean or what did it mean to you

20  during your time being responsible for merchant pricing?

21  A    Well, there's a headline rate that's the table rate.  And

22  then there are dollars that we spend with merchants, signing

23  bonuses, promotions, marketing, distribution programs for

24  card.  So there are various programs that go in.  Co-brand

25  relationships have more moneys not just from the merchant

GLENN - DIRECT / ORSINI                    4686

1   business that I just described, but also from the issuing

2   businesses as well.

3          So the net discount rate or effective discount rate

4   is the -- I guess the net sum of the headline rate, less a lot

5   of the moneys that we spend with the merchants.

6   Q   So I want to walk through each of those.  Let's start

7   with signing bonuses.  What were signing bonuses used for

8   during the time that you were responsible for pricing and

9   merchant relationships?

10  A   Signing bonuses are used to acquire new merchants or when

11  we're negotiating new terms of a merchant, either the contract

12  came up or the merchant wanted to renegotiate.  So we've used

13  signing bonuses to essentially sign or re-sign a merchant.

14  Q   And what impact does providing a signing bonus to a

15  merchant have on the net discount rate we were just talking

16  about?

17  A   It lowers it.

18  Q   So if American Express was willing in a particular

19  instance to give a signing bonus to a merchant to either start

20  a relationship or renew a relationship and the effect of that

21  was to lower the discount rate, why not just lower the

22  discount rate?

23  A   Because of what we described earlier, which is the

24  pricing table and the integrity.  So signing bonuses were in

25  exchange for a longer-term contract or gave us certainty and

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                4687

1   the merchant certainty in terms of the length of the contract

2   and the agreements that we had -- the contractual agreements

3   that we had.

4   Q    Can you give us a general sense of what the

5   decision-making process was around whether to give a signing

6   bonus, how big the signing bonus would be?  Not any specifics,

7   just the general way it worked in the business.

8   A    So there were general thresholds.  So Tom Pojero and his

9   folks, to a certain level, had the authority to provide

10  signing bonuses to merchants; Shane Berry or Joe Quagliata or

11  other folks on the client management side to renew.  Again, so

12  there were thresholds of approval.

13  Q    You talked about some marketing funds as playing into the

14  net effective rate.  Can you explain what those marketing

15  funds were and how those affected the effective rate?

16  A    Sure.  We -- so we -- we would give dollars to merchants

17  to engage in marketing programs with us.  Also, the value of

18  those marketing programs were sometimes quantified against the

19  headline rate.

20  Q    And were there -- were you familiar with something called

21  a business building bonus or a strategic investment fund,

22  otherwise known as --

23  A    Yes.

24  Q    Okay.  And what were those?

25  A    I don't remember the difference between the two.  But,

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                4688

1    essentially, they were types of incentives to encourage

2    merchants, or when merchants grew, they would get another form

3    of a discount.

4    Q    And those are sometimes referred to in documents as BBBs

5    for the business building bonus or SIF for the Strategic

6    Investment Fund?

7    A    Strategic, yes.

8    Q    A similar question I asked you with respect to the

9    signing bonuses.  If the effect of providing these marketing

10   funds was to lower the effective rate, why provide it through

11   marketing funds as opposed to just lowering the rate?

12   A    Again, it was -- it had to do with pricing integrity and

13   also agreement from the merchants to work on marketing with

14   us, right, which is they want to attract new customers.  We'd

15   like to encourage spend of our cardmembers.  And so it was in

16   exchange for participating in marketing programs.

17   Q    So what value do these marketing funds bring to American

18   Express?

19   A    Well, hopefully, just like rewards on the -- on the cards

20   themselves that the issuing business provides; right?  This

21   would be programs that are attractive to our cardmembers and

22   attractive to the merchants to encourage more spend.

23   Q    And how would these marketing programs benefit the

24   merchants?

25   A    Driving more spend from our cardmembers, building loyalty

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4689

1   among our cardmember base to that particular merchant.

2   Q     Another piece you mentioned of the net effective rate, I

3   believe, were card distribution programs; is that right?

4   A     Yes.

5   Q     And what are card distribution programs?

6   A     Well, there were a variety of them.  But, essentially, we

7   would provide funds to merchants to acquire cardmembers for

8   us.  So they would, in their stores or tabling or some other

9   vehicle, use their distribution channels to acquire new

10  cardmembers for American Express.

11  Q     How would they do that?  Would they put up signs?  Would

12  they have take ones?

13  A     Take ones is -- when I first joined the company, existed.

14  Then we did more things, like tabling at Costco.  So there

15  were actual tables there where they would put up signs and ask

16  people if they wanted to, you know, sign up for an American

17  Express card.

18  Q     When you say "tabling," can you just describe more what

19  that means?

20  A     Literally, it's a table --

21  Q     Okay.

22  A     -- in the stores; right?  And so there are various means

23  of acquisition from merchants to acquire cards for us.

24  Q     How would the merchants be compensated for participating

25  in these card distribution programs?

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                4690

1   A    I don't know all the elements of it.  But, essentially,

2   it worked on a bounty per card acquired, so a payment to the

3   merchant for every card they acquired for American Express.

4   Q    What types of cards did American Express run these

5   acquisition programs with?  Was it just credit cards?

6   A    Gift cards.  There were credit cards, gift cards.  I

7   think that's -- prepaid -- I guess prepaid cards.

8   Q    You also mentioned co-brand partnerships having an impact

9   on the net effective rate.  Can you explain what you meant by

10  that?

11  A    Sure.  A co-brand partner is a merchant, like Delta, we

12  have a relationship with.  And those cards are co-branded

13  American Express and Delta, or one of the other co-brand

14  partners.  And so there are moneys -- moneys given to that

15  merchant to support a co-brand relationship.  And it's not

16  just the moneys given directly.  There are revenues associated

17  with spend on that particular card.

18  Q    And what role did the co-brand relationships play in the

19  negotiations that American Express would have with the

20  partners on the Card Acceptance Agreements?

21  A    Well, the relationship starts with the Card Acceptance

22  Agreement, right, which is driven by the merchant -- by the

23  merchant business; right?  When we enter into a co-brand

24  relationship or a co-brand opportunity, both parties would --

25  you know, across American Express, the different divisions

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4691

1  would come together and present proposals to those particular

2  merchants.

3  Q    Why would different divisions be involved in presenting

4  those proposals?

5  A    Because there was -- you know, all the businesses were

6  creating and delivering more value to the merchant.  So it was

7  important for us to show the merchant the different

8  businesses, what value they were -- we were delivering to that

9  particular merchant.  And then also all the dollars,

10  essentially, rounded out to an effective lower discount rate.

11  Q    Before we come back to the discount rates, I'd just like

12  you to take a look in your binder, if you could -- it's a

13  binder I've handed you -- at the document marked Plaintiff's

14  Exhibit 0881.

15          MR. ORSINI:  Your Honor, this document is safe for

16  public consumption.

17  Q    The first page of this is an e-mail from you to

18  Ms. Doriann Medina regarding network principles re: airline

19  co-brands.  Who was Ms. Medina?

20  A    She was my assistant.

21  Q    Okay.  So this is an e-mail that you would have sent to

22  your assistant?

23  A    Yes.

24  Q    You were asking her to save it.  Did she maintain files

25  for you?

1    A    She did.

2            MR. ORSINI:  Your Honor, I offer PX 0881 into

3    evidence.

4            MR. HAMER:  No objection.

5            THE COURT:  All right.  PX 0881 is received in

6    evidence.

7            (Plaintiff Exhibit 0881 received in evidence.)

8    Q    Take a look at the next page.  Sorry, the next page.  Why

9    not try this?  The page ending in 881.  Thank you.  It's the

10   slide.  It ends in 881.

11           What was the purpose of this document?

12   A    This was an internal document from the pricing team

13   talking about the principles about how we would think about

14   the economics before going to the financials, the economics,

15   the proposal before going to the merchant.

16   Q    And why was there a conversation internally about this?

17   A    You know, essentially, the merchant services business got

18   16 percent or so of the discount rate and the issuing

19   businesses received 84 percent.  And so we wanted to make sure

20   that the issuing business understood what our role was in

21   terms of the financials and the offer.  So it differed than

22   the associations, Visa/MasterCard, our roles differed than the

23   associations and the issuing businesses.

24           So it was an internal -- you know, an internal

25   principle set up to have the right kinds of discussions before

GLENN - DIRECT / ORSINI                              4693

1    we went to the merchant.

2    Q    And how does this relate to what you were talking about a

3    few minutes ago about the notion that the co-brand benefits

4    impacted the net discount rate?

5    A    Well, essentially, this was -- it was set up to say what

6    merchant services would deliver to the co-brand relationship

7    in terms of funding what the issuing business would determine.

8    And all those dollars essentially rolled up to affect the

9    discount rate.

10   Q    And if you could take a look in your binder at PX 0999.

11        MR. ORSINI:  Your Honor, this document is already in

12   evidence.  I believe it was entered into evidence during

13   Mr. Funda's testimony.

14   Q    And if you could look at the page ending 1041, Mr. Glenn.

15   Was this document created for a similar purpose that you were

16   just describing?

17   A    Yes.

18   Q    So you can put these documents aside.

19        I want to go back to the considerations that you

20   said American Express had in mind or you had in mind when you

21   were making decisions about pricing and particular discount

22   rates.  I believe you mentioned three factors:  Value, cost

23   and competition; is that right?

24   A    Yes.

25   Q    Let's start with value.  What elements of value were part

GLENN - DIRECT / ORSINI                    4694

1   of your considerations as you were making decisions about

2   merchant pricing?

3   A    It -- value started with what cardmembers spend related

4   to -- or the relation of cardmember spend to the financial

5   benefit of the merchant.  So it was all the merchant lens, how

6   are we going to create more value to them, how our card

7   supported more value for them, as well as some of the other

8   programs that we could run with merchants, the marketing

9   programs, Business Insights, some of the programs that the

10  issuing business would run with the merchants, as well.

11  Q    Okay.  And we're going to come back and attack that a

12  little bit in a few minutes.

13           The second prong was cost.

14  A    Yes.

15  Q    How did cost play a role in the pricing decisions that

16  you were making?

17  A    Well, we're incurring costs all the time to power up our

18  value proposition, to put more resources against the

19  merchants, that -- our value proposition from merchant

20  services to the merchant, as well as the cost of the issuing

21  businesses would spend against the value proposition for our

22  cardmembers that helps the spend and a particular merchant.

23  All those relate to the value.

24  Q    And as you were making pricing decisions, how did these

25  costs factor into those decisions?

GLENN - DIRECT / ORSINI                                4695

1  A    Well, I know our costs were rising; right?  So our costs

2  were rising and we were putting more value into the

3  proposition.  And so, you know, ultimately, it's to try to

4  align the value we were providing to the merchant with the

5  price we were charging.

6  Q    And the third prong you mentioned was competition.  What

7  was the role of competition in the pricing decisions that you

8  were making?

9  A    Well, all these are commercial decisions, right, from the

10  merchants.  They're making a decision whether to accept us or

11  not accept us.  And so it's really important that we

12  understand where the competition is in terms of their price

13  and the difference between our price and the competitive

14  price.  And merchants would look at that, and they'd have to

15  evaluate is the cost of American Express, you know, is the

16  value based on the cost the right number, and they'd compare

17  us against the competition.

18  Q    And what role did that comparison that was being made by

19  the merchants play in your mind as you were making decisions

20  about what particular pricing strategies to take?

21  A    You know, that was the ultimate decision about whether we

22  were going to be successful or not in front of the merchant in

23  these negotiations.  And it wasn't just a contract time.  It

24  was -- merchants, like any other businesses, want a lower

25  rate.  They want to pay less; right?

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4696

1           And so our responsibility was to talk about the

2   value we created.  And in all those discussions internally, it

3   was really important that I understood where the competition

4   was, because they would make that comparison as well.

5   Q    Now, you mentioned earlier that there was a pricing team

6   that reported up to you when you were in charge of the pricing

7   decisions; correct?

8   A    Yes.

9   Q    And who was running that pricing team at the time?

10  A    Steve McCurdy.

11  Q    And was Mr. Funda on that pricing team as well?

12  A    Eventually.  Jack worked -- Jack Funda worked for Steve

13  McCurdy.

14  Q    And what was the role of the pricing team in helping you

15  make your decisions about pricing?

16  A    You know, essentially, it was to look at the landscape,

17  look at the competition, do as much analytics as we could on

18  the competition, look at the industry, evaluate the value that

19  we were creating, looking at all options that we had in terms

20  of different pricing scenarios for merchants, for acquisition,

21  and for retention of those merchants.

22  Q    And what role did the pricing team play in the

23  negotiations with merchants?

24  A    They didn't play a role in negotiating directly with

25  merchants.

GLENN - DIRECT / ORSINI                          4697

1   Q    Now --

2          THE COURT:  When you said look at the competition,

3   you mean the merchants' competition; is that it?

4          THE WITNESS:  No, Your Honor.  I was talking about

5   Visa and MasterCard pricing to the merchant.

6          THE COURT:  I see.  And how did the rate charged to

7   other merchants in the same area of business, like airlines or

8   big box stores or whatever, how did that figure into your

9   computation, if it did?  In other words, you know what you're

10  charging -- you know what you're charging Costco.  And so now

11  you're going to -- you're now negotiating with BJ's --

12         THE WITNESS:  Right.

13         THE COURT:  -- or with Wal-Mart and whatever, Sam's

14  Club.  So how did that all figure into the pricing negotiating

15  strategy?

16         THE WITNESS:  As I indicated earlier, we have rate

17  tables by industry, and so we're very conscious of spillover

18  spend, meaning that -- spillover pricing, meaning that it's

19  really important for us across these different industries to

20  have rate table integrity with different levels of volume in

21  it.

22         And then they are negotiations.  They're customized

23  negotiations.  So when I talked earlier about marketing funds

24  and signing bonuses, the difference in net effective rate

25  would essentially be the agreement between the merchant and

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                4698

1    ourselves to work on marketing programs or a longer term

2    agreement or a co-brand relationship.  So Costco is very

3    different than BJ's because we have a unique relationship.  So

4    we brought all that into the rate negotiations.

5           THE COURT:  And so did you also find that some of

6    the components, potential components of the agreement would be

7    of greater value to one merchant in the same class of

8    merchants as opposed to another?  For instance, a marketing

9    bonus might be of great value to Best Buy but not of such

10   great value to P.C. Richard, if you will.

11          THE WITNESS:  That's correct.  Right.  And those

12   were all laid out in these negotiations that we had.  And it

13   wasn't just a contractual time either; right?  There would be

14   marketing -- some merchants would not market with us for a

15   year or a year and a half.  And, you know, we have a client

16   management organization that's trying to drive more business

17   and value to that particular merchant.  They call on these

18   merchants all the time.

19          So you could be in the middle of a contract and a

20   merchant decides to run a marketing program with us and --

21   that didn't want to do it a year before.

22          THE COURT:  And they could go back and you could

23   negotiate that?

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you.

GLENN - DIRECT / ORSINI                4699

1    Q    I want to stay on that for a second, because I don't

2    think that's something that's come up much during the trial.

3            There are marketing funds that were part of the

4    negotiations of a contract itself; correct?

5    A    Correct.  Yes.

6    Q    And then I think we were just describing to the Court a

7    circumstance where, let's say, you have a five-year contract.

8    In the middle of the contract, someone, either Amex or the

9    merchant, decides to have another conversation about doing

10   some marketing with American Express for that merchant; right?

11   A    Yes.

12   Q    Can you describe generally how that would work?  I know

13   you weren't involved in every conversation.  But, generally,

14   how does that work and what are the different ways in which

15   the funding for that marketing program can come about?

16   A    So because we have a client management organization,

17   right, that calls on the merchants all the time, we also have

18   a centralized -- or had -- I think we still do -- a

19   centralized marketing team that's solely responsible for

20   marketing with merchants.  And so there's a whole organization

21   there that works on these programs.

22           And so the client manager's responsibility, continue

23   to add value and talk about our value to merchants on a daily

24   basis.  And marketing is a big part of the benefit and the

25   value we think we deliver to merchants.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4700

1          So it would either be a marketing program that is

2     fully funded by us or co-funded by the merchant.  You know, it

3     varies across the board.  But there -- it happens all the time

4     where we're trying to sell a merchant on the value of

5     marketing at terms of the contract.  They feel like they don't

6     need this value.  And then, you know, as we talk about our

7     business and the value and our cardmembers and what we can do

8     and the various things we can do, they decide to market with

9     us.

10          Similarly, on Business Insights, which is a group

11    that we started up that delivers analytics to merchants and

12    supports a lot of the marketing programs as well, some

13    merchants weren't interested in it.  My objective was to make

14    sure that we're working really, really hard to drive value to

15    merchants, and that's what the responsibilities of the client

16    management organization is and the marketing team and the

17    Business Insights team are, to continue to show value so we

18    continue to have acceptance.

19    Q    When you say that marketing programs sometimes could be

20    funded by American Express, what in particular was being

21    funded?  I'm not talking about a specific campaign.  But what

22    type of costs related to a marketing program was American

23    Express funding?

24    A    Creative development, the modeling for the merchant in

25    terms of what their objectives were.  You know, all businesses

1  want to have -- create or acquire new customers.  So merchants

2  want to acquire new customers.  They also want to retain those

3  customers after they acquire them.

4          So some of the work that we did was lapsed customers

5  who had shopped at a particular merchant but stopped shopping

6  for 12 months, and we knew who those folks were.  And

7  customers want to retain their -- you know, acquire new

8  customers and also retain them.

9          So all that work was driven by -- sort of the costs

10 were borne by us, typically.

11 Q   Were there instances where -- let's stick with the

12 business analytics.  Were there instances where American

13 Express would charge the merchant for business analytic?

14 A   Yes, we started to do that as well.  So some of it was

15 part of the value proposition and is embedded in the discount

16 rate and the cost -- and the value.  We incurred the cost.

17 There were other analytics that we started to develop that

18 other companies were charging for.  And so this was separate

19 than the Card Service Agreement -- you know, Acceptance

20 Agreement.  And we would charge for those.

21 Q   Why not charge for all the analytics that you provided to

22 merchants?

23 A   Because our closed loop model, which we talked a lot

24 about, right, which is we acquire merchants and have a direct

25 relationship with them.  We acquire cardmembers and have a

GLENN - DIRECT / ORSINI                4702

1   direct relationship with them is unique.  We get the

2   information on who's spending and where they're spending,

3   which is different than any of the other business models.

4            And so part of that is our value proposition, which

5   is we help merchants drive -- we want to help merchants and

6   create more value to merchants and, you know, help them to do

7   that.  I think a lot of those are part of our value

8   proposition as part of acceptance.

9            There were some deeper analytics that some merchants

10  would pay a consulting company to come in and do and pay them

11  a lot of money, that we had -- we had more information than

12  any of these other companies, because we had the transaction

13  information; right?  So the analytics we could do I think was

14  competitively advantaged against people in the payment space

15  and other companies as well.

16  Q    Going back to the marketing for one second, some of these

17  marketing programs would include offers to consumers to shop

18  at one merchant versus another; correct?

19  A    Yes.

20  Q    And who would fund those offers?  For example, if the

21  marketing program was spend this much at Merchant Y, get $25

22  off, who would fund that?

23  A    The discount would be funded --

24  Q    Let's say the $25, yes.

25  A    The discount would be funded by the merchant.

GLENN - DIRECT / ORSINI                          4703

1    Q    Okay.  Were there situations where American Express would

2    fund those with the marketing funds?

3    A    I'm sure there were some as well, you know, part of the

4    marketing agreement, but principally, the discounts were

5    funded by the merchants.

6    Q    A term the Court -- well, before I move on to a separate

7    but related topic, in your response to one of the Court's

8    questions a few minutes ago about how you take into account in

9    pricing the price you're charging to other merchants in a

10   particular area, you used the term "pricing spillover."

11   A    Yes.

12   Q    Can you explain what that term is?

13   A    Sure.  If we're negotiating with a particular merchant,

14   right, we want to make sure that anything beyond the discount

15   rate table there's agreement and there's a benefit and a

16   commitment from both teams.

17            And we're very, very concerned about potential

18   pricing spillover, which would be if we give, I think Your

19   Honor said BJ's or some large -- a different price than

20   Wal-Mart that may be a larger customer, right, you know, it

21   sort of destroys the integrity.  Then we're going to have to

22   lower prices for another merchant in the category, a similar

23   size merchant, and that hurts our economics.

24            And then, you know, once we start lowering price

25   without the benefit that we would get through a commitment or

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4704

1   a long-term commitment or a marketing program, it affects our

2   economics, which affects our ability to spend on merchant

3   value and cardmember value as well.

4   Q    Are you familiar with the term "holdout" as it relates to

5   American Express's merchant business?

6   A    Yes.

7   Q    And what does that term mean?

8   A    Holdout to the millions of merchants that don't accept

9   us.

10  Q    And were there lists of the larger ones who didn't accept

11  American Express?

12  A    Most of the ones that don't accept -- the majority of the

13  ones that don't accept are mid to smaller merchants.

14  Q    Are you familiar with the term like a "top holdout list"?

15  A    I know we had a big holdout list.  So there were -- those

16  were merchants that didn't accept that are -- probably Pojero

17  at the time, Tom Pojero's organization would go after to try

18  to sign.

19          So the top holdouts were on the prospect list for

20  our proprietary sales organization.

21  Q    And how would this concept of pricing spillover that you

22  were just talking about relate to decisions around how and

23  whether to sign particular prospects, I think was the term you

24  used?

25  A    Because all of those merchants fit into categories.

GLENN - DIRECT / ORSINI                    4705

1  They're fairly large, the ones that are targets for the

2  proprietary sales organization.  So acquiring a merchant of

3  fairly good size, if we gave them a lower price than a

4  merchant that we had currently and had for years and were

5  servicing for years, I would be very, very concerned -- we

6  would be very concerned about the pricing spillover, which is

7  what I just described, giving a lower price to a new merchant

8  to drive acceptance and then lowering price across the

9  industry to other current customers of that same size.

10  Q    How did that pricing spillover concept impact the

11  analysis of the profitability of a particular price that you

12  might offer to one of these prospects?

13  A    Well, to that particular merchant, we do look at the

14  profitability, right, but then have to calculate what the

15  potential spillover effect would be; that if, in fact, other

16  customers in that, you know -- in that same industry of

17  similar size, if we were giving a lower price there, we'd have

18  to give lower prices across the industry.

19  Q    I want to go back to the discount rate tables.  And if

20  you could take a look at Plaintiff's Exhibit 1240, which is in

21  your binder.

22         MR. ORSINI:  Your Honor, this document is already in

23  evidence.

24  Q    The cover of this is MSA Executive Team.  What's MSA?

25  A    Merchant Services Americas.

GLENN - DIRECT / ORSINI                    4706

1   Q    And as of 2011, was that a group that was headed by a
2   woman named Kim Goodman?
3   A    It was.
4   Q    And to whom did Ms. Goodman report?
5   A    She reported to me.
6   Q    So Merchant Services Americas fell within your area of
7   responsibility?
8   A    Yes.
9   Q    Now, if you take a look at the slide, Slide 6, it ends in
10  Bates number 0091.  You mentioned some analytics that the
11  pricing team would do for you earlier.  Is this an example of
12  those analytics?
13  A    It is.
14  Q    I know it's hard to read and I apologize for that.  But
15  there's a reference in a couple places on this slide to the
16  term "insistence," which is a term that is used in American
17  Express.  What does that term mean to you?
18  A    Insistence is a term we use for our most loyal
19  cardmembers.
20  Q    And what role did insistence play in the decisions that
21  you were making with respect to pricing?
22  A    Well, you know, it's survey-based, right, so it's
23  directionally correct, but surveys are surveys; right?  And so
24  we used that to, you know, evaluate how loyal our cardmembers
25  would be, generally.

GLENN - DIRECT / ORSINI                          4707

1    Q    And this analytic, is this something -- is this type of

2    analytic something that you recall seeing before where there

3    would be calculations based upon multiple elements of value?

4    A    Insistence or --

5    Q    Just generally, this calculation you see here, this

6    assessment.

7    A    Yes.

8    Q    And what did you, in making your decisions about pricing,

9    use this type of analytic for?

10   A    Again, it was really important that the pricing team came

11   in with all the different options and elements in the

12   analytics that they did.  And so we created -- you know,

13   obviously, it created a value number, the right, comparing it

14   to the competition, what we thought Visa and MasterCard's

15   all-in price would be to the merchant.

16           And then I used this to determine -- we used this to

17   determine, you know, how sellable this was, how commercially

18   viable it was against the competition and against the value

19   that we were calculating.

20   Q    And there's a reference all the way over to the right in

21   the gray box to "Amex value based premium at 50 percent

22   surplus value captured."  Are you familiar with this concept

23   of surplus value that was calculated from these analytics?

24   A    We didn't use it often, but it's in the document, so I

25   knew what it -- I knew what it meant.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4708

1    Q    Let me show you another document.  If you could take a

2    look at Plaintiff's Exhibit 0853.

3          MR. ORSINI:  Your Honor, this one is -- this one is

4    a confidential document.  This page isn't, but the page that

5    follows is.

6    A    0853?

7    Q    0853, yes.  The cover e-mail is an e-mail from

8    Ms. Elizabeth Langwith to Mr. Berry.  Who is Ms. Langwith?

9    A    I believe she worked for Jack Funda on the pricing team

10   at the time.

11   Q    And the subject is BUR document for Bill Glenn.  Bill

12   Glenn, that's you?

13   A    Yes.

14   Q    And what's BUR?

15   A    Business unit review.

16   Q    And what's a business unit review?

17   A    It's a term used for periodic reviews of different parts

18   of the business.  Different divisions have different

19   frequency, but it was -- it was normally against a business

20   update or a major initiative or things that we were -- were

21   important that needed focus.

22   Q    And were these reviews that you would participate in?

23   A    If it was a BUR of a direct report to me, I would

24   participate.

25   Q    And this unit was a direct report to you; correct?

GLENN - DIRECT / ORSINI                    4709

1   A    Yes.  The pricing, yes.

2              MR. ORSINI:  Your Honor, I offer PX 0853 into

3   evidence.

4              MR. HAMER:  No objection.

5              THE COURT:  PX 0853 is received in evidence.

6              (Plaintiff Exhibit 0853 received in evidence.)

7   Q    Now, Mr. Glenn, if you could turn to Slide 2 which ends

8   in Bates number 143.  And I just caution you, let's not use

9   specific numbers because they're confidential.

10  A    Okay.

11  Q    This is a slide entitled "Price Value Alignment by

12  Industry."  Is this another example of the type of analytics

13  that the pricing team did for you?

14  A    Yes.  I think this is maybe a chart summary of the last

15  document we -- some of the builds of value that we talked

16  about and the rate.

17  Q    So this is a table reflecting the types of calculations

18  we were just looking at?

19  A    I believe so, yes.

20  Q    Now, there are a couple of different -- there are a

21  number of columns here.  The first one is the industry.  Those

22  are the industries by which American Express had different

23  discount rates, is that right, or some of the industries?

24  A    Yes.  I don't know if they're all of them, but...

25  Q    The next column is the Current AXP Discount Rate.  I

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4710

1    presume that's exactly what it says?

2    A    Yes.

3    Q    The next column, Current Price Premium versus Visa, what

4    does that reflect?

5    A    That's our -- the difference between our rate and what we

6    think Visa's all-in rate to a merchant would be.

7    Q    And when you use the term "all-in rate," what do you mean

8    by that?

9    A    Well, there's interchange.  So there are different

10   components of their pricing.  There's interchange.  There are

11   network fees.  There are acquiring fees.  And so it's our best

12   estimate as to what Visa's all-in rate is.

13             THE COURT:  And this all-in rate, is this a -- does

14   this include the various different rates that Visa charges for

15   different cards?

16             THE WITNESS:  Yes.  So --

17             THE COURT:  Because they're expensive -- according

18   to testimony we've had here, there are some cards with heavy

19   rewards that have a higher discount rate at the merchant than

20   other cards which have no rewards or fewer rewards.

21             THE WITNESS:  Right.  That is correct.  And that's

22   why I said it's as good an approximation as we can get by

23   industry, because they price by card product.  But they also

24   don't have the acquiring business and the -- I think the only

25   one that's really published is the interchange rate that goes

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4711

1    directly to the banks.

2            But there's a network fee.  There's a payment they

3    make to acquirers, and then there's a card -- different

4    pricing by card product in the mix of that spend.  So all of

5    that translates into the merchant discount rate.

6    Q    The next column is entitled "Maximum Rational Price

7    Premium 100 Percent VC."  What does that mean?

8    A    I believe that reflects the total build of all the

9    elements we looked at before, which is insistence and spend

10   and those.  And this is the difference between what that adds

11   up to and the Visa's rate.

12   Q    So the prior slide we were looking at used the term

13   "surplus."  This would be the full surplus?

14   A    I believe so, yes.

15   Q    And then the next column is entitled "Rational Price

16   Premium at 50 Percent VC."  What does that reflect?

17   A    I think that's 50 percent of --

18   Q    So it's half of a hundred?

19   A    It looks like 50 percent of a hundred, right.

20   Q    And then if you skip over -- well, what's the next

21   column?

22   A    (Reviewing.)  I'm not sure of that calculation.

23   Q    Okay.  Do you know what the next column is, the Net

24   Benefits to AXP from Shift to 50 Percent VC?

25   A    I think it's the calculation of the ███ times the current

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                          4712

1    volume.

2    Q    So if you took the current volume in that industry and

3    increased the discount rate by that ██, that's the result?

4    A    I believe so.

5    Q    And there's a total number down at the bottom that's over

6    a billion dollars and we won't say the precise number?

7    A    Yes.

8    Q    And what does that reflect?

9    A    I think it's the sum total of all the industries added

10   up.

11   Q    Now, do you recall having conversations with the pricing

12   team about analytics like this where they would present to you

13   on the maximum rational price premium?

14   A    Yes.

15   Q    And what role did those presentations, based on these

16   analytics, play in your decision-making process about prices

17   for merchants?

18   A    Well, it helped me to assess that there's no way we were

19   going to go to market with these recommendations.

20   Q    And what do you mean by that?

21   A    You know, as I talked about, we priced on value.  And a

22   lot of that value of pricing was the economic value to a

23   merchant of the transaction, so the transaction size.  We

24   priced on looking at what the competition was doing, right,

25   and then our costs.

GLENN - DIRECT / ORSINI                    4713

1          And so I can tell you what happened in the room when

2     they presented it, which is essentially turn to the next page,

3     because there was no way we would have integrity going to

4     market with prices like this.  It wouldn't -- we couldn't sell

5     it.  We'd lose credibility with the merchants, which is

6     really, really important.  And I don't think our folks could

7     have confidence going in and trying to sell this.

8     Q    What do you mean by turn to the next page?

9     A    To the deck.  Whatever the next page was, essentially,

10    we're not -- you know, we're not looking at these options.

11    Q    And you said you didn't think you could have credibility

12    selling this in the market.  What did you mean by that?

13    A    You know, all of these -- a lot of the -- that said value

14    recapture were one-on-one conversations or our teams going in

15    and talking to merchants about the value we created and the

16    pricing recommendations.  And, you know, these merchants are

17    big businesses.  They're really sophisticated.

18          We actually -- I feel really good about the

19    credibility of our people and how they represent us every

20    single day in front of these merchants and the work that they

21    do.  And so A is, we wouldn't -- we couldn't sell this in;

22    right?  And some of the areas in here were, you know, internal

23    views of loyalty, but they're survey-based; right?  And so

24    it's really, really important that in those discussions we

25    maintain a lot of credibility and integrity.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4714

1            And the other fact is that the competition was

2    significantly lower; right?  And so all of a sudden now --

3    which we work on every single day, which is defending our

4    premium.  That happens every single day with the merchant

5    team.  All of a sudden, you're defending your premium of 34

6    basis points and then walking in and trying to defend a

7    premium of 265 basis points, and it's just not viable.

8    Q    What do you mean, not viable?

9    A    They wouldn't -- they wouldn't buy it, and I didn't want

10   our organization going in and trying to sell it.

11   Q    You can put that document aside.

12           While we're on the discount rate, you mentioned

13   something earlier when we were talking about co-brand

14   relationships.  You said that the merchant business got

15   84 percent and the issuers got 16 percent.  Can you explain

16   what that means and what you were referring to, percentages of

17   what?

18   A    Sure.  It's an internal allocation.  So there's the

19   discount rate that we charge merchants, and that comes back to

20   the company.  About 84 percent -- and it varies a little bit,

21   but I think, on average, 84 percent of those revenues go to

22   the issuing businesses and 16 percent go to the merchant

23   business.  So that creates the revenue for each business from

24   the discount rate.

25   Q    Okay.  So of all the discount revenue coming in that's

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4715

1  based upon the transactions that flow over to the merchants at

2  particular discount rates, that is allocated internally?

3  A    Yes.

4  Q    And what you're describing is 84 percent of that revenue

5  goes to the issuing business?

6  A    Businesses, yes.

7  Q    Businesses.  And what businesses were those or are those?

8  A    The consumer card business, our small -- our small

9  open -- our small business division, the corporate card

10  business.  You know, the same internationally, as well.

11  Q    And what percentage is retained in the merchant business?

12  A    Sixteen percent.

13  Q    Now, what did the merchant business use that revenue, its

14  16 percent of the overall discount revenue, to do?

15  A    So it funds the -- all the folks we have in the sales and

16  client management organization.  That's our revenue stream;

17  right?  So it funds the people that we have for sales and

18  client management, the marketing team, the information

19  insights team, the network development team that services and

20  runs transactions through that -- help run transactions

21  through the network, and our marketing programs, as well.

22  Q    When you were the head of Global Merchant Services, were

23  you an officer of the company?

24  A    I was, yes.

25  Q    Were you involved in strategy discussions with the other

GLENN - DIRECT / ORSINI                    4716

1    officers of the company?

2    A    Yes.

3    Q    That would involve strategy conversations with the

4    issuing businesses you just referenced?

5    A    Yes.

6    Q    And based upon those conversations, as a general matter,

7    what was your understanding of what the issuing businesses did

8    with their 84 percent of the discount revenue you were just

9    describing?

10   A    Similarly, their organizations, so the people in those

11   organizations, funding all the rewards programs, card

12   acquisition programs, co-brand relationships, so all the

13   things that run the business and add value to the cardmember

14   base.

15   Q    Now, you talked about some elements of value earlier that

16   American Express provides to merchants.  During the time that

17   you were managing first U.S. and Canada and then Global

18   Merchant Services, about a decade, how did the value that

19   American Express delivered to merchants change, from your

20   perspective?

21   A    I think it increased, and we worked really hard to make

22   it increase.  And so, you know, when I first got to American

23   Express, the marketing team was decentralized, so we created a

24   centralized marketing team.  The -- there was no Business

25   Insights team, so we created that.

GLENN - DIRECT / ORSINI                    4717

1            The network development team was -- wasn't
2    centralized.  We didn't have necessarily a telemarketing team
3    for acquisition and client retention.  So we spent a great
4    deal of money on and continuing to spend it on acquiring more
5    merchants, retaining our merchants, because we added folks to
6    the organization, proprietary folks in client management and
7    sales.
8            We centralized the marketing group.  We
9    centralized -- we created this Business Insights group.  And,
10   you know, the objective was to continue to add value to
11   merchants, because it was competitive.  We wanted to acquire
12   as many merchants, you know, as we could; and we also wanted
13   to retain those merchants.
14   Q    How did centralizing the marketing team benefit
15   merchants?
16   A    Then we would have a centralized center of excellence for
17   marketing rather than just regional folks.  And it allowed us
18   to attract, I think, stronger marketers, people who understood
19   what our objectives were.  Also, an organization that actually
20   spent time on marketing and partnering with our client
21   management organization to market with large merchants.
22           And at the same time, we created a small merchant
23   marketing function so that we could market with small
24   merchants and provide more value to those merchants as well.
25   Q    The Court has heard some testimony and I think we'll hear

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                              4718

1   more testimony in the coming weeks about -- testimony about

2   marketing towards large merchants.  You mentioned marketing

3   for small merchants.

4   A    Right.

5   Q    How would American Express engage in marketing with the

6   smaller merchants in the United States?

7   A    So we created things like Marketing in a Box, which was

8   an easy-to-use program.  We didn't have client managers

9   assigned to the millions of small merchants; right?  So they

10  had people they could talk to and numbers that they could

11  call.  But I thought there was a gap in terms of how we could

12  create more value for small merchants.  So one of the

13  initiatives we had was Marketing in a Box, which was an

14  easy-to-use tool for small merchants.

15         We also did things in the community and

16  with point-of-purchase materials that were iconic for the

17  local area that -- we would use local artists so we could get

18  more and more merchants to put up these point of purchase.

19         So there was a concerted effort not just for the

20  large merchants but with the smaller merchants to add as much

21  value as possible.

22  Q    If you could take a look in your binder -- look at some

23  examples of this -- at Defendant's Exhibit 6791.

24         MR. ORSINI:  Your Honor, this one we can display on

25  the public screen.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4719

1              THE COURT:  All right.

2    Q    This looks like a presentation by you, Mr. Glenn.  What

3    is this document?

4    A    It's a review of the Merchant Services Business.

5    Q    If you want to flip through it, my next question is, to

6    whom would you have presented this document?

7    A    I presented some internally as well, but I think this is

8    a review for the board.

9    Q    The American Express Board of Directors?

10   A    The American Express Board.

11             MR. ORSINI:  Your Honor, I offer DX 6791 into

12   evidence.

13             MR. HAMER:  No objection.

14             THE COURT:  All right.  Defense Exhibit 6791 is

15   received in evidence.

16             (Defendant Exhibit 6791 received in evidence.)

17             MR. ORSINI:  Thank you.

18   Q    Mr. Glenn, if you could look at Slide 20, which ends with

19   Bates numbers 5579.  What is this slide depicting?

20   A    It depicts and tries to communicate, right, the -- how

21   our value differentiates -- or differentiated value versus the

22   competition, how do we add more value to merchants we believe

23   than the competition does.

24             And so you see the consumer and cardmembers on the

25   left; right?  They provide data and relationships to our

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4720

1   network.  On the right, it's the data and relationships that

2   the merchant business has and other businesses.

3            So I talked earlier about the closed loop.  This

4   is -- we've had several attempts to try and depict the closed

5   loop; right?  But I think at the heart of it, it is about data

6   and relationships and how we use those.  So the relationships

7   we have with the cardmembers and relationships we have with

8   businesses and then the data that we get for that, which --

9   from that, which powers up both the card proposition and the

10  merchant proposition.

11  Q    Why was American Express focused on providing

12  differentiated value?

13  A    Because we have to.  I mean, our business model is based

14  on value and the closed loop.  And so we don't have the scale

15  that the other folks in Visa and MasterCard have.  And so it's

16  really important in terms of justifying our price and our

17  premium that we differentiate the value.  That's what the

18  model stands on.

19  Q    Now, if you take a look at Slide 25, which ends 5584,

20  this picks up on some of the things we were talking about a

21  minute ago, a reference to marketing capabilities.  And on --

22  there are sort of four examples.  The one on the upper left is

23  the Marketing in the Box.  Is that what you were describing a

24  few minutes ago?

25  A    Yes.

GLENN - DIRECT / ORSINI                    4721

1   Q    So what was it?  What was in the box?

2   A    You can see the -- so they received some insights in

3   terms of who their shoppers were, broadly, not personally

4   identified individuals; right?  And also, it was an

5   easy-to-use direct mail campaign, right, to reach those

6   customers with offers.

7   Q    Was there a charge for that?

8   A    I don't believe there was, no.

9   Q    To the right is another offering referred to as

10  registered card.  What is registered card?

11  A    So registered card was -- it was a platform to provide

12  value to cardmembers and merchants.  So a cardmember would

13  register their card online, right, for an offer for a

14  particular merchant.  Then they would be able to go in and use

15  the card.  Didn't have to use a coupon.  So what we found is a

16  lot of cardmembers were reluctant to come in with a coupon

17  into a restaurant.

18         And also, not only use a coupon in a particular --

19  in that restaurant, but also the ability to get that

20  transaction done at that particular restaurant, a restaurant

21  or a merchant would have to train their staff.  What is this

22  coupon?  They may not have been able to train their folks to

23  do it.  And so it was dissatisfying for our cardmembers and

24  also for the merchants.  It was disruptive.

25         So registered card allowed -- it was a coupon-less,

GLENN - DIRECT / ORSINI                    4722

1    right, offer.  So all you did was register online.  You'd go

2    to the restaurant, you'd swipe your card, and you would get a

3    credit on your statement.

4    Q    You'd register online at American Express's website?

5    A    Yes.

6    Q    And would merchants have to choose to participate in

7    this?

8    A    Absolutely, yes.

9    Q    Down on the lower left-hand side, the next offer is

10   "Preferred loyalty currency for targeted cardmembers (X

11   points)."  What is that referring to?

12   A    It's a program that -- a promotional program, again, that

13   a merchant could run.  And it would be funded by one time, two

14   times, three times the rewards that they have on their card.

15   Points and rewards.

16   Q    So shop at Costco this month, get triple points?

17   A    And whatever, yes.  Whatever the loyalty program is for

18   that particular card.

19   Q    Costco is a bad example.

20        To your right, "High exposure buzz-generating offers

21   (daily wish)," what is that?

22   A    So we try to create a lot of, you know, excitement in the

23   marketplace.  And this was an idea that came out of the

24   marketing group, which was how do we create this buzz in the

25   marketplace around the holidays.  So it was hard to get new

GLENN - DIRECT / ORSINI                    4723

1   items from different manufacturers, whether it was -- I think

2   there was a Best Buy, just some other products; right?  And we

3   created this online sort of auction that you could bid on

4   these.  So it was a -- sometimes using a merchant, sometimes

5   using manufacturers.  And it was a program that we ran to

6   support the cardmember business.

7   Q    If you take a look at Slide 26, which ends at 5585, the

8   next page, what is this slide showing the Board?

9   A    Two examples of both the previous page, an example of X

10  points and an example of registered card.

11  Q    What's the example for X points?

12  A    It's a program that we ran with Home Depot.  Again, as I

13  said earlier, merchants want to acquire new customers, engage

14  and build loyalty in those customers.  So I think this program

15  addressed that need for Home Depot.

16  Q    There's a response rate listed under the results.  Why

17  was that something you were presenting to the Board?

18  A    It was, I think, off the charts as response rates go.

19  Sixteen percent is very, very strong.  Normally, these

20  programs run 1 or maybe 2 percent.

21  Q    And when we're talking about a marketing program like

22  this, what is a response rate?

23  A    It's when cardmembers redeem the offer.  So there's an

24  offer out and they redeem it.

25  Q    Okay.  And the example on the right for registered card,

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                4724

1    what is that example?

2    A    So similarly, right, which is offered by Best Buy, and it

3    was spend 200 and get a 40-dollar credit.  And it was a

4    14 percent response rate.

5    Q    And, in your experience, how is a 14 percent response

6    rate in the marketing program?

7    A    Very, very high.

8    Q    Okay.  We can put that document aside.  We're going to

9    come back to it later, but we don't need to focus on it now.

10         The Court has heard a great deal of testimony about

11   something called value recapture.

12   A    Yes.

13   Q    What was value recapture, from your perspective?

14   A    So value recapture was a program we initiated, I think,

15   in 2005, which was to better align the discount rate we were

16   charging with the value we were delivering to merchants.

17   Q    And whose recommendation was it to begin value recapture?

18   A    It was mine.

19   Q    And whose decision ultimately was it to engage in value

20   recapture?

21   A    It was mine.

22   Q    And why did you believe when you recommended this and

23   decided to do it in 2005 that value recapture was a good thing

24   for American Express to do?

25   A    Well, I think, you know, a couple of factors.  We hadn't

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4725

1   raised prices in 10 or 15 years, depending on the industry,

2   just generally, 10 or 15 years, depending on the industry;

3   that our costs had gone up.  We were -- our costs in the

4   merchant business and certainly our costs on the cardmember

5   business.

6          And third is that the price we were receiving or the

7   price we were charging merchants wasn't aligned, I didn't

8   think, with the value we were creating for merchants.

9   Q    So you mentioned that the costs in the merchant business

10  were going up, and you also mentioned that the costs in the

11  cardmember business was going up.

12         What relevance did increased costs on the cardmember

13  side have to your decision to engage in value recapture on the

14  merchant side?

15  A    Overall, you know, responsibility for the company.  And,

16  as I said, you know, when costs go up and we're -- costs are

17  going up because we're spending more and more money on our

18  folks; and on the value from the merchant side, equally we're

19  spending more money.  And I really support the money we're

20  spending on the cardmember side, because that drives higher

21  spend with better points, better service -- better rewards,

22  better service.

23         And so, you know, in order to create value to

24  merchants and acquire more merchants and keep them accepting,

25  we need the cardmembers to spend, right, and create value --

GLENN - DIRECT / ORSINI                    4726

1    economic value for the merchants.

2              And so I wanted to make sure that we would continue

3    to fuel and fund those programs from the merchant and from the

4    cardmembers as well, ultimately creating value for the

5    merchants.

6    Q    Why did you think it was important to fuel those

7    cardmember investments as it related to getting and retaining

8    merchants?

9    A    Because merchants want to see higher spending, loyal

10   cardmembers.  And when they do that, transaction sizes are

11   higher, we're creating better economic value for the

12   merchants.  And if we're able to continue to do that, that

13   keeps us acquiring more merchants and retaining those

14   merchants.

15             So, you know, I talked earlier, it's not just the

16   contract negotiations that the merchants are talking to us

17   about, the rate and the value.  It's when we're in there every

18   single day.  And so it's really important for the model to

19   work that all of the businesses are supporting, you know, the

20   value proposition for merchants.

21   Q    Prior to the decision to engage in value recapture, what

22   had been the trend in the average discount rate in the United

23   States for American Express?

24   A    For -- I don't remember the particular year, but it has

25   been coming down, I think, 3 to 4 basis points a year.

SHERRY BRYANT, RMR CRR

1  Q    And when value recapture was implemented through when the

2  value recapture initiative -- well, let me withdraw that and

3  lay a foundation for the question first.

4        Was there a time when the value recapture initiative

5  came to an end?

6  A    Yes.

7  Q    And when was that?

8  A    I think it was 2010.

9  Q    Okay.  So during the time between when value recapture

10 started in 2005 through when it ended in 2010, what effect did

11 the value recapture initiative have on that prior trend of

12 declining average discount rate in the United States?

13 A    It slowed it down.  So I think it came down to one basis

14 point loss a year, something on average like that.

15 Q    Now, are you familiar with the concept of spend mix

16 changes affecting the average discount rate that American

17 Express is charging in the United States?

18 A    Yes.

19 Q    Okay.  Can you explain to me what that means?

20 A    Sure.  We have different -- we have different rates for

21 different industries; right?  And so as the spend changes by

22 industry -- and even within industry, because there are sort

23 of segments within industry -- it affects the overall discount

24 rate.  So it's a combination of different industries and rates

25 that come down in certain industries as well.

GLENN - DIRECT / ORSINI                          4728

1  Q    What effect do pricing changes in a particular year in an

2  industry have upon the impact of mix on the average discount

3  rate in future years?  I can ask that --

4  A    I'm not sure.

5  Q    You said that one thing that related to this spend mix

6  change was that you were lowering discount rates in certain

7  industries; correct?

8  A    Yes.

9  Q    And which industries tended to have the lower discount

10 rates?

11 A    Everyday spend industries, supermarkets, drug stores, so,

12 you know, everyday spend categories.

13 Q    And why were the rates lower for those industries as

14 compared to others?

15 A    Because our value wasn't as strong as it was in other

16 industries, right, and as well as where the competition was in

17 those particular industries.

18 Q    And by competition, to whom are you referring?

19 A    Visa and MasterCard.

20 Q    And so what impact would a shift in spend to those

21 industries have upon the average discount rate in future

22 periods?

23 A    It would lower the discount rate.

24 Q    You also talked about intra-industry mix?

25 A    Yes.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4729

1   Q    What does that mean?

2   A    Within an industry, there are -- I can't think of an

3   example here.  But there are sort of subsegments of

4   industries, different types, right, so they may have different

5   rates as well, but, again, table-based for those

6   subindustries.

7   Q    What impact does a change in mix to the lower discount

8   rate industries have upon American Express's margins?

9   A    Well, overall, right, if the discount rate is coming

10  down, our overall margins are shrinking.

11  Q    Is that even if the cause of the decline is a change in

12  mix?

13  A    Yes.

14  Q    Why is that?

15  A    Because all of the spend adds up to a number of revenue;

16  right?  And so if discount rate comes down, the overall margin

17  comes down as well.

18  Q    So going back to the value recapture.  When you made the

19  decision to implement value recapture, can you describe for

20  the Court generally what your decision-making process was as

21  to identifying those industries that would be subject to value

22  recapture?

23  A    Sure.  So when I made the decision, there was probably

24  another six or nine months, essentially, before we went to

25  market, so meaning to sell it in, to implement value

GLENN - DIRECT / ORSINI                    4730

1   recapture.

2            And so a lot of the work that needed to take place

3   were, A, making sure that we had value per industry, and we

4   did a lot of work to do that; that the value that -- the

5   decision -- or the pricing that we came up with was sellable,

6   as I indicated earlier, some of the analytics that the pricing

7   team had done.

8            Three is that our organization was trained and

9   confident in terms of the materials, you know.

10           And fourth, that we understood that, you know,

11   marketing would play a role, the client management team would

12   play a role, the analytics team would play a role, in terms of

13   putting together the value proposition.

14           And then also that internally, like for our folks in

15   the service aspects were ready for calls from merchants who

16   had questions about it or disputing it or -- and that they

17   were also equipped, folks on the phone, to receive these calls

18   and talk about the value and make some decisions in terms of

19   when merchants asked if there were, you know, any other

20   options to continue with the same rate.

21   Q    Let's stick with that last point.  What options did

22   people in the call centers have if merchants would call in and

23   raise concerns about value recapture?

24   A    Well, you know, we were -- I was particularly concerned

25   about it because they were phone-based, right, so that this

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4731

1  wasn't a one-on-one conversation with someone who was there in

2  person.  And so I wanted to make sure that it was negotiable

3  as well.  And so we armed them with not only the training

4  about what our value proposition was, but in the case of

5  merchants going to cancel, defer some of the value recapture

6  for a period of time.

7  Q    What size merchants would be the merchants who were

8  calling in to these 800 numbers?

9  A    You know, as I said, smaller merchants.  I don't remember

10 the spend threshold, but if you think about your -- you know,

11 the florist or some of the smaller businesses.  Most of those

12 were acquired by a third party acquiring.

13 Q    That's through the ESA channel or ESA channel that the

14 Court has heard about?

15 A    Yes.  External sales agents, yes.

16 Q    Were the value recapture decisions made on a sort of

17 national basis, that is to say, you made the decision with

18 respect to all industries, or were there decisions by

19 industry?

20 A    Well, the decisions were made by industry, right.  And I

21 don't remember how many were covered in terms of the -- in

22 value recapture.  Some we didn't, because, again, as I said,

23 the value we're providing and where the competition was,

24 right, determined that we were probably getting the right

25 value for what we were -- or the right price for the value

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4732

1    that we were delivering and where the competition was.

2    Q    In terms of process, when you were looking at value

3    recapture for a particular industry, what would be the

4    decision-making process?  Who would make the recommendation,

5    what would they make it based upon, and what was your role in

6    making the decision for that industry?

7    A    By industry, the pricing team did a lot of the analytics,

8    right, all, essentially, the analytics that we talked about

9    earlier, where we thought the competition was, the value

10   drivers.  And then the team would get together and, you know,

11   discuss that pricing recommendation, and ultimately I would

12   make the final decision.

13   Q    Were there instances where there was a recommendation

14   made for value recapture that you decided not to go with?

15   A    Yes.

16   Q    And there were instances where a recommendation was that

17   you decided to go with?

18   A    Yes.

19   Q    Now, what factors, when you were looking at those

20   analytics, did you have in mind as to whether or not you would

21   agree with the recommendation?

22   A    Well, as I said earlier, I think when we were looking at

23   the pricing -- the pricing build and the surplus, right, that

24   laid it out and then, you know, ultimately, getting feedback

25   from the team and then making a decision whether or not it

GLENN - DIRECT / ORSINI                4733

1   was -- whether or not we could sell it in, whether or not it

2   made sense.

3           And that was very important, as I said earlier, not

4   just because of the credibility -- of the organization's

5   credibility with the merchant that they interact with all the

6   time, right, but it was also how prepared the organization was

7   and whether, you know, they felt like the value that we were

8   delivering justified our price.

9   Q    So let's take a look, if we could, in your binder at

10  Defendant's Exhibit 2714.

11          MR. ORSINI:  Your Honor, this one does have

12  confidential information on it.  And for the Court's

13  reference, it's also been marked for identification as

14  Plaintiff's Exhibit 0368, but has not yet been moved into

15  evidence.

16  Q    Now, Mr. Glenn, if you'd just look at the front of this,

17  it references ESNA Business Unit Review, ES Pricing.  So what

18  was ESNA?

19  A    Establishment Services North America.  So it was the U.S.

20  and Canada.

21  Q    So this is the merchant business for U.S. and Canada?

22  A    Yes.

23  Q    And it later became merchant services?

24  A    Yes.

25  Q    And at this time, you were responsible for ESNA; correct?

GLENN - DIRECT / ORSINI                    4734

1   A    I was.

2   Q    And ES pricing would have been a group that was reporting

3   to you at that time?

4   A    You know, I'm not sure.  Sometime in 2005, I took

5   responsibility for pricing.  I'm not sure if it was in

6   September.  Before that, the finance team had pricing,

7   reporting to Dave House.  But this could be that period of

8   time when I took over pricing.  I just don't remember the

9   date.

10  Q    And would you have been involved, even before you took

11  over pricing in presentations, about pricing initiatives that

12  were going to be undertaken for the merchant groups you were

13  responsible for?

14  A    Yes.  Yes.

15           MR. ORSINI:  Your Honor, I offer DX 2714 into

16  evidence.

17           MR. HAMER:  No objection.

18           THE COURT:  All right, DX 2714 is received in

19  evidence.

20           (Defendant Exhibit 2714 received in evidence.)

21  Q    If you could take a look at page 4, which ends in Bates

22  number 9807.  What is this --

23           MR. ORSINI:  If we could blow it up, because it's

24  really hard to read in the document.

25  Q    What does this slide depict, Mr. Glenn?

GLENN - DIRECT / ORSINI                    4735

1  A    It shows American Express's discount rate, Visa's

2  discount rate over time, and the premium between the two -- or

3  the difference between the two rates.

4  Q    And what was the trend in the premium?

5  A    So the premium had come down as our discount rate --

6  Amex's discount rate had come down, and Visa's had risen.

7  Q    And what was the relevance to those trends in your mind

8  with respect to value recapture?

9  A    Again, it came down to the value that we were creating

10 for merchants and that -- you know, looking at the decrease in

11 discount rate, which affects our cost, which affects our

12 margins and, you know, the ability to invest more in the

13 business.

14 Q    If you could take a look at page 13, which is Bates

15 ending in 9816.

16 A    I'm sorry?

17 Q    The page ending 9816.  This is a page with respect to

18 lodging.  Was the lodging industry one of the industries that

19 was -- in which value recapture was applied?

20 A    Yes.

21 Q    And as reflected on this slide, what was the reason for

22 the value recapture initiative in the lodging industry?

23 A    We hadn't raised prices in ten years.  The premium had

24 come down.  The corporate travel had rebounded in terms of

25 just generally the environment had rebounded and, you know,

GLENN - DIRECT / ORSINI                    4736

1   again, the value we were creating in that industry and

2   delivering in that industry.

3   Q    Do you recall reviewing industry level analyses like

4   these for each industry to which value recapture was applied?

5   A    Yes.  I mean, that was the detail around making a

6   decision by industry to implement value recapture.

7   Q    And if you take a look at the page ending 9818, and this

8   is a reference to "Offline Travel Agent Tour Operator."  Let's

9   start with, what does offline mean?

10  A    The -- well, it's the opposite of on -- it's the opposite

11  of online.  So it's directly with travel agencies, right, not

12  booking online.

13  Q    So we're talking Liberty Travel at the mall, not

14  expedia.com?

15  A    Correct.

16  Q    Was that one of the industries in which value recapture

17  occurred?

18  A    It is, yes.

19  Q    Now, on the top of the slide, it says:  "We realigned

20  pricing with increased value in the industry as more travel

21  agents shift to a 'merchant model.'"  What does that mean?

22  A    So the merchant model is agents where they essentially

23  become the merchant of record.  It's not a -- essentially, a

24  pass-through to the end user; right?  And so there was value

25  we were creating for the industry for that particular agency,

GLENN - DIRECT / ORSINI                4737

1    for that particular -- who became a merchant; right?  So it

2    became more of a merchant than the value that we were

3    delivering there.

4    Q    And how was that different from when it was a

5    pass-through?

6    A    It was because those -- those costs were borne by the end

7    user, not by that particular agency.

8    Q    If you could look at the slide ending in 9821.  This one

9    relates to the cruise industry.  Was the cruise industry part

10   of value recapture?

11   A    It was, yes.

12   Q    And, again, why?

13   A    Again, the competition had increased prices.  And it says

14   eliminating any premium, and we continue to add more value to

15   the industry.  It wasn't aligned with some of the other T&E

16   industries; right?  And we believed we had a very strong value

17   proposition within the cruise industry.

18   Q    So if we could take a look at Defendant's Exhibit 7413,

19   please.  And the cover of this is an e-mail --

20             MR. ORSINI:  Your Honor, this one we can display on

21   the public screen, if you'd like.

22   Q    This is an e-mail from Mr. Funda to you; correct?

23   A    Yes.

24   Q    And it's referencing revised pages for the BOD

25   presentation.  What's BOD?

GLENN - DIRECT / ORSINI                4738

1    A    I believe it's Board of Directors for American Express.

2    Q    And if you turn to the page ending in 5628, it says it's

3    a draft price presentation; correct?

4    A    Yes.

5            MR. ORSINI:  Your Honor, I offer DX 7413 into

6    evidence.

7            MR. HAMER:  No objection.

8            THE COURT:  All right.  DX 7413 is received in

9    evidence.

10           (Defendant Exhibit 7413 received in evidence.)

11   Q    I just have a question about one page in this document,

12   Mr. Glenn.  If you could look at the page ending in 5630, and

13   what does this slide depict?

14   A    It shows the discount rate from American Express from --

15   it looks like 2004 on, what the rate would have been without

16   value recapture and what it was -- the actual discount rate at

17   the end of 2007 with value recapture.

18   Q    And what does it show the difference in the trend was?

19   A    That it was -- it came down, but didn't come down as much

20   as it would have without value recapture.

21   Q    Now, when you were making the decision to engage in value

22   recapture, did you believe that there were any risks to the

23   business associated with that decision?

24   A    Yes.

25   Q    What did you identify those risks to be?

1  A    Well, we were, you know, constantly under pressure to

2  lower our rates that we have to defend every single day,

3  that -- and so the risk of not acquiring more merchants or

4  losing merchants in terms of them cancelling was about as big

5  a risk as we have in our business model.  So more merchants

6  and retaining those merchants were really, really important.

7  Q    Were there debates within the company about whether to

8  engage in value recapture?

9  A    There were some, yes.

10 Q    And what were the ways that you identified to help

11 mitigate the risks that you've just described?

12 A    I told you that after we went through the analysis,

13 making sure that -- A is we had value proposition to defend

14 what our recommendations were and where we were negotiating;

15 that the organization had the confidence to go in and talk to

16 merchants about that; that internally folks were aligned and

17 trained, and, you know, that we continue to power up the --

18 you know, the value proposition continually.

19          So it wasn't something that we had done three years

20 ago and we decided to raise rates.  It was ongoing.  Powering

21 up our marketing programs, to do more on information and

22 insights, marketing to small and large merchants.  So all

23 those were, you know, continuing to take place, and making

24 sure that we continue to spend against those programs.

25 Q    Do you recall whether there were any, focusing on large

GLENN - DIRECT / ORSINI                    4740

1   merchants, large merchants that canceled American Express

2   acceptance as a result of value recapture?

3   A    I don't believe any large merchants canceled.

4   Q    I will spare you showing you your PMP to confirm that

5   point.  But to what do you attribute the fact that there were

6   not large merchant cancellations even while value recapture

7   was being rolled out?

8   A    That there were some -- a lot of negotiations and a lot

9   of discussions.  And some of these negotiations took place

10  over nine months and involved our folks with the merchants.

11  Q    And just as a general matter, what form did these

12  negotiations take?  Were the merchants able to be exempted

13  entirely from value recapture?  Were there other aspects of

14  the negotiations?

15  A    So there was -- there were deferrals of some of the

16  implementation.  There were discussions about more marketing

17  programs, distribution card agreements, things I talked about

18  earlier, right, more marketing programs, more insights.  It

19  was all part of those negotiations.

20  Q    When you say deferrals, what do you mean by that?

21  A    That we wouldn't implement on January 1st.  It could be a

22  later date.  There were some things done to -- because during

23  value recapture, too, we created new rate tables, right,

24  essentially, for new rates.  And some merchants we gave the

25  ability to move into a different rate, a higher band earlier

SHERRY BRYANT, RMR CRR

1    and projected than they actually did.  So there's a lot of

2    negotiations around.

3    Q    I just want to make sure we explain what that last piece

4    was.  You said you gave them the ability to move into a higher

5    band earlier than they might have otherwise been able to?

6    A    Correct.

7    Q    What does that mean, and what's the impact on the

8    merchant?

9    A    Sure.  The higher band -- we established new bands or had

10   rate tables, volume bands; right?  So then when they moved --

11   as I talked about earlier, when they moved into a higher band,

12   they would get a lower rate.  So sometimes --

13                THE COURT:  I understand that.  We've had other

14   testimony on that.

15                MR. ORSINI:  Thank you, Your Honor.

16   Q    Now, closing out the value recapture discussion, you

17   testified earlier that there was a decision made at some point

18   to end value recapture; correct?

19   A    Yes.

20   Q    And why was that decision made?

21   A    Well, it was made because -- in terms of having price

22   aligned with value, right.  Felt very, very comfortable about

23   where we were and where the competition was, because all of

24   that factored into, you know, value recapture at the outset.

25   And then I also -- I also believe that, you know, we felt

GLENN - DIRECT / ORSINI                    4742

1    comfortable that there was an alignment between price and

2    value and that the -- it no longer became a program or

3    initiative.  It was more of an ongoing look at the value that

4    we had for merchants.

5    Q    And who was involved in the decision to stop value

6    recapture?

7    A    Ed Gilligan.

8    Q    Okay.  Move on to a separate topic.

9         MR. ORSINI:  Your Honor, I don't know -- it's

10   earlier than I thought.  We can keep going.

11        THE COURT:  How long will you be examining this

12   witness on direct?

13        MR. ORSINI:  My guess, Your Honor, is I have maybe

14   another hour and 15 minutes.  I'm going to try and shorten it,

15   but that's my best estimate as I stand here right now.

16        THE COURT:  Why don't you take the next part of it,

17   and we'll take a break around 11:00?

18        MR. ORSINI:  Sounds good.

19        THE COURT:  Unless -- does anyone want to break now?

20   No?  Okay.

21        MR. ORSINI:  Continue, we shall.

22   Q    We've talked a couple times about the coverage gap or the

23   merchants who don't accept American Express.  Was improving

24   merchant coverage something that you were focused on in your

25   responsibility for merchant services?

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4743

1  A    Every single day in the organization, primary

2  responsibility is to acquire merchants, more merchants, and to

3  retain them.

4  Q    And why was coverage something that you were focused on?

5  A    Well, it's at the heart of -- it's at the heart of our

6  business; right?  Getting more merchants to accept drives both

7  spend and perceptions of coverage as well, and that it's

8  important for the economics of the business, as we talked

9  earlier, so that we had more money to put into value to our

10 merchants and the card side had more money to invest in the

11 cardmembers business.

12 Q    You mentioned earlier that most of the merchants who

13 don't accept the card are small merchants.  Are you familiar

14 with the term "spend coverage"?

15 A    I am.

16 Q    And what is spend coverage?

17 A    The calculation of spend coverage is where plastic is --

18 where plastic is accepted by merchants, what percentage of the

19 dollar amount is spent on American Express -- not percentage

20 of the dollar amount spent on American Express, but where our

21 cardmembers can use their card.

22 Q    And LIF coverage is the locations of coverage, how many

23 of the merchants actually take the card?

24 A    Locations in force, yes.

25 Q    Which number tends to be higher, in your experience,

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4744

1   spend coverage or locations in force coverage?

2   A    Spend coverage is higher.

3   Q    And why is spend coverage typically higher?

4   A    Well, the -- so if you look at the transaction size of

5   different industries, right, it's higher in travel and

6   entertainment than it is in supermarkets in terms of the

7   actual transaction and -- you know, and the spend number.

8   Q    So if American Express has a higher spend coverage

9   figure, why does it matter to the business that there are all

10  these small merchants who do not accept the card?

11  A    Because people want utility of the card across all

12  industries.  So it's not just spending in T & E, it's spending

13  across the board.  So what we know is that coverage gaps

14  affect not only the spend, but cardmembers' and prospects'

15  perception of where they can use the card and how they can use

16  the card.  So I'd love to have 100 percent coverage.

17  Q    Were there any studies that you were familiar with that

18  were conducted to measure the coverage, the perceptions of

19  coverage that cardmembers had of larger merchants?

20  A    Yes.  We did a lot of work on perceptions of coverage.

21  Q    And can you give some examples of some studies that were

22  done with respect to particular large merchants?

23  A    Sure, which some of those studies actually fueled a lot

24  of the work in spend that we did in terms of investment.  So,

25  you know, a couple of examples are, I think the number is only

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4745

1  60 percent of our cardmembers in the Pacific Northwest thought

2  we were accepted at Costco and we were the only credit card

3  accepted at Costco.  And I think it was much lower for

4  prospects.  So it's not just the cardmember behavior, but it's

5  our issuing business trying to get more cards into consumers'

6  hands.  So the perception of coverage from prospects is low.

7          The other study was at Dunkin' Donuts, where they

8  started in the northeast area, they started to accept all

9  plastic.  We had point of purchase materials consistent with

10  the other brands, Visa and MasterCard, in all of the Dunkin'

11  Donuts -- I think 1100 or 1099 of the 1100 Dunkin' Donuts in

12  the New England area.  And 56 or 65 percent of our cardmembers

13  didn't think we were accepted there, and the number for

14  prospects was about 50 percent, and we had equal treatment.

15          So not only getting the coverage, but working on

16  perceptions of coverage and working with the merchants to

17  promote the fact that -- promote or show the fact that they

18  accept American Express is really important.

19  Q    To what do you attribute the perception that American

20  Express was accepted -- or not accepted at these big merchants

21  who did accept American Express?

22  A    It's just years of, you know, working really hard to get

23  more and more coverage.  And so consumers' perception and

24  years of coverage gaps and suppression and some of those other

25  elements have impacted both our cardmembers and our prospects.

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4746

1    Q    So during the time that you were responsible for US and

2    then ultimately Global Merchant Services, what types of

3    initiatives did you undertake or the group undertake at your

4    direction to try to close this coverage gap?

5    A    Well, we -- we invested more in terms of feet on the

6    street, so our proprietary sales organization going after some

7    of these holdouts.  Had more programs with independent agents.

8    We implemented OnePoint, which was a program to drive more and

9    more coverage to small merchants.

10            And then we did things, as I talked earlier, like

11   Marketing in a Box.  We had telesales organizations internal

12   to American Express and external trying to drive coverage, you

13   know, more and more acceptance.

14            So a variety of things.

15   Q    The government has suggested to the Court in this case

16   that American Express made the choice not to have full

17   coverage by deciding to keep its discount rates where they

18   were.  Do you have a reaction to that?

19   A    That's not true at all.  I mean, I know that as a fact,

20   which is our objective is to get as much coverage and

21   ultimately 100 percent coverage, if we could.

22   Q    And what role did American Express's pricing to merchants

23   play in the coverage gap, in your experience?

24   A    It played a role.  There were other factors that, you

25   know, we looked at over time.  Relevance, meaning especially

GLENN - DIRECT / ORSINI                    4747

1   small merchants would see one transaction for American Express

2   versus 20 of Visa/MasterCard.  You know, we -- on average, I

3   think we have about 5 percent of the number of cards in the

4   marketplace and, on average, probably 7 percent of the

5   transactions.  So if you look at some of the -- even the

6   larger merchants, we represent 1 or 2 percent of their total

7   transactions, right.  So, you know, acquiring more cardmembers

8   is really important.

9   Q    If price was one of the factors, which I think you just

10  testified it was, it was one of the factors that went into

11  coverage issues, why not just lower prices across the board to

12  at least get rid of that issue?

13  A    So A is we've tried all kinds of pricing tests, right,

14  and none has driven coverage to 100 percent.  In fact, there

15  were some tests we had with zero discount rate, right, and we

16  didn't get the merchants to accept because of the relevance

17  that I talked about earlier.

18           THE COURT:  Because of the what?

19           THE WITNESS:  The relevance, the number of cards and

20  transactions that they see.

21           THE COURT:  Right.  So they felt there weren't

22  enough cards and transactions to justify having -- accepting

23  the card?

24           THE WITNESS:  That is correct.  And so relevance

25  played into it.  I also was going to talk about operational

GLENN - DIRECT / ORSINI                    4748

1  differences, which led to OnePoint, which is because we own

2  the contract with the merchant, there were things like

3  reconciliation and settlement that we did differently.  We

4  actually adjusted that to make it more merchant-friendly.

5  A    Pricing -- so to answer your question on pricing is, we

6  can always lower price, right, and lower our price.  The

7  problem is that the discount rate, as I talked about earlier,

8  fuels both the merchant value proposition in the merchant

9  organization as well as the card product value, value

10 proposition.  So more rewards, better service, fine hotels and

11 resorts, all of those programs as well.

12            And so, you know, it's fundamental to our business

13 model that we align price with value.  And what happens is we

14 lower the discount rate.  There's spillover of pricing.  We

15 have less money to invest in rewards and value proposition for

16 cardmembers and for merchants.  So really, it just impacts our

17 business model.

18 Q    And what impact did you think lowering the discount rate

19 and, thereby, reducing the investments that were available in

20 the cardmember value propositions you were just describing

21 would ultimately have upon American Express's coverage levels?

22 A    So it would go down.  Merchants see fewer cardmembers,

23 because it's a competitive environment on the cardmember side;

24 right?  And they are trying to power up their value

25 proposition, better service, more rewards, innovative

GLENN - DIRECT / ORSINI                          4749

1    programs.

2            And so there are fewer cardmembers, who if the value

3    proposition isn't right, they spend less and transact at a

4    lower price, which reduces the value to merchants, and, as I

5    said earlier, we're constantly negotiating to maintain

6    acceptance with merchants.

7            So, you know, it's actually the whole business

8    model.

9    Q    If we could take a look back at Defendant's Exhibit 6791.

10   This is the board presentation we were looking at a bit

11   earlier.

12           THE COURT:  I'm sorry, give me the --

13           MR. ORSINI:  Sure, Your Honor.  It's Defendant's

14   Exhibit 6791.  And I believe it's --

15           THE COURT:  It's in evidence.

16           MR. ORSINI:  It is in evidence and I also believe

17   it's safe for public consumption.

18           THE COURT:  Then let the public consume it.

19           MR. ORSINI:  We can let the public consume it.

20   Thank you, Your Honor.

21   Q    We had been looking at this earlier Mr. Glenn.  If you

22   can take a look now at slide 6, which ends in 5565.  And this

23   was the presentation to the board.  Here you're talking about

24   coverage gap.

25           Down at the bottom of coverage gap, the last main

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4750

1  bullet is "primarily with small merchants, driven by," and

2  then there are three sub-bullet points.

3         Does this relate to what you had been describing a

4  few minutes ago?

5  A    Yes, it does.  Scale and relevance, higher prices,

6  operational differences.

7  Q    And on the scale and relevance point, just to draw that

8  out a little bit more, if you look at the page ending in 5566.

9  A    Yes.

10 Q    And that's on the right side a CIF/LIF correlation.  What

11 is -- we've talked a lot about LIF, so we don't need to define

12 that again.  What is CIF?

13 A    Cards in force.  The number of cards in the market.

14 Q    And what's the correlation between those two?

15 A    That there is a correlation between having more cards and

16 higher coverage levels.

17 Q    Do you have a sense as to where in the United States

18 American Express has the highest ratio or the highest

19 correlation of CIF and LIF?

20 A    I believe it's the tri-state area, the New York Metro

21 area.

22 Q    Are you familiar with the term "activation rate"?

23 A    I am.

24 Q    What does that mean?

25 A    So I don't know how it's calculated today, but we

GLENN - DIRECT / ORSINI                    4751

1   calculate it as an active merchant had one transaction in a

2   12-month period.  So we would consider them active if they

3   just had --

4            THE COURT:  That's active?

5   A    Active.  One transaction in 12 months, from...

6   Q    And have you seen studies of the activation rate in New

7   York, at least during the time you were responsible for

8   merchant services?

9   A    I have, yes.

10  Q    And I don't want to give a specific number, but can you

11  give me a range within which those activation rates fell, just

12  percentage levels?

13  A    So I believe the New York area has the highest coverage,

14  in terms of we -- their accepting merchants, but the

15  activation rate is in the low 70s, I believe, low to mid 70s.

16  Q    And if you could look at the last slide I want to talk

17  about in this deck is 5567.

18            We have displayed a redacted version, Mr. Glenn, so

19  I'd just ask you not to reference specific numbers since those

20  are confidential.  But can you just describe generally what

21  this slide here is depicting to the board?

22  A    It shows to the board that pricing is not -- just

23  reducing pricing doesn't close the coverage gap.

24  Q    And there's a reference here to under "pricing is a

25  lever," it says:  "Previous pricing pilots have not proven

SHERRY BRYANT, RMR CRR

GLENN - DIRECT / ORSINI                    4752

1   effective."  I think you mentioned that briefly earlier.

2            What type of pilots had American Express run on

3   pricing issues related to coverage?

4   A    Zero discount rate for a period of time.  A fixed -- a

5   fixed rate for a merchant that we would say that your rate

6   would be lower if X number of transactions came through.  So

7   we've tried all sorts of things with pricing for small

8   merchants.

9   Q    And the last sub-bullet under that section is:  "Card

10  relevance challenges leave some merchants uninterested in

11  acceptance at any price."

12           Based on your experience, was that something with

13  which you agreed?

14  A    Yes.

15  Q    Then the next bullet point says:  "Cost to close coverage

16  gap would offset any upside."  And they get to some of the

17  numbers, so let's not use the numbers, but -- and I'll slow

18  down.  What did that mean?

19  A    That if we just moved to, it says -- if we move to parity

20  coverage and got -- by reducing pricing, it would be extremely

21  costly.  And I don't know if this fully takes in the spillover

22  effect that's referenced on the right.

23           So this analysis could have been just to get those

24  merchants to accept.  Again, I never thought we could get 100

25  percent acceptance anyway, because of the other factors,

1  right, but it would cost a significant amount of moneys and

2  result in spillover pricing as well.

3  Q    One last document on this topic, if we could look at

4  Plaintiff's Exhibit 1611.

5          MR. ORSINI:  Your Honor, this document is both in

6  evidence and safe for the public screen.

7  A    I'm sorry?

8  Q    It's Plaintiff's Exhibit 1611 and there's a presentation

9  attached to this e-mail that references Project Odyssey.  Just

10 remind us what that project was?

11 A    I think Odyssey was the pilot for -- that became

12 OnePoint.

13 Q    Take a look at the slide ending in 1317.  This was the

14 project and pilot that Tom Pojero was leading; correct?

15 A    Yes.

16 Q    Down at the bottom where it says "role of the network,"

17 there's a bullet point that says:  "Reality is that we are a

18 premium network with a very large merchant DR premium."  I

19 presume that means discount rate?

20 A    Yes.

21 Q    "Very different situation than Discover.  Our goal is to

22 find the right balance of DR and coverage."

23          So can you explain what that means?

24 A    Sure.  It's essentially what I just described, right,

25 which is the -- our discount rate funds the moneys that we put

GLENN - DIRECT / ORSINI                    4754

1    into an organization, the value proposition from both the
2    merchant side and the card side.  And without that value
3    proposition, we lose cardmembers and we're going to lose
4    merchants.
5           So maintaining a premium discount rate and having
6    a -- having that rate reflect the value that we're delivering
7    is very, very important.  Without it, our model falls apart.
8    We won't have -- lowering the rate lowers our ability to
9    invest in the business, both on the merchant side and the
10   cardmember side.  That lowers probably the number of
11   cardmembers we have and absolutely the money we can spend on
12   rewards and value proposition for those cardmembers.
13          MR. ORSINI:  I was going to move on to another
14   topic.
15          THE COURT:  Let's take a ten-minute break.  Please
16   don't discuss your testimony with anyone.
17          (Recess.)
18          (Continued on the next page.)
19
20
21
22
23
24
25

Glenn - direct - Orsini                                4755

1           THE COURT:  Please be seated, everyone.

2           Mr. Chesler, is everything all right?

3           MR. CHESLER:  Yes, Your Honor.  Sorry.  Yes, Your

4    Honor.

5           THE COURT:  You just seem preoccupied.

6           MR. CHESLER:  No, no.  I was dealing with a problem

7    unrelated to this.  I'm sorry, Your Honor.

8           THE COURT:  Oh, no, that's all right, I'm just

9    checking.

10          MR. CHESLER:  Thank you.

11          THE COURT:  Go ahead, Mr. Orsini.

12          MR. ORSINI:  Thank you, Your Honor.

13   DIRECT EXAMINATION (Cont'd.)

14   BY MR. ORSINI:

15   Q    New topic, Walgreens.

16          You were involved in discussions with Walgreens in

17   about 2004 and 2005, correct?

18   A    Yes.

19   Q    And what, generally, do you recall about the Walgreens

20   situation?

21   A    Walgreens had threatened to cancel and actually had

22   cancelled card acceptance.

23   Q    When were you brought into the discussions, I don't need

24   a specific date, I just mean generally at what stage of the

25   process were you brought in?

1  A    Well, I was advised I think fairly early on when it

2  became apparent to our team that they had an intent to cancel

3  and then got more involved over a couple of months.

4  Q    Now, at that time, around fall of 2004, your

5  responsibilities were all merchants in the U.S. and Canada?

6  A    Yes.

7  Q    Why were you brought into the Walgreens situation

8  particularly?

9  A    Well, because my team had responsibility for the

10 Walgreens relationship.

11 Q    And what was your reaction when you heard that Walgreens

12 was threatening to cancel?

13 A    Very, very concerned.

14 Q    Why?

15 A    A very large merchant which is really, really important

16 not just for our spend but for perceptions of our cardmembers

17 and, you know, a very large merchant, we worked really hard to

18 not only acquire them but also to renew them and strengthen

19 the relationship.

20 Q    When you were brought into the conversations around

21 Walgreens, what was your view as to whether or not they might

22 in fact follow through on their cancellation threat?

23 A    Well, because of the discussions we had at senior level

24 and eventually, you know, they sent us a termination

25 cancellation notice and then went public with it, I was

1   concerned from the outset because we're constantly in

2   negotiations with merchants, right, and talking about the rate

3   but cancellation threats are really, really critical for

4   our -- are important to us.

5   Q    What was your personal involvement in the Walgreens

6   situation?

7   A    So, involved with our team in terms of the negotiations,

8   looking at the proposals we were making.  I had a conversation

9   or two with their CFO and our folks I think and also engaged

10  in quite a few conversations and faxes or letters to their

11  CEO.

12  Q    The CEO, that Jeff Rein?

13  A    Yes.

14  Q    And CFO, was that a gentleman by the name of Bill

15  Rudolphsen?

16  A    I think he was the CFO.

17  Q    I'd like you to take a look, if you could, in your binder

18  at Plaintiff's Exhibit 1974.

19          MR. ORSINI:  Your Honor, this one is in evidence

20  already.  It also contains confidential information.

21  Q    So, the cover of this looks like a fax cover sheet from a

22  woman named Sandra to Mr. Rein; do you know who Sandra was?

23  A    Sandra Sanchez was my assistant at the time.

24  Q    Okay.  And if you flip to the next page, there's an

25  actual letter there.  Was this a letter that you sent to

1   Mr. Rein?

2   A    Yes.

3   Q    Or had sent to Mr. Rein?

4   A    Yes.

5   Q    And so, just starting at the top, you say:  "I look

6   forward to our conversation that would allow us to focus on

7   the following key items we had previously discussed over the

8   past few weeks, these are as follows:

9           The first bullet point talks about harnessing

10  marketing and information that could drive incremental top

11  line sales.

12          Can you explain what you were meaning to convey to

13  Mr. Rein by that bullet point?

14  A    Sure.  Using our marketing team and our marketing

15  capabilities and the information that we have to drive more

16  value in -- from our cardmembers to them and also resulting

17  in, you know, a benefit for Walgreens, value to Walgreens.

18  Q    And the next bullet point talks about providing Walgreens

19  with opportunities to build additional revenue streams and

20  reduce a portion of your discount rate cost structure with an

21  aggressive card acquisition partnership program.

22          Let's break that up a little bit.  An aggressive

23  card acquisition partnership program, what was that?

24  A    This was something we talked about earlier, right, which

25  is programs that we could run with merchants to provide

1    revenue for them.  So, in this case it was a card

2    acquisition -- Walgreens acquiring cards on behalf of American

3    Express and getting reimbursed for that.

4    Q    You state in this bullet point that that could reduce a

5    portion of Walgreens discount rate cost structure.

6              Can you explain what the relationship is between a

7    card acquisition partnership program and a discount rate paid

8    by the merchant?

9    A    Sure.  We talked about this earlier.  It is part of the

10   net effective rate.  Essentially discount rate is the headline

11   rate, right, and the amount they pay for the relationship and

12   acceptance, because it all starts with having the acceptance

13   relationship, would decrease their net effective rate, their

14   headline rate, their headline discount rate.

15   Q    What is the next bullet point about leveraging loyalty

16   and rewards expertise referring to?

17   A    I believe it has to do with our card folks in terms of

18   what they do in terms of loyalty and build loyalty and a

19   rewards program and a lot of people think that we have, and I

20   do, we have an industry leading rewards program, the expertise

21   there.  So, this is about capitalizing, having Walgreens

22   capitalizing on our expertise there to drive, you know,

23   loyalty and advise them on, if they want, advice on how they

24   could further drive loyalty.

25   Q    And is that something that American Express will from

1    time to time advise merchants on?

2    A    Yes, we -- so, you know, we have teams not only on the

3    loyalty side and do benchmarking and talk to the merchants

4    about, but also, you know, on the merchant side as well in the

5    analytics and information management.

6    Q    The final bullet point mentions payment choice; what were

7    you referring to there?

8    A    So, that continuing -- I obviously wanted them not to

9    cancel and continue to accept so they would provide choice of

10   payments, consumers could have their choice of using the card

11   of choice that they want at Walgreens.

12   Q    Okay.  Now, if we go further down in here, there's a

13   paragraph beginning Jeffrey.

14   A    Yes.

15   Q    It says:  Jeffrey -- I won't read the whole thing but it

16   goes on to talk about extending the partnership for an

17   additional, let's not say the number I guess -- an additional

18   period of months?

19   A    Right.

20   Q    Why were you proposing an extension for that time period

21   reflected in this document?

22   A    So, you know, our conversations had been with their teams

23   for quite some time about the value we provide, right, and

24   they wanted a lower rate and we had made I think at this point

25   in time probably a couple of revised offers for a contract and

1    it was apparent to me that they didn't think we were

2    delivering the value that they wanted us to deliver and so

3    what I was saying is for a period of time just give me the

4    opportunity, give our teams the opportunity to come in and

5    prove that value with some of the things we talked about

6    earlier, those three or four bullet points above, which is

7    information, expertise, marketing programs.

8    Q    You say later a little further down, actually the next

9    paragraph --

10   A    Yes.

11   Q    -- that were you willing to provide cash payment of a

12   certain amount of money in exchange for that period extension.

13   What would have happened -- well, first of all, did they

14   accept this offer?

15   A    They didn't.

16   Q    Had they accepted the offer and had decided after some

17   period of time that they didn't want to continue accepting

18   American Express, what would have happened to that money?

19   A    They would have kept it.

20   Q    Okay.  You go on to say:  "I will personally commit the

21   appropriate resources and marketing funds that I assure you

22   will make an impact in the marketplace."

23        What were you trying to convey at that point?

24   A    That he had my commitment and the organization's

25   commitment to work really, really hard on proving our value.

1   Q    So, what did you have in mind, what do you mean by work

2   very hard to prove value; what did you think you were going to

3   do with Walgreens during this period of time, had they agreed

4   it, to prove this value?

5   A    There was distribution -- the things that we had put on

6   the table in terms of marketing programs, card distribution

7   programs, having our card folks come in and talk to them

8   about, you know, loyalty programs and so, commitment of our

9   organization also to prove the value that I believed that we

10  had and could deliver further.

11  Q    Were you offering this amount of money for that period of

12  time to in essence buy time to allow American Express to get

13  in place the mechanisms it needed to shift its cardmembers

14  elsewhere if Walgreens followed through?

15  A    No, not at all.  It was all about negotiating with

16  Walgreens to continue acceptance.

17  Q    So, if you turn to the last page of this document,

18  there's a slide there, it's on page 5322.

19  A    Yes.

20  Q    The top mentions a Blue Cash Card acquisition

21  partnership.  The Blue Cash Card, what was that?

22  A    It's one of our products, products of American Express.

23  Q    A credit card?

24  A    Credit card, yes.

25  Q    It's called Cash because it had a cash back feature to

1    it?

2    A    Yes, cash back to the consumer.

3    Q    And so, generally, what were you proposing to Walgreens

4    with respect to the Blue Cash Card?

5    A    Well --

6    Q    Let's not use numbers, we'll walk through the bullet

7    points.  Just generally, what was the idea here?

8    A    Concessions on discount rate, a program where for every

9    card they acquired there was some dollar bounty that went back

10   to Walgreens, a funded gift certificate from Walgreens for

11   every card account that they acquired, for every card they

12   acquired.

13   Q    So, if Walgreens had agreed to do this partnership, what

14   would they have been doing for American Express?

15   A    They would have acquired more merchants -- I'm sorry,

16   they would have acquired more cardmembers for us, right, and

17   that's a value to us and they would have received a revenue

18   stream for that.

19   Q    So, if you look at the first bullet point, it references

20   a discount rate; that's the rate they would pay had they done

21   this partnership for every one of these Blue Cash cards that

22   they helped Amex acquire?

23   A    Right, that's correct.

24   Q    And the next bullet point refers to per-Card bounty

25   payments; what are those?

Glenn - direct - Orsini                                    4764

1    A    So, in addition to that, right, they would have received

2    that range of payment for every card they acquired.

3    Q    Okay.  That's actual -- that's cash payments, that's cash

4    money?

5    A    Yes.

6    Q    The next bullet point references:  AXP-funded gift

7    certificates; what is that?

8    A    So, it would be a Walgreens gift certificate for a

9    discount on anything the consumer used.

10   Q    And that's something Amex would have funded that could

11   have then been used to buy products from Walgreens?

12   A    That's correct, with any form of payment.

13   Q    Now, this Blue Cash Card acquisition partnership, has

14   American Express done partnerships like this over time?

15   A    We have.

16   Q    And in your experience dealing with those, how do the

17   terms that are reflected in this document that was proposed to

18   Walgreens compare with the terms that were offered to other

19   merchants?

20   A    I think this is a pretty rich offer.

21   Q    By rich, you mean rich for whom?

22   A    For the value to Walgreens in terms of revenue.

23   Q    The next section of this slide refers to a Gift Card

24   Distribution Partnership.  Is this similar except now they're

25   distributing gift cards instead of Blue cards?

1  A    Yes.

2  Q    And the first bullet point there's -- again we have to

3  stay away from the numbers, but there's an estimated year one

4  revenue number and it references commission payments; what are

5  those commission payments?

6  A    Similar to the bounty payments that I think is on the one

7  above which is payments made to Walgreens for selling each --

8  per card sale.

9  Q    And these were real dollars that would be paid per card?

10 A    Correct.

11 Q    Okay.  Did they accept this offer?

12 A    They -- the offer made on that date, no.

13 Q    Yes.  Okay.  Take a look at PX 1969, also in your binder.

14        MR. ORSINI:  Again, Your Honor, this document is in

15 evidence already and is confidential.

16 Q    So, this is roughly a month later -- no, not a month, a

17 couple of weeks later.

18        This is to Mr. Rein from Ms. Sanchez again; do you

19 recall having this letter sent to Mr. Rein?

20 A    I do.

21 Q    Okay.  If we could look at the second page of the letter,

22 that page right there, actually down towards the bottom there

23 are some proposed terms.  Now, the first one is term, and that

24 refers to the period for the agreement, correct?

25 A    It does, yes.

1    Q    Which is longer than the prior offer?

2    A    It is, yes.

3    Q    And why did the term of the agreement change from the

4    last proposal to this one?

5    A    You know, subsequent discussions with Mr. Rein in terms

6    of he didn't accept the last proposal, right, we had

7    discussions and I was trying to address all of the needs that

8    he talked about, so one was a longer term.

9    Q    And the next line is a payment and there's a dollar

10   figure there; what does that reflect?

11   A    It's a payment made directly to Walgreens.

12   Q    Signing bonus?

13   A    Yes.

14   Q    So, that's actual cash?

15   A    Yes.

16   Q    And had they accepted that term, how would that payment

17   have affected their net effective rate?

18   A    It would have been a significant decrease in their -- you

19   would take that over the volume.

20   Q    We can do the math but we'd have to use the numbers,

21   okay, so we'll move on.

22            The marketing impact, the next line, what is that a

23   reference to?

24   A    That's not a cash payment, that would be the impact and

25   value of the marketing programs to Walgreens as we calculate

Glenn - direct - Orsini                                4767

1   them.

2   Q    So, that number is a prediction that if you do the

3   marketing, you could deliver that?

4   A    Yes.

5   Q    Now, the next line references discount rates.  Was this a

6   new discount rate that was being offered to Walgreens as

7   compared to what they had been paying previously?

8   A    Yes.

9            THE COURT:  At a higher band?

10           THE DEFENDANT:  Yes, Your Honor, at a higher band.

11           THE COURT:  My recollection is from previous

12  testimony that they had not reached that higher spend on the

13  card at that point; is that right?

14           THE WITNESS:  I believe that's true, yes, sir.

15  Q    And this higher band, that was a band that had existed in

16  the discount rate table prior to these negotiations?

17  A    No, we established new bands.

18  Q    So, if they grew to that band, they would get the

19  discount rate benefit they would not have received under the

20  old deal, correct?

21  A    Correct.

22           THE COURT:  I see.

23           MR. ORSINI:  That's the point.

24  Q    Then in the next sentence there's a reference to gift

25  card and Blue distribution agreements representing a certain

Glenn - direct - Orsini                                4768

1    amount of additional revenue.  Those are the agreements we had

2    just talked about in the prior document?

3    A    Yes, they are.

4    Q    And unlike the marketing impact figure, some of this at

5    least reflected real payments directly to Walgreens contingent

6    upon how many cards they distributed, right?

7    A    Correct.

8    Q    Did they accept this offer?

9    A    They didn't.

10   Q    What did they do instead?

11   A    They announced their intention to cancel and I believe

12   that -- so, it was now publicly, I don't remember if they sent

13   us a letter before they announced publicly but they announced

14   that they were going to cancel about a month later in January.

15   Q    So, let's look at this document that is dated December

16   13th.  Let's look at Defendant's Exhibit 2219.

17              MR. ORSINI:  Your Honor, this one we could put on

18   the public screen, and this is also in evidence already.

19   Q    And do you recall seeing this release?

20   A    I do.

21   Q    What was your reaction when you saw this?

22   A    Well, again I don't remember if I heard about it before,

23   but very concerned obviously, I mean it's a public

24   announcement about a large merchant cancelling, not

25   threatening to cancel but actually cancelling card acceptance

1    a month later.

2    Q    Why did the fact that it was public concern you?

3    A    Well, you know, we talked about how hard we work to

4    acquire customers and retain customers and we talked about

5    spillover effect and so it concerned me for a couple of

6    reasons, one is our cardmembers being able to use their card

7    at a big, very big brand, a national brand, and the other is

8    that once it's public, and we had these private negotiations,

9    then I was very concerned about the potential of, you know,

10   spillover pricing and, you know, I wanted to work to keep them

11   accepting the card and once they made this announcement, so

12   other large customers would say, well, if they didn't cancel,

13   what programs did you give Walgreens.

14            So, it was concerning because it's a big customer,

15   spend, we know that big customers and having acceptance there

16   impacts our cardmembers' behavior and their perceptions of

17   coverage, and the fact that they went public with it.

18   Q    What other public steps do you recall Walgreens taking

19   with respect to their intended cancellation?

20   A    They put up signs in the stores in addition to this.

21   Q    Can you look at Defendant's Exhibit 7725.

22            And what does this reflect?

23   A    It's -- I don't recall the newspaper but it's an article

24   about merchant becomes latest merchant to quit taking cards,

25   so cancelling acceptance.

*Glenn - direct - Orsini*                                               4770

1    Q    Now, if you could just look at the picture itself, what

2    is that a picture of?

3    A    A sign in a Walgreens store, it says the effective date

4    is January 1st but the announcement was January 14th, I think

5    we just looked at.

6    Q    And do you recall that in fact Walgreens was posting

7    signs like this?

8    A    Yes.

9            MR. ORSINI:  Your Honor, I offer this exhibit into

10   evidence purely to show the statement was made, not for the

11   truth of any of the statements in the article.

12           THE COURT:  It looks like a USA Today photograph.

13           MR. ORSINI:  That's right, Your Honor.

14           THE COURT:  Was it in USA Today?

15           THE WITNESS:  I actually don't recall.

16           THE COURT:  You don't remember?

17           THE WITNESS:  No.

18           MR. ORSINI:  I believe it says USA Today right

19   underneath the picture.

20           THE COURT:  Yes, that's why --

21           MR. ORSINI:  I thought you just recognized their

22   font.

23           THE COURT:  I sleep with it under my pillow.

24           MR. ORSINI:  Next to the Durbin Amendment.

25           THE COURT:  Yes, sir.

1          MR. HAMER:  We'll notice an incomplete copy of the

2    article.

3          THE COURT:  I know.  I'm sure we could find it if we

4    really looked for it, we meaning you.

5          MR. ORSINI:  I'd be happy to find the full copy and

6    replace the exhibit with a full copy.

7          THE COURT:  Why don't you do that.

8          MR. HAMER:  With that understanding, no objection.

9          THE COURT:  Very well.  2219?

10          MR. ORSINI:  No, that was Defendant's Exhibit 7725.

11          THE COURT:  7725?

12          MR. ORSINI:  Yes.

13          THE COURT:  All right.

14          MR. ORSINI:  2219 was already in evidence.

15          THE COURT:  Got it.  All right.  7725 is received in

16    evidence subject to that stipulation.

17          (Defendant's Exhibit 7725 so marked in evidence.)

18    Q    Now, when Walgreens made the public announcement that it

19    was going to cancel American Express acceptance, did American

20    Express take any steps with respect to its own cardmembers and

21    their shopping at Walgreens?

22    A    Yes, we did.

23    Q    Okay.  And what, generally, did American Express do after

24    this public announcement?

25    A    Well, I don't remember the timing but throughout I'd even

1    told, you know, Mr. Rein in my conversations with him that,

2    you know, we want you to continue to accept, our cardmembers

3    like shopping at Walgreens, it is really important to us that

4    we protect our cardmembers as well.  So, some of the steps we

5    took were to plan some marketing programs that if our

6    cardmembers couldn't use their card at Walgreens, they would

7    use it at other places.

8    Q    And why was American Express planning for those programs?

9    A    Because Walgreens was going to cancel and that once they

10   cancelled acceptance, we wanted to protect our cardmembers and

11   their spend as well as, you know, the merchant network.  As I

12   talked earlier on, you know, not just small merchants, losing

13   a large merchant in terms of the impact on spend and

14   perceptions of the coverage is really -- it's a problem for

15   us, it is really concerning for us.

16   Q    Do you recall whether any of those marketing programs

17   actually were launched?

18   A    I don't think we launched any of the marketing programs.

19   Q    Do you recall any steps American Express took with

20   respect to its call centers if people were to call in about

21   the Walgreens announcement?

22   A    Yes, we told the folks in our call centers that if they

23   called to ask questions or to complain, we told them I believe

24   where they could go and use their card at other stores nearby

25   or other, you know, drug stores or drug chains or competitors,

1   as well as told them that they should voice their concerns to

2   Walgreens.

3   Q    And why was American Express preparing the call centers

4   for those messages?

5   A    Well, we were preparing because we knew the calls would

6   come in and, you know, as I talked to earlier, the value

7   recapture, we wanted to make sure that all of the folks that

8   touch our customers and our merchants and our cardmembers,

9   they're prepared for questions that would come up.

10  Q    Do you recall any steps that were considered with respect

11  to American Express employees and their filling of

12  prescriptions at Walgreens?

13  A    Yeah, we had our benefits folks look at if they could no

14  longer fill their subscriptions -- prescriptions at Walgreens,

15  where else they could go.

16  Q    And why did you consider that step?

17  A    Well, just like protecting our cardmembers, we wanted to

18  do the same thing with our employees and employees have a

19  share in the company and we wanted our employees to use their

20  card where they can use their card and to frequent merchants

21  that accept us.

22  Q    Now, if we look at Plaintiff's Exhibit 1972.

23          MR. ORSINI:  Your Honor, this one is confidential,

24  it's in evidence.

25  A    I'm sorry, what --

*Glenn - direct - Orsini*                                         4774

1    Q    Plaintiff's Exhibit 1972.  Is this another letter that

2    you sent to Mr. Rein?

3    A    It is, yes.

4    Q    What was the purpose of sending this letter?

5    A    Well, we had a conversation, as you see, the day before I

6    guess, January 12, they were scheduled to cancel acceptance on

7    January 14th, and I continued even after the public

8    announcement to talk with him and communicate with him and put

9    other offers on the table.

10   Q    Now, if you look at the next page, I think it's the next

11   page, yes, down towards the bottom, there's another offer that

12   you're making to Mr. Rein.  This is another longer term than

13   the previous one we had seen.  What was the reason for the

14   longer term?

15   A    Well, it was responding to all the discussions we were

16   having, I was putting on the table things that he continued to

17   talk to me about, right, rate certainty over a period of time

18   and so, you know, I'm trying to get them not to cancel and so

19   that's what the proposal represents.

20   Q    And down below under payment it references a number per

21   year in return for gift card distribution agreement; what

22   would that payment be, what does that reflect?

23   A    That was, I believe it was ███ -- it was a payment per

24   year for the term of the agreement in terms of entering into a

25   distribution agreement.

1   Q    Is that equivalent to sort of a signing bonus for the

2   distribution agreement that would renew every year?

3   A    Yes, it was a payment made to them.

4   Q    How does that relate to the other bounties and things we

5   had seen earlier in the gift card distribution agreement?

6   A    In addition to those other payments we talked about.

7   Q    Now, there's reference in here earlier in the letter, as

8   you said, to the fact that you were going to speak with

9   Mr. Rein that same day.  Do you recall whether you spoke to

10  him that day?

11  A    I did.

12  Q    And why did you want to speak to him?

13  A    I wanted him to -- I wanted to make sure we had a chance

14  to get back together after I sent him the note.

15  Q    Did that conversation in fact occur?

16  A    It did.

17  Q    And after you had that call with Mr. Rein, what did you

18  do?

19  A    I called Ken Chenault and Dave House.

20  Q    Why?

21  A    Because Mr. Rein told me that he was cancelling tomorrow

22  and -- or on the 14th at midnight and I wanted to make Ken and

23  Dave aware that they were cancelling.

24  Q    Why did you think you had to call Ken and Dave House?

25  A    It was really important, I mean, you know, from the start

*Glenn - direct - Orsini*                                           4776

1    I had kept them abreast of what was happening.  This was a

2    big -- it was a big deal for us, I mean a major customer

3    cancelling impacts our business model, impacts perceptions of

4    coverage, all the things we talked about, and this was

5    important to us.

6    Q    Did you speak to Mr. Rein again after that?

7    A    I did.

8    Q    When did you speak to him?

9    A    Early Friday morning, so I -- he had told me in one of

10   the prior conversations that he gets into the office really

11   early and I don't know if I called him at seven a.m. eastern

12   time or, but I reached him pretty early because I knew he got

13   into the office.

14   Q    Why did you call him that morning?

15   A    Because I didn't want him to cancel or continue

16   cancelling, I think they had cancelled card acceptance at

17   midnight, and so it was a continued effort to get him to --

18   get to some kind of an agreement.

19   Q    Were you prepared to make additional offers on that

20   call?

21   A    I was and subsequently there was a further concession or

22   more negotiations.

23   Q    Fair to say that throughout this period Walgreens wanted

24   a lower discount rate, right?

25   A    Yes.

1  Q    And American Express, we talked about the new band on the

2  table earlier, but American Express made offers of various

3  other types with respect to the overall economic relationship,

4  right?

5  A    Yes.

6  Q    If they just wanted a lower discount rate, why didn't

7  American Express give them the lower rate as opposed to the

8  other offers in other ways to deliver the money to Walgreens

9  that were made?

10  A    So, we know, we talked on that earlier, about spillover

11  impact and pricing and they're a big visible customer and so

12  pricing integrity is important to us but we put these programs

13  on the table and put another rate band so that (A) it would

14  lower their net effective rate, right, give them rate

15  certainty, and also the opportunity to lower their rate

16  through growing the business.

17  Q    Now, when you called Mr. Rein that Friday morning, what

18  did you say to him?

19  A    Well, I don't remember exactly what I told him but, you

20  know, one of the things that I had stressed all along is that

21  I said something about, yes, this is financials, it is also

22  about customer service, and I remember saying that I don't

23  understand why you would want to risk losing one customer and

24  we can provide benefits to you and value to you.

25  Q    And what was your view of the overall outcome of all of

1    the Walgreens negotiations?

2    A    Well, we -- they reinstated acceptance, participated in

3    some of the programs that we talked about and it was -- I

4    think it was consistent with some of the negotiations that we

5    have with merchants, you know, all the time about lowering the

6    rate.  This was just very, very visible, a very, very big

7    customer impacting our business.

8    Q    Okay.  One last topic, Mr. Glenn.  You're familiar with

9    the American Express non-discrimination provisions that are at

10   issue in this case?

11   A    I am.

12   Q    Generally speaking, from your perspective, why does

13   American Express have non-discrimination provisions?

14   A    Because we know that discouraging people from using the

15   card at point of sale has an impact on cardmember behavior and

16   spend and the economics of the business.

17   Q    If you could take a look at Defendant's Exhibit 4184.

18        MR. ORSINI:  Your Honor, this one is also in

19   evidence.  It is also confidential.

20   Q    Do you have that, Mr. Glenn?

21   A    Yes.

22   Q    This is entitled:  Perceptions of Coverage, Analytical

23   Findings and Emerging Global Strategy, Interim Review With

24   Bill Glenn.

25        Would you from time to time get updates on

1   perceptions of coverage issues?

2   A    Yes.

3   Q    Why?

4   A    Well, as I talked earlier, this is not a business unit

5   review, right, but for key initiatives that we were investing

6   in that was very important to the business model, we had

7   periodic reviews to make sure the teams -- I agreed with the

8   direction they were taking and had the resources and didn't

9   have any requests, that would help us do the job better.

10  Q    Now, if we could take a look at slide 5855, it's page 20.

11  This slide is about Carrefour.

12           What is Carrefour?

13  A    A large retailer.

14  Q    Where?

15  A    Principally in Europe.

16  Q    Okay.  What type of retailer?

17  A    A big box retailer so -- I don't know exactly what lines

18  they have and don't have but a major retailer.

19  Q    The title of this slide is:  New Signings Spillover GMS

20  Pricing.

21           You've talked a lot about spillover today.  In this

22  context, what does spillover mean?

23  A    This is spillover spend, so, and essentially that

24  means -- I know when we sign a large brand and we employ our

25  marketing with that particular brand, it impacts cardmembers'

1  perceptions of coverage and the ability to use the card in

2  that industry and other industries and so, it increases, you

3  know, overall spend.

4  Q    And can spend spillover work the other way, if you were

5  to lose a merchant, what would the spend spillover be of

6  that?

7  A    No, that impacts coverage and then perceptions of

8  coverage and utility of the card and overall spend.

9  Q    And as general matter, what was the result of this

10  Carrefour announcement -- let me step back for a second.

11        Was Carrefour a merchant that accepted American

12  Express?

13  A    Previously, no.

14  Q    And then American Express signed it?

15  A    Signed it, yes.

16  Q    And what was the analysis that was conducted based upon

17  the signing of Carrefour?

18  A    Well, we wanted to look at post-signing, right, not only

19  to look at it, at Carrefour itself, but what impact it had on

20  cardmember behavior in that industry and other industries.

21  Q    And what was the result of that analysis?

22  A    That when we sign a customer and market with that

23  customer through our distribution channels and make our

24  cardmembers aware of the spend, that it increases spend in

25  that category and other categories.

*Glenn - direct - Orsini*                                    4781

1   Q    If you could turn to I believe it's the next page -- yes,

2   it's the next page, 5856, this is a slide entitled:  New

3   Signing Spillover Effects GMS US Insights.

4         Can you just describe generally -- first of all,

5   what type of spillover effect are we talking about here, is

6   this pricing or spend?

7   A    This is spend spillover.

8   Q    Okay.  And what does this analysis demonstrate?

9   A    That the spillover -- there's a greater spillover spend

10  when you sign and work with large brands.

11  Q    And there's a reference here to larger merchants in EDS

12  generating the biggest impact; what does that mean?

13  A    It is that as we're increasing coverage, especially in

14  everyday spend categories, right, that it has an impact on

15  overall spend.

16  Q    Now, when you were in charge of Global Merchant Services,

17  as well as prior to that when you were in charge of the United

18  States and Canada, how did this type of spend spillover

19  analysis factor into your decision making process around

20  negotiations with large merchants?

21  A    Well, it had a lot to do with it, again, how much

22  marketing we were going to put against that particular

23  merchant, what kind of agreement we would make and so, while I

24  talked about pricing integrity and the discount rate table, it

25  also spoke to us about the benefit of signing larger iconic

1    brands, if you will, or bigger brands and pouring marketing

2    resources and analytics into the relationship and long-term

3    commitments, all the things that go into a contract, because

4    it has a spillover effect on our cardmember behavior and on

5    signing more merchants as well.

6    Q    How does it have a spillover effect on signing more

7    merchants?

8    A    More merchants see more merchants accepting, right, and

9    that leads to greater spend which leads to greater value for

10   the merchants.

11   Q    Can this work in the other way as well?

12   A    It does.

13   Q    And how?

14   A    Well, we have -- if merchants cancel or attrite, if they

15   suppress, it has an impact on other merchants and on our

16   cardmembers' behavior.

17   Q    You just used the term "suppress," what does suppress

18   mean?

19   A    Suppression is -- there are principally two forms of

20   suppression.  One is active suppression, when you walk into a

21   location, they say -- and you take out your American Express

22   Card and they say, we'd rather you use another form of

23   payment, or my terminal is broken, it is not working for

24   American Express, and then there's another form of suppression

25   where there's point of purchase material on the door or in the

*Glenn - direct - Orsini*                                    4783

1    store and it doesn't include American Express, it has the

2    other brands.

3    Q    There have been a couple of different words used in this,

4    court depending on who is using them; there's discrimination

5    or steering.  Is suppression the same thing as discrimination

6    and steering in your mind?

7    A    Yeah.

8    Q    Or a form of?

9    A    It is.

10   Q    I want to make sure we're talking about the same thing.

11             What relationship does suppression have to

12   perceptions of coverage?

13   A    So, if you're asked by a location to use another form of

14   payment, we know that impacts cardmembers' use of the card in

15   other similar industries, they may get treated the same way,

16   or there may not be coverage in those particular locations and

17   so it has a real impact on our cardmember behavior.

18   Q    You talked about point of purchase materials or POP or

19   P O P, right?

20   A    Yes.

21   Q    And what's POP or P O P?

22   A    P O P, point of purchase materials, so the decals, the

23   most prevalent form is in decals you see on the door of

24   retailers or merchants.

25   Q    These are the stickers that indicate what's accepted?

1    A    Yes.

2    Q    And under American Express's non-discrimination

3    provisions, what are merchants required to do with respect to

4    POP?

5    A    Equal treatment for all the brands they accept.

6    Q    And what do you mean by equal treatment?

7    A    So, the decals are stripped, so they have to -- Visa,

8    MasterCard, Discover, if we're accepted, we have to have

9    the same sort of treatment size decal that the other brands

10   do.

11   Q    Do they have to display it if they don't display the

12   others?

13   A    Do they have to -- I'm sorry?

14   Q    Do they have to display American Express POP if they're

15   not displaying any other POP?

16   A    No.

17   Q    You referenced a strip.  What do you mean by a strip as

18   opposed to POP?

19   A    Most of the decals are strips with all the brands on

20   them.

21   Q    How does American Express go about providing POP to

22   merchants?

23   A    So, we distribute these through our third-parties and

24   mailing and different distribution channels.  We've tried

25   online, so merchants can go online and get tools and POP

1    materials from a site as well.

2    Q    So, in this same presentation, if you could turn to slide

3    with Bates ending 5868.

4         Do you have that, Mr. Glenn?

5    A    Yes.

6    Q    In the middle there's a reference to POP being the

7    networks most visible and consistent, ATL communication and is

8    highly correlated with CM's POC.

9         What is ATL?

10   A    Above the line advertising.

11   Q    And POC is perceptions of coverage?

12   A    Yes.

13   Q    Right below that there is a reference to iconic POP, I

14   believe you mentioned it earlier in your testimony; what is

15   the iconic POP?

16   A    What we did is, again trying to drive value in the local

17   community and to local merchants who, you know, who feel a

18   part of the community, we engaged local artists in different

19   markets across the country to produce point of purchase

20   materials.  So, in San Francisco it could be the Golden Gate

21   Bridge, and in different markets different things that are

22   important or visible or people feel proud about in terms of

23   their town or their marketing community.

24   Q    The Court had asked some questions last week about what

25   American Express does particularly in the small merchant base

1    to monitor steering or discrimination and to take action about

2    steering and discrimination, so I'd like to focus on that for

3    the next few minutes, Mr. Glenn.

4           As a general matter, when you were responsible for

5    Merchant Services, did American Express take steps to monitor

6    whether merchants, we'll start with all merchants, were

7    engaged in conduct that violated the non-discrimination

8    provisions?

9    A    Yes, we did.  We did before I arrived and after I arrived

10   as well, so it is continually.

11   Q    Okay.  We'll talk about large merchants first and then

12   we'll go to small merchants.

13          With large merchants, what were the processes in

14   place to analyze whether the merchants were honoring their

15   non-discrimination provisions?

16   A    Well, you know, we had client managers attached to,

17   assigned to those particular merchants and part of that were,

18   you know, store checks and to see, it is much more visible.

19   Our cardmembers, you know, would call in as well.  But we had

20   people assigned to those particular merchants and so those

21   always came up in discussions as well.

22   Q    So, you said store visits, that would be the client

23   manager visiting the large merchant store?

24   A    Or people we have doing, you know, in the marketplace and

25   even our acquisition folks were in the marketplace as well,

1    right, so they would report back.

2    Q    And when American Express identified a situation where a

3    merchant was engaged in conduct that violated the

4    non-discrimination provisions in the large merchant base, how

5    would American Express deal with that?

6    A    Our client manager who had a relationship at headquarters

7    who negotiates the contracts and talks to them day-to-day

8    about marketing programs or provisions or operational issues

9    would raise it with those merchants.

10   Q    It would be resolved through those conversations?

11   A    Yes.

12   Q    Quickly before we talk about the small merchants,

13   there was some testimony earlier in this trial I think when

14   Mr. Pojero was here and some documents that reflected policy

15   that Bill Glenn had with respect to not signing up a merchant

16   acquisition target who at that time was engaged in forms of

17   conduct that violated the non-discrimination provisions; was

18   that in fact your policy?

19   A    Certainly.  We weren't going to sign someone who actually

20   talked to us about they were going to violate, you know, the

21   contract when we signed it.  So, yeah, it was a policy, just

22   like it was a policy to work with a merchant and try not to

23   have them suppress after they were accepting.  But ultimately,

24   as difficult as it is, we'd rather someone non-accept than

25   suppress and steer.

1    Q    Why is that?

2    A    Because we -- you know, over the years all the research

3    tells us that when our cardmembers are discriminated at point

4    of sale, that it affects their spend behavior not only at that

5    particular merchant but outside that particular merchant as

6    well and over time it, you know, it affects the cardmembers'

7    perceptions of coverage, where they can use the card.

8    Q    Now, acceptance also affects perceptions of coverage,

9    right?

10   A    Absolutely.

11   Q    So, why would you prefer to have the non-acceptance with

12   the effect that has on perceptions of coverage than acceptance

13   with discrimination?

14   A    Because of how our business model works, which is really

15   based on value, right, service and people being able to use

16   the card in a variety of places and the last thing we want is

17   people feeling discriminated against at point of sale and so,

18   all the research has told us, you know, over the years that it

19   impacts our business model and so I'd rather work with

20   merchants that are warmly accepting us and bring our resources

21   to bear than have a merchant who is constantly steering

22   customers because they stop using -- clearly they stop using

23   the cards at that particular merchant and we know it has a

24   spillover effect in their utility or using the cards in other

25   merchants, other locations, yes.

1   Q     So, to the small merchants that were accepting the

2   cards, can you describe generally the steps that were taken

3   in the organization to identify those small merchants that

4   were not acting in compliance with the non-discrimination

5   provisions?

6   A     Sure, the way we recognized it for -- a couple of means,

7   one is just people and the acquisition team in the areas, I

8   get call -- I got calls, right, from employees, from

9   relatives about people, you know, non-accepting or steering,

10  right.  And so, we also had a group internally that would

11  do the analytics of small merchants and so what it showed

12  was if all of a sudden volume dropped off for a period of

13  time, we thought they either potentially went out of business,

14  stopped accepting or suppressing, and so we made outbound

15  calls.  We have an organization and a group that's geared

16  towards that.

17  Q     And when those analytics were run, if there was a

18  merchant that was identified as a potential suppressor when

19  the outbound call was made, what would be done with respect to

20  those merchants, how would American Express handle it?

21  A     Well, it was pretty well scripted, we start with:  We've

22  noticed that your volume has fallen off, right, I'd like to

23  talk to you about the value of American Express and accepting.

24        Sometimes merchants would tell us that they're

25  suppressing for whatever reason and we try to work with them,

*Glenn - direct - Orsini*                                          4790

1  send them POP materials, try to talk to them about the value

2  of the relationship with American Express.

3  Q    And if you couldn't convince them to stop suppressing,

4  what would American Express do?

5  A    You know, eventually we'd cancel the merchant.

6  Q    Were there in fact situations with small merchants that

7  American Express did cancel for suppression?

8  A    Yes, which is tough, we're clearly not in the business of

9  firing merchants or cancelling merchants.

10  Q    So, I'd just like to show you one more document,

11  Mr. Glenn, if you could look at Plaintiff's Exhibit 890.

12          MR. ORSINI:  Your Honor, this one we can display

13  publicly.

14          THE COURT:  Okay.

15  Q    The cover of this is an e-mail from Robert A. Glick.  Who

16  is Mr. Glick?

17  A    He was head of -- he was in Corporate Communications and

18  Government Affairs.

19  Q    It is sent to an address that is amex@newmedia.com, do

20  you know what that is?

21  A    I don't.

22  Q    And it is copied to Mr. House and to you and a few

23  others, do you see that?

24  A    I do, yes.

25  Q    And the subject is:  Final BOD Deck.  What does that

1    refer to?

2    A    Board of directors.

3    Q    And if you take a look at the next page, you see the

4    cover for a presentation?

5    A    Yes.

6    Q    Do you recall whether this was a presentation that was

7    made to the board of directors?

8    A    I believe it was by Dave House.

9         MR. ORSINI:  Your Honor, I offer PX 0890 into

10   evidence.

11        THE COURT:  Any objection?

12        MR. HAMER:  No objection.

13        THE COURT:  All right, PX 0890 is received in

14   evidence.

15        (Plaintiff's Exhibit 0890 so marked in evidence.)

16   Q    Mr. Glenn, if you turn to the page that ends in Bates

17   number 5345, slide 32, this part has your name on it.

18   A    Okay.

19   Q    Do you recall that you made a portion of this

20   presentation?

21   A    I do.

22   Q    Now, if you then move to slide 40 which comes after the

23   section that starts your piece, it is on Bates number 5353,

24   the title is:  Suppression and Coverage.

25   A    Yes.

1    Q    Why were you presenting to the board on suppression

2    issues?

3    A    It was something we spend money on, it's important to our

4    business model, not having suppression is important to our

5    business model, it is critical to our business model and the

6    board has experienced it, right, and they know about it, they

7    know about that we spend money on it.  Coverage and

8    suppression are big issues.  I say in here it really is about

9    blocking and tackling of our business every day.

10   Q    You're pointing down to the speaker notes?

11   A    Yes.

12   Q    What did you mean by that, "blocking and tackling of our

13   business"?

14   A    At the core of our business it is to get more merchants

15   to accept, to retain those merchants and to have them warmly

16   accept your card and not suppress.

17   Q    And if you could just turn to slide 5357, slide 44, the

18   title is:  Suppression:  The Small Merchant.

19   A    Yes.

20   Q    Now, with respect to Europe, there's -- well, let me work

21   my way down.

22        With respect to Latin America, there's a reference

23   to blitzing the marketplace.  What does blitzing the

24   marketplace refer to?

25   A    So, we occasionally have had market blitzes where we'd

1   send not only the acquisition teams out but employees out to

2   check stores and to put up decals, so if the strips, the decal

3   strips weren't there, they actually brought them.  We'd have

4   these folks work with our acquisition folks on trying to

5   acquire merchants.  It was really an effort not only to get

6   more merchants to accept and to address suppression but it was

7   to educate our folks in the card business, in the service

8   centers about the value of merchant acceptance and how

9   critical it was to our business.  So, we had New York blitzes

10  and Phoenix blitzes and took people from all parts of the

11  organization.

12  Q    And under North America there's a reference to reducing

13  signage and active suppression, 57 percent, 41 percent,

14  respectively, in five key markets, listing the five key

15  markets.

16           What is that a reference to?

17  A    So, those were reduction in both signage suppression,

18  which means making sure that the decals are up, right, as well

19  as the active suppression, which I talked about, which is more

20  when you go to pay and someone asks you to use a different

21  form of payment.

22  Q    Do you recall how American Express targeted those issues

23  in those five key areas?

24  A    Well, they were -- you mean in the five key markets?

25  Q    Yes.

1  A    I think it was a combination of big markets for us where

2  we saw suppression up, right, and that was from the analytics

3  we did, the reporting that we had from employees and from

4  cardmembers generally.

5  Q    And down next to Europe it references:

6          Utilizing Predictive Model to Identify Potential

7  Suppressors.

8          Is that referring to what you've been talking about

9  doing in the United States?

10  A   The analytics in looking at the spending and transaction

11  history.

12  Q    Mr. Glenn, just two more questions.

13          When the United States government filed this

14  lawsuit, you were -- actually three questions -- you were the

15  head of Global Merchant Services, correct?

16  A    Yes.

17  Q    And did you agree with the decision by the company to

18  fight this lawsuit?

19  A    I did.

20  Q    And why?

21  A    Probably because I've lived in the merchant business

22  for, you know, my tenure at American Express and our

23  non-discrimination rules were put in place for a reason and

24  it's the evidence that I saw and the analytics I saw when I

25  joined and then my history in working, in leading Merchant

Glenn - direct - Orsini                                    4795

1    Services which is it is so critical to our brand.  We don't

2    have the transaction size that our competition has, right, and

3    we're not accepted everywhere and we work really, really hard

4    to gain acceptance and so, to gain that acceptance and have

5    cardmembers steered, it impacts our -- not just the merchant

6    business, it impacts our overall business.

7              MR. ORSINI:  Thank you, Mr. Glenn.

8              No further questions.

9              MR. HAMER:  If I could have a moment to set up?

10             THE COURT:  Sure.

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HAMER:  If I could have a moment to set up.

2          (Pause in the proceeding.)

3          MR. HAMER:  May I approach, Your Honor?

4          THE COURT:  Yes, you may.

5          All right.  The government may inquire on

6    cross-examination.

7          MR. HAMER:  Thank you, Your Honor.

8    CROSS EXAMINATION

9    BY MR. HAMER:

10   Q    Good morning, Mr. Glenn.  My name is Mark Hamer.  I

11   represent the United States.  I have a few more questions for

12   you.

13         First I want to go back to the issue you talked

14   quite a bit this morning on coverage and ask you some more

15   questions about that topic.  You've talked about locations and

16   you've talked about the spend, right?

17         Is that correct?

18   A    Yes.

19   Q    There's two different metrics of coverage that you look

20   at, right?

21   A    Yes.

22   Q    And location is focusing on the number of merchants and

23   spending is more focused on the transactions of the merchants,

24   right?

25   A    Yes.

GLENN-CROSS-HAMER                                     4797

1    Q    Would you agree that locations, in force, is not the most

2    reliable way to compare Amex's coverage to Visa and

3    MasterCard?

4    A    What I would say is that the -- the number of locations

5    calculated isn't as accurate because we don't know exactly how

6    Visa and MasterCard count the number of locations because it

7    comes through their acquiring businesses, which will -- we

8    know how many locations we have, right.  And so -- and we know

9    how many merchants are out there.  So internally, it's fairly

10   reliable.

11             THE COURT:  Hold on a second.  Can we check the live

12   feed.

13             (Pause in the proceeding.)

14   Q    Let me ask you the related question.  Would you agree

15   that even measured by merchant locations, lack of broad

16   acceptance is not one of the greatest barriers in America

17   Express's growth?

18   A    I didn't hear the end of the question.

19   Q    Would you agree that measured by merchant locations, lack

20   of broad acceptance is not one of the great barriers to

21   American Express's growth?

22   A    I would disagree with that.

23   Q    In front of you you have a white binder.  We're also

24   going to go back to Mr. Orsini's binder.  But right now, if

25   you can open your white binder of exhibits to PX 0905.  This

GLENN-CROSS-HAMER                                    4798

1   is an e-mail from Christine Elliott to Cristina Scardino,

2   S-C-A-R-D-I-N-O, and William Glenn.  Subject line:  "Final

3   script in Q & A, August 2nd, 2005."  On the second page of

4   that document is a Q & A entitled Bill Glenn, Financial

5   Communities Presentation Q & A Prep Document.

6              MR. HAMER:  Plaintiff's offer PX 0905 into evidence.

7              MR. ORSINI:  No objection, Your Honor.

8              THE COURT:  PX 0905 is received in evidence.

9              (So marked as Plaintiff's PX 0905 in evidence.)

10  Q    Mr. Glenn, as part of your duties when president of

11  global merchant services -- well, strike that.

12             At this time, in 2005, you were president of

13  establishment services, right.

14  A    Yes.  I don't know whether at that point in time I took

15  responsibility for the networks globally, which, around this

16  period of time, was ES North America.

17             MR. HAMER:  Your Honor, can we switch the screen.

18             THE COURT:  Sure.

19  Q    Global merchant services and establishment services, you

20  had occasion to talk to the financial communities, is that

21  correct?

22  A    Yes.

23  Q    When you did that, you were prepared by reviewing scripts

24  of possible questions and answers you might face, right?

25  A    Yes.

GLENN-CROSS-HAMER                                    4799

1   Q    It's important to be prepared and accurate when you met

2   with the financial community, right?

3   A    It is.

4   Q    So if you look at the first section on the page ending in

5   926, which is the second page of this exhibit, there's a

6   couple of questions about coverage.  The first question says,

7   "Isn't the lack of broad acceptance one of the greatest

8   barriers to AXP's growth?"

9          And AXP is American Express, right?

10  A    Uh-huh.

11  Q    Right?

12  A    Yes.

13  Q    And the answer is, "First, I would take issue with that

14  characterization.  As I said, our Locations in Force have been

15  growing at about 11 percent CABR each year for the past

16  decade.  We have long-term partnerships in both T&E and

17  everyday spend categories, and we are well positioned in

18  emerging industries due to plastics like health care

19  insurance, the luxury categories need to be accepted."

20         Did I read that correctly?

21  A    Yes, you.

22  Q    And again, these are anticipated questions from the

23  financial community to you, right?

24  A    Anticipated questions, yes.

25  Q    And these are your prepared answers so you can respond to

1  those questions, right?

2  A    Whether they're prepared or recommended for how I would

3  answer that question, which is different.

4  Q    Thank you.

5        And the next one, the next question is, "Why doesn't

6  AXP disclose a LIF number?"

7        Did I read that correctly?

8  A    Yes.

9  Q    And American Express has not disclosed LIF numbers in the

10  past, correct?

11  A    That is not true.

12  Q    At the time of this document, which is 2005, American

13  Express does not disclose any Location in Force numbers

14  publically, is that correct?

15  A    I believe that's true, at that point in time we stopped.

16  We had stopped at some point.

17  Q    In your 10Ks, American Express discloses spend coverage

18  as a coverage method, correct?

19  A    Yes.  I don't know when that began.

20  Q    So the answer to this question, your answer, proposed

21  answer, is, "We made that decision several years ago because

22  there is no standard industry definition of a merchant or

23  accepting location, so it's like comparing apples and

24  goldfish.  The bank card networks include ATMs and multiple

25  Point of Sale terminals in a single location merchant.  So one

GLENN-CROSS-HAMER                                    4801

1   drug store with five POS terminals and an ATM machine might be

2   counted as six locations in force.  In addition, we continue

3   to make considerable efforts to scrub our databases of

4   inactive merchants, merchants who might have gone out of

5   business or who are no longer accepting plastic.  By contrast,

6   Visa and MasterCard make little effort to clean their

7   databases.  And as a result, tend to cite numbers that are

8   considerably inflated."

9            Did I read that correctly?

10  A    You did.

11  Q    This is in 2005, throughout your tenure as head of

12  merchant services, you continue to have communications with

13  the financial community, right?

14  A    Yes.  Infrequent, but yes.

15  Q    Infrequent.  But when you had them they were important,

16  correct?

17  A    Yes.

18  Q    Let's look at another document, which is Plaintiff's

19  Exhibit 0131, also in your white binder.  This is a -- I'll

20  just read it for the record while you're looking.  This is a

21  printout of a Bloomberg transcript of a financial community

22  meeting August 4th, 2010.

23            MR. HAMER:  Plaintiff's would offer PX 0131 into

24  evidence.

25            MR. ORSINI:  No objection.

GLENN-CROSS-HAMER                          4802

1          THE COURT:  PX 0131 is received in evidence.

2          (So marked as Plaintiff's PX 0131 in evidence.)

3     MR. HAMER:

4     Q    This shows questions and answers.  And identifies who the

5     speaker is, correct?

6     A    It looks like it, yes.

7     Q    You are identified in about the middle of the page as the

8     speaker at this meeting, correct?

9     A    Yes.

10    Q    You did attend this meeting, correct?

11    A    I don't recall attending this meeting.  But I have no

12    reason to say I didn't.

13    Q    First, the first sentence in the middle, I'm looking at

14    the reference to your name.  You say -- there's a question

15    that's posed that I won't read that references merchant

16    acceptance as well as other issues including business insight.

17          Your answer says, "I don't know if I can give you

18    more context to what's been reported because it's a flawed

19    base, and I think that's why we stopped reporting probably ten

20    years ago."

21          What's the flawed base that you're referring to

22    there?

23    A    It's the reporting for locations in force that we

24    referenced earlier.

25    Q    Okay.  Thank you.

GLENN-CROSS-HAMER                                    4803

1    A    Again, not our locations, but compared to what Visa and

2    MasterCard reported.

3    Q    Thank you.

4         You go on to say, "I will tell you that our -- as I

5    said earlier, our transactions have been growing, our

6    locations in force and cost to grow have been growing.  You

7    see what OnePoint did in the U.S. in terms of that construct."

8    Then you go on to talk about spend.

9         You go to the next paragraph, you say the following:

10   "So I think we've found the model.  And remember, that most of

11   the GAP, the overwhelming majority of the GAP is with the

12   small merchants, right.  Because as you've seen, our spend

13   coverage is pretty high.  So I'd say if you add up the new

14   construct, and just looking at the U.S. and looking at

15   OnePoint, our transactions, and then the new book of charge

16   volume, I'd say that I'm pretty pleased with our performance

17   in terms of overall growth and location."

18        Did I read that correctly?

19   A    Yes.

20   Q    Let me turn you to another document on the same topic.

21        MR. HAMER:  One moment, Your Honor.

22   Q    If you turn to, in your white binder again, Mr. Glenn, to

23   Exhibit PX 2725, this is a new exhibit.  We added an exhibit

24   today.  This is from Amex's files.  The title is GMS Coverage

25   Growth Presentation for Ed Gilligan and Bill Glenn, July 9th,

GLENN-CROSS-HAMER                                    4804

1    2010.

2            Is this a deck that was presented to you and

3    Mr. Gilligan in 2010?

4    A    I actually don't recall.

5    Q    If you want to take a moment to look at it.

6            MR. HAMER:  Plaintiff's offer PX 2725 into evidence.

7            MR. ORSINI:  Your Honor, may I have moment to look

8    at it as it was added today?

9            THE COURT:  Okay.

10           MR. ORSINI:  No objection.

11           THE COURT:  PX 2725 is received in evidence.

12           (So marked as Plaintiff's PX 2725 in evidence.)

13   Q    Do you have any reason to doubt this was presented to you

14   on the topic of coverage in 2010?

15   A    And Ed Gilligan, no, I don't have a reason to believe

16   that it wasn't.

17   Q    Okay.  Thank you.

18           If you could look to page 644.  This is page 9 of

19   the slide presentation.

20   A    Sure.  Can I look through the entire document?

21   Q    Please do.

22           THE COURT:  Is this going to be redacted or is it

23   not for public disclosure?

24           MR. HAMER:  Let me make sure I know the answer to

25   that before I respond.

GLENN-CROSS-HAMER                                    4805

1          THE COURT:  Because it has a lot of numbers.

2          MR. ORSINI:  It never was disclosed to us.  We have

3   to review it for confidentiality.  I do see a lot of numbers,

4   so there may be things that we need to redact.  For now we'll

5   keep it confidential.  We'll let Your Honor know.

6          THE COURT:  That's fine.  Is that agreeable?

7          MR. HAMER:  That is agreeable.

8          THE COURT:  Very well.

9   Q    Did you have a chance to look at it?

10  A    Yes.

11  Q    You have no reason to doubt that this was a slide deck

12  presentation that was given to you and Mr. Gilligan, right?

13  A    Again, I don't.  But I don't recall reviewing it.

14  Q    If you can look at page 644, there's a deck -- or a

15  slide, rather, that says the following -- first, let me ask

16  you, I think I've got this right here.  In your direct

17  testimony you said that your objective is to get as much

18  coverage as you can.

19  A    Sure.

20  Q    It says this deck -- this slide says, "In the U.S. we

21  have strong coverage over 77 percent in the largest charged

22  DMAs."  We'll stop there.

23         This is referring to locations coverage, right?

24  A    Yes.

25  Q    DMA is the Designated Market Area, correct?

GLENN-CROSS-HAMER                                    4806

1   A    It's a marketing area.  I don't think it's designated.

2   It's some marketing area.

3   Q    It refers to a geographic area?

4   A    It does.

5   Q    So in this case, as you see in the slide, each city is a

6   different DMA, right?

7   A    Yes.

8   Q    And you measure locations in force by DMAs, right?

9   A    Correct.

10  Q    And those numbers fold up into your aggregate locations

11  figures for the whole country, right?

12  A    Yes.

13  Q    So this slide says, "In the U.S. we have strong coverage

14  over 77 percent in the largest charged DMAs indicating that

15  while there may be targeted opportunities for adding LIF" --

16  that's Location in Force, right?

17  A    Yes.

18  Q    "Increasing LIF across the network may not be necessary."

19       Did I read that correctly?

20  A    You did, yes.

21  Q    And if you look a little further at the data on this

22  chart, it's dividing up locations based on the top 25 cities

23  by charge volume, is that right?

24  A    It's tough to read.

25  Q    It is hard to read.

GLENN-CROSS-HAMER                                    4807

1    A      Yes.

2    Q      But you see at the bottom there's a list of city names?

3    A      Yes.

4    Q      It's ranking them by charge spend in those DMAs, right?

5    A      Looks like it, yes.

6    Q      To the far left, the most charge spend DMA is New York

7    City?

8    A      Yes.

9    Q      To the far right, the lowest of the top 25 is Oklahoma

10   City, right?

11   A      Yes.

12   Q      That's consistent with your recollection of this data,

13   right?

14   A      No.  It's consistent with what I'm seeing now.  I don't

15   recall seeing that.

16   Q      Okay.  Fair enough.

17          As an example, let's take the third listed.  It's

18   San Francisco, do you see that?

19   A      Yes.

20   Q      At the bottom it lists the total coverage and the

21   percentage, am I correct?

22   A      Yes.

23   Q      That's referring to the locations coverage, right?

24   A      Correct.

25   Q      The number in the bracketed figure for San Francisco,

GLENN-CROSS-HAMER                                    4808

1    that percentage is the percentage of locations in San

2    Francisco, right?

3    A    I'm sorry.  The ██ percent?  Is that ██ percent?

4    Q    Don't use the number.

5                THE COURT:  It'll be redacted later on, but try not

6    to use the number.

7    Q    That figure in the bracketed bar for San Francisco is the

8    percentage of Locations in Force in San Francisco?

9    A    Again, not active, but the percentage.

10   Q    If you look at the left-hand column, it lists dollar

11   amounts.  This shows the weighting of coverage based on the

12   charge in those different DMAs, is that right?

13   A    I'm sorry.  You're referring to?

14   Q    The left-hand chart at the left-hand side of this slide.

15   It has numbers from zero to 25.

16   A    Yes, it looks like it.

17   Q    So San Francisco is the third DMA based on charge card

18   spend in the United States as of this year, correct?

19   A    It looks like it, yes.

20   Q    So if you look on the previous page of this exhibit,

21   page ending in 643, there's a slide that says, "While there

22   are opportunities to grow LIF coverage, a more significant

23   opportunity exists to drive activation and merchant activity."

24                Did I read that correctly?

25   A    Yes.

GLENN-CROSS-HAMER                          4809

1          MR. HAMER:  May I have a moment, Your Honor?

2          (Pause in the proceeding.)

3    Q    If you go back to Mr. Orsini's binder, the black binder

4    to your right, let's look at a document that you were

5    discussing earlier today.  DX 6791.  This is the board

6    presentation that you described.

7          Do you have that?

8    A    I do.

9    Q    Look at page 565.  This is slide 6.  And I believe this

10   is a slide you were discussing with Mr. Orsini.

11   A    Yes.

12   Q    You were talking about the challenge in expanding

13   coverage by adjusting your price.

14          Do you recall that?

15   A    I do.

16   Q    Look down to the bottom right of this slide under

17   coverage gap.  The third bullet says, "Primarily with small

18   merchants driven by" -- and this means coverage gap is driven

19   by, correct?

20   A    Yes.

21   Q    "Primarily with small merchants coverage gap driven by

22   three items; scale and relevance challenges, higher pricing,

23   and operational differences."

24          Right?

25   A    Yes.

GLENN-CROSS-HAMER                                    4810

1   Q    So higher pricing is one of the three elements that is

2   driving the coverage gap with small merchants, right?

3   A    I said that, yeah.  I testified to that earlier.  It

4   certainly was, right.  And it's also the perception of what

5   the pricing is.

6   Q    The third item, operational differences, as you

7   testified, that also was a reason for the coverage gap among

8   small merchants?

9   A    Right, which we adjusted from time-to-time.

10  Q    Exactly.  So through the OnePoint program you adjusted

11  the difference between the operational efficiency of Visa and

12  MasterCard and the operational efficiency of American Express

13  for the merchant, right?

14  A    We adjusted ours.  Some of ours, not all the operational

15  pieces, right, to be more consistent with what the merchants

16  wanted to see.

17  Q    And the scale and relevance challenges, among those, LIF

18  activation is one of them, right?  If you improved your LIF

19  activation, you can impact the scale and relevance challenges

20  for small businesses?

21  A    No.  Actually, it's scale and relevance challenges are

22  the number of cards we have in the marketplace compared to

23  Visa and MasterCard, which is 50 million or 60 million, U.S.,

24  compared to 2 billion.  So that leads to activation, right.

25  And the numbers we saw earlier were not activation, they were

GLENN-CROSS-HAMER                                    4811

1   just coverage numbers.

2   Q    Understood.  So as you just said, the activation of the

3   merchants who have actually already signed up to accept the

4   card can also help with you closing the coverage gap among

5   small merchants, right?

6   A    So if we get more activation accepting merchants, right,

7   and through fighting suppression and steering and all that, I

8   think it will lead to greater spending and greater merchants.

9   Q    And in fact, as you testified, your perception of the

10  coverage.  To increasing activation improves your perception

11  of coverage, right?

12  A    Increasing perceptions of coverage increases activation.

13  Q    Okay.

14  A    That way.

15  Q    They're interrelated concepts, right?

16  A    I'd say that increasing perceptions of coverage and

17  actual coverage and not having suppression increases

18  activation, which we found in a lot of the small merchants,

19  right.  That's where the majority of the suppression and

20  steering takes places.

21  Q    A couple of more questions, Mr. Glenn, on the topic of

22  coverage.  If you can look in the white binder, the exhibit is

23  PX 924, 0924.

24         Do you have that in front of you?

25  A    I do.

1    Q    This is a slide presentation entitled DMA coverage update
2    WHG Staff Meeting, dated February 23rd, 2011.  And Plaintiff's
3    offer PX 0924 in evidence?
4              MR. ORSINI:  No objection, Your Honor.
5              THE COURT:  PX 0924 is received.
6              (So marked as Plaintiff's PX 0924 in evidence.)
7              THE COURT:  This is disclosed?
8              MR. HAMER:  It is something that is confidential.
9              THE COURT:  All right.
10   Q    If you can look briefly at the slide ending in 809.
11   A    I'm sorry?
12   Q    8809, slide 16 of this deck.
13        Do you have the document?
14   A    I do.
15   Q    At the bottom, does that accurately reflect the spend
16   coverage that American Express calculated for 2009 and 2010?
17   A    I believe it does.
18   Q    Then if you look on the page ending in 815, the slide
19   entitled Spend Coverage Methodology.  We're not going to go
20   through this now, but does this capture the methodology by
21   which American Express calculates spend coverage based on its
22   Locations in Force information?
23   A    I believe it does.
24   Q    If you look on the last page, 816, this is a copy of the
25   language in your 10K disclosing your spend coverage

1    percentage, right?

2    A     Yes.

3    Q     And this is part of the process by which American Express

4    determines what that disclosure should be, right?

5    A     You mean the analytics?

6    Q     Yes.  The documents part of that process; correct?

7    A     I don't -- I don't know if it's the document itself, but

8    this reflects the analytics.

9    Q     I just want to ask you, introduce one more document on

10   this topic.  If you could turn in the white binder to PX 2728.

11   This also is a newly-added document from American Express

12   files, and not currently on the exhibit list.  The title is

13   "Top to Top Meeting, Proctor & Gamble, American Express,

14   August 30th, 2010."

15          MR. HAMER:  Plaintiffs would offer this document

16   into evidence.

17          MR. ORSINI:  May I have a moment, Your Honor.

18          THE COURT:  Sure.

19          MR. ORSINI:  I don't have an objection, but I do

20   notice there are some confidential numbers in here, so keep it

21   confidential.

22          MR. HAMER:  Thank you.

23          THE COURT:  PX 2728 is received into evidence.

24          (So marked as Plaintiff's Exhibit 2728 in evidence.)

25   Q     Mr. Glenn, I just want to direct you to page ending in

GLENN-CROSS-HAMER                                    4814

1    190.   There is a slide that is entitled "spend coverage by

2    Industry Category."  Do you have that slide?

3    A    I do.

4    Q    At the top it says, "The comparison of our card members

5    spending on our network with our estimate what our card

6    members would spend on our network if all merchants that

7    accept credit cards accepted American Express cards."  Did I

8    read that correctly?

9    A    You did.

10   Q    Is that your understanding of what spend coverage is as

11   American Express uses it?

12   A    All merchants that accept credit cards -- I believe so.

13   Q    Thank you.  If you look at the breakdown by industry

14   category, there are some figures on the far right.  Do you see

15   that?

16   A    Yes.

17   Q    And that depicts the spend coverage by the various

18   industry categories listed; is that right?

19   A    I don't know if this is the spend coverage itself.  I

20   have never seen this the page, so I wasn't there it was on the

21   distribution list.

22   Q    Have you seen breakdowns by industry category of American

23   Express' spend coverage?

24   A    I have not.

25   Q    Then I was incorrect, I thought what you had is the last

GLENN-CROSS-HAMER                                    4815

1   document.  There is one final document on coverage I want to

2   ask you about, is the one that Mr. Orsini showed you earlier,

3   DX 4184 in your black binder.

4   A    I am sorry.  P or --

5   Q    DX 4184 in your black binder.  That's perceptions of

6   coverage.

7   A    All right.

8   Q    Do you have that document?

9   A    I do.

10  Q    If you look at page 860, I believe you were discussing

11  with Mr. Orsini, there's a slide that says "POS Drives Charge

12  Volume."  This is you were describing just how point of sale

13  materials can assist American Express in increasing its charge

14  volume; right?

15  A    Yes.  I don't think that we discussed this slide.

16  Q    Oh, I apologize.  Okay.  You discussed a similar slide to

17  this --

18  A    I know --

19  Q    Well, just focusing on this slide, 860, it discusses how

20  POS, or point of sale material can drive charge volume for

21  American Express; is that right?

22  A    Yes.

23  Q    You express a concern that if merchants steer away from

24  American Express, it lowers your perception of coverage;

25  right?

1    A    Yes.

2    Q    And you also said that, I believe that you said it could

3    work both ways, the practice of steering can work both ways;

4    correct?

5    A    Both ways in terms -- I'm sorry.

6    Q    Let me ask you the question.  If American Express had

7    more success in placing point of sale materials at merchants

8    to steer towards American Express, and advertise American

9    Express acceptance, that can assist American Express in

10   improving perceptions of coverage; right?

11   A    No, we don't put point of purchase up to steer.  We ask

12   for equal treatment of point of sale.  To me that is not a

13   steer.  It is recognition that the merchant accepts American

14   Express.

15   Q    I'm sorry, I didn't mean to suggest that you do right

16   now.  My question was if you were to do so, you agree that you

17   would be able to improve perceptions of coverage, by putting

18   American Express materials at the point of sale, advertising

19   that coverage?

20   A    I don't understand your question.  So if you could repeat

21   it.

22   Q    American Express could improve perceptions of coverage by

23   putting point of sale materials advertising American Express

24   acceptance at merchants; correct?

25   A    We can improve perceptions of coverage by having equal

GLENN-CROSS-HAMER                                    4817

1    treatment at point of sale, which is what we ask for in our

2    contract.  Non-discrimination.

3    Q    Check presenters, which is referenced on this slide, is

4    an example where it's not equal if only the American Express

5    logo is displayed on the check presenter; right?

6    A    Or MasterCard or Diners or some -- some other brand.

7    Q    This is a situation where the only logo displayed in the

8    item is the logo of a particular card network; right?

9    A    Correct.  I don't think I've seen multiple on check

10   presenters.  But I have seen that three months in they change

11   out to another check presenter as well.  So they use multiple

12   brands for check presenters.

13   Q    Has having American Express check presenters assisted

14   American Express in improving its perceptions of coverage?

15   A    Oh, I think it does, yes.

16            MR. HAMER:  Thank you.

17            THE COURT:  Could we get a clearer definition of

18   what spend coverage is, in your estimation, or in your

19   terminology, the way that you do your job?

20            THE WITNESS:  Yes.

21            THE COURT:  Because it can have a number of

22   different meanings.

23            THE WITNESS:  I think where people can use plastic

24   and the total spend across those industries; right?  We would

25   cover 90 percent plus of our card members' spend.  In the

GLENN-CROSS-HAMER                                    4818

1   international it is greater than 80, so where plastic is

2   used --

3           THE COURT:  If I am an Amex card holder and I have

4   other credit cards, your spend coverage for me would be if I

5   spent 90 percent of my spend using the Amex card, I would have

6   90 percent spend rate?

7           THE WITNESS:  It wouldn't be the individual.

8           THE COURT:  It would be who?

9           THE WITNESS:  Just generally, so where plastic is

10  accepted --

11          THE COURT:  Right.

12          THE WITNESS:  -- right?  That our card members can

13  spend in over 90 percent of those locations.  Not the

14  locations.  The total spend.

15          THE COURT:  Irrespective of the number of locations

16  comparatively you have as compared to Visa/MasterCard.

17          THE WITNESS:  That is correct.

18          THE COURT:  So you may have two thirds of the

19  locations that Visa/MasterCard have, but you might have a

20  larger spend ratio for the spend --

21          THE WITNESS:  Spend coverage.  So in the U.S., if

22  it's 77 percent coverage, we have a higher spend coverage than

23  location coverage; right?  But I said earlier, location

24  coverage impacts the card member, generally the card member

25  behavior.

1          THE COURT:  Anything else?

2    Q    Just to close that out, following up on the Court's

3    question, we saw some figures that were -- well, let me give

4    you a specific figure.  If a number for a particular industry

5    were 98 percent spend coverage, does that mean 98 out of a

6    hundred times when the Amex cardholder tries to use his or her

7    card in a merchant of that category, they would be able to?

8    A    No.  It has to do with the overall spend.

9    Q    All right.  So not weighted by spend?

10   A    Yes.

11         THE COURT:  It depends on dollars?  Dollars spent?

12         THE WITNESS:  Total dollars spent.  Not the

13   transaction.

14         THE COURT:  All right.

15         THE WITNESS:  So smaller merchants, smaller take-in

16   size, biggest gap.

17   BY MR. HAMER:

18   Q    So I guess a way to summarize it is if you had let's say

19   80 percent of the number of locations in a particular segment,

20   but had 90 percent of the spend in that segment, the spend

21   coverage would be 90 percent.

22   A    Not the spend.  The ability to spend.  Not the actual

23   spend.

24   Q    Thank you.  The ability to spend.

25   A    I think that is a calculation.  Again, I am not sure

GLENN-CROSS-HAMER                                          4820

1    exactly sure how that -- and I can take some time and go

2    through the pancake calculations but generally it is the

3    ability to use our plastic in those categories.

4    Q    Going back to what we just looked at in exhibits -- we

5    just ran through PX 2728.  The comparison of adding American

6    Express into the -- the comparison of American Express' card

7    members' spending on our network with our estimate of what our

8    card members would spend on our network if all merchants that

9    accept credit cards accepted American Express cards; is that

10   correct?

11   A    Again, that was a document that you referred to in the

12   Proctor & Gamble?

13   Q    Yes.

14   A    I don't understand that calculation.

15         THE COURT:  What page was that again?

16         MR. HAMER:  It was on 190 of exhibit PX 2728.

17         THE COURT:  It might be interesting to get some more

18   clarity on that from somebody.  It is an Amex document, so

19   clarity from Amex would be helpful to the Court.  So that this

20   witness, who isn't not that familiar, really, with it, and the

21   Court could have a better grasp.  Mr. Orsini.

22         MR. ORSINI:  We'll find one and let that happen,

23   Your Honor.

24         THE COURT:  I appreciate that.

25   BY MR. HAMER:

GLENN-CROSS-HAMER                                    4821

1   Q    Let me switch topics.  You talked about your efforts over

2   the last decade to enforce the anti-steering rules.  Do you

3   recall that?

4   A    Yes.

5   Q    And how important that is to you.  I want to explore that

6   in some specific details, and look how that played out with

7   particular merchants.

8              If you can look again in your white binder at

9   Exhibit PX 0969.  This is an e-mail from Christina Scardino,

10  S-C-A-R-D-I-N-O, to William Glenn, November 16th, 2004.  It

11  says "Attached performance management process."

12  A    I'm sorry, PX --

13  Q    PX 0969.

14             This is not one for the public.

15  A    I got it.

16  Q    If you can turn --

17             MR. HAMER:  Well, first of all, the plaintiffs offer

18  PX 0969 into evidence.

19             MR. ORSINI:  No objection, Your Honor.

20             THE COURT:  All right.  PX 0969 is received in

21  evidence.

22             (So marked Plaintiffs' Exhibit 0969 in evidence.)

23  Q    This is a self appraisal for Rocco Laterzo,

24  L-A-T-E-R-Z-O; right?

25  A    Yes, it appears to be.

GLENN-CROSS-HAMER                                    4822

1   Q    This is someone that reported up to you; right?

2   A    Yes.

3   Q    I am just going to focus you on one page on this

4   document, page ending in 268.  Do you have that there?

5   A    I do.

6   Q    In the middle it says, and this is Mr. Laterzo reporting

7   on his achievement for the year; correct?

8   A    Yes.

9   Q    About the center of the page he says, "Insured card

10  member choice at points of sale by eliminating preference

11  campaign," and then he lists six merchants:  ASL Resorts,

12  Liberty Travel, Regal Cinemas, Travelocity, Zagat Online,

13  CheapTickets.com.  Did I read that correctly?

14  A    You did.

15  Q    And these are all merchants who were involved in

16  preference campaigns with competitors?

17  A    I imagine they were, yes.

18  Q    And American Express has caused those merchants to stop

19  engaging in those campaigns; right?

20  A    We worked to eliminate preference campaigns.

21  Q    Let's look at a couple of those.  If you could turn to

22  Exhibit PX 1077.  And this is an e-mail from Alex Grimaldi,

23  G-R-I-M-A-L-D-I, to William Glenn dated January 7, 2005.

24       MR. HAMER:  The plaintiffs offer PX 1077 into

25  evidence.

GLENN-CROSS-HAMER                4823

1    MR. ORSINI:  No objection.

2    THE COURT:  PX 1077 is in evidence.

3    (So marked Plaintiff's Exhibit 1077 in evidence.)

4  Q    And on occasion, Mr. Glenn, while you had many of these

5  people working under your supervision, you were personally

6  involved in stopping preference campaigns on occasion; is that

7  right?

8  A    Yes, if I became aware of them.

9  Q    This is an e-mail chain concerning Zagat; is that right?

10  A    Yes.

11  Q    And they are a firm that provides restaurant reviews;

12  correct?

13  A    They are.

14  Q    If you look at the second page ending in 473 in the

15  center, there is a heading that says, "Zagat relationship with

16  MasterCard," and it says, "Zagat currently has a marketing

17  relationship with MasterCard, but they have eliminated use of

18  card prefers as of May 2004 after American Express

19  cancellation threat."  Did I get that correct?

20  A    You do.

21  Q    American Express threatened to cancel Zagat's acceptance

22  of the American Express card unless it ended a preference

23  campaign with MasterCard?

24  A    That is definitely how it reads, yes.

25  Q    And on the first page of this document, you have

GLENN-CROSS-HAMER                                        4824

1    forwarded the summary of the Zagat situation to "Attention:
2    All"; right?

3    A    Yes.

4    Q    And you obviously reported to Mr. Grimaldi at this time;
5    correct?

6    A    I did.

7    Q    Ultimately.  He is at the top of the list.

8    A    Oh, yes.

9    Q    You were advising him of this before he met with
10   Mr. Zagat; right?

11   A    Yes.

12   Q    If you can look at another of the merchants -- strike
13   that.  Let me ask this question:

14        Another of the merchants that Mr. Laterzo referenced
15   as having a definitive preference campaign was
16   CheapTickets.com.  Do you recall that?

17   A    I recall him referencing it, but I don't recall.

18   Q    Let's look at another document, PX 0295.  This is a
19   letter from Carlos Dafonte, D-A-F-O-N-T-E, of American Express
20   to Hitesh, H-I-T-E-S-H, Patel, P-a-t-e-l, of Cendant
21   Corporation, C-E-N-D-A-N-T, March 30th, 2004.

22        And plaintiffs offer 0295 into evidence.

23        MR. ORSINI:  No objection, Your Honor.

24        MR. HAMER:  I believe there is a confidentiality
25   objection to this document to be displayed.

GLENN-CROSS-HAMER                                    4825

1        THE COURT:  Very well.  PX 0295 is received in

2   evidence.

3        (So marked Plaintiffs' Exhibit 0295 in evidence.)

4   Q    On the bottom there is a list of people who were copied

5   on this, including Mr. Laterzo; correct?

6   A    Yes.

7   Q    He is someone whose performance review we were just

8   looking at a moment ago; right?

9   A    Laterzo was, yes.

10  Q    And Cendant was the parent of CheapTickets.com at this

11  time; right?

12  A    I don't know if that was the relationship.  But it seems

13  that it might be.  I wasn't copied on this.

14  Q    Let's see if this refreshes your recollection of these

15  events.  If you look at first paragraph of the letter, it

16  says, "As a follow-up to my December 15th, 2003 letter to Don

17  Smith, attached, and recent conversations with you regarding

18  the provision in our merchant agreement that prohibits

19  CheapTickets from stating a preference for a competing card,

20  we're serving you final notice that CheapTickets will no

21  longer be able to accept the American Express card as of

22  May 1, 2004, unless all instances of preference language,

23  e.g., we/CheapTickets prefers MasterCard are removed from the

24  CheapTickets website as well as any marketing or communication

25  vehicles, which indicate this payment preference."  Did I get

GLENN-CROSS-HAMER                                    4826

1   that right?

2   A     You did.

3   Q     Okay.  And the next paragraph says, "All of our merchant

4   agreements contain the clause prohibiting statements of

5   preference for competing payment vehicles."  Did I get that

6   right?

7   A     Yes some.

8   Q     Did CheapTickets.com in fact stop running a preference

9   campaign after that letter?

10  A     I don't know the result.  I assume they did.  This letter

11  also indicates that we've had several conversations with.  As

12  I indicated earlier, preferences impact our brand and our

13  business model and our card members, so we take it very

14  seriously.

15        But we work with them, you know, to try to

16  negotiate.  So I don't know what the end result is.  It looks

17  like on his performance review he said that they stopped

18  preferencing.

19  Q     Thank you.  And these events are consistent with the

20  policy you were describing on you direct exam with Mr. Orsini;

21  right?

22  A     The policy being ultimately we would cancel, absolutely.

23  Q     There were other occasions like this where American

24  Express cancelled merchants who were running preference

25  campaigns with American Express and its competitors; is that

GLENN-CROSS-HAMER                    4827

1    right?

2    A    I can't think of any specifics, but yes.

3    Q    Turn to PX 0486 in the same binder.  This is an e-mail

4    chain, the top of the chain is Kevin Carey, C-A-R-E-Y, to

5    Kathleen Finnagan, F-I-N-N-A-G-A-N, Travelocity update,

6    January 2nd, 2004.

7             THE COURT:  Is this subject to confidentiality?

8             MR. HAMER:  There is no confidentiality objection.

9             MR. ORSINI:  That's right.

10            MR. HAMER:  And I believe we have already introduced

11   this.  To be certain, though, we'd offer PX 0486 into

12   evidence.

13            THE COURT:  PX 0486 is in evidence.

14            (So marked Plaintiffs' Exhibit 0486 in evidence.)

15   Q    Mr. Glenn, you see in the middle of the chain the first

16   page includes an e-mail that is copied to you?

17   A    You mean to Kevin Carey?

18   Q    Yes.

19   A    Yes.

20   Q    So you were copied on part of this e-mail chain about

21   Travelocity; right?

22   A    I was.

23   Q    You were aware of the events as they occurred; right?

24   A    Yes.  I don't know quite when, but I was made aware of

25   it, yes, absolutely.

GLENN-CROSS-HAMER                                    4828

1   Q    At the bottom Mr. Carey reports, "Attached below is an

2   exchange of e-mails with Travelocity's earlier removal of the

3   preferred language from their website for January 1st.  With

4   this amendment we have withdrawn our notice to cancel their

5   merchant issue."

6        Did I read that correctly?

7   A    Yes.

8   Q    Travelocity, as you already heard from others, had run a

9   campaign for preference with MasterCard prior to this; right?

10  A    The last e-mail references that, yes.

11  Q    And you respond near the top of the e-mail chain, you

12  refer to saying, "Nice work.  We need to be sure that we are

13  aggressive and timely on all of these."  Did I read that

14  correctly?

15  A    Yes.

16  Q    And by "all of these," you mean in the case where

17  merchants who accept American Express are working with your

18  competitors and preferencing?

19  A    Where they have preference campaigns, which is against

20  our policy, absolutely.

21        MR. HAMER:  Your Honor, this would be a good

22  breaking point.

23        THE COURT:  We will take one hour for lunch.  I

24  remind the witness not to discuss his testimony with anyone.

25  See you in an hour.

GLENN-CROSS-HAMER                                    4829

1          We have a few matters to do right now.

2          (Luncheon Recess Taken at 1:00 p.m.)

3          (Matter continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GLENN - CROSS / HAMER                          4830

1          THE COURT:  I remind the witness that he is still

2     under oath.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  You may continue.

5          MR. HAMER:  Thank you.

6     CROSS-EXAMINATION (CONTINUED)

7     BY MR. HAMER:

8     Q    Before we move on to other topics, I want to return to

9     coverage just for a moment.  First of all, let me return you

10    to the exhibit which is marked PX 2725, and we were on page

11    644 of that document.

12    A    I'm sorry.  Is that -- which binder?

13    Q    This is in the white binder, PX 2725.  Do you have it

14    with you?

15    A    Yes.

16    Q    And again, this shows at the bottom with coverage for

17    different cities, and on the -- on the bar charts it shows the

18    spend in those different cities; right?

19    A    Is that Slide 9 or page 9?

20    Q    It's Slide 9, page 644.

21    A    Yes.

22    Q    Okay.  So San Francisco is listed in the percentage that

23    is in that box on the third bar; right?

24    A    Yes.

25    Q    Okay.  And San Francisco has that amount or higher today;

GLENN - CROSS / HAMER                    4831

1    right?  This is 2010, so the amount shown there or higher is

2    the LIF amount for San Francisco; is that fair?

3    A    I'm sorry.  This is the calculation at this point in

4    time.

5    Q    Which is 2010; right?

6    A    Yes -- or I don't know if it's 2010, but the report was

7    made in -- or the report out was 2010.  I don't know if it

8    measured 2009 or 2010.

9    Q    Okay.  And in this time frame, you had continued to

10   pursue measures to expand coverage in the United States;

11   right?

12   A    Yes.

13   Q    Okay.  And so is it true that San Francisco's LIF

14   coverage is the amount shown here or higher today?

15   A    I have no idea.

16   Q    It's certainly not true that San Francisco's LIF coverage

17   is 50 percent; right?

18   A    I don't know.  I don't think it is, but I have no idea.

19   I haven't run the business in quite some time.  Again, this is

20   a LIF, not an active LIF, right.

21   Q    As of this time frame, San Francisco's LIF coverage was

22   not 50 percent; right?

23   A    Correct.  It was -- the best I know, it was what was

24   represented here.

25   Q    Okay.  Thank you.  Let me ask you again about the

GLENN - CROSS / HAMER                    4832

1  difference between location coverage and spend coverage.

2  A    Okay.

3  Q    And let's imagine there's a VMA that only has two

4  merchants, one very large merchant like Wal-Mart and one like

5  your example, a florist.  Are you with me?

6  A    Okay.

7  Q    So assume that American Express doesn't -- is not

8  accepted at the florist but is accepted at Wal-Mart.  Does

9  that make sense?

10  A    Yes.

11  Q    Okay.  And assume also that 99 percent of credit card

12  spend in that area is at Wal-Mart, not at the florist.

13  A    Okay.

14  Q    Does that make sense?  So in that example, American

15  Express's LIF coverage in that area would be 50 percent;

16  right?

17  A    I just want to make sure.  Two merchants in the entire

18  market?

19  Q    Exactly.

20  A    Just two.  LIF coverage would be 50 percent, yes.

21  Q    But the spend coverage if American Express is accepted at

22  the large merchant would be 99 percent?

23  A    If 99 percent of all plastic spend is at that one

24  Wal-Mart --

25  Q    Yes.

SHERRY BRYANT, RMR CRR

1   A    -- or that one location, then the spend coverage would be

2   99 percent.

3   Q    Thank you.  So you talked a little bit this morning with

4   Mr. Orsini about co-brand deals and co-brand negotiations.  Do

5   you recall that?

6   A    Yes.

7   Q    I want to go back to a document you were looking at.

8   This is PX 0999, which is in the black binder.

9   A    I'm sorry.  PX?

10  Q    PX 0999.  Do you have it there?

11  A    I do, yes.

12  Q    Turn with me to page 041.

13  A    I just want to make sure.  So I'm looking at -- yes.

14  Q    Page 041, the typed line says, "Co-Brand Best Practices

15  Network Contribution Principal."

16  A    Yes.

17  Q    And, again, this is a document that summarizes American

18  Express's co-brand economics; is that right?

19  A    I don't know if it -- if it talks about the economics.

20  It just talks about best practice in terms of going --

21  internally aligning before we went to talk to the merchant.

22  Q    Okay.  If you look at the first bullet on page 041, it

23  says, "An issuer co-brand relationship is independent from the

24  card acceptance relationship and needs to support its own

25  value proposition."  Did I read that correctly?

GLENN - CROSS / HAMER                    4834

1   A    Yes, you did.

2   Q    And if you look at the fourth bullet down, it says, "The

3   GMS contribution should not be made in the form of a reduction

4   in the DR" -- that's discount rate; right?

5   A    It is, yes.

6   Q    -- "to the co-brand partner, because, one, pricing

7   integrity is central to containing spillover in a blank dollar

8   global industry; and second, discount rate reduction impacts

9   all issuers on the network and leads to cross subsidies among

10  products, issuers and markets."  Did I read that correctly?

11  A    Yes.

12  Q    I want to ask you a little bit more about the Walgreens

13  events that you described earlier today.

14  A    Okay.

15  Q    And you went through a bit of that chronology.  I want to

16  go through a little bit more of it with you.

17       You said in your direct exam that Walgreens wanted a

18  lower rate from American Express; right?

19  A    Yes.

20  Q    And you were personally involved; correct?

21  A    I was, yes.

22  Q    And we've heard testimony about finance people and

23  marketing people at merchants.  You were dealing with the CEO

24  of Walgreens; right?

25  A    And the CFO.

1   Q    Okay.  You dealt with both of them; right?

2   A    Yes.

3   Q    You talked about the offers that had been made at

4   different points in time, which you described as rich offers;

5   correct?

6   A    Yes.

7   Q    And --

8   A    I described some of them as rich offers, yes.

9   Q    But those offers were not accepted by Walgreens.  They

10  didn't view them the same way you did; right?

11  A    Ultimately, they did accept those offers.

12  Q    Before the cancellation events?

13       THE COURT:  No.  After January 14th, they accepted

14  an offer.  Are you before January 14th or on or after

15  January 14th?  I think that's the confusion.  So let's get

16  that -- get the question specified.

17       MR. HAMER:  Thank you, Your Honor.

18  Q    Before the cancellation letter that you described today,

19  do you recall that testimony earlier today?

20  A    The original -- the initial cancellation letter or --

21       THE COURT:  In December?

22  Q    Yes, the December 2004 letter.

23  A    There were -- there were -- I'm sorry.  There were --

24  there were a couple letters, I think, in December, I believe.

25  Q    Let's -- let me just withdraw the question and we can go

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4836

1  through in a little more detail.

2          First, let me take you back to September 2004; okay,

3  in that time frame?  Let me show you a document --

4  A    Okay.

5  Q    -- that I want to ask you about.  If you can turn with

6  me, please, in your white binder to Exhibit PX 0426.  This is

7  a slide deck entitled "American Express and Walgreens Company

8  Discussion of Sales at Risk," John Theiss, T-h-e-i-s-s,

9  September 16th, 2004.

10         First of all, Mr. Glenn, John Theiss was a

11  vice-president in your organization at that time?

12  A    Yes.  He worked for, I think, Paul Dottle, at the time,

13  who reported to me.

14  Q    And Mr. Theiss was someone who was responsible for the

15  Walgreens relationship?

16  A    Yes.  He had folks under him who had direct

17  responsibility, and he oversaw a number of merchants, but

18  Walgreens was one of them.

19  Q    Okay.  And he was knowledgeable about the events that you

20  described earlier today; right?

21  A    I believe he was, yes.

22  Q    Okay.  And he was familiar with the details of American

23  Express's sales at Walgreens at that time; right?

24  A    Yes.

25  Q    Okay.  In this document, if you turn with me to page

GLENN - CROSS / HAMER                    4837

1   649 --

2   A     Okay.

3   Q     -- the third page, it indicates at the very top, first of

4   all, the heading says "AXP Loyalist Segments at Walgreens,"

5   and then it goes on to say, "Hard number research indicates

6   strong loyalty to American Express cards and the importance of

7   card acceptance in chain drug stores with 2004 AXP or Amex

8   charge volume at Walgreens forecasted that blank million

9   dollars over blank million of sales are at risk if card

10  acceptance is canceled."  Did I read that correctly?

11  A     Yes.

12  Q     And if you turn to the next page, 650 --

13              THE COURT:  This is redacted.  Can I put it up?

14              MR. HAMER:  The redacted version can be published.

15  Thank you, Your Honor.

16  Q     On the page ending in 650, there's a slide entitled

17  "Interpreting the Research:  Walgreens Sales at Risk."  Do you

18  see that?

19  A     Yes.

20  Q     The first line says, "AXP or Amex has commissioned

21  research to understand the insistence of key cardmember

22  populations and specifically the impact within the drug store

23  industry of card non-acceptance."  And it lists some figures.

24        And then if you look at the next page, beginning at

25  651, also titled "Walgreens Sales at Risk," it says, "In

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4838

1   total, nearly blank million or blank percent of Walgreens'

2   charge volume would be at risk if American Express were no

3   longer accepted."  Did I read that correctly?

4   A    Yes.

5   Q    And were these figures communicated to you at Walgreens

6   in September 2004?

7   A    No, I don't -- I don't know if this was a deck that -- or

8   a presentation that went into Walgreens, but we did talk.  And

9   even in my letters to Mr. Rein in discussions, I talked about

10  our loyal cardmember base and based on the research.

11  Q    Okay.  And do these numbers seem consistent with the

12  numbers that you recall from that time frame?

13  A    I don't know if I was descriptive about the percentages

14  in my discussions with him, but I did talk about loyal

15  cardmembers.

16  Q    Okay.  Thank you.

17            MR. HAMER:  Plaintiffs offer PX 0426 into evidence.

18            MR. ORSINI:  No objection, Your Honor.

19            THE COURT:  All right.  PX 0426 is received in

20  evidence.

21            MR. HAMER:  Thank you, Your Honor.

22            (Plaintiff Exhibit 0426 received in evidence.)

23  Q    You talked a little bit, Mr. Glenn, about the planning

24  you were making in the event Walgreens did cancel.  Do you

25  recall that?

GLENN - CROSS / HAMER                    4839

1    A    Yes.

2    Q    Let's talk a little bit more about those plans.  Your

3    team developed contingency plans to steer Walgreens' customers

4    from Walgreens to Walgreens' competitors; right?

5    A    Our -- the teams, in the event of cancellation, had plans

6    so that our cardmembers could shop at other locations, because

7    Walgreens no longer accepted the card.  So it wasn't steering;

8    it was telling them where they could use their card.

9    Q    Your objective was to make plans so that if Walgreens

10   canceled, Walgreens' customers who held Amex cards would be

11   encouraged to use their Amex card at Walgreens' competitors;

12   right?

13   A    Well, what I would say is that we had plans so that our

14   cardmembers would know where they could shop and use their

15   card at other drug stores.

16   Q    Let's look at another document in your binder, PX 1164.

17   A    Same binder?

18   Q    This is the white binder.  I'm sorry, I gave you the

19   wrong number.  One moment.  That is the correct number,

20   PX 1164.

21   A    Okay.

22   Q    This is an e-mail from William Glenn to Michael Saunders,

23   S-a-u-n-d-e-r-s; subject, Walgreens, Jeffrey Rein, R-e-i-n,

24   information --

25   A    Excuse me.  Yes.

GLENN - CROSS / HAMER                    4840

1  Q    -- dated October 13th, 2004.

2         MR. HAMER:  And plaintiffs offer PX 1164 into

3  evidence.

4         MR. ORSINI:  No objection.

5         THE COURT:  PX 1164 is received in evidence.

6         (Plaintiff Exhibit 1164 received in evidence.)

7  Q    And, Mr. Glenn, this is an e-mail chain that included

8  you; correct?

9  A    Yes.

10  Q    If you look down on the second page of this exhibit, the

11  one ending in 772, there's a heading that says "Contingency

12  Plans."  Do you see that?

13  A    Yes.

14  Q    And it says, "Here are the key components and next steps

15  for our contingency plans if Walgreens were to cancel."

16         And these are plans that were being forwarded by

17  Mr. Saunders to you; right?

18  A    Yes.

19  Q    Who is Mr. Saunders?

20  A    He had responsibility for -- I believe for some of the

21  retail customers.  I don't remember whether he reported to

22  John Theiss or Paul Dottle; but, ultimately, Paul Dottle had

23  responsibilities for this.

24  Q    Thank you.  Let's go through a couple of these.  So the

25  beginning of this section under contingency plans, it says,

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4841

1    "Aggressive Marketing to Current Walgreens' Shoppers."  The

2    first item is "Offer compelling MR."  And that means

3    Membership Rewards; right?

4    A    It does, yes.

5    Q    "Offer compelling Membership Rewards and non-Membership

6    Rewards incentives to current Walgreens shoppers to get them

7    to switch to an alternative drug store"; is that right?

8    A    Yes.

9    Q    A little bit farther down -- well, the next line says,

10   "Targeted marketing programs/incentive details would vary

11   based on shopper loyalty to Walgreens.  For example, CMs" --

12   that's cardmembers; right?

13   A    Yes.

14   Q    -- "currently spending at Walgreens exclusively will

15   require a more robust incentive to switch as well as a program

16   structure designed to incent repeat visits at a competitor."

17              Did I get that right?

18   A    Yes.

19   Q    That's a Walgreens competitor; right?

20   A    Yes.

21   Q    Okay.  Next listed is, "Partner with specific competitors

22   such as CVS, Rite Aid, Brooks, Longs, et cetera, to drive

23   business away from Walgreens in their priority markets,

24   Florida, Texas, Illinois, New York, Arizona, NC, among

25   others."

GLENN - CROSS / HAMER                    4842

1           Next, "Develop platform concepts to drive

2    cardmembers to any drug store except Walgreens."

3           A little farther down, it says, "Suggested programs

4    concepts include sweepstakes, dollar off next purchase at a

5    competitor, bonus Membership Rewards points, pre-paid cards

6    for use in drug" -- I assume that means stores.  Did I read

7    that correctly?

8    A    In drug -- it doesn't say -- for use in drug.

9    Q    It looks like the sentence cuts off there in the e-mail;

10   is that right?

11   A    Yes.

12   Q    But did I read those contingency plans correctly?

13   A    You mean all of them?

14   Q    Or the ones that I read, did I read those correctly?

15   A    Yes.

16   Q    There are many others here; right?

17   A    Yes.

18   Q    These were, in fact, considered by American Express in

19   the event of Walgreens' cancellation; right?

20   A    If Walgreens canceled acceptance, right.  And different

21   words are used here, but the objective was to make sure our

22   cardmembers knew -- our cardmembers knew that they would have

23   other locations where they could use their card.  Because, as

24   I said before, acceptance is critically important; perceptions

25   of coverage, very important.  And this was a big cancellation

GLENN - CROSS / HAMER                     4843

1  threat; right?

2  Q    So if we look back at the first sentence I read under

3  "Aggressive Marketing to Current Walgreens Shoppers," based on

4  your testimony about the importance of the anti-steering rules

5  to you and to American Express, I take it that if Walgreens

6  offered incentives to its shoppers to get them to switch to an

7  alternative credit card network, you would have a problem with

8  that; right?

9  A    If it's a nondiscrimination point of sale, right.  We're

10 not disparaging Walgreens here.  We're reaching out to our

11 cardmembers to give them -- and make -- give them an

12 opportunity to spend someplace else.

13 Q    None of these measures that I just went through is

14 disparaging Walgreens; right?

15 A    I don't believe it is.

16 Q    There's nothing here that would harm Walgreens' brand by

17 doing this; right?

18 A    It's not -- not our intent at all.

19 Q    Your intent is just to move volume from Walgreens to

20 Walgreens' competitors; right?

21 A    Well, there would be no volume.  So once they cancel,

22 it's not shifting or moving volume, right.  It's protecting

23 our cardmember base where they have a place to spend.

24 Q    And at the time you were discussing this -- you were in

25 October; right? -- Walgreens had not yet canceled; correct?

GLENN - CROSS / HAMER                    4844

1    A    They hadn't canceled yet.

2    Q    Look at the last sentence of this e-mail on page 773.  It

3    says, "If we decide" -- "we" being Amex -- "decide that we

4    want to terminate our relationship with Walgreens before

5    January 1st, 2005 (12/1 is suggested) we can do so with

6    30 days' written notice."  Did I read that correctly?

7    A    You did.  Right.

8    Q    Did you consider terminating Walgreens before the

9    termination notice you got --

10   A    I never considered terminating Walgreens.  And again,

11   this is the team laying out some options for us.

12   Q    And these were options that you received from

13   Mr. Saunders; right?

14   A    Yes.

15   Q    Okay.  Let me look at another document with you.

16             THE COURT:  Could -- let me just ask this:  Could

17   Walgreens have canceled their agreement with you on 30 days'

18   written notice before the end of the contract period, if you

19   know?

20             THE WITNESS:  I don't -- I don't remember.  I think

21   30 days may have been both parties had the right to terminate

22   30 days, but, Your Honor, I don't remember the specific

23   contract.

24             THE COURT:  Do you recall ever having terminated a

25   merchant in the middle of a contract period during your

GLENN - CROSS / HAMER                          4845

1   tenure?

2              THE WITNESS:  I don't.

3              THE COURT:  All right.  Thank you.

4   Q    Mr. Glenn, I want to show you another document, PX --

5              THE WITNESS:  Your Honor, some of the contracts are

6   evergreen, right.  They don't have a start and an end date.

7              THE COURT:  No, I understand.  I understand.  But if

8   it's a contract with a termination date, it doesn't -- I'm

9   just curious whether there are circumstances that you can

10  recall where you were compelled or desired and actually did

11  terminate before the end of the contract period.

12             THE WITNESS:  Not outside of the -- what we've

13  agreed to in the contract.

14             THE COURT:  I see.  Okay.  Thank you.

15  Q    Mr. Glenn, turn, please, to PX 0902 in the white binder.

16  This is an e-mail from William Glenn to Jo Ann Stonier,

17  S-t-o-n-i-e-r.  And the subject line is "CVS Below the Line

18  Offers," December 21st, 2004.

19             MR. HAMER:  Plaintiffs offer PX 0902 in evidence.

20             MR. ORSINI:  No objection.

21             THE COURT:  0902 is received in evidence.

22             (Plaintiff Exhibit 0902 received in evidence.)

23  Q    Do you have that in front of you, Mr. Glenn?

24  A    I do, yes.

25  Q    Okay.  So this document is an e-mail -- the embedded

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4846

1    document is an e-mail to you; right?

2    A    I'm sorry.  The one underneath?

3    Q    Yeah.  There's an e-mail --

4    A    Yes.

5    Q    -- from Kathy Senior, S-e-n-i-o-r, to you dated

6    December 20th, 2004.  Do you see that?

7    A    Yes.

8    Q    And she's discussing three possible executions of a below

9    the line direct mail program with CVS.  Do you see that?

10   A    Yes.

11   Q    And it says, "As we discussed, number one would need

12   Ken's approval."  Is that Ken Chenault?

13   A    Yes.

14   Q    Number 1 says, "Bring in your new or transferred

15   prescription to CVS Pharmacy and receive a $25 CVS gift card."

16   Did I read that correctly?

17   A    You did.

18   Q    Is that a promotional initiative you were considering to

19   address the possibility of Walgreens' cancellation?

20   A    Yes.

21   Q    Okay.  Let's look at another document.  Well, before we

22   leave this, Mr. Glenn, if CVS offered a 25-dollar CVS gift

23   card for use of Discover, that would violate your

24   anti-steering rules; right?

25   A    Say that?  I'm sorry.

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                                        4847

1   Q    If CVS offered its customers a 25-dollar gift card if

2   they used their Discover card, that would violate your

3   anti-steering rules; right?

4   A    I think we weren't -- you know, the anti-steering rules

5   are for sustained steering of point of sale, not promotional

6   items.  You know, the other -- I just want to point out that I

7   believe Jo Ann was in our privacy office at the time, so all

8   the ones we're considering in terms of these promotions and

9   executions we wanted to make sure that we weren't violating

10  privacy laws or the commitments we have for merchants in terms

11  of how we market in the drug stores as well.  So that's why

12  you see Ken's name here and Jo Ann Stonier, right, not only to

13  protect sort of the consumers, but also how we market with

14  merchants in general.

15  Q    So the types of marketing initiatives that were discussed

16  in the prior exhibit, because it involves a drug store, have

17  particular privacy concerns?  Is that what you're saying?

18  A    The drug store -- yes, we do, right, in terms of

19  personally identified information and to make sure we're fully

20  protecting that.

21  Q    And you had your privacy team involved in considering

22  your response to Walgreens?

23  A    Yes.  I believe Jo Ann was in the privacy compliance

24  area.

25  Q    Let me show you another document, sir, the same binder,

GLENN - CROSS / HAMER                          4848

1    the white binder.  It's PX 0934.  This is an e-mail from John

2    Theiss to Paul Dottle December 14th, 2004, subject line

3    Walgreens contingency plans.

4              MR. HAMER:  Plaintiffs would offer PX 0934 into

5    evidence.

6              MR. ORSINI:  No objection.

7              THE COURT:  PX 0934 is received in evidence.

8              (Plaintiff Exhibit 0934 received in evidence.)

9    Q    The first sentence says, "I" -- and that's Mr. Theiss;

10   right?  Correct?

11   A    Yes.

12   Q    So Mr. Theiss says, "I have spoken with Bill multiple

13   times this morning.  The team is preparing a timeline and

14   associated plan that I will share with Bill."

15             Are you the "Bill" he's referring to?

16   A    I think I am.

17   Q    Because you were involved at this time; right?

18   A    Oh, December -- absolutely, yes.

19   Q    Okay.  Go a little farther down in this document.

20   There's a paragraph that begins "Additionally."  Do you see

21   that?

22   A    Yes.

23   Q    It says, "Additionally, we are working with the agency

24   and the team on deciphering which markets and which accounts

25   would make sense approaching for a campaign to shift share

GLENN - CROSS / HAMER                    4849

1    away from Walgreens.  We also found that we will have the

2    ability to communicate directly to Walgreens' shopper list so

3    we can market directly where it hurts them the most."

4            Did I read that correctly?

5    A    Yes.

6    Q    Okay.  This was not about protecting your cardmembers at

7    this point; right?  It was about hurting Walgreens?

8    A    It's all about protecting our cardmembers.  I don't agree

9    with you.

10   Q    The language in the e-mail says, "so we can market

11   directly where it hurts them the most."

12           Did I get that correct?

13   A    You did.  That's John Theiss's, right, language in an

14   e-mail talking about the marketing campaigns.  As I said

15   earlier, we're not shifting share.  There is no share once

16   they cancel.  It's about protecting our cardmember spend.

17   Q    Okay.  Thank you.  Let me show you another document,

18   PX 0438.  This is an e-mail chain.  And at the top of the

19   chain is an e-mail from John Theiss to Sumathi, S-u-m-a-t-h-i,

20   Laterza, L-a-t-e-r-z-a, re: Walgreens' cancellation

21   contingency plan ideas, October 9th, 2004.

22           MR. HAMER:  The plaintiffs offer PX 0438 into

23   evidence.

24           MR. ORSINI:  No objection.

25           THE COURT:  PX 0438 is received in evidence.

GLENN - CROSS / HAMER                    4850

1          (Plaintiff Exhibit 0438 received in evidence.)

2    Q    If you look on the bottom of the first page of this

3    exhibit, Mr. Glenn, there's an e-mail from Sumathi Laterza.

4    Do you see that?

5    A    I do.  I'm not copied on any of these.

6    Q    You're not listed on this e-mail chain; correct?

7    A    I'm not.

8    Q    Mr. Theiss is listed; right?

9    A    He is, yes.

10   Q    He was the person under your direction who was involved

11   in these events; right?

12   A    Working for Paul Dottle.

13   Q    If you look down at the bottom of the first page, it's

14   talking about incentives.  If you look at the sentence that --

15   well, let me just read this whole section here.

16          It says, "Marketing Awareness Communications.

17   Awareness mailing to all Walgreens' shoppers, reminding them

18   to use their card in drug stores listing key drug merchants in

19   their markets.  Consider a special message to heavy Walgreens

20   shoppers and mentioning that we're sorry they can't use their

21   card in Walgreens since these cardmembers will be most

22   impacted by the change and most likely to stick with Walgreens

23   even if they can't use American Express.  Provide them with an

24   incentive to go somewhere else.  The incentive structure

25   should be designed to encourage multiple visits to a

GLENN - CROSS / HAMER                    4851

1    competitor to get them to change behavior, XXX points per

2    transaction, or a huge amount of bonus points to be awarded

3    after they've spent XXX times at a competitor."

4            Did I read that correctly?

5    A    You did, yes.

6    Q    And then on the next page, 328, about eight or ten lines

7    down, it says, "Consider a program to get people to switching

8    prescriptions to another store.  (Privacy issues with this

9    idea)."  Did I read that correctly?

10   A    I think you did, but I didn't follow exactly where you

11   were on it.

12   Q    Okay.  The line starts "Consider a program."  It says,

13   "Consider a program to get" --

14   A    I see.

15   Q    Okay.  And I got that correctly?

16   A    You did, yes.

17   Q    And there are others listed here, but these were all

18   ideas that were considered by your team in response to the

19   potential for Walgreens canceling?

20   A    Consistent with the document we read before.  I'd also

21   tell you, during this period of time we were negotiating like

22   crazy with Walgreens.  You know, as I said earlier, this is a

23   big deal for us; right?  The last thing we wanted was for them

24   to cancel.  But at the same time, as we talked about, coverage

25   and perceptions of coverage are so important.  We were

GLENN - CROSS / HAMER                    4852

1  protecting our cardmembers.

2  Q    Let's turn to Exhibit PX 1814.  This is a --

3  A    I'm sorry?

4  Q    PX 1814.

5        MR. HAMER:  And plaintiffs offer PX 1814 into

6  evidence.

7        MR. ORSINI:  PX --

8        MR. HAMER:  1814.

9        MR. ORSINI:  No objection, Your Honor.

10        THE COURT:  All right.  PX 1814 is received in

11  evidence.

12        (Plaintiff Exhibit 1814 received in evidence.)

13  Q    So if you look on the page ending in 257, there are a

14  couple of mockups of an advertisement; is that right?

15  A    Of an offer, promotional, right.  Yes.

16  Q    Of a promotional offer; is that right?  This -- as we saw

17  before in the prior exhibit, you had considered a CVS gift

18  card to shift Walgreens' customers to CVS; right?

19  A    I think it said a gift card.  It talked about promotional

20  marketing programs.

21  Q    Was this mockup, which is Exhibit PX 1814, part of that

22  planning process for the possibility of Walgreens canceling?

23  A    I believe it was, yes.

24  Q    In the bottom left, you have a coupon or offer here that

25  says "Save $4 on a $20 purchase when you use your American

GLENN - CROSS / HAMER                          4853

1   Express card."  Did I read that correctly?

2   A    Yes.

3   Q    Again, if you -- if CVS were doing this for MasterCard

4   and it were not a short-term promotion -- as you pointed out,

5   you permit short-term promotions sometimes but not longer term

6   promotions.  If CVS were doing a longer term gift card

7   promotion just like you've mocked up here but it was towards

8   MasterCard, not American Express, that would violate your

9   anti-steering rules; right?

10  A    I don't know.  We -- you know, all of these things we

11  negotiate what competitors do and what they can't do, right.

12  And sustained -- or a point of sale steering allowed

13  continuously violates the agreement.

14         We do allow promotional programs like official card

15  programs, not preference campaigns.  But, certainly, we've

16  worked with plenty of merchants in terms of trying to

17  accommodate their objectives and promotions.

18  Q    As you testified before, you also have enforced your

19  rules against merchants who are steering in ways that you

20  don't think comply with it; right?

21  A    After we try really hard.  Because I think you saw from

22  some of the documents that this was after a series of

23  negotiations and meetings, yes.

24  Q    Now, in addition to shifting cardmembers from Walgreens

25  to Walgreens' competitors, you also considered working to

GLENN - CROSS / HAMER                           4854

1    shift American Express's employees who are on a prescription

2    drug plan with American Express from Walgreens to Walgreens'

3    competitors; right?

4    A    I don't know if it's shifting, but we wanted to make sure

5    that our cardmembers had a place to fill their prescriptions

6    -- our employees, right.  Just like any brand, you want your

7    employees using your brand.  We wanted the same.

8    Q    And this time frame, in 2004, Walgreens was an option for

9    the prescription drug plan for American Express employees;

10   right?

11   A    I believe they were, yes.

12   Q    And a substantial number of American Express employees

13   exclusively purchased at Walgreens at that time; right?

14   A    I don't remember the numbers.  I know we had employees

15   purchasing their prescriptions at Walgreens.

16   Q    Okay.  Well, we'll look at a couple numbers in a moment.

17   But you were making plans to drop Walgreens from American

18   Express's prescription drug coverage; correct?

19   A    I believe that's how you characterize it.  I don't

20   remember the exact details.  But, in essence, just enabling

21   our employees to fill their prescriptions elsewhere.

22   Q    Thank you.  Let's look at a document on this, PX 0886,

23   also in the white binder.

24   A    I'm sorry.  PX --

25   Q    0886.  This is an e-mail from David House to William

GLENN - CROSS / HAMER                    4855

1    Glenn, re: Further Walgreens --

2    A    I'm sorry.  It's right in front of me.  Sorry.

3    Q    Do you have it?

4    A    No, I've got it.

5    Q    Okay.  The subject line is "Further Walgreens Analysis,"

6    January 11th, 2005.

7              MR. HAMER:  Plaintiffs offer PX 0886 into evidence.

8              MR. ORSINI:  No objection, Your Honor.

9              THE COURT:  0886 is received in evidence.

10             (Plaintiff Exhibit 0886 received in evidence.)

11   Q    I want to direct you first to the e-mail from Jim Dwyer

12   to Paul Dottle, copying you, in the middle of the first page.

13   A    The first page.

14   Q    Do you see that?

15   A    Yes.

16   Q    And this is in January, January 10th of 2005, right at

17   the peak of the cancellation events that you described in your

18   direct exam; right?

19   A    Four days away.

20   Q    Okay.  So if you look on the top of the page ending in

21   655, there's a sentence that begins, "This is an estimate and

22   Medco shared this information for our knowledge only.

23   Approximately" --

24             MR. HAMER:  Is there any reason these numbers can't

25   be stated publicly?  They're not redacted, so I just want to

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                         4856

1    make sure before I mention them, if counsel had an objection.

2            MR. ORSINI:  I don't see a reason.  I don't know if

3    Walgreens would see a reason, the volume at that time on

4    particular types of transactions for particular employees, but

5    I don't have an objection.

6    Q    "Approximately 11,639 Amex members have a pattern of

7    exclusively using Walgreens.  It would suggest a need for a

8    transition period."  Did I read that correctly?

9    A    Yes.

10   Q    And that's consistent with your understanding of how many

11   Amex members exclusively used Walgreens?

12   A    I do have a memory of that number.

13   Q    Okay.  The e-mail below this from Gretchen Lennon,

14   L-e-n-n-o-n, to Jim Dwyer, talks about the elimination of

15   Walgreens from the network.  Do you see that --

16   A    Yes.

17   Q    -- the first sentence?

18           And then if you go to page 656, the first full

19   paragraph, it says, "Per Medco, our 2005 mail incentive will

20   likely result in a 47 to 50 percent reduction in Walgreens

21   spend by Amex members."  Do you see that?

22   A    Yes.

23   Q    And that's associated with this plan for changing your

24   prescription drug options; right?

25   A    Yes, I believe it is.

GLENN - CROSS / HAMER                            4857

1    Q    Okay.  And then if you go back to the first page, you

2    forwarded this e-mail to David House; right?

3    A    I did.

4    Q    And Mr. House was your boss at that time; right?

5    A    Yes.

6    Q    Okay.  And you say, "Regarding Walgreens, review quickly

7    and I'll give you an overview tomorrow"; right?

8    A    Yes.

9    Q    So you were involved in these events personally; right?

10   A    Not -- not doing the analytics, but certainly getting the

11   report out, yes.

12   Q    Did you request the analytics?

13   A    I don't remember who first requested it; but, obviously,

14   the team did it and reported.

15   Q    Okay.  Mr. House responds to you, "Bill, great stuff,

16   questions."  And then in the last part of his e-mail, he says,

17   "This is going to hurt Walgreens' bottom line.  I doubt that

18   they knew this."  Did I read that correctly?

19   A    Yes.

20   Q    He doesn't mention anything here about protecting

21   Walgreens or American Express cardholders; correct?

22   A    Not in this e-mail.

23   Q    Okay.  So Walgreens did not ultimately cancel American

24   Express acceptance; right?

25   A    I think they did.  I think --

GLENN - CROSS / HAMER                                    4858

1   Q    Very briefly; correct?

2   A    But they did cancel acceptance.

3   Q    What was the duration of that cancellation?

4   A    Between, I guess, midnight and sometime after my phone

5   call that morning to Mr. Rein.

6   Q    Let me show you another document, which I'm going to have

7   to hand to you.  It's PX 0142 -- I'm sorry.  The number of

8   this is PX 0446.  This is an e-mail from Stephen Samoy to

9   Cheryl Kiernan, K-i-e-r-n-a-n; subject Walgreens,

10  January 14th, 2005.

11           MR. HAMER:  The plaintiffs offer PX 0446 into

12  evidence.

13           MR. ORSINI:  No objection.

14           THE COURT:  PX 0446 is received in evidence.

15           (Plaintiff Exhibit 0446 received in evidence.)

16  Q    Okay.  Mr. Samoy was in your organization; right?

17  A    Yes.

18  Q    And he was personally involved in the Walgreens events?

19  A    Yes.

20  Q    Okay.  Mr. Samoy says to Ms. Kiernan, "Thanks.  They

21  actually settled for a deal that was not quite as rich for

22  them as the one we had back in November/December.  Go figure.

23  I believe it was the culmination of several events that

24  changed their mind, i.e., two days ago at their annual

25  stockholders meeting many shareholders expressed

GLENN - CROSS / HAMER                          4859

1    dissatisfaction to their board re the cancellation of Amex.

2    They must be receiving major customer complaints at the store

3    level.  CVS expressed a partnership with us."

4              Did I read that correctly?

5    A    Yes.

6    Q    And the November/December deal referenced in the first

7    sentence was the -- one of the deals that you were describing

8    earlier with Mr. Orsini; right?

9    A    I'm sorry.  Say that again.

10   Q    The deal referenced in the first sentence from

11   November/December was one of the deals that you had been

12   discussing in the prior documents this morning; right?

13   A    Well, this is Stephen Samoy's evaluation, right, who

14   reports to somebody, who reports to somebody, ultimately, his

15   interpretation.  Ultimately, as you saw from all the

16   discussions, Mr. Rein had to agree.  I don't -- I don't think

17   it was worse than the deal we put on the table.  Obviously, it

18   met, you know, his objectives, right.  So this is Stephen

19   Samoy -- and I actually don't know who Cheryl is, but sending

20   his interpretation, and he could have looked at one part of

21   the deal; right?  So...

22   Q    Mr. Samoy was the client manager for Walgreens at this

23   time; right?

24   A    I think he was -- he was on point at Walgreens.

25   Q    Let's look at another person's reaction to these events.

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4860

1   A    Okay.

2   Q    I'm going to introduce PX 0142.  Again, this is one I'm

3   going to have to hand to you.

4              MR. HAMER:  May I approach, Your Honor?

5              THE COURT:  Yes, you may.

6   Q    This is an e-mail from Ronald Schultz to Jose Morabito,

7   M-o-r-a-b-i-t-o, a January 25th, 2005 press release,

8   "Walgreens reaches agreement to continue accepting American

9   Express cards."

10             Who is Mr. Schultz at this time?

11  A    I don't -- he worked in the organization.  I don't

12  remember what his role was specifically.

13  Q    He was in the pricing organization; right?

14  A    Jose Morabito was, I think -- well, Ron Schultz was in

15  the pricing organization, right.  So I just don't remember at

16  this particular time where.

17  Q    Okay.  Mr. Schultz says, "Our customers voiced their

18  dissatisfaction with Walgreens' decision, and that is what

19  caused them to change their mind.  We did not offer them

20  anything additional to cause them to change their position.  I

21  understand that complaints were also voiced to the Board of

22  Directors at a shareholder meeting.  One correction per below.

23  I predict they will reach the next CV band within a year, not

24  five."

25             And this is in response to a question from

SHERRY BRYANT, RMR CRR

1    Mr. Morabito, saying, "What is the official answer to

2    merchants who asked us what we did to avert the Walgreens

3    cancellation?"

4            Did I read that correctly?

5    A    Both of those, yes, you read correctly.

6    Q    I want to switch topics and ask you a couple of questions

7    about pricing.

8            You've already addressed that a bit this morning.  I

9    just have a few follow-up issues for you.  First, I want to go

10   back to the document we already looked at, PX 0905.

11   A    I'm sorry.  Yours --

12   Q    This is in the white binder.  It's 0905.  This is already

13   admitted.  This is the Q and A script for your financial

14   community presentation.  Do you have that there?

15   A    Yes.  I would say that's the prep for.  It wasn't a

16   script, right?  It was preparation for potential questions.

17   Q    Thank you.  This is your advanced preparation before

18   meeting with the financial community at this time; right?

19   A    Yes.

20   Q    These are questions and answers that you prepared with

21   your team before that; right?

22   A    That were prepared for me.

23   Q    Okay.  So there's a section that's called "Discount

24   Rate."  Do you see that?

25   A    Yes.

GLENN - CROSS / HAMER                              4862

1    Q    There's a question at the bottom of page 926.  It's

2    asking about the trajectory of your discount rate premium.

3    This is back in 2005; right?

4    A    It was, yes.

5    Q    Okay.  The question is, "How can you maintain your

6    discount rate premium when the trajectory is clearly moving

7    south?"

8         Your answer:  "As I mentioned earlier, the 2 to 3

9    basis point decline in the past several years is an

10   intention" -- does that mean intentional, I assume?

11   A    Yes.

12   Q    Okay.  So the "decline in the past several years is an

13   intentional move on our part fueled by our expanded presence

14   in the non-T & E categories where the discount rates tend to

15   be lower.  And, importantly, the increases in our average

16   spend per card clearly outweigh any decline in the overall

17   rate."

18        That's referring to the change in mix of merchants;

19   right?

20   A    Yes, moving -- right, different categories have different

21   discount rates, right, as we talked about.

22   Q    And that change in mix was an intentional move, as you

23   described; right?

24   A    Well, we wanted to get coverage.  I talked about that,

25   right.  We want every merchant and every industry to accept

GLENN - CROSS / HAMER                    4863

1   the card.  So -- and then we align, as I said earlier, price

2   with value, so merchants accept.  And we can't force them to

3   accept.  They make a choice.

4   Q    And as you described, that could affect the premium that

5   you have over other networks; right?

6   A    I'm sorry.  Say that again.

7   Q    That decision to change the mix put pressure on the

8   premium that American Express has had over Visa/MasterCard;

9   right?

10  A    Well, as did Visa/MasterCard for a couple years raising

11  prices.

12  Q    Let's look at the next question.  It says, "What happens

13  when to your" -- I think it means -- the "to" is an error.

14  So, "What happens when your premium discount rate" -- well,

15  let me start over.  It's not an error.  It should be in there.

16         "What happens when to your premium discount rate

17  when the bottom falls out of interchange?"  I think there's an

18  extra "when" in there.

19         Your answer is, "First of all, that's a

20  hypothetical.  There's been merchant pressure for a while now

21  and associations" -- is that referring to Visa and MasterCard?

22  A    Yes.

23  Q    Okay.  "They only responded with higher rates.  We have a

24  different model and a different approach to pricing.  Also,

25  our rates are not tied to interchange.  And as I explained

SHERRY BRYANT, RMR CRR

1  earlier, we have a variety of relationships with our merchant

2  partners.  I'm very confident in our ability to maintain our

3  premium."

4        Did I read that correctly?

5  A    You did, yes.

6  Q    That's back in 2005 --

7  A    This was not my response to those questions.  You

8  understand that; right?  We talked about that; right?  These

9  were anticipated questions that would come up; right?  So

10 these were not the questions that were asked.  I don't

11 remember the questions that were asked.  And it was fair for

12 me, right, to start thinking about the questions.

13 Q    These were answers prepared by your team so you could be

14 prepared to answer questions that came up?

15 A    Just general anticipated questions, right.

16 Q    Before we leave this document, there is one more question

17 on Walgreens.  This same document at page 929 also has a

18 question and answer about Walgreens, which is happening around

19 this time; right?

20 A    Actually, before that, right, because this is August of

21 2005.  So the Walgreens was --

22 Q    Walgreens events were --

23 A    -- January --

24 Q    -- January --

25 A    -- of 2005, right.

GLENN - CROSS / HAMER                    4865

1   Q    So this is several months after the events; right?

2   A    Yes.

3   Q    You anticipated questions about Walgreens; right?

4   A    Yes.

5   Q    The bottom of page 929, the question, "Did you lower the

6   rate for Walgreens or not?"

7           Answer:  "We did not depart from our rate table in

8   our discussions with Walgreens.  As you may have read in the

9   American Banker, one of their executives (Susan DeVries)

10  admitted a couple of months ago that consumer reaction was a

11  major reason for them to reconsider their decision to stop

12  accepting the card.  She said, 'There was consumer fury.  They

13  said, how dare you tell me how I should pay at Walgreens?  We

14  heard that loud and clear.  In the end, we reached an

15  agreement on terms that were mutually beneficial.  Those terms

16  are based on the value that our cardmembers bring to

17  Walgreens.'"

18          And then I'll read the rest of this.  "There was

19  interest on both sides to see if we could continue card

20  acceptance.  We both wanted to allow customers to use their

21  Amex cards when shopping at Walgreens.  We were able to reach

22  a longer term agreement that made sense for both of us and our

23  mutual customers.  As I said earlier, we used the same

24  discount rate schedule for Walgreens that we use with other

25  merchants in the industry."

GLENN - CROSS / HAMER                    4866

1          Did I get that correctly?

2    A    Yes.

3    Q    Let's go to PX 1447 in the white binder.  This is a

4    Bloomberg transcript of a 2009 discussion with investors.  Do

5    you have that with you?

6    A    I do, yes.

7    Q    Look on page 3, the third full paragraph.  You briefly

8    discuss value recapture.  And this -- by the way, this is a

9    transcript of your comments; right?

10   A    I don't recall seeing it, but...

11   Q    If you look on the first page, it has your name, William

12   Glenn.

13   A    Yes.

14   Q    And on page 3, it's still part of your discussion; right?

15   A    Yes.

16   Q    The third paragraph says, "Additionally, this value-based

17   model has enabled us to raise our discount rate in many

18   industries.  The term value recapture which we've used in

19   these forums before reflects these activities.  The slight

20   decline in rate that you see is primarily the result of

21   continued and intended change in mix."

22          Did I read that correctly?

23   A    Yes.

24   Q    Then you talk about that mix over time in the next

25   paragraph.  "I note that our discount rate has remained

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4867

1   stable"; is that correct?

2   A    The end of the next paragraph.  I do see that, yes.

3   Q    And if I can return you to the black binder, PX 0890.

4   A    I'm sorry?

5   Q    PX 0890 in Mr. Orsini's binder.

6   A    Yes.

7   Q    Turn, please, to page 338.  There's a slide on the Amex

8   discount rate in the U.S.  Do you have it there?

9   A    Page 25 -- 25?

10  Q    Page 25 of the deck.

11  A    Okay.

12  Q    The Bates numbers end at 338.  Looking at the speaker

13  notes, it says, "In the U.S., our average discount rate has

14  been declining by blank basis points per year.  This is an

15  intentional move on our part as we have expanded into everyday

16  spend industries, such as supermarkets and mass merchandisers,

17  where our value is not as proven.  We, therefore, charge a

18  lower rate.  This shift from predominantly T & E to a more

19  balanced industry mix has decreased our overall rate."

20       Did I read that correctly?

21  A    You did, yes.

22       MR. HAMER:  I don't believe this was moved into

23  evidence, so plaintiffs would offer PX 0890 into evidence.

24       MR. ORSINI:  No objection.

25       THE COURT:  All right.  PX 0890 is received in

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4868

1    evidence.

2              (Plaintiff Exhibit 0890 received in evidence.)

3              THE COURT:  What about PX 1447?  Has that been moved

4    in?  I didn't see it with this witness.

5              MR. HAMER:  The Bloomberg transcript has not been.

6    We would offer that.

7              MR. ORSINI:  No objection.

8              THE COURT:  PX 1447 is received in evidence as well.

9              (Plaintiff Exhibit 1447 received in evidence.)

10             THE COURT:  Okay.

11   Q    Let me show you another value recapture document.  This

12   is PX 0457 in the white binder.

13   A    PX --

14   Q    0457.  This is an e-mail from Jack Funda to Elizabeth

15   Langwith, L-a-n-g-w-i-t-h, and others, August 6, 2008;

16   subject, TEI BUR.  And you see in the first line, it says,

17   "Team TEI, attached is the TEI BUR doc when you meet with Ed

18   and Bill.  Are you the Bill referenced there on the first

19   page?

20   A    I believe I am.  It says review with Ed Gilligan, but I

21   would assume it would be me as well.

22   Q    Okay.

23             MR. HAMER:  Plaintiffs offer PX 0457 into evidence.

24             MR. ORSINI:  No objection.

25             THE COURT:  PX 0457 is received in evidence.

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4869

1            (Plaintiff Exhibit 0457 received in evidence.)

2    Q    If you look at 3518, the second page, the title is Travel

3    and Entertainment Industry's Business Unit Review with Ed

4    Gilligan.  I just want you to look at a couple of pages with

5    me.

6            This is discussing the -- in part, the value

7    recapture issues in the travel and entertainment sector;

8    right?

9    A    Well, it also has a number of other items, as well.

10   Q    Right.  But, in part, it's discussing value recapture?

11   A    There's a piece of it.  I don't remember the document.  I

12   haven't seen this document, so...

13   Q    Fair enough.  So let's look at page 521, the executive

14   summary.  Number 4 says, "The discount rate is expected to

15   increase by nearly blank basis points, from blank percent to

16   blank percent."  And then it references as a subpoint, value

17   recapture continues in various segments listed that were all

18   within T & E; right?

19   A    That's what it says.  I don't -- I don't remember ever

20   seeing a forecast that it would increase, but that's what the

21   document says.

22   Q    Okay.  Thank you.  If you can turn, please, to page 536.

23   There's a slide entitled "TEI Value Recapture Initiatives."

24   The first line says, "Value recapture efforts have served as a

25   means to drive growth with an expected blank million in total

GLENN - CROSS / HAMER                    4870

1    contribution in 2009 versus a pre-value recapture in 2005

2    baseline."  Did I get that correct?

3    A    Yes.  That's a headline.

4    Q    And then it lists on the far right column by year the

5    cumulative benefit of value recapture in the travel and

6    entertainment industries; right?

7    A    Yes.

8    Q    And those numbers, are they consistent with your general

9    recollection of the success of the value recapture price

10   increases at that time?

11   A    Well, I think it's consistent with what we looked at

12   earlier.  There was a chart that showed without value

13   recapture and with value recapture, right, what the revenue

14   would be and the difference in revenue.  And the reason it

15   says means to drive growth is because, as I said earlier, it

16   was an ability to align price with value and give us money to

17   invest back into the business, to drive cardmember behavior

18   and loyalty, right, because it's a competitive environment.

19   So we needed to do that to make sure our merchant value

20   proposition was strong and our cardmember value proposition

21   was strong.

22   Q    Let's look at page 538.  It has more detail on the travel

23   and entertainment value recapture initiatives.  It looks

24   specifically at the year 2008 on the left box; right?

25   A    Yes.

GLENN - CROSS / HAMER                    4871

1   Q    And it shows a series of basis point increases on

2   particular merchants; is that right?

3   A    Industries and merchants.

4   Q    On the left, it shows particular merchants and it

5   identifies what industry they're in; right?

6   A    Yes.

7   Q    Then it has a cumulative impact at the bottom right of

8   that box?

9   A    Yes.  Well, it says dollar impact.  I assume it's

10  cumulative over a number of years.

11  Q    And then on the right, it shows the projected value

12  recapture targets for 2009, listing particular T & E merchants

13  that were the targets of the next year's value recapture;

14  right?

15  A    Correct, when their contracts came up.

16  Q    And it showed on the far right the expected dollar impact

17  of those price increases for 2009; right?

18  A    Yes.  I was just looking at the footnote here.

19  Q    Then if we go in the same document to page 553, there's a

20  slide that talks about the restaurant industry specifically.

21  And in the middle of that page, it mentions challenges.  Do

22  you see that?

23  A    Yes.

24  Q    And it says, "The industry is facing severe headwinds

25  resulting in increased bankruptcies, canceled openings, shift

GLENN - CROSS / HAMER                    4872

1    in franchising, increase in LTOs, value, venues, and multiple

2    C-level changes."

3             Did I get that correct?

4    A    Yes.

5    Q    And you did, in fact, successfully implement restaurant

6    value recapture in this time frame; right?

7    A    Well, we did implement it.  And I think what this speaks

8    to is -- you know, one of the things we looked at prior to

9    making a decision -- and I talked about that earlier, which is

10   the state of the industry -- I mean, you know, the

11   organization gets up every day and tries to keep merchants

12   accepting and gaining new merchants.

13            If we didn't have to negotiate with merchants, if,

14   in fact, they had to accept us, we wouldn't have an entire

15   merchant organization; right?  So planning is not only

16   important, but our folks work -- wake up every day and they

17   want to drive value to merchants, not threaten merchants, but

18   negotiate with merchants.  And it's so important to our

19   business model and our people.

20            So, you know, I'm sorry, but this takes into account

21   what situation the merchants are in, and we evaluate that and

22   weigh really heavily about are we creating value.

23            And I talked earlier about the credibility of going

24   to merchants and looking at where they are and the competitive

25   environment, right, and the value we're creating, because the

GLENN - CROSS / HAMER                    4873

1    last thing we want to do is have merchants cancel or threaten

2    to cancel.

3    Q    Look at page 555.  There's a reference --

4    A    I'm sorry.  5 --

5    Q    555.

6    A    Yes.

7    Q    This is more detail on restaurant value recapture.  And

8    it says, "Following successful restaurant value recapture of

9    blank million in 2007, we are now gearing up for RVR 2" --

10   which is restaurant value recapture phase 2; right?

11   A    I think so.

12   Q    -- "which is set to deliver approximately blank billion

13   by 2010."

14        Did I read that correctly?

15   A    Yeah.  I don't know what the blank billion.  It could be

16   total spend in the industry.  I'm not sure.

17   Q    And if you look at the embedded box on page 555, there's

18   a PTI impact.  Do you see that?

19   A    Yes.

20   Q    And it shows the number of accounts affected on the far

21   right.  Do you see that?

22   A    Yes.

23   Q    It says 287,539 restaurants were impacted by these value

24   recapture price increases, at least with the Card Not Present

25   fee; right?

GLENN - CROSS / HAMER                    4874

1    A    Right.  I'm sorry.  Can --

2    Q    It's the far right column under PTI impact lists the

3    number of merchants, number of accounts.  Do you see that?

4    A    Yes.

5    Q    Does that list the number of accounts that were impacted

6    by the restaurant value recapture?

7    A    Or potentially -- potentially impacted.  I believe that's

8    the number, yes.

9    Q    Thank you.  So you talked a moment ago about your

10   negotiations with merchants.  I want to ask you about a couple

11   of those.  Let me point you to PX 0100, also in your white

12   binder.

13   A    PX 0 --

14   Q    100.  And merchants have used the possibility of

15   steering -- well, strike that.

16            If you can first look at the first page of this

17   document.  It's entitled Global Pricing and Review Management,

18   2012 SQP review, October 12th, 2011.  Is this a presentation

19   that you received?

20   A    I actually don't remember.  Global Pricing and Review

21   Management and GMAR; is that --

22   Q    Yes.

23   A    I may have received it.  I don't remember.

24   Q    In your role as president of Global Merchant Services,

25   did you receive global pricing presentations from the pricing

GLENN - CROSS / HAMER                    4875

1   team?

2   A    I did.  This was close to my tenure ending, though, but I

3   just -- as head of Merchant Services, but pricing did report

4   to me.

5   Q    Okay.  Thank you.

6                THE COURT:  Is this to be -- is it redacted or --

7                MR. HAMER:  This one is -- make sure I'm correct

8   about this.  This one is redacted.

9                THE COURT:  So we can put it up?

10                MR. HAMER:  We can put this one up.  Plaintiffs

11   would offer PX 0100 into evidence.

12                MR. ORSINI:  No objection.

13                THE COURT:  All right.  0100 is received in

14   evidence.

15                (Plaintiff Exhibit 0100 received in evidence.)

16   Q    This document has a slide ending in 020 that is titled "A

17   Recent Illustrative Negotiation," and that refers to Home

18   Depot.

19   A    Yes, that's what --

20   Q    Do you see that?  The data has been redacted from this.

21   But the top part says, "Merchants are using the atmosphere

22   created by the Durbin Amendment, the DOJ lawsuit and the

23   private antitrust lawsuits as further arguments in favor of

24   their already challenging demands in negotiations."

25                And in the box on the right, under "Proposed deal

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4876

1   terms for Home Depot," on the second from the bottom, it says,

2   "Unlimited ability to steer surcharge, et cetera."

3            Do you see that?

4   A    Yes.

5   Q    Were -- have merchants, during your tenure, raised the

6   possibility of steering because of the regulatory and

7   litigation events in their negotiations with American Express?

8   A    They did.  I don't remember exactly who did; but

9   obviously, it was raised by Home Depot.

10  Q    And this was described as an illustrative example in this

11  presentation to you; right?

12  A    Yes.

13  Q    Let's look at PX 0922.  This is an e-mail from Steve

14  McCurdy to Bill Glenn, July 28 --

15  A    I'm sorry.

16  Q    PX 0922.

17           MR. HAMER:  And plaintiffs offer PX 0922 into

18  evidence.

19           MR. ORSINI:  Your Honor, no objection to the

20  document itself coming in, although there's a fair bit of

21  hearsay within hearsay.  In the bottom e-mail, it's reflecting

22  comments made by a non-Amex person.  If it's not coming in for

23  the truth, no objection.  If it is, then I would object.

24           MR. HAMER:  We're offering it for the state of mind.

25           THE COURT:  State of mind.  All right.  PX 0922 is

1  received in evidence.

2          (Plaintiff Exhibit 0922 received in evidence.)

3  Q    Do you have the document there, Mr. Glenn?

4  A    I do.

5  Q    Okay.  This discusses negotiations with Southwest

6  Airlines; right?

7  A    Yes.

8  Q    Look at the e-mail that is in the middle of the first

9  page from Stuart Moffett to Greg Hybl, H-y-b-l; subject line

10  Southwest call on Durbin.  Do you see that?

11  A    Greg Hybl and Nancy Polk, right.  A number of folks.

12  Q    Okay.

13  A    And it says Southwest call on Durbin.

14  Q    And this e-mail went up to Mr. Funda, who was in the

15  pricing group; right?  It was forwarded to Mr. Funda; right?

16  A    I guess.  He's not on the original distribution list.

17  Q    And then he forwarded it to Mr. McCurdy, who was his

18  boss; right?

19  A    Right.

20  Q    And Mr. McCurdy forwarded it to you; right?

21  A    Yes.

22  Q    Reporting on the status of Southwest negotiations or

23  discussions?

24  A    It says Southwest call, yes, or feedback from Southwest.

25  I haven't seen this e-mail --

GLENN - CROSS / HAMER                          4878

1    Q    If you look --

2    A    -- so I don't remember.

3    Q    -- at the second paragraph of the e-mail, it's reporting

4    on a conversation with Chris Priebe.  Do you understand that

5    to be a Southwest employee?

6    A    I actually have no idea who --

7    Q    Okay.  Let's look at the second paragraph.  It says,

8    "Overall, Chris didn't see an urgent need to revisit our

9    CSA" -- that usually refers to Card Services Agreement?

10   A    Yes.

11   Q    -- "at this point.  I gather his interest in following

12   the legislation waned after the provision to allow

13   differentiation on the basis of payment network was removed.

14   In his words, the bill was neutered."

15        Did I read that correctly?

16   A    You did, yes.

17   Q    If you look on the last page, 651, the second-to-last

18   full paragraph, Mr. Moffett reports that "My take on this is

19   that once the draft was changed to remove discrimination by

20   network that Chris figured he wouldn't be able to leverage

21   this to save Southwest a significant amount in 2010, so he

22   lost interest -- for now."

23        Did I read that correctly?

24   A    You did.

25   Q    And were you involved in analysis of the Durbin Amendment

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4879

1    in 2010?

2    A    I was.  I mean, the team reported -- reported out to me.

3    Q    And you understand that in the early drafts of that

4    legislation there was a possibility of steering directly to a

5    payment brand as opposed to a category of payment products;

6    right?

7    A    I don't remember the specifics, but I know there was

8    steering somewhere embedded in the Durbin Amendment.

9    Q    And while -- well, strike that.

10              You mentioned that you had responsibility for Canada

11   over the last decade; right?

12   A    I did, yes.

13   Q    And so your jurisdiction both when you were in

14   Establishment Services and then as president of Global

15   Merchant Services included Canada?

16   A    Yes.

17   Q    And were you involved in American Express's responses to

18   the regulatory environment in Canada?

19   A    I was.  The team reported out to me occasionally.

20   Q    And you got reports on what the rules were in Canada and

21   how they were changed?

22   A    Yes.

23   Q    Okay.  Before 2010, American Express's anti-steering

24   rules in the United States and in Canada were the same; right?

25   A    I believe they were consistent, but -- so I think they

GLENN - CROSS / HAMER                    4880

1  were consistent, yes.

2  Q    Okay.  And in 2010, Canada had a Code of Conduct that

3  changed what networks were able to do with merchants on

4  steering; right?

5  A    I know the Code of Conduct made some -- one of the

6  recommendations and some changes.  I actually don't remember

7  the specifics of that.

8  Q    Okay.  Do you remember that differential discounting or

9  discounting for a particular network was permitted in Canada

10 after 2010?

11 A    I actually don't remember.

12 Q    All right.  Let's look at a couple of documents, first of

13 all, PX 0005, which is an e-mail from Anna Cedeno,

14 C-e-d-e-n-o, to a number of people, dated October 8, 2010.

15 And on the second page it attaches a slide deck called Global

16 Pricing and Review Management 2011 SQP.

17 A    I see it, yes.

18         MR. HAMER:  Plaintiffs would offer PX 0005 into

19 evidence.

20         MR. ORSINI:  It may already be in evidence, Your

21 Honor, but if it's not, I have no objection.

22         THE COURT:  I'm sorry.  Say that again.

23         MR. ORSINI:  I believe it may already be in

24 evidence, but if it's not, I have no objection.

25         THE COURT:  Okay.  PX 0005 is received in evidence.

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4881

1              (Plaintiff Exhibit 0005 received in evidence.)

2    Q    And, again, is this type of slide deck one that you

3    received when you were head of Global Merchant Services?

4    A    I received a lot of these documents.  And it says I'm in

5    attendance, so there's no reason to believe I wasn't there.

6    Q    Okay.  Thank you.  If you'd turn to page ending in 346,

7    there's a deck on Canada Code of Conduct.  Are you with me

8    there?

9    A    Yes.

10   Q    Okay.  It says, "The Canadian Code of Conduct contains 10

11   elements that networks and acquirers have agreed to adopt,

12   including allowing merchants to differentially discount by

13   network."

14              And then it has a comparison of Durbin, which was

15   then going on in the United States, and on the right column

16   Canada Code of Conduct.  Do you see that?

17   A    I do.

18   Q    And the top line in that box says, "Merchants allowed to

19   differentiate by payment type and network."

20              Did I read that correctly?

21   A    Yes.

22   Q    So as of 2010 forward, American Express was required to

23   change its rules to allow merchants to discount for, for

24   example, a MasterCard or a Visa card; is that right?

25   A    I believe -- I don't remember what the final was, whether

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                              4882

1    this was the final ruling.

2    Q    Now, before that Code of Conduct was implemented,

3    American Express had opposed the changes; right?

4    A    Had opposed them?

5    Q    Had opposed the Code of Conduct.

6    A    I believe we did, yes.

7    Q    And was your team involved in talking to the Canadian

8    Competition Bureau about those issues?

9    A    I believe our head of Canada had discussions with the

10   Competition Bureau.

11   Q    Can you look at PX 1664?

12   A    I'm sorry.

13   Q    This is the --

14   A    16 --

15   Q    1664 --

16   A    Oh, I'm sorry.

17   Q    -- in the white binder.  This is American Express

18   submission of response to draft Code of Conduct for the credit

19   and debit card industry in Canada, January 11 -- or

20   January 18th, 2010.

21   A    I'm sorry.

22   Q    Do you have it there?  It's PX 1664.

23   A    Found it.  Sorry.

24   Q    And is this the submission that American Express made to

25   the authorities in Canada?

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4883

1  A    I don't remember seeing it, but it looks like it, yes.

2            MR. HAMER:  Plaintiffs would offer PX 1664 into

3  evidence.

4            MR. ORSINI:  No objection, Your Honor.

5            THE COURT:  PX 1664 is received in evidence.

6            (Plaintiff Exhibit 1664 received in evidence.)

7  Q    If you look on page 650 of your submission to the

8  Canadian government, you have a discussion of discounting.  Do

9  you see that?

10  A    Yes.

11  Q    And it discusses the then draft code, and it says that

12  "The Code proposes to give merchants the right to provide

13  discounts to consumers for different methods of payment (i.e.

14  cash, debit card and credit card) and also be allowed to

15  differentially discount among different brands.  American

16  Express opposes differential discounting between brands.  As a

17  network with a small market share, our ability to compete with

18  the dominant networks is put at risk by differential

19  discounting among brands, which we believe could be abused by

20  the dominant networks (directly or indirectly through

21  acquirers) by providing incentives to merchants to discount at

22  a higher rate for their products vis-a-vis American Express

23  products, ultimately lessening competition."

24            Was that your view at the time?

25  A    Yeah.  It's my view today, too, in terms of differential

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4884

1    discounting.

2    Q    And a little further down at the bottom of this page, it

3    says that "We believe that a merchant's ability to discount

4    must not be permitted to upset the balance of the two-sided

5    market (cardholder and merchant) at a significant cost to

6    consumers and competition."

7              That was your position to Canada at the time; right?

8    A    Yes.

9    Q    Okay.  So they did end up implementing the Code of

10   Conduct; right?

11   A    I don't remember exactly what was implemented.

12   Q    Okay.  Well, the document -- I won't pull it up now, but

13   the document that we just looked at summarized what the Code

14   of Conduct provided in the form of differential discounts.  Do

15   you recall that?

16   A    It said -- I -- I also said I didn't know if that was the

17   final Code of Conduct.  I just don't remember.

18   Q    Okay.  Well, let's look at another document that might

19   help.  I'll introduce -- or I'll point you to PX 2722, which

20   is another American Express presentation to the Competition

21   Bureau, October 26, 2010.

22             MR. HAMER:  This is not one that's on our exhibit

23   list.  It's a newly identified document.  We would offer this

24   in evidence.

25             MR. ORSINI:  If I can have a minute to review it,

GLENN - CROSS / HAMER                    4885

1    Your Honor.

2           THE COURT:  Sure.

3           MR. ORSINI:  I have no objection to the document,

4    Your Honor, although I do note this is the third document that

5    wasn't on the exhibit list that made it into the binder, but

6    we didn't see in advance.  So I would ask that in the future

7    the government be directed to actually give us notice of the

8    exhibits that are going to be used when they know they might

9    be using them.

10          MR. HAMER:  It's cross-examination, Your Honor, and

11   it has happened very rarely.  It has happened for both sides.

12   But we will certainly try to give notice of any new documents

13   that are not on the exhibit list.

14          THE COURT:  Thank you.  All right.  PX 2722 is

15   received in evidence.

16          (Plaintiff Exhibit 2722 received in evidence.)

17   Q    Do you have it in front of you there?

18   A    I do, yes.

19   Q    So if you look at page ending in 816 -- again, this is in

20   October of 2010 -- it describes the Code of Conduct for the

21   debit and credit card industry and it describes the steps that

22   American Express has taken to implement the Code of Conduct.

23   Do you see that?

24   A    Yes.

25   Q    And above that, under the heading "Code of Conduct," the

1   third bullet says that "Merchants have a greater ability to

2   promote lower cost forms of payment."  Do you see that?

3   A    Yes.

4   Q    Now, do you recall at this time whether in Canada there

5   was consideration of additional measures, like surcharging, as

6   a possibility at this time?

7   A    I don't.

8   Q    Were you involved in meeting with the Competition Bureau

9   in Canada?

10  A    I personally didn't meet with the Competition Bureau.

11  And I think this document, you know, represents a lot of which

12  explaining to the Competition Bureau our model, just as I was

13  in Washington, explaining to the folks there about how our

14  business model is different and the effects of regulation and

15  the effects of steering on our business.

16  Q    Okay.  Thank you.  If you look on page 817 --

17  A    Yes.

18  Q    Do you have that there?  The title is Government Policy

19  Should Protect Value and Choice.  The second bullet, it says,

20  "The Code of Conduct represents an effective and reasoned

21  approach to address concerns raised by merchants."

22       The next bullet says, "The Code of Conduct promotes

23  healthy competition between market participants, both

24  large" -- "small and large and is fair to merchants and

25  consumers.  A vigorously competitive marketplace encourages

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                    4887

1   new entrants and innovation and brings benefits to merchants

2   and consumers."  It says, "It is premature to evaluate the

3   impact of the Code of Conduct."

4          And the second-to-last bullet says, "Regulation

5   interferes in the complex balancing of interests comprising

6   payment systems and can lead to unintended consequences."

7          Does that refresh your memory as to whether at this

8   time frame, American Express was trying to persuade Canada not

9   to engage in further regulation or actions beyond the Code of

10  Conduct?

11  A    I don't remember at this point in time.  But our

12  discussion with the government in Canada and in the U.S. is

13  about the unintended consequences of regulation, pricing, or

14  differential surcharging.  It impacts our -- you know, our

15  business model.

16  Q    And that topic, if you look at page 819, the slide deck

17  talks about your concerns about surcharges; right?

18  A    And price regulation, right.

19  Q    Right.

20  A    Which is -- I think we've been consistent on that.

21  Q    Okay.  And then if you look on the final page, on

22  page 820 under "Conclusions," the third bullet says, "The Code

23  of Conduct is a balanced approach to address the concerns of

24  merchants without harming competition and consumers."

25          Did I get that right?

GLENN - CROSS / HAMER                4888

1    A    You did.

2    Q    Do you agree that merchants differentially discounting to

3    particular credit card networks is a balanced approach that

4    would address concerns of merchants without harming

5    competition and consumers?

6    A    No, I don't.

7    Q    Why not?

8    A    Because our business model works to equal treatment at

9    point-of-sale and not steering and discounting for different

10   forms of payment.  And we think that, you know, we've been

11   fairly consistent in terms of government regulation and

12   pricing has unintended consequences and ultimately doesn't

13   benefit the consumer, and it certainly hurts our business

14   model.

15   Q    You don't dispute that American Express communicated to

16   the Canadian authorities that it thought the Code of Conduct

17   allowing for differential discounting was a fair and balanced

18   approach?

19   A    I actually don't know whether -- and I didn't present it,

20   and I don't remember whether this sentence addresses

21   specifically differential surcharging.  I'm just not sure.

22        MR. HAMER:  If I may have a moment, Your Honor?

23        THE COURT:  Sure.

24   Q    I want to ask you very briefly about Business Insights.

25   You mentioned that earlier today.  Do you recall that?

SHERRY BRYANT, RMR CRR

1    A    Yes.

2    Q    And you were a leader in American Express in trying to

3    promote Business Insights as a service; right?

4    A    As part of the value proposition and potentially as a

5    service, a fee for revenue stream, as well, yes.

6    Q    So it's taking the closed loop data that you obtained

7    from transactions and monetizing it; right?

8    A    As well as embedding it in the value, the insights that

9    we have, embedding in the value, insights we give to

10   merchants, as well as supporting the marketing programs that

11   we run, as well as attempting to monetize some of these

12   analytics, yes.

13   Q    It's a separate team within American Express that

14   promotes Business Insights; right?

15   A    A separate team within the Merchant Services Business.  I

16   don't know where it stands today, but certainly when I left,

17   it was.

18   Q    Okay.  And it's a separate contract with a merchant to

19   purchase these services; right?

20   A    Yes.

21   Q    And these services allow merchants to identify American

22   Express cardmembers and assist it in developing marketing

23   strategies to help them; right?

24   A    Well, we don't give the list to the merchants, right.  So

25   there are various forms of the insights and what they provide

GLENN - CROSS / HAMER                          4890

1    for merchants.  Excuse me.  Some of them support the marketing

2    programs.  As I said earlier, merchants want to acquire new

3    customers, just like we do, and they want to keep those

4    customers.  So some of the analytics support marketing

5    programs.

6              There are other deep analytics that we do that are

7    monetized by competition.  MasterCard has a group that does

8    that.  MasterCard Advisors, I think they're called.  The

9    consulting companies have businesses that do that.

10   Q    There are competitive products on the market that sell

11   similar data services?

12   A    I don't know if it's similar, but there are people who

13   sell products and services to merchants.

14   Q    And the way you described it -- and I think I got this

15   right in your direct -- is, "We get information on who is

16   spending and where they are spending," through your normal

17   transaction data, and then you can sell information based on

18   that to merchants who would be able to use it for marketing

19   purposes; right?

20   A    Yeah.  We don't sell that information, right.  We --

21   it's -- some of it's embedded in the value proposition, right.

22   Other that we haven't monetized.  I don't think there's been a

23   lot of monetization of some of the analytics that we do or

24   deep analytics about their cardmembers and where they spend

25   and, you know, what other kinds of industries they spend in.

GLENN - CROSS / HAMER                    4891

1          So an example is some merchants actually think their

2    competition is industry and Merchants A, B, C and D, and we do

3    the analytics to tell them that, actually, they're not,

4    without giving them specifics.  So understanding who their

5    customers are are some of the deep analytics that we do.

6    Q    So if a new merchant were starting up a shop in a

7    particular location, you could sell data to assist that

8    merchant to identify other cardmembers in the area who might

9    be interested in working with that merchant?

10   A    We don't sell the data to merchants.  So that is not --

11   that's not what we do, right, which is we run market -- they

12   want to run marketing programs with us to help them do it.

13   Some of the insights that we sell are deep analytics that

14   aren't attached to marketing programs, right, but we don't

15   sell the data to merchants.  We sell sort of -- when we

16   monetized it, it was about the analytics and the service,

17   which is different.

18   Q    Thanks for that clarification.  But the services that you

19   sell is based on the data that you can collect from the

20   transactions --

21   A    Across the network, transactions, cardmembers, different

22   merchants, yes.

23   Q    And that type of information can allow a new merchant to

24   shift sales to itself from other merchants; correct?

25   A    It could allow them to acquire new customers from people

SHERRY BRYANT, RMR CRR

GLENN - CROSS / HAMER                                    4892

1   who shop at other merchants, right.  And merchants are aware

2   that we do these marketing programs.

3   Q    Do you disclose to the merchants whose customers are

4   being shifted to the new merchant that their transaction data

5   is being used for that purpose?

6   A    No, we don't.

7   Q    Do you disclose this information to your cardholders,

8   that their transaction information might be used to shift them

9   to particular merchants?

10  A    It's not their individual cardmember data.  This is all

11  like rounded, blind, right, not personally identified, and

12  takes in millions of transactions in millions of locations to

13  do modeling to help them market.

14  Q    The merchants, obviously, have data themselves, not just

15  about American Express cardholders but also about Visa and

16  MasterCard and Discover cardholders who shop at their stores;

17  right?

18  A    Absolutely, they do.  Yes.

19  Q    And I take it you would have concerns if merchants used

20  that data to try to shift their customers from American

21  Express usage to your competitors' usage through steering;

22  right?

23  A    Yes.

24            MR. HAMER:  One moment, Your Honor.

25            No further questions.

SHERRY BRYANT, RMR CRR

GLENN - REDIRECT / ORSINI                    4893

1          THE COURT:  Very well.  Redirect.

2          MR. HAMER:  Actually, Your Honor, I neglected to

3   offer one document that we referenced in evidence, DX 0890.

4   It was in Mr. Orsini's binder.

5          MR. ORSINI:  I have no objection, Your Honor.

6          THE COURT:  All right.  DX 0890 is received in

7   evidence.

8          (Defendant Exhibit 0890 received in evidence.)

9          THE COURT:  How much redirect do you have?

10          MR. ORSINI:  Not much, Your Honor.  Fifteen minutes.

11   REDIRECT EXAMINATION

12   BY MR. ORSINI:

13   Q    Mr. Hamer asked you a series of questions about the

14   Canadian Code of Conduct and specifically related to

15   differential discounting by networks.  Do you recall that?

16   A    I do, yes.

17   Q    Do you have any knowledge as to the extent to which there

18   actually has been any differential discounting by networks in

19   Canada?

20   A    I don't, no.

21   Q    Do you have any knowledge as to what the trend in the

22   Visa and MasterCard interchange rates have been since the Code

23   of Conduct was introduced in Canada?

24   A    I don't.

25   Q    He also asked you about some desire by the government in

GLENN - REDIRECT / ORSINI                    4894

1    Canada to allow for differential surcharging.  Do you recall

2    that?

3    A    Yes.

4    Q    Do you have any familiarity with the lawsuit that the

5    government of Canada filed against Visa and MasterCard and

6    lost on differential surcharging?

7    A    I don't.

8    Q    I'd like to go briefly to Walgreens.

9         MR. ORSINI:  I'm going to start, if I may, Your

10   Honor, by handing out one document.

11        THE COURT:  Yes, you may.  What are you going to

12   use?

13        MR. ORSINI:  Can we put a version on the screen?

14   This is the Walgreens' contract.  DX -- Mr. Glenn, what number

15   is on there?

16        THE WITNESS:  0359.

17        MR. ORSINI:  DX 0359.

18   Q    Mr. Glenn, is this document a contract amendment between

19   American Express and Walgreens from 1993?  You'll see the

20   date -- if you look on the first page up in the top, you'll

21   see the names of the parties and you'll see the date.

22   A    November 29th, 1993.

23   Q    It's between American Express and Walgreens?

24   A    Yes.

25   Q    Now, if you look down towards the bottom of that page,

GLENN - REDIRECT / ORSINI                    4895

1    you see the discount rates.  I'm not going to read those out

2    loud, but there's the discount rate at the highest volume band

3    at that time.  Was that the same discount rate that Walgreens

4    had been paying at the time of the cancellation threat?

5    A    I believe it was, yes.

6    Q    Take a look at the next page and address a question that

7    the Court had about the termination rights.  If you take a

8    look at paragraph 7, you see Term of Card Acceptance

9    Agreement.  Does that set forth -- and I guess we've redacted

10   the numbers, so let's not use the numbers.  Does that set

11   forth the rights that each respective party had with respect

12   to termination of the agreement?

13   A    It does.

14        MR. ORSINI:  Your Honor, I move this document into

15   evidence.

16        MR. HAMER:  No objection.

17        THE COURT:  All right.  DX 0359 is received in

18   evidence.

19        (Defendant Exhibit 0359 received in evidence.)

20        MR. ORSINI:  While we're on Walgreens, if I could

21   hand out another document.  Your Honor, this document has been

22   marked as Defendant's Exhibit 7725-A.  This is the full

23   *USA Today* article from which I had excerpted some this

24   morning.  I have no further questions about it, but I move the

25   document into evidence as a replacement for 7725.

GLENN - REDIRECT / ORSINI                    4896

1           MR. HAMER:  I commend them on their efficiency.

2           THE COURT:  But you're not surprised by it?

3           MR. HAMER:  Not surprised at all.

4           THE COURT:  It took them a while to get it to me.

5           MR. ORSINI:  It's because Mr. Hamer kept asking

6    questions, Your Honor.  That's the only reason.

7           MR. HAMER:  It obviously has a lot of hearsay.  We

8    haven't read it.  So with that reservation --

9           THE COURT:  Oh, don't worry about that.

10          MR. ORSINI:  And we're not seeking any of that for

11   the truth.

12          THE COURT:  Right.  I think it's the picture that

13   was the main objective of that exhibit, anyway.

14          MR. ORSINI:  That is correct, Your Honor.

15          THE COURT:  All right.  Thank you.  DX 7725-A is

16   received in evidence.

17          (Defendant Exhibit 7725-A received in evidence.)

18   Q    Now, Mr. Glenn, if you could look at the binder, the

19   white binder that Mr. Hamer gave you.  Take a look at

20   Plaintiff's Exhibit 0426.  This is the sales at risk analysis

21   that Mr. Theiss presented that Mr. Hamer asked you about

22   earlier.  Do you recall that discussion?

23   A    Yes.

24   Q    Look at the last page of this exhibit, which is Bates

25   number 9652.  What is a break-even analysis?

GLENN - REDIRECT / ORSINI                    4897

1   A    A break-even analysis is a financial analysis based on

2   our discount rate, our premium, and then the size of our

3   transaction difference that says, essentially, to break even

4   versus the bank cards, you would only need an incremental

5   number of sales dollars to financially break even.

6   Q    And if you look at the last of the break-even analysis,

7   there's a reference -- I won't read any of these numbers out

8   loud, but there's a reference to assumptions about what would

9   happen with American Express charge volume.  Can you explain

10  what this is setting forth?  Assuming what?

11  A    Well, we're trying to get a blended rate of what, you

12  know, the debit and bank card credit rates would be so that

13  we're not just comparing -- we're just not comparing our rate

14  to the credit card rate.  So some business would shift to

15  debit, some would shift to competitive networks, and

16  essentially trying to get the right comparison.

17  Q    And at this time, this sets forth the assumption that

18  American Express was using with Walgreens about which

19  percentage of Amex cardmembers would move to debit as compared

20  to competing credit cards?

21  A    Yes.

22  Q    If you could take a look now at Plaintiff's Exhibit 0886.

23  Do you have that in front of you, Mr. Glenn?

24  A    I'm sorry.  Yes.

25  Q    And this is the e-mail chain -- one of the e-mail chains

SHERRY BRYANT, RMR CRR

GLENN - REDIRECT / ORSINI                    4898

1   concerning the Medco issue and the question of whether

2   American Express employees would continue to fill

3   prescriptions at Walgreens?

4   A    Yes.

5   Q    Take a look at the page ending 656.  And Mr. Hamer read

6   to you, I think, the first sentence of the paragraph under

7   "Miscellaneous."  The second sentence is, "This is an

8   estimate, and Medco shared this information for our knowledge

9   only, which I confirmed we would not reveal to Walgreens."

10         To your knowledge, was that information ever

11  actually revealed to Walgreens?

12  A    No, it was not.

13  Q    Had Walgreens continued to accept American Express cards,

14  did American Express have any plans to stop its employees from

15  filling their prescriptions at Walgreens?

16  A    No, we didn't.

17  Q    And it was prior to this that Walgreens had made the

18  public announcement they were, in fact, going to cancel

19  American Express cards; correct?

20  A    They made the announcement on, I think, December 14th,

21  '04.  So it was about three weeks or four weeks before this.

22  Q    And some of the contingency planning that Mr. Hamer also

23  showed you, that had been contingency planning that was

24  occurring after that public announcement; correct?

25  A    Yes.

GLENN - REDIRECT / ORSINI                4899

1    Q    And some of that contingency planning included making

2    efforts to specifically inform cardmembers about the

3    cancellation and the fact that they could use their -- they

4    could do their grocery -- I'm sorry, not grocery, pharmacy

5    business at other places that did accept American Express;

6    correct?

7    A    Yes.

8    Q    And is that specific type of targeting something that

9    American Express had plans to do with respect to any other

10   pharmacies that were accepting American Express?

11   A    No.  Again, this was protecting our cardmembers after

12   they were aware that Walgreens was cancelling.  So we had

13   plans -- if, in fact, they canceled, we wanted to protect our

14   cardmembers and our spend.

15   Q    Now, those things you had had conversations with Mr. Rein

16   about as something American Express would have to consider if

17   they did cancel; right?

18   A    All along.  When we're talking about the marketing

19   programs and the cancellation, I told him that we were going

20   to do what we needed to do to protect our cardmembers and the

21   spend.  It was important to our business, our business model,

22   as we talked earlier, coverage, spend and perceptions of

23   coverage.  So I was consistent and clear with him.

24   Q    And notwithstanding that, they did go through by actually

25   cancelling effective midnight on that 14th; right?

GLENN - REDIRECT / ORSINI                    4900

1   A    They did.

2   Q    And it was you who called Mr. Rein that morning and had

3   another discussion with him; correct?

4   A    The morning of the 14th, yes.

5   Q    And it was after that conversation that they restarted

6   American Express acceptance?

7   A    Yes.

8   Q    Now, Mr. Rein testified in this trial that the reason he

9   restarted acceptance was because he didn't want to

10  inconvenience any consumers.  Was that consistent with your

11  understanding of the conversation you had with him that

12  morning?

13  A    Well, you know, what -- I think I testified earlier that

14  I made the call to plead with him that I didn't think it was

15  in his best interest to have one consumer walk away because

16  they weren't accepting American Express.  And so, you know, I

17  think that, in conjunction with the marketing programs and

18  things we put on the table, probably persuaded him to continue

19  acceptance.

20  Q    Mr. Hamer also showed you the prepared -- or the

21  preparation materials for the Q and A with investors.  I

22  believe that would have been in that summer, that August.  Do

23  you recall that?

24  A    Yes.

25  Q    And there was a reference there to this notion that

GLENN - REDIRECT / ORSINI                    4901

1   American Express would be willing to provide the same rate,

2   discount rate, that it provided to Walgreens to any other

3   pharmacy chains.  Do you recall that?

4   A    Yes.

5   Q    We also saw during your direct examination that American

6   Express had added a discount rate band to the table as part of

7   the Walgreens' negotiations.  Do you recall that?

8   A    Yes.

9   Q    And when Amex added that band, which Walgreens wasn't

10  eligible for at the time but was projected to be soon, did it

11  add it just for Walgreens or for all of the pharmacy players?

12  A    All of the folks -- all the merchants in the drug

13  industry.

14  Q    And why was it that American Express added that band at

15  that time?

16  A    Because we talked about the tables and transparency and

17  integrity of our pricing.  So if we added it for Walgreens, we

18  added it for the entire industry.

19  Q    Then, briefly, I just want to talk about coverage.  There

20  were a series of questions about spend coverage and locations

21  in force coverage.  During the time that you were managing the

22  Global Merchant Services business, I believe you testified

23  earlier today that you were focused upon expanding coverage;

24  correct?

25  A    Yes.

GLENN - REDIRECT / ORSINI                    4902

1   Q    And which coverage number was more significant, in your

2   view, in those efforts, LIF coverage or spend coverage?

3   A    It was all about LIF coverage.

4   Q    And can you explain why?

5   A    Because we had millions of merchants who didn't accept.

6   So we knew we had millions of merchants that didn't accept.  I

7   think the number we put in the board document was about

8   5 million merchants.  And, you know, publicly the competition

9   has said, we're accepted at three times the number of

10  locations.  So we're constantly fighting the perceptions of

11  coverage and what the competition talks about where Amex is

12  accepted.

13          So, you know, fundamental to our business model is

14  more merchants lead to greater cardmember spend, leads to

15  better economics for us that we can invest back in the value

16  proposition for our merchants and for our cardmembers.

17          So I talked about the blocking and tackling of the

18  merchant business is to acquire more merchants and continue

19  acceptance, you know, renew acceptance, continued acceptance

20  of those merchants.

21  Q    And if you could take a look back in the binder I gave

22  you this morning and look at Defendant's Exhibit 4184.

23          MR. ORSINI:  This document is in evidence,

24  Your Honor.  The slide I'm going to --

25          THE WITNESS:  I'm sorry?

SHERRY BRYANT, RMR CRR

GLENN - REDIRECT / ORSINI                4903

1    THE COURT:  4184.

2    MR. ORSINI:  4184.  The slide I'm going to focus on

3    actually has confidential information in it, Your Honor.

4    THE COURT:  Is this a redacted version?

5    MR. ORSINI:  Okay.  So we have a redacted version.

6    We can leave that up.

7    Q    If you take a look, Mr. Glenn, at the page ending 843.

8    Do you have that page entitled "Perceptions of Coverage"?

9    A    I do, yes.

10   Q    And the heading says, "Our recent research confirms that

11   POC," perception of coverage, "lags LIF coverage in all

12   markets apart from France, but it's significantly higher than

13   active LIF coverage, confirming an opportunity to increase

14   awareness of our existing merchant network."

15          And then there's a chart below it comparing the

16   various coverage metrics.

17          In your experience, was it typically the case that

18   perceptions of coverage would trail LIF coverage?

19   A    Absolutely.

20   Q    And if you can go back to the binder that Mr. Hamer gave

21   you, the white one.

22   THE COURT:  I'm sorry.  How do you measure

23   perceptions of coverage?

24   THE WITNESS:  It's done through cardmember research.

25   THE COURT:  Okay.  And why would that -- why would

SHERRY BRYANT, RMR CRR

GLENN - REDIRECT / ORSINI                    4904

1    that circumstance be logical, that the perceptions would be

2    higher than the actual LIF coverage?  Is that a messaging

3    problem or something else?

4              THE WITNESS:  I'm sorry, Your Honor.

5              THE COURT:  The percent -- it says here, "Our recent

6    research confirms that the perceptions of coverage" --

7              THE WITNESS:  Lags.

8              THE COURT:  -- "lags locations in force coverage";

9    right?

10             THE WITNESS:  Right.  So it's lower.

11             THE COURT:  It's lower?

12             THE WITNESS:  Yes.

13             THE COURT:  So why would you expect that to be the

14   case?

15             THE WITNESS:  Because, historically, I think back in

16   the '90s, our actual coverage was at 50 percent.  And so you

17   hear it all the time, like, Amex isn't accepted everywhere.

18   And so even when we gain coverage, we have to work really hard

19   to influence cardmembers' perception.

20             THE COURT:  So you're living with the perception,

21   the historical perceptions that are based in historical fact?

22             THE WITNESS:  Historic fact and actually current,

23   because we know where we don't have coverage, whether it's --

24   whether it's a coffee shop or a florist or a merchant in the

25   Midwest or somewhere that's larger than a small merchant, it

GLENN - REDIRECT / ORSINI                    4905

1    impacts peoples' perception of coverage.

2            I think I referenced the Costco example, which is,

3    to us, alarming, which is we're the only credit card accepted

4    at Costco locations -- credit card they accept there, and only

5    60 percent of our cardmembers in the Pacific Northwest, where

6    we have a high concentration of Costcos, perceive that we

7    have -- we actually are accepted at Costco.  And then it's

8    worse for the prospects.

9            So when our consumer business try to get people to

10   sign up for the card, right, the prospects say, well, it's not

11   accepted everywhere.  So it's not just the perceptions of

12   coverage of our cardmembers.  It's the issuing business

13   challenge to let cardmembers know they can use it in all

14   industries.

15           THE COURT:  I see.

16   Q    Mr. Glenn, if you could look in the white binder at

17   Plaintiff's Exhibit 2725.  And Mr. Hamer focused you on

18   pages 643 and 644, so I'd like to start with 644.

19           First of all, did you believe when you were running

20   Merchant Services that expanding LIF coverage was important?

21   A    Yes.  I not only believed it, but I was told we need to

22   expand coverage of LIF.

23   Q    Okay.  Mr. Hamer asked you a series of questions about

24   San Francisco, and I'll again remind all of us not to use the

25   numbers.  But the measure here for San Francisco, is this LIF

GLENN - REDIRECT / ORSINI                    4906

1    coverage or is it active LIF coverage?

2    A    This is LIF coverage.

3    Q    Okay.  So these are not necessarily the active LIFs in

4    San Francisco?

5    A    No.  I think I indicated that earlier, which was --

6    Q    Now, if you look at the page before, under the first

7    arrow is total LIF coverage.  It talks about those numbers,

8    based upon these DMAs.  Under number 2, which says "active LIF

9    coverage," there are numbers, percentages of the merchant base

10   that is inactive.  And here, can you tell what the definition

11   for inactive is?  Is it the same one you used earlier?

12   A    So active is one definition -- I'm sorry.  Active

13   represents one transaction at that particular merchant in a

14   12-month period of time.

15   Q    Okay.  So if you were to look at the numbers that we saw

16   in the other page we were just looking at for San Francisco

17   and it were to be an active locations in force percentage,

18   would you expect it to be higher or lower?

19   A    Active is always lower.

20   Q    And then under number 3 for merchant activity, there's a

21   number of merchants -- and these are the active small

22   merchants -- that see less than a certain number of ROCs per

23   year.  What is ROC?

24   A    It's a transaction, right.  So we looked at active a

25   couple of ways.  One is the lowest possible definition of

GLENN - REDIRECT / ORSINI                    4907

1    active, which is one transaction in a year.  And then we did

2    some analysis that said, okay, let's take that up to -- in

3    this case, it was five I think, right.  See five or less, less

4    than five ROCs per year.  That's 37 percent of our active

5    merchants.

6           So all this translates into what I talked about

7    earlier, which is relevance, right?  And people -- you know,

8    merchants are inactive because of relevance of card or

9    suppression, and we talked about active and passive

10   suppression as well.  So all that influences transactions.

11   Q    So this is a progression.  You start with sort of what

12   our total LIF number is.  Then you go to, of those LIFs, which

13   ones are active.  And then the last set of metrics is looking

14   at, okay, they're active because they have one per year, but

15   how many transactions did they sell?

16   A    Yes, because we know if it's one transaction per year

17   that merchants are eventually going to attrite.  And that's

18   why we spent a lot of time and effort trying to drive value

19   and Marketing in a Box and some of these other programs for

20   smaller merchants.

21           MR. ORSINI:  No further questions, Your Honor.

22           MR. HAMER:  One moment, Your Honor.

23           (Continued on the next page.)

24

25

*Glenn - recross - Hamer*                                          4908

1          THE COURT:  Before you start, I have a lingering

2    question.  At the very beginning of your testimony you said

3    you were now heading a joint venture and that American Express

4    had a 50 percent interest in it.  Who is the other 50 percent,

5    is it some sort of an investment vehicle?

6          THE WITNESS:  Yes, so BlackRock --

7          THE COURT:  BlackRock?

8          THE WITNESS:  BlackRock, Macquarie, Qatar, Macquarie

9    and Certares, and there's I think ███████████████████████████

10   ████████████████████████████████████

11           ████████████████████████████

12           ███████████████████████

13          THE COURT:  █████████████████████████████████████████

14   ██████████

15          All right.  Thank you.  I was just curious because

16   you said 50 percent.

17          THE WITNESS:  Yes.

18          THE COURT:  It left a big blank in my mind.

19          Go ahead.

20   RECROSS-EXAMINATION

21   BY MR. HAMER:

22   Q    Very quickly, back to the same exhibit you were

23   discussing, 2725, page 644, that has the list of the DMA

24   with it.

25   A    Yes.

*Glenn - recross - Hamer*                                          4909

1    Q    So, you said that the active coverage is always lower

2    than LIF coverage, is that right?

3    A    Yes.

4    Q    Okay.  The first column --

5    A    It has to be by definition, it is either the same or

6    lower, but I've never seen it.

7    Q    It makes sense.  If you look at the first column, there's

8    a percentage for New York City, do you see that?

9    A    I actually know it's on here, so I can't --

10             THE COURT:  What page?  We're on 644?

11             THE WITNESS:  Yes, number nine I guess.

12   Q    And I can't read it aloud for you.

13             THE COURT:  Is it is hard to read.

14             THE WITNESS:  Yeah.

15   Q    Would you agree the active LIF number for New York City

16   would be lower than this percentage listed on 644 for New

17   York, right?

18   A    Yes, I think I testified earlier that it was in the low

19   to mid 70's active, without disclosing this.

20   Q    Okay.  So, if someone said that the coverage for New York

21   was the percentage listed here and the coverage for San

22   Francisco were 50 percent, it wouldn't be comparing apples and

23   apples, right?

24             Let me ask that again.  If someone said that the

25   active LIF coverage for New York City were as listed here and

1    the active LIF coverage for San Francisco were 50 percent, it

2    wouldn't be comparing the same figures, right?

3    A    None of these are active LIF, is that what you're --

4    Q    That's fair enough.

5            So, none of the figures listed in the bottom of the

6    slide are active LIF, right?

7    A    No.

8            MR. HAMER:  Okay.  Thank you very much.  No further

9    questions.

10           MR. ORSINI:  I have no questions, Your Honor.

11           I don't make the news, I just report it.  I'm told

12   that the identity of the investors in the JV are confidential,

13   so we'll have to redact that piece of the transcript.  My

14   apologies.  Some of them at least.

15           THE COURT:  It is not relevant to the issues in this

16   case, so we'll redact it all and erase it from our minds.

17           MR. ORSINI:  Thank you, Your Honor.

18           THE COURT:  At the same time I have no interest in

19   any of those investment vehicles unfortunately.

20           MR. ORSINI:  Nor do I, Your Honor.

21           THE COURT:  All right.  All of that will be redacted

22   in the final version of the transcript.

23           MR. ORSINI:  Thank you, Your Honor.  I have no

24   further questions.

25           THE COURT:  Anything further?

*Glenn - recross - Hamer*                              4911

1          MR. ORSINI:  No, Your Honor.

2          THE COURT:  Very well.

3          Mr. Glenn, you're excused.  You may stand down.

4          THE WITNESS:  Thank you.

5          THE COURT:  Have a good day.

6          MR. ORSINI:  Thank you.

7          (Witness steps down.)

8          THE COURT:  Okay.  Now, who is going to be the next

9    witness?

10         MR. ORSINI:  It is my day, Your Honor.

11         THE COURT:  Your day.

12         And whose day is it on the other side?  Mr. Glass?

13   I saw you slip in.

14         MR. GLASS:  Good afternoon, Your Honor.

15         THE COURT:  Good afternoon and welcome.

16         Why don't we take a ten minute break and then we'll

17   resume.

18         MR. ORSINI:  Can I ask are we going to go to five

19   today or going later today?

20         THE COURT:  We'll go to six.  Is there any reason we

21   shouldn't go till six?

22         MR. ORSINI:  No, that's fine.

23         THE COURT:  We'll go till six to try to get more in.

24   All right, thank you.

25         (Recess taken.)

*Hayes - direct - Orsini*                                          4912

1            THE COURT:  Please be seated.

2            All right.  The defense may call its next witness.

3            MR. ORSINI:  Your Honor, American Express calls John

4    Hayes.

5            (Witness takes the stand.)

6            THE COURT:  Remain standing.

7            (Witness sworn by the clerk.)

8    J O H N    H A Y E S, having been first duly

9    sworn was examined and testified as follows:

10           THE CLERK:  Have a seat.  Please state and spell

11   your full name for the record.

12           THE WITNESS:  John -- do you want my middle name?

13           THE CLERK:  Everything.

14           THE WITNESS:  John Dennis Hayes,  J O H N,

15   D E N N I S, H A Y E S.

16           THE COURT:  You may inquire.

17           MR. ORSINI:  Thank you, Your Honor.

18   DIRECT EXAMINATION

19   BY MR. ORSINI:

20   Q    Good afternoon, Mr. Hayes.

21   A    Good afternoon.

22   Q    Mr. Hayes, by whom are you currently employed?

23   A    American Express.

24   Q    How long have you been working for American Express?

25   A    A little over 19 years.

1    Q    What position do you currently hold?

2    A    Chief Marketing Officer.

3    Q    To whom do you report?

4    A    Ken Chenault.

5    Q    Have you been the Chief Marketing Officer the entire 19

6    years you've been at American Express?

7    A    My responsibilities have been basically the same, the

8    title did change though in August of 2003.

9    Q    Okay.  So, the job responsibilities were the same but the

10   title changed?

11   A    That's correct.

12   Q    Now, are you an officer of the American Express Company?

13   A    Yes, I am.

14   Q    For how long have you been an officer of the American

15   Express Company?

16   A    The entire time I've been with the company.

17              THE COURT:  That title has been mentioned before.

18   What does it mean to be an officer of the American Express

19   Company?  What are the special responsibilities of being an

20   officer as opposed to not being an officer?

21              THE WITNESS:  Okay.  We are, all of the officers are

22   on the operating committee and the operating committee

23   operates as the -- think of it as the internal governance body

24   of the company.

25              THE COURT:  It manages the company?

*Hayes - direct - Orsini*                                    4914

1          THE WITNESS:  It manages the company and the people

2    who are officers come from many different disciplines.

3          THE COURT:  Okay.  I see.  Thank you.

4          MR. ORSINI:  Thank you, Your Honor.

5          THE COURT:  Thank you so much.

6    Q    Just briefly, before we come back to your

7    responsibilities as Chief Marketing Officer, what did you do

8    before you joined American Express?

9    A    I was in the advertising agency business and I had spent

10   my entire career in that business before coming to American

11   Express.

12   Q    What is your educational background?

13   A    I graduated with a BA in communications from Seton Hall

14   University.

15   Q    And when did you graduate from Seton Hall?

16   A    1976.

17   Q    So, focusing on the years you've spent as the Chief

18   Marketing Officer for American Express, in broad strokes, what

19   have been your responsibilities and what are you responsible

20   for today?

21   A    I oversee a few things.  First of all, I oversee what we

22   call end-to-end marketing which really is working with the

23   business units to be sure that we're taking an end-to-end view

24   of the customer, so that's one area.  Second is brand

25   management and managing the American Express brand across all

1   of our businesses around the world; the Marketplace Insights,

2   which is our market research function, that provides

3   information from the marketplace in various forms, and then,

4   lastly, our media function which really is buying media in all

5   of the different forms, whether it is television, radio,

6   internet, etc.

7   Q    When you say "buying media," what do you mean by that?

8   A    We purchase media for advertising, so anything that is

9   mass communications and is part of that area goes through my

10  group.  So, it is buying media in the sense of, you know,

11  buying television time for commercials to run and things like

12  that.

13  Q    You mentioned Marketplace Insights.  Is that sometimes

14  referred to as Global Marketplace Insights or GMPI?

15  A    Yes.

16  Q    And that group reports to you?

17  A    Yes, they do.

18  Q    Generally speaking, what does that group do?

19  A    That group works in a research -- with research skills to

20  go to the marketplace and either answer questions on behalf of

21  the businesses, so they'll ask questions on behalf of our

22  businesses but they also go into the market to try to track

23  how well we're performing mostly from a perceptual standpoint.

24  Q    The Court has seen various perceptions of coverage

25  studies; is that something that GMPI is responsible for?

1    A    Yes, it is.

2    Q    And the Court has also seen some merchant satisfaction

3    studies; is that something that GMPI is responsible for?

4    A    Yes, it is.  So, all of those studies would be included.

5    Q    The first responsibility you mentioned of the Chief

6    Marketing Officer was being responsible for, I believe you

7    said end-to-end marketing.  Can you explain what you mean by

8    that?

9    A    Certainly.  We just want to be sure that we -- there's a

10   lot of marketing that's done within our business units and we

11   also want to be sure though that we're taking a full

12   comprehensive view of the customer and recognizing that

13   there's many different messages that the customer might

14   receive and working to ensure that we bring a uniformity and

15   consistency to how we message in the market.

16   Q    And what type of customers are you talking about when

17   you're referencing customers for the end-to-end marketing?

18   A    Many customers of American Express; that would include

19   cardmembers, whether that's consumer, small business,

20   corporate, it would include merchants who are our customers

21   and so, it really would mean comprehensively anyone that we

22   would do business with.  The only group I wouldn't put into

23   that would be our bank partners because I refer to them more

24   as partners.

25   Q    Those are the GNS partners?

1    A    That's correct.

2    Q    The Court has also heard a fair bit of testimony about

3    the various targeted marketing programs that American Express

4    runs with merchants that accept its cards.  Are those type of

5    marketing programs within your group or is that handled in a

6    separate group?

7    A    That's handled in a separate group, that's within the

8    merchant group, Merchant Services Group.

9    Q    And the fourth piece of responsibility you mentioned a

10   few minutes ago was managing all aspects of overseeing the

11   American Express brand?

12   A    Yes.

13   Q    I'd like to talk generally a little bit, and then we'll

14   hone into the American Express brand, when you're using the

15   term "brand," what do you mean by that?

16   A    Well, you know, branding is an art form I guess but if I

17   think about branding, the origin of branding, I'll start

18   there, the origin of branding was really, you know, that's

19   my cow, that's where branding came from, that's where it

20   started, and it really has to do with creating a meaningful

21   identifier for what you're offerings are in the marketplace.

22   And so, in terms of what, you know, I try to do is to make

23   sure that we bring consistency, that we don't have confusion

24   in the marketplace for what our brand stands for.

25   Q    What is the importance of a brand for a company's

1  messaging to its sets of customers?

2  A    Well, it's very important because what a brand can -- you

3  know, brands really help consumers navigate the marketplace,

4  it helps them make decisions and so brands are fundamental to

5  the value of a company and can add enormous value in terms of

6  how much plus business and growth a company can get as well as

7  keeping a stable group of customers.  So, brands are

8  fundamental to the success of a business.

9  Q    Are you familiar with the term "brand attribute"?

10 A    Yes, I am.

11 Q    What is a brand attribute?

12 A    A brand attribute would be one of the things that might

13 define a brand and those attributes can be both rational or

14 emotional because there's both things at play with most strong

15 brands in the marketplace.

16 Q    Can you give us an example of what you mean by a rational

17 brand attribute?

18 A    A rational brand attribute might be something that's very

19 concrete in terms of how it might perform, all right.  So, if

20 we're talking about automobile brands, it might have to do

21 with how fast something accelerates in terms of performance

22 and if it's a car brand that performs in a very fast way, a

23 rational attribute might be how fast that car is.

24 Q    And what's an emotional attribute?

25 A    An emotional attribute is how good I look driving that

1    car.  It is much more on an emotional basis.  It is something

2    that will create a connection with a particular segment of the

3    population on an emotional basis and the emotions are really

4    important and I just want to take a moment, if I can, just to

5    explain because I think the emotional part sounds a little bit

6    amorphous but, you know, the emotional piece is critical and

7    one of the things I've seen in the last few years is there was

8    some research done in the motion picture business where what

9    they found was that when they surveyed people about their

10   favorite motion picture, they found that many people could not

11   recall many scenes from the film but what they remembered most

12   was how they felt.  So, someone would say, oh, that was such a

13   funny movie or I cried when I saw that movie, and those

14   emotional connections seem to be the most robust and most

15   important connections and so, branding is both a rational and

16   emotional set of elements.

17   Q    As you manage the American Express brand, are you

18   cognizant of both types of brand attributes?

19   A    Yes.

20   Q    Now, how does, still talking generally, how does a brand

21   become associated with certain attributes, whether they be

22   emotional or rational?

23   A    Well, I think there's two fundamental pieces.  The first

24   is the promise made.  So, you know, you can find the promise

25   that's being made by a brand in its communications, you know,

*Hayes - direct - Orsini*                                    4920

1    what does it promise it will do, what will it promise that it

2    will be and what will it promise who is it for.

3              So, the promise is a very important part of the

4    brand but just as important or probably even more important is

5    the delivery of that promise or how the promise is kept and

6    so, when we think about branding, we think about the promise

7    made and is that appealing, is that differentiated but, more

8    importantly, the promise kept and when I say the promise kept,

9    it really is how does that brand's products deliver on the

10   promises that that brand has made.  If it delivers well, there

11   will be high levels of satisfaction.  If it under-delivers,

12   there will be high levels of dissatisfaction.

13   Q    So, in your experience, what happens when a brand makes a

14   promise that it doesn't then live up to?

15   A    Usually the business will be hurt and the business could

16   be hurt considerably.  It's really important that, the

17   consistency of the promise so people can understand it, so you

18   have to have a promise that you make that is fairly

19   straightforward, that you do consistently, and then the

20   delivery of that promise has to be just as focused, just as

21   consistent and deliver on the promise that's been made.

22   Q    Can you think of some, or one example or two of

23   situations where a brand has made a promise that it didn't

24   keep and the effect that had on the company?

25   A    Yeah, I guess the best example I could come up with off

1    the top of my head would be Cadillac would be one brand that I

2    think has gone through an enormous set of issues.  It was an

3    extremely prominent brand if you go back to the 40's and 50's

4    but tended to lose its way in the late 60's and 70's and early

5    80's and while General Motors has done a lot of work to

6    rebuild that brand into something of prominence, they really

7    did lose much of their market dominance that they had at one

8    time enjoyed and it's mostly because there was a promise that

9    Cadillac had made, I mean people would even have an

10   expression, it's the Cadillac of whatever industry, meaning

11   the best, and they stopped delivering what would be considered

12   the best in the marketplace.

13           And, so that's just an example of a brand that's

14   gone through an evolution where the promise and the delivery

15   didn't align and, therefore, there was falloff in the

16   business, serious falloff.  Obviously for the last decade or

17   so General Motors has spent a lot of money to try to rebuild

18   that brand and its meaning.

19   Q    Now, do you consider a brand to be an asset of a company?

20   A    I do.

21   Q    And what do you mean by that?

22   A    Well, I think it's an aspect of a company that adds value

23   because it helps to define your products and offerings, it

24   helps to attract customers, it helps to retain customers from

25   a loyalty standpoint.  So, it performs a number of functions

1  for a company and if the brand is well defined and well

2  developed, it is an asset of that business.

3  Q    Are there firms out there that measure the monetary value

4  of particular brands associated with companies?

5  A    Yes, there are.

6  Q    And have you seen these from time to time with respect to

7  American Express?

8  A    I have.

9  Q    And according to these studies, what's the range of

10  values for the American Express brand?

11  A    Oh, you know, I've seen an enormous range because there

12  are different forms or methodologies to these individual

13  companies, these third parties that value brands.  I have seen

14  actually most recently a few months ago there was a BrandZ

15  study that was published in the New York Times and they valued

16  the American Express brand at someplace around 35 billion

17  dollars.  I've seen estimates that go as high as 45 billion

18  dollars and I've seen them as low as, you know, someplace

19  around 20 billion.  So, there's quite a range in terms of the

20  monetary value that someone might ascribe to the American

21  Express brand.

22  Q    What's BrandZ?

23  A    I don't know much about BrandZ.  As I said, they were

24  published in the New York Times, I don't know that much about

25  their formula.  I know more about the Interbrand formula in

*Hayes - direct - Orsini*                                              4923

1    terms of how they do valuations, but it was just something I

2    had noted because it was in the paper.

3    Q    So, BrandZ and Interbrand, these are organizations or --

4    A    Third parties, all third parties, all separate from us

5    certainly and they create their own formulas for how they go

6    about valuing a brand.

7    Q    What significance do you ascribe to these monetary

8    valuations of the American Express brand?

9    A    You know, I take them with a grain of salt partly because

10   there is so much, you know, volatility or difference in what

11   they report because for me the value of a brand is not in

12   these formulas that might estimate the asset value but rather

13   in what a brand can do for a business and that to me is where

14   the value of a brand comes in terms of what impact it might

15   have on business results.

16   Q    Now, you're Chief Marketing Officer; what role does

17   marketing play in establishing or preserving the value of a

18   brand?

19   A    Well, as I mentioned earlier, marketing is the promise

20   made.  I mean for the most part the marketing is designed to

21   help people in the marketplace, sometimes your customers,

22   sometimes your prospects, to better understand what you

23   promise in that marketplace and so, marketing is really

24   designed to communicate that promise and to put it out there

25   in the marketplace.

Hayes - direct - Orsini                                    4924

1    Q    So, marketing is the promise made.  How is the promise

2    kept?

3    A    Promise kept is really the experience and experiences are

4    really where brands are built, it is really where brands are

5    formulated.  And the challenge to branding today is to create

6    an experience that you can manage consistently across all of

7    the touch points that a customer will have.

8    Q    You use the term "touch points," what do you mean by

9    that?

10   A    Well, touch points are where you would touch the

11   customer, it's places where the customer will come in contact

12   with the brand through its products, through its services,

13   through its marketing, through everything that happens.  We

14   consider every time a customer comes in contact with

15   something, in our case American Express, that to be a touch

16   point that will create an experience that will either be

17   consistent and build the brand and build the value of the

18   brand or inconsistent and, therefore, begin to erode the

19   brand.

20   Q    So, let's focus in on the American Express brand.  Are

21   you familiar with the term "brand promise"?

22   A    I am.

23   Q    And does that relate to what you've been describing, the

24   promise that you make to your customers?

25   A    Yes, it is.

1    Q    What is the American Express brand promise?

2    A    The simplest way I can describe the American Express

3    brand promise is with three critical pieces, trust, security,

4    and service.  That's the promise that's made with everything

5    that American Express does.

6    Q    Okay.  I'll come to each of those but one question first,

7    what role does exclusivity play in the American Express brand

8    or the American Express brand promise?

9    A    Exclusivity is something that is attributable to some of

10   our products, so we have products whose value is derived

11   somewhat from exclusivity.  So, the best example I can use

12   would be the Centurion Card, the black American Express Card,

13   but that relates to that individual product.  The brand itself

14   is not really creating the attribute of exclusivity.

15            So, there are attributes that exist within our

16   products that might be specific to a product but not

17   necessarily carrying across everything we do and, therefore,

18   the brand in its totality, the enterprise view.

19   Q    So, can you give the Court some examples of products,

20   unlike the Centurion Card, where exclusivity is not part of

21   the brand aspect?

22   A    Serve and Bluebird would both be great examples of

23   products that are marketed on a mass basis.  They are easily

24   accessible, they can be purchased in many retail locations.

25   They don't require a credit check or any kind of credit

1  clearance.  So, they're extremely accessible products but

2  trust, security and service is still very present in those

3  products just as they would be at something that's exclusive

4  from us.

5  Q    So, were you involved in discussions around the launch of

6  the Serve product?

7  A    Yes, I was.

8  Q    Can you describe what the Serve product is?

9  A    Certainly.  It is a prepaid account, a full service

10 prepaid account is really the way we describe it, and full

11 service is critical here.  We named the product Serve for a

12 reason, because it's not just a disposable transaction device.

13 We don't view it as just a prepaid card that somebody might

14 load once and be done with.  We see it as a way of providing a

15 full service offering to a new segment of the population for

16 us.

17 Q    And you were also involved in discussions around the

18 Bluebird card?

19 A    Yes.

20 Q    And why did American Express launch the Bluebird card?

21 A    Well, it was a unique opportunity because it is a card

22 that comes from -- it is actually a co-branded card, it comes

23 from two brands, it comes from American Express and Wal-Mart,

24 and it was a unique opportunity to create a full service

25 prepaid account that allowed us to put it in a market and

1  bring it to market from both American Express and Wal-Mart

2  which those two brands are complementary but they bring

3  different attributes to the marketplace.

4  Q    So, what do you mean when you say the brands of American

5  Express and Wal-Mart are complementary?

6  A    Well, you know, the two brands are high quality brands.

7  We felt that the two of them together would provide a more

8  complete picture for this product.  So, you know, you've got

9  the trust, the security and the service from American Express

10 that people will expect of that product but you've also got

11 the convenience and value that Wal-Mart stands for and when

12 you bring them together, we think it can be a very unique and

13 potent offering in the marketplace.

14 Q    So, let's talk about these three words that you've been

15 using, trust, security and service.  When you talk about

16 trust, what do you mean by that?

17 A    Well, trust is something that, you know, requires --

18 first of all, it is an emotional response and it's something

19 that requires being built over time.  It is not something you

20 can claim, it is not something you can say.  In fact, probably

21 the worst thing you can say is "trust me" to create distrust.

22       So, trust is something you earn over time and it is

23 something that customers come to rely on as it relates to the

24 things that you're offering.  Can I just digress a bit in the

25 history?

1    Q     Sure.

2    A     Just to give you a little bit of perspective on why trust

3    is so important.  If you think about the businesses that

4    American Express has been in, starting in 1850 with freight

5    forwarding, moving forward from there to Travelers Cheques,

6    these businesses required that people turn over to us their

7    valuables, whether it is cash for the Travelers Cheque or

8    their goods to be forwarded in the freight forwarding

9    business, and because of that, trust was a high -- is a very

10   important element that this brand needed to stand for in the

11   marketplace and from the time of our beginnings trust is

12   something that we have developed over time by doing the right

13   thing by our customers and delivering on all of these products

14   and services that we've had in the market since 1850.

15   Q     So, how do you view trust as playing into the products

16   American Express offers today as compared to some of the

17   historical products you just described?

18   A     Well, it's just as essential today as it's always been

19   but just to finish on my last point, I think that earning

20   trust is really the point I'm making and so it's an attribute

21   of the American Express brand today not because we say so but

22   because we've earned it and it plays a very important role in

23   the business today.  You know, our customers trust us.  So,

24   when you talk about Serve and Bluebird, that trust manifests

25   in ways that people feel confident giving us their cash that

1    will then be put on a card that they can go off and use.  The

2    trust will be manifest in things like having the confidence to

3    do business, to transact with someone they may not be un --

4    they may not be familiar with, that may be unfamiliar to them

5    but the trust of American Express and the fact that they

6    believe we have their back is something that will add value to

7    that transaction because it gives them the confidence to do

8    that transaction.

9            That's just a couple of examples.  I guess the last

10   example I would say, in the digital world trust is a really

11   important factor.  You know, consumers need to trust us from

12   everything to -- as I just mentioned, the unfamiliar, which

13   the digital space has many places that are unfamiliar, all the

14   way through to their personal data, their privacy and how can

15   they trust that that will be managed well for them.  So, trust

16   plays a role in many aspects of our business today.

17   Q    How does security relate to these concepts you were just

18   describing as another aspect of the American Express brand

19   promise?

20   A    Well, security is definitely related to trust but the

21   difference is that the way I would describe security as it

22   relates to the customer really comes down to peace of mind.

23   It's the lack of worry.  It's that sense that, you know, I'm

24   confident that someone is going to have my back, is going to

25   help me if there's an issue.  And the point I want to make

1    here is we're talking about each of these elements separately

2    and I struggle a little bit talking about them separately

3    because when I conceptualize the trust, security and service

4    for American Express, I see it together, I see it as really

5    one entity because they're so related, trust and security are

6    so related and the service we provide is really what we do, is

7    more of the rational side of it, is what we do for people

8    that, you know, gives you that trust and that security.  So,

9    these things are very closely related.

10   Q    Now, how in your view has -- let's take the service

11   piece, how has American Express over the time that you've been

12   at the company reinforced this brand promise of service?

13   A    Well, service is critical to everything we do and, you

14   know, as I mentioned earlier, you can see that in our

15   communications, service has always been a critical part of the

16   value that we offer but we also invest an enormous amount in

17   the delivery of that service and the service delivery is a

18   critical part of what we consider to be our operations and to

19   what brings meaning to the brand.

20         So, service is a critical part of what we do and we

21   measure just about every aspect of service in our -- in the

22   delivery process to understand whether or not it is being well

23   received by the customer.

24   Q    And you mentioned a few times this notion that American

25   Express has people's back, what did you mean by that?

1  A    Well, what I mean by that is in terms of our service and
2  the way we treat our customers, there's a high level of
3  confidence that they will not be left stranded and some of
4  that came from the days when we were in the travel business
5  but a lot of it is relevant to, you know, where we are today
6  in the card business.
7         You know, this idea that we are going to have their
8  back, we're going to deliver for them is a big part of what
9  makes this brand valuable and, you know, when you think about
10 the value of this brand, it's so important that we view it in
11 light of the market that we are doing business in.  So,
12 service is a critical part of what we do and it's a critical
13 part of, you know, supporting the desirability of our products
14 in the marketplace.
15 Q    And when you said that there's a high level of confidence
16 that the customer will not be left stranded, can you give us
17 some examples of what you mean by that and the ways that
18 American Express has reinforced that?
19 A    Well, for years we have offered products, if you think
20 about the Travelers Cheque product and Don't Leave Home
21 Without It and the promise there was that this was a product
22 that was going to offer you the, you know, the confidence to
23 travel with your money and know that you're going to be safe
24 in the process.  That's just some of the history of that
25 confidence and having people's back and covering the things

1    that they need.  We have taken that all the way up to today

2    with many of the services that we offer as a company.

3    Q    And do those services include travel protections?

4    A    Oh, they include many things but travel protections is

5    certainly one of them, purchase protections are some of them.

6    There's, you know, a myriad of services that we offer that

7    give people the confidence to, you know, to purchase things,

8    to travel places, to do things, to live their lives and those

9    services ultimately deliver on this idea of confidence,

10   security for the brand.

11   Q    And are there circumstances in which American Express

12   provides, for example, travel protections even when it is

13   not contractually obligated to provide them to the

14   cardmembers?

15   A    Well, yeah, I mean, you know, there are examples where,

16   you know, I guess one of the things that, from where I sit,

17   that builds this brand is the actions we take and I think

18   about there was an event that followed shortly after 9/11 in

19   2001 and if you think back to that time, you'll recall that

20   there was a complete disarray in terms of travel, you know,

21   airlines were grounded, things had changed pretty radically

22   overnight and one of the knock-on effects was the cruise

23   business and, you know, we were -- I remember being in a

24   meeting not long after 9/11, I can't recall how long, it could

25   have been four or six weeks, where we were -- it was about

1   seven or eight of us talking about a cruise line, Renaissance

2   Cruise Line that was about to go under and, you know, when a

3   cruise line goes under, the creditors are -- many of them are

4   the ticket holders because they have to buy those tickets in

5   advance and we debated whether or not, you know, this was not

6   something that we had to refund to these folks, we didn't have

7   a responsibility from a legal standpoint but we decided in

8   that meeting that we would stand behind those customers and we

9   would refund those customers and the reason we did it is

10  because we said that's consistent with this brand, because I'm

11  not the only person at American Express who worries about this

12  brand, you can talk to people throughout the company and

13  they'll tell you about the American Express brand, I don't do

14  this alone, I do this with everyone else.

15          And in this particular case it was clear to

16  everybody in that room that refunding those people and having

17  their back was the right thing, even though the total amount

18  was, I don't know, someplace around 22 or 24 million dollars

19  to cover that, we thought it was the right thing to do because

20  these people had bought these tickets with their American

21  Express Card with the belief that we have their back.

22  Q    Now, there's been some discussion, I think you raised it

23  a little bit earlier, about the American Express closed loop

24  data and the things that American Express can do with that.

25  Does American Express also use that data to assist in this

1   goal of serving cardmembers?

2   A    We do.  We use it to serve -- the data is used in a

3   number of ways.  One way to use the date is obviously fraud

4   detection and understanding, you know, the normal patterns of

5   our cardmembers versus what we might see when something is out

6   of pattern.  But we've also used it in situations like if you

7   recall the tsunami in Thailand in 2000 -- I think it was 2004

8   right after the holidays or right during the holidays and we

9   were able to, you know, our service center in Asia was able to

10  make use of cardmember data and transactions to identify the

11  people who had in fact survived the tsunami and where they

12  might be following that event and we were able to get some of

13  that information back to their families so that they had an

14  idea of the fact that these people were okay and where, what

15  their whereabouts was at that point.

16         So, that's just an example of how that data can be

17  used and is used at times.  But -- that was an extraordinary

18  situation but on a daily basis, you know, protecting our

19  cardmembers and our merchants in terms of things like fraud,

20  that cardmember data is also used there.

21  Q    You also mentioned earlier that one of the things that

22  the brand is built on are experiences.

23         Do you have a role in creating experiences for

24  cardmembers?

25  A    I do.  You know, it is a very big part of what we do from

1    a marketing standpoint, creating events and creating

2    experiences in those events is a big part of both

3    reinforcing for our customers, our cardmembers what it

4    feels like, what is the value of American Express, but we

5    also do it to include prospects many times as well so that

6    they can feel what it is like to be a customer of American

7    Express.

8             And we do a variety of events, I mean we do things

9    like one of the things we've done for a number of years is

10   front of the line ticket access and giving people an advantage

11   to see and experience the things they want to see.

12            We've done a number of things to create unique

13   experiences at the U.S. Open., the U.S. Open tennis event,

14   it's been an event we've been involved with for the last 20

15   years, and we recognize that many of our cardmembers and

16   customers have a passion for tennis and so out there we create

17   a unique experience, whether it's getting the radio that clips

18   right on to your ear so you can see the play-by-play while

19   you're there which you can't experience live any other way;

20   it's creating services, we bring up some of our service people

21   from Fort Lauderdale and have them on-site to serve our

22   cardmembers and in some cases prospects, and so we do a number

23   of things.

24            Another event that we do is called Unstaged where we

25   live-stream special music concerts because we know another

1  passion of our cardmembers is music and we give them access

2  to unique acts that they really couldn't get to any other

3  way.  For something like that prospects, you know, non-

4  cardmembers as well as cardmembers have access to that for the

5  reasons I've cited because it is important for them to

6  understand what it feels like, what is the experience of being

7  a customer of American Express.

8  Q    Now, if you take a look at in your binder which I have

9  not handed to you so you can't.

10         MR. ORSINI:  Your Honor, if I may approach?

11         THE COURT:  Yes, you may.

12  Q    And in the binder I've handed you, Mr. Hayes, if you can

13  take a look at the document designated as Defendant's Exhibit

14  6763.

15         MR. ORSINI:  Your Honor, this document is not

16  confidential.

17         THE COURT:  Okay.

18  Q    Mr. Hayes, what is this document?

19  A    This is an internal document that my team created and

20  it's a document that we -- this is a good representation of

21  what we do internally to bring a focus to our brand on an

22  internal basis to help make sure everyone is focused on the

23  brand, that everybody is, you know, understanding it and

24  bringing it to what they do individually within the company.

25  Q    Okay.

1      MR. ORSINI:  Your Honor, I offer DX 6763 into

2  evidence.

3      MR. HAMER:  No objection, Your Honor.

4      THE COURT:  All right.  DX 6763 is received into

5  evidence.

6      (Defendant's Exhibit 6763 so marked in evidence.)

7  Q    Mr. Hayes, if you look at the page ending in 841.

8  A    Yes.

9  Q    There's a quote there attributed to Mr. Chenault.  Do you

10 agree with that?

11 A    Yes, I do.

12 Q    Why is that?

13 A    Because I've experienced over the last 19 plus years

14 the power of the American Express brand to be a contributor

15 to our growth as a business.

16 Q    And can you just describe briefly what you mean by

17 that, how does the brand contribute to your growth as a

18 business?

19 A    Well, you know, because it's so clearly defined in the

20 marketplace with this idea of trust, security and service and

21 it has been so well defined and then delivered upon, it gives

22 people an immediate expectation of what they can, what they

23 will get from American Express.

24      So, when we launch a new product into the market,

25 having a brand as well developed and as strong as American

1  Express gives us the ability to bring that product to

2  market.  If it was not branded at all and no one knew where

3  it came from, they wouldn't come to that product with the

4  expectation that they can trust it, that it would give them

5  high levels of service, that it would be something that could

6  provide some security for them.

7           So, the brand as an asset brings many things, many

8  expectations to what it is you're doing.  It allows us to

9  attract new customers and, you know, it's a -- the brand is

10 such an important asset because it really is a reflection of

11 the relationships that we have with our customers.

12 Q    And when you're using customers there, who are you

13 talking about, what category of customers, is that the same

14 group you talked about earlier?

15 A    Yes.

16 Q    And that includes whom?

17 A    It includes cardmembers, the various cardmembers that we

18 identified, whether it is consumers or small businesses or

19 corporations, as well as, you know, the merchant groups.

20 Q    Now, it is your view, Mr. Hayes, that American Express

21 has strong loyalty with its customer groups; is that correct?

22 A    Well, we work hard every day to develop loyalty.  I think

23 that the best way I can answer your question is to say that

24 the way we go to market is to build relationships with our

25 customers and I think the best evidence that I can give you,

*Hayes - direct - Orsini*                                          4939

1   it is anecdotal but to me it is compelling, is that whenever I

2   meet people and I ask them if they're American Express

3   Cardmembers, I'll follow that question with what's your member

4   since date and I am always amazed at how well people know that

5   date off the top of their head.  They don't open their wallet

6   and look at the card and say, oh, gosh.  They tell me

7   immediately, you know, 1981.  And I ask them with all the

8   passwords you have to remember and with everything else that

9   you've got in your mind, how is it you remember that date,

10  because functionally that date has no functionality in our

11  processes, and these people respond to me, well, it was -- I

12  remember when I got it, it was a moment, and I think that all

13  of that is emblematic of the fact that American Express is a

14  brand that has to build want in the marketplace.

15          Can I explain that a little bit?

16  Q     Sure.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

4940

1    CONTINUED DIRECT EXAMINATION

2    BY MR. ORSINI:

3    Q    Okay.

4    A    American Express, we are in the business, you know, that

5    I would argue that Visa and MasterCard are brands that are

6    needed in people's lives. They -- they -- frequently, people

7    frequently get those cards as an extension of another

8    relationship, they maybe seek it out particularly, but it was

9    part of a debit offering or a credit offering from the bank

10   they do business with.

11          But with American Express you have to take

12   deliberate step to get our products.  And the only way, and

13   quite frankly and somewhat unfortunately you can get through

14   life very well without an American Express card.

15          For us, we have to build that want in the market,

16   that desire.  And so building relationships with people is a

17   fundamental part of what we have to do in the market every

18   day, because in order for us to do business, we have to create

19   that want, that desire for our products.

20          And by building relationships, it allows us to

21   deepen what we do with people, but also allows us to then

22   build towards a level of loyalty.

23   Q    So what does that level of loyalty and the fact that

24   people know their membership, member since dates tell you

25   about what you do or don't need to do to continue to maintain

1  that relationship?

2  A    Well, it tells me that we have a very deep relationship,

3  but it's not something we can take for granted.  It's not

4  something that I believe will be there if we take it for

5  granted.

6         I'll give you an example of something that happened

7  very recently.  I recently learned that the first year we put

8  "member since" on the card was 1964.  And the way I learned

9  this was, because this year is 2014, it is the 50th

10 anniversary of those card members.

11        And I have gotten a number of letters and e-mails

12 from those customers that are celebrating their 50 years.  And

13 they are not pleased that it wasn't recognized.  In fact many

14 of those notes come to me and they say do 50 years not matter?

15 I mean, what is going on here?

16        And you can tell two things from that.  One, you can

17 tell the depth of the relationship, and it's real.  I mean,

18 these people want to be recognized for how long they have been

19 a card member.  But you also get the sense that, you know

20 what, the minute you take it for granted, you don't recognize

21 it, they are not going to be there for you.  Because the

22 emotion in some of those notes was -- is quite telling.

23 Q    What did you do in response to getting those notes?

24 A    Well, I have created a kit that we will be sending out to

25 every one of our card members when they reach their 50th

1   anniversary.  The kit includes a letter from Ken Chenault,

2   includes a replacement card which will be their same plastic,

3   so if they're a green card member, it will be a green card.

4          But the only difference on the card will be in the

5   filigree there is a "50" that is very clear and easy to

6   recognize, because we want these folks to be able to proudly

7   demonstrate that they're 50-year card members with American

8   Express.

9   Q    And why did you think that was something that was

10  important to do?

11  A    Well, because, you know, if you think about the

12  characterization of our service, respect and recognition is

13  the way we characterize, the way we deliver service, the

14  benefit of our service.  And I felt it was very important

15  based on these letters that these folks be recognized.

16         And by doing this, I think it recognizes who they

17  are and demonstrates our respect for the fact that they have

18  done business with us for 50 years.

19  Q    Now, if we could take a look at slide 843, please.  And

20  this is entitled, "Keys to Building a Strong Brand."  It lists

21  three fundamentals.  A clear brand promise, we've talked about

22  that.  Consistently implanted over time, I think we've talked

23  about that as well.  And then it references this concept of

24  touch points again.

25         So in the context of American Express' business,

HAYES-DIRECT-ORSINI                          4943

1   what did you mean when you were presenting internally about

2   touch points?

3   A    Well, it meant, you know, all of the places, as I

4   mentioned earlier, it is all of the places we touch our

5   customers.  I mean, this is where brand management gets

6   complex, because you have to insure that you're consistently

7   delivering whatever it is you promise across all of the touch

8   points for that particular customer.

9   Q    And so, for example, with respect to merchants, what are

10  some of the touch points that you manage?

11  A    Well, related to merchants --

12  Q    With merchants as customers.  Are there touch points with

13  merchants as customers?

14  A    Certainly.  I mean, you know, if you think about some of

15  those touch points, what we do from a fraud standpoint is one

16  of those services that touches the merchant.  There is many

17  things that we do in terms of making offers, and what we've

18  done with card synch that has allowed us to, you know, offer a

19  service of bringing more customers.

20          But also in our service centers, you know, what we

21  do, we measure every transaction that we have with recommend

22  to a friend in terms of our merchants and our merchant

23  services.

24  Q    Can you describe what you mean by that, by measuring and

25  recommending to a friend?

1   A    Yes.  We try to keep measurements really simple, because

2   we find that when you are operating in an enterprise as large

3   as ours, it is important to have simple clear metrics that you

4   can rely on just to measure different things.

5            In this case, it's satisfaction.  And the question

6   that we ask after a transaction with us, after a touch point

7   with us, with one of our service people, will be would you

8   recommend this brand to a friend.  And understanding that, and

9   understanding how well we perform after that touch point is

10  important for us in understanding how well we are performing

11  against the expectations for that customer.

12  Q    What does American Express do to monitor the consistency

13  of these merchant touch points that you've described?

14  A    Oh, we put an enormous amount into, you know, this

15  presentation is one of many things that we do inside the

16  company to reinforce for every organization the importance of

17  consistency at, whenever we are, in touching a customer,

18  whether that be, you know, signing a merchant or, you know,

19  servicing or offering value.

20           All of those touch points we look at, and we look to

21  create consistency across all of it.

22  Q    Now, shifting to card members as customers, does American

23  Express undertake efforts to maintain the consistency of touch

24  points with that set of customers?

25  A    Oh, yes.  I mean, it -- we -- we do an enormous number of

1    things again to provide consistency, because again you've got

2    separate business, separate business units, you know, people

3    driving those businesses, and it is so important that when we

4    get down to every one of the touch points that we manage it

5    with such clarity and simplicity.

6            I will give you an example. If you could see the

7    bank partners that we do business with.  I'll just use that as

8    an example.

9    Q    These are, just so we're clear --

10   A    I'm sorry, the GNS bank partners.

11   Q    And they issue credit cards, they're on the American

12   Express network, but also have their logo on it?

13   A    That is correct.  And if you look at what we do there,

14   and, you know, we've created something, it's quite a large

15   book called, we call it, the acronym is BOP, BOP meaning book

16   of permissions.

17           And what we do is we have outlined in copious detail

18   exactly how every touch point that that bank partner will have

19   in touching consumers needs to be managed, because managing it

20   consistently is the way we will build the brand.

21   Q    Why does it matter -- why does it matter how American

22   Express -- I am sorry -- how the bank partners interact with

23   their own card members?

24   A    Well, I was just going back to this -- this point here.

25   It says "across all touch points." Our business is quite

1  complex, and we have to manage very effectively across

2  multiple touch points, multiple customer segments, and we have

3  to manage that with great consistency, because confusion is

4  the enemy of great branding, as is inconsistency.

5  Q    And what are the other places where American Express has

6  touch points with its card members?

7  A    Well, our service delivery units, if you look at what we

8  do in terms of the service that we offer, we have touch points

9  where, you know, our customers are calling us and they are

10 looking for us to solve problems for them.

11        And those touch points are critical and again we

12 measure the transactions, we measure the value with recommend

13 to a friend, measurements to see how well we are performing

14 there.

15 Q    Now, over the years you have been involved in discussions

16 around potential co-branded partnerships within American

17 Express?

18 A    Yes.

19 Q    And what is your role in those discussions?

20 A    The role I play and my team plays is to look at the

21 compatibility of the brands that we are looking to do a

22 co-brand with and to determine whether or not that is going to

23 add value to our brand and add value obviously to the

24 co-branded partners' brands, and to understand whether or not

25 that is going to add to the value of American Express in the

1    marketplace, because what we are doing is consistent with the

2    things we stand for.

3    Q    And why does it matter whether or not American Express

4    brand is compatible with the brands that you are considering

5    partnering with?

6    A    Because people will judge and understand or not

7    understand the American Express brand based on the brands we

8    put it next to.  The brands we create partnerships with.  And

9    so it is very important, as I mentioned earlier, for

10   simplicity and clarity, for it to be easy and simple to

11   understand why is American Express doing business and

12   co-branding with that other brand.

13            I mentioned before with Bluebird, you know, Walmart

14   and American Express really is a very cohesive and very

15   powerful combination of brands that we can bring to the

16   marketplace for something like a full service prepaid account.

17   Q    And does American Express also sometimes partner with,

18   not the co-brand cards, but with organizations, you mentioned

19   USTA earlier.  Are there other organizations that American

20   Express aligns itself with?

21   A    Oh, yeah, there's many organizations that we align

22   ourselves with.  And we do the same approach with the

23   organizations that we are aligning ourselves with, whether

24   it's USTA, USGA.

25            When we look at organizations that we are going to

HAYES-DIRECT-ORSINI                                    4948

1   do a sponsorship with or get involved with in any way, we look

2   at whether or not that particular sponsorship or that entity

3   will live up to our values, live up to the integrity that

4   brings about the trust and security for American Express. So

5   who we align with is very important in terms of delivering on

6   those values and those attributes in the marketplace.

7   Q    And have you been involved in discussion about

8   essentially GNS partnerships and how that relates to American

9   Express?

10  A    Yes.

11  Q    And what was your role in those discussions?

12  A    Well, I guess the greatest outcome of my role would have

13  been the BOP, the book of permissions, to understand, you

14  know, how we will manage that new product offering in the

15  marketplace, and how the experience will be managed.  But we

16  also spent, you know, I spent time understanding each of these

17  entities, particularly in the early days with my team and I

18  spent time understanding the banks that we were going to be

19  doing business with, and understanding, you know, how they

20  served customers et cetera.

21  Q    And was one of those you were involved with discussions

22  with MBNA?

23  A    Yes.

24  Q    Take a look in your binder at Defendant's Exhibit 2003.

25  And what is this document?

HAYES-DIRECT-ORSINI                                    4949

1    A    This was a presentation that we did getting into the --

2    this is the very beginning of the relationship with MBNA.  Do

3    you want me to explain who they are?

4    Q    No -- sure.

5    A    Because MBNA no longer exists as a standalone entity.

6    They were purchased by Bank of America.  And they were a bank

7    that really specialized in doing affinity cards, like a

8    university card for people who were alumni of that university.

9              MR. ORSINI:  Your Honor, we offer DX 2003 into

10   evidence.

11             MR. GLASS:  Your Honor, no objection.

12             THE COURT:  All right.  DX 2003 is received in

13   evidence.

14             (So marked Defendant's Exhibit 2003 in evidence.)

15   Q    Take a look at slide 7 which ends in Bates number 3510.

16   A    Yes.

17   Q    The American Express brand promise.  What was the purpose

18   of presenting this slide to MBNA?

19   A    The purpose was to help them fully understand what we

20   needed to deliver in order for anything we do in the

21   marketplace to live up to being branded American Express.  So

22   we started with what was in the middle there with making

23   customers feel respected and special through unsurpassed

24   service, expertise and integrity.  I look at those as another

25   way of talking about the attributes of the American Express

HAYES-DIRECT-ORSINI                                    4950

1    brand?

2    Q    And did American Express ultimately partner with MBNA?

3    A    Yes, we did.

4    Q    And today Bank of America?

5    A    That's correct.

6    Q    You can put that document aside.

7         You mentioned earlier, Mr. Hayes, that GMPI is one

8    of the groups that reports to you.  Is one of the things that

9    they study the affinity that your card members have to the

10   American Express brand?

11   A    Yes.  You know, one of the things that I mentioned

12   earlier was anecdotal about the member since date.  But we are

13   in market, for example, with the brand Health Tracker, where

14   we are in markets basically every day serving the customer

15   base and prospects, to understand how they view the American

16   Express brand.

17        And the reason -- and we roll that up monthly and

18   view the results monthly.  And the reason we do it as a

19   tracker is because we want to understand any changes in the

20   marketplace related to the brand and how the brand is being

21   perceived by these different segments.

22   Q    When you say you are in market every day and then you

23   roll it up; what does that mean?

24   A    It means that we're -- when you do a tracking study, you

25   are in market asking the questions all of the time, every day.

HAYES-DIRECT-ORSINI                               4951

1    We probably don't do it on Saturdays and Sundays, but we are

2    out there every week asking the audience that we survey

3    questions about American Express.

4            And then we take the results of that, we don't look

5    at the results every day because it's is too frequent to look

6    at the results, but it's not too frequent to gather the

7    result.

8            So what we do is we roll them up on a monthly basis,

9    and then once a month we look at what are the fundamental

10   changes, are there things shifting, are there, you know,

11   changes that we see in the brand overall.

12   Q    If you could take a look in your binder at Defense

13   Exhibit 7617.  The cover is an e-mail from Adam Rothschild to

14   RSS, that's Bobby Schreiber, and you are copied on this.  Who

15   is Adam Rothschild?

16   A    Adam heads up the global marketplace insights group,

17   GMPI.

18   Q    If you look at the next page, you see there is a Deck

19   that was prepared, a presentation, entitled "Global Brand

20   Overview."

21           Do you see that?

22   A    Yes, I do.

23   Q    And this a type of document that GMPI creates?

24   A    Yes.  Yes.

25           MR. ORSINI:  Your Honor, I offer DX 7617.

HAYES-DIRECT-ORSINI                                        4952

1        MR. GLASS:  No objection, Your Honor.

2        THE COURT:  All right.  DX 7617 is received in

3    evidence.

4        (So marked Defendants' Exhibit 7617 is admitted.)

5    Q    Take a look at slide 7, which is Bates ending 763.

6    A    Yes.

7    Q    This document is actually confidential.

8        This is a slide that is entitled "Key Driver

9    Analysis, American Express Brand Tracker."

10   A    Yes.

11   Q    And brand tracker, is this the study you were referring

12   to a minute ago?

13   A    Yes, it is.

14   Q    And then if you go to the first column down on the left,

15   there are a series of rows.  Are these the key drivers that

16   were at least at that time being measured as part of the brand

17   tracker?

18   A    Yes, that is correct.

19   Q    And the first one under "Unaided brand awareness is for

20   someone like me."  Why is that a key driver that you studied?

21   A    For someone like me is fundamental, because when you are

22   talking to both customers and prospects, if they don't view

23   that your brand is for them, it is unlikely you are going to

24   either keep them as a customer or get them as a customer.

25        And so insuring that people feel that the brand is

HAYES-DIRECT-ORSINI                           4953

1    for them is a very important part of effectively managing the

2    brand over time.

3    Q    If you go down to the bottom one, right above "Likely to

4    recommend," key driver that is listed there is "Feel good

5    using it."  Is that also a key driver that the brand tracker

6    measures?

7    A    Yes, it is.

8    Q    Why is that one of the key drivers that you are

9    measuring?

10   A    Well, because it reflects one of the most important touch

11   points that we have.  I mean, we are in the payments business,

12   and our cards are payment cards.  And so how a customer feels

13   using that card is an important part of the delivery of the

14   brand.  And so it is very important information for that to be

15   measured and understood.

16   Q    You said it reflects one of the most important touch

17   points.  What is the important touch point you are referring

18   to?

19   A    When a customer will use their card.  So when they pay

20   for something.  When they go to pay for something and use the

21   American Express card, that experience is a very important

22   part of how they view the totality of the American Express

23   brand.

24        MR. ORSINI:  One moment, Your Honor.

25   Q    If you can take a look at slide 9, please.  Do you have

1  that in front of you?

2  A    Yes, I do.

3  Q    And this slide is talking about coverage as it relates to

4  brand help among both card members and prospects. Why is

5  coverage something that is measured as far as brand help

6  trackers?

7  A    Well, because coverage directly affects that the

8  experience of how I feel using the card.  You know if there is

9  a problem or a merchant doesn't accept American Express,

10  that's not a good thing for the brand, so we need to

11  understand what our coverage is.

12  Q    Why do you measure coverage or perceptions of coverage as

13  it relates to prospects?

14  A    Well, because we want prospects to become customers.  So

15  we look at prospects because we see them as our potential

16  future customers.  And we know that both coverage and the

17  perception of coverage are important measures related to

18  whether or not somebody wants to become an American Express

19  card member.

20        Remember, I go back to the fundamentals of what we

21  are trying to do with American Express.  We are not in the

22  need business. You don't need an American Express card.  We

23  have to get you to a place where you want an American Express

24  card.  That's why someone like me, I want this.

25        And it also goes to perceptions of coverage and

1  coverage.  You know, is this going to work for me.  Do I want

2  this product.  So that's just what underneath all of these

3  measures as we look at them.

4  Q    I would like to show you a different document, if you

5  could look at Defendant's Exhibit 6309.  The cover of this is

6  "Consumer Services Market Voice Executive Report."  What is

7  Market Voice?

8  A    Market Voice is similar to the brand Health Tracker in

9  the sense that it is another tracking study that we do in the

10 marketplace, and we roll it up once a month as well.  So it's,

11 from that standpoint, very similar.  But the focus of Market

12 Voice is on our products as opposed to just on our brand.

13 Q    And what sort of products are being measured as part of

14 the Market Voice study?

15 A    Well, in this particular case we were measuring the

16 consumer products, and the consumer cards that we have in the

17 market.

18 Q    This is not a study conducted by GMPI?

19 A    Yes, it is.

20        MR. ORSINI:  Your Honor, I offer DX 6309 as

21 evidence.

22        MR. GLASS:  No objection.

23        THE COURT:  All right.  DX 6309 is received in

24 evidence.

25        (So marked Defendants' Exhibit 6309 in evidence.)

HAYES-DIRECT-ORSINI                                    4956

1    Q    And if you look at page ending 288.

2    A    I don't have 288.  822, maybe?

3              MR. ORSINI:  I'm sorry.  One second.

4              THE COURT:  6309.  822, it's a possibility.

5              MR. ORSINI:  Sorry, I actually meant 825.  I am

6    sorry.

7    A    Okay.

8    Q    And the title of this slide is "Touch Points and Image

9    Attributes, Consumer Services Overall."  And what is this used

10   for within American Express' business?

11   A    Well, it is used for a few things, but most importantly

12   it tells us how well we are doing in the marketplace related

13   to the touch points, and how effectively we are delivering on

14   that, those touch points, and how it is ultimately affecting

15   the view of the American Express brand.

16   Q    Now, these Market Voice-type surveys, are they used only

17   by your group or are they used by other groups within American

18   Express?

19   A    No, they are used by the business units within American

20   Express.  And while my group will field the study for the

21   business units, the business units themselves are using this

22   data to make decision about what they need to do.

23   Q    So this one we said was focused on consumer cards.  Does

24   that mean the business unit would be Josh Silverman's business

25   unit?

HAYES-DIRECT-ORSINI                                    4957

1   A    That's correct.

2   Q    If you'd take a look at a different document, which is

3   Defendant's Exhibit 3974.  Do you have that?

4   A    I do.

5   Q    This is another study done out of GMPI?

6   A    Yes, it is.

7   Q    Is this one conducted regularly?

8   A    It is different than the Brand Health Tracker and Market

9   Voice.  It is not a continuous tracker.  So on a periodic

10  basis we go in and field this research.  We don't do the

11  research on a steady monthly basis.

12  Q    So you are distinguishing this from the one that's run

13  every day and rolled up monthly.  It's one that is done

14  periodically over time?

15  A    That's right.

16          MR. ORSINI:  Your Honor, I offer 3974.

17          MR. GLASS:  No objection, Your Honor.

18          THE COURT:  All right.  Defendant's Exhibit 3974 is

19  received in evidence.

20          (So marked Defendant's Exhibit 3974 in evidence.)

21  Q    Now, this one I would like you to look at page 288,

22  please.

23          THE COURT:  How do they get this information?  Do

24  they call people?

25          THE WITNESS:  We have, we use outside research firms

1   and they specialize in touching base with people.  It could be

2   a phone call, it could be a mail survey, it could be on line,

3   Internet.  There is a variety of way that we reach people to

4   ask these questions.

5              THE COURT:  So target population that they want to

6   measure, the views of which they want to measure, that is

7   where they go in order to provide you with the data for these

8   reports?

9              THE WITNESS:  That is exactly right.

10             THE COURT:  And GMPI is an outside vendor; in other

11  words, you employ them, or they work for you?

12             THE WITNESS:  GMPI is an internal group.  They are

13  actually in my organization.

14             THE COURT:  Oh, they are.

15             THE WITNESS:  What they will do is they will farm

16  out to those outside research vendors the specs.  In other

17  words, who we want to talk to, what are the questions that we

18  want answered, et cetera.  They'll put that together and field

19  it in the marketplace and bring it back to us.

20             They bring it back to GMPI first because those are

21  the people specialize in knowing if something is not done

22  right or if there's a misleading result to make sure that

23  we've got credibility in the results.  And then the GMPI

24  organization will bring it back to the business unit on whose

25  behalf they were fielding this.

HAYES-DIRECT-ORSINI                         4959

1          THE COURT:  So in effect, they validate it and then
2     they pass it along.
3          THE WITNESS:  That's correct.  And they'll summarize
4     it at times, too, and hopefully bring some insights to the
5     work, which is why we call them marketplace insights as a
6     group.
7          THE COURT:  Thank you.
8     CONTINUED DIRECT EXAMINATION
9     BY MR. ORSINI:
10    Q    If you look at the first page of this presentation, page
11    270, there's a reference to a research group, National Analyst
12    Worldwide.  What are they?
13    A    That would be an outside vendor that was used to field
14    this study.
15    Q    So if you can go back to 288, please.  There's reference
16    here to two coverage metrics.  There's perception of coverage,
17    which we've talked about quite a bit so we won't go into that.
18    And then there's SWC.  What does SWC mean?
19    A    Satisfaction with Coverage.
20    Q    What's the difference between Perception of Coverage and
21    Satisfaction with Coverage.
22    A    Let me explain, actually, all three.  The first is
23    coverage, right.  So we measure what the coverage is.  And
24    then we look at what are the perceptions of coverage among
25    both customers and prospects to understand if there's a

HAYES-DIRECT-ORSINI                                    4960

1   difference between the reality of coverage and the perception

2   that people might have of where our cards are accepted.

3           And then we also look at what is the satisfaction.

4   And the satisfaction is, really, the -- is focused, first of

5   all, on our cardmember base.  It's looking at, using a scale

6   of one to ten, how would you describe your satisfaction with

7   the level of coverage that we have.

8   Q    So beneath there's a yellow box that's labeled

9   Influencers, and then there are five influences beneath it.

10  So you talked about actual coverage.  What's usage experience,

11  is that just what it sounds like?

12  A    It sure it.  This is probably -- if we drew these boxes

13  in terms of their importance or what we believe to be their

14  impact, usage experiences would be very large because it's

15  what's influencing these folks based on what they see and what

16  happens in terms of the usage of the card at Point of Sale.

17  Q    What are visual cues?

18  A    Visual cues are things like decals at Point of Sale,

19  signage, things that clearly recognize that American Express

20  cards are accepted at a particular merchant.

21  Q    I think we talked about card affinity and relationship.

22  What's Communications and Info?

23  A    It's whatever might be put in the marketplace to

24  reinforce either what the coverage is, how easy it is to use

25  the card, things along those lines.

HAYES-DIRECT-ORSINI                          4961

1   Q    Okay.  You can put that document aside.

2        Now, Mr. Hayes, you're familiar with the

3   non-discrimination provision that are the focus of this

4   lawsuit, correct?

5   A    I am.

6   Q    From your perspective, what is the importance of the

7   nondiscrimination provisions to the American Express business?

8   A    Well, they're designed to manage that experience at Point

9   of Sale that our customers will have when they go to use an

10  American Express card.

11  Q    Why do you believe that that's important?

12  A    I think it's fundamental.  Because the -- we talked about

13  touch points before.  The touch point of usage of a card is,

14  frankly, one of the most important touch points that we have

15  with customers.  One, because the card is a payment device,

16  and also because of the frequency by which our customers are

17  in that situation of making use of the card at Point of Sale.

18  Q    If American Express wasn't able to have the

19  nondiscrimination provisions and deliver that consistent

20  experience what do you think the impact would be on its

21  business?

22  A    Oh, I think it would be very negative.  A very negative

23  impact on it because it would have negative impact on the

24  brand.  You know, maybe I look at the world through one lens,

25  which is the brand lens.  But, you know, this brand is who it

HAYES-DIRECT-ORSINI                          4962

1   is today because of the experience.

2            When you talk to our cardmembers and you talk to

3   them about what they believe in in American Express, they'll

4   go back to their experiences.  And their experiences are

5   varied, some of them are services experiences.  But the

6   purchase experience, the experience at Point of Sale is

7   critical to how they think about this brand.

8            The nondiscrimination provisions are designed to, no

9   different than the BOP with the bank partners, it is designed

10  to clearly state this is the experience we need to have our

11  cardmembers have with us.

12  Q    So --

13  A    We need our cardmembers to have.  That's what I was

14  trying to say.

15  Q    You were involved back in the 90's in American Express'

16  business reactions to the We Prefer Visa campaign, correct?

17  A    Yes, I was.

18  Q    What do you recall about the We Prefer campaign?

19  A    It had -- what I remembered most was it scared me.  It

20  was a -- it was a very impactful [sic] effort they were doing.

21  Q    Why was it something that scared you?

22  A    Because it had -- it had an impact on our cardmembers and

23  their perceptions.

24  Q    If you can take a look in your binder at Defendant's

25  Exhibit 7525.

HAYES-DIRECT-ORSINI                           4963

1          MR. ORSINI:  Your Honor, this document is in

2     evidence.

3     Q    Do you recall that there was an impact study done in 1997

4     on the We Prefer campaign?

5     A    I do.  I mean, my memories of this are probably

6     commensurate with the time that has elapsed since.  I remember

7     some things about it, yes.

8     Q    You're familiar with the term "welcome acceptance"?

9     A    Yes, I am.

10    Q    What does that term mean?

11    A    It is what our merchants provide at that point in the

12    service chain, which is, we want the card to be welcome when

13    an American Express cardmember presents their card for

14    payment.

15    Q    If you look at the second page of this memo.

16    A    Yes.

17    Q    Towards the top right, under Reaction to General Payment

18    Preferences Messages.  There's a statement that says, "Well,

19    being exposed to a payment preference message does not make

20    cardmembers and non-cardmembers feel unwelcome.  It does make

21    them feel that the establishment does not understand their

22    needs and is not making it convenient for them to make

23    purchases."

24          So can you explain -- you said welcome acceptance is

25    important.  And this is saying that message did not make

1   cardmembers and non-cardmembers feel unwelcome.  Can you

2   explain how those two are consistent?

3   A    Yes.  I think you have to take the entire statement into

4   account here.  What this summary states is that being exposed

5   to the payment preference message does not make cardmembers

6   feel unwelcome.  It does make them feel the establishment does

7   not understand their needs and is not making it convenient for

8   them to make purchases.

9          So, you know, that, to me, doesn't sound like

10  welcome acceptance.  That doesn't sound like the experience

11  that these cardmembers are having is one in which they are

12  feeling welcome as it relates to the payment device that

13  they're using.

14  Q    So when you use the term "welcome acceptance," are you

15  referring to -- what specifically are you referring to,

16  welcome to do what?

17  A    Welcome to pay with the card that they've chosen, okay.

18  Q    If you can look further down, at the bottom of that page

19  there is a bullet point that the Court has seen before about

20  "Nearly 60 percent of cardmembers believe that these

21  preference messages raise doubts in their minds as to whether

22  American Express is accepted."

23  A    Yes.

24  Q    You generally recall that that was the result of the

25  survey work that was done back then?

HAYES-DIRECT-ORSINI                                    4965

1   A    Yes, that's correct.

2   Q    What was your reaction to seeing that?

3   A    One of concern.  That is really where my concern is

4   coming from because it said that 60 percent of these believe

5   that these preference messages raise doubts in their mind on

6   whether Amex is accepted.  We go back to the issues of

7   coverage and, you know, whether or not this product will be

8   useful for that particular cardmember.

9         And when you look at everything we do to manage

10  consistently every touch point for our customers, to have this

11  be the outcome, doubting whether or not they can use it, is

12  very concerning.

13  Q    Now, back in the mid 1990's, American Express' actual

14  coverage figures are lower than they are today, correct?

15  A    Yes, they were.

16  Q    Fairly significant lower, right?

17  A    I'm not familiar with the exact numbers during that

18  period.  But I do know that we grew coverage.  I can't put an

19  adjective on it, but we definitely grew coverage.

20  Q    And since the 1990's, American Express has changed or

21  increased the way that it provides value to its cardmembers?

22  A    Yes.

23  Q    Given those changes in coverage level and changes in the

24  benefits provided to cardmembers, do you believe if the We

25  Prefer campaigns were to start today you would see a

HAYES-DIRECT-ORSINI                                    4966

1    significant difference in terms of the reaction of

2    cardmembers?

3    A    I don't.  I don't believe that we would see a measurable

4    difference.  I would say because there still are coverage gaps

5    that we have.  So even though we've improved coverage, we

6    haven't made the gaps go to zero by a long shot.  And I also

7    know that, you know, our cardmembers still -- the idea of

8    raising doubt is as relevant today as to what I am saying.

9    Q    Put that one aside.  If you can look at Defendant's

10   Exhibit 7492.

11         MR. ORSINI:  Your Honor, this document is already in

12   evidence as well.

13   Q    Now, the Court's seen this memo a number of times,

14   Mr. Hayes.  This is one that you coauthored with Mr. House and

15   Mr. Schick.  At the time, you were the chief marketing

16   officer, correct?

17   A    Well, my title at the time was executive vice president

18   of global advertising.  But I was still doing these functions,

19   yes.

20   Q    Okay.  Thank you.

21         David House was the head of establishment services

22   at that time?

23   A    As I recall, yes.

24   Q    And what was Mr. Schick's role?

25   A    He was head of CA&C, which is Consumer Affairs and

1   Communications, I think.

2   Q    Mr. Chenault and Mr. Golub were the two most senior

3   executives of the company, is that right?

4   A    Yes, that is correct.

5   Q    Was it typical to have a memo go to them that was

6   authored by three individual?

7   A    No, it was not.

8   Q    Why was this one done by all three together.

9   A    Well, I mean, again, it's a long time ago.  So I'll give

10  you what I can recall.  But you know, this subject was one

11  that was very important to us and had the attention of a

12  number of senior people in the company.

13  Q    Do you recall there being debates on how to respond to

14  this, "this" being the We Prefer campaign?

15  A    Yes.

16  Q    If you look down at the bottom bullet, it says, "These

17  developments are not only damaging in the short-term but could

18  lead to a disciplined concentrated attempt by Visa to surround

19  us with a Visa preferred world.  In one scenario they could

20  drop the "and they don't take American Express" tag line,

21  which has lost its potency in the face of our vastly expanded

22  coverage and substitute Visa preference as their signature."

23       What did that bullet point mean when you were

24  coauthoring this memo?

25  A    Well, it was referencing the size and scope of Visa and

HAYES-DIRECT-ORSINI                               4968

1   the impact and the scope of what they could do with Visa's

2   preferred campaign.  As I recall, up 'til that point it had

3   not been rolled out broadly and we were concerned that this

4   could begin to show up everywhere.

5   Q    Now, if you look at the next page, Action Steps on the

6   top.  The first bullet point says, "A response should not

7   involve market merchant preference campaigns of our own."  And

8   then you provide two reasons.  The first is "cannot afford to

9   go head-to-head in a bidding war with Visa in a multiplicity

10  of markets?

11       Why did you believe you couldn't go head-to-head

12  with Visa?

13  A    Well, again, because of the size of Visa.  We weren't

14  going to outgun them on a program like this.  And so to go

15  toe-to-toe we felt was just not a strategy that was going to

16  work because we were dwarfed by them.

17  Q    And the second piece of this bullet point talks about

18  "not abandoning the moral high ground."

19       What were you referring to there?

20  A    Well, the moral high ground really had to do with how we

21  were building this brand.  You know, we -- again, I go back to

22  building a brand around the idea of want and not need, and

23  recognizing that everyone didn't need an American Express.  It

24  was our feeling, my feeling, that we needed to stay on a

25  positive note.  We need to stay positive like the same way we

HAYES-DIRECT-ORSINI                                    4969

1    built this brand and not get into a very negative campaign

2    that I did not believe would help the issue, but we should

3    maintain the moral high ground and the way that we built this

4    brand right from the beginning.

5    Q    Now, attached to this memo there is some mock-ups of

6    potential ad campaigns around Australians preferring American

7    Express.

8             Do you see that?

9    A    Yes, I do.

10   Q    Was that something that was done, to your knowledge?

11   A    Yes.  I mean, as I recall, it was -- it was something --

12   I honestly don't recall this strongly like it was yesterday.

13   But I do recall that there was work developed to see what we

14   might do in trying a number of different approaches.

15   Q    So if you're referring in the memo to not engaging in a

16   preference war, how does that correlate to these potential

17   acts?

18   A    The idea behind this was, you know, what if we take the

19   idea of preferred and switch it from the merchant preferring

20   to what the cardmember prefers because it's their choice.

21   Q    In the next bullet point, to go back to the memo, you

22   say, "We should act aggressively but take the preferred

23   designation and position, indeed, the word itself away, from

24   Visa and, at a minimum, render it meaningless."

25             Now, were you referring to contract provision in

HAYES-DIRECT-ORSINI                                    4970

1   this bullet point?

2   A     No.

3   Q     You're not referring to the NDPs?

4   A     No.

5   Q     What were you referring to?

6   A     We were referring to things like you're looking at in

7   these ads which make use of the word "preference" or

8   "preferred".  And to see whether or not it would hold value to

9   have the word "prefer" appear in other context to see whether

10  or not that might be a competitive response.

11  Q     Now, take a look at, in your binder, a different

12  document, which is Plaintiff's Exhibit 1107.  There's actually

13  a series of memos built within this one exhibit.  It looks

14  like the first and second page and the final two pages of the

15  same memo is two copies of it, but there's a different one in

16  the middle.

17        Do you see that?

18  A     Yes.

19  Q     Let's start with the one that's on the cover.  This is a

20  memo from Harvey Golub to you, Ken, you, Tom Schick, and David

21  House.

22        Do you recall, generally, having discussions with

23  Mr. Golub around the idea of engaging in We Prefer campaigns

24  to American Express's own with merchants?

25  A     Yes, I do.

HAYES-DIRECT-ORSINI                    4971

1  Q    Do you recall what your view was as to whether or not

2  that would be the right move to take?

3  A    I was against -- as I said earlier, I was against taking

4  a frontal approach to this because I just felt it was not

5  going to be effective because we could not man the same, you

6  know, intensity and size and scope of campaign up against a

7  player like Visa.

8         So it was my view that we needed to do something.

9  But to do something that was a knee jerk and go back at it

10 with the same word was not, in my mind, the best alternative

11 at that time.

12 Q    Do you know whether or not American Express took that

13 alternative, as proposed here?

14 A    To the best of my knowledge, we did not.

15 Q    Now, in the intervening time, since the late 90's through

16 today, have you personally ever sought to have a merchant

17 state in those words a preference for American Express?

18 A    No.

19 Q    And why not?

20 A    Well, because my philosophy -- and frankly, the

21 philosophy of a few of us at the time, a number of us at the

22 time, was that we would rather get behind the idea of choice

23 and letting the customers choose because we felt that that was

24 the right way to approach things.  So that has been and was,

25 that was the way we focused at that time and it's the way we

1  focus today.  It certainly reflects my philosophy.

2  Q    I want to look at one more document, Mr. Hayes.

3  Defendant's Exhibit -- actually, I don't think I moved that

4  into evidence.

5          MR. ORSINI:  Your Honor, I offer PX 1107 into

6  evidence.

7          MR. GLASS:  No objection.

8          THE COURT:  PX 1107 is received.

9          (So marked as Defendant's PX 1107 in evidence.)

10 Q    Mr. Hayes, can you take a look at Defendant's 7595.

11 There is handwriting on the front of this.  Is that yours?

12 A    It looks like it.

13 Q    As of 1998, establishment services group, is that the

14 merchant group in the United States?

15 A    Yes.

16 Q    And this is relevant to the We Prefer Visa campaign,

17 correct?

18 A    To my recollection, yes.

19          MR. ORSINI:  Your Honor, I offer DX 7595.

20          MR. GLASS:  No objection.

21          THE COURT:  DX 7595 is received in evidence.

22          (So marked as Defendant's DX 7595 in evidence.)

23 Q    There's a reference in the first two bullet points to an

24 Everywhere You Want To Be campaign.  And in the next bullet

25 point you talk about the We Prefer campaign.

1          Do you see that?

2   A    Yes, I do.

3   Q    In your mind, at the time, what was the relationship

4   between those two campaigns?

5   A    Well, as I recall, the Visa preference, as we just

6   discussed, was something that was -- that had come about.  It

7   was mostly centered in terms of where it was present in the

8   Point of Sale and in merchant locations and whatnot.  Because

9   on television, when they first -- when Visa first started

10  doing the Visa preference campaign on television, they were

11  still doing the "and they don't take American Express"

12  advertising.

13          According to this, I know Visa moved from "they

14  don't take American Express" to "everywhere you want to be" as

15  their theme of their television and broad mass communications.

16  So I expect what this is referring to is that they're working

17  with both "everywhere you want to be" and the Visa preference

18  world.

19  Q    Now, if you take a look at page 6, there's a reference to

20  the first bullet point to the Visa War Chest.  And then the

21  second bullet point talks about what American Express could or

22  could not do in the long run.  I take it, based on your

23  testimony earlier, this was your view at that time?

24  A    Oh, yeah.  I mean -- and I can't say this strong enough.

25  It was definitely my view at the time.  I mean, you know, Visa

HAYES-DIRECT-ORSINI                    4974

1   was taking on programs like the Olympics sponsorship and

2   whatnot, things that we weren't about to afford to continue

3   on.  We felt that the -- you know, they were going to continue

4   to invest in this program because of the results that we saw.

5   We expected that would continue.

6   Q    Now, Mr. Hayes -- and you can put that document aside --

7   in your view, having lived through the experience, what do you

8   think the impact on American Express' business would have been

9   had the We Prefer campaigns continued unabated?

10  A    My view is it would have had a very, very strong impact

11  on our business.  And the reason I say that is we go back to

12  what we saw from a research standpoint.  This was having an

13  impact on our cardmembers.  And my belief is that, the way I

14  think about our business and our business model and the way it

15  works, is that our merchants are an extension of us.  They are

16  playing a role that is very important in one of these touch

17  points, that is, to provide a positive customer experience.

18          And you know, when I saw this, it was clear to me

19  that if this was going to continue, we weren't going to get

20  the positive experience that we needed at the Point of Sale.

21  And what my view is, if they had continued on, we would have

22  seen declines in the strength of our brand.  And the impact

23  would have been, I think, significant.  Certainly creating

24  some downward spiral of some sort over time.

25          (Matter continued on the next page.)

HAYES - DIRECT / ORSINI                         4975

1   DIRECT EXAMINATION (CONTINUED)

2   Q    Now, you mentioned earlier a couple ways in which

3   American Express has reinvented itself over the years, the

4   freight forwarding, the travelers checks, the credit cards.

5         Why, in your view, would the continuation of

6   preference campaigns lead to a downward spiral as opposed to

7   an opportunity for American Express to again reinvent its

8   brand and its business?

9   A    Well, because the decline that I was looking at in terms

10  of some of those numbers from a perception standpoint, and we

11  tend to think in most cases that changes in perception will

12  lead to changes in behavior.  And the view, our view was

13  that -- can you repeat the question?  I'm sorry.

14  Q    Yes, the question was, we talked earlier --

15        THE COURT:  I'm glad you asked.  We're going to

16  re-ask the question.  Ask that question again.

17        MR. ORSINI:  Thank you, Your Honor.

18  Q    You spoke earlier about the various ways in which

19  American Express's business has evolved over the years,

20  correct?

21  A    Yes, yes.

22  Q    It was a freight forwarding business, then it went to

23  travelers checks and then credit cards, do you recall that?

24  A    I do.  I do.

25  Q    I just asked you what you thought the impact would be on

1  the American Express business if the we prefer campaign had

2  continued.  Do you recall discussing that?

3  A    I do.

4  Q    And you said that you thought it would have a very

5  negative impact on the business and lead to, the term you used

6  was a downward spiral.  Do you recall that?

7  A    I do.

8  Q    So my question was, essentially, American Express has

9  reinvented itself all of these times over its history.  Why is

10  it your belief, as the chief marketing officer, that it

11  couldn't just do that again?

12  A    Well, because if you go back and look at the reinventions

13  of this company, there's a couple things that have always been

14  true.  The things that have remained intact are trust,

15  security and service, and that's the first point.

16         The second point is the existing business was not in

17  a downward spiral.  We were not replacing a business that was

18  in a lot of trouble.  It was just an evolution of our

19  business.  And these, these reinventions didn't happen in a

20  year or even five years or even a decade.

21         Think about the latest reinvention, from travelers

22  checks to cards.  It's been 56 years.  And travelers checks

23  are still here.  We didn't see that business in such a way in

24  1958, where we said, we got to replace this business, what are

25  we going to do?  An enterprise is not -- cannot be that

HAYES - DIRECT / ORSINI                    4977

1    nimble.  It has to take time to develop new businesses.

2          So the question really is would the Visa preference

3    campaign have given us the kind of time that we've had in the

4    past to reinvent, to build a new business.  My guess is no.

5    And so that's why I don't think it's just another reinvention

6    of the American Express business.

7          Secondly, what we were seeing in what was happening

8    with the research was some declines in some of those

9    trust/security/service measures, because they were expecting

10   that this point of sale was not -- this TouchPoint wasn't

11   working as well.

12         When we reinvented this company in previous times,

13   we were not dealing with situations that were negatively

14   impacting our measures or our positioning of trust, security

15   and service.

16         So for those reasons, I don't think -- I certainly

17   wasn't sitting here thinking this is going to be another

18   reinvention of American Express.  I saw this as being

19   something very different.

20         MR. ORSINI:  I have no further questions, Your

21   Honor.

22         THE COURT:  All right.  We're at about 6:00 and so

23   we're going to recess for the evening.  Please come back at

24   9:00 tomorrow morning for cross-examination.  Please do not

25   discuss your testimony with anyone.  And what's the projected

HAYES - DIRECT / ORSINI                    4978

1   length of your cross-examination?

2           MR. GLASS:  I hope to get it done in 30 minutes or

3   an hour.

4           THE COURT:  I'm sorry.  Say that again.

5           MR. GLASS:  30 minutes to an hour.

6           THE COURT:  Okay, all right.  Anything else for

7   tonight from the government?  The defense?

8           MR. CONRATH:  No, Your Honor.

9           MR. CHESLER:  No, Your Honor.

10          MR. HAMER:  There is one item, Your Honor.  We

11  neglected to offer PX 0142 into evidence with the previous

12  witness.  We would like to do that now, if we can.  This was

13  the Walgreens e-mail from Ronald Schultz.

14          MR. Orsini:  No objection.

15          THE COURT:  Plaintiff 0142.

16          MR. ORSINI:  Without objection, Your Honor.

17          THE COURT:  Is admitted into evidence without

18  objection.

19          (Plaintiff Exhibit 0142 received in evidence.)

20          THE COURT:  See you tomorrow morning at 9:00.  Thank

21  you, everybody.

22          (Whereupon, the proceedings were adjourned at 5:57

23  p.m. until August 5, 2014 at 9:00 a.m.)

24

25

4979

```
                          I N D E X


WITNESS
W I L L I A M   G L E N N                    4674
    DIRECT EXAMINATION                        4675
    BY MR. ORSINI
    CROSS EXAMINATION                         4796
    BY MR. HAMER
    CROSS-EXAMINATION (CONTINUED)             4830
    BY MR. HAMER
    REDIRECT EXAMINATION                      4893
    BY MR. ORSINI:
    RECROSS-EXAMINATION                       4908
    BY MR. HAMER
J O H N    H A Y E S
    DIRECT EXAMINATION                        4912
    BY MR. ORSINI
    CONTINUED DIRECT EXAMINATION              4959
    BY MR. ORSINI


EXHIBIT
Plaintiff Exhibit 0881                        4692
Plaintiff Exhibit 0853                        4709
Defendant Exhibit 6791                        4719
Defendant Exhibit 2714                        4734
```

4980

| | | |
|---|---|---|
| 1 | Defendant Exhibit 7413 | 4738 |
| 2 | Defendant's Exhibit 7725 | 4771 |
| 3 | Plaintiff's Exhibit 0890 | 4791 |
| 4 | Plaintiff's PX 0905 | 4798 |
| 5 | Plaintiff's PX 0131 | 4802 |
| 6 | Plaintiff's PX 2725 | 4804 |
| 7 | Plaintiff's PX 0924 | 4812 |
| 8 | Plaintiff's Exhibit 2728 | 4813 |
| 9 | Plaintiffs' Exhibit 0969 | 4821 |
| 10 | Plaintiff's Exhibit 1077 | 4823 |
| 11 | Plaintiffs' Exhibit 0295 | 4825 |
| 12 | Plaintiffs' Exhibit 0486 | 4827 |
| 13 | Plaintiff Exhibit 0426 | 4838 |
| 14 | Plaintiff Exhibit 1164 | 4840 |
| 15 | Plaintiff Exhibit 0902 | 4845 |
| 16 | Plaintiff Exhibit 0934 | 4848 |
| 17 | Plaintiff Exhibit 0438 | 4850 |
| 18 | Plaintiff Exhibit 1814 | 4852 |
| 19 | Plaintiff Exhibit 0886 | 4855 |
| 20 | Plaintiff Exhibit 0446 | 4858 |
| 21 | Plaintiff Exhibit 0890 | 4868 |
| 22 | Plaintiff Exhibit 1447 | 4868 |
| 23 | Plaintiff Exhibit 0457 | 4869 |
| 24 | | 4875 |
| 25 | | 4875 |

4981

| | | |
|---|---|---|
| 1 | Plaintiff Exhibit 0100 | 4875 |
| 2 | Plaintiff Exhibit 0922 | 4877 |
| 3 | Plaintiff Exhibit 0005 | 4881 |
| 4 | Plaintiff Exhibit 1664 | 4883 |
| 5 | Plaintiff Exhibit 2722 | 4885 |
| 6 | Defendant Exhibit 0890 | 4893 |
| 7 | Defendant Exhibit 0359 | 4895 |
| 8 | Defendant Exhibit 7725-A | 4896 |
| 9 | Defendant's Exhibit 6763 | 4937 |
| 10 | Defendant's Exhibit 2003 | 4949 |
| 11 | Defendants' Exhibit 7617 | 4952 |
| 12 | Defendants' Exhibit 6309 | 4955 |
| 13 | Defendant's Exhibit 3974 | 4957 |
| 14 | Defendant's PX 1107 | 4972 |
| 15 | Defendant's DX 7595 | 4972 |
| 16 | Plaintiff Exhibit 0142 | 4978 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**$**

**$20** [1] - 4852:25
**$25** [3] - 4702:21, 4702:24, 4846:15

**'**

**'04** [1] - 4898:21
**'90s** [1] - 4904:16
**'merchant** [1] - 4736:21
**'There** [1] - 4865:12

**0**

**0** [1] - 4874:13
**0005** [5] - 4880:13, 4880:18, 4880:25, 4881:1, 4981:3
**0091** [1] - 4706:10
**0100** [5] - 4874:11, 4875:11, 4875:13, 4875:15, 4981:1
**0131** [5] - 4801:19, 4801:23, 4802:1, 4802:2, 4980:5
**0142** [6] - 4858:7, 4860:2, 4978:11, 4978:15, 4978:19, 4981:16
**020** [1] - 4875:16
**0295** [5] - 4824:18, 4824:22, 4825:1, 4825:3, 4980:11
**0359** [5] - 4894:16, 4894:17, 4895:17, 4895:19, 4981:7
**0368** [1] - 4733:14
**041** [3] - 4833:12, 4833:14, 4833:22
**0426** [6] - 4836:6, 4838:17, 4838:19, 4838:22, 4896:20, 4980:13
**0438** [5] - 4849:18, 4849:22, 4849:25, 4850:1, 4980:17
**0446** [5] - 4858:8, 4858:11, 4858:14, 4858:15, 4980:20
**0457** [6] - 4868:12, 4868:14, 4868:23, 4868:25, 4869:1, 4980:23
**0486** [5] - 4827:3, 4827:11, 4827:13, 4827:14, 4980:12
**0853** [7] - 4708:2, 4708:6, 4708:7,

4709:2, 4709:5, 4709:6, 4979:23
**0881** [5] - 4691:14, 4692:2, 4692:5, 4692:7, 4979:22
**0886** [7] - 4854:22, 4854:25, 4855:7, 4855:9, 4855:10, 4897:22, 4980:19
**0890** [14] - 4791:9, 4791:13, 4791:15, 4867:3, 4867:5, 4867:23, 4867:25, 4868:2, 4893:3, 4893:6, 4893:8, 4980:3, 4980:21, 4981:6
**0902** [5] - 4845:15, 4845:19, 4845:21, 4845:22, 4980:15
**0905** [7] - 4797:25, 4798:6, 4798:8, 4798:9, 4861:10, 4861:12, 4980:4
**0922** [6] - 4876:13, 4876:16, 4876:17, 4876:25, 4877:2, 4981:2
**0924** [5] - 4811:23, 4812:3, 4812:5, 4812:6, 4980:7
**0934** [5] - 4848:1, 4848:4, 4848:7, 4848:8, 4980:16
**0969** [6] - 4821:9, 4821:13, 4821:18, 4821:20, 4821:22, 4980:9
**0999** [3] - 4693:10, 4833:8, 4833:10

**1**

**1** [4] - 4723:20, 4747:6, 4825:22, 4846:14
**10** [3] - 4725:1, 4725:2, 4881:10
**10-CV-4496** [1] - 4666:4
**100** [6] - 4711:7, 4744:16, 4746:21, 4747:14, 4752:24, 4874:14
**10019** [1] - 4667:11
**10022** [1] - 4667:15
**1041** [1] - 4693:14
**1077** [5] - 4822:22, 4822:24, 4823:2, 4823:3, 4980:10

**1099** [1] - 4745:11
**10K** [1] - 4812:25
**10Ks** [1] - 4800:17
**10th** [1] - 4855:16
**11** [2] - 4799:15, 4882:19
**11,639** [1] - 4856:6
**1100** [2] - 4745:11
**1107** [5] - 4970:12, 4972:5, 4972:8, 4972:9, 4981:14
**11201** [1] - 4667:19
**1164** [6] - 4839:16, 4839:20, 4840:2, 4840:5, 4840:6, 4980:14
**11:00** [1] - 4742:17
**11th** [1] - 4855:6
**12** [4] - 4676:22, 4701:6, 4751:5, 4774:6
**12-month** [2] - 4751:2, 4906:14
**12/1** [1] - 4844:5
**1240** [1] - 4705:20
**12th** [1] - 4847:18
**13** [1] - 4735:14
**1317** [1] - 4753:13
**13th** [2] - 4768:16, 4840:1
**14** [2] - 4724:4, 4724:5
**14,000** [1] - 4676:2
**143** [1] - 4709:8
**1447** [5] - 4866:3, 4868:3, 4868:8, 4868:9, 4980:22
**14th** [11] - 4770:4, 4774:7, 4775:22, 4835:13, 4835:14, 4835:15, 4848:2, 4858:10, 4898:20, 4899:25, 4900:4
**15** [3] - 4725:1, 4725:2, 4742:14
**15th** [2] - 4667:2, 4825:16
**16** [6] - 4692:18, 4714:15, 4714:22, 4715:14, 4812:12, 4882:14
**1611** [2] - 4753:4, 4753:8
**1664** [7] - 4882:11, 4882:15, 4882:22, 4883:2, 4883:5, 4883:6, 4981:4
**16th** [2] - 4821:10, 4836:9
**1814** [8] - 4852:2, 4852:4, 4852:5,

**1099** [1] - 4852:8, 4852:10, 4852:12, 4852:21, 4980:18
**1850** [2] - 4928:4, 4928:14
**18th** [1] - 4882:20
**19** [3] - 4912:25, 4913:5, 4937:13
**190** [2] - 4814:1, 4820:16
**1958** [1] - 4976:24
**1964** [1] - 4941:8
**1969** [1] - 4765:13
**1972** [2] - 4773:22, 4774:1
**1974** [1] - 4757:18
**1976** [1] - 4914:16
**1981** [1] - 4939:7
**1990's** [2] - 4965:13, 4965:20
**1993** [2] - 4894:19, 4894:22
**1997** [1] - 4963:3
**1998** [1] - 4972:13
**1:00** [1] - 4829:2
**1st** [4] - 4740:21, 4770:4, 4828:3, 4844:5

**2**

**2** [8] - 4709:7, 4723:20, 4747:6, 4810:24, 4862:8, 4873:9, 4873:10, 4906:8
**20** [5] - 4719:18, 4747:2, 4779:10, 4922:19, 4935:14
**200** [3] - 4668:24, 4672:21, 4724:3
**2000** [2] - 4679:14, 4934:7
**20001** [1] - 4666:21
**2001** [1] - 4932:19
**2002** [2] - 4677:24, 4677:25
**2003** [7] - 4825:16, 4913:8, 4948:24, 4949:9, 4949:12, 4949:14, 4981:10
**2004** [20] - 4738:15, 4755:17, 4756:4, 4821:10, 4823:18, 4824:21, 4825:22, 4827:6, 4835:22, 4836:2, 4836:9, 4837:7, 4838:6, 4840:1, 4845:18, 4846:6, 4848:2,

**2005** [22] - 4678:22, 4724:15, 4724:23, 4727:10, 4734:4, 4755:17, 4798:3, 4798:12, 4800:12, 4801:11, 4822:23, 4844:5, 4855:6, 4855:16, 4856:19, 4858:10, 4860:7, 4862:3, 4864:6, 4864:21, 4864:25, 4870:1
**2007** [3] - 4679:12, 4738:17, 4873:9
**2008** [2] - 4868:15, 4870:24
**2009** [6] - 4812:16, 4831:8, 4866:4, 4870:1, 4871:12, 4871:17
**2010** [24] - 4727:8, 4727:10, 4801:22, 4804:1, 4804:3, 4804:14, 4812:16, 4813:14, 4831:1, 4831:5, 4831:6, 4831:7, 4831:8, 4873:13, 4878:21, 4879:1, 4879:23, 4880:2, 4880:10, 4880:14, 4881:22, 4882:20, 4884:21, 4885:20
**2011** [5] - 4679:14, 4706:1, 4812:2, 4874:18, 4880:16
**2012** [1] - 4874:18
**2014** [3] - 4666:8, 4941:9, 4978:23
**20th** [1] - 4846:6
**21st** [1] - 4845:18
**22** [1] - 4933:18
**2219** [3] - 4768:16, 4771:9, 4771:14
**225** [1] - 4667:19
**23rd** [1] - 4812:2
**24** [1] - 4933:18
**25** [7] - 4720:19, 4806:22, 4807:9, 4808:15, 4867:9, 4867:10
**25-dollar** [2] - 4846:22, 4847:1
**257** [1] - 4852:13
**25th** [1] - 4860:7
**26** [2] - 4723:7, 4884:21
**265** [1] - 4714:7

USA v American Express    8/4/14    2

**268** [1] - 4822:4
**270** [1] - 4959:11
**2714** [5] - 4733:10, 4734:15, 4734:18, 4734:20, 4979:25
**2722** [4] - 4884:19, 4885:14, 4885:16, 4981:5
**2725** [9] - 4803:23, 4804:6, 4804:11, 4804:12, 4830:10, 4830:13, 4905:17, 4908:23, 4980:6
**2728** [6] - 4813:10, 4813:23, 4813:24, 4820:5, 4820:16, 4980:8
**28** [1] - 4876:14
**287,539** [1] - 4873:23
**288** [4] - 4956:1, 4956:2, 4957:21, 4959:15
**29th** [1] - 4894:22
**2nd** [2] - 4798:3, 4827:6

## 3

**3** [5] - 4726:25, 4862:8, 4866:7, 4866:14, 4906:20
**30** [6] - 4844:6, 4844:17, 4844:21, 4844:22, 4978:2, 4978:5
**300** [1] - 4667:2
**30th** [2] - 4813:14, 4824:21
**32** [1] - 4791:17
**328** [1] - 4851:6
**338** [2] - 4867:7, 4867:12
**34** [1] - 4714:5
**346** [1] - 4881:6
**35** [1] - 4922:16
**3510** [1] - 4949:15
**3518** [1] - 4869:2
**37** [1] - 4907:4
**3974** [5] - 4957:3, 4957:16, 4957:18, 4957:20, 4981:13

## 4

**4** [5] - 4666:8, 4726:25, 4734:21, 4852:25, 4869:14
**40** [1] - 4791:22
**40's** [1] - 4921:3
**40-dollar** [1] - 4724:3

**4000** [1] - 4666:21
**41** [1] - 4793:13
**4184** [6] - 4778:17, 4815:3, 4815:5, 4902:22, 4903:1, 4903:2
**44** [1] - 4792:17
**45** [1] - 4922:17
**450** [1] - 4666:20
**4674** [1] - 4979:4
**4675** [1] - 4979:5
**4692** [1] - 4979:22
**47** [1] - 4856:20
**4709** [1] - 4979:23
**4719** [1] - 4979:24
**473** [1] - 4823:14
**4734** [1] - 4979:25
**4738** [1] - 4980:1
**4771** [1] - 4980:2
**4791** [1] - 4980:3
**4796** [1] - 4979:7
**4798** [1] - 4980:4
**4802** [1] - 4980:5
**4804** [1] - 4980:6
**4812** [1] - 4980:7
**4813** [1] - 4980:8
**4821** [1] - 4980:9
**4823** [1] - 4980:10
**4825** [1] - 4980:11
**4827** [1] - 4980:12
**4830** [1] - 4979:9
**4838** [1] - 4980:13
**4840** [1] - 4980:14
**4845** [1] - 4980:15
**4848** [1] - 4980:16
**4850** [1] - 4980:17
**4852** [1] - 4980:18
**4855** [1] - 4980:19
**4858** [1] - 4980:20
**4868** [2] - 4980:21, 4980:22
**4869** [1] - 4980:23
**4875** [3] - 4980:24, 4980:25, 4981:1
**4877** [1] - 4981:2
**4881** [1] - 4981:3
**4883** [1] - 4981:4
**4885** [1] - 4981:5
**4893** [2] - 4979:11, 4981:6
**4895** [1] - 4981:7
**4896** [1] - 4981:8
**4908** [1] - 4979:13
**4912** [1] - 4979:16
**4937** [1] - 4981:9
**4949** [1] - 4981:10
**4952** [1] - 4981:11
**4955** [1] - 4981:12
**4957** [1] - 4981:13

**4959** [1] - 4979:18
**4972** [2] - 4981:14, 4981:15
**4978** [1] - 4981:16
**4th** [1] - 4801:22

## 5

**5** [4] - 4747:3, 4873:4, 4902:8, 4978:23
**50** [23] - 4676:11, 4707:21, 4711:16, 4711:17, 4711:19, 4711:24, 4745:14, 4810:23, 4831:17, 4831:22, 4832:15, 4832:20, 4856:20, 4904:16, 4908:4, 4908:16, 4909:22, 4910:1, 4941:12, 4941:14, 4942:5, 4942:18
**50's** [1] - 4921:3
**50-year** [1] - 4942:7
**50th** [2] - 4941:9, 4941:25
**521** [1] - 4869:13
**5322** [1] - 4762:18
**5345** [1] - 4791:17
**5353** [1] - 4791:23
**5357** [1] - 4792:17
**536** [1] - 4869:22
**538** [1] - 4870:22
**553** [1] - 4871:19
**555** [3] - 4873:3, 4873:5, 4873:17
**5565** [1] - 4749:22
**5566** [1] - 4750:8
**5567** [1] - 4751:17
**5579** [1] - 4719:19
**5584** [1] - 4720:19
**5585** [1] - 4723:7
**56** [2] - 4745:12, 4976:22
**5628** [1] - 4738:2
**5630** [1] - 4738:12
**565** [1] - 4809:9
**57** [1] - 4793:13
**575** [1] - 4667:14
**5855** [1] - 4779:10
**5856** [1] - 4781:2
**5868** [1] - 4785:3
**5:57** [1] - 4978:22

## 6

**6** [5] - 4706:9, 4749:22, 4809:9, 4868:15, 4973:19
**60** [5] - 4745:1,

**4810:23, 4905:5, 4964:20, 4965:4
**60's** [1] - 4921:4
**6309** [6] - 4955:5, 4955:20, 4955:23, 4955:25, 4956:4, 4981:12
**643** [2] - 4808:21, 4905:18
**644** [9] - 4804:18, 4805:14, 4830:11, 4830:20, 4905:18, 4908:23, 4909:10, 4909:16
**649** [1] - 4837:1
**65** [1] - 4745:12
**650** [3] - 4837:12, 4837:16, 4883:7
**651** [2] - 4837:25, 4878:17
**65102** [1] - 4667:6
**655** [1] - 4855:21
**656** [2] - 4856:18, 4898:5
**6763** [5] - 4936:14, 4937:1, 4937:4, 4937:6, 4981:9
**6791** [8] - 4718:23, 4719:11, 4719:14, 4719:16, 4749:9, 4749:14, 4809:5, 4979:24
**6:00** [1] - 4977:22

## 7

**7** [5] - 4747:4, 4822:23, 4895:8, 4949:15, 4952:5
**70's** [2] - 4909:19, 4921:4
**70s** [2] - 4751:15
**718-613-2636** [1] - 4667:20
**7413** [5] - 4737:18, 4738:5, 4738:8, 4738:10, 4980:1
**7492** [1] - 4966:10
**7525** [1] - 4962:25
**7595** [5] - 4972:10, 4972:19, 4972:21, 4972:22, 4981:15
**7617** [5] - 4951:13, 4951:25, 4952:2, 4952:4, 4981:11
**763** [1] - 4952:5
**77** [3] - 4805:21, 4806:14, 4818:22
**772** [1] - 4840:11
**7725** [7] - 4769:21,

**4771:10, 4771:11, 4771:15, 4771:17, 4895:25, 4980:2
**7725-A** [4] - 4895:22, 4896:15, 4896:17, 4981:8
**773** [1] - 4844:2
**78711-2548** [1] - 4667:3

## 8

**8** [1] - 4880:14
**80** [2] - 4818:1, 4819:19
**80's** [1] - 4921:5
**800** [1] - 4731:8
**809** [1] - 4812:10
**815** [1] - 4812:18
**816** [2] - 4812:24, 4885:19
**817** [1] - 4886:16
**819** [1] - 4887:16
**820** [1] - 4887:22
**822** [2] - 4956:2, 4956:4
**825** [2] - 4667:10, 4956:5
**84** [6] - 4692:19, 4714:15, 4714:20, 4714:21, 4715:4, 4716:8
**841** [1] - 4937:7
**843** [2] - 4903:7, 4942:19
**860** [2] - 4815:10, 4815:19
**8809** [1] - 4812:12
**881** [2] - 4692:9, 4692:10
**890** [1] - 4790:11
**899** [1] - 4667:6

## 9

**9** [5] - 4804:18, 4830:19, 4830:20, 4953:25
**9/11** [2] - 4932:18, 4932:24
**90** [6] - 4817:25, 4818:5, 4818:6, 4818:13, 4819:20, 4819:21
**90's** [2] - 4962:15, 4971:15
**924** [1] - 4811:23
**926** [2] - 4799:5, 4862:1
**929** [2] - 4864:17,

4865:5
**9652** [1] - 4896:25
**98** [2] - 4819:5
**9807** [1] - 4734:22
**9816** [2] - 4735:15, 4735:17
**9818** [1] - 4736:7
**9821** [1] - 4737:8
**99** [4] - 4832:11, 4832:22, 4832:23, 4833:2
**9:00** [4] - 4666:8, 4977:24, 4978:20, 4978:23
**9th** [2] - 4803:25, 4849:21

## A

**a.m** [3] - 4666:8, 4776:11, 4978:23
**abandoning** [1] - 4968:18
**ability** [18] - 4704:2, 4721:19, 4735:12, 4740:25, 4741:4, 4754:8, 4780:1, 4819:22, 4819:24, 4820:3, 4849:2, 4864:2, 4870:16, 4876:2, 4883:17, 4884:3, 4886:1, 4938:1
**able** [19] - 4721:14, 4721:22, 4726:12, 4740:12, 4741:5, 4769:6, 4788:15, 4816:17, 4819:7, 4825:21, 4865:21, 4878:20, 4880:3, 4890:18, 4934:9, 4934:12, 4942:6, 4961:18
**abreast** [1] - 4776:1
**absolutely** [11] - 4674:2, 4683:23, 4722:8, 4754:11, 4788:10, 4826:22, 4827:25, 4828:20, 4848:18, 4892:18, 4903:19
**abused** [1] - 4883:19
**accelerates** [1] - 4918:21
**accept** [46] - 4695:10, 4695:11, 4704:8, 4704:10, 4704:12, 4704:13, 4704:16, 4742:23, 4743:6, 4743:13, 4744:10,

4865:5
4745:8, 4745:18, 4745:21, 4747:16, 4752:24, 4760:9, 4761:14, 4765:11, 4766:6, 4768:8, 4772:2, 4773:21, 4784:5, 4787:24, 4792:15, 4792:16, 4793:6, 4811:3, 4814:7, 4814:12, 4820:9, 4825:21, 4828:17, 4835:11, 4862:25, 4863:2, 4863:3, 4872:14, 4898:13, 4899:5, 4902:5, 4902:6, 4905:4, 4917:4, 4954:9
**Acceptance** [4] - 4690:20, 4690:21, 4701:19, 4895:8
**acceptance** [52] - 4700:18, 4702:8, 4705:8, 4740:2, 4746:13, 4749:6, 4752:11, 4752:25, 4755:22, 4759:12, 4762:16, 4768:25, 4769:15, 4769:25, 4771:19, 4772:10, 4774:6, 4776:16, 4778:2, 4788:8, 4788:11, 4788:12, 4793:8, 4795:4, 4797:16, 4797:20, 4799:7, 4802:16, 4816:9, 4816:24, 4823:21, 4833:24, 4837:7, 4837:10, 4837:23, 4842:20, 4842:24, 4857:24, 4858:2, 4865:20, 4900:6, 4900:9, 4900:19, 4902:19, 4963:8, 4963:24, 4964:10, 4964:14
**accepted** [33] - 4743:18, 4745:2, 4745:3, 4745:13, 4745:20, 4761:16, 4766:16, 4780:11, 4783:25, 4784:8, 4795:3, 4799:19, 4814:7, 4818:10, 4820:9, 4832:8, 4832:21, 4835:9, 4835:13, 4838:3, 4839:7, 4902:9, 4902:12, 4904:17, 4905:3, 4905:7, 4905:11, 4960:2,

4960:20, 4964:22, 4965:6
**accepting** [21] - 4679:11, 4725:24, 4747:22, 4751:14, 4761:17, 4769:11, 4782:8, 4787:23, 4788:20, 4789:1, 4789:9, 4789:14, 4789:23, 4800:23, 4801:5, 4811:6, 4860:8, 4865:12, 4872:12, 4899:10, 4900:16
**accepts** [1] - 4816:13
**access** [3] - 4935:10, 4936:1, 4936:4
**accessible** [2] - 4925:24, 4926:1
**accommodate** [1] - 4853:17
**according** [3] - 4710:17, 4922:9, 4973:13
**account** [8] - 4703:8, 4763:11, 4872:20, 4926:9, 4926:10, 4926:25, 4947:16, 4964:4
**accounts** [4] - 4848:24, 4873:20, 4874:3, 4874:5
**accurate** [2] - 4797:5, 4799:1
**accurately** [1] - 4812:15
**achievement** [1] - 4822:7
**acquire** [24] - 4680:14, 4681:16, 4681:18, 4686:10, 4689:7, 4689:9, 4689:23, 4701:1, 4701:2, 4701:3, 4701:7, 4701:24, 4701:25, 4717:11, 4723:13, 4725:24, 4743:2, 4756:18, 4763:22, 4769:4, 4793:5, 4890:2, 4891:25, 4902:18
**acquired** [11] - 4680:15, 4682:3, 4690:2, 4690:3, 4731:12, 4763:9, 4763:11, 4763:12, 4763:15, 4763:16, 4764:2
**acquirers** [3] - 4711:3, 4881:11, 4883:21

**acquiring** [11] - 4681:19, 4705:2, 4710:11, 4710:24, 4717:4, 4726:13, 4731:12, 4739:3, 4747:7, 4759:2, 4797:7
**acquisition** [17] - 4683:11, 4689:23, 4690:5, 4696:20, 4716:12, 4717:3, 4758:21, 4758:23, 4759:2, 4759:7, 4762:20, 4764:13, 4786:25, 4787:16, 4789:7, 4793:1, 4793:4
**acronym** [1] - 4945:15
**acronyms** [1] - 4675:14
**act** [1] - 4969:22
**acting** [1] - 4789:4
**Action** [1] - 4968:5
**action** [1] - 4786:1
**actions** [3] - 4683:9, 4887:9, 4932:17
**activation** [14] - 4750:22, 4751:6, 4751:11, 4751:15, 4808:23, 4810:18, 4810:19, 4810:24, 4810:25, 4811:2, 4811:6, 4811:10, 4811:12, 4811:18
**active** [31] - 4751:1, 4751:2, 4751:4, 4751:5, 4782:20, 4793:13, 4793:19, 4808:9, 4831:20, 4903:13, 4906:1, 4906:3, 4906:8, 4906:12, 4906:17, 4906:19, 4906:21, 4906:24, 4907:1, 4907:4, 4907:9, 4907:13, 4907:14, 4909:1, 4909:15, 4909:19, 4909:25, 4910:1, 4910:3, 4910:6
**activities** [1] - 4866:19
**activity** [2] - 4808:23, 4906:20
**acts** [2] - 4936:2, 4969:17
**actual** [12] - 4689:15, 4738:16, 4744:7, 4757:25, 4764:3, 4766:14, 4811:17, 4819:22, 4904:2,

4904:16, 4960:10, 4965:13
**ad** [1] - 4969:6
**Adam** [3] - 4951:13, 4951:15, 4951:16
**add** [13] - 4699:23, 4716:13, 4717:10, 4718:20, 4719:22, 4737:14, 4803:13, 4901:11, 4918:5, 4929:6, 4946:23, 4946:25
**added** [10] - 4712:9, 4717:5, 4803:23, 4804:8, 4813:11, 4901:6, 4901:9, 4901:14, 4901:17, 4901:18
**adding** [2] - 4806:15, 4820:5
**addition** [5] - 4764:1, 4769:20, 4775:6, 4801:2, 4853:24
**additional** [9] - 4678:23, 4758:19, 4760:17, 4768:1, 4776:19, 4860:20, 4886:5
**Additionally** [3] - 4848:20, 4848:23, 4866:16
**address** [8] - 4766:7, 4790:19, 4793:6, 4846:19, 4886:21, 4887:23, 4888:4, 4895:6
**addressed** [2] - 4723:15, 4861:8
**addresses** [1] - 4888:20
**adds** [3] - 4711:10, 4729:15, 4921:22
**adjective** [1] - 4965:19
**adjourned** [1] - 4978:22
**adjusted** [4] - 4748:4, 4810:9, 4810:10, 4810:14
**adjusting** [1] - 4809:13
**admitted** [4] - 4861:13, 4865:10, 4952:4, 4978:17
**adopt** [1] - 4881:11
**ads** [1] - 4970:7
**advance** [2] - 4885:6, 4933:5
**advanced** [1] - 4861:17
**advantage** [1] -

4935:10
**advantaged** [1] - 4702:14
**advertise** [1] - 4816:8
**advertisement** [1] - 4852:14
**advertising** [7] - 4785:10, 4816:18, 4816:23, 4914:9, 4915:8, 4966:18, 4973:12
**advice** [1] - 4759:23
**advise** [2] - 4759:23, 4760:1
**advised** [1] - 4756:1
**advising** [1] - 4824:9
**Advisors** [1] - 4890:8
**Affairs** [2] - 4790:18, 4966:25
**affect** [3] - 4693:8, 4744:14, 4863:4
**affected** [3] - 4687:15, 4766:17, 4873:20
**affecting** [2] - 4727:16, 4956:14
**affects** [9] - 4704:1, 4704:2, 4727:23, 4735:11, 4788:4, 4788:6, 4788:8, 4954:7
**affinity** [3] - 4949:7, 4950:9, 4960:21
**afford** [2] - 4968:8, 4974:2
**afternoon** [6] - 4670:23, 4672:18, 4911:14, 4911:15, 4912:20, 4912:21
**agencies** [1] - 4736:11
**agency** [4] - 4736:25, 4737:7, 4848:23, 4914:9
**Agent** [1] - 4736:8
**agents** [4] - 4731:15, 4736:21, 4736:22, 4746:7
**aggregate** [1] - 4806:10
**Aggressive** [2] - 4841:1, 4843:3
**aggressive** [3] - 4758:21, 4758:22, 4828:13
**aggressively** [1] - 4969:22
**ago** [18] - 4671:12, 4672:3, 4693:3, 4703:8, 4720:21, 4720:24, 4739:20, 4750:4, 4800:21,

4802:20, 4825:8, 4858:24, 4865:10, 4874:9, 4917:10, 4922:14, 4952:12, 4967:9
**agree** [12] - 4670:6, 4732:21, 4794:17, 4797:1, 4797:14, 4797:19, 4816:16, 4849:8, 4859:16, 4888:2, 4909:15, 4937:10
**agreeable** [2] - 4805:6, 4805:7
**agreed** [6] - 4752:13, 4762:3, 4763:13, 4779:7, 4845:13, 4881:11
**agreement** [22] - 4688:13, 4697:25, 4698:2, 4698:6, 4703:4, 4703:15, 4765:24, 4766:3, 4774:21, 4774:24, 4774:25, 4775:2, 4775:5, 4776:18, 4781:23, 4825:18, 4844:17, 4853:13, 4860:8, 4865:15, 4865:22, 4895:12
**Agreement** [5] - 4690:22, 4701:19, 4701:20, 4878:9, 4895:9
**agreements** [7] - 4670:6, 4687:2, 4740:17, 4767:25, 4768:1, 4826:4
**Agreements** [1] - 4690:20
**ahead** [3] - 4674:21, 4755:11, 4908:19
**Aid** [1] - 4841:22
**airline** [1] - 4691:18
**airlines** [2] - 4697:7, 4932:21
**Airlines** [1] - 4877:6
**AL** [1] - 4666:12
**alarming** [1] - 4905:3
**Alex** [1] - 4822:22
**align** [8] - 4695:4, 4724:15, 4748:13, 4863:1, 4870:16, 4921:15, 4947:21, 4948:5
**aligned** [4] - 4725:7, 4737:15, 4739:16, 4741:22
**aligning** [2] - 4833:21, 4947:23

**alignment** [1] - 4742:1
**Alignment** [1] - 4709:11
**aligns** [1] - 4947:20
**all-in** [5] - 4707:15, 4710:6, 4710:7, 4710:12, 4710:13
**allocated** [1] - 4715:2
**allocation** [1] - 4714:18
**allow** [12] - 4673:25, 4685:2, 4758:6, 4762:12, 4853:14, 4865:20, 4878:12, 4881:23, 4889:21, 4891:23, 4891:25, 4894:1
**allowed** [7] - 4717:17, 4721:25, 4853:12, 4881:18, 4883:14, 4926:25, 4943:18
**allowing** [2] - 4881:12, 4888:17
**allows** [3] - 4938:8, 4940:20, 4940:21
**almost** [2] - 4669:9, 4676:22
**alone** [1] - 4933:14
**aloud** [1] - 4909:12
**alternative** [4] - 4841:7, 4843:7, 4971:10, 4971:13
**alumni** [1] - 4949:8
**amazed** [1] - 4939:4
**amendment** [2] - 4828:4, 4894:18
**Amendment** [4] - 4770:24, 4875:22, 4878:25, 4879:8
**AMERICA** [1] - 4666:4
**America** [7] - 4733:19, 4792:22, 4793:12, 4797:16, 4798:16, 4949:6, 4950:4
**American** [348] - 4667:10, 4668:15, 4668:17, 4669:4, 4669:8, 4669:12, 4671:10, 4671:12, 4672:9, 4674:7, 4675:8, 4675:10, 4675:12, 4675:21, 4676:5, 4676:9, 4676:11, 4676:20, 4676:21, 4676:23, 4677:11, 4677:23, 4678:1, 4678:16, 4679:10, 4679:25, 4680:8, 4681:1, 4681:3, 4681:13,

4681:15, 4684:18, 4684:22, 4685:6, 4686:18, 4688:17, 4689:10, 4689:16, 4690:3, 4690:4, 4690:13, 4690:19, 4690:25, 4693:20, 4695:15, 4699:10, 4700:20, 4700:22, 4701:12, 4703:1, 4704:5, 4704:11, 4706:16, 4709:22, 4716:16, 4716:19, 4716:22, 4718:5, 4719:9, 4719:10, 4720:11, 4722:4, 4724:24, 4726:23, 4727:16, 4729:8, 4735:1, 4738:1, 4738:14, 4740:1, 4742:23, 4743:19, 4743:20, 4744:8, 4745:18, 4745:19, 4745:21, 4746:12, 4746:16, 4746:22, 4747:1, 4748:21, 4750:18, 4752:2, 4759:2, 4759:25, 4761:18, 4762:12, 4762:22, 4763:14, 4764:14, 4771:19, 4771:23, 4772:8, 4772:19, 4773:3, 4773:11, 4777:1, 4777:2, 4777:7, 4778:9, 4778:13, 4780:11, 4780:14, 4782:21, 4782:24, 4783:1, 4784:2, 4784:14, 4784:21, 4785:25, 4786:5, 4787:2, 4787:5, 4789:20, 4789:23, 4790:2, 4790:4, 4790:7, 4793:22, 4794:22, 4797:21, 4799:9, 4800:9, 4800:12, 4800:17, 4810:12, 4812:16, 4812:21, 4813:3, 4813:11, 4813:13, 4814:7, 4814:11, 4814:22, 4815:13, 4815:21, 4815:24, 4816:6, 4816:8, 4816:9, 4816:13, 4816:18, 4816:22, 4816:23, 4817:4, 4817:13, 4817:14, 4820:5, 4820:6, 4820:9, 4822:18,

4823:18, 4823:21, 4823:22, 4824:19, 4825:21, 4826:23, 4826:25, 4828:17, 4832:7, 4832:14, 4832:21, 4833:17, 4834:18, 4836:7, 4836:22, 4837:6, 4838:2, 4842:18, 4843:5, 4850:23, 4852:25, 4853:8, 4854:1, 4854:2, 4854:9, 4854:12, 4854:17, 4857:21, 4857:23, 4860:8, 4863:8, 4865:9, 4876:7, 4879:17, 4879:23, 4881:22, 4882:3, 4882:17, 4882:24, 4883:15, 4883:22, 4884:20, 4885:22, 4887:8, 4888:15, 4889:2, 4889:13, 4889:21, 4892:15, 4892:20, 4894:19, 4894:23, 4897:9, 4897:18, 4898:2, 4898:13, 4898:14, 4898:19, 4899:5, 4899:9, 4899:10, 4899:16, 4900:6, 4900:16, 4901:1, 4901:5, 4901:14, 4908:3, 4912:3, 4912:23, 4912:24, 4913:6, 4913:12, 4913:14, 4913:18, 4914:8, 4914:10, 4914:18, 4914:25, 4916:18, 4917:3, 4917:11, 4917:14, 4919:17, 4922:7, 4922:10, 4922:16, 4922:20, 4923:8, 4924:15, 4924:20, 4925:1, 4925:2, 4925:5, 4925:7, 4925:8, 4925:12, 4926:20, 4926:23, 4927:1, 4927:4, 4927:9, 4928:4, 4928:16, 4928:21, 4929:5, 4929:18, 4930:4, 4930:11, 4930:24, 4931:18, 4932:11, 4933:11, 4933:13, 4933:20, 4933:23, 4933:24, 4933:25, 4935:4, 4935:6, 4936:7, 4937:14,

Case 1:10-cv-04496-NGG-RER    Document 595    Filed 09/08/14    Page 321 of 368 PageID #: 30715

4937:23, 4937:25,
4938:20, 4939:2,
4939:13, 4940:4,
4940:11, 4940:14,
4942:7, 4942:25,
4944:12, 4944:22,
4945:11, 4945:21,
4946:5, 4946:16,
4946:25, 4947:3,
4947:7, 4947:11,
4947:14, 4947:17,
4947:19, 4948:4,
4948:8, 4949:17,
4949:21, 4949:25,
4950:2, 4950:10,
4950:15, 4951:3,
4952:9, 4953:21,
4953:22, 4954:9,
4954:18, 4954:21,
4954:22, 4954:23,
4956:10, 4956:15,
4956:17, 4956:19,
4960:19, 4961:7,
4961:10, 4961:18,
4962:3, 4962:15,
4963:13, 4964:22,
4965:13, 4965:20,
4967:20, 4968:23,
4969:6, 4970:24,
4971:12, 4971:17,
4973:11, 4973:14,
4973:21, 4974:8,
4975:3, 4975:7,
4975:19, 4976:1,
4976:8, 4977:6,
4977:18
**AMERICAN** [1] -
4666:12
**Americas** [2] -
4705:25, 4706:6
**Amex** [26] - 4699:8,
4707:21, 4763:22,
4764:10, 4818:3,
4818:5, 4819:6,
4820:18, 4820:19,
4837:7, 4837:20,
4839:10, 4839:11,
4844:3, 4856:6,
4856:11, 4856:21,
4859:1, 4865:21,
4867:7, 4876:22,
4897:19, 4901:9,
4902:11, 4904:17,
4965:6
**Amex's** [3] - 4735:6,
4797:2, 4803:24
**amex@newmedia.
com** [1] - 4790:19
**amorphous** [1] -
4919:6

**amount** [17] - 4670:4,
4743:19, 4743:20,
4753:1, 4759:11,
4761:12, 4762:11,
4768:1, 4830:25,
4831:1, 4831:2,
4831:14, 4851:2,
4878:21, 4930:16,
4933:17, 4944:14
**amounts** [1] - 4808:11
**analyses** [1] - 4736:3
**Analysis** [2] - 4855:5,
4952:9
**analysis** [14] -
4705:11, 4739:12,
4752:23, 4780:16,
4780:21, 4781:8,
4781:19, 4878:25,
4896:20, 4896:25,
4897:1, 4897:6,
4907:2
**Analyst** [1] - 4959:11
**analytic** [4] - 4701:13,
4707:1, 4707:2,
4707:9
**Analytical** [1] -
4778:22
**analytics** [40] -
4682:17, 4696:17,
4700:11, 4701:12,
4701:17, 4701:21,
4702:9, 4702:13,
4706:10, 4706:12,
4707:12, 4707:23,
4709:12, 4712:12,
4712:16, 4730:6,
4730:12, 4732:7,
4732:8, 4732:20,
4760:5, 4782:2,
4789:11, 4789:17,
4794:2, 4794:10,
4794:24, 4813:5,
4813:8, 4857:10,
4857:12, 4889:12,
4890:4, 4890:6,
4890:23, 4890:24,
4891:3, 4891:5,
4891:13, 4891:16
**analyze** [1] - 4786:14
**AND** [1] - 4666:7
**anecdotal** [2] -
4939:1, 4950:12
**Ann** [4] - 4845:16,
4847:7, 4847:12,
4847:23
**Anna** [1] - 4880:13
**ANNE** [1] - 4667:4
**anniversary** [2] -
4941:10, 4942:1
**announced** [3] -

4768:11, 4768:13
**announcement** [11] -
4768:24, 4769:11,
4770:4, 4771:18,
4771:24, 4772:21,
4774:8, 4780:10,
4898:18, 4898:20,
4898:24
**annual** [1] - 4858:24
**Anre** [1] - 4671:16
**answer** [17] - 4683:16,
4748:5, 4799:13,
4800:3, 4800:20,
4800:21, 4802:17,
4804:24, 4861:1,
4862:8, 4863:19,
4864:14, 4864:18,
4865:7, 4915:20,
4938:23
**answered** [1] -
4958:18
**answers** [5] -
4798:24, 4799:25,
4802:4, 4861:20,
4864:13
**anti** [7] - 4821:2,
4843:4, 4846:24,
4847:3, 4847:4,
4853:9, 4879:23
**anti-steering** [7] -
4821:2, 4843:4,
4846:24, 4847:3,
4847:4, 4853:9,
4879:23
**anticipated** [5] -
4799:22, 4799:24,
4864:9, 4864:15,
4865:3
**antitrust** [1] - 4875:23
**ANTITRUST** [1] -
4666:19
**anyway** [2] - 4752:25,
4896:13
**apart** [2] - 4754:7,
4903:12
**apologies** [1] -
4910:14
**apologize** [2] -
4706:14, 4815:16
**apparent** [2] - 4756:2,
4761:1
**appealing** [1] - 4920:7
**appear** [1] - 4970:9
**appearances** [1] -
4668:2
**apples** [3] - 4800:23,
4909:22, 4909:23
**application** [1] -
4669:18
**applications** [1] -

4668:25
**applied** [2] - 4735:19,
4736:4
**appraisal** [1] -
4821:23
**appreciate** [2] -
4668:22, 4820:24
**approach** [12] -
4674:18, 4796:3,
4860:4, 4863:24,
4886:21, 4887:23,
4888:3, 4888:18,
4936:10, 4947:22,
4971:4, 4971:24
**approaches** [1] -
4969:14
**approaching** [1] -
4848:25
**appropriate** [1] -
4761:21
**approval** [2] -
4687:12, 4846:12
**approved** [1] - 4671:5
**approximation** [1] -
4710:22
**Area** [1] - 4805:25
**area** [18] - 4697:7,
4703:10, 4706:6,
4718:17, 4745:8,
4745:12, 4750:20,
4750:21, 4751:13,
4806:1, 4806:2,
4806:3, 4832:12,
4832:15, 4847:24,
4891:8, 4914:24,
4915:9
**areas** [4] - 4682:12,
4713:22, 4789:7,
4793:23
**argue** [1] - 4940:5
**arguments** [1] -
4875:23
**ARIZONA** [1] - 4666:4
**Arizona** [1] - 4841:24
**armed** [1] - 4731:3
**arrived** [3] - 4672:23,
4786:9
**arrow** [1] - 4906:7
**art** [1] - 4917:16
**article** [4] - 4769:23,
4770:11, 4771:2,
4895:23
**artists** [2] - 4718:17,
4785:18
**ascribe** [2] - 4922:20,
4923:7
**Asia** [1] - 4934:9
**aside** [7] - 4693:18,
4714:11, 4724:8,
4950:6, 4961:1,

4966:9, 4974:6
**ASL** [1] - 4822:11
**aspect** [5] - 4683:3,
4921:22, 4925:21,
4929:18, 4930:21
**aspects** [4] - 4730:15,
4740:13, 4917:10,
4929:16
**aspirin** [1] - 4677:9
**assess** [1] - 4712:18
**assessment** [1] -
4707:6
**asset** [5] - 4921:19,
4922:2, 4923:12,
4938:7, 4938:10
**assigned** [3] - 4718:9,
4786:17, 4786:20
**assist** [5] - 4815:13,
4816:9, 4889:22,
4891:7, 4933:25
**Assistant** [3] - 4667:2,
4667:5, 4667:8
**assistant** [3] -
4691:20, 4691:22,
4757:23
**assisted** [1] - 4817:13
**Assisted** [1] - 4667:22
**associated** [6] -
4690:16, 4738:23,
4848:14, 4856:23,
4919:21, 4922:4
**associations** [3] -
4692:22, 4692:23,
4863:21
**assume** [9] - 4673:13,
4683:18, 4826:10,
4832:7, 4832:11,
4842:6, 4862:10,
4868:21, 4871:9
**assuming** [1] -
4897:10
**assumption** [1] -
4897:17
**assumptions** [1] -
4897:8
**assure** [1] - 4761:21
**ATL** [2] - 4785:7,
4785:9
**ATM** [1] - 4801:1
**atmosphere** [1] -
4875:21
**ATMs** [1] - 4800:24
**attached** [6] - 4753:9,
4786:16, 4825:17,
4868:17, 4891:14,
4969:5
**Attached** [2] -
4821:11, 4828:1
**attaches** [1] - 4880:15
**attack** [1] - 4694:11

attempt [1] - 4967:18
attempting [1] - 4889:11
attempts [1] - 4720:4
attend [1] - 4802:10
attendance [1] - 4881:5
attending [1] - 4802:11
attention [1] - 4967:11
Attention [1] - 4824:1
Attorney [4] - 4667:2, 4667:5, 4667:8, 4667:8
attract [4] - 4688:14, 4717:18, 4921:24, 4938:9
attractive [2] - 4688:21, 4688:22
attributable [1] - 4925:9
attribute [12] - 4740:5, 4745:19, 4918:9, 4918:11, 4918:12, 4918:17, 4918:18, 4918:23, 4918:24, 4918:25, 4925:14, 4928:20
attributed [1] - 4937:9
Attributes [1] - 4956:9
attributes [7] - 4918:13, 4919:18, 4919:21, 4925:15, 4927:3, 4948:6, 4949:25
attrite [2] - 4782:14, 4907:17
auction [1] - 4723:3
audience [1] - 4951:2
August [9] - 4666:8, 4798:3, 4801:22, 4813:14, 4864:20, 4868:15, 4900:22, 4913:8, 4978:23
Austin [3] - 4667:3, 4668:10, 4668:19
Australians [1] - 4969:6
authenticate [1] - 4673:12
authored [1] - 4967:6
authorities [2] - 4882:25, 4888:16
authority [1] - 4687:9
automobile [1] - 4918:20
available [1] - 4748:19
Avenue [2] - 4667:10, 4667:14
average [11] -

4714:21, 4726:22, 4727:12, 4727:14, 4727:16, 4728:2, 4728:21, 4747:2, 4747:4, 4862:15, 4867:13
avert [1] - 4861:2
awarded [1] - 4851:2
aware [7] - 4775:23, 4780:24, 4823:8, 4827:23, 4827:24, 4892:1, 4899:12
Awareness [1] - 4850:16
awareness [3] - 4850:17, 4903:14, 4952:19
AXP [8] - 4709:25, 4711:24, 4764:6, 4799:9, 4800:6, 4837:4, 4837:7, 4837:20
AXP's [1] - 4799:8
AXP-funded [1] - 4764:6

**B**

BA [1] - 4914:13
background [1] - 4914:12
bad [1] - 4722:19
balance [2] - 4753:22, 4884:4
balanced [4] - 4867:19, 4887:23, 4888:3, 4888:17
balancing [1] - 4887:5
band [16] - 4740:25, 4741:5, 4741:9, 4741:11, 4767:9, 4767:10, 4767:15, 4767:18, 4777:1, 4777:13, 4860:23, 4895:2, 4901:6, 4901:9, 4901:14
bands [3] - 4741:9, 4741:10, 4767:17
Bank [2] - 4949:6, 4950:4
bank [11] - 4800:24, 4897:4, 4897:12, 4916:23, 4940:9, 4945:7, 4945:10, 4945:18, 4945:22, 4949:6, 4962:9
Banker [1] - 4865:9
bankruptcies [1] - 4871:25
banks [2] - 4711:1,

4948:18
bar [3] - 4808:7, 4830:17, 4830:23
BARBUR [1] - 4667:12
barriers [3] - 4797:16, 4797:20, 4799:8
base [12] - 4689:1, 4716:14, 4785:25, 4787:4, 4802:19, 4802:21, 4838:10, 4843:23, 4906:9, 4950:15, 4958:1, 4960:5
based [34] - 4670:15, 4695:16, 4706:22, 4707:3, 4707:21, 4712:15, 4713:23, 4715:1, 4716:6, 4720:13, 4729:5, 4730:25, 4732:5, 4752:12, 4780:16, 4788:15, 4806:22, 4808:11, 4808:17, 4812:21, 4838:10, 4841:11, 4843:3, 4865:16, 4866:16, 4890:17, 4891:19, 4897:1, 4904:21, 4906:8, 4942:15, 4947:7, 4960:15, 4973:22
baseline [1] - 4870:2
basis [20] - 4679:10, 4699:24, 4714:6, 4714:7, 4726:25, 4727:13, 4731:17, 4862:9, 4867:14, 4869:15, 4871:1, 4878:13, 4919:1, 4919:3, 4925:23, 4934:18, 4936:22, 4951:8, 4957:10, 4957:11
Bates [12] - 4706:10, 4709:8, 4719:19, 4734:21, 4735:14, 4785:3, 4791:16, 4791:23, 4867:12, 4896:24, 4949:15, 4952:5
BBBs [1] - 4688:4
bear [1] - 4788:21
became [7] - 4733:23, 4737:1, 4737:2, 4742:2, 4753:11, 4756:2, 4823:8
become [4] - 4736:23, 4919:21, 4954:14, 4954:18

becomes [3] - 4673:15, 4674:2, 4769:24
becoming [1] - 4676:17
BEFORE [1] - 4666:16
began [1] - 4800:19
begin [3] - 4724:17, 4924:18, 4968:4
beginning [7] - 4675:15, 4760:13, 4837:24, 4840:25, 4908:2, 4949:2, 4969:4
beginnings [1] - 4928:11
begins [2] - 4848:20, 4855:21
behalf [6] - 4681:12, 4681:18, 4759:2, 4915:20, 4915:21, 4958:25
behavior [12] - 4745:4, 4769:16, 4778:15, 4780:20, 4782:4, 4782:16, 4783:17, 4788:4, 4818:25, 4851:1, 4870:17, 4975:12
behind [3] - 4933:8, 4969:18, 4971:22
belief [3] - 4933:21, 4974:13, 4976:10
Below [1] - 4845:17
below [7] - 4774:20, 4785:13, 4828:1, 4846:8, 4856:13, 4860:22, 4903:15
BENCH [1] - 4666:16
benchmarking [1] - 4760:3
beneath [2] - 4960:8, 4960:9
beneficial [1] - 4865:15
benefit [12] - 4688:23, 4694:5, 4699:24, 4703:15, 4703:25, 4717:14, 4758:17, 4767:19, 4781:25, 4870:5, 4888:13, 4942:14
Benefits [1] - 4711:24
benefits [5] - 4693:3, 4773:13, 4777:24, 4887:1, 4965:24
Berry [3] - 4682:9, 4687:10, 4708:8
best [13] - 4710:11, 4742:15, 4831:23,

4833:20, 4900:15, 4920:25, 4921:11, 4921:12, 4925:11, 4938:23, 4938:25, 4971:10, 4971:14
Best [4] - 4698:9, 4723:2, 4724:2, 4833:14
better [12] - 4724:15, 4725:21, 4725:22, 4726:11, 4748:10, 4748:25, 4779:9, 4820:21, 4902:15, 4923:22
between [24] - 4675:21, 4681:11, 4687:25, 4695:13, 4697:25, 4710:5, 4711:10, 4727:9, 4735:2, 4735:3, 4742:1, 4750:14, 4750:15, 4759:6, 4810:11, 4832:1, 4858:4, 4883:16, 4886:23, 4894:18, 4894:23, 4959:20, 4960:1, 4973:4
beyond [2] - 4703:14, 4887:9
bid [1] - 4723:3
bidding [1] - 4968:9
big [24] - 4687:6, 4697:8, 4699:24, 4704:15, 4713:17, 4739:4, 4745:20, 4769:7, 4769:14, 4769:15, 4776:2, 4777:11, 4778:6, 4779:17, 4792:8, 4794:1, 4842:25, 4851:23, 4908:18, 4931:8, 4934:25, 4935:2
bigger [1] - 4782:1
biggest [2] - 4781:12, 4819:16
bill [1] - 4878:14
Bill [14] - 4708:11, 4757:14, 4778:24, 4787:15, 4798:4, 4803:25, 4848:12, 4848:14, 4848:15, 4857:15, 4868:18, 4876:14
billion [7] - 4712:6, 4810:24, 4873:12, 4873:15, 4922:16, 4922:17, 4922:19
binder [52] - 4691:12, 4691:13, 4693:10,

4705:21, 4718:22,
4733:9, 4757:17,
4765:13, 4797:23,
4797:24, 4797:25,
4801:19, 4803:22,
4809:3, 4811:22,
4813:10, 4815:3,
4815:5, 4821:8,
4827:3, 4830:12,
4830:13, 4833:8,
4836:6, 4839:16,
4839:17, 4839:18,
4845:15, 4847:25,
4848:1, 4854:23,
4861:12, 4866:3,
4867:3, 4867:5,
4868:12, 4874:12,
4882:17, 4885:5,
4893:4, 4896:18,
4896:19, 4902:21,
4903:20, 4905:16,
4936:8, 4936:12,
4948:24, 4951:12,
4962:24, 4970:11
**Bismol** [1] - 4677:9
**bit** [24] - 4694:12,
4714:20, 4749:10,
4750:8, 4758:22,
4796:14, 4833:3,
4834:12, 4834:15,
4834:16, 4838:23,
4839:2, 4841:9,
4861:8, 4876:20,
4917:2, 4917:13,
4919:5, 4927:24,
4928:2, 4930:2,
4933:23, 4939:15,
4959:17
**BJ's** [3] - 4697:11,
4698:3, 4703:19
**black** [6] - 4809:3,
4815:3, 4815:5,
4833:8, 4867:3,
4925:12
**BlackRock** [3] -
4908:6, 4908:7,
4908:8
**blank** [14] - 4834:7,
4837:8, 4837:9,
4838:1, 4867:14,
4869:15, 4869:16,
4869:25, 4873:9,
4873:12, 4873:15,
4908:18
**blended** [1] - 4897:11
**blind** [1] - 4892:11
**blitzes** [3] - 4792:25,
4793:9, 4793:10
**blitzing** [2] - 4792:23
**blocked** [1] - 4673:11

**blocking** [3] - 4792:9,
4792:12, 4902:17
**Bloomberg** [3] -
4801:21, 4866:4,
4868:5
**blow** [1] - 4734:23
**Blue** [7] - 4762:20,
4762:21, 4763:4,
4763:21, 4764:13,
4764:25, 4767:25
**Bluebird** [5] -
4925:22, 4926:18,
4926:20, 4928:24,
4947:13
**board** [16] - 4676:12,
4700:3, 4719:8,
4744:13, 4747:11,
4749:10, 4749:23,
4751:21, 4751:22,
4791:2, 4791:7,
4792:1, 4792:6,
4809:5, 4859:1,
4902:7
**Board** [6] - 4719:9,
4719:10, 4723:8,
4723:17, 4738:1,
4860:21
**Bobby** [1] - 4951:14
**BOD** [3] - 4737:24,
4737:25, 4790:25
**body** [1] - 4913:23
**BOIES** [1] - 4667:14
**BONANNO** [1] -
4666:25
**bonus** [11] - 4686:14,
4686:19, 4687:6,
4687:21, 4688:5,
4698:9, 4766:12,
4775:1, 4842:5,
4851:2
**bonuses** [9] -
4685:23, 4686:7,
4686:10, 4686:13,
4686:24, 4687:10,
4688:9, 4697:24
**book** [5] - 4674:19,
4803:15, 4945:15,
4948:13
**booking** [1] - 4736:12
**BOP** [4] - 4945:15,
4948:13, 4962:9
**borne** [2] - 4701:10,
4737:6
**boss** [2] - 4857:4,
4877:18
**bottling** [1] - 4677:17
**bottom** [28] - 4712:5,
4724:5, 4753:16,
4765:22, 4774:11,
4807:2, 4807:20,

4809:16, 4812:15,
4825:4, 4828:1,
4830:16, 4850:2,
4850:13, 4852:24,
4857:17, 4862:1,
4863:17, 4865:5,
4871:7, 4876:1,
4876:21, 4884:2,
4894:25, 4910:5,
4953:3, 4964:18,
4967:16
**bought** [1] - 4933:20
**bounties** [1] - 4775:4
**bounty** [4] - 4690:2,
4763:9, 4763:24,
4765:6
**Box** [6] - 4667:6,
4718:7, 4718:13,
4720:23, 4746:11,
4907:19
**box** [11] - 4697:8,
4707:21, 4721:1,
4779:17, 4830:23,
4870:24, 4871:8,
4873:17, 4875:25,
4881:18, 4960:8
**boxes** [1] - 4960:12
**bracketed** [2] -
4807:25, 4808:7
**brand** [149] - 4669:9,
4669:11, 4670:6,
4685:24, 4690:8,
4690:11, 4690:13,
4690:15, 4690:18,
4690:23, 4690:24,
4693:3, 4693:6,
4698:2, 4714:13,
4716:12, 4769:7,
4779:24, 4779:25,
4795:1, 4817:6,
4826:12, 4833:4,
4833:18, 4833:23,
4834:6, 4843:16,
4854:6, 4854:7,
4879:5, 4914:24,
4914:25, 4917:11,
4917:14, 4917:15,
4917:24, 4917:25,
4918:2, 4918:9,
4918:11, 4918:12,
4918:13, 4918:17,
4918:18, 4918:22,
4919:17, 4919:18,
4919:20, 4919:25,
4920:4, 4920:10,
4920:13, 4920:23,
4921:1, 4921:3,
4921:6, 4921:13,
4921:18, 4921:19,
4922:1, 4922:10,

4922:16, 4922:21,
4923:6, 4923:8,
4923:11, 4923:13,
4923:14, 4923:18,
4924:12, 4924:17,
4924:18, 4924:19,
4924:20, 4924:21,
4925:1, 4925:3,
4925:7, 4925:8,
4925:13, 4925:18,
4925:21, 4928:10,
4928:21, 4929:18,
4930:12, 4930:19,
4931:9, 4931:10,
4932:10, 4932:17,
4933:10, 4933:12,
4933:13, 4934:22,
4936:21, 4936:23,
4937:14, 4937:17,
4937:25, 4938:7,
4938:9, 4939:14,
4942:21, 4943:5,
4944:8, 4945:20,
4946:22, 4946:23,
4947:4, 4947:7,
4947:12, 4947:18,
4949:17, 4950:1,
4950:10, 4950:13,
4950:16, 4950:20,
4951:11, 4952:11,
4952:16, 4952:19,
4952:23, 4952:25,
4953:2, 4953:5,
4953:14, 4953:23,
4954:4, 4954:5,
4954:10, 4955:8,
4955:12, 4956:15,
4961:24, 4961:25,
4962:7, 4968:21,
4968:22, 4969:1,
4969:4, 4974:22,
4975:8
**Brand** [5] - 4833:14,
4942:20, 4951:19,
4952:9, 4957:8
**brand's** [1] - 4920:9
**branded** [6] - 4690:12,
4926:22, 4938:2,
4946:16, 4946:24,
4949:21
**branding** [10] -
4917:16, 4917:17,
4917:18, 4917:19,
4919:15, 4920:6,
4924:5, 4946:4,
4947:12
**brands** [35] - 4669:13,
4691:19, 4745:10,
4781:10, 4782:1,
4783:2, 4784:5,

4784:9, 4784:19,
4817:12, 4883:15,
4883:16, 4883:19,
4918:3, 4918:4,
4918:7, 4918:15,
4918:20, 4922:4,
4922:13, 4924:4,
4926:23, 4927:2,
4927:4, 4927:6,
4940:5, 4946:21,
4946:24, 4947:4,
4947:7, 4947:8,
4947:15
**BrandZ** [4] - 4922:14,
4922:22, 4922:23,
4923:3
**break** [10] - 4742:17,
4742:19, 4754:15,
4758:22, 4896:25,
4897:1, 4897:3,
4897:5, 4897:6,
4911:16
**break-even** [3] -
4896:25, 4897:1,
4897:6
**breakdown** [1] -
4814:13
**breakdowns** [1] -
4814:22
**breaking** [1] - 4828:22
**breaks** [1] - 4681:23
**BRENNER** [1] -
4667:16
**BRET** [1] - 4667:1
**Bret** [1] - 4668:6
**Bridge** [1] - 4785:21
**brief** [1] - 4675:9
**briefly** [10] - 4668:23,
4752:1, 4812:10,
4858:1, 4866:7,
4888:24, 4894:8,
4901:19, 4914:6,
4937:16
**Bright** [1] - 4671:20
**bright** [3] - 4671:21,
4671:22
**BRIGHT** [2] - 4671:25,
4672:2
**bring** [18] - 4673:12,
4674:1, 4688:17,
4788:20, 4865:16,
4916:14, 4917:23,
4927:1, 4927:2,
4927:12, 4935:20,
4936:21, 4938:1,
4947:15, 4958:19,
4958:20, 4958:24,
4959:4
**Bring** [1] - 4846:14
**bringing** [2] - 4936:24,

4943:19

**brings** [6] - 4670:9, 4672:21, 4887:1, 4930:19, 4938:7, 4948:4

**broad** [5] - 4797:15, 4797:20, 4799:7, 4914:18, 4973:15

**broadly** [2] - 4721:3, 4968:3

**broken** [1] - 4782:23

**Brooklyn** [2] - 4666:6, 4667:19

**Brooks** [1] - 4841:22

**brought** [6] - 4698:4, 4755:23, 4755:25, 4756:7, 4756:20, 4793:3

**BRYANT** [1] - 4667:18

**build** [13] - 4711:8, 4723:14, 4732:23, 4758:19, 4759:18, 4924:17, 4938:24, 4939:14, 4940:15, 4940:22, 4945:20, 4977:4

**building** [7] - 4687:21, 4688:5, 4688:25, 4940:16, 4940:20, 4968:21, 4968:22

**Building** [2] - 4667:5, 4942:20

**builds** [2] - 4709:15, 4932:17

**built** [6] - 4924:4, 4927:19, 4934:22, 4969:1, 4969:3, 4970:13

**bulk** [1] - 4670:24

**bullet** [36] - 4750:1, 4750:2, 4752:9, 4752:15, 4753:17, 4758:9, 4758:13, 4758:18, 4759:4, 4759:15, 4760:6, 4761:6, 4763:6, 4763:19, 4763:24, 4764:6, 4765:2, 4809:17, 4833:22, 4834:2, 4886:1, 4886:19, 4886:22, 4887:4, 4887:22, 4964:19, 4967:16, 4967:23, 4968:6, 4968:17, 4969:21, 4970:1, 4972:23, 4972:24, 4973:20, 4973:21

**BUR** [5] - 4708:11, 4708:14, 4708:23,

4868:16, 4868:17

**Bureau** [6] - 4882:8, 4882:10, 4884:21, 4886:8, 4886:10, 4886:12

**business** [172] - 4671:11, 4671:14, 4671:23, 4672:6, 4675:23, 4675:24, 4676:3, 4676:4, 4676:11, 4678:4, 4680:2, 4680:3, 4680:7, 4684:25, 4686:1, 4687:7, 4687:21, 4688:5, 4688:20, 4690:23, 4692:17, 4692:20, 4693:7, 4694:10, 4697:7, 4698:16, 4700:7, 4701:12, 4701:13, 4702:3, 4704:5, 4708:16, 4708:18, 4708:19, 4710:24, 4714:14, 4714:23, 4715:8, 4715:9, 4715:10, 4715:11, 4715:13, 4716:13, 4720:2, 4720:13, 4723:6, 4725:4, 4725:5, 4725:9, 4725:11, 4733:21, 4735:13, 4738:23, 4739:5, 4743:6, 4743:8, 4743:11, 4744:9, 4745:5, 4748:12, 4748:17, 4749:7, 4754:9, 4776:3, 4777:16, 4778:7, 4778:16, 4779:4, 4779:6, 4788:14, 4788:19, 4789:13, 4790:8, 4792:4, 4792:5, 4792:9, 4792:13, 4792:14, 4793:7, 4793:9, 4794:21, 4795:6, 4801:5, 4802:16, 4826:13, 4831:19, 4841:23, 4870:17, 4872:19, 4886:14, 4886:15, 4887:15, 4888:8, 4888:13, 4897:14, 4899:5, 4899:21, 4901:22, 4902:13, 4902:18, 4905:9, 4905:12, 4914:9, 4914:10, 4914:23, 4916:10, 4916:19, 4916:22, 4918:6,

4918:8, 4919:8, 4920:15, 4921:16, 4922:2, 4923:13, 4923:15, 4928:9, 4928:23, 4929:3, 4929:16, 4931:4, 4931:6, 4931:11, 4932:23, 4937:15, 4937:18, 4940:4, 4940:10, 4940:18, 4942:18, 4942:25, 4945:2, 4945:7, 4945:25, 4947:11, 4948:19, 4953:11, 4954:22, 4956:10, 4956:19, 4956:21, 4956:24, 4958:24, 4961:7, 4961:21, 4962:16, 4974:8, 4974:11, 4974:14, 4975:8, 4975:19, 4975:22, 4976:1, 4976:5, 4976:16, 4976:17, 4976:19, 4976:23, 4976:24, 4977:4, 4977:6

**Business** [21] - 4675:8, 4675:10, 4675:11, 4675:13, 4676:14, 4676:18, 4678:18, 4678:20, 4694:9, 4700:10, 4700:17, 4708:15, 4716:24, 4717:9, 4719:4, 4733:17, 4869:3, 4888:24, 4889:3, 4889:14, 4889:15

**businesses** [30] - 4686:2, 4691:5, 4691:8, 4692:19, 4692:23, 4694:21, 4695:24, 4700:25, 4713:17, 4714:22, 4715:6, 4715:7, 4716:4, 4716:7, 4720:2, 4720:8, 4726:19, 4731:11, 4797:7, 4810:20, 4890:9, 4915:1, 4915:21, 4915:22, 4928:3, 4928:6, 4938:18, 4945:3, 4977:1

**but..** [2] - 4709:24, 4866:10

**buy** [4] - 4714:9, 4762:12, 4764:11, 4933:4

**Buy** [3] - 4698:9,

4723:2, 4724:2

**buying** [4] - 4915:4, 4915:7, 4915:10, 4915:11

**buzz** [2] - 4722:20, 4722:24

**buzz-generating** [1] - 4722:20

**BY** [21] - 4666:22, 4667:11, 4667:15, 4675:4, 4755:14, 4796:9, 4819:17, 4820:25, 4830:7, 4893:12, 4908:21, 4912:19, 4940:2, 4959:9, 4979:6, 4979:8, 4979:10, 4979:12, 4979:14, 4979:17, 4979:19

## C

**C-level** [1] - 4872:2

**CA&C** [1] - 4966:25

**CABR** [1] - 4799:15

**Cadillac** [3] - 4921:1, 4921:9, 4921:10

**Cadman** [1] - 4667:19

**calculate** [3] - 4705:14, 4751:1, 4766:25

**calculated** [4] - 4707:23, 4750:25, 4797:5, 4812:16

**calculates** [1] - 4812:21

**calculating** [1] - 4707:19

**calculation** [7] - 4707:5, 4711:22, 4711:25, 4743:17, 4819:25, 4820:14, 4831:3

**calculations** [3] - 4707:3, 4709:17, 4820:2

**campaign** [21] - 4700:21, 4721:5, 4822:11, 4823:23, 4824:15, 4826:9, 4828:9, 4848:25, 4962:16, 4962:18, 4963:4, 4967:14, 4968:2, 4969:1, 4971:6, 4972:16, 4972:24, 4972:25, 4973:10, 4976:1, 4977:3

**campaigns** [15] - 4822:16, 4822:19,

4822:20, 4823:6, 4826:25, 4828:19, 4849:14, 4853:15, 4965:25, 4968:7, 4969:6, 4970:23, 4973:4, 4974:9, 4975:6

**Canada** [30] - 4678:4, 4679:4, 4679:7, 4680:13, 4716:17, 4733:20, 4733:21, 4756:5, 4781:18, 4879:10, 4879:15, 4879:18, 4879:20, 4879:24, 4880:2, 4880:9, 4881:7, 4881:16, 4882:9, 4882:19, 4882:25, 4884:7, 4886:4, 4886:9, 4887:8, 4887:12, 4893:19, 4893:23, 4894:1, 4894:5

**Canadian** [6] - 4678:17, 4881:10, 4882:7, 4883:8, 4888:16, 4893:14

**cancel** [31] - 4731:5, 4755:21, 4756:2, 4756:12, 4760:9, 4768:11, 4768:14, 4768:25, 4769:12, 4771:19, 4772:9, 4774:6, 4774:18, 4776:15, 4782:14, 4790:5, 4790:7, 4823:21, 4826:22, 4828:4, 4838:24, 4840:15, 4843:21, 4849:16, 4851:24, 4857:23, 4858:2, 4873:1, 4873:2, 4898:18, 4899:17

**canceled** [10] - 4740:1, 4740:3, 4837:10, 4839:10, 4842:20, 4843:25, 4844:1, 4844:17, 4871:25, 4899:13

**canceling** [2] - 4851:19, 4852:22

**cancellation** [20] - 4756:22, 4756:25, 4757:3, 4769:19, 4823:19, 4835:12, 4835:18, 4835:20, 4839:5, 4842:19, 4842:25, 4846:19, 4849:20, 4855:17, 4858:3, 4859:1,

4861:3, 4895:4, 4899:3, 4899:19
**cancellations** [1] - 4740:6
**cancelled** [4] - 4755:22, 4772:10, 4776:16, 4826:24
**cancelling** [11] - 4739:4, 4768:24, 4768:25, 4769:25, 4775:21, 4775:23, 4776:3, 4776:16, 4790:9, 4899:12, 4899:25
**cannot** [2] - 4968:8, 4976:25
**capabilities** [2] - 4720:21, 4758:15
**capitalizing** [2] - 4759:21, 4759:22
**capture** [1] - 4812:20
**captured** [1] - 4707:22
**car** [3] - 4918:22, 4918:23, 4919:1
**card** [181] - 4671:23, 4680:8, 4685:24, 4689:3, 4689:5, 4689:17, 4689:25, 4690:2, 4690:3, 4690:17, 4694:6, 4710:23, 4711:3, 4711:4, 4715:8, 4715:9, 4716:11, 4720:9, 4721:10, 4721:11, 4721:13, 4721:15, 4721:25, 4722:2, 4722:14, 4722:18, 4723:10, 4723:25, 4740:17, 4743:10, 4743:13, 4743:21, 4743:23, 4744:10, 4744:11, 4744:15, 4744:16, 4745:2, 4747:23, 4748:9, 4752:9, 4754:2, 4755:22, 4758:21, 4758:23, 4759:1, 4759:7, 4759:17, 4760:10, 4762:6, 4762:7, 4762:23, 4762:24, 4763:9, 4763:11, 4764:2, 4765:8, 4765:9, 4767:13, 4767:25, 4768:25, 4769:6, 4769:11, 4772:6, 4772:24, 4773:20, 4774:21, 4775:5, 4776:16, 4778:15, 4780:1,

4780:8, 4783:14, 4788:7, 4788:16, 4792:16, 4793:7, 4800:24, 4808:17, 4811:4, 4814:4, 4814:5, 4817:8, 4817:25, 4818:3, 4818:5, 4818:12, 4818:24, 4819:7, 4820:6, 4820:8, 4822:9, 4823:18, 4823:22, 4825:19, 4825:21, 4826:13, 4832:11, 4833:24, 4837:7, 4837:9, 4837:23, 4839:7, 4839:8, 4839:11, 4839:15, 4842:23, 4843:7, 4846:15, 4846:23, 4847:1, 4847:2, 4850:18, 4850:21, 4852:18, 4852:19, 4853:1, 4853:6, 4853:14, 4862:16, 4863:1, 4865:12, 4865:19, 4881:24, 4882:19, 4883:14, 4885:21, 4888:3, 4897:12, 4897:14, 4905:3, 4905:4, 4905:10, 4907:8, 4926:13, 4926:18, 4926:20, 4926:21, 4926:22, 4929:1, 4931:6, 4939:6, 4940:14, 4941:8, 4941:10, 4941:19, 4941:25, 4942:2, 4942:3, 4942:4, 4942:7, 4943:18, 4944:22, 4945:23, 4946:6, 4949:8, 4950:9, 4953:13, 4953:19, 4953:21, 4954:4, 4954:8, 4954:19, 4954:22, 4954:24, 4960:16, 4960:21, 4960:25, 4961:10, 4961:13, 4961:15, 4961:17, 4963:12, 4963:13, 4964:17
**Card** [17] - 4690:20, 4690:21, 4701:19, 4762:20, 4762:21, 4763:4, 4763:24, 4764:13, 4764:23, 4782:22, 4873:24, 4878:9, 4895:8, 4925:12, 4925:20, 4933:21

**cardholder** [2] - 4819:6, 4884:5
**cardholders** [4] - 4857:21, 4892:7, 4892:15, 4892:16
**cardmember** [34] - 4689:1, 4694:4, 4704:3, 4716:13, 4721:12, 4723:6, 4725:4, 4725:11, 4725:12, 4725:20, 4726:7, 4745:4, 4748:20, 4748:23, 4754:10, 4778:15, 4780:20, 4782:4, 4783:17, 4837:21, 4838:10, 4843:23, 4849:16, 4870:17, 4870:20, 4892:10, 4902:14, 4903:24, 4934:10, 4934:20, 4960:5, 4963:13, 4965:8, 4969:20
**Cardmembers** [1] - 4939:3
**cardmembers** [109] - 4688:15, 4688:21, 4688:25, 4689:7, 4689:10, 4694:3, 4694:22, 4700:7, 4701:25, 4706:19, 4706:24, 4719:24, 4720:7, 4721:12, 4721:16, 4721:23, 4722:10, 4723:23, 4725:25, 4726:4, 4726:10, 4743:11, 4743:21, 4744:19, 4745:1, 4745:12, 4745:25, 4747:7, 4748:16, 4748:22, 4749:2, 4754:3, 4754:11, 4754:12, 4756:16, 4758:16, 4762:13, 4763:16, 4769:6, 4771:20, 4772:2, 4772:4, 4772:6, 4772:10, 4773:8, 4773:17, 4780:24, 4786:19, 4788:3, 4794:4, 4795:5, 4838:15, 4839:6, 4839:14, 4841:12, 4842:2, 4842:22, 4843:11, 4849:6, 4849:8, 4850:21, 4852:1, 4853:24, 4854:5, 4865:16, 4889:22, 4890:24, 4891:8,

4891:21, 4897:19, 4899:2, 4899:11, 4899:14, 4899:20, 4902:16, 4905:5, 4905:12, 4905:13, 4916:19, 4932:14, 4934:1, 4934:5, 4934:19, 4934:24, 4935:3, 4935:15, 4935:22, 4936:1, 4936:4, 4938:17, 4962:2, 4962:11, 4962:13, 4962:22, 4963:20, 4964:1, 4964:5, 4964:11, 4964:20, 4965:21, 4965:24, 4966:2, 4966:7, 4974:13
**cardmembers'** [7] - 4744:14, 4769:16, 4779:25, 4782:16, 4783:14, 4788:6, 4904:19
**cards** [60] - 4680:4, 4680:5, 4688:19, 4689:23, 4690:4, 4690:5, 4690:6, 4690:7, 4690:12, 4710:15, 4710:18, 4710:20, 4745:5, 4747:3, 4747:19, 4747:22, 4750:13, 4750:15, 4759:2, 4763:21, 4764:25, 4768:6, 4769:24, 4788:23, 4788:24, 4789:2, 4810:22, 4814:7, 4814:12, 4818:4, 4820:9, 4837:6, 4839:10, 4842:5, 4860:9, 4865:21, 4897:4, 4897:20, 4898:13, 4898:19, 4917:4, 4940:7, 4945:11, 4947:18, 4949:7, 4953:12, 4955:16, 4956:23, 4960:2, 4960:20, 4975:4, 4975:23, 4976:22
**care** [1] - 4799:18
**career** [1] - 4914:10
**Carey** [3] - 4827:4, 4827:17, 4828:1
**CAREY** [1] - 4827:4
**Carlos** [1] - 4824:19
**Carrefour** [1] - 4779:11, 4779:12, 4780:10, 4780:11, 4780:17, 4780:19

**carrying** [1] - 4925:17
**case** [18] - 4668:1, 4670:19, 4670:22, 4673:25, 4731:4, 4746:15, 4759:1, 4778:10, 4806:5, 4828:16, 4903:17, 4904:14, 4907:3, 4910:16, 4924:15, 4933:15, 4944:5, 4955:15
**cases** [2] - 4935:22, 4975:11
**cash** [10] - 4761:11, 4762:25, 4763:2, 4764:3, 4766:14, 4766:24, 4883:14, 4928:7, 4928:25
**Cash** [6] - 4762:20, 4762:21, 4762:25, 4763:4, 4763:21, 4764:13
**categories** [11] - 4680:24, 4704:25, 4728:12, 4780:25, 4781:14, 4799:17, 4799:19, 4814:18, 4820:3, 4862:14, 4862:20
**category** [7] - 4703:22, 4780:25, 4814:14, 4814:22, 4819:7, 4879:5, 4938:13
**Category** [1] - 4814:2
**CAUSE** [1] - 4666:16
**caused** [2] - 4822:18, 4860:19
**caution** [1] - 4709:8
**Cedeno** [1] - 4880:13
**CEDENO** [1] - 4880:14
**celebrating** [1] - 4941:12
**Cendant** [2] - 4824:20, 4825:10
**CENDANT** [1] - 4824:21
**center** [4] - 4717:16, 4822:9, 4823:15, 4934:9
**centered** [1] - 4973:7
**centers** [6] - 4730:22, 4772:20, 4772:22, 4773:3, 4793:8, 4943:20
**central** [1] - 4834:7
**centralized** [7] - 4699:18, 4699:19, 4716:24, 4717:2, 4717:8, 4717:9,

4717:16
**centralizing** [1] -
4717:14
**Centurion** [2] -
4925:12, 4925:20
**CEO** [4] - 4676:17,
4757:11, 4757:12,
4834:23
**certain** [8] - 4687:9,
4727:25, 4728:6,
4761:12, 4767:25,
4827:11, 4906:22,
4919:21
**certainly** [17] - 4725:4,
4787:19, 4810:4,
4831:16, 4853:15,
4857:10, 4885:12,
4888:13, 4889:16,
4916:9, 4923:5,
4926:9, 4932:5,
4943:14, 4972:1,
4974:23, 4977:16
**certainty** [4] -
4686:25, 4687:1,
4774:17, 4777:15
**Certares** [1] - 4908:9
**certificate** [2] -
4763:10, 4764:8
**certificates** [1] -
4764:7
**cetera** [4] - 4841:22,
4876:2, 4948:20,
4958:18
**CFO** [4] - 4757:9,
4757:14, 4757:16,
4834:25
**chain** [13] - 4823:9,
4827:4, 4827:15,
4827:20, 4828:11,
4837:7, 4840:7,
4849:18, 4849:19,
4850:6, 4897:25,
4963:12
**chains** [3] - 4772:25,
4897:25, 4901:3
**chairman** [1] -
4679:18
**challenge** [3] -
4809:12, 4905:13,
4924:5
**challenges** [6] -
4752:10, 4809:22,
4810:17, 4810:19,
4810:21, 4871:21
**challenging** [1] -
4875:24
**chance** [2] - 4775:13,
4805:9
**change** [16] - 4716:19,
4728:6, 4729:7,

4729:11, 4766:3,
4817:10, 4850:22,
4851:1, 4860:19,
4860:20, 4862:18,
4862:22, 4863:7,
4866:21, 4881:23,
4913:8
**changed** [7] -
4858:24, 4878:19,
4879:21, 4880:3,
4913:10, 4932:21,
4965:20
**changes** [13] -
4727:16, 4727:21,
4728:1, 4872:2,
4880:6, 4882:3,
4950:19, 4951:10,
4951:11, 4965:23,
4975:11, 4975:12
**changing** [1] -
4856:23
**channel** [2] - 4731:13
**channels** [4] -
4683:14, 4689:9,
4780:23, 4784:24
**characteristics** [2] -
4684:9, 4684:11
**characterization** [2] -
4799:14, 4942:12
**characterize** [2] -
4854:19, 4942:13
**Charge** [1] - 4815:11
**charge** [20] - 4696:6,
4701:13, 4701:20,
4701:21, 4714:19,
4721:7, 4781:16,
4781:17, 4803:15,
4806:23, 4807:4,
4807:6, 4808:12,
4808:17, 4815:13,
4815:20, 4837:8,
4838:2, 4867:17,
4897:9
**charged** [3] - 4697:6,
4805:21, 4806:14
**charges** [1] - 4710:14
**charging** [8] - 4695:5,
4697:10, 4701:18,
4703:9, 4724:16,
4725:7, 4727:17
**chart** [7] - 4671:14,
4672:10, 4709:14,
4806:22, 4808:14,
4870:12, 4903:15
**charts** [2] - 4723:18,
4830:17
**CheapTickets** [3] -
4825:19, 4825:20,
4825:24
**CheapTickets.com**

[4] - 4822:13,
4824:16, 4825:10,
4826:8
**check** [9] - 4793:2,
4797:11, 4817:3,
4817:5, 4817:9,
4817:11, 4817:12,
4817:13, 4925:25
**checking** [1] - 4755:9
**checks** [5] - 4786:18,
4975:4, 4975:23,
4976:22
**Checks** [1] - 4678:12
**Chenault** [9] -
4672:11, 4678:15,
4679:19, 4775:19,
4846:12, 4913:4,
4937:9, 4942:1,
4967:2
**Cheque** [2] - 4928:7,
4931:20
**Cheques** [1] - 4928:5
**Cheryl** [2] - 4858:9,
4859:19
**CHESLER** [6] -
4667:11, 4668:14,
4755:3, 4755:6,
4755:10, 4978:9
**Chesler** [3] - 4668:15,
4672:22, 4755:2
**Chest** [1] - 4973:20
**Chief** [6] - 4913:2,
4913:5, 4914:7,
4914:17, 4916:5,
4923:16
**chief** [3] - 4672:9,
4966:15, 4976:10
**choice** [9] - 4746:16,
4760:6, 4760:9,
4760:10, 4760:11,
4822:10, 4863:3,
4969:20, 4971:22
**Choice** [1] - 4886:19
**choose** [2] - 4722:6,
4971:23
**chosen** [1] - 4964:17
**Chris** [3] - 4878:4,
4878:8, 4878:20
**Christina** [1] - 4821:9
**Christine** [1] - 4798:1
**chronology** [1] -
4834:15
**CIF** [2] - 4750:12,
4750:19
**CIF/LIF** [1] - 4750:10
**Cinemas** [1] - 4822:12
**circumstance** [2] -
4699:7, 4904:1
**circumstances** [2] -
4845:9, 4932:11

**cite** [1] - 4801:7
**cited** [1] - 4936:5
**cities** [3] - 4806:22,
4830:17, 4830:18
**city** [2] - 4806:5,
4807:2
**City** [6] - 4667:6,
4807:7, 4807:10,
4909:8, 4909:15,
4909:25
**CIVIL** [1] - 4666:16
**claim** [1] - 4927:20
**clarification** [1] -
4891:18
**clarity** [4] - 4820:18,
4820:19, 4945:5,
4947:10
**class** [1] - 4698:7
**clause** [1] - 4826:4
**clean** [1] - 4801:6
**clear** [8] - 4865:14,
4899:23, 4933:15,
4942:5, 4942:21,
4944:3, 4945:9,
4974:18
**clearance** [1] - 4926:1
**clearer** [1] - 4817:17
**clearly** [7] - 4782:22,
4790:8, 4862:6,
4862:16, 4937:19,
4960:19, 4962:10
**clerk** [2] - 4668:18,
4912:7
**CLERK** [2] - 4912:10,
4912:13
**client** [21] - 4679:3,
4681:2, 4681:3,
4681:16, 4683:10,
4687:11, 4698:15,
4699:16, 4699:22,
4700:15, 4715:16,
4715:18, 4717:3,
4717:6, 4717:20,
4718:8, 4730:11,
4786:16, 4786:22,
4787:6, 4859:22
**clips** [1] - 4935:17
**close** [6] - 4679:24,
4746:4, 4751:23,
4752:15, 4819:2,
4875:2
**closed** [6] - 4701:23,
4720:3, 4720:4,
4720:14, 4889:6,
4933:23
**closely** [1] - 4930:9
**closing** [2] - 4741:16,
4811:4
**Club** [1] - 4697:14
**CM's** [1] - 4785:8

**CMs** [1] - 4841:11
**Co** [1] - 4833:14
**co** [32] - 4669:9,
4669:11, 4669:13,
4670:6, 4685:24,
4690:8, 4690:11,
4690:12, 4690:13,
4690:15, 4690:18,
4690:23, 4690:24,
4691:19, 4693:3,
4693:6, 4698:2,
4700:2, 4714:13,
4716:12, 4833:4,
4833:18, 4833:23,
4834:6, 4926:22,
4946:16, 4946:22,
4946:24, 4947:12,
4947:18
**Co-Brand** [1] -
4833:14
**co-brand** [24] -
4669:9, 4669:11,
4670:6, 4685:24,
4690:8, 4690:11,
4690:13, 4690:15,
4690:18, 4690:23,
4690:24, 4693:3,
4693:6, 4698:2,
4714:13, 4716:12,
4833:4, 4833:18,
4833:23, 4834:6,
4946:22, 4947:18
**co-branded** [4] -
4690:12, 4926:22,
4946:16, 4946:24
**co-branding** [1] -
4947:12
**co-brands** [2] -
4669:13, 4691:19
**co-funded** [1] - 4700:2
**coauthored** [1] -
4966:14
**coauthoring** [1] -
4967:24
**Code** [23] - 4880:2,
4880:5, 4881:7,
4881:10, 4881:16,
4882:2, 4882:5,
4882:18, 4883:12,
4884:9, 4884:13,
4884:17, 4885:20,
4885:22, 4885:25,
4886:20, 4886:22,
4887:3, 4887:9,
4887:22, 4888:16,
4893:14, 4893:22
**code** [1] - 4883:11
**Codispoti** [4] -
4669:7, 4669:20,
4670:19, 4670:22

**coffee** [1] - 4904:24
**cognizant** [1] - 4919:18
**cohesive** [1] - 4947:14
**collect** [1] - 4891:19
**column** [13] - 4709:25, 4710:3, 4711:6, 4711:15, 4711:21, 4711:23, 4808:10, 4870:4, 4874:2, 4881:15, 4909:4, 4909:7, 4952:14
**columns** [1] - 4709:21
**combination** [3] - 4727:24, 4794:1, 4947:15
**comfortable** [2] - 4741:22, 4742:1
**coming** [9] - 4670:20, 4714:25, 4718:1, 4726:25, 4729:9, 4876:20, 4876:22, 4914:10, 4965:4
**commend** [1] - 4896:1
**commensurate** [1] - 4963:6
**comments** [3] - 4683:13, 4866:9, 4876:22
**commercial** [2] - 4680:3, 4695:9
**commercially** [1] - 4707:17
**commercials** [1] - 4915:11
**commission** [2] - 4765:4, 4765:5
**commissioned** [1] - 4837:20
**commit** [1] - 4761:20
**commitment** [6] - 4703:16, 4703:25, 4704:1, 4761:24, 4761:25, 4762:8
**commitments** [2] - 4782:3, 4847:10
**committee** [2] - 4913:22
**communicate** [6] - 4685:2, 4685:7, 4719:20, 4774:8, 4849:2, 4923:24
**communicated** [2] - 4838:5, 4888:15
**communication** [2] - 4785:7, 4825:24
**communications** [6] - 4801:12, 4914:13, 4915:9, 4919:25, 4930:15, 4973:15

**Communications** [4] - 4790:17, 4850:16, 4960:22, 4967:1
**Communities** [1] - 4798:5
**communities** [1] - 4798:20
**community** [10] - 4718:15, 4785:17, 4785:18, 4785:23, 4799:2, 4799:23, 4801:13, 4801:21, 4861:14, 4861:18
**companies** [6] - 4701:18, 4702:12, 4702:15, 4890:9, 4922:4, 4922:13
**COMPANY** [1] - 4666:12
**company** [28] - 4689:13, 4702:10, 4714:20, 4715:23, 4716:1, 4725:15, 4739:7, 4773:19, 4794:17, 4913:16, 4913:24, 4913:25, 4914:1, 4918:5, 4918:6, 4920:24, 4921:19, 4921:22, 4922:1, 4930:12, 4932:2, 4933:12, 4936:24, 4944:16, 4967:3, 4967:12, 4976:13, 4977:12
**Company** [5] - 4667:10, 4836:7, 4913:12, 4913:15, 4913:19
**company's** [1] - 4917:25
**comparatively** [1] - 4818:16
**compare** [3] - 4695:16, 4764:18, 4797:2
**compared** [8] - 4728:14, 4767:7, 4803:1, 4810:22, 4810:24, 4818:16, 4897:19, 4928:16
**comparing** [7] - 4707:13, 4800:23, 4897:13, 4903:15, 4909:22, 4910:2
**comparison** [7] - 4695:18, 4696:4, 4814:4, 4820:5, 4820:6, 4881:14, 4897:16
**compatibility** [1] -

4946:21
**compatible** [1] - 4947:4
**compelled** [1] - 4845:10
**compelling** [3] - 4841:2, 4841:5, 4939:1
**compensated** [1] - 4689:24
**compete** [1] - 4883:17
**competing** [3] - 4825:19, 4826:5, 4897:20
**competition** [35] - 4685:8, 4685:9, 4693:23, 4695:6, 4695:7, 4695:12, 4695:17, 4696:3, 4696:17, 4696:18, 4697:2, 4697:3, 4707:14, 4707:18, 4712:24, 4714:1, 4719:22, 4719:23, 4728:16, 4728:18, 4731:23, 4732:1, 4732:9, 4737:13, 4741:23, 4795:2, 4883:23, 4884:6, 4886:23, 4887:24, 4888:5, 4890:7, 4891:2, 4902:8, 4902:11
**Competition** [6] - 4882:8, 4882:10, 4884:20, 4886:8, 4886:10, 4886:12
**competitive** [10] - 4670:7, 4685:4, 4695:13, 4717:11, 4748:23, 4870:18, 4872:24, 4886:25, 4890:10, 4897:15, 4970:10
**competitively** [1] - 4702:14
**competitor** [5] - 4841:16, 4841:19, 4842:5, 4851:1, 4851:3
**competitors** [11] - 4772:25, 4822:16, 4826:25, 4828:18, 4839:4, 4839:11, 4841:21, 4843:20, 4853:11, 4853:25, 4854:3
**competitors'** [1] - 4892:21
**complain** [1] -

4772:23
**complaints** [2] - 4859:2, 4860:21
**complementary** [2] - 4927:2, 4927:5
**complete** [2] - 4927:8, 4932:20
**complex** [3] - 4887:5, 4943:6, 4946:1
**compliance** [2] - 4789:4, 4847:23
**comply** [1] - 4853:20
**component** [1] - 4684:5
**components** [6] - 4683:19, 4685:14, 4698:6, 4710:10, 4840:14
**comprehensive** [1] - 4916:12
**comprehensively** [1] - 4916:21
**comprising** [1] - 4887:5
**computation** [1] - 4697:9
**Computer** [1] - 4667:22
**Computer-Assisted** [1] - 4667:22
**concentrated** [1] - 4967:18
**concentration** [1] - 4905:6
**concept** [5] - 4704:21, 4705:10, 4707:22, 4727:15, 4942:23
**concepts** [4] - 4811:15, 4842:1, 4842:4, 4929:17
**conceptualize** [1] - 4930:3
**concern** [4] - 4769:2, 4815:23, 4965:3
**concerned** [10] - 4703:17, 4705:5, 4705:6, 4730:24, 4756:13, 4757:1, 4768:23, 4769:5, 4769:9, 4968:3
**concerning** [5] - 4769:14, 4772:15, 4823:9, 4898:1, 4965:12
**concerns** [8] - 4730:23, 4773:1, 4847:17, 4886:21, 4887:17, 4887:23, 4888:4, 4892:19
**concerted** [1] -

4718:19
**concerts** [1] - 4935:25
**concession** [1] - 4776:21
**concessions** [1] - 4763:8
**Conclusions** [1] - 4887:22
**concrete** [1] - 4918:19
**conduct** [3] - 4786:7, 4787:3, 4797:17
**Conduct** [22] - 4880:2, 4880:5, 4881:7, 4881:10, 4881:16, 4882:2, 4882:5, 4882:18, 4884:10, 4884:14, 4884:17, 4885:20, 4885:22, 4885:25, 4886:20, 4886:22, 4887:3, 4887:10, 4887:23, 4888:16, 4893:14, 4893:23
**conducted** [4] - 4744:18, 4780:16, 4955:18, 4957:7
**confess** [1] - 4672:24
**confidence** [10] - 4713:7, 4739:15, 4929:2, 4929:7, 4931:3, 4931:15, 4931:22, 4931:25, 4932:7, 4932:9
**confident** [4] - 4730:9, 4864:2, 4928:25, 4929:24
**confidential** [17] - 4669:17, 4708:4, 4709:9, 4733:12, 4751:20, 4757:20, 4765:15, 4773:23, 4778:19, 4805:5, 4812:8, 4813:20, 4813:21, 4903:3, 4910:12, 4936:16, 4952:7
**confidentiality** [5] - 4669:14, 4805:3, 4824:24, 4827:7, 4827:8
**confirm** [1] - 4740:4
**confirmed** [1] - 4898:9
**confirming** [1] - 4903:13
**confirms** [2] - 4903:10, 4904:6
**confusion** [3] - 4835:15, 4917:23, 4946:3
**conjunction** [1] -

4900:17
**CONNECTICUT** [1] -
4666:5
**connection** [1] -
4919:2
**connections** [2] -
4919:14, 4919:15
Conrath [1] - 4668:4
**CONRATH** [14] -
4666:22, 4668:3,
4670:3, 4671:1,
4672:23, 4673:1,
4673:3, 4673:5,
4673:16, 4673:19,
4673:22, 4673:24,
4674:4, 4978:8
**conscious** [1] -
4697:17
**consequences** [3] -
4887:6, 4887:13,
4888:12
**Consider** [3] - 4851:7,
4851:12, 4851:13
**consider** [8] - 4751:2,
4773:16, 4844:8,
4850:19, 4899:16,
4921:19, 4924:14,
4930:18
**considerable** [1] -
4801:3
**considerably** [2] -
4801:8, 4920:16
**consideration** [1] -
4886:5
**considerations** [2] -
4693:19, 4694:1
**considered** [7] -
4773:10, 4842:18,
4844:10, 4851:18,
4852:17, 4853:25,
4921:11
**considering** [4] -
4846:18, 4847:8,
4847:21, 4947:4
**consistency** [9] -
4916:15, 4917:23,
4920:17, 4944:12,
4944:17, 4944:21,
4944:23, 4945:1,
4946:3
**consistent** [24] -
4745:9, 4778:4,
4785:7, 4807:12,
4807:14, 4810:15,
4826:19, 4838:11,
4851:20, 4856:10,
4870:8, 4870:11,
4879:25, 4880:1,
4887:20, 4888:11,
4899:23, 4900:10,

4920:21, 4924:17,
4933:10, 4947:1,
4961:19, 4964:2
**consistently** [6] -
4920:19, 4924:6,
4942:22, 4943:6,
4945:20, 4965:10
**constantly** [5] -
4739:1, 4749:5,
4757:1, 4788:21,
4902:10
**construct** [2] - 4803:7,
4803:14
**consulting** [2] -
4702:10, 4890:9
**consume** [2] -
4749:18, 4749:19
**Consumer** [3] -
4955:6, 4956:9,
4966:25
**consumer** [14] -
4672:6, 4715:8,
4719:24, 4763:2,
4764:9, 4865:10,
4865:12, 4888:13,
4900:15, 4905:9,
4916:19, 4955:16,
4956:23
**consumers** [14] -
4702:17, 4760:10,
4847:13, 4883:13,
4884:6, 4886:25,
4887:2, 4887:24,
4888:5, 4900:10,
4918:3, 4929:11,
4938:18, 4945:19
**consumers'** [2] -
4745:5, 4745:23
**consumption** [2] -
4691:16, 4749:17
**Cont'd** [1] - 4755:13
**contact** [2] - 4924:11,
4924:14
**contain** [1] - 4826:4
**containing** [1] -
4834:7
**contains** [2] -
4757:20, 4881:10
**context** [5] - 4674:2,
4779:22, 4802:18,
4942:25, 4970:9
**contingency** [9] -
4839:3, 4840:15,
4840:25, 4842:12,
4848:3, 4849:21,
4898:22, 4898:23,
4899:1
**Contingency** [1] -
4840:11
**contingent** [1] -

4768:5
**continually** [2] -
4739:18, 4786:10
**continuation** [1] -
4975:5
**continue** [29] -
4699:22, 4700:17,
4700:18, 4717:10,
4726:2, 4726:12,
4730:20, 4737:14,
4739:17, 4739:24,
4742:21, 4760:9,
4761:17, 4762:16,
4772:2, 4776:15,
4801:2, 4801:12,
4830:4, 4860:8,
4865:19, 4898:2,
4900:18, 4902:18,
4940:25, 4974:2,
4974:3, 4974:5,
4974:19
**continued** [15] -
4754:18, 4774:7,
4774:16, 4776:17,
4795:11, 4829:3,
4831:9, 4866:21,
4898:13, 4902:19,
4907:23, 4974:9,
4974:21, 4974:25,
4976:2
**CONTINUED** [6] -
4830:6, 4940:1,
4959:8, 4975:1,
4979:9, 4979:18
**Continued** [1] -
4939:17
**continues** [1] -
4869:17
**continuing** [3] -
4717:4, 4739:23,
4760:8
**continuous** [1] -
4957:9
**continuously** [1] -
4853:13
**contract** [26] -
4681:19, 4686:11,
4686:25, 4687:1,
4695:23, 4698:19,
4699:4, 4699:7,
4699:8, 4700:5,
4726:16, 4748:2,
4760:25, 4782:3,
4787:21, 4817:2,
4844:18, 4844:23,
4844:25, 4845:8,
4845:11, 4845:13,
4889:18, 4894:14,
4894:18, 4969:25
**contracts** [3] - 4787:7,

4845:5, 4871:15
**contractual** [2] -
4687:2, 4698:13
**contractually** [1] -
4932:13
**contrast** [1] - 4801:5
**contribute** [1] -
4937:17
**contribution** [2] -
4834:3, 4870:1
**Contribution** [1] -
4833:15
**contributor** [1] -
4937:14
**convenience** [1] -
4927:11
**convenient** [2] -
4963:22, 4964:7
**conversation** [11] -
4692:16, 4699:9,
4699:13, 4731:1,
4757:8, 4758:6,
4774:5, 4775:15,
4878:4, 4900:5,
4900:11
**conversations** [13] -
4712:11, 4713:14,
4716:3, 4716:6,
4756:20, 4757:10,
4760:22, 4772:1,
4776:10, 4787:10,
4825:17, 4826:11,
4899:15
**convey** [2] - 4758:12,
4761:23
**convince** [1] - 4790:3
**copied** [7] - 4790:22,
4825:4, 4825:13,
4827:16, 4827:20,
4850:5, 4951:14
**copies** [1] - 4970:15
**copious** [1] - 4945:17
**copy** [4] - 4771:1,
4771:5, 4771:6,
4812:24
**copying** [1] - 4855:12
**core** [1] - 4792:14
**corporate** [9] -
4671:23, 4675:24,
4680:3, 4680:4,
4680:5, 4680:8,
4715:9, 4735:24,
4916:20
**Corporate** [1] -
4790:17
**Corporation** [1] -
4824:21
**corporations** [2] -
4676:15, 4938:19
**correct** [101] -

4671:19, 4671:22,
4672:12, 4676:8,
4679:8, 4680:7,
4684:5, 4684:9,
4685:17, 4696:7,
4698:11, 4699:4,
4699:5, 4702:18,
4706:23, 4708:25,
4710:21, 4728:7,
4733:25, 4736:15,
4737:22, 4738:3,
4741:6, 4741:18,
4747:24, 4753:14,
4755:17, 4763:23,
4764:12, 4765:10,
4765:24, 4767:20,
4767:21, 4768:7,
4794:15, 4796:17,
4798:21, 4800:10,
4800:14, 4800:18,
4801:16, 4802:5,
4802:8, 4802:10,
4805:25, 4806:9,
4807:21, 4807:24,
4808:18, 4809:19,
4813:6, 4816:4,
4816:24, 4817:9,
4818:17, 4820:10,
4822:7, 4823:12,
4823:19, 4824:5,
4825:5, 4831:23,
4834:20, 4835:5,
4839:19, 4840:8,
4843:25, 4848:10,
4849:12, 4850:6,
4854:18, 4857:21,
4858:1, 4867:1,
4870:2, 4871:15,
4872:3, 4875:7,
4891:24, 4896:14,
4898:19, 4898:24,
4899:6, 4900:3,
4901:24, 4913:11,
4917:1, 4938:21,
4945:13, 4950:5,
4952:18, 4957:1,
4959:3, 4961:4,
4962:16, 4965:1,
4965:14, 4966:16,
4967:4, 4972:17,
4975:20
**correction** [1] -
4860:22
**correctly** [37] -
4799:20, 4800:7,
4801:9, 4803:18,
4806:19, 4808:24,
4814:8, 4822:13,
4828:6, 4828:14,
4833:25, 4834:10,
4837:10, 4838:3,

4842:7, 4842:12,
4842:14, 4844:6,
4846:16, 4849:4,
4851:4, 4851:9,
4851:15, 4853:1,
4856:8, 4857:18,
4859:4, 4861:4,
4861:5, 4864:4,
4866:1, 4866:22,
4867:20, 4873:14,
4878:15, 4878:23,
4881:20
**correlate** [1] - 4969:16
**correlated** [1] - 4785:8
**correlation** [4] -
4750:10, 4750:14,
4750:15, 4750:19
**correspondence** [1] -
4668:22
**cost** [19] - 4685:3,
4685:8, 4685:9,
4693:22, 4694:13,
4694:15, 4694:20,
4695:15, 4695:16,
4701:16, 4735:11,
4752:15, 4753:1,
4758:20, 4759:5,
4803:6, 4884:5,
4886:2
**Costco** [10] - 4689:14,
4697:10, 4698:2,
4722:16, 4722:19,
4745:2, 4745:3,
4905:2, 4905:4,
4905:7
**Costcos** [1] - 4905:6
**costly** [1] - 4752:21
**costs** [16] - 4694:17,
4694:25, 4695:1,
4700:22, 4701:9,
4712:25, 4725:3,
4725:4, 4725:9,
4725:10, 4725:12,
4725:16, 4737:6
**counsel** [1] - 4856:1
**Counsel** [1] - 4668:1
**count** [1] - 4797:6
**counted** [1] - 4801:2
**country** [2] - 4785:19,
4806:11
**couple** [31] - 4677:16,
4680:20, 4680:22,
4706:15, 4709:20,
4724:25, 4742:22,
4744:25, 4756:3,
4760:25, 4765:17,
4769:5, 4783:3,
4789:6, 4799:6,
4811:21, 4822:21,
4835:24, 4840:24,

4852:14, 4854:16,
4861:6, 4863:10,
4865:10, 4869:4,
4874:10, 4880:12,
4906:25, 4929:9,
4975:2, 4976:13
**coupon** [6] - 4721:15,
4721:16, 4721:18,
4721:22, 4721:25,
4852:24
**coupon-less** [1] -
4721:25
**Court** [20] - 4667:5,
4667:18, 4682:4,
4682:8, 4699:6,
4703:6, 4717:25,
4724:10, 4729:20,
4731:14, 4746:15,
4785:24, 4820:19,
4820:21, 4895:7,
4915:24, 4916:2,
4917:2, 4925:19,
4964:19
**COURT** [222] - 4666:1,
4668:5, 4668:8,
4668:10, 4668:12,
4668:18, 4669:19,
4669:24, 4670:1,
4670:9, 4670:16,
4671:3, 4671:7,
4671:17, 4671:20,
4672:4, 4672:7,
4672:11, 4672:13,
4672:19, 4672:25,
4673:2, 4673:4,
4673:10, 4673:17,
4673:20, 4673:23,
4673:25, 4674:5,
4674:17, 4674:20,
4674:24, 4675:14,
4675:18, 4675:20,
4683:18, 4683:25,
4692:5, 4697:2,
4697:6, 4697:13,
4698:5, 4698:22,
4698:25, 4709:5,
4710:13, 4710:17,
4719:1, 4719:14,
4734:18, 4738:8,
4741:13, 4742:11,
4742:16, 4742:19,
4747:18, 4747:21,
4749:12, 4749:15,
4749:18, 4751:4,
4754:15, 4755:1,
4755:5, 4755:8,
4755:11, 4767:9,
4767:11, 4767:22,
4770:12, 4770:14,
4770:16, 4770:20,
4770:23, 4770:25,

4771:3, 4771:7,
4771:9, 4771:11,
4771:13, 4771:15,
4790:14, 4791:11,
4791:13, 4795:10,
4796:4, 4797:11,
4798:8, 4798:18,
4802:1, 4804:9,
4804:11, 4804:22,
4805:1, 4805:6,
4805:8, 4808:5,
4812:5, 4812:7,
4812:9, 4813:18,
4813:23, 4817:17,
4817:21, 4818:3,
4818:8, 4818:11,
4818:15, 4818:18,
4819:1, 4819:11,
4819:14, 4820:15,
4820:17, 4820:24,
4821:20, 4823:2,
4825:1, 4827:7,
4827:13, 4828:23,
4830:1, 4830:4,
4835:13, 4835:21,
4837:13, 4838:19,
4840:5, 4844:16,
4844:24, 4845:3,
4845:7, 4845:14,
4845:21, 4848:7,
4849:25, 4852:10,
4855:9, 4858:14,
4860:5, 4867:25,
4868:3, 4868:8,
4868:10, 4868:25,
4875:6, 4875:9,
4875:13, 4876:25,
4880:22, 4880:25,
4883:5, 4885:2,
4885:14, 4888:23,
4893:1, 4893:6,
4893:9, 4894:11,
4895:17, 4896:2,
4896:4, 4896:9,
4896:12, 4896:15,
4903:1, 4903:4,
4903:22, 4903:25,
4904:5, 4904:8,
4904:11, 4904:13,
4904:20, 4905:15,
4908:1, 4908:7,
4908:13, 4908:18,
4909:10, 4909:13,
4910:15, 4910:18,
4910:21, 4910:25,
4911:2, 4911:5,
4911:8, 4911:11,
4911:15, 4911:20,
4911:23, 4912:1,
4912:6, 4912:16,
4913:17, 4913:25,

4914:3, 4914:5,
4936:11, 4936:17,
4937:4, 4949:12,
4952:2, 4955:23,
4956:4, 4957:18,
4957:23, 4958:5,
4958:10, 4958:14,
4959:1, 4959:7,
4972:8, 4972:21,
4975:15, 4977:22,
4978:4, 4978:6,
4978:15, 4978:17,
4978:20
**court** [2] - 4669:6,
4783:4
**Court's** [4] - 4703:7,
4733:12, 4819:2,
4966:13
**Courthouse** [1] -
4666:6
**courtroom** [2] -
4668:25, 4671:4
**COURTROOM** [4] -
4668:1, 4674:10,
4674:12, 4674:15
**COVE** [1] - 4667:17
**cover** [13] - 4669:18,
4705:24, 4708:7,
4737:19, 4757:21,
4790:15, 4791:4,
4817:25, 4933:19,
4951:13, 4955:5,
4970:19
**coverage** [199] -
4742:22, 4742:24,
4743:4, 4743:7,
4743:14, 4743:16,
4743:17, 4743:22,
4744:1, 4744:2,
4744:3, 4744:8,
4744:13, 4744:16,
4744:18, 4744:19,
4744:20, 4745:6,
4745:15, 4745:16,
4745:23, 4745:24,
4746:4, 4746:9,
4746:12, 4746:17,
4746:20, 4746:21,
4746:23, 4747:11,
4747:14, 4748:21,
4749:24, 4749:25,
4750:16, 4751:13,
4751:23, 4752:3,
4752:15, 4752:20,
4753:22, 4769:17,
4772:14, 4776:4,
4779:1, 4780:1,
4780:7, 4780:8,
4781:13, 4783:12,
4783:16, 4785:11,

4788:7, 4788:8,
4788:12, 4792:7,
4796:14, 4796:19,
4797:2, 4799:6,
4800:17, 4800:18,
4803:13, 4804:14,
4805:18, 4805:21,
4805:23, 4806:13,
4807:20, 4807:23,
4808:11, 4808:22,
4809:13, 4809:17,
4809:18, 4809:21,
4810:2, 4810:7,
4811:1, 4811:4,
4811:10, 4811:11,
4811:12, 4811:16,
4811:17, 4811:22,
4812:1, 4812:16,
4812:21, 4812:25,
4814:1, 4814:10,
4814:17, 4814:19,
4814:23, 4815:1,
4815:6, 4815:24,
4816:10, 4816:17,
4816:19, 4816:22,
4816:25, 4817:14,
4817:18, 4818:4,
4818:21, 4818:22,
4818:23, 4818:24,
4819:5, 4819:21,
4830:9, 4830:16,
4831:10, 4831:14,
4831:16, 4831:21,
4832:1, 4832:15,
4832:20, 4832:21,
4833:1, 4842:25,
4851:24, 4851:25,
4854:18, 4862:24,
4899:22, 4899:23,
4901:19, 4901:20,
4901:21, 4901:23,
4902:1, 4902:2,
4902:3, 4902:11,
4903:11, 4903:13,
4903:16, 4903:18,
4903:23, 4904:2,
4904:6, 4904:8,
4904:16, 4904:18,
4904:23, 4905:1,
4905:12, 4905:20,
4905:22, 4906:1,
4906:2, 4906:7,
4906:9, 4909:1,
4909:2, 4909:20,
4909:21, 4909:25,
4910:1, 4915:24,
4954:3, 4954:5,
4954:7, 4954:11,
4954:12, 4954:16,
4954:17, 4954:25,
4955:1, 4959:16,

Case 1:10-cv-04496-NGG-RER     Document 595     Filed 09/08/14     Page 330 of 368 PageID #: 30724

4959:23, 4959:24, 4960:1, 4960:7, 4960:10, 4960:24, 4965:7, 4965:14, 4965:18, 4965:19, 4965:23, 4966:4, 4966:5, 4967:22
**Coverage** [8] - 4778:22, 4791:24, 4803:24, 4812:19, 4903:8, 4959:19, 4959:20, 4959:21
**covered** [2] - 4683:14, 4731:21
**covering** [2] - 4670:14, 4931:25
**cow** [1] - 4917:19
**CRAIG** [1] - 4666:22
**Craig** [1] - 4668:3
**CRAVATH** [1] - 4667:9
**crazy** [1] - 4851:22
**create** [19] - 4694:6, 4701:1, 4702:6, 4718:12, 4722:22, 4722:24, 4725:23, 4725:25, 4919:2, 4923:5, 4924:5, 4924:16, 4926:24, 4927:21, 4935:12, 4935:16, 4940:18, 4944:21, 4947:8
**created** [19] - 4671:12, 4680:6, 4680:7, 4693:15, 4696:2, 4707:12, 4707:13, 4713:15, 4716:23, 4716:25, 4717:9, 4717:22, 4718:7, 4723:3, 4740:23, 4875:22, 4936:19, 4941:24, 4945:14
**creates** [2] - 4714:23, 4951:23
**creating** [17] - 4691:6, 4696:19, 4725:8, 4726:4, 4726:11, 4735:9, 4736:1, 4736:25, 4872:22, 4872:25, 4917:20, 4925:14, 4934:23, 4935:1, 4935:20, 4974:23
**creative** [1] - 4700:24
**credibility** [8] - 4713:5, 4713:11, 4713:19, 4713:25, 4733:4, 4733:5, 4872:23, 4958:23
**credit** [28] - 4690:5, 4690:6, 4722:3,

4724:3, 4745:2, 4762:23, 4762:24, 4814:7, 4814:12, 4818:4, 4820:9, 4832:11, 4843:7, 4882:18, 4883:14, 4885:21, 4888:3, 4897:12, 4897:14, 4897:20, 4905:3, 4905:4, 4925:25, 4940:9, 4945:11, 4975:4, 4975:23
**creditors** [1] - 4933:3
**crest** [1] - 4677:9
**cried** [1] - 4919:13
**Cristina** [1] - 4798:1
**critical** [15] - 4757:3, 4792:5, 4793:9, 4795:1, 4919:6, 4925:3, 4926:11, 4930:13, 4930:15, 4930:18, 4930:20, 4931:12, 4946:11, 4962:7
**critically** [1] - 4842:24
**CROSS** [4] - 4796:8, 4830:6, 4979:7, 4979:9
**cross** [7] - 4670:1, 4670:3, 4796:6, 4834:9, 4885:10, 4977:24, 4978:1
**CROSS-EXAMINATION** [2] - 4830:6, 4979:9
**cross-examination** [4] - 4796:6, 4885:10, 4977:24, 4978:1
**cross-examining** [2] - 4670:1, 4670:3
**CRR** [1] - 4667:18
**cruise** [6] - 4737:9, 4737:17, 4932:22, 4933:1, 4933:3
**Cruise** [1] - 4933:2
**CSA** [1] - 4878:9
**cues** [2] - 4960:17, 4960:18
**culmination** [1] - 4858:23
**cumulative** [3] - 4870:5, 4871:7, 4871:10
**curious** [2] - 4845:9, 4908:15
**currency** [1] - 4722:10
**current** [3] - 4705:9, 4711:25, 4712:2, 4841:6, 4904:22

**Current** [4] - 4709:25, 4710:3, 4841:1, 4843:3
**customer** [33] - 4703:20, 4769:14, 4776:2, 4777:11, 4777:22, 4777:23, 4778:7, 4780:22, 4780:23, 4859:2, 4914:24, 4916:12, 4916:13, 4924:7, 4924:11, 4924:14, 4929:22, 4930:23, 4931:16, 4935:6, 4936:7, 4938:21, 4943:8, 4944:11, 4944:17, 4946:2, 4950:14, 4952:24, 4953:12, 4953:19, 4974:17
**customers** [77] - 4681:4, 4681:6, 4682:18, 4688:14, 4701:1, 4701:2, 4701:3, 4701:4, 4701:7, 4701:8, 4705:9, 4705:16, 4721:6, 4723:13, 4723:14, 4769:4, 4769:12, 4769:15, 4773:8, 4788:22, 4839:3, 4839:10, 4840:21, 4847:1, 4852:18, 4860:17, 4865:20, 4865:23, 4890:3, 4890:4, 4891:5, 4891:25, 4892:3, 4892:20, 4916:16, 4916:17, 4916:18, 4916:20, 4918:1, 4918:7, 4921:24, 4923:21, 4924:24, 4927:23, 4928:13, 4928:23, 4931:2, 4933:8, 4933:9, 4935:3, 4935:16, 4938:9, 4938:11, 4938:12, 4938:13, 4938:25, 4941:12, 4943:5, 4943:12, 4943:13, 4943:19, 4944:22, 4944:24, 4946:9, 4948:20, 4949:23, 4952:22, 4954:14, 4954:16, 4959:25, 4961:9, 4961:15, 4961:16, 4965:10, 4971:23
**customized** [1] - 4697:22

**cuts** [1] - 4842:9
**CV** [1] - 4860:23
**CVS** [13] - 4841:22, 4845:17, 4846:9, 4846:15, 4846:22, 4847:1, 4852:17, 4852:18, 4853:3, 4853:6, 4859:3

## D

**Dafonte** [1] - 4824:19
**DAFONTE** [1] - 4824:19
**daily** [3] - 4699:23, 4722:21, 4934:18
**damaging** [1] - 4967:17
**dare** [1] - 4865:13
**data** [27] - 4719:25, 4720:1, 4720:5, 4720:8, 4806:21, 4807:12, 4875:20, 4889:6, 4890:11, 4890:17, 4891:7, 4891:10, 4891:15, 4891:19, 4892:4, 4892:10, 4892:14, 4892:20, 4929:14, 4933:24, 4933:25, 4934:2, 4934:10, 4934:16, 4934:20, 4956:22, 4958:7
**databases** [2] - 4801:3, 4801:7
**date** [15] - 4734:9, 4740:22, 4755:24, 4765:12, 4770:3, 4845:6, 4845:8, 4894:20, 4894:21, 4934:3, 4939:4, 4939:5, 4939:9, 4939:10, 4950:12
**dated** [6] - 4768:15, 4812:2, 4822:23, 4840:1, 4846:5, 4880:14
**dates** [1] - 4940:24
**Dave** [7] - 4678:9, 4678:10, 4734:7, 4775:19, 4775:23, 4775:24, 4791:8
**David** [4] - 4854:25, 4857:2, 4966:21, 4970:20
**day-to-day** [4] - 4679:2, 4679:5, 4679:10, 4787:7
**days** [7] - 4673:21, 4844:21, 4844:22,

4855:19, 4858:24, 4931:4, 4948:17
**days'** [2] - 4844:6, 4844:17
**DC** [1] - 4666:21
**deal** [8] - 4717:4, 4724:10, 4767:20, 4776:2, 4787:5, 4851:23, 4858:21, 4859:6, 4859:10, 4859:17, 4859:21, 4875:25
**dealing** [4] - 4755:6, 4764:16, 4834:23, 4977:13
**deals** [3] - 4833:4, 4859:7, 4859:11
**dealt** [1] - 4835:1
**debated** [1] - 4933:5
**debates** [2] - 4739:7, 4967:13
**debit** [7] - 4882:19, 4883:14, 4885:21, 4897:12, 4897:15, 4897:19, 4940:9
**decade** [7] - 4671:13, 4716:18, 4799:16, 4821:2, 4879:11, 4921:16, 4976:20
**decal** [2] - 4784:9, 4793:2
**decals** [7] - 4783:22, 4783:23, 4784:7, 4784:19, 4793:2, 4793:18, 4960:18
**December** [11] - 4679:14, 4768:15, 4825:16, 4835:21, 4835:22, 4835:24, 4845:18, 4846:6, 4848:2, 4848:18, 4898:20
**decentralized** [1] - 4716:23
**decide** [3] - 4700:8, 4844:3
**decided** [6] - 4724:23, 4732:14, 4732:17, 4739:20, 4761:16, 4933:7
**decides** [2] - 4698:20, 4699:9
**deciding** [1] - 4746:17
**deciphering** [1] - 4848:24
**decision** [31] - 4683:9, 4687:5, 4695:10, 4695:21, 4712:16, 4724:19, 4725:13, 4726:21, 4729:19,

4729:20, 4729:23,
4730:5, 4731:17,
4732:4, 4732:6,
4732:12, 4732:25,
4736:6, 4738:21,
4738:23, 4741:17,
4741:20, 4742:5,
4781:19, 4794:17,
4800:21, 4860:18,
4863:7, 4865:11,
4872:9, 4956:22
**decision-making** [4] -
4687:5, 4712:16,
4729:20, 4732:4
**decisions** [21] -
4682:19, 4683:4,
4683:5, 4693:21,
4694:1, 4694:15,
4694:24, 4694:25,
4695:7, 4695:9,
4695:19, 4696:7,
4696:15, 4704:22,
4706:20, 4707:8,
4730:18, 4731:16,
4731:18, 4731:20,
4918:4
**Deck** [2] - 4790:25,
4951:18
**deck** [14] - 4713:9,
4751:17, 4804:2,
4805:11, 4805:14,
4805:20, 4812:12,
4836:7, 4838:7,
4867:10, 4880:15,
4881:2, 4881:7,
4887:16
**decline** [6] - 4729:11,
4862:9, 4862:12,
4862:16, 4866:20,
4975:9
**declines** [2] - 4974:22,
4977:8
**declining** [2] -
4727:12, 4867:14
**decrease** [3] -
4735:10, 4759:13,
4766:18
**decreased** [1] -
4867:19
**deep** [5] - 4890:6,
4890:24, 4891:5,
4891:13, 4941:2
**deepen** [1] - 4940:21
**deeper** [1] - 4702:9
**defend** [3] - 4714:6,
4739:2, 4739:13
**Defendant** [13] -
4667:9, 4719:16,
4734:20, 4738:10,
4893:8, 4895:19,

4896:17, 4979:24,
4979:25, 4980:1,
4981:6, 4981:7,
4981:8
**DEFENDANT** [1] -
4767:10
**defendant's** [1] -
4972:3
**Defendant's** [31] -
4718:23, 4733:10,
4737:18, 4749:9,
4749:13, 4768:16,
4769:21, 4771:10,
4771:17, 4778:17,
4895:22, 4902:22,
4936:13, 4937:6,
4948:24, 4949:14,
4955:5, 4957:3,
4957:18, 4957:20,
4962:24, 4966:9,
4972:9, 4972:10,
4972:22, 4980:2,
4981:9, 4981:10,
4981:13, 4981:14,
4981:15
**Defendants** [1] -
4666:13
**Defendants'** [4] -
4952:4, 4955:25,
4981:11, 4981:12
**defending** [2] -
4714:3, 4714:5
**defense** [3] - 4719:14,
4912:2, 4978:7
**Defense** [2] - 4675:1,
4951:12
**defer** [1] - 4731:5
**deferrals** [2] -
4740:15, 4740:20
**define** [3] - 4750:11,
4918:13, 4921:23
**defined** [3] - 4922:1,
4937:19, 4937:21
**definitely** [4] -
4823:24, 4929:20,
4965:19, 4973:25
**definition** [6] -
4800:22, 4817:17,
4906:10, 4906:12,
4906:25, 4909:5
**definitive** [1] -
4824:15
**degrees** [1] - 4677:1
**deliberate** [1] -
4940:12
**deliver** [14] - 4693:6,
4699:25, 4761:2,
4762:10, 4767:3,
4777:8, 4873:12,
4920:9, 4920:21,

4931:8, 4932:9,
4942:13, 4949:20,
4961:19
**delivered** [2] -
4716:19, 4937:21
**delivering** [14] -
4691:6, 4691:8,
4724:16, 4732:1,
4733:8, 4736:2,
4737:3, 4754:6,
4761:2, 4921:11,
4928:13, 4943:7,
4948:5, 4956:13
**delivers** [3] - 4700:11,
4920:10, 4920:11
**delivery** [8] - 4920:5,
4920:20, 4921:14,
4930:17, 4930:22,
4946:7, 4953:13
**Delta** [7] - 4669:11,
4670:9, 4670:12,
4671:2, 4690:11,
4690:13
**demands** [1] -
4875:24
**demonstrate** [2] -
4781:8, 4942:7
**demonstrates** [1] -
4942:17
**Dennis** [1] - 4912:14
**depart** [1] - 4865:7
**DEPARTMENT** [1] -
4666:20
**depict** [3] - 4720:4,
4734:25, 4738:13
**depicting** [2] -
4719:19, 4751:21
**depicts** [2] - 4719:20,
4814:17
**Depot** [5] - 4723:12,
4723:15, 4875:18,
4876:1, 4876:9
**depth** [1] - 4941:17
**DEPUTY** [4] - 4668:1,
4674:10, 4674:12,
4674:15
**derived** [1] - 4925:10
**describe** [13] -
4689:18, 4699:12,
4729:19, 4751:20,
4781:4, 4789:2,
4925:2, 4926:8,
4926:10, 4929:21,
4937:16, 4943:24,
4960:6
**described** [19] -
4678:24, 4686:1,
4686:23, 4705:7,
4739:11, 4753:24,
4809:6, 4834:13,

4835:4, 4835:8,
4835:18, 4836:20,
4855:17, 4862:23,
4863:4, 4876:10,
4890:14, 4928:17,
4944:13
**describes** [2] -
4885:20, 4885:21
**describing** [12] -
4693:16, 4699:6,
4715:4, 4716:9,
4720:23, 4748:20,
4750:3, 4815:12,
4826:20, 4859:7,
4924:23, 4929:18
**description** [1] -
4675:9
**descriptive** [1] -
4838:13
**Designated** [1] -
4805:25
**designated** [2] -
4806:1, 4936:13
**designation** [1] -
4969:23
**designed** [7] -
4841:16, 4850:25,
4923:20, 4923:24,
4961:8, 4962:8,
4962:9
**desirability** [1] -
4931:13
**desire** [3] - 4893:25,
4940:16, 4940:19
**desired** [1] - 4845:10
**destroys** [1] - 4703:21
**detail** [5] - 4736:5,
4836:1, 4850:22,
4873:7, 4945:17
**details** [4] - 4821:6,
4836:22, 4841:10,
4854:20
**detection** [1] - 4934:4
**determine** [5] -
4681:23, 4693:7,
4707:16, 4707:17,
4946:22
**determined** [1] -
4731:24
**determines** [1] -
4813:4
**develop** [3] - 4701:17,
4938:22, 4977:1
**Develop** [1] - 4842:1
**developed** [5] -
4839:3, 4922:2,
4928:12, 4937:25,
4969:13
**developing** [1] -
4889:22

**development** [4] -
4681:5, 4700:24,
4715:19, 4717:1
**developments** [1] -
4967:17
**device** [3] - 4926:12,
4961:15, 4964:12
**DeVries** [1] - 4865:9
**differ** [1] - 4684:8
**differed** [2] - 4692:21,
4692:22
**difference** [18] -
4687:25, 4695:13,
4697:24, 4710:5,
4711:10, 4735:3,
4738:18, 4810:11,
4832:1, 4870:14,
4897:3, 4923:10,
4929:21, 4942:4,
4959:20, 4960:1,
4966:1, 4966:4
**differences** [4] -
4748:1, 4750:6,
4809:23, 4810:6
**different** [74] -
4682:11, 4684:9,
4684:21, 4690:25,
4691:3, 4691:7,
4696:20, 4697:19,
4697:20, 4698:3,
4699:14, 4702:3,
4703:19, 4707:11,
4708:17, 4708:18,
4709:20, 4709:22,
4710:9, 4710:14,
4710:15, 4711:3,
4723:1, 4727:20,
4727:21, 4727:24,
4729:4, 4737:4,
4740:25, 4744:5,
4753:21, 4783:3,
4784:24, 4785:18,
4785:21, 4793:20,
4796:19, 4800:3,
4806:6, 4808:12,
4817:22, 4830:17,
4830:18, 4835:4,
4842:20, 4862:20,
4863:24, 4883:13,
4883:15, 4886:14,
4888:9, 4891:17,
4891:21, 4914:2,
4915:5, 4916:13,
4922:12, 4927:3,
4944:4, 4950:21,
4955:4, 4957:2,
4957:8, 4962:9,
4969:14, 4970:11,
4970:15, 4977:19
**differential** [12] -

4880:8, 4883:16, 4883:18, 4883:25, 4884:14, 4887:14, 4888:17, 4888:21, 4893:15, 4893:18, 4894:1, 4894:6
**differentially** [3] - 4881:12, 4883:15, 4888:2
**differentiate** [2] - 4720:17, 4881:19
**differentiated** [3] - 4719:21, 4720:12, 4920:7
**differentiates** [1] - 4719:21
**differentiation** [1] - 4878:13
**differently** [1] - 4748:3
**difficult** [1] - 4787:24
**digital** [2] - 4929:10, 4929:13
**digress** [1] - 4927:24
**Diners** [1] - 4817:6
**DIRECT** [9] - 4675:3, 4755:13, 4912:18, 4940:1, 4959:8, 4975:1, 4979:5, 4979:16, 4979:18
**direct** [16] - 4701:24, 4702:1, 4708:23, 4708:25, 4721:5, 4742:12, 4805:16, 4813:25, 4826:20, 4834:17, 4836:16, 4846:9, 4855:11, 4855:18, 4890:15, 4901:5
**directed** [1] - 4885:7
**direction** [3] - 4746:4, 4779:8, 4850:10
**directionally** [1] - 4706:23
**directly** [13] - 4683:1, 4690:16, 4696:24, 4711:1, 4736:11, 4766:11, 4768:5, 4849:2, 4849:3, 4849:11, 4879:4, 4883:20, 4954:7
**directors** [2] - 4791:2, 4791:7
**Directors** [3] - 4719:9, 4738:1, 4860:22
**disagree** [1] - 4797:22
**disarray** [1] - 4932:20
**disciplined** [1] - 4967:18
**disciplines** [1] - 4914:2

**disclose** [4] - 4800:6, 4800:13, 4892:3, 4892:7
**disclosed** [3] - 4800:9, 4805:2, 4812:7
**discloses** [1] - 4800:17
**disclosing** [2] - 4812:25, 4909:19
**disclosure** [2] - 4804:23, 4813:4
**Discount** [2] - 4709:25, 4861:23
**discount** [106] - 4683:20, 4684:3, 4684:8, 4684:13, 4684:14, 4684:18, 4684:20, 4684:23, 4685:16, 4686:3, 4686:15, 4686:21, 4686:22, 4688:3, 4691:10, 4691:11, 4692:18, 4693:4, 4693:9, 4693:21, 4701:15, 4702:23, 4702:25, 4703:14, 4705:19, 4709:23, 4710:19, 4711:5, 4712:3, 4714:12, 4714:19, 4714:24, 4714:25, 4715:2, 4715:14, 4716:8, 4724:15, 4726:22, 4727:12, 4727:16, 4727:23, 4728:2, 4728:6, 4728:9, 4728:21, 4728:23, 4729:7, 4729:9, 4729:16, 4735:1, 4735:2, 4735:5, 4735:6, 4735:11, 4738:14, 4738:16, 4746:17, 4747:15, 4748:7, 4748:14, 4748:18, 4752:4, 4753:19, 4753:25, 4754:5, 4758:20, 4759:5, 4759:7, 4759:10, 4759:14, 4763:8, 4763:20, 4764:9, 4767:5, 4767:6, 4767:16, 4767:19, 4776:24, 4777:6, 4781:24, 4834:4, 4834:8, 4862:2, 4862:6, 4862:14, 4862:21, 4863:14, 4863:16, 4865:24, 4866:17,

4866:25, 4867:8, 4867:13, 4869:14, 4881:12, 4881:23, 4883:15, 4883:21, 4884:3, 4895:1, 4895:2, 4895:3, 4897:2, 4901:2, 4901:6
**discounting** [11] - 4880:8, 4880:9, 4883:8, 4883:16, 4883:19, 4884:1, 4888:2, 4888:9, 4888:17, 4893:15, 4893:18
**discounts** [3] - 4703:4, 4883:13, 4884:14
**discouraging** [1] - 4778:14
**Discover** [5] - 4753:21, 4784:8, 4846:23, 4847:2, 4892:16
**discriminated** [2] - 4788:3, 4788:17
**discrimination** [17] - 4778:9, 4778:13, 4783:4, 4783:5, 4784:2, 4786:1, 4786:2, 4786:7, 4786:15, 4787:4, 4787:17, 4788:13, 4789:4, 4794:23, 4817:2, 4878:19, 4961:3
**discuss** [6] - 4669:1, 4732:11, 4754:16, 4828:24, 4866:8, 4977:25
**discussed** [6] - 4758:7, 4815:15, 4815:16, 4846:11, 4847:15, 4973:6
**discusses** [3] - 4815:19, 4877:5, 4883:11
**discussing** [10] - 4809:5, 4809:10, 4815:10, 4843:24, 4846:8, 4859:12, 4869:6, 4869:10, 4908:23, 4976:2
**Discussion** [1] - 4836:8
**discussion** [9] - 4741:16, 4866:14, 4866:14, 4883:8, 4887:12, 4896:22, 4900:3, 4933:22,

4948:7
**discussions** [26] - 4692:25, 4696:2, 4713:24, 4715:25, 4740:9, 4740:16, 4755:16, 4755:23, 4756:23, 4766:5, 4766:7, 4774:15, 4786:21, 4838:9, 4838:14, 4859:16, 4865:8, 4877:23, 4882:9, 4926:5, 4926:17, 4946:15, 4946:19, 4948:11, 4948:21, 4970:22
**disparaging** [2] - 4843:10, 4843:14
**display** [6] - 4718:24, 4737:20, 4784:11, 4784:14, 4790:12
**displayed** [4] - 4751:18, 4817:5, 4817:7, 4824:25
**displaying** [1] - 4784:15
**disposable** [1] - 4926:12
**dispute** [1] - 4888:15
**disputing** [1] - 4730:16
**disruptive** [1] - 4721:24
**dissatisfaction** [3] - 4859:1, 4860:18, 4920:12
**dissatisfying** [1] - 4721:23
**distinction** [1] - 4681:11
**distinguishing** [1] - 4957:12
**distribute** [1] - 4784:23
**distributed** [1] - 4768:6
**distributing** [1] - 4764:25
**distribution** [17] - 4685:23, 4689:3, 4689:5, 4689:9, 4689:25, 4740:17, 4762:5, 4762:6, 4767:25, 4774:21, 4774:25, 4775:2, 4775:5, 4780:23, 4784:24, 4814:21, 4877:16
**Distribution** [1] - 4764:24
**district** [1] - 4677:14

**DISTRICT** [3] - 4666:1, 4666:1, 4666:17
**distrust** [1] - 4927:21
**disturbing** [1] - 4673:5
**dividing** [1] - 4806:22
**DIVISION** [1] - 4666:19
**division** [3] - 4677:19, 4677:20, 4715:9
**divisions** [3] - 4690:25, 4691:3, 4708:18
**DMA** [6] - 4805:25, 4806:6, 4807:6, 4808:17, 4812:1, 4908:23
**DMAs** [6] - 4805:22, 4806:8, 4806:14, 4807:4, 4808:12, 4906:8
**doc** [1] - 4868:17
**Document** [1] - 4798:5
**document** [109] - 4691:13, 4691:15, 4692:11, 4692:12, 4693:11, 4693:15, 4705:22, 4707:24, 4708:1, 4708:4, 4708:11, 4709:15, 4714:11, 4719:3, 4719:6, 4724:8, 4734:24, 4738:11, 4753:3, 4753:5, 4760:21, 4762:17, 4764:17, 4765:14, 4768:2, 4768:15, 4790:10, 4798:4, 4800:12, 4801:18, 4803:20, 4804:20, 4809:4, 4812:13, 4813:7, 4813:9, 4813:11, 4813:15, 4815:1, 4815:8, 4820:11, 4820:18, 4822:4, 4823:25, 4824:18, 4824:25, 4830:11, 4833:7, 4833:17, 4836:3, 4836:25, 4839:16, 4844:15, 4845:4, 4845:25, 4846:1, 4846:21, 4847:25, 4848:19, 4849:17, 4851:20, 4854:22, 4858:6, 4861:10, 4864:16, 4864:17, 4868:11, 4869:11,

4869:12, 4869:21,
4871:19, 4874:17,
4875:16, 4876:20,
4877:3, 4884:12,
4884:13, 4884:18,
4884:23, 4885:3,
4885:4, 4886:11,
4893:3, 4894:10,
4894:18, 4895:14,
4895:21, 4895:25,
4902:7, 4902:23,
4936:13, 4936:15,
4936:18, 4936:19,
4936:20, 4948:25,
4950:6, 4951:23,
4952:7, 4955:4,
4957:2, 4961:1,
4963:1, 4966:11,
4970:12, 4972:2,
4974:6
**documents** [12] -
4668:24, 4673:12,
4674:2, 4688:4,
4693:18, 4787:14,
4813:6, 4853:22,
4859:12, 4880:12,
4881:4, 4885:12
**DOJ** [1] - 4875:22
**dollar** [11] - 4682:1,
4743:19, 4743:20,
4763:9, 4766:9,
4808:10, 4834:7,
4842:4, 4871:9,
4871:16
**dollars** [14] - 4685:22,
4687:16, 4691:9,
4693:8, 4712:6,
4765:9, 4819:11,
4819:12, 4837:9,
4897:5, 4922:17,
4922:18, 4933:18
**dominance** [1] -
4921:7
**dominant** [2] -
4883:18, 4883:20
**Don** [1] - 4825:16
**DONALD** [1] - 4667:17
**Donald** [1] - 4668:16
**done** [26] - 4673:11,
4721:20, 4730:7,
4739:19, 4740:22,
4744:22, 4763:20,
4764:14, 4789:19,
4903:24, 4916:10,
4919:8, 4921:5,
4926:14, 4935:9,
4935:12, 4942:18,
4943:18, 4957:5,
4957:13, 4958:21,
4963:3, 4964:25,

4967:8, 4969:10,
4978:2
**Donuts** [3] - 4745:7,
4745:11
**door** [2] - 4782:25,
4783:23
**Doriann** [1] - 4691:18
**Dottle** [6] - 4836:12,
4840:22, 4848:2,
4850:12, 4855:12
**doubt** [4] - 4804:13,
4805:11, 4857:17,
4966:8
**doubting** [1] - 4965:11
**doubts** [2] - 4964:21,
4965:5
**down** [45] - 4712:5,
4722:9, 4726:25,
4727:13, 4727:25,
4729:10, 4729:16,
4729:17, 4735:6,
4735:6, 4735:9,
4735:24, 4738:19,
4748:22, 4749:25,
4752:18, 4753:16,
4760:12, 4761:8,
4765:22, 4774:11,
4774:20, 4792:10,
4792:21, 4794:5,
4809:16, 4834:2,
4840:10, 4841:9,
4842:3, 4848:19,
4850:13, 4851:7,
4884:2, 4894:25,
4911:3, 4911:7,
4929:22, 4945:4,
4952:14, 4953:3,
4964:18, 4967:16
**downward** [4] -
4974:24, 4975:6,
4976:6, 4976:17
**DR** [3] - 4753:18,
4753:22, 4834:4
**draft** [4] - 4738:3,
4878:19, 4882:18,
4883:11
**drafts** [1] - 4879:3
**draw** [1] - 4750:7
**drew** [1] - 4960:12
**drive** [21] - 4684:11,
4698:16, 4700:14,
4702:5, 4705:8,
4746:8, 4746:12,
4758:10, 4758:15,
4759:22, 4759:24,
4785:16, 4808:23,
4815:20, 4841:22,
4842:1, 4869:25,
4870:15, 4870:17,
4872:17, 4907:18

**driven** [7] - 4690:22,
4701:9, 4747:14,
4750:1, 4809:18,
4809:21
**Driver** [1] - 4952:8
**driver** [3] - 4952:20,
4953:4, 4953:5
**drivers** [3] - 4732:10,
4952:15, 4953:8
**drives** [2] - 4725:20,
4743:6
**Drives** [1] - 4815:11
**driving** [4] - 4688:25,
4810:2, 4918:25,
4945:3
**drop** [2] - 4854:17,
4967:20
**dropped** [1] - 4789:12
**drug** [22] - 4728:11,
4772:25, 4801:1,
4837:7, 4837:22,
4839:15, 4841:7,
4842:2, 4842:6,
4842:8, 4847:11,
4847:16, 4847:18,
4850:18, 4854:2,
4854:9, 4854:18,
4856:24, 4901:12
**due** [1] - 4799:18
**duly** [2] - 4675:1,
4912:8
**Dunkin'** [3] - 4745:7,
4745:10, 4745:11
**duration** [1] - 4858:3
**Durbin** [7] - 4770:24,
4875:22, 4877:10,
4877:13, 4878:25,
4879:8, 4881:14
**during** [24] - 4669:14,
4673:21, 4678:22,
4679:5, 4679:17,
4679:19, 4682:5,
4685:20, 4686:8,
4693:12, 4699:2,
4716:16, 4727:9,
4740:22, 4746:1,
4751:7, 4762:3,
4844:25, 4851:21,
4876:5, 4901:5,
4901:21, 4934:8,
4965:17
**duties** [1] - 4798:10
**dwarfed** [1] - 4968:16
**Dwyer** [2] - 4855:11,
4856:14
**DX** [26] - 4719:11,
4734:15, 4734:18,
4738:5, 4738:8,
4809:5, 4815:3,
4815:5, 4893:3,

4893:6, 4894:14,
4894:17, 4895:17,
4896:15, 4937:1,
4937:4, 4949:9,
4949:12, 4951:25,
4952:2, 4955:20,
4955:23, 4972:19,
4972:21, 4972:22,
4981:15

**E**

**e-mail** [52] - 4691:17,
4691:21, 4708:7,
4737:19, 4737:22,
4753:9, 4790:15,
4798:1, 4821:9,
4822:22, 4823:9,
4827:3, 4827:16,
4827:20, 4828:10,
4828:11, 4839:22,
4840:7, 4842:9,
4844:2, 4845:16,
4845:25, 4846:1,
4846:3, 4848:1,
4849:10, 4849:14,
4849:18, 4849:19,
4850:3, 4850:6,
4854:25, 4855:11,
4856:13, 4857:2,
4857:16, 4857:22,
4858:8, 4860:6,
4868:14, 4876:13,
4876:21, 4877:8,
4877:14, 4877:25,
4878:3, 4880:13,
4897:25, 4951:13,
4978:13
**e-mails** [2] - 4828:2,
4941:11
**e.g** [1] - 4825:23
**ear** [1] - 4935:18
**early** [7] - 4756:1,
4776:9, 4776:11,
4776:12, 4879:3,
4921:4, 4948:17
**earn** [1] - 4927:22
**earned** [1] - 4928:22
**earning** [1] - 4928:19
**easily** [1] - 4925:23
**East** [1] - 4667:19
**eastern** [1] - 4776:11
**EASTERN** [1] - 4666:1
**easy** [6] - 4718:8,
4718:14, 4721:5,
4942:5, 4947:10,
4960:24
**easy-to-use** [3] -
4718:8, 4718:14,
4721:5

**economic** [4] -
4712:22, 4726:1,
4726:11, 4777:3
**economics** [9] -
4692:14, 4703:23,
4704:2, 4743:8,
4778:16, 4833:18,
4833:19, 4902:15
**economist** [1] -
4670:20
**Ed** [8] - 4679:16,
4679:17, 4742:7,
4803:25, 4804:15,
4868:17, 4868:20,
4869:3
**EDS** [1] - 4781:11
**educate** [1] - 4793:7
**educational** [2] -
4676:25, 4914:12
**effect** [14] - 4686:20,
4688:9, 4705:15,
4727:10, 4728:1,
4752:22, 4769:5,
4781:5, 4782:4,
4782:6, 4788:12,
4788:24, 4920:24,
4959:1
**effective** [19] -
4675:13, 4685:17,
4686:3, 4687:14,
4687:15, 4688:10,
4689:2, 4690:9,
4691:10, 4697:24,
4752:1, 4759:10,
4759:13, 4766:17,
4770:3, 4777:14,
4886:20, 4899:25,
4971:5
**effectively** [3] -
4946:1, 4953:1,
4956:13
**effects** [3] - 4886:14,
4886:15, 4932:22
**Effects** [1] - 4781:3
**efficiency** [3] -
4810:11, 4810:12,
4896:1
**effort** [6] - 4718:19,
4776:17, 4793:5,
4801:6, 4907:18,
4962:20
**efforts** [6] - 4801:3,
4821:1, 4869:24,
4899:2, 4902:2,
4944:23
**eight** [2] - 4851:6,
4933:1
**Eighth** [1] - 4667:10
**either** [12] - 4683:5,
4686:11, 4686:19,

4698:13, 4699:8,
4700:1, 4789:13,
4909:5, 4915:20,
4924:16, 4952:24,
4960:24
**elapsed** [1] - 4963:6
**element** [1] - 4928:10
**elements** [12] -
4685:8, 4690:1,
4693:25, 4707:3,
4707:11, 4711:9,
4716:15, 4745:25,
4810:1, 4881:11,
4919:16, 4930:1
**eligible** [1] - 4901:10
**eliminate** [1] -
4822:20
**eliminated** [1] -
4823:17
**eliminating** [2] -
4737:14, 4822:10
**elimination** [1] -
4856:14
**Elizabeth** [2] - 4708:8,
4868:14
**Elliott** [1] - 4798:1
**elsewhere** [2] -
4762:14, 4854:21
**embedded** [5] -
4701:15, 4845:25,
4873:17, 4879:8,
4890:21
**embedding** [2] -
4889:8, 4889:9
**emblematic** [1] -
4939:13
**Emerging** [1] -
4778:23
**emerging** [1] -
4799:18
**emotion** [1] - 4941:22
**emotional** [11] -
4918:14, 4918:24,
4918:25, 4919:1,
4919:3, 4919:5,
4919:6, 4919:14,
4919:16, 4919:22,
4927:18
**emotions** [1] - 4919:3
**employ** [2] - 4779:24,
4958:11
**employed** [6] -
4675:7, 4676:19,
4676:21, 4681:2,
4681:15, 4912:22
**employee** [3] -
4671:11, 4671:13,
4878:5
**employees** [20] -
4675:25, 4676:16,

4681:1, 4773:11,
4773:18, 4773:19,
4789:8, 4793:1,
4794:3, 4854:1,
4854:6, 4854:7,
4854:9, 4854:12,
4854:14, 4854:21,
4856:4, 4898:2,
4898:14
**enabled** [1] - 4866:17
**enabling** [1] - 4854:20
**encourage** [4] -
4688:1, 4688:15,
4688:22, 4850:25
**encouraged** [1] -
4839:11
**encourages** [1] -
4886:25
**end** [22] - 4727:5,
4736:24, 4737:6,
4738:17, 4741:18,
4797:18, 4826:16,
4844:18, 4845:6,
4845:11, 4865:14,
4867:2, 4867:12,
4884:9, 4914:22,
4914:23, 4916:7,
4916:17
**end-to-end** [4] -
4914:22, 4914:23,
4916:7, 4916:17
**ended** [2] - 4727:10,
4823:22
**ending** [31] - 4692:9,
4693:14, 4735:15,
4735:17, 4736:7,
4737:8, 4738:2,
4738:12, 4750:8,
4753:13, 4785:3,
4799:4, 4808:21,
4812:10, 4812:18,
4813:25, 4822:4,
4823:14, 4837:16,
4840:11, 4852:13,
4855:20, 4875:2,
4875:16, 4881:6,
4885:19, 4898:5,
4907:3, 4937:7,
4952:5, 4956:1
**ends** [10] - 4692:10,
4706:9, 4709:7,
4719:18, 4720:19,
4723:7, 4734:21,
4749:22, 4791:16,
4949:15
**enemy** [1] - 4946:4
**enforce** [1] - 4821:2
**enforced** [1] - 4853:18
**engage** [9] - 4687:17,
4718:5, 4723:13,

4724:19, 4725:13,
4726:21, 4738:21,
4739:8, 4887:9
**engaged** [6] - 4676:4,
4757:9, 4785:18,
4786:7, 4787:3,
4787:16
**engaging** [3] -
4822:19, 4969:15,
4970:23
**England** [1] - 4745:12
**enjoyed** [1] - 4921:8
**enormous** [6] -
4918:5, 4921:2,
4922:11, 4930:16,
4944:14, 4944:25
**ensure** [1] - 4916:14
**enter** [1] - 4690:23
**entered** [1] - 4693:12
**entering** [1] - 4774:24
**enterprise** [3] -
4925:18, 4944:2,
4976:25
**Entertainment** [1] -
4869:3
**entertainment** [4] -
4744:6, 4869:7,
4870:6, 4870:23
**entire** [8] - 4804:20,
4832:17, 4872:14,
4901:18, 4913:5,
4913:16, 4914:10,
4964:3
**entirely** [4] - 4669:8,
4669:9, 4669:18,
4740:13
**entities** [1] - 4948:17
**entitled** [17] - 4709:11,
4711:6, 4711:15,
4778:22, 4781:2,
4798:4, 4812:1,
4812:19, 4814:1,
4836:7, 4837:16,
4869:23, 4874:17,
4903:8, 4942:20,
4951:19, 4952:8
**entity** [3] - 4930:5,
4948:2, 4949:5
**entrants** [1] - 4887:1
**environment** [6] -
4685:4, 4735:25,
4748:23, 4870:18,
4872:25, 4879:18
**equal** [7] - 4745:14,
4784:5, 4784:6,
4816:12, 4816:25,
4817:4, 4888:8
**equally** [1] - 4725:18
**equipped** [1] -
4730:17

**equivalent** [1] -
4775:1
**erase** [1] - 4910:16
**ERIC** [1] - 4667:16
**erode** [1] - 4924:18
**error** [2] - 4863:13,
4863:15
**ES** [3] - 4733:17,
4734:2, 4798:16
**ESA** [2] - 4731:13
**ESNA** [3] - 4733:17,
4733:18, 4733:25
**especially** [2] -
4746:25, 4781:13
**ESQ** [17] - 4666:22,
4666:22, 4666:23,
4666:23, 4666:24,
4666:24, 4666:25,
4666:25, 4667:11,
4667:12, 4667:12,
4667:13, 4667:15,
4667:16, 4667:16,
4667:17, 4667:17
**essence** [2] - 4762:12,
4854:20
**essential** [1] - 4928:18
**essentially** [25] -
4671:15, 4686:13,
4688:1, 4689:6,
4690:1, 4691:10,
4692:17, 4693:5,
4693:8, 4696:16,
4697:25, 4713:2,
4713:9, 4729:24,
4732:8, 4736:22,
4736:23, 4740:24,
4753:24, 4759:10,
4779:23, 4897:3,
4897:16, 4948:8,
4976:8
**established** [3] -
4684:24, 4741:9,
4767:17
**establishing** [1] -
4923:17
**establishment** [7] -
4733:19, 4798:13,
4798:19, 4963:21,
4964:6, 4966:21,
4972:13
**Establishment** [4] -
4678:3, 4678:18,
4678:20, 4879:14
**estimate** [8] -
4669:21, 4710:12,
4742:15, 4814:5,
4820:7, 4855:21,
4898:8, 4923:12
**estimated** [2] -
4670:12, 4765:3

**estimates** [1] -
4922:17
**estimation** [1] -
4817:18
**ET** [1] - 4666:12
**et** [4] - 4841:22,
4876:2, 4948:20,
4958:18
**etc** [1] - 4915:6
**ETHAN** [1] - 4666:23
**Europe** [3] - 4779:15,
4792:20, 4794:5
**evaluate** [5] - 4695:15,
4696:18, 4706:24,
4872:21, 4887:2
**evaluation** [1] -
4859:13
**Evan** [1] - 4668:14
**EVAN** [1] - 4667:11
**evening** [1] - 4977:23
**event** [8] - 4838:24,
4839:5, 4842:19,
4932:18, 4934:12,
4935:13, 4935:14,
4935:24
**events** [18] - 4825:15,
4826:19, 4827:23,
4834:13, 4835:12,
4836:19, 4850:11,
4855:17, 4857:9,
4858:18, 4858:23,
4859:25, 4864:22,
4865:1, 4876:7,
4935:1, 4935:2,
4935:8
**eventually** [5] -
4677:18, 4696:12,
4756:24, 4790:5,
4907:17
**evergreen** [1] - 4845:6
**everyday** [5] -
4728:11, 4728:12,
4781:14, 4799:17,
4867:15
**everywhere** [6] -
4795:3, 4904:17,
4905:11, 4968:4,
4973:14, 4973:17
**Everywhere** [1] -
4972:24
**evidence** [144] -
4692:3, 4692:6,
4692:7, 4693:12,
4705:23, 4709:3,
4709:5, 4709:6,
4719:12, 4719:15,
4719:16, 4733:15,
4734:16, 4734:19,
4734:20, 4738:6,
4738:9, 4738:10,

4749:15, 4749:16,
4753:6, 4757:19,
4765:15, 4768:18,
4770:10, 4771:14,
4771:16, 4771:17,
4773:24, 4778:19,
4791:10, 4791:14,
4791:15, 4794:24,
4798:6, 4798:8,
4798:9, 4801:24,
4802:1, 4802:2,
4804:6, 4804:11,
4804:12, 4812:3,
4812:6, 4813:16,
4813:23, 4813:24,
4821:18, 4821:21,
4821:22, 4822:25,
4823:2, 4823:3,
4824:22, 4825:2,
4825:3, 4827:12,
4827:13, 4827:14,
4838:17, 4838:20,
4838:22, 4840:3,
4840:5, 4840:6,
4845:19, 4845:21,
4845:22, 4848:5,
4848:7, 4848:8,
4849:23, 4849:25,
4850:1, 4852:6,
4852:11, 4852:12,
4855:7, 4855:9,
4855:10, 4858:12,
4858:14, 4858:15,
4867:23, 4868:1,
4868:2, 4868:8,
4868:9, 4868:23,
4868:25, 4869:1,
4875:11, 4875:14,
4875:15, 4876:18,
4877:1, 4877:2,
4880:19, 4880:20,
4880:24, 4880:25,
4881:1, 4883:3,
4883:5, 4883:6,
4884:24, 4885:15,
4885:16, 4893:3,
4893:7, 4893:8,
4895:15, 4895:18,
4895:19, 4895:25,
4896:16, 4896:17,
4902:23, 4937:2,
4937:5, 4937:6,
4938:25, 4949:10,
4949:13, 4949:14,
4952:3, 4955:21,
4955:24, 4955:25,
4957:19, 4957:20,
4963:2, 4966:12,
4972:4, 4972:6,
4972:9, 4972:21,
4972:22, 4978:11,

4978:17, 4978:19
**evolution** [2] -
4921:14, 4976:18
**evolved** [1] - 4975:19
**exact** [3] - 4682:1,
4854:20, 4965:17
**exactly** [15] - 4670:5,
4683:23, 4684:1,
4710:1, 4777:19,
4779:17, 4797:5,
4810:10, 4820:1,
4832:19, 4851:10,
4876:8, 4884:11,
4945:18, 4958:9
**exam** [3] - 4826:20,
4834:17, 4855:18
**examination** [6] -
4672:16, 4796:6,
4885:10, 4901:5,
4977:24, 4978:1
**EXAMINATION** [17] -
4675:3, 4755:13,
4796:8, 4830:6,
4893:11, 4908:20,
4912:18, 4940:1,
4959:8, 4975:1,
4979:5, 4979:7,
4979:9, 4979:11,
4979:13, 4979:16,
4979:18
**examinations** [1] -
4669:17
**examined** [2] -
4675:2, 4912:9
**examining** [3] -
4670:1, 4670:3,
4742:11
**example** [32] -
4702:20, 4706:11,
4709:12, 4722:19,
4723:9, 4723:10,
4723:11, 4723:25,
4724:1, 4729:3,
4807:17, 4817:4,
4832:5, 4832:14,
4841:11, 4876:10,
4881:24, 4891:1,
4905:2, 4918:16,
4920:22, 4920:25,
4921:13, 4925:11,
4929:10, 4932:12,
4934:16, 4941:6,
4943:9, 4945:6,
4945:8, 4950:13
**examples** [10] -
4718:23, 4720:22,
4723:9, 4744:21,
4744:25, 4925:19,
4925:22, 4929:9,
4931:17, 4932:15

**excellence** [1] -
4717:16
**except** [2] - 4764:24,
4842:2
**excerpted** [1] -
4895:23
**exchange** [4] -
4686:25, 4688:16,
4761:12, 4828:2
**excitement** [1] -
4722:22
**exclusive** [1] - 4926:3
**exclusively** [4] -
4841:14, 4854:13,
4856:7, 4856:11
**exclusivity** [5] -
4925:7, 4925:9,
4925:11, 4925:14,
4925:20
**excuse** [2] - 4839:25,
4890:1
**excused** [1] - 4911:3
**executions** [2] -
4846:8, 4847:9
**executive** [2] -
4869:13, 4966:17
**Executive** [2] -
4705:24, 4955:6
**executives** [2] -
4865:9, 4967:3
**exempted** [1] -
4740:12
**EXHIBIT** [1] - 4979:21
**Exhibit** [116] -
4691:14, 4692:7,
4705:20, 4708:2,
4709:6, 4718:23,
4719:14, 4719:16,
4733:10, 4733:14,
4734:20, 4737:18,
4738:10, 4749:9,
4749:14, 4753:4,
4753:8, 4757:18,
4768:16, 4769:21,
4771:10, 4771:17,
4773:22, 4774:1,
4778:17, 4790:11,
4791:15, 4801:19,
4803:23, 4813:24,
4821:9, 4821:22,
4822:22, 4823:3,
4825:3, 4827:14,
4836:6, 4838:22,
4840:6, 4845:22,
4848:8, 4850:1,
4852:2, 4852:12,
4852:21, 4855:10,
4858:15, 4868:2,
4868:9, 4869:1,
4875:15, 4877:2,

4881:1, 4883:6,
4885:16, 4893:8,
4895:19, 4895:22,
4896:17, 4896:20,
4897:22, 4902:22,
4905:17, 4936:13,
4937:6, 4948:24,
4949:14, 4951:13,
4952:4, 4955:5,
4955:25, 4957:3,
4957:18, 4957:20,
4962:25, 4966:10,
4970:12, 4972:3,
4978:19, 4979:22,
4979:23, 4979:24,
4979:25, 4980:1,
4980:2, 4980:3,
4980:8, 4980:9,
4980:10, 4980:11,
4980:12, 4980:13,
4980:14, 4980:15,
4980:16, 4980:17,
4980:18, 4980:19,
4980:20, 4980:21,
4980:22, 4980:23,
4981:1, 4981:2,
4981:3, 4981:4,
4981:5, 4981:6,
4981:7, 4981:8,
4981:9, 4981:10,
4981:11, 4981:12,
4981:13, 4981:16
**exhibit** [21] - 4770:9,
4771:6, 4799:5,
4803:23, 4808:20,
4811:22, 4813:12,
4820:16, 4830:10,
4840:10, 4847:16,
4850:3, 4852:17,
4884:22, 4885:5,
4885:13, 4896:13,
4896:24, 4908:22,
4970:13
**exhibits** [4] - 4672:21,
4797:25, 4820:4,
4885:8
**exist** [1] - 4925:15
**existed** [2] - 4689:13,
4767:15
**existing** [2] - 4903:14,
4976:16
**exists** [4] - 4676:10,
4685:11, 4808:23,
4949:5
**expand** [2] - 4831:10,
4905:22
**expanded** [2] -
4862:13, 4867:15,
4967:21
**expanding** [3] -

4809:12, 4901:23,
4905:20
**expect** [7] - 4669:19,
4672:15, 4904:13,
4906:18, 4927:10,
4973:16
**expectation** [2] -
4937:22, 4938:4
**expectations** [2] -
4938:8, 4944:11
**expected** [4] -
4869:14, 4869:25,
4871:16, 4974:5
**expecting** [1] - 4977:9
**expedia.com** [1] -
4736:14
**expensive** [1] -
4710:17
**experience** [29] -
4676:25, 4724:5,
4743:25, 4746:23,
4752:12, 4764:16,
4903:17, 4920:13,
4924:3, 4924:6,
4924:16, 4935:11,
4935:17, 4935:19,
4936:6, 4948:15,
4953:21, 4954:8,
4960:10, 4961:8,
4961:20, 4962:1,
4962:6, 4962:10,
4964:10, 4974:7,
4974:17, 4974:20
**experienced** [2] -
4792:6, 4937:13
**experiences** [9] -
4924:3, 4934:22,
4934:23, 4935:2,
4935:13, 4960:14,
4962:4, 4962:5
**expertise** [5] -
4759:16, 4759:20,
4759:22, 4761:7,
4949:24
**explain** [18] - 4687:14,
4690:9, 4703:12,
4714:15, 4727:19,
4741:3, 4753:23,
4758:12, 4759:6,
4897:9, 4902:4,
4916:7, 4919:5,
4939:15, 4949:3,
4959:22, 4963:24,
4964:2
**explained** [1] -
4863:25
**explaining** [2] -
4886:12, 4886:13
**explore** [1] - 4821:5
**exposed** [2] -

4963:19, 4964:4
**exposure** [1] -
4722:20
**Express** [322] -
4667:10, 4668:15,
4668:17, 4669:4,
4669:8, 4669:12,
4671:10, 4671:12,
4672:9, 4674:7,
4675:8, 4675:10,
4675:11, 4675:12,
4675:21, 4676:5,
4676:11, 4676:20,
4676:21, 4676:23,
4677:11, 4677:23,
4678:2, 4678:16,
4679:11, 4679:25,
4680:9, 4681:1,
4681:3, 4681:13,
4681:15, 4684:19,
4684:22, 4685:6,
4686:18, 4688:18,
4689:10, 4689:17,
4690:3, 4690:4,
4690:13, 4690:19,
4690:25, 4693:20,
4695:15, 4699:10,
4700:20, 4700:23,
4701:13, 4703:1,
4704:11, 4706:17,
4709:22, 4716:16,
4716:19, 4716:23,
4718:5, 4719:9,
4719:10, 4720:11,
4724:24, 4726:23,
4727:17, 4738:1,
4738:14, 4740:1,
4742:23, 4743:19,
4743:20, 4744:8,
4745:18, 4745:20,
4745:21, 4746:12,
4746:16, 4747:1,
4750:18, 4752:2,
4759:3, 4759:25,
4761:18, 4762:12,
4762:22, 4763:14,
4764:14, 4771:19,
4771:20, 4771:23,
4772:8, 4772:19,
4773:3, 4773:11,
4777:1, 4777:2,
4777:7, 4778:9,
4778:13, 4780:12,
4780:14, 4782:21,
4782:24, 4783:1,
4784:14, 4784:21,
4785:25, 4786:5,
4787:2, 4787:5,
4789:20, 4789:23,
4790:2, 4790:4,
4790:7, 4793:22,

4794:22, 4799:9,
4800:9, 4800:13,
4800:17, 4810:12,
4812:16, 4812:21,
4813:3, 4813:11,
4813:13, 4814:7,
4814:11, 4815:13,
4815:21, 4815:24,
4816:6, 4816:8,
4816:9, 4816:14,
4816:18, 4816:22,
4816:23, 4817:4,
4817:13, 4817:14,
4820:6, 4820:9,
4822:18, 4823:18,
4823:21, 4823:22,
4824:19, 4825:21,
4826:24, 4826:25,
4828:17, 4832:7,
4832:21, 4834:18,
4836:7, 4837:6,
4838:2, 4842:18,
4843:5, 4850:23,
4853:1, 4853:8,
4854:2, 4854:9,
4854:12, 4857:21,
4857:24, 4860:9,
4863:8, 4876:7,
4881:22, 4882:3,
4882:17, 4882:24,
4883:16, 4883:22,
4884:20, 4885:22,
4887:8, 4888:15,
4889:2, 4889:13,
4889:22, 4892:15,
4892:21, 4894:19,
4894:23, 4897:9,
4897:18, 4898:2,
4898:13, 4898:14,
4898:19, 4899:5,
4899:9, 4899:10,
4899:16, 4900:6,
4900:16, 4901:1,
4901:6, 4901:14,
4908:3, 4912:3,
4912:23, 4912:24,
4913:6, 4913:12,
4913:15, 4913:18,
4914:8, 4914:11,
4914:18, 4914:25,
4916:18, 4917:3,
4917:11, 4917:14,
4919:17, 4922:7,
4922:10, 4922:16,
4922:21, 4923:8,
4924:15, 4924:20,
4925:1, 4925:2,
4925:5, 4925:7,
4925:8, 4925:12,
4926:20, 4926:23,
4927:1, 4927:5,

4927:9, 4928:4,
4928:16, 4928:21,
4929:5, 4929:18,
4930:4, 4930:11,
4930:25, 4931:18,
4932:11, 4933:11,
4933:13, 4933:21,
4933:23, 4933:24,
4933:25, 4935:4,
4935:7, 4936:7,
4937:14, 4937:23,
4938:1, 4938:20,
4939:2, 4939:13,
4940:4, 4940:11,
4940:14, 4942:8,
4944:12, 4944:23,
4945:12, 4945:22,
4946:5, 4946:17,
4946:25, 4947:3,
4947:7, 4947:11,
4947:14, 4947:17,
4947:20, 4948:4,
4948:9, 4949:17,
4949:21, 4949:25,
4950:2, 4950:10,
4950:16, 4951:3,
4952:9, 4953:21,
4953:22, 4954:9,
4954:18, 4954:21,
4954:22, 4954:23,
4956:15, 4956:18,
4956:20, 4960:19,
4961:7, 4961:10,
4961:18, 4962:3,
4963:13, 4964:22,
4965:20, 4967:20,
4968:23, 4969:7,
4971:12, 4971:17,
4973:11, 4973:14,
4973:21, 4975:3,
4975:7, 4976:1,
4976:8, 4977:6,
4977:18
**EXPRESS** [1] -
4666:12
**express** [1] - 4815:23
**Express'** [7] -
4814:23, 4820:6,
4942:25, 4956:10,
4962:15, 4965:13,
4974:8
**Express's** [9] -
4676:9, 4704:5,
4722:4, 4729:8,
4735:1, 4746:22,
4748:21, 4784:2,
4797:17, 4797:21,
4832:15, 4833:18,
4836:23, 4854:1,
4854:18, 4879:17,
4879:23, 4970:24,

4975:19
**expressed** [2] -
4858:25, 4859:3
**expression** [1] -
4921:10
**extending** [1] -
4760:16
**extension** [4] -
4760:20, 4761:12,
4940:7, 4974:15
**extent** [1] - 4893:17
**external** [3] - 4681:25,
4731:15, 4746:12
**extra** [2] - 4673:21,
4863:18
**extraordinary** [1] -
4934:17
**extremely** [1] -
4752:20, 4921:3,
4926:1

## F

**face** [2] - 4798:24,
4967:21
**facing** [1] - 4871:24
**fact** [34] - 4674:1,
4705:15, 4714:1,
4740:5, 4745:17,
4746:19, 4747:14,
4756:22, 4769:2,
4769:17, 4770:6,
4775:8, 4775:15,
4787:18, 4790:6,
4811:9, 4826:8,
4842:18, 4872:5,
4872:14, 4898:18,
4899:3, 4899:13,
4904:21, 4904:22,
4927:20, 4929:5,
4934:11, 4934:14,
4939:13, 4940:23,
4941:13, 4942:17
**factor** [3] - 4694:25,
4781:19, 4929:11
**factored** [1] - 4741:24
**factors** [7] - 4693:22,
4724:25, 4732:19,
4746:24, 4747:9,
4747:10, 4752:25
**fair** [10] - 4776:23,
4807:16, 4831:2,
4864:11, 4869:13,
4876:20, 4886:24,
4888:17, 4910:4,
4917:2
**fairly** [7] - 4705:1,
4705:3, 4756:1,
4797:9, 4888:11,
4920:18, 4965:16

**fall** [1] - 4756:4
**fallen** [1] - 4789:22
**falloff** [2] - 4921:15,
4921:16
**falls** [2] - 4754:7,
4863:17
**familiar** [18] - 4685:16,
4687:20, 4704:4,
4704:14, 4707:22,
4727:15, 4743:13,
4744:17, 4750:22,
4778:8, 4820:20,
4836:22, 4918:9,
4924:21, 4929:4,
4961:2, 4963:8,
4965:17
**familiarity** [1] - 4894:4
**families** [1] - 4934:13
**far** [8] - 4807:6,
4807:9, 4814:14,
4870:4, 4871:16,
4873:20, 4874:2,
4954:5
**farm** [1] - 4958:15
**fast** [4] - 4677:21,
4918:21, 4918:22,
4918:23
**fast-food** [1] - 4677:21
**favor** [1] - 4875:23
**favorite** [1] - 4919:10
**fax** [1] - 4757:21
**faxes** [1] - 4757:10
**feature** [1] - 4762:25
**February** [1] - 4812:2
**fee** [3] - 4711:2,
4873:25, 4889:5
**feed** [2] - 4674:22,
4797:12
**feedback** [3] -
4683:13, 4732:24,
4877:24
**fees** [2] - 4710:11
**feet** [1] - 4746:5
**fell** [2] - 4706:6,
4751:11
**felt** [11] - 4733:7,
4741:22, 4741:25,
4747:21, 4919:12,
4927:7, 4942:14,
4968:15, 4971:4,
4971:23, 4974:3
**few** [22] - 4671:12,
4672:3, 4685:13,
4693:3, 4694:12,
4703:8, 4720:24,
4750:4, 4757:10,
4758:8, 4786:3,
4790:22, 4796:11,
4829:1, 4861:9,
4914:21, 4917:10,

4919:7, 4922:14, 4930:24, 4956:11, 4971:21

**fewer** [3] - 4710:20, 4748:22, 4749:2

**field** [4] - 4956:20, 4957:10, 4958:18, 4959:13

**fielding** [1] - 4958:25

**fifteen** [1] - 4893:10

**Fifth** [1] - 4666:20

**fight** [1] - 4794:18

**fighting** [2] - 4811:7, 4902:10

**figure** [9] - 4697:8, 4697:14, 4744:9, 4766:10, 4768:4, 4807:25, 4808:7, 4819:4, 4858:22

**figured** [1] - 4878:20

**figures** [8] - 4806:11, 4814:14, 4819:3, 4837:23, 4838:5, 4910:2, 4910:5, 4965:14

**filed** [2] - 4794:13, 4894:5

**files** [3] - 4691:24, 4803:24, 4813:12

**filigree** [1] - 4942:5

**fill** [4] - 4773:14, 4854:5, 4854:21, 4898:2

**filling** [2] - 4773:11, 4898:15

**fills** [1] - 4671:16

**film** [1] - 4919:11

**final** [11] - 4732:12, 4760:6, 4798:2, 4815:1, 4825:20, 4881:25, 4882:1, 4884:17, 4887:21, 4910:22, 4970:14

**Final** [1] - 4790:25

**finance** [2] - 4734:6, 4834:22

**Financial** [1] - 4798:4

**financial** [9] - 4694:4, 4798:20, 4799:2, 4799:23, 4801:13, 4801:21, 4861:13, 4861:18, 4897:1

**financially** [1] - 4897:5

**financials** [3] - 4692:14, 4692:21, 4777:21

**Findings** [1] - 4778:23

**fine** [3] - 4748:10, 4805:6, 4911:22

**finish** [1] - 4928:19

**Finnagan** [1] - 4827:5

**FINNAGAN** [1] - 4827:5

**firing** [1] - 4790:9

**firm** [1] - 4823:11

**firms** [2] - 4922:3, 4957:25

**first** [89] - 4669:1, 4669:15, 4670:21, 4671:9, 4675:1, 4676:24, 4677:6, 4678:1, 4680:13, 4685:15, 4689:13, 4691:17, 4709:21, 4716:17, 4716:22, 4727:3, 4758:9, 4761:13, 4763:19, 4765:2, 4765:23, 4781:4, 4786:11, 4796:13, 4799:4, 4799:6, 4802:13, 4805:15, 4821:17, 4823:25, 4825:15, 4827:15, 4830:9, 4833:22, 4836:2, 4836:10, 4837:3, 4837:20, 4841:2, 4843:2, 4848:9, 4850:2, 4850:13, 4855:11, 4855:12, 4855:13, 4856:17, 4856:18, 4857:1, 4857:13, 4859:6, 4859:10, 4861:9, 4866:11, 4868:16, 4868:18, 4869:24, 4874:16, 4877:8, 4880:12, 4894:20, 4898:6, 4905:19, 4906:6, 4909:4, 4909:7, 4912:8, 4914:21, 4916:5, 4919:23, 4925:6, 4927:18, 4941:7, 4952:14, 4952:19, 4958:20, 4959:10, 4959:22, 4960:4, 4968:6, 4968:8, 4970:14, 4972:23, 4973:9, 4973:20, 4976:15

**First** [2] - 4799:13, 4863:19

**fit** [3] - 4684:12, 4704:25

**five** [13] - 4699:7, 4793:14, 4793:23, 4793:24, 4801:1, 4860:24, 4907:3,

4907:4, 4911:18, 4960:9, 4976:20

**five-year** [1] - 4699:7

**fixed** [2] - 4752:4, 4752:5

**flawed** [2] - 4802:18, 4802:21

**Flexner** [1] - 4668:17

**FLEXNER** [3] - 4667:14, 4667:17, 4668:16

**flip** [2] - 4719:5, 4757:24

**Florida** [1] - 4841:24

**florist** [5] - 4731:11, 4832:5, 4832:8, 4832:12, 4904:24

**flow** [1] - 4715:1

**focus** [14] - 4671:4, 4679:23, 4681:24, 4708:21, 4724:9, 4758:6, 4786:2, 4822:3, 4903:2, 4924:20, 4936:21, 4955:11, 4961:3, 4972:1

**focused** [12] - 4685:6, 4720:11, 4742:24, 4743:4, 4796:23, 4901:23, 4905:17, 4920:20, 4936:22, 4956:23, 4960:4, 4971:25

**focusing** [4] - 4739:25, 4796:22, 4815:19, 4914:17

**fold** [1] - 4806:10

**folks** [36] - 4681:21, 4683:16, 4687:9, 4687:11, 4701:6, 4713:6, 4715:15, 4717:5, 4717:6, 4717:17, 4720:15, 4721:22, 4725:18, 4730:14, 4730:17, 4739:16, 4740:10, 4757:9, 4759:17, 4762:7, 4772:22, 4773:7, 4773:13, 4786:25, 4793:4, 4793:7, 4836:16, 4872:16, 4877:11, 4886:13, 4901:12, 4933:6, 4942:6, 4942:15, 4960:15

**follow** [5] - 4756:22, 4825:16, 4851:10, 4861:9, 4939:3

**follow-up** [2] - 4825:16, 4861:9

**followed** [2] - 4762:14, 4932:18

**following** [5] - 4678:17, 4758:7, 4803:9, 4805:15, 4819:2, 4878:11, 4934:12

**Following** [1] - 4873:8

**follows** [4] - 4675:2, 4708:5, 4758:8, 4912:9

**font** [1] - 4770:22

**food** [3] - 4677:18, 4677:20, 4677:21

**footnote** [1] - 4871:18

**FOR** [1] - 4666:16

**force** [18] - 4681:10, 4681:11, 4681:12, 4681:14, 4681:25, 4743:24, 4744:1, 4750:13, 4797:1, 4801:2, 4802:23, 4803:6, 4806:8, 4863:2, 4901:21, 4904:8, 4906:17

**Force** [5] - 4799:14, 4800:13, 4806:16, 4808:8, 4812:22

**forces** [1] - 4681:12

**forecast** [1] - 4869:20

**forecasted** [1] - 4837:8

**form** [12] - 4688:2, 4740:11, 4764:12, 4782:22, 4782:24, 4783:8, 4783:13, 4783:23, 4793:21, 4834:3, 4884:14, 4917:16

**forms** [8] - 4782:19, 4787:16, 4886:2, 4888:10, 4889:25, 4915:3, 4915:5, 4922:12

**formula** [2] - 4922:25

**formulas** [2] - 4923:5, 4923:12

**formulated** [1] - 4924:5

**Fort** [1] - 4935:21

**forth** [5] - 4681:7, 4895:9, 4895:11, 4897:10, 4897:17

**forums** [1] - 4866:19

**forward** [3] - 4758:6, 4881:22, 4928:5

**forwarded** [7] - 4824:1, 4840:16, 4857:2, 4877:15, 4877:17, 4877:20,

followed [2] -

**followed** [2] - 

**forwarding** [4] - 4928:5, 4928:8, 4975:4, 4975:22

**foundation** [1] - 4727:3

**four** [7] - 4676:12, 4678:6, 4720:22, 4761:6, 4855:19, 4898:21, 4932:25

**fourth** [3] - 4730:10, 4834:2, 4917:9

**frame** [7] - 4831:9, 4831:21, 4836:3, 4838:12, 4854:8, 4872:6, 4887:8

**France** [1] - 4903:12

**franchising** [1] - 4872:1

**Francisco** [16] - 4785:20, 4807:18, 4807:25, 4808:2, 4808:7, 4808:8, 4808:17, 4830:22, 4830:25, 4831:2, 4905:24, 4905:25, 4906:4, 4906:16, 4909:22, 4910:1

**Francisco's** [3] - 4831:13, 4831:16, 4831:21

**frankly** [3] - 4940:13, 4961:14, 4971:20

**fraud** [3] - 4934:3, 4934:19, 4943:15

**freight** [4] - 4928:4, 4928:8, 4975:4, 4975:22

**frequency** [2] - 4708:19, 4961:16

**frequent** [3] - 4773:20, 4951:5, 4951:6

**frequently** [2] - 4940:6, 4940:7

**Friday** [2] - 4776:9, 4777:17

**friend** [4] - 4943:22, 4943:25, 4944:8, 4946:13

**friendly** [1] - 4748:4

**from..** [1] - 4751:5

**front** [12] - 4695:22, 4713:20, 4733:16, 4797:23, 4811:24, 4845:23, 4855:2, 4885:17, 4897:23, 4935:10, 4954:1, 4972:11

**frontal** [1] - 4971:4

**fuel** [2] - 4726:3,

**4928:8**

**forwarding** [4] -

4726:6
**fueled** [2] - 4744:23, 4862:13
**fuels** [1] - 4748:8
**fulfilled** [1] - 4680:24
**FULKERSON** [5] - 4667:1, 4668:6, 4668:9, 4668:11, 4668:13
**Fulkerson** [1] - 4668:7
**full** [16] - 4674:12, 4711:13, 4746:16, 4771:5, 4771:6, 4856:18, 4866:7, 4878:18, 4895:22, 4912:11, 4916:11, 4926:9, 4926:10, 4926:15, 4926:24, 4947:16
**fully** [5] - 4681:15, 4700:2, 4752:21, 4847:19, 4949:19
**function** [3] - 4717:23, 4915:2, 4915:4
**functionality** [1] - 4939:10
**functionally** [1] - 4939:10
**functions** [2] - 4921:25, 4966:18
**fund** [5] - 4687:21, 4702:20, 4702:22, 4703:2, 4726:3
**Fund** [1] - 4688:6
**Funda** [7] - 4696:11, 4696:12, 4708:9, 4737:22, 4868:14, 4877:14, 4877:15
**Funda's** [1] - 4693:13
**fundamental** [9] - 4748:12, 4902:13, 4918:4, 4918:8, 4919:23, 4940:17, 4951:9, 4952:21, 4961:12
**fundamentals** [2] - 4942:21, 4954:20
**funded** [11] - 4700:2, 4700:20, 4700:21, 4702:23, 4702:25, 4703:5, 4722:13, 4763:10, 4764:6, 4764:10
**funding** [4] - 4693:7, 4699:15, 4700:23, 4716:11
**funds** [13] - 4687:13, 4687:15, 4688:10, 4688:11, 4688:17, 4689:7, 4697:23,

4699:3, 4703:2, 4715:15, 4715:17, 4753:25, 4761:21
**funny** [1] - 4919:13
**fury** [1] - 4865:12
**future** [4] - 4728:3, 4728:21, 4885:6, 4954:16

## G

**G-l-e-n-n** [1] - 4674:16
**gain** [3] - 4795:4, 4904:18
**gaining** [1] - 4872:12
**Gamble** [4] - 4677:3, 4677:13, 4813:13, 4820:12
**gap** [15] - 4718:11, 4742:22, 4746:4, 4746:23, 4749:24, 4749:25, 4751:23, 4752:16, 4809:17, 4809:18, 4809:21, 4810:2, 4810:7, 4811:4, 4819:16
**GAP** [2] - 4803:11
**gaps** [4] - 4744:13, 4745:24, 4966:4, 4966:6
**GARAUFIS** [1] - 4666:16
**Gate** [1] - 4785:20
**gather** [2] - 4878:11, 4951:6
**geared** [1] - 4789:15
**gearing** [1] - 4873:9
**general** [14] - 4680:12, 4680:19, 4683:17, 4684:22, 4687:4, 4687:7, 4687:8, 4716:6, 4740:11, 4780:9, 4786:4, 4847:14, 4864:15, 4870:8
**General** [6] - 4667:2, 4667:5, 4667:8, 4921:5, 4921:17, 4963:17
**General's** [1] - 4667:8
**generally** [28] - 4676:13, 4682:14, 4683:6, 4699:12, 4699:13, 4706:25, 4707:5, 4725:2, 4729:20, 4735:25, 4751:20, 4755:19, 4755:24, 4763:3, 4763:7, 4771:23, 4778:12, 4781:4,

4789:2, 4794:4, 4818:9, 4818:24, 4820:2, 4915:18, 4917:13, 4919:20, 4964:24, 4970:22
**generating** [2] - 4722:20, 4781:12
**GENTILE** [1] - 4667:7
**gentleman** [1] - 4757:14
**geographic** [1] - 4806:3
**Gift** [1] - 4764:23
**gift** [15] - 4690:6, 4763:10, 4764:6, 4764:8, 4764:25, 4767:24, 4774:21, 4775:5, 4846:15, 4846:22, 4847:1, 4852:17, 4852:19, 4853:6
**Gilbert** [1] - 4670:20
**Gilligan** [9] - 4679:16, 4679:19, 4742:7, 4803:25, 4804:3, 4804:15, 4805:12, 4868:20, 4869:4
**Gilligan's** [1] - 4679:17
**given** [6] - 4680:2, 4690:14, 4690:16, 4805:12, 4965:23, 4977:3
**glad** [1] - 4975:15
**glass** [1] - 4911:12
**GLASS** [10] - 4666:23, 4911:14, 4949:11, 4952:1, 4955:22, 4957:17, 4972:7, 4972:20, 4978:2, 4978:5
**Glenn** [60] - 4671:10, 4672:16, 4674:8, 4674:14, 4675:5, 4675:7, 4693:14, 4708:11, 4708:12, 4709:7, 4719:2, 4719:18, 4733:16, 4734:25, 4738:12, 4749:21, 4751:18, 4778:8, 4778:20, 4778:24, 4785:4, 4786:3, 4787:15, 4790:11, 4791:16, 4794:12, 4795:7, 4796:10, 4798:2, 4798:4, 4798:10, 4803:22, 4803:25, 4811:21, 4813:25, 4821:10, 4822:23,

4823:4, 4827:15, 4836:10, 4838:23, 4839:22, 4840:7, 4845:4, 4845:15, 4845:16, 4845:23, 4846:22, 4850:3, 4855:1, 4866:12, 4876:14, 4877:3, 4894:14, 4894:18, 4896:18, 4897:23, 4903:7, 4905:16, 4911:3
**Glick** [2] - 4790:15, 4790:16
**Global** [28] - 4671:17, 4675:8, 4675:10, 4675:11, 4675:12, 4676:13, 4676:18, 4678:12, 4678:24, 4679:22, 4679:25, 4680:11, 4682:24, 4715:22, 4716:17, 4746:2, 4778:23, 4781:16, 4794:15, 4874:17, 4874:24, 4879:14, 4880:15, 4881:3, 4901:22, 4915:14, 4951:19
**global** [11] - 4676:3, 4679:10, 4680:2, 4680:3, 4798:11, 4798:19, 4834:8, 4874:20, 4874:25, 4951:16, 4966:18
**globally** [3] - 4678:19, 4680:14, 4798:15
**GMAR** [1] - 4874:21
**GMPI** [9] - 4915:14, 4915:25, 4916:3, 4950:7, 4951:17, 4951:23, 4955:18, 4957:5, 4958:10, 4958:12, 4958:20, 4958:23
**GMS** [4] - 4779:19, 4781:3, 4803:24, 4834:3
**GNS** [3] - 4916:25, 4945:10, 4948:8
**goal** [2] - 4753:21, 4934:1
**Gold** [3] - 4669:5, 4669:22, 4670:11
**GOLD** [1] - 4667:13
**Golden** [1] - 4785:20
**goldfish** [1] - 4800:24
**Golub** [3] - 4967:2, 4970:20, 4970:23
**Goodman** [2] - 4706:2, 4706:4

**goods** [1] - 4928:8
**gosh** [1] - 4939:6
**governance** [1] - 4913:23
**government** [11] - 4669:15, 4746:15, 4794:13, 4796:5, 4883:8, 4885:7, 4887:12, 4888:11, 4893:25, 4894:5, 4978:7
**Government** [2] - 4790:18, 4886:18
**graduate** [1] - 4914:15
**graduated** [2] - 4677:5, 4914:13
**grain** [1] - 4923:9
**granted** [3] - 4941:3, 4941:5, 4941:20
**grasp** [1] - 4820:21
**gray** [1] - 4707:21
**great** [9] - 4698:9, 4698:10, 4717:3, 4724:10, 4797:20, 4857:15, 4925:22, 4946:3, 4946:4
**greater** [9] - 4698:7, 4781:9, 4782:9, 4811:8, 4818:1, 4886:1, 4902:14
**greatest** [3] - 4797:16, 4799:7, 4948:12
**green** [2] - 4942:3
**Greg** [2] - 4877:9, 4877:11
**Gretchen** [1] - 4856:13
**grew** [4] - 4688:2, 4767:18, 4965:18, 4965:19
**Grimaldi** [2] - 4822:22, 4824:4
**GRIMALDI** [1] - 4822:23
**grocery** [2] - 4899:4
**ground** [3] - 4968:18, 4968:20, 4969:3
**grounded** [1] - 4932:21
**grounds** [1] - 4670:8
**group** [35] - 4675:21, 4678:11, 4679:18, 4682:5, 4682:9, 4700:10, 4706:1, 4717:8, 4717:9, 4722:24, 4734:2, 4746:3, 4789:10, 4789:15, 4877:15, 4890:7, 4915:10, 4915:16, 4915:18,

4915:19, 4916:22,
4917:5, 4917:6,
4917:7, 4917:8,
4918:7, 4938:14,
4951:16, 4956:17,
4956:20, 4958:12,
4959:6, 4959:11,
4972:13, 4972:14
**Group** [1] - 4917:8
**groups** [5] - 4734:12,
4938:19, 4938:21,
4950:8, 4956:17
**grow** [2] - 4803:6,
4808:22
**growing** [4] - 4777:16,
4799:15, 4803:5,
4803:6
**grows** [1] - 4684:17
**growth** [9] - 4797:17,
4797:21, 4799:8,
4803:17, 4869:25,
4870:15, 4918:6,
4937:15, 4937:17
**Growth** [1] - 4803:25
**guess** [17] - 4670:4,
4686:4, 4690:7,
4742:13, 4760:17,
4774:6, 4819:18,
4858:4, 4877:16,
4895:9, 4909:11,
4917:16, 4920:25,
4929:9, 4932:16,
4948:12, 4977:4

# H

**half** [5] - 4669:22,
4670:13, 4672:17,
4698:15, 4711:18
**Hall** [2] - 4914:13,
4914:15
**Hamer** [11] - 4796:10,
4893:13, 4896:5,
4896:19, 4896:21,
4898:5, 4898:22,
4900:20, 4903:20,
4905:17, 4905:23
**HAMER** [78] -
4666:22, 4692:4,
4709:4, 4719:13,
4734:17, 4738:7,
4771:1, 4771:8,
4791:12, 4795:9,
4796:1, 4796:3,
4796:7, 4796:9,
4798:6, 4798:17,
4801:23, 4802:3,
4803:21, 4804:6,
4804:24, 4805:7,
4809:1, 4812:8,

4813:15, 4813:22,
4817:16, 4819:17,
4820:16, 4820:25,
4821:17, 4822:24,
4824:24, 4827:8,
4827:10, 4828:21,
4830:5, 4830:7,
4835:17, 4837:14,
4838:17, 4838:21,
4840:2, 4845:19,
4848:4, 4849:22,
4852:5, 4852:8,
4855:7, 4855:24,
4858:11, 4860:4,
4867:22, 4868:5,
4868:23, 4875:7,
4875:10, 4876:17,
4876:24, 4880:18,
4883:2, 4884:22,
4885:10, 4888:22,
4892:24, 4893:2,
4895:16, 4896:1,
4896:3, 4896:7,
4907:22, 4908:21,
4910:8, 4937:3,
4978:10, 4979:8,
4979:10, 4979:14
**HAMPSHIRE** [1] -
4666:6
**hand** [7] - 4722:9,
4808:10, 4808:14,
4858:7, 4860:3,
4895:21
**handed** [3] - 4691:13,
4936:9, 4936:12
**handing** [1] - 4894:10
**handle** [1] - 4789:20
**handled** [2] - 4917:5,
4917:7
**hands** [1] - 4745:6
**handwriting** [1] -
4972:11
**happy** [1] - 4771:5
**hard** [16] - 4700:14,
4706:14, 4716:21,
4722:25, 4734:24,
4745:22, 4756:17,
4761:25, 4762:2,
4769:3, 4795:3,
4806:25, 4853:21,
4904:18, 4909:13,
4938:22
**Hard** [1] - 4837:5
**harm** [1] - 4843:16
**harming** [2] - 4887:24,
4888:4
**harnessing** [1] -
4758:9
**Harvey** [1] - 4970:20
**Hayes** [16] - 4672:9,

4672:17, 4912:4,
4912:14, 4912:20,
4912:22, 4936:12,
4936:18, 4937:7,
4938:20, 4950:7,
4961:2, 4966:14,
4972:2, 4972:10,
4974:6
**head** [16] - 4671:13,
4715:22, 4790:17,
4794:15, 4801:11,
4875:3, 4881:3,
4882:9, 4921:1,
4939:5, 4966:21,
4966:25, 4968:9,
4968:11
**head-to-head** [2] -
4968:9, 4968:11
**headed** [1] - 4706:1
**heading** [6] - 4823:15,
4837:4, 4840:11,
4885:25, 4903:10,
4908:3
**headline** [7] -
4685:21, 4686:4,
4687:19, 4759:10,
4759:14, 4870:3
**headquarters** [1] -
4787:6
**heads** [1] - 4951:16
**headwinds** [1] -
4871:24
**Health** [3] - 4950:13,
4955:8, 4957:8
**health** [1] - 4799:18
**healthy** [1] - 4886:23
**hear** [3] - 4717:25,
4797:18, 4904:17
**heard** [11] - 4682:4,
4682:8, 4717:25,
4724:10, 4731:14,
4756:11, 4768:22,
4828:8, 4834:22,
4865:14, 4917:2
**hearsay** [3] - 4876:21,
4896:7
**heart** [3] - 4720:5,
4743:5
**heavily** [1] - 4872:22
**heavy** [2] - 4710:18,
4850:19
**held** [1] - 4839:10
**help** [20] - 4673:20,
4702:5, 4702:6,
4715:20, 4739:10,
4779:9, 4811:4,
4884:19, 4889:23,
4891:12, 4892:13,
4918:3, 4923:21,
4929:25, 4936:22,

4949:19, 4954:4,
4954:5, 4969:2
**helped** [2] - 4712:18,
4763:22
**helpful** [1] - 4820:19
**helping** [1] - 4696:14
**helps** [5] - 4694:22,
4918:4, 4921:23,
4921:24
**hence** [1] - 4669:18
**high** [14] - 4717:4,
4803:13, 4905:6,
4920:11, 4920:12,
4922:17, 4927:6,
4928:9, 4931:2,
4931:15, 4938:5,
4968:18, 4968:20,
4969:3
**High** [1] - 4722:20
**higher** [30] - 4710:19,
4725:20, 4726:9,
4726:11, 4740:25,
4741:4, 4741:9,
4741:11, 4743:25,
4744:2, 4744:3,
4744:5, 4744:8,
4750:5, 4750:16,
4767:9, 4767:10,
4767:12, 4767:15,
4809:22, 4810:1,
4818:22, 4830:25,
4831:1, 4831:14,
4863:23, 4883:22,
4903:12, 4904:2,
4906:18
**highest** [4] - 4750:18,
4751:13, 4895:2
**highly** [1] - 4785:8
**historic** [1] - 4904:22
**historical** [3] -
4904:21, 4928:17
**historically** [1] -
4904:15
**history** [5] - 4794:11,
4794:25, 4927:25,
4931:24, 4976:9
**Hitesh** [1] - 4824:20
**HITESH** [1] - 4824:20
**hold** [4] - 4679:13,
4797:11, 4913:1,
4970:8
**holder** [1] - 4818:3
**holders** [1] - 4933:4
**holdout** [4] - 4704:4,
4704:8, 4704:14,
4704:15
**holdouts** [2] -
4704:19, 4746:7
**holiday** [1] - 4673:21
**holidays** [3] -

4722:25, 4934:8
**Home** [6] - 4723:12,
4723:15, 4875:17,
4876:1, 4876:9,
4931:20
**hone** [1] - 4917:14
**honestly** [1] - 4969:12
**Honor** [137] - 4668:3,
4668:6, 4668:9,
4668:14, 4668:16,
4669:3, 4669:13,
4670:4, 4670:18,
4671:6, 4671:9,
4671:15, 4671:19,
4672:8, 4672:12,
4672:15, 4672:23,
4673:7, 4673:16,
4673:22, 4674:4,
4674:7, 4674:18,
4674:21, 4675:17,
4683:23, 4691:15,
4692:2, 4693:11,
4697:4, 4703:19,
4705:22, 4708:3,
4709:2, 4718:24,
4719:11, 4733:11,
4734:15, 4737:20,
4738:5, 4741:15,
4742:9, 4742:13,
4749:13, 4749:20,
4753:5, 4755:3,
4755:4, 4755:7,
4755:12, 4757:19,
4765:14, 4767:10,
4768:17, 4770:9,
4770:13, 4773:23,
4778:18, 4790:12,
4791:9, 4796:3,
4796:7, 4798:7,
4798:17, 4803:21,
4804:7, 4805:5,
4809:1, 4812:4,
4813:17, 4820:23,
4821:19, 4824:23,
4828:21, 4830:3,
4835:17, 4837:15,
4838:18, 4838:21,
4844:22, 4845:5,
4852:9, 4855:8,
4860:4, 4876:19,
4880:21, 4883:4,
4885:1, 4885:4,
4885:10, 4888:22,
4892:24, 4893:2,
4893:5, 4893:10,
4894:10, 4895:14,
4895:21, 4896:6,
4896:14, 4902:24,
4903:3, 4904:4,
4907:21, 4907:22,
4910:10, 4910:17,

4910:20, 4910:23,
4911:1, 4911:10,
4911:14, 4912:3,
4912:17, 4914:4,
4936:10, 4936:15,
4937:1, 4937:3,
4949:9, 4949:11,
4951:25, 4952:1,
4953:24, 4955:20,
4957:16, 4957:17,
4963:1, 4966:11,
4972:5, 4972:19,
4975:17, 4977:21,
4978:8, 4978:9,
4978:10, 4978:16
**HONORABLE** [1] -
4666:16
**honoring** [1] -
4786:14
**hope** [1] - 4978:2
**hopefully** [2] -
4688:19, 4959:4
**hotels** [1] - 4748:10
**hour** [7] - 4669:22,
4670:12, 4742:14,
4828:23, 4828:25,
4978:3, 4978:5
**hours** [2] - 4669:23,
4672:17
**House** [10] - 4678:9,
4734:7, 4775:19,
4775:24, 4791:8,
4854:25, 4857:2,
4966:14, 4966:21,
4970:21
**house** [4] - 4678:14,
4790:22, 4857:4,
4857:15
**House's** [1] - 4678:10
**huge** [1] - 4851:2
**hundred** [3] - 4711:18,
4711:19, 4819:6
**hurt** [3] - 4857:17,
4920:15, 4920:16
**hurting** [1] - 4849:7
**hurts** [4] - 4703:21,
4849:3, 4849:11,
4888:13
**Hybl** [2] - 4877:9,
4877:11
**HYBL** [1] - 4877:9
**hypothetical** [1] -
4863:20

**I**

**i.e** [2] - 4858:24,
4883:13
**iconic** [4] - 4718:16,
4781:25, 4785:13,

4785:15
**IDAHO** [1] - 4666:5
**idea** [16] - 4672:20,
4722:23, 4763:7,
4831:15, 4831:18,
4878:6, 4931:7,
4932:9, 4934:14,
4937:20, 4966:7,
4968:22, 4969:18,
4969:19, 4970:23,
4971:22
**idea)** [1] - 4851:9
**ideas** [2] - 4849:21,
4851:18
**identification** [1] -
4733:13
**identified** [9] - 4721:4,
4739:10, 4787:2,
4789:18, 4802:7,
4847:19, 4884:23,
4892:11, 4938:18
**identifier** [1] - 4917:21
**identifies** [2] - 4802:4,
4871:5
**identify** [5] - 4738:25,
4789:3, 4889:21,
4891:8, 4934:10
**Identify** [1] - 4794:6
**identifying** [1] -
4729:21
**identity** [1] - 4910:12
**III** [1] - 4666:19
**ILLINOIS** [1] - 4666:5
**Illinois** [1] - 4841:24
**Illustrative** [1] -
4875:17
**illustrative** [1] -
4876:10
**Image** [1] - 4956:8
**imagine** [2] - 4822:17,
4832:3
**immediate** [1] -
4937:22
**immediately** [1] -
4939:7
**impact** [44] - 4684:17,
4686:14, 4690:8,
4705:10, 4728:2,
4728:20, 4729:7,
4741:7, 4748:18,
4761:22, 4766:22,
4766:24, 4768:4,
4772:13, 4777:11,
4778:15, 4780:19,
4781:12, 4781:14,
4782:15, 4783:17,
4810:19, 4826:12,
4837:22, 4871:7,
4871:9, 4871:16,
4873:18, 4874:2,

4887:3, 4923:14,
4960:14, 4961:20,
4961:23, 4962:22,
4963:3, 4968:1,
4974:8, 4974:10,
4974:13, 4974:22,
4975:25, 4976:5
**impacted** [6] - 4693:4,
4745:25, 4850:22,
4873:23, 4874:5,
4874:7
**impactful** [1] -
4962:20
**impacting** [2] -
4778:7, 4977:14
**impacts** [14] -
4748:16, 4769:16,
4776:3, 4779:25,
4780:7, 4783:14,
4788:19, 4795:5,
4795:6, 4818:24,
4834:8, 4887:14,
4905:1
**implanted** [1] -
4942:22
**implement** [7] -
4729:19, 4729:25,
4736:6, 4740:21,
4872:5, 4872:7,
4885:22
**implementation** [1] -
4740:16
**implemented** [4] -
4727:1, 4746:8,
4882:2, 4884:11
**implementing** [1] -
4884:9
**importance** [6] -
4837:6, 4843:4,
4917:25, 4944:16,
4960:13, 4961:6
**important** [72] -
4685:9, 4691:7,
4695:11, 4696:3,
4697:19, 4707:10,
4708:21, 4713:6,
4713:24, 4720:16,
4726:6, 4726:18,
4733:3, 4739:6,
4743:8, 4745:18,
4747:8, 4754:7,
4756:15, 4757:4,
4772:3, 4775:25,
4776:5, 4777:12,
4779:6, 4785:22,
4792:3, 4792:4,
4799:1, 4801:15,
4821:5, 4842:24,
4842:25, 4851:25,
4872:16, 4872:18,

4899:21, 4905:20,
4918:2, 4919:4,
4919:15, 4920:3,
4920:4, 4920:16,
4928:3, 4928:10,
4928:22, 4929:11,
4931:10, 4936:5,
4938:10, 4942:10,
4942:14, 4944:3,
4944:10, 4945:3,
4947:9, 4948:5,
4953:1, 4953:10,
4953:13, 4953:14,
4953:16, 4953:17,
4953:21, 4954:17,
4961:11, 4961:14,
4963:25, 4967:11,
4974:16
**importantly** [3] -
4862:15, 4920:8,
4956:11
**improve** [3] - 4816:17,
4816:22, 4816:25
**improved** [2] -
4810:18, 4966:5
**improves** [1] -
4811:10
**improving** [3] -
4742:23, 4816:10,
4817:14
**inactive** [4] - 4801:4,
4906:10, 4906:11,
4907:8
**incent** [1] - 4841:16
**incentive** [4] -
4841:15, 4850:24,
4856:19
**incentives** [5] -
4688:1, 4841:6,
4843:6, 4850:14,
4883:21
**include** [10] - 4702:17,
4710:14, 4783:1,
4800:24, 4842:4,
4916:18, 4916:20,
4932:3, 4932:4,
4935:5
**included** [4] - 4840:7,
4879:15, 4899:1,
4916:4
**includes** [5] -
4827:16, 4938:16,
4938:17, 4942:1,
4942:2
**including** [3] -
4802:16, 4825:5,
4881:12
**incomplete** [1] -
4771:1
**inconsistency** [1] -

4946:4
**inconsistent** [1] -
4924:18
**inconvenience** [1] -
4900:10
**incorrect** [1] - 4814:25
**increase** [5] -
4716:22, 4869:15,
4869:20, 4872:1,
4903:13
**increased** [7] -
4712:3, 4716:21,
4725:12, 4736:20,
4737:13, 4871:25,
4965:21
**increases** [9] -
4780:2, 4780:24,
4811:12, 4811:17,
4862:15, 4870:10,
4871:1, 4871:17,
4873:24
**increasing** [6] -
4781:13, 4806:18,
4811:10, 4811:12,
4811:16, 4815:13
**incremental** [2] -
4758:10, 4897:4
**incur** [1] - 4685:3
**incurred** [1] - 4701:16
**incurring** [1] -
4694:17
**indeed** [1] - 4969:23
**independent** [2] -
4746:7, 4833:23
**indicate** [2] - 4783:25,
4825:25
**indicated** [4] -
4697:16, 4730:6,
4826:12, 4906:5
**indicates** [3] -
4826:11, 4837:3,
4837:5
**indicating** [1] -
4806:14
**indirectly** [1] -
4883:20
**individual** [6] -
4669:10, 4818:7,
4892:10, 4922:12,
4925:13, 4967:6
**individually** [1] -
4936:24
**individuals** [1] -
4721:4
**industries** [37] -
4682:18, 4684:16,
4697:19, 4709:22,
4709:23, 4712:9,
4727:21, 4727:24,
4727:25, 4728:7,

4728:9, 4728:11, 4728:13, 4728:16, 4728:17, 4728:21, 4729:4, 4729:8, 4729:21, 4731:18, 4735:18, 4736:16, 4737:16, 4744:5, 4744:12, 4780:2, 4780:20, 4783:15, 4799:18, 4817:24, 4866:18, 4867:16, 4870:6, 4871:3, 4890:25, 4905:14
**Industry** [2] - 4709:12, 4814:2
**industry** [61] - 4684:15, 4685:11, 4696:18, 4697:17, 4705:9, 4705:16, 4705:18, 4709:21, 4710:23, 4712:2, 4725:1, 4725:2, 4727:22, 4727:23, 4728:2, 4728:24, 4729:2, 4730:3, 4731:19, 4731:20, 4732:3, 4732:6, 4732:7, 4735:18, 4735:22, 4736:1, 4736:2, 4736:3, 4736:4, 4736:6, 4736:20, 4736:25, 4737:9, 4737:15, 4737:17, 4759:20, 4780:2, 4780:20, 4800:22, 4814:13, 4814:18, 4814:22, 4819:4, 4834:8, 4837:23, 4862:25, 4865:25, 4867:19, 4871:5, 4871:20, 4871:24, 4872:10, 4873:16, 4882:19, 4885:21, 4891:2, 4901:13, 4901:18, 4921:10
**Industry's** [1] - 4869:3
**inflated** [1] - 4801:8
**influence** [1] - 4904:19
**Influencers** [1] - 4960:9
**influences** [2] - 4907:10, 4960:9
**influencing** [1] - 4960:15
**Info** [1] - 4960:22
**inform** [1] - 4899:2
**information** [29] - 4669:17, 4702:2,

4702:11, 4702:13, 4715:18, 4733:12, 4739:21, 4757:20, 4758:10, 4758:15, 4760:5, 4761:7, 4812:22, 4839:24, 4847:19, 4855:22, 4890:15, 4890:17, 4890:20, 4891:23, 4892:7, 4892:8, 4898:8, 4898:10, 4903:3, 4915:3, 4934:13, 4953:14, 4957:23
**infrequent** [2] - 4801:14, 4801:15
**initial** [1] - 4835:20
**initiated** [1] - 4724:14
**initiative** [7] - 4708:20, 4727:2, 4727:4, 4727:11, 4735:22, 4742:3, 4846:18
**initiatives** [6] - 4718:13, 4734:11, 4746:3, 4779:5, 4847:15, 4870:23
**Initiatives** [1] - 4869:23
**innovation** [1] - 4887:1
**innovative** [1] - 4748:25
**inquire** [3] - 4674:17, 4796:5, 4912:16
**inside** [1] - 4944:15
**insight** [1] - 4802:16
**insights** [11] - 4715:19, 4721:2, 4739:22, 4740:18, 4889:8, 4889:9, 4889:25, 4891:13, 4951:16, 4959:4, 4959:5
**Insights** [12] - 4694:9, 4700:10, 4700:17, 4716:25, 4717:9, 4781:3, 4888:24, 4889:3, 4889:14, 4915:1, 4915:13, 4915:14
**insistence** [6] - 4706:16, 4706:18, 4706:20, 4707:4, 4711:9, 4837:21
**instance** [3] - 4669:16, 4686:19, 4698:8
**instances** [5] - 4701:11, 4701:12, 4732:13, 4732:16,

4825:22
**instead** [2] - 4764:25, 4768:10
**insurance** [1] - 4799:19
**insure** [1] - 4943:6
**Insured** [1] - 4822:9
**insuring** [1] - 4952:25
**intact** [1] - 4976:14
**integrity** [15] - 4685:1, 4685:5, 4685:12, 4686:24, 4688:12, 4697:20, 4703:21, 4713:3, 4713:25, 4777:12, 4781:24, 4834:7, 4901:17, 4948:3, 4949:24
**intended** [2] - 4769:19, 4866:21
**intensity** [1] - 4971:6
**intent** [3] - 4756:2, 4843:18, 4843:19
**intention** [3] - 4670:23, 4768:11, 4862:10
**intentional** [4] - 4862:10, 4862:13, 4862:22, 4867:15
**interact** [2] - 4733:5, 4945:22
**Interbrand** [2] - 4922:25, 4923:3
**interchange** [6] - 4710:9, 4710:10, 4710:25, 4863:17, 4863:25, 4893:22
**interest** [6] - 4865:19, 4878:11, 4878:22, 4900:15, 4908:4, 4910:18
**interested** [2] - 4700:13, 4891:9
**interesting** [1] - 4820:17
**interests** [1] - 4887:5
**interferes** [1] - 4887:5
**Interim** [1] - 4778:23
**internal** [10] - 4692:12, 4692:24, 4713:22, 4714:18, 4746:11, 4913:23, 4936:19, 4936:22, 4958:12
**internally** [11] - 4692:16, 4696:2, 4715:2, 4719:7, 4730:14, 4739:16, 4789:10, 4797:9, 4833:21, 4936:21, 4943:1
**international** [1] -

4818:1
**internationally** [1] - 4715:10
**internet** [1] - 4915:6
**Internet** [1] - 4958:3
**interpretation** [2] - 4859:15, 4859:20
**Interpreting** [1] - 4837:17
**interrelated** [1] - 4811:15
**intervening** [1] - 4971:15
**intra** [1] - 4728:24
**intra-industry** [1] - 4728:24
**introduce** [3] - 4813:9, 4860:2, 4884:19
**introduced** [2] - 4827:10, 4893:23
**invest** [8] - 4735:12, 4743:10, 4748:15, 4754:9, 4870:17, 4902:15, 4930:16, 4974:4
**invested** [1] - 4746:5
**investing** [1] - 4779:5
**investment** [4] - 4687:21, 4744:24, 4908:5, 4910:19
**Investment** [1] - 4688:6
**investments** [2] - 4726:7, 4748:19
**investors** [4] - 4675:22, 4866:4, 4900:21, 4910:12
**involve** [2] - 4716:3, 4968:7
**involved** [33] - 4683:2, 4683:10, 4683:11, 4691:3, 4699:13, 4715:25, 4734:10, 4740:10, 4742:5, 4755:16, 4756:3, 4757:7, 4822:15, 4823:6, 4834:20, 4847:21, 4848:17, 4850:10, 4857:9, 4858:18, 4878:25, 4879:17, 4882:7, 4886:8, 4926:5, 4926:17, 4935:14, 4946:15, 4948:1, 4948:7, 4948:21, 4962:15
**involvement** [1] - 4757:5
**involves** [1] - 4847:16
**IOWA** [1] - 4666:5

**irrespective** [1] - 4818:15
**ISLAND** [1] - 4666:7
**issue** [11] - 4668:24, 4669:7, 4747:12, 4778:10, 4796:13, 4799:13, 4828:5, 4898:1, 4929:25, 4945:11, 4969:2
**issuer** [1] - 4833:23
**issuers** [3] - 4714:15, 4834:9, 4834:10
**issues** [19] - 4669:18, 4670:14, 4683:17, 4747:11, 4752:3, 4779:1, 4787:8, 4792:2, 4792:8, 4793:22, 4802:16, 4851:8, 4861:9, 4869:7, 4882:8, 4910:15, 4921:2, 4965:6
**issuing** [14] - 4686:1, 4688:20, 4692:18, 4692:20, 4692:23, 4693:7, 4694:10, 4694:20, 4714:22, 4715:5, 4716:4, 4716:7, 4745:5, 4905:12
**it'll** [1] - 4808:5
**item** [5] - 4669:14, 4810:6, 4817:8, 4841:2, 4978:10
**items** [5] - 4723:1, 4758:7, 4809:22, 4847:6, 4869:9
**itself** [12] - 4699:4, 4770:1, 4780:19, 4813:7, 4814:19, 4876:20, 4891:24, 4925:13, 4947:20, 4969:23, 4975:3, 4976:9

---

## J

**Jack** [4] - 4696:12, 4708:9, 4868:14
**JAMES** [1] - 4667:17
**January** [23] - 4668:19, 4740:21, 4768:14, 4770:4, 4774:6, 4774:7, 4822:23, 4827:6, 4828:3, 4835:13, 4835:14, 4835:15, 4844:5, 4855:6, 4855:16, 4858:10, 4860:7, 4864:23,

4864:24, 4882:19, 4882:20

**Jeff** [1] - 4757:12
**Jefferson** [1] - 4667:6
**Jeffrey** [3] - 4760:13, 4760:15, 4839:23
**jerk** [1] - 4971:9
**Jersey** [1] - 4677:18
**Jim** [2] - 4855:11, 4856:14
**Jo** [4] - 4845:16, 4847:7, 4847:12, 4847:23
**job** [5] - 4677:6, 4677:13, 4779:9, 4817:19, 4913:9
**jobs** [1] - 4677:12
**Joe** [1] - 4687:10
**John** [10] - 4672:9, 4836:8, 4836:10, 4840:22, 4848:1, 4849:13, 4849:19, 4912:3, 4912:12, 4912:14
**JOHN** [1] - 4666:23
**joined** [5] - 4677:23, 4678:1, 4689:13, 4794:25, 4914:8
**joint** [11] - 4671:11, 4675:19, 4675:21, 4675:23, 4676:1, 4676:3, 4676:10, 4676:14, 4676:18, 4680:6, 4908:3
**Jose** [2] - 4860:6, 4860:14
**Joseph** [1] - 4682:9
**Josh** [3] - 4672:2, 4672:4, 4956:24
**JUDGE** [1] - 4666:17
**judge** [1] - 4947:6
**July** [2] - 4803:25, 4876:14
**junior** [1] - 4675:18
**jurisdiction** [1] - 4879:13
**JUSTICE** [1] - 4666:20
**justified** [1] - 4733:8
**justify** [1] - 4747:22
**justifying** [1] - 4720:16
**JV** [5] - 4675:13, 4675:14, 4675:18, 4680:6, 4910:12

## K

**KATE** [1] - 4666:24
**Kathleen** [1] - 4827:5
**Kathy** [1] - 4846:5

**keep** [12] - 4669:16, 4725:24, 4742:10, 4746:17, 4769:10, 4805:5, 4813:20, 4872:11, 4890:3, 4920:24, 4944:1, 4952:24
**keeping** [1] - 4918:7
**keeps** [1] - 4726:13
**Ken** [8] - 4678:15, 4775:19, 4775:22, 4775:24, 4846:12, 4913:4, 4942:1, 4970:20
**Ken's** [2] - 4846:12, 4847:12
**kept** [8] - 4761:19, 4776:1, 4896:5, 4920:5, 4920:8, 4924:2, 4924:3
**Kevin** [4] - 4669:3, 4827:4, 4827:17
**KEVIN** [1] - 4667:12
**Key** [1] - 4952:8
**key** [14] - 4758:7, 4779:5, 4793:14, 4793:23, 4793:24, 4837:21, 4840:14, 4850:18, 4952:15, 4952:20, 4953:4, 4953:5, 4953:8
**Keys** [1] - 4942:20
**Kiernan** [2] - 4858:9, 4858:20
**KIERNAN** [1] - 4858:9
**Kim** [1] - 4706:2
**kind** [4] - 4776:18, 4781:23, 4925:25, 4977:3
**kinds** [3] - 4692:25, 4747:13, 4890:25
**kit** [2] - 4941:24, 4942:1
**knee** [1] - 4971:9
**knock** [1] - 4932:22
**knock-on** [1] - 4932:22
**knowing** [1] - 4958:21
**knowledge** [7] - 4855:22, 4893:17, 4893:21, 4898:8, 4898:10, 4969:10, 4971:14
**knowledgeable** [1] - 4836:19
**known** [1] - 4687:22
**KOROLOGOS** [1] - 4667:15

## L

**labeled** [1] - 4960:8
**Labor** [3] - 4673:11, 4673:13, 4674:3
**lack** [4] - 4797:15, 4797:19, 4799:7, 4929:23
**lags** [3] - 4903:11, 4904:7, 4904:8
**laid** [2] - 4698:12, 4732:24
**landscape** [1] - 4696:16
**language** [5] - 4812:25, 4825:22, 4828:3, 4849:10, 4849:13
**LANGWITH** [1] - 4868:15
**Langwith** [1] - 4708:8, 4868:15
**lapsed** [1] - 4701:4
**large** [33] - 4680:17, 4703:19, 4705:1, 4717:21, 4718:2, 4718:20, 4739:22, 4739:25, 4740:1, 4740:3, 4740:6, 4744:22, 4753:18, 4756:15, 4756:17, 4768:24, 4769:12, 4772:13, 4779:13, 4779:24, 4781:10, 4781:20, 4786:11, 4786:13, 4786:23, 4787:4, 4832:4, 4832:22, 4886:24, 4944:2, 4945:14, 4960:14
**larger** [8] - 4703:20, 4704:10, 4744:19, 4747:6, 4781:11, 4781:25, 4818:20, 4904:25
**largest** [2] - 4805:21, 4806:14
**last** [38] - 4672:24, 4673:3, 4674:15, 4677:13, 4709:14, 4730:21, 4741:3, 4749:25, 4751:16, 4752:9, 4753:3, 4762:17, 4766:4, 4766:6, 4778:8, 4785:24, 4788:16, 4812:24, 4814:25, 4821:2, 4828:10, 4844:2, 4851:23, 4857:16, 4873:1,

**labeled** — (see above)

**Leave** [1] - 4931:20
**leave** [4] - 4752:10, 4846:22, 4864:16, 4903:6
**led** [1] - 4748:1
**left** [17] - 4670:23,

4878:17, 4879:11, 4887:4, 4896:24, 4897:6, 4907:13, 4919:7, 4921:16, 4928:19, 4929:9, 4935:14, 4937:13
**lastly** [1] - 4915:4
**late** [5] - 4672:23, 4673:3, 4679:14, 4921:4, 4971:15
**Laterza** [2] - 4849:20, 4850:3
**LATERZA** [1] - 4849:20
**Laterzo** [5] - 4821:23, 4822:6, 4824:14, 4825:5, 4825:9
**LATERZO** [1] - 4821:24
**latest** [2] - 4769:24, 4976:21
**Latin** [1] - 4792:22
**Lauderdale** [1] - 4935:21
**launch** [3] - 4926:5, 4926:20, 4937:24
**launched** [2] - 4772:17, 4772:18
**law** [1] - 4668:18
**laws** [1] - 4847:10
**lawsuit** [5] - 4794:14, 4794:18, 4875:22, 4894:4, 4961:4
**lawsuits** [1] - 4875:23
**lay** [1] - 4727:3
**laying** [1] - 4844:11
**lead** [7] - 4811:8, 4887:6, 4902:14, 4967:18, 4975:6, 4975:12, 4976:5
**leader** [1] - 4889:2
**leading** [4] - 4681:8, 4753:14, 4759:20, 4794:25
**leads** [5] - 4782:9, 4810:24, 4834:9, 4902:14
**learned** [2] - 4941:7, 4941:8
**least** [9] - 4672:20, 4675:15, 4680:17, 4747:12, 4751:7, 4768:5, 4873:24, 4910:14, 4952:16

4679:25, 4719:25, 4720:22, 4722:9, 4807:6, 4808:10, 4808:14, 4852:24, 4870:24, 4871:4, 4889:16, 4908:18, 4931:3, 4931:16, 4952:14
**left-hand** [4] - 4722:9, 4808:10, 4808:14
**legal** [1] - 4933:7
**legislation** [2] - 4878:12, 4879:4
**Lehigh** [2] - 4677:2, 4677:5
**length** [2] - 4687:1, 4978:1
**Lennon** [1] - 4856:13
**LENNON** [1] - 4856:14
**lens** [3] - 4694:5, 4961:24, 4961:25
**less** [8] - 4686:4, 4695:25, 4721:25, 4748:15, 4749:3, 4906:22, 4907:3
**lessening** [1] - 4883:23
**letter** [19] - 4672:22, 4673:8, 4757:25, 4765:19, 4765:21, 4768:13, 4774:1, 4774:4, 4775:7, 4824:19, 4825:15, 4825:16, 4826:9, 4826:10, 4835:18, 4835:20, 4835:22, 4942:1
**letters** [6] - 4669:5, 4757:10, 4835:24, 4838:9, 4941:11, 4942:15
**letting** [1] - 4971:23
**level** [11] - 4687:9, 4736:3, 4756:23, 4859:3, 4872:2, 4931:2, 4931:15, 4940:22, 4940:23, 4960:7, 4965:23
**levels** [7] - 4697:20, 4748:21, 4750:16, 4751:12, 4920:11, 4920:12, 4938:5
**lever** [1] - 4751:25
**leverage** [1] - 4878:20
**leveraging** [1] - 4759:15
**Lexington** [1] - 4667:14
**Liberty** [2] - 4736:13, 4822:12

**LIF** [38] - 4743:22, 4750:11, 4750:19, 4800:6, 4800:9, 4806:15, 4806:18, 4808:22, 4810:17, 4810:18, 4831:2, 4831:13, 4831:16, 4831:20, 4831:21, 4832:15, 4832:20, 4902:2, 4902:3, 4903:11, 4903:13, 4903:18, 4904:2, 4905:20, 4905:22, 4905:25, 4906:1, 4906:2, 4906:7, 4906:8, 4907:12, 4909:2, 4909:15, 4909:25, 4910:1, 4910:3, 4910:6
**life** [1] - 4940:14
**LIFs** [2] - 4906:3, 4907:12
**light** [1] - 4931:11
**Likely** [1] - 4953:3
**likely** [2] - 4850:22, 4856:20
**limit** [1] - 4675:16
**line** [24] - 4758:11, 4766:9, 4766:22, 4767:5, 4785:10, 4798:2, 4833:14, 4837:20, 4841:9, 4845:17, 4846:9, 4848:2, 4851:12, 4855:5, 4857:17, 4868:16, 4869:24, 4877:9, 4881:18, 4933:1, 4933:3, 4935:10, 4958:2, 4967:20
**Line** [2] - 4845:17, 4933:2
**lines** [3] - 4779:17, 4851:6, 4960:25
**lingered** [1] - 4673:7
**lingering** [1] - 4908:1
**LISA** [1] - 4666:25
**list** [16] - 4704:14, 4704:15, 4704:19, 4807:2, 4813:12, 4814:21, 4824:7, 4874:5, 4877:16, 4884:23, 4885:5, 4885:13, 4889:24, 4908:23
**listed** [16] - 4670:19, 4670:22, 4723:16, 4807:17, 4814:18, 4830:22, 4841:21,

4850:6, 4850:8, 4851:17, 4869:17, 4909:16, 4909:21, 4909:25, 4910:5, 4953:4
**listing** [3] - 4793:14, 4850:18, 4871:12
**lists** [8] - 4704:10, 4807:20, 4808:10, 4822:11, 4837:23, 4870:4, 4874:2, 4942:20
**literally** [1] - 4689:20
**litigation** [1] - 4876:7
**LITIGATION** [1] - 4666:19
**live** [8] - 4797:11, 4920:14, 4932:8, 4935:19, 4935:25, 4948:3, 4949:21
**live-stream** [1] - 4935:25
**lived** [2] - 4794:21, 4974:7
**lives** [2] - 4932:8, 4940:6
**living** [1] - 4904:20
**LLP** [2] - 4667:9, 4667:14
**load** [1] - 4926:14
**local** [5] - 4718:17, 4785:16, 4785:17, 4785:18
**location** [11] - 4782:21, 4783:13, 4796:22, 4800:23, 4800:25, 4803:17, 4818:23, 4832:1, 4833:1, 4891:7
**Location** [2] - 4800:13, 4806:16
**locations** [37] - 4743:22, 4743:24, 4744:1, 4783:16, 4788:25, 4796:15, 4797:1, 4797:4, 4797:6, 4797:8, 4797:15, 4797:19, 4801:2, 4802:23, 4803:1, 4803:6, 4805:23, 4806:8, 4806:10, 4806:22, 4807:23, 4808:1, 4818:13, 4818:14, 4818:15, 4818:19, 4819:19, 4839:6, 4842:23, 4892:12, 4901:20, 4902:10, 4904:8, 4905:4, 4906:17, 4925:24,

4973:8
**Locations** [3] - 4799:14, 4808:8, 4812:22
**lodging** [3] - 4735:18, 4735:22
**logical** [1] - 4904:1
**logo** [4] - 4817:5, 4817:7, 4817:8, 4945:12
**long-term** [3] - 4704:1, 4782:2, 4799:16
**longer-term** [1] - 4686:25
**longest** [1] - 4669:25
**Longs** [1] - 4841:22
**look** [183] - 4691:12, 4692:8, 4693:10, 4693:14, 4695:14, 4696:16, 4696:17, 4696:18, 4697:2, 4705:13, 4705:20, 4706:9, 4708:2, 4718:22, 4719:18, 4720:19, 4723:7, 4733:9, 4733:16, 4734:21, 4735:14, 4736:7, 4737:8, 4737:18, 4738:12, 4742:3, 4744:4, 4747:5, 4749:9, 4749:22, 4750:8, 4751:16, 4753:3, 4753:13, 4757:17, 4758:5, 4763:19, 4765:13, 4765:21, 4768:15, 4768:16, 4769:21, 4770:1, 4773:13, 4773:22, 4774:10, 4778:17, 4779:10, 4780:18, 4780:19, 4790:11, 4791:3, 4796:19, 4799:4, 4801:18, 4804:5, 4804:7, 4804:18, 4804:20, 4805:9, 4805:14, 4806:21, 4808:10, 4808:20, 4809:4, 4809:9, 4809:16, 4811:22, 4812:10, 4812:18, 4812:24, 4814:13, 4815:10, 4821:6, 4821:8, 4822:21, 4823:14, 4824:12, 4824:18, 4825:15, 4833:22, 4834:2, 4837:24, 4839:16, 4840:10,

4843:2, 4844:2, 4844:15, 4846:21, 4850:2, 4850:13, 4850:14, 4852:13, 4854:16, 4854:22, 4855:20, 4859:25, 4863:12, 4866:7, 4866:11, 4869:2, 4869:4, 4869:13, 4870:22, 4873:3, 4873:17, 4874:16, 4876:13, 4877:8, 4878:1, 4878:7, 4878:17, 4880:12, 4882:11, 4883:7, 4884:18, 4885:19, 4886:16, 4887:16, 4887:21, 4894:20, 4894:25, 4895:6, 4895:8, 4896:18, 4896:19, 4896:24, 4897:6, 4897:22, 4898:5, 4902:21, 4902:22, 4903:7, 4905:16, 4906:6, 4906:15, 4909:7, 4918:25, 4936:8, 4936:13, 4937:7, 4939:6, 4942:19, 4944:20, 4945:13, 4946:7, 4946:20, 4947:25, 4948:1, 4948:24, 4949:15, 4949:24, 4951:4, 4951:5, 4951:9, 4951:12, 4951:18, 4952:5, 4953:25, 4954:15, 4955:3, 4955:5, 4956:1, 4957:2, 4957:21, 4959:10, 4959:24, 4960:3, 4961:24, 4962:24, 4963:15, 4964:18, 4965:9, 4966:9, 4967:16, 4968:5, 4970:11, 4972:2, 4972:10, 4973:19, 4976:12
**looked** [11] - 4711:9, 4746:25, 4770:5, 4771:4, 4820:4, 4859:20, 4861:10, 4870:11, 4872:8, 4884:13, 4906:24
**looking** [30] - 4696:19, 4709:18, 4711:12, 4712:24, 4713:10, 4732:2, 4732:19, 4732:22, 4735:10, 4749:10, 4749:21, 4757:8, 4794:10,

4801:20, 4802:13, 4803:14, 4825:8, 4833:7, 4833:13, 4867:12, 4871:18, 4872:24, 4906:16, 4907:13, 4946:10, 4946:21, 4960:5, 4970:6, 4975:9
**looks** [15] - 4711:19, 4719:2, 4738:15, 4757:21, 4770:12, 4802:6, 4807:5, 4808:16, 4808:19, 4826:16, 4842:9, 4870:23, 4883:1, 4970:13, 4972:12
**loop** [7] - 4679:24, 4701:23, 4720:3, 4720:5, 4720:14, 4889:6, 4933:23
**lose** [6] - 4713:5, 4754:3, 4780:5, 4921:4, 4921:7
**losing** [3] - 4739:4, 4772:12, 4777:23
**loss** [1] - 4727:14
**lost** [3] - 4878:22, 4894:6, 4967:21
**loud** [3] - 4865:14, 4895:2, 4897:8
**love** [2] - 4673:24, 4744:16
**low** [5] - 4745:6, 4751:15, 4909:18, 4922:18
**lower** [45] - 4686:21, 4688:10, 4691:10, 4695:24, 4703:22, 4705:3, 4705:7, 4705:17, 4705:18, 4714:2, 4722:9, 4728:9, 4728:13, 4728:23, 4729:7, 4739:2, 4741:12, 4745:3, 4747:11, 4748:6, 4748:14, 4749:4, 4752:6, 4760:24, 4776:24, 4777:6, 4777:7, 4777:14, 4777:15, 4834:18, 4862:15, 4865:5, 4867:18, 4886:2, 4904:10, 4904:11, 4906:18, 4906:19, 4909:1, 4909:6, 4909:16, 4965:14, 4965:16
**lowering** [7] - 4688:11, 4703:24, 4705:8, 4728:6,

4748:18, 4754:8,
4778:5
**lowers** [4] - 4686:17,
4754:8, 4754:10,
4815:24
**lowest** [2] - 4807:9,
4906:25
**loyal** [5] - 4706:18,
4706:24, 4726:9,
4838:10, 4838:14
**Loyalist** [1] - 4837:4
**loyalty** [20] - 4688:25,
4713:23, 4722:10,
4722:17, 4723:14,
4759:15, 4759:18,
4759:23, 4759:24,
4760:3, 4762:8,
4837:6, 4841:11,
4870:18, 4921:25,
4938:21, 4938:22,
4940:22, 4940:23
**LTOs** [1] - 4872:1
**lunch** [1] - 4828:23
**Luncheon** [1] - 4829:2
**luxury** [1] - 4799:19

# M

**machine** [1] - 4801:1
**machines** [1] -
4677:22
**Macquarie** [2] -
4908:8
**mail** [56] - 4691:17,
4691:21, 4708:7,
4721:5, 4737:19,
4737:22, 4753:9,
4790:15, 4798:1,
4821:9, 4822:22,
4823:9, 4827:3,
4827:16, 4827:20,
4828:10, 4828:11,
4839:22, 4840:7,
4842:9, 4844:2,
4845:16, 4845:25,
4846:1, 4846:3,
4846:9, 4848:1,
4849:10, 4849:14,
4849:18, 4849:19,
4850:3, 4850:6,
4854:25, 4855:11,
4856:13, 4856:19,
4857:2, 4857:16,
4857:22, 4858:8,
4860:6, 4868:14,
4876:13, 4876:21,
4877:8, 4877:14,
4877:25, 4878:3,
4880:13, 4897:25,
4951:13, 4958:2,

4978:13
**mailing** [2] - 4784:24,
4850:17
**mails** [2] - 4828:2,
4941:11
**main** [2] - 4749:25,
4896:13
**maintain** [8] -
4691:24, 4713:25,
4749:5, 4862:5,
4864:2, 4940:25,
4944:23, 4969:3
**maintaining** [1] -
4754:5
**major** [5] - 4708:20,
4776:2, 4779:18,
4859:2, 4865:11
**majority** [3] - 4704:12,
4803:11, 4811:19
**mall** [1] - 4736:13
**man** [1] - 4971:5
**manage** [9] - 4919:17,
4924:6, 4943:10,
4945:4, 4946:1,
4946:3, 4948:14,
4961:8, 4965:9
**managed** [5] - 4680:8,
4681:21, 4929:15,
4945:19, 4948:15
**Management** [3] -
4874:17, 4874:21,
4880:16
**management** [22] -
4676:9, 4676:12,
4679:3, 4679:6,
4679:10, 4681:2,
4681:3, 4681:16,
4683:10, 4687:11,
4698:16, 4699:16,
4700:16, 4715:16,
4715:18, 4717:6,
4717:21, 4730:11,
4760:5, 4821:11,
4914:25, 4943:5
**manager** [4] -
4677:14, 4786:23,
4787:6, 4859:22
**manager's** [1] -
4699:22
**managers** [2] -
4718:8, 4786:16
**manages** [2] -
4913:25, 4914:1
**managing** [7] -
4669:11, 4716:17,
4901:21, 4914:25,
4917:10, 4945:19,
4953:1
**manifest** [1] - 4929:2
**manifests** [1] -

4928:24
**manufacturers** [2] -
4723:1, 4723:5
**March** [1] - 4824:21
**margin** [1] - 4729:16
**margins** [3] - 4729:8,
4729:10, 4735:12
**MARK** [1] - 4666:22
**Mark** [1] - 4796:10
**marked** [22] - 4691:13,
4733:13, 4771:17,
4791:15, 4798:9,
4802:2, 4804:12,
4812:6, 4813:24,
4821:22, 4823:3,
4825:3, 4827:14,
4830:10, 4895:22,
4937:6, 4949:14,
4952:4, 4955:25,
4957:20, 4972:9,
4972:22
**market** [43] - 4670:6,
4682:19, 4685:10,
4698:14, 4700:8,
4712:19, 4713:4,
4713:12, 4717:21,
4717:23, 4729:25,
4750:13, 4780:22,
4792:25, 4832:18,
4847:11, 4847:13,
4849:3, 4849:10,
4883:17, 4884:5,
4886:23, 4890:10,
4891:11, 4892:13,
4915:2, 4915:22,
4916:15, 4921:7,
4926:25, 4927:1,
4928:14, 4931:11,
4937:24, 4938:2,
4938:24, 4940:15,
4940:17, 4950:13,
4950:22, 4950:25,
4955:17, 4968:7
**Market** [8] - 4805:25,
4955:6, 4955:7,
4955:8, 4955:11,
4955:14, 4956:16,
4957:8
**marketed** [1] -
4925:23
**marketers** [1] -
4717:18
**marketing** [117] -
4672:9, 4677:17,
4678:19, 4679:2,
4680:15, 4680:16,
4681:7, 4681:8,
4683:10, 4685:23,
4687:13, 4687:14,
4687:17, 4687:18,

4688:9, 4688:11,
4688:13, 4688:16,
4688:17, 4688:23,
4694:8, 4697:23,
4698:1, 4698:8,
4698:14, 4698:20,
4699:3, 4699:10,
4699:15, 4699:19,
4699:20, 4699:24,
4700:1, 4700:5,
4700:12, 4700:16,
4700:19, 4700:22,
4702:16, 4702:17,
4702:21, 4703:2,
4703:4, 4704:1,
4715:18, 4715:21,
4716:23, 4716:24,
4717:8, 4717:14,
4717:17, 4717:20,
4717:23, 4718:2,
4718:5, 4720:21,
4722:24, 4723:21,
4724:6, 4730:11,
4739:21, 4739:22,
4740:16, 4740:18,
4758:10, 4758:14,
4761:7, 4761:21,
4762:6, 4766:22,
4766:25, 4767:3,
4768:4, 4772:5,
4772:16, 4772:18,
4779:25, 4781:22,
4782:1, 4785:23,
4787:8, 4806:1,
4806:2, 4823:16,
4825:24, 4834:23,
4841:10, 4847:15,
4849:14, 4852:20,
4889:10, 4889:22,
4890:1, 4890:4,
4890:18, 4891:12,
4891:14, 4892:2,
4899:18, 4900:17,
4914:22, 4916:7,
4916:10, 4916:17,
4917:3, 4917:5,
4923:17, 4923:19,
4923:20, 4923:23,
4924:1, 4924:13,
4935:1, 4966:15,
4976:10
**Marketing** [14] -
4718:7, 4718:13,
4720:23, 4746:11,
4841:1, 4843:3,
4850:16, 4907:19,
4913:2, 4913:5,
4914:7, 4914:18,
4916:6, 4923:16
**marketplace** [38] -
4722:23, 4722:25,

4747:4, 4761:22,
4786:24, 4786:25,
4792:23, 4792:24,
4810:22, 4886:25,
4915:3, 4915:20,
4917:21, 4917:24,
4918:3, 4918:15,
4921:12, 4923:21,
4923:23, 4923:25,
4927:3, 4927:13,
4928:11, 4931:14,
4937:20, 4939:14,
4947:1, 4947:16,
4948:6, 4948:15,
4949:21, 4950:20,
4951:16, 4955:10,
4956:12, 4958:19,
4959:5, 4960:23
**Marketplace** [3] -
4915:1, 4915:13,
4915:14
**markets** [13] -
4785:19, 4785:21,
4793:14, 4793:15,
4793:24, 4794:1,
4834:10, 4841:23,
4848:24, 4850:19,
4903:12, 4950:14,
4968:10
**Mart** [10] - 4697:13,
4703:20, 4832:4,
4832:8, 4832:12,
4832:24, 4926:23,
4927:1, 4927:5,
4927:11
**MARYLAND** [1] -
4666:5
**mass** [4] - 4867:16,
4915:9, 4925:23,
4973:15
**MasterCard** [27] -
4697:5, 4720:15,
4728:19, 4745:10,
4784:8, 4797:3,
4797:6, 4801:6,
4803:2, 4810:12,
4810:23, 4817:6,
4823:16, 4823:17,
4823:23, 4825:23,
4828:9, 4853:3,
4853:8, 4863:21,
4881:24, 4890:7,
4890:8, 4892:16,
4893:22, 4894:5,
4940:5
**MasterCard's** [1] -
4707:14
**material** [2] - 4782:25,
4815:20
**materials** [13] -

4718:16, 4730:9,
4745:9, 4783:18,
4783:22, 4785:1,
4785:20, 4790:1,
4815:13, 4816:7,
4816:18, 4816:23,
4900:21
**math** [1] - 4766:20
**matter** [10] - 4684:22,
4716:6, 4740:11,
4744:9, 4780:9,
4786:4, 4941:14,
4945:21, 4947:3
**Matter** [2] - 4829:3,
4974:25
**matters** [1] - 4829:1
**MATTHEW** [1] -
4667:16
**maximum** [1] -
4712:13
**Maximum** [1] - 4711:6
**MBA** [2] - 4677:4,
4677:5
**MBNA** [5] - 4948:22,
4949:2, 4949:5,
4949:18, 4950:2
**McCurdy** [5] -
4696:10, 4696:13,
4876:14, 4877:17,
4877:20
**mean** [82] - 4683:15,
4684:20, 4685:8,
4685:19, 4697:3,
4704:7, 4706:17,
4710:7, 4711:7,
4712:20, 4713:8,
4713:12, 4714:8,
4720:13, 4729:1,
4736:5, 4736:9,
4736:21, 4740:20,
4741:7, 4746:19,
4750:24, 4752:18,
4755:24, 4762:1,
4764:21, 4768:23,
4775:25, 4776:2,
4779:22, 4781:12,
4782:18, 4784:6,
4784:17, 4792:12,
4793:24, 4813:5,
4816:15, 4819:5,
4827:17, 4828:16,
4842:13, 4862:10,
4872:10, 4879:2,
4913:18, 4915:7,
4916:7, 4916:21,
4917:15, 4918:16,
4921:9, 4921:21,
4923:20, 4924:8,
4927:4, 4927:16,
4930:25, 4931:1,

4931:17, 4932:15,
4935:8, 4937:16,
4941:15, 4941:17,
4943:1, 4943:5,
4943:14, 4943:24,
4944:25, 4950:23,
4953:11, 4956:24,
4959:18, 4963:5,
4963:10, 4967:9,
4967:23, 4969:11,
4973:24, 4973:25
**meaning** [10] -
4697:18, 4729:25,
4746:25, 4758:12,
4771:4, 4921:10,
4921:18, 4930:19,
4945:15
**meaningful** [1] -
4917:20
**meaningless** [1] -
4969:24
**meanings** [1] -
4817:22
**means** [16] - 4689:19,
4689:22, 4714:16,
4727:19, 4753:19,
4753:23, 4779:24,
4789:6, 4793:18,
4809:18, 4841:2,
4842:6, 4863:13,
4869:25, 4870:15,
4950:24
**meant** [4] - 4690:9,
4707:25, 4943:3,
4956:5
**measurable** [1] -
4966:3
**measure** [14] -
4744:18, 4806:8,
4903:22, 4905:25,
4922:3, 4930:21,
4943:21, 4944:4,
4946:12, 4954:12,
4958:6, 4959:23
**measured** [7] -
4797:15, 4797:19,
4831:8, 4952:16,
4953:15, 4954:5,
4955:13
**measurements** [2] -
4944:1, 4946:13
**measures** [4] -
4831:10, 4843:13,
4886:5, 4953:6,
4954:17, 4955:3,
4977:9, 4977:14
**measuring** [1] -
4943:24, 4953:9,
4955:15
**mechanical** [1] -

4667:21
**mechanisms** [1] -
4762:13
**Medco** [4] - 4855:22,
4856:19, 4898:1,
4898:8
**media** [5] - 4915:4,
4915:7, 4915:8,
4915:10
**Medina** [2] - 4691:18,
4691:19
**meet** [4] - 4684:21,
4868:17, 4886:10,
4939:2
**Meeting** [2] - 4812:2,
4813:13
**meeting** [10] -
4801:22, 4802:8,
4802:10, 4802:11,
4858:25, 4860:22,
4861:18, 4886:8,
4932:24, 4933:8
**meetings** [1] -
4853:23
**member** [10] -
4818:24, 4822:10,
4939:3, 4940:24,
4941:8, 4941:19,
4942:3, 4950:12,
4954:19
**members** [16] -
4814:4, 4814:6,
4818:12, 4820:8,
4826:13, 4856:6,
4856:11, 4856:21,
4941:10, 4941:25,
4942:7, 4944:22,
4945:23, 4946:6,
4950:9, 4954:4
**members'** [2] -
4817:25, 4820:7
**membership** [1] -
4940:24
**Membership** [4] -
4841:3, 4841:5,
4842:5
**memo** [9] - 4963:15,
4966:13, 4967:5,
4967:24, 4969:5,
4969:15, 4969:21,
4970:15, 4970:20
**memories** [1] - 4963:5
**memory** [2] - 4856:12,
4887:7
**memos** [1] - 4970:13
**mention** [2] - 4856:1,
4857:20
**mentioned** [34] -
4682:12, 4685:5,
4689:2, 4690:8,

4693:22, 4695:6,
4696:5, 4706:10,
4714:12, 4718:2,
4725:9, 4725:10,
4743:12, 4752:1,
4785:14, 4862:8,
4879:10, 4888:25,
4913:17, 4915:13,
4916:5, 4917:9,
4923:19, 4929:12,
4930:14, 4930:24,
4934:21, 4943:4,
4947:9, 4947:13,
4947:18, 4950:7,
4950:11, 4975:2
**mentioning** [1] -
4850:20
**mentions** [3] - 4760:6,
4762:20, 4871:21
**merchandisers** [1] -
4867:16
**merchant** [190] -
4671:14, 4678:4,
4679:6, 4681:23,
4681:24, 4682:6,
4682:10, 4682:22,
4683:6, 4684:3,
4684:5, 4684:9,
4684:16, 4684:17,
4685:20, 4685:25,
4686:9, 4686:11,
4686:12, 4686:13,
4686:15, 4686:19,
4687:1, 4689:1,
4690:3, 4690:11,
4690:15, 4690:22,
4690:23, 4691:6,
4691:7, 4691:9,
4692:15, 4692:17,
4693:1, 4693:6,
4694:2, 4694:5,
4694:19, 4694:20,
4694:22, 4695:4,
4695:22, 4697:5,
4697:25, 4698:7,
4698:17, 4698:20,
4699:9, 4699:10,
4700:2, 4700:4,
4700:24, 4701:5,
4701:13, 4702:18,
4702:25, 4703:13,
4703:22, 4703:23,
4704:2, 4704:5,
4705:2, 4705:4,
4705:7, 4705:13,
4707:15, 4710:6,
4710:19, 4711:5,
4712:23, 4714:4,
4714:14, 4714:22,
4715:11, 4715:13,
4717:22, 4720:2,

4720:10, 4721:14,
4721:21, 4722:13,
4723:4, 4725:4,
4725:9, 4725:14,
4725:18, 4726:3,
4733:5, 4733:21,
4733:23, 4734:12,
4736:22, 4736:23,
4737:1, 4737:2,
4740:6, 4741:8,
4742:24, 4742:25,
4748:2, 4748:4,
4748:8, 4751:1,
4751:8, 4752:5,
4753:18, 4754:2,
4754:9, 4756:15,
4756:17, 4759:8,
4760:4, 4768:24,
4769:24, 4772:11,
4772:13, 4780:5,
4780:11, 4781:23,
4785:25, 4786:23,
4787:3, 4787:4,
4787:15, 4787:22,
4788:5, 4788:21,
4788:23, 4789:18,
4790:5, 4793:8,
4794:21, 4795:5,
4797:15, 4797:19,
4798:11, 4798:19,
4800:22, 4800:25,
4801:12, 4802:15,
4808:23, 4810:13,
4816:13, 4819:7,
4825:18, 4826:3,
4828:5, 4832:4,
4832:22, 4833:21,
4844:25, 4862:25,
4863:20, 4864:1,
4870:19, 4872:15,
4884:5, 4889:18,
4891:6, 4891:8,
4891:9, 4891:23,
4892:4, 4902:18,
4903:14, 4904:24,
4904:25, 4906:9,
4906:13, 4906:20,
4916:2, 4917:8,
4938:19, 4943:16,
4943:22, 4944:13,
4944:18, 4954:9,
4960:20, 4968:7,
4969:19, 4971:16,
4972:14, 4973:8
**Merchant** [29] -
4671:17, 4678:13,
4678:20, 4678:24,
4679:1, 4679:22,
4679:25, 4680:12,
4682:24, 4702:21,
4705:25, 4706:6,

4715:22, 4716:18,
4719:4, 4746:2,
4781:16, 4786:5,
4792:18, 4794:15,
4794:25, 4874:24,
4875:3, 4879:15,
4881:3, 4889:15,
4901:22, 4905:20,
4917:8
**merchant's** [1] -
4884:3
**merchant-friendly** [1]
- 4748:4
**Merchants** [4] -
4875:21, 4881:18,
4886:1, 4891:2
**merchants** [320] -
4679:11, 4680:14,
4680:15, 4681:4,
4681:9, 4681:17,
4681:18, 4682:2,
4683:13, 4683:16,
4685:10, 4685:22,
4686:5, 4686:10,
4687:10, 4687:16,
4688:2, 4688:13,
4688:22, 4688:24,
4689:7, 4689:23,
4689:24, 4691:2,
4694:8, 4694:10,
4694:19, 4695:10,
4695:14, 4695:19,
4695:24, 4696:20,
4696:21, 4696:23,
4696:25, 4697:7,
4698:8, 4698:14,
4698:18, 4699:17,
4699:20, 4699:23,
4699:25, 4700:11,
4700:13, 4700:15,
4701:1, 4701:22,
4701:24, 4702:5,
4702:6, 4702:9,
4703:5, 4703:9,
4704:8, 4704:13,
4704:16, 4704:25,
4712:17, 4713:5,
4713:15, 4713:16,
4713:20, 4714:19,
4715:1, 4716:16,
4716:19, 4717:5,
4717:11, 4717:12,
4717:13, 4717:15,
4717:21, 4717:24,
4718:2, 4718:3,
4718:6, 4718:9,
4718:12, 4718:14,
4718:18, 4718:20,
4719:22, 4721:12,
4721:24, 4722:6,
4723:13, 4724:16,

4725:7, 4725:8,
4725:24, 4726:1,
4726:5, 4726:8,
4726:9, 4726:12,
4726:13, 4726:14,
4726:16, 4726:20,
4730:15, 4730:19,
4730:22, 4731:5,
4731:7, 4731:9,
4735:10, 4739:3,
4739:4, 4739:5,
4739:6, 4739:16,
4739:22, 4740:1,
4740:3, 4740:10,
4740:12, 4740:24,
4742:4, 4742:23,
4743:2, 4743:6,
4743:10, 4743:12,
4743:13, 4743:18,
4743:23, 4744:10,
4744:19, 4744:22,
4745:16, 4745:20,
4746:9, 4746:22,
4747:1, 4747:6,
4747:16, 4748:16,
4748:22, 4749:4,
4749:6, 4750:1,
4751:14, 4752:8,
4752:10, 4752:24,
4754:4, 4756:5,
4757:2, 4758:25,
4760:1, 4760:3,
4763:15, 4764:19,
4772:12, 4773:8,
4773:20, 4778:5,
4781:11, 4781:20,
4782:5, 4782:7,
4782:8, 4782:10,
4782:14, 4782:15,
4783:24, 4784:3,
4784:22, 4784:25,
4785:17, 4786:6,
4786:11, 4786:12,
4786:13, 4786:14,
4786:17, 4786:20,
4787:9, 4787:12,
4788:20, 4788:25,
4789:1, 4789:3,
4789:11, 4789:20,
4789:24, 4790:6,
4790:9, 4792:14,
4792:15, 4793:5,
4793:6, 4796:22,
4796:23, 4797:9,
4801:4, 4803:12,
4809:18, 4809:21,
4810:2, 4810:8,
4810:15, 4811:3,
4811:5, 4811:6,
4811:8, 4811:18,
4814:6, 4814:12,

4815:23, 4816:7,
4816:24, 4819:15,
4820:8, 4821:7,
4822:11, 4822:15,
4822:18, 4824:12,
4824:14, 4826:24,
4828:17, 4832:4,
4832:17, 4834:23,
4836:17, 4847:10,
4847:14, 4850:18,
4853:16, 4853:19,
4861:2, 4862:18,
4863:2, 4865:25,
4871:2, 4871:3,
4871:4, 4871:12,
4872:11, 4872:12,
4872:13, 4872:17,
4872:18, 4872:21,
4872:24, 4873:1,
4874:3, 4874:10,
4874:14, 4876:5,
4880:3, 4881:12,
4881:23, 4883:12,
4883:21, 4886:21,
4886:24, 4887:1,
4887:24, 4888:2,
4888:4, 4889:10,
4889:21, 4889:24,
4890:1, 4890:2,
4890:13, 4890:18,
4891:1, 4891:10,
4891:15, 4891:22,
4891:24, 4892:1,
4892:3, 4892:9,
4892:14, 4892:19,
4901:12, 4902:5,
4902:6, 4902:8,
4902:14, 4902:16,
4902:18, 4902:20,
4906:21, 4906:22,
4907:5, 4907:8,
4907:17, 4907:20,
4916:20, 4917:4,
4934:19, 4943:9,
4943:11, 4943:12,
4943:13, 4943:22,
4963:11, 4970:24,
4974:15
**merchants'** [1] -
4697:3
**message** [5] -
4850:19, 4916:15,
4963:19, 4963:25,
4964:5
**messages** [4] -
4773:4, 4916:13,
4964:21, 4965:5
**Messages** [1] -
4963:18
**messaging** [2] -

4904:2, 4918:1
**met** [4] - 4672:4,
4799:1, 4824:9,
4859:18
**method** [1] - 4800:18
**methodologies** [1] -
4922:12
**Methodology** [1] -
4812:19
**methodology** [1] -
4812:20
**methods** [1] - 4883:13
**metrics** [5] - 4796:19,
4903:16, 4907:13,
4944:3, 4959:16
**Metro** [1] - 4750:20
**Michael** [1] - 4839:22
**MICHIGAN** [1] -
4666:5
**mid** [4] - 4704:13,
4751:15, 4909:19,
4965:13
**middle** [15] - 4668:20,
4698:19, 4699:8,
4785:6, 4802:7,
4802:13, 4822:6,
4827:15, 4844:25,
4855:12, 4871:21,
4877:8, 4912:12,
4949:22, 4970:16
**midnight** [4] -
4775:22, 4776:17,
4858:4, 4899:25
**Midwest** [1] - 4904:25
**might** [33] - 4670:13,
4670:14, 4698:9,
4705:12, 4741:5,
4756:21, 4798:24,
4801:1, 4801:4,
4818:19, 4820:17,
4825:13, 4884:18,
4885:8, 4891:8,
4892:8, 4916:13,
4918:12, 4918:18,
4918:19, 4918:20,
4918:23, 4922:20,
4923:12, 4923:14,
4925:16, 4926:13,
4934:5, 4934:12,
4960:2, 4960:23,
4969:14, 4970:10
**MIKE** [1] - 4666:25
**Miller** [1] - 4670:10
**million** [9] - 4810:23,
4837:8, 4837:9,
4838:1, 4869:25,
4873:9, 4902:8,
4933:18
**millions** [6] - 4704:8,
4718:9, 4892:12,

4902:5, 4902:6
**mind** [17] - 4693:20,
4695:19, 4732:20,
4735:7, 4762:1,
4783:6, 4858:24,
4860:19, 4876:24,
4876:25, 4908:18,
4929:22, 4939:9,
4965:5, 4971:10,
4973:3
**minds** [2] - 4910:16,
4964:21
**mine** [2] - 4724:18,
4724:21
**minimum** [1] -
4969:24
**minute** [7] - 4676:24,
4720:21, 4754:15,
4884:25, 4911:16,
4941:20, 4952:12
**minutes** [12] -
4685:13, 4693:3,
4694:12, 4703:8,
4720:24, 4742:14,
4750:4, 4786:3,
4893:10, 4917:10,
4978:2, 4978:5
**Miscellaneous** [1] -
4898:7
**misleading** [1] -
4958:22
**MISSOURI** [1] -
4666:6
**Missouri** [1] - 4667:4
**MITCH** [1] - 4667:7
**MITCHELL** [1] -
4666:24
**MITCHELL-
TOMBRAS** [1] -
4666:24
**mitigate** [1] - 4739:11
**mix** [13] - 4711:4,
4727:15, 4728:2,
4728:5, 4728:24,
4729:7, 4729:12,
4862:18, 4862:22,
4863:7, 4866:21,
4866:24, 4867:19
**MO** [1] - 4667:6
**mock** [1] - 4969:5
**mock-ups** [1] - 4969:5
**mocked** [1] - 4853:7
**mockup** [1] - 4852:21
**mockups** [1] -
4852:14
**Model** [1] - 4794:6
**model** [32] - 4684:25,
4701:23, 4720:13,
4720:18, 4726:18,
4736:21, 4736:22,

4739:5, 4748:13,
4748:17, 4749:8,
4754:7, 4776:3,
4779:6, 4788:14,
4788:19, 4792:4,
4792:5, 4803:10,
4826:13, 4863:24,
4866:17, 4872:19,
4886:12, 4886:14,
4887:15, 4888:8,
4888:14, 4899:21,
4902:13, 4974:14
**modeling** [2] -
4700:24, 4892:13
**models** [1] - 4702:3
**Moffett** [2] - 4877:9,
4878:18
**moment** [18] - 4795:9,
4796:1, 4803:21,
4804:5, 4804:7,
4809:1, 4813:17,
4825:8, 4830:9,
4839:19, 4854:16,
4874:9, 4888:22,
4892:24, 4907:22,
4919:4, 4939:12,
4953:24
**Monday** [1] - 4666:8
**monetary** [3] - 4922:3,
4922:20, 4923:7
**monetization** [1] -
4890:23
**monetize** [1] -
4889:11
**monetized** [3] -
4890:7, 4890:22,
4891:16
**monetizing** [1] -
4889:7
**money** [19] - 4702:11,
4717:4, 4725:17,
4725:19, 4743:9,
4743:10, 4748:15,
4754:11, 4761:12,
4761:18, 4762:11,
4764:4, 4777:8,
4792:3, 4792:7,
4870:16, 4921:17,
4931:23
**moneys** [7] - 4685:25,
4686:5, 4690:14,
4690:16, 4753:1,
4753:25
**monitor** [3] - 4786:1,
4786:5, 4944:12
**MONTANA** [1] -
4666:6
**month** [7] - 4722:16,
4765:16, 4768:14,
4769:1, 4951:9,

4955:10
**monthly** [5] - 4950:17,
4950:18, 4951:8,
4957:11, 4957:13
**months** [11] - 4672:3,
4701:6, 4729:24,
4740:10, 4751:5,
4756:3, 4760:18,
4817:10, 4865:1,
4865:10, 4922:14
**MOORE** [1] - 4667:9
**Morabito** [3] - 4860:6,
4860:14, 4861:1
**MORABITO** [1] -
4860:7
**moral** [2] - 4968:18,
4968:20, 4969:3
**morning** [30] - 4668:3,
4668:5, 4668:6,
4668:14, 4668:16,
4668:18, 4669:3,
4669:6, 4669:22,
4670:21, 4674:22,
4675:5, 4675:6,
4776:9, 4776:14,
4777:17, 4796:10,
4796:14, 4833:3,
4848:13, 4858:5,
4859:12, 4861:8,
4895:24, 4900:2,
4900:4, 4900:12,
4902:22, 4977:24,
4978:20
**most** [29] - 4669:21,
4670:21, 4704:12,
4706:18, 4731:11,
4743:12, 4783:23,
4784:19, 4785:7,
4797:1, 4803:10,
4807:6, 4849:3,
4849:11, 4850:21,
4850:22, 4918:14,
4919:11, 4919:14,
4922:14, 4923:20,
4953:10, 4953:16,
4956:11, 4961:14,
4962:19, 4967:2,
4975:11
**mostly** [3] - 4915:23,
4921:8, 4973:7
**motion** [2] - 4919:8,
4919:10
**motions** [1] - 4669:15
**Motors** [2] - 4921:5,
4921:17
**move** [17] - 4703:6,
4740:25, 4741:4,
4742:8, 4752:19,
4754:13, 4766:21,
4791:22, 4830:8,

4843:19, 4862:13,
4862:22, 4867:15,
4895:14, 4895:24,
4897:19, 4971:2
**moved** [8] - 4733:14,
4741:10, 4741:11,
4752:19, 4867:22,
4868:3, 4972:3,
4973:13
**movie** [2] - 4919:13
**moving** [4] - 4843:22,
4862:6, 4862:20,
4928:5
**MR** [261] - 4668:3,
4668:6, 4668:9,
4668:11, 4668:13,
4668:14, 4668:16,
4669:3, 4669:21,
4669:25, 4670:3,
4670:10, 4670:18,
4671:1, 4671:6,
4671:9, 4671:19,
4671:21, 4671:25,
4672:1, 4672:2,
4672:6, 4672:8,
4672:12, 4672:15,
4672:23, 4673:1,
4673:3, 4673:5,
4673:16, 4673:19,
4673:22, 4673:24,
4674:4, 4674:7,
4674:18, 4674:21,
4675:4, 4683:23,
4684:1, 4691:15,
4692:2, 4692:4,
4693:11, 4705:22,
4708:3, 4709:2,
4709:4, 4718:24,
4719:11, 4719:13,
4719:17, 4733:11,
4734:15, 4734:17,
4734:23, 4737:20,
4738:5, 4738:7,
4741:15, 4742:9,
4742:13, 4742:18,
4742:21, 4749:13,
4749:16, 4749:19,
4753:5, 4754:13,
4755:3, 4755:6,
4755:10, 4755:12,
4755:14, 4757:19,
4765:14, 4767:23,
4768:17, 4770:9,
4770:13, 4770:18,
4770:21, 4770:24,
4771:1, 4771:5,
4771:8, 4771:10,
4771:12, 4771:14,
4773:23, 4778:18,
4790:12, 4791:9,
4791:12, 4795:7,

4795:9, 4796:1,
4796:3, 4796:7,
4796:9, 4798:6,
4798:7, 4798:17,
4801:23, 4801:25,
4802:3, 4803:21,
4804:6, 4804:7,
4804:10, 4804:24,
4805:2, 4805:7,
4809:1, 4812:4,
4812:8, 4813:15,
4813:17, 4813:19,
4813:22, 4817:16,
4819:17, 4820:16,
4820:22, 4820:25,
4821:17, 4821:19,
4822:24, 4823:1,
4824:23, 4824:24,
4827:8, 4827:9,
4827:10, 4828:21,
4830:5, 4830:7,
4835:17, 4837:14,
4838:17, 4838:18,
4838:21, 4840:2,
4840:4, 4841:2,
4845:19, 4845:20,
4848:4, 4848:6,
4849:22, 4849:24,
4852:5, 4852:7,
4852:8, 4852:9,
4855:7, 4855:8,
4855:24, 4856:2,
4858:11, 4858:13,
4860:4, 4867:22,
4867:24, 4868:5,
4868:7, 4868:23,
4868:24, 4875:7,
4875:10, 4875:12,
4876:17, 4876:19,
4876:24, 4880:18,
4880:20, 4880:23,
4883:2, 4883:4,
4884:22, 4884:25,
4885:3, 4885:10,
4888:22, 4892:24,
4893:2, 4893:5,
4893:10, 4893:12,
4894:9, 4894:13,
4894:17, 4895:14,
4895:16, 4895:20,
4896:1, 4896:3,
4896:5, 4896:7,
4896:10, 4896:14,
4902:23, 4903:2,
4903:5, 4907:21,
4907:22, 4908:21,
4910:8, 4910:10,
4910:17, 4910:20,
4910:23, 4911:1,
4911:6, 4911:10,
4911:14, 4911:18,

4911:22, 4912:3,
4912:17, 4912:19,
4914:4, 4936:10,
4936:15, 4937:1,
4937:3, 4940:2,
4949:9, 4949:11,
4951:25, 4952:1,
4953:24, 4955:20,
4955:22, 4956:3,
4956:5, 4957:16,
4957:17, 4959:9,
4963:1, 4966:11,
4972:5, 4972:7,
4972:19, 4972:20,
4975:17, 4977:20,
4978:2, 4978:5,
4978:8, 4978:9,
4978:10, 4978:14,
4978:16, 4979:6,
4979:8, 4979:10,
4979:12, 4979:14,
4979:17, 4979:19
**MSA** [2] - 4705:24
**multiple** [9] - 4707:3,
4800:24, 4817:9,
4817:11, 4848:12,
4850:25, 4872:1,
4946:2
**multiplicity** [1] -
4968:9
**music** [2] - 4935:25,
4936:1
**MUSSER** [1] - 4666:24
**must** [2] - 4859:2,
4884:4
**mutual** [1] - 4865:23
**mutually** [1] - 4865:15
**myriad** [1] - 4932:6

## N

**name** [11] - 4671:15,
4674:13, 4674:15,
4757:14, 4791:17,
4796:10, 4802:14,
4847:12, 4866:11,
4912:11, 4912:12
**named** [4] - 4669:7,
4706:2, 4757:22,
4926:11
**names** [2] - 4807:2,
4894:21
**Nancy** [1] - 4877:11
**national** [2] - 4731:17,
4769:7
**National** [1] - 4959:11
**nature** [1] - 4676:13
**navigate** [1] - 4918:3
**NC** [1] - 4841:24
**NDPs** [1] - 4970:3

Case 1:10-cv-04496-NGG-RER     Document 595     Filed 09/08/14     Page 348 of 368 PageID #: 30742

**near** [1] - 4828:11
**nearby** [1] - 4772:24
**nearly** [2] - 4838:1, 4869:15
**Nearly** [1] - 4964:20
**NEBRASKA** [1] - 4666:6
**necessarily** [3] - 4717:2, 4906:3, 4925:17
**necessary** [3] - 4673:15, 4674:3, 4806:18
**need** [27] - 4677:10, 4700:6, 4723:15, 4724:9, 4725:25, 4750:11, 4755:23, 4799:19, 4805:4, 4828:12, 4846:11, 4856:7, 4878:8, 4897:4, 4905:21, 4929:11, 4932:1, 4940:25, 4954:10, 4954:22, 4956:22, 4962:10, 4962:13, 4968:22, 4968:23, 4968:25
**needed** [11] - 4708:21, 4730:2, 4762:13, 4870:19, 4899:20, 4928:10, 4940:6, 4949:20, 4968:24, 4971:8, 4974:20
**needs** [5] - 4766:7, 4833:24, 4945:19, 4963:22, 4964:7
**negative** [5] - 4961:22, 4961:23, 4969:1, 4976:5
**negatively** [1] - 4977:13
**neglected** [2] - 4893:2, 4978:11
**negotiable** [1] - 4731:2
**negotiate** [5] - 4698:23, 4826:16, 4853:11, 4872:13, 4872:18
**negotiates** [1] - 4787:7
**negotiating** [9] - 4686:11, 4696:24, 4697:11, 4697:14, 4703:13, 4739:14, 4749:5, 4762:15, 4851:21
**Negotiation** [1] - 4875:17
**negotiations** [33] -

4669:9, 4683:6, 4690:19, 4695:23, 4696:23, 4697:22, 4697:23, 4698:4, 4698:12, 4699:4, 4726:16, 4740:8, 4740:9, 4740:12, 4740:14, 4740:19, 4741:2, 4757:2, 4757:7, 4767:16, 4769:8, 4776:22, 4778:1, 4778:4, 4781:20, 4833:4, 4853:23, 4874:10, 4875:24, 4876:7, 4877:5, 4877:22, 4901:7
**Net** [1] - 4711:23
**net** [14] - 4685:16, 4685:17, 4686:3, 4686:4, 4686:15, 4687:14, 4689:2, 4690:9, 4693:4, 4697:24, 4759:10, 4759:13, 4766:17, 4777:14
**network** [29] - 4681:5, 4691:18, 4710:11, 4711:2, 4715:19, 4715:21, 4717:1, 4720:1, 4753:16, 4753:18, 4772:11, 4806:18, 4814:5, 4814:6, 4817:8, 4820:7, 4820:8, 4834:9, 4843:7, 4856:15, 4878:13, 4878:20, 4880:9, 4881:13, 4881:19, 4883:17, 4891:21, 4903:14, 4945:12
**Network** [2] - 4678:12, 4833:15
**networks** [12] - 4785:7, 4798:15, 4800:24, 4863:5, 4880:3, 4881:11, 4883:18, 4883:20, 4888:3, 4893:15, 4893:18, 4897:19
**neutered** [1] - 4878:14
**never** [5] - 4752:24, 4805:2, 4814:20, 4844:10, 4909:6
**NEW** [2] - 4666:1, 4666:6
**new** [40] - 4668:8, 4675:13, 4681:16, 4681:17, 4686:10, 4686:11, 4688:14,

4689:9, 4701:1, 4701:2, 4701:7, 4705:7, 4722:25, 4723:13, 4740:23, 4740:24, 4741:9, 4755:15, 4767:6, 4767:17, 4777:1, 4803:13, 4803:15, 4803:23, 4846:14, 4872:12, 4885:12, 4887:1, 4890:2, 4891:6, 4891:23, 4891:25, 4892:4, 4926:15, 4937:24, 4938:9, 4948:14, 4977:1, 4977:4
**New** [25] - 4666:6, 4667:11, 4667:15, 4667:19, 4673:13, 4673:24, 4677:18, 4745:12, 4750:20, 4751:6, 4751:13, 4779:19, 4781:2, 4793:9, 4807:6, 4841:24, 4909:8, 4909:15, 4909:16, 4909:20, 4909:25, 4922:15, 4922:24
**newly** [2] - 4813:11, 4884:23
**newly-added** [1] - 4813:11
**news** [1] - 4910:11
**newspaper** [1] - 4769:23
**next** [69] - 4678:16, 4680:1, 4692:8, 4709:25, 4710:3, 4711:6, 4711:15, 4711:20, 4711:23, 4713:2, 4713:8, 4713:9, 4719:5, 4722:9, 4723:8, 4742:16, 4752:15, 4754:18, 4757:24, 4758:18, 4759:15, 4761:8, 4763:24, 4764:6, 4764:23, 4766:9, 4766:22, 4767:5, 4767:24, 4770:24, 4774:10, 4781:1, 4781:2, 4786:3, 4791:3, 4794:5, 4795:11, 4800:5, 4803:9, 4826:3, 4829:3, 4837:12, 4837:24, 4840:14, 4841:9, 4841:21, 4842:1, 4842:4, 4851:6,

4860:23, 4863:12, 4866:24, 4867:2, 4871:13, 4886:22, 4895:6, 4907:23, 4911:8, 4912:2, 4939:17, 4947:8, 4951:18, 4968:5, 4969:21, 4972:24, 4974:25
**NGG)(RER** [1] - 4666:4
**Nice** [1] - 4828:12
**NICHOLAS** [1] - 4666:16
**night** [2] - 4672:24, 4673:3
**nimble** [1] - 4977:1
**nine** [3] - 4729:24, 4740:10, 4909:11
**non** [21] - 4778:9, 4778:13, 4784:2, 4786:7, 4786:15, 4787:4, 4787:17, 4787:24, 4788:11, 4789:4, 4789:9, 4794:23, 4817:2, 4837:23, 4841:5, 4862:14, 4876:22, 4936:3, 4961:3, 4963:20, 4964:1
**non-accept** [1] - 4787:24
**non-acceptance** [2] - 4788:11, 4837:23
**non-accepting** [1] - 4789:9
**non-Amex** [1] - 4876:22
**non-cardmembers** [2] - 4963:20, 4964:1
**non-discrimination** [11] - 4778:9, 4778:13, 4784:2, 4786:7, 4786:15, 4787:4, 4787:17, 4789:4, 4794:23, 4817:2, 4961:3
**non-Membership** [1] - 4841:5
**non-T** [1] - 4862:14
**nondiscrimination** [4] - 4843:9, 4961:7, 4961:19, 4962:8
**none** [4] - 4747:14, 4843:13, 4910:3, 4910:5
**normal** [2] - 4890:16, 4934:4
**normally** [2] - 4708:19, 4723:19

**North** [3] - 4733:19, 4793:12, 4798:16
**northeast** [1] - 4745:8
**Northwest** [2] - 4745:1, 4905:5
**Norwich** [1] - 4677:9
**note** [4] - 4775:14, 4866:25, 4885:4, 4968:25
**noted** [1] - 4923:2
**notes** [5] - 4792:10, 4867:13, 4941:14, 4941:22, 4941:23
**nothing** [1] - 4843:16
**notice** [10] - 4756:25, 4771:1, 4813:20, 4825:20, 4828:4, 4844:6, 4844:9, 4844:18, 4885:7, 4885:12
**noticed** [1] - 4789:22
**notion** [3] - 4693:3, 4900:25, 4930:24
**notwithstanding** [1] - 4899:24
**November** [2] - 4821:10, 4894:22
**November/ December** [3] - 4858:22, 4859:6, 4859:11
**number** [82] - 4682:2, 4695:16, 4706:10, 4707:13, 4709:8, 4709:21, 4712:5, 4712:6, 4729:15, 4734:22, 4743:25, 4744:7, 4744:25, 4745:13, 4747:3, 4747:19, 4750:13, 4751:10, 4752:6, 4754:10, 4760:17, 4765:4, 4767:2, 4774:20, 4791:17, 4791:23, 4796:22, 4797:4, 4797:6, 4800:6, 4807:25, 4808:4, 4808:6, 4810:22, 4817:21, 4818:15, 4819:4, 4819:19, 4836:17, 4837:5, 4839:19, 4846:11, 4846:14, 4854:12, 4856:12, 4858:7, 4869:9, 4869:14, 4871:10, 4873:20, 4874:3, 4874:5, 4874:8, 4877:11, 4880:14, 4894:14, 4896:25,

**4897**:5, 4902:1, 4902:7, 4902:9, 4906:8, 4906:20, 4906:21, 4906:22, 4907:12, 4909:11, 4909:15, 4921:25, 4934:3, 4935:9, 4935:12, 4935:22, 4941:11, 4944:25, 4949:15, 4966:13, 4967:12, 4969:14, 4971:21

**numbers** [38] - 4680:18, 4680:19, 4709:9, 4718:10, 4719:19, 4731:8, 4751:19, 4752:17, 4763:6, 4765:3, 4766:20, 4800:9, 4800:13, 4801:7, 4805:1, 4805:3, 4806:10, 4808:15, 4810:25, 4811:1, 4813:20, 4838:11, 4838:12, 4854:14, 4854:16, 4855:24, 4867:12, 4870:8, 4895:10, 4897:7, 4905:25, 4906:7, 4906:9, 4906:15, 4965:17, 4975:10

**NW** [1] - 4666:20

## O

**oath** [1] - 4830:2
**object** [1] - 4876:23
**objection** [52] - 4670:7, 4671:2, 4692:4, 4709:4, 4719:13, 4734:17, 4738:7, 4771:8, 4791:11, 4791:12, 4798:7, 4801:25, 4804:10, 4812:4, 4813:19, 4821:19, 4823:1, 4824:23, 4824:25, 4827:8, 4838:18, 4840:4, 4845:20, 4848:6, 4849:24, 4852:9, 4855:8, 4856:1, 4856:5, 4858:13, 4867:24, 4868:7, 4868:24, 4875:12, 4876:19, 4876:23, 4880:21, 4880:24, 4883:4, 4885:3, 4893:5, 4895:16, 4937:3, 4949:11, 4952:1, 4955:22,

**4957**:17, 4972:7, 4972:20, 4978:14, 4978:16, 4978:18
**objective** [7] - 4700:13, 4717:10, 4746:20, 4805:17, 4839:9, 4842:21, 4896:13
**objectives** [4] - 4700:25, 4717:19, 4853:17, 4859:18
**obligated** [1] - 4932:13
**obtained** [1] - 4889:6
**obviously** [12] - 4707:13, 4760:8, 4768:23, 4824:4, 4857:13, 4859:17, 4876:9, 4892:14, 4896:7, 4921:16, 4934:3, 4946:23
**occasion** [3] - 4798:20, 4823:4, 4823:6
**occasionally** [2] - 4792:25, 4879:19
**occasions** [1] - 4826:23
**occur** [1] - 4775:15
**occurred** [2] - 4736:17, 4827:23
**occurring** [1] - 4898:24
**October** [7] - 4840:1, 4843:25, 4849:21, 4874:18, 4880:14, 4884:21, 4885:20
**Odyssey** [2] - 4753:9, 4753:11
**OF** [5] - 4666:1, 4666:4, 4666:4, 4666:16, 4666:20
**offer** [68] - 4692:2, 4692:21, 4705:12, 4709:2, 4719:11, 4721:13, 4722:1, 4722:9, 4723:23, 4723:24, 4734:15, 4738:5, 4761:14, 4761:16, 4764:20, 4765:11, 4765:12, 4766:1, 4768:8, 4770:9, 4774:11, 4791:9, 4798:6, 4801:23, 4804:6, 4812:3, 4813:15, 4821:17, 4822:24, 4824:22, 4827:11, 4835:14, 4838:17, 4840:2, 4841:5,

**4845**:19, 4848:4, 4849:22, 4852:5, 4852:15, 4852:16, 4852:24, 4855:7, 4858:11, 4860:19, 4867:23, 4868:6, 4868:23, 4875:11, 4876:17, 4880:18, 4883:2, 4884:23, 4893:3, 4930:16, 4931:22, 4932:2, 4932:6, 4937:1, 4943:18, 4946:8, 4949:9, 4951:25, 4955:20, 4957:16, 4972:5, 4972:19, 4978:11
**Offer** [1] - 4841:2
**offered** [7] - 4724:2, 4764:18, 4767:6, 4843:6, 4846:22, 4847:1, 4931:19
**offering** [10] - 4721:9, 4762:11, 4876:24, 4926:15, 4927:13, 4927:24, 4940:9, 4944:19, 4948:14
**offerings** [2] - 4917:21, 4921:23
**Offers** [1] - 4845:18
**offers** [16] - 4702:17, 4702:20, 4721:6, 4722:20, 4760:25, 4774:9, 4776:19, 4777:2, 4777:8, 4835:3, 4835:4, 4835:8, 4835:9, 4835:11, 4928:16, 4943:17
**office** [5] - 4672:24, 4673:1, 4776:10, 4776:13, 4847:7
**Office** [2] - 4667:6, 4667:8
**Officer** [6] - 4913:2, 4913:5, 4914:7, 4914:18, 4916:6, 4923:16
**officer** [9] - 4672:10, 4715:23, 4913:12, 4913:14, 4913:18, 4913:20, 4966:16, 4976:10
**officers** [3] - 4716:1, 4913:21, 4914:2
**official** [2] - 4853:14, 4861:1
**Offline** [1] - 4736:8
**offline** [1] - 4736:9
**offset** [1] - 4752:16

**often** [1] - 4707:24
**OHIO** [1] - 4666:6
**Ohio** [2] - 4667:7, 4667:8
**Oklahoma** [1] - 4807:9
**old** [1] - 4767:20
**Olympics** [1] - 4974:1
**on-site** [1] - 4935:21
**once** [10] - 4703:24, 4769:8, 4769:11, 4772:9, 4843:21, 4849:15, 4878:19, 4926:14, 4951:9, 4955:10
**one** [166] - 4669:7, 4670:13, 4670:14, 4682:12, 4684:5, 4690:13, 4698:7, 4702:16, 4702:18, 4703:7, 4705:12, 4708:3, 4709:21, 4710:25, 4713:14, 4718:12, 4718:24, 4720:22, 4722:13, 4727:13, 4728:5, 4731:1, 4733:11, 4735:18, 4736:16, 4737:8, 4737:20, 4738:11, 4747:1, 4747:9, 4747:10, 4751:1, 4751:5, 4753:3, 4757:19, 4762:22, 4763:21, 4765:3, 4765:6, 4765:23, 4766:4, 4766:8, 4768:17, 4769:6, 4773:23, 4774:13, 4776:9, 4777:20, 4777:23, 4778:8, 4778:18, 4782:20, 4789:7, 4790:10, 4790:12, 4797:16, 4797:20, 4799:7, 4800:5, 4800:25, 4803:21, 4810:1, 4810:18, 4813:9, 4815:1, 4815:2, 4820:22, 4821:14, 4822:3, 4828:23, 4832:4, 4832:23, 4833:1, 4834:6, 4836:18, 4839:19, 4840:11, 4846:2, 4846:11, 4858:22, 4859:7, 4859:11, 4859:20, 4860:2, 4860:22, 4864:16, 4865:9, 4872:8, 4875:7, 4875:8, 4875:10,

**4880**:5, 4881:2, 4884:22, 4892:24, 4893:3, 4894:10, 4897:25, 4900:15, 4903:21, 4906:11, 4906:12, 4906:13, 4906:25, 4907:1, 4907:14, 4907:16, 4907:22, 4914:24, 4918:12, 4919:7, 4920:22, 4921:1, 4921:7, 4925:6, 4930:5, 4932:5, 4932:16, 4932:22, 4934:3, 4934:21, 4935:9, 4938:2, 4941:16, 4941:25, 4943:15, 4944:7, 4944:15, 4945:4, 4948:21, 4950:7, 4950:8, 4950:11, 4952:19, 4953:3, 4953:8, 4953:10, 4953:16, 4953:24, 4956:3, 4956:23, 4957:7, 4957:12, 4957:13, 4957:21, 4960:6, 4961:14, 4961:15, 4961:24, 4964:11, 4965:3, 4966:9, 4966:14, 4967:8, 4967:10, 4967:19, 4970:13, 4970:15, 4970:19, 4972:2, 4974:16, 4978:10
**one-on-one** [2] - 4713:14, 4731:1
**OnePoint** [6] - 4746:8, 4748:1, 4753:12, 4803:7, 4803:15, 4810:10
**ones** [9] - 4689:12, 4689:13, 4704:10, 4704:12, 4704:13, 4705:1, 4842:14, 4847:8, 4907:13
**ongoing** [2] - 4739:20, 4742:3
**online** [8] - 4721:13, 4722:1, 4722:4, 4723:3, 4736:11, 4736:12, 4784:25
**Online** [1] - 4822:12
**Open** [2] - 4935:13
**open** [3] - 4715:9, 4797:25, 4939:5
**openings** [1] - 4871:25
**operates** [1] - 4913:23

**operating** [3] - 4913:22, 4944:2

**operational** [10] - 4680:16, 4683:17, 4747:25, 4750:6, 4787:8, 4809:23, 4810:6, 4810:11, 4810:12, 4810:14

**operations** [4] - 4677:17, 4678:19, 4679:2, 4930:18

**Operator** [1] - 4736:8

**opportunities** [3] - 4758:19, 4806:15, 4808:22

**opportunity** [10] - 4690:24, 4761:4, 4777:15, 4808:23, 4843:12, 4903:13, 4926:21, 4926:24, 4975:7

**opposed** [11] - 4688:11, 4698:8, 4777:7, 4784:18, 4879:5, 4882:3, 4882:4, 4882:5, 4913:20, 4955:12, 4975:6

**opposes** [1] - 4883:16

**opposite** [2] - 4736:10

**option** [1] - 4854:8

**options** [8] - 4696:19, 4707:11, 4713:10, 4730:20, 4730:21, 4844:11, 4844:12, 4856:24

**order** [4] - 4725:23, 4940:18, 4949:20, 4958:7

**org** [1] - 4672:10

**organization** [43] - 4680:17, 4680:24, 4681:1, 4681:2, 4681:3, 4681:5, 4681:7, 4681:15, 4681:20, 4683:8, 4698:16, 4699:16, 4699:20, 4700:16, 4704:17, 4704:20, 4705:2, 4714:10, 4715:16, 4717:6, 4717:19, 4717:21, 4730:8, 4733:6, 4739:15, 4743:1, 4746:6, 4748:9, 4754:1, 4762:9, 4789:3, 4789:15, 4793:11, 4836:11, 4858:16, 4860:11, 4860:13, 4860:15,

4872:11, 4872:15, 4944:16, 4958:13, 4958:24

**organization's** [2] - 4733:4, 4761:24

**organizational** [1] - 4671:14

**organizations** [11] - 4681:22, 4682:24, 4716:10, 4716:11, 4746:11, 4923:3, 4947:18, 4947:19, 4947:21, 4947:23, 4947:25

**origin** [2] - 4917:17, 4917:18

**original** [2] - 4835:20, 4877:16

**Orsini** [11] - 4669:2, 4669:3, 4755:11, 4809:10, 4815:2, 4815:11, 4820:21, 4826:20, 4833:4, 4859:8, 4978:14

**ORSINI** [149] - 4667:12, 4669:3, 4669:21, 4669:25, 4670:10, 4670:18, 4671:6, 4671:9, 4671:19, 4671:21, 4672:1, 4672:6, 4672:8, 4672:12, 4672:15, 4674:7, 4674:18, 4674:21, 4675:4, 4683:23, 4684:1, 4691:15, 4692:2, 4693:11, 4705:22, 4708:3, 4709:2, 4718:24, 4719:11, 4719:17, 4733:11, 4734:15, 4734:23, 4737:20, 4738:5, 4741:15, 4742:9, 4742:13, 4742:18, 4742:21, 4749:13, 4749:16, 4749:19, 4753:5, 4754:13, 4755:12, 4755:14, 4757:19, 4765:14, 4767:23, 4768:17, 4770:9, 4770:13, 4770:18, 4770:21, 4770:24, 4771:5, 4771:10, 4771:12, 4771:14, 4773:23, 4778:18, 4790:12, 4791:9, 4795:7, 4798:7, 4801:25, 4804:7, 4804:10, 4805:2,

4812:4, 4813:17, 4813:19, 4820:22, 4821:19, 4823:1, 4824:23, 4827:9, 4838:18, 4840:4, 4845:20, 4848:6, 4849:24, 4852:7, 4852:9, 4855:8, 4856:2, 4858:13, 4867:24, 4868:7, 4868:24, 4875:12, 4876:19, 4880:20, 4880:23, 4883:4, 4884:25, 4885:3, 4893:5, 4893:10, 4893:12, 4894:9, 4894:13, 4894:17, 4895:14, 4895:20, 4896:5, 4896:10, 4896:14, 4902:23, 4903:2, 4903:5, 4907:21, 4910:10, 4910:17, 4910:20, 4910:23, 4911:1, 4911:6, 4911:10, 4911:18, 4911:22, 4912:3, 4912:17, 4912:19, 4914:4, 4936:10, 4936:15, 4937:1, 4940:2, 4949:9, 4951:25, 4953:24, 4955:20, 4956:3, 4956:5, 4957:16, 4959:9, 4963:1, 4966:11, 4972:5, 4972:19, 4975:17, 4977:20, 4978:16, 4979:6, 4979:12, 4979:17, 4979:19

**Orsini's** [4] - 4797:24, 4809:3, 4867:5, 4893:4

**otherwise** [2] - 4687:22, 4741:5

**ought** [1] - 4668:22

**ourselves** [3] - 4698:1, 4947:22, 4947:23

**outbound** [2] - 4789:14, 4789:19

**outcome** [3] - 4777:25, 4948:12, 4965:11

**outgun** [1] - 4968:14

**outlined** [1] - 4945:17

**outset** [2] - 4741:24, 4757:1

**outside** [7] - 4679:7, 4788:5, 4845:12,

4957:25, 4958:10, 4958:16, 4959:13

**outweigh** [1] - 4862:16

**overall** [17] - 4715:14, 4725:15, 4727:23, 4729:9, 4729:10, 4729:16, 4777:3, 4777:25, 4780:3, 4780:8, 4781:15, 4795:6, 4803:17, 4819:8, 4862:16, 4867:19, 4951:11

**Overall** [2] - 4878:8, 4956:9

**overlapping** [1] - 4670:14

**overnight** [1] - 4932:22

**oversaw** [1] - 4836:17

**oversee** [2] - 4914:21

**overseeing** [1] - 4917:10

**overview** [1] - 4857:7

**Overview** [1] - 4951:20

**overwhelming** [1] - 4803:11

**own** [7] - 4748:1, 4771:20, 4833:24, 4923:5, 4945:23, 4968:7, 4970:24

**owned** [1] - 4681:19

# P

**P.C** [1] - 4698:10

**p.m** [2] - 4829:2, 4978:23

**Pacific** [2] - 4745:1, 4905:5

**page** [135] - 4691:17, 4692:8, 4692:9, 4693:14, 4708:4, 4713:2, 4713:8, 4713:9, 4723:8, 4723:9, 4734:21, 4735:14, 4735:17, 4736:7, 4738:2, 4738:11, 4738:12, 4750:8, 4754:18, 4757:24, 4762:17, 4762:18, 4765:21, 4765:22, 4774:10, 4774:11, 4779:10, 4781:1, 4781:2, 4791:3, 4791:16, 4795:11, 4798:3, 4799:4, 4799:5, 4802:7, 4804:18,

4805:14, 4808:20, 4808:21, 4809:9, 4812:18, 4812:24, 4813:25, 4814:20, 4815:10, 4820:15, 4822:3, 4822:4, 4822:9, 4823:14, 4823:25, 4827:16, 4829:3, 4830:10, 4830:19, 4830:20, 4833:12, 4833:14, 4833:22, 4836:25, 4837:3, 4837:12, 4837:16, 4837:24, 4840:10, 4844:2, 4850:2, 4850:13, 4851:6, 4852:13, 4855:12, 4855:13, 4855:20, 4856:18, 4857:1, 4862:1, 4864:17, 4865:5, 4866:7, 4866:11, 4866:14, 4867:7, 4867:9, 4867:10, 4868:19, 4869:2, 4869:13, 4869:22, 4870:22, 4871:19, 4871:21, 4873:3, 4873:17, 4874:16, 4877:9, 4878:17, 4880:15, 4881:6, 4883:7, 4884:2, 4885:19, 4886:16, 4887:16, 4887:21, 4887:22, 4894:20, 4894:25, 4895:6, 4896:24, 4898:5, 4903:7, 4903:8, 4906:6, 4906:16, 4907:23, 4908:23, 4909:10, 4937:7, 4939:17, 4951:18, 4956:1, 4957:21, 4959:10, 4963:15, 4964:18, 4968:5, 4970:14, 4973:19, 4974:25

**pages** [4] - 4737:24, 4869:4, 4905:18, 4970:14

**paid** [3] - 4759:7, 4765:9, 4842:5

**Pam** [1] - 4669:7

**pancake** [1] - 4820:2

**paper** [1] - 4923:2

**paragraph** [16] - 4760:13, 4761:9, 4803:9, 4825:15, 4826:3, 4848:20, 4856:19, 4866:7,

4866:16, 4866:25,
4867:2, 4878:3,
4878:7, 4878:18,
4895:8, 4898:6
**parent** [1] - 4825:10
**parity** [1] - 4752:19
**part** [51] - 4684:24,
4693:25, 4699:3,
4699:24, 4701:15,
4702:4, 4702:7,
4702:8, 4703:3,
4737:9, 4740:19,
4742:16, 4759:9,
4785:18, 4786:17,
4791:17, 4798:10,
4813:3, 4813:6,
4827:20, 4852:21,
4857:16, 4859:20,
4862:13, 4866:14,
4867:15, 4869:6,
4869:10, 4875:21,
4889:4, 4901:6,
4915:9, 4919:5,
4920:3, 4923:20,
4925:20, 4930:15,
4930:18, 4930:20,
4931:8, 4931:12,
4931:13, 4934:25,
4935:2, 4940:9,
4940:17, 4952:16,
4953:1, 4953:13,
4953:22, 4955:13
**participants** [1] -
4886:23
**participate** [3] -
4708:22, 4708:24,
4722:6
**participated** [1] -
4778:2
**participating** [2] -
4688:16, 4689:24
**particular** [62] -
4669:14, 4686:18,
4689:1, 4690:17,
4691:1, 4691:9,
4693:21, 4694:22,
4695:20, 4698:17,
4700:20, 4701:5,
4703:10, 4703:13,
4704:23, 4705:11,
4705:13, 4715:2,
4721:14, 4721:18,
4721:20, 4722:18,
4726:24, 4728:1,
4728:17, 4732:3,
4736:25, 4737:1,
4737:7, 4744:22,
4779:25, 4781:22,
4783:16, 4786:17,
4786:20, 4788:5,

4788:23, 4817:8,
4819:4, 4819:19,
4821:7, 4847:17,
4856:4, 4860:16,
4871:2, 4871:4,
4871:12, 4880:9,
4888:3, 4891:7,
4892:9, 4906:13,
4919:2, 4922:4,
4933:15, 4943:8,
4948:2, 4955:15,
4960:20, 4965:8
**particularly** [5] -
4730:24, 4756:8,
4785:25, 4940:8,
4948:17
**parties** [10] - 4669:16,
4681:18, 4682:3,
4690:24, 4784:23,
4844:21, 4894:21,
4922:13, 4923:4
**partly** [1] - 4923:9
**partner** [5] - 4824:11,
4834:6, 4945:18,
4947:17, 4950:2
**Partner** [1] - 4841:21
**partnering** [2] -
4717:20, 4947:5
**partners** [10] -
4690:14, 4690:20,
4864:2, 4916:23,
4916:24, 4916:25,
4945:7, 4945:10,
4945:22, 4962:9
**partners'** [1] - 4946:24
**partnership** [9] -
4758:21, 4758:23,
4759:7, 4760:16,
4762:21, 4763:13,
4763:21, 4764:13,
4859:3
**Partnership** [1] -
4764:24
**partnerships** [6] -
4690:8, 4764:14,
4799:16, 4946:16,
4947:8, 4948:8
**parts** [2] - 4708:17,
4793:10
**party** [5] - 4681:17,
4681:20, 4681:21,
4731:12, 4895:11
**pass** [3] - 4736:24,
4737:5, 4959:2
**pass-through** [2] -
4736:24, 4737:5
**passion** [2] - 4935:16,
4936:1
**passive** [1] - 4907:9
**passwords** [1] -

4939:8
**past** [6] - 4758:8,
4799:15, 4800:10,
4862:9, 4862:12,
4977:4
**Patel** [1] - 4824:20
**PATEL** [1] - 4824:20
**pattern** [2] - 4856:6,
4934:6
**patterns** [1] - 4934:4
**Paul** [6] - 4836:12,
4840:22, 4848:2,
4850:12, 4855:12
**pause** [3] - 4796:2,
4797:13, 4809:2
**pay** [11] - 4684:18,
4695:25, 4702:10,
4759:11, 4763:20,
4793:20, 4865:13,
4953:19, 4953:20,
4964:17
**paying** [2] - 4767:7,
4895:4
**payment** [34] - 4690:2,
4702:14, 4711:2,
4760:6, 4761:11,
4764:2, 4764:12,
4766:9, 4766:11,
4766:16, 4766:24,
4774:20, 4774:22,
4774:23, 4775:3,
4782:23, 4783:14,
4793:21, 4825:25,
4826:5, 4878:13,
4879:5, 4881:19,
4883:13, 4886:2,
4887:6, 4888:10,
4953:12, 4961:15,
4963:14, 4963:19,
4964:5, 4964:12
**Payment** [1] - 4963:17
**payments** [12] -
4680:3, 4760:10,
4763:25, 4764:3,
4765:4, 4765:5,
4765:6, 4765:7,
4768:5, 4775:6,
4953:11
**peace** [1] - 4929:22
**peak** [1] - 4855:17
**people** [72] - 4680:22,
4680:23, 4689:16,
4702:14, 4713:19,
4715:17, 4716:10,
4717:18, 4718:10,
4730:22, 4744:11,
4759:19, 4772:20,
4778:14, 4785:22,
4786:20, 4786:24,
4788:15, 4788:17,

4789:7, 4789:9,
4793:10, 4817:23,
4823:5, 4825:4,
4834:22, 4834:23,
4851:7, 4872:19,
4880:14, 4890:12,
4891:25, 4905:9,
4907:7, 4914:1,
4919:9, 4919:10,
4920:17, 4921:9,
4923:21, 4927:10,
4928:6, 4928:25,
4930:7, 4932:7,
4933:12, 4933:16,
4933:20, 4934:11,
4934:14, 4935:10,
4935:20, 4937:22,
4939:2, 4939:4,
4939:11, 4940:6,
4940:16, 4940:21,
4940:24, 4941:18,
4944:7, 4945:2,
4947:6, 4949:8,
4952:25, 4957:24,
4958:1, 4958:3,
4958:21, 4960:2,
4967:12
**people's** [3] - 4930:25,
4931:25, 4940:6
**peoples** [1] - 4905:1
**Pepsi** [2] - 4677:14,
4677:15
**Pepto** [1] - 4677:9
**Per** [1] - 4856:19
**per** [15] - 4690:2,
4730:3, 4763:24,
4765:8, 4765:9,
4774:20, 4774:23,
4851:1, 4860:22,
4862:16, 4867:14,
4906:22, 4907:4,
4907:14, 4907:16
**per-Card** [1] - 4763:24
**perceive** [1] - 4905:6
**perceived** [1] -
4950:21
**percent** [68] -
4676:11, 4692:18,
4692:19, 4707:21,
4711:17, 4711:19,
4714:15, 4714:20,
4714:21, 4714:22,
4715:4, 4715:12,
4715:14, 4716:8,
4723:19, 4723:20,
4724:4, 4724:5,
4744:16, 4745:1,
4745:12, 4745:14,
4746:21, 4747:3,
4747:4, 4747:6,

4747:14, 4752:25,
4793:13, 4799:15,
4805:21, 4806:14,
4808:3, 4817:25,
4818:5, 4818:6,
4818:13, 4818:22,
4819:5, 4819:19,
4819:20, 4819:21,
4831:17, 4831:22,
4832:11, 4832:15,
4832:20, 4832:22,
4832:23, 4833:2,
4838:1, 4856:20,
4869:15, 4869:16,
4904:5, 4904:16,
4905:5, 4907:4,
4908:4, 4908:16,
4909:22, 4910:1,
4964:20, 4965:4
**Percent** [3] - 4711:7,
4711:16, 4711:24
**percentage** [16] -
4715:11, 4743:18,
4743:19, 4751:12,
4807:21, 4808:1,
4808:8, 4808:9,
4813:1, 4830:22,
4897:19, 4906:17,
4909:8, 4909:16,
4909:21
**percentages** [3] -
4714:16, 4838:13,
4906:9
**perception** [17] -
4744:15, 4745:6,
4745:19, 4745:23,
4810:4, 4811:9,
4811:10, 4815:24,
4903:11, 4904:19,
4904:20, 4905:1,
4954:17, 4959:16,
4960:1, 4975:10,
4975:11
**Perception** [1] -
4959:20
**perceptions** [39] -
4743:7, 4744:18,
4744:20, 4745:16,
4756:16, 4769:16,
4772:14, 4776:3,
4779:1, 4780:1,
4780:7, 4783:12,
4785:11, 4788:7,
4788:8, 4788:12,
4811:12, 4811:16,
4815:5, 4816:10,
4816:17, 4816:22,
4816:25, 4817:14,
4842:24, 4851:25,
4899:22, 4902:10,

Case 1:10-cv-04496-NGG-RER    Document 595    Filed 09/08/14    Page 352 of 368 PageID #: 30746

4903:18, 4903:23, 4904:1, 4904:6, 4904:21, 4905:11, 4915:24, 4954:12, 4954:25, 4959:24, 4962:23

**Perceptions** [2] - 4778:22, 4903:8

**perceptual** [1] - 4915:23

**perform** [2] - 4918:19, 4944:9

**performance** [5] - 4803:16, 4821:11, 4825:7, 4826:17, 4918:21

**performing** [3] - 4915:23, 4944:10, 4946:13

**performs** [2] - 4918:22, 4921:25

**perhaps** [2] - 4669:1, 4673:17

**period** [26] - 4670:11, 4679:5, 4679:20, 4731:6, 4734:7, 4751:2, 4752:4, 4760:18, 4760:20, 4761:3, 4761:12, 4761:17, 4762:3, 4762:11, 4765:24, 4774:17, 4776:23, 4789:12, 4798:16, 4844:18, 4844:25, 4845:11, 4851:21, 4856:8, 4906:14, 4965:18

**periodic** [3] - 4708:17, 4779:7, 4957:9

**periodically** [1] - 4957:14

**periods** [1] - 4728:22

**permissions** [2] - 4945:16, 4948:13

**permit** [1] - 4853:5

**permitted** [2] - 4880:9, 4884:4

**person** [4] - 4731:2, 4850:10, 4876:22, 4933:11

**person's** [1] - 4859:25

**personal** [2] - 4757:5, 4929:14

**personally** [10] - 4721:3, 4761:20, 4823:5, 4834:20, 4847:19, 4857:9, 4858:18, 4886:10, 4892:11, 4971:16

**perspective** [5] -

4716:20, 4724:13, 4778:12, 4928:2, 4961:6

**persuade** [1] - 4887:8

**persuaded** [1] - 4900:18

**PETER** [1] - 4667:12

**pharmacies** [1] - 4899:10

**Pharmacy** [1] - 4846:15

**pharmacy** [3] - 4899:4, 4901:3, 4901:11

**phase** [1] - 4873:10

**PHILIP** [1] - 4667:15

**philosophy** [3] - 4971:20, 4971:21, 4972:1

**Phoenix** [1] - 4793:10

**phone** [4] - 4730:17, 4730:25, 4858:4, 4958:2

**phone-based** [1] - 4730:25

**phones** [1] - 4683:16

**photograph** [1] - 4770:12

**picks** [1] - 4720:20

**picture** [8] - 4683:22, 4770:1, 4770:2, 4770:19, 4896:12, 4919:8, 4919:10, 4927:8

**piece** [11] - 4680:7, 4680:8, 4689:2, 4741:3, 4791:23, 4869:11, 4910:13, 4917:9, 4919:6, 4930:11, 4968:17

**pieces** [3] - 4810:15, 4919:23, 4925:3

**pillow** [1] - 4770:23

**pilot** [2] - 4753:11, 4753:14

**pilots** [2] - 4751:25, 4752:2

**place** [9] - 4730:2, 4739:23, 4740:9, 4762:13, 4786:14, 4794:23, 4843:23, 4854:5, 4954:23

**places** [11] - 4706:15, 4772:7, 4788:16, 4811:20, 4899:5, 4924:11, 4929:13, 4932:8, 4943:3, 4943:4, 4946:5

**placing** [1] - 4816:7

**plaintiff** [1] - 4978:15

**Plaintiff** [40] - 4666:19, 4667:1, 4692:7, 4709:6, 4838:22, 4840:6, 4845:22, 4848:8, 4850:1, 4852:12, 4855:10, 4858:15, 4868:2, 4868:9, 4869:1, 4875:15, 4877:2, 4881:1, 4883:6, 4885:16, 4978:19, 4979:22, 4979:23, 4980:13, 4980:14, 4980:15, 4980:16, 4980:17, 4980:18, 4980:19, 4980:20, 4980:21, 4980:22, 4980:23, 4981:1, 4981:2, 4981:3, 4981:4, 4981:5, 4981:16

**plaintiff's** [3] - 4798:6, 4801:23, 4804:6

**Plaintiff's** [30] - 4691:13, 4705:20, 4708:2, 4733:14, 4753:4, 4753:8, 4757:18, 4773:22, 4774:1, 4790:11, 4791:15, 4798:9, 4801:18, 4802:2, 4804:12, 4812:2, 4812:6, 4813:24, 4823:3, 4896:20, 4897:22, 4905:17, 4970:12, 4980:3, 4980:4, 4980:5, 4980:6, 4980:7, 4980:8, 4980:10

**plaintiffs** [18] - 4813:15, 4821:17, 4822:24, 4824:22, 4838:17, 4840:2, 4845:19, 4848:4, 4849:22, 4852:5, 4855:7, 4858:11, 4867:23, 4868:23, 4875:10, 4876:17, 4880:18, 4883:2

**Plaintiffs** [1] - 4666:8

**Plaintiffs** [6] - 4821:22, 4825:3, 4827:14, 4980:9, 4980:11, 4980:12

**plan** [7] - 4670:18, 4772:5, 4848:14, 4849:21, 4854:2, 4854:9, 4856:23

**planning** [7] - 4772:8, 4838:23, 4852:22,

4872:15, 4898:22, 4898:23, 4899:1

**Plans** [1] - 4840:12

**plans** [15] - 4668:23, 4839:2, 4839:3, 4839:5, 4839:9, 4839:13, 4840:15, 4840:16, 4840:25, 4842:12, 4848:3, 4854:17, 4898:14, 4899:9, 4899:13

**plastic** [10] - 4743:17, 4743:18, 4745:9, 4801:5, 4817:23, 4818:1, 4818:9, 4820:3, 4832:23, 4942:2

**plastics** [1] - 4799:18

**platform** [2] - 4721:11, 4842:1

**play** [17] - 4690:18, 4694:15, 4695:19, 4696:22, 4696:24, 4706:20, 4712:16, 4730:11, 4730:12, 4746:23, 4918:14, 4923:17, 4925:7, 4935:18, 4946:20

**play-by-play** [1] - 4935:18

**played** [3] - 4746:24, 4747:25, 4821:6

**player** [1] - 4917:7

**players** [1] - 4901:11

**playing** [3] - 4687:13, 4928:15, 4974:16

**plays** [3] - 4928:22, 4929:16, 4946:20

**Plaza** [2] - 4667:10, 4667:19

**plead** [1] - 4900:14

**pleased** [2] - 4803:16, 4941:13

**plenty** [1] - 4853:16

**plus** [3] - 4817:25, 4918:6, 4937:13

**PMP** [1] - 4740:4

**POC** [3] - 4785:8, 4785:11, 4903:11

**Point** [8] - 4800:25, 4960:16, 4960:18, 4961:8, 4961:17, 4962:6, 4973:8, 4974:20

**point** [83] - 4718:16, 4718:18, 4727:14, 4730:21, 4740:5, 4741:17, 4745:9, 4750:7, 4752:15, 4753:17, 4758:9,

4758:13, 4758:18, 4759:4, 4759:15, 4760:6, 4760:24, 4761:23, 4763:19, 4763:24, 4764:6, 4765:2, 4767:13, 4767:23, 4778:15, 4782:25, 4783:18, 4783:22, 4785:19, 4788:3, 4788:17, 4798:14, 4800:15, 4800:16, 4815:12, 4815:20, 4816:7, 4816:11, 4816:12, 4816:18, 4816:23, 4817:1, 4828:22, 4831:3, 4843:9, 4847:5, 4847:6, 4849:7, 4853:12, 4859:24, 4862:9, 4871:1, 4874:11, 4878:11, 4884:19, 4887:11, 4888:9, 4924:16, 4928:19, 4928:20, 4929:25, 4934:15, 4944:6, 4944:9, 4945:18, 4945:24, 4953:17, 4961:13, 4963:11, 4964:19, 4965:10, 4967:23, 4968:2, 4968:6, 4968:17, 4969:21, 4970:1, 4972:25, 4973:20, 4973:21, 4976:15, 4976:16, 4977:10

**point-of-purchase** [1] - 4718:16

**point-of-sale** [1] - 4888:9

**pointed** [1] - 4853:4

**pointing** [1] - 4792:10

**points** [45] - 4682:11, 4714:6, 4714:7, 4722:15, 4722:16, 4723:10, 4723:11, 4725:21, 4726:25, 4750:2, 4761:6, 4763:7, 4822:10, 4835:4, 4842:5, 4851:1, 4851:2, 4867:14, 4869:15, 4924:7, 4924:8, 4924:10, 4942:24, 4943:2, 4943:8, 4943:10, 4943:12, 4943:15, 4944:13, 4944:20, 4944:24, 4945:4, 4945:25, 4946:2, 4946:6,

4946:8, 4946:11,
4953:11, 4953:17,
4956:13, 4956:14,
4961:13, 4961:14,
4972:23, 4974:17
**Points** [1] - 4956:8
**points** [1] - 4722:11
**Pojero** [6] - 4682:5,
4687:8, 4704:16,
4753:14, 4787:14
**Pojero's** [1] - 4704:17
**policy** [9] - 4682:25,
4683:5, 4787:14,
4787:18, 4787:21,
4787:22, 4826:20,
4826:22, 4828:20
**Policy** [1] - 4886:18
**Polk** [1] - 4877:11
**POP** [12] - 4783:18,
4783:21, 4784:4,
4784:14, 4784:15,
4784:18, 4784:21,
4784:25, 4785:6,
4785:13, 4785:15,
4790:1
**population** [3] -
4919:3, 4926:15,
4958:5
**populations** [1] -
4837:22
**portion** [4] - 4671:23,
4758:20, 4759:5,
4791:19
**POS** [3] - 4801:1,
4815:11, 4815:20
**posed** [1] - 4802:15
**position** [12] - 4675:9,
4678:1, 4678:10,
4678:16, 4679:13,
4679:15, 4679:17,
4680:1, 4860:20,
4884:7, 4913:1,
4969:23
**positioned** [1] -
4799:17
**positioning** [1] -
4977:14
**positive** [4] - 4968:25,
4974:17, 4974:20
**possibility** [7] -
4846:19, 4852:22,
4874:14, 4876:6,
4879:4, 4886:6,
4956:4
**possible** [4] -
4718:21, 4798:24,
4846:8, 4906:25
**Post** [1] - 4667:6
**post** [1] - 4780:18
**post-signing** [1] -

4780:18
**posting** [1] - 4770:6
**potency** [1] - 4967:21
**potent** [1] - 4927:13
**Potential** [1] - 4794:6
**potential** [12] - 4682:2,
4698:6, 4703:17,
4705:15, 4769:9,
4789:18, 4851:19,
4861:16, 4946:16,
4954:15, 4969:6,
4969:16
**potentially** [4] -
4789:13, 4874:7,
4889:4
**pouring** [1] - 4782:1
**power** [4] - 4694:17,
4739:17, 4748:24,
4937:14
**powerful** [1] - 4947:15
**powering** [1] -
4739:20
**powers** [1] - 4720:9
**practice** [2] - 4816:3,
4833:20
**Practices** [1] -
4833:14
**pre** [2] - 4842:5,
4870:1
**pre-paid** [1] - 4842:5
**pre-value** [1] - 4870:1
**precise** [2] - 4680:18,
4712:6
**predict** [1] - 4860:23
**prediction** [1] - 4767:2
**Predictive** [1] - 4794:6
**predominantly** [1] -
4867:18
**Prefer** [9] - 4962:16,
4962:18, 4963:4,
4965:25, 4967:14,
4970:23, 4972:16,
4972:25, 4974:9
**prefer** [3] - 4788:11,
4970:9, 4976:1
**preference** [29] -
4822:10, 4822:16,
4822:20, 4823:6,
4823:22, 4824:15,
4825:19, 4825:22,
4825:25, 4826:5,
4826:8, 4826:24,
4828:9, 4828:19,
4853:15, 4963:19,
4964:5, 4964:21,
4965:5, 4967:22,
4968:7, 4969:16,
4970:7, 4971:17,
4973:5, 4973:10,
4973:17, 4975:6,

4977:2
**preferences** [1] -
4826:12
**Preferences** [1] -
4963:18
**preferencing** [2] -
4826:18, 4828:18
**Preferred** [1] -
4722:10
**preferred** [5] - 4828:3,
4967:19, 4968:2,
4969:19, 4969:22
**preferred"** [1] -
4970:8
**preferring** [2] -
4969:6, 4969:19
**prefers** [3] - 4823:18,
4825:23, 4969:20
**premature** [1] -
4887:2
**premium** [22] -
4707:21, 4712:13,
4714:4, 4714:5,
4714:7, 4720:17,
4735:2, 4735:4,
4735:5, 4735:23,
4737:14, 4753:18,
4754:5, 4862:2,
4862:6, 4863:4,
4863:8, 4863:14,
4863:16, 4864:3,
4897:2
**Premium** [3] - 4710:3,
4711:7, 4711:16
**preoccupied** [1] -
4755:5
**prep** [1] - 4861:15
**Prep** [1] - 4798:5
**prepaid** [7] - 4690:7,
4926:9, 4926:10,
4926:13, 4926:25,
4947:16
**preparation** [3] -
4861:16, 4861:17,
4900:21
**prepared** [14] -
4673:8, 4733:6,
4773:9, 4776:19,
4798:23, 4799:1,
4799:25, 4800:2,
4861:20, 4861:22,
4864:13, 4864:14,
4900:20, 4951:19
**preparing** [3] -
4773:3, 4773:5,
4848:13
**prescription** [5] -
4846:15, 4854:1,
4854:9, 4854:18,
4856:24

**prescriptions** [8] -
4773:12, 4773:14,
4851:8, 4854:5,
4854:15, 4854:21,
4898:3, 4898:15
**presence** [1] -
4862:13
**Present** [2] - 4873:24
**present** [5] - 4691:1,
4712:12, 4888:19,
4926:2, 4973:7
**Presentation** [2] -
4798:5, 4803:25
**presentation** [23] -
4719:2, 4737:25,
4738:3, 4749:10,
4749:23, 4753:8,
4785:2, 4791:4,
4791:6, 4791:20,
4804:19, 4805:12,
4809:6, 4812:1,
4838:8, 4861:14,
4874:18, 4876:11,
4884:20, 4944:15,
4949:1, 4951:19,
4959:10
**presentations** [3] -
4712:15, 4734:11,
4874:25
**presented** [6] -
4713:2, 4719:6,
4719:7, 4804:2,
4804:13, 4896:21
**presenter** [2] - 4817:5,
4817:11
**presenters** [4] -
4817:3, 4817:10,
4817:12, 4817:13
**presenting** [5] -
4691:3, 4723:17,
4792:1, 4943:1,
4949:18
**presents** [1] - 4963:13
**preserving** [1] -
4923:17
**president** [10] -
4671:17, 4676:17,
4678:11, 4679:18,
4798:10, 4798:12,
4836:11, 4874:24,
4879:14, 4966:17
**president/CEO** [1] -
4675:12
**press** [1] - 4860:7
**pressure** [3] - 4739:1,
4863:7, 4863:20
**presume** [2] - 4710:1,
4753:19
**pretty** [6] - 4764:20,
4776:12, 4789:21,

4803:13, 4803:16,
4932:21
**prevalent** [1] -
4783:23
**previous** [7] - 4723:9,
4751:25, 4767:11,
4774:13, 4808:20,
4977:12, 4978:11
**previously** [4] -
4676:4, 4758:7,
4767:7, 4780:13
**price** [39] - 4685:2,
4685:7, 4685:8,
4695:5, 4695:12,
4695:13, 4695:14,
4703:9, 4703:19,
4703:24, 4705:3,
4705:7, 4705:8,
4705:11, 4705:17,
4707:15, 4710:23,
4712:13, 4720:16,
4725:6, 4725:7,
4731:25, 4733:8,
4738:3, 4741:21,
4742:1, 4747:9,
4748:6, 4748:13,
4749:4, 4752:11,
4809:13, 4863:1,
4870:9, 4870:16,
4871:17, 4873:24,
4887:18
**Price** [4] - 4709:11,
4710:3, 4711:6,
4711:15
**priced** [2] - 4712:21,
4712:24
**prices** [10] - 4703:22,
4705:18, 4712:16,
4713:4, 4725:1,
4735:23, 4737:13,
4747:11, 4750:5,
4863:11
**Pricing** [5] - 4733:17,
4779:20, 4874:17,
4874:20, 4880:16
**pricing** [111] -
4678:19, 4679:2,
4681:20, 4682:12,
4682:14, 4682:20,
4682:21, 4682:22,
4682:25, 4683:1,
4683:2, 4683:4,
4683:5, 4683:7,
4683:8, 4683:19,
4683:21, 4683:22,
4684:5, 4685:1,
4685:5, 4685:12,
4685:20, 4686:8,
4686:24, 4688:12,
4692:12, 4693:21,

4694:2, 4694:15,
4694:24, 4695:7,
4695:20, 4696:5,
4696:6, 4696:9,
4696:11, 4696:14,
4696:15, 4696:20,
4696:22, 4697:5,
4697:14, 4697:18,
4703:9, 4703:10,
4703:18, 4704:21,
4705:6, 4705:10,
4706:11, 4706:21,
4707:8, 4707:10,
4708:9, 4709:1,
4709:13, 4710:10,
4711:4, 4712:11,
4712:22, 4713:16,
4728:1, 4730:5,
4730:6, 4732:7,
4732:11, 4732:23,
4734:2, 4734:5,
4734:6, 4734:8,
4734:11, 4736:20,
4746:22, 4747:13,
4748:5, 4748:14,
4751:22, 4751:23,
4751:24, 4751:25,
4752:3, 4752:7,
4752:20, 4753:2,
4769:10, 4777:11,
4777:12, 4781:6,
4781:24, 4809:22,
4810:1, 4810:5,
4834:6, 4860:13,
4860:15, 4861:7,
4863:24, 4874:25,
4875:3, 4877:15,
4887:13, 4888:12,
4901:17
**Priebe** [1] - 4878:4
**Primarily** [2] -
4809:17, 4809:21
**primarily** [2] - 4750:1,
4866:20
**primary** [1] - 4743:1
**Principal** [1] - 4833:15
**principally** [5] -
4684:15, 4684:25,
4703:4, 4779:15,
4782:19
**principle** [1] - 4692:25
**principles** [2] -
4691:18, 4692:13
**printout** [1] - 4801:21
**priority** [1] - 4841:23
**privacy** [7] - 4847:7,
4847:10, 4847:17,
4847:21, 4847:23,
4851:8, 4929:14
**private** [2] - 4769:8,

4875:23
**problem** [7] - 4673:18,
4748:7, 4755:6,
4772:14, 4843:7,
4904:3, 4954:9
**problems** [1] -
4946:10
**proceeding** [3] -
4796:2, 4797:13,
4809:2
**Proceedings** [1] -
4667:21
**proceedings** [1] -
4978:22
**process** [13] - 4687:5,
4712:16, 4729:20,
4732:2, 4732:4,
4755:25, 4781:19,
4813:3, 4813:6,
4821:11, 4852:22,
4930:22, 4931:24
**processes** [2] -
4786:13, 4939:11
**Proctor** [4] - 4677:7,
4677:13, 4813:13,
4820:12
**produce** [1] - 4785:19
**produced** [1] -
4667:22
**product** [18] -
4710:23, 4711:4,
4748:9, 4925:13,
4925:16, 4926:6,
4926:8, 4926:11,
4927:8, 4927:10,
4931:20, 4931:21,
4937:24, 4938:1,
4938:3, 4948:14,
4955:2, 4965:7
**products** [30] -
4723:2, 4762:22,
4764:11, 4834:10,
4879:5, 4883:22,
4883:23, 4890:10,
4890:13, 4920:9,
4921:23, 4924:12,
4925:10, 4925:16,
4925:19, 4925:23,
4926:1, 4926:3,
4928:13, 4928:15,
4928:17, 4931:13,
4931:19, 4940:12,
4940:19, 4955:12,
4955:13, 4955:16
**Professor** [1] -
4670:19
**profitability** [2] -
4705:11, 4705:14
**program** [32] -
4698:20, 4699:15,

4700:1, 4700:22,
4702:21, 4704:1,
4718:8, 4722:12,
4722:17, 4723:5,
4723:12, 4723:14,
4723:21, 4724:6,
4724:14, 4742:2,
4746:8, 4758:21,
4758:23, 4759:7,
4759:19, 4759:20,
4763:8, 4810:10,
4841:15, 4846:9,
4851:7, 4851:12,
4851:13, 4968:14,
4974:4
**programs** [62] -
4681:8, 4685:23,
4685:24, 4687:17,
4687:18, 4688:16,
4688:21, 4688:23,
4689:3, 4689:5,
4689:25, 4690:5,
4694:8, 4694:9,
4698:1, 4699:21,
4700:12, 4700:19,
4702:17, 4715:21,
4716:11, 4716:12,
4723:20, 4726:3,
4739:21, 4739:24,
4740:17, 4740:18,
4746:7, 4748:11,
4749:1, 4758:25,
4761:7, 4762:6,
4762:7, 4762:8,
4766:25, 4769:13,
4772:5, 4772:8,
4772:16, 4772:18,
4777:12, 4778:3,
4787:8, 4842:3,
4852:20, 4853:14,
4853:15, 4889:10,
4890:2, 4890:5,
4891:12, 4891:14,
4892:2, 4899:19,
4900:17, 4907:19,
4917:3, 4917:5,
4974:1
**programs/incentive**
[1] - 4841:10
**progression** [1] -
4907:11
**prohibiting** [1] -
4826:4
**prohibits** [1] - 4825:18
**Project** [1] - 4753:9
**project** [2] - 4753:10,
4753:14
**projected** [4] - 4741:1,
4871:11, 4901:10,
4977:25

**prominence** [1] -
4921:6
**prominent** [1] -
4921:3
**promise** [37] -
4919:24, 4920:1,
4920:2, 4920:3,
4920:5, 4920:6,
4920:8, 4920:14,
4920:17, 4920:18,
4920:20, 4920:21,
4920:23, 4921:8,
4921:14, 4923:19,
4923:23, 4923:24,
4924:1, 4924:3,
4924:21, 4924:24,
4925:1, 4925:3,
4925:4, 4925:8,
4929:19, 4930:12,
4931:21, 4942:21,
4943:7, 4949:17
**promises** [1] -
4920:10
**promote** [4] - 4745:17,
4886:2, 4889:3
**promotes** [2] -
4886:22, 4889:14
**promotion** [2] -
4853:4, 4853:7
**promotional** [7] -
4722:12, 4846:18,
4847:5, 4852:15,
4852:16, 4852:19,
4853:14
**promotions** [5] -
4685:23, 4847:8,
4853:5, 4853:6,
4853:17
**prong** [2] - 4694:13,
4695:6
**proposal** [4] -
4692:15, 4766:4,
4766:6, 4774:19
**proposals** [3] -
4691:1, 4691:4,
4757:8
**Proposed** [1] -
4875:25
**proposed** [4] -
4764:17, 4765:23,
4800:20, 4971:13
**proposes** [1] -
4883:12
**proposing** [2] -
4760:20, 4763:3
**proposition** [29] -
4694:18, 4694:19,
4694:21, 4695:3,
4701:15, 4702:4,
4702:8, 4720:9,

4720:10, 4726:20,
4730:13, 4731:4,
4737:17, 4739:13,
4739:18, 4748:8,
4748:10, 4748:15,
4748:25, 4749:3,
4754:1, 4754:3,
4754:12, 4833:25,
4870:20, 4889:4,
4890:21, 4902:16
**propositions** [1] -
4748:20
**proprietary** [10] -
4680:25, 4681:7,
4681:10, 4681:11,
4681:14, 4681:24,
4704:20, 4705:2,
4717:6, 4746:6
**prospect** [1] - 4704:19
**prospects** [19] -
4704:23, 4705:12,
4745:4, 4745:6,
4745:14, 4745:25,
4905:8, 4905:10,
4923:22, 4935:5,
4935:22, 4936:3,
4950:15, 4952:22,
4954:4, 4954:13,
4954:14, 4954:15,
4959:25
**prospects'** [1] -
4744:14
**protect** [5] - 4772:4,
4772:10, 4847:13,
4899:13, 4899:20
**Protect** [1] - 4886:19
**protecting** [10] -
4773:17, 4843:22,
4847:20, 4849:6,
4849:8, 4849:16,
4852:1, 4857:20,
4899:11, 4934:18
**protections** [4] -
4932:3, 4932:4,
4932:5, 4932:12
**proud** [1] - 4785:22
**proudly** [1] - 4942:6
**prove** [4] - 4761:5,
4762:2, 4762:4,
4762:9
**proven** [2] - 4751:25,
4867:17
**provide** [27] - 4676:15,
4680:15, 4685:3,
4687:9, 4688:10,
4689:7, 4717:24,
4719:25, 4721:11,
4758:25, 4760:9,
4760:23, 4761:11,
4777:24, 4850:23,

4883:12, 4889:25, 4901:1, 4927:7, 4930:6, 4932:13, 4938:6, 4945:1, 4958:7, 4963:11, 4968:8, 4974:17
**provided** [4] - 4701:21, 4884:14, 4901:2, 4965:24
**provides** [7] - 4676:14, 4688:20, 4716:16, 4823:11, 4915:2, 4932:12, 4965:21
**providing** [9] - 4686:14, 4688:9, 4695:4, 4720:11, 4731:23, 4758:18, 4784:21, 4883:21, 4926:14
**proving** [1] - 4761:25
**provision** [4] - 4825:18, 4878:12, 4961:3, 4969:25
**provisions** [12] - 4778:9, 4778:13, 4784:3, 4786:8, 4786:15, 4787:4, 4787:8, 4787:17, 4789:5, 4961:7, 4961:19, 4962:8
**PTI** [2] - 4873:18, 4874:2
**public** [21] - 4691:16, 4718:25, 4737:21, 4749:17, 4749:18, 4749:19, 4753:6, 4756:25, 4768:18, 4768:23, 4769:2, 4769:8, 4769:17, 4769:18, 4771:18, 4771:24, 4774:7, 4804:23, 4821:14, 4898:18, 4898:24
**publically** [1] - 4800:14
**publicly** [5] - 4768:12, 4768:13, 4790:13, 4855:25, 4902:8
**published** [4] - 4710:25, 4837:14, 4922:15, 4922:24
**pull** [1] - 4884:12
**purchase** [15] - 4718:16, 4718:18, 4745:9, 4782:25, 4783:18, 4783:22, 4785:19, 4816:11, 4842:4, 4852:25, 4889:19, 4915:8,

4932:5, 4932:7, 4962:6
**purchased** [3] - 4854:13, 4925:24, 4949:6
**purchases** [2] - 4963:23, 4964:8
**purchasing** [1] - 4854:15
**purely** [1] - 4770:10
**purpose** [6] - 4692:11, 4693:15, 4774:4, 4892:5, 4949:17, 4949:19
**purposes** [1] - 4890:19
**pursue** [1] - 4831:10
**put** [43] - 4673:6, 4689:11, 4689:15, 4693:18, 4694:18, 4714:11, 4718:18, 4724:8, 4743:9, 4753:25, 4762:5, 4768:17, 4769:20, 4774:8, 4777:12, 4777:13, 4781:22, 4793:2, 4794:23, 4816:11, 4837:13, 4859:17, 4863:7, 4875:9, 4875:10, 4883:18, 4894:13, 4900:18, 4902:7, 4916:22, 4923:24, 4926:25, 4929:1, 4941:7, 4944:14, 4947:8, 4950:6, 4958:18, 4960:23, 4961:1, 4965:18, 4966:9, 4974:6
**putting** [6] - 4670:11, 4695:2, 4730:13, 4774:16, 4816:17, 4816:23
**PX** [112] - 4692:2, 4692:5, 4693:10, 4709:2, 4709:5, 4765:13, 4791:9, 4791:13, 4797:25, 4798:6, 4798:8, 4798:9, 4801:23, 4802:1, 4802:2, 4803:23, 4804:6, 4804:11, 4804:12, 4811:23, 4812:3, 4812:5, 4812:6, 4813:10, 4813:23, 4820:5, 4820:16, 4821:9, 4821:12, 4821:13, 4821:18, 4821:20, 4822:22,

4822:24, 4823:2, 4824:18, 4825:1, 4827:3, 4827:11, 4827:13, 4830:10, 4830:13, 4833:8, 4833:9, 4833:10, 4836:6, 4838:17, 4838:19, 4839:16, 4839:20, 4840:2, 4840:5, 4845:4, 4845:15, 4845:19, 4848:1, 4848:4, 4848:7, 4849:18, 4849:22, 4849:25, 4852:2, 4852:4, 4852:5, 4852:7, 4852:10, 4852:21, 4854:22, 4854:24, 4855:7, 4858:7, 4858:8, 4858:11, 4858:14, 4860:2, 4861:10, 4866:3, 4867:3, 4867:5, 4867:23, 4867:25, 4868:3, 4868:8, 4868:12, 4868:13, 4868:23, 4868:25, 4874:11, 4874:13, 4875:11, 4876:13, 4876:16, 4876:17, 4876:25, 4880:13, 4880:18, 4880:25, 4882:11, 4882:22, 4883:2, 4883:5, 4884:19, 4885:14, 4972:5, 4972:8, 4972:9, 4978:11, 4980:4, 4980:5, 4980:6, 4980:7, 4981:14

## Q

**Qatar** [1] - 4908:8
**Quagliata** [2] - 4682:9, 4687:10
**quality** [1] - 4927:6
**quantified** [1] - 4687:18
**questions** [47] - 4683:13, 4703:8, 4730:16, 4772:23, 4773:9, 4785:24, 4794:12, 4794:14, 4795:8, 4796:11, 4796:15, 4798:24, 4799:6, 4799:22, 4799:24, 4800:1, 4802:4, 4811:21, 4857:16, 4861:6, 4861:16, 4861:20,

4864:7, 4864:9, 4864:10, 4864:11, 4864:12, 4864:14, 4864:15, 4865:3, 4892:25, 4893:13, 4895:24, 4896:6, 4901:20, 4905:23, 4907:21, 4910:9, 4910:10, 4910:24, 4915:20, 4915:21, 4950:25, 4951:3, 4958:4, 4958:17, 4977:20
**quickly** [3] - 4787:12, 4857:6, 4908:22
**quit** [1] - 4769:24
**quite** [13] - 4672:23, 4757:10, 4760:23, 4796:14, 4827:24, 4831:19, 4858:21, 4922:19, 4940:13, 4941:22, 4945:14, 4945:25, 4959:17
**quote** [1] - 4937:9

## R

**radically** [1] - 4932:21
**radio** [2] - 4915:5, 4935:17
**raise** [6] - 4730:23, 4739:20, 4787:9, 4866:17, 4964:21, 4965:5
**raised** [6] - 4725:1, 4735:23, 4876:5, 4876:9, 4886:21, 4933:22
**raising** [2] - 4863:10, 4966:8
**ran** [6] - 4677:18, 4678:3, 4681:8, 4723:5, 4723:12, 4820:5
**range** [6] - 4672:16, 4751:11, 4764:2, 4922:9, 4922:11, 4922:19
**ranking** [1] - 4807:4
**rarely** [1] - 4885:11
**rate** [154] - 4683:20, 4684:3, 4684:8, 4684:13, 4684:14, 4684:18, 4684:20, 4684:23, 4685:16, 4685:17, 4685:21, 4686:3, 4686:4, 4686:15, 4686:21, 4686:22, 4687:14, 4687:15, 4687:19,

4688:10, 4688:11, 4689:2, 4690:9, 4691:10, 4692:18, 4693:4, 4693:9, 4695:25, 4697:6, 4697:16, 4697:20, 4697:24, 4698:4, 4701:16, 4703:15, 4705:19, 4709:16, 4710:5, 4710:6, 4710:7, 4710:12, 4710:13, 4710:19, 4710:25, 4711:5, 4711:11, 4712:3, 4714:12, 4714:19, 4714:24, 4723:16, 4723:22, 4724:4, 4724:6, 4724:15, 4726:17, 4726:22, 4727:12, 4727:16, 4727:24, 4728:3, 4728:21, 4728:23, 4729:8, 4729:9, 4729:16, 4730:20, 4735:1, 4735:2, 4735:5, 4735:6, 4735:11, 4738:14, 4738:15, 4738:16, 4740:23, 4740:25, 4741:10, 4741:12, 4747:15, 4748:7, 4748:14, 4748:18, 4750:22, 4751:6, 4751:15, 4752:4, 4752:5, 4753:19, 4753:25, 4754:5, 4754:6, 4754:8, 4757:2, 4758:20, 4759:5, 4759:7, 4759:10, 4759:11, 4759:13, 4759:14, 4760:24, 4763:8, 4763:20, 4766:17, 4767:6, 4767:16, 4767:19, 4774:17, 4776:24, 4777:6, 4777:7, 4777:13, 4777:14, 4777:15, 4778:6, 4781:24, 4818:6, 4834:4, 4834:8, 4834:18, 4862:2, 4862:6, 4862:17, 4863:14, 4863:16, 4865:6, 4865:7, 4865:24, 4866:17, 4866:20, 4866:25, 4867:8, 4867:13, 4867:18, 4867:19, 4869:14, 4895:2, 4895:3, 4897:2,

4897:11, 4897:13,
4897:14, 4901:1,
4901:2, 4901:6
**Rate** [2] - 4709:25,
4861:24
**rates** [26] - 4691:11,
4693:22, 4709:23,
4710:14, 4715:2,
4723:18, 4727:20,
4727:24, 4728:6,
4728:10, 4728:13,
4729:5, 4735:3,
4739:2, 4739:20,
4740:24, 4746:17,
4751:11, 4767:5,
4862:14, 4862:21,
4863:23, 4863:25,
4893:22, 4895:1,
4897:12
**rather** [7] - 4717:17,
4782:22, 4787:24,
4788:19, 4805:15,
4923:12, 4971:22
**ratio** [2] - 4750:18,
4818:20
**rational** [8] - 4712:13,
4918:13, 4918:16,
4918:18, 4918:23,
4919:15, 4919:22,
4930:7
**Rational** [2] - 4711:6,
4711:15
**re** [6] - 4686:13,
4691:18, 4849:20,
4855:1, 4859:1,
4975:16
**re-ask** [1] - 4975:16
**re-sign** [1] - 4686:13
**reach** [6] - 4668:19,
4721:5, 4860:23,
4865:21, 4941:25,
4958:3
**reached** [3] - 4767:12,
4776:12, 4865:14
**reaches** [1] - 4860:8
**reaching** [1] - 4843:10
**reaction** [7] - 4746:18,
4756:11, 4768:21,
4859:25, 4865:10,
4965:2, 4966:1
**Reaction** [1] - 4963:17
**reactions** [1] -
4962:16
**Read** [1] - 4670:3
**read** [54] - 4706:14,
4734:24, 4760:15,
4799:20, 4800:7,
4801:9, 4801:20,
4802:15, 4803:18,
4806:19, 4806:24,

4806:25, 4808:24,
4814:8, 4822:13,
4828:6, 4828:13,
4833:25, 4834:10,
4837:10, 4838:3,
4842:6, 4842:12,
4842:14, 4843:2,
4844:6, 4846:16,
4849:4, 4850:15,
4851:4, 4851:9,
4851:20, 4853:1,
4856:8, 4857:18,
4859:4, 4861:4,
4861:5, 4864:4,
4865:8, 4865:18,
4866:22, 4867:20,
4873:14, 4878:15,
4878:23, 4881:20,
4895:1, 4896:8,
4897:7, 4898:5,
4909:12, 4909:13
**READ** [1] - 4666:23
**reads** [1] - 4823:24
**ready** [1] - 4730:15
**real** [5] - 4676:12,
4765:9, 4768:5,
4783:17, 4941:17
**realigned** [1] -
4736:19
**reality** [2] - 4753:17,
4960:1
**really** [77] - 4685:9,
4695:11, 4696:3,
4697:19, 4700:14,
4707:10, 4710:25,
4713:6, 4713:17,
4713:18, 4713:24,
4716:21, 4720:16,
4725:19, 4726:18,
4734:24, 4739:6,
4745:18, 4745:22,
4747:8, 4748:16,
4756:15, 4756:17,
4757:3, 4761:25,
4771:4, 4772:3,
4772:14, 4772:15,
4775:25, 4776:10,
4788:14, 4792:8,
4793:5, 4795:3,
4820:20, 4853:21,
4872:22, 4904:18,
4914:22, 4915:4,
4916:21, 4917:18,
4917:20, 4918:3,
4919:3, 4920:9,
4920:16, 4921:6,
4923:23, 4924:3,
4924:4, 4925:14,
4926:10, 4928:20,
4929:10, 4929:22,

4930:4, 4930:6,
4936:2, 4938:10,
4944:1, 4947:14,
4949:7, 4960:4,
4965:3, 4968:20,
4977:2
**reason** [23] - 4735:21,
4774:13, 4789:25,
4794:23, 4802:12,
4804:13, 4804:15,
4805:11, 4810:7,
4855:24, 4856:2,
4856:3, 4865:11,
4870:14, 4881:5,
4896:6, 4900:8,
4911:20, 4926:12,
4933:9, 4950:17,
4950:18, 4974:11
**reasoned** [1] -
4886:20
**reasons** [5] - 4671:1,
4769:6, 4936:5,
4968:8, 4977:16
**rebounded** [2] -
4735:24, 4735:25
**rebuild** [2] - 4921:6,
4921:17
**Recapture** [1] -
4869:23
**recapture** [66] -
4713:14, 4724:11,
4724:13, 4724:14,
4724:17, 4724:20,
4724:23, 4725:13,
4726:21, 4727:1,
4727:2, 4727:4,
4727:9, 4727:11,
4729:18, 4729:19,
4729:22, 4730:1,
4730:23, 4731:5,
4731:16, 4731:22,
4732:3, 4732:14,
4735:8, 4735:19,
4735:22, 4736:4,
4736:6, 4736:16,
4737:10, 4738:16,
4738:17, 4738:20,
4738:22, 4739:8,
4740:2, 4740:6,
4740:13, 4740:23,
4741:16, 4741:18,
4741:24, 4742:6,
4773:7, 4866:8,
4866:18, 4868:11,
4869:7, 4869:10,
4869:17, 4869:24,
4870:1, 4870:5,
4870:9, 4870:13,
4870:23, 4871:12,
4871:13, 4872:6,

4873:7, 4873:8,
4873:10, 4873:24,
4874:6
**receive** [4] - 4730:17,
4846:15, 4874:25,
4916:14
**received** [76] - 4692:5,
4692:7, 4692:19,
4709:5, 4709:6,
4719:15, 4719:16,
4721:2, 4734:18,
4734:20, 4738:8,
4738:10, 4763:17,
4764:1, 4767:19,
4771:15, 4791:13,
4798:8, 4802:1,
4804:11, 4812:5,
4813:23, 4821:20,
4825:1, 4838:19,
4838:22, 4840:5,
4840:6, 4844:12,
4845:21, 4845:22,
4848:7, 4848:8,
4849:25, 4850:1,
4852:10, 4852:12,
4855:9, 4855:10,
4858:14, 4858:15,
4867:25, 4868:2,
4868:8, 4868:9,
4868:25, 4869:1,
4874:19, 4874:23,
4875:13, 4875:15,
4877:1, 4877:2,
4880:25, 4881:1,
4881:3, 4881:4,
4883:5, 4883:6,
4885:15, 4885:16,
4893:6, 4893:8,
4895:17, 4895:19,
4896:16, 4896:17,
4930:23, 4937:4,
4949:12, 4952:2,
4955:23, 4957:19,
4972:8, 4972:21,
4978:19
**receiving** [2] - 4725:6,
4859:2
**Recent** [1] - 4875:17
**recent** [4] - 4669:21,
4825:17, 4903:10,
4904:5
**recently** [4] - 4676:7,
4922:14, 4941:7
**recess** [3] - 4754:17,
4911:25, 4977:23
**Recess** [1] - 4829:2
**recognition** [2] -
4816:13, 4942:12
**recognize** [4] -
4935:15, 4941:20,

4942:6, 4960:19
**recognized** [5] -
4770:21, 4789:6,
4941:13, 4941:18,
4942:15
**recognizes** [1] -
4942:16
**recognizing** [2] -
4916:12, 4968:23
**recollection** [5] -
4767:11, 4807:12,
4825:14, 4870:9,
4972:18
**recommend** [4] -
4943:21, 4944:8,
4946:12, 4953:4
**recommendation** [6] -
4724:17, 4732:4,
4732:11, 4732:13,
4732:16, 4732:21
**recommendations** [4]
- 4712:19, 4713:16,
4739:14, 4880:6
**recommended** [2] -
4724:22, 4800:2
**recommending** [1] -
4943:25
**reconciliation** [1] -
4748:3
**reconsider** [1] -
4865:11
**record** [4] - 4674:13,
4736:23, 4801:20,
4912:11
**recorded** [1] - 4667:21
**RECROSS** [2] -
4908:20, 4979:13
**RECROSS-
EXAMINATION** [2] -
4908:20, 4979:13
**redact** [3] - 4805:4,
4910:13, 4910:16
**REDACTED** [1] -
4666:16
**redacted** [13] -
4751:18, 4804:22,
4808:5, 4837:13,
4837:14, 4855:25,
4875:6, 4875:8,
4875:20, 4895:9,
4903:4, 4903:5,
4910:21
**redeem** [2] - 4723:23,
4723:24
**redirect** [2] - 4893:1,
4893:9
**REDIRECT** [2] -
4893:11, 4979:11
**reduce** [3] - 4684:20,
4758:20, 4759:4

**reduces** [2] - 4684:20, 4749:4
**reducing** [4] - 4748:19, 4751:23, 4752:20, 4793:12
**reduction** [4] - 4793:17, 4834:3, 4834:8, 4856:20
**refer** [4] - 4791:1, 4792:24, 4828:12, 4916:23
**reference** [25] - 4706:15, 4707:20, 4720:21, 4733:13, 4736:8, 4751:19, 4751:24, 4766:23, 4767:24, 4775:7, 4781:11, 4785:6, 4785:13, 4792:22, 4793:12, 4793:16, 4802:14, 4873:3, 4897:7, 4897:8, 4900:25, 4959:11, 4959:15, 4972:23, 4973:19
**referenced** [11] - 4716:4, 4752:22, 4784:17, 4802:24, 4817:3, 4824:14, 4859:6, 4859:10, 4868:18, 4893:3, 4905:2
**references** [12] - 4733:17, 4753:9, 4763:19, 4764:6, 4765:4, 4767:5, 4774:20, 4794:5, 4802:15, 4828:10, 4869:16, 4942:23
**referencing** [4] - 4737:24, 4824:17, 4916:17, 4967:25
**referred** [4] - 4688:4, 4721:9, 4820:11, 4915:14
**referring** [24] - 4714:16, 4722:11, 4728:18, 4759:16, 4760:7, 4794:8, 4802:21, 4805:23, 4807:23, 4808:13, 4848:15, 4862:18, 4863:21, 4952:11, 4953:17, 4964:15, 4968:19, 4969:15, 4969:25, 4970:3, 4970:5, 4970:6, 4973:16
**refers** [6] - 4763:24, 4764:23, 4765:24,

4806:3, 4875:17, 4878:9
**reflect** [8] - 4710:4, 4711:16, 4712:8, 4754:6, 4766:10, 4769:22, 4774:22, 4812:15
**reflected** [5] - 4735:21, 4760:21, 4764:17, 4768:5, 4787:14
**reflecting** [2] - 4709:17, 4876:21
**reflection** [1] - 4938:10
**reflects** [6] - 4711:8, 4813:8, 4866:19, 4953:10, 4953:16, 4972:1
**refresh** [1] - 4887:7
**refreshes** [1] - 4825:14
**refund** [2] - 4933:6, 4933:9
**refunding** [1] - 4933:16
**Regal** [1] - 4822:12
**regarding** [2] - 4691:18, 4825:17
**Regarding** [1] - 4857:6
**regional** [1] - 4717:17
**register** [3] - 4721:13, 4722:1, 4722:4
**registered** [6] - 4721:10, 4721:11, 4721:25, 4723:10, 4723:25
**regularly** [1] - 4957:7
**Regulation** [1] - 4887:4
**regulation** [5] - 4886:14, 4887:9, 4887:13, 4887:18, 4888:11
**regulatory** [2] - 4876:6, 4879:18
**reimbursed** [1] - 4759:3
**REIN** [1] - 4839:23
**Rein** [23] - 4757:12, 4757:22, 4758:1, 4758:3, 4758:13, 4765:18, 4765:19, 4766:5, 4772:1, 4774:2, 4774:12, 4775:9, 4775:17, 4775:21, 4776:6, 4777:17, 4838:9, 4839:23, 4858:5,

4859:16, 4899:15, 4900:2, 4900:8
**reinforce** [2] - 4944:16, 4960:24
**reinforced** [2] - 4930:12, 4931:18
**reinforcing** [1] - 4935:3
**reinstated** [1] - 4778:2
**reinvent** [2] - 4975:7, 4977:4
**reinvented** [3] - 4975:3, 4976:9, 4977:12
**reinvention** [3] - 4976:21, 4977:5, 4977:18
**reinventions** [2] - 4976:12, 4976:19
**relate** [7] - 4693:2, 4694:23, 4704:22, 4750:3, 4775:4, 4924:23, 4929:17
**related** [18] - 4682:14, 4683:6, 4694:3, 4700:22, 4703:7, 4726:7, 4728:5, 4752:3, 4797:14, 4893:14, 4929:20, 4930:5, 4930:6, 4930:9, 4943:11, 4950:20, 4954:17, 4956:12
**relates** [10] - 4684:13, 4704:4, 4737:9, 4925:13, 4927:23, 4929:22, 4948:8, 4954:3, 4954:13, 4964:12
**relation** [1] - 4694:4
**relationship** [36] - 4669:12, 4686:20, 4690:12, 4690:15, 4690:21, 4690:24, 4693:6, 4698:2, 4698:3, 4701:25, 4702:1, 4756:10, 4756:19, 4759:6, 4759:11, 4759:13, 4777:3, 4782:2, 4783:11, 4787:6, 4790:2, 4823:15, 4823:17, 4825:12, 4833:23, 4833:24, 4836:15, 4844:4, 4940:8, 4941:1, 4941:2, 4941:17, 4949:2, 4960:21, 4973:3
**relationships** [17] -

4669:10, 4679:6, 4685:25, 4686:9, 4690:18, 4714:14, 4716:12, 4719:25, 4720:1, 4720:6, 4720:7, 4864:1, 4938:11, 4938:24, 4940:16, 4940:20
**relatives** [1] - 4789:9
**release** [2] - 4768:19, 4860:7
**relevance** [15] - 4725:12, 4735:7, 4746:25, 4747:16, 4747:19, 4747:24, 4750:5, 4750:7, 4752:10, 4809:22, 4810:17, 4810:19, 4810:21, 4907:7, 4907:8
**relevant** [4] - 4910:15, 4931:5, 4966:8, 4972:16
**reliable** [2] - 4797:2, 4797:10
**reluctant** [1] - 4721:16
**rely** [2] - 4927:23, 4944:4
**remain** [1] - 4912:6
**remained** [2] - 4866:25, 4976:14
**remember** [44] - 4682:1, 4687:25, 4726:24, 4731:9, 4731:21, 4734:8, 4768:12, 4768:22, 4770:16, 4771:25, 4777:19, 4777:22, 4803:10, 4840:21, 4844:20, 4844:22, 4854:14, 4854:20, 4857:13, 4860:12, 4860:15, 4864:11, 4869:11, 4869:19, 4874:20, 4874:23, 4876:8, 4878:2, 4879:7, 4880:6, 4880:8, 4880:11, 4881:25, 4883:1, 4884:11, 4884:17, 4887:11, 4888:20, 4932:23, 4939:8, 4939:9, 4939:12, 4954:20, 4963:6
**remembered** [2] - 4919:11, 4962:19
**remind** [4] - 4753:10, 4828:24, 4830:1, 4905:24
**reminding** [1] -

4850:17
**removal** [1] - 4828:2
**remove** [1] - 4878:19
**removed** [2] - 4825:23, 4878:13
**Renaissance** [1] - 4933:1
**render** [1] - 4969:24
**renegotiate** [1] - 4686:12
**renew** [5] - 4686:20, 4687:11, 4756:18, 4775:2, 4902:19
**reopen** [1] - 4673:25
**rep** [1] - 4677:7
**repeat** [3] - 4816:20, 4841:16, 4975:13
**replace** [2] - 4771:6, 4976:24
**replacement** [2] - 4895:25, 4942:2
**replacing** [1] - 4976:17
**Report** [1] - 4955:6
**report** [14] - 4678:8, 4678:14, 4679:15, 4706:4, 4708:23, 4708:25, 4787:1, 4831:6, 4831:7, 4857:11, 4875:3, 4910:11, 4913:3, 4923:11
**reported** [15] - 4671:20, 4678:9, 4683:1, 4696:6, 4706:5, 4802:18, 4803:2, 4822:1, 4824:4, 4836:13, 4840:21, 4857:14, 4879:2, 4879:19
**Reporter** [1] - 4667:18
**reporting** [10] - 4679:19, 4683:8, 4734:2, 4734:7, 4794:3, 4802:19, 4802:23, 4822:6, 4877:22, 4878:3
**reports** [9] - 4672:11, 4828:1, 4859:14, 4878:18, 4879:20, 4915:16, 4950:8, 4958:8
**represent** [3] - 4713:19, 4747:6, 4796:11
**representation** [1] - 4936:20
**represented** [1] - 4831:24
**representing** [1] -

4767:25
**represents** [4] - 4774:19, 4886:11, 4886:20, 4906:13
**request** [1] - 4857:12
**requested** [1] - 4857:13
**requests** [1] - 4779:9
**require** [2] - 4841:15, 4925:25
**required** [3] - 4784:3, 4881:22, 4928:6
**requires** [2] - 4927:17, 4927:19
**research** [19] - 4788:2, 4788:18, 4837:5, 4837:21, 4838:10, 4903:10, 4903:24, 4904:6, 4915:2, 4915:19, 4919:8, 4957:10, 4957:11, 4957:25, 4958:16, 4959:11, 4974:12, 4977:8
**Research** [1] - 4837:17
**reservation** [1] - 4896:8
**resolved** [1] - 4787:10
**resorts** [1] - 4748:11
**Resorts** [1] - 4822:11
**resources** [5] - 4694:18, 4761:21, 4779:8, 4782:2, 4788:20
**respect** [25] - 4679:24, 4682:25, 4688:8, 4706:21, 4731:18, 4735:8, 4735:17, 4744:22, 4763:4, 4769:19, 4771:20, 4772:20, 4773:10, 4777:3, 4784:3, 4787:15, 4789:19, 4792:20, 4792:22, 4895:11, 4899:9, 4922:6, 4942:12, 4942:17, 4943:9
**respected** [1] - 4949:23
**respective** [1] - 4895:11
**respectively** [1] - 4793:14
**respond** [5] - 4799:25, 4804:25, 4828:11, 4939:11, 4967:13
**responded** [1] - 4863:23
**responding** [1] -

4774:15
**responds** [1] - 4857:15
**response** [16] - 4673:8, 4703:7, 4723:16, 4723:18, 4723:22, 4724:4, 4724:5, 4847:22, 4851:18, 4860:25, 4864:7, 4882:18, 4927:18, 4941:23, 4968:6, 4970:10
**responses** [1] - 4879:17
**responsibilities** [16] - 4678:23, 4678:25, 4679:1, 4679:3, 4679:6, 4680:12, 4682:13, 4682:15, 4700:15, 4756:5, 4840:23, 4913:7, 4913:9, 4913:19, 4914:7, 4914:19
**responsibility** [21] - 4678:5, 4678:18, 4679:9, 4680:2, 4682:13, 4682:16, 4696:1, 4699:22, 4706:7, 4725:15, 4734:5, 4742:25, 4743:2, 4756:9, 4798:15, 4836:17, 4840:20, 4879:10, 4916:5, 4917:9, 4933:7
**responsible** [14] - 4681:8, 4685:20, 4686:8, 4699:19, 4733:25, 4734:13, 4746:1, 4751:7, 4786:4, 4836:14, 4914:19, 4915:25, 4916:3, 4916:6
**rest** [1] - 4865:18
**restarted** [2] - 4900:5, 4900:9
**restaurant** [12] - 4721:17, 4721:19, 4721:20, 4722:2, 4823:11, 4871:20, 4872:5, 4873:7, 4873:8, 4873:10, 4874:6
**restaurants** [3] - 4677:21, 4873:23
**result** [13] - 4712:3, 4740:2, 4753:2, 4780:9, 4780:21, 4801:7, 4826:10, 4826:16, 4856:20,

4866:20, 4951:7, 4958:22, 4964:24
**resulting** [2] - 4758:16, 4871:25
**results** [8] - 4723:16, 4923:15, 4950:18, 4951:4, 4951:5, 4951:6, 4958:23, 4974:4
**resume** [1] - 4911:17
**retail** [2] - 4840:21, 4925:24
**retailer** [4] - 4779:13, 4779:16, 4779:17, 4779:18
**retailers** [1] - 4783:24
**retain** [9] - 4680:14, 4701:2, 4701:7, 4701:8, 4717:13, 4743:3, 4769:4, 4792:15, 4921:24
**retained** [1] - 4715:11
**retaining** [4] - 4717:5, 4726:7, 4726:13, 4739:6
**retention** [2] - 4696:21, 4717:3
**return** [4] - 4774:21, 4830:8, 4830:9, 4867:3
**reveal** [1] - 4898:9
**revealed** [1] - 4898:11
**revenue** [17] - 4714:23, 4714:25, 4715:4, 4715:13, 4715:14, 4715:16, 4716:8, 4729:15, 4758:19, 4759:1, 4763:17, 4764:22, 4765:4, 4768:1, 4870:13, 4870:14, 4889:5
**revenues** [2] - 4690:16, 4714:21
**Review** [6] - 4733:17, 4778:23, 4869:3, 4874:17, 4874:20, 4880:16
**review** [12] - 4708:15, 4708:16, 4719:4, 4719:8, 4779:5, 4805:3, 4825:7, 4826:17, 4857:6, 4868:20, 4874:18, 4884:25
**reviewing** [4] - 4711:22, 4736:3, 4798:23, 4805:13
**reviews** [4] - 4708:17, 4708:22, 4779:7,

4823:11
**revised** [2] - 4737:24, 4760:25
**revisit** [1] - 4878:8
**Rewards** [4] - 4841:3, 4841:5, 4841:6, 4842:5
**rewards** [17] - 4688:19, 4710:19, 4710:20, 4716:11, 4722:14, 4722:15, 4725:21, 4748:10, 4748:15, 4748:25, 4754:12, 4759:16, 4759:19, 4759:20
**RHODE** [1] - 4666:6
**rich** [6] - 4764:20, 4764:21, 4835:4, 4835:8, 4858:21
**Richard** [1] - 4698:10
**rid** [1] - 4747:12
**rights** [2] - 4895:7, 4895:11
**risen** [1] - 4735:6
**rising** [2] - 4695:1, 4695:2
**Risk** [3] - 4836:8, 4837:17, 4837:25
**risk** [7] - 4739:3, 4739:5, 4777:23, 4837:9, 4838:2, 4883:18, 4896:20
**risks** [3] - 4738:22, 4738:25, 4739:11
**Rite** [1] - 4841:22
**RMR** [1] - 4667:18
**Robert** [1] - 4790:15
**robust** [2] - 4841:15, 4919:14
**ROC** [1] - 4906:23
**Rocco** [1] - 4821:23
**ROCs** [2] - 4906:22, 4907:4
**role** [33] - 4671:16, 4676:9, 4682:25, 4690:18, 4692:20, 4694:15, 4695:7, 4695:18, 4696:14, 4696:22, 4696:24, 4706:20, 4712:15, 4730:11, 4730:12, 4732:5, 4746:22, 4746:24, 4753:16, 4860:12, 4874:24, 4923:16, 4925:7, 4928:22, 4929:16, 4934:23, 4946:19, 4946:20, 4948:11, 4948:12, 4966:24, 4974:16

**roles** [3] - 4677:16, 4680:23, 4692:22
**roll** [4] - 4950:17, 4950:23, 4951:8, 4955:10
**rolled** [4] - 4693:8, 4740:7, 4957:13, 4968:3
**Ron** [1] - 4860:14
**Ronald** [2] - 4860:6, 4978:13
**room** [2] - 4713:1, 4933:16
**Rothschild** [2] - 4951:13, 4951:15
**roughly** [10] - 4670:11, 4672:17, 4675:25, 4676:2, 4677:11, 4677:23, 4678:6, 4678:21, 4765:16
**rounded** [2] - 4691:10, 4892:11
**rows** [1] - 4952:15
**RSS** [1] - 4951:14
**Rudolphsen** [1] - 4757:15
**rules** [11] - 4794:23, 4821:2, 4843:4, 4846:24, 4847:3, 4847:4, 4853:9, 4853:19, 4879:20, 4879:24, 4881:23
**ruling** [1] - 4882:1
**run** [19] - 4690:4, 4694:8, 4694:10, 4698:20, 4715:20, 4716:13, 4722:13, 4723:20, 4752:2, 4758:25, 4789:17, 4828:8, 4831:19, 4889:11, 4891:11, 4891:12, 4915:11, 4957:12, 4973:22
**running** [8] - 4671:11, 4678:17, 4682:6, 4682:10, 4696:9, 4826:8, 4826:24, 4905:19
**runs** [2] - 4715:20, 4917:4
**RVR** [1] - 4873:9

## S

**S-t-o-n-i-e-r** [1] - 4845:17
**safe** [4] - 4691:15, 4749:17, 4753:6, 4931:23

**sale** [17] - 4765:8, 4778:15, 4788:4, 4788:17, 4815:12, 4815:20, 4816:7, 4816:12, 4816:18, 4816:23, 4817:1, 4822:10, 4843:9, 4847:5, 4853:12, 4888:9, 4977:10
**Sale** [8] - 4800:25, 4960:16, 4960:18, 4961:9, 4961:17, 4962:6, 4973:8, 4974:20
**Sales** [3] - 4836:8, 4837:17, 4837:25
**sales** [27] - 4677:7, 4677:14, 4677:16, 4679:3, 4680:25, 4681:10, 4681:11, 4681:12, 4681:14, 4681:16, 4681:24, 4681:25, 4704:20, 4705:2, 4715:15, 4715:17, 4717:7, 4731:15, 4746:6, 4758:11, 4836:23, 4837:9, 4891:24, 4896:20, 4897:5
**salt** [1] - 4923:9
**Sam's** [1] - 4697:13
**Samoy** [5] - 4858:8, 4858:16, 4858:20, 4859:19, 4859:22
**Samoy's** [1] - 4859:13
**San** [19] - 4785:20, 4807:18, 4807:25, 4808:1, 4808:7, 4808:8, 4808:17, 4830:22, 4830:25, 4831:2, 4831:13, 4831:16, 4831:21, 4905:24, 4905:25, 4906:4, 4906:16, 4909:21, 4910:1
**Sanchez** [2] - 4757:23, 4765:18
**Sandra** [2] - 4757:22, 4757:23
**satisfaction** [7] - 4916:2, 4920:11, 4944:5, 4959:19, 4960:3, 4960:4, 4960:6
**Satisfaction** [1] - 4959:21
**Saturdays** [1] - 4951:1
**Saunders** [4] - 4839:22, 4840:17, 4840:19, 4844:13

**SAUNDERS** [1] - 4839:23
**save** [2] - 4691:24, 4878:21
**Save** [1] - 4852:25
**saw** [17] - 4768:21, 4794:2, 4794:24, 4810:25, 4819:3, 4852:16, 4853:21, 4859:15, 4901:5, 4906:15, 4911:13, 4919:13, 4974:4, 4974:12, 4974:18, 4977:18
**sbryant102@verizon .net** [1] - 4667:20
**scale** [8] - 4720:14, 4750:5, 4750:7, 4809:22, 4810:17, 4810:19, 4810:21, 4960:5
**SCANLON** [1] - 4666:25
**Scardino** [2] - 4798:1, 4821:9
**SCARDINO** [2] - 4798:2, 4821:10
**scared** [2] - 4962:19, 4962:21
**scenario** [1] - 4967:19
**scenarios** [1] - 4696:20
**scenes** [1] - 4919:11
**schedule** [1] - 4865:24
**scheduled** [1] - 4774:6
**Schick** [2] - 4966:15, 4970:20
**Schick's** [1] - 4966:24
**SCHILLER** [1] - 4667:14
**SCHNEIDER** [1] - 4667:4
**Schreiber** [1] - 4951:14
**Schultz** [5] - 4860:6, 4860:10, 4860:14, 4860:17, 4978:13
**Scope** [1] - 4677:9
**scope** [4] - 4683:21, 4967:25, 4968:1, 4971:6
**screen** [6] - 4718:25, 4737:21, 4753:6, 4768:18, 4798:17, 4894:13
**script** [3] - 4798:3, 4861:13, 4861:16
**scripted** [1] - 4789:21

**scripts** [1] - 4798:23
**scrub** [1] - 4801:3
**seal** [3] - 4668:25, 4669:18, 4671:4
**sealing** [2] - 4670:7, 4671:2
**seat** [2] - 4674:10, 4912:10
**seated** [2] - 4755:1, 4912:1
**seats** [1] - 4676:12
**second** [28] - 4672:8, 4694:13, 4699:1, 4702:16, 4765:21, 4780:10, 4797:11, 4798:3, 4799:5, 4823:14, 4834:8, 4840:10, 4869:2, 4876:1, 4878:3, 4878:7, 4878:17, 4880:15, 4886:19, 4887:4, 4898:7, 4914:24, 4956:3, 4963:15, 4968:17, 4970:14, 4973:21, 4976:16
**second-to-last** [2] - 4878:17, 4887:4
**secondly** [1] - 4977:7
**section** [7] - 4752:9, 4764:23, 4791:23, 4799:4, 4840:25, 4850:15, 4861:23
**sector** [1] - 4869:7
**security** [16] - 4925:3, 4926:2, 4927:9, 4927:15, 4929:17, 4929:20, 4929:21, 4930:3, 4930:5, 4930:8, 4932:10, 4937:20, 4938:6, 4948:4, 4976:15, 4977:14
**see** [96] - 4672:22, 4673:7, 4697:6, 4707:5, 4719:24, 4721:2, 4726:9, 4747:1, 4747:20, 4748:22, 4767:22, 4774:5, 4782:8, 4783:23, 4786:18, 4790:23, 4791:3, 4803:7, 4805:3, 4806:5, 4807:2, 4807:18, 4810:16, 4814:14, 4825:14, 4827:15, 4828:25, 4837:18, 4840:12, 4845:14, 4846:6, 4846:9, 4847:12,

4848:20, 4850:4, 4851:14, 4855:14, 4856:2, 4856:3, 4856:15, 4856:21, 4861:24, 4865:19, 4866:20, 4867:2, 4868:4, 4868:16, 4871:22, 4873:18, 4873:21, 4874:3, 4875:20, 4876:3, 4877:10, 4878:8, 4880:17, 4881:16, 4883:9, 4885:6, 4885:23, 4886:2, 4894:19, 4894:21, 4895:1, 4895:8, 4905:15, 4906:22, 4907:3, 4909:8, 4914:3, 4926:14, 4930:4, 4930:14, 4934:5, 4935:11, 4935:18, 4945:6, 4946:13, 4951:11, 4951:18, 4951:21, 4954:15, 4960:15, 4965:25, 4966:3, 4969:8, 4969:13, 4970:8, 4970:9, 4970:17, 4973:1, 4976:23, 4978:20
**seeing** [9] - 4707:2, 4768:19, 4807:14, 4807:15, 4866:10, 4869:20, 4883:1, 4965:2, 4977:7
**seek** [1] - 4940:8
**seeking** [1] - 4896:10
**seem** [3] - 4755:5, 4838:11, 4919:14
**segment** [4] - 4819:19, 4819:20, 4919:2, 4926:15
**Segments** [1] - 4837:4
**segments** [4] - 4727:23, 4869:17, 4946:2, 4950:21
**self** [1] - 4821:23
**sell** [18] - 4700:4, 4713:4, 4713:7, 4713:21, 4714:10, 4729:25, 4733:1, 4890:10, 4890:13, 4890:17, 4890:20, 4891:7, 4891:10, 4891:13, 4891:15, 4891:19, 4907:15
**sellable** [2] - 4707:17, 4730:5
**selling** [4] - 4677:8, 4677:21, 4713:12,

4765:7
**send** [2] - 4790:1, 4793:1
**sending** [3] - 4774:4, 4859:19, 4941:24
**senior** [3] - 4756:23, 4967:2, 4967:12
**Senior** [1] - 4846:5
**SENIOR** [1] - 4846:5
**sense** [12] - 4687:4, 4733:2, 4750:17, 4832:9, 4832:14, 4848:25, 4865:22, 4909:7, 4915:10, 4929:23, 4941:19, 4955:9
**sensitivity** [1] - 4669:14
**sent** [10] - 4669:5, 4691:21, 4756:24, 4757:25, 4758:3, 4765:19, 4768:12, 4774:2, 4775:14, 4790:19
**sentence** [14] - 4767:24, 4802:13, 4842:9, 4843:2, 4844:2, 4848:9, 4850:14, 4855:21, 4856:17, 4859:7, 4859:10, 4888:20, 4898:6, 4898:7
**separate** [11] - 4701:18, 4703:6, 4742:8, 4889:13, 4889:15, 4889:18, 4917:6, 4917:7, 4923:4, 4945:2
**separately** [2] - 4930:1, 4930:2
**September** [5] - 4677:25, 4734:6, 4836:2, 4836:9, 4838:6
**series** [7] - 4853:22, 4871:1, 4893:13, 4901:20, 4905:23, 4952:15, 4970:13
**serious** [1] - 4921:16
**seriously** [1] - 4826:14
**serve** [3] - 4925:22, 4934:2, 4935:21
**Serve** [4] - 4926:6, 4926:8, 4926:11, 4928:24
**served** [2] - 4869:24, 4948:20
**service** [50] - 4677:18, 4677:20, 4725:21,

4725:22, 4730:15, 4748:10, 4748:25, 4777:22, 4788:15, 4793:7, 4889:3, 4889:5, 4891:16, 4925:4, 4926:2, 4926:9, 4926:11, 4926:15, 4926:24, 4927:9, 4927:15, 4930:3, 4930:6, 4930:10, 4930:12, 4930:13, 4930:15, 4930:17, 4930:20, 4930:21, 4931:1, 4931:12, 4934:9, 4935:20, 4937:20, 4938:5, 4942:12, 4942:13, 4942:14, 4943:19, 4943:20, 4944:7, 4946:7, 4946:8, 4947:16, 4949:24, 4963:12, 4976:15, 4977:15

**Service** [1] - 4701:19

**serviced** [1] - 4681:6

**services** [32] - 4676:15, 4682:6, 4682:10, 4692:17, 4693:6, 4694:20, 4715:19, 4733:23, 4742:25, 4751:8, 4798:11, 4798:13, 4798:19, 4801:12, 4889:19, 4889:21, 4890:11, 4890:13, 4891:18, 4924:12, 4928:14, 4932:2, 4932:3, 4932:6, 4932:9, 4935:20, 4943:16, 4943:23, 4962:5, 4966:21, 4972:13

**Services** [36] - 4671:18, 4676:14, 4678:3, 4678:12, 4678:13, 4678:18, 4678:20, 4678:24, 4679:1, 4679:23, 4680:1, 4680:12, 4682:24, 4705:25, 4706:6, 4715:22, 4716:18, 4719:4, 4733:19, 4746:2, 4781:16, 4786:5, 4794:15, 4795:1, 4874:24, 4875:3, 4878:9, 4879:14, 4879:15, 4881:3, 4889:15, 4901:22, 4905:20, 4917:8, 4955:6, 4956:9

**servicing** [4] - 4683:12, 4683:15, 4705:5, 4944:19

**serving** [3] - 4825:20, 4934:1, 4950:14

**set** [15] - 4681:20, 4682:17, 4683:7, 4684:15, 4692:25, 4693:5, 4795:9, 4796:1, 4873:12, 4895:9, 4895:10, 4907:13, 4919:16, 4921:2, 4944:24

**Seton** [2] - 4914:13, 4914:15

**sets** [2] - 4897:17, 4918:1

**setting** [1] - 4897:10

**settled** [1] - 4858:21

**settlement** [1] - 4748:3

**seven** [2] - 4776:11, 4933:1

**several** [7] - 4720:4, 4800:21, 4826:11, 4858:23, 4862:9, 4862:12, 4865:1

**severe** [1] - 4871:24

**shall** [1] - 4742:21

**Shane** [2] - 4682:8, 4687:10

**share** [6] - 4773:19, 4848:14, 4848:25, 4849:15, 4883:17

**shared** [2] - 4855:22, 4898:8

**shareholder** [1] - 4860:22

**shareholders** [1] - 4858:25

**sheet** [1] - 4757:21

**SHERRY** [1] - 4667:18

**Shift** [1] - 4711:24

**shift** [13] - 4728:20, 4736:21, 4762:13, 4848:25, 4852:18, 4854:1, 4867:18, 4871:25, 4891:24, 4892:8, 4892:20, 4897:14, 4897:15

**shifted** [1] - 4892:4

**shifting** [6] - 4843:22, 4849:15, 4853:24, 4854:4, 4944:22, 4951:10

**shocking** [1] - 4673:5

**shop** [8] - 4702:17, 4722:16, 4839:6, 4839:14, 4891:6, 4892:1, 4892:16,

4904:24

**shopped** [1] - 4701:5

**shopper** [2] - 4841:11, 4849:2

**Shoppers** [2] - 4841:1, 4843:3

**shoppers** [5] - 4721:3, 4841:6, 4843:6, 4850:17, 4850:20

**shopping** [4] - 4701:5, 4771:21, 4772:3, 4865:21

**short** [4] - 4673:20, 4853:4, 4853:5, 4967:17

**short-term** [3] - 4853:4, 4853:5, 4967:17

**shorten** [1] - 4742:14

**shorter** [1] - 4670:13

**shortly** [1] - 4932:18

**shot** [1] - 4966:6

**show** [15] - 4691:7, 4700:17, 4708:1, 4738:18, 4745:17, 4770:10, 4790:10, 4836:3, 4845:4, 4847:25, 4849:17, 4858:6, 4868:11, 4955:4, 4968:4

**showed** [6] - 4789:11, 4815:2, 4870:12, 4871:16, 4898:23, 4900:20

**showing** [2] - 4723:8, 4740:4

**shown** [3] - 4671:5, 4831:1, 4831:14

**shows** [11] - 4735:1, 4738:14, 4751:22, 4802:4, 4808:11, 4830:16, 4830:17, 4871:1, 4871:4, 4871:11, 4873:20

**shrinking** [1] - 4729:10

**sic** [1] - 4962:20

**side** [20] - 4669:11, 4672:6, 4687:11, 4722:9, 4725:13, 4725:14, 4725:18, 4725:20, 4743:10, 4748:23, 4750:10, 4754:2, 4754:9, 4754:10, 4760:3, 4760:4, 4808:14, 4911:12, 4930:7

**sided** [1] - 4884:4

**sides** [2] - 4865:19, 4885:11

**SIF** [1] - 4688:5

**sign** [11] - 4686:13, 4689:16, 4704:18, 4704:23, 4770:3, 4779:24, 4780:22, 4781:10, 4787:19, 4905:10

**signage** [3] - 4793:13, 4793:17, 4960:19

**signature** [1] - 4967:22

**signed** [4] - 4780:14, 4780:15, 4787:21, 4811:3

**significance** [1] - 4923:7

**significant** [9] - 4753:1, 4766:18, 4808:22, 4878:21, 4884:5, 4902:1, 4965:16, 4966:1, 4974:23

**significantly** [2] - 4714:2, 4903:12

**Signing** [1] - 4781:3

**signing** [22] - 4685:22, 4686:7, 4686:10, 4686:13, 4686:14, 4686:19, 4686:24, 4687:5, 4687:6, 4687:10, 4688:9, 4697:24, 4766:12, 4775:1, 4780:17, 4780:18, 4781:25, 4782:5, 4782:6, 4787:15, 4944:18

**Signings** [1] - 4779:19

**signs** [4] - 4689:11, 4689:15, 4769:20, 4770:7

**Silverman** [3] - 4672:2, 4672:4, 4672:5

**Silverman's** [1] - 4956:24

**similar** [13] - 4670:4, 4688:8, 4693:15, 4703:22, 4705:17, 4764:24, 4765:6, 4783:15, 4815:16, 4890:11, 4890:12, 4955:8, 4955:11

**similarly** [3] - 4700:10, 4716:10, 4724:2

**simple** [3] - 4944:1, 4944:3, 4947:10

**simplest** [1] - 4925:2

**simplicity** [2] - 4945:5, 4947:10

**single** [7] - 4713:20, 4714:3, 4714:4, 4726:18, 4739:2, 4743:1, 4800:25

**sit** [1] - 4932:16

**site** [2] - 4785:1, 4935:21

**sitting** [1] - 4977:17

**situation** [10] - 4753:21, 4755:20, 4756:7, 4757:6, 4787:2, 4817:7, 4824:1, 4872:21, 4934:18, 4961:17

**situations** [5] - 4703:1, 4790:6, 4920:23, 4934:6, 4977:13

**six** [7] - 4729:24, 4801:2, 4822:11, 4911:20, 4911:21, 4911:23, 4932:25

**sixteen** [2] - 4715:12, 4723:19

**size** [18] - 4681:23, 4682:18, 4684:15, 4684:17, 4703:23, 4705:3, 4705:9, 4705:17, 4712:23, 4731:7, 4744:4, 4784:9, 4795:2, 4819:16, 4897:2, 4967:25, 4968:13, 4971:6

**sizes** [1] - 4726:10

**skills** [1] - 4915:19

**skip** [1] - 4711:20

**sky** [1] - 4675:16

**sleep** [1] - 4770:23

**Slide** [7] - 4706:9, 4709:7, 4719:18, 4720:19, 4723:7, 4830:19, 4830:20

**slide** [69] - 4692:10, 4706:9, 4706:15, 4709:11, 4711:12, 4719:19, 4723:8, 4734:25, 4735:21, 4736:19, 4737:8, 4738:13, 4749:22, 4751:16, 4751:21, 4753:13, 4762:18, 4764:23, 4779:10, 4779:11, 4779:19, 4781:2, 4785:2, 4791:17, 4791:22, 4792:17, 4804:19, 4805:11, 4805:15, 4805:20, 4806:5, 4806:13, 4808:14,

4808:21, 4809:9, 4809:10, 4809:16, 4812:1, 4812:10, 4812:12, 4812:18, 4814:1, 4814:2, 4815:11, 4815:15, 4815:16, 4815:19, 4817:3, 4836:7, 4837:16, 4867:7, 4869:23, 4871:20, 4875:16, 4880:15, 4881:2, 4887:16, 4902:24, 4903:2, 4910:6, 4942:19, 4949:15, 4949:18, 4952:5, 4952:8, 4953:25, 4954:3, 4956:8

**slight** [1] - 4866:19
**slip** [1] - 4911:13
**slow** [1] - 4752:17
**slowed** [1] - 4727:13
**Small** [1] - 4792:18
**small** [38] - 4715:8, 4715:9, 4717:22, 4717:23, 4718:3, 4718:9, 4718:12, 4718:14, 4739:22, 4743:13, 4744:10, 4746:9, 4747:1, 4750:1, 4752:7, 4772:12, 4785:25, 4786:12, 4787:12, 4789:1, 4789:3, 4789:11, 4790:6, 4803:12, 4809:17, 4809:21, 4810:2, 4810:8, 4810:20, 4811:5, 4811:18, 4883:17, 4886:24, 4904:25, 4906:21, 4916:19, 4938:18
**smaller** [10] - 4681:18, 4682:2, 4704:13, 4718:6, 4718:20, 4731:9, 4731:11, 4819:15, 4907:20
**Smith** [1] - 4825:17
**so..** [2] - 4859:21, 4869:12
**soda** [1] - 4677:21
**solely** [1] - 4699:19
**solution** [1] - 4673:18
**solve** [1] - 4946:10
**someone** [17] - 4699:8, 4731:1, 4787:19, 4787:24, 4793:20, 4822:1, 4825:7, 4836:14, 4909:20, 4909:24,

4919:12, 4922:20, 4929:3, 4929:24, 4952:20, 4952:21, 4954:24
**someplace** [4] - 4843:12, 4922:16, 4922:18, 4933:18
**sometime** [4] - 4678:22, 4679:12, 4734:4, 4858:4
**sometimes** [13] - 4668:20, 4687:18, 4688:4, 4700:19, 4723:4, 4741:12, 4789:24, 4853:5, 4915:13, 4923:21, 4923:22, 4947:17
**somewhat** [2] - 4925:11, 4940:13
**somewhere** [3] - 4850:24, 4879:8, 4904:25
**soon** [1] - 4901:10
**sophisticated** [1] - 4713:17
**Sorry** [1] - 4956:5
**sorry** [56] - 4675:17, 4683:25, 4692:8, 4735:16, 4749:12, 4753:7, 4755:3, 4755:7, 4763:15, 4773:25, 4784:13, 4808:3, 4808:13, 4812:11, 4815:4, 4816:5, 4816:15, 4821:12, 4830:12, 4831:3, 4833:9, 4835:23, 4839:18, 4846:2, 4846:25, 4850:20, 4852:3, 4854:24, 4855:2, 4858:7, 4859:9, 4861:11, 4863:6, 4867:4, 4872:20, 4873:4, 4874:1, 4876:15, 4880:22, 4882:12, 4882:16, 4882:21, 4882:23, 4897:24, 4899:4, 4902:25, 4903:22, 4904:4, 4906:12, 4945:10, 4945:22, 4956:3, 4956:6, 4975:13, 4978:4
**sort** [15] - 4701:9, 4703:21, 4720:22, 4723:3, 4727:22, 4729:3, 4731:16, 4775:1, 4784:9, 4847:13, 4891:15,

4907:11, 4908:5, 4955:13, 4974:24
**sorts** [1] - 4752:7
**sought** [1] - 4971:16
**sound** [2] - 4964:9, 4964:10
**sounds** [3] - 4742:18, 4919:5, 4960:11
**south** [1] - 4862:7
**Southwest** [8] - 4877:5, 4877:10, 4877:13, 4877:22, 4877:24, 4878:5, 4878:21
**space** [2] - 4702:14, 4929:13
**spare** [1] - 4740:4
**speaker** [4] - 4792:10, 4802:5, 4802:8, 4867:12
**speaking** [2] - 4778:12, 4915:18
**speaks** [1] - 4872:7
**special** [4] - 4850:19, 4913:19, 4935:25, 4949:23
**specialize** [2] - 4958:1, 4958:21
**specialized** [1] - 4949:7
**specific** [12] - 4683:6, 4700:21, 4709:9, 4751:10, 4751:19, 4755:24, 4819:4, 4821:6, 4841:21, 4844:22, 4899:8, 4925:16
**specifically** [8] - 4837:22, 4860:12, 4870:24, 4871:20, 4888:21, 4893:14, 4899:2, 4964:15
**specifics** [5] - 4687:6, 4827:2, 4879:7, 4880:7, 4891:4
**specified** [1] - 4835:16
**specs** [1] - 4958:16
**spell** [3] - 4674:12, 4674:15, 4912:10
**Spend** [1] - 4812:19
**spend** [124] - 4685:22, 4686:5, 4688:15, 4688:22, 4688:25, 4690:17, 4694:3, 4694:4, 4694:21, 4694:22, 4697:18, 4702:21, 4704:2, 4711:4, 4711:9, 4717:4, 4724:3,

4725:21, 4725:25, 4727:15, 4727:21, 4728:5, 4728:11, 4728:12, 4728:20, 4729:15, 4731:10, 4739:24, 4743:7, 4743:14, 4743:16, 4743:17, 4744:1, 4744:2, 4744:3, 4744:7, 4744:8, 4744:14, 4744:24, 4749:3, 4754:11, 4756:16, 4767:12, 4769:15, 4772:11, 4772:13, 4778:16, 4779:23, 4780:3, 4780:4, 4780:5, 4780:8, 4780:24, 4781:6, 4781:7, 4781:9, 4781:14, 4781:15, 4781:18, 4782:9, 4788:4, 4792:3, 4792:7, 4796:16, 4799:17, 4800:17, 4803:8, 4803:12, 4807:4, 4807:6, 4808:18, 4812:15, 4812:21, 4812:25, 4814:1, 4814:6, 4814:10, 4814:17, 4814:19, 4814:23, 4817:18, 4817:24, 4817:25, 4818:4, 4818:5, 4818:6, 4818:13, 4818:14, 4818:20, 4818:21, 4818:22, 4819:5, 4819:8, 4819:9, 4819:20, 4819:22, 4819:23, 4819:24, 4820:8, 4830:18, 4832:1, 4832:12, 4832:21, 4832:23, 4833:1, 4843:12, 4843:23, 4849:16, 4856:21, 4862:16, 4867:16, 4873:16, 4890:24, 4890:25, 4899:14, 4899:21, 4899:22, 4901:20, 4902:2, 4902:14
**spending** [16] - 4702:2, 4725:17, 4725:19, 4725:20, 4726:9, 4744:12, 4794:10, 4796:23, 4811:8, 4814:5, 4820:7, 4841:14, 4890:16
**spent** [15] - 4717:3,

4717:20, 4743:19, 4743:20, 4818:5, 4819:11, 4819:12, 4851:3, 4907:18, 4914:9, 4914:17, 4921:17, 4948:16, 4948:18
**Spillover** [2] - 4779:19, 4781:3
**spillover** [28] - 4697:17, 4697:18, 4703:10, 4703:18, 4704:21, 4705:6, 4705:10, 4705:15, 4748:14, 4752:21, 4753:2, 4769:5, 4769:10, 4777:10, 4779:21, 4779:22, 4779:23, 4780:4, 4780:5, 4781:5, 4781:7, 4781:9, 4781:18, 4782:4, 4782:6, 4788:24, 4834:7
**spiral** [4] - 4974:24, 4975:6, 4976:6, 4976:17
**spoken** [1] - 4848:12
**sponsorship** [3] - 4948:1, 4948:2, 4974:1
**spun** [1] - 4676:7
**SQP** [2] - 4874:18, 4880:16
**stable** [2] - 4867:1, 4918:7
**staff** [1] - 4721:21
**Staff** [1] - 4812:2
**stage** [1] - 4755:24
**stake** [1] - 4676:11
**stand** [7] - 4669:20, 4742:15, 4911:3, 4912:5, 4928:10, 4933:8, 4947:2
**standalone** [1] - 4949:5
**standard** [1] - 4800:22
**standing** [1] - 4912:6
**standpoint** [8] - 4915:23, 4921:25, 4933:7, 4935:1, 4943:15, 4955:11, 4974:12, 4975:10
**stands** [4] - 4720:18, 4889:16, 4917:24, 4927:11
**start** [20] - 4670:21, 4676:24, 4686:6, 4686:19, 4693:25, 4703:24, 4736:9,

4775:25, 4786:6,
4789:21, 4845:6,
4863:15, 4864:12,
4894:9, 4905:18,
4907:11, 4908:1,
4917:17, 4965:25,
4970:19
**started** [11] - 4674:6,
4694:3, 4700:11,
4701:14, 4701:17,
4727:10, 4745:8,
4917:20, 4949:22,
4973:9
**starting** [4] - 4668:19,
4758:5, 4891:6,
4928:4
**starts** [4] - 4690:21,
4759:12, 4791:23,
4851:12
**State** [4] - 4667:2,
4667:4, 4667:7,
4668:7
**state** [10] - 4668:2,
4674:12, 4750:20,
4759:4, 4872:10,
4876:24, 4876:25,
4912:10, 4962:10,
4971:17
**statement** [4] -
4722:3, 4770:10,
4963:18, 4964:3
**statements** [2] -
4770:11, 4826:4
**STATES** [4] - 4666:1,
4666:4, 4666:4,
4666:17
**states** [1] - 4964:4
**States** [19] - 4666:6,
4668:4, 4679:7,
4680:18, 4680:21,
4718:6, 4726:23,
4727:12, 4727:17,
4750:17, 4781:18,
4794:9, 4794:13,
4796:11, 4808:18,
4831:10, 4879:24,
4881:15, 4972:14
**stating** [1] - 4825:19
**status** [1] - 4877:22
**stay** [4] - 4699:1,
4765:3, 4968:24,
4968:25
**steady** [1] - 4957:11
**steer** [7] - 4787:25,
4815:23, 4816:8,
4816:11, 4816:13,
4839:3, 4876:2
**steered** [1] - 4795:5
**steering** [28] - 4783:5,
4783:6, 4786:1,

4786:2, 4788:21,
4789:9, 4811:7,
4811:20, 4816:3,
4821:2, 4839:7,
4843:4, 4846:24,
4847:3, 4847:4,
4847:5, 4853:9,
4853:12, 4853:19,
4874:15, 4876:6,
4879:4, 4879:8,
4879:23, 4880:4,
4886:15, 4888:9,
4892:16
**stenography** [1] -
4667:21
**step** [4] - 4677:10,
4773:16, 4780:10,
4940:12
**Stephen** [3] - 4858:8,
4859:13, 4859:18
**steps** [10] - 4769:18,
4771:20, 4772:4,
4772:19, 4773:10,
4786:5, 4789:2,
4840:14, 4885:21,
4911:7
**Steps** [1] - 4968:5
**Steve** [3] - 4696:10,
4696:12, 4876:13
**stick** [4] - 4684:14,
4701:11, 4730:21,
4850:22
**stickers** [1] - 4783:25
**still** [12] - 4678:17,
4680:8, 4699:18,
4830:1, 4866:14,
4919:20, 4926:2,
4966:4, 4966:7,
4966:18, 4973:11,
4976:23
**stipulated** [1] -
4669:15
**stipulation** [1] -
4771:16
**stockholders** [1] -
4858:25
**Stonier** [2] - 4845:16,
4847:12
**stop** [9] - 4742:5,
4788:22, 4790:3,
4805:22, 4822:18,
4826:8, 4865:11,
4898:14
**stopped** [7] - 4701:5,
4789:14, 4800:15,
4800:16, 4802:19,
4826:17, 4921:11
**stopping** [1] - 4823:6
**store** [13] - 4770:3,
4783:1, 4786:18,

4786:22, 4786:23,
4801:1, 4837:22,
4841:7, 4842:2,
4847:16, 4847:18,
4851:8, 4859:2
**stores** [14] - 4689:8,
4689:22, 4697:8,
4728:11, 4769:20,
4772:24, 4772:25,
4793:2, 4837:7,
4839:15, 4842:6,
4847:11, 4850:18,
4892:16
**straightforward** [1] -
4920:19
**stranded** [2] - 4931:3,
4931:16
**strategic** [1] - 4687:21
**Strategic** [2] - 4688:5,
4688:7
**strategies** [2] -
4695:20, 4889:23
**Strategy** [1] - 4778:23
**strategy** [5] - 4682:16,
4697:15, 4715:25,
4716:3, 4968:15
**stream** [4] - 4715:16,
4763:18, 4889:5,
4935:25
**streams** [1] - 4758:19
**street** [1] - 4746:6
**Street** [2] - 4666:20,
4667:2
**strength** [1] - 4974:22
**strengthen** [1] -
4756:18
**stressed** [1] - 4777:20
**strike** [5] - 4684:7,
4798:11, 4824:12,
4874:15, 4879:9
**strip** [2] - 4784:17
**stripped** [1] - 4784:7
**strips** [3] - 4784:19,
4793:2, 4793:3
**strokes** [1] - 4914:18
**strong** [13] - 4723:19,
4728:15, 4737:16,
4805:21, 4806:13,
4837:6, 4870:20,
4870:21, 4918:14,
4937:25, 4938:21,
4973:24, 4974:10
**Strong** [1] - 4942:20
**stronger** [1] - 4717:18
**strongly** [1] - 4969:12
**structure** [4] -
4758:20, 4759:5,
4841:16, 4850:24
**struggle** [1] - 4930:2
**Stuart** [1] - 4877:9

**STUART** [1] - 4667:13
**studied** [1] - 4952:20
**studies** [8] - 4744:17,
4744:21, 4744:23,
4751:6, 4915:25,
4916:3, 4916:4,
4922:9
**study** [12] - 4745:7,
4922:15, 4950:9,
4950:24, 4952:11,
4955:9, 4955:14,
4955:18, 4956:20,
4957:5, 4959:14,
4963:3
**stuff** [1] - 4857:15
**sub** [2] - 4750:2,
4752:9
**sub-bullet** [2] -
4750:2, 4752:9
**subindustries** [1] -
4729:6
**subject** [14] - 4708:11,
4729:21, 4771:16,
4790:25, 4798:2,
4827:7, 4839:23,
4845:17, 4848:2,
4855:5, 4858:9,
4868:16, 4877:9,
4967:10
**submission** [3] -
4882:18, 4882:24,
4883:7
**subpoint** [1] - 4869:16
**subscriptions** [1] -
4773:14
**subsegments** [1] -
4729:3
**subsequent** [1] -
4766:5
**subsequently** [1] -
4776:21
**subsidies** [1] - 4834:9
**substantial** [1] -
4854:12
**substitute** [1] -
4967:22
**success** [3] - 4816:7,
4870:9, 4918:8
**successful** [2] -
4695:22, 4873:8
**successfully** [1] -
4872:5
**sudden** [3] - 4714:2,
4714:5, 4789:12
**suggest** [3] - 4673:6,
4816:15, 4856:7
**suggested** [2] -
4746:15, 4844:5
**Suggested** [1] -
4842:3

**Suite** [1] - 4666:21
**sum** [2] - 4686:4,
4712:9
**Sumathi** [2] - 4849:19,
4850:3
**SUMATHI** [1] -
4849:19
**summarize** [2] -
4819:18, 4959:3
**summarized** [1] -
4884:13
**summarizes** [1] -
4833:17
**summary** [4] -
4709:14, 4824:1,
4869:14, 4964:4
**summer** [1] - 4900:22
**Sundays** [1] - 4951:1
**supermarkets** [3] -
4728:11, 4744:6,
4867:16
**supervision** [1] -
4823:5
**support** [8] - 4680:16,
4690:15, 4723:6,
4725:19, 4833:24,
4890:1, 4890:4
**supported** [1] -
4694:7
**supporting** [3] -
4726:19, 4889:10,
4931:13
**supports** [1] - 4700:12
**suppress** [6] -
4782:15, 4782:17,
4787:23, 4787:25,
4792:16
**suppressing** [3] -
4789:14, 4789:25,
4790:3
**suppression** [21] -
4745:24, 4782:19,
4782:20, 4782:24,
4783:5, 4783:11,
4790:7, 4792:1,
4792:4, 4792:8,
4793:6, 4793:13,
4793:17, 4793:19,
4794:2, 4811:7,
4811:17, 4811:19,
4907:9, 4907:10
**Suppression** [2] -
4791:24, 4792:18
**suppressor** [1] -
4789:18
**Suppressors** [1] -
4794:7
**Supreme** [1] - 4667:5
**surcharge** [1] - 4876:2
**surcharges** [1] -

4887:17
**surcharging** [5] - 4886:5, 4887:14, 4888:21, 4894:1, 4894:6
**surplus** [5] - 4707:22, 4707:23, 4711:13, 4732:23
**surprised** [2] - 4896:2, 4896:3
**surround** [1] - 4967:18
**survey** [5] - 4706:22, 4713:23, 4951:2, 4958:2, 4964:25
**survey-based** [2] - 4706:22, 4713:23
**surveyed** [1] - 4919:9
**surveys** [3] - 4706:23, 4956:16
**survived** [1] - 4934:11
**SUSAN** [1] - 4666:24
**Susan** [1] - 4865:9
**suspect** [2] - 4670:10, 4670:20
**sustained** [2] - 4847:5, 4853:12
**SWAINE** [1] - 4667:9
**SWC** [2] - 4959:18
**sweepstakes** [1] - 4842:4
**swipe** [1] - 4722:2
**switch** [8] - 4674:22, 4798:17, 4821:1, 4841:7, 4841:15, 4843:6, 4861:6, 4969:19
**switching** [4] - 4851:7
**sworn** [4] - 4674:9, 4675:1, 4912:7, 4912:9
**synch** [1] - 4943:18
**systems** [1] - 4887:6

## T

**T&E** [2] - 4737:15, 4799:16
**table** [21] - 4684:11, 4684:12, 4685:11, 4685:21, 4686:24, 4689:20, 4697:20, 4703:15, 4709:17, 4729:5, 4762:6, 4767:16, 4774:9, 4774:16, 4777:2, 4777:13, 4781:24, 4859:17, 4865:7, 4900:18, 4901:6
**table-based** [1] -

4729:5
**tables** [17] - 4682:17, 4683:6, 4683:7, 4684:3, 4684:8, 4684:15, 4684:20, 4684:23, 4685:2, 4685:13, 4689:15, 4697:17, 4705:19, 4740:23, 4741:10, 4901:16
**tabling** [3] - 4689:8, 4689:14, 4689:18
**tackling** [3] - 4792:9, 4792:12, 4902:17
**tag** [1] - 4967:20
**take-in** [1] - 4819:15
**talks** [12] - 4758:9, 4758:18, 4787:7, 4833:19, 4833:20, 4856:14, 4871:20, 4887:17, 4902:11, 4906:7, 4968:17, 4973:21
**target** [2] - 4787:16, 4958:5
**targeted** [4] - 4722:10, 4793:22, 4806:15, 4917:3
**Targeted** [1] - 4841:10
**targeting** [1] - 4899:8
**targets** [3] - 4705:1, 4871:12, 4871:13
**team** [58] - 4674:21, 4683:1, 4683:10, 4692:12, 4696:5, 4696:9, 4696:11, 4696:14, 4696:22, 4699:19, 4700:16, 4700:17, 4706:11, 4707:10, 4708:9, 4709:13, 4712:12, 4714:5, 4715:18, 4715:19, 4716:23, 4716:24, 4716:25, 4717:1, 4717:2, 4717:14, 4730:7, 4730:11, 4730:12, 4732:7, 4732:10, 4732:25, 4734:6, 4756:2, 4756:9, 4757:7, 4758:14, 4789:7, 4839:3, 4844:11, 4847:21, 4848:13, 4848:24, 4851:18, 4857:14, 4861:21, 4864:13, 4875:1, 4879:2, 4879:19, 4882:7, 4889:13, 4889:15, 4936:19, 4946:20,

4948:17
**Team** [2] - 4705:24, 4868:17
**teams** [11] - 4683:11, 4683:12, 4683:15, 4703:16, 4713:14, 4760:2, 4760:22, 4761:4, 4779:7, 4793:1, 4839:5
**TEI** [4] - 4868:16, 4868:17, 4869:23
**telemarketing** [1] - 4717:2
**telesales** [1] - 4746:11
**television** [5] - 4915:5, 4915:11, 4973:9, 4973:10, 4973:15
**ten** [6] - 4735:23, 4754:15, 4802:19, 4851:6, 4911:16, 4960:6
**ten-minute** [1] - 4754:15
**tend** [3] - 4801:7, 4862:14, 4975:11
**tended** [2] - 4728:9, 4921:4
**tends** [1] - 4743:25
**TENNESSEE** [1] - 4666:7
**tennis** [2] - 4935:13, 4935:16
**tenure** [5] - 4794:22, 4801:11, 4845:1, 4875:2, 4876:5
**term** [47] - 4681:10, 4685:16, 4685:19, 4686:25, 4698:1, 4703:6, 4703:10, 4703:12, 4704:1, 4704:4, 4704:7, 4704:14, 4704:23, 4706:16, 4706:17, 4706:18, 4708:17, 4710:7, 4711:12, 4743:14, 4750:22, 4765:23, 4766:3, 4766:8, 4766:16, 4774:12, 4774:14, 4774:24, 4782:2, 4782:17, 4799:16, 4853:4, 4853:5, 4853:6, 4865:22, 4866:18, 4917:15, 4918:9, 4924:8, 4924:21, 4963:8, 4963:10, 4964:14, 4967:17, 4976:5
**Term** [1] - 4895:8
**terminal** [1] - 4782:23

**terminals** [2] - 4800:25, 4801:1
**terminate** [3] - 4844:4, 4844:21, 4845:11
**terminated** [1] - 4844:24
**terminating** [2] - 4844:8, 4844:10
**termination** [5] - 4756:24, 4844:9, 4845:8, 4895:7, 4895:12
**terminology** [1] - 4817:19
**terms** [71] - 4683:4, 4683:5, 4683:7, 4683:9, 4686:11, 4687:1, 4692:21, 4693:7, 4695:12, 4696:19, 4700:5, 4700:25, 4718:11, 4720:16, 4721:3, 4730:9, 4730:12, 4730:18, 4731:21, 4732:2, 4735:24, 4739:4, 4741:21, 4744:6, 4744:24, 4746:5, 4751:14, 4757:7, 4759:17, 4759:18, 4762:6, 4764:17, 4764:18, 4764:22, 4765:23, 4766:5, 4772:13, 4774:24, 4785:22, 4803:7, 4803:17, 4816:5, 4833:20, 4847:8, 4847:10, 4847:18, 4865:14, 4865:15, 4876:1, 4883:25, 4888:11, 4917:22, 4918:5, 4918:19, 4918:21, 4922:19, 4923:1, 4923:14, 4931:1, 4932:20, 4934:19, 4943:17, 4943:22, 4946:8, 4948:5, 4960:13, 4960:16, 4966:1, 4973:7, 4975:9
**testified** [12] - 4675:2, 4741:17, 4747:10, 4810:3, 4810:7, 4811:9, 4853:18, 4900:8, 4900:13, 4901:22, 4909:18, 4912:9
**testify** [1] - 4669:8
**testimony** [26] - 4670:24, 4671:5,

4675:15, 4679:23, 4682:4, 4682:8, 4693:13, 4710:18, 4717:25, 4718:1, 4724:10, 4741:14, 4754:16, 4767:12, 4785:14, 4787:13, 4805:17, 4828:24, 4834:22, 4835:19, 4843:4, 4908:2, 4917:2, 4973:23, 4977:25
**tests** [2] - 4747:13, 4747:15
**TEXAS** [1] - 4666:7
**Texas** [5] - 4667:2, 4667:3, 4668:7, 4668:8, 4841:24
**Thailand** [1] - 4934:7
**THE** [280] - 4666:16, 4668:5, 4668:8, 4668:10, 4668:12, 4668:18, 4669:19, 4669:24, 4670:1, 4670:9, 4670:16, 4671:3, 4671:7, 4671:17, 4671:20, 4672:4, 4672:7, 4672:11, 4672:13, 4672:19, 4672:25, 4673:2, 4673:4, 4673:10, 4673:17, 4673:20, 4673:23, 4673:25, 4674:5, 4674:11, 4674:14, 4674:16, 4674:17, 4674:20, 4674:24, 4675:14, 4675:17, 4675:18, 4675:19, 4675:20, 4683:18, 4683:25, 4692:5, 4697:2, 4697:4, 4697:6, 4697:12, 4697:13, 4697:16, 4698:5, 4698:11, 4698:22, 4698:24, 4698:25, 4709:5, 4710:13, 4710:16, 4710:17, 4710:21, 4719:1, 4719:14, 4734:18, 4738:8, 4741:13, 4742:11, 4742:16, 4742:19, 4747:18, 4747:19, 4747:21, 4747:24, 4749:12, 4749:15, 4749:18, 4751:4, 4754:15, 4755:1, 4755:5, 4755:8, 4755:11, 4767:9,

4767:10, 4767:11,
4767:14, 4767:22,
4770:12, 4770:14,
4770:15, 4770:16,
4770:17, 4770:20,
4770:23, 4770:25,
4771:3, 4771:7,
4771:9, 4771:11,
4771:13, 4771:15,
4790:14, 4791:11,
4791:13, 4795:10,
4796:4, 4797:11,
4798:8, 4798:18,
4802:1, 4804:9,
4804:11, 4804:22,
4805:1, 4805:6,
4805:8, 4808:5,
4812:5, 4812:7,
4812:9, 4813:18,
4813:23, 4817:17,
4817:20, 4817:21,
4817:23, 4818:3,
4818:7, 4818:8,
4818:9, 4818:11,
4818:12, 4818:15,
4818:17, 4818:18,
4818:21, 4819:1,
4819:11, 4819:12,
4819:14, 4819:15,
4820:15, 4820:17,
4820:24, 4821:20,
4823:2, 4825:1,
4827:7, 4827:13,
4828:23, 4830:1,
4830:3, 4830:4,
4835:13, 4835:21,
4837:13, 4838:19,
4840:5, 4844:16,
4844:20, 4844:24,
4845:2, 4845:3,
4845:5, 4845:7,
4845:12, 4845:14,
4845:21, 4848:7,
4849:25, 4852:10,
4855:9, 4858:14,
4860:5, 4867:25,
4868:3, 4868:8,
4868:10, 4868:25,
4875:6, 4875:9,
4875:13, 4876:25,
4880:22, 4880:25,
4883:5, 4885:2,
4885:14, 4888:23,
4893:1, 4893:6,
4893:9, 4894:11,
4894:16, 4895:17,
4896:2, 4896:4,
4896:9, 4896:12,
4896:15, 4902:25,
4903:1, 4903:4,
4903:22, 4903:24,

4903:25, 4904:4,
4904:5, 4904:7,
4904:8, 4904:10,
4904:11, 4904:12,
4904:13, 4904:15,
4904:20, 4904:22,
4905:15, 4908:1,
4908:6, 4908:7,
4908:8, 4908:13,
4908:17, 4908:18,
4909:10, 4909:11,
4909:13, 4909:14,
4910:15, 4910:18,
4910:21, 4910:25,
4911:2, 4911:4,
4911:5, 4911:8,
4911:11, 4911:15,
4911:20, 4911:23,
4912:1, 4912:6,
4912:10, 4912:12,
4912:13, 4912:14,
4912:16, 4913:17,
4913:21, 4913:25,
4914:1, 4914:3,
4914:5, 4936:11,
4936:17, 4937:4,
4949:12, 4952:2,
4955:23, 4956:4,
4957:18, 4957:23,
4957:25, 4958:5,
4958:9, 4958:10,
4958:12, 4958:14,
4958:15, 4959:1,
4959:3, 4959:7,
4972:8, 4972:21,
4975:15, 4977:22,
4978:4, 4978:6,
4978:15, 4978:17,
4978:20
**Theiss** [10] - 4836:8,
4836:10, 4836:14,
4840:22, 4848:2,
4848:9, 4848:12,
4849:19, 4850:8,
4896:21
**THEISS** [1] - 4836:8
**Theiss's** [1] - 4849:13
**theme** [1] - 4973:15
**themselves** [4] -
4685:13, 4688:20,
4892:14, 4956:21
**thereby** [1] - 4748:19
**therefore** [5] -
4673:14, 4867:17,
4921:15, 4924:18,
4925:17
**they've** [3] - 4674:22,
4851:3, 4964:17
**thinking** [2] - 4864:12,
4977:17

**third** [24] - 4669:16,
4681:17, 4681:20,
4681:21, 4682:3,
4695:6, 4725:6,
4731:12, 4784:23,
4807:17, 4808:17,
4809:17, 4810:6,
4830:23, 4837:3,
4866:7, 4866:16,
4885:4, 4886:1,
4887:22, 4922:13,
4923:4
**third-parties** [1] -
4784:23
**third-party** [2] -
4681:20, 4681:21
**thirds** [1] - 4818:18
**thousand** [1] -
4680:22
**threat** [4] - 4756:22,
4823:19, 4843:1,
4895:4
**threaten** [2] - 4872:17,
4873:1
**threatened** [2] -
4755:21, 4823:21
**threatening** [2] -
4756:12, 4768:25
**threats** [1] - 4757:3
**three** [23] - 4678:6,
4685:8, 4693:22,
4722:14, 4730:8,
4739:19, 4750:2,
4761:6, 4794:14,
4809:22, 4810:1,
4817:10, 4846:8,
4898:21, 4902:9,
4925:3, 4927:14,
4942:21, 4959:22,
4967:6, 4967:8
**threshold** [1] -
4731:10
**thresholds** [3] -
4684:21, 4687:8,
4687:12
**throughout** [5] -
4680:13, 4771:25,
4776:23, 4801:11,
4933:12
**ticket** [2] - 4933:4,
4935:10
**tickets** [2] - 4933:4,
4933:20
**tied** [1] - 4863:25
**time-to-time** [1] -
4810:9
**timeline** [1] - 4848:13
**timely** [1] - 4828:13
**timing** [1] - 4771:25
**title** [12] - 4779:19,

4791:24, 4792:18,
4803:24, 4813:12,
4869:2, 4886:18,
4913:8, 4913:10,
4913:17, 4956:8,
4966:17
**titled** [2] - 4837:25,
4875:16
**today** [38] - 4671:8,
4671:9, 4672:14,
4676:10, 4679:23,
4750:25, 4779:21,
4803:24, 4804:8,
4809:5, 4830:25,
4831:14, 4834:13,
4835:18, 4835:19,
4836:20, 4883:25,
4888:25, 4889:16,
4901:23, 4911:19,
4914:20, 4924:5,
4928:16, 4928:18,
4928:21, 4928:23,
4929:16, 4931:5,
4932:1, 4950:4,
4962:1, 4965:14,
4965:25, 4966:8,
4971:16, 4972:1
**Today** [4] - 4770:12,
4770:14, 4770:18,
4895:23
**toe** [2] - 4968:15
**toe-to-toe** [1] -
4968:15
**together** [9] - 4691:1,
4730:13, 4732:10,
4775:14, 4927:7,
4927:12, 4930:4,
4958:18, 4967:8
**Tom** [6] - 4682:4,
4682:5, 4687:8,
4704:17, 4753:14,
4970:20
**TOMBRAS** [1] -
4666:24
**tomorrow** [7] -
4670:19, 4670:20,
4670:21, 4775:21,
4857:7, 4977:24,
4978:20
**tonight** [1] - 4978:7
**took** [15] - 4678:18,
4678:23, 4680:7,
4683:9, 4712:2,
4734:4, 4734:8,
4734:10, 4740:9,
4772:5, 4772:19,
4793:10, 4798:14,
4896:4, 4971:12
**tool** [1] - 4718:14
**tools** [1] - 4784:25

**toothpaste** [1] -
4677:9
**top** [23] - 4672:10,
4704:14, 4704:19,
4736:19, 4758:5,
4758:10, 4762:20,
4806:22, 4807:9,
4814:4, 4824:7,
4827:4, 4828:11,
4837:3, 4849:18,
4855:20, 4875:21,
4881:18, 4894:20,
4921:1, 4939:5,
4963:17, 4968:6
**Top** [2] - 4813:13
**topic** [12] - 4703:7,
4742:8, 4753:3,
4754:14, 4755:15,
4778:8, 4796:15,
4803:20, 4804:14,
4811:21, 4813:10,
4887:16
**topics** [3] - 4821:1,
4830:8, 4861:6
**total** [14] - 4711:8,
4712:5, 4712:9,
4747:6, 4807:20,
4817:24, 4818:14,
4819:12, 4838:1,
4869:25, 4873:16,
4906:7, 4907:12,
4933:17
**totality** [2] - 4925:18,
4953:22
**Touch** [1] - 4956:8
**touch** [36] - 4669:6,
4773:8, 4924:7,
4924:8, 4924:10,
4924:15, 4942:24,
4943:2, 4943:4,
4943:7, 4943:10,
4943:12, 4943:15,
4944:6, 4944:9,
4944:13, 4944:20,
4944:23, 4945:4,
4945:18, 4945:25,
4946:2, 4946:6,
4946:8, 4946:11,
4953:10, 4953:16,
4953:17, 4956:13,
4956:14, 4961:13,
4961:14, 4965:10,
4974:16
**touches** [1] - 4943:16
**touching** [3] -
4944:17, 4945:19,
4958:1
**TouchPoint** [1] -
4977:10
**tough** [2] - 4790:8,

Case 1:10-cv-04496-NGG-RER     Document 595     Filed 09/08/14     Page 365 of 368 PageID #: 30759

4806:24
**Tour** [1] - 4736:8
**towards** [10] - 4672:10, 4718:2, 4765:22, 4774:11, 4789:16, 4816:8, 4853:7, 4894:25, 4940:22, 4963:17
**town** [2] - 4673:14, 4785:23
**track** [1] - 4915:22
**Tracker** [4] - 4950:13, 4952:9, 4955:8, 4957:8
**tracker** [5] - 4950:19, 4952:11, 4952:17, 4953:5, 4957:9
**trackers** [1] - 4954:6
**tracking** [2] - 4950:24, 4955:9
**trail** [1] - 4903:18
**train** [2] - 4721:21, 4721:22
**trained** [2] - 4730:8, 4739:17
**training** [1] - 4731:3
**trajectory** [2] - 4862:2, 4862:6
**transact** [2] - 4749:3, 4929:3
**transaction** [27] - 4702:12, 4712:23, 4721:20, 4726:10, 4744:4, 4744:7, 4747:1, 4751:1, 4751:5, 4794:10, 4795:2, 4819:13, 4851:2, 4890:17, 4892:4, 4892:8, 4897:3, 4906:13, 4906:24, 4907:1, 4907:16, 4926:12, 4929:7, 4929:8, 4943:21, 4944:6
**transactions** [21] - 4681:6, 4715:1, 4715:20, 4747:5, 4747:7, 4747:20, 4747:22, 4752:6, 4796:23, 4803:5, 4803:15, 4856:4, 4889:7, 4891:20, 4891:21, 4892:12, 4907:10, 4907:15, 4934:10, 4946:12
**transcript** [7] - 4667:21, 4801:21, 4866:4, 4866:9, 4868:5, 4910:13, 4910:22

**TRANSCRIPT** [1] - 4666:16
**Transcript** [1] - 4667:22
**transferred** [1] - 4846:14
**transition** [1] - 4856:8
**translates** [2] - 4711:5, 4907:6
**transparency** [2] - 4685:1, 4901:16
**Travel** [10] - 4675:8, 4675:10, 4675:11, 4675:13, 4676:14, 4676:18, 4736:8, 4736:13, 4822:12, 4869:2
**travel** [21] - 4671:11, 4675:24, 4676:3, 4676:15, 4676:16, 4680:2, 4680:7, 4735:24, 4736:11, 4736:20, 4744:5, 4869:7, 4870:5, 4870:22, 4931:4, 4931:23, 4932:3, 4932:4, 4932:8, 4932:12, 4932:20
**Traveler's** [1] - 4678:12
**Travelers** [3] - 4928:5, 4928:7, 4931:20
**travelers** [4] - 4975:4, 4975:23, 4976:21, 4976:22
**Travelocity** [4] - 4822:12, 4827:5, 4827:21, 4828:8
**Travelocity's** [1] - 4828:2
**treat** [1] - 4931:2
**treated** [1] - 4783:15
**treatment** [7] - 4745:14, 4784:5, 4784:6, 4784:9, 4816:12, 4817:1, 4888:8
**trend** [5] - 4726:22, 4727:11, 4735:4, 4738:18, 4893:21
**trends** [1] - 4735:7
**tri** [1] - 4750:20
**tri-state** [1] - 4750:20
**trial** [5] - 4668:1, 4682:4, 4699:2, 4787:13, 4900:8
**TRIAL** [1] - 4666:16
**tried** [3] - 4747:13, 4752:7, 4784:24
**tries** [3] - 4719:20,

4819:6, 4872:11
**trimmed** [1] - 4670:14
**triple** [1] - 4722:16
**TRIPOLITSIOTIS** [1] - 4667:16
**trouble** [1] - 4976:18
**true** [7] - 4746:19, 4767:14, 4800:11, 4800:15, 4831:13, 4831:16, 4976:14
**trust** [30] - 4925:3, 4926:2, 4927:9, 4927:15, 4927:16, 4927:17, 4927:21, 4927:22, 4928:2, 4928:9, 4928:17, 4928:15, 4928:20, 4928:23, 4928:24, 4929:2, 4929:5, 4929:10, 4929:11, 4929:15, 4929:20, 4930:3, 4930:5, 4930:8, 4937:20, 4938:4, 4948:4, 4976:14, 4977:14
**trust/security/ service** [1] - 4977:9
**truth** [3] - 4770:11, 4876:23, 4896:11
**try** [22] - 4671:3, 4692:9, 4695:3, 4704:17, 4720:4, 4722:22, 4742:14, 4746:4, 4787:22, 4789:25, 4790:1, 4808:5, 4826:15, 4853:21, 4885:12, 4892:20, 4905:9, 4911:23, 4915:22, 4917:22, 4921:17, 4944:1
**trying** [22] - 4698:16, 4700:4, 4713:7, 4714:6, 4714:10, 4745:5, 4746:12, 4748:24, 4761:23, 4766:7, 4774:18, 4785:16, 4793:4, 4853:16, 4887:8, 4889:2, 4897:11, 4897:16, 4907:18, 4954:21, 4962:14, 4969:14
**tsunami** [2] - 4934:7, 4934:11
**turn** [25] - 4709:7, 4713:2, 4713:8, 4738:2, 4762:17, 4781:1, 4785:2, 4791:16, 4792:17,

4803:20, 4803:22, 4813:10, 4821:16, 4822:21, 4827:3, 4833:12, 4836:5, 4836:25, 4837:12, 4845:15, 4852:2, 4867:7, 4869:22, 4881:6, 4928:6
**two** [36] - 4668:25, 4669:23, 4670:24, 4672:16, 4687:25, 4722:13, 4723:9, 4735:2, 4735:3, 4750:14, 4757:9, 4782:19, 4794:12, 4796:19, 4818:18, 4832:3, 4832:17, 4832:20, 4858:24, 4884:4, 4919:23, 4920:22, 4926:23, 4927:2, 4927:6, 4927:7, 4941:16, 4959:16, 4964:2, 4967:2, 4968:8, 4970:14, 4970:15, 4972:23, 4973:4
**two-sided** [1] - 4884:4
**type** [17] - 4669:16, 4700:22, 4707:1, 4707:9, 4709:12, 4752:2, 4779:16, 4781:5, 4781:18, 4881:2, 4881:19, 4891:23, 4899:8, 4916:16, 4917:4, 4951:23, 4956:16
**typed** [1] - 4833:14
**types** [11] - 4683:19, 4684:11, 4688:1, 4690:4, 4709:17, 4729:4, 4746:2, 4777:3, 4847:15, 4856:4, 4919:18
**typical** [1] - 4967:5
**typically** [3] - 4701:10, 4744:3, 4903:17

# U

**U.S** [21] - 4666:20, 4678:4, 4678:17, 4679:3, 4680:13, 4680:20, 4716:17, 4733:19, 4733:21, 4756:5, 4803:7, 4803:14, 4805:20, 4806:13, 4810:23, 4818:21, 4867:8, 4867:13, 4887:12, 4935:13

**U.S.A** [1] - 4666:20
**ultimate** [2] - 4683:9, 4695:21
**ultimately** [21] - 4695:3, 4724:19, 4726:4, 4732:11, 4732:24, 4746:2, 4746:21, 4748:21, 4787:23, 4824:7, 4826:22, 4835:11, 4840:22, 4857:23, 4859:14, 4859:15, 4883:23, 4888:12, 4932:9, 4950:2, 4956:14
**unabated** [1] - 4974:9
**Unaided** [1] - 4952:19
**under** [29] - 4723:16, 4739:1, 4751:24, 4752:9, 4767:19, 4770:23, 4774:20, 4784:2, 4793:12, 4809:16, 4823:5, 4830:2, 4836:16, 4840:25, 4843:2, 4850:10, 4874:2, 4875:25, 4885:25, 4887:22, 4898:6, 4906:6, 4906:8, 4906:20, 4920:11, 4933:2, 4933:3, 4952:19, 4963:17
**under-delivers** [1] - 4920:11
**undergraduate** [2] - 4677:3, 4677:4
**underneath** [3] - 4770:19, 4846:2, 4955:2
**understood** [6] - 4692:20, 4696:3, 4717:18, 4730:10, 4811:2, 4953:15
**undertake** [3] - 4746:3, 4944:23
**undertaken** [1] - 4734:12
**unfamiliar** [3] - 4929:4, 4929:12, 4929:13
**unfortunately** [2] - 4910:19, 4940:13
**uniformity** [1] - 4916:14
**unintended** [3] - 4887:6, 4887:13, 4888:12
**uninterested** [1] - 4752:10
**unique** [8] - 4698:3,

4702:1, 4926:21, 4926:24, 4927:12, 4935:12, 4935:17, 4936:2
**unit** [8] - 4676:4, 4708:15, 4708:16, 4708:25, 4779:4, 4956:24, 4956:25, 4958:24
**Unit** [2] - 4733:17, 4869:3
**UNITED** [3] - 4666:1, 4666:4, 4666:17
**United** [19] - 4666:6, 4668:4, 4679:7, 4680:18, 4680:21, 4718:6, 4726:22, 4727:12, 4727:17, 4750:17, 4781:17, 4794:9, 4794:13, 4796:11, 4808:18, 4831:10, 4879:24, 4881:15, 4972:14
**units** [7] - 4914:23, 4916:10, 4945:2, 4946:7, 4956:19, 4956:21
**University** [2] - 4677:2, 4914:14
**university** [2] - 4949:8
**unless** [3] - 4742:19, 4823:22, 4825:22
**unlike** [4] - 4768:4, 4925:20
**unlikely** [1] - 4952:23
**Unlimited** [1] - 4876:2
**unrelated** [1] - 4755:7
**Unstaged** [1] - 4935:24
**unsurpassed** [1] - 4949:23
**unwelcome** [3] - 4963:20, 4964:1, 4964:6
**up** [81] - 4672:10, 4686:12, 4689:11, 4689:15, 4689:16, 4692:25, 4693:5, 4693:8, 4694:17, 4696:6, 4699:2, 4700:11, 4711:11, 4712:10, 4718:18, 4720:9, 4720:20, 4725:3, 4725:10, 4725:11, 4725:16, 4725:17, 4729:15, 4730:5, 4734:23, 4739:17, 4739:21, 4748:24, 4758:22, 4769:20, 4773:9,

4786:21, 4787:15, 4793:2, 4793:18, 4794:2, 4795:9, 4796:1, 4803:13, 4806:10, 4806:22, 4811:3, 4816:11, 4819:2, 4822:1, 4825:16, 4837:13, 4853:7, 4861:9, 4864:9, 4864:14, 4871:15, 4872:11, 4872:16, 4873:9, 4875:9, 4875:10, 4877:14, 4884:9, 4884:12, 4891:6, 4894:20, 4903:6, 4905:10, 4907:2, 4920:14, 4920:25, 4932:1, 4935:20, 4948:3, 4949:21, 4950:17, 4950:23, 4951:8, 4951:16, 4955:10, 4957:13, 4968:2, 4968:4, 4971:6
**update** [3] - 4708:20, 4812:1, 4827:5
**updates** [1] - 4778:25
**upper** [1] - 4720:22
**ups** [1] - 4969:5
**upset** [1] - 4884:4
**upside** [1] - 4752:16
**urgent** [1] - 4878:8
**US** [2] - 4746:1, 4781:3
**USA** [4] - 4770:12, 4770:14, 4770:18, 4895:23
**usage** [6] - 4892:21, 4960:10, 4960:14, 4960:16, 4961:13
**useful** [1] - 4965:8
**user** [2] - 4736:24, 4737:7
**uses** [1] - 4814:11
**USGA** [1] - 4947:24
**USTA** [2] - 4947:19, 4947:24
**UT** [1] - 4668:19
**UTAH** [1] - 4666:7
**utility** [3] - 4744:11, 4780:8, 4788:24
**Utilizing** [1] - 4794:6

## V

**validate** [1] - 4959:1
**valuable** [1] - 4931:9
**valuables** [1] - 4928:7
**valuations** [2] -

4923:1, 4923:8
**Value** [4] - 4709:11, 4869:23, 4869:24, 4886:19
**value** [238] - 4685:3, 4685:9, 4687:17, 4688:17, 4691:6, 4691:8, 4693:22, 4693:25, 4694:3, 4694:6, 4694:7, 4694:18, 4694:19, 4694:21, 4694:23, 4695:2, 4695:4, 4695:16, 4696:2, 4696:18, 4698:7, 4698:9, 4698:10, 4698:17, 4699:23, 4699:25, 4700:4, 4700:6, 4700:7, 4700:14, 4700:17, 4701:15, 4701:16, 4702:4, 4702:6, 4702:7, 4704:3, 4707:3, 4707:13, 4707:18, 4707:21, 4707:22, 4707:23, 4709:15, 4712:21, 4712:22, 4713:13, 4713:15, 4716:13, 4716:15, 4716:18, 4717:10, 4717:24, 4718:12, 4718:21, 4719:21, 4719:22, 4720:12, 4720:14, 4720:17, 4721:12, 4724:11, 4724:13, 4724:14, 4724:16, 4724:17, 4724:19, 4724:23, 4725:8, 4725:13, 4725:18, 4725:23, 4725:25, 4726:1, 4726:4, 4726:11, 4726:17, 4726:20, 4726:21, 4727:1, 4727:2, 4727:4, 4727:9, 4727:11, 4728:15, 4729:18, 4729:19, 4729:21, 4729:25, 4730:3, 4730:4, 4730:13, 4730:18, 4730:23, 4731:4, 4731:5, 4731:16, 4731:22, 4731:23, 4731:25, 4732:2, 4732:9, 4732:14, 4733:7, 4735:8, 4735:9, 4735:19, 4735:22, 4736:1, 4736:4, 4736:6, 4736:16, 4736:20,

4736:24, 4737:2, 4737:10, 4737:14, 4737:16, 4738:16, 4738:17, 4738:20, 4738:21, 4739:8, 4739:13, 4739:18, 4740:2, 4740:6, 4740:13, 4740:23, 4741:16, 4741:18, 4741:22, 4741:24, 4742:2, 4742:3, 4742:5, 4743:9, 4743:8, 4748:9, 4748:13, 4748:15, 4748:20, 4748:24, 4749:2, 4749:4, 4754:1, 4754:2, 4754:6, 4754:12, 4758:16, 4758:17, 4760:23, 4761:2, 4761:5, 4761:25, 4762:2, 4762:4, 4762:9, 4763:17, 4764:22, 4766:25, 4773:6, 4777:24, 4782:9, 4785:16, 4788:15, 4789:23, 4790:1, 4793:8, 4833:25, 4863:2, 4865:16, 4866:8, 4866:16, 4866:18, 4867:17, 4868:11, 4869:6, 4869:10, 4869:16, 4870:1, 4870:5, 4870:9, 4870:12, 4870:13, 4870:16, 4870:19, 4870:20, 4870:23, 4871:11, 4871:13, 4872:1, 4872:6, 4872:17, 4872:22, 4872:25, 4873:7, 4873:8, 4873:10, 4873:23, 4874:6, 4889:4, 4889:8, 4889:9, 4890:21, 4902:15, 4907:18, 4918:5, 4921:22, 4922:3, 4922:13, 4922:20, 4923:11, 4923:12, 4923:14, 4923:17, 4924:17, 4925:10, 4927:11, 4929:6, 4930:16, 4931:10, 4935:4, 4944:19, 4946:12, 4946:23, 4946:25, 4965:21, 4970:8
**value-based** [1] - 4866:16
**valued** [1] - 4922:15

**values** [3] - 4922:10, 4948:3, 4948:6
**valuing** [1] - 4923:6
**varied** [1] - 4962:5
**varies** [2] - 4700:3, 4714:20
**variety** [7] - 4684:8, 4689:6, 4746:14, 4788:16, 4864:1, 4935:8, 4958:3
**various** [17] - 4677:12, 4680:23, 4682:17, 4685:24, 4689:22, 4700:8, 4710:14, 4777:2, 4814:17, 4869:17, 4889:25, 4903:16, 4915:3, 4915:24, 4917:3, 4938:17, 4975:18
**varsity** [1] - 4675:18
**vary** [1] - 4841:10
**vastly** [1] - 4967:21
**VC** [3] - 4711:7, 4711:16, 4711:24
**vehicle** [2] - 4689:9, 4908:5
**vehicles** [3] - 4825:25, 4826:5, 4910:19
**vending** [1] - 4677:22
**vendor** [2] - 4958:10, 4959:13
**vendors** [1] - 4958:16
**venture** [11] - 4671:11, 4675:19, 4675:21, 4675:23, 4676:1, 4676:4, 4676:10, 4676:14, 4676:18, 4680:6, 4908:3
**venues** [1] - 4872:1
**VERMONT** [1] - 4666:7
**version** [6] - 4751:18, 4837:14, 4894:13, 4903:4, 4903:5, 4910:22
**versus** [8] - 4681:25, 4702:18, 4710:3, 4719:21, 4747:2, 4870:1, 4897:4, 4934:5
**viable** [3] - 4707:18, 4714:7, 4714:8
**vice** [3] - 4679:18, 4836:11, 4966:17
**vice-chairman** [1] - 4679:18
**vice-president** [1] - 4836:11
**view** [29] - 4756:21, 4777:25, 4835:10,

4883:24, 4883:25, 4902:2, 4914:23, 4916:12, 4925:18, 4926:13, 4928:15, 4930:10, 4931:10, 4938:20, 4950:15, 4950:18, 4952:22, 4953:22, 4956:15, 4971:1, 4971:8, 4973:23, 4973:25, 4974:7, 4974:10, 4974:21, 4975:5, 4975:12

**views** [2] - 4713:23, 4958:6

**vigorously** [1] - 4886:25

**violate** [4] - 4787:20, 4846:23, 4847:2, 4853:8

**violated** [3] - 4786:7, 4787:3, 4787:17

**violates** [1] - 4853:13

**violating** [1] - 4847:9

**vis** [2] - 4883:22

**vis-a-vis** [1] - 4883:22

**Visa** [39] - 4697:5, 4707:14, 4710:3, 4710:14, 4720:15, 4728:19, 4745:10, 4784:7, 4797:2, 4797:6, 4801:6, 4803:1, 4810:11, 4810:23, 4863:21, 4881:24, 4892:15, 4893:22, 4894:5, 4940:5, 4962:16, 4967:18, 4967:19, 4967:22, 4967:25, 4968:9, 4968:12, 4968:13, 4969:24, 4971:7, 4972:16, 4973:5, 4973:9, 4973:10, 4973:13, 4973:17, 4973:20, 4973:25, 4977:2

**Visa's** [6] - 4710:6, 4710:12, 4711:11, 4735:1, 4735:6, 4968:1

**Visa/MasterCard** [6] - 4692:22, 4747:2, 4818:16, 4818:19, 4863:8, 4863:10

**visible** [5] - 4777:11, 4778:6, 4785:7, 4785:22, 4786:18

**visiting** [1] - 4786:23

**visits** [3] - 4786:22, 4841:16, 4850:25

**visual** [2] - 4960:17, 4960:18

**VMA** [1] - 4832:3

**Voice** [7] - 4955:6, 4955:7, 4955:8, 4955:12, 4955:14, 4956:16, 4957:9

**voice** [1] - 4773:1

**Voice-type** [1] - 4956:16

**voiced** [2] - 4860:17, 4860:21

**volatility** [1] - 4923:10

**Volume** [1] - 4815:12

**volume** [20] - 4684:21, 4697:20, 4712:1, 4712:2, 4741:10, 4766:19, 4789:12, 4789:22, 4803:16, 4806:23, 4815:14, 4815:20, 4837:8, 4838:2, 4843:19, 4843:21, 4843:22, 4856:3, 4895:2, 4897:9

---

# W

**wake** [1] - 4872:16

**Wal** [10] - 4697:13, 4703:20, 4832:4, 4832:8, 4832:12, 4832:24, 4926:23, 4927:1, 4927:5, 4927:11

**Wal-Mart** [10] - 4697:13, 4703:20, 4832:4, 4832:8, 4832:12, 4832:24, 4926:23, 4927:17, 4927:5, 4927:11

**Walgreens** [146] - 4755:15, 4755:16, 4755:19, 4755:21, 4756:7, 4756:10, 4756:11, 4756:21, 4757:5, 4758:17, 4758:18, 4759:2, 4759:5, 4759:21, 4760:11, 4762:3, 4762:14, 4762:16, 4763:3, 4763:10, 4763:13, 4764:8, 4764:11, 4764:18, 4764:22, 4765:7, 4766:11, 4766:25, 4767:6, 4768:5, 4769:13, 4769:18, 4770:3, 4770:6, 4771:18, 4771:21,

**Walgreens'** [20] - 4838:1, 4839:3, 4839:4, 4839:10, 4839:11, 4841:1, 4842:19, 4843:16, 4843:20, 4846:19, 4849:2, 4849:20,

4772:3, 4772:6, 4772:9, 4772:21, 4773:2, 4773:12, 4773:14, 4776:23, 4777:8, 4778:1, 4834:12, 4834:17, 4834:24, 4835:9, 4836:7, 4836:15, 4836:18, 4836:23, 4837:4, 4837:8, 4837:17, 4837:25, 4838:5, 4838:8, 4838:24, 4839:4, 4839:7, 4839:9, 4839:23, 4840:15, 4841:6, 4841:11, 4841:14, 4841:19, 4841:23, 4842:2, 4842:20, 4843:3, 4843:5, 4843:10, 4843:14, 4843:19, 4843:25, 4844:4, 4844:8, 4844:10, 4844:17, 4847:22, 4848:3, 4849:1, 4849:7, 4850:19, 4850:21, 4850:22, 4851:19, 4851:22, 4852:22, 4853:24, 4854:2, 4854:8, 4854:13, 4854:15, 4854:17, 4855:1, 4855:5, 4856:3, 4856:7, 4856:11, 4856:15, 4856:20, 4857:6, 4857:21, 4857:23, 4858:9, 4858:18, 4859:22, 4859:24, 4860:8, 4861:2, 4864:17, 4864:18, 4864:21, 4864:22, 4865:3, 4865:6, 4865:8, 4865:13, 4865:17, 4865:21, 4865:24, 4894:8, 4894:19, 4894:23, 4895:3, 4895:20, 4897:18, 4898:3, 4898:9, 4898:11, 4898:13, 4898:15, 4898:17, 4899:12, 4901:2, 4901:9, 4901:11, 4901:17, 4978:13

4850:17, 4852:18, 4853:25, 4854:2, 4857:17, 4860:18, 4894:14, 4901:7

**walk** [4] - 4686:6, 4763:6, 4782:20, 4900:15

**walking** [1] - 4714:6

**wallet** [1] - 4939:5

**Walmart** [1] - 4947:13

**waned** [1] - 4878:12

**wants** [1] - 4954:18

**war** [2] - 4968:9, 4969:16

**War** [1] - 4973:20

**warmly** [2] - 4788:20, 4792:15

**Washington** [2] - 4666:21, 4886:13

**ways** [13] - 4699:14, 4739:10, 4777:8, 4816:3, 4816:5, 4853:19, 4906:25, 4928:25, 4931:17, 4934:3, 4975:2, 4975:18

**we/CheapTickets** [1] - 4825:23

**website** [3] - 4722:4, 4825:24, 4828:3

**Wednesday** [3] - 4670:16, 4670:25, 4671:4

**week** [4] - 4668:23, 4672:21, 4785:24, 4951:2

**weekend** [4] - 4673:11, 4673:13, 4673:21, 4674:3

**weeks** [7] - 4671:12, 4718:1, 4758:8, 4765:17, 4898:21, 4932:25

**weigh** [1] - 4872:22

**weighted** [1] - 4819:9

**weighting** [1] - 4808:11

**welcome** [11] - 4668:12, 4668:21, 4911:15, 4963:8, 4963:12, 4963:24, 4964:10, 4964:12, 4964:14, 4964:16, 4964:17

**well..** [1] - 4672:7

**West** [1] - 4667:2

**whatnot** [2] - 4973:8, 4974:2

**whereabouts** [1] - 4934:15

**WHG** [1] - 4812:2

**white** [21] - 4797:23, 4797:25, 4801:19, 4803:22, 4811:22, 4813:10, 4821:8, 4830:13, 4836:6, 4839:18, 4845:15, 4848:1, 4854:23, 4861:12, 4866:3, 4868:12, 4874:11, 4882:17, 4896:19, 4903:21, 4905:16

**whole** [6] - 4683:21, 4699:20, 4749:7, 4760:15, 4806:11, 4850:15

**William** [10] - 4671:10, 4674:8, 4674:14, 4798:2, 4821:10, 4822:23, 4839:22, 4845:16, 4854:25, 4866:11

**Williams** [1] - 4671:16

**willing** [3] - 4686:18, 4761:11, 4901:1

**wish** [1] - 4722:21

**withdraw** [2] - 4727:2, 4835:25

**withdrawn** [1] - 4828:4

**WITNESS** [56] - 4674:11, 4674:14, 4674:16, 4675:17, 4675:19, 4697:4, 4697:12, 4697:16, 4698:11, 4698:24, 4710:16, 4710:21, 4747:19, 4747:24, 4767:14, 4770:15, 4770:17, 4817:20, 4817:23, 4818:7, 4818:9, 4818:12, 4818:17, 4818:21, 4819:12, 4819:15, 4830:3, 4844:20, 4845:2, 4845:5, 4845:12, 4894:16, 4902:25, 4903:24, 4904:4, 4904:7, 4904:10, 4904:12, 4904:15, 4904:22, 4908:6, 4908:8, 4908:17, 4909:11, 4909:14, 4911:4, 4912:12, 4912:14, 4913:21, 4914:1, 4957:25, 4958:9, 4958:12, 4958:15, 4959:3, 4979:3

**witness** [22] - 4669:7,

4669:10, 4669:20,
4670:2, 4670:4,
4670:9, 4670:12,
4671:9, 4672:8,
4674:9, 4674:19,
4742:12, 4820:20,
4828:24, 4830:1,
4868:4, 4911:7,
4911:9, 4912:2,
4912:5, 4912:7,
4978:12

**witnesses** [4] -
4670:24, 4671:8,
4673:12, 4674:1

**woman** [3] - 4669:7,
4706:2, 4757:22

**word** [4] - 4969:23,
4970:7, 4970:9,
4971:10

**words** [9] - 4683:21,
4697:9, 4783:3,
4842:21, 4878:14,
4927:14, 4958:11,
4958:17, 4971:17

**works** [5] - 4699:21,
4788:14, 4888:8,
4915:19, 4974:15

**world** [5] - 4915:1,
4929:10, 4961:24,
4967:19, 4973:18

**worldwide** [1] -
4675:25

**Worldwide** [2] -
4667:10, 4959:12

**worries** [1] - 4933:11

**worry** [2] - 4896:9,
4929:23

**worse** [2] - 4859:17,
4905:8

**worst** [1] - 4927:21

**written** [2] - 4844:6,
4844:18

## X

**XXX** [2] - 4851:1,
4851:3

## Y

**year** [27] - 4698:15,
4698:21, 4699:7,
4726:24, 4726:25,
4727:14, 4728:1,
4765:3, 4774:21,
4774:24, 4775:2,
4799:15, 4808:18,
4822:7, 4860:23,
4867:14, 4870:4,
4870:24, 4906:23,

4907:1, 4907:4,
4907:14, 4907:16,
4941:7, 4941:9,
4976:20

**year's** [1] - 4871:13

**years** [36] - 4676:22,
4678:6, 4678:7,
4705:4, 4705:5,
4725:1, 4725:2,
4728:3, 4735:23,
4739:19, 4745:22,
4745:24, 4788:2,
4788:18, 4800:21,
4802:20, 4862:9,
4862:12, 4863:10,
4871:10, 4912:25,
4913:6, 4914:17,
4919:7, 4931:19,
4935:9, 4935:15,
4937:13, 4941:12,
4941:14, 4942:18,
4946:15, 4975:3,
4975:19, 4976:20,
4976:22

**yellow** [1] - 4960:8

**yesterday** [1] -
4969:12

**YORK** [1] - 4666:1

**York** [21] - 4666:6,
4667:11, 4667:15,
4667:19, 4673:13,
4673:24, 4750:20,
4751:7, 4751:13,
4793:9, 4807:6,
4841:24, 4909:8,
4909:15, 4909:17,
4909:20, 4909:25,
4922:15, 4922:24

## Z

**Zagat** [6] - 4822:12,
4823:9, 4823:15,
4823:16, 4824:1,
4824:10

**Zagat's** [1] - 4823:21

**zero** [4] - 4747:15,
4752:4, 4808:15,
4966:6