UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, et al.,

v.

AMERICAN EXPRESS CO., et al.

Civil Action No.:
1:10-CV-04496-NGG-RER

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

September 18, 2014

## Table of Contents

I.     Section One of the Sherman Act Condemns Restraints That Unreasonably Restrain Competition ........................................................................................ 1

    A.    American Express's Restraint Is Appropriately Judged by the Rule of Reason.................................................................................................................. 1

    B.    Plaintiffs Can Prove Adverse Effect in Two Ways ....................................... 3

II.    Plaintiffs Have Shown Actual Adverse Effects on Competition ........................ 5

    A.    The Sherman Act Protects the Competitive Process...................................... 5

    B.    A Showing of Harm to the Competitive Process Satisfies Plaintiffs' Initial Burden ............................................................................................... 6

    C.    Showing Adverse Price Effects Satisfies Plaintiffs' Initial Burden........................... 10

    D.    Showing Reduced Output, Quality, or Innovation Satisfies Plaintiffs' Initial Burden ............................................................................................. 11

    E.    Showing Harm at the Merchant Level Satisfies Plaintiffs' Initial Burden ............................................................................................. 13

    F.    The Court Does Not Need to Quantify Harm for Plaintiffs to Prevail ....................... 14

III.    General Purpose Credit and Charge Card Network Services Constitute a Relevant Antitrust Market.................................................................................. 20

    A.    Relevant Markets Provide Context for Assessing Competitive Effects .................... 20

    B.    The Relevant Product Market Includes Only Reasonably Interchangeable Products ........................................................................... 21

    C.    Courts Have Used the Hypothetical Monopolist Test as a Tool for Defining Relevant Markets ........................................................................ 23

    D.    Mere Functional Interchangeability Is Insufficient To Show Reasonable Interchangeability ................................................................... 24

    E.    Courts Have Concluded That General Purpose Credit and Charge Card Network Services Have No Reasonable Substitutes.................................... 26

    F.    Relevant Markets Also Have a Geographic Dimension ............................. 27

IV.    General Purpose Credit and Charge Card Network Services to Travel and Entertainment Merchants Constitute a Distinct Relevant Antitrust Market .................... 27

V.    American Express Possesses Substantial Market Power Within Both
      Relevant Markets ................................................................................ 30

      A.    Definition and Proof of Market Power ....................................... 30

      B.    American Express's Market Share Is Evidence of Market Power ............................. 33

      C.    Cardholder Insistence Strongly Supports American Express's Market Power .......... 36

      D.    American Express's Profitable Price Increases Demonstrate Its Market Power ........ 37

      E.    Price Discrimination Provides Further Evidence of Market Power........................... 39

      F.    High Barriers to Entry or Expansion Support a Finding of Market Power ............... 39

      G.    American Express Has Market Power in the Travel and Entertainment Market........ 41

      H.    American Express's Negotiations With Some Merchants Do Not
            Negate the Evidence of its Market Power.................................... 42

VI.   American Express's Purported Procompetitive Effects Are Meritless........................... 45

      A.    American Express Bears the Burden of Proving That its Anti-Steering
            Rules Are Procompetitive ........................................................... 45

      B.    Protecting American Express From Interbrand Competition is Not a
            Cognizable Procompetitive Effect ............................................... 46

      C.    American Express's "Two-Sided" Defense Cannot Justify the Restraint ................. 50

      D.    American Express's Free-Riding Argument Fails to Demonstrate Any
            Procompetitive Benefit Because the "Ride" is Not "Free"........................................ 54

      E.    Procompetitive Claims Should Be Discounted When Evidence Shows
            the Restraint's Actual Purpose Was Anticompetitive................................................. 55

VII.  The Court Has Broad Remedial Powers to Restore Competition.................................... 56

## Table of Authorities

### Cases

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
 181 F.3d 216 (2d Cir. 1999)..................................................................... 23, 27, 44

*Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co.,*
 220 F. Supp. 784 (S.D.N.Y. 1963) ....................................................................... 1

*Allen-Myland, Inc. v. IBM Corp.,*
 33 F.3d 194 (3d Cir. 1994)......................................................................... 34, 38

*Alvord-Polk, Inc. v. F. Schumacher & Co.,*
 37 F.3d 996 (3d Cir. 1993)................................................................................ 55

*Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.,*
 912 F.2d 563 (2d Cir. 1990)............................................................................... 31

*Anderson News, LLC v. Am. Media, Inc.,*
 680 F.3d 162 (2d Cir. 2012)................................................................................ 1

*Ansell, Inc. v. Schmid Labs., Inc.,*
 941 F.2d 1200 (3d Cir. 1991)............................................................................ 29

*Ansell Inc. v. Schmid Labs., Inc.,*
 757 F. Supp. 467 (D.N.J. 1991) ......................................................................... 29

*Anza v. Ideal Steel Supply Corp.,*
 547 U.S. 451 (2006)............................................................................................. 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
 472 U.S. 585 (1985)........................................................................................... 49

*Balaklaw v. Lovell,*
 14 F.3d 793 (2d Cir. 1994)........................................................................... 16, 21

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins. Co.,*
 784 F.2d 1325 (7th Cir. 1986) .................................................................... 35, 40

*Bates v. State Bar of Ariz.,*
 433 U.S. 350 (1977)............................................................................................. 9

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
 603 F.2d 263 (2d Cir. 1979)......................................................................... 37, 42

*Bogan v. Hodgkins,*
 166 F.3d 509 (2d Cir. 1999)............................................................................... 27

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ........................................................................... 19

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
  651 F.2d 122 (2d Cir. 1981) ............................................................................... 34

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................... 21, 28

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ............................................................................... 4, 9

*California v. Sutter Health Sys.*,
  130 F. Supp. 2d 1109 (N.D. Cal. 2001) ........................................................... 10

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ........................................................... 2, 3, 12, 46

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ............................................................................... 44, 49

*CDC Tech., Inc. v. IDEXX Labs., Inc.*,
  186 F.3d 74 (2d Cir. 1999) ............................................................................... 16

*Chicago Bd. of Trade v. United States*,
  246 U.S. 231 (1918) ............................................................................... 2, 55

*Chicago Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ............................................................................... 38

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
  961 F.2d 667 (7th Cir. 1992) ............................................................................... 54

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) ............................................................................... 21

*Commercial Data Servers, Inc. v. IBM Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003) ............................................................... 30

*Community Publishers, Inc. v. DR Partners*,
  139 F.3d 1180 (8th Cir. 1998) ............................................................................... 51

*Consol. Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir. 1989) ............................................................................... 23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ............................................................................... 31

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) ................................................................................. 2, 15, 17

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) ................................................................... 42

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
    472 F. Supp. 2d 385 (E.D.N.Y. 2007) .................................................... 49

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d. Cir 2006) ...................................................................... 16

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ........................................................................... passim

*Eiberger v. Sony Corp. of Am.*,
    622 F.2d 1068 (2d Cir. 1980) .................................................. 14, 50, 51, 54

*E.I. du Pont de Nemours & Co. v. FTC*,
    729 F.2d 128 (2d Cir. 1984) .................................................................... 17

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ................................................................... 28

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997) .................................................................... 16

*Emigra Grp. LLC v. Fragomen, Del Rey, Bernsen & Loewy LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) .................................................... 24

*Fashion Originators' Guild of Am., Inc. v. FTC*,
    312 U.S. 457 (1941) ................................................................................ 48

*Fed. Mar. Comm'n v. Aktiebolaget Svenska Amerika Linien*,
    390 U.S. 238 (1968) ................................................................................ 54

*Fishman v. Wirtz*,
    807 F.2d 520 (7th Cir. 1986) ............................................................ 13, 43

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ................................................................................ 56

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ......................................................................... 6, 45

*FTC v. Elders Grain, Inc.*,
    868 F.2d 901 (7th Cir. 1989) ................................................................... 40

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................................ 13

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) .......................................................................... passim

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990) ........................................................................ 47-48

*Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*,
    386 F.3d 485 (2d Cir. 2004) .............................................................. passim

*Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*,
    880 F.2d 1514 (2d Cir. 1989) ................................................................. 7

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989) ............................................................... 31

*Hanover Shoe Co. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) .......................................................................... 13

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir. 1984) ................................................................ 21

*Hertz Corp. v. City of New York*,
    1 F.3d 121 (2d Cir. 1993) ............................................................... 2, 45

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) .......................................................... 38

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .......................................................................... 13

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .......................................................... 55

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) ............................................................ 39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) ............................................ passim

*In re Visa Check/Mastermoney Antitrust Litig.*,
    No. 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ............................. 27

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947) .......................................................................... 56

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995).................................................................... passim

*Kartell v. Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984)................................................................... 18, 19

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*,
   845 F.2d 404 (2d Cir. 1988).......................................................................... 40

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) .................................................................... 20

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007).................................................................... 2, 15, 19, 20

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008).................................................................... 2, 54

*Malaney v. UAL Corp.*,
   434 F. App'x 620 (9th Cir. 2011) ................................................................. 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................... 44

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)...................................................................................... 9

*Morrison v. Murray Biscuit Co.*,
   797 F.2d 1430 (7th Cir. 1986) ...................................................................... 5

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978).............................................................................. passim

*Natsource LLC v. GFI Grp., Inc.*,
   332 F. Supp. 2d 626 (S.D.N.Y. 2004).......................................................... 24

*NCAA v. Bd. of Regents*,
   468 U.S. 85 (1984)................................................................................ passim

*Ne. Tel. Co. v. AT&T Co.*,
   651 F.2d 76 (2d Cir. 1981)........................................................................... 50

*New York v. Anheuser-Busch, Inc.*,
   673 F. Supp. 664 (E.D.N.Y. 1987) ............................................................... 41

*New York v. Kraft Gen. Foods, Inc.*,
   926 F. Supp. 321 (S.D.N.Y. 1995)................................................................ 24

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) ........................................................................................ 5, 20

*N. Tex. Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ............................................................................ 14

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
   883 F.2d 1101 (1st Cir. 1989) ........................................................................... 18

*Oreck Corp. v. Whirlpool Corp.*,
   579 F.2d 126 (2d Cir. 1978) .............................................................................. 17

*Park West Radiology v. CareCore Nat'l LLC*,
   675 F. Supp. 2d 314 (S.D.N.Y. 2009) ............................................................... 23

*PepsiCo, Inc. v. Coca-Cola, Inc.*,
   315 F.3d 101 (2d Cir. 2002) .............................................................................. 29

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ........................................................................... 33

*S. Pac. Commc'ns Co. v. AT&T Co.*,
   740 F.2d 980 (D.D.C. 1984) .............................................................................. 41

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978) ............................................................................ 21

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
   431 F.3d 917 (6th Cir. 2005) ....................................................................... 28, 30

*Stamatakis Indus., Inc. v. King*,
   965 F.2d 469 (7th Cir. 1992) ............................................................................. 49

*Standard Oil Co. v. FTC*,
   340 U.S. 231 (1951) ...................................................................................... 5, 12

*State Oil Co. v. Kahn*,
   522 U.S. 3 (1997) .............................................................................. 1, 2, 14, 15

*Sullivan v. NFL*,
   34 F.3d 1091 (1st Cir. 1994) .............................................................................. 6, 8

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) .......................................................................................... 36

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
   875 F.2d 86 (6th Cir. 1989) ............................................................................... 19

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953)..............................................................................................20, 22, 51-52

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)................................................................................... passim

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)..................................................................................... passim

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................................. passim

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
  454 F. Supp. 2d 62 (E.D.N.Y. 2006) ............................................................................ 16

*United Air Lines, Inc. v. Austin Travel Corp.*,
  867 F.2d 737 (2d Cir. 1989)........................................................................................ 30

*United Air Lines, Inc. v. Austin Travel Corp.*,
  681 F. Supp. 176 (S.D.N.Y. 1988)............................................................................... 30

*United States v. Aluminum Co. of Am.*,
  148 F.2d 416 (2d Cir. 1945)........................................................................................ 25

*United States v. Am. Express Co.*,
  No. 10-cv-4496, 2014 WL 1817427 (E.D.N.Y. May 7, 2014)........................................ passim

*United States v. Apple, Inc.*,
  No. 12-cv-2826, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013) ............................................ 57

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013)........................................................................... 48

*United States v. Archer-Daniels-Midland Co.*,
  866 F.2d 242 (8th Cir. 1988) ............................................................................. 6, 24, 26

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990)..................................................................................... 34

*United States v. Blue Cross Blue Shield of Mich.*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011)........................................................................ 18

*United States v. Brown Univ.*,
  5 F.3d 658 (3d Cir. 1993) ................................................................................... 10, 46-47

*United States v. Chas. Pfizer & Co.*,
  246 F. Supp. 464 (E.D.N.Y. 1965) .......................................................................... 24, 25

*United States v. Columbia Steel Co.*,
    334 U.S. 495 (1948) ............................................................................... 34, 44

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1978) ..................................................................................... 22

*United States v. Delta Dental of R.I.*,
    943 F. Supp. 172 (D.R.I. 1996) .................................................................. 18

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ............................................................... passim

*United States v. Dentsply Int'l, Inc.*,
    277 F. Supp. 2d 387 (D. Del. 2003) ........................................................... 44

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ........................................................................... 37

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ..................................................................................... 56

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................................... 21, 30

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974) ..................................................................................... 38

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ......................................................................42, 44, 56-57

*United States v. Grinnell Corp.*,
    236 F. Supp. 244 (D.R.I. 1964) .................................................................. 42

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................... 24, 25

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................. passim

*United States v. Microsoft Corp.*,
    84 F. Supp. 2d 9 (D.D.C. 2000) .......................................................... 38, 43

*United States v. Microsoft Corp.*,
    No. CIV. A. 98-1232, 1998 WL 614485 (D.D.C. Sept. 14, 1998) ......................54-55

*United States v. Parke, Davis & Co.*,
    362 U.S. 29 (1960) ....................................................................................... 56

*United States v. Phila. Nat'l Bank,*
374 U.S. 321 (1963) ................................................................. 51

*United States v. Rockford Mem'l Corp.,*
898 F.2d 1278 (7th Cir. 1990) ................................................ 22

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940) .................................................. 6, 48-49

*United States v. Topco Assocs., Inc.,*
405 U.S. 596 (1972) ................................................................ 51

*United States v. United Shoe Mach. Corp.,*
391 U.S. 244 (1968) ................................................................ 57

*United States v. Visa U.S.A., Inc.,*
344 F.3d 229 (2d Cir. 2003) ............................................ passim

*United States v. Visa U.S.A., Inc.,*
183 F. Supp. 2d 613 (S.D.N.Y. 2001) ................................... 42

*United States v. Visa U.S.A., Inc.,*
163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................ passim

*United States v. Ward Baking Co.,*
376 U.S. 327 (1964) ................................................................ 56

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,*
7 F.3d 986 (11th Cir. 1993) ............................................ 28-29, 39

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
257 F.3d 256 (2d Cir. 2001) ..................................................... 4

*ZF Meritor, LLC v. Eaton Corp.,*
696 F.3d 254 (3d Cir. 2012) ................................................... 17

## Statutes and Other Authorities

15 U.S.C. § 1 .............................................................................. 1

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2012)............................... passim

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) .......... passim

I.     **Section One of the Sherman Act Condemns Restraints That Unreasonably Restrain Competition**

    A.     **American Express's Restraint Is Appropriately Judged by the Rule of Reason**

    1.     Section 1 of the Sherman Act prohibits "[e]very contract . . . in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has consistently held "that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 237-38 (2d Cir. 2003).

    2.     To establish a violation of Section 1, a plaintiff must show: (1) a contract, combination, or conspiracy, i.e., concerted action or joint conduct, that (2) unreasonably restrains trade. *Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).

    3.     American Express's (Amex's) card acceptance agreements with merchants, which include the Anti-Steering Rules, constitute concerted action. *Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co.*, 220 F. Supp. 784, 787 (S.D.N.Y. 1963) ("A contract between a buyer and a seller . . . is enough to satisfy the joint conduct requirement of section 1 of the Sherman Act"). "Agreements within the scope of § 1 may be either horizontal, i.e., agreements between competitors at the same level of the market structure, or vertical, i.e., combinations of persons at different levels of the market structure, e.g., manufacturers and distributors." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (alterations and internal quotation marks omitted). "All parties agree that Amex's anti-steering rules constitute a vertical agreement between Defendants and participating merchants." *United States v. Am. Express Co.*, No. 10-cv-4496, 2014 WL 1817427, at *5 (E.D.N.Y. May 7, 2014).

    4.     "Certain arrangements, such as [horizontal] price fixing and market division, are considered unreasonable *per se*, but most other restraints are evaluated case by case, under the 'rule of reason.'" *Visa*, 344 F.3d at 238; *see State Oil*, 522 U.S. at 10. The rule of reason applies

to most vertical restraints.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877,

885-887 (2007).  It is "the accepted standard for testing whether a practice restrains trade in

violation of § 1."  *Id.* at 885.  Amex's Anti-Steering Rules are appropriately judged under the

rule of reason.

   5.  The rule of reason requires "the factfinder [to] weigh[] all of the circumstances of

a case in deciding whether a restrictive practice should be prohibited as imposing an

unreasonable restraint on competition."  *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49

(1977); *see Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238-39 (1918); *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316-17 (2d Cir. 2008); *Capital Imaging

Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993).  "[T]he

purpose of the analysis is to form a judgment about the competitive significance of the restraint."

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). The rule of reason

directs the inquiry to "whether the challenged agreement is one that promotes competition or one

that suppresses competition." *Id.* at 691.  The rule of reason analysis takes "into account a variety

of factors, including specific information about the relevant business, its condition before and

after the restraint was imposed, and the restraint's history, nature, and effect."  *State Oil*, 522

U.S. at 10; *Leegin*, 551 U.S. at 885.

   6.  The burden-shifting framework courts employ under the rule of reason proceeds

in three steps.  First, "[p]laintiffs have an initial burden of demonstrating that Defendants'

behavior adversely affected competition."  *American Express*, 2014 WL 1817427, at *5; *see

Geneva,* 386 F.3d at 506-07.  Second, when "the plaintiffs satisfy their initial burden, the burden

shifts to the defendants to offer evidence of the procompetitive effects of their agreement."

*Geneva*, 386 F.3d at 506-07; *see also Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir.

1993) (explaining that the defendant has the burden to "demonstrate that the procompetitive aspects of the agreement outweigh its anticompetitive aspects").  Third, "[a]ssuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means."  *Geneva,* 386 F.3d at 507; *see K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995); *Capital Imaging*, 996 F.2d at 543.

### B.   Plaintiffs Can Prove Adverse Effect in Two Ways

7.   Plaintiffs have "two independent means by which to satisfy the adverse-effect requirement":  (1) by "show[ing] an actual adverse effect on competition," or (2) by "establishing that [the defendant] had sufficient market power to cause an adverse effect on competition," *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998), and that there are "other grounds to believe that the defendant's behavior will harm competition market-wide." *K.M.B. Warehouse*, 61 F.3d at 129.

8.   Evidence that Amex's Anti-Steering Rules caused adverse effects on competition is sufficient to meet Plaintiffs' initial burden.  "[P]roof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) (internal quotation marks omitted).  "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition," a finding that the challenged restraint has "actual, sustained adverse effects on competition" is "legally sufficient to support a finding that the challenged restraint [is] unreasonable even in the absence of elaborate market analysis." *Id.*

9.   The Second Circuit has consistently held that a plaintiff can carry its initial burden under the rule of reason by directly proving actual adverse effects on competition.

*American Express*, 2014 WL 1817427, at *7 ("Plaintiffs may carry their initial burden by proving actual adverse effects directly and are not limited to establishing market power . . . ."); *Geneva*, 386 F.3d at 509; *K.M.B. Warehouse*, 61 F.3d at 128-29; *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (Sotomayor, J.) ("In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim;" an "actual adverse effect on competition . . . arguably is more direct evidence of market power than calculations of elusive market share figures."); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001); *Tops Markets*, 142 F.3d at 96 (2d Cir. 1998).

10.     Direct proof of adverse effects on competition is permitted not just in cases applying what is termed a "quick look" or abbreviated rule-of-reason.  *Todd*, 275 F.3d at 207 ("Defendants mistake this approach for the 'quick look' or 'truncated' rule of reason inquiry that the Supreme Court has endorsed in certain contexts. . . .  The use of anticompetitive effects to demonstrate market power, however, is not limited to 'quick look' or 'truncated' rule of reason cases.") (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)).

11.     The "actual effects" path for meeting plaintiffs' initial burden without separate proof of market power is available in cases involving vertical restraints as well as those involving horizontal restraints.  *See Geneva*, 386 F.3d at 509 (applying *Indiana Federation* to vertical exclusive dealing claim under Section 1); *K.M.B. Warehouse*, 61 F.3d at 127-29; *American Express*, 2014 WL 1817427, at *7 (observing that the Second Circuit "has consistently held that market power is not a requirement under the rule of reason if a plaintiff can prove actual adverse effect on competition" and declining "to declare a new rule in this case" requiring a showing of market power if actual adverse effects on competition are demonstrated).

4

12. Under the second method of proving adverse effects, Plaintiffs may "demonstrate[] 'adverse effect' indirectly by establishing that [Defendants] had sufficient market power to cause an adverse effect on competition," *Tops Markets*, 142 F.3d at 96, and showing that there are "other grounds to believe that the defendants' behavior will harm competition market-wide such as the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market." *K.M.B. Warehouse*, 61 F.3d at 129.

13. Under each method of proving adverse effects, the government must meet its initial burden by the preponderance of the evidence. *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 345 (S.D.N.Y. 2001).

## II. Plaintiffs Have Shown Actual Adverse Effects on Competition

### A. The Sherman Act Protects the Competitive Process

14. "The antitrust laws . . . safeguard consumers by protecting the competitive process*." Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 489 (2d Cir. 2004); *Morrison v. Murray Biscuit Co*., 797 F.2d 1430, 1437 (7th Cir. 1986) (Posner, J.) ("The purpose of antitrust law, at least as articulated in the modern cases, is to protect the competitive process as means of promoting economic efficiency.").

15. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951). The Supreme Court explained:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see NCAA v. Bd. of Regents*, 468 U.S. 85, 104 n.27 (1984) (same).

16.     The antitrust laws are based in part on the insight that sellers often compete by offering lower prices to induce buyers to purchase their products, rather than those of a competitor.  For this reason, price is the "central nervous system of the economy."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940); *see Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 692 (1978) (same); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 482 (2006) (Breyer, J., concurring in part and dissenting in part) ("The basic objective of antitrust law is to encourage the competitive process.  In particular, that law encourages businesses to compete by offering lower prices, better products, better methods of production, and better systems of distribution."); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 245 (8th Cir. 1988) (The "goal [of the antitrust laws] is full and free competition in the marketplace. . . . Their premise is that the unrestrained interaction of competitive forces will yield the best allocation of resources").

**B.     A Showing of Harm to the Competitive Process Satisfies Plaintiffs' Initial Burden**

17.     "Identifying 'anticompetitive effects' under the rule of reason involves analysis of whether the competitive process itself has been harmed."  *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 344 (S.D.N.Y. 2001).  Thus, "harm [to] the competitive process" is an "anticompetitive effect."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc); *Sullivan v. NFL*, 34 F.3d 1091, 1096-97 (1st Cir. 1994) (defining "anticompetitive effects" as "injury to competition" or "harm to the competitive process"); *Visa*, 163 F. Supp. 2d at 342 ("In this case the abusive conduct alleged is the impeding of the competitive process by the associations' dual governance structure and their exclusionary rules."); *see also FTC v. Actavis*,

*Inc.,* 133 S. Ct. 2223, 2236-37 (2013) (finding the "relevant anticompetitive harm" to be the "pay for delay" patent settlement payment that "likely seeks to prevent the risk of competition").

18.     Restraints have an adverse effect on competition if they "disrupt the proper functioning of the price-setting mechanism of the market," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461-62 (1986).   By imposing Anti-Steering Rules that destroy the incentives for networks to compete on pricing, Amex has harmed the competitive process.   The Rules are "no less than a refusal to compete with respect to the price term of an agreement," and "impair[] the ability of the market to advance social welfare by ensuring the provision of" network services "at a price approximating the marginal cost of providing them." *Id*. at 459.   Though "it is very difficult to analyze the effects on consumer welfare of increases or decreases in interchange rates, merchants—and ultimately consumers—have an interest in the vigor of competition to ensure that interchange pricing points are established competitively."  *Visa*, 163 F. Supp. 2d at 396.

19.     Amex's Anti-Steering Rules impermissibly harm the competitive process by impeding the incentives and efforts of Amex's network rivals to promote lower-priced choices to merchants and their customers at the point of sale.  *Visa,* 163 F. Supp. 2d at 379 (finding adverse effect on competition when "consumer welfare and consumer choice are decreased"); *Professional Engineers*, 435 U.S. at 692-93 (condemning restraint that "deprives the customer of the ability to utilize and compare prices in selecting" the relevant product) (internal quotation markets omitted); *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 880 F.2d 1514, 1517 (2d Cir. 1989) (in vertical tying agreement case, focusing on "harm to consumer choice in the tied-product market").  When a restraint "impairs . . . choice in the marketplace," an

anticompetitive effect is established.  *United States v. Dentsply Int'l, Inc*., 399 F.3d 181, 194 (3d

Cir. 2005).

20.     Restraints that impede responses to changes in price are anticompetitive,

regardless of their precise effect on price.  "[S]tunting price competition" is itself an adverse

competitive effect.  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003).  *See*

*Professional Engineers*, 435 U.S. at 695 (finding a "ban on competitive bidding [that]

prevent[ed] all customers from making price comparisons . . . and impose[d] [Defendants']

views of the costs and benefits of competition on the entire market" as "nothing less than a

frontal assault on the basic policy of the Sherman Act").  As the First Circuit similarly observed:

> The Supreme Court has emphasized . . . that overall consumer preferences in
> setting output and prices is more important than higher prices and lower output,
> *per se*, in determining whether [or not] there has been an injury to competition.  In
> this case, regardless of the exact price effects of [defendant's] policy, the overall
> market effects of the policy are plainly unresponsive to consumer demand for [the
> relevant product].

*Sullivan*, 34 F.3d at 1101 (quoting *NCAA*, 468 U.S. at 107).

21.     To demonstrate competitive harm, plaintiffs need not establish precisely what

choices consumers would have made absent the challenged restraint, how Amex's network rivals

would have vied for consumer preference, or how the competitive battle would have resolved.  It

is sufficient that the restraint had a significant adverse impact on the competitive process by

"disrupt[ing] the proper functioning of the price-setting mechanism of the market."  *Indiana*

*Federation*, 476 U.S. at 461 (internal quotation marks omitted).  In *Indiana Federation,*

defendant dentists unreasonably restrained trade by agreeing to deny insurers access to x-rays the

insurers requested to evaluate dental claims.  *See id.* at 448-53.  Although the FTC offered no

"proof that [the restraint] resulted in higher prices," the Supreme Court held that harming the

competitive process through an effort to "withhold (or make more costly) information desired by

consumers for the purpose of determining whether a particular purchase is cost justified" is itself

a cognizable and sufficient anticompetitive effect.  *Id*. at 461-62.

22.     Because Amex's Anti-Steering Rules prevent most merchants from even

disclosing price differences among card brands to their merchants' customers, they harm the

competitive process.     *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 773 (1999) (describing as

"unexceptionable" the lower court's statements, in explaining potential anticompetitive effects of

an advertising ban, that "price advertising is fundamental to price competition" and "restrictions

on the ability to advertise prices normally make it more difficult for consumers to find a lower

price and for dentists to compete on the basis of price"); *Morales v. Trans World Airlines, Inc.*,

504 U.S. 374, 388 (1992) (recognizing, in deceptive advertising case, that "it is clear as an

economic matter" that "inform[ing] the public of the . . . prices of products and services . . .

performs an indispensable role in the allocation of resources") (internal quotation marks

omitted); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364, 377 (1977) (because of ban on attorney

advertising, "attorneys are isolated from competition, and the incentive to price competitively is

reduced . . . . [W]here consumers have the benefit of price advertising, retail prices often are

dramatically lower than they would be without the advertising.").

23.     Amex's Anti-Steering Rules harmed the competitive process even though Amex's

competitors have not been completely blocked from the market, and even though Amex has not

blocked all steering.  *Cf. Microsoft*, 253 F.3d at 64 (Microsoft's defense "that, despite the

restrictions in the OEM license, Netscape is not completely blocked from distributing its product

. . . is insufficient to shield Microsoft from liability for those restrictions because, although

Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-

efficient ones"); *Dentsply*, 399 F.3d at 191 (in exclusive dealing case, "[t]he test is not total

foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit").

### C.   Showing Adverse Price Effects Satisfies Plaintiffs' Initial Burden

24.     Although, as outlined above, the harm to the competitive process caused by Amex's Anti-Steering Rules suffices to establish actual adverse effects, the Rules have also harmed competition by causing prices in the relevant markets to be higher than they would be without the restraint.  When the plaintiff shows that there was an "actual detrimental effect on competition" through proof that "prices were actually higher" in the relevant market, the initial burden is met.  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (emphasis omitted); *see Todd v. Exxon Corp.*, 275 F.3d 191, 207 (2d Cir. 2001) ("[U]nder the traditional rule of reason a plaintiff may satisfy its burden by proving the existence of actual anticompetitive effects, such as . . . increase in price.") (internal quotation marks and alterations omitted) (quoting *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)).

25.     Steering is a critical tool for keeping prices low.  In *California v. Sutter Health System*, 130 F. Supp. 2d 1109, 1129-30 (N.D. Cal. 2001), the district court noted that "[w]hen faced with price increases, . . . [t]he primary mechanism by which [health plans] keep prices low is through the 'steering' of patients," and that "[s]teering has been quite effective in disciplining prices because hospitals are sensitive to declines in volume." "When faced with rising prices, [health plans] can attempt to steer patients to lower cost health care providers and away from the hospital imposing a price increase, thereby pressuring the hospital to eliminate the price increase." *Id.*  Because the Anti-Steering Rules deny merchants this tool, Amex has been able to successfully implement profitable price increases, including through its "Value Recapture" program.  Pls. Proposed Findings of Fact § IV.C.ii, ¶¶ 114, 252 [hereinafter PFOF].  This constitutes direct evidence of a price effect.

26. "[C]utting prices to increase business is the very essence of competition," *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 478 (1992) (internal quotation and citation omitted). A restraint that materially reduces the incentive to cut prices by reducing the reward of increased business causes prices to be higher than they would be absent the restraint. By imposing Anti-Steering Rules that impeded efforts by network rivals to gain share by offering merchants lower prices, Amex caused prices to be higher that they would have been absent the restraint. For example, Discover was forced to abandon its low-price strategy because the Anti-Steering Rules prevented merchants from responding by delivering greater volume as a reward for low prices. PFOF ¶¶ 67-69. This also is an independent price effect.

27. By arguing that its higher discount rates result in higher-quality card products, Amex tacitly concedes that the effect of its restraint on interbrand competition is, in fact, higher discount rates. "The logic of this argument rests on the assumption that the agreement will tend to maintain the price level; if it had no such effect, it would not serve its intended purpose." *Professional Engineers*, 435 U.S. at 693.

### D.   Showing Reduced Output, Quality, or Innovation Satisfies Plaintiffs' Initial Burden

28. Plaintiffs can also demonstrate harm to competition by proving that output was reduced. *NCAA*, 468 U.S. at 99. In *Visa*, the district court found that the exclusionary rules had resulted in an output reduction, explaining that "[t]he term 'output reduction' can mean 'a marketwide decrease in the number of units produced. But it can also refer to a decline in the quality of the goods, or a decline in the rate of improvement or innovation that is committed to a particular market.'" *Visa*, 163 F. Supp. 2d at 406 n.28 (quoting 13 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2104a at 36.

29.     Among the ways in which a plaintiff can show an actual anticompetitive effect is by demonstrating a "decrease in quality" of the product or service.  *Visa*, 163 F. Supp. 2d at 345 ("the [g]overnment bears the initial burden . . . of demonstrating that each restraint has substantial adverse effects on competition such as . . . a decrease in quality"); *Capital Imaging*, 996 F.2d at 546 ("any decrease in quality" is an adverse effect).  A healthy competitive process benefits consumers not just by lowering price, but also by increasing quality:

> The Sherman Act reflects a legislative judgment that ultimately competition will not only produce not only lower prices, but also better goods and services.  "The heart of our national economic policy long has been faith in the value of competition."  The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers.

*Professional Engineers*, 435 U.S. at 695 (quoting *Standard Oil*, 340 U.S. at 248).

30.     When "product innovation . . . has been stunted by the challenged policies," *Visa*, 344 F.3d at 241, an anticompetitive effect has been shown.  *Visa* held that increased competition through removal of the exclusionary rules likely meant that "innovation in services would be enhanced."  *Id*. at 240-41.  In that case, the government proved through testimony from defendants that both Visa and MasterCard would "respond to . . . greater network competition by offering new and better products and services."  *Id*.  In other countries, where the challenged exclusionary rules did not exist, Visa had in fact "proactively strengthen[ed] its product offerings."  *Id*.  Removal of the restraints would therefore cause Visa "to respond to the greater network competition by offering new and better products and services of their own, thereby benefiting consumers."  *Visa,* 163 F. Supp. 2d at 396.  Here, the Anti-Steering Rules stifle the incentives of merchants, networks, and other parties to innovate with emerging technologies to facilitate steering among networks.  PFOF ¶¶ 116-25.

### E.   Showing Harm at the Merchant Level Satisfies Plaintiffs' Initial Burden

31.     It suffices for Plaintiffs to prove harm to competition at the merchant level

because they are "consumers" protected by antitrust law.  Merchants purchase general purpose

credit and charge card network services from networks. *Visa*, 344 F.3d at 239.  Proof of harm to

the merchant's retail customers is not required.  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C.

Cir. 2001) ("[N]o court has ever held that a reduction in competition for wholesale purchasers is

not relevant unless the plaintiff can prove impact at the consumer level.").  In *Dentsply*, 399 F.3d

at 190, the Third Circuit reversed a trial verdict for the defendant tooth manufacturer in part

because "the Court's scrutiny should have been applied not to the 'ultimate consumers' who used

the teeth, but to the 'customers' who purchased the teeth, the relevant category which included

dealers as well as laboratories," a "mis-focus [that] led the District Court into clear error."

32.     As Amex itself advocated to the Second Circuit in *Visa*, "no amount of issuer

competition can eliminate the effects of increased prices, or reduced output, choice, or

innovation at the network level. . . .  Nor is there any requirement that the Government prove

harm to competition at *both* the network level and the issuer level. . . . Harm at the upstream

(network) level is enough, as the cases uniformly hold."  Brief of American Express Co. as

Amicus Curiae in Support of Affirmance at 6-7, *United States v. Visa, U.S.A., Inc.*, 344 F.3d 229

(2d Cir. 2003) (No. 02-6074), 2002 WL 32828497, at *6-7 (citing *Ill. Brick Co. v. Illinois*, 431

U.S. 720, 741-45 (1977); *Hanover Shoe Co. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968);

*Heinz*, 246 F.3d at 718-19; *Fishman v. Wirtz*, 807 F.2d 520, 535-38 (7th Cir. 1986)).  Because

the anticompetitive effects of Amex's Anti-Steering Rules harm competition for the charge

volume of merchants who purchase its network services, Plaintiffs have met their initial burden.

33.     Nevertheless, the Anti-Steering Rules also harm the merchants' customers.  If

merchants were able to lower their costs, benefits would likely flow through to customers

(regardless of their method of payment) because "part of the price of card services [is] reflected in higher prices charged by merchants who accept[] the cards, and these higher prices [have] to be charged indiscriminately to all purchasers, whether or not they used a Visa card." *See* 2B Areeda & Hovenkamp ¶ 562b, at 377 (3d ed. 2007) (discussing *United States v. Visa*).

**F.      The Court Does Not Need to Quantify Harm for Plaintiffs to Prevail**

34.      The court need not measure the anticompetitive pricing effects of the Anti-Steering Rules to render a verdict for plaintiffs.  A restraint of trade that is "likely . . . to disrupt the proper functioning of the price-setting mechanism of the market . . . may be condemned even absent proof that it resulted in higher prices. . . ." *Indiana Federation*, 476 U.S. at 461-62; *N. Tex. Specialty Physicians v. FTC,* 528 F.3d 346, 367 (5th Cir. 2008) ("The fact that there is no evidence in the record that [defendant] obtained higher prices . . . does not foreclose a determination that [its] practices had anticompetitive effects," when the challenged restraint "erect[s] barriers between [parties] who would otherwise be willing to negotiate directly" and "erects obstacles to price communications between" buyers and sellers).

**G.      Vertical Restraints Are Unlawful If They Harm Interbrand Competition**

35.      Amex rests much of its "effects" defense on the argument that its Anti-Steering Rules are vertical restraints, which are rarely *per se* unlawful and can have procompetitive benefits.  Amex Pretrial Mem. at 77-84, ECF No. 505.  However, "[t]hat a practice is not *per se* unlawful does not mean it is *per se* lawful." *Eiberger v. Sony Corp. of Am.*, 622 F.2d 1068, 1076 (2d Cir. 1980).  Because they harm interbrand competition among general purpose credit card networks, Amex's Anti-Steering Rules are unlawful vertical restraints.

36.      "[T]he primary purpose of the antitrust laws is to protect interbrand competition." *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997).  Vertical restraints often "can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of

14

product," e.g., the competition between Ralph Lauren shirts and other shirt brands, "by reducing intrabrand competition—the competition among retailers selling the same brand," e.g., the competition among department stores selling Ralph Lauren shirts.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007); *Cont'l T.V.*, 433 U.S. at 54-55 (recognizing that some "[v]ertical restrictions promote interbrand competition").

37.     Courts have often found vertical restraints lawful under the Sherman Act because the defendant manufacturer's restraint on intrabrand competition among its distributors enabled its brand to compete more vigorously against the manufacturer's rival brands.  *See Leegin*, 551 U.S. at 890 ("Minimum resale price maintenance can stimulate interbrand competition . . . by reducing intrabrand competition . . . ."); *State Oil,* 522 U.S. at 14, 18 (holding that "there is insufficient economic justification for *per se* invalidation of vertical maximum price fixing" due to the potential that such an agreement "may stimulate interbrand competition even as it reduces intrabrand competition.").

38.     "[I]mplicit in every decision sustaining vertical restrictions under the rule of reason" is the conclusion that they "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products" even though they "reduce intrabrand competition by limiting the number of sellers of a particular product . . . ." *Cont'l T.V.,* 433 U.S. at 54; *see Leegin,* 551 U.S. at 890-91.  That conclusion cannot be reached here.  Merchants bound by the restraints are consumers of Amex network services, not intrabrand-competing distributors of those services.  The Anti-Steering Rules are not designed to restrain competition among Amex-accepting merchants; rather, they constrain an important form of interbrand competition among the four card brands.  This makes the Anti-Steering Rules different from the great bulk of vertical restraints that have been evaluated by the courts.

39.      Amex has argued that exclusive dealing cases support the proposition that "a vertical restraint is not necessarily anticompetitive simply because it restricts some forms of horizontal competition."  Amex Pretrial Mem. 79.  But the cases Amex cited did not involve restraints on (or harm to) horizontal interbrand competition.  *See CDC Tech., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999) (affirming dismissal of exclusive dealing claim because there was no evidence plaintiff was impeded in its "ability to reach the ultimate consumers"); *Balaklaw v. Lovell*, 14 F.3d 793, 798 (2d Cir. 1994) (affirming dismissal of exclusive dealing claim because the vertical contract resulted in "only a reshuffling of competitors," not harm to interbrand competition).

40.      Indeed, some other "exclusive dealing" cases cited by Amex involve only exclusive distributor arrangements with no restraint at all on interbrand competition.  *See E&L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23, 29-31 (2d Cir. 2006) (involving a "vertical restraint between a supplier[] and a distributor[]," a "run-of-the-mill exclusive distributorship controversy, where a former exclusive distributor is attempting to protect its competitive position vis a vis its supplier," with no effect on interbrand competition); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244-45 (2d Cir. 1997) (holding that an exclusive distribution agreement implicated only "the way one product is distributed, a question of intrabrand competition," and thus plaintiff had failed to show "an actual adverse effect on interbrand competition"); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.,* 454 F. Supp. 2d 62, 72-73 (E.D.N.Y. 2006) (dismissing exclusive distribution claim, a "restraint on intrabrand competition," because it was "unclear that the relationship imposes any negative restriction on competition in the market whatsoever").  These cases offer no guidance for a vertical restraint, like this one, aimed entirely at blocking interbrand competition.

41.     Amex fails to acknowledge that vertical exclusive dealing agreements can be unlawful when evaluated under the rule of reason.  Though vertical exclusive dealing agreements could "promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products," *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir. 1978) (citing *Cont'l T.V.*, 433 U.S. at 54), they also "could freeze out competition to an extent that greatly outweigh[s] any procompetitive effects," *Geneva*, 386 F.3d at 509, or "limit[] the choices of products" available to consumers, *Dentsply,* 399 F.3d at 194.  In *Geneva Pharmaceuticals*, a generic drug maker claimed that a supplier's exclusive contract with a different drug maker for a key ingredient violated antitrust law.  The district court granted summary judgment for the defendant, finding that the exclusive contract "was the product of reasonable business decisions and had pro-competitive benefits."  386 F.3d at 494.  The Second Circuit reversed (in part) because the plaintiff "presented evidence that the vertical exclusive dealing arrangement reduced the supply of [the key ingredient] available to generic manufacturers," *id.* at 509, thus showing harm to interbrand competition.  Other circuits agree that exclusive vertical agreements violate antitrust law when they harm interbrand competition. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) ("[E]xclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition . . . .").

42.     Amex attempts to analogize its Anti-Steering Rules to Most-Favored Nation ("MFN") clauses.  Amex Pretrial Mem. at 80-81.  The few cases analyzing MFN clauses provide no support for Amex's Anti-Steering Rules.  An MFN clause typically is a vertical agreement under which a "seller promise[s] that no customer would be charged a higher price than other customers."  *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 130 (2d Cir. 1984).  A

vertical MFN clause can "produce substantial anticompetitive effects in particular circumstances." *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 176 (D.R.I. 1996) (denying motion to dismiss where defendant had alleged market share of 35-45% of insurance market and MFN clauses in its contracts with 90% of Rhode Island dentists); *see United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (denying motion to dismiss section 1 claim based on MFN's potential anticompetitive effects).

43.     Amex has cited *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101 (1st Cir. 1989), involving an insurer's requirement that it not pay its physicians more than the physicians were accepting from a competing HMO, and *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984), involving a prohibition on extra charges to insured patients above physicians' contractual reimbursement amounts.  Amex Pretrial Mem. 80-81. Unlike the Anti-Steering Rules, the agreements in both of these cases resulted in low consumer prices, not high prices, a fact the First Circuit found significant.  *Ocean State,* 883 F.2d at 1111 ("the prices at issue were *low* prices, not high prices . . . courts . . . should be . . . reluctant to condemn too speedily . . . an arrangement that, on its face, appears to bring low price benefits to the consumer") (quoting *Kartell*, 749 F.2d at 930-31); *see Dental Dental*, 943 F. Supp. at 177 ("*Kartell* is distinguishable from this case because the ban on balance billing at issue in *Kartell* resulted in lower prices for Blue Shield's enrollees, while the Government here alleges that Delta's Prudent Buyer policy at issue here ultimately results in higher prices . . . .").  Moreover, these cases further demonstrate that the Sherman Act is aimed at protecting interbrand competition.  In *Kartell,* "Blue Shield's program d[id] not stop doctors from taking other patients or from charging those other patients what they like," 749 F.2d at 927,

and so the insurer's policy did not restrain interbrand competition by other insurers to sign up patients or providers.

44.     Amex has cited *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), in support of the argument that reduced "downward competitive pressure on price" is not an adverse effect in itself, *see* Amex Pretrial Mem. 80, but ignores the context of the language quoted.  The higher prices and reduced "downward competitive pressure" referred to in *Brantley* are those caused by "resale price maintenance agreements" that limit only intrabrand price competition.  *Id*. at 1202 (citing *Leegin*, 551 U.S. at 895-97 (explaining that because resale price maintenance may promote interbrand competition, the resulting higher retail prices could be "consistent with both procompetitive and anticompetitive theories")).  This provides no support for a restraint like Amex's Anti-Steering Rules that cripples interbrand competitive pressure, which "the antitrust laws are designed primarily to protect."  *Leegin*, 551 U.S. at 895.

45.     Finally, Amex has cited *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989), for the proposition that a card network may "limit the differential between the prices quoted to its customers and the prices quoted to customers paying cash."  Amex Pretrial Mem. 81.  But this case does not help Amex.  The restraint at issue was a fuel card issuer's limit on the surcharge that truckstops could charge for fuel purchases.  875 F.2d at 87.  The alleged harm was to competition in the fuel market, not a network services market; the case addressed  only standing, not effects; and its conclusion that the card issuer acts as a "buyer" for its cardholders is inconsistent with the way the Second Circuit views networks as sellers of network services to merchants.  *Visa,* 344 F.3d at 239.

46.     Another type of vertical restraint, a tying agreement, can be unlawful where it harms interbrand competition.  A tying arrangement is a vertical "agreement by a party to sell

19

one product but only on the condition that the buyer also purchases a different (or tied) product

. . . ." *Eastman Kodak*, 504 U.S. at 461-62 (quoting *Northern Pacific*, 356 U.S. at 5-6). A firm

violates Section 1 when it uses a tying arrangement to substantially foreclose rival sellers of the

tied product from making sales that they otherwise could have made. *See Eastman Kodak Co.,*

504 U.S. at 465 (reversing summary judgment where tying agreement caused consumers to

"switch to Kodak service even though they preferred [competing] ISO service."); *see also Times-*

*Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953).

47.     Vertical restraint jurisprudence provides no quarter for Amex's Anti-Steering

Rules. If a vertical restraint is evaluated under the rule of reason on a robust evidentiary record,

like the one developed at trial here, and is found to harm interbrand competition without

substantial offsetting procompetitive effects, it is unlawful under the Sherman Act. "As should

be evident, the potential anticompetitive consequences of vertical price restraints must not be

ignored or underestimated." *Leegin*, 551 U.S. at 894.

## III.     General Purpose Credit and Charge Card Network Services Constitute a Relevant Antitrust Market

### A.     Relevant Markets Provide Context for Assessing Competitive Effects

48.     A "finding of actual, sustained adverse effects on competition" can be "legally

sufficient to support a finding that the challenged restraint was unreasonable even in the absence

of elaborate market analysis." *FTC v. Ind. Fed'n of Dentists*, 476 U.S 447, 461 (1986).

Nonetheless, it can be "helpful to define the relevant market" because "a market definition

provides the context against which to measure the competitive effects of an agreement." *Geneva*

*Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495-496 (2d Cir. 2004); *see Law v.*

*NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998) (market definition "is not an end unto itself but

rather exists to illuminate a practice's effect on competition").

49.      "The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva*, 386 F.3d at 496.  Courts should apply "a pragmatic, factual approach to the definition of the relevant market and not a formalistic, legalistic one."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  Market definition is a factual determination that must take into account the "commercial realities" of the marketplace.  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992); *see Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) ("The basic principle is that the relevant market definition must encompass the realities of competition.") (internal quotation and citation omitted).

### B.   The Relevant Product Market Includes Only Reasonably Interchangeable Products

50.      "The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level."  *Geneva*, 386 F.3d at 496 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *see City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (same); *Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *Kodak*, 504 U.S. at 482 (articulating reasonable interchangeability standard). Reasonably interchangeable products have the ability to "take significant amounts of business away from each other."  *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70-71 (2d Cir. 1984) (citing *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978)). Reasonable interchangeability "exists if consumers would respond to a slight increase in the price of one product by switching to another product."  *Todd v. Exxon Corp.*, 275 F.3d 191,

201-02 (2d Cir. 2001).  "Interchangeability of use and cross-elasticity of demand are not to be used to obscure competition but to recognize competition where, in fact, competition exists." *United States v. Cont'l Can Co.*, 378 U.S. 441, 452 (1978) (internal quotation marks omitted).

51.     Here, the "customers" on which the reasonable interchangeability analysis must focus are merchants.  Unlike cardholders, on which Amex focuses, merchants are the purchasers of network services to process credit card transactions.  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003).  In *Visa*, "[t]he district court found, on the basis of expert testimony, that there are no products reasonably interchangeable, in the eyes of issuers or merchants, with the network services provided by the four major brands."  *Id*.  Because merchants are "buyers" that consume network services, *id.*, the pertinent inquiry here is whether merchants consider general purpose credit and charge card network services to be reasonably interchangeable with other services.  Since merchants do not consider other services reasonably interchangeable, general purpose credit and charge card network services is a separate product (or service) market.  *Id*.

52.     Of course, some consumers in any relevant market may switch away from a product in that relevant market to a product outside it.  The inquiry is not whether there is *some* consumer switching, but rather whether there is *enough* consumer switching to prevent a small, but significant, price increase.  *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) ("For every product, substitutes exist.  But a relevant market cannot meaningfully encompass that infinite range.  The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small."); *cf. United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284-85 (7th Cir. 1990) (Posner, J.)

(affirming market definition of "the provision of inpatient services by acute-care hospitals in Rockford and its hinterland" even though some "people who live in Rockford . . . use hospitals outside the area").

### C. Courts Have Used the Hypothetical Monopolist Test as a Tool for Defining Relevant Markets

53.     The hypothetical monopolist test has been used by the Second Circuit as a tool for implementing the reasonable interchangeability standard.  That test defines a relevant market as "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (emphasis and internal quotation marks omitted); *see Todd,* 275 F.3d at 202 ("Thus, the inquiry is whether a 'hypothetical cartel' would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers.") (quoting *AD/SAT*, 181 F.3d at 228); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001) (explaining that "a market is properly defined when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, i.e., without losing too many sales to other products to make its price unprofitable"); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (affirming district court's market definition, based on a hypothetical monopolist test measuring the "response to a non-temporary increase of 5% or more in prices of the primary product," and describing the test as "an accepted economic benchmark").

54.     The hypothetical monopolist test is set out in the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines.  *See* §§ 4.1.1, 4.1.2 (2010).  Trial courts in this circuit often rely on the Horizontal Merger Guidelines to inform their approach to market definition.  *See, e.g., Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314,

327-28 (S.D.N.Y. 2009) ("The Merger Guidelines have been recognized by this Court in antitrust cases as a tool used to define a relevant market, and to assess market power.") (citations and internal quotations marks omitted); *Emigra Grp. LLC v. Fragomen, Del Rey, Bernsen & Loewy LLP*, 612 F. Supp. 2d 330, 352 (S.D.N.Y. 2009) (recognizing the Horizontal Merger Guidelines as "another tool used to define a relevant market"); *Natsource LLC v. GFI Grp., Inc.*, 332 F. Supp. 2d 626, 636 n.3 (S.D.N.Y. 2004) (stating that Merger Guidelines "are helpful in providing an analytical framework for evaluating antitrust cases."); *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 359-61 & n.9 (S.D.N.Y. 1995) ("The court notes that the Merger Guidelines are helpful in providing an analytical framework . . . .").

**D.    Mere Functional Interchangeability Is Insufficient To Show Reasonable Interchangeability**

55.      "Functional interchangeability is certainly a *prima facie* indication that consumers of one product might be willing to switch to the other in the face of a non-trivial price increase," but it does not establish reasonable interchangeability. *Geneva*, 386 F.3d at 496 (holding that brand-name and generic drugs were in separate product markets despite having such a high degree of functional interchangeability that they were "certified by the FDA as therapeutically equivalent"); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) ("While sugar and [high-fructose corn syrup] are functionally interchangeable, they are not reasonably interchangeable because of the price differential between the two products."). "For products to be classified in the same market they must be both functionally *and* reasonably interchangeable." *United States v. Chas. Pfizer & Co.*, 246 F. Supp. 464, 468 n.3 (E.D.N.Y. 1965) (emphasis added); *see United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 64, 71 (D.D.C. 2011) (finding that evidence of consumer switching between functionally similar products "ruled out" some overly broad, "inappropriate proposed relevant markets," but "alone

cannot answer the relevant market inquiry" because it "relied on switching data as a proxy for diversion" in reaction to price increases).  "Having found one or more products functionally interchangeable with [a given product] in a particular use, the next question to be resolved is one of purchaser reaction—the willingness or readiness to substitute one for the other." *Chas. Pfizer*, 246 F. Supp. at 468.  As a result, "[w]hile a finding of functional interchangeability must precede that of a reasonable (reactive) interchangeability, it is not determinative." *Id.* at 468 n.3.  For products to be in the same market, both functional and reasonable interchangeability must be shown.

56.     Mere functional interchangeability between credit cards and debit cards does not imply that they are reasonably interchangeable, even if some substitution between the two actually occurs.  *See, e.g.*, *Geneva*, 386 F.3d at 496 (reversing summary judgment based on the district court's erroneous conclusion that "the chemical equivalence between Coumadin and generics" meant that the relevant market included both Coumadin and its generic version); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424-25 (2d Cir. 1945) (Hand, J.) (defining relevant market to include only "virgin" ingot and excluding "secondary" ingot, even though "for most purposes ['secondary'] competes upon a substantial equality with 'virgin'"); *H&R Block*, 833 F. Supp. 2d at 54 (concluding that the relevant market included only tax-preparation software and excluded other tax-preparation services, even though "[a]ll tax preparation methods provide taxpayers with a means to perform the task of completing a tax return").  The district court in *Visa* explained its reasoning for excluding other forms of payment, including debit, from the relevant market, despite some evidence of functional interchangeability:

> Finally, although it is literally true that, in a general sense, cash and checks compete with general purpose [credit and charge] cards as an option for payment by consumers and that growth in payments via cards takes share from cash and checks in some instances, cash and checks do not drive many of the means of

> competition in the general purpose card market. . . .  Accordingly, because card consumers have very little sensitivity to price increases in the card market and because neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards, general purpose cards constitute a product market.

163 F. Supp. 2d at 338.

57.     Historical evidence of significant displacement of one product by another is insufficient to establish that both belong in the same relevant market.  As the Eighth Circuit explained, what matters is whether current buyers would switch in the event of a small increase in the displaced product's price:

> The district court relied on two erroneous findings to conclude that there is sufficient cross-elasticity of demand between sugar and [high fructose corn syrup] to demonstrate that the two products belong in the same relevant product market.  The evidence of the substantial displacement of sugar by HFCS is irrelevant because this displacement focuses on static, rather than dynamic, price and demand relationships.  The appropriate question is whether a slight increase in the price of HFCS causes a considerable number of buyers of HFCS to switch to sugar.

*Archer-Daniels-Midland*, 866 F.2d at 248 n.1.

### E.     Courts Have Concluded That General Purpose Credit and Charge Card Network Services Have No Reasonable Substitutes

58.     The district court in *Visa* held that "general purpose [credit and charge] card network services . . . constitute a product market because merchant consumers exhibit little price sensitivity and the networks provide core services that cannot reasonably be replaced by other sources."  163 F. Supp. 2d at 338.  In reaching that conclusion, the court adopted the opinion of the plaintiff's expert economist, Professor Michael Katz, that "there would be no loss to network transaction volume in the face of even a 10% increase in price for network services" because the card networks' customers (banks in that case) could not have provided network services themselves and it was "implausible" that those customers would have stopped buying network services "in response to such a small increase in price."  *Id.* at 339.  The Second Circuit affirmed

the district court's market definition.  *Visa*, 344 F.3d at 238-39 ("agree[ing]" with district court's finding that there was a relevant market consisting of "the network services market for general purpose cards").

59.     Similarly, in this District a court granted summary judgment against defendants who argued that the relevant market included general purpose credit, charge, and debit card network services.  There was "no genuine issue of material fact requiring trial with respect to the fact that the relevant market, at its broadest, is the provision of general purpose credit and charge card services."  *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003).  The same court also found debit card services to be a separate relevant product market given the "inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole" and held that "[n]o rational jury could conclude otherwise."  *Id*. at *7.

### F.     Relevant Markets Also Have a Geographic Dimension

60.     To define a relevant antitrust market, the court must determine a geographic market as well as a product market.  *See AD/SAT*, 181 F.3d at 226.  There is no dispute in this case that the relevant geographic market is the United States.  PFOF ¶ 406.

## IV.   General Purpose Credit and Charge Card Network Services to Travel and Entertainment Merchants Constitute a Distinct Relevant Antitrust Market

61.     "Reasonable interchangeability sketches the boundaries of a market, but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *Bogan v. Hodgkins*, 166 F.3d 509, 516 (2d Cir. 1999) (recognizing that "a submarket may function as the relevant market for antitrust purposes").  "The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact

27

'reasonable' substitutes and are therefore part of the same market." *Geneva*, 386 F.3d at 496. The Supreme Court has held that an "economically significant" market may exist within another market, indicated by factors including "distinct customers, distinct prices," "industry . . . recognition," and low "sensitivity to price changes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

62.     The Horizontal Merger Guidelines provide for relevant markets "defined around . . . targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a [small but significant non-transitory increase in price]." Horizontal Merger Guidelines § 4.1.4 (2010). Under the Guidelines, it is appropriate to define markets "for targeted customers when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product," *id.*, and "the targeted customers" are not "able to defeat the price increase of concern by arbitrage, e.g., by purchasing indirectly from or through other customers." *Id.* at § 3. As discussed above, the Horizontal Merger Guidelines are frequently used by courts in the Second Circuit as a guide for market definition. *See supra* ¶ 54.

63.     Courts have recognized that a relevant market may be appropriately defined around customers vulnerable to price discrimination. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (complaint properly pled a "distinct relevant geographic market" including only U.S. consumers, who "pay more than consumers elsewhere"); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) (holding that evidence, including "internal documents on pricing," witness testimony, and expert opinions, could support a finding that "leisure or price-sensitive passengers represent a separate and distinct market" from other airline passengers); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7

28

F.3d 986, 997-98 (11th Cir. 1993) (concluding that a high-priced line of anchors "may have constituted its own market" because of evidence of "price discrimination against a distinct group of consumers"); *Ansell Inc. v. Schmid Labs., Inc.*, 757 F. Supp. 467, 471-75 (D.N.J.) (finding "economically significant submarket" of "branded latex condoms [sold] to retail distributors," based on analysis of *Brown Shoe* factors showing significant differences between retailers and other purchasers), *aff'd*, 941 F.2d 1200 (3d Cir. 1991); *see PepsiCo, Inc. v. Coca-Cola, Inc.*, 315 F.3d 101, 106 & n.1 (2d Cir. 2002) (stating that plaintiff's attempt to define a relevant market "confined" to certain customers "in theory, may have merit"); 2B Areeda & Hovenkamp ¶ 534d(1), at 269 ("Successful price discrimination means that the disfavored geographic or product class is insulated from the favored class and, if the discrimination is of sufficient magnitude, should be counted as a separate relevant market.").

64.     General purpose credit and charge card network services provided to travel and entertainment merchants constitute a relevant market because those merchants pay significantly higher prices, have been specifically targeted for price increases, and are especially vulnerable to those increases due to higher cardholder insistence, despite receiving the same network services as other merchants.  *See* PFOF ¶¶ 626-38.  Merchants targeted for price increases cannot circumvent those increases through "arbitrage," by purchasing network services from other merchants that pay a lower rate.  *See* Horizontal Merger Guidelines § 3.

65.     Amex's principal argument against a relevant market for network services to travel and entertainment merchants is that Amex could not survive if it served only those merchants.  *See* Amex Pretrial Mem. 37, ECF No. 505.  Whether or not that is true as a matter of fact, business viability is not the proper test of market definition.  The correct test focuses on reasonable interchangeability in use.  *See supra* § III.B.  In fact, courts regularly define relevant

markets as products and geographic areas that could hardly sustain an entire business on their own, such as airline city pairs. *See, e.g., United Air Lines, Inc. v. Austin Travel Corp.*, 681 F. Supp. 176, 182 (S.D.N.Y. 1988) (finding relevant markets of air travel and computerized air reservation services provided to Long Island), *aff'd*, 867 F.2d 737 (2d Cir. 1989); *Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) (rejecting an alleged "national market in air travel" in favor of a "city-pair market" that "satisf[ies] the reasonable interchangeability standard"); *Spirit Airlines*, 431 F.3d at 932-35 (holding that evidence supported relevant markets of "leisure or price-sensitive passengers" on "the Detroit-Boston and Detroit Philadelphia routes").

## V. American Express Possesses Substantial Market Power Within Both Relevant Markets

### A. Definition and Proof of Market Power

66.      Market power is the "power to control prices or exclude competition." *United States v. Visa, U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "Market power may be shown by evidence of specific conduct indicating the defendant's power to control prices or exclude competition." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (internal quotation marks omitted); *United States v. Am. Express Co.*, No. 10-cv-4496, 2014 WL 1817427, at *7 (E.D.N.Y. May 7, 2014) (stating that "this Circuit has suggested that actual adverse effect on competition may in some instances demonstrate market power") (citing *Todd v. Exxon*, 275 F.3d 191, 206 (2d Cir. 2001)); *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 73 (S.D.N.Y. 2003) (recognizing that market "power may be demonstrated by direct evidence of specific conduct indicating the defendant's ability to control price or exclude competition"). Market power means the defendant has "the capacity to inhibit competition market-wide."

*K.M.B. Warehouse*, 61 F.3d at 129.  Market power can be established when the defendant "force[s] a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992).

67.     Assessment of market power is necessarily a question of fact.  "Whether a market is freely competitive and, if not, whether a particular seller enjoys more market power than would obtain in a freely competitive market are matters of fact . . . .  Like many matters of fact, the competitiveness of a market and the market power of a seller may be ascertained with the aid of expert opinions, whose persuasive force is by itself a factual matter within the purview of the fact-finder."  *Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569-70 (2d Cir. 1990) (reviewing "findings about the market and ASCAP's market power" under a "clearly erroneous" standard).

68.     Courts should examine the evidence of market power in its totality, not piecemeal. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 402 (E.D.N.Y. 2008) (when assessing monopoly power, courts consider market share "in the context of all the evidence of the relevant market's dynamics," including "information about entry barriers, the strength of competition, the nature of the challenged conduct and the probable development of the industry . . . [which] can shed light on whether a defendant has acquired 'the kind of competitive advantage about which the antitrust laws should be concerned'") (*quoting Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500-01 (2d Cir. 2004)); *see also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir. 1989) (recognizing that courts "must accord plaintiffs 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

As this Court observed in denying Defendants' motion for summary judgment: "Although market share is an important part of determining whether Defendants have market power, it is not the only component. The court may also consider factors such as cardmember insistence, price increases, and price discrimination." *United States v. Am. Express Co.*, No. 10-cv-4496, 2014 WL 1817427, at *12 (E.D.N.Y. May 7, 2014).

69. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 562 F. Supp. 2d 392, provides useful insight on how market power may be established in the market for general purpose credit and charge card network services. Plaintiffs there alleged that MasterCard had monopoly power because, among other factors: (1) MasterCard "has controlled prices by setting 'pricing tiers' for different groups of merchants [and] increasing the level of its interchange fees . . . without losing business;" (2) MasterCard "has forced merchants to accept a series of rules that effectively insulate its interchange fees from competition;" (3) the "increased demand [for MasterCard cards] leads to higher prices," not lower prices; (4) "MasterCard is a supplier that can set the price of its product without regard to its costs;" and (5) "the overwhelming majority of interchange fees is profit." *Id.* at 400-03. "If the Individual Plaintiffs can prove these allegations, they will succeed in demonstrating that MasterCard has the ability to control prices and exclude competition—that is, they will establish MasterCard's monopoly power . . . even in the face of evidence that MasterCard's share of the market is less than 30 percent." *Id.* at 401.

70. Trial testimony from merchants and from Amex's network rivals provides compelling evidence of Amex's market power because their perceptions are important to determine the degree of competitive discipline on the defendant, and thus its market power. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930-31 (7th Cir. 2000) (citing evidence that even the

largest toy manufacturers believed they could not find other retailers to replace defendant-

retailer); *see also Todd*, 275 F.3d at 205 (Sotomayor, J., concurring) (noting that "economic

actors usually have accurate perceptions of economic realities") (quoting *Rothery Storage & Van

Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986)).

71.     *United States v. Visa* provides a roadmap for assessing a card network's market

power.  Both the district court and Second Circuit emphasized three major types of evidence

supporting the market-power finding: (1) the defendants' market shares in a highly concentrated

market with high entry barriers; (2) cardholder insistence; and (3) continued merchant

acceptance despite price increases. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322,

340-42 (S.D.N.Y. 2001); *Visa*, 344 F.3d at 239-40.

### B.     American Express's Market Share Is Evidence of Market Power

72.     Amex has the second-largest market share of the four firms in the relevant market.

Its current share is greater than that of MasterCard, a firm previously determined by the Second

Circuit, and alleged by Amex, to possess market power.  Given the specific circumstances of this

market, Amex's share of 26% is evidence that it possesses market power.  In *Visa*, the district

court found that both MasterCard and Visa "have large market shares in a highly concentrated

network market with only four significant competitors."  163 F. Supp. 2d at 341.  The Second

Circuit agreed: "Visa U.S.A. and MasterCard, jointly and separately, have [market] power within

the market for network services. 344 F.3d at 239.  The Second Circuit pointed out that "the

[district] court inferred market power from the defendants' large shares of a highly concentrated

market." *Id.* at 240 (noting that MasterCard accounted for approximately 26% of the market).

73.     The relevant metric for assigning market shares of card networks is dollar volume

of credit and charge card transactions on the networks. *See Visa*, 163 F. Supp. 2d at 341; *Visa*,

344 F.3d at 240; *In re Payment Card,* 562 F. Supp. 2d at 400; *see also* U.S. Dep't of Justice &

Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.2 (2010) ("In most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market.").

74.     Courts in the Second Circuit do not require a minimum market share for finding the monopoly power required in monopolization cases, which is greater than the market power required in Section 1 cases.  *In re Payment Card,* 562 F. Supp. at 400 (reasoning that "a finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that [plaintiffs] may succeed on their Section 2 claims" by proving monopoly power); *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981) (explaining that, "when the evidence presents a fair jury issue of monopoly power, the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share"); *see Kodak*, 504 U.S. at 481 (explaining that monopoly power is "something greater than market power under § 1").

75.     Market shares are simply one factor in assessing market power, and that a firm's share is below an arbitrary threshold alone cannot disprove market power.  *See United States v. Columbia Steel Co.*, 334 U.S. 495, 528 (1948) ( "The relative effect of percentage command of a market varies with the setting in which that factor is placed.").  In *Toys "R" Us*, the Seventh Circuit held that substantial evidence supported a finding that Toys "R" Us had market power in toy retailing despite possessing only a 20% share of the national market.  221 F.3d at 930, 937. "Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them."  *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 209 (3d Cir. 1994) (internal quotation marks omitted); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 992 (D.C. Cir. 1990) (same); *Ball Mem'l*

*Hosp., Inc. v. Mutual Hosp. Ins. Co.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (Easterbrook, J.)

(same).

76.     Amex relies heavily on its market share as evidence it lacks market power, but

that factor is less informative of market power here because of the structure of the network

services market:

> Generally, a defendant with a low degree of power in the relevant market cannot
> successfully wield monopoly power; customers dissatisfied with the defendant's
> prices can and do simply turn to other suppliers.  Evidence of a defendant's high
> market share indirectly suggests that the defendant has the power to control prices
> if only because it demonstrates that there are few competitors and that customers'
> alternatives are limited in the event they decide the defendant's prices are too
> high. Where the structure of the market as a whole prevents a customer's ability to
> purchase lower-priced alternatives to the defendant's product, however, a
> defendant's market share may be less probative of its monopoly power.

*In re Payment Card,* 562 F. Supp. 2d at 402 (citations omitted).  In a market in which buyers

tend to purchase services from one of many competing suppliers, a supplier's share of 26%

would be relevant to determine how readily customers can avoid the exercise of market power by

turning to other suppliers.  In a market in which merchants believe they need to accept more than

one network's brand, Amex's 26% share of charge volume indicates substantial market power,

because merchants need access to the 26% of credit card revenue that Amex cardholders

represent.

77.     High market concentration also increases the risk that Amex's restraints will

continue to have substantial anticompetitive effects.  Here, the market is highly concentrated.

There are only four significant competitors providing general purpose credit and charge card

network services.  *See Visa*, 163 F. Supp. 2d at 341-42 (concluding that the general purpose

credit and charge card network services market  is "a highly concentrated network market with

only four competitors").

78.     In analogizing its Anti-Steering Rules to exclusive dealing arrangements, Amex makes a faulty comparison.  Amex Pretrial Mem. 79-80, ECF No. 505.  In exclusive dealing cases, courts assess (among other things) a defendant's market share and the percentage of the market covered by the exclusive dealing arrangement.  *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Amex conflated these two distinct factors by asserting that an exclusive dealing arrangement is only unlawful under Section 1 if it forecloses at least 30 percent of the market, and by arguing that its market share falls below that threshold.  Amex Pretrial Mem. 79-80.  Here, the analogous percentage of market coverage is the portion of market-wide merchant charge volume subject to the Anti-Steering Rules, which is over 90 percent.  PFOF ¶ 597.  Amex's Anti-Steering Rules thus directly restrain competition over nearly all of the relevant market, at a percentage far exceeding Amex's 26 percent share of general purpose card charge volume.  PFOF ¶ 639.

## C.     Cardholder Insistence Strongly Supports American Express's Market Power

79.     Amex's highly insistent cardholder base substantially explains why Amex has market power.  In *Visa*, the district court found market power in part because merchants "cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them."  *Visa*, 163 F. Supp. 2d at 340.  The court also observed that Visa and MasterCard had market power because they were "able to charge substantially different prices for those hundreds of thousands of merchants who must take credit cards at any price because their customers insist on using those cards."  *Id*. at 341.  The Second Circuit agreed that "customer preference" led merchants to accept price increases from Visa and MasterCard rather than dropping acceptance of either network, demonstrating market power.  *See Visa*, 344 F.3d at 240.

80.     When buyers are price sensitive and can easily shift purchases away from a firm with market power to its competitors, customer preference for a firm's products may not suggest that the firm has significant market power. *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 108 (2d Cir. 1995).  However, when purchasers are not price sensitive or cannot shift purchases to a firm's competitors, as is true for merchants in this market while Amex's Anti-Steering Rules remain in place, insistence can help generate significant market power.  *American Express*, 2014 WL 1817427, at \*11.

### D.     American Express's Profitable Price Increases Demonstrate Its Market Power

81.     Amex's ability to raise prices substantially without losing sufficient sales to make the increases unprofitable, including its Value Recapture increases, demonstrates its market power.  In *Visa*, one factor supporting the district court's finding of market power was that the networks "raised  . . . rates charged to merchants a number of times, without losing a single merchant customer as a result."  163 F. Supp. 2d at 340.  The Second Circuit concurred with this reasoning.  *See Visa*, 344 F.3d at 240.

82.     Evidence that Amex has elected not to extract the highest possible price its insistence levels would warrant does not undermine a finding of market power.  "[T]he fact that the power has not been used to extract [a monopoly price] provides no succor to the monopolist." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979); *see also Microsoft*, 253 F.3d at 57 ("[A] price lower than the short-term profit-maximizing price is not inconsistent with possession or improper use of monopoly power."); *Dentsply*, 399 F.3d at 191 (same).

83.     Nor do arguments by Amex that innovation exists in the market, or that prices have decreased by some measures, preclude a finding that Amex has market power.  As the Third Circuit has explained:

> The district court also believed that market power was inconsistent with the fact that technology in the computer industry was rapidly advancing.  Although the performance of computers has been rapidly increasing as costs for performance have plummeted, it proves too much to say that this improvement is inconsistent with market power. . . .  Here, technology was improving and prices were steadily falling, but the district court cited no evidence that these changes had any connection with a decrease in IBM's market power. We hold that the district court erred when it ruled that innovation and price reductions precluded a finding of market power.

*Allen-Myland*, 33 F.3d at 210-11; *see also United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 26 (D.D.C. 2000) ("The fact that Microsoft invests heavily in research and development does not evidence a lack of monopoly power.").

84.     Amex's argument that it ceased imposing new Value Recapture price increases and thus lacks market power should be discounted since the decision occurred after this litigation commenced.  *Cf. United States v. Gen'l Dynamics Corp.*, 415 U.S. 486, 504-05 (1974) (recognizing that "probative value of [post-acquisition] evidence was found to be extremely limited," because "[i]f a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a [section 7] divestiture suit, violators could stave off such actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending.")  In the merger context, justifications proffered and evidence created post-merger are "deemed of limited value not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence *could arguably* be subject to manipulation."  *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.) ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

### E.     Price Discrimination Provides Further Evidence of Market Power

85.     The defendants' ability to price discriminate can be another indication of market power.  The district court relied on price discrimination in *Visa*.  163 F. Supp. 2d at 340 ("Defendants' ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards.").  "Price discrimination implies market power, that is, the power to charge a price above cost . . . without losing so much business so fast to competitors that the price is unsustainable." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783 (7th Cir. 1999) (Posner, J.); *see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 997-98 (11th Cir. 1993) ("[T]he ability to discriminate against a distinct group of customers by charging higher prices for otherwise similar products demonstrates the existence of market power with respect to that group.").

### F.     High Barriers to Entry or Expansion Support a Finding of Market Power

86.     High barriers to entry, and the impediments posed by Amex's Anti-Steering Rules to the expansion of existing competitors, support a finding that Amex has market power, that its market power is durable, and that the other market power factors demonstrate even greater risk of adverse effects on competition.  High barriers to entry or expansion mean "the longer the lags before new entry, [and thus] the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints." *Visa*, 163 F. Supp. 2d at 342 (citing Horizontal Merger Guidelines); *In re Payment Card*, 562 F. Supp. 2d at 402 (noting that "whereas a seller in a market with low entry barriers could not raise its prices without the risk that a new seller would enter the market and offer the same product for a lower price, a competitor in a market with high entry barriers could raise its prices unfettered by the prospect of a new entrant into the market who would undercut prices");

39

*see also Geneva*, 386 F.3d at 509 (noting that "[t]he exclusive dealing agreement in the present case is of particular concern" in part because "[t]here is also evidence of high barriers to entry, meaning that potential suppliers could not easily enter the market."). The more time needed for any price-disciplining entry, the less the constraint on a firm with market power. *See, e.g.*, *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989); *Ball Memorial*, 784 F.2d at 1335.

87.    In *Visa*, the district court found "significant barriers to entry into the general purpose card network services market" and that the "difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985." *Visa*, 163 F. Supp. 2d at 341-42. The court cited testimony that entering the market would require "expenditures and investment of over $1 billion." *Id*. at 341. And any new entrant would have a "'chicken-and-egg' problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place." *Id*. at 342. *See also Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc*., 845 F.2d 404, 408 (2d Cir. 1988) (high barriers to entry shown by fact that only two companies entered market in eleven year period and significant costs to enter impeded new entrants).

88.    In these circumstances, Amex's Anti-Steering Rules themselves impede not only entry by a low-cost network seeking to offer competitive terms, but expansion by an existing lower-cost competitor seeking to capitalize on its low costs to attract merchant transaction volume, as exemplified by Discover's unsuccessful efforts to expand through lower network services pricing combined with steering. PFOF ¶¶ 59-78; *cf. Geneva*, 386 F.3d at 491, 494, 509-10 (holding that evidence established a prima facie Section 1 violation where defendant's exclusive dealing arrangement with supplier of essential input that was otherwise difficult to

40

procure delayed generic-drug competitor's entry); *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 980, 1001 (D.D.C. 1984) ("Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry . . . .").

89.     The market's high barriers to entry, with no new entry in three decades, reinforce the significance of Amex's 26 percent market share as supportive of Amex's market power and the Anti-Steering Rules' anticompetitive effects.  A court in this District has previously held that when "relatively few firms share a large percentage of the [relevant] market, high barriers to entry can magnify the effects of industry-wide vertical agreements," and "[f]or this reason alone, the market share of the [defendants] should not be a basis on which we grant summary judgment." *New York v. Anheuser-Busch, Inc.*, 673 F. Supp. 664, 668 (E.D.N.Y. 1987) (refusing to grant summary judgment on Section 1 claim for defendants with market shares of 8 and 5 percent).

### G.     American Express Has Market Power in the Travel and Entertainment Market

90.     Amex's market share of 34% in providing GPCC network services to travel and entertainment merchants provides an even stronger foundation for its market power over those merchants in particular.  *Cf. supra* § V.B.  Furthermore, Amex's distinctly higher prices to those merchants, part of the body of evidence supporting a relevant market for network services sold to travel and entertainment merchants, *see supra* ¶ 64, also tend to show Amex's market power over those merchants.  Finally, those higher prices also arise in part from and demonstrate Amex's greater cardholder insistence with respect to travel and entertainment merchants, another factor identified by the Second Circuit in *Visa* as relevant to show market power.  *See id.*; 344 F.3d at 240.

91.     Amex argues that the district court in *Visa*, in a later post-trial dispute over the final judgment, found Amex lacked market power over corporate cards.  *See* Amex Pretrial Mem. 11 n.4; *United States v. Visa U.S.A., Inc.*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001).  That opinion simply discussed whether Visa had proved that Amex had market power as an issuer of corporate cards, not market power as a provider of network services.  The court held that Visa failed to meet its burden in its effort to re-define the market after being found liable, and noted that the argument was inconsistent with the opinion of Visa's own expert.  *Id.* at 616-17.  Visa's failure in that context—to show high entry barriers for issuers—does not override the uncontradicted evidence here of the difficulty of entering both sides of the platform with a competitive general purpose credit services network.

### H.     American Express's Negotiations With Some Merchants Do Not Negate the Evidence of its Market Power

92.     The fact that Amex negotiates some terms in some of its merchant contracts is not evidence that it lacks market power.  Even monopolists negotiate.  *Compare Microsoft*, 253 F.3d at 51-56 (finding Microsoft had monopoly power) *with Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006) (noting that the "prices that [Microsoft's] customers paid were negotiated and, as a consequence, were both discounted and unique to each transaction"); *see United States v. Grinnell Corp.*, 236 F. Supp. 244, 254, 257 (D.R.I. 1964), *aff'd in relevant part*, 384 U.S. 563, 576 (1966) (finding the defendant monopolized its industry even though it had "not always been able to receive the standard they [had] set for themselves, the so-called 'Minimum Basic Rates', . . . or annual service charges"); *Berkey Photo*, 603 F.2d at 300 n.61 (finding that Kodak agreed to "a limited" concession to another company).

93.     *Toys "R" Us* provides a useful example. Toys "R" Us ("TRU") entered into illegal agreements with toy manufacturers restraining their sales to low-price warehouse club

stores.  221 F.3d at 930.  The Seventh Circuit affirmed the FTC's finding that TRU possessed

market power.  *Id*. at 936-37.  Yet the FTC had found "an abundance of evidence of promises,

negotiations, compromises, and cooperative conduct [between TRU and toy manufacturers] with

respect to the development, adoption, and enforcement of the club policy."  TRU "engaged in

extended negotiations with companies that were reluctant to adopt the restraint, and worked out

agreed-upon compromise solutions . . . ."  *Id.* at 546.  In fact, "[a] prolonged and extensive

period of negotiations between TRU and the toy manufacturers . . . followed TRU's

announcement of its club policy."  *Id.* at 570.  "The details often varied from toy manufacturer to

toy manufacturer but the core of the arrangement was consistent."  *Id.* at 540.

94.     Amex possesses significant market power even though some large merchants

have some negotiating leverage.  "Even a monopolist is subject to limitations on how far it can

increase price."  *Todd,* 275 F.3d at 204; *see also Dentsply,* 399 F.3d at 185 (finding that

defendant had monopoly power over dealers even though it "abandoned" plan to bypass dealers

and sell directly "because of fear that dealers would retaliate by refusing to buy its other dental

products").

95.     Moreover, Amex's suggestion that it lacks market power in the provision of

network services to merchants because it competes to enter co-brand or other relationships with

merchants is also misplaced.  Tying claims, under which a firm with power in one market forces

customers to purchase a product over which the defendant lacks power, *see Kodak,* 504 U.S. at

465, demonstrate that Amex can unlawfully exercise its market power over merchants in one

market while lacking such power in another.

96.     Nor does the fact that Amex may invest to maintain its market position undermine

a finding of antitrust market power.  *Microsoft*, 84 F. Supp. 2d at 26 (finding that the fact that

"Microsoft invests heavily in research and development does not evidence a lack of monopoly power" and that even "Microsoft has incentives to innovate aggressively despite its monopoly power.").  "Moreover, because innovation can increase an already dominant market share and further delay the emergence of competition, even monopolists have reason to invest in R&D."  *Microsoft*, 253 F.3d at 57.  Amex's investment as an issuer of card products sheds little light on whether it lacks market power as a network services provider to merchants.  *See id.* ("The R&D expenditures Microsoft points to are not simply for Windows, but for its entire company, which most likely does not possess a monopoly for all of its products."); *see also United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 412 (D. Del. 2003) (finding that the defendant upgraded its technology every three to four years), *rev'd*, 399 F.3d 181 (3d Cir. 2005) (holding that, despite innovations and other evidence cited by district court, defendant had monopoly power).

97.     Amex argues it should not be liable because any market power it has requires continuing investment in cardholder rewards, and so is not "durable."  Amex Pretrial Mem. 70-73.  This argument misconstrues the meaning of "durability" in antitrust law.  The "two prerequisites for durable market power" are the "ability to raise price above cost" and "[h]igh entry barriers or other impediments to rivals' entry or expansion."  2B Areeda & Hovenkamp ¶ 501, at 110 (3d ed. 2007).  High barriers to entry here make Amex's market power durable.  "[W]ithout barriers to entry into the market it would presumably be impossible to maintain supracompetitive prices for an extended time."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 119-20 n.15 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 591 n.15 (1986).  Amex cites *AD/SAT, Division of Skylight, Inc.*, 181 F.3d 216 (2d Cir. 1996), to support its "durability" argument, but that case makes it clear that antitrust concerns are only

minimized "when market forces themselves would bring the defendant's power to an end fairly quickly." *Id.* at 229.  Amex has had in place and vigorously enforced its Anti-Steering Rules for at least two decades, PFOF ¶¶ 623-25, while at the same time profitably implementing price increases on many merchants, PFOF § IV.C.ii; those facts fatally undermine any claim that Amex's power to maintain a restraint on competition is transient.

## VI.   American Express's Purported Procompetitive Effects Are Meritless

### A.   American Express Bears the Burden of Proving That its Anti-Steering Rules Are Procompetitive

98.    After the plaintiffs have proven the first step of the rule-of-reason analysis, "the burden shifts to the defendants to offer evidence of the procompetitive effects of their agreement." *Geneva,* 386 F.3d at 507; *Visa*, 163 F. Supp. 2d at 399.  The defendants must "demonstrate that the procompetitive aspects of the agreement outweigh its anticompetitive aspects." *Hertz v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993).

99.    The rule of reason "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 688 (1978).  Rather, the analysis "focuses directly on the challenged restraint's impact on competitive conditions." *Id.*  Courts should avoid "consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question—that of the presence of significant unjustified anticompetitive consequences." *FTC v. Actavis, Inc.,* 133 S. Ct. 2223, 2238 (2013) (citing 7 Areeda & Hovenkamp ¶ 1508c, at 438-440 (3d ed. 2010)).

100.    When a defendant demonstrates that a restraint's procompetitive benefits offset the anticompetitive harm, the plaintiff can still win by showing that "any legitimate competitive benefits offered by defendant[] could have been achieved through less restrictive means."

*Geneva*, 386 F.3d at 507 (citing *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

### B.     Protecting American Express From Interbrand Competition is Not a Cognizable Procompetitive Effect

101.    Amex argues that it needs to restrain price competition among payment networks at the point of sale to succeed under its chosen business model.  Just like the arguments against competitive bidding proffered in *Professional Engineers*, Amex's argument "is nothing less than a frontal assault on the basic policy of the Sherman Act."  435 U.S. at 695.  Preserving a non-competitive "level playing field between various competitors" offers no competitive benefit and is not a legitimate justification for restraining interbrand competition.  *See Visa*, 163 F. Supp. 2d at 405 (citing *NCAA v. Bd. of Regents*, 468 U.S. 85, 117-20 (1984)); *see also Visa,* 344 F.3d at 243*; see* 11 Areeda & Hovenkamp ¶ 1907(b), at 273 (3d ed. 2011) (defenses that  agreement ensuring weaker market participants get a "fair" share of the market are generally rejected).

102.    Amex cannot prove a procompetitive effect by arguing that the Anti-Steering Rules on merchants assist Amex in interbrand competition for issuers or cardholders, no matter how much Amex prefers to direct the locus of competition there.  *See Professional Engineers,* 435 U.S. at 695 (a defendant cannot "impose[ its] views of the costs and benefits of competition on the entire marketplace"); *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (noting that "[t]he Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market").  Amex has failed to demonstrate that both sides of the two-sided platform at issue cannot function competitively—much less that its Anti-Steering Rules are necessary to enhance competition on either side.  That a restraint on one form of interbrand competition may enhance another is not a cognizable procompetitive effect.  *See United States v. Brown Univ.*, 5 F.3d 658, 675 (3d Cir.

46

1993) (horizontal restraint on one aspect of competition "naturally" will lead to competition in other areas, but "[t]his is not the kind of procompetitive virtue contemplated under the Act").

103.    Amex in essence argues that its restraint is needed because it believes interbrand competition through merchant steering is not in the best interests of the marketplace.  This argument on its face negates any demonstration of procompetitive benefit.  Amex "is not entitled to pre-empt the working of the market by deciding for itself that its customers [merchants] do not need that which they demand." *Indiana Federation*, 476 U.S. at 462.   In *NCAA v. Board of Regents*, 468 U.S. 85, the defendant limited the number of televised college football games because it was "necessary to protect live attendance."  *Id.* at 116.  The Supreme Court found a "fundamental reason for rejecting this defense":

> The NCAA's argument . . . is  . . . based on . . . a fear that the product will not prove sufficiently attractive to draw live attendance when faced with competition from televised games.  At bottom the NCAA's position is that ticket sales for most college games are unable to compete in a free market.  The television plan protects ticket sales by limiting output—just as any monopolist increases revenues by reducing output.  By seeking to insulate live ticket sales from the full spectrum of competition because of its assumption that the product itself is insufficiently attractive to consumers, petitioner forwards a justification that is inconsistent with the basic policy of the Sherman Act.  The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.

*Id.* at 116-17 (footnote, internal quotation marks, and alterations omitted).  "[T]he purpose of [rule of reason] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry," because "that policy decision has been made by the Congress." *Professional Engineers,* 435 U.S. at 692, 695 (rejecting an engineering trade association's justification that a prohibition on competitive bidding by members was needed to prevent "deceptively low bids" and thus "inferior work with consequent risk to public safety and health"); *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990)

(condemning agreement among lawyers to fix their fees, even though "the quality of representation may improve when rates are increased").

104.     Amex cannot defend its Anti-Steering Rules by arguing that merchants are unsophisticated and incapable of comparing prices of competing networks accurately, or that disclosing comparative prices to their customers would cause confusion or be impractical.  As the Supreme Court made clear in *Indiana Federation*, "even if the desired information were in fact completely useless" or "the costs of evaluating the information were far greater than the costs savings resulting from its use," defendants still harm competition by withholding information that their customers want for purchasing decisions.  476 U.S. at 462.  This is true even if customers make "unwise or even dangerous choices."  *Id*. at 463.  If such an eventuality occurred, "the discipline of the market would itself soon result in merchants abandoning" activities related to steering.  *Id.*

105.     Amex's professed fear of future misconduct by Visa does not render its Anti-Steering Rules procompetitive.  If such misconduct occurs, resort to the judicial process suffices to guard competition.  *See United States v. Apple Inc.*, 952 F. Supp. 2d 638, 708 (S.D.N.Y. 2013) ("Another company's alleged violation of antitrust laws is not an excuse for engaging in your own violations of law."); *Indiana Federation*, 476 U.S. at 465 ("That a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it."); *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 468 (1941) (rejecting an argument that restraint of trade was necessary to protect against piracy of clothing designs).

106.     Amex has failed to demonstrate any procompetitive effect based on its argument that without its Anti-Steering Rules, Amex would lose profits, change its business model, fall into a "downward spiral" or "death spiral," or be a diminished competitor.  *United States v.*

48

*Socony-Vacuum Oil Co.*, 310 U.S. 150, 220-21 (1940) ("The elimination of so-called competitive evils is no legal justification . . . .  Ruinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing.").  "[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).  Amex's argument also proves too much; it seeks not to promote competition, but to be protected from it, which is anticompetitive on its face. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (explaining that it would be a "perverse result" to "hold that the antitrust laws protect competitors from the loss of profits due to . . . price competition"); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 402 (E.D.N.Y. 2007) ("[T]he antitrust laws are not intended to protect profit margins but consumer welfare.") (internal quotation marks omitted).

107.    Amex's ability to adapt, and thrive, in the face of differential surcharging in Australia undercuts its claim that merchants' steering activities in the United States would send it into a "death spiral."  Courts can look to foreign markets when analyzing the impact of restraints. *See Visa*, 163 F. Supp. 2d at 398-99 (examining evidence regarding countries without exclusionary rules, and noting that "both Visa and MasterCard reacted competitively" in markets without the restraint); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-04 & n.30 (1985) (looking to other geographic markets in considering the importance of the change in the market at issue).

108.    Amex's assertion that the Anti-Steering Rules are justified because they allegedly were in place in its merchant contracts when it was a new entrant in the market, or because it faces larger competitors in the market, also fails to prove any procompetitive effects.  In

*Eiberger v. Sony Corp. of America*, 622 F.2d 1068 (2d Cir. 1980), the Second Circuit rejected

defendant Sony's defense that its vertical restraint was justified because of its "status as a new

entrant in the dictation machine market" with a market share of only 12%.  *Id.* at 1080 (internal

quotation marks omitted).  The court noted that Sony was the fifth-ranked seller of dictation

machines, that Sony was the "fastest growing," and that the top five sellers (including Sony)

accounted for 96% of market sales.  *Id.*  Sony's "strong market position completely undercut[]

any argument for leniency based on its 'new entrant' status."  *Id.* at 1080-81. Here, Amex cannot

justify restraints it wields in an anticompetitive way today based on some unproven virtue they

allegedly had when Amex first entered the market decades ago.

109.    There is no credible evidence in the record that Amex would be crippled as a

competitor or become anything less than a successful and profitable company without its Anti-

Steering Rules.  Even if—contrary to the evidence—it would face such challenges, Amex's

argument is not a cognizable procompetitive benefit offsetting harm from its anticompetitive

conduct.  "[S]hould a conflict arise in a particular case between the desire to preserve the

competitive process and the wish to rescue a competitor, courts must favor competition."  *Ne.

Tel. Co. v. AT&T Co.*, 651 F.2d 76, 87 (2d Cir. 1981).

## C.    American Express's "Two-Sided" Defense Cannot Justify the Restraint

110.    The Court is not required to quantify the effect of a restraint on prices, whether

"two-sided" or "one-sided," in finding the restraint to be anticompetitive.  *See Indiana

Federation*, 476 U.S. at 461-62 (holding that defendant's conduct was "likely enough to disrupt

the proper functioning of the price-setting mechanism of the market that it may be condemned

even absent proof that it results in higher prices").

111.    Courts have refused to entertain defense arguments that a restraint's

anticompetitive effects in one market can be ignored or excused if the restraint has

procompetitive effects in another market.   *See United States v. Topco Assocs., Inc*., 405 U.S.
596, 610 (1972) (explaining that "the freedom to compete . . . cannot be foreclosed with respect
to one sector of the economy because certain private citizens or groups believe that such
foreclosure might promote greater competition in a more important sector of the economy"); *see
also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (rejecting argument that
"anticompetitive effects in one market could be justified by procompetitive consequences in
another").

112.     Courts have decades of experience evaluating restraints on competition in
industries involving two-sided platforms, though they tend not to use the label "two-sided." *See,
e.g.*, *Visa*, 344 F.3d at 239-40 (card networks bringing together issuers and merchants); *Times-
Picayune Publ'g Co. v. United States*, 345 U.S. 598, 610 (1953) (newspapers bringing together
subscribers and advertisers); *Microsoft*, 253 F.3d at 55 (operating systems bringing together
consumers and developers); *Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1184
(8th Cir. 1998) (recognizing that "the local daily newspaper market" is "in fact two markets: one
for readers and one for advertisers").   But Plaintiffs are not aware of any case that has ever
required a plaintiff to prove more than that the defendant's restraint harmed competition on one
side of the two-sided platform.  Nor are Plaintiffs aware of any case that has used benefits to
consumers on one side of the two-sided platform to offset harms to consumers on the other side
of the platform.

113.     In *Times-Picayune*, the Supreme Court recognized that newspapers are two-sided
platforms, noting that "every newspaper is a dual trader in separate though interdependent
markets" for advertisers and for readers.  345 U.S. at 610.  Despite appreciating the industry's
two-sidedness, the Court emphasized that "[t]his case concerns solely one of these markets"

because the defendant "stands accused" of restraining only the advertising market. *Id*. Consistent with that focus, the Court assessed only whether the restraint affected competition among newspapers for advertisers and did not consider effects on competition for readers. *Id*. at 614-21.

114.     In *Microsoft*, 253 F.3d at 55, the D.C. Circuit identified the key facts that make operating systems two-sided platforms linking consumers and developers: "(1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base." Despite those two-sided features, the court was able to determine that some of Microsoft's practices were unlawful without assessing whether benefits to consumers outweighed harms to developers (or vice versa). *Id*. at 59-78.

115.     In *Visa*, the Second Circuit described one of the "two interrelated, but separate, product markets" as "the network services market for general purpose cards." 344 F.3d at 238-39. In that market, "the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers." *Id*. at 239. The court further explained that "MasterCard and/or Visa U.S.A. . . . compete with Amex and Discover for the [issuing] banks' business" and that the "[n]etworks also compete for merchants." *Id*. Despite recognizing that the competition among networks for issuing banks business was distinct from their competition for merchants, the Second Circuit focused only on the competition for issuers because the conduct at issue in that case restrained only that kind of competition. Thus, the court concentrated on how, "[a]s a result . . . of the challenged policies, only two rival networks are effectively able to compete for the business of issuer banks," without weighing the effects of the restraint on network competition for merchants. *Id*. at 239-40. Although Visa involved restraints on the issuing side of the

network services platform, and this case involves restraints on the merchant side of the platform, the Second Circuit's approach – focusing on effects on only one side of the platform – demonstrates that Plaintiffs here can meet their burden by demonstrating harm to competition in the sale of network services to merchants.  No more is required.

116.    Amex's proposed market for "transactions" is impossible to reconcile with *Visa*.  Amex argues that network services to issuers are in the same antitrust market as issuers' sales of card products to cardholders.  But the Second Circuit has expressly held that there were two "interrelated, but separate" relevant product markets for (1) general purpose credit and charge card network services sold by networks, and (2) general purpose credit and charge cards sold by issuers.  *Visa*, 344 F.3d at 239.  The issuers who were the focus of that case were buyers in the first market and sellers in the second.  *Id*.  Moreover, the district court noted that "defendants argue strenuously that no consumer harm results from the exclusionary rules because the member banks of the associations compete fiercely as card issuers with each other and with American Express and Discover to offer lower interest rates and all manner of incentive programs and services to card consumers. This issuer-level competition, however, does not take the place of competition at the network level . . . ."  163 F. Supp. 2d at 330.   Amex's attempt to sweep competition at each of these levels into a single market for "transactions" is inconsistent with *Visa*.

117.    If effects on cardholders and issuers are included in the rule-of-reason analysis, the Court may consider them without developing a novel antitrust framework for two-sided platforms.  Under the traditional rule-of-reason framework, when "the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the procompetitive effects of their agreement."  *Geneva*, 386 F.3d at 507.  Accordingly, if the Court admits the possibility

that procompetitive effects on the cardholder side of the platform could offset harm to

competition among networks for merchant business, then Amex bears the burden of proving that

these alleged procompetitive benefits exist and that they offset the clear harm to competition at

the merchant point-of-sale.

### D. American Express's Free-Riding Argument Fails to Demonstrate Any Procompetitive Benefit Because the "Ride" is Not "Free"

118.  Amex's "free riding" argument provides no defense for its Anti-Steering Rules

because Amex sells the services on which it claims others can take a free ride.  "Free-riding is

the diversion of value from a business rival's efforts without payment." *Chicago Prof'l Sports*

*Ltd. P'ship v. NBA*, 961 F.2d 667, 675 (7th Cir. 1992) (Easterbrook, J.).  The Second Circuit has

described "[t]he 'free rider' effect [as] the result of that situation where some retailers will prefer

to provide no services and instead take a 'free ride' on those retailers who do," *Eiberger*, 622

F.2d at 1078 (internal quotation marks omitted), or more succinctly, as "one entity's cashing in

on the efforts of another" without payment.  *Major League Baseball Props., Inc v. Salvino, Inc.*,

542 F.3d 290, 305 (2d Cir. 2008).

119.  "When payment is possible, free-riding is not a problem because the 'ride' is not

free." *Chicago Professional Sports*, 961 F.2d at 675; 13 Areeda & Hovenkamp ¶ 2223b3, at 422

(3d ed. 2012) (concluding that "free riding would not be a problem" if seller could "price the

service and the product separately"); *see Fed. Mar. Comm'n v. Aktiebolaget Svenska Amerika*

*Linien*, 390 U.S. 238, 251-52 (1968) (expenses were reimbursed, thereby removing any valid

"free rider" claim); *United States v. Microsoft Corp.*, No. CIV. A. 98-1232, 1998 WL 614485, at

*21 (D.D.C. Sept. 14, 1998) ("Microsoft also argues that the limitations on [online service

providers] are justified to prevent 'free-riding' by other browser manufacturers on Microsoft's

investment[s] . . . .  [but] in order to recoup its investment, Microsoft could simply charge [the

service providers] a fee rather than extract exclusionary rights.”); *see also Toys “R” Us*, 221 F.3d at 937-38 (holding that a purchaser “is not taking a free ride if the cost of the service can be captured in the price of the item”); *Visa*, 163 F. Supp. 2d at 404-05 (finding no support for free-riding justification because “Visa and MasterCard have *no* interest in the [issuing] banks’ relationships with their customers; so there is no asset on which free-riding could occur”).

### E.    Procompetitive Claims Should Be Discounted When Evidence Shows the Restraint’s Actual Purpose Was Anticompetitive

120.    While performing a rule of reason analysis, courts examine “[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained . . . .  This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.” *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918).

121.    Factually unsupported, purportedly procompetitive justifications for challenged restraints proffered at trial that are inconsistent with the actual motives for the restraint should be discounted.  *Cf. Visa*, 163 F. Supp. 2d at 401, 404-05 (rejecting procompetitive arguments, including a free-riding argument, when “evidence shows that defendants’ motives are to restrict competition”); *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212, 1219 (9th Cir. 1997); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1012-13 (3d Cir. 1993) (noting evidence that defendant was “attempting to disguise the true reasons for its actions”); *Dentsply*, 399 F.3d at 196 (“Dentsply’s asserted justifications for its exclusionary policies are inconsistent with its announced reason for the exclusionary policies, its conduct in enforcing the policy, its rival suppliers’ actions, and dealers’ behavior in the marketplace”).

122.    Though Amex claims steering at the merchant point of sale harms its brand and causes a negative customer experience for its cardholders, Amex has openly permitted steering exceptions, including for co-brand steering, private label steering, and limited-time promotions. A procompetitive claim can be shown to be mere pretext by the defendant's lack of a coherent and consistent application of the restraint. *See Kodak*, 504 U.S. at 484.

## VII.    The Court Has Broad Remedial Powers to Restore Competition

123.    "The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960); *see also Int'l Salt Co. v. United States,* 332 U.S. 392, 401 (1947) ("In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices.  A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.").  Antitrust judgments operate prospectively to prohibit unlawful conduct in the future and to restore effective competition.  *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961) ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.").

124.    "[District courts] are invested with large discretion to model their judgments to fit the exigencies of the particular case."  *International Salt*, 332 U.S. at 400–01; *see Parke, Davis & Co.*, 362 U.S. at 48.  Courts may fashion the remedy to "unfetter a market from anticompetitive conduct," *Ford Motor Co. v. United States*, 405 U.S. 562, 577-78 (1972); "to prevent future violations and eradicate existing evils," *United States v. Microsoft Corp.*, 253 F.3d 34, 102 (D.C.Cir. 2001) (en banc) (quoting *United States v. Ward Baking Co.*, 376 U.S. 327, 330-31 (1964)); to "deprive the defendants of any benefits of the illegal conduct," *United States*

*v. Grinnell Corp.*, 384 U.S. 563, 577 (1966); and to "deny to the defendant the fruits of its statutory violation," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968).

125.    Amex has argued that if it is ordered to remove the Anti-Steering Rules from its merchant contracts, this will constitute an "infringement on American Express's ability to choose *not* to do business with merchants," a result that is purportedly "contrary to decades of antitrust jurisprudence that recognizes that a firm has the 'right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.'"  Amex Pretrial Mem. 112, ECF No. 505.  In *Toys "R" Us*, 221 F.3d 928, however, the Seventh Circuit rejected the type of argument that Amex makes here.  In that case, the defendant challenged the relief imposed by the FTC for entering into unlawful vertical and horizontal agreements, arguing that "the five-year restriction on refusals to deal impermissibly cabins its *Colgate* rights to choose the suppliers with which it wants to deal.  In effect, it claims, the decree will force it to purchase all toys that are offered to anyone . . . ."  *Id.* at 939.  The Seventh Circuit disagreed, holding that, although the decree "might indirectly inhibit [defendant] from exercising its unilateral judgment," a decree generally "can restrict the options for a company that has violated [antitrust law] to ensure that the violation will cease and competition will be restored."  *Id.* at 940.

126.    Courts have used this broad remedial discretion to order antitrust defendants not to enforce certain contract terms, or to terminate contracts in their entirety if necessary to achieve effective relief.  *See, e.g.*, *United States v. Apple, Inc.*, No. 12-cv-2826, 2013 WL 4774755 at *2-3 (S.D.N.Y. Sept. 5, 2013) (ordering that defendant "shall not enforce" Most Favored Nations clause in its contracts; "shall not enter into any agreement" containing such a clause; "shall not enter into or maintain any agreement" restricting the ability "to offer price discounts"; and shall "modify" or "terminate" any agreement that does not comply with the decree); *Visa*, 163 F.

Supp. 2d 322, 408-09 (S.D.N.Y. 2001) (ordering defendants to permit banks to rescind issuing

agreements with defendants to remedy "past foreclosure" of competition).


Dated:  September 18, 2014                 Respectfully submitted,

                                           **U.S. DEPARTMENT OF JUSTICE**

                                           /s/Craig W. Conrath_____
                                           Craig W. Conrath
                                           (craig.conrath@usdoj.gov)
                                           Mark H. Hamer
                                           (mark.hamer@usdoj.gov)
                                           Joseph P. Vardner
                                           (joseph.vardner@usdoj.gov)
                                           Thomas E. Carter
                                           (thomas.carter2@usdoj.gov)
                                           U.S. Department of Justice, Antitrust Division
                                           450 Fifth Street, NW, Suite 4000
                                           Washington, DC 20530
                                           Tel:  (202) 532-4560
                                           Fax:  (202) 307-9952

                                           *Counsel for Plaintiff United States of America*

                                           **OFFICE OF THE ATTORNEY GENERAL**
                                           **State of Ohio**

                                           /s/Mitchell L. Gentile_____
                                           Mitchell L. Gentile
                                           (mitchell.gentile@ohioattorneygeneral.gov)
                                           Office of the Ohio Attorney General
                                           150 East Gay Street, 23rd Floor
                                           Columbus, OH 43215
                                           Tel:  (614) 466-4328
                                           Fax:  (614) 995-0266

                                           *Counsel for State of Ohio and on behalf of all*
                                           *Plaintiff States*