UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, et al.,

v.

AMERICAN EXPRESS CO., et al.

Civil Action No.:
1:10-CV-04496-NGG-RER

NON-PUBLIC VERSION
FILED UNDER SEAL

PLAINTIFFS' PROPOSED FINDINGS OF FACT

September 18, 2014

**<u>Table of Contents</u>**

I.    AMEX'S ASRs SIGNFICANTLY IMPEDE COMPETITION AMONG GENERAL PURPOSE CREDIT CARD NETWORKS TO REDUCE MERCHANT DISCOUNT FEES. ................................................................................................................. 1

    A.   Market background. ................................................................................. 7

    B.   Amex's ASRs prevent procompetitive behavior. ................................... 11

       i.    The ASRs bind Amex merchants. ............................................. 12

       ii.   Amex merchants with custom contracts are also restricted from steering. ................... 15

    C.   Amex's ASRs have caused actual adverse competitive effects. ................ 17

       i.    The ASRs blocked low price competition from Discover. .......... 18

       ii.   The ASRs blocked preference campaigns. ................................. 26

          a.   Amex used its ASRs to stop Visa's "We Prefer" campaign. ................... 26

             *i.    Visa's "We Prefer" campaign helped it shift share from Amex in the 1990s.* ..... 26

             *ii.   Instead of competing on the merits, Amex used its ASRs to stop Visa's "We Prefer" campaign.* ................................ 29

          b.   Amex also enforced its ASRs against other networks. ................... 32

       iii.   Amex's ASRs enable it to increase prices through value recapture ......................... 37

       iv.   Amex's ASRs prevent innovative steering strategies. ................... 39

       v.    Large merchants will lead the way in steering. ......................... 42

    D.   Pass through does not cure the ASRs anticompetitive effects. ................ 45

    E.   Vigorous issuer competition cannot compensate for diminished network competition. ... 46

II.   STEERING IS PROCOMPETITIVE. ............................................... 48

    A.   Amex steers. ........................................................................... 48

       i.    Amex benefits from steering. ................................................ 49

       ii.   Merchants steer to Amex. ..................................................... 51

B.    A broad cross-section of merchants testified about the ASR's real-world
      impact....................................................................................................... 53

C.    ASRs prevent procompetitive steering by merchants. ...................................... 55

      i.    Controlling costs is important to merchants.............................................. 57

      ii.   Credit card fees are important to merchants.............................................. 58

      iii.  Merchants use competition to get better prices from suppliers but cannot do so with
            credit card networks. ............................................................................... 60

      iv.   Merchants use competition to get better terms from co-brand partners....................... 62

      v.    Merchants use competition to get better prices from debit card networks.................... 63

      vi.   Merchants steer today as much as the ASRs allow. ...................................... 64

      vii.  Merchants with custom contracts are subject to limits on steering. ........................... 66

      viii. Merchants have asked Amex for more steering freedom. ............................................ 68

      ix.   Merchants would consider many ways to steer if not constrained by the ASRs.......... 70

      x.    Merchants would gain some negotiating leverage with credit card networks if the
            ASRs were removed. .................................................................................. 74

      xi.   Lower merchant fees would benefit consumers. .......................................... 76

      xii.  Merchants understand their credit card costs. ............................................ 80

      xiii. Merchants would share truthful information about credit card costs with their
            customers................................................................................................... 81

      xiv.  Merchants have no incentives to disparage Amex or other card networks. ................. 83

D.    Amex arguments about the number of cards are without significance............................ 85

E.    Discover is not likely to block steering........................................................... 86

III.  A RELEVANT MARKET CONSISTS SOLELY OF GPCC CARD NETWORK
      SERVICES PROVIDED TO MERCHANTS IN THE UNITED STATES........................ 87

A.    When anticompetitive effects are proved there is no need to define a relevant market. .. 89

B.    Amex previously agreed that GPCC card network services constitute a relevant
      product market. ........................................................................................ 90

ii

C.  The hypothetical monopolist test confirms GPCC card network services provided to merchants is a relevant market. ...................................................................... 91

D.  Debit cards would not constrain an exercise of market power by a hypothetical monopolist of credit cards. ................................................................................ 93

E.  Because of the power of insistence, Amex calculates it can raise prices without losing merchants. .................................................................................................. 96

F.  A hypothetical monopolist of GPCC card network services could profitably raise prices. ........................................................................................................... 98

G.  Katz applied the hypothetical monopolist test considering the two-sided nature of GPCC card networks. ...................................................................................... 100

H.  Merchants do not perceive the acceptance of debit cards to be a close substitute for the acceptance of credit cards. ...................................................................... 101

I.  Merchants testified that they cannot substitute credit for debit even if their credit card prices increase. ........................................................................................ 107

J.  GPCC card networks base their credit card prices on the prices of other credit cards, not debit cards. ............................................................................................... 107

K.  Credit card pricing is unrelated to debit card pricing as the Durbin Amendment demonstrated. ................................................................................................... 109

L.  Customers prefer different payment options for different types of purchases. ........................................................................................................ 114

M.  Considering the cardholder side, merchant data demonstrates that a large portion of credit card users pay only with credit cards. ................................................... 116

N.  Professor Bernheim did not consider price as he purported to analyze the relevant market. ............................................................................................................ 117

O.  Broad market trends do not show that customers generally switch between credit and debit or that debit should be included in the relevant market. ......................... 119

P.  The parties agree that the United States is the relevant geographic market. ............................................................................................................ 121

IV.  AMEX HAS MARKET POWER IN THE GPCC CARD NETWORK SERVICES MARKET. ......................................................................................................... 121

A.  The GPCC card network services market structure supports a finding that Amex has market power. .................................................................................................. 122

    i.    Market shares and concentration in the GPCC card network services market support a finding of Amex market power. .................................................................. 122

    ii.   The difficulty of entry into the GPCC card network services market supports a finding of Amex market power. ................................................................................ 124

B.  Cardholder "insistence" gives Amex market power over merchants. ........................... 127

    i.    Sources of Amex insistence. ..................................................................................... 127

        a.   Cardholder rewards. ............................................................................................ 127

        b.   Corporate card and small business card insistence. ................................................ 128

        c.   Single-homing. .................................................................................................... 130

    ii.   Amex measures cardholder insistence and calculates a "maximum rational price." . 132

    iii.  Amex uses insistence to show merchants that they must accept Amex. .................... 135

    iv.  Avon's and Allegiant Airlines' non-acceptance of Amex does not undermine a finding of Amex market power. ................................................................................... 137

    v.   Natural experiments have shown that insistence is not a marketing ploy. ................. 139

    vi.  Merchants cannot drop Amex. .................................................................................. 140

    vii.  Walgreens tried and failed to drop Amex. ................................................................ 146

C.  Amex pricing demonstrates its market power. ............................................................. 149

    i.    On average, Amex charges merchants the highest prices of any card network. ........ 149

        a.   Merchants do not receive additional value from Amex. .......................................... 152

        b.   Amex surveys undermine its premium value claims. ............................................. 155

    ii.   Amex imposed profitable "Value Recapture" price increases on top of its already high prices. ........................................................................................................... 157

        a.   Restaurant value recapture. .................................................................................. 162

        b.   Gross pay fee increase. ....................................................................................... 163

        c.   Amex's claim that competitive pressures were a check on value recapture is wrong. ................................................................................................................... 163

    iii.  Amex price discriminates. ........................................................................................ 165

D.  Amex's pricing arguments do not overcome evidence of market power. ..................... 166

   i.  Amex's premium eroded because of its change in card mix..................................... 166

   ii.  Amex's limited pricing concessions do not offset its higher prices to merchants. .... 168

   iii.  Amex's two-sided pricing calculations are erroneous and unreliable....................... 171

E.  Amex's lower acceptance rate among small merchants does not indicate a lack of market power. ............................................................................................................. 184

F.  Discover price increases do not show that Amex lacks market power........................... 191

G.  Amex's market power is durable. ................................................................................. 192

H.  Amex's ASRs have become more restrictive over time. ................................................ 192

V.  THERE IS A RELEVANT MARKET CONSISTING OF THE PROVISION OF GPCC CARD NETWORK SERVICES TO T&E MERCHANTS................................................ 195

A.  It is appropriate to define a separate market for network services to T&E merchants... 195

B.  The hypothetical monopolist test demonstrates that the provision of GPCC card network services to T&E merchants is a relevant market................................................ 198

VI.  AMEX HAS MARKET POWER IN THE T&E MARKET. ............................................. 200

A.  Due to high insistence, Amex is able to charge higher prices to airlines, hotels, restaurants, and car rental agencies.............................................................................. 202

B.  Amex successfully imposed value recapture on T&E merchants on top of its already high prices................................................................................................................... 203

VII.  AMEX OFFERS NO PROCOMPETITIVE JUSTIFICATIONS FOR ITS ASRs. ....... 206

A.  Alleged "free-riding" do not justify Amex's ASRs........................................................ 206

   i.  Merchants cannot free ride on benefits that Amex provides directly to merchants... 207

   ii.  Merchants cannot free ride on benefits cardholders accrue by using their cards....... 209

   iii.  Merchants cannot free ride on Amex's alleged credentialing or brand association... 210

B.  Protecting Amex does not justify Amex's ASRs............................................................ 212

   i.  Amex can continue to compete effectively without the ASRs.................................. 212

   ii.  Protecting "Welcome Acceptance" of Amex cards does not justify Amex's ASRs.. 227

iii.    Protecting the Amex brand does not justify its ASRs. ................................................. 229

APPENDIX A .................................................................................................................................. i

I.       **AMEX'S ASRs SIGNFICANTLY IMPEDE COMPETITION AMONG GENERAL PURPOSE CREDIT CARD NETWORKS TO REDUCE MERCHANT DISCOUNT FEES.**

1.       Credit card networks have for years blocked merchants from encouraging consumers to pay with low-cost credit cards.  The networks have done so through rules or contractual restrictions referred to in this case as the "Anti-Steering Rules" (the "ASRs").  *See* Trial Tr. 3821:11-3822:4 (Katz) (ASRs block "substitution towards the network" with lower prices); 779:5-7 (Quagliata/Amex) (stating Visa and MasterCard had their own rules that blocked steering).  By breaking the essential link between lower prices and more sales, the ASRs eliminate a powerful incentive for networks to reduce merchant prices – leading to higher merchant fees and ultimately higher retail prices.  *See* Trial Tr. 3821:11-3822:4 (Katz) (ASRs "tak[e] away the award for competing harder" on price); 3854:18-3855:25 (Katz) (ASRs "raise merchants' costs and "an economically rational merchant is going to pass that on to its consumers").  The ASRs also eliminate competitive pressure for networks to offer more attractive services to cardholders.  *See* Trial Tr. 6678:1-6678:15 (Katz) (if the ASRs were removed, networks might respond to the increased competitive pressure by offering more attractive services to cardholders to make them more insistent).

2.       While Visa and MasterCard abandoned their ASRs in the face of this litigation, Amex's ASRs continue to reduce price competition at the millions of merchants that accept Amex cards by blocking those merchants from steering their customers – even those who present or intend to pay with a Visa or MasterCard card – to lower-cost credit or charge cards.   *See* Trial Tr. 5128:22-5131:8 (Gilbert).  For example, an Amex-accepting merchant cannot post a sign asking MasterCard or Visa cardholders to pay with Discover.

THE COURT:  So if that sign said, We do our best to keep our costs and your prices down, if you're planning to use a MasterCard or a Visa and you have a Discover card in your wallet, we'd rather have you use a Discover card, would that in any way be in violation of the terms of your contract with the merchant regarding the use of the American Express Card, because it raises the specter of the American Express Card having a certain cost, even though it's not mentioned?

THE WITNESS:  Yes, absolutely so. And I think that's where the line is crossed because in the communication that you just outlined, it could be misconstrued by the card member, the American Express Card member saying not only is Discover a more advantageous product to use versus Visa or MasterCard, but also American Express.

THE COURT:  Even though it's not mentioned?

THE WITNESS:  Even those it's not mentioned, yes.

Trial Tr. 671:7-672:2 (Quagliata/Amex).  Amex's economic expert, Professor Gilbert, acknowledged that Amex's ASRs on their face block network competition for merchants.  *See* Trial Tr. 5128:22-5131:8 (Gilbert).  Merchants, therefore, do not benefit from competition among credit card networks to increase each network's share of merchant sales.  As Southwest Airlines' Director of Accounting Operations testified, "the market is broken" because card networks do not compete on the basis of price for his company's business.  Trial Tr. 2440:4-15 (Priebe/Southwest).

3.      Amex realizes that merchants, if not for the ASRs, would steer to lower-priced credit cards.  Multiple merchants have asked Amex to eliminate or modify the ASRs.  Trial Tr. 2738:4-20 (Funda/Amex); *see* PX0701 at -584 (U.S. Airways wanted to remove the ASRs); PX1846 at -018, -087 (Southwest tried to modify the ASRs); PX0842 at -285 (Amex email stating United Airlines "insists on right to preference Amex competitors that have lower discount rates and this of course is not acceptable to us."); PX0033 at -204 (Carnival Cruise Lines launched MasterCard preference campaign during "negotiation window" with Amex).

Moreover, Professor Gilbert, recognized in a white paper he prepared on behalf of Amex that, "[i]f merchants had unfettered freedom to steer customers at the point of sale, it is likely that they would encourage customers to use the card that has the lowest merchant discount fee."  PX0093 at 15.  "Merchants will always have an incentive to offer selective discounting against American Express unless:  Merchant's margin is very … [or] The premium over V/MC is below the level of a reasonable discount."  PX0089 at -353.

4.      As a result, the ASRs insulate Amex from the competitive pressure that generally occurs when competitors offer lower prices.  *See* PX0357 at -952; Trial Tr. 2595:11-2596:16, 2694:1-4, 2694:21-24 (Funda/Amex) (admitting certain pricing pressure does not exist in the United States because of the ASRs).  Jack Funda, Amex's Senior Vice President for Global Merchant Pricing, acknowledged that, since a "merchant should accept all AMEX transactions that comes to [its] stores," a merchant "can't directly effect [sic] how much volume" it has on Amex credit cards.  Trial Tr. 2595:11-23 (Funda/Amex).  As a result, with the ASRs in place, merchants can avoid Amex's high prices only by no longer accepting Amex cards.

5.      Amex's recognition that its ASRs insulate it from pricing pressure from other credit card networks is further reflected in Amex's pricing methodology, which entirely ignores the possibility Amex would lose sales from steering.  Trial Tr. 2594:4-7, 2594:17-20, 2596:12-20 (Funda/Amex).  Mr. Funda conceded that, if not for the ASRs, it is "[q]uite possibl[e]" that Amex would have to change its pricing methodology to account for merchants' ability to influence charge volume.  Trial Tr. 2596:21-2597:5 (Funda/Amex).  Amex has not decreased the merchant discount rate to get merchants "to increase the sales volume on American Express because merchants couldn't do that due to the Visa and MasterCard anti-steering rules."  Trial Tr. 2646:19-24 (Funda/Amex).

3

6.      The ASRs cushion Amex from pricing pressure to such a degree that Amex has simply decided that "we don't compete on costs."  Trial Tr. 2667:23-2668:9, 2668:23-2669:3 (Funda/Amex); *see* PX0038 at -702 (Amex email stating "[w]e should not compete on costs vs [Visa/ MasterCard]").  As Mr. Funda testified, "I don't think anybody's business strategy is be cheaper than the next guy . . . ."  Trial Tr. 2667:23-2668:9 (Funda/Amex).

7.      Since Amex's ASRs prevent merchants that accept Amex cards from attempting to encourage, for example, a MasterCard cardholder to use a Discover card, all General Purpose Credit and Charge (GPCC) card networks experience significantly less pricing pressure. Because of the ASRs, other networks felt no competitive pressure to respond when Discover tried to increase its network volume by charging low fees to merchants. *See* Trial Tr. 3822:5-13 (Katz); 2665:21-2666:7(Funda/Amex); PX0357 at -944-946 (Amex document listing pressures on Visa and MasterCard pricing).  As a result, the prices that merchants pay for GPCC card network services are higher than they would be if not for the ASRs.

8.      The ASRs create a competitive environment in which there is nothing to offset the GPCC card networks' incentives to increase prices to merchants.  Mr. Funda described the pressure to increase rates as an industry "dynamic[] that we observed."  Trial Tr. 2643:3-8 (Funda/Amex).

9.      For example, Discover abandoned its low-cost strategy and substantially increased prices to merchants after realizing that Amex's ASRs prevented merchants from responding to its low prices by steering transaction volume to Discover.   Trial Tr. 3822:5-13 (Katz); 853:19-854:15 (Hochschild/Discover).

10.     Because they had their own anti-steering rules until October 2010, Visa and MasterCard did not face pressure from another credit card network with a lower discount rate. Trial Tr. 2665:11-2666:7 (Funda/Amex); PX0357 at -944-946.

11.     Visa and MasterCard successfully raised their average merchant discount rates from 1.81 percent and 1.84 percent, respectively, in 1997 to 2.31 percent and 2.34 percent in 2009.  PX0357 at -959; Trial Tr. 2664:15-2665:4 (Funda/Amex) (stating that Visa and MasterCard raised their merchant prices in a variety of ways).

12.     Subsequently, Amex raised its discount rates to airlines, restaurants, and other industries to regain its premium pricing over Visa.  PX0056A at -259 (Amex raised airline pricing); PX0062 at -394 (Amex raised restaurant pricing because of its negative premium); PX1240 at -092 (Amex ███████████████████████████); Trial Tr. 2689:12-2690:24 (Funda/Amex) (stating competitive pressure did not have influence on Amex's decision to stop increasing prices by industry).

13.     Professor Katz testified that the ASRs make merchants less responsive to price, and "that's why the price is going up to merchants."  Trial Tr. 3853:25-3854:17 (Katz).  Because the price increase is caused by the fact that demand is less responsive to price, "economic theory says the networks are going to keep some of that for themselves. They're not going to pass it all through" to cardholders as rewards. Trial Tr. 3853:25-3854:17, 4039:16-20 (Katz).

14.     On the other hand, if the ASRs were removed, and if "steering [were] possible, credit and charge card networks will face greater competitive pressures, and that gives them incentive to innovate and try to figure out how do I deal with the changing market conditions, given that now if I don't keep up with the times, merchants can steer their customers away . . . ." Trial Tr. 3876:17-3879:5 (Katz).  Mr. Funda stated that Amex might respond by reducing its

merchant discount rate, providing more merchant benefits, increasing its cardholder rewards, or some combination of these possibilities. *See* Trial Tr. 2754:14-2755:6 (Funda/Amex) (stating that, if not for the ASRs, "we may need to increase incentives to consumers" and "[w]e may need to reduce pricing to merchants"); 2748:3-7 (Funda/Amex) (if not for the ASRs, "one strategy clearly" would be to increase cardholder rewards); 2742:17-25 (Funda/Amex) (if Durbin Amendment had allowed for steering among GPCC card brands, Amex would have tried "to incent the right behavior and reward merchants who are engaging with us in ways that we thought were productive"). Mr. Funda acknowledged that Amex could provide additional cardholder rewards at the expense of its profits. Trial Tr. 2748:18-25 (Funda/Amex). Mr. Silverman, President of Amex's Consumer Card Services business, admitted that reduced Amex profits from competition would be good for consumers. Trial Tr. 3775:2-10 (Silverman/Amex).

15.     Professor Gilbert acknowledged that eliminating the ASRs might cause Amex to reduce its prices. He wrote in a white paper submitted by Amex in this matter that "[i]f such steering were pervasive, it might force AmEx to charge a lower merchant discount fee . . . ." PX0093 at 15.

16.     Internal Amex documents also show that Amex realizes it might reduce its discount rate to combat the competitive pressure that would emerge if the ASRs no longer existed. For example, an Amex document stated that Amex could "[r]emove economic incentive for merchants to discount/cancel American Express" by "[s]electively (by industry) reduc[ing] American Express discount rate." PX0090 at -473; *see also* PX1176 at -384 (Amex could adopt a "[p]referred merchant program" providing [e]xclusive access and/or discounts to specific American Express products and services."); PX1176 at -384 (considering "[r]ate reduction in high-risk industries."); PX1239 at -943 (finding that the potential risks of "Discounting for

6

Credit (Differential)" were "Discount Rate pressure, Loss of DBV share"); Trial Tr. 702:3-10 (Quagliata/Amex) (if merchants could discount, Amex risks experiencing pressure on its discount rate and losing market share); PX0005 at -346 (merchant steering may cause rate pressure); Trial Tr. 2693:25-2694:4, 2694:20-23 (Funda/Amex) (if merchants could steer among networks, they could demand rate reductions).

17.     Finally, Mr. Funda agreed that removing the ASRs may lead other GPCC card networks to reduce their prices.  Trial Tr. 2762:8-17 (Funda/Amex) (merchants may be able to negotiate rebates with Visa or MasterCard if not for the ASRs).

     **A.     Market background.**

18.     General purpose payment cards can be used by consumers to purchase goods and services at a wide variety of merchants.  ECF #447-1 at ¶ 1.  Those cards include GPCC cards[1] as well as debit cards and prepaid cards.  ECF #447-1 at ¶ 1.

19.     Credit cards allow cardholders to pay for goods and services by accessing a line of credit extended by the entity that issued the card.  ECF #447-1 at ¶ 2.  The cardholder is invoiced for purchases typically once per month and has a grace period during which to make a payment.  ECF #447-1 at ¶ 2.  Cardholders can either pay the balance in full each month or pay the balance over time while accruing interest on the balance.  ECF #447-1 at ¶ 2.  Many credit card issuers impose a preset spending limit on cardholders' outstanding credit amount, typically based on the cardholder's creditworthiness.  ECF #447-1 at ¶ 2.

---

[1] Facts for this section were derived mainly from the Joint Statement of Undisputed Fact (ECF #447-1) ("Joint Statement").  In the Joint Statement, the parties distinguished credit cards from charge cards.  Plaintiffs have maintained that the distinction here when citing to the Joint Statement.  In subsequent sections, "credit cards" refers to both credit cards and charge cards.

20.     Charge cards allow cardholders to pay for goods and services by accessing a line of credit extended by the entity that issued the card, but typically do not offer a revolving credit facility and generally require that cardholders pay the card balance in full each month.  ECF #447-1 at ¶ 3.  Some charge cards, however, do offer a revolving credit facility.  ECF #447-1 at ¶ 3.  Depending on when in the billing cycle a purchase is made, cardholders may not need to pay for several weeks.  ECF #447-1 at ¶ 3.  Charge cards typically do not have a preset spending limit.  ECF #447-1 at ¶ 3.

21.     Merchants' demand for payment card acceptance is derived from consumers' demand for payment card usage.  ECF #447-1 at ¶ 4.

22.     Consumers obtain credit or charge cards from card issuers, which are banks or financial institutions that issue the payment card to the consumer and bill the consumer for purchases made using the credit or charge card.  ECF #447-1 at ¶ 5; Trial Tr. 815:7-10 (Hochschild/Discover).

23.     A cardholding consumer - either a household member or business employee - can use a credit, charge, debit or prepaid card to make purchases at merchants that accept that brand of card.  ECF #447-1 at ¶ 6.  To do so, the merchant must have a relationship with an acquiring institution (acquirer).  ECF #447-1 at ¶ 6.

24.     An acquirer is a bank or financial institution that accepts card transaction data from a merchant for verification and processing.  ECF #447-1 at ¶ 7.

25.     For most large merchants (as measured by transaction volume), Amex itself serves as the acquirer for Amex transactions.  ECF #447-1 at ¶ 8.

26.     In the vast majority of instances (measured by either the number of transactions or the transaction volume) where Amex is the credit and charge card network, it is also the card

issuer.  ECF #447-1 at ¶ 9.  In some instances, however, Amex relies on financial institutions to serve as issuers and acquirers.  ECF #447-1 at ¶ 9.

27.     MasterCard and Visa do not act as issuers or acquirers.  ECF #447-1 at ¶ 10. Instead, MasterCard and Visa each provide certain core payment services and rely entirely on financial institutions to serve as issuers and acquirers.  ECF #447-1 at ¶ 10.

28.     Amex's business model is often referred to as a "three-party" model or "closed-loop" network because Amex operates the network and, for a large portion of its transactions, has relationships with cardholders and merchants.  ECF #447-1 at ¶ 11.

29.     When the merchant accepts the consumer's payment card for payment, swipes it, and transmits the transactional information to the acquirer, the acquirer in effect acquires the receivable owed by the cardholder arising from the cardholder's purchase.  ECF #447-1 at ¶ 12. The acquirer thus has a payable obligation to the merchant.  ECF #447-1 at ¶ 12.

30.     The acquirer pays the merchant the purchase amount, less an amount called the "merchant discount fee."  ECF #447-1 at ¶ 13.  The merchant discount fee typically consists of an ad valorem component (i.e., that is proportional to the dollar value of the transaction) and may include other fees.  ECF #447-1 at ¶ 13.

31.     On the Amex network, the merchant discount fee typically consists of an ad valorem component computed by multiplying a specified merchant discount rate by the dollar value of transaction.  ECF #447-1 at ¶ 14.  For a given merchant, the same merchant discount rate typically applies to all Amex credit or charge card products.  ECF #447-1 at ¶ 14.  For some transactions, Amex may also charge the merchant an additional fee.  ECF #447-1 at ¶ 14.

32.     On the Visa and MasterCard networks, the merchant discount fee is comprised of, among other things, an ad valorem interchange fee (calculated by multiplying an interchange rate

by the transaction amount), a network fee, and an acquirer fee.  ECF #447-1 at ¶ 15.  The

interchange fee is the part that the issuing bank keeps. In the case of American Express, it is

called the issuer rate.  The acquiring fee is the part that the acquiring bank keeps.  The network

fee is the part that the network retains.  The interchange fee generally comprises the bulk of what

the merchant pays.  The interchange fee is set by the network, but the network does not keep it.

Trial Tr. 3832: 9-3833:24 (Katz).  Merchants may be charged additional fees as well.  ECF #447-

1 at ¶ 15; Trial Tr. 3832:9-3833:13(Katz).

33.     Unlike the Amex network where the same merchant discount rate typically

applies to all Amex credit or charge card products for a given merchant, the interchange rate a

merchant is charged for a transaction on the Visa or MasterCard network can vary significantly

by the card product presented.  ECF #447-1 at ¶ 16.  Specifically, Visa has more than 70

different interchange rate categories and MasterCard has more than 240 different interchange

rate categories.  ECF #447-1 at ¶ 16.

34.     As of 2013, Visa accounted for 45 percent of GPCC card purchase volume in the

U.S., Amex accounted for 26.4 percent, MasterCard accounted for 23.3 percent, and Discover

accounted for 5.3 percent.  ECF #447-1 at ¶ 20.

35.     As of 2013, approximately 9.4 million merchant locations in the U.S. accepted

Visa and MasterCard credit and charge cards, 9.2 million accepted Discover and 6.4 million

accepted Amex.  ECF #447-1 at ¶ 22.

36.     The 6.4 million Amex-accepting merchant locations are operated by about 3.4

million different merchants.  PX1985.

37.     Merchants and their customers are both consumers of network services.  Trial Tr.

3821: 6-10, 3829:4-13 (Katz).

10

38.     A key feature of the credit card industry is that merchants and their customers jointly decide which payment instruments to use, and steering is all about "the interaction between the two sides in order to make that joint decision."  Trial Tr. 3834:7-24 (Katz); PX2702 at 9; *see also* Trial Tr. 3831:1-21 (Katz) ("[T]he choice of what payment instrument gets used for a transaction is a choice that's jointly made by merchants and their customers . . . . So to understand how competition works here, we have to understand both what the merchant wants to do and also what the customer wants to do.").

39.     Professor Katz testified that a GPCC card network is two-sided because its "business ultimately is to facilitate transactions between merchants on one side and their customers on the other."  Trial Tr. 3828:23-3829:3 (Katz); *see also* Trial Tr. 3828: 13-22 (Katz) (The most fundamental function a network performs is to provide a set of protocols, procedures and standards that allow all the parts of the network to work together.).

40.     In the GPCC card industry, network effects arise because, from the customer's perspective a network is more valuable the more merchants that are on it, and because a merchant wants to accept a network when lots of customers want to use it. As Professor Katx explained: "customers want to be where merchants want to be and merchants want to be where the customers are."  Trial Tr. 3829:14-3830:7 (Katz).

**B.     Amex's ASRs prevent procompetitive behavior.**

41.     Amex's ASRs apply to the vast majority of the largest retailers in the United States.  Out of the 100 largest U.S. retailers, identified by the National Retail Federation based on 2010 sales volume, 98 accept Amex cards in some or all of their locations.  Stipulation Regarding Non-Standard Card Acceptance Agreements and Merchant Acceptance of American Express, ECF #590 ¶¶ 8-12 (hereinafter "Schmitt Stip."); PX2273.  The two retailers from this

11

list that do not accept Amex do not accept any general purpose credit or charge cards.  Schmitt Stip. ¶¶ 11-12; PX2780 at 1 nn.42, 78.

42.     Because of the ASRs, merchants that accept Amex have no ability to influence how much of their purchase volume goes on Amex cards.  Merchants thus face an all-or-nothing choice:  accept Amex cards and its high prices or decline Amex acceptance and risk losing credit-insistent cardholders.  Trial Tr. 2617:1-2618:12 (Funda/Amex) ("Q So by operation of the nondiscrimination rules, the piece of the widget market which is that price increases are disciplined by the movement of some sales volume to competitors is missing from the credit card industry, correct? A  Okay. Perhaps you could argue that."); 2595:11-23; 2600:1-25 (Funda/Amex).

43.     Almost all merchants who accept Amex are bound by some version of Amex's ASRs.  *See* Trial Tr. 636:2-5, 639:3-13 (Quagliata/Amex); PX2609.

### i.     The ASRs bind Amex merchants.

44.     The vast majority of Amex's merchants – numbering in the millions – are bound by Amex's standard form acceptance agreement and, consequently, Amex's standard ASR.  Trial Tr. 636:2-5, 639:3-13, 645:8-647:25 (Quagliata/Amex); PX0003; PX0002 at 16-17 (Regulation 3.2).  The merchants bound by Amex's standard form acceptance agreement include over 90 percent of the merchants in Amex's Regional Client Group and all of the millions of merchants too small to be in the Regional Client Group.  Trial Tr. 639:7-12 (Quagliata/Amex); Trial Tr. 2831:17-25 (Funda/Amex) (Amex probably has less than 1,000 custom contracts.).

45.     Amex's standard form card acceptance agreement requires adherence to the policies and procedures found in Amex's Merchant Regulations.  Trial Tr. 642:15-643:5 (Quagliata/Amex); PX0003 at 13 (Section 1.b.i).

12

46.     The Merchant Regulations instruct merchants what they can and cannot do when they accept Amex cards.  Trial Tr. 644:12-24 (Quagliata/Amex).  Merchant Regulation 3.2 contains Amex's standard ASRs.  Trial Tr. 645:8-647:22 (Quagliata/Amex); PX0002 at 2 (Regulation 1.2), 16 (Regulation 3.2).

47.     Merchant Regulation 3.2 prohibit merchants from: (1) offering customers discounts or other incentives to pay with cards that cost merchants less than Amex cards; (2) informing customers that they would prefer for them to pay with lower-cost cards; (3) displaying the logos of low-cost cards more prominently than the Amex logo; and even (4) informing their customers how much it costs to accept different cards.  Trial Tr. 645:8- 647:22 (Quagliata/Amex); PX0002 at 16 (Regulation 3.2).

48.     In practice, the ASRs prevent merchants from engaging in a wide range of procompetitive conduct,  including:

a.      A merchant cannot say "please keep in mind that credit and charge expenses are some of our highest costs" or that its prices would be lower if its credit card costs were lower.  Trial Tr. 649:4-7, 682:13-15 (Quagliata/Amex).

b.      A merchant cannot tell customers that it costs more to accept Amex than other credit cards, even if the merchant accurately assesses its credit card costs.  Trial Tr. 651:11-14, 654:17-655:12 (Quagliata/Amex); PX2620.  A merchant cannot post a sign indicating the relative costs of different credit card networks.  Trial Tr. 656:22-657:6, 673:7-676:8 (Quagliata/Amex); PX2620; PX2631.

c.      A merchant cannot tell customers what its credit card costs are.  Trial Tr. 667:17-21 (Quagliata/Amex).

13

d.  A merchant cannot offer customers the option of inquiring about its credit card prices.  Trial Tr. 667:22-668:17 (Quagliata/Amex); PX2629.

e.  A merchant cannot answer a question from a customer about its different credit card costs.  Trial Tr. 669:11-15 (Quagliata/Amex).

f.  A merchant cannot offer a discount or other incentive to use a credit card that is less costly for the merchant.  Trial Tr. 676:9-14, 683:22-25, 686:15-687:5 (Quagliata/Amex).  The ASRs, for example, forbid the offer of a 1 percent discount for using Discover, free shipping for using Discover, a coupon contingent on a customer using MasterCard, or an exclusive Discover checkout lane.  Trial Tr. 676:15-17, 676:18-23, 679:25-680:5, 687:3-5, 687:12-23 (Quagliata/Amex); PX2630.

g.  A merchant cannot offer to share the savings with the customer if the customer uses a card that costs the merchant less.  Trial Tr. 682:19-22 (Quagliata/Amex).

h.  A merchant cannot state a preference for a credit card other than Amex.  Trial Tr. 689:13-690:15 (Quagliata/Amex).

i.  A merchant cannot post a sign saying "We love American Express.  We really love MasterCard."  Trial Tr. 792:2-5 (Quagliata/Amex); PX2626.

j.  A merchant cannot post a sign saying "Thank you for using Discover."  Trial Tr. 792:17-22 (Quagliata/Amex); PX2625.

k.  A merchant cannot post a sign stating, "Save a Dollar!  Discover" or "All Items Are on Sale If You Use Discover."  Trial Tr. 794:2-5, 795:21-796:19 (Quagliata/Amex); PX2621; PX2622.

l.      A merchant cannot tell customers:  "We do our best to keep our costs and your prices down, if you're planning to use a MasterCard or a Visa and you have a Discover card in your wallet, we'd rather you use your Discover card."  Trial Tr. 671:7-22 (Quagliata/Amex).

m.      A merchant cannot post a sign offering a discount to Visa cardholders to use their Discover cards.  Trial Tr. 672:16-21 (Quagliata/Amex).

n.      A merchant cannot answer the phone and say:  "Thank you for calling us, we proudly accept the Discover card."  Trial Tr. 785:11-19 (Quagliata/Amex).

### ii.      Amex merchants with custom contracts are also restricted from steering.

49.     Few of the millions of merchants that accept Amex cards have custom acceptance agreements with provisions that differ from Amex's standard form acceptance agreement.  Trial Tr. 638:6-14, 685:5-686:5 (Quagliata/Amex).  These merchants are predominantly Amex's largest merchants.  Trial Tr. 684:12-16 (Quagliata/Amex); 2831:17-2832:2 (Funda/Amex).

50.     Joseph Quagliata, the Senior Vice President of Amex's Regional Client Group, testified about how exceedingly rare it is for a merchant within his group to negotiate a modification of the standard ASRs.  Out of the 9,200 merchant contracts in the group, merchants with custom provisions modifying the standard ASRs would number in the "single digit[s], if [there were] any at all."  Trial Tr. 685:5-686:5 (Quagliata/Amex).  Amex negotiates modifications to its standard ASRs "[n]ot often at all" with the merchants in the Regional Client Group.  Trial Tr. 685:5-686:5 (Quagliata/Amex).

51.     Even where a custom contract modifies the ASRs, the ASRs still prohibit most forms of steering and typically allow only limited, short-term promotions with other credit cards

15

or steering to the merchant's private label or co-brand cards.  *See* Trial Tr. 1613:14-25 (Brennan/Hilton); 1041:23-1042:7, 1043:14-1045:9, 1134:22-1137:25 (Quagliata/Amex); DX3946 at -821.

52.     Across three separate documents, Amex identified 139 merchants with customized contracts containing non-standard ASRs.  Schmitt Stip. ¶ 1; PX1392, at Point 14, at 9-12; PX1395.  Ann Schmitt, "a consultant with twenty-five years of experience in the payments industry," summarized the ASRs in 125 of these contracts.  Schmitt Stip. ¶¶ 2, 6.  In accordance with a ruling by Judge Reyes, Ms. Schmitt did not review the other 14 contracts, which took effect after December 31, 2010.  Schmitt Stip. ¶ 4.  Ms. Schmitt's summary addressed whether these custom ASRs allow differential discounting or brand display (outside of limited-time promotions), expressions of preference for another card brand, or differential promotions.  Schmitt Stip. ¶ 6; PX2609.

53.     Ms. Schmitt found significant restrictions in these contracts on the merchants' ability to steer customers to other card brands:

a.     124 out of 125 contracts prohibit differential discounts outside of limited-time promotions, PX2775 at 1;

b.     96 out of 125 contracts prohibit differential display of card brands, two contracts allow it only in certain circumstances, and 27 do not address the issue, PX2775 at 2;

c.     123 out of 125 contracts prohibit expressions of preference for another card brand in any circumstances, one contract allows it only in certain circumstances, and one does not address the issue, PX2775 at 3;

16

d.  19 out of 125 contracts prohibit all differential promotions of another card product, 74 allow promotions with restrictions on length, 6 allow promotions with a requirement to give Amex a similar promotion opportunity, and six do not address the issue, PX2775 at 4; and

e.  Of the 74 contracts allowing time-restricted promotions of other card brands, 60 require the merchant to obtain funding from another card issuer before running the promotion, PX2775 at 6.  Schmitt Stip. ¶ 7.

54.  Thus the small number of merchants with custom contracts are significantly restricted from steering.

**C.  Amex's ASRs have caused actual adverse competitive effects.**

55.  The critical question in antitrust analysis is identifying competitive effects.  Trial Tr. 5157:12-20 (Gilbert).   Professor Katz testified that when, as here, the practices at issue have already taken place, it is appropriate to look at market facts and industry participants' behavior to identify direct evidence of how practices have affected competition.  Trial Tr. 3823:15-3824:19 (Katz).  Amex's economic expert, Professor Gilbert, acknowledged that it is possible for a firm to harm competition through vertical restraints without having market power.  Trial Tr. 5220:7-19 (Gilbert).

56.  At trial, evidence showed that Amex's ASRs cause "significant adverse competitive effects" and harm competition, merchants, and their customers.  Trial Tr. 3821:6-10, 3825:14-22, 3851:13-3852:4, 3856:1-7 (Katz).  Amex's ASRs thwart a fundamental benefit of competitive markets:  a firm can gain more volume by reducing prices.  Trial Tr. 3821:11-3822:4 (Katz).  The ASRs, therefore, "tak[e] away [a network's] [re]ward for competing harder."  Trial Tr. 3821:11-3822:4 (Katz).  In addition, the ASRs remove one of the main incentives for a

network to refrain from raising its price:  the fear that merchants would steer to competing networks.  *See* Trial Tr. 3847:1-3850:17 (Katz).  The ASRs therefore reduce competition and cause actual adverse effects in the market.  Trial Tr. 3821:11-3822:4 (Katz).

57.     Testimony from Discover, Visa, MasterCard, merchants, Professor Katz and other evidence provided four concrete examples of how the ASRs  harm competition:  (1) the failure of Discover's low-price strategy; (2) Amex's response to preference campaigns (3) the success of Amex's value recapture program to raise prices; and (4) the ASRs have  blocked merchant innovations.  *See* Section I.C.i-iv; *see also* Trial Tr. 3835:9-3836:6 (Katz); PX2702 at 11.  Reduced competition caused by the ASRs has led to higher merchant prices and, ultimately, higher consumer prices.  Trial Tr. 3840:10-23 (Katz).

58.     Despite ample opportunity, Amex offered no evidence at trial of networks reducing merchant fees to win business from rivals.  The complete absence of such price competition since at least the 1990s is powerful evidence of the harmful effects of the ASRs.

### i.     The ASRs blocked low price competition from Discover.

59.     Discover's unsuccessful attempt to gain share by offering low prices to merchants illustrates vividly the harm caused by the ASRs.  Trial Tr. 3822:5-13 (Katz).  Discover's President and COO, Roger Hochschild, testified that the ASRs prevented merchants from taking advantage of Discover's low prices.  Trial Tr. 853:23-854:18 (Hochschild/Discover).

60.     Discover historically embraced a low-price business model.  When Discover launched in 1985, it priced "very aggressively for merchants," setting its merchant discount rate significantly below its network competitors.  Trial Tr. 820:23-821:16 (Hochschild/Discover).  Discover provided both "a good value proposition for [its] cardholders" ("no annual fees," "the

first card to have any form of rewards with providing cash back on every transaction") and "a good value proposition to [its] merchants."   Trial Tr. 820:23-822:5 (Hochschild/Discover).

61.     When other GPCC card networks increased prices, Discover sought to take advantage of its low merchant prices to gain share.  In the late 1990s, Visa and MasterCard significantly increased their merchant prices.  Trial Tr. 832:24-833:11 (Hochschild/Discover).  At that time, Amex's average discount rate was higher than the average rates of both Visa and MasterCard.  *Unites States v. Visa, U.S.A., Inc.*, 163 F. Supp. 2d 322, 333 (S.D.N.Y. 2001) ("American Express' average merchant discount rate in 1999 was approximately 2.73 percent compared to Discover's rate of approximately 1.5 percent and Visa's and MasterCard's rates of approximately 2 percent.").   Discover observed merchant frustration over Visa's and MasterCard's price increases and believed merchants would work with Discover to reduce their costs.  Trial Tr. 833:16-834:3 (Hochschild/Discover).  Discover commissioned a merchant survey that confirmed this understanding.  It found that 63 percent of merchants were upset with increasing credit card costs and that most of those merchants would incentivize consumers to use lower-cost credit cards.  PX1277 at -094; Trial Tr. 834:21-835:17 (Hochschild/Discover).  Discover therefore "launched a major campaign to bring the merchants' attention to this increase in pricing, and to try to get them to shift their business to [Discover's] lower-priced network."  Trial Tr. 832:24-833:11 (Hochschild/Discover).  The share shift "would be Discover's competitive reward . . . for having given the merchants a good deal."  Trial Tr. 3836:9-3838:18 (Katz).

62.     During an April 12, 1999 speech to a major credit card industry conference, Discover's then-president proposed that merchants steer to Discover's low-cost network.  Trial Tr. 834:13-20 (Hochschild/Discover); PX1277 at -087, -094-095.  In his speech, he noted the

19

Visa and MasterCard price increases and stated that Amex was not a good alternative for merchants "because their prices are even higher."  PX1277 at -090.  He characterized this situation as creating a "great opportunity" for Discover and explained that Discover wanted to work with merchants "to help them save money by encouraging their customers to pay with Discover Card."  PX1277 at -090, -094-095.

63.     Following this speech, Discover sent a letter to each of its merchants encouraging the merchants to save money by shifting volume to Discover.  Trial Tr. 836:6-16 (Hochschild/Discover).

64.     Discover also met with its largest merchants, offering discounts off its already lower prices if they would steer volume to Discover.  Trial Tr. 836:23-837:18, 839:17-20, 840:9-14 (Hochschild/Discover); PX1292 at -991 ██████████████████████████████████ ██████████████████ .  Discover believed that price reductions would generate greater transaction volume and therefore higher discount rate and interest revenues.  Trial Tr. 837:13-25, 845:3-15 (Hochschild/Discover); PX1293 at -876 ████████████████████████ ████████████████████████████████ .  Discover also believed that increasing its volume through merchant steering to its low-price network would enable it to remain attractive to third-party issuers.  Trial Tr. 859:14-860:15, 872:24-873:1 (Hochschild/Discover).

65.     Discover suggested that merchants use savings from steering to reduce their consumer prices and consequently increase consumer loyalty.  *See* PX1293 at -876.  Mr. Hochschild distinguished this approach from the "vicious circle" enabled by the higher-priced card networks like Amex, in which a network uses its higher discount fees to build consumer loyalty for the network instead of the merchant.  Trial Tr. 847:8-848:1 (Hochschild/Discover).

20

In that situation, the network is "taking the merchant's money and using it against it."  Trial Tr. 847:8-848:1 (Hochschild/Discover).

66.     Discover also suggested specific steps that merchants might take to encourage consumers to pay with Discover, including signs promoting Discover at the point of sale. PX1293 at -871 (███████████████████████████████████ ; Trial Tr. 843:16-20 (Hochschild/Discover).  Mr. Hochschild testified that point-of-sale signage "has always been viewed as key in the industry" because that is "when consumers are deciding which payment vehicle to use."  Trial Tr. 840:24-841:6 (Hochschild/Discover).

67.     Discover's efforts, however, failed to produce "any significant movement in share" because the ASRs deprived merchants of the tools needed to shift share.  Trial Tr. 848:15-849:7 (Hochschild/Discover); *see also* Trial Tr. 855:5-8 (Hochschild/Discover); PX0075 at -032 (████████████████████████████████████████████████████ ████████████ .  Although merchants regarded Discover as a "natural partner" to help them reduce their acceptance costs, "the limitations placed by the other networks didn't give them any effective strategies to shift share."  Trial Tr. 852:24-853:15 (Hochschild/Discover).

68.     This failure ultimately led Discover to abandon low-price strategies and increase merchant pricing.  Trial Tr. 853:23-854:15 (Hochschild/Discover); *see also* Trial Tr. 831:23-832:17 (Hochschild/Discover) ("lowering your price . . . does not drive incremental sales.").  As shown in the chart below, Discover described this change in how it set its discount rates as

███████████████████████████████████████████████████████

███████████████████

21

**Figure 1**



PX1285 at -474.

      69.     Discover concluded that "giving the retailers a discount without getting anything in return didn't make business sense" and "it was leaving money on the table."  Trial Tr. 854:7-15 (Hochschild/Discover).  Today, Discover prices similarly to Visa and MasterCard.  Trial Tr. 863:25-864:8 (Hochschild/Discover); *see also* PX1285 at -474  (depicting ███████████

███████████████████████████████████████

█████████████████████████████████).  As part

of "restructur[ing] [its] pricing to match the market," Discover also shifted away from its "very

straightforward bundled rate" to the more complicated pricing structure maintained by Visa and MasterCard.  Trial Tr. 855:5-8, 856:8-857:1, 857:22-25 (Hochschild/Discover); PX0075 at -030.

70.     Discover also abandoned Project Monet – a plan it had discussed with large merchants to offer them equity ownership in Discover or to create a new network where merchants could control card acceptance prices – because the merchants determined that the other networks' ASRs prevented them from promoting the new merchant-owned network.  Trial Tr. 838:21-839:11, 956:11-17 (Hochschild/Discover).

71.     Because the ASRs blocked Discover's attempt to gain share with low prices, "merchants are paying higher prices for the use of Discover cards and presum[ably] for the use of other credit and charge cards as well."  Trial Tr. 3840:10-23 (Katz).  In addition, customers – including those that do not use credit cards – are paying higher retail prices because merchants generally pass on their higher costs.  Trial Tr. 3840:10-23 (Katz).

72.     If the ASRs were removed, Discover would "aggressively pursue" reducing its prices and providing incentives for merchant steering.  Trial Tr. 872:3-10 (Hochschild/Discover).  Discover would work with merchants to test a variety of messages and promotions to shift share.  Trial Tr. 866:20-872:2 (Hochschild/Discover); *see also* PX2622; PX2623; PX2624; PX2625; PX2628; PX2630.[2]  Discover would work to implement such programs in a way that did not detract from the customer experience.  Trial Tr. 983:19-984:15 (Hochschild/Discover).  If not for the ASRs, Discover would return to offering merchants simple bundled prices if merchants expressed an interest in them.  Trial Tr. 858:11-16, 916:10-19 (Hochschild/Discover).

---

[2] PX2622, PX2623, PX2624, PX2625, PX2628, PX2630 are all demonstratives showing different promotional programs that Discover would consider implementing absent Amex's ASRs.

73.     Discover's plan to return to its low-priced strategy, if merchants could steer, is consistent with basic economic principles.  Trial Tr. 3841:13-23 (Katz); PX2702 at 18.  Because "the lack of steering reduces the gains from lower prices," Professor Katz concluded that "if we brought steering in as a possibility, that would increase [Discover's] incentives to lower prices." Trial Tr. 3841:24-3842:6 (Katz); PX2072 at 18.

74.     Discover created an internal task force and evaluated whether it could take advantage of Visa's and MasterCard's repeal of their ASRs as a result of their settlements in this case.  Trial Tr. 986:2-25 (Hochschild/Discover).  The task force considered whether meaningful opportunities existed to work with merchants that did not accept Amex cards.  When Discover found that all of its top 100 merchants remained bound by Amex's ASR and, therefore, could not steer volume to Discover, it discontinued its evaluation.  Trial Tr. 985:23-987:4 (Hochschild/Discover).

75.     Discover has found ways to compete in spite of being hindered by the ASRs.  In 1986, Discover had a "breakthrough value proposition" for cardholders which included the first cardholder rewards program in the industry, cash back on every transaction, and no annual fees. Trial Tr. 820:23-821:16 (Hochschild/Discover).  Mr. Hochschild testified that Discover continues to offer a good value proposition to both merchants and cardholders and that it can do this because it has one of the lowest levels of operating expenses in the industry.  Trial Tr. 821:17-822:9 (Hochschild/Discover).  Discover today offers cash back bonus rewards and other innovations to cardholders, such as printing a customer's FICO score on their statement every month.  Trial Tr. 828:24-829:13 (Hochschild/Discover).  Discover is also the only credit card network that offers "cash over purchase" functionality, allowing a Discover cardholder to avoid a trip to the ATM by receiving cash back from a merchant.  Trial Tr. 829:22-830:20

24

(Hochschild/Discover).  Cash over purchase is a "functionality of network primarily used in grocery stores, where if you are making a purchase with your Discover card, you can get 20 or $40 in cash over the amount of your purchase. . . ."  Trial Tr. 829:22-830:3 (Hochschild/Discover).   This benefits cardholders by saving them the ATM fee and benefits merchants by reducing their cost of handling cash and increasing customer loyalty.  Trial Tr. 829:4-20 (Hochschild/Discover).

76.     Discover's competitive strengths have been recognized.  A 2013 Amex summary of recent JD Power transactor scores showed that Discover cards are rated higher than Amex cards in many categories such as rewards, benefits and services, and problem resolution. PX2521 at -129.  An Amex executive even admits that Discover cards are "neck-and-neck" with Amex cards and Discover is "doing a pretty good job."  Trial Tr. 3760:18-3761:9 (Silverman/Amex); PX2521 at -129.

77.     At trial, Amex offered no evidence contradicting the evidence that Discover's lower price and simple pricing strategies were thwarted by the ASRs, or that the Amex ASRs continue to hinder Discover.

78.     Professor Bernheim did not dispute that the ASRs prevented Discover from competing for merchant business.  Trial Tr. 6596:16-24 (Bernheim).  Instead, he argued that Discover can compete against Amex in other ways, noting Discover still could incentivize its customers "by, for example, just giving them more cash rewards."  Trial Tr. 6482:21-6483:4 (Bernheim); DX7828 at 136.  He admitted that Discover had to abandon its low-price strategy, and Discover should undertake "after that point in time to compete through these other mechanisms."  *See* Trial Tr. at 6482:19-6483:24, 6596:25-6597:13 (Bernheim) (testifying that instead of "reducing merchant fees by twenty basis points, having the merchants pass that onto

the consumers, and having the consumer respond to that," Discover could have "incentivize[d] the very same customers directly, by, for example, just giving them more cash rewards").

### ii.     The ASRs blocked preference campaigns.

79.     Amex uses its ASRs to block other networks from running preference campaigns, promotional efforts where a merchant encourages customers to use another GPCC card by telling its customers that it prefers that card.  Amex thereby insulates itself from competitive pressure and adversely affects competition.  Trial Tr. 3845:15-18 (Katz).  Preference campaigns benefit merchants and, ultimately, their customers in at least two ways.  First, they help merchants steer to a less expensive payment method, thereby saving merchants money.  Trial Tr. 3844:1-14 (Katz).  Second, networks competing to secure a preference relationship offer financial incentives to merchants to select and promote them.  Trial Tr. 3844:4-14 (Katz).  Amex's response to preference campaigns such as Visa's "We Prefer" promotion illustrates how the ASRs interfere with this competition.

### a.     Amex used its ASRs to stop Visa's "We Prefer" campaign.

#### i.     *Visa's "We Prefer" campaign helped it shift share from Amex in the 1990s.*

80.     Visa's successful initiative to compete with Amex with its lower merchant pricing included its "We Prefer Visa" campaign.  As part of this competition, Visa educated merchants about its price advantage, created innovative ways of encouraging merchants to steer to Visa, and prompted merchants to pressure Amex to reduce its prices.  These efforts shifted share to Visa, enabling it to reap rewards from lowering prices

81.     Visa launched its "We Prefer" campaign in response to competitive pressure from the higher-priced Amex.  In the early 1990s, Amex expanded beyond its historical travel and

entertainment stronghold into Visa's "bread and butter" merchants, such as gas stations and fast food restaurants. Trial Tr. 3309:13-23; 3310:3-7; 3312:24-3313:6 (Morgan/Visa); PX0132 at -867. Visa, therefore, launched a merchant relations group to "do a better job of telling the Visa story to merchants" and endeavored to focus on "the key Amex vulnerability," that Amex's 3.25 percent average merchant discount rate was much higher Visa's 1.75 percent average rate. Trial Tr. 3317:15-3318:15 (Morgan/Visa); PX0132 at -879-880, -882.

82. Visa distributed materials to merchants containing a "Profit Improvement Calculator" that enabled each merchant to determine "how much additional profit [it] could get a year if [it] could transfer . . . sales from Amex to Visa." Trial Tr. 3318:16-3319:4, 3392:13-15 (Morgan/Visa); PX0082 at -543.

83. The Visa materials also included advice as to how merchants could "[i]mprove [their] profits by shifting sales volume from American Express to Visa." PX0082 at -544; Trial Tr. 3319:5-21 (Morgan/Visa). At the time, Amex itself was using point-of-sale materials with merchants to shift share. Trial Tr. 3308:2-25, 3320:13-21 (Morgan/Visa). Visa suggested that merchants "[i]nstall signage which favors your most profitable payment options." PX0082 at -544. It offered decals to merchants to use for this purpose and advised merchants to train their sales people to adopt "inoffensive, yet effective" steering messages to encourage Visa use, such as "Would you like to put this on your Visa?" PX0082 at -544; *see also* Trial Tr. 3382:12-25 (Morgan/Visa).

84. Merchants responded positively to these Visa materials, leading to competitive pressure on Amex. Trial Tr. 3320:22-24 (Morgan/Visa). For example, shortly after Visa distributed the materials, the owner of a Boston-area restaurant led a well-publicized protest against Amex's merchant discount fees, known as the "Boston Fee Party." Trial Tr. 3320:25-

27

3321:20 (Morgan/Visa).  Approximately one hundred Boston-area restaurants threatened to stop

accepting Amex cards unless Amex reduced its merchant discount fees.  *See* DX7315 at 1.

85.     The next phase of Visa's initiative consisted of a marketing program in which

merchants communicated "We Prefer Visa" to their customers.  It was rational for merchants to

prefer Visa because Visa was, at the time, significantly cheaper for the merchant than Amex.

The program began in Vail, Colorado, with shops displaying signs stating "Vail Prefers Visa."

Trial Tr. 3321:21-3323:6 (Morgan/Visa); PX0133 at -985.  Visa provided "signage and decals

and other pieces of promotion material to say 'We Prefer Visa.'"  Trial Tr. 3322:11-16

(Morgan/Visa).  Visa also "hoped that the merchants would train people at the point of sale to

specifically ask for a Visa card."  Trial Tr. 3322:11-16 (Morgan/Visa).  Visa focused specifically

on point-of-sale materials because its research showed that they best influence a consumer's

card-selection process.  Trial Tr. 3325:17-3326:3 (Morgan/Visa); *see also* Trial Tr. 3455:9-14

(Morgan/Visa) ("[W]hen a person pulled out their wallet and made the decision of which card to

pull out to give to the merchant, that's when you had the greatest impact.").  Professor Katz

characterized the "We prefer Visa" campaign as a form of competition on the merits that

benefited merchants by helping them steer to a lower-priced payment form.  Trial Tr. 3844:1-14

(Katz).

86.     Visa's "We Prefer" campaign resulted in a shift in volume from Amex to Visa

and demonstrated the effectiveness of preference campaigns in steering consumers to lower-cost

credit cards.  Trial Tr. 3843:5-9 (Katz); 4487:7-16, 4548:8-22 (Chenault/Amex); DX7595 at -637

("Visa Preference campaigns gaining traction – from mass media to point of purchase.  Proven

evidence of share shift from Amex to Visa.");  Trial Tr. 4972:19-22 (Hayes/Amex).  Visa

estimated that the "Vail Prefers Visa" campaign "showed a 25% - 45% shift from American

Express to Visa."  PX0133 at -986; Trial Tr. 3323:24-3325:9 (Morgan/Visa). *See also* DX7828-50 (Amex's share of credit card spend dropped from 24.7 percent to 19.2 percent).  After Visa expanded the "We Prefer Visa" program across the country, it observed "that point-of-sale signage expressing a preference for Visa typically yields Visa volume gains of 15 percent or more among T&E merchants."  PX0084 at -555; Trial Tr. 33217:18-3328:2, 3330:3-8 (Morgan/Visa).  Amex "certainly perceived" such competition to be problematic.  Trial Tr. 4498:14-4499:5 (Chenault/Amex); PX0163 at -029.

> ii.   *Instead of competing on the merits, Amex used its ASRs to stop Visa's "We Prefer" campaign.*

87.      It is undisputed that Amex used its ASRs to thwart Visa's "We Prefer" campaign.  *See* Trial Tr. 4490:13-4491:18 (Chenault/Amex).  Instead of responding competitively to the campaign, Amex chose to enforce its ASRs and prevent merchants from participating in the program.  Amex went so far as to terminate acceptance at some merchants that refused to comply.  Trial Tr. 4491:6-18, 4514:14-19 (Chenault/Amex)

88.      Amex initially considered multiple procompetitive responses to Visa's preference campaign.  In March 1992, Amex convened a group of executives for a "creative brainstorming" session to consider how Amex might persuade merchants not to engage in a Visa preference campaign.  Trial Tr. 4499:6-23 (Chenault/Amex); *see generally* PX0163.  The executives discussed a variety of potential responses, including: (1) creating an alternative marketing program emphasizing choice instead of preference; (2) negotiating long term contracts that incent key partners – through a lower discount rate and increased marketing dollars – not to participate in preference campaigns; (3) cutting discount rate to zero in any market where Visa pursued a  preference campaign; and (4) creating greater consumer insistence for Amex by

offering additional cardholder rewards.  PX0163 at -030, -032, -033, -035-36; Trial Tr. 4499:19-4504:20 (Chenault/Amex); *see* Trial Tr. 3843:10-15 (Katz) (noting Amex considered a price response to Visa's "We Prefer" campaign); PX2702 at 19.  Professor Katz considered these responses competition on the merits.  Trial Tr. 3843:16-19 (Katz).

89.     Amex also contemplated countering Visa by "leverag[ing] our most potent brand equities" and pursuing "investment, focus, and integration across all relevant Blue Box activities" to persuade merchants of the value of Amex acceptance.  DX7595 at -639-640.  Amex considered telling merchants about its "Customer (service) orientation and recognition are key brand equities -- in addition to the (differential) value of our [c]ardmember base," with the potential tag line, "We bring you a better customer, so you will make more money." DX7595 at -639.  Similarly, Amex considered "[w]e need to disrupt Visa's superior financial leverage by persuading [service establishments] (rationally and emotionally) that they will make more money -- and be seen to be more customer-oriented by allowing the customer to choose their preferred payment method."  DX7595 at -640.

90.     Amex, however, ultimately chose a different path – enforcing its ASRs to stop merchant participation in the "We Prefer" campaign.   Mr. Chenault testified that, in response to the "We Prefer" campaign, Amex "went back to merchants and said to them, live up to your contract," a contract which Amex asserted prohibited such campaigns.  Trial Tr. 4490:13-4491:18 (Chenault/Amex); *see also* Trial Tr. 4998:3-9 (Hayes) (acknowledging that the preference campaigns were stopped).

91.     Prior to Visa's "We Prefer" campaign, an Amex standard form contract prohibited merchants from "publish[ing] a preference for any other card."  DX6630 at -160; Trial Tr. 4634:20-4637:6 (Chenault/Amex); 3412:8-10 (Morgan/Visa).  No evidence at trial established

how many merchants had such a contract in force when the Visa preference campaign began in the early 1990s.   The evidence does show, however, that Visa's preference campaign caused Amex to strengthen its contract restrictions in 1992 and 1998.  *Compare* PX1389 at 189 (Amex's 1992 standard contract), 293 (Amex's 1998 standard form contract) *with* PX1389 at 155 (Amex's 1989 standard form contract containing much less restrictive ASR provisions).  Mr. Chenault admitted that the language of today's ASRs is in part a response to Visa's "We Prefer" campaign.  Trial Tr. 4492:16-4493:14, 4531:17-4532:11 (Chenault/Amex).  By January 1992, Amex had begun approaching T&E merchants with a new contract agreement which appears aimed at stopping the success of Visa's merchant relations efforts and also at limiting the ability of merchants to negotiate further discount rate reductions.  PX0084 at -555.  The new contracts prohibited merchants from "stat[ing] or impl[ing] a preference for any other card brand."  PX0084 at -556.

92.     Amex enforced merchant compliance with its prohibitions on preference campaigns.  Trial Tr. 4509:2-21 (Chenault/Amex); PX1103 at -396.  Amex merchant representatives instructed merchants running preference campaigns to abandon them.  Trial Tr. 4507:11-15, 4511:19-4512:16 (Chenault/Amex); PX1103 at -396-397.  If merchants did not, Amex representatives would punish them by taking away marketing funds.  Trial Tr. 4511:19-4512:16 (Chenault/Amex); PX1103 at -396, -405.

93.     In addition, merchants engaging in preference campaigns risked Amex termination, and Amex eventually cancelled certain merchants that failed to comply with its ASRs.  Trial Tr. 4491:6-18; 4514:14-19 (Chenault/Amex); *see also* Trial Tr. 3332:8-21 (Morgan/Visa) (Amex "booted out of the system" some merchants, "trying to teach a lesson or make an object lesson for other merchants").  For example, Amex terminated the Steamboat Ski

31

Area in Steamboat Springs, Colorado for its "Steamboat Prefers Visa" campaign.  PX0087 at
-131; Trial Tr. 3332:22-24, 3334:1-7 (Morgan/Visa).  Amex also terminated acceptance by
retailer Laura Ashley and a Toronto-area restaurant called La Bodega after those merchants
engaged in "We Prefer Visa" campaigns.  PX0087 at -131; Trial Tr. 3334:18-3335:24
(Morgan/Visa).

94.     Amex's actions against Visa worked:  Amex's top executives wrote to all Amex
employees that Amex had "thwarted a nationwide Visa marketing campaign in a number of key
markets."  PX0152, at -183; *see also* DX0319 at -005 (1996 speech by Ken Chenault stating that
Amex is "neutralizing Visa's efforts to get We Prefer Visa campaigns off the ground.  We
stopped a dozen such campaigns last year.").

95.     Professor Bernheim did not deny that enforcement of Amex's ASRs in response
to the "We Prefer Visa" campaigns eliminated Visa price competition.  In fact, he conceded that
"We Prefer Visa" campaigns "undermin[ed] the American express value proposition."  Trial Tr.
6421:5-6422:19 (Bernheim).

96.     Although Professor Bernheim did not regard the "We Prefer Visa" campaigns to
constitute "an expression of helpful competition," he saw no problems with Amex's own
preference agreements with merchants, such as those with Ticketmaster, Expedia, and Trial Tr.
6480:14-6481:20 (Bernheim) (condemning only a subset of preference campaigns); PX2766 at -
142 (Ticketmaster); PX0858 at -707 (Expedia).

### b.     Amex also enforced its ASRs against other networks.

97.     Nina Biornstad, MasterCard's Vice President for the travel and entertainment
industry, testified that merchant preference statements were successful.  Trial Tr. 3229:12-22
(Biornstad/MasterCard).  Consequently, MasterCard has paid more to a merchant that expresses

a "preference" for MasterCard than it has for other types of marketing.  Trial Tr. 3241:1-4 (Biornstad/MasterCard).

98.     Amex has enforced its ASRs to prevent MasterCard from engaging in preference campaigns.  In the early 2000s, MasterCard established a relationship with on-line travel agency Travelocity under which Travelocity communicated "Travelocity Prefers MasterCard" to its customers.  Trial Tr. 3244:18-3246:16 (Biornstad/MasterCard); 2891:22-2892:2 (Pojero); PX1324 at -615.  Amex responded with a letter from its chief litigation counsel to MasterCard's general counsel stating that "indicating a preference for MasterCard violates American Express's Card acceptance agreements."  Trial Tr. 2897:1-2899:10 (Pojero/Amex); PX0385.  The same letter "demand[s] that MasterCard immediately cease and desist all such advertising and activities."  Tr. 2897:1-2899:10 (Pojero/Amex); PX0385.  Several months later, Amex "issued a cancellation letter to Travelocity.com in response to its continuing breach of [Amex's] card services agreement via its use of 'preference' slogan/verbiage promoting MasterCard on its website."  PX1085 at -728; PX0466; Trial Tr. 2892:5-2896:25 (Pojero).  Even though Travelocity disagreed "with Amex's interpretation of the underlying American Express Card Acceptance Agreement," Travelocity responded by dropping "Travelocity Prefers MasterCard" Trial Tr. 2899:11-2900:24 (Pojero), 3246:17-3247:7, 3247:18-3248:1, 3251:1-3251:7 (Biornstad/MasterCard); PX0449 at -553-554; PX1324 at -615.

99.     MasterCard believes this change "diminish[ed] the value of MasterCard as Travelocity's preferred brand," a distinction for which MasterCard had provided Travelocity a "substantial financial incentive."  PX1324 at -615; Trial Tr. 3245:20-3246:5, 3247:8-17, 3250:2-3251:25 (Biornstad/MasterCard); PX1324 at -615.  When the promotional message was "Travelocity Prefers MasterCard," the message succeeded in shifting charge volume to

33

MasterCard from its competitors.  Trial Tr. 3246:6-8 (Biornstad/MasterCard). MasterCard ran television, radio, and print advertisements touting Travelocity's preference for MasterCard.  Trial Tr. 3248:17-3249:2 (Biornstad/MasterCard).  After Travelocity instead began referring to MasterCard as its official card, MasterCard observed less share movement, and MasterCard "basically stopped" its promotion of the relationship.  Trial Tr. 3248:18-3249:3 (Biornstad/MasterCard).  MasterCard then also reduced its financial compensation to Travelocity.  Trial Tr. 3296:22-3297:10 (Biornstad/MasterCard).

100.     Professor Katz analyzed MasterCard's testimony that there was less share shifting through its Travelocity partnership after Travelocity could no longer state a preference for it and concluded it shows that the ASRs adversely affect competition.  Trial Tr. 3844:15-3845:5 (Katz) (reviewing Trial Tr. 3248:17-3249:2, 3258:25-3259:13 (Biornstad/MasterCard); PX2702 at 20). He described the situation as "a lessening of competitive pressure."  Trial Tr. 3844:19-3845:5 (Katz).

101.     Amex's ASRs also impeded other promotional relationships MasterCard sought to establish with merchants.  For instance, in early 2004, MasterCard negotiated with Orbitz over a promotional deal under which MasterCard would provide financial incentives for Orbitz to express a preference for using MasterCard.  Trial Tr. 3254:23-3255:11 (Biornstad/MasterCard). After Orbitz indicated its unwillingness to express its preference for MasterCard because of Amex's ASRs, MasterCard cut its proposed promotional funding to Orbitz in half.  PX1928 at -042 ("[W]e've had to change the terms significantly due to Amex.  The funding is cut in half . . . ."), -043 ("During our contract negotiations with Orbitz we were informed that they could no longer fulfill our contractual obligation for Preferencing."); Trial Tr. 3255:21-3257:18 (Biornstad/MasterCard).

34

102.     In addition, Chelsea Piers had a "We Prefer MasterCard" logo on the part of its website where it identified forms of payment it accepted.  Trial Tr. 2901:1-14, 2903:18-2904:4 (Pojero/Amex); PX0425 at -698.  An Amex account manager reported this "violation of [its] Card Acceptance Agreement" to the director of the contracts team.  Trial Tr. 2903:18-2904:4 (Pojero/Amex); PX0425 at -698.  Chelsea Piers then removed the preference language from its website and its print communications.  Trial Tr. 2904:8-14 (Pojero/Amex); PX0425 at -698.

103.     MasterCard remains interested in entering preference relationships with merchants, but its experiences with Travelocity and Orbitz have dissuaded it from making similar proposals to other merchants.  Trial Tr. 3257:19-3259:1:24 (Biornstad/MasterCard).  If Amex's ASRs did not block merchants from expressing a preference for MasterCard, MasterCard would once again seek to establish preference relationships with merchants and would allocate funds to entice merchants to do so.  Trial Tr. 3259:1-3259:14; 3298:5-11 (Biornstad/MasterCard).  MasterCard's statement that it would engage in preference campaigns in the future, if allowed, is consistent with economic principles.  Trial Tr. 3845:6-14 (Katz).

104.     Amex used its ASRs to prevent preference campaigns not only with MasterCard and Visa, but also with Discover.  Amex stopped Chicago's Ravinia Music Festival from expressing a preference for Discover.  Trial Tr. 2906:3-2908:15 (Pojero/Amex); PX0458.  Ravinia Music Festival's advertising featured the Discover logo along with "Preferred Card of Ravinia."  Trial Tr. 2907:8-13 (Pojero/Amex); PX0458 at -428.  After an Amex client manager told a Ravinia representative that this advertising violated Ravinia's contract with Amex, Ravinia removed the preference language from its advertising.  Trial Tr. 2907:14-2908:15 (Pojero/Amex); PRX0458 at -428.

35

105.    Amex also blocked merchants, such as KSL Resorts, Liberty Travel, Regal Cinemas, Zagat Online, Sam's Wine & Spirits, Lettuce Entertain You, and CheapTickets.com, from engaging in preference campaigns with other networks.  PX0969 at -268; Trial Tr. 4822:9-4828:20 (Glenn/Amex); Trial Tr. 2908:2-15, 2909:13-2911:5 (Pojero/Amex); PX0458 at -427; PX0487 at -828; PX1077 at -473; PX0295; PX0486.

106.    Professor Bernheim provided no testimony contesting Professor Katz's and Ms. Biornstad's testimony regarding the effect of American Express's ASRs on MasterCard's preference campaigns.

107.    Amex did not offer any evidence refuting that its ASRs blocked competition that arises from preference campaigns.

108.    Amex argues that Visa used the threat of increased prices to force merchants to participate in its "We Prefer Visa" campaign.  Amex Pre-Trial Mem., ECF #514 at 89.  But Brad Morgan, who was involved in the launch of the "We Prefer Visa" campaign at Visa, testified that Visa did not employ such tactics during his tenure.  Trial Tr. 3321:21-3322:10, 3388:17-3391:3, 3454:1-8 (Morgan/Visa); *see also* Trial Tr. 3326:9-14 (Morgan/Visa) (testifying that Visa did not offer financial incentives to merchants to participate in campaign).

109.    Amex also claimed that preference campaigns confused customers into thinking that Amex was not accepted.  Amex Pre-Trial Mem., ECF #514 at 39-40.  But Amex (1) failed to explain how that view comports with the plain English meaning of the word "prefer"; (2) offered no evidence on this subject that is recent enough to reflect Amex's wide acceptance in the current market; and (3) failed to explain why it is necessary to outlaw all preference programs rather than merely enforcing its rules requiring display of its logos as a sign of acceptance (which is not at issue in this litigation).

36

### iii. Amex's ASRs enable it to increase prices through value recapture.

110. Amex's value recapture, a "set of pricing initiatives by [Amex] where it raised its prices to targeted merchant segments," constitutes another actual adverse effect of Amex's ASRs. Trial Tr. 3845:19-25 (Katz). These price increases were not offset by changes on the cardholders' side of the two-sided platform. Trial Tr. 3853:3-24, 3985:3-24 (Katz). Amex's analysis of its value recapture price increases indicates that the ASRs blocked an avenue of competition that would have moderated certain price increases. Trial Tr. 3846:1-15, 3850:8-17 (Katz).

111. The difference in Amex's analysis of the profitability of its price increases at managed merchants and unmanaged merchants (small merchants where Amex struggles "to see what's going on" regarding their compliance with the ASRs) highlights how the ASRs reduce competition. Trial Tr. 3847:1-3850:17 (Katz); PX1753A at -033; PX1099 at -555; PX2072 at 22.

112. For unmanaged merchants, Amex's profitability analysis identified two potential merchant reactions that would render its price increase unprofitable. Trial Tr. 3847:8-3849:9 (Katz). Amex considered that, in response to the value recapture price increase, some merchants would stop accepting Amex and some merchants would suppress – steer away from – Amex in violation of the ASRs. Trial Tr. 3847:8-3849:9 (Katz); PX1753A at -033; PX2702 at 22. This analysis reflects Amex's understanding that merchant steering, if permitted, would constrain its ability to increase its prices profitably. *See* Trial Tr. 3846:1-15, 3847:8-3849:9 (Katz); PX1753A at -033; PX2702 at 22. Amex estimated that the amount of steering that occurred among its small, unmanaged merchants (in violation of the ASRs) likely would not come "close to" making

its value recapture price increases unprofitable.  Trial Tr. 3847:8-3849:9 (Katz); PX1753A at -033; PX2702 at 22.

113.    In contrast, for larger, managed merchants whose compliance with the ASRs Amex could monitor more closely, Amex did not believe the threat of steering would diminish the profits it expected to earn through its price increases.  Amex's profitability analyses instead considered only whether a merchant would cancel acceptance altogether.  Trial Tr. 3849:10-3850:17 (Katz); PX1099 at -555; PX2072 at 23.  This difference reflects Amex's understanding that the ASRs prevent steering among its managed merchants so effectively that Amex need not consider losses in transaction volume due to steering in evaluating the anticipated profitability of a price increase.

114.    Merchant testimony confirms that, if not for the ASRs, Amex's large, managed merchants would steer customers away from Amex in response to a price increase.  For example, Southwest testified that, if it had had a chance to steer in response to Amex's price increase, it would have tried to use steering to "mitigate [Amex's] price hike."  Trial Tr. 3851:1-9 (Katz); PX2702 at 2.  *See also* Trial Tr. 580:25-582:6 (Bouchard/Sears).

115.    Professor Bernheim did not dispute Professor Katz's opinion that the ASRs had the anticompetitive effect of making it easier for Amex to increase prices through value recapture without fear of those merchants steering customers to less-expensive payment options.  Professor Bernheim argued that "[c]ompanies adjust fees up and down all the time[,] [t]hat doesn't mean that they are acting in an anti-competitive way," Trial Tr. 6481:21-6482:12 (Bernheim).  In doing so, Professor Bernheim failed to account for evidence that these prices rose without regard to increases in Amex's costs or improvements to Amex's services to those merchants.  Professor Bernheim also failed to explain why this Court should disregard the merchant witnesses who

38

testified that they would steer customers away from using Amex cards to try to blunt the effect of Amex price increases.

### iv. Amex's ASRs prevent innovative steering strategies.

116. Merchants testified that, for credit card sales, Amex's ASRs prevent them from using technology they developed to lower their payment costs.  This testimony shows that the ASRs harm competition.

117. Some merchants have, or are developing technology to provide their customers with immediate discounts at the point of sale for using a less-expensive credit card.  For example, Sinclair Oil currently uses technology to steer customers to its proprietary charge and ACH cards.  Trial Tr. 3158:4-14 (Gibson/Sinclair).  Sinclair-branded gas stations post marketing materials at their point-of-sale electronic terminals informing customers that a discount, or "rollback," will automatically be applied if they pay with a Sinclair proprietary card.  Trial Tr. 3158:21-3160:11 (Gibson/Sinclair).  Russell Gibson, manager of marketing technical services for Sinclair Oil Corporation, testified that when a customer swipes a Sinclair proprietary card, the point-of-sale device identifies the card type by its BIN number (the first six or seven digits of an individual's credit card number) and recognizes it as a card type that is eligible for a discount.  Trial Tr. 3159:18-3160:14 (Gibson/Sinclair).  The dispenser then automatically "rolls back" to a lower price per gallon, usually five to ten cents lower, and the customer immediately saves money.  Trial Tr. 3159:18-3160:11 (Gibson/Sinclair).

118. Gibson testified that the point-of-sale device that recognizes card types and initiates the "roll back" can accommodate additional card types.  Trial Tr. 3161:5-7 (Gibson/Sinclair).  But Amex's ASRs prohibit Sinclair-branded stations from using the technology to offer rollbacks to users of particular GPCC cards.  *See* Trial Tr. 3157:12-3158:14

(Gibson/Sinclair); PX1341 at -002.  If Amex's rule prohibiting steering to other credit cards did

not exist, Sinclair would consider various ways to steer, including offering a "rollback" for

payment with a particular credit card brand, resulting in users of the promoted cards immediately

saving money at the pump.  Trial Tr. 3161:12-18, 3165:3-8 (Gibson/Sinclair).

119.    Sinclair Oil also is developing a mobile commerce application for use at its

branded stations.  Trial Tr. 3166:13-3168:1 (Gibson/Sinclair).  The application facilitates easy

payment with Sinclair's proprietary card.  Trial Tr. 3169:19-3170:13 (Gibson/Sinclair).  Sinclair

has plans to incentivize customers to pay using their proprietary card stored on the mobile app,

for example, by offering them a five or ten cent price "roll back" at participating stations. Trial

Tr. 3170:14-3171:4 (Gibson/Sinclair).  Eventually Sinclair's application will allow customers to

use their mobile phones to pay with other payment forms, including general purpose credit cards.

Trial Tr. 3169:19-3170:13 (Gibson/Sinclair).  Mr. Gibson testified that, if Amex's ASRs did not

exist, Sinclair would consider offering incentives or engaging in other forms of steering among

general purpose credit cards on the mobile commerce application.  Trial Tr. 3171:5-9

(Gibson/Sinclair).

120.    Another merchant, ████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████



121. 

122. 

123.    Forty merchants have joined together to create the Merchant Customer Exchange ("MCX").  Trial Tr. 2433:6-18 (Priebe/Southwest).  These merchants envision offering a platform that will allow customers to purchase products or services through mobile phones, but with lower-cost credit and debit options.  Trial Tr. 2433:12-2435:4 (Priebe/Southwest).  Mr.

Priebe, a board member of MCX, testified that this joint, innovative effort has struggled, however, "figur[ing] out how we're going to move forward" given Amex's ASRs.  Trial Tr. 2433:25-2434:7, 2436:1-20 (Priebe/Southwest).  Those ASRs preclude the merchants from "comparing and contrasting" for consumers the benefit of using MCX versus Amex's, MasterCard's and Visa's plastic credit cards.   Trial Tr. 2436:1-20, 2505:5-13 (Priebe/Southwest).

124.    Professor Bernheim acknowledged that "American Express is not alone in its ability to innovate," in the credit card industry, Trial Tr. 6580:14-22 (Bernheim), but did not contest the testimony of Messrs. Gibson and Mitchell, or of any other witnesses, that innovation in the payments industry has been adversely affected by Amex's ASRs.

125.    Professors Bernheim and Gilbert argue that there has been some innovation in the credit card industry despite the presence of the ASRs, Trial Tr. 6580:14-6581:20 (Bernheim); 5113:16-5114:25 (Gilbert), but neither of Amex's testifying experts deny that innovation, whether driven by merchants (*e.g.* Official Payments' transaction analysis technology) or card networks (*e.g.*, Discover's low-price strategy) has been adversely affected by Amex's ASRs.

### v.    Large merchants will lead the way in steering.

126.    Amex argues that merchants will not steer and there will be no benefit if the government prevails because the very small merchants that do not take Amex have not steered in the three years since the consent decree was approved.  Trial Tr. 169:19-170:12 (Amex's opening statement).

127.    For the millions of merchants that accept Amex, the changes to Visa's and MasterCard's rules have no effect because of Amex's ASRs.  Judge Gleeson called this the "American Express problem."  *See In re Payment Card Interchange Fee & Merchant Discount*

42

*Antitrust Litig.*, No. 05-MD-1720, 2013 WL 6510737, at *20 (E.D.N.Y. Dec. 13, 2013) (internal quotation marks omitted).

128.     Discover thought that the Visa and MasterCard settlements presented an opportunity to lower its discount rates and gain market share through steering.  Discover created an internal task force and evaluated whether it could take advantage of Visa's and MasterCard's repeal of their ASRs.  *See* Trial Tr. 986:10-25 (Hochschild/Discover).

129.     Discover logically then approached the largest merchants, where the largest amount of volume is available.  *See* Trial Tr. 986:10-25 (Hochschild/Discover).  When Discover found that all of its top 100 merchants accepted Amex and, therefore, could not meaningfully steer, it discontinued its evaluation.  *See* Trial Tr. 985:23-987:4 (Hochschild/Discover)].  Thus, any absence of steering after the Visa and MasterCard settlements shows the need for relief here, and not the opposite, as Amex argues.

130.     Amex's claim that no steering occured after the Visa/MasterCard settlement ignores not only Discover's efforts, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

131.     Other merchants testified that they steer today when permitted by Amex's ASRs, *see* ¶¶ 206-214, and want to steer more once the ASRs are eliminated.  *See* ¶¶ 215-50.  Alaska Airlines' even told Amex about the discounts it would like to provide to corporate accounts if

those accounts had their employees pay with less expensive corporate cards.  Amex strongly

rebuffed this proposal.  *See* ¶¶ 231-33.

132.    It is not surprising that steering has not taken off generally among non-Amex

merchants.  First, non-Amex accepting merchants are usually very small, often half the size of

the corner florist.  *See* PX0890 at -353-354; Trial Tr. 5814:10-14 (Gilligan/Amex).  In Australia,

when surcharge steering was allowed, it was the large merchants who "led the way."  Trial Tr.

5813:5-23 (Gilligan/Amex); PX1126 at -629.

133.    Australian surcharging data showed that year after year very small merchants

were the least likely to take advantage of their ability to surcharge.  Trial Tr. 5813:5-23

(Gilligan/Amex); PX1126 at -629.  Mr. Gilligan explained that it is hard to observe very small

merchant steering even when it occurs.  While it is "clear when a large merchant" surcharges,

"it's not clear to me how we find out how very small merchants surcharge."  Trial Tr. 5814:15-

5815:3 (Gilligan/Amex).  He continued that observing "what small merchants are doing is an

inexact science."  Trial Tr. 5814:15-5815:3 (Gilligan/Amex).

134.    Moreover, it took four years after surcharging was permitted before "merchants

beg[a]n to react to surcharge option" in Australia.  PX1126 at -632; Trial Tr. 5812:23-5813:4

(Gilligan/Amex); PX1239 at -949 (surcharging permitted in 2003, but Amex did not witness

"[s]ignificant increases in merchant adoption" until 2007, and credit card networks did not start

to use "pricing and marketing concessions" to reduce surcharging until 2007-2009).

135.    The Visa and MasterCard injunctions became effective on July 20, 2011.  Given

the "inexact science" for observing the behavior of small merchants, Trial Tr. 5814:5-5815:3

(Gilligan/Amex), Australian evidence that large merchants were needed to "lead the way," Trial

Tr. 5813:2-23, 5814:6-9 (Gilligan/Amex), and the lag time inherent in adapting to new

conditions, *see* Trial Tr. 2946:3-2947:3 (Pojero/Amex) (stating that Amex's coverage is lagging behind the pace of market expansion); Trial Tr. 4976:8-4977:19 (Hayes/Amex) (explaining that it has taken more than ten years for Amex to "reinvent" itself because it "has to take time to develop new businesses"), it is not surprising very small merchants have not steered between Visa, MasterCard, and Discover.

### D. Pass through does not cure the ASRs anticompetitive effects.

136. Amex cardholder rewards do not compensate for its higher prices due to the ASRs. Since the ASRs make merchants less able to respond to price increases, a credit card network will not pass through one hundred percent of its price increases to cardholders. Trial Tr. 3853:25-3854:17 (Katz); *see also* Trial Tr. 4039:16-4040:4 (Katz). Illustrating that Amex does not fully pass through its rate increases, in June 2013, Amex's Chief Financial Officer told investors that Amex "drop[s]" part of its premium "to the bottom line." PX1475 at 2; Trial Tr. 3853:3-24 (Katz); PX2702 at 26. Amex's Chief Financial officer admitted that Amex is "able to get a premium pric[e] with merchants" and "take[s] that premium pricing, and part of it we drop to the bottom line, but part of it we invest in better value propositions for" cardholders. PX1475 at 2. In addition, Professor Katz testified that Amex's rewards payments account for significantly less than half of its merchant discount rates. Trial Tr. 3853:3-24 (Katz).

137. Even if Amex passed through all of the higher prices caused by the ASRs to Amex cardholders, merchants and their customers would still be harmed because the ASRs raise merchants' costs. As a result, "what's going to happen is prices are going to go up with the merchant for everybody, including people who are not using American Express cards, and those customers are going to be worse off." Trial Tr. 3854:18-3855:25 (Katz).

### E.   Vigorous issuer competition cannot compensate for diminished network competition.

138.   Competition among issuers for cardholder business or co-brand relationships, regardless of how intense, cannot make up for anticompetitive restrictions on network competition for merchants.  Amex acknowledged that "we're in three businesses: we're an issuing bank, we're a merchant acquirer, and we're a network."  Trial Tr. 3791:4-15 (Silverman/Amex); *see* Trial Tr. 1069:18-1070:10 (Quagliata/Amex); PX0357 at -938.  Amex focused at trial on how it competes for cardholders and co-brand relationships.  But this competition relates to its issuing business, not to the network business primarily at issue in this case.

139.   Issuing banks, such as Chase and Amex, compete among themselves to gain cardholders, while networks, such as Visa, MasterCard, and Amex, provide the infrastructure connecting issuers and cardholders on one side of a transaction with merchants on the other.  *See* Trial Tr. 3107:9-17 (Pojero/Amex).  For a merchant, the network acts as a gatekeeper to the insistent cardholders that issuers have attracted.  *See* Trial Tr. 6651:23-6652:13 (Katz).

140.   Issuer competition for cardholders includes competition to win co-brand relationships with merchants.  Trial Tr. 6415:11-22 (Bernheim), 5420:20-5421:9 (Codispoti/Amex).  Even though issuers compete vigorously, diminished network competition for merchants matters because prices, profits, and consumer welfare depend on what is happening on both sides of the two-sided platform.  Trial Tr. 4260:21-4261:5 (Katz).  Amex executives recognized that issuer competition to win cardholders differs from network competition for merchants.  Mr. Silverman, head of Amex's issuing business, explained that Visa and MasterCard "compete to win cardmembers" but "what they don't compete on is discount

rate at the merchant." Trial Tr. 3751:17-3752:9 (Silverman/Amex). Mr. Silverman admitted

that, "fierce" competition on the issuing side alone is not a substitute for competition on the

merchant side. "Having competition on the issuing side alone without the closed loop is not a

powerful competition and will not move the market forward in any way." Trial Tr. 3543:10-15,

3754:20-3755:2 (Silverman/Amex).

141.    Amex views its co-brand relationships as distinct from its role in network

activities. Payments that Amex makes to merchants as part of co-brand deals are "payments for

card issuance" and have nothing to do with merchant acceptance. Trial Tr. 4252:11-18 (Katz).

It is "best practice" at Amex for co-brand relationships to be kept independent from its card

acceptance agreements. Trial Tr. 2713:21-24, 2716:23-2717:18 (Funda/Amex); 4833:7-4834:11

(Glenn/Amex); PX0999 at -041 ("An issuer co-brand relationship is independent from the Card

acceptance relationship and needs to support its own value proposition."). Mr. Funda explained

that "[t]he point is we shouldn't cross-subsidize. Both [the co-brand and acceptance] deals

should stand on their own legs." Trial Tr. 2717:13-18 (Funda/Amex).

142.    Delta's negotiations with Amex over its co-brand and acceptance agreements

illustrate the significant differences in the competitive pressures Amex faces in each area. Delta

recognizes that its negotiating position with Amex differs significantly depending on whether it

is negotiating a co-brand or card acceptance agreement. Trial Tr. 5385:3-7 (Miller/Delta). In its

2008 negotiations, Delta received concessions from Amex during the co-brand discussions by

threatening to choose a different co-brand partner. Trial Tr. 5385:8-12 (Miller/Delta). Delta

benefited "tremendously" from issuers competing to be its co-brand partner, with Amex

improving its bid because of a competing bid. Trial Tr. 5385:25-5386:7, 5387:22-24

(Miller/Delta). Delta, however, does not receive competing bids when negotiating credit card

47

acceptance and has failed to get concessions from Amex on its acceptance agreement.  Trial Tr. 5385:8-15, 5387:25-5388:2 (Miller/Delta).  If more network competition existed, Delta might be able to negotiate a lower merchant discount rate.  Trial Tr. 5385:16-19 (Miller/Delta).

## II.    STEERING IS PROCOMPETITIVE.

143.    The evidence at trial showed that steering is an everyday part of business. Merchants testified that in many parts of their businesses, steering is an important tool to control costs and reward favored vendors.  Amex knows how effective steering can be; it steers today in its travel business to reward vendors that give Amex good prices and to encourage vendors whose prices are higher to be more competitive.  Amex also partners with merchants to steer customers towards Amex, using methods that go right up to, and sometimes over the lines it sets for merchants in its ASRs.

144.    Plaintiffs presented evidence from a range of merchants who testified knowledgably and credibly about how they work to control costs today, how Amex's ASRs prevent them from using the basic tool of steering to control credit card costs, the myriad of ways they would consider steering if unshackled from Amex rules, and how they could do so and still provide a positive consumer experiences to all customers, whether Amex cardholders or not.

### A.    Amex steers.

145.    In areas of its business in which Amex purchases services from competing suppliers, Amex recognizes the critical link between low prices and more sales.  Amex fosters competition by steering between its preferred suppliers and nonpreferred suppliers in its travel agency business.  Trial Tr. 3496:11-24 (Corbett/Amex).  Amex believes there is nothing wrong with shifting share between preferred and nonpreferred travel suppliers.  Trial Tr. 3492:17-3493:12 (Corbett/Amex).  Amex has also encouraged its card-accepting merchants to steer

customers to Amex, using practices that Amex would prohibit under its ASRs if the beneficiary were another card network.

        **i.**      **Amex benefits from steering.**

146.    Amex operates one of the largest business travel agencies in the United States. Trial Tr. 3460:7-10 (Corbett/Amex); 5313:10-14 (Miller/Delta Airlines).

147.    Amex's business travel agency is akin to a merchant, in that it sells services to travelers from travel suppliers such as airlines, hotels, and rental car companies. Trial Tr. 3460:11-22, 3461:24-3462:17 (Corbett/Amex).

148.    Amex promotes those suppliers that it has selected as "preferred" and that offer Amex the best deal and whom Amex selects as "preferred." See, e.g., PX1823 at -534 ("We have come to a good agreement with Hertz and need to make them Preferred again - hopefully today."); *see also* Trial Tr. 3472:4-11, 3473:2-5 (Corbett/Amex). Amex's promotion of its preferred hotels or airlines over other hotels or airlines increases usage of the preferred suppliers. Trial Tr. 3467:2-3468:1 (Corbett/Amex) (Amex does what it "can to shift share to those [preferred] suppliers as opposed to nonpreferred suppliers."). As a result, Amex's preferred suppliers "gain more business" than nonpreferred suppliers. Trial Tr. 3461:10-23 (Corbett/Amex).

149.    Amex can shift share by simply listing the preferred airline or hotel first in search results on its website. Trial Tr. 5389:18-5390:5 (Miller/Delta Airlines).

150.    Amex not only promotes its preferred suppliers, it actively sells away from suppliers that it does not prefer. PX1685 at -686 ("Our second principle is that we try to sell and promote only preferred suppliers, and we actively sell away from nonpreferred suppliers."); *see also* PX1824A at -902 (". . . Hilton is not preferred in the US (neither Hilton Corp or Hilton

International). . . . we wanted to make sure the travel counselors knew they shouldn't be selling Hilton. . . . [Hilton, British Airways, and Alamo/National Car Rental] are all nonpreferred partners that we are trying to sell away from.").

151.     This steering between preferred and nonpreferred vendors gives airlines, hotels, and car rental companies incentives to be preferred by Amex.  *See* PX1685 at -686 (recognizing that "what keeps our preferreds coming back to us is their fear of how aggressive we actually are against nonpreferreds (for example, [British Airways]"); Trial Tr. 3480:4-11 (Corbett/Amex). Delta recognizes that Amex "can move a lot of share away from Delta to Delta's competitors" simply "by preferencing Delta's competitors over Delta" and that can make "a big difference in revenues for a company like Delta."  Trial Tr. 5389:13-5390:5 (Miller/Delta Airlines); *see also* PX0094 at -059 (estimating that Amex could move 12% of Delta's business (or approximately ▮▮▮▮▮▮▮▮) "utilizing our normal tools").

152.     Travel providers pay Amex for preferred status, effectively reducing the prices Amex pays hotels and airlines for rooms and flights.  PX1685 at -685 ("[The Business Development Agreement fee] is the price of entry for any supplier who wants to become a preferred vendor and list their products within our network."); Trial Tr. 3468:4-15, 3478:7-14 (Corbett/Amex); *see also* PX1685 at -685 (Hilton was a nonpreferred supplier in 2003 because it refused to pay Amex's fee).

153.     When Northwest Airlines tried to raise fees to Amex, Amex withheld its promotion of Northwest (*i.e.*, "unpreferred" it) and forced Northwest to rescind the price increase.  In 2004, Northwest raised its booking fees.  *See* PX1678 at -060-061; PX0064 at -114. In response, Amex took "corrective action to overturn" Northwest's price hike, which included

███████████████████████████████   PX1678 at -061; *see also* PX0064 at -114 (Amex "un-preferenced NWA globally at POS" and "organized boycott by 50% of accounts with NWA activity").  Amex's response caused Northwest to lose 10-16 percent of bookings from Amex in one week.  PX0064 at -114; *see also* PX1678 at -060.  Northwest soon rescinded the fee increase.  PX1678 at -060.

154.    When British Airways decided not to accept Amex and other credit cards for corporate fares, Amex instituted "Project Patriot."  The project's "objectives" were to push British Airways to resume acceptance of Amex for its corporate billings, "stop other carriers from pursuing the same action", and "demonstrate to BA and the industry that AmEx has the ability and commitment to move business to preferred suppliers."  PX1007 at -941.  "To achieve these objectives, Travel has implemented an aggressive share-shift programme that will significantly reduce BA travel sales-volumes with AmEx worldwide."  PX1007 at -941.  This aggressive share-shift program included signing Virgin Atlantic to a plan that discounted its fares.  PX1007 at -947.  Amex successfully moved business away from British Airways.  *See* PX1007 at -942. ("From 1st June to 11th November [Amex] reduced BA's air sales volume with AmEx by ███████████", including shifting ██████ in US Corporate sales and ██████ in US consumer sales).

### ii.    Merchants steer to Amex.

155.    Amex has done what its ASRs prevent other networks from doing - entered into agreements with merchants to steer, promote and prefer Amex.

156.    Amex has agreed with a number of merchants such as Ticketmaster, Expedia, Universal Studios, and Radio City Music Hall to have them steer to Amex.  *See* PX0355 at -411; PX2766 at -142; PX0858 at -707; PX0150 at -036; PX2602 at -943.

51

157.    In the early 1990s, Amex paid Ticketmaster to tell callers that Amex was its preferred card.  PX2766 at -142.  Amex and Ticketmaster currently have a contract requiring that, when orders are taken by phone, Ticketmaster will say: "Our card of choice is American Express.  Would you like to use your American Express card today?"  PX0355 at -411.

158.    In return for sponsoring certain Radio City Music Hall performances, Amex required  Radio City Music Hall to communicate to customers "Radio City Welcomes the American Express Card" and to designate one box office window exclusively for American Express card purchases during peak sales periods.  PX0150 at -036.

159.    Amex contracted to be the "Official Payment Services Provider" for Universal Studios Theme Park.  PX2602 at -938.  Amex required hotels associated with the theme park to ask customers "if they would like to use their American Express Card when completing a purchase or making a reservation."  PX2602 at -944-945; Trial Tr. 4557:4-4558:17.  The agreement also required Universal to offer discounts to Amex cardholders at its parks.  Trial Tr. 4569:4-17 (Chenault/Amex).  Amex's contract with Universal also provides that Universal will discount certain food, non-alcoholic beverages, and merchandise purchases made using an Amex card.  Trial Tr. 4569:4-17, 4571:10-4572:4 (Chenault/Amex); PX2602 at -950; PX2552.

160.    Amex also contractually requires that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮  See, e.g., DX3027 at -452, -520 (▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); DX1269 at -310 (▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).



Finally, Amex has prepared to steer customers to a merchants' competitors if the merchant stops accepting Amex.  *See* ¶ 493.

**B.  A broad cross-section of merchants testified about the ASR's real-world impact.**

161.    Plaintiffs offered testimony from 15 merchant witnesses at trial: Denis Bouchard (Sears); Scott Brennan (formerly Hilton); Frank Bruno (Crate & Barrel); Jennifer Dale (Sprint/Nextel); Russell Gibson (Sinclair); Peter Haslam (Office Depot); Steven Holtey (Solitude Ski Resort); Dwaine Kimmet (Home Depot); Benjamin Mitchell (Official Payments); Diedre O'Malley (Best Buy); Chris Priebe (Southwest Airlines); Jeff Rein (formerly Walgreens); John Robinson (IKEA); George Satkowski (Enterprise); and Kevin Thiel (Alaska Airlines).  These witnesses represented a wide swath of the market.  Some are large and some are small; some are retailers and some are airlines; some focus on brick-and-mortar locations and some focus on internet sales.

162.    While their testimony was unique to each of their businesses, it was consistent in its broad themes.  As discussed below, each testified that they had to accept Amex cards, that debit cards were not substitutes for credit cards, that Amex raised their fees without extra benefits or services, and that they would like Amex to remove its ASRs so that they could steer to the lowest-cost credit card network.  The representativeness of these merchants' testimony was confirmed by Amex's own internal surveys, which found that while Amex is over-priced for the value they provide, merchants cannot stop accepting Amex cards.

163.    In contrast, Amex called four merchant witnesses to testify in its case:  Scott Miller (Delta); David Flueck (Starwood Hotels); Nelson Gutierrez (Strictly Bicycles); and Michael Landau (Drybar).  Each of those merchants confirmed the testimony of Plaintiffs' 15

53

merchants and the Amex merchant surveys.  See, e.g., Trial Tr. at 5297:19-5298:5, 5300:8-

5301:5, 5303:17-21 (Gutierrez/Strictly Bicycles) (telling Amex counsel "I would not drop

[Amex], no."); Trial Tr. 5908:2-18 (Flueck/Starwood Hotels).  For example, Mr. Flueck of

Starwood testified:

> Q   Do you think -- can you imagine any scenario in which Starwood would
> choose not to accept American Express?
>
> A   No, I cannot imagine any scenario.

Trial Tr. 5898:4-6 (Flueck/Starwood Hotels).

164.    That Amex's merchant witnesses did not testify in support of its ASRs is

noteworthy since they all had a reason to favor Amex.  Delta and Starwood have co-brand

relationships with American Express.  These co-brand relationships mean that Delta and

Starwood (as well as the other five co-brand partners) have a closer financial relationship with

Amex than any other merchant in America.  Trial Tr. 5565:14-5566:11 (Codispoti/Amex) (only

seven merchants in the United States are co-brand partners with Amex); 5868:23-5869:16

(Flueck/Starwood Hotels) (co-brand partners, such as Starwood, receive "strong financial

benefits" from Amex); 5377:3-20 (one of the significant benefits that Delta receives from the

Amex relationship is the money derived from the use of the co-brand).  Since co-brand

relationships mean that the merchants share in the issuing costs and benefits, those merchants

also share in the benefits of the ASRs in much the same way that Amex does.  Basically, █████

████████████████████████████████████████████████████████████████████████████

██████   See, e.g., DX3027; DX4335.  The co-brand partners' incentives are aligned with

Amex's – if spend on Amex cards goes down because merchants are steering away from the high

cost Amex cards to a low-cost competitor, Delta and Starwood would receive less compensation

from Amex.  Thus, they share with Amex an interest in preventing merchants from steering consumers away from Amex cards to credit cards that have lower merchant costs.

165.     The other two Amex merchant witnesses – Strictly Bicycles and Drybar – have unique relationships with Amex.  Unlike millions of other small merchants in the United States, Strictly Bicycles and Drybar were both featured in Amex commercials.  Trial Tr. 5299:6-11 (Gutierrez/Strictly Bicycles); 5544:19-22 (Landau/Drybar).  Neither company paid for the beneficial exposure provided by these commercials.  *See* Trial Tr. 5544:23-5545:1 (Landau/Drybar).  As Mr. Gutierrez testified, these commercials provided "free marketing" for his company.  Trial Tr. at 5299:15-16 (Gutierrez/Strictly Bicycles).

166.     Moreover, in 2013, Amex suddenly changed its relationship with Strictly Bicycles.  Since 1994, Strictly Bicycles did not have any negotiations with Anex regarding its discount rate ("The rate was the rate"); Strictly Bicycles even tried in May 2013 to obtain a lower discount rate from Amex, but Amex refused to lower the rate; later in 2013, after Mr. Gutierrez agreed to testify for Amex in this case, Amex thanked Strictly Bicycles for its "willingness to advocate for American Express," assigned a dedicated client manager, and agreed to a rebate incentive agreement.  Trial Tr. 5289:9-5296:22; PX2434, at -732.

**C.     ASRs prevent procompetitive steering by merchants.**

167.     Amex's ASRs prevent merchants from encouraging customers to use lower-cost credit and charge cards for purchases.   Because merchants cannot effectively shift purchase volume, merchants have little ability to negotiate lower fees with any of the credit card networks.

168.     The disconnect between price and purchase volume means that credit card networks do not need to compete for merchants' business.  As Southwest Airlines' Director of

Accounting Operations testified, "the market is broken" because card networks do not compete on the basis of price for his company's business.  Trial Tr.  2440:4-15 (Priebe/Southwest).

169.     Steering customers to cheaper credit cards would allow Home Depot to lower its costs of credit card acceptance and at the same time benefit consumers by passing on to them a percentage of those savings.  Trial Tr. 1276:4-8 (Kimmet/Home Depot).

170.     Over time, as their aggregate costs of card acceptance decrease, merchants could return savings to customers in the form of lower prices and improved service.  Trial Tr. 1278:1-14 (Kimmet/Home Depot); *see also* Trial Tr. 582:4-12 (Bouchard/Sears); 1543:23-1544:6 (O'Malley/Best Buy); 499:8-25 (Satkowski/Enterprise); 2328:9-2329:4 (Bruno/Crate & Barrel); 3149:17-3150:25 (Gibson/Sinclair).

171.     Merchants could also use the prospect of steering as a tool to negotiate more effectively with card networks than they can today.  Trial Tr. 581:4-8 (Bouchard/Sears); 3219:17-22 (Gibson/Sinclair); 2353:14-2354:6, 2354:11-14 (Bruno/Crate & Barrel).  By offering networks more charge volume through customer steering, merchants could seek better prices from card networks.  *See* Trial Tr. 2328:9-2329:7 (Bruno/Crate & Barrel).

172.     For example, Hilton is negotiating an agreement with Visa pursuant to which Visa would offer a substantial rebate on the interchange fees it charges Hilton in return for Hilton increasing Visa's share of charge volume.  Hilton determined what promotions it could run that would grow Visa's share without violating Amex's ASRs.  Trial Tr. 1614:22-1616:20 (Brennan/Hilton).  Without Amex's ASRs, Hilton would have sought an even more sizeable deal with Visa.  Trial Tr. 1617:4-7 (Brennan/Hilton).

173.     Amex itself recognizes that the kinds of steering it prohibits in its ASRs can benefit both merchants and networks.  As discussed above, Amex regularly engages in steering that benefits it and its partners.

### i.     Controlling costs is important to merchants.

174.     Merchants operate in competitive markets and keeping costs low is critically important to their business.  *See* Trial Tr. 1343:22-1344:4, 1344:17-1345:20 (Rein/Walgreens); 219:6-17, 221:9-12, 221:24-222:10 (Thiel/Alaska Airlines); 375:7-12, 382:19-383:9 (Robinson/IKEA); 1522:17-18, 1522:21-1523:14 (O'Malley/Best Buy); Trial Tr.  2370:7-2372:13 (Priebe/Southwest).

175.     It is "absolutely critical" for Walgreens to control costs to remain competitive. Trial Tr. 1343:22-1344:4, 1344:17-1345:20 (Rein/Walgreens).  If Walgreens did not control costs, and instead raised prices, competitors would "clean our clock."  Trial Tr. 1344:17-1345:20 (Rein/Walgreens).

176.     Best Buy offers a low-price guarantee to stay competitive with other consumer electronics retailers and because "it is an expectation of consumers these days."  Trial Tr. 1522:21-1523:9 (O'Malley/Best Buy).  To offer its low-price guarantee, Best Buy must keep its payment costs as low as possible.  Trial Tr. 1522:17-18, 1522:21-1523:14 (O'Malley/Best Buy).

177.     Similarly, IKEA focuses on being a "low-price, value-oriented retailer", but, to do so, IKEA must "achieve low costs in [its] operations."  Trial Tr. 375:7-12 (Robinson/IKEA).

178.     Solitude focuses on limiting expenses because "a dollar saved is a dollar" Solitude can use to invest in improvements, such as a new ski lift. Trial Tr. 2536:2-2536:15 (Holtey/Solitude).

179.     Alaska Airlines needs to keep costs down to offer low fares because travelers often select their airline "first by price and then by carrier of choice."  Trial Tr. 219:6-17, 220:5-15 (Thiel/Alaska Airlines).  "[I]f a carrier cannot offer a competing fare, consumers will go to the lower-cost option."  Trial Tr. 221:13-18 (Thiel/Alaska Airlines).  Alaska Airlines goes to great lengths to keep costs low, even resorting to drilling holes in the drawers of its beverage carts to reduce the weight each airplane carries.  Trial Tr. 221:9-12, 221:24-222:10 (Thiel/Alaska Airlines).

180.     Southwest Airlines' brand message is "low cost."  If Southwest doesn't "drive our costs down, we can't set our prices; somebody else will do that for us.  And if that happens, we face severe competitive pressures."  Trial Tr.  2371:20-2372:2 (Priebe/Southwest).  In setting its ticket prices, Southwest wants to be the pricing "floor to the extent it can be.  There are markets that -- there are prices that we want to set as low as possible.  And it encourages more consumer purchases on our airline."  Trial Tr. 2371:24-2372:13 (Priebe/Southwest).

181.     Official Payments must keep its costs down in order to offer a competitively-priced convenience fee for credit transactions on its Choice Pay website.  Trial Tr. 6134:24-6137:1 (Mitchell/Official Payments).  By offering a lower-priced option, Official Payments has attracted new customers to its services.  Trial Tr. 6133:11-18 (Mitchell/Official Payments).  Official Payments has tracked the performance of its Choice Pay website and found that "there are definitely cost shopping consumers and it was important for them to find the lowest cost option available."  Trial Tr. 6133:22-6134:6 (Mitchell/Official Payments).

## ii.     Credit card fees are important to merchants.

182.     Credit card fees constitute a significant cost for many merchants.  See, e.g., Trial Tr. 2318:24-2319:19 (Bruno/Crate & Barrel) (credit card fees are a "significant cost"); *see also*

Trial Tr. 192:14-18 (Thiel/Alaska Airlines); 387:1-7 (Robinson/IKEA);  480:7:13 (Satkowski/Enterprise); 1608:14-18 (Brennan/Hilton); 2523:2-18 (Holtey/Solitude); 3155:17-3156:8 (Gibson/Sinclair); 1222:10-17 (Kimmet/Home Depot); 6120:21-6121:4 (Mitchell/Official Payments).

183.    Alaska Airlines' credit card fees totaled "probably two times the wages that we pay for our airport employees here in the U.S."  Trial Tr. 192:14-18 (Thiel/Alaska Airlines).

184.    Enterprise will pay around $70 million in credit card fees in fiscal year 2014. Trial Tr. 480:7:13 (Satkowski/Enterprise).

185.    In 2013, Hilton paid between $500 million and $1 billion to accept credit cards from the four major credit card networks.  Trial Tr. 1608:14-18 (Brennan/Hilton).

186.    Solitude's credit cards fees total around $315,000 a year.  Trial Tr. 2523:7-10 (Holtey/Solitude).  This is "a very significant cost" for Solitude, and is more than Solitude spends annually for diesel fuel to groom its ski slopes or the power to run its lifts. Trial Tr. 2523:7-18. (Holtey/Solitude).

187.    Credit card fees are a "significant expense" to Sinclair gas station owners.  Trial Tr. 3155:17-22 (Gibson/Sinclair).  Typically the majority of the profit on a gallon of gas goes to the credit card company for card acceptance fees.  Trial Tr. 3155:17-3156:8 (Gibson/Sinclair).

188.    Payment acceptance costs are IKEA's fourth-highest operating cost, following staff, advertising, and rent.  Trial Tr. 387:1-7 (Robinson/IKEA).

189.    Payment acceptance costs are one of Home Depot's "most significant costs." Trial Tr. 1222:5-17 (Kimmet/Home Depot).

190.    Payment acceptance costs are the largest cost within Official Payments' business model.  Trial Tr. 6120:21-6121:4 (Mitchell/Official Payments).

iii.     **Merchants use competition to get better prices from suppliers but cannot do so with credit card networks.**

191.     To reduce their costs, merchants routinely seek bids from multiple suppliers outside the credit card industry and reward competitive bidders with greater purchase volume. As discussed below, it is a competitive necessity for many merchants to accept multiple credit card networks, including Amex, and merchants cannot, due to the ASRs, move volume to lower priced networks. Consequently, merchants cannot effectively play credit card networks off each other to get lower prices.

192.     Alaska Airlines has a department that manages its supply chain, and "when we buy just about anything, you know, a computer system, or aircraft parts, ground service equipment, you know contractors to service the equipment at the airport, we will typically put out a request for a proposal and hopefully have a number of vendors that we can send the request for proposal to and then they come back to us and bid on the business." Trial Tr. 223:9-20 (Thiel/Alaska Airlines). Bidding goods and services out to multiple vendors reduces the costs to Alaska. Trial Tr. 223:9-20 (Thiel/Alaska Airlines)

193.     But the GPCC card network services that supply Alaska Airlines face no similar competitive pressures, because the ASRs prevent Alaska Airlines from playing one credit card network against another to try to secure a lower rate. Trial Tr. 224:11-16 (Thiel/Alaska Airlines). Today, credit card networks do not compete on the fees they charge Alaska Airlines. Trial Tr. 224:20-22 (Thiel/Alaska Airlines).

194.     As IKEA has grown, it "[has] been able to leverage off higher volumes and work with suppliers and providers in all different areas of our business to realize economies of scale in the form of lower costs for those services and goods that we need to run our business." Trial Tr.

381:8-15 (Robinson/IKEA).   IKEA seeks competitive bids from its suppliers ranging from advertising agencies to armored cars and has generally achieved lower costs for services by doing so.  Trial Tr. 381:16-382:18 (Robinson/IKEA).  While IKEA's credit card volume has increased as IKEA has expanded in the United States, IKEA has not been able to engage in this bidding process with credit card networks because "we can't discriminate or we can't express a preference, and as a result we're locked into a cost structure that doesn't change."  Trial Tr. 381:2-7; 382:7-18 (Robinson/IKEA).

195.    To control costs, Walgreens "would bid out the products or bid out the services" and "essentially either negotiate[] face-to face or [use] electronic auctions" for as many services and products as possible.  Trial Tr. 1344:5-16 (Rein/Walgreens).  By having competing suppliers bid against each other, Walgreens was able to get lower prices for the products and services required to operate its stores.  Trial Tr. 1344:17-1345:20, 1345:21-1346:18 (Rein/Walgreens).

196.    Walgreens encouraged manufacturers of consumer goods to compete more vigorously against each other by promoting the products of the company that gave it the best terms.  Because Walgreens' promotions drove volume, manufacturers were willing to improve their pricing to Walgreens in return for Walgreens' promotion of their products.  When one company would not give Walgreens "the deal we wanted," Walgreens explained to that company that "we are going to still carry" your products, but "we will not promote" them in our Sunday circular or through our in-store promotions.  Trial Tr. 1344:17-1345:20 (Rein/Walgreens).

197.    By advertising one company's products more aggressively than the others, Walgreens encouraged companies to bid "against one another," and then "got the lowest price, was able to share that lowering of the price with our customers, draw people into our stores, and

increase our sales." Trial Tr. 1344:17-1345:20 (Rein/Walgreens); *see also* Trial Tr. 1346:19-1347:13 (Rein/Walgreens).

198.    Jeffrey Rein, former Chairman and CEO of Walgreens, testified that he was "absolutely" not able to use competitive bidding to obtain lower prices from the credit card networks.  Trial Tr. 1347:14-16, 1402:1-10 (Rein/Walgreens).

199.    Professor Katz explained that retailers routinely engage in steering.  Retailers use end-of-aisle displays, discounting, or other promotional methods to encourage the purchase of particular products or brands.  Even in a world in which steering is prevalent, some manufacturers have succeeded in offering premium products at premium prices.  Trial Tr. 4011:20-4014:2 (Katz).

### iv.    Merchants use competition to get better terms from co-brand partners.

200.    While the ASRs block merchants from creating competition among GPCC card networks over card acceptance costs, merchants benefit from competition among issuers for the co-branded credit cards.  This competition results in significant benefits to merchants from the winning co-brand issuer.

201.    For instance, there was intense competition among issuers including Chase, Citibank, and Amex to win Hilton's co-brand business and Hilton received large bonuses from the issuer it selected.  Trial Tr. 1628:12-18 (Brennan/Hilton).  Co-brand agreement discussions are "much more competitive" than discussions on Hilton's card acceptance agreement with Amex.  Trial Tr. 1623:15-25 (Brennan/Hilton).

202.    Similarly, Delta's negotiating position against Amex is different when it is negotiating a co-brand card agreement than when it is negotiating a card acceptance agreement.

Trial Tr. 5385:3-15 (Miller/Delta).  In its 2008 co-brand card selection process, Delta played a number of issuers, including Amex, against each other to get the best deal it could.  Trial Tr. 5386:8-12 (Miller/Delta).  Amex improved its co-brand offer to Delta because of a competing bid by Chase and Visa.  Trial Tr. 5387:15-24 (Miller/Delta).

203.    Delta has a difficult negotiating position for standalone card acceptance agreement because Delta cannot tell Amex it might chose another partner.  Trial Tr. 5385:3-12 (Miller/Delta).  If networks competed over credit card acceptance terms, Delta could potentially use that competition to negotiate lower discount rates.  Trial Tr. 5385:16-19 (Miller/Delta).

> **v.    Merchants use competition to get better prices from debit card networks.**

204.    The Durbin Amendment gave merchants the ability to choose among a number of networks through which to route PIN debit transactions.  Trial Tr. 1237:19-1238:8 (Kimmet/Home Depot).  With that change, debit networks began to vie for purchase volume from merchants.  Trial Tr. 1238:12-1239:6 (Kimmet/Home Depot).  Post-Durbin, Home Depot saw that debit networks "would have dialogues with us about price reductions.  So, lower cost routing, that we would then direct volume their way."  Trial Tr. 1239:9-13 (Kimmet/Home Depot).  Home Depot negotiated lower prices with all of the PIN debit networks it accepts, resulting in a reduction in its debit card acceptance costs.  Trial Tr. 12:40:22-24; 1242:5-8 (Kimmet/Home Depot).

205.    After the Durbin Amendment was passed, Sprint also negotiated agreements with MasterCard and Visa for increased debit volume in exchange for interchange rebates.  Trial Tr. 1746:18-1747:9 (Dale/Sprint).

### vi.    Merchants steer today as much as the ASRs allow.

206.    As discussed above, a small percentage of Amex merchants have non-standard card acceptance agreements.  Some merchants with custom contracts have limited steering rights carved out from the general anti-steering prohibitions.  Trial Tr. 1614:11-13 (Brennan/Hilton). Merchants use this limited steering ability to reduce their costs.

207.    Best Buy has limited carve-outs that allow it to steer to its private label card.  *See* PX0345 at -346-348.

208.    Best Buy lowers its costs by accepting its private label "Best Buy" card and, therefore, works to increase the volume of payments on the Best Buy card.  Trial Tr. 1538:23-1539:8; 1541:16-23 (O'Malley/Best Buy).  Best Buy steers by prompting customers to use the Best Buy card at the point of sale, offering extended financing and loyalty points for customers who use the Best Buy card, and instructing its sales representatives to orally suggest that customers use the Best Buy card.  Trial Tr. 1537:8-10; 1537:15-1538:22 (O'Malley/Best Buy).

209.    Best Buy's steering  has increased its customers' use of the Best Buy private label card, and that increased usage of a lower-cost payment form has "absolutely" lowered Best Buy's overall cost of acceptance.  Trial Tr. 1538:23-25; 1539:6-8 (O'Malley/Best Buy).  Best Buy passes its savings from use of its private label card on to consumers.  Trial Tr. 1539:9-12 (O'Malley/Best Buy).

210.    Crate & Barrel also successfully steers to its private label card.  Crate & Barrel sought a carve-out from the ASRs in its Amex contract to "drive traffic to our private label card." Trial Tr. 2324:23-2325:3 (Bruno/Crate & Barrel).  Since negotiating this carve-out, Crate & Barrel has promoted its private label card by offering a discount to customers who open an account, posting signage on websites and in stores on registers and doors, and by having sales

associates ask customers to use the card.  Trial Tr. 2325:21-2326:8, 2327:3-13 (Bruno/Crate & Barrel).

211.    Since Crate & Barrel started promoting its private label card in 2012, use of the private label card has grown from two percent to more than ten percent of overall tender, decreasing Crate & Barrel's overall cost of acceptance "considerably."  Trial Tr. 2326:15-24 (Bruno/Crate & Barrel).  These savings allow Crate & Barrel to fund various benefits for its customers, including a loyalty program and deferred financing options.  Trial Tr. 2324:23-2325:16 (Bruno/Crate & Barrel).

212.    Sprint can engage in limited term promotions with other credit cards under its Amex agreement. Trial Tr. 1699:5-19 (Dale/Sprint); PX0612 at -403.  Sprint has conducted limited-term promotions with Visa, MasterCard, and Amex, including an offer for a statement credit to encourage customers to sign up for recurring billing. Trial Tr. 1699:20-1700:14, 1701:23-1702:6 (Dale/Sprint).

213.    Sears is permitted to steer customers to its private label card and its co-brand card with MasterCard by "ask[ing] the customer as they come up to the point of sale whether [Sears] could put it on their Sears card."  Trial Tr. 577:17-578:9 (Bouchard/Sears).  Sears sales personnel make this request every time a customer approaches the cash register.  Trial Tr. 578:12-17 (Bouchard/Sears).  This steering is effective and has increased the sales volume on Sears cards. Trial Tr. 578:12-22 (Bouchard/Sears).

214.    Southwest promotes its co-brand card with "$50 off, $100 off on the first purchase" or with "up to 50,000 [rewards] points."  Such promotions have shifted share to the Southwest co-brand card.  Trial Tr. 2426:25-2427:11 (Priebe/Southwest).

### vii.    Merchants with custom contracts are subject to limits on steering.

215.    While some custom card acceptance agreements that Amex maintains with its largest merchants contain narrow exceptions to the ASRs, those agreements continue to interfere with the merchants' ability to engage in many steering practices, including expressing a preference for another card brand.  *See* PX2775 at 3 (123 of the 125 large-merchant customized contracts examined by Ms. Schmitt ban the practice).

216.    Although Hilton negotiated a custom contract with Amex, significant restrictions remain on its ability to encourage its customers to use a lower-cost credit card network.  Hilton may promote its co-brand card in some ways and engage in certain short-term promotions to other credit cards.  Hilton, however, cannot communicate to customers how its co-brand card compares to Amex credit cards.  Trial Tr. 1613:12-19 (Brennan/Hilton).  Hilton cannot state that it prefers any credit card over Amex.  Trial Tr. 1613:20-22 (Brennan/Hilton).  In addition, Hilton cannot offer a permanent benefit for use of a particular type of credit card.  Trial Tr. 1613:23-25 (Brennan/Hilton).

217.    Merchants cannot state or indicate that they prefer their customers use a credit card other than Amex.  Merchants including IKEA, Sears, and Southwest want the freedom to state or indicate a preference for a credit card brand.  Trial Tr. 408:21-411:9 (Robinson/IKEA); 580:4-581:12 (Bouchard/Sears); 2424:5-10 (Priebe/Southwest Airlines).

218.    While Amex allows some merchants with custom contracts to engage in promotions with other credit cards, the majority of custom contracts have time restrictions that prevent merchants from promoting other cards on an on-going basis.  PX2775 at 4-5.

219.    Even merchants with negotiated exceptions may find that they are unable to run promotions that would benefit both the merchant and the merchant's customers, because Amex

66

narrowly interprets and applies the exceptions to its ASRs.  For example, Enterprise is able to

run limited promotions to other credit cards under its Amex contract.  *See* PX0650 at -229, -230;

Trial Tr. 500:4-18 (Satkowski/Enterprise).  Enterprise asked Amex if it could run a promotion

"offering a 5 percent discount to a customer if they presented a MasterCard."  Trial Tr. 526:5-11

(Satkowski/Enterprise).  Amex said that Enterprise could not run the promotion because the

promotion violated the terms of Enterprise's contract with Amex.  Trial Tr. 526:12-13

(Satkowski/Enterprise).

220.    Sprint's ASRs allow it to engage in short-term promotions with other credit card.

*See* Trial Tr. 1699:5-19 (Dale/Sprint).  Sprint has had only "limited success" with these short-

term promotions because customers will sign up to "get whatever the offer is" but as "time goes,

by, usually within six months," the enrollment rates have gone back down to pre-offer levels.

Trial Tr. 1702:7-15 (Dale/Sprint).  Sprint believes that, if it could engage in longer-term

promotions, it could "have a higher stickiness rate for people signing up for recurring" billing

and that promotions could "have a longer lasting effect and benefit."  Trial Tr. 1702:25-1703:11

(Dale/Sprint).

221.    IKEA believes long-term promotions are more effective because "a good

customer for Ikea may only come several times a year, and it may not be monthly."   If IKEA

runs only short-term promotions, customers "might not be aware or realize" that the promotion

existed.  Trial Tr. 405:16-24 (Robinson/IKEA).

222.    Sears has a three month time limit on short-term promotions, which affects Sears'

willingness to run such promotions because "short term promotions generally change behavior

for that period, and then goes back to normal."  Trial Tr. 579:15-580:3 (Bouchard/Sears).  Sears

believes that for promotions to be effective, "they have to be longer term and consistent." Trial Tr. 579:24-580:3 (Bouchard/Sears).

223. Professor Katz testified that the possibility that Amex may allow some short-term promotions or other minimal exceptions does not eliminate the harm caused by the ASRs because, even with such exceptions, the ASRs still limit effective steering. Trial Tr. 4010:16-4011:19 (Katz). "[T]here's no such thing as saying, well, there's enough competition. Always have more competition, and more competition would be better." Trial Tr. 4010:16-4011:19 (Katz).

### viii. Merchants have asked Amex for more steering freedom.

224. Merchants recognize the constraints that Amex's ASRs put on their ability to reduce credit card costs and have, in many instances, sought changes to their Amex contracts to gain more freedom to steer. Trial Tr. 1257:25-1258:19 (Kimmet/Home Depot); 1697:13-1698:10 (Dale/Sprint), 261:7-263:9; 264:4-15 (Thiel/Alaska Airlines); 411:20-412:10 (Robinson/IKEA); 1612:21-1614:10 (Brennan/Hilton); 5891:10-5892:12 (Flueck/Starwood Hotels); 2339:3-2340:6, 2352:5-12 (Bruno/Crate & Barrel); 1541:11-15 (O'Malley/Best Buy); PX1130 at -883-884; PX1178 at -300.

225. Home Depot asked Amex to "remove the restrictions on steering" from its contract because "those restrictions" limit Home Depot's ability to steer "on the credit side and I want to have that flexibility to help give me some leverage with respect to networks in whatever form they play out." Trial Tr. at 1257:25-12:58:17 (Kimmet/Home Depot). Amex refused to remove the ASRs. Trial Tr. at 1258:15-19. (Kimmet/Home Depot).

226. In Sprint's 2008 negotiations with Amex, it sent Amex a draft acceptance agreement with the ASR language stricken in its entirety. Trial Tr. at 1697:13-1698:10

(Dale/Sprint); PX1178 at -278.   Amex did not agree to remove the ASR language.  Trial Tr. at 1698:11-13 (Dale/Sprint).

227.    Alaska sent proposed changes to the ASRs to Amex that would allow Alaska to prompt customers to use less expensive credit cards.  Amex did not agree to the changes.  Trial Tr. 264:4-15 (Thiel/Alaska Airlines).

228.    In its negotiations with Amex for its 2010 contract, IKEA objected to being governed by standard merchant regulations, rather than having customized ASRs.  Amex responded by telling IKEA that "it was not going to be an Ikea customized version of the merchant regulations."  IKEA accepted the standard merchant regulations that Amex demanded. Trial Tr. 411:20-412:10 (Robinson/ IKEA)

229.    Best Buy asked Amex for a change in its ASRs to allow Best Buy to prefer its proprietary card but was not granted that change. Trial Tr. 1541:11-15 (O'Malley/Best Buy). Other merchants have sought changes to the ASRs in their Amex acceptance agreements.  *See* PX0524 at -992-993 (Norwegian Cruise Line's proposed changes to the ASRs in its 2006 card acceptance agreement with Amex); PX1074 at -734-736 (Enterprise's proposed changes to the ASRs in its 2007 card service agreement with Amex); PX1076 at -430-433 (Royal Caribbean Cruise Line's proposed changes to the ASRs in its 2007 card acceptance agreement with Amex); PX1217 at -978 (Alaska Airlines' proposed changes to the ASRs in its 2009 card acceptance agreement with Amex); PX1846 at -018-020 (Southwest Airlines' proposed changes to the ASRs in its 2009 card service agreement with Amex); PX1170 (Hewlett-Packard); PX1130 (Starwood Hotels); Trial Tr. 5920:3-13 (Flueck/Starwood Hotels); 5973:2-22 (McNeal/Amex) (Target sought ability to state preference); 6063:11-24 (McNeal/Amex) (discussing Dell).

### ix.    Merchants would consider many ways to steer if not constrained by the ASRs.

230.    If ASRs did not limit merchants' freedom to encourage customers to pay with low-cost cards, merchants could influence how much of Amex's services they purchase. Merchants want this freedom.  See, e.g., Trial Tr. 408:21-23 (Robinson/IKEA).  Merchants testified about the options they would consider, if not impeded by the ASRs.

231.    Alaska Airlines' Managing Director of Revenue Accounting, Kevin Thiel, testified that Alaska Airlines tells corporations like Microsoft, Boeing, Intel and Starbucks that if "you put your travelers on Alaska, we can give you a lower airfare if you'll give us a certain amount of volume."  Trial Tr. 262:8-24 (Thiel/Alaska Airlines).  Alaska wants to encourage those corporate clients to use less expensive credit cards in exchange for even lower contractual fares.  Trial Tr. 261:7-262:7 (Thiel/Alaska Airlines).

232.    When Alaska asked Amex whether it could encourage its corporate customers to use cheaper credit cards, Trial Tr. 261:8-262:7 (Thiel/Alaska Airlines), Amex's reaction was "immediate and negative."  Trial Tr. 262:25-263:9 (Thiel/Alaska Airlines).  Amex told Alaska negotiators, "[i]f you go after our corporate clients, the gloves will come off."  Trial Tr. 263:4-6 (Thiel/Alaska Airlines).

233.    Alaska continues to seek fexibility from Amex to pursue this idea, but Amex has continued to reject the necessary changes to Alaska's ASRs.  Trial Tr. 264:4-266:18 (Thiel/Alaska Airlines); PX1217 at -978.

234.    Official Payments ██████████████████████████████████████ ████████████████████████████████████ Trial Tr. 6147:10-6148:16 (Mitchell/Official Payments); PX1337A at -058, -081.  Official Payments ████████████

██████████████████████████████████████████████

████████████████████████   Trial Tr. 6140:20-6142:2; 6147:10-6148:16; 6188:14-25

(Mitchell/Official Payments); PX1337A at -058, -081.

235.   Best Buy would consider stating a preference for a general purpose credit card because that would be a "very good avenue to [negotiate] with a network to develop a partnership with them."  Trial Tr. 1542:12-25 (O'Malley/Best Buy).  Partnering with a credit card network could reduce the cost of credit card acceptance.  Trial Tr. 1543:23-1544:3 (O'Malley/Best Buy).

236.   Crate & Barrel would "cultivate and enrich a larger partnership with a specific card brand.  We would most likely introduce some competition.  We would put out an RFP for not only a preferred merchant-card related status with our company, but we have a wide array of other book of business and services that we could utilize with card companies."   Trial Tr. 2328:9-2329:22 (Bruno/Crate & Barrel).  By doing so, Crate & Barrel would look for "an opportunity for hopefully some concession pricing" so that it could "return some of those savings to our customers."  Trial Tr. 2328:12-2329:4 (Bruno/Crate & Barrel).  Crate & Barrel would consider all the card networks, including Amex, as potential partners.  Trial Tr. 2329:5-7 (Bruno/Crate & Barrel).

237.   Sprint would consider a range of options to steer, including offering "statement credits," ring tones, "or a discount off of certain small dollar" products such as accessories or case covers.  Trial Tr. 1703:17-1704:5 (Dale/Sprint).   Sprint also would consider stating a preference for a particular credit card and would "probably negotiate across the board with all the brands on various marketing opportunities or promotions."  Trial Tr. 1705:16-22 (Dale/Sprint).

238.     Solitude would seek a partnership with a credit card brand, in which "the brand would help support our marketing effort and that, in exchange for that, we would be willing to say that we prefer that type of card or that brand over the other brands."   Trial Tr. 2529:19-2531:2 (Holtey/Solitude); PX0002 at -18.

239.     Grand America would "love" to be able to steer customers to less expensive forms of payment such as MasterCard or Visa, particularly for sales and catering events that may cost $100,000 or more.  Trial Tr. 3149:12-3150:25 (Gibson/Sinclair); PX1342 at -020.  It would be "easy" for Grand America to offer a discount to customers for paying with a less-expensive credit card in Grand America's sales and catering business.  Trial Tr. 3150:6-14 (Gibson/Sinclair); PX1342 at -020.

240.     Sinclair is developing a mobile commerce application to facilitate payment with Sinclair's proprietary card.  Trial Tr. 3166:13-3168:1; 3169:19-3170:13 (Gibson/Sinclair). Because the technology also supports other forms of payment, Trial Tr. 3170:1-13 (Gibson/Sinclair), Sinclair would consider offering discounts or engaging in other forms of steering among general purpose credit cards on the mobile commerce application.  Trial Tr. 3171:5-9 (Gibson/Sinclair).

241.     Hilton evaluated and is interested in establishing promotional partnerships with credit card networks, under which Hilton might offer a permanent benefit for use of its partner's credit cards.  For example, a Hilton customer who pays with a Visa Signature card could be "elevated to Silver status, for as long as they are using that Visa card."  Trial Tr. 1613:23-1614:7 (Brennan/Hilton).

242.     Enterprise wants to provide its customers with incentives for using a lower-priced card.  There are times during the year when Enterprise sees "opportunities to provide incentives

to customers to perhaps use a lower priced card to help boost the rental volume" and would encourage customers to use "a lower-priced card" by providing them with added value, such as "an extra rental day free of charge" or "free damage coverage."  Trial Tr. 497:11-498:18 (Satkowski/Enterprise).  Enterprise's "goal" in steering to less expensive credit cards would be to "take the price difference" and pass it on to the customer "to increase their satisfaction so that we have a committed customer."  Trial Tr. 499:10-17 (Satkowski/Enterprise).

243.    Enterprise also wants the option to engage in brand advertising with other credit card networks, but this is prohibited by Amex's ASRs.  For example, Enterprise and Visa both advertise heavily during the Olympics, and "there could be some synergies for advertising together for brand awareness."  Trial Tr. 501:11-502:15 (Satkowski/Enterprise).

244.    IKEA would consider issuing an RFP for credit card networks to compete to be IKEA's preferred supplier for an IKEA promotion, such as the IKEA kitchen event.  In return, IKEA could get a lower rate for all purchases associated with the kitchen event.  Trial Tr. 408:21-410:13 (Robinson/IKEA).  IKEA would also like to be able to "speak to our customers and give them" choices, but IKEA is "right now prohibited in terms of what [it] can do in talking to [customers] about payment preference."  Trial Tr. 411:3-9 (Robinson/IKEA).

245.    Sears would consider stating a preference for a card brand, tagging that card brand or the network's logo in Sears' advertising, or providing "special offers" to customers for using a specific card brand.  Trial Tr. 580:4-581:12 (Bouchard/Sears).

246.    Home Depot would consider sending marketing messages about a preferred card offering to its customers' mobile devices as they walk in Home Depot stores.  Trial Tr. 1273:3-1274:3 (Kimmet/Home Depot).

247.     Southwest Airlines wants the freedom to engage in preference campaigns in order to "motivate the consumer behavior, to reduce costs" and "to maximize the value to [its] customers."  Trial Tr. 2424:5-10 (Priebe/Southwest).

248.     Southwest wants to be able to directly compare "any aspect of its co-brand card to Amex's credit cards."  Trial Tr. 2426:1-3, 2426:16-24 (Priebe/Southwest).  Southwest's marketing department specifically asked "to be able to describe exactly how [Southwest's co-brand offerings] compare to other payment products, including American Express."  Trial Tr. 2517:5-13 (Priebe/Southwest).

249.     Southwest's contract with Amex also prohibits the purchase of airline tickets through PayPal accounts linked to Amex cards.  Trial Tr. 2428:16-24 (Priebe/Southwest); PX0332 at -753.  Southwest would like to be able to accept purchases on Amex through PayPal because transactions through PayPal are materially less expensive than purchases made directly on an Amex card.  Trial Tr. 2428:2-6 (Priebe/Southwest).

250.     Given the opportunity to reduce costs, Southwest will "exhaust efforts to seek the best solution that's publicly available."  Trial Tr. 2432:12-2433:5 (Priebe/Southwest).  If Southwest were permitted to steer customers to forms of payment other than Amex, the airline would "absolutely in the name of low cost try to encourage customers" to use those forms of payment through a lower price.  Trial Tr. 2432:12-2433:5 (Priebe/Southwest).

> **x.      Merchants would gain some negotiating leverage with credit card networks if the ASRs were removed.**

251.     Merchants recognize that greater competition among the credit card networks could help them negotiate lower credit acceptance fees.

252.    Southwest would have been able to negotiate a better discount rate if Amex rules prohibiting steering had not been in place in 2009 when Amex raised Southwest's rate.  Trial Tr. 2418:3-17, 2412:20-2414:13 (Priebe/Southwest).

253.    Sinclair would have "more leverage" to negotiate the discount rate if it had "the ability to steer to different forms of credit."  Trial Tr. 3219:17-3220:1 (Gibson/Sinclair).

254.    The ability to enter into long-term promotions and state a preference for a brand would be valuable to Crate & Barrel in negotiating contracts with credit card companies.  Trial Tr. 2353:25-2354:14 (Bruno/Crate & Barrel).

255.    Sears believes that steering would give it "additional negotiating leverage with the different [credit card] brands."  Trial Tr. 580:25-581:8 (Bouchard/Sears).

256.    Office Max would gain leverage it currently does not have over Amex if it could steer. Tr. 2170:25-2171:18 (Haslam/Office Max).

257.    Official Payments believes that Amex's inclusion on its Choice Pay website in 2015 will affect its negotiating posture with Visa and MasterCard.  Trial Tr. 6137:18-24 (Mitchell/Official Payments).  Official Payments cannot charge lower prices for less expensive credit cards on its Choice Pay website if it accepts Amex because of Amex's ASRs.  Trial Tr. 6137:11-17 (Mitchell/Official Payments).  Amex's inclusion on the ChoicePay website, therefore, "makes it much more difficult to continue to drive the price to the consumer down and drive the corresponding costs down through competitive pressure and negotiation."  Trial Tr. 6137:18-24 (Mitchell/Official Payments).

258.    Amex's restrictions on steering not only prevent merchants from negotiating to reduce their discount rate, but they also encourage the other credit card networks to raise their prices to merchants.  For example, Starwood understands that Amex's premium discount rates

encourage the other networks to raise their rates.  Trial Tr. 5905:24-5906:8 (Flueck/Starwood Hotels).  In addition, Visa and MasterCard directly "warned Walgreens they can justify future rate increases because [Walgreens pays] Amex' high fees."  PX1960 at -974, Trial Tr. 1378:24-1379:3 (Rein/Walgreens).  Walgreens' President, Jeff Rein, told his Board that "if we did not do anything to stop American Express than [sic] Visa and MasterCard would for sure raise their interchange fees."  Trial Tr. 1378:24-1379:8 (Rein/Walgreens).  Walgreens believed that a risk of its public challenge to Amex's proposed rate increases was that Visa and MasterCard might raise their rates as well.  Trial Tr. 1517:21-1519:8 (Rein/Walgreens).  After Walgreens backed down in its negotiations with Amex, Visa and MasterCard did, in fact, raise their rates to Walgreens. Trial Tr. 1516:11-1517:20 (Rein/Walgreens).

259.  Amex's rules have encouraged Discover to raise its prices to merchants.  Trial Tr. 853:23-854:15, 872:3-10 (Hochschild/Discover) (Amex's, MasterCard's, and Visa's ASRs caused Discover to abandon a low-cost pricing strategy to merchants, but if the ASRs were removed, Discover would "aggressively" lower its prices).

260.  Professor Katz explained that Amex's ASRs "tak[e] away the award for competing harder" on price.  Trial Tr. 3821:11-3822:4, 3840:10-23 (Katz) (given the ASRs, merchants are paying higher prices for Discover, MasterCard, and Visa).

### xi.  Lower merchant fees would benefit consumers.

261.  Merchants will consider steering by offering customers discounts or other benefits for using a specific credit card.  Customers who take advantage of these offers will benefit immediately from the incentives offered to use that card.  Longer term, if merchants reduce their costs of accepting credit cards, competitive pressure would push many of them to pass savings along to their customers in the form of lower prices. Trial Tr. 1346:19-1347:13

76

(Rein/Walgreens).  All customers, even those who do not use credit cards, would benefit if merchants could use their lower credit card fees to reduce the prices the merchants charge for goods and services they sell.  See, e.g., DX2214 at -983 (Walgreens document stating that "[t]he high cost of doing business with American Express will be reflected in higher prices for all Walgreens customers, not just those who use American Express cards.  We don't think that's fair."); Trial Tr. 1405:22-1407:11 (Rein/Walgreens) (explaining why Amex's higher costs are passed on to consumers who do not pay with Amex's credit or charge cards).  Even Professor Gilbert acknowledged that consumers who do not have an Amex rewards card pay higher prices and are worse off because of Amex's ASRs.  He stated:

> Q So a dynamic that could be operating here is that while non-American Express credit card users are paying the price, they're not getting the benefit of the American Express rewards; is that fair?
>
> A Yes, but that's like a lot of things.  You know, in competitive effects, that -- firms do a lot of things for some customers that don't benefit other customers. And so in a sense, other customers are paying for things that they don't get. . . .
>
> Q  So if I am a consumer who doesn't have high enough income or who otherwise can't qualify for an American Express rewards card, I don't get the benefit at the retailer of the lower price paid by American Express cardholders; is that correct?
>
> A That's correct. . . .

Trial Tr. 5252:9-5254:5 (Gilbert).

262.    Merchants reduce their retail prices when their costs decline.  For example, IKEA is a "low-price, value-oriented retailer" that works "to sell at a low price" by achieving "low cost in our operations."  Trial Tr. 375:7-12 (Robinson/IKEA).  IKEA has translated cost savings it achieved with its suppliers into lower prices for its customers.  Trial Tr. 382:19-383:7 (Robinson/IKEA).

263.    Home Depot has a "long standing practice for any cost reduction we get, we pass along, generally about 60 percent of that to customers, typically in the form of a price decrease, to help drive volume to our stores."  Trial Tr. 1278:1-1278:14 (Kimmet/Home Depot).

264.    Crate & Barrel would seek lower merchant discount fees through a preference deal and "look to return some those savings to our customers."  Trial Tr. 2328:12-2329:4 (Bruno/Crate & Barrel).

265.    If Grand America saves money through steering to a less-expensive card, it would share those savings with the customer in the form of a discount.  Trial Tr. 3150:15-25 (Gibson/Sinclair).  Grand America could offer a "basic price" that covers the most expensive card fees, and offer the customer a discount based on how much less expensive the card is that the customer chooses to use.  Trial Tr. 3218:21-3219:9 (Gibson/Sinclair).

266.    When Official Payments launched the Choice Pay site in 2011, it offered MasterCard credit transactions at the lowest convenience fee available to consumers.  Trial Tr. 6133:7-10 (Mitchell/Official Payments).  Official Payments was able to offer the lower price because its costs associated with accepting MasterCard were lower than for other networks. Trial Tr. 6132:2-9 (Mitchell/Official Payments).  As a result, Official Payments attracted new users to its services, and consumers benefited from the lower price.  Trial Tr. 6133:11-21 (Mitchell/Official Payments).

267.    Best Buy would pass savings on to its customers.  Trial Tr. 1544:4-6 (O'Malley/Best Buy).

268.    When Walgreens reduces its costs, it passes the savings on to its customers by reducing prices.  Jeff Rein described this as a "virtuous cycle," and testified that "[a]ny time you can lower costs, you can pass it on to the customers, you lower your prices, you get more

78

business, you get more productive and voila, your costs are going down per unit or per sale. Then you keep doing that until you get more and more [customers]."  Trial Tr. 1346:19-1347:13 (Rein/Walgreens).

269.    Amex argues that merchants' customers would not necessarily benefit if merchants pay lower credit card costs.  In making this argument, some Amex witnesses referenced a statement by the Reserve Bank of Australia ("RBA") on whether the Australian surcharging reforms had benefited merchants' customers. *See* Trial Tr. 4654:4-4655:17 (Chenault/Amex); 5816:21-5817:10 (Gilligan/Amex).  In fact, the entirety of the statement from the RBA supports the conclusion that merchants' customers will benefit from the reforms.  In a 2008 study of the impact of the Australian payment system reforms, the RBA looked at the question of "whether the cost savings that merchants have received from lower merchant service fees have been passed on to consumers in the form of lower prices for goods and services than would otherwise have been the case."  DX4026 at 22; Trial Tr. 5817:18-5820:22 (Gilligan/Amex).  The RBA concluded that although no "concrete evidence" had been presented on this question, "this is not surprising, as the effect is difficult to isolate.  The Bank had previously estimated that the cost savings would be likely to lead to the CPI being around 0.1 to 0.2 percentage points lower than would otherwise be the case over the longer term (all else constant).  It is very difficult to detect this against a background where other costs are changing by much larger amounts and the CPI is increasing by around 2½ percent per year on average.  Despite the difficulties of measurement, the Board's judgment remains that the bulk of these savings have been, or will eventually be, passed through into savings to consumers.  This judgment is consistent with standard economic analysis which suggests that, ultimately, changes in business costs are reflected in the prices that businesses charge."  DX4026 at 23.

xii.     **Merchants understand their credit card costs.**

270.     Contrary to Amex's assertions, merchants know what they pay to accept credit cards.  For example, John Robinson, treasurer of IKEA North American Services, testified that IKEA calculates the all-in discount rate for each network and evaluates the prices on an apples-to-apples basis.  Trial Tr. 385:10-386:9, 386:16-19 (Robinson/IKEA); PX2615 at Column A. IKEA "simply sum[s] up all of the individual cost components and add[s] them together" to calculate an all-in rate.  Trial Tr. 385:10-386:9 (Robinson/IKEA); PX2615 at Column A.

271.     Other merchants similarly track the costs of accepting credit cards for each network in the ordinary course of business and use those numbers for cost comparisons.  *See* Trial Tr. 2380:11-20, 2381:20-2382:4 (Priebe/Southwest Airlines); PX1348 at -002; Trial Tr. 3144:23-3145:3, 3156:12-17 (Gibson/Sinclair); 557:1-8 (Bouchard/Sears); PX2617; Trial Tr. 474:18-475:10, 475:25-478:7 (Satkowski/Enterprise); PX2632; Trial Tr. 1523:10-14, 1525:3-8 (O'Malley/Best Buy); 1332:23-1333:11 (Kimmet/Home Depot); PX2422 at -103.

272.     Official Payments knows the exact cost of every transaction it processes, including the difference in costs between various types of cards within a card network.  Trial Tr. 6123:8-24 (Mitchell/Official Payments).  Official Payments tracks its card acceptance costs "very closely" because its business model "is founded on understanding the cost of the transaction" so that it can offer its "service to [its] customers at the lowest cost possible to them." Trial Tr. 6123:8-24 (Mitchell/Official Payments).

273.     Amex itself admitted that some merchants can figure out accurate credit card costs themselves and that merchants could have their acquiring bank, a consultant, or an accountant determine their actual costs of accepting various credit cards.  Trial Tr. 664:19-22, 665:2-16 (Quagliata/Amex).  Amex also admitted that it has provided this service for its

merchants.  For example, Amex used Riggins Oil's bank statements to calculate an accurate all-in net effective Visa and MasterCard discount rate and provided the results to Riggins Oil.  Trial Tr. 662:24-664:9 (Quagliata/Amex); PX0429 at -831.

### xiii. Merchants would share truthful information about credit card costs with their customers.

274.    Amex's ASRs prohibit merchants from posting redit card costs, informing their customers about them, or telling their customers that it costs more to accept Amex than other credit cards.  Trial Tr. 651:11-14, 653:17-25 (Quagliata/Amex).

275.    Even if accurate and true, merchants cannot post signs like PX2620 and PX2631. Trial Tr. 654:17-655:12, 673:14-675:1 (Quagliata/Amex); PX2620; PX2631.

276.    Some merchants are interested in providing information to consumers to allow them to decide what payment product to use.  For example, Southwest's marketing team last year made a "specific request" for clarity on the scope of Amex's ASR because "they would like to be able to describe exactly how they compare [Southwest's co-brand card] to other payment products, including American Express."  Trial Tr. 2517:2-16 (Priebe/Southwest).  The marketing team wanted to provide truthful information to consumers comparing the benefits and features of Amex's credit cards with Southwest's co-brand card with Chase.  But the marketing team was told such direct, truthful comparisons are prohibited by Amex's ASR.  Trial Tr. 2426:1-24, 2517:2-16 (Priebe/Southwest).

277.    Hilton was prohibited from directly comparing the features and advantages of its Visa co-brand card against Amex's credit cards.  Trial Tr. 1613:12-19, 1670:5-9 (Brennan/Hilton).  Mr. Brennan testified he would have been interested in testing and seeing how such comparisons worked.  Trial Tr. 1670:10-15 (Brennan/Hilton).

278.     Billiards.com previously told customers that "American Express charges us 80% higher processing fees than other credit card companies.  As you can tell by our low prices, we try to pass as much savings along to our customers as we possibly can.  If Visa, MasterCard or Discover is an option for you, we'd prefer it.  Thanks."  PX0238 at -059; Trial Tr. 783:21-784:5 (Quagliata/Amex).  Billiard.com's effort to communicate its costs to consumers violated Amex's ASRs.  Trial Tr. 784:6-14 (Quagliata/Amex).  Mr. Quagliata testified that Amex would work to "correct the problem" including reserving the "right to cancel the relationship.  Trial Tr. 784:15-785:10 (Quagliata/Amex).

279.     Official Payments



Trial Tr. 6147:10-6148:24 (Mitchell/Official Payments); PX1337A at -081.

Trial Tr. 6147:10-6148:16 (Mitchell/Official Payments).

280.     Similarly, Sinclair Oil has the technology to "roll back" immediately the price of gas, if a consumer uses a less expensive credit card.  Trial Tr. 3159:18-3160:11, 3161:5-7 (Gibson/Sinclair).  Sinclair Oil is also developing an app that will eventually allow customers to use their mobile phones to pay with general purpose credit cards at its branded stations.  Trial Tr. 3166:13-3168:1, 3169:19-3170:13 (Gibson/Sinclair).  If Amex's ASRs did not exist, Sinclair would consider steering among credit cards within the app.  Trial Tr. 3171:5-9 (Gibson/Sinclair).

281.     Mr. Priebe, Director of Payment Strategies at Southwest, is a board member of Merchant Customer Exchange or MCX, a platform created by 40 merchants to facilitate low-cost credit and debit transactions through mobile phones.  To promote MCX, a merchant "would have

to be able to display the rate at which it's charged versus what the competitive market is.  And I think there are restrictions in the contract that would preclude us from comparing side by side American Express to MCX."  Trial Tr. 2505:1-13 (Priebe/Southwest).  Amex's ASRs will prevent merchants from "comparing and contrasting" the low-cost MCX alternative to "what American Express has in the marketplace today" and merchants would therefore be "precluded" from "showing those cost differentials" to customers.   Trial Tr. 2436:1-20 (Priebe/Southwest). This is a "conflict" that the innovative MCX has not "been quite able to figure out how we're going to be able to move forward with it."  Trial Tr. 2436:1-20 (Priebe/Southwest).

> ### xiv.   Merchants have no incentives to disparage Amex or other card networks.

282.    Merchants have strong incentives to provide positive customer experiences, lest customers choose their competitors over them.  Merchants that steer today have not experienced consumer backlash from doing so.

283.    Crate & Barrel is not aware of any customer complaints or concerns relating to its promotion of its private label card.  Trial Tr. 2327:14-18 (Bruno/Crate & Barrel).

284.    Best Buy's senior director of payment acceptance testified that she is not aware of any customers who have had any negative experiences from Best Buy encouraging customers to use its private label card.  Trial Tr. 1539:13-21 (O'Malley/Best Buy).

285.     IKEA, which considers itself a "customer centered retailer," routinely promotes or steers to different products without annoying or offending its customers.  Trial Tr. 398:1-399:10, 404:24-405:9 (Robinson/IKEA).

286.    Sprint would steer in a manner that would not make its customers feel embarrassed or upset because customer satisfaction is "a huge priority with Sprint."  Trial Tr. 1704:6-14 (Dale/Sprint).

287.    Sears currently steers its customers to its private label cards.  Last year, no Amex-using customers complained that they were embarrassed or felt unwelcome by Sears' steering.  Trial Tr. 579:2-11 (Bouchard/Sears).  Sears has never received a complaint from Amex cardholders about steering to the Sears cards.  Trial Tr. 579:12-14 (Bouchard/Sears).

288.    Home Depot also steers to its private label card and has never heard a complaint from Home Depot's customers that they feel embarrassed or unwelcome when they are encouraged to use a private label card.  Trial Tr. 1265:10-24 (Kimmet/Home Depot).  Instead, Home Depot's "Voice of Customers" customer satisfaction survey found that customer satisfaction is higher when customers are steered to Home Depot's private label card because Home Depot is engaged with the customer.  Trial Tr. 1265:14-1266:3 (Kimmet/Home Depot).

289.    Sinclair currently steers customers to ACH and its proprietary cards.  Trial Tr. 3159:18-3160:11 (Gibson/Sinclair).  Sinclair has never received complaints from Amex cardholders about Sinclair's efforts to steer to its proprietary cards at merchant stations.  Trial Tr. 3163:21-3164:3 (Gibson/Sinclair).

290.    Hilton expects to be able to steer volume to a card network like Visa while maintaining a positive customer experience for Hilton customers that pay with a different card.  Hilton has an interest in encouraging steering to a certain card network in a way that does not diminish the experience of the customers that pay with alternative cards.  Trial Tr. 1616:21-1617:3 (Brennan/Hilton).

84

291.     Alaska Airlines would be able to offer a corporate discount in a way that does not embarrass, mistreat, or humiliate its customers and that still warmly welcomes Amex cardholders.  Trial Tr. 263:14-264:3 (Thiel/Alaska Airlines).

292.     Amex suggested at trial that if not for the ASRs, a merchant might post a sign showing the Amex logo with a red strike through it.  *See* DX7645; Trial Tr. 1010:10-1011:9 (Quagliata/Amex).  Joseph Quagliata testified that he was aware of a merchant actually posting such a sign, but the merchant he identified had posted such signs only at a time when it did not accept Amex.  The signs merely communicated to the merchant's customers that it did not accept Amex, and when the merchant started accepting Amex, it took down the signs.  Trial Tr. 1011:20-25, 1030:6-1031:9, 1174:18-1175:24 (Quagliata/Amex).

### D.     Amex arguments about the number of cards are without significance.

293.     Amex argues that it has fewer cards in circulation than Visa and MasterCard, and suggests that this means that it will be difficult for Amex to encourage merchants to steer to Amex.  See, e.g., Trial Tr. 4430:9-4431:2, 4434:21-4435:10 (Chenault/Amex).  This argument is wrong for several reasons.  First, it is sensible for merchants to care much more about the potential dollar volume of sales available on cards, rather than the simple number of cards.  Amex itself frequently touts to merchants the affluent nature of its cardholders and its "spend-centric" approach.  See, e.g., Trial Tr. 2091:8-2092:2 (Berry/Amex); PX1601 at -273.  Second, as discussed above, Amex already has entered into steering arrangements:  co-brand partners such as Delta Airlines, Starwood Hotels, and JetBlue steer to Amex and firms such as Ticketmaster and Universal Studios steer to Amex.  Third, Discover has a number of cards in circulation not that different from Amex, and Discover is not afraid of competing for steering arrangements.  *See* PX2749; Trial Tr. 859:1-8 (Hochschild/Discover).

85

### E. Discover is not likely to block steering.

294. Discover's 2011 share of the GPCC card market was ███ percent. PX2702 at 74, PX2779 at 15. Discover has never enforced its nondiscrimination rule against a merchant. Trial Tr. 984:16-19 (Hochschild/Discover). Discover has never told a merchant that it needs to stop steering volume to one of Discover's competitors, nor has Discover ever threatened to cancel a merchant that was steering to one of Discover's competitors. Trial Tr. 984:20-25 (Hochschild/Discover). When Discover received complaints from merchants about Discover's surcharging prohibition, Discover "changed its rules for merchants and eliminated the blanket disallowance of surcharges." Trial Tr. 985:4-12 (Hochschild/Discover). If Discover were the only credit card network that had a nondiscrimination rule and merchants indicated that it was a barrier to steering, Discover would not bar that activity. Trial Tr. 985:13-22 (Hochschild/Discover). As discussed above, Discover will pursue a strategy of reducing its merchant acceptance fees to merchants that agree to steer to Discover.

295. Merchants agree that Discover's nondiscrimination rule would not prohibit them from steering. See, e.g., Trial Tr. 369:22-370:12 (Thiel/Alaska Airlines) (Alaska Airlines would be able to get an amendment to Discover's antisteering provisions); 1544:14-23 (O'Malley/Best Buy) (Discover does not have the "market power" to prevent Best Buy from steering); 504:1-23 (Satkowski/Enterprise) (Enterprise has told Discover that if Amex no longer had its ASRs, Discover would either need to remove its ASRs, or Enterprise would have to reconsider its agreement with Discover).

296. Merchants have more negotiating leverage over Discover than other networks. See, e.g., Trial Tr. 2416:17-2418:2 (Priebe/Southwest) (Southwest has prevented Discover from raising its rates by telling Discover that Southwest would "consider turning [Discover] off");

86

457:23-458:22 (Robinson/IKEA) (IKEA objected to a fee Discover tried to impose and Discover "backed off" from the fee).

297.    For many merchants, Discover accounts for much less charge volume and is viewed by some as less essential than other networks. Trial Tr. 2550:14-19 (Holtey/Solitude) (Solitude would not be "adversely impacted economically" if it stopped accepting Discover); 1608:7-13 (Brennan/Hilton) (It would be easier for Hilton to stop accepting Discover than to stop accepting Amex because Discover accounts for "far less" revenue than Amex); 504:1-23 (Satkowski/Enterprise) ( Enterprise is "fully comfortable that if [it] were to eliminate the Discover brand that [Enterprise] will not see any loss in any business").

## III.    A RELEVANT MARKET CONSISTS SOLELY OF GPCC CARD NETWORK SERVICES PROVIDED TO MERCHANTS IN THE UNITED STATES.

298.    Evidence at trial demonstrated that GPCC card network services provided to merchants constitute a relevant market.  Merchants testified that they cannot substitute debit cards for credit cards because a significant portion of their customers insist on using credit cards for a variety of reasons, particularly the availability of a line of credit.  Even after debit prices fell dramatically following implementation of the Durbin Amendment, merchants did not stop accepting credit cards and many merchants explained that the cost of debit has no impact on whether they accept credit cards.  In addition, Amex insistence data and loyalty data from several merchants show that a large portion of customers will not readily switch from credit cards. Amex and Discover executives also testified that they price their credit products in relation to other networks' credit prices, without factoring in prices associated with debit card use. Professor Katz relied on this evidence in concluding that GPCC card network services provided

to merchants constitutes a well-defined relevant product market.  Trial Tr. 3858:14-25, 3935:19-3937 (Katz); PX2702 at 69.

299.    The evidence Amex presented at trial on market definition failed to show a market broader than GPCC card network services.  Amex's economic expert, Professor Bernheim, agreed with plaintiffs that general purpose charge cards should be included in the relevant product market along with general purpose credit cards.  Trial Tr. 6216:2-10 (Bernheim).  His analysis purporting to show that the relevant market extends beyond credit and charge cards, however, is seriously flawed.  Professor Bernheim focused only on consumer usage of  payment methods under existing conditions and ignored the critical question in defining markets – *i.e.*, whether a network that increased the price of credit card acceptance would lose sufficient merchant volume to debit cards to make a price increase unprofitable.  *See* Trial Tr. 6217:1-21 (Bernheim).  Professor Bernheim, in short, erred by not performing a hypothetical monopolist test and by doing a one-sided analysis while ignoring the merchant side of the market. In addition, Amex's expert did not properly account for the meaningful differences between credit and debit cards, particularly the credit facility associated with credit cards.

300.    Amex's other economic expert, Professor Gilbert, acknowledged that functional similarities alone are insufficient to put products in the same relevant antitrust market.  Trial Tr. 5203:16-5204:2 (Gilbert).  For example, in *United States v. Apple*, Professor Gilbert defined the relevant antitrust market as "trade e-books," excluding print books,  Trial Tr. 5201:23-25 (Gilbert), even though e-books and print books are functional substitutes for some uses, Trial Tr. 5202:9-12 (Gilbert), and some readers bought both e-books and print books.  Trial Tr. 5205:22-24 (Gilbert).

301.    The market definition analysis below confirms what courts consistently have found.  The availability of other payment methods – *e.g.*, debit, cash, check – cannot prevent adverse effects from a reduction in GPCC card network services competition.

**A.     When anticompetitive effects are proved there is no need to define a relevant market.**

302.    Courts define relevant markets to assist in determining the competitive effects of an alleged restraint on trade.  Here the purpose of market definition is to determine whether debit cards are a close enough substitute for credit cards that they can prevent harm from a reduction in competition among credit card networks.

303.    Professor Gilbert agreed that market definition is not required if the competitive effects analysis is done correctly.  Trial Tr. 5157:12-5158:12 (Gilbert).  As he wrote in a recent paper, "there are circumstances in which the effort to reach a formal evaluation as to the specific scope of the market can be distracting, if not misleading.  In such cases, it will be beneficial to undertake the competitive effects analysis without necessarily reaching a formal conclusion on market definition."  Trial Tr. 5156:23-5157:11 (Gilbert).

304.    Professor Katz used two analytical approaches to assess whether the ASRs have adverse competitive effects.  Trial Tr. 3823:15-3825:15 (Katz); PX2702 at 2. The actual adverse effect approach entails looking at direct evidence of how the practices at issue affected competition. Trial Tr. 3824:11-19 (Katz); PX2702 at 2. The market power approach is an indirect approach to determine whether a practice has negatively affected competition; it consists of identifying relevant markets, assessing a firm's market power, and identifying whether anticompetitive effects are likely.  Trial Tr. 3824:20-3825:3 (Katz); PX2702 at 2.  Professor Katz

reached the same conclusion using both approaches:  there are significant adverse competitive effects from the ASRs.  Trial Tr. 3824:7-3825:22 (Katz); PX2702 at 25, 94, 96.

**B.**     **Amex previously agreed that GPCC card network services constitute a relevant product market.**

305.     Before this suit was filed, Amex agreed that GPCC card network services constitute a relevant product market.  Amex consistently and repeatedly represented to courts and government agencies that it does not compete with debit card networks because of debit's limited substitutability with credit.  In its 2004 complaint against Visa and MasterCard, Amex argued that "[t]he 'general purpose card network services market' or 'network services market' is a distinct 'Relevant Product Market'" and that "[c]onsumers do not consider debit cards to be reasonably interchangeable with general purpose credit and charge cards."  PX0106 at ¶ 75, ¶ 152; *see also* PX0254 at -641 (2005 presentation to the Federal Reserve stating that Amex considers the market "to be general purpose charge and credit cards; debit is a different market"); PX0004 at -046 (2007 presentation to GAO); PX1408 at 22 (Amex 2009 10-K stating that "[t]he ability to substitute debit cards for credit and charge cards is limited"); PX1407 at 21 (Amex 2008 10-K); PX1406 at 20 (Amex 2007 10-K); Trial Tr. 4588:3-14 (Chenault/Amex) (admitting Amex argued that credit and debit were in different markets in its case against Visa and MasterCard).

306.     Amex made such representations to courts as late as 2008.  *See* PX1498 at 13-15 (Mem. of Law in Supp. of Pl. American Express Travel Related Services Company, Inc.'s Mot. for Partial Summ. J. on Count 1, *Am. Express Travel Related Servs. Co. v. MasterCard Inc.*, No. 04-CV-08967 (BSJ) (DFE) (S.D.N.Y. June 9, 2008)).  Amex admitted that its "Complaint alleges the same relevant markets that were found in the *DOJ Action*."  PX1498 at 15.

307.     In the 2008 *Marcus* litigation, Professor Gilbert defined a credit and charge market that excluded debit, as does Professor Katz here.  Trial Tr. 5160:14-5164:2 (Gilbert); PX2072 at ¶ 200.  There, Professor Gilbert excluded debit from the market in part because debit has no credit facility.  Trial Tr. 5164:11-5165:16 (Gilbert); PX1408 at 22.  Here, Professor Gilbert acknowledged that little has changed in terms of debit's substitutability for credit since 2008.  Trial Tr. 5165:17-5167:19 (Gilbert) (stating that credit cards still have a credit facility while debit cards do not and that the growth of debit "by itself doesn't tell you much").  In 2008, Professor Gilbert testified for Amex that, after surveying the various cases about payment cards including the *Visa* decisions, "███████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████."  PX2072 at ¶ 200.

### C.     The hypothetical monopolist test confirms GPCC card network services provided to merchants is a relevant market.

308.     Economists use the hypothetical monopolist test to define relevant markets.  Trial Tr. 3859:7-11 (Katz); *see* Trial Tr. 6502:1-3 (Bernheim) (referring to the hypothetical monopolist test as "well-accepted"); 5204:3-5205:13 (Gilbert) (admitting he applied the hypothetical monopolist test in *U.S. v. Apple*).  The hypothetical monopolist test provides a structured way to determine whether goods or services are reasonable substitutes.  Trial Tr. 3859:17-3860:24 (Katz)

309.     The hypothetical monopolist test is widely used by courts.  Trial Tr. 3859:12-16 (Katz).  The test asks whether a monopolist would find it profitable to impose a small, but significant, non-transitory price increase above competitive levels on a proposed set of products. Trial Tr. 3862:9-3863:9 (Katz).  If the monopolist could raise price significantly, that

demonstrates that competition among these products matters.  Trial Tr. 3862:9-3863:9 (Katz).

If so, then the products constitute a relevant market; if not, the relevant market should be

broader.  Trial Tr. 3862:9-3863:9 (Katz); PX2702 at 32.

310.    This analysis does not require inclusion of all substitutes in the relevant market –

only those that are close enough to constrain the hypothetical monopolist's pricing.  Trial Tr.

3861:12-3862:7 (Katz).

311.    The hypothetical monopolist test indicates that GPCC card network services is a

relevant market.  Professor Katz applied the hypothetical monopolist test by analyzing whether it

would be profitable for a hypothetical monopolist consisting of Visa, Amex, MasterCard, and

Discover GPCC card operations to impose a small but significant, non-transitory increase in

price above the competitive level (1) on network fees and (2) on the average merchant discount

rate.  Using these analyses, Professor Katz determined that a relevant market consists solely of

GPCC card network services.  Trial Tr. 3858:14-25, 3863:12-3864:5, 3903:19-3904:10, 3922:9-

3923:11 (Katz); PX2702 at 59-61.

312.    Neither Amex economist attempted to perform a hypothetical monopolist test to

determine the relevant market in this case.  Trial Tr. 6501:22-25 (Bernheim); *see* Trial Tr.

5208:9-22 (Gilbert) (deferring to Bernheim's market definition analysis).  That failure is telling,

especially since Professor Bernheim testified that he could recall only one other instance when

he submitted an expert opinion as to a product market without having done a hypothetical

monopolist test -- the *Virgin Atlantic* case.  Trial Tr. 6503:6-6504:8 (Bernheim).

**D.      Debit cards would not constrain an exercise of market power by a hypothetical monopolist of credit cards.**

313.     Whether it is profitable for a GPCC card monopolist to raise the price to accept credit cards ultimately depends on whether the price hike would cause sufficient merchants to stop accepting credit cards.

314.     Given the nature of this market, the profitability of a price increase ultimately depends on how many merchants would stop accepting credit cards as a result.  For a price increase to be unprofitable, merchants and their customers must jointly substitute away from credit.  Trial Tr. 3864:6-3865:25 (Katz).  Cardholders do not see the price increase or pay it (except as part of higher retail prices to all consumers), so cardholders cannot be expected to react to it.  Because merchants are the ones facing higher prices, they are the ones who will want to substitute.  Merchants, hamstrung by their limited ability to steer under Amex's current rules, could initiate such substitution in only two ways:  they could offer untargeted debit discounts (Durbin discounts) or they could stop accepting credit cards.  Trial Tr. 3864:21-3865:25 (Katz).

315.     Merchants, however, generally find untargeted discounts to be prohibitively expensive because they must offer these discounts to the "bunch [of] people" who were already going to use debit.  Trial Tr. 3866:1-3867:18 (Katz).  Amex recognizes this distinction between targeted and untargeted (or "holistic") discounting and it also recognizes that untargeted discounting is less effective.  Trial Tr. 3866:1-3867:18 (Katz) (discussing PX1205 at -720).   As a result, it is the merchants' ability to drop credit card acceptance, not broad discounts for debit usage, that will determine a price increase's profitability.  Trial Tr. 3866:1-3868:3, 3874:15-3876:3 (Katz).

93

316.    Amex economists testified about derived demand and consumer switching without evaluating how it might be related to a price increase by a hypothetical monopolist and thus to reasonable substitutability.  Professor Bernheim ignored the question of merchant substitution in the face of a price increase, claiming that his focus on consumers is sufficient because merchant demand is derived from customer demand.  Trial Tr. 6217:1-12 (Bernheim) (discussing DX7828 at 6).  But this approach is incorrect because Professor Bernheim ignored the fact that credit card-using customers do not pay any increased price (other than through higher retail prices for all customers) and merchants are largely blocked by the ASRs from taking any action to influence customer choice.  Trial Tr. 6628:4-6632:17, 6638:18-6639:1 (Katz).  Because Professor Bernheim conducted a one-sided analysis focused on the cardholder side of the market, his conclusions about market definition are unsound.

317.    A merchant's acceptance decision hinges on its estimate of its credit-insistent customers.  Trial Tr. 3867:23-3871:24, 3899:18-3901:19 (Katz).  Professor Bernheim agreed that merchants' demand for payment products is based on their customers' demand for those payment products.  Trial Tr. 6217:4-12; 6282:14-18 (Bernheim).

318.    As Professor Katz testified at trial using the diagram below, in considering whether to drop credit cards, a merchant would compare its gain from sales it successfully converts from credit to a lower-cost payment form against its lost profits from customers who will only pay with credit cards.  The amount saved depends on the rate differential between credit and the other payment forms, while the amount lost depends on the merchant's profit margins.  Trial Tr. 3867:23-3871:24 (Katz).

**Figure 2**



PX2702 at 35.

The larger a merchant's margin, the smaller the percentage of insistent volume needed to deter a

merchant from dropping credit cards.  Trial Tr. 3871:25-3872:5 (Katz).  Since a merchant's

margin often far exceeds the rate differential between payment forms, a merchant would not

"have to lose very much business" to conclude that "the economically rational thing to d[o] is to

keep accepting credit and charge cards."  Trial Tr. 3870-23-3871:24 (Katz). [3]

319.    This focus on credit-insistent customers is necessary because the credit card

industry is two-sided and the ASRs are in place.  In a typical, one-sided market, "the people who

really matter for competition" are "the people who don't care that strongly between say one

---

[3] The following example illustrates how little insistent volume a merchant needs to lose before it
becomes irrational to stop accepting credit.  If the rate differential between credit and other
payment forms is one percent, a merchant's margin is twenty percent, and the merchant keeps
$950 out of $1000 in charge volume when it drops credit, the merchant cannot rationally drop
credit cards.  Trial Tr. 3867:23-3871:24 (Katz).  That is because the $9.50 gain from dropping
credit cards ($950 non-insistent volume multiplied by the one percent rate differential) is less
than the $10.00 loss it inflicts on the merchant ($50 insistent volume multiplied by the twenty
percent margin).  Trial Tr. 3867:23-3871:24 (Katz).  This example shows that a small (even less
than five percent) core of loyal credit users could prevent the merchant from dropping credit card
acceptance.

brand and the other" and "are willing to switch." Trial Tr. 3899:18-3901:19 (Katz). But, here, the ASRs create an "all or nothing" acceptance decision for a merchant, so the extent of a merchant's credit-insistent volume dictates whether it can substitute away in the face of a price increase on credit. Trial Tr. 3899:18-3901:19 (Katz).

320. As a result, the economic analysis focuses not on "the people who are happy to switch easily" but rather "the people who are really loyal," because those are the people the merchant would lose if it dropped credit. Trial Tr. 3899:18-3901:19 (Katz). Professor Katz concluded that, "even if most people say I don't care how I pay, if there's a core of people who do care and are loyal to credit cards," then "the merchant's going to find it economically rational, profitable or just sensible to continue accepting credit and charge cards." Trial Tr. 3874:15-3876:3, 3974:18-3976:1 (Katz).

321. As part of his analysis, Professor Katz followed a standard approach of aggregating merchants in different industry segments when applying the hypothetical monopolist test. This aggregation process, described in the Horizontal Merger Guidelines, is common in situations where a monopolist could price differently to thousands or hundreds of segments. Trial Tr. 3911:14-3912:11 (Katz).

E.     **Because of the power of insistence, Amex calculates it can raise prices without losing merchants.**

322. Amex takes a similar approach as Professor Katz when it calculates the levels of insistence for its credit cards. Specifically, Amex estimates by industry the percentage of Amex charge volume that a merchant would lose if it no longer accepted Amex. PX1240 at -103; PX0111 at -826; Trial Tr. 3872:8-3873:21, 3896:12-3898:10 (Katz). For example, Amex calculates insistence of 42 percent in airlines, 36 percent in car rentals, 28 percent in lodging, 23

percent in drug stores, and 22 percent in supermarkets.  PX1240 at -103.  Professor Katz testified that Amex insistence estimates are "large numbers," representing "a fair amount of business to be at risk for a merchant."  Trial Tr. 3896:12-3898:10 (Katz)

323.    Moreover, Amex's analyses reveal that its insistence calculations underestimate the actual extent of Amex cardholder insistence.  After one merchant, Murphy Oil, stopped accepting Amex, Amex's analysis indicated that much of Murphy's Amex volume – double the amount its insistence calculations predicted – went to other gas stations.  PX0454 at -089; PX0031 at -668; Trial Tr. 2699:12-2700:17 (Funda/Amex).

324.    Amex uses these insistence numbers to explain to merchants why dropping it would be unprofitable.  Trial Tr. 3872:8-3873:21 (Katz); PX0111 at -826.  Amex compares for merchants the savings from dropping Amex and having non-insistent cardholders pay with a less expensive card against the loss of having Amex-insistent cardholders chose to spend less or shop elsewhere.  Trial Tr. 3872:8-3873:11 (Katz); PX0111 at -826.  In a presentation to Alaska Airlines, Amex used this approach to estimate Alaska's profit margin at ▮▮▮▮▮▮, and showed that Alaska need not "lose very much volume" – only ▮▮▮▮▮▮ – to conclude that Alaska "should continue to accept" Amex.  Trial Tr. 3873:12-21 (Katz); PX0111 at -826.

325.    Professor Katz explained that insistence for credit cards collectively would be much greater than insistence for Amex alone.  Trial Tr. 3896:12-3898:10 (Katz).  For a hypothetical monopolist, "you'd expect these insisten[ce] numbers to be much larger" than for Amex because "if a merchant drops American Express . . . many of its cardholders . . . would switch to" Visa or MasterCard credit cards.  Trial Tr. 3896:12-3898:10 (Katz).  With a hypothetical monopolist, consumers cannot switch to another credit and charge card.  Trial Tr. 3896:12-3898:10 (Katz).

326.     These insistence numbers show that "for many people for many transactions other payment instruments are poor substitutes for credit cards."  Trial Tr. 3899:18-3901:19 (Katz).  Merchants are concerned about this credit-insistent volume because it "would ultimately make it a money losing decision to stop accepting credit and charge cards even in the face of a price hike."  Trial Tr. 3899:18-3901:19 (Katz).

**F.     A hypothetical monopolist of GPCC card network services could profitably raise prices.**

327.     Professor Katz examined whether a hypothetical monopolist of GPCC card network services would find it profitable to raise network fees.

328.     Analyzing network fees isolates network operations and focuses only on the portion of revenue that a network keeps when "it is facilitating transactions by others."  Trial Tr. 3914:20-3917:11 (Katz).  By considering the full revenue earned on network operations, Professor Katz takes "into account the institutional features and the fact that we're dealing with two-sided platforms."  Trial Tr. 3914:20-3917:11 (Katz).

329.     Professor Katz considered an increase in merchant fees of an amount equivalent to 10 percent of total network fees.  Trial Tr. 3922:9-20 (Katz).  In doing this, he held the price to cardholders constant to account for the fact that a platform is two-sided.  For the same reason, he allowed for the possibility of feedback effects.  Trial Tr. 3903:19-3904:10 (Katz).  The consideration of a 10 percent increase, "instead of taking five percent which is common," was conservative.  Trial Tr. 3904:11-21, 3922:13-20 (Katz).

330.     For his calculations, Professor Katz assumed that the hypothetical monopolist had a 100 percent profit margin, which conservatively overestimates the negative profit impact of sales lost due to the price increase.  3914:20-3917:4 (Katz).  This calculation indicated that a

price increase from 2.60 percent to 2.63 percent would be profitable unless it caused merchant volume to fall more than 9.1 percent. PX2702 at 59-60; Trial Tr. 3922:13-20 (Katz).

331.    Professor Katz concluded that this candidate market met the test. This was based on evidence that consumers use credit and debit cards differently; evidence from Amex and merchants showing that credit customers are insistent; evidence that Amex profitably raised prices during its value recapture initiative; and evidence that debit price decreases post-Durbin did not result in switching from credit to debit. Trial Tr. 3917: 20-3919:15, 3922:13-19. Therefore Professor Katz concluded that it would be "extremely unlikely" that a hypothetical monopolist would lose more than nine percent of its volume due to a three basis point price increase. Trial Tr. 3917:12-3919:15, 3922:13-3923:24 (Katz); PX2702 at 56-57, 59-61. Thus GPCC card network services provided to merchants is a relevant market. Trial Tr. 3858:14-25, 3922:13-3923:24 (Katz).

332.    As a "belt and suspenders" effort, Professor Katz also performed a hypothetical monopolist test on the average merchant discount rate. Trial Tr. 3924:3-24 (Katz). While holding the level of cardholder rewards constant, he calculated that a hypothetical monopolist of GPCC card network services could profitably raise the average price to merchants by 5 percent, unless doing so would cause a loss of 23 percent or more of its charge volume. PX2702 at 61; Trial Tr. 3924:3-24 (Katz). For the reasons stated in the preceding paragraph, Professor Katz found it economically implausible that merchants accounting for almost one quarter of all GPCC card volume would stop accepting those cards if they faced a 5 percent price increase in their credit card fees. As a result, he concluded that GPCC card network services provided to merchants constitute a relevant antitrust market. Trial Tr. 3924:3-24 (Katz).

99

G.   **Katz applied the hypothetical monopolist test considering the two-sided nature of GPCC card networks.**

333.   Professor Katz applied the hypothetical monopolist test in a manner that took into account the "two-sided" nature of GPCC card networks by examining changes to prices charged to merchants while keeping constant prices charged (or rewards given) to cardholders.  Trial Tr. 3827:12-20, 3903:19-3904:10 (Katz).

334.   Professor Gilbert agreed that a properly applied hypothetical monopolist test can help define a two-sided market, conceding that "[y]ou don't abandon" the thinking about antitrust economics when presented with a two-sided platform.  Trial Tr. 5171:18-20, 5196:19-23 (Gilbert).  Professor Gilbert also agreed with Professor Katz, "You can have one two-sided market, or you can talk about two one-sided markets so long as you keep track of those two markets and how they interact."  Trial Tr. 5026:11-19 (Gilbert).  Professor Gilbert conceded that a way to apply the hypothetical monopolist test to a two-sided platform is to raise the price on one side of the platform and hold the price on the other side constant, as Professor Katz did.  Trial Tr. 5177:20-5178:12 (Gilbert).

335.   In *United States v. Apple*, Professor Gilbert testified for the United States that e-book sales platforms were two-sided platforms.  Trial Tr. 5201:8-11 (Gilbert).  In that case, Professor Gilbert applied the Hypothetical Monopolist Test similarly to how Professor Katz did so here, looking only at the price paid by consumers of e-books, and not the price on the other side of e-books platforms.  Trial Tr. 5204:13-5205:13 (Gilbert).  In addition, Professor Gilbert in his review of *United States v. Microsoft* considered only the price of operating systems, which is the price on one side of a two-sided market; there was "no reason" to calculate a two-sided price in that case.  Trial Tr. 5249:2-5250:17 (Gilbert).

### H.   Merchants do not perceive the acceptance of debit cards to be a close substitute for the acceptance of credit cards.

336.   Merchants do not view debit and credit as close substitutes.  For example, Alaska Airlines views credit and debit as distinct products that do not compete with each other and cannot substitute for each other, while Crate & Barrel regards credit cards and debit cards to be "totally different products."  Trial Tr. 252:6-11, 252:25-253:2 (Thiel/Alaska Airlines); Trial Tr. 2322:5-7 (Bruno/Crate & Barrel).

337.   The following themes emerged from merchant testimony about the substitutability of debit and credit:  (1) credit users and debit users represent different populations of customers; (2) certain customers need to access credit; (3) corporate cardholders generally want to use credit; (4) credit provides convenient security for certain purchases; and (5) a large price difference exists between credit and debit.

338.   First, merchants view credit users and debit users as different customer populations, with little substitution between payment forms in each population.  *See* Trial Tr. 251:10-19 (Thiel/Alaska Airlines); Trial Tr. 6122:10-15; 6151:23-6152:6 (Mitchell/Official Payments); Trial Tr. 564:20-565:9 (Bouchard/Sears); Trial Tr. 387:21-388:7 (Robinson/IKEA).

339.   Some Alaska Airline customers would "much rather" pay with credit than debit. Trial Tr. 251:10-19 (Thiel/Alaska Airlines).

340.   Official Payments' customers typically choose to use a debit card when their transaction is less than $300 and choose to use to credit cards when the transaction is greater than $300.  Trial Tr. 6122:10-15; 6151:23-6152:6 (Mitchell/Official Payments).

341.   Some Sears customers have preferences, regardless of transaction size, to pay with a particular kind of card.  As a result, Sears believes it would be at a competitive

101

disadvantage if it dropped credit and relied only on debit.  Trial Tr. 564:20-565:9

(Bouchard/Sears).

      342.    IKEA accepts credit cards because "our customers have different tendencies and

preferences in terms of how they want to pay for their purchases."  Trial Tr. 387:8-18

(Robinson/IKEA).  Some IKEA customers prefer credit while others prefer debit.  IKEA

customers who prefer debit "may be people who don't want to carry a balance at the end of the

month; they may be people who are budget conscious and simply [do] not want to spend more

than what's in their bank account."  Certain credit customers "are willing to, basically, carry a

balance from month to month."  IKEA's "experience has shown us different customers . . .  have

different preferences, and we have to offer those choices."  Trial Tr. 387:21-388:7

(Robinson/IKEA).  Between 2003 and 2006, IKEA offered discounts on future purchases to

customers paying with PIN debit.  It found that the promotion encouraged only its customers

who had been paying with checks to switch to debit cards.  Trial Tr. 398:9-403:1

(Robinson/IKEA).  When IKEA offered a similar deal between 2008 and 2012, customers

switched primarily from signature debit cards to PIN debit cards.  Trial Tr. 404:10-406:20

(Robinson/IKEA).

      343.    Even though debit cards are a "much lower" cost  for Best Buy than credit cards,

Best Buy has never considered accepting only debit cards because "consumers are expecting to

pay with credit cards" and for certain individuals "it can be a challenge" to pay with debit for

some items.  Trial Tr. 1525:9-21 (O'Malley/Best Buy).

      344.    Discover, too, has seen that many consumers have "very strong preferences" for

credit card or debit cards.  Consumers who tend not to carry a balance on their credit cards –

known as "transactors" – generally use credit cards for every purchase.  Consumers with little

credit available to them or who are carrying credit balances frequently prefer the discipline of debit cards, particularly for day-to-day purchases such as gas, groceries, or drug stores.  Trial Tr. 819:17-820:5 (Hochschild/Discover).

345.    Second, merchants observe that customers either want or need access to the line of credit that credit cards offer.  The majority of Southwest Airlines' customers pay by credit card because credit cards offer a line of credit, whereas customers must have funds in their checking account to pay by debit card.  Trial Tr. 2402:10-18 (Priebe/Southwest).

346.    Sears cannot drop credit cards and rely on debit cards because its customers need the ability to pay over time, versus paying up front, for big ticket items like appliances.  Trial Tr. 564:13-19 (Bouchard/Sears).

347.    Likewise, given Home Depot's large average ticket size, Home Depot is "almost required to accept credit cards."  Trial Tr. 1231:1-5 (Kimmet/Home Depot).  Home Depot "customers want to pay with credit when they walk in the store" and "may want to finance" their purchases.  Trial Tr. 1231:6-14, 1231:25-1232:12 (Kimmet/Home Depot).  If Home Depot did not accept credit, a segment of its customer base would move to its competitors that do because that segment either wants to or "can only pay" with credit.  Trial Tr. 1232:13-24 (Kimmet/Home Depot).

348.    Third, merchants are concerned that they would lose business travelers or corporate card users if they stopped accepting credit cards.  *See* Trial Tr. 251:10-22 (Thiel/Alaska Airlines); 5908:2-18 (Flueck/Starwood Hotels).  Alaska Airline has seen that debit is a poor substitute for corporate travelers because they buy expensive items such as airline tickets and want to be reimbursed before having to write a check for their travel expenses.  Trial Tr. 251:10-22 (Thiel/Alaska Airlines).  For business travelers, debit is not a good substitute for

credit because credit allows the traveler to be reimbursed before the traveler has to pay out of her own account.  Trial Tr. 5908:2-18 (Flueck/Starwood Hotels).

349.    Fourth, merchants' demand for credit cards and debit cards differs from their customers' demand.  Professor Bernheim asserted that "[t]he only reason that a merchant wants to use a payment product is that a customer wants to use the product."  Trial Tr. 6217:1-12 (Bernheim).  This approach is incomplete, however, because he ignores the fact that customers do not pay any increased prices that networks impose on merchants; moreover, merchants are largely blocked by the ASRs from taking any action to influence customer choice.  As a result, Professor Bernheim's analysis omits "a critical part of market definition."  *See* Trial Tr. 6628:24-6629:21 (Katz).

350.    At trial, merchants testified they have reasons beyond customer preference to accept credit cards.  For example, debit is an extremely poor substitute for credit when a merchant requires security for a purchase.  Trial Tr. 482:5-484:8, 485:7-23 (Satkowski/Enterprise); 1610:2-1611:17 (Brennan/Hilton); 3141:22-3143:24 (Gibson/Sinclair); Trial Tr. 5906:22-5907:20 (Flueck/Starwood Hotels).

351.    Hilton actively discourages customers from using a debit card on Hilton property, describing use of debit as an "atrocious" experience for the consumer.  Trial Tr. 1610:2-14, 1612:18-20 (Brennan/Hilton).  If a customer pays with a debit card, Hilton takes an overage out of the customer's checking or cash account at check-in to ensure that there are sufficient funds to cover any expenses beyond the expected charges.  Trial Tr. 1610:16-1611:7 (Brennan/Hilton). The overage typically is $500.  Trial Tr. 1610:16-21 (Brennan/Hilton).  It may take six weeks for the overage to be returned to the customer.  Trial Tr. 1611:4-9 (Brennan/Hilton).

352.     Grand America prefers that customers pay by credit card, rather than debit, because credit cards usually offer a higher credit limit.  Trial Tr. 3141:22-3142:18 (Gibson/Sinclair).  Grand America places a hold on guests' credit or debit cards to cover expenses beyond the basic cost of a room.  Trial Tr. 3142:4-1343:6 (Gibson/Sinclair).  The funds subject to the hold often exceed the money available in the guest's checking account.  Trial Tr. 3142:4-1343:6 (Gibson/Sinclair).  Guests who pay by debit card often bounce checks because they do not realize that their money is being held.  Trial Tr. 3142:4-1343:6 (Gibson/Sinclair). Guests who pay by credit card tend to have a better experience because they are less likely to incur expenses that exceed their credit limit.  Trial Tr. 3143:10-18 (Gibson/Sinclair).

353.     When a customer presents a debit card, Starwood puts a hold on a guest's account, which is generally equal to the cost of the stay plus a 30 percent premium.  Trial Tr. 5906:22-5907:2 (Flueck/Starwood Hotels).  The hold can last for 30 days and can cause unaware guests to bounce checks.  Trial Tr. 5907:6-10 (Flueck/Starwood Hotels).  Starwood, therefore, warns its guests about paying with a debit card.  Trial Tr. 5907:11-20 (Flueck/Starwood Hotels).

354.     Enterprise prefers that its customers use credit cards because they provide more identity verification and security for car rentals.  If a customer uses cash or debit, Enterprise must go through extra steps to validate the individual's identity and to confirm that they have enough financial resources to be entrusted with a car.  Trial Tr. 482:5-484:8, 485:7-23 (Satkowski/Enterprise)

355.     Professor Katz explained that customer preferences are the major factor that drives merchants' decisions on whether to accept particular payment instruments, but merchants also take costs into account, such as training costs and how long a payment instrument takes to use at the point of sale.  Merchants also consider other characteristics of the network services

that merchants receive, such as whether payment instruments differ in aspects such as speed of pay and the quality of customer service.  Trial Tr. 3831:22-3832:8 (Katz).

356.    Fifth, credit cards cost significantly more than other payment forms merchants generally accept.  Credit cards generally are a merchants' most expensive payment form.  See, e.g., Trial Tr. 380:9-12 (Robinson/IKEA) (credit cards are IKEA's most expensive payment form); 1684:14-17 (Dale/Sprint); PX2615; PX2616.  Some merchants' credit card rates are several multiples larger than their debit rates.  For example, Home Depot's cost of accepting credit cards is four times its cost of debit acceptance, and credit cards are three times more expensive for Southwest than debit cards.  Trial Tr. 1230:19-22 (Kimmet/Home Depot); Trial Tr. 2401:14-19 (Priebe/Southwest); PX1348 at -002.

357.    Despite the significantly higher price of credit cards than debit cards, credit cards are widely accepted.  For example, 98 of the 100 largest retailers in the United States accept credit cards.  Trial Tr. 6751:21-6752:1 (Stipulation); PX2273.  Amex's CEO testified that the vast majority of merchants accept credit cards.  Trial Tr. 4363:12-21 (Chenault/Amex).

358.    Merchant acceptance of credit cards has grown steadily since 2007.  Trial Tr. 3931:3-9 (Katz); PX2702 at 65.  Credit card networks have expanded into new merchants that previously did not accept credit cards.  Trial Tr. 826:18-827:4 (Hochschild/Discover).

359.    If credit and debit cards were close substitutes, some merchants would likely have stopped accepting credit cards in favor of less expensive debit, but the evidence shows that this has not occurred.  "[T]he fact that merchants are accepting credit cards when they're more expensive for the merchants and they're not offering a higher quality service for the merchant is an indicator that in fact they're not reasonably interchangeable."  Trial Tr. 6632:18-6633:16 (Katz).  For example, the low cost of debit fees has no impact on Alaska Airlines' decision to

accept credit.  Trial Tr. 254:4-7 (Thiel/Alaska Airlines); *see also* Trial Tr. 561:14-562:10, 564:1-15 (Bouchard/Sears); 2159:8-17 (Haslam/OfficeMax); 2321:2-2322:7 (Bruno/Crate & Barrel); 2404:7-16 (Priebe/Southwest Airlines); 5298:1-5 (Gutierrez/Strictly Bicycles).

**I.**     **Merchants testified that they cannot substitute credit for debit even if their credit card prices increase.**

360.     Merchants would not abandon credit card acceptance in the face of a ten percent price increase.  Trial Tr. 1233:10-25 (Kimmet/Home Depot); 1683:24-1684:5 (Dale/Sprint).

361.     For example, even though credit cards are more than five times more expensive for Sprint than debit cards, Sprint would not stop accepting credit cards even if the cost of credit cards increased by ten percent.  Trial Tr. 1683:24-1684:5, 1685:4-6 (Dale/Sprint).  Sprint believes that it would not be competitive and would lose sales if it did not accept credit cards. Trial Tr. 1684:3-14 (Dale/Sprint).

362.     Likewise, "given the materiality of credit in [its] business, it would be . . . impossible for [Home Depot] to not accept" credit cards even if Home Depot's costs of accepting credit increased by ten percent.   Trial Tr. 1233:10-25 (Kimmet/Home Depot).

**J.**     **GPCC card networks base their credit card prices on the prices of other credit cards, not debit cards.**

363.     Amex compares its prices to Visa and MasterCard credit pricing, not debit pricing, when making business decisions, suggesting that debit is not a close substitute for credit. Mr. Funda testified that the starting point for Amex's pricing methodology is Visa's and MasterCard's all-in credit rate, which is comprised of interchange, network fees, and acquiring fees, on Amex's mix of business.  Trial Tr. 2562:3-10, 2562:19-2563:9, 2565:19-2568:3 (Funda/Amex); PX1240 at -091.  Amex uses this methodology as a basis for its pricing decisions.  Trial Tr. 2564:17-2565:10 (Funda/Amex).

364.    Mr. Funda testified that Amex does not compare its prices to a blend of Visa and MasterCard credit and debit prices because credit "is a different enough product with a sufficiently different feature set" than debit and "a sufficiently different cost structure than debit, that it should be priced on its own merits and not combined with debit."  Trial Tr. 2730:17-23 (Funda/Amex).

365.    In seeking to justify its premium over Visa and MasterCard, Amex told one merchant that "we do not compete with debit so we didn't include it in [the rate] analysis." PX0010.  Amex also instructed its merchant sales force to advise merchants that, "█████ ███████████████████████████████████████████████████ ███████████████████."  PX1110 at -311; *see also* PX0068 at -514 (explaining that comparing Amex to Visa and MasterCard "on a credit to credit basis" is "a more accurate comparison" than a comparison including debit).

366.    Although Amex claims that merchants frequently mention their blended credit and debit prices in an effort to lower their discount rate, Amex could point to only one of its millions of merchants, Jetro, for which it changed its rate in response to the blended credit and debit rate.  *See* Trial Tr. 2282:17-2284:10 (Berry/Amex).  But even in that case, Amex said that "Jetro will need to be educated on why debit and credit are separate products and why AXP should only be compared to credit."  PX0011 at -627.  And a 2009 Amex presentation entitled "Jetro and American Express" stated that "[l]arge value differences exist between Credit and Debit products, which drives the different pricing."  PX0037 at -497.  The same presentation also stated that "[s]ignificant differences exist between Charge/Lending and Debit products," including "Capital access," "Flexible Spend / Float," "Marketing / Spend Data," "Risk assumption," "Insistence," and "Loyalty / Rewards / Rebates."  PX0037 at -490.

367.    Amex also compares its credit products to other credit products on the cardholder side of the market.  Amex stated that its Platinum Card competes "predominantly vs. Chase United and Citi Advantage."  PX2528 at -229.  Those products are credit, not debit, cards.  Trial Tr. 3587:10-23 (Silverman/Amex); *see also* Trial Tr. 3755:3-19 (Silverman/Amex) (no debit cards among Amex "Select Competitor Products" shown on demonstrative DX7754).  Amex also identified only credit cards as the "Key Competitors" to its Blue Cash Card.  PX2528 at -247; Trial Tr. 3588:16-3589:5 (Silverman/Amex).  In addition, even for the Amex EveryDay Card, Amex identified only credit cards as its "Top Competitors."  PX2528 at -262; Trial Tr. 3589:19-3590:7 (Silverman/Amex).  On the other hand, Amex launched a new product, called BlueBird, when it wanted to market a "Debit and Checking Alternative."  PX2578A at -397; Trial Tr. 3583:2-14 (Silverman/Amex).

368.    Discover, like Amex, does not consider the prices charged by debit card networks when it sets merchant fees for its credit card transactions.  Discover instead looks to the credit prices charged by the other credit card networks:  Visa, MasterCard, and Amex.  Trial Tr. 818:16-23 (Hochschild/Discover).

### K.    Credit card pricing is unrelated to debit card pricing as the Durbin Amendment demonstrated.

369.    The Durbin Amendment created a "natural experiment" showing that credit and debit cards are not in the same relevant market.  After the Durbin Amendment lowered debit rates, the credit card networks did not respond by reducing credit discount rates to merchants.  Nor did merchants stop accepting credit cards in favor of less expensive debit cards.  This lack of response to lower debit rates demonstrates that debit does not constrain credit card pricing and cannot be considered in the same market.

370.    The Durbin Amendment instructed the Federal Reserve to regulate the price of debit, leading the Federal Reserve to cap how much certain debit issuers could charge.  Trial Tr. 407:7-12 (Robinson/IKEA); 819:2-10 (Hochschild/Discover); 2750:15-19 (Funda/Amex).

371.    Following the implementation of the Durbin Amendment in October 2011, the average debit interchange rate fell by 37 percent according to Federal Reserve data.  Trial Tr. 3926:10-24 (Katz); PX2702 at 63; *see also* Trial Tr. 2720:15-2721:2 (Funda/Amex) (acknowledging that merchants' costs of accepting debit fell significantly after Durbin). Professor Katz confirmed the drastic drop in debit prices to merchants by using data, presented in the chart below, from a merchant processor to analyze "all-in" debit rates.  Trial Tr. 3927:4-3928:10 (Katz); PX2702 at 64l; PX2779 at 11.  He found a "substantial" drop in the all-in debit rates post-Durbin.  Trial Tr. 3927:4-22 (Katz); PX2702 at 64; PX2779 at 11.

**Figure 3**



PX2779 at 11.

372.    If debit card and GPCC card network services were close substitutes, such a large decline in debit fees should have caused the GPCC card networks to respond.  They did not. Trial Tr. 3925:1-3926:3 (Katz).

373.    The substantial fall in debit prices did not lead to a comparable decline in credit prices.  Market data showed that "[v]ery little, if anything," happened with credit card prices after Durbin was implemented.  Trial Tr. 3930:1-7 (Katz).

374.    Discover testified it did not reduce its credit card fees in response to the post-Durbin decline in debit rates.  Trial Tr. 820:6-8 (Hochschild/Discover).

375.    Merchants observed no decrease in credit pricing after debit card fees decreased post-Durbin.  Trial Tr. 251:23-252:8 (Thiel/Alaska Airlines); 408:4-6 (Robinson/IKEA); 1525:24-1526:6 (O'Malley/Best Buy); 1611:22-1612:5 (Brennan/Hilton).

376.    If debit card and GPCC card network services were close substitutes, such a large decline in debit fees should have caused some merchants to substitute away from GPCC card network services and toward debit and network services.  They did not.  Trial Tr. 3925:1-3926:3 (Katz).

377.    Merchants did not stop accepting credit cards to take advantage of the large decline in debit pricing.  *See* Trial Tr. 1234:12-1235:5 (Kimmet/Home Depot); 1525:9-1526:3 (O'Malley/Best Buy); 2321:21-2322:7 (Bruno/Crate & Barrel); *see also* Trial Tr. 2554:16-25 (Holtey/Solitude); 5297:16-5298:5 (Gutierrez/Strictly Bicycles); 2723:5-8 (Funda/Amex) (stating he was not aware of any merchant that had stopped accepting credit and relied solely on debit).  Despite reduced debit costs, Sprint continues to accept credit cards to stay competitive.  Trial Tr. 1685:21-1686:6 (Dale/Sprint).

378.    Amex offered no evidence of any merchant dropping credit card acceptance in response to the Durbin Amendment price changes.  In an internal email, an Amex executive noted "the fact that debit and credit are not substitutes in the consumer's (or Durbin's) mind."  PX0920 at -912.

379.    Market data show that the number of merchants accepting credit continued to grow after Durbin's implementation, with each GPCC card network's acceptance increasing despite the decline in debit prices.  Trial Tr. 3931:3-3932:1 (Katz); PX2702 at 65; PX2779 at 12.

380.    Amex itself correctly predicted that merchants would not drop Amex despite the debit price decrease caused by Durbin.  In an internal analysis, Amex concluded there was little

112

risk that any merchants in most industries would stop accepting credit cards, even if debit were significantly less expensive.  *See* PX0089 -345-346.  "Merchants did not respond [to Durbin] by dropping credit cards en masse.  In fact, what you see happening here is that merchant acceptance of credit continued to grow after Durbin so it wasn't a big drop of the sort that you would have expected had they been close substitutes."  Trial Tr. 3931:3-9 (Katz).

381.    Additionally, market data shows merchants did not switch customers to debit in response to the large decline in debit pricing.  Discover observed no substitution between debit cards and credit cards after debit was regulated.  Trial Tr. 818:24-820:5, 990:21-991:3 (Hochschild/Discover).  Professor Katz also observed "no visible break in the trend" of credit and debit volume growth, even though if debit and credit were "close substitutes, we would have expected to see a substantial change in that trend."  Trial Tr. 3934:14-3935:18 (Katz); PX2702 at 68.

Figure 4



PX2779 at 13.

382.    And Amex offered no evidence of any merchant attempting to switch customers from credit to debit in response to the Durbin Amendment price changes.

**L.    Customers prefer different payment options for different types of purchases.**

383.    Cardholder behavior affects merchant credit card acceptance decisions.   The primary functional difference between credit and debit is the credit facility.   Credit cards allow the cardholder to pay in the future and to carry a balance beyond the month in which a charge is incurred; in contrast, debit card payments are immediately taken out of the cardholder's checking account.   Trial Tr. 817:13-818:5 (Hochschild/Discover); 2729:6-19 (Funda/Amex); 3880:19-3883:6 (Katz); 6244:12-18 (Bernheim).

384. This credit facility enables credit cards to "play the role of a security deposit" in some industries, such as lodging and car rentals.  Trial Tr. 3880:19-3383:6 (Katz).

385. Amex's economic expert Professor Gilbert acknowledged that he testified in 2008 that "[c]harge cards are often thought of as requiring that the entire balance be paid at the end of a 30-day billing cycle.  However, AmEx cardmembers have had the ability to revolve on charge cards since 1965, even before bank credit cards were widely available.  Subsequent developments in AmEx's Lending on Charge program have further blurred the distinction between charge and credit cards for American Express cardmembers."  Trial Tr. 5161:10-24 (Gilbert); PX2072 at 40.  He testified that that description remains true today.  Trial Tr. 5161:10-24 (Gilbert).

386. Customers tailor their payment choices based on certain transaction characterizations.  For example, debit cards are used primarily for smaller transactions.  Trial Tr. 3888:19-3889:10 (Katz); PX2702 at 43; PX2779 at 5.

387. Amex calls this "compartmentalization."  Trial Tr. 6507:21-6508:3 (Bernheim).  In a 2012 analysis of "spend compartmentalization," Amex described consumers as using debit "when a purchase feels mundane or 'everyday,'" and "when a purchase falls below a personal threshold (anywhere from $20 – $200)."  PX2543 at -643.

388. Amex executive Joseph Quagliata recognized that customers use different payment forms for different situations.  He testified that "many people compartmentalize their spend."  Trial Tr. 754:9-24 (Quagliata/Amex).  This means that customers "use different products for different reasons.  Trial Tr. 754:9-24 (Quagliata/Amex).  I use my Amex cards for these kinds of purchases" and "I use my debit card for these kinds of purchases."  Trial Tr. 754:9-24 (Quagliata/Amex).

**M.** **Considering the cardholder side, merchant data demonstrates that a large portion of credit card users pay only with credit cards.**

389.    Drugstore and supermarket data show that a large segment of credit card users do not switch between credit and debit use.  Drugstores and supermarkets may have roughly equal shares of credit and debit purchasers, but that does not mean that a large percentage of those customers are switching between the two payment forms.  Trial Tr. 3889:19-3891:17 (Katz).  A relevant question is "whether people are willing to switch back and forth or whether this could be two separate populations."  Trial Tr. 3892:17-3893:1 (Katz); *see* PX2702 at 45-47.  To address this question, Professor Katz analyzed customer data at one drugstore and two supermarkets that tracked customer payment choices over time for customers using loyalty cards.  Trial Tr. 3892:17-3894:24 (Katz); PX2702 at 45-47.  Professor Katz's analysis evidenced that a large portion of those merchant's credit customers paid only with credit.  Trial Tr. 3889:19-3891:17 (Katz); *see* PX2702 at 44.

390.    The drugstore data showed that, of people who used credit cards, "half of them only use credit cards."  Trial Tr. 3893:2-3894:24 (Katz); *see* PX2702 at 45.  Professor Katz stated that this data suggest "that there's a set of people that are loyal to credit, and that the merchant would be concerned about losing if it were to decide not to accept credit cards."  Trial Tr. 3893:2-3894:24 (Katz); *see* PX2702 at 45.

391.    The supermarket data provided a "similar story."  Trial Tr. 3895:5-17 (Katz).  The data showed that, "of the people who use credit and/or credit and debit, [a] significant percentage of those only used credit."  Trial Tr. 3895:5-17 (Katz); *see* PX2702 at 46-47.

392.    Together, these data sources indicate that "these merchants would be concerned that if they were to drop credit and charge cards that the insistence volume, the volume they

116

would lose by not taking credit and charge cards would be significant . . . ."  Trial Tr. 3895:23-3896:9 (Katz); *see* PX2702 at 45-47.

393.    Professor Katz concluded that the drugstore and supermarket data showed that "it's not that the credit card people say I'm happy to pay with debit"; instead, a sizeable proportion wants to pay with credit.  Trial Tr. 3889:19-3891:17 (Katz); *see* PX2702 at 44.  As a result, merchants likely would continue to accept credit cards "even in the face of a price increase."  Trial Tr. 3895:23-3896:9 (Katz); *see* PX2702 at 45-47.

394.    Professor Bernheim's similar analysis supports the proposition that there is a core of insistent credit card users.  Professor Bernheim analyzed transactions at five drugstores and grocery stores.  That data show approximately a quarter to a third of those customers used only credit cards over the course of ten or more transactions at the merchant.  DX7828 at 31.

**N.    Professor Bernheim did not consider price as he purported to analyze the relevant market.**

395.    Professor Bernheim compared usage patterns for credit and charge cards compared to debit cards when he analyzed the relevant market, Trial Tr. 6217:22-6218:11 (Bernheim), but he did not examine how those patterns would change as prices changed.  As Professor Gilbert stated, market definition is "concerned with switching that is in some way related to price or some price-like factor in the market."  Trial Tr. 5174:17-5175:1 (Gilbert).

396.    Professor Bernheim opined based on the Boston Federal Reserve's Survey of Consumer Payment Choice that "[a]s GPCC is becoming less expensive, looking across people, we're seeing less use of debit."  Trial Tr. 6248:22-6249:17 (Bernheim); *see* DX7828 at 26.  To reach that opinion, he inappropriately compared survey answers across respondents, who may have interpreted the questions very differently.  Trial Tr. 6641:4-6642:11 (Katz).  Further,

117

respondents were "free to use the ratings however they think is appropriate" when providing answers on a 1-5 scale.  Trial Tr. 6251:23-6252:17 (Bernheim).  For example, respondents could answer differently year-to-year, whether or not their costs or usage patterns changed.  Trial Tr. 6256:7-24 (Bernheim).  Professor Katz corrected Professor Bernheim's errors by examining the survey responses for individuals who were tracked by the survey over time and the empirical basis for Professor Bernheim's conclusions disappeared.  There was "no statistically significant relationship between the changes in the perceived cost and the changes in the use."  Trial Tr. 6642:21-6643:15 (Katz).

397.    Similarly, Professor Bernheim analyzed loyalty-card data from several merchants, and found that when Amex cardholders use their Amex card for one transaction, then used a different payment method for the next transaction at that merchant, they used a debit card as often as they used a different GPCC card.  Trial Tr. 6276:3-15; *see* DX7828 at 35.  Once again, these data did not describe why customers switched payment methods, Trial Tr. 6637:24-6638:17 (Katz), or take account of why two-thirds to three-quarters of the time, Amex cardholders did not switch and used their Amex card for the next transaction.  Trial Tr. 6635:22-6636:23 (Katz); *see* DX7828 at 35.  Professor Bernheim's market definition analyses suffers from a fundamental flaw – they are not informative as to how a merchant's customers would react to a price increase.

398.    As described above, merchants consider debit cards separate products compared to credit cards.  Even if one accepts Professor Bernheim's claim that debit cards are currently reasonably interchangeable with credit cards from the perspective of many cardholders, the essentially uncontested fact is that there are significant numbers of cardholders who insist on paying with credit cards.  This means that a merchant still has to accept credit cards even though

the acceptance costs of debit cards are much lower, or lose significant numbers of customers. Thus, from the merchant's perspective, debit cards and credit cards are not reasonably interchangeable.  *See* Trial Tr. 6628:4-6632:11 (Katz).

> **O.    Broad market trends do not show that customers generally switch between credit and debit or that debit should be included in the relevant market.**

399.    Broad market trends do not show that consumers switch readily between credit and debit.  *See* Trial Tr. 3883:8-3885:3 (Katz).  Analyzing "broad secular trends [is] not the same" as analyzing how consumers "switch their purchase decisions" and "respon[d] to [a] price change," which is the proper market definition inquiry.  Trial Tr. 3883:8-3885:3 (Katz).

400.    Professor Gilbert agreed, acknowledging that the faster growth of debit does not itself show whether debit and credit compete.  Trial Tr. 5166:9-5167:19 (Gilbert).  He stated that, "[y]ou have to consider how consumers and suppliers would move between the products . . . The growth by itself doesn't tell you much.  You have to understand why it has grown, how it is used, and how consumers and merchants react to the availability of those products."  Trial Tr. 5166:24-5167:19 (Gilbert).

401.    This was true in *U.S. v. Apple*.  There Professor Gilbert observed that e-books were growing rapidly over the period at issue, and taking sales from print books.  Trial Tr. 5205:14-19 (Gilbert).  But, after conducting the hypothetical monopolist test, he concluded that print books were not in the same market as e-books.  Trial Tr. 5201:23-25 (Gilbert).

402.    In this case, a careful review of the broad market trends indicate that debit has largely replaced cash and checks, not credit.  As Professor Katz testified, using the chart below, the "strongest trends over this 20-year period ha[ve] been the demise of checks, coupled with the rise of debit cards."  Trial Tr. 3883:8-3885:3 (Katz); PX2702 at 40.

**Figure 5**



PX2702 at 40.

Professor Katz noted that, "for many purposes, debit cards really replace checks because debit cards give access to your checking account, just the way checks did, but they do it more conveniently."  Trial Tr. 3883:8-3885:3 (Katz).

403.    Professor Katz added that, when Visa introduced the debit card, it named it the Visa Check Card "to train customers to think" of debit as a check replacement.  Trial Tr. 3883:8-3885:3 (Katz).  Over the same time period, credit's share of all payment forms "has slowly been rising," except for a dip during the Great Recession.  As a result, Professor Katz concluded that the secular trends do not show that debit has replaced credit.  Trial Tr. 3883:8-3885:3 (Katz).

404.    Moreover, Discover has never detected a change in its credit card sales volume

based on increases in consumers' use of debit cards.  Trial Tr. 972:12-19 (Hochschild/Discover).

405.    In a final argument, Amex asserts that because it restricts its co-brand partners

from issuing co-brand debit cards, debit cards are in the market.  However, Amex restricted its

co-brand partners from issuing co-brand debit cards as early as 2006 when it represented to the

Securities & Exchange Commission that "[t]he ability to substitute debit cards for credit and

charge cards is limited."  PX1408 at -22 (Amex's 2009 10-K); PX1405 at -22 (Amex's 2006 10-

K); see, e.g., Trial Tr. 5337:11-5338:3 (Miller/Delta Airlines) (in 2001, Amex prohibited Delta

from issuing a co-brand debit card); 5632:7-5634:23 (Codispoti/Amex) (███████████████████

███████████████████████████ ; DX1269 at -280, -290;  5448:15-5449:5, 5451:12-

5452:10 (Codispoti/Amex) (████████████████████████████████████████

████████); DX4913A at -928 (███████████████████████████████████

████████████████████████████); 5482:24-5483:18

(Codispoti/Amex) (███████████████████████████████████████████

████████).

**P.      The parties agree that the United States is the relevant geographic market.**

406.    The parties agree that the United States is the relevant geographic market.  Trial

Tr. 3859:1-6 (Katz).

## IV.   AMEX HAS MARKET POWER IN THE GPCC CARD NETWORK SERVICES MARKET.

407.    Market power is the "ability of a supplier . . . within a relevant market to raise the

price profitably above the competitive level . . . for a sustained period of time . . . or exclude

competition."  Trial Tr. 3937:16-3938:4 (Katz).

408.    Amex has substantial market power in both the general and T&E product markets. Trial Tr. 3937:12-15, 3938:12-14 (Katz).  Professor Katz based his conclusion that Amex has substantial market power on three factors:  (1) the market structure; (2) cardholder insistence for Amex; and (3) Amex's pricing strategy.  Trial Tr. 3938:15-3939:2 (Katz).

409.    Evidence from merchants, Amex documents, surveys and executives support Professor Katz's findings that Amex has market power.

410.    Evidence Amex presented at trial does not defeat a finding of market power. Amex claimed, among other things, that merchant insistence is a marketing ploy and not a demonstration of market power, that it provides extra value to merchants for the higher prices it charges, that it does not actually charge higher prices than other credit card networks, that it does not actually charge a higher "two-sided price," that it has fewer merchants on its network (because of its pricing decisions) so it cannot have market power and that it cannot have market power because Discover has, at times, raised rates to merchants.  None of these arguments have merit.

**A.    The GPCC card network services market structure supports a finding that Amex has market power.**

**i.    Market shares and concentration in the GPCC card network services market support a finding of Amex market power.**

411.    The credit card network market is concentrated and includes only a small number of major suppliers.  Trial Tr. 3826:9-3827:9, 3939:5-3940:20 (Katz).  Professor Katz testified that "there are only four competitors and three of them are much larger than the other one," which "raise[s] questions about just how competitive this industry is."  Trial Tr. 3826:9-3827:9 (Katz); PX2702 at 4; PX2779 at 2.  This is a "market structure . . . that is concentrated, that American Express has a significant market share [in]; [where] entry is difficult, and [these

factors] support[] a finding that American Express has market power."  Trial Tr. 3990:15-3991:15 (Katz).

412.    The Herfindahl-Hirschman Index, a widely used measure of industry concentration, indicates that "these are highly concentrated markets."  Trial Tr. 3939:5-3940:20 (Katz); PX2702 at 73-74; PX2779 at 14-15.  Markets above 2500 on the index are considered highly concentrated and, as a result, "there's heightened concerns about the degree of competition in those markets."  Trial Tr. 3939:6-3940:20 (Katz).  Between 2009 and 2011, the Herfindahl-Hirschman Index ranged from 3261 to 3297 in the T&E market and from 3246 to 3270 in the general market, both of which are "well above" the "threshold for being highly concentrated."  Trial Tr. 3939:5-3941:22 (Katz); PX2702 at 73-74; PX2779 at 14-15.

413.    It is possible for more than one firm in a market to have substantial market power.  Courts have already found that Visa and MasterCard each have market power.  Trial Tr. 3941:23-3942:3 (Katz).

414.    Looking at share by purchase volume – the measure used in *U.S. v. Visa* – Amex's share of the GPCC card network services market in 2011 was ██████████ higher than MasterCard at ██████████ and Discover at ██████████.  163 F. Supp. 2d at 341; PX2702 at 74; PX2779 at 15.

415.    In *U.S. v. Visa*, the courts found that MasterCard's 26 percent share of purchase volume was sufficient for a showing of market power.  163 F. Supp. 2d at 341; 344 F.3d at 240.  Amex's share of purchase volume today is at least as high as MasterCard's share when courts found MasterCard had market power.  *Compare* 163 F. Supp. 2d at 341, 344 F.3d at 240 *with* PX2702 at 74; PX2779 at 15; *see* Trial Tr. 3941:11-3942:3 (Katz).

416.     In analyzing market power, Professor Katz distinguished the situation of Discover from Amex.  Trial Tr. 4158:4-17 (Katz).  He explained that "market shares play an important role in the ability to impose restrictions such as American Express's merchant restraints" and that Amex's market share is five times that of Discover.  Trial Tr. 4158:4-17 (Katz); *see also* ECF #447-1 at ¶ 20.

> ii.     **The difficulty of entry into the GPCC card network services market supports a finding of Amex market power.**

417.     Entry into the credit card industry is difficult.  Trial Tr. 3942:4-19 (Katz).  Entry is relevant because, "if entry is easy enough, it could defeat attempts at anticompetitive actions."  Trial Tr. 3942:4-15 (Katz).  Entry into the credit card industry is difficult because of the "chicken and egg" problem.  Trial Tr. 3942:16-3943:2 (Katz).  This problem describes the difficulty a network faces both in gaining merchant acceptance if not many cardholders carry it and in gaining cardholders if not many merchants accept it.  Trial Tr. 3942:16-3943:2 (Katz).  Professor Katz noted that merchants believe that a network with very small volume is "just not worth taking . . . because there are some setup costs associated with it."  Trial Tr. 3943:3-3944:8 (Katz).

418.     Amex recognizes this chicken and egg.  In its 2004 complaint against Visa, Amex alleged that a new entrant into the GPCC card would face "a 'chicken-and-egg' problem of developing merchant acceptance without an initial network of cardholders who, in turn, are needed to induce merchants to accept cards in the first place."  PX0106 at ¶ 81.  Mr. Chenault noted the same in 2013, stating in a speech that there is a "chicken-and-egg situation" and explained, "I can't tell you exactly who's the chicken and who's the egg.  You need more

customers to drive relevance to get more merchant coverage. You need more merchant coverage to have relevance for the customer. So you've got to do both." PX1591 at 8.

419. Since Discover launched its general purpose card network in 1985, no other firm has entered the general purpose card network services market in the United States. Trial Tr. 820:9-15 (Hochschild/Discover). Mr. Hochschild explained that potential network entrants face "the chicken and the egg problem": "You have a hard time finding merchants to sign up for a network that doesn't have any cardholders, and you have a hard time getting cardholders to sign up with a network without merchants." Trial Tr. 820:23-821:16 (Hochschild/Discover). Discover's entry was facilitated by two unique situations. First, Discover simultaneously offered "very aggressive[]" pricing for merchants and a "breakthrough value proposition" for cardholders, with no annual fees, 24-hour customer support, and cashback rewards - making Discover "the first card to have any form of rewards." Trial Tr. 820:23-821:16 (Hochschild/Discover). Second, Discover was owned by Sears – a very substantial U.S. retailer at the time – which offered Discover cards to its pre-existing large portfolio of private label cardholders. Trial Tr. 823:3-16 (Hochschild/Discover). Mr. Hochschild testified that today it would be "impossible" to start another general purpose card network in the United States, as a new network would be hard pressed to create a compelling value proposition for cardholders and merchants. Trial Tr. 822:25-823:16 (Hochschild/Discover).

420. In addition, digital wallet firms currently do not pose an entry threat to Amex. *See* Trial Tr. 3946:15-19 (Katz). PayPal, Google Wallet, Square, Isis, and MCX do not issue credit cards. Trial Tr. 3790:5-19 (Silverman/Amex). Instead, PayPal, for example, functions like an electronic wallet, enabling a consumer to load multiple payment methods, such as his credit card, debit card, and checking account, and choose which one to use at purchase time.

125

Trial Tr. 1271:16-1272:9 (Kimmet/Home Depot); 2428:7-15 (Priebe/Southwest); *see also* Trial

Tr. 3791:16-18 (Silverman/Amex) (stating Google Wallet and Square also act as electronic

wallets); 3876:17-3879:12 (Katz) (PayPal and similar services are "piggybacking" on debit and

credit networks).

421.    Professor Katz testified that a digital wallet company like Square could not today

or in the near term replace the Visa or Amex credit card networks.  Trial Tr. 3946:15-19 (Katz).

While "Square acts as an interface" making "it much easier for a small merchant to be able to

accept things like Visa and MasterCard," it is "piggybacking on the existing networks," not

creating a competing network.  Trial Tr. 3944:9-3946:13 (Katz).

422.    Credit card networks treat digital wallets as merchants, not competing credit card

networks.  *See* Trial Tr. 823:17-23 (Hochschild/Discover) (stating that Discover views PayPal as

a merchant, not a credit card network); 3714:5-3715:1 (Silverman/Amex) (stating that Amex

views Square as a merchant that accepts Amex).

423.    Discover does not regard PayPal as a general purpose card network.  From

Discover's perspective, PayPal is merely a Discover-accepting merchant.  Trial Tr. 823:17-23.

(Hochschild/Discover).

424.    Amex also interacts with digital wallets as merchants, not competitors.  PayPal

actually "help[s] [American Express's] business," in that it brings in hundreds of thousands of

merchants who otherwise would not accept GPCC cards, including American Express.  Trial Tr.

3711:22-3712:6 (Silverman/Amex).  PayPal is among the merchants that Amex's Global Client

Group manages.  Trial Tr. 5932:24-5933:5 (McNeal/Amex).  Amex also imposes its ASRs on

PayPal and Google Wallet, as it does with other merchants.  PX2609 at 3, 5; PX2398 at -738;

PX2333 at -852-853.

425.     While Amex expressed some concern about the competitive threat posed by PayPal, that concern does not relate to its (or other digital wallets') entry into the GPCC card network services market.  Mr. Silverman testified that Amex views PayPal as a competitive threat because PayPal encourages its customers to use debit cards and ACH (checking accounts) to fund PayPal transactions.  Trial Tr. 3711:20-3714:4 (Silverman/Amex).  But, as described above, debit cards are not sufficiently close substitutes for credit cards to be considered a part of the relevant market.  The same reasons that render debit cards a poor substitute for credit cards apply to ACH.  An ACH transaction is an electronic withdrawal from an individual's checking account, meaning the individual must have sufficient funds currently available to use it.  Trial Tr. 3715:15-3716:14 (Silverman/Amex).  In addition, as ACH was designed for banks to move money between banks, it offers consumers significantly less security than credit cards.  Trial Tr. 3715:15-3716:14 (Silverman/Amex).

**B.     Cardholder "insistence" gives Amex market power over merchants.**

426.     Merchants must accept Amex because many Amex cardholders so strongly prefer to pay with Amex that they will "walk away" from or "spend less" at any merchant that does not accept Amex.  Amex refers to this concept as insistence or loyalty.  Trial Tr. 758:24-759:6 (Quagliata/Amex).

**i.     Sources of Amex insistence.**

**a.     Cardholder rewards.**

427.     Consumer cardholder insistence derives, in part, from Amex rewards.  Enrollees in Amex's Membership Rewards program receive points for purchases they make with their Amex cards, and they can redeem those points for gift certificates, merchandise, frequent flyer miles, statement credits, and other goods and services.  See, e.g., PX0426 at -649 ("Cardmember

research indicates strong loyalty to American Express Cards."  Cardholders are "[d]riven by ability to earn points, miles, or cash rebates, many use American Express exclusively to consolidate rewards."); PX0906 at -821 ("Approximately 88% of Shell's 2007 US $2.376 billion charge volume is insistent.  American Express Consumer Cardmembers are incented to use their American Express Cards through a variety of rich rewards program."); PX 1974 at - 319; Trial Tr. 4759:15-24 (Glenn/Amex); 3548:13-3549:22 (Silverman/Amex).

428.    A 2011 survey found that 84 percent of Amex cardholders were enrolled in one of Amex's loyalty programs.  PX0815 at -284.  According to Amex, many of those cardholders "are addicted to their points and usually only shop at establishments that accept" Amex.  PX1689 at   -547.

429.    Amex "operates a very attractive rewards program," which is "the big source of insistence" for a majority of Amex consumer cardholders.  Trial Tr. 3962:3-24 (Katz); PX2702 at 80.  Amex made a presentation to Alaska Airlines explaining that its rewards program makes cardholders loyal to it and that much of Alaska's Amex charge volume comes from such cardholders.  Trial Tr. 3962:3-24 (Katz); PX0111 at -812.  Amex's presentation demonstrated to Alaska that Amex's rewards program makes its customers "insistent and therefore you should be willing to pay our rates."  Trial Tr. 3962:25-3963:5 (Katz); PX0111 at -812.

### b.        Corporate card and small business card insistence.

430.    Amex is "the leading network for corporate cards."  Trial Tr. 3962:3-24, 3963:6-3964:19 (Katz).  Corporate card users have "a high level of insistence" because some companies have a formal corporate mandation program, requiring their employees to use their corporate card, and other companies have a "smoother" reimbursement process for employees using their corporate cards.  Trial Tr. 3963:6-3964:19 (Katz).  Corporate card volume is "a very substantial

part" of Amex volume at some merchants, particularly T&E merchants, leading to higher Amex insistence at such merchants.  Trial Tr. 3963:6-3964:19 (Katz); PX2702 at 81.  Merchants such as hotels would be "quite concerned" that, if they did not accept Amex, they would "be hard-pressed" to convince Amex corporate card users, which account for "a significant piece of money," to stay at their hotels.  Trial Tr. 3966:13-22 (Katz).

431.    Amex derives insistence from its strength in the corporate card segment.  Amex is the largest issuer of corporate cards today.  Trial Tr. 817:2-9 (Hochschild/Discover).  In the first half of 2013, Amex cards accounted for more than 60 percent of corporate-card spending.  PX2486 at -053 (reporting 64.3 percent share for Amex corporate cards).

432.    An Amex survey of corporate cardholders found that ██████████████████ ████████████████████████████████████  PX0634 at -112 (reporting that ███████████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████).  Those Amex corporate cardholders are highly insistent because "MOST of them HAVE TO use their cards when paying for . . . business expenses. . . . [I]f a merchant does not take the [Amex] card, [Amex] Corporate [cardholders] can't spend there."  PX1689 at -547 (emphasis in original).

433.    Amex also "owns" more than half of the U.S. small business card purchase volume.  PX0112 at -731; PX2486 at -053 (reporting 52.7 percent share for OPEN, Amex's small business cards).  Amex "created the small business plastic market" and now has a "base of 8 million small business Cardmembers" that help drive Amex's insistence to merchants.  PX0112 at -731, -745.

129

434.     Similarly, Joseph Quagliata, Senior Vice President of Amex's Regional Client Group, testified that "[v]ery few" corporate cardholders will want to deal with the "inconvenience" associated with receiving reimbursement for business expenses made using a card other than the employee's assigned corporate card.  Trial Tr. 755:3-25 (Quagliata/Amex); PX0957 at -917.

435.     Amex's corporate card strength factors heavily in a merchant's calculation of whether to accept Amex.  For example, Jennifer Dale, Sprint's Assistant Treasurer and Director of Treasury Services, testified that Sprint continues to accept Amex because it is concerned it would lose customers, especially given Amex's "particularly large presence with business customers through their commercial card programs," if it did not.  Trial Tr. 1687:12-23; 1688:18-23 (Dale/Sprint).  As "corporate commercial card use is mandated within certain companies" (including Sprint), Sprint feared it would lose those business customers if it did not accept Amex.  Trial Tr. 1688:24-1689:7, 1690:20-25 (Dale/Sprint).  Enterprise continued to accept Amex because it had too many corporate customers who objected to paying "with a different form of payment" than Amex.  Trial Tr. 489:15-20 (Satkowski/Enterprise).

<strong>c.     Single-homing.</strong>

436.     Single-homing is another source of Amex insistence.  A consumer single homes when he or she has or uses credit cards from only one network.  According to research conducted for Amex, 10 percent of Amex cardholders regularly carry Amex cards but no other GPCC cards.  PX0815 at -290.  In a presentation created by Amex to inform restaurants that it was increasing their rates, Amex stated that insistence, or "[l]oyalty to American Express Card usage among casual dining Cardmembers is driven by several factors," one of which is the fact that 40 percent of Amex cardholders "[u]sed only American Express Cards and no other major credit or

130

charge cards."  PX0957 at -917.  For fine dining restaurants, Amex stated that loyalty is driven by the fact that 46 percent of Amex cardholders "[u]sed only American Express Cards and no other major credit or charge cards."  PX0957 at -924.

437.    Amex presented data to Hilton showing that 14 percent of its active cardholders single homed.  *See* DX7249 at -207.  Perhaps even more relevant to merchants, Amex explained that "49% [of its cardholders] agree that American Express is their Card of choice."  DX7249 at -207.

438.    Instead of using Amex's definition of 'insistence,' as Professor Katz did in his analysis, Professor Bernheim redefined the term to include only people who use Amex exclusively at a merchant in the course of a year.  Trial Tr. 6361:3-16 (Bernheim); DX7828 at -081-82.  This definition excludes as "insistent" Amex customers who pay with any other payment instrument, including cash and debit cards.  Trial Tr. 6361:3-16 (Bernheim); DX7828 at -081-82.  This means that at a supermarket, a customer who uses an Amex card for groceries every week, but on one random occasion, pays for a small purchase with cash, is not considered "insistent" under Professor Bernheim's analysis even if that customer's only credit or charge card is an Amex card.  This definition of insistence is not used by Amex in the ordinary course of business.  In an analysis of Visa data, Professor Bernheim considered another restrictive version of 'insistence' as people who use Amex and do not use any other GPCC or debit card at any merchants. Trial Tr. 6366:15-24 (Bernheim); DX7828 at 86.  Amex uses a broader definition in the ordinary course of business.  *See* ¶¶ 439-456.

ii.    **Amex measures cardholder insistence and calculates a "maximum rational price."**

439.    When Amex sets its merchant discount rates, it adds to the baseline Visa/MasterCard all-in credit card rates the value of "the incremental business that we bring to our merchants." Trial Tr. 2563:5-9 (Funda/Amex). Amex calculates this incremental value based on cardholder insistence. Trial Tr. 2563:10-22 (Funda/Amex).

440.    Amex uses two types of insistence values for consumer cards: "'walkaway' insistence" and "'spend less' insistence." PX1240 at -091. Walkaway insistence describes an Amex cardholder who, upon learning that a merchant does not take Amex, does not spend one dollar at that merchant. Trial Tr. 2569:7-11 (Funda/Amex). Spend less insistence is a milder form in which the Amex cardholder, upon learning that a merchant does not accept Amex, either spends less than he or she would have had the merchant accepted Amex or visits that merchant less frequently. Trial Tr. 2569:12-17 (Funda/Amex).

441.    Amex uses vendors to survey cardholders to ensure that its insistence assessments are accurate. Trial Tr. 2570:16-24 (Funda/Amex). These vendors administer industry-specific surveys to measure insistence values by industry. Trial Tr. 2570:16-2571:8 (Funda/Amex). Amex refreshes the surveys every two years to keep the information current. Trial Tr. 2570:25-2571:11 (Funda/Amex). Amex designs surveys "very methodically to make sure that they get a representative population of cardmembers… so that the results are statistically meaningful." Trial Tr. 2584:7-2585:14 (Funda/Amex).

442.    Amex also measures corporate insistence by assessing what percentage of Amex's corporate card accounts mandate or strongly encourage their employees to use their corporate cards for business expenses. Trial Tr. 2569:2-2750:15 (Funda/Amex).

443.    Amex uses consumer walkaway insistence, consumer spend-less insistence and corporate insistence to calculate "total insistence."  PX1240 at -103.  Total insistence is the amount of Amex charge volume that the merchant would lose if it did not take Amex.  Trial Tr. 2819:19-2820:4 (Funda/Amex).  "This is at the core of [Amex's] business model . . . If there were no foregone profit, then there is no reason for customers to actually accept our cards.  They accept our cards to capture this incremental profit that our relationship can bring to them."  Trial Tr. 2671:23-2672:9 (Funda/Amex).

444.    Amex multiplies its assessment of insistence by a merchant's margin to determine incremental insistence value, which is the "[f]oregone profit" to a merchant if Amex "were not accepted." Trial Tr. 2580:7-11 (Funda/Amex); PX0357 at -948.  Using Visa and MasterCard credit card pricing as a baseline and incorporating the additional insistence value, Amex calculates a "Maximum Rational Price."  Trial Tr. 2589:8-2590:4 (Funda/Amex) ("Q. So it seeks to calculate the price at which one penny more it would be rational for a merchant to stop accepting American Express but up until that price, it would be rational for the merchant to keep accepting American Express, right? A.  Theoretically, yes."); *see also* PX0124A at -604.

445.    Amex uses the results of these calculations to identify opportunities to raise price. As Mr. Funda testified, there is a "direct link" from this pricing methodology to the targets of Value Recapture price increases.  Trial Tr. 2639:15-23 (Funda/Amex).

446.    Amex's choice not to raise discount rates to the maximum possible level is consistent with Sir John Hicks' statement that "the best of all monopoly profits is the quiet life." Trial Tr. 5247:15-5248:3 (Gilbert).  Professor Gilbert agreed that the fact that Amex could charge merchants more than it has did not mean that Amex lacks market power.  Trial Tr. 5245:20-5247:14 (Gilbert).  "[A] firm with a lot of market power" should actually be careful

133

about "disrupt[ing] its own industry."  Trial Tr. 5248:4-15 (Gilbert).  The use of insistence

calculations to identify the ability to charge higher prices is indicative of the role of insistence as

a source of market power.  Trial Tr. 3960:19-3961:16 (Katz).

447.    Professor Bernheim claimed that Amex just used insistence as a marketing tool.

Trial Tr. 6357:25-6358:24 (Bernheim); DX7828 at 80.  This claim is contradicted by Amex's

own documents and trial testimony and Professor Bernheim's own concession that insistence in

fact was used by Amex for pricing.  Trial Tr. 6580:9-13 (Bernheim).

448.    Certain Amex witnesses attempted to downplay the role of Amex's pricing group

in setting prices to merchants.  These claims, however, are contradicted by the record evidence,

which showed that the pricing group plays a central role.  Mr. Funda, testified that his group has

"responsibility to manage pricing for all merchants across the globe."  Trial Tr. 2561:21-2562:2

(Funda/Amex).  Other Amex witnesses agreed that pricing is "done by a specific function called

global pricing that's responsible for looking at the variables that would guide how we would

price [to] merchants."  Trial Tr. 781:6-782:19 (Quagliata/Amex); *see also* Trial Tr. 2133:11-21

(Berry/Amex) (Berry relied on the pricing group "to determine the appropriate price that

American Express should charge relative to the value that we are delivering").  Mr. Glenn

acknowledged that it is the function of pricing to set the standard pricing tables that apply to all

merchant industries.  Trial Tr. 4683:1-14 (Glenn/Amex); PX1113.  Due to its policy of

maintaining "price integrity," Amex strictly adheres to these tables in most cases.  Trial Tr.

2773:18-21 (Funda/Amex); 4684:22-4685:12; 4697:16-21 (Glenn/Amex); PX0067 at -574 ("We

will not move on rate as we have rate integrity across airlines"); PX0842 at -285 ("the rate is the

rate and we're not negotiating it").

449.    In instances where Amex does negotiate on price terms with a merchant, the pricing group performs the "analytics" and makes recommendations on prices to the head of Merchant Services, who has final approval.  Trial Tr. 4696:14-21; 4732:2-12 (Glenn/Amex); *see also* Trial Tr. 5952:13-5954:15 (McNeal/Amex) (describing how the pricing team develops the price recommendations for her negotiations).  Amex witnesses did not contest the testimony and documentary record showing that the pricing group uses a standard, insistence-based methodology to help establish merchant prices and to target particular merchants for value recapture price increases.  Trial Tr. 2562:3-2593:7; 2639:11-23; 2672:20-24 (Funda/Amex); PX1240 at -091; Trial Tr. 5716:14-17 (Gilligan/Amex) (agreeing that the pricing group creates the formulas used to justify price increases to merchants).

### iii.    Amex uses insistence to show merchants that they must accept Amex.

450.    When Amex raised prices for the entire airline industry, it reminded airlines that billions of dollars of sales came from Amex's "highly insistent customers" and warned them that "[i]t is essential to accept American Express."  See, e.g., PX1601 at -263 (Southwest); PX0047 at -327 (United Airlines); PX1218 at -334 (Alaska Airlines); PX0517 at -026 (American Airlines); PX0231 at -055 (Delta).

451.    In the "Restaurant Value Recapture Deck," Amex gave its employees a presentation to use with restaurants subject to price increases.  PX0957 at -900.  That presentation demonstrated to merchants that Amex cardholders are particularly important customers because they spend more.  PX0957 at -909-912, -919-921.  Amex also showed the merchants that a significant portion of that merchant's business would be lost by not accepting Amex.  PX0957 at -916.

452.    For example, an Amex presentation showed that if Amex were not accepted by a casual dining restaurant, 45 percent of Amex cardholders "[w]ould no longer dine, [w]ould dine less often, or would spend less" at that restaurant.  PX0957 at -916.  Another 43 percent "[w]ould be unlikely to return at all."  PX0957 at -916.  In the "coaching tips" for the Amex employees tasked with presenting that slide to restaurants, Amex summarized these data:  "Even customers who are familiar and loyal to your restaurant are affected by card acceptance.  Almost half would not return, would return less often, and/or would spend less if they did return if American Express was not accepted.  This addresses the objection that in the restaurant, the consumer belongs to the merchant and not American Express.  Clearly, the consumer is shared."  PX0957 at -916.

453.    In another slide titled, "Insistent Cardmembers," Amex showed why so many customers would spend less or walk away from a restaurant that stopped taking Amex.  PX0957 at -917.  First, 40 percent of Amex cardholders used only Amex and no other major credit or charge cards.  PX0957 at -917.  Second, 46 percent of business/corporate cardholders have employers that require or prefer use of the Amex corporate card.  PX0957 at -917.  And third, 89 percent are enrolled in an Amex loyalty program.  PX0957 at -917.  "Loyalty groups are highly insistent, and have an overall less positive experience when they cannot use their preferred form of payment."  PX0957 at -917.

454.    In its Forms 10-K filed with the SEC for 2008 and 2009, Amex stated that its discount rate was principally determined by the value Amex delivered to merchants.  Trial Tr. 4582:8-18 (Chenault/Amex); PX1407 at 10; PX1408 at 10.  Amex cited "Cardmembers' insistence on using their Cards" as one way it delivered greater value to merchants than other

networks.  Trial Tr. 4581:22-4582:18, 4583:20-4584:3 (Chenault/Amex); PX1407 at 10; PX1408 at 10.

455.    Amex deleted the reference to insistence in its 2010 Form 10-K, which Amex filed with the SEC after this litigation commenced.  Trial Tr. 4584:25-4585:3; 4585:20-4586:11 (Chenault/Amex); PX1409 at 10.

456.    After this case was filed, Amex adopted "new communications guidelines" instructing employees to "h[o]ld back on some specifics regarding insistence."  Trial Tr. 4587:8-14 (Chenault/Amex); PX2414 at -440.  Another internal Amex communication questioned how the "DOJ suit affect[s] our ability to demonstrate value to merchants" and reported that "there is chatter that we can't use the word insistence."  PX2415 at -834.

> **iv.    Avon's and Allegiant Airlines' non-acceptance of Amex does not undermine a finding of Amex market power.**

457.    Insistence also explains why some merchants with unusual business models, such as Avon and Allegiant Airlines, do not accept Amex.  DX5571 at -403; PX0709 at -033.

458.    Avon has a unique business model, with two separate customer relationships:  (1) between Avon and the Avon sales representative; and (2) between the ultimate purchaser and the Avon sales representative.  Trial Tr. 1185:5-21 (Quagliata/Amex).  Avon's Amex agreement applies only to sales made by Avon to its sales representatives and not to sales made by the sales representative to the ultimate purchaser of Avon products.  Trial Tr. 1185:22-1186:9 (Quagliata/Amex).  Avon faces little competition from other companies in the services it provides to its sales representatives, therefore, it need not fear that, if it did not accept Amex cards its sales representatives would purchase their products from other Amex-accepting merchants.  *See* DX5571 at -403 (observing that insistence "does not apply to Avon in the same

way [as] other merchants.  80% of the AXP [card volume] comes from Avon reps paying on

behalf of their customers.  So, if Avon stopped accepting AXP, [it is] doubtful that these reps

would look for work elsewhere.").  Even with relatively lower degree of insistence and Amex's

refusal to reduce its discount rate, Avon accepted Amex until 2013.  Trial Tr. 1193:21-24

(Quagliata/Amex).

459.    Allegiant Airlines also has a unique business model.  PX0709 at -033-034.   An

Amex document explained about Allegiant:  "Their business model is similar to Ryan [A]ir, as

they focus on low-cost leisure travel with disaggregated (charge extra for all services) pricing.

The airline flies almost exclusively to unserved small cities, for inbound Las Vegas, Clearwater

and Orlando, FL, (per the airline, 'we look for routes where [it's] fly us or go Greyhound.')

They typically fly city pairs only a few times a week to concentrate demand."  PX0709 at -033.

460.    Because Allegiant faces little or no competition on the routes it flies, an Allegiant

Airline executive, explaining Alligiant's nonacceptance of Amex stated that "if he were at any

other airline[,] he would have no issue [accepting Amex], but due to Allegiant's unique business

model[,] Amex's value is negligible[,] and as such[,] our premium price is not warranted."

PX0709 at -033.

461.    Amex agreed with Allegiant's assessment:  "Post meeting, analyzed their route

structure with [Amex airline experts], and have determined that they have a monopoly on 98 out

of their 106 route pairs.  Also, met with Pricing to brainstorm to get best practices to address

Allegiant's pushback on our value.  As Allegiant's business model negates the core of our value

prop, the team did not come up with a new solution."  PX0709 at -033-034.

462.    Professor Bernheim testified that insistence is not a source of market power

because when Amex incentivizes customers to use the card, this is an expression of competition.

138

Trial Tr. 6352:14-6353:11 (Bernheim); DX7828 at 80.  Professor Gilbert testified that he

believes that insistence is not a source of antitrust market power because it is not durable; if

Amex stopped investing in cardholders there would not be much insistence. Trial Tr. 5067:6-

5068:12 (Gilbert).  This is not a necessary condition for showing that Amex has market power.

As Professor Katz testified, newspapers can have market power with respect, in part due to the

newspaper's large base of readers, maintained through continual investments in content that

readers find attractive. Trial Tr. 4258:1-4259:3 (Katz).

> **v.      Natural experiments have shown that insistence is not a marketing ploy.**

463.    When Murphy Oil, a gasoline merchant that has stations at Wal-Mart stores,

stopped accepting Amex cards, Amex tracked Murphy Oil customers to see whether they

continued to shop at Murphy Oil or switched to Murphy Oil's competitors.  Trial Tr. 2700:5-17

(Funda/Amex).  Amex learned through this exercise that cardholder insistence "as demonstrated

by [cardholder] behavior appears to be ~28% (almost double the [insistence] research of 14-

16%)."  PX0031 at -668.  "Bottom line, this case example suggests that [cardholder] insistence in

Oil is real and strong – we should be able to make use of this data in our merchant negotiations."

PX0031 at -668.

464.    Murphy Oil eventually determined that its decision to discontinue Amex

acceptance was a mistake and it resumed accepting Amex. Trial Tr. 2703:24-2704:1

(Funda/Amex).

465.    When a group of Shell gas stations temporarily stopped accepting Amex in 2007,

Amex determined that a sufficient number of its insistent cardholders switched to other gas

stations that the Shell stations lost money by not accepting Amex.  PX0049 at -881-884; PX0906 at -820.

> **vi.**     Merchants cannot drop Amex.

466.     As a practical, commercial matter, merchants cannot drop Amex.  *See* Trial Tr. 246:11-247:13, 248:4-13 (Thiel/Alaska); 389:10-390:10 (Robinson/Ikea); 491:1-494:8 (Satkowski/Enterprise); 573:6-574:5 (Bouchard/Sears); 1529:6-1536:22 (O'Malley/Best Buy); 1262:19-1263:14 (Kimmet/Home Depot); 2159:18-2161:4 (Haslam/Office Max); 2322:21-2323:4 (Bruno/Crate & Barrel); 2414:4-13 (Priebe/Southwest Airlines); 1687:12-1690:12 (Dale/Sprint); 3146:2-3147:10 (Gibson/Sinclair);  5390:15-5393:12 (Miller/Delta); 5551:9-13, 5558:22-5560:20 (Landau/Drybar); 5898:4-6, 5905:1-17 (Flueck/Starwood Hotels); 2523:23-2524:4, 2538:11-15 (Holtey/Solitude); 6126:6-19 (Mitchell/Official Payments); 1606:4-18, 1664:15-24 (Brennan/Hilton); 3194:15-3197:13 (Gibson/Sinclair).

467.     Merchants know that their competitors accept Amex so they offer the card to stay competitive.  Trial Tr. 3146:2-7, 3147:2-10 (Gibson/Sinclair); 1687:12-1690:12 (Dale/Sprint); 6126:17-19 (Mitchell/Official Payments); 1262:19-22 (Kimmet/Home Depot); 2322:17-20 (Bruno/Crate & Barrel); 2160:9-23 (Haslam/Office Depot); 573:6-16 (Bouchard/Sears); 1606:4-18 (Brennan/Hilton); 246:4-15 (Thiel/Alaska Airlines); 5905:4-14 (Flueck/Starwood Hotels).

468.     Sprint twice considered dropping Amex, but did not do so because "[t]here was a concern that we would lose customers, particularly in the business segment, if we made that decision."  Trial Tr. 1687:12-1690:12, 1759:13-23 (Dale/Sprint).

469.     Official Payments processes approximately $2.5 billion in federal tax payments each year and approximately one-third of that transaction volume is on Amex cards.  Trial Tr. 6125:15-24 (Mitchell/Official Payments).  If Official Payments did not accept Amex in the

federal tax space, it would lose customers to one of its competitors.  Trial Tr. 6126:17-19 (Mitchell/Official Payments).

470.   Home Depot's principal competitors accept Amex.  Trial Tr. 1262:23-25 (Kimmet/Home Depot).  If Home Depot stopped accepting Amex cards, Home Depot "would lose sales if [its] competitor continued to accept [Amex]."  Trial Tr. 1262:19-22 (Kimmet/Home Depot).

471.   Amex accounts for approximately 33% of credit card purchases at Crate & Barrel. Crate & Barrel accepts Amex because its customers want to use Amex and because its competitors accept Amex.  Trial Tr. 2322:8-20 (Bruno/Crate & Barrel).  Frank Bruno, Treasury Director at Crate & Barrel, testified that he would be "extremely nervous" that sales would be adversely impacted if Crate & Barrel dropped Amex because of the "large percentage of spend coming through [Amex]."  Trial Tr. 2322:21-2323:4 (Bruno/Crate & Barrel).

472.   If Office Max's competitors accepted Amex and Office Max did not, some of Office Max customers "would be more likely to shop at [Office Max's] competitors."  Trial Tr. 2160:9-23 (Haslam/Office Depot).

473.   Sears has never considered dropping Amex "[b]ecause [it] would lose an unacceptable amount of sales."  Trial Tr. 573:6-16 (Bouchard/Sears).

474.   If Hilton dropped Amex, Hilton estimated that two-thirds of its Amex charge volume would migrate "to other hotel companies that would still accept [Amex]."  Trial Tr. 1606:4-1607:1 (Brennan/Hilton).  Hilton projected the loss of revenue from dropping Amex at "[a]round four to five billion dollars."  Trial Tr. 1606:4-18 (Brennan/Hilton).

475.   Amex is "indispensible" and "essential" to Alaska Airlines.  Trial Tr. 234:5-7, 248:9-11, 232:14-16 (Thiel/Alaska Airlines).  Alaska faces competition in its Seattle home

market from Delta, Southwest and American Airlines.  Those airlines all accept Amex, and if Alaska Airlines stopped accepting Amex, customers would use those other airlines instead of Alaska.  Trial Tr. 246:4-15 (Thiel/Alaska Airlines).

476.    Sinclair Oil accepts Amex at its hotel properties because "[y]ou'd be crazy not to take it.  It's 35 percent of the business, 34 percent of the business.  Our competition takes [Amex].  And if we don't take it, we're not competitive with our competition."  Trial Tr. 3146:2-6 (Gibson/Sinclair Oil).

477.    All of Starwood's major competitors accept Amex and Starwood would lose sales to competitors if it did not accept Amex.  Trial Tr. 5905:4-14 (Flueck/Starwood Hotels).

478.    Southwest would not drop Amex, even if Amex raised its discount rate ██████ ████, which equates to a more than a ███ price increase. PX2660; PX1348 at -002; PX0186 at -284; PX0332 at -788; Trial Tr. 2378:14-2383:19, 2469:5-24, 2414:4-13, 2416:3-12 (Priebe/Southwest).

479.    Merchants hoping to reduce their payment acceptance costs have analyzed whether they could profitably drop Amex and have found that they could not.  Best Buy conducted a "war game" in 2010 to see if there was a "business case to discontinue American Express."  Trial Tr. 1529:9-21 (O'Malley/Best Buy).  Best Buy analyzed its sales to Amex consumer, small business, and corporate cardholders and estimated the likelihood that each of those cardholder groups would continue to shop at Best Buy if Amex wasn't accepted.  Trial Tr. 1530:4-19 (O'Malley/Best Buy).  For each cardholder segment, Best Buy estimated the percentage of Amex cardholders likely to shop elsewhere and calculated the margins Best Buy would lose from those sales. Trial Tr. 1530:6-19 (O'Malley/Best Buy).  Best Buy then compared those lost margins to the costs savings it would accrue from the Amex cardholders that continued

142

to shop at Best Buy and use a cheaper form of payment. Trial Tr. 1530:6-1532:7, 1532:17-1535:12 (O'Malley/Best Buy). Best Buy analyzed the potential cost savings from dropping Amex and "the numbers [were] pretty stark" that Best Buy should continue to accept Amex. Trial Tr. 1535:23-1536:10 (O'Malley/Best Buy).

480.   Enterprise considered dropping Amex three times. To test whether it was "financially feasible to discontinue" Amex acceptance, Enterprise surveyed customers to determine whether "they would be willing to use a different form of payment" than Amex. Trial Tr. 486:25-487:22 (Satkowski/Enterprise). Enterprise has contracts with corporate customers to provide cars at negotiated rates in exchange for a minimum rental volume. In 2002, Enterprise asked some of these corporate customers "if they would be willing to continue to maintain the contract but pay with a different form of payment." Trial Tr. 487:23-488:17 (Satkowski/Enterprise). Based on its corporate customers' response, Enterprise determined that it had to continue to accept Amex because it "had too many corporate customers who had objected to the notion of paying" with a different form of payment. Trial Tr. 489:15-20 (Satkowski/Enterprise).

481.   Enterprise surveyed its corporate customers about dropping Amex again in 2007 and 2011, and both times determined that these customers "were not interested in either changing the card type they used or the method of payment." Trial Tr. 489:21-490:15, 491:18-492:8 (Satkowski/Enterprise).

482.   In 2011, Enterprise surveyed customers of its Alamo brand, which is focused on leisure travelers and has "no corporate customers." Trial Tr. 469:3-6, 492:10-13 (Satkowski/Enterprise). Enterprise asked Alamo customers if they would be willing to switch card brands if "we would provide them with a lower rate or other item of value" and found that

143

those customers "were very interested in receiving some added value and were willing to use a variety of card brands."  Trial Tr. 492:14-493:2 (Satkowski/Enterprise).

483.    Because Alamo customers indicated a willingness to switch card brands if given an incentive to do so, Enterprise asked Amex whether it could accept Amex at the Enterprise and National brands but not at the Alamo brand.  Amex "indicated that that was not an acceptable [offer] and that [Enterprise] would need to accept the card on all three brands."  Trial Tr. 493:22-494:1 (Satkowski/Enterprise).  At the end of negotiations, Enterprise determined it "had no choice but [to] accept the American Express card at all three brands."  Trial Tr. 490:16-494:8 (Satkowski/Enterprise).

484.    IKEA surveyed its customers about Amex acceptance and concluded that it could not drop Amex.  Trial Tr. 389:10-390:6 (Robinson/IKEA).   IKEA surveyed "customers who had transacted using American Express" and asked them "if Ikea stopped using [Amex], how would this affect or impact your decision to shop at Ikea?"  Trial Tr. 389:21-390:0 (Robinson/IKEA). IKEA found "there was a percentage of customers who said if they were not able to use their American Express card at IKEA they wouldn't shop at IKEA."  Trial Tr. 389:10-390:6 (Robinson/IKEA).  IKEA concluded that the number of customers who would not shop at IKEA if Amex were no longer a payment option was large enough that it could not drop Amex.  Trial Tr. 389:10-20, 390:7-10 (Robinson/IKEA).

485.    Amex's 2010 merchant satisfaction surveys show that most merchants believe they need to accept Amex as well as Visa and MasterCard.  In the surveys, Amex measured "overall attitudes toward accepting" Amex, Visa, and MasterCard among a representative sample of U.S. merchants of all sizes.  PX0702 at -326; Trial Tr. 1788:2-1789:20, 1796:9-13, 1823:10-1824:3 (Ford). ███████████████████████████████

144

███████████████████████████████ PX0043 at -971. ██████████

███████████████████████████████████████████████

██████ PX0043 at -971.

486. Amex executives testified that merchants have "no choice" but to accept MasterCard and Visa. Mr. Chenault testified, "[Visa and MasterCard are] must-have. There's no choice. If you are a merchant and you want to accept plastic, you have to accept MasterCard and Visa." Trial Tr. 4363:12-21 (Chenault/Amex). Mr. Silverman testified, "[Visa and MasterCard have incredible control over the merchant. You can't be a merchant of any scale at all in America and not accept plastic." Trial Tr. 3730:5-3731:5 (Silverman/Amex). He stated, "[Visa and MasterCard] are ubiquitously accepted and they have market power." Trial Tr. 3673:16-3675:7 (Silverman/Amex).

487. Professor Katz explained, "[I]f you think about what those executives are saying, they're saying Visa has market power because merchants can't profitably drop Visa. Well, why couldn't you profitably drop Visa if you were a merchant, it's because you would lose too much business. Well, that's just saying that Visa cardholders are insistent and you'd lose too much insistence volume if you stop taking Visa cards. So, it is making exactly the point that insistence is a source of market power." Trial Tr. 6651:10-22 (Katz).

488. Professor Katz testified that his analysis does not imply that any firm in any industry with a core of loyal customers has antitrust market power. Trial Tr. 3974:18-3976:12 (Katz). He explained that Amex's core of insistent cardholders gives it market power because Amex operates a two-sided platform in which the merchant's only available response to a price increase is its "all-or-nothing" acceptance decision. Trial Tr. 3974:18-3976:12 (Katz). This situation shifts the antitrust focus from looking at people who are relatively indifferent between

145

credit cards (that would otherwise be susceptible to steering) to a network's core of loyal customers because "the merchants are getting locked in by that core."  Trial Tr. 3974:18-3976:12 (Katz).  Iinsistence – the percentage of charge volume that a merchant would lose if it stops accepting Amex – is a key source of Amex's market power because it explains why merchants will pay more for Amex.   Trial Tr. 3956:18-3957:10, 3969:3-7 (Katz).  If a network's cardholders have a high enough degree of insistence, it could set its price above the competitive level.  Trial Tr. 4153:20-4154:6 (Katz).  This is referred to as a bottleneck, a feature of two-sided platforms.  Trial Tr. 4153:20-4154:6 (Katz).

### vii.    Walgreens tried and failed to drop Amex.

489.    Walgreens believed it was in a strong position to drop Amex.  Trial Tr. 1353:19-1354:6, 1354:15-17 (Rein/Walgreens).  At the time Walgreens tried to drop Amex, it was the ninth largest retailer in the United States, and Amex accounted for only a small percentage of its transactions.  Trial Tr. 1343:2-4, 1375:21-1376:5 (Rein/Walgreens); PX1960 at -610.  Walgreens found that it could not drop Amex and continued to pay Amex a large premium over Visa and MasterCard.  *See* Trial Tr. 1391:18-1392:18, 1396:12-1397:8 (Rein/Walgreens).

490.    In mid-2004, Walgreens attempted to negotiate a lower rate with Amex.  Trial Tr. 1353:12-18 (Rein/Walgreens).  Amex's discount rate was at least 30 percent higher than the Visa and MasterCard rates.  Trial Tr. 1352:1-8 (Rein/Walgreens); PX1977 at -434; PX1960 at -610.

491.    Walgreens approached the negotiations believing that, as the ninth largest retailer in the United States, it was "the 800-pound gorilla" and could make Amex agree to its terms.  Trial Tr. 1343:2-4, 1353:19-1354:6 (Rein/Walgreens).  At that time, Amex made up only about ███████ of Walgreens' total sales.  PX1960 at -610; Trial Tr. 1375:21-1376:5 (Rein/Walgreens).

492.    Walgreens' goal was to persuade Amex to reduce its discount rate to the rates it paid to Visa and MasterCard.  Trial Tr. 1352:23-1353:11 (Rein/Walgreens).  But after months of negotiations, Amex would reduce its rate by at most ten basis points – a proposal that, by Walgreens' account, would still leave a ███████ gap between Amex's rate and the rates of Visa and MasterCard.  PX1969 at -367; DX2143 at -943; Trial Tr. 1363:11-1364:17 (Rein/Walgreens).  To Walgreens, Amex's offer of a mere ten-basis-point reduction was unacceptable.  Therefore, on December 15, 2004, it informed Amex and the public that it would stop accepting Amex effective January 14, 2005.  PX1966; DX2219 at -608; Trial Tr. 1363:11-1365:19; 1458:22-25 (Rein/Walgreens).

493.    Meanwhile, Amex planned to shift share away from Walgreens if Wagreens cancelled Amex.  Amex evaluated "which markets and which accounts would make sense approaching for a campaign to shift share away from Walgreens," trying to "market directly where it hurts [Walgreens] the most."  PX0934; Trial Tr. 4848:23-4849:5 (Glenn/Amex).  Amex began preparing a direct mail program with CVS to offer a $25 gift card for a transferred prescription.  PX0902; PX1814 at -257; Trial Tr. 4846:8-20, 4852:13-23 (Glenn/Amex).  Amex even planned to drop Walgreens from its prescription drug plan for Amex employees, a move that Amex predicted would "hurt Walgreens' bottom line."  PX0886 at -654-655; Trial Tr. 4853:24-4854:21, 4856:13-25, 4857:15-19 (Glenn/Amex).  None of this was necessary, however, because of the customer outcry that followed Walgreens' announcement it would terminate Amex.

494.    Walgreens customers were "livid" and "went through the roof" when they learned that Walgreens would no longer accept Amex.  Trial Tr. 1368:7-1368:13 (Rein/Walgreens). Walgreens had never before received so many "passionate" and "from the heart" complaints or

experienced such "widespread dissatisfaction" among its customers.  Trial Tr. 1371:21-1372:8, 1390:9-17 (Rein/Walgreens).  Jeffrey Rein, then President and later Chairman and CEO of Walgreens, realized that it was very important to some customers to use their Amex card and they would shop at a competitor that accepted Amex rather than at Walgreens.  Trial Tr. 1368:14-1371:20, 1380:10-1381:23 (Rein/Walgreens).  Mr. Rein worried Walgreens would lose customers to competitors.  Trial Tr. 1368:14-1371:20 (Rein/Walgreens).

495.    Mr. Rein informed his board of the customer reaction and provided to the board a number of actual customer complaint e-mails.  *See* PX1960 at -613-642.  Mr. Rein testified it was an "absolute mistake" to stop taking Amex cards. Trial Tr. 1391:18-1392:18 (Rein/Walgreens). He resolved to reach a new acceptance agreement with Amex.  Trial Tr. 1391:18-1393:8, 1396:12-1397:2 (Rein/Walgreens).[4]

496.    Just hours after the cancellation took effect, Walgreens and Amex agreed on new terms, one of which was a ten-basis-point reduction in the discount rate starting January 1, 2006. PX1962 at -647; PX1965; Trial Tr. 1397:6-8, 1398:18-1399:4 (Rein/Walgreens); 4857:23-4858:5 (Glenn/Amex).  Rein testified that Walgreens "didn't even come close" to its goal of getting Amex to match Visa and MasterCard rates and that the deal struck was not a "win at all" for Walgreens.  Trial Tr. 1396:12-21, 1399:5-7 (Rein/Walgreens).

---

[4] Contrary to Amex's claims in its opening statement that Walgreens changed its mind because it "ultimately concluded we could not inconvenience a single customer.  A single customer, that's the testimony." Trial Tr. 159:18-161:6. (Amex Opening Statement), it was this intense feedback from a broad range of Walgreens customers that persuaded Mr. Rein to change his decision. Indeed, despite Amex's characterization in the opening, the only testimony about a "single customer" was Amex's Bill Glenn arguing to Rein "I don't understand why you would want to risk losing one customer."  Trial Tr. 4777:17-24 (Glenn/Amex).

148

497.    Amex did not materially improve the term of its offer to avert the Walgreens

cancellation, stating in an internal email: "Our customers voiced their dissatisfaction with

Walgreen[s'] decision and that is what caused them to change their mind.  We did not offer them

anything additional to cause them to change their position."  PX0142 at -945; Trial Tr. 4860:6-

4861:5 (Glenn/Amex).  In another internal Amex email, the client manager for Walgreens at the

time of the cancellation events, said that Walgreens "actually settled for a deal that was not quite

as rich for them as the one we had back in Nov/Dec.  Go figure?!"  PX0446; Trial Tr. 4858:20-

4859:5, 4859:22-24 (Glenn/Amex).

### C.    Amex pricing demonstrates its market power.

498.    Amex's pricing decisions over time demonstrate its market power.  Amex prices

to merchants at a premium over its network competitors without providing commensurate value.

When its premium began to narrow, Amex implemented sweeping price increases with virtually

no loss of merchant acceptance.  Amex has also successfully price discriminated to merchant

segments where its market power is even greater than it is over other merchant customers.

### i.    On average, Amex charges merchants the highest prices of any card network.

499.    Amex charges merchants the highest prices, on average, of any card network.  *See*

Trial Tr. 3978:25-3982:8 (Katz) (Amex's "pricing strategy has been to have premium pricing");

PX2702 at -85; PX2779 at -18 (showing an Amex premium of ███ over Visa's mix-adjusted

rate and ███ over MasterCard's mix-adjusted rate and a premium of ███ over Visa's all-in

rate and ███ over MasterCard's all-in rate).

500.    Amex's premium pricing indicates that Amex has market power.  Trial Tr.

3978:25-3982:8 (Katz).  Professor Katz, using the most recent data Amex provided through the

discovery process, applied Amex's methodology of adjusting rates to compare Amex's all-in rates to Visa's and MasterCard's all-in rates.  Trial Tr. 3978:25-3982:8 (Katz); PX2702 at 85; PX2779 at 18.  He determined that "in the vast majority of cases" Amex charges a premium over Visa and MasterCard, which "are networks with market power in a concentrated industry."  Trial Tr. 3978:25-3982:8 (Katz); PX2702 at 85; PX2779 at 18.  He concluded this premium pricing is "one element of their strategy" that indicates Amex possesses market power.  Trial Tr. 3978:25-3982:8 (Katz).

501.    For many industries, including car rental, lodging, communications, department stores, and airlines, Amex maintains a larger premium over Visa's and MasterCard's rates than its average premium across all industries.  PX0357 at -960.

502.    Amex is the most expensive credit card on average for many merchants.  See, e.g., PX2613; Trial Tr. 194:5-196:20, 197:1-12 (Thiel/Alaska Airlines) (Amex is Alaska's most expensive card); 384:15-19, 449:8-13, 451:20-452:5, 456:17-457:1 (Robinson/IKEA) (Amex is IKEA's most expensive credit card.); 1679:25-1680:4, 1680:17-25, 1681:18-1682:8, 1686:25-1687:2, 1764:1-11 (Dale/Sprint); PX2611 at 1; PX1343 (Amex is roughly ███████████ ████████████████████████████████████); 1526:13-16 (O'Malley/Best Buy) (Amex is Best Buy's most expensive credit card.); 1352:1-8 (Rein/Walgreens) (Amex's rate was approximately 30 percent higher than the rates charged by competing credit card networks.); 1608:22-24 (Brennan/Hilton) (Amex is Hilton's most expensive credit card.); 558:6-8 (Bouchard/Sears); PX2617 (Amex is ███████████████████.); 2161:8-2162:9 (Haslam/Office Depot) (Amex is 20 percent more expensive than Office Depot's second-most expensive card, Discover.); 3145:4-7; 3156:12-14 (Gibson/Sinclair) (Amex is the most expensive card for Sinclair Oil's hotel and oil businesses.).

150

503.     Small merchants also pay a premium to Amex.  One way that Amex expanded its coverage at small merchants was through a program called OnePoint, through which Amex used third-party processors.  Trial Tr. 4746:1-14 (Glenn/Amex).  Though Professor Bernheim initially asserted at trial that small merchants pay lower rates to American Express than to MasterCard and Visa, he conceded on cross-examination that this was in fact not the case and that Professor Katz found that "[a named processor's] OnePoint merchants on average pay 24 basis points more to American Express than to Visa, and 11 basis points more than to MasterCard."  Trial Tr. 6497:6-13 (Bernheim); PX1589A.  Professor Bernheim ultimately acknowledged that Professor Katz pointed to OnePoint merchants as evidence that small merchants pay higher prices for Amex than for Visa and MasterCard, not lower prices, as Professor Bernheim had originally testified.  Trial Tr. 6498:5-11 (Bernheim).

504.     Mr. Quagliata's group at Amex is evaluated on its success in protecting Amex's pricing premium over Visa and MasterCard.  Trial Tr. 709:15-22, 710:24-711:8 (Quagliata/Amex); PX0051 at -677 ("Maintaining our rate premium is an integral part of driving positive results to our P&L.").

505.     Amex's claims at trial that Amex's premium has been eliminated were based on nothing more than unsubstantiated assertions by Amex executives.  *See e.g.*, Trial Tr. 4403:4-15 (Chenault/Amex) (testifying that Amex's mix-adjusted premium "has gone away" without pointing to any documents or data for support); 702:7-25 (Quagliata/Amex) (testifying that Amex's "premium relative to Visa or MasterCard has evaporated" without pointing to any supporting documents or data); 2666:25-2667:3 (Funda/Amex) (testifying that Amex's "premium in the US is essentially zero," without pointing to any documents or data).  Professor Bernheim also presented no independent evidence and relied only on Mr. Chenault and other

Amex executives' unsupported statements that Amex no longer had a price premium.  Trial Tr. 6343:19-6344:1 (Bernheim); DX7828 at 77-78.  Professor Gilbert too offered no evidence for this assertion beyond pointing to Mr. Chenault's testimony. Trial Tr. 5223:6-5224:1 (Gilbert); DX7808 at 48.

### a.  Merchants do not receive additional value from Amex.

506.  Amex's higher prices are not offset by additional benefits or services to merchants.  Trial Tr. 198:6-8 (Thiel/Alaska Airlines); 395:14-16 (Robinson/IKEA); Trial Tr. 1608:25-1609:2, 1609:18-20 (Brennan/Hilton); 1687:9-11 (Dale/Sprint).

507.  Alaska Airlines receives no benefits or services from Amex that it does not also receive from Visa.  Trial Tr. 198:6-8 (Thiel/Alaska Airlines). Instead, Amex takes more time to pay Alaska than other networks.  Visa and MasterCard pay Alaska the next day for transactions on their networks while Amex does not pay Alaska for seven to ten days.  Tr. 188:6-18, 189:9-11(Thiel/Alaska Airlines).  Alaska Airlines has calculated the cost of the delay in receiving funds from Amex to be about ten basis points.  Trial Tr. 216:22-217:1 (Thiel/Alaska Airlines).  To Alaska Airlines, Amex's price premium over other networks is not justified.  Trial Tr. 198:9-11 (Thiel/Alaska Airlines).

508.  Amex pays Southwest Airlines in seven days while other networks pay Southwest ███████   This delay amounts to a cost increase to Southwest of seven basis points.  Trial Tr. 2391:3-2392:6 (Priebe/Southwest Airlines).

509.  Sears receives payments from Amex more slowly than from other card networks and has calculated the two day delay in Amex payments to translate into three basis points on top of the discount rate Sears pays to Amex.  Trial Tr. 558:9-560:7 (Bouchard/Sears).

510.     Amex recognizes that its speed of pay is inferior to other networks: "We recognize here there are parts of our business that are actually less attractive to merchants than Visa and MasterCard and speed of pay is one." Trial Tr. 2581:24-2582:9 (Funda/Amex); PX1240 at -091.

511.     Amex did not have higher average sales value than Visa at Walgreens.  Trial Tr. 1401:13-19 (Rein/Walgreens). Walgreens paid Amex's higher rate because Amex had a "very, very loyal customer base that would take their business elsewhere if we didn't accept [Amex]." Trial Tr. 1401:13-19 (Rein/Walgreens).

512.     Merchants do not believe that Amex cardholders spend more, on average, because they are using an Amex card.  A larger sale to an Amex customer is attributable to the fact that the customer is likely more affluent than an average customer.  An affluent person who happens to use an Amex card would spend the same amount as a similarly affluent person using a different card.  Trial Tr. 603:24-604:15 (Bouchard/Sears).

513.     Amex provides Solitude Ski Resort with a summary of Amex cardholder spend at Solitude.  Trial Tr. 2524:18-2525:8 (Holtey/Solitude).  The Amex summary duplicates information Solitude already tracks in its property management system and Solitude does not use the Amex report "for much of anything" beyond double checking its own data.  Trial Tr. 2525:9-25, 2547:6-2550:6 (Holtey/Solitude).

514.     Amex's closed-loop marketing can use information collected from one merchant to help another merchant take away the first merchant's customers.  *See e.g.*, DX4846 at -986; Trial Tr. 2270:6-2274:14 (Berry/Amex) (showing that Amex used data from Dunkin' Donuts' peer set, including McDonalds, Starbucks, Tim Hortons, Krispy Kreme, Burger King, WaWa, and Panera Bread, in order to help Dunkin' Donuts target customers that were spending with

153

competitors and incent "those customers to increase their patronage of Dunkin' Donuts"). Amex used its data analytics to tell Delta which Amex cardholders purchased tickets on United or Continental Airlines so Delta could solicit them for Delta. Trial Tr. 5375:15-5376:23, 5395:24-5396:12 (Miller/Delta Airlines). However, Amex can turn around and sell similar information to Delta's competitors about Amex cardholders' purchases on Delta. Trial Tr. 5396:5-21 (Miller/Delta Airlines). Some merchants testified about their concern that Amex could sell their data to competitors. For example, Sears expressed concern that Amex could "take [Sears'] customer information from this year and sell it to Home Depot next year. So the customers can go right back there." Trial Tr. 575:8-576:8 (Bouchard/Sears). Sears cannot tell Amex not to use Sears' sales data to try to encourage its customers to shop at Sears' competitors. Trial Tr. 576:9-12 (Bouchard/Sears). Similarly, when Amex told Southwest that it could provide aggregated data on the Atlanta market, Southwest became concerned about how its own data "could have been handed off to [Southwest's] competitors in a reverse situation." Trial Tr. 2437:3-2438:10 (Priebe/Southwest Airlines).

515. Amex provided data analytics to IKEA as "a test for American Express to demonstrate what they could offer IKEA in terms of analytics." Trial Tr. 396:25-397:21 (Robinson/IKEA). The data was provided as "sort of a one-time freebie," and after that, "if [IKEA] wanted to use [Amex's] analytics [it] would have to purchase the analytics." Trial Tr. 396:25-397:21 (Robinson/IKEA). After the test, IKEA decided not to purchase Amex's analytics. IKEA has, however, purchased other analytics from outside companies. Trial Tr. 397:17-21 (Robinson/IKEA).

**b.      Amex surveys undermine its premium value claims.**

516.      Amex regularly conducts surveys that measure merchant satisfaction with service provided by Amex and other credit card networks.  Trial Tr. 1781:9-20, 1782:10-17 (Ford).

517.      Plaintiff's expert, Professor Gary T. Ford, evaluated the reliability of the results of merchant satisfaction surveys conducted by Amex in 2010.  Trial Tr. 1775:13-1776:5 (Ford).

518.      Professor Ford is an expert in survey research, methodology and analysis with over 40 years of experience in the field.  He was a professor of marketing for 34 years, taught numerous classes on survey research, published over 40 articles in the area of survey research, and served on the boards of two leading marketing journals and the leading academic research organization for consumer behavior research.  Trial Tr. 1770:13-1772:15 (Ford).  Professor Ford has been retained as a survey expert in litigation close to 100 times and has testified as an expert in federal court approximately ten to 12 times.  Nearly all of this expert work involved designing surveys for his clients or rendering opinions on surveys conducted by opposing parties.  Trial Tr. 1772:16-1774:11 (Ford).

519.      Professor Ford determined the reliability of the 2010 surveys by applying recognized criteria set forth in marketing textbooks and the Reference Manual on Scientific Evidence and by relying on his own training and experience in survey research.  Trial Tr. 1777:24-1781:8, 1786:21-1796:13 (Ford).

520.      Professor Ford concluded that the 2010 merchant satisfaction surveys are reliable.  Trial Tr. 1777:3-6, 1795:9-1796:8 (Ford).

521.      Amex concluded from the 2010 merchant satisfaction surveys that, overall, ███████████████████████████████████████████████████████████████"  PX0043 at -963; Trial Tr. 1796:25-1800:4 (Ford).  Amex scored ██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ PX0043 at -963; Trial Tr. 1796:25-1800:4 (Ford).

522.    The 2010 merchant satisfaction surveys measured merchant satisfaction with ███

█████████████████████████████████████████████████████. PX0043 at

-965.  The questionnaire asked merchants: "How would you rate the value you receive from

[Amex, Visa, and MasterCard] given the price you pay?"  PX0702 at -327.  The results of this

question showed that ██████████████████████████████████████

PX0043 at -965; Trial Tr. 1803:11-1804:15 (Ford).  The gap between Amex and

Visa/MasterCard was ████████████████████████████████████

████████████████████).  PX0043 at -965; Trial Tr. 1797:5-1799:5 (Ford).

523.    Merchants' responses to satisfaction surveys Amex conducted in other years

validate the "value" question in the 2010 survey:

a.    In 2006, two surveys of unmanaged merchant satisfaction ██████████████

███████████████████████████████████████████████████████"

Trial Tr. 1811:23-1814:20 (Ford); PX0705 at -702, -726.  With respect to

managed merchants, Amex scored ████████████████████████████

██████████████ Trial Tr. 1814:21-1815:14 (Ford).

b.    The 2008 merchant satisfaction survey found that ██████████████████

████████████████████████████████████████████████████

████  PX0041 at -098.  Amex also concluded from the 2008 data that ██████

████████████████████████████████████████████████

██████████████ PX0042 at -994.

524.    The 2012 merchant satisfaction survey found that Amex ███████████ ██████████████████████████████████████████████. PX1246 at -526-528; Trial Tr. 1804:21-1807:12 (Ford).

> ### ii.   Amex imposed profitable "Value Recapture" price increases on top of its already high prices.

525.    As Visa's and MasterCard's prices rose over time, Amex's premium – the amount that Amex charges merchants over and above Visa and MasterCard's own supracompetitive prices – declined.  It was important to Amex to retain its price premium over Visa and MasterCard. PX0051 at -677 ("Maintaining our rate premium is an integral part of driving positive results to our P&L."); Trial Tr. 709:20-22 (Quagliata/Amex).

526.    To maintain its price premium, Amex instituted price increases across many industries under an initiative it called "value recapture."  *See* PX0121 at -459; Trial Tr. 777:20-779:1 (Quagliata/Amex) (Amex's negative premium in the restaurant industry was one factor Amex looked at in making pricing decisions for value recapture.); PX0062 at -394-95; PX0051 at -677 ("One of the cornerstones of protecting rate and enhancing profitability is Value Recapture, which is an important part of our Score card.").

527.    Professor Katz determined that Amex's value recapture pricing "illustrates the successful exercise of market power."  Trial Tr. 3985:3-24, 3989:13-3990:12, 3990:15-3991:15 (Katz).  Value recapture consisted of a series of targeted price increases, in which Amex increased pricing that was already at or, more likely, above competitive levels.  Trial Tr. 3985:3-24, 3989:12-3990:12 (Katz).

528.    Because there "were not offsetting changes on the cardholders' side," the value recapture initiatives represent a two-sided price increase, in which Amex "both raised revenues

and . . . raised profits." Trial Tr. 3985:3-24, 3990:15-3991:15 (Katz). This differs from what generally happens in a competitive market. Trial Tr. 3988:20-3990:12 (Katz). Typically when a firm raises its prices, the firm's revenues fall, but its costs may fall further, thereby making the price increase worthwhile. Trial Tr. 3988:20-3990:12 (Katz). But, here, Amex's price increases raised its revenues, which Professor Katz characterized as a "somewhat unusual" result evidencing Amex's market power. Trial Tr. 3988:20-3990:12 (Katz).

529.    Professors Bernheim and Gilbert misunderstand the nature of Professor Katz's analyses of value recapture when they contend that evidence on value recapture only considered a one-sided price. Trial Tr. 6336:24-6337:8 (Bernheim); DX7828 at 72; Trial Tr. 5079:11-17(Gilbert). By taking into account the fact that there were not offsetting changes to cardholders as a result of the value recapture price initiatives, Professor Katz properly accounted for effects on both merchants and cardholders and considered the changes to the two-sided price charged by Amex as a result of value recapture.

530.    Value recapture was widespread, *see* PX0121 at -459, and resulted in minimal merchant cancellations. No "large merchants canceled" as a result of value recapture. Trial Tr. 4739:25-4740:3 (Glenn/Amex). Amex ██████████████████████████████████ ████████████████████████████████████ PX1240 at -100 (stating that "Value Recapture has been conducted over a substantial portion of our base," with ████████████████████████████████████████████████████████). While Professors Bernheim and Gilbert are correct that "companies profitably adjust[ing] prices up and down" is not necessarily "a reflection of antitrust market power," Trial Tr. 6337:9-17 (Bernheim); DX7828 at 72; *see also* Trial Tr. 5079:1-17 (Gilbert), Amex's value recapture program was not the usual price adjustments. Amex's nearly 100% retention of merchants

despite rate increases deviates from the normal pattern where a firm "might say, well, we've raised their price; maybe our revenues have gone down a little bit, but our costs have fallen by even more. Here, what [Amex is] saying is when they raised the price, it actually raised their revenue, which is somewhat unusual for firms." Trial Tr. 3990:5-12 (Katz). For this reason, the success of value recapture is further evidence of Amex's market power.

531.     Amex carefully measured the costs and benefits of value recapture and concluded that value recapture was highly profitable for Amex for both large managed and small unmanaged merchants. PX1753A at -032-033; PX0008 at -487-489. As a result, as shown in the chart below, from 2006 to 2010, value recapture returned $1.3 billion in incremental pre-tax income and increased Amex's weighted average discount rate in the United States by 8.8 basis points over what it otherwise would have been.

**Figure 6**



PX0357 at -949; *see also* PX0028 at -375; Trial Tr. 4426:15-4427:13 (Chenault/Amex) (Mr. Chenault admitted that Amex's average discount rate increased by 2.2 basis points during Amex's value recapture initiatives.).

532.    Amex's Regional Client Group in 2009 raised the discount rate on 2,600 of 8,000 merchants.  PX0706 at -676.  Only approximately 200 even threatened to cancel their acceptance of Amex cards and less than 0.1% actually cancelled.  PX0706 at -676, -685.  Of those merchants that cancelled or threatened to cancel, Amex cannot determine whether the threats or cancellations had anything to do with the value recapture price increases.  Trial Tr. 721:6-12 (Quagliata/Amex).  In 2010, Mr. Quagliata reported continued value recapture initiatives, with

"99.9+%" merchant retention.  PX1000 at -929; Trial Tr. 744:19-745:5 (Quagliata/Amex).  Only seven merchants (out of about 9000) in the Regional Client Group stopped accepting Amex in 2010, and Amex characterized only three of the cancellations as a "voluntary" decision by the merchant. Trial Tr. at 742:22-743:9, 744:6-746:1 (Quagliata/Amex); PX1000 at -929.

533.    Amex successfully imposed value recapture price increases on its larger merchants as well.  PX0984 at -958 (showing that Mr. Berry's National Client Group met value recapture goals in 2010).  Merchants in "everyday spend" industries in which insistence is relatively low were also subject to value recapture, *see* PX1201 at -048 (value recapture imposed in 2011 on Giant Eagle supermarket chain), and even merchants that Amex perceived as cancellation threats accepted discount rate increases.  PX0069 at -415 (cancellation threats by BJ's and Jetro averted and price increases imposed).

534.    Mr. Funda described value recapture as encompassing a "methodical look at the price[/]value relationship across multiple industry segments" to ensure that "we were, in fact getting compensated properly for the value we were creating in various industry segments." Trial Tr. 2764:3-11 (Funda/Amex); *see also* Trial Tr. 4724:22-4725:8 (Glenn/Amex).  As Mr. Funda acknowledged, Amex calculates the "value" it brings to merchants by measuring the amount of cardholder insistence Amex has in each industry segment.  *See* ¶¶ 439-449.  Thus, at its core, the goal of value recapture was to ensure that Amex was "getting compensated properly" for the insistence of its cardholders to use Amex.  *See* Trial Tr. 2764:3-11 (Funda/Amex).

535.    While Amex's value recapture initiatives did not extract every penny it believed possible from merchants, that fact does not demonstrate that Amex lacked market power. American Express calculates a maximum rational price premium for merchants but prices below

161

it.  Trial Tr. 4712:11-4713:7 (Glenn/Amex).  Professor Gilbert co-wrote an article with Professor Katz discussing *United States v. Microsoft Corp.*, 252 F.3d 34 (D.C. Cir. 2001), *see* PX2248, and at trial he acknowledged that "in both cases [*Microsoft* and this matter], the fact that the price could have been higher is – doesn't show that there's not market power."  Trial Tr. 5246:22-5247:8 (Gilbert).

### a. Restaurant value recapture.

536.    Three of Amex's value recapture initiatives focused on the restaurant industry: Restaurant Value Recapture 1; Restaurant Value Recapture 2 and Restaurant Value Recapture 3.  PX0062 at -392, -393, -395.  In 2007, Restaurant Value Recapture 1 raised the discount rate on approximately 330 merchants by 5-15 basis points.  PX0062 at -392.  In 2009, Restaurant Value Recapture 2 introduced a new 30 basis point Card Not Present Fee for approximately 280,000 merchants.  PX0062 at -393.

537.    In 2010, Amex implemented Restaurant Value Recapture 3 even though Amex recognized "it may be a challenging time for merchants."  PX0957 at -983.  Restaurant Value Recapture 3 utilized three different "pricing levers":  a $0.05 fixed fee per transaction; expanding its 30 basis point Card Not Present Fee to more merchants; and a 5 basis point base discount rate increase.  PX0062 at -395.  All restaurants were subject to at least one of these "pricing levers," and some were impacted by more than one.  PX0062 at -396.  In the Regional Client Group supervised by Mr. Quagliata, Amex applied Restaurant Value Recapture 3 price increases to 1,500 merchants.  PX0706 at -685.

538.    Amex imposed Restaurant Value Recapture 3 price increases unilaterally and did not require the agreement of the merchants subject to rate increases.  PX0957 at -948 (frequently asked questions concerning Restaurant Value Recapture 3:  "How can you raise rates or fees

162

without my agreement? . . . Our standard card acceptance agreements with merchant give us the right to adjust discount rates and fees.").

539.    Restaurant value recapture was a success.  In his 2010 performance review, Mr. Quagliata reported, "100% of RVR3 messages delivered.  No cancellations."  PX1000 at -928.

### b.        Gross pay fee increase.

540.    Merchants pay Amex a fee that allows them to pay Amex once a month ("gross pay") instead of at the time of each transaction ("net pay").  Trial Tr. 1089:11-19 (Quagliata/Amex).  In 2009, Amex raised the "Gross Pay Fee" in two ways:  it reduced the threshold at which a merchant had to pay a fee to get gross pay, and it increased the fee itself. Trial Tr. 1194:22-1196:3 (Quagliata/Amex).  These fee increases affected approximately 50% of Mr. Quagliata's Regional Client Group.  PX0784 at -380.

541.    Mr. Quagliata expressed concern about his ability to impose the gross pay fee increase because "we are increasing cost without any real corresponding benefit."  PX0784 at -380.  Another Amex merchant services executive, Mr. Pojero, observed that Amex planned to impose the price increase, "because we can."  PX1168 at -021.  In spite of Mr. Quagliata's concerns, and as predicted by Mr. Pojero, Amex successfully implemented the gross pay fee increases.  Trial Tr. 1200:8-10 (Quagliata/Amex).

### c.        Amex's claim that competitive pressures were a check on value recapture is wrong.

542.    Amex asserted that its value recapture price increases were somehow not profitable because they caused merchants to cancel other relationships with Amex.  That assertion was based principally on Continental Airlines' decision years later to terminate lounge access for Amex cardholders and discontinue its participation in Membership Rewards.  *See*

Trial Tr. 2269:3-20 (Berry/Amex).  But Amex's contemporaneous internal documents confirm that Continental based its action on the "significant penalties" it faced under its co-brand agreement with Chase and not because of the value recapture price increase.  PX1203A at -245 ("Re-signing these Amex partnerships would result in significant penalties to Continental from their co-brand issuer (Chase)"); *see also* PX1033 at -151 ("As we've discussed with several members of your team over the past year, any extension of M[embership] R[ewards] is very difficult because of our co-brand agreement with Chase."); Trial Tr. 5471:4-14 (Codispoti/Amex) (Amex was "fairly certain that ████████████████████████████████ ████████████████████████████████████████████████████).[5]

    543.    Amex also asserted that some value recapture price increases were offset by other payments to merchants.  But, for this argument, Amex only points to payments to a couple of its co-brand partners.  The evidence showed that Amex's standard practice is to negotiate card acceptance and co-brand partnerships separately.  PX0842 at -284 ("[C]ard and travel deals need to be negotiated separately.  [E]ven in the case of Delta, where we were negotiating the cobrand renewal, we keep them separate.").  Amex believes that co-brand and card acceptance agreements should not "cross-subsidize" each other, and that each must "support its own value proposition" and "stand on [its] own two legs."  Trial Tr. 2717:7-18 (Funda/Amex); PX0999 at -041 ("An issuer co-brand relationship is independent from the card acceptance relationship and needs to support its own value proposition."); DX7374 at -649-650 (co-brand agreement "must

---

[5] Counsel eventually backed off the claims about Continental's exit from Membership Rewards and the lounge program: "Q And I believe you suggested that the exit of Continental from those two American Express programs was related to the value recapture discount rate increase that American Express imposed on Continental, is that correct?  MR. KOROLOGOS: Objection, Your Honor.  I believe that misstates the witness' testimony.  It's only as to time, not relation."  Trial Tr. 2294:13-19.

meet its own hurdle for ROE [return on equity]"); Trial Tr. 5623:13-22 (Codispoti/Amex) (co-brand ███████████████ .

544. Amex's largest payments to co-brand partners were made apart from card acceptance agreement negotiations. Amex's $1 billion pre-purchase of Delta SkyMiles was not ████████ accepted until after the discount rate and all the other terms were finalized. Trial Tr. 5504:5-21, 5507:3-10 (Codispoti/Amex). As Ms. Codispoti testified, the pre-purchase "was actually a post closer closer" to the other terms. Trial Tr. 5507:6-10 (Codispoti/Amex). Additionally, Amex agreed to pre-purchase $250,000 worth of Starwood points at a discount in 2009. "The pre-purchase of points had nothing to do with the discount rate that is set in that 2011 merchant acceptance agreement." Trial Tr. 5910:8-16 (Flueck/Starwood Hotels).

### iii. Amex price discriminates.

545. Amex's price discrimination is consistent with the finding that Amex has significant market power, as "one of the prerequisites for being able to engage in price discrimination is to have some degree of market power." Trial Tr. 3982:11-3983:23 (Katz). Professor Katz calculated the amount Amex keeps as a network in different industries by taking Amex's discount rate by industry and subtracting the industry's issuer rate as derived from Amex's third-party issuing agreements. Trial Tr. 3982:11-3983:17 (Katz); PX2702 at 86; PX2779 at 19. The portion that Amex keeps varies greatly by industry, with some industries being "several multiples of the other." Professor Katz testified that "these differences are larger than any plausible . . . cost differences." Trial Tr. 3982:11-3983:17 (Katz); PX2702 at 86; PX2779 at 19. Such pricing differences amount to price discrimination. Trial Tr. 3982:11-3983:23 (Katz)

546.     Professor Katz also examined Amex's contribution margin, or Amex's "estimate of how much they gain or what their profit is from the merchant relationship," by industry and determined that contribution margins differ greatly by industry.  Trial Tr. 3984:11-3984:1-20 (Katz); PX2702 at 87; PX2779 at 20.  He concluded that these differences in contribution margins also indicated that Amex price discriminates, "which [it] would be able to do only if [it] possessed market power."  Trial Tr. 3984:1-20 (Katz).

      **D.**    **Amex's pricing arguments do not overcome evidence of market power.**

            **i.**    **Amex's premium eroded because of its change in card mix.**

547.     Amex claims that its shrinking premium over Visa and MasterCard means it does not have market power.  *See* Amex Pre-Trial Mem., ECF #514 at 58.  While Amex's premium over Visa and MasterCard has eroded over time, that is mostly because Visa and MasterCard have raised their prices.  PX0357 at -959; Trial Tr. 2667:4-7 (Funda/Amex).  That is indicative of the absence of competition among networks over merchant fees. To the extent Amex's *average* discount rate across all industries – a measure Amex does not use in making business decisions, Trial Tr. 2829:12-2930:8 (Funda/Amex) – has declined, that decline reflects a shift in the mix of merchants at which Amex's cardholders make their purchases, with increased spending occurring at "everyday spend" merchants subject to lower discount rates.  Trial Tr. 2649:11-2654:20 (Funda/Amex); PX0890 at -338 (Amex board presentation stated that declining discount rate is "primarily due to mix changes" and is "an intentional move on our part.").

548.     Professor Bernheim testified that Amex's reported average merchant discount rate has declined because its composition of merchants has shifted towards having more merchants that have lower discount rates, such as supermarkets.  Trial Tr. 6548:14-18 (Bernheim); DX7828 at 59; *see* PX0254 at -647; PX0004 at -055; Trial Tr. 4254:19-4255:18 (Katz) (explaining that

the Amex discount rate has been relatively flat because it has been expanding into industries with a lower discount rate while at the same time increasing its price to other merchants).

549. The mix of merchants at which Amex cardholders make their purchases has a significant effect on Amex's average merchant discount rate. For example, in 2009 Amex's average discount rate would have increased if the mix had stayed the same. Trial Tr. 2662:21-2663:1 (Funda/Amex) ("Q. So if you took out mix from the average Amex discount rate, you would have been forecasting an increase from 2008 to 2009, right? A. A slight increase, yes."); PX0791 at -145. In other recent years (like 2008), the average discount rate has actually gone up in spite of mix effects. PX0791 at -144.

550. Professor Bernheim acknowledged that Amex told the Federal Reserve Board in 2005 that its average discount rate was slowly declining due to its expansion into everyday spend industries (such as grocery stores and drugstores). Trial Tr. 6549:19-6550:13 (Bernheim). Professor Bernheim also acknowledged that Amex told the Government Accountability Office in 2007 that "[t]he shift from predominantly T&E to a more balanced industry mix has decreased our overall rate." Trial Tr. 6551:1-6552:1 (Bernheim). When Professor Katz appropriately controlled for the impact of industry mix, he found that American Express's average overall discount rate is rising. *See* ¶¶ 573-574.

551. Shifting its merchant mix toward merchants in segments with lower average discount rates did not create an economic justification or need for Amex to raise its discount rates to T&E merchants. The merchant segments with lower rates still have positive contribution margins – that is, they still contribute to American Express's profits, rather than generating a loss. Trial Tr. 6653:23-6654:10 (Katz).

167

552.     Amex also ignores that decreasing prices do not establish an absence of market power.  Professor Bernheim conceded that "as a general rule that the fact that a firm's average price is declining, does not necessarily mean that it doesn't have market power."  Trial Tr. 6547:18-6548:6 (Bernheim).  A firm's decreasing price may be unrelated to market power. Professor Bernheim admitted that he previously concluded Intel had market power at a time when its prices were steadily declining. Trial Tr. 6548:2-6 (Bernheim).

553.     Even with a flat discount rate, Amex collects more in fees from merchants over time because of inflation.  Amex's rate is a percentage of the merchant's sales price.  So Amex collects more from merchants as the merchants' prices to consumers rise, even if the discount rate does not increase.  See, e.g., Trial Tr. 560:22-561:13 (Bouchard/Sears) (the payment Amex receives rises proportionate to inflation, even if the discount rate stays the same); 362:25-363:15 (Thiel/Alaska Airlines) (if fuel costs rise, Alaska Airlines pays more to Amex, even if discount rate stays the same; 2518:4-15 (Priebe/Southwest); 6742:3-18 (Katz).  As a result, the fact that time has passed since previous Amex price increases is irrelevant.  Trial Tr. 6721:2-6722:10 (Katz).

### ii.     Amex's limited pricing concessions do not offset its higher prices to merchants.

554.     The concessions that Amex makes on price through rate negotiations, marketing funds, strategic investment funds, or signing bonuses do not result in meaningful benefits to merchants.  Even the concessions that Amex makes to some of its largest merchants are small when compared to the rates these merchants pay to accept Amex.  Trial Tr. 1667:10-15 (Brennan/Hilton); 2390:10-18 (Priebe/Southwest); 215:12-22 (Thiel/Alaska Airlines); 5911:5-25 (Flueck/Starwood Hotels).

168

555.    Amex rarely makes price concession to merchants.  In one such instance, the

merchant still received a price increase – it was just less than what Amex initially proposed – and

the rate break was only temporary.  During 2008 contract negotiations with Southwest Airlines,

Amex told Southwest that it was raising Southwest's discount rate from ██████ to ███

███.  Trial Tr. 2398:9-20, 2404:21-2405:11, 2406:21-2408:20 (Priebe/Southwest Airlines);

PX0186 at -267, -284; PX0809 at -120 (2008 email from Amex to Southwest stating that "SW's

new rate will move to ████ starting 1/1/09").  Southwest resisted, but Amex imposed the ████

percent rate anyway, before a new acceptance agreement had been reached.  Trial Tr. 2409:2-

2410:5, 2412:20-2413:15, 2414:4-13 (Priebe/Southwest Airlines); PX0809 at -121; PX2612 at -

453-454.  After months of negotiations, Amex agreed that Southwest would pay ██████ in

the first year of the new contract, but that the rate would return to ██████ starting in the

second year.  Trial Tr. 2414:21-2415:18 (Priebe/Southwest Airlines); PX0332 at -788; *see also*

PX0056A at -237 (Amex presentation showing 2008-2009 price increase imposed on Southwest

through Value Recapture).  Southwest ended up paying Amex nearly ██████ more than it

had before the rate hike and significantly more than it was paying to accept Visa and

MasterCard.  Trial Tr. 2383:20-2384:6, 2405:12-15 (Priebe/Southwest Airlines) (discussing

PX2660); PX1348 at -002 (showing Southwest's September 2012 YTD costs of acceptance: ███

██ for Amex versus ██████ for Visa/MasterCard).

556.    The marketing funds that Hilton receives from Amex are relatively small as a

percentage of the discount rates that Hilton pays to accept Amex.  Trial Tr. 1667:10-15

(Brennan/Hilton).

557.    The marketing funds that Southwest receives from Amex represent only ████ of

the value that Southwest pays to Amex.  Trial Tr. 2386:21-2390:18 (Priebe/Southwest); PX2661;

PX1348 at -002; PX0332 at -733.  These marketing funds would only change the discount rate Southwest pays to accept Amex by three or four basis points.  Trial Tr. 2390:10-18 (Priebe/Southwest).

558.    The cash that Alaska receives from Amex's marketing funds is "less than ▮ of the merchant fees [it] pay[s]."  These marketing funds either would have reduced Alaska's discount rate by a "very small" amount, or would have had no impact at all.  Trial Tr. 215:10-22 (Thiel/Alaska Airlines).

559.    For Starwood, the increase in Amex's discount rate from 2003 to 2007 was more than the increase in the marketing funds that Starwood received from Amex during the same period.  Trial Tr. 5911:15-18 (Flueck/Starwood Hotels).  When Amex raised Starwood's discount rate again in 2011, Starwood did not receive an increase in marketing funds.  Trial Tr. 5883:13-5884:2, 5901:1-7 (Flueck/Starwood Hotels).  The marketing funds that Starwood receives from Amex are not a direct offset to the discount rate that Starwood pays to accept Amex.  Trial Tr. 5911:23-25 (Flueck/Starwood Hotels).

560.    Marketing funds also often come with significant strings attached that make them valuable for Amex, but less valuable for the merchant.  There are limits on how merchants can use those funds that are designed to encourage spend on American Express.  See, e.g., DX7278 at -889 (contract with Alaska Airlines restricting how it can use Amex marketing funds, including a requirement that Amex approve all marketing fund expenditures); PX0332 at -734 (similar contract with Southwest Airlines); Trial Tr. 214:14-20 (Thiel/Alaska); 2386:11-20 (Priebe/Southwest) (marketing fund use is "really restrictive"); 5322:12-16, 5395:7-24 (Miller/Delta Airlines); DX4335 at -258.

561.     Amex's "concession" to a couple of co-brand partners to pre-purchase their rewards points during the financial crisis did not negate price hikes or show Amex lacked market power.  As discussed above, Amex's decision to pre-purchase points and miles from co-brand partners had no effect on those co-brand partners' discount rates.  For example, the pre-purchase of Starwood points was not a concession but a profitable business deal.  Starwood approached Amex during the liquidity crisis because Amex could cheaply get money through the Federal Reserve's discount window.  Trial Tr. 5870:19-5871:15, 5908:19-5909:4 (Flueck/Starwood Hotels).  Amex obtained the points at a discount, making the pre-purchase effectively a loan to Starwood.  Trial Tr. 5909:5-24 (Flueck/Starwood Hotels).  That loan had an implied interest rate of seven to eight pecent to Starwood.  PX2776.  In addition to the loan, Amex demanded and secured a two-year extension of its co-brand partnership with Starwood.   Trial Tr. 5870:19-5871:2, 5910:2-7 (Flueck/Starwood Hotels); 5436:6-5437:1 (Codispoti/Amex).

562.     Even if Amex made concessions to merchants, that would not indicate that Amex lacks market power.  Economists recognize that even a monopolist may negotiate with its customers to figure out each customer's willingness to pay.  Trial Tr. 4268:14-24 (Katz).  Additionally, firms with substantial market power negotiate.  Trial Tr. 4268:14-4269:12 (Katz).  Merchants likewise testified that they negotiate with other companies that have market power.  Trial Tr. 364:23-365:18 (Thiel/Alaska) (testifying that Alaska negotiates with monopolists such as an airport).

### iii.     Amex's two-sided pricing calculations are erroneous and unreliable.

563.     Amex premised a significant part of its defense at trial on the assertion that its "two-sided" price has been declining and that a declining price necessarily establishes Amex's lack of market power.  Trial Tr. 143:25-144:17 (Amex Opening Statement).  By "two-sided"

price, Amex refers to its revenues generated by merchant discount fees minus its cost of funding cardholder rewards.  Amex failed to establish at trial any reliable basis for calculating a hypothetical two-sided price or that its two-sided price actually declined during any relevant period.

564.    Amex offered scant evidence of contemporaneous business records or executive testimony to establish that the company measures two-sided prices in the ordinary course of its business.  When Amex reports on its prices to its highest executives, it routinely reports its average *merchant* price, not a two-sided price.  See, e.g., PX0028 at -395.

565.    Only one purported contemporaneous business document was offered that purported to relate to a two-sided price.  DX7409.  This document was labeled as a "margin" calculation, not a price calculation.  DX7409 at -022.  That document was prepared in 2013, years after this lawsuit was filed.  Indeed, Amex offered no calculation created pre-complaint that it argued was reflective of two-sided prices.

566.    Amex's Joshua Silverman testified on examination by Amex's counsel about DX7409, but he did not explain how or by whom the calculations were made.  Silverman conceded that he could recall no conversations with others at Amex, at any point in time, linking changes in discount fees to changes in reward levels. Trial Tr. 3577:8-23 (Silverman/Amex).  In short, Amex hinged its two-sided price arguments on presentations by its two experts, Professors Gilbert and Bernheim.

567.    Professor Gilbert included DX7409 on two of the slides he used in connection with his testimony.  *See* DX7808 at 17, 46.  He conceded that he was not aware of any other Amex document that purported to show a two-sided price other than a graph from this single, post-complaint document.  Trial Tr. 5213:1-16 (Gilbert); DX7409 at -022.   The "relevant

number" that he identified as the two-sided price and that he interpreted as evidence of change in Amex's two-sided price over time is the gap between the two lines in the graph.  Trial Tr. 5081:18-5082:7 (Gilbert); DX7409 at -022.  However, Professor Gilbert did not know what was included in either of the two lines in the graph ("discount revenue less cashback" and "total rewards"), Trial Tr. 5214:1-5 (Gilbert); DX7409 at -022.  Professor Gilbert also acknowledged that the change shown in it could be due to mix effects and did not know whether an accounting change American Express implemented in 2009 could have affected the graph's representation of total rewards.  Trial Tr. 5214:6-17 (Gilbert).  Professor Gilbert made no effort to replicate the Amex calculations, notwithstanding that DX7409 contained the only allegedly two-sided price quantifications in his trial presentation.  Trial Tr. 5214:25-5215:7 (Gilbert).  In sum, Professor Gilbert's testimony about Amex's supposed declining two-sided price, by his own admission, was unsupported by reliable analysis or investigation of any kind.  As Professor Gilbert explained, "You have to check with Professor Bernheim on that.  He's done a lot of calculations."   Trial Tr. 5213:1-7 (Gilbert).

568.    Professor Bernheim's calculations fall short of reliable or credible evidence that American Express's two-sided price did, in fact, decline.  His analysis suffered from several significant flaws which, if corrected, reverse his finding of a decline.

569.    There were two significant errors in Professor Bernheim's calculation of the merchant's component of the two-sided price.  First, almost all of the decline asserted by Professor Bernheim was attributable to his remarkable conclusion, as he described in the table shown below, that since 2008 the discount fee Amex has charged Delta Airlines is near zero or even negative, *i.e.*, that Amex is effectively paying Delta each time a Delta passenger uses an

Amex card – the opposite of what happens when a credit card is used at every other merchant in the country.  Trial Tr. 6657:8-6658:3, 6662:3-6663:3 (Katz); PX2778 at 6, 7.

**Figure 7**



DX6563A.

570.    Professor Bernheim arrives at this counterintuitive position only by treating all payments flowing from Amex to Delta as reductions in Delta's discount fee.  Trial Tr. 6556:18-6557:1 (Bernheim).  For example, he included in his price calculations the value of a $1 billion "interest-free loan" Amex gave Delta to secure its co-brand relationship. Trial Tr. 5658:16-23 (Codispoti/Amex); 6556:18-6557:1 (Bernheim); 6657:8-6658:3 (Katz).  But Amex seeks co-brand relationships to obtain "access to customers that would otherwise not be Amex customers, and via channels that we otherwise would not have access to (*e.g.* Costco, Delta's website, etc.)."

174

DX5561 at -128; *see also* Trial Tr. 5420:12-5421:9 (Codispoti/Amex) (explaining that Amex was "interested in partnering with a co-brand partner [] so that we could acquire customers of that co-brand partner").

571.    It is improper to include Amex's payments to obtain a co-brand partner as part of the "price" a merchant pays to accept Amex. *See* Trial Tr. 6658:15-6659:1 (Katz) (it is improper to include payments "associated with the co-brand agreement which is about Delta serving as a partner, almost as a distributor for American Express Cards . . . it's very distinct[ly] helping American Express issue cards and attract cardholders [rather] than saying, well, when people come to our airline, they use your credit card to buy things").

572.    In contemporary business documents and trial testimony, Delta itself recognized that payments from Amex were not related to the discount rate or cardholder rewards, but were to compensate it for issuing, marketing, or other efforts. *See* Trial Tr. 5330:19-5331:8, 5340:13-5341:4, 5342:19-25, 5345:5-5346:23, 5376:11-20 (Miller/Delta Airlines); *see also* DX4335 at -252 (██████████████████████████████████████████████████ ██████████████████████████████████████████).

573.    Professor Bernheim's attribution of a large negative discount rate for Delta affects his overall conclusions on two-sided price. Trial Tr. 6661:10-6663:3 (Katz). When Professor Katz corrected for this price adjustment and similar, but smaller, adjustment for other co-brand partners by only using information from Amex's internal "GMAPS" system, Professor Bernheim's results reversed and, as Professor Katz described at trial using the chart below, Amex's T&E merchant price in fact rose from 2002 to 2010:

**Figure 8**



*See* PX2779 at 31; Trial Tr. 6662:3-6663:3 (Katz) (discussing PX2778 at 7); 6328:24-6329:3 (Bernheim).

574.    Second, Professor Bernheim incorrectly controlled for changes in the mix of Amex's merchants.  Correcting for Professor Bernheim's treatment of the Delta and JetBlue co-brand agreements by relying on Amex's GMAPS data and controlling for changes in Amex's merchant mix shows that Amex's merchant discount rate rose over time, contrary to Professor Bernheim's testimony.  As Professor Katz described at trial using the chart below, correcting just these two methodological errors results in the average discount rate paid by merchants to accept American Express rising from 2.60% in 2002 to 2.65% in 2010.

**Figure 9**



PX2779 at 29; Trial Tr. 6654:11-6656:2 (Katz) (discussing PX2778 at 5).

575.    Professor Katz's calculations of a steady to slightly rising average discount rate match Amex's contemporaneous documents much more closely than do Professor Bernheim's litigation calculations.  *See* PX0028 at -395 (reporting on average prices to Amex's Operating Committee and noting that "[o]ur Value Recapture efforts have maintained AXP's average discount rate since 2004").  Likewise, Mr. Chenault told Amex's investors in 2009 – a year in which Professor Bernheim claims Amex's prices fell by 19 basis points – that "[a]t a time when many companies have had to cut or discount their prices or fees, we have been able to hold our own . . . [O]ur merchant pricing has remained stable and . . . [w]e are not lowering prices to get or keep cardmembers or merchants."  PX2706 at -159.

576.     In addition to miscalculating Amex's discount rate, Professor Bernheim's calculation of Amex's two-sided price also improperly focused on Amex's cost of providing benefits to cardholders instead of the actual value of those benefits.  Trial Tr. 6731:16-20 (Katz). Professor Katz described three flaws in that approach.

577.     First, airlines have been devaluing their frequent flyer miles over the years, either making it harder for travelers to redeem miles or requiring more miles to book the same flights. PX1657 at -652 (█████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████); *see also* Trial Tr. 5433:12-23, 5659:12-5662:4 (Codispoti/Amex) (stating that Amex was concerned "Delta would continue to devalue their points," and customers were frustrated by an "inability to redeem points").

578.     Professor Bernheim did not take into account Delta's devaluation of its SkyMiles program.  Trial Tr. 6669:12-14 (Katz).   Because American Express cardholders were getting less valuable rewards as a result of Delta's devaluation, the two-sided price would have risen if correctly calculated.  Trial Tr. 6669:6-11 (Katz).

579.     Second, testimony established that, when Continental Airlines exited the Amex Membership Rewards program, the value of Amex rewards to cardholders decreased as cardholders would no longer be able to redeem rewards points to travel on Continental.  Trial Tr. 2823:25-2824:2 (Funda/Amex); 6664:12-6665:9 (Katz).   Continental's exit from Membership Rewards was therefore equivalent to an *increase* in American Express's two-sided price.  Trial Tr. 6665:10-6666:6 (Katz) ("So, when the value of rewards goes up, that's equivalent to a price decrease but it also follows the other way, that when the value of rewards goes down . . . that

178

corresponds to a price increase.").  However, Professor Bernheim calculated Continental's exit from Membership Rewards as a *decrease* in American Express's two-sided price, absurdly meaning Continental's exit benefitted merchants and cardholders.  Trial Tr. 6666:7-16 (Katz). Because Professor Bernheim's methodology removes American Express's rewards liability for Continental awards off the two-sided price, "he would count this [exit by Continental from Membership Rewards] as having lowered American Express's price rather than raising it which would have been the correct thing to do." Trial Tr. 6667:19-6668:8 (Katz).

580.    Amex's internal analysis shows that because of the devaluation of Delta SkyMiles, the Continental exit, and other factors, Amex rewards programs have degraded over time. Trial Tr. 3557:23-3559:12; PX2528 at -236 (showing Membership Rewards 'Value Per Point Over Time' falling from ███████████ in 2008 to ███████████ in 2010 to ███████████ in 2012 and stating "We're seeing continued erosion in benefits due to point transfer value reduction and imminent loss of lounges,").  Mr. Silverman agreed that competitor loyalty programs have "passed American Express by," and that Amex rewards differentiation has "roughly gone away." Trial Tr.  3562:23-3564:15 (Silverman/Amex).

581.    Third, Professor Bernheim's calculation of the two-sided price is also affected by point bank repricing.  Trial Tr. 6673:14-18 (Katz).

582.    Cardholders who earn points through the American Express rewards program typically do not use them right away, so there is an accrued "bank" of points that have been earned but not yet redeemed.  Trial Tr. 6671:2-25 (Katz).  American Express recognizes those points as a liability.  Trial Tr. 6671:2-25 (Katz).  American Express includes in its liability calculations both a projection of the likelihood that a cardholder will actually redeem his or her points and a projection of how much the points that are redeemed will cost American Express at

179

the time of redemption.  Trial Tr. 6671:2-25 (Katz).  American Express updates its projections from time to time.  Trial Tr. 6671:8-25 (Katz).  When American Express reprices the points bank upward, it recognizes on its books that its rewards liability has gone up.  Trial Tr. 6672:1-5 (Katz).

583.  Under Professor Bernheim's approach, repricing the point bank to account for a greater liability for points already earned by cardholders corresponds to a decrease in American Express's current two-sided price for upcoming transactions.  Trial Tr. 6673:19-6674:5 (Katz).  As Professor Katz explained, however, repricing the point bank upward does not actually confer a benefit on cardholders "almost by definition, because it is about points and based on transactions that have occurred previously."  Trial Tr. 6673:19-6674:5 (Katz).

584.  Bernheim's error over point bank repricing is significant.  Trial Tr. 6674:6-20 (Katz).  For 2010, Amex's "reserve adjustment" – that is, its increase in its rewards liabilities because of point bank repricing – was $362 million, or almost 20 percent of its $1.9 billion expense for new points.  Trial Tr. 6674:6-6675:3 (Katz); PX2644 at -909.  The inclusion of that point bank repricing adjustment in the calculation of Amex's rewards costs misleadingly lowered Amex's two-sided price as calculated by Professor Bernheim.  Trial Tr. 6675:12-17 (Katz).

585.  Professor Katz determined that Bernheim's two-sided price methodology is "fundamentally unsound."  Trial Tr. 6732:3-11 (Katz).

586.  When Professor Bernheim's errors in calculating what the merchant pays to accept American Express are corrected, the evidence shows that Amex's average overall discount rate is rising.  *See* ¶ 574

587.  To help advance its market power arguments, Amex elicited testimony from Mr. Silverman that its "marginal profit is getting squeezed."  Trial Tr. 3639:1-3640:7

(Silverman/Amex).  Such evidence does not preclude a finding of market power, as even a monopolist may see its profits decrease from one year to the next, based on factors (such as a recession) that do not speak to the substitutability of other products.  In fact, Mr. Chenault stated that when Amex's margins were "being squeezed " in the past, it was able to respond by raising the discount rate to merchants through value recapture – an exercise of market power.   Trial Tr. 4401:10-15 (Chenault/Amex).

588.   Contrary to the suggestions of a "squeeze," the evidence at trial showed that Amex's margins for its cards have grown to "a pre-recession high of ▮▮▮ "  PX2548 at -518; Trial Tr. 3572:12-22 (Silverman/Amex).  Mr. Silverman also said that "the margins on our charge products are very good."  Trial Tr. 3606:15-3607:11 (Silverman/Amex).

589.   In advancing its "squeeze" defense, Amex asked Mr. Silverman about two graphs found in DX7409 at -022.  Trial Tr. 3638:11-3641:11 (Silverman/Amex).  Those two graphs included only some of Amex's total card revenues and costs.  Trial Tr. 3638:20-3640:7, 3640:16-3641:4, 3780:19-3781:14 (Silverman/Amex).   On the same page of the same exhibit, there are two graphs that accounted for the rest of Amex's card revenues and costs.  Those other two graphs provide the whole picture and demonstrate that Amex has high and growing margins.  Mr. Silverman did not testify about either of those graphs.  *See* DX7409 at -022.  The entire page from this presentation is reproduced below:

**Figure 10**



DX7409 at -022.

590.    The first graph Mr. Silverman testified about compared only the per-transaction average discount revenue Amex gets from a merchant to the per-transaction average reward Amex pays.  Trial Tr. 3639:1-3640:12 (Silverman/Amex); *see* top left graph of DX7409 at -022. Looking only at those particular revenues and expenses, the graph shows Amex keeps substantially ███ as spend "profit" than it pays out in rewards.  *See* DX7409 at -022 (In 2012,

Amex collects ▮ basis points in discount revenue and pays ▮ basis points in rewards, providing a contribution margin to Amex of ▮ basis points).[6]

591.    The second graph Mr. Silverman testified about, on the bottom left of the same page, compares only Amex's revenues from the annual fees it charges cardholders (and other similar revenues) to Amex's fixed costs to service those cardholders (*e.g.*, insurance and lounge access fees paid to airlines).  *See* DX7409 at -022; Trial Tr. 3640:16-3641:4, 3780:23-3781:14 (Silverman/Amex).   Mr. Silverman admitted that this graph shows that Amex earns a margin that is triple its costs.  Trial Tr. 3781:15-3782:7 (Silverman/Amex); *see* DX7409 at -022 (For 2012, Amex collects on average ▮ per account; its average cost to service an account is ▮, yielding a margin of more than ▮).

592.    Mr. Silverman did not testify about the two other graphs shown on DX7409 at -022.  The graph on the top right addresses Amex's remaining revenues and costs, such as those associated with interest on outstanding credit balances paid by cardholders, a growing source of Amex revenue.   That graph shows the "net yield" that Amex earns from lending money to its cardholders versus the "Provision Expense," or how much it costs Amex to extend credit.  The graph shows a large (and growing) margin for Amex.  PX7409 at -022.

593.    The final graph on the bottom right of the same page combines the three previous graphs and shows that Amex had a total pre-tax income or "PTI margin" in 2012 of ▮ DX7409 at -022.  That evidence is consistent with PX2548.   That graph also shows that the PTI margin for Amex rose significantly from ▮ in 2007 to ▮ in 2012.  DX7409 at -022.

---

[6] Some of the changes in the average discount rate over time were due to changes in the mix of merchants served, and some of the changes for rewards costs were, in part, a reflection of changes in Amex's accounting practices.  Trial Tr. 3776:11-3779:18 (Silverman/Amex).

594.     Amex's experts said nothing about these three other graphs on DX7409, with Professor Gilbert admitting that he did not know how the information was calculated.  Trial Tr. 5214:1-24 (Gilbert).  Thus, the undisputed documentary evidence shows that Amex's profit margins are large and, contrary to the testimony of Mr. Silverman, growing.

**E.     Amex's lower acceptance rate among small merchants does not indicate a lack of market power.**

595.     Accepted by more than 3.4 million merchants at 6.4 million merchant locations, Amex is the second-largest card network by charge volume in the United States.  ECF #447-1 at ¶ 20; PX1985; DX6576 at 10.  Nearly all major U.S. merchants accept Amex, and hence its network accommodates all but a fraction of its cardholders' spending needs.  Amex itself believes that it has a strong merchant network, as shown by its contemporaneous business documents.  Amex's lower merchant coverage compared to other card networks is not evidence of a lack of market power, but rather is a product of its conscious decision to maintain high prices at the expense of expanding coverage.

596.     In SEC filings, Amex regularly evaluates its merchant network in terms of "spend coverage."  *See* PX1412 at 8; PX1411 at 7; DX6069 at 9; PX1409 at 9; PX1408 at 9; PX1407 at 9; PX1406 at 8; PX1405 at 9; Trial Tr. 4800:17-19 (Glenn/Amex).  To measure spend coverage, Amex compares "our Card Members' spending on our network currently with our estimate of what our Card Members would spend on our network if all merchants that accept general-purpose credit and charge cards accepted American Express Cards."  PX1412 at 8.  Spend coverage thus gauges Amex's ability to "satisfy the spending needs of [its] customers as far as their general purpose spending."  Trial Tr. 4440:21-4441:7 (Chenault/Amex); *see also* Trial Tr. 1159:7-1160:8 (Quagliata/Amex); 2947:13-25 (Pojero/Amex).

597.    Amex reported in its most recent 10-K filing that, "as of the end of 2013, our merchant network in the United States accommodated more than 90 percent of our Card Members' general-purpose card spending."  PX1412 at 8; *see also* PX0924 at -809 (internal presentation showing 94 percent spend coverage in 2010); PX0018 at -649; PX0990.  In key industries, Amex's spend coverage is even greater:  in 2010, Amex had 100 percent spend coverage in airlines, 99 percent spend coverage in car rental, and 98 percent spend coverage in lodging.  PX2728 at -190; *see also* PX0639 at -742 (reporting 97 percent T&E coverage); PX0020 at -376; Trial Tr. 1923:5-1924:22 (Berry/Amex).

598.    Amex also calculates the percentage of Visa and MasterCard-accepting merchants that accept Amex cards – a measure it refers to as "locations in force" (LIF).  Locations in force measures, which are not weighted by charge volume, can distort a network's actual relevance because they count a large merchant like Delta Airlines the same as a small merchant like a corner dry cleaner.  Trial Tr. 2852:24-2853:6 (Pojero/Amex).  For example, if there were only two merchants in a given area, a Wal-Mart and a local florist, and 99 percent of credit card spend in that area took place at Wal-Mart, and Wal-Mart accepted Amex but the florist only accepted Visa, then Amex's LIF coverage for the area would be only 50 percent but its spend coverage would be 99 percent.  Trial Tr. 4831:25-4833:2 (Glenn/Amex).

599.    Amex instructs employees that a "simple comparison" between the number of merchants that accept Amex cards and the number of merchants that accept other networks' cards is "not meaningful" and that Amex instead "focuses on Spend Coverage as a reliable measure of determining [merchant] acceptance."  PX0016 at -890.  Amex proposed to dispel a co-brand partner's concerns about coverage by telling it, "Although LIF coverage is below that of Visa/MC, spend coverage is [the] more important metric since spend drives remuneration."

PX0219 at -797; Trial Tr. 5598:14-5599:2 (Codispoti/Amex).  Moreover, Amex believes that

differences in how card networks count merchant locations make comparisons of LIF coverage

unreliable.  PX0016 at -890; PX0131 at 28; PX0905 at -926; Trial Tr. 4802:13-4803:2

(Glenn/Amex).

600.    A document used to prepare Amex executives for an August 2005 financial

community meeting rejected the notion that "the lack of broad acceptance [was] one of the

greatest barriers to [Amex]'s growth," highlighting the fact that Amex's locations in force had

been growing by 11 percent per year for the previous decade.  PX0905 at -926; Trial Tr.

4798:19-4800:3 (Glenn/Amex).  At an August 2010 financial community meeting, Amex

similarly observed that its locations in force "have been growing" and said that it was "pretty

pleased with [its] performance in terms of overall growth and location[s]."  PX0131 at 28; Trial

Tr. 4803:3-19 (Glenn/Amex).  The "coverage gap" that Amex has today is largely a matter of

perception based on history, and Amex believes that it is in the "last mile" of eliminating that

perception.  PX2745 at 5.  As its Chief Financial Officer recently told investors, "We'd expect at

a minimum to see the numbers of small merchants that we acquire each year grow by at least

50%.  So if you run that out over a number of years, we think this can make a tremendous

difference in closing, what I might call the last mile of the coverage gap that we have in terms of

perception in the U.S."  PX2745 at 5; Trial Tr. 5755:13-5757:19 (Gilligan/Amex).

601.    Even if LIF is a relevant metric, Amex has "strong coverage" in the largest U.S.

geographic areas.  PX2725 at -644.  In 2010, for example, Amex's LIF coverage was ▮ percent

in New York City and ▮ percent in Los Angeles.  PX2725 at -644; Trial Tr. 4805:14-4806:9

(Glenn/Amex).   Amex has accordingly concluded that "while there may be targeted

opportunities for adding LIF, increasing LIF across the Network may not be necessary." PX2725 at -644; Trial Tr. 4806:13-20 (Glenn/Amex).

602.    The vast majority of merchants that do not already accept Amex cards are very small.  Trial Tr. 2859:19-22, 3002:13-3004:2 (Pojero/Amex); *see also* PX0021 at -127 (chart showing that 91 percent of LIF gap is with merchants under $50,000 in annual volume); PX0131 at 28; DX6791 at -565 (coverage gaps is "[p]rimarily with small merchants").  A presentation to Amex's Board of Directors explained that 75 percent of merchants that accept credit cards but not Amex cards are "probably half the size" of "your local florist."  PX0890 at -353-354.  A 2007 presentation prepared for Ed Gilligan similarly estimated that 91 percent of merchants that accept credit cards but not Amex cards would generate less than $50,000 in Amex charge volume and that less than one percent of such merchants would generate more than $500,000 in Amex charge volume.  PX0021 at -122, -127; Trial Tr. 2856:8-15, 2857:6-10, 2858:8-15, 2859:15-18 (Pojero/Amex).  Tom Pojero testified that "most of the[] merchants in the [coverage] gap are very, very small merchants" and that "[t]he vast majority sit well below [$]20,000 in Amex annual charge volume potential."  Trial Tr. 3002:13-3004:2 (Pojero/Amex).

603.    The Senior Vice President of Amex's Regional Client Group could not identify a single retailer out of the largest 100 retailers in the country (or any other large retailer) that does not accept Amex.  Trial Tr. 628:23-25, 629:12-22, 630:18-21 (Quagliata/Amex).

604.    A major flaw in Amex's coverage arguments arises from the fact that any existing "gap" in LIF or coverage is in large part due to conscious business decisions to limit network growth.  Amex recognizes internally – and its executives recognized at trial – that high merchant fees are a factor in keeping many small merchants from accepting Amex.  DX6791 at -565 ("higher pricing" is a driver of the coverage gap); Trial Tr. 4749:21-4750:6, 4810:1-5

187

(Glenn/Amex); *see also* PX0465 at -538-539; Trial Tr. 2958:23-2959:14 (Pojero/Amex). Amex recognizes that it cannot have it both ways, as "100% coverage and premium price may be incompatible." PX0013 at -237. Amex's price to merchants was and remains a "formidable obstacle" for Amex in expanding coverage and Amex could, therefore, expand its acceptance network by reducing its prices. Trial Tr. 1148:24-1149:1, 1153:23-1154:21, 1155:8-14 (Quagliata/Amex).

605.    Amex has even calculated lower discount rates that it could charge if it wanted to sign specific merchants but then it chose to not sign those merchants at the lower rates, leaving profitable acceptance deals on the table. In March 2010, Amex identified fifty "top" merchant prospects and set forth "'proposed' pricing changes as to what it might take to close [acceptance] deals" with these merchants. PX0465 at -538; Trial Tr. 2861:5-17 (Pojero/Amex). For many merchants, price apparently was the "roadblock," yet Tom Pojero could not recall any of the listed merchants that had been offered the proposed rates. Trial Tr. 2865:17-2867:22 (Pojero/Amex). Amex data show that, had Amex lowered its rates to the levels proposed and successfully signed these merchants, the acceptance deals would have been profitable for Amex. PX2702 at 77; PX2779 at 16; Trial Tr. 3950:16-3952:13 (Katz).[7]

606.    Amex has often chosen to do business in ways that have made it less attractive to merchants. Amex has insisted on direct contractual relationships with merchants and was late to adopt the third-party acquirer model; as a result merchants have had to separately deal with Amex for servicing and settlement and receive separate statements from Amex. DX3750 at -

---

[7] Amex argued that "efforts to literally offer zero discount rates to get in the door" did not convince merchants to join its acceptance network. Trial Tr. 151:12-18 (Amex Opening Statement). Amex's 2009 experimented with offering a zero discount rate for one year found it the most successful strategy Amex has tried. DX4366 at -716.

818; Trial Tr. 3002:13-3004:2, 3096:15-3097:18, 3103:1-4, 3108:2-12 (Pojero/Amex); 4607:12-4609:22 (Chenault/Amex).  Amex has been slower to pay than other networks.  Trial Tr. 188:6-18, 189:9-12 (Thiel/Alaska Airlines); Trial Tr. 558:9-559:22 (Bouchard/Sears); Trial Tr. 2391:3-2392:6 (Priebe/Southwest Airlines); Trial Tr. 2582:4-9 (Funda/Amex).  And Amex has treated refunds less favorably than other networks.  Trial Tr. 607:11-609:16 (Bouchard/Sears).

607.    Amex in fact recognizes that the ASRs deter "a lot" of merchants from accepting its cards.  Trial Tr. 3716:25-3717:18 (Silverman/Amex) ("If we allowed for steering, we could certainly have a lot more merchant[s] in the network . . . .").

608.    Amex has demonstrated its ability to expand its network when it decides to do so.  It increased its LIF coverage from less than 50 percent in the early 1990s to more than 70 percent today.  Trial Tr. 2846:13-2848:19, 3096:8-3098:12 (Pojero/Amex).  Amex's 2007 decision to work with third-party acquiring banks through its OnePoint program made it easier for merchants to accept Amex from an operational standpoint and measurably increased Amex's coverage levels.  Trial Tr. 2847:16-2848:16, 3002:13-3004:2, 3097:11-24 (Pojero/Amex); Trial Tr. 4810:10-16 (Glenn/Amex).  And Amex's recent launch of the OptBlue program gives acquirers more flexibility, which Amex believes will further expand coverage.  Trial Tr. 2849:15-2850:2, 3097:25-3098:5 (Pojero/Amex); 4609:23-4610:9 (Chenault/Amex).

609.    Amex is concerned that if it reduces prices to attract new, smaller merchants, it may face pressure from its existing merchants to reduce their prices as well.  Concerns over so-called "pricing spillover" have prompted Amex to make the business decision not to reduce its prices for small merchants it does not currently serve.  Trial Tr. 4704:21-4705:9 (Glenn/Amex).  But any suggestion that Amex's smaller network is something other than a conscious decision by

189

Amex is contrary to the evidence.  The choice to keep overall prices higher, but have fewer merchants, is consistent with possessing market power.  Trial Tr. 3946:20-3947:14 (Katz).

610.     Discover's success in expanding merchant coverage shows that Amex could gain acceptance at more merchants if it chose to.  Discover initially pursued a model similar to Amex's model, under which it only used direct contractual relationships with its merchants.  Trial Tr. 824:15-825:4 (Hochschild/Discover).  In 2006, Discover and Amex were accepted at a similar number of merchant locations.  Trial Tr. 5764:20-24 (Gilligan/Amex); PX2749; *see also* Trial Tr. 3932:6-21 (Katz).  Around that time, Discover changed its strategy and began working with acquiring banks that could sign up merchants on Discover's behalf and process Discover transactions.  Discover now maintains direct relationships with its largest 1,300 of its largest merchants and relies on acquiring banks to manage its relationships with all other Discover-accepting merchants.  Trial Tr. 813:22-814:5, 824:7-825:4 (Hochschild/Discover).  As a result, Discover has been able to increase the size of its merchant acceptance network by over 20 percent.  Trial Tr. 825:5-16 (Hochschild/Discover).  By 2012, Discover's LIF coverage was almost the same as that of Visa and MasterCard.  PX2702 at 65; PX2779 at 12; Trial Tr. 3931:3-3932:21 (Katz).

611.     Roger Hochschild testified that, by setting its prices at a level at or below Visa's or MasterCard's, Discover has been able to expand its merchant acceptance and increase its sales volume.  If Discover were to set its prices at a premium to other general purpose card networks, merchants would be less likely to want to accept Discover cards.  Trial Tr. 826:3-14 (Hochschild/Discover).

612.     Amex has chosen not to go the way of Discover, having described itself as "a *premium* network with a very large merchant [discount rate] premium" – a "[v]ery different

190

situation than Discover."  PX1611 at -317; Trial Tr. 2853:7-2854:5 (Pojero/Amex).  Amex's

preferred strategy is not to seek the maximum coverage attainable, but rather "to find the right

balance of [discount rate] and coverage."  PX1611 at -317 (emphasis omitted); Trial Tr. 2854:11-

14 (Pojero/Amex).

613.    In fact, Amex's smaller merchant network is evidence that Amex has market

power.  As Professor Katz testified, a hallmark of market power is the ability to raise price and

restrict output, and Amex makes a conscious choice "to pursue a higher-price-lower-volume

strategy."  Trial Tr. 3946:20-3948:12 (Katz).

614.    Amex argues that because it is not accepted by certain small merchants, it is a

discretionary card for *all* merchants.  However, this claim is clearly contradicted by the evidence

in this case.  *See* Section IV.B.

**F.    Discover price increases do not show that Amex lacks market power.**

615.    At trial, Professor Bernheim presented his opinion that Amex's ability to increase

prices to merchants via its market power initiatives does not show that it has market power, since

Discover increased prices from 2008 to 2011 as well, including for airlines.  Trial Tr. 6338:12-

6339:23 (Bernheim); DX7828 at 72-73.  However, the discount rates Discover charged to

airlines in 2011, after three years of price increases, were still lower than the discount rates

charged by Amex in 2008, according to Professor Bernheim (holding aside Amex co-brand

partners JetBlue and Delta for reasons described above). DX7828 at -73; DX6563A; Trial Tr.

6554:10-6555:24 (Bernheim).  Similarly, when Discover raised its discount rate to IKEA, the

rate never reached a point where it was higher than the discount rates for Amex, MasterCard, or

Visa.  Trial Tr. 456:17-457:1 (Robinson/IKEA).  If Discover's discount rate ever rose above

Visa or MasterCard, IKEA "might have to consider dropping them." Trial Tr. 457:2-8 (Robinson/IKEA).

### G. Amex's market power is durable.

616.     Amex has argued that it has continued to advertise its products and introduce innovations to the marketplace, and that its need to compete against its rivals in this way shows that it does not possess durable market power. *See* Amex Pretrial Mem., ECF #514 at 52-53. This is incorrect, as conceded by Professor Bernheim, who acknowledged that during the time he concluded that Intel had market power in microprocessors, it spent money on advertising, Trial Tr. 6578:7-20 (Bernheim), and continued to invest in improvements to its products. Trial Tr. 6579:1-10 (Bernheim).

### H. Amex's ASRs have become more restrictive over time.

617.     Amex contends that it has "utilized Non-Discrimination Provisions in its merchant agreements since it first launched a payment card in the late 1950s," *see* Amex Pretrial Mem., ECF #514 at 17-18, when it "was the little guy on the corner," Trial Tr. 6389:22-6390:7 (Bernheim), suggesting the ASRs must therefore be procompetitive. That argument is inconsistent with the history of the ASRs.

618.     Today's ASRs are not as old as Amex suggests. Amex's 1959 card acceptance agreement contained only a no-surcharge rule. Trial Tr. 5807:17-20 (Gilligan/Amex); PX1389 at 3-4. It did not ban competitor discounts, promotions, or expressions of preference. It simply provided that the merchant's prices "charged to holders of our credit cards will not be greater than those charged to your other customers." PX1389 at 3; Trial Tr. 5807:7-20 (Gilligan/Amex). The purpose of that no-surcharge rule, as Amex explained to Congress in 1970, was to prevent

merchants from assessing an "extra charge" for the financing Amex was providing that the merchant "would otherwise have to supply himself." PX1389 at -15.

619. In its first few decades as a T&E card company, when Amex imposed its early no-surcharge rule, it had a substantial market position competing with only Carte Blanche and Diner's Club as issuers of T&E charge cards; Visa and MasterCard did not yet exist. Trial Tr. 4328:16-4329:13 (Chenault/Amex). By the 1980s, Amex was the dominant brand among T&E merchants. Trial Tr. 3307:12-17, 3312:10-14 (Morgan/Visa); PX1389 at -81 ("[T]he *Chicago Sun-Times* succinctly concluded that Amex 'owned' the travel and entertainment category at the time of the 1985 launch of the 'It's Everywhere' campaign.").

620. Amex wielded its early no-surcharge rule in an anticompetitive way. In 1974, Amex was sued under the antitrust laws for using its no-surcharge rule to prohibit merchants from offering discounts to customers paying with cash. PX2061 at 5-6. Amex settled, agreeing to change its contracts to permit cash discounts. PX1389 at -43-45. The Truth in Lending Act was then amended in 1976 to protect cash discounts by law. PX1389 at 47-48. By 1980, when lobbying Congress for a ban on surcharges, Amex completed an about-face on cash discounts; Amex's representative testified that "we support the concept of cash discounts on the grounds that such discounts, if offered, are beneficial because they lead to lower consumer prices." PX1389 at -62. Amex testified that surcharges and discounts were different:

> There are those who argue that there is really no difference between a discount for cash and a surcharge for credit card use. That may be true from a strictly theoretical or mathematical viewpoint. But there's a very real difference in fact. If a merchant offers a cash discount, that's fine because it means lower prices for the public. But if a merchant imposes a surcharge, he simply taxes the credit card user and the cash customer doesn't save a cent. That's higher prices for the public for no discernible benefit.

193

PX1389 at -59.

621.     By 1979, Amex's card acceptance agreement had neither a no-surcharge rule nor a non-discrimination rule.  PX1389A; Trial Tr. 5808:4-5809:1 (Gilligan/Amex).

622.     Visa began its "Everywhere You Want To Be" campaign in 1985, followed by its "We Prefer Visa" campaign in 1990.  Both sought to shift share from competitors including Amex.  Trial Tr. 3306:4-3307:3, 3321:21-3322:10, 3326:4-8, 3432:6-3433:8 (Morgan/Visa); 5154:16-5155:2 (Gilbert); PX1392 at -15; PX1389 at -79, -84-85.

623.     By 1989, in its retail card acceptance agreement, Amex had inserted an early version of its ASR.  DX6630 at -158.  An expanded version, similar to the current ASR, was in use by 1992.  PX1389 at -189.

624.     After Visa began preference efforts with merchants, Visa observed in 1992 that Amex "began approaching T&E merchants with a new contract agreement which appears aimed at stopping the success of Visa's merchant relations efforts and also at limiting the ability of merchants to negotiate further discount rate reductions."  Trial Tr. 3300:9-3331:6, 3336:13-20 (Morgan/Visa); PX0084 at -555; PX0136; PX1366.

625.     In its 2010 presentation to the Department of Justice before this litigation commenced, Amex admitted that an "important purpose" of its ASR language was to prevent "organized discrimination" because, "[a]fter Visa and MasterCard promote[d] merchant share shifting at the [point of sale], Amex expand[ed] the existing ASRs to provide that merchants may not:  [s]eek to persuade a customer to use another payment product , . . . [d]iscourage payment with Amex, . . . [or s]tate or publish a preference for other cards."  PX1392 at -19.  The 1998 version included further language to achieve the same purpose of blocking competition.  PX1392 at -19.  The core ASR language at issue in this case was inserted and enforced two decades ago

in direct response to network competition at the merchant point-of-sale, and for the purpose of quashing that competition.

## V.     THERE IS A RELEVANT MARKET CONSISTING OF THE PROVISION OF GPCC CARD NETWORK SERVICES TO T&E MERCHANTS.

### A.     It is appropriate to define a separate market for network services to T&E merchants.

626.     Since GPCC card networks charge different prices to merchants in different industries, Professor Katz considered whether defining a price discrimination market consisting of merchants in market segments that could be targeted for price increases is appropriate.  Trial Tr. 3910:8-19 (Katz).  Based on that analysis, Professor Katz concluded that defining a relevant market for GPCC card network services to T&E merchants is appropriate.  Trial Tr. 3912:15-19, 6645:16-19 (Katz).

627.     Defining markets by identifying market segments that a hypothetical monopolist could target for price increases is a standard approach to market definition; "it is often referred to as defining price discrimination markets."  Trial Tr. 3911:2-7 (Katz).  Professor Bernheim agreed that using price discrimination was an appropriate way to define relevant product markets.  Trial Tr. 6296:25-6297:10 (Bernheim).  The Horizontal Merger Guidelines "identify the definition of price discrimination markets as something that can be appropriate depending on [market] circumstances."  Trial Tr. 3911:8-13 (Katz).

628.     Under the Horizontal Merger Guidelines, defining relevant markets using price discrimination is appropriate when "the hypothetical monopolist could engage in profitable targeting" of a merchant segment for price increases.  Trial Tr. 6645:23-6646:14 (Katz); *see also* Trial Tr. 3906:20-3907:23 (Katz).  Professor Bernheim agreed that if a hypothetical monopolist can identify a group of customers and profitably impose a small but significant and non-

transitory increase in price on customers within the group, the sale of the product at issue to that group of customers, by virtue of price discrimination, can qualify as an antitrust product market. Trial Tr. 6536:21-6537:18 (Bernheim).

629.    Professor Katz testified that the two conditions laid out in the Horizontal Merger Guidelines for price discrimination to be feasible are met.  These conditions are:  (1) that GPCC card networks must be able to target customers and to price to them differently; and (2) that it must not be possible for the targeted customers to engage in arbitrage to take advantage of the lower prices charged to other customers.  Trial Tr. 6648:14-6650:11 (Katz).

630.    Merchant segmentation is a central feature of pricing GPCC card network services.  Trial Tr. 3906:20-3907:23 (Katz).  Amex segments its pricing strategy in a variety of ways, including by industry.  *See* PX0357 at 947; Trial Tr. 732:17-733:22 (Quagliata/Amex) ("we have a rate table classification by industry that is the guiding criteria for how we price merchants"); 3907:24-3908:16 (Katz).  Amex's average merchant discount for T&E merchants significantly exceeds its average merchant discount for non-T&E merchants – ███ versus ███ in 2011.  Trial Tr. 3908:21-3909:16 (Katz); PX2779 at 10.  Other networks also engage in pricing to merchants by segments.  Trial Tr. 3909:18-3910:7 (Katz).  If a merchant is in an industry category with high merchant discount rates, it cannot outsource its credit card acceptance function to another merchant paying lower discount rates to take advantage of that lower rate, *i.e.*, there is no opportunity for arbitrage among merchants.  Trial Tr. 6537:11-6538:7 (Bernheim).  Since networks can identify their customers, charge different customers different prices, and the customers are not able to arbitrage, a hypothetical monopolist could target price increases at certain merchant segments – *i.e.*, price discriminate.  Trial Tr. 3906:20-3907:23, 3908:21-3909:16; 6648:14-6650:11 (Katz);  *see also* Trial Tr. 6537:22-6538:7 (Bernheim).

196

631.    Professor Katz testified that, after meeting the two conditions laid out in the Horizontal Merger Guidelines for price discrimination, the remaining question is whether it would be profitable for a hypothetical monopolist of credit and charge cards to charge different prices in T&E industries. Trial Tr. 6645:23-6646:14 (Katz). Professor Katz then considered whether price discrimination to T&E merchants would be profitable for a hypothetical monopolist and concluded that it would be. Trial Tr. 6648:14-6650:11 (Katz). Professor Katz testified that "given the importance of credit and charge cards to any major airline, . . . a hypothetical monopolist of credit and charge cards could profitably charge much higher prices to airlines than it could to supermarkets. Trial Tr. 6648:14-6650:11 (Katz). In support of this conclusion, Professor Katz relied on testimony of airline executives concerning the importance of credit card acceptance. *See* Trial Tr. 6648:25-6651:1 (Katz). As a result, Professor Katz concluded that consideration of price discrimination markets is appropriate.

632.    Professor Katz rejected Professor Bernheim's argument that because a T&E-only card is not commercially viable, it is inappropriate to define a T&E market. Trial Tr.6295:4-6296:7 (Bernheim). Professor Katz explained using the analogy of airlines. The most prominent approach in antitrust analysis of the airline industry is to treat city pairs as relevant markets. Trial Tr. 6657:5-6648:9 (Katz). Professor Bernheim agreed that antitrust analysis of airlines sometimes defines relevant markets by city pairs even though no city pair by itself could sustain a modern airline. Trial Tr. 6539:2-7 (Bernheim). He also acknowledged that a single firm can be found to operate in multiple relevant markets. Trial Tr. 6539:8-10 (Bernheim). For the same reason, Professor Katz rejected Professor Bernheim's arguments that it is not possible to define a T&E market because a GPCC card network has joint costs that apply to multiple merchant

197

segments and because general acceptance is important for a network's success.  Trial Tr. 6646:23-6648:13 (Katz).

**B.      The hypothetical monopolist test demonstrates that the provision of GPCC card network services to T&E merchants is a relevant market.**

633.    Professor Katz applied the hypothetical monopolist test to the provision of GPCC card network services to T&E merchants and found that it constitutes a relevant market.  Trial Tr. 3858:14-25; 3912:15-19; 3922:2-8 (Katz).  To make this determination, Professor Katz analyzed whether it would be profitable for a hypothetical monopolist to impose a small but significant, non-transitory increase in price above the competitive level (1) on network fees associated with transactions to T&E merchants, (2) on the average merchant discount rate to T&E merchants.  Trial Tr. 3912:20-3922:8 (Katz).

634.    Professor Katz examined whether a hypothetical monopolist of GPCC card network services to T&E merchants would find it profitable to raise network fees, the portion of revenue that networks keep for "facilitating transactions by others."  Trial Tr. 3914:20-3917:4 (Katz).  Professor Katz increased merchant discount rates by a conservative amount equivalent to 10 percent of total network fees, "instead of taking five percent which is common," while holding rewards to cardholders constant.  Trial Tr. 3903:19-3906:14, 3914:20-3917:4 (Katz).  For his calculations, Professor Katz assumed that the hypothetical monopolist had a 100 percent profit margin, which conservatively overestimates the negative profit impact of sales lost due to the price increase.  Trial Tr. 3914:20-3917:4 (Katz).  This calculation indicated that an increase in the average T&E price from ██████████ to ██████████ would be profitable unless it caused merchant volume to fall more than 9.1 percent.  Trial Tr. 3914:20-3919:11 (Katz); PX2702 at 56-57.

635.    Professor Katz found that it was "extremely unlikely" that T&E merchants representing roughly nine percent of T&E merchant charge volume would stop accepting credit. Professor Katz, therefore, concluded that GPCC card network services to T&E merchants is a relevant market.  Trial Tr. 3917:20-3919:11 (Katz).

636.    In reaching this conclusion, Professor Katz relied on the reasons described above: evidence that customers use different payments instruments differently; evidence that merchants, such as hotels and car rental agencies, other payment instruments are imperfect substitutes; merchant testimony that cardholders are insistent to use credit and charge cards; the lack of response to Durbin; and Amex's insistence calculations for T&E merchants.  Trial Tr. 3917:20-3919:11 (Katz).  In addition, Professor Katz noted that Amex's success in imposing value recapture price increases, implies that a hypothetical monopolist of all GPCC card network services to T&E merchants would be even more likely to impose price increases.  Trial Tr. 3917:20-3919:11 (Katz).  Moreover, Professor Katz noted that customers are likely to be more credit-insistent at T&E merchants than at other merchants.  Often T&E transactions are "relatively large transactions, for example, or they could be transactions you're undertaking for business, where you're hoping to get reimbursed and, again, it's large."  Trial Tr. 3887:13-24 (Katz).  Amex insistence estimates also indicate that insistence is "particularly large" in the T&E segment, reflecting the importance of credit cards to those industries.  Trial Tr. 3899:3-15 (Katz); PX1240 at -103.   In addition, for car rental agencies, hotels, and airlines, "the vast proportion of [their] payment volume is on credit cards."  Trial Tr. 3889:19-3890:23:23 (Katz); PX2779 at 6.  For example, Christopher Priebe, Director of Payment Strategies at Southwest Airlines, testified that it "wouldn't be prudent" to stop accepting credit cards because 84-85 percent of Southwest's sales are on credit cards.  Trial Tr. 2404:7-16 (Priebe/Southwest).

637.   As part of his "belt and suspenders approach," Professor Katz also performed a hypothetical monopolist test on the average merchant discount rate.  Trial Tr. 3919:16-3922:1 (Katz).  While holding the level of cardholder rewards constant, he calculated that a hypothetical monopolist of GPCC card network services could profitably raise the average price to merchants by five percent (a 15 basis point increase), unless doing so would cause a loss of ███████ or more of its T&E charge volume.  Trial Tr. 3919:16-3922:1 (Katz) (discussing PX2702 at -58). For the reasons stated in the preceding paragraph, Professor Katz found it economically implausible that merchants accounting for almost one quarter of all GPCC card volume in T&E segments would stop accepting all credit cards if they faced a five percent price increase.  Trial Tr. 3919:16-3922:1 (Katz).  After applying the hypothetical monopolist test in both ways, he concluded that GPCC card network services to T&E merchants constitute a relevant antitrust market.  Trial Tr. 3922:2-8 (Katz).

638.   No Amex economist performed a hypothetical monopolist test regarding the T&E relevant market. Trial Tr. 6501:22-25 (Bernheim).

## VI.   AMEX HAS MARKET POWER IN THE T&E MARKET.

639.   Amex's 34 percent share of purchases made with GPCC cards at T&E merchants exceeds its 26 percent share at merchants generally.  PX2779 at 14-15.

640.   T&E merchants face higher levels of Amex cardholder insistence than merchants in other industries.  *See* PX1240 at -103.  Professor Katz testified about Amex's insistence calculations for T&E merchants, calling out the "[t]otal insistence" levels for car rental, lodging, and airlines in particular, Trial Tr. 3896:10-3893:10, and stating that "those numbers are particularly large reflecting the importance generally of credit and charge cards to that industry

and here reflecting the particular importance of American Express to those merchants." Trial Tr. 3899:3-15 (Katz); PX1240 at -103.

641.     Insistence levels are particularly high in T&E industries because T&E merchants often depend on corporate customers for substantial portions of their sales. Professor Katz testified that "the use of [c]orporate cards is much more in travel and entertainment than in other[] [industries]." Trial Tr. 3963:6-3964:21 (Katz). In 2010, Amex's corporate card charge volume as a share of its total volume was about ▮▮▮▮▮ at T&E merchants, versus only about ▮▮▮▮▮ at non-T&E merchants. PX2779 at 17. This figure was even higher for certain categories of T&E merchants – the share of corporate card volume was over ▮▮▮▮▮ for airlines and over ▮▮▮▮▮ for lodging and car rental. PX2779 at 12. These high corporate card shares are "relevant because of the insistence of corporate card users." Trial Tr. 3963:6-3964:21 (Katz). Amex cards account for more than 60 percent of all corporate card sales, PX2486 at -053, and ▮▮▮▮▮ of Amex corporate cardholders work at companies that require employees to use their Amex cards for business expenses. PX0634 at -112. Accordingly, T&E merchants are "going to be concerned with the insistent volume," and so, as Professor Katz explained, "if you were a hotel, you would be quite concerned that if you didn't take American Express you're going to maybe be hard-pressed to get American Express [c]orporate card users to come to your hotel and that is a significant piece of money." Trial Tr. 3966:13-22 (Katz).

642.     Amex's consumer cardholders also strongly insist on paying T&E merchants using Amex cards. According to Amex, "79% of American Express Consumer Cardmembers agree they would choose an airline that accepts American Express over one that does not, all else being equal." PX1601 at -271 (Southwest Airlines); *see also* PX0119A at -902 (American Airlines); PX0769 at -223 (JetBlue Airways); PX0023 at -872 (Amex presentation toJjetBlue

describing Amex cardholders as "more loyal, highly-insistent customers who prefer to use the Card for Airline purchases"); PX0112 at -709 (Amex presentation to JetBlue explaining that Amex "aim[s] to be an indispensable payment partner" by providing access to "Highly Insistent" cardholders).

643.     Amex has additional leverage in negotiations with T&E merchants, given it has the largest business travel agency and can steer business away from a hotel, car rental or airline merchant.  *See* Trial Tr. 5313:10-14, 5390:11-14 (Miller/Delta Airlines).  For example, to understand the size of the "stick" it could use in negotiations for Delta's co-brand business, Amex spent months calculating how much business it could shift away from Delta with its travel agency.  See, e.g., PX0235 at -265; PX0094 at -061; PX1668 at -842; PX0219 at -811-814 ("stick" analysis presented to Mr. Chenault); PX1660 at -000 (travel agency could "reduce Delta's business to ███ of fair market share"); Trial Tr. 5581:6-5582:8, 5584:12-5585:5, 5586:4-5588:2 (Codispoti/Amex).  Delta understood that Amex can move a lot of share away from Delta to Delta's competitors simply by preferencing Delta's competitors over Delta and that can make a big difference in revenues for a company like Delta.  Trial Tr. 5389:7-5390:5 (Miller/Delta Airlines).

**A.     Due to high insistence, Amex is able to charge higher prices to airlines, hotels, restaurants, and car rental agencies.**

644.     High levels of insistence allow Amex to charge higher prices to T&E merchants than other merchants.  PX2779 at 10, 19; *see also* PX0124A at -605 (displaying the "Current [Amex] Discount Rate" by industry); PX0210 at -881 (2.861 percent discount rate in T&E versus 2.614 percent discount rate overall).  Professor Katz highlighted the "substantial difference" between the average merchant discount rate for T&E merchants and the average merchant

discount rate for non-T&E merchants from 2001 to 2011.  Trial Tr. 3908:21-3909:16 (Katz); PX2779 at 10.  As of 2011, the difference between the T&E and non-T&E average rates was more than forty basis points.  PX2779 at 10.

> **B.   Amex successfully imposed value recapture on T&E merchants on top of its already high prices.**

645.    Because of strong customer insistence to pay with Amex at T&E merchants, the prices that Amex charges those merchants are "100% controllable."  PX0961 at -363.  As a result, during Value Recapture, Amex was able not only to successfully impose rate increases on T&E merchants, but also to increase their rates by more than it increased the rates for non-T&E merchants.  PX210 at -889.

646.    In 2005, Amex generated ███████ in pre-tax income by raising prices to hotels and found that "merchant pushback ha[d] been minimal."  PX0553-B at -390.  Price increases to travel agents and tour operators yielded another ██████ in incremental profits for Amex, again with "minimal" pushback.  PX0553-B at -391.  Following those early successes, Amex continued imposing Value Recapture price increases on T&E merchants, targeting airlines, hotels, car rental agencies, restaurants, and other travel industries in 2007 and 2008.  By mid-2008, Amex predicted that Value Recapture initiatives aimed at North American T&E merchants would cumulatively generate ██████ in pre-tax income by the end of the year.  PX0860 at -059.

647.    Amex increased T&E merchants' discount rates notwithstanding the difficult economic circumstances that these merchants were facing.  In a slide titled "2009 Landscape & Industry Forecast," Amex said that "each industry managed within TEI [travel and entertainment industries] is expected to face challenges in 2009."  PX0210 at -892.  Another Amex assessment

said, "The first quarter looked dismal for the lodging industry" and that "[t]he last year and a half has been incredibly tumultuous for the airlines industry."  PX0056A at -187, -233.  Amex proceeded with the second phase of Restaurant Value Recapture even as it noted that the restaurant industry was "facing severe headwinds."  Trial Tr. 4871:19-4873:2 (Glenn/Amex); PX0457 at -553.  And despite the condition hotel merchants were in during the mid-to-late 2000s, Amex celebrated its success in raising the discount rate for every hotel in 2008 ("nearly 3000 accounts"), delivering significant increases in Amex profits.  PX0778 at -523.

648.    Amex's execution of Value Recapture on airlines is illustrative of its control over T&E prices.  Between 2007 and 2010, Amex implemented Value Recapture for all U.S. airlines, raising their discount rates by at least ██████████  PX0056A at -237; Trial Tr. 1931:25-1936:6 (Berry/Amex); *see also* PX2779 at 21.  Alaska Airlines, for example, saw its discount rate increase from ██████████ in 2006, to ██████████ in 2008, to ██████████ in 2009, to ██████████ in 2010.  PX0056A at -237.

649.    The airlines protested the Value Recapture rate increases, but that did not stop Amex from imposing them.  When Amex raised the discount rate on Continental Airlines, for example, "[t]here was no pricing negotiation."  PX0895 at -469.  Continental asked Amex to preserve the old discount rate (██████) for ticket purchases through Continental.com and to maintain Continental's ability to cash out the marketing funds.  PX0799 at -344.  But Amex refused, raising the rate for all Continental purchases to ██████████ and eliminating the marketing fund cash out option.  PX0045 at -938.

650.    An executive at Alaska Airlines also complained about the discount rate increase, saying, "I wanted to reiterate our disappointment at the steep increase in discount rate and, as strongly, the discrimination toward us as a smaller carrier through volume pricing."  PX1738 at -

204

523.  Amex internally described the price increase as "terrific news and a big win for you and your team."  PX1738 at -523.

651.    In an internal Amex discussion, Shane Berry reacted to a JetBlue request for some relief on the discount rate by stating, "We will not move on rate as we have rate integrity across airlines."  PX0067 at -574.

652.    Even where Amex had to make some concessions, as it did for United, the result was "an improved agreement" that resulted in greater profitability for Amex.  PX1011 at -668.

653.    Amex relied heavily on its cardholder insistence calculations in delivering Value Recapture messages to airlines.  PX0056A at -260.  In presentations to airlines, Amex demonstrated, using the same Brookfield survey data that it uses to set discount rates, how much airlines would lose if they stopped accepting Amex cards.  For example, of Amex consumer cardholders surveyed, "91% say that they have more than 1 airline that goes places they want to go," "79% would choose an airline that accepts American Express over one that does not, all else being equal," and "38% agree that they are more loyal to American Express than they are to American Airlines."  PX0119A at -902.  Amex presented similar data for corporate cardholders. PX0119A at -902.

654.    Based on the consumer and corporate cardholder data, Amex demonstrated that an airline would place a significant amount of revenue "at risk" if it stopped accepting Amex cards. PX0119A at -903, -904.  For example, taking a conservative approach, Amex calculated that American Airlines would lose ███████ a year.  PX0119A at -905.  In a presentation to Delta, Amex calculated the insistent revenues to be ████████ per year and then described this as "[w]hat Delta would lose by not accepting American Express."  PX0025 at -906.  Amex presented similar calculations of "at risk" revenues for other airlines.  PX1601 at -271

(Southwest); PX0111 at -814 (Alaska); PX0769 at -223 (JetBlue).  The result was Amex telling

airlines: "It is essential to accept American Express Cards as one of your payment choices . . . ."

PX0517 at -026 (American); PX1601 at -263 (Southwest); PX0728 at -815 (United); PX0111 at -

806 (Alaska); PX0769 at -221 (JetBlue).  In these presentations, Amex did not identify Discover

as an "essential" payment choice.  *Id.*

655.    Amex's actions to raise discount rates in the other T&E industries, including

cruise, car rental, travel agents/tour operators, and restaurants, were similarly effective.  PX0857

at -385; *see also* Section IV.C.ii.a (describing three separate rounds of Restaurant Value

Recapture).  While Value Recapture was expanding across T&E merchants, Mr. Berry's groups

(Travel & Entertainment Industries and National Client Group) had 100 percent account

retention.  PX0070 at -522; PX0069 at -415; PX0984 at -960; Trial Tr. 2079:6-2080:6

(Berry/Amex).

## VII.    AMEX OFFERS NO PROCOMPETITIVE JUSTIFICATIONS FOR ITS ASRs.

656.    Amex asserted several purported justifications for its ASRs, none of which are

supported by the factual record.  Professor Katz considered whether the anti-steering rules have

procompetitive justifications and concluded that "none of them generated significant

procompetitive benefits" and that none offset the harms the rules cause.  Trial Tr. 3822:17-22,

4014:3-11 (Katz).

### A.    Alleged "free-riding" do not justify Amex's ASRs.

657.    In the field of economics, the term "free-riding" refers to "a situation where

somebody undertakes a costly action and then somebody else benefits from that action without

having to pay for it."  Trial Tr. 3994:11-15 (Katz).  Professor Katz analyzed three types of free

riding raised by Amex as justifications for its ASRs:  (1) free riding on benefits provided

206

directly to merchants; (2) free riding on benefits to cardholders generated by card usage; and (3) free riding on Amex's "brand halo" or investments in certifying merchant quality.  Trial Tr. 3995:17-4005:10 (Katz).  Professor Katz concluded that the ASRs are not justified by any claims of potential free-riding.  Trial Tr. 3995:17-4005:10, 4014:3-11 (Katz).

i.      **Merchants cannot free ride on benefits that Amex provides directly to merchants.**

658.    Benefits Amex provides directly to merchants include analytics derived from data collected by Amex in its capacity as merchant acquirer and card issuer, as well as marketing and promotional services. Trial Tr. 3995:21-3996:10 (Katz).

659.    With respect to merchant analytics, Professor Katz concluded that it is "impossible for a merchant to freeride on merchant analytics if American Express didn't want them to, because American Express doesn't have to provide them the information."  Trial Tr. 3996:11-3997:3 (Katz).  Amex has a choice of whether to charge merchants for such services or not.  Amex "today charges for some of the merchant analytics. They don't charge for all of it, but they charge for some, and it's their decision whether or not to charge for it."  Trial Tr. 3996:11-3997:3 (Katz).

660.    Likewise, with respect to marketing and promotions, "American Express can refuse to do a merchant-specific promotion" if it believes the merchant is free-riding on Amex's efforts.  Trial Tr. 3996:11-3997:3 (Katz).  Amex therefore has a direct way to address free-riding other than the ASRs.

661.    Merchants testified that Amex is not the only source of data analytics.  Merchants can obtain data from other sources that is equivalent to the data provided by Amex.  For instance, Hilton has purchased data analytics from Amex and Visa.  The quality of the data was

equivalent, but Visa's data analytics cost less than Amex's.  Visa also delivered the data analytics several weeks faster than Amex.  Trial Tr. 1624:1-25 (Brennan/Hilton).

662.    Amex provided data analytics to Ikea as "a test for American Express to demonstrate what they could offer Ikea in terms of analytics."  Trial Tr. 396:25-397:16 (Robinson/Ikea).  The data was provided as "sort of a one-time freebie," and after that, "if [Ikea] wanted to use [Amex's] analytics [it] would have to purchase the analytics."  Trial Tr. 397:8-397:16 (Robinson/Ikea).  After the test, Ikea decided not to purchase Amex's analytics.  Trial Tr. 397:17-19 (Robinson/Ikea).  Ikea, however, has purchased other analytics from other companies. Trial Tr. 397:20-21 (Robinson/Ikea).

663.    Likewise, with respect to marketing and promotions, "American Express can refuse to do a merchant-specific promotion" if it believes the merchant is free-riding on Amex's efforts.  Trial Tr. 3996:11-3997:3 (Katz).  Amex, therefore, has a direct way to address free-riding other than the ASRs.  Trial Tr. 3996:11-3997:3 (Katz).

664.    Professor Gilbert conceded that "if you could charge directly and not sacrifice the value of the program, then I think I would agree that that could solve the free-riding problem." Trial Tr. 5121:14-5122:1 (Gilbert).

665.    Professor Bernheim's testimony of what he considered free-riding included two examples discussing Burger King and Yume Sushi.  Trial Tr. 6441:12-6443:16 (Bernheim). Although he had access to Amex's internal database of cardholder complaints, these are the only two database entries that Professor Bernheim presented during his testimony.  However, these were not complaints involving free-riding, but rather of merchants not accepting Amex when a cardholder is trying to make a purchase – behavior that Professor Bernheim acknowledges is not the subject of this lawsuit.  Trial Tr. 6581:21-6582:23 (Bernheim).

666.     Professor Bernheim conceded that Amex has the ability to cure what it perceives as free riding on co-operative promotion or marketing programs by cancelling such programs with offending merchants.  Trial Tr. 6451:9-6452:5 (Bernheim).

> **ii.     Merchants cannot free ride on benefits cardholders accrue by using their cards.**

667.     Professor Katz examined Amex's claim that merchants could free-ride on the benefit they receive from higher spending on Amex cards caused by the Amex Membership Rewards program.  Professor Katz concluded that this scenario is "not freeriding because it's not free; the merchant is paying for this benefit in the form of the merchant discount."  Trial Tr. 3997:4-3998:5 (Katz).  If customers buy more because they are using their Amex card, "they're also triggering an obligation for the merchant to pay, because when you use your American Express, the merchant is then going to owe the discount rate times whatever you bought."  Trial Tr. 3997:4-3998:5 (Katz).  Therefore, "the merchant is paying for this benefit in the form of the merchant discount" and there is no possible free-riding.  Trial Tr. 3997:4-3998:5 (Katz).

668.     Professor Bernheim agreed with Professor Katz that free-riding is not possible with respect to cardholder rewards because if a merchant steers a customer away from using Amex, Amex never incurs the costs of the rewards.  Trial Tr. 6428:4-6429:12 (Bernheim).

669.     Professor Bernheim acknowledged that no free-riding occurs in a scenario where a "customer comes in to a store to buy something that they would buy anyway, and they didn't come in because American Express helped to direct them there," the merchant offers a $20 discount for using a different brand of credit card, and the customer decides to use that card to receive the discount.  Trial Tr. 6434:6-6435:12 (Bernheim).

### iii.  Merchants cannot free ride on Amex's alleged credentialing or brand association.

670.    Professor Katz analyzed Amex's claim that there is a "credentialing effect" or brand "halo effect" on merchants, which means that "by accepting an American Express Card, not by actually having people use it, but by the fact that you accept the American Express Card that you as a merchant would benefit because you would be seen as having a better reputation …." Trial Tr. 3998:6-3998:20 (Katz).  Professor Katz concluded:

a.    Any alleged credentialing "is not the result of a specific investment" by Amex. Any such effect is "an ancillary benefit [of] their business model, so even if people were freeriding on it, it wouldn't be changing American Express' incentive to provide whatever benefit that is."  Therefore, "there's not a potential problem with freeriding, because they're not making the prerequisite investment, which then could be under-provided because of freeriding."  Trial Tr. 3998:21-4000:1 (Katz).

b.    Amex's own cardholder surveys show that competing networks, including Visa and MasterCard are "a more effective form of credentialing than American Express."  Trial Tr. 4002:1-4004:12 (Katz); PX0815 at -294-295.  For example, one such survey from July 2011 showed that 72 percent of Visa, MasterCard, Discover, and Diners' Club cardholders agreed with the proposition that "they feel more confident about purchasing from merchants that display" the logos of these brands, compared with 63 percent of Amex cardholders who said the same about the Amex logo.  PX0815 at -294.  Likewise, Amex scored below the other card networks on the propositions "I am more likely to trust websites that accept

[card brand]" and "I am more likely to try a new merchant when I know that [card brand] is accepted." PX0815 at -295. This data indicates that "there is nothing uniquely valuable here about American Express in playing this [credentialing] role or that suggests they would be particularly be subject to freeriding." Trial Tr. 4002:1-4004:12 (Katz).

    c.    Other sources of information about merchant quality exist (*e.g.*, Yelp). Trial Tr. 4004:14-4005:10 (Katz).

671.    Professor Bernheim conceded that Amex brand association has minimal or no value to merchants when the merchant is already a household name, or when customers are already familiar with the merchant. Trial Tr. 6586:9-6587:13 (Bernheim).

672.    John Hayes, Amex's Chief Marketing Officer, admitted that Amex generally does not refuse merchants who want to sign up to accept Amex, and does not do anything to screen good merchants from bad merchants. Trial Tr. 5004:17-5007:13 (Hayes/Amex). Mr. Hayes also admitted that acceptance of Amex does not necessarily indicate that a merchant is a premium merchant, has a high level of customer service, or is of high quality. Trial Tr. 5004:17-5007:13 (Hayes/Amex). The presence of the Amex logo is not necessarily an endorsement of the quality of a merchant. Trial Tr. 5004:17-5007:13 (Hayes/Amex).

673.    The negligible impact of the Amex brand association/credentialing effect is underscored by the fact that so many merchants that accept Amex and have the option to place the Amex logo in their stores (and thereby benefit from these alleged brand effects) have instead chosen to maintain "Clean Stores." Clean Stores are merchants who choose not to display any credit card logos in their establishments. Trial Tr. 691:18-20 (Quagliata/Amex). A 2009 Amex-sponsored audit of more than 250,000 merchants in ten major markets showed that 41 percent of

merchants maintained clean stores.  PX0382 at -405.  After Amex visited these merchants and offered them point of purchase display materials, 22 percent of merchants still chose to maintain clean stores.  PX0382 at -405.  A similar Amex-sponsored audit in 2006 found that over 30 percent of merchants maintained clean stores.  PX0542 at -230.  One of the merchants Amex called to testify, Drybar, intentionally chooses to maintain a clean store, and does not display the Amex logo in its stores.  Trial Tr. 5551:14-5553:9, 5555:5-12 (Landau/Drybar); PX2424.  If the mere presence of the Amex logo carried with it the dramatic benefits that Amex posits, it is likely that very few merchants would refuse to display the Amex logo.

> **B.** **Protecting Amex does not justify Amex's ASRs.**
>
> > **i.** **Amex can continue to compete effectively without the ASRs.**

674.    At trial, Amex proffered a series of arguments that, at base, seek to justify the anti-steering rules as necessary to protect Amex from the effects of increased competition for merchant business.  Removing the ASRs, Amex witnesses claimed, would either cause Amex to go out of business or enter into a downward spiral that would leave it a marginalized niche competitor, or expose Amex to anticompetitive conduct that would entrench Visa and MasterCard's market power.  All of these claims fail to find factual support in the record.  Furthermore, they ignore the critical fact that Amex is a highly successful company with substantial assets and a long track record of overcoming competitive challenges to its business.  The record evidence shows that, far from being helpless in the face of steering, Amex would be able to bring its assets and experience to bear to meet the competitive challenge.

675.    Amex has many assets to deploy when faced with competitive challenges.  For example, Amex has talented and capable employees (including those who testified at trial), one of the most valuable brands in the world, a worldwide payment network, and a sizable team of

merchant client managers. Trial Tr. 4632:5-18 (Chenault/Amex); 4992:1-7 (Hayes/Amex); 2084:20-2085:1 (Berry/Amex). Mr. Chenault was hired as a catalytic agent of change and has been successful in that role. Trial Tr. 4631:17-22 (Chenault/Amex).

a.  Amex is a highly profitable company. In 2013, Amex generated nearly $33 billion in revenue worldwide and reported net income (after taxes) of over $5.3 billion. PX1412 at 135 (Exh. 13, Table 1). Amex's U.S. consumer and small business card issuing business (USCS) alone generated about $5 billion in pre-tax income in 2013. PX1412 at 142 (Exh. 13, Table 9). The pre-tax income margin for the USCS business unit ███████████████████████████████ ████████████████████████████████████████████ ██████████████████. DX7409 at -022.

b.  By purchase volume, American Express is the largest credit card issuer in the United States with $610 billion in volume in 2013, as shown in the *Nilson Report* chart reproduced below. PX1560 at 8. In 2013, American Express was one-third larger than the second largest issuer, Chase. PX1560 at 8.

**Figure 11**



213

PX1560 at 8.

c.    The Amex brand is a "strong financial asset."  DX6763 at -842.  It is the twenty-fourth most valuable brand in the world, worth $15 billion, according to Interbrand.  PX2143 at 1.  It is a more valuable competitive asset than the brands of Visa, MasterCard, Nike, Kleenex, Starbucks, JPMorgan Chase, and Citi; Amex's brand is almost twice as valuable as Visa's and MasterCard's brands combined.  PX2143 at 1.

d.    Mr. Hayes did not disagree that all of these assets combined would give Amex a pretty good set of assets to compete in a world in which steering was allowed. Trial Tr. 4993:21-25 (Hayes).

676.    Amex has a flexible business model that has successfully adapted to major changes in the past.

a.    In its long history, Amex has successfully adapted to many changes in its business, such as financial downturns, the decline of the travelers check business, the failure of the Optima Card, the failure of the "financial supermarket" strategy, the entry of Discover in 1985, the need to move away from a T&E-focused merchant business to embrace "everyday spend" merchants, and the launch of the Global Network Services "GNS" business issuing Amex cards though partner banks.  *See* Trial Tr. 4630:2-4631:16 (Chenault/Amex); 4998:24-5000:6 (Hayes/Amex); 2995:16-20; 3132:1-3133:6 (Pojero/Amex).

b.    Amex executives agree that Amex's business model is flexible and adaptable to changes in the marketplace.  For example, when asked at an investor meeting

about the potential impact of regulatory action, including this litigation, CEO Ken

Chenault's answer included the following statement:

> What we've also demonstrated is that we have a flexible business model that has allowed us to deal with a number of regulatory issues because of the diversity of our business model and I think that's very important.
>
> So there are clearly – I can't project what will happen in the future. What I do believe, though, is that as long as we stay focused on really leveraging the flexibility of our model and we demonstrate that we're providing value to merchants and cardmembers and we're innovating as we have been doing over the last several years with an increase in competition, with an increase in regulation, I think we're going to continue to perform well.

PX1438 at 22; *see also id.* at 24 ("What we can say is, as I said, in Australia or

Argentina, what we have been able to demonstrate is that because of our flexible

model, we have been able to manage through and navigate through that over time.

And my view is, because of that flexibility in our model that we will be able to do

that."); PX0131 at 7 (Chenault tells investors: "based on our commitment to

provide high quality customers and services to merchants, and because of our

ability to innovate in the marketplace, we're confident in our ability to adapt to a

changing environment"); PX1473 at 11 (Chenault tells investors: "And I think

we've demonstrated an ability around the world in a lot of different situations –

some where the rate has been regulated – that we can deliver value to our

merchants, and so we can manage through a range of scenarios"); PX1442 at 18

(Gilligan tells investors: "Generally our approach is when there is a change in the

system; the equilibrium that exists has to adjust. There are usually risks, but there

are always opportunities in a change like that.  And we try to look at it through

both lenses"); *see* Trial Tr. 5747:4-20 (Gilligan/Amex) ("I've worked at

American Express for a long time and we've faced many different challenges

during my career. I think we pride ourselves on being customer focused, resilient,

innovative and finding new ways of competition").

677.     Amex claimed for the first time during the trial that it "if NDPs are eliminated,

[Amex] will not survive as a company," and that "if the NDPs go away, [Amex] will go away."

Trial Tr. 4633:5-4634:7 (Chenault/Amex).  Amex did not assert in its Pretrial Memorandum, in

its other filings with the Court, or in its opening statement that Amex would go out of business

absent the ASRs.  For the reasons set forth below, the evidence in the record does not support

this claim.

678.     Amex had an expert economist on its trial witness list, Professor George Hay, to

address the topic of Amex profitability.  Amex did not call Professor Hay to testify at trial.

679.     Amex presented no expert testimony, no financial analysis, and no data

demonstrating that Amex will not survive as a company if the anti-steering rules are eliminated.

680.     Amex witnesses presented conflicting testimony on whether Amex would not

survive without the anti-steering rules.  In contrast to Mr. Chenault's testimony, when the

President of Amex was asked "Do you believe that if the NDPs go away American Express goes

away?," he responded:  "So, if the company goes away, I don't know . . . ."  Trial Tr. 5833:3-17

(Gilligan/Amex).  In response to the question, "You're not predicting that eliminating the NDPs

will mean the end of American Express?" the President of Amex responded: "I still have ten

years or so to work there, I'm not –."  Trial Tr. 5833:18-20 (Gilligan/Amex).

681.     Amex's economic experts do not predict that Amex will go out of business if the

ASRs are removed.  Professor Bernheim, when asked for his "bottom line" conclusion about the

anti-steering rules, answered, "I am not saying that American Express will not survive," and

noted that Amex is "a flexible company." Trial Tr. 6484:24-6486:8 (Bernheim). When asked by the Court whether Amex would be unable to survive without its ASRs, Professor Bernheim responded, "I would not want to make a prediction that American Express will vanish. I wouldn't go that far." Trial Tr. 6486:10-20 (Bernheim).

682. Amex presented no testimony from merchants to support the proposition that point-of-sale steering would threaten the existence of Amex. To the contrary, merchant testimony was strongly in favor of steering, and merchants explained how the right to steer would invigorate competition among the credit card networks. Amex offered no explanation for why merchants would support abolishing the anti-steering rules if doing so would lead to Amex's exit from the market and enhance the market power of Visa and MasterCard, a result that would seem to be contrary to merchants' interests.

683. As Amex's economic experts conceded, it is not uncommon for defendants in antitrust cases to claim that enforcement of the antitrust laws would have dire consequences for their business. Trial Tr. 5255:13-5260:14 (Gilbert); 6599:11-6601:10 (Bernheim). However, such claims are often exaggerated and ultimately turn out be false: in *United States v. Visa*, for example, Visa testified that enforcement of the antitrust laws against it would lead to the "destruction" of Visa and that Visa would "disappear," Trial Tr. 5257:5-5260:14 (Gilbert), while the other defendant in the case, MasterCard, testified that if the government prevailed, "it could be a shattering blow to MasterCard." Trial Tr. 6599:10-6601:11 (Bernheim). Professor Gilbert acknowledged that Microsoft made similar predictions in *United States v. Microsoft*:

> In its defense, Microsoft contended that the company is a vigorous competitor that benefitted consumers by supplying high quality, innovative products. According to Microsoft, the antitrust action against it would dampen incentives for competition and slow software innovation.

PX2248 at 25; Trial Tr. 5244:22-5245:5, 5255:16-5256:14 (Gilbert).   Microsoft also predicted that antitrust enforcement "threatened to 'commoditize' the underlying operating system." PX2248 at 27 (citations omitted).

684.    Another claim made by Amex witnesses is that Amex would have no choice but to abandon its differentiated product strategy if it could no longer block merchant steering. Professor Katz analyzed this claim and concluded that this is "not a valid argument" because it ignores the "merchants' incentive." Trial Tr. 4011:20-4014:2 (Katz).  Merchants will assess the quality of each network from the merchants' perspective, "so if American Express or another network can differentiate itself by offering particular value to the merchant, the merchant will take that into account, and that's something that could offset a higher price." Trial Tr. 4011:20-4014:2 (Katz).  Merchants also will take "customers' preferences into account" and accept Amex if Amex "generates significant value for its cardholders"; in that circumstance, "merchants will want to accept American Express cards because their customers will want to use them." Trial Tr. 4011:20-4014:2 (Katz).  Professor Katz concluded that, "if [Amex] is truly creating value through its differentiated strategy, then it will be able to compete successfully in a world where steering is possible. . . ." Trial Tr. 4011:20-4014:2 (Katz).

685.    Most businesses operate in markets where steering regularly occurs.  For example, "[m]ost manufacturers live in a world with steering, and we certainly see manufacturers that successfully have premium products, not just premium pricing, premium quality to go with it." Trial Tr. 4011:20-4014:2 (Katz).  Amex's ASRs therefore are not "essential to protecting American Express' differentiat[ed] model. The differentiat[ed] model can stand on its own." Trial Tr. 4011:20-4014:2 (Katz).

686.    Amex has already developed strategies to respond to potential merchant steering in the U.S.  In 2010, when the proposed Durbin Amendment would have permitted merchants to steer among credit card brands, Amex formed a Durbin Task Force to analyze Amex's competitive options.  The Task Force reported on its work on multiple occasions to high-level Amex executives, including Mr. Gilligan and Mr. Glenn.  The Task Force suggested a number of actions Amex could take, such as to "engage merchants and provide them with benefits so they wouldn't steer customers away from American Express", Trial Tr. 2742:17-25 (Funda/Amex); lower the discount rate to merchants in industries where there was a high risk of steering against Amex cards, Trial Tr. 2743:8-18 (Funda/Amex); and add "improved cardmember benefits" and "[e]nrich rewards" to make cardholders more resistant to steering.  Trial Tr. 2754:7-20 (Funda/Amex); *see also* PX1176 at -383-385; PX0090 at -473; PX0091 at -906-907.  The Amex executive who led the Durbin Task Force, Jack Funda, acknowledged that these are options that Amex could employ if Plaintiffs were to prevail in this case.  Trial Tr. 2748:8-17, 2753:17-23; 2754:14-20 (Funda/Amex).  As Mr. Funda testified, Amex "would be fighting to retain the business by any means necessary, right. So, yes, we may need to increase incentives to consumers. We may need to reduce pricing to merchants."  Trial Tr. 2754:21-2755:6 (Funda/Amex).

687.    Amex's experience in Australia shows that it successfully adapted its differentiated business model to a market in which steering is permissible.  Amex has frequently touted Australia to investors as an example of how it can adapt to changes in the regulatory environment.  PX1442 at 18 (Chenault tells investors: "we've experienced surcharging in Australia. And while we had a momentary adjustment period obviously, to that, I think we were able to surmount the issues, and we're running a very profitable business in Australia"); PX1473

219

at 12 (Chenault tells investors: "And in the Australia situation, we had surcharging as well as the rate going down, and that if you look at what we've done in Australia over the last several years, that's become, not only it was, but it's become even more of a profitable and strong market for us despite what many experts would have said when it first happened that we would have been in very tough shape. And that goes to the levers that we're focused on pulling as we go forward"); PX0131 at 8 (Chenault tells investors: "we do have experience dealing successfully in countries where rate regulation is more pervasive. Among the most stringent is Australia, where the Central Bank established a strong regulatory framework governing Visa and MasterCard interchange pricing among other changes. Now, we were not directly affected by the pricing changes, but we did adapt . . . .  As a result, our business in Australia today is both strong and profitable"); PX1457 at 10 (Gilligan tells investors: "regardless of what happens we try to find ways to navigate. There are certain threats that come out of surcharging, but also we look for opportunities. And I think Australia has been a good example where there have been a number of threats to our business model over the years, but we found, you know, many more opportunities to grow our business differently as a result and to adjust our economic model"); PX1458 at 9 (Gilligan tells investors that, after the regulatory changes in Australia, "[w]e did many GNS deals in the market. We continued to grow our proprietary issuing business, both consumer and corporate. We expanded the merchant network. And we have a thriving business in Australia today. . . .").

688.    Amex's arguments that ending its ASRs would damage the Amex differentiated business model is flatly inconsistent with Amex's enthusiasm for using the ASRs to quash Discover's differentiated business model.  Discover differentiated itself by being a low cost option for merchants and by offering cashback benefits to consumers, yet the ASRs stifled

Discover.  Professor Bernheim's response was that Discover could work harder to give cardholder benefits, *i.e.*, become more like Amex.  DX7828 at 136; Trial Tr. 6482:19-6483:24 (Bernheim) (testifying that instead of "reducing merchant fees by twenty basis points, having the merchants pass that onto consumers, and having the consumer respond to that," Discover could have "incentivize[d] the very same customers directly, by, for example, just giving them more cash rewards").

689.    Another claim made by Amex witnesses is that Amex needs to be shielded from competitive forces because, in the absence of the anti-steering rules, Amex "would start losing merchant acceptance and also lose cardholders; and that because of the network effects . . . as they had fewer merchants, they'd have fewer cardholders, and fewer cardholders would lead to fewer merchants, and that would be the spiral effect."  Trial Tr. 4005:12-25 (Katz).  Professor Katz analyzed this alleged spiral effect and concluded that "I don't believe it is likely for American Express."  Trial Tr. 4006:1-4 (Katz).  Professor Katz testified that the strength of the "network effect" cannot be as great as Amex posits because, if it were, Amex could not have successfully engaged in its practice of "turning away merchants in order to maintain their premium price strategy."  Trial Tr. 4006:19-4007:19 (Katz).  Moreover, Discover would not have been able to achieve a larger merchant network than Amex despite its smaller charge volume.  Trial Tr. 4006:19-4007:19 (Katz).  Because Amex has chosen not to follow Discover's strategy of expanding merchant acceptance, "that certainly suggests, then, that they [Amex] don't perceive these effects to be as large as you would need for the downward spiral to be a serious problem."  Trial Tr. 4006:19-4007:19 (Katz).

690.    The testimony of Amex's economic expert, Professor Gilbert, did not support this alleged spiral effect.  Professor Gilbert testified that he did not know whether Amex's market

share would go down or up if merchants were permitted to steer customers to lower-cost cards. Trial Tr. 5151:8-24 (Gilbert).  Professor Gilbert conceded that, if Amex were to lose market share, it may be able to "make it back up."  Trial Tr. 5153:2-20 (Gilbert).  In addition, Professor Gilbert could not say whether Amex would "become more differentiated or less differentiated or stay the same" without its ASRs, acknowledging that is a "complicated business strategy decision."  Trial Tr. 5151:8-24 (Gilbert).  Professor Gilbert was unable to say exactly how the level of competition in the market would change in the absence of the ASRs.  Trial Tr. 5148:21-5149:20 (Gilbert).

691. The removal of the ASRs is likely to cause Amex's merchant acceptance to *increase*, not decrease.  As Professor Katz testified, "what economics indicates is that eliminating the steering rules would actually make American Express acceptance more attractive to merchants and the reason it would have that effect is that now when a merchant accepts American Express, the merchant has more flexibility in how it makes American Express and other credit and charge card networks available to its customers and so that extra flexibility can translate into profits potentially for the merchant, so it is actually more attractive to take American Express."  Trial Tr. 6675:18-6676:9 (Katz); *see also* Trial Tr. 3716:25-3717:18 (Silverman/Amex) ("If we allowed for steering, we could certainly have a lot more merchants in the network . . . ."); Trial Tr. 6185:9-15 (Mitchell/Official Payments) (if differential pricing of credit cards were allowed, it likely would increase incentives for Official Payments' clients to accept American Express).

692. Even if some risk of a spiral effect did exist, Amex has many options to prevent the type of merchant and cardholder attrition that might cause such a spiral to occur.  As discussed above, Amex has identified cutting prices, enhancing merchant services, and enriching

cardholder rewards as viable options to respond to potential merchant steering. *See also* Trial Tr. 4007:20-4008:12 (Katz).

693.    Amex's claim that gaining co-brand partners is important to its success and that Amex will be disadvantaged in co-brand competition without the ASRs is unavailing.  First, Amex has never lost a co-brand partner.  Trial Tr. 5618:5-14 (Codispoti/Amex).  Second, as discussed above, allowing steering will help Amex improve merchant coverage – an area Amex claimed put it at a disadvantage compared to other issuers when competing for co-brand partners. *See* Trial Tr. 5397:25-5398:17 (Miller/Delta Airlines) (acknowledging that it would be good for Delta if eliminating Amex's anti-steering rules increased coverage); Trial Tr. 5490:24-4291:4 (Codispoti/Amex)

694.    Amex has not entered a "downward spiral" in countries where steering is allowed.

a.    *Australia*.  In Australia, merchants have been permitted to differentially surcharge credit card brands for over ten years, but Amex has maintained a successful and profitable business in Australia.  PX0131 at 8 (Chenault tells investors, "our business in Australia today is both strong and profitable"); PX1442 at 18 (Chenault tells investors, "we've experienced surcharging in Australia.  And while we had a momentary adjustment period obviously, to that, I think we were able to surmount the issues and we're running a very profitable business in Australia"); PX1473 at 12 (Chenault tells investors, "in the Australia situation we had surcharging as well as the rate going down, and that if you look at what we've done in Australia over the last several years, that's become, not only it was, but it's become even more of a profitable and strong market for us despite what many experts would have said when it first happened that we would have been in very

223

tough shape.  And that goes to the levers we're focused on pulling as we go forward."); PX1458 at 9-10 (Gilligan tells investors that "we have a thriving business in Australia today");  Trial Tr. 5821:6-5823:15 (Gilligan/Amex) (Amex's business in Australia "started growing at a very healthy rate" after surcharging began and "we gained market share in Australia").

b. *Canada*.  In Canada, merchants have been permitted to offer differential discounts by credit card brand since 2010.  Trial Tr. 5737:10-5738:6 (Gilligan/Amex). Amex continues to operate a profitable business in Canada with a high level of customer service and robust cardholder rewards.  Trial Tr. 2694:25-2695:11 (Funda/Amex).  Amex told Canadian government that the Code of Conduct, the regulation that authorized differential discounting, "is a balanced approach to address the concerns of merchants without harming competition and consumers." PX2722 at -820.

695.    Amex witnesses also claimed that Amex needs to be protected from competition because "tipping" of the market to Visa and MasterCard could occur if steering is permitted.  *See* Trial Tr. 5051:11-22 (Gilbert).  In the context of markets with network effects, tipping refers to "the tendency of one system to pull away from its rivals in popularity once it has gained an initial edge."  DX0229 at 105-106.  However, Professor Gilbert acknowledged that product "differentiation can overcome" this tendency.  Trial Tr. 5049:3-18; 5051:7-10 (Gilbert); *see also* DX0229 at 106; Trial Tr. 4250:7-24 (Katz) (noting that there is differentiation among credit cards).  As an example, Professor Gilbert pointed to the fact that in computer operating systems, the "market had pretty much tipped to the Windows platform" until "Apple came out with its product, differentiated from the Microsoft platform. It won a lot of adherents, who said this is a

224

better product, and worked very hard and eventually overcame a lot of those disadvantages." Trial Tr. 5049:3-18 (Gilbert).  Professor Gilbert acknowledged that Amex could further increase its differentiation in response to steering.  Trial Tr. 5151:8-5152:11 (Gilbert).

696.    The risk of tipping is lower in the credit card industry due to the prevalence of "multi-homing" by merchants – *i.e.*, merchants typically accept multiple card brands, rather than choosing just one, and "that greatly diminishes the tipping and makes it feasible – or more likely that multiple networks will survive."  Trial Tr. 4250:25-4251:18 (Katz); *see also* Trial Tr. 4208:1-17 (Katz).  Professor Gilbert agreed with Professor Katz "that the risk of tipping is mitigated somewhat with multihoming . . . ."  Trial Tr. 5052:2-17.

697.    Professor Gilbert was unable to say at what point tipping is likely to occur in this market.  Professor Gilbert conceded that the credit card market did not tip to Visa/MasterCard when Amex's market share fell from 24.7 percent in 1990 to 19.2 percent in 1995 (a 20 percent drop in share).  Trial Tr. 5154:7-5155:2 (Gilbert).  Professor Gilbert testified that he did not know whether Amex's market share would go down if steering were permitted and conceded that, even if Amex did lose some market share in the future as a result of steering, Trial Tr. 5151:8-24 (Gilbert), it may be able to "make it back up" without tipping occurring.  Trial Tr. 5153:2-10 (Gilbert).

698.    Amex attempted to blame many of its difficulties during the 1990s on Visa's preference campaign.  See, e.g., Trial Tr. 4338:4-4339:6 (Chenault/Amex); DX7789.  While the evidence showed that the Visa preference campaigns were effective at shifting share where they were used, it is also true that Amex's share had "declined steadily since 1984," *i.e.*, beginning five years before Visa began its first "We Prefer" campaigns.  DX0319 at -998; Trial Tr. 4629:9-4630:1.  Indeed, when Mr. Chenault made his "call to arms" speech, he noted that Amex charge

225

volume was growing – the problem, as Amex saw it, was that Visa was growing faster.  Trial Tr. 4475:21-4478:12; DX0319 at -988.  Mr. Chenault and Mr. Hayes admitted that Amex faced other challenges in the late 1980s and the 1990s in addition to Visa's preference campaigns – some of those challenges of Amex's own making.  *See* Trial Tr. 4629:9-4630:23 (Chenault/Amex); 4998:24-5000:6 (Hayes/Amex).

699.    Finally, Amex witnesses claimed that Amex needs the ASRs to protect itself from its competitors because, otherwise, Amex could be a "victim of exclusionary behavior," such as preference campaigns.  Trial Tr. 4008:18-4009:2 (Katz).  Professor Katz concluded, "I don't think it is a justification for this rule, and the reason for that is that preference campaigns can be procompetitive."  Trial Tr. 4009:3-4010:15 (Katz).  Amex is "preempting the antitrust process" by adopting its own "per se, rule against preference campaigns. . . . And the danger with using the rules to do that is they're throwing out the good with the potential bad.  These rules are sweeping. There's no assessment in these rules, well, is this [a] procompetitive or anticompetitive preference campaign, it just says you can't have preference campaigns."  Trial Tr. 4009:3-4010:15 (Katz).

700.    Rather than employ a self-help remedy like the ASRs, the proper recourse for Amex in response to anticompetitive activity is to seek enforcement of the antitrust laws: "if Visa were to turn out to have a preference campaign that actually harmed competition, [then] American Express would be free to initiate private litigation against them.  And also the U.S. Department of Justice would be in a position to litigate, and that's what happened with *U.S. v. Visa*."  Trial Tr. 4009:3-4010:15 (Katz).

ii.     Protecting "Welcome Acceptance" of Amex cards does not justify Amex's ASRs.

701.    Protecting "welcome acceptance" does not justify the ASRs. As Amex's own witnesses agreed, many forms of steering do not interfere with "welcome acceptance."

a.     Amex's CEO agrees that a merchant offering a "benefit" to a customer for using a particular credit card does not interfere with welcome acceptance.  Trial Tr. 4575:7-4576:10 (Chenault/Amex).  As Mr. Chenault testified: "There is nothing wrong with MasterCard offering a program like if you go to Whole Foods you'll get X-amount off of an item or you'll get free shipping."  Trial Tr. 4576:12-18 (Chenault/Amex).

b.     Amex's CEO agrees that when merchants steer to co-brand cards issued by another network, such as by offering discounts, "that does not interfere with welcome acceptance."  Trial Tr. 4550:6-4551:23 (Chenault/Amex).

c.     Amex's CEO agrees that a merchant prompting customers for payment with a competing card brand does not interfere with welcome acceptance when done pursuant to a "sponsorship" agreement with a network.  Trial Tr. 4557:22-4563:6, 4564:2-4565:16 (Chenault/Amex).

d.     Amex's own consumer research on the "We Prefer Visa" campaign concluded that "being exposed to a payment preference message does not make CMs [cardmembers] and Non-CMs feel unwelcome . . . ."  DX7525 at -382.  Amex executive Tom Pojero agreed that this finding of the study was accurate:  "If that's what it says, I wouldn't dispute it."  Trial Tr. 3126:9-24 (Pojero/Amex).

227

e.      A statement by a merchant that Amex is the merchant's "card of choice" does not necessarily make holders of competing cards feel unwelcome – it is "a matter of opinion as to whether it does or whether it doesn't.  Circumstantial."  Trial Tr. 790:20-24 (Quagliata/Amex).

f.      In its travel agency business, Amex steers buyers from nonpreferred suppliers to preferred suppliers without making buyers feel unwelcome, and without disparaging nonpreferred suppliers or damaging their brands.  Trial Tr. 3492:4-16 (Corbett/Amex).

g.      In Amex's view, all Amex cards are "welcome" on the Delta site, even though only Amex Delta SkyMiles cardholders are given the benefit of a free checked bag.  Trial Tr. 5642:3-9 (Codispoti/Amex).

702.     As discussed in Section II.C.xiv, merchants can steer in a way that is not unwelcoming to customers.

703.     In its travel business, Amex is able to shift share without disparaging or damaging a nonpreferred supplier's brand or making customers who want to book with a nonpreferred provider feel unwelcome.  Trial Tr. 3492:4-16 (Corbett/Amex).

704.     Amex claimed in its Pretrial Memorandum that the ASRs were necessary to prevent "embarrassment caused by discriminatory treatment at the point of sale," but at trial Amex conceded that the purpose of the ASRs is not to prevent its card holders from being embarrassed at the point of sale.  *Compare* Amex Pre-Trial Mem., ECF #505 at 88, *with* Trial Tr. 3068:13-17, 3126:25-3127:11 (Pojero/Amex) (stating that the nondiscrimination provisions are not primarily about embarrassment because "it would be foolish for [Amex] to stand on that.")

228

705. Consumers would welcome, and benefit from, the choice to receive discounts and other incentives from merchants at the point of sale if the ASRs were removed. Amex cardholders would still have the choice of using their Amex cards if they decide that Amex provides superior value. Trial Tr. 6678:1-6680:10 (Katz) (consumers would benefit from having options because "it is giving the cardholder more choice, more chance to decide . . . whether he or she wants to get the rewards for that given purchase . . . from the card issuer or whether he or she would rather get some sort of reward from the merchant, for example."); PX2778 at 11-12; Trial Tr. 2736:14-2737:18 (Funda/Amex) (agreeing that, if merchants were permitted to offer discounts by card brand, customers would have a choice of benefits and could "make a decision one way or another"); 688:23-689:12 (Quagliata/Amex) (agreeing that, if a merchant offered a benefit for using Discover, Amex cardholders who also have a Discover card would be able to choose which benefits to receive); 3124:10-3126:1 (Pojero/Amex) (testifying that if he were offered a choice of a discount to use another card "[i]t wouldn't cause me a problem" and acknowledging that some customers may choose to take the discount); 6188:14-25 (Mitchell/Official Payments) (Official Payments wants to offer customers discounts for using cheaper cards so customers "can make their own choice as to whether they want to use their rewards card or not or if it is more important for them at that moment in time to save some money"); PX1176 at -379 ("With selective discounting, the risk of loyal Amex Cardmembers walking away (not returning) is much lower; they are being offered a discount but still allowed to use Amex if they prefer").

### iii. Protecting the Amex brand does not justify its ASRs.

706. Amex's claim that steering causes harm to the Amex brand is not supported by verifiable data or analysis. Amex has never studied whether there would be any impact on its

brand value from steering. Trial Tr. 4985:21-25 (Hayes/Amex). Nor has Amex studied whether the co-brand steering and limited-time promotions that go on in the market today cause harm to the Amex brand. Trial Tr. 4987:13-21 (Hayes/Amex). Amex submitted no surveys, studies or other data at trial showing that steering causes brand damage.

707. Amex had a brand expert on its witness list, Professor Kevin Keller. Professor Keller was not called as a witness at trial.

708. The President of Amex agrees that if a merchant offers an incentive to an Amex cardholder to use another card, "[i]t doesn't say anything bad about the [Amex] brand." Trial Tr. 5663:25-5664:2, 5832:9-21 (Gilligan/Amex).

Dated:  September 18, 2014                Respectfully submitted,

                                          U.S. DEPARTMENT OF JUSTICE

                                          /s/Craig W. Conrath_____
                                          Craig W. Conrath
                                          (craig.conrath@usdoj.gov)
                                          Aaron Comenetz
                                          (aaron.comenetz@usdoj.gov)
                                          Bennett J. Matelson
                                          (bennett.matelson@usdoj.gov)
                                          Lisa Scanlon
                                          (lisa.scanlon@usdoj.gov)
                                          Rachel L. Zwolinski
                                          (rachel.zwolinski@usdoj.gov)
                                          U.S. Department of Justice, Antitrust Division
                                          450 Fifth Street, NW, Suite 4000
                                          Washington, DC 20530
                                          Tel:  (202) 532-4560
                                          Fax:  (202) 307-9952

                                          Counsel for Plaintiff United States of America

                                          OFFICE OF THE ATTORNEY GENERAL
                                          State of Ohio

                                          /s/Mitchell L. Gentile_____
                                          Mitchell L. Gentile
                                          (mitchell.gentile@ohioattorneygeneral.gov)
                                          Office of the Ohio Attorney General
                                          150 East Gay Street, 23rd Floor
                                          Columbus, OH 43215
                                          Tel:  (614) 466-4328
                                          Fax:  (614) 995-0266

                                          Counsel for State of Ohio and on behalf of all Plaintiff
                                          States

# APPENDIX A

# APPENDIX A

## GOVERNMENT WITNESSES

1.      **Nina Biornstad (MasterCard).**  Nina Biornstad is a Vice President at MasterCard.  Trial Tr. 3231:23-3232:1 (Biornstad/MasterCard).  She manages the relationships that MasterCard has with the hospitality industry.  Trial Tr. 3232:2-5 (Biornstad/MasterCard). She oversees the development of agreements with merchants on promotions to drive share. Before assuming her current position, Ms. Biornstad was in MasterCard's marketing group where she worked with a variety of merchants, including online travel agencies, car rental agencies, and cruise lines.  Trial Tr. 3232:12-22 (Biornstad/MasterCard).

2.      **Denis Bouchard (Sears).**  Denis Bouchard is Divisional Vice President, Payment Acceptance, for Sears Holding Corporation ("Sears").  Trial Tr. 547:15-16 (Bouchard/Sears). Sears is an integrated retailer that sells appliances, tools, lawn and garden equipment, apparel, and housewares in the U.S under the trade names of Sears and Kmart.  Trial Tr. 547:17-20 (Bouchard/Sears).  It is the sixteenth largest retailer in the United States, with 1,900 stores and annual revenues of $32 billion.  Trial Tr. 548:2-13 (Bouchard/Sears).  At Sears, Mr. Bouchard manages electronic payments, "including debit and credit cards and electronic checks." Trial Tr. 549:24-550:3 (Bouchard/Sears).  His "primary mission" is to lower Sears' acceptance costs. Trial Tr. 550:21-23 (Bouchard/Sears).  Before joining Sears in 2010, he worked for MasterCard where he was the "voice of the merchant" within the MasterCard organization.  Trial Tr. 548:20-549:7 (Bouchard/Sears).

i

      **3.**     **Scott Brennan (Hilton Hotels).**  Scott Brennan was the Vice President of Global Strategic Partnerships at Hilton Worldwide ("Hilton"), a major hotel chain. Trial Tr. 1602:6-21 (Brennan/Hilton).  Hilton's annual revenues are approximately $30 billion. Trial Tr. 1603:23-24 (Brennan/Hilton).  Mr. Brennan was responsible for overseeing Hilton's strategic partnerships, which included partnerships with American Express and Visa, and serving as a primary negotiator for its credit card contracts. Trial Tr. 1602:22-1603:4; 1605:17-18 (Brennan/Hilton). Mr. Brennan left Hilton at the end of January 2014.   Trial Tr. 1604:19-23 (Brennan/Hilton).

      **4.**     **Frank Bruno (Crate & Barrel).**  Frank Bruno is Treasury Director for Crate & Barrel, a housewares and furniture retailer.  Trial Tr. 2314:13-14 (Bruno/Crate & Barrel).  Mr. Bruno is responsible for negotiating credit card acceptance agreements and oversees Crate & Barrel's relationships with the credit card networks.  Trial Tr. 2315:10-22 (Bruno/Crate & Barrel).  He also has responsibilities relating to Crate & Barrel's private label card.  Trial Tr. 2315:23-2316:6 (Bruno/Crate & Barrel).

      **5.**     **Jennifer Dale (Sprint).**  Jennifer Dale is the Assistant Treasurer and Director of Treasury Services for Sprint Communications ("Sprint").  Trial Tr. 1676:21-22 (Dale/Sprint). Sprint had revenues of approximately $35 billion in 2013.  Trial Tr. 1676:19-20 (Dale/Sprint). Ms. Dale manages Sprint's payment acceptance costs.  Trial Tr. 1676:23-25 (Dale/Sprint).  She has been responsible for Sprint's relationships with the credit card networks, including negotiations, for thirteen years.  Trial Tr. 1676:23-1677:8 (Dale/Sprint).

      **6.**     **Professor Gary T. Ford.**  Professor Gary T. Ford is an expert in survey research, methodology and analysis with over 40 years of experience in the field.  He was a Professor of Marketing for 34 years, taught numerous classes on survey research, published over 40 articles in the area of survey research, and served on the boards of two leading marketing journals and

the leading academic research organization for consumer behavior research.  Trial Tr. 1770:13-1772:15 (Ford).  Professor Ford has been retained as a survey expert in litigation close to 100 times and has testified as an expert in federal court approximately 10-12 times.  Nearly all of this expert work involved designing surveys for his clients or rendering opinions on surveys conducted by opposing parties.  Trial Tr. 1772:16-1774:11 (Ford).

7.    **Russell Gibson (Sinclair Oil).**  Russell Gibson is Manager of Marketing Technical Services at Sinclair Oil ("Sinclair").  Trial Tr. 3138:12-13 (Gibson/Sinclair).  He manages Sinclair's relationships with the credit card networks and has marketing responsibilities relating to payment forms.  Trial Tr. 3138:16-3140:7(Gibson/Sinclair).  As part of his responsibilities, he is familiar with the costs associated with accepting credit cards.  Trial Tr. 3141:18-21 (Gibson/Sinclair).

8.    **Peter Haslam (Office Max).**  Peter Haslam began working for Office Max in 2006 and recently transitioned over to Office Depot after the two companies merged in November 2013.  Trial Tr. 2155:24- 2156:11 (Haslam/Office Max).  Office Max sold office supplies and office solutions at over 800 retail stores in the United States and online.  Trial Tr. 2157:3-16 (Haslam/Office Max).  Mr. Haslam was the Director of Revenue and Cash Accounting at Office Max.  Trial Tr. 2156:15-16 (Haslam/Office Max).  He was responsible for "overseeing the accounting and administration of the company's U.S. payments," and his team was responsible for credit cards.  Trial Tr. 2156:17-23 (Haslam/Office Max).

9.    **Roger Hochschild (Discover).**  Roger Hochschild is President and Chief Operating Officer of Discover Financial Services ("Discover").  Trial Tr. 812:7-10 (Hochschild/Discover).  Mr. Hochschild has broad responsibility for Discover's business,

including credit cards issued on the company's network. Trial Tr. 812:11-16, 812:21-813:6 (Hochschild/Discover).

10. **Steven Holtey (Solitude Mountain Resort).** Steven Holtey is the Controller at Solitude Mountain Resort ("Solitude"), which has annual revenues of about $13 million. Trial Tr. 2520:20-21, 2521:3-4 (Holtey/Solitude). Mr. Holtey oversees all of the accounting functions at Solitude, including credit card acceptance expenses. Trial Tr. 2521:16-21, 2523:2-18 (Holtey/Solitude). He also ensures that credit card payments are received into Solitude's bank account. Trial Tr. 2522:3-9 (Holtey/Solitude) ("My responsibilities mainly revolve around working with the processor in making sure that the payments are received.").

11. **Professor Michael L. Katz.** Professor Michael Katz served as the Chief Economist at the Federal Communications Commission and as the Deputy Assistant Attorney General for Economics in the Department of Justice's Antitrust Division. Trial Tr. 3818:13-3819:12 (Katz). Professor Katz was a testifying expert in *U.S. v. Visa*, an antitrust case involving the credit card industry. Trial Tr. 3819:23-3820:9 (Katz). Professor Katz currently is an economics professor and the Sarin Chair in Strategy and Leadership in the Haas School of Business at the University of California at Berkley. Trial Tr. 3816:1-7 (Katz); PX2703 at 1. His principal field of academic research is industrial organization, which is the study of competition. Trial Tr. 3816:14-18 (Katz). Professor Katz has published extensively in the fields of industrial organization and antitrust economics, a related field focusing particularly on questions relevant to antitrust enforcement. Trial Tr. 3816:19-3817:6 (Katz); PX2703 at 3-10.

12. **Dwaine Kimmet (The Home Depot).** Dwaine Kimmet is Vice President of Financial Services and Treasurer at The Home Depot ("Home Depot"). Trial Tr. 1220:9-10 (Kimmet/Home Depot). Home Depot is the fifth largest retailer in the United States with

annual revenues of approximately $80 billion.  Trial Tr. 1220:11-17 (Kimmet/Home Depot).

Mr. Kimmet manages Home Depot's relationships with the credit card networks and has led

negotiations with them since 2007.  Trial Tr.1220:18-1221:9, 1221:19-25 (Kimmet/Home

Depot) ("…I am responsible for our private label credit portfolio, which is about 22 percent of

our sales, and all of our bank card relationships.").

13.    **Bradford Morgan (Visa).**  Bradford Morgan was the Executive Vice President of

Marketing and Sales at Visa from 1988 to 1993.  Trial Tr. 3303:19-25 (Morgan/MasterCard).

He was responsible for marketing and sales operations for Visa in the United States.  Trial Tr.

3304:3-8 (Morgan/MasterCard).  He developed a strategy that helped Visa compete with Amex

in the travel and entertainment industry.  Trial Tr. 3307:22-24, 3324:23-3325:4

(Morgan/MasterCard); PX0133 at -985

14.    **Diedre O'Malley (Best Buy).**  Diedre O'Malley is the Senior Director of

Payment Acceptance at Best Buy, a nationwide consumer electronics retailer.  Trial Tr.

1522:15-20 (O'Malley/Best Buy).  She manages payment acceptance issues relating to general

purpose credit cards and interacts directly with the credit card networks.  Trial Tr. 1523:15-21

(O'Malley/Best Buy) ("I manage items related to payment acceptance of general purpose credit

cards, including rules, regulations, technology, and industry related activity in the payment

space.").

15.    **Chris Priebe (Southwest Airlines).**  Chris Priebe is Director of Payment

Strategies at Southwest Airlines ("Southwest").  Trial Tr. 2368:18-23 (Priebe/Southwest).

Southwest carries more passengers in the United States than any other airline.  Trial Tr. 2370:7-

9 (Priebe/Southwest).  Mr. Priebe manages nearly $500 million in credit card acceptance

expenses, and leads all contract negotiations with the credit card networks.  Trial Tr. 2369:2-8,

2369:14-18 (Priebe/Southwest ).  He has had responsibilities relating to credit card acceptance at Southwest for 17 years.  Trial Tr. 2369:9-13 (Southwest/Priebe) (explaining that his "Primary responsibility is managing nearly half a billion dollars in expense for credit card acceptance, form-of-payment acceptance").

16.    **Jeffrey A. Rein (Walgreens).**  Jeffrey Rein was CEO of Walgreens from 2006 to 2008 and Chairman from 2007 to 2008.  Trial Tr. 1339:24-1340:2, 1340:12-1341:19 (Rein/Walgreens).  He was president and chief operating officer from 2002 to 2006, when Walgreens was the ninth largest retailer in the United States by sales and the largest drugstore chain in the United States by store count and sales.  Trial Tr. 1340:12-1341:19, 1342:21-1343:4 (Rein/Walgreens).

17.    **John Robinson (IKEA).**  John Robinson is Treasurer for IKEA's operations in the United States.  Trial Tr. 374:3-14 (Robinson/IKEA).  IKEA is a home furnishings company with 38 stores in the United States.  Trial Tr. 374:25-375:4, 375:17-19 (Robinson/IKEA).  Domestic revenues were about $4.5 billion in 2013.  Trial Tr. 376:4-6 (Robinson/IKEA).  Mr. Robinson has managed IKEA's cost of accepting credit card payments for nearly 13 years.  Trial Tr. 374:15-24 (Robinson/IKEA) ("As treasurer, my job responsibilities include liquidity and cash management, debt and real estate financing, armored courier and other financial services along with payment processing and corporate governance matters.").

18.    **George Satkowski (Enterprise).**  George Satkowski is the Assistant Vice President and Business Manager for Rental Operations at Enterprise.  Trial Tr. 466:23-25 (Satkowski/Enterprise).  Enterprise is a privately-held car rental company.  Trial Tr. 467:3-4, 469:18-23 (Satkowski/Enterprise).  It is roughly twice the size of its most recognized competitors, Avis and Hertz.  Trial Tr. 469:15-23 (Satkowski/ Enterprise).  Mr. Satkowski

manages Enterprise's relationships with the credit card networks.  Trial Tr. 470:6-20 (Satkowski/Enterprise) ("And I also have responsibility for working with and managing our credit card relationships.").   He is also involved in marketing through his daily interactions with Enterprise's corporate sales team.  Trial Tr. 470:21-471:2 (Satkowski/ Enterprise).

**19.    Kevin Thiel (Alaska Airlines).**  Kevin Thiel is the Managing Director of Revenue Accounting for Alaska Airlines ("Alaska"), the sixth largest airline in the U.S with annual revenues of about $5 billion.  Trial Tr. 182:4-5, 184:4-5, 184:15-17 (Thiel/Alaska).  Mr. Thiel has been responsible for Alaska's relationships with credit card companies and the negotiation of credit card fees for approximately 20 years.  Trial Tr. 182:13-20 (Thiel/Alaska). He is on the board of the Airline Reporting Corporation ("ARC") and is a board member and the president of the Airlines Clearing House ("ACH").  Trial Tr. 182:21-183:1, 183:9-10 (Thiel/Alaska).  ARC facilitates the settlement of ticket sales between U.S. travel agencies and airlines.  Trial Tr. 183:15-21 (Thiel/Alaska).  ACH facilitates the settlement of interline tickets; it clears approximately $80 billion per year. Trial Tr. 183:2-8, 11-14 (Thiel/Alaska).