3810

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2

3   UNITED STATES OF AMERICA,       )
    STATES OF ARIZONA, CONNECTICUT, )
4   IDAHO, ILLINOIS, IOWA,          )
    MARYLAND, MICHIGAN, MISSOURI,   )
5   MONTANA, NEBRASKA,              )   10-CV-4496 (NGG)
    NEW HAMPSHIRE, OHIO,            )
6   RHODE ISLAND, TENNESSEE,        )   United States Courthouse
    TEXAS, UTAH AND VERMONT,        )   Brooklyn, New York
7                                   )
                    Plaintiffs,     )
8                                   )
        -against-                   )
9                                   )
    AMERICAN EXPRESS COMPANY,       )   TUESDAY, JULY 29, 2014
10  ET AL.,                         )   9:00 a.m.
                                    )
11                  Defendants.     )
    _____)
12

13        TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
14             UNITED STATES DISTRICT JUDGE

15  APPEARANCES:

16

17  FOR THE PLAINTIFF:   ANTITRUST DIVISION, LITIGATION III
    U.S.A.               U.S. DEPARTMENT OF JUSTICE
18                       450 Fifth Street NW, Suite 4000
                         Washington D.C. 20001
19                       BY:  CRAIG W. CONRATH, ESQ.
                              MARK H. HAMER, ESQ.
20                            ETHAN GLASS, ESQ.
                              JOHN READ, ESQ.
21                            LISA SCANLON, ESQ.
                              SUSAN MUSSER, ESQ.
22                            KATE MITCHELL-TOMBRAS, ESQ.

23  FOR THE PLAINTIFF:   GREG ABBOT
    STATE OF TEXAS       Attorney General of Texas
24                       BY:  BRET L. FULKERSON
                         Assistant Attorney General
25                       Post Office Box 12548
                         Austin, Texas 78711-2548

                    NICOLE CANALES, CSR, RPR
                       Official Court Reporter

*Proceedings*                                                    3811

```
 1   FOR THE STATE OF MISSOURI:   ANNE E. SCHNEIDER
                                  Assistant Attorney General
 2                                Supreme Court Building
                                  Post Office Box 899
 3                                Jefferson City, Missouri 65102

 4
     FOR THE STATE OF OHIO:       MITCH GENTILE
 5                                Assistant Attorney General
                                  Ohio Attorney General's Office
 6

 7   FOR THE DEFENDANT:           CRAVATH, SWAINE & MOORE LLP
                                  Worldwide Plaza
 8                                825 Eighth Avenue
                                  New York, New York 10019
 9                                BY:  EVAN R. CHESLER, ESQ.
                                       KEVIN J. ORSINI, ESQ.
10                                     PETER T. BARBUR, ESQ.
                                       STUART W. GOLD, ESQ.
11
                                  BOIES, SCHILLER & FLEXNER LLP
12                                575 Lexington Avenue
                                  New York, New York 10022
13                                BY:  PHILIP C. KOROLOGOS, ESQ.
                                       ERIC BRENNER, ESQ.
14                                     MATTHEW TRIPOLITSIOTIS, ESQ.
                                       DONALD L. FLEXNER, ESQ.
15                                     JAMES COVE, ESQ.

16

17

18   THE COURT REPORTER:         NICOLE CANALES, CSR, RPR
19                                225 Cadman Plaza East
                                  Brooklyn, New York 11201
20                                cnlsnic@aol.com

21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer-assisted transcript.

23

24

25
```

*Proceedings*                                                    3812

1          (In open court.)

2          THE COURT:  Please be seated.

3          COURTROOM DEPUTY:  Case on trial.

4          Lead counsel state your appearances, please.

5          MR. CONRATH:  Good morning, Your Honor.  Craig

6    Conrath for the United States.

7          THE COURT:  Good morning.

8          MR. GENTILE:  Good morning.  Mitch Gentile for the

9    plaintiff states.

10         THE COURT:  Good morning.

11         MR. CHESLER:  Good morning, Your Honor.  Evan

12   Chesler for American Express.

13         MR. FLEXNER:  Good morning, Your Honor.  Donald

14   Flexner for American Express.

15         THE COURT:  Good morning, everyone.

16         Before we begin with the next witness, is there

17   anything from either of the parties?

18         MR. CONRATH:  Nothing from us, Your Honor.

19         THE COURT:  And your expectation on the length of

20   your witness's presentation?

21         MR. CONRATH:  I'd predict between five and six

22   hours, Your Honor.

23         THE COURT:  Five and six hours, all right.

24         Okay.  You may call your witness.

25         MR. CONRATH:  Your Honor, the United States calls

*Proceedings*                                              3813

1    Professor Michael Katz.

2              May I approach, Your Honor?

3              THE COURT:  Yes, you may.

4              (Professor Michael Katz enters the courtroom and

5    takes the witness stand.)

6              THE COURT:  Should we have a sidebar?

7              Sure.  Let's have a sidebar.

8              Please take the stand.  We'll be with you in a

9    moment.  This gives me an opportunity to...

10             (Sidebar.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                    3814

1          (Sidebar conference held on the record out of the

2     hearing of the public.)

3          MR. ORSINI:  I just want to protect third party

4     confidentiality information.  One of the gentlemen in the jury

5     box is an American Express employee.  I know that there's

6     third party confidential information in the binder that Mr.

7     Conrath has.  So I just wanted to remind Mr. Conrath it

8     probably shouldn't go to the American Express executive.

9          We have no objection to him being here, I just

10    wanted to make sure we have the confidentiality.

11         MR. CONRATH:  Thank you.

12         THE COURT:  Thank you, very much.  Thank you,

13    everybody.

14         (Sidebar end.)

15         (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  Thank you, Mr. Orsini, for making this

3    possible.

4          MR. ORSINI:  You're welcome, Your Honor.

5          COURTROOM DEPUTY:  Please raise your right hand.

6

7    MICHAEL L. KATZ,

8          called by the Government, having been first duly

9    sworn, was examined and testified as follows:

10          COURTROOM DEPUTY:  Please state and spell your full

11   name for the record.

12          THE WITNESS:  My name is Michael L.  Katz, it's

13   M-I-C-H-A-E-L L K-A-T-Z.

14   DIRECT EXAMINATION

15   BY MR. CONRATH:

16   Q    Good morning, Professor Katz.  I'm going to start today

17   by letting the Court know about your academic and professional

18   background.

19          If you could, would you open your binder in front of

20   you to Tab 1, PX-2703.

21          What is PX-2703?

22   A    Well, I don't have an exhibit number on it, but I'm

23   guessing you're looking at my curriculum vitae.

24   Q    Yes, that's correct.  To make it easier to discuss your

25   background for the Court, we'll use this as a guide.

1         Does PX-2703 describe your academic and professional

2    qualifications?

3    A    Yes, it does.

4    Q    What is your current academic position?

5    A    I'm the Sarin Chair in strategy and leadership at the

6    Haas School of Business at the University of California at

7    Berkeley where I'm also a professor of economics.

8    Q    Have you taught anywhere else?

9    A    Yes, I've taught at Princeton and also at N.Y.U.

10   Q    And what did you teach at N.Y.U.?

11   A    I taught in the business school.  I taught competitive

12   and corporate strategies to the MBA's, and then I thought an

13   economics and strategies course to graduate students.

14   Q    What is your field of academic research?

15   A    My principal field is industrial organization.

16   Q    And what is industrial organization?

17   A    It's the study of competition and how it's affected by

18   particular structures of industries and markets.

19   Q    Have you heard people sometimes use the term "antitrust

20   economics"?

21   A    Yes, I have.

22   Q    And what does that mean to you?

23   A    So, it's the study of competition.  There's a high degree

24   of overlap with industrial organization, but it's focusing

25   particularly on questions relevant to antitrust enforcement.

Katz - Direct / Conrath                      3817

1  Q     Have you published in the fields of industrial

2  organization or antitrust economics?

3  A     I published in both.

4  Q     Is there a list of your publications at the end of your

5  CV in PX-2703?

6  A     Yes, there is.

7  Q     I'm not going to go through those, but if we look at the

8  most recent ones in the last few pages, I see there's some

9  non-academic publications there like a 2012 paper for the

10 Kansas City Federal Reserve Bank on "Increasing Connectiveness

11 in Consumer Payments."

12         Could you describe that for us?

13 A     So the Kansas City Fed asked me to present paper --

14 prepare a paper for a conference they were having on the

15 future of the payments industry, and because they knew me both

16 because of my work on payments and also work having to do with

17 mobile telephony, they asked me to prepare a paper thinking

18 about the intersection of those two and how future

19 technological developments would change the payments industry.

20 Q     So you write for non-academic audiences as well as for

21 academic audiences?

22 A     Yes, I write particularly for policy audiences and

23 practitioner audiences in some cases.

24 Q     Is there an area of your research that people would say

25 you're best known for?

1   A    Yeah, I'm best known for my work on network effects.

2   Q    Has any of your work involved the analysis of vertical

3   restraints?

4   A    Yes, it has.

5   Q    Can you give us some examples?

6   A    Well, I mean, one thing I did is I wrote a handbook

7   chapter where I was asked to summarize the state of knowledge

8   about vertical restraints at the time.  More recently, I wrote

9   a back chapter analyzing a particular antitrust case which

10  involved vertical restraints and then as part of that talking

11  about the general theories of economic theories that were

12  relevant to that analysis.

13  Q    Moving outside of your academic work, Professor Katz,

14  your CV notes that you were chief economist at the Federal

15  Communications Commission from January 1994 to January 1996;

16  is that correct?

17  A    That's correct.

18  Q    And what were your responsibilities as chief economist of

19  the FCC?

20  A    So there were two really when I went.  One was just to

21  build up the economic staff and the capabilities of the

22  agency, but then because they were just being built up, my job

23  personally was also to make sure there was good economics in

24  all of the major decisions that the commission reached.  So I

25  was there to advise the commission.

1  Q    You also served as deputy assistant attorney general for

2  economics in the Antitrust Division of the Department of

3  Justice from September 2001 to January 2003; is that right?

4  A    That's correct.

5  Q    And so I note your phrase included the title "attorney

6  general," but you weren't an attorney, are you?

7  A    No, that's correct.

8  Q    So what were your responsibilities as deputy assistant

9  attorney general for economics?

10 A    Well, there was to lead a well-established staff of

11 economists, but again it was to oversee the use of economic

12 analysis in support of antitrust analysis.

13 Q    Have you worked on competition policy issues with

14 government agencies in other countries?

15 A    Yes, I have.

16 Q    And can you give us an example of that?

17 A    So I had several engagements for the Reserve Bank of

18 Australia having to do with credit card regulation and also

19 debit card regulation.

20 Q    Aside from your work as an academic and in government,

21 have you been involved as a consultant on antitrust matters?

22 A    Yes, I have.

23 Q    Have you been involved in antitrust cases involving the

24 credit card industry?

25 A    Yes, I have.

1    Q     And what was that?

2    A     So the case, the shorthanded view of U.S. v. Visa having

3    to do with the exclusionary rules that Visa and MasterCard had

4    were aimed at limiting competition from American Express and

5    from Discover and then also had another feature known as

6    duality that they were not truly independent competitors.

7    Q     And did you provide testimony during that trial before

8    the district court?

9    A     Yes, I did.

10              MR. CONRATH:  Your Honor, at this point, I'd like to

11   offer Professor Katz as an expert in economics.

12              THE COURT:  Any objection?

13              MR. CHESLER:  No objection, Your Honor.

14              THE COURT:  All right.  The witness is designated as

15   an expert in economics.

16              MR. CONRATH:  Thank you, Your Honor.

17   BY MR. CONRATH:

18   Q     Professor Katz, were you asked by the Department of

19   Justice to review certain provisions in the agreement

20   between -- agreements between American Express and its

21   merchants?

22   A     Yes, I was.

23   Q     And can we refer to those provisions as the anti-steering

24   rules?

25   A     Yes.

1   Q    Did the department ask you to consider whether the

2   anti-steering rules adversely affect competition?

3   A    Yes, it did.

4   Q    And did you reach conclusions about whether they do?

5   A    Yes.

6   Q    And please tell the Court the principal conclusion that

7   you reached.

8   A    So my central conclusion is that the anti-steering rules

9   harm competition and consumers, and consumers in this case

10  means merchants and their customers.

11  Q    Can you explain how the anti-steering rules harm

12  competition?

13  A    Well, fundamentally, I think a way to see it is ask what

14  would happen if a credit and chargecard network was thinking

15  about lowering its prices to merchants.  Now, the reason it

16  might do that is it would expect to get additional business,

17  right.  That would be the reward for lowering its prices would

18  be the additional business.

19          Now, in the absence of anti-steering rules, what

20  you'd expect to have happen is that some merchants would say

21  well, now that this is cheaper for us, let's steer our

22  customers, let's encourage them to use the cheaper credit card

23  network and that would be the reward for lowering the prices,

24  but in the presence of the anti-steering rules, the merchants

25  are limited from doing that.  So there's less substitution

1  towards the network that's lowered its prices.  Therefore

2  there's less of a reward for lowering prices, there's less of

3  an incentive to do it, so it's dampening or thwarting

4  competition.  It's taking away the award for competing harder.

5  Q     Can you give me an example?

6  A     Yes.  As we'll see in a few minutes, the Discover network

7  is an example of that where they had a strategy where they

8  were going to be lower-priced than other networks.  That was

9  predicated in part on merchants steering their customers to

10  Discover, and when Discover learned that that wasn't going to

11  happen because of anti-steering rules, Discover changed its

12  strategy and stopped trying to be particularly low-priced to

13  merchants.

14  Q     Did you also consider whether the anti-steering rules

15  have procompetitive effects?

16  A     Yes, I did.

17  Q     And what conclusion did you reach about the

18  procompetitive effects?

19  A     I considered several different theories, but I considered

20  that when you sort of looked at the facts of them, that none

21  of them generated significant procompetitive benefits and that

22  none outweighed the harms I found earlier.

23  Q     Before we talk about the rules further, did you prepare a

24  slide deck that will help us walk through your analysis?

25  A     Yes, I did.

Katz - Direct / Conrath                                    3823

1    Q    All right.  So could we turn to Tab 2 of the binder in

2    front of you, which is PX-2702?

3              MR. CONRATH:  And, Your Honor, if we can, I'm going

4    to have to go back between public screen and non-public screen

5    periodically, but we'll start on the public side.  So I'll

6    apologize in advance for calling on you to perform that

7    gatekeeper role.

8              THE COURT:  We're starting with the public screen?

9              MR. CONRATH:  With the public, yes.

10             THE COURT:  All right.

11             (The above-referred to exhibit was published.)

12   BY MR. CONRATH:

13   Q    Is this your slide deck, Professor Katz?

14   A    Yes.

15   Q    Next slide, please.

16             Could you tell the Court the framework you will use

17   to explain your expert opinions in this case?

18   A    Yes, and this slide outlines that framework.

19             So there's three broad steps in the approach I'm

20   going to describe today.  The first one is to identify the key

21   economic features of the industry which is to say learn about

22   the institutional details of the industry, how competition

23   functions and works in this particular industry because that's

24   going to give us the context for understanding how the rules

25   potentially affect competition either adversely or favorably.

1    Q    And what's the second set?

2    A    So then the second step was to assess whether there are

3    adverse competitive effects.

4    Q    And what's the third step?

5    A    And then the third one is to see if they're

6    procompetitive justifications or procompetitive effects.

7    Q    Could you explain why the middle step is divided into two

8    approaches?

9    A    Because there are two alternatives for conducting that

10   middle step.

11   Q    What is the actual adverse effect approach?

12   A    So the actual adverse effect, and sometimes it's just

13   what it says, you look to see the actual effects.  It's an

14   approach you can use when, as here, the conduct at issue has

15   already taken place.  So you can look at market facts and look

16   at industry participants' behavior and try -- and look for

17   direct evidence of what's happened and how the practices, you

18   know, here the anti-steering rules, how those practices have

19   affected competition.

20   Q    And what is the market power approach?

21   A    The market power approach is an indirect approach to get

22   at the same source of questions, but you go through a

23   different process to find relevant markets and then assess the

24   market power that the firm whose conduct at issue, you know,

25   assess whether it has significant market power, whether it has

1  sufficient market power that its actions could harm

2  competition, and then you look for likely adverse effects

3  within that framework.

4  Q    And why are there two approaches?

5  A    Well, because the first approach, one reason why it's

6  good there are two approaches is the first approach is

7  something you can use where the conduct's already taken place.

8  The second approach is useful in something like a merger where

9  the harms you're worried about are in the future.  You're

10  saying after they merge there's going to be less competition,

11  so you need a way to predict what's going to happen.  You want

12  a framework for that.  So the market power approach is very

13  useful when you're looking forward.

14  Q    Which approach did you take here?

15  A    I took both approaches.

16  Q    And did you reach the same or different conclusions when

17  applying these approaches?

18  A    I reached the same conclusion because they're really

19  doing the -- trying to do the same thing.

20  Q    And what was that conclusion that you reached?

21  A    Is that there are significant adverse competitive effects

22  from the rules.

23  Q    And why did you do both approaches?

24  A    It's really belt-and-suspenders because you can look in

25  this case as the direct evidence of what's happened in the

Katz - Direct / Conrath                                         3826

1    past, but it's also useful to use the market power approach

2    because you can bring in additional evidence, bring in direct

3    evidence to help resolve the questions here.

4    Q    Let's start with discussing your analysis on the first

5    step.  Could we turn to the next slide, please?

6              So what are the first of the key industry

7    characteristics that you identified?

8    A    I guess we'll turn to the next slide, if we could.

9    Q    And if I mess up on the slides, you just tell me and

10   we'll pick up.

11   A    All right.  So the first one, and something we'll come

12   back to and talk more about, is just -- if it's okay, I'm

13   going to refer to them, at some points at least, as credit

14   card networks rather than credit and chargecard networks, just

15   to shorten things.

16             But the first thing is that the credit card network

17   industry is a concentrated industry, there's a small number of

18   major suppliers, and what this chart is showing is who they

19   are and how big they are and giving some sense of their

20   relative size.  And so what it's showing if you look along the

21   bottom is the number of years going from 2001 to 2012 and then

22   on the side it's saying -- it's showing you these are the

23   networks measured by their purchase volumes, and what you can

24   see from this is that Visa has consistently been the largest

25   network, they're the red line at the top, and that in the

Katz - Direct / Conrath                                3827

1   recent years American Express, a blue line appropriately

2   enough, the blue line is showing that American Express is now

3   the second largest credit card network, followed by

4   MasterCard, and then significantly smaller than that is

5   Discover.

6          So one thing to note is there are only four

7   competitors and three of them are much larger than the other

8   one, and so that's going to raise questions about just how

9   competitive this industry is.

10  Q    So that dip that occurs in 2008/2009, what's that?

11  A    That's the Great Recession.

12  Q    Next slide, please.

13         Did you identify other key characteristics of the

14  industry?

15  A    Yes.  A central feature of this industry is the credit

16  card networks are two-sided platforms, which is to say that

17  they're middlemen between merchants and their customers, and

18  what this diagram is doing is showing you that while the

19  network is the middleman, there are also other parties

20  involved.

21  Q    All right.  And what do these boxes labeled "issuer" and

22  "acquirer" represent?

23  A    So you can see the network is in the middle and I've

24  shown in parentheses underneath an example of the network of

25  course would be Visa, as we were just saying.  If you're a

Katz - Direct / Conrath                                    3828

1    customer, a cardholder, you don't deal directly with Visa.

2    You deal with the bank that issues your credit or chargecard,

3    in this case the example is Citibank.  So card issuers are

4    just what the name suggests:  they issue cards to the

5    customer, they manage the customer relationship and the

6    billing, and they serve as an intermediary between the network

7    and the customer.

8            The acquirer is doing the same thing for the

9    merchant, and First Data is one of the largest, probably the

10   largest acquirer, and so they service the bank for the

11   merchant and they serve as the liaison between the merchant

12   and the network.

13   Q    What functions do networks perform as middlemen?

14   A    So the most fundamental function they provide is to have

15   a set of protocols and procedures and standards that allow all

16   these parts to work together.  They also do things like they

17   run communications networks to let them go together.  Then in

18   a different vein the important thing is they do branding.  You

19   know, Visa is one of the best known brands in the world.

20   American Express is certainly a well-known and respected

21   brand.  They also set prices and they also set rules such as

22   the anti-steering rules.

23   Q    Why do you say a network is two-sided, the platform is

24   two-sided?

25   A    Because its business is to bring together two different

1   sides.  Its business ultimately is to facilitate transactions

2   between merchants on one side and their customers on the

3   other.

4   Q    Who are the consumers of network services in this

5   diagram?

6   A    Both merchants and customers are consumers of the network

7   services.

8   Q    So you're saying merchants are consumers?

9   A    Yes, for these purposes.  And that's one thing, again

10  I'll try to be consistent in my terminology and say customers,

11  but I'm sure at some point I will slip into also using the

12  term "consumer" to mean households and individuals, but for

13  the technical economic purposes, merchants are consumers.

14  Q    You've written about network effects.

15       What do network effects mean in the context of this

16  industry?

17  A    So a network effect generally is when the more people

18  consume a good or service, the more valuable it is to consume

19  it.  The classic example being the telephone network, that the

20  reason you have a phone is so you can call other people.

21       Well, in this industry the way it works is, think

22  about it from the customer's perspective, why have a credit

23  and chargecard is so you can use it, and for you, the more

24  merchants there are on a particular network, the more valuable

25  that network is.  So that's a positive network effect where

Katz - Direct / Conrath                    3830

1  the customers look at the number of merchants.  Similarly, if

2  it's a card that -- if you're a merchant, you think about

3  well, why would I carry a -- you know, why would I accept a

4  credit and chargecard network's cards?  It's basically lots of

5  customers want to use it.  So you have it going both ways:

6  customers want to be where merchants want to be and merchants

7  want to be where the customers are.

8  Q    So in this slide you're looking at, you use Visa as an

9  example of a network.

10        Does this slide also describe American Express's

11 relationship as a network with its merchants and customers?

12 A    It does describe American Express's relationship as a

13 network, but with American Express there's some further

14 complications.

15 Q    Okay.  Could we have the next slide, please?

16        What does this slide show?

17 A    Well, this is showing the further complications because

18 while American Express does make use of third parties, just

19 like in the previous diagrams, for example Wells Fargo issues

20 American Express cards and First Data serves as an acquirer

21 for American Express, the bulk of American Express's charge

22 volume goes in-house.  It's a -- the largest issuer of credit

23 and chargecards and it's also a large acquirer.  So it's

24 integrated into the other functions.

25 Q    All right.  Can we have the next slide, please?

1          What's the next key feature of the industry that you

2    identify?

3    A     Well, this is a feature that really follows from the fact

4    that the credit and chargecard networks are two-sided

5    platforms and what it's showing is the fact that the choice of

6    what payment instrument gets used for a transaction is a

7    choice that's made jointly by merchants and their customers,

8    that the merchant initially chooses which payment instruments

9    to accept, the merchant decides whether or not it will take

10   checks, whether to accept cash, debit cards, credit cards,

11   which brands, and then when the customer comes in to the

12   store, say at the point of sale, the merchant may engage in

13   steering depending on if its allowed, depending on what the

14   merchant's preference is for that, but then the customer

15   ultimately chooses what gets used because the customer's going

16   to look and say well, here's what the merchant accepts, I'll

17   pick which one I want to do.  So it's important here that it's

18   both the merchant and the customer are making the decision.

19   So to understand how competition works here, we have to

20   understand what the merchant wants to do and also what the

21   customer wants to do.

22   Q     Is the customer's preference the only factor driving

23   merchants' decision on whether to accept credit cards?

24   A     No.  I think it's fair to say it's the major factor, but

25   merchants certainly take into account the cost too, both what

1    they have to pay, but also things like what are the training

2    costs.  For large, sophisticated merchants, they worry a lot

3    even how quickly the payment instrument gets used at the point

4    of sale, so they'll consider that.  The merchants also

5    consider whether there are particular aspects of quality that

6    differ across payment instruments such as, you know, how

7    quickly they get paid or whether there's good customer

8    service.

9    Q    So can we have the next slide, please?

10              And what does this next slide illustrate?

11   A    So this is just showing as we go forward where the money

12   goes when the merchant pays because one of the things to note,

13   as this diagram will show, is when the merchants paying, the

14   money's actually going to the three different parts that I

15   showed you between the customer and the merchant.

16              So I've taken here is just a round number of three

17   percent.  So these numbers are just are broadly suggestive,

18   these are not supposed to be actual market data.  So take the

19   example where a customer buys something worth a hundred

20   dollars, pays the credit card bill a hundred dollars.  The

21   issuer receives that because that's where you send the money.

22   The issuer then keeps what's known as an interchange fee, in

23   the case of MasterCard and Visa, or it's also called in

24   American Express an issuer rate.  So in this case, you see

25   that while the issuer gets a hundred dollars, the issuer only

1    passes on 97.50.  That $2.50 difference is what the issuers

2    keep and that's the payment to the issuer for maintaining the

3    customer relationship, for having attracted the customer in

4    the first place.  Then the network passes on the money to the

5    acquirer because, remember, the acquirer is the merchant's

6    bank, and you see here that the network has kept 30 cents for

7    itself and those are the network fees.  And then finally the

8    acquirer passes the money on to the merchant, but in this

9    example, the acquirer has kept 20 cents for itself.  It's

10   called processing fees.  They also have other names with them,

11   but often you're going to think those are the acquirer's fees.

12   So you can see then ultimately the merchant gets $97, that

13   $3.00 difference being the so-called discount.

14   Q    So if I understand the chart correctly, in this example,

15   the interchange fee or issuer rate would be about $2.50?

16   A    That's correct.

17   Q    And is it generally the case that the interchange fee or

18   the acquirer rate comprises the bulk of what the merchant

19   pays?

20   A    Yes.

21   Q    The merchant discount?

22   A    Yes, that's true.

23   Q    And who sets the interchange fee or the issuer rate?

24   A    It's set by the network.

25   Q    And does the network get to keep that fee?

1  A    No, the network doesn't, and that's an important thing to

2  understand in thinking about the pricing in this industry.

3  It's basically something you can think of as being passed

4  through by the network where it's -- think ultimately how the

5  money is going, it's passed through by the network from the

6  merchant side, from the acquirer to the issuer.

7  Q    Can we have the next slide, please?

8           Summing up, what are the key features of the credit

9  card industry that we should remember as we talk more about it

10  today?

11  A    So as we just saw, there's a small number of networks.

12  We want to keep that in mind in assessing competition.  It's

13  going to be really important to think about the fact that

14  merchants and their customers are jointly deciding which

15  payment instruments to use.  In fact, I mean that's what

16  steering is all about is the interaction between the two sides

17  in order to make that joint decision.  And then the other

18  thing to do is that the principal reason that merchants accept

19  credit and chargecards is because that's what customers want

20  because in terms of cost, merchants generally find credit and

21  chargecards to be one of the most expensive or the most

22  expensive payment instrument to accept and in general the

23  reason they're doing is because that's what their customers

24  want.

25  Q    Can we have the next slide, please?

1        Professor Katz, once we've identified these key

2   features, what's the next step in the analytical framework

3   that you're walking us through?

4   A    Well, as I said, the next step is to assess the adverse

5   competitive effects and this is where there's two different

6   approaches, and as indicated on this slide, the one I'd like

7   to start with today is to talk about the actual adverse effect

8   approach.

9   Q    Next slide, please.

10       What is the actual adverse effect or effects on

11  competition that you'd like to talk about today?

12  A    So there are going to be three that I'd like to talk

13  about this morning.  So one I already mentioned is that the

14  fact that merchants were blocked from steering, that impeded

15  Discover's ability to compete on the merits using the

16  strategy, it was a low-price strategy, it was low-priced to

17  the merchants so we will see also they certainly saw

18  themselves as offering high value to their customers.

19       Second thing I want to look at are examples of

20  preference campaigns and how those induce substantial

21  substitutions, so it shows that steering can matter and it

22  also shows that it can trigger competitive responses so that

23  the steering was beneficial.

24       And then the final one I'll talk about very briefly,

25  because it's something we'll come back to later today to talk

Katz - Direct / Conrath                    3836

1   in much more detail, is value recapture by American Express

2   which is a set of targeted price increases, and the point I'd

3   like to make here is that the anti-steering rules resulted in

4   value recapture being more profitable than it otherwise would

5   have.  So there was less pressure to hold price down than

6   there would have been absent the rules.

7   Q     Let's go over all three of those one at a time.

8               Can we have the next slide, please?

9               What happened with Discover?

10  A     What happened?  Well, the first thing is Discover entered

11  the market in 1985, mid-'80s, and going along for several

12  years and then what started to happen -- first of all, I

13  should say what their strategy was.  They wanted to come in

14  and they saw themselves as offering something that offered

15  particular value to merchants.  They had although for the

16  merchants a low-price strategy, but as the quotation on this

17  slide is emphasizing, they also did things to be attractive to

18  cardholders and they were pioneers in cash back rewards and,

19  as I said, things like no annual fees.  So they came in and

20  that was their strategy.

21              Okay, then if we could turn to the next slide.  What

22  happens, so they had -- they came in with that strategy, and

23  then in the late '90s, what was happening is Visa and

24  MasterCard started raising the rates to merchants, and

25  American Express at the time already had higher charges to

Katz - Direct / Conrath                                    3837

1    merchants, and so what's being captured in this long

2    quotation, which I will spare you my reading of, is that

3    Discover saw this as an opportunity, because what they saw

4    happened is, okay, everybody else is getting more expensive,

5    we're not going to follow them up as they do that and this

6    will be our chance to gain share.

7    Q    All right.  Can we look at the next slide, please?

8    A    Okay.  And as you see, because that was from, that

9    quotation was from a speech in 1999, I put this next slide up

10   just to show, and I apologize it's hard to read, but this is

11   the best copy I could get a hold of.  Remember that speech was

12   in 1999, so it's on the left side of this diagram and it's

13   just to show that indeed MasterCard and Visa were raising

14   their rates.  The speech mentioned there had been a price

15   increase in the previous year and the year after that, and in

16   fact as you see, they were going up at that time.

17   Q    So the bottom two lines on this chart are the MasterCard

18   and Visa rates; is that right?

19   A    That's correct, and then what it's showing on the

20   vertical axis is their discount rates.

21            THE COURT:  Is this a public document?

22            MR. CONRATH:  This was I think confidentiality had

23   not been claimed on this slide, as I understand it.

24            Is that right?

25            THE COURT:  That's fine.  I'm just checking.  Go

1    ahead.

2    BY MR. CONRATH:

3    Q    Next slide, please.

4    A    Okay.  So what happened, as I said, is the prices were

5    going up to merchants, and Discover saw this as an opportunity

6    and so what they did is they reached out to merchants.  The

7    earlier quotation was from a speech doing that.  The excerpt

8    here is from a letter that was sent out to merchants and

9    pointing out to them, look, they have -- it says the response

10   to Visa and MasterCard, but it's referring to their having

11   increased their prices.  It says look, we want to work with

12   you, you know, here's ways to do it.  And it's just one thing

13   to note here that this is just as an example of it, it says

14   we've enclosed signs to display at the point of sale.  But

15   fundamentally, the strategy was to get merchants to steer

16   their customers to Discover and then that would be Discover's

17   competitive reward, if you will, for having given the

18   merchants a good deal.

19   Q    The next slide, please.

20        Was this strategy successful?

21   A    No, it wasn't.

22   Q    And explain what's on this slide about why that strategy

23   was not successful.

24   A    So what we've identified here is that a central reason it

25   wasn't successful is, as I say, it was predicated on the

Katz - Direct / Conrath                                    3839

1   merchants were going to -- Discover thought they would have

2   this better deal for merchants, merchants would steer their

3   customers to Discover, Discover would gain sales, gain market

4   share.  Didn't happen.  They didn't see much of a response, as

5   this quotation of earlier testimony in this trial is

6   describing.  They didn't see much of a response, and when they

7   looked into why, when they talked to merchants, the merchants

8   said well, we can't steer because we're blocked by

9   anti-steering rules.

10  Q    So what did Discover do with its low-priced strategy when

11  it realized that merchants couldn't steer to it?

12  A    It moved to a different strategy and it's moved to a

13  strategy much more of pricing similarly to Visa and

14  MasterCard, which we'll see on the next slide.

15            MR. CONRATH:  Could we switch the monitor at this

16  point in time?

17  A    Okay.

18            THE COURT:  Go ahead.

19  Q    So now if we could have the next slide.

20  A    As some of us can see, so again, I don't think it --

21  well, maybe it's in the old days they didn't have very good

22  technology for copying this.  Again, I apologize, it's hard to

23  read the slide, but if you look along the bottom, I think this

24  part is not confidential, you see it's broken out into the low

25  cost provider strategy and when they say closed competitor gap

Katz - Direct / Conrath                           3840

1  and then the breakpoint between those is 1999 which is when

2  that speech was made and when this initiative occurred, and so

3  what was happening is Discover had been going along, and I

4  describe this in general terms, their prices had dipped and

5  come back some, but then when they saw that that initiative

6  didn't work out at that breakpoint, you see they then just

7  steadily increased their prices to merchants following that

8  because that's when they abandoned the strategy of trying to

9  be a particularly low-priced network to merchants.

10  Q    So what has been the effect on merchants and customers as

11  a result of Discover abandoning its low price strategy?

12  A    Well, so as a result of that, merchants are paying higher

13  prices for the use of Discover cards and presuming for the use

14  of other credit and chargecards as well because now there's

15  less pressure on the pricing there, and then that means that

16  an economically rational merchant is going to pass those

17  higher costs on to its customers, and even though it may be

18  difficult for anybody to perceive that because it's a small

19  amount for any one customer, that adds up ultimately to

20  substantial amounts of money.  So customers ultimately are

21  paying more at the merchants and that includes people who use

22  credit and chargecards, but it also includes people who don't

23  use them.

24  Q    So is it your opinion that the impeding of Discover's

25  low-cost strategy by the anti-steering rules adversely

1  affected competition?

2  A    Yes.

3          I just want to be clear about one thing.  When I

4  say -- when you say the rules, the anti-steering rules were in

5  effect at the time.  So were the MasterCard and Visa rules.

6  So my testimony is that those rules at this time collectively

7  did it, but it's also certainly my conclusion that had it been

8  the anti-steering rules of American Express, the rules, been

9  in place by themselves, they would have had this effect.

10 Q    Next slide, please.

11         And this is public, Your Honor.

12         (The above-referred to exhibit was published.)

13 Q    Do you think that Discover would use steering strategies

14 in the future if the anti-steering rules were lifted?

15 A    Yes.  At trial earlier, Mr. Hochschild from Discover

16 testified to that extent and that's what this quotation is

17 showing.  It said that if merchants could steer, that Discover

18 would return to having this price strategy of lower prices to

19 merchants in order to give the merchants incentives to steer

20 and certainly Discover would hope to get them incremental

21 volume which would make the lower prices profitable.

22 Q    And is that consistent with economic principles?

23 A    Yes, it is.

24 Q    In what way?

25 A    It's really in a sense he's saying -- he's saying what I

Katz - Direct / Conrath                          3842

1   said earlier at the outset when you asked me how is

2   competition harmed.  It's because the lack of steering reduces

3   the gains from lower prices and so he's saying it the other

4   way around: if we brought steering in as a possibility, that

5   would increase our incentives to lower prices and we would do

6   it.

7   Q    All right.  Professor Katz, the second example you

8   mentioned was preference campaigns.

9        Can we turn to the next slide, please, and can you

10  tell me what a preference campaign is in the credit card

11  industry?

12  A    So a preference campaign is where the credit card network

13  will have an initiative where it will encourage merchants,

14  sometimes I think just by asking them, but they also could

15  provide financial rewards, encourage them to express a

16  preference for a particular brand of credit card and in

17  particular express that preference to the merchant's customer

18  either advertising or at its point of sale.

19  Q    Could you tell us about the specific Visa preference

20  campaign that's described on this slide?

21  A    So it's probably the most famous preference campaign, the

22  "We prefer Visa" campaign where they encouraged merchants to

23  supply signs at the merchant's premises.  They would say "We

24  prefer Visa," so they're expressing the preference.  And as

25  part of encouraging merchants to participate in the campaign,

*Katz - Direct / Conrath*                                    3843

1  Visa highlighted to the merchant that they were cheaper from

2  the merchant's perspective than was American Express and at

3  the time also that American Express apparently had slower

4  payment turnaround times to the merchant.

5  Q    What were the effects of this preference campaign on

6  merchant and customer behavior?

7  A    So it had significant effects on -- it led to share shift

8  and particularly share shift away from American Express to

9  Visa, sometimes in the double digits.

10 Q    Did American Express respond by competing?

11 A    In part, yes.  So they, as it says here, allocated

12 resources to merchant outreach.  They made promotional

13 investments of their own in advertising, and they also

14 considered as a response reducing merchant discounts for some

15 merchants.  So they considered a price response.

16 Q    Were these forms of -- these forms of response by

17 American Express to Visa's "we prefer" campaign a form of

18 competition on the merits?

19 A    Yes, I think that's exactly what they were.

20 Q    Have other credit cards networks also engaged in

21 preference campaigns?

22 A    Yes.  Well, in fact, at the time that Visa launched this

23 American Express had its own preference campaign before Visa

24 did and there's certainly been preference campaigns and

25 preference relations since.

1  Q    Would you consider the "We prefer Visa" preference

2  campaign to be a form of competition on the merits?

3  A    Yes.

4  Q    And can you explain why?  What was the effect on

5  merchants and consumers?

6  A    Well, again because what it's doing is they're saying,

7  well, even if they don't offer any incremental rewards to the

8  merchant, what it's saying to the merchant is we'll work with

9  you to steer customers to what's the cheaper way of paying

10  things.  So there's a benefit right there.  The other thing is

11  there's benefits when the -- when the network, benefits to the

12  merchants if the networks compete to have that preference

13  relationship and they offer various financial incentives to

14  the merchants.

15  Q    Are you aware of an instance when MasterCard had a

16  preference campaign with Travelocity?

17  A    Yes, you said they had a preference relationship with

18  them, yes.

19  Q    Can we turn to the next slide, please?

20        What conclusion do you draw from the information

21  that's on this slide?

22  A    Well, the first box, the one on the left, and this is

23  again from trial testimony earlier this month from MasterCard

24  executive where she was saying that they had this preference

25  relationship with Travelocity and then after pressure from

*Katz - Direct / Conrath*                               3845

1  American Express they ended it, and the MasterCard executive

2  indicated that then it had less of an effect, that they were

3  less successful at shifting share and that the campaign was

4  degraded.  And so again it's saying it's a lessening of

5  competitive pressure here as a result of this.

6  Q    And is it consistent with economic principles, can you in

7  light of economic principles evaluate whether it's likely that

8  MasterCard would conduct similar campaigns in the future if

9  anti-steering rules were lifted?

10 A    Well, I mean, certainly they would have, as a general

11 matter, they would have the incentive to do that, see a way,

12 and in fact they've indicated in testimony, right, that they

13 would be interested in doing it and that if their rivals did

14 it, that that would put competitive pressure on them.

15 Q    So is it your understanding that the anti-steering rules,

16 to the extent they impede preference campaigns, adversely

17 affect competition?

18 A    Yes.

19 Q    Next slide, please.

20        Professor Katz, the third item you mentioned under

21 actual anticompetitive effects was value recapture.

22        What is value or was value recapture?

23 A    So it was a set of -- it was a pricing and set of pricing

24 initiatives by American Express where it raised its prices to

25 targeted merchant segments.

1  Q    And what is the connection between value recapture and

2  the anti-steering rules?

3  A    Well, as was alluded to briefly earlier, the

4  anti-steering rules resulted in the charge volume or the

5  demand for American Express's services being less responsive

6  to the merchant discount, and when demand is less responsive

7  to the price, in this case less responsive to the price

8  charged to the merchant, that results in the profit maximizing

9  price being higher.  So that means, in this case, the American

10 Express with the anti-steering rules in place has a higher

11 profit-maximizing price, so it's telling us that had the

12 anti-steering rules not been in place, American Express would

13 have faced greater competitor pressures or greater downward

14 pressures on its pricing that would have moderated the price

15 increases.

16        MR. CONRATH:  Could we switch the monitor, Your

17 Honor, before we go to the next slide?

18        (Pause.)

19 Q    All right.  Next slide, please.

20        Professor Katz, did American Express assess the

21 profitability of its value recapture of price increases?

22 A    Yes, it did.

23 Q    And did they do it separately for unmanaged and for

24 managed merchants?

25 A    Yes.

1  Q    And what do those categories mean?

2  A    So, managed merchants are those, as a general matter,

3  they are larger merchants, they're the ones that are important

4  enough to American Express that they get assigned a account

5  representative.

6  Q    And the unmanaged merchants are those that don't get --

7  A    That don't and they tend to be the smaller ones.

8  Q    Was American Express concerned about steering by

9  unmanaged merchants, generally the smaller merchants?

10  A    Yes.

11  Q    And do they have a term for this?

12  A    Well, they talk about, I mean, suppression and generally

13  suppression in different American Express documents mean

14  different things, but generally it's the concept of steering

15  away from American Express.

16  Q    Can you explain what you take from the document that is

17  on the screen here on this slide?

18  A    So the document is something where American Express was

19  assessing the results of value recapture and assessing the

20  profitability and the particular parts I've highlighted that I

21  wanted to focus on and it shows that American Express was, in

22  fact, concerned when they raised the price, they were

23  concerned about losing volume, which is what you would expect,

24  and when they looked at unmanaged merchants, there were two

25  components of that concern.

*Katz - Direct / Conrath*                                      3848

1          So one, they realized that by charging higher prices

2     that some merchants would stop accepting American Express and

3     that's when they talked about incremental cancellations.  So

4     they determined a particular number, which I won't say, of the

5     merchants, of the unmanaged merchants they thought were

6     canceling because of the higher prices and then that had a

7     financial impact which is shown in that number in parentheses

8     which had to be balanced against the gains which is something

9     we'll talk about later.

10         What's notable here too though is there's a second

11    component of that where they talk about the break-even

12    incremental suppression rate and what they're doing there is

13    they're identifying a rate at which they say wait, if there's

14    more steering than this, this will be an unprofitable

15    initiative.

16         So they're taking both of those sources of demand

17    response of this into account, and then what it's showing in

18    the other box is they've concluded two things; one, that

19    incremental suppression is difficult to measure.  Remember

20    these are small merchants, so it's hard for them to see what

21    was going on, but they said that they were reasonably

22    confident that they're not close to the break-even.  At the

23    end they said look, we're not sure what their -- their best

24    assessment was that they were below that, but their takeaway

25    point from here is that the possibility of steering and

Katz - Direct / Conrath                    3849

1  suppression was something they had to look at and consider

2  when thinking about is it worth it to raise price.

3  Q    So this document we're looking at addresses unmanaged or

4  smaller merchants.  Now I'd like to ask about the larger

5  managed merchants.

6         Did Amex keep track of how these managed merchants

7  responded to the price increases associated with the value

8  recapture initiative?

9  A    Yes, they did.

10 Q    Can we have the next slide, please?

11        What does this document show?

12 A    Well, in some sense what it shows is what's not on there,

13 and in that sense I need to say that this document is just a

14 representative document of other ones telling a similar story,

15 and if you look at the callout here, it mentions the ISSUE of

16 retention or of losing merchants and it says in this case for

17 this particular organization, which is part of American

18 Express which deals with the very largest merchants, that in

19 fact there were no losses, but it is something they were

20 tracking and they were potentially concerned with and, okay,

21 but in this particular case they didn't.

22        What's notable is there's no mention of any sort of

23 incremental suppression or any concern with that and that's

24 not surprising because they had the anti-steering rules in

25 place, and then this document's also noting, as a result, the

Katz - Direct / Conrath                    3850

1   value recapture was profitable.

2   Q    And that's this particular element of value recapture,

3   that amount on this slide?

4   A    That's right, this particular one, and then if you look

5   more broadly for managed merchants that they generally found

6   that few, if any, dropped and I didn't see any concern with

7   incremental suppression.

8   Q    So in sum, how does Amex's ability to implement value

9   recapture relate to the anti-steering rules?

10  A    Well, had there not been anti-steering rules, one would

11  have expected to see the managed merchants engage in

12  incremental suppression and then American Express would have

13  had to take that into account and when they asked themselves

14  the question is it worth it to raise prices or will we lose

15  too much business, there would have been another source of

16  substitution away from American Express that would have been

17  another source of competitive pressure to hold prices down.

18  Q    All right.  Could we switch the monitor again, Your

19  Honor?

20              THE COURT:  Public?

21              MR. CONRATH:  Yes, to public.

22              (The above-referred to exhibit was published.)

23              MR. CONRATH:  And can we have the next slide before

24  we do?  I'm sorry, I got that backwards.  I apologize, Your

25  Honor.

1  Q    So looking at this next slide, is it -- could merchant

2  steering have been used to respond to the value recapture of

3  price increases?

4  A    I mean, certainly it could have in principle and we would

5  have expected it to have an effect, and what this slide is

6  showing is that earlier at trial, an executive from Southwest

7  is testifying that in fact had they had the chance to do it,

8  they would have tried to use steering to, as he said, mitigate

9  the price hike that they were getting from American Express.

10  Q    And could merchant steering be used in the future if

11  there were price increases if merchant steering were allowed?

12  A    Certainly.

13  Q    Next slide, please.

14            What do you conclude, Professor Katz, from these

15  three instances of steering and price increases about the

16  impact of American Express's anti-steering rules on

17  competition?

18  A    So the bottom line is that the anti-steering rules harm

19  competition on the merits and they do so substantially, and we

20  saw that with Discover where one of the factors when they were

21  abandoning this strategy of being particularly low-priced to

22  merchants in the face of the -- of anti-steering rules; saw it

23  in the case of the preference campaigns and preference

24  relationships that these things can -- that such relationships

25  can be effective in moving share and that they can create and

Katz - Direct / Conrath                     3852

1   do create competitive pressures and pressures to respond by

2   competing on the merits; and lastly, value recapture is

3   illustrating just sort of the detailed mechanism by which

4   steering takes away one of the avenues of competition.

5   Q    So you've told us that the anti-steering rules lead to

6   higher prices to merchants.

7          Could the higher prices affect prices to cardholders

8   on the other side of the platform?

9   A    Yes, they could.

10  Q    And in what way?

11  A    Well, remember these are two-sided platforms.  So we need

12  to keep track of what's going on on the other side of the

13  platform, see how these interact, and when -- when merchants

14  are being charged higher prices, that can give the credit and

15  chargecard networks incentives to then give lower prices to

16  the cardholders.  Think about it in terms of rewards because

17  when we start talking about negative prices, at least I get

18  confused.

19         So it works this way.  If I'm charging the merchants

20  more, gives me incentives to give bigger rewards to my

21  customers.  Why am I doing that?  Well, because the higher

22  rewards are going to get them to use their cards more, and

23  since I'm charging the merchant more money, every time I

24  succeed in getting my customer to use the card more, I'm

25  getting more money.  So economic principles will tell us that

Katz - Direct / Conrath                          3853

1   if the networks are charging higher prices to merchants, some

2   of that's going to get passed on to the cardholders.

3   Q    So does American Express pass through all of the merchant

4   discount that it collects to cardholders?

5   A    No, they don't.

6   Q    Next slide, please.

7         How do you know that?

8   A    Well, one thing is American Express says so.  This is a

9   statement by their CFO, I guess this is an investor call or

10  investor conference.  I apologize, I can't remember which.

11  But anyway, it's a statement by their CFO pointing out that

12  they pass some of it on, but that they, as it says, part of it

13  we drop to the bottom line, which of course there's nothing

14  wrong with that, they're in the business to make money, but it

15  is a fact they keep it.

16        It's also true if you look at data for their rewards

17  expenses, that's something that there's some dispute among the

18  economic experts in this case on the exact numbers, but I

19  think there's no disagreement that rewards payments are well

20  less than half of the discount rates, significantly less, and

21  it's certainly my view that if you look at, and my conclusion,

22  if you look at value recapture that when American Express

23  raised the prices they were charging the merchants, they did

24  not pass that through to cardholders.

25  Q    What does economic theory tell us about whether a

Katz - Direct / Conrath                          3854

1    network's higher prices to merchants resulting from

2    anti-steering rules would be passed through to cardholders?

3    A    So your question's bringing up is one of the things that

4    when we talk about higher prices to merchants and what the

5    effects are on cardholders, it depends in part on why the

6    prices are higher and if the prices are higher as we're

7    talking about here because the merchants' ability to respond

8    has gone down.  So one side of the market now is less

9    responsive to price, that's why the price is going up to

10   merchants, economic theory says the networks are going to keep

11   some of that for themselves.  They're not going to pass it all

12   through because they're taking advantage of the fact that

13   demand is less responsive to price, and so there's a clear

14   prediction that that's what will happen.  That in this

15   particular case, there will be less than a hundred percent

16   passthrough, and as I said, in fact the evidence indicates,

17   there's less than a hundred percent passthrough.

18   Q    So you've said that American Express does not pass

19   through a hundred percent of the merchant fees to cardholders.

20         Assume that it were true that a hundred percent of

21   the higher prices caused by the anti-steering rules were

22   passed through to Amex cardholders, does that mean that

23   merchants and their customers are not harmed?

24         And I think we need the next slide here.

25   A    No, it doesn't.  If you think about it, what this slide

1   is summarizing is that the anti-steering rules are going to

2   raise merchants' costs, okay, first off for the reasons we

3   talked about that there's less competition among credit and

4   chargecard networks and also even taking the prices as given,

5   even ignoring that aspect of generally raising charges to

6   merchants, you've also got the thing that the rules stop

7   merchants from pointing or steering their customers to cheaper

8   chargecards or cheaper credit cards, okay, and those two

9   effects then are going to result in the merchants having

10  higher costs of accepting appointments and then they're going

11  to -- an economically rational merchant is going to pass that

12  on to its customers.

13          Now, exactly which ones it passes it on to depends

14  on how much it engages in any sort of targeted discounting or

15  charging different prices for different payment instruments,

16  but generally merchants are charging the same price for

17  everything.  So what's going to happen is prices are going to

18  go up with the merchant for everybody, including people who

19  are not using American Express cards, and those customers are

20  going to be worse off.

21          So for example, if you're somebody who is going into

22  a merchant and you always pay with cash or you always pay with

23  a debit card, you're going to be paying higher prices and the

24  fact that some or all of the credit card users are getting

25  rewards is not going to help you.

1  Q    So Professor Katz, summing up on the actual adverse

2  effect question, is it your opinion based on the actual

3  adverse effect approach that the anti-steering rules have had

4  an adverse and have an adverse competitive effect?

5  A    Yeah, it's my conclusion that they have an adverse -- you

6  know, they have had, as you said, an adverse competitive

7  effect and that they continue the do so.

8             THE COURT:  Professor Katz, in other places, Europe,

9  Asia, wherever, where they may not have these anti-steering

10  provisions in these agreements in those places that exist, is

11  there evidence that at the place of sale there is a

12  differentiation between the price for cash purchases and

13  credit or debit card purchases?

14             THE WITNESS:  So at a broad level, they're

15  actually -- the distinction between cash and others, sometimes

16  we see even in the U.S. because legally the firms have the

17  right to do, and you see that often in gas stations, but the

18  one I'm familiar with another country would be Australia where

19  they allow very targeted steering.

20             And one thing I should distinguish between the

21  United States and this case and Australia, Australia in fact

22  allows merchants to put surcharges on particular networks, and

23  in Australia merchants have used surcharges and the threat of

24  the surcharges has certainly been seen to have had an effect

25  on how credit and chargecards are priced.  So they've been

1   very particular.  They would say if you use this particular

2   credit card, this is the price you're going to pay and if you

3   use a different one it's this and if you use debit it will be

4   yet another price.  So they have made use of the targeting and

5   the steering when they've had the ability.

6   BY MR. CONRATH:

7   Q    Professor Katz, do you happen to know whether there's

8   some version of the anti-steering rules for American Express

9   in Europe or Asia?

10  A    No, because sitting here -- I may know it, but not as I'm

11  sitting here, I can't remember.

12  Q    Professor Katz, does that complete your presentation of

13  adverse anticompetitive effects using the actual adverse

14  effect approach?

15  A    Yes, it does.

16  Q    All right.  Next slide, please.

17       If we recall your diagram that describes your

18  framework, is the market power approach an alternative method

19  of analyzing adverse effects that could result from the

20  anti-steering rules?

21  A    Yes.

22  Q    Next slide, please.

23       (Continued on following page.)

24

25

Katz - Direct - Conrath                    3858

1   Q    Can you provide the Court with an overview of the steps

2   involved in implementing market power,

3   A    Yes, that's exactly what this slide does.  And we'll be

4   walking through them, but our first step is to define the

5   relevant markets; and then once we've done that, we'll analyze

6   market power in that, the markets we defined in that

7   framework, and then we'll turn to the last step of identifying

8   whether competitive effects are likely, given the market.

9          MR. CONRATH:  Next slide, please.

10  Q    Let's talk about this first step.  Were you able to

11  define product markets in this case?

12  A    Fortunately, yes.

13         MR. CONRATH:  All right.  The next slide, please.

14  Q    What two candidate relevant product markets did you

15  consider?

16  A    I considered two candidates; the ones shown in the slide,

17  the one that's a general purpose credit and charge card

18  network services provided to merchants, to T and E merchants,

19  which is travel and entertainment, in the United States.  And

20  then the other one was general purpose credit and charge card

21  network services provided to merchants overall in the

22  United States.

23  Q    Did you conclude, based on your analysis that these two

24  markets were well-defined relevant product markets?

25  A    Yes, I did.

Katz - Direct - Conrath                3859

1    Q    Do you understand that there's agreement among the

2    parties here that the United States, as far as the geographic

3    market of the United States, is a relevant geographic market?

4    A    Yes.

5    Q    That's not a matter of dispute?

6    A    Yes.

7    Q    Is there a generally accepted methodology used by

8    economists to define relevant markets in antitrust cases?

9    A    Yes.

10   Q    What is it called?

11   A    It's called the Hypothetical Monopolist Test.

12   Q    Is it widely used?

13   A    Yes, it is.  It's widely used in court cases.  It's also

14   enshrined in the horizontal merger guidelines which are issued

15   by the Department of Justice and the Federal Trade Commission

16   jointly.

17   Q    So before we get into the mechanics of the Hypothetical

18   Monopolist Test, could you explain to the Court what

19   fundamental economic concept the Hypothetical Monopolist Test

20   seeks to capture?

21   A    It's trying to get at the notion of what goods or

22   services are reasonable substitutes, and it's giving us a

23   structured way, to answer the question, about what makes the

24   substitutes reasonable.

25   Q    Why is it important to evaluate whether products are

Katz - Direct - Conrath                    3860

1   reasonable substitutions for each other?

2   A    Well, substitution is essential to understanding

3   competition, because the way competition works suppliers of

4   different goods are trying to get the buyers to substitute

5   among them.  And so then we've got this question, we want to

6   understand substitution, and that's going to help us

7   understand competition.  But there are lots of degrees of

8   substitution.  You think about it, you know, bicycles and

9   automobiles are substitutes.  Especially, in San Francisco and

10  New York, you take your life in your hands, in both cities.

11  But if bicycle and automobiles are substitutes for some

12  purpose for many people, but you wouldn't want to conclude

13  competition from bicycles are stopping automobile

14  manufacturers from raising their prices, while their

15  substitutes are just not close enough.  What we need is a way

16  of deciding how close is close enough.

17  Q    So what is the goal of the Hypothetical Monopolist Test?

18  A    Is to answer that question, is to have a way of saying,

19  well, which substitutes do we need to include, because those

20  are essential to understanding competition and which we hold

21  aside.  They still may be substitutes and they still may have

22  some effects, but we don't have to include them in those

23  relevant markets to get an assessment of what's happened.

24  Q    Can you give the Court an example of how the Hypothetical

25  Monopolist Test might be used?

Katz - Direct - Conrath                    3861

1    A     For example, if you had two beer producers that were

2    going to merge, you would want to know what relevant market

3    they're in, and you might observe that wine and beer clearly

4    are clearly substitutes for many people; and you'd want to ask

5    the question, then, well, are wine and beer sufficiently close

6    substitutes it would put them in the same relevant market.  Or

7    should we conclude that beer alone is the relevant market,

8    and that could give you a the different view of the affects of

9    that merger, because you would be wondering, well, how much

10   competition would the merging parties be getting from

11   elsewhere.

12   Q     Is the relevant market supposed to include all of the

13   substitutes for a given product?

14   A     No, and that's why the Hypothetical Monopolist Test is to

15   help us draw the boundary.  But it's important to recognize

16   that when you do the Hypothetical Monopolist Test, first off,

17   you're not trying to put everything in.  And, second of all,

18   when you do it, it doesn't mean that you should exclude from

19   your analysis considering the effects of what's outside it.

20   In particular, when you're looking at actual market outcome --

21   actual market outcome is nobody saying, well, this is the

22   boundary of the market, therefore, we're going to somehow do

23   something different.  So when you're looking at market data,

24   you're sort of automatically seeing both what's going on in

25   the market, but any outside influences are also going to be in

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                          3862

1    your data analysis.

2    Q    So you said earlier that, for example, wine is for some

3    people or, in some sense, a substitute for beer.  Does that

4    mean that beer and wine belong in the same relevant market?

5    A    No, that by itself is not.  You'd have to go through and

6    do an application of the Hypothetical Monopolist Test in order

7    to determine whether they're close enough substitutes.

8              MR. CONRATH:  Can we turn to the next slide, please.

9    Q    How does Hypothetical Monopolist Test work?

10   A    Okay.  So this slide is going on set out the mechanics of

11   it.  We start with a Hypothetical Monopolist, hence the name,

12   or you can also think of it -- it's sometimes called a

13   hypothetical cartel.  And the idea is monopolist or cartel

14   controls the candidate set of products, and then we ask the

15   question, well, if that Hypothetical Monopolist existed, would

16   it be profitable for that monopolist to impose -- and this is

17   a term much beloved by economists, snip -- a small by

18   significant and non-transitory increase in price above the

19   competitive level.

20             So will the monopolist find it profitable to raise

21   the price above the competitive level?  And if the answer is

22   yes, then those products constitute a relevant market.  If the

23   answer is no, then you've got to look for something still

24   brooder.  And the thing about it -- the reason why this is a

25   sensible way to do it is what we're saying, look, if a

NICOLE CANALES, CSR, RPR

1   Hypothetical Monopolist controlling these products could raise

2   price -- and that's why it has these caveats about

3   significantly and not just for a day.  But if it could raise

4   price significantly, that tells you that competition among

5   these products really matters.  And if the competition among

6   these products is harmed, it can result or will result in

7   higher prices.  And so what it's getting at, then, is saying

8   how many products do we have to consider to understand when

9   competition among them really matters.

10          MR. CONRATH:  Could we turn to the next slide,

11  please.

12  Q    Could you explain for uses how the Hypothetical

13  Monopolist Test applies to credit cards numbers?

14  A    Okay.  So what I've done here, on a slide, is shown the

15  step you start with, with the candidate market, where you say

16  let's consider, and we said the candidate market is going to

17  be credit card network services.  I already said there's going

18  to be two, but at this level it's the same principle.  We

19  considered a hypothetical credit network monopolist.  It has

20  the rules in place and it raises price to merchants, and then

21  we ask the question would that price increase be profitable?

22  And if the answer is yes, then that's telling us, by applying

23  this test, that the credit card network services to merchants

24  do, in fact, constitute a relevant market.

25  Q    So in the case of the credit card networks, this

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3864

1  hypothetical monopolist would consist of which firms?

2  A    So it would be Visa, American Express, MasterCard and

3  Discover.

4  Q    And just credit card operations?

5  A    Credit and charge card operations, yes.

6  Q    What determines whether a price increase would be

7  profitable?

8  A    Well, we've been talking about it.  It depends on what

9  the quantity response would be.  When the Hypothetical

10  Monopolist raises the prices of its network services, it's

11  going to be more profitable the less quantity response there

12  is, the less responsive demand.  So the question comes down to

13  how responsive would demand be to this price increase, how

14  much would demand fall when prices went up.

15  Q    When you say much would the required response be, you're

16  talking about people would buy less if the price is higher?

17  A    Yes, in particular here, the monopolist would raise

18  prices, and it would see that the use of credit and charge

19  cards, the charge volume falls as a result of the higher

20  prices.

21  Q    When you say merchants might substitute away, how might

22  merchants substitute away and lead to a fall in credit card

23  volume?

24  A    Well, because it's a joint decision, it's really got to

25  be the merchants and their customers jointly substitute away,

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3865

1  and there's two -- but merchants, of course, are the ones who

2  are going to want to initiate this because they're the ones

3  facing the higher prices, and there's two ways they can think

4  about doing it, given that it can't steer -- or ability to

5  steer is very limited.  One is there's certain kinds of

6  discounts they do have the legal right to offer.  And we'll

7  talk about it in a second.  There's certain kinds of

8  untargeted discounts.  And I'm hesitant to say they're Durbin

9  discounts.  I know you've heard a lot about Durbin, perhaps

10  more than you care to.  But, your Honor, we're going to have

11  to hear a little bit more --

12          THE COURT:  Mr. Conrath warned you about that?

13          THE WITNESS:  Yes.

14          THE COURT:  That's all right.  You're in a different

15  category.

16          THE WITNESS:  Thank you, your Honor.  I'll try not

17  to abuse the privilege.  But one thing, there's certain kinds

18  of untargeted steering that you do.

19          MR. CONRATH:  And could we switch the monitor?

20          THE COURT:  One minute.

21          THE WITNESS:  Untargeted steering, they can do, and,

22  really, the focus is going to be on the other thing a merchant

23  can do, is stop accepting credit and charge cards, because,

24  clearly, if it doesn't accept them, its customers can't use

25  them.

Katz - Direct - Conrath                                3866

1    Q    Tell us what you take away from this slide about

2    untargeted discounting or Durbin discounting?

3    A    Well, let me step back before I talk about the slide.

4    The problems with untargeted discounting, the central problem

5    is this, you can come get someone -- they can come into your

6    store and say, okay, we have a sign up that says if you pay

7    with a debit card, it costs less.  The problem with that from

8    the merchant's perspective is there's a bunch people that will

9    use debit cards anyway, and you're going to have to give them

10   the discount even though they're not doing anything

11   differently.

12          The Durbin amendment doesn't give you the right to

13   say if you were going to use a credit card, I'll give you a

14   discount for using a debit card.  It has to just say I will

15   give you discount for using a debit card no matter what.  And

16   so it's untargeted, and that makes it a lot less cost

17   effective for merchants, mainly giving discounts to people who

18   didn't need it, and, particularly, because merchants don't

19   think that many people are going to switch from credit to

20   debit.  They're saying we're giving a lot of people discounts

21   who don't need it; they're losing money, and we don't think

22   we're actually going to swing that many people from credit to

23   debit, so it's not an effective way for them to do it.

24          And what this is showing here is an American Express

25   slide, thinking about how merchants could react to some

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3867

1   changes in what's available to them.  And what you see, one

2   call is talking about the holistically discount debit versus

3   all credit, because American Express, in its documents,

4   recognizes this distinction between targeted discounting and

5   what they call holistic or untargeted discounting, so they

6   recognize holistic discounting is less effective.

7           And then the other call-out is saying -- making this

8   point, saying, look, you're going to offer discounts or

9   incentives on your existing debit purchases, so they're saying

10  these are the people who are going to use debit anyway.

11  You're going to be giving them a discount; that's going to be

12  losing money, from the perspective of the merchant.  And then

13  the next bullet is questioning whether you would convert

14  enough of your customers from credit to debit to make it worth

15  it.  So this slide is showing that they recognize the logic,

16  and, in fact, we've seen limited uses of such kinds of

17  discounting, which is not surprising given that it's such a

18  blunt instrument.

19  Q    So what's your conclusion about whether untargeted

20  steering would be a significant response to a hypothetical

21  monopolist who raised prices?

22  A    My conclusion is it would not be a major response.

23  Q    Is there another way that merchants could substitute away

24  from credit cards?

25  A    Yes.  And that would be -- as I mentioned just a little

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3868

1    bit ago, that would be to actually drop credit card, to stop

2    accepting them, because by definition, their customers

3    couldn't use them.

4            MR. CONRATH:  Could we switch back to the public

5    monitor, your Honor?  And the next slide.

6    Q    What does this slide show, Professor Katz?

7    A    This slide is intended to provide a way of visualizing

8    what the merchant's decision would be when thinking about

9    would it make sense to respond to the price increase by no

10   longer accepting credit and charge cards.  And so the

11   merchants going to think about what would happen if I stopped

12   accepting credit cards?  Well, the motivation for doing it is

13   you would hope that there are people who were using credit

14   cards before, who would continue to make purchases from you,

15   but now would use something else.  And so that box that's

16   labeled "payment switching volume" is to capture that idea;

17   that there's some set of your customers who -- when you don't

18   take credit cards, they'll switch to something else.  And

19   we're going to measure them, though, in terms of dollar volume

20   because that's money, and that's how you pay for credit and

21   charge card network services.

22            And then what we ask, well, what good does it do the

23   merchant, that people have switched to something else?  Well,

24   the good it will do is labeled here on the rate deferential.

25   So if the other payment mechanisms are cheaper for the

Katz - Direct - Conrath                     3869

1    merchant, they will say, well, some volume of people will

2    switch; they'll switch to something cheaper, and that's the

3    game.

4            Now, there's another side to it as well, though, and

5    that is that the merchant will be concerned that some of its

6    customers, when it sees that it doesn't accept credit and

7    charge cards, instead of switching to something -- another way

8    of paying, instead they'll switch to another merchant.  Or

9    they'll continue to shop at that merchant but they'll spend

10   less.  And that's what I have here labeled as "insistence

11   volume," because it's saying they're insisting on using credit

12   and charge cards.  So those are sales that the merchant's

13   going to lose by making the decision not to accept credit and

14   charge cards.

15           And then we have to ask, well, when you lose those

16   sales, how bad is that?  And that's going to depend on what

17   the merchant's profit margins was on those sales.  What the

18   merchant's then going to do, then, is say here's the volume

19   I'm going to lose, here's how much money I was making as a

20   percentage of those sales, and I'll balance those two things

21   against each other to see whether at these price it makes

22   sense to drop credit and charge cards.  And what I've done is

23   on the next slide -- we'll show on the slide how should

24   numerical examples that can help make that more concrete.

25   Q    Could you walk us through this numerical example?

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3870

1  A    I put some numbers on it, and so, here, let's think about

2  it's a merchant with a thousand dollars in sales on credit

3  cards.  And what the merchant is determined that if it stops

4  accepting credit and charge cards that $800 of that thousand

5  dollars sales will -- it will continue to make that.  Those

6  people still shop there; they'll use something different.  And

7  not only that, but what they use different will be two

8  percentage points cheaper, 200 basis points.

9            So the merchant will perceive a gain from shifting

10 people of $16; however, as you can see below that, we got to

11 talk about the other $200, and that, in this example, is the

12 insistent volume and that's sales volume that the merchant

13 will lose.  And, here, we're taking the example of a merchant

14 that was earning a 20 percent margin, so those $200 of sales

15 didn't cost the merchant the full $200, because when it lost

16 the sales, it also didn't have to buy whatever the goods and

17 services were.  But you can see, even the 20 percent margin,

18 the loss here is far greater than the gain; because even

19 though the merchant is retaining most of the sales and getting

20 to switch to something cheaper, the problem from the

21 merchant's perspective is losing volume is a big problem

22 because of the 20 percent.

23 Q    Can we look at the next slide for another numerical

24 example?

25 A    Okay.  So in this example, I've actually changed a couple

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                     3871

1    of numbers, so first off, you'll notice that now the merchant

2    retains an even higher percentage rate.  95 percent of the

3    volume switches from one payment to the other but stays with

4    the merchant, and the merchant only loses 5 percent of $50 out

5    of a thousand.  And then the second thing that's changed here

6    is now the rate differential is one percentage point rather

7    than two.

8            So consider an example where the merchant saves less

9    money when somebody switches from credit and charge card

10   networks and something else, and also doesn't lose very much

11   volume percentage wise.  But you'll see, even in this example,

12   when we calculate it out that the 1 percent of $950 is 950,

13   and the 20 percent of $50 is 10.  So even in this case, where

14   only 5 percent of the volume is insistent, the merchant is

15   still worse off dropping credit and charge cards.

16           And so this is, you know, a key driver, then, of the

17   merchant's decision making.  And what's -- the reason these

18   numbers come out the way they are, so striking, is often

19   because the merchant's margin is large relative to the rate

20   differentials we're talking about.  So you don't have to lose

21   very much business in order to conclude as a merchant the

22   economically rational thing to did is to keep accepting credit

23   and charge cards, even if they're more expensive than other

24   payment instruments.

25   Q    How would your analysis change here if the merchant's

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                      3872

1   margin was larger than 20 percent?

2   A    If it were larger, then the loss would be even bigger.

3   And, in fact, an even smaller percentage of insistence volume

4   would also deter the merchant from dropping credit and charge

5   cards.

6             MR. CONRATH:  Could we switch the monitor,

7   your Honor?  And could we now switch the slide?

8   Q    Does American Express use the logic that you've just

9   walked us through on the previous slides?

10  A    Yes, they do.  And the slide here is a presentation for

11  Alaska Airline, in which American Express is essentially

12  explaining this logic.  Because what they're doing -- you see,

13  actually, they have -- in Line D, they talk about the rate

14  deferential.  One thing I should say, American Express is

15  interested in what happens to America Express' prices, not

16  with credit and charge card pricing, generally.  They're not a

17  hypothetical monopolist of all credit and charge card

18  networks.

19            But what this is, showing the logic, American

20  Express is saying to the merchant, in Line D, here's the rate

21  differential.  If you were to stop taking American Express,

22  here's a number for how much you could save when volumes

23  switched.  And then they're saying here, is they're saying,

24  well, suppose all of your volume on American Express, which is

25  line A, suppose all of that volume switched, you would get

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3873

1  that volume times the rate differential "D", that number, and

2  that then that Line E is telling you how much money you would

3  be saving.  Okay.  So that's the same concept as the green

4  boxes we've looked at before.  But then what American Express

5  is also saying here, to this airline, saying, look, you have a

6  high margin on your incremental sales.  When you lose American

7  Express sales, those are sales you were making a lot of money

8  on, and think about that, too; you were going to fly the

9  planes anyway, you've got the same crew, etcetera.  And so

10 that number in "F", as you can see, is much higher than the

11 number I used in my example.

12 Q    It's higher than 20 percent, in other words?

13 A    Yes, it is.  And as a result of that, what American

14 Express is saying here in Line G, is they're saying, look, you

15 do not have to lose much volume at all.  And you can see Line

16 G is a small fraction of Line A.  They're saying you really

17 don't have to lose very much volume in order to include.  In

18 this case, that you should continue to accept American

19 Express.  But this is the same logic you would say to a

20 merchant, this is why you should continue to accept credit and

21 charge cards, even if they're more expensive.

22 Q    So you've told us that American Express uses this logic

23 that was laid out in previous slides.  Do merchants actually

24 think this way?

25 A    Yes, certainly, some do.  Some of them, in fact,

Katz - Direct - Conrath                    3874

1    calculate this out and spend a fair amount of effort to try to

2    figure out these rate points.

3    Q    So you've told us that a merchant doesn't have to lose

4    very much volume in order for it to be unprofitable if it

5    drops credit cards, even if they're more expensive than other

6    payment forms.  What determines how much volume a merchant who

7    lose if it stopped accepting credit cards?

8    A    This is where we have to look at both sides of the

9    platform, because that's going to be driven by the merchant's

10   customers' preferences.  And so what will matter to the

11   merchant is how much its customers insist on using credit and

12   charge cards.

13        MR. CONRATH:  Next slide.  And we can switch to the

14   public monitor now.

15   Q    So did you consider how much various payment forms mean

16   to customers and why?

17   A    Let me answer the question about why consider this.  Step

18   back for a moment.  So the question we're asking here is would

19   a credit and charge card monopolist, the hypothetical

20   monopolist, find it profitable to raise prices at the

21   competitive level?  And what we said is that untargeted

22   discounting is not going to put significant pressure on the

23   monopolist prices, so if something is going to stop the

24   hypothetical monopolist from raising its prices profitably,

25   it's going to be that merchants stop accepting credit and

Katz - Direct - Conrath                           3875

1   charge cards.

2        So then we just talked about what goes into the

3   merchant's calculation of whether to stop accepting credit and

4   charge cards?  It asks itself how much business will I lose?

5   And then it multiplies by the margins and the deferentials,

6   but, fundamentally, one of the things it has to determine is

7   how much business will it lose if it doesn't take credit and

8   charge cards?  And the answer so that question depends on what

9   its customers are going to do.  They're the ones making the

10  decision we'll either switch to another payment instrument or

11  we'll just stop purchasing from the merchant.

12       And so that's why the next step in my analysis is to

13  look at what customers think of different payment instruments

14  and how close they think they are as substitutes.  But a

15  really critical point here is we're not worrying about the

16  customer's decision just understand their decision; we're

17  worrying about the customer's decision to understand what it

18  means for the merchant.  And what's critical for the merchant,

19  when its making an acceptable decision is, is there a core --

20  a hardcore set of credit card users?  And so that's really

21  what we're trying to get at, because if there is -- even if

22  most people say I don't care how I pay, if there's a core of

23  people who do care and are loyal to credit cards, that means

24  that the merchant's going to find it economically rational,

25  profitable or just sensible to continue accepting credit and

Katz - Direct - Conrath                    3876

1   charge cards.  So this analysis coming up is really trying to

2   get at the question would there be a core of customers that

3   the merchant would lose?

4          THE COURT:  But that's a static consideration;

5   that's today.  But it has evolved.  Whatever it is, it's

6   evolved, and it could evolve from what it is today to

7   something else, depending upon what the rules are in the

8   future; isn't that right, too?

9          THE WITNESS:  Certainly the markets could continue

10  to evolve, yes, that's right.

11         THE COURT:  And the question to the Court to some

12  degree will be so that's the situation today.  If the rules

13  for the structure changes, how will that permit it to evolve

14  in certain ways that promote competition or that promote

15  monopolization?

16         THE WITNESS:  Uh-huh.  That's certainly correct --

17         THE COURT:  Even though the issue for this case is a

18  restraint in trade, there are issues having to do with how the

19  public or the customers view their choices.  But this could

20  be -- you know, those considerations can change and evolve

21  over time, depending on how the public views the use of credit

22  cards in the future.  There's been an education that's been

23  provided, and the question -- one of the questions is that

24  education is one thing, but what about how public will be

25  educated in the future?  And the public is being educated in

Katz - Direct - Conrath                    3877

1  ways that were never even conceived of 20 years ago, if you

2  just look at the way information is provided to the public

3  using electronic means today.  So there are a lot of issues

4  here that are not static, you know, they're a constant --

5  there's a constant evolution in the public perceptions.  So I

6  just point that out to you.  I don't know how you would

7  measure that as an economist, but it is a consideration.

8          THE WITNESS:  I certainly agree, your Honor, that

9  it's a consideration.  But also to speak to your question

10 about how the market will evolve, it's my conclusion that in

11 the absence of the anti-steering rules -- the market will

12 evolve in many different dimensions, but that creates

13 competitive pressures stimulating more favorable evolution of

14 the industry.  For example, when steering is possible, credit

15 and charge card networks will face greater competitive

16 pressures, and that gives them incentive to innovate and try

17 to figure out how do I deal with the changing market

18 conditions, given that now if I don't keep up with the times,

19 merchants can steer their customers away from it.  It actually

20 creates greater incentives for them to innovate.

21          You're also right it's difficult for anyone to

22 forecast what the market will look like 20 years from now.

23 Certainly, we can go back and look at the role of credit cards

24 and how it -- you know, it's increased -- it increased over

25 time.  Things have changed.  We'll see in just a few minutes

Katz - Direct - Conrath                    3878

1    how people don't use checks anymore.  Yes, things do change,

2    but I think there's every reason to believe the credit and

3    charge cards are going to continue to be important for many

4    years to come.  One of the things people talk about as well,

5    they say, well, aren't all these sort of online services, and

6    PayPal and things like those coming along?  But those

7    services, generally, are piggybacking on credit and charge

8    card networks; they're piggybacking on debit networks.  In

9    fact, that was one of the things I was asked to speak about.

10           They said what's the future of things?  Aren't

11   mobile phones going to replace credit cards?  My conclusion, I

12   said, well, in a narrow sense that might be right.  You might

13   use your phone and swipe at a merchant, you can do that,

14   instead of the piece of plastic.  That's not what the

15   important issue is.  The important issue is are you still

16   using the credit card networks to do this?  Are you still

17   using the banks?  No offense, but you and I are old enough, I

18   think, to remember the days of the charger plate, where you

19   had the physical machine, where you give the merchant your

20   credit card and they ran the plate over to take a paper --

21   okay.  They don't do that anymore.  Now, we've moved to

22   electronic, but it's still the same network.  It's just

23   they're upgrading their technology.

24           And things like mobile phones, it's the same thing;

25   yes, phones can play an important role in the different

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3879

1    technologies and PayPal's trying to do things, but it's still

2    building on the same structure.  In fact, we've seen this with

3    the mobile phone companies; they thought they would create

4    some sort of alternative, which, unfortunately for them, they

5    named Isis, so they just recently had to change the name.

6            THE COURT:  Sounds like a good idea.

7            THE WITNESS:  And there's an obvious reason they

8    changed their name.  It just hasn't worked out, because I

9    think what we're seeing instead is that Visa, and MasterCard

10   and American Express are figuring out to evolve to use those

11   new technologies, but it's not that those technologies are

12   replacing them.

13           THE COURT:  We had a witness yesterday from American

14   Express, Mr. Silverman, who discussed a number of new products

15   that American Express is promoting to different segments of

16   the consumer community, which had different attributes that

17   are -- might be of a particular interest to those aspects of

18   the community.  And so it's clear that American Express is

19   working to find and promote products that will deal with the

20   needs of those elements of the consumer community, so they're

21   not letting grass grow under their feet either.  And I think

22   that, you know, some will work and some may not work, and then

23   they'll refine, and change and so forth.  So there's a certain

24   dynamic aspect of what this company is doing that is in

25   keeping with what you just said.  And you might be interested

Katz - Direct - Conrath                    3880

1  in reading that testimony before tomorrow, when I ask you

2  again about it.

3          MR. CONRATH:  While we won't communicate with the

4  witness, we'll leave a copy of that testimony where he can

5  read it.

6          THE COURT:  Go ahead.

7  Q    So just picking up on the question of education, if

8  merchants were free to steer their customers among payment

9  forms, among credit cards, would part of the ways merchants

10 might steer their customers involve educating those customers?

11 A    Certainly could be part of what they would do.

12 Q    So now let's take you back to the part where we were on

13 market definition.  I think you'd explained to us that the

14 question is -- for the merchant, the question can I drop

15 credit cards, which is a relevant question in market

16 definition, depends on is there a core of people who are going

17 to want to use credit cards.  Do I have that part right?

18 A    Yes, you do.

19 Q    And so you said, then, let's look at what customers think

20 about payment, the ways they can pay payment instruments.  I

21 think that's the point you were about to explain, and I think

22 the slide goes to that.  So if you could explain to us what

23 this tells us about customers --

24         MR. CONRATH:  Back up.  I don't think we've left

25 that slide yet.

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                          3881

1   Q     -- about what customers are looking for when they look

2   for a way to pay at a merchant.

3   A     Okay.  So what I put up here are four dimensions of

4   characteristics of different payment instruments that

5   customers would care about.  And one thing I would say about

6   these, your Honor, is these are the core dimensions, and I

7   think there's every reason to believe, at this level, these

8   are going to continue to be concerns.  They were concerns

9   30 years ago; they were concerns a hundred years ago, and

10  they'll be concerns or dimensions of differentiation, going

11  forward, for the next hundred years.  Now, how different

12  payment instruments score on these different dimensions, that,

13  of course, could change.  But these are the sorts of things

14  that customers are going to care about with any payment

15  instrument.

16          So the first one on the list is ubiquity of

17  acceptance, which is to say how widely can you use it?  Can

18  you use it where you want to?  And, for example, checks

19  increasingly suffer from that.  Second one is security, and in

20  the case of security, clearly there are differences.  Cash is

21  one of the least secure forms of payment, and that's true,

22  actually, certainly from the customer's point of view but also

23  from a merchant's point of view.  And if you look at debit

24  versus credit, you'll see that credit cards have different

25  legal protections, stronger legal protections than debit cards

Katz - Direct - Conrath                    3882

1   do, in the point of the view of the customer.  And then debit

2   cards also have the disadvantage from a security perspective

3   of if someone is able to break into your account, they have

4   access to your checking account; and that even if you're

5   protected financially, because some institutions choose to do

6   that; they go beyond the federally mandated protections and

7   they'll protect you from losses, you still may have this thing

8   that your checking account is frozen for a while and you're

9   unable to use it.  So there's security differences.

10          A clear difference is their credit function.  Credit

11  and charge cards, the money is not being taken out of your

12  account immediately; whereas with cash, you've got to take the

13  money out in advance; and with a debit card, the money is,

14  essentially, being taken out of your account immediately.  So

15  credit cards have this thing that they're providing credit,

16  which is also useful for some industries where they play the

17  role of a security deposit.  You do to a car rental company or

18  to a hotel, typically they want you to give them a credit

19  card.  There are instances where you can give them big piles

20  of cash, in the case of hotels, and there are some rental card

21  companies that will accept debit cards.  But, generally, they

22  want a credit card; it has a particular feature of a security

23  deposit.

24          And, also, of course, different payment instruments

25  differ in terms of any sort of ancillary benefits, and a big

Katz - Direct - Conrath                    3883

1    one, in the case of credit cards, is that they often come with

2    rewards.  So there are these different dimensions, along with

3    payment instruments matter and ones in which credit cards

4    stand out.  It's a credit function.  And then, also, they do

5    have very desirable security features, despite the fact that

6    we do see a lot of credit card fraud.

7              MR. CONRATH:  Could we turn to the next slide.

8    Q    And tell us what this slide shows?

9    A    Well, this is just -- just stepping back for a minute and

10   looking at very broad trends.  And what this is showing is --

11   again, looking at the bottom, we're looking at a period of

12   1990 to 2011, and what it's showing is just the share of U.S.

13   consumer payment.  It's saying, look, how much do people use,

14   different types of payment mechanisms.  And the blue line at

15   the top that has been plummeting for years is the use of

16   checks.  And we've seen that checks are being used less and

17   less.  And then the purple dash line at the bottom is debit

18   cards.

19             There's a strongest trends over this 20-year period

20   has been the demise of checks, coupled with the rise of debit

21   cards.  In fact, for many purposes, debit cards really replace

22   checks because debit cards give access to your checking

23   account, just the way checks did, but they do it more

24   conveniently.  They haven't completely replaced checks because

25   people use checks for making large payments, and people pay

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                3884

1   their credit card bills using a check, for example.  And

2   there's not the only thing replacing checks, because things

3   like electronic bill pay is replacing checks as well.  But the

4   big trend is debit.  The broadest level is that debit has been

5   replacing checks, and, in fact, debit cards were brought out

6   initially.  Visa called them Visa Check Card; they were trying

7   to train customers to think that way.

8          Now, the other thing you see is that cash's share

9   fell in the 90s, but cash is sort of holding its own; and that

10  credit share, with the exception of the dip for the Great

11  Recession, good credit has slowly been rising.  Part of that

12  is credit in some cases is replacing checks, but there has

13  been some growth as credit has fallen, that some of that has

14  been taken up by credit.  Now, you ask from that, you know,

15  does that mean, then, that credit and checks are competing

16  with each other?  Now, they're substitutes as a broad level,

17  will but it's sort of like asking the question is you're

18  thinking about going across the country, do trains and planes

19  compete?

20         If you looked historically, you'd see most people

21  went across the country using trains.  Now everyone flies.

22  There are still some people who would take a train, but it's

23  not a meaningful substitute for purposes of market definition

24  and for understanding competition, and that's the same

25  situation here; that these broad secular trends are not the

Katz - Direct - Conrath                              3885

1   same as saying how do consumers move around; how do they

2   switch their purchase decisions and what payments they use in

3   response to price change?

4   Q    Could you turn to the next slide and tell us what it

5   shows, please.

6   A    So, again, this is looking at long-term trends.  Now,

7   here, instead of looking at the shares, it's looking at the

8   amounts of moneys it spends on both.  And we can see here is

9   that both debit, the lower red line, and credit, the upper

10  line, have generally been increasing, increasing together,

11  except, of course, now familiar with the Great Recession,

12  where you see the debit -- credit drops significantly before

13  recovery, as the economy did.  So you see, though, that

14  they've both been growing.  It's a very different situation in

15  terms of long-term trends and checks, where you've seen debits

16  going up while, in terms of share, while check share is going

17  down significantly.  Here you see that both of them have been

18  growing in absolute volume overall.

19  Q    Did you also look at consumer use of payment instruments

20  at a more detailed level?

21  A    Yes, I did.  And the reason for doing that is it's going

22  to get out this question of, okay, you said, you know, payment

23  instruments can differ in terms of ubiquity, or security, or

24  these other things but do those differences matter?  And so

25  one way of getting at that question is to look to see do

Katz - Direct - Conrath                          3886

1   customers use different payment instruments in different

2   situations?

3   Q     And what does this slide explain?

4   A     The answer is they do.  In fact, if you think about it,

5   the typical customer uses a portfolio payment instruments,

6   which is to say you may have a single person who at some point

7   sometimes uses checks, sometimes uses his or her debit card;

8   sometimes pays with a credit card, sometimes cash, and so any

9   one person, depending on the situation, may use a variety of

10  different ways of paying.  And then what the second bullet is

11  pointing out is that that can evolve, matching the

12  characteristics of the payment instrument with characteristics

13  of the transaction.

14           So if you think about the characteristics of the

15  transaction, is whether it's a small or large one, so cash

16  works well for small transactions; you give someone a couple

17  dollars for coffee or whatever.  Also could be the location;

18  is it something that's near your house, or is it where you're

19  traveling?  That may affect how much flexibility you need to

20  how the payment works.  Is it face to face?  You can hand

21  somebody the cash or check, or is it remote?  Say you're

22  making an online purchase; is it something you planned or

23  something you did at the last moment?  So that's one thing

24  that customers will take into account when they're figuring

25  out which way to pay.

Katz - Direct - Conrath                    3887

1          The other thing that will matter is the customer,

2    him or herself.  Turns out, if you look, people behave

3    differently, depending on their education and their income,

4    their attitudes towards borrowing.  And another thing we see

5    is age.  This speaks to a point you were raising.  We see

6    younger people tend to use debit cards more, and there's

7    economic research emerging on this, but it's sort of when you

8    came of age that sort of affects your attitudes toward credit

9    and whether you think I should use a debit card to maintain

10   financial discipline, or whether you're somebody comfortable

11   using a credit card.  So all of those factors will go into

12   someone's decision what to use for a given transaction.

13   Q    Is there anything distinguishing about travel and

14   entertainment merchants in regard to customer tailoring of

15   payment choices?

16   A    Well, I mean, if you think about it, often we're talking

17   about transactions that could be relatively large

18   transactions, for example, or they could be transactions

19   you're undertaking for business, where you're hoping to get

20   reimbursed and, again, it's large.  Could be ones where you

21   were not somewhere where they know you and are happy to accept

22   a check.  One other thing I should say, a lot of them are

23   thinking about something like airlines, where a lot of it

24   nowadays would be an online transaction, similarly for hotels.

25          MR. CONRATH:  Could we switch the monitor?

Katz - Direct - Conrath                    3888

1   Q    Do you have some slides that illustrate some more of your

2   findings on consumer payment choices, Professor Katz?

3   A    Yes.

4   Q    Explain this for us, please.

5   A    This side is one that doesn't have time along the bottom.

6   If you look along the bottom, you'll see what it's identifying

7   are different buckets of transaction slides.  So if you look

8   on the left, between the zero and that first tick mark, it's

9   saying transactions that are greater than equal to $5 and less

10  than on equal to $25.  And then as you move to the right, the

11  transaction size is getting larger and larger.  And then what

12  the different colored lines are showing is what percentage of

13  that bucket is accounted for by a particular payment

14  instrument.  So if we take the bucket that's the smallest one,

15  the greater than equal to 5 and less than 25, and the greater

16  and equal to 5 because of the data source and what they track,

17  but what it shows is that cash is the predominant way people

18  pay for small transactions.

19  Q    And cash is the red one?

20  A    And that's the red line that's at the top.  But then what

21  you see, of course -- what you see is that the use of cash

22  falls off dramatically as transactions get larger, so people

23  are tailoring their use of cash to small transactions.  You

24  also see that for the smallest transaction that debit cards

25  come first, and that debit cards, you see, are used --

1   primarily they're used -- for the smaller transactions, they

2   drop off.  And credit cards, when you get to this middle

3   transaction, you see, in fact, for a lot of the sort of

4   day-to-day transactions, credit cards are used the most of

5   anything.  The green line is the highest, when you're looking

6   at range, from $25 to a hundred and twenty-five dollars.  So

7   the fact that these lines have these various slopes, they're

8   not all just flat, is showing you that the transaction size is

9   an important consideration when someone's trying to figure

10  out, well, what should I pay with?

11           THE COURT:  What is other?  Is that electronic

12  transfers?

13           THE WITNESS:  It may have some other categories,

14  too, but primarily it seems like electronic transfers.  It's

15  one of the ones you see.  Part of the things we see, other

16  rising, when you get to large ones.  When you're talking about

17  bill pay, you'll see those larger transactions.

18           MR. CONRATH:  Can we have the next slide, please?

19  Q    And what does the next slide show?

20  A    What this slide does is focuses on credit and debit,

21  because that seems to be where the disagreement among the

22  economic experts is, in drawing the boundaries of the markets,

23  and so this slide focuses on those two.  And so if we look,

24  what it's showing along the bottom is it's indicating

25  different categories of merchants.  So, again, the one to the

Katz - Direct - Conrath                    3890

1    left most is car rental agencies, and next to that are, then,

2    hotels and other forms of lodging.  What the bars are showing

3    is what percentage of the transactions for that type of

4    merchant, what share of those are measured in dollars, are on

5    credit and what shares are debit, and then the difference,

6    because you'll see those first two bars don't add up to a

7    hundred.  The difference is what's -- is how people pay using

8    everything else.

9            So, reading this chart, what it's saying if you're a

10   car rental agency, the vast proportion of your payment volume

11   is going to be with people paying with credit cards, and then

12   there's going to be a small amount with debit cards and then

13   there's a residual amount that's everything else.  Similarly,

14   if you look at hotels and other lodging, the preponderance is

15   on credit and the same thing for airlines.  And we can

16   continue, you see, for other industries, though, for types of

17   merchants, such as quick-service restaurants, or groceries and

18   supermarkets, the use of credit is much more limited, and the

19   use of debit in some of those industries is greater.  So this

20   is showing that there is some variation, so customers are

21   tailoring how they use credit and debit cards here, and it's

22   also showing you some merchant's credit is really very

23   significant, the vast majority of their sales.

24   Q    In industry categories, where the bars are relatively

25   equal, like we can look at gasoline stations here, does that

Katz - Direct - Conrath                    3891

1   mean that customers at gas stations are indifferent between

2   debit and credit?

3   A    No, it doesn't indicate that, because even though the

4   level of debit and credit usage is roughly the same there --

5   first off, even if it was the same person using them, they

6   might be using debit and credit differently at a gas station

7   depending on the nature of purchase.  So, for example, you

8   imagine somebody saying, well, when it's -- I need a repair

9   for my car and it's a lot of money, I'm going to pay with my

10  credit card.  But when I'm just buying gas for my weekly

11  commute, I'm going to use my debit card.  But the other thing

12  is, those are unlikely to be the same person doing it 50/50.

13  In fact, it can be as some people are paying with credit cards

14  and other people are paying with debit cards, and it's not

15  that the credit card people say I'm happy to pay with debit,

16  it's I want to pay with credit.  There's a comparable number

17  saying I want to pay with the other one.

18            THE COURT:  In the case of gas stations, as a

19  practical matter, there's some stations that charge a premium

20  for the use of a credit card, and so you might choose to use a

21  debit card to avoid paying the extra dime per gallon, or

22  whatever they charge, for your gasoline.  So the same

23  purchaser might be using the debit card on some occasions and

24  a credit card on other occasions.

25            THE WITNESS:  That's certainly a possibility, and

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3892

1   there are people who do do that.  I don't know about the

2   particular reason you said, but there are people who use both

3   credit cards sometimes and debit cards sometimes.

4          THE COURT:  What is the time frame of this slide?

5   Is it the same as the next slide which was -- which indicates

6   it's in January 2010 from March 2011?  I don't see a number or

7   a date.

8          THE WITNESS:  I'm sorry, there's a notes page of

9   this slide that has those parts I believe that this is going

10  through more recent data.

11         THE COURT:  Okay.  I'll find it.  That's fine.

12         MR. CONRATH:  If you look at the notes page, which

13  is in the back of your binder, this references 2011.

14         THE COURT:  Okay.

15         MR. CONRATH:  This is from proprietary Visa data.

16         THE COURT:  Thank you very much.

17  Q    So we look at another category where the credit use in

18  total and debit use in total are quite similar, and that would

19  be drugstores on this slide.  Similar question, does that mean

20  that debit and credit are close substitutes for the merchant,

21  the drugstore?

22  A    No, it doesn't.  Because, again, as this question of --

23  we want to get at whether people are willing to switch back

24  and forth or whether this could be two separate populations,

25  again, people targeting how they use credit and debit for

Katz - Direct - Conrath                    3893

1    particular transactions.

2    Q    All right.  You have some other evidence that will help

3    us understand whether those transactions at drugstores, for

4    example, are the same people using alternatively debit and

5    credit or different groups of people using credit from those

6    who are use debit?

7    A    Yes, I have a sequence of slides, three that are showing

8    data from --

9    Q    So I think maybe even the names of these companies, so

10   just refer to the category, if you would.

11   A    From the parallel case, the private plaintiffs, and this

12   data were available from them, because they track -- those are

13   merchants that have loyalty card users, and they track them,

14   so we had available data, and we could look to see how those

15   people use credit and charge cards to some degree.  So this

16   first one is showing the drugstore, probably heard of, and

17   what it's showing is -- if you go along the bottom, again,

18   this is in buckets, and it's saying, when we look at these

19   people who are using credit cards, or debit cards or both, and

20   they have at least two -- I think this is two transactions.

21   When we look at those people, we're going to ask, well, what

22   percentage of the time did they use debit?

23        So when you see the number that's on the far left,

24   it says zero and then there's that bar above it, that's saying

25   those are people who, when they make purchases from this

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3894

1   particular drugstore, they always use credit; they never use

2   debit.  And then if you look at the bar at the other extreme,

3   where it says a hundred, it says those are people that always

4   use debit and never used credit.  And then you have the people

5   in the middle, and those are people who, in fact, did use both

6   to varying degrees, and so you'll see, for example, if you

7   go -- I can't say the numbers, but if you go to the right, to

8   that 90 to 99 category, it says that percentage of people used

9   a debit card at least 90 percent of the time when they shopped

10  at this particular store.

11          And so one of the things you see from this measure,

12  is that of the -- again, I can't say the exact numbers -- what

13  this is telling you is that somewhat more than half the people

14  either used credit cards exclusively or they used them at some

15  point.  So we're taking the people -- the people always use,

16  but of the other ones, somewhat more than half who use credit

17  cards at least once.  And you see of those credit card users,

18  half of them use only credit cards.  So there are a lot of

19  people -- the people who use only credit cards, there's a

20  large group, roughly comparable group are the people who use

21  credit and also use debit at various points.  So it suggests

22  that there are people -- that there's a set of people that are

23  loyal to credit, and that the merchant would be concerned

24  about losing if it were to decide not to accept credit cards.

25  Q    Can we just note the dates of this data?  I think it's at

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                                    3895

1    the bottom there.

2    A    Yes, it's January 2010 to March 2011.

3    Q    Okay.  And go ahead with the next slide.

4    A    So then the next slide is looking --

5    Q    This is a grocery store chain; is that right?

6    A    It's a holding company for some grocery store chains.

7    They have more than one chain, but I won't say the names, but

8    you would recognize them.  It's a whole -- grocery store

9    holding company.  Again, I won't go through the specific

10   numbers, but it's telling a similar story that we see, that

11   there are many people who just use debit; there are many

12   people who just use credit; there are people who use both.

13   And, again, of the people who use credit and/or credit and

14   debit, there's significant percentage of those only used

15   credit.  And then we turn on the next slide, it's another

16   supermarket chain, and, again, we see a similar story, similar

17   path.

18   Q    This last one reflects data up through March 2012; is

19   that right?

20   A    That's right.  And it was driving these dates or the data

21   that were made available by the private plaintiffs in the

22   production in this case.

23   Q    So what are the implications of these three charts for

24   your analysis?

25   A    Well, what these are indicating is that -- particularly

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3896

1   these merchants, but illustrates the point more generally,

2   that these merchants would be concerned that if they were to

3   drop credit and charge cards that the insistence volume, the

4   volume they would lose by not taking credit and charge cards

5   would be significant; that they would suffer economic losses

6   because of that, and, therefore, they should decide instead to

7   continue to accept credit and charge cards.  And, in fact, it

8   suggests that they would do that even in the face of a price

9   increase.

10  Q    Has American Express done any analysis of insistence?

11  A    Yes, they have.

12  Q    And could we turn to the next slide, please, and will you

13  tell us what this slide means?

14  A    Well, we'll come back to this slide later.  But when we

15  talk about American Express itself, because, of course,

16  America Express' interest would be with merchants' incentive

17  to accept American Express.  As far as I know, they haven't

18  done an analysis of overall insistence for credit and charge

19  cards.  They didn't do a Hypothetical Monopolist Test that I

20  know of.  But what this is showing is their estimates of the

21  insistence, so this is -- expresses a percentage, this

22  call-out says -- it's estimates they did of what percentage of

23  the business would a merchant lose -- if it had been on

24  American Express what percentage -- what percentage of that

25  business would the merchant lose if it no longer accepted

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                            3897

1    American Express.

2            So, for example, that first category, and I won't

3    read out the numbers, but it's saying for quick-service

4    restaurants, what they've estimated is something called "total

5    insistence," so you would lose that fraction of your business

6    if you didn't accept them.  And they've done it for a variety

7    of merchant categories.  And we'll return later to talk about

8    what the earlier columns mean.  The point to note here is they

9    have a particular way that they calculate that number from

10   some composite ones.  And the point to take with away from

11   this is, A, this is partly as a reality check for me that I

12   said here's how merchants who think about these things, in

13   terms of, you know, what their economic incentives are, and

14   this is showing that American Express is thinking the same

15   way.  And also they've concluded in their case -- insistence

16   numbers are, as you'll see, large numbers when you start

17   thinking about what they mean be for the merchant's decision.

18   This is a fair amount of business to be at risk for a

19   merchant.

20           Now, again these are estimates that American Express

21   as made, and they've made more than one estimate, but the

22   bottom line from it is these are significant numbers they

23   would be at risk for a merchant.  And in thinking about the

24   hypothetical monopolist, you'd expect the insistence numbers

25   to be larger; because if you think about it, if a merchant

Katz - Direct - Conrath                          3898

1   drops American Express, one of the things you would expect

2   happen, and what American Express has said would happen, many

3   of its cardholders do have Visa and MasterCard, credit and

4   charge cards, and they would switch to those cards.  If you

5   think about the hypothetical monopolist raise in price,

6   there's no way to go.  You can't switch to another credit and

7   charge card, because the monopolist has the ability to raise

8   the price on all of those.  So for the hypothetical

9   monopolist, you'd expect these insistent numbers to be much

10  larger.

11           (Proceedings continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NICOLE CANALES, CSR, RPR

1   DIRECT EXAMINATION (CONT'D.)

2   BY MR. CONRATH:

3   Q    In your market definition you specifically identified

4   travel and entertainment merchants.  Does this data on this

5   slide suggest that the travel and entertainment segment is the

6   different from other segments?

7   A    Well, what you see on this if you look say at the line

8   for airlines or you look for car rental or lodging, so the big

9   components of travel and entertainment, so car rental being

10  the second line of numbers and then lodging the third and then

11  airlines the bottom of that first blue box, the T&E box, you

12  see those numbers are particularly large reflecting the

13  importance generally of credit and charge cards to that

14  industry and here reflecting the particular importance of

15  American Express to those merchants.

16          MR. CONRATH:  We can do the next slide publicly,

17  Your Honor.

18  Q    So, what are the implications of what you have told us so

19  far for market definition?

20  A    So, what this is suggesting or indicating is that while

21  it is the case that there are payment instruments that

22  substitute each other for a lot of consumers for lots of

23  transactions, there are also situations where for many people

24  for many transactions other payment instruments are poor

25  substitutes for credit cards.  So, what that's telling us is

Katz - direct - Conrath                              3900

1   the merchant is going to be concerned about insistent volume,

2   it is going to be concerned that if it responded to the price

3   hike of the hypothetical monopolist that it would lose

4   significant volume of business that would cost it money and

5   that would ultimately make it a money losing decision to stop

6   accepting credit and charge cards even in the face of a price

7   hike.

8              And two things that I think are important about

9   that, one is that would be true even in a lot of situations

10  consumers would be willing to stop using credit cards and

11  switch to something else and that's one thing that I think is

12  important for me to get across is normally when we think about

13  competition between different goods and services, the people

14  who really matter for competition are sort of the people who

15  don't care that strongly between say one brand and the other

16  because normally what we're doing is say, well, you know,

17  there's somebody -- suppose you and I are automobile

18  manufacturers, there's somebody who thinks your car and mine

19  are almost as good as each other's so then what we do is we

20  each try to attract that person because I can pull them away

21  from you.  There's somebody I know just absolutely loves your

22  brand of automobile, that's probably not the person I'm

23  competing for because he's probably going to buy from you

24  anyway.  I want the person who is sort of indifferent between

25  us, who is willing to switch to -- a lot of time economists

Katz - direct - Conrath                                    3901

1    talk about competition at the margin or for the marginal

2    customer but here what's happening is the merchant is faced

3    with this all or nothing decision, I'm either taking credit

4    and charge cards or I'm not and so what matters to me now is

5    not the people who are happy to switch easily, I mean I'm glad

6    there are those people because they'll keep shopping at my

7    store but what also matters to me is the people who are really

8    loyal, that core because those are the people I'm going to

9    lose and that's something -- when I said earlier we need to

10   look at the unique features of the industry, we need to

11   understand key economic features, that's one of the key

12   features that when a merchant is thinking about dropping, it's

13   making this all or nothing decision so it has to be concerned

14   with the core of people who are really loyal, if there are

15   ones and my analysis indicates there are and merchants think

16   so too, it has to be concerned with that core of people that

17   are sufficiently loyal to credit and charge cards that they

18   would buy less from the merchant even if the merchant didn't

19   take those cards.

20              THE COURT:  Well, that's what that last chart was

21   all about on insistence, right?

22              THE WITNESS:  Yes.

23              MR. CONRATH:  Your Honor, I'm about to start walking

24   through applying the Hypothetical Monopolist Test and this is,

25   if you're inclined --

*Katz - direct - Conrath*                                    3902

1          THE COURT:  I think it is about midway in the

2   morning, so we're going to take a ten minute break and return

3   for the walk through the test.

4          MR. CONRATH:  Thank you, Your Honor.

5          THE COURT:  All right, thank you.

6          (Recess taken.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Katz - direct - Conrath*                                        3903

1           (Witness resumes the stand.)

2           THE COURT:  Please be seated.

3           I remind the witness that he is still under oath.

4   And how do you want to proceed?

5           MR. CONRATH:  This slide is public, Your Honor.  The

6   next one will not be.

7           THE COURT:  All right.  You may proceed.

8           MR. CONRATH:  Right.

9   DIRECT EXAMINATION (Cont'd.)

10  BY MR. CONRATH:

11  Q    Professor Katz, I think you told us this morning that the

12  goal of the Hypothetical Monopolist Test is to identify

13  reasonably close substitutes; is that right?

14  A    Yes.

15  Q    Have you used the analysis that you've just explained to

16  us about customers and their preferences in implementing the

17  Hypothetical Monopolist Test?

18  A    Yes, I have.

19  Q    Would you explain to us what is on this slide that we

20  have in front of us?

21  A    So, this is just a recap of what we were talking about

22  before with a little more detail.  So, we're going to look at

23  a hypothetical monopolist of all the credit and charge card

24  networks, so Visa, American Express, MasterCard and Discover,

25  and then ask whether it would be profitable to impose the

Katz - direct - Conrath                                3904

1   SSNIP, the small but significant and non-transitory increase

2   in price above the competitive level, but we're going to have

3   to be sensitive to the fact that we're dealing with two-sided

4   platforms here, this monopolist would be a two-sided platform.

5           So, what I'm going to do is consider the situation

6   where the monopolist is raising the price to merchants, so it

7   is going to raise the price to one side of the platform, and

8   then in my analysis I'm going to hold the price of the

9   cardholders constant, then take into account, allow for the

10  possibility for there to be some sort of feedback effects.

11  Q   So, Professor Katz, you mentioned the term small but

12  significant and non-transitory increase in price, could you

13  explain what economists mean when they use that term?

14  A   Typically what we're talking about is a five percent

15  increase in price.  Sometimes we use ten percent or it could

16  be a different amount in the particulars of an industry but

17  five percent is common, and then the non-transitory part is

18  that we're interested in a price that's put into effect and

19  remains, you know, some non-trivial amount of time so people

20  can actually respond to it.  So, I'm just thinking here of the

21  monopolist raises the price and keeps it up.

22  Q   You say increase --

23          THE COURT:  I'm sorry.  Holding the prices to

24  cardholders, is that the price that the monopolist is charging

25  for the cardholder to possess the card?

*Katz - direct - Conrath*                                              3905

1           THE WITNESS:  No.

2           THE COURT:  Or is it the merchant's price to the

3   cardholder for the good or service that's being purchased?

4           THE WITNESS:  So, I'm going to raise the price that

5   the merchant pays through its acquirer to the credit and

6   charge card network and then I'm going to hold constant the

7   price and really what I mean here is the rewards, I'm going to

8   hold the rewards constant that the cardholders are getting,

9   okay.  So, for example, I'm not -- I'm going to make sure this

10  is money that is being kept by the hypothetical monopolist

11  because we're asking the question can it raise its profits, so

12  I'm thinking about raising the network fee, for example, as

13  opposed to if you remember that slide with the three dollars,

14  I'm not talking about raising the interchange fee which would

15  then just go across the network, I'm talking about the network

16  keeping the money.

17  Q    Do economists sometimes think of credit card rewards as a

18  negative price for cardholders?

19  A    Yes.

20  Q    So, sometimes when we talk about price to cardholders,

21  what we mean is the rewards in essence are paying the

22  cardholders for using the card or a negative price?

23  A    Yes, and also generally when I'm talking about the price

24  to cardholders, I am talking about rewards and any charges

25  that the cardholder has that would vary with the level of

1    transactions as opposed to say either you pay an annual fee or

2    something, that annual fee will be set by the credit card

3    issuer and generally is not set by the credit card network, so

4    I'm usually not talking about annual fees unless I explicitly

5    say that I am.

6            THE COURT:  Unless the issuer is American Express.

7            MR. CONRATH:  Well, which is both an issuer and a

8    network.

9            THE COURT:  Right.

10   Q    Is that right?

11   A    That's right.  So, when I talk about American Express as

12   a network, I'll be talking about its network operations but

13   you're certainly right, American Express as a company is

14   setting annual fees.

15           THE COURT:  All right.  Thank you.

16           MR. CONRATH:  Now, could we switch, Your Honor.

17   Thank you.  You're ahead of me.

18           THE COURT:  Go ahead.

19           MR. CONRATH:  Could we have the next slide please.

20   Q    So, Professor Katz, the slide is referencing merchant

21   segmentation as a central feature of American Express's

22   pricing strategy.  Why is that relevant to market definition?

23   A    Well, as I was just saying, in defining relevant markets

24   we need to be sensitive to industry characteristics.  We want

25   to tailor our analysis to the facts at hand and one of the

Katz - direct - Conrath                           3907

1    things to take into account in market definition is whether or

2    not the hypothetical monopolist would raise price to everybody

3    for all of its products or whether it might tailor the price

4    increases and target them and what the next few slides are

5    going to show is that the hypothetical monopolist would

6    certainly have the ability to do that if it wanted to.

7              Now, I should say I want to distinguish between two

8    things because one of them is a source of disagreement among

9    the experts, I believe the other one can't be but perhaps

10   they'll show me wrong.  There's disagreement among the experts

11   on whether or not, for example, American Express currently

12   engages in price discrimination and I believe they do and I

13   believe you will hear from American Express's expert witnesses

14   they think American Express does not.  However, for the

15   purposes of the Hypothetical Monopolist Test, the question is

16   could the hypothetical monopolist engage in price

17   discrimination and I think the answer to that is unequivocally

18   yes and what I'm going to show in the next two slides is that

19   the credit and charge card networks, do they have the ability

20   to target their pricing and to charge different prices to

21   different merchant segments and therefore the hypothetical

22   monopolist could do that as well and could do it in a

23   discriminatory fashion if it chose to do so.

24   Q    Which are the parts that you want to call our attention

25   to on the slide that's on the screen now, on slide 51?

*Katz - direct - Conrath*                                           3908

1    A    Okay.  I just want to point out here that American

2    Express in its pricing strategy segments merchants and it

3    segments merchants a variety of different ways and you'll see

4    that box in the middle is showing the different categories

5    because this is a slide summarizing American Express's overall

6    philosophy or strategy towards pricing and it is showing that

7    merchants are segmented by their location, we're going to be

8    concerned with merchants in the United States, but important

9    for our purposes, it segments them by industry and then it

10   also has different prices by size and as the right part of the

11   table indicates, there's many different segments but the key

12   point is that the American Express can in fact target the

13   pricing to different industry segments and as the next slide

14   will show --

15   Q    Before we leave that --

16   A    -- they actually do.

17   Q    Well, just to be clear, you're calling our attention to

18   that central box, you've placed a red highlighting around it;

19   is that right?

20   A    Yes.

21   Q    Okay, great.  Go ahead to the next slide.  What does this

22   slide show?

23   A    So, this is -- before we have the pop-up.  Can we remove

24   that.  Go back for one second.  Go to slide 52 please without

25   the pop-up if you can.  Thank you.

1         So, we'll look at the pop-up in just a second but

2    what this is is calculations of American Express's discount

3    rates and over this period from 2001 to 2011 and what it is

4    showing is the discount rates broken out by the different

5    merchant segments, okay, and as you can see just looking at

6    them that there are differences across segments, in fact there

7    is segmented or targeted pricing.

8         And now if we could have the pop-up, to just make

9    the point, summarizing this, if you look at the average

10   merchant discount for T&E and the average merchant discount

11   for non-T&E merchants, you'll see there is a substantial

12   difference between them.  So, in fact, they are engaging in

13   segmentation, whether you call it price discrimination or not,

14   they clearly have the ability to identify their customers, to

15   charge different customers different prices and the customers

16   are not able to arbitrage those differences away.

17            MR. CONRATH:  Next slide please.

18   Q    Do other credit card networks also engage in pricing to

19   merchants by segments?

20   A    Yes, they do and what I've shown here is a table that's

21   publicly available of Visa USA's interchange.  Now, remember

22   that's not the same as the merchant fees or the network fees

23   but for our purposes of identifying segmentation this is

24   appropriate because the interchange fee is the biggest part of

25   what a merchant is paying when it accepts a Visa card, and if

1    we could have the highlights shown, this just gives an example

2    where it is showing that if you're a hotel or a car rental

3    agency, you are paying a much higher rate, so it is much

4    higher from the merchant's perspective than, for example, if

5    you're a supermarket.  So, again, it is to illustrate that the

6    different networks do segment the merchants and prices, the

7    different types of merchants differently.

8    Q    How did you take merchant segmentation into account in

9    defining markets in this case?

10   A    Well, it is because of the merchant segmentation and the

11   possibility of price discrimination by the hypothetical

12   monopolist that I ended up looking at two distinct relevant

13   markets because the reason, as I said before, one of the

14   markets is network services to travel and entertainment

15   merchants and as these data are showing, the network, the

16   hypothetical monopoly can charge different prices to them and

17   so it is worth then considering whether it would be profitable

18   to raise prices in a way targeted at travel and entertainment

19   merchants but then I also want to look at the general market.

20         MR. CONRATH:  Next slide please and, yes, this can

21   be public, Your Honor.

22   Q    So, will you remind us again of the two candidate markets

23   that you analyzed?

24   A    Yes, there's the general purpose credit and charge card

25   network services market to T&E merchants and then the parallel

1   market to all merchants in the United States.

2   Q    Is defining markets for certain segments that could be

3   targeted a standard approach?

4   A    Yes, it is.

5   Q    And is there a term for this practice?

6   A    Yes, it is often referred to as defining price

7   discrimination markets.

8   Q    And is this a practice or approach that's used in the

9   horizontal merger guidelines?

10  A    Yes, they identify -- the merger guidelines identify the

11  definition of price discrimination markets as something that

12  can be appropriate depending on the circumstances of the

13  market such as here.

14  Q    And when you look at the general market or the more

15  broader overall market, did that involve combining or

16  aggregating different segments?

17  A    Yes, you can certainly think of it that way because if

18  you either think of those Visa categories that we looked at or

19  American Express's, they have many more merchant segments that

20  they define and what the general market is doing is

21  aggregating those up and looking at them at one time.

22  Q    Is it a standard approach to combine segments?

23  A    Yes, it is because you could have as here I think

24  situations where if you really looked at every single segment

25  where the monopolist could price differently, you might have

1    thousands of markets or hundreds and it becomes impractical to

2    look at every one separately, so it is a common practice then

3    to roll them up into one and analyze the conditions in the

4    broader market.

5    Q    Is there a term for combining such segments?

6    A    Yes, sometimes it is referred to as aggregation markets.

7    Q    Is that an approach that's used in the horizontal merger

8    guidelines?

9    A    Again, the horizontal merger guidelines do identify that

10   sort of approach as something that can be appropriate and

11   used.

12   Q    Did you apply the Hypothetical Monopolist Test to the two

13   candidate markets you looked at?

14   A    Yes, I did.

15   Q    All right.  Let's start with the travel and entertainment

16   market.  Did you reach conclusions about whether there is a

17   relevant market for general purpose credit card network

18   services for travel and entertainment markets?

19   A    Yes, I concluded it is a relevant market.

20           MR. CONRATH:  All right.  Can we have the next

21   supplied please.

22   Q    Will you explain to us how you reached that conclusion

23   using the Hypothetical Monopolist Test please?

24   A    Okay.  So, recall what we're doing is we're asking would

25   the price increase be profitable for the hypothetical

Katz - direct - Conrath                                    3913

1   monopolist, so let's think about the hypothetical monopolist's

2   profits and what happens when it raises the price.  Well, one

3   effect of raising the price is to raise the margin, that's a

4   gain for the monopolist, but another effect of raising the

5   price would be to depress the volume and so the question for

6   the hypothetical monopolist in terms of thinking about the

7   profitability of the price increase and therefore the question

8   for our Hypothetical Monopolist Test is, well, does the margin

9   go up faster than the volume falls or is it the other way

10  around because if the margin is going up faster, then the

11  volume is doing down, then it is going to be a profitable

12  price increase and the Hypothetical Monopolist Test will tell

13  us this is a relevant market.  So, that's why you want to

14  think about how that works.

15          Now, what I put here, and I won't try to recreate

16  the arithmetic, is a formula that says, well, exactly how much

17  when the price goes up and the volume goes down, where is the

18  break even point and so what the formula I have here says is

19  if you take a particular percentage price increase, typically

20  we take five percent, and then you have a particular margin

21  that the monopolist -- now, remember earlier we were talking

22  about the merchant's margin, here now we're going to talk

23  about the monopolist's margin, if you take those two numbers,

24  what you do is the formula tells us here's how fast the volume

25  would have to fall in order to defeat the price increase.  So,

1    if the volume changes by less than this threshold number, then

2    raising the price will be profitable and it is a relevant

3    market and so what I'm doing here then is identifying that

4    threshold and then what we do is we've got to look at that

5    threshold against the evidence available to us in the market

6    to ascertain, well, is it likely that the monopolist will lose

7    more or less volume than this threshold and so that's what I'm

8    doing here is just setting up the formula that identifies that

9    threshold.

10   Q    So, part of what you're saying is even a monopolist can't

11   keep raising the price forever?

12   A    Certainly not.  You know, at some point the price is

13   going to get so high that merchants or in this case merchants

14   will stop -- start turning away from it and also it is the

15   case that you'd expect even a monopolist to lose some

16   merchants right away.  It is all a question of degree and also

17   of, like you're asking, the starting point.

18           MR. CONRATH:  So, the next slide is confidential or

19   has confidential information.

20   Q    So, Professor Katz, I think a couple of the numbers, the

21   specific numbers on here are confidential so if you could

22   describe them in a general way and tell us what you did, what

23   this slide explains about implementing the formula in the

24   candidate credit card market.

25   A    Okay.  So, one of the questions that comes up because

1  we're -- well, would come up in any market but comes up here,

2  we want to take into account the institutional features and

3  the fact that we're dealing with two-sided platforms.  It is

4  asked when we take say five percent, five percent of what, and

5  so what I'm showing here is what happens, talking about taking

6  about five percent of the network fees because that's what the

7  network is keeping for itself, it is facilitating transactions

8  by others, it's doing things like collecting interchange but

9  that's being passed through.  The part it's keeping for itself

10  are these network fees, that's what I'm talking about

11  increasing.

12          And so, what's described on the slide, and I will

13  not it read out the number, is that American Express did a

14  benchmarking analysis looking at Visa and MasterCard, and this

15  is part of American Express evaluating its own network

16  operations, and it came up with the number shown there as a

17  range.  Now, if you take that and take five percent of it,

18  you'll see you're dealing with that number of basis points

19  shown there as the decimal in the middle.  One of the things I

20  did was instead of taking five percent which is common, I

21  said, well, let me be conservative and take ten percent

22  instead, in part doing that to avoid the criticism that say,

23  well, okay that other number is so small, you know, who would

24  even know.  Now, first off, I think that's not right, you

25  know, people in the industry do worry about numbers at that

1  level but, in any event, to be conservative I used the ten

2  percent SSNIP, looked at an even larger price increase which

3  yields that's number of basis points shown there.

4          Now, the other thing to do to put in that formula is

5  the monopolist margin and what I've done here is I've just

6  made an assumption that the margin is 100 percent which is to

7  say I've assumed that this hypothetical monopolist has no

8  costs.  Now, the reason that's conservative, right, we know

9  the monopolist is going to have some costs, its actual margin

10 will be smaller, but the reason that's conservative is what

11 I'm doing by making this assumption that when the hypothetical

12 monopolist loses business, this is as painful as that can be

13 because this is saying when you loss some amount of business,

14 it was all profit that you just lost, whereas in fact when you

15 lose -- a real world firm, when them lose, some of it would be

16 we lost the sales but at least we saved some costs, okay.  So,

17 that's why when I say this is being conservative.

18         So, then if we put in 100 percent margin, as I said

19 we'll use here also to be conservative, the ten percent price

20 increase into the formula, what it tells us is that this

21 critical volume for the question of market definition is -- I

22 guess I shouldn't say.

23 Q    You can say that number.

24 A    Well, actually I can't say that number because there are

25 people in the room who could calculate it I think if I told

1  you that number.  Well, actually that part they couldn't,

2  you're right, never mind.  Once they know the ten percent and

3  the 100, they can calculate that it is 9.1 percent.  It

4  doesn't give away the other number.

5  Q    Okay.

6  A    So, what this is saying to us is that if in response to

7  that price increase shown here that I can't say, the

8  monopolist would lose less than roughly nine percent of its

9  volume on credit and charge cards, then the price increase

10  would be profitable and credit and charge card network

11  services constitute a relevant market.

12  Q    And did you reach a conclusion as to whether the fall in

13  volume in the case of that price increase would be less than

14  nine percent?

15  A    Yes, I did.

16  Q    What was that conclusion?

17  A    The evidence indicates it would be less than nine

18  percent.

19        MR. CONRATH:  Turn to the next slide please.

20  Q    Can you explain the basis for your conclusion that a

21  hypothetical monopolist would loss less than nine percent of

22  its volume?

23  A    Okay.  What the numbers, which again I won't say out

24  loud, but the numbers here, what the first bullet is doing is

25  putting them in perspective and saying this increase in the

Katz - direct - Conrath                    3918

1   network fees, which would represent a ten percent increase in

2   the charge to the networks and when you think about what the

3   volume is that's going over the credit and charge card

4   networks would amount to a large amount of money, okay, that

5   increase though, if you think about it from the perspective of

6   a merchant in percentage terms, you'll see it is a small

7   percentage in terms of what the merchant is paying and that

8   number shown after the e.g. is saying, for example, for an

9   average merchant in travel and entertainment, you might see a

10  discount rate go from that one number to the other.  Okay.

11           So, then we ask the question, when a merchant sees

12  that happen, are we going to see the credit and charge card

13  monopolist lose more than nine percent of its volume with

14  these merchants.  We're talking about merchants really

15  accounting for nine percent or more of that volume no longer

16  accepting credit cards.  And my conclusion is the evidence

17  shows it is extremely unlikely and it's not what is going to

18  happen and the basis for saying that is, first, as we saw,

19  that customers do use different payment instruments

20  differently, they clearly don't consider them to be perfect

21  substitutes and, in fact, it suggests and we know thinking

22  about things like hotels and car rentals that other things are

23  quite imperfect substitutes; seeing estimates that American

24  Express has put forth that cardholder insistence is

25  significant and we've also have heard from merchants on that

1   and there are also two things which you haven't talked about

2   yet but which factor into my conclusion and I'm going to turn

3   to later today, one is the evidence that American Express

4   profitably raised price as part of its value recapture

5   initiative, okay, and, as we've talked about, that they would

6   face more competitive pressure certainly than the hypothetical

7   monopolist, so that they can do it suggesting the hypothetical

8   monopolist can do it.  And the other thing which I want to

9   turn to in just a few minutes is really the lack of a reaction

10  to a very significant fall in debit prices which is the effect

11  of the Durbin Amendment.

12  Q    And so, what is the conclusion from just this calculation

13  whether there's a relevant market?

14  A    As I said, this led me to conclude it is a relevant

15  market.

16  Q    Did you also employ an alternative version of the

17  Hypothetical Monopolist Test in the travel and entertainment

18  segment?

19  A    Yes, I did.  I did what in some ways you could think of

20  as a one-sided test because --

21  Q    Next slide please.

22  A    -- instead of taking as the base the part that the

23  network keeps as a middleman, I said, well, let's keep the

24  price increase, the five percent price increase of the entire

25  merchant discount, so to do sort of a belt and suspenders

1    approach.

2            So, what I've shown in that second level bullet at

3    the top is what happens if you take, as in this example, if

4    you take five percent of American Express's average travel and

5    entertainment discount rate and so you see that gives us a

6    number and because we're taking a percentage increase of the

7    entire merchant discount including these other parts the

8    network doesn't keep, we end up with a bigger number.  Now,

9    doing this, it just would be just too conservative to say,

10   well, wait a minute, the hypothetical monopolist keeps all of

11   the discount because it clearly doesn't keep all of it so what

12   I've done, again being conservative, I said, well, look the

13   only part we'll subtract out is the issuer fees or in the case

14   of Visa and MasterCard it would be taking out the interchange

15   fees and so let's use that as an estimate of what the

16   hypothetical monopolist margin would be when that margin is

17   expressed in terms of the total discount rate as opposed to

18   expressing the margin in terms of just its network fees and

19   you see there's a number there that comes out of, looking at

20   that average discount rate and looking at differences, this

21   was based on data from American Express, looking at

22   differences between what the discount rate is that they take

23   in and then what they pay out to third-party issuers, that

24   yields that number.

25           So, again, what we can do is use that formula I

1    mentioned earlier where we put in the five percent price

2    change and we put in that margin number that I won't say and

3    now it comes up with a threshold number which I also will not

4    say because now that threshold number depends in part on

5    proprietary many data but you see --

6    Q     That's the fall in volume number that is --

7    A     Yes.  I just need to check, I believe it is okay to say

8    what that basis point change is because I think it's rounded

9    enough that that's a well known number.

10   Q     I think that's right, it is a rounded off generally known

11   discount rate I think.

12   A     Okay.  We will, hearing no objection, okay.  So, what it

13   is saying is, look, there's a 15 basis point increase, unless

14   it triggers a fall in volume that's bigger than that number

15   shown for the threshold, that would tell us that the

16   hypothetical monopolist would find the price increase to be

17   profitable and therefore the credit and charge card network

18   services to T&E merchants constitutes a relevant market and my

19   conclusion is for the reasons I've talked about and I've

20   identified, will talk about later today, particularly the

21   response to Durbin and other things that it is implausible, it

22   is in fact highly unlikely that that size increase would

23   trigger that type of response because remember what that's

24   saying, given the lack of steering, that that's essentially

25   saying that many merchants measured volume would have to stop

1    accepting credit and charge cards.

2    Q    So, what is your overall conclusion applying the

3    Hypothetical Monopolist Test to the travel and entertainment

4    market?

5    A    So, both ways are, you know, either of these two

6    approaches I just described give rise to the same conclusion

7    which is that the candidate market is in fact a relevant

8    market.

9    Q    Did you also apply the Hypothetical Monopolist Test to

10   the general market?

11   A    Yes, I did.

12        MR. CONRATH:  Can we turn to the next slide please.

13   Q    Can you tell us what you did using this slide?

14   A    Okay.  So, again I took, the starting point, took the

15   network fees because that's what they're keeping, it's a

16   two-sided platform and I took ten percent to be conservative

17   and again I took 100 percent to be conservative in terms of

18   the margin and since I'm using those same numbers in this

19   conservative approach, we again have the same threshold that

20   comes out of that.

21   Q    And what does the next slide show?

22   A    So, what the next slide is doing is saying, all right, we

23   have this threshold but what does it mean when we look at the

24   general market, you know, are we likely to see a change in

25   volume above or below that threshold and again the first

1   bullet is to put that increase in perspective and on average

2   merchants are paying less than just the T&E average.  So,

3   you'll see I've used a different number there, let me put it

4   in perspective, but again we're asking in response to that

5   change that the merchant would see would we see more than nine

6   percent volume lost.  For the same sets of reasons as for the

7   T&E merchants, I think the answer is yes.  The difference

8   between those is, I think that the effects are particularly

9   strong in the case of T&E merchants but it is the same

10  principles and it is the same types of evidence that lead to

11  that conclusion.

12  Q    When you were answering that I think you said for the

13  same sets of reasons for the T&E merchants I think the answer

14  is yes.  Let's clarify yes what; yes, there would be a bigger

15  loss or yes, there would not be a bigger loss?

16  A    There would be a smaller loss than that because of the

17  differences in payment instruments and cardholder insistence

18  and because of what we learned from value recapture and from

19  the Durbin experience.

20  Q    And what does that tell you about whether there is --

21  this test tells you about whether there's a relevant market

22  and a general market?

23  A    It says that this candidate market is also a relevant

24  market.

25  Q    Did you also perform the alternative version of the

Katz - direct - Conrath                                          3924

1   Hypothetical Monopolist Test for the general market?

2   A    Yes, I did.

3   Q    Next slide.

4   A    That slide shows that -- what you see is again we went

5   back to this belt and suspenders approach, that's taking five

6   percent of the entire discount rate and you'll see that's a

7   different number though because the average discount rate

8   overall for merchants is lower than the discount -- average

9   discount rate just for T&E merchants and again I took the

10  approach on the margin numbers of using the difference between

11  what was taken in from the merchants and then paid out in the

12  issuer fees and you'll see that the -- if you compare the

13  slides, you'll see the numbers used are different, although

14  they round to the same number here, so that's why you'll see

15  that the critical threshold for the fall in volume ends up

16  being the same number that we had before and again the

17  parallel reasoning as you can see in that bottom bullet, I

18  won't read the numbers out but if in response to that increase

19  in the fees that the merchant sees, a smaller percentage than

20  that, you know, decide to drop, again measured in volume, that

21  tells us that credit and charge card networks are a relevant

22  market and my conclusion based on the evidence tells us that

23  the drop will be smaller than that and candidate to candidate,

24  the relevant market is an actual relevant market.

25            MR. CONRATH:  Can we turn to the next slide please.

*Katz - direct - Conrath*                          3925

1  Q    Professor Katz, you've been promising us to talk more

2  about Durbin and I think we'll have the opportunity now.  So,

3  can you tell us -- you've told us that the market response to

4  the Durbin Amendment was evidence that supports your findings

5  about market definition.  Can you explain that using this

6  slide.

7  A    So, as everyone now knows, due to this Regulation II that

8  was implementing the Durbin Amendment, the price of debit

9  network services charged to merchants fell dramatically

10  relative to the price of credit network services.  You can ask

11  yourselves what would we expect to see happen if debit and

12  credit were close substitutes.  Well, one thing we'd expect to

13  see is that the credit card networks would respond to it

14  because if they were really close substitutes and they were

15  close competitors, then the credit card networks would be

16  compelled by the competitive forces to do something to take

17  into account that the competing product had gotten so much

18  cheaper.  If they were close substitutes, we'd expect to see

19  some reaction by the credit and charge card networks.  The

20  other thing -- and as we'll see, we didn't see such a

21  response.

22         Now, the other thing you'd expect to see is if they

23  were such close substitutes, then the merchants would engage

24  in substitution because the merchants would say, well, debit

25  has gotten a lot cheaper, I'll switch to debit, which would

1    mean in this case I'll stop accepting credit cards and my

2    customers will then switch to debit and, in fact, we didn't

3    see either of those things happen.

4              MR. CONRATH:  So, can we switch to the monitor for

5    the next slide, Your Honor?

6              THE COURT:  To the public monitor?

7              MR. CONRATH:  Oh, sorry, my fault for not having

8    switched back, no.  Thank you.

9              THE COURT:  Go ahead.

10   Q    Take a look at the next slide please.

11             So, I believe the Court has already heard that the

12   Durbin Amendment lowered fees for using debit cards.  Can you

13   tell us how significant that change was?

14   A    Well, first off, what this slide is showing is that

15   when -- the regulation went into effect in October 2011 and

16   what this slide is showing is it is giving us some numbers to

17   show that there were these large percentage decreases measured

18   in terms of the interchange rates which again are the biggest

19   component of what the merchant pays but certainly not

20   everything.

21   Q    So, I think you can reference the Federal Reserve data

22   but not the data underneath it.

23   A    So, the Federal Reserve number is showing a 37 percent

24   decrease in the interchange component.

25   Q    And below that is some private data that shows a

1   different measures of the interchange; is that right?

2   A    Yes.

3            MR. CONRATH:  Can we have the next slide please.

4   Q    Did this change in the interchange rates that was on the

5   previous slide show up in the total amount that merchants paid

6   for debit?

7   A    Yes, it did but it wasn't one for one necessarily.  So,

8   one of the things I did was using data available to me and the

9   people working under my direction from a merchant processor,

10  we looked at their data to understand what happened to the

11  all-in debit rate, this is in particular charged by MasterCard

12  and Visa, so this would be acquirer fees and debit network

13  fees and anything else that the merchant was paying because

14  there were some other fees that partially offset the fall in

15  interchange, that they went up for some of them, but what this

16  chart is showing, that horizontal -- I'm sorry, the vertical

17  dashed line is the date of Durbin, what it is showing is in

18  fact the fees did drop, in this case they dropped again by a

19  substantial percentage which is shown in the title of the

20  slide which I guess I shouldn't say.  So, this is then taking

21  into account the other components of what merchants were

22  paying.

23           THE COURT:  And the all-in fee means what?

24           THE WITNESS:  So, this would be saying what you're

25  paying to the acquirer and what you're paying to the network

1   and what you're paying through to the issuer.

2            THE COURT:  All the charges combined?

3            THE WITNESS:  That's right.

4            THE COURT:  Okay.

5   Q    And do these numbers take into account the fact that some

6   banks are not regulated by Durbin?

7   A    That's right, this was the average, this was what the

8   merchant would face average for the regulated rates that came

9   down and then also the unregulated rates which did not

10  necessarily follow.

11           THE COURT:  And those institutions are not covered

12  by the Fed?

13           MR. CONRATH:  The regulation applies differently to

14  large institutions and small ones.  Large ones are regulated.

15  The small ones are either unregulated or differently

16  regulated.

17           THE COURT:  And the differentiation is in the

18  statute; is that right?

19           THE WITNESS:  Yeah, I believe it's the statute.

20  Certainly I know the regulation says, it is whether your

21  assets are above or below ten billion dollars.

22           THE COURT:  So, Citibank, Chase, Bank of America,

23  they're all in the regulated side of the house?

24           MR. CONRATH:  Exactly, very substantial amount of

25  the volume of assets is in the regulated side of the house.

*Katz - direct - Conrath*                                3929

1          THE COURT:  All right.  Got it.

2   Q    Professor Katz, the date of that change is October 2011;

3   is that right?

4   A    That's correct.

5   Q    So, a debit card network is also a two-sided platform,

6   right, so were there offsetting changes on the cardholder side

7   of the platform?

8   A    Yes, there were some.

9   Q    And what did you see?

10  A    So, to a much lesser degree than credit cards, debit --

11  some debit cards have rewards and when the interchange fee

12  fell, remember that's the payment that ultimately is going to

13  the issuer, some of the issuers responded by cutting back

14  there debit card rewards but the key point is that debit card

15  rewards were never very important.  It turns out there were

16  people who were eligible to get them but didn't even bother to

17  sign up and then also the Fed as part of studying what was

18  happening with Durbin, in that study I referenced earlier,

19  looked at what was happening with debit card rewards and

20  concluded it was a very small amount of money was actually

21  being spent on debit card rewards.  So, while they went down

22  in some cases, it wasn't a large offset.  The net is that the

23  two-sided price for debit went down by a lot, debit became

24  much cheaper than credit -- sorry, it was already cheaper but

25  the price -- it fell relative to the price of credit.

*Katz - direct - Conrath*                                      3930

1   Q     While this big drop in debit prices was happening, what

2   was happening with the prices of the credit card networks?

3   A     Very little, if anything.  If one looks, for example, at

4   the -- this is Visa schedule, like with interchange there were

5   just a few small sort of, you might even think of sort of

6   clean up changes but really nothing, nothing wholesale,

7   nothing dramatic.

8            MR. CONRATH:  Can we have the next slide please.

9            THE COURT:  And is that a public or a private --

10  Q     I believe that's public.  These I think are Nelson (ph)

11  data.

12  A     They are Nilson data.

13  Q     Nilson data.

14            (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

*Katz - Direct / Conrath*                                    3931

1    DIRECT EXAMINATION (continued)

2    BY MR. CONRATH:

3    Q    Professor Katz, in light of this large price decrease for

4    debit, was there a large drop in credit card acceptance?

5    A    No, the merchants did not respond by dropping credit

6    cards en masse.  In fact, what you see happening here is that

7    merchant acceptance of credit continued to grow after Durbin,

8    so it wasn't a big drop of the sort that you would have

9    expected had they been close substitutes.

10   Q    So just walk us through how this chart works, what's

11   being measured?

12   A    So what it's showing again is time along the bottom and

13   we've got the dotted line to show us when Durbin went into

14   effect, and what it's doing is for each year it's showing the

15   size of the acceptance network for each of the networks, and

16   as you can see, maybe we should start to look at for 2007

17   because the differences are easier to see, you can see that

18   the red line is Visa which at the time is the largest and then

19   MasterCard below it, followed by Discover and then American

20   Express, and you'll see as you go over to 2012 that MasterCard

21   and Visa and almost Discover, essentially they've converged in

22   terms of the sizes of their acceptance networks, whereas

23   American Express is still substantially less when measured in

24   terms of number of merchants, but in all of the cases in the

25   period following Durbin the size of their acceptance networks

1  continue to rise.

2  Q    So can I just as a sideline here ask you to look at the

3  purple line.

4        The purple line is Discover, right?

5  A    Yes, it is.

6  Q    So am I right that in between 2007 and 2008 the Discover

7  line is growing at a kind of a steep rate.

8        Do you know what's going on there?

9  A    Yes.  Well, this chart doesn't show it, but if you look

10  at other figures that were in my expert report, what this

11  shows is if you went a few years earlier than this, Discover

12  and American Express were pretty close this size with their

13  acceptance networks and then Discover made a concerted effort

14  I believe based primarily on greater use of third party

15  processors and I believe Mr. Hochschild testified as to that

16  effort, but they tried to make -- they made greater use of

17  third party processors, they made a push to expand their

18  acceptance network, and in fact they succeeded to the point

19  that their acceptance network is almost as large as Visa and

20  MasterCard's despite the fact that they're the smallest

21  network if you look on the cardholder's side.

22  Q    So we can come back to that later.

23        You say that merchant acceptance continued to grow.

24        Did merchants testify at trial on this topic?

25        Could we have the next slide, please?

1  A    Yes, they did and what I have here is so the excerpts

2  from trial testimony which are -- it's really the merchants

3  giving voice to the economic principles and the evidence that

4  we've looked at before because you see here in the first one

5  where Sprint was being asked about their reaction to Durbin

6  and did they drop cards and they said no, they didn't even

7  though the cost fell a lot from their perspective is they said

8  they need to do it because their competitors do it and that's

9  a factor that the academic literature has consistently

10 identified as a reason for merchants to accept credit cards

11 because when you think about it, it's really one of the -- the

12 factors that goes into insistence.  If I'm a merchant and I've

13 got a bunch of competitors and they're accepting credit cards

14 and consumers want them, I'm going to lose some of that

15 business and so that's Sprint is pointing that out.  In Crate

16 and Barrel's case, it's just I think, in their words, a way of

17 saying that these are not substitutes when they're calling

18 them totally different products.

19 Q    The next slide, please?

20 A    So then the next slide is an executive from Southwest

21 saying that they too didn't drop and again pointing out, and

22 this is consistent with the slide we saw much earlier talking

23 about the use of debit and credit with airlines, they're

24 saying look, credit cards are really a big deal to us and, you

25 know, I interpret this as their way of saying we'd be too

1   worried about losing business.

2          And then lastly, the Alaska Airlines testimony is

3   speaking to this overall issue but from a slightly different

4   perspective, and they're saying so, did this help you?  When

5   it got cheaper, did that put competitive pressures that

6   allowed you to get a better deal from the credit card

7   networks?  And the answer is no, which we knew generally

8   because we saw that the networks didn't respond, and again I

9   believe Mr. Hochschild testified to that too, that Discover

10  did not respond in terms of its pricing, and so then when

11  asked why not, again he's saying, well, there's no competition

12  between the two, which is to say they're not close enough

13  substitutes.

14  Q    Okay.  So you've told us that you did not see a change in

15  the extent to which merchants accepted credit cards after the

16  Durbin amendment brought debit prices down.

17         Did you also look at the volume of credit card use

18  following the Durbin Amendment?

19  A    Yes, I did.

20  Q    Can we have the next slide, please?

21         What does this slide show?

22  A    So, what it's showing is the bar chart showing for these

23  different years that are labeled on the bottom, the purchase

24  volumes on credit cards and on debit cards and what we see is

25  following -- after the Great Recession, you see that both

1  debit and credit were rising, and in particular the blue bars

2  for 2011 and 2012 are telling you that in the year -- the

3  first full year following implementation of Regulation II,

4  credit continued to grow, and you can see in there there's,

5  you know, no break in the -- no visible break in the trend,

6  and had these been such close substitutes, we would have

7  expected to see a substantial change in that trend.  Again, if

8  you go back to the sorts of threshold numbers we were talking

9  about before, it would have to be something much bigger than

10  what you saw.

11  Q    So in other words, in response to the kind of price

12  change in debit that we saw in the fed study mentioned the 37

13  percent increase in interchange and you looked at the other

14  numbers in the all-in rate, in response to that kind of a

15  price drop for debit, you would expect if they were in the

16  same market to see something different than what's on this

17  slide; is that right?

18  A    That's correct.

19  Q    Could we have the next slide, please?

20        And Professor Katz, could you summarize for us your

21  analysis on the question of relevant market?

22  A    Okay.  So this slide is showing, and what we've been

23  talking about this morning, the typical merchant would expect

24  to lose a substantial volume of sales, that if it didn't

25  accept credit and chargecards, it would lose insistent volume

Katz - Direct / Conrath                    3936

1    and what that's telling us is that it's not that no merchant

2    would drop credit cards, because there probably are some that

3    would.  There could be merchants today that are right on the

4    edge of whether they want to accept a credit and chargecard or

5    not, but what it's telling us though is for the vast majority

6    of merchants, they're willing to pay, they have this insistent

7    buy and they're going to be willing to pay a premium.

8           By the way, I should say the vast majority of

9    merchants as measured by volume because there's always

10   questions about really small merchants and what they're going

11   to do and there are lots of them, but the large merchants are

12   where the money is.

13          So I say that, so the merchants -- we heard

14   merchants testify to, but I think that the broader market data

15   also show is you're just not going to see enough merchants

16   stop taking credit and chargecards to defeat the price

17   increase.  So the monopolist is going to find profitable the

18   Durbin Amendment because it's direct insight into that.  It

19   provides a natural experiment.  We saw the Government come in

20   and change the price and the sense in which it makes it an

21   experiment, maybe a word that participants in the industry are

22   not happy being guinea pigs, but it's saying the Government

23   came in and made the change and now let's see how the market

24   responds, and turns out the market didn't respond by very

25   much, which suggests very, very strongly that debit is in a

1   different market than the credit market and that's why we

2   didn't see the response, and so that's, you know, strong

3   evidence that supports the ultimate conclusion that credit and

4   chargecard network services to merchants constitute a relevant

5   market and then and that's true when considered for the T&E

6   market and it's also true when applied to the broad market.

7   Q    All right.  Professor Katz, continuing with the market

8   power approach after defining the relevant markets, what was

9   the next step of the analytical framework you're going to walk

10  us through?

11  A    So the next step is to assess market power.

12  Q    Next slide, please.

13          And did you do this in both the T&E and the general

14  purpose general market?

15  A    Yes, I did.

16  Q    Next slide, please.

17          Can you tell us what you mean by market power?

18  A    So when economists talk about market power, the typical

19  definition is the one I've given in the first bullet is:  The

20  ability of a supplier or a set of suppliers, you can apply the

21  concept that way too, within a relevant market to raise the

22  price profitably above the competitive level and for a

23  sustained period of time.  So again we're not interested in,

24  you know, could you raise price for a day and lower it before

25  anyone noticed.

1              Now, there's also a second definition here which is
2     used by -- is used by antitrust economists, but it's also a
3     definition frequently used by the courts which is:  The power
4     to control prices or exclude competition.
5     Q    Is market power an all-or-nothing concept?
6     A    No, it's not.  There's gradations of it.  You might have
7     no market power, you might have a little, you could have a
8     lot.  And so where antitrust economists would become concerned
9     or antitrust economics would be concerned is where you have
10    substantial market power, or what some people would call
11    antitrust market power, but it's a continuous concept.
12    Q    Did you find that American Express has substantial market
13    power in the product markets you identified?
14    A    Yes, I did.
15    Q    Take the next slide, please.
16              What kinds of evidence did you find that indicates
17    that American Express possesses market power?
18    A    Well, as a starting point in the analysis, I looked at
19    the market structure and market share, and as we already
20    heard, it's a concentrated market, but I looked at it in more
21    detail.  Then I looked at cardholder insistence, in this case
22    from the perspective of insistence for using American Express
23    cards as opposed to earlier this morning when we were looking
24    at insistence for the credit cards overall, and then the other
25    thing that I did was looked at several dimensions of American

1    Express's pricing strategy to see what that indicated about

2    the degree of market power they possess.

3         MR. CONRATH:  Could we switch the monitor, Your

4    Honor, and could we have the next slide?

5    Q    So let's start with market structure and market share.

6         How would you describe the market structure of the

7    credit card industry?

8    A    So I would describe it as a concentrated market, and what

9    this slide is showing is the particular quantification of

10   that, and so you can see that the rows of numbers generally

11   are for the four networks, American Express, Discover,

12   MasterCard, and Visa, and then what the columns of numbers are

13   doing are showing the charge volume in dollars, but then

14   converting those numbers in the sort of paired-up columns,

15   converting those into market shares.

16        Okay.  And I did it for several different years

17   because one of the things economists will look at is, well,

18   does the market share jump around a lot from year to year, and

19   you'd see here while they're changing, it's not that there's

20   some dramatic jumps that you think, well, wait a minute, if I

21   look this year I'll get a completely different answer than if

22   I look the year after.

23        And what it's showing in one levels we already --

24   see, what we already knew is that Visa is the largest and

25   American Express is second, but what you see, looking for 2011

1    for example, that when we look at shares for network services

2    being provided to T&E merchants, you see that American Express

3    is much closer to Visa than they are overall.  While they're

4    still second, they're a much closer second and you can see,

5    you know, they're quite a bit above MasterCard.

6              But, so this is telling us again it's a concentrated

7    market, and that bottom row of numbers I put there is a

8    particular measure of concentration that's widely used in

9    antitrust economics and is used in the courts and it's the

10   Herfindahl-Hirschman Index, and without going into the

11   calculation of it I'll say what it is is it's a measure of

12   concentration, it can range between zero and 10,000, and the

13   horizontal merger guidelines when they talk about it identify

14   different categories of markets and markets above 2500 are

15   markets that are highly concentrated and those are markets

16   then in which there's heightened concerns about the degree of

17   competition in those markets, and as you can see from the

18   numbers that I won't read out loud that for each of these

19   years, that concentration number is above that threshold, that

20   these are highly concentrated markets.

21   Q    I think you can give one of those numbers out loud.  I

22   think that one is not a problem.  So the third, the most

23   recent year, the Herfindahl-Hirschman Index is what?

24   A    For T&E it's 3297.

25   Q    So you said that you used the shares to measure purchase

1    volume or charge volume.

2            Why did you use that?

3    A    For one it's because that's how the -- the money is

4    actually collected from merchants, that's what we've been

5    talking about merchant discounts.  All of those things are

6    triggered by the volume of commerce, but I also think it's the

7    single best measure of the importance of different networks to

8    merchants because ultimately merchants care about their sales

9    and this is measuring the different networks in terms of the

10   sales that merchants would have on those networks.

11   Q    Can we have the next slide, please?  So let's turn to the

12   general market for general purpose credit card services for

13   all merchants.

14           What's the market concentration and market shares in

15   that market?

16   A    Well, this is showing the parallel figures and you can

17   see in this one that if you look for 2011 again that American

18   Express now is they're larger than MasterCard, but they are

19   closer to it, but that this is still a concentrated market.

20   And I guess I can read the number, you'll see it's 3270, so

21   again it's well above the -- the threshold for being highly

22   concentrated.

23   Q    Is it possible for more than one firm to have substantial

24   market power in the market?

25   A    Yes, it is.  I mean, I understand that this trial is

1  about whether American Express does, but in the past trial in

2  U.S. v. Visa, for example, the courts had found that both

3  MasterCard and Visa possessed market power.

4  Q    Did you examine the entry conditions in the industry?

5  A    Yes, I did.

6  Q    And how can entry conditions be relevant to a

7  concentration of market share?

8  A    Well, it's relevant to the assessment of competition in

9  that if entry is easy enough, it could defeat attempts at

10  anticompetitive actions.  For example, if the competition was

11  harmed among the existing credit and chargecard networks, but

12  that an entrant could come in and not be subject to the same

13  restrictions somehow, it could then defeat that action.  So a

14  standard thing for economists to do is also look at the

15  conditions of entry.

16  Q    And what did you find about entry conditions into the

17  credit card industry?

18  A    That it's difficult.  I mean, there's a reason that

19  Discover is the last one to come in in 1985.

20  Q    And what is the reason why it's difficult?

21  A    Well, a central reason is the so-called "chicken and egg"

22  problem which is arising from the network effects that we

23  talked about much earlier today where the problem you face as

24  a new network is if you have no cardholders, the merchant's

25  asking, well, why should we go through the cost of accepting

1    you, and then vice versa if you have no merchants, why does a

2    cardholder want to hold your card.

3              THE COURT:  But is there a cost of accepting an

4    additional card other than just putting a sticker on the door?

5              THE WITNESS:  Yes, there is and that's one of the

6    things you see that while, you know, one of the things the

7    merchant's going to look for, obviously, is the price of the

8    credit and chargecard, do they want to take it, but also if

9    the volume of the credit and chargecard gets too low, the

10   merchant is going to say, well, wait a minute, do I really

11   want to, for example, you know, possibly to have -- it depends

12   on what service my acquirer offers, but do I have to add

13   another account on or is it one more thing to keep track of,

14   do I have to train my people at the point of sale how to deal

15   with the other credit card, and sometimes there can be

16   differences in terms of what they do.  So one of the things

17   you'll see happen is a merchant that thinks they're going to

18   have a very small volume at a credit and chargecard network

19   and say look, it's just not worth taking it because there are

20   some setup costs associated with it.

21             In fact, I think that's one of the things if you go

22   back and look at Discover, they used to have a much smaller

23   merchant acceptance and one of the reasons is, remember, they

24   have a very low charge volume compared to the others.  If a

25   merchant would say, well, wait a minute, it's a hassle dealing

1    with you, you know, there are some costs associated with

2    setting up to deal with you, it's just not worth it.  So then

3    when Discover went to the strategy of going to third party

4    acquirers, I think one of the things it did was it could

5    piggyback on things with Visa and MasterCard and then the

6    merchants said okay, it's easier to take you and so we'll do

7    it.  So they were precisely to overcome some of these setup

8    costs.

9            THE COURT:  But a new card entry would have some of

10   the benefits of improvements in technology, for instance,

11   where there's just you don't have to put the card through one

12   of these mechanical devices where you get a receipt and you

13   have to sign it, everything's done automatically.  It would

14   just be a question of some company being interested in putting

15   up the capital to create a new card.

16           THE WITNESS:  Okay.  I want to make sure I

17   understand one part of your question.

18           If you're saying that the new company would use a

19   new kind of point of sale terminal.

20           THE COURT:  No, I would say use the same terminal

21   and if there's a sufficient profit margin in it, wouldn't that

22   encourage entrepreneurs or venture capitalists to, you know,

23   set up a new credit card offering?

24           THE WITNESS:  To date --

25           THE COURT:  Has anyone even indicated an interest in

1   doing it?

2          THE WITNESS:  Not that I know of.  I mean, if you

3   think of something like, I don't know if you're familiar with

4   Square where you have something you --

5          THE COURT:  Sort of.  It's come up here.

6          THE WITNESS:  So Square has a device you can plug in

7   to a mobile -- if you have a smart phone, you can plug it in

8   and then you can actually swipe a credit card and the mobile

9   phone then connects with Square's thing, and it's something

10  that's used a lot.  You know, if you go to something like a

11  farmers market they'll do it.  It's popular with the small

12  merchants.

13         THE COURT:  I've seen it.

14         THE WITNESS:  Okay.  And it's popular I think for

15  two reasons.  One, they like you can just plug it into your

16  mobile phone.  The point of sale device is a great innovation.

17         THE COURT:  Well, it's good for a small merchant at

18  a farmers market who wants to increase the number of sales.

19         THE WITNESS:  That's absolutely right.

20         THE COURT:  For people who live in a credit

21  environment.

22         THE WITNESS:  That's absolutely right, and what it's

23  doing though is allowing the small merchant to accept the

24  existing credit cards.  So what Square is doing is they're

25  putting a -- again, they're piggybacking on the existing

1  networks, and there's, as I understand it, two parts to their

2  business model.  One is this innovative capture device, which

3  is particularly good.  The other thing is is that very small

4  merchants pay very high discount rates, and they also I was

5  told, because I was told some of this by executives from

6  Square, but told that there's a lot of hassle for a small

7  merchant dealing, and they were talking particularly about

8  Visa and MasterCard, and that Square acts as an interface for

9  some of that and it makes it much easier for a small merchant

10 to be able to accept things like Visa and MasterCard.

11         So again, they are innovating and the entire

12 industry is innovating, but they are still doing it

13 piggybacking on the existing networks.

14 BY MR. CONRATH:

15 Q    So is there any possibility that Square could become an

16 alternative network and be a replacement for Visa or American

17 Express?

18 A    Not today.  You know, I can't rule out ten years from now

19 they may have that, but not in the near future.

20 Q    So we have heard American Express say that it must not

21 have market power because its cards are not accepted in as

22 many locations as Visa and MasterCard and Discover.

23         So could we have the next slide, please?

24         And my question to you is does American Express's

25 smaller acceptance network prove that American Express does

1   not have market power?

2   A    No.  I mean, it doesn't prove it for several reasons, one

3   of which is just potentially they have the logic backwards,

4   and what this slide is pointing out is that, you know, one of

5   the hallmarks of exercise of market power is raising price and

6   restricting output, okay, and one interpretation, I think the

7   correct one, of what's happened with American -- or part of

8   why American Express has a smaller merchant acceptance network

9   is they've chosen to because they've chosen to pursue a

10  higher-price-lower-volume strategy, okay.

11          And if we could have the callout on this, this is

12  from an American Express document and there are others talking

13  about the merchant acceptance and I guess this is not -- this

14  is correct this is not confidential?

15  Q    This is confidential.

16  A    Okay.  The reason I'm asking, it's not marked on my

17  slide.  So let me.

18  Q    Sorry.

19  A    All right.  So I won't read it out, but I think the thing

20  is to note is that what it's doing is it's linking their

21  pricing strategy with what that means for the extent of

22  merchant coverage and saying, well, we recognize there's a

23  tradeoff and that higher price then goes along with a lower

24  degree of coverage and they're distinguishing themselves here

25  from Discover, which we've talked about, you know, certainly

1    historically tried to be merchant friendly in terms of its

2    pricing and even today has lower prices than American Express

3    does to merchants and has also made these pushes to make it

4    easier to deal with them.  So part of this is saying, what

5    this is really saying, the bottom line is that American

6    Express's smaller acceptance network today is the result of

7    their decisions.

8              THE COURT:  It's a conscious decision to have this

9    business model?

10             THE WITNESS:  Yes.

11             THE COURT:  Is that what you're saying?

12             THE WITNESS:  Yes.

13   BY MR. CONRATH:

14   Q    Could we have the next slide, please?

15             Does American Express sign up every merchant that it

16   would be profitable for American Express to serve?

17   A    No, they don't.

18   Q    So what do you draw what from the quotation in the -- on

19   the slide?

20   A    Okay.  Am I correct I'm not supposed to say the name of

21   the company?  Okay.

22             So this is describing negotiation, or this is part

23   of a description, this is deposition testimony because this

24   witness has not yet testified, was describing a negotiation

25   between American Express and this particular merchant and the

1    merchant was going to drop American Express and American

2    Express was trying to figure out what to do to keep them and

3    they eventually got the offer.  They said, well, this is as

4    low as we're willing to go in terms of our price and that's

5    it, we'd rather lose you than go lower.  And the witness was

6    asked:  Well, at that time, were you at such a low price that

7    if you went lower you would lose money?  And it says:  No - as

8    it says - probably not.  We were above that.

9            And we'll see that in other instances too that

10   American Express there were times where it believes it could

11   charge a lower price and get the merchant, but it makes the

12   conscious decision not to even though it would be profitable

13   viewed for that specific merchant, and one of the reasons they

14   don't go lower is they're worried that a lower price to that

15   merchant would trigger pressure for them to lower the price to

16   other merchants.  So it's not that dealing with this merchant

17   directly is unprofitable.  They're worried about what they

18   think is a, what they call sometimes as a pricing spillover,

19   that if I give you a good deal, then I would have to give Mr.

20   Conrath a good deal and I don't want to do that, so I'm

21   willing to turn your business away rather than give you the

22   lower price you demand.

23           THE COURT:  Well, could that be because by giving

24   you a better deal, you're not going below the what you would

25   call the breakpoint, but if I give you that deal, I go to this

1   other merchant, if I give them the same deal, I'm going to be

2   losing money and I don't want to start down that slippery

3   slope and that's a business decision that I make to preserve

4   my profitability with regard to the other merchant?

5            THE WITNESS:  No, certainly that's -- what they are

6   trying to do that is preserve their profitability and --

7            THE COURT:  So it may not seem fair to this

8   merchant, you know, but in terms of an industry or segment, it

9   may be an appropriate business decision.

10            THE WITNESS:  No, I'm certainly not questioning from

11   their business perspective whether they're maximizing profits

12   and it would be an appropriate decision for them, but it is

13   showing that they are making a tradeoff of saying we'll take

14   higher prices even if that means a lower network size for us.

15   BY MR. CONRATH:

16   Q    Could we turn to the next slide, please?

17            What does this slide show?

18   A    Okay.  And so what we have here in the callout is,

19   because the slide is hard to read given the size, but what

20   it's showing is it's a table of 50 merchants that were

21   identified by American Express or in some terms like the top

22   50 merchants that don't take them and I do not believe it was

23   by size.  It was by some sense of significance that American

24   Express had.  And what the entries in the table are doing, and

25   I've called out one for a particular company, is they said

1   okay, for this company, you see they have the industry

2   classification, they said here's our estimate of the rate we'd

3   have to give them to get them to sign up with us and then

4   that's in column C.  And then the number next to that says

5   okay, we're going to ask ourselves -- let me make sure this is

6   right.  We're going to ask ourselves, all right, given that,

7   if we lower the rate to meet what they want, okay, would we

8   still be having a positive contribution?  Because their

9   contribution margin is, this is in deposition testimony it was

10  described by an American Express executive as saying their

11  best measure of how much the merchant relationship is worth to

12  them.  And so what this is saying is, well, you want us to

13  drop, saying to the merchant, you would like us to drop your

14  price to this level shown in C.  What we've calculated is that

15  drop, which is just the difference between D and C, it's

16  relatively -- they've said the drop is that number of basis

17  and then what I've calculated or taken from their accounting

18  is E, which is, well, American Express, what were you saying

19  is the value of merchants in that industry to you, how much --

20  how profitable is it for you?  Okay.  And what it's showing is

21  that there's room for them to drop the rate and for it still

22  to be profitable and that's what that number in F is doing.

23         And now if we look, if we do the other pop-up, if we

24  could, it's still not so popped up, but if you looked at that

25  with all of those numbers are positive, and what it's showing

1    is in all of these cases, American Express data are indicating

2    that if they were to lower the price to meet the level they

3    think they needed to to get the merchant, that their

4    accounting shows they would still make -- be making money.

5    Now, it doesn't mean that they would be right in every case

6    and maybe they wouldn't get some of the merchants, okay, but

7    what I think this is showing though is, again, they're making

8    this conscious decision, they're making a tradeoff of these

9    higher prices and are recognizing that that may mean fewer

10   merchants, which is certainly, from the point of view of

11   economics, that's their right to do and it's rational, but

12   this is indicating that the size of their merchant acceptance

13   network is something that they're choosing.

14   Q    Could we look at the next slide, please?

15        American Express has said that there are millions of

16   merchants who don't take American Express.

17        Does that mean that Amex doesn't have market power?

18   A    No, it doesn't, and one thing that this slide is pointing

19   out, and if we could just call out the pop-up, one thing just

20   to put the millions of merchants in perspective, which I think

21   the Court has already heard, they were generally talking about

22   small merchants, and what this slide is identifying, and I

23   should be clear that this is a slide talking about American

24   Express globally, although parts of it call out specifically

25   the United States and the statements here are relevant to the

Katz - Direct / Conrath                    3953

1   United States, they're saying look, it's primarily small

2   merchants where we lack coverage.  One of the factors is the

3   higher pricing, but then the other factors are what they call

4   scale and relevance challenges.  Relevance is what American

5   Express means when they're talking about the merchant may not

6   see American Express cardholders that often and starts asking

7   is it worth the trouble to deal with them to incur the setup

8   costs associated with American Express, and then operational

9   differences I believe is referring to something American

10  Express has identified elsewhere as certain costs associated

11  with working with American Express as opposed to other credit

12  and chargecard networks.

13          So yes, there are millions of merchants, they're

14  primarily small merchants, and one of the reasons is because

15  they're small merchants is because of the setup costs that you

16  were asking about earlier.

17  Q    I think you've told us earlier that Discover is a network

18  with a much smaller charge volume or market share than

19  American Express; is that right?

20  A    That's correct.

21  Q    And does that turnout reflected in Discover being

22  accepted at a smaller number of merchants than American

23  Express?

24  A    No.  As you said, Discover is accepted at many more than

25  American Express.

1   Q    And what's the reason for that?

2   A    I think if you look at these three factors that one of

3   the differences between Discover and American Express is the

4   pricing, but also I believe that Discover's worked to minimize

5   any operational differences from the perspective of the small

6   merchants.

7   Q    So those are choices the networks make?

8   A    Yes.

9   Q    All right.  Professor Katz --

10             THE COURT:  We heard testimony yesterday having to

11   do with the fact that a concern for American Express is that

12   because their coverage was substantially less than Visa, for

13   instance that when you go to a shop in San Francisco and offer

14   your American Express Card, there's a one in two chance that

15   the merchant's going to say we don't take that and that that

16   kind of rejection could have an adverse effect on the use of

17   the card by that customer at other merchants who do take the

18   American Express Card because either they don't want to be

19   rejected or it's a nuisance to have to put forward a second

20   card and it's just inconvenient and so this works against the

21   interest of the American Express brand, and so on the one

22   hand, you're saying that they reject merchants for whatever

23   reasons they have, and on the other hand, I'm being told that

24   they're concerned about the non-acceptance of the card in one

25   out of two locations in San Francisco.

1          How do those apparently conflicting facts get

2    explained?

3          THE WITNESS:  Okay.  I think there are a couple of

4    things there.

5              So one, they do face a tradeoff.  I mean, they would

6    clearly like to be able to get, I believe they'd like to be

7    able to get every merchant, if they could get them, at a high

8    price.  So partly they just have to make a tradeoff and some

9    extent then they face a tough choice:  Do you want the high

10   price or do you want merchant acceptance?

11             But I think another thing to keep in mind, they said

12   one out of -- you know, when you go to use your card, one out

13   of two times it will be rejected, I think that that would be a

14   very, very, very unrepresentative consumer, that if you look

15   at this, it may be true that half the merchants don't.  I

16   haven't looked specifically for San Francisco, but the

17   merchants who don't take American Express are going to be the

18   small ones with low charge volume.  So if you're a tourist and

19   you go to San Francisco and you pull out your American Express

20   Card, certainly weighted by dollar volume it's going to be

21   90-some percent of the time you're going to be able to use

22   your American Express Card.

23             So when they do it in terms of the number of

24   merchants, it gives a very different picture than if you look,

25   well, okay, how are people really spending their money.  So I

1  think that's a big part of it.  People use their American

2  Express cards all the time in San Francisco.

3             The other thing is when they say, well, look, if I

4  don't -- if this merchant doesn't take it, I may not use it at

5  ones that do, the merchants that do take American Express are

6  free to use the American Express signage and to have it up,

7  and so if I'm at the merchant and I see that it says "We take

8  American Express," I'm not going to be concerned that my

9  American Express Card's going to be rejected.  So they do have

10  ways to educate the customers about where it's used.

11             THE COURT:  All right.  Thank you.

12  BY MR. CONRATH:

13  Q    I should say you live in San Francisco?

14  A    Yes, I do.

15             THE COURT:  I had no idea.  I really had no idea.

16             Now he's a fact witness.

17             MR. CONRATH:  What can I do, Your Honor?

18  Q    All right, Professor Katz, I'd like to move to the second

19  topic you mentioned, which is insistence.

20             What does American Express mean when it uses the

21  term "insistence"?

22  A    So they're using it similarly to the way I used it this

23  morning talking about a credit and chargecard, the

24  hypothetical monopolist, but they're using it talking

25  specifically about American Express cards, and so the concept

1    of insistence is getting at if I'm a merchant and I accept

2    American Express cards, I'm going to have some volume of

3    business that uses them and if I stop taking American Express

4    cards, I'm going to lose some of that business, and insistence

5    is a measure of how much I'm going to lose.

6    Q    And what's the relevance of insistence to your evaluation

7    of whether American Express has market power?

8    A    Well, insistence is a key source of market power because

9    it's explaining why it is that merchants are willing to pay

10   more for American Express.

11   Q    And I should say here is insistence your term, or did you

12   pick it up from American Express?

13   A    I've certainly used the word before, but using it as a

14   term in talking about insistence and insistence value, that's

15   from American Express documents.

16   Q    Could we have the next slide, please?

17              MR. CONRATH:  And this is confidential, sorry.  Are

18   we still on confidential mode?

19              THE COURT:  Yes, we are.

20   Q    How does the concept of insistence enter into American

21   Express's pricing to merchants?

22   A    Well, what this document is showing is how American

23   Express thinks about what insistence means for its pricing.

24   So as part of how it evaluates things.  And what the document

25   is doing is it's starting with the baseline value and what

Katz - Direct / Conrath                    3958

1   that baseline value, as you see in 1 how they're interpreting

2   it, they're saying, well, what does it cost the merchant to

3   accept Visa and MasterCard's credit cards because Visa and

4   MasterCard credit cards are their big, that's their

5   competitor.

6          So then they're saying, well, so we could charge

7   that amount because, you know, we go back and think about in

8   terms of the logic of the slides with the green and the red

9   boxes.  If we just charge the same amount as Visa and

10  MasterCard, then there's not going to be a rate differential.

11  So the merchant's not going to have an incentive to want to

12  move away from us because they'll say look, we're the same

13  price and Visa and MasterCard, why would the merchant care

14  which one is used.

15         All right.  So then they ask themselves, they said,

16  well, we'll start from that baseline of our competitors and

17  now let's take into account insistence, and what's shown here,

18  and maybe we could highlight it in red, what they do is

19  they're asking the same question of the merchant:  How much

20  are you going to lose, okay, if you stop taking American

21  Express?  And so they calculate this insistence value, if we

22  could do the next callout, and they break insistence down into

23  two parts.  The CM is for cardmember.  They're saying look,

24  there's walk-away insistence, the people aren't going to shop

25  with you so you're going to lose the business, and then the

1    other callout is what they call the spend less, which even if

2    they continue to shop with you, they're not going to spend as

3    much money.  And so what the boxes above that are doing is

4    saying we're figuring out then how much money is that worth to

5    the merchant, right, given that they know that the merchant

6    would lose business by not accepting us, American Express, so

7    how much more can we charge than MasterCard and Visa are

8    charging for their credit cards, and this is again is charging

9    to the merchant.  So that's what those amounts are saying is

10   this is how much more that we can charge.

11          Then the rest of the diagram is showing things or

12   ways American Express creates value other ways.  And then if

13   you go to 4 they're showing certain things with operational

14   costs for merchants, they're saying, you know, these policy,

15   their policy driven costs for merchants, and again that gets

16   back to this question that the issue for merchant, it's not

17   just about what it pays for a payment instrument or what it

18   pays for a credit and chargecard.  There are also other costs

19   associated with it.

20          So they very much look at insistence as something to

21   think about when evaluating their pricing because it's giving

22   a sense of what sort of premium they can charge over their

23   competitors Visa and MasterCard and for it still to be

24   rational for a merchant to accept it.

25          And now if you go to sort of the tall white box on

Katz - Direct / Conrath                          3960

1    the right side next to the black box, what they've done there

2    when they say the value surplus and they say when we put all

3    the pieces together and the biggest components of that value

4    surplus are the insistence numbers, when we put all those

5    pieces together, that's how much we're worth to the merchant

6    than MasterCard and Visa.  That's really the language I was

7    talking about before, that's what you're going to lose because

8    of the insistence and some other factors if you don't take us.

9            And then what they're doing in the black box is

10   their labeling.  If you look at that dashed line, the bid

11   above says well, this is how much we charge today, the part

12   above that dashed line, this is how much we charge today and

13   this is showing, and this is just an illustrative example as

14   it shows here, it's saying our value to the merchants that we

15   get from switching to other things is bigger than the premium

16   we are charging.  So what this is showing though is that

17   American Express recognizes insistence is one of the things

18   that gives them the ability to charge merchants higher prices.

19           THE COURT:  But they don't charge the full value

20   surplus?

21           THE WITNESS:  No, they generally don't.

22           THE COURT:  According to them.

23           THE WITNESS:  And I agree with that and we will come

24   to that, Your Honor, we'll look at some specific calculations

25   by industries that this is clearly something they use as part

1    of an overall process, but they're not literally going up to

2    these numbers because as we'll see in some cases the numbers

3    are very high, we'll see when we get to them, but they're very

4    high numbers, but what it's doing is it's identifying the

5    source of the ability to charge higher prices and then giving

6    a sense that there's a lot of room for them to charge the

7    higher prices, but, you know, American Express does bargain

8    with their merchants, so merchants are getting surplus too

9    and, you know, why I'm going to focus on here's why they can

10   charge merchants more, of course there are things offsetting

11   that and what we're looking at really is the balance and

12   that's why they're not going to get all of that surplus, some

13   of that is going to go to merchants.  But the point that I

14   take away from my economic analysis though is there is a bunch

15   of surplus there and which is translating into the ability to

16   charge higher prices.

17          MR. CONRATH:  I probably should have mentioned, by

18   the way, Your Honor, that you might recognize this document

19   and one very much like it that Mr. Funda talked about earlier

20   in the trial.

21   BY MR. CONRATH:

22   Q    And can I just ask you one thing, Professor Katz.

23          That baseline cost, the starting point on this

24   calculation is Visa and MasterCard credit; is that right?

25   A    Yes, that's what it says.

1  Q     It's not blended credit and debit?

2  A     No, it says credit.

3  Q     Could we have the next slide, please?

4        What are the sources of American Express's

5  cardholder insistence?

6  A     Well, American Express breaks it up, and remember before

7  I promised or threatened to show those insistence

8  calculations, what else was in there, but they break it up

9  between you can think of it as consumer insistence or people

10 sort of generally and then they're also going to look at

11 cooperate cards because they're the leading network for

12 corporate cards and for most of their cardholders, a big -- or

13 a majority of their cardholders the big source of insistence

14 is the rewards.  People want to use their American Express

15 cards because they get rewards and American Express operates a

16 very attractive rewards program.

17       And what this document is doing is another

18 presentation to Alaska that's representative of others in

19 which they're explaining in this presentation that they do

20 have a good rewards program and that because of that they have

21 customers who are loyal to them and they are pointing out to

22 Alaska Airlines that a lot of the charge volume in American

23 Express is coming from cardmembers, their term for

24 cardholders, that are in a loyalty program.

25 Q     Could we have the first callout?

Katz - Direct / Conrath                                    3963

1   A      So it does have all of them.  They're talking about their

2   point that they have a good rewards program and they're saying

3   to Alaska you should care about that because this rewards

4   program is going to mean that our customers are insistent and

5   therefore you should be willing to pay our rates.

6   Q      Could we have the next slide, please?  And you mentioned

7   that Corporate cardholders are another source of insistence.

8          Can you explain what this slide shows?

9   A      Well, before I get to this slide, if I could just say one

10  thing about why should we care what's on this slide.

11         So American Express is the leading network for

12  corporate cards and they are the leading network because they

13  provide a lot of their services and value of using their

14  Corporate card and they provide accounting and things like

15  that for the users, and a common thing for a Corporate card

16  account is for the company to require its employees to use the

17  Corporate card when spending for business.  They have

18  corporate mandation programs and even if they don't have a

19  formal corporate mandation program, corporations will also

20  have a policy though saying look, if you don't use your

21  American Express Corporate card, we'll pay -- you know, we'll

22  reimburse you, but it may take longer, there may be more

23  hassle, but when you do it through the Corporate card program

24  it's going to be smoother for you as an employee.

25         So what that means is that Corporate card use has a

1  high level insistence because of things like corporate

2  mandation, and what this document is showing us is that for

3  some merchant segments, and it will come as no surprise

4  particularly in travel and entertainment, that Corporate card

5  volume is a very substantial part of the American Express

6  volume at a merchant.  So again if you look at the first line,

7  if you look at airlines, you can see in -- well, I just won't

8  say the number.  If you look at column B, you can see for

9  airlines that it's a very substantial part of the volume of

10 American Express -- this is saying that's the percentage at an

11 airline of American Express charge volume that's on a

12 Corporate card.  So it's -- it's a big part of what's going

13 on, and that's relevant because of the insistence of Corporate

14 card users, and what you can see is I've calculated some

15 averages shown in column B in bold and you can see generally

16 the use of Corporate cards is much more in travel and

17 entertainment than in others.  So that American -- it's part

18 of the fact that American Express is particularly important to

19 travel and entertainment merchants.

20 Q    And that percentage is in column D, as in dog?

21 A    That's right.

22           THE COURT:  And the Corporate card is a negotiated

23 agreement between the corporation and American Express,

24 correct?

25           THE WITNESS:  Yes, and in that case, American

Katz - Direct / Conrath                    3965

1    Express as an issuer, but yes.

2              THE COURT:  As an issuer.

3              THE WITNESS:  Yes.

4              THE COURT:  Right.

5              THE WITNESS:  That's my understanding.

6              THE COURT:  So there is a benefit for the

7    corporation that it sees in requiring the use or authorizing

8    the use of the American Express Corporate card for its

9    employees.

10             THE WITNESS:  Yes.  No, clearly American Express is

11   very successful as a corporate card issuer.

12             THE COURT:  So they're giving something to get

13   something in that situation.  It's like a rewards program for

14   corporations, if you will, because the corporation is

15   obviously negotiating a price that is beneficial to the

16   corporation.

17             THE WITNESS:  That's correct.

18             THE COURT:  So they have, there's an added player in

19   the equation, isn't there?  You have the member who's getting

20   rewards who's holding the card, you have the corporation who

21   has an agreement with American Express which is arguably

22   beneficial to the corporation.

23             THE WITNESS:  That's right.

24             THE COURT:  And then you have American Express the

25   merchants over there somewhere.

1              THE WITNESS:  That's right.  If you went back

2    earlier to my diagram that showed the customer at the point of

3    the sale with the merchant, we could have expanded that and we

4    could have had, you know, the accounting office or somebody,

5    as the company was essentially steering the card user at the

6    merchant, saying okay, we want to steer you to using your

7    American Express Corporate card because that's what's good for

8    the company.

9              THE COURT:  So that's a form of steering, but it's

10   by a third party.

11             THE WITNESS:  That's right.

12   BY MR. CONRATH:

13   Q    And so just to add the other actor in here, the merchant,

14   what does it mean to the merchant that American Express has

15   this corporate card relationship that involves mandatory use

16   by the employees?

17   A    Well, the merchant, as we've been saying, is going to be

18   concerned with the insistent volume, and so if you were a

19   hotel, you would be quite concerned that if you didn't take

20   American Express you're going to maybe be hard-pressed to get

21   American Express Corporate card users to come to your hotel

22   and that is a significant piece of money.

23   Q    Can we look at the next slide, please?

24             How does American Express use insistence to evaluate

25   pricing?

Katz - Direct / Conrath                          3967

1   A    I'm tempted to plead that we can go eat lunch before I

2   walk you through this.

3           THE COURT:  You wouldn't get an argument from me on

4   this slide.

5           We've been through this before.

6           MR. CONRATH:  Well, you all --

7           THE COURT:  I have nightmares over this one.

8           THE WITNESS:  This is not above your bed.

9           THE COURT:  Are you going to make me understand

10  this?  Is that your job?  The last witness I'm not so sure.

11          THE WITNESS:  That may suggest -- well, there's

12  some --

13          THE COURT:  Well, why don't you try.

14          THE WITNESS:  -- high-level take-away.

15          THE COURT:  Better we should deal with it on an

16  empty stomach.  Go ahead.

17          MR. CONRATH:  All right.

18  BY MR. CONRATH:

19  Q    So does this slide show a methodology?

20  A    Yes, it does.

21  Q    And can you walk us through how American Express uses

22  insistence in this pricing methodology?

23  A    Okay.  Well, this is not only sort of using it, but how

24  you calculate it.  So let's break it down into some pieces.

25          So if we were to look at the first yellow line,

1    okay, where we see it says in blue it says "industry category"

2    and then it gives a charge volume and then it has various

3    numbers under it says "consumer walk away insistence,"

4    "consumer spend less insistence," and then "total consumer

5    insistence."  What it's doing here is it's putting in

6    estimates for this particular merchant category of the

7    different kinds of insistence based on American Express's

8    experience and data they've looked at and they're saying okay,

9    these are estimates we have of that.  They're combining those

10   different estimates of different kinds of consumer insistence

11   to get a single consumer insistence number, okay, and up in

12   the blue, which I will not walk through in the dotted blue

13   lines, is talking about how some of that's done, but the main

14   thing to take away is they come up with a consumer insistence

15   number and then also in a different column they come up with a

16   corporate insistence number, okay, which is see it's a higher

17   number.  If you look, it's the third number from the right

18   that's in yellow and they have -- okay.  So they come up with

19   they have a corporate number, they have a consumer number, and

20   then what they do is they weight those.  They say, well, in

21   this particular consumer segment, how important are consumer

22   cards versus how important are corporate cards?  So the

23   overall thing to do is they come up with a weighted average

24   which is what's labeled there as "total insistence."  It has

25   the dashed blue lines around it in the box.  So without going

1   into details, it's to say they build up to get an insistence

2   number.

3   Q    What is that insistence number intended to represent in

4   this calculation you're about to do?

5   A    As I said, it's representing what percentage of the

6   American Express charge volume the merchant would lose if it

7   were to cease accepting American Express cards.

8   Q    And that's because that's the percentage that is so

9   insistent that it would walk away or would not come back as

10  often?

11  A    Well, it's that it would walk away or would spend less or

12  would be subject to corporate insistence.

13  Q    Okay.

14  A    Now, the next yellow line is really doing part of again

15  what we were doing this morning because it's the same logic

16  being applied at a different level, but it's always coming

17  back to the merchant's decision and how do you trade off price

18  against quantity.  What the next line is saying is, well, we

19  need to take into account when you lose the business as a

20  merchant, how important is that to you that you've lost that

21  business.  So if you look at on the left in that second yellow

22  column, there's a number there, the business as usual

23  operating margin.  So that's an estimate for this industry

24  what the operating margin would be because that's what we're

25  going to multiply, or they're going to multiply in this

Katz - Direct / Conrath                              3970

1    instance, that's what's going to get multiplied by the

2    insistence in order to figure out how much the merchant would

3    lose by not taking American Express cards and that's what that

4    callout is doing because --

5    Q    Which callout is that?

6    A    I was going to say that, at least with my eyes the

7    orange.  I just couldn't read.

8              So it's brought out at the bottom, but notice it's

9    saying how much is insistence worth incremental value and

10   they're saying it's the total insistence times the operating

11   margin.  So if you think back this morning to the red boxes,

12   remember we were doing the same sort of calculation where we

13   said, well, what's the insistence volume and what's your

14   margin.  I didn't break out the particular kind of margin, but

15   what's your margin because you're saying, all right, well,

16   that's how much it's worth to the merchant and therefore how

17   much it's worth to American Express that the merchant would

18   lose that business.

19             Now, the other parts of that calculation in that

20   yellow line is what they refer to as a negative value to -- is

21   American Express putting a price on some of the operational

22   issues associated with dealing with them from the merchants'

23   point of view, and so they do a set of adjustments.

24             THE WITNESS:  But to touch on something you

25   mentioned earlier, Your Honor, when you get to the number at

Katz - Direct / Conrath                                    3971

1    the end, the one that has a green arrow coming from below it,

2    that's where they said here's how much more we're worth.

3    Well, let's compare though what our premium is today, the

4    number in red, and they said okay, we come up with a bottom

5    line number.

6              Now, that bottom line number in this calculation is

7    not based on trying to get all of the surplus, and in fact as

8    they've indicated here, the particular calculation shown here

9    they're trying to get half of that, they're talking about what

10   if we got half of that surplus.  We'll see that they often

11   typically price even lower than that.  So as I said, they're

12   not using these numbers to get every last bit of it, but it is

13   giving them a sense of the room to raise prices or the room to

14   charge prices higher than their competitors are charging for

15   credit and chargecard services.

16             MR. CONRATH:  Any more questions on this from the

17   Court?  I don't want to leave this very attractive chart.

18             THE COURT:  Well, the example is just the first

19   example on the next chart; is that right?

20             MR. CONRATH:  Yes.

21             THE WITNESS:  I would have to --

22             THE COURT:  You've got a chart that goes by industry

23   categories and so forth, but the first example QSR.

24             MR. CONRATH:  Quick service restaurants, Your Honor.

25             THE COURT:  Quick service restaurants is just the

1    example that's used on this first chart 82.

2              THE WITNESS:  That's right.

3              THE COURT:  And you would apply the same basic

4    analysis to each one of these subgroups.

5              THE WITNESS:  That's exactly right.

6              Now, 83, the slide 83 is essentially taking that

7    first yellow line that we talked about on 82 and then applying

8    it to the different industry groups, so that's why you see

9    that called-out column is -- that's the insistence number.

10             THE COURT:  Right, on the right.

11             THE WITNESS:  That's absolutely right.

12   Q    Anything else to explain about this chart, Professor

13   Katz?

14   A    No.

15             MR. CONRATH:  I've got maybe one more chart and

16   we'll wrap up this topic, Your Honor.

17             THE COURT:  All right.  Let's do the last chart

18   then.

19   Q    Professor Katz, slide 84, can you explain what that is?

20   A    So as we just saw with slide 83, there was essentially

21   taking that first yellow line on 82 and carrying those

22   calculations out for a range of merchant segments.  Slide 84

23   is now doing that same thing but in parallel with the second

24   yellow line.

25             We put that somewhat in English, what slide 84 is

*Katz - Direct / Conrath*                                      3973

1    doing is saying, well, let's look at the merchant's estimated

2    margin and then let's talk about how that coupled with the

3    insistence numbers we just have seen, what does that mean in

4    terms of the incremental value derived.  So again, how much of

5    a premium can we charge making these other adjustments.  And

6    then what they have here is this calculation that's blown out

7    saying, well, given where our pricing is today, given our

8    estimate of the surplus value we have above our competitors

9    Visa and MasterCard's credit cards, how much more could we

10   charge so that we would be taking 50 percent of the surplus

11   value.

12           As you can see here, these numbers, I mean, these

13   are large numbers that you think about them generally relative

14   to the overall merchant discount rate and that's one of the

15   points I'm making.  I said they're not actually charging, like

16   say the first number for QSR, they're not charging that much

17   more than Visa and MasterCard.  So these numbers are providing

18   ballparks, but not actual numbers, and you can see that's

19   generally true, although you see some cases where they're

20   estimating actually that they don't have a lot of room to grow

21   and you see in one case it's actually negative, but most it's

22   quite substantial.

23           (Continued on following page.)

24

25

Katz - Direct - Conrath                    3974

1   Q    So how does American Express use these insistence

2   estimates when it's dealing with merchants?

3   A    American Express has merchant presentations, where they

4   bring this sort of calculation to the merchant's attention,

5   and they say to the merchants this is why it's worth it to you

6   to take American Express, because if you don't, you're going

7   to lose volume, and that volume is going to cost you money.

8   So they show them -- weighted by the profit margin.  If you go

9   back, if you remember, we saw that presentation of Alaska

10  Airlines, they were doing exactly this kind of logic.

11  Although, there, they were saying it only takes a really low

12  level of insistence for it to work, given how high their

13  margin is.  Here, they're actually calculating out a low level

14  of insistence.

15           MR. CONRATH:  Your Honor, I've got three or four

16  more minutes to wrap up this insistence; is that all right?

17           THE COURT:  Go ahead.

18  Q    Does your analysis, Professor Katz, of insistence imply

19  any firm in any industry that has a core of loyal customers

20  has antitrust market power?

21  A    No, it does not.

22  Q    Why not?

23  A    Let's talk about why it does, in this industry, it's

24  because we're talking about two-sided platform, and we're

25  talking about merchants being faced with this all-or-nothing

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3975

1  decision.  So we talked about this a little bit earlier today.

2  I would say most markets or a lot of markets what happens is,

3  if you're a merchant, you're a customer, if you're buying

4  something, and the seller raises the prices, there's a set of

5  people that say, wait a minute, I'm going to leave because

6  there's another product that's almost just as good.  That's

7  what I meant when I was talking about competing with people at

8  the margin.

9          Here, we're talking about insistence on the

10  cardholder's side and how that translates into the merchants

11  being only -- calculating that they have to pay these higher

12  prices because of what's happening on that side.  Because when

13  the merchant looks at it, he says I have an all-or-nothing

14  decision; I either accept credit cards or I don't, and in this

15  case, I accept American Express or I don't.  And if I drop

16  American Express, it's those -- the people on the other side

17  of the platform, it's the core ones that are going to matter,

18  and, typically, that's not what happens in a market.

19          Typically, you don't have this kind of

20  all-or-nothing decision, you have the -- I raise the price and

21  I'm going to lose the people at the margin.  Here, it's

22  there's a sense in which the merchants are getting locked in

23  by that core, so it's a different thing arising; because we're

24  talking about a two-sided platform, and we're talking about

25  the behavior on one side and what that means for the demand by

Katz - Direct - Conrath                        3976

1    the parties on the other side.

2    Q    So American Express says that the source of their

3    insistence is just that they make a high quality product for

4    cardholders, and then they say having a high quality product

5    cannot be a source of market problem, so let's break those up

6    into one part at a time.  Do you agree American Express offers

7    a high quality product for cardholders?

8    A    Certainly many people think that's the case.  And there

9    are people for other ones, but it's clear that there are a lot

10   of people who see American Express as offering very high

11   quality products, and that's one of the reasons they're

12   willing to pay the annual fees.

13   Q    Do you agree with the proposition that having a high

14   quality product cannot be a source of market power?

15   A    No, I'm certainly not.  Part of why that question would

16   even come up is -- maybe it's a misunderstanding in the sense

17   that having market power itself is not a bad thing.  It's

18   certainly recognized principle in antitrust economics.  If the

19   way you get market power is by competing and coming up with a

20   really high quality product in something that is better than

21   what anybody else has, there's nothing wrong with that.  In

22   fact, it's a good thing you competed and been so successful.

23   The concern of economics is abusing the market power or trying

24   to get market power through means other than completing, but

25   there's nothing wrong with getting market power by doing good

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3977

1   things, by competing on the merits, and that could include

2   having a very high quality product.

3         Giving an example of that, suppose you have a

4   pharmaceutical company that innovates and comes up with a drug

5   that's just -- maybe all the other treatments, you'll live for

6   a few months and then you'll die; you take this drug, you'll

7   survive.  Obviously that's an extremely high quality product,

8   and it's a great thing that they've come up with that

9   innovation and they've done it, but by no means would that

10  imply they don't have market power.  In fact, you'd think with

11  a drug like that, you'd have market power, so it's just wrong

12  to say that if the reason I have market power -- it's wrong to

13  say that high quality can't be a source of market power, as a

14  general matter.

15        And, then, moreover, here, we want to take into

16  account the fact that we're talking about the two-sided

17  platform, and we're talking about what are the implications of

18  having high quality on one side and what that means of market

19  power, the overall two-sided platform, and in particular what

20  does it mean for how it affects demand on the other side of

21  the platform.

22  Q    So the question, if you have market power because you

23  have a high quality product, is what do you do with that

24  market power?  Is that the relevant antitrust question?

25  A    That would be a relevant antitrust question, yes.

Katz - Direct - Conrath                    3978

 1          MR. CONRATH:  Your Honor, this would be a good place
 2    to break.
 3          THE COURT:  All right.  What we'll do now is we'll
 4    break until 2:30.  And about how much more time will you be on
 5    direct?  Two hours?
 6          MR. CONRATH:  Approximately two hours.
 7          THE COURT:  And then we'll start cross.  All right.
 8    Thank you very much.
 9          MR. CONRATH:  Thank you, your Honor.
10                       (Lunch recess.)
11          THE COURT:  Please be seated, everybody.  Okay.
12          MR. CONRATH:  Thank you, your Honor.  If we could
13    start the afternoon with the monitor on confidential.
14          THE COURT:  Yes, it is.
15          I remind the witness that he is still under oath.
16          THE WITNESS:  Okay.
17    DIRECT EXAMINATION(CONTINUED)
18    BY MR. CONRATH:
19    Q    So, Professor Katz, I believe the third item in your list
20    of factors that you considered in evaluating whether American
21    Express has market power was evaluation of some elements of
22    America Express' pricing strategy; is that right?  That's
23    where we are?
24    A    That's correct.
25    Q    Would you take a look at the -- this next slide and tell

Katz - Direct - Conrath                              3979

1    us how this slide relates to pricing strategy.

2              THE COURT:  Slide number?

3              MR. CONRATH:  Slide Number 85.

4              THE COURT:  All right.

5              THE WITNESS:  One element of America Express'

6    pricing strategy has been to have premium pricing, which is to

7    say to charge more than the competing credit and charge card

8    networks.  And what this slide is showing are calculations of

9    those premiums done using -- you'll see methodology of America

10   Express'.  So, again, things are broken down in Column A by

11   merchant segment.  Column B is America Express' discount rate.

12   And then the other columns, there's two sets, you'll see, for

13   MasterCard and Visa.  The All-in rate, as we talked about, is

14   the rate for Visa and MasterCard, including the interchange,

15   and acquiring fees and the other ones.  And that is using

16   America Express' estimates of what MasterCard and Visas'

17   columns are on different cards.

18              So one of the things that makes this a little more

19   complicated is that MasterCard and Visa charge different rates

20   to merchants for different cards, and so it's necessary to

21   average over those things.  And the so-called All-in rate is

22   taking a look at that.  And then you'll see, for example,

23   Column D is saying here's the estimated difference between

24   America Express' discount rate and MasterCard's, and where

25   it's expressed is a positive number.  That indicates that

Katz - Direct - Conrath                    3980

1  American Express is charging a higher price to merchants than,

2  in this case, MasterCard but in other columns Visa.  And where

3  it's negative, it's saying the reverse, American Express is

4  cheaper.

5          Now, the second set of columns -- let me lay that

6  out -- is the mix adjusted rate.  And what that's doing is

7  reflected in American Express' methodology, where American

8  Express is attempting to get at the issue of how to deal with

9  the fact that different Visa cards, for example, have

10  different rates on them.  American Express is saying the types

11  of cardholders we have would tend to use expensive Visa cards,

12  and so we want to take that into account when comparing our

13  rates with theirs.  And so that's what the mixed adjusted rate

14  is doing.

15          And what one sees from these numbers, in the vast

16  majority of cases, American Express is charging a premium, and

17  it's charging a premium over other networks, MasterCard and

18  Visa, that are networks with market power and in a

19  concentrated industry.  And so it's notable that they are, in

20  fact, able to charge a premium over those other networks.  And

21  so that's one element of their strategy that's consistent

22  with -- supports the notion or the finding that they possess

23  market power.  And so what we've gone -- from before lunch we

24  were talking about various calculations American Express was

25  making in potential premiums, and this is showing that they

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3981

1   charge actual premiums.  And, of course, as we were discussing

2   before lunch, these are much smaller than the premiums they

3   calculated.  They're not trying to take the full amount of

4   those calculations, but they are premium.

5   Q    So could you just point us to an example here, maybe

6   using the average rates of where one would look on the chart

7   on slide 85 to find a comparison with American Express and

8   Visa under both the mixed adjusted rate and the All-in rate.

9   A    So you'll see that the comparison -- so the America

10  Express' average rate is shown at the lowest number in column

11  B.  And then Visas all -- their average All-in rate is shown

12  at the bottom of Column E, and so then that's compared at the

13  bottom of F, and so you see they're indicating the premium

14  that American Express is charging over Visa.  Then if you

15  look -- go further over to Column J, the right most column,

16  that's using America Express' methodology to make adjustments

17  that they think are appropriate to make it an apples-apples

18  comparison, and so by that measure as well that American

19  Express is charging a premium over Visa.

20  Q    And these data were used or these data -- these numbers

21  were calculated on the most recent reliable data that you were

22  able to get from American Express through the discovery

23  process; is that right?

24  A    Yes, I believe so.

25  Q    Okay.  So what -- just sum up for us the conclusion for

Katz - Direct - Conrath                    3982

1   what this should -- ought to tell us about whether American

2   Express has market power?

3   A    This supports the finding that they do, the fact that

4   they're engaged in premium.  Pricing I should point out even

5   if they didn't have premium pricing against Visa, that's still

6   consistent with having an exercising market power, given that

7   Visa itself has market power.  But the fact that they did

8   charge more than Visa is a further indicator.

9              MR. CONRATH:  Could we turn to the next slide,

10  please.

11  Q    Is there another element of America Express' pricing

12  strategy that is relevant to whether American Express has

13  market power that is discussed on this next slide?

14  A    Yes, something else that is consistent with the finding

15  that they have significant market power and, therefore,

16  reenforces their finding is that they engage in price

17  discrimination.  And what's shown on this slide is a way of

18  calculating what they're doing as a network, and so it's

19  taking -- let's start with the first row, to the industry of

20  other transportation.  What it's showing, a number for the

21  discount rate, and so that's saying here's what we're charging

22  on average, that merchant category.  Then it's subtracting off

23  from that the issuer rate it has in an agreement with a third

24  party issuer.

25              So the difference between those two, shown in Column

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                     3983

1   D, that difference is reflecting what American Express is

2   keeping -- in this case, actually, both as issuer -- I

3   misspoke.  In this case, what it's keeping as a network, but

4   also it has acquiring built in.  Although there's no -- that's

5   the best I can do in determines of disaggregating their data.

6   And there's no reason to think that the acquiring fees --

7   costs are significantly different across these different

8   elements.  And so when you look down at Column D, one of the

9   things you'll notice is there's a wide range of numbers.

10  While there are several that are sort of clustered near each

11  other, there are also some numbers -- several multiples of the

12  other.

13          So it's showing that there are -- why differences in

14  the pricing that they're keeping as a network, and that these

15  differences are larger than any plausible price -- cost

16  differences, certainly larger than any underlying cost

17  differences that I was able to identify.

18  Q    And so what does that tell you about price

19  discrimination?

20  A    Well, this indicates that they are engaging in price

21  discrimination.  And one of the prerequisites for being able

22  to engage in price discrimination is to have some degree of

23  market power.

24          MR. CONRATH:  Could we look at the next slide,

25  please?

Katz - Direct - Conrath                           3984

1   Q    What does this next slide show?

2   A    So this is another way of getting at this question of

3   price discrimination, because, again, it's not looking just at

4   differences in prices but differences in prices relative to

5   cost.  And what this is looking at is the contribution margin,

6   while we talked earlier, that it's American Express' estimate

7   of how much they gain or what their profit is from the

8   merchant relationship.  Now, again, I want to point out that

9   this contribution margin is going to be for the whole company,

10  because even though this case is about the networks and

11  American Express' operation in the network, they are

12  integrated into the other things.

13         And so sometimes I've had to look at the integrated

14  numbers to get a sense of what American Express is doing.  And

15  what these numbers again indicate is that there's a wide range

16  of margins here of differences between the revenues that

17  American Express is bringing in from these merchants and then

18  what its costs are.  So, again, this is indicating price

19  discrimination, which they would be able to do only if they

20  possessed market power.

21         MR. CONRATH:  Could we turn to the next slide,

22  please.  And this slide can be public, your Honor.

23  Q    So, Professor Katz, I would like to return to value

24  recapture.  I think you said this is a third element of

25  America Express' strategy that you consider as being relevant

NICOLE CANALES, CSR, RPR

1    to market power; is that correct?

2    A    That's correct.

3    Q    Can you explain what value recapture shows, about whether

4    American Express has substantial market power?

5    A    So as we were discussing earlier today, they had -- value

6    recapture was a targeted -- set of targeted price increases,

7    and it illustrates my conclusion.  It illustrates the

8    successful exercise of market power.  American Express was

9    starting from prices that were not below the competitive

10   levels.  They were prices -- they were being charged in a

11   concentrated industry with other firms have been found to have

12   market power, that were being -- the prices were in the

13   presence of the anti-steering rules, which certainly my

14   conclusion, further elevated the prices.  I think there's no

15   assertion by anyone that they're actually lowering the prices.

16          The procompetitive benefits don't have to do with

17   that.  We're starting from a level where the prices are at or

18   above competitive level and we're raising those.  And when we

19   see what happened is they increased the prices on the merchant

20   side.  They were not offsetting changes on the cardholders'

21   side, so that the net price, if you will, the two-sided price,

22   increased, and that those two-sided price increases were

23   profitable.  They both raised revenues and they raised

24   profits.

25          MR. CONRATH:  Could we look at the next -- can we

Katz - Direct - Conrath                          3986

1    change the monitor and then look at the next slide?  Sorry,

2    your Honor.  Okay.  Next slide.

3    Q    Professor Katz, is this an example of value recapture?

4    A    This is showing the discount rates American Express is

5    charging to the top ten airlines plus another airline category

6    over the period starting before value recapture and running

7    through.  And if you look at that, if you look, for example,

8    at the top line, Delta, I won't call out the numbers, but

9    you'll see between the start of the period and the end, there

10   was a significant increase in the discount rate charged to

11   Delta.  And if you go down the list, comparing them, you'll

12   see that with the exception of Air France that all of them

13   went up, and that American Express instituted price increases

14   for the top nine airlines.

15            MR. CONRATH:  Could we take a look at the next

16   slide, please?

17   Q    What does this next slide show?

18   A    Well, surprisingly, American Express valuated the

19   profitability of what they were doing, and what this slide is

20   showing is the results of one of their analyses, where they

21   were looking to assess how it had done.  And what this is

22   doing is identifying the effects of the program on their

23   revenues and on their average discount rate.  And as you can

24   see, in the one number that's circled in the red ellipse, it's

25   saying that their U.S. weighted average discount rate went up

Katz - Direct - Conrath                    3987

1   by that number.

2           And the other thing they're doing is they've

3   identified the total benefits or the cumulative benefits of

4   these different initiatives, because the way this chart is

5   working is that box shown for 2006 is the incremental PTI they

6   got from the 2006 initiative.  And then the box next to it,

7   the white box, if you go over to 2007, is saying what were the

8   affects of those 2006 initiatives when we continued those

9   through to 2007.  And then that's why that box carries over to

10  the other years, including the forecast.  And then that black

11  box, if you look at 2007, that's on top of, then that's the

12  value of the 2007 initiatives that then carry across, and

13  that's why the later years have more boxes.

14          And they concluded -- and they were projecting that

15  the total amount of that would be that number shown circled in

16  red, where it says "incremental pretax income," although I

17  should note that in deposition testimony that they're saying

18  that that's more of a revenue change, and there were some

19  offsets, which we will talk about, but, as we'll see, the

20  offsets were far below that number.

21          MR. CONRATH:  Can we take a look at the next slide,

22  please?

23  Q    So what does this next slide show?

24  A    So this is one we looked at before, and as an example,

25  but just generally illustrating the point that almost no

Katz - Direct - Conrath                          3988

1  managed merchants dropped, so American Express didn't suffer

2  from attrition from doing this, and that they generally gained

3  from doing it.  Although, as mentioned in the title of this

4  slide, it's not that this -- that they just automatically did

5  everything they wanted to, they did in some cases have to give

6  incremental marketing funds to merchants, so that was a bit of

7  a concession.

8             But if we turn to the next slide, we'll see -- this

9  is a slide, an American Express internal document again --

10  that they concluded -- as we can see the pop up, they

11  concluded that the revenue benefit they got from this, from

12  having value recapture, in their words, was substantially

13  larger than the advertising promotion, so substantially larger

14  than the marketing funds that they had to give to merchants.

15  So they concluded that these price increases from profitable

16  for managed merchants.  And this is one document, but there

17  are others that reached the same conclusion, and their

18  executives have said that they found it overall was

19  profitable.

20  Q    All right.  That was managed merchants, the large ones.

21  Did you also look at unmanaged merchants?

22             MR. CONRATH:  And can we have the next slide?

23  A    Yes, American Express did look at it.  And, again, this

24  is the slide we saw earlier this morning, coming back to look

25  at more detail, where now we have in that first call-out is

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3989

1    the revenue benefit that they saw from the deal.  Earlier this

2    morning, we talked about the offset from incremental

3    cancellations, and you can now see them together in

4    perspective, that the cost of the incremental cancellations

5    was far below the revenue benefits they saw themselves

6    getting.

7           And, then, as we discussed earlier, they weren't

8    sure exactly what the suppression rate was, the incremental

9    suppression, when it triggered.  But they said that they were

10   reasonably confident they were below that, so that their

11   estimate was value recapture was also profitable to the

12   unmanaged merchants as well.

13   Q    So when thinking about market power, is America Express'

14   value recapture program evidence of American Express having

15   market power in the relevant markets?

16   A    Yes, it's evidence of their exercising it, because they

17   did these price increases in both T and E markets but also

18   non-T and E markets.  They raised the prices certainly no

19   lower than competitive levels, and they did to profitably.  In

20   fact, one of the things that's notable is they're saying that

21   their revenues went up.  Typically what you would expect to

22   see happen when a firm raises its prices is the revenues might

23   fall but its costs would fall further, and that's why you

24   might do it.  Here, they're saying there was so little

25   response -- at least with managed merchants, there was so

Katz - Direct - Conrath                            3990

1   little response we raised the price.  Revenues went up even

2   before we had to get any benefit from saving -- normally what

3   would happen if you raised your price, it would lower the

4   volume, and then you would have some cost savings.

5   Q    Is what that what would happen in a competitive market?

6   A    Well, what in most markets you would expect that to

7   happen.  So you might say, well, we've raised their price;

8   maybe our revenues have gone down a little bit, but our costs

9   have fallen by even more.  Here, what they're saying is when

10  they raised the price, it actually raised their revenue, which

11  is somewhat unusual for firms.  I think it's further evidence

12  that they had market power.

13              MR. CONRATH:  If we can turn to the next slide, this

14  one can be public, your Honor.

15  Q    Can you summarize for us, Professor Katz?

16  A    All right.  So what this slide is doing is just -- we

17  were looking at it before lunch and just talked about now

18  that -- look at the different pieces of evidence speaking to

19  whether American Express possesses market power in the two

20  relevant markets, that in each case the market structure is

21  one that is concentrated, that American Express has a

22  significant market share; the entry is difficult, and that

23  supports a finding that American Express has market power.

24              Then, in both markets, American Express has

25  insisting cardholders.  Not every cardholder is going to

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    3991

1   insist on using American Express but substantial percentages

2   will, and, therefore, it's quite costly for a merchant faced

3   with such cardholders to cease accepting American Express.

4   Again, that doesn't mean every merchant will accept them;

5   there are other considerations, clearly, but it does mean,

6   particularly, for the large merchants, that it's a costly

7   decision for them to drop.

8           And, then, finally, as we've just been talking about

9   after lunch, American Express' prizing strategy itself

10  provides evidence that their premium pricing supports a

11  finding they have market power.  The fact that they engage in

12  extensive price discrimination is consistent with having

13  market power, and you have to have some market power to do it.

14  And then value recapture is an example of successful exercise

15  of market power.

16          MR. CONRATH:  Next slide, please.

17  Q    So now that you've identified American Express as having

18  market power, what's the next step under the approach that

19  we're following here?

20  A    So remember the steps, we're at define markets, assess

21  whether American Express had market power within it, and then

22  the third step is to identify whether anticompetitive effects

23  are likely, given the findings in the earlier stage about the

24  scope of the relevant market and America Express' market power

25  within that market.

NICOLE CANALES, CSR, RPR

1          MR. CONRATH:  Next slide, please.

2     Q    What did you find when evaluating thi?

3     A    My conclusion, as I said earlier, anti-steering rules

4     harm competition; more specifically, within the market power

5     approach, that American Express does possess substantial

6     market power in both markets; that the anti-steering rules

7     limit substitution directly.  By limiting steering, they're

8     taking away a mechanism by which the market would otherwise

9     respond to higher prices to merchants, and thus by doing so,

10    it weakens or harms competition on the merits.  And for that

11    reason, given their accommodation to market power and economic

12    mechanism by which the anti-steering rules affect competition,

13    we see that it harms competition.

14          In addition, the evidence is available, when we

15    looked at actual adverse effects and applied that approach,

16    of course, applies here as well and reenforces the findings

17    both of market power and of significant harm to competition,

18    so what I put here, again, as a reminder, as we saw what

19    happened with Discover, where they were impeded from competing

20    on the merits with a low price strategy to merchants, we saw

21    that the preference campaigns that shifted share, competitive

22    responses.  And we also their value recapture in a somewhat

23    different light, where what was notable was for managed

24    merchants, the absence of concern about steering or

25    suppression, and, therefore, that it was more profitable than

Katz - Direct - Conrath                    3993

1    it otherwise would have been, and they faced less competitive

2    pressure.

3    Q    Are you saying that the anti-steering rules just affect

4    America Express' behavior, or do they affect the behavior of

5    the other networks as well?

6    A    They affect the behavior of the other networks as well.

7    We saw that with the Discover example, what happened with them

8    and what continues to happen with Discover, as Mr. Hochschild

9    testified.  And, then, also we saw that with the preference

10   campaigns, as the MasterCard witness identified, that

11   MasterCard would be interested in having preference campaigns

12   if they could, and while certain kinds of preferences can be

13   done if they're limited by the rules.  So it's affecting

14   behavior of all of the networks.  It's affecting competition

15   industry wide.

16   Q    Who is hurt by this loss of competition?

17   A    So it's going to hurt merchants, and it also hurts

18   merchants' customers, and we're talking about both customers

19   who use credit and charge cards but also, in particular,

20   customers who don't use credit and charge cards.

21           MR. CONRATH:  Next slide, please.

22   Q    Did you address possible procompetitive justifications

23   for the anti-steering rules?

24   A    Yes, I did.

25   Q    And what were the main procompetitive justifications that

1   you evaluated?

2           MR. CONRATH:  Can we have the next slide, please?

3   A    Looking at the next slide, I tried to just group them

4   into categories, and what I've shown here are three categories

5   of preventing freeriding by merchants, preventing a downward

6   spiral.  Here the downward spiral is referring to American

7   Express concerns or allegations that they would shrink in the

8   absence of the rules in away that would harm competition.  And

9   then a third set put under the title of protecting American

10  Express.

11  Q    Let's take those one at a time.  What do you mean by the

12  term "freeriding"?

13  A    So freeriding refers to a situation where somebody

14  undertakes a costly action and then somebody else benefits

15  from that action without having to pay for it.

16  Q    What would be an example of freeriding?

17  A    Think of one -- let's say one involving merchants and

18  retailers.  Suppose a manufacturer has a whole bunch of

19  different retailers, and some of them have showrooms and some

20  of them don't.  Especially if you think about cities like

21  New York or San Francisco, operating a showroom can be a

22  pretty expensive proposition.  So what happens is some of the

23  retailers operate the showrooms, and people come in and see

24  the manufacturer's goods, TVs or something.  And, then,

25  freeriding would occur if another retailer said, well, we'll

1  carry the product but we're not going to have a showroom.  And

2  what we'll tell people to do is jus come buy it from us.

3  We'll give you a low price.  Come buy if from us after you go

4  see it somewhere else.  So those retailers would be freeriding

5  on the efforts of the other retails who are providing the

6  showroom.  So that would be an example.

7  Q    Why do economist care about freeriding?

8  A    The concern is -- these are costly activities.  They take

9  some sort of investment or ongoing expenditure.  If everybody

10  freerides, then nothing happens.  So a manufacturer would

11  worry about this as well, that if its retailers can all

12  freeride, then nobody wants to provide the showroom, and so

13  there's no showroom provided to customers.  What we're worried

14  about is that freeriding can lead to under-provision of the

15  service or underinvestment.

16         MR. CONRATH:  Next slide, please.

17  Q    What types of alleged freeriding described by American

18  Express did you examine?

19  A    So it broke it down into three categories.  So the first

20  category benefits that are provided directly to the merchants.

21  Q    What benefits does American Express provide directly to

22  merchants?

23  A    So, for example, because American Express operates a

24  so-called closed-loop network, that they are an issuer and an

25  acquirer and they have a lot of information, they have

Katz - Direct - Conrath                          3996

1    information they think is valuable to the merchants, so they

2    can tell the merchants things about their customers that could

3    help the merchant target promotions or something like that.

4    Q    Is that sometimes called merchant analytics?

5    A    Yes.  So that would be an example.  Or they might have

6    promotional campaigns that are specific to a particular

7    merchant.  So what's relevant about both of those is they're

8    providing the merchant analytics directly to a particular

9    merchant, or they're providing marketing directly to that

10   merchant.

11   Q    What did you conclude about whether freeriding is

12   possible and benefits that Amex provides directly to

13   merchants?

14   A    Well, to the extent that there's freeriding there, in a

15   sense, it's America Express' choice whether to allow it.  If

16   you take something like merchant analytics, American Express

17   today charges for some of the merchant analytics.  They don't

18   charge for all of it, but they charge for some, and it's their

19   decision whether or not to charge for it.  It would be

20   impossible for a merchant to freeride on merchant analytics if

21   American Express didn't want them to, because American Express

22   doesn't have to provide them the information.  That's one of

23   the reasons they're able to sell it to them.  And, similarly,

24   American Express can refuse to do a merchant-specific

25   promotion.  So the bottom line I reach on that is that

Katz - Direct - Conrath                3997

1    preventing this kind of freeriding cannot be a procompetitive

2    justification of the rules.  American Express has a direct way

3    to address this issue.

4    Q    Well, one other category of freeriding that you put on

5    the slide is the benefits based on card use.  What kind of

6    benefits are based on card use?  What do you mean by that?

7    A    Well, for example, America Express' position that it's

8    cardholders will -- I believe, will spend more at a merchant

9    because they're using an American Express card, says, because

10   of the Rewards Program, that the rewards give someone

11   incentive to spend more, and that then would be a benefit for

12   the merchant.

13   Q    So how would the rewards benefit the merchant?  By

14   encouraging people to buy a little bit more based on the

15   rewards?  Is that the idea?

16   A    Yes, that is what they would say.

17   Q    Is it possible that a merchant could freeride on that

18   benefit?

19   A    Well, no, because we think about what it means; we're

20   saying the customer's buying more because they're using their

21   American Express card.  But that means, then, that they're

22   also triggering an obligation for the merchant to pay, because

23   when you use your American Express, the merchant is then going

24   to owe the discount rate times whatever you bought.  So,

25   again, that's not freeriding because it's not free; the

Katz - Direct - Conrath                    3998

1   merchant is paying for this benefit in the form of the

2   merchant discount.

3   Q    The customer can't get the rewards unless they use their

4   American Express card, right?

5   A    That's correct.

6   Q    Can you tell us about the third category here,

7   credentialing effects?

8   A    So the third category, which I've labeled here as

9   credentialing effect, sometimes people refer to it as halo

10  effect, although halo effect sometimes is used in other ways.

11  But it's the idea that by accepting an American Express Card,

12  not by actually having people use it, but by the fact that you

13  accept the American Express Card that you as a merchant would

14  benefit because you would be seen as having a better

15  reputation, that either when people -- when people see the

16  decal in the window, they say this merchant has higher quality

17  customer service, or that this merchant, you know, is somehow

18  a better restaurant.  But the idea here is that the mere act

19  of accepting American Express confers a benefit on the

20  merchant.

21  Q    So is Amex actually a significant source of credentialing

22  for merchants?  Were you able to examine that?

23  A    Yes, I have.  And what you can see on the next slide --

24  if I can say one thing before we turn to that slide, if it's

25  all right, because there's another factor that's relevant to

1   the issue of freeriding.  One will be whether there is, in

2   fact, significant credentialing, but the other is whether

3   American Express significantly invests in this.  Because if

4   you recall, the concern with freeriding is, well, if

5   everybody's freeriding, it won't get done, because it's some

6   costly activity, like the showroom.  But my understanding of

7   America Express' argument is not that they actively try to

8   credential merchants; they don't screen merchants following

9   some process to make sure they meet some high standard, which

10   then is a signal to customers.

11        They're saying by the nature of American Express and

12   its particular business model that the merchants they get are

13   high quality merchants, and that then signals consumers.  Now,

14   why that matters is it's essentially saying that even taking

15   their theory at face value, that that credentialing is not the

16   result of a specific investment they're making.  It's really

17   an ancillary benefit are their business model, so even if

18   people were freeriding on it, it wouldn't be changing American

19   Express' incentive to provide whatever benefit that is;

20   because they're saying the benefit comes out of things like

21   their superior customer service, which they're offering for a

22   different reason.

23        First off, there's not a potential problem with

24   freeriding, because they're not making the prerequisite

25   investment, which then could be under-provided because of

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    4000

1    freeriding.

2            MR. CONRATH:  Could we change the monitor,

3    your Honor?

4            THE COURT:  I just have a question on the credential

5    effects.  If -- wouldn't it more availing, as an argument, if

6    American Express had exclusive relationships with certain

7    retailers, let's say, like take Bergdorf Goodman, for

8    instance, and the only card you could use would be the store

9    card or the American Express Card; that that type of

10   credentialing would have a greater benefit potentially,

11   intellectually, or subliminally with the customer than if they

12   take American Express, Visa, MasterCard and Discover and their

13   own card?

14           THE WITNESS:  Uh-huh.

15           THE COURT:  Have you looked at that?  Are there

16   any -- is there a group of retailers or merchants who have

17   that kind of relationship with American Express?

18   A    So to my knowledge --

19           THE COURT:  Other than Costco.

20           THE WITNESS:  I was going to say, to my knowledge,

21   they used to have the relationship with Bergdorf's, which in

22   San Francisco is Neiman Marcus, which is why the only

23   proprietary store card I carry is a Neiman Marcus Card.  And I

24   believe that that one with Bergdorf's and Neiman's has ended.

25           THE COURT:  I didn't know that there ever was that

Katz - Direct - Conrath                    4001

1   kind of relationship.  No, I just -- I picked a store I've

2   never been in, and I figured that might be the one.

3          THE WITNESS:  If I were you, I would go buy a

4   lottery ticket tonight since you've managed to guess where I

5   live and pick one of the two merchant that I know of that have

6   an exclusive relationship with American Express.

7          THE COURT:  We'll be finishing early.

8          THE WITNESS:  But, I mean, an interesting question

9   that comes up with one, though, like the relationship with

10  Bergdorf is also the question which way it goes and whether,

11  in fact, American Express, then, would be certifying Bergdorf,

12  or to a New York audience Bergdorf would be certifying

13  American Express.  And, in fact, I think the intellectual

14  argument is that each one is helping the other, mutually

15  reenforcing.  And I think you see that also with -- you'll see

16  like sporting events certain clusters of brands that will want

17  to support it together; and they want to be associated with

18  the event and the event wants to be associated with them, and

19  I think that's one of the things that's going on here.  But to

20  my knowledge, those exclusive relationships are very limited.

21         THE COURT:  I see.  All right.

22         MR. CONRATH:  If we can change the slide, I believe

23  the next slide might actually be relevant to your Honor's

24  question in a slightly different way.  Confidential.

25         THE COURT:  All right.  We're set.

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                                    4002

1   Q    What does this next slide show, Professor Katz?

2   A    Okay.  So this slide is showing the results of the survey

3   that was commissioned by American Express, one of several

4   they've done; and in this case they were surveying card

5   holders, both American Express cardholders, and also people

6   who are not American Express cardholders --

7              MR. CONRATH:  Can I interject for a moment.

8   Your Honor, this is one of the surveys Professor Thorp

9   testified about, to put it in context.  Sorry for the

10  interruption.

11             THE COURT:  Continue.

12             THE WITNESS:  This is a survey they conducted of

13  cardholders that said both American Express cardholder and

14  then also the cardholders of other networks; MasterCard, and

15  Visa and Discover, and I think quite possibly Diner's Club, b

16  but I can't remember.  In any case, that would be trivial in

17  this.  And if we can have the first pop up call-out.  So they

18  ask a number of different questions, but one of them was

19  whether or not the cardholder agreed that he or she feels more

20  confident about purchasing from a merchant that displays --

21  and you'll see card in parenthesis -- that logo.  So what they

22  did is they asked American Express cardholders when you see an

23  American card logo at the merchant, does that make you feel

24  more confident about purchasing from the merchant?

25             What they also did is they asked the Visa cardholder

NICOLE CANALES, CSR, RPR

1   when you see Visa logo, do you feel more confident?  Think of

2   this as a question of, getting at this issue of credentialing,

3   and what you'll see here is, if you compare the number in

4   Column A with the number in Column C, this is where they

5   looked at all the cardholders.  And they compared the

6   difference -- they wanted to look at what the difference is

7   between the percentage of American Express cardholders that

8   felt confident and the percentage of people using other cards

9   that felt confident.

10          And you'll see, to the extent that this is, you

11  know, a measure of credentialing, that, the other networks,

12  they were a more effective form of credentialing than American

13  Express, and that includes MasterCard and Visa, which have

14  agreed not to have their version of the anti-steering rules.

15  And then if you look to compare Column B with Column D, it's

16  making that same sort of comparison, but what they're doing is

17  they're asking it for people who are cardholders that are in

18  loyalty programs.  And, again, you see that the other networks

19  have -- there's a higher percentage of their cardholders

20  feeling confident than with American Express.  And those

21  footnotes are just indicating that when they did the survey,

22  they found that to be statistically significant.

23          We have the second pop up.  We'll see it's similar

24  sorts of ideas that -- one of the questions is do you agree

25  with the statement you're more likely to trust a website that

Katz - Direct - Conrath                                    4004

1    attracts your -- takes your particular card?  It indicates it

2    on the website.  And then also whether your more likely to try

3    a new merchant, which is when you might think credentially

4    would be particularly important when it's a merchant that's

5    new to you, when you know a particular card is accepted.  And

6    what you see is in each case, whether you look at overall

7    cardholders or the loyalty cardholders, that these

8    credentialing effects are stronger than for the other

9    networks.  What it's indicating is there is nothing uniquely

10   valuable here about American Express in playing this role or

11   that suggests they would be particularly be subject to

12   freeriding.

13             MR. CONRATH:  Could we have the next slide, please?

14   Q    Are there other ways that consumers can find information

15   about the quality or value of the merchants they want to

16   patronize?

17   A    Yes.  And that they are ways that I believe are not

18   confidential.

19             MR. CONRATH:  Yes.  We can go back to the public

20   view, if your Honor likes.

21   Q    So my question to you, Professor Katz, there are other

22   ways consumers can find information about quality of

23   merchants?

24   A    Yes.  And I put up here two of the most obvious examples,

25   and I've done it for restaurants.  One way to put it in

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                                4005

1  perspective is to ask yourself if you were picking a

2  restaurant and trying to decide how good it was, is whether

3  you would do it by going to the restaurant and looking in the

4  window to see whether or not they accept American Express, or

5  whether you would go online and use something like Yelp, or

6  use Zagat or many other online resources to get that

7  information.  So there clearly are other sources of

8  information about many, many types of merchants and many

9  merchants, especially when you're talking about something like

10 Yelp.

11         MR. CONRATH:  Could we have the next slide, please.

12 Q    The second category you have on your list is prevent a

13 downward spiral.  What do you understand American Express to

14 mean by this argument?

15 A    What they've done is express the concern in the absence

16 of the rules that they would start losing merchant acceptance

17 and also lose cardholders; and that because of the network

18 effects that we talked about very early on today that as they

19 had fewer merchants, they'd have fewer cardholders, and fewer

20 card holds would lead to fewer merchants, and that would be

21 the spiral effect.  And because they would have fewer and

22 fewer, that it would be downward.  And it's their position

23 that would weaken them to the point -- I believe they're

24 saying it would weaken them to the point they would not be an

25 effective competitor.

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    4006

1    Q    Is this sort of spiral likely if the anti-steering rules

2    were removed?

3    A    I don't believe it is likely for American Express.  My

4    analysis indicates it is not.

5    Q    Do you agree there are networks effects in this industry?

6    A    I certainly agree with that.  It's one of the things that

7    makes it difficult for a new network to come in, and I agree

8    that American Express is subject to network effects.  It's a

9    question of both the degree and also what American Express

10   would do in the absence of the rules and how they would

11   respond, but I certainly agree that network effects are

12   significant in this industry.

13   Q    If network effects were as strong as American Express --

14   and you understand network effects to be the basis of their

15   claim for the existence of a downward spiral.  Is that what

16   you mean?

17   A    It is my understanding they're basing this on what

18   economist would call network effects, yes.

19   Q    If network effects were that strong, wouldn't we see

20   American Express basically bending over backward to sign up

21   every merchant they possibly could to avoid the negative

22   network effects?

23   A    That's your prerogative to say something more strongly

24   than I would.  But I would expect them, though, to be making

25   efforts to sign up the merchants, and the fact that we see

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    4007

1   them turning away merchants in order to maintain their premium

2   price strategy, the tradeoff they're making, I think that's

3   one factor -- that it's a factor that suggests that this

4   concern with shrinking -- it is a concern for them.  They do

5   worry about their size -- that it can't be as strong as they

6   make out, because also -- let's think about this in terms of

7   Discover.  Discover is a much smaller network in terms of

8   what's going on in cardholder side.

9            If things were being driven by just network effects,

10  they would say Discover must have a tiny merchant acceptance

11  network, but as we know they have one that's larger than

12  American Express because they've chosen to pursue this

13  different strategy that American Express hasn't.  And I

14  believe American Express could have chosen to pursue a similar

15  strategy, even within the context of their overall

16  differential model had they chosen so to.  So it's a decision

17  they've made not to do that, and that certainly suggests,

18  then, that they don't perceive these effects to be as large as

19  you would need for the downward spiral to be a serous problem.

20  Q    Going forward, if American Express really thought a

21  downward spiral was likely, would American Express have

22  options open to it?

23  A    Yes, they would have options, and I would expect them to

24  take advantage of those, both in terms of considering doing

25  some things that could involve lower prices to merchants or

Katz - Direct - Conrath                    4008

1   higher value.  Or another way to respond to it, if they were

2   concerned about steering, would be to offer improved value to

3   their cardholders.  Indeed Mr. Funda testified at trial that

4   that's one of the ways American Express would consider

5   responding if the anti-steering rules weren't here.  He said

6   we'd have to look at what to do for value for the merchants,

7   and also look at the possibility of trying to make our

8   products more value to the our customers because that way the

9   customer would be more resistant to steering.  So I would

10  expect American Express to consider and ultimately to respond

11  in all of those ways, in order to prevent the downward spiral

12  from happening.

13          MR. CONRATH:  Can we have the next slide, please.

14  Q    What's the final category of a possible competitive

15  justification that you looked at, Professor Katz?

16  A    There are a couple different things I put together under

17  the heading of protecting American Express.

18          MR. CONRATH:  Can we look at the next slide?

19  Q    What are the arguments that American Express makes in

20  this regard?

21  A    Well, one of the arguments that their experts made was a

22  concern that absent these rules, American Express would be

23  victim of exclusionary behavior, I think, particularly, by --

24  the concern was particularly exclusionary behavior by Visa,

25  that it would figure out various ways to get merchants not to

Katz - Direct - Conrath                                    4009

1    accept American Express Card, certainly to do much less in

2    America Express' favor and more in Visa's.

3    Q    Is that a valid argument, according to the economic

4    principles?

5    A    No, I don't think it is a justification for this rule,

6    and the reason for that is that preference campaigns can be

7    procompetitive, and I believe the ones we saw in the past were

8    procompetitive.  That, of course, doesn't mean that there

9    aren't ways that you could have something you might call a

10   preference campaign but figure out some way to make it

11   anticompetitive for it ultimately to be exclusionary.  But I

12   think what's wrong with these rules, trying to do that, is

13   basically American Express, if you accept this argument, sort

14   of preempting the antitrust process.

15           We know that preference campaigns can be

16   procompetitive; we've seen examples of it.  And essentially

17   what American Express's rule is doing is saying we're going to

18   have our own, per se, rule against preference campaigns.

19   Whereas, the antitrust economics is a far better way to do it,

20   is to allow campaigns, but to have those subject to antitrust

21   oversight, so that if Visa were to turn out to have a

22   preference campaign that actually harmed competition, that

23   American Express would be free to initiate private litigation

24   against them.

25           And also the U.S. Department of Justice would be in

NICOLE CANALES, CSR, RPR

Katz - Direct - Conrath                    4010

1   a position to litigate, and that's what happened with U.S. V.

2   Visa.  A critical part of that case was that Visa and

3   MasterCard were engaged in exclusionary behavior against

4   American Express and Discover; and the Department of Justice

5   brought suit against them, and I testified at that trial, but

6   it was precisely to protect the competitive process.

7           And the danger with using the rules to do that is

8   they're throwing out the good with the potential bad.  These

9   rules are sweeping.  There's no assessment in these rules,

10  well, is this procompetitive or anticompetitive preference

11  campaign, it just says you can't have preference campaigns.

12  And that's why I conclude from that, that these rules are --

13  that it's not a procompetitive benefit of these rules, it's a

14  procompetitive benefit of having antitrust law, is what we

15  should rely on.

16          THE COURT:  There has been testimony that under the

17  Amex nondiscrimination rules that short term preference

18  campaigns are a possibility.  Why wouldn't that be

19  satisfactory to blunt the consequences of the rules?

20          THE WITNESS:  So it partially does.  It's certainly

21  the case that having some preference campaigns and some

22  exceptions.  The affects of the rules are not as strong as

23  they would be, but the rules still have effects.  So I believe

24  it's the MasterCard witness who testified, saying that they

25  had to change the nature of their preference relationship with

Katz - Direct - Conrath                                    4011

1    Travelocity, and said, yes, it still had some beneficial

2    effects but they were weaker, and so --

3              THE COURT:  They went from being the preferred card

4    to the official card.

5              THE WITNESS:  That's right.  And they said the

6    effects of that -- they're weaker.  Just as there are other

7    exceptions, there's exceptions for co-brand cards.  But in all

8    these cases, it's still limiting the overall degree steering.

9    In this case of co-brand card, it's special cases.  In terms

10   of these preference campaigns, holding them short term, people

11   in the industry have said the short term ones are less

12   effective.  They can not very effective during that short term

13   but then they drop off after that.

14             And so there are exceptions, and those exceptions

15   then do allow some of the competitive steering, but at the

16   same time they're also limiting it.  And one way to say it is

17   there's no such thing as saying, well, there's enough

18   competition.  Always have more competition, and more

19   competition would be better.

20             MR. CONRATH:  Could we -- what does the second role

21   on this slide mean?

22             THE WITNESS:  So the second bullet is speaking to,

23   again, my understanding of what American Express is saying,

24   which is through their experts and through their executives,

25   saying if they didn't have the rules, they wouldn't be able to

Katz - Direct - Conrath                              4012

1   maintain their differentiated strategy, which clearly is

2   valuable, very valuable with some cardholders.  And their

3   experts have said, well, in the absence of these rules, what a

4   merchant's going to do is just whatever is the cheapest

5   network, they're going to push their customers into using

6   that.  And then a network such as ours, that comes in and

7   offers a lot of value to cardholders is not going to be able

8   to survive.

9            My conclusion is that that's not a valid argument,

10  because it's ignoring merchants' incentive.  An economically

11  rational merchant, first off, is going to look at the quality

12  of the network from the merchants' perspective, so if American

13  Express or another network can differentiate itself by

14  offering particular value to the merchant, the merchant will

15  take that into account, and that's something that could offset

16  a higher price.

17           But the other thing is the merchant takes its

18  customers' preferences into account.  If merchants didn't care

19  about their customers' preferences and just took whatever's

20  cheapest, we would see no merchants in America except in

21  credit and charge cards.  All the merchants would just take

22  debit cards, for example, because they're cheaper.  The

23  reasons merchants take credit and charge cards, even though

24  they're more expensive, is precisely because the merchants

25  care about their customers' preferences.

1          So if American Express generates significant value

2     for its cardholders and can generate -- and it doesn't cost

3     them more money to generate the value than the value itself,

4     then they would be able to survive, because the merchants will

5     want to accept American Express cards because their customers

6     will want to use them.  And I think that's, in fact, why

7     Mr. Funda was saying this thing that one response to getting

8     rid of the rule could be to increase cardholder benefits, in

9     order to make those cardholders more attractive or more

10    insistent, really, so that then merchants will continue to

11    take American Express.

12          So my bottom line conclusion on that is if American

13    Express is truly creating value through its differentiated

14    strategy, then it will be able to compete successfully in a

15    world where steering is possible, because this is the world

16    that most business firms live in.  It's manufacturers selling

17    to retailers.  Retailers are steering their customers all the

18    time.  When you walk into a store, they make suggestions to

19    you which brands to use.  If you go into super market, there

20    are end-of-aisle displays.  They can have special prices

21    discounting.  Most manufacturers live in a world with

22    steering, and we certainly see manufacturers that successfully

23    have premium products, not just premium pricing, premium

24    quality to go with it.  So I think there's no basis for

25    concluding that these rules are essential to protecting

Katz - Direct - Conrath                    4014

1   American Express' differentiating model.  The differentiating

2   model can stand on its own.

3   Q    Professor Katz, we've gone over several possible

4   justifications for the merchant restraints, the anti-steering

5   rules.  Could you sum up your conclusions about whether there

6   is a procompetitive justification that warrants the

7   anti-steering rules?

8   A    My conclusion is that there is not, is that the rules do

9   harm competition and consumers, where again, consumers means

10  both merchants and their customers, and there's not an

11  offsetting procompetitive justification.

12          MR. CONRATH:  All right.  Thank you.  I have no

13  further questions, your Honor.

14          THE COURT:  Very well.  Cross-examination.

15          MR. CONRATH:  Mr. Chesler points out something to

16  me, that I may have misspoken, that -- of course, obviously,

17  are -- the chart 100 is not one of the surveys that Professor

18  Ford testified about, it's a consumer survey.  Professor Ford

19  testified about the merchant survey.  It's a different survey

20  from the same source, but it was not one of the ones he

21  testified --

22          THE COURT:  The two exhibits you identified.

23          MR. CONRATH:  Yes may we admit them?

24          THE COURT:  2703, which is the professor's CV and

25  2702, which is the slide presentation.

NICOLE CANALES, CSR, RPR

1          MR. CONRATH:  Yes, I offer those, your Honor.

2          THE COURT:  Any objection?

3          MR. CHESLER:  I assume the slide presentation is for

4   demonstrative purposes, your Honor?

5          THE COURT:  Yes.

6          MR. CHESLER:  No objection.

7          THE COURT:  All right.  Yeah, PX2703 and PX2702 are

8   received without objection, 2702 for demonstrative purposes.

9          (Government's Exhibit PX2702, PX2702  were received

10  in evidence.)

11         MR. CHESLER:  May, I your Honor?

12         THE COURT:  Yes, you may.

13         MR. CHESLER:  I have some books to hand out.

14         THE COURT:  I can see.

15         MR. CHESLER:  There are trees falling all over

16  America.

17         May we approach the witness, your Honor?

18         THE COURT:  Yes, you may.  Could you just lower the

19  microphone a bit.  Thank you.

20         MR. CHESLER:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. CHESLER:

23  Q    Good afternoon, Professor.

24  A    Good afternoon.

25  Q    Nice to see you again.

1   A     Likewise.

2   Q     Professor, you use the phrase "two-sided platform" a

3   number of times today, did you not?

4   A     Yes, I did.

5   Q     Do you agree that what we have here is a two-sided

6   platform that links together two separate antitrust markets?

7   A     I don't believe the platform is linking together markets.

8   If you're asking do I believe that there's a two-sided

9   platform that can be viewed as operating in two different

10  antitrust markets, yes, I do.

11  Q     What are the two different antitrust markets?

12  A     So they're operating in the market for general purpose

13  credit and charge card services to T and E merchants in the

14  United States and also operating in the same market but to

15  merchants overall.

16  Q     Would you agree, though, that the interaction between

17  payment services and consumers, on the one hand, and payment

18  services and merchants, on the other hand, are part of a

19  single two-sided market?

20  A     They could be viewed that way, yes.

21  Q     And you, in fact, you view it that way, don't you?

22  A     I think that's one of the ways to view it, and I also

23  believe they can be viewed as -- even think of them as

24  one-sided markets that are back to back, but if you do that,

25  it's important to take into account the links between the two.

Katz - Cross - Chesler                    4017

1   Q    But you, in fact, agree with America Express' experts

2   that American Express operates in one or more two-sided

3   markets, don't you?

4   A    Yes, you can view it that way.

5   Q    I understand you can view it that way, but I'm asking if

6   you view it that way?

7   A    As I've indicated, I believe it can be viewed two

8   different ways.  You can view them as being -- you can have

9   one two-sided market, or you can talk about two one-sided

10  markets as long as you keep track of those two markets and how

11  they interact.

12          MR. CHESLER:  Your Honor, I'm told we need to switch

13  the feed to our side of the courtroom.

14          THE COURT:  Well, that's fine.  I just didn't think

15  you'd put anything up yet.

16          MR. CHESLER:  No, I haven't.

17          THE COURT:  Thank you for your efficient staff.

18          MR. CHESLER:  Was that a compliment, your Honor?

19          THE COURT:  No further comment.  You're all doing an

20  excellent job.

21  Q    Professor, we put two books up there.  One is your

22  deposition in this case, deposition in some other litigation

23  and your reports.  That's volume one.  Volume two are

24  individual documents that -- some of which I will ask you to

25  look at during the course of the cross-examination.  So I'd

Katz - Cross - Chesler                                    4018

1    like you to look in the first volume at your deposition in

2    this case.  And that's right up front in the book.  And I'd

3    like you to look at page 14, and I asked you, at line five,

4    would you agree that American Express in conducting its

5    business operating in one or more two-sided markets, and you

6    said yes?

7    A    Yes.

8    Q    And I take it you agree with that?

9    A    That's why I said just a few minutes ago that that's one

10   way of viewing it, and I thought the other one was appropriate

11   as well, but, yes, I agreed this is a way to do it both then

12   and now.

13   Q    And, in fact, you agree with Professor Burnheim, and

14   Professor Gilbert and Professor Hay that not only does

15   American Express operate in one or more two-sided markets, but

16   that an assessment of market definition, market power and

17   competitive effects should account for the two-sided nature of

18   the market, correct?

19   A    Yes.

20   Q    I'd like you to look in the second volume at Defendants'

21   Exhibit 1917.  They should be in number order.  I hope they

22   are.

23   A    Yes.

24   Q    I hope my efficient staff has put them in number order.

25   You recognize 1917 as a presentation that you made in April of

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4019

1   2004?

2   A    I'm sorry.  I apologize.  Can you repeat the number

3   again?

4   Q    Yes, 1917.  Defendants' Exhibit 1917.

5   A    I misunderstood when you said they were in order.  I

6   thought they were in order you were going to use them, as

7   opposed to numerical order.  I apologize.  Yes, I do recognize

8   it.

9   Q    So this is a presentation you made at an American Bar

10  Association meeting in 2004, correct?

11  A    Yes.

12  Q    And it was entitled market definition, power and shares

13  in the payments industry, correct?

14  A    Yes.

15  Q    I'd like you to look at page 2, which also has a Bates

16  number at the bottom that ends 716.  Do you have that?

17  A    Yes.

18  Q    And you see that there's a diagram there with the network

19  in the middle, issuer and consumer on one side, and the

20  acquirer and the merchant on the other side, and they're all

21  connected with either solid or dotted lines?

22  A    Yes.

23  Q    And you indicate there in the third bullet under that

24  diagram that network effects and two-sided market

25  considerations are important, correct?

Katz - Cross - Chesler                                    4020

1    A     Yes, I do.

2    Q     And I think you summarized network effects several times

3    during your testimony as something along the lines of the more

4    people who hold a card, the more merchants will want to accept

5    it.  And the more merchants who accept the card, the more

6    people will want to hold it, generally speaking; is that

7    right?

8    A     Yes.  Those are examples of network effects, yes.

9    Q     Now, if you look at the next page of this Exhibit 1917,

10   page 3, the title is network and two-sided market effects are

11   prevalent.  And you say there that to succeed a payment system

12   must successfully navigate issues of customer coordination and

13   expectations.  Issuers and merchants want to join networks

14   that others have joined.  And then below that you say attract

15   both issuers and merchants through balanced pricing.  And the

16   last bullet on the page that I want to asking you about in

17   that context is you say it can be efficient for one side of

18   the market to subsidize the other, correct?

19   A     Yes, that's correct.

20             (Proceedings continued on the following page.)

21

22

23

24

25

1    CROSS EXAMINATION (CONT'D.)

2    BY MR. CHESLER:

3    Q    What did you mean in the context of the presentation you

4    made on the payment industry about one side of the market

5    subsidizing the other as a form of efficiency in the payments

6    industry?

7    A    Well, I recall at the time there was concern among some

8    regulators and some governments that there was necessarily

9    something wrong with the fact that people got rewards for

10   credit cards, for example, and so I was pointing out here that

11   the economics indicates that in some cases the efficient

12   prices on one side of a two-sided platform or we'd like to say

13   one side of a two-sided market could be negative.  That's what

14   I meant here when I was talking about one could subsidize the

15   other.

16   Q    When you say the price on one side could be negative, is

17   it fair to say that an example of a negative price would be

18   granting rewards to the consumer?

19   A    Yes.

20   Q    And so, the merchant is paying a positive price in the

21   form of merchant fees on transactions and the consumer is

22   paying a negative price in the form of receipt of rewards,

23   correct?

24   A    Yeah, that's certainly a possibility.

25   Q    Would you turn to page nine of the presentation please.

Katz - Cross - Chesler                                    4022

1  It's the last page of the presentation.

2         In the summary you say:  It is essential to consider

3  both sides of the market at once in defining relevant markets.

4         And then the third bullet says:  Market power

5  depends on a variety of market characteristics on both sides

6  of the market.

7         I take it you agree with both of those statements?

8  A    Yes, I do.

9  Q    And in this instance, in the examples we're talking

10 about, the both sides of the market would be referring to the

11 consumer side and the merchant side, correct?

12 A    I'd have to go back and look at the thing, the particular

13 context of this but it would either be the merchants and the

14 customers or it is conceivable I was talking about acquirers

15 and issuers but if you just talk about the two sides broadly,

16 yes.

17 Q    In the context of two-sided markets and, in particular, a

18 two-sided market in the context of the payment industry, are

19 you familiar with the concept of a two-sided price?

20 A    Yes.

21 Q    In fact, an example of a two-sided price is what we were

22 just talking about, a positive price in which the merchant is

23 paying fees on transactions executed at the merchant and a

24 negative price in the form of rewards given to the consumers

25 who are coming into the merchant's store and using their

Katz - Cross - Chesler                                    4023

1   cards, correct?

2   A    Well, the two-sided price would be the sum of those two

3   things but, yes, that's the overall concept.

4   Q    I take it you would agree with me that the idea of a

5   two-sided price was not invented by any of American Express's

6   experts for purpose of this litigation, wouldn't you?

7   A    I agree that they did not invent the concept, yes.

8   Q    Now, is it possible to actually determine what the net

9   two-sided price is in a two-sided market?

10  A    It would depend on the circumstances and what data are

11  available but as a general matter it certainly could be.

12  There are also situations where the data aren't available.

13  Q    Would you agree that the net two-sided price that

14  American Express receives for a particular transaction, the

15  price with respect to the merchant, the price with respect to

16  the cardholder is relevant to assessing whether American

17  Express has market power?

18  A    I would like to ask for one clarification because when

19  you're talking about American Express, it's not clear to me if

20  you're talking about American Express as a company that's an

21  issuer, acquirer and a network or if you're talking to me

22  about American Express as a network.

23  Q    American Express as a company that is an issuer, acquirer

24  and a network?

25  A    Okay.

*Katz - Cross - Chesler*                                              4024

1   Q     The so-called closed loop.  In that context, would you

2   agree with me that the net two-sided price that American

3   Express receives for a transaction is relevant to assessing

4   whether it has market power?

5   A     In its role as doing all of those together, yes.

6   Q     Would you also agree that changes in one of those prices

7   in a two-sided market can affect the price on the other side

8   of market?

9   A     Yes, I testified to that effect earlier today.

10  Q     And in order to avoid reaching unwarranted conclusions

11  about market power, you would need to assess the price changes

12  on both sides of the market, correct?

13  A     That's correct.

14  Q     And, in fact, I think in your report in this case you

15  give an example of how failing to consider the price on both

16  sides of the market can lead to unwarranted conclusions.  The

17  example is a situation in which competition is driving the

18  network to set prices that lose money serving one side of the

19  market in order to attract consumers on the other side of the

20  market and if you looked at the side on which they're losing

21  money, you might draw an erroneous conclusion of

22  unprofitability and if you looked at only the other side of

23  the market, you might drew an erroneous conclusion of greater

24  profitability than the company was actually enjoying; do you

25  recall that?

Katz - Cross - Chesler                                    4025

1   A    I don't recall the example but the principle sounds fine.

2   I don't dispute that it's there.

3   Q    Do you recall in 2010 writing an article in connection

4   with a conference in Lisbon on competition, law and economics?

5   A    I know what you're talking about.  Just to be precise, I

6   gave a speech which they then used the transcript and turned

7   it into an article which would explain some of the many typos

8   in it.

9   Q    Okay.  I appreciate the clarification.  Would you look at

10  Defendant's Exhibit 7747.

11  A    7747?

12  Q    Yes, sir.

13        MR. CHESLER:  Your Honor, before I move on, I'd like

14  to offer 1917.

15        THE COURT:  Any objection to 1917?

16        MR. CONRATH:  No objection.

17        THE COURT:  Defense Exhibit 1917 is received.  And

18  now we're discussing 7747.

19        MR. CHESLER:  Yes, Your Honor.

20        (Defendant's Exhibit 1917 received in evidence.)

21  Q    So, this is entitled:  Two-Sided Markets - A Challenge

22  for Competition, Policy and Regulation?

23        Correct?

24  A    Yes.  Well -- I'm sorry, I think actually that is not the

25  title.  Maybe you don't care, I believe the title is what's in

*Katz - Cross - Chesler*                                    4026

1   light gray and the dark gray is the title of the conference

2   session.

3   Q      Thank you.  So, it is:  Two-Sided Markets - A New

4   Challenge for Competition, Policy and Regulation?

5   A      Yeah, that's my recollection that that's the title.

6   Q      Okay.  Thank you.

7            In this article you give another example of why it

8   is so important to look at pricing on both sides of a

9   two-sided market to avoid coming to erroneous conclusions.  Do

10  you recall the example you gave of a singles bar?

11  A      No.  I certainly used the example of a singles bar in

12  various writings.  I don't recall using it -- whether I used

13  it here or not.

14  Q      Why don't you look at paragraph 22, it is on page four.

15  A      I have it in front of me.

16  Q      So, why don't you take a moment and just look at that, to

17  yourself.

18            (Pause.)

19  A      I have reviewed it.

20  Q      Do you see that you use the singles bar example there?

21  A      Yes, I do.

22  Q      Would you just explain to the Court briefly how that

23  example works to illustrate the importance of considering the

24  price on both sides of the two-sided market to avoid reaching

25  erroneous conclusions?

1  A    So, what it's saying here is if you look, I'll take the

2  case of a singles bar and what it's assuming here is what the

3  singles bar is doing, it figures that men want to be with

4  women more than women want to be with men and certainly if I'm

5  the man, that's the correct statement.  So, what it's saying

6  here is you might see a singles bar that's charging high

7  prices, what look like high prices to men and low prices to

8  women and rather than look just at the one side and say, whoa,

9  high prices to men, you must be making a lot of money, you

10 have to say, well, why are the men there, they're there for

11 the women and you were charging a low price for them, and so

12 you need to take that into account and look at both sets of

13 prices at once if we're trying to look just at price levels

14 and determine are they high or low.

15         THE COURT:  Yes, I have a vague recollection.

16         MR. CHESLER:  Of being more interested in women than

17 women were in you?

18         THE COURT:  Of a singles bar, how it works.  We

19 don't really have to go into this very deeply.  We can just --

20         MR. CHESLER:  That's as far as we're going.

21         THE COURT:  That's as far as we're going?

22         MR. CHESLER:  Yes.

23         THE COURT:  Let's move on.

24         MR. CHESLER:  Thank you.

25 Q    Would you look at paragraph 23 please, the next paragraph

Katz - Cross - Chesler                                    4028

1   in this paper.  You say at the beginning of that paragraph:

2   Subsidizing one side of the market to increase the value of

3   the platform to the other side is an example of a strategy

4   intended to create network effects that raise the value of the

5   platform to users and thus raise the potential for the

6   platform owner to earn profits.

7           Do you see that, sir?

8   A    Yes.

9   Q    And in the payments industry there are examples of that

10  type of subsidization of one side of the market to increase

11  value of the platform to the other side, aren't there?

12  A    Yes, there are.

13  Q    And, in fact, the merchants who pay fees to fund rewards

14  to consumers is an example of such two-sided subsidization,

15  isn't it?

16  A    Yes.

17  Q    And do you agree that the effect of that can be to

18  increase the overall value of the platform?

19  A    Yes.  I want to just be clear on one thing which is why I

20  hesitated to say yes.  So, I don't want to change my answer

21  but I want to be clear, to get into a technical definition of

22  what it means to be a subsidy using an economics definition

23  but as the word is understood in everyday language and the way

24  I'm interpreting you to use it, yes, it is a subsidy.

25  Q    Thank you.  In the last sentence of that paragraph you

1  conclude:  Thus, differential treatment of the two sides of

2  the market is neither evidence of the exercise of market power

3  nor sufficient grounds for concluding that regulation would

4  improve market performance.

5           Do you agree with that statement?

6  A   Yes, I do.

7           MR. CHESLER:  Your Honor, I would offer 7747.

8           MR. CONRATH:  No objection.

9           THE COURT:  All right, DX 7747 is received in

10 evidence.

11          (Defendant's Exhibit 7747 received in evidence.)

12 Q   You mentioned early in your direct testimony,

13 Professor, that you served as a witness for the government

14 in the U.S. v. Visa case, correct?

15 A   That is correct.

16 Q   You also testified in another antitrust case called

17 United States against First Data, do you recall that?

18 A   Yes, I do.

19 Q   And in that case you were not testifying on behalf of the

20 government, you were testifying on behalf of debit networks

21 that were trying to merge over the opposition of the

22 government, correct?

23 A   That's right, Professor Ordover and I had reverse

24 roles.

25 Q   And, in fact, speaking of roles, the lead trial counsel

1   in that case was our friend Mr. Conrath, right?

2   A    I have to admit I didn't remember until he reminded me.

3   Q    He has that effect on a lot of people.

4           THE COURT:  He's made a better impression here.

5           MR. CONRATH:  I should clarify, that case did not go

6   to trial because the defendants agreed with us at the last

7   hour.

8           MR. CHESLER:  How nice of them.

9   A    But in any case, he did remind me of that fact.

10  Q    He reminded you of that fact before you came on the stand

11  today?

12  A    Yeah, talking a couple of days before.

13  Q    So, in that case there were two PIN debit networks, First

14  Data and Concord EFS that wanted to merge, correct?

15  A    I believe that's correct.

16  Q    And the government brought suit to prevent the merger,

17  right?

18  A    That's my recollection.

19  Q    And the government alleged that the merger would result

20  in a loss of competition for point of sale debit network

21  services and would harm consumers through its effects on

22  pricing practices of the merchants, do you recall that?

23  A    No.  First, I just don't recollect but also I'm puzzled

24  because I thought the government alleged a narrower market

25  than that but I may be misremembering.

1   Q    Well, why don't we look at Defendant's Exhibit 7183.

2         I'm sorry, this is in volume one.  We have your

3   prior reports in various volumes.  I apologize.

4         I'll say just for clarity, because we included your

5   full reports from this case but only excerpts of reports from

6   the other case because of the sheer volume of them.

7         Do you have 7183, sir?

8   A    Yes, I do.

9   Q    Okay.

10        THE COURT:  And it has redactions.

11        MR. CHESLER:  Yes, it does.

12  Q    So, would you look at paragraph ten please which is on

13  page three and, by the way, you recognize this as excerpts of

14  your report in that First Data litigation?

15  A    A very cloudy version of that report, yes, but that

16  report.

17  Q    Okay.  So, if you look at paragraph ten on page three,

18  you see it says:

19        Plaintiffs assert that the merger of Concord and

20  First Data would result in a loss of competition in the

21  provision of point of sale debit network services that would

22  harm consumers through its effects on the pricing practices of

23  merchants?

24        Do you see that, sir?

25  A    Yes, I do.

1    Q    Does that refresh your recollection of what the

2    allegation by the government was?

3    A    No, what it reminds -- what it's telling me, I'm not sure

4    what the term point of sale debit network means as it was used

5    then because I thought they were making a distinction between

6    PIN and signature and as I sit here, I just don't remember but

7    I'm assuming it is right that whatever they had said was what

8    I was using here but I don't recall this particular

9    terminology.

10   Q    Do you recall that the government argued that the merger

11   would make pricing for PIN debit network services to merchants

12   less competitive and that merchants would pass on at least

13   some of those higher costs to consumers?

14   A    My recollection is that it was that the government

15   alleged that interchange rates would change and that -- well,

16   that's -- if it's that, now that would result in higher prices

17   to merchants.  I don't remember the rest.

18   Q    All right.  Why don't you look at paragraph five of your

19   report which starts on page three.

20   A    I'm sorry.

21   Q    No, I'm sorry, I referred you to the wrong document.  I

22   want you to look at Defendant's Exhibit 7756 which is in the

23   other volume.  This is in the complaint in that case.

24        I apologize for jumping back and forth but we had to

25   find some way of organizing this?

*Katz - Cross - Chesler*                                          4033

1   A    7756?

2   Q    Yes, sir.

3   A    And paragraph five in that document?

4   Q    Paragraph five, you see that this is the complaint of the

5   U.S. Government and various states versus First Data and

6   Concord EFS, the case we're talking about?

7   A    Yes, I do.

8   Q    Okay.  You look at paragraph five of the government's

9   complaint, see it says:

10          First Data's acquisition of Concord would

11   substantially reduce competition among the PIN debit networks

12   for retail transactions.

13          Then it picks up on the next page:

14          The merger would make pricing for PIN debit network

15   services to merchants less competitive.  Merchants will pass

16   on at least some of the higher costs of PIN debit transactions

17   by raising the prices of their goods and services to the

18   detriment of tens of millions of consumers throughout the

19   United States.

20          Does that refresh your recollection, sir, that that

21   was the allegation of the government in that case?

22   A    Yes, and it also refreshes my recollection when I was

23   saying to you before about the terminology because it is

24   saying here PIN debit and they're distinguishing between what

25   would typically be referred to as PIN debit and signature

1   debit and that was the source of my earlier confusion.

2   Q    Thank you.

3        Now, you conducted an economic analysis in that case

4   of the claims made by the government, did you not?

5   A    Yes, I did.

6   Q    And one of the things that you concluded in that case was

7   that the market involving PIN debit network services was a

8   two-sided market, didn't you?

9   A    I don't recall concluding that there was a market for

10  PIN debit but I'd have to look at my report to refresh my

11  memory.

12  Q    Okay.  Why don't you go back to your report which is 7183

13  in the first volume and if you look at paragraph 27 of your

14  report which starts on page 11, carries over to page 12, take

15  a moment and reviewed that paragraph to yourself.

16       (Pause.)

17  A    I'm sorry, I got distracted.  You're saying

18  paragraph 27?

19  Q    Yes, sir, it begins at the very bottom of page 11 and

20  carries over on to page 12.

21       (Pause.)

22  Q    Toward the end of that paragraph you say:

23       Thus, a profit maximizing debit network will seek an

24  interchange fee level that balances the interests of merchants

25  and issuers simultaneously.  Because the network must consider

Katz - Cross - Chesler                                    4035

1    the responses of both issuers and merchants simultaneously,

2    that is it must consider two sides of the market at once, a

3    debit network is said to operate in a two-sided market.

4              Do you see that?

5    A    I do see that.

6    Q    And you recall that that was, in fact, your view as

7    expressed in the First Data case?

8    A    Let me be clear about what question you're saying,

9    asking.  If you're asking do I agree with that sentence, the

10   answer is yes, it was a two-sided market.  If you're asking

11   for the answer to your earlier question, did I say that PIN

12   debit was a relevant market, was a two-sided market for PIN

13   debit, I noticed while opening this report that that's not

14   what I concluded.

15   Q    It's not what you concluded.  Okay.

16             Let me ask you to look at Defendant's Exhibit 7183.

17   That's the report, correct?

18   A    Yes, that's what I have in front of me.

19   Q    Yes.  If you look at page four.

20   A    Yes.

21   Q    If you look at the last bullet on page four, this is

22   under the heading Overview of Opinion, correct?

23   A    Yes.

24   Q    You say in that bullet:

25             The complaint misses half of the competitive story

*Katz - Cross - Chesler*                                    4036

1  by focusing on only one side of what is a two-sided market.

2  Debit networks serve as middlemen to bring together two sides

3  of a market, merchant acquirers and issuers.  To compete

4  successfully, a debit network must balance demands on each

5  side of the market.  By failing to recognize this fundamental

6  phenomenon, the complaint draws faulty conclusions about

7  market definition, the nature of competition and the likely

8  effects of the merger.

9              Do you agree with that statement?

10  A    Yes, I do.

11  Q    And you agree that the government missed half of the

12  competitive story by focusing on only one side of what is a

13  two-sided market?

14  A    Yes, I do.

15  Q    Did you also conclude in First Data that even if one knew

16  that a proposed merger would increase some measure of network

17  market power, it does not follow either that interchange fees

18  would rise or that even if they did rise, merchant or consumer

19  welfare levels would fall?

20  A    I don't recall saying what you're saying and I

21  am wondering is this a quotation or your substituting the term

22  some measure for market power for something I said and since

23  in the past there's been some misunderstanding about that, if

24  you could be clear about what you're asking it would be

25  helpful to me.  I know you intended to be clear, I didn't mean

1  that as an insult but if you'd just repeat the question.

2  Q    Why don't we, so there isn't any failure of

3  communication, why don't you look at paragraph 157 of your

4  report which is the 7183, that is page 70.  It should be the

5  excerpt in your book.

6  A    I'm sorry, would you repeat the paragraph number?

7  Q    157, it is at the top of page 70 and you'll see, I think

8  I was reading it accurately, you say:

9         In summary, as a matter of economic theory, even if

10 one knew that a proposed merger would increase some measure of

11 network market power, it does not follow either that

12 interchange fees would rise or that even if interchange fees

13 did rise, merchant or consumer welfare levels would fall as a

14 result.

15        It goes on to say:  It is critical not to draw

16 unwarranted and misleading conclusions by focusing solely on

17 one side of a two-sided market.

18        I take it you agree that you made that statement in

19 that case, sir?

20 A    I agree I made it and I agree with the statement.

21 Q    Thank you.

22        Now, I believe that one of the markets that you say

23 you defined for purposes of this case is the market for

24 network services provided to merchants, correct?

25 A    That's correct.

Katz - Cross - Chesler                                    4038

1   Q    And then there's a separate market for such services

2   provided to travel and entertainment merchants, correct?

3   A    That's correct.

4   Q    Now, have you been following the trial record of this

5   trial as it's developed over the last several weeks?

6   A    I followed parts of it but certainly not all of it.  As

7   you might imagine, I've been busy getting ready with my

8   slides.

9   Q    Do you recall that virtually all if not all of the

10  merchant witnesses who were called by the government testified

11  not about network fee increases but about total merchant fee

12  increases or interchange increases?

13  A    I have not personally reviewed all of the testimony.  I

14  wouldn't be surprised if that were the case since they tend to

15  think of what the bottom line of what they pay I suspect

16  rather than the components.

17  Q    And, in fact, I think one of the charts you used on your

18  direct showed, you used hypothetical numbers just to

19  demonstrate how it works, the overwhelming preponderance of

20  the merchant fee is the interchange which goes to the issuing

21  bank, correct?

22  A    That's the biggest portion, yes.

23  Q    In fact, the network fee is a very small, even in your

24  example, a very small proportion, five percent, something like

25  that?

Katz - Cross - Chesler                                              4039

1   A     Larger than five percent but it is certainly

2   significantly smaller than the interchange fee.

3   Q     And given that your market definition is network services

4   to merchants, is that the only fee that your analysis is

5   concerned with, sir, just the network portion of the fee which

6   is this whatever percentage, small percentage of the total

7   fee?

8   A     My analysis took into account the other portions of the

9   fee at various points.  As you know, I talked about some of

10  the things, about the total merchant discount fee and there

11  are pieces of evidence having to do with the interchange fee

12  but ultimately in thinking about the network, what the network

13  keeps is the network fee and, for example, that's why when I

14  looked at the five percent increase, I was looking at the

15  two-sided price of the network.

16  Q     So, let me ask the question a slightly different way.  Is

17  the price that you believe is too high by virtue of American

18  Express's non-discrimination provisions the network fee

19  portion of what the merchant pays?

20  A     I believe that it is a result -- my analysis, my

21  conclusion is the result of the anti-steering rules is to

22  reduce the sensitivity of demand on the merchant side of the

23  platform and, as a result of that, the merchants pay higher

24  prices and that less than the full amount is passed on to

25  cardholders and that some of that is captured by the networks

1    and when I did my test of the hypothetical monopolist, it was

2    looking in the case where it would all be captured by the

3    networks but I also believe some of it would be passed on to

4    the issuers themselves.

5    Q    I'm not sure I understood the answer.  Are you concerned

6    about the interchange fee that's set by the networks, Visa and

7    MasterCard, being higher than you believe it would be if there

8    were no non-discrimination provisions in American Express's

9    merchant agreements or just the network portion of the fee?

10   A    I believe that both elements of that are affected which

11   is why in my analysis I talked about the network fee going up

12   but then also why I talked about that it is not those

13   increases in what the merchant pays are not fully passed on to

14   cardholders.  Any passing on to cardholders that does occur

15   would occur through the interchange.  So, my analysis

16   indicates that both things would be affected because the

17   rules of diminishing competition in making demand on the

18   merchant side less responsive, that's going to affect what the

19   merchants pay overall including the different components of

20   what they pay.

21   Q    In fact, you know that significant amounts of interchange

22   are in fact passed on to consumers in the market today in the

23   form of rewards and other consumer benefits, don't you?

24   A    Yes, to some consumers certainly.

25              MR. CHESLER:  A different subject, Your Honor.

1   Q    I want to talk to you about the aspect of your -- some

2   aspects of your market definition, in particular your

3   discussion about debit and some of the things you said about

4   the Hypothetical Monopolist or SSNIP test.

5            Would you agree, Professor, that in defining a

6   relevant market for antitrust purposes, one looks to determine

7   what are reasonably close substitutes for one another?

8   A    Yes.

9   Q    Would you also agree that in this particular two-sided

10  market the demand by the merchants depends upon the demands of

11  the consumers on the other side of the market?

12  A    Yes, that's my testimony.

13  Q    So, your focus about substitution for purposes of

14  defining what is in the market needs to be on both sides, the

15  consumer side and the merchant side, correct?

16  A    That's correct.

17  Q    And so, therefore, you would want to understand how

18  consumers substitute among various payment instruments,

19  wouldn't you?

20  A    Yes.

21  Q    And I take it you'd go so far as to say that merchants'

22  demand for credit and charge card network services is largely

23  driven by consumer demand, isn't it?

24  A    Yes.

25  Q    Now, aren't there a number of ways to go about looking at

1    the substitutability of different products for the purposes of

2    coming up with a market definition?

3    A    There is more than one way, yes.

4    Q    So, the Hypothetical Monopolist or SSNIP test is one way

5    but it is certainly not the only way to define a market,

6    correct?

7    A    That's correct.

8    Q    Another way to assess the substitutability of products

9    for purposes of defining a market is to look at whether they

10   are reasonably interchangeable for use, isn't that so?

11   A    Yes, that is an approach that can be taken.

12   Q    And, in fact, that's what you did in the First Data case

13   instead of doing a SSNIP test, isn't it?

14   A    I'd have to go back and look but I could well have.

15   Q    Do you recall that, in fact, in the First Data case the

16   government criticized your market definition because you did

17   not do a Hypothetical Monopolist Test?

18   A    No, I don't recall that.

19   Q    Okay.  Let me ask you to look in volume one at your First

20   Data case deposition which is Defendant's Exhibit 1690.

21           Do you have that, sir?

22   A    Yes, I do.

23   Q    I'd like you to turn to page 99 please.

24           It should be toward the beginning of the excerpt.

25   Do you have that?

Katz - Cross - Chesler                                    4043

1    A    I found that out, I went in 99 pages.

2    Q    I'm sorry about that.  We tried to eliminate pages I

3    wasn't going to ask you about.

4         You see on page 99 of your deposition in First

5    Data you are asked at line 12:  "What are the well known

6    flaws in the Hypothetical Monopolist Test to which your

7    report alludes?"

8         Now, do you recall that you discussed in your

9    report that the Hypothetical Monopolist Test had well known

10   flaws?

11   A    I don't recall saying that in my report but I do recall

12   having that opinion.

13   Q    Okay.  Why don't you take a minute and look at your

14   answer.

15        You said:  "One of the flaws is that it can give you

16   overly narrow markets and some problems with this use of this

17   notion of putting in the next best substitute for the -- well,

18   I think that's the terminology used in constructing a market

19   in order to come up with this so-called smallest set of

20   products because I think there is agreement that you can

21   sometimes do these things in the wrong -- well, the wrong

22   order in terms of getting the economically sensible answer.

23   It is the right order according to the algorithm and the

24   merger guidelines, so I mean that's one of the problems" and

25   you go on.

1          Do you agree one of the flaws in the Hypothetical

2    Monopolist Test is that it can lead to an overly narrow market

3    definition?

4    A    Yes, I believe that can be a problem if you bring

5    products into the candidate market in the wrong order.

6          MR. CONRATH:  Your Honor, could we read the whole

7    answer.

8          MR. CHESLER:  I was about to take him through the

9    rest of the answer, yes.

10          MR. CONRATH:  Very well.

11   Q    I want you to look at the rest and I'm happy to read it

12   into the record so we're not just referring to it without

13   reading it.

14          You say:  "I guess related to that is that you can

15   have situations and when you have differentiated products I

16   think there is a real question that in a lot of economist's

17   minds whether the market definition exercise of the

18   hypothetical monopolist is worth doing or whether it makes

19   very much sense because it is trying to draw sharp boundaries

20   where there aren't any.  There is also -- I mean we've got to

21   be careful about the language.  There is some things, it's not

22   the Hypothetical Monopolist Test itself that's the problem,

23   it's when one tries to mechanically apply it without regard

24   for the market realities and try to use it for more than

25   getting insight into what's going on.  So, that may be more a

1   flaw in the application than the approach itself.  You know,

2   as you know, I've certainly taken the position and continue to

3   that it can be useful for thinking about things but one has to

4   be careful how one does it."

5           I'd like you to focus on the second paragraph of

6   your answer, the one that begins on line six of page 100 that

7   I just read.

8           So, do you agree, sir, as you testified in First

9   Data, that when you have differentiated products, there's a

10  real question in a lot of economist's minds whether the market

11  definition exercise of the hypothetical monopolist is worth

12  doing?

13  A    Yes, I think there is a question and actually the present

14  case is one that can illustrate some of the problems because

15  as American Express has emphasized that they pursue a

16  differentiated model so certainly they perceive that they are

17  a differentiated network.  What that means is the market share

18  you see may not accurately represent the degree of competition

19  because you have a market where the firms in it are highly

20  differentiated, there may be less competition than is apparent

21  from looking at the market shares.  So, that's why there are

22  two concerns with differentiated products, one is you're

23  overstating the degree of competition because you say, well,

24  we've put them in the same market but really there's some

25  important differences among the products within the market and

Katz - Cross - Chesler                                    4046

1   we're missing that when we just define relevant markets and

2   just look at shares and we ignore the fact that the different

3   producers are differentiated.

4          The other problem that can come up, that's why I was

5   asking this about economists asking is it worth doing is if

6   you have enough differentiation among all the products, it

7   becomes very hard to decide where to draw the line and that

8   when you do do that, you may be missing the story because of

9   these important differences within the market.

10  Q    Do you recall that in the First Data case you were asked

11  why it was that you had opted to not use a Hypothetical

12  Monopolist Test when you had in fact used one in the Visa case

13  a few years before?

14  A    I don't recall that.

15  Q    You don't recall.  Okay.

16         Would you look at the same deposition, page 125

17  please, First Data case?

18         I'm sorry, 124, I apologize, down at the bottom,

19  line 19 you were asked:

20         "Is it your view, Dr. Katz, that it is never

21  appropriate in the context of a two-sided market to apply a

22  Hypothetical Monopolist Test?

23         "Answer:   No, it is not my view that it is never

24  appropriate.  My view is that you've got to be careful how you

25  do it and that it can be misused and misapplied."

1          And then you were asked:  "Are you aware of any

2    other two-sided market where applying the Hypothetical

3    Monopolist Test would be analytically unsound?"

4          You say:  "I haven't attempted to apply it to other

5    markets so I couldn't answer by other markets, I mean beyond

6    payment mechanisms and certainly I -- when you're asking me

7    where it is unsound, I think there is some question about

8    exactly how to do it in the credit card networks services

9    market which I'm distinguishing because in my report from

10   which you're quoting I distinguish two markets, I talked about

11   the market where consumers were purchasing credit card

12   services and I also talked about the market for credit and

13   charge card network services and in the latter case I did try

14   to do a calculation of one of the many things that are done.

15   That calculation I think has some shortcomings but obviously I

16   put it in my report because I also thought it was one -- it

17   was of some information value as well."

18          Does that help to refresh your recollection that you

19   were being asked in the First Data case why it was you had not

20   adopted a Hypothetical Monopolist Test to define the market

21   when you had used it in First Data -- in U.S. v. Visa and you

22   were being asked about your use of the test in the U.S. v.

23   Visa case?

24   A    I mean partially.  Is the question in what context is

25   this being done, because as I recall, a central issue is that

1    the government was trying to do all of this in terms of the

2    interchange fee which I don't believe is an appropriate way to

3    do a Hypothetical Monopolist Test or to define relevant

4    markets in general and what I'm not sure about is how much of

5    this is a shorthand about talking about that or whether it is

6    asking broader but certainly I'm answering questions about

7    difficulties of applying a two-sided hypothetical monopoly

8    test.

9    Q    When you say that the government was trying to focus on

10   the interchange which you did not think was an appropriate

11   way, you're talking about what the government was doing in the

12   First Data case, correct?

13   A    Yes.

14   Q    Now, in this case coming back to the --

15   A    Present.

16   Q    -- present case and the testimony you gave this morning

17   about the Hypothetical Monopolist Test, you recall your

18   discussion this morning about the ability of the hypothetical

19   monopolist to raise its prices without inducing a sufficiently

20   large number of merchants to drop credit and charge card

21   acceptance?

22   A    Yes.

23   Q    Would you agree with me, Professor, that if you were

24   looking at functional interchangeability, an alternative way

25   of defining market as we discussed a few minutes ago, you

1    could find that two products are in the same relevant market

2    without concluding that consumers would entirely replace one

3    by the other?

4              MR. CONRATH:  Objection.

5              I think the reference functional interchangeability

6    misstates the prior discussion.

7              THE COURT:  Well, the witness can explain.

8              MR. CHESLER:  Thank you, Your Honor.

9    Q    Do you need the question read again?

10   A    Well, we may need to have it read again.  Let me just

11   raise a question before that.  When you say consumers, about

12   whom are you speaking?

13   Q    In my question?

14   A    Yes.

15   Q    Well, I was not asking about interchangeability yet in

16   this particular market so I was asking generally, so my

17   question was intended to be generic.

18   A    Okay.  You could reask the question.  I think I

19   misunderstood that.

20   Q    I'm sorry for the confusion.

21             If you were looking at functional interchangeability

22   as a basis for defining a market to determine whether two

23   products are in the same market as opposed to doing a SSNIP

24   analysis, do you agree with me that you could find that two

25   products are in fact in the same market on the basis of

1  functional interchangeability even though consumers do not

2  necessarily completely replace the use of one product with the

3  other?

4  A    Under what circumstances are they replacing one with the

5  other?

6  Q    They're making a choice between two products and

7  sometimes they choose one and sometimes they choose the other

8  but they don't always choose one in favor of the other?

9  A    I'm sorry, since you're not telling me why they're

10 switching, it is possible you could do that but it may be from

11 what you've defined it's also not true, I'm just having

12 trouble understanding the hypothetical, from my perspective it

13 is missing something.

14 Q    I'm sorry, let me try again.

15        Let's take charge cards and credit cards.  For

16 purposes of this case, your general purpose market for

17 merchant network services includes charge cards and credit

18 cards but not debit cards?

19 A    That's correct.

20 Q    Would you agree with me that consumers, that is people

21 like us who use plastic to make transactions do not

22 necessarily always use a credit card in place of a charge

23 card, sometimes they use credit, sometimes they use charge?

24 A    Yes, I agree with that.

25 Q    And you believe that credit and charge coexist in the

Katz - Cross - Chesler                                   4051

1    same market, don't you?

2    A    Yes.

3    Q    Because for a fair degree of applications or uses they

4    are interchangeable with one another, substitutable, aren't

5    they?

6    A    No, the basis of my opinion is what this means to

7    merchants is why I asked you the earlier question when I was

8    asking you what you meant by consumers because a central part

9    of my economic analysis is that merchant demand is derive

10   demand from consumer demands in the everyday sense of the word

11   consumer but we have to take into account what that means for

12   merchants and, as I've testified, from the perspective of a

13   merchant thinking to drop -- whether or not to drop credit and

14   charge cards and to stop accepting them, it is not just about

15   a bunch of consumers who are willing to switch, it is worried

16   about the core.

17        So, when we're talking about functional

18   interchangeability and what it means for markets, we should be

19   talking about functional interchangeability from the point of

20   view of the merchant and whether or not there are close enough

21   substitutes for the merchant.

22        Now, to answer that question, and you could also ask

23   about functional interchangeability from the perspective of

24   households and consumers but you can't do that in isolation

25   without thinking about what the implications are for the

Katz - Cross - Chesler                                    4052

1   merchants.

2   Q    Okay.  Let's take it one at a time.  Let's start with

3   where you started which is on the merchant side, would you

4   agree with me that with respect to the merchant side of this

5   two-sided market, charge cards and credit cards are both in

6   the same market?

7   A    Yes.

8   Q    And would you agree with me that merchants accept both,

9   they don't accept one to the exclusion of the other, it is not

10  an all or nothing substitution?

11  A    I've got to make sure I understand -- you're saying that,

12  you're asking about different brands of credit and charge

13  cards.  I'm not sure when you say it's both, it's not all or

14  nothing, if you'd just clarify that.

15  Q    Well, take, for example, American Express has charge

16  cards, correct?

17  A    Yes.

18  Q    Visa has credit cards, correct?

19  A    Yes.

20  Q    Merchants accept both the American Express charge cards

21  and the Visa credit cards in the relevant market that you've

22  defined, correct?

23  A    Yes.

24  Q    It is not necessary that merchants take only one, say the

25  Visa credit cards to the exclusion of the American Express

1  charge cards in order for you to conclude that they're both in

2  the market, correct?

3  A    That's certainly correct.

4  Q    Okay.  Now, let's take the consumer side, would you agree

5  with me that consumers, that if you look at the market from

6  the consumer's perspective which you've said before is related

7  to and drives merchant demand, that consumers view credit and

8  charge cards as reasonable substitutes for one another?

9  A    Yes, for many consumers they do, yes.

10 Q    And it is not necessary that a consumer decide I'm only

11 going to use a charge card in favor of credit or vice versa,

12 sometimes she may use one, sometimes she may choose to use the

13 other, correct?

14 A    Yes.

15 Q    Now, I want to ask you to consider this, the four

16 networks that you've put in both of your markets, Visa.

17 MasterCard, American Express and Discover; those are the four

18 networks, correct?

19 A    Yes.

20 Q    Now, are you aware that a number of merchants have

21 testified that they would simply not under any circumstances

22 stop accepting Visa cards or MasterCards or American Express

23 cards?

24 A    I don't know -- I don't recall whether they actually said

25 they wouldn't under any circumstances but certainly I know

Katz - Cross - Chesler                                    4054

1   that merchants -- I've seen merchant testimony saying they

2   wouldn't stop accepting in the face of a substantial price

3   increase but I don't recall hearing that they wouldn't under

4   any circumstances.

5   Q    All right.  Let's stay with your recollection.  You

6   recall that merchants testified that they would not stop

7   taking a particular network brand of card in the face of a

8   substantial price increase, correct?

9   A    As I sit here, I actually don't recall testimony about

10  Visa but it certainly would be consistent with things I've

11  heard over the years being involved in the industry.

12  Q    Okay.  Now, if you did a SSNIP test to define your

13  network market, your network services market, one way you

14  can do that would be to take -- if you were starting out on

15  a blank board and you were trying to figure out which

16  networks should be in the market, would you agree with me

17  that one way to go about doing that using a SSNIP test would

18  be to pick one of the networks, say Visa, assume a SSNIP by

19  Visa and determine whether the SSNIP was profitable or not

20  and if it was not profitable, you would look to expand your

21  market definition to include one or more other networks,

22  correct?

23  A    Well, my understanding of how the Hypothetical Monopolist

24  Test is done is by defining products, not by defining specific

25  firms and that the way it proceeds, you take a candidate set

Katz - Cross - Chesler                    4055

1    of products, you can ask what a hypothetical monopolist would

2    do over that set of products and then you say, well, let's

3    look at the providers of those products and they're in the

4    relevant market.

5           So, when I was talking about the Hypothetical

6    Monopolist Test applied to credit and charge card network

7    monopolists, I was taking credit and charge cards as the

8    starting point for the candidate market and then you'd say,

9    well, who supplies credit and charge cards, we're talking

10   about the big four networks, but it is done in terms of the

11   product and then asking about expanding the set.

12          If you do it the way you're talking about, that

13   would be an example of one of my points where I was saying

14   that the way you put products into the candidate market if

15   done wrong can give you overly narrow markets.  There are

16   people who would say that Visa is its own candidate market.  I

17   think it is a more appropriate approach to take a broader

18   market and take into account a wider spectrum of competition.

19   Q    All right.

20          Let's try it this way then.  You understand that the

21   only one of the four networks that offers a charge card,

22   meaning a non-revolving card is American Express?

23   A    I actually thought that some of the fleet cards or some

24   of the other things offered by Visa and MasterCard might in

25   fact be charge cards but to the extent if we want to agree

Katz - Cross - Chesler                                    4056

1    that it is a very small portion of their business if they do

2    it.

3    Q    All right.  I want you to assume that you were trying to

4    define not whether debit is in or out of your market, which is

5    the exercise you were talking about this morning, but you were

6    trying to define what credit and charge cards were in your

7    network services market and you started with the American

8    Express charge cards and you assumed a SSNIP on the American

9    Express charge cards.

10             Now, in light of the testimony of various merchants

11   that even in the face of a very significant price increase

12   they would not drop the American Express Card, using that

13   example, wouldn't you agree with me that applying the SSNIP

14   test there would cause you not to include, for example, the

15   credit card products that Visa, MasterCard and Discover offer

16   in your relevant market?

17   A    So, there are economists that apply the Hypothetical

18   Monopolist Test or this type of thinking and do conclude that

19   American Express constitutes a separate relevant market and

20   has market power.  In fact, I believe that that's the position

21   of at least one of the expert economists in the associated

22   case with the private plaintiffs and, as you have pointed out,

23   there is a coherent logic to that.

24             However, as I've said, you've got to be aware of

25   applying the Hypothetical Monopolist Test in a mechanical way

1    and my view that defining the relevant market to be American

2    Express and then saying that American Express has one hundred

3    percent market share and is a monopoly would be taking, you

4    know, in some sense an unwarranted shortcut and so I chose to

5    take the broader market definition so that I wouldn't be just

6    assuming what the answer was and that's exactly what I was

7    talking about in the prior testimony of mine that you cited

8    how you can by misapplying it get what I consider to be overly

9    narrow network -- sorry, overly narrow markets.

10   Q    So, in fact, you did not apply the Hypothetical

11   Monopolist Test in determining that the four networks were in

12   your network services market, did you?

13   A    Well, as I said before, my understanding, and I believe

14   it's in line with what the merger guidelines say, is the

15   Hypothetical Monopolist Test is a test for products, not a

16   test for firms, so that one asks the question are credit and

17   charge card network services in the same market, when then if

18   you conclude yes or while you're testing it you then identify

19   who it is who provides credit and charge card network services

20   and that's how I applied the test to do the products.

21        I did not consider there to be so much

22   differentiation that each of the networks would be considered

23   as a separate stand-alone product.

24        THE COURT:  Mr. Chesler, are you moving on to

25   something else?

*Katz - Cross - Chesler*                                          4058

1            MR. CHESLER:  A subtopic within a broader topic,

2    yes, Your Honor.

3            THE COURT:  I thought we'd take a ten minute break

4    and we can continue until six.

5            MR. CHESLER:  Fine, Your Honor.

6            THE COURT:  All right.  Thank you.

7            (Time noted:  4:34 p.m.)

8            (Witness steps down.

9            (Recess taken.)

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2              THE COURT:  Please be seated.

3              Okay.  Continue.

4              I remind the witness he's still under oath.

5              THE WITNESS:  I understand, Your Honor.

6    CROSS-EXAMINATION (continued)

7    BY MR. CHESLER:

8    Q    Professor, how did you decide that the credit and charge

9    cards were in the same market?

10   A    Applying the Hypothetical Monopolist Test.

11   Q    You applied the Hypothetical Monopolist Test in putting

12   credit and charge together in the market?

13   A    I started with them together, that's right, and then

14   asked the question about increasing the prices.  I did not

15   consider chargecards separately as their own relevant market.

16   Q    That's my question, sir.  I'm not asking about the SSNIP

17   test you described this morning where you had credit and

18   charge together and you were considering whether debit was in

19   or not.  I'm asking you how you decided to put credit and

20   charge together in the market in the first place.

21   A    Because the industry people have always considered them

22   together to be very similar products, the fact that they both

23   are a form of deferred payment, that was the starting point of

24   my analysis.

25   Q    What was the ending point of your analysis?

1    A    When I applied the Hypothetical Monopolist Test to that

2    cluster of products, it indicated that they're a relevant

3    product market and I stopped there.

4    Q    So your initial decision to put them together was based

5    upon what exactly, industry?

6    A    Consideration of the industry.  Again, I guess I could

7    have tried looking and ask are chargecards a separate relevant

8    market.  Even if I concluded that they were, I would not have

9    stopped there because I don't think that would be a useful

10   market definition to say chargecards are a separate relevant

11   market and let's just, you know, let's assign American Express

12   a hundred percent market share.  So I considered the broader

13   market.

14   Q    So just so we're clear, when you initially put them

15   together in your working assumption was that credit cards and

16   chargecards were in the same market, you didn't at that stage

17   do any of the things you talked about this morning in terms of

18   the Hypothetical Monopolist Test to determine what a relevant

19   market is, did you?

20   A    I'm not sure when you say any of the things I did this

21   morning.  It certainly is the case that I did not consider

22   whether to say that American Express constituted its own

23   relevant market as the sole major provider of chargecards.  I

24   determined to consider a broader market than that.  As I

25   mentioned before in the -- related to the private plaintiff's

1  case, it's conceivable that had I applied the test just to

2  American Express and to its chargecards, I would have -- it

3  would have indicated that American Express had a near hundred

4  percent market share of that market.  I found it more useful

5  to avoid the pitfalls of the Hypothetical Monopolist Test that

6  I mentioned that I considered a broader market and the fact

7  that American Express does face competition from other credit

8  card providers.

9  Q    How did you know at that stage that American Express

10 faced competition from credit card providers?

11 A    Because their documents indicate that.  As we've talked

12 about in the -- in this morning's testimony, looked at

13 documents where American Express talked about their pricing

14 relative to other credit cards and certainly in deposition

15 testimony and I believe also in trial testimony, American

16 Express executives have identified credit card networks as

17 their competitors.  Had they not identified them as

18 competitors, had the evidence indicated the chargecards had no

19 competitors, it would have only reinforced the conclusion that

20 American Express has market power.  So by including credit

21 cards in the market along with chargecards, it's leading to a

22 broader market, which in a sense is tilting things towards

23 finding that American Express doesn't have market power.  So

24 it's a conservative approach.

25 Q    So you, among other things, relied upon the statements of

1  American Express employees and their documents recognizing

2  competition between credit and chargecards, correct?

3  A    That was part of what I did, yes.

4  Q    Now, beyond the SSNIP test that you described this

5  morning, you also looked at consumer behavior in the payment

6  industry in connection with your market definition activities

7  here; is that right?

8  A    That's correct.

9  Q    Now, would you agree with me, sir, that with respect to

10 the report that you filed in this case on consumer behavior

11 you literally just lifted verbatim the words from your Visa

12 report from twelve years ago or some such time?

13 A    If you're asking the question did I literally lift a

14 small fraction of the words from the report, yes, that was an

15 intentional decision.

16 Q    And the report that you filed in Visa from which you

17 lifted that language was filed in June of 2000, correct, about

18 14 years ago?

19 A    I don't remember the date as we sit here, but I'll -- I

20 take your word for it if you say it's 14 years ago.

21 Q    Thank you.

22       I'd like you to -- well, before I show you the

23 document, I take it you would agree that the volume of

24 purchases on debit cards has increased pretty dramatically in

25 the last ten years?

*Katz - Cross / Chesler*                                    4063

1  A     Yes.

2  Q     Are you familiar with the survey done by the Boston

3  Federal Reserve on consumer payment choice?

4  A     Yes.  They may do more than one survey, but certainly I'm

5  aware of those surveys.

6  Q     Let me ask you to look at Defendant's Exhibit 7760, which

7  is in the second volume.  This is a demonstrative exhibit

8  actually from Dr. Bernheim's report.

9         Were you familiar with the ratings that consumers

10  provided to the Boston Fed with respect to security acceptance

11  and convenience of general purpose credit and chargecards and

12  debit cards?

13  A     You're asking am I familiar?  Yes.

14  Q     Yes.  You are familiar with the ratings that are depicted

15  graphically here from the Boston Fed survey in 2009?

16  A     Yes.  I couldn't tell you the numbers from memory or

17  anything like that, but I'm certainly aware that the survey

18  asks that sort of question.

19  Q     Do these data look consistent with your recollection of

20  how consumers responded with respect to those issues?

21  A     As I sit here they do.  I'd have to look at my reports

22  and Dr. Bernheim's, but they appear to be consistent.

23  Q     Are you familiar with an economist at Dartmouth by the

24  name of Jonathan Zinman?

25  A     I know the name because he's published in the literature.

1   I'm not familiar with him.

2   Q     Do you recall an article by Professor Zinman called

3   "Debit or Credit" from the Journal of Banking and Finance

4   several years ago?

5   A     I know I've looked at articles by him, but I don't recall

6   that particular title.  So I couldn't tell you about that

7   particular article from memory.

8   Q     All right.  Let me ask you to look at Defendant's

9   Exhibit 4399, please, also in the second volume.

10          Do you have that, sir?

11  A     Yes, I do.

12  Q     Are you familiar with this article?

13  A     I'd have to look through it to see.  I mean, looking just

14  at the front page, it doesn't jump to mind.  Again, I remember

15  at one point having reviewed one or more articles by him, but

16  as I sit here, I don't recall the particulars of this article.

17  Q     I'd like you to turn to page 365, the numbers are up in

18  the top right-hand corner of the page, the section entitled

19  "Conclusion."

20          Do you have that, sir?

21  A     Yes.

22  Q     And Professor Zinman writes:  "I find that debit card use

23  responds strongly to the price of making payments by a close

24  substitute, a credit card."  And he goes on about using data

25  from the most complete nationally representative survey with

1  data on both debit and credit use.  "I find that debit use is

2  significantly higher among consumers facing a relatively high

3  cost on marginal credit card charges, those who revolve debt,

4  those who face a binding credit limit constraint and those who

5  lack a credit card."

6          Is that consistent with your view, or do you

7  disagree with Professor Zinman's conclusion?

8  A    No, that of course is consistent with my view.

9  Q    Now, do you agree that the distinction, if I asked you

10 this before I apologize, but I don't think I did, the

11 principal distinction between a charge card and a credit card

12 is that on a credit card you can revolve a balance and pay

13 interest, whereas on a charge card you pay the balance off

14 each month?

15 A    That's my understanding in terms of the formal def -- I

16 mean, that is the formal definition of which I'm aware.  It's

17 also my understanding that American Express chargecards often

18 have some degree of credit facility associated with them

19 beyond the 30-day float.

20 Q    And would you agree that debit cards are closer

21 substitutes for charge cards than they are for credit cards?

22 A    Yes.

23 Q    Are you aware that for the last four years, American

24 Express has been reporting to its shareholders each year in

25 its 10K reports that debit cards are perceived as an

*Katz - Cross / Chesler*                                              4066

1   alternative to credit or charge cards and used in that manner?

2   A    I don't remember the exact dates at which it started to

3   say that, but that sounds about right, that around 2010 they

4   started saying that, yes.

5   Q    And are you aware that Discover started making a similar

6   statement in its 10Ks a year before American Express did?

7   A    I believe I've read something American Express said that

8   that was the case.  I haven't gone back and looked, but.

9   Q    You have no reason to doubt that, do you?

10  A    No.

11  Q    Now, do you recall that when you testified in the Visa

12  case, one of your conclusions was that debit was not properly

13  included in the same relevant market as credit and charge

14  cards?

15  A    Yes.

16  Q    And do you recall that one of the things you relied upon,

17  one category of support for that conclusion, were internal

18  documents that were produced by Visa and MasterCard in the

19  course of the litigation?

20  A    I don't recall they were specifically for that

21  conclusion.  As part of my overall analysis and as a basis for

22  some of my conclusions, I certainly used internal documents,

23  but, you know, sitting here 14 years later, I can't recall

24  which documents went to which decisions.

25  Q    I appreciate that.  That's perfectly understandable.

*Katz - Cross / Chesler* 4067

1      Would you look in volume 1 at Defendant's
2   Exhibit 733, please.
3      By the way, in the Visa case, was it the procedure
4   that the experts put their direct testimony in in writing
5   rather than providing it from the witness stand?
6   A    That's correct.
7   Q    So do you recognize this document, Defendant's
8   Exhibit 733, as your written direct testimony, or I should say
9   excerpts of your testimony from the Visa case?
10  A    Yes.
11  Q    Would you look, please, at paragraph 107, which begins at
12  page 52.
13      Do you have that, sir?
14  A    Yes, I do.
15  Q    And you see that you state at 107:  "Market data and
16  association analyses."
17      By association you're referring to Visa and
18  MasterCard?
19  A    Yes, at the time they were associations.
20  Q    "Market data and association analyses of consumer
21  cardholding and use confirmed that debit cards are not
22  sufficiently close substitutes for credit and chargecards to
23  be considered in the same relevant market."  You then cite a
24  Visa study from December of '97, and then several lines
25  further down you cite a MasterCard study reaching the same

*Katz - Cross / Chesler*                                    4068

1  finding, and then you cite another Visa study and quote from

2  it, and then on the next page you cite a 1998 MasterCard

3  survey about debit cards.

4          You see that you cited all of those internal Visa

5  and MasterCard documents in support of the conclusion you

6  state in the first sentence of 107?

7  A    Yes, I do.

8  Q    Now, in the report that you filed a few years later in

9  the First Data case where you were on the side of the

10 companies that were seeking to merge, do you recall that you

11 cited the very same Visa and MasterCard documents to support

12 your conclusion that debit was not in the same relevant market

13 as credit and charge?

14 A    Well, I don't recall it and I'm surprised I would have

15 been saying that in that case, that it would have come up,

16 because the issue was whether the debit market was narrower

17 than just debit, but I would have to look.  I certainly don't

18 recall saying that.

19 Q    All right.  Why don't we go back to 7183 in the same

20 volume, which is your report from First Data, DX-7183, and in

21 particular I'd like you to look at paragraphs 141 and 143.

22 They begin on the bottom of page 62.

23          Let's take a moment and look at those paragraphs.

24 Tell me if you see that you cited the very same internal Visa

25 and MasterCard documents in your report in First Data.

1  A     (Perusing document.)

2          I'd have to go back and look and compare, but

3  certainly looks like I'm citing documents that were cited

4  earlier in my report.

5  Q    I'll represent to you that they're the same documents

6  that are cited in the Visa direct testimony.  And in fact, in

7  the First Data case, you testified that you relied on these

8  internal network documents as probative because they're

9  evidence about how the competitors think about competition in

10 their market.

11         Does that sound like something you would have said,

12 sir?

13 A    Yes.

14         Just give me one second because you asked me a

15 question about the documents, but also how I was using the

16 documents here, and I just need to see.  I'm not sure I agree

17 with your characterization of how I was using them, but this

18 is what threw me.

19 Q    Why don't you look at, for example, the first sentence of

20 paragraph 141 of 7183 you say:  "As I testified in U.S. v.

21 Visa, record evidence in that matter shows that the

22 MasterCard, Visa and other industry analysts view MasterCard

23 and Visa's debit cards as competing primarily with other debit

24 cards as well as cash and checks."

25 A    Yes.  In that statement, I agree with your earlier

*Katz - Cross / Chesler*                                    4070

1   characterization that I was trying to show that they were not

2   in the market with credit and chargecards.  I don't think it's

3   an accurate summary and that's why I was confused.

4   Q    If I said that, I apologize.  Credit and charge were not

5   the market that were the focus of First Data.  If I said that,

6   I apologize.

7           You were here talking about debit competing

8   primarily with other debit cards, as well as cash and checks,

9   correct?

10  A    Yes.

11  Q    And citing the same, apparently the same Visa and

12  MasterCard internal documents to support for your market

13  conclusion in First Data as you had cited for a different

14  purpose in the U.S. v. Visa case; is that fair?

15  A    Well, at some fundamental level they're showing the same

16  things, but the lessons I was drawing from them were speaking

17  to different questions, but yes, I accept your representations

18  that these are the same documents.

19  Q    Okay.  Now, my question to go back to where I was a

20  minute ago, I asked if you recalled saying that the reason you

21  relied upon these internal documents in the First Data case as

22  being probative was because they were evidence of how the

23  competitors think about competition in their market.

24          Does that sound like something you would have said?

25  A    It sounds like something I could have said, yes.

1    Q    Now, are you aware that there's a 2009 Visa study on

2    spend share patterns that finds that at the top 10 merchants,

3    there's been a shift to debit and Interlink as credit's share

4    of volume and transactions declines?  Are you aware of that

5    study?

6    A    I've certainly seen studies about shifts in the usage of

7    credit and debit at different merchants.  I'm not sure I'm

8    recalling the specific study you've seen.

9    Q    Why don't you look at Defendant's Exhibit 4583, it's in

10   the second volume.

11            MR. CHESLER:  I'm told this is designated as

12   confidential by Visa, Your Honor.

13   Q    Do you have 4583, sir?

14   A    Yes.

15   Q    Would you look at that and see if you can remember

16   whether you're familiar with it?  It's a 2009 Visa study on

17   spend share patterns at the top 10 merchants.

18   A    (Perusing document.)

19            I do see that.  I don't recall this particular

20   study.  I certainly recalled seeing data on shares of credit

21   and debit.

22   Q    And you see that on the first page, that is the first

23   page after the title page, I won't recite any of the numbers,

24   but the sentence at the top of the page under the heading

25   "Share By Product Top 10 Merchants" says:  "There has been a

*Katz - Cross / Chesler*                                    4072

1   shift to debit and Interlink as credit's share of volume and

2   transactions declines.  Interlink has seen the highest growth

3   relative to last year."  And then it has numbers, which again

4   I won't recite on the record.

5           Do you see that, sir?

6   A    Yes.

7           MR. CHESLER:  Your Honor, I offer 4583.

8           MR. CONRATH:  No objection.

9           THE COURT:  All right.  Defense Exhibit 4583 is

10  received in evidence.

11          (Defendant's Exhibit 4583 was received in evidence.)

12  BY MR. CHESLER:

13  Q    Now, in the same year, there was an analysis done by

14  MasterCard, and I want to know if you're familiar with this

15  one, it's 4628.  It's entitled "Converging Pressures Within

16  the Payments Industry, a U.S. Card Payment's Perspective,"

17  from MasterCard Worldwide.

18          MR. CHESLER:  Your Honor, there are some redactions

19  in this document, but not at the portion that I'm going to ask

20  the witness to look at.

21          THE COURT:  So I can put it up?

22          MR. CHESLER:  Can we?

23          No.  I think this means no (indicating).

24          THE COURT:  That does mean no.

25          MR. CHESLER:  My staff is making a sign.

1          THE COURT:  Yes, yes, yes.

2     BY MR. CHESLER:

3     Q     Professor, do you have 4628 in front of you?

4     A     Yes.

5     Q     Do you recall this MasterCard study from 2009?

6     A     Looking at it briefly, I -- it does look to me like

7     something -- some of the words in it, I think it's something I

8     looked at before there could be something related to this, but

9     this does look familiar.

10    Q     Would you look at the page with the Bates number 149 at

11    the bottom?  At the bottom of the page there's a section

12    entitled "A Debit Disadvantage."

13          Do you see that?

14    A     Yes.

15    Q     And it says:  "While the secular shift away from

16    cash/check continues, consumer debit card usage, especially

17    among younger consumers, continues to grow at the expense of

18    credit putting pressure on issuer revenue streams.

19    MasterCard's low debit penetration coupled with this new

20    debit-centric consumer preference is resulting in significant

21    debit share loss.  Specifically consumers are showing a

22    preference for PIN debit which merchants often encourage at

23    the point of sale and online and to a lesser degree ACH for

24    bill payments.  At the same time on the processing side,

25    regional PIN network rules are disadvantaging Maestro in

1    routing priority in the U.S."  It goes on.

2           When you were doing your analysis of the market

3    definition for this case, sir, did you make an effort to

4    consider internal network documents talking about the way the

5    networks saw competition in their market as you had done in

6    both the U.S. v. Visa case and in the U.S. v. First Data case?

7    A    Yes.  I believe the first sentence you read to me, in

8    fact, was one of the bases for what I testified to earlier

9    today when I was indicating that there's been -- it says here

10   a secular shift, that one of the things when consumers, now in

11   the everyday sense of the word, when they're matching the

12   payment instrument to the particular transaction, and one of

13   the things that I mentioned is that younger people tend to use

14   debit and older people tend to use credit and one of my bases

15   for saying that is that MasterCard had indicated that there

16   was a shift when it was saying especially among younger

17   consumers.

18   Q    Do you recall looking at a 2010 market analysis created

19   by TNS Financial Services, an industry consultant, in

20   connection with your market definition work here?

21   A    I've looked at documents by TNS, but I'm assuming there

22   are multiple documents, so I don't know the one you're -- the

23   specific one you're talking about.

24   Q    Let me ask you to look at Defendant's Exhibit 5376.

25              MR. CHESLER:  Your Honor, I'd like to offer --

1          THE COURT:  4628.

2          MR. CHESLER:  Yes, Your Honor.

3          THE COURT:  Any objection to 4628?

4          MR. CONRATH:  No objection.

5          THE COURT:  Defense Exhibit 4628 is received in

6    evidence.

7          MR. CHESLER:  Thank you, Your Honor.

8          (Defendant's Exhibit 4628 was received in evidence.)

9          THE COURT:  Next.

10         MR. CHESLER:  5376 is already in evidence, Your

11   Honor.

12         THE COURT:  Okay.

13   BY MR. CHESLER:

14   Q    It's entitled "Consumer Card Strategies Research Programs

15   State of the Card Market Report November 2010."

16         Is this one of the TNS reports with which you're

17   familiar, sir?

18   A    I would have to look at the report.  At this point, just

19   looking at the cover page, it -- I don't recollect this

20   report.

21   Q    Okay.  Let me ask you to look at the page that ends '057

22   in the Bates number.  It's a page entitled "Key findings in

23   areas of focus."

24         Do you have that?

25   A    Yes.

*Katz - Cross / Chesler*                                          4076

1    Q    And you see the third bullet on that page says:  "Debit

2    cards are increasingly the payment of choice"?

3    A    Yes.

4    Q    "Debit card ownership increased from 64 percent in '08 to

5    71 percent in 2010 and the largest single payment method being

6    replaced - credit cards.  Among the 22 percent of consumers

7    that are using debit cards more this year as a direct result

8    of economic and financial concerns, 28 percent replaced credit

9    card transactions, 19 replaced a combination of payments, 17

10   percent replaced checks, and 12 percent replaced cash.  Of

11   this group of consumers, 24 percent did not replace any other

12   payments but increased activity on their debit card."

13            Did you take these data into account, sir, when you

14   were doing your market definition exercise for this case?

15   A    I don't recall the specific ones, but certainly the sorts

16   of things they're talking about here are consistent with the

17   market definitions I had.  I just don't recall this particular

18   study.

19   Q    Let me show you another one.  This is an analysis

20   conducted by Discover.

21            MR. CHESLER:  And Your Honor, this one is in

22   evidence as well, it's Defendant's Exhibit 3836.  It's

23   entitled "2008 Attitudes and Usage Initial Learning and

24   Application" from Discover.

25

 1   BY MR. CHESLER:

 2   Q     I'd like you to look at the page that ends '949.

 3         Do you have that page, sir?

 4   A     Yes, I do.

 5   Q     And you see the first bullet says:  "Debit card use has

 6   dramatically increased from 2004 to 2008, particularly among

 7   revolvers who appear to be using debit cards to minimize use

 8   of credit."

 9         Do you see that, sir?

10   A     Yes, I do.

11   Q     Did you take this document into account when you engaged

12   in your market definition exercise in this case?

13   A     I don't believe I took Discover document -- I don't

14   recall this document.  I did take into account other sources

15   about the fact that people were revolving and having then very

16   high cost of usage of credit and charge cards, or in this case

17   they were revolving to credit cards, were switching to debit

18   cards in response to those high costs.

19   Q     Did you also consider the testimony of the various

20   merchant witnesses who have testified in this case about the

21   use of debit at their respective enterprises?

22   A     I certainly reviewed merchant deposition testimony and

23   some merchants' testimony at trial, though I haven't read

24   through all of it on my own.

25   Q     Do you recall which witness's testimony you reviewed

1    specifically with respect to the use of debit at their

2    particular business or enterprise?

3    A    No.  I read various parts of the testimony about aspects

4    of debit.  I couldn't tell you which one said which particular

5    things about how much it's used.  I more recall, you know, I

6    guess it's Best Buy doing a study of whether or not they could

7    drop credit cards and it had to do with switching to debit and

8    the ones about whether debit could be used, but I don't recall

9    ones where they said -- I may well have read.  I just don't

10   recall them saying here's the percentage of debit at our

11   merchant.

12   Q    Did you consider the testimony of any of the American

13   Express witnesses at trial about their views concerning

14   competition that they face for their credit and charge

15   products from them?

16   A    No, I did not, that I can recollect.

17   Q    I take it, sir, that it's your view that all of this

18   evidence, these internal documents talking about substituting

19   debit for credit or credit for debit, the merchants'

20   testimony, the various studies we've looked at, whatever the

21   American Express people have said, your view is that all of

22   that is effectively trumped by the analysis you did which you

23   testified about this morning; is that right?

24   A    No.

25   Q    It's not?  Okay.

1  A    Well, maybe it's how you're using the word "trumped."  If

2  you're asking the things you're citing, do I believe they

3  overturned my analysis, I don't believe they do.  I think

4  they're a part that should be factored into the overall

5  analysis.

6  Q    All right.  I appreciate that qualification, correction.

7          Do you recall that in your surrebuttal report in

8  this case you conducted a regression analysis to isolate the

9  effects of the infamous Durbin amendment?

10 A    Yes.

11 Q    And in fact, that regression analysis showed, did it not,

12 that there was a shift from credit and charge card use to

13 debit as a result of Durbin, in particular debit volume had

14 increased by 16 percent while credit volume had decreased by 8

15 percent.

16         Do you recall that regression analysis?

17 A    Yes.  The way -- it wasn't about the -- exactly about

18 what the amounts had done, but yes, I recall the analysis.

19 I'm sure it's the one you're referring to.

20 Q    Let me just make sure I have a clear record.

21         I didn't ask what it was about.  I asked whether you

22 did a regression, the regression was intended to isolate the

23 effects of Durbin, and facts which the regression outputted,

24 if that's the right verb, were included that debit volume

25 increased by 16 percent while credit volume decreased by 8

1   percent.

2            Do you recall that?

3   A    I don't recall it's precisely what it said, but I recall

4   the study you're talking about.

5   Q    You don't believe that it showed that there was an

6   increase in debit volume of 16 percent and a decrease of

7   credit volume by 8 percent?

8   A    I believe it was showing those numbers meant something

9   slightly different than what you're saying, yes.  I may be

10  miss-recollecting, but I believe it meant something different.

11  Q    Would you look at in volume 1 DX-6540.

12           Do you have that, sir?

13  A    Yes, I do.

14  Q    Do you recognize this as a copy of your surrebuttal

15  report in this case --

16  A    Yes.

17  Q    -- from July of 2013?

18  A    I apologize for cutting you off.

19           Yes, I do recognize it.

20  Q    Okay.  Would you look at paragraph 342 which begins at

21  page 195?  Why don't you take a moment to look at that

22  paragraph to yourself, and I'm particularly interested in the

23  latter portion of the paragraph that appears on the upper half

24  of 196.

25  A    (Perusing document.)

1              I have reviewed it.

2    Q    Now, would you agree that in the wake of the Durbin

3    Amendment, as you testified this morning, you might expect

4    that there would be incentives for merchants to switch to

5    debit because of the lower transaction cost?  There was at the

6    same time, as you mention here, a large increase in issuer

7    incentives to promote credit relative to debit, correct?

8    A    That is correct.

9    Q    And that's because the issuer's issuing bank would make

10   more money on a credit transaction, particularly with the

11   lowering of the interchange fees for debit, it was a lot more

12   lucrative to the issuers if merchants processed transactions

13   on credit, correct?

14   A    That's correct.

15   Q    So there was these kind of countervailing forces going on

16   in the marketplace, merchants with an incentive to go to

17   debit, issuers with an incentive to move the merchants to

18   credit, correct?

19   A    That's correct.

20   Q    And it's in that context that you say in your report:  "I

21   find that in response to a large increase in issuers'

22   incentives to promote credit relative to debit, credit volume

23   decreased by 8 percent and debit volume increased by about

24   16.3 percent."

25              Correct?

1  A    Yes.

2  Q    And that was the result of the regression that you did to

3  isolate the effects of the Durbin Amendment?

4  A    So the part when you were asking this before where I said

5  I thought you were talking about this study has to do with

6  that this was isolating this, that this wasn't the general

7  trend, the way I interpreted your question earlier I thought

8  you were including that in, but I agree with the statement in

9  my surrebuttal report.

10 Q    Okay.  Thank you.  Let me move to a different but related

11 topic.

12       You mentioned this morning on direct, it may have

13 been this afternoon, I apologize if I've got the time of the

14 day wrong, that you looked at loyalty card data for several

15 retail merchants, data that was produced in the separate

16 private litigation against American Express, correct?

17 A    Yes, I did.

18 Q    All right.  Now, I'm going to be careful not to mention

19 the numbers or the names, as you were very careful this

20 morning with Mr. Conrath.

21       You used -- you looked at the data of four of the

22 merchants that produced loyalty data, correct?

23 A    For the -- the charts I was showing this morning, I only

24 did three and I believe that's the full set of private

25 plaintiffs for which we looked at data.

*Katz - Cross / Chesler*                                           4083

1    Q    Okay.  There were in fact data produced -- there were in

2    fact data produced -- I used to be an English teacher.  I'm

3    supposed to get those right.

4              THE COURT:  You got it right.

5              MR. CHESLER:  Thank you.  My children are terrified

6    to split infinitives in my presence.  They're damaged as a

7    result.

8              THE COURT:  I'll be very careful when I write the

9    decision.

10             MR. CHESLER:  That would be a great standard to

11   adopt for many purposes.

12   BY MR. CHESLER:

13   Q    When you looked at the data, you did not look at the

14   data, or at least you didn't present in your report the data

15   for all of the retail establishments that produced loyalty

16   card data, did you?

17   A    That's correct.  In fact, I didn't look at the data for

18   the other ones due to the expense.

19   Q    Okay.  So let me ask you to look at Defendant's

20   Exhibit 7769 which I believe is similar to, but not quite the

21   same as, your demonstrative number 45 from this morning.

22   A    I'm sorry, could you repeat the number?  I think I

23   misheard you.

24   Q    Yes, sir.  7769, it's in Volume 2.

25   A    Thank you.

1   Q    Do you have it, sir?

2   A    Yes, I do.

3   Q    Now, again I won't mention the name of the retailer, but

4   one thing I would like to start with here is the title.  The

5   title of this chart as it appeared in your report was:

6   "Distribution of - blank - loyalty customers by relative

7   debit/credit use January 2010 to March 2011."

8        Correct?

9   A    That is correct.

10  Q    The same data are on that chart as are on page 45 of your

11  demonstrative, correct?

12  A    I'd have to look, but I mean, there's certainly supposed

13  to be because this chart, as it should say in the notes

14  version of my demonstrative, I think would cite to this figure

15  as the source.

16  Q    I believe the data are the same.

17  A    Okay.  It was intended to be.

18  Q    I thought that was the intent, but the title's changed,

19  correct?  The title is now in your demonstrative "A high

20  percentage of - blank - credit users do not use debit."

21        Right?

22  A    That's correct.  The demonstrative --

23  Q    Did you make the decision to change the title from what

24  was in your report to the one that was in your testimony this

25  morning?

1    A    Yes, I did.

2    Q    Okay.  Now, just to make sure we're on the same page and

3    the record's clear about what is shown on this chart, the

4    column all the way to the right that has a percentage number

5    at the top and has 100 at the bottom, meaning all of the

6    people in that column use only debit, correct?

7    A    That's correct.

8    Q    And the percentage number at the top is the percentage of

9    the consumers you looked at for this compilation who only used

10   debit during the relevant period of time at that merchant,

11   correct?

12   A    Sorry, you may have misspoken and, I apologize, I may

13   have misheard.  If you could just repeat the question.

14   Q    Yes.

15        Is the column on the right-hand side of the chart

16   that has 100 at the bottom and a percentage number at the top,

17   is that the percentage of consumers you looked at for this

18   compilation who used only debit cards during the relevant time

19   period?

20   A    Yes.

21   Q    And the bar all the way to the left that has zero under

22   it and a percentage at the top is the percentage of the

23   consumers you looked at for this compilation who used only

24   credit during the relevant time, correct?

25   A    That's correct.

Katz - Cross / Chesler                                    4086

1  Q     And then the smaller columns going from left to right in
2  the middle of the chart are, represent the consumers who used
3  both credit and charge during the relevant period of time,
4  correct?
5  A     Yes.
6  Q     All right.  And the -- so if I wanted to identify the
7  universe of consumers you looked at who used credit cards
8  either exclusively or some of the time, I would look at all of
9  the bars from the left to the right except the last bar,
10 correct?
11 A     Yes, the one -- you're saying except for the bar with the
12 100 under it, that's correct.
13 Q     Right.  And if I were doing a SSNIP test using these
14 data, if I was trying to determine who would likely switch
15 away from credit in the face of a SSNIP, a price increase, I
16 would look at the users who used credit in whole or in part,
17 wouldn't I?  That is I wouldn't look at the people who were
18 only using credit for that purpose because they couldn't
19 switch from credit to debit, right?
20 A     I'm sorry, you're saying they couldn't switch from credit
21 to debit because they hadn't been using credit, that's
22 correct.
23 Q     Okay.
24 A     I mean, yes, they hadn't been using credit, that's
25 correct.

*Katz - Cross / Chesler* 4087

1   Q    Okay.

2   A    Although I have to think about when you say use it in the

3   SSNIP test in the sense that you're taking into account what

4   this means for how consumers perceive different credit and

5   chargecard -- different credit, charge and debit products, but

6   I take your point there's certain calculations you might not

7   use.

8   Q    Let me restate the question so I think I can clear up

9   your concern.

10          If I were interested in looking at consumers who

11  were, to some degree, potentially switching from credit to

12  debit cards during the relevant period of time in their

13  transactions at this consumer, I would be looking at all of

14  the bars except the last one on the right because those people

15  were only using debit so they couldn't be switching from

16  credit to debit; is that fair?

17  A    So if you're thinking about starting at current prices

18  and raising them, that would be fair, yes.

19  Q    Now, I don't want to mention the numbers because of

20  confidentiality, but would you agree with me that if you tried

21  to calculate what percentage of the people who used credit

22  were also using debit, the denominator of that fraction would

23  be all of the percentages that appear at the top of all of the

24  columns except the one all the way to the right and the

25  numerator would be the percentages of the smaller bars in the

1  middle that are using some debit, correct?

2  A     That's right.  It would be -- to make sure we're on the

3  same page, it would be the same as the calculation I had

4  mentioned this morning except, you'd leave your number the

5  same base, except the numerator in my calculation was zero and

6  the numerator, if I understand correctly, in your calculation

7  you're saying is everything between.

8  Q     That's right.

9           So I would take all of the people in the middle here

10 who used debit and credit and I'd put them over all the people

11 who used credit to determine what percentage of the credit

12 users at this retailer were using both credit and debit to

13 some extent during the relevant time, correct?

14 A     That's correct.

15 Q     And if I did that, you can't tell me from eyeballing,

16 I'll understand, but if I did that, wouldn't it show that more

17 than half of the credit users were also using debit during the

18 relevant period of time?

19 A     Yes, because just the way, I won't try at this hour of

20 the day, but this morning I testified that this was somewhere

21 near a half, but less than half that were credit exclusive, so

22 it follows that your number is bigger than a half.

23 Q     Okay.

24           Now, is it correct that in choosing which consumers

25 to include in this compilation, you included any consumer that

*Katz - Cross / Chesler*                                    4089

1    had made two plastic transactions or more during the relevant

2    time period?

3    A    I believe my recollection is that that's what this chart

4    is showing, yes.

5    Q    And do you agree with me, sir, that if you picked a

6    higher threshold, if you picked a set of consumers who were

7    using, who were doing more transactions in the relevant time

8    than just two, the likelihood is that the percentage of that

9    universe who used both credit and debit would go up?

10   A    Yes.

11   Q    I'd like you to look at Defendant's Exhibit 7761, please,

12   in Volume 2.

13             Do you have that, sir?

14   A    Yes, I do.

15   Q    Okay.  Now, this is an exhibit that I believe was

16   prepared by Professor Bernheim, and on the first page it

17   relates to loyalty customers of one particular retail

18   establishment that's named up at the top.

19             Do you see that?

20   A    Yes, I do.

21   Q    And then on the second page similar data but for a

22   different establishment, right?

23   A    Yes.

24   Q    And then on the third and the fourth and the fifth pages

25   the data are compiled in a similar format, but each page is

1   for a different one of the merchants for which we had loyalty

2   data, correct?

3   A    Yes.

4   Q    And do you understand that what Professor Bernheim did

5   here was to look at the consumers at each of those

6   establishments for a particular period of time, only those

7   consumers who used credit at all, and calculate the percentage

8   that used only credit or charge and the percentage that used

9   credit, charge, and debit based upon a consumer set that had a

10  threshold of 10 transactions during the relevant time rather

11  than the two that you used?  You understand that's what he

12  did?

13  A    Well, he's showing both of those, but the results

14  reported in green, that's my understanding of what they are.

15  Q    Okay, good.  Yes, you're absolutely right about that.

16       And would you agree with me that in each one of

17  these situations the percentage of consumers in Dr. Bernheim's

18  set of people who used plastic more often than in your

19  selection, who used both general purpose credit charge and

20  debit, is higher than the percentage that you found in your

21  set for the same consumers -- I'm sorry, the same retail

22  establishments during the same period of time?

23  A    Yes, that's what one would expect and that's what it

24  shows.

25  Q    Now, if you look at the last two pages of this exhibit

Katz - Cross / Chesler                                          4091

1    which relate to two merchants whose names I won't mention, but

2    they're figures 11 and 12, those are the two merchants of the

3    five that are in here for whom you did not compile your data

4    based upon consumers that had done two plastic transactions in

5    the relevant period, correct?

6    A    That is correct.

7    Q    And would you agree with me that the two merchants that

8    you did not look at are the merchants who in Dr. Bernheim's

9    compilation have the highest percentage of debit and credit

10   users among the selected consumer population?

11   A    I want to be clear when we're talking about the

12   population of ones I did not look at.

13           I believe, I may be misremembering, my recollection

14   is that there were eight merchants, that you have there were

15   five, and so my staff picked three at random.  It is true that

16   these are the two of the five that Dr. Bernheim reported that

17   I didn't look at it, but I don't think -- I worry it creates a

18   misimpression if you say well, the only two I didn't look at

19   are these because there's set I didn't look at that I believe

20   was larger than this.

21   Q    That was not the intent of my question, so let me

22   restate.

23           You looked at three and they are the first three

24   retailers identified in Exhibit 7761, correct?

25   A    That's correct.

1   Q    Dr. Bernheim looked at those three plus two more,

2   correct?

3   A    At least those, yes.

4   Q    And he took a set of consumers that had done at least ten

5   plastic transactions during that relevant time period, whereas

6   you had looked at a set that had done at least two, correct?

7   A    Yes.

8   Q    And for every one of these establishments, his

9   percentages of the people using both credit and debit at those

10  establishments are higher than yours, correct?

11  A    Percentage of people do both, yes.

12  Q    And the two that have the highest percentages are the two

13  that he looked at which were not among the three that you

14  looked at, right?

15  A    That's correct.

16        MR. CHESLER:  Different topic, Your Honor.

17  Q    I want to talk to you about your trust and estates -- I

18  have a trust and estates department and when I hear T&E that's

19  all I think about are lawyers who write my will.

20  A    Well, if I can get some free advice.

21  Q    No.  We're not running a special summer sale here.

22        MR. CHESLER:  I said that for the benefit of the

23  clients, Your Honor.

24        As you pointed out earlier today, you know, if you

25  cut your price to one merchant, you never know what's going to

Katz - Cross / Chesler                                    4093

1    be unleashed.

2          THE COURT:  I would suggest you see an attorney in

3    California about that.

4          THE WITNESS:  I have an attorney in California who

5    agrees with you.

6    Q    Okay.  Travel and entertainment, you talked about

7    defining what you called I think a price discrimination

8    market, correct?

9    A    Yes.

10   Q    Now, would you agree that price discrimination is a

11   supplier's charging different prices to two customers after

12   accounting for differences in the supplier's incremental costs

13   of serving those two customers?

14   A    Yes.

15   Q    So a relevant metric for determining whether there's

16   price discrimination is the supplier's margin, correct?

17   A    Yes.

18   Q    The revenue minus some cost element, right?

19   A    Yes.

20   Q    Now, I believe if you look at page 58 of your

21   demonstratives from this morning, just for the record, that's

22   Defendant's Exhibit -- Plaintiff's Exhibit 2702.

23   A    Can I ask if you're going to ask me to look at something

24   else simultaneously just as a matter of binder management?

25   Q    Well, the answer is I don't know if I am or not.  It

1    depends if you remember what I'm going to ask you.  If not,

2    I'll have to show you, but if I do, it will be from volume 1.

3              THE COURT:  What page of the demonstrative?

4              MR. CHESLER:  Page 58, Your Honor.

5              THE WITNESS:  Sorry, if I could just have a minute

6    to clean things up.

7              (Pause.)

8              THE WITNESS:  Okay.  I'm ready.  Thank you.

9    Q    So 58 is what you described as your alternative version

10   of the test for travel and entertainment and you say it

11   supports the same conclusion about your market definition,

12   correct?

13   A    Yes.

14   Q    And as we just discussed about margin being a relevant

15   metric, you did a margin calculation here.

16             MR. CHESLER:  And, Your Honor, I can say the

17   percentage.  I won't say the underlying numbers that led to

18   the calculation.

19   Q    But the margin calculation that you did came to 17

20   percent, correct?

21   A    Yes, it's rounded that is the number.

22   Q    And this relates to your travel and entertainment market

23   that you defined, correct?

24   A    I want to be clear about one thing and what margin that

25   is.

1            This is the appropriate margin to use when

2    calculating that formula, that R over the R-plus-M formula.

3    However, if you're thinking about the margin that the network

4    is earning, the appropriate margin is the one I talked about

5    before, the margin on the network fees, which for these

6    purposes I assumed to be a hundred percent.  The actual margin

7    is lower than that, but yes, it's correct that there is a

8    margin number here reported for that formula, that 17 percent.

9    Q    And without identifying the particular percentages you

10   used, let me see if I can describe and you can agree or

11   disagree with how you got to 17 percent.

12           You took American Express's, what you identified as

13   American Express's average travel and entertainment discount

14   rate and you then subtracted from that American Express's

15   average travel and entertainment rate that you estimated

16   looking at its G&S business, an acquiring business, that it

17   pays to issuing banks that issue American Express cards, or

18   what would in the Visa world be called an interchange,

19   correct?

20   A    That's correct.

21   Q    So you took the total discount rate and you subtracted

22   essentially the interchange or your determination of what you

23   thought the interchange was and you got a difference of a

24   certain number of basis points between those two numbers,

25   correct?

1   A     Yes.

2   Q     And then you took that difference and you put it over the

3   average discount rate for travel and entertainment merchants

4   that you started with and that got you to the 17 percent

5   margin, correct?

6   A     That's correct.

7   Q     Okay.  Now, that's for travel and entertainment.

8         You did a similar calculation for the general

9   purpose credit and charge market that you defined, correct?

10  A     That's correct.

11  Q     And would you look at page 61 of your demonstrative,

12  please.

13  A     I'm on page 61.

14  Q     And this is the chart that related to your alternative

15  version of the test for price discrimination in the general

16  market as opposed to the travel and entertainment market,

17  correct?

18  A     Yes, that's correct.

19  Q     Okay.  And again what you did here was you took an Amex

20  average discount rate for all merchants and you deducted or

21  subtracted from that an average rate for essentially the

22  issuing part of the Amex business that you took in this case

23  from a particular agreement with a particular issuing bank

24  with which Amex does business, correct?

25  A     That's correct.

1  Q    And again, you took the first number, you subtracted the

2  bank interchange and you got a certain number of basis points

3  which you then put over the original discount rate and you

4  derived a margin percentage, correct?

5  A    That's correct.

6  Q    And the margin percent you derived is the same 17 percent

7  for the general purpose T&E market -- excuse me, for the

8  general purpose market as it was for the T&E market?

9  A    Yes, and as you say when you round it, yes, it's the same

10  number.

11  Q    Well, even if you, for whatever reason, decided not to

12  pause on the fact that it's rounded, the number of basis point

13  difference between these two analyses that you point to as

14  evidence of price discrimination is 7 basis points, correct,

15  the actual number of basis points?

16  A    Yes, which if you look at that as a percentage of what

17  the network fees are is a significant number.  As I said

18  before, in thinking about margins, I think the appropriate way

19  if you're going to ask questions about this and how to turn it

20  into percentage is you should be looking at the percentage

21  margin on the base of the two-sided price which is what the

22  network is collecting because what this -- as I said, this is

23  an appropriate number and I stand by these because that's what

24  goes into the threshold formula when you do the price

25  increasing as a percentage of the merchant discounts, but if

1    you start using it to calculate things like, well, what's the

2    network's margin on its fees, it's similar to the following.

3              Suppose you had a stockbroker and they sell you

4    $10,000 worth of stock and they charge you a hundred dollars

5    for it and their costs are $50.  Well, if you calculated their

6    margin here, you would be saying wait, their margin's almost

7    nothing because using this method, which is completely

8    appropriate for what I did in the market definition, you would

9    say wait a minute, their revenues were $10,100 and they only

10   earned $50.  You see that's a tiny margin.  However, if you

11   view it appropriately which is they're providing middleman

12   services, their revenues are the hundred dollars, which here

13   would correspond to the network fees, and in that case their

14   margin would be 50 percent.

15             So you've got to be careful what you're using the

16   margin for and talking about these things being equal is 17

17   percent.  The reason they're equal is mechanically is while

18   the network charges a fair amount larger, so are the merchant

19   discounts as reflecting those, and the fact that it's

20   reflecting those is going to push the average down, but that's

21   a different concept than asking what's margin as price minus

22   cost divided by price.

23   Q    Just to be sure we're clear, you did two alternative

24   analyses in support of your price discrimination market

25   definition.  You compared a margin figure for the travel and

*Katz - Cross / Chesler*                                    4099

1   entertainment market.  You did a margin figure for the general

2   purpose market.  Both margin figures in your alternative

3   analysis came out to the same margin percentage, correct?

4   A    Wait.  Let's be clear when you say for my price

5   discrimination analysis.

6            Based on the fact that a hypothetical monopolist

7   clearly could price discriminate, I defined two separate

8   markets and, as candidate markets, and then when I applied the

9   numbers to do the test and come up with the threshold, I used

10  the same margin number when I did the alternative version of

11  the test in each of those two markets taking a percentage

12  price increase of the merchant discount.  That's a correct

13  statement.

14  Q    No, you didn't use the same margin number.  Your

15  calculations resulted in the same margin number of 17 percent

16  on both of those charts for both of those alternative

17  analyses, one for travel and entertainment, one for general

18  purpose; isn't that correct, sir?

19  A    That's correct.

20  Q    And if you don't look at the percentage margin but,

21  rather, the number of basis point difference between your

22  travel and entertainment market and your general purpose

23  market, it's 7 basis points, that is 7/100 of a penny on a

24  dollar of charge volume, correct?

25  A    That's correct.

1    Q    Thank you.

2         Now, I'd like you to look at Defendant's

3    Exhibit 6466, please.  This is a table from your first report,

4    so it will be in volume 1.  It's 6466, which is your first

5    report, page 314.

6    A    And this one has all the pages?

7    Q    This has all the pages, yes.  At least it's supposed to.

8    A    Reminds me of my doctoral dissertation which turned out

9    to be missing four key pages.

10   Q    But they were ultimately found.

11   A    Well, it worked actually to my advantage because one of

12   the examiners hadn't noticed, so then he would be too

13   embarrassed to fail me.

14        I'm sorry, could you repeat the page number?

15   Q    Yes, 314.

16   A    Thank you.

17   Q    It's table 16A entitled "Estimated Credit and Chargecard

18   Premium 2008."

19        Do you see that, sir?

20   A    Yes, I do.

21   Q    Would you agree that one metric from which you can

22   potentially draw conclusions about the competitiveness of a

23   market is the profit margin that suppliers in that market

24   earn?

25   A    Yes, it's informative of that, yes.

Katz - Cross / Chesler                                    4101

1   Q    And at least economic theory would say that the more

2   competitive the lower the margin would be, correct?

3   A    All else equal, yes.

4   Q    In fact, if you look at the margin numbers in the gross

5   margin column of this chart for all of the industries that are

6   listed on the left from airlines all the way down to

7   supermarkets, there's only one industry on that list that has

8   a lower profit margin than the 17 percent that you calculated

9   in your alternative analyses for the T&E and general purpose

10  markets, correct?

11  A    I would agree with the statement.  I didn't check, but

12  I'll take your representation that all of the numbers but one

13  are bigger than 17 percent.  I don't agree that this is an

14  appropriate calculation to determine the relative

15  profitability.

16          For example, if you go back to my calculations,

17  talking about the network and what I believe is the

18  appropriate basis, which is to say look at the two-sided --

19  your experts would say look at the two-sided price, what I was

20  calling looking at the network fees, the margin based on that

21  I think is much closer -- I used a hundred percent to be

22  conservative, but I believe it's much closer to a hundred

23  percent than it is to 17 percent, which would be bigger than

24  these numbers.

25  Q    And you're talking about this network fee portion of

1    American Express's discount rate, correct?

2    A    Yeah, I'm talking about what American Express would be

3    earning in its role as a network facilitating transactions.

4    Q    But in fact, American Express charges a single merchant

5    fee or discount rate to its merchants which includes not just

6    the what you've identified as a network fee, but what you

7    would also call an acquiring fee and what you would also call

8    an interchange or an issuing fee, correct?

9    A    It does charge that, yes.

10   Q    Now, you also talked this morning about looking at

11   contribution margin.

12        Do you recall that?

13   A    Yes, I do.

14   Q    And you said, I think you said this is a term that

15   American Express uses to talk about what the value of business

16   with a particular merchant is?

17   A    A merchant or a merchant class, that was my recollection

18   of testimony.  It may have been Mr. McCurdy, I don't recall

19   which witness at this point.

20   Q    And these data that you used were from a database called

21   GMAPS, correct?

22   A    GMAPS is certainly an American Express database.  I'd

23   have to look at which one, but that sounds right.

24   Q    Well, if you look at Defendant's Exhibit 6466, the same

25   document we're in, at paragraph 321, which is at page 188.

*Katz - Cross / Chesler*                                        4103

1              Do you have that paragraph?

2    A    Yes, I see that.

3    Q    And you say beginning in the second sentence:  "To

4    determine whether these differences which are different

5    discount rates, in discount rates represent price

6    discrimination, I use American Express's GMAPS database in

7    which Americas calculates a contribution margin for each

8    merchant."  And it goes on, correct?

9    A    Yes.

10   Q    Now, the GMAPS database does not, in fact, reflect profit

11   that American Express earns by providing network services to

12   merchants, does it?

13   A    I believe that is part of what's in the GMAPS, but I may

14   be misremembering.

15   Q    I didn't say part.  I said the numbers in the GMAPS

16   database are not only profits that it makes from providing

17   network services to merchants, but includes its issuing side

18   revenue and issuing side cost, correct, in the same database?

19   A    I believe that's a different question, but yes, I agree

20   with that.

21   Q    So when you were doing this analysis, you actually looked

22   at a database that included revenues and costs from the

23   American Express card business or issuing business, correct?

24   A    Yes.  When I was doing this particular exercise, I did.

25   Q    And in fact, you're familiar with the difference between

1  economic profits and accounting profits for purposes of

2  assessing market power, aren't you?

3  A    Yes.

4  Q    There are in fact, as far as you know, several well-known

5  ways in which accounting profits diverge from economic

6  profits?

7  A    They certainly can, yes.

8  Q    Do you agree that it's well-recognized among economists

9  that accounting measures of profitability are ill-suited for

10  gauging competitive intensity?

11  A    They certainly can be and therefore relying on them

12  generally without adjusting makes them ill-suited.  There

13  could be times when they're correct, but I agree caution is

14  warranted.

15  Q    And the various ways in which accounting profits diverge

16  from economic profits is a, in your view, a serious issue

17  because economic profits are the measure relevant to the

18  assessment of market performance.

19          Wouldn't you agree with that?

20  A    Yes, I stand by that statement, although there are

21  certainly times that accounting profits are relevant as well

22  for various features, but yes, I think economic profits are

23  important.

24  Q    And the GMAPS data that you looked at for this purpose do

25  not reflect economic profits of American Express, do they?

1  A    It's quite -- well, it depends on to what purpose you're

2  putting them, but there's certainly things would be reported

3  in GMAPS I think would diverge from how an economist would do

4  the calculations, yes.

5  Q    And in fact, they're not even GAAP accounting records,

6  are they, that is the GMAPS data?

7  A    I don't recall seeing that.  My recollection is they're

8  an internal database.  I don't think it would have to be GAAP.

9          MR. CHESLER:  I'd like to turn to -- Your Honor, I'm

10  going to go to a different topic.

11          THE COURT:  Would this be a good time to break for

12  the day?

13          MR. CHESLER:  If it's okay with Your Honor, yeah.

14          THE COURT:  That would be fine with me.

15          I didn't mean anything by that.

16          MR. CHESLER:  You might curb your enthusiasm, Your

17  Honor.

18          THE COURT:  No, let's go on.

19          For tomorrow morning, about how long will your cross

20  continue?

21          MR. CHESLER:  Your Honor, my best estimate is it

22  would probably take us to the luncheon break.

23          THE COURT:  Okay.

24          MR. CHESLER:  I could be off a bit, but that's my

25  best estimate.

*Proceedings* 4106

1          THE COURT:  All right.  I'm just trying to figure

2     out what comes next and when it arrives.

3          And then redirect?

4          MR. CONRATH:  I might have an hour based on four

5     more hours of cross-examination, something like that.

6          MR. CHESLER:  So we'll be kind of at that tipping

7     point.

8          THE COURT:  We'll be at the witching moment.

9          I think we would do -- let's put it this way.  If we

10    go until three, then I would want to have three hours with the

11    next witness, but if we go until 4:30, then we'll pack it in

12    for the day and start the next morning.

13         Does that work for your next witness?

14         MR. CHESLER:  Yes, Your Honor.  So on the assumption

15    that hopefully my estimate is reasonably close to right, if I

16    go 'til about one, we take our normal hour, unless we're going

17    to take a longer?

18         THE COURT:  No.

19         MR. CHESLER:  Then sounds like Mr. Conrath might go

20    to about three-ish or so.  Obviously he'll do whatever he

21    does, but it sounds like for estimating purposes, we probably

22    would bring our witness over here.

23         THE COURT:  Well, yes, unless you have a lot of

24    recross.

25         MR. CHESLER:  Obviously I don't know, but I don't

*Proceedings*                                                         4107

1   think we can safely assume he should remain on the other side

2   of the river and then we find that we've got several hours and

3   nobody here to fill them.

4           THE COURT:  Yes.  So if he comes here midafternoon,

5   then he can -- he doesn't have to sit in the courthouse.  He

6   can sit in the other facility, right?

7           MR. CHESLER:  Yes.

8           THE COURT:  There is another facility.

9           MR. CHESLER:  Indeed there is, Your Honor.

10          THE COURT:  And I'm sure you'll make him

11  comfortable.

12          MR. CHESLER:  He's paying the rent, Your Honor.

13  He'll be comfortable.

14          THE COURT:  Mr. Bright, if you want to be excused so

15  that you can be with the boss, I would certainly understand

16  that.

17          MR. BRIGHT:  I look forward to those opportunities,

18  Your Honor.

19          THE COURT:  All right.  So what we'll plan on is

20  that the next witness will begin tomorrow afternoon, assuming

21  that we finish with the Professor around midafternoon.

22          MR. CHESLER:  Thank you, Your Honor.

23          MR. CONRATH:  And I'll certainly be prepared to give

24  a revised estimate of redirect after hearing all the cross and

25  that may inform us as well.

*Proceedings*                                                    4108

1          THE COURT:  And then we would go from three 'til six

2   again with testimony tomorrow.

3          MR. CHESLER:  Your Honor, may we have a, Mr. Conrath

4   and I, have a very brief sidebar with you for one moment.

5          THE COURT:  Sure.

6          (Sidebar held off the record and out of the hearing

7   of the public.)

8          MR. CHESLER:  I'm sorry, Your Honor, Mr. Barbur

9   apparently has a housekeeping matter.

10         THE COURT:  Yes.

11         MR. BARBUR:  Yesterday during the testimony of Mr.

12  Silverman, we had a demonstrative exhibit relating to Home

13  Depot and Your Honor had asked for the underlying data.  We

14  now have that.  I'm going to hand one copy to the Department

15  of Justice and one copy to your clerk.

16         THE COURT:  Okay.  Thank you, very much.  Thanks for

17  following up.

18         Okay.  Yes, sir?

19         MR. CONRATH:  So I have one question.  Your Honor

20  asked that we provide Professor Katz with the testimony of Mr.

21  Silverman, which we would be glad to do.

22         THE COURT:  Is there an objection to that?

23         MR. CHESLER:  No.

24         MR. CONRATH:  And the second point is though the

25  testimony of Professor Silverman, or Mr. Silverman, you know,

*Proceedings*                                                      4109

1    it's kind of long, and would you like me to direct him to some

2    particular parts of it?  I'd be glad to do that, but I'm not

3    sure.

4              THE COURT:  Well, I don't recall exactly which --

5              MR. CONRATH:  The topics.

6              THE COURT:  Which topic.  Think about that and then

7    you can direct him as you please.

8              MR. CONRATH:  All right.  Thank you.

9              THE COURT:  I'm not --

10             MR. CONRATH:  Fine.  That's all I wanted.

11             THE COURT:  It's not critical.

12             MR. CONRATH:  Okay.

13             THE COURT:  And it will put you to sleep probably,

14   but maybe that's good.

15             MR. CONRATH:  Thank you, Your Honor.

16             THE COURT:  Okay.  Is there anything else for

17   tonight?

18             MR. BARBUR:  No, Your Honor.

19             THE COURT:  Anything else from you, sir?

20             MR. CONRATH:  No, Your Honor.

21             THE COURT:  All right.  9:00 tomorrow morning.

22             (Time noted:  6:02 p.m.)

23             (Whereupon, the proceedings were adjourned to

24    July 30, 2014, at 9:00 a.m.)

25

4110

# I N D E X

WITNESS                                                    PAGE


MICHAEL L. KATZ

     DIRECT EXAMINATION BY MR. CONRATH          3815

     CROSS-EXAMINATION BY MR. CHESLER          4015

4111

**E X H I B I T S**

Government's Exhibit PX2702, PX2702                    4015

1

## $

**$10,000** [1] - 4098:4
**$10,100** [1] - 4098:9
**$16** [1] - 3870:10
**$2.50** [2] - 3833:1, 3833:15
**$200** [3] - 3870:11, 3870:14, 3870:15
**$25** [2] - 3888:10, 3889:6
**$3.00** [1] - 3833:13
**$50** [4] - 3871:4, 3871:13, 4098:5, 4098:10
**$800** [1] - 3870:4
**$950** [1] - 3871:12
**$97** [1] - 3833:12

## '

**'057** [1] - 4075:21
**'08** [1] - 4076:4
**'90s** [1] - 3836:23
**'949** [1] - 4077:2
**'97** [1] - 4067:24

## 1

**1** [7] - 3815:20, 3871:12, 3958:1, 4067:1, 4080:11, 4094:2, 4100:4
**10** [5] - 3871:13, 4071:2, 4071:17, 4071:25, 4090:10
**10,000** [1] - 3940:12
**10-CV-4496** [1] - 3810:5
**100** [9] - 3916:6, 3916:18, 3917:3, 3922:17, 4014:17, 4045:6, 4085:5, 4085:16, 4086:12
**10019** [1] - 3811:8
**10022** [1] - 3811:12
**107** [3] - 4067:11, 4067:15, 4068:6
**10K** [1] - 4065:25
**10Ks** [1] - 4066:6
**11** [3] - 4034:14, 4034:19, 4091:2
**11201** [1] - 3811:19
**12** [5] - 4034:14, 4034:20, 4043:5, 4076:10, 4091:2
**124** [1] - 4046:18
**125** [1] - 4046:16
**12548** [1] - 3810:25
**14** [4] - 4018:3, 4062:18, 4062:20, 4066:23
**141** [2] - 4068:21, 4069:20
**143** [1] - 4068:21
**149** [1] - 4073:10
**15** [1] - 3921:13
**157** [2] - 4037:3, 4037:7
**16** [3] - 4079:14, 4079:25, 4080:6
**16.3** [1] - 4081:24
**1690** [1] - 4042:20
**16A** [1] - 4100:17
**17** [11] - 4076:9, 4094:19, 4095:8, 4095:11, 4096:4, 4097:6, 4098:16, 4099:15, 4101:8, 4101:13, 4101:23
**188** [1] - 4102:25
**19** [2] - 4046:19, 4076:9

**1917** [9] - 4018:21, 4018:25, 4019:4, 4020:9, 4025:14, 4025:15, 4025:17, 4025:20
**195** [1] - 4080:21
**196** [1] - 4080:24
**1985** [2] - 3836:11, 3942:19
**1990** [1] - 3883:12
**1994** [1] - 3818:15
**1996** [1] - 3818:15
**1998** [1] - 4068:2
**1999** [3] - 3837:9, 3837:12, 3840:1

## 2

**2** [4] - 3823:1, 4019:15, 4083:24, 4089:12
**20** [9] - 3833:9, 3870:14, 3870:17, 3870:22, 3871:13, 3872:1, 3873:12, 3877:1, 3877:22
**20-year** [1] - 3883:19
**200** [1] - 3870:8
**2000** [1] - 4062:17
**20001** [1] - 3810:18
**2001** [3] - 3819:3, 3826:21, 3909:3
**2003** [1] - 3819:3
**2004** [3] - 4019:1, 4019:10, 4077:6
**2006** [3] - 3987:5, 3987:6, 3987:8
**2007** [5] - 3931:16, 3932:6, 3987:7, 3987:9, 3987:11, 3987:12
**2008** [4] - 3932:6, 4076:23, 4077:6, 4100:18
**2008/2009** [1] - 3827:10
**2009** [4] - 4063:15, 4071:1, 4071:16, 4073:5
**2010** [8] - 3892:6, 3895:2, 4025:3, 4066:3, 4074:18, 4075:15, 4076:5, 4084:7
**2011** [11] - 3883:12, 3892:6, 3892:13, 3895:2, 3909:3, 3926:15, 3929:2, 3935:2, 3939:25, 3941:17, 4084:7
**2012** [5] - 3817:9, 3826:21, 3895:18, 3931:20, 3935:2
**2013** [1] - 4080:17
**2014** [2] - 3810:9, 4109:24
**22** [2] - 4026:14, 4076:6
**225** [1] - 3811:19
**23** [1] - 4027:25
**24** [1] - 4076:11
**25** [1] - 3888:15
**2500** [1] - 3940:14
**27** [2] - 4034:13, 4034:18
**2702** [3] - 4014:25, 4015:8, 4093:22
**2703** [1] - 4014:24
**28** [1] - 4076:8
**29** [1] - 3810:9
**2:30** [1] - 3978:4

## 3

**3** [1] - 4020:10
**30** [3] - 3833:6, 3881:9, 4109:24
**30-day** [1] - 4065:19

**314** [2] - 4100:5, 4100:15
**321** [1] - 4102:25
**3270** [1] - 3941:20
**3297** [1] - 3940:24
**342** [1] - 4080:20
**365** [1] - 4064:17
**37** [2] - 3926:23, 3935:12
**3815** [1] - 4110:6
**3836** [1] - 4076:22

## 4

**4** [1] - 3959:13
**4000** [1] - 3810:17
**4015** [2] - 4110:7, 4111:4
**4399** [1] - 4064:9
**45** [2] - 4083:21, 4084:10
**450** [1] - 3810:17
**4583** [5] - 4071:9, 4071:13, 4072:7, 4072:9, 4072:11
**4628** [6] - 4072:15, 4073:3, 4075:1, 4075:3, 4075:5, 4075:8
**4:30** [1] - 4106:11
**4:34** [1] - 4058:7

## 5

**5** [5] - 3871:4, 3871:14, 3888:9, 3888:15, 3888:16
**50** [4] - 3950:20, 3950:22, 3973:10, 4098:14
**50/50** [1] - 3891:12
**51** [1] - 3907:25
**52** [2] - 3908:24, 4067:12
**5376** [2] - 4074:24, 4075:10
**575** [1] - 3811:12
**58** [3] - 4093:20, 4094:4, 4094:9

## 6

**61** [2] - 4096:11, 4096:13
**62** [1] - 4068:22
**64** [1] - 4076:4
**6466** [3] - 4100:3, 4100:4, 4102:24
**65102** [1] - 3811:3
**6:02** [1] - 4109:22

## 7

**7** [2] - 4097:14, 4099:23
**7/100** [1] - 4099:23
**70** [2] - 4037:4, 4037:7
**71** [1] - 4076:5
**716** [1] - 4019:16
**7183** [7] - 4031:1, 4031:7, 4034:12, 4035:16, 4037:4, 4068:19, 4069:20
**733** [2] - 4067:2, 4067:8
**7747** [5] - 4025:10, 4025:11, 4025:18, 4029:7, 4029:9, 4029:11
**7756** [2] - 4032:22, 4033:1
**7760** [1] - 4063:6
**7761** [2] - 4089:11, 4091:24
**7769** [2] - 4083:20, 4083:24

**78711-2548** [1] - 3810:25

## 8

**8** [4] - 4079:14, 4079:25, 4080:7, 4081:23
**82** [3] - 3972:1, 3972:7, 3972:21
**825** [1] - 3811:8
**83** [3] - 3972:6, 3972:20
**84** [3] - 3972:19, 3972:22, 3972:25
**85** [2] - 3979:3, 3981:7
**899** [1] - 3811:2

## 9

**9.1** [1] - 3917:3
**90** [2] - 3894:8, 3894:9
**90-some** [1] - 3955:21
**90s** [1] - 3884:9
**95** [1] - 3871:2
**950** [1] - 3871:12
**97.50** [1] - 3833:1
**99** [4] - 3894:8, 4042:23, 4043:1, 4043:4
**9:00** [3] - 3810:10, 4109:21, 4109:24

## A

**a.m** [2] - 3810:10, 4109:24
**abandoned** [1] - 3840:8
**abandoning** [2] - 3840:11, 3851:21
**ABBOT** [1] - 3810:23
**ability** [14] - 3835:15, 3850:8, 3854:7, 3857:5, 3865:4, 3898:7, 3907:6, 3907:19, 3909:14, 3937:20, 3960:18, 3961:5, 3961:15, 4048:18
**able** [18] - 3858:10, 3882:3, 3909:16, 3946:10, 3955:6, 3955:7, 3955:21, 3980:20, 3981:22, 3983:17, 3983:21, 3984:19, 3996:23, 3998:22, 4011:25, 4012:7, 4013:4, 4013:14
**above-referred** [3] - 3823:11, 3841:12, 3850:22
**absence** [7] - 3821:19, 3877:11, 3992:24, 3994:8, 4005:15, 4006:10, 4012:3
**absent** [2] - 3836:6, 4008:22
**absolute** [1] - 3885:18
**absolutely** [5] - 3900:21, 3945:19, 3945:22, 3972:11, 4090:15
**abuse** [1] - 3865:17
**abusing** [1] - 3976:23
**academic** [10] - 3815:17, 3816:1, 3816:4, 3816:14, 3817:9, 3817:20, 3817:21, 3818:13, 3819:20, 3933:9
**accept** [39] - 3830:3, 3831:9, 3831:10, 3831:23, 3834:18, 3834:22, 3865:24, 3869:6, 3869:13, 3873:18, 3873:20, 3882:21, 3887:21, 3894:24, 3896:7, 3896:17, 3897:6, 3933:10, 3935:25, 3936:4, 3945:23, 3946:10, 3957:1, 3958:3, 3959:24, 3975:14, 3975:15, 3991:4, 3998:13, 4005:4, 4009:1, 4009:13, 4013:5, 4020:4, 4020:5,

4052:8, 4052:9, 4052:20, 4070:17
**acceptable** [1] - 3875:19
**acceptance** [22] - 3881:17, 3931:4, 3931:7, 3931:15, 3931:22, 3931:25, 3932:13, 3932:18, 3932:19, 3932:23, 3943:23, 3946:25, 3947:8, 3947:13, 3948:6, 3952:12, 3954:24, 3955:10, 4005:16, 4007:10, 4048:21, 4063:10
**accepted** [7] - 3859:7, 3896:25, 3934:15, 3946:21, 3953:22, 3953:24, 4004:5
**accepting** [27] - 3848:2, 3855:10, 3865:23, 3868:2, 3868:10, 3868:12, 3870:4, 3871:22, 3874:7, 3874:25, 3875:3, 3875:25, 3900:6, 3918:16, 3922:1, 3926:1, 3933:13, 3942:25, 3943:3, 3959:6, 3969:7, 3991:3, 3998:11, 3998:19, 4051:14, 4053:22, 4054:2
**accepts** [2] - 3831:16, 3909:25
**access** [2] - 3882:4, 3883:22
**accommodation** [1] - 3992:11
**according** [3] - 3960:22, 4009:3, 4043:23
**account** [36] - 3831:25, 3847:4, 3848:17, 3850:13, 3882:3, 3882:4, 3882:8, 3882:12, 3882:14, 3883:23, 3886:24, 3904:9, 3907:1, 3910:8, 3915:2, 3925:17, 3927:21, 3928:5, 3943:13, 3958:17, 3963:16, 3969:19, 3977:16, 3980:12, 4012:15, 4012:18, 4016:25, 4018:17, 4027:12, 4039:8, 4051:11, 4055:18, 4076:13, 4077:11, 4077:14, 4087:3
**accounted** [1] - 3888:13
**accounting** [12] - 3918:15, 3951:17, 3952:4, 3963:14, 3966:4, 4093:12, 4104:1, 4104:5, 4104:9, 4104:15, 4104:21, 4105:5
**accurate** [1] - 4070:3
**accurately** [2] - 4037:8, 4045:18
**ACH** [1] - 4073:23
**acquirer** [19] - 3827:22, 3828:8, 3828:10, 3830:20, 3830:23, 3833:5, 3833:8, 3833:9, 3833:18, 3834:6, 3905:5, 3927:12, 3927:25, 3943:12, 3995:25, 4019:20, 4023:21, 4023:23
**acquirer's** [1] - 3833:11
**acquirers** [3] - 3944:4, 4022:14, 4036:3
**acquiring** [5] - 3979:15, 3983:4, 3983:6, 4095:16, 4102:7
**acquisition** [1] - 4033:10
**act** [1] - 3998:18
**action** [3] - 3942:13, 3994:14, 3994:15
**actions** [2] - 3825:1, 3942:10
**actively** [1] - 3999:7
**activities** [2] - 3995:8, 4062:6
**activity** [2] - 3999:6, 4076:12
**actor** [1] - 3966:13
**acts** [1] - 3946:8
**actual** [19] - 3824:11, 3824:12, 3824:13,

3832:18, 3835:7, 3835:10, 3845:21, 3856:1, 3856:2, 3857:13, 3861:20, 3861:21, 3916:9, 3924:24, 3973:18, 3981:1, 3992:15, 4095:6, 4097:15
**add** [3] - 3890:6, 3943:12, 3966:13
**added** [1] - 3965:18
**addition** [1] - 3992:14
**additional** [4] - 3821:16, 3821:18, 3826:2, 3943:4
**address** [2] - 3993:22, 3997:3
**addresses** [1] - 3849:3
**adds** [1] - 3840:19
**adjourned** [1] - 4109:23
**adjusted** [3] - 3980:6, 3980:13, 3981:8
**adjusting** [1] - 4104:12
**adjustments** [3] - 3970:23, 3973:5, 3981:16
**admit** [2] - 4014:23, 4030:2
**adopt** [1] - 4083:11
**adopted** [1] - 4047:20
**advance** [2] - 3823:6, 3882:13
**advantage** [2] - 3854:12, 4007:24, 4100:11
**adverse** [19] - 3824:3, 3824:11, 3824:12, 3825:2, 3825:21, 3835:4, 3835:7, 3835:10, 3856:1, 3856:3, 3856:4, 3856:5, 3856:6, 3857:13, 3857:19, 3954:16, 3992:15
**adversely** [4] - 3821:2, 3823:25, 3840:25, 3845:16
**advertising** [3] - 3842:18, 3843:13, 3988:13
**advice** [1] - 4092:20
**advise** [1] - 3818:25
**affect** [11] - 3821:2, 3823:25, 3845:17, 3852:7, 3886:19, 3992:12, 3993:3, 3993:4, 3993:6, 4024:7, 4040:18
**affected** [5] - 3816:17, 3824:19, 3841:1, 4040:10, 4040:16
**affecting** [2] - 3993:13, 3993:14
**affects** [5] - 3861:8, 3887:8, 3977:20, 3987:8, 4010:22
**afternoon** [5] - 3978:13, 4015:23, 4015:24, 4082:13, 4107:20
**age** [2] - 3887:5, 3887:8
**agencies** [2] - 3819:14, 3890:1
**agency** [3] - 3818:22, 3890:10, 3910:3
**aggregating** [2] - 3911:16, 3911:21
**aggregation** [1] - 3912:6
**ago** [11] - 3868:1, 3877:1, 3881:9, 4018:9, 4048:25, 4062:12, 4062:18, 4062:20, 4064:4, 4070:20
**agree** [64] - 3877:8, 3960:23, 3976:6, 3976:13, 4003:24, 4006:5, 4006:6, 4006:7, 4006:11, 4016:5, 4016:16, 4017:1, 4018:4, 4018:8, 4018:13, 4022:7, 4023:4, 4023:7, 4023:13, 4024:2, 4024:6, 4028:17, 4029:5, 4035:9, 4036:9, 4036:11, 4037:18, 4037:20, 4041:5, 4041:9, 4044:1, 4045:8, 4048:23, 4049:24, 4050:20,

4050:24, 4052:4, 4052:8, 4053:4, 4054:16, 4055:25, 4056:13, 4062:9, 4062:23, 4065:9, 4065:20, 4069:16, 4069:25, 4081:2, 4082:8, 4087:20, 4089:5, 4090:16, 4091:7, 4093:10, 4095:10, 4100:21, 4101:11, 4101:13, 4103:19, 4104:8, 4104:13, 4104:19

**agreed** [4] - 4002:19, 4003:14, 4018:11, 4030:6

**agreement** [7] - 3820:19, 3859:1, 3964:23, 3965:21, 3982:23, 4043:20, 4096:23

**agreements** [3] - 3820:20, 3856:10, 4040:9

**agrees** [1] - 4093:5

**ahead** [10] - 3838:1, 3839:18, 3880:6, 3895:3, 3906:17, 3906:18, 3908:21, 3926:9, 3967:16, 3974:17

**aimed** [1] - 3820:4

**Air** [1] - 3986:12

**Airline** [1] - 3872:11

**airline** [3] - 3873:5, 3964:11, 3986:5

**Airlines** [3] - 3934:2, 3962:22, 3974:10

**airlines** [10] - 3887:23, 3890:15, 3899:8, 3899:11, 3933:23, 3964:7, 3964:9, 3986:5, 3986:14, 4101:6

**aisle** [1] - 4013:20

**AL** [1] - 3810:10

**Alaska** [6] - 3872:11, 3934:2, 3962:18, 3962:22, 3963:3, 3974:9

**algorithm** [1] - 4043:23

**All-in** [4] - 3979:13, 3979:21, 3981:8, 3981:11

**all-in** [3] - 3927:11, 3927:23, 3935:14

**all-or-nothing** [4] - 3938:5, 3974:25, 3975:13, 3975:20

**allegation** [2] - 4032:2, 4033:21

**allegations** [1] - 3994:7

**alleged** [4] - 3995:17, 4030:19, 4030:24, 4032:15

**allocated** [1] - 3843:11

**allow** [6] - 3828:15, 3856:19, 3904:9, 3996:15, 4009:20, 4011:15

**allowed** [3] - 3831:13, 3851:11, 3934:6

**allowing** [1] - 3945:23

**allows** [1] - 3856:22

**alluded** [1] - 3846:3

**alludes** [1] - 4043:7

**almost** [6] - 3900:19, 3931:21, 3932:19, 3975:6, 3987:25, 4098:6

**alone** [2] - 3861:7, 4057:23

**alternative** [14] - 3857:18, 3879:4, 3919:16, 3923:25, 3946:16, 4048:24, 4066:1, 4094:9, 4096:14, 4098:23, 4099:2, 4099:10, 4099:16, 4101:9

**alternatively** [1] - 3893:4

**alternatives** [1] - 3824:9

**amendment** [3] - 3866:12, 3934:16, 4079:9

**Amendment** [8] - 3919:11, 3925:4, 3925:8, 3926:12, 3934:18, 3936:18,

4081:3, 4082:3

**AMERICA** [1] - 3810:3

**America** [23] - 3872:15, 3896:16, 3928:22, 3978:22, 3979:5, 3979:9, 3979:11, 3979:16, 3979:24, 3981:9, 3981:16, 3982:11, 3984:25, 3989:13, 3991:24, 3993:4, 3996:15, 3997:7, 3999:7, 4009:2, 4012:20, 4015:16, 4017:1

**American** [368] - 3812:12, 3812:14, 3814:5, 3814:8, 3820:4, 3820:20, 3827:1, 3827:2, 3828:20, 3830:10, 3830:12, 3830:13, 3830:18, 3830:20, 3830:21, 3832:24, 3836:1, 3836:25, 3841:8, 3843:2, 3843:3, 3843:8, 3843:10, 3843:17, 3843:23, 3845:1, 3845:24, 3846:5, 3846:9, 3846:12, 3846:20, 3847:4, 3847:8, 3847:13, 3847:15, 3847:18, 3847:21, 3848:2, 3849:17, 3850:12, 3850:16, 3851:9, 3851:16, 3853:3, 3853:8, 3853:22, 3854:18, 3855:19, 3857:8, 3864:2, 3866:24, 3867:3, 3872:8, 3872:11, 3872:14, 3872:19, 3872:21, 3872:24, 3873:4, 3873:6, 3873:13, 3873:18, 3873:22, 3879:10, 3879:13, 3879:15, 3879:18, 3896:10, 3896:15, 3896:17, 3896:24, 3897:1, 3897:14, 3897:20, 3898:1, 3898:2, 3899:15, 3903:24, 3906:6, 3906:11, 3906:13, 3906:21, 3907:11, 3907:13, 3907:14, 3908:1, 3908:5, 3908:12, 3909:2, 3911:19, 3915:13, 3915:15, 3918:23, 3919:3, 3920:4, 3920:21, 3931:19, 3931:23, 3932:12, 3938:12, 3938:17, 3938:22, 3938:25, 3939:11, 3939:25, 3940:2, 3941:17, 3942:1, 3946:16, 3946:20, 3946:24, 3946:25, 3947:7, 3947:8, 3947:12, 3948:2, 3948:5, 3948:15, 3948:16, 3948:25, 3949:1, 3949:10, 3950:21, 3950:23, 3951:10, 3951:18, 3952:1, 3952:15, 3952:16, 3952:23, 3953:4, 3953:6, 3953:8, 3953:9, 3953:11, 3953:19, 3953:22, 3953:25, 3954:3, 3954:11, 3954:14, 3954:18, 3954:21, 3955:17, 3955:19, 3955:22, 3956:1, 3956:5, 3956:6, 3956:8, 3956:9, 3956:20, 3956:25, 3957:2, 3957:3, 3957:7, 3957:10, 3957:12, 3957:15, 3957:20, 3957:22, 3958:20, 3959:6, 3959:12, 3960:17, 3961:7, 3962:4, 3962:6, 3962:14, 3962:15, 3962:22, 3963:11, 3963:21, 3964:5, 3964:10, 3964:11, 3964:17, 3964:18, 3964:23, 3964:25, 3965:8, 3965:10, 3965:21, 3965:24, 3966:7, 3966:14, 3966:20, 3966:21, 3966:24, 3967:21, 3968:7, 3969:6, 3969:7, 3970:3, 3970:17, 3970:21, 3974:1, 3974:3, 3974:6, 3975:15, 3975:16, 3976:2, 3976:6, 3976:10, 3978:20, 3980:1, 3980:3, 3980:7, 3980:10, 3980:16,

3980:24, 3981:7, 3981:14, 3981:18, 3981:22, 3982:1, 3982:12, 3983:1, 3984:6, 3984:11, 3984:14, 3984:17, 3985:4, 3985:8, 3986:4, 3986:13, 3986:18, 3988:1, 3988:9, 3988:23, 3989:14, 3990:19, 3990:21, 3990:23, 3990:24, 3991:1, 3991:3, 3991:9, 3991:17, 3991:21, 3992:5, 3994:6, 3994:9, 3995:17, 3995:21, 3995:23, 3996:16, 3996:21, 3996:24, 3997:2, 3997:9, 3997:21, 3997:23, 3998:4, 3998:11, 3998:13, 3999:19, 3999:3, 3999:11, 3999:18, 4000:6, 4000:9, 4000:12, 4000:17, 4001:6, 4001:11, 4001:13, 4002:3, 4002:5, 4002:6, 4002:13, 4002:22, 4002:23, 4003:7, 4003:12, 4003:20, 4004:10, 4005:4, 4005:13, 4006:3, 4006:8, 4006:9, 4006:13, 4006:20, 4007:12, 4007:13, 4007:14, 4007:20, 4007:21, 4008:4, 4008:10, 4008:17, 4008:19, 4008:22, 4009:1, 4009:13, 4009:17, 4009:23, 4010:4, 4011:23, 4012:12, 4013:1, 4013:5, 4013:11, 4013:12, 4014:1, 4017:2, 4018:4, 4018:15, 4019:9, 4023:5, 4023:14, 4023:16, 4023:19, 4023:20, 4023:22, 4023:23, 4024:2, 4039:17, 4040:8, 4045:15, 4052:15, 4052:20, 4052:25, 4053:17, 4053:22, 4055:22, 4056:7, 4056:8, 4056:12, 4056:19, 4057:1, 4057:2, 4060:11, 4060:22, 4061:2, 4061:3, 4061:7, 4061:9, 4061:13, 4061:15, 4061:20, 4061:23, 4062:1, 4065:17, 4065:23, 4066:6, 4066:7, 4078:12, 4078:21, 4082:16, 4095:12, 4095:13, 4095:14, 4095:17, 4102:1, 4102:2, 4102:4, 4102:15, 4102:22, 4103:6, 4103:11, 4103:23, 4104:25

**AMERICAN** [1] - 3810:9

**Americas** [1] - 4103:7

**Amex** [9] - 3849:6, 3854:22, 3952:17, 3996:12, 3998:21, 4010:17, 4096:19, 4096:22, 4096:24

**Amex's** [1] - 3850:8

**amount** [20] - 3840:19, 3850:3, 3874:1, 3890:12, 3890:13, 3897:18, 3904:16, 3904:19, 3916:13, 3918:4, 3927:5, 3928:24, 3929:20, 3958:7, 3958:9, 3981:3, 3987:15, 4039:24, 4098:18

**amounts** [5] - 3840:20, 3885:8, 3959:9, 4040:21, 4079:18

**analyses** [7] - 3986:20, 4067:16, 4067:20, 4097:13, 4098:24, 4099:17, 4101:9

**analysis** [51] - 3818:2, 3818:12, 3819:12, 3822:24, 3826:4, 3858:23, 3861:19, 3862:1, 3871:25, 3875:12, 3876:1, 3895:24, 3896:10, 3896:18, 3901:15, 3903:15, 3904:8, 3906:25, 3915:14, 3935:21, 3938:18, 3961:14, 3972:4, 3974:18, 4006:4, 4034:3,

4

4039:4, 4039:8, 4039:20, 4040:11, 4040:15, 4049:24, 4051:9, 4059:24, 4059:25, 4066:21, 4072:13, 4074:2, 4074:18, 4076:19, 4078:22, 4079:3, 4079:5, 4079:8, 4079:11, 4079:16, 4079:18, 4099:3, 4099:5, 4103:21

**analysts** [1] - 4069:22

**analytical** [2] - 3835:2, 3937:9

**analytically** [1] - 4047:3

**analytics** [5] - 3996:4, 3996:8, 3996:16, 3996:17, 3996:20

**analyze** [2] - 3858:5, 3912:3

**analyzed** [1] - 3910:23

**analyzing** [2] - 3818:9, 3857:19

**ancillary** [2] - 3882:25, 3999:17

**AND** [1] - 3810:6

**ANNE** [1] - 3811:1

**annual** [6] - 3836:19, 3906:1, 3906:2, 3906:4, 3906:14, 3976:12

**Answer** [1] - 4046:23

**answer** [26] - 3859:23, 3860:18, 3862:21, 3862:23, 3863:22, 3874:17, 3875:8, 3886:4, 3907:17, 3923:7, 3923:13, 3934:7, 3939:21, 4028:20, 4035:10, 4035:11, 4040:5, 4043:14, 4043:22, 4044:7, 4044:9, 4045:6, 4047:5, 4051:22, 4057:6, 4093:25

**answering** [2] - 3923:12, 4048:6

**anti** [49] - 3820:23, 3821:2, 3821:8, 3821:11, 3821:19, 3821:24, 3822:11, 3822:14, 3824:18, 3828:22, 3836:3, 3839:9, 3840:25, 3841:4, 3841:8, 3841:14, 3845:9, 3845:15, 3846:2, 3846:4, 3846:10, 3846:12, 3849:24, 3850:9, 3850:10, 3851:16, 3851:18, 3851:22, 3852:5, 3854:2, 3854:21, 3855:1, 3856:3, 3856:9, 3857:8, 3857:20, 3877:11, 3985:13, 3992:3, 3992:6, 3992:12, 3993:3, 3993:23, 4003:14, 4006:1, 4008:5, 4014:4, 4014:7, 4039:21

**anti-steering** [49] - 3820:23, 3821:2, 3821:8, 3821:11, 3821:19, 3821:24, 3822:11, 3822:14, 3824:18, 3828:22, 3836:3, 3839:9, 3840:25, 3841:4, 3841:8, 3841:14, 3845:9, 3845:15, 3846:2, 3846:4, 3846:10, 3846:12, 3849:24, 3850:9, 3850:10, 3851:16, 3851:18, 3851:22, 3852:5, 3854:2, 3854:21, 3855:1, 3856:3, 3856:9, 3857:8, 3857:20, 3877:11, 3985:13, 3992:3, 3992:6, 3992:12, 3993:3, 3993:23, 4003:14, 4006:1, 4008:5, 4014:4, 4014:7, 4039:21

**anticompetitive** [6] - 3845:21, 3857:13, 3942:10, 3991:22, 4009:11, 4010:10

**antitrust** [26] - 3816:19, 3816:25, 3817:2, 3818:9, 3819:12, 3819:21, 3819:23, 3859:8, 3938:2, 3938:8, 3938:9, 3938:11, 3940:9, 3974:20, 3976:18, 3977:24, 3977:25, 4009:14,

4009:19, 4009:20, 4010:14, 4016:6, 4016:10, 4016:11, 4029:16, 4041:6

**Antitrust** [1] - 3819:2

**ANTITRUST** [1] - 3810:16

**anyway** [5] - 3853:11, 3866:9, 3867:10, 3873:9, 3900:24

**apologize** [6] - 3823:6, 3837:10, 3839:22, 3850:24, 3853:10, 4019:2, 4019:7, 4031:3, 4032:24, 4046:18, 4065:10, 4070:4, 4070:6, 4080:18, 4082:13, 4085:12

**apparent** [1] - 4045:20

**appear** [3] - 4063:22, 4077:7, 4087:23

**appearances** [2] - 3810:15, 3812:4

**appeared** [1] - 4084:5

**apples** [2] - 3981:17

**apples-apples** [1] - 3981:17

**Application** [1] - 4076:24

**application** [2] - 3862:6, 4045:1

**applications** [1] - 4051:3

**applied** [9] - 3937:6, 3969:16, 3992:15, 4055:6, 4057:20, 4059:11, 4060:1, 4061:1, 4099:8

**applies** [3] - 3863:13, 3928:13, 3992:16

**apply** [9] - 3912:12, 3922:9, 3937:20, 3972:3, 4044:23, 4046:21, 4047:4, 4056:17, 4057:10

**applying** [10] - 3825:17, 3863:22, 3901:24, 3922:2, 3972:7, 4047:2, 4048:7, 4056:13, 4056:25, 4059:10

**appointments** [1] - 3855:10

**appreciate** [3] - 4025:9, 4066:25, 4079:6

**approach** [35] - 3813:2, 3823:19, 3824:11, 3824:14, 3824:20, 3824:21, 3825:5, 3825:6, 3825:8, 3825:12, 3825:14, 3826:1, 3835:8, 3856:3, 3857:14, 3857:18, 3911:3, 3911:8, 3911:22, 3912:7, 3912:10, 3920:1, 3922:19, 3924:5, 3924:10, 3937:8, 3991:18, 3992:5, 3992:15, 4015:17, 4042:11, 4045:1, 4055:17, 4061:24

**approaches** [8] - 3824:8, 3825:4, 3825:6, 3825:15, 3825:17, 3825:23, 3835:6, 3922:6

**appropriate** [19] - 3909:24, 3911:12, 3912:10, 3950:9, 3950:12, 3981:17, 4018:10, 4046:21, 4046:24, 4048:2, 4048:10, 4055:17, 4095:1, 4095:4, 4097:18, 4097:23, 4098:8, 4101:14, 4101:18

**appropriately** [2] - 3827:1, 4098:11

**April** [1] - 4018:25

**arbitrage** [1] - 3909:16

**area** [1] - 3817:24

**areas** [1] - 4075:23

**arguably** [1] - 3965:21

**argued** [1] - 4032:10

**argument** [8] - 3967:3, 3999:7, 4000:5, 4001:14, 4005:14, 4009:3, 4009:13, 4012:9

**arguments** [2] - 4008:19, 4008:21

**arising** [2] - 3942:22, 3975:23

**arithmetic** [1] - 3913:16

**ARIZONA** [1] - 3810:3

**arrives** [1] - 4106:2

**arrow** [1] - 3971:1

**article** [7] - 4025:3, 4025:7, 4026:7, 4064:2, 4064:7, 4064:12, 4064:16

**articles** [2] - 4064:5, 4064:15

**ascertain** [1] - 3914:6

**Asia** [2] - 3856:9, 3857:9

**aside** [2] - 3819:20, 3860:21

**aspect** [3] - 3855:5, 3879:24, 4041:1

**aspects** [4] - 3832:5, 3879:17, 4041:2, 4078:3

**assert** [1] - 4031:19

**assertion** [1] - 3985:15

**assess** [10] - 3824:2, 3824:23, 3824:25, 3835:4, 3846:20, 3937:11, 3986:21, 3991:20, 4024:11, 4042:8

**assessing** [6] - 3834:12, 3847:19, 4023:16, 4024:3, 4104:2

**assessment** [6] - 3848:24, 3860:23, 3942:8, 4010:9, 4018:16, 4104:18

**assets** [2] - 3928:21, 3928:25

**assign** [1] - 4060:11

**assigned** [1] - 3847:4

**Assistant** [3] - 3810:24, 3811:1, 3811:5

**assistant** [2] - 3819:1, 3819:8

**assisted** [1] - 3811:22

**associated** [11] - 3849:7, 3943:20, 3944:1, 3953:8, 3953:10, 3959:19, 3970:22, 4001:17, 4001:18, 4056:21, 4065:18

**association** [3] - 4067:16, 4067:17, 4067:20

**Association** [1] - 4019:10

**associations** [1] - 4067:19

**assume** [5] - 3854:20, 4015:3, 4054:18, 4056:3, 4107:1

**assumed** [3] - 3916:7, 4056:8, 4095:6

**assuming** [5] - 4027:2, 4032:7, 4057:6, 4074:21, 4107:20

**assumption** [4] - 3916:6, 3916:11, 4060:15, 4106:14

**attempted** [1] - 4047:4

**attempting** [1] - 3980:8

**attempts** [1] - 3942:9

**attention** [3] - 3907:24, 3908:17, 3974:4

**attitudes** [2] - 3887:4, 3887:8

**Attitudes** [1] - 4076:23

**attorney** [6] - 3819:1, 3819:5, 3819:6, 3819:9, 4093:2, 4093:4

**Attorney** [5] - 3810:23, 3810:24, 3811:1, 3811:5, 3811:5

**attract** [3] - 3900:20, 4020:14, 4024:19

**attracted** [1] - 3833:3

**attractive** [4] - 3836:17, 3962:16, 3971:17, 4013:9

**attracts** [1] - 4004:1

**attributes** [1] - 3879:16

**attrition** [1] - 3988:2
**audience** [1] - 4001:12
**audiences** [4] - 3817:20, 3817:21, 3817:22, 3817:23
**Austin** [1] - 3810:25
**Australia** [5] - 3819:18, 3856:18, 3856:21, 3856:23
**authorizing** [1] - 3965:7
**automatically** [3] - 3861:24, 3944:13, 3988:4
**automobile** [3] - 3860:13, 3900:17, 3900:22
**automobiles** [2] - 3860:9, 3860:11
**available** [10] - 3867:1, 3893:12, 3893:14, 3895:21, 3909:21, 3914:5, 3927:8, 3992:14, 4023:11, 4023:12
**availing** [1] - 4000:5
**Avenue** [2] - 3811:8, 3811:12
**avenues** [1] - 3852:4
**average** [25] - 3909:9, 3909:10, 3918:9, 3920:4, 3920:20, 3923:1, 3923:2, 3924:7, 3924:8, 3928:7, 3928:8, 3968:23, 3979:21, 3981:6, 3981:10, 3981:11, 3982:22, 3986:23, 3986:25, 4095:13, 4095:15, 4096:3, 4096:20, 4096:21, 4098:20
**averages** [1] - 3964:15
**avoid** [7] - 3891:21, 3915:22, 4006:21, 4024:10, 4026:9, 4026:24, 4061:5
**award** [1] - 3822:4
**aware** [11] - 3844:15, 4047:1, 4053:20, 4056:24, 4063:5, 4063:17, 4065:16, 4065:23, 4066:5, 4071:1, 4071:4
**axis** [1] - 3837:20

## B

**background** [2] - 3815:18, 3815:25
**backward** [1] - 4006:20
**backwards** [2] - 3850:24, 3947:3
**bad** [3] - 3869:16, 3976:17, 4010:8
**balance** [5] - 3869:20, 3961:11, 4036:4, 4065:12, 4065:13
**balanced** [2] - 3848:8, 4020:15
**balances** [1] - 4034:24
**ballparks** [1] - 3973:18
**Bank** [3] - 3817:10, 3819:17, 3928:22
**bank** [7] - 3828:2, 3828:10, 3833:6, 4038:21, 4081:9, 4096:23, 4097:2
**Banking** [1] - 4064:3
**banks** [3] - 3878:17, 3928:6, 4095:17
**bar** [13] - 3893:24, 3894:2, 3934:22, 4026:10, 4026:11, 4026:20, 4027:2, 4027:3, 4027:6, 4027:18, 4085:21, 4086:9, 4086:11
**Bar** [1] - 4019:9
**BARBUR** [3] - 3811:10, 4108:11, 4109:18
**Barbur** [1] - 4108:8
**bargain** [1] - 3961:7
**Barrel's** [1] - 3933:16

**bars** [7] - 3890:2, 3890:6, 3890:24, 3935:1, 4086:9, 4087:14, 4087:25
**base** [3] - 3919:22, 4088:5, 4097:21
**based** [16] - 3856:2, 3858:23, 3920:21, 3924:22, 3932:14, 3968:7, 3971:7, 3997:5, 3997:6, 3997:14, 4060:4, 4090:9, 4091:4, 4099:6, 4101:20, 4106:4
**baseline** [4] - 3957:25, 3958:1, 3958:16, 3961:23
**bases** [4] - 4074:8, 4074:14
**basic** [1] - 3972:3
**basing** [1] - 4006:17
**basis** [22] - 3870:8, 3915:18, 3916:3, 3917:20, 3918:18, 3921:8, 3921:13, 3951:16, 4006:14, 4013:24, 4049:22, 4049:25, 4051:6, 4066:21, 4095:24, 4097:2, 4097:12, 4097:14, 4097:15, 4099:21, 4099:23, 4101:18
**Bates** [3] - 4019:15, 4073:10, 4075:22
**became** [1] - 3929:23
**become** [2] - 3938:8, 3946:15
**becomes** [2] - 3912:1, 4046:7
**bed** [1] - 3967:8
**beer** [6] - 3861:1, 3861:3, 3861:5, 3861:7, 3862:3, 3862:4
**BEFORE** [1] - 3810:13
**begin** [3] - 3812:16, 4068:22, 4107:20
**beginning** [3] - 4028:1, 4042:24, 4103:3
**begins** [4] - 4034:19, 4045:6, 4067:11, 4080:20
**behalf** [2] - 4029:19, 4029:20
**behave** [1] - 3887:2
**behavior** [12] - 3824:16, 3843:6, 3975:25, 3993:4, 3993:6, 3993:14, 4008:23, 4008:24, 4010:3, 4062:5, 4062:10
**believes** [1] - 3949:10
**belong** [1] - 3862:4
**beloved** [1] - 3862:17
**below** [13] - 3848:24, 3870:10, 3922:25, 3926:25, 3928:21, 3931:19, 3949:24, 3971:1, 3985:9, 3987:20, 3989:5, 3989:10, 4020:14
**belt** [3] - 3825:24, 3919:25, 3924:5
**belt-and-suspenders** [1] - 3825:24
**BENCH** [1] - 3810:13
**benchmarking** [1] - 3915:14
**bending** [1] - 4006:20
**beneficial** [4] - 3835:23, 3965:15, 3965:22, 4011:1
**benefit** [14] - 3844:10, 3965:6, 3988:11, 3989:1, 3990:2, 3997:11, 3997:13, 3997:18, 3998:1, 3998:14, 3998:19, 3999:17, 3999:19, 3999:20, 4000:10, 4010:13, 4010:14, 4092:22
**benefits** [17] - 3822:21, 3844:11, 3882:25, 3944:10, 3985:16, 3987:3, 3989:5, 3994:14, 3995:20, 3995:21, 3996:12, 3997:5, 3997:6, 4013:8, 4040:23

**Bergdorf** [4] - 4000:7, 4001:10, 4001:11, 4001:12
**Bergdorf's** [2] - 4000:21, 4000:24
**Berkeley** [1] - 3816:7
**Bernheim** [4] - 4089:16, 4090:4, 4091:16, 4092:1
**Bernheim's** [4] - 4063:8, 4063:22, 4090:17, 4091:8
**Best** [1] - 4078:6
**best** [11] - 3817:25, 3818:1, 3828:19, 3837:11, 3848:23, 3941:7, 3951:11, 3983:5, 4043:17, 4105:21, 4105:25
**better** [10] - 3839:2, 3934:6, 3949:24, 3967:15, 3976:20, 3998:14, 3998:18, 4009:19, 4011:19, 4030:4
**between** [51] - 3812:21, 3820:20, 3823:4, 3827:17, 3828:6, 3828:11, 3829:2, 3832:15, 3834:16, 3840:1, 3846:1, 3856:12, 3856:15, 3856:20, 3867:4, 3888:8, 3891:1, 3900:13, 3900:15, 3900:24, 3907:7, 3909:12, 3920:22, 3923:8, 3924:10, 3932:6, 3934:12, 3940:12, 3948:25, 3951:15, 3954:3, 3962:9, 3964:23, 3979:23, 3982:25, 3984:16, 3986:9, 4003:7, 4016:16, 4016:25, 4032:5, 4033:24, 4050:6, 4062:2, 4065:11, 4088:7, 4095:24, 4097:13, 4099:21, 4103:25
**beyond** [4] - 3882:6, 4047:5, 4062:4, 4065:19
**bicycle** [1] - 3860:11
**bicycles** [2] - 3860:8, 3860:13
**bid** [1] - 3960:10
**big** [15] - 3826:19, 3870:21, 3882:19, 3882:25, 3884:4, 3899:8, 3930:1, 3931:8, 3933:24, 3956:1, 3958:4, 3962:12, 3962:13, 3964:12, 4055:10
**bigger** [11] - 3852:20, 3872:2, 3920:8, 3921:14, 3923:14, 3923:15, 3935:9, 3960:15, 4088:22, 4101:13, 4101:23
**biggest** [4] - 3909:24, 3926:18, 3960:3, 4038:22
**bill** [4] - 3832:20, 3884:3, 3889:17, 4073:24
**billing** [1] - 3828:6
**billion** [1] - 3928:21
**bills** [1] - 3884:1
**binder** [5] - 3814:6, 3815:19, 3823:1, 3892:13, 4093:24
**binding** [1] - 4065:4
**bit** [10] - 3865:11, 3868:1, 3940:5, 3971:12, 3975:1, 3988:6, 3990:8, 3997:14, 4015:19, 4105:24
**black** [3] - 3960:1, 3960:9, 3987:10
**blank** [4] - 4054:15, 4084:6, 4084:20
**blended** [1] - 3962:1
**blocked** [2] - 3835:14, 3839:8
**blown** [1] - 3973:6
**blue** [9] - 3827:1, 3827:2, 3883:14, 3899:11, 3935:1, 3968:1, 3968:12, 3968:25

**blunt** [2] - 3867:18, 4010:19
**board** [1] - 4054:15
**BOIES** [1] - 3811:11
**bold** [1] - 3964:15
**book** [2] - 4018:2, 4037:5
**books** [2] - 4015:13, 4017:21
**borrowing** [1] - 3887:4
**boss** [1] - 4107:15
**Boston** [3] - 4063:2, 4063:10, 4063:15
**bother** [1] - 3929:16
**bottom** [35] - 3826:21, 3837:17, 3839:23, 3851:18, 3853:13, 3883:11, 3883:17, 3888:5, 3888:6, 3889:24, 3893:17, 3895:1, 3897:22, 3899:11, 3924:17, 3931:12, 3934:23, 3940:7, 3948:5, 3970:8, 3971:4, 3971:6, 3981:12, 3981:13, 3996:25, 4013:12, 4019:16, 4034:19, 4038:15, 4046:18, 4068:22, 4073:11, 4085:5, 4085:16
**bought** [1] - 3997:24
**boundaries** [2] - 3889:22, 4044:19
**boundary** [2] - 4115:6, 3861:22
**Box** [2] - 3810:25, 3811:2
**box** [17] - 3814:5, 3844:22, 3848:18, 3868:15, 3899:11, 3908:4, 3908:18, 3959:25, 3960:1, 3960:9, 3968:25, 3987:5, 3987:6, 3987:7, 3987:9, 3987:11
**boxes** [6] - 3827:21, 3873:4, 3958:9, 3959:3, 3970:11, 3987:13
**brand** [8] - 3828:21, 3842:16, 3900:15, 3900:22, 3954:21, 4011:7, 4011:9, 4054:7
**branding** [1] - 3828:18
**brands** [5] - 3828:19, 3831:11, 4001:16, 4013:19, 4052:12
**break** [17] - 3848:11, 3848:22, 3882:3, 3902:2, 3913:18, 3935:5, 3958:22, 3962:8, 3967:24, 3970:14, 3976:5, 3978:2, 3978:4, 4058:3, 4105:11, 4105:22
**break-even** [2] - 3848:11, 3848:22
**breakpoint** [3] - 3840:1, 3840:6, 3949:25
**breaks** [1] - 3962:6
**BRENNER** [1] - 3811:13
**BRET** [1] - 3810:24
**brief** [1] - 4108:4
**briefly** [4] - 3835:24, 3846:3, 4026:22, 4073:6
**Bright** [1] - 4107:14
**BRIGHT** [1] - 4107:17
**bring** [7] - 3826:2, 3828:25, 3974:4, 4036:2, 4044:4, 4106:22
**bringing** [2] - 3854:3, 3984:17
**broad** [6] - 3823:19, 3856:14, 3883:10, 3884:16, 3884:25, 3937:6
**broader** [11] - 3911:15, 3912:4, 3936:14, 4048:6, 4055:17, 4057:5, 4058:1, 4060:12, 4060:24, 4061:6, 4061:22

**broadest** [1] - 3884:4
**broadly** [3] - 3832:17, 3850:5, 4022:15
**broke** [1] - 3995:19
**broken** [3] - 3839:24, 3909:4, 3979:10
**brooder** [1] - 3862:24
**Brooklyn** [2] - 3810:6, 3811:19
**brought** [6] - 3842:4, 3884:5, 3934:16, 3970:8, 4010:5, 4030:16
**bucket** [2] - 3888:13, 3888:14
**buckets** [2] - 3888:7, 3893:18
**build** [2] - 3818:21, 3969:1
**Building** [1] - 3811:2
**building** [1] - 3879:2
**built** [2] - 3818:22, 3983:4
**bulk** [2] - 3830:21, 3833:18
**bullet** [15] - 3867:13, 3886:10, 3917:24, 3920:2, 3923:1, 3924:17, 3937:19, 4011:22, 4019:23, 4020:16, 4022:4, 4035:21, 4035:24, 4076:1, 4077:5
**bunch** [5] - 3866:8, 3933:13, 3961:14, 3994:18, 4051:15
**Burnheim** [1] - 4018:13
**Business** [1] - 3816:6
**business** [48] - 3816:11, 3821:16, 3821:18, 3828:25, 3829:1, 3850:15, 3853:14, 3871:21, 3875:4, 3875:7, 3887:19, 3896:23, 3896:25, 3897:5, 3897:18, 3900:4, 3916:12, 3916:13, 3933:15, 3934:1, 3946:2, 3948:9, 3949:21, 3950:3, 3950:9, 3950:11, 3957:3, 3957:4, 3958:25, 3959:6, 3963:17, 3969:19, 3969:21, 3969:22, 3970:18, 3999:12, 3999:17, 4013:16, 4018:5, 4056:1, 4078:2, 4095:16, 4096:22, 4096:24, 4102:15, 4103:23
**busy** [1] - 4038:7
**Buy** [1] - 4078:6
**buy** [9] - 3864:16, 3870:16, 3900:23, 3901:18, 3936:7, 3995:2, 3995:3, 3997:22, 4001:3
**buyers** [1] - 3860:4
**buying** [3] - 3891:10, 3975:3, 3997:20
**buys** [1] - 3832:19
**BY** [30] - 3810:18, 3810:24, 3811:9, 3811:13, 3815:15, 3820:17, 3823:12, 3838:2, 3857:6, 3899:2, 3903:10, 3931:2, 3946:14, 3948:13, 3950:15, 3956:12, 3961:21, 3966:12, 3967:18, 3978:18, 4015:22, 4021:2, 4059:7, 4072:12, 4073:2, 4075:13, 4077:1, 4083:12, 4110:6, 4110:7

## C

**Cadman** [1] - 3811:19
**calculate** [10] - 3871:12, 3874:1, 3897:9, 3916:25, 3917:3, 3958:21, 3967:24, 4087:21, 4090:7, 4098:1
**calculated** [7] - 3951:14, 3951:17, 3964:14, 3981:3, 3981:21, 4098:5, 4101:8
**calculates** [1] - 4103:7

**calculating** [4] - 3974:13, 3975:11, 3982:18, 4095:2
**calculation** [21] - 3875:3, 3919:12, 3940:11, 3961:24, 3969:4, 3970:12, 3970:19, 3971:6, 3971:8, 3973:6, 3974:4, 4047:14, 4047:15, 4088:3, 4088:5, 4088:6, 4094:15, 4094:18, 4094:19, 4096:8, 4101:14
**calculations** [11] - 3909:2, 3960:24, 3962:8, 3972:22, 3979:8, 3980:24, 3981:4, 4087:6, 4099:15, 4101:16, 4105:4
**California** [3] - 3816:6, 4093:3, 4093:4
**call-out** [4] - 3867:7, 3896:22, 3988:25, 4002:17
**called-out** [1] - 3972:9
**callout** [8] - 3849:15, 3947:11, 3950:18, 3958:22, 3959:1, 3962:25, 3970:4, 3970:5
**campaign** [15] - 3842:10, 3842:12, 3842:20, 3842:21, 3842:22, 3842:25, 3843:5, 3843:17, 3843:23, 3844:2, 3844:16, 3845:3, 4009:10, 4009:22, 4010:11
**campaigns** [19] - 3835:20, 3842:8, 3843:21, 3843:24, 3845:8, 3845:16, 3851:23, 3992:21, 3993:10, 3993:11, 3996:6, 4009:6, 4009:15, 4009:18, 4009:20, 4010:11, 4010:18, 4010:21, 4011:10
**CANALES** [1] - 3811:18
**canceling** [1] - 3848:6
**cancellations** [3] - 3848:3, 3989:3, 3989:4
**candidate** [17] - 3858:14, 3862:14, 3863:15, 3863:16, 3910:22, 3912:13, 3914:24, 3922:7, 3923:23, 3924:23, 4044:5, 4054:25, 4055:8, 4055:14, 4055:16, 4099:8
**candidates** [1] - 3858:16
**cannot** [3] - 3976:5, 3976:14, 3997:1
**capabilities** [1] - 3818:21
**capital** [1] - 3944:15
**capitalists** [1] - 3944:22
**capture** [3] - 3859:20, 3868:16, 3946:2
**captured** [3] - 3837:1, 4039:25, 4040:2
**car** [9] - 3882:17, 3890:1, 3890:10, 3891:9, 3899:8, 3899:9, 3900:18, 3910:2, 3918:22
**card** [183] - 3819:18, 3819:19, 3819:24, 3821:22, 3826:14, 3826:16, 3827:3, 3827:16, 3828:3, 3830:2, 3832:20, 3834:9, 3842:10, 3842:12, 3842:16, 3852:24, 3855:23, 3855:24, 3856:13, 3857:2, 3858:17, 3858:20, 3863:17, 3863:23, 3863:25, 3864:4, 3864:5, 3864:22, 3866:7, 3866:13, 3866:14, 3866:15, 3868:1, 3868:21, 3871:9, 3872:16, 3872:17, 3874:19, 3875:20, 3877:15, 3878:8, 3878:16, 3878:20, 3882:13, 3882:19, 3882:20, 3882:22,

3883:6, 3884:1, 3886:7, 3886:8, 3887:9, 3887:11, 3891:10, 3891:11, 3891:15, 3891:20, 3891:21, 3891:23, 3891:24, 3893:13, 3894:9, 3894:17, 3898:7, 3903:23, 3904:25, 3905:6, 3905:17, 3905:22, 3906:2, 3906:3, 3907:19, 3909:18, 3909:25, 3910:24, 3912:17, 3914:24, 3917:10, 3918:3, 3918:12, 3921:17, 3924:21, 3925:13, 3925:15, 3925:19, 3929:5, 3929:14, 3929:19, 3929:21, 3930:2, 3931:4, 3934:6, 3934:17, 3939:7, 3941:12, 3942:17, 3943:2, 3943:4, 3943:15, 3944:9, 3944:11, 3944:15, 3944:23, 3945:8, 3954:17, 3954:20, 3954:24, 3955:12, 3963:14, 3963:15, 3963:17, 3963:21, 3963:23, 3963:25, 3964:4, 3964:12, 3964:14, 3964:22, 3965:8, 3965:11, 3965:20, 3966:5, 3966:7, 3966:15, 3966:21, 3979:7, 3997:5, 3997:6, 3997:9, 3997:21, 3998:4, 4000:8, 4000:9, 4000:13, 4000:23, 4002:4, 4002:21, 4002:23, 4004:1, 4004:5, 4005:20, 4011:3, 4011:4, 4011:9, 4016:13, 4020:4, 4020:5, 4041:22, 4047:8, 4047:11, 4047:13, 4048:20, 4050:22, 4050:23, 4053:11, 4054:7, 4055:6, 4055:21, 4055:22, 4056:15, 4057:17, 4057:19, 4061:8, 4061:10, 4061:16, 4064:22, 4064:24, 4065:3, 4065:5, 4065:11, 4065:12, 4065:13, 4073:16, 4076:4, 4076:9, 4076:12, 4077:5, 4079:12, 4082:14, 4083:16, 4103:23

**Card** [14] - 3884:6, 3954:14, 3954:18, 3955:20, 3955:22, 3998:11, 3998:13, 4000:9, 4000:23, 4009:1, 4056:12, 4072:16, 4075:14, 4075:15

**Card's** [1] - 3956:9

**cardholder** [17] - 3828:1, 3904:25, 3905:3, 3905:25, 3918:24, 3923:17, 3929:6, 3938:21, 3943:2, 3962:5, 3990:25, 4002:13, 4002:19, 4002:25, 4007:8, 4013:8, 4023:16

**cardholder's** [2] - 3932:21, 3975:10

**cardholders** [51] - 3836:18, 3852:7, 3852:16, 3853:2, 3853:4, 3853:24, 3854:2, 3854:5, 3854:19, 3854:22, 3898:3, 3904:9, 3904:24, 3905:8, 3905:18, 3905:20, 3905:22, 3905:24, 3942:24, 3953:6, 3962:12, 3962:13, 3962:24, 3963:7, 3976:4, 3976:7, 3980:11, 3990:25, 3991:3, 3997:8, 4002:5, 4002:6, 4002:13, 4002:14, 4002:22, 4003:5, 4003:7, 4003:17, 4003:19, 4004:7, 4005:17, 4005:19, 4008:3, 4012:2, 4012:7, 4013:2, 4013:9, 4039:25, 4040:14

**cardholders'** [1] - 3985:20

**cardholding** [1] - 4067:21

**cardmember** [1] - 3958:23

**cardmembers** [1] - 3962:23

**cards** [197] - 3828:4, 3830:4, 3830:20, 3831:10, 3831:23, 3840:13, 3843:20, 3852:22, 3855:8, 3855:19, 3863:13, 3864:19, 3865:23, 3866:9, 3867:24, 3868:10, 3868:12, 3868:14, 3868:18, 3869:7, 3869:12, 3869:14, 3869:22, 3870:3, 3870:4, 3871:15, 3871:23, 3872:5, 3873:21, 3874:5, 3874:7, 3874:12, 3875:1, 3875:4, 3875:8, 3875:23, 3876:1, 3876:22, 3877:23, 3878:3, 3878:11, 3880:9, 3880:15, 3880:17, 3881:24, 3881:25, 3882:2, 3882:11, 3882:15, 3882:21, 3883:1, 3883:3, 3883:18, 3883:21, 3883:22, 3884:5, 3887:6, 3888:24, 3889:25, 3889:2, 3889:4, 3890:11, 3890:12, 3890:21, 3891:13, 3891:14, 3892:3, 3893:15, 3893:19, 3894:14, 3894:17, 3894:18, 3894:19, 3894:24, 3896:3, 3896:4, 3896:7, 3896:19, 3898:4, 3899:13, 3899:25, 3900:6, 3900:10, 3901:4, 3901:17, 3901:19, 3917:9, 3918:16, 3922:1, 3926:1, 3926:12, 3929:10, 3929:11, 3931:6, 3933:6, 3933:10, 3933:13, 3933:24, 3934:15, 3934:24, 3936:2, 3938:23, 3938:24, 3945:24, 3946:21, 3956:2, 3956:25, 3957:2, 3957:4, 3958:3, 3958:4, 3959:8, 3962:11, 3962:12, 3962:15, 3963:12, 3964:16, 3968:22, 3969:7, 3970:3, 3973:9, 3975:14, 3979:17, 3979:20, 3980:9, 3980:11, 3993:19, 3993:20, 4003:8, 4011:7, 4012:21, 4012:22, 4012:23, 4013:5, 4021:10, 4023:1, 4050:15, 4050:17, 4050:18, 4051:14, 4052:5, 4052:13, 4052:16, 4052:18, 4052:20, 4052:21, 4052:25, 4053:1, 4053:8, 4053:22, 4053:23, 4055:7, 4055:9, 4055:23, 4055:25, 4056:6, 4056:8, 4056:9, 4059:9, 4060:15, 4061:14, 4061:21, 4062:24, 4063:12, 4065:20, 4065:21, 4065:25, 4066:1, 4066:14, 4067:21, 4068:3, 4069:23, 4069:24, 4070:8, 4076:2, 4076:6, 4076:7, 4077:7, 4077:16, 4077:17, 4077:18, 4078:7, 4085:18, 4086:7, 4087:12, 4095:17

**care** [14] - 3865:10, 3875:22, 3875:23, 3881:5, 3881:14, 3900:15, 3941:8, 3958:13, 3963:3, 3963:10, 3995:7, 4012:18, 4012:25, 4025:25

**careful** [7] - 4044:21, 4045:4, 4046:24, 4082:18, 4082:19, 4083:8, 4098:15

**carries** [3] - 3987:9, 4034:14, 4034:20

**carry** [4] - 3830:3, 3987:12, 3995:1, 4000:23

**carrying** [1] - 3972:21

**cartel** [2] - 3862:13

**case** [118] - 3812:3, 3818:9, 3820:2, 3821:9, 3823:17, 3825:25, 3828:3, 3832:23, 3832:24, 3833:17, 3846:7, 3846:9, 3849:16, 3849:21, 3851:23,

3853:18, 3854:15, 3856:21, 3858:11, 3863:25, 3871:13, 3873:18, 3876:17, 3881:20, 3882:20, 3883:1, 3891:18, 3893:11, 3895:22, 3897:15, 3899:21, 3910:9, 3914:13, 3914:15, 3917:13, 3920:13, 3923:9, 3926:1, 3927:18, 3933:16, 3938:21, 3952:5, 3964:25, 3973:21, 3975:15, 3976:8, 3980:2, 3983:2, 3983:3, 3984:10, 3990:20, 4002:4, 4002:16, 4004:6, 4010:2, 4010:21, 4011:9, 4017:22, 4018:2, 4024:14, 4027:2, 4029:14, 4029:16, 4029:19, 4030:1, 4030:5, 4030:9, 4030:13, 4031:5, 4031:6, 4032:23, 4033:6, 4033:21, 4034:3, 4034:6, 4035:7, 4037:19, 4037:23, 4038:14, 4040:2, 4042:12, 4042:15, 4042:20, 4045:14, 4046:10, 4046:12, 4046:17, 4047:13, 4047:19, 4047:23, 4048:12, 4048:14, 4048:16, 4050:16, 4056:22, 4060:21, 4061:1, 4062:10, 4066:8, 4066:12, 4067:3, 4067:9, 4068:9, 4068:15, 4069:7, 4070:14, 4070:21, 4074:3, 4074:6, 4076:14, 4077:12, 4077:16, 4077:20, 4079:8, 4080:15, 4096:22, 4098:13

**cases** [15] - 3817:23, 3819:23, 3859:8, 3859:13, 3884:12, 3929:22, 3931:24, 3952:1, 3961:2, 3973:19, 3980:16, 3988:5, 4011:8, 4011:9, 4021:11

**cash** [19] - 3831:10, 3836:18, 3855:22, 3856:12, 3856:15, 3881:20, 3882:12, 3882:20, 3884:9, 3886:8, 3886:15, 3886:21, 3888:17, 3888:19, 3888:21, 3888:23, 4069:24, 4070:8, 4076:10

**cash's** [1] - 3884:8

**cash/check** [1] - 4073:16

**categories** [12] - 3847:1, 3889:13, 3889:25, 3890:24, 3897:7, 3908:4, 3911:18, 3940:14, 3971:23, 3994:4, 3995:19

**category** [16] - 3865:15, 3892:17, 3893:10, 3894:8, 3897:2, 3968:1, 3968:6, 3982:22, 3986:5, 3995:20, 3997:4, 3998:6, 3998:8, 4005:12, 4008:14, 4066:17

**CAUSE** [1] - 3810:13

**caused** [1] - 3854:21

**caution** [1] - 4104:13

**caveats** [1] - 3863:2

**cease** [2] - 3969:7, 3991:3

**central** [9] - 3821:8, 3827:15, 3838:24, 3866:4, 3906:21, 3908:18, 3942:21, 4047:25, 4051:8

**centric** [1] - 4073:20

**cents** [2] - 3833:6, 3833:9

**certain** [15] - 3820:19, 3865:5, 3865:7, 3865:17, 3876:14, 3879:23, 3911:2, 3953:10, 3959:13, 3993:12, 4000:6, 4001:16, 4087:6, 4095:24, 4097:2

**certainly** [78] - 3828:20, 3831:25, 3835:17, 3841:7, 3841:20, 3843:24,

3845:10, 3851:4, 3851:12, 3853:21, 3856:24, 3873:25, 3876:9, 3876:16, 3877:8, 3877:23, 3880:11, 3881:22, 3891:25, 3906:13, 3907:6, 3911:17, 3914:12, 3919:6, 3926:19, 3928:20, 3947:25, 3950:5, 3950:10, 3952:10, 3955:20, 3957:13, 3976:8, 3976:15, 3976:18, 3983:16, 3985:13, 3989:18, 4006:6, 4006:11, 4007:17, 4009:1, 4010:20, 4013:22, 4021:24, 4023:11, 4026:11, 4027:4, 4038:6, 4039:1, 4040:24, 4042:5, 4045:2, 4045:16, 4047:6, 4048:6, 4053:3, 4053:25, 4054:10, 4060:21, 4061:14, 4063:4, 4063:17, 4066:22, 4068:17, 4069:3, 4071:6, 4071:20, 4076:15, 4077:22, 4084:12, 4102:22, 4104:7, 4104:11, 4104:21, 4105:2, 4107:15, 4107:23

**certifying** [2] - 4001:11, 4001:12

**CFO** [2] - 3853:9, 3853:11

**chain** [3] - 3895:5, 3895:7, 3895:16

**chains** [1] - 3895:6

**Chair** [1] - 3816:5

**Challenge** [2] - 4025:21, 4026:4

**challenges** [1] - 3953:4

**chance** [3] - 3837:6, 3851:7, 3954:14

**change** [28] - 3817:19, 3871:25, 3876:20, 3878:1, 3879:5, 3879:23, 3881:13, 3885:3, 3921:2, 3921:8, 3922:24, 3923:5, 3926:13, 3927:4, 3929:2, 3934:14, 3935:7, 3935:12, 3936:20, 3936:23, 3986:1, 3987:18, 4000:2, 4001:22, 4010:25, 4028:20, 4032:15, 4084:23

**changed** [6] - 3822:11, 3870:25, 3871:5, 3877:25, 3879:8, 4084:18

**changes** [8] - 3867:1, 3876:13, 3914:1, 3929:6, 3930:6, 3985:20, 4024:6, 4024:11

**changing** [3] - 3877:17, 3939:19, 3999:18

**chapter** [2] - 3818:7, 3818:9

**characteristics** [8] - 3826:7, 3827:13, 3881:4, 3886:12, 3886:14, 3906:24, 4022:5

**characterization** [2] - 4069:17, 4070:1

**charge** [150] - 3830:21, 3846:4, 3858:17, 3858:20, 3864:5, 3864:18, 3864:19, 3865:23, 3868:10, 3868:21, 3869:7, 3869:12, 3869:14, 3869:22, 3870:4, 3872:16, 3872:17, 3873:21, 3874:12, 3874:19, 3875:1, 3875:4, 3875:8, 3876:1, 3877:15, 3878:3, 3878:7, 3882:11, 3891:19, 3891:22, 3893:15, 3896:3, 3896:4, 3896:7, 3896:18, 3898:4, 3898:7, 3899:13, 3900:6, 3901:4, 3901:17, 3903:23, 3905:6, 3907:19, 3907:20, 3909:15, 3910:16, 3910:24, 3917:9, 3917:10, 3918:2, 3918:3, 3918:12, 3921:17, 3922:1, 3924:21, 3925:19, 3939:13, 3941:1,

3943:24, 3949:11, 3953:18, 3955:18, 3958:6, 3958:9, 3959:7, 3959:10, 3959:22, 3960:11, 3960:12, 3960:18, 3960:19, 3961:5, 3961:6, 3961:10, 3961:16, 3962:22, 3964:11, 3968:2, 3969:6, 3971:14, 3973:5, 3973:10, 3979:7, 3979:19, 3980:20, 3981:1, 3982:8, 3993:19, 3993:20, 3996:18, 3996:19, 4012:21, 4012:23, 4016:13, 4041:22, 4047:13, 4048:20, 4050:15, 4050:17, 4050:22, 4050:23, 4050:25, 4051:14, 4052:5, 4052:12, 4052:15, 4052:20, 4053:1, 4053:8, 4053:11, 4055:6, 4055:7, 4055:9, 4055:21, 4055:25, 4056:6, 4056:8, 4056:9, 4057:17, 4057:19, 4059:8, 4059:12, 4059:18, 4059:20, 4065:11, 4065:13, 4065:21, 4066:1, 4066:13, 4068:13, 4070:4, 4077:16, 4078:14, 4079:12, 4086:3, 4087:5, 4090:8, 4090:9, 4090:19, 4096:9, 4098:4, 4099:24, 4102:9

**Chargecard** [1] - 4100:17

**chargecard** [19] - 3821:14, 3826:14, 3828:2, 3829:23, 3830:4, 3831:4, 3852:15, 3855:4, 3936:4, 3937:4, 3942:11, 3943:8, 3943:9, 3943:18, 3953:12, 3956:23, 3959:18, 3971:15, 4087:5

**chargecards** [22] - 3830:23, 3834:19, 3834:21, 3840:14, 3840:22, 3855:8, 3856:25, 3935:25, 3936:16, 4059:15, 4060:7, 4060:10, 4060:16, 4060:23, 4061:2, 4061:18, 4061:21, 4062:2, 4063:11, 4065:17, 4067:22, 4070:2

**charged** [6] - 3846:8, 3852:14, 3925:9, 3927:11, 3985:10, 3986:10

**charger** [1] - 3878:18

**charges** [8] - 3836:25, 3855:5, 3905:24, 3928:2, 3996:17, 4065:3, 4098:18, 4102:4

**charging** [24] - 3848:1, 3852:19, 3852:23, 3853:1, 3853:23, 3855:15, 3855:16, 3904:24, 3959:8, 3960:16, 3971:14, 3973:15, 3973:16, 3980:1, 3980:16, 3980:17, 3981:14, 3981:19, 3982:21, 3986:5, 4027:6, 4027:11, 4093:11

**chart** [28] - 3826:18, 3833:14, 3837:17, 3890:9, 3901:20, 3927:16, 3931:10, 3932:9, 3934:22, 3971:17, 3971:19, 3971:22, 3972:1, 3972:12, 3972:15, 3972:17, 3981:6, 3987:4, 4014:17, 4084:5, 4084:10, 4084:13, 4085:3, 4085:15, 4086:2, 4089:3, 4096:14, 4101:5

**charts** [4] - 3895:23, 4038:17, 4082:23, 4099:16

**Chase** [1] - 3928:22

**cheaper** [17] - 3821:21, 3821:22, 3843:1, 3844:9, 3855:7, 3855:8, 3868:25, 3869:2, 3870:8, 3870:20,

3925:18, 3925:25, 3929:24, 3934:5, 3980:4, 4012:22

**cheapest** [2] - 4012:4, 4012:20

**check** [7] - 3884:1, 3885:16, 3886:21, 3887:22, 3897:11, 3921:7, 4101:11

**Check** [1] - 3884:6

**checking** [4] - 3837:25, 3882:4, 3882:8, 3883:22

**checks** [20] - 3831:10, 3878:1, 3881:18, 3883:16, 3883:20, 3883:22, 3883:23, 3883:24, 3883:25, 3884:2, 3884:3, 3884:5, 3884:12, 3884:15, 3885:15, 3886:7, 4069:24, 4070:8, 4076:10

**Chesler** [3] - 3812:12, 4014:15, 4057:24

**CHESLER** [67] - 3811:9, 3812:11, 3820:13, 4015:3, 4015:6, 4015:11, 4015:13, 4015:15, 4015:20, 4015:22, 4017:12, 4017:16, 4017:18, 4021:2, 4025:13, 4025:19, 4027:16, 4027:20, 4027:22, 4027:24, 4029:7, 4030:8, 4031:11, 4040:25, 4044:8, 4049:8, 4058:1, 4058:5, 4059:7, 4071:11, 4072:7, 4072:12, 4072:18, 4072:22, 4072:25, 4073:2, 4074:25, 4075:2, 4075:7, 4075:10, 4075:13, 4076:21, 4077:1, 4083:5, 4083:10, 4083:12, 4092:16, 4092:22, 4094:4, 4094:16, 4105:9, 4105:13, 4105:16, 4105:21, 4105:24, 4106:6, 4106:14, 4106:19, 4106:25, 4107:7, 4107:9, 4107:12, 4107:22, 4108:3, 4108:8, 4108:23, 4110:7

**chicken** [1] - 3942:21

**chief** [2] - 3818:14, 3818:18

**children** [1] - 4083:5

**choice** [7] - 3831:5, 3831:7, 3955:9, 3996:15, 4050:6, 4063:3, 4076:2

**choices** [4] - 3876:19, 3887:15, 3888:2, 3954:7

**choose** [6] - 3882:5, 3891:20, 4050:7, 4050:8, 4053:12

**chooses** [2] - 3831:8, 3831:15

**choosing** [2] - 3952:13, 4088:24

**chose** [2] - 3907:23, 4057:4

**chosen** [5] - 3947:9, 4007:12, 4007:14, 4007:16

**circled** [2] - 3986:24, 3987:15

**circumstances** [6] - 3911:12, 4023:10, 4050:4, 4053:21, 4053:25, 4054:4

**cite** [5] - 4067:23, 4067:25, 4068:1, 4068:2, 4084:14

**cited** [7] - 4057:7, 4068:4, 4068:11, 4068:24, 4069:3, 4069:6, 4070:13

**Citibank** [2] - 3828:3, 3928:22

**cities** [2] - 3860:10, 3994:20

**citing** [3] - 4069:3, 4070:11, 4079:2

**City** [3] - 3811:3, 3817:10, 3817:13

**CIVIL** [1] - 3810:13

**claim** [1] - 4006:15

**claimed** [1] - 3837:23

**claims** [1] - 4034:4

**clarification** [2] - 4023:18, 4025:9
**clarify** [3] - 3923:14, 4030:5, 4052:14
**clarity** [1] - 4031:4
**class** [1] - 4102:17
**classic** [1] - 3829:19
**classification** [1] - 3951:2
**clean** [2] - 3930:6, 4094:6
**clear** [21] - 3841:3, 3854:13, 3879:18, 3882:10, 3908:17, 3952:23, 3976:9, 4023:19, 4028:19, 4028:21, 4035:8, 4036:24, 4036:25, 4060:14, 4079:20, 4085:3, 4087:8, 4091:11, 4094:24, 4098:23, 4099:4
**clearly** [14] - 3861:3, 3861:4, 3865:24, 3881:20, 3909:14, 3918:20, 3920:11, 3955:6, 3960:25, 3965:10, 3991:5, 4005:7, 4012:1, 4099:7
**clerk** [1] - 4108:15
**clients** [1] - 4092:23
**close** [23] - 3848:22, 3860:15, 3860:16, 3861:5, 3862:7, 3875:14, 3892:20, 3903:13, 3925:12, 3925:14, 3925:15, 3925:18, 3925:23, 3931:9, 3932:12, 3934:12, 3935:6, 4041:7, 4051:20, 4064:23, 4067:22, 4106:15
**closed** [3] - 3839:25, 3995:24, 4024:1
**closed-loop** [1] - 3995:24
**closer** [6] - 3940:3, 3940:4, 3941:19, 4065:20, 4101:21, 4101:22
**cloudy** [1] - 4031:15
**Club** [1] - 4002:15
**cluster** [1] - 4060:2
**clustered** [1] - 3983:10
**clusters** [1] - 4001:16
**CM** [1] - 3958:23
**cnlsnic@aol.com** [1] - 3811:20
**co** [2] - 4011:7, 4011:9
**co-brand** [2] - 4011:7, 4011:9
**coexist** [1] - 4050:25
**coffee** [1] - 3886:17
**coherent** [1] - 4056:23
**collected** [1] - 3941:4
**collecting** [2] - 3915:8, 4097:22
**collectively** [1] - 3841:6
**collects** [1] - 3853:4
**colored** [1] - 3888:12
**column** [14] - 3951:4, 3964:8, 3964:15, 3964:20, 3968:15, 3969:22, 3972:9, 3979:11, 3981:10, 3981:15, 4085:4, 4085:6, 4085:15, 4101:5
**Column** [10] - 3979:10, 3979:23, 3981:12, 3981:15, 3982:25, 3983:8, 4003:4, 4003:15
**columns** [9] - 3897:8, 3939:12, 3939:14, 3979:12, 3979:17, 3980:2, 3980:5, 4086:1, 4087:24
**combination** [1] - 4076:9
**combine** [1] - 3911:22
**combined** [1] - 3928:2
**combining** [3] - 3911:15, 3912:5, 3968:9

**comfortable** [3] - 3887:10, 4107:11, 4107:13
**coming** [11] - 3876:1, 3878:6, 3962:23, 3969:16, 3971:1, 3976:19, 3988:24, 4022:25, 4026:9, 4042:2, 4048:14
**comment** [1] - 4017:19
**commerce** [1] - 3941:6
**Commission** [2] - 3818:15, 3859:15
**commission** [2] - 3818:24, 3818:25
**commissioned** [1] - 4002:3
**common** [4] - 3904:17, 3912:2, 3915:20, 3963:15
**communicate** [1] - 3880:3
**communication** [1] - 4037:3
**communications** [1] - 3828:17
**Communications** [1] - 3818:15
**community** [3] - 3879:16, 3879:18, 3879:20
**commute** [1] - 3891:11
**companies** [4] - 3879:3, 3882:21, 3893:9, 4068:10
**COMPANY** [1] - 3810:9
**company** [18] - 3879:24, 3882:17, 3895:6, 3895:9, 3906:13, 3944:14, 3944:18, 3948:21, 3950:25, 3951:1, 3963:16, 3966:5, 3966:8, 3977:4, 3984:9, 4023:20, 4023:23, 4024:24
**comparable** [2] - 3891:16, 3894:20
**compare** [5] - 3924:12, 3971:3, 4003:3, 4003:15, 4069:2
**compared** [4] - 3943:24, 3981:12, 4003:5, 4098:25
**comparing** [3] - 3980:12, 3986:11
**comparison** [4] - 3981:7, 3981:9, 3981:18, 4003:16
**compelled** [1] - 3925:16
**compete** [5] - 3835:15, 3844:12, 3884:19, 4013:14, 4036:3
**competed** [1] - 3976:22
**competing** [5] - 3822:4, 3843:10, 3852:2, 3884:15, 3900:23, 3925:17, 3975:7, 3976:19, 3977:1, 3979:7, 3992:19, 4069:23, 4070:7
**Competition** [2] - 4025:22, 4026:4
**competition** [75] - 3816:17, 3816:23, 3819:13, 3820:4, 3821:2, 3821:9, 3821:12, 3822:4, 3823:22, 3823:25, 3824:19, 3825:2, 3825:10, 3831:19, 3834:12, 3835:11, 3841:1, 3842:2, 3843:18, 3844:2, 3845:17, 3851:17, 3851:19, 3852:4, 3855:3, 3860:3, 3860:7, 3860:13, 3860:20, 3861:10, 3863:4, 3863:5, 3863:9, 3876:14, 3884:24, 3900:13, 3900:14, 3901:1, 3934:11, 3938:4, 3940:17, 3942:8, 3942:10, 3992:4, 3992:10, 3992:12, 3992:13, 3992:17, 3993:14, 3993:16, 3994:8, 4009:22, 4011:18, 4011:19, 4014:9, 4024:17, 4025:4, 4030:20, 4031:20, 4033:11, 4036:7, 4040:17, 4045:18, 4045:20, 4045:23, 4055:18,

4061:7, 4061:10, 4062:2, 4069:9, 4070:23, 4074:5, 4078:14
**competitive** [40] - 3816:11, 3824:3, 3825:21, 3827:9, 3835:5, 3835:22, 3838:17, 3845:5, 3845:14, 3850:17, 3852:1, 3856:4, 3856:6, 3858:8, 3862:19, 3862:21, 3874:21, 3877:13, 3877:15, 3904:2, 3919:6, 3925:16, 3934:5, 3937:22, 3985:9, 3985:18, 3989:19, 3990:5, 3992:21, 3993:1, 4008:14, 4010:6, 4011:15, 4018:17, 4032:12, 4033:15, 4035:25, 4036:12, 4101:2, 4104:10
**competitiveness** [1] - 4100:22
**competitor** [4] - 3839:25, 3846:13, 3958:5, 4005:25
**competitors** [14] - 3820:6, 3827:7, 3925:15, 3933:8, 3933:13, 3958:16, 3959:23, 3971:14, 3973:8, 4061:17, 4061:18, 4061:19, 4069:9, 4070:23
**compilation** [4] - 4085:9, 4085:18, 4085:23, 4088:25, 4091:9
**compile** [1] - 4091:3
**compiled** [1] - 4089:25
**complaint** [5] - 4032:23, 4033:4, 4033:9, 4035:25, 4036:6
**complete** [2] - 3857:12, 4064:25
**completely** [4] - 3883:24, 3939:21, 4050:2, 4098:7
**completing** [1] - 3976:24
**complicated** [1] - 3979:19
**complications** [2] - 3830:14, 3830:17
**compliment** [1] - 4017:18
**component** [3] - 3848:11, 3926:19, 3926:24
**components** [6] - 3847:25, 3899:9, 3927:21, 3960:3, 4038:16, 4040:19
**composite** [1] - 3897:10
**comprises** [1] - 3833:18
**computer** [1] - 3811:22
**computer-assisted** [1] - 3811:22
**conceivable** [2] - 4022:14, 4061:1
**conceived** [1] - 3877:1
**concentrated** [11] - 3826:17, 3938:20, 3939:8, 3940:6, 3940:15, 3940:20, 3941:19, 3941:22, 3980:19, 3985:11, 3990:21
**concentration** [5] - 3940:8, 3940:12, 3940:19, 3941:14, 3942:7
**concept** [12] - 3847:14, 3859:19, 3873:3, 3937:21, 3938:5, 3938:11, 3956:25, 3957:20, 4022:19, 4023:3, 4023:7, 4098:21
**concern** [15] - 3847:25, 3849:23, 3850:6, 3954:11, 3976:23, 3992:24, 3995:8, 3999:4, 4005:15, 4007:4, 4008:22, 4008:24, 4021:7, 4087:9
**concerned** [21] - 3847:8, 3847:22, 3847:23, 3849:20, 3869:5, 3894:23, 3896:2, 3900:1, 3900:2, 3901:13, 3901:16, 3908:8, 3938:8, 3938:9,

3954:24, 3956:8, 3966:18, 3966:19, 4008:2, 4039:5, 4040:5
**concerning** [1] - 4078:13
**concerns** [8] - 3881:8, 3881:9, 3881:10, 3940:16, 3994:7, 4045:22, 4076:8
**concerted** [1] - 3932:13
**concession** [1] - 3988:7
**conclude** [13] - 3851:14, 3858:23, 3860:12, 3861:7, 3871:21, 3919:14, 3996:11, 4010:12, 4029:1, 4036:15, 4053:1, 4056:18, 4057:18
**concluded** [12] - 3848:18, 3897:15, 3912:19, 3929:20, 3987:14, 3988:10, 3988:11, 3988:15, 4034:6, 4035:14, 4035:15, 4060:8
**concluding** [4] - 4013:25, 4029:3, 4034:9, 4049:2
**conclusion** [45] - 3821:6, 3821:8, 3822:17, 3825:18, 3825:20, 3841:7, 3844:20, 3853:21, 3856:5, 3867:19, 3867:22, 3877:10, 3878:11, 3912:22, 3917:12, 3917:16, 3917:20, 3918:16, 3919:2, 3919:12, 3921:19, 3922:2, 3922:6, 3923:11, 3924:22, 3937:3, 3981:25, 3985:7, 3985:14, 3987:18, 3992:3, 4012:9, 4013:12, 4014:8, 4024:21, 4024:23, 4039:21, 4061:19, 4065:7, 4066:17, 4066:21, 4068:5, 4068:12, 4070:13, 4094:11
**Conclusion** [1] - 4064:19
**conclusions** [13] - 3821:4, 3825:16, 3912:16, 4014:5, 4024:10, 4024:16, 4026:9, 4026:25, 4036:6, 4037:16, 4066:12, 4066:22, 4100:22
**Concord** [4] - 4030:14, 4031:19, 4033:6, 4033:10
**concrete** [1] - 3869:24
**conditions** [6] - 3877:18, 3912:3, 3942:4, 3942:6, 3942:15, 3942:16
**conduct** [3] - 3824:14, 3824:24, 3845:8
**conduct's** [1] - 3825:7
**conducted** [4] - 4002:12, 4034:3, 4076:20, 4079:8
**conducting** [2] - 3824:9, 4018:4
**conference** [5] - 3814:1, 3817:14, 3853:10, 4025:4, 4026:1
**confers** [1] - 3998:19
**confident** [8] - 3848:22, 3989:10, 4002:20, 4002:24, 4003:1, 4003:8, 4003:9, 4003:20
**confidential** [13] - 3814:6, 3839:24, 3914:18, 3914:19, 3914:21, 3947:14, 3947:15, 3957:17, 3957:18, 3978:13, 4001:24, 4000:18, 4071:12
**confidentiality** [4] - 3814:4, 3814:10, 3837:22, 4087:20
**confirmed** [1] - 4067:21
**conflicting** [1] - 3955:1
**confused** [2] - 3852:18, 4070:3
**confusion** [2] - 4034:1, 4049:20
**connected** [1] - 4019:21

**CONNECTICUT** [1] - 3810:3
**connection** [4] - 3846:1, 4025:3, 4062:6, 4074:20
**Connectiveness** [1] - 3817:10
**connects** [1] - 3945:9
**CONRATH** [128] - 3810:18, 3812:5, 3812:18, 3812:21, 3812:25, 3814:11, 3815:15, 3820:10, 3820:16, 3820:17, 3823:3, 3823:9, 3823:12, 3837:22, 3838:2, 3839:15, 3846:16, 3850:21, 3850:23, 3857:6, 3858:9, 3858:13, 3862:8, 3863:10, 3865:19, 3868:4, 3872:6, 3874:13, 3880:3, 3880:24, 3883:7, 3887:25, 3889:18, 3892:12, 3892:15, 3899:2, 3899:16, 3901:23, 3902:4, 3903:5, 3903:8, 3903:10, 3906:7, 3906:16, 3906:19, 3909:17, 3910:20, 3912:20, 3914:18, 3917:19, 3922:12, 3924:25, 3926:4, 3926:7, 3927:3, 3928:13, 3928:24, 3930:8, 3931:2, 3939:3, 3946:14, 3948:13, 3950:15, 3956:12, 3956:17, 3957:17, 3961:17, 3961:21, 3966:12, 3967:6, 3967:17, 3967:18, 3971:16, 3971:20, 3971:24, 3972:15, 3974:15, 3978:1, 3978:6, 3978:9, 3978:12, 3978:18, 3979:3, 3982:9, 3983:24, 3984:21, 3985:25, 3986:15, 3987:21, 3988:22, 3990:13, 3991:16, 3992:1, 3993:21, 3994:2, 3995:16, 4000:2, 4001:22, 4002:7, 4004:13, 4004:19, 4005:11, 4008:13, 4008:18, 4011:20, 4014:12, 4014:15, 4014:23, 4015:1, 4025:16, 4029:8, 4030:5, 4044:6, 4044:10, 4049:4, 4072:8, 4075:4, 4106:4, 4107:23, 4108:19, 4108:24, 4109:5, 4109:8, 4109:10, 4109:12, 4109:15, 4109:20, 4110:6
**Conrath** [8] - 3812:6, 3814:7, 3865:12, 3949:20, 4030:1, 4082:20, 4106:19, 4108:3
**conrath** [1] - 3814:7
**conscious** [3] - 3948:8, 3949:12, 3952:8
**consequences** [1] - 4010:19
**conservative** [13] - 3915:21, 3916:1, 3916:8, 3916:10, 3916:17, 3916:19, 3920:9, 3920:12, 3922:16, 3922:17, 3922:19, 4061:24, 4101:22
**consider** [30] - 3821:1, 3822:14, 3832:4, 3832:5, 3844:1, 3849:1, 3858:15, 3863:8, 3863:16, 3871:8, 3874:15, 3874:17, 3904:5, 3918:20, 3984:25, 4008:4, 4008:10, 4022:2, 4024:15, 4034:25, 4035:2, 4053:15, 4057:8, 4057:21, 4059:15, 4060:21, 4060:24, 4074:4, 4077:19, 4078:12
**consideration** [5] - 3876:4, 3877:7, 3877:9, 3889:9, 4060:6
**considerations** [3] - 3876:20, 3991:5, 4019:25
**considered** [13] - 3822:19, 3843:14,

3843:15, 3858:16, 3863:19, 3937:5, 3978:20, 4057:22, 4059:21, 4060:12, 4061:6, 4067:23
**considering** [5] - 3861:19, 3910:17, 4007:24, 4026:23, 4059:18
**consist** [1] - 3864:1
**consistent** [14] - 3829:10, 3841:22, 3845:6, 3933:22, 3980:21, 3982:6, 3982:14, 3991:12, 4054:10, 4063:19, 4063:22, 4065:6, 4065:8, 4076:16
**consistently** [2] - 3826:24, 3933:9
**constant** [5] - 3877:4, 3877:5, 3904:9, 3905:6, 3905:8
**constitute** [4] - 3862:22, 3863:24, 3917:11, 3937:4
**constituted** [1] - 4060:22
**constitutes** [2] - 3921:18, 4056:19
**constraint** [1] - 4065:4
**constructing** [1] - 4043:18
**consultant** [2] - 3819:21, 4074:19
**consume** [2] - 3829:18
**Consumer** [2] - 3817:11, 4075:14
**consumer** [41] - 3829:12, 3879:16, 3879:20, 3883:13, 3885:19, 3888:2, 3955:14, 3962:9, 3968:3, 3968:4, 3968:10, 3968:11, 3968:14, 3968:19, 3968:21, 4014:18, 4019:19, 4021:18, 4021:21, 4022:11, 4036:18, 4037:13, 4040:23, 4041:15, 4041:23, 4051:10, 4051:11, 4053:4, 4053:10, 4062:5, 4062:10, 4063:3, 4067:20, 4073:16, 4073:20, 4087:13, 4088:25, 4090:9, 4091:10
**consumer's** [1] - 4053:6
**consumers** [63] - 3821:9, 3829:4, 3829:6, 3829:8, 3829:13, 3844:5, 3885:1, 3899:22, 3900:10, 3933:14, 3999:13, 4004:14, 4004:22, 4014:9, 4016:17, 4022:24, 4024:19, 4028:14, 4030:21, 4031:22, 4032:13, 4033:18, 4040:22, 4040:24, 4041:11, 4041:18, 4047:11, 4049:2, 4049:11, 4050:1, 4050:20, 4051:8, 4051:15, 4051:24, 4053:5, 4053:7, 4053:9, 4063:9, 4063:20, 4065:2, 4073:17, 4073:21, 4074:10, 4074:17, 4076:6, 4076:11, 4085:9, 4085:17, 4085:23, 4086:2, 4086:7, 4087:4, 4087:10, 4088:24, 4089:6, 4090:5, 4090:7, 4090:17, 4090:21, 4091:4, 4092:4
**Cont'd** [1] - 3903:9
**CONT'D** [2] - 3899:1, 4021:1
**context** [13] - 3823:24, 3829:15, 4002:9, 4007:15, 4020:17, 4021:3, 4022:13, 4022:17, 4022:18, 4024:1, 4046:21, 4047:24, 4081:20
**continue** [20] - 3856:7, 3868:14, 3869:3, 3870:5, 3873:18, 3873:20, 3875:25, 3876:9, 3878:3, 3881:8, 3890:16, 3896:7, 3932:1, 3959:2, 4002:11, 4013:10, 4045:2, 4058:4, 4059:3,

4105:20
**Continued** [6] - 3813:11, 3814:15, 3857:23, 3902:7, 3930:14, 3973:23
**continued** [9] - 3898:11, 3931:1, 3931:7, 3932:23, 3935:4, 3987:8, 4020:20, 4058:10, 4059:6
**continues** [3] - 3993:8, 4073:16, 4073:17
**continuing** [1] - 3937:7
**continuous** [1] - 3938:11
**contribution** [6] - 3951:8, 3951:9, 3984:5, 3984:9, 4102:11, 4103:7
**control** [1] - 3938:4
**controlling** [1] - 3863:1
**controls** [1] - 3862:14
**convenience** [1] - 4063:11
**conveniently** [1] - 3883:24
**converged** [1] - 3931:21
**Converging** [1] - 4072:15
**convert** [1] - 3867:13
**converting** [2] - 3939:14, 3939:15
**cooperate** [1] - 3962:11
**coordination** [1] - 4020:12
**copy** [5] - 3837:11, 3880:4, 4080:14, 4108:14, 4108:15
**copying** [1] - 3839:22
**core** [12] - 3875:19, 3875:22, 3876:2, 3880:16, 3881:6, 3901:8, 3901:14, 3901:16, 3974:19, 3975:17, 3975:23, 4051:16
**corner** [1] - 4064:18
**corporate** [12] - 3816:12, 3962:12, 3963:12, 3963:18, 3963:19, 3964:1, 3965:11, 3966:15, 3968:16, 3968:19, 3968:22, 3969:12
**Corporate** [15] - 3963:7, 3963:14, 3963:15, 3963:17, 3963:21, 3963:23, 3963:25, 3964:4, 3964:12, 3964:13, 3964:16, 3964:22, 3965:8, 3966:7, 3966:21
**corporation** [6] - 3964:23, 3965:7, 3965:14, 3965:16, 3965:20, 3965:22
**corporations** [2] - 3963:19, 3965:14
**correct** [137] - 3815:24, 3818:16, 3818:17, 3819:4, 3819:7, 3833:16, 3837:19, 3876:16, 3929:4, 3935:18, 3947:7, 3947:14, 3948:20, 3953:20, 3964:24, 3965:17, 3978:24, 3985:1, 3985:2, 3998:5, 4018:18, 4019:10, 4019:13, 4019:25, 4020:18, 4020:19, 4021:23, 4022:11, 4023:1, 4024:12, 4024:13, 4027:5, 4029:14, 4029:15, 4029:22, 4030:14, 4030:15, 4035:17, 4035:22, 4037:24, 4037:25, 4038:2, 4038:3, 4038:21, 4041:15, 4041:16, 4042:6, 4042:7, 4048:12, 4050:19, 4052:16, 4052:18, 4052:22, 4053:2, 4053:3, 4053:13, 4053:18, 4054:8, 4054:22, 4062:2, 4062:8, 4062:17, 4067:6, 4070:9, 4081:7, 4081:8, 4081:13, 4081:14, 4081:18, 4081:19,

4081:25, 4082:16, 4082:22, 4083:17, 4084:8, 4084:9, 4084:11, 4084:19, 4084:22, 4085:6, 4085:7, 4085:11, 4085:24, 4085:25, 4086:4, 4086:10, 4086:12, 4086:22, 4088:1, 4088:13, 4088:14, 4088:24, 4090:2, 4091:5, 4091:6, 4091:24, 4091:25, 4092:2, 4092:6, 4092:10, 4092:15, 4093:8, 4093:16, 4094:12, 4094:20, 4094:23, 4095:7, 4095:19, 4095:20, 4095:25, 4096:5, 4096:6, 4096:9, 4096:10, 4096:17, 4096:18, 4096:24, 4096:25, 4097:4, 4097:5, 4097:14, 4099:3, 4099:12, 4099:18, 4099:19, 4099:24, 4099:25, 4101:2, 4101:10, 4102:1, 4102:8, 4102:21, 4103:8, 4103:18, 4103:23, 4104:13
**Correct** [1] - 4025:23
**correction** [1] - 4079:6
**correctly** [2] - 3833:14, 4088:6
**correspond** [1] - 4098:13
**cost** [25] - 3831:25, 3834:20, 3839:25, 3840:25, 3866:16, 3870:15, 3900:4, 3933:7, 3942:25, 3943:3, 3958:2, 3961:23, 3974:7, 3983:15, 3983:16, 3984:5, 3989:4, 3990:4, 4013:2, 4065:3, 4077:16, 4081:5, 4093:18, 4098:22, 4103:18
**Costco** [1] - 4000:19
**costly** [5] - 3991:2, 3991:6, 3994:14, 3995:8, 3999:6
**costs** [27] - 3832:2, 3840:17, 3855:2, 3855:10, 3866:7, 3916:8, 3916:9, 3916:16, 3943:20, 3944:1, 3944:8, 3953:8, 3953:10, 3953:15, 3959:14, 3959:15, 3959:18, 3983:7, 3984:18, 3989:23, 3990:8, 4032:13, 4033:16, 4077:18, 4093:12, 4098:5, 4103:22
**counsel** [2] - 3812:4, 4029:25
**countervailing** [1] - 4081:15
**countries** [1] - 3819:14
**country** [3] - 3856:18, 3884:18, 3884:21
**couple** [6] - 3870:25, 3886:16, 3914:20, 3955:3, 4008:16, 4030:12
**coupled** [1] - 3883:20, 3973:2, 4073:19
**course** [17] - 3816:13, 3827:25, 3853:13, 3865:1, 3881:13, 3882:24, 3885:11, 3888:21, 3896:15, 3961:10, 3981:1, 3992:16, 4009:8, 4014:16, 4017:25, 4065:8, 4066:19
**Court** [13] - 3811:2, 3815:17, 3815:25, 3821:6, 3823:16, 3858:1, 3859:18, 3860:24, 3876:11, 3926:11, 3952:21, 3971:17, 4026:22
**court** [5] - 3812:1, 3815:1, 3820:8, 3859:13, 4059:1
**COURT** [176] - 3810:1, 3811:18, 3812:2, 3812:7, 3812:10, 3812:15, 3812:19, 3812:23, 3813:3, 3813:6, 3814:12, 3815:2, 3820:12, 3820:14, 3823:8, 3823:10, 3837:21, 3837:25, 3839:18,

3850:20, 3856:8, 3865:12, 3865:14, 3865:20, 3876:4, 3876:11, 3876:17, 3879:6, 3879:13, 3880:6, 3889:11, 3891:18, 3892:4, 3892:11, 3892:14, 3892:16, 3901:20, 3902:1, 3902:5, 3903:2, 3903:7, 3904:23, 3905:2, 3906:6, 3906:9, 3906:15, 3906:18, 3926:6, 3926:9, 3927:23, 3928:2, 3928:4, 3928:11, 3928:17, 3928:22, 3929:1, 3930:9, 3943:3, 3944:9, 3944:20, 3944:25, 3945:5, 3945:13, 3945:17, 3945:20, 3948:8, 3948:11, 3949:23, 3950:7, 3954:10, 3956:11, 3956:15, 3957:19, 3960:19, 3960:22, 3964:22, 3965:2, 3965:4, 3965:6, 3965:12, 3965:18, 3965:24, 3966:9, 3967:3, 3967:7, 3967:9, 3967:13, 3967:15, 3971:18, 3971:22, 3971:25, 3972:3, 3972:10, 3972:17, 3974:17, 3978:3, 3978:7, 3978:11, 3978:14, 3979:2, 3979:4, 4000:4, 4000:15, 4000:19, 4000:25, 4001:7, 4001:21, 4001:25, 4002:11, 4010:16, 4011:3, 4014:14, 4014:22, 4014:24, 4015:2, 4015:5, 4015:7, 4015:12, 4015:14, 4015:18, 4017:14, 4017:17, 4017:19, 4025:15, 4025:17, 4027:15, 4027:18, 4027:21, 4027:23, 4029:9, 4030:4, 4031:10, 4049:7, 4057:24, 4058:3, 4058:6, 4059:2, 4072:9, 4072:21, 4072:24, 4073:1, 4075:1, 4075:3, 4075:5, 4075:9, 4075:12, 4083:4, 4083:8, 4093:2, 4094:3, 4105:11, 4105:14, 4105:18, 4105:23, 4106:1, 4106:8, 4106:18, 4106:23, 4107:4, 4107:8, 4107:10, 4107:14, 4107:19, 4108:1, 4108:5, 4108:10, 4108:16, 4108:22, 4109:4, 4109:6, 4109:9, 4109:11, 4109:13, 4109:16, 4109:19, 4109:21
**courthouse** [1] - 4107:5
**Courthouse** [1] - 3810:6
**courtroom** [2] - 3813:4, 4017:13
**COURTROOM** [3] - 3812:3, 3815:5, 3815:10
**courts** [3] - 3938:3, 3940:9, 3942:2
**COVE** [1] - 3811:15
**cover** [1] - 4075:19
**coverage** [4] - 3947:22, 3947:24, 3953:2, 3954:12
**covered** [1] - 3928:11
**CRAIG** [1] - 3810:18
**Craig** [1] - 3812:5
**Crate** [1] - 3933:15
**CRAVATH** [1] - 3811:7
**create** [5] - 3851:25, 3852:1, 3879:3, 3944:15, 4028:4
**created** [1] - 4074:18
**creates** [4] - 3877:12, 3877:20, 3959:12, 4091:17
**creating** [1] - 4013:13

**credential** [2] - 3999:8, 4000:4
**credentialing** [10] - 3998:7, 3998:9, 3998:21, 3999:2, 3999:15, 4000:10, 4003:2, 4003:11, 4003:12, 4004:8
**credentially** [1] - 4004:3
**credit** [351] - 3819:18, 3819:24, 3821:14, 3821:22, 3826:13, 3826:14, 3826:16, 3827:3, 3827:15, 3828:2, 3829:22, 3830:4, 3830:22, 3831:4, 3831:10, 3831:23, 3832:20, 3834:8, 3834:19, 3834:20, 3840:14, 3840:22, 3842:10, 3842:12, 3842:16, 3843:20, 3852:14, 3855:3, 3855:8, 3855:24, 3856:13, 3856:25, 3857:2, 3858:17, 3858:20, 3863:13, 3863:17, 3863:19, 3863:23, 3863:25, 3864:4, 3864:5, 3864:18, 3864:22, 3865:23, 3866:13, 3866:19, 3866:22, 3867:3, 3867:14, 3867:24, 3868:1, 3868:10, 3868:12, 3868:13, 3868:18, 3868:20, 3869:6, 3869:11, 3869:13, 3869:22, 3870:2, 3870:4, 3871:9, 3871:15, 3871:22, 3872:4, 3872:16, 3872:17, 3873:20, 3874:5, 3874:7, 3874:11, 3874:19, 3874:25, 3875:3, 3875:7, 3875:20, 3875:23, 3875:25, 3876:21, 3877:14, 3877:23, 3878:2, 3878:7, 3878:11, 3878:16, 3878:20, 3880:9, 3880:15, 3880:17, 3881:24, 3882:10, 3882:15, 3882:18, 3882:22, 3883:1, 3883:3, 3883:4, 3883:6, 3884:1, 3884:10, 3884:11, 3884:12, 3884:13, 3884:14, 3884:15, 3885:9, 3885:12, 3886:8, 3887:8, 3887:11, 3889:4, 3889:20, 3890:5, 3890:11, 3890:15, 3890:18, 3890:21, 3890:22, 3891:2, 3891:4, 3891:6, 3891:10, 3891:13, 3891:15, 3891:16, 3891:20, 3891:24, 3892:3, 3892:17, 3892:20, 3892:25, 3893:5, 3893:15, 3893:19, 3894:1, 3894:4, 3894:14, 3894:16, 3894:17, 3894:18, 3894:19, 3894:21, 3894:23, 3894:24, 3895:12, 3895:13, 3895:15, 3896:3, 3896:4, 3896:7, 3896:18, 3898:3, 3898:6, 3899:13, 3899:25, 3900:6, 3900:10, 3901:3, 3901:17, 3903:23, 3905:5, 3905:17, 3906:2, 3906:3, 3907:19, 3909:18, 3910:24, 3912:17, 3914:24, 3917:9, 3917:10, 3918:3, 3918:12, 3918:16, 3921:17, 3922:1, 3924:21, 3925:10, 3925:12, 3925:13, 3925:15, 3925:19, 3926:1, 3929:10, 3929:24, 3929:25, 3930:2, 3931:4, 3931:5, 3931:7, 3933:10, 3933:13, 3933:23, 3933:24, 3934:6, 3934:15, 3934:17, 3934:24, 3935:1, 3935:4, 3935:25, 3936:2, 3936:4, 3936:16, 3937:1, 3937:3, 3938:24, 3939:7, 3941:12, 3942:11, 3942:17, 3943:8, 3943:9, 3943:15, 3943:18, 3944:23, 3945:8, 3945:20, 3945:24, 3953:11, 3956:23, 3958:3, 3958:4, 3959:8,

3959:18, 3961:24, 3962:1, 3962:2, 3971:15, 3973:9, 3975:14, 3979:7, 3993:19, 3993:20, 4012:21, 4012:23, 4016:13, 4021:10, 4041:22, 4047:8, 4047:11, 4047:12, 4048:20, 4050:15, 4050:17, 4050:22, 4050:23, 4050:25, 4051:13, 4052:5, 4052:12, 4052:18, 4052:21, 4052:25, 4053:7, 4053:11, 4055:6, 4055:7, 4055:9, 4056:6, 4056:15, 4057:16, 4057:19, 4059:8, 4059:12, 4059:17, 4059:19, 4060:15, 4061:7, 4061:10, 4061:14, 4061:16, 4061:20, 4062:2, 4063:11, 4064:24, 4065:1, 4065:3, 4065:4, 4065:5, 4065:11, 4065:12, 4065:18, 4065:21, 4066:1, 4066:13, 4067:22, 4068:13, 4070:2, 4070:4, 4071:7, 4071:20, 4073:18, 4074:14, 4076:6, 4076:8, 4077:8, 4077:16, 4077:17, 4078:7, 4078:14, 4078:19, 4079:12, 4079:14, 4079:25, 4080:7, 4081:7, 4081:10, 4081:13, 4081:18, 4081:22, 4084:20, 4085:24, 4086:3, 4086:7, 4086:15, 4086:16, 4086:18, 4086:19, 4086:20, 4086:21, 4086:24, 4087:4, 4087:5, 4087:11, 4087:16, 4087:21, 4088:10, 4088:11, 4088:12, 4088:17, 4088:21, 4089:9, 4090:7, 4090:8, 4090:9, 4090:19, 4091:9, 4092:9, 4096:9
**Credit** [2] - 4064:3, 4100:17
**credit's** [2] - 4071:3, 4072:1
**crew** [1] - 3873:9
**critical** [7] - 3875:15, 3875:18, 3916:21, 3924:15, 4010:2, 4037:15, 4109:11
**criticism** [1] - 3915:22
**criticized** [1] - 4042:16
**cross** [6] - 3978:7, 4014:14, 4017:25, 4105:19, 4106:5, 4107:24
**CROSS** [4] - 4015:21, 4021:1, 4059:6, 4110:7
**cross-examination** [3] - 4014:14, 4017:25, 4106:5
**CROSS-EXAMINATION** [3] - 4015:21, 4059:6, 4110:7
**CSR** [1] - 3811:18
**cumulative** [1] - 3987:3
**curb** [1] - 4105:16
**current** [2] - 3816:4, 4087:17
**curriculum** [1] - 3815:23
**customer** [31] - 3828:1, 3828:5, 3828:7, 3831:11, 3831:14, 3831:18, 3831:21, 3832:7, 3832:15, 3832:19, 3833:3, 3840:19, 3842:17, 3843:6, 3852:24, 3882:1, 3886:5, 3887:1, 3887:14, 3901:2, 3954:17, 3966:2, 3975:3, 3998:3, 3998:17, 3999:21, 4000:11, 4008:9, 4020:12
**customer's** [7] - 3829:22, 3831:15, 3831:22, 3875:16, 3875:17, 3881:22, 3997:20
**customers** [80] - 3821:10, 3821:22,

3822:9, 3827:17, 3829:2, 3829:6, 3829:10, 3830:1, 3830:5, 3830:6, 3830:7, 3830:11, 3831:7, 3834:14, 3834:19, 3834:23, 3835:18, 3838:16, 3839:3, 3840:10, 3840:17, 3840:20, 3844:9, 3852:21, 3854:23, 3855:7, 3855:12, 3855:19, 3864:25, 3865:24, 3867:14, 3868:2, 3868:17, 3869:6, 3876:2, 3876:19, 3877:19, 3880:8, 3880:10, 3880:19, 3880:23, 3881:1, 3881:5, 3881:14, 3884:7, 3886:1, 3886:24, 3890:20, 3891:1, 3903:16, 3909:14, 3909:15, 3918:19, 3926:2, 3956:10, 3962:21, 3963:4, 3974:19, 3993:18, 3993:20, 3995:13, 3996:2, 3999:10, 4008:8, 4012:5, 4013:5, 4013:17, 4014:10, 4022:14, 4084:6, 4089:17, 4093:11, 4093:13
**customers'** [4] - 3874:10, 4012:18, 4012:19, 4012:25
**cut** [1] - 4092:25
**cutting** [2] - 3929:13, 4080:18
**CV** [3] - 3817:5, 3818:14, 4014:24

# D

**D.C** [1] - 3810:18
**damaged** [1] - 4083:6
**dampening** [1] - 3822:3
**danger** [1] - 4010:7
**dark** [1] - 4026:1
**Dartmouth** [1] - 4063:23
**dash** [1] - 3883:17
**dashed** [4] - 3927:17, 3960:10, 3960:12, 3968:25
**data** [64] - 3832:18, 3853:16, 3861:23, 3862:1, 3888:16, 3892:10, 3892:15, 3893:8, 3893:12, 3893:14, 3894:25, 3895:18, 3895:20, 3899:4, 3910:15, 3920:21, 3921:5, 3926:21, 3926:22, 3926:25, 3927:8, 3927:10, 3930:11, 3930:12, 3930:13, 3936:14, 3952:1, 3968:8, 3981:20, 3981:21, 3983:5, 4023:10, 4023:12, 4063:19, 4064:24, 4065:1, 4067:15, 4067:20, 4071:20, 4076:13, 4082:14, 4082:15, 4082:21, 4082:22, 4082:25, 4083:1, 4083:2, 4083:13, 4083:14, 4083:16, 4083:17, 4084:10, 4084:16, 4086:14, 4089:21, 4089:25, 4090:2, 4091:3, 4102:20, 4104:24, 4105:6, 4108:13
**Data** [27] - 3828:9, 3830:20, 4029:17, 4030:14, 4031:14, 4031:20, 4033:5, 4035:7, 4036:15, 4042:12, 4042:15, 4042:20, 4043:5, 4045:9, 4046:10, 4046:17, 4047:19, 4047:21, 4048:12, 4068:9, 4068:20, 4068:25, 4069:7, 4070:5, 4070:13, 4070:21, 4074:6
**Data's** [1] - 4033:10
**database** [8] - 4102:20, 4102:22, 4103:6, 4103:10, 4103:16, 4103:18,

4103:22, 4105:8
**date** [5] - 3892:7, 3927:17, 3929:2, 3944:24, 4062:19
**dates** [3] - 3894:25, 3895:20, 4066:2
**day-to-day** [1] - 3889:4
**days** [3] - 3839:21, 3878:18, 4030:12
**deal** [20] - 3828:1, 3828:2, 3838:18, 3839:2, 3877:17, 3879:19, 3933:24, 3934:6, 3943:14, 3944:2, 3948:4, 3949:19, 3949:20, 3949:24, 3949:25, 3950:1, 3953:7, 3967:15, 3980:8, 3989:1
**dealing** [8] - 3904:3, 3915:3, 3915:18, 3943:25, 3946:7, 3949:16, 3970:22, 3974:2
**deals** [1] - 3849:18
**debit** [188] - 3819:19, 3831:10, 3855:23, 3856:13, 3857:3, 3866:7, 3866:9, 3866:14, 3866:15, 3866:20, 3866:23, 3867:2, 3867:9, 3867:10, 3867:14, 3878:8, 3881:23, 3881:25, 3882:1, 3882:13, 3882:21, 3883:17, 3883:20, 3883:21, 3883:22, 3884:4, 3884:5, 3885:9, 3885:12, 3886:7, 3887:6, 3887:9, 3888:24, 3888:25, 3889:20, 3890:5, 3890:12, 3890:19, 3890:21, 3891:2, 3891:4, 3891:11, 3891:14, 3891:15, 3891:21, 3891:23, 3892:3, 3892:18, 3892:20, 3892:25, 3893:4, 3893:6, 3893:19, 3893:22, 3894:2, 3894:4, 3894:9, 3894:21, 3895:11, 3895:14, 3919:10, 3925:8, 3925:11, 3925:24, 3925:25, 3926:2, 3926:12, 3927:6, 3927:11, 3927:12, 3929:5, 3929:10, 3929:11, 3929:14, 3929:19, 3929:21, 3929:23, 3930:1, 3931:4, 3933:23, 3934:16, 3934:24, 3935:1, 3935:12, 3935:15, 3936:25, 3962:1, 4012:22, 4029:20, 4030:13, 4030:20, 4031:21, 4032:4, 4032:11, 4033:11, 4033:14, 4033:16, 4033:24, 4033:25, 4034:1, 4034:7, 4034:10, 4034:23, 4035:3, 4035:12, 4035:13, 4036:2, 4036:4, 4041:3, 4050:18, 4056:4, 4059:18, 4062:24, 4063:12, 4064:22, 4065:1, 4065:20, 4065:25, 4066:12, 4067:21, 4068:3, 4068:12, 4068:16, 4068:17, 4069:23, 4070:7, 4070:8, 4071:3, 4071:7, 4071:21, 4072:1, 4073:16, 4073:19, 4073:20, 4073:21, 4073:22, 4074:14, 4076:1, 4076:4, 4076:7, 4076:12, 4077:5, 4077:7, 4077:17, 4077:21, 4078:1, 4078:4, 4078:7, 4078:8, 4078:10, 4078:19, 4079:13, 4079:24, 4080:6, 4081:5, 4081:7, 4081:11, 4081:17, 4081:22, 4081:23, 4084:20, 4085:6, 4085:10, 4085:18, 4086:19, 4086:21, 4087:5, 4087:12, 4087:15, 4087:16, 4087:22, 4088:1, 4088:10, 4088:12, 4088:17, 4089:9, 4090:9, 4090:20, 4091:9, 4092:9
**Debit** [2] - 4064:3, 4073:12
**debit-centric** [1] - 4073:20
**debit/credit** [1] - 4084:7
**debits** [1] - 3885:15
**debt** [1] - 4065:3
**decal** [1] - 3998:16
**December** [1] - 4067:24
**decide** [7] - 3894:24, 3896:6, 3924:20, 4005:2, 4046:7, 4053:10, 4059:8
**decided** [2] - 4059:19, 4097:11
**decides** [1] - 3831:9
**deciding** [2] - 3834:14, 3860:16
**decimal** [1] - 3915:19
**decision** [34] - 3831:18, 3831:23, 3834:17, 3864:24, 3868:8, 3869:13, 3871:17, 3875:10, 3875:16, 3875:17, 3875:19, 3887:12, 3897:17, 3900:5, 3901:3, 3901:13, 3948:8, 3949:12, 3950:3, 3950:9, 3950:12, 3952:8, 3969:17, 3975:1, 3975:14, 3975:20, 3991:7, 3996:19, 4007:16, 4060:4, 4062:15, 4083:9, 4084:23
**decisions** [4] - 3818:24, 3885:2, 3948:7, 4066:24
**deck** [2] - 3822:24, 3823:13
**declines** [2] - 4071:4, 4072:2
**decrease** [3] - 3926:24, 3931:3, 4080:6
**decreased** [2] - 4079:14, 4079:25, 4081:23
**decreases** [1] - 3926:17
**deducted** [1] - 4096:20
**deeply** [1] - 4027:19
**def** [1] - 4065:15
**defeat** [4] - 3913:25, 3936:16, 3942:9, 3942:13
**DEFENDANT** [1] - 3811:7
**Defendant's** [21] - 4025:10, 4025:20, 4029:11, 4031:1, 4032:22, 4035:16, 4042:20, 4063:6, 4064:8, 4067:1, 4067:7, 4071:9, 4072:11, 4074:24, 4075:8, 4076:22, 4083:19, 4089:11, 4093:22, 4100:2, 4102:24
**Defendants** [1] - 3810:11
**defendants** [1] - 4030:6
**Defendants'** [2] - 4018:20, 4019:4
**defense** [3] - 4025:17, 4072:9, 4075:5
**deferential** [2] - 3868:24, 3872:14
**deferentials** [1] - 3875:5
**deferred** [1] - 4059:23
**define** [12] - 3858:4, 3858:11, 3859:8, 3911:20, 3991:20, 4042:5, 4046:1, 4047:20, 4048:3, 4054:12, 4056:4, 4056:6
**defined** [8] - 3858:6, 3858:24, 4037:23, 4050:11, 4052:22, 4094:23, 4096:9, 4099:7
**defining** [15] - 3906:23, 3910:9, 3911:2, 3911:6, 3937:8, 4022:3, 4041:5, 4041:14, 4042:9, 4048:25, 4049:22, 4054:24, 4057:1, 4093:7
**definition** [38] - 3868:22, 3880:13,

3880:16, 3884:23, 3899:3, 3899:19, 3906:22, 3907:1, 3911:11, 3916:21, 3925:5, 3937:19, 3938:1, 3938:3, 4018:16, 4019:12, 4028:21, 4028:22, 4036:7, 4039:3, 4041:2, 4042:2, 4042:16, 4044:3, 4044:17, 4045:11, 4054:21, 4057:5, 4060:10, 4062:6, 4065:16, 4074:3, 4074:20, 4076:14, 4077:12, 4094:11, 4098:8, 4098:25
**definitions** [1] - 4076:17
**degraded** [1] - 3845:4
**degree** [17] - 3816:23, 3876:12, 3893:15, 3914:16, 3929:10, 3939:2, 3940:16, 3947:24, 3983:22, 4006:9, 4011:8, 4045:18, 4045:23, 4051:3, 4065:18, 4073:23, 4087:11
**degrees** [2] - 3860:7, 3894:6
**Delta** [2] - 3986:8, 3986:11
**demand** [18] - 3846:5, 3846:6, 3848:16, 3854:13, 3864:12, 3864:13, 3864:14, 3949:22, 3975:25, 3977:20, 4039:22, 4040:17, 4041:10, 4041:22, 4041:23, 4051:9, 4051:10, 4053:7
**demands** [3] - 4036:4, 4041:10, 4051:10
**demise** [1] - 3883:20
**demonstrate** [1] - 4038:19
**demonstrative** [11] - 4015:4, 4015:8, 4063:7, 4083:21, 4084:11, 4084:14, 4084:19, 4084:22, 4094:3, 4096:11, 4108:12
**demonstratives** [1] - 4093:21
**denominator** [1] - 4087:22
**DEPARTMENT** [1] - 3810:17
**Department** [6] - 3819:2, 3820:18, 3859:15, 4009:25, 4010:4, 4108:14
**department** [2] - 3821:1, 4092:18
**depicted** [1] - 4063:14
**deposit** [2] - 3882:17, 3882:23
**deposition** [11] - 3948:23, 3951:9, 3987:17, 4017:22, 4018:1, 4042:20, 4043:4, 4046:16, 4061:14, 4077:22
**Depot** [1] - 4108:13
**depress** [1] - 3913:5
**deputy** [2] - 3819:1, 3819:8
**DEPUTY** [3] - 3812:3, 3815:5, 3815:10
**derive** [1] - 4051:9
**derived** [3] - 3973:4, 4097:4, 4097:6
**describe** [10] - 3816:1, 3817:12, 3823:20, 3830:10, 3830:12, 3840:4, 3914:22, 3939:6, 3939:8, 4095:10
**described** [8] - 3842:20, 3915:12, 3922:6, 3951:10, 3995:17, 4059:17, 4062:4, 4094:9
**describes** [1] - 3857:17
**describing** [3] - 3839:6, 3948:22, 3948:24
**description** [1] - 3948:23
**designated** [2] - 3820:14, 4071:11
**desirable** [1] - 3883:5
**despite** [2] - 3883:5, 3932:20
**detail** [4] - 3836:1, 3903:22, 3938:21,

3988:25

**detailed** [2] - 3852:3, 3885:20
**details** [2] - 3823:22, 3969:1
**deter** [1] - 3872:4
**determination** [1] - 4095:22
**determine** [12] - 3862:7, 3875:6, 4023:8, 4027:14, 4041:6, 4049:22, 4054:19, 4060:18, 4086:14, 4088:11, 4101:14, 4103:4
**determined** [3] - 3848:4, 3870:3, 4060:24
**determines** [3] - 3864:6, 3874:6, 3983:5
**determining** [2] - 4057:11, 4093:15
**detriment** [1] - 4033:18
**developed** [1] - 4038:5
**developments** [1] - 3817:19
**device** [3] - 3945:6, 3945:16, 3946:2
**devices** [1] - 3944:12
**diagram** [9] - 3827:18, 3829:5, 3832:13, 3837:12, 3857:17, 3959:11, 3966:2, 4019:18, 4019:24
**diagrams** [1] - 3830:19
**die** [1] - 3977:6
**differ** [3] - 3832:6, 3882:25, 3885:23
**difference** [19] - 3833:1, 3833:13, 3882:10, 3890:5, 3890:7, 3909:12, 3923:7, 3924:10, 3951:15, 3979:23, 3982:25, 3983:1, 4003:6, 4095:23, 4096:2, 4097:13, 4099:21, 4103:25
**differences** [24] - 3881:20, 3882:9, 3885:24, 3909:6, 3909:16, 3920:20, 3920:22, 3923:17, 3931:17, 3943:16, 3953:9, 3954:3, 3954:5, 3983:13, 3983:15, 3983:16, 3983:17, 3984:4, 3984:16, 4045:25, 4046:9, 4093:12, 4103:4
**different** [121] - 3822:19, 3824:23, 3825:16, 3828:18, 3828:25, 3832:14, 3835:5, 3839:12, 3847:13, 3847:14, 3855:15, 3857:3, 3860:4, 3861:8, 3861:23, 3865:14, 3870:6, 3870:7, 3875:13, 3877:12, 3878:25, 3879:15, 3879:16, 3881:4, 3881:11, 3881:12, 3881:24, 3882:24, 3883:2, 3883:14, 3885:14, 3886:1, 3886:10, 3888:7, 3888:12, 3889:25, 3893:5, 3899:6, 3900:13, 3904:16, 3907:20, 3907:21, 3908:3, 3908:4, 3908:10, 3908:11, 3908:13, 3909:4, 3909:15, 3910:6, 3910:7, 3910:16, 3911:16, 3918:19, 3923:3, 3924:7, 3924:13, 3927:1, 3933:18, 3934:3, 3934:23, 3935:16, 3937:1, 3939:16, 3939:21, 3940:14, 3941:7, 3941:9, 3955:24, 3968:7, 3968:10, 3968:15, 3969:16, 3972:8, 3975:23, 3979:17, 3979:19, 3979:20, 3980:9, 3980:10, 3983:7, 3987:4, 3990:18, 3992:23, 3994:19, 3999:22, 4001:24, 4002:18, 4007:13, 4008:16, 4014:19, 4016:9, 4016:11, 4017:8, 4039:16, 4040:19, 4040:25, 4042:1,

4046:2, 4052:12, 4070:13, 4070:17, 4071:7, 4080:9, 4080:10, 4082:10, 4087:4, 4087:5, 4089:22, 4090:1, 4092:16, 4093:11, 4098:21, 4103:4, 4103:19, 4105:10
**differential** [6] - 3871:6, 3872:21, 3873:1, 3958:10, 4007:16, 4029:1
**differentials** [1] - 3871:20
**differentiate** [1] - 4012:13
**differentiated** [9] - 4012:1, 4013:13, 4044:15, 4045:9, 4045:16, 4045:17, 4045:20, 4045:22, 4046:3
**differentiating** [2] - 4014:1
**differentiation** [5] - 3856:12, 3881:10, 3928:17, 4046:6, 4057:22
**differently** [3] - 3866:11, 3887:3, 3891:6, 3910:7, 3911:25, 3918:20, 3928:13, 3928:15
**difficult** [7] - 3840:18, 3848:19, 3877:21, 3942:18, 3942:20, 3990:22, 4006:7
**difficulties** [1] - 4048:7
**digits** [1] - 3843:9
**dime** [1] - 3891:21
**dimensions** [7] - 3877:12, 3881:3, 3881:6, 3881:10, 3881:12, 3883:2, 3938:25
**diminishing** [1] - 4040:17
**Diner's** [1] - 4002:15
**dip** [2] - 3827:10, 3884:10
**dipped** [1] - 3840:4
**direct** [15] - 3824:17, 3825:25, 3826:2, 3936:18, 3978:5, 3997:2, 4029:12, 4038:18, 4067:4, 4067:8, 4069:6, 4076:7, 4082:12, 4109:1, 4109:7
**DIRECT** [6] - 3815:14, 3899:1, 3903:9, 3931:1, 3978:17, 4110:6
**direction** [1] - 3927:9
**directly** [8] - 3828:1, 3949:17, 3992:7, 3995:20, 3995:21, 3996:8, 3996:9, 3996:12
**Disadvantage** [1] - 4073:12
**disadvantage** [1] - 3882:2
**disadvantaging** [1] - 4073:25
**disaggregating** [1] - 3983:5
**disagree** [2] - 4065:7, 4095:11
**disagreement** [4] - 3853:19, 3889:21, 3907:8, 3907:10
**discipline** [1] - 3887:10
**discount** [50] - 3833:13, 3833:21, 3837:20, 3846:6, 3853:4, 3853:20, 3866:10, 3866:14, 3866:15, 3867:2, 3867:11, 3909:2, 3909:4, 3909:10, 3918:10, 3919:25, 3920:5, 3920:7, 3920:11, 3920:17, 3920:20, 3920:22, 3921:11, 3924:6, 3924:7, 3924:8, 3924:9, 3946:4, 3973:14, 3979:11, 3979:24, 3982:21, 3986:4, 3986:10, 3986:23, 3986:25, 3997:24, 3998:2, 4039:10, 4095:13, 4095:21, 4096:3, 4096:20, 4097:3, 4099:12, 4102:1,

4102:5, 4103:5
**discounting** [10] - 3855:14, 3866:2, 3866:4, 3867:4, 3867:5, 3867:6, 3867:17, 3874:22, 4013:21
**discounts** [10] - 3843:14, 3865:6, 3865:8, 3865:9, 3866:17, 3866:20, 3867:8, 3941:5, 4097:25, 4098:19
**Discover** [57] - 3820:5, 3822:6, 3822:10, 3822:11, 3827:5, 3836:9, 3836:10, 3837:3, 3838:5, 3838:16, 3839:1, 3839:3, 3839:10, 3840:3, 3840:11, 3840:13, 3841:13, 3841:15, 3841:17, 3841:20, 3851:20, 3864:3, 3903:24, 3931:19, 3931:21, 3932:4, 3932:6, 3932:11, 3932:13, 3934:9, 3939:11, 3942:19, 3943:22, 3944:3, 3946:22, 3947:25, 3953:17, 3953:21, 3953:24, 3954:3, 3992:19, 3993:7, 3993:8, 4000:12, 4002:15, 4007:7, 4007:10, 4010:4, 4053:17, 4056:15, 4066:5, 4076:20, 4076:24, 4077:13
**Discover's** [4] - 3835:15, 3838:16, 3840:24, 3954:4
**discovery** [1] - 3981:22
**discriminate** [1] - 4099:7
**discrimination** [23] - 3907:12, 3907:17, 3909:13, 3910:11, 3911:7, 3911:13, 3982:17, 3983:19, 3983:21, 3983:22, 3984:3, 3984:19, 3991:12, 4039:18, 4040:8, 4093:7, 4093:10, 4093:16, 4096:15, 4097:14, 4098:24, 4099:5, 4103:6
**discriminatory** [1] - 3907:23
**discuss** [1] - 3815:24
**discussed** [6] - 3879:14, 3982:13, 3989:7, 4043:8, 4048:25, 4094:14
**discussing** [4] - 3826:4, 3981:1, 3985:5, 4025:18
**discussion** [3] - 4041:3, 4048:18, 4049:6
**display** [1] - 3838:14
**displays** [2] - 4002:20, 4013:20
**dispute** [3] - 3853:17, 3859:5, 4025:2
**dissertation** [1] - 4100:8
**distinct** [1] - 3910:12
**distinction** [5] - 3856:15, 3867:4, 4032:5, 4065:9, 4065:11
**distinguish** [3] - 3856:20, 3907:7, 4047:10
**distinguishing** [4] - 3887:13, 3947:24, 4033:24, 4047:9
**distracted** [1] - 4034:17
**distribution** [1] - 4084:6
**district** [1] - 3820:8
**DISTRICT** [3] - 3810:1, 3810:1, 3810:14
**diverge** [3] - 4104:5, 4104:15, 4105:3
**divided** [2] - 3824:7, 4098:22
**Division** [1] - 3819:2
**DIVISION** [1] - 3810:16
**doctoral** [1] - 4100:8
**document** [27] - 3837:21, 3847:16,

3847:18, 3849:3, 3849:11, 3849:13, 3849:14, 3947:12, 3957:22, 3957:24, 3961:18, 3962:17, 3964:2, 3988:9, 3988:16, 4032:21, 4033:3, 4062:23, 4067:7, 4069:1, 4071:18, 4072:19, 4077:11, 4077:13, 4077:14, 4080:25, 4102:25

**document's** [1] - 3849:25
**documents** [25] - 3847:13, 3867:3, 3957:15, 4017:24, 4061:11, 4061:13, 4062:1, 4066:18, 4066:22, 4066:24, 4068:5, 4068:11, 4068:25, 4069:3, 4069:5, 4069:8, 4069:15, 4069:16, 4070:12, 4070:18, 4070:21, 4074:4, 4074:21, 4074:22, 4078:18
**dog** [1] - 3964:20
**dollar** [3] - 3868:19, 3955:20, 4099:24
**dollars** [13] - 3832:20, 3832:25, 3870:2, 3870:5, 3886:17, 3889:6, 3890:4, 3905:13, 3928:21, 3939:13, 4098:4, 4098:12
**Donald** [1] - 3812:13
**DONALD** [1] - 3811:14
**done** [31] - 3858:5, 3863:14, 3869:22, 3896:10, 3896:18, 3897:6, 3916:5, 3920:12, 3944:13, 3960:1, 3968:13, 3977:9, 3979:9, 3986:21, 3993:13, 3999:5, 4002:4, 4004:25, 4005:15, 4047:14, 4047:25, 4054:24, 4055:10, 4055:15, 4063:2, 4072:13, 4074:5, 4079:18, 4091:4, 4092:4, 4092:6
**door** [1] - 3943:4
**dotted** [3] - 3931:13, 3968:12, 4019:21
**double** [1] - 3843:9
**doubt** [1] - 4066:9
**down** [24] - 3836:5, 3850:17, 3854:8, 3864:12, 3885:17, 3913:11, 3913:17, 3928:9, 3929:21, 3929:23, 3934:16, 3950:2, 3958:22, 3967:24, 3979:10, 3983:8, 3986:11, 3990:8, 3995:19, 4046:18, 4058:8, 4067:25, 4098:20, 4101:6
**downward** [9] - 3846:13, 3994:5, 3994:6, 4005:13, 4005:22, 4006:15, 4007:19, 4007:21, 4008:11
**Dr** [7] - 4046:20, 4063:8, 4063:22, 4090:17, 4091:8, 4091:16, 4092:1
**dramatic** [2] - 3930:7, 3939:20
**dramatically** [4] - 3888:22, 3925:9, 4062:24, 4077:6
**draw** [8] - 3844:20, 3861:15, 3948:18, 4024:21, 4037:15, 4044:19, 4046:7, 4100:22
**drawing** [2] - 3889:22, 4070:16
**draws** [1] - 4036:6
**drew** [1] - 4024:23
**driven** [4] - 3874:9, 3959:15, 4007:9, 4041:23
**driver** [1] - 3871:16
**drives** [1] - 4053:7
**driving** [3] - 3831:22, 3895:20, 4024:17

**drop** [30] - 3853:13, 3868:1, 3869:22, 3880:14, 3889:2, 3896:3, 3924:20, 3924:23, 3927:18, 3930:1, 3931:4, 3931:8, 3933:6, 3933:21, 3935:15, 3936:2, 3949:1, 3951:13, 3951:15, 3951:16, 3951:21, 3975:15, 3991:7, 4011:13, 4048:20, 4051:13, 4056:12, 4078:7
**dropped** [2] - 3850:6, 3927:18, 3988:1
**dropping** [4] - 3871:15, 3872:4, 3901:12, 3931:5
**drops** [3] - 3874:5, 3885:12, 3898:1
**drug** [3] - 3977:4, 3977:6, 3977:11
**drugstore** [3] - 3892:21, 3893:16, 3894:1
**drugstores** [2] - 3892:19, 3893:3
**duality** [1] - 3820:6
**due** [2] - 3925:7, 4083:18
**duly** [1] - 3815:8
**Durbin** [26] - 3865:8, 3865:9, 3866:2, 3866:12, 3919:11, 3921:21, 3923:19, 3925:2, 3925:4, 3925:8, 3926:12, 3927:17, 3928:6, 3929:18, 3931:7, 3931:13, 3931:25, 3933:5, 3934:16, 3934:18, 3936:18, 4079:9, 4079:13, 4079:23, 4081:2, 4082:3
**during** [16] - 3820:7, 4011:12, 4017:25, 4020:3, 4085:10, 4085:18, 4085:24, 4086:3, 4087:12, 4088:13, 4088:17, 4089:1, 4090:10, 4090:22, 4092:5, 4108:11
**DX** [1] - 4029:9
**DX-6540** [1] - 4080:11
**DX-7183** [1] - 4068:20
**dynamic** [1] - 3879:24

**E**

**e.g** [1] - 3918:8
**early** [3] - 4001:7, 4005:18, 4029:12
**earn** [2] - 4028:6, 4100:24
**earned** [1] - 4098:10
**earning** [3] - 3870:14, 4095:4, 4102:3
**earns** [1] - 4103:11
**easier** [5] - 3815:24, 3931:17, 3944:6, 3946:9, 3948:4
**easily** [1] - 3901:5
**East** [1] - 3811:19
**EASTERN** [1] - 3810:1
**easy** [1] - 3942:9
**eat** [1] - 3967:1
**economic** [33] - 3818:11, 3818:21, 3819:11, 3823:21, 3829:13, 3841:22, 3845:6, 3845:7, 3852:25, 3853:18, 3853:25, 3854:10, 3859:19, 3887:7, 3889:22, 3896:5, 3897:13, 3901:11, 3933:3, 3961:14, 3992:11, 4009:3, 4034:3, 4037:9, 4051:9, 4076:8, 4101:1, 4104:1, 4104:5, 4104:16, 4104:17, 4104:22, 4104:25
**economically** [6] - 3840:16, 3855:11, 3871:22, 3875:24, 4012:10, 4043:22

**economics** [18] - 3816:7, 3816:13, 3816:20, 3817:2, 3818:23, 3819:2, 3819:9, 3820:11, 3820:15, 3938:9, 3940:9, 3952:11, 3976:18, 3976:23, 4009:19, 4021:11, 4025:4, 4028:22
**economist** [7] - 3818:14, 3818:18, 3877:7, 3995:7, 4006:18, 4063:23, 4105:3
**economist's** [2] - 4044:16, 4045:10
**economists** [15] - 3819:11, 3859:8, 3862:17, 3900:25, 3904:13, 3905:17, 3937:18, 3938:2, 3938:8, 3939:17, 3942:14, 4046:5, 4056:17, 4056:21, 4104:8
**economy** [1] - 3885:13
**edge** [1] - 3936:4
**educate** [1] - 3956:10
**educated** [1] - 3876:25
**educating** [1] - 3880:10
**education** [4] - 3876:22, 3876:24, 3880:7, 3887:3
**effect** [32] - 3824:11, 3824:12, 3829:17, 3829:25, 3835:7, 3835:10, 3840:10, 3841:5, 3841:9, 3844:4, 3845:2, 3851:5, 3856:2, 3856:3, 3856:4, 3856:7, 3856:24, 3857:14, 3904:18, 3913:3, 3913:4, 3919:10, 3926:15, 3931:14, 3954:16, 3998:9, 3998:10, 4005:21, 4024:9, 4028:17, 4030:3
**effective** [8] - 3851:25, 3866:17, 3866:23, 3867:6, 4003:12, 4005:25, 4011:12
**effectively** [1] - 4078:22
**effects** [57] - 3818:1, 3822:15, 3822:18, 3824:3, 3824:6, 3824:13, 3825:2, 3825:21, 3829:14, 3829:15, 3835:5, 3835:10, 3843:5, 3843:7, 3845:21, 3854:5, 3855:9, 3857:13, 3857:19, 3858:8, 3860:22, 3861:19, 3904:10, 3923:8, 3942:22, 3986:22, 3991:22, 3992:15, 3998:7, 4000:5, 4004:8, 4005:18, 4006:5, 4006:8, 4006:11, 4006:13, 4006:14, 4006:18, 4006:19, 4006:22, 4007:9, 4007:18, 4010:23, 4011:2, 4011:6, 4018:17, 4019:24, 4020:2, 4020:8, 4020:10, 4028:4, 4030:21, 4031:22, 4036:8, 4079:9, 4079:23, 4082:3
**efficiency** [1] - 4021:5
**efficient** [4] - 4017:17, 4018:24, 4020:17, 4021:11
**effort** [4] - 3874:1, 3932:13, 3932:16, 4074:3
**efforts** [2] - 3995:5, 4006:25
**EFS** [2] - 4030:14, 4033:6
**egg** [1] - 3942:21
**eight** [1] - 4091:14
**Eighth** [1] - 3811:8
**either** [12] - 3812:17, 3823:25, 3842:18, 3875:10, 3879:21, 3894:14, 3901:3, 3906:1, 3911:18, 3922:5, 3926:3,

3928:15, 3954:18, 3975:14, 3998:15, 4019:21, 4022:13, 4036:17, 4037:11, 4086:8

**electronic** [5] - 3877:3, 3878:22, 3884:3, 3889:11, 3889:14

**element** [6] - 3850:2, 3979:5, 3980:21, 3982:11, 3984:24, 4093:18

**elements** [4] - 3879:20, 3978:21, 3983:8, 4040:10

**elevated** [1] - 3985:14

**eligible** [1] - 3929:16

**eliminate** [1] - 4043:2

**ellipse** [1] - 3986:24

**elsewhere** [2] - 3861:11, 3953:10

**embarrassed** [1] - 4100:13

**emerging** [1] - 3887:7

**emphasized** [1] - 4045:15

**emphasizing** [1] - 3836:17

**employ** [1] - 3919:16

**employee** [2] - 3814:5, 3963:24

**employees** [4] - 3963:16, 3965:9, 3966:16, 4062:1

**empty** [1] - 3967:16

**en** [1] - 3931:6

**enclosed** [1] - 3838:14

**encourage** [5] - 3821:22, 3842:13, 3842:15, 3944:22, 4073:22

**encouraged** [1] - 3842:22

**encouraging** [2] - 3842:25, 3997:14

**end** [8] - 3814:14, 3817:4, 3848:23, 3920:8, 3971:1, 3986:9, 4013:20, 4034:22

**end-of-aisle** [1] - 4013:20

**ended** [3] - 3845:1, 3910:12, 4000:24

**ending** [1] - 4059:25

**ends** [4] - 3924:15, 4019:16, 4075:21, 4077:2

**enforcement** [1] - 3816:25

**engage** [8] - 3831:12, 3850:11, 3907:16, 3909:18, 3925:23, 3982:16, 3983:22, 3991:11

**engaged** [4] - 3843:20, 3982:4, 4010:3, 4077:11

**engagements** [1] - 3819:17

**engages** [2] - 3855:14, 3907:12

**engaging** [2] - 3909:12, 3983:20

**English** [2] - 3972:25, 4083:2

**enjoying** [1] - 4024:24

**enshrined** [1] - 3859:14

**enter** [1] - 3957:20

**entered** [1] - 3836:10

**enterprise** [1] - 4078:2

**enterprises** [1] - 4077:21

**enters** [1] - 3813:4

**entertainment** [28] - 3858:19, 3887:14, 3899:4, 3899:5, 3899:9, 3910:14, 3910:18, 3912:15, 3912:18, 3918:9, 3919:17, 3920:5, 3922:3, 3964:4, 3964:17, 3964:19, 4038:2, 4093:6, 4094:10, 4094:22, 4095:13, 4095:15, 4096:3, 4096:7, 4096:16, 4099:1,

4099:17, 4099:22

**enthusiasm** [1] - 4105:16

**entire** [4] - 3919:24, 3920:7, 3924:6, 3946:11

**entirely** [1] - 4049:2

**entitled** [9] - 4019:12, 4025:21, 4064:18, 4072:15, 4073:12, 4075:14, 4075:22, 4076:23, 4100:17

**entrant** [1] - 3942:12

**entrepreneurs** [1] - 3944:22

**entries** [1] - 3950:24

**entry** [7] - 3942:4, 3942:6, 3942:9, 3942:15, 3942:16, 3944:9, 3990:22

**environment** [1] - 3945:21

**equal** [7] - 3888:9, 3888:10, 3888:15, 3888:16, 3890:25, 4098:16, 4098:17, 4101:3

**equation** [1] - 3965:19

**ERIC** [1] - 3811:13

**erroneous** [4] - 4024:21, 4024:23, 4026:9, 4026:25

**especially** [5] - 3860:9, 3994:20, 4005:9, 4073:16, 4074:16

**ESQ** [16] - 3810:18, 3810:19, 3810:19, 3810:20, 3810:20, 3810:21, 3810:21, 3811:9, 3811:9, 3811:10, 3811:10, 3811:13, 3811:13, 3811:14, 3811:14, 3811:15

**essence** [1] - 3905:21

**essential** [4] - 3860:2, 3860:20, 4013:25, 4022:2

**essentially** [11] - 3872:11, 3882:14, 3921:24, 3931:21, 3966:5, 3972:6, 3972:20, 3999:14, 4009:16, 4095:22, 4096:21

**established** [1] - 3819:10

**establishment** [2] - 4089:18, 4089:22

**establishments** [5] - 4083:15, 4090:6, 4090:22, 4092:8, 4092:10

**estates** [2] - 4092:17, 4092:18

**estimate** [11] - 3897:21, 3920:15, 3951:2, 3969:23, 3973:8, 3984:6, 3989:11, 4105:21, 4105:25, 4106:15, 4107:24

**Estimated** [1] - 4100:17

**estimated** [4] - 3897:4, 3973:1, 3979:23, 4095:15

**estimates** [9] - 3896:20, 3896:22, 3897:20, 3918:23, 3968:6, 3968:9, 3968:10, 3974:2, 3979:16

**estimating** [2] - 3973:20, 4106:21

**ET** [1] - 3810:10

**etcetera** [1] - 3873:9

**ETHAN** [1] - 3810:19

**Europe** [2] - 3856:8, 3857:9

**evaluate** [3] - 3845:7, 3859:25, 3966:24

**evaluated** [1] - 3994:1

**evaluates** [1] - 3957:24

**evaluating** [4] - 3915:15, 3959:21, 3978:20, 3992:2

**evaluation** [2] - 3957:6, 3978:21

**Evan** [1] - 3812:11

**EVAN** [1] - 3811:9

**event** [3] - 3916:1, 4001:18

**events** [1] - 4001:16

**eventually** [1] - 3949:3

**everyday** [3] - 4028:23, 4051:10, 4074:11

**evidence** [41] - 3824:17, 3825:25, 3826:2, 3826:3, 3854:16, 3856:11, 3893:2, 3914:5, 3917:17, 3918:16, 3919:3, 3923:10, 3924:22, 3925:4, 3933:3, 3937:3, 3963:9, 3989:14, 3989:16, 3990:11, 3990:18, 3991:10, 3992:14, 4015:10, 4025:20, 4029:2, 4029:10, 4029:11, 4039:11, 4061:18, 4069:9, 4069:21, 4070:22, 4072:10, 4072:11, 4075:6, 4075:8, 4075:10, 4076:22, 4078:18, 4097:14

**evolution** [2] - 3877:5, 3877:13

**evolve** [8] - 3876:6, 3876:10, 3876:13, 3876:20, 3877:10, 3877:12, 3879:10, 3886:11

**evolved** [2] - 3876:5, 3876:6

**exact** [3] - 3853:18, 3894:12, 4066:2

**exactly** [13] - 3843:19, 3855:13, 3858:3, 3913:16, 3928:24, 3972:5, 3974:10, 3989:8, 4047:8, 4057:6, 4060:5, 4079:17, 4109:4

**EXAMINATION** [9] - 3815:14, 3899:1, 3903:9, 3931:1, 4015:21, 4021:1, 4059:6, 4110:6, 4110:7

**examination** [3] - 4014:14, 4017:25, 4106:5

**EXAMINATION(CONTINUED)** [1] - 3978:17

**examine** [3] - 3942:4, 3995:18, 3998:22

**examined** [1] - 3815:9

**examiners** [1] - 4100:12

**example** [86] - 3819:16, 3822:5, 3822:7, 3827:24, 3828:3, 3829:19, 3830:9, 3830:19, 3832:19, 3833:9, 3833:14, 3838:13, 3842:7, 3855:21, 3860:24, 3861:1, 3862:2, 3869:25, 3870:11, 3870:13, 3870:24, 3870:25, 3871:8, 3871:11, 3873:11, 3877:14, 3881:18, 3884:1, 3887:18, 3891:7, 3893:4, 3894:6, 3897:2, 3905:9, 3905:12, 3907:11, 3910:1, 3910:4, 3918:8, 3920:3, 3930:3, 3940:1, 3942:2, 3942:10, 3943:11, 3960:13, 3971:18, 3971:19, 3971:23, 3972:1, 3977:3, 3979:22, 3980:9, 3981:5, 3986:3, 3986:7, 3987:24, 3991:14, 3993:7, 3994:16, 3995:6, 3995:23, 3996:5, 3997:7, 4012:22, 4021:10, 4021:17, 4022:21, 4024:15, 4024:17, 4025:1, 4026:7, 4026:10, 4026:14, 4026:20, 4026:23, 4028:3, 4028:14, 4038:24, 4039:13, 4052:15, 4055:13, 4056:13, 4056:14, 4069:19, 4101:16

**examples** [8] - 3818:5, 3835:19,

3869:24, 4004:24, 4009:16, 4020:8, 4022:9, 4028:9
**excellent** [1] - 4017:20
**except** [8] - 3885:11, 4012:20, 4086:9, 4086:11, 4087:14, 4087:24, 4088:4, 4088:5
**exception** [2] - 3884:10, 3986:12
**exceptions** [5] - 4010:22, 4011:7, 4011:14
**excerpt** [3] - 3838:7, 4037:5, 4042:24
**excerpts** [4] - 3933:1, 4031:5, 4031:13, 4067:9
**exclude** [2] - 3861:18, 3938:4
**exclusion** [2] - 4052:9, 4052:25
**exclusionary** [5] - 3820:3, 4008:23, 4008:24, 4009:11, 4010:3
**exclusive** [4] - 4000:6, 4001:6, 4001:20, 4088:21
**exclusively** [2] - 3894:14, 4086:8
**excuse** [1] - 4097:7
**excused** [1] - 4107:14
**executed** [1] - 4022:23
**executive** [6] - 3814:8, 3844:24, 3845:1, 3851:6, 3933:20, 3951:10
**executives** [4] - 3946:5, 3988:18, 4011:24, 4061:16
**exercise** [10] - 3947:5, 3985:8, 3991:14, 4029:2, 4044:17, 4045:11, 4056:5, 4076:14, 4077:12, 4103:24
**exercising** [2] - 3982:6, 3989:16
**exhibit** [8] - 3815:22, 3823:11, 3841:12, 3850:22, 4063:7, 4089:15, 4090:25, 4108:12
**Exhibit** [31] - 4015:9, 4018:21, 4019:4, 4020:9, 4025:10, 4025:17, 4025:20, 4029:11, 4031:1, 4032:22, 4035:16, 4042:20, 4063:6, 4064:9, 4067:2, 4067:8, 4071:9, 4072:9, 4072:11, 4074:24, 4075:5, 4075:8, 4076:22, 4083:20, 4089:11, 4091:24, 4093:22, 4100:3, 4102:24, 4111:4
**exhibits** [1] - 4014:22
**exist** [1] - 3856:10
**existed** [1] - 3862:15
**existence** [1] - 4006:15
**existing** [5] - 3867:9, 3942:11, 3945:24, 3945:25, 3946:13
**expand** [2] - 3932:17, 4054:20
**expanded** [1] - 3966:3
**expanding** [1] - 4055:11
**expect** [20] - 3821:16, 3821:20, 3847:23, 3897:24, 3898:1, 3898:9, 3914:15, 3925:11, 3925:12, 3925:18, 3925:22, 3935:15, 3935:23, 3989:21, 3990:6, 4006:24, 4007:23, 4008:10, 4081:3, 4090:23
**expectation** [1] - 3812:19
**expectations** [1] - 4020:13
**expected** [4] - 3850:11, 3851:5, 3931:9, 3935:7
**expenditure** [1] - 3995:9

**expense** - 4073:17, 4083:18
**expenses** [1] - 3853:17
**expensive** [9] - 3834:21, 3834:22, 3837:4, 3871:23, 3873:21, 3874:5, 3980:11, 3994:22, 4012:24
**experience** [2] - 3923:19, 3968:8
**experiment** [2] - 3936:19, 3936:21
**expert** [6] - 3820:11, 3820:15, 3823:17, 3907:13, 3932:10, 4056:21
**experts** [11] - 3853:18, 3889:22, 3907:9, 3907:10, 4008:21, 4011:24, 4012:3, 4017:1, 4023:6, 4067:4, 4101:19
**explain** [24] - 3821:11, 3823:17, 3824:7, 3838:22, 3844:4, 3847:16, 3859:18, 3863:12, 3880:21, 3880:22, 3886:3, 3888:4, 3903:19, 3904:13, 3912:22, 3917:20, 3925:5, 3963:8, 3972:12, 3972:19, 3985:3, 4025:7, 4026:22, 4049:7
**explained** [3] - 3880:13, 3903:15, 3955:2
**explaining** [3] - 3872:12, 3957:9, 3962:19
**explains** [1] - 3914:23
**explicitly** [1] - 3906:4
**Express** [332] - 3812:12, 3812:14, 3814:5, 3814:8, 3820:4, 3820:20, 3827:1, 3827:2, 3828:20, 3830:13, 3830:18, 3830:20, 3830:21, 3832:24, 3836:1, 3836:25, 3841:8, 3843:2, 3843:3, 3843:8, 3843:10, 3843:17, 3843:23, 3845:1, 3845:24, 3846:10, 3846:12, 3846:20, 3847:4, 3847:8, 3847:13, 3847:15, 3847:18, 3847:21, 3848:2, 3849:18, 3850:12, 3850:16, 3851:9, 3853:3, 3853:8, 3853:22, 3854:18, 3855:19, 3857:8, 3864:2, 3866:24, 3867:3, 3872:8, 3872:11, 3872:14, 3872:22, 3872:21, 3872:24, 3873:4, 3873:7, 3873:14, 3873:19, 3873:22, 3879:10, 3879:14, 3879:15, 3879:18, 3896:10, 3896:15, 3896:17, 3896:24, 3897:1, 3897:14, 3897:20, 3898:1, 3898:2, 3899:15, 3903:24, 3906:6, 3906:11, 3906:13, 3907:11, 3907:14, 3908:2, 3908:12, 3915:13, 3915:15, 3918:24, 3919:3, 3920:21, 3931:20, 3931:23, 3932:12, 3938:12, 3938:17, 3938:22, 3939:11, 3939:25, 3940:2, 3941:18, 3942:1, 3946:17, 3946:20, 3946:25, 3947:8, 3947:12, 3948:2, 3948:15, 3948:16, 3948:25, 3949:1, 3949:2, 3949:10, 3950:21, 3950:24, 3951:10, 3951:18, 3952:1, 3952:15, 3952:16, 3952:24, 3953:5, 3953:6, 3953:8, 3953:10, 3953:11, 3953:19, 3953:23, 3953:25, 3954:3, 3954:11, 3954:14, 3954:18, 3954:21, 3955:17, 3955:19, 3955:22, 3956:2, 3956:5, 3956:6, 3956:8, 3956:9, 3956:20, 3956:25, 3957:2, 3957:3, 3957:7, 3957:10, 3957:12, 3957:15,

3957:23, 3958:21, 3959:6, 3959:12, 3960:17, 3961:7, 3962:6, 3962:14, 3962:15, 3962:23, 3963:11, 3963:21, 3964:5, 3964:10, 3964:11, 3964:18, 3964:23, 3965:1, 3965:8, 3965:10, 3965:21, 3965:24, 3966:7, 3966:14, 3966:20, 3966:21, 3966:24, 3967:21, 3969:6, 3969:7, 3970:3, 3970:17, 3970:21, 3974:1, 3974:3, 3974:6, 3975:15, 3975:16, 3976:2, 3976:6, 3976:10, 3978:21, 3980:1, 3980:3, 3980:8, 3980:10, 3980:16, 3980:24, 3981:7, 3981:14, 3981:19, 3981:22, 3982:2, 3982:12, 3983:1, 3984:14, 3984:17, 3985:4, 3985:8, 3986:4, 3986:13, 3986:18, 3988:1, 3988:9, 3988:23, 3989:14, 3990:19, 3990:21, 3990:23, 3990:24, 3991:1, 3991:3, 3991:17, 3991:21, 3992:5, 3994:7, 3994:10, 3995:18, 3995:21, 3995:23, 3996:16, 3996:21, 3996:24, 3997:2, 3997:9, 3997:21, 3997:23, 3998:4, 3998:11, 3998:13, 3998:19, 3999:3, 3999:11, 4000:6, 4000:9, 4000:12, 4000:17, 4001:6, 4001:11, 4001:13, 4002:22, 4003:7, 4003:13, 4003:20, 4004:10, 4005:4, 4005:13, 4006:3, 4006:8, 4006:9, 4006:13, 4006:20, 4007:12, 4007:13, 4007:14, 4007:20, 4007:21, 4008:4, 4008:10, 4008:17, 4008:19, 4008:22, 4009:1, 4009:13, 4009:23, 4010:4, 4011:23, 4012:13, 4013:1, 4013:5, 4013:11, 4013:13, 4017:2, 4018:4, 4018:15, 4023:14, 4023:17, 4023:19, 4023:20, 4023:22, 4023:23, 4024:3, 4045:15, 4052:15, 4052:20, 4052:25, 4053:17, 4053:22, 4055:22, 4056:8, 4056:9, 4056:12, 4056:19, 4057:2, 4060:11, 4060:22, 4061:2, 4061:3, 4061:7, 4061:9, 4061:13, 4061:16, 4061:20, 4061:23, 4062:1, 4065:17, 4065:24, 4066:6, 4066:7, 4078:13, 4078:21, 4082:16, 4095:17, 4102:2, 4102:4, 4102:15, 4102:22, 4103:11, 4103:23, 4104:25
**EXPRESS** [1] - 3810:9
**express** [3] - 3842:15, 3842:17, 4005:15
**Express'** [26] - 3872:15, 3896:16, 3978:22, 3979:5, 3979:10, 3979:11, 3979:16, 3979:24, 3980:7, 3981:10, 3981:16, 3982:11, 3984:6, 3984:11, 3984:25, 3989:13, 3991:9, 3991:24, 3993:4, 3996:15, 3997:7, 3999:7, 3999:19, 4009:2, 4014:1, 4017:1
**Express's** [26] - 3830:10, 3830:12, 3830:21, 3846:5, 3851:16, 3906:21, 3907:13, 3908:5, 3909:2, 3911:19, 3920:4, 3939:1, 3946:24, 3948:6, 3957:21, 3962:4, 3968:7, 4009:17, 4023:5, 4039:18, 4040:8, 4095:12, 4095:13, 4095:14, 4102:1, 4103:6

**expressed** [3] - 3920:17, 3979:25, 4035:7
**expresses** [1] - 3896:21
**expressing** [2] - 3842:24, 3920:18
**extensive** [1] - 3991:12
**extent** [9] - 3841:16, 3845:16, 3934:15, 3947:21, 3955:9, 3996:14, 4003:10, 4055:25, 4088:13
**extra** [1] - 3891:21
**extreme** [1] - 3894:2
**extremely** [2] - 3918:17, 3977:7
**eyeballing** [1] - 4088:15
**eyes** [1] - 3970:6

# F

**face** [19] - 3851:22, 3877:15, 3886:20, 3896:8, 3900:6, 3919:6, 3928:8, 3942:23, 3955:5, 3955:9, 3999:15, 4054:2, 4054:7, 4056:11, 4061:7, 4065:4, 4078:14, 4086:15
**faced** [6] - 3846:13, 3901:2, 3974:25, 3991:2, 3993:1, 4061:10
**facilitate** [1] - 3829:1
**facilitating** [2] - 3915:7, 4102:3
**facility** [3] - 4065:18, 4107:6, 4107:8
**facing** [2] - 3865:3, 4065:2
**fact** [107] - 3831:3, 3831:5, 3834:13, 3834:15, 3835:14, 3837:16, 3843:22, 3845:12, 3847:22, 3849:19, 3851:7, 3853:15, 3854:12, 3854:16, 3855:24, 3856:21, 3863:24, 3867:16, 3872:3, 3873:25, 3878:9, 3879:2, 3883:5, 3883:21, 3884:5, 3886:4, 3889:3, 3889:7, 3891:13, 3894:5, 3896:7, 3904:3, 3908:12, 3909:6, 3909:12, 3915:3, 3916:14, 3918:21, 3921:22, 3922:7, 3926:2, 3927:18, 3928:5, 3931:6, 3932:18, 3932:20, 3943:21, 3954:11, 3956:16, 3964:18, 3971:7, 3976:22, 3977:10, 3977:16, 3980:9, 3980:20, 3982:3, 3982:7, 3989:20, 3991:11, 3998:12, 3999:2, 4001:11, 4001:13, 4006:25, 4013:6, 4016:21, 4017:1, 4018:13, 4021:9, 4022:21, 4024:14, 4028:13, 4029:3, 4030:9, 4030:10, 4035:6, 4038:17, 4038:23, 4040:21, 4040:22, 4042:12, 4042:15, 4046:2, 4046:12, 4049:25, 4055:25, 4056:20, 4057:10, 4059:22, 4061:6, 4069:6, 4074:8, 4077:15, 4079:11, 4083:1, 4083:2, 4083:17, 4097:12, 4098:19, 4099:6, 4101:4, 4102:4, 4103:10, 4103:25, 4104:4, 4105:5
**factor** [7] - 3831:22, 3831:24, 3919:2, 3933:9, 3998:25, 4007:3
**factored** [1] - 4079:4
**factors** [8] - 3851:20, 3887:11, 3933:12, 3953:2, 3953:3, 3954:2, 3960:8, 3978:20
**facts** [5] - 3822:20, 3824:15, 3906:25, 3955:1, 4079:23

**fail** [1] - 4100:13
**failing** [2] - 4024:15, 4036:5
**failure** [1] - 4037:2
**fair** [10] - 3831:24, 3874:1, 3897:18, 3950:7, 4021:17, 4051:3, 4070:14, 4087:16, 4087:18, 4098:18
**fall** [13] - 3864:14, 3864:22, 3913:25, 3917:12, 3919:10, 3921:6, 3921:14, 3924:15, 3927:14, 3989:23, 4036:19, 4037:13
**fallen** [2] - 3884:13, 3990:9
**falling** [1] - 4015:15
**falls** [3] - 3864:19, 3888:22, 3913:9
**familiar** [16] - 3856:18, 3885:11, 3945:3, 4022:19, 4063:2, 4063:9, 4063:13, 4063:14, 4063:23, 4064:1, 4064:12, 4071:16, 4072:14, 4073:9, 4075:17, 4103:25
**famous** [1] - 3842:21
**far** [12] - 3859:2, 3870:18, 3893:23, 3896:17, 3899:19, 3987:20, 3989:5, 4009:19, 4027:20, 4027:21, 4041:21, 4104:4
**Fargo** [1] - 3830:19
**farmers** [2] - 3945:11, 3945:18
**fashion** [1] - 3907:23
**fast** [1] - 3913:24
**faster** [2] - 3913:9, 3913:10
**fault** [1] - 3926:7
**faulty** [1] - 4036:6
**favor** [3] - 4009:2, 4050:8, 4053:11
**favorable** [1] - 3877:13
**favorably** [1] - 3823:25
**FCC** [1] - 3818:19
**feature** [6] - 3820:5, 3827:15, 3831:1, 3831:3, 3882:22, 3906:21
**features** [9] - 3823:21, 3834:8, 3835:2, 3883:5, 3901:10, 3901:11, 3901:12, 3915:2, 4104:22
**fed** [1] - 3935:12
**Fed** [5] - 3817:13, 3928:12, 3929:17, 4063:10, 4063:15
**Federal** [6] - 3817:10, 3818:14, 3859:15, 3926:21, 3926:23, 4063:3
**federally** [1] - 3882:6
**fee** [35] - 3832:22, 3833:15, 3833:17, 3833:23, 3833:25, 3905:12, 3905:14, 3906:1, 3906:2, 3909:24, 3927:23, 3929:11, 4034:24, 4038:11, 4038:20, 4038:23, 4039:2, 4039:4, 4039:5, 4039:7, 4039:9, 4039:10, 4039:11, 4039:13, 4039:18, 4040:6, 4040:9, 4040:11, 4048:2, 4101:25, 4102:5, 4102:6, 4102:7, 4102:8
**feed** [1] - 4017:13
**feedback** [1] - 3904:10
**fees** [38] - 3833:7, 3833:10, 3833:11, 3836:19, 3854:19, 3906:4, 3906:14, 3909:22, 3915:6, 3915:10, 3918:1, 3920:13, 3920:15, 3920:18, 3922:15, 3924:12, 3924:19, 3926:12, 3927:12,

3927:13, 3927:14, 3927:18, 3976:12, 3979:15, 3983:6, 4021:21, 4022:23, 4028:13, 4036:17, 4037:12, 4081:11, 4095:5, 4097:17, 4098:2, 4098:13, 4101:20
**feet** [1] - 3879:21
**fell** [5] - 3884:9, 3925:9, 3929:12, 3929:25, 3933:7
**felt** [2] - 4003:8, 4003:9
**few** [13] - 3817:8, 3822:6, 3850:6, 3877:25, 3907:4, 3919:9, 3930:5, 3932:11, 3977:6, 4018:9, 4046:13, 4048:25, 4068:8
**fewer** [7] - 3952:9, 4005:19, 4005:20, 4005:21, 4005:22
**field** [2] - 3816:14, 3816:15
**fields** [1] - 3817:1
**fifth** [1] - 4089:24
**Fifth** [1] - 3810:17
**figure** [12] - 3874:2, 3877:17, 3889:9, 3949:2, 3970:2, 4008:25, 4009:10, 4054:15, 4084:14, 4098:25, 4099:1, 4106:1
**figured** [1] - 4001:2
**figures** [5] - 3932:10, 3941:16, 4027:3, 4091:2, 4099:2
**figuring** [3] - 3879:10, 3886:24, 3959:4
**filed** [4] - 4062:10, 4062:16, 4062:17, 4068:8
**fill** [1] - 4107:3
**final** [2] - 3835:24, 4008:14
**finally** [2] - 3833:7, 3991:8
**Finance** [1] - 4064:3
**Financial** [1] - 4074:19
**financial** [5] - 3842:15, 3844:13, 3848:7, 3887:10, 4076:8
**financially** [1] - 3882:5
**findings** [5] - 3888:2, 3925:4, 3991:23, 3992:16, 4075:22
**fine** [7] - 3837:25, 3892:11, 4017:14, 4025:1, 4058:5, 4105:14, 4109:10
**finish** [1] - 4107:21
**finishing** [1] - 4001:7
**firm** [5] - 3824:24, 3916:15, 3941:23, 3974:19, 3989:22
**firms** [8] - 3856:16, 3864:1, 3985:11, 3990:11, 4013:16, 4045:19, 4054:25, 4057:16
**first** [63] - 3815:8, 3823:20, 3825:5, 3825:6, 3826:4, 3826:6, 3826:11, 3826:16, 3833:4, 3836:10, 3836:12, 3844:22, 3855:2, 3858:4, 3858:10, 3861:16, 3871:1, 3881:16, 3888:8, 3888:25, 3890:6, 3891:5, 3893:16, 3897:2, 3899:11, 3915:24, 3917:24, 3918:18, 3922:25, 3926:14, 3933:4, 3935:3, 3937:19, 3962:25, 3964:6, 3967:25, 3971:18, 3971:23, 3972:1, 3972:7, 3972:21, 3973:16, 3982:19, 3988:25, 3995:19, 3999:23, 4002:17, 4012:11, 4018:1, 4030:23, 4034:13,

4059:20, 4068:6, 4069:19, 4071:22, 4074:7, 4077:5, 4089:16, 4091:23, 4097:1, 4100:3, 4100:4

**First** [28] - 3828:9, 3830:20, 4029:17, 4030:13, 4031:14, 4031:20, 4033:5, 4033:10, 4035:7, 4036:15, 4042:12, 4042:15, 4042:19, 4043:4, 4045:8, 4046:10, 4046:17, 4047:19, 4047:21, 4048:12, 4068:9, 4068:20, 4068:25, 4069:7, 4070:5, 4070:13, 4070:21, 4074:6

**five** [26] - 3812:21, 3812:23, 3889:6, 3904:14, 3904:17, 3913:20, 3915:4, 3915:6, 3915:17, 3915:20, 3919:24, 3920:4, 3921:1, 3924:5, 4018:3, 4032:18, 4033:3, 4033:4, 4033:8, 4038:24, 4039:1, 4039:14, 4091:3, 4091:15, 4091:16

**flat** [1] - 3889:8

**flaw** [1] - 4045:1

**flaws** [4] - 4043:6, 4043:10, 4043:15, 4044:1

**fleet** [1] - 4055:23

**flexibility** [1] - 3886:19

**FLEXNER** [3] - 3811:11, 3811:14, 3812:13

**Flexner** [1] - 3812:14

**flies** [1] - 3884:21

**float** [1] - 4065:19

**fly** [1] - 3873:8

**focus** [8] - 3847:21, 3865:22, 3961:9, 4041:13, 4045:5, 4048:9, 4070:5, 4075:23

**focuses** [2] - 3889:20, 3889:23

**focusing** [4] - 3816:24, 4036:1, 4036:12, 4037:16

**follow** [4] - 3837:5, 3928:10, 4036:17, 4037:11

**followed** [3] - 3827:3, 3931:19, 4038:6

**following** [15] - 3814:15, 3840:7, 3857:23, 3898:11, 3931:25, 3934:18, 3934:25, 3935:3, 3973:23, 3991:19, 3999:8, 4020:20, 4038:4, 4098:2, 4108:17

**follows** [3] - 3815:9, 3831:3, 4088:22

**footnotes** [1] - 4003:21

**FOR** [6] - 3810:13, 3810:16, 3810:23, 3811:1, 3811:4, 3811:7

**forces** [2] - 3925:16, 4081:15

**Ford** [2] - 4014:18

**forecast** [2] - 3877:22, 3987:10

**forever** [1] - 3914:11

**form** [11] - 3843:17, 3844:2, 3966:9, 3998:1, 4003:12, 4021:5, 4021:21, 4021:22, 4022:24, 4040:23, 4059:23

**formal** [3] - 3963:19, 4065:15, 4065:16

**format** [1] - 4089:25

**forms** [7] - 3843:16, 3874:6, 3874:15, 3880:9, 3881:21, 3890:2

**formula** [12] - 3913:16, 3913:18, 3913:24, 3914:8, 3914:23, 3916:4,

3916:20, 3920:25, 4095:2, 4095:8, 4097:24

**forth** [5] - 3879:23, 3892:24, 3918:24, 3971:23, 4032:24

**fortunately** [1] - 3858:12

**forward** [6] - 3825:13, 3832:11, 3881:11, 3954:19, 4007:20, 4107:17

**four** [16] - 3827:6, 3881:3, 3939:11, 3974:15, 4026:14, 4035:19, 4035:21, 4053:15, 4053:17, 4055:10, 4055:21, 4057:11, 4065:23, 4082:21, 4100:9, 4106:4

**fourth** [1] - 4089:24

**fraction** [4] - 3873:16, 3897:5, 4062:14, 4087:22

**frame** [1] - 3892:4

**framework** [8] - 3823:16, 3823:18, 3825:3, 3825:12, 3835:2, 3857:18, 3858:7, 3937:9

**France** [1] - 3986:12

**Francisco** [9] - 3860:9, 3954:13, 3954:25, 3955:16, 3955:19, 3956:2, 3956:13, 3994:21, 4000:22

**fraud** [1] - 3883:6

**free** [5] - 3880:8, 3956:6, 3997:25, 4009:23, 4092:20

**freeride** [3] - 3995:12, 3996:20, 3997:17

**freerides** [1] - 3995:10

**freeriding** [21] - 3994:5, 3994:12, 3994:13, 3994:16, 3994:25, 3995:4, 3995:7, 3995:14, 3995:17, 3996:11, 3996:14, 3997:1, 3997:4, 3997:25, 3999:1, 3999:4, 3999:5, 3999:18, 3999:24, 4000:1, 4004:12

**frequently** [1] - 3938:3

**friend** [1] - 4030:1

**friendly** [1] - 3948:1

**front** [8] - 3815:19, 3823:2, 3903:20, 4018:2, 4026:15, 4035:18, 4064:14, 4073:3

**frozen** [1] - 3882:8

**FULKERSON** [1] - 3810:24

**full** [8] - 3815:10, 3870:15, 3935:3, 3960:19, 3981:3, 4031:5, 4039:24, 4082:24

**fully** [1] - 4040:13

**function** [3] - 3828:14, 3882:10, 3883:4

**functional** [7] - 4048:24, 4049:5, 4049:21, 4050:1, 4051:17, 4051:19, 4051:23

**functions** [3] - 3823:23, 3828:13, 3830:24

**fund** [1] - 4028:13

**Funda** [2] - 3961:19, 4008:3

**funda** [1] - 4013:7

**fundamental** [4] - 3828:14, 3859:19, 4036:5, 4070:15

**fundamentally** [3] - 3821:13, 3838:15, 3875:6

**funds** [2] - 3988:6, 3988:14

**future** [11] - 3817:15, 3817:18, 3825:9,

3841:14, 3845:8, 3851:10, 3876:8, 3876:22, 3876:25, 3878:10, 3946:19

## G

**G&S** [1] - 4095:16

**GAAP** [2] - 4105:5, 4105:8

**gain** [7] - 3837:6, 3839:3, 3870:9, 3870:18, 3913:4, 3984:7

**gained** [1] - 3988:2

**gains** [2] - 3842:3, 3848:8

**gallon** [1] - 3891:21

**game** [1] - 3869:3

**gap** [1] - 3839:25

**GARAUFIS** [1] - 3810:13

**gas** [5] - 3856:17, 3891:1, 3891:6, 3891:10, 3891:18

**gasoline** [2] - 3890:25, 3891:22

**gatekeeper** [1] - 3823:7

**gauging** [1] - 4104:10

**general** [40] - 3818:11, 3819:1, 3819:6, 3819:9, 3834:22, 3840:4, 3845:10, 3847:2, 3858:17, 3858:20, 3910:19, 3910:24, 3911:14, 3911:20, 3912:17, 3914:22, 3922:10, 3922:24, 3923:22, 3924:1, 3937:13, 3937:14, 3941:12, 3977:14, 4016:12, 4023:11, 4048:4, 4050:16, 4063:11, 4082:6, 4090:19, 4096:8, 4096:15, 4097:7, 4097:8, 4099:1, 4099:17, 4099:22, 4101:9

**General** [4] - 3810:23, 3810:24, 3811:1, 3811:5

**General's** [1] - 3811:5

**generally** [32] - 3829:17, 3833:17, 3834:20, 3847:9, 3847:12, 3847:14, 3850:5, 3855:5, 3855:16, 3859:7, 3872:16, 3878:7, 3882:21, 3885:10, 3896:1, 3899:13, 3905:23, 3906:3, 3921:10, 3934:7, 3939:10, 3952:21, 3960:21, 3962:10, 3964:15, 3973:13, 3973:19, 3987:25, 3988:2, 4020:6, 4049:16, 4104:12

**generate** [2] - 4013:2, 4013:3

**generated** [1] - 3822:21

**generates** [1] - 4013:1

**generic** [1] - 4049:17

**GENTILE** [2] - 3811:4, 3812:8

**Gentile** [1] - 3812:8

**gentlemen** [1] - 3814:4

**geographic** [2] - 3859:2, 3859:3

**Gilbert** [1] - 4018:14

**given** [21] - 3838:17, 3855:4, 3858:8, 3861:13, 3865:4, 3867:17, 3877:18, 3887:12, 3921:24, 3937:19, 3950:19, 3951:6, 3959:5, 3973:7, 3974:12, 3982:6, 3991:23, 3992:11, 4022:24, 4039:3

**glad** [3] - 3901:5, 4108:21, 4109:2

**GLASS** [1] - 3810:19

**globally** [1] - 3952:24

**GMAPS** [9] - 4102:21, 4102:22, 4103:6, 4103:10, 4103:13, 4103:15, 4104:24,

4105:3, 4105:6
**goal** [2] - 3860:17, 3903:12
**GOLD** [1] - 3811:10
**Goodman** [1] - 4000:7
**goods** [6] - 3859:21, 3860:4, 3870:16, 3900:13, 3994:24, 4033:17
**government** [19] - 3819:14, 3819:20, 4029:13, 4029:20, 4029:22, 4030:16, 4030:19, 4030:24, 4032:2, 4032:10, 4032:14, 4033:21, 4034:4, 4036:11, 4038:10, 4042:16, 4048:1, 4048:9, 4048:11
**Government** [4] - 3815:8, 3936:19, 3936:22, 4033:5
**government's** [1] - 4033:8
**Government's** [2] - 4015:9, 4111:4
**governments** [1] - 4021:8
**gradations** [1] - 3938:6
**graduate** [1] - 3816:13
**granting** [1] - 4021:18
**graphically** [1] - 4063:15
**grass** [1] - 3879:21
**gray** [2] - 4026:1
**great** [4] - 3908:21, 3945:16, 3977:8, 4083:10
**Great** [4] - 3827:11, 3884:10, 3885:11, 3934:25
**greater** [13] - 3846:13, 3870:18, 3877:15, 3877:20, 3888:9, 3888:15, 3890:19, 3932:14, 3932:16, 4000:10, 4024:23
**green** [5] - 3873:3, 3889:5, 3958:8, 3971:1, 4090:14
**GREG** [1] - 3810:23
**groceries** [1] - 3890:17
**grocery** [3] - 3895:5, 3895:6, 3895:8
**gross** [1] - 4101:4
**grounds** [1] - 4029:3
**group** [5] - 3894:20, 3994:3, 4000:16, 4076:11
**groups** [2] - 3893:5, 3972:8
**grow** [6] - 3879:21, 3931:7, 3932:23, 3935:4, 3973:20, 4073:17
**growing** [3] - 3885:14, 3885:18, 3932:7
**growth** [2] - 3884:13, 4072:2
**guess** [10] - 3826:8, 3853:9, 3916:22, 3927:20, 3941:20, 3947:13, 4001:4, 4044:14, 4060:6, 4078:6
**guessing** [1] - 3815:23
**guide** [1] - 3815:25
**guidelines** [8] - 3859:14, 3911:9, 3911:10, 3912:8, 3912:9, 3940:13, 4043:24, 4057:14
**guinea** [1] - 3936:22

## H

**Haas** [1] - 3816:6
**half** [14] - 3853:20, 3894:13, 3894:16, 3894:18, 3955:15, 3971:9, 3971:10, 4035:25, 4036:11, 4080:23, 4088:17,

4088:21, 4088:22
**hallmarks** [1] - 3947:5
**halo** [2] - 3998:9, 3998:10
**HAMER** [1] - 3810:19
**HAMPSHIRE** [1] - 3810:5
**hand** [11] - 3815:5, 3886:20, 3906:25, 3954:22, 3954:23, 4015:13, 4016:17, 4016:18, 4064:18, 4085:15, 4108:14
**handbook** [1] - 3818:6
**hands** [1] - 3860:10
**happy** [5] - 3887:21, 3891:15, 3901:5, 3936:22, 4044:11
**hard** [6] - 3837:10, 3839:22, 3848:20, 3950:19, 3966:20, 4046:7
**hard-pressed** [1] - 3966:20
**hardcore** [1] - 3875:20
**harder** [1] - 3822:4
**harm** [10] - 3821:9, 3821:11, 3825:1, 3851:18, 3992:4, 3992:17, 3994:8, 4014:9, 4030:21, 4031:22
**harmed** [5] - 3842:2, 3854:23, 3863:6, 3942:11, 4009:22
**harms** [5] - 3822:22, 3825:9, 3992:10, 3992:13
**hassle** [3] - 3943:25, 3946:6, 3963:23
**Hay** [1] - 4018:14
**heading** [3] - 4008:17, 4035:22, 4071:24
**hear** [3] - 3865:11, 3907:13, 4092:18
**heard** [11] - 3816:19, 3865:9, 3893:16, 3918:25, 3926:11, 3936:13, 3938:20, 3946:20, 3952:21, 3954:10, 4054:11
**hearing** [3] - 3814:2, 3921:12, 4054:3, 4107:24, 4108:6
**heightened** [1] - 3940:16
**held** [2] - 3814:1, 4108:6
**help** [10] - 3822:24, 3826:3, 3855:25, 3860:6, 3861:15, 3869:24, 3893:2, 3934:4, 3996:3, 4047:18
**helpful** [1] - 4036:25
**helping** [1] - 4001:14
**hence** [1] - 3862:11
**Herfindahl** [2] - 3940:10, 3940:23
**Herfindahl-Hirschman** [2] - 3940:10, 3940:23
**herself** [1] - 3887:2
**hesitant** [1] - 3865:8
**hesitated** [1] - 4028:20
**high** [34] - 3816:23, 3835:18, 3873:6, 3914:13, 3946:4, 3955:7, 3955:9, 3961:3, 3961:4, 3964:1, 3967:14, 3974:12, 3976:3, 3976:4, 3976:7, 3976:10, 3976:13, 3976:20, 3977:2, 3977:7, 3977:13, 3977:18, 3977:23, 3999:9, 3999:13, 4027:6, 4027:7, 4027:9, 4027:14, 4039:17, 4065:2, 4077:16, 4077:18, 4084:19
**high-level** [1] - 3967:14
**higher** [55] - 3836:25, 3840:12, 3840:17, 3846:9, 3846:10, 3848:1, 3848:6, 3852:6, 3852:7, 3852:14, 3852:21,

3853:1, 3854:1, 3854:4, 3854:6, 3854:21, 3855:10, 3855:23, 3863:7, 3864:16, 3864:19, 3865:3, 3871:2, 3873:10, 3873:12, 3910:3, 3910:4, 3947:10, 3947:23, 3950:14, 3952:9, 3953:3, 3960:18, 3961:5, 3961:7, 3961:16, 3968:16, 3971:14, 3975:11, 3980:1, 3992:9, 3998:16, 4003:19, 4008:1, 4012:16, 4032:13, 4032:16, 4033:16, 4039:23, 4047:4, 4065:2, 4089:6, 4090:20, 4092:10
**higher-price-lower-volume** [1] - 3947:10
**highest** [4] - 3889:5, 4072:2, 4091:9, 4092:12
**highlight** [1] - 3958:18
**highlighted** [2] - 3843:1, 3847:20
**highlighting** [1] - 3908:18
**highlights** [1] - 3910:1
**highly** [5] - 3921:22, 3940:15, 3940:20, 3941:21, 4045:19
**hike** [3] - 3851:9, 3900:3, 3900:7
**Hirschman** [2] - 3940:10, 3940:23
**historically** [2] - 3884:20, 3948:1
**Hochschild** [4] - 3841:15, 3932:15, 3934:9, 3993:8
**hold** [10] - 3836:5, 3837:11, 3850:17, 3860:20, 3904:8, 3905:6, 3905:8, 3943:2, 4020:4, 4020:6
**holders** [1] - 4002:5
**holding** [6] - 3884:9, 3895:6, 3895:9, 3904:23, 3965:20, 4011:10
**holds** [1] - 4005:20
**holistic** [2] - 3867:5, 3867:6
**holistically** [1] - 3867:2
**Home** [1] - 4108:12
**Honor** [91] - 3812:5, 3812:11, 3812:13, 3812:18, 3812:22, 3812:25, 3813:2, 3815:4, 3820:10, 3820:13, 3820:16, 3823:3, 3841:11, 3846:17, 3850:19, 3850:25, 3865:10, 3865:16, 3868:5, 3872:7, 3877:8, 3881:6, 3899:17, 3901:23, 3902:4, 3903:5, 3906:16, 3910:21, 3926:5, 3939:4, 3956:17, 3960:24, 3961:18, 3970:25, 3971:24, 3972:16, 3974:15, 3978:1, 3978:9, 3978:12, 3984:22, 3986:2, 3990:14, 4000:3, 4002:8, 4004:20, 4014:13, 4015:1, 4015:4, 4015:11, 4015:17, 4015:20, 4017:12, 4017:18, 4025:13, 4025:19, 4029:7, 4040:25, 4044:6, 4049:8, 4058:2, 4058:5, 4059:5, 4071:12, 4072:7, 4072:18, 4074:25, 4075:2, 4075:7, 4075:11, 4076:21, 4092:16, 4092:23, 4094:4, 4094:16, 4105:9, 4105:13, 4105:17, 4105:21, 4106:14, 4107:9, 4107:12, 4107:18, 4107:22, 4108:3, 4108:8, 4108:13, 4109:15, 4109:18, 4109:20
**Honor's** [1] - 4001:23
**HONORABLE** [1] - 3810:13

**hope** [4] - 3841:20, 3868:13, 4018:21, 4018:24
**hopefully** [1] - 4106:15
**hoping** [1] - 3887:19
**horizontal** [6] - 3859:14, 3911:9, 3912:7, 3912:9, 3927:16, 3940:13
**hotel** [4] - 3882:18, 3910:2, 3966:19, 3966:21
**hotels** [5] - 3882:20, 3887:24, 3890:2, 3890:14, 3918:22
**hour** [4] - 4030:7, 4088:19, 4106:4, 4106:16
**hours** [7] - 3812:22, 3812:23, 3978:5, 3978:6, 4106:5, 4106:10, 4107:2
**house** [4] - 3830:22, 3886:18, 3928:23, 3928:25
**households** [2] - 3829:12, 4051:24
**housekeeping** [1] - 4108:9
**hundred** [20] - 3832:19, 3832:20, 3832:25, 3854:15, 3854:17, 3854:19, 3854:20, 3881:9, 3881:11, 3889:6, 3890:7, 3894:3, 4057:2, 4060:12, 4061:3, 4095:6, 4098:4, 4098:12, 4101:21, 4101:22
**hundreds** [1] - 3912:1
**hurt** [2] - 3993:16, 3993:17
**hurts** [1] - 3993:17
**hypothetical** [40] - 3862:13, 3863:19, 3864:1, 3867:20, 3872:17, 3874:19, 3874:24, 3897:24, 3898:5, 3898:8, 3900:3, 3903:23, 3905:10, 3907:2, 3907:5, 3907:16, 3907:21, 3910:11, 3910:16, 3912:25, 3913:1, 3913:6, 3919:7, 3920:10, 3920:16, 3921:16, 3956:24, 4038:18, 4040:1, 4044:18, 4045:11, 4048:7, 4048:18, 4050:12, 4055:1, 4099:6
**Hypothetical** [51] - 3859:11, 3859:17, 3859:19, 3860:17, 3860:24, 3861:14, 3861:16, 3862:6, 3862:9, 3862:11, 3862:15, 3863:1, 3863:12, 3864:9, 3896:19, 3901:24, 3903:12, 3903:17, 3907:15, 3912:12, 3912:23, 3913:8, 3913:12, 3919:17, 3922:3, 3922:9, 3924:1, 4041:4, 4042:4, 4042:17, 4043:6, 4043:9, 4044:1, 4044:22, 4046:11, 4046:22, 4047:2, 4047:20, 4048:3, 4048:17, 4054:23, 4055:5, 4056:17, 4056:25, 4057:10, 4057:15, 4059:10, 4059:11, 4060:1, 4060:18, 4061:5

## I

**IDAHO** [1] - 3810:4
**idea** [9] - 3862:13, 3868:16, 3879:6, 3956:15, 3997:15, 3998:11, 3998:18, 4023:4
**ideas** [1] - 4003:24
**identified** [18] - 3826:7, 3835:1, 3838:24, 3899:3, 3921:20, 3933:10, 3938:13, 3950:21, 3953:10, 3987:3, 3991:17, 3993:10, 4014:22, 4061:16, 4061:17, 4091:24, 4095:12, 4102:6
**identifies** [1] - 3914:8
**identify** [13] - 3823:20, 3827:13, 3831:2, 3903:12, 3909:14, 3911:10, 3912:9, 3940:13, 3983:17, 3991:22, 4057:18, 4086:6
**identifying** [9] - 3848:13, 3858:7, 3888:6, 3909:23, 3914:3, 3952:22, 3961:4, 3986:22, 4095:9
**ignore** [1] - 4046:2
**ignoring** [2] - 3855:5, 4012:10
**II** [2] - 3925:7, 3935:3
**III** [1] - 3810:16
**ill** [2] - 4104:9, 4104:12
**ill-suited** [2] - 4104:9, 4104:12
**ILLINOIS** [1] - 3810:4
**illustrate** [5] - 3832:10, 3888:1, 3910:5, 4026:23, 4045:14
**illustrates** [3] - 3896:1, 3985:7
**illustrating** [2] - 3852:3, 3987:25
**illustrative** [1] - 3960:13
**imagine** [2] - 3891:8, 4038:7
**immediately** [2] - 3882:12, 3882:14
**impact** [2] - 3848:7, 3851:16
**impede** [1] - 3845:16
**impeded** [2] - 3835:14, 3992:19
**impeding** [1] - 3840:24
**imperfect** [1] - 3918:23
**implausible** [1] - 3921:21
**implement** [1] - 3850:8
**implementation** [1] - 3935:3
**implementing** [4] - 3858:2, 3903:16, 3914:23, 3925:8
**implications** [4] - 3895:23, 3899:18, 3977:17, 4051:25
**imply** [2] - 3974:18, 3977:10
**importance** [4] - 3899:13, 3899:14, 3941:7, 4026:23
**important** [7] - 3828:18, 3831:17, 3834:1, 3834:13, 3847:3, 3859:25, 3861:15, 3878:13, 3878:15, 3878:25, 3889:9, 3900:8, 3900:12, 3908:8, 3929:15, 3964:18, 3968:21, 3968:22, 3969:20, 4004:4, 4016:25, 4019:25, 4026:8, 4045:25, 4046:9, 4104:23
**impose** [2] - 3862:16, 3903:25
**impossible** [1] - 3996:20
**impractical** [1] - 3912:1
**impression** [1] - 4030:4
**improve** [1] - 4029:4
**improved** [1] - 4008:2
**improvements** [1] - 3944:10
**in-house** [1] - 3830:22
**incentive** [10] - 3822:3, 3845:11, 3877:16, 3896:16, 3958:11, 3997:11, 3999:19, 4012:10, 4081:16, 4081:17
**incentives** [11] - 3841:19, 3842:5, 3844:13, 3852:15, 3852:20, 3867:9, 3877:20, 3897:13, 4081:4, 4081:7, 4081:22
**inclined** [1] - 3901:25
**include** [8] - 3860:19, 3860:22, 3861:12, 3873:17, 3977:1, 4054:21, 4056:14, 4088:25
**included** [6] - 3819:5, 4031:4, 4066:13, 4079:24, 4088:25, 4103:22
**includes** [6] - 3840:21, 3840:22, 4003:13, 4050:17, 4102:5, 4103:17
**including** [7] - 3855:18, 3920:7, 3979:14, 3987:10, 4040:19, 4061:20, 4082:8
**income** [2] - 3887:3, 3987:16
**inconvenient** [1] - 3954:20
**increase** [52] - 3837:15, 3842:5, 3862:18, 3863:21, 3864:6, 3864:13, 3868:9, 3896:9, 3904:1, 3904:12, 3904:15, 3904:22, 3912:25, 3913:7, 3913:12, 3913:19, 3913:25, 3916:2, 3916:20, 3917:7, 3917:9, 3917:13, 3917:25, 3918:1, 3918:5, 3919:24, 3920:6, 3921:13, 3921:16, 3922:2, 3923:1, 3924:18, 3935:13, 3936:17, 3945:18, 3986:10, 4013:8, 4028:2, 4028:10, 4028:18, 4036:16, 4037:10, 4039:14, 4054:3, 4054:8, 4056:11, 4080:6, 4081:6, 4081:21, 4086:15, 4099:12
**increased** [13] - 3838:11, 3840:7, 3877:24, 3985:19, 3985:22, 4062:24, 4076:4, 4076:12, 4077:6, 4079:14, 4079:25, 4081:23
**increases** [17] - 3836:2, 3846:15, 3846:21, 3849:7, 3851:3, 3851:11, 3851:15, 3907:4, 3985:6, 3985:22, 3986:13, 3988:15, 3989:17, 4038:11, 4038:12, 4040:13
**Increasing** [1] - 3817:10
**increasing** [5] - 3885:10, 3915:11, 4059:14, 4097:25
**increasingly** [2] - 3881:19, 4076:2
**incremental** [18] - 3841:20, 3844:7, 3848:3, 3848:12, 3848:19, 3849:23, 3850:7, 3850:12, 3873:6, 3970:9, 3973:4, 3987:5, 3987:16, 3988:6, 3989:2, 3989:4, 3989:8, 4093:12
**incur** [1] - 3953:7
**indeed** [3] - 3837:13, 4008:3, 4107:9
**independent** [1] - 3820:6
**Index** [2] - 3940:10, 3940:23
**indicate** [4] - 3891:3, 3984:15, 4019:23, 4061:11
**indicated** [11] - 3835:6, 3845:2, 3845:12, 3939:1, 3944:25, 3971:8, 4017:7, 4060:2, 4061:3, 4061:18, 4074:15
**indicates** [12] - 3854:16, 3892:5, 3901:15, 3908:11, 3917:17, 3938:16, 3979:25, 3983:20, 4004:1, 4006:4, 4021:11, 4040:16
**indicating** [10] - 3889:24, 3895:25,

3899:20, 3952:1, 3952:12, 3981:13, 3984:18, 4003:21, 4004:9, 4074:9
**indicating)** [1] - 4072:23
**indicator** [1] - 3982:8
**indifferent** [2] - 3891:1, 3900:24
**indirect** [1] - 3824:21
**individual** [1] - 4017:24
**individuals** [1] - 3829:12
**induce** [1] - 3835:20
**inducing** [1] - 4048:19
**industrial** [4] - 3816:15, 3816:16, 3816:24, 3817:1
**industries** [6] - 3816:18, 3882:16, 3890:16, 3890:19, 3960:25, 4101:5
**Industry** [1] - 4072:16
**industry** [62] - 3817:15, 3817:19, 3819:24, 3823:21, 3823:22, 3823:23, 3824:16, 3826:6, 3826:17, 3827:9, 3827:14, 3827:15, 3829:16, 3829:21, 3831:1, 3834:2, 3834:9, 3842:11, 3877:14, 3890:24, 3899:14, 3901:10, 3904:16, 3906:24, 3908:9, 3908:13, 3915:25, 3936:21, 3939:7, 3942:4, 3942:17, 3946:12, 3950:8, 3951:1, 3951:19, 3968:1, 3969:23, 3971:22, 3972:8, 3974:19, 3974:23, 3980:19, 3982:19, 3985:11, 3993:15, 4006:5, 4006:12, 4011:11, 4019:13, 4021:4, 4021:6, 4022:18, 4028:9, 4054:11, 4059:21, 4060:5, 4060:6, 4062:6, 4069:22, 4074:19, 4101:7
**infamous** [1] - 4079:9
**infinitives** [1] - 4083:6
**influences** [1] - 3861:25
**inform** [1] - 4107:25
**information** [13] - 3814:4, 3814:6, 3844:20, 3877:2, 3914:19, 3995:25, 3996:1, 3996:22, 4004:14, 4004:22, 4005:7, 4005:8, 4047:17
**informative** [1] - 4100:25
**initial** [1] - 4060:4
**Initial** [1] - 4076:23
**initiate** [2] - 3865:2, 4009:23
**initiative** [7] - 3840:2, 3840:5, 3842:13, 3848:15, 3849:8, 3919:5, 3987:6
**initiatives** [4] - 3845:24, 3987:4, 3987:8, 3987:12
**innovate** [2] - 3877:16, 3877:20
**innovates** [1] - 3977:4
**innovating** [2] - 3946:11, 3946:12
**innovation** [2] - 3945:16, 3977:9
**innovative** [1] - 3946:2
**insight** [2] - 3936:18, 4044:25
**insist** [2] - 3874:11, 3991:1
**insistence** [69] - 3869:10, 3872:3, 3896:3, 3896:10, 3896:18, 3896:21, 3897:5, 3897:15, 3897:24, 3901:21, 3918:24, 3923:17, 3933:12, 3938:21, 3938:22, 3938:24, 3956:19, 3956:21, 3957:1, 3957:4, 3957:6, 3957:8, 3957:11, 3957:14, 3957:20, 3957:23,

3958:17, 3958:21, 3958:22, 3958:24, 3959:20, 3960:4, 3960:8, 3960:17, 3962:5, 3962:7, 3962:9, 3962:13, 3963:7, 3964:1, 3964:13, 3966:24, 3967:22, 3968:3, 3968:4, 3968:5, 3968:7, 3968:10, 3968:11, 3968:14, 3968:16, 3968:24, 3969:1, 3969:3, 3969:12, 3970:2, 3970:9, 3970:10, 3970:13, 3972:9, 3973:3, 3974:1, 3974:12, 3974:14, 3974:16, 3974:18, 3975:9, 3976:3
**insistent** [10] - 3870:12, 3871:14, 3898:9, 3900:1, 3935:25, 3936:6, 3963:4, 3966:18, 3969:9, 4013:10
**insisting** [2] - 3869:11, 3990:25
**instance** [6] - 3844:15, 3944:10, 3954:13, 3970:1, 4000:8, 4022:9
**instances** [2] - 3851:15, 3882:19, 3949:9
**instead** [10] - 3869:7, 3869:8, 3878:14, 3879:9, 3885:7, 3896:6, 3915:20, 3915:22, 3919:22, 4042:13
**instituted** [1] - 3986:13
**institutional** [2] - 3823:22, 3915:2
**institutions** [3] - 3882:5, 3928:11, 3928:14
**instrument** [10] - 3831:6, 3832:3, 3834:22, 3867:18, 3875:10, 3881:15, 3886:12, 3888:14, 3959:17, 4074:12
**instruments** [20] - 3831:8, 3832:6, 3834:15, 3855:15, 3871:24, 3875:13, 3880:20, 3881:4, 3881:12, 3882:24, 3883:3, 3885:19, 3885:23, 3886:1, 3886:5, 3899:21, 3899:24, 3918:19, 3923:17, 4041:18
**insult** [1] - 4037:1
**integrated** [3] - 3830:24, 4012:12, 3984:13
**intellectual** [1] - 4001:13
**intellectually** [1] - 4000:11
**intended** [7] - 3868:7, 3969:3, 4028:4, 4036:25, 4049:17, 4079:22, 4084:17
**intensity** [1] - 4104:10
**intent** [2] - 4084:18, 4091:21
**intentional** [1] - 4062:15
**interact** [2] - 3852:13, 4017:11
**interaction** [2] - 3834:16, 4016:16
**interchange** [38] - 3832:22, 3833:15, 3833:17, 3833:23, 3905:14, 3909:21, 3909:24, 3915:8, 3920:14, 3926:18, 3926:24, 3927:1, 3927:4, 3927:15, 3929:11, 3930:4, 3935:13, 3979:14, 4032:15, 4034:24, 4036:17, 4037:12, 4038:12, 4038:20, 4039:2, 4039:11, 4040:6, 4040:15, 4040:21, 4048:2, 4048:10, 4081:11, 4095:18, 4095:22, 4095:23, 4097:2, 4102:8
**interchangeability** [8] - 4048:24, 4049:5, 4049:15, 4049:21, 4050:1, 4051:18, 4051:19, 4051:23
**interchangeable** [2] - 4042:10, 4051:4

**interest** [5] - 3879:17, 3896:16, 3944:25, 3954:21, 4065:13
**interested** [10] - 3845:13, 3872:15, 3879:25, 3904:18, 3937:23, 3944:14, 3993:11, 4027:16, 4080:22, 4087:10
**interesting** [1] - 4001:8
**interests** [1] - 4034:24
**interface** [1] - 3946:8
**interject** [1] - 4002:7
**Interlink** [3] - 4071:3, 4072:1, 4072:2
**intermediary** [1] - 3828:6
**internal** [11] - 3988:9, 4066:17, 4066:22, 4068:4, 4068:24, 4069:8, 4070:12, 4070:21, 4074:4, 4078:18, 4105:8
**interpret** [1] - 3933:25
**interpretation** [1] - 3947:6
**interpreted** [1] - 4082:7
**interpreting** [2] - 3958:1, 4028:24
**interruption** [1] - 4002:10
**intersection** [1] - 3817:18
**invent** [1] - 4023:7
**invented** [1] - 4023:5
**investment** [3] - 3995:9, 3999:16, 3999:25
**investments** [1] - 3843:13
**investor** [2] - 3853:9, 3853:10
**invests** [1] - 3999:3
**involve** [3] - 3880:10, 3911:15, 4007:25
**involved** [7] - 3818:2, 3818:10, 3819:21, 3819:23, 3827:20, 3858:2, 4054:11
**involves** [1] - 3966:15
**involving** [3] - 3819:23, 3994:17, 4034:7
**IOWA** [1] - 3810:4
**ish** [1] - 4106:20
**Isis** [1] - 3879:5
**ISLAND** [1] - 3810:6
**isolate** [3] - 4079:8, 4079:22, 4082:3
**isolating** [1] - 4082:6
**isolation** [1] - 4051:24
**ISSUE** [1] - 3849:15
**issue** [16] - 3824:14, 3824:24, 3828:4, 3876:17, 3878:15, 3934:3, 3959:16, 3980:8, 3997:3, 3999:1, 4003:2, 4047:25, 4068:16, 4095:17, 4104:16
**issued** [1] - 3859:14
**issuer** [30] - 3827:21, 3830:22, 3832:21, 3832:22, 3832:24, 3832:25, 3833:2, 3833:15, 3833:23, 3834:6, 3906:3, 3906:6, 3906:7, 3920:13, 3924:12, 3928:1, 3929:13, 3965:1, 3965:2, 3965:11, 3982:23, 3982:24, 3983:2, 3995:24, 4019:19, 4023:21, 4023:23, 4073:18, 4081:6
**issuer's** [1] - 4081:9
**issuers** [13] - 3828:3, 3833:1, 3920:23, 3929:13, 4020:13, 4020:15, 4022:15, 4034:25, 4035:1, 4036:3, 4040:4, 4081:12, 4081:17
**issuers'** [1] - 4081:21
**issues** [8] - 3819:13, 3828:2, 3830:19, 3876:18, 3877:3, 3970:22, 4020:12,

4063:20

**issuing** [9] - 4038:20, 4081:9, 4095:17, 4096:22, 4096:23, 4102:8, 4103:17, 4103:18, 4103:23

**item** [2] - 3845:20, 3978:19

**itself** [14] - 3833:7, 3833:9, 3862:5, 3875:4, 3896:15, 3915:7, 3915:9, 3976:17, 3982:7, 3991:9, 4012:13, 4013:3, 4044:22, 4045:1

## J

**JAMES** [1] - 3811:15
**January** [6] - 3818:15, 3819:3, 3892:6, 3895:2, 4084:7
**Jefferson** [1] - 3811:3
**job** [3] - 3818:22, 3967:10, 4017:20
**JOHN** [1] - 3810:20
**join** [1] - 4020:13
**joined** [1] - 4020:14
**joint** [2] - 3834:17, 3864:24
**jointly** [4] - 3831:7, 3834:14, 3859:16, 3864:25
**Jonathan** [1] - 4063:24
**Journal** [1] - 4064:3
**JUDGE** [1] - 3810:14
**July** [2] - 4080:17, 4109:24
**JULY** [1] - 3810:9
**jump** [2] - 3939:18, 4064:14
**jumping** [1] - 4032:24
**jumps** [1] - 3939:20
**June** [1] - 4062:17
**jury** [1] - 3814:4
**jus** [1] - 3995:2
**JUSTICE** [1] - 3810:17
**Justice** [6] - 3819:3, 3820:19, 3859:15, 4009:25, 4010:4, 4108:15
**justification** [5] - 3997:2, 4008:15, 4009:5, 4014:6, 4014:11
**justifications** [4] - 3824:6, 3993:22, 3993:25, 4014:4

## K

**K-A-T-Z** [1] - 3815:13
**Kansas** [2] - 3817:10, 3817:13
**KATE** [1] - 3810:21
**KATZ** [2] - 3815:7, 4110:5
**Katz** [44] - 3813:1, 3813:4, 3815:12, 3815:16, 3818:13, 3820:11, 3820:18, 3823:13, 3835:1, 3842:7, 3845:20, 3846:20, 3851:14, 3856:1, 3856:8, 3857:7, 3857:12, 3868:6, 3888:2, 3903:11, 3904:11, 3906:20, 3914:20, 3925:1, 3929:2, 3931:3, 3935:20, 3937:7, 3954:9, 3956:18, 3961:22, 3972:13, 3972:19, 3974:18, 3978:19, 3984:23, 3986:3, 3990:15, 4002:1, 4004:21, 4008:15, 4014:3, 4046:20, 4108:20

**keep** [18] - 3833:2, 3833:25, 3834:12, 3849:6, 3852:12, 3853:15, 3854:10,

3871:22, 3877:18, 3901:6, 3914:11, 3919:23, 3920:8, 3920:11, 3943:13, 3949:2, 3955:11, 4017:10

**keeping** [8] - 3879:25, 3905:16, 3915:7, 3915:9, 3922:15, 3983:2, 3983:3, 3983:14

**keeps** [5] - 3832:22, 3904:21, 3919:23, 3920:10, 4039:13

**kept** [3] - 3833:6, 3833:9, 3905:10

**KEVIN** [1] - 3811:9

**Key** [1] - 4075:22

**key** [13] - 3823:20, 3826:6, 3827:13, 3831:1, 3834:8, 3835:1, 3871:16, 3901:11, 3908:11, 3929:14, 3957:8, 4100:9

**kind** [15] - 3932:7, 3935:11, 3935:14, 3944:19, 3954:16, 3970:14, 3974:10, 3975:19, 3997:1, 3997:5, 4000:17, 4001:1, 4081:15, 4106:6, 4109:1

**kinds** [8] - 3865:5, 3865:7, 3865:17, 3867:16, 3938:16, 3968:7, 3968:10, 3993:12

**knowledge** [4] - 3818:7, 4000:18, 4000:20, 4001:20

**known** [11] - 3817:25, 3818:1, 3820:5, 3828:19, 3828:20, 3832:22, 3921:9, 3921:10, 4043:5, 4043:9, 4104:4

**knows** [1] - 3925:7

**KOROLOGOS** [1] - 3811:13

## L

**labeled** [7] - 3827:21, 3868:16, 3868:24, 3869:10, 3934:23, 3968:24, 3998:8

**labeling** [1] - 3960:10

**lack** [5] - 3842:2, 3919:9, 3921:24, 3953:2, 4065:5

**laid** [1] - 3873:23

**language** [4] - 3960:6, 4028:23, 4044:21, 4062:17

**large** [27] - 3830:23, 3832:2, 3871:19, 3883:25, 3886:15, 3887:17, 3887:20, 3889:16, 3894:20, 3897:16, 3899:12, 3918:4, 3926:17, 3928:14, 3929:22, 3931:3, 3931:4, 3932:19, 3936:11, 3973:13, 3988:20, 3991:6, 4007:18, 4048:20, 4081:6, 4081:21

**largely** [1] - 4041:22

**larger** [21] - 3827:7, 3847:3, 3849:4, 3872:1, 3872:2, 3888:11, 3888:22, 3889:17, 3897:25, 3898:10, 3916:2, 3941:18, 3983:15, 3983:16, 3988:13, 4007:11, 4039:1, 4091:20, 4098:18

**largest** [9] - 3826:24, 3827:3, 3828:9, 3828:10, 3830:22, 3849:18, 3931:18, 3939:24, 4076:5

**last** [21] - 3817:8, 3858:7, 3886:23, 3895:18, 3901:20, 3942:19, 3967:10, 3971:12, 3972:17, 4020:16, 4022:1, 4028:25, 4030:6, 4035:21, 4038:5, 4062:25, 4065:23, 4072:3, 4086:9, 4087:14, 4090:25

**lastly** [2] - 3852:2, 3934:2
**late** [1] - 3836:23
**latter** [2] - 4047:13, 4080:23
**launched** [1] - 3843:22
**law** [2] - 4010:14, 4025:4
**lawyers** [1] - 4092:19
**lay** [1] - 3980:5
**lead** [10] - 3812:4, 3819:10, 3852:5, 3864:22, 3923:10, 3995:14, 4005:20, 4024:16, 4029:25, 4044:2
**leadership** [1] - 3816:5
**leading** [4] - 3962:11, 3963:11, 3963:12, 4061:21
**learn** [1] - 3823:21
**learned** [2] - 3822:10, 3923:18
**Learning** [1] - 4076:23
**least** [18] - 3826:13, 3852:17, 3881:21, 3893:20, 3894:9, 3894:17, 3916:16, 3970:6, 3989:25, 4032:12, 4033:16, 4056:21, 4083:14, 4092:3, 4092:4, 4092:6, 4100:7, 4101:1
**leave** [5] - 3880:4, 3908:15, 3971:17, 3975:5, 4088:4
**led** [3] - 3843:7, 3919:14, 4094:17
**left** [11] - 3837:12, 3844:22, 3880:24, 3888:8, 3890:1, 3893:23, 3969:21, 4085:21, 4086:1, 4086:9, 4101:6
**legal** [3] - 3865:6, 3881:25
**legally** [1] - 3856:16
**length** [1] - 3812:19
**less** [52] - 3821:25, 3822:2, 3825:10, 3836:5, 3840:15, 3845:2, 3845:3, 3846:5, 3846:6, 3846:7, 3853:20, 3854:8, 3854:13, 3854:15, 3854:17, 3855:3, 3864:11, 3864:12, 3864:16, 3866:7, 3866:16, 3867:6, 3869:10, 3871:8, 3883:16, 3883:17, 3888:9, 3888:15, 3901:18, 3914:1, 3914:7, 3917:8, 3917:13, 3917:17, 3917:21, 3923:2, 3931:23, 3954:12, 3959:1, 3968:4, 3969:11, 3993:1, 4009:1, 4011:11, 4032:12, 4033:15, 4039:24, 4040:18, 4045:20, 4088:21
**lessening** [1] - 3845:4
**lesser** [2] - 3929:10, 4073:23
**lessons** [1] - 4070:16
**letter** [1] - 3838:8
**letting** [2] - 3815:17, 3879:21
**level** [26] - 3856:14, 3862:19, 3862:21, 3863:18, 3874:21, 3881:7, 3884:4, 3884:16, 3885:20, 3891:4, 3904:2, 3905:25, 3916:1, 3920:2, 3937:22, 3951:14, 3952:2, 3964:1, 3967:14, 3969:16, 3974:12, 3974:13, 3985:17, 3985:18, 4034:24, 4070:15
**levels** [6] - 3939:23, 3985:10, 3989:19, 4027:13, 4036:19, 4037:13
**Lexington** [1] - 3811:12
**liaison** [1] - 3828:11
**life** [1] - 3860:10
**lift** [1] - 4062:13

**lifted** [4] - 3841:14, 3845:9, 4062:11, 4062:17
**light** [5] - 3845:7, 3931:3, 3992:23, 4026:1, 4056:10
**likelihood** [1] - 4089:8
**likely** [13] - 3825:2, 3845:7, 3858:8, 3914:6, 3922:24, 3991:23, 4003:25, 4004:2, 4006:1, 4006:3, 4007:21, 4036:7, 4086:14
**likewise** [1] - 4016:1
**limit** [2] - 3992:7, 4065:4
**limited** [6] - 3821:25, 3865:5, 3867:16, 3890:18, 3993:13, 4001:20
**limiting** [4] - 3820:4, 3992:7, 4011:8, 4011:16
**Line** [6] - 3872:13, 3872:20, 3873:2, 3873:14, 3873:15, 3873:16
**line** [44] - 3826:25, 3827:1, 3827:2, 3851:18, 3853:13, 3872:25, 3883:14, 3883:17, 3885:9, 3885:10, 3888:20, 3889:5, 3897:22, 3899:7, 3899:10, 3927:17, 3931:13, 3931:18, 3932:3, 3932:4, 3932:7, 3948:5, 3960:10, 3960:12, 3964:6, 3967:25, 3969:14, 3969:18, 3970:20, 3971:5, 3971:6, 3972:7, 3972:21, 3972:24, 3986:8, 3996:25, 4013:12, 4018:3, 4038:15, 4043:5, 4045:6, 4046:7, 4046:19, 4057:14
**lines** [8] - 3837:17, 3888:12, 3889:7, 3968:13, 3968:25, 4019:21, 4020:3, 4067:24
**linking** [2] - 3947:20, 4016:7
**links** [2] - 4016:6, 4016:25
**LISA** [1] - 3810:20
**Lisbon** [1] - 4025:4
**list** [6] - 3817:4, 3881:16, 3978:19, 3986:11, 4005:12, 4101:7
**listed** [1] - 4101:6
**literally** [3] - 3961:1, 4062:11, 4062:13
**literature** [2] - 3933:9, 4063:25
**litigate** [1] - 4010:1
**LITIGATION** [1] - 3810:16
**litigation** [6] - 4009:23, 4017:22, 4023:6, 4031:14, 4066:19, 4082:16
**live** [6] - 3945:20, 3956:13, 3977:5, 4001:5, 4013:16, 4013:21
**LLP** [2] - 3811:7, 3811:11
**location** [2] - 3886:17, 3908:7
**locations** [2] - 3946:22, 3954:25
**locked** [1] - 3975:22
**lodging** [4] - 3890:2, 3890:14, 3899:8, 3899:10
**logic** [11] - 3867:15, 3872:8, 3872:12, 3872:19, 3873:19, 3873:22, 3947:3, 3958:8, 3969:15, 3974:10, 4056:23
**logo** [3] - 4002:21, 4002:23, 4003:1
**long-term** [2] - 3885:6, 3885:15
**look** [218] - 3817:7, 3824:13, 3824:15, 3824:16, 3825:2, 3825:24, 3826:20, 3830:1, 3831:16, 3835:19, 3837:7,

3838:9, 3838:11, 3839:23, 3848:23, 3849:1, 3849:15, 3850:4, 3853:16, 3853:21, 3853:22, 3862:23, 3862:25, 3867:8, 3870:23, 3873:5, 3873:14, 3874:8, 3875:13, 3877:2, 3877:22, 3877:23, 3880:19, 3881:1, 3881:23, 3883:13, 3885:19, 3885:25, 3887:2, 3888:6, 3888:7, 3889:23, 3890:14, 3893:18, 3893:21, 3894:2, 3899:7, 3899:8, 3901:10, 3903:22, 3909:1, 3909:9, 3910:19, 3911:14, 3912:2, 3914:4, 3920:12, 3921:13, 3922:23, 3926:10, 3931:16, 3932:2, 3932:9, 3932:21, 3933:24, 3934:17, 3939:17, 3939:21, 3939:22, 3940:1, 3941:17, 3942:14, 3943:7, 3943:19, 3943:22, 3951:23, 3952:14, 3953:1, 3954:2, 3955:14, 3955:24, 3956:3, 3958:12, 3958:23, 3959:20, 3960:10, 3960:24, 3962:10, 3963:20, 3964:6, 3964:7, 3964:8, 3966:23, 3967:25, 3968:17, 3969:21, 3973:1, 3978:25, 3979:22, 3981:6, 3981:15, 3983:8, 3983:24, 3984:13, 3985:25, 3986:1, 3986:7, 3986:15, 3987:11, 3987:21, 3988:21, 3988:23, 3988:24, 3990:18, 4003:6, 4003:15, 4004:6, 4008:6, 4008:7, 4008:18, 4012:11, 4017:25, 4018:1, 4018:3, 4018:20, 4019:15, 4020:9, 4022:12, 4025:9, 4026:8, 4026:14, 4026:16, 4027:1, 4027:7, 4027:8, 4027:12, 4027:13, 4027:25, 4031:1, 4031:12, 4031:17, 4032:18, 4032:22, 4033:8, 4034:10, 4034:13, 4035:16, 4035:19, 4035:21, 4037:3, 4042:9, 4042:14, 4042:19, 4043:13, 4044:11, 4046:2, 4046:16, 4053:5, 4054:20, 4055:3, 4063:6, 4063:19, 4063:21, 4064:8, 4064:13, 4067:1, 4067:11, 4068:17, 4068:21, 4068:23, 4069:2, 4069:19, 4071:9, 4071:15, 4072:20, 4073:6, 4073:9, 4073:10, 4074:24, 4075:18, 4075:21, 4077:2, 4080:11, 4080:20, 4080:21, 4083:13, 4083:17, 4083:19, 4084:12, 4086:8, 4086:16, 4086:17, 4089:11, 4090:5, 4090:25, 4091:8, 4091:12, 4091:17, 4091:18, 4091:19, 4093:20, 4093:23, 4096:11, 4097:16, 4099:20, 4100:2, 4101:4, 4101:18, 4101:19, 4102:23, 4102:24, 4107:17
**looked** [50] - 3822:20, 3839:7, 3847:24, 3873:4, 3884:20, 3911:18, 3911:24, 3912:13, 3916:2, 3927:10, 3929:19, 3933:4, 3935:13, 3938:18, 3938:20, 3938:21, 3938:25, 3951:24, 3955:16, 3968:8, 3987:24, 3992:15, 4000:15, 4003:5, 4008:15, 4024:20, 4024:22, 4039:14, 4061:12, 4062:5, 4064:5, 4066:8, 4073:8, 4074:21, 4078:20, 4082:14, 4082:21, 4082:25, 4083:13,

4085:9, 4085:17, 4085:23, 4086:7, 4091:23, 4092:1, 4092:6, 4092:13, 4092:14, 4103:21, 4104:24
**looking** [49] - 3815:23, 3825:13, 3830:8, 3849:3, 3851:1, 3861:20, 3861:23, 3881:1, 3883:10, 3883:11, 3885:6, 3885:7, 3889:5, 3895:4, 3909:5, 3910:12, 3911:21, 3915:14, 3920:19, 3920:20, 3920:21, 3938:23, 3939:25, 3961:11, 3984:3, 3984:5, 3986:21, 3990:17, 3994:3, 4005:3, 4039:14, 4040:2, 4041:25, 4045:21, 4048:24, 4049:21, 4060:7, 4064:13, 4073:6, 4074:18, 4075:19, 4087:10, 4087:13, 4095:16, 4097:20, 4101:20, 4102:10
**looks** [4] - 3930:3, 3975:13, 4041:6, 4069:3
**loop** [2] - 3995:24, 4024:1
**lose** [46] - 3850:14, 3869:13, 3869:15, 3869:19, 3870:13, 3871:10, 3871:20, 3873:6, 3873:15, 3873:17, 3874:3, 3874:7, 3875:4, 3875:7, 3876:3, 3896:4, 3896:23, 3896:25, 3897:5, 3900:3, 3901:9, 3914:6, 3914:15, 3916:15, 3917:8, 3918:13, 3933:14, 3935:24, 3935:25, 3949:5, 3949:7, 3957:4, 3957:5, 3958:20, 3958:25, 3959:6, 3960:7, 3969:6, 3969:19, 3970:3, 3970:18, 3974:7, 3975:21, 4005:17, 4024:18
**loses** [2] - 3871:4, 3916:12
**losing** [11] - 3847:23, 3849:16, 3866:21, 3867:12, 3870:21, 3894:24, 3900:5, 3934:1, 3950:2, 4005:16, 4024:20
**loss** [7] - 3870:18, 3872:2, 3916:13, 3917:21, 3923:15, 3923:16, 3993:16, 4030:20, 4031:20, 4073:21
**losses** [3] - 3849:19, 3882:7, 3896:5
**lost** [5] - 3870:15, 3916:14, 3916:16, 3923:6, 3969:20
**lottery** [1] - 4001:4
**loud** [3] - 3917:24, 3940:18, 3940:21
**loves** [1] - 3900:21
**low** [23] - 3822:12, 3835:16, 3836:16, 3839:10, 3839:24, 3840:9, 3840:11, 3840:25, 3851:21, 3943:9, 3943:24, 3949:4, 3949:6, 3955:18, 3974:11, 3974:13, 3992:20, 3995:3, 4027:7, 4027:17, 4027:14, 4073:19
**low-cost** [1] - 3840:25
**low-price** [2] - 3835:16, 3836:16
**low-priced** [5] - 3822:12, 3835:16, 3839:10, 3840:9, 3851:21
**lower** [31] - 3822:8, 3841:18, 3841:21, 3842:3, 3842:5, 3852:15, 3885:9, 3924:8, 3937:24, 3947:10, 3947:23, 3948:2, 3949:5, 3949:7, 3949:11, 3949:14, 3949:15, 3949:22, 3950:14, 3951:7, 3952:2, 3971:11, 3989:19, 3990:3, 4007:25, 4015:18, 4081:5, 4095:7, 4101:2, 4101:8

**lower-priced** [1] - 3822:8
**lowered** [2] - 3822:1, 3926:12
**lowering** [6] - 3821:15, 3821:17, 3821:23, 3822:2, 3985:15, 4081:11
**lowest** [1] - 3981:10
**loyal** [7] - 3875:23, 3894:23, 3901:8, 3901:14, 3901:17, 3962:21, 3974:19
**loyalty** [10] - 3893:13, 3962:24, 4003:18, 4004:7, 4082:14, 4082:22, 4083:15, 4084:6, 4089:17, 4090:1
**lucrative** [1] - 4081:12
**lunch** [6] - 3967:1, 3978:10, 3980:23, 3981:2, 3990:17, 3991:9
**luncheon** [1] - 4105:22

## M

**machine** [1] - 3878:19
**Maestro** [1] - 4073:25
**main** [2] - 3968:13, 3993:25
**maintain** [3] - 3887:9, 4007:1, 4012:1
**maintaining** [1] - 3833:2
**major** [5] - 3818:24, 3826:18, 3831:24, 3867:22, 4060:23
**majority** [5] - 3890:23, 3936:5, 3936:8, 3962:13, 3980:16
**man** [1] - 4027:5
**manage** [1] - 3828:5
**managed** [12] - 3846:24, 3847:2, 3849:5, 3849:6, 3850:5, 3850:11, 3988:1, 3988:16, 3988:20, 3989:25, 3992:23, 4001:4
**management** [1] - 4093:24
**mandated** [1] - 3882:6
**mandation** [3] - 3963:18, 3963:19, 3964:2
**mandatory** [1] - 3966:15
**manner** [1] - 4066:1
**manufacturer** [2] - 3994:18, 3995:10
**manufacturer's** [1] - 3994:24
**manufacturers** [5] - 3860:14, 3900:18, 4013:16, 4013:21, 4013:22
**March** [4] - 3892:6, 3895:2, 3895:18, 4084:7
**Marcus** [2] - 4000:22, 4000:23
**margin** [74] - 3870:14, 3870:17, 3871:19, 3872:1, 3873:6, 3901:1, 3913:3, 3913:8, 3913:10, 3913:20, 3913:22, 3913:23, 3916:5, 3916:6, 3916:9, 3916:18, 3920:16, 3920:18, 3921:2, 3922:18, 3924:10, 3944:21, 3951:9, 3969:23, 3969:24, 3970:11, 3970:14, 3970:15, 3973:2, 3974:8, 3974:13, 3975:8, 3975:21, 3984:5, 3984:9, 4093:16, 4094:14, 4094:15, 4094:19, 4094:24, 4095:1, 4095:3, 4095:4, 4095:5, 4095:6, 4095:8, 4096:5, 4097:4, 4097:6, 4097:21, 4098:2, 4098:6, 4098:14, 4098:16, 4098:21, 4098:25, 4099:1, 4099:2, 4099:3, 4099:10, 4099:14, 4099:15, 4099:20, 4100:23, 4101:2,

4101:4, 4101:5, 4101:8, 4101:20, 4102:11, 4103:7
**margin's** [1] - 4098:6
**marginal** [2] - 3901:1, 4065:3
**margins** [4] - 3869:17, 3875:5, 3984:16, 4097:18
**MARK** [1] - 3810:19
**mark** [1] - 3888:8
**marked** [1] - 3947:16
**market** [360] - 3824:15, 3824:20, 3824:21, 3824:24, 3824:25, 3825:1, 3825:12, 3826:1, 3832:18, 3836:11, 3839:3, 3854:8, 3857:18, 3858:2, 3858:6, 3858:8, 3859:3, 3861:2, 3861:6, 3861:7, 3861:12, 3861:20, 3861:21, 3861:22, 3861:23, 3861:25, 3862:4, 3862:22, 3863:15, 3863:16, 3863:24, 3877:10, 3877:11, 3877:17, 3877:22, 3880:13, 3880:15, 3884:23, 3899:3, 3899:19, 3906:22, 3907:1, 3910:19, 3910:25, 3911:1, 3911:13, 3911:14, 3911:15, 3911:20, 3912:4, 3912:16, 3912:17, 3912:19, 3913:13, 3914:3, 3914:5, 3914:24, 3915:1, 3916:21, 3917:11, 3919:13, 3919:15, 3921:18, 3922:4, 3922:7, 3922:8, 3922:10, 3922:24, 3923:21, 3923:22, 3923:23, 3923:24, 3924:1, 3924:22, 3924:24, 3925:3, 3925:5, 3935:16, 3935:21, 3936:14, 3936:23, 3936:24, 3937:1, 3937:5, 3937:6, 3937:7, 3937:11, 3937:14, 3937:17, 3937:18, 3937:21, 3938:5, 3938:7, 3938:10, 3938:11, 3938:12, 3938:17, 3938:19, 3938:20, 3939:2, 3939:5, 3939:6, 3939:8, 3939:15, 3939:18, 3940:7, 3941:12, 3941:14, 3941:15, 3941:19, 3941:24, 3942:3, 3942:7, 3945:11, 3945:18, 3946:21, 3947:1, 3947:5, 3952:17, 3953:18, 3957:7, 3957:8, 3974:20, 3975:18, 3976:5, 3976:14, 3976:17, 3976:19, 3976:23, 3976:24, 3976:25, 3977:10, 3977:11, 3977:12, 3977:13, 3977:18, 3977:22, 3977:24, 3978:21, 3980:18, 3980:23, 3982:2, 3982:6, 3982:7, 3982:13, 3982:15, 3983:23, 3984:20, 3985:1, 3985:4, 3985:8, 3985:12, 3989:13, 3989:15, 3990:5, 3990:12, 3990:19, 3990:20, 3990:22, 3990:23, 3991:11, 3991:13, 3991:15, 3991:18, 3991:21, 3991:24, 3991:25, 3992:4, 3992:6, 3992:8, 3992:11, 3992:17, 4013:19, 4016:12, 4016:14, 4016:19, 4017:9, 4018:16, 4018:18, 4019:12, 4019:24, 4020:10, 4020:18, 4021:4, 4021:13, 4022:3, 4022:4, 4022:5, 4022:6, 4022:10, 4022:18, 4023:9, 4023:17, 4024:4, 4024:7, 4024:8, 4024:11, 4024:12, 4024:16, 4024:19, 4024:20, 4024:23, 4026:9, 4026:24, 4028:2, 4028:10, 4029:2, 4029:4, 4030:24, 4034:7,

4034:8, 4034:9, 4035:2, 4035:3, 4035:10, 4035:12, 4036:1, 4036:3, 4036:5, 4036:7, 4036:13, 4036:17, 4036:22, 4037:11, 4037:17, 4037:23, 4038:1, 4039:3, 4040:22, 4041:2, 4041:6, 4041:10, 4041:11, 4041:14, 4042:2, 4042:5, 4042:9, 4042:16, 4043:18, 4044:2, 4044:5, 4044:17, 4044:24, 4045:10, 4045:17, 4045:19, 4045:21, 4045:24, 4045:25, 4046:9, 4046:21, 4047:2, 4047:9, 4047:11, 4047:12, 4047:20, 4048:25, 4049:1, 4049:16, 4049:22, 4049:23, 4049:25, 4050:16, 4051:1, 4052:5, 4052:6, 4052:21, 4053:2, 4053:5, 4054:13, 4054:16, 4054:21, 4055:4, 4055:8, 4055:14, 4055:16, 4055:18, 4056:4, 4056:7, 4056:16, 4056:19, 4056:20, 4057:1, 4057:3, 4057:5, 4057:12, 4057:17, 4059:9, 4059:12, 4059:15, 4059:20, 4060:3, 4060:8, 4060:10, 4060:11, 4060:12, 4060:13, 4060:16, 4060:19, 4060:23, 4060:24, 4061:4, 4061:6, 4061:20, 4061:21, 4061:22, 4061:23, 4062:6, 4066:13, 4067:15, 4067:20, 4067:23, 4068:12, 4068:16, 4069:10, 4070:2, 4070:5, 4070:12, 4070:23, 4074:2, 4074:5, 4074:18, 4074:20, 4076:14, 4076:17, 4077:12, 4093:8, 4094:11, 4094:22, 4096:9, 4096:16, 4097:7, 4097:8, 4098:8, 4098:24, 4099:1, 4099:2, 4099:22, 4099:23, 4100:23, 4104:2, 4104:18
**Market** [1] - 4075:15
**marketing** [3] - 3988:6, 3988:14, 3996:9
**marketplace** [1] - 4081:16
**markets** [69] - 3816:18, 3824:23, 3858:5, 3858:6, 3858:11, 3858:14, 3858:24, 3859:8, 3860:23, 3876:9, 3889:22, 3906:23, 3910:9, 3910:13, 3910:14, 3910:22, 3911:2, 3911:7, 3911:11, 3912:1, 3912:6, 3912:13, 3912:18, 3937:8, 3938:13, 3940:14, 3940:15, 3940:17, 3940:20, 3975:2, 3989:15, 3989:17, 3989:18, 3990:6, 3990:20, 3990:24, 3991:20, 3992:6, 4016:6, 4016:7, 4016:10, 4016:11, 4016:24, 4017:3, 4017:10, 4018:5, 4018:15, 4022:3, 4022:17, 4037:22, 4043:16, 4046:1, 4047:5, 4047:10, 4048:4, 4051:18, 4053:16, 4055:15, 4057:9, 4099:8, 4099:11, 4101:10
**Markets** [2] - 4025:21, 4026:3
**MARYLAND** [1] - 3810:4
**masse** [1] - 3931:6
**MasterCard** [69] - 3820:3, 3827:4, 3832:23, 3836:24, 3837:13, 3837:17, 3838:10, 3839:14, 3841:5, 3844:15, 3844:23, 3845:1, 3845:8, 3864:2, 3879:9, 3898:3, 3903:24, 3915:14, 3920:14, 3927:11, 3931:19, 3931:20, 3939:12, 3940:5, 3941:18, 3942:3,

3944:5, 3946:8, 3946:10, 3946:22,
3958:4, 3958:10, 3958:13, 3959:7,
3959:23, 3960:6, 3961:24, 3973:17,
3979:13, 3979:14, 3979:16, 3979:19,
3980:2, 3980:17, 3993:10, 3993:11,
4000:12, 4002:14, 4003:13, 4010:3,
4010:24, 4040:7, 4053:17, 4055:24,
4056:15, 4066:18, 4067:18, 4067:25,
4068:2, 4068:5, 4068:11, 4068:25,
4069:22, 4070:12, 4072:14, 4072:17,
4073:5, 4074:15

**MasterCard's** [5] - 3932:20, 3958:3, 3973:9, 3979:24, 4073:19

**MasterCards** [1] - 4053:22

**matching** [2] - 3886:11, 4074:11

**matter** [18] - 3835:21, 3845:11, 3847:2,
3859:5, 3866:15, 3874:10, 3883:3,
3885:24, 3887:1, 3891:19, 3900:14,
3975:17, 3977:14, 4023:11, 4037:9,
4069:21, 4093:24, 4108:9

**matters** [6] - 3819:21, 3863:5, 3863:9,
3901:4, 3901:7, 3999:14

**MATTHEW** [1] - 3811:14

**maximizing** [4] - 3846:8, 3846:11,
3950:11, 4034:23

**MBA's** [1] - 3816:12

**McCurdy** [1] - 4102:18

**mean** [62] - 3816:22, 3818:6, 3829:12,
3829:15, 3834:15, 3845:10, 3847:1,
3847:12, 3847:13, 3851:4, 3854:22,
3861:18, 3862:4, 3874:15, 3884:15,
3887:16, 3891:1, 3892:19, 3897:8,
3897:17, 3901:5, 3904:13, 3905:7,
3905:21, 3922:23, 3926:1, 3937:17,
3941:25, 3942:18, 3945:2, 3947:2,
3952:5, 3952:9, 3952:17, 3955:5,
3956:20, 3963:4, 3966:14, 3973:3,
3973:12, 3977:20, 3991:4, 3991:5,
3994:11, 3997:6, 4001:8, 4005:14,
4006:16, 4009:8, 4011:21, 4021:3,
4036:25, 4043:24, 4044:20, 4047:5,
4047:24, 4064:13, 4065:16, 4072:24,
4084:12, 4086:24, 4105:15

**meaning** [2] - 4055:22, 4085:5

**meaningful** [1] - 3884:23

**means** [28] - 3821:10, 3840:15, 3846:9,
3875:18, 3875:23, 3877:3, 3896:13,
3927:23, 3947:21, 3950:14, 3953:5,
3957:23, 3963:25, 3975:25, 3976:24,
3977:9, 3977:18, 3997:19, 3997:21,
4014:9, 4028:22, 4032:4, 4045:17,
4051:6, 4051:11, 4051:18, 4072:23,
4087:4

**meant** [5] - 3975:7, 4021:14, 4051:8,
4080:8, 4080:10

**measure** [16] - 3848:19, 3868:19,
3877:7, 3894:11, 3940:8, 3940:11,
3940:25, 3941:7, 3951:11, 3957:5,
3981:18, 4003:11, 4036:16, 4036:22,
4037:10, 4104:17

**measured** [8] - 3826:23, 3890:4,
3921:25, 3924:20, 3926:17, 3931:11,

3931:23, 3936:9

**measures** [2] - 3927:1, 4104:9

**measuring** [1] - 3941:9

**mechanical** [3] - 3811:21, 3944:12,
4056:25

**mechanically** [2] - 4044:23, 4098:17

**mechanics** [2] - 3859:17, 3862:10

**mechanism** [3] - 3852:3, 3992:8,
3992:12

**mechanisms** [3] - 3868:25, 3883:14,
4047:6

**meet** [3] - 3951:7, 3952:2, 3999:9

**meeting** [1] - 4019:10

**member** [1] - 3965:19

**memory** [4] - 4034:11, 4063:16, 4064:7

**men** [5] - 4027:3, 4027:4, 4027:7,
4027:9, 4027:10

**mention** [6] - 3849:22, 4081:6, 4082:18,
4084:3, 4087:19, 4091:1

**mentioned** [19] - 3835:13, 3837:14,
3842:8, 3845:20, 3867:25, 3904:11,
3921:1, 3935:12, 3956:19, 3961:17,
3963:6, 3970:25, 3988:3, 4029:12,
4060:25, 4061:6, 4074:13, 4082:12,
4088:4

**mentions** [1] - 3849:15

**merchant** [259] - 3828:9, 3828:11,
3830:2, 3831:8, 3831:9, 3831:12,
3831:16, 3831:18, 3831:20, 3832:12,
3832:15, 3833:8, 3833:12, 3833:18,
3833:21, 3834:6, 3840:16, 3843:1,
3843:4, 3843:6, 3843:12, 3843:14,
3844:8, 3845:25, 3846:6, 3846:8,
3851:1, 3851:10, 3851:11, 3852:23,
3853:3, 3854:19, 3855:11, 3855:18,
3855:22, 3865:22, 3867:12, 3868:23,
3869:1, 3869:5, 3869:8, 3869:9,
3870:2, 3870:3, 3870:9, 3870:12,
3870:13, 3870:15, 3870:19, 3871:1,
3871:4, 3871:8, 3871:14, 3871:21,
3872:4, 3872:20, 3873:20, 3874:3,
3874:6, 3874:11, 3875:11, 3875:18,
3876:3, 3878:13, 3878:19, 3880:14,
3881:2, 3890:4, 3892:20, 3894:23,
3896:23, 3896:25, 3897:7, 3897:19,
3897:23, 3897:25, 3900:1, 3901:2,
3901:12, 3901:18, 3905:5, 3906:20,
3907:21, 3909:5, 3909:10, 3909:22,
3909:25, 3910:8, 3910:10, 3911:19,
3918:6, 3918:7, 3918:9, 3918:11,
3919:25, 3920:7, 3923:5, 3924:19,
3926:19, 3927:9, 3927:13, 3928:8,
3931:7, 3932:23, 3933:12, 3935:23,
3936:1, 3941:5, 3943:10, 3943:17,
3943:23, 3943:25, 3945:17, 3945:23,
3946:7, 3946:9, 3947:8, 3947:13,
3947:22, 3948:1, 3948:15, 3948:25,
3949:1, 3949:11, 3949:13, 3949:15,
3949:16, 3950:1, 3950:4, 3950:8,
3951:11, 3951:13, 3952:3, 3952:12,
3953:5, 3955:7, 3955:10, 3956:4,
3956:7, 3957:1, 3958:2, 3958:13,

3958:19, 3959:5, 3959:9, 3959:16,
3959:24, 3960:5, 3964:3, 3964:6,
3966:3, 3966:6, 3966:13, 3966:14,
3966:17, 3968:6, 3969:6, 3969:20,
3970:2, 3970:16, 3970:17, 3972:22,
3973:14, 3974:3, 3975:3, 3975:13,
3979:11, 3982:22, 3984:8, 3985:19,
3991:2, 3991:4, 3996:3, 3996:4,
3996:7, 3996:8, 3996:9, 3996:10,
3996:16, 3996:17, 3996:20, 3996:24,
3997:8, 3997:12, 3997:13, 3997:17,
3997:22, 3997:23, 3998:1, 3998:2,
3998:13, 3998:16, 3998:17, 3998:20,
4001:5, 4002:20, 4002:23, 4002:24,
4004:3, 4004:4, 4005:16, 4006:21,
4007:10, 4012:11, 4012:14, 4012:17,
4014:4, 4014:19, 4019:20, 4021:20,
4021:21, 4022:11, 4022:22, 4022:23,
4023:15, 4036:3, 4036:18, 4037:13,
4038:10, 4038:11, 4038:20, 4039:10,
4039:19, 4039:22, 4040:9, 4040:13,
4040:18, 4041:15, 4050:17, 4051:9,
4051:13, 4051:20, 4051:21, 4052:3,
4052:4, 4053:7, 4054:1, 4077:20,
4077:22, 4078:11, 4085:10, 4092:25,
4097:25, 4098:18, 4099:12, 4102:4,
4102:16, 4102:17, 4103:8

**merchant's** [32] - 3831:14, 3833:5,
3842:17, 3842:23, 3843:2, 3866:8,
3868:8, 3869:12, 3869:17, 3869:18,
3870:21, 3871:17, 3871:19, 3871:25,
3874:9, 3875:3, 3875:24, 3881:23,
3890:22, 3897:17, 3905:2, 3910:4,
3913:22, 3942:24, 3943:7, 3954:15,
3958:11, 3969:17, 3973:1, 3974:4,
4012:4, 4022:25

**merchant-specific** [1] - 3996:24

**Merchants** [1] - 4071:25

**merchants** [321] - 3820:21, 3821:10,
3821:15, 3821:20, 3821:24, 3822:9,
3822:13, 3827:17, 3829:2, 3829:6,
3829:8, 3829:13, 3829:24, 3830:1,
3830:6, 3830:11, 3831:7, 3831:25,
3832:2, 3832:4, 3832:13, 3834:14,
3834:18, 3834:20, 3835:14, 3835:17,
3836:15, 3836:16, 3836:24, 3837:1,
3838:5, 3838:6, 3838:8, 3838:15,
3838:18, 3839:1, 3839:2, 3839:7,
3839:11, 3840:7, 3840:9, 3840:10,
3840:12, 3840:21, 3841:17, 3841:19,
3842:13, 3842:22, 3842:25, 3843:15,
3844:5, 3844:12, 3844:14, 3846:24,
3847:2, 3847:3, 3847:6, 3847:9,
3847:24, 3848:2, 3848:5, 3848:20,
3849:4, 3849:5, 3849:6, 3849:16,
3849:18, 3850:5, 3850:11, 3851:22,
3852:6, 3852:13, 3852:19, 3853:1,
3853:23, 3854:1, 3854:4, 3854:10,
3854:23, 3855:6, 3855:7, 3855:9,
3855:16, 3856:22, 3856:23, 3858:18,
3858:21, 3863:20, 3863:23, 3864:21,
3864:22, 3864:25, 3865:1, 3866:17,

3866:18, 3866:25, 3867:23, 3868:11, 3873:23, 3874:25, 3877:19, 3880:8, 3880:9, 3887:14, 3889:25, 3890:17, 3893:13, 3896:1, 3896:2, 3897:12, 3899:4, 3899:15, 3901:15, 3904:6, 3908:2, 3908:3, 3908:7, 3908:8, 3909:11, 3909:19, 3910:6, 3910:7, 3910:15, 3910:19, 3910:25, 3911:1, 3914:13, 3914:16, 3918:14, 3918:25, 3921:18, 3921:25, 3923:2, 3923:7, 3923:9, 3923:13, 3924:8, 3924:9, 3924:11, 3925:9, 3925:23, 3925:24, 3927:5, 3927:21, 3931:5, 3931:24, 3932:24, 3933:2, 3933:10, 3934:15, 3936:3, 3936:6, 3936:9, 3936:10, 3936:11, 3936:13, 3936:14, 3936:15, 3937:4, 3940:2, 3941:4, 3941:8, 3941:10, 3941:13, 3943:1, 3944:6, 3945:12, 3946:4, 3948:3, 3949:16, 3950:20, 3950:22, 3951:19, 3952:6, 3952:10, 3952:16, 3952:20, 3952:22, 3953:2, 3953:13, 3953:14, 3953:15, 3953:22, 3954:6, 3954:17, 3954:22, 3955:15, 3955:17, 3955:24, 3956:5, 3957:9, 3957:21, 3959:14, 3959:15, 3960:14, 3960:18, 3961:8, 3961:10, 3961:13, 3964:19, 3965:25, 3974:2, 3974:5, 3974:25, 3975:10, 3975:22, 3979:20, 3980:1, 3984:17, 3988:1, 3988:6, 3988:14, 3988:16, 3988:20, 3988:21, 3989:12, 3989:25, 3991:6, 3992:9, 3992:20, 3992:24, 3993:17, 3994:5, 3994:17, 3995:20, 3995:22, 3996:1, 3996:2, 3996:13, 3998:22, 3999:8, 3999:12, 3999:13, 4000:16, 4004:15, 4004:23, 4005:8, 4005:9, 4005:19, 4005:20, 4006:25, 4007:1, 4007:25, 4008:6, 4008:25, 4012:18, 4012:20, 4012:21, 4012:23, 4012:24, 4013:4, 4013:10, 4014:10, 4016:13, 4016:15, 4016:18, 4020:4, 4020:5, 4020:13, 4020:15, 4022:13, 4028:13, 4030:22, 4031:23, 4032:11, 4032:12, 4032:17, 4033:15, 4034:24, 4035:1, 4037:24, 4038:2, 4039:4, 4039:23, 4040:19, 4041:10, 4048:20, 4051:7, 4051:12, 4052:1, 4052:8, 4052:20, 4052:24, 4053:20, 4054:1, 4054:6, 4056:10, 4071:2, 4071:7, 4071:17, 4073:22, 4081:4, 4081:12, 4081:16, 4081:17, 4082:15, 4082:22, 4090:1, 4091:1, 4091:2, 4091:7, 4091:8, 4091:14, 4096:3, 4096:20, 4102:5, 4103:12, 4103:17

**merchants'** [11] - 3831:23, 3854:7, 3855:2, 3896:16, 3970:22, 3993:18, 4012:10, 4012:12, 4041:21, 4077:23, 4078:19

**mere** [1] - 3998:18

**merge** [5] - 3825:10, 3861:2, 4029:21, 4030:14, 4068:10

**merger** [18] - 3825:8, 3859:14, 3861:9,

3911:9, 3911:10, 3912:7, 3912:9, 3940:13, 4030:16, 4030:19, 4031:19, 4032:10, 4033:14, 4036:8, 4036:16, 4037:10, 4043:24, 4057:14

**merging** [1] - 3861:10

**merits** [8] - 3835:15, 3843:18, 3844:2, 3851:19, 3852:2, 3977:1, 3992:10, 3992:20

**mess** [1] - 3826:9

**method** [3] - 3857:18, 4076:5, 4098:7

**methodology** [6] - 3859:7, 3967:19, 3967:22, 3979:9, 3980:7, 3981:16

**metric** [3] - 4093:15, 4094:15, 4100:21

**MICHAEL** [3] - 3815:7, 3815:13, 4110:5

**Michael** [3] - 3813:1, 3813:4, 3815:12

**MICHIGAN** [1] - 3810:4

**microphone** [1] - 4015:19

**mid-'80s** [1] - 3836:11

**midafternoon** [2] - 4107:4, 4107:21

**middle** [11] - 3824:7, 3824:10, 3827:23, 3889:2, 3894:5, 3908:4, 3915:19, 4019:19, 4086:2, 4088:1, 4088:9

**middleman** [3] - 3827:19, 3919:23, 4098:11

**middlemen** [3] - 3827:17, 3828:13, 4036:2

**midway** [1] - 3902:1

**might** [38] - 3821:16, 3860:25, 3861:3, 3864:21, 3878:12, 3879:17, 3879:25, 3880:10, 3891:6, 3891:20, 3891:23, 3907:3, 3911:25, 3918:9, 3930:5, 3938:6, 3938:7, 3961:18, 3989:22, 3989:24, 3990:7, 3996:5, 4001:2, 4001:23, 4004:3, 4009:9, 4024:21, 4024:23, 4027:6, 4038:7, 4055:24, 4081:3, 4087:6, 4105:16, 4106:4, 4106:19

**millions** [4] - 3952:15, 3952:20, 3953:13, 4033:18

**mind** [4] - 3834:12, 3917:2, 3955:11, 4064:14

**minds** [2] - 4044:17, 4045:10

**mine** [2] - 3900:18, 4057:7

**minimize** [2] - 3954:4, 4077:7

**minus** [2] - 4093:18, 4098:21

**minute** [13] - 3865:20, 3883:9, 3902:2, 3920:10, 3939:20, 3943:10, 3943:25, 3975:5, 4043:13, 4058:3, 4070:20, 4094:5, 4098:9

**minutes** [6] - 3822:6, 3877:25, 3919:9, 3974:16, 4018:9, 4048:25

**misapplied** [1] - 4046:25

**misapplying** [1] - 4057:8

**misheard** [2] - 4083:23, 4085:13

**misimpression** [1] - 4091:18

**misleading** [1] - 4037:16

**misremembering** [3] - 4030:25, 4091:13, 4103:14

**miss** [1] - 4080:10

**miss-recollecting** [1] - 4080:10

**missed** [1] - 4036:11

**misses** [1] - 4035:25

**missing** [4] - 4046:1, 4046:8, 4050:13, 4100:9

**Missouri** [1] - 3811:3

**MISSOURI** [2] - 3810:4, 3811:1

**misspoke** [1] - 3983:3

**misspoken** [2] - 4014:16, 4085:12

**misstates** [1] - 4049:6

**misunderstanding** [2] - 3976:16, 4036:23

**misunderstood** [2] - 4019:5, 4049:19

**misused** [1] - 4046:25

**Mitch** [1] - 3812:8

**MITCH** [1] - 3811:4

**MITCHELL** [1] - 3810:21

**MITCHELL-TOMBRAS** [1] - 3810:21

**mitigate** [1] - 3851:8

**mix** [1] - 3980:6

**mixed** [2] - 3980:13, 3981:8

**mobile** [7] - 3817:17, 3878:11, 3878:24, 3879:3, 3945:7, 3945:8, 3945:16

**mode** [1] - 3957:18

**model** [8] - 3946:2, 3948:9, 3999:12, 3999:17, 4007:16, 4014:1, 4014:2, 4045:16

**moderated** [1] - 3846:14

**moment** [10] - 3813:9, 3874:18, 3886:23, 4002:7, 4026:16, 4034:15, 4068:23, 4080:21, 4106:8, 4108:4

**money** [41] - 3832:11, 3832:21, 3833:4, 3833:8, 3834:5, 3840:20, 3852:23, 3852:25, 3853:14, 3866:21, 3867:12, 3868:20, 3869:19, 3871:9, 3873:2, 3873:7, 3882:11, 3882:13, 3891:9, 3900:4, 3900:5, 3905:10, 3905:16, 3918:4, 3929:20, 3936:12, 3941:3, 3949:7, 3950:2, 3952:4, 3955:25, 3959:3, 3959:4, 3966:22, 3974:7, 4013:3, 4024:18, 4024:21, 4027:9, 4081:10

**money's** [1] - 3832:14

**moneys** [1] - 3885:8

**monitor** [14] - 3839:15, 3846:16, 3850:18, 3865:19, 3868:5, 3872:6, 3874:14, 3887:25, 3926:4, 3926:6, 3939:3, 3978:13, 3986:1, 4000:2

**monopolist** [56] - 3862:13, 3862:16, 3862:20, 3863:19, 3864:1, 3864:17, 3867:21, 3872:17, 3874:19, 3874:20, 3874:23, 3874:24, 3897:24, 3898:5, 3898:7, 3898:9, 3900:3, 3903:23, 3904:4, 3904:6, 3904:21, 3904:24, 3905:10, 3907:2, 3907:5, 3907:16, 3907:22, 3910:12, 3911:25, 3913:1, 3913:4, 3913:6, 3913:21, 3914:6, 3914:10, 3914:15, 3916:5, 3916:7, 3916:9, 3916:12, 3917:8, 3917:21, 3918:13, 3919:7, 3919:8, 3920:10, 3920:16, 3921:16, 3936:17, 3956:24, 4040:1, 4044:18, 4045:11, 4048:19, 4055:1, 4099:6

NICOLE CANALES, CSR, RPR

**Monopolist** [51] - 3859:11, 3859:18, 3859:19, 3860:17, 3860:25, 3861:14, 3861:16, 3862:6, 3862:9, 3862:11, 3862:15, 3863:1, 3863:13, 3864:10, 3896:19, 3901:24, 3903:12, 3903:17, 3907:15, 3912:12, 3912:23, 3913:8, 3913:12, 3919:17, 3922:3, 3922:9, 3924:1, 4041:4, 4042:4, 4042:17, 4043:6, 4043:9, 4044:2, 4044:22, 4046:12, 4046:22, 4047:3, 4047:20, 4048:3, 4048:17, 4054:23, 4055:6, 4056:18, 4056:25, 4057:11, 4057:15, 4059:10, 4059:11, 4060:1, 4060:18, 4061:5

**monopolist's** [2] - 3913:1, 3913:23
**monopolists** [1] - 4055:7
**monopolization** [2] - 3876:15
**monopoly** [3] - 3910:16, 4048:7, 4057:3
**MONTANA** [1] - 3810:5
**month** [2] - 3844:23, 4065:14
**months** [1] - 3977:6
**MOORE** [1] - 3811:7
**moreover** [1] - 3977:15
**morning** [39] - 3812:5, 3812:7, 3812:8, 3812:10, 3812:11, 3812:13, 3812:15, 3815:16, 3835:13, 3902:2, 3903:11, 3935:23, 3938:23, 3956:23, 3969:15, 3970:11, 3988:24, 3989:2, 4048:16, 4048:18, 4056:5, 4059:17, 4060:17, 4060:21, 4062:5, 4078:23, 4081:3, 4082:12, 4082:20, 4082:23, 4083:21, 4084:25, 4088:4, 4088:20, 4093:21, 4102:10, 4105:19, 4106:12, 4109:21
**morning's** [1] - 4061:12
**most** [21] - 3817:8, 3828:14, 3834:21, 3842:21, 3870:19, 3875:22, 3884:20, 3889:4, 3890:1, 3940:22, 3962:12, 3973:21, 3975:2, 3981:15, 3981:21, 3990:6, 4004:24, 4013:16, 4013:21, 4064:25
**motivation** [1] - 3868:12
**move** [8] - 3885:1, 3888:10, 3956:18, 3958:12, 4025:13, 4027:23, 4081:17, 4082:10
**moved** [3] - 3839:12, 3878:21
**moving** [3] - 3818:13, 3851:25, 4057:24
**MR** [200] - 3812:5, 3812:8, 3812:11, 3812:13, 3812:18, 3812:21, 3812:25, 3814:3, 3814:11, 3815:4, 3815:15, 3820:10, 3820:13, 3820:16, 3820:17, 3823:3, 3823:9, 3823:12, 3837:22, 3838:2, 3839:15, 3846:16, 3850:21, 3850:23, 3857:6, 3858:9, 3858:13, 3862:8, 3863:10, 3865:19, 3868:4, 3872:6, 3874:13, 3880:3, 3880:24, 3883:7, 3887:25, 3889:18, 3892:12, 3892:15, 3899:2, 3899:16, 3901:23, 3902:4, 3903:5, 3903:8, 3903:10, 3906:7, 3906:16, 3906:19, 3909:17, 3910:20, 3912:20, 3914:18, 3917:19, 3922:12, 3924:25, 3926:4, 3926:7,

3927:3, 3928:13, 3928:24, 3930:8, 3931:2, 3939:3, 3946:14, 3948:13, 3950:15, 3956:12, 3956:17, 3957:17, 3961:17, 3961:21, 3966:12, 3967:6, 3967:17, 3967:18, 3971:16, 3971:20, 3971:24, 3972:15, 3974:15, 3978:1, 3978:6, 3978:9, 3978:12, 3978:18, 3979:3, 3982:9, 3983:24, 3984:21, 3985:25, 3986:15, 3987:21, 3988:22, 3990:13, 3991:16, 3992:1, 3993:21, 3994:2, 3995:16, 4000:2, 4001:22, 4002:7, 4004:13, 4004:19, 4005:11, 4008:13, 4008:18, 4011:20, 4014:12, 4014:15, 4014:23, 4015:1, 4015:3, 4015:6, 4015:11, 4015:13, 4015:15, 4015:20, 4015:22, 4017:12, 4017:16, 4017:18, 4021:2, 4025:13, 4025:16, 4025:19, 4027:16, 4027:20, 4027:22, 4027:24, 4029:7, 4029:8, 4030:5, 4030:8, 4031:11, 4040:25, 4044:6, 4044:8, 4044:10, 4049:4, 4049:8, 4058:1, 4058:5, 4059:7, 4071:11, 4072:7, 4072:8, 4072:12, 4072:18, 4072:22, 4072:25, 4073:2, 4074:25, 4075:2, 4075:4, 4075:7, 4075:10, 4075:13, 4076:21, 4077:1, 4083:5, 4083:10, 4083:12, 4092:16, 4092:22, 4094:4, 4094:16, 4105:9, 4105:13, 4105:16, 4105:21, 4105:24, 4106:4, 4106:6, 4106:14, 4106:19, 4106:25, 4107:7, 4107:9, 4107:12, 4107:17, 4107:22, 4107:23, 4108:3, 4108:8, 4108:11, 4108:19, 4108:23, 4108:24, 4109:5, 4109:8, 4109:10, 4109:12, 4109:15, 4109:18, 4109:20, 4110:6, 4110:7
**multiple** [1] - 4074:22
**multiples** [1] - 3983:11
**multiplied** [1] - 3970:1
**multiplies** [1] - 3875:5
**multiply** [2] - 3969:25
**MUSSER** [1] - 3810:21
**must** [7] - 3946:20, 4007:10, 4020:12, 4027:9, 4034:25, 4035:2, 4036:4
**mutually** [1] - 4001:14

# N

**N.Y.U** [2] - 3816:9, 3816:10
**name** [10] - 3815:11, 3815:12, 3828:4, 3862:11, 3879:5, 3879:8, 3948:20, 4063:24, 4063:25, 4084:3
**named** [2] - 3879:5, 4089:18
**names** [5] - 3833:10, 3893:9, 3895:7, 4082:19, 4091:1
**narrow** [6] - 3878:12, 4043:16, 4044:2, 4055:15, 4057:9
**narrower** [2] - 4030:24, 4068:16
**nationally** [1] - 4064:25
**natural** [1] - 3936:19
**nature** [5] - 3891:7, 3999:11, 4010:25, 4018:17, 4036:7

**navigate** [1] - 4020:12
**near** [5] - 3886:18, 3946:19, 3983:10, 4061:3, 4088:21
**NEBRASKA** [1] - 3810:5
**necessarily** [5] - 3927:7, 3928:10, 4021:8, 4050:2, 4050:22
**necessary** [3] - 3979:20, 4052:24, 4053:10
**need** [23] - 3825:11, 3849:13, 3852:11, 3854:24, 3860:15, 3860:19, 3866:18, 3866:21, 3886:19, 3891:8, 3901:9, 3901:10, 3906:24, 3921:7, 3933:8, 3969:19, 4007:19, 4017:12, 4024:11, 4027:12, 4049:9, 4049:10, 4069:16
**needed** [1] - 3952:3
**needs** [2] - 3879:20, 4041:14
**negative** [12] - 3852:17, 3905:18, 3905:22, 3970:20, 3973:21, 3980:3, 4006:21, 4021:13, 4021:16, 4021:17, 4021:22, 4022:24
**negotiated** [1] - 3964:22
**negotiating** [1] - 3965:15
**negotiation** [2] - 3948:22, 3948:24
**Neiman** [2] - 4000:22, 4000:23
**Neiman's** [1] - 4000:24
**Nelson** [1] - 3930:10
**net** [5] - 3929:22, 3985:21, 4023:8, 4023:13, 4024:2
**network** [177] - 3818:1, 3821:14, 3821:23, 3822:1, 3822:6, 3826:16, 3826:25, 3827:3, 3827:19, 3827:23, 3827:24, 3828:6, 3828:12, 3828:23, 3829:4, 3829:6, 3829:14, 3829:15, 3829:17, 3829:19, 3829:24, 3829:25, 3830:9, 3830:11, 3830:13, 3833:4, 3833:6, 3833:7, 3833:24, 3833:25, 3834:1, 3834:4, 3834:5, 3840:9, 3842:12, 3844:11, 3858:18, 3858:21, 3863:17, 3863:19, 3863:23, 3864:10, 3868:21, 3878:22, 3905:6, 3905:12, 3905:15, 3906:3, 3906:8, 3906:12, 3909:22, 3910:14, 3910:15, 3910:25, 3912:17, 3915:6, 3915:7, 3915:10, 3915:15, 3917:10, 3918:1, 3919:23, 3920:8, 3920:18, 3921:17, 3922:15, 3925:9, 3925:10, 3927:12, 3927:25, 3929:5, 3931:15, 3932:18, 3932:19, 3932:21, 3937:4, 3940:1, 3942:22, 3942:24, 3943:18, 3946:16, 3946:25, 3947:8, 3948:6, 3950:14, 3952:13, 3953:17, 3962:11, 3963:11, 3963:12, 3982:18, 3983:3, 3983:14, 3984:11, 3995:24, 4005:17, 4006:7, 4006:8, 4006:11, 4006:13, 4006:14, 4006:18, 4006:19, 4006:22, 4007:7, 4007:9, 4007:11, 4012:5, 4012:6, 4012:12, 4012:13, 4019:18, 4019:24, 4020:2, 4020:8, 4020:10, 4023:21, 4023:22, 4023:24, 4024:18, 4028:4, 4030:20, 4031:21, 4032:4, 4032:11, 4033:14, 4034:7, 4034:23, 4034:25, 4035:3, 4036:4, 4036:16, 4037:11, 4037:24,

4038:11, 4038:23, 4039:3, 4039:5, 4039:12, 4039:13, 4039:15, 4039:18, 4040:9, 4040:11, 4041:22, 4045:17, 4047:13, 4050:17, 4054:7, 4054:13, 4055:6, 4056:7, 4057:9, 4057:12, 4057:17, 4057:19, 4069:8, 4073:25, 4074:4, 4095:3, 4095:5, 4097:17, 4097:22, 4098:13, 4098:18, 4101:17, 4101:20, 4101:25, 4102:3, 4102:6, 4103:11, 4103:17

**network's** [3] - 3830:4, 3854:1, 4098:2

**networks** [82] - 3822:8, 3826:14, 3826:23, 3827:16, 3828:13, 3828:17, 3831:4, 3834:11, 3843:20, 3844:12, 3852:15, 3853:1, 3854:10, 3855:4, 3856:22, 3863:25, 3871:10, 3872:18, 3877:15, 3878:8, 3878:16, 3903:24, 3907:19, 3909:18, 3910:6, 3918:2, 3918:4, 3924:21, 3925:13, 3925:15, 3925:19, 3930:2, 3931:15, 3931:22, 3931:25, 3932:13, 3934:7, 3934:8, 3939:11, 3941:7, 3941:9, 3941:10, 3942:11, 3946:1, 3946:13, 3953:12, 3954:7, 3979:8, 3980:17, 3980:18, 3980:20, 3984:10, 3993:5, 3993:6, 3993:14, 4002:14, 4003:11, 4003:18, 4004:9, 4006:5, 4020:13, 4029:20, 4030:13, 4033:11, 4036:2, 4039:25, 4040:3, 4040:6, 4047:8, 4053:16, 4053:18, 4054:16, 4054:18, 4054:21, 4055:10, 4055:21, 4057:11, 4057:22, 4061:16, 4074:5

**never** [9] - 3877:1, 3894:1, 3894:4, 3917:2, 3929:15, 4001:2, 4046:20, 4046:23, 4092:25

**new** [12] - 3879:11, 3879:14, 3942:24, 3944:9, 3944:15, 3944:18, 3944:19, 3944:23, 4004:3, 4004:5, 4006:7, 4073:19

**NEW** [2] - 3810:1, 3810:5

**New** [10] - 3810:6, 3811:8, 3811:12, 3811:19, 3860:10, 3994:21, 4001:12, 4026:3

**next** [152] - 3812:16, 3813:11, 3823:15, 3826:5, 3826:8, 3827:12, 3830:15, 3830:25, 3831:1, 3832:9, 3832:10, 3834:7, 3834:25, 3835:2, 3835:4, 3835:9, 3836:8, 3836:21, 3837:7, 3837:9, 3838:3, 3838:19, 3839:14, 3839:19, 3841:10, 3842:9, 3844:19, 3845:19, 3846:17, 3846:19, 3849:10, 3850:23, 3851:1, 3851:13, 3853:6, 3854:24, 3857:16, 3857:22, 3858:9, 3858:13, 3862:8, 3863:10, 3867:13, 3868:5, 3869:23, 3870:23, 3874:13, 3875:12, 3881:11, 3883:7, 3885:4, 3889:18, 3889:19, 3890:1, 3892:5, 3895:3, 3895:4, 3895:15, 3896:12, 3899:16, 3902:7, 3903:6, 3906:19, 3907:4, 3907:18, 3908:13, 3908:21, 3909:17, 3910:20, 3912:20, 3914:18, 3917:19, 3919:21, 3922:12, 3922:21,

3922:22, 3924:3, 3924:25, 3926:5, 3926:10, 3927:3, 3930:8, 3930:14, 3932:25, 3933:19, 3933:20, 3934:20, 3935:19, 3937:9, 3937:11, 3937:12, 3937:16, 3938:15, 3939:4, 3941:11, 3946:23, 3948:14, 3950:16, 3951:4, 3952:14, 3957:16, 3958:22, 3960:1, 3962:3, 3963:6, 3966:23, 3969:14, 3969:18, 3971:19, 3978:25, 3982:9, 3982:13, 3983:24, 3984:1, 3984:21, 3985:25, 3986:1, 3986:2, 3986:15, 3986:17, 3987:6, 3987:21, 3987:23, 3988:8, 3988:22, 3990:13, 3991:16, 3991:18, 3992:1, 3993:21, 3994:2, 3994:3, 3995:16, 3998:23, 4001:23, 4002:1, 4004:13, 4005:11, 4008:13, 4008:18, 4020:9, 4027:25, 4033:13, 4043:17, 4058:10, 4068:2, 4075:9, 4106:2, 4106:11, 4106:12, 4106:13, 4107:20

**NGG** [1] - 3810:5

**nice** [2] - 4015:25, 4030:8

**NICHOLAS** [1] - 3810:13

**NICOLE** [1] - 3811:18

**nightmares** [1] - 3967:7

**Nilson** [2] - 3930:12, 3930:13

**nine** [9] - 3917:8, 3917:14, 3917:17, 3917:21, 3918:13, 3918:15, 3923:5, 3986:14, 4021:25

**nobody** [3] - 3861:21, 3995:12, 4107:3

**non** [14] - 3817:9, 3817:20, 3823:4, 3862:18, 3904:1, 3904:12, 3904:17, 3904:19, 3909:11, 3954:24, 3989:18, 4039:18, 4040:8, 4055:22

**non-academic** [2] - 3817:9, 3817:20

**non-acceptance** [1] - 3954:24

**non-discrimination** [2] - 4039:18, 4040:8

**non-public** [1] - 3823:4

**non-revolving** [1] - 4055:22

**non-T** [1] - 3989:18

**non-T&E** [1] - 3909:11

**non-transitory** [4] - 3862:18, 3904:1, 3904:12, 3904:17

**non-trivial** [1] - 3904:19

**nondiscrimination** [1] - 4010:17

**none** [2] - 3822:20, 3822:22

**normal** [1] - 4106:16

**normally** [3] - 3900:12, 3900:16, 3990:2

**notable** [5] - 3848:10, 3849:22, 3980:19, 3989:20, 3992:23

**note** [8] - 3819:5, 3827:6, 3832:12, 3838:13, 3894:25, 3897:8, 3947:20, 3987:17

**noted** [2] - 4058:7, 4109:22

**notes** [4] - 3818:14, 3892:8, 3892:12, 4084:13

**nothing** [18] - 3812:18, 3853:13, 3901:3, 3901:13, 3930:6, 3930:7, 3938:5, 3974:25, 3975:13, 3975:20, 3976:21, 3976:25, 3995:10, 4004:9, 4052:10,

4052:14, 4098:7

**notice** [3] - 3871:1, 3970:8, 3983:9

**noticed** [3] - 3937:25, 4035:13, 4100:12

**noting** [1] - 3849:25

**notion** [3] - 3859:21, 3980:22, 4043:17

**November** [1] - 4075:15

**nowadays** [1] - 3887:24

**nuisance** [1] - 3954:19

**Number** [1] - 3979:3

**number** [114] - 3815:22, 3826:17, 3826:21, 3830:1, 3832:16, 3834:11, 3848:4, 3848:7, 3872:22, 3873:1, 3873:10, 3873:11, 3879:14, 3891:16, 3892:6, 3893:23, 3897:9, 3914:1, 3915:13, 3915:16, 3915:18, 3915:23, 3916:3, 3916:23, 3916:24, 3917:1, 3917:4, 3918:8, 3918:10, 3920:6, 3920:8, 3920:19, 3920:24, 3921:2, 3921:3, 3921:4, 3921:6, 3921:9, 3921:14, 3923:3, 3924:7, 3924:14, 3924:16, 3926:23, 3931:24, 3940:19, 3941:20, 3945:18, 3951:4, 3951:16, 3951:22, 3953:22, 3955:23, 3964:8, 3968:11, 3968:15, 3968:16, 3968:17, 3968:19, 3969:2, 3969:3, 3969:22, 3970:25, 3971:4, 3971:5, 3971:6, 3972:9, 3973:16, 3979:2, 3979:25, 3981:10, 3982:20, 3986:24, 3987:1, 3987:15, 3987:20, 4002:18, 4003:3, 4003:4, 4016:3, 4018:21, 4018:24, 4019:2, 4019:16, 4037:6, 4041:25, 4048:20, 4053:20, 4073:10, 4075:22, 4083:21, 4083:22, 4085:4, 4085:8, 4085:16, 4088:4, 4088:22, 4094:21, 4095:8, 4095:24, 4097:1, 4097:2, 4097:10, 4097:12, 4097:15, 4097:17, 4097:23, 4099:10, 4099:14, 4099:15, 4099:21, 4100:14

**numbers** [71] - 3832:17, 3853:18, 3863:13, 3870:1, 3871:1, 3871:18, 3894:7, 3894:12, 3895:10, 3897:3, 3897:16, 3897:22, 3897:24, 3898:9, 3899:10, 3899:12, 3913:23, 3914:20, 3914:21, 3915:25, 3917:23, 3917:24, 3922:18, 3924:10, 3924:13, 3924:18, 3926:16, 3928:5, 3935:8, 3935:14, 3939:10, 3939:12, 3939:14, 3940:7, 3940:18, 3940:21, 3951:25, 3960:4, 3961:2, 3961:4, 3968:3, 3971:12, 3973:3, 3973:12, 3973:13, 3973:17, 3973:18, 3980:15, 3981:20, 3983:9, 3983:11, 3984:14, 3984:15, 3986:8, 4038:18, 4063:16, 4064:17, 4071:23, 4072:3, 4080:8, 4082:19, 4087:19, 4094:17, 4095:24, 4099:9, 4101:4, 4101:12, 4101:24, 4103:15

**numerator** [3] - 4087:25, 4088:5, 4088:6

**numerical** [4] - 3869:24, 3869:25, 3870:23, 4019:7

**NW** [1] - 3810:17

# O

oath [3] - 3903:3, 3978:15, 4059:4
objection [15] - 3814:9, 3820:12, 3820:13, 3921:12, 4015:2, 4015:6, 4015:8, 4025:15, 4025:16, 4029:8, 4049:4, 4072:8, 4075:3, 4075:4, 4108:22
obligation [1] - 3997:22
observe [1] - 3861:3
obvious [2] - 3879:7, 4004:24
obviously [7] - 3943:7, 3965:15, 3977:7, 4014:16, 4047:15, 4106:20, 4106:25
occasions [2] - 3891:23, 3891:24
occur [3] - 3994:25, 4040:14, 4040:15
occurred [1] - 3840:2
occurs [1] - 3827:10
October [2] - 3926:15, 3929:2
OF [8] - 3810:1, 3810:3, 3810:3, 3810:13, 3810:17, 3810:23, 3811:1, 3811:4
offense [1] - 3878:17
offer [14] - 3820:11, 3844:7, 3844:13, 3865:6, 3867:8, 3949:3, 3954:13, 4008:2, 4015:1, 4025:14, 4029:7, 4056:15, 4072:7, 4074:25
offered [2] - 3836:14, 4055:24
offering [6] - 3835:18, 3836:14, 3944:23, 3976:10, 3999:21, 4012:14
offers [4] - 3943:12, 3976:6, 4012:7, 4055:21
Office [3] - 3810:25, 3811:2, 3811:5
office [1] - 3966:4
official [1] - 4011:4
offset [4] - 3927:14, 3929:22, 3989:2, 4012:15
offsets [2] - 3987:19, 3987:20
offsetting [4] - 3929:6, 3961:10, 3985:20, 4014:11
often [12] - 3833:11, 3856:17, 3871:18, 3883:1, 3887:16, 3911:6, 3953:6, 3969:10, 3971:10, 4065:17, 4073:22, 4090:18
OHIO [2] - 3810:5, 3811:4
Ohio [1] - 3811:5
old [2] - 3839:21, 3878:17
older [1] - 4074:14
once [7] - 3835:1, 3858:5, 3894:17, 3917:2, 4022:3, 4027:13, 4035:2
one [308] - 3814:4, 3818:6, 3818:20, 3823:20, 3824:5, 3825:5, 3826:11, 3827:6, 3827:8, 3828:9, 3828:19, 3829:2, 3829:9, 3831:17, 3832:12, 3834:21, 3835:6, 3835:13, 3835:24, 3836:7, 3838:12, 3840:19, 3841:3, 3844:22, 3848:1, 3848:18, 3850:4, 3850:10, 3851:20, 3852:4, 3853:8, 3854:3, 3854:8, 3856:18, 3856:20, 3857:3, 3858:17, 3858:20, 3865:5, 3865:17, 3865:20, 3867:1, 3871:3, 3871:6, 3872:14, 3875:6, 3876:23,

3876:24, 3878:4, 3878:9, 3881:5, 3881:16, 3881:19, 3881:21, 3883:1, 3885:25, 3886:9, 3886:15, 3886:23, 3887:22, 3888:5, 3888:14, 3888:19, 3889:15, 3889:25, 3891:17, 3893:16, 3894:11, 3895:7, 3895:18, 3897:21, 3898:1, 3900:9, 3900:11, 3900:15, 3901:11, 3903:6, 3904:7, 3906:25, 3907:8, 3907:9, 3908:24, 3910:13, 3911:21, 3912:2, 3912:3, 3913:2, 3914:25, 3915:19, 3918:10, 3919:3, 3919:20, 3925:12, 3927:7, 3927:8, 3930:3, 3933:4, 3933:11, 3937:19, 3939:17, 3939:23, 3940:21, 3940:22, 3941:3, 3941:17, 3941:23, 3942:19, 3943:5, 3943:6, 3943:13, 3943:16, 3943:21, 3943:23, 3944:4, 3944:11, 3944:17, 3945:15, 3947:2, 3947:4, 3947:6, 3947:7, 3949:13, 3950:25, 3952:18, 3952:19, 3953:2, 3953:14, 3954:2, 3954:14, 3954:21, 3954:24, 3955:5, 3955:12, 3958:14, 3960:17, 3961:19, 3961:22, 3963:9, 3967:7, 3971:1, 3972:4, 3972:15, 3973:14, 3973:21, 3975:25, 3976:6, 3976:11, 3977:18, 3979:5, 3979:18, 3980:15, 3980:21, 3981:6, 3983:8, 3983:21, 3986:20, 3986:24, 3987:24, 3988:16, 3989:20, 3990:14, 3990:21, 3994:11, 3994:17, 3996:22, 3997:4, 3998:24, 3999:1, 4000:24, 4001:2, 4001:5, 4001:9, 4001:14, 4001:19, 4002:3, 4002:8, 4002:18, 4003:24, 4004:25, 4006:6, 4007:3, 4007:11, 4008:4, 4008:21, 4011:16, 4013:7, 4014:17, 4014:20, 4016:17, 4016:22, 4016:24, 4017:2, 4017:9, 4017:21, 4017:23, 4018:5, 4018:9, 4018:10, 4018:15, 4019:19, 4020:17, 4021:4, 4021:12, 4021:13, 4021:14, 4021:16, 4023:18, 4024:6, 4024:18, 4027:8, 4028:2, 4028:10, 4028:19, 4031:2, 4034:6, 4036:1, 4036:12, 4036:15, 4037:10, 4037:17, 4037:22, 4038:17, 4041:6, 4041:7, 4042:3, 4042:4, 4042:19, 4043:15, 4043:24, 4044:1, 4044:23, 4045:3, 4045:4, 4045:6, 4045:14, 4045:22, 4046:12, 4047:14, 4047:16, 4049:2, 4050:2, 4050:4, 4050:7, 4050:8, 4051:4, 4052:2, 4052:9, 4052:24, 4053:8, 4053:12, 4054:13, 4054:17, 4054:18, 4054:21, 4055:13, 4055:21, 4056:21, 4057:2, 4057:16, 4063:4, 4064:15, 4066:12, 4066:16, 4066:17, 4069:14, 4072:15, 4074:8, 4074:10, 4074:12, 4074:14, 4074:22, 4074:23, 4075:16, 4076:19, 4076:21, 4078:4, 4079:19, 4084:4, 4084:24, 4086:11, 4087:14, 4087:24, 4089:17, 4090:1, 4090:16, 4090:23, 4092:8, 4092:25, 4094:24, 4095:4, 4099:17, 4100:6, 4100:11, 4100:21, 4101:7,

4101:12, 4102:23, 4106:16, 4108:4, 4108:14, 4108:15, 4108:19
One [1] - 3946:2
one-sided [3] - 3919:20, 4016:24, 4017:9
ones [33] - 3817:8, 3847:3, 3847:7, 3849:14, 3855:13, 3858:16, 3865:1, 3865:2, 3875:9, 3883:3, 3887:20, 3889:15, 3889:16, 3894:16, 3897:10, 3901:15, 3928:14, 3928:15, 3955:18, 3956:5, 3975:17, 3976:9, 3979:15, 3988:20, 4009:7, 4011:11, 4014:20, 4076:15, 4078:8, 4078:9, 4083:18, 4091:12
ongoing [1] - 3995:9
online [6] - 3878:5, 3886:22, 3887:24, 4005:5, 4005:6, 4073:23
open [5] - 3812:1, 3815:1, 3815:19, 4007:22, 4059:1
opening [1] - 4035:13
operate [3] - 3994:23, 4018:15, 4035:3
operates [3] - 3962:15, 3995:23, 4017:2
operating [3] - 3969:23, 3969:24, 3970:10, 3994:21, 4016:9, 4016:12, 4016:14, 4018:5
operation [1] - 3984:11
operational [2] - 3953:8, 3954:5, 3959:13, 3970:21
operations [4] - 3864:4, 3864:5, 3906:12, 3915:16
opinion [4] - 3840:24, 3856:2, 4043:12, 4051:6
Opinion [1] - 4035:22
opinions [1] - 3823:17
opportunities [1] - 4107:17
opportunity [4] - 3813:9, 3837:3, 3838:5, 3925:2
opposed [2] - 3905:13, 3906:1, 3920:17, 3938:23, 3953:11, 4019:7, 4049:23, 4096:16
opposition [1] - 4029:21
opted [1] - 4046:11
options [2] - 4007:22, 4007:23
orange [1] - 3970:7
order [23] - 3834:17, 3841:19, 3862:6, 3871:21, 3873:17, 3874:4, 3913:25, 3970:2, 4007:1, 4008:11, 4013:9, 4018:21, 4018:24, 4019:5, 4019:6, 4019:7, 4024:10, 4024:19, 4043:19, 4043:22, 4043:23, 4044:5, 4053:1
Ordover [1] - 4029:23
organization [5] - 3816:15, 3816:16, 3816:24, 3817:2, 3849:17
organizing [1] - 4032:25
original [1] - 4097:3
ORSINI [3] - 3811:9, 3814:3, 3815:4
Orsini [1] - 3815:2
otherwise [3] - 3836:4, 3992:8, 3993:1
ought [1] - 3982:1
ourselves [2] - 3951:5, 3951:6
outcome [2] - 3861:20, 3861:21

**outlines** [1] - 3823:18
**output** [1] - 3947:6
**outputted** [1] - 4079:23
**outreach** [1] - 3843:12
**outset** [1] - 3842:1
**outside** [3] - 3818:13, 3861:19, 3861:25
**outweighed** [1] - 3822:22
**overall** [24] - 3858:21, 3885:18, 3896:18, 3908:5, 3911:15, 3922:2, 3924:8, 3934:3, 3938:24, 3940:3, 3961:1, 3968:23, 3973:14, 3977:19, 3988:18, 4004:6, 4007:15, 4011:8, 4016:15, 4023:3, 4028:18, 4040:19, 4066:21, 4079:4
**overcome** [1] - 3944:7
**overlap** [1] - 3816:24
**overly** [5] - 4043:16, 4044:2, 4055:15, 4057:8, 4057:9
**oversee** [1] - 3819:11
**oversight** [1] - 4009:21
**overstating** [1] - 4045:23
**overturned** [1] - 4079:3
**overview** [1] - 3858:1
**Overview** [1] - 4035:22
**overwhelming** [1] - 4038:19
**owe** [1] - 3997:24
**own** [11] - 3843:13, 3843:23, 3884:9, 3915:15, 4000:13, 4009:18, 4014:2, 4055:16, 4059:15, 4060:22, 4077:24
**owner** [1] - 4028:6
**ownership** [1] - 4076:4

# P

**p.m** [2] - 4058:7, 4109:22
**pack** [1] - 4106:11
**page** [68] - 3813:11, 3814:15, 3857:23, 3892:8, 3892:12, 3898:11, 3902:7, 3930:14, 3973:23, 4018:3, 4019:15, 4020:9, 4020:10, 4020:16, 4020:20, 4021:25, 4022:1, 4026:14, 4031:13, 4031:17, 4032:19, 4033:13, 4034:14, 4034:19, 4034:20, 4035:19, 4035:21, 4037:4, 4037:7, 4042:23, 4043:4, 4045:6, 4046:16, 4058:10, 4064:14, 4064:17, 4064:18, 4067:12, 4068:2, 4068:22, 4071:22, 4071:23, 4071:24, 4073:10, 4073:11, 4075:19, 4075:21, 4075:22, 4076:1, 4077:2, 4077:3, 4080:21, 4084:10, 4085:2, 4088:3, 4089:16, 4089:21, 4089:25, 4093:20, 4094:3, 4094:4, 4096:11, 4096:13, 4100:5, 4100:14, 4102:25
**PAGE** [1] - 4110:3
**pages** [8] - 3817:8, 4043:1, 4043:2, 4089:24, 4090:25, 4100:6, 4100:7, 4100:9
**paid** [3] - 3832:7, 3924:11, 3927:5
**painful** [1] - 3916:12
**paired** [1] - 3939:14
**paired-up** [1] - 3939:14
**paper** [6] - 3817:9, 3817:13, 3817:14,

3817:17, 3878:20, 4028:1
**paragraph** [25] - 4026:14, 4027:25, 4028:1, 4028:25, 4031:12, 4031:17, 4032:18, 4033:3, 4033:4, 4033:8, 4034:13, 4034:15, 4034:18, 4034:22, 4037:3, 4037:6, 4045:5, 4067:11, 4069:20, 4080:20, 4080:22, 4080:23, 4102:25, 4103:1
**paragraphs** [2] - 4068:21, 4068:23
**parallel** [5] - 3893:11, 3910:25, 3924:17, 3941:16, 3972:23
**parentheses** [2] - 3827:24, 3848:7
**parenthesis** [1] - 4002:21
**part** [53] - 3818:10, 3822:9, 3839:24, 3842:25, 3843:11, 3849:17, 3853:12, 3854:5, 3880:9, 3880:11, 3880:12, 3880:17, 3884:11, 3889:15, 3904:17, 3908:10, 3909:24, 3914:10, 3915:9, 3915:15, 3915:22, 3917:1, 3919:4, 3919:22, 3920:13, 3921:4, 3929:17, 3944:17, 3947:7, 3948:4, 3948:22, 3956:1, 3957:24, 3960:11, 3960:25, 3964:5, 3964:9, 3964:12, 3964:17, 3969:14, 3976:6, 3976:15, 4010:2, 4016:18, 4051:8, 4062:3, 4066:21, 4079:4, 4082:4, 4086:16, 4096:22, 4103:13, 4103:15
**partially** [3] - 3927:14, 4010:20, 4047:24
**participants** [1] - 3936:21
**participants'** [1] - 3824:16
**participate** [1] - 3842:25
**particular** [74] - 3816:18, 3818:9, 3823:23, 3829:24, 3832:5, 3836:15, 3842:16, 3842:17, 3847:20, 3848:4, 3849:17, 3849:21, 3850:2, 3850:4, 3854:15, 3856:22, 3857:1, 3861:20, 3864:17, 3879:17, 3882:22, 3888:13, 3892:2, 3893:1, 3894:1, 3894:10, 3897:9, 3899:14, 3913:19, 3913:20, 3927:11, 3935:1, 3939:9, 3940:8, 3948:25, 3950:25, 3968:6, 3968:21, 3970:14, 3977:8, 3977:19, 3993:19, 3996:6, 3996:8, 3999:12, 4004:1, 4004:5, 4012:14, 4022:12, 4022:17, 4023:14, 4032:8, 4041:2, 4041:9, 4049:16, 4054:7, 4064:6, 4064:7, 4068:21, 4071:19, 4074:12, 4076:17, 4078:2, 4078:4, 4079:13, 4089:17, 4090:6, 4095:9, 4096:23, 4102:16, 4103:24, 4109:2
**particularly** [23] - 3816:25, 3817:22, 3822:12, 3840:9, 3843:8, 3851:21, 3866:18, 3895:25, 3899:12, 3921:20, 3923:8, 3946:3, 3946:7, 3964:4, 3964:18, 3991:6, 4004:4, 4004:11, 4008:23, 4008:24, 4077:6, 4080:22, 4081:10
**particulars** [2] - 3904:16, 4064:16
**parties** [6] - 3812:17, 3827:19, 3830:18, 3859:2, 3861:10, 3976:1
**partly** [2] - 3897:11, 3955:8
**parts** [13] - 3828:16, 3832:14, 3847:20,

3892:9, 3907:24, 3920:7, 3946:1, 3952:24, 3958:23, 3970:19, 4038:6, 4078:3, 4109:2
**party** [8] - 3814:3, 3814:6, 3920:23, 3932:14, 3932:17, 3944:3, 3966:10, 3982:24
**pass** [9] - 3840:16, 3853:3, 3853:12, 3853:24, 3854:11, 3854:18, 3855:11, 4032:12, 4033:15
**passed** [10] - 3834:3, 3834:5, 3853:2, 3854:2, 3854:22, 3915:9, 4039:24, 4040:3, 4040:13, 4040:22
**passes** [4] - 3833:1, 3833:4, 3833:8, 3855:13
**passing** [1] - 4040:14
**passthrough** [2] - 3854:16, 3854:17
**past** [4] - 3826:1, 3942:1, 4009:7, 4036:23
**path** [1] - 3895:17
**patronize** [1] - 4004:16
**patterns** [2] - 4071:2, 4071:17
**pause** [5] - 3846:18, 4026:18, 4034:21, 4094:7, 4097:12
**Pause** [1] - 4034:16
**pay** [39] - 3832:1, 3855:22, 3857:2, 3866:6, 3868:20, 3875:22, 3880:20, 3881:2, 3883:25, 3884:3, 3886:25, 3888:18, 3889:10, 3889:17, 3890:7, 3891:9, 3891:15, 3891:16, 3891:17, 3906:1, 3920:23, 3936:6, 3936:7, 3946:4, 3957:9, 3963:5, 3963:21, 3975:11, 3976:12, 3994:15, 3997:22, 4028:13, 4038:15, 4039:23, 4040:19, 4040:20, 4065:12, 4065:13
**paying** [26] - 3832:13, 3840:12, 3840:21, 3844:9, 3855:23, 3869:8, 3886:10, 3890:11, 3891:13, 3891:14, 3891:21, 3905:21, 3909:25, 3910:3, 3918:7, 3923:2, 3927:13, 3927:22, 3927:25, 3928:1, 3998:1, 4021:20, 4021:22, 4022:23, 4107:12
**payment** [57] - 3831:6, 3831:8, 3832:3, 3832:6, 3833:2, 3834:15, 3834:22, 3843:4, 3855:15, 3868:16, 3868:25, 3871:3, 3871:24, 3874:6, 3874:15, 3875:10, 3875:13, 3880:8, 3880:20, 3881:4, 3881:12, 3881:14, 3881:21, 3882:24, 3883:3, 3883:13, 3883:14, 3885:19, 3885:22, 3886:5, 3886:12, 3886:20, 3887:15, 3888:2, 3888:13, 3890:10, 3899:21, 3899:24, 3918:19, 3923:17, 3929:12, 3959:17, 4016:17, 4020:11, 4021:4, 4022:18, 4041:18, 4047:6, 4059:23, 4062:5, 4063:3, 4074:12, 4076:2, 4076:5
**Payment's** [1] - 4072:16
**Payments** [2] - 3817:11, 4072:16
**payments** [13] - 3817:15, 3817:16, 3817:19, 3853:19, 3883:25, 3885:2, 4019:13, 4021:5, 4028:9, 4064:23, 4073:24, 4076:9, 4076:12

**PayPal** [1] - 3878:6
**PayPal's** [1] - 3879:1
**pays** [11] - 3832:12, 3832:20, 3833:19, 3886:8, 3905:5, 3926:19, 3959:17, 3959:18, 4039:19, 4040:13, 4095:17
**penetration** [1] - 4073:19
**penny** [1] - 4099:23
**people** [128] - 3816:19, 3817:24, 3829:17, 3829:20, 3840:21, 3840:22, 3855:18, 3860:12, 3861:4, 3862:3, 3864:16, 3866:8, 3866:17, 3866:19, 3866:20, 3866:22, 3867:10, 3868:13, 3868:23, 3869:1, 3870:6, 3870:10, 3875:22, 3875:23, 3878:1, 3878:4, 3880:16, 3883:13, 3883:25, 3884:20, 3884:22, 3887:2, 3887:6, 3888:17, 3888:22, 3890:7, 3890:11, 3891:13, 3891:14, 3891:15, 3892:1, 3892:2, 3892:23, 3892:25, 3893:4, 3893:5, 3893:15, 3893:19, 3893:21, 3893:25, 3894:3, 3894:4, 3894:5, 3894:8, 3894:13, 3894:15, 3894:19, 3894:20, 3894:22, 3895:11, 3895:12, 3895:13, 3899:23, 3900:13, 3900:14, 3901:5, 3901:6, 3901:7, 3901:8, 3901:14, 3901:16, 3904:19, 3915:25, 3916:25, 3927:9, 3929:16, 3938:10, 3943:14, 3945:20, 3955:25, 3956:1, 3958:24, 3962:9, 3962:14, 3975:5, 3975:7, 3975:16, 3975:21, 3976:8, 3976:9, 3976:10, 3994:23, 3995:2, 3997:14, 3998:9, 3998:12, 3998:15, 3999:18, 4002:5, 4003:8, 4003:17, 4011:10, 4020:4, 4020:6, 4021:9, 4030:3, 4050:20, 4055:16, 4059:21, 4074:13, 4074:14, 4077:15, 4078:21, 4085:6, 4086:17, 4087:14, 4087:21, 4088:9, 4088:10, 4090:18, 4092:9, 4092:11
**per** [2] - 3891:21, 4009:18
**perceive** [5] - 3840:18, 3870:9, 4007:18, 4045:16, 4087:4
**perceived** [1] - 4065:25
**percent** [86] - 3832:17, 3854:15, 3854:17, 3854:19, 3854:20, 3870:14, 3870:17, 3870:22, 3871:2, 3871:4, 3871:12, 3871:13, 3871:14, 3872:1, 3873:12, 3894:9, 3904:14, 3904:15, 3904:17, 3913:20, 3915:4, 3915:6, 3915:17, 3915:20, 3915:21, 3916:2, 3916:6, 3916:18, 3916:19, 3917:2, 3917:3, 3917:14, 3917:16, 3917:18, 3917:21, 3918:1, 3918:13, 3918:15, 3919:24, 3920:4, 3921:1, 3922:16, 3922:17, 3923:6, 3924:6, 3926:23, 3935:13, 3955:21, 3973:10, 4038:24, 4039:1, 4039:14, 4057:3, 4060:12, 4061:4, 4076:4, 4076:5, 4076:6, 4076:8, 4076:10, 4076:11, 4079:14, 4079:15, 4079:25, 4080:1, 4080:6, 4080:7, 4081:23, 4081:24, 4094:20, 4095:6, 4095:8, 4095:11, 4096:4, 4097:6, 4098:14, 4098:17, 4099:15,

4101:8, 4101:13, 4101:21, 4101:23
**percentage** [58] - 3869:20, 3870:8, 3871:2, 3871:6, 3871:11, 3872:3, 3888:12, 3890:3, 3893:22, 3894:8, 3895:14, 3896:21, 3896:22, 3896:24, 3913:19, 3918:6, 3918:7, 3920:6, 3924:19, 3926:17, 3927:19, 3964:10, 3964:20, 3969:5, 3969:8, 4003:7, 4003:8, 4003:19, 4039:6, 4078:10, 4084:20, 4085:4, 4085:8, 4085:16, 4085:17, 4085:22, 4087:21, 4088:11, 4089:8, 4090:7, 4090:8, 4090:17, 4090:20, 4091:9, 4092:11, 4094:17, 4097:4, 4097:16, 4097:20, 4097:25, 4099:3, 4099:11, 4099:20
**percentages** [6] - 3991:1, 4087:23, 4087:25, 4092:9, 4092:12, 4095:9
**perceptions** [1] - 3877:5
**perfect** [1] - 3918:20
**perfectly** [1] - 4066:25
**perform** [3] - 3823:6, 3828:13, 3923:25
**performance** [2] - 4029:4, 4104:18
**perhaps** [2] - 3865:9, 3907:9
**period** [17] - 3883:11, 3883:19, 3909:3, 3931:25, 3937:23, 3986:6, 3986:9, 4085:10, 4085:19, 4086:3, 4087:12, 4088:18, 4089:2, 4090:6, 4090:22, 4091:5, 4092:5
**periodically** [1] - 3823:5
**permit** [1] - 3876:13
**person** [7] - 3886:6, 3886:9, 3891:5, 3891:12, 3900:20, 3900:22, 3900:24
**personally** [2] - 3818:23, 4038:13
**perspective** [24] - 3829:22, 3843:2, 3866:8, 3867:12, 3870:21, 3882:2, 3910:4, 3917:25, 3918:5, 3923:1, 3923:4, 3933:7, 3934:4, 3938:22, 3950:11, 3952:20, 3954:5, 3989:4, 4005:1, 4012:12, 4050:12, 4051:12, 4051:23, 4053:6
**Perspective** [1] - 4072:16
**Perusing** [3] - 4069:1, 4071:18, 4080:25
**PETER** [1] - 3811:10
**ph** [1] - 3930:10
**pharmaceutical** [1] - 3977:4
**phenomenon** [1] - 4036:6
**PHILIP** [1] - 3811:13
**philosophy** [1] - 3908:6
**phone** [6] - 3829:20, 3878:13, 3879:3, 3945:7, 3945:9, 3945:16
**phones** [3] - 3878:11, 3878:24, 3878:25
**phrase** [2] - 3819:5, 4016:2
**physical** [1] - 3878:19
**pick** [5] - 3826:10, 3831:17, 3957:12, 4001:5, 4054:18
**picked** [4] - 4001:1, 4089:5, 4089:6, 4091:15
**picking** [2] - 3880:7, 4005:1
**picks** [1] - 4033:13
**picture** [1] - 3955:24
**piece** [2] - 3878:14, 3966:22

**pieces** [5] - 3960:3, 3960:5, 3967:24, 3990:18, 4039:11
**piggyback** [1] - 3944:5
**piggybacking** [4] - 3878:7, 3878:8, 3945:25, 3946:13
**pigs** [1] - 3936:22
**piles** [1] - 3882:19
**PIN** [14] - 4030:13, 4032:6, 4032:11, 4033:11, 4033:14, 4033:16, 4033:24, 4033:25, 4034:7, 4034:10, 4035:11, 4035:12, 4073:22, 4073:25
**pioneers** [1] - 3836:18
**pitfalls** [1] - 4061:5
**place** [12] - 3824:15, 3825:7, 3833:4, 3841:9, 3846:10, 3846:12, 3849:25, 3856:11, 3863:20, 3978:1, 4050:22, 4059:20
**placed** [1] - 3908:18
**places** [2] - 3856:8, 3856:10
**plaintiff** [1] - 3812:9
**PLAINTIFF** [2] - 3810:16, 3810:23
**Plaintiff's** [1] - 4093:22
**plaintiff's** [1] - 4060:25
**Plaintiffs** [1] - 3810:7
**plaintiffs** [5] - 3893:11, 3895:21, 4031:19, 4056:22, 4082:25
**plan** [1] - 4107:19
**planes** [2] - 3873:9, 3884:18
**planned** [1] - 3886:22
**plastic** [6] - 3878:14, 4050:21, 4089:1, 4090:18, 4091:4, 4092:5
**plate** [2] - 3878:18, 3878:20
**platform** [26] - 3828:23, 3852:8, 3852:13, 3874:9, 3904:4, 3904:7, 3922:16, 3929:5, 3929:7, 3974:24, 3975:17, 3975:24, 3977:17, 3977:19, 3977:21, 4016:2, 4016:6, 4016:7, 4016:9, 4021:12, 4028:3, 4028:5, 4028:6, 4028:11, 4028:18, 4039:23
**platforms** [5] - 3827:16, 3831:5, 3852:11, 3904:4, 3915:3
**plausible** [1] - 3983:15
**play** [2] - 3878:25, 3882:16
**player** [1] - 3965:18
**playing** [1] - 4004:10
**Plaza** [2] - 3811:7, 3811:19
**plead** [1] - 3967:1
**plug** [3] - 3945:6, 3945:7, 3945:15
**plummeting** [1] - 3883:15
**plus** [3] - 3986:5, 4092:1, 4095:2
**point** [67] - 3820:10, 3829:11, 3831:12, 3832:3, 3836:2, 3838:14, 3839:16, 3842:18, 3848:25, 3867:8, 3871:6, 3875:15, 3877:6, 3880:21, 3881:22, 3881:23, 3882:1, 3886:6, 3887:5, 3894:15, 3896:1, 3897:8, 3897:10, 3908:1, 3908:12, 3909:9, 3913:18, 3914:12, 3914:17, 3921:8, 3921:13, 3922:14, 3929:14, 3932:18, 3938:18, 3943:14, 3944:19, 3945:16, 3952:10, 3961:13, 3961:23, 3963:2, 3966:2,

3970:23, 3981:5, 3982:4, 3984:8, 3987:25, 4005:23, 4005:24, 4030:20, 4031:21, 4032:4, 4051:19, 4055:8, 4059:23, 4059:25, 4064:15, 4073:23, 4075:18, 4087:6, 4097:12, 4097:13, 4099:21, 4102:19, 4106:7, 4108:24

**pointed** [2] - 4056:22, 4092:24

**pointing** [10] - 3838:9, 3853:11, 3855:7, 3886:11, 3933:15, 3933:21, 3947:4, 3952:18, 3962:21, 4021:10

**points** [16] - 3826:13, 3870:8, 3874:2, 3894:21, 3915:18, 3916:3, 3973:15, 4014:15, 4039:9, 4055:13, 4095:24, 4097:2, 4097:14, 4097:15, 4099:23

**Policy** [2] - 4025:22, 4026:4

**policy** [5] - 3817:22, 3819:13, 3959:14, 3959:15, 3963:20

**poor** [1] - 3899:24

**pop** [9] - 3908:23, 3908:25, 3909:1, 3909:8, 3951:23, 3952:19, 3988:10, 4002:17, 4003:23

**pop-up** [6] - 3908:23, 3908:25, 3909:1, 3909:8, 3951:23, 3952:19

**popped** [1] - 3951:24

**popular** [2] - 3945:11, 3945:14

**population** [2] - 4091:10, 4091:12

**populations** [1] - 3892:24

**portfolio** [1] - 3886:5

**portion** [8] - 4038:22, 4039:5, 4039:19, 4040:9, 4056:1, 4072:19, 4080:23, 4101:25

**portions** [1] - 4039:8

**position** [6] - 3816:4, 3997:7, 4005:22, 4010:1, 4045:2, 4056:20

**positive** [6] - 3829:25, 3951:8, 3951:25, 3979:25, 4021:20, 4022:22

**possess** [4] - 3904:25, 3939:2, 3980:22, 3992:5

**possessed** [2] - 3942:3, 3984:20

**possesses** [2] - 3938:17, 3990:19

**possibility** [9] - 3842:4, 3848:25, 3891:25, 3904:10, 3910:11, 3946:15, 4008:7, 4010:18, 4021:24

**possible** [11] - 3815:3, 3877:14, 3941:23, 3993:22, 3996:12, 3997:17, 4008:14, 4013:15, 4014:3, 4023:8, 4050:10

**possibly** [3] - 3943:11, 4002:15, 4006:21

**Post** [2] - 3810:25, 3811:2

**potential** [4] - 3980:25, 3999:23, 4010:8, 4028:5

**potentially** [6] - 3823:25, 3849:20, 3947:3, 4000:10, 4087:11, 4100:22

**power** [88] - 3824:20, 3824:21, 3824:24, 3824:25, 3825:1, 3825:12, 3826:1, 3857:18, 3858:2, 3858:6, 3937:8, 3937:11, 3937:17, 3937:18, 3938:3, 3938:5, 3938:7, 3938:10, 3938:11, 3938:13, 3938:17, 3939:2, 3941:24, 3942:3, 3946:21, 3947:1, 3947:5,

3952:17, 3957:7, 3957:8, 3974:20, 3976:14, 3976:17, 3976:19, 3976:23, 3976:24, 3976:25, 3977:10, 3977:11, 3977:12, 3977:13, 3977:19, 3977:22, 3977:24, 3978:21, 3980:18, 3980:23, 3982:2, 3982:6, 3982:7, 3982:13, 3982:15, 3983:23, 3984:20, 3985:1, 3985:4, 3985:8, 3985:12, 3989:13, 3989:15, 3990:12, 3990:19, 3990:23, 3991:11, 3991:13, 3991:15, 3991:18, 3991:21, 3991:24, 3992:4, 3992:6, 3992:11, 3992:17, 4018:16, 4019:12, 4022:4, 4023:17, 4024:4, 4024:11, 4029:2, 4036:17, 4036:22, 4037:11, 4056:20, 4061:20, 4061:23, 4104:2

**practical** [1] - 3891:19

**practice** [3] - 3911:5, 3911:8, 3912:2

**practices** [4] - 3824:17, 3824:18, 4030:22, 4031:22

**practitioner** [1] - 3817:23

**precise** [1] - 4025:5

**precisely** [4] - 3944:7, 4010:6, 4012:24, 4080:3

**predicated** [2] - 3822:9, 3838:25

**predict** [2] - 3812:21, 3825:11

**prediction** [1] - 3854:14

**predominant** [1] - 3888:17

**preempting** [1] - 4009:14

**prefer** [4] - 3842:22, 3842:24, 3843:17, 3844:1

**preference** [40] - 3831:14, 3831:22, 3835:20, 3842:8, 3842:10, 3842:12, 3842:16, 3842:17, 3842:19, 3842:21, 3842:24, 3843:5, 3843:21, 3843:23, 3843:24, 3843:25, 3844:1, 3844:12, 3844:16, 3844:17, 3844:24, 3845:16, 3851:23, 3992:21, 3993:9, 3993:11, 4009:6, 4009:10, 4009:15, 4009:18, 4009:22, 4010:10, 4010:11, 4010:17, 4010:21, 4010:25, 4011:10, 4073:20, 4073:22

**preferences** [6] - 3874:10, 3903:16, 3993:12, 4012:18, 4012:19, 4012:25

**preferred** [1] - 4011:3

**premises** [1] - 3842:23

**Premium** [1] - 4100:18

**premium** [20] - 3891:19, 3936:7, 3959:22, 3960:15, 3971:3, 3973:5, 3979:6, 3980:16, 3980:17, 3980:20, 3981:4, 3981:13, 3981:19, 3982:4, 3982:5, 3991:10, 4007:1, 4013:23

**premiums** [4] - 3979:9, 3980:25, 3981:1, 3981:2

**prepare** [3] - 3817:14, 3817:17, 3822:23

**prepared** [2] - 4089:16, 4107:23

**preponderance** [2] - 3890:14, 4038:19

**prerequisite** [1] - 3999:24

**prerequisites** [1] - 3983:21

**prerogative** [1] - 4006:23

**presence** [3] - 3821:24, 3985:13, 4083:6

**present** [5] - 3817:13, 4045:13,

4048:15, 4048:16, 4083:14

**presentation** [13] - 3812:20, 3857:12, 3872:10, 3962:18, 3962:19, 3974:9, 4014:25, 4015:3, 4018:25, 4019:9, 4021:3, 4021:25, 4022:1

**presentations** [1] - 3974:3

**preserve** [2] - 3950:3, 3950:6

**pressed** [1] - 3966:20

**pressure** [11] - 3836:5, 3840:15, 3844:25, 3845:5, 3845:14, 3850:17, 3874:22, 3919:6, 3949:15, 3993:2, 4073:18

**pressures** [7] - 3846:13, 3846:14, 3852:1, 3877:13, 3877:16, 3934:5

**Pressures** [1] - 4072:15

**presuming** [1] - 3840:13

**pretax** [1] - 3987:16

**pretty** [3] - 3932:12, 3994:22, 4062:24

**prevalent** [1] - 4020:11

**prevent** [3] - 4005:12, 4008:11, 4030:16

**preventing** [3] - 3994:5, 3997:1

**previous** [5] - 3830:19, 3837:15, 3872:9, 3873:23, 3927:5

**price** [192] - 3835:16, 3836:2, 3836:5, 3836:16, 3837:14, 3840:11, 3841:18, 3843:15, 3846:7, 3846:9, 3846:11, 3846:14, 3846:21, 3847:22, 3849:2, 3849:7, 3851:3, 3851:9, 3851:11, 3851:15, 3854:9, 3854:13, 3855:16, 3856:12, 3857:2, 3857:4, 3862:18, 3862:21, 3863:2, 3863:4, 3863:20, 3863:21, 3864:6, 3864:13, 3864:16, 3868:9, 3869:21, 3885:3, 3896:8, 3898:5, 3898:8, 3900:2, 3900:6, 3904:2, 3904:6, 3904:7, 3904:8, 3904:12, 3904:15, 3904:18, 3904:21, 3904:24, 3905:2, 3905:4, 3905:7, 3905:18, 3905:20, 3905:22, 3905:23, 3907:2, 3907:3, 3907:12, 3907:16, 3909:13, 3910:11, 3911:6, 3911:11, 3911:25, 3912:25, 3913:2, 3913:3, 3913:5, 3913:7, 3913:12, 3913:17, 3913:19, 3913:25, 3914:2, 3914:11, 3914:12, 3916:2, 3916:19, 3917:7, 3917:9, 3917:13, 3919:4, 3919:24, 3921:1, 3921:16, 3925:8, 3925:10, 3929:23, 3929:25, 3931:3, 3935:11, 3935:15, 3936:16, 3936:20, 3937:22, 3937:24, 3943:7, 3947:5, 3947:10, 3947:23, 3949:4, 3949:6, 3949:11, 3949:14, 3949:15, 3949:22, 3951:14, 3952:2, 3955:8, 3955:10, 3958:13, 3965:15, 3969:17, 3970:21, 3971:11, 3975:20, 3980:1, 3982:16, 3983:15, 3983:18, 3983:20, 3983:22, 3984:3, 3984:18, 3985:6, 3985:21, 3985:22, 3986:13, 3988:15, 3989:17, 3990:1, 3990:3, 3990:7, 3990:10, 3991:12, 3992:20, 3995:3, 4007:2, 4012:16, 4021:16, 4021:17, 4021:20, 4021:22, 4022:19, 4022:21, 4022:22, 4022:24, 4023:2, 4023:5, 4023:9, 4023:13,

4023:15, 4024:2, 4024:7, 4024:11, 4024:15, 4026:24, 4027:11, 4027:13, 4039:15, 4039:17, 4054:2, 4054:8, 4056:11, 4064:23, 4086:15, 4092:25, 4093:7, 4093:10, 4093:16, 4096:15, 4097:14, 4097:21, 4097:24, 4098:21, 4098:22, 4098:24, 4099:4, 4099:7, 4099:12, 4101:19, 4103:5

**priced** [7] - 3822:8, 3822:12, 3835:16, 3839:10, 3840:9, 3851:21, 3856:25

**prices** [101] - 3821:15, 3821:17, 3821:23, 3822:1, 3822:2, 3828:21, 3838:4, 3838:11, 3840:4, 3840:7, 3840:13, 3841:18, 3841:21, 3842:3, 3842:5, 3845:24, 3848:1, 3848:6, 3850:14, 3850:17, 3852:6, 3852:7, 3852:14, 3852:15, 3852:17, 3853:1, 3853:23, 3854:1, 3854:4, 3854:6, 3854:21, 3855:4, 3855:15, 3855:17, 3855:23, 3860:14, 3863:7, 3864:10, 3864:14, 3864:18, 3864:20, 3865:3, 3867:21, 3872:15, 3874:20, 3874:23, 3874:24, 3904:23, 3907:20, 3908:10, 3909:15, 3910:6, 3910:16, 3910:18, 3919:10, 3930:1, 3930:2, 3934:16, 3938:4, 3948:2, 3950:14, 3952:9, 3960:18, 3961:5, 3961:7, 3961:16, 3971:13, 3971:14, 3975:4, 3975:12, 3984:4, 3985:9, 3985:10, 3985:12, 3985:14, 3985:15, 3985:17, 3985:19, 3989:18, 3989:22, 3992:9, 4007:25, 4013:20, 4021:12, 4024:6, 4024:18, 4027:7, 4027:9, 4027:13, 4032:16, 4033:17, 4039:24, 4048:19, 4059:14, 4087:17, 4093:11

**pricing** [44] - 3834:2, 3839:13, 3840:15, 3845:23, 3846:14, 3872:16, 3906:22, 3907:20, 3908:2, 3908:6, 3908:13, 3909:7, 3909:18, 3934:10, 3939:1, 3947:21, 3948:2, 3949:18, 3953:3, 3954:4, 3957:21, 3957:23, 3959:21, 3966:25, 3967:22, 3973:7, 3978:22, 3979:1, 3979:6, 3982:4, 3982:5, 3982:11, 3983:14, 3991:10, 4013:23, 4020:15, 4026:8, 4030:22, 4031:22, 4032:11, 4033:14, 4061:13

**primarily** [7] - 3889:1, 3889:14, 3932:14, 3953:1, 3953:14, 4069:23, 4070:8

**Princeton** [1] - 3816:9

**principal** [4] - 3816:15, 3821:6, 3834:18, 4065:11

**principle** [4] - 3851:4, 3863:18, 3976:18, 4025:1

**principles** [7] - 3841:22, 3845:6, 3845:7, 3852:25, 3923:10, 3933:3, 4009:4

**priority** [1] - 4074:1

**private** [9] - 3893:11, 3895:21, 3926:25, 3930:9, 4009:23, 4056:22, 4060:25, 4082:16, 4082:24

**privilege** [1] - 3865:17

**prizing** [1] - 3991:9

**probative** [2] - 4069:8, 4070:22

**problem** [13] - 3866:4, 3866:7, 3870:20, 3870:21, 3940:22, 3942:22, 3942:23, 3976:5, 3999:23, 4007:19, 4044:4, 4044:22, 4046:4

**problems** [4] - 3866:4, 4043:16, 4043:24, 4045:14

**procedure** [1] - 4067:3

**procedures** [1] - 3828:15

**proceed** [2] - 3903:4, 3903:7

**Proceedings** [2] - 3811:21, 3898:11

**proceedings** [2] - 4020:20, 4109:23

**proceeds** [1] - 4054:25

**process** [6] - 3824:23, 3961:1, 3981:23, 3999:9, 4009:14, 4010:6

**processed** [1] - 4081:12

**processing** [2] - 3833:10, 4073:24

**processor** [1] - 3927:9

**processors** [2] - 3932:15, 3932:17

**procompetitive** [17] - 3822:15, 3822:18, 3822:21, 3824:6, 3985:16, 3993:22, 3993:25, 3997:1, 4009:7, 4009:8, 4009:16, 4010:10, 4010:13, 4010:14, 4014:6, 4014:11

**produced** [7] - 3811:22, 4066:18, 4082:15, 4082:22, 4083:1, 4083:2, 4083:15

**producers** [2] - 3861:1, 4046:3

**Product** [1] - 4071:25

**product** [20] - 3858:11, 3858:14, 3858:24, 3861:13, 3925:17, 3938:13, 3975:6, 3976:3, 3976:4, 3976:7, 3976:14, 3976:20, 3977:2, 3977:7, 3977:23, 3995:1, 4050:2, 4055:11, 4057:23, 4060:3

**production** [1] - 3895:22

**products** [39] - 3859:25, 3862:14, 3862:22, 3863:1, 3863:5, 3863:6, 3863:8, 3879:14, 3879:19, 3907:3, 3933:18, 3976:11, 4008:8, 4013:23, 4042:1, 4042:8, 4043:20, 4044:5, 4044:15, 4045:9, 4045:22, 4045:25, 4046:6, 4049:1, 4049:23, 4049:25, 4050:6, 4054:24, 4055:1, 4055:2, 4055:3, 4055:14, 4056:15, 4057:15, 4057:20, 4059:22, 4060:2, 4078:15, 4087:5

**professional** [2] - 3815:17, 3816:1

**Professor** [60] - 3813:1, 3813:4, 3815:16, 3818:13, 3820:11, 3820:18, 3823:13, 3835:1, 3842:7, 3845:20, 3846:20, 3851:14, 3856:1, 3856:8, 3857:7, 3857:12, 3868:6, 3888:2, 3903:11, 3904:11, 3906:20, 3914:20, 3925:1, 3929:2, 3931:3, 3935:20, 3937:7, 3954:9, 3956:18, 3961:22, 3972:12, 3972:19, 3974:18, 3978:19, 3984:23, 3986:3, 3990:15, 4002:1, 4002:8, 4004:21, 4008:15, 4014:3, 4014:17, 4014:18, 4015:23, 4018:13,

**professor** [5] - 3816:7, 4016:2, 4017:21, 4059:8, 4073:3

**professor's** [1] - 4014:24

**profit** [11] - 3846:8, 3846:11, 3869:17, 3916:14, 3944:21, 3974:8, 3984:7, 4034:23, 4100:23, 4101:8, 4103:10

**profit-maximizing** [1] - 3846:11

**profitability** [9] - 3846:21, 3847:20, 3913:7, 3950:4, 3950:6, 3986:19, 4024:24, 4101:15, 4104:9

**profitable** [29] - 3836:4, 3841:21, 3850:1, 3862:16, 3862:20, 3863:21, 3864:7, 3864:11, 3874:20, 3875:25, 3903:25, 3910:17, 3912:25, 3913:11, 3914:2, 3917:10, 3921:17, 3936:17, 3948:16, 3949:12, 3951:20, 3951:22, 3985:23, 3988:15, 3988:19, 3989:11, 3992:25, 4054:19, 4054:20

**profitably** [4] - 3874:24, 3919:4, 3937:22, 3989:19

**profits** [16] - 3905:11, 3913:2, 3950:11, 3985:24, 4028:6, 4103:16, 4104:1, 4104:5, 4104:6, 4104:15, 4104:16, 4104:17, 4104:21, 4104:22, 4104:25

**Program** [1] - 3997:10

**program** [10] - 3962:16, 3962:20, 3962:24, 3963:2, 3963:4, 3963:19, 3963:23, 3965:13, 3986:22, 3989:14

**Programs** [1] - 4075:14

**programs** [2] - 3963:18, 4003:18

**projecting** [1] - 3987:14

**promised** [1] - 3962:7

**promising** [1] - 3925:1

**promote** [5] - 3876:14, 3879:19, 4081:7, 4081:22

**promoting** [1] - 3879:15

**promotion** [2] - 3988:13, 3996:25

**promotional** [2] - 3843:12, 3996:6

**promotions** [1] - 3996:3

**properly** [1] - 4066:12

**proportion** [2] - 3890:10, 4038:24

**proposed** [2] - 4036:16, 4037:10

**proposition** [2] - 3976:13, 3994:22

**proprietary** [3] - 3892:15, 3921:5, 4000:23

**protect** [3] - 3814:3, 3882:7, 4010:6

**protected** [1] - 3882:5

**protecting** [3] - 3994:9, 4008:17, 4013:25

**protections** [3] - 3881:25, 3882:6

**protocols** [1] - 3828:15

**prove** [2] - 3946:25, 3947:2

**provide** [12] - 3820:7, 3828:14, 3842:15, 3858:1, 3868:7, 3963:13, 3963:14, 3995:12, 3995:21, 3996:22, 3999:19, 4108:20

**provided** [11] - 3858:18, 3858:21,

3876:23, 3877:2, 3940:2, 3995:13, 3995:20, 3999:25, 4037:24, 4038:2, 4063:10
**provider** [2] - 3839:25, 4060:23
**providers** [3] - 4055:3, 4061:8, 4061:10
**provides** [4] - 3936:19, 3991:10, 3996:12, 4057:19
**providing** [9] - 3882:15, 3973:17, 3995:5, 3996:8, 3996:9, 4067:5, 4098:11, 4103:11, 4103:16
**provision** [2] - 3995:14, 4031:21
**provisions** [5] - 3820:19, 3820:23, 3856:10, 4039:18, 4040:8
**PTI** [1] - 3987:5
**public** [27] - 3814:2, 3823:4, 3823:5, 3823:8, 3823:9, 3837:21, 3841:11, 3850:20, 3850:21, 3868:4, 3874:14, 3876:19, 3876:21, 3876:24, 3876:25, 3877:2, 3877:5, 3903:5, 3910:21, 3926:6, 3930:9, 3930:10, 3984:22, 3990:14, 4004:19, 4108:7
**publications** [2] - 3817:4, 3817:9
**publicly** [2] - 3899:16, 3909:21
**published** [6] - 3817:1, 3817:3, 3823:11, 3841:12, 3850:22, 4063:25
**pull** [2] - 3900:20, 3955:19
**purchase** [6] - 3826:23, 3885:2, 3886:22, 3891:7, 3934:23, 3940:25
**purchased** [1] - 3905:3
**purchaser** [1] - 3891:23
**purchases** [6] - 3856:12, 3856:13, 3867:9, 3868:14, 3893:25, 4062:24
**purchasing** [4] - 3875:11, 4002:20, 4002:24, 4047:11
**purple** [3] - 3883:17, 3932:3, 3932:4
**purpose** [23] - 3858:17, 3858:20, 3860:12, 3910:24, 3912:17, 3937:14, 3941:12, 4016:12, 4023:6, 4050:16, 4096:9, 4097:7, 4097:8, 4099:2, 4099:18, 4099:22, 4101:9, 4104:24, 4105:1
**purposes** [19] - 3829:9, 3829:13, 3883:21, 3884:23, 3907:15, 3908:9, 3909:23, 4015:4, 4015:8, 4037:23, 4041:6, 4041:13, 4042:1, 4042:9, 4050:16, 4083:11, 4095:6, 4104:1, 4106:21
**pursue** [4] - 3947:9, 4007:12, 4007:14, 4045:15
**push** [3] - 3932:17, 4012:5, 4098:20
**pushes** [1] - 3948:3
**put** [49] - 3837:9, 3845:14, 3856:22, 3861:6, 3861:17, 3870:1, 3874:22, 3881:3, 3904:18, 3913:15, 3916:4, 3916:18, 3918:24, 3921:1, 3921:2, 3923:1, 3923:3, 3934:5, 3940:7, 3944:11, 3952:20, 3954:19, 3960:2, 3960:4, 3972:25, 3992:18, 3994:9, 3997:4, 4002:9, 4004:24, 4004:25, 4008:16, 4017:15, 4017:21, 4018:24,

4045:24, 4047:16, 4053:16, 4055:14, 4059:19, 4060:4, 4060:14, 4067:4, 4072:21, 4088:10, 4096:2, 4097:3, 4106:9, 4109:13
**putting** [10] - 3917:25, 3943:4, 3944:14, 3945:25, 3968:5, 3970:21, 4043:17, 4059:11, 4073:18, 4105:2
**puzzled** [1] - 4030:23
**PX-2702** [1] - 3823:2
**PX-2703** [4] - 3815:20, 3815:21, 3816:1, 3817:5
**PX2702** [5] - 4015:7, 4015:9, 4111:4
**PX2703** [1] - 4015:7

**Q**

**QSR** [2] - 3971:23, 3973:16
**qualification** [1] - 4079:6
**qualifications** [1] - 3816:2
**quality** [18] - 3832:5, 3976:3, 3976:4, 3976:7, 3976:11, 3976:14, 3976:20, 3977:2, 3977:7, 3977:13, 3977:18, 3977:23, 3998:16, 3999:13, 4004:15, 4004:22, 4012:11, 4013:24
**quantification** [1] - 3939:9
**quantity** [3] - 3864:9, 3864:11, 3969:18
**question's** [1] - 3854:3
**questioning** [2] - 3867:13, 3950:10
**questions** [14] - 3816:25, 3824:22, 3826:3, 3827:8, 3876:23, 3914:25, 3936:10, 3971:16, 4002:18, 4003:24, 4014:13, 4048:6, 4070:17, 4097:19
**quick** [4] - 3890:17, 3897:3, 3971:24, 3971:25
**quick-service** [2] - 3890:17, 3897:3
**quickly** [2] - 3832:3, 3832:7
**quite** [9] - 3892:18, 3918:23, 3940:5, 3966:19, 3973:22, 3991:2, 4002:15, 4083:20, 4105:1
**quotation** [8] - 3836:16, 3837:2, 3837:9, 3838:7, 3839:5, 3841:16, 3948:18, 4036:21
**quote** [1] - 4068:1
**quoting** [1] - 4047:16

**R**

**R-plus-M** [1] - 4095:2
**raise** [26] - 3815:5, 3827:8, 3849:2, 3850:14, 3855:2, 3862:20, 3863:1, 3863:3, 3864:17, 3874:20, 3898:5, 3898:7, 3904:7, 3905:4, 3905:11, 3907:2, 3910:18, 3913:3, 3937:21, 3937:24, 3971:13, 3975:20, 4028:4, 4028:5, 4048:19, 4049:11
**raised** [13] - 3845:24, 3847:22, 3853:23, 3867:21, 3919:4, 3985:23, 3989:18, 3990:1, 3990:3, 3990:7, 3990:10
**raises** [6] - 3863:20, 3864:10, 3904:21, 3913:2, 3975:4, 3989:22
**raising** [17] - 3836:24, 3837:13, 3855:5, 3860:14, 3874:24, 3887:5, 3904:6,

3905:12, 3905:14, 3913:3, 3913:4, 3914:2, 3914:11, 3947:5, 3985:18, 4033:17, 4087:18
**ran** [1] - 3878:20
**random** [1] - 4091:15
**range** [6] - 3889:6, 3915:17, 3940:12, 3972:22, 3983:9, 3984:15
**rate** [59] - 3832:24, 3833:15, 3833:18, 3833:23, 3848:12, 3848:13, 3868:24, 3871:2, 3871:6, 3871:19, 3872:13, 3872:20, 3873:1, 3874:2, 3910:3, 3918:10, 3920:5, 3920:17, 3920:20, 3920:22, 3921:11, 3924:6, 3924:7, 3924:9, 3927:11, 3932:7, 3935:14, 3951:2, 3951:7, 3951:21, 3958:10, 3973:14, 3979:11, 3979:13, 3979:14, 3979:21, 3979:24, 3980:6, 3980:13, 3981:8, 3981:10, 3981:11, 3982:21, 3982:23, 3986:10, 3986:23, 3986:25, 3989:8, 3997:24, 4095:14, 4095:15, 4095:21, 4096:3, 4096:20, 4096:21, 4097:3, 4102:1, 4102:5
**rates** [21] - 3836:24, 3837:14, 3837:18, 3837:20, 3853:20, 3909:3, 3909:4, 3926:18, 3927:4, 3928:8, 3928:9, 3946:4, 3963:5, 3979:19, 3980:10, 3980:13, 3981:6, 3986:4, 4032:15, 4103:5
**rather** [9] - 3826:14, 3871:6, 3949:5, 3949:21, 4027:8, 4038:16, 4067:5, 4090:10, 4099:21
**ratings** [2] - 4063:9, 4063:14
**rational** [7] - 3840:16, 3855:11, 3871:22, 3875:24, 3952:11, 3959:24, 4012:11
**reach** [6] - 3821:4, 3822:17, 3825:16, 3912:16, 3917:12, 3996:25
**reached** [7] - 3818:24, 3821:7, 3825:18, 3825:20, 3838:6, 3912:22, 3988:17
**reaching** [3] - 4024:10, 4026:24, 4067:25
**react** [1] - 3866:25
**reaction** [3] - 3919:9, 3925:19, 3933:5
**READ** [1] - 3810:20
**read** [21] - 3837:10, 3839:23, 3880:15, 3897:3, 3915:13, 3924:18, 3940:18, 3941:20, 3947:19, 3950:19, 3970:7, 4044:6, 4044:11, 4045:7, 4049:9, 4049:10, 4066:7, 4074:7, 4077:23, 4078:3, 4078:9
**reading** [5] - 3837:2, 3880:1, 3890:9, 4037:8, 4044:13
**ready** [2] - 4038:7, 4094:8
**real** [3] - 3916:15, 4044:16, 4045:10
**realities** [1] - 4044:24
**reality** [1] - 3897:11
**realized** [2] - 3839:11, 3848:1
**really** [43] - 3818:20, 3825:18, 3825:24, 3831:3, 3834:13, 3841:25, 3863:5, 3863:9, 3864:24, 3865:22, 3873:16, 3875:15, 3875:20, 3876:1, 3883:21,

3890:22, 3900:14, 3901:7, 3901:14, 3905:7, 3911:24, 3918:14, 3919:9, 3925:14, 3930:6, 3933:2, 3933:11, 3933:24, 3936:10, 3943:10, 3948:5, 3955:25, 3956:15, 3960:6, 3961:11, 3969:14, 3974:11, 3976:20, 3999:16, 4007:20, 4013:10, 4027:19, 4045:24
**reask** [1] - 4049:18
**reason** [31] - 3821:15, 3825:5, 3829:20, 3834:18, 3834:23, 3838:24, 3862:24, 3871:17, 3878:2, 3879:7, 3881:7, 3885:21, 3892:2, 3910:13, 3916:8, 3916:10, 3933:10, 3942:18, 3942:20, 3942:21, 3947:16, 3954:1, 3977:12, 3983:6, 3992:11, 3999:22, 4009:6, 4066:9, 4070:20, 4097:11, 4098:17
**reasonable** [4] - 3859:22, 3859:24, 3860:1, 4053:8
**reasonably** [6] - 3848:21, 3903:13, 3989:10, 4041:7, 4042:10, 4106:15
**reasoning** [1] - 3924:17
**reasons** [13] - 3855:2, 3921:19, 3923:6, 3923:13, 3943:23, 3945:15, 3947:2, 3949:13, 3953:14, 3954:23, 3976:11, 3996:23, 4012:23
**recalled** [2] - 4070:20, 4071:20
**recalling** [1] - 4071:8
**recap** [1] - 3903:21
**recapture** [26] - 3836:1, 3836:4, 3845:21, 3845:22, 3846:1, 3846:21, 3847:19, 3849:8, 3850:1, 3850:2, 3850:9, 3851:2, 3852:2, 3853:22, 3919:4, 3923:18, 3984:24, 3985:3, 3985:6, 3986:3, 3986:6, 3988:12, 3989:11, 3989:14, 3991:14, 3992:22
**receipt** [2] - 3944:12, 4021:22
**received** [10] - 4015:8, 4015:9, 4025:17, 4025:20, 4029:9, 4029:11, 4072:10, 4072:11, 4075:5, 4075:8
**receives** [3] - 3832:21, 4023:14, 4024:3
**recent** [5] - 3817:8, 3827:1, 3892:10, 3940:23, 3981:21
**recently** [2] - 3818:8, 3879:5
**recess** [2] - 3978:10, 4058:9
**Recess** [1] - 3902:6
**Recession** [4] - 3827:11, 3884:11, 3885:11, 3934:25
**recite** [2] - 4071:23, 4072:4
**recognize** [13] - 3861:15, 3867:6, 3867:15, 3895:8, 3947:22, 3961:18, 4018:25, 4019:7, 4031:13, 4036:5, 4067:7, 4080:14, 4080:19
**recognized** [2] - 3976:18, 4104:8
**recognizes** [2] - 3867:4, 3960:17
**recognizing** [2] - 3952:9, 4062:1
**recollect** [3] - 4030:23, 4075:19, 4078:16
**recollecting** [1] - 4080:10
**recollection** [14] - 4026:5, 4027:15, 4030:18, 4032:1, 4032:14, 4033:20, 4033:22, 4047:18, 4054:5, 4063:19,

4089:3, 4091:13, 4102:17, 4105:7
**record** [9] - 3814:1, 3815:11, 4038:4, 4044:12, 4069:21, 4072:4, 4079:20, 4093:21, 4108:6
**record's** [1] - 4085:3
**recorded** [1] - 3811:21
**records** [1] - 4105:5
**recovery** [1] - 3885:13
**recreate** [1] - 3913:15
**recross** [1] - 4106:24
**red** [12] - 3826:25, 3885:9, 3888:19, 3888:20, 3908:18, 3931:13, 3958:8, 3958:18, 3970:11, 3971:4, 3986:24, 3987:16
**redactions** [2] - 4031:10, 4072:18
**redirect** [2] - 4106:3, 4107:24
**reduce** [2] - 4033:11, 4039:22
**reduces** [1] - 3842:2
**reducing** [1] - 3843:14
**reenforces** [2] - 3982:16, 3992:16
**reenforcing** [1] - 4001:15
**refer** [5] - 3820:23, 3826:13, 3893:10, 3970:20, 3998:9
**reference** [2] - 3926:21, 4049:5
**referenced** [1] - 3929:18
**references** [1] - 3892:13
**referencing** [1] - 3906:20
**referred** [7] - 3823:11, 3841:12, 3850:22, 3911:6, 3912:6, 4032:21, 4033:25
**referring** [7] - 3838:10, 3953:9, 3994:6, 4022:10, 4044:12, 4067:17, 4079:19
**refers** [1] - 3994:13
**refine** [1] - 3879:23
**reflect** [2] - 4103:10, 4104:25
**reflected** [1] - 3953:21, 3980:7
**reflecting** [5] - 3899:12, 3899:14, 3983:1, 4098:19, 4098:20
**reflects** [1] - 3895:18
**refresh** [4] - 4032:1, 4033:20, 4034:10, 4047:18
**refreshes** [1] - 4033:22
**refuse** [1] - 3996:24
**regard** [4] - 3887:14, 3950:4, 4008:20, 4044:23
**regional** [1] - 4073:25
**regression** [7] - 4079:8, 4079:11, 4079:16, 4079:22, 4079:23, 4082:2
**regulated** [6] - 3928:6, 3928:8, 3928:14, 3928:16, 3928:23, 3928:25
**regulation** [6] - 3819:18, 3819:19, 3926:15, 3928:13, 3928:20, 4029:3
**Regulation** [4] - 3925:7, 3935:3, 4025:22, 4026:4
**regulators** [1] - 4021:8
**reimburse** [1] - 3963:22
**reimbursed** [1] - 3887:20
**reinforced** [1] - 4061:19
**reject** [1] - 3954:22
**rejected** [3] - 3954:19, 3955:13, 3956:9
**rejection** [1] - 3954:16

**relate** [2] - 3850:9, 4091:1
**related** [6] - 4044:14, 4053:6, 4060:25, 4073:8, 4082:10, 4096:14
**relates** [3] - 3979:1, 4089:17, 4094:22
**relating** [1] - 4108:12
**relations** [1] - 3843:25
**relationship** [16] - 3828:5, 3830:11, 3830:12, 3833:3, 3844:13, 3844:17, 3844:25, 3951:11, 3966:15, 3984:8, 4000:17, 4000:21, 4001:1, 4001:6, 4001:9, 4010:25
**relationships** [4] - 3851:24, 4000:6, 4001:20
**relative** [12] - 3826:20, 3871:19, 3925:10, 3929:25, 3973:13, 3984:4, 4061:14, 4072:3, 4081:7, 4081:22, 4084:6, 4101:14
**relatively** [4] - 3887:17, 3890:24, 3951:16, 4065:2
**relevance** [3] - 3953:4, 3957:6
**relevant** [90] - 3816:25, 3818:12, 3824:23, 3858:5, 3858:14, 3858:24, 3859:3, 3859:8, 3860:23, 3861:2, 3861:6, 3861:7, 3861:12, 3862:4, 3862:22, 3863:24, 3880:15, 3906:22, 3906:23, 3910:12, 3912:17, 3912:19, 3913:13, 3914:2, 3917:11, 3919:13, 3919:14, 3921:18, 3922:7, 3923:21, 3923:23, 3924:21, 3924:24, 3935:21, 3937:4, 3937:8, 3937:21, 3942:6, 3942:8, 3952:25, 3964:13, 3977:24, 3977:25, 3982:12, 3984:25, 3989:15, 3990:20, 3991:24, 3996:7, 3998:25, 4001:23, 4022:3, 4023:16, 4024:3, 4035:12, 4041:6, 4046:1, 4048:3, 4049:1, 4052:21, 4055:4, 4056:16, 4056:19, 4057:1, 4059:15, 4060:2, 4060:7, 4060:10, 4060:18, 4060:23, 4066:13, 4067:23, 4068:12, 4085:10, 4085:18, 4085:24, 4086:3, 4087:12, 4088:13, 4088:18, 4089:1, 4089:7, 4090:10, 4091:5, 4092:5, 4093:15, 4094:14, 4104:17, 4104:21
**reliable** [1] - 3981:21
**relied** [4] - 4061:25, 4066:16, 4069:7, 4070:21
**rely** [1] - 4010:15
**relying** [1] - 4104:11
**remain** [1] - 4107:1
**remains** [1] - 3904:19
**remember** [27] - 3833:5, 3834:9, 3837:11, 3848:19, 3852:11, 3853:10, 3857:11, 3878:18, 3905:13, 3909:21, 3913:21, 3921:23, 3929:12, 3943:23, 3962:6, 3970:12, 3974:9, 3991:20, 4002:16, 4030:2, 4032:6, 4032:17, 4062:19, 4064:14, 4066:2, 4071:15, 4094:1
**remind** [6] - 3814:7, 3903:3, 3910:22, 3978:15, 4030:9, 4059:4
**reminded** [2] - 4030:2, 4030:10

reminder [1] - 3992:18
reminds [2] - 4032:3, 4100:8
remote [1] - 3886:21
remove [1] - 3908:23
removed [1] - 4006:2
rent [1] - 4107:12
rental [7] - 3882:17, 3882:20, 3890:1, 3890:10, 3899:8, 3899:9, 3910:2
rentals [1] - 3918:22
repair [1] - 3891:8
repeat [6] - 4019:2, 4037:1, 4037:6, 4083:22, 4085:13, 4100:14
replace [5] - 3878:11, 3883:21, 4049:2, 4050:2, 4076:11
replaced [6] - 3883:24, 4076:6, 4076:8, 4076:9, 4076:10
replacement [1] - 3946:16
replacing [6] - 3879:12, 3884:2, 3884:3, 3884:5, 3884:12, 4050:4
Report [1] - 4075:15
report [37] - 3932:10, 4024:14, 4031:14, 4031:15, 4031:16, 4032:19, 4034:10, 4034:12, 4034:14, 4035:13, 4035:17, 4037:4, 4043:7, 4043:9, 4043:11, 4047:9, 4047:16, 4062:10, 4062:12, 4062:14, 4062:16, 4063:8, 4068:8, 4068:20, 4068:25, 4069:4, 4075:18, 4075:20, 4079:7, 4080:15, 4081:20, 4082:9, 4083:14, 4084:5, 4084:24, 4100:3, 4100:5
reported [4] - 4090:14, 4091:16, 4095:8, 4105:2
REPORTER [1] - 3811:18
reporting [1] - 4065:24
reports [7] - 4017:23, 4031:3, 4031:5, 4063:21, 4065:25, 4075:16
represent [7] - 3827:22, 3918:1, 3969:3, 4045:18, 4069:5, 4086:2, 4103:5
representation [1] - 4101:12
representations [1] - 4070:17
representative [4] - 3847:5, 3849:14, 3962:18, 4064:25
representing [1] - 3969:5
reputation [1] - 3998:15
require [1] - 3963:16
required [1] - 3864:15
requiring [1] - 3965:7
research [3] - 3816:14, 3817:24, 3887:7
Research [1] - 4075:14
Reserve [5] - 3817:10, 3819:17, 3926:21, 3926:23, 4063:3
residual [1] - 3890:13
resistant [1] - 4008:9
resolve [1] - 3826:3
resources [2] - 3843:12, 4005:6
respect [7] - 4023:15, 4052:4, 4062:9, 4063:10, 4063:20, 4078:1
respected [1] - 3828:20
respective [1] - 4077:21
respond [15] - 3843:10, 3851:2, 3852:1, 3854:7, 3868:9, 3904:20, 3925:13,

3931:5, 3934:8, 3934:10, 3936:24, 3992:9, 4006:11, 4008:1, 4008:10
responded [4] - 3849:7, 3900:2, 3929:13, 4063:20
responding [1] - 4008:5
responds [2] - 3936:24, 4064:23
response [28] - 3838:9, 3839:4, 3839:6, 3843:14, 3843:15, 3843:16, 3848:17, 3864:9, 3864:11, 3864:15, 3867:20, 3867:22, 3885:3, 3917:6, 3921:21, 3921:23, 3923:4, 3924:18, 3925:3, 3925:21, 3935:11, 3935:14, 3937:2, 3989:25, 3990:1, 4013:7, 4077:18, 4081:21
responses [3] - 3835:22, 3992:22, 4035:1
responsibilities [2] - 3818:18, 3819:8
responsive [8] - 3846:5, 3846:6, 3846:7, 3854:9, 3854:13, 3864:12, 3864:13, 4040:18
rest [4] - 3959:11, 4032:17, 4044:9, 4044:11
restate [2] - 4087:8, 4091:22
restaurant [3] - 3998:18, 4005:2, 4005:3
restaurants [5] - 3890:17, 3897:4, 3971:24, 3971:25, 4004:25
restraint [1] - 3876:18
restraints [4] - 3818:3, 3818:8, 3818:10, 4014:4
restricting [1] - 3947:6
restrictions [1] - 3942:13
result [23] - 3840:11, 3840:12, 3845:5, 3849:25, 3855:9, 3857:19, 3863:6, 3864:19, 3873:13, 3948:6, 3999:16, 4030:19, 4031:20, 4032:16, 4037:14, 4039:20, 4039:21, 4039:23, 4076:7, 4079:13, 4082:2, 4083:7
resulted [3] - 3836:3, 3846:4, 4099:15
resulting [2] - 3854:1, 4073:20
results [5] - 3846:8, 3847:19, 3986:20, 4002:2, 4090:13
resumes [1] - 3903:1
retail [5] - 4033:12, 4082:15, 4083:15, 4089:17, 4090:21
retailer [3] - 3994:25, 4084:3, 4088:12
retailers [10] - 3994:18, 3994:19, 3994:23, 3995:4, 3995:11, 4000:7, 4000:16, 4013:17, 4091:24
retails [1] - 3995:5
retaining [1] - 3870:19
retains [1] - 3871:2
retention [1] - 3849:16
return [4] - 3841:18, 3897:7, 3902:2, 3984:23
revenue [8] - 3987:18, 3988:11, 3989:1, 3989:5, 3990:10, 4073:18, 4093:18, 4103:18
revenues [10] - 3984:16, 3985:23, 3986:23, 3989:21, 3989:22, 3990:1, 3990:8, 4098:9, 4098:12, 4103:22
reverse [2] - 3980:3, 4029:23

review [1] - 3820:19
reviewed [7] - 4026:19, 4034:15, 4038:13, 4064:15, 4077:22, 4077:25, 4081:1
revised [1] - 4107:24
revolve [2] - 4065:3, 4065:12
revolvers [1] - 4077:7
revolving [3] - 4055:22, 4077:15, 4077:17
reward [3] - 3821:17, 3821:23, 3822:2, 3838:17
Rewards [1] - 3997:10
rewards [38] - 3836:18, 3842:15, 3844:7, 3852:16, 3852:20, 3852:22, 3853:16, 3853:19, 3855:25, 3883:2, 3905:7, 3905:8, 3905:17, 3905:21, 3905:24, 3929:11, 3929:14, 3929:15, 3929:19, 3929:21, 3962:14, 3962:15, 3962:16, 3962:20, 3963:2, 3963:3, 3965:13, 3965:20, 3997:10, 3997:13, 3997:15, 3998:3, 4021:9, 4021:18, 4021:22, 4022:24, 4028:13, 4040:23
RHODE [1] - 3810:6
rid [1] - 4013:8
right-hand [2] - 4064:18, 4085:15
rise [7] - 3883:20, 3922:6, 3932:1, 4036:18, 4037:12, 4037:13
rising [3] - 3884:11, 3889:16, 3935:1
risk [2] - 3897:18, 3897:23
rivals [1] - 3845:13
river [1] - 4107:2
role [8] - 3823:7, 3877:23, 3878:25, 3882:17, 4004:10, 4011:20, 4024:5, 4102:3
roles [2] - 4029:24, 4029:25
roll [1] - 3912:3
room [6] - 3916:25, 3951:21, 3961:6, 3971:13, 3973:20
roughly [3] - 3891:4, 3894:20, 3917:8
round [3] - 3832:16, 3924:14, 4097:9
rounded [4] - 3921:8, 3921:10, 4094:21, 4097:12
routing [1] - 4074:1
row [2] - 3940:7, 3982:19
rows [1] - 3939:10
RPR [1] - 3811:18
rule [5] - 3946:18, 4009:5, 4009:17, 4009:18, 4013:8
rules [84] - 3820:3, 3820:24, 3821:2, 3821:8, 3821:11, 3821:19, 3821:24, 3822:11, 3822:14, 3822:23, 3823:24, 3824:18, 3825:22, 3828:21, 3828:22, 3836:3, 3836:6, 3839:9, 3840:25, 3841:4, 3841:5, 3841:6, 3841:8, 3841:14, 3845:9, 3845:15, 3846:2, 3846:4, 3846:10, 3846:12, 3849:24, 3850:9, 3850:10, 3851:16, 3851:18, 3851:22, 3852:5, 3854:2, 3854:21, 3855:1, 3855:6, 3856:3, 3857:8, 3857:20, 3863:20, 3876:7, 3876:12, 3877:11, 3985:13, 3992:3, 3992:6,

3992:12, 3993:3, 3993:13, 3993:23, 3994:8, 3997:2, 4003:14, 4005:16, 4006:1, 4006:10, 4008:5, 4008:22, 4009:12, 4010:7, 4010:9, 4010:12, 4010:13, 4010:17, 4010:19, 4010:22, 4010:23, 4011:25, 4012:3, 4013:25, 4014:5, 4014:7, 4014:8, 4039:21, 4040:17, 4073:25
**run** [1] - 3828:17
**running** [2] - 3986:6, 4092:21

## S

**safely** [1] - 4107:1
**sale** [14] - 3831:12, 3832:4, 3838:14, 3842:18, 3856:11, 3943:14, 3944:19, 3945:16, 3966:3, 4030:20, 4031:21, 4032:4, 4073:23, 4092:21
**sales** [20] - 3839:3, 3869:12, 3869:16, 3869:17, 3869:20, 3870:2, 3870:5, 3870:12, 3870:14, 3870:16, 3870:19, 3873:6, 3873:7, 3890:23, 3916:16, 3935:24, 3941:8, 3941:10, 3945:18
**San** [9] - 3860:9, 3954:13, 3954:25, 3955:16, 3955:19, 3956:2, 3956:13, 3994:21, 4000:22
**Sarin** [1] - 3816:5
**satisfactory** [1] - 4010:19
**save** [1] - 3872:22
**saved** [1] - 3916:16
**saves** [1] - 3871:8
**saving** [2] - 3873:3, 3990:2
**savings** [1] - 3990:4
**saw** [26] - 3834:11, 3835:17, 3836:14, 3837:3, 3838:5, 3840:5, 3851:20, 3851:22, 3918:18, 3933:22, 3934:8, 3935:10, 3935:12, 3936:19, 3972:20, 3974:9, 3988:24, 3989:1, 3989:5, 3992:18, 3992:20, 3993:7, 3993:9, 4009:7, 4074:5
**scale** [1] - 3953:4
**SCANLON** [1] - 3810:20
**schedule** [1] - 3930:4
**SCHILLER** [1] - 3811:11
**SCHNEIDER** [1] - 3811:1
**School** [1] - 3816:6
**school** [1] - 3816:11
**scope** [1] - 3991:24
**score** [1] - 3881:12
**screen** [2] - 3823:4, 3823:8, 3847:17, 3907:25, 3999:8
**se** [1] - 4009:18
**seated** [4] - 3812:2, 3903:2, 3978:11, 4059:2
**second** [38] - 3824:1, 3824:2, 3825:8, 3827:3, 3835:19, 3842:7, 3848:10, 3861:17, 3865:7, 3871:5, 3881:19, 3886:10, 3899:10, 3908:24, 3909:1, 3920:2, 3938:1, 3939:25, 3940:4, 3954:19, 3956:18, 3969:21, 3972:23, 3980:5, 4003:23, 4005:12, 4011:20, 4011:22, 4018:20, 4045:5, 4063:7,

4064:9, 4069:14, 4071:10, 4089:21, 4103:3, 4108:24
**section** [2] - 4064:18, 4073:11
**secular** [3] - 3884:25, 4073:15, 4074:10
**secure** [1] - 3881:21
**security** [9] - 3881:19, 3881:20, 3882:2, 3882:9, 3882:17, 3882:22, 3883:5, 3885:23, 4063:10
**see** [213] - 3817:8, 3821:13, 3822:6, 3824:5, 3824:13, 3826:24, 3827:23, 3832:24, 3833:6, 3833:12, 3835:17, 3837:8, 3837:16, 3839:4, 3839:6, 3839:14, 3839:20, 3839:24, 3840:6, 3845:11, 3848:20, 3850:6, 3850:11, 3852:13, 3856:16, 3856:17, 3864:18, 3867:1, 3869:21, 3870:10, 3870:17, 3871:11, 3872:12, 3873:10, 3873:15, 3877:25, 3881:24, 3883:6, 3884:8, 3884:20, 3885:8, 3885:12, 3885:13, 3885:17, 3885:25, 3887:4, 3887:5, 3888:6, 3888:21, 3888:24, 3888:25, 3889:3, 3889:15, 3889:17, 3890:6, 3890:16, 3892:6, 3893:14, 3893:23, 3894:6, 3894:11, 3894:17, 3895:10, 3895:16, 3897:16, 3899:7, 3899:12, 3908:3, 3909:5, 3909:11, 3915:18, 3918:6, 3918:9, 3918:12, 3920:5, 3920:19, 3921:5, 3922:24, 3923:3, 3923:5, 3924:4, 3924:6, 3924:12, 3924:13, 3924:14, 3924:17, 3925:11, 3925:13, 3925:18, 3925:20, 3925:22, 3926:3, 3929:9, 3930:6, 3931:16, 3931:17, 3931:20, 3933:4, 3934:14, 3934:24, 3934:25, 3935:4, 3935:7, 3935:16, 3936:15, 3936:23, 3937:2, 3939:1, 3939:10, 3939:19, 3939:24, 3939:25, 3940:2, 3940:4, 3940:17, 3941:17, 3941:20, 3943:6, 3943:17, 3949:9, 3951:1, 3953:6, 3956:7, 3958:1, 3961:2, 3961:3, 3964:7, 3964:8, 3964:14, 3964:15, 3968:1, 3968:16, 3971:10, 3972:8, 3973:12, 3973:18, 3973:19, 3973:21, 3976:10, 3979:9, 3979:12, 3979:22, 3981:9, 3981:13, 3985:19, 3986:9, 3986:12, 3986:24, 3987:19, 3988:8, 3988:10, 3989:3, 3989:22, 3992:13, 3994:23, 3995:4, 3998:15, 3998:23, 4001:15, 4001:21, 4002:21, 4002:22, 4003:1, 4003:3, 4003:10, 4003:18, 4003:23, 4004:6, 4005:4, 4006:19, 4006:25, 4012:20, 4013:22, 4015:14, 4015:25, 4019:18, 4026:20, 4027:6, 4028:7, 4031:18, 4031:24, 4033:4, 4033:9, 4035:4, 4035:5, 4037:7, 4043:4, 4045:18, 4064:13, 4067:15, 4068:4, 4068:24, 4069:16, 4071:15, 4071:19, 4071:22, 4072:5, 4073:13, 4076:1, 4077:5, 4077:9, 4089:19, 4093:2, 4095:10, 4098:10, 4100:19, 4103:2
**seeing** [5] - 3861:24, 3879:9, 3918:23, 4071:20, 4105:7

**seek** [1] - 4034:23
**seeking** [1] - 4068:10
**seeks** [1] - 3859:20
**seem** [1] - 3950:7
**sees** [5] - 3869:6, 3918:11, 3924:19, 3965:7, 3980:15
**segment** [7] - 3899:5, 3910:6, 3911:24, 3919:18, 3950:8, 3968:21, 3979:11
**segmentation** [5] - 3906:21, 3909:13, 3909:23, 3910:8, 3910:10
**segmented** [2] - 3908:7, 3909:7
**segments** [19] - 3845:25, 3879:15, 3899:6, 3907:21, 3908:2, 3908:3, 3908:9, 3908:11, 3908:13, 3909:5, 3909:6, 3909:19, 3911:2, 3911:16, 3911:19, 3911:22, 3912:5, 3964:3, 3972:22
**selected** [1] - 4091:10
**selection** [1] - 4090:19
**sell** [2] - 3996:23, 4098:3
**seller** [1] - 3975:4
**selling** [1] - 4013:16
**send** [1] - 3832:21
**sense** [23] - 3826:19, 3841:25, 3849:12, 3849:13, 3862:3, 3868:9, 3869:22, 3878:12, 3936:20, 3950:23, 3959:22, 3961:6, 3971:13, 3975:22, 3976:16, 3984:14, 3996:15, 4044:19, 4051:10, 4057:4, 4061:22, 4074:11, 4087:3
**sensible** [3] - 3862:25, 3875:25, 4043:22
**sensitive** [2] - 3904:3, 3906:24
**sensitivity** [1] - 4039:22
**sent** [1] - 3838:8
**sentence** [7] - 4028:25, 4035:9, 4068:6, 4069:19, 4071:24, 4074:7, 4103:3
**separate** [9] - 3892:24, 4016:6, 4038:1, 4056:19, 4057:23, 4060:7, 4060:10, 4082:15, 4099:7
**separately** [3] - 3846:23, 3912:2, 4059:15
**September** [1] - 3819:3
**sequence** [1] - 3893:7
**serious** [1] - 4104:16
**serous** [1] - 4007:19
**serve** [4] - 3828:6, 3828:11, 3948:16, 4036:2
**served** [2] - 3819:1, 4029:13
**serves** [1] - 3830:20
**service** [12] - 3828:10, 3829:18, 3832:8, 3890:17, 3897:3, 3905:3, 3943:12, 3971:24, 3971:25, 3995:15, 3998:17, 3999:21
**Services** [1] - 4074:19
**services** [51] - 3829:4, 3829:7, 3846:5, 3858:18, 3858:21, 3859:22, 3863:17, 3863:23, 3864:10, 3868:21, 3870:17, 3878:5, 3878:7, 3900:13, 3910:14, 3910:25, 3912:18, 3917:11, 3921:18, 3925:9, 3925:10, 3937:4, 3940:1, 3941:12, 3963:13, 3971:15, 4016:13,

4016:17, 4016:18, 4030:21, 4031:21,
4032:11, 4033:15, 4033:17, 4034:7,
4037:24, 4038:1, 4039:3, 4041:22,
4047:8, 4047:12, 4047:13, 4050:17,
4054:13, 4056:7, 4057:12, 4057:17,
4057:19, 4098:12, 4103:11, 4103:17

**serving** [2] - 4024:18, 4093:13

**session** [1] - 4026:2

**set** [37] - 3824:1, 3828:15, 3828:21,
3833:24, 3836:2, 3845:23, 3862:10,
3862:14, 3868:17, 3875:20, 3894:22,
3906:2, 3906:3, 3937:20, 3944:23,
3970:23, 3975:4, 3980:5, 3985:6,
3994:9, 4001:25, 4024:18, 4040:6,
4043:19, 4054:25, 4055:2, 4055:11,
4082:24, 4089:6, 4090:9, 4090:18,
4090:21, 4091:19, 4092:4, 4092:6

**sets** [5] - 3833:23, 3923:6, 3923:13,
3979:12, 4027:12

**setting** [3] - 3906:14, 3914:8, 3944:2

**setup** [4] - 3943:20, 3944:7, 3953:7,
3953:15

**several** [17] - 3819:17, 3822:19,
3836:11, 3938:25, 3939:16, 3947:2,
3983:10, 3983:11, 4002:3, 4014:3,
4020:2, 4038:5, 4064:4, 4067:24,
4082:14, 4104:4, 4107:2

**Share** [1] - 4071:25

**share** [28] - 3837:6, 3839:4, 3843:7,
3843:8, 3845:3, 3851:25, 3883:12,
3884:8, 3884:10, 3885:16, 3890:4,
3938:19, 3939:5, 3939:18, 3942:7,
3953:18, 3990:22, 3992:21, 4045:17,
4057:3, 4060:12, 4061:4, 4071:2,
4071:3, 4071:17, 4072:1, 4073:21

**shareholders** [1] - 4065:24

**shares** [10] - 3885:7, 3890:5, 3939:15,
3940:1, 3940:25, 3941:14, 4019:12,
4045:21, 4046:2, 4071:20

**sharp** [1] - 4044:19

**sheer** [1] - 4031:6

**shift** [8] - 3843:7, 3843:8, 4071:3,
4072:1, 4073:15, 4074:10, 4074:16,
4079:12

**shifted** [1] - 3992:21

**shifting** [2] - 3845:3, 3870:9

**shifts** [1] - 4071:6

**shop** [5] - 3869:9, 3870:6, 3954:13,
3958:24, 3959:2

**shopped** [1] - 3894:9

**shopping** [1] - 3901:6

**short** [4] - 4010:17, 4011:10, 4011:11,
4011:12

**shortcomings** [1] - 4047:15

**shortcut** [1] - 4057:4

**shorten** [1] - 3826:15

**shorthand** [1] - 4048:5

**shorthanded** [1] - 3820:2

**show** [33] - 3830:16, 3832:13, 3837:10,
3837:13, 3849:11, 3868:6, 3869:23,
3889:19, 3907:5, 3907:10, 3907:18,

3908:14, 3908:22, 3922:21, 3926:17,
3927:5, 3931:13, 3932:9, 3934:21,
3936:15, 3950:17, 3962:7, 3967:19,
3974:8, 3984:1, 3986:17, 3987:23,
4002:1, 4062:22, 4070:1, 4076:19,
4088:16, 4094:2

**showed** [5] - 3832:15, 3966:2, 4038:18,
4079:11, 4080:5

**showing** [72] - 3826:18, 3826:20,
3826:22, 3827:2, 3827:18, 3830:17,
3831:5, 3832:11, 3837:19, 3841:17,
3848:17, 3851:6, 3866:24, 3867:15,
3872:19, 3883:10, 3883:12, 3888:12,
3889:8, 3889:24, 3890:2, 3890:20,
3890:22, 3893:7, 3893:16, 3893:17,
3896:20, 3897:14, 3908:4, 3908:6,
3909:4, 3910:2, 3910:15, 3915:5,
3926:14, 3926:16, 3926:23, 3927:16,
3927:17, 3931:12, 3931:14, 3934:22,
3935:22, 3939:9, 3939:13, 3939:23,
3941:16, 3950:13, 3950:20, 3951:20,
3951:25, 3952:7, 3957:22, 3959:11,
3959:13, 3960:13, 3960:16, 3964:2,
3979:8, 3980:25, 3982:20, 3983:13,
3986:4, 3986:20, 4002:2, 4070:15,
4073:21, 4080:8, 4082:23, 4089:4,
4090:13

**shown** [26] - 3827:24, 3848:7, 3858:16,
3863:14, 3909:20, 3910:1, 3915:16,
3915:19, 3916:3, 3917:7, 3918:8,
3920:2, 3921:15, 3927:19, 3951:14,
3958:17, 3964:15, 3971:8, 3981:10,
3981:11, 3982:17, 3982:25, 3987:5,
3987:15, 3994:4, 4085:3

**showroom** [6] - 3994:21, 3995:1,
3995:6, 3995:12, 3995:13, 3999:6

**showrooms** [2] - 3994:19, 3994:23

**shows** [17] - 3835:21, 3835:22, 3847:21,
3849:12, 3883:8, 3885:5, 3888:17,
3918:17, 3924:4, 3926:25, 3932:11,
3952:4, 3960:14, 3963:8, 3985:3,
4069:21, 4090:24

**shrink** [1] - 3994:7

**shrinking** [1] - 4007:4

**side** [64] - 3823:5, 3826:22, 3829:2,
3834:6, 3837:12, 3852:8, 3852:12,
3854:8, 3869:4, 3888:5, 3904:7,
3928:23, 3928:25, 3929:6, 3932:21,
3960:1, 3975:10, 3975:12, 3975:16,
3975:25, 3976:1, 3977:18, 3977:20,
3985:20, 3985:21, 4007:8, 4017:13,
4019:19, 4019:20, 4020:17, 4021:4,
4021:12, 4021:13, 4021:16, 4022:11,
4024:7, 4024:18, 4024:19, 4024:20,
4024:22, 4027:8, 4028:2, 4028:3,
4028:10, 4028:11, 4036:1, 4036:5,
4036:12, 4037:17, 4039:22, 4040:18,
4041:11, 4041:15, 4052:3, 4052:4,
4053:4, 4068:9, 4073:24, 4085:15,
4103:17, 4103:18, 4107:1

**sidebar** [4] - 3813:6, 3813:7, 4108:4,
4108:6

**Sidebar** [3] - 3813:10, 3814:1, 3814:14

**sided** [63] - 3827:16, 3828:23, 3828:24,
3831:4, 3852:11, 3904:3, 3904:4,
3915:3, 3919:20, 3922:16, 3929:5,
3929:23, 3974:24, 3975:24, 3977:16,
3977:19, 3985:21, 3985:22, 4016:2,
4016:5, 4016:8, 4016:19, 4016:24,
4017:2, 4017:9, 4018:5, 4018:15,
4018:17, 4019:24, 4020:10, 4021:12,
4021:13, 4022:17, 4022:18, 4022:19,
4022:21, 4023:2, 4023:5, 4023:9,
4023:13, 4024:2, 4024:7, 4026:9,
4026:24, 4028:14, 4034:8, 4035:3,
4035:10, 4035:12, 4036:1, 4036:13,
4037:17, 4039:15, 4041:9, 4046:21,
4047:2, 4048:7, 4052:5, 4097:21,
4101:18, 4101:19

**Sided** [2] - 4025:21, 4026:3

**sideline** [1] - 3932:2

**sides** [15] - 3829:1, 3834:16, 3874:8,
4022:3, 4022:5, 4022:10, 4022:15,
4024:12, 4024:16, 4026:8, 4026:24,
4029:1, 4035:2, 4036:2, 4041:14

**sign** [8] - 3866:6, 3929:17, 3944:13,
3948:15, 3951:3, 4006:20, 4006:25,
4072:25

**signage** [1] - 3956:6

**signal** [1] - 3999:10

**signals** [1] - 3999:13

**signature** [2] - 4032:6, 4033:25

**significance** [1] - 3950:23

**significant** [31] - 3822:21, 3824:25,
3825:21, 3843:7, 3862:18, 3867:20,
3874:22, 3890:23, 3895:14, 3896:5,
3897:22, 3900:4, 3904:1, 3904:12,
3918:25, 3919:10, 3926:13, 3966:22,
3982:15, 3986:10, 3990:22, 3992:17,
3998:21, 3999:2, 4003:22, 4006:12,
4013:1, 4040:21, 4056:11, 4073:20,
4097:17

**significantly** [10] - 3827:4, 3853:20,
3863:3, 3863:4, 3885:12, 3885:17,
3983:7, 3999:3, 4039:2, 4065:2

**signs** [2] - 3838:14, 3842:23

**Silverman** [5] - 3879:14, 4108:12,
4108:21, 4108:25

**similar** [16] - 3845:8, 3849:14, 3892:18,
3892:19, 3895:10, 3895:16, 4003:23,
4007:14, 4059:22, 4066:5, 4083:20,
4089:21, 4089:25, 4096:8, 4098:2

**similarly** [6] - 3830:1, 3839:13, 3887:24,
3890:13, 3956:22, 3996:23

**simply** [1] - 4053:21

**simultaneously** [3] - 4034:25, 4035:1,
4093:24

**single** [7] - 3886:6, 3911:24, 3941:7,
3968:11, 4016:19, 4076:5, 4102:4

**singles** [7] - 4026:10, 4026:11, 4026:20,
4027:2, 4027:3, 4027:6, 4027:18

**sit** [7] - 4032:6, 4054:9, 4062:19,
4063:21, 4064:16, 4107:5, 4107:6

**sitting** [3] - 3857:10, 3857:11, 4066:23
**situation** [8] - 3876:12, 3884:25, 3885:14, 3886:9, 3904:5, 3965:13, 3994:13, 4024:17
**situations** [7] - 3886:2, 3899:23, 3900:9, 3911:24, 4023:12, 4044:15, 4090:17
**six** [5] - 3812:21, 3812:23, 4045:6, 4058:4, 4108:1
**size** [13] - 3826:20, 3888:11, 3889:8, 3908:10, 3921:22, 3931:15, 3931:25, 3932:12, 3950:14, 3950:19, 3950:23, 3952:12, 4007:5
**sizes** [1] - 3931:22
**sleep** [1] - 4109:13
**slide** [216] - 3822:24, 3823:13, 3823:15, 3823:18, 3826:5, 3826:8, 3827:12, 3830:8, 3830:10, 3830:15, 3830:16, 3830:25, 3832:9, 3832:10, 3834:7, 3834:25, 3835:6, 3835:9, 3836:8, 3836:17, 3836:21, 3837:7, 3837:9, 3837:23, 3838:3, 3838:19, 3838:22, 3839:14, 3839:19, 3839:23, 3841:10, 3842:9, 3842:20, 3844:19, 3844:21, 3845:19, 3846:17, 3846:19, 3847:17, 3849:10, 3850:3, 3850:23, 3851:1, 3851:5, 3851:13, 3853:6, 3854:24, 3854:25, 3857:16, 3857:22, 3858:3, 3858:9, 3858:13, 3858:16, 3862:8, 3862:10, 3863:10, 3863:14, 3866:1, 3866:3, 3866:25, 3867:15, 3868:5, 3868:6, 3868:7, 3869:23, 3870:23, 3872:7, 3872:10, 3874:13, 3880:22, 3880:25, 3883:7, 3883:8, 3885:4, 3886:3, 3889:18, 3889:19, 3889:20, 3889:23, 3892:4, 3892:5, 3892:9, 3892:19, 3895:3, 3895:4, 3895:15, 3896:12, 3896:13, 3896:14, 3899:5, 3899:16, 3903:5, 3903:19, 3905:13, 3906:19, 3906:20, 3907:25, 3908:5, 3908:13, 3908:21, 3908:22, 3908:24, 3909:17, 3910:20, 3914:18, 3914:23, 3915:12, 3917:19, 3919:21, 3922:12, 3922:13, 3922:21, 3922:22, 3924:3, 3924:4, 3924:25, 3925:6, 3926:5, 3926:10, 3926:14, 3926:16, 3927:3, 3927:5, 3927:20, 3930:8, 3932:25, 3933:19, 3933:20, 3933:22, 3934:20, 3934:21, 3935:17, 3935:19, 3935:22, 3937:12, 3937:16, 3938:15, 3939:4, 3939:9, 3941:11, 3946:23, 3947:4, 3947:17, 3948:14, 3948:19, 3950:16, 3950:17, 3950:19, 3952:14, 3952:18, 3952:22, 3952:23, 3957:16, 3962:3, 3963:6, 3963:8, 3963:9, 3963:10, 3966:23, 3967:4, 3967:19, 3972:6, 3972:19, 3972:20, 3972:22, 3972:25, 3978:25, 3979:1, 3979:2, 3979:3, 3979:8, 3981:7, 3982:9, 3982:13, 3982:17, 3983:24, 3984:1, 3984:21, 3984:22, 3986:1, 3986:2, 3986:16, 3986:17, 3986:19, 3987:21, 3987:23,

3988:4, 3988:8, 3988:9, 3988:22, 3988:24, 3990:13, 3990:16, 3991:16, 3992:1, 3993:21, 3994:2, 3994:3, 3995:16, 3997:5, 3998:23, 3998:24, 4001:22, 4001:23, 4002:1, 4002:2, 4004:13, 4005:11, 4008:13, 4008:18, 4011:21, 4014:25, 4015:3
**slides** [11] - 3826:9, 3872:9, 3873:23, 3888:1, 3888:7, 3893:7, 3907:4, 3907:18, 3924:13, 3958:8, 4038:8
**slightly** [4] - 3934:3, 4001:24, 4039:16, 4080:9
**slip** [1] - 3829:11
**slippery** [1] - 3950:2
**slope** [1] - 3950:3
**slopes** [1] - 3889:7
**slower** [1] - 3843:3
**slowly** [1] - 3884:11
**small** [38] - 3826:17, 3834:11, 3840:18, 3848:20, 3862:17, 3873:16, 3886:15, 3886:16, 3888:18, 3888:23, 3890:12, 3904:1, 3904:11, 3915:23, 3918:6, 3928:14, 3928:15, 3929:20, 3930:5, 3936:10, 3943:18, 3945:11, 3945:17, 3945:23, 3946:3, 3946:6, 3946:9, 3952:22, 3953:1, 3953:14, 3953:15, 3954:5, 3955:18, 4038:23, 4038:24, 4039:6, 4056:1, 4062:14
**smaller** [21] - 3827:4, 3847:7, 3847:9, 3849:4, 3872:3, 3889:1, 3916:10, 3923:16, 3924:19, 3924:23, 3943:22, 3946:25, 3947:8, 3948:6, 3953:18, 3953:22, 3981:2, 4007:7, 4039:2, 4086:1, 4087:25
**smallest** [4] - 3888:14, 3888:24, 3932:20, 4043:19
**smart** [1] - 3945:7
**smoother** [1] - 3963:24
**snip** [1] - 3862:17
**so-called** [6] - 3833:13, 3942:21, 3979:21, 3995:24, 4024:1, 4043:19
**sole** [1] - 4060:23
**solely** [1] - 4037:16
**solid** [1] - 4019:21
**someone** [4] - 3866:5, 3882:3, 3886:16, 3997:10
**sometimes** [29] - 3816:19, 3824:12, 3842:14, 3843:9, 3856:15, 3862:12, 3886:7, 3886:8, 3892:3, 3904:15, 3905:17, 3905:20, 3912:6, 3943:15, 3949:18, 3984:13, 3996:4, 3998:9, 3998:10, 4043:21, 4050:7, 4050:23, 4053:12
**somewhat** [5] - 3894:13, 3894:16, 3972:25, 3990:11, 3992:22
**somewhere** [4] - 3887:21, 3965:25, 3995:4, 4088:20
**sophisticated** [1] - 3832:2
**sorry** [30] - 3850:24, 3892:8, 3904:23, 3926:7, 3927:16, 3929:24, 3947:18, 3957:17, 3986:1, 4002:9, 4019:2,

4025:24, 4031:2, 4032:20, 4032:21, 4034:17, 4037:6, 4043:2, 4046:18, 4049:20, 4050:9, 4050:14, 4057:9, 4083:22, 4085:12, 4086:20, 4090:21, 4094:5, 4100:14, 4108:8
**sort** [35] - 3822:20, 3849:22, 3852:3, 3855:14, 3861:24, 3878:5, 3879:4, 3882:25, 3884:9, 3884:17, 3887:7, 3887:8, 3889:3, 3900:14, 3900:24, 3904:10, 3912:10, 3919:25, 3930:5, 3931:8, 3939:14, 3945:5, 3959:22, 3959:25, 3962:10, 3967:23, 3970:12, 3974:4, 3983:10, 3995:9, 4003:16, 4006:1, 4009:13, 4063:18
**sorts** [4] - 3881:13, 3935:8, 4003:24, 4076:15
**sound** [2] - 4069:11, 4070:24
**sounds** [7] - 3879:6, 4025:1, 4066:3, 4070:25, 4102:23, 4106:19, 4106:21
**source** [17] - 3824:22, 3850:15, 3850:17, 3888:16, 3907:8, 3957:8, 3961:5, 3962:13, 3963:7, 3976:2, 3976:5, 3976:14, 3977:13, 3998:21, 4014:20, 4034:1, 4084:15
**sources** [4] - 3848:16, 3962:4, 4005:7, 4077:14
**Southwest** [2] - 3851:6, 3933:20
**spare** [1] - 3837:2
**speaking** [7] - 3934:3, 3990:18, 4011:22, 4020:6, 4029:25, 4049:12, 4070:16
**speaks** [1] - 3887:5
**special** [3] - 4011:9, 4013:20, 4092:21
**specific** [12] - 3842:19, 3895:9, 3914:21, 3949:13, 3960:24, 3996:6, 3996:24, 3999:16, 4054:24, 4071:8, 4074:23, 4076:15
**specifically** [4] - 3899:3, 3952:24, 3955:16, 3956:25, 3992:4, 4066:20, 4073:21, 4078:1
**spectrum** [1] - 4055:18
**speech** [6] - 3837:9, 3837:11, 3837:14, 3838:7, 3840:2, 4025:6
**spell** [1] - 3815:10
**spend** [10] - 3869:9, 3874:1, 3959:1, 3959:2, 3968:4, 3969:11, 3997:8, 3997:11, 4071:2, 4071:17
**spending** [2] - 3955:25, 3963:17
**spends** [1] - 3885:8
**spent** [1] - 3929:21
**spillover** [1] - 3949:18
**spiral** [9] - 3994:6, 4005:13, 4005:21, 4006:1, 4006:15, 4007:19, 4007:21, 4008:11
**split** [1] - 4083:6
**sporting** [1] - 4001:16
**Sprint** [2] - 3933:5, 3933:15
**Square** [6] - 3945:4, 3945:6, 3945:24, 3946:6, 3946:8, 3946:15
**Square's** [1] - 3945:9
**SSNIP** [17] - 3904:1, 3916:2, 4041:4,

4042:4, 4042:13, 4049:23, 4054:12, 4054:17, 4054:18, 4054:19, 4056:8, 4056:13, 4059:16, 4062:4, 4086:13, 4086:15, 4087:3
**staff** [6] - 3818:21, 3819:10, 4017:17, 4018:24, 4072:25, 4091:15
**stage** [3] - 3991:23, 4060:16, 4061:9
**stand** [10] - 3813:5, 3813:8, 3883:4, 3903:1, 4014:2, 4030:10, 4057:23, 4067:5, 4097:23, 4104:20
**stand-alone** [1] - 4057:23
**standard** [5] - 3911:3, 3911:22, 3942:14, 3999:9, 4083:10
**standards** [1] - 3828:15
**start** [24] - 3815:16, 3823:5, 3826:4, 3835:7, 3852:17, 3862:11, 3863:15, 3897:16, 3901:23, 3912:15, 3914:14, 3931:16, 3939:5, 3950:2, 3958:16, 3978:7, 3978:13, 3982:19, 3986:9, 4005:16, 4052:2, 4084:4, 4098:1, 4106:12
**started** [9] - 3836:12, 3836:24, 4052:3, 4056:7, 4059:13, 4066:2, 4066:4, 4066:5, 4096:4
**starting** [13] - 3823:8, 3914:17, 3922:14, 3938:18, 3957:25, 3961:23, 3985:9, 3985:17, 3986:6, 4054:14, 4055:8, 4059:23, 4087:17
**starts** [3] - 3953:6, 4032:19, 4034:14
**STATE** [3] - 3810:23, 3811:1, 3811:4
**state** [5] - 3812:4, 3815:10, 3818:7, 4067:15, 4068:6
**State** [1] - 4075:15
**statement** [14] - 3853:9, 3853:11, 4003:25, 4027:5, 4029:5, 4036:9, 4037:18, 4037:20, 4066:6, 4069:25, 4082:8, 4099:13, 4101:11, 4104:20
**statements** [3] - 3952:25, 4022:7, 4061:25
**STATES** [4] - 3810:1, 3810:3, 3810:3, 3810:14
**states** [2] - 3812:9, 4033:5
**States** [15] - 3810:6, 3812:6, 3812:25, 3856:21, 3858:19, 3858:22, 3859:2, 3859:3, 3908:8, 3911:1, 3952:25, 3953:1, 4016:14, 4029:17, 4033:19
**static** [2] - 3876:4, 3877:4
**station** [1] - 3891:6
**stations** [5] - 3856:17, 3890:25, 3891:1, 3891:18, 3891:19
**statistically** [1] - 4003:22
**statute** [2] - 3928:18, 3928:19
**stay** [1] - 4054:5
**stays** [1] - 3871:3
**steadily** [1] - 3840:7
**steep** [1] - 3932:7
**steer** [14] - 3821:21, 3838:15, 3839:2, 3839:8, 3839:11, 3841:17, 3841:19, 3844:9, 3865:4, 3865:5, 3877:19, 3880:8, 3880:10, 3966:6
**steering** [87] - 3820:23, 3821:2, 3821:8,

3821:11, 3821:19, 3821:24, 3822:9, 3822:11, 3822:14, 3824:18, 3828:22, 3831:13, 3834:16, 3835:14, 3835:21, 3835:23, 3836:3, 3839:9, 3840:25, 3841:4, 3841:8, 3841:13, 3841:14, 3842:2, 3842:4, 3845:9, 3845:15, 3846:2, 3846:4, 3846:10, 3846:12, 3847:8, 3847:14, 3848:14, 3848:25, 3849:24, 3850:9, 3850:10, 3851:2, 3851:8, 3851:10, 3851:11, 3851:15, 3851:16, 3851:18, 3851:22, 3852:4, 3852:5, 3854:2, 3854:21, 3855:1, 3855:7, 3856:3, 3856:9, 3856:19, 3857:5, 3857:8, 3857:20, 3865:18, 3865:21, 3867:20, 3877:11, 3877:14, 3921:24, 3966:5, 3966:9, 3985:13, 3992:3, 3992:6, 3992:7, 3992:12, 3992:24, 3993:3, 3993:23, 4003:14, 4006:1, 4008:2, 4008:5, 4008:9, 4011:8, 4011:15, 4013:15, 4013:17, 4013:22, 4014:4, 4014:7, 4039:21
**stenography** [1] - 3811:21
**step** [18] - 3824:2, 3824:4, 3824:7, 3824:10, 3826:5, 3835:2, 3835:4, 3858:4, 3858:7, 3858:10, 3863:15, 3866:3, 3874:17, 3875:12, 3937:9, 3937:11, 3991:18, 3991:22
**stepping** [1] - 3883:9
**steps** [4] - 3823:19, 3858:1, 3991:20, 4058:8
**sticker** [1] - 3943:4
**still** [28] - 3860:21, 3862:23, 3870:6, 3871:15, 3878:15, 3878:16, 3878:22, 3879:1, 3882:7, 3884:22, 3903:3, 3931:23, 3940:4, 3941:19, 3946:12, 3951:8, 3951:21, 3951:24, 3952:4, 3957:18, 3959:23, 3978:15, 3982:5, 4010:23, 4011:1, 4011:8, 4059:4
**stimulating** [1] - 3877:13
**stock** [1] - 4098:4
**stockbroker** [1] - 4098:3
**stomach** [1] - 3967:16
**stop** [21] - 3848:2, 3855:6, 3865:23, 3868:1, 3872:21, 3874:23, 3874:25, 3875:3, 3875:11, 3900:5, 3900:10, 3914:14, 3921:25, 3926:1, 3936:16, 3957:3, 3958:20, 4051:14, 4053:22, 4054:2, 4054:6
**stopped** [5] - 3822:12, 3868:11, 3874:7, 4060:3, 4060:9
**stopping** [1] - 3860:13
**stops** [1] - 3870:3
**store** [12] - 3831:12, 3866:6, 3894:10, 3895:5, 3895:6, 3895:8, 3901:7, 4000:8, 4000:23, 4001:1, 4013:18, 4022:25
**story** [6] - 3849:14, 3895:10, 3895:16, 4035:25, 4036:12, 4046:8
**Strategies** [1] - 4075:14
**strategies** [3] - 3816:12, 3816:13, 3841:13

**strategy** [42] - 3816:5, 3822:7, 3822:12, 3835:16, 3836:13, 3836:16, 3836:20, 3836:22, 3838:15, 3838:20, 3838:22, 3839:10, 3839:12, 3839:13, 3839:25, 3840:8, 3840:11, 3840:25, 3841:18, 3851:21, 3906:22, 3908:2, 3908:6, 3939:1, 3944:3, 3947:10, 3947:21, 3978:22, 3979:1, 3979:6, 3980:21, 3982:12, 3984:25, 3991:9, 3992:20, 4007:2, 4007:13, 4007:15, 4012:1, 4013:14, 4028:3
**streams** [1] - 4073:18
**Street** [1] - 3810:17
**striking** [1] - 3871:18
**strong** [6] - 3923:9, 3937:2, 4006:13, 4006:19, 4007:5, 4010:22
**stronger** [2] - 3881:25, 4004:8
**strongest** [1] - 3883:19
**strongly** [4] - 3900:15, 3936:25, 4006:23, 4064:23
**structure** [6] - 3876:13, 3879:2, 3938:19, 3939:5, 3939:6, 3990:20
**structured** [1] - 3859:23
**structures** [1] - 3816:18
**STUART** [1] - 3811:10
**students** [1] - 3816:13
**studies** [2] - 4071:6, 4078:20
**study** [17] - 3816:17, 3816:23, 3929:18, 3935:12, 4067:24, 4067:25, 4068:1, 4071:1, 4071:5, 4071:8, 4071:16, 4071:20, 4073:5, 4076:18, 4078:6, 4080:4, 4082:5
**studying** [1] - 3929:17
**subgroups** [1] - 3972:4
**subject** [6] - 3942:12, 3969:12, 4004:11, 4006:8, 4009:20, 4040:25
**subliminally** [1] - 4000:11
**subsidization** [2] - 4028:10, 4028:14
**subsidize** [2] - 4020:18, 4021:14
**subsidizing** [2] - 4021:5, 4028:2
**subsidy** [2] - 4028:22, 4028:24
**substantial** [18] - 3835:20, 3840:20, 3909:11, 3927:19, 3928:24, 3935:7, 3935:24, 3938:10, 3938:12, 3941:23, 3964:5, 3964:9, 3973:22, 3985:4, 3991:1, 3992:5, 4054:2, 4054:8
**substantially** [6] - 3851:19, 3931:23, 3954:12, 3988:12, 3988:13, 4033:11
**substitutability** [2] - 4042:1, 4042:8
**substitutable** [1] - 4051:4
**substitute** [11] - 3860:4, 3862:3, 3864:21, 3864:22, 3864:25, 3867:23, 3884:23, 3899:22, 4041:18, 4043:17, 4064:24
**substitutes** [31] - 3859:22, 3859:24, 3860:9, 3860:11, 3860:15, 3860:19, 3860:21, 3861:4, 3861:6, 3861:13, 3862:7, 3875:14, 3884:16, 3892:20, 3899:25, 3903:13, 3918:21, 3918:23, 3925:12, 3925:14, 3925:18, 3925:23, 3931:9, 3933:17, 3934:13, 3935:6,

4041:7, 4051:21, 4053:8, 4065:21, 4067:22
**substituting** [2] - 4036:21, 4078:18
**substitution** [9] - 3821:25, 3850:16, 3860:2, 3860:6, 3860:8, 3925:24, 3992:7, 4041:13, 4052:10
**substitutions** [2] - 3835:21, 3860:1
**subtopic** [1] - 4058:1
**subtract** [1] - 3920:13
**subtracted** [4] - 4095:14, 4095:21, 4096:21, 4097:1
**subtracting** [1] - 3982:22
**succeed** [2] - 3852:24, 4020:11
**succeeded** [1] - 3932:18
**successful** [8] - 3838:20, 3838:23, 3838:25, 3845:3, 3965:11, 3976:22, 3985:8, 3991:14
**successfully** [4] - 4013:14, 4013:22, 4020:12, 4036:4
**suffer** [3] - 3881:19, 3896:5, 3988:1
**sufficient** [3] - 3825:1, 3944:21, 4029:3
**sufficiently** [4] - 3861:5, 3901:17, 4048:19, 4067:22
**suggest** [3] - 3899:5, 3967:11, 4093:2
**suggesting** [2] - 3899:20, 3919:7
**suggestions** [1] - 4013:18
**suggestive** [1] - 3832:17
**suggests** [8] - 3828:4, 3894:21, 3896:8, 3918:21, 3936:25, 4004:11, 4007:3, 4007:17
**suit** [2] - 4010:5, 4030:16
**Suite** [1] - 3810:17
**suited** [2] - 4104:9, 4104:12
**sum** [4] - 3850:8, 3981:25, 4014:5, 4023:2
**summarize** [3] - 3818:7, 3935:20, 3990:15
**summarized** [1] - 4020:2
**summarizing** [3] - 3855:1, 3908:5, 3909:9
**summary** [3] - 4022:2, 4037:9, 4070:3
**summer** [1] - 4092:21
**summing** [2] - 3834:8, 3856:1
**super** [1] - 4013:19
**superior** [1] - 3999:21
**supermarket** [2] - 3895:16, 3910:5
**supermarkets** [2] - 3890:18, 4101:7
**supplied** [1] - 3912:21
**supplier** [1] - 3937:20
**supplier's** [3] - 4093:11, 4093:12, 4093:16
**suppliers** [4] - 3826:18, 3860:3, 3937:20, 4100:23
**supplies** [1] - 4055:9
**supply** [1] - 3842:23
**support** [7] - 3819:12, 4001:17, 4066:17, 4068:5, 4068:11, 4070:12, 4098:24
**supports** [7] - 3925:4, 3937:3, 3980:22, 3982:3, 3990:23, 3991:10, 4094:11
**suppose** [6] - 3872:24, 3872:25,

3900:17, 3977:3, 3994:18, 4098:3
**supposed** [6] - 3832:18, 3861:12, 3948:20, 4083:3, 4084:12, 4100:7
**suppression** [11] - 3847:12, 3847:13, 3848:12, 3848:19, 3849:1, 3849:23, 3850:7, 3850:12, 3989:8, 3989:9, 3992:25
**Supreme** [1] - 3811:2
**surcharges** [3] - 3856:22, 3856:23, 3856:24
**surplus** [10] - 3960:2, 3960:4, 3960:20, 3961:8, 3961:12, 3961:15, 3971:7, 3971:10, 3973:8, 3973:10
**surprise** [1] - 3964:3
**surprised** [2] - 4038:14, 4068:14
**surprising** [2] - 3849:24, 3867:17
**surprisingly** [1] - 3986:18
**surrebuttal** [4] - 4079:7, 4080:14, 4082:9
**survey** [12] - 4002:2, 4002:12, 4003:21, 4014:18, 4014:19, 4063:2, 4063:4, 4063:15, 4063:17, 4064:25, 4068:3
**surveying** [1] - 4002:4
**surveys** [3] - 4002:8, 4014:17, 4063:5
**survive** [3] - 3977:7, 4012:8, 4013:4
**SUSAN** [1] - 3810:21
**suspect** [1] - 4038:15
**suspenders** [2] - 3825:24, 3919:25, 3924:5
**sustained** [1] - 3937:23
**SWAINE** [1] - 3811:7
**sweeping** [1] - 4010:9
**swing** [1] - 3866:22
**swipe** [2] - 3878:13, 3945:8
**switch** [34] - 3839:15, 3846:16, 3850:18, 3865:19, 3866:19, 3868:4, 3868:18, 3869:2, 3869:8, 3870:20, 3872:6, 3872:7, 3874:13, 3875:10, 3885:2, 3887:25, 3892:23, 3898:4, 3898:6, 3900:11, 3900:25, 3901:5, 3906:16, 3925:25, 3926:2, 3926:4, 3939:3, 4017:12, 4051:15, 4081:4, 4086:14, 4086:19, 4086:20
**switched** [4] - 3868:23, 3872:23, 3872:25, 3926:8
**switches** [3] - 3871:3, 3871:9
**switching** [8] - 3868:16, 3869:7, 3960:15, 4050:10, 4077:17, 4078:7, 4087:11, 4087:15
**sworn** [1] - 3815:9
**system** [1] - 4020:11

## T

**T&E** [18] - 3899:11, 3909:10, 3909:11, 3910:25, 3921:18, 3923:2, 3923:7, 3923:9, 3923:13, 3924:9, 3937:5, 3937:13, 3940:2, 3940:24, 4092:18, 4097:7, 4097:8, 4101:9
**Tab** [2] - 3815:20, 3823:1
**table** [6] - 3908:11, 3909:20, 3950:20, 3950:24, 4100:3, 4100:17

**tailor** [2] - 3906:25, 3907:3
**tailoring** [3] - 3887:14, 3888:23, 3890:21
**take-away** [1] - 3967:14
**takeaway** [1] - 3848:24
**tall** [1] - 3959:25
**target** [4] - 3907:4, 3907:20, 3908:12, 3996:3
**targeted** [10] - 3836:2, 3845:25, 3855:14, 3856:19, 3867:4, 3909:7, 3910:18, 3911:3, 3985:6
**targeting** [2] - 3857:4, 3892:25
**taught** [4] - 3816:8, 3816:9, 3816:11
**teach** [1] - 3816:10
**teacher** [1] - 4083:2
**technical** [2] - 3829:13, 4028:21
**technological** [1] - 3817:19
**technologies** [3] - 3879:1, 3879:11
**technology** [3] - 3839:22, 3878:23, 3944:10
**telephone** [1] - 3829:19
**telephony** [1] - 3817:17
**tempted** [1] - 3967:1
**ten** [16] - 3902:2, 3904:15, 3915:21, 3916:1, 3916:19, 3917:2, 3918:1, 3922:16, 3928:21, 3946:18, 3986:5, 4031:12, 4031:17, 4058:3, 4062:25, 4092:4
**tend** [6] - 3847:7, 3887:6, 3980:11, 4038:14, 4074:13, 4074:14
**TENNESSEE** [1] - 3810:6
**tens** [1] - 4033:18
**term** [22] - 3816:19, 3829:12, 3847:11, 3862:17, 3885:6, 3885:15, 3904:11, 3904:13, 3911:5, 3912:5, 3956:21, 3957:11, 3957:14, 3962:23, 3994:12, 4010:17, 4011:10, 4011:11, 4011:12, 4032:4, 4036:21, 4102:14
**terminal** [2] - 3944:19, 3944:20
**terminology** [4] - 3829:10, 4032:9, 4033:23, 4043:18
**terms** [9] - 3834:20, 3840:4, 3852:16, 3868:19, 3882:25, 3885:15, 3885:16, 3885:23, 3897:13, 3913:6, 3918:6, 3918:7, 3920:17, 3920:18, 3922:17, 3926:18, 3931:22, 3931:24, 3934:10, 3941:9, 3943:16, 3948:1, 3949:4, 3950:8, 3950:21, 3955:23, 3958:8, 3973:4, 4007:6, 4007:7, 4007:24, 4011:9, 4043:22, 4048:1, 4055:10, 4060:17, 4065:15
**terrified** [1] - 4083:5
**test** [25] - 3863:23, 3902:3, 3919:20, 3923:21, 4040:1, 4041:4, 4042:4, 4042:13, 4047:22, 4048:8, 4054:12, 4054:17, 4056:14, 4057:15, 4057:16, 4057:20, 4059:17, 4061:1, 4062:4, 4086:13, 4087:3, 4094:10, 4096:15, 4099:9, 4099:11
**Test** [45] - 3859:11, 3859:18, 3859:19, 3860:17, 3860:25, 3861:14, 3861:16,

3862:6, 3862:9, 3863:13, 3896:19, 3901:24, 3903:12, 3903:17, 3907:15, 3912:12, 3912:23, 3913:8, 3913:12, 3919:17, 3922:3, 3922:9, 3924:1, 4042:17, 4043:6, 4043:9, 4044:2, 4044:22, 4046:12, 4046:22, 4047:3, 4047:20, 4048:3, 4048:17, 4054:24, 4055:6, 4056:18, 4056:25, 4057:11, 4057:15, 4059:10, 4059:11, 4060:1, 4060:18, 4061:5

**testified** [28] - 3815:9, 3841:16, 3932:15, 3934:9, 3948:24, 3993:9, 4002:9, 4008:3, 4010:5, 4010:24, 4014:18, 4014:19, 4014:21, 4024:9, 4029:16, 4038:10, 4045:8, 4051:12, 4053:21, 4054:6, 4066:11, 4069:7, 4069:20, 4074:8, 4077:20, 4078:23, 4081:3, 4088:20

**testify** [2] - 3932:24, 3936:14

**testifying** [3] - 3851:7, 4029:19, 4029:20

**testimony** [43] - 3820:7, 3839:5, 3841:6, 3844:23, 3845:12, 3880:1, 3880:4, 3933:2, 3934:2, 3948:23, 3951:9, 3954:10, 3987:17, 4010:16, 4020:3, 4029:12, 4038:13, 4041:12, 4048:16, 4054:1, 4054:9, 4056:10, 4057:7, 4061:12, 4061:15, 4067:4, 4067:8, 4067:9, 4069:6, 4077:19, 4077:22, 4077:23, 4077:25, 4078:3, 4078:12, 4078:20, 4084:24, 4102:18, 4108:2, 4108:11, 4108:20, 4108:25

**testing** [1] - 4057:18

**TEXAS** [2] - 3810:6, 3810:23

**Texas** [2] - 3810:23, 3810:25

**THE** [244] - 3810:13, 3810:16, 3810:23, 3811:1, 3811:4, 3811:7, 3811:18, 3812:2, 3812:7, 3812:10, 3812:15, 3812:19, 3812:23, 3813:3, 3813:6, 3814:12, 3815:2, 3815:12, 3820:12, 3820:14, 3823:8, 3823:10, 3837:21, 3837:25, 3839:18, 3850:20, 3856:8, 3856:14, 3865:12, 3865:13, 3865:14, 3865:16, 3865:20, 3865:21, 3876:4, 3876:9, 3876:11, 3876:16, 3876:17, 3877:8, 3879:6, 3879:7, 3879:13, 3880:6, 3889:11, 3889:13, 3891:18, 3891:25, 3892:4, 3892:8, 3892:11, 3892:14, 3892:16, 3901:20, 3901:22, 3902:1, 3902:5, 3903:2, 3903:7, 3904:23, 3905:1, 3905:2, 3905:4, 3906:6, 3906:9, 3906:15, 3906:18, 3926:6, 3926:9, 3927:23, 3927:24, 3928:2, 3928:3, 3928:4, 3928:11, 3928:17, 3928:19, 3928:22, 3929:1, 3930:9, 3943:3, 3943:5, 3944:9, 3944:16, 3944:20, 3944:24, 3944:25, 3945:2, 3945:5, 3945:6, 3945:13, 3945:14, 3945:17, 3945:19, 3945:20, 3945:22, 3948:8, 3948:10, 3948:11, 3948:12, 3949:23, 3950:5, 3950:7, 3950:10, 3954:10, 3955:3, 3956:11,

3956:15, 3957:19, 3960:19, 3960:21, 3960:22, 3960:23, 3964:22, 3964:25, 3965:2, 3965:3, 3965:4, 3965:5, 3965:6, 3965:10, 3965:12, 3965:17, 3965:18, 3965:23, 3965:24, 3966:1, 3966:9, 3966:11, 3967:3, 3967:7, 3967:8, 3967:9, 3967:11, 3967:13, 3967:14, 3967:15, 3970:24, 3971:18, 3971:21, 3971:22, 3971:25, 3972:2, 3972:3, 3972:5, 3972:10, 3972:11, 3972:17, 3974:17, 3978:3, 3978:7, 3978:11, 3978:14, 3978:16, 3979:2, 3979:4, 3979:5, 4000:4, 4000:14, 4000:15, 4000:19, 4000:20, 4000:25, 4001:3, 4001:7, 4001:8, 4001:21, 4001:25, 4002:11, 4002:12, 4010:16, 4010:20, 4011:3, 4011:5, 4011:22, 4014:14, 4014:22, 4014:24, 4015:2, 4015:5, 4015:7, 4015:12, 4015:14, 4015:18, 4017:14, 4017:17, 4017:19, 4025:15, 4025:17, 4027:15, 4027:18, 4027:21, 4027:23, 4029:9, 4030:4, 4031:10, 4049:7, 4057:24, 4058:3, 4058:6, 4059:2, 4059:5, 4072:9, 4072:21, 4072:24, 4073:1, 4075:1, 4075:3, 4075:5, 4075:9, 4075:12, 4083:4, 4083:8, 4093:2, 4093:4, 4094:3, 4094:5, 4094:8, 4105:11, 4105:14, 4105:18, 4105:23, 4106:1, 4106:8, 4106:18, 4106:23, 4107:4, 4107:8, 4107:10, 4107:14, 4107:19, 4108:1, 4108:5, 4108:10, 4108:16, 4108:22, 4109:4, 4109:6, 4109:9, 4109:11, 4109:13, 4109:16, 4109:19, 4109:21

**theirs** [1] - 3980:13

**themselves** [9] - 3835:18, 3836:14, 3841:9, 3850:13, 3854:11, 3947:24, 3958:15, 3989:5, 4004:9

**theories** [1] - 3818:11, 3822:19

**theory** [5] - 3853:25, 3854:10, 3999:15, 4037:9, 4101:1

**therefore** [13] - 3822:1, 3861:22, 3896:6, 3907:21, 3913:7, 3921:17, 3963:5, 3970:16, 3982:15, 3991:2, 3992:25, 4041:17, 4104:11

**they've** [23] - 3845:12, 3848:18, 3856:25, 3857:5, 3885:14, 3897:4, 3897:6, 3897:15, 3897:21, 3931:21, 3947:9, 3951:16, 3960:1, 3968:8, 3971:8, 3977:8, 3977:9, 3987:2, 4002:4, 4005:15, 4007:12, 4007:17

**thi** [1] - 3992:2

**thinking** [25] - 3817:17, 3821:14, 3834:2, 3849:2, 3866:25, 3868:8, 3884:18, 3887:23, 3897:14, 3897:17, 3897:23, 3901:12, 3904:20, 3905:12, 3913:6, 3918:21, 3989:13, 4039:12, 4045:3, 4051:13, 4051:25, 4056:18, 4087:17, 4095:3, 4097:18

**thinks** [3] - 3900:18, 3943:17, 3957:23

**third** [25] - 3814:3, 3814:6, 3824:4,

3824:5, 3830:18, 3845:20, 3899:10, 3920:23, 3932:14, 3932:17, 3940:22, 3944:3, 3966:10, 3968:17, 3978:19, 3982:23, 3984:24, 3991:22, 3994:9, 3998:6, 3998:8, 4019:23, 4022:4, 4076:1, 4089:24

**third-party** [1] - 3920:23

**Thorp** [1] - 4002:8

**thousand** [3] - 3870:2, 3870:4, 3871:5

**thousands** [1] - 3912:1

**threat** [1] - 3856:23

**threatened** [1] - 3962:7

**three** [27] - 3823:19, 3827:7, 3832:14, 3832:16, 3835:12, 3836:7, 3851:15, 3893:7, 3895:23, 3905:13, 3954:2, 3974:15, 3994:4, 3995:19, 4031:13, 4031:17, 4032:19, 4082:24, 4091:15, 4091:23, 4092:1, 4092:13, 4106:10, 4106:20, 4108:1

**three-ish** [1] - 4106:20

**threshold** [19] - 3914:1, 3914:4, 3914:5, 3914:7, 3914:9, 3921:3, 3921:4, 3921:15, 3922:19, 3922:23, 3922:25, 3924:15, 3935:8, 3940:19, 3941:21, 4089:6, 4090:10, 4097:24, 4099:9

**threw** [1] - 4069:18

**throughout** [1] - 4033:18

**throwing** [1] - 4010:8

**thwarting** [1] - 3822:3

**tick** [1] - 3888:8

**ticket** [1] - 4001:4

**tilting** [1] - 4061:22

**tiny** [2] - 4007:10, 4098:10

**tipping** [1] - 4106:6

**title** [15] - 3819:5, 3927:19, 3988:3, 3994:9, 4020:10, 4025:25, 4026:1, 4026:5, 4064:6, 4071:23, 4084:4, 4084:5, 4084:19, 4084:23

**title's** [1] - 4084:18

**TNS** [3] - 4074:19, 4074:21, 4075:16

**to..** [1] - 3813:9

**today** [31] - 3815:16, 3823:20, 3834:10, 3835:7, 3835:11, 3835:25, 3876:5, 3876:6, 3876:12, 3877:3, 3919:3, 3921:20, 3936:3, 3942:23, 3946:18, 3948:2, 3948:6, 3960:11, 3960:12, 3971:3, 3973:7, 3975:1, 3985:5, 3996:17, 4005:18, 4016:3, 4024:9, 4030:11, 4040:22, 4074:9, 4092:24

**together** [20] - 3828:16, 3828:17, 3828:25, 3885:10, 3960:3, 3960:5, 3989:3, 4001:17, 4008:16, 4016:6, 4016:7, 4024:5, 4036:2, 4059:12, 4059:13, 4059:18, 4059:20, 4059:22, 4060:4, 4060:15

**TOMBRAS** [1] - 3810:21

**tomorrow** [5] - 3880:1, 4105:19, 4107:20, 4108:2, 4109:21

**tonight** [2] - 4001:4, 4109:17

**took** [16] - 3825:15, 3922:14, 3922:16, 3922:17, 3924:9, 4012:19, 4039:8,

4077:13, 4092:4, 4095:12, 4095:21, 4096:2, 4096:19, 4096:22, 4097:1

**Top** [1] - 4071:25

**top** [20] - 3826:25, 3883:15, 3888:20, 3920:3, 3950:21, 3986:5, 3986:8, 3986:14, 3987:11, 4037:7, 4064:18, 4071:2, 4071:17, 4071:24, 4085:5, 4085:8, 4085:16, 4085:22, 4087:23, 4089:18

**topic** [8] - 3932:24, 3956:19, 3972:16, 4058:1, 4082:11, 4092:16, 4105:10, 4109:6

**topics** [1] - 4109:5

**total** [14] - 3892:18, 3897:4, 3920:17, 3927:5, 3968:4, 3968:24, 3970:10, 3987:3, 3987:15, 4038:11, 4039:6, 4039:10, 4095:21

**totally** [1] - 3933:18

**touch** [1] - 3970:24

**tough** [1] - 3955:9

**tourist** [1] - 3955:18

**toward** [3] - 3887:8, 4034:22, 4042:24

**towards** [4] - 3822:1, 3887:4, 3908:6, 4061:22

**track** [7] - 3849:6, 3852:12, 3888:16, 3893:12, 3893:13, 3943:13, 4017:10

**tracking** [1] - 3849:20

**Trade** [1] - 3859:15

**trade** [2] - 3876:18, 3969:17

**tradeoff** [6] - 3947:23, 3950:13, 3952:8, 3955:5, 3955:8, 4007:2

**train** [3] - 3884:7, 3884:22, 3943:14

**training** [1] - 3832:1

**trains** [2] - 3884:18, 3884:21

**transaction** [15] - 3831:6, 3886:13, 3886:15, 3887:12, 3887:24, 3888:7, 3888:11, 3888:24, 3889:3, 3889:8, 4023:14, 4024:3, 4074:12, 4081:5, 4081:10

**transactions** [36] - 3829:1, 3886:16, 3887:17, 3887:18, 3888:9, 3888:18, 3888:22, 3888:23, 3889:1, 3889:4, 3889:17, 3890:3, 3893:1, 3893:3, 3893:20, 3899:23, 3899:24, 3906:1, 3915:7, 4021:21, 4022:23, 4033:12, 4033:16, 4050:21, 4071:4, 4072:2, 4076:9, 4081:12, 4087:13, 4089:1, 4089:7, 4090:10, 4091:4, 4092:5, 4102:3

**TRANSCRIPT** [1] - 3810:13

**transcript** [3] - 3811:21, 3811:22, 4025:6

**transfers** [2] - 3889:12, 3889:14

**transitory** [4] - 3862:18, 3904:1, 3904:12, 3904:17

**translates** [1] - 3975:10

**translating** [1] - 3961:15

**transportation** [1] - 3982:20

**travel** [28] - 3858:19, 3887:13, 3899:4, 3899:5, 3899:9, 3910:14, 3910:18, 3912:15, 3912:18, 3918:9, 3919:17,

3920:4, 3922:3, 3964:4, 3964:16, 3964:19, 4038:2, 4093:6, 4094:10, 4094:22, 4095:13, 4095:15, 4096:3, 4096:7, 4096:16, 4098:25, 4099:17, 4099:22

**traveling** [1] - 3886:19

**Travelocity** [3] - 3844:16, 3844:25, 4011:1

**treatment** [1] - 4029:1

**treatments** [1] - 3977:5

**trees** [1] - 4015:15

**trend** [4] - 3884:4, 3935:5, 3935:7, 4082:7

**trends** [5] - 3883:10, 3883:19, 3884:25, 3885:6, 3885:15

**TRIAL** [1] - 3810:13

**trial** [20] - 3812:3, 3820:7, 3839:5, 3841:15, 3844:23, 3851:6, 3932:24, 3933:2, 3941:25, 3942:1, 3961:20, 4008:3, 4010:5, 4029:25, 4030:6, 4038:4, 4038:5, 4061:15, 4077:23, 4078:13

**tried** [7] - 3851:8, 3932:16, 3948:1, 3994:3, 4043:2, 4060:7, 4087:20

**tries** [1] - 4044:23

**trigger** [3] - 3835:22, 3921:23, 3949:15

**triggered** [2] - 3941:6, 3989:9

**triggering** [1] - 3997:22

**triggers** [1] - 3921:14

**TRIPOLITSIOTIS** [1] - 3811:14

**trivial** [2] - 3904:19, 4002:16

**trouble** [2] - 3953:7, 4050:12

**true** [11] - 3833:22, 3853:16, 3854:20, 3881:21, 3900:9, 3937:5, 3937:6, 3955:15, 3973:19, 4050:11, 4091:15

**truly** [2] - 3820:6, 4013:13

**trumped** [2] - 4078:22, 4079:1

**trust** [3] - 4003:25, 4092:17, 4092:18

**try** [15] - 3824:16, 3829:10, 3865:16, 3874:1, 3877:16, 3900:20, 3913:15, 3967:13, 3999:7, 4004:2, 4044:24, 4047:13, 4050:14, 4050:20, 4088:19

**trying** [31] - 3822:12, 3825:19, 3840:8, 3859:21, 3860:4, 3861:17, 3875:21, 3876:1, 3879:1, 3884:6, 3889:9, 3949:2, 3950:6, 3971:7, 3971:9, 3976:23, 3981:3, 4005:2, 4008:7, 4009:12, 4027:13, 4029:21, 4044:19, 4048:1, 4048:9, 4054:15, 4056:3, 4056:6, 4070:1, 4086:14, 4106:1

**TUESDAY** [1] - 3810:9

**turn** [32] - 3823:1, 3826:5, 3826:8, 3836:21, 3842:9, 3844:19, 3858:7, 3862:8, 3863:10, 3883:7, 3885:4, 3895:15, 3896:12, 3917:19, 3919:12, 3919:9, 3922:12, 3924:25, 3941:11, 3949:21, 3950:16, 3982:9, 3984:21, 3988:8, 3990:13, 3998:24, 4009:21, 4021:25, 4042:23, 4064:17, 4097:19, 4105:9

**turnaround** [1] - 3843:4

**turned** [2] - 4025:6, 4100:8

**turning** [2] - 3914:14, 4007:1

**turnout** [1] - 3953:21

**turns** [3] - 3887:2, 3929:15, 3936:24

**TVs** [1] - 3994:24

**twelve** [1] - 4062:12

**twenty** [1] - 3889:6

**twenty-five** [1] - 3889:6

**Two** [2] - 4025:21, 4026:3

**two** [154] - 3817:18, 3818:20, 3824:7, 3824:9, 3825:4, 3825:6, 3827:16, 3828:23, 3828:24, 3828:25, 3831:4, 3834:16, 3835:5, 3837:17, 3847:24, 3848:18, 3852:11, 3855:8, 3858:14, 3858:16, 3858:23, 3861:1, 3863:18, 3865:1, 3865:3, 3869:20, 3870:7, 3871:7, 3889:23, 3890:6, 3892:24, 3893:20, 3900:8, 3904:3, 3904:4, 3907:7, 3907:18, 3910:12, 3910:22, 3912:12, 3913:23, 3915:3, 3919:1, 3922:5, 3922:16, 3929:5, 3929:23, 3934:12, 3945:15, 3946:1, 3954:14, 3954:25, 3955:13, 3958:23, 3974:24, 3975:24, 3977:16, 3977:19, 3978:5, 3978:6, 3979:12, 3982:25, 3985:21, 3985:22, 3990:19, 4001:5, 4004:24, 4014:22, 4016:2, 4016:5, 4016:6, 4016:8, 4016:9, 4016:11, 4016:19, 4016:25, 4017:2, 4017:7, 4017:9, 4017:10, 4017:21, 4017:23, 4018:5, 4018:15, 4018:17, 4019:24, 4020:10, 4021:12, 4021:13, 4022:15, 4022:17, 4022:18, 4022:19, 4022:21, 4023:2, 4023:5, 4023:9, 4023:13, 4024:2, 4024:7, 4026:9, 4026:24, 4028:14, 4029:1, 4030:13, 4034:8, 4035:2, 4035:3, 4035:10, 4035:12, 4036:1, 4036:2, 4036:13, 4037:17, 4039:15, 4041:9, 4045:22, 4046:21, 4047:2, 4047:10, 4048:7, 4049:1, 4049:22, 4049:24, 4050:6, 4052:5, 4089:1, 4089:8, 4090:11, 4090:25, 4091:1, 4091:2, 4091:4, 4091:7, 4091:16, 4091:18, 4092:1, 4092:6, 4092:12, 4093:11, 4093:13, 4095:24, 4097:13, 4097:21, 4098:23, 4099:7, 4099:11, 4101:18, 4101:19

**two-sided** [60] - 3827:16, 3828:23, 3828:24, 3831:4, 3852:11, 3904:3, 3904:4, 3915:3, 3922:16, 3929:5, 3929:23, 3974:24, 3975:24, 3977:16, 3977:19, 3985:21, 3985:22, 4016:2, 4016:5, 4016:8, 4016:19, 4017:2, 4017:9, 4018:5, 4018:15, 4018:17, 4019:24, 4020:10, 4021:12, 4021:13, 4022:17, 4022:18, 4022:19, 4022:21, 4023:2, 4023:5, 4023:9, 4023:13, 4024:2, 4024:7, 4026:9, 4026:24, 4028:14, 4034:8, 4035:3, 4035:10, 4035:12, 4036:1, 4036:13, 4037:17, 4039:15, 4041:9, 4046:21, 4047:2, 4048:7, 4052:5, 4097:21, 4101:18,

4101:19

**Two-Sided** [2] - 4025:21, 4026:3
**type** [5] - 3890:3, 3921:23, 4000:9, 4028:10, 4056:18
**types** [7] - 3883:14, 3890:16, 3910:7, 3923:10, 3980:10, 3995:17, 4005:8
**typical** [3] - 3886:5, 3935:23, 3937:18
**typically** [8] - 3882:18, 3904:14, 3913:19, 3971:11, 3975:18, 3975:19, 3989:21, 4033:25
**typos** [1] - 4025:7

## U

**U.S** [18] - 3810:17, 3820:2, 3856:16, 3883:12, 3942:2, 3986:25, 4009:25, 4010:1, 4029:14, 4033:5, 4047:21, 4047:22, 4069:20, 4070:14, 4072:16, 4074:1, 4074:6
**U.S.A** [1] - 3810:17
**ubiquity** [2] - 3881:16, 3885:23
**ultimate** [1] - 3937:3
**ultimately** [13] - 3829:1, 3831:15, 3833:12, 3834:4, 3840:19, 3840:20, 3900:5, 3929:12, 3941:8, 4008:10, 4009:11, 4039:12, 4100:10
**unable** [1] - 3882:9
**under** [23] - 3845:20, 3879:21, 3903:3, 3927:9, 3968:3, 3978:15, 3981:8, 3991:18, 3994:9, 3995:14, 3999:25, 4008:16, 4010:16, 4019:23, 4035:22, 4050:4, 4053:21, 4053:25, 4054:3, 4059:4, 4071:24, 4085:21, 4086:12
**under-provided** [1] - 3999:25
**under-provision** [1] - 3995:14
**underinvestment** [1] - 3995:15
**underlying** [3] - 3983:16, 4094:17, 4108:13
**underneath** [2] - 3827:24, 3926:22
**understandable** [1] - 4066:25
**understood** [2] - 4028:23, 4040:5
**undertakes** [1] - 3994:14
**undertaking** [1] - 3887:19
**unequivocally** [1] - 3907:17
**unfortunately** [1] - 3879:4
**unique** [1] - 3901:10
**uniquely** [1] - 4004:9
**UNITED** [3] - 3810:1, 3810:3, 3810:14
**United** [15] - 3810:6, 3812:6, 3812:25, 3856:21, 3858:19, 3858:22, 3859:2, 3859:3, 3908:8, 3911:1, 3952:25, 3953:1, 4016:14, 4029:17, 4033:19
**universe** [2] - 4086:7, 4089:9
**University** [1] - 3816:6
**unleashed** [1] - 4093:1
**unless** [6] - 3906:4, 3906:6, 3921:13, 3998:3, 4106:16, 4106:23
**unlikely** [3] - 3891:12, 3918:17, 3921:22
**unmanaged** [8] - 3846:23, 3847:6, 3847:9, 3847:24, 3848:5, 3849:3, 3988:21, 3989:12

**unprofitability** [1] - 4024:22
**unprofitable** [3] - 3848:14, 3874:4, 3949:17
**unregulated** [2] - 3928:9, 3928:15
**unrepresentative** [1] - 3955:14
**unsound** [2] - 4047:3, 4047:7
**untargeted** [9] - 3865:8, 3865:18, 3865:21, 3866:2, 3866:4, 3866:16, 3867:5, 3867:19, 3874:21
**unusual** [1] - 3990:11
**unwarranted** [4] - 4024:10, 4024:16, 4037:16, 4057:4
**up** [107] - 3818:21, 3818:22, 3826:9, 3826:10, 3834:8, 3837:5, 3837:9, 3837:16, 3838:5, 3840:19, 3854:3, 3854:9, 3855:18, 3856:1, 3864:14, 3866:6, 3876:1, 3877:18, 3880:7, 3880:24, 3881:3, 3884:14, 3885:16, 3890:6, 3895:18, 3904:21, 3908:23, 3908:25, 3909:1, 3909:8, 3910:12, 3911:21, 3912:3, 3913:9, 3913:10, 3913:17, 3914:8, 3914:25, 3915:1, 3915:16, 3920:8, 3921:3, 3924:15, 3927:5, 3927:15, 3929:17, 3930:6, 3939:14, 3944:2, 3944:15, 3944:23, 3945:5, 3948:15, 3951:3, 3951:23, 3951:24, 3952:19, 3956:6, 3957:12, 3961:1, 3962:6, 3962:8, 3968:11, 3969:1, 3971:4, 3972:16, 3974:16, 3976:5, 3976:16, 3976:19, 3977:4, 3977:8, 3981:25, 3986:13, 3986:25, 3988:10, 3989:21, 3990:1, 4001:9, 4002:17, 4003:23, 4004:24, 4006:20, 4006:25, 4014:5, 4017:15, 4017:21, 4018:2, 4033:13, 4040:11, 4042:2, 4043:19, 4046:4, 4064:17, 4068:15, 4072:21, 4087:8, 4089:9, 4089:18, 4094:6, 4099:9, 4108:17
**upgrading** [1] - 3878:23
**upper** [2] - 3885:9, 4080:23
**USA's** [1] - 3909:21
**usage** [4] - 3891:4, 4071:6, 4073:16, 4077:16
**Usage** [1] - 4076:23
**useful** [7] - 3825:8, 3825:13, 3826:1, 3882:16, 4045:3, 4060:9, 4061:4
**user** [1] - 3966:5
**users** [13] - 3855:24, 3875:20, 3893:13, 3894:17, 3963:15, 3964:14, 3966:21, 4028:5, 4084:20, 4086:16, 4088:12, 4088:17, 4091:10
**uses** [11] - 3863:12, 3867:16, 3873:22, 3886:5, 3886:7, 3956:20, 3957:3, 3967:21, 4051:3, 4102:15
**usual** [1] - 3969:22
**UTAH** [1] - 3810:6

## V

**vague** [1] - 4027:15
**valid** [2] - 4009:3, 4012:9

**valuable** [6] - 3829:18, 3829:24, 3996:1, 4004:10, 4012:2
**valuated** [1] - 3986:18
**value** [64] - 3835:18, 3836:1, 3836:4, 3836:15, 3845:21, 3845:22, 3846:1, 3846:21, 3847:19, 3849:7, 3850:1, 3850:2, 3850:8, 3851:2, 3852:2, 3853:22, 3919:4, 3923:18, 3951:19, 3957:14, 3957:25, 3958:1, 3958:21, 3959:12, 3960:2, 3960:3, 3960:14, 3960:19, 3963:13, 3970:9, 3970:20, 3973:4, 3973:8, 3973:11, 3984:23, 3985:3, 3985:5, 3986:3, 3986:6, 3991:14, 3992:22, 3999:15, 4004:15, 4008:1, 4008:2, 4008:6, 4008:8, 4012:7, 4012:14, 4013:1, 4013:3, 4013:13, 4028:2, 4028:4, 4028:11, 4028:18, 4047:17, 4102:15
**variation** [1] - 3890:20
**variety** [4] - 3886:9, 3897:6, 3908:3, 4022:5
**various** [18] - 3844:13, 3874:15, 3889:7, 3894:21, 3968:2, 3980:24, 4008:25, 4026:12, 4031:3, 4033:5, 4039:9, 4041:18, 4056:10, 4077:19, 4078:3, 4078:20, 4104:15, 4104:22
**vary** [1] - 3905:25
**varying** [1] - 3894:6
**vast** [5] - 3890:10, 3890:23, 3936:5, 3936:8, 3980:15
**vein** [1] - 3828:18
**venture** [1] - 3944:22
**verb** [1] - 4079:24
**verbatim** [1] - 4062:11
**VERMONT** [1] - 3810:6
**versa** [2] - 3943:1, 4053:11
**version** [9] - 3857:8, 3919:16, 3923:25, 4003:14, 4031:15, 4084:14, 4094:9, 4096:15, 4099:10
**versus** [4] - 3867:2, 3881:24, 3968:22, 4033:5
**vertical** [5] - 3818:2, 3818:8, 3818:10, 3837:20, 3927:16
**vice** [2] - 3943:1, 4053:11
**victim** [1] - 4008:23
**view** [30] - 3820:2, 3853:21, 3861:8, 3876:19, 3881:22, 3881:23, 3882:1, 3952:10, 3970:23, 4004:20, 4016:21, 4016:22, 4017:4, 4017:5, 4017:6, 4017:8, 4035:6, 4046:20, 4046:23, 4046:24, 4051:20, 4053:7, 4057:1, 4065:6, 4065:8, 4069:22, 4078:17, 4078:21, 4098:11, 4104:16
**viewed** [5] - 3949:13, 4016:9, 4016:20, 4016:23, 4017:7
**viewing** [1] - 4018:10
**views** [2] - 3876:21, 4078:13
**virtually** [1] - 4038:9
**virtue** [1] - 4039:17
**Visa** [120] - 3820:2, 3820:3, 3826:24,

3827:25, 3828:1, 3828:19, 3830:8,
3832:23, 3836:23, 3837:13, 3837:18,
3838:10, 3839:13, 3841:5, 3842:19,
3842:22, 3842:24, 3843:1, 3843:9,
3843:22, 3843:23, 3844:1, 3864:2,
3879:9, 3884:6, 3892:15, 3898:3,
3903:24, 3909:21, 3909:25, 3911:18,
3915:14, 3920:14, 3927:12, 3930:4,
3931:18, 3931:21, 3932:19, 3939:12,
3939:24, 3940:3, 3942:2, 3942:3,
3944:5, 3946:8, 3946:10, 3946:16,
3946:22, 3954:12, 3958:3, 3958:9,
3958:13, 3959:7, 3959:23, 3960:6,
3961:24, 3973:9, 3973:17, 3979:13,
3979:14, 3979:19, 3980:2, 3980:9,
3980:11, 3980:18, 3981:8, 3981:14,
3981:19, 3982:5, 3982:7, 3982:8,
4000:12, 4002:15, 4002:25, 4003:1,
4003:13, 4008:24, 4009:21, 4010:2,
4029:14, 4040:6, 4046:12, 4047:21,
4047:23, 4052:18, 4052:21, 4052:25,
4053:16, 4053:22, 4054:10, 4054:18,
4054:19, 4055:16, 4055:24, 4056:15,
4062:11, 4062:16, 4066:11, 4066:18,
4067:3, 4067:9, 4067:17, 4067:24,
4068:1, 4068:4, 4068:11, 4068:24,
4069:6, 4069:21, 4069:22, 4070:11,
4070:14, 4071:1, 4071:12, 4071:16,
4074:6, 4095:18
**Visa's** [3] - 3843:17, 4009:2, 4069:23
**Visas** [1] - 3981:11
**Visas'** [1] - 3979:16
**visible** [1] - 3935:5
**visualizing** [1] - 3868:7
**vitae** [1] - 3815:23
**voice** [1] - 3933:3
**volume** [110] - 3830:22, 3841:21,
3846:4, 3847:23, 3864:19, 3864:23,
3868:16, 3868:19, 3869:1, 3869:11,
3869:18, 3870:12, 3870:21, 3871:3,
3871:11, 3871:14, 3872:3, 3872:24,
3872:25, 3873:1, 3873:15, 3873:17,
3874:4, 3874:6, 3885:18, 3890:10,
3896:3, 3896:4, 3900:1, 3900:4,
3913:5, 3913:9, 3913:11, 3913:17,
3913:24, 3914:1, 3914:7, 3916:21,
3917:9, 3917:13, 3917:22, 3918:3,
3918:13, 3918:15, 3921:6, 3921:14,
3921:25, 3922:25, 3923:6, 3924:15,
3924:20, 3928:25, 3934:17, 3935:24,
3935:25, 3936:9, 3939:13, 3941:1,
3941:6, 3943:9, 3943:18, 3943:24,
3947:10, 3953:18, 3955:18, 3955:20,
3957:2, 3962:22, 3964:5, 3964:6,
3964:9, 3964:11, 3966:18, 3968:2,
3969:6, 3970:13, 3974:7, 3990:4,
4017:23, 4018:1, 4018:20, 4031:2,
4031:6, 4032:23, 4034:13, 4042:19,
4062:23, 4063:7, 4064:9, 4067:1,
4068:20, 4071:4, 4071:10, 4072:1,
4079:13, 4079:14, 4079:24, 4079:25,
4080:6, 4080:7, 4080:11, 4081:22,

4081:23, 4094:2, 4099:24, 4100:4
**Volume** [2] - 4083:24, 4089:12
**volumes** [4] - 3826:23, 3872:22,
3934:24, 4031:3

## W

**wait** [9] - 3848:13, 3920:10, 3939:20,
3943:10, 3943:25, 3975:5, 4098:6,
4098:9, 4099:4
**wake** [1] - 4081:2
**walk** [13] - 3822:24, 3869:25, 3902:3,
3931:10, 3937:9, 3958:24, 3967:2,
3967:21, 3968:3, 3968:12, 3969:9,
3969:11, 4013:18
**walk-away** [1] - 3958:24
**walked** [1] - 3872:9
**walking** [3] - 3835:3, 3858:4, 3901:23
**wants** [5] - 3830:20, 3831:21, 3945:18,
3995:12, 4001:18
**warned** [1] - 3865:12
**warranted** [1] - 4104:14
**warrants** [1] - 4014:6
**Washington** [1] - 3810:18
**ways** [27] - 3830:5, 3838:12, 3865:3,
3876:14, 3877:1, 3880:9, 3880:20,
3886:10, 3908:3, 3919:19, 3922:5,
3956:10, 3959:12, 3998:10, 4004:14,
4004:17, 4004:22, 4008:4, 4008:11,
4008:25, 4009:9, 4016:22, 4017:8,
4041:25, 4104:5, 4104:15
**weaken** [2] - 4005:23, 4005:24
**weakens** [1] - 3992:10
**weaker** [2] - 4011:2, 4011:6
**website** [2] - 4003:25, 4004:2
**weekly** [1] - 3891:10
**weeks** [1] - 4038:5
**weight** [1] - 3968:20
**weighted** [4] - 3955:20, 3968:23,
3974:8, 3986:25
**welcome** [1] - 3815:4
**welfare** [2] - 4036:19, 4037:13
**well-defined** [1] - 3858:24
**well-established** [1] - 3819:10
**well-known** [2] - 3828:20, 4104:4
**well-recognized** [1] - 4104:8
**Wells** [1] - 3830:19
**whatever's** [1] - 4012:19
**whereas** [6] - 3882:12, 3916:14,
3931:22, 4009:19, 4065:13, 4092:5
**white** [2] - 3959:25, 3987:7
**whoa** [1] - 4027:8
**whole** [5] - 3895:8, 3984:9, 3994:18,
4044:6, 4086:16
**wholesale** [1] - 3930:6
**wide** [3] - 3983:9, 3984:15, 3993:15
**widely** [4] - 3859:12, 3859:13, 3881:17,
3940:8
**wider** [1] - 4055:18
**willing** [11] - 3892:23, 3900:10,
3900:25, 3936:6, 3936:7, 3949:4,

3949:21, 3957:9, 3963:5, 3976:12,
4051:15
**window** [2] - 3998:16, 4005:4
**wine** [4] - 3861:3, 3861:5, 3862:2,
3862:4
**wise** [1] - 3871:11
**witching** [1] - 4106:8
**WITNESS** [64] - 3815:12, 3856:14,
3865:13, 3865:16, 3865:21, 3876:9,
3876:16, 3877:8, 3879:7, 3889:13,
3891:25, 3892:8, 3901:22, 3905:1,
3905:4, 3927:24, 3928:3, 3928:19,
3943:5, 3944:16, 3944:24, 3945:2,
3945:6, 3945:14, 3945:19, 3945:22,
3948:10, 3948:12, 3950:5, 3950:10,
3955:3, 3960:21, 3960:23, 3964:25,
3965:3, 3965:5, 3965:10, 3965:17,
3965:23, 3966:1, 3966:11, 3967:8,
3967:11, 3967:14, 3970:24, 3971:21,
3972:2, 3972:5, 3972:11, 3978:16,
3979:5, 4000:14, 4000:20, 4001:3,
4001:8, 4002:12, 4010:20, 4011:5,
4011:22, 4059:5, 4093:4, 4094:5,
4094:8, 4110:3
**witness** [26] - 3812:16, 3812:24, 3813:5,
3820:14, 3879:13, 3880:4, 3903:3,
3948:24, 3949:5, 3956:16, 3967:10,
3978:15, 3993:10, 4010:24, 4015:17,
4029:13, 4049:7, 4058:8, 4059:4,
4067:5, 4072:20, 4102:19, 4106:11,
4106:13, 4106:22, 4107:20
**Witness** [1] - 3903:1
**witness's** [2] - 3812:20, 4077:25
**witnesses** [4] - 3907:13, 4038:10,
4077:20, 4078:13
**women** [6] - 4027:4, 4027:8, 4027:11,
4027:16, 4027:17
**wondering** [2] - 3861:9, 4036:21
**word** [7] - 3936:21, 3957:13, 4028:23,
4051:10, 4062:20, 4074:11, 4079:1
**words** [7] - 3873:12, 3933:16, 3935:11,
3988:12, 4062:11, 4062:14, 4073:7
**works** [13] - 3823:23, 3829:21, 3831:19,
3852:19, 3860:3, 3886:16, 3886:20,
3913:14, 3931:10, 3954:20, 4026:23,
4027:18, 4038:19
**world** [6] - 3828:19, 3916:15, 4013:15,
4013:21, 4095:18
**Worldwide** [2] - 3811:7, 4072:17
**worried** [6] - 3825:9, 3934:1, 3949:14,
3949:17, 3995:13, 4051:15
**worry** [5] - 3832:2, 3915:25, 3995:11,
4007:5, 4091:17
**worrying** [2] - 3875:15, 3875:17
**worse** [2] - 3855:20, 3871:15
**worth** [20] - 3832:19, 3849:2, 3850:14,
3867:14, 3910:17, 3943:19, 3944:2,
3951:11, 3953:7, 3959:4, 3960:5,
3970:9, 3970:16, 3970:17, 3971:2,
3974:5, 4044:18, 4045:11, 4046:5,
4098:4

47

**wrap** [2] - 3972:16, 3974:16
**write** [4] - 3817:20, 3817:22, 4083:8, 4092:19
**writes** [1] - 4064:22
**writing** [2] - 4025:3, 4067:4
**writings** [1] - 4026:12
**written** [2] - 3829:14, 4067:8
**wrote** [2] - 3818:6, 3818:8

## Y

**year** [15] - 3837:15, 3931:14, 3935:2, 3935:3, 3939:18, 3939:21, 3939:22, 3940:23, 4065:24, 4066:6, 4072:3, 4072:13, 4076:7
**years** [27] - 3826:21, 3827:1, 3836:12, 3877:1, 3877:22, 3878:4, 3881:9, 3881:11, 3883:15, 3932:11, 3934:23, 3939:16, 3940:19, 3946:18, 3987:10, 3987:13, 4046:13, 4054:11, 4062:12, 4062:18, 4062:20, 4062:25, 4064:4, 4065:23, 4066:23, 4068:8
**yellow** [8] - 3967:25, 3968:18, 3969:14, 3969:21, 3970:20, 3972:7, 3972:21, 3972:24
**Yelp** [2] - 4005:5, 4005:10
**yesterday** [3] - 3879:13, 3954:10, 4108:11
**yields** [2] - 3916:3, 3920:24
**YORK** [1] - 3810:1
**York** [9] - 3810:6, 3811:8, 3811:12, 3811:19, 3860:10, 3994:21, 4001:12
**younger** [4] - 3887:6, 4073:17, 4074:13, 4074:16
**yourself** [4] - 4005:1, 4026:17, 4034:15, 4080:22
**yourselves** [1] - 3925:11

## Z

**Zagat** [1] - 4005:6
**zero** [5] - 3888:8, 3893:24, 3940:12, 4085:21, 4088:5
**Zinman** [3] - 4063:24, 4064:2, 4064:22
**Zinman's** [1] - 4065:7