4112

1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3  UNITED STATES OF AMERICA,      )
   STATES OF ARIZONA, CONNECTICUT, )
4  IDAHO, ILLINOIS, IOWA,         )
   MARYLAND, MICHIGAN, MISSOURI,  )
5  MONTANA, NEBRASKA,             )  10-CV-4496 (NGG)
   NEW HAMPSHIRE, OHIO,           )
6  RHODE ISLAND, TENNESSEE,       )  United States Courthouse
   TEXAS, UTAH AND VERMONT,       )  Brooklyn, New York
7                                 )
                  Plaintiffs,     )
8                                 )
        -against-                 )
9                                 )
   AMERICAN EXPRESS COMPANY,      )  WEDNESDAY, JULY 30, 2014
10 ET AL.,                        )  9:00 a.m.
                                  )
11                Defendants.     )
   _____)
12

13      REDACTED TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
        BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
14              UNITED STATES DISTRICT JUDGE

15
   APPEARANCES:
16
   FOR THE PLAINTIFF:    ANTITRUST DIVISION, LITIGATION III
17 U.S.A.                U.S. DEPARTMENT OF JUSTICE
                         450 Fifth Street NW, Suite 4000
18                       Washington D.C. 20001
                         BY:  CRAIG W. CONRATH, ESQ.
19                            MARK H. HAMER, ESQ.
                              ETHAN GLASS, ESQ.
20                            JOHN READ, ESQ.
                              LISA SCANLON, ESQ.
21                            SUSAN MUSSER, ESQ.
                              KATE MITCHELL-TOMBRAS, ESQ.
22

23 FOR THE PLAINTIFF:    GREG ABBOT
   STATE OF TEXAS        Attorney General of Texas
24                       BY:  BRET L. FULKERSON
                         Assistant Attorney General
25                       Post Office Box 12548
                         Austin, Texas 78711-2548

                    NICOLE CANALES, CSR, RPR

4113

```
 1   FOR THE STATE OF MISSOURI:   ANNE E. SCHNEIDER
                                  Assistant Attorney General
 2                                Supreme Court Building
                                  Post Office Box 899
 3                                Jefferson City, Missouri 65102

 4
     FOR THE STATE OF OHIO:       MITCH GENTILE
 5                                Assistant Attorney General
                                  Ohio Attorney General's Office
 6

 7   FOR THE DEFENDANT:           CRAVATH, SWAINE & MOORE LLP
                                  Worldwide Plaza
 8                                825 Eighth Avenue
                                  New York, New York 10019
 9                                BY:  EVAN R. CHESLER, ESQ.
                                       KEVIN J. ORSINI, ESQ.
10                                     PETER T. BARBUR, ESQ.
                                       STUART W. GOLD, ESQ.
11
                                  BOIES, SCHILLER & FLEXNER LLP
12                                575 Lexington Avenue
                                  New York, New York 10022
13                                BY:  PHILIP C. KOROLOGOS, ESQ.
                                       ERIC BRENNER, ESQ.
14                                     MATTHEW TRIPOLITSIOTIS, ESQ.
                                       DONALD L. FLEXNER, ESQ.
15                                     JAMES COVE, ESQ.

16

17

18
     THE COURT REPORTER:         NICOLE CANALES, CSR, RPR
19                               225 Cadman Plaza East
                                 Brooklyn, New York 11201
20                               cnlsnic@aol.com

21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer-assisted transcript.

23

24

25
```

4114

1           THE COURT:  Please be seated.

2           THE CLERK:  Case on trial.  Counsel, please state

3    your appearances for the record.

4           MR. CONRATH:  Craig Conrath for the United States.

5           THE COURT:  Good morning.

6           MR. CONRATH:  Good morning, Your Honor.

7           MR. GENTILE:  Mitch Gentile for the plaintiff

8    states.  Good morning, Your Honor.

9           THE COURT:  Good morning, sir.

10          MR. CHESLER:  Good morning, Your Honor, Evan Chesler

11   for American Express.

12          THE COURT:  Good morning.

13          MR. FLEXNER:  Good morning, Your Honor, Donald

14   Flexner for American Express.

15          THE COURT:  Good morning.

16          All right.  We're on cross-examination.  Anything

17   before we start?

18          MR. CONRATH:  Nothing from us, Your Honor.

19          THE COURT:  Okay.  Let's bring the witness please.

20          (Witness enters courtroom and resumes the stand.)

21          THE COURT:  Good morning, sir.  Please be seated.

22          THE WITNESS:  Thank you.

23          THE COURT:  I remind the witness that he is still

24   under oath.

25          You may continue your cross-examination,

4115

1    Mr. Chesler.

2              MR. CHESLER:  Thank you, Your Honor.

3              Your Honor, by way of housekeeping, there are two

4    documents that I used yesterday with the witness which I'd

5    like to offer only for demonstrative purposes.  They had

6    numbers on them which I did not read aloud because of

7    confidentiality and, therefore, in order to be clear on the

8    record what numbers the witness and we were all looking at, I

9    think we need to offer those two documents and one of them I'm

10   going to offer in in an amended form for a reason I'll explain

11   in a moment but the two numbers are DX 7760A, I used 7760

12   yesterday and I'll explain the difference of the A version,

13   and 7761 for illustrative purposes only.

14             THE COURT:  I had written down 7760, that's your

15   witness' rebuttal report.

16             MR. CHESLER:  Yes, the three pie chart.

17             THE COURT:  The demonstrative, the pie charts.

18             MR. CHESLER:  Yes.

19             THE COURT:  It's a demonstrative, I'm sure we'll

20   hear from Dr. Bernheim about it.

21             MR. CONRATH:  I think so, Your Honor.  So, as to

22   7761, I have no objection; as to 7760A, I guess I should wait

23   to hear what the difference is before I comment.

24             THE COURT:  Yes.

25             MR. CHESLER:  Let me give a copy of that to counsel.

4116

1   May I hand up a copy?

2           THE COURT:  Yes, of course.  7761 is received in

3   evidence without objection.

4           (Defendant's Exhibit 7761 so marked in evidence.)

5           THE COURT:  And the difference is in 7760?

6           MR. CHESLER:  In the text below the middle and the

7   right-hand pie charts, Your Honor, in 7760 there was an error,

8   they both said more secure, more secure rather than more

9   accepted, more convenient, so it was just a typo, they should

10  have said the same thing as the words at the top of each pie

11  chart.  The first bullet under each pie chart said secure in

12  all three cases.  That was a mistake, it should have said

13  accepted in the middle one and convenience in the right-hand

14  one, so we just corrected those two words.

15          THE COURT:  Does that bear any relationship to the

16  testimony of the witness?

17          MR. CHESLER:  No, the witness was actually looking

18  and I directed him to the words on the top of the pie charts

19  which were in that exhibit just as they are in this one, they

20  haven't changed.  The typo was in the first bullet below each

21  pie chart.

22          THE COURT:  Let me show the witness the changes.

23          THE WITNESS:  Your Honor, I was reading across the

24  top, I understood it to be three different pie charts.

25          THE COURT:  Okay.  Then is there an objection to it

1    serving as a demo exhibit?

2              MR. CONRATH:  As a demonstrative, no, Your Honor.

3    We'll take a look at the correction.  I guess I reserve any

4    right if we look at the correction and find there's some

5    problem with it but I don't have an objection as to the

6    demonstrative.

7              THE COURT:  All right, that's fine.

8              Please be seated, sir.

9              All right.  DX 7760A is received in evidence as a

10   demonstrative.

11             MR. CHESLER:  Thank you, Your Honor.

12             (Defendant's Exhibit 7760 so marked in evidence.)

13   M I C H A E L   K A T Z,   having been previously

14   duly sworn was examined and testified as follows:

15   CROSS-EXAMINATION (Cont'd.)

16   BY MR. CHESLER:

17   Q    Good morning, Dr. Katz.

18   A    Good morning.

19   Q    Dr. Katz, would you agree that it is necessary to know

20   what products are at issue in order to assess whether there is

21   more or less competition among those products?

22   A    Yes.

23   Q    And so, in order to properly evaluate the competitive

24   effect of a vertical restraint, do you agree that the market

25   in which that vertical restraint exists has to be properly

1  defined?

2  A     No, I don't fully agree with that.  I certainly am in

3  favor of proper market definition and think an improper one

4  could mislead you but it's well known that among economists

5  there are numerous ways to analyze the effects of something

6  without having to formally define a relevant market.  That's

7  an opinion that I hold and share actually with at least some

8  of your own experts.

9  Q     Okay.  But you, in any event, agree I think you said that

10  in order to determine whether there's more or less competition

11  among a group of products, you need to be sure you've

12  identified which products you have in mind, correct?

13  A     Yes.

14  Q     Now, do you agree that if a firm does not possess

15  significant market power in a relevant market, one is unlikely

16  to be concerned with the effects of its behavior on

17  competition?

18  A     Yes, as a general matter that's right, one is unlikely.

19  There are exceptions but I agree with that statement, I

20  believe I've made it in my report.

21  Q     Do you also agree that in this two-sided market a firm

22  could even have the power to set price above a competitive

23  level based, for example, on insistence and yet at the same

24  time lack sufficient market power to engage in

25  anti-competitive conduct?

1    A    So, it would depend on the conduct but there could be

2    situations where that's true, yes.

3    Q    And, in fact, you believe, do you not, that the ability

4    to set prices greater than at a competitive level is not

5    equivalent to the ability to harm competition more broadly

6    through many vertical restraints such as the

7    non-discrimination provisions?

8    A    That's right, by itself it does not imply that.

9    Q    And, in particular, you believe that market shares play

10   an important role in a firm's ability to impose vertical

11   restrictions that harm competition?

12   A    Certainly they can and I believe in this market they do

13   play that role.

14   Q    Now, in the U.S. v. Visa case you concluded that Visa and

15   MasterCard had substantial market power, correct?

16   A    In the relevant markets in that case, yes.

17   Q    And you also concluded that competition from American

18   Express was limited in the market for credit and charge card

19   network services, correct?

20   A    Yes.

21   Q    And you also in that case testified that the high

22   combined market share of Visa and MasterCard went hand-in-hand

23   with low market shares for American Express and Discover,

24   isn't that true?

25   A    Yes.  That's an accounting identity since the shares have

1   to add up to 100.

2   Q    So, in the U.S. v. Visa case you actually characterized

3   American Express's market share as low, didn't you?

4   A    I don't recall.  I certainly characterized it as lower

5   than their shares and lower than I thought it would be absent

6   the exclusionary rules.

7   Q    Well, let me ask you to look at Defendant's Exhibit 733

8   which is in volume one, that's your direct testimony from the

9   Visa case, and in particular paragraph 169 which begins on

10  page 89.

11  A    I'm sorry, I must be looking at the wrong exhibit.  What

12  number?

13  Q    The exhibit is DX 733, page is page 89 from the excerpt

14  that appears behind that tab and in particular paragraph 169.

15       Do you have that, sir?

16  A    Yes, I do.

17  Q    And you see that in the first sentence of paragraph 169

18  of your direct testimony you said:

19       "A second reason why market shares are informative

20  follows from the fact that the large combined market share of

21  the associations --

22       That was Visa and MasterCard, right?

23  A    Yes.

24  Q    -- goes hand-in-hand with the low market shares of

25  American Express and Discover/Novus."

*Katz - cross - Chesler*                                    4121

1           Do you see that, sir?

2   A    Yes, I do.

3   Q    So, did you characterize American Express's market share

4   in that case as low?

5   A    Yes, and I think if you look in context though in the

6   next sentence that I'm saying that the shares of the two

7   associations were high and by that I mean the other ones are

8   low being the opposite of it and as you see in the second

9   sentence, I'm saying the relatively low shares.  I certainly

10  believed then and believe now that their shares were lower and

11  significantly lower than the combined shares.

12          MR. CHESLER:  Your Honor, my efficient staff has

13  told me we have to turn on our feed on our side of the

14  courtroom.

15          THE COURT:  Thank you.

16  Q    Do you recall that at the time that you so characterized

17  the American Express share that it was about 20 percent of

18  spend volume?

19  A    That's my recollection but I'd have to check but that's

20  my recollection.

21  Q    You also testified, did you not, that the relatively low

22  market share that American Express had reflected the fact that

23  it would likely have difficulty taking business away from

24  MasterCard and Visa if those networks were to reduce the

25  attractiveness of their offerings by raising prices, lowering

Katz - cross - Chesler                                    4122

1   product and service quality or reducing their level of

2   innovation, do you recall testifying to that?

3   A    I don't recall saying that specifically except as part of

4   reading the paragraph I saw, I did in fact say that.

5   Q    You did in fact say that.  Thank you.

6          You also said that it was your belief that American

7   Express could take actions to increase the size of its'

8   acceptance network including by lowering its price but that

9   American Express did not do so because it thought that doing

10  so would not be a profitable strategy and that the costs of

11  doing so would outweigh the benefits, do you recall testifying

12  to that, sir?

13  A    I don't recall testifying to that in that case but that

14  certainly -- wait a minute, not supports, that certainly

15  reports economic logic that I would support so I would not be

16  at all surprised that I said it.

17  Q    Let me ask you to look at Defendant's Exhibit 708 please.

18  This is also in volume one.  These are excerpts from your

19  testimony in the U.S. v. Visa case and -- I'm sorry, this is

20  actually from your deposition in that case.  I'd like you to

21  turn to page 380 of the transcript.

22  A    I'm there.

23  Q    I'm sorry, I've taken you to the wrong page.  Page 150.

24         Page 150 of Defendant's Exhibit 708, do you have

25  that?

*Katz - cross - Chesler*                                        4123

1    A    Yes, I do.

2    Q    Now, beginning -- these pages for some reason are not

3    numbered, the lines are not numbered but about three or four

4    questions down into the page there's a question that begins

5    "Prior to 1995," do you have that one?

6    A    Yes, I do.

7    Q    The question was:  "Prior to 1995 could American Express

8    have taken actions that would have increased the size of their

9    network such as lowering the merchant discount rate, for

10   example?"

11        Your answer was:  "Yeah, I believe the actions they

12   could have that they might be able to increase the size of the

13   merchant acceptance network."

14        Then you were asked:

15        "Question:    And do you know why they didn't?

16        "Answer:    My belief would be that they thought

17   that doing so would not be a profitable strategy and that the

18   cost of doing it would outweigh the benefits."

19        So far do you agree with the testimony that you gave

20   there, sir?

21   A    Yes.

22   Q    Now, you were then asked in the very next question:

23        "Does that imply anything about whether or not

24   American Express has market power?"  That being the strategy

25   that you just described, correct?

1    A    Yes.

2    Q    And your answer was:

3         "Answer:    I don't see how the fact that they found

4    their actions, the fact that there were actions that they

5    might have taken that they didn't but would have been

6    unprofitable, as I sit here I don't see how that is indicative

7    of having market power."

8         Do you stand by that testimony, sir?

9    A    I stand by the testimony I gave there based on the

10   general statement about the fact that it was unprofitable to

11   lower the price to increase the acceptance network.  My

12   testimony in this case is based on information that goes

13   beyond that.  I'm not relying just on the fact that it was

14   unprofitable, I'm relying on the fact it was unprofitable even

15   though they were getting positive contribution margins from

16   merchants.  This is a statement about a broader logic.  So, I

17   agree with the statement I made there and I believe it is

18   fully consistent with what I've done in this case.

19   Q    All right.  We'll probe that a bit further in a few

20   minutes.

21        THE COURT:  Oh, I don't seem to have that page in my

22   book so that's all right, I've got it on the screen but I

23   would just like to have it for my record.

24        MR. CHESLER:  We will provide that, Your Honor, I'm

25   sorry.

1          THE COURT:  Thank you.

2    Q    Now, you also testified in the Visa case that the size

3    and coverage of a systems acceptance network is one of the

4    most important characteristics of a credit and charge card

5    system, didn't you?

6    A    I believe I did, yes.

7    Q    And that a system with limited acceptance is of limited

8    value to potential cardholders because of the network effect,

9    correct?

10   A    That's correct.

11   Q    And do you recall that you relied in that case on

12   statements from American Express executives that the smaller

13   size of their acceptance network relative to Visa and

14   MasterCard was a source of competitive disadvantage to

15   American Express, do you recall doing that, sir?

16   A    I don't recall doing that but it is certainly plausible

17   that I would have done that.

18   Q    Let's look at 733 again which is your direct testimony

19   and at page 213, footnote 542 on 213, you say:

20          "American Express executives indicated that the

21   smaller size of the American Express acceptance network

22   relative to those of MasterCard and Visa continues to be a

23   significant source of competitive disadvantage in attracting

24   consumer cardholders?"

25          So, do you see that you in fact refer to that and

1    that's consistent with your recollection, sir?

2    A    As I say, I don't recollect it but I'm not at all

3    surprised I said it and I certainly agree I said it.

4    Q    Now, are you aware that the evidence in this case

5    indicates that Discover has many more accepting merchants than

6    American Express does?

7    A    You're saying the present case?

8    Q    Yes, sir?

9    A    Yes.

10   Q    In fact, the locations in force, according to industry

11   sources, are something like three million more for Discover

12   than American Express?

13   A    That sounds about right.  I more have the visual in my

14   mind but yes.

15   Q    And are you aware that Mr. Hochschild of Discover

16   testified in this case that Discover's coverage gap even with

17   that many merchants, this is coverage gap as compared to Visa

18   and MasterCard, is a competitive weakness of Discover?

19   A    No, I don't recall seeing that testimony.

20   Q    Back in the Visa case you testified, did you not, that

21   executives from Visa and MasterCard had identified the fact

22   that American Express had a smaller acceptance network as a

23   significant source of competitive disadvantage for American

24   Express in competing against the larger networks?

25   A    Again I don't recall but it sounds plausible.

1   Q    Just so we're clear in the record, if you'd look at

2   paragraph 69 of your Visa testimony which is Exhibit 733, it

3   is at page 33, you see the last sentence on page 33 carrying

4   over to 34, you say:  "MasterCard and Visa executives have

5   identified the fact that American Express has a smaller

6   acceptance network than either of the two associations as a

7   significant source of competitive disadvantage for American

8   Express."

9          Do you see that?

10  A    Yes, I do.

11  Q    And American Express still has a significant coverage gap

12  as compared to Visa and MasterCard, correct?

13  A    Certainly measured in terms of the number of merchants it

14  is, you'd have to go back and look at the composition of the

15  merchants who weren't covered then and there to say if it is

16  the same gap but yes, there are millions of merchants they

17  don't take even though they are a small percentage of charge.

18  Q    Are you aware of the testimony in this record that the

19  merchants that American Express does not have acceptance at

20  are merchants that are largely in the range of half a million

21  dollars or less of charge volume, are you aware of that

22  testimony, sir?

23  A    I've seen -- I don't recall the testimony.  I've seen

24  various documents talking about them being small but I don't

25  have a particular threshold in mind.

1  Q    Are you aware of the testimony that that same size, half

2  a million dollars or less of charge volume, is in fact the

3  size of approximately 98 percent of American Express's current

4  merchants?

5  A    I wouldn't be surprised.  My understanding is that most

6  of the current merchants are in fact small merchants if you're

7  just counting them, yes.

8          MR. CONRATH:  Your Honor, I believe this document is

9  labeled as filed under seal in the prior case and I don't know

10  if that's ever been restricted and I don't think anything

11  that's been discussed here is significant but we probably

12  should honor that prior sealing since we haven't done anything

13  to remove it.

14          MR. CHESLER:  I agree, Your Honor.  I've stayed away

15  from anything that we thought was and I'm not going to go any

16  further into the content on the record.

17          THE COURT:  All right.

18  Q    Now, in your direct testimony yesterday you testified

19  that American Express was able to profitably increase its

20  rates to merchants through its value recapture initiative, do

21  you recall that?

22  A    Yes, I do.

23  Q    And you cited that in the context of your discussion of

24  market power?

25  A    Yes.

1    Q     Now, you agree, do you not, that a price increase alone

2    does not demonstrate the existence of antitrust market power?

3    A     Yes, I do.

4    Q     And are you aware, sir, that during the period of

5    American Express's value recapture effort Discover raised its

6    prices in a number of industry segments including travel and

7    entertainment?

8    A     That's my recollection, yes.

9    Q     And I'd like you to look at Defendant's Exhibit 6466

10   which is in the first volume, this is your first report in

11   this case, and I'd like you to look at, if I can get there,

12   page 288 which is one of the diagrams, it is actually

13   Figure VI.

14          So, we're in Defendant's Exhibit 6466, which is your

15   first report in this case, Figure VI which appears at page

16   288, do you have that?

17   A     Yes, I do.

18   Q     Now, the blue line in the middle on this chart is your

19   effort to depict American Express's average effective discount

20   rate between 2001 and 2011.  This is for -- that line is for

21   the combined travel and entertainment and the rest of the

22   market combined, correct?

23   A     That's correct.

24   Q     So, according to your compilation of the data, during

25   that ten year period American Express's average effective

1    discount rate declined, correct?

2    A    Yes.

3    Q    And that includes the period of time during which the

4    value recapture initiative took place, correct?

5    A    That's correct.

6    Q    Now, as you presented it in your report, if I understand

7    this correctly, the effective discount rate reflects money

8    that the merchant pays to American Express such as the

9    discount fee and other fees associated with transactions such

10   as a card not present fee, correct?

11   A    I believe that's right that that's calculated in the

12   discount revenue actuals, yes.

13   Q    And it also reflects money that American Express pays to

14   the merchant, some money such as signing bonuses and marketing

15   funds that are not actually used for marketing, right?

16   A    That's right, my recollection is it has contra revenues.

17   Q    You netted those out and that number was used to

18   calculate your effective discount rate as depicted on

19   Figure VI, correct?

20   A    I believe so, yes.

21   Q    Now, there were certain categories of payments that

22   American Express makes to merchants that are not included in

23   your calculation of the net effective discount rate, correct?

24   A    That is correct.

25   Q    So, for example, payments that American Express makes to

*Katz - cross - Chesler*                                    4131

1  merchants in connection with co-brand deals were not factored

2  into your calculation, correct?

3  A    Let's be clear, you are talking about payments that were

4  made to a merchant that was a co-brand partner in its role as

5  being a co-brand partner, those were not included, that's

6  correct.

7  Q    So, for example, you're aware that American Express, I

8  won't mention the amount, but American Express paid to Delta

9  Airlines a signing bonus as part of its 2008 co-brand

10  agreement of a significant amount of money that's not included

11  in your calculation of American Express's net discount rate,

12  correct?

13  A    That's correct.

14  Q    And the same is true of the signing bonus that American

15  Express paid to JetBlue, which again I won't mention on the

16  record, you didn't include that in your calculations either,

17  did you?

18  A    As a signing bonus for co-brand, it would not be

19  included.

20  Q    Now, are you also aware that in 2008 American Express

21  pre-purchased, and I can state this number because it's

22  been publicly reported by the merchant, American Express

23  pre-purchased a billion dollars worth of Delta SkyMiles, do

24  you recall that?

25  A    I remember they did a big pre-purchase and that number

1   sounds familiar.

2   Q    And so, in 2008 which was part of what you described

3   yesterday as the Great Recession, right?

4   A    Yes.

5   Q    So, in the midst or early on in the Great Recession

6   American Express gave Delta a billion dollars interest free as

7   a pre-purchase of SkyMiles, correct?

8   A    That's correct.

9   Q    And you did not, for example, factor in the value of

10  Delta having not the billion dollars itself but the value of

11  having a billion dollars of cash in its hands, for example,

12  the interest value, the carrying value of that money, you did

13  not include that in your calculation of the net discount rate

14  to merchants during that period, did you?

15  A    That's correct.

16  Q    Now, I'd like you to look at Defendant's Exhibit 6540

17  please which is another one of your reports in this case and I

18  want you to look at page 430 of that document.

19        Now, this is a table which is labeled Table VI G-1,

20  correct?

21  A    Yes.

22  Q    And it is entitled:  American Express's Overall Economic

23  Price of Payment Services and Net Discount Rate Components of

24  Dr. Bernheim's Figure 2 and Figure 5 Calculations All

25  Merchants; did I read that correctly?

*Katz - cross - Chesler*                                        4133

1   A     I believe you did.

2   Q     All right.  Would you agree with me, sir, that the

3   forgone interest value on the billion dollars of pre-purchased

4   SkyMiles by itself would reduce the American Express net

5   interest rate, net discount rate, excuse me, to all merchants

6   by the number of basis points that appears on the third line

7   up from the bottom of this chart on the right-hand column, the

8   last column on the right under 2010, the line is entitled

9   Forgone Interest?

10  A     I'm looking at the line -- sorry, I just have to look,

11  there are a lot of tables, I want to make sure I understand my

12  own table, but I believe that's what this is showing.

13  Q     And also if you included the co-brand remunerations which

14  you did not include, the effect on American Express's net

15  discount rate for all merchants in 2010 would be the number of

16  basis points that appears on the line right above that,

17  correct?

18  A     Yes.

19  Q     Now, would you look at the next page, page 431, this is a

20  similar table but this relates just to travel and

21  entertainment merchants, correct?

22  A     Yes.

23  Q     This one is labeled Table VI G-2.

24        Now, again, would you agree that the forgone

25  interest on the SkyMiles deal had you included it in your

*Katz - cross - Chesler*                                         4134

1   calculation of American Express's net discount rate would have

2   in 2010 represented the number of basis points that appears in

3   the 2010 column toward the bottom on the line labeled Forgone

4   Interest?

5   A    Actually to be clear, so the record is clear, these are

6   expressed as percentages but, yes, they do imply basis points

7   but the units here are not basis points but other than that I

8   agree, yes.

9   Q    Okay.  And again, if you had included co-brand

10  remuneration in your calculation, then the effect of that on

11  lowering American Express's net effective discount rate for

12  2010 would be the number of basis points that appears on the

13  co-brand remuneration line, this is for travel and

14  entertainment merchants in 2010, correct?

15  A    Yes.

16             MR. CHESLER:  Your Honor, for illustrative purposes

17  I would like to offer those two charts, pages 430 and 431 of

18  Defendant's Exhibit 6540, we'll submit them separately, as

19  6540 A and B, if that's acceptable.

20             MR. CONRATH:  As demonstratives I have no objection,

21  Your Honor.

22             THE COURT:  All right.  You'll mark them and submit

23  them as 6540 A and B.  They're admitted in evidence as

24  demonstrative exhibits.

25             MR. CHESLER:  Thank you, Your Honor.

*Katz - cross - Chesler* 4135

1          (Defendant's Exhibits 6540 A and B so marked in

2    evidence.)

3    Q     Now, you did not include those items in your calculation

4    because in your view co-brand relationships are separate from

5    the acceptance relationship, correct?

6    A     Yes.  So, if you were to impute all of it, for example,

7    to the Delta relationship, my recollection is that the sort of

8    calculation Dr. Bernheim did would imply that American Express

9    was paying Delta to accept American Express at a negative

10   discount rate and I think that's an implausible result and I

11   think it is because, as you're saying, that the co-brand

12   relationship is a card issuing relationship and is something

13   different than a merchant acceptance relationship.

14   Q     When you came to that conclusion, sir, did you consider

15   the evidence presented by Mr. Berry of American Express, by

16   internal American Express e-mails about the Starwood co-brand

17   relationship, the testimony of Mr. Brennan from Hilton Hotels,

18   the deposition testimony of Mr. Phillips from Delta, all

19   concerning the relationship between their co-brand agreements

20   and their acceptance agreements with American Express?

21   A     I mean I considered different people.  Those -- I don't

22   recall the specific names as I sit here but certainly there

23   was a set of people I considered including American Express

24   executives testifying that they tried to keep the two

25   negotiations separate.

1    Q    Let me ask you to look at Defendant's Exhibit 5817 which

2    is in the other volume.

3               I'm not going to mention the numbers here because

4    they're deemed confidential by Delta.  Do you see that this

5    appears to be a memorandum or a document from Chris Phillips

6    to someone named Wayne Aaron and with copies to others

7    entitled American Express Rate Update from July 14th 2011?

8    A    I see that, yes.

9    Q    And you see that the document lists American Express

10   merchant rate across all card types and there's a number next

11   to it and then it says American Express merchant rate across

12   all card types after remuneration credit, do you see that?

13   A    Yes.

14   Q    And then it says SkyMiles co-brand card merchant rate if

15   remuneration is only applied to this subset of American

16   Express cards, and there's another rate, correct?

17   A    Yes.

18   Q    Did you consider this document from Delta in connection

19   with your decision not to include co-brand consideration in

20   your calculation of American Express's net discount rate?

21   A    I don't recall having seen this document so I might have

22   but as I sit here, I don't recall incorporating it.

23   Q    All right.  I'd like you to look at Defendant's Exhibit

24   7775.  This is an excerpt from the deposition of Mr. Phillips,

25   the author of that document.  Do you have it, sir?

1   A    Yes, I do.

2   Q    And I'd like you to look at, beginning at page 72 of the

3   transcript, and you see he's asked -- he's talking about this

4   document and he's asked at line 15:

5             "Okay.  So, what you're doing here is you're trying

6   to figure out what the effective rate is considering various

7   other benefits that American Express provides to Delta?

8             "Answer:    That is correct."

9             Do you see that?

10  A    Yes.

11  Q    Okay.  I'd like you then to turn to page 82 of his

12  deposition transcript.  At the very bottom of the page, line

13  22, it says:

14            "If you could please refer to Defendant's Exhibit

15  809.  So, American Express's counsel -- this is Mr. Glass

16  questioning him -- American Express's counsel directed you to

17  the sentence that reads:  AX merchant rate across all card

18  types after remuneration credit -" and then there's a

19  percentage number, correct?

20  A    Yes.

21  Q    The witness says, "Yes."

22            Then he's asked:

23            "Question:    What's the remuneration credit?

24            "Answer:    That's the number of basis points that

25  Delta receives for spend on all Delta co-brand credit cards."

1              Do you see that, sir?

2    A    Yes, I do.

3    Q    He's plainly keeping track of calculating his overall

4    effective rate including the benefits that Delta was receiving

5    from the co-brand card, wasn't he?

6    A    He's certainly doing some sort of calculation.  From

7    looking at the page you have earlier it doesn't appear it's

8    the same set of calculations that Dr. Bernheim was suggesting

9    should be done because I believe the number is much higher, so

10   I don't know exactly what calculation Delta was doing but he

11   certainly says here, the plain English, that they were making

12   some adjustment for remuneration credit.

13   Q    Did you review this, did you take this into consideration

14   when you decided to keep the co-brand consideration out of

15   your calculation?

16   A    As I sit here, I don't know if I did or not.  I don't

17   recall reading this text before.

18   Q    Is it at all relevant to you in making this determination

19   that Mr. Brennan of Hilton Hotels testified here at trial, he

20   was asked:  "And as I think you said in response to questions

21   from Mr. Read, therefore you leveraged that co-brand

22   relationship that American Express valued when you were

23   negotiating the terms of the card acceptance agreement,

24   correct?

25              "Answer:  Yes, we brought that up relatively early

 1  in the negotiations."

 2          Is that relevant to you in your consideration of

 3  whether to keep co-brand remuneration and discount rate

 4  separate?

 5  A    That statement, no.

 6  Q    Okay.

 7          MR. CONRATH:  Your Honor, just for the rule of

 8  completeness, I'd like to read the next couple of questions

 9  that Mr. Phillips -- and answers that Mr. Phillips had in the

10  examination by Mr. Glass.

11          MR. CHESLER:  How far would you like me to read,

12  counsel?

13          THE COURT:  I'd like to know page number of the

14  transcript.

15          MR. CHESLER:  Yes, sir, I believe we're looking at

16  Defendant's Exhibit 7775 was the testimony of Mr. Phillips

17  that counsel is referring to.

18          MR. CONRATH:  Correct.

19          MR. CHESLER:  And I was reading from the top of page

20  83 a few minutes ago with the witness.

21          THE COURT:  Yes, but I thought you were -- what were

22  you reading from just now?

23          MR. CHESLER:  I was reading just now --

24          THE COURT:  From the transcript of this trial, yes?

25          MR. CHESLER:  Yes, sir.

*Katz - cross - Chesler*                                           4140

1          THE COURT:  Is that what you're talking about?

2          MR. CONRATH:  No, I'm talking about Mr. Phillips.

3          THE COURT:  Oh, all right.  I would like to know

4    where in the transcript of this trial you read from just for

5    completeness of the record.

6          MR. CHESLER:  Yes, Your Honor, I was reading from

7    transcript page 1628 beginning at line 22.

8          THE COURT:  Okay.  Thank you.  All right.

9          And as to Mr. Phillips's deposition, what are you

10   going to add?

11         MR. CONRATH:  We're on page 83 and I'd like to begin

12   reading at line eight.

13         MR. CHESLER:  Until where?

14         MR. CONRATH:  Until 84, line 11.

15         MR. CHESLER:  Okay.

16         "Question:    Would Delta have received the

17   remuneration credit from American Express if it chose a

18   different co-brand partner?

19         "Answer:    We -- there's an objection -- we would

20   not receive that from American Express, no.

21         "Question:    So, if Delta chose a co-brand partner

22   other than American Express, its merchant rate discount rate

23   would be blank percent -- objection.

24         "The Witness:  It would be blank percent.

25         "Question:    So, the ████ basis point remuneration

*Katz - cross - Chesler*                                              4141

1    credit directly relates to whether or not American Express won

2    the co-brand relationship with Delta?

3              "Answer:    No.

4              "Question:    Why not?

5              "Answer:    Many factors went into determining which

6    co-brand partner we went into and the remuneration was just

7    part of it.

8              "Question:    Okay.  I'll just rephrase that.

9              So, had American Express lost the co-brand

10   partnership, Delta would not have received the ▮▮▮▮ basis

11   point remuneration credit on the discount rate?

12             There's an objection.

13             "Answer:    I believe that's correct."

14             THE COURT:  All right, thank you.

15             MR. CONRATH:  Thank you.  And we'd probably have to

16   go out and edit that number, there was a number that I think

17   you didn't intend that --

18             THE COURT:  About the basis points?

19             MR. CONRATH:  Yes, we'll check it on the transcript.

20             THE COURT:  The number of basis points.

21             MR. CHESLER:  I don't think that's confidential.  It

22   was the numbers that led to that number that were confidential

23   and I did not recite those I believe.

24             THE COURT:  The percentages you believe.

25             MR. CHESLER:  Correct.

*Katz - cross - Chesler*                                          4142

1        THE COURT:  Yes, I understand.

2    Q    Now, Dr. Katz, would you go back to 6540, Defendant's

3    6540 which is one of your reports in this case.  We were

4    looking at that a little while ago.  I think it is your third

5    report and --

6    A    I apologize.  This is volume one?

7        THE COURT:  One.

8    Q    Yes, sir.

9        THE COURT:  Volume one.

10   Q    And in that document 6540, page 389.  Do you have that,

11   sir?

12   A    Yes.

13   Q    This is Figure VI G-1 of your third report, correct?

14   A    Yes.

15   Q    Now, the orange, I guess it is orange sort of thick

16   dotted line across the top, that is your calculation of the

17   American Express net discount rate, correct?

18   A    I think so.  In any case, it's the net discount rate

19   based on the GMAPS system and how it assigns things which I

20   believe is what I was using.

21   Q    Thank you.  And the purple line that runs close to it but

22   not identical to it, that's Dr. Bernheim's calculation of the

23   net discount rate, correct?

24   A    Yes.

25   Q    And then down below the two -- the dotted and solid lines

Katz - cross - Chesler                                    4143

1   lower down on the chart, those are -- the red dotted line is

2   your so-called economic price based upon the GMAPS data,

3   correct?

4   A    I believe it is actually Professor Bernheim assigning

5   names, his -- what he called the economic price but it is

6   using his concept that's based on GMAPS components only.

7   Q    And his calculation of that economic price is the solid

8   blue line that runs close to that dotted line, correct?

9   A    That's right.  He made some adjustments that were

10  different -- well, adjustments to GMAPS.

11  Q    All right.

12          Now, if you take the top two lines, yours and

13  Dr. Bernheim's on the top, the net discount rate

14  calculations you did, Dr. Bernheim's shows a decrease

15  from 2002 to 2010 of 11 basis points, correct?

16  A    I'm sorry, taking the top line -- yes.

17  Q    And yours shows a net decrease of two basis points,

18  correct?

19  A    That's correct.

20  Q    And the difference between those two slopes, a decrease

21  of 11 basis points versus a decrease of two is based upon

22  whether you include or exclude these additional items, forgone

23  interest and co-brand remuneration that we've been talking

24  about, correct?

25  A    I'd have to check if those were the specific adjustments

Katz - cross - Chesler                                    4144

1   to which this table refers but if that's what you represent, I

2   have no reason to doubt it.

3   Q    Okay.  Thank you.  I do.

4        Now, if you look at the next page of your report,

5   page 390 of Defendant's Exhibit 6540, this is a similar chart

6   but this one relates to travel and entertainment merchants

7   only, correct?

8   A    That is correct.

9   Q    And, again, if you look at your calculation of the net

10  discount rate which is the sort of thick orange dotted line

11  across the top, you show an increase from 2002 to 2010 of 20

12  basis points, correct?

13  A    Yes.

14  Q    And for that same period of time Dr. Bernheim, including

15  the adjustments that you did not include, shows a decrease of

16  nine basis points during that same period of time, correct?

17  A    That is correct.

18  Q    And that's within the T&E segment, correct?

19  A    Yes.

20  Q    And if you looked at the so-called economic rates that

21  are lower down on that chart, Dr. Bernheim would show a

22  decrease of over 50 basis points, right?

23  A    Yes.

24  Q    And you show a decrease of about half of that, correct?

25  A    When you say I show, I mean it's a particular calculation

1   I did but yes, that calculation shows a smaller decrease.

2   Q    About half of the amount of basis point decrease as

3   Dr. Bernheim showed, correct?

4   A    Yes.

5            MR. CHESLER:  Your Honor, I would like to offer

6   these two charts, and we'll supply them separately to the

7   Court, as 6540 A and B for illustrative purposes only so as to

8   clarify the witness' testimony since we're not reciting all

9   the numbers on the record.

10           MR. CONRATH:  I think those particular numbers have

11  already been used, they might have to be C and D.

12           THE COURT:  Yes, A and B --

13           MR. CHESLER:  Sorry.

14           THE COURT:  A and B are taken.

15           MR. CHESLER:  I'm sorry, Your Honor, counsel and are

16  you are absolutely right.  We'll make them C and D then.

17           THE COURT:  C and D are not taken.  Now they are

18  taken.

19           MR. CONRATH:  But as demonstratives, I do not

20  object.

21           THE COURT:  Yes, as demonstrative exhibits they're

22  received in evidence, 6540 C is Figure VL G-1 and D is VL G-2.

23           (Defendant's Exhibits 6540 C and D so marked in

24  evidence.)

25           MR. CHESLER:  Thank you very much, Your Honor.

1           THE COURT:  Thank you very much.  Okay.

2  Q    Now, on this value recapture issue, your position is that

3  value recapture shows that it is profitable for American

4  Express to raise the sum of its prices to merchants and

5  cardholders above the competitive level, correct?

6  A    I mean it showed in that instance, yes.  I mean I'm

7  saying that's what value recapture represented.

8  Q    Now, there's a disagreement I take it between you and

9  Dr. Bernheim as to how to calculate the consumer side of the

10  two-sided price, isn't there?

11  A    Yes.

12  Q    You say that the consumer side of the price should be

13  measured by the value delivered to the cardmember rather than

14  the cost or the liabilities that American Express incurred to

15  deliver that value; is that correct?

16  A    Certainly we're talking about price, yes.

17  Q    Now, when you looked at market power and you were

18  determining the value to the cardholder on the consumer side

19  of the two-sided price, you looked at cost when you calculated

20  the two-sided price in connection with your Hypothetical

21  Monopolist Test, didn't you?

22  A    Cost is one of the things I looked at because if it

23  doesn't change, then holding aside some things, there were

24  degradations in the quality of American Express's rewards

25  programs, it was saying they weren't making expenditures that

Katz - cross - Chesler                                    4147

1    would have increased the value, so it is an indirect way of

2    getting at it and I did use it, you're right.

3    Q    Again, so in your SSNIP test analysis when you were

4    looking at market power on the consumer side, you looked at

5    cost, correct?

6    A    No, ultimately I was saying there is no change in what's

7    going to that side so there was no change in benefits and the

8    way it is modeled is -- well, as I said, the monopolist raised

9    the price to one side and did not lower the price to the other

10   side.

11   Q    And, in fact, you said that, "The principal way in which

12   I conducted the Hypothetical Monopolist Test was to consider a

13   net two-sided price, the costs of rewards and other benefits

14   are reflected in the equilibrium interchange fees or in the

15   case of American Express's proprietary issuing and internal

16   transfer price."

17              That's a correct statement that you gave?

18   A    Yes.

19   Q    And it looked at cost of the rewards and other benefits,

20   correct?

21   A    Yes, and holding those constant was holding the rewards

22   constant, yes.

23   Q    Now, it is your belief that American Express charges a

24   rate premium over its competitors and this is one of the

25   pieces of evidence that you referred to in connection with

Katz - cross - Chesler                                    4148

1    your assessment of market power?

2    A    Overall it has a premium pricing strategy.  It doesn't

3    charge premiums in every instance.

4    Q    You agree that the existence of a premium does not in and

5    of itself prove the existence of market power, correct?

6    A    That's correct.

7    Q    Are you familiar with the concept of an oligopoly price

8    umbrella?

9    A    Yes.

10   Q    That's where you can have nondominant firms that are

11   behaving competitively but are able to achieve high

12   equilibrium prices because the larger firms in the market that

13   dominate have set high prices, correct?

14   A    That is correct.

15   Q    And it is possible that a nondominant firm competing with

16   an oligopoly can price even above the dominant firms if it

17   provides a differentiated product, correct?

18   A    Yes.

19   Q    And you also note, don't you, that Discover charges a

20   prime over Visa and/or MasterCard in some industry segments,

21   right?

22   A    That's my recollection, yes.

23   Q    In fact, if you take a moment and look at Defendant's

24   Exhibit 6507, this is in volume one, this was your second

25   report, page 99, Table 1-A, do you have that?

Katz - cross - Chesler                                    4149

1   A    Yes, I do.

2   Q    And you see if you look -- let me pull out four of these

3   lines under the acquirer interchange program, if you look at

4   public services, Discover is priced above Visa Traditional

5   Rewards, correct?

6   A    I'm sorry, I just -- I was looking at the table.  Which

7   one?

8   Q    Public services, about a third of the way down.

9   A    Okay.

10  Q    Discover's rate to merchants is higher than Visa,

11  correct?

12  A    The interchange rate, yes.

13  Q    And the retail line, Discover is again higher than Visa,

14  correct?

15  A    Higher than this particular Visa rewards card, yes.  So,

16  when you say higher than Visa, yes, higher than the Visa card

17  listed here.  That's different than a statement about higher

18  than Visa overall but certainly I stand by this table.

19  Q    Indeed, you put the table together, correct?

20  A    Yes.

21  Q    And on the restaurant line Discover is higher than the

22  MasterCard Enhanced Card, correct?

23  A    Yes.

24  Q    And for card not present, E-commerce Discover is higher

25  than the Visa column, correct?

Katz - cross - Chesler                                        4150

1   A    I'm sorry -- yes.

2   Q    Do those prices indicate to you that Discover has market

3   power?

4   A    No.

5   Q    Now, you acknowledge that Visa and MasterCard charge

6   higher interchange fees for different types of credit cards,

7   those with higher rewards for example, correct?

8   A    Yes, that's my understanding.

9   Q    And the rewards cards for which Visa and MasterCard

10  charge higher rates, higher merchant fees are closer to, in

11  terms of their consumer benefits, closer to the American

12  Express cards, aren't they?

13  A    Certainly that's my view that that's what's generally

14  true.  I haven't looked at specific cards to match them but

15  that's my general impression, yes.

16  Q    You recall in your reports and I think in your direct

17  testimony you talked a bit about doing comparison merchant

18  fees on a mix adjusted basis?

19  A    Yes, that American Express does that.

20  Q    And that's where American Express tries to map their

21  cards against particular Visa and MasterCard cards in order to

22  do an apples to apples comparison of merchant rates?

23  A    That's a large part of what it's doing.  I think the

24  testimony is somewhat unclear as to what else they're doing

25  because there's some discussion of matching cardholder

*Katz - cross - Chesler*                                      4151

1   characteristics as well.

2   Q    All right.

3          Are you aware, sir, that Discover's president,

4   Mr. Hochschild, testified here at trial that in his view it is

5   necessary to adjust for mix in order to avoid the inaccuracies

6   that come from a comparison based on a blended average rate?

7   A    First, mix has been used multiple ways in this litigation

8   and also blended rate has been used to refer to multiple

9   things.  So, he could well have made such a statement but it

10  would be certainly helpful for me to know what kind of mix

11  we're talking about and what we're talking about being

12  blended.

13  Q    I won't take the time because his testimony is in the

14  record, but did you read Mr. Hochschild's testimony, sir?

15  A    I don't believe I read all of it.  I certainly read large

16  parts, which is not to say I remember all of it.

17  Q    Okay.  Now, you've been informed that American Express

18  asserts in this litigation that at present on a mix adjusted

19  basis, that is mapping cards to cards of comparable consumer

20  benefit, American Express's average discount rate does not

21  reflect any premium over Visa and MasterCard?

22  A    That has been relayed to me that American Express has

23  said that.

24  Q    Now, given your testimony about the significance to you

25  of AmEx's overall premium as you described it in your direct

Katz - cross - Chesler                                    4152

1   testimony, if you assume it is correct that American Express

2   does not have a premium over Visa and MasterCard on a mix

3   adjusted basis, does that have any significance to your

4   testimony, sir?

5   A    It would certainly play a role in my thinking.  It would

6   not take away from the fact that American Express has long had

7   a premium pricing strategy and it would certainly raise

8   questions in my mind why American Express wasn't doing it but

9   it also would take away the current premium as a basis for

10  concluding they had market power.

11  Q    It would take away the current premium as a basis for

12  concluding that American Express had market power, is that

13  your testimony?

14  A    Yes, that's right.  It wouldn't change the facts up to

15  that point but that would be something to consider.

16  Q    Now, you're aware that American Express's expert,

17  Dr. Bernheim, found that smaller merchants are more likely to

18  pay higher all-in rates to Visa and MasterCard than they pay

19  for American Express?

20  A    As I recall, he made a number of claims about that and I

21  had some serious reservations about several of the

22  calculations he did, so I do know he made some such claims, I

23  recall that.

24  Q    Well, didn't you state, sir, that with respect to his

25  identifying the fact that smaller merchants that pay less for

1   American Express transactions than for those on Visa and

2   MasterCard, he looked across a series of four separate figures

3   and he confirmed that the smaller merchants are more likely to

4   pay higher all-in rates to MasterCard and Visa and you said

5   that this finding was not a surprise to you?

6   A    I may well have said that I mean, and I may be mis-

7   recollecting, but I thought he found merchants that accounted

8   for some tiny fraction of his sample.  I may be mixing which

9   things -- he and I did a lot of things in the course of

10  writing our reports.  There was certainly -- if you look at a

11  large number of merchants, it is certainly not surprising that

12  some would go one way and some the other.

13  Q    Okay.  Now, you talked in your direct testimony about

14  insistence as a source of AmEx's market power, correct?

15  A    Yes, I did.

16  Q    And you agree that by itself high levels of insistence do

17  not establish that American Express has antitrust market

18  power, correct?

19  A    That's correct.

20  Q    I take it you also agree that a firm with a very small

21  market share may be unable to set prices above competitive

22  levels even if its cardholders have a high degree of

23  insistence, correct?

24  A    If your cardholders had a high enough degree of

25  insistence you might be able to set the price for your

1  cardholders above the competitive level by some degree because

2  of the fact you have insistence, that's the nature of

3  two-sided platforms and what in economics it's referred to as

4  having a bottleneck.  So, there is a feature of two-sided

5  platforms where you can have a small share and still have the

6  ability to raise the price just for your product.

7              MR. CHESLER:  Let's look at Defendant's Exhibit 6540

8  again.

9              You know, Your Honor, before I do that, I just

10  reminded myself, I think I did not say that I wanted to offer

11  the two most recent charts we looked at as A and B from a

12  different report of Dr. Katz's.  When we take a break, I'll go

13  back and figure out which two those are and offer them.

14              THE COURT:  6507 A and B?

15              MR. CHESLER:  6507 A and B.

16              THE COURT:  It may be too late to do that.

17              MR. CHESLER:  Is there a rule that I fall on the

18  wrong side of?

19              THE COURT:  A two minute rule.  If you ask too many

20  questions afterwards, you're out of luck.

21              MR. CHESLER:  I should have known.

22              THE COURT:  Is there any objection with regard to

23  tables?

24              What is it, the table on 99 and 100, is it, those

25  two tables?

1              MR. CHESLER:  I think it was actually just the one

2    on 99.

3              THE COURT:  So, that would just be A.

4              MR. CHESLER:  6507 A, yes, sir.

5              THE COURT:  Any objection as a demonstrative

6    exhibit?

7              MR. CONRATH:  No.

8              I want to make sure I'm talking about the right

9    thing.  This is the table from Dr. Katz's report, Table 1-A at

10   page 99?

11             THE COURT:  Yes.

12             MR. CONRATH:  I have no objection.

13             THE COURT:  Of DX 6507?

14             MR. CONRATH:  No objection.

15             THE COURT:  All right.  6507 A is received in

16   evidence.

17             You'll provide me with a marked copy.

18             MR. CHESLER:  Yes, Your Honor, we will.

19             THE COURT:  As a demonstrative exhibit.

20             MR. CHESLER:  Yes.

21             (Defendant's Exhibit 6507 A so marked in evidence.)

22             THE COURT:  Let's move on.

23             THE WITNESS:  I apologize, could I ask if I could do

24   one thing, when you are referring to my reports could I use a

25   copy I brought because you used higher gloss paper and I

1   recently had a retinal tearing surgery and the light

2   reflecting off of this is causing problems for me reading.

3           MR. CHESLER:  Of course.

4           THE WITNESS:  If it is okay with you.

5           MR. CHESLER:  Of course.

6           THE COURT:  And they are unmarked copies.

7           MR. CHESLER:  I will just point out to the Court

8   that I always examine witnesses from blue paper for that exact

9   reason.

10          THE COURT:  I thought there was a law at your law

11  firm.

12          MR. CHESLER:  There is, Your Honor, but as the

13  chairman, I was trying to be egalitarian so I didn't want to

14  mention that.  Now that you've outed me --

15          THE COURT:  I've ordered ten cases of blue paper.

16          MR. CHESLER:  It would be good for the blue paper

17  industry.

18          THE COURT:  Yes, I suppose but it will raise the

19  price.

20          MR. CHESLER:  It will, that's true.  I think it is a

21  one-sided market.

22  Q    Of course you can use your version of it.

23  A    Thank you.

24  Q    So, we're going to look at 6540 which is your third

25  report, that is your --

1    A     Surrebuttal.

2    Q     Surrebuttal.

3          And I'd like you to look at paragraph 604 which

4    begins on page 340.  I'm really interested in the part of

5    paragraph 604 that appears on the next page but why don't you

6    take a moment and look at the whole paragraph.

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Katz - Cross / Chesler*                                          4158

1    CROSS-EXAMINATION (continued)

2    BY MR. CHESLER:

3    A     Okay.  I have looked it over.

4    Q     And you see that beginning in about the fourth line down

5    from the top on page 341 you say:  "Hence, a firm with a very

6    small market share may be unable to set prices above

7    competitive levels even if its cardholders have a high degree

8    of insistence.  Moreover, the ability to set prices greater

9    than the competitive level is not equivalent to the ability to

10   harm competition more broadly through policies such as the

11   merchant restraints.  As discussed in my initial report,

12   market shares play an important role in the ability to impose

13   restrictions such as American Express's merchant restraints.

14   In this regard, it's notable that American Express's charge

15   volume is approximately five times Discover's."

16             Do you see that, sir?

17   A     Yes, I do.

18   Q     And do you agree with your statement in that context that

19   "hence, a firm with a very small market share may be unable to

20   set prices above competitive levels even if its cardholders

21   have a high degree of insistence"?

22   A     Yes.  So to make sure the record is clear about what I

23   was saying before, there's circumstances where you could have

24   a very low market share and because of insistence have the

25   ability to set prices above the competitive level due to

*Katz - Cross / Chesler*                                           4159

1   what's known as having this bottleneck effect.  What I've

2   identified here, and I believe correctly so, is saying that in

3   this particular industry, there are some setup costs or fixed

4   costs that also come into play and could be an offsetting

5   factor.

6   Q    Now, I'd like you to go back to an exhibit we looked at

7   yesterday, which is Defendant's Exhibit 1917 which is in

8   Volume 2 and it's already in evidence.  This was the

9   presentation to the American Bar Association in 2004 "Payment

10  Networks, the Antitrust Perspective."

11          Do you have that, sir?

12  A    Yes, I do.

13  Q    Now, if you look at page seven which has a Bates number

14  that ends '721, you pose the question on that page:  "Can a

15  firm have market power on one side of the market but not the

16  other?"

17          Do you see that, sir?

18  A    Yes, I do.

19  Q    And then under that the first bullet reads:  "Competition

20  to serve the side for which there is no market power will lead

21  to complete rent dissipation.  Hence, there is no meaningful

22  market power for the intermediary."

23          Now, would you just explain to the Court what the

24  first bullet means:  "Competition to serve the side for which

25  there is no market power will lead to the complete rent

1   dissipation"?

2   A    So, what here it's saying is you had perfect competition

3   on the one side and if you're asking where the perfect is it's

4   implied in the complete rent dissipation.  So it's saying if

5   you have perfect competition on one side of the market, that

6   any gains you've got on the other would be dissipated on this

7   side.

8   Q    And in fact, you went on to say that that concept, that

9   having market power on one side of a two-sided market but not

10  on the other will persist, was contradictory to the

11  government's position in the U.S. v. First Data case, correct?

12  A    That's what it says, yes.

13  Q    And that's the case where you testified opposite the

14  government and testified about the nature of that two-sided

15  market, correct?

16  A    That's correct.

17  Q    Now, in the same presentation you also pointed out that

18  this conclusion regarding the market power of the intermediary

19  contradicted the government's position, as we just saw.

20        Do you recall what the government's position was

21  that this principle contradicted?

22  A    What I recall about it is that the government was

23  focusing on changes in the interchange rate as a measure of --

24  of market power and I would think from that then it's saying

25  well, if you change the interchange and it goes up to the

*Katz - Cross / Chesler*                                          4161

1   issuing side, that then the issuing side would dissipate.  I

2   believe that's what this is referring to, but I'd have to

3   reconstruct it from ten years later.

4   Q    The government in the First Data case was taking the

5   position that the merger that you were proposing or you were a

6   proponent of would have the effect of raising interchange

7   rates on the merchant's side of the market?

8   A    No, interchange rates -- right, interchange rate is a

9   passthrough rate.  So yes, they were saying that it would go

10  up on the merchant's side, but then as part of the definition,

11  it would go down on the other side.  I mean, that's what it

12  means to be an interchange rate.  You can't change just one

13  side of it.

14  Q    And you took the position, as we saw yesterday, that by

15  looking only at one side of the market, the government was, in

16  your words, telling only half the story, correct?

17  A    Yes, with the interchange rate, certainly.

18  Q    Now, you're aware that American Express routinely pays

19  consumers and corporate cardholders to use its cards, right?

20  A    Yes.

21  Q    And that, in fact, American Express offers a rewards

22  program that many cardmembers find attractive, correct?

23  A    Yes.

24  Q    And that's a big part of American Express's value

25  proposition, an element of its success?

*Katz - Cross / Chesler*                                         4162

1    A    Yes, that's my understanding.

2    Q    And you understand that American Express uses rewards to

3    attract and retain cardmembers and encourage them to use their

4    cards when they go to merchants to make purchases?

5    A    Yes, I assume that's the point of paying the rewards.

6    Q    And you also agree that if American Express were to cease

7    offering a competitive rewards program, it would see a

8    significant decline in its cardmember insistent levels,

9    correct?

10   A    Yes, I would expect that.

11   Q    And it would see a significant decline in its charge

12   volume if it were to cease offering a competitive rewards

13   program, correct?

14   A    Yes, if it didn't substitute it with something else, yes.

15   Q    And if in fact it had a less attractive rewards program,

16   it would have a lower share of spend than it has today,

17   wouldn't it?

18   A    Again, unless it did something offsetting, yes.

19   Q    Now, at your deposition I asked you what factors, in your

20   view, tend to enhance brand loyalty in this industry, the

21   credit card industry, and you recall that you said that so

22   long as the consumer continued to have good experiences with

23   the card provider and with using the card, it would remain a

24   user and you called that loyalty; do you recall that, sir?

25              MR. CONRATH:  Can we have a page and line, Your

*Katz - Cross / Chesler*                                          4163

1    Honor?

2    A    I don't recall saying that, but that's -- I agree with

3    the statement.

4    Q    All right.  Let's look at your deposition, which is the

5    first tab in Volume 1, transcript page 231.

6    A    I'm sorry, you said page 231?

7    Q    Yes, sir, I did.

8    A    Thank you.

9    Q    You have that page, sir?

10   A    Yes.

11   Q    All right.  And I'd draw your attention to line 7 on 231

12   of your deposition.  My question:  "So far as you're aware,

13   what factors tend to create an enhanced brand loyalty in the

14   credit card industry?

15           "Answer:  If a consumer thinks that he or she is,

16   you know, getting particularly high value from using a

17   particular card, I would expect that that consumer would be

18   more loyal to that card in the sense of preferring to use it,

19   and as long as that consumer continued to have good

20   experiences with the card provider and with using, it would

21   remain a user and I would call that being loyal.

22           "Question:  Could that value, for example, come in

23   the form of rewards?

24           "Answer:  Yes."

25           And then your testimony goes on.

1          MR. CONRATH:  Your Honor, I object to not reading

2    the complete answer.

3          THE COURT:  Yeah, read the rest of the answer,

4    please.

5          MR. CHESLER:  Okay.

6    Q    "I should also state though since we brought up this

7    issue about marketing, there are people who would say that's

8    not evidence of loyalty at all, somewhat the way a friend of

9    mine once said that dogs are loyal and he said they're loyal

10   only as long as you're feeding them.  So that's why there's a

11   debate in marketing about what we mean by loyalty.  So that's

12   why single-homing is not necessarily equivalent to the

13   concept."

14        And then I asked you:  "Well, to use your dog

15   analogy might be analogous to they are loyal so long as they

16   keep getting the rewards?

17        "Answer:  Yes."

18        Do you recall giving that testimony, sir?

19   A    I certainly remember the dog testimony, yes.

20   Q    And do you stand by the dog, sir?

21   A    As long as he doesn't bite me, yes.

22   Q    Thank you.

23        And you would also agree, would you not, that there

24   are no significant barriers that face issuers from offering

25   rewards programs similar to American Express's?

1   A     Be careful I guess by what with he mean by barriers.  I

2   think a lot of thinking and research and experience has gone

3   into developing American Express's rewards programs, and I

4   believe witnesses have testified to that at trial, but there's

5   nothing to stop somebody else from trying and there are other

6   successful rewards programs.

7   Q     And Discover believes that it offers an effective rewards

8   program, right, its cashback program?

9   A     Yes, I believe they're proud of it.

10  Q     And despite that program, you would agree that they have

11  not been able to achieve ubiquity that Visa has on the issuing

12  side of the market, correct?

13  A     I'm sorry, by ubiquity on the issuing side are you saying

14  that they don't have anywhere near the number of third party

15  issuers that Visa does, is that the question?

16  Q     And anywhere near the number of cards-in-force as Visa

17  has, correct?

18  A     Yes.

19  Q     And when I asked you if you knew why that was the case,

20  you said you did not, you'd be speculating.  That's at page

21  205 of your deposition.

22         Do you recall that you gave that testimony?

23  A     I don't recall saying that.

24  Q     Why don't you look at page 205.  You can read the prior

25  testimony, if you'd like, and just it really begins with the

1    prior question, line 3:

2         "You agree that in the general purpose credit and

3    charge market you've defined Visa has a significantly higher

4    share than Discover?

5         "Yes.

6         "And it has significantly higher share than Amex

7    has?

8         "Answer:  For some purposes, sure, it's significant.

9         "Question:  Do you have a view as to why on the

10   issuers' side of the market Discover has not been able to

11   achieve ubiquity that Visa has?

12        "Answer:  No, I would be speculating."

13        Does that refresh your recollection, sir?

14   A    Yes, although it does raise the question here what I

15   thought you meant when you said "ubiquity," but it's certainly

16   what I said there.

17        MR. CHESLER:  Your Honor, I have a note that the

18   courtroom system is apparently down.  So we're not publishing

19   anything on the screens.  I don't know that there's much to be

20   done about it, but I just -- apparently the technology folks

21   are working on it.

22        (Pause.)

23        THE COURT:  There's something up there now.  Is that

24   what you're publishing?

25        MR. CHESLER:  Yes, that was the page of the

1   transcript we were just looking at.

2            THE COURT:  Then we're up.

3            MR. CHESLER:  Thank you, Your Honor.

4            THE COURT:  Okay?

5            MR. CHESLER:  Thank you.

6            THE COURT:  It's up on the screen here.

7            Thank you.  Go ahead.

8   BY MR. CHESLER:

9   Q    Now, with respect to this issue of insistence, do you

10  agree, sir, that there are often consumers who are loyal in

11  some sense to the merchant with whom American Express is doing

12  business?

13  A    Yes, that's why the insistence numbers are less than a

14  hundred percent.

15  Q    And in fact, what's going on is there are some consumers

16  who are more concerned with using their American Express Card

17  than with the particular merchant and there are some consumers

18  who are more concerned with doing business with the particular

19  merchant than with using their American Express Card; is that

20  fair?

21  A    Yes.

22  Q    Now, if you'd look, please, at Defendant's 6466, this is

23  your first report, and at page 322.

24  A    I'm sorry, could you give me a figure or table number,

25  because if I use my copy --

*Katz - Cross / Chesler*                                    4168

1    Q    Table 22.

2    A    Thank you, because my copy doesn't have pagination at

3    that point.

4    Q    Okay.

5              THE COURT:  We're not publishing this, are we?

6              MR. CHESLER:  No, Your Honor.

7    Q    Do you have that?

8    A    Yes, I do.

9    Q    And so if you look at the total insistence column in the

10   middle, would you agree with me that across, assuming these

11   figures are accurate, across every industry, less than half of

12   the cardmembers are insistent, that is insistent on using

13   their American Express Card?

14   A    Subject to one amendment.  I believe insistence is done

15   in terms of charge volume, not numbers of cardmembers, but if

16   you're using it just as a shorthand, certainly I agree.

17   Q    And I take it you would agree, sir, then in any

18   negotiation between American Express and a merchant, if the

19   result of that negotiation were to be that American Express

20   and the merchant no longer did business together directly,

21   while the merchant faces the prospect that some number of

22   consumers will no longer shop at her store, American Express

23   faces the prospect that some number of its cardmembers may use

24   someone else's card to continue shopping at that store?

25   A    Yes.

*Katz - Cross / Chesler*                                          4169

1   Q    So it's a two-edge sword, so to speak, in that

2   negotiation in which both sides may well have something to

3   lose, correct?

4   A    Yes.

5   Q    And are you familiar with the concept in the card

6   industry of spillover?

7   A    I believe it's used more than one way, but yes.

8   Q    Let me be sure we're using it the same way for these

9   questions.  I'm intending to use spillover as the phenomenon

10  that if a card loses acceptance at a particular merchant it

11  may result in that particular consumer who's using that card

12  using it less at other merchants other than the one at which

13  it's been cancelled.

14  A    Yes.

15  Q    Okay.

16  A    I'm not sure -- okay, I understand that that's the

17  concept that you're talking about here.

18  Q    All right.  Have you done any research on your own into

19  the significance of an impact of the spillover effect as I've

20  just defined it?

21  A    No.

22  Q    Moving to a somewhat different topic.

23       Did you read Mr. Conrath's opening statement to the

24  Court?

25  A    I'm not sure I did.  I know I was provided a copy, but

1   with apologies to Mr. Conrath, I may not have.

2   Q    He doesn't seem to be getting a lot of -- you didn't

3   remember he was in the First Data case, you didn't read his

4   opening statement.

5          MR. CHESLER:  I don't know why you stand for it.

6   A    I'm sorry, I may have.  I just --

7   Q    It just wasn't memorable, is that what you're saying?

8   A    Possibly.

9   Q    I'm only kidding.

10          THE COURT:  I heard it, so I'm not as concerned

11   about the witness.

12          MR. CHESLER:  Thank you, Your Honor.

13          THE COURT:  Go ahead.

14   Q    One of the things Mr. Conrath said in his opening is:

15   "If merchants could steer price competition breakout,

16   merchants could save money."

17          Doesn't surprise you that he said that, does it?

18   A    No.

19   Q    Now, I take it that you're aware that the government

20   called a number of merchant witnesses during the course of its

21   case-in-chief here?

22   A    Yes.

23   Q    Are you aware that the government called no consumers and

24   no consumer group representatives?

25   A    I'm certainly not aware of it having called any.  I

Katz - Cross / Chesler                                    4171

1  haven't looked at the complete witness list, but I don't

2  recall any.

3  Q     Did you find that in the group of merchants called by the

4  government, virtually all of them came from the finance

5  function in their companies as opposed to the marketing

6  function?

7  A     I'd have -- I'm not sure I recall all the titles, but the

8  ones I do recall I guess would be in a finance function.  I

9  know that like for Southwest I think it's the person who dealt

10  with payments and I'm not sure which part of the company

11  that's in, but that's what I recall.

12  Q     Now, going back for a moment to the Visa case again.

13        MasterCard had an expert in that case by the name of

14  Pindyck, correct?

15  A     That's correct.

16  Q     Robert Pindyck?

17  A     Yes.

18  Q     And Professor Pindyck also focused on the level of

19  merchant discount rates and he made claims about American

20  Express's rates being too high, didn't he?

21  A     Yes.  I think he was saying they were too high from the

22  perspective of overall consumer welfare, yes.

23  Q     And in fact, he argued that if the exclusionary rules

24  were eliminated, American Express would use issuing banks to

25  which it would then have access to increase the volume of

*Katz - Cross / Chesler*                                                4172

1  transactions that would be charged at higher discount rates to

2  merchants, didn't he?

3  A    I'd have to recall specifically.  I believe his

4  testimony, as I sit here my recollection is he said that

5  interchange rates would be driven up so that merchants would

6  be paying more and that more money would be paid to the

7  issuers' side than the consumers'.  I think it was about

8  interchange, but I'd have to go back and look.

9  Q    All right.  I think we're in agreement on that.

10           Now, you responded, part of your role was to respond

11 to Professor Pindyck, wasn't it?

12 A    Well, my role was to analyze, you know, the economic

13 issues in the case, and certainly I took into account what he

14 said and I responded where I thought he, you know, he either

15 had a good point or a bad point, yes.

16 Q    And one of the things you responded to Professor Pindyck

17 about was you said that his focus on discount rates was

18 unsound, didn't you?

19 A    I think if we're talk -- yes, if we're talking about

20 interchange, his focus exclusively on discount rates is

21 unsound, yes.

22 Q    And you testified that by focusing solely on one

23 dimension of a multidimensional competitive behavior, he was

24 providing an incomplete, and thus misleading, picture of

25 economic effects.

1          Wasn't that your testimony, sir?

2    A    Yes.

3    Q    And you said that merchant and consumer welfare has to be

4    measured in terms of the total package of benefits that they

5    receive, not just the merchant discount rate, correct?

6    A    So because this was in your opening statement, I actually

7    had -- this is something I had gone back and looked at.  So I

8    want to just clarify a couple of things.

9          One, the consumer there is meaning consumer in the

10   everyday use of the word.  So that's why it's in -- it's what

11   I would have said in current terminology as merchant and

12   customer, but yes, I said it was about both of them.  And that

13   that statement was saying you have to look not just at price,

14   but also at quality.

15          MR. CONRATH:  Could I object to the fact that

16   apparently the witness read Mr. Chesler's opening statement

17   but not mine?

18          THE COURT:  When you get his bill, you can adjust.

19          MR. CONRATH:  I am delighted that he saved the time

20   that would have been wasted reading my opening.

21          MR. CHESLER:  I'm not good at taking --

22          THE COURT:  I'm very impressed, Mr. Chesler, about

23   the fact that the witness is so familiar with your work.

24          THE WITNESS:  Not as familiar as he is with mine.

25          THE COURT:  Apparently so.

1          Go ahead.

2          MR. CHESLER:  Thank you, Your Honor.

3    BY MR. CHESLER:

4    Q    So picking up on the last answer you gave that it's also

5    necessary to be concerned about quality as well as price, you

6    remember just saying that a few minutes ago?

7    A    Yes, I do.

8    Q    So you are of the view that you have to take into account

9    changes in the nature and quality of products and services

10   that both merchants and consumers receive, correct?

11   A    Yes.

12   Q    And in the context of the elimination or the possible

13   elimination of the exclusionary rules, that, in your view, was

14   an important consideration in addition to whatever the impact

15   might be on the discount rate, correct?

16   A    Yes, in that case, certainly.

17   Q    In fact, you recognized in the Visa case, didn't you,

18   that removing the exclusionary rules could actually result in

19   increasing merchant fees?

20   A    I -- yes, through raising the interchange rate, yes.

21   Q    And in fact, after the exclusionary rules were

22   eliminated, merchant fees increased, didn't they?

23   A    The interchange fees did go up after that, resulting in

24   an increase in the merchant discount fees, although one has to

25   be careful whether one attributes it to that litigation or the

1   outcome, for example, the Wal-Mart litigation and other

2   factors, but yes, merchant discount rates did go up in the

3   years following that litigation.

4   Q    And the interchange, I think we've established, is by far

5   the largest component of the merchant fee in the card

6   industry, correct?

7   A    Yes.

8   Q    And one of the things that you emphasized in First Data,

9   moving from Visa to First Data.

10  A    Thank you.

11  Q    One of the things you emphasized in First Data was that

12  it was very important to acknowledge that increased

13  interchange fees which the government was saying would occur

14  in the presence of that merger were in fact passed back to

15  consumers both directly in rewards and indirectly in the

16  overall services that issuers provide to consumers, correct?

17  A    I don't recall saying the second part, but I would

18  certainly agree with the -- that economic analysis, and I do

19  recall the first part.

20  Q    And to sum up this point, your view in First Data was

21  that because of the two-sided interrelated nature of the

22  market, it was incorrect to think that the effects of

23  interchange fees on consumer welfare can be understood by

24  looking solely at the merchant side of the market?

25  A    Yes.

1    Q    Isn't it true, sir, that in this two-sided payment

2    market, in examining competitive effects, it is improper to

3    equate an increase in network charges to merchants with harm

4    to competition or consumers?

5    A    The increase itself, yes, it would depend on the process

6    that gave rise to the increase.

7    Q    And in fact, an increase in merchant fees can be the

8    result of increased competition, not a sign or consequence of

9    harm to competition; isn't that true?

10   A    I want to actually just clarify one thing.  It probably

11   won't change my answer, but I want to make sure the record is

12   clear.

13         Are you asking me when you said, we were talking

14   about First Data and you started to say this market.  Are you

15   still talking about what the government alleged was a separate

16   market for PIN debit, or are you talking about --

17   Q    Yes, I'm talking about your views in the context of the

18   First Data case.  If I didn't make that clear, I apologize.

19   A    I'm sorry, I think it was clear by implication, but I

20   just wasn't sure.  I'm sorry, if you could just ask the

21   question again.

22   Q    Let me ask that second question again.

23         In fact, isn't it true that an increase in merchant

24   fees can be the result of increased competition, not a sign or

25   consequence of harm to competition?

1    A    Yes.

2    Q    And that in a two-sided market, interchange rates can and

3    have been driven up by an increase in competition, correct?

4    A    Now, so you're now asking generically?

5    Q    Yes.  I'm quoting from your First Data testimony, but I

6    quoted it exactly you gave it "in a two-sided market."

7    A    Yes, I agree with that statement.

8    Q    Thank you.

9         Now, is it similarly true, sir, that if interchange

10   rates were to be lowered, that can harm consumers through the

11   resulting effects on card issuers' pricing and service

12   quality?

13   A    Yes.

14   Q    And can an increase in interchange rates also increase

15   merchant welfare as well as consumer welfare?

16   A    In theory, yes.

17   Q    For example, an increase in interchange could provide

18   incentives for issuers to offer card features like rewards

19   that encourage consumers to use their cards with the merchants

20   and that can benefit the merchants, correct?

21   A    Depending on what the payment alternatives are, it could

22   be the case, yes.

23   Q    I just want to ask you a bit about the but-for world that

24   you considered in connection with this case.

25   A    The present case.

1    Q    Now, that would be a world in which American Express did

2    not have these non-discrimination provisions in its merchant

3    agreements, correct?

4    A    Yes.

5    Q    And by necessity, that's a hypothetical world, right?

6    You didn't have an actual model to examine, correct?

7    A    That's -- that's correct.

8    Q    And you would agree, would you not, that it is possible

9    that the actual discount rate to merchants might rise over

10   time in that but-for world, correct?

11   A    Certainly.

12   Q    Now, if the merchant rates went up in the but-for world

13   and the benefits to consumers went up even more, the value to

14   consumers exceeded the increase in merchant fees, your view is

15   that that would be an improvement in the quality adjusted

16   price, as you call it, correct?

17   A    If I understand your hypothetical correctly, yes.

18   Q    Now, you know that the merchant testimony in this case

19   has been different from that, don't you, that the merchant

20   testimony here has been that if the discount rate went up and

21   benefits to consumers went up even more, that would,

22   nevertheless, from the merchant's perspective, be a bad thing.

23            Are you aware of that testimony?

24   A    I'm aware that some of them have said that.  I don't

25   believe that I've reviewed all of the merchants testimony on

*Katz - Cross / Chesler*                                                  4179

1    that subject.

2    Q    And the reason that the merchants have come here and

3    admitted that is because they're looking at only one side of a

4    two-sided market; isn't that true?

5    A    Well, certainly the part that they're most concerned

6    about is their side and their profits, but I think it's

7    probably inaccurate to say they've looked at only one side of

8    it.  They have quite a lot of concern about what's going on on

9    the other side.  I mean, that's why they take credit and

10   chargecards and that's why they take American Express is

11   precisely because they're concerned about what's going on on

12   the other side, but I agree with the statement that at the end

13   what they're concerned with is their profitability.

14   Q    And so concerned with their profitability that some of

15   them have come in here and said "if my rates were to go up in

16   the but-for world and consumer benefits were to go up even

17   more, that would still be bad from my perspective," correct?

18   A    I believe they've said things that implied that.  I don't

19   recall if someone said exactly that.  I certainly would not be

20   surprised to learn that some had that opinion.

21   Q    Well, in the trial transcript I'm reading, Your Honor,

22   from transcript page 1424 and 1425, this is Mr. Rein from

23   Wal-Mart.  I'll just read this to you and see if you are

24   familiar with this.

25             "Question:  Suppose the cost to Walgreens of

1  accepting a credit card went up by 50 basis points in a

2  particular year, costs you half a percent more of your sales

3  in that year than it had the year before, do you understand

4  that assumption?

5          "Answer:  Yes.

6          "Question:  But suppose that in the same year, the

7  value of rewards that credit card customers were getting from

8  the credit card companies went up 100 basis points, one

9  percent increase in the value of the rewards.

10          "Question:  Is that a good thing or a bad thing from

11  your perspective at Walgreens?

12          "Answer:  It depends on what they're purchasing.  If

13  they purchase all sale items, we lose money due to production

14  costs, logistics costs, payroll costs.  It just depends on

15  what they purchase.

16          "Question:  If your cost of acceptance goes up, that

17  is not something that you want to happen, right?

18          "Answer:  That is correct.

19          "Question:  The fact that the rewards value to the

20  customers have gone up doesn't change the fact that your costs

21  have gone up, so that is not a good thing for Walgreens,

22  correct?

23          "Answer:  Right."

24          Now, were you familiar with that testimony, sir?

25  A    I don't recall that testimony.

*Katz - Cross / Chesler*                                    4181

1            MR. CONRATH:  I think just for the record, Your

2    Honor, if I heard it correctly, counsel misspoke and said

3    "Wal-Mart" instead of "Walgreens," but just to have a clear

4    record, I think Mr. Rein is from Walgreens.

5            MR. CHESLER:  He certainly is and if I said

6    "Wal-Mart," I apologize, Your Honor.

7            THE COURT:  That's all right.

8    A    You said it once and then you said "Walgreens" the second

9    time.

10   Q    All those W's confuse me.

11           So to the extent that Mr. Rein expressed those

12   views, I understand you say, and I agree with you frankly,

13   that merchants accept credit cards and whatever they accept

14   for payment is because of what consumers want and that's on

15   the other side of the market, but to the extent Mr. Rein

16   expressed the views about it not being good if his fees went

17   up even if reward value went up even more, that's because he

18   was, in that context, primarily focused on his side, correct?

19   A    Well, actually, I don't fully agree with what you're

20   saying, but I don't want to be up here arguing with you

21   because the testimony speaks for itself, but actually the way

22   the questions were asked, it seemed to me he gave a much

23   narrower answer because he said there were specific questions

24   that said 'well, the part about the fees going up, that would

25   be bad for you' and he said 'yes, that would be,' but that

Katz - Cross / Chesler                                    4182

1  actually broke off that part from the rest.  I don't -- I

2  didn't take away from that that he was offering an overall

3  assessment of welfare.

4          As I said, my assumption as an economist is that had

5  you asked him about the overall situation, or whoever was

6  examining, he would have said that, but that was not what I

7  heard from the testimony you read.

8  Q    Okay.  Now, you testified that, in your deposition in

9  this case, that you would expect Discover to be more

10 successful with its low-cost-to-merchant strategy in the

11 but-for world, correct?

12 A    Yes.

13 Q    And you agree that Discover has significantly lower

14 relevance rates than Visa and MasterCard, correct?

15 A    Yes.  Let's just be careful, I mean, because relevance, I

16 understand, is a broad concept, but it also gets used

17 different ways in the industry.  So perhaps you could just

18 tell me what you mean by it just to make sure we're on the

19 same page.

20 Q    Well, why don't we look at your deposition page 516.

21         Do you have it, sir?

22 A    Yes, I do.

23 Q    I'm looking at line 16 of page 516.

24         "Question:  Do you agree that Discover has

25 significantly lower relevance rates than Visa and MasterCard?

1          "Answer:  Yeah.  I don't know if there are any

2    merchants where that's an exception, but as a broad matter,

3    yes."

4          What did you, if you recall, what did you understand

5    relevance to be when you gave that answer, sir?

6    A    So, I don't recall specifically what I was thinking then,

7    but generally think of relevance as some notion of the overall

8    charge volume that the merchants can see of people who would

9    be wanting to use Discover cards.

10   Q    Okay.

11   A    But as I said, there are also sometimes a variance of

12   that, but they're all getting at some notion of the

13   significance to the merchants of customers wanting to use that

14   particular network's cards.

15   Q    Thank you.

16         And you also agree that Discover has significantly

17   lower single-homing rates than Visa or MasterCard, correct?

18   A    Yes.

19         Does it say that?

20   Q    And single-homing meaning people that use just that one

21   card?

22   A    We would have to go back and look in context because

23   single-homing generally means people using, favoring a

24   particular card or primarily using it.  The strongest version

25   of single-homing is you carry only one credit and charge card.

*Katz - Cross / Chesler*                                              4184

1   The term is also used in the industry and in economics

2   literature sometimes to mean people that it's the card you use

3   most of the time.  There's a range of concepts, but I'm

4   guessing that this one in context was talking about the strict

5   form of single-homing.  Certainly for the strict form of

6   single-homing it would be a correct statement.

7   Q    Strict form meaning a person who carries only that card

8   in her wallet, correct?

9   A    Yes.

10  Q    And you also agree that Discover has fewer cards-in-force

11  than Visa and MasterCard, correct?

12  A    Yes.

13  Q    Now, at the same time, Discover is accepted at many more

14  merchant locations than American Express, correct?

15  A    Yes.

16  Q    Discover has more cards-in-force than American Express in

17  the United States?

18  A    I -- that's my recollection, but I'll have to check.

19  Q    Do you recall it's something like 10 million more, 60-odd

20  million as opposed to 50-odd million?

21  A    No, I'm afraid I don't, but it's my recollection they

22  have more cards-in-force.

23  Q    And although it's accepted at millions more merchant

24  locations and has some significant number of more

25  cards-in-force, whatever that is, it has a share of spend

1    about one-fifth of American Express's, correct?

2    A    That's correct, that's my recollection.

3    Q    And so I take it the math would demonstrate that although

4    there are more people walking around, apparently, with

5    Discover cards in their wallets, or at least available to

6    them, and more merchants where they could use them, they're

7    spending much less on the cards, correct, than they are on

8    American Express cards?

9    A    That's right, American Express has a much higher spend

10   per card.

11   Q    And you would infer from that that American Express has

12   somehow managed to provide a more compelling value proposition

13   to the people that have its card than Discover has, wouldn't

14   you?

15   A    No, I would infer from that that American Express has put

16   forth a value proposition that appeals to people who purchase

17   a lot on their cards.  In fact, I think Discover's value

18   proposition is viewed very favorably by the people who hold

19   Discover cards, but those people have different

20   characteristics than the -- you know, on average, I'm sure

21   there's some overlap, but on average the people who hold

22   Discover cards have different spend characteristics than the

23   people who hold American Express cards.

24   Q    Now, staying just for one more minute with this but-for

25   world with respect to this case.

*Katz - Cross / Chesler*                                              4186

1          You testified before that it's possible that

2   merchant fees would go up, right?

3   A    Following this case, yes.

4   Q    And in fact, your view is that although they may go up,

5   that we should just let the chips fall where they may.  Isn't

6   that your view, sir?

7   A    If the chips are falling where they may as a result of

8   increased competition, yes, that is my view.

9   Q    So if all of the merchants who came in here, merchant

10  after merchant after merchant, and said "my rates are too

11  high, they need to come down" and if Mr. Conrath in his

12  opening said "if we win this case, merchant rates will come

13  down," and if it turns out that your proposition that they may

14  go up turns out to be correct that's fine would you?

15  A    It would depend on why they went up, but if the reason

16  they went up is competition, that would be fine with me.

17  There's certainly other reasons that they could go up that I

18  would say they're not fine with me, by which I mean in

19  conducting an antitrust non-economic analysis I would find

20  that there is a problem.

21  Q    Thank you.  Let me move to a different subject.

22          You agree, do you not, that many agreements between

23  vertically-related parties can have procompetitive effects?

24  A    Yes.

25  Q    And in fact, a vertical restraint is not necessarily

Katz - Cross / Chesler                                    4187

1    anticompetitive simply because it restricts some form of

2    horizontal competition, correct?

3    A    Correct.

4    Q    And in fact, even the most exclusive form of vertical

5    arrangement and exclusive dealing arrangement where the

6    parties agree that they're the only ones who will do business

7    together for a particular service or product can, in fact, be

8    procompetitive, can it not?

9    A    In some circumstances, yes.

10   Q    And exclusive dealing arrangements are explicitly

11   permitted by the government's decree with Visa and MasterCard

12   that settled their portion of this case, aren't they?

13   A    Yes, I believe that's correct.

14   Q    And by definition, exclusive dealing arrangements have an

15   impact on horizontal competition, don't they?

16   A    They can.  They could have effects either direction, yes.

17   Q    Now, when a vertical restraint has an impact on

18   horizontal competition, it's often on inter-brand competition,

19   correct?

20   A    I'm sorry, inter?

21   Q    Inter-brand.

22   A    I mean, the effects of a vertical restraint can be felt

23   throughout the markets, so yes, the effects can be felt on

24   inter-brand competition.  I'm not sure -- yes, if you're just

25   asking about the word "effects" and you don't mean the scope

*Katz - Cross / Chesler*                                          4188

1   of the contract, yes, the effects can be on inter-brand

2   competition.

3   Q     Okay, and I think we all understand this, but for clarity

4   of the record, inter-brand competition is competition between

5   two distinct brands as compared to intra-brand competition,

6   which is competition between multiple suppliers of the same

7   brand, correct?

8   A     Let me just to clarify.  It might be better if we said

9   multiple retailers of the same brand because suppliers gets

10  into the question of whether you're talking about the

11  manufacturer.

12  Q     All right.  So let me restate the question.

13        Inter-brand competition would be illustrated by

14  competition between different distinct brands of products,

15  correct?

16  A     Yes.

17  Q     And that could take place at a single retailer or

18  multiple retailers, correct?

19  A     That's correct.

20  Q     And intra-brand competition would be competition among

21  multiple retailers who were selling the same brand, right?

22  A     Yes.

23  Q     And would you agree that a vertical restraint can have

24  beneficial effects on both forms of competition?

25  A     Yes.

1  Q    So if the government has argued to this court that a

2  vertical restraint can have beneficial effects only when it

3  restricts intra-brand competition, you would disagree with

4  that, wouldn't you?

5  A    I'll have -- I think there can be situations where -- I'm

6  sorry, I want to make sure I understand something.  This is

7  where we're getting to the effects versus restrictions.

8         Can you ask your question again because this is

9  harping back to the earlier question I had about exactly what

10 you're asking?  So if you could ask it again.

11 Q    To the extent that the government has argued to this

12 Court that a vertical restraint can have beneficial effects

13 only when it restricts intra-brand competition, you would

14 disagree with that, wouldn't you?

15 A    Yeah, I think theoretically it would be possible to have

16 vertical restraints that might have restriction on some part

17 of inter-brand.  I mean, I have to think about the theory, but

18 I think that's possible.

19 Q    Thank you.  Let me ask you and about an issue that's come

20 up at the trial concerning the rate complexity in this

21 marketplace.

22        Are you aware that a number of parties have come

23 before the court to seek confidential treatment for merchant

24 rates that are being paid to the various card networks?

25 A    I know, yeah, they sought confidential treatment for a

*Katz - Cross / Chesler*                                              4190

1   lot of things and I believe included those.

2   Q    And it wouldn't surprise you that Discover's president

3   came here and said that he believed that the particular fees

4   that it charges to merchants are confidential, competitively

5   sensitive information, would it?

6   A    No, that wouldn't surprise me.

7   Q    Do you, from your observation of the market, do you

8   agree, Professor, that many merchants are in fact unable to

9   determine what they're actually paying Visa and MasterCard for

10  particular transactions presented on particular cards?

11  A    My understanding is there are merchants that have not

12  worked to figure that out.  I'm surprised that they say they

13  literally couldn't do it because I would think they could go

14  to their acquirers and ask for an accounting of what it is

15  they're paying, but I'm aware that there are merchants that if

16  you ask them, they don't know what the number is.

17  Q    And merchants have testified that when a consumer shows

18  up at their cash register and hands them a particular card,

19  Visa or MasterCard, they don't know what the rate there is

20  that they're going to pay to handle that transaction on that

21  particular card; you're aware of that, are you not?

22  A    My recollection is that merchants have said that there

23  are systems you could do that do that, but that they don't

24  have them in place.  So in general at the point of sale, they

25  don't know what the rate's going to be.

1   Q    In fact, the testimony was that those systems don't yet

2   exist in the marketplace, wasn't it?

3   A    I'm not aware of the testimony here.  I believe I've read

4   elsewhere that there are ways you could do it, but.

5   Q    You're familiar with the decree the government entered

6   into with Visa and MasterCard in connection with this case?

7   A    You and I spent some time reading through it.  I don't

8   know if I'd say familiar, but yes, I've seen it.

9   Q    We spent some time at your deposition, right?

10  A    Indeed we did.

11  Q    There's nothing in that decree that requires Visa and

12  MasterCard to make their fee structures less complex than they

13  are now, is there?

14  A    I don't believe there is.

15  Q    In fact, there's nothing in the decree that would prevent

16  them from making their fee structures even more complex than

17  they are now, is there?

18  A    That's my recollection, yes.

19  Q    Did you read the testimony of the merchants who testified

20  from Southwest Airlines and Alaska Airlines?

21  A    I certainly read portions of it.

22  Q    Did you note in the testimony of the Southwest Airlines

23  employee whose name was Mr. Priebe that American Express's

24  merchant fees at Southwest went up and American Express's

25  volume of purchase at Southwest went down?

1    A    I don't recall that.

2    Q    Do you recall that the same thing took place at Alaska,

3    that is the testimony was American Express's rates went up,

4    American Express volume at Alaska Air went down?

5    A    No.

6    Q    Now, one of the things that you and I discussed at your

7    deposition about the decree, the decree being with Visa and

8    MasterCard and the government, that you assumed that under the

9    decree if American Express were to be subject to the same

10   rules, merchants would be able to steer from American Express

11   at the point of sale to a lower-cost card assuming that the

12   merchant could figure out whether it was a lower-cost card,

13   correct?

14   A    Yes, if American -- well, if American Express was under

15   exactly the same decree, yes, American Express with some

16   merchants would be the able to enter into agreement so that it

17   wouldn't be possible, but certainly my interpretation of the

18   decree is that for most merchants, American Express would not

19   be able to stop that.

20   Q    And under the decree, Visa and MasterCard can enter into

21   an agreement to pay a merchant to steer to them, correct?

22   A    Yes.

23   Q    I take it you would agree with me, sir, that you can't

24   get a consumer to be steered to you if the consumer doesn't

25   have your card, correct?

1   A    Yes, I would agree with that.

2   Q    And you would also agree that the vast majority of

3   American Express cardholders also have Visa and/or

4   MasterCards, correct?

5   A    Yes.

6   Q    But the vast majority of Visa and/or MasterCard

7   cardholders do not have American Express cards, correct?

8   A    I believe that's correct.

9   Q    So Visa and MasterCard could enter into agreements under

10  a decree with the government and pay merchants to steer

11  consumers, for example who show up with their American Express

12  Card, to steer to Visa and MasterCard, correct?

13  A    Yes.

14  Q    Now, if American Express were governed by those rules and

15  it were to pay merchants to steer to American Express from

16  Visa or MasterCard, that would only work if the Visa or

17  MasterCard consumer at the counter actually have an American

18  Express Card in her wallet, correct?

19  A    In terms of steering from that to American Express, yes.

20  Q    And you recall that I also asked you whether in the

21  but-for world that you considered here, if American Express

22  found itself in a situation in which it had an accepting

23  merchant that was actively steering its cardholders,

24  cardmembers away to a competing card, American Express could

25  not terminate those relationships and decide to walk away

*Katz - Cross / Chesler*                                    4194

1   rather than have its cardmembers steered; do you recall that?

2   A    I recall having that general discussion, yes.

3   Q    And that is your view, is it not?

4   A    My view is that that's correct, subject to bounds on the

5   steering that the steering's not taking the form of

6   disparagement or some sort of mischaracterization, but, you

7   know, for example if the steering is some form of discount,

8   yes, my view is they could do it.

9   Q    And that American Express could not just say 'look, if

10  that's what you're going to do, I choose not to have you as my

11  representative, I'm terminating,' American Express could not

12  do that, correct?

13  A    In my but-for world, yes.

14  Q    Now, do you agree that American Express is an important

15  competitive check on the exercise of market power by

16  MasterCard and Visa?

17  A    Yes, that was certainly my opinion at the time of U.S. v.

18  Visa and it would be my opinion today.

19  Q    In fact, it's an opinion you stated in one of your

20  reports in this case, correct?

21  A    I don't know if I said it this time, but it is my

22  opinion, so.

23  Q    Well, let's just for the record make sure we get it

24  clear.

25              Defendant's Exhibit 6507, which is your second

1    report, it's in Volume 1, your rebuttal report.  At page 78,

2    paragraph 148 you say:  "Professors Bernheim, Gilbert and

3    Ordover identify American Express as an important competitive

4    check on the exercise of market power by MasterCard and Visa

5    as discussed below.  I agree with them on this point.  Where

6    we disagree and where I believe their claims are at odds with

7    the facts is that they believe that merchant restraints

8    strengthen competition among American Express and rival credit

9    and chargecard networks."

10           Correct?

11   A    Yes.

12   Q    So is it still your view as expressed there?

13   A    Yes.

14   Q    And the fact of that competition from American Express

15   for Visa and MasterCard has important consumer benefits

16   associated with it, correct?

17   A    Yes.  Where here consumers being interpreted I -- well, I

18   would like to know how you mean consumer, just so I'm clear in

19   my answer.

20   Q    I mean you and I, people who carry the card, get rewards,

21   use the card to buy things at merchants.

22   A    You mean specifically American Express cardholders?

23   Q    Yes.  Well, yes.  Let me ask the question again.

24           Does the fact that American Express presents

25   significant competition for Visa and MasterCard have important

1    consumer benefits, using consumer in the sense that I've just

2    given to you?

3    A    Meaning important benefits for American Express

4    cardholders, I mean, the existence of American Express

5    certainly generates benefits for American Express cardholders,

6    yes.

7    Q    And as we just talked about, most American Express

8    cardholders are also Visa and MasterCard cardholders, correct?

9    A    Yes.

10   Q    And it was concern that the possibility of rendering

11   American Express less able effectively to compete with Visa

12   and MasterCard that was a principal motivation for the

13   exclusionary rules case where you testified on behalf of the

14   government, correct?

15   A    Yes.  It was a concern that it was harming the competitor

16   process and that in that, that harm would manifest through the

17   effects on American Express and Discover's abilities to

18   compete.

19   Q    So it wasn't the case of protecting American Express

20   there, it was a case of protecting competition, correct?

21   A    Correct.  Although Visa did not see it that way, I do

22   believe it was about protecting competition.

23   Q    And in that case, in U.S. v. Visa, you testified that the

24   quality of offerings enjoyed by MasterCard and Visa

25   cardholders was driven to a significant degree by competition

1    from American Express and Discover, correct?

2    A    I don't recall the specific thing, but I hold that view,

3    yes.

4    Q    And in fact, you pointed to the fact that Visa had had

5    meetings, internal meetings, to determine how to improve their

6    Visa Gold Card because of competition posed by American

7    Express.

8              Do you recall that?

9    A    I don't recall the specific example, but it's certainly

10   my view that American Express's premium cards have stimulated

11   efforts by MasterCard and Visa to respond.

12   Q    And in fact, you noted that MasterCard's group called

13   Premium Card Strategy Council stated that American Express was

14   their primary competitive target and similarly that Visa tried

15   to develop a premium credit and chargecards that were aimed

16   directly at American Express.

17             Do you recall that?

18   A    I don't recall that specifically, but certainly at the

19   time, American Express was a leader in premium cards and that

20   Visa and MasterCard were lagging and looked at American

21   Express as, you know, a place to -- a place to go

22   metaphorically, I guess.

23             MR. CHESLER:  Your Honor, I'm about to go to a

24   somewhat different topic.  Is this a good time?

25             THE COURT:  Yes, it is.  Let's take our ten minute

*Katz - Cross / Chesler*                                4198

1    morning break now.

2              MR. CHESLER:  Thank you, Your Honor.

3              (Recess taken.)

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Katz - Cross - Chesler                                    4199

1          THE COURT:  Please be seated.

2          Mr. Chesler.

3          MR. CHESLER:  Your Honor, I still believe I will, as

4    I said yesterday, finish by the lunch break.  There's some

5    variance in that estimate, but I'm still -- as far as I can

6    tell, still on track.

7          THE COURT:  Remind the witness you're still under

8    oath.

9          THE WITNESS:  I understand, your Honor.

10   CROSS-EXAMINATION(CONTINUED)

11   BY MR. CHESLER:

12   Q    Dr. Katz, I want to go back quickly on the topics we've

13   just been discussing recently.  Recall I asked you about

14   whether Discover increased its rates during the period of the

15   American Express Recapture Program?

16   A    Yes.

17   Q    You're not aware of Discover being cancelled by my

18   merchants in connection with those rate increases, are you?

19   A    I'm not aware.  I didn't look into that.  I'm not aware,

20   one way or the other.

21   Q    A question about the consent decree we were talking

22   about.  Remember I asked you about whether Visa and MasterCard

23   could pay merchants to steer to them; do you recall that?

24   A    Yes.

25   Q    It's also the case under the decree that a card network

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                4200

1    is not permitted to pay merchants not to steer away from this,

2    correct?

3    A    I thought, in fact, it could do that in limited

4    circumstances, other -- under the decree, though.  That's

5    not -- according to my recollection.  I would be happy to look

6    at the decree, if you would like.

7    Q    We may come back to that.  You think that you can, in

8    fact, pay not to have consumers steered away from?

9    A    I thought in some circumstances, yes.

10   Q    All right.  We may come back to the decree, and I'll ask

11   you about that.  One other question on the topics we've

12   covered already, you talked about -- just before the break,

13   you talked about the other networks improving their Rewards

14   Programs; you thought was fair to say that that was in

15   response to competition presented by American Express.  Do you

16   recall that?

17   A    I thought I was saying they worked at having premium

18   cards and benefits associated with that, specifically,

19   improving Rewards Programs, but, yes, I recall the discussion

20   about premium cards.

21   Q    Premium cards tend to have a higher level of rewards

22   associated with them, don't they?

23   A    Yes.

24   Q    And there are many, many more cardholders with Visa and

25   MasterCards than there are with American Express Cards,

Katz - Cross - Chesler                    4201

1    correct?

2    A    Yes.

3    Q    And to the extent that the competition you were talking

4    about before the break has caused an overall increase in the

5    rewards and benefits to the cardholders of those other

6    networks, those are benefits that are now possessed by many,

7    many more consumers in the market place than just those that

8    hold American Express Cards, correct?

9    A    Yes.

10   Q    So the topic I want to move to now is something called

11   tipping.  You're familiar with the concept of tipping, are you

12   not?

13   A    Yes, I note it's been used in some slightly different

14   ways.  It's the same overall concept, but there's a range of

15   ways it's used.  But, yes, I'm familiar with the overall

16   concept.

17   Q    Why don't you describe to the Court what tipping is, as

18   you're familiar with it.

19   A    So in markets with network effects, because there's this

20   benefit of being larger, that it makes you more attractive to

21   consumers, there can be a tendency that as a network gets

22   bigger it becomes a reenforcing process.  It gets bigger; it

23   makes it more attractive, more people want it.  It's then more

24   attractive still, and then more people want to join it after

25   that.  So the most extreme form people talk about in economics

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4202

1   it tipping to a monopoly, where everyone piles on to the same

2   network.

3   Q    And the corollary to that, I take it, is that a smaller

4   network could become smaller still as people pile onto the

5   dominant network, which would further reduce demand by the

6   cardholders and further reduce the attractiveness to

7   merchants, because of network effects?

8   A    There are circumstances in which that could happen, yes.

9   Q    And one of the things that you focused on in your

10  testimony in *U.S. V Visa* was that you thought one of the

11  benefits of getting rid of the exclusionary rules, and opening

12  up issuing banks to American Express and Discover, would be to

13  lessen the possibility of the market tipping to the dominant

14  networks, Visa and MasterCard, correct?

15  A    Something like that sounds familiar, yes.

16  Q    And one of the things you cited in connection with that

17  danger was that at the time American Express was about half

18  and Discover about one-quarter the size of MasterCard,

19  measured by the charge volume or number of transactions.  Do

20  you recall using that metric?

21  A    I'm sorry.  I just didn't hear the last thing.  Do I

22  recall using --

23  Q    That metric?

24  A    I believe I used several metrics, and that was one of

25  them.

Katz - Cross - Chesler                              4203

1    Q    Let me ask you to look at your direct testimony in the
2    Visa case, DX733, we looked at before, and in particular page
3    176, paragraph 313.  Do you have that, sir?
4    A    Yes.
5    Q    You can certainly look at the whole paragraph for a
6    moment before I ask you about it.
7              MR. CONRATH:  Your Honor, I think this should not be
8    on the public screen, for the reason I said before.  It's
9    under the protective order in the prior case.
10             MR. CHESLER:  I apologize, your Honor.  I should
11   have said that.
12   Q    Have you had a chance to look at that, sir?
13   A    Yes, I have.
14   Q    So you're talking about some of the things that Professor
15   Pindyck had said; you were responding to him?
16   A    Yes.
17   Q    And you talk about the fact that he asserts network
18   effects make it difficult for a small system to survive
19   because of the danger of tipping, and then you have an
20   indented paragraph about tipping, correct?
21   A    Yes.
22   Q    And then toward the bottom of the paragraph, you say that
23   the value of multi-issuance, multi-issuance, meaning access to
24   multiple-issuing banks?
25   A    I'm not sure, because it says -- it's related to that,

Katz - Cross - Chesler                    4204

1   clearly.  The previous sentence, where it talks about duality,

2   helping MasterCard, I'm wondering what he -- giving issuer,

3   doing multiple brands, or whether he's talking about a given

4   network having multiple issuers.  And it says --

5   multi-issuance is making me think -- because it's talking

6   about duality.  It's talking about a single bank carrying

7   multiple brands of cards, is what I believe it's saying.

8   Q    So a single bank issuing, for example, Visa Cards as well

9   as American Express Cards?

10  A    Yes.  And, in particular, Professor Pindyck was talking

11  about the bank doing MasterCard and Visa.  And I was saying if

12  that argument is correct for MasterCard and Visa, it would

13  hold with even more strength, to the argument is correct, for

14  MasterCard and Discover being issued by the same bank as is

15  issuing Visa.

16  Q    Thank you.  In that context you say towards the end that

17  the value of this multi-issuance for strengthening competition

18  and preventing a downward spiral, should be even greater for

19  American Express and Discover, you say American Express is

20  approximately one-half the size of MasterCard measured by

21  charge volume or number of transactions, correct?

22  A    Yes.

23  Q    Now, at the time -- I think you said before you recall

24  that America Express' share of spend at that time was about

25  20 percent, correct?

Katz - Cross - Chesler                    4205

1    A    Yes.

2    Q    And MasterCard was about 25 percent at the time?

3    A    Roughly.  That's my recollection, yes.

4    Q    So when you said here that American Express was

5    approximately one-half the size of MasterCard, you were

6    presumably referring to the metric of number of transactions,

7    correct?

8    A    That number -- yeah, it looks like there's something

9    wrong with the sentence, because it would -- it says by charge

10   volume or number of transactions, and it was not half the size

11   by charge volume, so there's something wrong with the

12   sentence.

13   Q    I was trying to make sure I understood.  You couldn't

14   have meant American Express was half the size of MasterCard

15   based on charge volume; it was about four-fifths of the size

16   at the time, correct?

17   A    Yes.

18   Q    So to the extent you were emphasizing that this

19   multi-issuance would have particular significance for American

20   Express, given that it was about half the size of MasterCard,

21   you were presumably referring to the metric of number of

22   transactions?

23   A    The half would -- or else the half was a mistake and was

24   supposed to be a different fraction referring to the volume.

25   The half does not correctly refer to volume; that's the safe

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4206

1  statement.

2  Q    Would you agree with me that as of today American Express

3  is still much smaller than MasterCard on the basis of number

4  of transactions?

5  A    I believe that's correct.  I'd have to look at the

6  numbers, but if you represent it is, I accept that.

7  Q    You have no reason to doubt that it still lags way behind

8  MasterCard on number of transactions?

9  A    It's a question of way behind, but my recollection is it

10 has a significantly smaller number of transactions.

11 Q    Now, you recall co-authoring a paper with an economist by

12 the name of Carl Shapiro that dealt with systems competition

13 and network effects?

14 A    We co-authorized a number of papers on that subject.  We

15 also have one that has a title close to what you just said.

16 Q    And Carl Shapiro is an economist who at one time had the

17 same position that you had at the Antitrust Division of the

18 Department of Justice, Chief Economist, correct?

19 A    He had it two times, but yes.

20 Q    In fact, he had it at the time this lawsuit was filed,

21 didn't he?

22 A    I'm not sure -- around then.  I'm not sure the date of

23 his tenure in that, but around then, yes.

24 Q    I'd like you to look at Defendant's Exhibit 229, which is

25 in the second volume.  I think it's the first document in the

1   book.  Do you have that, sir?

2   A    Yes, I do.

3   Q    And this appears to be an article entitled "Systems

4   Competition and Market Effect," Michael L. Katz, Carl Shapiro,

5   from the Journal of Economic Perspective, Spring 1994; is that

6   right?

7   A    Yes.

8   Q    And this is, in fact, one of the papers you've

9   co-authorized with Professor Shapiro?

10  A    Yes.

11          MR. CHESLER:  Your Honor, I offer DX229.

12          MR. CONRATH:  It's an out-of-court statement, but I

13  don't have an objection to this, your Honor.

14          THE COURT:  DX229 is received in evidence.

15          (Defendants' Exhibit DX229  was received in

16  evidence.)

17          MR. CHESLER:  Thank you, your Honor.

18  Q    Would you turn to page 105, please.

19  A    I'm there.

20  Q    If you'd look at the paragraph that begins at the bottom

21  of page 105, you and Professor Shapiro state that in markets

22  with network effects -- we established this clearly, but just

23  to be clear, the payment market we're talking about is a

24  market with network effects, correct?

25  A    That's correct.

1   Q    In markets with network effects, there is natural

2   tendency toward de facto standardization, which means everyone

3   using the same system.  Because of the strong positive

4   feedback elements, systems markets are especially prone to

5   tipping, which is the tendency of one system to pull away from

6   its rivals in popularity once it has gained an initial edge.

7   And then you go on to say tipping has been observed in many

8   situations, including AM stereo radio, FM versus AM radio,

9   color versus black-and-white TV; and VHS versus Beta, and

10  video casette recorder, typewriter keyboards, etcetera.

11         In the next paragraph you say consumer heterogeneity

12  and product differentiation tend to limit tipping and sustain

13  multiple networks.  Do you agree with that statement, sir?

14  A    Yes.

15  Q    And would you agree that in the payments industry there

16  is product differentiation?

17  A    Yes.

18  Q    What did you -- what is meant when you say because of the

19  strong positive feedback elements, systems markets are

20  especially prone to tipping?  What are positive feedback

21  elements?

22  A    That was the process I was describing to the Court; that

23  network effect, the larger is the system the more benefit it

24  gives to a user from being part of that system, that then

25  could attract additional users, and that's in the positive

Katz - Cross - Chesler                    4209

1  feedback because those additional users can then make the

2  system still more attractive.

3  Q    Would you also agree that when tipping of a market in

4  favor of one network in a multi-network market is likely,

5  exclusive dealing by that same network with individual

6  customers is more of a concern than if tipping were unlikely?

7  A    I guess if that's the only difference, yes.

8  Q    Would you also agree that a firm in a systems market has

9  strong incentives to build up consumer beliefs about its own

10 system and to tear down consumer beliefs about rival systems,

11 in an effort to tip the market in its favor?

12 A    It certainly can, yes.

13 Q    And, in fact, you and Professor Shapiro talked about that

14 situation in your article, did you not?

15 A    Yes.

16 Q    And you cited a couple examples of situations, real world

17 examples, where firms attempted to tear down consumer beliefs

18 about rivals and build up consumer beliefs about their own

19 systems, in an effort to tip the market in their favor.  Do

20 you recall citing some examples of that?

21 A    I recall citing one example that was in your opening

22 statement.  We also -- yeah, I recall two.

23 Q    And the one that I cite in my opening statement was

24 Visa's campaign of "Everywhere You Want To Be," whereas

25 merchants don't take American Express, you and Professor

Katz - Cross - Chesler                                        4210

1   Shapiro cited that example as an example of this type of

2   attempt at tipping the market, correct?

3   A    I misspoke.  Because you made reference, I believe, in

4   your opening statement to a preference campaign, which this is

5   not, as I understand the term, but I inferred from that you

6   were characterizing this example.  But, actually, I shouldn't

7   put words in your mouth.  My view is the words that came from

8   your mouth don't match this example.

9   Q    All right.  Let's see if we can clarify that issue.

10  There are two different campaigns.  One was "Everywhere You

11  Want To Be," and the other was "We Prefer Visa," correct?

12  A    Whether they call them one campaign or another, I don't

13  know, but, here, we were talking about the particular

14  advertising of the "We Prefer Visa."

15  Q    And, in fact, you know, do you not -- let me rephrase.

16  Do you know that a Mr. Morgan testified -- a former employee

17  of Visa testified at the trial?

18  A    Yes.

19  Q    And he testified about both the "Everywhere You Want To

20  Be" and the "We Prefer Visa" efforts.  Do you recall that?

21  A    I don't recall the testimony about the "Everywhere You

22  Want To Be."

23  Q    So you don't recall that he, in fact, was shown documents

24  where Visa tracts the impact on perception of American Express

25  by consumers, and showed that the "We Prefer Visa" was even

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                          4211

1   more impactful on American Express than "Everywhere You Want

2   To Be"?  You're not aware of that?

3   A    No.  I wouldn't be surprised, but I'm not aware of it.

4   Q    Okay.  I won't take the time to show you Mr. Morgan's

5   testimony, it's already in the record, but I do want to -- I

6   want to ask you if you're aware of -- did you read the

7   testimony Mr. Morgan gave about his presentation to the Visa

8   Board in Cannes?

9   A    No, I didn't read that testimony.  I did hear that there

10  was a meeting in Cannes, but I didn't read that testimony.

11  Q    Okay.  It wouldn't surprise you, would it, Professor,

12  that Visa focused on the circle, the cycle, of using merchant

13  fees to fund rewards and other consumer benefits, so as to

14  make your value proposition to consumer more attractive and

15  thereby incent them to go to merchants and use your card?  It

16  wouldn't surprise you that Visa was focusing on that cycle

17  that takes place in this two-sided market, would it?

18  A    That's correct; it would not surprise me.

19  Q    Would it surprise you that Visa focused in particularly

20  on its strategy of breaking that cycle for American Express by

21  focusing in on its fund supply for merchant fees?

22  A    I could imagine Visa doing that.  I don't recall seeing

23  documents to that, but I can imagine Visa having a strategy

24  like that.

25  Q    You understand from your study of the industry that

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                              4212

1   American Express began primarily -- didn't begin, but began

2   its card business primarily as a payment provider for travel

3   and entertainment merchants and business travelers who use

4   those merchants?

5   A    Yes.

6   Q    That was the niche, the niche in which it started, and

7   then it expanded over time to groceries, and supermarkets, and

8   just drugstores and so-called everyday spend?

9   A    Yes.

10  Q    So suppose the evidence here showed that Visa was

11  focussing in on breaking that cycle of American Expresses'

12  business model in order to push American Express back into

13  being just a niche provider, as opposed to a broad provider of

14  payment services across industries, suppose that was what the

15  evidence showed.  Is it your view that that's procompetitive,

16  to push American Express back into being just a niche

17  provider?

18  A    It would depend on how they did it?  If they did it by

19  offering superior products that had greater appeal to

20  cardholders and to merchants, that would be a competitive

21  response; and that would be good for consumers, where

22  "consumers" is understood to be merchants and their customers.

23  Q    And there are ways that they could have gone about doing

24  it which would be anticompetitive, aren't they?

25  A    Yes, I would say that the exclusionary rules were one of

Katz - Cross - Chesler                    4213

1   the ways to do that, and I testified to that effect, that it

2   was to harm American Express and limit its ability to compete.

3   Q    And if, in fact, there were anticompetitive ways not only

4   to choke off America Express' access to issuing banks, but to,

5   in fact, prevent American Express from obtaining funds for

6   merchant fees to fund its rewards program, that could be

7   anticompetitive as well, couldn't it?

8   A    I can't rule it out as a general matter; it would depend

9   on the specific way they did it.  But I believe, given enough

10  time, I could come up with a theory in which they were doing

11  bad things and they were anticompetitive rather than

12  competition on the merits.

13  Q    And is it fair to say, sir, that you have not studied the

14  Visa Preference Campaign that Mr. Morgan was talking about?

15  A    I'm not sure what, you're saying, the preference campaign

16  he's talking about.  If you're asking me about "We Prefer

17  Visa," that campaign, do I consider that to be

18  anticompetitive, I do not.

19  Q    My question was is it fair to say that you have not

20  studied that campaign?

21  A    I guess there's a question of what you mean by "studied."

22  I looked at the documents available to me that described the

23  features.  I've then reported those features in my reports and

24  reached a conclusion based on those facts.

25  Q    Did you study the presentation that Mr. Morgan made to

Katz - Cross - Chesler                                    4214

1  the Visa Board in Cannes?

2  A     No.

3  Q     Did you study Mr. Morgan's testimony about what their

4  intent was and how they went about it, as delivered in this

5  case?

6  A     No, I did not look at evidence of their intent.

7  Q     Thank you.  Did you study the tracking studies that Visa

8  undertook to map the effects of their campaign?

9  A     I certainly saw some evidence of -- the one to know is

10  whether the campaigns were effective and evidence that, in

11  fact, there was significant share shift, whether there was a

12  specific Visa tracking study, I don't recall.  But certainly I

13  looked at evidence that share was shifted as a result of the

14  campaign.

15  Q     Did you read Mr. Hochschild's, from Discover, testimony

16  that in connection with the we prefer campaign, Visa put

17  through price increases in its interchange rates and then

18  offered to reduce those price increases if the merchants would

19  participate in the Visa preference campaign?

20         MR. CONRATH:  Objection.  I believe that misstates

21  the prior testimony.

22         THE WITNESS:  I did --

23         MR. CHESLER:  I'm happy to show the witness the

24  testimony.

25         THE COURT:  Why don't you do that.

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                              4215

1   Q     Let's look at Defendants' Exhibit 7766, please, which is

2   in Volume II.  Do you have that exhibit, sir?

3   A     Yes, I do.

4   Q     Would you look at page 934, please.  I'm happy to have

5   you look at any other context, and I'm sure if Counsel wants

6   me to direct you to others, he will.  Let me ask you to look

7   at page 934, beginning at line five.  Actually, beginning at

8   line seven.  I'm asking a question, and I said:

9          "So this very good example, this very good example

10   that you cited was a situation in which Visa, if I understood

11   your testimony, was putting through price increases to

12   merchants and was saying we will roll back a portion of those

13   price increases if you agree that you will participate in the

14   Preferred Visa Campaign, correct?"

15          Answer:  "Yes."

16          Question:  "And you're saying that, in your view,

17   was a good example with the need for nondiscrimination

18   provisions, because it related to situations in which your

19   price was actually lower; your merchant price was lower than

20   Visa's, correct?"

21          Answer:  "Yes."

22          So you see that Mr. Hochschild was talking about his

23   own nondiscrimination provisions in the context of Visa

24   putting through price increases to merchants and saying that

25   they would roll back a portion of those price increases if the

NICOLE CANALES, CSR, RPR

1  merchant agreed to participate in the We Prefer Visa Campaign?

2  A    Yes, I had read that testimony.

3  Q    And do you remember other testimony that some merchants

4  described this as blackmail?

5  A    That sounds familiar.  I can't remember if it was in

6  testimony or deposition, but something to that effect, though.

7  Q    And is it your view that this kind of tactic by Visa,

8  with its share of the market and its dominant position of

9  using rollbacks in price increases, to get merchants to

10 participate in the We Prefer Visa Campaign was procompetitive?

11 A    Yes, offering discounts to merchants in order to get them

12 to express a preference can be procompetitive.  It's

13 conceivable that taken to an extreme, it could become

14 exclusionary, but I believe it was procompetitive.

15 Q    You believe -- and not withstanding the characterization

16 by merchants it was blackmail, you believe it was

17 procompetitive, correct?

18 A    Yes.  As we've established from some of your earlier

19 questions, my concern is with competition not with the views

20 of particular merchants.

21 Q    Right.  And, then, we just let the chips fall where they

22 may, right?

23 A    If the chips are falling where they may as a result of

24 increased competition, yes.

25 Q    Now, if, in fact, a dominant network is able to tip the

Katz - Cross - Chesler                    4217

1    market through this type of tactic or others, can that be

2    anticompetitive?

3    A    There are situations where it could be, yes.

4    Q    If it, in fact, eliminates the competitive constraints

5    that are for the good of consumers, as a result of the market

6    tipping away from the smaller competitor in favor of the

7    larger competitor, that could have anticompetitive effects in

8    the market?

9    A    Yes.

10   Q    Just assume for purposes of my question -- indulge me for

11   a moment and assume Visa and MasterCard were able to tip this

12   market, as you reported with Professor Shapiro that at least

13   they tried to do at an earlier time --

14   A    I'm sorry.  I want to make sure you're not using tip now

15   in -- by tip now you just mean suppose they succeeded in

16   shifting some share to themselves?

17   Q    No, I mean tipping in the sense that there is a kind of

18   run on the market, if you will; there's a tipping that moves

19   so much share to the dominant network that is successfully

20   tipping, that it actually diminishes in a material way the

21   ability of one or more smaller competitors to effectively

22   compete.  That's a possible consequence of market tipping,

23   isn't it?

24   A    Yes.

25   Q    Suppose that happened, would we be left in that

Katz - Cross - Chesler                    4218

1   situation, effectively, with a duopoly in the payment market?

2          MR. CO RATH:  I object that this is an incomplete

3   hypothetical.

4          THE COURT:  I'll let the witness answer in whatever

5   way the witness wishes to answer.

6          THE WITNESS:  No.

7   Q    You do not believe that we would be left with a duopoly?

8   A    If I understand your hypothetical correctly that American

9   Express and Discover would remain as competitors, so by

10  definition it wouldn't be a duopoly.

11  Q    In order for it to be duopoly, they would have be to be

12  entirely eliminated as competitors American Express, they,

13  meaning American Express and Discover?

14  A    Duopoly means there are two suppliers.

15  Q    You can have a monopoly in a market in which there are

16  other competitors, correct?

17  A    The term is -- the economist using the term precisely

18  would say, no, a monopoly as you are the only supplier.  We

19  can talk about situations where somebody has monopoly power

20  and act like a monopolist, as a shorthand, so it depends on

21  how you mean it.  If you're asking me the question -- of what

22  your hypothetical is saying is we have two firms that are

23  stronger than others, and as part of your hypothetical the

24  other two were made weaker and that's diminished competition,

25  I'd certainly agree with that.

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4219

1   Q    Let's see if we can get on a common footing here.  Are

2   you aware of situations in which companies have been found to

3   have monopoly power but the company is not the only competitor

4   in the defined market?

5   A    Yes, just the same.  The term is used that way.

6   Q    Can you similarly conceive of situations in which two

7   firms are deemed to have duopoly power, but that doesn't mean

8   that there aren't some other competitors left in the market?

9   A    Yeah, I'm not familiar with the term being used that way,

10  but sure.

11  Q    If there were such a situation here, that is, where

12  American Express and Discover were left in the market but in

13  an effectively diminished -- substantially diminished capacity

14  as a result of tipping, would you expect the prices charged by

15  Visa and MasterCard to merchants to go up or down?

16  A    I would expect the networks overall to keep more -- the

17  money for themselves.  As a result of the harm to competition,

18  I would have to think about what it would mean for the fees to

19  networks, because, as I testified in *U.S. V Visa,* which is, in

20  some sense is the flip side of what you and I are talking

21  about, that it would be quite possible that increased

22  competition from American Express would raise interchange

23  rates; and, therefore, it logically follows a decreased

24  competition from American Express to lower interchange rates.

25  However, I think it would also be a harm to competition

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                          4220

1  because the networks themselves would be keeping more money.

2  And, generally, the fact that this change was brought about by

3  a harm to competition would be a bad thing.

4  Q    Okay.

5          THE COURT:  You know, I don't have any problem with

6  these scenarios, but there are so many other factors.  You

7  know, where is Senator Durbin in all this.  You know, if you

8  have these kinds of seismic changes in the market place and

9  whether there would be some effort on the part of government

10 to influence the availability of -- or protect the rights of

11 consumers in this process?  We just don't know.  He came

12 riding up with the Durbin Amendment, and we are dealing with

13 that here, to some degree.  So I'm little concerned that

14 while, you know, you're discussing factors that may actually

15 play out some day, I don't know, there may be other factors

16 that we're not even putting into the mix that could influence,

17 you know, where the market goes in the future.

18          So I just mention to you that anyone whose been

19 involved in how the government jumps into a situation, where

20 it has commerce clause power, I don't think that -- whatever

21 scenario you construct here, it's -- it's going to provide me

22 with a global understanding of what might happen.  So I just

23 point that out to you so there be no mistake that -- I think

24 it's a more sophisticated exercise than just dealing with the

25 current players.  But go ahead.

NICOLE CANALES, CSR, RPR

1          MR. CHESLER:  Thank you, your Honor.  I appreciate

2   that.

3   Q     Let me turn inform a subject that you mentioned on

4   direct, freeriding.  Do you remember talking about that?

5   A     Yes, I do.

6   Q     And I think you defined freeriding as a situation where

7   somebody undertakes a costly action, and then somebody else

8   benefits from that action without having to pay for it,

9   correct?

10  A     Yes.

11  Q     And you testified yesterday, in substance -- you tell me

12  if I've correctly or incorrectly summarized this -- that you

13  did not think that merchants can freeride on America Express'

14  rewards because American Express incurred the liability for

15  that reward only when the card member actually uses his or her

16  card at the merchant, right?

17  A     Well, I guess I would agree with that part of the

18  statement, but what I said was that when the cardholder uses

19  the rewards card at a merchant, the merchant then has to make

20  a payment to American Express and so that it's not freeriding.

21  Q     And if the cardholder is steered to a different card, the

22  cardholder doesn't make a payment to American Express, right?

23  A     Well, the cardholder doesn't make a payment to American

24  Express.

25  Q     I misspoke.  If the cardholder is steered to a different

Katz - Cross - Chesler                                    4222

1   card, then the merchant doesn't make a payment to American

2   Express?

3   A     That's correct.

4   Q     Now, isn't is true, sir, that American Express incurred

5   certain expenses to provide customer service, marketing

6   innovating in its consumer programs which are incurred whether

7   or not a particular consumer uses her American Express Card to

8   complete a particular transaction?

9   A     Yes.

10  Q     And to the extent that any or all of those fixed costs

11  are incurred as an incentive to get the consumer to use her

12  American Express Card, and she is steered by the merchant to

13  use a different card, don't you agree that in that instance

14  the merchant is freeriding on America Express' fixed

15  investments?

16  A     No.

17  Q     And if, in fact, the consumer was brought into that store

18  because the store identified itself as an accepting American

19  Express merchant and she came in with the intent to make a

20  purchase, perhaps higher than average purchase for that

21  merchant with her American Express Card, and is then steered

22  to Visa, you also think that is not freeriding, correct?

23  A     Yes, for a different reason.  But, yes.

24  Q     Let me go to a different subject.  I think we've

25  established that there are several million merchant locations

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4223

1   in the United States that accept Visa and MasterCard and not

2   American Express Cards, correct?

3   A    Yes.

4   Q    And I think there's some -- I asked you at your

5   deposition whether you thought that that number was on the

6   order of 3 or 4 million locations, and you agreed with that.

7   You still think that's a fair estimate?

8   A    Yes.  I think you asked me earlier today, and I said --

9   the same question.  Or you asked me about 3 million and that

10  seems about right, yes.

11  Q    I think I asked that in the context of Discover but I'm

12  asking now --

13  A    Discover's quite close.  In any case, yes, that sounds

14  about right.

15  Q    Okay.  Now, as a result of the Consent Decree between the

16  government, and Visa and MasterCard, at those 3 or 4 million

17  merchants locations, whatever the number is, those are

18  merchants that are not subject to the previous non-steering or

19  nondiscrimination provisions of Visa and MasterCard, correct?

20  A    That's correct.

21  Q    Now, many of those merchants also accept Discover, right?

22  A    Yes.

23  Q    And so they may or may not be subject to Discover's

24  provisions, correct?

25  A    That's correct.

Katz - Cross - Chesler                                    4224

1   Q    But, in any event, they're not subject to America

2   Express' provisions because American Express is not accepted

3   at those merchants?

4   A    Yes, by definition.

5   Q    Now, at your deposition, I asked you about Discover's

6   nondiscrimination rules, and you pointed out that you thought

7   that a witness from Discover had said that its rules were

8   different, and they were in force in a different way from

9   America Express'.  Do you recall that?

10  A    I recall the general discussion, yes.

11  Q    And you also said that when you had read the rules

12  yourself, you thought that the rules were consistent with that

13  witness' testimony, that the Discover rules were different

14  from the American Express rules.  Do you recall that?

15  A    No, I don't.

16  Q    Okay.  Let me ask you to look at your deposition, page

17  329.  So this would be in Volume I.  I think it's the second

18  day of your deposition.  Do you have it, sir?

19  A    Yes, I do.

20  Q    So beginning at line three I ask, "Oh, so --"

21  A    I'm sorry.  Maybe I misheard you.  I didn't hear the page

22  number.

23  Q    329.

24  A    Sorry.  Okay.  I'm now on page 329.

25  Q    Beginning at line three, I ask, "Oh, so you did read them

Katz - Cross - Chesler                          4225

1   trying to determine whether they, in your view, were different
2   from what he said they were?"  I'm referring there, "them" as
3   Discover's rules, and "he" is the Discover witness who turns
4   out to be Mr. Hochschild.  And you said, "Yes."  Then I said,
5   "Okay.  And you concluded they were consistent with what he
6   said?"  "Yes."
7           Question:  "So then you believe, having read the
8   rules, that they are different from America Express' rules?"
9           Answer:  "Yes.  I just want to be clear that that's
10  not what I believe you asked me before, so if I misunderstood
11  your earlier question, I apologize.  But I believe you asked
12  me a question about reading them, holding aside whatever the
13  witness said."
14          And then I said, "All right.  In any event, you read
15  them, and your view, having read the rules, is they are
16  different from America Express' rules."  There was an
17  objection.  And then you said, "As I've said, the Discover
18  witness said that the rules were different, and they were in
19  force in a different way.  When I read the rules, I thought it
20  was consistent with the witness' testimony.  Some of the
21  testimony is not about what's in the four corners of the
22  contract, it has to do -- well, arguably, I guess, everything
23  is in it, but it's about how he testified Discover interprets
24  its rules and enforces them."
25          Do you believe that the actual text of the Discover

Katz - Cross - Chesler                    4226

1  rules show that they're different from America Express', that

2  they're enforced in a different way?

3  A    I don't recall specifically what the rules say, but from

4  reading my deposition testimony, I don't believe that my view

5  about their enforcement was based on the rules themselves, but

6  instead it was based on Mr. Hochschild's deposition testimony.

7  Q    Okay.  Do you have an understanding of whether Discover

8  is enforcing its nondiscrimination rules at the 3 or 4 million

9  merchant locations that today accept Discover, Visa,

10  MasterCard but not American Express?

11 A    I believe it was testified to at trial that they

12 haven't -- I have to be careful about using the word

13 "enforcement."  That they haven't brought an action against

14 anybody, if I'm remembering correctly, but I think they're

15 enforcing the rule, if they have it, but -- that's my belief.

16 But I can't -- as I sit here, I'm not sure I saw something

17 saying specifically whether they're enforcing the rule or not.

18 Q    Do you think that Discover, a merchant which accepts

19 Visa, MasterCard and Discover but not American Express, that

20 Discover can effectively enforce its nondiscrimination rules

21 to prevent the merchant from steering?

22 A    It would depend on the circumstance.  In particular,

23 circumstances where we have Discover, Visa and MasterCard

24 pricing close together, yes, that the merchants will agree to

25 the rules.  Now, if the merchant had some strong reason to

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4227

1  steer, it's my testimony that, then, it would be difficult for

2  Discover to maintain its rule.

3  Q    And why would it be difficult for Discover to maintain

4  its rule?

5  A    Because of its -- the small share it has with the

6  merchants, relative to the other ones, that if someone wanted

7  to steer, say, between MasterCard or Visa because there was a

8  significant difference between the two, that -- the potential

9  of benefits of steering would be large relative to the costs

10 that would be incurred by no longer accepting Discover.

11 Q    So it would be a function of the small share that

12 Discover has at a particular merchant?

13 A    Relative to the shares of the networks between which the

14 merchant was seeking to steer, yes.

15 Q    And in many merchants, Discover has like a single-digit

16 share of the spend of the merchant, correct?

17 A    Yes.

18 Q    And that's true of American Express, isn't it; aren't

19 there many, many merchants, particularly in the everyday spend

20 category, where American Express' share of spend is low single

21 digits?

22 A    I would -- could well be, especially by merchant count,

23 yes.

24 Q    And so by force of logic, wouldn't you agree that if

25 Discover was unable to enforce its steering rules at that

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4228

1    those merchants, American Express would similarly be unable to

2    enforce its steering rules where it had 3, 4, 5 percent of

3    spend?

4    A    In the presence of large differentials, in the rates, it

5    gave the merchants incentive to steer otherwise, yes.

6              THE COURT:  Are we going to have testimony on your

7    case about how American Express enforces its

8    antidiscrimination provision with small merchants?

9              MR. CHESLER:  I believe so, your Honor.  I think

10   there's been some --

11             THE COURT:  There's been some.

12             MR. CHESLER:  -- already.

13             THE COURT:  But more focused.  Since you raised that

14   issue with this witness, I'd like to know more about it.

15             MR. CHESLER:  Thank you, your Honor.  We'll

16   certainly do that.

17   Q    Have you done any study of the number of merchants at

18   which American Express has, in fact, a single-digit share, as

19   compared to much larger shares by Visa and MasterCard of the

20   spend?

21   A    I don't believe I have.

22   Q    Now, you agree, do you not, that merchant resistance

23   could be expected to induce the Discover network to drop its

24   restrictions on steering and discounts if America Express'

25   merchant restraints were no longer in effect?

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4229

1    A    Yes, it certainly could happen.

2    Q    And at the 3 or 4 million merchant locations that don't

3    accept American Express, America Express' provisions are not

4    in effect by definition, correct?

5    A    Yes.

6    Q    Now, you're not aware of any evidence, are you, to

7    suggest that in the year since the Consent Decree went into

8    effect, Discover has experienced any significant level of

9    cancellations at the merchants that accept its card, as well

10   as Visa and MasterCard, but not American Express?

11   A    That's correct; I'm not aware of the evidence.

12   Q    Are you aware, sir, that when the government entered into

13   its Consent Decree with Visa and MasterCard, it filed

14   Competitive Impact Statement with this Court?

15   A    Yes.

16   Q    And have you reviewed that at some point?  Have you read

17   it?

18   A    I believe I've read some of the paragraphs.  I don't

19   think I've read the whole thing.

20   Q    Are you familiar with the statement in the Competitive

21   Impact Statement that merchants that currently accept only

22   Visa, or MasterCard or both will benefit immediately from the

23   final judgment by having the freedom to encourage their

24   customers to choose the merchant's preferred method of

25   payment?

Katz - Cross - Chesler                                    4230

1   A    I don't recall reading that.

2   Q    May I ask you to look at Defendants' Exhibit 7580,

3   please.  It's in Volume II.  Do you have that?

4   A    Yes, I do.

5   Q    You see this is the Competitive Impact Statement filed by

6   the United States --

7   A    Yes.

8   Q    -- in this case?

9   A    Yes.

10  Q    Would you turn to page 14, please?  You see the paragraph

11  at the top of page 14 starts with the sentence I just read to

12  you.  Merchants that currently accept only Visa, or MasterCard

13  or both will benefit immediately from the final judgment by

14  having the freedom to encourage their customers to choose the

15  merchant's preferred method of payment.  And it goes on to

16  talk about several new options that would be available to

17  accomplish this.  Do you see that, sir?

18  A    Yes.

19  Q    And, in fact, the government held a press conference on

20  the day that it announced the settlement, did it not?

21  A    I would expect that they did.

22  Q    And made a similar statement, then, that the 4 million

23  merchants across the U.S. that only accept MasterCard and

24  Visa, that their customers should begin to seek immediate

25  results because immediately the restrictions are lifted on

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4231

1  those merchants to begin to compete for those consumer

2  dollars?

3  A    I believe, your now current partner, I saw something to

4  the effect that she said that.  I was shown separately from

5  the press conference, but that sounds familiar.

6  Q    This was then Assistant Attorney General Varney?

7  A    Yes.

8  Q    Now, in fact, Discover's president testified that at

9  those merchants, as far as he knows, the merchant fees have

10  increased since the Consent Decree went into effect?

11  A    I don't recall his testimony on that.

12  Q    Does it surprise you that that would be the case?

13  A    No.

14  Q    Now, you address some proposed explanations for why the

15  immediate effects that the government predicted have not come

16  about.  Do you recall doing that in your report, your

17  surrebuttal report?

18  A    I recall talking about reasons that, when you look at

19  merchants that don't take American Express, why you would see

20  what you see.  I don't recall whether I addressed specifically

21  what's here, which is talking about merchants that take Visa

22  and MasterCard and nothing else, but their arguments would be

23  relevant to that.

24  Q    So let me ask you to look at Defendants' Exhibit 6540,

25  which is your surrebuttal report.  That's in Volume I,

NICOLE CANALES, CSR, RPR

1    beginning at paragraph 551.  I believe that's page 313.

2    A    Yes.

3    Q    And you have a heading there.  It says "Merchants that

4    don't accept American Express today."  Do you see that?

5    A    Yes.

6    Q    And you talk about, in 551, Dr. Gilbert, Richard Gilbert,

7    observing that many merchants accept Discover, MasterCard and

8    Visa but do not offer discounts; and that Dr. Bernheim makes a

9    related argument, and, specifically, he asserts that the

10   merchant restraints must not be anticompetitive because

11   merchants that do not accept American Express Cards have not

12   received systematic reductions in interchange fees, following

13   the Consent Decree entered into by MasterCard and Visa.  And

14   you then say there were several reasons why Dr. Bernheim's and

15   Gilbert's arguments are unpersuasive and invalid, correct?

16   A    Yes.

17   Q    And you then go on to recite what those arguments are?

18   A    Yes.

19   Q    So one argument which you assert in paragraph 552 is that

20   it is not clear to which networks Doctors Bernheim and Gilbert

21   believe steering should occur.  Weighted by charge volume,

22   American Express, generally, but not always is the highest

23   cost network, while other networks tend to be comparably

24   priced; hence, the merchant generally has much less incentive

25   to engage in steering if American Express is not one of the

Katz - Cross - Chesler                    4233

1  credit and charge card networks that the merchant accepts.

2          That's the argument you made there?

3  A     Yes.

4  Q     Now, if one of the cards of the three that the merchant

5  accepts is cheaper to the merchant than the other two, would

6  you agree that the merchant had the opportunity to save money

7  if it steers to whatever that cheapest card is of that

8  merchant?

9  A     It would depend on the cost of steering, but there's a

10 potential benefit from the steering if one is cheaper than the

11 other and the steering is successful.

12 Q     And it's not your opinion that merchants are satisfied

13 with the rates that they're currently paying to Visa,

14 MasterCard, Discover today, right?

15 A     That's correct.

16 Q     So, in fact, if merchants are not satisfied with the

17 current rates and they were free to steer because American

18 Express is not present at that merchant, then they would have

19 an incentive to steer, in an effort to cause a lowering of the

20 rates by one or more of the networks whose cards they accept,

21 right?

22 A     That would depend on the merchant.  If you're a small

23 merchant, MasterCard and Visa do not bargain with you; they

24 literally represent the -- my understanding is they literally

25 won't talk to you if you're a small merchant.  So, in fact,

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4234

1   you can't engage in bargaining and you can't say to a network,

2   well, if you don't lower your price, we're going to steer to

3   somebody else, so it would depend on the merchant involved.

4   Q    And there's nothing in your but-for world that says that

5   Visa and MasterCard networks would have to talk to the

6   merchants then, just as they're not talking to them now?

7   A    To the small ones, yes, that's correct.

8   Q    The small ones, as we discussed before, $500,000 or less,

9   that's 98 percent of America Express' current merchants,

10  right?

11  A    That's what you had said earlier, and I'll accept that

12  representation.

13  Q    And do you agree that even where the networks have their

14  prices fairly closely clustered together, Visa, MasterCard and

15  Discover, that merchants could use steering to get competition

16  moving, and that would be of a benefit?

17  A    Again, it would depend on the merchant, whether an

18  individual merchant would have the ability to do that.  If

19  you're talking about a large merchant that's engaged in

20  individual bargaining, then it's a possibility.  If you're

21  talking about a small merchant that just takes the prices

22  given, that individual merchant, essentially, has very little,

23  if anything, that it can do.

24  Q    So for all of those merchants, then, steering would have

25  no benefit; is that your testimony?

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4235

1   A     No, if it were allowed completely and -- one of the

2   things we have to add into this, if you're thinking about

3   having a network initiative, at this point, applying it to

4   small merchants, my understanding is that Visa, MasterCard and

5   Discover would not know which merchants take American Express

6   and which don't, so it would be hard-pressed to figure out

7   where their initiative applied.  So that's a situation that

8   would change.  If no one had the rule, then you would always

9   know that you had the initiative, that steering could be

10  possible; and that would then change a network's incentive to

11  engage in practices that could lower prices, for example, that

12  could then create incentives for steering.

13  Q     If Visa and MasterCard know that a particular merchant

14  doesn't accept American Express and, therefore, that that

15  merchant is not subject to America Express' provisions, and

16  Visa and MasterCard have agreed not to enforce their

17  provisions, does Visa -- do Visa and MasterCard have any

18  incentive to lower their rates to that merchant?

19  A     We're talking about a large merchant or small one?

20  Q     I didn't qualify it by size.

21  A     Okay.  If it's a small merchant, I think they would have

22  very little incentive.

23  Q     That's true now, and it would be true in your but-for

24  world, correct?

25  A     At the level thinking about an individual merchant, yes.

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4236

1    Q    Do you know how much purchase volume is represented by

2    the 3 or 4 million merchant locations that accept Visa,

3    MasterCard and, perhaps, Discover but not American Express?

4    A    No.

5    Q    Have you made any effort to determine how much it is?

6    A    I don't believe I have.

7    Q    If I told you that it could be as much as 3- to

8    $400 billion every year, would that surprise you?

9    A    No.

10   Q    You mentioned Australia briefly in your testimony, if

11   it's 3- or $400 billion a year of spend volume that the

12   merchants that don't accept American Express, do you know

13   that's about the size of the Australian economy?

14   A    No, I don't know that, but I'll accept your reputation.

15   Q    Can the networks -- meaning Visa and MasterCard, could

16   they simply publish different rates for merchants that do

17   accept American Express and merchants that don't?

18   A    If you're asking do they have the technical ability to do

19   it, yes; that's something I have thought about and wonder what

20   the reaction would be in terms of potential antitrust action,

21   but I believe they could do it.  Certainly have the ability to

22   do it physically.

23   Q    So to your knowledge they aren't done that with respect

24   to the merchants in the post-Consent Decree world who don't

25   accept American Express, have they?

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                          4237

1   A    I don't believe that they have identified separate rates

2   for merchants that do and don't accept American Express.

3   Q    You also said in paragraph 554 of your surrebuttal report

4   that there may be a lack of steering of merchants that do not

5   accept American Express today, because these merchants are

6   slow to adapt to changes and/or want other merchants to test

7   the waters.  Do you see that, sir?

8   A    Yes.

9   Q    The decree's been in effect for more than three years,

10  right?

11  A    I guess at this point that's correct.

12  Q    And you've testified that a period of at least a year

13  should be a sufficient amount of time to see changes resulting

14  from the removal of restrictions on steering, if such steering

15  were going to occur, haven't you?

16  A    I don't recall saying that, but I expect to see some

17  merchants do some steering over that time period, if there

18  were significant incentives to do so.

19  Q    And, in fact, in connection with the Durbin Amendment,

20  haven't you testified that not observing steering after a

21  period of a year or longer suggests that it's not going to

22  take place?

23  A    I certainly thought that there wasn't steering during

24  that period; that right now is confirming the fact that that's

25  different to steer that way, yes.

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4238

1  Q    When you read Mr. Hochschild's testimony, did you read

2  his testimony about forming a task force to look at the

3  hundred largest merchants?

4  A    I remember parts in his testimony, things where he talked

5  about reaching out to large merchants.  I'm not sure I

6  remember the specific task force you're talking about.

7  Q    I'll leave that, because it's in the record.

8         I think you said this before.  I just want to

9  confirm it.  You're aware, with respect to the large

10  merchants, American Express, in fact, negotiates its

11  acceptance agreements?

12  A    Yes.

13  Q    Including customizing, in many instances, the

14  nondiscrimination provisions?

15  A    I think we may run into question of terminology or what

16  the scope of what you call the nondiscrimination provisions, I

17  was calling them merchant restraints, and now have been

18  calling to be neutral.  I started -- forgot what I started

19  calling them.  But I'm not sure -- I'd have to see where the

20  particular parts are.  I'm aware that American Express

21  negotiates various things, allowing steering with co-brands.

22  I just can't remember if that's within the four corners of the

23  text that the complaint identifies as the rules.  But I am

24  certainly aware that there are forms of steering that American

25  Express allows.

1   Q    With respect to the government statement to the Court in

2   its Competitive Impact Statement and the statement at the

3   press conference that consumers would see immediate benefits

4   at the 3- or 4 million merchant locations that do not accept

5   American Express Cards, that has turned out to be inaccurate,

6   hasn't it?

7   A    One thing, the statement -- the one thing you showed me,

8   actually, did not say -- it says the ones that accept -- only

9   Visa and MasterCard or both, which I believe is, actually, a

10  few hundred thousand merchants.

11  Q    Are you aware of any immediate impact for consumers at

12  those merchants since the Consent Decree went into effect?

13  A    No.

14  Q    And, in fact, what Assistant Attorney General Varney said

15  at the press conference, she referred to 4 million merchants

16  that were going to see immediate effects?

17  A    I don't recall, but if that's what you say she said,

18  obviously I have no reason to doubt that.

19          THE COURT:  She's your partner.

20          MR. CHESLER:  Indeed, she is, your Honor.  She

21  became partner of our law firm when she left government

22  service.

23          THE COURT:  Did you ask her?

24          MR. CHESLER:  I'm not allowed to speak to her about

25  this case, your Honor.

Katz - Cross - Chesler                          4240

1            THE COURT:  Good thing.

2            MR. CHESLER:  Literally not allowed.

3            THE COURT:  Yes, I understand.  Just checking.

4            MR. CHESLER:  Is Mr. Gold here?  I need my counsel.

5    Q    Assuming she referred to 4 million merchants, where there

6    would be immediate benefits for consumers, that would have to

7    include the merchants that accept Discover as well as Visa and

8    MasterCard but not American Express?

9    A    I would think so.

10   Q    So with respect to that statement, the immediate effects

11   that were predicted, so far as you know, have not occurred; is

12   that fair?

13   A    That's correct.

14           MR. CHESLER:  Two other things, your Honor, and then

15   I'll be done.

16           THE COURT:  Okay.

17           MR. CHESLER:  Do we have a copy of the decree that I

18   can show the witness?  Is it in the book.  It's in the binder.

19   Q    DX5828, please.

20   A    This is in Volume II.

21   Q    It's in Volume II.  5828.  Do you have that?

22   A    Yes, I do.

23   Q    All right.  I'd like you to turn to Section Capital B,

24   which begins on page seven.

25   A    I'm there.

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                                    4241

1    Q     And just for context, on page 5, theres a Roman Numeral

2    VI called "Prohibited Conduct" that as a Section Capital A

3    that begins on 5 and runs over to the top of page 7.  And then

4    Section Capital B begins.  Do you see that, sir?

5    A     Yes.

6    Q     Okay.  So Capital B says subject to compliance with the

7    antitrust laws that Dodd Frank Wall Street Reform and Consumer

8    Protection Act of 2010 and any other applicable state or

9    federal law, nothing in this final judgment shall prohibit

10   MasterCard or Visa from -- and then there are numbered

11   paragraphs which explain what they're not prohibited from

12   doing, correct?

13   A     That is correct.

14   Q     All right.  So let's go down to subparagraph three.  So

15   nothing in the judgment shall prohibit them from -- paragraph

16   three -- enforcing existing agreements or entering into

17   agreements pursuant to which a merchant agrees -- and then

18   little sub (i), that it will encourage customers through

19   practices enumerated in other sections of the judgment to use

20   general purpose cards bearing the defendant's brand as payment

21   for goods and services.  So let's stop there.

22         So with would you agree that nothing in the judgment

23   prohibits MasterCard or Visa from enforcing agreements or

24   entering into agreements in which the merchant agrees that it

25   will steer customers to them, to Visa and MasterCard?

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                            4242

1   A    Yes, subject to the rest of the paragraph, but, yes,

2   that's what the first part says.

3   Q    Okay.  And, then, sub (i)(2) says nothing in the judgment

4   shall prohibit MasterCard or Visa from enforcing existing

5   agreements or entering into agreements, pursuant to which a

6   merchant agrees that it will not use one or more practices

7   enumerated elsewhere in the judgment, to encourage customers

8   to use general purpose cards bearing any other person's brand

9   as payments -- payment for good and service.  And then there

10  are some provisos, right?

11  A    Yes.

12  Q    What is your understanding of sub (2)(i)?

13  A    That in the circumstances that -- it's looking at things

14  as a pair; that, one, is saying here are the things you can do

15  to encourage the use.  And, then, two is saying and that when

16  you're doing that, you can also have as part of the agreement

17  that you won't do those things to steer to another brand,

18  subject to the later proviso.

19  Q    Okay.  So do you have an understanding of whether Visa

20  and MasterCard can pay merchants not to steer away from them,

21  as opposed to paying a merchant to steer to them?

22  A    On a limited -- I thought they have this thing -- they

23  have some part talking about some steering to them and some

24  away.  I guess in the extreme form, yes, it would suggest that

25  they could have payments not to steer away from them on the

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4243

1  limited basis identified by the rest, yes.

2  Q    And not otherwise?

3  A    I'm sorry?

4  Q    And not otherwise, other than the limited basis that's

5  stated here?

6  A    I -- well, this basis states what the limit is on how

7  much they're allowed to do it, subject to that limit.

8  Q    Okay.  Just ask you quickly about Australia, because it

9  came up, I think, in colloquy with the Court yesterday.

10         Australia is a situation where the national bank,

11  the reserve bank, issued regulations relating to merchant

12  surcharging, correct?

13  A    That's correct.

14  Q    So it was not an antitrust enforcement case by their

15  antitrust division, if there is one, it was a government

16  regulation that instituted merchant surcharging there,

17  correct?

18  A    That's right.  The antitrust would have been the ACCC,

19  which, I think, commented in the proceeding, but it was a

20  regulatory proceeding.

21  Q    Now, are you familiar a report that was issued by the

22  United States GAO, the Government Accountability Office, that

23  looked at and made comments about the reserve Bank of

24  Australia regulations?

25  A    I don't recall that.  I may have seen it, but as I sit

NICOLE CANALES, CSR, RPR

1   here, I don't recall that.

2   Q    Let me ask you to look at Defendants' Exhibit 3994.

3          MR. CHESLER:  This one, your Honor, was not in the

4   book because we didn't anticipate this question coming up.

5   We're going to hand it up.

6          THE WITNESS:  You can answer for me.  Thank you.

7   Q    3994?

8   A    Yes.

9   Q    You recognize this as a report of the GAO on credit and

10  debit cards?

11  A    Yes.

12  Q    It's dated, apparently, May 2008 in the upper left-hand

13  corner.  Do you see that?

14  A    Yes.

15  Q    Let me ask you to --

16         MR. CHESLER:  Just need to find the reference,

17  your Honor.  Just give me a moment.  I'm sorry, your Honor,

18  can we just have a moment?

19         THE COURT:  That's fine.  You're doing pretty good.

20         MR. CHESLER:  Thank you.

21             (Pause in proceedings.)

22         THE WITNESS:  I guess you're going to be looking in

23  the 30s.

24         MR. CHESLER:  Sorry, your Honor, it should be 7202.

25  I apologize, your Honor, turns out there were two GAO reports,

Katz - Cross - Chesler                                4245

1    both in May of 2008.  Got the wrong one.

2              THE WITNESS:  I have two copies of -- certainly from

3    the cover page and the numbering, they appear to be the same

4    report because they're both GAO08558.

5              MR. CHESLER:  May I approach the witness,

6    your Honor?

7              THE COURT:  Sure.

8              THE WITNESS:  They have different exhibit numbers,

9    but the GAO numbers are the same.

10   Q    Okay.  So the record is clear, I have now handed you a

11   copy of 7202, Defendants' 7202.  Do you have that?

12   A    I'm sorry.  Can I just ask -- it's quite odd that there

13   would be two reports from the GAO with the same number.  Can

14   you tell me what the difference is?

15   Q    I see that they have the same number, and I don't know is

16   the answer.

17   A    Perhaps they didn't have someone remind them of a number

18   that had already been used.

19   Q    Maybe.

20             MR. CONRATH:  For what it's worth, your Honor, they

21   look to me to be two different DX numbers.

22             MR. CHESLER:  No, they're not.  They're not the same

23   document.  But I have to say I don't know why.

24             THE COURT:  All right.  Let's move on.

25   Q    If you look at the second page of 7202, it's a page

NICOLE CANALES, CSR, RPR

Katz - Cross - Chesler                    4246

1    entitled "Credit and debit cards.  Federal entities are taking

2    actions to limit their interchange fees, but additional

3    revenue collection cost savings may exist."  Do you have that

4    page, sir?

5    A     Yes.

6    Q     Okay.  Down in the middle of that page, there's a

7    paragraph, second paragraph, under the heading "What GAO

8    found."  Do you have that?

9    A     Yes.

10   Q     It says several countries have taken steps to lower

11   interchange rates, but information on their effects is

12   limited.  Among the three countries GAO examined, regulators

13   in Australia and Israel intervene directly to establish limits

14   on interchange change rates, while Mexico's banking

15   association voluntarily lowered some rates.  Since Australia's

16   regulators acted in 2003, total merchant discount fees paid by

17   merchants have declined, but no conclusive evidence exists

18   that lower interchange fees led merchants to reduce retail

19   prices for goods.  Further, some costs for card users, such as

20   annual and other fees, have increased.

21          Then it goes on to talk about Mexico and Israel.  Do

22   you see that, sir?

23   A     Yes, I do.

24   Q     Do you have any reason to doubt the GOA's findings as of

25   May 2008?

NICOLE CANALES, CSR, RPR

1   A    No.

2   Q    And, in fact, sir, you understand that in the Australian

3   case, the Visa and MasterCard interchange fees were capped by

4   the regulations, correct?

5   A    That's my recollection.  They were regulated and limited

6   in some way.

7   Q    There's something no the Consent Decree between the

8   Department of Justice, and Visa and MasterCard that caps their

9   fees, is there?

10  A    Not that I recall ever seeing.

11          MR. CHESLER:  Your Honor, I have no further

12  questions.

13          Your Honor, before I step away, I'm told that figure

14  six from Dr. Katz' first report, which is Defendants'

15  Exhibit 6466, that I should be identifying that as 6466A,

16  offered just for illustrative purposes, and that I

17  neglected --

18          THE COURT:  That's table -- which table?

19          MR. CHESLER:  Figure six, from Defendants' 646.  And

20  also table 22, which I referred the witness to from the same

21  exhibit, we would offer that as 6466B, for illustrative

22  purposes only.

23          THE COURT:  Any objection?

24          MR. CONRATH:  No.  But if I could have a moment to

25  get the proper references?

Katz - Redirect - Conrath                    4248

1          MR. CHESLER:  Figure 6 and table 22.  Table 22 is B.

2          MR. CONRATH:  6266B.  No objection.  Demonstrative.

3          THE COURT:  DX6466A and DX6646B are received in

4    evidence as demonstrative exhibits.

5          (Defendants' Exhibit DX6466A and DX6466B  were

6    received in evidence.)

7    REDIRECT EXAMINATION

8    BY MR. CONRATH:

9    Q    Good afternoon, Dr. Katz.

10   A    Good afternoon.

11   Q    Could I begin by asking you to turn to your article in

12   the Journal of Economic Perspective with Dr. Shapiro, which I

13   believe is DX0229?

14   A    Yes.

15   Q    So could I ask you to turn to page 107 of Exhibit 0229,

16   please?

17   A    Yes.

18   Q    So I'm going to direct -- do you recall some questions

19   from counsel for American Express about this is the tipping

20   article?

21   A    Yes.

22   Q    And some questions specifically about the references to

23   Visa here?

24   A    Yes.

25   Q    I just would like to be clear about what you were talking

NICOLE CANALES, CSR, RPR

1    about here, so could we look at on page 107, the paragraph

2    second from the bottom that begins more generally.  And

3    this -- I believe that you were read this first sentence, but

4    I like to focus your attention on the last sentence in this

5    paragraph that talk about what Visa activities you were

6    discussing here.

7             Does it read:  "And Visa has had a long-running

8    advertising telling consumers that Visa cards are accepted

9    quote, "Everywhere You Want To Be," closed quote, whereas

10   merchants, quote, "Don't take American Express," closed quote?

11       Did I read that right?

12   A    Actually, I thought you missed a word, but, yes.

13   Q    All right.  And so when you were talking about the

14   possibility of tipping in connection with Visa, were you

15   discussing the part of this advertisement that talks about

16   don't take American Express, and they don't take American

17   Express?

18   A    You're talking about both parts.  It's the point that you

19   want consumers to be aware that you have a large network; and

20   to the extent that your competitors have smaller networks, you

21   also want consumers to be aware of that, so it's referring to

22   both parts.

23   Q    And you were not discussing Visa Preference or We Prefer

24   Campaign; is that right?

25   A    No, this was a different thing.  The preference

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                    4250

1    relationships are with merchants, and this is about the

2    advertising that Visas doing as a network.

3    Q    As far as you understand, the American Express

4    anti-steering rules don't have anything to do with whether

5    Visa can or cannot run advertising campaigns?

6    A    I don't see how they could.

7    Q    Could you turn to the previous page, please, of DX0229.

8    I'd like to direct you to the first full paragraph on that

9    page that begins "consumer heterogeneity."  Do you see that?

10   A    Yes.

11   Q    So counsel read you the first sentence here, which I will

12   read again.  "Consumer heterogeneity and product

13   differentiation tend to limit tipping and sustain multiple

14   networks."  And I'm going to go on to read the next sentence.

15        "If the rival systems have distinct features sought

16   by certain consumers, two or more systems may be able to

17   survive by catering to consumers who care more about product

18   attributes than network size."

19        Did I read that correctly?

20   A    I believe you did.

21   Q    So is the credit card networks' market one in which rival

22   systems have distinct features sought by certain consumers?

23   A    Yes.  The networks do, and the cards that they provide a

24   gateway to differ, yes.

25   Q    Is the credit card networks' industry one in which

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                    4251

1   merchants can use more than one credit card network?

2   A   Yes, it's quite typical for a merchant to accept multiple

3   networks, credit and charge cards.

4   Q   So one doesn't have to abandon one network in order -- if

5   one is a merchant, one doesn't have to abandon one network in

6   order to take another network?

7   A   That's correct.

8   Q   And is that a factor that's relevant to whether tipping

9   is a serious possibility in the credit card network industry?

10  A   Yes.  I mean, it's a factor that's been identified by

11  economists, generally.  It's what's known as multi-homing.

12  And we talked about single homing on the cardholder side and

13  to extent that that happens, although many cardholder

14  multi-home.  There's also multi-homing on the merchant side,

15  which is quite prevalent.  And as we were just discussing, it

16  means you don't have to pick between one and the other, and so

17  that greatly diminishes the tipping and makes it feasible --

18  or more likely that multiple networks will survive.

19  Q   You can put that aside.  I'd like to look at --

20         MR. CONRATH:  The exhibits, we just found the number

21  for.

22  Q   So I'd like to direct your attention to DX6466A, which is

23  your initial expert report and figure six.

24  A   Yes.

25  Q   All right.  Do you recall some questions about this from

Katz - Redirect - Conrath                    4252

1    counsel for American Express?

2    A    I recall I was asked questions.

3    Q    The blue line here is what's described as American

4    Express' effective discount rate overall, right?

5    A    That's correct.

6    Q    You were asked some questions about whether it was --

7    whether you included or not co-brand payments, right?

8    A    I certainly asked that.  I can't remember if it was in

9    conjunction with this or others.  But yes, I was asked about

10   co-brand payments and calculating discount rate.

11   Q    Would you explain to us why you thought it was

12   appropriate not to include co-brand deal payments in trying to

13   measure what you were trying to measure with this chart?

14   A    The central reason is co-brand payments were payments

15   precisely for that; they're payments for card issuance.  In a

16   way it's paying the merchant in its role as a distributor of

17   cards.  It's not something that's -- it's not a charge or a

18   negative charge having to do with the merchant acceptance.

19   Q    Do you recall that there was also some discussion of a

20   prepurchase of Delta SkyMiles.  Do you recall that discussion?

21   A    Yes.

22   Q    And that I think was also a payment from American Express

23   to Delta, buying some SkyMiles, and you thought that was also

24   inappropriate to include in the discount rate calculation you

25   were doing in Defendants' Exhibit 6466A; is that right?

1          MR. CHESLER:  Your Honor, objection.  The

2     questioning was about the use of the funds, not the payment

3     itself.  I believe the questions were very clear in that

4     record.  Then Counsel's question asked whether the witness

5     thought it was appropriate or inappropriate to include the

6     actual payment of the billion dollar prepayment.  That was not

7     the question.

8          MR. CONRATH:  I'm not sure I see the difference, but

9     I'll be glad to rephrase the question.

10         THE COURT:  Rephrase the question, if you like.

11         THE WITNESS:  I do see the difference.

12         MR. CONRATH:  There you go.  Once again I'm the odd

13    man out, your Honor.

14         THE COURT:  Roll with the punches.

15         MR. CONRATH:  I have a suspicion that I understand.

16         THE COURT:  Go ahead.

17    Q    You concluded that it was not appropriate to include the

18    use of the funds connected with the prepurchase of SkyMiles

19    as -- in calculating your estimate here of the effective

20    discount rate, right?

21    A    That's correct.

22    Q    And could you explain what was the reasoning behind why

23    you thought that was not the right thing to include?

24    A    Again, if I'm remembering it correctly, that prepurchase

25    was part of the competition to obtain the co-branding

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                    4254

1   agreement, and it was essentially a payment for the

2   co-branding, so, again, it was about obtaining card issuance.

3   Q    And the prepurchase of SkyMiles is something that

4   American Express has to do in order to just to run a Rewards

5   Program that includes offering Delta SkyMiles; is that right?

6   A    I don't know if they have to prepurchase it or not.

7   Certainly at some point they would have to purchase them.

8   Q    So if -- and just to be clear, if Delta gets some money

9   in connection with a co-brand payment or in connection with

10  the use of the money on prepurchase of miles, that doesn't do

11  anything to benefit other -- doesn't do anything to reduce the

12  discount rate that's paid by, say, United Airlines, if United

13  experienced a price increase at the same time; is that right?

14  A    That's correct.

15  Q    It certainly doesn't do anything to benefit a big box

16  retailer if they were facing price increases, trying to

17  recapture price increases at the same time?

18  A    That's correct.

19  Q    Now, I'd like to ask another question about this, because

20  this, the blue line, the overall average, American Express

21  discount rate, is relatively flat during the period you've

22  shown on your -- most of the period that's shown on this

23  figure six; is that right?

24  A    Yes, that's correct.

25  Q    And so how is it that the overall effective discount rate

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                    4255

1    is flat at a time when, as you've previously testified, value

2    recapture price increases were increasing prices to some

3    merchants?

4    A    I'd say we're increasing prices to some merchants, and

5    that's reflected, for example, in the T&E merchants line,

6    where value recapture was particular prevalent.  The other

7    thing that this line is capturing, though, it changes in

8    merchant mix.  And to extent of what's happened on a very

9    broad level, as we talked about earlier with counsel for

10   American Express, just as Visa and MasterCard were moving --

11   well, I -- let me step back.

12            Talked about earlier, counsel for American Express,

13   that American Express moved away from T&E and more into other

14   merchant categories and that trend has continued, and those

15   other merchant categories, even within non-T&E, they've been

16   moving into ones with lower discount rates.  So as the mix of

17   merchants changes the average discount rate associated with

18   that mix has been going down.

19   Q    All right.  So for purposes of your evaluation of the

20   value recapture price increases and what impact they had on

21   your opinion, is your evaluation of those price increases

22   diminished by the fact that the average American Express rate

23   overall remain flat during this period?

24   A    No, I was looking at the value recapture price increases

25   and trying to look with as narrow a focus as possible in order

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                                4256

1   to isolate those price changes from other things, because I

2   believe we talked about over the last two days, there can be a

3   variety of factors driving prices, and so that value recapture

4   analysis -- or my analysis of value recapture tended to focus

5   on those specific effects to isolate other effects such as mix

6   changes.

7   Q    Do you recall some questions from counsel for American

8   Express related to the proposition that American Express says

9   that today they do not have a premium versus Visa and

10  MasterCard?

11  A    Yes.

12  Q    If what has happened -- if that's true, and if what has

13  happened is that Visa and MasterCard rates have increased up

14  to American Express rather than American Express rates coming

15  down to Visa and MasterCard, is that -- the reason why that

16  gap has changed relevant to your consideration of America

17  Express' position in the market?

18  A    Well, as I said all along, if we're talking about rates

19  with Visa and MasterCard that affirms -- that have market

20  power, the fact that American Express had a particular premium

21  than relative to those firms was evidence as part of the

22  overall package of American Express possessing market power.

23  If it no longer has the premium at the present time, then by

24  definition the premium has not been served as additional

25  evidence, but certainly the fact that it had the premium up to

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                              4257

1    that point does.  And it could be relevant to understand what

2    was going on with MasterCard and Visa, but I would have to see

3    what it was that was driving their price increases.

4    Q    Do you recall some questions about a dog?

5    A    Actually, I don't believe we had questions about a dog.

6    I think I mentioned a dog.  Yes, there was a question.

7              THE COURT:  You mentioned the dog in one of your

8    papers.

9              THE WITNESS:  That's right.  Oh, no, it came up -- I

10   think you're the most important person to fill in at my

11   deposition.

12             THE COURT:  I'm glad you think so.

13             THE WITNESS:  So it was because of a discussion

14   about the loyalty, it came up in my definition.

15             THE COURT:  About the food, and the loyalty, and --

16             THE WITNESS:  That's right.  And then, without

17   meaning to disparage American Express, the analogy being that

18   rewards were being analogized to dog food, you have to keep

19   giving the cardholders the rewards in order to keep their

20   loyalty, just the way you'd have to keep giving the dog food.

21             THE COURT:  Go ahead.  What is it about this?  I

22   think we've gone as far as we can go with this.

23             MR. CONRATH:  Perhaps.  But I do have another

24   question.

25             THE COURT:  No, please.

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                                    4258

1   Q    So is it your -- let me ask you this, your analogy was

2   that if you keep feeding the dog, the dog remains loyal;

3   that's an analogy to rewards, so my question to you is can

4   insistence driven by continuing spending on rewards be a

5   source of market power?

6   A    Yes.  I mean, it's a source of market -- as my

7   conclusion, it's a source of market power for American

8   Express.  It's also a key source of market power for Visa.

9   And I think there's agreement among economic experts on Visa

10  having market power; and I believe if you look to see the

11  basis of that, there will have to be agreement that it's being

12  driven by the loyalty or insistence of Visa cardholders.

13         Take a nonpayment industry example, and it will be

14  an old one, because I'm going to talk about newspapers when

15  they had market power, but newspapers are also an example of

16  the two-sided platform because they bring together the

17  advertisers with the viewers and subscribers.  And it's

18  recognized in the past that newspapers could have substantial

19  market power with respect to advertisers, and the way they got

20  that market power is by attracting readers, which meant

21  continually having to invest in providing content that the

22  readers found attractive and, therefore, wanted to be in the

23  newspaper.

24         So it's the same mechanism, that you're attracting

25  the subscriber, and then that brings you the advertisers.  And

Katz - Redirect - Conrath                        4259

1  in the case of newspapers, again, before the rise of the

2  Internet, they often had substantial market power against

3  advertisers on the other side of the platform.

4  Q    Do you recall some questions about Amex bringing

5  competition on the issuing side during the *U.S. V Visa* time

6  frame?

7  A    Yes.

8  Q    So going back to that point, Visa and MasterCard were

9  owned by the banks that had a lot of overlap between

10 themselves; is that right?

11 A    Yes.

12 Q    And since then there's been *U.S. V Visa,* the court

13 decision, right?

14 A    Yes.

15 Q    And there have been IPOs with Visa and MasterCard, so

16 that they no longer have the same overlap of ownership that

17 they had before?

18 A    They have changed their corporate structure, so instead

19 of being associations, they're now corporations, but I have

20 not examined the ownership under this new corporate structure.

21 Q    Bank issuers today do compete with each other even if the

22 bank issuers are on the same network; is that right?

23 A    Yes, that's true.

24 Q    And did you happen to -- in your reading for the Court's

25 homework assignment of Mr. Silverman's testimony, did you

NICOLE CANALES, CSR, RPR

Katz - Redirect - Conrath                    4260

1   happen to see his testimony about the fact that competition

2   among -- the proposition that competition among issuers has

3   driven up rewards amongst a wide variety of issuers?

4   A    I'm not sure I recall the specific testimony.  Certainly

5   the -- I read a bunch of his testimony having to do with

6   rewards and competing by offering attractive rewards.

7   Q    Is it true today that different issuers of cards, not

8   just American Express, but lots of different issuers of cards

9   are competing with each other to provide the most attractive

10  rewards for consumers in order to attract cardholders?

11  A    They're certainly competing by offering what they hope

12  cardholders will consider to be attractive rewards, in order

13  to attract their business, yes.

14  Q    Even if it were true 15 years ago that American Express

15  was bringing a unique form of attraction for cardholders in

16  the form of rewards, today there are lots of issuers who are

17  bringing competition to attract cardholders through rewards

18  and other programs?

19  A    There was competition among issuers then there's

20  competition now, yes.

21  Q    Does the -- so -- the fact that there's competition on

22  the issuing side, does that mean that competition on the

23  merchants side is something that is unimportant?

24  A    No.

25  Q    Could you explain why not?

NICOLE CANALES, CSR, RPR

1    A    Well, the prices, the profits and consumer welfare, the

2    two-sided platform, are going to depend on what's happening on

3    both sides of the platform.  And competition on the merchant

4    side of the platform is going to be an important part in

5    determining that overall outcome.

6                THE COURT:  Mr. Conrath, I think this may be a good

7    time to break for lunch.

8                MR. CONRATH:  Sure.

9                THE COURT:  After lunch, we have about an hour left?

10               MR. CONRATH:  Probably about that, your Honor.

11               THE COURT:  All right.  And you anticipate that you

12   have very much on recross, at this point?

13               MR. CHESLER:  Not so far, your Honor.

14               THE COURT:  And so after Professor Katz' testimony

15   is completed, we'll take a ten-minute break, and then you'll

16   call your next witness after that.

17               MR. CHESLER:  Our first witness, your Honor.  We had

18   several in their case.

19               THE COURT:  I know that.  I wasn't going to correct

20   you, though, because I think I've done enough of that already.

21               MR. CHESLER:  As far as I'm concerned, your Honor,

22   that's where we are.

23               THE COURT:  That's good.  We'll take an hour for

24   lunch.  Thank you.

25               MR. CHESLER:  Thank you, your Honor.

1                          (Lunch recess.)

2              (Proceedings continued on the following page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N    S E S S I O N

2               THE COURT:  Be seated, everyone.

3               All right.  You may continue, sir.

4               MR. CONRATH:  Thank you, Your Honor.

5               THE COURT:  I remind the witness he's still under

6     oath.

7               THE WITNESS:  Yes.

8     M I C H A E L    K A T Z,   having been previously

9     duly sworn was examined and testified as follows:

10    REDIRECT EXAMINATION (Cont'd.)

11    BY MR. CONRATH:

12    Q    Professor Katz, could you turn to DX 7747 which was your

13    speech in Lisbon and I think it should be in the second

14    binder.

15    A    7747?

16    Q    That's right.

17    A    Yes.

18    Q    So, turn to the last page of DX 7747, if you would.

19    A    Yes.

20    Q    All right.  So, I think you said, but correct me if I'm

21    wrong, that at this time there was some discussion of whether

22    direct regulation of credit card network fees was appropriate

23    in Europe?

24    A    You're asking me if that's what I was saying in this

25    article?

1    Q    Yes.

2    A    I would have to look at the article to refresh my

3    recollection but that sounds right.

4    Q    Do you recall that there was a time when that was an

5    issue in Europe?

6    A    Yes.

7    Q    Okay.  I would like to direct your attention to the

8    sentence that is like the third sentence from the end of your

9    speech, "but I have yet to hear," do you see that?

10   A    Yes.

11   Q    Okay.  Let me read that and tell me if this is what you

12   said:  "But I have yet to hear a sound argument that as a

13   matter of course regulation is likely to lead to better

14   outcomes in two-sided markets than would competition subject

15   to competition policy oversight."

16            Did I read that right?

17   A    Yes, you did.

18   Q    Were you making the point in Lisbon that it is

19   appropriate to treat two-sided markets by relying on

20   competition subject to competition policy oversight?

21   A    That was one of the points I was making, yes.

22   Q    And that that was an appropriate answer superior to

23   regulation, is that right, direct regulation?

24   A    That's certainly what I'm saying there, that I hadn't

25   heard an argument otherwise.

1   Q    And does competition policy oversight include antitrust

2   enforcement?

3   A    Yes, the competition policy tends to be the word used

4   with European audiences but I understand it -- well, I

5   actually understand it to be slightly broader than antitrust

6   enforcement but largely synonymous.

7   Q    You recall some questions about tipping and the

8   possibility that Visa might do something and you acknowledged

9   that Visa -- you could imagine that Visa could do something

10  that was anti-competitive in the space of the credit card

11  network industry?

12  A    Yes.

13  Q    Is it correct that competition policy in this country,

14  actions by a dominant firm that harm competition are addressed

15  either by government enforcement, such as the U.S. v. Visa

16  case, or by private lawsuits or sometimes by legislation

17  rather than by private self-help action?

18  A    Those are certainly all possible responses, yes.

19  Q    Professor Katz, I'd like to direct your attention to

20  DX 4583 in the second binder.  These are some of the surveys

21  that counsel went over with you that relate to debit and

22  credit.

23       Do you have it there, DX 4583?

24  A    Yes, I do.

25  Q    Would you note the date that's on the front page of

Katz - redirect - Conrath                                    4266

1    DX 4583.

2    A    It says May 2009.

3         MR. CONRATH:  May we switch control of the screens,

4    Your Honor, although I don't think this document cannot be

5    displayed.

6         THE COURT:  All right.  Okay.

7    Q    And if we look at the next two pages of DX 4583, do you

8    see there are charts there that Mr. Chesler directed your

9    attention to and what years are encompassed in the data on

10   those charts?

11   A    The first two pages, it looks like the data are all from

12   2008 and 2009.

13   Q    And if I could test your memory of the -- let's test your

14   coordination, ask you to look at slide 41 in your slides.

15        MR. CONRATH:  Slide 41 could be public.

16        THE COURT:  What's that?

17        MR. CONRATH:  Slide 41 could be public.

18        THE COURT:  Do you have it?

19        THE WITNESS:  I do have it, yes, this one.

20        We have our copies.

21   Q    All right, that's fine.

22        What was happening to credit in the period 2008 and

23   2009 in general in the economy?

24   A    In general the volume of credit transactions, credit and

25   charge card transactions were falling over that period which,

Katz - redirect - Conrath                                    4267

1   as we talked about before, was the Great Recession and then it

2   started to recover at the end of 2009.

3   Q    Referring to slide 41, other than the period from 2008 to

4   2009, was there ever another year on the years covered on this

5   chart from 1990 to 2011 when credit card purchase volume

6   declined on year-over-year basis?

7   A    No.

8   Q    So, looking back at DX 4583, the document that you were

9   examined by counsel for American Express, you see a quote at

10  the top of the page that says:  "There has been a shift to

11  debit and Interlink as credit share volume and transactions

12  decline."

13         That quote refers to charts that measure activity

14  during the period of the Great Recession when credit generally

15  was declining, isn't that right?

16  A    Yes, generally that's right.

17  Q    Now, more generally the surveys here that we're looking

18  at relate to consumer behavior with respect to use of credit

19  and debit; is that right?

20  A    I said more generally -- if you could repeat.

21  Q    The data reported in DX 4583 relate to consumer behavior

22  with respect to credit and debit; is that right?

23  A    I mean I believe it reflects the behavior of both

24  merchants and their customers.  So, if by consumer you mean

25  their customers, that's certainly reflected in here.

1   Q    And it is relevant to the question of whether merchants

2   will continue to accept credit cards only in the ways you

3   described this morning that there's a joint decision by both

4   parties; is that right?

5   A    Yes, if I understand the question.  Well, if the question

6   is is customer behavior relevant in assessing the increases to

7   the merchant, the price increases to the merchant and it's

8   relevant as it factors through merchant behavior, yes, that's

9   correct.

10  Q    Professor Katz, you had some questions this morning that

11  related to the fact that AmEx sometimes bargains with

12  merchants, do you recall that?

13  A    Yes.

14  Q    Is it correct from an economic perspective that even a

15  monopolist may negotiate?

16  A    Yes.

17  Q    And why is that?

18  A    Well, I mean a monopolist, I'm assuming you're talking

19  about a profit maximizing monopolist, may not know the

20  willingness to pay of every one of its potential customers and

21  so it may engage in a bargaining process as part of getting to

22  a price that it thinks is an optimal price for dealing with

23  that particular customer and the bargaining process is a way

24  to do that.

25  Q    And that, if it's true of a monopolist, would that

1   principle also apply to a firm that has market power?

2   A     Yes.

3   Q     Go ahead?

4   A     Yes, I mean in fact for it to make sense to engage in

5   bargaining there has to be some reason you think there could

6   be a different outcome of the price.  If you were a perfectly

7   competitive firm, you would just look at what the market price

8   is, there would be no reason to bargain at all.  Yes, you

9   could see a firm with market power engage in bargaining.

10  Q     Does that include firms that have substantial market

11  power?

12  A     Yes.

13  Q     Do you remember a question the nature of which was if the

14  government were arguing that, then it described vertical -- a

15  certain treatment of vertical restraints under the antitrust

16  law, do you recall that?

17  A     I'm not sure which question you're asking.

18  Q     There was a question that Mr. Chesler asked you that said

19  if the government were arguing that vertical restraints were

20  only unlawful in certain circumstances, now do you recall that

21  question?

22  A     I mean the general gist of it, yes.  It was something

23  about only if it pertained to intra-brand competition and not

24  inter-brand but I don't remember the specific question.

25  Q     And actually I have a very narrow point for you which is

1    to say when you were answering that, you were answering it in

2    the if sense and you were not agreeing that Mr. Chesler had

3    correctly characterized the government's position, isn't that

4    right?

5    A    That is correct.

6    Q    Could you turn to DX 6507 which is your -- or maybe your

7    second report, if you prefer that volume.

8         If you would turn in DX 6507 to paragraph 148 please

9    on page 78.  Do you recall Mr. Chesler read you portions of

10   the first paragraph and perhaps the second to the proposition

11   that American Express is an important competitive check on the

12   exercise of market power by MasterCard and Visa; do you recall

13   that discussion?

14   A    Yeah, my recollection is that he read paragraph 148.

15   Q    Could you turn the page please to paragraph 150, and I

16   think this was not read to you but I'd like to have it also in

17   the record and ask you if this is also your opinion:

18        The fact that competition from American Express has

19   important consumer benefits does not give American Express a

20   free pass to engage in anti-competitive actions on the grounds

21   that those actions benefit American Express.  Indeed, this

22   fact has the opposite implication.  Weakening American Express

23   alone would be sufficient to have significant harmful effects

24   on competition and consumers, then it follows that weakening

25   competition among all credit and charge card networks, which

1  is the effect of American Express's merchant restraints, will

2  harm consumers by even more."

3          Did I read that correctly?

4  A    Yes.

5  Q    And is that an important corollary to the opinion you

6  expressed in paragraph 148?

7  A    Yes, I stand by the opinion, I guess you could say it's a

8  corollary.

9  Q    Do you remember some discussion with counsel for American

10 Express around the question of whether merchants are able to

11 determine what a particular Visa or MasterCard type of card

12 costs when it's presented?

13 A    Yes.

14 Q    I'd like to ask you some questions about that in relation

15 to economic principles.  Is it correct that it could be of

16 value to merchants to be able to determine how much a

17 particular Visa or MasterCard costs if the merchants could use

18 that information to steer customers?

19 A    Yes.

20 Q    All else equal, if merchants have no ability to steer,

21 there would be little reason for merchants to invest in

22 technology that would allow them to determine the costs of a

23 particular Visa or MasterCard, isn't that correct?

24 A    Yes, if you're saying as part of that did they know what

25 the average cost is, yes, because they would just have to

Katz - redirect - Conrath                                    4272

1   accept cards on average so that additional information would

2   not have any value that I can think of as I sit here.

3   Q    But if they did obtain the ability to steer amongst them,

4   then there might be reason for merchants to invest in

5   technology?

6   A    Yes.

7   Q    All else equal?

8   A    Yes.

9        THE COURT:  Are you saying that if a merchant knew

10  the relevant discount rates for different cards within the

11  Visa portfolio, that if he were presented with a Premier Visa

12  card which had a discount rate of three point something

13  percent, I don't know that that's the case but, that if the

14  merchant had the ability to steer to other cards, the merchant

15  might say, do you have an American Express Card, knowing that

16  the discount rate for that card was a lower rate?

17       THE WITNESS:  Yes, and I suspect a large

18  sophisticated merchant could have incentives to do that sort

19  of thing because the differences among the MasterCard and Visa

20  credit cards, I recall some of those differences are

21  significant.

22  Q    Professor Katz, do you recall some questions about your

23  testimony during U.S. v. Visa on the subject of American

24  Express and its market positions, its possession or not of

25  market power?

1   A    Yes, although that was a couple of hours ago, I have a

2   vague recollection, yes.

3   Q    Maybe I can refresh your recollection about that.

4             MR. CONRATH:  If I may approach, Your Honor?

5             THE COURT:  Yes.  Yes, you may.

6             MR. CONRATH:  Thank you.

7   Q    Professor Katz, I've handed you DX 0743.  These are

8   excerpts, pages 3581 and then page 3803 through 3804.

9             Do you have that?

10  A    Yes.

11  Q    This is your testimony before Judge Jones?

12  A    I don't know.

13  Q    Let me direct you to the particular question and answer

14  I'm going to ask and I'll ask if you recognize it.  I see that

15  it does not -- the excerpts we were able to copy do not have

16  your name on them, but look on page 3804 please, the first

17  full question and answer, do you see that?

18  A    Yes.

19  Q    And do you recognize that as your testimony?

20  A    Give me one minute to read it.

21  Q    Yes, of course.

22            (Pause.)

23  A    I believe this is my cross-examination, yes.

24  Q    And were you asked at that point the following question

25  and did you give the following answer:

*Katz - redirect - Conrath*                                      4274

1          "Question:     If the Corporate Card in fact

2    constitutes a separate market, is it a market American Express

3    is able to exercise market power?

4          "Answer:     I haven't fully analyzed it as a

5    separate market but it would be my opinion that American

6    Express would have market power."

7          And that was your view at the time of U.S. v. Visa?

8    A    My view, what I stated here at the time of my

9    cross-examination, yes.

10         MR. CONRATH:  One moment, Your Honor.  (Pause.)

11         One moment.  I'm sorry, Your Honor.

12         THE COURT:  No problem.

13         (Pause.)

14   Q    Do you recall some questions, Professor Katz, about

15   your -- a variety of questions in fact about your testimony in

16   United States versus First Data?

17   A    Yes.

18         MR. CONRATH:  May I approach, Your Honor?

19         THE COURT:  Yes, you may.

20   Q    (Handing.)

21   A    Thank you.

22   Q    I have handed you, Professor Katz, PX 2711 which is

23   defendant's pretrial memorandum in this case and I'd like to

24   direct your attention to page 83.

25   A    I'm there.

1  Q    All right.  Do you see at the top of the page -- sorry, I

2  was on the wrong page.  The problem was mine.

3        At the bottom of page 83 it has a quotation from

4  you, do you see that?

5  A    Yes, I do.

6  Q    All right.  And this is a quotation that you were read

7  this morning and you answered questions about this quotation;

8  do you recall that discussion?

9  A    I'm not sure I recall being read this and being told it

10  was a quotation but I had questions on something similar to

11  this.

12  Q    All right.  Well, let's try to get at that.  In the first

13  sentence here it says:  "It is impossible to calculate any

14  harm to consumers from changes in -- and then there's a word

15  in brackets, it says discount rates without considering both

16  sides of the market."

17        Do you see that?

18  A    Yes, I do.

19  Q    And a little bit later in that it refers to the effects

20  of, and again discount is in brackets, discount fees on

21  consumer welfare, the effects of discount fees on consumer

22  welfare can be understood by looking solely at the merchant

23  side of the market; is that right?

24  A    That is what it says, yes.

25  Q    All right.  Could we look at your expert -- the citation

Katz - redirect - Conrath                                              4276

1    here is to your expert report in U.S. v. First Data; is that

2    right?

3    A    That's correct.

4    Q    Could we look at your expert report in U.S. v. First Data

5    which is DX 7183.

6    A    I'm guessing it is volume one.

7    Q    Yes, I think so.

8    A    I'm sorry, could repeat the number please.

9    Q    DX 7183.  I'd like to ask you to direct your attention to

10   paragraph 156 in DX 7183.

11   A    Yes.

12   Q    So, if you look at that, the relevant sentence that's

13   quoted there in paragraph 156 of DX 7183, were you in fact

14   talking about discount rates in that paragraph?

15   A    No, what I said in the paragraph, both places where the

16   word "discount" appears in square brackets I was talking about

17   the interchange rate.

18   Q    All right.  Can you clarify for us whether it makes a

19   difference whether one is referring to an interchange rate or

20   a discount rate?

21   A    It makes a huge difference for these purposes because

22   with an interchange rate, which is what I was talking about in

23   my report, by definition it is a pass-through the network

24   passes through, so that when the interchange rate goes up, the

25   merchant is paying more and the cardholder side of the market

1    is paying less.  That's what the interchange is doing, it is a

2    transfer from one side to the other.  It is impossible to

3    raise the interchange to the merchant without then having an

4    equal and offsetting effect of interchange on the other side

5    because that's the definition of interchange is a payment from

6    one side to the other.  And so, what I was testifying to in

7    the First Data case is saying, well, it doesn't make sense to

8    say here's what happens when you raise to one side and

9    simultaneously lower to the other side and look only at the

10   one side.

11        Now, in talking about a merchant discount, it's

12   certainly correct, the interchange is the biggest portion but

13   there are other pieces and because of those other pieces such

14   as the network fees it certainly is possible to raise the

15   merchant discount without affecting the price on the other

16   side, whereas that's a logical impossibility in the case of

17   changing just the interchange rate.  So, it is a very

18   significant difference, it is just a different meaning.

19   Q    And so, your criticism in the expert report in the First

20   Data case, your criticism of Professor Ordover who was at that

21   point the government's witness, was that the theory of raising

22   interchange rates inherently involved evaluation or a rate

23   that had affected both sides of the market; is that right?

24   A    Yes, the interchange inherently affects both sides and

25   therefore you should take that into account when assessing the

Katz - redirect - Conrath                                            4278

1    effects of a change in the interchange rate.

2    Q    In this case is your theory that the harm caused would be

3    a raise in interchange rates?

4    A    It is my testimony that as a result of the harm to

5    competition which then reduces the sensitivity to price on the

6    merchant side but that that will raise what the networks will

7    keep but I also anticipate that that would have an effect on

8    the interchange as well by affecting the balance.

9    Q    So, your testimony is that if the merchant discount rates

10   go up, have gone up as a result of the reduction in

11   competition, some of that stays with the network and doesn't

12   pass through to the other side, is that right?

13   A    That's correct.

14   Q    And all of the many quotations that you were read

15   concerning First Data were in the context of your criticizing

16   Professor Ordover for a theory that was about interchange

17   rates only; is that right.

18   A    That's my recollection as I sit here.  I was read several

19   quotations but that's my recollection.

20   Q    Do you recall being asked some questions about the

21   U-shaped charts, the charts that showed usage of credit and

22   debit at a variety of retailers that we didn't -- whose names

23   we didn't mention?

24   A    Yes.

25   Q    And you also looked at some variations of those charts

Katz - redirect - Conrath                                    4279

1   done by Professor Bernheim, is that right?

2   A    Yes.

3   Q    Could you turn please to those charts which are at

4   DX 7761.  I think it's in the second binder.  Do you have

5   those?  And can you also get from your slides slide 45 which

6   is the version that is from your report.

7           (Pause.)

8           All right.  Do you have that?

9           So, let's start with asking you questions about

10  slide 45 of the slides that you presented in your direct.

11  So, the bars on this chart that reflect people who used

12  credit cards either exclusively or in some mix are all the

13  bars except the far right-hand bar; is that right?

14  A    That's correct.

15  Q    If you were doing a hypothetical monopolist test

16  encompassing a SSNIP on the question of whether merchants can

17  drop credit cards if there were a SSNIP, what of these bars

18  would you consider that a merchant should focus on in

19  evaluating whether to drop credit cards?

20  A    I mean I think the merchant should take into account all

21  of the bars in thinking about it because it is providing

22  information to the merchant about how its customers view the

23  different payment instruments.  Certainly if I were the

24  merchant though, I would have concerns about the people who

25  have used credit exclusively but also the people who almost

1  always use credit as well is my concern as a merchant is that

2  those are people who would spend less in my establishment if I

3  no longer accepted credit and charge cards.

4  Q    And for those people who had used some of both, the

5  merchant would have to consider them because those might be

6  people who, for instance, are making particular types of

7  purchases, always used credit cards, for example,

8  prescriptions might be a lot more expensive than sundries,

9  than shampoo?

10 A    Yes, that's certainly a possibility.

11 Q    You looked at the data that created slides 45, 46 and 47

12 from three merchants; is that right?

13 A    That's correct.

14 Q    And AmEx's expert eventually looked at five, is that

15 right?

16 A    I don't recall as I sit here but there are five that were

17 shown to me earlier today.  I can't remember if he did -- I

18 know he did at least five.

19 Q    That was a better question, thank you.

20      And I want to be clear, you testified that the

21 reason you looked at three was that these kind of analyses are

22 quite expensive?

23 A    Yes.

24 Q    During the questioning do you recall that counsel for

25 American Express tried to call attention to the fact that

Katz - redirect - Conrath                                4281

1  certain -- well, let's -- actually I need to clarify what's in

2  Dr. Bernheim's charts.

3          So, if we could look at the first page, the first

4  page that's in your binder, it's actually page 12 of DX 7721;

5  what's on the left, correct, is what is -- the blue bars are

6  bars taken from your analysis, the analysis that you did, is

7  that right?

8          MR. CHESLER:  Excuse me, Your Honor, I think counsel

9  misspoke, I think counsel said 7721, it is 7761.

10         MR. CONRATH:  Yes, thank you.  I appreciate that.

11 Let me start again so I don't have a muddled record.

12 Q    In DX 7761, page 12, there are two pairs of bar charts;

13 is that right?

14 A    Yes.

15 Q    And the one on the left is taken from your bar chart that

16 was used with -- that is in this case, your slide 47; is that

17 right?

18 A    I don't know, we'd have to look.  I mean it certainly

19 says that it used the same threshold number of transactions

20 and refers to the matching we did to use BIN data but I don't

21 know whether there are other things he did to the data that

22 might be different.  It's not labeled as reporting the exact

23 numbers I did.  I'd have to go check to see if that's what

24 they are.

25 Q    And a difference is that the percentages, the two bars in

Katz - redirect - Conrath                                    4282

1   Professor Bernheim's chart where he's looking at loyalty cards

2   with two transactions, the percentages add up to 100 percent

3   and they reflect -- they basically exclude consumers who used

4   only debit; is that right?

5   A    That's certainly a difference, yes.

6   Q    All right.  And the additional analysis done by

7   Dr. Bernheim was with cardholders who you had at least ten

8   transactions and that's the green bars; is that right?

9   A    Yes.

10  Q    So, first, do you recall that counsel tried to draw

11  attention to the fact that the two which are the last two that

12  were merchants that you didn't focus on, as he said, had a

13  higher number who used both general purpose credit cards and

14  debit cards than the ones you referenced, do you recall when

15  he tried to call attention to that fact?

16  A    Yes, I think it was either showing that it was a higher

17  percentage but yes.

18  Q    A higher percentage, you're correct.

19        So, we didn't mention the numbers yesterday but

20  because the identities are not disclosed I think I can

21  actually mention the numbers, I just want to call out just how

22  significant or not that difference was that counsel was

23  calling attention to.  So, the highest number in that column

24  for ten transactions among the three that you looked at was

25  70, is that right, 70 percent?

Katz - redirect - Conrath                                    4283

1    A    I'm sorry, the highest --

2    Q    So, look at the highest --

3    A    You're saying the highest percentage for those who used

4    general purpose credit and charge cards and debit?

5    Q    Yes?

6    A    Yes.

7    Q    That's 70.  And the ones counsel was calling attention to

8    that were higher are 75 and 76; is that right?

9    A    Yes.

10          THE COURT:  And that's using Professor Bernheim's

11   methodology, is that it, of ten or more transactions?

12          MR. CONRATH:  Yes.

13          THE COURT:  Go ahead.

14   Q    Now, looking at DX 7761 and these bars, I'm going to ask

15   you again to consider if a merchant was -- or if you were

16   doing a Hypothetical Monopolist Test or, more precisely, if

17   you're thinking about what customers a merchant would need to

18   keep in mind if it was thinking about dropping all credit

19   cards, of the two bars, the ones who used only general purpose

20   credit cards or the ones who used both general purpose credit

21   cards and debit, which bar is more important to the merchant?

22   A    I'm sorry, are you asking me if I'm thinking about -- if

23   I were a merchant and asking myself the question which

24   customers do I think would be more at risk if I were to drop

25   acceptance of general purpose credit and charge cards, it

1   would be, picking between the two bars, it would be the bar of

2   people who used them exclusively.

3   Q    And looking at the percentages on those bars, if we look,

4   for example, at the first merchant, the one on page 12 of

5   DX 7761, of the two groups that are reported here, what this

6   reports is that 35 percent of those customers who came to the

7   store at least ten times and always used credit, is that what

8   this first bar means, the first green bar means?

9   A    Yes.

10  Q    And that's something a merchant would have to take

11  seriously into account in thinking whether the merchant should

12  drop all credit cards; is that right?

13  A    I mean it should take it into account, yes.

14  Q    And the other percentages range from 24 to 35; is that

15  right?

16  A    I thought we looked at the -- I think the other ones

17  range from 24 to 34.

18  Q    And those are of people who came to the store at least

19  ten times and used only credit; is that right?

20  A    That's correct.

21         THE COURT:  Can I just interrupt for a minute.  On

22  the last area of questioning about where there was an issue

23  about the interchange fee changing, that has an effect on

24  merchants and then you said on the other side of the equation

25  it would have an effect on the customer.

1          THE WITNESS:  Yes.

2          THE COURT:  And how would it manifest itself if the

3    interchange fee increased?  I know how it manifests itself

4    with regard to the discount rate that affects the merchant.

5    How does that manifest itself with regard to the customer?

6          THE WITNESS:  So, a slight complication.  Let me

7    start with taking it back to First Data because it is a little

8    clearer.  I believe there, I may be wrong, I think there the

9    focus was on the customer actually being the debit card issuer

10   because you remember, right, we've got the five steps, so

11   sometimes in these cases we look what -- usually people ignore

12   the acquirers because it is so competitive, they just sort of

13   pass things through.

14         THE COURT:  You mean the acquirer who is the

15   connection to the network from the merchant?

16         THE WITNESS:  That's right but sometimes we end up

17   focusing on the link between the network and the issuer and

18   talk about the issuers as customers and in fact in U.S. v.

19   Visa my testimony was that the issuers wouldn't have somewhere

20   else to go if the network raised fees to them, if I'm

21   remembering it correctly.

22         THE COURT:  The issuer meaning like a bank, like

23   Chase or Citibank?

24         THE WITNESS:  That's right.  The reason I want to

25   start with that is so when the interchange rate goes up, it

Katz - redirect - Conrath                                        4286

1  means you're charging more to the merchant side but then by

2  definition you're giving more to the issuer and then what

3  you'd expect is the issuers would then pass some of that on to

4  their cardholders but the immediate effect is that the

5  merchant side goes up and then the issuer side goes down by

6  exactly the same amount.

7          THE COURT:  And how would the issuer pass that along

8  to the cardholder?

9          THE WITNESS:  So in the case of --

10         THE COURT:  By increasing the interest rate or some

11 other means?

12         THE WITNESS:  So, in the case of credit and charge

13 card networks one of the ways you would see it is when the

14 issuer was getting paid more by the network for each dollar of

15 charge volume, it might increase its rewards for example.

16         THE COURT:  So that would benefit the cardholder?

17         THE WITNESS:  Yes, and that was the point I was

18 making in the First Data case.

19         THE COURT:  I see.

20         THE WITNESS:  You're taking money from one side and

21 passing it to the other and so you should think about that

22 effect.

23         THE COURT:  I see.  Okay.  Thank you.

24 Q    Professor Katz, I'd like to direct your attention to

25 DX 7580 which I believe is in your second binder and which is

Katz - redirect - Conrath                                    4287

1   the government's competitive impact statement that was

2   discussed with you on cross.

3   A    Yes.

4   Q    Would you turn please to page 14 of DX 7580.  Do you have

5   that?

6   A    Yes.

7   Q    All right.  Do you recall that you were read the first

8   paragraph on that page concerning merchants that accept only

9   Visa or MasterCard?

10  A    Yes.

11  Q    I think you were not read the second paragraph and I'd

12  like to read it to you and ask if you agree with it.

13          "Merchants that accept American Express cards,

14  including the vast majority of the major retailers in the

15  United States, will be unable to influence customer's payment

16  methods because the anti-competitive American Express merchant

17  restraints will continue to constrain those merchants pending

18  the outcome of this litigation.  American Express stands as

19  the last obstacle to achieving the full benefits of

20  competition now suppressed by the challenged merchant

21  restraints."

22          Do you agree with those observations as well,

23  Professor Katz?

24  A    Depends on the interpretation of that last sentence.  My

25  conclusion in my analysis is that while on paper Discover

*Katz - redirect - Conrath*                                      4288

1    rules could be the last obstacle, as a practical matter they

2    will not be a binding constraint.

3            MR. CONRATH:  Your Honor, I don't want to let the

4    moment pass without reminding you that you might have

5    questions about Professor Katz's Silverman homework, if you

6    had things you wanted to follow up on, I don't want to leave

7    that, but that concludes my questions.

8            THE COURT:  All right.  I think that's sufficient.

9            MR. CONRATH:  That we've gotten there.

10           THE COURT:  I think we're there.

11           Anything else from the defense?

12           MR. CHESLER:  No questions, Your Honor.

13           THE COURT:  All right.  The Professor is excused.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  Have a nice day.  Have a good trip home.

16           THE WITNESS:  Thank you.

17           THE COURT:  You may stand down.

18           (Witness steps down.)

19           THE COURT:  A couple of things, we're going to take

20   a ten minute break, and police up the materials here but

21   before we did that, there are two things; one is does the

22   government have any additional witnesses on its case?

23           MR. CONRATH:  Just the one from who has been ill who

24   is scheduled I think for August 11.

25           THE COURT:  Apart from that?

4289

1          MR. CONRATH:  Apart from that, we do not.

2          THE COURT:  Apart from that, the government rests?

3          MR. CONRATH:  I think we also have some documents

4    that we'll offer when we find ourselves at the end of a day

5    after we've resolved as many objections as we can resolve but

6    those two things are what remains in our case, Your Honor.

7          THE COURT:  All right.  Very good.

8          Before we go any further I just want to remind

9    everyone that the Court agreed that during the government's

10   case for the purposes of efficiency the American Express

11   company witnesses that the government called were also

12   questioned by the defense on direct so that they wouldn't have

13   to come back, so some of the defense case has already been

14   heard, principal defense case has already been heard during

15   the, in effect, the cross-examination of some of the American

16   Express witnesses.

17         Isn't that right, Mr. Chesler?

18         MR. CHESLER:  Yes, Your Honor.

19         THE COURT:  Okay.  So, there may have been some

20   people who didn't hear that at the beginning of the trial, I

21   just wanted to make it clear that that's how we decided to

22   proceed which is a little unusual but I think for purposes of

23   a bench trial of this complexity it was appropriate.

24         All right.  So, we'll begin your presentation in ten

25   minutes.

4290

1          MR. CHESLER:  Thank you, Your Honor.

2          THE COURT:  You're welcome.

3          (Time noted:  2:50 p.m.)

4          (Recess taken.)

5

6

7          THE COURT:  Please be seated.

8          Yes, sir.

9          MR. CONRATH:  If I may introduce a colleague who

10   hasn't been at the table before, Mark Ryan.

11          THE COURT:  Welcome.  Are you from Washington too?

12          MR. RYAN:  I am, Your Honor.

13          THE COURT:  Welcome to New York.

14          MR. RYAN:  Thank you.

15          THE COURT:  Mr. Chesler, you may call your witness.

16          MR. CHESLER:  Thank you, Your Honor.  We call

17   Kenneth Chenault.

18          (Witness takes the stand and is sworn by the clerk.)

19          THE CLERK:  Please have a seat and please state and

20   spell your full name for the record.

21          THE WITNESS:  Yes, Kenneth Irvine Chenault,

22   K E N N E T H, I R V I N E, C H E N A U L T.

23          THE COURT:  You may inquire.

24          MR. CHESLER:  Thank you, Your Honor.  May I approach

25   the witness with some documents?

*Chenault - direct - Chesler*                                    4291

1          THE COURT:  Yes, you may.

2          MR. CHESLER:  (Handing.)

3          THE WITNESS:  Thank you.

4    K E N N E T H    C H E N A U L T, having been first duly

5    sworn was examined and testified as follows:

6    DIRECT EXAMINATION

7    BY MR. CHESLER:

8    Q    Mr. Chenault, you're employed by American Express

9    Corporation?

10   A    Yes, I am.

11   Q    And what is your position there?

12   A    I'm Chairman, Chief Executive Officer.

13   Q    And how long have you been at the company, sir?

14   A    For 33 years.

15   Q    And how long have you been the Chairman and Chief

16   Executive Officer?

17   A    For 12 years.

18   Q    Just briefly would you just describe for the Court --

19   A    Actually 13.  It sounds like it's a lot of fun.

20   Q    Before that 13-year period, would you just briefly

21   describe for the Court what your positions were as you moved

22   through the company?

23   A    Yes, I joined the company in September of 1981 as the

24   Director of Strategic Planning and that was sort of a middle

25   management position and I served in that position for I think

*Chenault - direct - Chesler*                    4292

1    two and a half years.  Then I went to run a marketing area in

2    what was at that time called the Merchandise Sales Division

3    that sold merchandise through the mail and I was Vice

4    President of Marketing; then a year and a half later became

5    Senior Vice President of Marketing; a few years later became

6    Executive Vice President and General Manager of the Gold Card/

7    Platinum Card Group; then became Executive Vice President-

8    General Manager of the Personal Card Group, and then was

9    promoted to President of the U.S. Consumer Card Group, served

10   in that position for several years, and then became Vice

11   Chairman of the company and received responsibility for our

12   U.S. and international businesses and at that time the area of

13   the company was called Travel Related Services, that had the

14   card business, travel business, travelers check business.  And

15   then I believe in 1997 I was promoted to the position of

16   President and Chief Operating Officer of the company, and then

17   in January 2001 became Chief Executive Officer of the company

18   and in April of 2001 I became Chairman of American Express.

19   Q    And at about the time you became the President and Chief

20   Operating Officer of the company, were you also elected to the

21   Board of Directors?

22   A    Yes, I was.

23   Q    Just tell the Court what your educational background is,

24   sir.

25   A    I went to Bowdoin College in Brunswick, Maine and Harvard

Chenault - direct - Chesler                                    4293

1   Law School.

2   Q    And what did you do after getting out of law school?

3   A    I went to Rogers & Wells and then I went to Bain &

4   Company, a consulting firm, and then I came to American

5   Express in 1981.

6   Q    So, you've been at the company about 33 years?

7   A    33 years, yes.

8   Q    Just in your own words describe for the Court please what

9   the business of American Express is?

10  A    We are in the payments services business and we in fact

11  are focused on meeting the payment needs of our customers but

12  we're also in what I call the services business in that we use

13  the payments platform to provide a range of services to

14  consumers, to merchants, to corporations, to small businesses

15  and so it's very important to emphasize the service aspect of

16  our business.

17  Q    And in that connection, do you describe the business or

18  at least part of the business as a closed loop?

19  A    Yes.  What's very important to understand is American

20  Express operates a unique business model in that we have an

21  integrated payments platform which means that we acquire

22  merchants, we do merchant processing, we are a network, we're

23  an issuer processor and we issue cards and what's critical to

24  understand is the information and data that we have because it

25  is a very interdependent model and what is critical is that we

1    actually have a very strong link with our cardmembers and our

2    merchants and the information and data that we have in this

3    integrated differentiated model is very, very important and

4    unique in the payments industry.

5    Q    I take it you compete, among others, with Visa and

6    MasterCard?

7    A    We certainly do.

8    Q    How does their model in connection with the closed loop

9    that you've just described, how does the Visa-MasterCard model

10   differ?

11   A    In essence, Visa and MasterCard are a network and so they

12   do not acquire merchants and they do not acquire cardmembers,

13   so it is a fundamentally different model from ours.  It is not

14   an integrated model, it is not an interdependent model with

15   cardmembers and merchants.

16   Q    What types of cards does American Express offer?

17   A    We offer a wide variety of cards.  From a category

18   standpoint, we offer charge cards that are pay in full

19   products.  We offer reloadable prepaid cards where you load

20   funds into the card, your funds into the card.  We offer

21   revolving credit cards.  We offer co-brand cards.

22   Q    You also offer corporate cards?

23   A    We offer cards to small businesses, to medium size

24   corporations and to large corporations.

25   Q    And what is a co-brand card?

*Chenault - direct - Chesler*                                    4295

1   A    Co-brand is really a partnership with a company where

2   both of the companies' brands are on the card and in fact we

3   provide the credit to the customer, we provide the marketing,

4   we provide the customer service.  From a rewards standpoint,

5   we also pay for those.

6   Q    Now, does American Express have some cards that are

7   actually issued by banks?

8   A    Yes, we do, we have a business that we call Global

9   Network Services.

10  Q    Or GNS sometimes?

11  A    GNS is really what we commonly refer to it.

12  Q    And what is that business?

13  A    That business is where banks will issue cards on our

14  network and it's branded with our blue box, so it has the

15  acceptance mark of our company, American Express.

16  Q    How many banks are there in the United States today that

17  issue American Express cards?

18  A    Nine banks.

19  Q    Do you know approximately how many banks there are that

20  issue Visa and MasterCard cards?

21  A    10,000 or more.

22  Q    Does American Express function as a closed loop with

23  respect to the GNS issued cards?

24  A    Yes, we do.

25  Q    And how do you do that given that they've been issued by

1   a bank?

2   A    What we have is, as I said, we have the information of

3   the merchant spending on the card.

4   Q    Now, beyond just completing a transaction, what value do

5   you believe American Express offers to its cardmembers?

6   A    I think what I would start with fundamentally is what the

7   American Express brand represents is trust; trust, integrity

8   and service, that's really what has built our company over 164

9   years.  So, the affinity with our brand is very, very

10  important.

11  Q    You also offer your cardmembers rewards programs?

12  A    We have made substantial investments in our reward

13  programs and those programs are critical because, back to the

14  integrated model and one of the things I talk about to more

15  simply describe this integrated interdependent model is the

16  chicken and the egg, and the reality is we need more cards to

17  get more merchants, we need more merchants to get more cards

18  and I've been very clear, I don't know who's the chicken or

19  who's the egg but you need both, it is critical that you meet

20  the needs of both of those groups and so rewards plays a very,

21  very critical role because it gives the customer a reason to

22  use the card because fundamental to our model in the

23  integrated model is spend and we need welcome acceptance which

24  is a fundamental promise going to trust that is critical.

25          Rewards also create demand, not just at a particular

1    merchant but for all merchants it creates that demand.  So,

2    rewards plays a very important role.  Customer service plays a

3    very important role for us because what we believe is that

4    personal recognition and providing a high level of service

5    also correlates into increase loyalty and increase spending

6    and what's very important here is we want customers who will

7    engage in responsible spending and that is critical that we

8    service those customers, that's why we invest and innovate in

9    our customer service very strongly and it is why since 2007 we

10   have won the J.D. Power Award each year.

11   Q    What do you mean by responsible spending in that last

12   answer, sir?

13   A    Well, I think what's critical again in our model is it's

14   a charge card, it's a pay in full product and that financial

15   discipline is very, very important, customers pay at the end

16   of 30 days, and what that builds into our psyche of our

17   customer is a level of responsibility.  We don't want

18   customers who are going to spend above their means.  What we

19   want, because it's critical to the positioning of our product,

20   it's important to our economics for both the cardmember and

21   the merchants, we want customers who will spend in a

22   responsible way.  We also want customers that are highly

23   creditworthy.  And so, from a financial economic standpoint,

24   only 15 percent of our revenues are generated from revolving

25   credit products which is fundamentally different from a bank

1   card and is another reason why we're able to create demand for

2   merchants because with a revolving credit card the customer is

3   using some of their discretionary dollars to service debt and

4   so with us those are dollars that they can spend in a

5   responsible way which also increases demand back to the

6   chicken and the egg that I've talked about.

7   Q    Let me ask you a few questions about your rewards

8   program.  The name of it is the Membership Rewards, correct?

9   A    Yes, Membership Rewards, it first started off as

10  Membership Miles and came out in 1991.

11  Q    Do you have cups up there?

12  A    Yes.

13  Q    So, it was originally called Membership Miles, then it

14  was renamed Membership Rewards at some point?

15  A    Yes.

16  Q    I take it there are merchants who are in the Membership

17  Rewards program at which a cardmember can redeem her rewards;

18  is that correct?

19  A    Yes.

20  Q    Are those the only merchants who in your view benefit

21  from the Membership Rewards program, those where they

22  participate in the redemption program?

23  A    No.  In fact, what's important, because this was one of

24  the products that I actually led the development of,

25  Membership Miles, and the concept from the beginning was

1    really giving customers a benefit when they use the card to

2    give them a reward for using their card.  What was also very

3    important was to give them flexibility and choice, to give

4    them a range of redemption options which we really have

5    expanded substantially but also not just to give the benefit

6    to the merchant participant in the reward program.

7              So, what you have with Membership Rewards in

8    essence, and it really has built to that, is think of a

9    concept of a virtual currency, if you will, and so any

10   merchant where our card is accepted and used benefits from

11   Membership Rewards because of the increased demand and that

12   was fundamental to the creation of the program.

13   Q    Now, has there in more recent years been a modification

14   or enhancement to the Membership Rewards called Pay with

15   Points?

16   A    Yes.

17   Q    What is that?

18   A    Yes, Pay with Points is a very exciting innovation and I

19   would just emphasize that what is critical in a competitive

20   marketplace is that you're constantly innovating and what is

21   exciting about Pay with Points is it brought an early concept

22   of virtual currency to life and it gives the customer

23   tremendous flexibility and choice and increases the demand

24   even more for merchants.  So, what it means is you could

25   decide I, in fact, am going to engage in the following set of

1   spending activity, all right, I want to go on a trip at this

2   time or I want to buy a merchandise item at this time.  Unlike

3   some airline reward programs where you have a blackout, you

4   can in fact use Membership Reward points to pay for that trip,

5   to pay for that merchandise and you can simply decide -- you

6   don't even have to decide at the point of sale, you can decide

7   when you get your statement that I want to pay with points.

8           So, that has become now one of the most popular

9   redemption categories because of the choice and optionality

10  that we provide to the cardmember and the benefits to all

11  merchants are there is increased demand because cardmembers

12  are saying, boy, this is a program that has incredible utility

13  and flexibility.

14  Q    So, you can decide to pay part of your bill, for example,

15  with cash or check, whatever, and part of it with points?

16  A    Yes.

17  Q    And is there any limitation on which items on the bill

18  you can apply the points to?

19  A    No.

20  Q    Now, with respect to the rewards program, do you have

21  features where at times purchases at particular merchants will

22  trigger a multiplier of point reward rather than one point per

23  dollar?

24  A    Yes, there could be certain categories, it could be

25  supermarkets, it could be gas stations, it could be at a

Chenault - direct - Chesler                          4301

1    particular merchant where you can earn multiple points and

2    what's very important is when you then can earn those multiple

3    points, it really results in the cardmember receiving a

4    discount and so even though they may just earn those points in

5    a certain category or at a certain merchant, their capacity to

6    spend more from a discretionary standpoint has increased and

7    that benefits all merchants.

8    Q    I take it that the company incurs costs in connection

9    with the rewards program, is that fair?

10   A    Yes, it is a very costly program.  It's probably our most

11   significant cost item but, again, what we believe fully in our

12   integrated model that it differentiates us in the marketplace

13   and provides substantial value to the cardmember and to the

14   merchant.

15   Q    You create accounting reserves for the rewards that are

16   issued to your cardmembers when they buy on the card, is that

17   right?

18   A    Yes.

19   Q    Now, you actually have to pay for those points when the

20   rewards are later redeemed, correct?

21   A    We absolutely do.

22   Q    Over time, particularly in recent years what kind of

23   adjustments, if any, have you had to make to the reserves for

24   rewards in light of the redemption rules?

25   A    We've made substantial adjustments and I think what is

*Chenault - direct - Chesler*                                    4302

1   important in this program and it is something that I

2   emphasized in our company and outside our company from the

3   beginning is historically there have been a number of reward

4   programs where in fact people, meaning companies did not

5   particularly focus on the engagement of the reward program, it

6   was more promotional.  What I emphasized from the beginning

7   is we want to offer real value in everything we do to our

8   customers and one of the most important metrics that we need

9   to follow is we want engagement and so one of the things I got

10  from people inside our company as well as sometimes investors

11  is, boy, it looks like your costs are going up, engagement is

12  going up and what I say is that's terrific because that means

13  our customers are seeing value in the rewards program and our

14  merchants are benefiting from the increased demand.

15  Q    Now, are you familiar with provisions in the American

16  Express agreements with its merchants that are called

17  non-discrimination provisions?

18  A    Yes.

19  Q    From your vantage point, what is the purpose of those

20  provisions?

21  A    What is absolutely critical and fundamental when I talked

22  about our brand and trust, the most damaging thing that can

23  happen to the American Express brand is when our cardmember is

24  discriminated against at the point of sale.

25  Q    Why is that, sir?

1  A     Because we've made a promise and we've told them that

2  they will receive welcome acceptance and trust, as I said

3  earlier, is one of the most important attributes of our brand

4  and has been for over 164 years.  So, welcome acceptance is

5  the cornerstone of our business model.

6  Q     You've described the business model of the company as a

7  spend-centric model?

8  A     Yes.

9  Q     How is that distinguished from the basic model of your

10  competitors, Visa and MasterCard?

11  A     Spend is really the engine that drives our company and

12  what I have consistently emphasized is the moment of truth is

13  when our customer pulls their card out of their wallet and

14  they use it.  So, spend really drives it.

15            Now, as I mentioned earlier, our economic model is

16  really based on spend which is fundamentally different from a

17  bank card model which is based on lend and that's why I said

18  earlier only 15 percent of our revenues are achieved from

19  lending products but one of the points that I also make in our

20  lending business and have made to investors when they've

21  asked, well, what's the objective of lending, I said our

22  objective is to get spend.  So, our orientation, our strategy

23  is a differentiated strategy and is very different from a

24  lendcentric model.

25  Q     Do you track, does the company track the degree to which

*Chenault - direct - Chesler*                          4304

1    your cardmembers tend to spend more at merchants than your

2    competitor cardmembers do?

3    A    Yes, that's a very important metric for us.

4    Q    I'd like you to look in the book I've put up there at a

5    document, the tab should be DX 7743.

6              I'm sorry, I asked you for the wrong exhibit.  I

7    apologize, my mistake.

8              How, in your experience, does the level of spend of

9    your cardmembers compare, I don't mean specific numbers but

10   generally how does it compare to the amount that Visa and

11   MasterCard members are spending on their cards with merchants?

12   A    It is substantially higher on average than the amount of

13   spending of Visa and Master cardholders.

14   Q    Do you do anything -- you said you want your members to

15   spend responsibly, you want people of means who are spending

16   within their means; do you do anything to try to ensure that

17   those are the cardmembers that you have?

18   A    Yes, we have put together very sophisticated models that

19   help us sort out those prospects that we believe will spend in

20   a responsible way and will also be creditworthy and that was a

21   very, very strong focus for us.

22              (Continued on next page.)

23

24

25

Chenault - Direct - Chesler                    4305

1    Q    And do you track your default rates, the rates of debt

2    that are not repaid by your card members?

3    A    Yes.  And we consistently have best performing credit,

4    because of our focus, and that's not only on our charge credit

5    card products, which, obviously, is the bulk of our portfolio

6    in our business but also our lending products.

7    Q    Let me turn to the merchants for a moment, since you were

8    talking about the card member.  What sorts of services does

9    American Express provide to the merchants who accept your

10   cards?

11   A    Well, we provide a range of services.  One, we provide a

12   range of data services to them, because we can help them

13   analyze their business and that is very, very critical.  So,

14   for example, with airlines, we might help them on their route

15   structure from the analysis that we're able to do.  With

16   restaurants, we have been able to help them basically focus on

17   where would be the best places to open up restaurants.  So

18   what's critical is that the analysis that we're able to do for

19   them is important.

20         Second thing we do is we work with them in a range

21   of targeted marketing programs, and this is where we can

22   really bring the closed loop to life, and we can model out and

23   say people who have had purchases in certain merchandise

24   categories have a propensity to purchase more in other

25   categories.  Or to say you're selling items in this category,

1    the capacity of this customer to buy more is actually higher.

2    What I would emphasize is we do not give out any personal

3    information or data.  So this is done by looking at like types

4    of customers and segments, but from a targeted marketing

5    standpoint, we're able to do a range of marketing promotions

6    for our merchants.

7            Third is in the area of fraud management, and I

8    think, clearly, everyone knows that fraud in our society, in

9    our overall economy, is a major problem.  Billions dollars are

10   lost due to fraud.  And because of the closed loop that we can

11   connect the merchant data and the card member data, that gives

12   us unbelievable insights into where that fraud takes place,

13   and so I think what we're doing is helping the economy

14   overall, whenever you reduce fraud losses.  What's also

15   important is it's helping our merchants and it's helping our

16   card members.  And our fraud loss rates are 50 percent less

17   than Visa and MasterCard.

18           Another area that's important for us is that we have

19   client relationship managers, and what their task is -- and

20   these are several hundred people.  Their task is to work very

21   closely with merchants to understand what are their business

22   needs?  What are their marketing needs?  How can we help them

23   grow their business?  And to have a dedicated group that will

24   really understand what the particular needs are of larger

25   merchants.

Chenault - Direct - Chesler                    4307

1      And the last one would be the point that I made
2  starting off, is the opportunity to affiliate with our brand,
3  because our brand does stand for something, and it says to our
4  card members this is a place that you can feel comfortable
5  going to; Amex is behind it, is supporting it.  And it's also
6  helpful to the merchant in attracting customers who are using
7  our products and the benefits we have provided them.
8  Q    Saving with the benefits to merchants for another few
9  minutes, do you have a program called "Smart Offer"?
10 A    Yes, we do.
11 Q    Would you describe that to the Court, please?
12 A    That is a very, very exciting program, where what we've
13 done is really harness the elements of the closed loop from a
14 digital and technology standpoint that benefits merchants and
15 card members alike.  So let me just give you a few examples
16 and just talk briefly about how it works.
17 Q    Uh-huh?
18 A    So, for example, we did a program with Whole Foods.  And
19 the way this program works is that you opt in, meaning you
20 register to come in; and based on your activities and your
21 spending categories, we actually can work with the merchant to
22 then personalize the offer.  So if you think about this, the
23 amount of marketing dollars that you got to do in a
24 scattershot manner, we actually can personalize those
25 marketing messages.  So that's the first key point.

Chenault - Direct - Chesler                    4308

1        So in the case of Whole Foods, they wanted to build

2   traffic into their stores, and so -- but they wanted to target

3   it, so there are different options.  You can say I'm going to

4   invite everyone to come in; that's going to be pretty costly.

5   Or I'm going to target the program.  So we targeted the

6   program.  And the way it worked is if you went to Whole Foods

7   three times, you got $50.  But here was the benefit of the

8   closed loop and the digital capabilities that we put in:  One

9   is the card member didn't have to carry a coupon.  It was

10  coupon less.

11       We could alert them to the offer on their mobile

12  phone but they could forget about it.  But if they went to

13  Whole Foods, made their purchase, were there for three times,

14  nothing had to happen at the cash register.  For the merchant,

15  they didn't need to train anyone.  The cash register didn't

16  have to know.  The cashier didn't have to know at all.  So if

17  you think about the cost of training, the marketing expense

18  and being able to target that, all that happened was the card

19  was swiped.

20       The intelligence then went into our system because

21  we have to authorize the charge, right, and we have this

22  interdependency between the merchant and the card member.  We

23  would send an alert, often to the card member.  Maybe the card

24  member forgot.  It then shows up on the statement.  So this is

25  a real example of harnessing the value and the capabilities of

Chenault - Direct - Chesler                    4309

1    the closed loop.

2          We've recently done an offer with Best Buy.  You

3    spend $250, you get $25 back.  Works the same way.  We had an

4    offer with JCPenney; you spend $50, you get $10 back.  So

5    what's critical for anyone who's engaged in marketing, the

6    more segmentation and targeting you can do, the more you can

7    be personal, you're then not only saving money, you're

8    creating a stronger relationship with that customer.  That

9    customer is saying that's giving value.  The benefit to the

10   merchant is that it's seamless.  They don't have to change

11   their processes and procedures, their POS terminals, it just

12   happens.  And other merchants benefit, so it's not just Whole

13   Foods, or Best Buy or JCPenney that gets the benefit, the

14   savings that the card member has incurred, they now have

15   increased discretionary money to spend in a responsible way.

16   Q    Let me go back just for a moment to the consumer side.

17   In addition to rewards, you offer other benefits to your

18   cardholders' card members, correct?

19   A    Yes.

20   Q    So just very briefly for the Court, purchase protection,

21   travel protection, what are those?

22   A    Purchase protection is that if you buy an item, its

23   stolen or damaged, up to 90 days from the time that you bought

24   that item, you can get it returned or repaired.  So it enables

25   the customer to shop with a level of security and is viewed as

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                    4310

1   a very, very positive benefit.  Travel protection works very

2   much the same way.

3   Q     Now, all of these benefits you've been describing, both

4   to the consumers and to the merchants, I take it that there

5   are costs associated with those for the company; is that fair?

6   A     Absolutely.

7   Q     Why do you spend all that money on these benefits?  Why

8   not just process the transactions, collect your fee from the

9   merchants, and score it up as profits?

10  A     You clearly need to focus on what I was saying; that we

11  have a differentiated business model that is an integrated

12  payments model.  What is absolutely essential to make this

13  work is the chicken and the egg.  I need to, in fact, have

14  customers who will use my card product at the merchant.  I

15  need to generate spend for the merchant, because that helps

16  them grow their business.  And if I'm doing that, I'm offering

17  the merchant more value and the card member is being welcomed

18  in that merchant.

19          So for us, this is a virtuous circle, that it is

20  absolutely essential that I'm meeting needs of this

21  interdependent group.  They can't survive without each other,

22  in my model.  I've got to take care of the card member, and

23  I've got to take care of the merchant for it to work.  And

24  I've got to fund that, because I'm not running just a one-line

25  business, I'm running an integrated business with a

Chenault - Direct - Chesler                    4311

1   differentiated business model.  And as I said earlier, what's

2   driving our model is spend, responsible spend on the part of

3   our card members.  So I got to meet the needs of my card

4   members and my merchants.

5   Q    Now, there's been some talk here at the trial, some

6   testimony about the fact that your merchant fees, your

7   discount rate is typically set as a percentage of the amount

8   of the transaction at the merchant, correct?

9   A    Yes.

10  Q    And so some of the testimony's been, well, if there's

11  inflation and the merchant prices go up, then you collect more

12  money because you're getting a percentage of the total

13  transaction price.  Do you understand that?

14  A    Yes.

15  Q    What happens to the costs that you're incurring -- for

16  rewards, fraud protection, travel protection, purchase

17  protection, targeted marketing for the merchants, all the

18  programs you talk about, if the inflation is it driving up the

19  merchant prices, what's happening to your costs?

20  A    My costs are going up.  That's the reality; my costs are

21  going up.  And here's the other point:  We're in an intensely

22  competitive environment, so clearly with inflation, my costs

23  go up.  But I'm not operating in a vacuum, I'm operating in an

24  intensely competitive environment.

25  Q    Could you just fund all of your rewards and your

Chenault - Direct - Chesler                    4312

1   different programs by money you collect on the card member

2   side of the business?

3   A    No, I've got an integrated model that -- what I can't do

4   is say -- I can take an action on one lever and it doesn't

5   matter to the other, it matters to the chicken or the egg,

6   what I do.  And so the thought that I could implement a

7   strategy on one part of the business would destroy my ability

8   to continue to fund the investments needed to drive my

9   differentiated business model.

10  Q    Based on all of your years in the company, Mr. Chenault,

11  is American Express a must-carry card?

12  A    We are an a discretionary card.  We do not have the

13  ubiquity and the size of Visa and MasterCard.  You ask me how

14  many bank card issuers we have.  We got 9.  They got 10,000

15  plus.  They got a billion cards.  I got fewer than 55 million.

16  They got 9 million merchants.  I got around 6.  I mean, I am

17  dwarfed, so we are swimming in a sea of bank cards.  So the

18  reality is that a merchant who wants to be in business and

19  offering plastic has zero choice but to accept Visa and

20  MasterCard.  They are not in business.

21       A customer knows, if I'm going to use plastic, I got

22  to have MasterCard and Visa.  What I have to do is I have to

23  persuade a merchant and persuade a customer that they should

24  carry our card.  The way I do that is the way companies in

25  many industries operate, is I offer a differentiated product

NICOLE CANALES, CSR, RPR

1    and service.  And my job is to convince them, and to deliver

2    on this, better value; because they are not required to use

3    me, and that is a fundamental difference between MasterCard

4    and Visa and us, is any merchant will tell you, if I want to

5    be in business accepting plastic there is no choice but to

6    accept MasterCard or Visa.  When it comes to us, there's a

7    choice, and that is in evidence by the fact that there are 3

8    million merchant locations out there that have said we're not

9    going to accept American Express.

10   Q    Now, I'll come to this a bit later, but we've heard

11   testimony, including testimony this morning, that, yeah, there

12   may be 3- or 4 million location that's accept them and not

13   you, but they're all small and they don't really matter.  Do

14   you agree with that?

15   A    Absolutely not.

16   Q    If you know, what -- approximately what percentage of

17   your customers are so-called small customers, that is, your

18   current merchant customers are so-called small merchants

19   today?

20   A    98 percent, so they're the same size.  And the reality is

21   that 98 percent of the total of our merchants represent the

22   same size.  So the reality is that those merchants have

23   clearly decided; they have freedom of choice, that they're not

24   going to accept us.  And those merchants matter because

25   coverage matters.  Perception of coverage is very important.

Chenault - Direct - Chesler                    4314

1   Q    We'll come back to that.  When you say that the
2   98 percent of your merchants are the same size, same size as
3   the ones who don't accept you?
4   A    Yes.
5   Q    We'll come back to the merchants who don't accept you.
6   Let me ask you to look -- I hope I got this one in the book.
7   PX -- PXs are further down in the book than the DXs.  PX2528,
8   I think it's the last document in your book.
9   A    Yes.
10            MR. CHESLER:  Your Honor, I believe this is already
11   in evidence and came in during Mr. Silverman's testimony.
12   Q    What is this -- starting on the second page, titled "U.S.
13   Consumer Services Strategy and Product Update from
14   November 2013," what is this?
15   A    It's an update on the Consumer Services Strategy and
16   Product Update, and I frequently get updates of this nature on
17   the business.
18   Q    And if you look at the cover page, the e-mail on the
19   cover page, on the subject line toward the top it says "Final,
20   November 7th, Ken," deck.  Are you the Ken that's referred to
21   there?
22   A    I'm sorry.  I was looking at the page after.
23   Q    Yeah.
24   A    So this is the e-mail to me.
25   Q    Yes.  Are you the Ken that's referred to --

Chenault - Direct - Chesler                    4315

1   A    Yes, I am.

2   Q    Okay.  Now, would you look at slide five, please, in this

3   deck.  That's the page that has a Bate's number that -- stamp

4   number at the bottom that ends 203?

5   A    Yes, I see it.

6   Q    So this one is entitled "Chase," correct?

7   A    Yes.

8   Q    Chase's strategy.  And the first bullet says "Chase is

9   copying our playbook, making inroads in penetrating the

10  affluent segment while growing overall spend share."

11          I take it Chase refers to the Chase Bank?

12  A    Yes.

13  Q    And they're an issuer?

14  A    Correct.

15  Q    On what networks does Chase issue cards?

16  A    On MasterCard and Visa.

17  Q    And what does it mean when you're told that they're

18  copying your playbook?

19  A    What we have clearly seen, particularly after the U.S.

20  Government brought their case is --

21  Q    Which case?

22  A    This was the U.S. Government against Visa and MasterCard

23  in 2000 that I was actually asked to testify in by Joel Klein.

24  And one of the key points was that if we were allowed to issue

25  cards with banks, the Justice Department felt very strongly

Chenault - Direct - Chesler                    4316

1   that even though we were a small player that we would be able

2   to dramatically change the competitive marketplace, and that

3   there would be more competition and innovation in the

4   marketplace.  What has happened is that the bank cards have

5   become more competitive, but what also happened is that Visa

6   and MasterCard increased their interchange rates to, in fact,

7   enable the banks and encourage the banks to offer rewards and

8   premium products.  So this model that you reference that we

9   use, they said we've got to replicate that model, and we need

10  to, in fact, replicate Amex's strategies so that we can gain a

11  position in the affluent segment.

12          MR. CHESLER:  Your Honor, I think we have to switch

13  the system over.

14          THE COURT:  Oh, sure.

15          MR. CHESLER:  Thank you, your Honor.

16  Q    Now, is Chase the only issuer that is copying your

17  playbook, Mr. Chenault?

18  A    A number of issuers are copying our playbook.  I think it

19  is very, very clear that our strategies and tactics are being

20  replicated by a number of players, not just the bank cards but

21  MasterCard and Visa.

22  Q    And when it says they're making inroads and penetrating

23  the affluent segment while growing overall spend share, are

24  they growing spend share only among affluent segment or more

25  generally?

NICOLE CANALES, CSR, RPR

1   A    Both.

2   Q    Now, were the bank issuers competing in this way, copying

3   your playbook, back in the '80s and '90s, before the

4   competition among issuers started?

5   A    No, it was not in this way at all.  In fact, exactly what

6   Joel Kline and the Justice Department said would happen, that

7   as a result of Amex being able to work with the banks, because

8   of the elimination of the exclusionary rule, that there would

9   be a tremendous level of procompetitive activity that would

10  benefit the consumer.  And he made it very, very clear to me,

11  when he said we're not doing this for your company at all,

12  this has nothing to do with your company, we're doing this for

13  the market place and the consumer.  And we believe, though,

14  that Amex can play a primary role in driving competition, even

15  as a small player against the dominant networks.  And history

16  would serve him well here.

17  Q    Let me ask you to turn to slide 17 in the same document,

18  please.  That's at the page that ends 215.

19  A    Yes.

20  Q    So this one is entitled "Becoming a more inclusive

21  brand."  It says we have an opportunity to unlock growth while

22  becoming a more inclusive blunt brand.  Then there are

23  subheadings, financially underserved, mass affluent and

24  affluent.  Do you see that?

25  A    Yes.

Chenault - Direct - Chesler                    4318

1    Q    So what is this referring to with respect to the

2    financially underserved and the references -- one references,

3    for example, the Blue Bird at the bottom of that side of the

4    chart?

5    A    I think what is very important -- and if you permit me,

6    it might be useful to go back in a little bit of history on

7    the company.  One of the points that I emphasized is that we

8    have through our history been focused on a range of customers

9    segments.  And if you think about the traveler's check

10   business, that was a business that I've emphasized in our

11   company that had no income requirement at all, and it played a

12   major role in building our brand.  It was also a product that

13   was built on trust.  Clearly you needed to have trust to carry

14   around a financial instrument that you thought people would

15   accept and would make good on.

16            And what's exciting about Blue Bird, which Blue Bird

17   is our co-branded product with Walmart and Serve is that there

18   are 70 million Americans who are unbanked.

19   Q    What does that mean, unbanked?

20   A    Meaning they do not have a checking account.  And so we

21   believe that this is a group that is underserved by existing

22   institutions.  If you have a -- if you don't have a checking

23   account, you pay several hundred dollars a year just to get

24   basic services.  And what we said is -- we said we've got a

25   differentiated business model.  We have got this closed loop,

Chenault - Direct - Chesler                    4319

1    and we can offer a more attractive product financially.  So we

2    dramatically reduced the fees on these reloadable prepaid

3    cards.  But what we also did was we put this product also on a

4    digital mobile platform, so you can operate it like a physical

5    card.  You can also operate it on your mobile phone.  And

6    what's important about this is -- the term that we've coined

7    is, "It is expensive to be poor in this country."

8            So we're focused on financial inclusion, and we

9    believe very strongly that we have products and services --

10   and the Blue Bird product and the Serve product are products

11   that we are making substantial investments in to provide

12   capabilities and services.  Now, what's important, just to

13   give you one example, is that you've got to pay an exorbitant

14   amount to cash a paycheck, and for that privilege of paying an

15   exorbitant amount, you just go to Bed-Stuy, you go up to the

16   Bronx and you can wait online for 45 minutes on a Friday.  And

17   we've had our executives do that so they, in fact, could

18   understand the experience that these people were going through

19   and are going through.

20           Now, what we can do is not just meet some of their

21   basic financial needs of helping them pay their bills; they

22   can load their paycheck in, is they can now use this card on

23   the Internet.  They were deprived because they could not

24   qualify for a credit card.  Now, the option for us on the

25   other side was to say we're going to get into the subprime

Chenault - Direct - Chesler                    4320

1    business and offer exorbitant interest rates to these

2    customers.  Some of them wouldn't be able to qualify for that

3    card.  And what's important here is this is totally consistent

4    with our spend-centric strategy, because we're giving

5    customers the right type of product for their needs.  So this

6    customer's getting excellent customer service, purchase

7    protection that you mentioned.  This customer's getting that

8    also because we value the needs.

9           Now, they're not getting all the services that we

10   would give a Centurion card member, because that economic

11   balance is not going to work, but we're making a fundamental

12   difference in their lives, as we are serving the mass affluent

13   and we're serving affluent customers.  And I believe very

14   firmly that our company, American Express, must have products

15   and services that meet a range of customers' needs, and we're

16   very excited about what we're doing with serving people.

17   Q    Generally speaking, how does the merchant fee -- when a

18   customer uses a Serve Card, for example, to do a transaction,

19   how does that fee compare to a fee on the traditional Amex

20   Cards?

21   A    It's lower.

22   Q    Substantially lower?

23   A    Yes.

24   Q    Would you look at slide 39, please.  That's page 237, the

25   same document.  The title says "Reinvigorating platinum value

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                     4321

1    approach and tactics."  Do you see that?

2    A    Yes.

3    Q    What does platinum value mean?

4    A    Platinum value means the services and the benefits that

5    we have on the Platinum Card.

6    Q    And why were you focusing on reinvigorated that value?

7    A    Because what was happening, as we just talked about, is

8    that our strategies and tactics were being replicated.  As a

9    result of the Visa MasterCard increasing their interchange

10   rates, the bankrupts were, in fact, increasing their funding

11   and investment in coming out with services to compete with us.

12   So whether it was reward programs or other types of benefits

13   and services, literally, you could go through our playbook, as

14   Josh indicated in his deck, and they were just taking the

15   pages out.  But they were also funding those investments

16   largely from the increase in the interchange rates.

17   Q    Now, in -- on the merchant side, we've talked about Chase

18   and other issuers taking your playbook or taking pages out of

19   your playbook on the card member side, the consumer side.

20   Have they been trying to duplicate features of your closed

21   loop on the merchant's side?

22   A    Yes.  The reality is that they have been active in

23   building up capabilities in trying to buy companies that can

24   perform some of the analysis or develop some of the

25   capabilities that will allow them to do more targeted

Chenault - Direct - Chesler                    4322

1  marketing; that will allow them to provide certain services

2  that are very similar to what we do.  From a client

3  relationship standpoint, I talked about we had a I group,

4  well, they all of a sudden created dedicated groups working

5  with merchants, so, again, exactly what Joel Klein and Justice

6  Department said would happen.  There was more competition at

7  the -- with the networks, and there was more competition at

8  the bank card level, and consumers really got far more

9  benefits.

10 Q    Before we go to another topic, let me just pick up on

11 your comment about Mr. Klein.  You mentioned that you

12 testified as a government witness in *U.S. V. Visa*; is that

13 right?

14 A    Yes, I did.

15 Q    And were you prepared through your testimony before you

16 came to court to testify?

17 A    Yes, I was.

18 Q    And in the context of that preparation, did you have

19 direct face-to-face conversation, one or more, with then

20 Assistant Attorney General Klein?

21 A    Several.

22 Q    What, if anything, did he tell you about your role or the

23 significance of American Express testifying in that case?

24 A    What he said to me is -- he said, Ken, it's very

25 important that you emphasize that American Express has a

NICOLE CANALES, CSR, RPR

1    differentiated business model, because it's important to drive

2    more competition in the market place, and that is something

3    that I want you to do, is tell the story.  Talk about your

4    model, that it is different, because what's critical is to

5    have increased competition and to have more innovation in the

6    marketplace.  And he was particularly focused on making the

7    market more procompetitive, but it was also very focused

8    because he said I believe that there are going to be more

9    changes in technology, and so it's going to be critical that

10   that competition in the market be more open.  And so he asked

11   me to really emphasize those points.

12          MR. CHESLER:  Your Honor, I'm going to move to a

13   different topic.  May we take five minutes?

14          THE COURT:  Why don't we take a ten-minute break.

15                (Recess in proceedings)

16          THE COURT:  Please be seated.

17          Let me just say it's a pleasure to have Mr. Chenault

18   in my courtroom today.  He is a person of great stature in our

19   city and irrespective of the issues in this case, which are

20   being aggressively litigated, sir.

21          THE WITNESS:  That's what I understand.

22          THE COURT:  You know, the fact is that quite

23   independently of all that, it's a pleasure to have you here.

24          THE WITNESS:  Thank you, your Honor.  It's a

25   pleasure for me to be here.

Chenault - Direct - Chesler                    4324

1          THE COURT:  Well, I don't know about that.

2          THE WITNESS:  I can think of other things I might

3    do, but --

4          THE COURT:  There goes his veracity.  Only kidding.

5    Go ahead.

6    Q    Mr. Chenault, just one clean-up question on the subject

7    we were just talking about, you talked about the Blue Bird

8    product and the under-banked issue.  There was another product

9    named on that chart called "Serve."  I want you to explain to

10   the Court what Serve is, because you described your answer in

11   terms of Blue Bird.

12   A    Yes.  Serve is a reloadable prepaid card also that is

13   meeting the needs of the under-banked.  And I think what's

14   important to understand, just as with charge cards and credit

15   cards, it's useful to have segmented products.  And so the

16   Blue Bird product is a co-branded card with Walmart, obviously

17   is available to anyone who wants to acquire it.  But what

18   we're also doing with Serve is that that is a product that --

19   we're working with a range of retailers in the U.S. right now,

20   although we hope to expand on an international basis, that

21   provide that product.

22          And it really is broadly targeted at the

23   under-banked and underserved.  And we believe similar to Blue

24   Bird that it's meeting a real customer need and demand out

25   there, and it's doing it in a way that is attractive to the

Chenault - Direct - Chesler                    4325

1    customer, from a pricing stand point, and also will generate

2    us appropriate economics, so we think it's going to be a

3    win-win.

4    Q    Moving to another topic, do you, as part of your

5    responsibility, track and have people inform you of America

6    Express' share of spend in the United States and around the

7    world?

8    A    Yes.  As I said, spend, that's the engine for this

9    company.

10   Q    Let me ask you to look at Defendants' Exhibit 7789.

11   A    I have it.

12   Q    And are you familiar -- you see at the bottom of this

13   chart, it refers to Nilson Report, are you familiar with the

14   Nilson Report?

15   A    Yes.

16   Q    Your experience, the people at American Express use them

17   to collect data about the industry?

18   A    Yes.  That's an industry report that we review

19   frequently.

20   Q    You see that this chart is entitled "Amex's purchase

21   volume share for general purpose credit and charge cards."

22   And I just inform you these numbers do not include debit

23   volumes, just so you know that.

24            So I want you to focus on the left-hand side of this

25   chart, particularly the years 1990 to 1995.  Do you see those?

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                    4326

1    A    Yes.

2    Q    Now, according to this, the share of general purpose

3    credit charge card volume for American Express in those years

4    dropped by about a fifth of the whole business; is that

5    correct?

6    A    Yes.

7    Q    So from 24 percent and change to a little over 19 percent

8    during those 5 years?

9    A    That's correct.

10   Q    And, then, in the middle period, between those verdict

11   dotted lines, from about '95 to 2003 it looks like it was

12   essentially flat; is that consistent with your experience?

13   A    Yes.

14   Q    And then from 2003 on, basically to the last ten years or

15   so, up through 2012, it's been climbing, more or less, as

16   indicated there.  Is that also consistent with your

17   experience?

18   A    Yes.

19   Q    You mentioned earlier that you have this GNS business,

20   the business where banks are issuing cards on the American

21   Express network, correct?

22   A    Yes.

23   Q    So as of today, about what percentage of America Express'

24   share spend is due to the GNS issued cards?

25   A    Around 1 percent.

Chenault - Direct - Chesler                    4327

1   Q    One percentage point?

2   A    Point.

3   Q    So, for example, if the 2012 number looks like

4   26.4 percent, so if you deductible out the cards that are

5   issued from the nine banks, it would be about 25 percent

6   change?

7   A    Yes.

8   Q    Would you look at 7790 in your book?  Should be the next

9   tab.

10  A    Yes.

11  Q    This says Amex's purchase volume share for general

12  purpose credit and charge debit and prepaid cards, correct?

13  A    Yes.

14  Q    Also based apparently on Nilson Reports?

15  A    Yes.

16  Q    Now, this one shows a sort of steadily declining share,

17  from about 24 percent in 1990, to less than 14 percent in

18  2011.  Is that also consistent with your understanding, as you

19  looked at and tracked the company's shares over time?

20  A    Yes, it is.

21  Q    When did American Express first enter the payment card

22  business?

23  A    In 1958.

24  Q    And what was the company's first product, if you know?

25  A    It was a charge card.  It was actually made out of paper,

Chenault - Direct - Chesler                    4328

1   and sort of had a white, sort of purple, coloring.

2   Q    Was it targeted at some particular segment of the

3   population?

4   A    It was really targeted at the business traveler, and so

5   it really had more of a business, travel and entertainment

6   orientation.

7   Q    And did American Express, from around that time, have

8   nondiscrimination provisions in its agreements with accepting

9   merchants?

10  A    Yes.

11  Q    Now, if the early days, I know this is before you got to

12  the company, but I that I can take it you've made an effort to

13  become familiar with the history of the card business through

14  your 30-odd years with the company?

15  A    Yes.

16  Q    In the early days of the card business, did American

17  Express have any competitors who were issuing charge cards?

18  A    Yes, we had two major competitors.

19  Q    Who were there?

20  A    Carte Blanche and Diners.

21  Q    Were those cards also targeted at particular segments of

22  the business?

23  A    They were targeted at the business traveler, and travel

24  and entertainment category.

25  Q    Were they also charge cards, meaning you paid in full

Chenault - Direct - Chesler                    4329

1   each month?

2   A      They were charge cards, yes.

3   Q      So none of the three company, at that time, was issuing

4   any credit cards; is that right?

5   A      No.

6   Q      That's correct?

7   A      That's correct, yes.

8   Q      Were Diners Club and Carte Blanche cards at the time

9   affiliated with banks?

10  A      No, they were not.

11  Q      So when, approximately, did Visa and MasterCard appear on

12  the scene?

13  A      They came on the scene in the mid '60s.

14  Q      And were they, from their initial introduction,

15  affiliated with the banks?

16  A      They were really creatures of the banks.  Reality is the

17  banks created and, if you will, owned Visa and MasterCard.

18  Q      What happened to -- before the period picked up by these

19  charts, what happened to America Express' share of spend after

20  introduction of Visa and MasterCard?

21  A      It went down.  The reality is that Visa and MasterCard

22  spread like wildfire because they had access to all the banks,

23  channels and capabilities.  So you open up a checking account,

24  you got a card.  The reality is they were -- they were true

25  creatures of the banks.

Chenault - Direct - Chesler                    4330

1    Q    Did they issue charge cards when they came into the

2    business?

3    A    No, they stated off issuing revolving credit cards and

4    that's continued.

5    Q    So how did American Express respond to the competition of

6    Visa and MasterCard once they entered the business?

7    A    I think, initially, they were still marketing their

8    product in the T&E category, but then what you started to see

9    is they started to go after some selected department stores,

10   and moved slowly in some areas, but they were still primarily

11   focused on the T&E category.

12   Q    We heard about some department stores at which the judge

13   apparently doesn't shop, some stores earlier you think you

14   said yesterday?

15            THE COURT:  Just one.

16            MR. CHESLER:  One.

17   Q    Do you remember any of the particular stores with which

18   American Express had these targeted card programs?

19   A    Yes.  And I may be off some years, very frankly, but

20   Neiman Marcus would be one, possibly Saks Fifth Avenue might

21   be another.  And so these tended to be more high-end, affluent

22   retailers.

23   Q    By the time you arrived at the company, 1981, how far had

24   this strategy of expanding beyond the T&E segment gone?

25   A    They'd made some movement into other categories, but I

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                    4331

1   wouldn't characterize it as substantial movement.

2   Q    I think you testified earlier that when you came into the

3   company, you were director of strategic planning; is that

4   right?

5   A    Yes.

6   Q    What was the nature of your responsibilities in that job?

7   A    It was a very, very, very small group.  At the time,

8   actually the person who was running TRS at the time was Louis

9   Gerstner.

10  Q    TRS stands for?

11  A    Travel Related Services.

12  Q    That was the part of the business that had the cards?

13  A    Yes.

14  Q    This is Louis Gerstner, who went on to be the CEO of IBM?

15  A    Yes.  And he formed a strategic planning group, and the

16  focus of the group was to really work on strategies.  The way

17  he characterized it to me when he hired me was that he wanted

18  a few "catalytic agents of change," as he called it.  So the

19  focus was to really drive and initiate different strategies

20  for the company.

21  Q    Now, in particular, with respect to this fact that the

22  company was largely focused on the T&E segment and had made

23  some, but not a lot, of progress expanding out, did you have

24  any role, did you form any view, as part of the strategic

25  planning function, about what to do on that strategic front?

1   A    Yes.

2   Q    What was that?

3   A    One of my concerns early on was that the company needed

4   to focus on what I call "the spending needs of our customers,"

5   and that it was a mistake to just focus on one category of

6   spending, particularly with what was happening with Carte

7   Blanche and Diners.  So you could see them becoming

8   increasingly irrelevant, and my view, and let me be very clear

9   here, it took several years for that view to gain some

10  acceptance.  And, also, I would say, it was the view of

11  several others that the company needed to expand its

12  relevance.  And the way I would characterize that is really

13  being more relevant in people's lives, and that was by meeting

14  more of their spending needs.

15  Q    So, specifically, what was it about going beyond T&E that

16  would, in your view, make the product more relevant in

17  people's lives?

18  A    Because if the focus is spend and the focus is point of

19  sale, you want your product being pulled out of the wallet

20  more often; you want to be able to meet the spending needs of

21  your customers.  And to, in my view, artificially say I'll

22  only meet travel and entertainment spending needs, and, you

23  know what, I don't care what else you do, to me seemed to be a

24  very narrow way of thinking about the customer and the

25  customer needs.

1   Q    So what did the company do to pursue this expansion

2   strategy once it got traction within the company?

3   A    There were several things that we did, and one back to

4   this chicken and egg focus, was, one, to say we need to expand

5   our acceptance outside of the travel and entertainment

6   category and actually try to understand where the spending

7   takes place so that we can meet the needs of our customers.

8   So we've got to expand outside of the travel and entertainment

9   category.  The second was to develop some services, and

10  capabilities and products that would meet the needs of people

11  who wanted to use a card product outside of the travel and

12  entertainment category.

13  Q    And during this period of expanding the base, was that

14  when the Membership Miles Program was born?

15  A    Actually, right before, in 1987, we introduced the Optima

16  Card, which was a revolving credit card.

17  Q    Was that the first one the company introduced?

18  A    That was the first one that the company had offered.  And

19  the focus there was, in keeping with -- in being more relevant

20  in the lives of our customers, is it was important that our

21  merchants see us; and if we're going into non-travel and

22  entertainment categories, it's pretty critical that they see

23  our brand and our considered being used.

24          In 1991, we developed Membership Miles, and what was

25  important about, again, the development of Membership Miles is

Chenault - Direct - Chesler                4334

1   that at the same time, because of the interdependency of card,

2   and merchant and chicken and egg, is we started to more

3   aggressively expand into everyday spending categories; because

4   if you're going to create what I talked about earlier with

5   rewards, this virtual currency, people need to be able to use

6   it.

7   Q    And I think you said this before, but just so the record

8   is clear, Membership Miles is what ultimately became

9   Membership Rewards?

10  A    Yes.

11  Q    So the Optima Card comes along in the late '80s.  The

12  Rewards Program begins in the early '90s.  Was there during

13  this period of time a general expansion into merchants beyond

14  T&E?

15  A    Yes, we began very aggressively expanding.

16  Q    How about the card member base?  Was that growing at the

17  same time?

18  A    We were growing the card member base.

19  Q    In the early '90s, what was roughly the division, at that

20  point, between charge volume at T&E merchants and charge

21  volume at non-T&E merchants?

22  A    Roughly 70 percent coming out of T&E merchants, 30

23  percent everyday merchants.

24  Q    What's that balance today, approximately?

25  A    It's been, really, exactly reversed, so 30 percent coming

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                    4335

1   out of T&E merchants, 70 percent coming out of everyday
2   merchants.
3              THE COURT:  I'm sorry.  Is that -- say, charge
4   volume, is that in terms of number of charges or in terms of
5   volume expenses?
6              THE WITNESS:  That would be purchase volume.
7              THE COURT:  Purchase volume.  Dollars?
8   A    Dollars, yes.
9              THE COURT:  Oh, and I had a question.  There's been
10  a lot of discussions about the different cards.  There's also
11  a type of card that hasn't been discussed here.  Maybe you can
12  tell me what that is.  The American Express Black Card what's
13  that?
14             THE WITNESS:  The Black Card --
15             THE COURT:  Well, I've never actually seen one of
16  those.
17             THE WITNESS:  Your Honor, if you would permit me,
18  this is mine, so I can't give it to you.
19             THE COURT:  You can't give anything to me.
20             MR. CHESLER:  There are lots of reasons why you
21  can't give it to him.
22             THE WITNESS:  This is a Black Card.  It's made out
23  of titanium.  And what it has is a set of very specialized
24  services, so concierge type of services.  So you can almost
25  think of it as your personal aide, I like to say.  So it will

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                    4336

1  help you with travel; it has a number of benefits on it, and

2  it is offered by invitation only to those customers within our

3  franchise who, in fact, spend at a certain level.

4           THE COURT:  I see.  I'm going to need a personal

5  aide, at some point.  I'm not quite sure if that does it,

6  though.

7           THE WITNESS:  Well, after the trial, and

8  everything's done --

9           THE COURT:  I don't want to know.

10          THE WITNESS:  Part of my job is to persuade.

11          THE COURT:  All right.  Sorry I asked.  Let's move

12  on.

13  Q    In the same time period as this strategy was being rolled

14  out, introduction of credit cards, introduction of Membership

15  Miles Program, was there also an aspect to the strategy that

16  involved technology?

17  A    Yes, because back to the closed loop, which was very

18  important and was also one of the areas that Joel Klein wanted

19  me to focus on, was uniqueness of closed loop.  The

20  information, the data, the analytics' capabilities were very

21  important.  And what was essential was to continue to build on

22  and innovate the information and data that we got across our

23  integrated pavements model so we could continue to really

24  build on this differentiated business model through the use of

25  data and analytics.

1  Q    Was there a program launched in the '80s called Project
2  Genesis?
3  A    Yes.  It was it was launched in the '80s.  It was a very
4  significant project that involved hundreds of people and had a
5  very substantial cost to it.
6  Q    And what was Genesis?
7  A    Genesis was a project to really harness the information
8  capabilities, the data from the closed loop, so that we could
9  offer more powerful capabilities to merchants and also market
10 in a more effective way to our card members, so really
11 harnessing the power of the closed loop and having the
12 information from the merchant and the card member, and being
13 able to leverage that capability.
14 Q    And is that the beginning of the systems that have
15 allowed you to do things like the analytics you talked about
16 before and the targeted marketing programs you talked about
17 before?
18 A    Absolutely.
19 Q    Now did Diners Club and Carte Blanche pursue a similar
20 strategy to beyond expanding between T&E?
21 A    No, they stayed in the travel and entertainment category.
22 Q    Where are they today in the marketplace, in terms of the
23 hierarchy of the networks?
24 A    They're irrelevant.
25 Q    So let me turn -- as we move through the chronology a

Chenault - Direct - Chesler                           4338

1    bit, let me ask you to look again at Defendants' Exhibit 7789,

2    please.  It's that a share chart?

3    A    Yes.

4    Q    Living through that first five years that's shown on the

5    chart, '90 to '95, what was the reaction within the company to

6    that experience?

7    A    A pretty terrifying experience.  When you see the

8    precipitous decline in market share, it was frightening.

9    Q    Did you at the time have a view as to what was causing

10   that decline?

11   A    I think there were two fundamental things that were

12   happening, and I would call it the "double choke hold."  As we

13   were trying to grow, the exclusionary rules that Visa and

14   MasterCard had put in, denying us the opportunity to work with

15   banks, essentially constricted our air supply.  It's part of

16   the growth.  And so it made it very difficult for us, because

17   we did not have access to one of the most important areas of

18   growth.  At a time when the payments industry was exploding,

19   we were denied that opportunity.

20         The second choke hold was We Prefer Visa.  Now, it's

21   one thing, from a competitive standpoint to say Amex is not

22   accepted, so that advertising campaign and they don't take

23   Amex; but what We Prefer did, in fact, went to the fundamental

24   strength and pillar that I talked about, of trust being part

25   of our brand and the cornerstone of our model of welcome

Chenault - Direct - Chesler                    4339

1   acceptance.  It said I don't care what American Express says,

2   merchants that accept American Express prefer Visa.  So that

3   raised incredible doubt, because we had a position in the

4   marketplace that you can trust American Express, and welcome

5   acceptance was the cornerstone of that.  So that went to the

6   core of our model.

7   Q    Are you familiar in your -- in the course of your

8   responsibilities with something known as "spillover"?

9   A    Yes.

10  Q    What is spillover, as far as your understanding?

11  A    Spillover is exactly what it means, that it's not

12  contained.  So if a merchant does not accept us, or suppresses

13  us or says use another card, that spills over to other

14  merchants.  And the card member then says, well, if it's not

15  accepted here, I'm not sure it's accepted at other places.  So

16  it is incredibly damaging because it's not isolated and it's

17  not controllable, so the spillover can continue, and it is a

18  serious, serious problem when that happens.

19  Q    Have you actually experienced it, seen it in the business

20  where you've been cut out of a particular areas or geographic

21  areas that there is, in fact, a spillover effect, more

22  generally, on spending volumes on cards?

23  A    Absolutely.  Here's the point:  You can meet a

24  substantial percentage of someone's spending needs, and then

25  they go to a place and the card's not accepted; and they then

Chenault - Direct - Chesler                    4340

1    question the entire value proposition.  They question it
2    substantially when that place says, well, I accept Amex, and
3    then with We Prefer that raised substantial doubt on the part
4    of our customers, so it was pervasive impact.
5    Q    With respect to the first of those choke holds you
6    mentioned, exclusionary rules, all these years later, in 2014,
7    has the company recovered from the effects of those rules?
8    A    Absolutely not.  I mean, the reality is that the
9    inability to work with banks is shown in the fact that we got
10   9.  9.  Visa and MasterCard have 10,000.  And the advantages
11   of being the creatures of the banks have remained.  But,
12   frankly, that wasn't enough, because just the threat of the
13   lawsuit, the networks moved to the next level.
14   Q    And what was that?
15   A    And they came out with dedication agreements.
16   Q    What are those?
17   A    What those are, are the banks had to commit that a
18   substantial percentage of their cards would be on the network.
19   So while the case was going on, and even before, they were
20   preparing for the contingency, well, if we lose, first of all,
21   we got a major advantage.  We got decades of an advantage.
22   But now with these dedication agreements we're going to lock
23   it in so that if we the Justice Department prevails, Amex will
24   have real difficulty signing up paying partners.
25   Q    Has that been --

Chenault - Direct - Chesler                    4341

1    THE COURT:  Which case are you talking about now?

2    Because we've had three different --

3    MR. CHESLER:  We were talking about the exclusionary

4    rules case, your Honor.

5    THE COURT:  Exclusionary rules.

6    Q    Has that strategy of the dedication agreements largely

7    worked for the banks?

8    A    It clearly has worked for the banks.

9    Q    Now, in addition to those two choke holds you talk about,

10   the exclusionary rules and the preference campaign, which

11   we'll come back to, were there issues, at the time, between

12   American Express and its agents over the level of your fees?

13   A    Yes, we did have some issues.

14   Q    And you remember something called the "Boston Fee Party"?

15   A    Yes, I do.

16   Q    What was that?

17   A    The "Boston Fee Party," a number of restaurants actually

18   revolted against the company in the form of cancellation.  We

19   actually had one restauranteur -- there was a photograph, I

20   remember, in the Boston Globe -- who put a knife through an

21   Amex Card, and they were, in fact, complaining about the fees.

22   Q    And that was about 1990, was it?

23   A    In that time frame, yes.

24   Q    What, if anything, did American Express do in response?

25   A    We met with the restauranteurs.  We did several things.

NICOLE CANALES, CSR, RPR

Chenault - Direct - Chesler                     4342

1    One, is we reduced our merchant rates.  The second thing that

2    we recognized is, from a messaging standpoint, we had not

3    emphasized enough to the merchants the value that we brought.

4    So the value story of the incremental spend that we can

5    provide to them, that we needed to communicate that more

6    strongly.  What we also recognized, back to the chicken and

7    the egg, is we needed to bring out more products that would

8    meet the needs of our card members and also increase demand

9    for merchants.

10           (Proceedings continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION (continued)

2    BY MR. CHESLER:

3    Q    Were there issues with other merchants other than the

4    restauranteurs in Boston at the time?

5    A    Well, as I said earlier, back to spillover, it spread

6    into other areas and we had to deal with that and it also

7    raised issues in the minds of a number of cardmembers relative

8    to acceptance because when you have the articles that came out

9    about the issues relative to acceptance, that certainly caused

10   us problems.

11   Q    Was one of the merchants that you had difficulty with in

12   that same time frame as Disney?

13   A    Yes, we had difficulty with Disney.

14   Q    What happened there?

15   A    Disney basically threatened if we did not lower our

16   discount rate and if we -- even in any negotiation you have a

17   lot of back and forth, but one of the ways that Disney derives

18   substantial revenues is through sponsorships, and they

19   basically said, you know, if you don't do the following, we're

20   going to cancel you.

21        Now, you can imagine at that time, we're coming off

22   the Boston Fee Party.  Disney, marquee name, and we were

23   terrified, and so we ended up doing a deal with Disney that,

24   frankly from an economic standpoint, was not a good deal to

25   do, but it was the right deal from an economic standpoint in

*Chenault - Direct / Chesler*                                    4344

1    the moderate to long-term because if we had lost Disney, the

2    impact would have been far greater than losing the charge

3    volume at Disney.  It would have spilled over and spread to a

4    range of merchant categories.

5            THE COURT:  Did you have a marketing agreement or a

6    co-brand card with Disney?

7            THE WITNESS:  No, we did not, Your Honor.  We did

8    have a marketing deal, and as I said, part of what Disney did,

9    it was not just a merchant acceptance deal, is they very much

10   focused on sponsorships, and so when you go to Disney, you'll

11   see all these different exhibits that are generally sponsored

12   by a company, whether that's Hertz or Avis or an airline, and

13   so we had -- we ended up agreeing to be a sponsor.

14           THE COURT:  I see.  And that continues with Disney?

15           THE WITNESS:  We do not have the same relationship

16   with Disney.  They still accept the card, but they actually

17   have, I believe still, a co-branded card with Chase.

18           THE COURT:  I think you're right about that.

19           THE WITNESS:  Yeah.

20           THE COURT:  But you do have sponsorships with other

21   merchants and other events, with events.

22           THE WITNESS:  We do.

23           THE COURT:  Like the U.S. Open Tennis tournament,

24   for instance.

25           THE WITNESS:  That's an example of a sponsorship.

*Chenault - Direct / Chesler* 4345

1   We, in fact with the U.S. Open, we've had a long-term

2   sponsorship.  We are not the top-tier sponsor, but I think

3   we've put some very innovative programs in place where it

4   works very well for us and works very well for the U.S. Open

5   and works very well for our cardmembers.

6   BY MR. CHESLER:

7   Q    There was a suggestion in testimony earlier today that if

8   you looked at a relationship between Amex and another

9   particular merchant in the way in which one of the economists

10  working on our side of the case looks at it, that it would be

11  an unprofitable relationship and the witness testified earlier

12  that therefore it couldn't possibly be the proper way to look

13  at it because it would be unprofitable.

14          Was the deal you made with Disney in order to avoid

15  being cancelled that you were just talking about, was that a

16  profitable or unprofitable deal if you looked at the deal that

17  was struck at the time?

18  A    It was an unprofitable deal.

19          THE COURT:  It was unprofitable at the time

20  financially, but it was the right business decision to make,

21  is what you said?

22          THE WITNESS:  Yes, Your Honor.

23  BY MR. CHESLER:

24  Q    Now, let me go back to the exclusionary rules case for a

25  moment.

1          After that case ended, what happened to the

2    interchange rates that Visa and MasterCard were charging?

3    A    The interchange rates increased.

4    Q    What happened to American Express's discount rates in

5    that period, that is from the early 2000s up 'til today, the

6    last decade or so?

7    A    They came down and they've been coming down.

8    Q    Now, there's been some discussion at the trial that one

9    of the reasons that American Express rates have been coming

10   down is mix of merchants.

11         Has the mix of American Express's merchants, in

12   fact, changed over time?

13   A    The mix of merchants has certainly changed from the early

14   '90s and mix has been an issue, but what we've also had to do

15   is make a number of concessions to merchants, and so it's not

16   just a mix issue.  So mix certainly contributed to the

17   decline, but we also specifically have reduced discount rates

18   in different categories and to different merchants and we've

19   given bonus payments, and so that has contributed to the

20   decline.

21   Q    And when the discount rate comes down, whether it's a

22   consequence of mix or the concessions that you've made in

23   merchant negotiations or both, what happens to American

24   Express's margin?

25   A    Those margins are squeezed.  Obviously as we are trying

*Chenault - Direct / Chesler*                                    4347

1   to satisfy both the chicken and the egg, we're have -- we have

2   to continue to increase and improve the value proposition and

3   the benefits to the cardmember and we have to do the same with

4   the merchant.

5   Q    And as your margin declines as a result of a lowering

6   discount rate whether by mix or concessions or both, what

7   happens to your ability, sitting in your seat, to be able to

8   continue to fund those investments that you're talking about

9   on the consumer side of the business?

10  A    It becomes more challenging to fund those investments,

11  but what's absolutely critical is that we're driving spend and

12  that we're getting welcome acceptance at the merchants.  That

13  becomes, and is, as I said from the beginning, core.

14  Q    Let me ask you to turn to, we've talked about the

15  exclusionary rules a bit, we've talked about the Boston Fee

16  Party and your problems with Disney and some merchant issues

17  you had at the time.  I want to come back to this "We Prefer

18  Visa" issue that you mentioned before.

19          Would you look at Plaintiff's Exhibit 132, please,

20  PX 132.  It's about two or three documents in the back of the

21  book.

22  A    Yes.  Does it start with "Visa USA Inc."?

23  Q    Yes, that's it.

24          MR. CHESLER:  Your Honor, this document's in

25  evidence.

*Chenault - Direct / Chesler*                                    4348

1   Q    Now, Mr. Chenault, these are minutes of a Visa board of

2   directors meeting held in 1989.  The document was produced by

3   Visa in this case.  I'd like you to turn to page 3929 if you

4   look in the stamps at the bottom.

5             (The above-referred to exhibit was published.)

6             MR. CONRATH:  Your Honor, I don't believe I've heard

7   a foundation for this document, this document with this

8   witness.  It's a Visa document.

9             MR. CHESLER:  If I can have a few moments, Your

10  Honor, I think I can demonstrate why it's relevant for this

11  witness to testify about it.

12            THE COURT:  All right.  Go ahead then.

13  BY MR. CHESLER:

14  Q    So 3929 is a page from this Visa document entitled "Amex

15  Competitive Strategy Amex Success Cycle."

16            Do you see it, sir?

17  A    Yes.

18  Q    So it's a circle, right, connected by lines, arrows?

19  A    Yes.

20  Q    It says at the top:  "Amex has real and perceived

21  advantages."  And then down in the lower right it says:  "Amex

22  charges merchants and consumers a premium."  And then over on

23  the left it says:  "Amex invests the premium in advertising,

24  systems, and services."

25            Correct?

1   A    Yes.

2   Q    Now, is that a pretty accurate description of what your

3   business looked like in 1989 when this document was apparently

4   prepared?

5   A    Yes.

6   Q    If you look at 3930, the next page, you see that they've

7   put an X through the "Amex has real and perceived advantages"

8   and stated next to it:  "Eliminate Amex's meaningful

9   advantages."  And then down at the bottom there's an arrow

10  that says:  "Breaking the success cycle will pressure their

11  merchant discount and thus weaken their financial engine and

12  encourage consumer preference for Visa and keep Amex as a

13  niche product."

14            Do you agree, Mr. Chenault, that if the success

15  cycle were broken and the ability of American Express to

16  provide meaningful advantages, as stated here, were to happen,

17  that that would in fact have the results that Visa predicted

18  or stated at the bottom of this page?

19  A    That would destroy my business.  That goes back to what I

20  discussed about our integrated differentiated model.  This

21  goes directly at how we operate our business model and

22  directly how we fund our differentiated business model.

23  Q    If Amex had been kept as a niche product, what, in your

24  view, would be the company's position as a competitor in the

25  marketplace today?

1    A    We'd be irrelevant.

2    Q    Would you be any more relevant than Carte Blanche or

3    Diners?

4    A    As I said, this would have destroyed our business model.

5    We would have gone the way of Carte Blanche and Diners.

6    Q    More broadly, as the chief executive of the company, what

7    is your view of the impact that that would have on

8    competition, not on your company as per say, but on

9    competition more generally, were this strategy to eliminate

10   the meaningful advantages, to break the success cycle, were

11   that to succeed?

12   A    It would be horrible.  It reinforced the reasons why Joel

13   Klein asked me to testify and the Department of Justice

14   brought the lawsuit against MasterCard and Visa.  Competition

15   would have been stifled.  The only two players on the field

16   would be Visa and MasterCard who were the creatures of the

17   banks, and for consumers, the innovation that has taken place

18   post-2000 has been enormous and the consumer has benefitted

19   greatly.  We would have been living in a totally different

20   world dominated by two players.

21   Q    What about Discover?

22   A    Discover has a three percent market share, and the

23   reality is Discover is in a situation where they have more

24   merchants and more cardholders than we do, and in my view,

25   frankly, they have a flawed model because they have not

*Chenault - Direct / Chesler*                    4351

1    invested enough in differentiating their products and

2    services.

3    Q    What impact did the "We Prefer" campaign have on your

4    business?

5    A    It had a dramatic impact.  You saw the precipitous

6    decline in market share and we were fighting for our survival.

7    Q    Wasn't it just competition, I mean, kind of bare knuckles

8    competition?

9    A    It was certainly not bare knuckles competition.  As I

10   said, this double chokehold of the exclusionary rule, which

11   was totally anticompetitive, and as this chart demonstrates,

12   they were trying to break our success cycle and our ability to

13   fund our investments, and the way to do that, the way to do

14   that is what I said at the beginning of my testimony is the

15   most important attribute of our brand is trust and the

16   cornerstone of that trust is welcome acceptance.

17           MR. CONRATH:  Your Honor, I think we're now getting

18   beyond what there was foundation for in talking about what

19   Visa was thinking and I object.

20           THE COURT:  All right.  Well, this document is in

21   evidence.  What Visa was thinking is for Visa to say.  How the

22   American Express Company perceived what they knew about it and

23   what they did about it is appropriate.  So I'll allow it, but

24   anything about conjecture about how the Visa executives at the

25   time were posturing this in the marketplace or what steps they

*Chenault - Direct / Chesler*                                    4352

1    took is something for them to say and not for this witness.

2            Go ahead.

3            MR. CHESLER:  Thank you, Your Honor.

4            MR. CONRATH:  Thank you, Your Honor.

5    BY MR. CHESLER:

6    Q    Would you look at page 3874 in the Visa document, please.

7    Do you have that?  3874 down in the lower right-hand corner of

8    the page.

9    A    Yes.

10   Q    If you look up in the third, sort of second full

11   paragraph on that page it says:  "We believe the bank card

12   industry needs to recognize right now the threat the Project

13   Genesis," I assume it means "that Project Genesis means to

14   their long-term market share.  We believe the bank card

15   industry needs to take action to counteract this threat

16   immediately.  It is Visa's intention to take the lead in this

17   process."

18           You mentioned Project Genesis earlier and Genesis

19   was already underway by the time of this document in '89,

20   correct?

21   A    That's correct.

22   Q    And there had been public statements and reports about

23   it?

24   A    Yes.

25   Q    Had Genesis been killed for lack of funding, for example

*Chenault - Direct / Chesler*                                4353

1   if your cycle of success had been broken, what, from your

2   perspective, would be the impact currently in American

3   Express's ability to provide competitive advantages to

4   merchants as well as consumers?

5   A    Our model would be destroyed because the reality back to

6   the chicken and egg is we have to, in fact, have the ability

7   to, first and foremost, the moment of truth is welcome

8   acceptance.  So the investments that we've talked about,

9   rewards, customer service, technology, are meaningless if in

10  fact our card cannot be used at the moment of truth, at point

11  of sale, and we cannot deliver on the promise of welcome

12  acceptance.

13  Q    Let me ask you to look at another document, sir,

14  Defendant's Exhibit 7525.

15        Do you have that, sir?

16  A    Yes.

17  Q    So this is entitled "TRS Market Research Department

18  Executive Summary Report."  And it says a little further down

19  "We Prefer Visa CM Impact Study."

20        CM stands for cardmember; is that right?

21  A    Yes.

22  Q    This is dated September 1997.

23        MR. CHESLER:  I believe, Your Honor, that this was

24  also marked as Plaintiff's Exhibit 293.  I don't think it's

25  been offered in evidence, but I just wanted the Court to note

1   that a document that I think is the same as this document was

2   marked by both sides.

3   Q    What is this document?

4   A    This appears to be a executive summary report from our

5   Market Research Department that summarizes some of the impacts

6   of the "We Prefer Visa" campaign on cardmembers.

7   Q    What did TRS stand for?

8   A    Travel Related Services.

9   Q    That was the part of the business that had the cards in

10  it?

11  A    Yes.

12  Q    And if you look at the third page of the document, it has

13  a number at the bottom that ends '383, there's a distribution

14  list on this page.

15       Do you see it?

16  A    Yes.

17  Q    And in the first group TRS executive, is that your name

18  the fourth one down, K. Chenault?

19  A    Yes.

20  Q    So were you, in fact, an executive in the TRS business at

21  that time?

22  A    Yes.

23  Q    And apparently a recipient of this document?

24  A    Yes.

25       MR. CHESLER:  Your Honor, I offer DX-7525.

*Chenault - Direct / Chesler*                                    4355

1              MR. CONRATH:  No objection, Your Honor.

2              THE COURT:  All right.  DX-7525 is received in

3    evidence.

4              (Defense Exhibit 7525 was received in evidence.)

5    BY MR. CHESLER:

6    Q    Would you look at the second page, the page opposite the

7    one we just looked at which has a '382 at the bottom.

8              Do you see that?

9    A    Yes, I do.

10   Q    And there's a heading in the middle of the page that says

11   "Reactions to the We Prefer Message?"

12             Do you have that section?

13   A    Yes.

14   Q    And I want you to go down to the second paragraph in that

15   section, the one that begins "when faced with."

16   A    Yes.

17   Q    It says:  "When faced with this message at the points of

18   sale (when they had planned to use the card) insistence

19   remains high, but a fairly large percentage of spend is lost."

20             There's a bullet under that that says:  "Over 70

21   percent of CMs would still use their American Express Card.

22   However, 21 percent of persons" - of personal, I think there's

23   an L missing - "Personal/Gold/Optima CMs feel they would

24   switch to another payment method."

25   A    Yes.

1  Q     So from your vantage point at the time, it says 70

2  percent of your cardmembers would still use the card, but 21

3  percent of the Personal, Gold and Optima cardmembers feel they

4  would switch, how significant was that to American Express in

5  terms of its ability to be a viable competitor?

6  A     That's enormous.  If you have that type of perception

7  that builds and spreads, you're not going to have much of a

8  business left.

9  Q     How does it spread if it's 21 percent?  Why would it

10 become more over time?

11 A     Because as a cardmember, if I have doubt whether I can

12 use the card, I keep it in my pocket, I don't pull it out, and

13 so the effect is major because part of what you have to have

14 on the part of a customer is they have to have a level of

15 confidence that they can use the product, and if they have

16 that doubt, that doubt builds, and the reality is that that is

17 a very alarming number because that's just not a number that

18 stays static, it builds, and it builds because of the doubt

19 that is created in the customer's mind.

20 Q     If you look at the next passage at the bottom of that

21 page, it says:  "Visa's preference messages appear to affect

22 our cardmembers perceptions of coverage.  Nearly 60 percent of

23 cardmembers believe that these preference messages raise

24 doubts in their minds on whether Amex is accepted."

25       What is perception of coverage?  Is that a metric

1   that you use at American Express?

2   A    Yes, and basically what it means is what do people

3   perceive where the card can be used, and as I said earlier,

4   that perception of coverage does not just go to a particular

5   category or merchant.  It spreads.  So if I've got problems

6   with coverage at a restaurant, that can spread over to retail.

7   So it's not isolated and it's really got to be focused on very

8   strongly.

9   Q    So there's been some fair amount of testimony about words

10  in this case: preference, prefer, sponsor, official.

11          Based on all of your years of experience in the

12  company, sir, is there any real difference among those words?

13  What's all the reason for this attention on the word "prefer"

14  or "preference"?

15  A    Here's what's critical.  As I said earlier, the worst

16  thing that can happen to the American Express brand is

17  discrimination at the point of sale.  When we're offering,

18  this is a fundamental cornerstone, welcome acceptance, that

19  preference, "we prefer" from a merchant that has agreed

20  contractually not to discriminate against us, when that

21  merchant then says use another card, pardon my language, but

22  what that says to the customer is that card's a piece of crap,

23  I don't like it, use something else.  How do you think that

24  customer feels?  And what that says is and that's what

25  discrimination is all about is disparagement and denigration

*Chenault - Direct / Chesler*                                    4358

1    and that's why it has a big difference.  If I'm a sponsor,

2    everybody, you can be a sponsor.  That does not denigrate.

3    That does not discriminate, but "we prefer," that

4    discriminates against our card.

5    Q    Now, you had these, you said before, the

6    non-discrimination provisions had been in the merchant

7    agreements all the way back perhaps as early as the late '50s,

8    early '60s, right?

9    A    Yes.

10   Q    And there were provisions that said you can't express a

11   preference for somebody else's card well before this campaign

12   took place, right?

13   A    Absolutely.

14   Q    So what, if anything, did American Express do in response

15   to the preference campaign with respect to these provisions

16   that were already in the agreement and didn't prevent Visa

17   from engaging in this program to begin with?

18   A    What we said to the merchants is you cannot discriminate

19   against American Express.  That is in violation of the

20   contract and agreement that you signed and that Visa is

21   encouraging you to discriminate and violate the contract and

22   they're doing that obviously it was being done in favor of the

23   dominant networks MasterCard and Visa.  So what was important

24   for us is to remind the merchants that what they were doing

25   was in violation of an agreement that they had entered into

*Chenault - Direct / Chesler*                    4359

1  freely, because as I said, we are a discretionary product,

2  earlier in my testimony.  They are under no obligation, they

3  don't need to operate their business accepting us, but they do

4  need Visa and MasterCard, and they made a contractual

5  commitment and they made a promise, and in my view of

6  business, when you promise something, you need to keep that

7  and that's how competition really can be generated.  I'm fine

8  for merit-based competition, but violating an agreement that

9  you have willingly signed and be encouraged by someone to

10 discriminate cannot happen, and the impact of that, as I said

11 earlier, is it negates all the investments that we made for

12 cardmembers and merchants because we cannot provide welcome

13 acceptance.

14          THE COURT:  Mr. Chesler, are you going to go into

15 how the cardmember insistence figures into this analysis and

16 discussion?

17          MR. CHESLER:  Yes.

18          THE COURT:  Because I think we've had testimony

19 about cardmember insistence and your measure of it and how

20 that works in your discussions with merchants and so forth.

21 So I was just wondering whether this was a good time, or are

22 you going to go into it later?

23          MR. CHESLER:  We are going to cover it a little

24 later, if I may.

25          THE COURT:  That's fine.

*Chenault - Direct / Chesler*                    4360

1          MR. CHESLER:  I plan to do that.

2          THE COURT:  But I just point out that the issue of

3    cardmember insistence also is, it would seem, part of the

4    equation here, and so I'd like to hear about that.

5          MR. CHESLER:  Yes, we fully intend to cover that

6    with Mr. Chenault.

7          THE COURT:  Okay.

8    BY MR. CHESLER:

9    Q    Let me ask you, sir, to turn to DX-7492.

10         Do you have that one, sir?

11   A    Yes, I do.

12   Q    It appears to be a memo from John Hayes, David House and

13   Tom Schick to Harvey Golub and Ken Chenault dated February 23,

14   1998.

15         Do you have that, sir?

16   A    Yes, I do.

17   Q    So you were a recipient of this memo?

18   A    Yes, I was.

19   Q    And if you recall, what was Mr. Hayes's job at the time?

20   A    Chief marketing officer.

21   Q    And Mr. House, what was he doing?

22   A    He was president of Merchant Services.  We may have

23   called it back then Establishment Services.

24   Q    But it's the part of the business that dealt with the

25   merchants?

*Chenault - Direct / Chesler*                                    4361

1    A    That manages the merchants, yes.

2    Q    And how about Tom Schick, what was his job?

3    A    Tom Schick is head of Public Affairs, communications.

4    Q    And what was Mr. Golub's job at the time?

5    A    Harvey was chairman and CEO.

6    Q    And you were what?

7    A    I believe I was president and chief operating officer at

8    that time.

9             MR. CHESLER:  Your Honor, I offer 7492.

10            MR. CONRATH:  No objection, Your Honor.

11            THE COURT:  All right.  DX-7492 is received in

12   evidence.

13            MR. CHESLER:  Thank you, Your Honor.

14            (Defense Exhibit 7492 was received in evidence.)

15   BY MR. CHESLER:

16   Q    If you look on the first page, the first bullet under

17   "Premises" says:  "In the few markets in which Visa has

18   managed to launch a preference campaign we have experienced a

19   reduction in spending on our card products."

20            Then if you jump down two bullets it says:  "The

21   likelihood that we can continue to successfully combat these

22   initiatives through a combination of moral suasion and

23   political contacts is diminishing.  This is because of the

24   growing number of markets Visa appears to be targeting for

25   these campaigns and the increased financial incentives they

*Chenault - Direct / Chesler*                          4362

1    are offering."

2            Do you have any memory of what kinds of financial

3    incentives they were offering?

4    A    Well, they were paying merchants to advertise in the "We

5    Prefer" campaign.

6    Q    Down at the bottom of this page it says:  "These

7    developments are not only damaging in the short-term, but

8    could lead to a disciplined concentrated attempt by Visa to

9    surround us with a Visa-preferred world.  In one scenario,

10   they could drop the "And they don't take American Express" tag

11   line which has lost its potency in the face of our vastly

12   expanded coverage and substitute Visa preference as their

13   signature."

14           Now, was it the sense of you and your colleagues at

15   the time that your ability to have diffused the "They don't

16   take American Express" campaign would not, in fact, be

17   successful with respect to the "We Prefer Visa" effort?

18   A    We thought that the "We Prefer Visa" effort had gained

19   and was gaining substantial traction, and as I said before,

20   because it was advocating discrimination against the American

21   Express Card, it went right to welcome acceptance and would,

22   in fact, destroy our model.

23   Q    Would you look at the next page.  It says "Action Steps."

24   The first bullet says:  "Our response should not involve

25   market/merchant preference campaigns of our own since, 1, we

1    cannot afford to go they head to head in a bidding war with

2    Visa in a multiplicity of markets, and 2, we ought not to

3    abandon the moral high ground we now enjoy and which we can

4    continue to lever."

5            Was that consistent with your recollection of the

6    reaction to what your responses should be?

7    A    Absolutely.  I mean, we were competing with a monopoly

8    that was, in essence, as I said earlier, a utility and there

9    is no way financially we could compete with them in that way.

10   There was no way, given their ubiquity, the power that they

11   had that we could go tit for tat with them.

12   Q    When you say that they're a utility, what does that mean?

13   What do you mean by that?

14   A    What it means is they're must-have.  There's no choice.

15   If you are a merchant and you want to accept plastic, you have

16   to accept MasterCard and Visa.  Now, there are a few, we all

17   know there are a few who don't accept credit cards, but the

18   reality is the vast majority of merchants, you can really

19   count the ones who don't, anyone who accepts plastic knows

20   they have no choice, no choice but to accept MasterCard and

21   Visa.

22           MR. CHESLER:  Your Honor, I'm going to move to

23   another topic.  I just want to have a sense of what your plans

24   are for the day.  How late do you plan to go today?

25           THE COURT:  Unless the witness needs to leave at any

1    given time, I would go until something close to six.

2              Is that acceptable?

3              THE WITNESS:  That's acceptable to me, Your Honor.

4              THE COURT:  All right.  Should we take a break or

5    just keep going?

6              MR. CHESLER:  Could we take five minutes, Your

7    Honor?

8              THE COURT:  Let's take a five minute break.

9              MR. CHESLER:  Thank you, very much, Your Honor.

10             (Recess taken.)

11             (In open court.)

12   BY MR. CHESLER:

13   Q    Mr. Chenault, at the time of the preference campaign,

14   Visa and MasterCard were owned by the banks; is that right?

15   A    Correct, yes.

16   Q    What, if any, advantages did that give them in their

17   ability to or advantage in competing against you at the time?

18   A    Well --

19   Q    The fact that they were owned by the banks?

20   A    Reality is you were dealing with a group that could act

21   almost as one, and it really was at the end of the day a

22   monopoly and a cartel and that's the way they operated, and so

23   what you did not see is Visa competing with MasterCard,

24   MasterCard competing with Visa.  They could really, if you

25   will, gang up on a relatively small competitor and really

1   devote their resources to their own business.

2           So certainly you had some competition amongst banks,

3   but the reality is when you look at the level of competition

4   that took place, the relative lack of innovation that was

5   going on in the marketplace, it was sort of like they were

6   just divvying up the world and, you know, we'll see how things

7   go, but we're really running things.

8   Q    Do you see a lot of competition between Visa and

9   MasterCard today?

10  A    The reality is I don't see a lot of competition between

11  Visa and MasterCard today, and that is incredible when you

12  think about the marketplace and the opportunities.  It doesn't

13  seem that different to me from what we saw pre-2000.  There

14  are obviously things they can't do, but you don't see Visa

15  taking out advertising criticizing MasterCard or MasterCard

16  criticizing Visa.  I just haven't seen much competition

17  between them at all.

18  Q    Are there any merchants that you're aware of that accept

19  one and not the other of Visa and MasterCard?

20  A    No.  That's why, as I said before, what's I think very

21  important to understand when we discuss the lingering effects

22  of the exclusionary rules, it really means what we're talking

23  about are the lingering and lasting effects of the

24  associations being creatures of the banks and the competition

25  really doesn't take place, and for a merchant, you don't find

1   merchants that say 'well, I'm going to take Visa versus

2   MasterCard.'  They know they are utilities, they're

3   interchangeable.  'If I'm going to be in the business, it's

4   going to be MasterCard and Visa.'  You don't have a

5   cardmember, cardholder or a customer walk into a store and say

6   "Do you accept MasterCard?  Do you accept Visa?"  They don't

7   say that.  So there's no, there's really no competition that's

8   going on.

9         So you see competition at the issuer level.

10  MasterCard and Visa may compete on some different deals and

11  from a dedication agreement standpoint there's some

12  competition, but if we look at what the essential elements are

13  here and the lingering effects from a merchant acceptance

14  standpoint, the merchant at the end of the day knows they got

15  to accept both, they're interchangeable.

16  Q    So let me ask you to look at Defendant's Exhibit 319 in

17  the book.  It's way up toward the front.

18        Do you have that, sir?

19  A    Yes, I do.

20  Q    It's entitled "Market Share.  The Will to Win."  It has

21  your name on it.  Then it says:  "Establishment Services

22  Worldwide Meeting Puerto Rico January 23, 1996."

23        What is this document, sir?

24  A    This is a speech that I delivered to the Establishment

25  Services Group that we now call the Merchant Services Group,

*Chenault - Direct / Chesler*                    4367

1   and it was a meeting of the worldwide organization, so it was

2   not just the U.S., this was a worldwide organization of

3   Establishment Services.  That's the group responsible for

4   managing the merchant relationships.

5   Q    And what position were you in in the company in January

6   of '96; do you recall?

7   A    I believe I was vice-chairman of the company at the time.

8   Q    Why did you give this speech?

9   A    Because I was very concerned about the future of American

10  Express and I wanted to get the organization together, and at

11  this meeting, we not only had people from the Establishment

12  Services Group, but we also had people from the Consumer Card

13  Businesses, and I wanted to talk to them about the competitive

14  challenges that they faced, the structural challenges that we

15  faced as a company, and I wanted to talk to them about what we

16  needed to do.

17  Q    And during this period of time, January '96, were you

18  facing the double chokehold that you referred to earlier?

19  A    Yes.

20            MR. CHESLER:  Your Honor, I offer Defendant's 319 in

21  evidence.

22            MR. CONRATH:  No objection, Your Honor.

23            THE COURT:  All right.  Defendant's Exhibit 319 is

24  received in evidence.

25            (Defense Exhibit 319 was received in evidence.)

1           MR. CHESLER:  Thank you, Your Honor.

2    BY MR. CHESLER:

3    Q     Would you turn to page 8, please, which has a stamp Bates

4    number ending '998?

5    A     I see it.

6    Q     At the top you say:  "Now I'm going to show you the root

7    cause of my concern for our market share."  Then at the bottom

8    the last bullet says:  "I'll tell you what's not debatable.

9    We're behind and we're going to have to grow market share

10   substantially in terms of charge volume and share of

11   outstandings.  This is the game we are in for the Card

12   business.  We must become more relevant in the marketplace by

13   becoming more relevant in our customers lives.  We can't

14   explain away our decline.  We must reverse it."

15          What did you mean by becoming more relevant in your

16   customers lives and in the marketplace?

17   A     I think as I said earlier, spend is the engine that

18   drives our business model and I thought it was very important

19   to emphasize to people that we needed to grow and we needed to

20   grow our share of spend and in doing that we would be more

21   relevant in the lives of our customers.  We had to come out

22   with products that met their needs.  We had to be innovative

23   in the services that we developed, but we could not accept a

24   decline in market share because I did not want us to go the

25   way of Diners Club and Carte Blanche.

*Chenault - Direct / Chesler*                                    4369

1   Q    Did you at the time feel the need to further

2   differentiate your products?

3   A    Absolutely.  What was essential is to communicate to

4   people that to win in the marketplace we had to be more

5   innovative, we had to be more aggressive, and we needed to

6   invest to differentiate our business model even more.

7   Q    Mr. Silverman testified the other day that in this

8   market, this two-sided network effect market, as he described

9   it, you either needed to be the biggest or the best.

10             Do you agree with that?

11  A    I do.

12  Q    You're not the biggest, right?

13  A    We certainly are not.

14  Q    So is the strategy to be the best to pursue this

15  differentiated strategy in all of the closed-loop advantages

16  and the customer programs that you've been talking about?

17  A    Yes.

18  Q    Why didn't you adopt a plan here like Discover apparently

19  adopted to be the low-cost provider, just lower your discount

20  rate so you're the cheapest option to the merchants?

21  A    Because the reality is the chicken and the egg.  We have

22  to fund the investments like rewards, like customer service,

23  like technology so we, in fact, can deliver sustainable value

24  to merchants and cardmembers, and I think that our

25  differentiated business model has proven successful

1  particularly when you look at the situation of Discover, three

2  percent market share.

3  Q    Has their share been sort of consistent over the years?

4  A    Yes.

5  Q    Why not fund your differentiated product just on the

6  consumer side of the business then in, you know, fees to your

7  cardmembers, interest payments on their outstanding balances

8  if they're revolving a balance?

9  A    That goes against the integrated payments model that we

10 have constructed.  The reality is that what you can't do in

11 business when you are running a differentiated business model

12 is simply say "I can make a change here" and it's not going to

13 have an effect, a damaging effect elsewhere.  The reason why

14 we have this model is because it has allowed us to

15 differentiate ourselves in the marketplace, and we have to do

16 that by meeting the needs of cardmembers and merchants, and

17 that all comes together, all culminates at the point of

18 welcome acceptance because the engine that drives us is spend,

19 and that's what happens in a range of industries.  That's what

20 differentiation is all about.

21 Q    Do you have any examples, for example, from the computer

22 industry of how that differentiation strategy works?

23 A    I'll give you one example, and I think a very good one,

24 with Apple.  You know, people forget.  I mean, they got an

25 incredible market cap now, but people forget where Apple was,

1   and you remember when they came out with the Macintosh, people

2   were saying, "Steve Jobs, you're crazy.  You can't offer this

3   price."  And he said, "Wait a minute.  I'm focused on the

4   functionality and design of the product.  I want a

5   differentiated product in the marketplace."  There were a

6   number of lower-cost competitors, but what he said, that is

7   frankly not very different from what I said, is he said, "I

8   want to be relevant in people's lives, I want to make a

9   difference in their lives, and I want to provide real value."

10          And so we're providing real value to cardmembers and

11  merchants, but what you can't do is then say to Apple 'hey,

12  wait a minute, why don't you just change this feature,'

13  because that's running a business for a year or two.  I'm not

14  running a business for a day or a week or a month.  I'm

15  running a business for moderate and long-term success.  That's

16  what I've been very clear about with our people, very clear

17  about with our investors.

18  Q    Let me ask you to turn to page 12 from your speech.  It's

19  a page headed "Role of Establishment Services Worldwide in

20  Growing Market Share."

21          Do you have that page?

22  A    Yes.

23  Q    Going down to the second and third bullets you say:

24  "Their growing market share is not something that's done in a

25  vacuum.  Responsibility doesn't fall solely to card marketing

1    and advertising.  In fact, I would argue that responsibility

2    for the most critical factors rests with the people in this

3    room."  And you go on to say:  "Because while the

4    competitiveness of our card value propositions is driven by

5    many factors, welcome acceptance is the core promise of

6    Payment Systems products.  Without welcome acceptance, the

7    rest of our value proposition has only marginal value."

8                Is it fair to say, sir, that this concept of welcome

9    acceptance and the core promise wasn't something that was

10   created by the company for purposes of using it in this

11   litigation?

12   A    I would have to be very clairvoyant to know that in 2000

13   the U.S. Government would ask me to testify about our

14   differentiated business model, that it would rest on the

15   criticality of welcome acceptance.

16               What this represents is what I started off in my

17   testimony, that trust over 164 years is what is most important

18   in our brand and welcome acceptance is the cornerstone, and I

19   think I made it very clear that whatever we did in other value

20   propositions, which were very, very important, made that very

21   clear, very important, were meaningless unless we could

22   deliver on welcome acceptance because that was the promise

23   that we made to our cardmembers, that is the commitment we

24   asked from our merchants and they agreed to, and that is the

25   way that we fund our differentiated business model, and I

1  believed that way before 1996 and I believe it firmly now.

2  Q    You remember we looked at that share chart and the market

3  share, if you don't include debit, started to climb slowly in

4  the, I think, 2003 period and by, I don't know, a year or so

5  ago it was essentially where you had been 25 years before,

6  correct?

7  A    Yes.

8  Q    You kind of went through a trough and over a 25-year

9  period basically got back to where you had been in 1990.

10          Is that fair?

11 A    That is absolutely fair.

12 Q    So why did it take so long, why was that climb back a

13 decade long?

14 A    The reality is, as I said, we were dealing with the

15 double chokehold, just going through that trough, just

16 staunching the bleeding took an incredible effort on the part

17 of the entire company because you don't change these things

18 overnight, and so we had to deal with the double chokehold, we

19 had to invest substantial dollars in improving our value

20 propositions to merchants and cardmembers, we had to make

21 substantial investments in rewards, in customer service, in

22 technology, but we were able to get through that period, but

23 it took a tremendous amount of resilience, dedication, focus,

24 and commitment of our organization.

25 Q    If you had not been able to stop the preference campaign,

*Chenault - Direct / Chesler*                                    4374

1  "We Prefer Visa," in your judgment, given your position in the

2  company and your experience, would you have come out of that

3  slump?

4  A    We would not have come out.  I think I made it very clear

5  in my speech and very clear in my testimony that welcome

6  acceptance is at the core of our business model and without

7  that we will not be able to continue to invest in a

8  differentiated business model and it will be over.

9  Q    Let me ask you to look at Defendant's Exhibit 3096,

10 please.  I think it's the next document in the book.  This is

11 entitled "U.S. Membership Rewards Ken Chenault shirtsleeves

12 session June 13, 2006."

13         Do you have that document?

14 A    Yes, I do.

15 Q    What is a shirtsleeves session?

16 A    These are sessions where sometimes I get updates on

17 business issues, sometimes we drill down on a subject,

18 sometimes we have a deck, sometimes - meaning a presentation -

19 sometimes it's more of a conversation on different issues.  So

20 it's a way, in addition to the regular business meetings, that

21 I have that I can spend more time on particular issues.

22 Q    Who proposes the subjects for your shirtsleeves meetings?

23 Is it you or members of the staff?

24 A    It's mutual.  Sometimes I will say here are some subjects

25 I would like to cover.  Sometimes the management team said --

1   says here are some subjects we would like to cover with you

2   and review.

3             MR. CHESLER:  Your Honor, I offer Defendant's 3096.

4             MR. CONRATH:  No objection, Your Honor.

5             THE COURT:  All right.  Defense Exhibit 3096 is

6   received in evidence.

7             (Defense Exhibit 3096 was received in evidence.)

8   BY MR. CHESLER:

9   Q    Let me ask you to turn to slide 3, Mr. Chenault, third

10  page.

11            Do you have that?

12  A    Yes.

13  Q    It says "Executive Summary."  That's the chart we're

14  looking at, right?

15  A    Yes.

16  Q    And the first bullet says:  "Despite its centrality to

17  our results, we historically under-invested in maintaining

18  Membership Rewards market leadership.  In the past two years,

19  however, we significantly ramped up investing in improving

20  Membership Rewards."

21            Now, is that consistent with your memory that

22  beginning in about 2004 there was a significant ramp-up in the

23  investments in the Rewards program?

24  A    Yes.

25  Q    Why in particular did it happen in that time frame?

*Chenault - Direct / Chesler*                                    4376

1    A    Because what we saw is MasterCard and Visa, as I said

2    earlier, had raised their interchange rates encouraging the

3    banks to get more heavily involved in rewards and other

4    products for the premium segment, and the competition was

5    getting more intense because, as I said earlier, they were

6    basically replicating our playbook, and it was, in fact,

7    becoming almost an arms race in some areas and we had to ramp

8    up our investment.

9    Q    We talked earlier about the way you would incur costs,

10   set up reserves, have to adjust the reserves when the

11   redemptions take place.

12        Do you recall that discussion?

13   A    Yes.

14   Q    Let me ask you to turn to the next slide, slide 4.

15        You see this one is entitled "U.S. Membership

16   Rewards Program Performance," right?

17   A    Yes.

18   Q    And you've got a column headed "2006F."

19        Is that a forecast?

20   A    Yes.

21   Q    And then the column to the right says "2005."

22        Are those actuals?

23   A    Yes.

24   Q    And then there's a comparison of the 2005 forecast with

25   the 2005 actuals, right?

1  A    Yes.

2            THE COURT:  The numbers are redacted.

3            MR. CHESLER:  Yes, and I'm not going to have the

4  witness recite the numbers in court, Your Honor.

5            THE COURT:  Please remind the witness.

6            MR. CHESLER:  Thank you, Your Honor.

7  Q    There have been many, including myself, who have fallen

8  afoul of that rule.  Let's see if we can get through this with

9  a perfect batting average and not mention the numbers.

10           There's one line on this chart "Ultimate Redemption

11 Rate."

12           Do you see that?

13 A    Yes.

14 Q    What does the ultimate redemption rate mean?  What is

15 that a measurement of?

16 A    That's our projection of the level of where we think the

17 points will be redeemed.

18 Q    And without stating the numbers, is it right that the

19 forecast for 2006 showed an increase over the actual

20 redemption rate for 2005?

21 A    Correct.

22 Q    And when you increase the ultimate redemption rate, what

23 does that do to the reserves that you have to book for the

24 cost of your rewards program?

25 A    You have to increase the reserves.

1    Q    So even though the -- even though the rewards haven't yet

2    actually been redeemed, so you haven't actually paid the

3    airline for that seat or you haven't paid the vendor for

4    whatever the product was that the customer bought with your

5    reward points, you have to up the reserve even when you just

6    change the estimate of the ultimate redemption rate?

7    A    Yes.

8    Q    And those costs, I take it, come off of your revenue to

9    get to your income, right?

10   A    Yes.

11   Q    Lowers your margin?

12   A    Yes.

13   Q    Would you look at slide 6, please.  And again the numbers

14   have been redacted here.  It's entitled "MR Expense 2006 to

15   2009 LRP."

16              What is LRP?

17   A    Long range plan.

18   Q    Without stating the numbers, what's the message of this

19   chart?

20   A    The message is that we had a substantial increase over

21   that time period.

22   Q    And again without stating the numbers, are the dollars

23   that appear at the top of each of those blue bars in billions

24   of dollars?

25   A    Yes, they are.

1  Q    So those are billions of MR expense incurred or estimated

2  to be incurred in each of those years?

3  A    Yes.

4  Q    Did the actuals come out to be relatively consistent with

5  the estimates?

6  A    Yes.

7  Q    Look at slide 9, please.  It's entitled "MR Key

8  Achievements January '05 to May '06."  It's a pretty busy

9  chart.  I don't want to take the time to go through it all,

10  but there's one that I would like to pause on for a moment.

11          At the bottom of the chart where it says "Partner

12  signings 2005," one of the merchants listed there is iTunes.

13          What do your Membership Rewards have to do with

14  iTunes?

15  A    What I think is very important, it goes to the utility

16  and the value of the program and this notion that I talked

17  about of virtual currency, that you could redeem your points

18  to buy songs from iTunes, and I think we all understand how

19  popular iTunes are, and to have a redemption option that

20  someone did not have to build up high level of points and they

21  could redeem something that they considered of real value was

22  very important, and as I said earlier, is the benefit of that

23  is not just to Apple, but the benefit is to all merchants

24  because the customer knows if I'm using my card, I'm earning

25  points and I have a wide variety of options in the way that I

*Chenault - Direct / Chesler*                                    4380

1    can redeem those points.  So it's making the program more

2    attractive and accessible for the cardmember in giving them a

3    wide range of redemption options, and that proved to be a

4    very, very good program, and as I said, the benefit went to

5    almost all merchants where someone was using our card.

6              THE COURT:  Is there a Membership Rewards feature

7    for Bluebird?

8              THE WITNESS:  There is not, Your Honor, at this

9    point.  The economics would be more challenging.  So we have

10   different features, but from a rewards standpoint, we do not

11   have Membership Rewards on Bluebird, but what we have done, as

12   I said earlier, is we have substantially reduced the fees, and

13   so the benefit to the customer is substantial and we've given

14   them also a very strong level of customer service and they do

15   have benefits like purchase protection.

16             THE COURT:  I see.

17             MR. CHESLER:  Your Honor, just one other page in

18   this document, then I think we're ready to conclude.

19   BY MR. CHESLER:

20   Q    Would you turn to slide 39, please, Mr. Chenault.  It's

21   entitled "Competitive Comparison Travel Redemptions."

22             Do you see that?

23   A    Yes.

24   Q    Now, listed across the top are a bunch of issuers.

25             Are those some selected competitors for travel

*Chenault - Direct / Chesler*                                          4381

1   redemptions?

2   A    Yes.

3   Q    Why in your shirtsleeves session do you get briefed on

4   this kind of information, what competitors are offering for

5   travel redemptions?

6   A    I think it's very critical that we review competitive

7   comparisons pricing, value, benefits, services, features.

8   That is essential for us to stay very competitive in the

9   marketplace.

10            MR. CHESLER:  Your Honor, I'm going to move to a

11   somewhat different subject.  Is this a good time?

12            THE COURT:  Yes, I think this is a good time to

13   adjourn for the evening.

14            Let me ask about how much more time do you think

15   you're going to use for the direct for Mr. Chenault?

16            MR. CHESLER:  I think, Your Honor, perhaps around

17   the midmorning break or so, maybe a little over that, but

18   around the eleven o'clock break or so.

19            THE COURT:  All right.  And in terms of the

20   Government on cross-examination?

21            MR. CONRATH:  I would estimate about three hours,

22   Your Honor.

23            THE COURT:  And that would mean that you'll be able

24   to call your next witness tomorrow afternoon.

25            MR. CHESLER:  Yes, Your Honor.  We have another

4382

1    witness and we've informed the Government of who that is.

2            THE COURT:  Okay.  That's fine.  And I also wanted

3    you to provide this information for the witness so he would

4    know about when he'd be released from his indenture here.

5            MR. CHESLER:  It sounds like if we're doing our math

6    right, probably around three p.m. or so.

7            THE COURT:  That sounds about right to me.

8            MR. CHESLER:  We haven't been great in our

9    estimates, but we're getting there.

10           THE COURT:  All right.  That's fine.  I just wanted

11   to get a general idea.

12           MR. CHESLER:  Thank you.

13           THE COURT:  All right.  We'll see you tomorrow

14   morning, sir, 9:00.

15           THE WITNESS:  Thank you, very much, Your Honor.

16           MR. CHESLER:  Thank you, Your Honor.

17           (Time noted:  6:03 p.m.)

18           (Whereupon, the proceedings were adjourned to

19   July 31, 2014, at 9:00 a.m.)

20

21

22

23

24

25

4383

I N D E X

**WITNESS**                                              **PAGE**


    M I C H A E L   K A T Z                              4117

    CROSS-EXAMINATION (Cont'd.)

    BY MR. CHESLER                                       4117

    REDIRECT EXAMINATION BY MR. CONRATH                  4248

    K E N N E T H   C H E N A U L T                      4291

    DIRECT EXAMINATION

    BY MR. CHESLER                                       4291

4384

1                            **E X H I B I T S**

2

3

4     Defendant's Exhibit 7761                              4116

5

6     Defendant's Exhibit 7760                              4117

7

8     Defendant's Exhibits 6540 A and B                     4135

9

10    Defendant's Exhibits 6540 C and D                     4145

11

12    Defendant's Exhibit 6507 A                            4155

13

14    Defendants' Exhibit DX229                             4207

15

16    Defendants' Exhibit DX6466A and DX6466B               4248

17

18    Defense Exhibit 7525                                  4355

19

20    Defense Exhibit 7492                                  4361

21

22    Defense Exhibit 319                                   4367

23

24    Defense Exhibit 3096                                  4375

25

1

**$**

**$10** [1] - 4309:4
**$25** [1] - 4309:3
**$250** [1] - 4309:3
**$400** [2] - 4236:8, 4236:11
**$50** [2] - 4308:7, 4309:4
**$500,000** [1] - 4234:8

**'**

**'05** [1] - 4379:8
**'06** [1] - 4379:8
**'382** [1] - 4355:7
**'383** [1] - 4354:13
**'50s** [1] - 4358:7
**'60s** [2] - 4329:13, 4358:8
**'721** [1] - 4159:14
**'80s** [4] - 4317:3, 4334:11, 4337:1, 4337:3
**'89** [1] - 4352:19
**'90** [1] - 4338:5
**'90s** [4] - 4317:3, 4334:12, 4334:19, 4346:14
**'95** [2] - 4326:11, 4338:5
**'96** [2] - 4367:6, 4367:17
**'998** [1] - 4368:4
**'hey** [1] - 4371:11
**'if** [1] - 4366:3
**'look** [1] - 4194:9
**'well** [2] - 4181:24, 4366:1
**'yes** [1] - 4181:25

**0**

**0229** [1] - 4248:15
**0743** [1] - 4273:7

**1**

**1** [4] - 4163:5, 4195:1, 4326:25, 4362:25
**1-A** [2] - 4148:25, 4155:9
**10** [1] - 4184:19
**10,000** [3] - 4295:21, 4312:14, 4340:10
**10-CV-4496** [1] - 4112:5
**100** [4] - 4120:1, 4154:24, 4180:8, 4282:2
**10019** [1] - 4113:8
**10022** [1] - 4113:12
**105** [2] - 4207:18, 4207:21
**107** [2] - 4248:15, 4249:1
**11** [4] - 4140:14, 4143:15, 4143:21, 4288:24
**11201** [1] - 4113:19
**12** [5] - 4281:4, 4281:12, 4284:4, 4291:17, 4371:18
**12548** [1] - 4112:25
**13** [2] - 4291:19, 4374:12
**13-year** [1] - 4291:20
**132** [2] - 4347:19, 4347:20
**14** [4] - 4230:10, 4230:11, 4287:4, 4327:17

**1424** [1] - 4179:22
**1425** [1] - 4179:22
**148** [4] - 4195:2, 4270:8, 4270:14, 4271:6
**14th** [1] - 4136:7
**15** [4] - 4137:4, 4260:14, 4297:24, 4303:18
**150** [3] - 4122:23, 4122:24, 4270:15
**156** [2] - 4276:10, 4276:13
**16** [1] - 4182:23
**1628** [1] - 4140:7
**164** [3] - 4296:8, 4303:4, 4372:17
**169** [3] - 4120:9, 4120:14, 4120:17
**17** [1] - 4317:17
**176** [1] - 4203:3
**19** [1] - 4326:7
**1917** [1] - 4159:7
**1958** [1] - 4327:23
**1981** [3] - 4291:23, 4293:5, 4330:23
**1987** [1] - 4333:15
**1989** [2] - 4348:2, 4349:3
**1990** [5] - 4267:5, 4325:25, 4327:17, 4341:22, 4373:9
**1991** [2] - 4298:10, 4333:24
**1994** [1] - 4207:5
**1995** [3] - 4123:5, 4123:7, 4325:25
**1996** [2] - 4366:22, 4373:1
**1997** [2] - 4292:15, 4353:22
**1998** [1] - 4360:14

**2**

**2** [3] - 4132:24, 4159:8, 4363:2
**2)(i** [1] - 4242:12
**20** [3] - 4121:17, 4144:11, 4204:25
**2000** [2] - 4315:23, 4372:12
**20001** [1] - 4112:18
**2000s** [1] - 4346:5
**2001** [3] - 4129:20, 4292:17, 4292:18
**2002** [2] - 4143:15, 4144:11
**2003** [4] - 4246:16, 4326:11, 4326:14, 4373:4
**2004** [2] - 4159:9, 4375:22
**2005** [5] - 4376:21, 4376:24, 4376:25, 4377:20, 4379:12
**2006** [3] - 4374:12, 4377:19, 4378:14
**2006F** [1] - 4376:18
**2007** [1] - 4297:9
**2008** [9] - 4131:9, 4131:20, 4132:2, 4244:12, 4245:1, 4246:25, 4266:12, 4266:22, 4267:3
**2009** [6] - 4266:2, 4266:12, 4266:23, 4267:2, 4267:4, 4378:15
**2010** [9] - 4133:8, 4133:15, 4134:2, 4134:3, 4134:12, 4134:14, 4143:15, 4144:11, 4241:8
**2011** [4] - 4129:20, 4136:7, 4267:5, 4327:18
**2012** [2] - 4326:15, 4327:3
**2013** [1] - 4314:14
**2014** [3] - 4112:9, 4340:6, 4382:19

**203** [1] - 4315:4
**205** [2] - 4165:21, 4165:24
**21** [3] - 4355:22, 4356:2, 4356:9
**213** [1] - 4125:19
**215** [1] - 4317:18
**22** [6] - 4137:13, 4140:7, 4168:1, 4247:20, 4248:1
**225** [1] - 4113:19
**229** [1] - 4206:24
**23** [2] - 4360:13, 4366:22
**231** [3] - 4163:5, 4163:6, 4163:11
**237** [1] - 4320:24
**24** [4] - 4284:14, 4284:17, 4326:7, 4327:17
**25** [3] - 4205:2, 4327:5, 4373:5
**25-year** [1] - 4373:8
**26.4** [1] - 4327:4
**2711** [1] - 4274:22
**288** [2] - 4129:12, 4129:16
**293** [1] - 4353:24
**2:50** [1] - 4290:3

### 3

**3** [14] - 4166:1, 4223:6, 4223:9, 4223:16, 4226:8, 4228:2, 4229:2, 4236:2, 4236:7, 4236:11, 4239:4, 4313:7, 4313:12, 4375:9
**30** [4] - 4112:9, 4297:16, 4334:22, 4334:25
**30-odd** [1] - 4328:14
**3096** [5] - 4374:9, 4375:3, 4375:5, 4375:7, 4384:24
**30s** [1] - 4244:23
**31** [1] - 4382:19
**313** [2] - 4203:3, 4232:1
**319** [5] - 4366:16, 4367:20, 4367:23, 4367:25, 4384:22
**322** [1] - 4167:23
**329** [3] - 4224:17, 4224:23, 4224:24
**33** [5] - 4127:3, 4291:14, 4293:6, 4293:7
**34** [2] - 4127:4, 4284:17
**340** [1] - 4157:4
**341** [1] - 4158:5
**35** [2] - 4284:6, 4284:14
**3581** [1] - 4273:8
**380** [1] - 4122:21
**3803** [1] - 4273:8
**3804** [2] - 4273:8, 4273:16
**3874** [2] - 4352:6, 4352:7
**389** [1] - 4142:10
**39** [2] - 4320:24, 4380:20
**390** [1] - 4144:5
**3929** [2] - 4348:3, 4348:14
**3930** [1] - 4349:6
**3994** [2] - 4244:2, 4244:7

### 4

**4** [12] - 4223:6, 4223:16, 4226:8, 4228:2, 4229:2, 4230:22, 4236:2, 4239:4, 4239:15, 4240:5, 4313:12, 4376:14

**4000** [1] - 4112:17
**41** [4] - 4266:14, 4266:15, 4266:17, 4267:3
**4116** [1] - 4384:4
**4117** [3] - 4383:6, 4383:8, 4384:6
**4135** [1] - 4384:8
**4145** [1] - 4384:10
**4155** [1] - 4384:12
**4207** [1] - 4384:14
**4248** [2] - 4383:9, 4384:16
**4291** [2] - 4383:10, 4383:12
**430** [2] - 4132:18, 4134:17
**431** [2] - 4133:19, 4134:17
**4355** [1] - 4384:18
**4361** [1] - 4384:20
**4367** [1] - 4384:22
**4375** [1] - 4384:24
**45** [4] - 4279:5, 4279:10, 4280:11, 4319:16
**450** [1] - 4112:17
**4583** [6] - 4265:20, 4265:23, 4266:1, 4266:7, 4267:8, 4267:21
**46** [1] - 4280:11
**47** [2] - 4280:11, 4281:16

### 5

**5** [5] - 4132:24, 4228:2, 4241:1, 4241:3, 4326:8
**50** [3] - 4144:22, 4180:1, 4306:16
**50-odd** [1] - 4184:20
**516** [2] - 4182:20, 4182:23
**542** [1] - 4125:19
**55** [1] - 4312:15
**551** [2] - 4232:1, 4232:6
**552** [1] - 4232:19
**554** [1] - 4237:3
**575** [1] - 4113:12
**5817** [1] - 4136:1
**5828** [1] - 4240:21

### 6

**6** [3] - 4248:1, 4312:16, 4378:13
**60** [1] - 4356:22
**60-odd** [1] - 4184:19
**604** [2] - 4157:3, 4157:5
**6266B** [1] - 4248:2
**646** [1] - 4247:19
**6466** [4] - 4129:9, 4129:14, 4167:22, 4247:15
**6466A** [2] - 4247:15, 4252:25
**6466B** [1] - 4247:21
**6507** [11] - 4148:24, 4154:14, 4154:15, 4155:4, 4155:13, 4155:15, 4155:21, 4194:25, 4270:6, 4270:8, 4384:12
**65102** [1] - 4113:3
**6540** [17] - 4132:16, 4134:18, 4134:19, 4134:23, 4135:1, 4142:2, 4142:3, 4142:10, 4144:5, 4145:7, 4145:22, 4145:23, 4154:7, 4156:24, 4231:14, 4384:8, 4384:10

**69** [1] - 4127:2
**6:03** [1] - 4382:17

### 7

**7** [2] - 4163:11, 4241:3
**70** [8] - 4282:25, 4283:7, 4318:18, 4334:22, 4335:1, 4355:20, 4356:1
**708** [2] - 4122:17, 4122:24
**7183** [4] - 4276:5, 4276:9, 4276:10, 4276:13
**72** [1] - 4137:2
**7202** [4] - 4244:24, 4245:11, 4245:25
**733** [4] - 4120:7, 4120:13, 4125:18, 4127:2
**7492** [3] - 4361:9, 4361:14, 4384:20
**75** [1] - 4283:8
**7525** [3] - 4353:14, 4355:4, 4384:18
**7580** [3] - 4230:2, 4286:25, 4287:4
**76** [1] - 4283:8
**7721** [2] - 4281:4, 4281:9
**7743** [1] - 4304:5
**7747** [3] - 4263:12, 4263:15, 4263:18
**7760** [6] - 4115:11, 4115:14, 4116:5, 4116:7, 4117:12, 4384:6
**7760A** [3] - 4115:11, 4115:22, 4117:9
**7761** [10] - 4115:13, 4115:22, 4116:2, 4116:4, 4279:4, 4281:9, 4281:12, 4283:14, 4284:5, 4384:4
**7766** [1] - 4215:1
**7775** [2] - 4136:24, 4139:16
**7789** [2] - 4325:10, 4338:1
**7790** [1] - 4327:8
**78** [2] - 4195:1, 4270:9
**78711-2548** [1] - 4112:25
**7th** [1] - 4314:20

### 8

**8** [1] - 4368:3
**809** [1] - 4137:15
**82** [1] - 4137:11
**825** [1] - 4113:8
**83** [4] - 4139:20, 4140:11, 4274:24, 4275:3
**84** [1] - 4140:14
**89** [2] - 4120:10, 4120:13
**899** [1] - 4113:2

### 9

**9** [5] - 4312:14, 4312:16, 4340:10, 4379:7
**90** [1] - 4309:23
**934** [2] - 4215:4, 4215:7
**98** [5] - 4128:3, 4234:9, 4313:20, 4313:21, 4314:2
**99** [4] - 4148:25, 4154:24, 4155:2, 4155:10
**9:00** [3] - 4112:10, 4382:14, 4382:19

## A

**a.m** [2] - 4112:10, 4382:19
**Aaron** [1] - 4136:6
**abandon** [3] - 4251:4, 4251:5, 4363:3
**ABBOT** [1] - 4112:23
**abilities** [1] - 4196:17
**ability** [25] - 4119:3, 4119:5, 4119:10, 4154:6, 4158:8, 4158:9, 4158:12, 4158:25, 4213:2, 4217:21, 4234:18, 4236:18, 4236:21, 4271:20, 4272:3, 4272:14, 4312:7, 4347:7, 4349:15, 4351:12, 4353:3, 4353:6, 4356:5, 4362:15, 4364:17
**above-referred** [1] - 4348:5
**absent** [1] - 4120:5
**absolutely** [15] - 4145:16, 4301:21, 4302:21, 4310:6, 4310:12, 4310:20, 4313:15, 4337:18, 4339:23, 4340:8, 4347:11, 4358:13, 4363:7, 4369:3, 4373:11
**ACCC** [1] - 4243:18
**accept** [55] - 4135:9, 4181:13, 4206:6, 4223:1, 4223:21, 4226:9, 4229:3, 4229:9, 4229:21, 4230:12, 4230:23, 4232:4, 4232:7, 4232:11, 4233:20, 4234:11, 4235:14, 4236:2, 4236:12, 4236:14, 4236:17, 4236:25, 4237:2, 4237:5, 4239:4, 4239:8, 4240:7, 4251:2, 4268:2, 4272:1, 4287:8, 4287:13, 4305:9, 4312:19, 4313:6, 4313:9, 4313:12, 4313:24, 4314:3, 4314:5, 4318:15, 4339:2, 4339:12, 4340:2, 4344:16, 4363:15, 4363:16, 4363:17, 4363:20, 4365:18, 4366:6, 4366:15, 4368:23
**acceptable** [3] - 4134:19, 4364:2, 4364:3
**acceptance** [46] - 4122:8, 4123:13, 4124:11, 4125:3, 4125:7, 4125:13, 4125:21, 4126:22, 4127:6, 4127:19, 4135:5, 4135:13, 4135:20, 4138:23, 4169:10, 4180:16, 4238:11, 4252:18, 4283:25, 4295:15, 4296:23, 4303:2, 4303:4, 4332:10, 4333:5, 4339:1, 4339:5, 4343:8, 4343:9, 4344:9, 4347:12, 4351:16, 4353:8, 4353:12, 4357:18, 4359:13, 4362:21, 4366:13, 4370:18, 4372:5, 4372:6, 4372:9, 4372:15, 4372:18, 4372:22, 4374:6
**accepted** [13] - 4116:9, 4116:13, 4184:13, 4184:23, 4224:2, 4249:8, 4280:3, 4299:10, 4338:22, 4339:15,

4339:25, 4356:24
**accepting** [8] - 4126:5, 4180:1, 4193:22, 4222:18, 4227:10, 4313:5, 4328:8, 4359:3
**accepts** [4] - 4226:18, 4233:1, 4233:5, 4363:19
**access** [5] - 4171:25, 4203:23, 4213:4, 4329:22, 4338:17
**accessible** [1] - 4380:2
**accomplish** [1] - 4230:17
**according** [4] - 4126:10, 4129:24, 4200:5, 4326:2
**account** [9] - 4172:13, 4174:8, 4277:25, 4279:20, 4284:11, 4284:13, 4318:20, 4318:23, 4329:23
**Accountability** [1] - 4243:22
**accounted** [1] - 4153:7
**accounting** [3] - 4119:25, 4190:14, 4301:15
**accurate** [2] - 4168:11, 4349:2
**achieve** [3] - 4148:11, 4165:11, 4166:11
**achieved** [1] - 4303:18
**Achievements** [1] - 4379:8
**achieving** [1] - 4287:19
**acknowledge** [2] - 4150:5, 4175:12
**acknowledged** [1] - 4265:8
**acquire** [4] - 4293:21, 4294:12, 4324:17
**acquirer** [2] - 4149:3, 4285:14
**acquirers** [2] - 4190:14, 4285:12
**act** [2] - 4218:20, 4364:20
**Act** [1] - 4241:8
**acted** [1] - 4246:16
**action** [7] - 4221:7, 4221:8, 4226:13, 4236:20, 4265:17, 4312:4, 4352:15
**Action** [1] - 4362:23
**actions** [9] - 4122:7, 4123:8, 4123:11, 4124:4, 4246:2, 4265:14, 4270:20, 4270:21
**active** [1] - 4321:22
**actively** [1] - 4193:23
**activities** [2] - 4249:5, 4307:20
**activity** [3] - 4267:13, 4300:1, 4317:9
**actual** [5] - 4178:6, 4178:9, 4225:25, 4253:6, 4377:19
**actuals** [4] - 4130:12, 4376:22, 4376:25, 4379:4
**adapt** [1] - 4237:6
**add** [4] - 4120:1, 4140:10, 4235:2, 4282:2
**addition** [4] - 4174:14, 4309:17, 4341:9, 4374:20
**additional** [8] - 4143:22, 4208:25, 4209:1, 4246:2, 4256:24, 4272:1, 4282:6, 4288:22
**address** [1] - 4231:14
**addressed** [2] - 4231:20, 4265:14
**adjourn** [1] - 4381:13
**adjourned** [1] - 4382:18
**adjust** [3] - 4151:5, 4173:18, 4376:10
**adjusted** [4] - 4150:18, 4151:18, 4152:3, 4178:15

**adjustment** [1] - 4138:12
**adjustments** [6] - 4143:9, 4143:10, 4143:25, 4144:15, 4301:23, 4301:25
**admitted** [2] - 4134:23, 4179:3
**adopt** [1] - 4369:18
**adopted** [1] - 4369:19
**advantage** [3] - 4340:21, 4364:17
**advantages** [9] - 4340:10, 4348:21, 4349:7, 4349:9, 4349:16, 4350:10, 4353:3, 4364:16, 4369:15
**advertise** [1] - 4362:4
**advertisement** [1] - 4249:15
**advertisers** [4] - 4258:17, 4258:19, 4258:25, 4259:3
**advertising** [8] - 4210:14, 4249:8, 4250:2, 4250:5, 4338:22, 4348:22, 4365:15, 4372:1
**advocating** [1] - 4362:20
**Affairs** [1] - 4361:3
**affect** [1] - 4356:21
**affected** [1] - 4277:23
**affecting** [2] - 4277:15, 4278:8
**affects** [2] - 4277:24, 4285:4
**affiliate** [1] - 4307:2
**affiliated** [2] - 4329:9, 4329:15
**affinity** [1] - 4296:9
**affirms** [1] - 4256:19
**affluent** [9] - 4315:10, 4316:11, 4316:23, 4316:24, 4317:23, 4317:24, 4320:12, 4320:13, 4330:21
**afford** [1] - 4363:1
**afoul** [1] - 4377:8
**afraid** [1] - 4184:21
**afternoon** [4] - 4248:9, 4248:10, 4381:24
**afterwards** [1] - 4154:20
**agents** [2] - 4331:18, 4341:12
**aggressive** [1] - 4369:5
**aggressively** [3] - 4323:20, 4334:3, 4334:15
**ago** [6] - 4139:20, 4142:4, 4174:6, 4260:14, 4273:1, 4373:5
**agree** [67] - 4117:19, 4117:24, 4118:2, 4118:9, 4118:14, 4118:19, 4118:21, 4123:19, 4124:17, 4126:3, 4128:14, 4129:1, 4133:2, 4133:24, 4134:8, 4148:4, 4153:16, 4153:20, 4158:18, 4162:6, 4163:2, 4164:23, 4165:10, 4166:2, 4167:10, 4168:10, 4168:16, 4168:17, 4175:18, 4177:7, 4178:8, 4179:12, 4181:12, 4181:19, 4182:13, 4182:24, 4183:16, 4184:10, 4186:22, 4187:6, 4188:23, 4190:8, 4192:23, 4193:1, 4193:2, 4194:14, 4195:5, 4206:2, 4208:13, 4208:15, 4209:3, 4209:8, 4215:13, 4218:25, 4221:17, 4222:13, 4226:24, 4227:24, 4228:22, 4233:6, 4234:13, 4241:22, 4287:12, 4287:22, 4313:14, 4349:14, 4369:10
**agreed** [6] - 4216:1, 4223:6, 4235:16, 4289:9, 4357:19, 4372:24

4

agreeing [2] - 4270:2, 4344:13
agreement [15] - 4131:10, 4138:23,
4172:9, 4192:16, 4192:21, 4242:16,
4254:1, 4258:9, 4258:11, 4344:5,
4358:16, 4358:20, 4358:25, 4359:8,
4366:11
agreements [18] - 4135:19, 4135:20,
4178:3, 4186:22, 4193:9, 4238:11,
4241:16, 4241:17, 4241:23, 4241:24,
4242:5, 4302:16, 4328:8, 4340:15,
4340:22, 4341:6, 4358:7
agrees [3] - 4241:17, 4241:24, 4242:6
ahead [11] - 4167:7, 4170:13, 4174:1,
4220:25, 4253:16, 4257:21, 4269:3,
4283:13, 4324:5, 4348:12, 4352:2
aide [2] - 4335:25, 4336:5
aimed [1] - 4197:15
Air [1] - 4192:4
air [1] - 4338:15
airline [3] - 4300:3, 4344:12, 4378:3
Airlines [5] - 4131:9, 4191:20, 4191:22,
4254:12
airlines [1] - 4305:14
AL [1] - 4112:10
alarming [1] - 4356:17
Alaska [3] - 4191:20, 4192:2, 4192:4
alert [2] - 4308:11, 4308:23
alike [1] - 4307:15
all-in [2] - 4152:18, 4153:4
alleged [1] - 4176:15
allow [4] - 4271:22, 4321:25, 4322:1,
4351:23
allowed [7] - 4235:1, 4239:24, 4240:2,
4243:7, 4315:24, 4337:15, 4370:14
allowing [1] - 4238:21
allows [1] - 4238:25
almost [5] - 4279:25, 4335:24, 4364:21,
4376:7, 4380:5
alone [2] - 4129:1, 4270:23
aloud [1] - 4115:6
alternatives [1] - 4177:21
AM [2] - 4208:8
amended [1] - 4115:10
Amendment [2] - 4220:12, 4237:19
amendment [1] - 4168:14
AMERICA [1] - 4112:3
America [17] - 4204:24, 4213:4,
4221:13, 4222:14, 4224:1, 4224:9,
4225:8, 4225:16, 4226:1, 4228:24,
4229:3, 4234:9, 4235:15, 4256:16,
4325:5, 4326:23, 4329:19
American [319] - 4114:11, 4114:14,
4119:17, 4119:23, 4120:3, 4120:25,
4121:3, 4121:17, 4121:22, 4122:6,
4122:9, 4123:7, 4123:24, 4125:12,
4125:15, 4125:20, 4125:21, 4126:6,
4126:12, 4126:22, 4126:23, 4127:5,
4127:7, 4127:11, 4127:19, 4128:3,
4128:19, 4129:5, 4129:19, 4129:25,
4130:8, 4130:13, 4130:22, 4130:25,
4131:7, 4131:8, 4131:11, 4131:14,

4131:20, 4131:22, 4132:6, 4132:22,
4133:4, 4133:14, 4134:1, 4134:11,
4135:8, 4135:9, 4135:15, 4135:16,
4135:20, 4135:23, 4136:7, 4136:9,
4136:11, 4136:15, 4136:20, 4137:7,
4137:15, 4137:16, 4138:22, 4140:17,
4140:20, 4140:22, 4141:1, 4141:9,
4142:17, 4146:3, 4146:14, 4146:24,
4147:15, 4147:23, 4150:11, 4150:19,
4150:20, 4151:17, 4151:20, 4151:22,
4152:1, 4152:6, 4152:8, 4152:12,
4152:16, 4152:19, 4153:1, 4153:17,
4158:13, 4158:14, 4159:9, 4161:18,
4161:21, 4161:24, 4162:2, 4162:6,
4164:25, 4165:3, 4167:11, 4167:16,
4167:19, 4168:13, 4168:18, 4168:19,
4168:22, 4171:19, 4171:24, 4178:1,
4179:10, 4184:14, 4184:16, 4185:1,
4185:8, 4185:9, 4185:11, 4185:15,
4185:23, 4191:23, 4191:24, 4192:3,
4192:4, 4192:9, 4192:10, 4192:14,
4192:15, 4192:18, 4193:3, 4193:7,
4193:11, 4193:14, 4193:15, 4193:17,
4193:19, 4193:21, 4193:24, 4194:9,
4194:11, 4194:14, 4195:3, 4195:8,
4195:14, 4195:22, 4195:24, 4196:3,
4196:4, 4196:5, 4196:7, 4196:11,
4196:17, 4196:19, 4197:1, 4197:6,
4197:10, 4197:13, 4197:16, 4197:19,
4197:20, 4199:15, 4200:15, 4200:25,
4201:8, 4202:12, 4202:17, 4204:9,
4204:19, 4205:4, 4205:14, 4205:19,
4206:2, 4209:25, 4210:24, 4211:1,
4211:20, 4212:1, 4212:11, 4212:12,
4212:16, 4213:2, 4213:5, 4218:8,
4218:12, 4218:13, 4219:12, 4219:22,
4219:24, 4221:14, 4221:20, 4221:22,
4221:23, 4222:1, 4222:4, 4222:7,
4222:12, 4222:18, 4222:21, 4223:2,
4224:2, 4224:14, 4226:10, 4226:19,
4227:18, 4227:20, 4228:1, 4228:7,
4228:18, 4229:3, 4229:10, 4231:19,
4232:4, 4232:11, 4232:22, 4232:25,
4233:17, 4235:5, 4235:14, 4236:3,
4236:12, 4236:17, 4236:25, 4237:2,
4237:5, 4238:10, 4238:20, 4238:24,
4239:5, 4240:8, 4248:19, 4249:10,
4249:16, 4250:3, 4252:1, 4252:3,
4252:22, 4254:4, 4254:20, 4255:10,
4255:12, 4255:13, 4255:22, 4256:7,
4256:8, 4256:14, 4256:20, 4256:22,
4257:17, 4258:7, 4260:8, 4260:14,
4267:9, 4270:11, 4270:18, 4270:19,
4270:21, 4270:22, 4271:1, 4271:9,
4272:15, 4272:23, 4274:2, 4274:5,
4280:25, 4287:13, 4287:16, 4287:18,
4289:10, 4289:15, 4291:8, 4292:18,
4293:4, 4293:9, 4293:19, 4294:16,
4295:6, 4295:15, 4295:17, 4295:22,
4296:5, 4296:7, 4302:15, 4302:23,
4305:9, 4312:11, 4313:9, 4320:14,
4322:23, 4322:25, 4325:16, 4326:3,

4326:20, 4327:21, 4328:7, 4328:16,
4330:5, 4330:18, 4335:12, 4339:1,
4339:2, 4339:4, 4341:12, 4341:24,
4346:4, 4346:9, 4346:11, 4346:23,
4349:15, 4351:22, 4353:2, 4355:21,
4356:4, 4357:1, 4357:16, 4358:14,
4358:19, 4362:10, 4362:16, 4362:20,
4367:9
AMERICAN [1] - 4112:9
Americans [1] - 4318:18
Amex [22] - 4166:6, 4259:4, 4268:11,
4307:5, 4317:7, 4317:14, 4320:19,
4338:21, 4338:23, 4340:2, 4340:23,
4341:21, 4345:8, 4348:14, 4348:15,
4348:20, 4348:21, 4348:23, 4349:7,
4349:12, 4349:23, 4356:24
Amex's [7] - 4151:25, 4153:14, 4280:14,
4316:10, 4325:20, 4327:11, 4349:8
amount [13] - 4131:8, 4131:10, 4145:2,
4237:13, 4286:6, 4304:10, 4304:12,
4307:23, 4311:7, 4319:14, 4319:15,
4357:9, 4373:23
analogized [1] - 4257:18
analogous [1] - 4164:15
analogy [4] - 4164:15, 4257:17, 4258:1,
4258:3
analyses [1] - 4280:21
analysis [13] - 4147:3, 4175:18,
4186:19, 4256:4, 4281:6, 4282:6,
4287:25, 4305:15, 4305:18, 4321:24,
4359:15
analytics [2] - 4336:25, 4337:15
analytics' [1] - 4336:20
analyze [3] - 4118:5, 4172:12, 4305:13
analyzed [1] - 4274:4
AND [1] - 4112:6
ANNE [1] - 4113:1
announced [1] - 4230:20
annual [1] - 4246:20
answer [32] - 4123:11, 4124:2, 4163:15,
4163:24, 4164:2, 4164:3, 4164:17,
4166:8, 4166:12, 4174:4, 4176:11,
4180:5, 4180:12, 4180:18, 4180:23,
4181:23, 4183:1, 4183:5, 4195:19,
4215:15, 4215:21, 4218:4, 4218:5,
4225:9, 4244:6, 4245:16, 4264:22,
4273:13, 4273:17, 4273:25, 4297:12,
4324:10
Answer [10] - 4123:16, 4124:3, 4137:8,
4137:24, 4138:25, 4140:19, 4141:3,
4141:5, 4141:13, 4274:4
answered [1] - 4275:7
answering [2] - 4270:1
answers [1] - 4139:9
anti [5] - 4118:25, 4250:4, 4265:10,
4270:20, 4287:16
anti-competitive [4] - 4118:25, 4265:10,
4270:20, 4287:16
anti-steering [1] - 4250:4
anticipate [3] - 4244:4, 4261:11, 4278:7
anticompetitive [10] - 4187:1, 4212:24,

5

4213:3, 4213:7, 4213:11, 4213:18,
4217:2, 4217:7, 4232:10, 4351:11
**antidiscrimination** [1] - 4228:8
**ANTITRUST** [1] - 4112:16
**Antitrust** [2] - 4159:10, 4206:17
**antitrust** [11] - 4129:2, 4153:17,
4186:19, 4236:20, 4241:7, 4243:14,
4243:15, 4243:18, 4265:1, 4265:5,
4269:15
**apart** [3] - 4288:25, 4289:1, 4289:2
**apologies** [1] - 4170:1
**apologize** [8] - 4142:6, 4155:23,
4176:18, 4181:6, 4203:10, 4225:11,
4244:25, 4304:7
**appeal** [1] - 4212:19
**appeals** [1] - 4185:16
**appear** [5] - 4138:7, 4245:3, 4329:11,
4356:21, 4378:23
**appearances** [2] - 4112:15, 4114:3
**Apple** [4] - 4370:24, 4370:25, 4371:11,
4379:23
**apples** [2] - 4150:22
**applicable** [1] - 4241:8
**applied** [2] - 4136:15, 4235:7
**apply** [2] - 4269:1, 4300:18
**applying** [1] - 4235:3
**appreciate** [2] - 4221:1, 4281:10
**approach** [5] - 4245:5, 4273:4, 4274:18,
4290:24, 4321:1
**appropriate** [9] - 4252:12, 4253:5,
4253:17, 4263:22, 4264:19, 4264:22,
4289:23, 4325:2, 4351:23
**April** [1] - 4292:18
**area** [5] - 4284:22, 4292:1, 4292:12,
4306:7, 4306:18
**areas** [7] - 4330:10, 4336:18, 4338:17,
4339:20, 4339:21, 4343:6, 4376:7
**arguably** [1] - 4225:22
**argue** [1] - 4372:1
**argued** [3] - 4171:23, 4189:1, 4189:11
**arguing** [3] - 4181:20, 4269:14, 4269:19
**argument** [7] - 4204:12, 4204:13,
4232:9, 4232:19, 4233:2, 4264:12,
4264:25
**arguments** [2] - 4231:22, 4232:15,
4232:17
**ARIZONA** [1] - 4112:3
**arms** [1] - 4376:7
**arrangement** [2] - 4187:5
**arrangements** [2] - 4187:10, 4187:14
**arrived** [1] - 4330:23
**arrow** [1] - 4349:9
**arrows** [1] - 4348:18
**article** [6] - 4207:3, 4209:14, 4248:11,
4248:20, 4263:25, 4264:2
**articles** [1] - 4343:8
**artificially** [1] - 4332:21
**aside** [3] - 4146:23, 4225:12, 4251:19
**aspect** [2] - 4293:15, 4336:15
**assert** [1] - 4232:19
**asserts** [3] - 4151:18, 4203:17, 4232:9

**assess** [1] - 4117:20
**assessing** [2] - 4268:6, 4277:25
**assessment** [2] - 4148:1, 4182:3
**assigning** [1] - 4143:4
**assignment** [1] - 4259:25
**assigns** [1] - 4142:19
**Assistant** [6] - 4112:24, 4113:1, 4113:5,
4231:6, 4239:14, 4322:20
**assisted** [1] - 4113:22
**associated** [6] - 4130:9, 4195:16,
4200:18, 4200:22, 4255:17, 4310:5
**Association** [1] - 4159:9
**association** [1] - 4246:15
**associations** [5] - 4120:21, 4121:7,
4127:6, 4259:19, 4365:24
**assume** [5] - 4152:1, 4162:5, 4217:10,
4217:11, 4352:13
**assumed** [1] - 4192:8
**assuming** [4] - 4168:10, 4192:11,
4240:5, 4268:18
**assumption** [2] - 4180:4, 4182:4
**attempt** [2] - 4210:2, 4362:8
**attempted** [1] - 4209:17
**attention** [15] - 4163:11, 4249:4,
4251:22, 4264:7, 4265:19, 4266:9,
4274:24, 4276:9, 4280:25, 4282:11,
4282:15, 4282:23, 4283:7, 4286:24,
4357:13
**Attorney** [8] - 4112:23, 4112:24, 4113:1,
4113:5, 4113:5, 4231:6, 4239:14,
4322:20
**attract** [5] - 4162:3, 4208:25, 4260:10,
4260:13, 4260:17
**attracting** [4] - 4125:23, 4258:20,
4258:24, 4307:6
**attraction** [1] - 4260:15
**attractive** [14] - 4161:22, 4162:15,
4201:20, 4201:23, 4201:24, 4209:2,
4211:14, 4258:22, 4260:6, 4260:9,
4260:12, 4319:1, 4324:25, 4380:2
**attractiveness** [2] - 4121:25, 4202:6
**attribute** [1] - 4351:15
**attributes** [3] - 4174:25, 4250:18,
4303:3
**audiences** [1] - 4265:4
**August** [1] - 4288:24
**Austin** [1] - 4112:25
**Australia** [5] - 4236:10, 4243:8,
4243:10, 4243:24, 4246:13
**Australia's** [1] - 4246:15
**Australian** [2] - 4236:13, 4247:2
**author** [1] - 4136:25
**authoring** [1] - 4206:11
**authorize** [1] - 4308:21
**authorized** [2] - 4206:14, 4207:9
**availability** [1] - 4220:10
**available** [4] - 4185:5, 4213:22,
4230:16, 4324:17
**Avenue** [3] - 4113:8, 4113:12, 4330:20
**average** [14] - 4129:19, 4129:25,
4151:6, 4151:20, 4185:20, 4185:21,

4222:20, 4254:20, 4255:17, 4255:22,
4271:25, 4272:1, 4304:12, 4377:9
**Avis** [1] - 4344:12
**avoid** [2] - 4151:5, 4345:14
**Award** [1] - 4297:10
**aware** [38] - 4126:4, 4126:15, 4127:18,
4127:21, 4128:1, 4129:4, 4131:7,
4131:20, 4151:3, 4152:16, 4161:18,
4163:12, 4170:19, 4170:23, 4170:25,
4178:23, 4178:24, 4189:22, 4190:15,
4190:21, 4191:3, 4199:17, 4199:19,
4211:2, 4211:3, 4211:6, 4219:2,
4229:6, 4229:11, 4229:12, 4238:9,
4238:20, 4238:24, 4239:11, 4249:19,
4249:21, 4365:18
**AX** [1] - 4137:17

# B

**background** [1] - 4292:23
**bad** [7] - 4172:15, 4178:22, 4179:17,
4180:10, 4181:25, 4213:11, 4220:3
**Bain** [1] - 4293:3
**balance** [4] - 4278:8, 4320:11, 4334:24,
4370:8
**balances** [1] - 4370:7
**Bank** [2] - 4243:23, 4315:11
**bank** [20] - 4204:6, 4204:8, 4204:11,
4204:14, 4243:10, 4243:11, 4259:21,
4259:22, 4285:22, 4296:1, 4297:25,
4303:17, 4312:14, 4312:17, 4316:4,
4316:20, 4317:2, 4322:8, 4352:11,
4352:14
**banked** [3] - 4324:8, 4324:13, 4324:23
**banking** [1] - 4246:14
**bankrupts** [1] - 4321:10
**banks** [34] - 4171:24, 4202:12, 4203:24,
4213:4, 4259:9, 4295:7, 4295:13,
4295:16, 4295:18, 4295:19, 4315:25,
4316:7, 4317:7, 4326:20, 4327:5,
4329:9, 4329:15, 4329:16, 4329:17,
4329:22, 4329:25, 4338:15, 4340:9,
4340:11, 4340:17, 4341:7, 4341:8,
4350:17, 4364:14, 4364:19, 4365:2,
4365:24, 4376:3
**bar** [7] - 4279:13, 4281:12, 4281:15,
4283:21, 4284:1, 4284:8
**Bar** [1] - 4159:9
**BARBUR** [1] - 4113:10
**bare** [2] - 4351:7, 4351:9
**bargain** [2] - 4233:23, 4269:8
**bargaining** [6] - 4234:1, 4234:20,
4268:21, 4268:23, 4269:5, 4269:9
**bargains** [1] - 4268:11
**barriers** [2] - 4164:24, 4165:1
**bars** [13] - 4279:11, 4279:13, 4279:17,
4279:21, 4281:5, 4281:6, 4281:25,
4282:8, 4283:14, 4283:19, 4284:1,
4284:3, 4378:23
**base** [3] - 4333:13, 4334:16, 4334:18
**based** [19] - 4118:23, 4124:9, 4124:12,
4142:19, 4143:2, 4143:6, 4143:21,

4151:6, 4205:15, 4213:24, 4226:5, 4226:6, 4303:16, 4303:17, 4307:20, 4312:10, 4327:14, 4357:11, 4359:8
**basic** [3] - 4303:9, 4318:24, 4319:21
**basis** [32] - 4133:6, 4133:16, 4134:2, 4134:6, 4134:7, 4134:12, 4137:24, 4140:25, 4141:10, 4141:18, 4141:20, 4143:15, 4143:17, 4143:21, 4144:12, 4144:16, 4144:22, 4145:2, 4150:18, 4151:19, 4152:3, 4152:9, 4152:11, 4180:1, 4180:8, 4206:3, 4243:1, 4243:4, 4243:6, 4258:11, 4267:6, 4324:20
**Bate's** [1] - 4315:3
**Bates** [2] - 4159:13, 4368:3
**batting** [1] - 4377:9
**bear** [1] - 4116:15
**bearing** [2] - 4241:20, 4242:8
**became** [9] - 4239:21, 4292:4, 4292:5, 4292:7, 4292:10, 4292:17, 4292:18, 4292:19, 4334:8
**become** [7] - 4202:4, 4216:13, 4300:8, 4316:5, 4328:13, 4356:10, 4368:12
**becomes** [3] - 4201:22, 4347:10, 4347:13
**becoming** [5] - 4317:22, 4332:7, 4368:13, 4368:15, 4376:7
**Becoming** [1] - 4317:20
**Bed** [1] - 4319:15
**Bed-Stuy** [1] - 4319:15
**BEFORE** [1] - 4112:13
**began** [3] - 4212:1, 4334:15
**begin** [7] - 4140:11, 4212:1, 4230:24, 4231:1, 4248:11, 4289:24, 4358:17
**beginning** [17] - 4123:2, 4137:2, 4140:7, 4158:4, 4215:7, 4224:20, 4224:25, 4232:1, 4289:20, 4298:25, 4302:3, 4302:6, 4337:14, 4347:13, 4351:14, 4375:22
**begins** [12] - 4120:9, 4123:4, 4157:4, 4165:25, 4207:20, 4240:24, 4241:3, 4241:4, 4249:2, 4250:9, 4334:12, 4355:15
**behalf** [1] - 4196:13
**behaving** [1] - 4148:11
**behavior** [7] - 4118:16, 4172:23, 4267:18, 4267:21, 4267:23, 4268:6, 4268:8
**behind** [6] - 4120:14, 4206:7, 4206:9, 4253:22, 4307:5, 4368:9
**belief** [4] - 4122:6, 4123:16, 4147:23, 4226:15
**beliefs** [4] - 4209:9, 4209:10, 4209:17, 4209:18
**believes** [1] - 4165:7
**below** [4] - 4116:6, 4116:20, 4142:25, 4195:5
**BENCH** [1] - 4112:13
**bench** [1] - 4289:23
**beneficial** [3] - 4188:24, 4189:2, 4189:12

**benefit** [26] - 4151:20, 4177:20, 4201:20, 4208:23, 4229:22, 4230:13, 4233:10, 4234:16, 4234:25, 4254:11, 4254:15, 4270:21, 4286:16, 4298:20, 4299:1, 4299:5, 4308:7, 4309:9, 4309:12, 4309:13, 4310:1, 4317:10, 4379:22, 4379:23, 4380:4, 4380:13
**benefiting** [1] - 4302:14
**benefits** [43] - 4122:11, 4123:18, 4137:7, 4138:4, 4147:7, 4147:13, 4147:19, 4150:11, 4173:4, 4178:13, 4178:21, 4179:16, 4195:15, 4196:1, 4196:3, 4196:5, 4200:18, 4201:5, 4201:6, 4202:11, 4211:13, 4221:8, 4227:9, 4239:3, 4240:6, 4270:19, 4287:19, 4299:10, 4300:10, 4301:7, 4307:7, 4307:8, 4307:14, 4309:17, 4310:3, 4310:7, 4321:4, 4321:12, 4322:9, 4336:1, 4347:3, 4380:15, 4381:7
**benefitted** [1] - 4350:18
**Bernheim** [14] - 4115:20, 4135:8, 4138:8, 4143:4, 4144:14, 4144:21, 4145:3, 4146:9, 4152:17, 4195:2, 4232:8, 4232:20, 4279:1, 4282:7
**Bernheim's** [8] - 4132:24, 4142:22, 4143:13, 4143:14, 4232:14, 4281:2, 4282:1, 4283:10
**Berry** [1] - 4135:15
**Best** [2] - 4309:2, 4309:13
**best** [4] - 4305:3, 4305:17, 4369:9, 4369:14
**Beta** [1] - 4208:9
**better** [4] - 4188:8, 4264:13, 4280:19, 4313:2
**between** [28] - 4129:20, 4135:19, 4143:20, 4146:8, 4168:18, 4186:22, 4188:4, 4188:6, 4188:14, 4223:15, 4227:7, 4227:8, 4227:13, 4247:7, 4251:16, 4259:9, 4284:1, 4285:17, 4308:22, 4313:3, 4326:10, 4334:20, 4337:20, 4341:11, 4345:8, 4365:8, 4365:10, 4365:17
**beyond** [7] - 4124:13, 4296:4, 4330:24, 4332:15, 4334:13, 4337:20, 4351:18
**bidding** [1] - 4363:1
**big** [4] - 4131:25, 4161:24, 4254:15, 4358:1
**bigger** [2] - 4201:22
**biggest** [3] - 4277:12, 4369:9, 4369:12
**bill** [3] - 4173:18, 4300:14, 4300:17
**billion** [9] - 4131:23, 4132:6, 4132:10, 4132:11, 4133:3, 4236:8, 4236:11, 4253:6, 4312:15
**billions** [3] - 4306:9, 4378:23, 4379:1
**bills** [1] - 4319:21
**BIN** [1] - 4281:20
**binder** [6] - 4240:18, 4263:14, 4265:20, 4279:4, 4281:4, 4286:25
**binding** [1] - 4288:2
**Bird** [8] - 4318:3, 4318:16, 4319:10,

4324:7, 4324:11, 4324:16, 4324:24
**bit** [8] - 4124:19, 4150:17, 4177:23, 4275:19, 4313:10, 4318:6, 4338:1, 4347:15
**bite** [1] - 4164:21
**Black** [3] - 4335:12, 4335:14, 4335:22
**black** [1] - 4208:9
**black-and-white** [1] - 4208:9
**blackmail** [2] - 4216:4, 4216:16
**blackout** [1] - 4300:3
**Blanche** [7] - 4328:20, 4329:8, 4332:7, 4337:19, 4350:2, 4350:5, 4368:25
**blank** [2] - 4140:23, 4140:24
**bleeding** [1] - 4373:16
**blended** [3] - 4151:6, 4151:8, 4151:12
**Blue** [8] - 4318:3, 4318:16, 4319:10, 4324:7, 4324:11, 4324:16, 4324:23
**blue** [10] - 4129:18, 4143:8, 4156:8, 4156:15, 4156:16, 4252:3, 4254:20, 4281:5, 4295:14, 4378:23
**Bluebird** [2] - 4380:7, 4380:11
**blunt** [1] - 4317:22
**board** [1] - 4348:1
**Board** [3] - 4211:8, 4214:1, 4292:21
**BOIES** [1] - 4113:11
**bonus** [4] - 4131:9, 4131:14, 4131:18, 4346:19
**bonuses** [1] - 4130:14
**book** [13] - 4124:22, 4207:1, 4240:18, 4244:4, 4304:4, 4314:6, 4314:7, 4314:8, 4327:8, 4347:21, 4366:17, 4374:10, 4377:23
**born** [1] - 4333:14
**Boston** [6] - 4341:14, 4341:17, 4341:20, 4343:4, 4343:22, 4347:15
**bottleneck** [2] - 4154:4, 4159:1
**bottom** [19] - 4133:7, 4134:3, 4137:12, 4203:22, 4207:20, 4249:2, 4275:3, 4315:4, 4318:3, 4325:12, 4348:4, 4349:9, 4349:18, 4354:13, 4355:7, 4356:20, 4362:6, 4368:7, 4379:11
**bought** [2] - 4309:23, 4378:4
**bounds** [1] - 4194:4
**Bowdoin** [1] - 4292:25
**box** [2] - 4254:15, 4295:14
**Box** [2] - 4112:25, 4113:2
**boy** [2] - 4300:12, 4302:11
**brackets** [3] - 4275:15, 4275:20, 4276:16
**brand** [70] - 4131:1, 4131:4, 4131:5, 4131:9, 4131:18, 4133:13, 4134:9, 4134:13, 4135:4, 4135:11, 4135:16, 4135:19, 4136:14, 4136:19, 4137:25, 4138:5, 4138:14, 4138:21, 4139:3, 4140:18, 4140:21, 4141:2, 4141:6, 4141:9, 4143:23, 4162:20, 4163:13, 4187:18, 4187:21, 4187:24, 4188:1, 4188:4, 4188:5, 4188:7, 4188:9, 4188:13, 4188:20, 4188:21, 4189:3, 4189:13, 4189:17, 4241:20, 4242:8, 4242:17, 4252:7, 4252:10, 4252:12,

4252:14, 4254:9, 4269:23, 4269:24, 4294:21, 4294:25, 4295:1, 4296:7, 4296:9, 4302:22, 4302:23, 4303:3, 4307:2, 4307:3, 4317:21, 4317:22, 4318:12, 4333:23, 4338:25, 4344:6, 4351:15, 4357:16, 4372:18
**branded** [4] - 4295:14, 4318:17, 4324:16, 4344:17
**branding** [2] - 4253:25, 4254:2
**brands** [6] - 4188:5, 4188:14, 4204:3, 4204:7, 4238:21, 4295:2
**break** [15] - 4154:12, 4198:1, 4199:4, 4200:12, 4201:4, 4261:7, 4261:15, 4288:20, 4323:14, 4350:10, 4351:12, 4364:4, 4364:8, 4381:17, 4381:18
**breaking** [3] - 4211:20, 4212:11, 4349:10
**breakout** [1] - 4170:15
**Brennan** [2] - 4135:17, 4138:19
**BRENNER** [1] - 4113:13
**BRET** [1] - 4112:24
**briefed** [1] - 4381:3
**briefly** [5] - 4236:10, 4291:18, 4291:20, 4307:16, 4309:20
**bring** [4] - 4114:19, 4258:16, 4305:22, 4342:7
**bringing** [3] - 4259:4, 4260:15, 4260:17
**brings** [1] - 4258:25
**broad** [4] - 4182:16, 4183:2, 4212:13, 4255:9
**broader** [2] - 4124:16, 4265:5
**broadly** [4] - 4119:5, 4158:10, 4324:22, 4350:6
**broke** [1] - 4182:1
**broken** [2] - 4349:15, 4353:1
**Bronx** [1] - 4319:16
**Brooklyn** [2] - 4112:6, 4113:19
**brought** [10] - 4138:25, 4155:25, 4164:6, 4220:2, 4222:17, 4226:13, 4299:21, 4315:20, 4342:3, 4350:14
**Brunswick** [1] - 4292:25
**build** [6] - 4209:9, 4209:18, 4308:1, 4336:21, 4336:24, 4379:20
**Building** [1] - 4113:2
**building** [2] - 4318:12, 4321:23
**builds** [5] - 4297:16, 4356:7, 4356:16, 4356:18
**built** [3] - 4296:8, 4299:8, 4318:13
**bulk** [1] - 4305:5
**bullet** [10] - 4116:11, 4116:20, 4159:19, 4159:24, 4315:8, 4355:20, 4361:16, 4362:24, 4368:8, 4375:16
**bullets** [2] - 4361:20, 4371:23
**bunch** [2] - 4260:5, 4380:24
**business** [93] - 4121:23, 4167:12, 4167:18, 4168:20, 4187:6, 4212:2, 4212:3, 4212:12, 4260:13, 4292:14, 4293:9, 4293:10, 4293:12, 4293:16, 4293:17, 4293:18, 4293:20, 4295:8, 4295:12, 4295:13, 4303:5, 4303:6, 4303:20, 4305:6, 4305:13, 4306:21,

4306:23, 4310:11, 4310:16, 4310:25, 4311:1, 4312:2, 4312:7, 4312:9, 4312:18, 4312:20, 4313:5, 4314:17, 4318:10, 4318:25, 4320:1, 4323:1, 4326:4, 4326:19, 4326:20, 4327:22, 4328:4, 4328:5, 4328:13, 4328:16, 4328:22, 4328:23, 4330:2, 4330:6, 4331:12, 4336:24, 4339:19, 4345:20, 4347:9, 4349:3, 4349:19, 4349:21, 4349:22, 4350:4, 4351:4, 4354:9, 4354:20, 4356:8, 4359:3, 4359:6, 4360:24, 4365:1, 4366:3, 4368:12, 4368:18, 4369:6, 4369:25, 4370:6, 4370:11, 4371:13, 4371:14, 4371:15, 4372:14, 4372:25, 4374:6, 4374:8, 4374:17, 4374:20
**Businesses** [1] - 4367:13
**businesses** [3] - 4292:12, 4293:14, 4294:23
**busy** [1] - 4379:8
**but-for** [10] - 4177:23, 4178:10, 4178:12, 4179:16, 4182:11, 4185:24, 4193:21, 4194:13, 4234:4, 4235:23
**buy** [7] - 4195:21, 4300:2, 4301:16, 4306:1, 4309:22, 4321:23, 4379:18
**Buy** [2] - 4309:2, 4309:13
**buying** [1] - 4252:23
**BY** [27] - 4112:18, 4112:24, 4113:9, 4113:13, 4117:16, 4158:2, 4167:8, 4174:3, 4199:11, 4248:8, 4263:11, 4291:7, 4343:2, 4345:6, 4345:23, 4348:13, 4352:5, 4355:5, 4360:8, 4361:15, 4364:12, 4368:2, 4375:8, 4380:19, 4383:8, 4383:9, 4383:12

## C

**Cadman** [1] - 4113:19
**calculate** [3] - 4130:18, 4146:9, 4275:13
**calculated** [2] - 4130:11, 4146:19
**calculating** [3] - 4138:3, 4252:10, 4253:19
**calculation** [19] - 4130:23, 4131:2, 4131:11, 4132:13, 4134:1, 4134:10, 4135:3, 4135:8, 4136:20, 4138:6, 4138:10, 4138:15, 4142:16, 4142:22, 4143:7, 4144:9, 4144:25, 4145:1, 4252:24
**calculations** [4] - 4131:16, 4138:8, 4143:14, 4152:22
**Calculations** [1] - 4132:24
**Campaign** [5] - 4213:14, 4215:14, 4216:1, 4216:10, 4249:24
**campaign** [21] - 4209:24, 4210:4, 4210:12, 4213:15, 4213:17, 4213:20, 4214:8, 4214:14, 4214:16, 4214:19, 4338:22, 4341:10, 4351:3, 4354:6, 4358:11, 4358:15, 4361:8, 4362:5, 4362:16, 4364:13, 4373:25
**campaigns** [5] - 4210:10, 4214:10, 4250:5, 4361:25, 4362:25
**CANALES** [1] - 4113:18

**cancel** [1] - 4343:20
**cancellation** [1] - 4341:18
**cancellations** [1] - 4229:9
**cancelled** [3] - 4169:13, 4199:17, 4345:15
**Cannes** [3] - 4211:8, 4211:10, 4214:1
**cannot** [8] - 4250:5, 4266:4, 4353:10, 4353:11, 4358:18, 4359:10, 4359:12, 4363:1
**cap** [1] - 4370:25
**capabilities** [10] - 4308:8, 4308:25, 4319:12, 4321:23, 4321:25, 4329:23, 4333:10, 4336:20, 4337:8, 4337:9
**capability** [1] - 4337:13
**capacity** [4] - 4219:13, 4301:5, 4306:1
**Capital** [4] - 4240:23, 4241:2, 4241:4, 4241:6
**capped** [1] - 4247:3
**caps** [1] - 4247:8
**capturing** [1] - 4255:7
**Card** [29] - 4149:22, 4167:16, 4167:19, 4168:13, 4193:12, 4193:18, 4197:6, 4197:13, 4222:7, 4222:12, 4222:21, 4272:15, 4274:1, 4292:6, 4292:7, 4292:8, 4292:9, 4320:18, 4321:5, 4333:16, 4334:11, 4335:12, 4335:14, 4335:22, 4341:21, 4355:21, 4362:21, 4367:12, 4368:11
**card** [160] - 4119:18, 4125:4, 4130:10, 4135:12, 4136:10, 4136:12, 4136:14, 4137:17, 4138:5, 4138:23, 4149:15, 4149:16, 4149:24, 4162:21, 4162:23, 4163:14, 4163:17, 4163:18, 4163:20, 4168:24, 4169:5, 4169:10, 4169:11, 4175:5, 4177:11, 4177:18, 4180:1, 4180:7, 4180:8, 4183:21, 4183:24, 4183:25, 4184:2, 4184:7, 4185:10, 4185:13, 4189:24, 4190:18, 4190:21, 4192:11, 4192:12, 4192:25, 4193:24, 4195:20, 4195:21, 4199:25, 4211:15, 4212:2, 4221:15, 4221:16, 4221:19, 4221:21, 4222:1, 4222:13, 4229:9, 4233:1, 4233:7, 4246:19, 4250:21, 4250:25, 4251:1, 4251:9, 4252:15, 4254:2, 4263:22, 4265:10, 4266:25, 4267:5, 4270:25, 4271:11, 4272:12, 4272:16, 4285:9, 4286:13, 4292:14, 4294:20, 4294:25, 4295:2, 4296:3, 4296:22, 4297:14, 4298:1, 4298:2, 4299:1, 4299:2, 4299:10, 4301:16, 4303:13, 4303:17, 4305:2, 4305:5, 4305:8, 4306:11, 4306:16, 4307:4, 4307:15, 4308:9, 4308:18, 4308:22, 4308:23, 4309:14, 4309:18, 4310:14, 4310:17, 4310:22, 4311:3, 4312:1, 4312:11, 4312:12, 4312:14, 4312:24, 4319:5, 4319:22, 4319:24, 4320:3, 4320:10, 4321:19, 4322:8, 4324:12, 4324:16, 4326:3, 4327:21, 4327:25, 4328:13, 4328:16, 4329:24, 4330:18, 4333:11, 4333:16, 4334:1, 4334:16, 4334:18, 4335:11, 4337:10, 4337:12,

8

4339:13, 4339:14, 4342:8, 4344:6, 4344:16, 4344:17, 4352:11, 4352:14, 4353:10, 4355:18, 4356:2, 4356:12, 4357:3, 4357:21, 4358:4, 4358:11, 4361:19, 4371:25, 4372:4, 4379:24, 4380:5

**card's** [2] - 4339:25, 4357:22

**cardholder** [13] - 4146:18, 4150:25, 4221:18, 4221:21, 4221:22, 4221:23, 4221:25, 4251:12, 4251:13, 4276:25, 4286:8, 4286:16, 4366:5

**cardholders** [32] - 4125:8, 4125:24, 4146:5, 4153:22, 4153:24, 4154:1, 4158:7, 4158:20, 4161:19, 4193:3, 4193:7, 4193:23, 4195:22, 4196:4, 4196:5, 4196:8, 4196:25, 4200:24, 4201:5, 4202:6, 4212:20, 4257:19, 4258:12, 4260:10, 4260:12, 4260:15, 4260:17, 4282:7, 4286:4, 4304:13, 4350:24

**cardholders'** [1] - 4309:18

**cardmember** [16] - 4146:13, 4162:8, 4297:20, 4298:17, 4300:10, 4301:3, 4301:13, 4302:23, 4347:3, 4353:20, 4356:11, 4359:15, 4359:19, 4360:3, 4366:5, 4380:2

**cardmembers** [32] - 4161:22, 4162:3, 4168:12, 4168:15, 4168:23, 4193:24, 4194:1, 4294:1, 4294:12, 4294:15, 4296:5, 4296:11, 4300:11, 4301:16, 4304:1, 4304:2, 4304:9, 4304:17, 4343:7, 4345:5, 4354:6, 4356:2, 4356:3, 4356:22, 4356:23, 4359:12, 4369:24, 4370:7, 4370:16, 4371:10, 4372:23, 4373:20

**cards** [115] - 4136:16, 4137:25, 4150:6, 4150:9, 4150:12, 4150:14, 4150:21, 4151:19, 4161:19, 4162:4, 4165:16, 4177:19, 4181:13, 4183:9, 4183:14, 4184:10, 4184:16, 4184:22, 4184:25, 4185:5, 4185:7, 4185:8, 4185:17, 4185:19, 4185:22, 4185:23, 4190:10, 4193:7, 4197:10, 4197:19, 4200:18, 4200:20, 4200:21, 4204:7, 4233:4, 4233:20, 4241:20, 4242:8, 4244:10, 4246:1, 4249:8, 4250:23, 4251:3, 4252:17, 4260:7, 4260:8, 4268:2, 4272:1, 4272:10, 4272:14, 4272:20, 4279:12, 4279:17, 4279:19, 4280:3, 4280:7, 4282:1, 4282:13, 4282:14, 4283:4, 4283:19, 4283:20, 4283:21, 4283:25, 4284:12, 4287:13, 4293:23, 4294:16, 4294:17, 4294:18, 4294:19, 4294:21, 4294:22, 4294:23, 4295:6, 4295:13, 4295:17, 4295:20, 4295:23, 4296:16, 4296:17, 4304:11, 4305:10, 4312:15, 4312:17, 4315:15, 4315:25, 4316:4, 4316:20, 4319:3, 4324:14, 4324:15, 4325:21, 4326:20, 4326:24, 4327:4, 4327:12, 4328:17, 4328:21, 4328:25, 4329:2, 4329:4, 4329:8, 4330:1, 4330:3, 4331:12, 4335:10,

4336:14, 4339:22, 4340:18, 4354:9, 4363:17

**Cards** [8] - 4200:25, 4201:8, 4204:8, 4204:9, 4223:2, 4232:11, 4239:5, 4320:20

**cards-in-force** [5] - 4165:16, 4184:10, 4184:16, 4184:22, 4184:25

**care** [5] - 4250:17, 4310:22, 4310:23, 4332:23, 4339:1

**careful** [4] - 4165:1, 4174:25, 4182:15, 4226:12

**Carl** [2] - 4206:12, 4206:16, 4207:4

**carries** [1] - 4184:7

**carry** [6] - 4183:25, 4195:20, 4308:9, 4312:11, 4312:24, 4338:6, 4338:11

**carrying** [3] - 4127:3, 4132:12, 4204:6

**Carte** [7] - 4328:20, 4329:8, 4332:6, 4337:19, 4350:2, 4350:5, 4368:25

**cartel** [1] - 4364:22

**case** [94] - 4114:2, 4119:14, 4119:16, 4119:21, 4120:2, 4120:9, 4121:4, 4122:13, 4122:19, 4122:20, 4124:12, 4124:18, 4125:2, 4125:11, 4126:4, 4126:7, 4126:16, 4126:20, 4128:9, 4129:11, 4129:15, 4132:17, 4142:3, 4142:18, 4147:15, 4160:11, 4160:13, 4161:4, 4165:19, 4170:3, 4170:21, 4171:12, 4171:13, 4172:13, 4174:16, 4174:17, 4176:18, 4177:22, 4177:24, 4177:25, 4178:18, 4182:9, 4185:25, 4186:3, 4186:12, 4187:12, 4191:6, 4194:20, 4196:13, 4196:19, 4196:20, 4196:23, 4199:25, 4203:2, 4203:9, 4214:5, 4223:13, 4228:7, 4230:8, 4231:12, 4239:25, 4243:14, 4247:3, 4259:1, 4261:18, 4265:16, 4272:13, 4274:23, 4277:7, 4277:16, 4277:20, 4278:2, 4281:16, 4286:9, 4286:12, 4286:18, 4288:22, 4289:6, 4289:10, 4289:13, 4289:14, 4308:1, 4315:20, 4315:21, 4322:23, 4323:19, 4340:19, 4341:1, 4341:4, 4345:10, 4345:24, 4346:1, 4348:3, 4357:10

**case-in-chief** [1] - 4170:21

**cases** [3] - 4116:12, 4156:15, 4285:11

**casette** [1] - 4208:10

**cash** [6] - 4132:11, 4190:18, 4300:15, 4308:14, 4308:15, 4319:14

**cashback** [1] - 4165:8

**cashier** [1] - 4308:16

**catalytic** [1] - 4331:18

**categories** [13] - 4130:21, 4255:14, 4255:15, 4300:9, 4300:24, 4305:24, 4305:25, 4307:21, 4330:25, 4333:22, 4334:3, 4344:4, 4346:18

**category** [13] - 4227:20, 4294:17, 4301:5, 4305:25, 4328:24, 4330:8, 4330:11, 4332:5, 4333:6, 4333:9, 4333:12, 4337:21, 4357:5

**catering** [1] - 4250:17

**CAUSE** [1] - 4112:13

**caused** [3] - 4201:4, 4278:2, 4343:9

**causing** [2] - 4156:2, 4338:9

**cease** [2] - 4162:6, 4162:12

**central** [1] - 4252:14

**centrality** [1] - 4375:16

**centric** [2] - 4303:7, 4320:4

**Centurion** [1] - 4320:10

**CEO** [2] - 4331:14, 4361:5

**certain** [13] - 4130:21, 4222:5, 4250:16, 4250:22, 4269:15, 4269:20, 4281:1, 4300:24, 4301:5, 4305:23, 4322:1, 4336:3

**certainly** [74] - 4118:2, 4119:12, 4120:4, 4121:9, 4122:14, 4125:16, 4126:3, 4127:13, 4135:22, 4138:6, 4138:11, 4146:16, 4149:18, 4150:13, 4151:10, 4151:15, 4152:5, 4152:7, 4153:10, 4153:11, 4161:17, 4164:19, 4166:15, 4168:16, 4170:25, 4172:13, 4174:25, 4175:18, 4178:11, 4179:5, 4179:19, 4181:5, 4184:5, 4186:17, 4191:21, 4192:17, 4194:17, 4196:5, 4197:9, 4197:18, 4203:5, 4209:12, 4214:9, 4214:12, 4218:25, 4228:16, 4229:1, 4236:21, 4237:23, 4238:24, 4245:2, 4252:8, 4254:7, 4254:15, 4256:25, 4260:4, 4260:11, 4264:24, 4265:18, 4267:25, 4277:12, 4277:14, 4279:23, 4280:10, 4281:18, 4282:5, 4294:7, 4343:9, 4346:13, 4346:16, 4351:9, 4365:2, 4369:13

**Chairman** [4] - 4291:12, 4291:15, 4292:11, 4292:18

**chairman** [3] - 4156:13, 4361:5, 4367:7

**challenged** [1] - 4287:20

**challenges** [2] - 4367:14

**challenging** [2] - 4347:10, 4380:9

**chance** [1] - 4203:12

**change** [22] - 4146:23, 4147:6, 4147:7, 4152:14, 4160:25, 4161:12, 4176:11, 4180:20, 4220:2, 4235:8, 4235:10, 4246:14, 4278:1, 4300:9, 4316:2, 4326:7, 4327:6, 4331:18, 4370:12, 4371:12, 4373:17, 4378:6

**changed** [5] - 4116:20, 4256:16, 4259:18, 4346:12, 4346:13

**changes** [12] - 4116:22, 4160:23, 4174:9, 4220:8, 4237:6, 4237:13, 4255:7, 4255:17, 4256:1, 4256:6, 4275:14, 4323:9

**changing** [2] - 4277:17, 4284:23

**channels** [1] - 4329:23

**characteristics** [4] - 4125:4, 4151:1, 4185:20, 4185:22

**characterization** [1] - 4216:15

**characterize** [3] - 4121:3, 4331:1, 4332:12

**characterized** [5] - 4120:2, 4120:4, 4121:16, 4270:3, 4331:17

**characterizing** [1] - 4210:6

**charge** [49] - 4119:18, 4125:4, 4127:17,

4127:21, 4128:2, 4148:3, 4150:5, 4150:10, 4158:14, 4162:11, 4166:3, 4168:15, 4183:8, 4183:25, 4202:19, 4204:21, 4205:9, 4205:11, 4205:15, 4232:21, 4233:1, 4251:3, 4252:17, 4252:18, 4266:25, 4270:25, 4280:3, 4283:4, 4283:25, 4286:12, 4286:15, 4294:18, 4297:14, 4305:4, 4308:21, 4324:14, 4325:21, 4326:3, 4327:12, 4327:25, 4328:17, 4328:25, 4329:2, 4330:1, 4334:20, 4335:3, 4344:2, 4368:10

**chargecard** [1] - 4195:9
**chargecards** [2] - 4179:10, 4197:15
**charged** [2] - 4172:1, 4219:14
**charges** [6] - 4147:23, 4148:19, 4176:3, 4190:4, 4335:4, 4348:22
**charging** [2] - 4286:1, 4346:2
**chart** [28] - 4115:16, 4116:11, 4116:21, 4129:18, 4133:7, 4143:1, 4144:5, 4144:21, 4252:13, 4267:5, 4279:11, 4281:15, 4282:1, 4318:4, 4324:9, 4325:13, 4325:20, 4325:25, 4338:2, 4338:5, 4351:11, 4373:2, 4375:13, 4377:10, 4378:19, 4379:9, 4379:11
**charts** [17] - 4115:17, 4116:7, 4116:18, 4116:24, 4134:17, 4145:6, 4154:11, 4266:8, 4266:10, 4267:13, 4278:21, 4278:25, 4279:3, 4281:2, 4281:12, 4329:19
**Chase** [9] - 4285:23, 4315:6, 4315:8, 4315:11, 4315:15, 4316:16, 4321:17, 4344:17
**Chase's** [1] - 4315:8
**cheaper** [2] - 4233:5, 4233:10
**cheapest** [2] - 4233:7, 4369:20
**check** [11] - 4121:19, 4141:19, 4143:25, 4184:18, 4194:15, 4195:4, 4270:11, 4281:23, 4292:14, 4300:15, 4318:9
**checking** [4] - 4240:3, 4318:20, 4318:22, 4329:23
**Chenault** [17] - 4290:17, 4290:21, 4291:8, 4312:10, 4316:17, 4323:17, 4324:6, 4348:1, 4349:14, 4354:18, 4360:6, 4360:13, 4364:13, 4374:11, 4375:9, 4380:20, 4381:15
**CHESLER** [145] - 4113:9, 4114:10, 4115:2, 4115:16, 4115:18, 4115:25, 4116:6, 4116:17, 4117:11, 4117:16, 4121:12, 4124:24, 4128:14, 4134:16, 4134:25, 4139:11, 4139:15, 4139:19, 4139:23, 4139:25, 4140:6, 4140:13, 4140:15, 4141:21, 4141:25, 4145:5, 4145:13, 4145:15, 4145:25, 4154:7, 4154:15, 4154:17, 4154:21, 4155:1, 4155:4, 4155:18, 4155:20, 4156:3, 4156:5, 4156:7, 4156:12, 4156:16, 4156:20, 4158:2, 4164:5, 4166:17, 4166:25, 4167:3, 4167:5, 4167:8, 4168:6, 4170:5, 4170:12, 4173:21, 4174:2, 4174:3, 4181:5, 4197:23, 4198:2, 4199:3, 4199:11, 4203:10,

4207:11, 4207:17, 4214:23, 4221:1, 4228:9, 4228:12, 4228:15, 4239:20, 4239:24, 4240:2, 4240:4, 4240:14, 4240:17, 4244:3, 4244:16, 4244:20, 4244:24, 4245:5, 4245:22, 4247:11, 4247:19, 4248:1, 4253:1, 4261:13, 4261:17, 4261:21, 4261:25, 4281:8, 4288:12, 4289:18, 4290:1, 4290:16, 4290:24, 4291:2, 4291:7, 4314:10, 4316:12, 4316:15, 4323:12, 4330:16, 4335:20, 4341:3, 4343:2, 4345:6, 4345:23, 4347:24, 4348:9, 4348:13, 4352:3, 4352:5, 4353:23, 4354:25, 4355:5, 4359:17, 4359:23, 4360:1, 4360:5, 4360:8, 4361:9, 4361:13, 4361:15, 4363:22, 4364:6, 4364:9, 4364:12, 4367:20, 4368:1, 4368:2, 4375:3, 4375:8, 4377:3, 4377:6, 4380:17, 4380:19, 4381:10, 4381:16, 4381:25, 4382:5, 4382:8, 4382:12, 4382:16, 4383:8, 4383:12
**Chesler** [11] - 4114:10, 4115:1, 4173:22, 4199:2, 4266:8, 4269:18, 4270:2, 4270:9, 4289:17, 4290:15, 4359:14
**Chesler's** [1] - 4173:16
**chicken** [11] - 4296:16, 4296:18, 4298:6, 4310:13, 4312:5, 4333:4, 4334:2, 4342:6, 4347:1, 4353:6, 4369:21
**Chief** [6] - 4206:18, 4291:12, 4291:15, 4292:16, 4292:17, 4292:19
**chief** [4] - 4170:21, 4350:6, 4360:20, 4361:7
**chips** [4] - 4186:5, 4186:7, 4216:21, 4216:23
**choice** [10] - 4299:3, 4299:23, 4300:9, 4312:19, 4313:5, 4313:7, 4313:23, 4363:14, 4363:20
**choke** [5] - 4213:4, 4338:12, 4338:20, 4340:5, 4341:9
**chokehold** [4] - 4351:10, 4367:18, 4373:15, 4373:18
**choose** [3] - 4194:10, 4229:24, 4230:14
**chose** [2] - 4140:17, 4140:21
**Chris** [1] - 4136:5
**chronology** [1] - 4337:25
**circle** [3] - 4211:12, 4310:19, 4348:18
**circumstance** [1] - 4226:22
**circumstances** [8] - 4158:23, 4187:9, 4200:4, 4200:9, 4202:8, 4226:23, 4242:13, 4269:20
**citation** [1] - 4275:25
**cite** [1] - 4209:23
**cited** [5] - 4128:23, 4202:16, 4209:16, 4210:1, 4215:10
**Citibank** [1] - 4285:23
**citing** [2] - 4209:20, 4209:21
**City** [1] - 4113:3
**city** [1] - 4323:19
**CIVIL** [1] - 4112:13
**claims** [4] - 4152:20, 4152:22, 4171:19,

4195:6
**clairvoyant** [1] - 4372:12
**clarify** [7] - 4145:8, 4173:8, 4176:10, 4188:8, 4210:9, 4276:18, 4281:1
**clarity** [1] - 4188:3
**clause** [1] - 4220:20
**clean** [1] - 4324:6
**clean-up** [1] - 4324:6
**clear** [32] - 4115:7, 4127:1, 4131:3, 4134:5, 4158:22, 4176:12, 4176:18, 4176:19, 4181:3, 4194:24, 4195:18, 4207:23, 4225:9, 4232:20, 4245:10, 4248:25, 4253:3, 4254:8, 4280:20, 4289:21, 4296:18, 4316:19, 4317:10, 4332:8, 4334:8, 4371:16, 4372:19, 4372:21, 4374:4, 4374:5
**clearer** [1] - 4285:8
**clearly** [9] - 4204:1, 4207:22, 4306:8, 4310:10, 4311:22, 4313:23, 4315:19, 4318:13, 4341:8
**clerk** [1] - 4290:18
**CLERK** [2] - 4114:2, 4290:19
**client** [2] - 4306:19, 4322:2
**climb** [1] - 4373:3, 4373:12
**climbing** [1] - 4326:15
**close** [6] - 4142:21, 4143:8, 4206:15, 4223:13, 4226:24, 4364:1
**closed** [17] - 4249:9, 4249:10, 4293:18, 4294:8, 4295:22, 4305:22, 4306:10, 4307:13, 4308:8, 4309:1, 4318:25, 4321:20, 4336:17, 4336:19, 4337:8, 4337:11, 4369:15
**closed-loop** [1] - 4369:15
**closely** [2] - 4234:14, 4306:21
**closer** [2] - 4150:10, 4150:11
**Club** [3] - 4329:8, 4337:19, 4368:25
**clustered** [1] - 4234:14
**CM** [2] - 4353:19, 4353:20
**CMs** [2] - 4355:21, 4355:23
**cnlsnic@aol.com** [1] - 4113:20
**co** [43] - 4131:1, 4131:4, 4131:5, 4131:9, 4131:18, 4133:13, 4134:9, 4134:13, 4135:4, 4135:11, 4135:16, 4135:19, 4136:14, 4136:19, 4137:25, 4138:5, 4138:14, 4138:21, 4139:3, 4140:18, 4140:21, 4141:2, 4141:6, 4141:9, 4143:23, 4206:11, 4206:14, 4207:9, 4238:21, 4252:7, 4252:10, 4252:12, 4252:14, 4253:25, 4254:2, 4254:9, 4294:21, 4294:25, 4295:1, 4318:17, 4324:16, 4344:6, 4344:17
**CO** [1] - 4218:2
**co-authoring** [1] - 4206:11
**co-authorized** [2] - 4206:14, 4207:9
**co-brand** [34] - 4131:1, 4131:4, 4131:5, 4131:9, 4131:18, 4133:13, 4134:9, 4134:13, 4135:4, 4135:11, 4135:16, 4135:19, 4136:14, 4136:19, 4137:25, 4138:5, 4138:14, 4138:21, 4139:3, 4140:18, 4140:21, 4141:2, 4141:6, 4141:9, 4143:23, 4252:7, 4252:10,

4252:12, 4252:14, 4254:9, 4294:21, 4294:25, 4295:1, 4344:6

**co-branded** [3] - 4318:17, 4324:16, 4344:17

**co-branding** [2] - 4253:25, 4254:2

**co-brands** [1] - 4238:21

**coined** [1] - 4319:6

**colleague** [1] - 4290:9

**colleagues** [1] - 4362:14

**collect** [4] - 4310:8, 4311:11, 4312:1, 4325:17

**collection** [1] - 4246:3

**College** [1] - 4292:25

**colloquy** [1] - 4243:9

**color** [1] - 4208:9

**coloring** [1] - 4328:1

**column** [8] - 4133:7, 4133:8, 4134:3, 4149:25, 4168:9, 4282:23, 4376:18, 4376:21

**combat** [1] - 4361:21

**combination** [1] - 4361:22

**combined** [5] - 4119:22, 4120:20, 4121:11, 4129:21, 4129:22

**comfortable** [1] - 4307:4

**coming** [9] - 4244:4, 4256:14, 4321:11, 4334:22, 4334:25, 4335:1, 4343:21, 4346:7, 4346:9

**comment** [2] - 4115:23, 4322:11

**commented** [1] - 4243:19

**comments** [1] - 4243:23

**commerce** [2] - 4149:24, 4220:20

**commit** [1] - 4340:17

**commitment** [3] - 4359:5, 4372:23, 4373:24

**common** [1] - 4219:1

**commonly** [1] - 4295:11

**communicate** [2] - 4342:5, 4369:3

**communications** [1] - 4361:3

**companies** [6] - 4171:5, 4180:8, 4219:2, 4302:4, 4312:24, 4321:23

**companies'** [1] - 4295:2

**COMPANY** [1] - 4112:9

**company** [56] - 4171:10, 4219:3, 4289:11, 4291:13, 4291:22, 4291:23, 4292:11, 4292:13, 4292:16, 4292:17, 4292:20, 4293:6, 4295:1, 4295:15, 4296:8, 4301:8, 4302:2, 4302:10, 4303:6, 4303:11, 4303:25, 4310:5, 4312:10, 4317:11, 4317:12, 4318:7, 4318:11, 4320:14, 4325:9, 4328:12, 4328:14, 4329:3, 4330:23, 4331:3, 4331:20, 4331:22, 4332:3, 4332:11, 4333:1, 4333:2, 4333:17, 4333:18, 4338:5, 4340:7, 4341:18, 4344:12, 4350:6, 4350:8, 4357:12, 4367:5, 4367:7, 4367:15, 4372:10, 4373:17, 4374:2

**Company** [2] - 4293:4, 4351:22

**company's** [3] - 4327:19, 4327:24, 4349:24

**comparable** [1] - 4151:19

**comparably** [1] - 4232:23

**compare** [3] - 4304:9, 4304:10, 4320:19

**compared** [4] - 4126:17, 4127:12, 4188:5, 4228:19

**Comparison** [1] - 4380:21

**comparison** [4] - 4150:17, 4150:22, 4151:6, 4376:24

**comparisons** [1] - 4381:7

**compelling** [1] - 4185:12

**compete** [4] - 4196:11, 4196:18, 4213:2, 4217:22, 4231:1, 4259:21, 4294:5, 4321:11, 4363:9, 4366:10

**competing** [1] - 4126:24, 4148:15, 4193:24, 4260:6, 4260:9, 4260:11, 4317:2, 4363:7, 4364:17, 4364:23, 4364:24

**Competition** [1] - 4207:4

**competition** [110] - 4117:21, 4118:10, 4118:17, 4119:5, 4119:11, 4119:17, 4158:10, 4159:19, 4159:24, 4160:2, 4160:5, 4170:15, 4176:4, 4176:8, 4176:9, 4176:24, 4176:25, 4177:3, 4186:8, 4186:16, 4187:2, 4187:15, 4187:18, 4187:24, 4188:2, 4188:4, 4188:5, 4188:6, 4188:13, 4188:14, 4188:20, 4188:24, 4189:3, 4189:13, 4195:8, 4195:14, 4195:25, 4196:20, 4196:22, 4196:25, 4197:6, 4200:15, 4201:3, 4204:17, 4206:12, 4213:12, 4216:19, 4216:24, 4218:24, 4219:17, 4219:22, 4219:24, 4219:25, 4220:3, 4234:15, 4253:25, 4259:5, 4260:1, 4260:2, 4260:17, 4260:19, 4260:20, 4260:21, 4260:22, 4261:3, 4264:14, 4264:15, 4264:20, 4265:1, 4265:3, 4265:13, 4265:14, 4269:23, 4270:18, 4270:24, 4270:25, 4278:5, 4287:11, 4287:20, 4316:3, 4317:4, 4317:14, 4322:6, 4322:7, 4323:2, 4323:5, 4323:10, 4330:5, 4350:8, 4350:9, 4350:14, 4351:7, 4351:8, 4351:9, 4359:7, 4359:8, 4365:2, 4365:3, 4365:8, 4365:10, 4365:16, 4365:24, 4366:7, 4366:9, 4366:12, 4376:4

**Competitive** [6] - 4229:14, 4229:20, 4230:5, 4239:2, 4348:15, 4380:21

**competitive** [42] - 4117:23, 4118:22, 4118:25, 4119:4, 4125:14, 4125:23, 4126:18, 4126:23, 4127:7, 4146:5, 4153:21, 4154:1, 4158:7, 4158:9, 4158:20, 4158:25, 4162:7, 4162:12, 4172:23, 4176:2, 4194:15, 4195:3, 4197:14, 4212:20, 4217:4, 4265:10, 4269:7, 4270:11, 4270:20, 4285:12, 4287:1, 4287:16, 4299:19, 4311:22, 4311:24, 4316:2, 4316:5, 4338:21, 4353:3, 4367:13, 4381:6, 4381:8

**competitively** [1] - 4148:11, 4190:4

**competitiveness** [1] - 4372:4

**competitor** [8] - 4196:15, 4217:6, 4217:7, 4219:3, 4304:2, 4349:24, 4356:5, 4364:25

**competitors** [13] - 4147:24, 4217:21, 4218:9, 4218:12, 4218:16, 4219:8, 4249:20, 4303:10, 4328:17, 4328:18, 4371:6, 4380:25, 4381:4

**compilation** [1] - 4129:24

**complaining** [1] - 4341:21

**complaint** [1] - 4238:23

**complete** [6] - 4159:21, 4159:25, 4160:4, 4164:2, 4171:1, 4222:8

**completed** [1] - 4261:15

**completely** [1] - 4235:1

**completeness** [2] - 4139:8, 4140:5

**completing** [1] - 4296:4

**complex** [2] - 4191:12, 4191:16

**complexity** [2] - 4189:20, 4289:23

**compliance** [1] - 4241:6

**complication** [1] - 4285:6

**component** [1] - 4175:5

**components** [1] - 4143:6

**Components** [1] - 4132:23

**composition** [1] - 4127:14

**computer** [2] - 4113:22, 4370:21

**computer-assisted** [1] - 4113:22

**conceivable** [1] - 4216:13

**conceive** [1] - 4219:6

**concentrated** [1] - 4362:8

**concept** [14] - 4143:6, 4148:7, 4160:8, 4164:13, 4169:5, 4169:17, 4182:16, 4201:11, 4201:14, 4201:16, 4298:25, 4299:9, 4299:21, 4372:8

**concepts** [1] - 4184:3

**concern** [7] - 4179:8, 4196:10, 4196:15, 4209:6, 4216:19, 4280:1, 4368:7

**concerned** [12] - 4118:16, 4167:16, 4167:18, 4170:10, 4174:5, 4179:5, 4179:11, 4179:13, 4179:14, 4220:13, 4261:21, 4367:9

**concerning** [4] - 4135:19, 4189:20, 4278:15, 4287:8

**concerns** [2] - 4279:24, 4332:3

**concessions** [3] - 4346:15, 4346:22, 4347:6

**concierge** [1] - 4335:24

**conclude** [1] - 4380:18

**concluded** [4] - 4119:14, 4119:17, 4225:5, 4253:17

**concludes** [1] - 4288:7

**concluding** [2] - 4152:10, 4152:12

**conclusion** [5] - 4135:14, 4160:18, 4213:24, 4258:7, 4287:25

**conclusive** [1] - 4246:17

**Conduct** [1] - 4241:2

**conduct** [2] - 4118:25, 4119:1

**conducted** [2] - 4147:12

**conducting** [1] - 4186:19

**conference** [4] - 4230:19, 4231:5, 4239:3, 4239:15

**confidence** [1] - 4356:15

**confidential** [6] - 4136:4, 4141:21, 4141:22, 4189:23, 4189:25, 4190:4

**confidentiality** [1] - 4115:7

**confirm** [1] - 4238:9
**confirmed** [1] - 4153:3
**confirming** [1] - 4237:24
**confuse** [1] - 4181:10
**conjecture** [1] - 4351:24
**conjunction** [1] - 4252:9
**connect** [1] - 4306:11
**connected** [2] - 4253:18, 4348:18
**CONNECTICUT** [1] - 4112:3
**connection** [17] - 4131:1, 4136:18, 4146:20, 4147:25, 4177:24, 4191:6, 4199:18, 4202:16, 4214:16, 4237:19, 4249:14, 4254:9, 4285:15, 4293:17, 4294:8, 4301:8
**CONRATH** [65] - 4112:18, 4114:4, 4114:6, 4114:18, 4115:21, 4117:2, 4128:8, 4134:20, 4139:7, 4139:18, 4140:2, 4140:11, 4140:14, 4141:15, 4141:19, 4145:10, 4145:19, 4155:7, 4155:12, 4155:14, 4162:25, 4164:1, 4173:15, 4173:19, 4181:1, 4203:7, 4207:12, 4214:20, 4245:20, 4247:24, 4248:2, 4248:8, 4251:20, 4253:8, 4253:12, 4253:15, 4257:23, 4261:8, 4261:10, 4263:4, 4263:11, 4266:3, 4266:15, 4266:17, 4273:4, 4273:6, 4274:10, 4274:18, 4281:10, 4283:12, 4288:3, 4288:9, 4288:23, 4289:1, 4289:3, 4290:9, 4348:6, 4351:17, 4352:4, 4355:1, 4361:10, 4367:22, 4375:4, 4381:21, 4383:9
**Conrath** [5] - 4114:4, 4170:1, 4170:14, 4186:11, 4261:6
**Conrath's** [1] - 4169:23
**Consent** [8] - 4223:15, 4229:7, 4229:13, 4231:10, 4232:13, 4236:24, 4239:12, 4247:7
**consent** [1] - 4199:21
**consequence** [4] - 4176:8, 4176:25, 4217:22, 4346:22
**consider** [9] - 4135:14, 4136:18, 4147:12, 4152:15, 4213:17, 4260:12, 4279:18, 4280:5, 4283:15
**consideration** [6] - 4136:19, 4138:13, 4138:14, 4139:2, 4174:14, 4256:16
**considered** [6] - 4135:21, 4135:23, 4177:24, 4193:21, 4333:23, 4379:21
**considering** [2] - 4137:6, 4275:15
**consistent** [13] - 4124:18, 4126:1, 4224:12, 4225:5, 4225:20, 4320:3, 4326:12, 4326:16, 4327:18, 4363:5, 4370:3, 4375:21, 4379:4
**consistently** [2] - 4303:12, 4305:3
**constant** [2] - 4147:21, 4147:22
**constantly** [1] - 4299:20
**constitutes** [1] - 4274:2
**constrain** [1] - 4287:17
**constraint** [1] - 4288:2
**constraints** [1] - 4217:4
**constricted** [1] - 4338:15
**construct** [1] - 4220:21

**constructed** [1] - 4370:10
**consulting** [1] - 4293:4
**consumer** [57] - 4125:24, 4146:9, 4146:12, 4146:18, 4147:4, 4150:11, 4151:19, 4162:22, 4163:15, 4163:17, 4163:19, 4169:11, 4170:24, 4171:22, 4173:3, 4173:9, 4175:23, 4177:15, 4179:16, 4190:17, 4192:24, 4193:17, 4195:15, 4195:18, 4196:1, 4208:11, 4209:9, 4209:10, 4209:17, 4209:18, 4211:13, 4211:14, 4222:6, 4222:7, 4222:11, 4222:17, 4231:1, 4250:9, 4250:12, 4261:1, 4267:18, 4267:21, 4267:24, 4270:19, 4275:21, 4309:16, 4317:10, 4317:13, 4321:19, 4347:9, 4349:12, 4350:18, 4370:6
**Consumer** [3] - 4241:7, 4292:9, 4314:13, 4314:15, 4367:12
**consumers** [46] - 4161:19, 4167:10, 4167:15, 4167:17, 4168:22, 4170:23, 4174:10, 4175:15, 4175:16, 4176:4, 4177:10, 4177:19, 4178:13, 4178:14, 4178:21, 4181:14, 4193:11, 4195:17, 4200:8, 4201:7, 4201:21, 4210:25, 4212:21, 4212:22, 4217:5, 4220:11, 4239:3, 4239:11, 4240:6, 4249:8, 4249:19, 4249:21, 4250:16, 4250:17, 4250:22, 4260:10, 4270:24, 4271:2, 4275:14, 4282:3, 4293:14, 4310:4, 4322:8, 4348:22, 4350:17, 4353:4
**consumers'** [1] - 4172:7
**Cont'd** [3] - 4117:15, 4263:10, 4383:7
**contacts** [1] - 4361:23
**contained** [1] - 4339:12
**content** [2] - 4128:16, 4258:21
**context** [15] - 4121:5, 4128:23, 4158:18, 4174:12, 4176:17, 4181:18, 4183:22, 4184:4, 4204:16, 4215:5, 4215:23, 4223:11, 4241:1, 4278:15, 4322:18
**contingency** [1] - 4340:20
**continually** [1] - 4258:21
**continue** [14] - 4114:25, 4168:24, 4263:3, 4268:2, 4287:17, 4312:8, 4336:21, 4336:23, 4339:17, 4347:2, 4347:8, 4361:21, 4363:4, 4374:7
**continued** [10] - 4157:7, 4158:1, 4162:22, 4163:19, 4255:14, 4262:2, 4304:22, 4330:4, 4342:10, 4343:1
**Continued** [1] - 4198:4
**continues** [2] - 4125:22, 4344:14
**continuing** [1] - 4258:4
**contra** [1] - 4130:16
**contract** [4] - 4188:1, 4225:22, 4358:20, 4358:21
**contractual** [1] - 4359:4
**contractually** [1] - 4357:20
**contradicted** [2] - 4160:19, 4160:21
**contradictory** [1] - 4160:10
**contributed** [2] - 4346:16, 4346:19
**contribution** [1] - 4124:15
**control** [1] - 4266:3

**controllable** [1] - 4339:17
**convenience** [1] - 4116:13
**convenient** [1] - 4116:9
**conversation** [2] - 4322:19, 4374:19
**convince** [1] - 4313:1
**coordination** [1] - 4266:14
**copies** [4] - 4136:6, 4156:6, 4245:2, 4266:20
**copy** [10] - 4115:25, 4116:1, 4155:17, 4155:25, 4167:25, 4168:2, 4169:25, 4240:17, 4245:11, 4273:15
**copying** [5] - 4315:9, 4315:18, 4316:16, 4316:18, 4317:2
**core** [5] - 4339:6, 4347:13, 4372:5, 4372:9, 4374:6
**corner** [2] - 4244:13, 4352:7
**corners** [2] - 4225:21, 4238:22
**cornerstone** [6] - 4303:5, 4338:25, 4339:5, 4351:16, 4357:18, 4372:18
**corollary** [3] - 4202:3, 4271:5, 4271:8
**corporate** [3] - 4161:19, 4259:18, 4259:20, 4294:22
**Corporate** [1] - 4274:1
**Corporation** [1] - 4291:9
**corporations** [4] - 4259:19, 4293:14, 4294:24
**correct** [225] - 4118:12, 4119:15, 4119:19, 4123:25, 4125:9, 4125:10, 4127:12, 4129:22, 4129:23, 4130:1, 4130:4, 4130:5, 4130:10, 4130:19, 4130:23, 4130:24, 4131:2, 4131:6, 4131:12, 4131:13, 4132:7, 4132:8, 4132:15, 4132:20, 4133:17, 4133:21, 4134:14, 4135:5, 4136:16, 4137:8, 4137:19, 4138:24, 4139:18, 4141:13, 4141:25, 4142:13, 4142:17, 4142:23, 4143:3, 4143:8, 4143:15, 4143:18, 4143:19, 4143:24, 4144:7, 4144:8, 4144:12, 4144:16, 4144:17, 4144:18, 4144:24, 4145:3, 4146:5, 4146:15, 4147:5, 4147:17, 4147:20, 4148:5, 4148:6, 4148:13, 4148:14, 4148:17, 4149:5, 4149:11, 4149:14, 4149:19, 4149:22, 4149:25, 4150:7, 4152:1, 4153:14, 4153:18, 4153:19, 4153:23, 4160:11, 4160:15, 4160:16, 4161:16, 4161:22, 4162:9, 4162:13, 4165:12, 4165:17, 4169:3, 4171:14, 4171:15, 4173:5, 4174:10, 4174:15, 4175:6, 4175:16, 4177:3, 4177:20, 4178:3, 4178:6, 4178:7, 4178:10, 4178:16, 4179:17, 4180:18, 4180:22, 4181:18, 4182:11, 4182:14, 4183:17, 4184:6, 4184:8, 4184:11, 4184:14, 4185:1, 4185:2, 4185:7, 4186:14, 4187:2, 4187:3, 4187:13, 4187:19, 4188:7, 4188:15, 4188:18, 4188:19, 4192:13, 4192:21, 4192:25, 4193:4, 4193:7, 4193:8, 4193:12, 4193:18, 4194:4, 4194:12, 4194:20, 4195:10, 4195:16, 4196:8, 4196:14, 4196:20, 4196:21,

4197:1, 4200:2, 4201:1, 4201:8, 4202:14, 4203:20, 4204:12, 4204:13, 4204:21, 4204:25, 4205:7, 4205:16, 4206:5, 4206:18, 4207:24, 4207:25, 4210:2, 4210:11, 4211:18, 4215:14, 4215:20, 4216:17, 4218:16, 4221:9, 4222:3, 4222:22, 4223:2, 4223:19, 4223:20, 4223:24, 4223:25, 4227:16, 4229:4, 4229:11, 4232:15, 4233:15, 4234:7, 4235:24, 4237:11, 4240:13, 4241:12, 4241:13, 4243:12, 4243:13, 4243:17, 4247:4, 4251:7, 4252:5, 4253:21, 4254:14, 4254:18, 4254:24, 4261:19, 4263:20, 4265:13, 4268:9, 4268:14, 4270:5, 4271:15, 4271:23, 4276:3, 4277:12, 4278:13, 4279:14, 4280:13, 4281:5, 4282:18, 4284:20, 4298:8, 4298:18, 4301:20, 4309:18, 4311:8, 4315:6, 4315:14, 4326:5, 4326:9, 4326:21, 4327:12, 4329:6, 4329:7, 4348:25, 4352:20, 4352:21, 4364:15, 4373:6, 4377:21

**corrected** [1] - 4116:14

**correction** [2] - 4117:3, 4117:4

**correctly** [14] - 4130:7, 4132:25, 4159:2, 4178:17, 4181:2, 4205:25, 4218:8, 4221:12, 4226:14, 4250:19, 4253:24, 4270:3, 4271:3, 4285:21

**correlates** [1] - 4297:5

**cost** [21] - 4123:18, 4146:14, 4146:19, 4146:22, 4147:5, 4147:19, 4179:25, 4180:16, 4182:10, 4192:11, 4192:12, 4232:23, 4233:9, 4246:3, 4271:25, 4301:11, 4308:17, 4337:5, 4369:19, 4371:6, 4377:24

**costly** [3] - 4221:7, 4301:10, 4308:4

**costs** [25] - 4122:10, 4147:13, 4159:3, 4159:4, 4180:2, 4180:14, 4180:20, 4222:10, 4227:9, 4246:19, 4271:12, 4271:17, 4271:22, 4301:8, 4302:11, 4310:5, 4311:15, 4311:19, 4311:20, 4311:22, 4376:9, 4378:8

**Council** [1] - 4197:13

**Counsel** [1] - 4215:5

**counsel** [24] - 4114:2, 4115:25, 4137:15, 4137:16, 4139:12, 4139:17, 4145:15, 4181:2, 4240:4, 4248:19, 4250:11, 4252:1, 4255:9, 4255:12, 4256:7, 4265:21, 4267:9, 4271:9, 4280:24, 4281:8, 4281:9, 4282:10, 4282:22, 4283:7

**Counsel's** [1] - 4253:4

**count** [2] - 4227:22, 4363:19

**counter** [1] - 4193:17

**counteract** [1] - 4352:15

**counting** [1] - 4128:7

**countries** [2] - 4246:10, 4246:12

**country** [2] - 4265:13, 4319:7

**couple** [5] - 4139:8, 4173:8, 4209:16, 4273:1, 4288:19

**coupon** [2] - 4308:9, 4308:10

**course** [9] - 4116:2, 4153:9, 4156:3, 4156:5, 4156:22, 4170:20, 4264:13, 4273:21, 4339:7

**COURT** [190] - 4112:1, 4113:18, 4114:1, 4114:5, 4114:9, 4114:12, 4114:15, 4114:19, 4114:21, 4114:23, 4115:14, 4115:17, 4115:19, 4115:24, 4116:2, 4116:5, 4116:15, 4116:22, 4116:25, 4117:7, 4121:15, 4124:21, 4125:1, 4128:17, 4134:22, 4139:13, 4139:21, 4139:24, 4140:1, 4140:3, 4140:8, 4141:14, 4141:18, 4141:20, 4141:24, 4142:1, 4142:7, 4142:9, 4145:12, 4145:14, 4145:17, 4145:21, 4146:1, 4154:14, 4154:16, 4154:19, 4154:22, 4155:3, 4155:5, 4155:11, 4155:13, 4155:15, 4155:19, 4155:22, 4156:6, 4156:10, 4156:15, 4156:18, 4164:3, 4166:23, 4167:2, 4167:4, 4167:6, 4168:5, 4170:10, 4170:13, 4173:18, 4173:22, 4173:25, 4181:7, 4197:25, 4199:1, 4199:7, 4207:14, 4214:25, 4218:4, 4220:5, 4228:6, 4228:11, 4228:13, 4239:19, 4239:23, 4240:1, 4240:3, 4240:16, 4244:19, 4245:7, 4245:24, 4247:18, 4247:23, 4248:3, 4253:10, 4253:14, 4253:16, 4257:7, 4257:12, 4257:15, 4257:21, 4257:25, 4261:6, 4261:9, 4261:11, 4261:14, 4261:19, 4261:23, 4263:2, 4263:5, 4266:6, 4266:16, 4266:18, 4272:9, 4273:5, 4274:12, 4274:19, 4283:10, 4283:13, 4284:21, 4285:2, 4285:14, 4285:22, 4286:7, 4286:10, 4286:16, 4286:19, 4286:23, 4288:8, 4288:10, 4288:13, 4288:15, 4288:17, 4288:19, 4288:25, 4289:2, 4289:7, 4289:19, 4290:2, 4290:7, 4290:11, 4290:13, 4290:15, 4290:23, 4291:1, 4316:14, 4323:14, 4323:16, 4323:22, 4324:1, 4324:4, 4330:15, 4335:3, 4335:7, 4335:9, 4335:15, 4335:19, 4336:4, 4336:9, 4336:11, 4341:1, 4341:5, 4344:5, 4344:14, 4344:18, 4344:20, 4344:23, 4345:19, 4348:12, 4351:20, 4355:2, 4359:14, 4359:18, 4359:25, 4360:2, 4360:7, 4361:11, 4363:25, 4364:4, 4364:8, 4367:23, 4375:5, 4377:2, 4377:5, 4380:6, 4380:16, 4381:12, 4381:19, 4381:23, 4382:2, 4382:7, 4382:10, 4382:13

**Court** [20] - 4113:2, 4145:7, 4156:7, 4159:23, 4169:24, 4189:12, 4201:17, 4208:22, 4229:14, 4239:1, 4243:9, 4289:9, 4291:18, 4291:21, 4292:23, 4293:8, 4307:11, 4309:20, 4324:10, 4353:25

**court** [7] - 4189:1, 4189:23, 4207:12, 4259:12, 4322:16, 4364:11, 4377:4

**Court's** [1] - 4259:24

**Courthouse** [1] - 4112:6

**courtroom** [4] - 4114:20, 4121:14,

4166:18, 4323:18

**COVE** [1] - 4113:15

**cover** [7] - 4245:3, 4314:18, 4314:19, 4359:23, 4360:5, 4374:25, 4375:1

**coverage** [11] - 4125:3, 4126:16, 4126:17, 4127:11, 4313:25, 4356:22, 4356:25, 4357:4, 4357:6, 4362:12

**covered** [3] - 4127:15, 4200:12, 4267:4

**Craig** [1] - 4114:4

**CRAIG** [1] - 4112:18

**crap** [1] - 4357:22

**CRAVATH** [1] - 4113:7

**crazy** [1] - 4371:2

**create** [6] - 4163:13, 4235:12, 4296:25, 4298:1, 4301:15, 4334:4

**created** [5] - 4280:11, 4322:4, 4329:17, 4356:19, 4372:10

**creates** [1] - 4297:1

**creating** [1] - 4309:8

**creation** [1] - 4299:12

**creatures** [5] - 4329:16, 4329:25, 4340:11, 4350:16, 4365:24

**Credit** [1] - 4246:1

**credit** [77] - 4119:18, 4125:4, 4136:12, 4137:18, 4137:23, 4137:25, 4138:12, 4140:17, 4141:1, 4141:11, 4150:6, 4162:21, 4163:14, 4166:2, 4179:9, 4180:1, 4180:7, 4180:8, 4181:13, 4183:25, 4195:8, 4197:15, 4233:1, 4244:9, 4250:21, 4250:25, 4251:1, 4251:3, 4251:9, 4263:22, 4265:10, 4265:22, 4266:22, 4266:24, 4267:5, 4267:11, 4267:14, 4267:18, 4267:22, 4268:2, 4270:25, 4272:20, 4278:21, 4279:12, 4279:17, 4279:19, 4279:25, 4280:1, 4280:3, 4280:7, 4282:13, 4283:4, 4283:18, 4283:20, 4283:25, 4284:7, 4284:12, 4284:19, 4286:12, 4294:21, 4295:3, 4297:25, 4298:2, 4305:3, 4305:4, 4319:24, 4324:14, 4325:21, 4326:3, 4327:12, 4329:4, 4330:3, 4333:16, 4336:14, 4363:17

**creditworthy** [2] - 4297:23, 4304:20

**critical** [21] - 4293:23, 4293:25, 4296:13, 4296:19, 4296:21, 4296:24, 4297:7, 4297:13, 4297:19, 4299:19, 4302:21, 4305:13, 4305:18, 4309:5, 4323:4, 4323:9, 4333:22, 4347:11, 4357:15, 4372:2, 4381:6

**criticality** [1] - 4372:15

**criticism** [2] - 4277:19, 4277:20

**criticizing** [3] - 4278:15, 4365:15, 4365:16

**CROSS** [3] - 4117:15, 4158:1, 4383:7

**cross** [8] - 4114:16, 4114:25, 4199:10, 4273:23, 4274:9, 4287:2, 4289:15, 4381:20

**CROSS-EXAMINATION** [3] - 4117:15, 4158:1, 4383:7

**cross-examination** [6] - 4114:16, 4114:25, 4273:23, 4274:9, 4289:15,

4381:20
**cROSS-EXAMINATION(CONTINUED** [1] - 4199:10
**CSR** [1] - 4113:18
**culminates** [1] - 4370:17
**cups** [1] - 4298:11
**currency** [4] - 4299:9, 4299:22, 4334:5, 4379:17
**current** [10] - 4128:3, 4128:6, 4152:9, 4152:11, 4173:11, 4220:25, 4231:3, 4233:17, 4234:9, 4313:18
**customer** [40] - 4173:12, 4222:5, 4268:6, 4268:23, 4284:25, 4285:5, 4285:9, 4295:3, 4295:4, 4296:21, 4297:2, 4297:9, 4297:17, 4298:2, 4299:22, 4303:13, 4306:1, 4309:8, 4309:9, 4309:25, 4312:21, 4312:23, 4320:6, 4320:18, 4324:24, 4325:1, 4332:24, 4332:25, 4353:9, 4356:14, 4357:22, 4357:24, 4366:5, 4369:16, 4369:22, 4373:21, 4378:4, 4379:24, 4380:13, 4380:14
**customer's** [4] - 4287:15, 4320:6, 4320:7, 4356:19
**customers** [49] - 4180:7, 4180:20, 4183:13, 4209:6, 4212:22, 4229:24, 4230:14, 4230:24, 4241:18, 4241:25, 4242:7, 4267:24, 4267:25, 4268:20, 4271:18, 4279:22, 4283:17, 4283:24, 4284:6, 4285:18, 4293:11, 4297:6, 4297:8, 4297:15, 4297:18, 4297:21, 4297:22, 4299:1, 4302:8, 4302:13, 4306:4, 4307:6, 4310:14, 4313:17, 4313:18, 4318:8, 4320:2, 4320:5, 4320:13, 4332:4, 4332:21, 4333:7, 4333:20, 4336:2, 4340:4, 4368:13, 4368:16, 4368:21
**customers'** [1] - 4320:15
**customizing** [1] - 4238:13
**cut** [1] - 4339:20
**Cycle** [1] - 4348:15
**cycle** [9] - 4211:12, 4211:16, 4211:20, 4212:11, 4349:10, 4349:15, 4350:10, 4351:12, 4353:1

**D**

**D.C** [1] - 4112:18
**damaged** [1] - 4309:23
**damaging** [4] - 4302:22, 4339:16, 4362:7, 4370:13
**danger** [2] - 4202:17, 4203:19
**data** [19] - 4129:24, 4143:2, 4266:9, 4266:11, 4267:21, 4280:11, 4281:20, 4281:21, 4293:24, 4294:2, 4305:12, 4306:3, 4306:11, 4325:17, 4336:20, 4336:22, 4336:25, 4337:8
**Data** [18] - 4160:11, 4161:4, 4170:3, 4175:8, 4175:9, 4175:11, 4175:20, 4176:14, 4176:18, 4177:5, 4274:16, 4276:1, 4276:4, 4277:7, 4277:20, 4278:15, 4285:7, 4286:18

**date** [2] - 4206:22, 4265:25
**dated** [3] - 4244:12, 4353:22, 4360:13
**David** [1] - 4360:12
**days** [5] - 4256:2, 4297:16, 4309:23, 4328:11, 4328:16
**de** [1] - 4208:2
**deal** [13] - 4133:25, 4252:12, 4343:6, 4343:23, 4343:24, 4343:25, 4344:8, 4344:9, 4345:14, 4345:16, 4345:18, 4373:18
**dealing** [9] - 4187:5, 4187:10, 4187:14, 4209:5, 4220:12, 4220:24, 4268:22, 4364:20, 4373:14
**deals** [2] - 4131:1, 4366:10
**dealt** [3] - 4171:9, 4206:12, 4360:24
**debatable** [1] - 4368:8
**debate** [1] - 4164:11
**debit** [16] - 4176:16, 4244:10, 4246:1, 4265:21, 4267:11, 4267:19, 4267:22, 4278:22, 4282:4, 4282:14, 4283:4, 4283:21, 4285:9, 4325:22, 4327:12, 4373:3
**debt** [2] - 4298:3, 4305:1
**decade** [2] - 4346:6, 4373:13
**decades** [1] - 4340:21
**decide** [6] - 4193:25, 4299:25, 4300:5, 4300:6, 4300:14
**decided** [3] - 4138:14, 4289:21, 4313:23
**decision** [3] - 4136:19, 4259:13, 4268:3, 4345:20
**deck** [4] - 4314:20, 4315:3, 4321:14, 4374:18
**decline** [10] - 4162:8, 4162:11, 4267:12, 4338:8, 4338:10, 4346:17, 4346:20, 4351:6, 4368:14, 4368:24
**declined** [3] - 4130:1, 4246:17, 4267:6
**declines** [1] - 4347:5
**declining** [2] - 4267:15, 4327:16
**decrease** [9] - 4143:14, 4143:17, 4143:20, 4143:21, 4144:15, 4144:22, 4144:24, 4145:1, 4145:2
**decreased** [1] - 4219:23
**decree** [17] - 4187:11, 4191:5, 4191:11, 4191:15, 4192:7, 4192:9, 4192:15, 4192:18, 4192:20, 4193:10, 4199:21, 4199:25, 4200:4, 4200:6, 4200:10, 4240:17
**Decree** [8] - 4223:15, 4229:7, 4229:13, 4231:10, 4232:13, 4236:24, 4239:12, 4247:7
**decree's** [1] - 4237:9
**dedicated** [2] - 4306:23, 4322:4
**dedication** [5] - 4340:15, 4340:22, 4341:6, 4366:11, 4373:23
**deductible** [1] - 4327:4
**deemed** [2] - 4136:4, 4219:7
**default** [1] - 4305:1
**DEFENDANT** [1] - 4113:7
**defendant's** [2] - 4241:20, 4274:23
**Defendant's** [35] - 4116:4, 4117:12, 4120:7, 4122:17, 4122:24, 4129:9,

4129:14, 4132:16, 4134:18, 4135:1, 4136:1, 4136:23, 4137:14, 4139:16, 4142:2, 4144:5, 4145:23, 4148:23, 4154:7, 4155:21, 4159:7, 4167:22, 4194:25, 4206:24, 4353:14, 4366:16, 4367:20, 4367:23, 4374:9, 4375:3, 4384:4, 4384:6, 4384:8, 4384:10, 4384:12
**Defendants** [1] - 4112:11
**Defendants'** [14] - 4207:15, 4215:1, 4230:2, 4231:24, 4244:2, 4245:11, 4247:14, 4247:19, 4248:5, 4252:25, 4325:10, 4338:1, 4384:14, 4384:16
**Defense** [9] - 4355:4, 4361:14, 4367:25, 4375:5, 4375:7, 4384:18, 4384:20, 4384:22, 4384:24
**defense** [4] - 4118:1, 4289:12, 4289:13, 4289:14
**define** [1] - 4118:6
**defined** [5] - 4118:1, 4166:3, 4169:20, 4219:4, 4221:6
**definition** [11] - 4118:3, 4161:10, 4187:14, 4218:10, 4224:4, 4229:4, 4256:24, 4257:14, 4276:23, 4277:5, 4286:2
**degradations** [1] - 4146:24
**degree** [8] - 4153:22, 4153:24, 4154:1, 4158:7, 4158:21, 4196:25, 4220:13, 4303:25
**delighted** [1] - 4173:19
**deliver** [5] - 4146:15, 4313:1, 4353:11, 4369:23, 4372:22
**delivered** [3] - 4146:13, 4214:4, 4366:24
**Delta** [22] - 4131:8, 4131:23, 4132:6, 4132:10, 4135:7, 4135:9, 4135:18, 4136:4, 4136:18, 4137:7, 4137:25, 4138:4, 4138:10, 4140:16, 4140:21, 4141:2, 4141:10, 4252:20, 4252:23, 4254:5, 4254:8
**demand** [11] - 4202:5, 4296:25, 4297:1, 4298:1, 4298:5, 4299:11, 4299:23, 4300:11, 4302:14, 4324:24, 4342:8
**demo** [1] - 4117:1
**demonstrate** [3] - 4129:2, 4185:3, 4348:10
**demonstrates** [1] - 4351:11
**demonstrative** [12] - 4115:5, 4115:17, 4115:19, 4117:2, 4117:6, 4117:10, 4134:24, 4145:21, 4155:5, 4155:19, 4248:2, 4248:4
**demonstratives** [2] - 4134:20, 4145:19
**denied** [1] - 4338:19
**denigrate** [1] - 4358:2
**denigration** [1] - 4357:25
**denying** [1] - 4338:14
**DEPARTMENT** [1] - 4112:17
**Department** [9] - 4206:18, 4247:8, 4315:25, 4317:6, 4322:6, 4340:23, 4350:13, 4353:17, 4354:5
**department** [2] - 4330:9, 4330:12
**depict** [1] - 4129:19

depicted [1] - 4130:18
deposition [21] - 4122:20, 4135:18, 4136:24, 4137:12, 4140:9, 4162:19, 4163:4, 4163:12, 4165:21, 4182:8, 4182:20, 4191:9, 4192:7, 4216:6, 4223:5, 4224:5, 4224:16, 4224:18, 4226:4, 4226:6, 4257:11
deprived [1] - 4319:23
derives [1] - 4343:17
describe [7] - 4201:17, 4291:18, 4291:21, 4293:8, 4293:17, 4296:15, 4307:11
described [12] - 4123:25, 4132:2, 4151:25, 4213:22, 4216:4, 4252:3, 4268:3, 4269:14, 4294:9, 4303:6, 4324:10, 4369:8
describing [2] - 4208:22, 4310:3
description [1] - 4349:2
design [1] - 4371:4
despite [2] - 4165:10, 4375:16
destroy [3] - 4312:7, 4349:19, 4362:22
destroyed [2] - 4350:4, 4353:5
determination [1] - 4138:18
determine [8] - 4118:10, 4190:9, 4197:5, 4225:1, 4236:5, 4271:11, 4271:16, 4271:22
determining [3] - 4141:5, 4146:18, 4261:5
develop [3] - 4197:15, 4321:24, 4333:9
developed [2] - 4333:24, 4368:23
developing [1] - 4165:3
development [2] - 4298:24, 4333:25
developments [1] - 4362:7
devote [1] - 4365:1
diagrams [1] - 4129:12
differ [2] - 4250:24, 4294:10
difference [20] - 4115:12, 4115:23, 4116:5, 4143:20, 4209:7, 4227:8, 4245:14, 4253:8, 4253:11, 4276:19, 4276:21, 4277:18, 4281:25, 4282:5, 4282:22, 4313:3, 4320:12, 4357:12, 4358:1, 4371:9
differences [2] - 4272:19, 4272:20
different [67] - 4116:24, 4135:13, 4135:21, 4140:18, 4143:10, 4149:17, 4150:6, 4154:12, 4169:22, 4178:19, 4182:17, 4185:19, 4185:22, 4186:21, 4188:14, 4197:24, 4201:13, 4205:24, 4210:10, 4221:21, 4221:25, 4222:13, 4222:23, 4222:24, 4224:8, 4224:13, 4225:1, 4225:8, 4225:16, 4225:18, 4225:19, 4226:1, 4226:2, 4236:16, 4237:25, 4245:8, 4245:21, 4249:25, 4260:7, 4260:8, 4269:6, 4272:10, 4277:18, 4279:23, 4281:22, 4294:13, 4297:25, 4303:16, 4303:23, 4308:3, 4312:1, 4323:4, 4323:13, 4331:19, 4335:10, 4341:2, 4344:11, 4346:18, 4350:19, 4365:13, 4366:10, 4371:7, 4374:19, 4380:10, 4381:11
differentials [1] - 4228:4

differentiate [3] - 4369:2, 4369:6, 4370:15
differentiated [20] - 4148:17, 4294:3, 4303:23, 4310:11, 4311:1, 4312:9, 4312:25, 4318:25, 4323:1, 4336:24, 4349:20, 4349:22, 4369:15, 4369:25, 4370:5, 4370:11, 4371:5, 4372:14, 4372:25, 4374:8
differentiates [1] - 4301:12
differentiating [1] - 4351:1
differentiation [5] - 4208:12, 4208:16, 4250:13, 4370:20, 4370:22
difficult [4] - 4203:18, 4227:1, 4227:3, 4338:16
difficulty [4] - 4121:23, 4340:24, 4343:11, 4343:13
diffused [1] - 4362:15
digit [2] - 4227:15, 4228:18
digital [3] - 4307:14, 4308:8, 4319:4
digits [1] - 4227:21
dimension [4] - 4172:23
diminished [4] - 4218:24, 4219:13, 4255:22
diminishes [2] - 4217:20, 4251:17
diminishing [1] - 4361:23
Diners [7] - 4328:20, 4329:8, 4332:7, 4337:19, 4350:3, 4350:5, 4368:25
DIRECT [3] - 4291:6, 4343:1, 4383:11
direct [25] - 4120:8, 4120:18, 4125:18, 4128:18, 4150:16, 4151:25, 4153:13, 4203:1, 4215:6, 4221:4, 4248:18, 4250:8, 4251:22, 4263:22, 4264:7, 4264:23, 4265:19, 4273:13, 4274:24, 4276:9, 4279:10, 4286:24, 4289:12, 4322:19, 4381:15
directed [3] - 4116:18, 4137:16, 4266:8
direction [1] - 4187:16
directly [7] - 4141:1, 4168:20, 4175:15, 4197:16, 4246:13, 4349:21, 4349:22
director [1] - 4331:3
Director [1] - 4291:24
directors [1] - 4348:2
Directors [1] - 4292:21
disadvantage [4] - 4125:14, 4125:23, 4126:23, 4127:7
disagree [3] - 4189:3, 4189:14, 4195:6
disagreement [1] - 4146:8
discipline [1] - 4297:15
disciplined [1] - 4362:8
disclosed [1] - 4282:20
Discount [1] - 4132:23
discount [69] - 4123:9, 4129:19, 4130:1, 4130:7, 4130:9, 4130:12, 4130:18, 4130:23, 4131:11, 4132:13, 4133:5, 4133:15, 4134:1, 4134:11, 4135:10, 4136:20, 4139:3, 4140:22, 4141:11, 4142:17, 4142:18, 4142:23, 4143:13, 4144:10, 4151:20, 4171:19, 4172:1, 4172:17, 4172:20, 4173:5, 4174:15, 4174:24, 4175:2, 4178:9, 4178:20, 4194:7, 4246:16, 4252:4, 4252:10,

4252:24, 4253:20, 4254:12, 4254:21, 4254:25, 4255:16, 4255:17, 4272:10, 4272:12, 4272:16, 4275:15, 4275:20, 4275:21, 4276:14, 4276:16, 4276:20, 4277:11, 4277:15, 4278:9, 4285:4, 4301:4, 4311:7, 4343:16, 4346:4, 4346:17, 4346:21, 4347:6, 4349:11, 4369:19
discounts [3] - 4216:11, 4228:24, 4232:8
Discover [72] - 4119:23, 4126:5, 4126:11, 4126:15, 4126:18, 4129:5, 4148:19, 4149:4, 4149:13, 4149:21, 4149:24, 4150:2, 4165:7, 4166:4, 4166:10, 4182:9, 4182:13, 4182:24, 4183:9, 4183:16, 4184:10, 4184:13, 4184:16, 4185:5, 4185:13, 4185:19, 4185:22, 4197:1, 4199:14, 4199:17, 4202:12, 4202:18, 4204:14, 4204:19, 4214:15, 4218:9, 4218:13, 4219:12, 4223:11, 4223:21, 4224:7, 4224:13, 4225:3, 4225:17, 4225:23, 4225:25, 4226:7, 4226:9, 4226:18, 4226:19, 4226:20, 4226:23, 4227:2, 4227:3, 4227:10, 4227:12, 4227:15, 4227:25, 4228:23, 4229:8, 4232:7, 4233:14, 4234:15, 4235:5, 4236:3, 4240:7, 4287:25, 4350:21, 4350:22, 4350:23, 4369:18, 4370:1
Discover's [12] - 4126:16, 4149:10, 4151:3, 4158:15, 4185:17, 4190:2, 4196:17, 4223:13, 4223:23, 4224:5, 4225:3, 4231:8
Discover/Novus [1] - 4120:25
discretionary [5] - 4298:3, 4301:6, 4309:15, 4312:12, 4359:1
discriminate [5] - 4357:20, 4358:3, 4358:18, 4358:21, 4359:10
discriminated [1] - 4302:24
discriminates [1] - 4358:4
discrimination [7] - 4119:7, 4178:2, 4302:17, 4357:17, 4357:25, 4358:6, 4362:20
discuss [1] - 4365:21
discussed [8] - 4128:11, 4158:11, 4192:6, 4195:5, 4234:8, 4287:2, 4335:11, 4349:20
discussing [6] - 4199:13, 4220:14, 4249:6, 4249:15, 4249:23, 4251:15
discussion [15] - 4128:23, 4150:25, 4194:2, 4200:19, 4224:10, 4252:19, 4252:20, 4257:13, 4263:21, 4270:13, 4271:9, 4275:8, 4346:8, 4359:16, 4376:12
discussions [2] - 4335:10, 4359:20
Disney [15] - 4343:12, 4343:13, 4343:15, 4343:17, 4343:22, 4343:23, 4344:1, 4344:3, 4344:6, 4344:8, 4344:10, 4344:14, 4344:16, 4345:14, 4347:16
disparage [1] - 4257:17
disparagement [2] - 4194:6, 4357:25

**displayed** [1] - 4266:5
**dissipate** [1] - 4161:1
**dissipated** [1] - 4160:6
**dissipation** [3] - 4159:21, 4160:1, 4160:4
**distinct** [4] - 4188:5, 4188:14, 4250:15, 4250:22
**distinguished** [1] - 4303:9
**distribution** [1] - 4354:13
**distributor** [1] - 4252:16
**DISTRICT** [3] - 4112:1, 4112:1, 4112:14
**Division** [2] - 4206:17, 4292:2
**division** [2] - 4243:15, 4334:19
**DIVISION** [1] - 4112:16
**divvying** [1] - 4365:6
**Doctors** [1] - 4232:20
**document** [36] - 4128:8, 4132:18, 4136:5, 4136:9, 4136:18, 4136:21, 4136:25, 4137:4, 4142:10, 4206:25, 4245:23, 4266:4, 4267:8, 4304:5, 4314:8, 4317:17, 4320:25, 4348:2, 4348:7, 4348:8, 4348:14, 4349:3, 4351:20, 4352:6, 4352:19, 4353:13, 4354:1, 4354:3, 4354:12, 4354:23, 4366:23, 4374:10, 4374:13, 4380:18
**document's** [1] - 4347:24
**documents** [9] - 4115:4, 4115:9, 4127:24, 4210:23, 4211:23, 4213:22, 4289:3, 4290:25, 4347:20
**Dodd** [1] - 4241:7
**dog** [11] - 4164:14, 4164:19, 4164:20, 4257:4, 4257:5, 4257:6, 4257:7, 4257:18, 4257:20, 4258:2
**dogs** [1] - 4164:9
**dollar** [3] - 4253:6, 4286:14, 4300:23
**dollars** [18] - 4127:21, 4128:2, 4131:23, 4132:6, 4132:10, 4132:11, 4133:3, 4231:2, 4298:3, 4298:4, 4306:9, 4307:23, 4318:23, 4335:7, 4335:8, 4373:19, 4378:22, 4378:24
**dominant** [9] - 4148:16, 4202:5, 4202:13, 4216:8, 4216:25, 4217:19, 4265:14, 4317:15, 4358:23
**dominate** [1] - 4148:13
**dominated** [1] - 4350:20
**Donald** [1] - 4114:13
**DONALD** [1] - 4113:14
**done** [20] - 4124:18, 4125:17, 4128:12, 4138:9, 4166:20, 4168:14, 4169:18, 4228:17, 4236:23, 4240:15, 4261:20, 4279:1, 4282:6, 4306:3, 4307:13, 4309:2, 4336:8, 4358:22, 4371:24, 4380:11
**dotted** [6] - 4142:16, 4142:25, 4143:1, 4143:8, 4144:10, 4326:11
**double** [5] - 4338:12, 4351:10, 4367:18, 4373:15, 4373:18
**doubt** [10] - 4144:2, 4206:7, 4239:18, 4246:24, 4339:3, 4340:3, 4356:11, 4356:16, 4356:18
**doubts** [1] - 4356:24

**down** [39] - 4115:14, 4123:4, 4142:25, 4143:1, 4144:21, 4149:8, 4158:4, 4161:11, 4166:18, 4186:11, 4186:13, 4191:25, 4192:4, 4209:10, 4209:17, 4219:15, 4241:14, 4246:6, 4255:18, 4256:15, 4286:5, 4288:17, 4288:18, 4314:7, 4329:21, 4346:7, 4346:10, 4346:21, 4348:21, 4349:9, 4352:7, 4353:18, 4354:18, 4355:14, 4361:20, 4362:6, 4371:23, 4374:17
**downward** [1] - 4204:18
**Dr** [26] - 4115:20, 4117:17, 4117:19, 4132:24, 4135:8, 4138:8, 4142:2, 4142:22, 4143:13, 4143:14, 4144:14, 4144:21, 4145:3, 4146:9, 4152:17, 4154:12, 4155:9, 4199:12, 4232:6, 4232:8, 4232:14, 4247:14, 4248:9, 4248:12, 4281:2, 4282:7
**dramatic** [1] - 4351:5
**dramatically** [2] - 4316:2, 4319:2
**draw** [2] - 4163:11, 4282:10
**drill** [1] - 4374:17
**drive** [3] - 4312:8, 4323:1, 4331:19
**driven** [7] - 4172:5, 4177:3, 4196:25, 4258:4, 4258:12, 4260:3, 4372:4
**drives** [4] - 4303:11, 4303:14, 4368:18, 4370:18
**driving** [6] - 4256:3, 4257:3, 4311:2, 4311:18, 4317:14, 4347:11
**drop** [6] - 4228:23, 4279:17, 4279:19, 4283:24, 4284:12, 4362:10
**dropped** [1] - 4326:4
**dropping** [1] - 4283:18
**drugstores** [1] - 4212:8
**duality** [2] - 4204:1, 4204:6
**due** [4] - 4158:25, 4180:13, 4306:10, 4326:24
**duly** [3] - 4117:14, 4263:9, 4291:4
**duopoly** [6] - 4218:1, 4218:7, 4218:10, 4218:11, 4218:14, 4219:7
**duplicate** [1] - 4321:20
**Durbin** [3] - 4220:7, 4220:12, 4237:19
**during** [21] - 4129:4, 4129:24, 4130:3, 4132:14, 4144:16, 4170:20, 4199:14, 4237:23, 4254:21, 4255:23, 4259:5, 4267:14, 4272:23, 4280:24, 4289:9, 4289:14, 4314:11, 4326:8, 4333:13, 4334:12, 4367:17
**dwarfed** [1] - 4312:17
**DX** [28] - 4115:11, 4117:9, 4120:13, 4155:13, 4245:21, 4263:12, 4263:18, 4265:20, 4265:23, 4266:1, 4266:7, 4267:8, 4267:21, 4270:6, 4270:8, 4273:7, 4276:5, 4276:9, 4276:10, 4276:13, 4279:4, 4281:4, 4281:12, 4283:14, 4284:5, 4286:25, 4287:4, 4304:5
**DX-7492** [2] - 4360:9, 4361:11
**DX-7525** [2] - 4354:25, 4355:2
**DX0229** [2] - 4248:13, 4250:7
**DX229** [4] - 4207:11, 4207:14, 4207:15,

4384:14
**DX5828** [1] - 4240:19
**DX6466A** [4] - 4248:3, 4248:5, 4251:22, 4384:16
**DX6466B** [2] - 4248:5, 4384:16
**DX6646B** [1] - 4248:3
**DX733** [1] - 4203:2
**DXs** [1] - 4314:7

# E

**E-commerce** [1] - 4149:24
**e-mail** [2] - 4314:18, 4314:24
**e-mails** [1] - 4135:16
**early** [12] - 4132:5, 4138:25, 4299:21, 4328:11, 4328:16, 4332:3, 4334:12, 4334:19, 4346:5, 4346:13, 4358:7, 4358:8
**earn** [3] - 4301:1, 4301:2, 4301:4
**earning** [1] - 4379:24
**East** [1] - 4113:19
**EASTERN** [1] - 4112:1
**Economic** [3] - 4132:22, 4207:5, 4248:12
**economic** [17] - 4122:15, 4143:2, 4143:5, 4143:7, 4144:20, 4172:12, 4172:25, 4175:18, 4186:19, 4258:9, 4268:14, 4271:15, 4297:23, 4303:15, 4320:10, 4343:24, 4343:25
**economics** [6] - 4154:3, 4184:1, 4201:25, 4297:20, 4325:2, 4380:9
**economist** [4] - 4182:4, 4206:11, 4206:16, 4218:17
**Economist** [1] - 4206:18
**economists** [3] - 4118:4, 4251:11, 4345:9
**economy** [4] - 4236:13, 4266:23, 4306:9, 4306:13
**edge** [2] - 4169:1, 4208:6
**edit** [1] - 4141:16
**educational** [1] - 4292:23
**effect** [30] - 4117:24, 4125:8, 4133:14, 4134:10, 4159:1, 4161:6, 4169:19, 4208:23, 4213:1, 4216:6, 4228:25, 4229:4, 4229:8, 4231:4, 4231:10, 4237:9, 4239:12, 4271:1, 4277:4, 4278:7, 4284:23, 4284:25, 4286:4, 4286:22, 4289:15, 4339:21, 4356:13, 4369:8, 4370:13
**Effect** [1] - 4207:4
**effective** [14] - 4129:19, 4129:25, 4130:7, 4130:18, 4130:23, 4134:11, 4137:6, 4138:4, 4165:7, 4214:10, 4252:4, 4253:19, 4254:25, 4337:10
**effectively** [5] - 4196:11, 4217:21, 4218:1, 4219:13, 4226:20
**effects** [40] - 4118:5, 4118:16, 4172:25, 4175:22, 4176:2, 4177:11, 4186:23, 4187:16, 4187:22, 4187:23, 4187:25, 4188:1, 4188:24, 4189:2, 4189:7, 4189:12, 4196:17, 4201:19, 4202:7, 4203:18, 4206:13, 4207:22, 4207:24,

4208:1, 4214:8, 4217:7, 4231:15, 4239:16, 4240:10, 4246:11, 4256:5, 4270:23, 4275:19, 4275:21, 4278:1, 4340:7, 4365:21, 4365:23, 4366:13
**efficiency** [1] - 4289:10
**efficient** [1] - 4121:12
**effort** [11] - 4129:5, 4129:19, 4209:11, 4209:19, 4220:9, 4233:19, 4236:5, 4328:12, 4362:17, 4362:18, 4373:16
**efforts** [2] - 4197:11, 4210:20
**egalitarian** [1] - 4156:13
**egg** [11] - 4296:16, 4296:19, 4298:6, 4310:13, 4312:5, 4333:4, 4334:2, 4342:7, 4347:1, 4353:6, 4369:21
**eight** [1] - 4140:12
**Eighth** [1] - 4113:8
**either** [8] - 4127:6, 4131:16, 4172:14, 4187:16, 4265:15, 4279:12, 4282:16, 4369:9
**elected** [1] - 4292:20
**element** [1] - 4161:25
**elements** [5] - 4208:4, 4208:19, 4208:21, 4307:13, 4366:12
**eleven** [1] - 4381:18
**eliminate** [2] - 4349:8, 4350:9
**eliminated** [3] - 4171:24, 4174:22, 4218:12
**eliminates** [1] - 4217:4
**elimination** [3] - 4174:12, 4174:13, 4317:8
**elsewhere** [3] - 4191:4, 4242:7, 4370:13
**emphasize** [6] - 4293:15, 4299:19, 4306:2, 4322:25, 4323:11, 4368:19
**emphasized** [8] - 4175:8, 4175:11, 4302:2, 4302:6, 4303:12, 4318:7, 4318:10, 4342:3
**emphasizing** [1] - 4205:18
**employed** [1] - 4291:8
**employee** [2] - 4191:23, 4210:16
**enable** [1] - 4316:7
**enables** [1] - 4309:24
**encompassed** [1] - 4266:9
**encompassing** [1] - 4279:16
**encourage** [9] - 4162:3, 4177:19, 4229:23, 4230:14, 4241:18, 4242:7, 4242:15, 4316:7, 4349:12
**encouraged** [1] - 4359:9
**encouraging** [2] - 4358:21, 4376:2
**end** [10] - 4179:12, 4204:16, 4264:8, 4267:2, 4285:16, 4289:4, 4297:15, 4330:21, 4364:21, 4366:14
**ended** [3] - 4343:23, 4344:13, 4346:1
**ending** [1] - 4368:4
**ends** [4] - 4159:14, 4315:4, 4317:18, 4354:13
**enforce** [4] - 4226:20, 4227:25, 4228:2, 4235:16
**enforced** [1] - 4226:2
**enforcement** [6] - 4226:5, 4226:13, 4243:14, 4265:2, 4265:6, 4265:15
**enforces** - 4225:24, 4228:7

**enforcing** [6] - 4226:8, 4226:15, 4226:17, 4241:16, 4241:23, 4242:4
**engage** [10] - 4118:24, 4232:25, 4234:1, 4235:11, 4268:21, 4269:4, 4269:9, 4270:20, 4297:7, 4299:25
**engaged** [4] - 4234:19, 4309:5
**engagement** [3] - 4302:5, 4302:9, 4302:11
**engaging** [1] - 4358:17
**engine** [5] - 4303:11, 4325:8, 4349:11, 4368:17, 4370:18
**English** [1] - 4138:11
**enhance** [1] - 4162:20
**Enhanced** [1] - 4149:22
**enhanced** [1] - 4163:13
**enhancement** [1] - 4299:14
**enjoy** [1] - 4363:3
**enjoyed** [1] - 4196:24
**enormous** [2] - 4350:18, 4356:6
**ensure** [1] - 4304:16
**enter** [4] - 4192:16, 4192:20, 4193:9, 4327:21
**entered** [5] - 4191:5, 4229:12, 4232:13, 4330:6, 4358:25
**entering** [3] - 4241:16, 4241:24, 4242:5
**enters** [1] - 4114:20
**entertainment** [14] - 4129:7, 4129:21, 4133:21, 4134:14, 4144:6, 4212:3, 4328:5, 4328:24, 4332:22, 4333:5, 4333:8, 4333:12, 4333:22, 4337:21
**entire** [2] - 4340:1, 4373:17
**entirely** [1] - 4218:12
**entities** [1] - 4246:1
**entitled** [16] - 4132:22, 4133:8, 4136:7, 4207:3, 4246:1, 4315:6, 4317:20, 4325:20, 4348:14, 4353:17, 4366:20, 4374:11, 4376:15, 4378:14, 4379:7, 4380:21
**enumerated** [2] - 4241:19, 4242:7
**environment** [2] - 4311:22, 4311:24
**equal** [3] - 4271:20, 4272:7, 4277:4
**equate** [1] - 4176:3
**equation** [2] - 4284:24, 4360:4
**equilibrium** [2] - 4147:14, 4148:12
**equivalent** [2] - 4119:5, 4158:9, 4164:12
**ERIC** [1] - 4113:13
**error** [1] - 4116:7
**especially** [3] - 4208:4, 4208:20, 4227:22
**ESQ** [16] - 4112:18, 4112:19, 4112:19, 4112:20, 4112:20, 4112:21, 4112:21, 4113:9, 4113:9, 4113:10, 4113:10, 4113:13, 4113:13, 4113:14, 4113:14, 4113:15
**essence** [3] - 4294:11, 4299:8, 4363:8
**essential** [6] - 4310:12, 4310:20, 4336:21, 4366:12, 4369:3, 4381:8
**essentially** [5] - 4234:22, 4254:1, 4326:12, 4338:15, 4373:5
**establish** [2] - 4153:17, 4246:13
**established** [4] - 4175:4, 4207:22,

4216:18, 4222:25
**establishment** [2] - 4280:2, 4366:21
**Establishment** [5] - 4360:23, 4366:24, 4367:3, 4367:11, 4371:19
**estimate** [5] - 4199:5, 4223:7, 4253:19, 4378:6, 4381:21
**estimated** [1] - 4379:1
**estimates** [2] - 4379:5, 4382:9
**ET** [1] - 4112:10
**etcetera** [1] - 4208:10
**ETHAN** [1] - 4112:19
**Europe** [2] - 4263:23, 4264:5
**European** [1] - 4265:4
**evaluate** [1] - 4117:23
**evaluating** [1] - 4279:19
**evaluation** [3] - 4255:19, 4255:21, 4277:22
**Evan** [1] - 4114:10
**EVAN** [1] - 4113:9
**evening** [1] - 4381:13
**event** [3] - 4118:9, 4224:1, 4225:14
**events** [1] - 4344:21
**eventually** [1] - 4280:14
**everyday** [6] - 4173:10, 4212:8, 4227:19, 4334:3, 4334:23, 4335:1
**Everywhere** [6] - 4209:24, 4210:10, 4210:19, 4210:21, 4211:1, 4249:9
**evidence** [44] - 4116:3, 4116:4, 4117:9, 4117:12, 4126:4, 4134:23, 4135:2, 4135:15, 4145:22, 4145:24, 4147:25, 4155:16, 4155:21, 4159:8, 4164:8, 4207:14, 4207:16, 4212:10, 4212:15, 4214:6, 4214:9, 4214:10, 4214:13, 4229:6, 4229:11, 4246:17, 4248:4, 4248:6, 4256:21, 4256:25, 4313:7, 4314:11, 4347:25, 4351:21, 4353:25, 4355:3, 4355:4, 4361:12, 4361:14, 4367:21, 4367:24, 4367:25, 4375:6, 4375:7
**exact** [2] - 4156:8, 4281:22
**exactly** [10] - 4138:10, 4177:6, 4179:19, 4189:9, 4192:15, 4286:6, 4317:5, 4322:5, 4334:25, 4339:11
**examination** [7] - 4114:16, 4114:25, 4139:10, 4273:23, 4274:9, 4289:15, 4381:20
**EXAMINATION** [9] - 4117:15, 4158:1, 4248:7, 4263:10, 4291:6, 4343:1, 4383:7, 4383:9, 4383:11
**EXAMINATION(CONTINUED)** [1] - 4199:10
**examine** [2] - 4156:8, 4178:6
**examined** [6] - 4117:14, 4246:12, 4259:20, 4263:9, 4267:9, 4291:5
**examining** [2] - 4176:2, 4182:6
**example** [42] - 4118:23, 4123:10, 4130:25, 4131:7, 4132:9, 4132:11, 4135:6, 4150:7, 4163:22, 4175:1, 4177:17, 4193:11, 4194:7, 4197:9, 4204:8, 4209:21, 4210:1, 4210:6, 4210:8, 4215:9, 4215:17, 4235:11,

4255:5, 4258:13, 4258:15, 4280:7,
4284:4, 4286:15, 4300:14, 4305:14,
4307:18, 4308:25, 4318:3, 4319:13,
4320:18, 4327:3, 4344:25, 4352:25,
4370:21, 4370:23
**examples** [5] - 4209:16, 4209:17,
4209:20, 4307:15, 4370:21
**exceeded** [1] - 4178:14
**excellent** [1] - 4320:6
**except** [2] - 4122:3, 4279:13
**exception** [1] - 4183:2
**exceptions** [1] - 4118:19
**excerpt** [2] - 4120:13, 4136:24
**excerpts** [3] - 4122:18, 4273:8, 4273:15
**excited** [1] - 4320:16
**exciting** [4] - 4299:18, 4299:21,
4307:12, 4318:16
**exclude** [2] - 4143:22, 4282:3
**exclusionary** [19] - 4120:6, 4171:23,
4174:13, 4174:18, 4174:21, 4196:13,
4202:11, 4212:25, 4216:14, 4317:8,
4338:13, 4340:6, 4341:3, 4341:5,
4341:10, 4345:24, 4347:15, 4351:10,
4365:22
**exclusive** [5] - 4187:4, 4187:5, 4187:10,
4187:14, 4209:5
**exclusively** [4] - 4172:20, 4279:12,
4279:25, 4284:2
**excuse** [2] - 4133:5, 4281:8
**excused** [1] - 4288:13
**Executive** [7] - 4291:12, 4291:16,
4292:6, 4292:7, 4292:17, 4353:18,
4375:13
**executive** [4] - 4350:6, 4354:4, 4354:17,
4354:20
**executives** [7] - 4125:12, 4125:20,
4126:21, 4127:4, 4127:4, 4135:24, 4319:17,
4351:24
**exercise** [5] - 4194:15, 4195:4, 4220:24,
4270:12, 4274:3
**Exhibit** [52] - 4116:4, 4117:12, 4120:7,
4122:17, 4122:24, 4127:2, 4129:9,
4129:14, 4132:16, 4134:18, 4136:1,
4136:23, 4137:14, 4139:16, 4144:5,
4148:24, 4154:7, 4155:21, 4159:7,
4194:25, 4206:24, 4207:15, 4215:1,
4230:2, 4231:24, 4244:2, 4247:15,
4248:5, 4248:15, 4252:25, 4325:10,
4338:1, 4347:19, 4353:14, 4353:24,
4355:4, 4361:14, 4366:16, 4367:23,
4367:25, 4374:9, 4375:5, 4375:7,
4384:4, 4384:6, 4384:12, 4384:14,
4384:16, 4384:18, 4384:20, 4384:22,
4384:24
**exhibit** [12] - 4116:19, 4117:1, 4120:11,
4120:13, 4155:6, 4155:19, 4159:6,
4215:2, 4245:8, 4247:21, 4304:6,
4348:5
**exhibits** [5] - 4134:24, 4145:21, 4248:4,
4251:20, 4344:11
**Exhibits** [4] - 4135:1, 4145:23, 4384:8,

4384:10
**exist** [2] - 4191:2, 4246:3
**existence** [4] - 4129:2, 4148:4, 4148:5,
4196:4
**existing** [3] - 4241:16, 4242:4, 4318:21
**exists** [2] - 4117:25, 4246:17
**exorbitant** [3] - 4319:13, 4319:15,
4320:1
**expand** [5] - 4324:20, 4332:11, 4333:4,
4333:8, 4334:3
**expanded** [4] - 4212:7, 4299:5, 4362:12
**expanding** [5] - 4330:24, 4331:23,
4333:13, 4334:15, 4337:20
**expansion** [2] - 4333:1, 4334:13
**expect** [8] - 4162:10, 4163:17, 4182:9,
4219:14, 4219:16, 4230:21, 4237:16,
4286:3
**expected** [1] - 4228:23
**expenditures** [1] - 4146:25
**expense** [2] - 4308:17, 4379:1
**Expense** [1] - 4378:14
**expenses** [2] - 4222:5, 4335:5
**expensive** [3] - 4280:8, 4280:22, 4319:7
**experience** [10] - 4165:2, 4304:8,
4319:18, 4325:16, 4326:12, 4326:17,
4338:6, 4338:7, 4357:11, 4374:2
**experienced** [4] - 4229:8, 4254:13,
4339:19, 4361:18
**experiences** [2] - 4162:22, 4163:20
**expert** [8] - 4152:16, 4171:13, 4251:23,
4275:25, 4276:1, 4276:4, 4277:19,
4280:14
**experts** [2] - 4118:8, 4258:9
**explain** [9] - 4115:10, 4115:12, 4159:23,
4241:11, 4252:11, 4253:22, 4260:25,
4324:9, 4368:14
**explanations** [1] - 4231:14
**explicitly** [1] - 4187:10
**exploding** [1] - 4338:18
**EXPRESS** [1] - 4112:9
**express** [2] - 4216:12, 4358:10
**Express** [280] - 4114:11, 4114:14,
4119:18, 4119:23, 4120:25, 4121:17,
4121:22, 4122:7, 4122:9, 4123:7,
4123:24, 4125:12, 4125:15, 4125:20,
4125:21, 4126:6, 4126:12, 4126:22,
4126:24, 4127:5, 4127:8, 4127:11,
4127:19, 4128:19, 4130:8, 4130:13,
4130:22, 4130:25, 4131:7, 4131:8,
4131:15, 4131:20, 4131:22, 4132:6,
4133:4, 4135:8, 4135:9, 4135:15,
4135:16, 4135:20, 4135:23, 4136:7,
4136:9, 4136:11, 4136:16, 4137:7,
4138:22, 4140:17, 4140:20, 4140:22,
4141:1, 4141:9, 4142:17, 4146:4,
4146:14, 4147:23, 4150:12, 4150:19,
4150:20, 4151:17, 4151:22, 4152:1,
4152:6, 4152:8, 4152:12, 4152:19,
4153:1, 4153:17, 4161:18, 4161:21,
4162:2, 4162:6, 4167:11, 4167:16,
4167:19, 4168:13, 4168:18, 4168:19,

4168:22, 4171:24, 4178:1, 4179:10,
4184:14, 4184:16, 4185:8, 4185:9,
4185:11, 4185:15, 4185:23, 4192:4,
4192:9, 4192:10, 4192:14, 4192:15,
4192:18, 4193:3, 4193:7, 4193:11,
4193:14, 4193:15, 4193:18, 4193:19,
4193:21, 4193:24, 4194:9, 4194:11,
4194:14, 4195:3, 4195:8, 4195:14,
4195:22, 4195:24, 4196:3, 4196:4,
4196:5, 4196:7, 4196:11, 4196:17,
4196:19, 4197:1, 4197:7, 4197:13,
4197:16, 4197:19, 4197:21, 4199:15,
4200:15, 4200:25, 4201:8, 4202:12,
4202:17, 4204:9, 4204:19, 4205:4,
4205:14, 4205:20, 4206:2, 4209:25,
4210:24, 4211:1, 4211:20, 4212:1,
4212:12, 4212:16, 4213:2, 4213:5,
4218:9, 4218:12, 4218:13, 4219:12,
4219:22, 4219:24, 4221:14, 4221:20,
4221:22, 4221:24, 4222:2, 4222:4,
4222:7, 4222:12, 4222:19, 4222:21,
4223:2, 4224:2, 4224:14, 4226:10,
4226:19, 4227:18, 4228:1, 4228:7,
4228:18, 4229:3, 4229:10, 4231:19,
4232:4, 4232:11, 4232:22, 4232:25,
4233:18, 4235:5, 4235:14, 4236:3,
4236:12, 4236:17, 4236:25, 4237:2,
4237:5, 4238:10, 4238:20, 4238:25,
4239:5, 4240:8, 4248:19, 4249:10,
4249:16, 4249:17, 4250:3, 4252:1,
4252:22, 4254:4, 4254:20, 4255:10,
4255:12, 4255:13, 4255:22, 4256:8,
4256:14, 4256:20, 4256:22, 4257:17,
4258:8, 4260:8, 4260:14, 4267:9,
4270:11, 4270:18, 4270:19, 4270:21,
4270:22, 4271:10, 4272:15, 4272:24,
4274:2, 4274:6, 4280:25, 4287:13,
4287:16, 4287:18, 4289:10, 4289:16,
4291:8, 4292:18, 4293:5, 4293:9,
4293:20, 4294:16, 4295:6, 4295:15,
4295:17, 4295:22, 4296:5, 4296:7,
4302:16, 4302:23, 4305:9, 4312:11,
4313:9, 4320:14, 4322:23, 4322:25,
4325:16, 4326:3, 4326:21, 4327:21,
4328:7, 4328:17, 4330:5, 4330:18,
4335:12, 4339:1, 4339:2, 4339:4,
4341:12, 4341:24, 4346:9, 4349:15,
4351:22, 4355:21, 4356:4, 4357:1,
4357:16, 4358:14, 4358:19, 4362:10,
4362:16, 4362:21, 4367:10
**Express'** [19] - 4204:24, 4213:4,
4221:13, 4222:14, 4224:2, 4224:9,
4225:8, 4225:16, 4226:1, 4227:20,
4228:24, 4229:3, 4234:9, 4235:15,
4252:4, 4256:17, 4325:6, 4326:23,
4329:19
**Express's** [34] - 4120:3, 4121:3, 4128:3,
4129:5, 4129:19, 4129:25, 4131:11,
4132:22, 4133:14, 4134:1, 4134:11,
4136:20, 4137:15, 4137:16, 4146:24,
4147:15, 4151:20, 4152:16, 4158:13,
4158:14, 4161:24, 4164:25, 4165:3,

4171:20, 4185:1, 4191:23, 4191:24, 4192:3, 4197:10, 4271:1, 4346:4, 4346:11, 4346:24, 4353:3
**expressed** [5] - 4134:6, 4181:11, 4181:16, 4195:12, 4271:6
**Expresses'** [1] - 4212:11
**extent** [9] - 4181:11, 4181:15, 4189:11, 4201:3, 4205:18, 4222:10, 4249:20, 4251:13, 4255:8
**extreme** [3] - 4201:25, 4216:13, 4242:24

## F

**face** [4] - 4164:24, 4322:19, 4362:11
**face-to-face** [1] - 4322:19
**faced** [4] - 4355:15, 4355:17, 4367:14, 4367:15
**faces** [2] - 4168:21, 4168:23
**facing** [2] - 4254:16, 4367:18
**fact** [123] - 4119:3, 4120:20, 4121:22, 4122:4, 4122:5, 4124:3, 4124:4, 4124:10, 4124:13, 4124:14, 4125:25, 4126:10, 4126:21, 4127:5, 4128:2, 4128:6, 4147:11, 4148:23, 4152:6, 4152:25, 4154:2, 4160:8, 4161:21, 4162:15, 4167:15, 4171:23, 4173:15, 4173:23, 4174:17, 4174:21, 4175:14, 4176:7, 4176:23, 4180:19, 4180:20, 4185:17, 4186:4, 4186:25, 4187:4, 4187:7, 4190:8, 4191:1, 4191:15, 4194:19, 4195:14, 4195:24, 4197:4, 4197:12, 4200:3, 4200:8, 4203:17, 4206:20, 4207:8, 4209:13, 4210:15, 4210:23, 4213:3, 4213:5, 4214:11, 4216:25, 4217:4, 4220:2, 4222:17, 4228:18, 4230:19, 4231:8, 4233:16, 4233:25, 4237:19, 4237:24, 4238:10, 4239:14, 4247:2, 4255:22, 4256:20, 4256:25, 4260:1, 4260:21, 4268:11, 4269:4, 4270:18, 4270:22, 4274:1, 4274:15, 4276:13, 4280:25, 4282:11, 4282:15, 4285:18, 4293:10, 4295:2, 4298:23, 4299:25, 4300:4, 4302:4, 4310:13, 4311:6, 4313:7, 4316:6, 4316:10, 4317:5, 4319:17, 4321:10, 4323:22, 4331:21, 4336:3, 4338:23, 4339:21, 4340:9, 4341:21, 4345:1, 4346:12, 4349:17, 4353:6, 4353:10, 4354:20, 4362:16, 4362:22, 4364:19, 4369:23, 4372:1, 4376:6
**facto** [1] - 4208:2
**factor** [4] - 4132:9, 4159:5, 4251:8, 4251:10
**factored** [1] - 4131:1
**factors** [11] - 4141:5, 4162:19, 4163:13, 4175:2, 4220:6, 4220:14, 4220:15, 4256:3, 4268:8, 4372:2, 4372:5
**facts** [3] - 4152:14, 4195:7, 4213:24
**fair** [12] - 4167:20, 4200:14, 4213:13, 4213:19, 4223:7, 4240:12, 4301:9, 4310:5, 4357:9, 4372:8, 4373:10, 4373:11

**fairly** [2] - 4234:14, 4355:19
**fall** [4] - 4154:17, 4186:5, 4216:21, 4371:25
**fallen** [1] - 4377:7
**falling** [3] - 4186:7, 4216:23, 4266:25
**familiar** [23] - 4132:1, 4148:7, 4169:5, 4173:23, 4173:24, 4179:24, 4180:24, 4191:5, 4191:8, 4201:11, 4201:15, 4201:18, 4202:15, 4216:5, 4219:9, 4229:20, 4231:5, 4242:21, 4302:15, 4325:12, 4325:13, 4328:13, 4339:7
**far** [16] - 4123:19, 4139:11, 4163:12, 4175:4, 4199:5, 4231:9, 4240:11, 4250:3, 4257:22, 4261:13, 4261:21, 4279:13, 4322:8, 4330:23, 4339:10, 4344:2
**favor** [5] - 4118:3, 4209:4, 4209:11, 4209:19, 4217:6, 4358:22
**favorably** [1] - 4185:18
**favoring** [1] - 4183:23
**feasible** [1] - 4251:17
**feature** [3] - 4154:4, 4371:12, 4380:6
**features** [9] - 4177:18, 4213:23, 4250:15, 4250:22, 4300:21, 4321:20, 4380:10, 4381:7
**February** [1] - 4360:13
**federal** [2] - 4241:9, 4246:1
**fee** [11] - 4130:9, 4130:10, 4175:5, 4191:12, 4191:16, 4284:23, 4285:3, 4310:8, 4320:17, 4320:19
**Fee** [4] - 4341:14, 4341:17, 4343:22, 4347:15
**feed** [1] - 4121:13
**feedback** [4] - 4208:4, 4208:19, 4208:20, 4209:1
**feeding** [2] - 4164:10, 4258:2
**fees** [42] - 4130:9, 4147:14, 4150:6, 4150:10, 4150:18, 4174:19, 4174:22, 4174:23, 4174:24, 4175:13, 4175:23, 4176:7, 4176:24, 4178:14, 4181:16, 4181:24, 4186:2, 4190:3, 4191:24, 4211:13, 4211:21, 4213:6, 4219:18, 4231:9, 4232:12, 4246:2, 4246:16, 4246:18, 4246:20, 4247:3, 4247:9, 4263:22, 4275:20, 4275:21, 4277:14, 4285:20, 4311:6, 4319:2, 4341:12, 4341:21, 4370:6, 4380:12
**felt** [3] - 4187:22, 4187:23, 4315:25
**few** [13] - 4124:19, 4139:20, 4174:6, 4239:10, 4292:5, 4298:7, 4307:8, 4307:15, 4331:18, 4348:9, 4361:17, 4363:16, 4363:17
**fewer** [2] - 4184:10, 4312:15
**field** [1] - 4350:15
**Fifth** [2] - 4112:17, 4330:20
**fifth** [2] - 4185:1, 4326:4
**fifths** [1] - 4205:15
**fighting** [1] - 4351:6
**Figure** [7] - 4129:13, 4129:15, 4130:19, 4132:24, 4142:13, 4145:22
**figure** [11] - 4137:6, 4154:13, 4167:24,

4190:12, 4192:12, 4235:6, 4247:13, 4247:19, 4248:1, 4251:23, 4254:23
**figures** [3] - 4153:2, 4168:11, 4359:15
**filed** [4] - 4128:9, 4206:20, 4229:13, 4230:5
**fill** [1] - 4257:10
**final** [3] - 4229:23, 4230:13, 4241:9
**Final** [1] - 4314:19
**finance** [2] - 4171:4, 4171:8
**financial** [8] - 4297:14, 4297:23, 4318:14, 4319:8, 4319:21, 4349:11, 4361:25, 4362:2
**financially** [5] - 4317:23, 4318:2, 4319:1, 4345:20, 4363:9
**findings** [1] - 4246:24
**fine** [10] - 4117:7, 4186:14, 4186:16, 4186:18, 4244:19, 4266:21, 4359:7, 4359:25, 4382:2, 4382:10
**finish** [1] - 4199:4
**firm** [15] - 4118:14, 4118:21, 4148:15, 4153:20, 4156:11, 4158:5, 4158:19, 4159:15, 4209:8, 4239:21, 4265:14, 4269:1, 4269:7, 4269:9, 4293:4
**firm's** [1] - 4119:10
**firmly** [2] - 4320:14, 4373:1
**firms** [8] - 4148:10, 4148:12, 4148:16, 4209:17, 4218:22, 4219:7, 4256:21, 4269:10
**first** [47] - 4116:11, 4116:20, 4120:17, 4129:10, 4129:15, 4151:7, 4159:19, 4159:24, 4163:5, 4167:23, 4175:19, 4206:25, 4242:2, 4247:14, 4249:3, 4250:8, 4250:11, 4261:17, 4266:11, 4270:10, 4273:16, 4275:12, 4281:3, 4282:10, 4284:4, 4284:8, 4287:7, 4291:4, 4298:9, 4307:25, 4315:8, 4327:21, 4327:24, 4333:17, 4333:18, 4338:4, 4340:5, 4340:20, 4353:7, 4354:17, 4361:16, 4362:24, 4375:16
**First** [10] - 4116:11, 4161:4, 4170:3, 4175:8, 4175:9, 4175:11, 4175:20, 4176:14, 4176:18, 4177:5, 4274:16, 4276:1, 4276:4, 4277:7, 4277:19, 4278:15, 4285:7, 4286:18
**five** [11] - 4158:15, 4215:7, 4280:14, 4280:16, 4280:18, 4285:10, 4315:2, 4323:13, 4338:4, 4364:6, 4364:8
**fixed** [3] - 4159:3, 4222:10, 4222:14
**flat** [4] - 4254:21, 4255:1, 4255:23, 4326:12
**flawed** [1] - 4350:25
**flexibility** [3] - 4299:3, 4299:23, 4300:13
**Flexner** [1] - 4114:14
**FLEXNER** [3] - 4113:11, 4113:14, 4114:13
**flip** [1] - 4219:20
**FM** [1] - 4208:8
**focus** [24] - 4172:17, 4172:20, 4249:4, 4255:25, 4256:4, 4279:18, 4282:12, 4285:9, 4302:5, 4304:21, 4305:4, 4305:16, 4310:10, 4325:24, 4331:16,

4331:19, 4332:4, 4332:5, 4332:18, 4333:4, 4333:19, 4336:19, 4373:23
**focused** [16] - 4171:18, 4181:18, 4202:9, 4211:12, 4211:19, 4228:13, 4293:11, 4318:8, 4319:8, 4323:6, 4323:7, 4330:11, 4331:22, 4344:10, 4357:7, 4371:3
**focusing** [6] - 4160:23, 4172:22, 4211:16, 4211:21, 4285:17, 4321:6
**focussing** [1] - 4212:11
**folks** [1] - 4166:20
**follow** [2] - 4288:6, 4302:9
**following** [10] - 4175:3, 4186:3, 4198:4, 4232:12, 4262:2, 4273:24, 4273:25, 4299:25, 4342:10, 4343:19
**follows** [6] - 4117:14, 4120:20, 4219:23, 4263:9, 4270:24, 4291:5
**food** [3] - 4257:15, 4257:18, 4257:20
**Foods** [5] - 4307:18, 4308:1, 4308:6, 4308:13, 4309:13
**footing** [1] - 4219:1
**footnote** [1] - 4125:19
**FOR** [6] - 4112:13, 4112:16, 4112:23, 4113:1, 4113:4, 4113:7
**force** [11] - 4126:10, 4165:16, 4184:10, 4184:16, 4184:22, 4184:25, 4224:8, 4225:19, 4227:24, 4238:2, 4238:6
**forecast** [3] - 4376:19, 4376:24, 4377:19
**foremost** [1] - 4353:7
**forget** [3] - 4308:12, 4370:24, 4370:25
**forgone** [3] - 4133:3, 4133:24, 4143:22
**Forgone** [2] - 4133:9, 4134:3
**forgot** [2] - 4238:18, 4308:24
**form** [15] - 4115:10, 4163:23, 4184:5, 4184:7, 4187:1, 4187:4, 4194:5, 4194:7, 4201:25, 4242:24, 4260:15, 4260:16, 4331:24, 4341:18
**formally** [1] - 4118:6
**formed** [1] - 4331:15
**former** [1] - 4210:16
**forming** [1] - 4238:2
**forms** [2] - 4188:24, 4238:24
**forth** [3] - 4185:16, 4343:17, 4359:20
**foundation** [2] - 4348:7, 4351:18
**four** [6] - 4123:3, 4149:2, 4153:2, 4205:15, 4225:21, 4238:22
**four-fifths** [1] - 4205:15
**fourth** [2] - 4158:4, 4354:18
**fraction** [2] - 4153:8, 4205:24
**frame** [4] - 4259:6, 4341:23, 4343:12, 4375:25
**franchise** [1] - 4336:3
**Frank** [1] - 4241:7
**frankly** [6] - 4181:12, 4330:19, 4340:12, 4343:24, 4350:25, 4371:7
**fraud** [7] - 4306:7, 4306:8, 4306:10, 4306:12, 4306:14, 4306:16, 4311:16
**free** [3] - 4132:6, 4233:17, 4270:20
**freedom** [3] - 4229:23, 4230:14, 4313:23

**freely** [1] - 4359:1
**freeride** [1] - 4221:13
**freeriding** [5] - 4221:4, 4221:6, 4221:20, 4222:14, 4222:22
**frequently** [2] - 4314:16, 4325:19
**Friday** [1] - 4319:16
**friend** [1] - 4164:8
**frightening** [1] - 4338:8
**front** [3] - 4265:25, 4331:25, 4366:17
**FULKERSON** [1] - 4112:24
**full** [8] - 4250:8, 4273:17, 4287:19, 4290:20, 4294:18, 4297:14, 4328:25, 4352:10
**fully** [6] - 4118:2, 4124:18, 4181:19, 4274:4, 4301:11, 4360:5
**fun** [1] - 4291:19
**function** [6] - 4171:5, 4171:6, 4171:8, 4227:11, 4295:22, 4331:25
**functionality** [1] - 4371:4
**fund** [13] - 4211:13, 4211:21, 4213:6, 4310:24, 4311:25, 4312:8, 4347:8, 4347:10, 4349:22, 4351:13, 4369:22, 4370:5, 4372:25
**fundamental** [9] - 4296:22, 4296:24, 4299:12, 4302:21, 4313:3, 4320:11, 4338:11, 4338:23, 4357:18
**fundamentally** [4] - 4294:13, 4296:6, 4297:25, 4303:16
**funding** [3] - 4321:10, 4321:15, 4352:25
**funds** [6] - 4130:15, 4213:5, 4253:2, 4253:18, 4294:20
**future** [2] - 4220:17, 4367:9

# G

**G-1** [3] - 4132:19, 4142:13, 4145:22
**G-2** [2] - 4133:23, 4145:22
**gain** [2] - 4316:10, 4332:9
**gained** [2] - 4208:6, 4362:18
**gaining** [1] - 4362:19
**gains** [1] - 4160:6
**game** [1] - 4368:11
**gang** [1] - 4364:25
**GAO** [7] - 4243:22, 4244:9, 4244:25, 4245:9, 4245:13, 4246:7, 4246:12
**GAO8558** [1] - 4245:4
**gap** [5] - 4126:16, 4126:17, 4127:11, 4127:16, 4256:16
**GARAUFIS** [1] - 4112:13
**gas** [1] - 4300:25
**gateway** [1] - 4250:24
**General** [9] - 4112:23, 4112:24, 4113:1, 4113:5, 4231:6, 4239:14, 4292:6, 4292:8, 4322:20
**general** [23] - 4118:18, 4124:10, 4150:15, 4166:2, 4190:24, 4194:2, 4213:8, 4224:10, 4241:20, 4242:8, 4266:23, 4266:24, 4269:22, 4282:13, 4283:4, 4283:19, 4283:20, 4283:25, 4325:21, 4326:2, 4327:11, 4334:13, 4382:11

**General's** [1] - 4113:5
**generally** [18] - 4150:13, 4183:7, 4183:23, 4220:2, 4232:22, 4232:24, 4249:2, 4251:11, 4267:14, 4267:16, 4267:17, 4267:20, 4304:10, 4316:25, 4320:17, 4339:22, 4344:11, 4350:9
**generate** [2] - 4310:15, 4325:1
**generated** [2] - 4297:24, 4359:7
**generates** [1] - 4196:5
**generically** [1] - 4177:4
**Genesis** [8] - 4337:2, 4337:6, 4337:7, 4352:13, 4352:18, 4352:25
**GENTILE** [2] - 4113:4, 4114:7
**Gentile** [1] - 4114:7
**geographic** [1] - 4339:20
**Gerstner** [2] - 4331:9, 4331:14
**Gilbert** [4] - 4195:2, 4232:6, 4232:20
**Gilbert's** [1] - 4232:15
**gist** [1] - 4269:22
**given** [12] - 4151:24, 4196:2, 4204:3, 4205:20, 4213:9, 4234:22, 4295:25, 4346:19, 4363:10, 4364:1, 4374:1, 4380:13
**glad** [2] - 4253:9, 4257:12
**glass** [2] - 4137:15, 4139:10
**GLASS** [1] - 4112:19
**Global** [1] - 4295:8
**global** [1] - 4220:22
**Globe** [1] - 4341:20
**gloss** [1] - 4155:25
**GMAPS** [4] - 4142:19, 4143:2, 4143:6, 4143:10
**GNS** [5] - 4295:10, 4295:11, 4295:23, 4326:19, 4326:24
**GOA's** [1] - 4246:24
**GOLD** [1] - 4113:10
**Gold** [3] - 4197:6, 4292:6, 4356:3
**gold** [1] - 4240:4
**Golub** [1] - 4360:13
**Golub's** [1] - 4361:4
**goods** [2] - 4241:21, 4246:19
**governed** [1] - 4193:14
**Government** [6] - 4243:22, 4315:20, 4315:22, 4372:13, 4381:20, 4382:1
**government** [31] - 4160:14, 4160:22, 4161:4, 4161:15, 4170:19, 4170:23, 4171:4, 4175:13, 4176:15, 4189:1, 4189:11, 4191:5, 4192:8, 4193:10, 4196:14, 4220:9, 4220:19, 4223:16, 4229:12, 4230:19, 4231:15, 4239:1, 4239:21, 4243:15, 4265:15, 4269:14, 4269:19, 4288:22, 4289:2, 4289:11, 4322:12
**government's** [4] - 4160:11, 4160:19, 4160:20, 4187:11, 4270:3, 4277:21, 4287:1, 4289:9
**Great** [4] - 4132:3, 4132:5, 4267:1, 4267:14
**great** [2] - 4323:18, 4382:8
**greater** [5] - 4119:4, 4158:8, 4204:18, 4212:19, 4344:2

**greatly** [2] - 4251:17, 4350:19
**green** [2] - 4282:8, 4284:8
**GREG** [1] - 4112:23
**groceries** [1] - 4212:7
**ground** [1] - 4363:3
**grounds** [1] - 4270:20
**Group** [6] - 4292:7, 4292:8, 4292:9, 4366:25, 4367:12
**group** [14] - 4118:11, 4170:24, 4171:3, 4197:12, 4306:23, 4310:21, 4318:21, 4322:3, 4331:7, 4331:15, 4331:16, 4354:17, 4364:20, 4367:3
**groups** [3] - 4284:5, 4296:20, 4322:4
**grow** [6] - 4306:23, 4310:16, 4338:13, 4368:9, 4368:19, 4368:20
**growing** [7] - 4315:10, 4316:23, 4316:24, 4334:16, 4334:18, 4361:24, 4371:24
**Growing** [1] - 4371:20
**growth** [3] - 4317:21, 4338:16, 4338:18
**guess** [14] - 4115:22, 4117:3, 4142:15, 4165:1, 4171:8, 4197:22, 4209:7, 4213:21, 4221:17, 4225:22, 4237:11, 4242:24, 4244:22, 4271:7
**guessing** [2] - 4184:4, 4276:6

# H

**half** [18] - 4127:20, 4128:1, 4144:24, 4145:2, 4161:16, 4168:11, 4180:2, 4202:17, 4204:20, 4205:5, 4205:10, 4205:14, 4205:20, 4205:23, 4205:25, 4292:1, 4292:4
**HAMER** [1] - 4112:19
**HAMPSHIRE** [1] - 4112:5
**hand** [13] - 4116:1, 4116:7, 4116:13, 4119:22, 4120:24, 4133:7, 4244:5, 4244:12, 4279:13, 4325:24, 4352:7
**hand-in-hand** [2] - 4119:22, 4120:24
**handed** [3] - 4245:10, 4273:7, 4274:22
**handing** [2] - 4274:20, 4291:2
**handle** [1] - 4190:20
**hands** [2] - 4132:11, 4190:18
**happy** [5] - 4200:5, 4214:23, 4215:4
**hard** [1] - 4235:6
**hard-pressed** [1] - 4235:6
**harm** [17] - 4119:5, 4119:11, 4158:10, 4176:3, 4176:9, 4176:25, 4177:10, 4196:16, 4213:2, 4219:17, 4219:25, 4220:3, 4265:14, 4271:2, 4275:14, 4278:2, 4278:4
**harmful** [1] - 4270:23
**harming** [1] - 4196:15
**harness** [2] - 4307:13, 4337:7
**harnessing** [2] - 4308:25, 4337:11
**harping** [1] - 4189:9
**Harvard** [1] - 4292:25
**Harvey** [2] - 4360:13, 4361:5
**Hayes** [1] - 4360:12
**Hayes's** [1] - 4360:19
**head** [3] - 4361:3, 4363:1

**headed** [2] - 4371:19, 4376:18
**heading** [3] - 4232:3, 4246:7, 4355:10
**hear** [9] - 4115:20, 4115:23, 4202:21, 4211:9, 4224:21, 4264:9, 4264:12, 4289:20, 4360:4
**heard** [9] - 4170:10, 4181:2, 4182:7, 4264:25, 4289:14, 4313:10, 4330:12, 4348:6
**heavily** [1] - 4376:3
**held** [2] - 4230:19, 4348:2
**help** [7] - 4265:17, 4304:19, 4305:12, 4305:14, 4305:16, 4306:22, 4336:1
**helpful** [2] - 4151:10, 4307:6
**helping** [5] - 4204:2, 4306:13, 4306:15, 4319:21
**helps** [1] - 4310:15
**hence** [4] - 4158:5, 4158:19, 4159:21, 4232:24
**Hertz** [1] - 4344:12
**heterogeneity** [3] - 4208:11, 4250:9, 4250:12
**hierarchy** [1] - 4337:23
**high** [18] - 4119:21, 4121:7, 4148:11, 4148:13, 4153:16, 4153:22, 4153:24, 4158:7, 4158:21, 4163:16, 4171:20, 4171:21, 4186:11, 4297:4, 4330:21, 4355:19, 4363:3, 4379:20
**high-end** [1] - 4330:21
**higher** [28] - 4138:9, 4149:10, 4149:13, 4149:15, 4149:16, 4149:17, 4149:21, 4149:24, 4150:6, 4150:7, 4150:10, 4152:18, 4153:4, 4155:25, 4166:3, 4166:6, 4172:1, 4185:9, 4200:21, 4222:20, 4282:13, 4282:16, 4282:18, 4283:8, 4304:12, 4306:1
**highest** [5] - 4232:22, 4282:23, 4283:1, 4283:2, 4283:3
**highly** [1] - 4297:22
**Hilton** [2] - 4135:17, 4138:19
**hired** [1] - 4331:17
**historically** [2] - 4302:3, 4375:17
**history** [4] - 4317:15, 4318:6, 4318:8, 4328:13
**Hochschild** [4] - 4126:15, 4151:4, 4215:22, 4225:4
**Hochschild's** [4] - 4151:14, 4214:15, 4226:6, 4238:1
**hold** [9] - 4118:7, 4185:18, 4185:21, 4185:23, 4197:2, 4201:8, 4204:13, 4338:12, 4338:20
**holding** [4] - 4146:23, 4147:21, 4225:12
**holds** [2] - 4340:5, 4341:9
**home** [3] - 4251:14, 4288:15
**homework** [2] - 4259:25, 4288:5
**homing** [10] - 4164:12, 4183:17, 4183:20, 4183:23, 4183:25, 4184:5, 4184:6, 4251:11, 4251:12, 4251:14
**honor** [1] - 4128:12
**Honor** [124] - 4114:6, 4114:8, 4114:10, 4114:13, 4114:18, 4115:2, 4115:3, 4115:21, 4116:7, 4116:23, 4117:2,

4117:11, 4121:12, 4124:24, 4128:8, 4128:14, 4134:16, 4134:21, 4134:25, 4139:7, 4140:6, 4145:5, 4145:15, 4145:25, 4154:9, 4155:18, 4156:12, 4163:1, 4164:1, 4166:17, 4167:3, 4168:6, 4170:12, 4174:2, 4179:21, 4181:2, 4181:6, 4197:23, 4198:2, 4199:3, 4199:9, 4203:7, 4203:10, 4207:11, 4207:13, 4207:17, 4221:1, 4228:9, 4228:15, 4239:20, 4239:25, 4240:14, 4244:3, 4244:17, 4244:24, 4244:25, 4245:6, 4245:20, 4247:11, 4247:13, 4253:1, 4253:13, 4261:10, 4261:13, 4261:17, 4261:21, 4261:25, 4263:4, 4266:4, 4273:4, 4274:10, 4274:11, 4274:18, 4281:8, 4288:3, 4288:12, 4288:14, 4289:6, 4289:18, 4290:1, 4290:12, 4290:16, 4290:24, 4314:10, 4316:12, 4316:15, 4323:12, 4323:24, 4335:17, 4341:4, 4344:7, 4345:22, 4347:24, 4348:6, 4348:10, 4351:17, 4352:3, 4352:4, 4353:23, 4354:25, 4355:1, 4361:9, 4361:10, 4361:13, 4363:22, 4364:3, 4364:7, 4364:9, 4367:20, 4367:22, 4368:1, 4375:3, 4375:4, 4377:4, 4377:6, 4380:8, 4380:17, 4381:10, 4381:16, 4381:22, 4381:25, 4382:15, 4382:16
**HONORABLE** [1] - 4112:13
**hope** [3] - 4260:11, 4314:6, 4324:20
**horizontal** [3] - 4187:2, 4187:15, 4187:18
**horrible** [1] - 4350:12
**Hotels** [2] - 4135:17, 4138:19
**hour** [2] - 4261:9, 4261:23
**hours** [2] - 4273:1, 4381:21
**House** [1] - 4360:12
**house** [1] - 4360:21
**housekeeping** [1] - 4115:3
**huge** [1] - 4276:21
**hundred** [5] - 4167:14, 4238:3, 4239:10, 4306:20, 4318:23
**hundreds** [1] - 4337:4
**hypothetical** [7] - 4178:5, 4178:17, 4218:3, 4218:8, 4218:22, 4218:23, 4279:15
**Hypothetical** [3] - 4146:20, 4147:12, 4283:16

# I

**i)(2** [1] - 4242:3
**IBM** [1] - 4331:14
**IDAHO** [1] - 4112:4
**idea** [1] - 4382:11
**identical** [1] - 4142:22
**identified** [8] - 4118:12, 4126:21, 4127:5, 4159:2, 4222:18, 4237:1, 4243:1, 4251:10
**identifies** [1] - 4238:23
**identify** [1] - 4195:3
**identifying** [2] - 4152:25, 4247:15

**identities** [1] - 4282:20
**identity** [1] - 4119:25
**ignore** [1] - 4285:11
**II** [4] - 4215:2, 4230:3, 4240:20, 4240:21
**III** [1] - 4112:16
**ill** [1] - 4288:23
**ILLINOIS** [1] - 4112:4
**illustrated** [1] - 4188:13
**illustrative** [5] - 4115:13, 4134:16, 4145:7, 4247:16, 4247:21
**imagine** [4] - 4211:22, 4211:23, 4265:9, 4343:21
**immediate** [8] - 4230:24, 4231:15, 4239:3, 4239:11, 4239:16, 4240:6, 4240:10, 4286:4
**immediately** [4] - 4229:22, 4230:13, 4230:25, 4352:16
**impact** [15] - 4169:19, 4174:14, 4187:15, 4187:17, 4210:24, 4239:11, 4255:20, 4287:1, 4340:4, 4344:2, 4350:7, 4351:3, 4351:5, 4353:2, 4359:10
**Impact** [5] - 4229:14, 4229:21, 4230:5, 4239:2, 4353:19
**impactful** [1] - 4211:1
**impacts** [1] - 4354:5
**implausible** [1] - 4135:10
**implement** [1] - 4312:6
**implication** [2] - 4176:19, 4270:22
**implied** [2] - 4160:4, 4179:18
**imply** [4] - 4119:8, 4123:23, 4134:6, 4135:8
**important** [57] - 4119:10, 4125:4, 4158:12, 4174:14, 4175:12, 4194:14, 4195:3, 4195:15, 4195:25, 4196:3, 4257:10, 4261:4, 4270:11, 4270:19, 4271:5, 4283:21, 4293:15, 4293:19, 4294:3, 4296:10, 4297:2, 4297:3, 4297:6, 4297:15, 4297:20, 4298:23, 4299:3, 4301:2, 4302:1, 4302:8, 4303:3, 4304:3, 4305:19, 4306:15, 4306:18, 4313:25, 4318:5, 4319:6, 4319:12, 4320:3, 4322:25, 4323:1, 4324:14, 4333:20, 4333:25, 4336:18, 4336:21, 4338:17, 4351:15, 4358:23, 4365:21, 4368:18, 4372:17, 4372:20, 4372:21, 4379:15, 4379:22
**impose** [2] - 4119:10, 4158:12
**impossibility** [1] - 4277:16
**impossible** [2] - 4275:13, 4277:2
**impressed** [1] - 4173:22
**impression** [1] - 4150:15
**improper** [2] - 4118:3, 4176:2
**improve** [2] - 4197:5, 4347:2
**improvement** [1] - 4178:15
**improving** [4] - 4200:13, 4200:19, 4373:19, 4375:19
**impute** [1] - 4135:6
**inability** [1] - 4340:9
**inaccuracies** [1] - 4151:5
**inaccurate** [2] - 4179:7, 4239:5

**inappropriate** [2] - 4252:24, 4253:5
**Inc** [1] - 4347:22
**incent** [1] - 4211:15
**incentive** [7] - 4222:11, 4228:5, 4232:24, 4233:19, 4235:10, 4235:18, 4235:22
**incentives** [7] - 4177:18, 4209:9, 4235:12, 4237:18, 4272:18, 4361:25, 4362:3
**include** [17] - 4131:16, 4132:13, 4133:14, 4135:3, 4136:19, 4143:22, 4144:15, 4240:7, 4252:12, 4252:24, 4253:5, 4253:17, 4253:23, 4265:1, 4269:10, 4325:22, 4373:3
**included** [9] - 4130:22, 4131:5, 4131:10, 4131:19, 4133:13, 4133:25, 4134:9, 4190:1, 4252:7
**includes** [2] - 4130:3, 4254:5
**including** [10] - 4122:8, 4129:6, 4135:23, 4138:4, 4144:14, 4208:8, 4238:13, 4287:14, 4313:11, 4377:7
**inclusion** [1] - 4319:8
**inclusive** [2] - 4317:20, 4317:22
**income** [2] - 4318:11, 4378:9
**incomplete** [2] - 4172:24, 4218:2
**incorporating** [1] - 4136:22
**incorrect** [1] - 4175:22
**incorrectly** [1] - 4221:12
**increase** [31] - 4122:7, 4123:12, 4124:11, 4128:19, 4129:1, 4144:11, 4171:25, 4174:24, 4176:3, 4176:5, 4176:6, 4176:7, 4176:23, 4177:3, 4177:14, 4177:17, 4178:14, 4180:9, 4201:4, 4254:13, 4286:15, 4297:5, 4321:16, 4342:8, 4347:2, 4377:19, 4377:22, 4377:25, 4378:20
**increased** [23] - 4123:8, 4147:1, 4174:22, 4175:12, 4176:8, 4176:24, 4186:8, 4199:14, 4216:24, 4219:21, 4231:10, 4246:20, 4256:13, 4285:3, 4299:11, 4300:11, 4301:6, 4302:14, 4309:15, 4316:6, 4323:5, 4346:3, 4361:25
**increases** [19] - 4199:18, 4214:17, 4214:18, 4215:11, 4215:13, 4215:24, 4215:25, 4216:9, 4254:16, 4254:17, 4255:2, 4255:20, 4255:21, 4255:24, 4257:3, 4268:6, 4268:7, 4298:5, 4299:23
**increasing** [6] - 4174:19, 4255:2, 4255:4, 4286:10, 4321:9, 4321:10
**increasingly** [1] - 4332:8
**incredible** [5] - 4300:12, 4339:3, 4365:11, 4370:25, 4373:16
**incredibly** [1] - 4339:16
**incremental** [1] - 4342:4
**incur** [1] - 4376:9
**incurred** [9] - 4146:14, 4221:14, 4222:4, 4222:6, 4222:11, 4227:10, 4309:14, 4379:1, 4379:2
**incurring** [1] - 4311:15

**incurs** [1] - 4301:8
**indeed** [4] - 4149:19, 4191:10, 4239:20, 4270:21
**indented** [1] - 4203:20
**indenture** [1] - 4382:4
**independently** [1] - 4323:23
**indicate** [1] - 4150:2
**indicated** [3] - 4125:20, 4321:14, 4326:16
**indicates** [1] - 4126:5
**indicative** [1] - 4124:6
**indirect** [1] - 4147:1
**indirectly** [1] - 4175:15
**individual** [5] - 4209:5, 4234:18, 4234:20, 4234:22, 4235:25
**induce** [1] - 4228:23
**indulge** [1] - 4217:10
**industries** [3] - 4212:14, 4312:25, 4370:19
**industry** [26] - 4126:10, 4129:6, 4148:20, 4156:17, 4159:3, 4162:20, 4162:21, 4163:14, 4168:11, 4169:6, 4175:6, 4182:17, 4184:1, 4208:15, 4211:25, 4250:25, 4251:9, 4258:13, 4265:11, 4294:4, 4325:17, 4325:18, 4338:18, 4352:12, 4352:15, 4370:22
**infer** [2] - 4185:11, 4185:15
**inferred** [1] - 4210:5
**inflation** [3] - 4311:11, 4311:18, 4311:22
**influence** [3] - 4220:10, 4220:16, 4287:15
**inform** [3] - 4221:3, 4325:5, 4325:22
**information** [16] - 4124:12, 4190:5, 4246:11, 4271:18, 4272:1, 4279:22, 4293:24, 4294:2, 4296:2, 4306:3, 4336:20, 4336:22, 4337:7, 4337:12, 4381:4, 4382:3
**informative** [1] - 4120:19
**informed** [2] - 4151:17, 4382:1
**inherently** [2] - 4277:22, 4277:24
**initial** [4] - 4158:11, 4208:6, 4251:23, 4329:14
**initiate** [1] - 4331:19
**initiative** [5] - 4128:20, 4130:4, 4235:3, 4235:7, 4235:9
**initiatives** [1] - 4361:22
**innovate** [2] - 4297:8, 4336:22
**innovating** [2] - 4222:6, 4299:20
**innovation** [6] - 4122:2, 4299:18, 4316:3, 4323:5, 4350:17, 4365:4
**innovative** [3] - 4345:3, 4368:22, 4369:5
**inquire** [1] - 4290:23
**inroads** [2] - 4315:9, 4316:22
**inside** [1] - 4302:10
**insights** [1] - 4306:12
**insistence** [19] - 4118:23, 4153:14, 4153:16, 4153:23, 4153:25, 4154:2, 4158:8, 4158:21, 4158:24, 4167:9, 4167:13, 4168:9, 4168:14, 4258:4, 4258:12, 4355:18, 4359:15, 4359:19,

4360:3
**insistent** t [1] - 4162:8, 4168:12
**instance** [5] - 4146:6, 4148:3, 4222:13, 4280:6, 4344:24
**instances** [1] - 4238:13
**instead** [3] - 4181:3, 4226:6, 4259:18
**instituted** [1] - 4243:16
**institutions** [1] - 4318:22
**instrument** [1] - 4318:14
**instruments** [1] - 4279:23
**integrated** [13] - 4293:21, 4294:3, 4294:14, 4296:14, 4296:15, 4296:23, 4301:12, 4310:11, 4310:25, 4312:3, 4336:23, 4349:20, 4370:9
**integrity** [1] - 4296:7
**intelligence** [1] - 4308:20
**intend** [2] - 4141:17, 4360:5
**intending** [1] - 4169:9
**intense** [1] - 4376:5
**intensely** [2] - 4311:21, 4311:24
**intent** [3] - 4214:4, 4214:6, 4222:19
**intention** [1] - 4352:16
**inter** [9] - 4187:18, 4187:20, 4187:21, 4187:24, 4188:1, 4188:4, 4188:13, 4189:17, 4269:24
**inter-brand** [6] - 4187:18, 4187:21, 4187:24, 4188:1, 4188:4, 4188:13, 4189:17, 4269:24
**interchange** [57] - 4147:14, 4149:3, 4149:12, 4150:6, 4160:23, 4160:25, 4161:6, 4161:8, 4161:12, 4161:17, 4172:5, 4172:8, 4172:20, 4174:20, 4174:23, 4175:4, 4175:13, 4175:23, 4177:2, 4177:9, 4177:14, 4177:17, 4214:17, 4219:22, 4219:24, 4232:12, 4246:2, 4246:11, 4246:14, 4246:18, 4247:3, 4276:17, 4276:19, 4276:22, 4276:24, 4277:1, 4277:3, 4277:4, 4277:5, 4277:12, 4277:17, 4277:22, 4277:24, 4278:1, 4278:3, 4278:8, 4278:16, 4284:23, 4285:3, 4285:25, 4316:6, 4321:9, 4321:16, 4346:2, 4346:3, 4376:2
**interchangeable** [2] - 4366:3, 4366:15
**interdependency** [2] - 4308:22, 4334:1
**interdependent** [4] - 4293:25, 4294:14, 4296:15, 4310:21
**interest** [9] - 4132:6, 4132:12, 4133:3, 4133:5, 4133:25, 4143:23, 4286:10, 4320:1, 4370:7
**Interest** [2] - 4133:9, 4134:4
**interested** [1] - 4157:4
**Interlink** [1] - 4267:11
**intermediary** [2] - 4159:22, 4160:18
**internal** [3] - 4135:16, 4147:15, 4197:5
**international** [2] - 4292:12, 4324:20
**Internet** [2] - 4259:22, 4319:23
**interpretation** [2] - 4192:17, 4287:24
**interpreted** [1] - 4195:17
**interprets** [1] - 4225:23
**interrelated** [1] - 4175:21

**interrupt** [1] - 4284:21
**intervene** [1] - 4246:13
**intra** [5] - 4188:5, 4188:20, 4189:3, 4189:13, 4269:23
**intra-brand** [5] - 4188:5, 4188:20, 4189:3, 4189:13, 4269:23
**introduce** [1] - 4290:9
**introduced** [2] - 4333:15, 4333:17
**introduction** [4] - 4329:14, 4329:20, 4336:14
**invalid** [1] - 4232:15
**invest** [7] - 4258:21, 4271:21, 4272:4, 4297:8, 4369:6, 4373:19, 4374:7
**invested** [4] - 4351:1, 4375:17
**investing** [1] - 4375:19
**investment** [2] - 4321:11, 4376:8
**investments** [13] - 4222:15, 4296:12, 4312:8, 4319:11, 4321:15, 4347:8, 4347:10, 4351:13, 4353:8, 4359:11, 4369:22, 4373:21, 4375:23
**investors** [3] - 4302:10, 4303:20, 4371:17
**invests** [1] - 4348:23
**invitation** [1] - 4336:2
**invite** [1] - 4308:4
**involve** [1] - 4362:24
**involved** [6] - 4220:19, 4234:3, 4277:22, 4336:16, 4337:4, 4376:3
**IOWA** [1] - 4112:4
**IPOs** [1] - 4259:15
**irrelevant** [3] - 4332:8, 4337:24, 4350:1
**irrespective** [1] - 4323:19
**Irvine** [1] - 4290:21
**ISLAND** [1] - 4112:6
**isolate** [2] - 4256:1, 4256:5
**isolated** [2] - 4339:16, 4357:7
**Israel** [2] - 4246:13, 4246:21
**issuance** [7] - 4203:23, 4204:5, 4204:17, 4205:19, 4252:15, 4254:2
**issue** [21] - 4117:20, 4146:2, 4164:7, 4167:9, 4189:19, 4210:9, 4228:14, 4264:5, 4284:22, 4293:23, 4295:13, 4295:17, 4295:20, 4315:15, 4315:24, 4324:8, 4330:1, 4346:14, 4346:16, 4347:18, 4360:2
**issued** [9] - 4204:14, 4243:11, 4243:21, 4295:7, 4295:23, 4295:25, 4301:16, 4326:24, 4327:5
**issuer** [12] - 4204:2, 4285:9, 4285:17, 4285:22, 4286:2, 4286:5, 4286:7, 4286:14, 4293:23, 4315:13, 4316:16, 4366:9
**issuers** [22] - 4164:24, 4165:15, 4175:16, 4177:18, 4204:4, 4259:21, 4259:22, 4260:2, 4260:3, 4260:7, 4260:8, 4260:16, 4260:19, 4285:18, 4285:19, 4286:3, 4312:14, 4316:18, 4317:2, 4317:4, 4321:18, 4380:24
**issuers'** [3] - 4166:10, 4172:7, 4177:11
**issues** [11] - 4172:13, 4323:19, 4341:11, 4341:13, 4343:3, 4343:7, 4343:9,

4347:16, 4374:17, 4374:19, 4374:21
**issuing** [18] - 4135:12, 4147:15, 4161:1, 4165:11, 4165:13, 4171:24, 4202:12, 4203:24, 4204:8, 4204:15, 4213:4, 4259:5, 4260:22, 4326:20, 4328:17, 4329:3, 4330:3
**item** [4] - 4300:2, 4301:11, 4309:22, 4309:24
**items** [5] - 4135:3, 4143:22, 4180:13, 4300:17, 4305:25
**itself** [13] - 4119:8, 4132:10, 4133:4, 4148:5, 4153:16, 4176:5, 4181:21, 4193:22, 4222:18, 4253:3, 4285:2, 4285:3, 4285:5
**iTunes** [4] - 4379:12, 4379:14, 4379:18, 4379:19

## J

**J.D** [1] - 4297:10
**JAMES** [1] - 4113:15
**January** [5] - 4292:17, 4366:22, 4367:5, 4367:17, 4379:8
**JCPenney** [2] - 4309:4, 4309:13
**Jefferson** [1] - 4113:3
**JetBlue** [1] - 4131:15
**job** [5] - 4313:1, 4331:6, 4336:10, 4360:19, 4361:2, 4361:4
**Jobs** [1] - 4371:2
**Joel** [5] - 4315:23, 4317:6, 4322:5, 4336:18, 4350:12
**John** [1] - 4360:12
**JOHN** [1] - 4112:20
**join** [1] - 4201:24
**joined** [1] - 4291:23
**joint** [1] - 4268:3
**Jones** [1] - 4273:11
**Josh** [1] - 4321:14
**Journal** [2] - 4207:5, 4248:12
**judge** [1] - 4330:12
**JUDGE** [1] - 4112:14
**Judge** [1] - 4273:11
**judgment** [9] - 4229:23, 4230:13, 4241:9, 4241:15, 4241:19, 4241:22, 4242:3, 4242:7, 4374:1
**July** [2] - 4136:7, 4382:19
**JULY** [1] - 4112:9
**jump** [1] - 4361:20
**jumps** [1] - 4220:19
**June** [1] - 4374:12
**JUSTICE** [1] - 4112:17
**Justice** [4] - 4206:18, 4247:8, 4315:25, 4317:6, 4322:5, 4340:23, 4350:13

## K

**KATE** [1] - 4112:21
**Katz** [15] - 4117:17, 4117:19, 4142:2, 4199:12, 4207:4, 4248:9, 4263:12, 4265:19, 4268:10, 4272:22, 4273:7, 4274:14, 4274:22, 4286:24, 4287:23
**Katz'** [2] - 4247:14, 4261:14

**Katz's** [3] - 4154:12, 4155:9, 4288:5
**keep** [15] - 4135:24, 4138:14, 4139:3, 4164:16, 4219:16, 4257:18, 4257:19, 4257:20, 4258:2, 4278:7, 4283:18, 4349:12, 4356:12, 4359:6, 4364:5
**keeping** [3] - 4138:3, 4220:1, 4333:19
**Ken** [6] - 4314:20, 4314:25, 4322:24, 4360:13, 4374:11
**Kenneth** [2] - 4290:17, 4290:21
**kept** [1] - 4349:23
**KEVIN** [1] - 4113:9
**key** [3] - 4258:8, 4307:25, 4315:24
**Key** [1] - 4379:7
**keyboards** [1] - 4208:10
**kidding** [2] - 4170:9, 4324:4
**killed** [1] - 4352:25
**kind** [8] - 4151:10, 4216:7, 4217:17, 4280:21, 4301:22, 4351:7, 4373:8, 4381:4
**kinds** [2] - 4220:8, 4362:2
**Klein** [6] - 4315:23, 4322:5, 4322:11, 4322:20, 4336:18, 4350:13
**Kline** [1] - 4317:6
**knife** [1] - 4341:20
**knowing** [1] - 4272:15
**knowledge** [1] - 4236:23
**known** [5] - 4118:4, 4154:21, 4159:1, 4251:11, 4339:8
**knows** [6] - 4231:9, 4306:8, 4312:21, 4363:19, 4366:14, 4379:24
**knuckles** [2] - 4351:7, 4351:9
**KOROLOGOS** [1] - 4113:13

## L

**labeled** [5] - 4128:9, 4132:19, 4133:23, 4134:3, 4281:22
**lack** [4] - 4118:24, 4237:4, 4352:25, 4365:4
**lagging** [1] - 4197:20
**lags** [1] - 4206:7
**language** [1] - 4357:21
**large** [14] - 4120:20, 4150:23, 4151:15, 4153:11, 4227:9, 4228:4, 4234:19, 4235:19, 4238:5, 4238:9, 4249:19, 4272:17, 4294:24, 4355:19
**largely** [5] - 4127:20, 4265:6, 4321:16, 4331:22, 4341:6
**larger** [7] - 4126:24, 4148:12, 4201:20, 4208:23, 4217:7, 4228:19, 4306:24
**largest** [2] - 4175:5, 4238:3
**last** [18] - 4127:3, 4133:8, 4174:4, 4202:21, 4249:4, 4256:2, 4263:18, 4282:11, 4284:22, 4287:19, 4287:24, 4288:1, 4297:11, 4307:1, 4314:8, 4326:14, 4346:6, 4368:8
**lasting** [1] - 4365:23
**late** [4] - 4154:16, 4334:11, 4358:7, 4363:24
**launch** [1] - 4361:18
**launched** [2] - 4337:1, 4337:3

**law** [6] - 4156:10, 4239:21, 4241:9, 4269:16, 4293:2
**Law** [1] - 4293:1
**laws** [1] - 4241:7
**lawsuit** [3] - 4206:20, 4340:13, 4350:14
**lawsuits** [1] - 4265:16
**lead** [5] - 4159:20, 4159:25, 4264:13, 4352:16, 4362:8
**leader** [1] - 4197:19
**leadership** [1] - 4375:18
**learn** [1] - 4179:20
**least** [9] - 4118:7, 4185:5, 4217:12, 4237:12, 4280:18, 4282:7, 4284:7, 4284:18, 4293:18
**leave** [4] - 4238:7, 4288:6, 4363:25
**led** [3] - 4141:22, 4246:18, 4298:24
**left** [12] - 4217:25, 4218:7, 4219:8, 4219:12, 4239:21, 4244:12, 4261:9, 4281:5, 4281:15, 4325:24, 4348:23, 4358:6
**left-hand** [2] - 4244:12, 4325:24
**legislation** [1] - 4265:16
**lend** [1] - 4303:17
**lendcentric** [1] - 4303:24
**lending** [4] - 4303:19, 4303:20, 4303:21, 4305:6
**less** [20] - 4117:21, 4118:10, 4127:21, 4128:2, 4152:25, 4162:15, 4167:13, 4168:11, 4169:12, 4185:7, 4191:12, 4196:11, 4232:24, 4234:8, 4277:1, 4280:2, 4306:16, 4308:10, 4326:15, 4327:17
**lessen** [1] - 4202:13
**level** [27] - 4118:23, 4119:4, 4122:1, 4146:5, 4154:1, 4158:9, 4158:25, 4171:18, 4200:21, 4229:8, 4235:25, 4255:9, 4297:4, 4297:17, 4304:8, 4309:25, 4317:9, 4322:8, 4336:3, 4340:13, 4341:12, 4356:14, 4365:3, 4366:9, 4377:16, 4379:20, 4380:14
**levels** [5] - 4153:16, 4153:22, 4158:7, 4158:20, 4162:8
**lever** [2] - 4312:4, 4363:4
**leverage** [1] - 4337:13
**leveraged** [1] - 4138:21
**Lexington** [1] - 4113:12
**liabilities** [1] - 4146:14
**liability** [1] - 4221:14
**life** [2] - 4299:22, 4305:22
**lifted** [1] - 4230:25
**light** [2] - 4156:1, 4301:24
**likelihood** [1] - 4361:21
**likely** [6] - 4121:23, 4152:17, 4153:3, 4209:4, 4251:18, 4264:13
**limit** [6] - 4208:12, 4213:2, 4243:6, 4243:7, 4246:2, 4250:13
**limitation** [1] - 4300:17
**limited** [9] - 4119:18, 4125:7, 4200:3, 4242:22, 4243:1, 4243:4, 4246:12, 4247:5
**limits** [1] - 4246:13

**line** [39] - 4129:18, 4129:20, 4133:6, 4133:8, 4133:10, 4133:16, 4134:3, 4134:13, 4137:4, 4137:12, 4140:7, 4140:12, 4140:14, 4142:16, 4142:21, 4143:1, 4143:8, 4143:16, 4144:10, 4149:13, 4149:21, 4158:4, 4162:25, 4163:11, 4166:1, 4182:23, 4215:7, 4215:8, 4224:20, 4224:25, 4252:3, 4254:20, 4255:5, 4255:7, 4310:24, 4314:19, 4362:11, 4377:10
**lines** [6] - 4123:3, 4142:25, 4143:12, 4149:3, 4326:11, 4348:18
**lingering** [3] - 4365:21, 4365:23, 4366:13
**link** [2] - 4285:17, 4294:1
**LISA** [1] - 4112:20
**Lisbon** [2] - 4263:13, 4264:18
**list** [2] - 4171:1, 4354:14
**listed** [3] - 4149:17, 4379:12, 4380:24
**lists** [1] - 4136:9
**literally** [5] - 4190:13, 4233:24, 4240:2, 4321:13
**literature** [1] - 4184:2
**litigated** [1] - 4323:20
**LITIGATION** [1] - 4112:16
**litigation** [7] - 4151:7, 4151:18, 4174:25, 4175:1, 4175:3, 4287:18, 4372:11
**lives** [9] - 4320:12, 4332:13, 4332:17, 4333:20, 4368:13, 4368:16, 4368:21, 4371:8, 4371:9
**living** [2] - 4338:4, 4350:19
**LLP** [2] - 4113:7, 4113:11
**load** [2] - 4294:19, 4319:22
**location** [1] - 4313:12
**locations** [11] - 4126:10, 4184:14, 4184:24, 4222:25, 4223:6, 4223:17, 4226:9, 4229:2, 4236:2, 4239:4, 4313:8
**lock** [1] - 4340:22
**logic** [3] - 4122:15, 4124:16, 4227:24
**logical** [1] - 4277:16
**logically** [1] - 4219:23
**logistics** [1] - 4180:14
**long-running** [1] - 4249:7
**long-term** [4] - 4344:1, 4345:1, 4352:14, 4371:15
**look** [102] - 4117:3, 4117:4, 4120:7, 4121:5, 4122:17, 4125:18, 4127:1, 4127:14, 4129:9, 4129:11, 4132:16, 4132:18, 4133:10, 4133:19, 4136:1, 4136:23, 4137:2, 4144:4, 4144:9, 4148:23, 4149:2, 4149:3, 4153:10, 4154:7, 4156:24, 4157:3, 4157:6, 4159:13, 4163:4, 4165:24, 4167:22, 4168:9, 4172:8, 4173:13, 4182:20, 4183:22, 4199:19, 4200:5, 4203:1, 4203:5, 4203:12, 4206:5, 4206:24, 4207:20, 4214:6, 4215:1, 4215:4, 4215:5, 4215:6, 4224:16, 4230:2, 4231:18, 4231:24, 4238:2, 4244:2,

4245:21, 4245:25, 4249:1, 4251:19,
4255:25, 4258:10, 4264:2, 4266:7,
4266:14, 4269:7, 4273:16, 4275:25,
4276:4, 4276:12, 4277:9, 4281:3,
4281:18, 4283:2, 4284:3, 4285:11,
4304:4, 4314:6, 4314:18, 4315:2,
4320:24, 4325:10, 4327:8, 4338:1,
4345:12, 4347:19, 4348:4, 4349:6,
4352:6, 4352:10, 4353:13, 4354:12,
4355:6, 4356:20, 4361:16, 4362:23,
4365:3, 4366:12, 4366:16, 4370:1,
4374:9, 4378:13, 4379:7
**looked** [31] - 4144:20, 4146:17,
4146:19, 4146:22, 4147:4, 4147:19,
4150:14, 4153:2, 4154:11, 4158:3,
4159:6, 4171:1, 4173:7, 4179:7,
4197:20, 4203:2, 4213:22, 4214:13,
4243:23, 4278:25, 4280:11, 4280:14,
4280:21, 4282:24, 4284:16, 4327:19,
4345:8, 4345:16, 4349:3, 4355:7,
4373:2
**looking** [26] - 4115:8, 4116:17, 4120:11,
4133:10, 4138:7, 4139:15, 4142:4,
4147:4, 4149:6, 4161:15, 4167:1,
4175:24, 4179:3, 4182:23, 4242:13,
4244:22, 4255:24, 4267:8, 4267:17,
4275:22, 4282:1, 4283:14, 4284:3,
4306:3, 4314:22, 4375:14
**looks** [6] - 4205:8, 4266:11, 4302:11,
4326:11, 4327:3, 4345:10
**loop** [15] - 4293:18, 4294:8, 4295:22,
4305:22, 4306:10, 4307:13, 4308:8,
4309:1, 4318:25, 4321:21, 4336:17,
4336:19, 4337:8, 4337:11, 4369:15
**lose** [3] - 4169:3, 4180:13, 4340:20
**loses** [1] - 4169:10
**losing** [1] - 4344:2
**loss** [1] - 4306:16
**losses** [1] - 4306:14
**lost** [5] - 4141:9, 4306:10, 4344:1,
4355:19, 4362:11
**Louis** [2] - 4331:8, 4331:14
**low** [11] - 4119:23, 4120:3, 4120:24,
4121:4, 4121:8, 4121:9, 4121:21,
4158:24, 4182:10, 4227:20, 4369:19
**low-cost** [1] - 4369:19
**low-cost-to-merchant** [1] - 4182:10
**lower** [32] - 4120:4, 4120:5, 4121:10,
4121:11, 4124:11, 4143:1, 4144:21,
4147:9, 4162:16, 4182:13, 4182:25,
4183:17, 4192:11, 4192:12, 4215:19,
4219:24, 4234:2, 4235:11, 4235:18,
4246:10, 4246:18, 4255:16, 4272:16,
4277:9, 4320:21, 4320:22, 4343:15,
4348:21, 4352:7, 4369:19, 4371:6
**lower-cost** [3] - 4192:11, 4192:12,
4371:6
**lowered** [2] - 4177:10, 4246:15
**lowering** [6] - 4121:25, 4122:8, 4123:9,
4134:11, 4233:19, 4347:5
**lowers** [1] - 4378:11

**loyal** [7] - 4163:18, 4163:21, 4164:9,
4164:15, 4167:10, 4258:2
**loyalty** [11] - 4162:20, 4162:24, 4163:13,
4164:8, 4164:11, 4257:14, 4257:15,
4257:20, 4258:12, 4282:1, 4297:5
**LRP** [2] - 4378:15, 4378:16
**luck** [1] - 4154:20
**lunch** [5] - 4199:4, 4261:7, 4261:9,
4261:24, 4262:1

# M

**Macintosh** [1] - 4371:1
**mail** [3] - 4292:3, 4314:18, 4314:24
**mails** [1] - 4135:16
**Maine** [1] - 4292:25
**maintain** [2] - 4227:2, 4227:3
**maintaining** [1] - 4375:17
**major** [6] - 4287:14, 4306:9, 4318:12,
4328:18, 4340:21, 4356:13
**majority** [4] - 4193:2, 4193:6, 4287:14,
4363:18
**man** [1] - 4253:13
**managed** [2] - 4185:12, 4361:18
**management** [3] - 4291:25, 4306:7,
4374:25
**Manager** [2] - 4292:6, 4292:8
**managers** [1] - 4306:19
**manages** [1] - 4361:1
**managing** [1] - 4367:4
**manifest** [3] - 4196:16, 4285:2, 4285:5
**manifests** [1] - 4285:3
**manner** [1] - 4307:24
**manufacturer** [1] - 4188:11
**map** [2] - 4150:20, 4214:8
**mapping** [1] - 4151:19
**Marcus** [1] - 4330:20
**margin** [3] - 4346:24, 4347:5, 4378:11
**marginal** [1] - 4372:7
**margins** [2] - 4124:15, 4346:25
**MARK** [1] - 4112:19
**Mark** [1] - 4290:10
**mark** [2] - 4134:22, 4295:15
**marked** [8] - 4116:4, 4117:12, 4135:1,
4145:23, 4155:17, 4155:21, 4353:24,
4354:2
**market** [141] - 4117:24, 4118:3, 4118:6,
4118:15, 4118:21, 4118:24, 4119:9,
4119:12, 4119:15, 4119:18, 4119:22,
4119:23, 4120:3, 4120:19, 4120:20,
4120:24, 4121:3, 4121:22, 4123:24,
4124:7, 4128:24, 4129:2, 4129:22,
4146:17, 4147:4, 4148:1, 4148:5,
4148:12, 4150:2, 4152:10, 4152:12,
4153:14, 4153:17, 4153:21, 4156:21,
4158:6, 4158:12, 4158:19, 4158:24,
4159:15, 4159:20, 4159:22, 4159:25,
4160:5, 4160:9, 4160:15, 4160:18,
4160:24, 4161:7, 4161:15, 4165:12,
4166:3, 4166:10, 4175:22, 4175:24,
4176:2, 4176:14, 4176:16, 4177:2,

4177:6, 4179:4, 4181:15, 4190:7,
4194:15, 4195:4, 4201:7, 4202:13,
4207:23, 4207:24, 4209:3, 4209:4,
4209:8, 4209:11, 4209:19, 4210:2,
4211:17, 4216:8, 4217:1, 4217:5,
4217:8, 4217:12, 4217:18, 4217:22,
4218:1, 4218:15, 4219:4, 4219:8,
4219:12, 4220:8, 4220:17, 4250:21,
4256:17, 4256:19, 4256:22, 4258:5,
4258:6, 4258:7, 4258:8, 4258:10,
4258:15, 4258:19, 4258:20, 4259:2,
4269:1, 4269:7, 4269:9, 4269:10,
4270:12, 4272:24, 4272:25, 4274:2,
4274:3, 4274:5, 4274:6, 4275:16,
4275:23, 4276:25, 4277:23, 4317:13,
4323:2, 4323:7, 4323:10, 4337:9,
4338:8, 4350:22, 4351:6, 4352:14,
4368:7, 4368:9, 4368:24, 4369:8,
4370:2, 4370:25, 4371:24, 4373:2,
4375:18
**Market** [5] - 4207:4, 4353:17, 4354:5,
4366:20, 4371:20
**market/merchant** [1] - 4362:25
**marketing** [24] - 4130:14, 4130:15,
4164:7, 4164:11, 4171:5, 4222:5,
4292:1, 4295:3, 4305:21, 4306:4,
4306:5, 4306:22, 4307:23, 4307:25,
4308:17, 4309:5, 4311:17, 4322:1,
4330:7, 4337:16, 4344:5, 4344:8,
4360:20, 4371:25
**Marketing** [2] - 4292:4, 4292:5
**marketplace** [9] - 4189:21, 4191:2,
4299:20, 4301:12, 4316:2, 4316:4,
4323:6, 4337:22, 4339:4, 4349:25,
4351:25, 4365:5, 4365:12, 4368:12,
4368:16, 4369:4, 4370:15, 4371:5,
4381:9
**markets** [12] - 4119:16, 4187:23,
4201:19, 4207:21, 4208:1, 4208:4,
4208:19, 4264:14, 4264:19, 4361:17,
4361:24, 4363:2
**marquee** [1] - 4343:22
**Mart** [4] - 4175:1, 4179:23, 4181:3,
4181:6
**MARYLAND** [1] - 4112:4
**mass** [2] - 4317:23, 4320:12
**Master** [1] - 4304:13
**MasterCard** [155] - 4119:15, 4119:22,
4120:22, 4121:24, 4125:14, 4125:22,
4126:18, 4126:21, 4127:4, 4127:12,
4148:20, 4149:22, 4150:5, 4150:9,
4150:21, 4151:21, 4152:2, 4152:18,
4153:2, 4153:4, 4171:13, 4182:14,
4182:25, 4183:17, 4184:11, 4187:11,
4190:9, 4190:19, 4191:6, 4191:12,
4192:8, 4192:20, 4193:6, 4193:9,
4193:12, 4193:16, 4193:17, 4194:16,
4195:4, 4195:15, 4195:25, 4196:8,
4196:12, 4196:24, 4197:11, 4197:20,
4199:22, 4202:14, 4202:18, 4204:2,
4204:11, 4204:12, 4204:14, 4204:20,
4205:2, 4205:5, 4205:14, 4205:20,

4206:3, 4206:8, 4217:11, 4219:15, 4223:1, 4223:16, 4223:19, 4226:10, 4226:19, 4226:23, 4227:7, 4228:19, 4229:10, 4229:13, 4229:22, 4230:12, 4230:23, 4231:22, 4232:7, 4232:13, 4233:14, 4233:23, 4234:5, 4234:14, 4235:4, 4235:13, 4235:16, 4235:17, 4236:3, 4236:15, 4239:9, 4240:8, 4241:10, 4241:23, 4241:25, 4242:4, 4242:20, 4247:3, 4247:8, 4255:10, 4256:10, 4256:13, 4256:15, 4256:19, 4257:2, 4259:8, 4259:15, 4270:12, 4271:11, 4271:17, 4271:23, 4272:19, 4287:9, 4294:6, 4294:9, 4294:11, 4295:20, 4303:10, 4304:11, 4306:17, 4312:13, 4312:20, 4312:22, 4313:3, 4313:6, 4315:16, 4315:22, 4316:6, 4316:21, 4321:9, 4329:11, 4329:17, 4329:20, 4329:21, 4330:6, 4338:14, 4340:10, 4346:2, 4350:14, 4350:16, 4358:23, 4359:4, 4363:16, 4363:20, 4364:14, 4364:23, 4364:24, 4365:9, 4365:11, 4365:15, 4365:19, 4366:2, 4366:4, 4366:6, 4366:10, 4376:1

**MasterCard's** [1] - 4197:12

**MasterCards** [2] - 4193:4, 4200:25

**match** [2] - 4150:14, 4210:8

**matching** [2] - 4150:25, 4281:20

**material** [1] - 4217:20

**materials** [1] - 4288:20

**math** [2] - 4185:3, 4382:5

**matter** [8] - 4118:18, 4183:2, 4213:8, 4264:13, 4288:1, 4312:5, 4313:13, 4313:24

**matters** [2] - 4312:5, 4313:25

**MATTHEW** [1] - 4113:14

**maximizing** [1] - 4268:19

**mean** [54] - 4121:7, 4135:21, 4144:25, 4146:6, 4153:6, 4161:11, 4164:11, 4165:1, 4179:9, 4182:15, 4182:18, 4184:2, 4186:18, 4187:22, 4187:25, 4189:17, 4195:18, 4195:20, 4195:22, 4196:4, 4213:21, 4217:15, 4217:17, 4218:21, 4219:7, 4219:18, 4251:10, 4258:6, 4260:22, 4267:23, 4267:24, 4268:18, 4269:4, 4269:22, 4279:20, 4281:18, 4284:13, 4285:14, 4297:11, 4304:9, 4312:16, 4315:17, 4318:19, 4321:3, 4340:8, 4351:7, 4363:7, 4363:12, 4363:13, 4368:15, 4370:24, 4377:14, 4381:23

**meaning** [15] - 4173:9, 4183:20, 4184:7, 4196:3, 4203:23, 4218:13, 4236:15, 4257:17, 4277:18, 4285:22, 4302:4, 4307:19, 4318:20, 4328:25, 4374:18

**meaningful** [4] - 4159:21, 4349:8, 4349:16, 4350:10

**meaningless** [2] - 4353:9, 4372:21

**means** [23] - 4159:24, 4161:12, 4183:23, 4208:2, 4218:14, 4251:16, 4284:8, 4286:1, 4286:11, 4293:21, 4297:18, 4299:24, 4302:12, 4304:15,

4304:16, 4321:4, 4339:11, 4352:13, 4357:2, 4363:14, 4365:22

**meant** [4] - 4166:15, 4205:14, 4208:18, 4258:20

**measure** [5] - 4160:23, 4252:13, 4267:13, 4359:19

**measured** [5] - 4127:13, 4146:13, 4173:4, 4202:19, 4204:20

**measurement** [1] - 4377:15

**mechanical** [1] - 4113:21

**mechanism** [1] - 4258:24

**medium** [1] - 4294:23

**meet** [10] - 4296:19, 4311:3, 4319:20, 4320:15, 4332:20, 4332:22, 4333:7, 4333:10, 4339:23, 4342:8

**meeting** [10] - 4211:10, 4293:11, 4310:20, 4324:13, 4324:24, 4332:13, 4348:2, 4367:1, 4367:11, 4370:16

**Meeting** [1] - 4366:22

**meetings** [4] - 4197:5, 4374:20, 4374:22

**member** [17] - 4221:15, 4305:8, 4306:11, 4308:9, 4308:22, 4308:23, 4308:24, 4309:14, 4310:17, 4310:22, 4312:1, 4320:10, 4321:19, 4334:16, 4334:18, 4337:12, 4339:14

**members** [12] - 4304:11, 4304:14, 4305:2, 4306:16, 4307:4, 4307:15, 4309:18, 4311:3, 4311:4, 4337:10, 4342:8, 4374:23

**Membership** [25] - 4298:8, 4298:9, 4298:10, 4298:13, 4298:14, 4298:16, 4298:21, 4298:25, 4299:7, 4299:11, 4299:14, 4300:4, 4333:14, 4333:24, 4333:25, 4334:8, 4334:9, 4336:14, 4374:11, 4375:18, 4375:20, 4376:15, 4379:13, 4380:6, 4380:11

**memo** [2] - 4360:12, 4360:17

**memorable** [1] - 4170:7

**memorandum** [2] - 4136:5, 4274:23

**memory** [3] - 4266:13, 4362:2, 4375:21

**mention** [9] - 4131:8, 4131:15, 4136:3, 4156:14, 4220:18, 4278:23, 4282:19, 4282:21, 4377:9

**mentioned** [11] - 4221:3, 4236:10, 4257:6, 4257:7, 4303:15, 4320:7, 4322:11, 4326:19, 4340:6, 4347:18, 4352:18

**Merchandise** [1] - 4292:2

**merchandise** [4] - 4292:3, 4300:2, 4300:5, 4305:23

**merchant** [209] - 4123:9, 4123:13, 4130:8, 4130:14, 4131:4, 4131:22, 4135:13, 4136:10, 4136:11, 4136:14, 4137:17, 4140:22, 4150:10, 4150:17, 4150:22, 4158:11, 4158:13, 4167:11, 4167:17, 4167:19, 4168:18, 4168:20, 4168:21, 4169:10, 4170:20, 4171:19, 4173:3, 4173:5, 4173:11, 4174:19, 4174:22, 4174:24, 4175:2, 4175:5, 4175:24, 4176:7, 4176:23, 4177:15, 4178:2, 4178:12, 4178:14, 4178:18,

4178:19, 4182:10, 4184:14, 4184:23, 4186:2, 4186:9, 4186:10, 4186:12, 4189:23, 4191:24, 4192:12, 4192:21, 4193:23, 4195:7, 4211:12, 4211:21, 4213:6, 4215:19, 4216:1, 4221:16, 4221:19, 4222:1, 4222:12, 4222:14, 4222:19, 4222:21, 4222:25, 4226:9, 4226:18, 4226:21, 4226:25, 4227:12, 4227:14, 4227:16, 4227:22, 4228:22, 4228:25, 4229:2, 4231:9, 4232:10, 4232:24, 4233:1, 4233:4, 4233:5, 4233:6, 4233:8, 4233:18, 4233:22, 4233:23, 4233:25, 4234:3, 4234:17, 4234:18, 4234:19, 4234:21, 4234:22, 4235:13, 4235:15, 4235:18, 4235:19, 4235:21, 4235:25, 4236:2, 4238:17, 4239:4, 4241:17, 4241:24, 4242:6, 4242:21, 4243:11, 4243:16, 4246:16, 4251:2, 4251:5, 4251:14, 4252:16, 4252:18, 4255:8, 4255:14, 4255:15, 4261:3, 4268:7, 4268:8, 4271:1, 4272:9, 4272:14, 4272:18, 4275:22, 4276:25, 4277:3, 4277:11, 4277:15, 4278:6, 4278:9, 4279:18, 4279:20, 4279:22, 4279:24, 4280:1, 4280:5, 4283:15, 4283:17, 4283:21, 4283:23, 4284:4, 4284:10, 4284:11, 4285:4, 4285:15, 4286:1, 4286:5, 4287:16, 4287:20, 4293:22, 4296:3, 4297:1, 4299:6, 4299:10, 4301:1, 4301:5, 4301:14, 4306:11, 4307:6, 4307:21, 4308:14, 4308:22, 4309:10, 4310:14, 4310:15, 4310:17, 4310:18, 4310:23, 4311:6, 4311:8, 4311:11, 4311:19, 4312:18, 4312:23, 4313:4, 4313:8, 4313:18, 4320:17, 4321:17, 4334:2, 4337:12, 4339:12, 4342:1, 4344:4, 4344:9, 4345:9, 4346:23, 4347:4, 4347:16, 4349:11, 4357:5, 4357:19, 4357:21, 4358:6, 4363:15, 4365:25, 4366:13, 4366:14, 4367:4

**Merchant** [2] - 4360:22, 4366:25

**merchant's** [6] - 4161:7, 4161:10, 4178:22, 4229:24, 4230:15, 4321:21

**Merchants** [2] - 4132:25, 4232:3

**merchants** [240] - 4124:16, 4126:5, 4126:17, 4127:13, 4127:15, 4127:16, 4127:19, 4127:20, 4128:4, 4128:6, 4128:20, 4130:22, 4131:1, 4132:14, 4133:5, 4133:15, 4133:21, 4134:14, 4144:6, 4146:4, 4149:10, 4152:17, 4152:25, 4153:3, 4153:7, 4153:11, 4162:4, 4169:12, 4170:15, 4170:16, 4171:3, 4172:2, 4172:5, 4174:10, 4176:3, 4177:19, 4177:20, 4178:9, 4178:25, 4179:2, 4181:13, 4183:2, 4183:8, 4183:13, 4185:6, 4186:9, 4190:4, 4190:8, 4190:11, 4190:15, 4190:17, 4190:22, 4191:19, 4192:10, 4192:16, 4192:18, 4193:10, 4193:15, 4195:21, 4199:18, 4199:23, 4200:1, 4202:7, 4209:25, 4211:15, 4212:3,

4212:4, 4212:20, 4212:22, 4214:18, 4215:12, 4215:24, 4216:3, 4216:9, 4216:11, 4216:16, 4216:20, 4219:15, 4221:13, 4223:17, 4223:18, 4223:21, 4224:3, 4226:24, 4227:6, 4227:15, 4227:19, 4228:1, 4228:5, 4228:8, 4228:17, 4229:9, 4229:21, 4230:12, 4230:23, 4231:1, 4231:9, 4231:19, 4231:21, 4232:7, 4232:11, 4233:12, 4233:16, 4234:6, 4234:9, 4234:15, 4234:24, 4235:4, 4235:5, 4236:12, 4236:16, 4236:17, 4236:24, 4237:2, 4237:4, 4237:5, 4237:6, 4237:17, 4238:3, 4238:5, 4238:10, 4239:10, 4239:12, 4239:15, 4240:5, 4240:7, 4242:20, 4246:17, 4246:18, 4249:10, 4250:1, 4251:1, 4255:3, 4255:4, 4255:5, 4255:17, 4260:23, 4267:24, 4268:1, 4268:12, 4271:10, 4271:16, 4271:17, 4271:20, 4271:21, 4272:4, 4279:16, 4280:12, 4282:12, 4284:24, 4287:8, 4287:13, 4287:17, 4293:14, 4293:22, 4294:2, 4294:12, 4294:15, 4296:17, 4297:1, 4297:21, 4298:2, 4298:16, 4298:20, 4299:24, 4300:11, 4300:21, 4301:7, 4302:14, 4302:16, 4304:1, 4304:11, 4305:7, 4305:9, 4306:6, 4306:15, 4306:21, 4306:25, 4307:8, 4307:14, 4309:12, 4310:4, 4310:9, 4311:4, 4311:17, 4312:16, 4313:18, 4313:21, 4313:22, 4313:24, 4314:2, 4314:5, 4322:5, 4328:9, 4333:21, 4334:13, 4334:20, 4334:21, 4334:22, 4334:23, 4335:1, 4335:2, 4337:9, 4339:2, 4339:14, 4342:3, 4342:9, 4343:3, 4343:11, 4344:21, 4346:10, 4346:11, 4346:13, 4346:15, 4346:18, 4347:12, 4348:22, 4350:24, 4353:4, 4358:18, 4358:24, 4359:12, 4359:20, 4360:25, 4361:1, 4362:4, 4363:18, 4365:18, 4366:1, 4369:20, 4369:24, 4370:16, 4371:11, 4372:24, 4373:20, 4379:12, 4379:23, 4380:5

**merger** [2] - 4161:5, 4175:14

**merit** [1] - 4359:8

**merit-based** [1] - 4359:8

**merits** [1] - 4213:12

**Message** [1] - 4355:11

**message** [3] - 4355:17, 4378:18, 4378:20

**messages** [3] - 4307:25, 4356:21, 4356:23

**messaging** [1] - 4342:2

**met** [2] - 4341:25, 4368:22

**metaphorically** [1] - 4197:22

**method** [3] - 4229:24, 4230:15, 4355:24

**methodology** [1] - 4283:11

**methods** [1] - 4287:16

**metric** [6] - 4202:20, 4202:23, 4205:6, 4205:21, 4304:3, 4356:25

**metrics** [2] - 4202:24, 4302:8

**Mexico** [1] - 4246:21

**Mexico's** [1] - 4246:14

**Michael** [1] - 4207:4

**MICHIGAN** [1] - 4112:4

**mid** [1] - 4329:13

**middle** [8] - 4116:6, 4116:13, 4129:18, 4168:10, 4246:6, 4291:24, 4326:10, 4355:10

**midmorning** [1] - 4381:17

**midst** [1] - 4132:5

**might** [23] - 4123:12, 4124:5, 4136:21, 4145:11, 4153:25, 4164:15, 4174:15, 4178:9, 4188:8, 4189:16, 4220:22, 4265:8, 4272:4, 4272:15, 4280:5, 4280:8, 4281:22, 4286:15, 4288:4, 4305:14, 4316:8, 4324:2, 4330:20

**miles** [1] - 4254:10

**Miles** [8] - 4298:10, 4298:13, 4298:25, 4333:14, 4333:24, 4333:25, 4334:8, 4336:15

**million** [22] - 4126:11, 4127:20, 4128:2, 4184:19, 4184:20, 4222:25, 4223:6, 4223:9, 4223:16, 4226:8, 4229:2, 4230:22, 4236:2, 4239:4, 4239:15, 4240:5, 4312:15, 4312:16, 4313:8, 4313:12, 4318:18

**millions** [2] - 4127:16, 4184:23

**mind** [6] - 4118:12, 4116:14, 4127:25, 4152:8, 4283:18, 4356:19

**minds** [2] - 4343:7, 4356:24

**mine** [5] - 4164:9, 4173:17, 4173:24, 4275:2, 4335:18

**minute** [12] - 4122:14, 4154:19, 4185:24, 4197:25, 4261:15, 4273:20, 4284:21, 4288:20, 4323:14, 4364:8, 4371:3, 4371:12

**minutes** [9] - 4124:20, 4139:20, 4174:6, 4289:25, 4307:9, 4319:16, 4323:13, 4348:1, 4364:6

**mis** [1] - 4153:6

**mischaracterization** [1] - 4194:6

**misheard** [1] - 4224:21

**mislead** [1] - 4118:4

**misleading** [1] - 4172:24

**missed** [1] - 4249:12

**missing** [1] - 4355:23

**Missouri** [1] - 4113:3

**MISSOURI** [2] - 4112:4, 4113:1

**misspoke** [4] - 4181:2, 4210:3, 4221:25, 4281:9

**misstates** [1] - 4214:20

**mistake** [5] - 4116:12, 4205:23, 4220:23, 4304:7, 4332:5

**misunderstood** [1] - 4225:10

**MITCH** [1] - 4113:4

**Mitch** [1] - 4114:7

**MITCHELL** [1] - 4112:21

**MITCHELL-TOMBRAS** [1] - 4112:21

**mix** [20] - 4150:18, 4151:5, 4151:7, 4151:10, 4151:18, 4152:2, 4220:16, 4255:8, 4255:16, 4255:18, 4256:5, 4279:12, 4346:10, 4346:11, 4346:13,

4346:14, 4346:16, 4346:22, 4347:6

**mixing** [1] - 4153:8

**mobile** [3] - 4308:11, 4319:4, 4319:5

**model** [57] - 4178:6, 4212:12, 4293:20, 4293:25, 4294:3, 4294:8, 4294:9, 4294:13, 4294:14, 4296:14, 4296:15, 4296:22, 4296:23, 4297:13, 4301:12, 4303:5, 4303:6, 4303:7, 4303:9, 4303:15, 4303:17, 4303:24, 4305:22, 4310:11, 4310:12, 4310:22, 4311:1, 4311:2, 4312:3, 4312:9, 4316:8, 4316:9, 4318:25, 4323:1, 4323:4, 4336:23, 4336:24, 4338:25, 4339:6, 4349:20, 4349:21, 4349:22, 4350:4, 4350:25, 4353:5, 4362:22, 4368:18, 4369:6, 4369:25, 4370:9, 4370:11, 4370:14, 4372:14, 4372:25, 4374:6, 4374:8

**modeled** [1] - 4147:8

**models** [1] - 4304:18

**moderate** [2] - 4344:1, 4371:15

**modification** [1] - 4299:13

**moment** [19] - 4115:11, 4148:23, 4157:6, 4171:12, 4203:6, 4217:11, 4244:17, 4244:18, 4247:24, 4274:10, 4274:11, 4288:4, 4303:12, 4305:7, 4309:16, 4345:25, 4353:7, 4353:10, 4379:10

**moments** [1] - 4348:9

**money** [19] - 4130:7, 4130:13, 4130:14, 4131:10, 4132:12, 4170:16, 4172:6, 4180:13, 4219:17, 4220:1, 4233:6, 4254:8, 4254:10, 4286:20, 4309:7, 4309:15, 4310:7, 4311:12, 4312:1

**Monopolist** [3] - 4146:21, 4147:12, 4283:16

**monopolist** [7] - 4147:8, 4218:20, 4268:15, 4268:18, 4268:19, 4268:25, 4279:15

**monopoly** [7] - 4202:1, 4218:15, 4218:18, 4218:19, 4219:3, 4363:7, 4364:22

**MONTANA** [1] - 4112:5

**month** [2] - 4329:1, 4371:14

**MOORE** [1] - 4113:7

**moral** [2] - 4361:22, 4363:3

**moreover** [1] - 4158:8

**Morgan** [4] - 4210:16, 4211:7, 4213:14, 4213:25

**Morgan's** [2] - 4211:4, 4214:3

**morning** [17] - 4114:5, 4114:6, 4114:8, 4114:9, 4114:10, 4114:12, 4114:13, 4114:15, 4114:21, 4117:17, 4117:18, 4198:1, 4268:3, 4268:10, 4275:7, 4313:11, 4382:14

**most** [21] - 4125:4, 4128:5, 4154:11, 4179:5, 4184:3, 4187:4, 4192:18, 4196:7, 4201:25, 4254:22, 4257:10, 4260:9, 4300:8, 4301:10, 4302:8, 4302:22, 4303:3, 4338:17, 4351:15, 4372:2, 4372:17

**motivation** [1] - 4196:12
**mouth** [2] - 4210:7, 4210:8
**move** [9] - 4155:22, 4186:21, 4201:10, 4245:24, 4323:12, 4336:11, 4337:25, 4363:22, 4381:10
**moved** [4] - 4255:13, 4291:21, 4330:10, 4340:13
**movement** [2] - 4330:25, 4331:1
**moves** [1] - 4217:18
**moving** [6] - 4169:22, 4175:9, 4234:16, 4255:10, 4255:16, 4325:4
**MR** [216] - 4114:4, 4114:6, 4114:7, 4114:10, 4114:13, 4114:18, 4115:2, 4115:16, 4115:18, 4115:21, 4115:25, 4116:6, 4116:17, 4117:2, 4117:11, 4117:16, 4121:12, 4124:24, 4128:8, 4128:14, 4134:16, 4134:20, 4134:25, 4139:7, 4139:11, 4139:15, 4139:18, 4139:19, 4139:23, 4139:25, 4140:2, 4140:6, 4140:11, 4140:13, 4140:14, 4140:15, 4141:15, 4141:19, 4141:21, 4141:25, 4145:5, 4145:10, 4145:13, 4145:15, 4145:19, 4145:25, 4154:7, 4154:15, 4154:17, 4154:21, 4155:1, 4155:4, 4155:7, 4155:12, 4155:14, 4155:18, 4155:20, 4156:3, 4156:5, 4156:7, 4156:12, 4156:16, 4156:20, 4158:2, 4162:25, 4164:1, 4164:5, 4166:17, 4166:25, 4167:3, 4167:5, 4167:8, 4168:6, 4170:5, 4170:12, 4173:15, 4173:19, 4173:21, 4174:2, 4174:3, 4181:1, 4181:5, 4197:23, 4198:2, 4199:3, 4199:11, 4203:7, 4203:10, 4207:11, 4207:12, 4207:17, 4214:20, 4214:23, 4218:2, 4221:1, 4228:9, 4228:12, 4228:15, 4239:20, 4239:24, 4240:2, 4240:4, 4240:14, 4240:17, 4244:3, 4244:16, 4244:20, 4244:24, 4245:5, 4245:20, 4245:22, 4247:11, 4247:19, 4247:24, 4248:1, 4248:2, 4248:8, 4251:20, 4253:1, 4253:8, 4253:12, 4253:15, 4257:23, 4261:8, 4261:10, 4261:13, 4261:17, 4261:21, 4261:25, 4263:4, 4263:11, 4266:3, 4266:15, 4266:17, 4273:4, 4273:6, 4274:10, 4274:18, 4281:8, 4281:10, 4283:12, 4288:3, 4288:9, 4288:12, 4288:23, 4289:1, 4289:3, 4289:18, 4290:1, 4290:9, 4290:12, 4290:14, 4290:16, 4290:24, 4291:2, 4291:7, 4314:10, 4316:12, 4316:15, 4323:12, 4330:16, 4335:20, 4341:3, 4343:2, 4345:6, 4345:23, 4347:24, 4348:6, 4348:9, 4348:13, 4351:17, 4352:3, 4352:4, 4352:5, 4353:23, 4354:25, 4355:1, 4355:5, 4359:17, 4359:23, 4360:1, 4360:5, 4360:8, 4361:9, 4361:10, 4361:13, 4361:15, 4363:22, 4364:6, 4364:9, 4364:12, 4367:20, 4367:22, 4368:1, 4368:2, 4375:3, 4375:4, 4375:8, 4377:3, 4377:6, 4378:14, 4379:1, 4379:7,

4380:17, 4380:19, 4381:10, 4381:16, 4381:21, 4381:25, 4382:5, 4382:8, 4382:12, 4382:16, 4383:8, 4383:9, 4383:12
**muddled** [1] - 4281:11
**multi** [9] - 4203:23, 4204:5, 4204:17, 4205:19, 4209:4, 4251:11, 4251:14
**multi-home** [1] - 4251:14
**multi-homing** [2] - 4251:11, 4251:14
**multi-issuance** [5] - 4203:23, 4204:5, 4204:17, 4205:19
**multi-network** [1] - 4209:4
**multidimensional** [1] - 4172:23
**multiple** [16] - 4151:7, 4151:8, 4188:6, 4188:9, 4188:18, 4188:21, 4203:24, 4204:3, 4204:4, 4204:7, 4208:13, 4250:13, 4251:2, 4251:18, 4301:1, 4301:2
**multiple-issuing** [1] - 4203:24
**multiplicity** [1] - 4363:2
**multiplier** [1] - 4300:22
**MUSSER** [1] - 4112:21
**must** [7] - 4120:11, 4232:10, 4312:11, 4320:14, 4363:14, 4368:12, 4368:14
**must-carry** [1] - 4312:11
**must-have** [1] - 4363:14
**mutual** [1] - 4374:24

# N

**name** [9] - 4171:13, 4191:23, 4206:12, 4273:16, 4290:20, 4298:8, 4343:22, 4354:17, 4366:21
**named** [2] - 4136:6, 4324:9
**names** [3] - 4135:22, 4143:5, 4278:22
**narrow** [3] - 4255:25, 4269:25, 4332:24
**narrower** [1] - 4181:23
**national** [1] - 4243:10
**natural** [1] - 4208:1
**nature** [7] - 4154:2, 4160:14, 4174:9, 4175:21, 4269:13, 4314:16, 4331:6
**near** [2] - 4165:14, 4165:16
**nearly** [1] - 4356:22
**NEBRASKA** [1] - 4112:5
**necessarily** [2] - 4164:12, 4186:25
**necessary** [3] - 4117:19, 4151:5, 4174:5
**necessity** [1] - 4178:5
**need** [26] - 4115:9, 4118:11, 4186:11, 4215:17, 4240:4, 4244:16, 4281:1, 4283:17, 4296:16, 4296:17, 4296:19, 4296:23, 4302:8, 4308:15, 4310:10, 4310:13, 4310:15, 4316:9, 4324:24, 4333:4, 4334:5, 4336:4, 4359:3, 4359:4, 4359:6, 4369:1
**needed** [11] - 4312:8, 4318:13, 4332:3, 4332:11, 4342:5, 4342:7, 4367:16, 4368:19, 4369:5, 4369:9
**needs** [26] - 4293:11, 4296:20, 4306:22, 4306:24, 4310:20, 4311:3, 4319:21, 4320:5, 4320:8, 4320:15, 4324:13, 4332:4, 4332:14, 4332:20, 4332:22, 4332:25, 4333:7, 4333:10, 4339:24,

4342:8, 4352:12, 4352:15, 4363:25, 4368:22, 4370:16
**negates** [1] - 4359:11
**negative** [2] - 4135:9, 4252:18
**neglected** [1] - 4247:17
**negotiate** [1] - 4268:15
**negotiates** [2] - 4238:10, 4238:21
**negotiating** [1] - 4138:23
**negotiation** [4] - 4168:18, 4168:19, 4169:2, 4343:16
**negotiations** [3] - 4135:25, 4139:1, 4346:23
**Neiman** [1] - 4330:20
**net** [16] - 4130:23, 4131:11, 4132:13, 4133:4, 4133:5, 4133:14, 4134:1, 4134:11, 4136:20, 4142:17, 4142:18, 4142:23, 4143:13, 4143:17, 4144:9, 4147:13
**Net** [1] - 4132:23
**netted** [1] - 4130:17
**network** [59] - 4119:19, 4122:8, 4123:9, 4123:13, 4124:11, 4125:3, 4125:8, 4125:13, 4125:21, 4126:22, 4127:6, 4176:3, 4199:25, 4201:19, 4201:21, 4202:2, 4202:4, 4202:5, 4202:7, 4203:17, 4204:4, 4206:13, 4207:22, 4207:24, 4208:1, 4208:23, 4209:4, 4209:5, 4216:25, 4217:19, 4228:23, 4250:2, 4250:18, 4251:1, 4251:4, 4251:5, 4251:6, 4251:9, 4259:22, 4263:22, 4265:11, 4276:23, 4277:14, 4278:11, 4285:15, 4285:17, 4285:20, 4286:14, 4293:22, 4294:11, 4295:14, 4326:21, 4340:18, 4369:8
**Network** [1] - 4295:9
**network's** [2] - 4183:14, 4235:10
**Networks** [1] - 4159:10
**networks** [33] - 4121:24, 4126:24, 4189:24, 4195:9, 4200:13, 4201:6, 4202:14, 4208:13, 4219:16, 4219:19, 4220:1, 4227:13, 4232:20, 4232:23, 4233:1, 4233:20, 4234:5, 4234:13, 4236:15, 4249:20, 4250:14, 4250:23, 4251:3, 4251:18, 4270:25, 4278:6, 4286:13, 4315:15, 4317:15, 4322:7, 4337:23, 4340:13, 4358:23
**networks'** [2] - 4250:21, 4250:25
**neutral** [1] - 4238:18
**never** [1] - 4335:15
**nevertheless** [1] - 4178:22
**NEW** [2] - 4112:1, 4112:5
**new** [2] - 4230:16, 4259:20
**New** [7] - 4112:6, 4113:8, 4113:12, 4113:19, 4290:13
**newspaper** [1] - 4258:23
**newspapers** [4] - 4258:14, 4258:15, 4258:18, 4259:1
**next** [22] - 4121:6, 4123:22, 4133:19, 4136:10, 4139:8, 4144:4, 4157:5, 4157:7, 4208:11, 4250:14, 4261:16,

4266:7, 4304:22, 4327:8, 4340:13, 4349:6, 4349:8, 4356:20, 4362:23, 4374:10, 4376:14, 4381:24
**NGG** [1] - 4112:5
**nice** [1] - 4288:15
**niche** [6] - 4212:6, 4212:13, 4212:16, 4349:13, 4349:23
**NICHOLAS** [1] - 4112:13
**NICOLE** [1] - 4113:18
**Nilson** [3] - 4325:13, 4325:14, 4327:14
**nine** [3] - 4144:16, 4295:18, 4327:5
**non** [9] - 4119:7, 4178:2, 4186:19, 4223:18, 4255:15, 4302:17, 4333:21, 4334:21, 4358:6
**non-discrimination** [1] - 4119:7, 4178:2, 4302:17, 4358:6
**non-economic** [1] - 4186:19
**non-steering** [1] - 4223:18
**non-T&E** [2] - 4255:15, 4334:21
**non-travel** [1] - 4333:21
**nondiscrimination** [9] - 4215:17, 4215:23, 4219:3, 4224:6, 4226:8, 4226:20, 4238:14, 4238:16, 4328:8
**nondominant** [2] - 4148:10, 4148:15
**none** [1] - 4329:3
**nonpayment** [1] - 4258:13
**notable** [1] - 4158:14
**note** [6] - 4148:19, 4166:17, 4191:22, 4201:13, 4265:25, 4353:25
**noted** [3] - 4197:12, 4290:3, 4382:17
**nothing** [12] - 4114:18, 4165:5, 4191:11, 4191:15, 4231:22, 4234:4, 4241:9, 4241:15, 4241:22, 4242:3, 4308:14, 4317:12
**notion** [3] - 4183:7, 4183:12, 4379:16
**November** [2] - 4314:14, 4314:20
**number** [70] - 4120:12, 4127:13, 4129:6, 4130:17, 4131:21, 4131:25, 4133:6, 4133:15, 4134:2, 4134:12, 4136:10, 4137:19, 4137:24, 4138:9, 4139:13, 4141:16, 4141:20, 4141:22, 4152:20, 4153:11, 4159:13, 4165:14, 4165:16, 4167:24, 4168:21, 4168:23, 4170:20, 4184:24, 4189:22, 4190:16, 4202:19, 4204:21, 4205:6, 4205:8, 4205:10, 4205:21, 4206:3, 4206:8, 4206:10, 4206:14, 4223:5, 4223:17, 4224:22, 4228:17, 4245:13, 4245:15, 4245:17, 4251:20, 4276:8, 4281:19, 4282:13, 4282:23, 4302:3, 4315:3, 4315:4, 4316:18, 4316:20, 4327:3, 4335:4, 4336:1, 4341:17, 4343:7, 4346:15, 4354:13, 4356:17, 4361:24, 4368:4, 4371:6
**numbered** [3] - 4123:3, 4241:10
**numbering** [1] - 4245:3
**numbers** [25] - 4115:6, 4115:8, 4115:11, 4136:3, 4141:22, 4145:9, 4145:10, 4167:13, 4168:15, 4206:6, 4245:8, 4245:9, 4245:21, 4281:23, 4282:19, 4282:21, 4304:9, 4325:22, 4377:2,

4377:4, 4377:9, 4377:18, 4378:13, 4378:18, 4378:22
**Numeral** [1] - 4241:1
**numerous** [1] - 4118:5
**NW** [1] - 4112:17

**O**

**o'clock** [1] - 4381:18
**oath** [3] - 4114:24, 4199:8, 4263:6
**object** [5] - 4145:20, 4164:1, 4173:15, 4218:2, 4351:19
**objection** [22] - 4115:22, 4116:3, 4116:25, 4117:5, 4134:20, 4140:19, 4140:23, 4141:12, 4154:22, 4155:5, 4155:12, 4155:14, 4207:13, 4214:20, 4225:17, 4247:23, 4248:2, 4253:1, 4355:1, 4361:10, 4367:22, 4375:4
**objections** [1] - 4289:5
**objective** [2] - 4303:21, 4303:22
**obligation** [1] - 4359:2
**observation** [1] - 4190:7
**observations** [1] - 4287:22
**observed** [1] - 4208:7
**observing** [2] - 4232:7, 4237:20
**obstacle** [1] - 4287:19, 4288:1
**obtain** [2] - 4253:25, 4272:3
**obtaining** [2] - 4213:5, 4254:2
**obviously** [6] - 4239:18, 4305:5, 4324:16, 4346:25, 4358:22, 4365:14
**occur** [3] - 4175:13, 4232:21, 4237:15
**occurred** [1] - 4240:11
**odd** [2] - 4245:12, 4253:12
**odds** [1] - 4195:6
**OF** [8] - 4112:1, 4112:3, 4112:3, 4112:13, 4112:17, 4112:23, 4113:1, 4113:4
**offer** [37] - 4115:5, 4115:9, 4115:10, 4134:17, 4145:5, 4154:10, 4154:13, 4177:18, 4207:11, 4232:8, 4247:21, 4289:4, 4294:16, 4294:17, 4294:18, 4294:19, 4294:20, 4294:21, 4294:22, 4294:23, 4296:11, 4302:7, 4307:22, 4308:11, 4309:2, 4309:4, 4309:17, 4312:25, 4316:7, 4319:1, 4320:1, 4337:9, 4354:25, 4361:9, 4367:20, 4371:2, 4375:3
**Offer** [1] - 4307:9
**offered** [5] - 4214:18, 4247:16, 4333:18, 4336:2, 4353:25
**offering** [15] - 4162:7, 4162:12, 4164:24, 4182:2, 4212:19, 4216:11, 4254:5, 4260:6, 4260:11, 4310:16, 4312:19, 4357:17, 4362:1, 4362:3, 4381:4
**offerings** [2] - 4121:25, 4196:24
**offers** [3] - 4161:21, 4165:7, 4296:5
**Office** [4] - 4112:25, 4113:2, 4113:5, 4243:22
**officer** [2] - 4360:20, 4361:7
**Officer** [5] - 4291:12, 4291:16, 4292:16, 4292:17, 4292:20

**official** [1] - 4357:10
**offsetting** [3] - 4159:4, 4162:18, 4277:4
**often** [5] - 4167:10, 4187:18, 4259:2, 4308:23, 4332:20
**Ohio** [1] - 4113:5
**OHIO** [2] - 4112:5, 4113:4
**old** [1] - 4258:14
**oligopoly** [2] - 4148:7, 4148:16
**once** [6] - 4164:9, 4181:8, 4208:6, 4253:12, 4330:6, 4333:2
**one** [179] - 4115:9, 4116:13, 4116:14, 4116:19, 4118:3, 4118:15, 4118:18, 4120:8, 4122:18, 4123:5, 4125:3, 4129:12, 4132:17, 4133:23, 4142:3, 4142:6, 4142:7, 4142:9, 4144:6, 4146:22, 4147:9, 4147:24, 4148:24, 4149:7, 4153:12, 4155:1, 4155:24, 4156:21, 4159:15, 4160:3, 4160:5, 4160:9, 4161:12, 4161:15, 4168:14, 4169:7, 4169:12, 4170:14, 4172:16, 4172:22, 4173:9, 4174:24, 4174:25, 4175:8, 4175:11, 4176:10, 4179:3, 4179:7, 4180:8, 4183:20, 4183:25, 4184:4, 4185:1, 4185:24, 4192:6, 4194:19, 4199:20, 4200:11, 4202:9, 4202:10, 4202:16, 4202:18, 4202:24, 4204:20, 4205:5, 4206:15, 4206:16, 4207:8, 4208:5, 4209:4, 4209:21, 4209:23, 4210:10, 4210:12, 4212:25, 4214:9, 4217:21, 4232:19, 4232:25, 4233:4, 4233:10, 4233:20, 4235:1, 4235:8, 4235:19, 4239:7, 4242:6, 4242:14, 4243:15, 4244:3, 4245:1, 4250:21, 4250:25, 4251:1, 4251:4, 4251:5, 4251:16, 4257:7, 4258:14, 4264:21, 4266:19, 4268:20, 4273:20, 4274:10, 4274:11, 4276:6, 4276:19, 4277:2, 4277:6, 4277:8, 4277:10, 4281:15, 4284:4, 4286:13, 4286:20, 4288:21, 4288:23, 4296:14, 4298:23, 4300:8, 4300:22, 4302:8, 4302:9, 4303:3, 4303:19, 4305:11, 4307:1, 4308:8, 4310:24, 4312:4, 4312:7, 4314:6, 4315:6, 4315:24, 4317:20, 4318:2, 4318:7, 4319:13, 4322:19, 4324:6, 4327:1, 4327:16, 4330:15, 4330:16, 4330:20, 4332:3, 4332:5, 4333:3, 4333:4, 4333:17, 4333:18, 4335:15, 4336:18, 4338:17, 4338:21, 4341:19, 4342:1, 4343:11, 4343:17, 4345:9, 4346:8, 4354:18, 4355:7, 4355:15, 4360:10, 4362:9, 4364:21, 4365:19, 4370:23, 4376:15, 4377:10, 4379:10, 4379:12, 4380:17
**one-fifth** [1] - 4185:1
**one-half** [2] - 4204:20, 4205:5
**one-line** [1] - 4310:24
**one-quarter** [1] - 4202:18
**one-sided** [1] - 4156:21
**ones** [15] - 4121:7, 4171:8, 4187:6, 4227:6, 4234:7, 4234:8, 4239:8, 4255:16, 4282:14, 4283:7, 4283:19,

4283:20, 4284:16, 4314:3, 4363:19
**online** [1] - 4319:16
**open** [4] - 4305:17, 4323:10, 4329:23, 4364:11
**Open** [3] - 4344:23, 4345:1, 4345:4
**opening** [11] - 4169:23, 4170:4, 4170:14, 4173:6, 4173:16, 4173:20, 4186:12, 4202:11, 4209:21, 4209:23, 4210:4
**operate** [5] - 4312:25, 4319:4, 4319:5, 4349:21, 4359:3
**operated** [1] - 4364:22
**operates** [1] - 4293:20
**operating** [3] - 4311:23, 4361:7
**Operating** [2] - 4292:16, 4292:20
**opinion** [12] - 4118:7, 4179:20, 4194:17, 4194:18, 4194:19, 4194:22, 4233:12, 4255:21, 4270:17, 4271:5, 4271:7, 4274:5
**opportunities** [1] - 4365:12
**opportunity** [5] - 4233:6, 4307:2, 4317:21, 4338:14, 4338:19
**opposed** [4] - 4171:5, 4184:20, 4212:13, 4242:21
**opposite** [4] - 4121:8, 4160:13, 4270:22, 4355:6
**opt** [1] - 4307:19
**Optima** [3] - 4333:15, 4334:11, 4356:3
**optimal** [1] - 4268:22
**option** [3] - 4319:24, 4369:20, 4379:19
**optionality** [1] - 4300:9
**options** [5] - 4230:16, 4299:4, 4308:3, 4379:25, 4380:3
**orange** [3] - 4142:15, 4144:10
**order** [19] - 4115:7, 4117:20, 4117:23, 4118:10, 4150:21, 4151:5, 4203:9, 4212:12, 4216:11, 4218:11, 4223:6, 4251:4, 4251:6, 4254:4, 4255:25, 4257:19, 4260:10, 4260:12, 4345:14
**ordered** [1] - 4156:15
**Ordover** [3] - 4195:3, 4277:20, 4278:16
**organization** [4] - 4367:1, 4367:2, 4367:10, 4373:24
**orientation** [2] - 4303:22, 4328:6
**originally** [1] - 4298:13
**ORSINI** [1] - 4113:9
**otherwise** [4] - 4228:5, 4243:2, 4243:4, 4264:25
**ought** [1] - 4363:2
**ourselves** [2] - 4289:4, 4370:15
**out-of-court** [1] - 4207:12
**outcome** [4] - 4175:1, 4261:5, 4269:6, 4287:18
**outcomes** [1] - 4264:14
**outed** [1] - 4156:14
**outside** [4] - 4302:2, 4333:5, 4333:8, 4333:11
**outstanding** [1] - 4370:7
**outstandings** [1] - 4368:11
**outweigh** [2] - 4122:11, 4123:18
**overall** [23] - 4138:3, 4148:2, 4149:18,

4151:25, 4171:22, 4175:16, 4182:2, 4182:5, 4183:7, 4201:4, 4201:14, 4201:15, 4219:16, 4252:4, 4254:20, 4254:25, 4255:23, 4256:22, 4261:5, 4306:9, 4306:14, 4315:10, 4316:23
**Overall** [1] - 4132:22
**overlap** [3] - 4185:21, 4259:9, 4259:16
**overnight** [1] - 4373:18
**oversight** [3] - 4264:15, 4264:20, 4265:1
**own** [9] - 4118:8, 4133:12, 4169:18, 4209:9, 4209:18, 4215:23, 4293:8, 4362:25, 4365:1
**owned** [4] - 4259:9, 4329:17, 4364:14, 4364:19
**ownership** [2] - 4259:16, 4259:20

## P

**p.m** [3] - 4290:3, 4382:6, 4382:17
**package** [2] - 4173:4, 4256:22
**PAGE** [1] - 4383:3
**page** [123] - 4120:10, 4120:13, 4122:21, 4122:23, 4122:24, 4123:4, 4124:21, 4125:19, 4127:3, 4129:12, 4129:15, 4132:18, 4133:19, 4137:2, 4137:11, 4137:12, 4138:7, 4139:13, 4139:19, 4140:7, 4140:11, 4142:10, 4144:4, 4144:5, 4148:25, 4155:10, 4157:4, 4157:5, 4157:7, 4158:5, 4159:13, 4159:14, 4162:25, 4163:5, 4163:6, 4163:9, 4165:20, 4165:24, 4166:25, 4167:23, 4179:22, 4182:19, 4182:20, 4182:23, 4195:1, 4198:4, 4203:2, 4207:18, 4207:21, 4215:4, 4215:7, 4224:16, 4224:21, 4224:24, 4230:10, 4230:11, 4232:1, 4240:24, 4241:1, 4241:3, 4245:3, 4245:25, 4246:4, 4246:6, 4248:15, 4249:1, 4250:7, 4250:9, 4262:2, 4263:18, 4265:25, 4267:10, 4270:9, 4270:15, 4273:8, 4273:16, 4274:24, 4275:1, 4275:2, 4275:3, 4281:3, 4281:4, 4281:12, 4284:4, 4287:4, 4287:8, 4304:22, 4314:12, 4314:18, 4314:19, 4314:22, 4315:3, 4317:18, 4320:24, 4342:10, 4348:3, 4348:14, 4349:6, 4349:18, 4352:6, 4352:8, 4352:11, 4354:12, 4354:14, 4355:6, 4355:10, 4356:21, 4361:16, 4362:6, 4362:23, 4368:3, 4371:18, 4371:19, 4371:21, 4375:10, 4380:17
**pages** [7] - 4123:2, 4134:17, 4266:7, 4266:11, 4273:8, 4321:15, 4321:18
**pagination** [1] - 4168:2
**paid** [10] - 4131:8, 4131:15, 4172:6, 4189:24, 4246:16, 4254:12, 4286:14, 4328:25, 4378:2, 4378:3
**pair** [1] - 4242:14
**pairs** [1] - 4281:12
**paper** [7] - 4155:25, 4156:8, 4156:15, 4156:16, 4206:11, 4287:25, 4327:25

**papers** [3] - 4206:14, 4207:8, 4257:8
**paragraph** [39] - 4120:9, 4120:14, 4120:17, 4122:4, 4127:2, 4157:3, 4157:5, 4157:6, 4195:2, 4203:3, 4203:5, 4203:20, 4203:22, 4207:20, 4208:11, 4230:10, 4232:1, 4232:19, 4237:3, 4241:15, 4242:1, 4246:7, 4249:1, 4249:5, 4250:8, 4270:8, 4270:10, 4270:14, 4270:15, 4271:6, 4276:10, 4276:13, 4276:14, 4276:15, 4287:8, 4287:11, 4352:11, 4355:14
**paragraphs** [2] - 4229:18, 4241:11
**pardon** [1] - 4357:21
**part** [48] - 4122:3, 4131:9, 4132:2, 4141:7, 4150:23, 4157:4, 4161:10, 4161:24, 4171:10, 4172:10, 4175:17, 4175:19, 4179:5, 4181:24, 4182:1, 4189:16, 4208:24, 4218:23, 4220:9, 4221:17, 4242:2, 4242:16, 4242:23, 4249:15, 4253:25, 4256:21, 4261:4, 4268:21, 4271:24, 4293:18, 4300:14, 4300:15, 4311:2, 4312:7, 4325:4, 4331:12, 4331:24, 4336:10, 4338:15, 4338:24, 4340:3, 4344:8, 4354:9, 4356:13, 4356:14, 4360:3, 4360:24, 4373:16
**participant** [1] - 4299:6
**participate** [5] - 4214:19, 4215:13, 4216:1, 4216:10, 4298:22
**particular** [55] - 4119:9, 4120:9, 4120:14, 4127:25, 4144:25, 4145:10, 4149:15, 4150:21, 4159:3, 4163:17, 4167:17, 4167:18, 4169:10, 4169:11, 4180:2, 4183:14, 4183:24, 4187:7, 4190:3, 4190:10, 4190:18, 4190:21, 4203:2, 4204:10, 4205:19, 4210:13, 4216:20, 4222:7, 4222:8, 4226:22, 4227:12, 4235:13, 4238:20, 4255:6, 4256:20, 4268:23, 4271:11, 4271:17, 4271:23, 4273:13, 4280:6, 4296:25, 4300:21, 4301:1, 4306:24, 4328:2, 4328:21, 4330:17, 4331:21, 4339:20, 4345:9, 4357:4, 4374:21, 4375:25
**particularly** [10] - 4163:16, 4211:19, 4227:19, 4301:22, 4302:5, 4315:19, 4323:6, 4325:25, 4332:6, 4370:1
**parties** [4] - 4186:23, 4187:6, 4189:22, 4268:4
**Partner** [1] - 4379:11
**partner** [8] - 4131:4, 4131:5, 4140:18, 4140:21, 4141:6, 4231:3, 4239:19, 4239:21
**partners** [1] - 4340:24
**partnership** [2] - 4141:10, 4295:1
**parts** [5] - 4151:16, 4238:4, 4238:20, 4249:18, 4249:22
**party** [1] - 4165:14
**Party** [5] - 4341:14, 4341:17, 4343:22, 4347:16
**pass** [7] - 4270:20, 4276:23, 4278:12, 4285:13, 4286:3, 4286:7, 4288:4

**pass-through** [1] - 4276:23
**passage** [1] - 4356:20
**passed** [1] - 4175:14
**passes** [1] - 4276:24
**passing** [1] - 4286:21
**passthrough** [1] - 4161:9
**past** [2] - 4258:18, 4375:18
**pause** [7] - 4166:22, 4244:21, 4273:22, 4274:10, 4274:13, 4279:7, 4379:10
**pavements** [1] - 4336:23
**Pay** [3] - 4299:14, 4299:18, 4299:21
**pay** [26] - 4152:18, 4152:25, 4153:4, 4190:20, 4192:21, 4193:10, 4193:15, 4199:23, 4200:1, 4200:8, 4221:8, 4242:20, 4268:20, 4294:18, 4295:5, 4297:14, 4297:15, 4300:4, 4300:5, 4300:7, 4300:14, 4301:19, 4318:23, 4319:13, 4319:21
**paycheck** [2] - 4319:14, 4319:22
**paying** [13] - 4135:9, 4162:5, 4172:6, 4190:9, 4190:15, 4233:13, 4242:21, 4252:16, 4276:5, 4277:1, 4319:14, 4340:24, 4362:4
**Payment** [3] - 4132:23, 4159:9, 4372:6
**payment** [26] - 4176:1, 4177:21, 4181:14, 4207:23, 4212:2, 4212:14, 4218:1, 4221:20, 4221:22, 4221:23, 4222:1, 4229:25, 4230:15, 4241:20, 4242:9, 4252:22, 4253:2, 4253:6, 4254:1, 4254:9, 4277:5, 4279:23, 4287:15, 4293:11, 4327:21, 4355:24
**payments** [22] - 4130:21, 4130:25, 4131:3, 4171:10, 4208:15, 4242:9, 4242:25, 4252:7, 4252:10, 4252:12, 4252:14, 4252:15, 4293:10, 4293:13, 4293:21, 4294:4, 4310:12, 4338:18, 4346:19, 4370:7, 4370:9
**payroll** [1] - 4180:14
**pays** [3] - 4130:8, 4130:13, 4161:18
**pending** [1] - 4287:17
**penetrating** [2] - 4315:9, 4316:22
**people** [52] - 4135:21, 4135:23, 4164:7, 4183:8, 4183:20, 4183:23, 4184:2, 4185:4, 4185:13, 4185:16, 4185:18, 4185:19, 4185:21, 4185:23, 4195:20, 4201:23, 4201:24, 4201:25, 4202:4, 4279:11, 4279:24, 4279:25, 4280:2, 4280:4, 4280:6, 4284:2, 4284:18, 4285:11, 4289:20, 4302:4, 4302:10, 4304:15, 4305:23, 4306:20, 4318:14, 4319:18, 4320:16, 4325:5, 4325:16, 4333:10, 4334:5, 4337:4, 4357:2, 4367:11, 4367:12, 4368:19, 4369:4, 4370:24, 4370:25, 4371:1, 4371:16, 4372:2
**people's** [3] - 4332:13, 4332:17, 4371:8
**per** [3] - 4185:10, 4300:22, 4350:8
**perceive** [1] - 4357:3
**perceived** [3] - 4348:20, 4349:7, 4351:22
**percent** [40] - 4121:17, 4128:3, 4140:23,

4140:24, 4167:14, 4180:2, 4180:9, 4204:25, 4205:2, 4228:2, 4234:9, 4272:13, 4282:2, 4282:25, 4284:6, 4297:24, 4303:18, 4306:16, 4313:20, 4313:21, 4314:2, 4326:7, 4326:25, 4327:4, 4327:5, 4327:17, 4334:22, 4334:23, 4334:25, 4335:1, 4350:22, 4355:21, 4355:22, 4356:2, 4356:3, 4356:9, 4356:22, 4370:2
**percentage** [13] - 4127:17, 4137:19, 4282:17, 4282:18, 4283:3, 4311:7, 4311:12, 4313:16, 4326:23, 4327:1, 4339:24, 4340:18, 4355:19
**percentages** [6] - 4134:6, 4141:24, 4281:25, 4282:2, 4284:3, 4284:14
**perception** [5] - 4210:24, 4313:25, 4356:6, 4356:25, 4357:4
**perceptions** [1] - 4356:22
**perfect** [4] - 4160:2, 4160:3, 4160:5, 4377:9
**perfectly** [1] - 4269:6
**perform** [1] - 4321:24
**Performance** [1] - 4376:16
**performing** [1] - 4305:3
**perhaps** [8] - 4182:17, 4222:20, 4236:3, 4245:17, 4257:23, 4270:10, 4358:7, 4381:16
**period** [30] - 4129:4, 4129:25, 4130:3, 4132:14, 4144:14, 4144:16, 4199:14, 4237:12, 4237:17, 4237:21, 4237:24, 4254:21, 4254:22, 4255:23, 4266:22, 4266:25, 4267:3, 4267:14, 4291:20, 4326:10, 4329:18, 4333:13, 4334:13, 4336:13, 4346:5, 4367:17, 4373:4, 4373:9, 4373:22, 4378:21
**permit** [2] - 4318:5, 4335:17
**permitted** [2] - 4187:11, 4200:1
**persist** [1] - 4160:10
**person** [5] - 4171:9, 4184:7, 4257:10, 4323:18, 4331:8
**person's** [1] - 4242:8
**Personal** [2] - 4292:8, 4356:3
**personal** [6] - 4297:4, 4306:2, 4309:7, 4335:25, 4336:4, 4355:22
**Personal/Gold/Optima** [1] - 4355:23
**personalize** [2] - 4307:22, 4307:24
**persons** [1] - 4355:22
**perspective** [6] - 4171:22, 4178:22, 4179:17, 4180:11, 4268:14, 4353:2
**Perspective** [3] - 4159:10, 4207:5, 4248:12
**persuade** [2] - 4312:23, 4336:10
**pertained** [1] - 4269:23
**pervasive** [1] - 4340:4
**PETER** [1] - 4113:10
**phenomenon** [1] - 4169:9
**PHILIP** [1] - 4113:13
**Phillips** [7] - 4135:18, 4136:5, 4136:24, 4139:9, 4139:16, 4140:2
**Phillips's** [1] - 4140:9
**phone** [2] - 4308:12, 4319:5

**photograph** [1] - 4341:19
**physical** [1] - 4319:4
**physically** [1] - 4236:22
**pick** [2] - 4251:16, 4322:10
**picked** [1] - 4329:18
**picking** [2] - 4174:4, 4284:1
**picture** [1] - 4172:24
**pie** [8] - 4115:16, 4115:17, 4116:7, 4116:10, 4116:11, 4116:18, 4116:21, 4116:24
**piece** [1] - 4357:22
**pieces** [2] - 4147:25, 4277:13
**pile** [1] - 4202:4
**piles** [1] - 4202:1
**pillar** [1] - 4338:24
**PIN** [1] - 4176:16
**Pindyck** [7] - 4171:14, 4171:16, 4171:18, 4172:11, 4172:16, 4203:15, 4204:10
**place** [23] - 4130:4, 4188:17, 4190:24, 4192:2, 4197:21, 4201:7, 4211:17, 4220:8, 4237:22, 4306:12, 4307:4, 4317:13, 4323:2, 4333:7, 4339:25, 4340:2, 4345:3, 4350:17, 4358:12, 4365:4, 4365:25, 4376:11
**places** [3] - 4276:15, 4305:17, 4339:15
**plain** [1] - 4138:11
**plainly** [1] - 4138:3
**plaintiff** [1] - 4114:7
**PLAINTIFF** [2] - 4112:16, 4112:23
**Plaintiff's** [2] - 4347:19, 4353:24
**Plaintiffs** [1] - 4112:7
**plan** [4] - 4360:1, 4363:24, 4369:18, 4378:17
**planned** [1] - 4355:18
**Planning** [1] - 4291:24
**planning** [3] - 4331:3, 4331:15, 4331:25
**plans** [1] - 4363:23
**plastic** [5] - 4312:19, 4312:21, 4313:5, 4363:15, 4363:19
**platform** [8] - 4258:16, 4259:3, 4261:2, 4261:3, 4261:4, 4293:13, 4293:21, 4319:4
**platforms** [2] - 4154:3, 4154:5
**Platinum** [2] - 4292:7, 4321:5
**platinum** [3] - 4320:25, 4321:3, 4321:4
**plausible** [2] - 4125:16, 4126:25
**play** [7] - 4119:9, 4119:13, 4152:5, 4158:12, 4159:4, 4220:15, 4317:14
**playbook** [9] - 4315:9, 4315:18, 4316:17, 4316:18, 4317:3, 4321:13, 4321:18, 4321:19, 4376:6
**played** [1] - 4318:11
**player** [2] - 4316:1, 4317:15
**players** [4] - 4220:25, 4316:20, 4350:15, 4350:20
**plays** [3] - 4296:20, 4297:2
**Plaza** [2] - 4113:7, 4113:19
**pleasure** [3] - 4323:17, 4323:23, 4323:25
**plus** [1] - 4312:15

pocket [1] - 4356:12
point [50] - 4140:25, 4141:11, 4145:2, 4152:15, 4156:7, 4162:5, 4168:3, 4172:15, 4175:20, 4190:24, 4192:11, 4195:5, 4220:23, 4229:16, 4235:3, 4237:11, 4249:18, 4254:7, 4257:1, 4259:8, 4261:12, 4264:18, 4269:25, 4272:12, 4273:24, 4277:21, 4286:17, 4298:14, 4300:6, 4300:22, 4302:19, 4302:24, 4307:1, 4307:25, 4311:21, 4325:1, 4327:1, 4327:2, 4332:18, 4334:20, 4336:5, 4339:23, 4353:10, 4356:1, 4357:17, 4360:2, 4370:17, 4380:9
pointed [3] - 4160:17, 4197:4, 4224:6
points [37] - 4133:6, 4133:16, 4134:2, 4134:6, 4134:7, 4134:12, 4137:24, 4141:18, 4141:20, 4143:15, 4143:17, 4143:21, 4144:12, 4144:16, 4144:22, 4180:1, 4180:8, 4264:21, 4300:4, 4300:7, 4300:15, 4300:18, 4301:1, 4301:3, 4301:4, 4301:19, 4303:19, 4315:24, 4318:7, 4323:11, 4355:17, 4377:17, 4378:5, 4379:17, 4379:20, 4379:25, 4380:1
Points [3] - 4299:15, 4299:18, 4299:21
police [1] - 4288:20
policies [1] - 4158:10
policy [5] - 4264:15, 4264:20, 4265:1, 4265:3, 4265:13
political [1] - 4361:23
poor [1] - 4319:7
popular [2] - 4300:8, 4379:19
popularity [1] - 4208:6
population [1] - 4328:3
portfolio [2] - 4272:11, 4305:5
portion [4] - 4187:12, 4215:12, 4215:25, 4277:12
portions [2] - 4191:21, 4270:9
POS [1] - 4309:11
pose [1] - 4159:14
posed [1] - 4197:6
position [20] - 4146:2, 4160:11, 4160:19, 4160:20, 4161:5, 4161:14, 4206:17, 4216:8, 4256:17, 4270:3, 4291:11, 4291:25, 4292:10, 4292:15, 4316:11, 4339:3, 4349:24, 4367:5, 4374:1
positioning [1] - 4297:19
positions [2] - 4272:24, 4291:21
positive [6] - 4124:15, 4208:3, 4208:19, 4208:20, 4208:25, 4310:1
possess [1] - 4118:14
possessed [1] - 4201:6
possessing [1] - 4256:22
possession [1] - 4272:24
possibility [7] - 4196:10, 4202:13, 4234:20, 4249:14, 4251:9, 4265:8, 4280:10
possible [13] - 4148:15, 4174:12, 4178:8, 4186:1, 4189:15, 4189:18,

4192:17, 4217:22, 4219:21, 4235:10, 4255:25, 4265:18, 4277:14
possibly [3] - 4170:8, 4330:20, 4345:12
post [1] - 4236:24
Post [2] - 4112:25, 4113:2
post-2000 [1] - 4350:18
post-Consent [1] - 4236:24
posturing [1] - 4351:25
potency [1] - 4362:11
potential [5] - 4125:8, 4227:8, 4233:10, 4236:20, 4268:20
Power [1] - 4297:10
power [49] - 4118:15, 4118:22, 4118:24, 4119:15, 4123:24, 4124:7, 4128:24, 4129:2, 4146:17, 4147:4, 4148:1, 4148:5, 4150:3, 4152:10, 4152:12, 4153:14, 4153:18, 4159:15, 4159:20, 4159:22, 4159:25, 4160:9, 4160:18, 4160:24, 4194:15, 4195:4, 4218:19, 4219:3, 4219:7, 4220:20, 4256:20, 4256:22, 4258:5, 4258:7, 4258:8, 4258:10, 4258:15, 4258:19, 4258:20, 4259:2, 4269:1, 4269:9, 4269:11, 4270:12, 4272:25, 4274:3, 4274:6, 4337:11, 4363:10
powerful [1] - 4337:9
practical [1] - 4288:1
practices [3] - 4235:11, 4241:19, 4242:6
pre [5] - 4131:21, 4131:23, 4131:25, 4132:7, 4133:3
pre-2000 [1] - 4365:13
pre-purchase [2] - 4131:25, 4132:7
pre-purchased [3] - 4131:21, 4131:23, 4133:3
precipitous [2] - 4338:8, 4351:5
precisely [4] - 4179:11, 4218:17, 4252:15, 4283:16
predicted [3] - 4231:15, 4240:11, 4349:17
Prefer [20] - 4210:11, 4210:14, 4210:20, 4210:25, 4213:16, 4216:1, 4216:10, 4249:23, 4338:20, 4338:23, 4340:3, 4347:17, 4351:3, 4353:19, 4354:6, 4355:11, 4362:5, 4362:17, 4362:18, 4374:1
prefer [7] - 4214:16, 4270:7, 4339:2, 4357:10, 4357:13, 4357:19, 4358:3
preference [19] - 4210:4, 4213:15, 4214:19, 4216:12, 4249:25, 4341:10, 4349:12, 4356:21, 4356:23, 4357:10, 4357:14, 4357:19, 4358:11, 4358:15, 4361:18, 4362:12, 4362:25, 4364:13, 4373:25
Preference [2] - 4213:14, 4249:23
preferred [3] - 4229:24, 4230:15, 4362:9
Preferred [1] - 4215:14
preferring [1] - 4163:18
Premier [1] - 4272:11
Premises [1] - 4361:17
Premium [1] - 4197:13
premium [24] - 4147:24, 4148:2, 4148:4,

4151:21, 4151:25, 4152:2, 4152:7, 4152:9, 4152:11, 4197:10, 4197:15, 4197:19, 4200:17, 4200:20, 4200:21, 4256:9, 4256:20, 4256:23, 4256:24, 4256:25, 4316:8, 4348:22, 4348:23, 4376:4
premiums [1] - 4148:3
prepaid [4] - 4294:19, 4319:2, 4324:12, 4327:12
preparation [1] - 4322:18
prepared [2] - 4322:15, 4349:4
preparing [1] - 4340:20
prepayment [1] - 4253:6
prepurchase [6] - 4252:20, 4253:18, 4253:24, 4254:3, 4254:6, 4254:10
prescriptions [1] - 4280:8
presence [2] - 4175:14, 4228:4
present [7] - 4126:7, 4130:10, 4149:24, 4151:18, 4177:25, 4233:18, 4256:23
presentation [6] - 4159:9, 4160:17, 4211:7, 4213:25, 4289:24, 4374:18
presented [7] - 4130:6, 4135:15, 4190:10, 4200:15, 4271:12, 4272:11, 4279:10
presents [1] - 4195:24
President [7] - 4292:4, 4292:5, 4292:6, 4292:7, 4292:9, 4292:16, 4292:19
president [5] - 4151:3, 4190:2, 4231:8, 4360:22, 4361:7
press [4] - 4230:19, 4231:5, 4239:3, 4239:15
pressed [1] - 4204:18
pressure [1] - 4349:10
presumably [2] - 4205:6, 4205:21
pretrial [1] - 4274:23
pretty [6] - 4244:19, 4308:4, 4333:22, 4338:7, 4349:2, 4379:8
prevails [1] - 4340:23
prevalent [2] - 4251:15, 4255:6
prevent [4] - 4191:15, 4213:5, 4226:21, 4358:16
preventing [1] - 4204:18
previous [3] - 4204:1, 4223:18, 4250:7
previously [3] - 4117:13, 4255:1, 4263:8
Price [1] - 4132:23
price [53] - 4118:22, 4122:8, 4124:11, 4129:1, 4143:2, 4143:5, 4143:7, 4146:10, 4146:12, 4146:16, 4146:19, 4146:20, 4147:9, 4147:13, 4147:16, 4148:7, 4148:16, 4153:25, 4154:6, 4156:19, 4170:15, 4173:13, 4174:5, 4178:16, 4214:17, 4214:18, 4215:11, 4215:13, 4215:19, 4215:24, 4215:25, 4216:9, 4224:2, 4254:13, 4254:16, 4254:17, 4255:2, 4255:20, 4255:21, 4255:24, 4256:1, 4257:3, 4268:7, 4268:22, 4269:6, 4269:7, 4277:15, 4278:5, 4311:13, 4371:3
priced [2] - 4149:4, 4232:24
prices [23] - 4119:4, 4121:25, 4129:6,

32

4146:4, 4148:12, 4148:13, 4150:2, 4153:21, 4158:6, 4158:8, 4158:20, 4158:25, 4219:14, 4234:14, 4234:21, 4235:11, 4246:19, 4255:2, 4255:4, 4256:3, 4261:1, 4311:11, 4311:19
**pricing** [6] - 4148:2, 4152:7, 4177:11, 4226:24, 4325:1, 4381:7
**Priebe** [1] - 4191:23
**primarily** [5] - 4181:18, 4183:24, 4212:1, 4212:2, 4330:10
**primary** [2] - 4197:14, 4317:14
**prime** [1] - 4148:20
**principal** [3] - 4147:11, 4196:12, 4289:14
**principle** [2] - 4160:21, 4269:1
**principles** [1] - 4271:15
**private** [2] - 4265:16, 4265:17
**privilege** [1] - 4319:14
**probe** [1] - 4124:19
**problem** [7] - 4117:5, 4186:20, 4220:5, 4274:12, 4275:2, 4306:9, 4339:18
**problems** [4] - 4156:2, 4343:10, 4347:16, 4357:5
**procedures** [1] - 4309:11
**proceed** [1] - 4289:22
**proceeding** [2] - 4243:19, 4243:20
**Proceedings** [1] - 4113:21
**proceedings** [5] - 4244:21, 4262:2, 4323:15, 4342:10, 4382:18
**process** [9] - 4176:5, 4196:16, 4201:22, 4208:22, 4220:11, 4268:21, 4268:23, 4310:8, 4352:17
**processes** [1] - 4309:11
**processing** [1] - 4293:22
**processor** [1] - 4293:23
**procompetitive** [9] - 4186:23, 4187:8, 4212:15, 4216:10, 4216:12, 4216:14, 4216:17, 4317:9, 4323:7
**produced** [2] - 4113:22, 4348:2
**Product** [2] - 4314:13, 4314:16
**product** [37] - 4122:1, 4148:17, 4154:6, 4187:7, 4208:12, 4208:16, 4250:12, 4250:17, 4297:14, 4297:19, 4310:14, 4312:25, 4318:12, 4318:17, 4319:1, 4319:3, 4319:10, 4320:5, 4324:8, 4324:16, 4324:18, 4324:21, 4327:24, 4330:8, 4332:16, 4332:19, 4333:11, 4349:13, 4349:23, 4356:15, 4359:1, 4370:5, 4371:4, 4371:5, 4378:4
**production** [1] - 4180:13
**products** [27] - 4117:20, 4117:21, 4118:11, 4118:12, 4174:9, 4188:14, 4212:19, 4294:19, 4297:25, 4298:24, 4303:19, 4305:5, 4305:6, 4307:7, 4316:8, 4319:9, 4319:10, 4320:14, 4324:15, 4333:10, 4342:7, 4351:1, 4361:19, 4368:22, 4369:2, 4372:6, 4376:4
**Professor** [30] - 4143:4, 4171:18, 4172:11, 4172:16, 4190:8, 4203:14, 4204:10, 4207:9, 4207:21, 4209:13,

4209:25, 4211:11, 4217:12, 4261:14, 4263:12, 4265:19, 4268:10, 4272:22, 4273:7, 4274:14, 4274:22, 4277:20, 4278:16, 4279:1, 4282:1, 4283:10, 4286:24, 4287:23, 4288:5, 4288:13
**professors** [1] - 4195:2
**profit** [1] - 4268:19
**profitability** [2] - 4179:13, 4179:14
**profitable** [4] - 4122:10, 4123:17, 4146:3, 4345:16
**profitably** [1] - 4128:19
**profits** [3] - 4179:6, 4261:1, 4310:9
**program** [35] - 4149:3, 4161:22, 4162:7, 4162:13, 4162:15, 4165:8, 4165:10, 4213:6, 4298:8, 4298:17, 4298:21, 4298:22, 4299:6, 4299:12, 4300:12, 4300:20, 4301:9, 4301:10, 4302:1, 4302:5, 4302:13, 4307:9, 4307:12, 4307:18, 4307:19, 4308:5, 4308:6, 4337:1, 4358:17, 4375:23, 4377:24, 4379:16, 4380:1, 4380:4
**Program** [6] - 4199:15, 4254:5, 4333:14, 4334:12, 4336:15, 4376:16
**programs** [19] - 4146:25, 4164:25, 4165:3, 4165:6, 4222:6, 4260:18, 4296:11, 4296:13, 4300:3, 4302:4, 4305:21, 4311:18, 4312:1, 4321:12, 4330:18, 4337:16, 4345:3, 4369:16
**Programs** [2] - 4200:14, 4200:19
**progress** [1] - 4331:23
**prohibit** [3] - 4241:9, 4241:15, 4242:4
**Prohibited** [1] - 4241:2
**prohibited** [1] - 4241:11
**prohibits** [1] - 4241:23
**Project** [4] - 4337:1, 4352:12, 4352:13, 4352:18
**project** [2] - 4337:4, 4337:7
**projection** [1] - 4377:16
**promise** [8] - 4296:24, 4303:1, 4353:11, 4359:5, 4359:6, 4372:5, 4372:9, 4372:22
**promoted** [2] - 4292:9, 4292:15
**promotional** [1] - 4302:6
**promotions** [1] - 4306:5
**prone** [2] - 4208:4, 4208:20
**propensity** [1] - 4305:24
**proper** [3] - 4118:3, 4247:25, 4345:12
**properly** [2] - 4117:23, 4117:25
**proponent** [1] - 4161:6
**proposed** [1] - 4231:14
**proposes** [1] - 4374:22
**proposing** [1] - 4161:5
**proposition** [12] - 4161:25, 4185:12, 4185:16, 4185:18, 4186:13, 4211:14, 4256:8, 4260:2, 4270:10, 4340:1, 4347:2, 4372:7
**propositions** [3] - 4372:4, 4372:20, 4373:20
**proprietary** [1] - 4147:15
**prospect** [2] - 4168:21, 4168:23
**prospects** [1] - 4304:19

**protect** [1] - 4220:10
**protecting** [3] - 4196:19, 4196:20, 4196:22
**protection** [9] - 4309:20, 4309:21, 4309:22, 4310:1, 4311:16, 4311:17, 4320:7, 4380:15
**Protection** [1] - 4241:8
**protective** [1] - 4203:9
**proud** [1] - 4165:9
**prove** [1] - 4148:5
**proved** [1] - 4380:3
**proven** [1] - 4369:25
**provide** [26] - 4124:24, 4155:17, 4175:16, 4177:17, 4185:12, 4220:21, 4222:5, 4250:23, 4260:9, 4293:13, 4295:3, 4295:4, 4300:10, 4305:9, 4305:11, 4319:11, 4319:12, 4324:21, 4342:5, 4349:16, 4353:3, 4359:12, 4371:9, 4382:3
**provided** [2] - 4169:25, 4307:7
**provider** [7] - 4162:23, 4163:20, 4212:2, 4212:13, 4212:17, 4369:19
**provides** [3] - 4137:7, 4148:17, 4301:13
**providing** [5] - 4172:24, 4258:21, 4279:21, 4297:4, 4371:10
**provision** [1] - 4228:8
**provisions** [19] - 4119:7, 4178:2, 4215:18, 4215:23, 4223:19, 4223:24, 4224:2, 4229:3, 4235:15, 4235:17, 4238:14, 4238:16, 4302:15, 4302:17, 4302:20, 4328:8, 4358:6, 4358:10, 4358:15
**proviso** [1] - 4242:18
**provisos** [1] - 4242:10
**psyche** [1] - 4297:16
**Public** [1] - 4361:3
**public** [6] - 4149:4, 4149:8, 4203:8, 4266:15, 4266:17, 4352:22
**publicly** [1] - 4131:22
**publish** [1] - 4236:16
**published** [1] - 4348:5
**publishing** [3] - 4166:18, 4166:24, 4168:5
**Puerto** [1] - 4366:22
**pull** [3] - 4149:2, 4208:5, 4356:12
**pulled** [1] - 4332:19
**pulls** [1] - 4303:13
**punches** [1] - 4253:14
**purchase** [22] - 4131:25, 4132:7, 4180:13, 4180:15, 4185:16, 4191:25, 4222:20, 4236:1, 4254:7, 4267:5, 4305:24, 4308:13, 4309:20, 4309:22, 4311:16, 4320:6, 4325:20, 4327:11, 4335:6, 4335:7, 4380:15
**purchased** [3] - 4131:21, 4131:23, 4133:3
**purchases** [4] - 4162:4, 4280:7, 4300:21, 4305:23
**purchasing** [1] - 4180:12
**purple** [2] - 4142:21, 4328:1
**purpose** [12] - 4166:2, 4241:20, 4242:8,

4282:13, 4283:4, 4283:19, 4283:20, 4283:25, 4302:19, 4325:21, 4326:2, 4327:12

**purposes** [13] - 4115:5, 4115:13, 4134:16, 4145:7, 4166:8, 4217:10, 4247:16, 4247:22, 4255:19, 4276:21, 4289:10, 4289:22, 4372:10

**pursuant** [2] - 4241:17, 4242:5

**pursue** [3] - 4333:1, 4337:19, 4369:14

**push** [2] - 4212:12, 4212:16

**put** [13] - 4149:19, 4185:15, 4210:7, 4214:16, 4251:19, 4304:4, 4304:18, 4308:8, 4319:3, 4338:14, 4341:20, 4345:3, 4349:7

**putting** [3] - 4215:11, 4215:24, 4220:16

**PX** [3] - 4274:22, 4314:7, 4347:20

**PX2528** [1] - 4314:7

**PXs** [1] - 4314:7

## Q

**qualify** [3] - 4235:20, 4319:24, 4320:2

**quality** [8] - 4122:1, 4146:24, 4173:14, 4174:5, 4174:9, 4177:12, 4178:15, 4196:24

**quarter** [1] - 4202:18

**questioned** [1] - 4289:12

**questioning** [4] - 4137:16, 4253:2, 4280:24, 4284:22

**questions** [34] - 4123:4, 4138:20, 4139:8, 4152:8, 4154:20, 4169:9, 4181:22, 4181:23, 4216:19, 4247:12, 4248:18, 4248:22, 4251:25, 4252:2, 4252:6, 4253:3, 4256:7, 4257:4, 4257:5, 4259:4, 4265:7, 4268:10, 4271:14, 4272:22, 4274:14, 4274:15, 4275:7, 4275:10, 4278:20, 4279:9, 4288:5, 4288:7, 4288:12, 4298:7

**quickly** [2] - 4199:12, 4243:18

**quite** [9] - 4179:8, 4219:21, 4223:13, 4245:12, 4251:2, 4251:15, 4280:22, 4323:22, 4336:5

**quotation** [4] - 4275:3, 4275:6, 4275:7, 4275:10

**quotations** [2] - 4278:14, 4278:19

**quote** [6] - 4249:9, 4249:10, 4267:9, 4267:13

**quoted** [4] - 4177:6, 4276:13

**quoting** [1] - 4177:5

## R

**race** [1] - 4376:7

**radio** [2] - 4208:8

**raise** [12] - 4146:4, 4152:7, 4154:6, 4156:18, 4166:14, 4219:22, 4277:3, 4277:8, 4277:14, 4278:3, 4278:6, 4356:23

**raised** [8] - 4129:5, 4147:8, 4228:13, 4285:20, 4339:3, 4340:3, 4343:7, 4376:2

**raising** [4] - 4121:25, 4161:6, 4174:20,

4277:21

**ramp** [2] - 4375:22, 4376:7

**ramp-up** [1] - 4375:22

**ramped** [1] - 4375:19

**range** [18] - 4127:20, 4184:3, 4201:14, 4284:14, 4284:17, 4293:13, 4299:4, 4305:11, 4305:12, 4305:20, 4306:5, 4318:8, 4320:15, 4324:19, 4344:4, 4370:19, 4378:17, 4380:3

**Rate** [3] - 4132:23, 4136:7, 4377:11

**rate** [82] - 4123:9, 4129:20, 4130:1, 4130:7, 4130:18, 4130:23, 4131:11, 4132:13, 4133:5, 4133:15, 4134:1, 4134:11, 4135:10, 4136:10, 4136:11, 4136:14, 4136:16, 4136:20, 4137:6, 4137:17, 4138:4, 4139:3, 4140:22, 4141:11, 4142:17, 4142:18, 4142:23, 4143:13, 4144:10, 4147:24, 4149:10, 4149:12, 4151:6, 4151:8, 4151:20, 4160:23, 4161:8, 4161:9, 4161:12, 4161:17, 4173:5, 4174:15, 4174:20, 4178:9, 4178:20, 4189:20, 4190:19, 4199:18, 4252:4, 4252:10, 4252:24, 4253:20, 4254:12, 4254:21, 4254:25, 4255:17, 4255:22, 4272:12, 4272:16, 4276:17, 4276:19, 4276:20, 4276:22, 4276:24, 4277:17, 4277:22, 4278:1, 4285:4, 4285:25, 4286:10, 4311:7, 4343:16, 4346:21, 4347:6, 4369:20, 4377:14, 4377:20, 4377:22, 4378:6

**rate's** [1] - 4190:25

**rates** [66] - 4128:20, 4144:20, 4150:10, 4150:22, 4152:18, 4153:4, 4161:7, 4161:8, 4171:19, 4171:20, 4172:1, 4172:5, 4172:17, 4172:20, 4175:2, 4177:2, 4177:10, 4177:14, 4178:12, 4179:15, 4182:14, 4182:25, 4183:17, 4186:10, 4186:12, 4189:24, 4192:3, 4199:14, 4214:17, 4219:23, 4219:24, 4228:4, 4233:13, 4233:17, 4233:20, 4235:18, 4236:16, 4237:1, 4246:11, 4246:14, 4246:15, 4255:16, 4256:13, 4256:14, 4256:18, 4272:10, 4275:15, 4276:14, 4277:22, 4278:3, 4278:9, 4278:17, 4305:1, 4306:16, 4316:6, 4320:1, 4321:10, 4321:16, 4342:1, 4346:2, 4346:3, 4346:4, 4346:9, 4346:17, 4376:2

**RATH** [1] - 4218:2

**rather** [7] - 4116:8, 4146:13, 4194:1, 4213:11, 4256:14, 4265:17, 4300:22

**reached** [1] - 4213:24

**reaching** [1] - 4238:5

**reaction** [3] - 4236:20, 4338:5, 4363:6

**Reactions** [1] - 4355:11

**READ** [1] - 4112:20

**read** [58] - 4115:6, 4132:25, 4138:21, 4139:8, 4139:11, 4140:4, 4151:14, 4151:15, 4164:3, 4165:24, 4169:23, 4170:3, 4173:16, 4179:23, 4182:7, 4191:3, 4191:19, 4191:21, 4211:6, 4211:9, 4211:10, 4214:15, 4216:2,

4224:11, 4224:25, 4225:7, 4225:14, 4225:15, 4225:19, 4229:16, 4229:18, 4229:19, 4230:11, 4238:1, 4249:3, 4249:7, 4249:11, 4250:11, 4250:12, 4250:14, 4250:19, 4260:5, 4264:11, 4264:16, 4270:9, 4270:14, 4270:16, 4271:3, 4273:20, 4275:6, 4275:9, 4278:14, 4278:18, 4287:7, 4287:11, 4287:12

**readers** [2] - 4258:20, 4258:22

**reading** [17] - 4116:23, 4122:4, 4138:17, 4139:19, 4139:22, 4139:23, 4140:6, 4140:12, 4156:2, 4164:1, 4173:20, 4179:21, 4191:7, 4225:12, 4226:4, 4230:1, 4259:24

**reads** [2] - 4137:17, 4159:19

**ready** [1] - 4380:18

**real** [11] - 4209:16, 4302:7, 4308:25, 4324:24, 4340:24, 4348:20, 4349:7, 4357:12, 4371:9, 4371:10, 4379:21

**reality** [20] - 4296:16, 4311:20, 4312:18, 4313:20, 4313:22, 4321:22, 4329:16, 4329:21, 4329:24, 4340:8, 4350:23, 4353:5, 4356:16, 4363:18, 4364:20, 4365:3, 4365:10, 4369:21, 4370:10, 4373:14

**really** [39] - 4157:4, 4165:25, 4295:1, 4295:11, 4296:8, 4299:1, 4299:4, 4299:8, 4301:3, 4303:11, 4303:14, 4303:16, 4305:22, 4306:24, 4307:13, 4313:13, 4322:8, 4323:11, 4324:22, 4328:4, 4328:5, 4329:16, 4331:16, 4331:19, 4332:12, 4334:25, 4336:23, 4337:7, 4337:10, 4357:7, 4359:7, 4363:18, 4364:21, 4364:24, 4364:25, 4365:7, 4365:22, 4365:25, 4366:7

**reason** [25] - 4115:10, 4120:19, 4123:2, 4144:2, 4156:9, 4179:2, 4186:15, 4203:8, 4206:7, 4222:23, 4226:25, 4239:18, 4246:24, 4252:14, 4256:15, 4269:5, 4269:8, 4271:21, 4272:4, 4280:21, 4285:24, 4296:21, 4298:1, 4357:13, 4370:13

**reasoning** [1] - 4253:22

**reasons** [6] - 4186:17, 4231:18, 4232:14, 4335:20, 4346:9, 4350:12

**rebuttal** [2] - 4115:15, 4195:1

**Recapture** [1] - 4199:15

**recapture** [13] - 4128:20, 4129:5, 4130:4, 4146:2, 4146:3, 4146:7, 4254:17, 4255:2, 4255:6, 4255:20, 4255:24, 4256:3, 4256:4

**receive** [4] - 4140:20, 4173:5, 4174:10, 4303:2

**received** [20] - 4116:2, 4117:9, 4140:16, 4141:10, 4145:22, 4155:15, 4207:14, 4207:15, 4232:12, 4248:3, 4248:6, 4292:11, 4355:2, 4355:4, 4361:11, 4361:14, 4367:24, 4367:25, 4375:6, 4375:7

**receives** [1] - 4137:25

**receiving** [2] - 4138:4, 4301:3

recent [3] - 4154:11, 4299:13, 4301:22
recently [3] - 4156:1, 4199:13, 4309:2
Recess [1] - 4290:4
recess [4] - 4198:3, 4262:1, 4323:15, 4364:10
Recession [4] - 4132:3, 4132:5, 4267:1, 4267:14
recipient [2] - 4354:23, 4360:17
recite [3] - 4141:23, 4232:17, 4377:4
reciting [1] - 4145:8
recognition [1] - 4297:4
recognize [4] - 4244:9, 4273:14, 4273:19, 4352:12
recognized [4] - 4174:17, 4258:18, 4342:2, 4342:6
recollect [1] - 4126:2
recollecting [1] - 4153:7
recollection [25] - 4121:19, 4121:20, 4126:1, 4129:8, 4130:16, 4135:7, 4148:22, 4166:13, 4172:4, 4184:18, 4184:21, 4185:2, 4190:22, 4191:18, 4200:5, 4205:3, 4206:9, 4247:5, 4264:3, 4270:14, 4273:2, 4273:3, 4278:18, 4278:19, 4363:5
reconstruct [1] - 4161:3
record [25] - 4114:3, 4115:8, 4124:23, 4127:1, 4127:18, 4128:16, 4131:16, 4134:5, 4140:5, 4145:9, 4151:14, 4158:22, 4176:11, 4181:1, 4181:4, 4188:4, 4194:23, 4211:5, 4238:7, 4245:10, 4253:4, 4270:17, 4281:11, 4290:20, 4334:7
recorded [1] - 4113:21
recorder [1] - 4208:10
recover [1] - 4267:2
recovered [1] - 4340:7
recross [1] - 4261:12
red [1] - 4143:1
redacted [2] - 4377:2, 4378:14
redeem [4] - 4298:17, 4379:17, 4379:21, 4380:1
redeemed [2] - 4301:20, 4377:17, 4378:2
Redemption [1] - 4377:10
redemption [10] - 4298:22, 4299:4, 4300:9, 4301:24, 4377:14, 4377:20, 4377:22, 4378:6, 4379:19, 4380:3
redemptions [3] - 4376:11, 4381:1, 4381:5
Redemptions [1] - 4380:21
REDIRECT [3] - 4248:7, 4263:10, 4383:9
reduce [8] - 4121:24, 4133:4, 4202:5, 4202:6, 4214:18, 4246:18, 4254:11, 4306:14
reduced [4] - 4319:2, 4342:1, 4346:17, 4380:12
reduces [1] - 4278:5
reducing [1] - 4122:1
reduction [2] - 4278:10, 4361:19
reductions [1] - 4232:12

reenforcing [1] - 4201:22
refer [5] - 4125:25, 4137:14, 4151:8, 4205:25, 4295:11
reference [3] - 4210:3, 4244:16, 4316:8
referenced [1] - 4282:14
references [4] - 4247:25, 4248:22, 4318:2
referred [9] - 4147:25, 4154:3, 4239:15, 4240:5, 4247:20, 4314:20, 4314:25, 4348:5, 4367:18
referring [11] - 4139:17, 4155:24, 4161:2, 4205:6, 4205:21, 4205:24, 4225:2, 4249:21, 4267:3, 4276:19, 4318:1
refers [6] - 4144:1, 4267:13, 4275:19, 4281:20, 4315:11, 4325:13
reflect [3] - 4151:21, 4279:11, 4282:3
reflected [4] - 4121:22, 4147:14, 4255:5, 4267:25
reflecting [1] - 4156:2
reflects [3] - 4130:7, 4130:13, 4267:23
Reform [1] - 4241:7
refresh [3] - 4166:13, 4264:2, 4273:3
regard [4] - 4154:22, 4158:14, 4285:4, 4285:5
regarding [1] - 4160:18
register [4] - 4190:18, 4307:20, 4308:14, 4308:15
regular [1] - 4374:20
regulated [1] - 4247:5
regulation [5] - 4243:16, 4263:22, 4264:13, 4264:23
regulations [3] - 4243:11, 4243:24, 4247:4
regulators [2] - 4246:12, 4246:16
regulatory [1] - 4243:20
Rein [4] - 4179:22, 4181:4, 4181:11, 4181:15
reinforced [1] - 4350:12
reinvigorated [1] - 4321:6
Reinvigorating [1] - 4320:25
relate [3] - 4265:21, 4267:18, 4267:21
related [6] - 4186:23, 4203:25, 4215:18, 4232:9, 4256:8, 4268:11
Related [3] - 4292:13, 4331:11, 4354:8
relates [3] - 4133:20, 4141:1, 4144:6
relating [1] - 4243:11
relation [1] - 4271:14
relationship [16] - 4116:15, 4135:5, 4135:7, 4135:12, 4135:13, 4135:17, 4135:19, 4138:22, 4141:2, 4306:19, 4309:8, 4322:3, 4344:15, 4345:8, 4345:11
relationships [4] - 4135:4, 4193:25, 4250:1, 4367:4
relative [9] - 4125:13, 4125:22, 4227:6, 4227:9, 4227:13, 4256:21, 4343:7, 4343:9, 4365:4
relatively [6] - 4121:9, 4121:21, 4138:25, 4254:21, 4364:25, 4379:4
relayed [1] - 4151:22

released [1] - 4382:4
relevance [6] - 4182:14, 4182:15, 4182:25, 4183:5, 4183:7, 4332:12
relevant [24] - 4118:6, 4118:15, 4119:16, 4138:18, 4139:2, 4231:23, 4251:8, 4256:16, 4257:1, 4268:1, 4268:6, 4268:8, 4272:10, 4276:12, 4332:13, 4332:16, 4333:19, 4348:10, 4350:2, 4368:12, 4368:13, 4368:15, 4368:21, 4371:8
relied [1] - 4125:11
reloadable [3] - 4294:19, 4319:2, 4324:12
relying [3] - 4124:13, 4124:14, 4264:19
remain [3] - 4162:23, 4163:21, 4218:9, 4255:23
remained [1] - 4340:11
remains [3] - 4258:2, 4289:6, 4355:19
remember [23] - 4131:25, 4151:16, 4164:19, 4170:3, 4174:6, 4199:22, 4216:3, 4216:5, 4221:4, 4238:4, 4238:6, 4238:22, 4252:8, 4269:13, 4269:24, 4271:9, 4280:17, 4285:10, 4330:17, 4341:14, 4341:20, 4371:1, 4373:2
remembering [3] - 4226:14, 4253:24, 4285:21
remind [7] - 4114:23, 4199:7, 4245:17, 4263:5, 4289:8, 4358:24, 4377:5
reminded [1] - 4154:10
reminding [1] - 4288:4
removal [1] - 4237:14
remove [1] - 4128:13
removing [1] - 4174:18
remuneration [13] - 4134:10, 4134:13, 4136:12, 4136:15, 4137:18, 4137:23, 4138:12, 4139:3, 4140:17, 4140:25, 4141:6, 4141:11, 4143:23
remunerations [1] - 4133:13
renamed [1] - 4298:14
rendering [1] - 4196:10
rent [3] - 4159:21, 4159:25, 4160:4
repaid [1] - 4305:2
repaired [1] - 4309:24
repeat [2] - 4267:20, 4276:8
rephrase [4] - 4141:8, 4210:15, 4253:9, 4253:10
replicate [3] - 4316:9, 4316:10
replicated [2] - 4316:20, 4321:8
replicating [1] - 4376:6
report [33] - 4115:15, 4118:20, 4129:10, 4129:15, 4130:6, 4142:5, 4142:13, 4144:4, 4148:25, 4154:12, 4155:9, 4156:25, 4158:11, 4167:23, 4195:1, 4231:16, 4231:17, 4231:25, 4237:3, 4243:21, 4244:9, 4245:4, 4247:14, 4251:23, 4270:7, 4276:1, 4276:4, 4276:23, 4277:19, 4279:6, 4325:18, 4354:4
Report [3] - 4325:13, 4325:14, 4353:18
reported [5] - 4131:22, 4213:23,

4217:12, 4267:21, 4284:5
**REPORTER** [1] - 4113:18
**reporting** [1] - 4281:22
**reports** [12] - 4122:15, 4132:17, 4142:3, 4150:16, 4153:10, 4155:24, 4194:20, 4213:23, 4244:25, 4245:13, 4284:6, 4352:22
**Reports** [1] - 4327:14
**represent** [4] - 4144:1, 4206:6, 4233:24, 4313:21
**representation** [1] - 4234:12
**representative** [1] - 4194:11
**representatives** [1] - 4170:24
**represented** [3] - 4134:2, 4146:7, 4236:1
**represents** [2] - 4296:7, 4372:16
**reputation** [1] - 4236:14
**required** [1] - 4313:2
**requirement** [1] - 4318:11
**requires** [1] - 4191:11
**Research** [2] - 4353:17, 4354:5
**research** [2] - 4165:2, 4169:18
**reservations** [1] - 4152:21
**reserve** [4] - 4117:3, 4243:11, 4243:23, 4378:5
**reserves** [6] - 4301:15, 4301:23, 4376:10, 4377:23, 4377:25
**resilience** [1] - 4373:23
**resistance** [1] - 4228:22
**resolve** [1] - 4289:5
**resolved** [1] - 4289:5
**resources** [1] - 4365:1
**respect** [17] - 4152:24, 4167:9, 4185:25, 4236:23, 4238:9, 4239:1, 4240:10, 4258:19, 4267:18, 4267:22, 4295:23, 4300:20, 4318:1, 4331:21, 4340:5, 4358:15, 4362:17
**respond** [3] - 4172:10, 4197:11, 4330:5
**responded** [3] - 4172:10, 4172:14, 4172:16
**responding** [1] - 4203:15
**response** [6] - 4138:20, 4200:15, 4212:21, 4341:24, 4358:14, 4362:24
**responses** [2] - 4265:18, 4363:6
**responsibilities** [2] - 4331:6, 4339:23
**responsibility** [5] - 4292:11, 4297:17, 4325:5, 4371:25, 4372:1
**responsible** [8] - 4297:7, 4297:11, 4297:22, 4298:5, 4304:20, 4309:15, 4311:2, 4367:3
**responsibly** [1] - 4304:15
**rest** [7] - 4129:21, 4164:3, 4182:1, 4242:1, 4243:1, 4372:7, 4372:14
**restate** [1] - 4188:12
**restaurant** [2] - 4149:21, 4357:6
**restauranteur** [1] - 4341:19
**restauranteurs** [2] - 4341:25, 4343:4
**restaurants** [3] - 4305:16, 4305:17, 4341:17
**restraint** [8] - 4117:24, 4117:25, 4186:25, 4187:17, 4187:22, 4188:23,

4189:2, 4189:12
**restraints** [13] - 4119:6, 4158:11, 4158:13, 4189:16, 4195:7, 4228:25, 4232:10, 4238:17, 4269:15, 4269:19, 4271:1, 4287:17, 4287:21
**restricted** [1] - 4128:10
**restriction** [1] - 4189:16
**restrictions** [6] - 4119:11, 4158:13, 4189:7, 4228:24, 4230:25, 4237:14
**restricts** [3] - 4187:1, 4189:3, 4189:13
**rests** [2] - 4289:2, 4372:2
**result** [18] - 4135:10, 4168:19, 4169:11, 4174:18, 4176:8, 4176:24, 4186:7, 4214:13, 4216:23, 4217:5, 4219:14, 4219:17, 4223:15, 4278:4, 4278:10, 4317:7, 4321:9, 4347:5
**resulting** [3] - 4174:23, 4177:11, 4237:13
**results** [4] - 4230:25, 4301:3, 4349:17, 4375:17
**resumes** [1] - 4114:20
**retail** [3] - 4149:13, 4246:18, 4357:6
**retailer** [2] - 4188:17, 4254:16
**retailers** [7] - 4188:9, 4188:18, 4188:21, 4278:22, 4287:14, 4324:19, 4330:22
**retain** [2] - 4162:3
**retinal** [1] - 4156:1
**returned** [1] - 4309:24
**revenue** [3] - 4130:12, 4246:3, 4378:8
**revenues** [4] - 4130:16, 4297:24, 4303:18, 4343:18
**reverse** [1] - 4368:14
**reversed** [1] - 4334:25
**review** [4] - 4138:13, 4325:18, 4375:2, 4381:6
**reviewed** [2] - 4178:25, 4229:16
**revolted** [1] - 4341:18
**revolving** [6] - 4294:21, 4297:24, 4298:2, 4330:3, 4333:16, 4370:8
**Reward** [1] - 4300:4
**reward** [11] - 4181:17, 4221:15, 4296:12, 4299:2, 4299:6, 4300:3, 4300:22, 4302:3, 4302:5, 4321:12, 4378:5
**rewards** [68] - 4146:24, 4147:13, 4147:19, 4147:21, 4149:15, 4150:7, 4150:9, 4161:21, 4162:2, 4162:5, 4162:7, 4162:12, 4162:15, 4163:23, 4164:16, 4164:25, 4165:3, 4165:6, 4165:7, 4175:15, 4177:18, 4180:7, 4180:9, 4180:19, 4195:20, 4200:21, 4201:5, 4211:13, 4213:6, 4221:14, 4221:19, 4257:18, 4257:19, 4258:3, 4258:4, 4260:3, 4260:6, 4260:10, 4260:12, 4260:16, 4260:17, 4286:15, 4295:4, 4296:11, 4296:20, 4296:25, 4297:2, 4298:7, 4298:17, 4300:20, 4301:9, 4301:15, 4301:20, 4301:24, 4302:13, 4309:17, 4311:16, 4311:25, 4316:7, 4334:5, 4353:9, 4369:22, 4373:21, 4376:3, 4377:24, 4378:1,

4380:10
**Rewards** [22] - 4149:5, 4200:13, 4200:19, 4254:4, 4298:8, 4298:9, 4298:14, 4298:17, 4298:21, 4299:7, 4299:11, 4299:14, 4334:9, 4334:12, 4374:11, 4375:18, 4375:20, 4375:23, 4376:16, 4379:13, 4380:6, 4380:11
**RHODE** [1] - 4112:6
**Richard** [1] - 4232:6
**Rico** [1] - 4366:22
**rid** [1] - 4202:11
**riding** [1] - 4220:12
**right-hand** [5] - 4116:7, 4116:13, 4133:7, 4279:13, 4352:7
**rights** [1] - 4220:10
**rise** [3] - 4176:6, 4178:9, 4259:1
**risk** [1] - 4283:24
**rival** [4] - 4195:8, 4209:10, 4250:15, 4250:21
**rivals** [2] - 4208:6, 4209:18
**Robert** [1] - 4171:16
**Rogers** [1] - 4293:3
**Role** [1] - 4371:19
**role** [15] - 4119:10, 4119:13, 4131:4, 4152:5, 4158:12, 4172:10, 4172:12, 4252:16, 4296:21, 4297:2, 4297:3, 4317:14, 4318:12, 4322:22, 4331:24
**roll** [3] - 4215:12, 4215:25, 4253:14
**rollbacks** [1] - 4216:9
**rolled** [1] - 4336:13
**Roman** [1] - 4241:1
**room** [1] - 4372:3
**root** [1] - 4368:6
**roughly** [3] - 4205:3, 4334:19, 4334:22
**route** [1] - 4305:14
**routinely** [1] - 4161:18
**RPR** [1] - 4113:18
**rule** [12] - 4139:7, 4154:17, 4154:19, 4213:8, 4226:15, 4226:17, 4227:2, 4227:4, 4235:8, 4317:8, 4351:10, 4377:8
**rules** [45] - 4120:6, 4171:23, 4174:13, 4174:18, 4174:21, 4192:10, 4193:14, 4196:13, 4202:11, 4212:25, 4224:6, 4224:7, 4224:11, 4224:12, 4224:13, 4224:14, 4225:3, 4225:8, 4225:15, 4225:16, 4225:18, 4225:19, 4225:24, 4226:1, 4226:3, 4226:5, 4226:8, 4226:20, 4226:25, 4227:25, 4228:2, 4238:23, 4250:4, 4288:1, 4301:24, 4338:13, 4340:6, 4340:7, 4341:4, 4341:5, 4341:10, 4345:24, 4347:15, 4365:22
**run** [5] - 4217:18, 4238:15, 4250:5, 4254:4, 4292:1
**running** [9] - 4249:7, 4310:24, 4310:25, 4331:8, 4365:7, 4370:11, 4371:13, 4371:14, 4371:15
**runs** [3] - 4142:21, 4143:8, 4241:3
**Ryan** [1] - 4290:10
**RYAN** [2] - 4290:12, 4290:14

# S

safe [1] - 4205:25
Saks [1] - 4330:20
sale [9] - 4180:13, 4190:24, 4192:11, 4300:6, 4302:24, 4332:19, 4353:11, 4355:18, 4357:17
Sales [1] - 4292:2
sales [2] - 4180:2
sample [1] - 4153:8
satisfied [2] - 4233:12, 4233:16
satisfy [1] - 4347:1
save [2] - 4170:16, 4233:6
saved [1] - 4173:19
saving [2] - 4307:8, 4309:7
savings [2] - 4246:3, 4309:14
saw [9] - 4122:4, 4160:19, 4161:14, 4214:9, 4226:16, 4231:3, 4351:5, 4365:13, 4376:1
SCANLON [1] - 4112:20
scattershot [1] - 4307:24
scenario [2] - 4220:21, 4362:9
scenarios [1] - 4220:6
scene [2] - 4329:12, 4329:13
scheduled [1] - 4288:24
Schick [3] - 4360:13, 4361:2, 4361:3
SCHILLER [1] - 4113:11
SCHNEIDER [1] - 4113:1
School [1] - 4293:1
school [1] - 4293:2
scope [2] - 4187:25, 4238:16
score [1] - 4310:9
screen [3] - 4124:22, 4167:6, 4203:8
screens [2] - 4166:19, 4266:3
sea [1] - 4312:17
seal [1] - 4128:9
sealing [1] - 4128:12
seamless [1] - 4309:10
seat [3] - 4290:19, 4347:7, 4378:3
seated [7] - 4114:1, 4114:21, 4117:8, 4199:1, 4263:2, 4290:7, 4323:16
second [28] - 4120:19, 4121:8, 4148:24, 4175:17, 4176:22, 4181:8, 4194:25, 4206:25, 4224:17, 4245:25, 4246:7, 4249:2, 4263:13, 4265:20, 4270:7, 4270:10, 4279:4, 4286:25, 4287:11, 4305:20, 4314:12, 4333:9, 4338:20, 4342:1, 4352:10, 4355:6, 4355:14, 4371:23
section [2] - 4355:12, 4355:15
Section [3] - 4240:23, 4241:2, 4241:4
sections [1] - 4241:19
secure [3] - 4116:8, 4116:11
security [1] - 4309:25
see [94] - 4120:17, 4121:1, 4121:8, 4124:3, 4124:6, 4125:25, 4127:3, 4127:9, 4136:4, 4136:8, 4136:9, 4136:12, 4137:3, 4137:9, 4138:1, 4149:2, 4158:4, 4158:16, 4159:17, 4162:7, 4162:11, 4179:23, 4183:8, 4196:21, 4210:9, 4215:22, 4219:1,

4230:5, 4230:10, 4230:17, 4231:19, 4231:20, 4232:4, 4237:7, 4237:13, 4237:16, 4238:19, 4239:3, 4239:16, 4241:4, 4244:13, 4245:15, 4246:22, 4250:6, 4250:9, 4253:8, 4253:11, 4257:2, 4258:10, 4260:1, 4264:9, 4266:8, 4267:9, 4269:9, 4273:14, 4273:17, 4275:1, 4275:4, 4275:17, 4281:23, 4286:13, 4286:19, 4286:23, 4315:5, 4317:24, 4321:1, 4325:12, 4325:20, 4325:25, 4330:8, 4332:7, 4333:21, 4333:22, 4336:4, 4338:7, 4344:11, 4344:14, 4348:16, 4349:6, 4354:15, 4355:8, 4364:23, 4365:6, 4365:8, 4365:10, 4365:14, 4366:9, 4368:5, 4376:15, 4377:8, 4377:12, 4380:16, 4380:22, 4382:13
seeing [4] - 4126:19, 4211:22, 4247:10, 4302:13
seek [2] - 4189:23, 4230:24
seeking [1] - 4227:14
seem [4] - 4124:21, 4170:2, 4360:3, 4365:13
segment [9] - 4144:18, 4315:10, 4316:11, 4316:23, 4316:24, 4328:2, 4330:24, 4331:22, 4376:4
segmentation [1] - 4309:6
segmented [1] - 4324:15
segments [5] - 4129:6, 4148:20, 4306:4, 4318:9, 4328:21
seismic [1] - 4220:8
selected [2] - 4330:9, 4380:25
self [1] - 4265:17
self-help [1] - 4265:17
selling [2] - 4188:21, 4305:25
Senator [1] - 4220:7
send [1] - 4308:23
Senior [1] - 4292:5
sense [10] - 4163:18, 4167:11, 4196:1, 4217:17, 4219:20, 4269:4, 4270:2, 4277:7, 4362:14, 4363:23
sensitive [1] - 4190:5
sensitivity [1] - 4278:5
sentence [18] - 4120:17, 4121:6, 4121:9, 4127:3, 4137:17, 4204:1, 4205:9, 4205:12, 4230:11, 4249:3, 4249:4, 4250:11, 4250:14, 4264:8, 4275:13, 4276:12, 4287:24
separate [8] - 4135:4, 4135:25, 4139:4, 4153:2, 4176:15, 4237:1, 4274:2, 4274:5
separately [3] - 4134:18, 4145:6, 4231:4
September [2] - 4291:23, 4353:22
series [1] - 4153:2
serious [4] - 4152:21, 4251:9, 4339:18
seriously [1] - 4284:11
Serve [6] - 4318:17, 4319:10, 4320:18, 4324:9, 4324:10, 4324:18
serve [4] - 4159:20, 4159:24, 4317:16, 4324:12
served [3] - 4256:24, 4291:25, 4292:9

service [20] - 4122:1, 4177:11, 4187:7, 4222:5, 4239:22, 4242:9, 4293:15, 4295:4, 4296:8, 4297:2, 4297:4, 4297:8, 4297:9, 4298:3, 4313:1, 4320:6, 4353:9, 4369:22, 4373:21, 4380:14
services [29] - 4119:19, 4149:4, 4149:8, 4174:9, 4175:16, 4212:14, 4241:21, 4293:10, 4293:12, 4293:13, 4305:8, 4305:11, 4305:12, 4318:24, 4319:9, 4319:12, 4320:9, 4320:15, 4321:4, 4321:11, 4321:13, 4322:1, 4333:9, 4335:24, 4348:24, 4351:2, 4368:23, 4381:7
Services [15] - 4132:23, 4292:13, 4295:9, 4314:13, 4314:15, 4331:11, 4354:8, 4360:22, 4360:23, 4366:21, 4366:25, 4367:3, 4367:12, 4371:19
serving [4] - 4117:1, 4320:12, 4320:13, 4320:16
session [3] - 4374:12, 4374:15, 4381:3
sessions [1] - 4374:16
set [15] - 4118:22, 4119:4, 4135:23, 4138:8, 4148:13, 4153:21, 4153:25, 4158:6, 4158:8, 4158:20, 4158:25, 4299:25, 4311:7, 4335:23, 4376:10
settled [1] - 4187:12
settlement [1] - 4230:20
setup [1] - 4159:3
[5] - 4140:25, 4141:10, 4159:13, 4215:8, 4240:24
several [16] - 4152:21, 4202:24, 4222:25, 4230:16, 4232:14, 4246:10, 4261:18, 4278:18, 4292:10, 4306:20, 4318:23, 4322:21, 4332:9, 4332:11, 4333:3, 4341:25
shall [2] - 4241:9, 4241:15, 4242:4
shampoo [1] - 4280:9
shaped [1] - 4278:21
Shapiro [9] - 4206:12, 4206:16, 4207:4, 4207:9, 4207:21, 4209:13, 4210:1, 4217:12, 4248:12
share [53] - 4118:7, 4119:22, 4120:3, 4120:20, 4121:3, 4121:17, 4121:22, 4153:21, 4154:5, 4158:6, 4158:19, 4158:24, 4162:16, 4166:4, 4166:6, 4184:25, 4204:24, 4214:11, 4214:13, 4216:8, 4217:16, 4217:19, 4227:5, 4227:11, 4227:16, 4227:20, 4228:18, 4267:11, 4315:10, 4316:23, 4316:24, 4325:6, 4325:21, 4326:2, 4326:24, 4327:11, 4327:16, 4329:19, 4338:2, 4338:8, 4350:22, 4351:6, 4352:14, 4368:7, 4368:9, 4368:10, 4368:20, 4368:24, 4370:2, 4370:3, 4371:24, 4373:2, 4373:3
Share [2] - 4366:20, 4371:20
shares [14] - 4119:9, 4119:23, 4119:25, 4120:5, 4120:19, 4120:24, 4121:6, 4121:9, 4121:10, 4121:11, 4158:12, 4227:13, 4228:19, 4327:19

**shift** [2] - 4214:11, 4267:10
**shifted** [1] - 4214:13
**shifting** [1] - 4217:16
**shirtsleeves** [4] - 4374:11, 4374:15, 4374:22, 4381:3
**shop** [3] - 4168:22, 4309:25, 4330:13
**shopping** [1] - 4168:24
**short** [1] - 4362:7
**short-term** [1] - 4362:7
**shorthand** [2] - 4168:16, 4218:20
**show** [11] - 4116:22, 4144:11, 4144:21, 4144:24, 4144:25, 4193:11, 4211:4, 4214:23, 4226:1, 4240:18, 4368:6
**showed** [8] - 4145:3, 4146:6, 4210:25, 4212:10, 4212:15, 4239:7, 4278:21, 4377:19
**showing** [2] - 4133:12, 4282:16
**shown** [7] - 4210:23, 4231:4, 4254:22, 4280:17, 4338:4, 4340:9
**shows** [8] - 4143:14, 4143:17, 4144:15, 4145:1, 4146:3, 4190:17, 4308:24, 4327:16
**side** [71] - 4121:13, 4146:9, 4146:12, 4146:18, 4147:4, 4147:7, 4147:9, 4147:10, 4154:18, 4159:15, 4159:20, 4159:24, 4160:3, 4160:5, 4160:7, 4160:9, 4161:1, 4161:7, 4161:10, 4161:11, 4161:13, 4161:15, 4165:12, 4165:13, 4166:10, 4172:7, 4175:24, 4179:3, 4179:6, 4179:7, 4179:9, 4179:12, 4181:15, 4181:18, 4219:20, 4251:12, 4251:14, 4259:3, 4259:5, 4260:22, 4260:23, 4261:4, 4275:23, 4276:25, 4277:2, 4277:4, 4277:6, 4277:8, 4277:9, 4277:10, 4277:16, 4278:6, 4278:12, 4284:24, 4286:1, 4286:5, 4286:20, 4309:16, 4312:2, 4318:3, 4319:25, 4321:17, 4321:19, 4321:21, 4325:24, 4345:10, 4347:9, 4370:6
**sided** [21] - 4118:21, 4146:10, 4146:19, 4146:20, 4147:13, 4154:3, 4154:4, 4156:21, 4160:9, 4160:14, 4175:21, 4176:1, 4177:2, 4177:6, 4179:4, 4211:17, 4258:16, 4261:2, 4264:14, 4264:19, 4369:8
**sides** [6] - 4169:2, 4261:3, 4275:16, 4277:23, 4277:24, 4354:2
**sign** [2] - 4176:8, 4176:24
**signature** [1] - 4362:13
**signed** [2] - 4358:20, 4359:9
**significance** [6] - 4151:24, 4152:3, 4169:19, 4183:13, 4205:19, 4322:23
**significant** [26] - 4118:15, 4125:23, 4126:23, 4127:7, 4127:11, 4128:11, 4131:10, 4162:8, 4162:11, 4164:24, 4166:8, 4184:24, 4195:25, 4196:25, 4214:11, 4227:8, 4229:8, 4237:18, 4270:23, 4272:21, 4277:18, 4282:22, 4301:11, 4337:4, 4356:4, 4375:22
**significantly** [8] - 4121:11, 4166:3,

4166:6, 4182:13, 4182:25, 4183:16, 4206:10, 4375:19
**signing** [5] - 4130:14, 4131:9, 4131:14, 4131:18, 4340:24
**signings** [1] - 4379:12
**Silverman** [2] - 4288:5, 4369:7
**Silverman's** [2] - 4259:25, 4314:11
**similar** [8] - 4133:20, 4144:5, 4164:25, 4230:22, 4275:10, 4322:2, 4324:23, 4337:19
**similarly** [4] - 4177:9, 4197:14, 4219:6, 4228:1
**simply** [5] - 4187:1, 4236:16, 4296:15, 4300:5, 4370:12
**simultaneously** [1] - 4277:9
**single** [14] - 4164:12, 4183:17, 4183:20, 4183:23, 4183:25, 4184:5, 4184:6, 4188:17, 4204:6, 4204:8, 4227:15, 4227:20, 4228:18, 4251:12
**single-digit** [2] - 4227:15, 4228:18
**single-homing** [7] - 4164:12, 4183:17, 4183:20, 4183:23, 4183:25, 4184:5, 4184:6
**sit** [5] - 4124:6, 4135:22, 4136:22, 4138:16, 4172:4, 4226:16, 4243:25, 4272:2, 4278:18, 4280:16
**sitting** [1] - 4347:7
**situation** [12] - 4182:5, 4193:22, 4209:14, 4215:10, 4218:1, 4219:11, 4220:19, 4221:6, 4235:7, 4243:10, 4350:23, 4370:1
**situations** [9] - 4119:2, 4189:5, 4208:8, 4209:16, 4215:18, 4217:3, 4218:19, 4219:2, 4219:6
**six** [5] - 4247:14, 4247:19, 4251:23, 4254:23, 4364:1
**size** [24] - 4122:7, 4123:8, 4123:12, 4125:2, 4125:13, 4125:21, 4128:1, 4128:3, 4202:18, 4204:20, 4205:5, 4205:10, 4205:14, 4205:15, 4205:20, 4235:20, 4236:13, 4250:18, 4294:23, 4312:13, 4313:20, 4313:22, 4314:2
**SkyMiles** [10] - 4131:23, 4132:7, 4133:4, 4133:25, 4136:14, 4252:20, 4252:23, 4253:18, 4254:3, 4254:5
**slide** [16] - 4266:14, 4266:15, 4266:17, 4267:3, 4279:5, 4279:10, 4281:16, 4315:2, 4317:17, 4320:24, 4375:9, 4376:14, 4378:13, 4379:7, 4380:20
**slides** [4] - 4266:14, 4279:5, 4279:10, 4280:11
**slight** [1] - 4285:6
**slightly** [2] - 4201:13, 4265:5
**slopes** [1] - 4143:20
**slow** [1] - 4237:6
**slowly** [2] - 4330:10, 4373:3
**slump** [1] - 4374:3
**small** [28] - 4127:17, 4127:24, 4128:6, 4153:20, 4154:5, 4158:6, 4158:19, 4203:18, 4227:5, 4227:11, 4228:8, 4233:22, 4233:25, 4234:7, 4234:8,

4234:21, 4235:4, 4235:19, 4235:21, 4293:14, 4294:23, 4313:13, 4313:17, 4313:18, 4316:1, 4317:15, 4331:7, 4364:25
**smaller** [15] - 4125:12, 4125:21, 4126:22, 4127:5, 4145:1, 4152:17, 4152:25, 4153:3, 4202:3, 4202:4, 4206:3, 4206:10, 4217:6, 4217:21, 4249:20
**Smart** [1] - 4307:9
**so-called** [5] - 4143:2, 4144:20, 4212:8, 4313:17, 4313:18
**society** [1] - 4306:8
**sold** [1] - 4292:3
**solely** [4] - 4172:22, 4175:24, 4275:22, 4371:25
**solid** [2] - 4142:25, 4143:7
**someone** [8] - 4136:6, 4168:24, 4179:19, 4227:6, 4245:17, 4359:9, 4379:20, 4380:5
**sometimes** [8] - 4183:11, 4184:2, 4265:16, 4268:11, 4285:11, 4285:16, 4295:10, 4302:10, 4374:16, 4374:17, 4374:18, 4374:19, 4374:24, 4374:25
**somewhat** [5] - 4150:24, 4164:8, 4169:22, 4197:24, 4381:11
**somewhere** [1] - 4285:19
**songs** [1] - 4379:18
**sophisticated** [3] - 4220:24, 4272:18, 4304:18
**sorry** [35] - 4120:11, 4122:19, 4122:23, 4124:25, 4133:10, 4143:16, 4145:13, 4145:15, 4149:6, 4150:1, 4163:6, 4165:13, 4167:24, 4170:6, 4176:19, 4176:20, 4187:20, 4189:6, 4202:21, 4217:14, 4224:21, 4224:24, 4243:3, 4244:17, 4244:24, 4245:12, 4274:11, 4275:1, 4276:8, 4283:1, 4283:22, 4304:6, 4314:22, 4335:3, 4336:11
**sort** [15] - 4135:7, 4138:6, 4142:15, 4144:10, 4194:6, 4272:18, 4285:12, 4291:24, 4304:19, 4327:16, 4328:1, 4352:10, 4365:5, 4370:3
**sorts** [1] - 4305:8
**sought** [3] - 4189:25, 4250:15, 4250:22
**sound** [1] - 4264:12
**sounds** [11] - 4126:13, 4126:25, 4132:1, 4202:15, 4216:5, 4223:13, 4231:5, 4264:3, 4291:19, 4382:5, 4382:7
**source** [9] - 4125:14, 4125:23, 4126:23, 4127:7, 4153:14, 4258:5, 4258:6, 4258:7, 4258:8
**sources** [1] - 4126:11
**Southwest** [5] - 4171:9, 4191:20, 4191:22, 4191:24, 4191:25
**space** [1] - 4265:10
**speaking** [1] - 4320:17
**speaks** [1] - 4181:21
**specialized** [1] - 4335:23
**specific** [13] - 4135:22, 4143:25, 4150:14, 4181:23, 4197:2, 4197:9,

4213:9, 4214:12, 4238:6, 4256:5, 4260:4, 4269:24, 4304:9
**specifically** [13] - 4122:3, 4172:3, 4183:6, 4195:22, 4197:18, 4200:18, 4226:3, 4226:17, 4231:20, 4232:9, 4248:22, 4332:15, 4346:17
**speculating** [2] - 4165:20, 4166:12
**speech** [6] - 4263:13, 4264:9, 4366:24, 4367:8, 4371:18, 4374:5
**spell** [1] - 4290:20
**spend** [53] - 4121:18, 4137:25, 4162:16, 4184:25, 4185:9, 4185:22, 4204:24, 4212:8, 4227:16, 4227:19, 4227:20, 4228:3, 4228:20, 4236:11, 4280:2, 4296:23, 4297:18, 4297:21, 4298:4, 4301:6, 4303:7, 4303:11, 4303:14, 4303:16, 4303:22, 4304:1, 4304:8, 4304:15, 4304:19, 4309:3, 4309:4, 4309:15, 4310:7, 4310:15, 4311:2, 4315:10, 4316:23, 4316:24, 4320:4, 4325:6, 4325:8, 4326:24, 4329:19, 4332:18, 4336:3, 4342:4, 4347:11, 4355:19, 4368:17, 4368:20, 4370:18, 4374:21
**spend-centric** [2] - 4303:7, 4320:4
**spending** [21] - 4185:7, 4258:4, 4296:3, 4297:5, 4297:7, 4297:11, 4300:1, 4304:11, 4304:13, 4304:15, 4307:21, 4332:4, 4332:6, 4332:14, 4332:20, 4332:22, 4333:6, 4334:3, 4339:22, 4339:24, 4361:19
**spent** [2] - 4191:7, 4191:9
**spilled** [1] - 4344:3
**spillover** [9] - 4169:6, 4169:9, 4169:19, 4339:8, 4339:10, 4339:11, 4339:17, 4339:21, 4343:5
**spills** [1] - 4339:13
**spiral** [1] - 4204:18
**sponsor** [5] - 4344:13, 4345:2, 4357:10, 4358:1, 4358:2
**sponsored** [1] - 4344:11
**sponsorship** [2] - 4344:25, 4345:2
**sponsorships** [3] - 4343:18, 4344:10, 4344:20
**spread** [5] - 4329:22, 4343:5, 4344:3, 4356:9, 4357:6
**spreads** [2] - 4356:7, 4357:5
**Spring** [1] - 4207:5
**square** [1] - 4276:16
**squeezed** [1] - 4346:25
**SSNIP** [3] - 4147:3, 4279:16, 4279:17
**staff** [2] - 4121:12, 4374:23
**stamp** [1] - 4315:3, 4368:3
**stamps** [1] - 4348:4
**stand** [12] - 4114:20, 4124:8, 4124:9, 4149:18, 4164:20, 4170:5, 4271:7, 4288:17, 4290:18, 4307:3, 4325:1, 4354:7
**standardization** [1] - 4208:2
**standpoint** [14] - 4294:18, 4295:4, 4297:23, 4301:6, 4306:5, 4307:14,

4322:3, 4338:21, 4342:2, 4343:24, 4343:25, 4366:11, 4366:14, 4380:10
**stands** [3] - 4287:18, 4331:10, 4353:20
**start** [7] - 4114:17, 4279:9, 4281:11, 4285:7, 4285:25, 4296:6, 4347:22
**started** [12] - 4176:14, 4212:6, 4238:18, 4267:2, 4298:9, 4317:4, 4330:8, 4330:9, 4334:2, 4372:16, 4373:3
**starting** [2] - 4307:2, 4314:12
**starts** [1] - 4230:11
**Starwood** [1] - 4135:16
**STATE** [3] - 4112:23, 4113:1, 4113:4
**state** [7] - 4114:2, 4131:21, 4152:24, 4164:6, 4207:21, 4241:8, 4290:19
**Statement** [4] - 4229:14, 4229:21, 4230:5, 4239:2
**statement** [34] - 4118:19, 4124:10, 4124:16, 4124:17, 4139:5, 4147:17, 4149:17, 4151:9, 4158:18, 4163:3, 4169:23, 4170:4, 4173:6, 4173:13, 4173:16, 4177:7, 4179:12, 4184:6, 4206:1, 4207:12, 4208:13, 4209:22, 4209:23, 4210:4, 4221:18, 4229:20, 4230:22, 4239:1, 4239:2, 4239:7, 4240:10, 4287:1, 4300:7, 4308:24
**statements** [2] - 4125:12, 4352:22
**states** [2] - 4114:8, 4243:6
**STATES** [4] - 4112:1, 4112:3, 4112:3, 4112:14
**States** [10] - 4112:6, 4114:4, 4184:17, 4223:1, 4230:6, 4243:22, 4274:16, 4287:15, 4295:16, 4325:6
**static** [1] - 4356:18
**stating** [3] - 4377:18, 4378:18, 4378:22
**stations** [1] - 4300:25
**stature** [1] - 4323:18
**staunching** [1] - 4373:16
**stay** [1] - 4381:8
**stayed** [2] - 4128:14, 4337:21
**staying** [1] - 4185:24
**stays** [2] - 4278:11, 4356:18
**steadily** [1] - 4327:16
**steer** [25] - 4170:15, 4192:10, 4192:21, 4193:10, 4193:12, 4193:15, 4199:23, 4200:1, 4227:1, 4227:7, 4227:14, 4228:5, 4233:17, 4233:19, 4234:2, 4237:25, 4241:25, 4242:17, 4242:20, 4242:21, 4242:25, 4271:18, 4271:20, 4272:3, 4272:14
**steered** [7] - 4192:24, 4194:1, 4200:8, 4221:21, 4221:25, 4222:12, 4222:21
**steering** [29] - 4193:19, 4193:23, 4194:5, 4194:7, 4223:18, 4226:21, 4227:9, 4227:25, 4228:2, 4228:24, 4232:21, 4232:25, 4233:9, 4233:10, 4233:11, 4234:15, 4234:24, 4235:9, 4235:12, 4237:4, 4237:14, 4237:17, 4237:20, 4237:23, 4238:21, 4238:24, 4242:23, 4250:4
**steering's** [1] - 4194:5
**steers** [1] - 4233:7

**stenography** [1] - 4113:21
**step** [2] - 4247:13, 4255:11
**Steps** [1] - 4362:23
**steps** [4] - 4246:10, 4285:10, 4288:18, 4351:25
**stereo** [1] - 4208:8
**Steve** [1] - 4371:2
**stifled** [1] - 4350:15
**still** [23] - 4114:23, 4127:11, 4154:5, 4176:15, 4179:17, 4195:12, 4199:3, 4199:5, 4199:6, 4199:7, 4201:24, 4202:4, 4206:3, 4206:7, 4209:2, 4223:7, 4263:5, 4330:7, 4330:10, 4344:16, 4344:17, 4355:21, 4356:2
**stimulated** [1] - 4197:10
**stolen** [1] - 4309:23
**stop** [4] - 4165:5, 4192:19, 4241:21, 4373:25
**store** [7] - 4168:22, 4168:24, 4222:17, 4222:18, 4284:7, 4284:18, 4366:5
**stores** [5] - 4308:2, 4330:9, 4330:12, 4330:13, 4330:17
**story** [3] - 4161:16, 4323:3, 4342:4
**Strategic** [1] - 4291:24
**strategic** [4] - 4331:3, 4331:15, 4331:24, 4331:25
**strategies** [5] - 4316:10, 4316:19, 4321:8, 4331:16, 4331:19
**Strategy** [4] - 4197:13, 4314:13, 4314:15, 4348:15
**strategy** [23] - 4122:10, 4123:17, 4123:24, 4148:2, 4152:7, 4182:10, 4211:20, 4211:23, 4303:22, 4303:23, 4312:7, 4315:8, 4320:4, 4330:24, 4333:2, 4336:13, 4336:15, 4337:20, 4341:6, 4350:9, 4369:14, 4369:15, 4370:22
**Street** [2] - 4112:17, 4241:7
**strength** [2] - 4204:13, 4338:24
**strengthen** [1] - 4195:8
**strengthening** [1] - 4204:17
**strict** [3] - 4184:4, 4184:5, 4184:7
**strong** [7] - 4208:3, 4208:19, 4209:9, 4226:25, 4294:1, 4304:21, 4380:14
**stronger** [2] - 4218:23, 4309:8
**strongest** [1] - 4183:24
**strongly** [5] - 4297:9, 4315:25, 4319:9, 4342:6, 4357:8
**struck** [1] - 4345:17
**structural** [1] - 4367:14
**structure** [3] - 4259:18, 4259:20, 4305:15
**structures** [2] - 4191:12, 4191:16
**STUART** [1] - 4113:10
**studied** [3] - 4213:13, 4213:20, 4213:21
**studies** [1] - 4214:7
**Study** [1] - 4353:19
**study** [6] - 4211:25, 4213:25, 4214:3, 4214:7, 4214:12, 4228:17
**Stuy** [1] - 4319:15
**suasion** [1] - 4361:22

sub [3] - 4241:18, 4242:3, 4242:12
subheadings [1] - 4317:23
subject [23] - 4168:14, 4179:1, 4186:21, 4192:9, 4194:4, 4206:14, 4221:3, 4222:24, 4223:18, 4223:23, 4224:1, 4235:15, 4241:6, 4242:1, 4242:18, 4243:7, 4264:14, 4264:20, 4272:23, 4314:19, 4324:6, 4374:17, 4381:11
subjects [3] - 4374:22, 4374:24, 4375:1
submit [2] - 4134:18, 4134:22
subparagraph [1] - 4241:14
subprime [1] - 4319:25
subscriber [1] - 4258:25
subscribers [1] - 4258:17
subset [1] - 4136:15
substance [1] - 4221:11
substantial [19] - 4119:15, 4258:18, 4259:2, 4269:10, 4296:12, 4301:13, 4301:25, 4319:11, 4331:1, 4337:5, 4339:24, 4340:3, 4340:18, 4343:18, 4362:19, 4373:19, 4373:21, 4378:20, 4380:13
substantially [7] - 4219:13, 4299:5, 4304:12, 4320:22, 4340:2, 4368:10, 4380:12
substitute [2] - 4162:14, 4362:12
succeed [1] - 4350:11
succeeded [1] - 4217:15
success [7] - 4161:25, 4349:10, 4349:14, 4350:10, 4351:12, 4353:1, 4371:15
Success [1] - 4348:15
successful [5] - 4165:6, 4182:10, 4233:11, 4362:17, 4369:25
successfully [2] - 4217:19, 4361:21
sudden [1] - 4322:4
sufficient [4] - 4118:24, 4237:13, 4270:23, 4288:8
suggest [2] - 4229:7, 4242:24
suggesting [1] - 4138:8
suggestion [1] - 4345:7
suggests [1] - 4237:21
Suite [1] - 4112:17
sum [2] - 4146:4, 4175:20
summarized [1] - 4221:12
summarizes [1] - 4354:5
Summary [2] - 4353:18, 4375:13
summary [1] - 4354:4
sundries [1] - 4280:8
superior [2] - 4212:19, 4264:22
supermarkets [2] - 4212:7, 4300:25
supplier [1] - 4218:18
suppliers [3] - 4188:6, 4188:9, 4218:14
supply [3] - 4145:6, 4211:21, 4338:15
support [1] - 4122:15
supporting [1] - 4307:5
supports [1] - 4122:14
suppose [7] - 4156:18, 4179:25, 4180:6, 4212:10, 4212:14, 4217:15, 4217:25
supposed [1] - 4205:24

suppressed [1] - 4287:20
suppresses [1] - 4339:12
Supreme [1] - 4113:2
surcharging [2] - 4243:12, 4243:16
surgery [1] - 4156:1
surprise [10] - 4153:5, 4170:17, 4190:2, 4190:6, 4211:11, 4211:16, 4211:18, 4211:19, 4231:12, 4236:8
surprised [6] - 4122:16, 4126:3, 4128:5, 4179:20, 4190:12, 4211:3
surprising [4] - 4153:11
surrebuttal [5] - 4157:1, 4157:2, 4231:17, 4231:25, 4237:3
surround [1] - 4362:9
surveys [2] - 4265:20, 4267:17
survival [4] - 4351:6
survive [4] - 4203:18, 4250:17, 4251:18, 4310:21
SUSAN [1] - 4112:21
suspect [1] - 4272:17
suspicion [4] - 4253:15
sustain [2] - 4208:12, 4250:13
sustainable [1] - 4369:23
SWAINE [1] - 4113:7
swimming [1] - 4312:17
swiped [1] - 4308:19
switch [4] - 4266:3, 4316:12, 4355:24, 4356:4
sword [1] - 4169:1
sworn [4] - 4117:14, 4263:9, 4290:18, 4291:5
synonymous [1] - 4265:6
system [13] - 4125:5, 4125:7, 4142:19, 4166:18, 4203:18, 4208:3, 4208:5, 4208:23, 4208:24, 4209:2, 4209:10, 4308:20, 4316:13
systematic [1] - 4232:12
Systems [2] - 4207:3, 4372:6
systems [14] - 4125:3, 4190:23, 4191:1, 4206:12, 4208:4, 4208:19, 4209:8, 4209:10, 4209:19, 4250:15, 4250:16, 4250:22, 4337:14, 4348:24

## T

T&E [15] - 4144:18, 4255:5, 4255:13, 4255:15, 4330:8, 4330:11, 4330:24, 4331:22, 4332:15, 4334:14, 4334:20, 4334:21, 4334:22, 4335:1, 4337:20
tab [4] - 4120:14, 4163:5, 4304:5, 4327:9
table [17] - 4132:19, 4133:12, 4133:20, 4144:1, 4149:6, 4149:18, 4149:19, 4154:24, 4155:9, 4167:24, 4168:1, 4247:18, 4247:20, 4248:1, 4290:10
Table [4] - 4132:19, 4133:23, 4148:25, 4155:9
tables [1] - 4133:11, 4154:23, 4154:25
tactic [2] - 4216:7, 4217:1
tactics [3] - 4316:19, 4321:1, 4321:8
tag [1] - 4362:10

talks [2] - 4204:1, 4249:15
target [4] - 4197:14, 4308:2, 4308:5, 4308:18
targeted [12] - 4305:21, 4306:4, 4308:5, 4311:17, 4321:25, 4324:22, 4328:2, 4328:4, 4328:21, 4328:23, 4330:18, 4337:16
targeting [2] - 4309:6, 4361:24
task [4] - 4238:2, 4238:6, 4306:19, 4306:20
tat [1] - 4363:11
team [1] - 4374:25
tear [2] - 4209:10, 4209:17
tearing [1] - 4156:1
technical [1] - 4236:18
technology [9] - 4166:20, 4271:22, 4272:5, 4307:14, 4323:9, 4336:16, 4353:9, 4369:23, 4373:22
ten [14] - 4129:25, 4156:15, 4161:3, 4197:25, 4261:15, 4282:7, 4282:24, 4283:11, 4284:7, 4284:19, 4288:20, 4289:24, 4323:14, 4326:14
ten-minute [2] - 4261:15, 4323:14
tend [7] - 4162:20, 4163:13, 4200:21, 4208:12, 4232:23, 4250:13, 4304:1
tended [2] - 4256:4, 4330:21
tendency [3] - 4201:21, 4208:2, 4208:5
tends [1] - 4265:3
TENNESSEE [1] - 4112:6
Tennis [1] - 4344:23
tenure [1] - 4206:23
term [12] - 4184:1, 4210:5, 4218:17, 4219:5, 4219:9, 4319:6, 4344:1, 4345:1, 4352:14, 4362:7, 4371:15
terminals [1] - 4309:11
terminate [1] - 4193:25
terminating [1] - 4194:11
terminology [2] - 4173:11, 4238:15
terms [14] - 4127:13, 4138:23, 4150:11, 4168:15, 4173:4, 4193:19, 4236:20, 4324:11, 4335:4, 4337:22, 4356:5, 4360:18, 4381:19
terrific [1] - 4302:12
terrified [1] - 4343:23
terrifying [1] - 4338:7
Test [3] - 4146:21, 4147:12, 4283:16
test [5] - 4147:3, 4237:6, 4266:13, 4279:15
testified [38] - 4117:14, 4119:21, 4121:21, 4125:2, 4126:16, 4126:20, 4128:18, 4138:19, 4151:4, 4160:13, 4160:14, 4165:4, 4172:22, 4182:8, 4186:1, 4190:17, 4191:19, 4196:13, 4196:23, 4210:16, 4210:17, 4210:19, 4213:1, 4219:19, 4221:11, 4225:23, 4226:11, 4231:8, 4237:12, 4237:20, 4255:1, 4263:9, 4280:20, 4291:5, 4322:12, 4331:2, 4345:11, 4369:7
testify [5] - 4315:23, 4322:16, 4348:11, 4350:13, 4372:13
testifying [6] - 4122:2, 4122:11,

4122:13, 4135:24, 4277:6, 4322:23
**testimony** [102] - 4116:16, 4120:8, 4120:18, 4122:19, 4123:19, 4124:8, 4124:9, 4124:12, 4125:18, 4126:19, 4127:2, 4127:18, 4127:22, 4127:23, 4128:1, 4128:18, 4135:17, 4135:18, 4139:16, 4145:8, 4150:17, 4150:24, 4151:13, 4151:14, 4151:24, 4152:1, 4152:4, 4152:13, 4153:13, 4163:25, 4164:18, 4164:19, 4165:22, 4165:25, 4172:4, 4173:1, 4177:5, 4178:18, 4178:20, 4178:23, 4178:25, 4180:24, 4180:25, 4181:21, 4182:7, 4191:1, 4191:3, 4191:19, 4191:22, 4192:3, 4202:10, 4203:1, 4210:21, 4211:5, 4211:7, 4211:9, 4211:10, 4214:3, 4214:15, 4214:21, 4214:24, 4215:11, 4216:2, 4216:3, 4216:6, 4224:13, 4225:20, 4225:21, 4226:4, 4226:6, 4227:1, 4228:6, 4231:11, 4234:25, 4236:10, 4238:1, 4238:2, 4238:4, 4259:25, 4260:1, 4260:4, 4260:5, 4261:14, 4272:23, 4273:11, 4273:19, 4274:15, 4278:4, 4278:9, 4285:19, 4311:6, 4313:11, 4314:11, 4322:15, 4345:7, 4351:14, 4357:9, 4359:2, 4359:18, 4372:17, 4374:5
**testimony's** [1] - 4311:10
**Texas** [2] - 4112:23, 4112:25
**TEXAS** [2] - 4112:6, 4112:23
**text** [4] - 4116:6, 4138:17, 4225:25, 4238:23
**THE** [246] - 4112:13, 4112:16, 4112:23, 4113:1, 4113:4, 4113:7, 4113:18, 4114:1, 4114:2, 4114:5, 4114:9, 4114:12, 4114:15, 4114:19, 4114:21, 4114:22, 4114:23, 4115:14, 4115:17, 4115:19, 4115:24, 4116:2, 4116:5, 4116:15, 4116:22, 4116:24, 4116:25, 4117:7, 4121:15, 4124:21, 4125:1, 4128:17, 4134:22, 4139:13, 4139:21, 4139:24, 4140:1, 4140:3, 4140:8, 4141:14, 4141:18, 4141:20, 4141:24, 4142:1, 4142:7, 4142:9, 4145:12, 4145:14, 4145:17, 4145:21, 4146:1, 4154:14, 4154:16, 4154:19, 4154:22, 4155:3, 4155:5, 4155:11, 4155:13, 4155:15, 4155:19, 4155:22, 4155:23, 4156:4, 4156:6, 4156:10, 4156:15, 4156:18, 4164:3, 4166:23, 4167:2, 4167:4, 4167:6, 4168:5, 4170:10, 4170:13, 4173:18, 4173:22, 4173:24, 4173:25, 4181:7, 4197:25, 4199:1, 4199:7, 4199:9, 4207:14, 4214:22, 4214:25, 4218:4, 4218:6, 4220:5, 4228:6, 4228:11, 4228:13, 4239:19, 4239:23, 4240:1, 4240:3, 4240:16, 4244:6, 4244:19, 4244:22, 4245:2, 4245:7, 4245:8, 4245:24, 4247:18, 4247:23, 4248:3, 4253:10, 4253:11, 4253:14, 4253:16, 4257:7, 4257:9, 4257:12, 4257:13, 4257:15, 4257:16,

4257:21, 4257:25, 4261:6, 4261:9, 4261:11, 4261:14, 4261:19, 4261:23, 4263:2, 4263:5, 4263:7, 4266:6, 4266:16, 4266:18, 4266:19, 4272:9, 4272:17, 4273:5, 4274:12, 4274:19, 4283:10, 4283:13, 4284:21, 4285:1, 4285:2, 4285:6, 4285:14, 4285:16, 4285:22, 4285:24, 4286:7, 4286:9, 4286:10, 4286:12, 4286:16, 4286:17, 4286:19, 4286:20, 4286:23, 4288:8, 4288:10, 4288:13, 4288:14, 4288:15, 4288:16, 4288:17, 4288:19, 4288:25, 4289:2, 4289:7, 4289:19, 4290:2, 4290:7, 4290:11, 4290:13, 4290:15, 4290:19, 4290:21, 4290:23, 4291:1, 4291:3, 4316:14, 4323:14, 4323:16, 4323:21, 4323:22, 4323:24, 4324:1, 4324:2, 4324:4, 4330:15, 4335:3, 4335:6, 4335:7, 4335:9, 4335:14, 4335:15, 4335:17, 4335:19, 4335:22, 4336:4, 4336:7, 4336:9, 4336:10, 4336:11, 4341:1, 4341:5, 4344:5, 4344:7, 4344:14, 4344:15, 4344:18, 4344:19, 4344:20, 4344:22, 4344:23, 4344:25, 4345:19, 4345:22, 4348:12, 4351:20, 4355:2, 4359:14, 4359:18, 4359:25, 4360:2, 4360:7, 4361:11, 4363:25, 4364:3, 4364:4, 4364:8, 4367:23, 4375:5, 4377:2, 4377:5, 4380:6, 4380:8, 4380:16, 4381:12, 4381:19, 4381:23, 4382:2, 4382:7, 4382:10, 4382:13, 4385:9, 4259:10
**themselves** [5] - 4217:16, 4219:17, 4220:1, 4226:5, 4259:10
**theoretically** [1] - 4189:15
**theory** [6] - 4177:16, 4189:17, 4213:10, 4277:21, 4278:2, 4278:16
**thereby** [1] - 4211:15
**therefore** [7] - 4115:7, 4138:21, 4219:23, 4235:14, 4258:22, 4277:25, 4345:12
**they've** [7] - 4179:7, 4179:18, 4255:15, 4295:25, 4303:20, 4346:7, 4349:6
**thick** [2] - 4142:15, 4144:10
**thinking** [13] - 4152:5, 4165:2, 4183:6, 4235:2, 4235:25, 4279:21, 4283:17, 4283:18, 4283:22, 4284:11, 4332:24, 4351:19, 4351:21
**thinks** [2] - 4163:15, 4268:22
**third** [12] - 4133:6, 4142:4, 4142:13, 4149:8, 4156:24, 4165:14, 4264:8, 4306:7, 4352:10, 4354:12, 4371:23, 4375:9
**thousand** [1] - 4239:10
**threat** [3] - 4340:12, 4352:12, 4352:15
**threatened** [1] - 4343:15
**three** [25] - 4115:16, 4116:12, 4116:24, 4123:3, 4126:11, 4224:20, 4224:25, 4233:4, 4237:9, 4241:14, 4241:16, 4246:12, 4272:12, 4280:12, 4280:21, 4282:24, 4308:7, 4308:13, 4329:3, 4341:2, 4347:20, 4350:22, 4370:1,

4381:21, 4382:6
**threshold** [2] - 4127:25, 4281:19
**throughout** [1] - 4187:23
**tier** [1] - 4345:2
**tiny** [1] - 4153:8
**tip** [6] - 4209:11, 4209:19, 4216:25, 4217:11, 4217:14, 4217:15
**tipping** [26] - 4201:11, 4201:17, 4202:1, 4202:13, 4203:19, 4203:20, 4208:5, 4208:7, 4208:12, 4208:20, 4209:3, 4209:6, 4210:2, 4217:6, 4217:17, 4217:18, 4217:20, 4217:22, 4219:14, 4248:19, 4249:14, 4250:13, 4251:8, 4251:17, 4265:7
**tit** [1] - 4363:11
**titanium** [1] - 4335:23
**title** [2] - 4206:15, 4320:25
**titled** [1] - 4314:12
**titles** [1] - 4171:7
**today** [25] - 4162:16, 4194:18, 4206:2, 4223:8, 4226:9, 4232:4, 4233:14, 4237:5, 4256:9, 4259:21, 4260:7, 4260:16, 4280:17, 4295:16, 4313:19, 4323:18, 4326:23, 4334:24, 4337:22, 4345:7, 4346:5, 4349:25, 4363:24, 4365:9, 4365:11
**together** [9] - 4149:19, 4168:20, 4187:7, 4226:24, 4234:14, 4258:16, 4304:18, 4367:10, 4370:17
**Tom** [3] - 4360:13, 4361:2, 4361:3
**TOMBRAS** [1] - 4112:21
**tomorrow** [2] - 4381:24, 4382:13
**took** [10] - 4130:4, 4161:14, 4172:13, 4192:2, 4332:9, 4352:1, 4358:12, 4365:4, 4373:16, 4373:23
**top** [20] - 4116:10, 4116:18, 4116:24, 4139:19, 4142:16, 4143:12, 4143:13, 4143:16, 4144:11, 4158:5, 4230:11, 4241:3, 4267:10, 4275:1, 4314:19, 4345:2, 4348:20, 4368:6, 4378:23, 4380:24
**top-tier** [1] - 4345:2
**topic** [7] - 4169:22, 4197:24, 4201:10, 4322:10, 4323:13, 4325:4, 4363:23
**topics** [2] - 4199:12, 4200:11
**total** [5] - 4168:9, 4173:4, 4246:16, 4311:12, 4313:21
**totally** [3] - 4320:3, 4350:19, 4351:11
**tournament** [1] - 4344:23
**toward** [5] - 4134:3, 4203:22, 4208:2, 4314:19, 4366:17
**towards** [1] - 4204:16
**track** [6] - 4138:3, 4199:6, 4303:25, 4305:1, 4325:5
**tracked** [1] - 4327:19
**tracking** [2] - 4214:7, 4214:12
**traction** [2] - 4333:2, 4362:19
**tracts** [1] - 4210:24
**Traditional** [1] - 4149:4
**traditional** [1] - 4320:19
**traffic** [1] - 4308:2

**train** [1] - 4308:15
**training** [1] - 4308:17
**transaction** [6] - 4190:20, 4222:8, 4296:4, 4311:8, 4311:13, 4320:18
**transactions** [21] - 4153:1, 4172:1, 4190:10, 4202:19, 4204:21, 4205:6, 4205:10, 4205:22, 4206:4, 4206:8, 4206:10, 4266:24, 4266:25, 4267:11, 4281:19, 4282:2, 4282:8, 4282:24, 4283:11, 4310:8
**TRANSCRIPT** [1] - 4112:13
**transcript** [14] - 4113:21, 4113:22, 4122:21, 4137:3, 4137:12, 4139:14, 4139:24, 4140:4, 4140:7, 4141:19, 4163:5, 4167:1, 4179:21, 4179:22
**transfer** [2] - 4147:16, 4277:2
**Travel** [4] - 4292:13, 4331:11, 4354:8, 4380:21
**travel** [21] - 4129:6, 4129:21, 4133:20, 4134:13, 4144:6, 4212:2, 4292:14, 4309:21, 4310:1, 4311:16, 4328:5, 4328:23, 4332:22, 4333:5, 4333:8, 4333:11, 4333:21, 4336:1, 4337:21, 4380:25, 4381:5
**traveler** [2] - 4328:4, 4328:23
**traveler's** [1] - 4318:9
**travelers** [2] - 4212:3, 4292:14
**treat** [1] - 4264:19
**treatment** [3] - 4189:23, 4189:25, 4269:15
**tremendous** [3] - 4299:23, 4317:9, 4373:23
**trend** [1] - 4255:14
**TRIAL** [1] - 4112:13
**trial** [15] - 4114:2, 4138:19, 4139:24, 4140:4, 4151:4, 4165:4, 4179:21, 4189:20, 4210:17, 4226:11, 4289:20, 4289:23, 4311:5, 4336:7, 4346:8
**tried** [6] - 4135:24, 4197:14, 4217:13, 4280:25, 4282:10, 4282:15
**tries** [1] - 4150:20
**trigger** [1] - 4300:22
**trip** [3] - 4288:15, 4300:1, 4300:4
**TRIPOLITSIOTIS** [1] - 4113:14
**trough** [2] - 4373:8, 4373:15
**TRS** [6] - 4331:8, 4331:10, 4353:17, 4354:7, 4354:17, 4354:20
**true** [20] - 4119:2, 4119:24, 4131:14, 4150:14, 4156:20, 4176:1, 4176:9, 4176:23, 4177:9, 4179:4, 4222:4, 4227:18, 4235:23, 4256:12, 4259:23, 4260:7, 4260:14, 4268:25, 4329:24
**trust** [12] - 4296:7, 4296:24, 4302:22, 4303:2, 4318:13, 4338:24, 4339:4, 4351:15, 4351:16, 4372:17
**truth** [3] - 4303:12, 4353:7, 4353:10
**try** [3] - 4275:12, 4304:16, 4313:6
**trying** [14] - 4137:5, 4156:13, 4165:5, 4205:13, 4225:1, 4252:12, 4252:13, 4254:16, 4255:25, 4321:20, 4321:23, 4338:13, 4346:25, 4351:12

**turn** [28] - 4121:13, 4122:21, 4137:11, 4207:18, 4221:3, 4230:10, 4240:23, 4248:11, 4248:15, 4250:7, 4263:12, 4263:18, 4270:6, 4270:8, 4270:15, 4279:3, 4287:4, 4305:7, 4317:17, 4337:25, 4347:14, 4348:3, 4360:9, 4368:3, 4371:18, 4375:9, 4376:14, 4380:20
**turned** [1] - 4239:5
**turns** [4] - 4186:13, 4186:14, 4225:3, 4244:25
**TV** [1] - 4208:9
**two** [79] - 4115:3, 4115:9, 4115:11, 4116:14, 4118:21, 4121:6, 4127:6, 4134:17, 4135:24, 4142:25, 4143:12, 4143:17, 4143:20, 4143:21, 4145:6, 4146:10, 4146:19, 4146:20, 4147:13, 4154:3, 4154:4, 4154:11, 4154:13, 4154:19, 4154:25, 4160:9, 4160:14, 4169:1, 4175:21, 4176:1, 4177:2, 4177:6, 4179:4, 4188:5, 4206:19, 4209:22, 4210:10, 4211:17, 4218:14, 4218:22, 4218:24, 4219:6, 4227:8, 4233:5, 4240:14, 4242:15, 4244:25, 4245:2, 4245:13, 4245:21, 4250:16, 4256:2, 4258:16, 4261:2, 4264:14, 4264:19, 4266:7, 4266:11, 4281:12, 4281:25, 4282:2, 4282:11, 4283:19, 4284:1, 4284:5, 4288:21, 4289:6, 4292:1, 4328:18, 4338:11, 4341:9, 4347:20, 4350:15, 4350:20, 4361:20, 4369:8, 4371:13, 4375:18
**two-edge** [1] - 4169:1
**two-sided** [20] - 4118:21, 4146:10, 4146:19, 4146:20, 4147:13, 4154:3, 4154:4, 4160:9, 4160:14, 4175:21, 4176:1, 4177:2, 4179:4, 4211:17, 4258:16, 4261:2, 4264:14, 4264:19, 4369:8
**type** [7] - 4210:1, 4217:1, 4271:11, 4320:5, 4335:11, 4335:24, 4356:6
**types** [8] - 4136:10, 4136:12, 4137:18, 4150:6, 4280:6, 4294:16, 4306:3, 4321:12
**typewriter** [1] - 4208:10
**typical** [1] - 4251:2
**typically** [1] - 4311:7
**typo** [2] - 4116:9, 4116:20

# U

**U-shaped** [1] - 4278:21
**U.S** [32] - 4112:17, 4119:14, 4120:2, 4122:19, 4160:11, 4194:17, 4196:23, 4202:10, 4219:19, 4230:23, 4259:5, 4259:12, 4265:15, 4272:23, 4274:7, 4276:1, 4276:4, 4285:18, 4292:9, 4292:12, 4314:12, 4315:19, 4315:22, 4322:12, 4324:19, 4344:23, 4345:1, 4345:4, 4367:2, 4372:13, 4374:11, 4376:15
**U.S.A** [1] - 4112:17

**ubiquity** [6] - 4165:11, 4165:13, 4166:11, 4166:15, 4312:13, 4363:10
**Ultimate** [1] - 4377:10
**ultimate** [3] - 4377:14, 4377:22, 4378:6
**ultimately** [2] - 4147:6, 4334:8
**umbrella** [1] - 4148:8
**unable** [7] - 4153:21, 4158:6, 4158:19, 4190:8, 4227:25, 4228:1, 4287:15
**unbanked** [2] - 4318:18, 4318:19
**unbelievable** [1] - 4306:12
**unclear** [1] - 4150:24
**under** [25] - 4114:24, 4116:11, 4128:9, 4133:8, 4149:3, 4159:19, 4192:8, 4192:14, 4192:20, 4193:9, 4199:7, 4199:25, 4200:4, 4203:9, 4246:7, 4259:20, 4263:5, 4269:15, 4324:8, 4324:13, 4324:23, 4355:20, 4359:2, 4361:16, 4375:17
**under-banked** [3] - 4324:8, 4324:13, 4324:23
**under-invested** [1] - 4375:17
**underserved** [4] - 4317:23, 4318:2, 4318:21, 4324:23
**understood** [6] - 4116:24, 4175:23, 4205:13, 4212:22, 4215:10, 4275:22
**undertakes** [1] - 4221:7
**undertook** [1] - 4214:8
**underway** [1] - 4352:19
**unimportant** [1] - 4260:23
**unique** [3] - 4260:15, 4293:20, 4294:4
**uniqueness** [1] - 4336:19
**UNITED** [3] - 4112:1, 4112:3, 4112:14
**United** [12] - 4112:6, 4114:4, 4184:17, 4223:1, 4230:6, 4243:22, 4254:12, 4274:16, 4287:15, 4295:16, 4325:6
**units** [1] - 4134:7
**unlawful** [1] - 4269:20
**unless** [3] - 4162:18, 4363:25, 4372:21
**unlike** [1] - 4300:2
**unlikely** [3] - 4118:15, 4118:18, 4209:6
**unlock** [1] - 4317:21
**unmarked** [1] - 4156:6
**unpersuasive** [1] - 4232:15
**unprofitable** [9] - 4124:6, 4124:10, 4124:14, 4345:11, 4345:13, 4345:16, 4345:18, 4345:19
**unsound** [2] - 4172:18, 4172:21
**unusual** [1] - 4289:22
**up** [100] - 4116:1, 4120:1, 4133:7, 4138:25, 4152:14, 4160:25, 4161:10, 4164:6, 4166:23, 4167:2, 4167:6, 4172:5, 4174:4, 4174:23, 4175:2, 4175:20, 4177:3, 4178:12, 4178:13, 4178:20, 4178:21, 4179:15, 4179:16, 4180:1, 4180:8, 4180:16, 4180:20, 4180:21, 4181:17, 4181:20, 4181:24, 4186:2, 4186:4, 4186:14, 4186:15, 4186:16, 4186:17, 4189:20, 4190:18, 4191:24, 4192:3, 4193:11, 4202:12, 4209:9, 4209:18, 4213:10, 4219:15, 4220:12, 4243:9, 4244:4, 4244:5,

4256:13, 4256:25, 4257:9, 4257:14, 4260:3, 4276:24, 4278:10, 4282:2, 4285:16, 4285:25, 4286:5, 4288:6, 4288:20, 4298:11, 4302:11, 4302:12, 4304:4, 4305:17, 4308:24, 4309:23, 4310:9, 4311:11, 4311:18, 4311:20, 4311:21, 4311:23, 4319:15, 4321:23, 4322:10, 4324:6, 4326:15, 4329:18, 4329:23, 4340:24, 4343:23, 4344:13, 4346:5, 4352:10, 4364:25, 4365:6, 4366:17, 4375:19, 4375:22, 4376:8, 4376:10, 4378:5, 4379:20
**update** [1] - 4314:15
**Update** [3] - 4136:7, 4314:13, 4314:16
**updates** [2] - 4314:16, 4374:16
**upper** [1] - 4244:12
**USA** [1] - 4347:22
**usage** [1] - 4278:21
**useful** [2] - 4318:6, 4324:15
**user** [3] - 4162:24, 4163:21, 4208:24
**users** [3] - 4208:25, 4209:1, 4246:19
**uses** [5] - 4162:2, 4221:15, 4221:18, 4222:7, 4320:18
**UTAH** [1] - 4112:6
**utilities** [1] - 4366:2
**utility** [4] - 4300:12, 4363:8, 4363:12, 4379:15

---

## V

**vacuum** [2] - 4311:23, 4371:25
**vague** [1] - 4273:2
**value** [66] - 4125:8, 4128:20, 4129:5, 4130:4, 4132:9, 4132:10, 4132:12, 4133:3, 4146:2, 4146:3, 4146:7, 4146:13, 4146:15, 4146:18, 4147:1, 4161:24, 4163:16, 4163:22, 4178:13, 4180:7, 4180:9, 4180:19, 4181:17, 4185:12, 4185:16, 4185:17, 4203:23, 4204:17, 4211:14, 4255:1, 4255:6, 4255:20, 4255:24, 4256:3, 4256:4, 4271:16, 4272:2, 4296:4, 4301:13, 4302:7, 4302:13, 4308:25, 4309:9, 4310:17, 4313:2, 4320:8, 4320:25, 4321:3, 4321:4, 4321:6, 4340:1, 4342:3, 4342:4, 4347:2, 4369:23, 4371:9, 4371:10, 4372:4, 4372:7, 4372:19, 4373:19, 4379:16, 4379:21, 4381:7
**valued** [1] - 4138:22
**vantage** [1] - 4302:19, 4356:1
**variance** [2] - 4183:11, 4199:5
**variations** [1] - 4278:25
**variety** [6] - 4256:3, 4260:3, 4274:15, 4278:22, 4294:17, 4379:25
**various** [4] - 4127:24, 4137:6, 4189:24, 4238:21
**Varney** [2] - 4231:6, 4239:14
**vast** [4] - 4193:2, 4193:6, 4287:14, 4363:18
**vastly** [1] - 4362:11
**vendor** [1] - 4378:3

**veracity** [1] - 4324:4
**verdict** [1] - 4326:10
**VERMONT** [1] - 4112:6
**version** [4] - 4115:12, 4156:22, 4183:24, 4279:6
**versus** [8] - 4143:21, 4189:7, 4208:8, 4208:9, 4256:9, 4274:16, 4366:1
**vertical** [15] - 4117:24, 4117:25, 4119:6, 4119:10, 4186:25, 4187:4, 4187:17, 4187:22, 4188:23, 4189:2, 4189:12, 4189:16, 4269:14, 4269:15, 4269:19
**vertically** [1] - 4186:23
**vertically-related** [1] - 4186:23
**VHS** [1] - 4208:9
**VI** [7] - 4129:13, 4129:15, 4130:19, 4132:19, 4133:23, 4142:13, 4241:2
**viable** [1] - 4356:5
**vice** [1] - 4367:7
**Vice** [5] - 4292:3, 4292:5, 4292:6, 4292:7, 4292:10
**vice-chairman** [1] - 4367:7
**video** [1] - 4208:10
**view** [40] - 4135:4, 4150:13, 4151:4, 4162:20, 4166:9, 4174:8, 4174:13, 4175:20, 4178:14, 4186:6, 4186:8, 4194:3, 4194:4, 4194:8, 4195:12, 4197:2, 4197:10, 4210:7, 4212:15, 4215:16, 4216:7, 4225:1, 4225:15, 4226:4, 4274:7, 4274:8, 4279:22, 4298:20, 4331:24, 4332:8, 4332:9, 4332:10, 4332:16, 4332:21, 4338:9, 4349:24, 4350:7, 4350:24, 4359:5
**viewed** [2] - 4185:18, 4309:25
**viewers** [1] - 4258:17
**views** [4] - 4176:17, 4181:12, 4181:16, 4216:19
**violate** [1] - 4358:21
**violating** [1] - 4359:8
**violation** [2] - 4358:19, 4358:25
**virtual** [4] - 4299:9, 4299:22, 4334:5, 4379:17
**virtually** [1] - 4171:4
**virtuous** [1] - 4310:19
**Visa** [258] - 4119:14, 4119:22, 4120:2, 4120:9, 4120:22, 4121:24, 4122:19, 4125:2, 4125:13, 4125:22, 4126:17, 4126:20, 4126:21, 4127:2, 4127:4, 4127:12, 4148:20, 4149:4, 4149:10, 4149:13, 4149:15, 4149:16, 4149:18, 4149:25, 4150:5, 4150:9, 4150:21, 4151:21, 4152:2, 4152:18, 4153:1, 4153:4, 4165:11, 4165:15, 4165:16, 4166:3, 4166:11, 4171:12, 4174:17, 4175:9, 4182:14, 4183:17, 4184:11, 4187:11, 4190:9, 4190:19, 4191:6, 4191:11, 4192:7, 4192:20, 4193:3, 4193:6, 4193:9, 4193:12, 4193:16, 4194:16, 4194:18, 4195:4, 4195:15, 4195:25, 4196:8, 4196:11, 4196:21, 4196:23, 4196:24, 4197:4,

4197:6, 4197:11, 4197:14, 4197:20, 4199:22, 4200:24, 4202:10, 4202:14, 4203:2, 4204:8, 4204:11, 4204:12, 4204:15, 4210:11, 4210:14, 4210:17, 4210:20, 4210:24, 4210:25, 4211:7, 4211:12, 4211:16, 4211:19, 4211:22, 4211:23, 4212:10, 4213:14, 4213:17, 4214:1, 4214:7, 4214:12, 4214:16, 4214:19, 4215:10, 4215:14, 4215:23, 4216:1, 4216:7, 4216:10, 4217:11, 4219:15, 4219:19, 4222:22, 4223:1, 4223:16, 4223:19, 4226:6, 4226:19, 4226:23, 4227:7, 4228:19, 4229:10, 4229:13, 4229:22, 4230:12, 4230:24, 4231:21, 4232:8, 4232:13, 4233:13, 4233:23, 4234:5, 4234:14, 4235:4, 4235:13, 4235:16, 4235:17, 4236:2, 4236:15, 4239:9, 4240:7, 4241:10, 4241:23, 4241:25, 4242:4, 4242:19, 4247:3, 4247:8, 4248:23, 4249:5, 4249:7, 4249:8, 4249:14, 4249:23, 4250:5, 4250:10, 4256:9, 4256:13, 4256:15, 4256:19, 4257:2, 4258:8, 4258:9, 4258:12, 4259:5, 4259:8, 4259:12, 4259:15, 4265:8, 4265:9, 4265:15, 4270:12, 4271:11, 4271:17, 4271:23, 4272:11, 4272:19, 4272:23, 4274:7, 4285:19, 4287:9, 4294:5, 4294:9, 4294:11, 4295:20, 4303:10, 4304:10, 4304:13, 4306:17, 4312:13, 4312:19, 4312:22, 4313:4, 4313:6, 4315:16, 4315:22, 4316:5, 4316:21, 4321:9, 4322:12, 4329:11, 4329:17, 4329:20, 4329:21, 4330:6, 4338:13, 4338:20, 4339:2, 4340:10, 4346:2, 4347:18, 4347:22, 4348:1, 4348:3, 4348:8, 4348:14, 4349:12, 4349:17, 4350:14, 4350:16, 4351:19, 4351:21, 4351:24, 4352:6, 4353:19, 4354:6, 4358:16, 4358:20, 4358:23, 4359:4, 4361:17, 4361:24, 4362:8, 4362:9, 4362:12, 4362:17, 4362:18, 4363:2, 4363:16, 4363:21, 4364:14, 4364:23, 4364:24, 4365:8, 4365:11, 4365:14, 4365:16, 4365:19, 4366:1, 4366:4, 4366:6, 4366:10, 4374:1, 4376:1
**Visa's** [4] - 4209:24, 4215:20, 4352:16, 4356:21
**Visa-MasterCard** [1] - 4294:9
**Visa-preferred** [1] - 4362:9
**Visas** [1] - 4250:2
**visual** [1] - 4126:13
**VL** [2] - 4145:22
**volume** [45] - 4120:8, 4121:18, 4122:18, 4127:21, 4128:2, 4129:10, 4136:2, 4142:6, 4142:9, 4148:24, 4158:15, 4162:12, 4168:15, 4171:25, 4183:8, 4191:25, 4192:4, 4202:19, 4204:21, 4205:10, 4205:11, 4205:15, 4205:24, 4205:25, 4206:25, 4232:21, 4236:1, 4236:11, 4266:24, 4267:5, 4267:11, 4270:7, 4276:6, 4286:15, 4325:21,

4326:3, 4327:11, 4334:20, 4334:21, 4335:4, 4335:5, 4335:6, 4335:7, 4344:3, 4368:10
**Volume** [9] - 4159:8, 4163:5, 4195:1, 4215:2, 4224:17, 4230:3, 4231:25, 4240:20, 4240:21
**volumes** [2] - 4325:23, 4339:22
**voluntarily** [1] - 4246:15

## W

**W's** [1] - 4181:10
**Wait** [1] - 4371:3
**wait** [4] - 4115:22, 4122:14, 4319:16, 4371:12
**Wal** [4] - 4175:1, 4179:23, 4181:3, 4181:6
**Wal-Mart** [4] - 4175:1, 4179:23, 4181:3, 4181:6
**Walgreens** [6] - 4179:25, 4180:11, 4180:21, 4181:3, 4181:4, 4181:8
**walk** [2] - 4193:25, 4366:5
**walking** [1] - 4185:4
**Wall** [1] - 4241:7
**wallet** [4] - 4184:8, 4193:18, 4303:13, 4332:19
**wallets** [1] - 4185:5
**Walmart** [2] - 4318:17, 4324:16
**wants** [3] - 4215:5, 4312:18, 4324:17
**war** [1] - 4363:1
**Washington** [2] - 4112:18, 4290:11
**wasted** [1] - 4173:20
**waters** [1] - 4237:7
**Wayne** [1] - 4136:6
**ways** [12] - 4118:5, 4151:7, 4182:17, 4191:4, 4201:14, 4201:15, 4212:23, 4213:1, 4213:3, 4268:2, 4286:13, 4343:17
**weaken** [1] - 4349:11
**weakening** [2] - 4270:22, 4270:24
**weaker** [1] - 4218:24
**weakness** [1] - 4126:18
**WEDNESDAY** [1] - 4112:9
**week** [1] - 4371:14
**weighted** [1] - 4232:21
**welcome** [23] - 4290:2, 4290:11, 4290:13, 4296:23, 4303:2, 4303:4, 4338:25, 4339:4, 4347:12, 4351:16, 4353:7, 4353:11, 4357:18, 4359:12, 4362:21, 4370:18, 4372:5, 4372:6, 4372:8, 4372:15, 4372:18, 4372:22, 4374:5
**welcomed** [1] - 4310:17
**welfare** [9] - 4171:22, 4173:3, 4175:23, 4177:15, 4182:3, 4261:1, 4275:21, 4275:22
**Wells** [1] - 4293:3
**whereas** [3] - 4209:24, 4249:9, 4277:16
**white** [2] - 4208:9, 4328:1
**Whole** [5] - 4307:18, 4308:1, 4308:6, 4308:13, 4309:12

**whole** [4] - 4157:6, 4203:5, 4229:19, 4326:4
**wide** [4] - 4260:3, 4294:17, 4379:25, 4380:3
**wildfire** [1] - 4329:22
**willingly** [1] - 4359:9
**willingness** [1] - 4268:20
**Win** [1] - 4366:20
**win** [4] - 4186:12, 4325:3, 4369:4
**win-win** [1] - 4325:3
**wishes** [1] - 4218:5
**withstanding** [1] - 4216:15
**Witness** [1] - 4140:24
**witness** [46] - 4114:19, 4114:20, 4114:23, 4115:4, 4115:8, 4116:16, 4116:17, 4116:22, 4137:21, 4139:20, 4170:11, 4171:1, 4173:16, 4173:23, 4199:7, 4214:23, 4218:4, 4218:5, 4224:7, 4225:3, 4225:13, 4225:18, 4228:14, 4240:18, 4245:5, 4247:20, 4253:4, 4261:16, 4261:17, 4263:5, 4277:21, 4288:18, 4290:15, 4290:18, 4290:25, 4322:12, 4345:11, 4348:8, 4348:11, 4352:1, 4363:25, 4377:4, 4377:5, 4381:24, 4382:1, 4382:3
**WITNESS** [50] - 4114:22, 4116:23, 4155:23, 4156:4, 4173:24, 4199:9, 4214:22, 4218:6, 4244:6, 4244:22, 4245:2, 4245:8, 4253:11, 4257:9, 4257:13, 4257:16, 4263:7, 4266:19, 4272:17, 4285:1, 4285:6, 4285:16, 4285:24, 4286:9, 4286:12, 4286:17, 4286:20, 4288:14, 4288:16, 4290:21, 4291:3, 4323:21, 4323:24, 4324:2, 4335:6, 4335:14, 4335:17, 4335:22, 4336:7, 4336:10, 4344:7, 4344:15, 4344:19, 4344:22, 4344:25, 4345:22, 4364:3, 4380:8, 4382:15, 4383:3
**witness'** [4] - 4115:15, 4145:8, 4224:13, 4225:20
**witnesses** [6] - 4156:8, 4165:4, 4170:20, 4288:22, 4289:11, 4289:16
**won** [2] - 4141:1, 4297:10
**wonder** [1] - 4236:19
**wondering** [2] - 4204:2, 4359:21
**word** [8] - 4173:10, 4187:25, 4226:12, 4249:12, 4265:3, 4275:14, 4276:16, 4357:13
**words** [9] - 4116:10, 4116:14, 4116:18, 4161:16, 4210:7, 4293:8, 4357:9, 4357:12
**works** [9] - 4307:16, 4307:19, 4309:3, 4310:1, 4345:4, 4345:5, 4359:20, 4370:22
**world** [18] - 4177:23, 4178:1, 4178:5, 4178:10, 4178:12, 4179:16, 4182:11, 4185:25, 4193:21, 4194:13, 4209:16, 4234:4, 4235:24, 4236:24, 4325:7, 4350:20, 4362:9, 4365:6
**Worldwide** [3] - 4113:7, 4366:22, 4371:19

**worldwide** [2] - 4367:1, 4367:2
**worst** [1] - 4357:15
**worth** [2] - 4131:23, 4245:20
**writing** [1] - 4153:10
**written** [1] - 4115:14

## Y

**year** [18] - 4129:25, 4180:2, 4180:3, 4180:6, 4229:7, 4236:8, 4236:11, 4237:12, 4237:21, 4267:4, 4267:6, 4292:4, 4297:10, 4318:23, 4371:13, 4373:4
**year-over-year** [1] - 4267:6
**years** [33] - 4161:3, 4175:3, 4237:9, 4260:14, 4266:9, 4267:4, 4291:14, 4291:17, 4292:1, 4292:5, 4292:10, 4293:6, 4293:7, 4296:9, 4299:13, 4301:22, 4303:4, 4312:10, 4325:25, 4326:3, 4326:8, 4326:14, 4328:14, 4330:19, 4332:9, 4338:4, 4340:6, 4357:11, 4370:3, 4372:17, 4373:5, 4375:18, 4379:2
**yesterday** [11] - 4115:4, 4115:12, 4128:18, 4132:3, 4159:7, 4161:14, 4199:4, 4221:11, 4243:9, 4282:19, 4330:14
**YORK** [1] - 4112:1
**York** [7] - 4112:6, 4113:8, 4113:12, 4113:19, 4290:13
**you'** [1] - 4181:25
**yourself** [1] - 4224:12

## Z

**zero** [1] - 4312:19