UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>    Plaintiffs<br><br>                v.<br><br>AMERICAN EXPRESS CO., et al.,<br>    Defendants | **MEMORANDUM IN SUPPORT<br>OF PROPOSED<br>FINAL JUDGMENT AND<br>REMEDIAL ORDER<br>AS TO THE AMERICAN<br>EXPRESS DEFENDANTS**<br><br>No. 10-CV-04496 (NGG) |

# Table of Contents

I.     INTRODUCTION. ...................................................................................................... 1

II.    THE COURT HAS BROAD POWERS TO STOP AMEX'S UNLAWFUL CONDUCT AND TO ENSURE IT DOES NOT RECUR. ................................................................. 2

III.   THE PROPOSED JUDGMENT IS WELL CRAFTED TO STOP AMEX'S ANTITRUST VIOLATION AND PREVENT ITS RECURRENCE, WHILE PROTECTING AMEX'S LEGITIMATE BUSINESS INTERESTS. ....................................................................... 4

IV.   THE CORE STEERING PROVISIONS MUST GIVE BROAD FREEDOM TO MERCHANTS TO FOSTER COMPETITION. ............................................................... 5

   A.   Amex's Refusal To Specify How To Change Its NDPs Disregards The Court's Decision, Unnecessarily Defers Disputes, and Delays Restoration of Competition ........ 5

   B.   The Proposed Judgment Enables the Steering Envisioned by the Court's Decision. ...... 6

   C.   Amex's Proposal Imposes Restrictions on Steering that Perpetuate Harm to Competition. ........................................................................................................... 7

      1.   Amex's "Less-Expensive Card" Restriction Undermines the Remedy ...................... 8

      2.   Amex's "No General Steering" Restriction Undermines the Remedy. ...................... 11

      3.   Amex's "No Other Payment Forms" Restriction Undermines the Remedy. ............. 12

   D.   Amex's Proposed Loopholes Would Enable It to Undermine the Court's Decision and Reinstate Its Restraints. ...................................................................................... 14

      1.   Amex's Proposal for Special Dispensation to Terminate Merchants Who Steer Would Allow It to Continue to Impede Merchant Steering. ................................................... 14

      2.   Amex's "Marketing" Loophole Could Enable It to Continue to Restrict Competition. ……………………………………………………………………………16

      3.   Amex's Broad Loopholes Cannot Be Permitted to Undermine the "Required Conduct" Section of the Proposed Judgment. ............................................................ 17

   E.   Amex's Provisions to Deter Merchant Steering Undermine Effective Relief. ............. 18

      1.   Amex's Signage, Verbal and Online Steering Restrictions Would Deter Merchant Steering. ...................................................................................................................... 18

2.     Amex's Advance Notice Restrictions Would Deter Merchant Steering. ................... 21

V.     THE PROPOSED JUDGMENT INCLUDES REASONABLE CARVE-OUTS THAT
PROTECT AMEX'S LEGITIMATE BUSINESS INTERESTS. ................................... 22

A.     Plaintiffs Agree that Amex May Limit Certain Steering Involving Co-Brands,
Exclusivity, and Amex Issuers. ..................................................................... 22

B.     Amex Should Be Free to Prevent Disparagement Provided that Amex Cannot Use this
Exception to Reinstate Anti-Steering Rules. .................................................. 23

C.     The Proposed Judgment Provides Amex Freedom to Enter Individually Negotiated
Promotional Agreements Provided this Exception Is Not Used to Reinstate Its
Restraints. ..................................................................................................... 25

D.     Amex Is Not Restricted from Steering Its Cardholders Among Merchants and Needs No
Special Provision. .......................................................................................... 28

VI.    THE PROPOSED JUDGMENT CONTAINS ESSENTIAL ENFORCEMENT AND
IMPLEMENTATION PROVISIONS THAT AMEX SEEKS TO UNDERMINE. ........ 28

A.     For the Remedy to Be Effective, Merchants Must Receive Meaningful Notice. ........... 28

B.     For the Remedy to Be Effective, Reasonable Compliance Provisions Must Be Included.
…………………………………………………………………………………….30

1.     The Proposed Judgment's Reporting Requirements Are Necessary. ......................... 30

2.     The Proposed Judgment's Internal Compliance Requirements Are Necessary. ........ 32

3.     The Proposed Judgment's Access and Inspection Provisions Are Necessary............ 32

4.     Amex's Proposal for No Meaningful Compliance Requirements Is Unjustified....... 33

C.     There Is No Reason to Shorten the 10-Year Duration of the Proposed Judgment......... 34

VII.   THE COURT'S DECISION AND THE TRIAL RECORD AMPLY SUPPORT THE
PROPOSED JUDGMENT ............................................................................. 34

VIII.  CONCLUSION.............................................................................................. 36

## I.      INTRODUCTION.

Following a seven-week trial, the Court held that American Express's (Amex's) "Non-Discrimination Provisions" (NDPs) violate Section 1 of the Sherman Act, 15 U.S.C. § 1. *United States v. American Express Co.*, No. 10-cv-4496, slip op. at 150 (E.D.N.Y. Feb . 19, 2015), ECF No. 619, ("Decision"). The Court concluded that, by prohibiting merchants from steering customers to preferred cards, the NDPs impede competition among card networks, block low-cost business models, stifle innovation, and result in higher prices to merchants and consumers. The NDPs "caused actual anticompetitive effects on interbrand competition."  Decision at 6.

"The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960).  Plaintiffs' Proposed Judgment (Exhibit 1) protects the public from Amex's violation by enabling merchant steering in much the same manner as the Final Judgment as to Defendants MasterCard and Visa (ECF No. 143, "Visa/MC Judgment") but includes appropriate customization to reflect Amex's different operations.  It also respects Amex's legitimate business interests; it protects Amex from merchant disparagement and ensures Amex can compete vigorously.  The Proposed Judgment will end Amex's continuing violation, prevent its recurrence, and restore competitive conditions to the market.

Amex, in contrast, has proposed a remedy that would perpetuate its suppression of competition.  (Proposed Final Judgment as to the American Express Defendants and Order Entering Injunction ("Amex's Proposal")).  Rather than respect the Court's Decision and open up the market to competition, Amex would restrict and punish steering to the point that merchants might find no workable ways to reduce their acceptance costs.  Amex's Proposal

would empower it effectively to re-impose restrictions that the Court has found unlawful. Amex does not even take up the Court's invitation to participate in shaping the specifics of the remedy; it made no proposal on how to revise the text of its NDPs. Nor did it seriously address important compliance and enforcement provisions. Rather, Amex asks the Court, Plaintiffs, and merchants simply to trust it to abstain from anticompetitive practices that it fought aggressively to maintain, and which are thoroughly embedded in the company's practices. Amex's Proposal would invite continued disputes on interpretation and enforcement as merchants confront its roadblocks to steering.

As the Court directed, the parties engaged in the process of conferring over the possibility of a joint proposed judgment. Appendix 3 of the Joint Submission on Remedy reflects the areas on which the parties were able to agree. Important disagreements remain that require the Court's attention. Amex's Proposal should be rejected, and Plaintiffs' Proposed Judgment should be entered.[1]

## II. THE COURT HAS BROAD POWERS TO STOP AMEX'S UNLAWFUL CONDUCT AND TO ENSURE IT DOES NOT RECUR.

An antitrust remedy should "pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947). Permanent injunctive relief must (1) end the violation; (2) prevent a recurrence of the same or similar violation; and (3) restore competition in the market. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).

---

[1] For the Court's convenience, attached to this Memorandum are Plaintiffs' Proposed Judgment (Exhibit 1) and a three-column side-by-side comparison of Plaintiffs' Proposed Judgment, the Visa/MC Judgment, and Amex's Proposal (Exhibit 2).

To ensure that there is no "recurrence of the violation," the Court is not limited to "a simple proscription against the precise conduct previously pursued." *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698. Relief may "range broadly through practices connected with acts actually found to be illegal," *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950), and the Court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) (quoting *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941)).

District courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Salt*, 332 U.S. at 400-01; *see Parke, Davis & Co.*, 362 U.S. at 48. Courts can fashion the remedy to "unfetter a market from anticompetitive conduct," *Ford Motor Co.*, 405 U.S. at 577-78, and "to prevent future violations and eradicate existing evils," *United States v. Microsoft Corp.*, 253 F.3d 34, 102 (D.C. Cir. 2001) (en banc) (quoting *United States v. Ward Baking Co.*, 376 U.S. 327, 330-31 (1964)).

If the remedy falls short of these important objectives, the government may have "won a lawsuit and lost a cause." *Int'l Salt*, 332 U.S. at 401. "[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." *du Pont*, 366 U.S. at 326. Thus, "[i]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to remedy are to be resolved in its favor." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170-71 (2004) (quoting *du Pont*, 366 U.S. 316 at 334).

**III.     THE PROPOSED JUDGMENT IS WELL CRAFTED TO STOP AMEX'S
           ANTITRUST VIOLATION AND PREVENT ITS RECURRENCE, WHILE
           PROTECTING AMEX'S LEGITIMATE BUSINESS INTERESTS.**

As the Court concluded, "Amex's rules ensure that the set of customers responsible for

driving demand for network services (cardholders) cannot be influenced in their payment choice

by the set of customers on the other side of the platform, who are informed of and responsible for

paying the swipe fees associated with that decision (merchants)."  Decision at 101.  "Providing

merchants the freedom to participate in their customers' payment decisions will foster greater

interbrand competition among the GPCC networks and restore downward pressure on their

merchant prices."  *Id*. at 118.  "Elimination of American Express's anti-steering rules would

restore merchants' responsiveness to changes in network pricing and, in turn, unlock an

important avenue of competition among the credit card networks."  *Id*. at 116.

Plaintiffs' Proposed Judgment ensures that these important avenues of interbrand

competition are finally unlocked.  It protects merchants' freedom to influence their customers'

payment choices without interference by Amex, and thus protects the competitive process.  It

avoids loopholes that Amex could use to re-impose its restraints or discourage merchants from

exercising their freedom to foster interbrand competition.  The Proposed Judgment also protects

Amex's legitimate competitive interests in preventing disparagement of its products and in

competing for exclusive acceptance agreements, certain individually negotiated promotional

agreements, and co-brand agreements.

As the Court is aware, anti-steering rules were once imposed on merchants by three

networks with market power:  Visa, MasterCard, and Amex.  The rules of Visa and MasterCard

were previously removed by this Court upon a finding, after receipt of public comment, that the

Visa/MC Judgment was in the public interest. (ECF No. 142).  The core provisions of Plaintiff's

Proposed Judgment closely follow the Visa/MC Judgment.  But any one of the three dominant

networks' rules could limit competition, and the most restrictive rules of any one can limit competition for all three.  *See* Decision at 124 (Discover did not pursue steering opportunities under the Visa/MC Judgment because large merchants "remained bound by Amex's NDPs.")  Thus, the judgment should not provide Amex with opportunities to restrict steering in ways Visa and MasterCard cannot and thus perpetuate the market impediments that this Court found unlawful.

## IV.   THE CORE STEERING PROVISIONS MUST GIVE BROAD FREEDOM TO MERCHANTS TO FOSTER COMPETITION.

### A.   Amex's Refusal To Specify How To Change Its NDPs Disregards The Court's Decision, Unnecessarily Defers Disputes, and Delays Restoration of Competition.

*Proposed Judgment*.  Section V.B of the Proposed Judgment specifies modifications that must be made to Amex's rules to eliminate the language through which Amex imposed its NDPs.  This section also sets forth the new language for Amex's rules to ensure that merchant steering is expressly protected by the new Amex rules.  The Visa/MC Judgment contains parallel provisions: V.B (revising the specific wording of the Visa rules) and V.C (revising the specific wording of the MasterCard rules).  It is essential that Amex's offending language be deleted, and that specific new language protecting steering be added in the Final Judgment.

*Amex's Proposal*.  It is disappointing that Amex does not even propose new text to eliminate the rules constituting the essence of its antitrust violation.  Amex's Proposal's Section IV.C implies that Amex will make future rules changes as a result of the Final Judgment, but nowhere does Amex's Proposal impose an obligation to do so – much less specify the changes to be made.

If the actual text of rule changes is present in the Final Judgment, the Court can minimize loopholes, restrictions, and future disputes over whether the rules are effective in addressing the

Court's Decision.  In response to Plaintiffs' proposed new rule language, Amex simply struck the text and replaced it with a general authorization for Amex to adopt its own new rules later. Amex's Proposal, Section IV.A.  Amex is effectively telling the Court, "Trust us."  That is an unacceptable approach in light of the litigated judgment against Amex, and it is less than was required in the Visa and MasterCard settlements where both of those networks acknowledged the need for specific changes in their rules.  The Court "is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do."  *Prof'l Eng'rs*, 435 U.S. at 698 (quoting *Int'l Salt Co.*, 332 U.S. at 400).

### B. The Proposed Judgment Enables the Steering Envisioned by the Court's Decision.

*Proposed Judgment.*  Section IV.A of Plaintiffs' Proposed Judgment – the core provision eliminating the restraint and restoring competition – lists eight types of merchant steering that may not be prohibited ("Protected Steering").  These provisions seek to grant merchants full freedom to foster competition through familiar as well as innovative steering.  They ensure that Amex will not directly or indirectly impede the types of merchant steering about which this Court heard extensive evidence at trial.  *See* Decision at 29-30 (noting that Amex's NDPs prevent merchants from: (1) offering a discount off the posted price, free shipping, gift cards, or other monetary incentives; (2) providing customers priority boarding on an airline for using a particular card; (3) posting a sign saying "We Prefer Discover"; (4) telling consumers "we proudly accept the Discover card"; (5) posting a sign comparing the relative costs of acceptance across card brands; or (6) informing customers Amex costs the merchant more than other credit card brands).  Removing Amex's restraints on such conduct will promote competition by allowing merchants "to direct a greater share of their charge volume to lower-cost credit or

charge card networks, whether by offering discounts to customers for using such cards, posting the relative costs of different modes of payment, or engaging in another form of point-of-sale steering . . . ."  Decision at 118.  Because the Protected Steering list is not exhaustive, merchants in the future retain flexibility to innovate in the ways they foster competition though steering.

*Comparison to Visa/MC Judgment.*  The Visa/MC Judgment contains virtually the same provisions. The one difference is a clarifying insertion (underscored below) in IV.A.7:

> communicating to a Customer the reasonably estimated <u>(including, e.g., average)</u> or actual costs incurred by the Merchant when a Customer uses a particular Brand or Type of General Purpose Card or a particular Form of Payment or the relative costs of using different Brands or Types of General Purpose Cards or different Forms of Payment.

The reasons for the insertion are that Amex argued at trial that merchants might not be able to calculate exactly their costs for a particular card type, that Visa and MasterCard have different card types with different discount rates, and that average cost across all Visa credit cards or MasterCard credit cards is not a suitable basis for comparison to Amex.  Decision at 125-26. Without this clarifying language, Amex might interpret "reasonably estimated" to enable it to prohibit a merchant from making a cost comparison by using an average.  The insertion ensures that merchants who wish to engage in this form of steering may "reasonably estimate" their costs of card acceptance by using an average, if they so choose. Merchants are in the best position to determine their relative costs of card acceptance, and Plaintiffs' Proposed Judgment gives them flexibility to do so using any reasonable metric.

## C.    Amex's Proposal Imposes Restrictions on Steering that Perpetuate Harm to Competition.

*Amex's Proposal.*  The version of these core steering provisions in Amex's Proposal (Section III.A) purports to allow much of the same types of steering.  But it contains overly restrictive and unworkable qualifying language that would vitiate effective relief.   Moreover,

under Amex's Proposal, it would be free to impose restrictions on merchants not permitted to Visa and MasterCard, effectively blocking Amex-accepting merchants from engaging in many of the steering practices specifically allowed under the Visa/MC Judgment.

Amex would allow steering only to a "Less Expensive General Purpose Card," defined as "a General Purpose Card that, for the particular transaction, has an All-In Merchant Fee that is lower than the All-In Merchant Fee that the Merchant would pay for that same transaction if the Customer were to use an American Express General Purpose Card."  Amex's Proposal, I.15. Amex defines "All-In Merchant Fee" as "the total of all fees incurred by a Merchant for the particular transaction when a Customer uses a particular General Purpose Card to purchase goods or services from the Merchant, including, but not limited to, the merchant discount rate, interchange fees, network fees, processing fees and acquirer fees, whether charged or collected on (a) per transaction basis, or (b) an annual basis or any other basis, in which case the calculation shall be pro-rata."  *Id*. at I.2.  Amex's Proposal impedes procompetitive steering in three important ways.

### 1.      Amex's "Less-Expensive Card" Restriction Undermines the Remedy.

Amex proposes that it be permitted to block steering unless a merchant can establish that it is steering to a "Less Expensive" card, as defined by Amex.  Under the antitrust laws, it is not for Amex to dictate the conditions or terms under which a merchant may steer to a competing network.  Free markets work because participants are free to make decisions that they perceive to be in their interest.  It is true that a key reason why many merchants would choose to steer to a particular card is because it is less expensive. Decision at 119 (merchants may steer "to a preferred (and likely cheapest) payment network").  But Amex's Proposal would have that decision made by Amex through its rules, not by the merchant.  Amex violated Section 1 of the

Sherman Act by "decid[ing] on behalf of the entire market which legitimate forms of interbrand competition should be available and which should not." Decision at 136. Remarkably, this Court's Decision has not dissuaded Amex from continuing on that same course.

Amex proposes to place a hurdle in the path of merchants wanting to steer. Amex's Proposal would require a merchant, before it can steer, to perform a price calculation devised by Amex – a calculation that might be difficult for the merchant to perform with precision. Amex proposes this mandatory price comparison despite its position at trial that it can be difficult for merchants to make accurate price comparisons. Decision at 125.

Of course, the evidence established that merchants can, in fact, make reasonable price comparisons. *Id*. And, if steering is permitted, there may be added incentive for merchants to make reasonable comparisons, and for others to assist them. *Id*. But the fact that merchants *are able to make* a price comparison does not mean that Amex ought to be able to demand that merchants *must make* a particular price comparison before steering. Merchants should be free to define "less expensive" for themselves without wondering whether it complies with Amex's technical definition imposed via court order.

In fact, Amex's Proposal may demand an impossible price comparison: If merchants "shall" make the mandatory price comparison by using a "pro-rata" application of any annual fee, but the merchant does not know how many transactions its steering will attract to the preferred card, the merchant may be unable to calculate whether "a particular transaction" is less expensive on Amex or the other card.

In addition, Amex's Proposal would not allow a merchant making the mandatory price comparison to account for payments received from a card network, for example, as part of a preferred card marketing arrangement. This is the kind of arrangement that Amex squelched

9

involving Travelocity and MasterCard.  Decision at 32.  Such payments are not part of the calculation set forth in Amex's definition of "All-In Merchant Fee," even though they may factor into a merchant's assessment as to which network is preferred.  *See* Trial Tr. 385:10-386:19; 391:20-392:15 (Robinson/Ikea) (Ikea compares network costs using an "all-in rate" including base discount rate offset by all fees, rebates, and bonuses; and Amex's all-in rate rose between 2011 and 2013 even though its base rate declined).  Indeed, the way Amex calculates the "All-In Merchant Fee" is so restrictive that even a merchant attempting to calculate whether it could steer *toward* Amex because of Amex's marketing dollars to the merchant could not consider those marketing dollars in making its required "All-In Merchant Fee" price comparison.

This is not a problem likely to be resolved by rewriting the definition of "All-In Merchant Fee."  The problem arises from *having* a definition, because no definition can take into account all the factors millions of diverse merchants might reasonably want to consider.  More fundamentally, it is the merchant's judgment – not Amex's – that should dictate the circumstances when steering to the merchant's preferred card is worth pursuing.[2]

This "Less-Expensive Card" restriction is also wrong-headed because, as trial evidence showed, merchants sometimes care about more than just the "All-In Merchant Fee," as defined by Amex.  Merchants may care about non-price features – such as speed of pay or treatment of refunds – in determining whether a network is "attractive" to them.  Decision at 95 & n. 39; Trial Tr. 607:7-609:23 (Bouchard/Sears).  But Amex's Proposal would not allow a merchant to base a decision to steer on such factors.  Amex's overly restrictive proposal would not even allow a merchant to steer towards Amex for its own desirable features, unless Amex always had the cheapest "All-In Merchant Fee."  *See* Decision at 141 (Amex "strenuously insisted" that it

---

[2] Perhaps Amex insists on the mandatory price calculation because it is afraid that there is an inaccurate perception among merchants that Amex is a high-priced card.  But if so, "the fault for allowing such a misconception to persist and the burden for remedying it lies with [Amex.]"  Decision at 125.

"offers merchants a . . . premium set of services" and, if so, "merchants will take that additional value into account when deciding whether . . . to steer."). Amex's proposal is difficult to reconcile with its position throughout trial that merchants desire the many non-price features of Amex that bring merchants value. *See, e.g.,* Decision at 19-20 (discussing targeting support, fraud management, and merchant promotions).

Amex's approach is basically that merchants do not know what is good for them, and that Amex ought to be the one to control their choices. But Amex "is not entitled to pre-empt the working of the market by deciding for itself that [merchants] do not need that which they demand." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 462 (1986). Merchants are entitled to make their own decisions about whether and how to steer without a threat of reprisal for making decisions Amex deems unacceptable.

### 2. Amex's "No General Steering" Restriction Undermines the Remedy.

Amex's Proposal allows a merchant to make the "Less Expensive General Purpose Card" determination only "for the particular transaction." Amex's Proposal would prevent a merchant from steering generally to a particular card network, rather than on a transaction-by-transaction basis. Thus, a merchant could not decide, for example, that because MasterCard is less expensive for it in 95% of transactions, it will post a sign encouraging customers to use MasterCard. This limitation could effectively impede many forms of steering that the Court discussed favorably in its Decision, because those forms of steering require general postings that are not transaction-specific, such as "All Items Are on Sale If You Use Discover" (PX2622); "Use MasterCard; Get a Free Gift" (PX2624); or "We Prefer MasterCard" (PX2628). *See* Decision at 29-30, 32, 104-106, 120-121. Rather than "help overcome any remaining logistical

hurdles to interbrand competition associated with merchant steering," Decision at 126, Amex's proposal would substitute new hurdles.

Indeed, because of the transaction-by-transaction limitation, Amex's Proposal would likely prohibit the kind of steering that Amex itself has engaged in, such as the special discounts for Amex cardholders at Universal theme parks or the special Amex-only cashier window during busy times at Radio City Music Hall. *See* Decision at 117-18. Both of these forms of steering were a benefit generally available to Amex cardholders without a transaction-by-transaction evaluation of whether Amex is the "Less Expensive Card" in a particular case.

### 3. Amex's "No Other Payment Forms" Restriction Undermines the Remedy.

Amex's Proposal would permit it to bar steering to payment forms other than General Purpose Credit Cards. That is not true of the Visa/MC Judgment; under its terms, Visa must allow merchants to offer discounts for MasterCard debit cards, for example, but Amex wants to remain free to block that same procompetitive conduct. Although the evidence established that the relevant market consists of general purpose credit and charge cards, Amex's implication – that only competition from other general purpose cards need be addressed in the remedy – is incorrect. *See United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 408 (S.D.N.Y. 2001) ("[I]ncluding debit as a necessary part of the remedy does not put it in the same product market with general purpose cards.").

The Court's description of the anticompetitive effects of Amex's NDPs recognized that, "without Amex's contractual restraints, merchants actually are likely to steer customers between various forms of payment or GPCC networks." Decision at 122. *See* Decision at 70-71 ("PayPal and Square . . . have proven effective at steering customers *to debit and ACH*" (emphasis added)); *id.* at 71 (noting that Amex cardholder insistence impedes the "ability of merchants to

resist potential anticompetitive behavior by Amex . . . by shifting customers to less expensive credit card networks *or other forms of payment*" (emphasis added)); *id.* at 51 ("Amex cardholders . . . may not be *as easily* switched from GPCC cards to another form of payment entirely" (summarizing Katz testimony, emphasis added)); *id.* at 46 (noting "limited substitutability" of debit, but not *no* substitutability).  Merchants testified at trial that they would like to be free to steer to other payment forms. (*See, e.g.*, Trial Tr. 408-13 (Robinson/Ikea) (experimented with steering to PIN debit); *id.* 3166:12-3168:11 (Gibson/Sinclair Oil) ("The plan is to have all methods of payment available for the app."); *id.* 6179:22-6180:14 (Mitchell/Official Payments).  Amex has no basis for demanding the right, unavailable to Visa or MasterCard, to block merchants from attempting to steer customers to payment forms outside the relevant market, including to particular brands of those payment forms.

Plaintiffs' Complaint specifically challenged Amex's NDPs not just because they blocked steering within the relevant market but also because they blocked steering to other forms of payment.  *See* Amended Complaint ¶ 69(6) ECF No. 57 (Amex's restraint blocks discounts and promotions to a "General Purpose Card or other payment method"); ¶ 71 (noting competition between credit cards and "other payment methods" and alleging the restraints "also restrict the competition that exists and otherwise would emerge from these other payment methods").  While the Durbin Amendment protects certain steering to debit, it does not protect all steering to debit (e.g., steering to a particular brand of debit).  The Visa/MC Judgment protects such steering from network restrictions; the judgment against Amex should do the same.

Moreover, a new Amex-only rule parsing which cards can be steered and which cannot could chill efforts by merchants and competitors to experiment with any steering, including steering among credit and charge card brands.  Amex's restriction would complicate merchants'

efforts to test and evaluate different ways to reduce their payment costs.  Adding this complexity

would only deter merchants from engaging in steering in the first place, including steering

among general purpose cards, and would hinder restoration of competition among general

purpose card networks. "When the purpose to restrain trade appears from a clear violation of

law, it is not necessary that all of the untraveled roads to that end be left open and that only the

worn one be closed." *Int'l Salt*, 332 U.S. at 400.

> **D.    Amex's Proposed Loopholes Would Enable It to Undermine the Court's Decision and Reinstate Its Restraints.**
>
> > **1.    Amex's Proposal for Special Dispensation to Terminate Merchants Who Steer Would Allow It to Continue to Impede Merchant Steering.**

*Amex's Proposal.*  Amex proposes a provision (Section IV.B.8 of Amex's Proposal)

explicitly permitting it to "exercise[e] its right not to do or continue to do business with a

Merchant that engages in any of the [permitted steering]."  Neither Plaintiffs' Proposed

Judgment nor the Visa/MC Judgment contains such a provision.

With this proposed provision, Amex seeks explicit Court authorization to achieve the

same anticompetitive objective that the Court condemned in its Decision.  The evidence showed

that Amex uses merchant termination and threats of termination to enforce its prohibitions on

merchant steering. *See* Decision at 31-32.  Amex seeks in this provision to maintain termination

or threats of termination as tools to stifle the interbrand competition that merchant steering will

create.  Competition would be no less suppressed, however, if the NDPs were effectively

continued through a policy enforced by termination. *See United States v. Dentsply Int'l, Inc.*,

399 F.3d 181, 193-94 (3d Cir. 2005) (defendant was able to engage in unlawful exclusive dealing

without including exclusivity provisions in written contracts by terminating dealers that violated

its exclusivity policy).

To make the remedy effective, this Court undoubtedly has the power to constrain Amex from terminating merchants because they steer, and it certainly is entitled to deny Amex's request for a special dispensation to terminate steering merchants. "[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." *du Pont*, 366 U.S. at 326. This is no less true when the remedy restricts a right that non-violators freely exercise. Even if the decree "might indirectly inhibit [defendant] from exercising its unilateral judgment," a decree "can restrict the options for a company that has violated [antitrust law] to ensure that violation will cease and competition will be restored." *Toys "R"Us, Inc. v. FTC*, 221 F.3d 928, 940 (7th Cir. 2000); *see FTC v. Nat'l Lead Co.*, 352 U.S. 419, 427, 430 (1957) (upholding decree prohibiting a "lawful, competitive sales method" where prohibiting it was "calculated to preclude the revival of the illegal practices"); *see also Visa*, 163 F. Supp. 2d at 408-09 (holding that banks must be permitted to rescind issuing agreements with defendants to remedy "past foreclosure" of competition even though the agreements were "not inherently anticompetitive").

Amex has argued that its right to terminate merchants is guaranteed by *United States v. Colgate & Co.*, 250 U.S. 300 (1910). But *Colgate* does not give Amex the unlimited right to continue by other means its vertical restraint that has been adjudicated unlawful. Yet that is precisely what Amex seeks this Court's blessing to do: Its proposal would allow it to attempt to use the termination of steering merchants in order to maintain its unlawful merchant restraints. To give Amex the power to punish merchants for exercising the rights to steer that the judgment protects would negate the judgment's remedial effect. *Colgate* does not require this absurd result. "[D]ecrees often suppress a lawful device when it is used to carry out an unlawful purpose." *Nat'l Lead*, 352 U.S. at 430.

15

To the contrary, when a district court has "found the [defendant] guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the [defendant's] future activities," even over the defendant's claim that the court's restrictions "abridge[d] its First Amendment rights." *Prof'l Eng'rs*, 435 U.S. at 697. "While the resulting order may curtail the exercise of liberties that the [defendant] might otherwise enjoy, that is a necessary and, in cases such as this, unavoidable consequence of the violation." *Id.*

### 2. Amex's "Marketing" Loophole Could Enable It to Continue to Restrict Competition.

*Amex's Proposal.* Amex proposes the following broad carve-out (Section IV.B.6 of Amex's Proposal) – not present in Plaintiffs' Proposed Judgment or the Visa/MC Judgment – from its obligations under the Final Judgment:

> Providing certain benefits, programs or services, including marketing benefits intended to increase Merchant sales on American Express General Purpose Cards, available only to Merchants (whether under an existing contract or a contract entered into hereafter) that do not engage in any of the practices enumerated in Sections III.A.1 through III.A.8 of this Final Judgment or differentiating the fee charged to a Merchant for such benefits, programs or services based on whether or not the Merchant engages in any of the practices enumerated in Sections III.A.1 through III.A.8 of this Final Judgment (e.g., charging a Merchant that engages in any of the practices enumerated in Sections III.A.1 through III.A.8 of this Final Judgment a higher fee for certain benefits, programs or services than American Express charges to Merchants that do not engage in any of those practices).

This carve-out could undermine the Final Judgment. It would free Amex to continue enforcing its anti-steering policy under the guise of a marketing campaign. It would allow widespread use of standard marketing agreements—or standard marketing clauses in its form acceptance agreements governing millions of merchants—by which Amex could ban all steering upon a merchant's receipt of even token marketing funds or undefined "benefits, programs or services." Amex claims that even receipt by a merchant of its business analytics would free Amex to block

16

all steering by that merchant.  This is particularly problematic given merchant testimony at trial that Amex's analytics are often of dubious value to the merchant.  *See* Decision at 87-88.

Moreover, this part of Amex's Proposal is not limited to marketing agreements.  It would authorize Amex to reimpose the NDPs in any agreement in which it might claim that a merchant received any "benefits, programs or services," however slight.  For instance, Amex could raise its discount rates to all merchants by 10% and then offer "level playing field discount agreements" providing 10% discounts (a "benefit") to any merchants who agreed to anti-steering rules identical to those found by the Court to violate the Sherman Act.

Amex, of course, can and should compete against other networks for marketing agreements, promotions with merchants, and other agreements.  The separate carve-out for individually negotiated agreements—discussed at Section V.C below—permits such agreements, but with important safeguards to ensure the exception does not eviscerate the Final Judgment.  Amex's proposed additional marketing carve-out has no safeguards, is duplicative of the individual negotiation clause, and should not be included.

### 3.     Amex's Broad Loopholes Cannot Be Permitted to Undermine the "Required Conduct" Section of the Proposed Judgment.

Section V.A of the Proposed Judgment orders Amex to stop enforcing rules or contract provisions that constitute its antitrust violation, i.e., those prohibited by Section IV.A.  The Visa/MC Judgment contains the same provision.  Amex's Proposal has a corresponding provision, but inserts the qualifier – "subject to Section III.B."  That section contains the loopholes discussed above (on terminating steering merchants and on marketing provisions) that would effectively allow Amex to continue its violation unabated.  Amex's obligation to repeal anticompetitive rules should be absolute, not qualified as Amex proposes.

17

### E.     Amex's Provisions to Deter Merchant Steering Undermine Effective Relief.

#### 1.     Amex's Signage, Verbal and Online Steering Restrictions Would Deter Merchant Steering.

*Amex's Proposal.*  Amex's proposed Section IV.B.5 – not present in Plaintiffs' Proposed

Judgment or in the Visa/MC Judgment –  would, first, require that a merchant post "signage at

the point of sale indicating that American Express . . . Cards are accepted."  This concept is not

objectionable if compliance can be as simple as posting an Amex logo when merchants choose

to display all payment logos, but it should be rejected as unnecessary because nothing in the

Proposed Judgment can be understood to prohibit such a requirement.  Indeed, the Proposed

Judgment's Section V.B.3 would allow a rule stating:  "Subject to preserving a Merchant's

ability to attempt to influence payment choice as set forth in Section 3.2 [of Amex's Merchant

Regulations], whenever you communicate the payment methods that you accept to customers, or

when customers ask what payments are accepted, you must indicate your acceptance of the

Card."

Second, Amex's proposed provision would be intrusive and restrictive of verbal

merchant steering, allowing Amex to impose a rule requiring a Merchant:

> (b) if the Merchant engages in any of the practices enumerated in Sections III.A.1
> through III.A.8 of this Final Judgment only through verbal communications, to mention
> that American Express General Purpose Cards are accepted by the Merchant as part of
> that same communication.

Plaintiffs oppose these requirements as unnecessary and as an undue interference with merchant

steering.  Under Amex's proposed provision, a merchant that wanted to express a preference for

Discover would have to say:  "You can get a discount if you use Discover, but we also accept

American Express."   This would make merchants less likely to engage in such steering, and

Amex's competitors less likely to compete to encourage it.

Third, Amex proposes new language, not present in the Visa/MC Judgment, that appears aimed at deterring innovative, technology-driven merchants from steering:

> With respect to online or mobile transactions, if a Merchant engages in any of the practices enumerated in Sections III.A.1 through III.A.8 of this Final Judgment, American Express shall be entitled to require that the signage indicating American Express acceptance must appear at the earliest point within the payment path at which any such practice occurs.

The trial record confirmed that Amex's anti-steering rules have blocked steering on online payment pages. *See* Trial Tr. 258:14-21 (Thiel/Alaska). Indeed, Official Payments needed to set up two web sites, rather than simply a single payments site with different prices by brand, because of the NDPs. Trial Tr. 6129:17-6137:24 (Mitchell/Official Payments). Amex's proposed new restriction could be misused to impede steering on online payments pages and to reduce flexibility for online merchants to develop steering in the online environment; thus it could undermine the effectiveness of the Final Judgment.

To ensure there is clarity that Amex cannot restrain steering by merchants that facilitate online government payments (like Official Payments) and merchants that facilitate mobile wallet transactions (like PayPal), Plaintiffs' Proposed Judgment adds the following clarifying language to the definition of "merchant": "For the avoidance of doubt, 'Merchant' includes Merchants that offer the service of facilitating General Purpose Card payments for other Persons (such as governmental entities and universities) and Merchants that offer mobile wallet services." This language should be included in the Final Judgment, and Amex's Section IV.B.5 should be rejected.

Official Payments facilitates credit card payments for fees, tuition and taxes for governments, utilities and universities, largely through online or mobile payments. Trial Tr. 6114:17-6115:6; 6119:2-6120:5; 6165:15-19 (Mitchell/Official Payments). Without anti-

steering rules, Official Payments would be able to offer a discount on its fees when customers use a card that costs less to accept.  *Id*. at 6131:4-19.  Official Payments has been an innovator eager to explore novel forms of steering.  Decision at 115.   Such merchants that facilitate credit card payments for others should not be excluded from the remedy.

Similarly, digital and mobile wallet providers enable small merchants (especially very small merchants) to accept traditional network brands.  From the perspective of the networks, these wallet providers are themselves the merchants.  Trial Tr. 823:17-23 (Hochschild/Discover) ("PayPal is a merchant . . . one of our largest merchants on the Discover network"); *id*. at 5932:24-5933:5 (McNeal/Amex) (identifying PayPal, Google and Amazon as online merchants in her portfolio); *id*. at 3714:3-3715:14 (Silverman/Amex) ("Square acts as the merchant, and . . . from Amex's point of view, it's actually Square that was the merchant, and that's how Square is able to allow these millions of merchant to all sign up and accept plastic . . . .").  They permit small merchants who otherwise would not accept credit cards to do so.  *Id*. at 3711:20-3712:6 (Silverman/Amex) (PayPal "help[s] our business, in that they bring on hundreds of thousands of merchant[s] who otherwise wouldn't accept credit card payments").  Denying these merchants relief would mean denying effective relief for the many small merchants relying on their digital wallet services.

It is vital to these merchants to be able to steer among payment forms within the digital wallets they offer.  *Id*. at 3711:20-3712:6 (Silverman/Amex) (PayPal "is highly motivated to get our customers to pay them with ACH or debit instead of with a credit card"); *id.* at 3715:2-14 (noting that Square and Google Wallet are  "going to the card member and saying we'd like you to fund those payments with traditionally ACH and debit because that's che[a]p for them").

Going forward, these merchants will likely be on the cutting edge of steering.  One of Home Depot's "objectives" for accepting PayPal "was to outsource steering" because "PayPal has a proven history of helping impact and influence the way customers fund their account."  *Id.* at 1269:18-1270:24 (Kimmet/Home Depot).  "I do think mobile payments, not necessarily just PayPal, but mobile devices will help tremendously to the extent retailers have relaxation or elimination of these rules, to help guide customers in a way which will help take costs down . . . ."  *Id.*  It would undermine the Final Judgment if Amex could impose steering restrictions on online and digital wallet merchants that, as intermediaries, could enable other merchants to steer effectively and to promote competition.

### 2.    Amex's Advance Notice Restrictions Would Deter Merchant Steering.

*Amex's Proposal.*  Amex's proposed Section IV.B.9 – not present in Plaintiffs' Proposed Judgment or the Visa/MC Judgment – would explicitly permit Amex to require that a merchant give "reasonable advance notice" before engaging in the limited steering practices Amex would allow, if the merchant has not steered for a 12-month period.

This proposal shows that Amex does not accept a proposition fundamental to the Court's decision – that merchant steering is a normal part of a competitive market economy.  *See* Decision at 3.  In free markets, firms are not entitled to advance notice of their rivals' competitive moves**.**

Amex's Proposal adds a hurdle that might especially impact small or medium-sized merchants.  For example, if a merchant saw that a larger competitor down the street started offering a special discount for using Discover, the merchant might want to match that immediately, or to counter it with, for example, a similar discount for using MasterCard.  As the Court recognized, steering may develop as a few large, innovative merchants on the "vanguard

of widespread steering" experiment with forms of steering that countless other, smaller

merchants emulate.  *Id.* at 124.  Amex's proposal would impede such normal marketplace

behavior and would position Amex to quash steering innovations before they take flight.

Finally, because this provision has no parallel in the Visa/MC Judgment, Amex could use

it to obtain advance notice of its competitors' moves, while they would not obtain advance notice

of Amex's.

## V.  THE PROPOSED JUDGMENT INCLUDES REASONABLE CARVE-OUTS THAT PROTECT AMEX'S LEGITIMATE BUSINESS INTERESTS.

Plaintiffs recognize that Amex should be able to restrict certain narrow categories of

steering consistent with fostering competition on the merits among networks.  Section IV.B.

### A.  Plaintiffs Agree that Amex May Limit Certain Steering Involving Co-Brands, Exclusivity, and Amex Issuers.

The Proposed Judgment provides that Amex may compete to become a merchant's

exclusive general purpose card (Section IV.B.1) and may compete to become a merchant's co-

brand card issuing partner (Section IV.B.2) without violating the Proposed Judgment.  There is

vigorous interbrand competition for these relationships today, and the Proposed Judgment does

not impede that competition.  The Visa/MC Judgment has the same carve-outs, as does Amex's

Proposal.

The Proposed Judgment also allows Amex to insist that merchants treat Amex-branded

cards issued by an issuing bank (GNS cards) the same as other Amex cards (Section IV.B.4).

The Visa/MC Judgment contains the same provision, as does Amex's Proposal.

Finally, the Proposed Judgment ensures that price information about particular card types

cannot be kept from merchants (Section IV.D).  Such a provision was part of the Visa/MC

Judgment and was necessary with respect to Visa and MasterCard, because they have numerous

card types with different interchange fees.  Amex currently does not have different fees for

different card types, but this provision would apply should it do so.  Amex agrees this text is

appropriate.

**B.      Amex Should Be Free to Prevent Disparagement Provided that Amex Cannot Use this Exception to Reinstate Anti-Steering Rules.**

*Proposed Judgment*.  Section IV.C of the Proposed Judgment confirms that Amex may

maintain rules that prohibit a merchant from disparaging or mischaracterizing its card, as such

rules were not challenged in this case.  Decision at 26-27.   This provision also makes clear that

the prohibition on disparagement does not restrict a merchant's ability to encourage customers to

use other general purpose cards or forms of payment.

The Court received substantial evidence regarding Amex's claim that steering harms

Amex's "welcome acceptance" policy.  *Id.* at 128-43.  The Court found, however, that not all

steering would be inconsistent with "welcome acceptance," and some of Amex's own witnesses

so testified.  *Id.* at 134 n.53 (noting testimony that consumers exposed to "'a payment preference

message does not make [them] feel unwelcome' and results in negative opinions of the merchant

rather than the network").  The prohibition on disparagement purposely carves out the various

types of protected steering so that Amex cannot resume its unlawful conduct under the guise of

enforcing a non-disparagement rule.  Thus, the non-disparagement rule is "[s]ubject to" the

Protected Steering provisions in Section IV.A, i.e., the networks cannot claim that any form of

Protected Steering constitutes disparagement.

*Comparison to Visa/MC Judgment*.  The Visa/MC Judgment contains a similar

provision.  The Proposed Judgment contains the language of the Visa/MC Judgment provision,

but adds additional language to ensure that the provision cannot be misinterpreted or misapplied.

23

The Visa/MC Judgment (Section IV.C) allows those networks to prohibit merchants from disparaging their brand.  Specifically, the Visa/MC Judgment provides that "[s]ubject to Section IV.A of this Final Judgment [the Protected Steering provisions], nothing in this Final Judgment shall prohibit MasterCard or Visa from adopting, maintaining, and enforcing Rules that prohibit Merchants from disparaging its Brand."  The Proposed Judgment allows Amex likewise to prohibit merchants from disparaging the American Express brand (Section IV.C.), but it contains additional text underscored here, and each addition is explained below:

> C. Subject to Section IV.A of this Final Judgment, nothing in this Final Judgment shall prohibit American Express from adopting, maintaining, and enforcing Rules (including the Rules identified in Section V.B of this Final Judgment, if modified in accordance with that Section V.B) or entering into or enforcing agreements that prohibit Merchants from disparaging its Brand, including (1) mischaracterizing American Express General Purpose Cards, or (2) engaging in activities that harm American Express's business or its Brand. For the avoidance of doubt, American Express shall not prohibit, prevent, or restrain a Merchant from engaging in any of the practices enumerated in Sections IV.A of this Final Judgment on the grounds that American Express believes or asserts that one or more of such practices disparage its Brand, including by mischaracterizing its General Purpose Cards or harming its business or Brand.

First, for clarity, the specific relevant Amex rules are referenced in a parenthetical.  This addition also recognizes that Amex sometimes imposes rules by means of merchant agreements, and it expressly recognizes its ability to do so with a non-disparagement rule.

Second, the meaning of "disparaging" is clarified by adding an explanatory phrase: "including (1) mischaracterizing American Express General Purpose Cards, or (2) engaging in activities that harm American Express's business or its Brand."   Plaintiffs did not challenge Amex's rules against mischaracterization or harm to its brand.  Amended Complaint ¶ 28; Decision at 26.  Thus, these particular provisions are named here as types of "disparaging."  No change in meaning is intended; that is, Visa and MasterCard similarly would be able to apply any

non-disparagement rule to prevent conduct that mischaracterizes or harms their brands, so long as the conduct did not constitute Protected Steering.

Third, the primacy of the Protected Steering provisions is expressly stated: "For the avoidance of doubt, American Express shall not prohibit, prevent, or restrain a Merchant from engaging in any of the practices enumerated in Section IV.A of this Final Judgment on the grounds that American Express believes or asserts that one or more of such practices disparage its Brand, including by mischaracterizing its General Purpose Cards or harming its business or Brand." This provision is necessary because Amex has characterized some forms of legitimate, protected steering as disparagement.[3] This provision will ensure that both merchants and Amex personnel will understand that an Amex rule about disparagement cannot be used to block steering protected by the Final Judgment.

*Amex's Proposal*. Amex's Proposal contains a provision corresponding to that in the Visa/MC Judgment. For the reasons explained above, this provision needs to be clarified as Plaintiffs have proposed.

### C. The Proposed Judgment Provides Amex Freedom to Enter Individually Negotiated Promotional Agreements Provided this Exception Is Not Used to Reinstate Its Restraints.

*Proposed Judgment*. Amex should be able to compete for promotional agreements, such as an exclusive preference arrangement, by which a merchant agrees to steer customers towards Amex and not simultaneously use the same method to steer customers towards Amex's competitors. For example, Amex should be able to offer consideration to a merchant to post

---

[3] Disparagement includes mischaracterization, denigration, or harm to the brand. *See* Trial Tr. 4357:9-4358:4 (Chenault/Amex) (" 'we prefer' . . . pardon my language, but what that says to the customer is that card's a piece of crap, . . . that's what discrimination is all about is disparagement and denigration"); 4657:14-20 (Chenault/Amex) ("I've also made it very clear that we do not allow 'We Prefer' because it denigrates and disparages and absolutely discriminates against our card."); 656:6-12 (Quagliata/Amex) ("hurt our brand"); 656:22-657:6 (Quagliata/Amex) ("damaging to our business, to our brand"); 670:15-671:22 (Quagliata/Amex) ("could be misconstrued"); 675:2-16 (Quagliata/Amex) ("misleading"); 687:24-689:12 (Quagliata/Amex) ("incredibly damaging to our business"); 3718:21- 3719:14 (Silverman/Amex) ("very damaging effect on the business").

"We Prefer Amex" signs for a specified time while not simultaneously posting "We Prefer MasterCard" signs.  The Proposed Judgment contains a provision (Section IV.B.3) permitting individually negotiated steering arrangements. It is largely the same as the Visa/MC Judgment, with slight modifications needed to account for Amex's business model and practices.  Amex's proposal ignores these differences and would incorporate the provision from the Visa/MC Judgment without making any adjustment for the fact that Amex does business differently.

Although the Visa/MC Judgment generally requires Visa and MasterCard to permit merchant steering, it allows those networks to enter merchant agreements that restrict steering if the agreements are both (a) individually negotiated and not part of a standard agreement generally offered to multiple merchants; and (b) unrelated to card acceptance.  Basic market facts demonstrate the narrowness of that exception – as applied to Visa and MasterCard.  As the Court recognized, "to accept [Visa and MasterCard] credit cards, a merchant must have a relationship with an acquiring bank or financial institution" and the acquirer – not Visa or MasterCard – "is responsible . . . for merchant acquisition (i.e., signing up merchants to accept particular brands of cards . . .)."  Decision at 14-15; *see also* Amex Proposed FOF ¶ 166 (citing evidence that "Visa and MasterCard . . . do not negotiate with merchants").  In the ordinary course of business, Visa and MasterCard do not maintain direct card acceptance relationships with merchants, and have direct contractual relationships only with a small subset of merchants for promotional agreements.  *See* Trial Tr. 3297:21-3298:1 (Biornstad/MasterCard) ("Q. When you negotiate with merchants for promotional deals, are you able to increase or decrease the card acceptance price to merchants?  A. No.  Q. Is Amex able to do that?  A. It's a different model, but yes.").  This marketplace reality means Visa or MasterCard have little opportunity to

26

use pre-existing merchant acceptance relationships as a way to inhibit inter-network competition.

In contrast, "American Express operates a business model that is materially different than that of Visa and MasterCard."  Decision at 14; *see also* Amex Proposed FOF ¶ 166 ("American Express's approach to rate negotiation stands in stark contrast to Visa and MasterCard"); *id.* ¶ 166.2 (referring to divergent approaches to merchant negotiation as an "important distinction").  Unlike Visa and MasterCard, "American Express will negotiate its acceptance agreements with certain large merchants."  Decision at 18; *see also* Trial Tr. 2831:17-2832:2 (Quagliata testimony that Amex has contracts with nonstandard pricing terms with between 200 and 1000 merchants).  Amex also maintains direct relationships with millions of merchants in its role as an acquirer.  Decision at 16.  Thus, the provision in the Visa/MC Judgment dealing with individually negotiated contracts, if applied to Amex, could be misinterpreted or misapplied to authorize Amex to reintroduce the anti-steering rules through a series of contracts with the many merchants with which it already negotiates and/or has direct relationships.[4]  In short, although Amex may claim that it is asking only to be treated the "same" as Visa and MasterCard, the effect of the "same" language could be dramatically different in light of Amex's dramatically different way of contracting with merchants.

Nonetheless, Plaintiffs have not proposed to enjoin Amex from entering all individually negotiated contracts that prohibit steering.  Instead, Plaintiffs propose to allow Amex to enter individually negotiated merchant contracts that prohibit steering if (a) the merchant agrees to steer customers towards Amex cards; (b) the contract prohibits the merchant only from using the

---

[4] In Australia, small merchants generally began steering only after large merchants had been steering for some time.  *See* Decision at 124.  Thus, if Amex could prevent many large merchants from steering through individually negotiated contracts, small merchants would observe fewer effective examples of merchant steering, and they would be less likely to learn of or experiment with steering.

same methods to steer customers towards other cards that it has agreed to use to steer customers towards Amex cards; (c) the contract is not a standard agreement offered to multiple merchants; and (d) the contract is not a card acceptance agreement and is not related to or conditioned upon the merchant's entry into a card acceptance agreement.  For instance, if the merchant agrees to make Amex a preferred card, the agreement can provide that the merchant will not also designate Visa or MasterCard or Discover as preferred general purpose cards.  Plaintiffs' proposal ensures that the Final Judgment will not impede Amex from competing with Visa, MasterCard, and Discover for individually negotiated merchant promotional agreements.  But, unlike Amex's proposal, it will not allow Amex to exploit its different business model to evade other provisions in the Proposed Judgment.

> **D.     Amex Is Not Restricted from Steering Its Cardholders Among Merchants and Needs No Special Provision.**

Amex proposes a provision (Section IV.B.7) – contained in neither Plaintiffs' Proposed Judgment nor the Visa/MC Judgment – explicitly permitting it to steer its cardholders toward merchants who do not steer.  The substance of Amex's proposed provision, notably, is that Amex seeks unrestricted protection for its own right to steer while also seeking to restrict, delay, or outright deny merchants' right to steer.  The provision is not needed; nothing in the Proposed Judgment stops Amex from such steering.  Moreover, adding this provision could create confusion about unequal rights of different networks in regard to this conduct.

**VI.    THE PROPOSED JUDGMENT CONTAINS ESSENTIAL ENFORCEMENT AND IMPLEMENTATION PROVISIONS THAT AMEX SEEKS TO UNDERMINE.**

> **A.     For the Remedy to Be Effective, Merchants Must Receive Meaningful Notice.**

*Proposed Judgment.*  Section V.C of the Proposed Judgment requires Amex to notify merchants of its anti-steering rule changes promptly.  Amex's notice must include the text of new rules, and also a plain-language statement that merchants are now permitted to encourage

customers to use a particular General Purpose Card or other form of payment.  Amex would be required to ensure that all merchants that contract both directly with it and through third-party acquirers receive notice of their right to steer.

*Comparison to Visa/MC Judgment*.  Section V.E of the Visa/MC Judgment contains a similar provision requiring Visa and MasterCard to give notice.  The Proposed Judgment contains the same general obligation tailored to Amex's manner of doing business (recognizing that Amex most commonly interacts directly with merchants rather than through acquiring banks).  Both the Proposed Judgment and the Visa/MC Judgment provide that the communication to merchants is subject to approval by the United States to ensure its meaning is clear.   The Proposed Judgment adds important language notifying merchants that this Court has found Amex's rules to be unlawful.

*Amex's Proposal*.  Amex's Proposal contains a limited notice provision, Section IV.C.  Unlike the Visa/MC Judgment, it does not state that a purpose of the notice provisions is to ensure that merchants "(ii) are not restricted, discouraged, or prevented from engaging in any of the [Protected Steering] practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment."  Nor does it provide that merchants will be informed "that they are permitted to engage in any of the [Protected Steering] practices enumerated in Sections IV.A.1 through IV.A.8 of this Final Judgment."

These omissions from Amex's Proposal exacerbate concern about another omission:  Amex rejected Plaintiffs' proposed notice text.  Amex's Proposal includes no alternative notice text, deferring any disagreements to a later day.  Nor does Amex provide for Department of Justice "approval" of the notice text, unlike the Visa/MC Judgment (Section V.E).  Rather, Amex's Proposal envisions a "comment" process that contemplates "judicial intervention."  The

grudging nature of the merchant notification that Amex proposes underscores the need for a clear, specific notice provision in the Final Judgment.

Notice is even more critical now than at the time of the Visa/MC Judgment, because now all three dominant networks have liberated merchants from anti-steering restraints. The Court has recognized the value of "meaningful steps to alert these small business owners of their new freedom to participate in their customers' card choices." Decision at 124. Plaintiffs' Proposed Judgment best achieves this goal.

### B. For the Remedy to Be Effective, Reasonable Compliance Provisions Must Be Included.

#### 1. The Proposed Judgment's Reporting Requirements Are Necessary.

*Proposed Judgment*. Plaintiffs' Proposed Judgment includes reporting requirements to enable effective implementation of the Final Judgment.

Section V.D requires Amex to report to Plaintiffs any agreement executed pursuant to Section IV.B.3 (the carve-out for individually negotiated agreements). This reporting requirement enables Plaintiffs to ensure that this provision is not being misinterpreted or misused.

Sections V.E-F require Amex to make certain reports concerning terminations of merchants.[5] Trial evidence showed that Amex used termination and threats of termination to enforce its NDPs, Decision at 31-32; Trial Tr. 4491:6-18 (Chenault/Amex), and Amex employees have been accustomed to regard most steering as "disparagement" or "mischaracterization." *Supra*, footnote 3. Thus, it is important for Plaintiffs to be able to review terminations and threats or notices of termination to determine whether they are improperly

---

[5] In *United States  v. Dentsply*, the final judgment required the defendant to obtain permission from the Department of Justice before terminating certain dealers that also sold competing products. Final Judgment at 4, *United States v. Dentsply Intl., Inc.*, No. 99-005, at 4 (D. Del. Apr. 26, 2006), *available at* http://www.justice.gov/atr/cases/f218200/218215.pdf.

based on merchant steering activity protected by the Final Judgment.[6]  Moreover, the fact that meaningful reporting is required is itself a deterrent.

Thus, Section V.E requires Amex to report quarterly its termination or suspension of merchants and its reason for doing so.  Similarly, Section V.F requires Amex to notify Plaintiffs before communicating termination to any Merchant, when (1) the termination is based on the Merchant's actual, planned, or suspected steering as permitted in Section IV.A of the Final Judgment; (2) the termination is based on the Merchant disparaging or mischaracterizing Amex's cards, brand, or business; or (3) Amex knows, or has reason to believe, the Merchant is engaging in steering permitted in Section IV.A, even if the stated  basis for termination is not the Merchant's steering.

Section V.F defines termination as allowing contracts to expire and threatening to terminate, even if no actual termination takes place.  Even a notice or threat of termination (without actual termination) can cause a merchant to stop steering.  Decision at 32 & n.6 (noting several merchants that stopped steering after Amex sent notices of its intent to terminate the merchant).

Finally, Sections V.G and V.H of the Proposed Judgment require Amex to notify the Department of Justice and the Representative Plaintiff States of any future rule change or future agreement that restricts, limits, or restrains "how any Merchant accepts, processes, promotes, or encourages use of (1) Forms of Payment other than General Purpose Cards or (2) General Purpose Cards bearing the Brand of another General Purpose Card Network."  These provisions ensure that the substantive protections of competition contained in the Final Judgment cannot be revised or reversed without notice to Plaintiffs.

---

[6] Similar termination provisions were not needed in the Visa/MC Judgment, because there was no comparable record of merchant terminations.

31

## 2.   The Proposed Judgment's Internal Compliance Requirements Are Necessary.

*Proposed Judgment.*  To ensure compliance with the Final Judgment, Section VI.E

assigns the responsibility for compliance to an existing Amex official, the "Chief Compliance

Officer of American Express," or other officer designated by Amex.  This Officer would be

assigned specified duties, including informing and training Amex merchant-facing personnel as

well as taking action upon discovering any violation to ensure compliance with the Final

Judgment.  Similar obligations for internal compliance arrangements are found in other antitrust

judgments.[7]

## 3.   The Proposed Judgment's Access and Inspection Provisions Are Necessary.

*Proposed Judgment.*  Section VI.A of the Proposed Judgment provides that, upon

request, Plaintiffs can inspect documents and interview personnel at Amex on issues regarding

its compliance with the Final Judgment.  Section VI.B provides for sworn, written interrogatory

responses from Amex relating to final judgment enforcement.  And Sections VI.C and D provide

protections to Amex for any discovery obtained under the access and inspection provisions.

Provisions of this sort are customary in government antitrust decrees.  *See generally United*

*States v. Grinnell Corp.*, 384 U.S. 563, 579 (1966) (directing district court to reconsider denial

of "so important and customary a provision" as "requiring reports, examining documents, and

---

[7] Similar internal compliance officer duties were required by the final judgments in *United States v. National Association of Realtors*, No. 1:05-cv-05140, at § V,G (N.D. Ill. Nov. 7, 2008), *available at* http://www.justice.gov/atr/cases/f239600/239655 htm; *United States v. Dentsply International, Inc*., No. 99-005, at § II (D. Del. Apr. 26, 2006), *available at* http://www.justice.gov/atr/cases/f218200/218215.pdf; and *United States v. Microsoft Corp.*, No. 1:98-cv-01232-CKK, at § IV.C (D.D.C. Sept. 7, 2006), *available at* http://www.justice.gov/atr/cases/f218300/218339.pdf.

interviewing company personnel").[8]  The Visa/MC Judgment contains Plaintiffs' access

provisions similar to those of the Proposed Judgment.

<div align="center">

**4.     Amex's Proposal for No Meaningful Compliance Requirements Is Unjustified.**

</div>

*Amex's Proposal*.  Amex proposes only that it provide an affidavit describing the steps it

took to comply with the Final Judgment.  It also proposes a version of the access and inspection

provisions, although it inserts the modifier "reasonable" into the standard language, which

invites litigation and delay.  *Compare* Section VI.B of Plaintiffs' Proposed Judgment *with*

Section V.B of Amex's Proposal.

Amex makes no attempt to identify the steps it will take to ensure compliance with the

Final Judgment.  Such specificity is vital.  It was clear at trial that Amex has established

procedures for detecting and stopping merchant steering as "suppression" – procedures that

involved "the merchant's client manager at American Express" and the "small merchant team."

Decision at 31.  The procedures also can involve "random on-site visits," as well as a "guidance

document concerning official responses to steering."  *Id.* at 31-32.  In short, it is clear that Amex

has extensively trained and instructed its personnel in how to detect and stop merchant steering.

An effective remedy must deal with this existing reality, created over the course of years, and

establish sufficient obligations on Amex to ensure that its employees are trained and instructed to

respect merchants' legitimate rights to steer.  Amex should be required to devote as least as

much attention to monitoring compliance with the Final Judgment as it did to monitoring

merchants' compliance with its anticompetitive restraints.

---

[8] *See also, e.g.*, Final Judgment at 10, *United States v. Nat'l Assn of Realtors*, No. 1:05-cv-05140, at § VII (N.D.Ill. Nov. 7, 2008), *available at* http://www.justice.gov/atr/cases/f239600/239655.htm; Final Judgment at 15, *United States v. Bazaarvoice, Inc*., No. 3:13-cv-00133-WHO, at § X (N.D. Cal. Dec. 2, 2014), *available at* http://www.justice.gov/atr/cases/f311000/311069.pdf; Final Judgment at 6-7, *United States v. Dentsply Int'l, Inc*., No. 99-005, at § IV (D. Del. Apr. 26, 2006) , *available at* http://www.justice.gov/atr/cases/f218200/218215.pdf; Final Judgment at 13-14, *United States v. Nexstar Broadcasting Group, Inc*., No. 1:14-cv-02007-KBJ, at § X (D.D.C.  Feb. 27, 2015), *available at* http://www.justice.gov/atr/cases/f312200/312220.pdf.

### C.     There Is No Reason to Shorten the 10-Year Duration of the Proposed Judgment.

*Proposed Judgment.* The Proposed Judgment, as well as the Visa/MC Judgment, contains a provision for termination of the Final Judgment in ten years.  It also encompasses a possibility of one-year extensions.  SectionVII.D.  As the trial record confirmed, it can take time for steering to be used widely in the marketplace after first-movers experiment with it, *see* PX1126; Trial Tr. 5812:11-5813:4, 5814:6-9 (Gilligan/Amex), so the judgment must be in force for a substantial period of time.

*Amex's Proposal***.**  Amex proposes a novel addition to the 10-year termination provision, a clause providing for earlier termination at

> the date upon which either Visa or MasterCard adopts Rules that prohibit Merchants from engaging in any of the practices enumerated in Sections III.A.1 through III.A.8 of this Final Judgment.  § VI.C (b).

Amex apparently envisions that it will self-terminate the Court's Final Judgment upon Amex's own determination that Visa or MasterCard has adopted a rule that meets this provision.  It provides no termination process and no notice obligations.  Amex's provision would operate automatically to terminate Amex's Final Judgment even if Plaintiffs were in court to block any new offending Visa or MasterCard rule.

The provision is unnecessary.  At any time during the life of the judgment, if Amex believes that there has been a material change that warrants revision of the Final Judgment, it may make application to the Court pursuant to Proposed Judgment Section VII.B.

## VII.   THE COURT'S DECISION AND THE TRIAL RECORD AMPLY SUPPORT THE PROPOSED JUDGMENT

At closing argument, Amex hinted that it may argue that an evidentiary hearing is needed on remedy.  Trial Tr. 6946:15-6949:02.  But no further evidence is needed here.  It is difficult to

34

imagine a more robust factual record to support the Proposed Judgment.  Over seven weeks of

trial, the court heard testimony of 38 witnesses, including four experts, and admitted over one

thousand exhibits, and both sides had trial time available to them that remained unused.  The

trial evidence included extensive discussion of the effects of the Amex NDPs, including

evidence about how competition among networks likely would differ but for the NDPs,[9] and the

remedy proposed is removal of the NDPs.  Moreover, Amex's claim that the NDPs produce

procompetitive effects was fully litigated and addressed in the Decision.[10]  Nothing more is

needed to craft an appropriate remedy.

A separate evidentiary hearing on remedy is unnecessary when "the matter of relief was

part of the trial on liability" or when no disputed factual issues exist.  *See Microsoft*, 253 F.3d at

101; *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 442 (5th Cir. 2008) ("Generally, a

hearing is required if, for example, new evidence was not presented at trial or important factual

issues were not resolved by the trier of fact in respect to the remedy.").  The key question is

whether material factual disputes not litigated at trial affect the remedy.  *Compare Microsoft*,

253 F.3d at 101 ("[T]here can be no serious doubt that the parties disputed a number of facts

during the remedies phase," where breaking Microsoft into separate companies was at issue),

*with Chicago Bridge*, 534 F.3d at 442 (holding at the remedy phase that there was "no new

factual dispute warranting a remand for an evidentiary trial").

---

[9] For example, the Decision addresses types of merchant steering that has been blocked by the Amex NDPs (at 29-30; Amex's claims about whether merchants are in fact likely to steer (at 117-20); and how merchant's right to steer will engender competition, even if merchants do not actively steer customers (at 119).

[10] For example, the Decision addresses Amex's claims that the NDPs are needed to generate "welcome acceptance" (at 128-43) and that the NDPs are needed to prevent inefficient "free riding" (at 143-49).

In establishing a remedial order, a district court should simply "explain[] how its remedies decree would accomplish [its] objectives." *Microsoft*, 253 F.3d at 103.  In this case, the Court can draw on its comprehensive Decision and the trial record to make this explanation.

## VIII.   CONCLUSION.

Contrary to controlling precedent, Amex proposes a judgment that would not end the violation.  The limited steering that would be "allowed" under Amex's Proposal would be subject to significant loopholes.  Amex's Proposal is not a serious attempt to remedy the wrongs that the Court found in its Decision. It should be rejected, and Plaintiffs' Proposed Judgment should be entered.

Respectfully submitted,

Dated: March 23, 2015

<div style="margin-left:40%">

**U.S. DEPARTMENT OF JUSTICE**

/s/Craig W. Conrath
Craig W. Conrath
Mark H. Hamer
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Tel: (202) 532-4562
Fax: (202) 307-9952
***Counsel for Plaintiff United States of America***

**OFFICE OF THE ATTORNEY GENERAL**
**State of Ohio**
/s/Mitchell L. Gentile
Mitchell L. Gentile
615 West Superior Ave, 11th Floor
Cleveland, OH 44113
Tel: (216) 787-5820
***Counsel for State of Ohio and on behalf of all***
***Plaintiff States***

</div>