UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>Plaintiffs<br><br>v.<br><br>AMERICAN EXPRESS CO., et al.,<br>Defendants | **No. 10-CV-04496 (NGG) (RER)**<br>**ECF Case**<br><br>**PUBLIC REDACTED VERSION** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PROPOSED FINAL
JUDGMENT AND ORDER ENTERING INJUNCTION**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Attorneys for Defendants*

March 23, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.........................................................................................i

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND .........................................................................................................3

ARGUMENT................................................................................................................5

I.     LEGAL STANDARD ........................................................................................5

II.    THE COURT SHOULD ENTER AMERICAN EXPRESS'S PROPOSED FINAL
       JUDGMENT. ......................................................................................................8

       A.     Merchant Steering Rights Should Be Tailored to the Competitive Harm
              Found By the Court...................................................................................8

              1.     Merchant Steering Should Be Limited to Lower Cost GPCC Cards. .....8

              2.     There Is No Basis in the Liability Decision to Permit Steering to
                     Products That Are Outside the Defined Market.................................17

       B.     American Express Should Be Entitled To Prevent Merchants from
              Mischaracterizing Its Network and Products........................................20

       C.     American Express Should Be Entitled to Require Merchants That Steer to
              Also Indicate That They Accept American Express Cards at the Point of
              Sale.........................................................................................................22

       D.     American Express Should Be Entitled to Prevent Free-Riding on Its
              Merchant Benefits..................................................................................23

       E.     American Express Should Not Be Compelled to Do Business With a
              Steering Merchant...................................................................................26

       F.     American Express Should Be Entitled to Steer Card Members to
              Merchants That Do Not Steer.................................................................31

       G.     American Express Should Be Permitted to Individually Negotiate
              Exclusive Steering Agreements in the Same Way as All of the Other
              GPCC Networks. ....................................................................................32

       H.     American Express Should Be Entitled to Notice Before a Merchant Begins
              Steering...................................................................................................34

       I.     The Court Should Adopt American Express's Proposed Effective Date.............36

       J.     The Court Should Adopt the Duration of the Final Judgment Set Forth in
              American Express's Proposal. ................................................................36

       K.     The Court Should Adopt American Express's Proposed Definition of
              "Merchant". ............................................................................................37

L.     The Court Should Adopt American Express's Proposed Definitions of the Terms "Issuing Bank" and "Rule". .................................................................... 39

M.     The Court Should Adopt Language in the Final Judgment That Appropriately Accounts for the Concept of Control. ........................................... 40

III.   THE COURT SHOULD REJECT THE GOVERNMENT'S ONEROUS AND UNNECESSARY NOTICE AND COMPLIANCE REQUESTS. .................................. 41

A.     The Court Should Adopt American Express's Compliance and Enforcement Procedures and Reject the Government's Onerous and Unnecessary Additional Procedures. ................................................................ 41

B.     The Court Should Adopt American Express's Proposed Written Merchant Notification Provisions. ....................................................................................... 46

C.     The Court Should Not Regulate the Specific Language of American Express's Contracts. ............................................................................................ 49

CONCLUSION ................................................................................................................ 51

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n,
    633 F. Supp. 201 (N.D. Ill. 1986) ......................................................................25

Bel Canto Design, Ltd. v. MSS HiFi, Inc., No. 11 CIV. 6353 CM,
    2012 WL 2376466 (S.D.N.Y. June 20, 2012) ...................................................27

Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc.,
    996 F.2d 537 (2d Cir. 1993) ..............................................................................27

City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011)...................passim

Doctor's Assocs., Inc. v. Reinert & Duree, P.C., 191 F.3d 297 (2d Cir. 1999) ...........................40

Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911)................................27

E.E.O.C. v. Fed. Express Corp., 268 F. Supp. 2d 192 (E.D.N.Y. 2003) ......................................7

FTC v. Beech-Nut Packing Co., 257 U.S. 441 (1922)............................................................7, 28

Hartford-Empire Co. v. United States, 323 U.S. 386 (1945) ...........................................6, 33, 47

Image Technical Servs., Inc. v. Eastman Kodak Co.,
    125 F.3d 1195 (9th Cir. 1997) .............................................................................7

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,
    No. 05-MD-1720 (JG) (JO) (E.D.N.Y. October 19, 2012) .............................36, 38

Int'l Salt Co. v. United States, 332 U.S. 392 (1947)........................................................6, 33, 47

Konik v. Champlain Valley Physicians Hosp., 733 F.2d 1007 (2d Cir. 1984) ............................25

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877 (2007) ...................................25

Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561 (7th Cir. 1951) ...................6, 33, 37, 38

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984) ..................................................26

NBO Indus. Treadway Cos. v. Brunswick Corp., 523 F.2d 262 (3d Cir. 1975) ...........................7

New York v. Microsoft Corp., 224 F. Supp. 2d 76 (D.D.C. 2002) .......................................passim

Paramount Film Distrib. Corp. v. Vill. Theatre,
    228 F.2d 721 (10th Cir. 1955) ............................................................6, 33, 37, 38

iii

<u>Petrello v. White</u>, 533 F.3d 110 (2d Cir. 2008) ...................................................................34

<u>Toys "R" Us v. FTC</u>, 221 F.3d 928 (7th Cir. 2000) ..........................................................28, 29

<u>United States v. Am. Exp. Co.</u>, No. 10-CV-4496 (NGG)(RER),
    2015 WL 728563 (E.D.N.Y.) ..................................................................................passim

<u>United States v. Apple, Inc.</u>, 992 F. Supp. 2d 263 (S.D.N.Y. 2014) ...........................................45

<u>United States v. Bausch & Lomb Optical Co.</u>, 321 U.S. 707 (1944).....................................7, 27

<u>United States v. Bazaarvoice, Inc.</u>, No. 3:13-cv-00133-WHO,
    2014 WL 203966 (N.D. Cal. Jan. 8, 2014)...........................................................................45

<u>United States v. Colgate & Co.</u>, 250 U.S. 300 (1919) ..........................................................26, 27

<u>United States v. Imperial Chem. Indus.</u>, 105 F. Supp. 215 (S.D.N.Y. 1952)...........................5, 10

<u>United States v. Microsoft Corp.</u>, 253 F.3d 34 (D.C. Cir. 2001).......................................6, 9, 10

<u>United States v. Nat'l Ass'n of Realtors</u>, No. 1:05-cv-05140,
    2008 WL 5411637 (N.D. Ill. Nov. 18, 2008) .......................................................................46

<u>United States v. Visa U.S.A., Inc.</u>,
    183 F. Supp. 2d 613 (S.D.N.Y. Nov. 26, 2001)....................................................................20

<u>Waldman Pub. Corp. v. Landoll, Inc.</u>, 43 F.3d 775 (2d Cir. 1994) ..............................................5

**Statutes & Rules**

Bank Secrecy Act, 12 U.S.C. § 1829b, 1951 et seq. (2012)........................................................29

Fed. R. Civ. P. 65(d) ...................................................................................................................33

Fed. R. Evid. 801(d)(2)(B) ..........................................................................................................19

Money Laundering Control Act of 1986, 18 U.S.C. § 1956 (2012) ............................................29

Trading with the Enemy Act of 1917, 12 U.S.C. § 95a,
    50 U.S.C. App'x § 1-44  (2012).........................................................................................29

USA PATRIOT Act § 326, 31 U.S.C. § 5318 (2012)..................................................................29

**Other Authorities**

Enhancing Airline Passenger Protections, 76 Fed. Reg. 23,109 (Apr. 25, 2011)........................16

Jon Leibowitz, Chairman, FTC, Remarks at a Conference on the Economics of Drip
   Pricing (May 21, 2012)........................................................................................15

Joseph Farrell, FTC, FTC Drip Pricing Economic Workshop Presentation: Consumer and
   Competitive Effects of Obscure Pricing (May 21, 2012).......................................16

Office of the Comptroller of the Currency, Comptroller's Handbook:  Merchant
   Processing 29 (Aug. 2014) ..................................................................................29

Press Release, American Express, American Express and Costco U.S. Partnership
   Agreements Set to End March 31, 2016 (Feb. 12, 2015),  ....................................15

U.S. Dep't of Justice Antitrust Div., Antitrust Division Policy Guide to Merger Remedies
   (2011) .........................................................................................................passim

Visa, Visa International Operating Regulations (Oct. 15, 2013)..................................38

Visa, Visa International Operating Regulations (Oct. 15, 2012)..................................38

William Charles, American Express & jetBlue Partnership Will Expire December 31st,
   2015, Doctor of Credit (Mar. 1, 2015)  ...............................................................15

Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "American Express") respectfully submit this Memorandum of Law in Support of Defendants' Proposed Final Judgment and Order Entering Injunction ("Proposed Final Judgment") pursuant to the Court's Scheduling Order dated February 19, 2015.[1]

## PRELIMINARY STATEMENT[2]

American Express's Proposed Final Judgment is supported by the Court's analysis and controlling law. The changes to the NDPs proposed by American Express are intended to: (i) modify the NDPs consistent with the Court's findings so as to give effect to the Court's Liability Decision; (ii) provide American Express with certain narrowly tailored, less-restrictive rights that would confirm the Company's ability to engage and deal with merchants and Card Members in procompetitive ways explicitly contemplated by the Court's Liability

---

[1] American Express reserves all rights to appeal the findings of fact and conclusions of law in the Court's February 19, 2015, Decision. (Dkt. No. 619 [hereinafter "Liability Decision].) As the Court recognized in its February 19, 2015, Scheduling Order, the statements and requests made herein and in the accompanying Proposed Final Judgment "shall not prejudice or waive any of [the parties'] rights, including their rights to present arguments on appeal". (See Scheduling Order, Dkt. No. 620 [hereinafter "Scheduling Order"] at 2.) Thus, for example, while American Express continues respectfully to believe that its Non-Discrimination Provisions ("NDPs") are lawful and no injunction is necessary or appropriate, American Express is proposing here to modify its NDPs in certain respects consistent with the Court's Liability Decision in light of the current procedural posture. In addition, the fact that American Express is not specifically seeking certain rights as part of the final judgment to which it believes it is entitled under the law is without waiver of its appellate positions, including but not limited to: (i) the right to enter into individually negotiated NDPs with a merchant; (ii) the right to contractually require merchants not to state preferences for competing networks; and (iii) the right to prohibit merchants from steering American Express Card Members after they have indicated an intention to use an American Express Card.

[2] For ease of reference, attached as Exhibit C to this Memorandum is a chart identifying the provisions of both parties' Proposed Final Judgments that are a subject of disagreement and the section(s) of this Memorandum in which those provisions are discussed.

Decision; and (iii) provide American Express with the same rights under the same restrictions that the Government accorded Visa and MasterCard under the Consent Decree, thereby ensuring that American Express is not improperly penalized or put at a competitive disadvantage.

By contrast, the Government proposes relief that is far broader than, and fundamentally inconsistent with, the Court's liability findings, its own allegations and the law. The Government's proposed relief also improperly seeks to penalize American Express for litigating this rule-of-reason case—which the Court recognized raised issues that are both complex and "not obvious". (See Liability Decision at 4-5, 33 n.7.)  For example, the Government's Proposed Final Judgment would:  (i) improperly constrain American Express's ability to limit steering in ways that exceed the relief necessary to address the competitive harm identified by the Court; (ii) fundamentally limit American Express's ability to engage with merchants and Card Members, and address merchant free-riding, in ways that the Court's Liability Decision explicitly states are permissible and procompetitive; (iii) restrict American Express's fundamental right to choose the merchants with which it will do business; (iv) restrict American Express's ability to limit steering beyond the ways that Visa and MasterCard are restricted under the Government's Consent Decree—even though these firms represent 70% of the antitrust market defined by the Court—while simultaneously making it more difficult for American Express to encourage the very type of merchant steering behavior that the Court found to be procompetitive; and (v) impose onerous, unprecedented and wholly unwarranted compliance obligations despite the absence of any evidence that American Express has or would intentionally violate the antitrust laws or that American Express might in the future unintentionally violate the Final Judgment in a manner that would not be easily detected by merchants and the Government.

American Express respectfully submits that the Government's effort to remove the NDPs in full will disable the Company from effectively competing against the dominant networks.  While the Court has concluded that the NDPs violate Section 1 of the Sherman Act, it has also found that American Express has a legitimate need to protect itself from the power and practices of those networks.  (See Liability Decision at 133-34, 140-42; see also Scheduling Order at 1-2.)  The relief imposed by the Court should not unnecessarily disadvantage American Express in its ability to compete.  Accordingly, and for the reasons discussed below, American Express respectfully requests that the Court enter the Proposed Final Judgment submitted herewith by American Express.[3]

## BACKGROUND

Following a bench trial, the Court issued its findings of fact and conclusions of law on February 19, 2015, finding that American Express's NDPs violate Section 1 of the Sherman Act, 15 U.S.C. § 1.  Pursuant to the Scheduling Order also issued on February 19, 2015, the Court directed the parties to attempt to reach agreement on the terms of a remedial order and final judgment in recognition that the parties were "best equipped to determine how American Express's merchant regulations might be rewritten so as to satisfy American Express's" legitimate "business interest in preserving a positive point-of-sale experience for [its] cardholders, and protecting [its] products from actual mistreatment, mischaracterization, or

---

[3] In light of the significance of these issues to American Express's ability to compete effectively in the marketplace going forward, American Express's interests will be prejudiced if it is not given the opportunity to respond to the Government's arguments concerning the scope of the appropriate remedy in this case.  Accordingly, American Express reserves all rights to respond and will request the opportunity to file a responsive written submission and/or request a hearing once it has received the Government's memorandum in support of its proposed final judgment.

denigration by merchants" in a manner that comports with the Sherman Act.  (See Scheduling Order at 1-2.)  The Court also expressed its confidence that "there exists a middle ground that strikes the appropriate balance" between American Express's legitimate business interests and the public interest, as protected by the federal antitrust laws, and suggested that the middle ground might involve revising, amending or recharacterizing, rather than excising, certain provisions of the NDPs.  (Id.)  The Court further directed the parties, should they be unable to reach an agreement on the terms of the final judgment, to file both a joint submission indicating the areas of agreement and impasse and individual submissions explaining why the Court should adopt that party's proposed final judgment.  (Id. at 3.)

On March 6, 2015, the Government sent a draft proposed final judgment to American Express's counsel.  On March 13, American Express sent its initial draft Proposed Final Judgment to the Government.  On March 17, the parties conferred telephonically in an attempt to negotiate a mutually agreeable final judgment.  The parties participated in another call on March 19, to follow up on certain issues from the prior call and to continue to discuss a mutually agreeable remedial order.  Later that day, the parties exchanged revised draft final judgments.  On March 23, American Express sent the Government a further revised draft Proposed Final Judgment.  (See Ex. A (Defs.' [Proposed] Final J. as to the American Express Defs. and Order Entering Inj. [hereinafter "Defs.' Proposed Final J."]); see also Ex. B (Pls.' [Proposed] Remedial Order and Final J. as to the American Express Defs. [hereinafter "Pls.' Proposed Final J."].)  The parties were unable to reach agreement on the issues discussed below, which are also reflected in the chart attached hereto as Exhibit C.  (See Ex. C (Chart of Impasse Issues [hereinafter "Impasse Chart"]).)

ARGUMENT

## I.      LEGAL STANDARD

The equitable relief granted in an antitrust action must go no further than necessary to redress the competitive harm giving rise to the defendant's liability.  See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir. 2011) ("Although a district court has 'a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct,' it is nonetheless 'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'" (quoting Forschner Grp., Inc. v. Arrow Trading Co., 124 F.3d 402, 406 (2d Cir. 1997))).  Indeed, as the Department of Justice itself has explained, "the remedy should fit the violation and flow from the theory or theories of competitive harm", and "[a] remedy carefully tailored to the competitive harm is the best way to ensure effective relief".  See U.S. Dep't of Justice Antitrust Div., Antitrust Division Policy Guide to Merger Remedies [hereinafter "DOJ Remedies Policy Guide"] 3-4 (2011).

Similarly, "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity".  Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994) (citing Soc'y For Good Will To Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1251 (2d Cir. 1984)); see also United States v. Imperial Chem. Indus., 105 F. Supp. 215, 220 (S.D.N.Y. 1952) ("Only those provisions reasonably necessary to accomplish correction and adjustment of a dislocated competitive situation may be applied."); New York v. Microsoft Corp., 224 F. Supp. 2d 76, 100 (D.D.C. 2002) ("Notwithstanding this flexibility, the Court may not simply enjoin 'all future violations of the antitrust laws'.  Rather, a remedy 'should be tailored to fit the wrong creating the occasion for the remedy.'" (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 133

5

(1969)), aff'd, 373 F.3d 1199 (D.C. Cir. 2004).  Accordingly, a court "must base its relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended'".  United States v. Microsoft Corp., 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust Principles and Their Application [hereinafter "Areeda & Hovenkamp"] ¶ 653(b) (1996)).

Punishment of past transgressions is not an appropriate remedial purpose.  See Int'l Salt Co. v. United States, 332 U.S. 392, 401 (1947) abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006); see also Hartford-Empire Co. v. United States, 323 U.S. 386, 409 (1945) ("[W]e may not impose penalties in the guise of preventing future violations.").  Consequently, equitable relief in an antitrust case should "not embody harsh measures when less severe ones will do".  Areeda & Hovenkamp ¶ 325(a).

Thus, an injunction "should not go further than to put the parties in the position they would enjoy" if no antitrust violation had existed, and it should not provide the defendant's rivals with a "positive competitive advantage".  See Paramount Film Distrib. Corp. v. Vill. Theatre, 228 F.2d 721, 727 (10th Cir. 1955); see also Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 571 (7th Cir. 1951) ("The plaintiff has no right to the award of a position superior to that of other competitors.").  The Department of Justice has itself affirmed this principle, explaining in its Merger Remedies Policy Guide that "decree provisions should preserve competition generally rather than protect or favor particular competitors".  See DOJ Remedies Policy Guide at 3.

As the Department of Justice has also confirmed, "[c]ourts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter". (See Response of Pl. United States to Public Comments on the Proposed Final J., Dkt. No. 119-1 [hereinafter "Pl. U.S. Response to Tunney Comments"] at 10); see also Mickalis Pawn Shop, 645 F.3d at 146; E.E.O.C. v. Fed. Express Corp., 268 F. Supp. 2d 192, 206 (E.D.N.Y. 2003). Accordingly, while withholding rights from American Express that were granted to Visa and MasterCard in the Consent Decree in this case would be inappropriately punitive, the fact that the decree with Visa and MasterCard includes certain restrictions on their activity cannot, on its own, form the basis for imposing those same restrictions on American Express.

In reviewing final judgments in antitrust cases, appellate courts have rejected or narrowed the scope of injunctions where the relief ordered by the Court ran afoul of these limitations. See, e.g., Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1225-28 (9th Cir. 1997) (modifying injunction to remove terms that were "unnecessary" and anticompetitive, including requirement to sell all Kodak replacement parts, not just those made by Kodak, and to sell at "reasonable" prices); NBO Indus. Treadway Cos. v. Brunswick Corp., 523 F.2d 262, 279 (3d Cir. 1975), vacated on other grounds sub nom., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) (rejecting injunction requiring divestiture on the ground that "less drastic relief will provide sufficient redress"); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 728-29 (1944); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 443 & n.1, 455-56 (1922).

II.    THE COURT SHOULD ENTER AMERICAN EXPRESS'S PROPOSED FINAL
       JUDGMENT.

      A.      **Merchant Steering Rights Should Be Tailored to the Competitive Harm
Found By the Court.**

            1.      Merchant Steering Should Be Limited to Lower Cost GPCC Cards.

In the Liability Decision, the Court determined that American Express's NDPs insulated it from competition at the point of sale by limiting the ability of merchants to steer customers to lower priced general purpose credit and charge cards. American Express therefore proposes a remedy that will prohibit it from limiting merchants' steering rights in situations where the merchant would be steering customers to a GPCC card that is less costly for the merchant to accept than an American Express Card. Specifically, under American Express's proposal, American Express would be required to permit merchants to steer to a GPCC card that, for the particular transaction in question, has an All-In Merchant Fee that is lower than the All-In Merchant Fee the merchant would pay if the customer used an American Express Card. (See Ex. A (Defs.' Proposed Final J.) §§ I.2, I.15, III.A.)[4] The Government, on the other hand, proposes that there be no cost-based limitations relating to a merchant's ability to steer. (See Ex. B (Pls.' Proposed Final J.) § IV.A.) In other words, under the Government's Proposed Final Judgment, American Express would be required to permit merchants to steer away from its Cards to GPCC cards even if those other GPCC cards are more costly for the merchant to accept. Such an

---

[4] To ensure that merchants post only accurate and complete rate information and steer only to cards that actually cost the merchant less to accept than American Express Cards, American Express's Proposed Final Judgment defines "All-In Merchant Fee" as the total of all fees incurred by a merchant for the particular transaction, including, but not limited to, the merchant discount rate, interchange fees, network fees, processing fees and acquirer fees, whether charged or collected on (i) a per transaction basis, or (ii) an annual basis or any other basis (in which case such fees should be allocated to the merchants' transactions on a pro-rata basis). (See Ex. A (Defs.' Proposed Final J.) § I.2.)

outcome is inconsistent with the Court's Liability Decision, and the Government's proposal should be rejected.

First, enabling steering to lower cost GPCC cards is "consistent with the [Court's] analysis set forth in [its] Decision", (see Scheduling Order at 2), while a remedy permitting merchants to steer to higher cost cards would lack the necessary "causal connection between the conduct enjoined or mandated and the violation found", see United States v. Microsoft, 253 F.3d at 105 (quoting Areeda & Hovenkamp ¶ 653(b)).  Moreover, the Court's Liability Decision—and the Government's entire theory of competitive effects—is premised on the theory that merchants need the ability to steer to lower cost GPCC cards to enhance competition among the GPCC card networks for merchant business.  To cite just a few examples:

- "Defendants' Merchant Restraints, however, prevent merchants from offering their customers a discount or benefit for using a network credit card that is less costly to the merchant . . . . In short, Defendants' Merchant Restraints prohibit merchants from fostering competition among credit card networks at the point of sale."  (Am. Compl., Dkt. No. 57 ¶ 3 (emphasis added).)

- The NDPs "sever the essential link between the price and sales of network services by denying merchants the opportunity to influence their customers' payment decisions and thereby shift spending to less expensive cards".  (See Liability Decision at 98 (emphasis added).)

- "But pursuant to Amex's N[DP]s, merchants who accept American Express are not permitted to encourage customers to pay for their transactions with credit cards that cost the merchants less to accept."  (Id. at 4 (emphasis added).)

- "By suppressing the incentives of its network rivals to offer merchants, and by extension their customers, lower priced payment options at the point of sale—short of triggering defection, merchant demand for network services is largely unresponsive to changes in price unless merchants are able to steer customers among the GPCC networks— American Express's merchant restraints harm interbrand competition."  (Id. at 100-01 (emphasis added).)

- "By preventing merchants from steering additional charge volume to their least expensive network, for example, the NDPs short-circuit the ordinary price-setting mechanism in the network services market by removing the competitive 'reward' for networks offering merchants a lower price for acceptance services."  (Id. at 6 (emphasis added).)

9

- "Restrained by Amex's anti-steering rules, merchants cannot inject price competition into the network services industry by encouraging their customers to use their <u>lowest cost supplier</u>, as they can in other aspects of their businesses." (<u>Id.</u> at 103 (emphasis added).)

- "Were merchants able to direct a greater share of their charge volume to <u>lower-cost credit or charge card networks</u>, whether by offering discounts to customers for using such cards, posting the relative costs of different modes of payment, or engaging in another form of point-of-sale steering, they would be better able to control and lower their costs of credit card acceptance." (<u>Id.</u> at 118 (emphasis added).)

- "Indeed, American Express itself recognizes that several of its larger merchants desire the ability to steer volume to <u>less expensive networks</u>, and that removal of its NDPs may require Amex to reduce its premium discount rates." (<u>Id.</u> at 119 (emphasis added).)

- "Amex witnesses also testified that the network would face increased pressure to reduce its rates if merchants could shift share to a <u>less expensive network</u>." (<u>Id.</u> at 120 (emphasis added).)

According to the Court's reasoning, the NDPs have harmed competition principally by denying rival networks "the opportunity to pursue a business model that differentiates itself by offering merchants a <u>low price</u> in return for greater volume". (<u>Id.</u> at 107 (emphasis added).)

By contrast, there is <u>no</u> suggestion in any filing or economic analysis submitted by the Government, nor anywhere in the Court's Liability Decision, that merchant steering to <u>higher cost</u> (or even comparable cost) GPCC cards would result in more competition among the networks or provide <u>any</u> benefits to merchants or consumers. Thus, a remedy that denies American Express the right to limit steering to higher cost or comparable cost GPCC cards would be improper because it would not "flow from the theory or theories of competitive harm" alleged by the Government and reflected in the Court's ruling. <u>See</u> DOJ Remedies Policy Guide at 4; <u>see also</u> <u>United States v. Microsoft</u>, 253 F.3d at 105; <u>New York v. Microsoft</u>, 224 F. Supp. 2d at 100; <u>Imperial Chem. Indus.</u>, 105 F. Supp. at 220.

Notably, the Government's own witness, Discover's CFO Roger Hochschild, recognized that it is entirely plausible that some merchants could find themselves in situations in which it is rational for them to steer customers to higher cost cards given the power of the dominant firms in this industry. As Mr. Hochschild explained, Visa used its "We Prefer" campaign to shift volume away from Discover despite the fact that Discover's cards were significantly cheaper for the merchant than Visa's.[5] (See Trial Tr. at 932:22-934:13, 938:15-939:4 (Hochschild/Discover).) As a consequence, Discover's NDPs, according to Mr. Hochschild, limit steering only to the extent that alternative cards are more expensive for the merchant than Discover's card. (See Trial Tr. at 932:22-934:13, 938:15-939:4 (Hochschild/Discover).) Under the logic of the Liability Decision, American Express should have the same rights.

Second, the only way to ensure that merchants are steering to lower cost cards, and thereby acting in a manner consistent with the Court's Liability Decision, is to require that the cost comparison be done at the transaction level. As the Court found, "the discount rates applied to purchases on Visa or MasterCard [or Discover] products vary depending on the type of card used—i.e., high rewards cards are subject to higher interchange rates and thus cost merchants more to accept". (See Liability Decision at 18.) The record also demonstrates that many merchants pay more to accept Visa and MasterCard high-end rewards cards and corporate

---

[5] In addition to returning to its "We Prefer" tactics, the record demonstrates that Visa could also easily respond to steering by implementing a pricing structure involving high fixed fees and low variable fees that incented merchants to steer toward Visa—with the merchant believing in good faith that doing so was in its economic self-interest—despite the fact that those networks were continuing to charge overall higher fees than rival networks. (See Trial Tr. 6476:4-6479:14 (Bernheim/Amex).) This is also why American Express's proposed definition of "All-In Merchant Fee" includes fees charged "on an annual basis or other basis (in which case such fees should be allocated to the merchant's transaction on a pro-rata basis)." (See Ex. A (Defs.' Proposed Final J.) § I.2.)

card products than they pay to accept American Express Cards.  (See Trial Tr. 438:8-10 (Robinson/Ikea) (testifying that some Visa and MasterCard products cost Ikea more to accept than American Express Cards); see also Trial Tr. 2346:10-16 (Bruno/Crate & Barrel) (same with respect to Crate & Barrel); Trial Tr. at 1658:7-9 (Brennan/Hilton) (same with respect to Hilton); Liability Decision at 89.)  As a result, it is undisputed that steering based solely on network identity will, in many instances, result in steering to higher priced cards.

The Government cannot now argue that transaction-level steering would be infeasible and unworkable given its arguments to the contrary during the liability phase of this case.  For example, in its post-trial Findings of Fact, the Government wrote that "[s]ome merchants have, or are developing technology to provide their customers with immediate discounts at the point of sale for using a less-expensive credit card".  (See Pls.' Proposed Findings of Fact, Dkt. No. 600 [hereinafter "Pls.' FOF"] ¶ 117; see also Pls.' FOF ¶¶ 118-23.)[6] The Court accepted these arguments in its Liability Decision, finding that transaction-level steering will be feasible because merchants will have the incentive to figure out their costs, networks and acquirers will have the incentive to help them do so, and new technologies will come to the market to facilitate merchants' steering efforts.  (See Liability Decision at 125

---

[6] The Government made the same arguments in 2011 during the Tunney Act public comment period on the then-proposed Consent Decree with Visa and MasterCard.  Specifically, in response to a concern raised by the Retail Industry Leaders Association ("RILA") regarding whether merchants would be able to distinguish between different types of Visa and MasterCard GPCC cards in order to effectively steer customers to the least expensive cards, the Government argued that the concern was unfounded because Visa and MasterCard offered "electronic inquiry services" that allow merchants and/or their acquiring banks to determine the type of card and cost associated with it at the point of sale without requiring the consummation of a transaction, and because, according to the Government, "[c]ompetition among Acquiring Banks will give them incentives to find new and innovative ways to meet merchant demand for information and technology that will allow them to implement their desired steering methods.  Acquiring Banks that find efficient and useful ways to meet merchants' new-found demand will win more merchant business".  (See Pl. U.S. Response to Tunney Comments at 16-24.)

("[T]he court believes that Amex's competitors and/or the merchant's acquiring bank or processor would be in a position to provide merchants with an accurate measure of their true costs of acceptance were there demand for such information."); see also id. at 126 ("Even if the practical difficulties of steering were as significant as Defendants suggest, the record provides several examples of how new technologies under development by several merchants, including real-time pricing tools being developed by Official Payments and Sinclair Oil, would help overcome any remaining logistical hurdles to interbrand competition associated with merchant steering." (citations omitted)).)

Third, any suggestion that the Court should reject a transaction-level steering approach and instead limit steering to GPCC transactions that are, on average, less expensive to the merchant must fail. As an initial matter, such an approach would inevitably result in merchants sending inaccurate pricing signals to many of their customers. For example, as the merchant witness from Ikea testified, some Visa and MasterCard high-rewards cards are more expensive for Ikea to accept than American Express, yet, according to the witness, Ikea's blended average rates for Visa and MasterCard are lower than American Express's rates. (See Trial Tr. 438:8-10 (Robinson/Ikea).) Thus, under the Government's Proposed Final Judgment, Ikea could steer an American Express Card Member to a higher cost Visa card by indicating to the Card Member that "Visa costs less" (for example, by posting Ikea's blended average acceptance costs showing a lower overall rate for Visa transactions or by offering a discount for all Visa transactions). That statement would of course be false when made to that customer, and would also have broader competitive implications. Such a result, which is both permissible and likely under the Government's Proposed Final Judgment, would be misleading and would result in the same type of inefficient informational asymmetry that the Court identified as an

anticompetitive effect of the NDPs.  (See Liability Decision at 101 (finding that, because of the NDPs, consumers do not "internalize the full cost of their payment choice or account for the costs of different forms of payment when deciding which form to use").)

    Fourth, permitting steering to more expensive credit and charge cards would lead to significant competitive harm.  As noted, there are many Visa and MasterCard products that cost merchants more to accept than American Express.  Those products are the ones most like American Express Cards in that they provide very attractive rewards programs.  (See Trial Tr. 3695:21-3697:10 (Silverman/Amex) (explaining that American Express Card Members are more likely to carry premium Visa and MasterCard products).)  A merchant that steers to a network that is on average less expensive to accept could, therefore, easily mislead those Card Members into incorrectly believing that using their high-end Visa or MasterCard would help the merchant reduce its acceptance costs.  For the minority of American Express Card Members who do not already own Visa or MasterCard products, they could similarly be incented to obtain and use high-rewards Visa or MasterCard products based on the mistaken belief that by using such a card they could get their rewards while also using a product that costs the merchant less than American Express.  Given spillover effects, the adverse impact on American Express's charge volume from such misleading merchant conduct would extend well beyond the steering merchant and further disadvantage American Express's ability to invest in the highly competitive issuing business, violating the spirit and letter of the Court's Liability Decision.  (See Trial Tr. 4355:6-4357:8 (Chenault/Amex); see also Tr. 5043:1-14 (Gilbert/Amex).)[7]

---

[7] As the Court found in the Liability Decision, competition for card issuing is already fierce. Visa and MasterCard each has thousands of banks that issue its cards.  In contrast, American Express has the "fewest cardholders and fewest issuing banks of any major network".  (Liability Decision at 93 n.38.)  American Express also has a significant merchant coverage gap, which "represents a significant competitive challenge for American Express in the card issuance

The Government's proposed approach would incent all networks to have the same pricing model:  <u>more</u> complex and <u>less</u> transparent pricing.  American Express is currently the only network with straightforward, transparent pricing.  All other networks utilize "teaser" rates and complex rate structures that end up misleading merchants into thinking they are paying less to accept Visa and MasterCard than they actually are.  (<u>See</u> Trial Tr. 2976:8-2977:6, 3104:9-3105:13 (Pojero/Amex); <u>see also</u> Tr. 6341:25-6342:20 (Bernheim/Amex).)  Adoption of the Government's approach would provide further incentives for the dominant firms to use those misleading practices and ensure that pricing complexity will proliferate in this marketplace and impede the effect of this Court's intended remediation.  There can be no question that this will reduce both competition and consumer welfare.  <u>See</u> Jon Leibowitz, Chairman, FTC, <u>Remarks at a Conference on the Economics of Drip Pricing</u> (May 21, 2012) (transcript available at http://www.ftc.gov/be/workshops/drippricing/) ("At the FTC, we recognize the importance of truthful, nondeceptive price advertising.  It promotes price competition.  It allows consumers to purchase the products and services they want.  On the other hand, drip pricing, by advertising

---

market".  (<u>Id.</u> at 93-94.)  Recent significant developments only underscore the fierce competition that American Express faces for card issuance.  On February 12, 2015, American Express announced that, effective March 31, 2016, its co-brand relationship with Costco would end.  As a result, American Express will no longer issue a co-brand card with Costco.  Instead, Citibank will issue those cards, which will run on the Visa network, and Costco—American Express's largest accepting merchant in the United States—will also terminate its acceptance of American Express Cards.  <u>See</u> Press Release, American Express, <u>American Express and Costco U.S. Partnership Agreements Set to End March 31, 2016</u> (Feb. 12, 2015), http://about.americanexpress.com/news/pr/2015/amex-costco-us-agreement-to-end.aspx.  Shortly thereafter, it was also announced that American Express had lost its co-brand relationship with JetBlue.  William Charles, <u>American Express & jetBlue Partnership Will Expire December 31st, 2015,</u> Doctor of Credit (Mar. 1, 2015), http://www.doctorofcredit.com/american-express-jetblue-partnership-will-expire-december-31st-2015.  Thus, in a few short weeks, American Express lost two of its four largest co-brand partners in the United States, which is of particular significance given that, in 2012, total co-brand spending accounted for approximately 40% of American Express's consumer spend in the United States.  (<u>See</u> Trial Tr. 4421:19-4422:21 (Chenault/Amex); <u>see also</u> DX7409 at '021.)

15

only part of a price, has the potential to mislead and harm consumers, causing them to pay too much and to waste time searching for cell phone plans, airline or concert tickets, hotel rooms, or rental cars with deceptively low prices."); see also Enhancing Airline Passenger Protections, 76 Fed. Reg. 23,109 at 23,142-43 (Apr. 25, 2011) (noting consumer protection concerns with complex prices that obscure the total costs paid by the consumer); Joseph Farrell, FTC, FTC Drip Pricing Economic Workshop Presentation:  Consumer and Competitive Effects of Obscure Pricing (May 21, 2012), at 8, available at www.ftc.gov/be/workshops/drippricing/docs/ jfarrell.pdf (noting that competitive pressure is weaker if purchasers cannot comparison shop due to complex pricing).

For these reasons, American Express respectfully submits that the Court should adopt Sections  I.2, I.15 and III.A. of its Proposed Final Judgment.

Finally, American Express also notes that the Government's request that American Express be required to allow merchants to "communicat[e] to a Customer the reasonably estimated (including, e.g., average) or actual costs incurred by the Merchant" should be rejected for the same reasons because it does not explicitly require that the cost comparison be completed at the transactional level.  (See Ex. B (Pls.' Proposed Final J.) § IV.A.7 (emphasis added).)  In addition, even were the Court to reject American Express's proposal to confine steering to situations where the card to which the consumer is being steered is in fact less expensive, the Government's proposed Subsection IV.A.7 must be rejected for the additional reason that it could be read to suggest that a merchant can compare the costs of American Express acceptance to the blended credit/debit cost of acceptance for Visa or MasterCard.  This approach advocated by the Government is both inconsistent with the Court's market definition and highly likely to mislead consumers.  As established at trial, merchants pay less to accept

16

debit cards than credit cards.  (See Liability Decision at 59-60.)  Blending together credit and debit prices will overstate the difference between the cost to the merchant for Visa/MasterCard credit acceptance and American Express credit acceptance given the fact that American Express does not have debit cards.  For example, one merchant analysis conducted by American Express using the merchant's acquirer statement demonstrated that the merchant's blended rate for the acceptance of Visa debit and credit was ███, while its blended rate for Visa credit alone was ███  ███████████  If merchants are permitted to disclose "average" costs—as we submit, for the reasons stated above, that they should not be—the average cost must be limited to those products that are actually in the market advocated by the Government and defined by the Court.

       2.    <u>There Is No Basis in the Liability Decision to Permit Steering to Products That Are Outside the Defined Market.</u>

Consistent with the Court's market definition findings, American Express's Proposed Final Judgment restricts American Express's ability to limit steering only with respect to credit and charge card products.  (See Ex. A (Defs.' Proposed Final J.) § III.A.)  By contrast, the Government seeks relief that interferes with American Express's rights to limit steering from its credit and charge cards to all other forms of payment, including debit, which the Government has consistently said are outside the relevant market and are <u>not</u> reasonably interchangeable with GPCC cards.  (See Ex. B (Pls.' Proposed Final J.) § IV.A.)

As explained at the outset of this submission, equitable relief granted in an antitrust action must go no further than seeking to redress the competitive harm giving rise to the defendant's liability.  See <u>Mickalis Pawn Shop</u>, 645 F.3d at 144 ("[A] court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'" (quoting <u>Forschner</u>, 124 F.3d at 406)); <u>see also</u> DOJ Remedies Policy Guide at 3-4.

Here, the competitive harm identified by the Court based on the Government's allegations is the restriction of competition among credit and charge card networks. (See Liability Decision at 100-01 ("By suppressing the incentives of its network rivals to offer merchants, and by extension their customers, lower priced payment options at the point of sale—short of triggering defection, merchant demand for network services is largely unresponsive to changes in price unless merchants are able to steer customers among the GPCC networks—American Express's merchant restraints harm interbrand competition."); see also id. at 127 ("In sum, Plaintiffs have proven by a preponderance of the evidence that American Express's Non-Discrimination Provisions have imposed actual, concrete harms on competition in the credit and charge card network services market.").)

There was no finding by the Court (and no allegation by the Government) that American Express's NDPs have limited what would otherwise be vigorous competition between credit and charge cards and other payment products such as cash, checks and debit cards. To the contrary, the Government strenuously argued, and the Court found, that debit (and all other payment forms) do not compete in the same relevant antitrust market as credit and charge cards because neither merchants nor consumers view those other payment forms as close substitutes given the "core functional differences between debit and GPCC cards". (See, e.g., id. at 54 ("For the following reasons, the court finds that the actual dynamics in the marketplace for network services confirm that debit is properly excluded from the relevant product market in this case"); id. at 56 ("[W]ith regard to the cardholder side of the platform, product substitution at the point of sale is limited by the core functional differences between debit and GPCC cards."); id. at 58 ("Merchants recognize that these qualitative differences influence customer payment behavior, and that the resulting spending patterns limit their ability to switch away from GPCC

acceptance."); id. at 58-59 ("[T]he testimony elicited at trial suggests that merchants are sensitive to the spending preferences and credit-insistence of their customer base and, as a result, do not view debit network services as an economically viable substitute for GPCC networks services given the revenue that presumably would be lost to their credit-accepting competitors.  Other merchants strongly prefer payment by credit and charge cards for reasons independent of cardholder demand, particularly when the merchant requires some form of security for a purchase.").)

          In short, under the reasoning of the Court's Liability Decision, the conduct that the Court's remedy should redress has nothing to do with non-GPCC payment forms.  Indeed, at his deposition in this case, the Government's expert agreed that removing restrictions on steering among GPCC cards only—and thus leaving the NDP restrictions on steering to other payment forms in force—would be sufficient to cure the anticompetitive effects on the GPCC market he claimed (and the Court now agrees) are caused by the NDPs.  (See Dep. Tr. 354:10-355:17 (Katz/Government).)[8]  It would, therefore, be both unnecessary and improper to place restrictions on American Express's ability to limit steering between its GPCC Cards and non-GPCC payment products, as the Government now proposes.  See, e.g., New York v. Microsoft, 224 F. Supp. 2d at 104, 128-37 (declining to include certain provisions of the plaintiff states' proposed injunctive relief as they related to products that fell outside of the relevant product market that the court had found during the liability phase and noting more generally that, but for unique circumstances not present here, "[o]rdinarily, the Court might conclude rather swiftly that

---

    [8] Dr. Katz's concession is an adoptive admission by the Government under Rule 801(d)(2)(B) of the Federal Rules of Evidence.  Thus, although this particular statement was not part of the trial record, American Express could establish its admissibility for the truth of the matter asserted at an evidentiary hearing.

products which fall outside of the relevant market are inappropriate for discussion and

consideration by the Court in conjunction with the crafting of a remedy for illegal monopoly

maintenance").[9]

> B.  **American Express Should Be Entitled to Prevent Merchants from Mischaracterizing Its Network and Products.**

In the Liability Decision, the Court recognized that American Express has a

legitimate interest in preventing mischaracterization of its brand and products, holding:

> "Thus, even after a remedial order is issued pursuant to this
> Decision, under the surviving provisions of Amex's merchant
> rules, a merchant likely will still be prohibited from, among other
> things, posting a sign purporting to show the networks' relative
> costs that is inaccurate or that mischaracterizes the relative cost of
> American Express, refusing to accept an Amex card when
> presented at the point of sale, or disparaging American Express to
> the merchants' customers."

(See Liability Decision at 142 (emphasis added).)  Accordingly, American Express has requested

that the Final Judgment confirm that American Express will retain the right to "adopt[],

maintain[] and enforc[e] Rules that prohibit Merchants from disparaging or mischaracterizing its

---

[9] In Microsoft, the court ultimately included middleware within the scope of the remedial order it entered despite excluding middleware from the relevant market of Intel-compatible operating systems.  However, as the court made clear, it did so only because "the theory of liability pursuant to which Plaintiffs[] prevailed involved Microsoft's response to a type of product which did not fall within the monopoly market, but nevertheless posed a potential threat to Microsoft's monopoly".  Id. at 104.  A similar issue came up in United States v. Visa U.S.A., Inc., and resulted in the court including debit in its ban on the future adoption of exclusionary rules despite finding that debit was not in the relevant market.  163 F. Supp. 2d 322, 408 (S.D.N.Y. 2001).  However, similar to the situation in Microsoft, the Visa court found that "the future of credit card products will be built on, and dependent upon, debit functionality", and therefore, "[c]redit cards that do not also have debit functionality will fall by the wayside".  Id. In contrast to those cases, here, of course, there is no allegation and no finding by the Court that debit (or any other non-GPCC payment product) would have developed into a more serious competitive threat but for American Express's conduct, nor is there any support for the proposition that including debit in the proposed relief would be necessary to remedy the harms caused by the NDPs according to the Court's analysis.  In fact, as noted, Professor Katz rejected the proposition when asked about it during his deposition.

Brand or making untrue statements about American Express or the Merchant's All-In Merchant Fee for accepting American Express General Purpose Cards". (See Ex. A (Defs.' Proposed Final J.) § III.C.)

The Government has rejected this language, instead proposing that American Express be permitted only to "prohibit Merchants from disparaging its Brand, including (1) mischaracterizing American Express General Purpose Cards, or (2) engaging in activities that harm American Express's business or its Brand". (See Ex. B (Pls.' Proposed Final J.) § IV.C.) However, the Government's proposed language conflates American Express's right to prohibit mischaracterization with its right to prohibit disparagement, providing that American Express's rights are not triggered unless the mischaracterization rises to the level of disparagement. There is no basis for that approach. As the Court recognized, American Express has the separate and distinct right to prevent merchants from making untrue statements about their costs of American Express acceptance, regardless of whether the factual misrepresentation rises to the subjective level of "disparagement". (See Liability Decision at 142.)

Accordingly, American Express respectfully submits that the Court should adopt the language from Section III.C of its Proposed Final Judgment.[10]

_____

[10] The Government has also proposed a sentence stating: "For the avoidance of doubt, American Express shall not prohibit, prevent, or restrain a Merchant from engaging in any of the practices enumerated in Section IV.A of this Final Judgment on the grounds that American Express believes or asserts that one or more of such practices disparage its Brand, including by mischaracterizing its General Purpose Cards or harming its business or Brand". (See Ex. B (Pls.' Proposed Final J.) § IV.C.) This language is unnecessary, as it is already plain from American Express's proposal that it cannot limit merchant steering of GPCC based on its belief that all forms of steering harm its brand.

21

C.   **American Express Should Be Entitled to Require Merchants That Steer to Also Indicate That They Accept American Express Cards at the Point of Sale.**

American Express's Proposed Final Judgment also would allow American Express to require merchants that steer to either (i) post signage at the point of sale (or, with respect to online or mobile transactions, the earliest point within the payment path at which the steering occurs) indicating that American Express Cards are accepted by the merchant; or (ii) if the merchant steers only through verbal communications and does not want to display a sign indicating American Express acceptance, to mention that the merchant accepts American Express Cards as part of that same communication.  (See Ex. A (Defs.' Proposed Final J.) § III.B.5.)  There is ample evidence in the record underscoring the importance of these provisions requiring merchants who steer to communicate the fundamental fact of acceptance.

The evidence presented at trial demonstrated that steering away from American Express Cards causes some consumers to mistakenly believe that the steering merchant does not accept American Express Cards.  For example, following Visa's "We Prefer" Campaign in the early 1990s, numerous studies showed that the campaigns caused nearly 60% of Card Members faced with a "We Prefer" message at the point of sale to doubt that American Express Cards were accepted.  (See DX7525 at '382; see also DX1792 at '001.)  Because of network effects, this, in turn, causes a significant detrimental effect on Card Members' willingness to carry and use the Card at other merchants.  (See Trial Tr. 4787:12-4788:25 (Glenn/Amex) (explaining that American Express research found that steering negatively "affects the cardmembers' perceptions of coverage, where they can use the card" and "has a spillover effect in their utility or using the cards in other merchants"); see also Liability Decision at 12-13, 77.)

At the liability phase of the case, the Government conceded that American Express could continue to require merchants to display acceptance logos to avoid such

confusion.  Specifically, in its post-trial submissions, the Government argued that American Express could "enforc[e] its rules requiring display of its logos as a sign of acceptance (which is not at issue in this litigation)" to avoid situations in which merchant steering confuses customers into thinking, incorrectly, that the merchant does not accept American Express Cards.  (<u>See</u> Pls.' FOF ¶ 109.)  Now, the Government has reversed course and rejected American Express's proposal to implement this protection as part of the Final Judgment.  While the Government appears willing to allow American Express to require a merchant to indicate acceptance of its Cards when the merchant indicates all the other forms of payments it accepts, (<u>see</u> Ex. B (Pls.' Proposed Final J.) § V.B.1, .2), the Government's proposal fails to address the consumer confusion and corresponding competitive harm to American Express that can be caused when a merchant that has agreed to accept American Express Cards <u>steers</u> customers away from them without clearly denoting American Express acceptance.[11]

For these reasons, and consistent with the Government's prior representations, American Express respectfully submits that the Court should adopt Section III.B.5 of its Proposed Final Judgment.

D.    **American Express Should Be Entitled to Prevent Free-Riding on Its Merchant Benefits.**

As established at trial, American Express routinely engages in targeted marketing campaigns with specific merchants designed to increase spend on American Express Cards at those merchants.[12]  American Express also routinely provides merchants with significant non-

---

[11] As evidenced at trial, this concern is particularly applicable to American Express given its coverage gap.  (<u>See</u> Defs.' Proposed Findings of Fact and Conclusions of Law, Dkt. 604 ¶¶ 129-41, 267.)

[12] (<u>See, e.g.</u>, PX0769 at '232 (chart showing "Targeted Promotions" for JetBlue to attract new and lapsed customers); <u>see also</u> DX4489 at '658 (summarizing the results of a marketing

marketing benefits that go well beyond the processing of GPCC transactions, such as valuable business insights, data analytics and fraud prevention services.  (See Liability Decision at 19-20; see also Trial Tr. 4305:20-4306:1, 4306:7-17 (Chenault/Amex); Trial Tr. 4720:19-4723:15, 4933:22-4934:6 (Glenn/Amex); Trial Tr. 2277:4-17 (Berry/Amex); Trial Tr. 1072:5-1079:18 (Quagliata).)  These supplemental services require significant investments by American Express and, as the Court recognized in the Liability Decision, American Express has a legitimate business interest in protecting these investments from free-riding.  (See Liability Decision at 144 ("The Supreme Court has recognized that prevention of free-riding is a legitimate, procompetitive justification for vertical restraints on trade." (citation omitted)).)  Accordingly, American Express's Proposed Final Judgment includes a provision narrowly tailored to prevent free-riding on these investments.  (See Ex. A (Defs.' Proposed Final J.) § III.B.6.)

        First, the Court has already found that American Express could withhold benefits from, or charge separate prices to, merchants that American Express believes are free-riding on business insights and other supplementary benefits provided by American Express.  (See Liability Decision at 146-47 ("Thus, American Express's ability to separately price and sell the data-analytics services it claims are susceptible to free-riding, as well as its concomitant ability to exclude a merchant from receiving these benefits if Amex believes it is free-riding or otherwise paying an insufficient amount for these services, leads the court to conclude that the network possesses equally effective and significantly less restrictive means of preventing this form of free-riding.").)  Notably, the removal of this provision from the Final Judgment would result in American Express being required to provide marketing benefits to merchants even in

---

campaign with Hyatt); DX6791 at '585 (summarizing the results of marketing campaigns with Home Depot and Best Buy).)

situations where the merchant is free-riding on those benefits.  There is simply no basis in the law or the Court's Liability Decision for such extreme relief.  Indeed, the law is to the contrary.[13]

Second, the Court found that there would be no competitive harm in allowing American Express to continue to prohibit steering by a merchant during the pendency of a specific marketing campaign involving that merchant.  (See Liability Decision at 146 n.62 ("American Express does not dispute that it retains the capacity to end free-riding by a specific merchant should it so choose by, for example, ending the specific marketing campaign or even terminating that merchant's acceptance agreement.").)[14]

---

[13] See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 890 (2007) (explaining that absent vertical restraints, services "that enhance interbrand competition might be underprovided . . . because discounting retailers can free ride" on firms "who furnish services and then capture some of the increased demand those services generate"); Konik v. Champlain Valley Physicians Hosp., 733 F.2d 1007, 1014 (2d Cir. 1984) ("[A]ntitrust analysis takes into account that some arrangements may be necessary in order to remedy 'market imperfections such as the so-called 'free-rider' effect.'" (quoting Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55 (1977)); Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n, 633 F. Supp. 201, 219-20 (N.D. Ill. 1986) (finding that "the . . . Rules [preventing steering] are not impermissible restrictions on interbrand free riding" but rather facilitate "interbrand competition to offer better services and more attractive products" by preventing such free-riding on the networks' brands and promotional efforts through steering).

[14] American Express's proposed language applies to both existing agreements and agreements that American Express may enter into in the future.  As the record reflects, American Express currently has merchant agreements in place that include marketing commitments to specific merchants (e.g., Home Depot received annual marketing funds and a "very large strategic investment fund" in both its 2007 and 2012 acceptance agreements with American Express).  (See Trial Tr. 1247:25-1249:1, 1252:7-11, 1316:18-20 (Kimmet/Home Depot); see also PX0350 at '954; PX1915 at '843.)  Those contracts were negotiated on the expectation that the merchant would not free-ride on American Express's investments by utilizing the marketing to get the customers into the store and then steering them to another network's card, thereby precluding American Express from being compensated for its marketing investment.  American Express's Proposed Final Judgment confirms that American Express may continue to protect against free-riding by retaining existing non-discrimination provisions in negotiated contracts only during the pendency of targeted marketing campaigns.  Of course, if any merchant that is eligible for such marketing campaigns would rather steer than get the marketing support or the funds allocated to that support, that would be the merchant's choice to make.

For these reasons, American Express respectfully submits that the Court should adopt Section III.B.6 of its Proposed Final Judgment.

E.      **American Express Should Not Be Compelled to Do Business With a Steering Merchant.**

American Express proposes that the Court confirm in its Final Judgment that American Express is entitled to exercise its right not to do or continue to do business with a merchant that chooses to steer Card Members away from its Cards.  (See Ex. A (Defs.' Proposed Final J.) § III.B.8.)  The Government's attempt to deny American Express this fundamental right contravenes decades of well-established antitrust law.

The Court has already recognized in the Liability Decision that American Express should have cancellation rights.  As the Court noted, when a merchant that is engaged in a marketing program with American Express nonetheless steers away from American Express, American Express has the right to not only cancel that steering merchant's marketing agreement, but also that merchant's acceptance agreement.  (See Liability Decision at 146, n.62.)  There is no reason to limit that cancellation right to instances involving a merchant that is free-riding on marketing services.  Indeed, the Court's recognition of American Express's fundamental right to select its business partners is firmly rooted in controlling law.

For nearly a hundred years, a basic principle of American antitrust law has been that a firm "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently".  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) (citing United States v. Colgate & Co., 250 U.S. 300, 307 (1919)).  The Supreme Court first enunciated this rule in United States v. Colgate & Co., in which it held that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he

26

will deal; and, of course . . . announce in advance the circumstances under which he will refuse to sell". 250 U.S. 300, 307 (1919).

Under the Colgate doctrine, "[u]nilateral conduct on the part of a single person or enterprise falls outside the purview of [§ 1 of the Sherman Act]". Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc., 996 F.2d 537, 542 (2d Cir. 1993). "Unilateral action by one market participant against another is not a basis for an anti-trust claim, even if the action has the effect of restraining trade, because unilateral action is inconsistent with an illegal 'agreement' or conspiracy." Bel Canto Design, Ltd. v. MSS HiFi, Inc., No. 11 CIV. 6353 CM, 2012 WL 2376466, at *5 (S.D.N.Y. June 20, 2012). Thus, a firm has the right to "'deal or refuse to deal with whomever it chooses'" and "'to announce in advance the circumstances under which it will refuse to sell, so long as it does so independently'". Id., at *6 (quoting Campbell v. Austin Air Sys., Ltd., 423 F. Supp. 2d 61, 68-69 (W.D.N.Y. 2005)). This right survives even if a firm's unilateral act could arguably have the same effect on competition as a contract that would be unlawful under the antitrust laws. Indeed, in Colgate itself, the Supreme Court—which only eight years prior had held resale price maintenance by contract per se unlawful in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 406-09 (1911), overruled by Leegin, 551 U.S. at 887-89—held that a manufacturer could lawfully announce the resale price at which it desired its goods to be sold and thereafter refuse to deal with distributors who did not comply. See Colgate, 250 U.S. at 307-08 (distinguishing Dr. Miles as a case in which "the unlawful combination was effected through contracts").

Consistent with the Colgate doctrine, courts have, for decades, narrowly tailored antitrust orders to preserve the firm's right to choose its business partners through unilateral policies. See Bausch & Lomb, 321 U.S. at 728-29 (rejecting the Government's request to

27

require defendant to "sell its product, without discrimination, to any person offering to pay cash therefor[e]" because the antitrust laws were not intended "to interfere with ordinary commercial practices" and in a business "of a luxury or near-luxury character, the right to select its customers may well be the most essential factor in the maintenance of the highest standards of service"); see also Beech-Nut Packing Co., 257 U.S. at 444 n1., 455-56 (narrowing FTC order from one prohibiting defendant from, inter alia, "[r]efusing to sell to any such distributors because of their failure to adhere to any such system of resale prices" to one prohibiting defendant from enacting its policy "by co-operative methods in which the [defendant] and its distributors, customers and agents undertake to prevent others from obtaining the company's products at less than the prices designated by it". (emphasis added)).

The Government's principal case in support of its claim that Colgate has no bearing on the scope of the remedy that should be entered here is Toys "R" Us v. FTC, 221 F.3d 928 (7th Cir. 2000), which the Government cited in its post-trial briefing.  (See Pls.' Proposed Conclusions of Law, Dkt. No. 602 ¶ 125.)  Putting aside the dubious legal proposition that a Court of Appeals decision should be read to overturn long-established Supreme Court precedents, that case is inapposite.  There, Toys "R" Us was found to have unlawfully coordinated a horizontal conspiracy among toy manufacturers to boycott certain warehouse clubs.  See Toys "R" Us, 221 F.3d at 933.  As a result, the FTC entered an order:  (i) prohibiting Toys "R" Us from pressuring suppliers to limit their supply or to refuse to sell toys to a warehouse club; and (ii) prohibiting Toys "R" Us for a period of five years from refusing to purchase toys from a supplier because that supplier sold toys to a warehouse club.  See id. at 939.

Toys "R" Us appealed, arguing, inter alia, that the relief ordered by the FTC would impermissibly cabin its rights under Colgate.  Id. at 939.  The court disagreed, explaining

28

that "unilateral actions of the sort protected by <u>Monsanto</u> and <u>Colgate</u> are not the same thing as a retailer's request to the manufacturer to change the latter's business practice" and that under the FTC's decree, Toys "R" Us "must not tell the manufacturer what to do; it is still permitted to decide which toys it wants to carry and which ones to drop, based on business considerations such as the expected popularity of the item". <u>Id.</u> at 939-40.  As for the five-year restriction on refusals to deal, the court recognized that the issue was a "closer call" but ultimately upheld the restriction because refusals to deal "were the means [Toys "R" Us] used to accomplish the unlawful result, and as such, they are subject to regulation by the Commission". <u>Id.</u> at 940. Thus, the court upheld the injunction <u>only</u> because refusals to deal were the very means through which Toys "R" Us effectuated its unlawful horizontal conspiracy.  Even with those facts— which are absent here, as American Express has not even been alleged to have engaged in unlawful refusals to deal—the court recognized that it was a close call.  The Government's reliance on <u>Toys "R" Us</u> is misplaced.[15]

---

[15] In addition to being inconsistent with established principles of antitrust law, denying American Express the right to choose not to do business with a merchant if that merchant is steering will chill American Express from cancelling merchants in situations where it is actually required to do so by law.  American Express has a variety of legal obligations that require it to terminate Card acceptance by a merchant that it learns is engaged in various illegal activities, including, for example, criminal statutes and regulations that prohibit it from participating in money laundering or transacting with restricted countries or organizations. <u>See, e.g.</u>, Money Laundering Control Act of 1986, 18 U.S.C. § 1956 (2012); <u>see also, e.g.</u>, Bank Secrecy Act, 12 U.S.C. § 1829b, 1951 et seq. (2012); Trading with the Enemy Act of 1917, 12 U.S.C. § 95a, 50 U.S.C. App'x § 1-44 (2012); USA PATRIOT Act § 326, 31 U.S.C. § 5318 (2012).  It should also be noted that when American Express reports suspicious activities to the government (SAR filings), which, ultimately, may trigger merchant terminations, it is prohibited from alerting the subject merchant. <u>See</u> USA PATRIOT Act § 326, 31 U.S.C. § 5318(g)(2) (2012).  In addition, given American Express's designation as a bank holding company, as well as its fiduciary obligations to its shareholders, American Express is expected to guard against and terminate merchant acceptance agreements in the face of excessive fraud or credit risks. <u>See, e.g.</u>, Office of the Comptroller of the Currency, <u>Comptroller's Handbook:  Merchant Processing</u> 29 (Aug. 2014) ("Once fraud is suspected, management must file a SAR with the Financial Crimes Enforcement Network (FinCEN) [and] the account of a fraudulent merchant should be

In short, American Express has a fundamental right to choose with whom it wants to contract.  Accordingly, American Express respectfully submits that the Court should adopt Section III.B.8 of its Proposed Final Judgment.

Because American Express is entitled to choose the merchants that it will and will not allow to accept its Card, the Court should also reject the Government's proposals requiring American Express to provide the Government with extensive notice concerning merchant cancellations.  (See Ex. B (Pls.' Proposed Final J.) §§ V.E-F.)  And, even if the Court were to limit American Express's ability to choose the merchants with which it will do business, it should nonetheless strike the Government's proposed termination notice protocols as unnecessary and unreasonable.  Because American Express can and must promptly cease doing business with merchants for any number of legitimate reasons in the ordinary course of business that have nothing to do with steering (see supra n.15), the Government's proposal that American Express report every instance of merchant cancellation would impose a significant and unnecessary burden on the company.  The Government's proposed requirement that American Express provide ten days advance notice before cancelling a steering merchant would also subject American Express to undue legal and credit risk by denying it the necessary and required flexibility to act swiftly against merchants in situations where cancellation is necessary to

---

terminated.").  If American Express faces a contempt proceeding every time it cancels a merchant that also happens to be steering, American Express would uniquely be penalized for exercising cancellation rights even when cancellation would be required by law, regulation or prudent business judgment.  Visa and MasterCard do not have this same type of exposure since they do not have acceptance agreements with merchants, nor do their acquirers and processors face similar exposure since those entities are not subject to the same notice and termination requirements that the Government proposes against American Express here.  Subjecting American Express alone to that type of "catch-22" risk is unfair, unnecessary to redress the anticompetitive harm found by the Court and contrary to the public interest reflected in the statutes cited above.

discharge American Express's regulatory or legal obligations.

F.   **American Express Should Be Entitled to Steer Card Members to Merchants That Do Not Steer.**

American Express also requests that the Court confirm that American Express is entitled to communicate with its Card Members in an effort to steer them to merchants that provide a positive point-of-sale experience for American Express.  (See Ex. A (Defs.' Proposed Final J.) § III.B.7.)

First, when discussing American Express's potential reaction to merchant steering in the Liability Decision, the Court already found that American Express should have exactly this right:

> "Recognizing that the network 'would look to protect the business . . . [by] looking to incent the right behavior' among merchants, the Task Force identified a number of potential competitive responses the network might take to mitigate the likelihood that its merchants would be willing to engage in steering, including:  engaging with merchants to reinforce Amex's value proposition and better explain the benefits of accepting American Express; targeting high visibility 'Anchor' merchants with its own steering programs to preserve Amex's relevance in key industries; shifting share away from non-friendly merchants; and reducing the network's discount rate in industries where merchants might be particularly inclined to steer. . . . These same competitive options are available to American Express in the wake of this litigation."

(See Liability Decision at 139-40 (emphasis added).)  Section III.B.7 of American Express's Final Judgment merely implements that finding.

Second, the Government's rejection of American Express's proposed language confirming its right to steer cannot be reconciled with its basic litigation position throughout this case.  The Government argued in its opening statement that steering "is an everyday part of the competitive process".  (Trial Tr. at 24:14-24 (Gov't Opening).)  The Government further emphasized in its post-trial papers that "steering is effective in sparking competition".  (Pls.' Post-Trial Mem., Dkt. No. 606, at 6-7.)  Based on these arguments, the Court held that "steering

31

is both pro-competitive and ubiquitous". (See Liability Decision at 3.) There is, therefore, no

basis to fashion a world in which only American Express is prohibited from steering.

       Accordingly, American Express respectfully submits that the Court should adopt

Section III.B.7 of its Proposed Final Judgment.

      G.    **American Express Should Be Permitted to Individually Negotiate Exclusive Steering Agreements in the Same Way as All of the Other GPCC Networks.**

       The parties agree that American Express should be entitled to enter into

individually negotiated exclusive steering agreements—that is, an agreement pursuant to which a

merchant commits to steer towards American Express Cards and not towards any other GPCC

network—as long as any such agreements are individually negotiated and the merchant's

acceptance of American Express Cards is unrelated to and not conditioned upon its entry into

any such agreement. (See Ex. A (Defs.' Proposed Final J.) § III.B.3.) American Express's

proposed language on this issue is identical to the language from the Consent Decree applicable

to Visa and MasterCard. (See Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc.

(DX5826)) § IV.B.3.)

       The Government, however, has proposed additional language not present in the

Consent Decree. Specifically, the Government proposes that any such exclusive steering

agreement not be part of the Merchant's Card Acceptance Agreement and purports to define

what a "standard agreement" is by adding the language that "an agreement is not made 'non-

standard' by inclusion of minor variations in wording; only a significant and substantive

difference makes an agreement 'non-standard'". (See Ex. B (Pls.' Proposed Final J. § IV.B.3.)

The Government also proposes that American Express be obligated to provide the Government

with copies of any exclusive steering agreement within five days of its execution, (see Ex. B

(Pls.' Proposed Final J.) § V.D), even though there is no similar obligation imposed on Visa and

MasterCard.  The Government's additions are unnecessary and inappropriate.

First, there is no reason to be concerned that American Express will somehow be able to undermine all of the relief granted to merchants in the Final Judgment unless this new language is adopted.  Under the language of the Consent Decree—which is the language American Express has proposed—American Express cannot force a merchant to accept an exclusive steering arrangement, and it cannot make those contracts so formulaic in nature that it becomes a de facto rule.  (Compare Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc. (DX5826)) § IV.B.3, with Ex. A (Defs.' Proposed Final J.) § III.B.3.)  To the extent merchants become concerned that such an outcome is at risk, they can and will raise it with the Government and, if necessary, the Court.  The same theoretical risk that exclusive steering agreements could be forced on merchants was more of a concern for Visa and MasterCard, yet the Government was satisfied that the existing protections in the Consent Decree were sufficient. There is no basis to single out American Express by adding notice obligations not present for Visa or MasterCard or the purely form-over-substance requirement that such agreements be separate pieces of paper from the Card Acceptance Agreements.  See Int'l Salt, 332 U.S. at 401 (2006) ("[W]e may not impose penalties in the guise of preventing future violations."); see also Hartford-Empire, 323 U.S. at 409; Paramount, 228 F.2d at 727; Loew's, 190 F.2d at 572; DOJ Remedies Policy Guide at 3.

Second, the new language proposed by the Government that defines when a contract is "non-standard" is anything but clear.  Indeed, this language is so vague that it cannot satisfy the specificity requirements of Rule 65(d).  As the Second Circuit stated in Mickalis Pawn Shop:

> "The Supreme Court has explained: '[T]he specificity provisions
> of Rule 65(d) are no mere technical requirements.  The Rule was
> designed to prevent uncertainty and confusion on the part of those
> faced with injunctive orders, and to avoid the possible founding of
> a contempt citation on a decree too vague to be understood.  Since
> an injunctive order prohibits conduct under threat of judicial
> punishment, basic fairness requires that those enjoined receive
> explicit notice of precisely what conduct is outlawed.'"

645 F.3d at 143 (quoting Schmidt v. Lessard, 414 U.S. 473, 476 (1974) ("[I]njunctions that do

not satisfy the requirements of Rule 65(d) 'will not withstand appellate scrutiny'" (quoting

Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 158 (2d Cir. 2004)))); see also Petrello v.

White, 533 F.3d 110, 114 (2d Cir. 2008) ("Rule 65(d) 'is satisfied only if the enjoined party can

ascertain from the four corners of the order precisely what acts are forbidden' or required."

(citation omitted)).  If the Court were to adopt the Government's proposal, there would be no

way for American Express to be reasonably certain of when a change is "significant" or

"substantive".  And, as noted above, this language is unnecessary to the extent that it is meant to

address the purported concern that American Express will force de facto steering rules on

merchants.

Accordingly, American Express respectfully submits that the Court should reject

the unnecessary and unworkable additional restrictions that the Government has proposed in

Sections IV.B.3 and V.D of its Proposed Final Judgment.

## H. **American Express Should Be Entitled to Notice Before a Merchant Begins Steering.**

American Express also requests the right to require reasonable advance notice

from a merchant before it begins steering away from American Express after having not done so

during the preceding twelve months.  (See Ex. A (Defs.' Proposed Final J.) § III.B.9.)

34

First, requiring advance notice that a merchant will steer will help ensure that American Express can exercise the rights granted to it under the Final Judgment.  For example, before American Express can take actions to redress merchant free-riding on its marketing services or to encourage Card Members to shop at merchants that do not steer, American Express needs to know if a merchant is steering.  This is particularly important with respect to verbal steering and steering by small merchants, both of which could be difficult for American Express to identify at all, or at least in time to avoid the adverse effects on its investments caused by the steering.

Second, if the putative purpose of steering is to induce the GPCC networks to lower merchant fees, that goal can only be enhanced by requiring merchants to actually tell the GPCC networks that they intend to steer.  (See Liability Decision at 119 ("Even if a merchant were not inclined to engage in steering, its freedom to do so in the future would enhance its bargaining position relative to Amex and its competitor networks, placing additional downward competitive pressure on rates.").)

Third, requiring merchants to provide American Express with reasonable advance notice of their intent to begin steering would not be unduly burdensome.  Large merchants already have regular discussions with client managers at American Express.  (See, e.g., Trial Tr. 5934:14-23 (McNeal/Amex); see also, e.g., Trial Tr. 2084:20-2085:7 (Berry/Amex); Trial Tr. 626:1-3, 626:25-627:20 (Quagliata/Amex).)  For small merchants, the lead class plaintiffs in MDL 1720—which included a number of small merchants—agreed to very similar notice obligations to Visa and MasterCard on behalf of all merchants in the class action settlement that has been granted final approval by Judge Gleeson.  See Definitive Class Settlement Agreement

¶¶ 42(c), 55(c), <u>In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.</u>, No. 05-MD-1720 (JG) (JO) (E.D.N.Y. Oct. 19, 2012) [hereinafter "MDL 1720 Settlement"] (conditioning a merchant's ability to apply either a Brand Level or Product Level surcharge on an agreement to, <u>inter alia</u>, provide Visa and/or MasterCard and the merchant's acquirer with no less than thirty days' advance written notice of the merchant's intent to impose surcharges).

I.   **The Court Should Adopt American Express's Proposed Effective Date.**

American Express proposes that this Final Judgment take effect the later of either: (i) ninety days following the date on which it is entered; or (ii) ninety days following the expiration of any stay of the Final Judgment entered by the Court or any appellate court of competent jurisdiction.  (<u>See</u> Ex. A (Defs.' Proposed Final J.) § I.9.)

American Express's ninety-day proposal is precisely the same amount of time that Judge Jones ordered in <u>United States v. Visa</u>.  (<u>See</u> Ex. E (Final J., <u>United States v. Visa U.S.A., Inc.</u>, 183 F. Supp. 2d 613 (S.D.N.Y. Nov. 26, 2001) [hereinafter "Final J., <u>United States v. Visa</u>"]) § V.B.)  A ninety-day period allows the parties and the Court sufficient time to fully brief and decide the motion to stay that American Express will submit to maintain the status quo during the pendency of its appeal, thus eliminating the risk that merchants would engage in conduct that should be stayed pending the outcome of American Express's appeal.

J.   **The Court Should Adopt the Duration of the Final Judgment Set Forth in American Express's Proposal.**

The Government proposes that the Final Judgment expire ten years after its entry. American Express agrees to a ten-year term, but under American Express's proposal, American Express would be allowed to re-instate its NDPs if and when Visa and MasterCard regain the right to utilize NDPs as a result of the expiration of the Consent Decree.  (<u>See</u> Ex. A (Defs.' Proposed Final J.) § VI.C.)  The limits in the Consent Decree on Visa and MasterCard's rights to

36

prevent steering expire in 2021—well before the Court's Final Judgment would expire if the Court adopts a ten-year term.  It is possible that Visa and MasterCard will regain the right to use NDPs at that time.  If that happens, American Express must be allowed to use NDPs as well in order to avoid a substantial competitive imbalance in the marketplace.  See DOJ Remedies Policy Guide at 3; see also Paramount, 228 F.2d at 727; Loew's, 190 F.2d at 572.

K.    **The Court Should Adopt American Express's Proposed Definition of "Merchant".**

American Express and the Government disagree over the definition of the term "Merchant" that should be used in the Final Judgment.  American Express proposes that the Final Judgment use the identical definition of "Merchant" that was used in the Visa and MasterCard Consent Decree.  (See Ex. A (Defs.' Proposed Final J.) § I.17; see also Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc. (DX5826)) § II.12.)  By contrast, the Government proposes broader language by explicitly sweeping in "mobile wallet services" and entities that facilitate GPCC payments for merchants.  (See Ex. B (Pls.' Proposed Final J.) § I.O.) There is no reason to depart from the definition used in the Consent Decree.

First, by using the "For the avoidance of doubt" formulation, the Government appears to be suggesting that it believes the definition of Merchant proposed here is the same definition that was used in the Consent Decree.  While that may be true from the Government's perspective, there is nothing indicating that Visa, MasterCard and the marketplace participants share in that view.  Indeed, if anything, the Government's refusal to use identical language suggests that it believes there is at least a perceived distinction between the Consent Decree and its proposed final judgment.  In addition while the Government's proposed definition of "Merchant" would include mobile wallets, it is notable that in the settlement of MDL 1720, Visa and MasterCard explicitly established different surcharging rules for ordinary merchants on the

37

one hand and mobile wallets on the other.  See MDL 1720 Settlement ¶ 42(f).  To the extent the definition of "Merchant" in the Consent Decree covers the types of entities referenced in the sentence added by the Government here, there is no need for that additional sentence.  To the extent it does not, then adding this language to the Final Judgment applicable to American Express would unfairly restrict American Express and harm its competitive position.  See Paramount, 228 F.2d at 727; see also Loew's, 190 F.2d at 572.

Second, the Government's proposed definition, along with its other provisions, appears to suggest that a payment aggregator that accepts payment cards for Government entities could charge different fees—referred to in the industry as "convenience fees"—to customers based upon which network's card is presented.  However, both before the Consent Decree and after the Consent Decree, Visa maintained a "Convenience Fees" policy that required that any such fees be charged at parity across networks.  See Visa, Visa International Operating Regulations, at 522 (Oct. 15, 2012); see also Visa, Visa International Operating Regulations, at 457 (Oct. 15, 2013).[16]  Thus, Visa certainly did not have the same interpretation of "Merchant" that the Government now advocates.

For these reasons, American Express respectfully submits that the Court should adopt the definition of "Merchant" proposed by American Express in Section I.17 of its Proposed Final Judgment.

---

[16] While such a merchant can today charge different amounts based on card type under Visa's rules, that is a function of the settlement in MDL 1720, not the Consent Decree.  This confirms that "convenience fees" have been treated by everyone in the industry as more akin to surcharges than discounts.  As the Court has noted, surcharging is not at issue in this case.  (See Liability Decision at 26.)

L.    **The Court Should Adopt American Express's Proposed Definitions of the Terms "Issuing Bank" and "Rule".**

Both parties agree that American Express should have the right to prevent steering within its network based on the identity of the issuer of a particular Card.  (See Ex. A (Defs.' Proposed Final J.) § III.B.4; see also Ex. B (Pls.' Proposed Final J.)§ IV.B.4.)  In other words, the Government agrees that a merchant should not be permitted to steer away from only those American Express Cards issued by a particular bank (such as Citibank or Wells Fargo) that has partnered with American Express as part of its "GNS" business.  As the Court will recall, this same protection was included for Visa and MasterCard in the Consent Decree. (See Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc. (DX5826)) § IV.B.4.)  However, as the Court noted in its Liability Decision, American Express—unlike Visa and MasterCard—actually issues its own Cards to many of its Card Members.  Accordingly, American Express has proposed a definition of "Issuer" that recognizes this unique aspect of American Express's business and ensures that American Express is accorded the same protection as Citibank or Wells Fargo when it is acting as an issuer of Cards.  (See Ex. A (Defs.' Proposed Final J.) § I.14.)[17]

American Express has also added the words "in connection with accepting General Purpose Cards" to the end of the definition of the term "Rule" for the purpose of clarifying that the Final Judgment relates only to those network rules that are actually related to Card acceptance. (See Ex. A (Defs.' Proposed Final J.) § I.22.)  It is obviously true that this litigation has focused only on network rules that relate to Card acceptance and not, for example,

---

[17] Similarly, the language of American Express's proposal permitting it the right to limit steering among its Cards based on the identity of the issuer more accurately accounts for the unique nature of American Express's issuing business than the Government's proposed language.  (Compare Ex. A (Defs.' Proposed Final J.) § III.B.4, with Ex. B (Pls.' Proposed Final J.) § IV.B.4.)

network rules that relate to when a Card Member is entitled to insurance coverage for a defective item.  American Express's proposed language merely confirms that the scope of the injunction is properly tethered to the issues in this case.  See Mickalis Pawn Shop, 645 F.3d at 144; see also DOJ Remedies Policy Guide at 3-4.

> M.   **The Court Should Adopt Language in the Final Judgment That Appropriately Accounts for the Concept of Control.**

American Express has proposed to define the term "American Express" to include only those subsidiaries actually controlled by the Company.  (See Ex. A (Defs.' Proposed Final J.) § I.3.)  The Government has rejected this approach.  (See Ex. B (Pls.' Proposed Final J.) § II.B.)  However, the Government's approach is inconsistent with basic jurisdictional principles.  American Express and every entity it controls is, of course, subject to the Final Judgment and cannot, therefore, engage in any of the prohibited conduct or cause other entities to engage in any of the prohibited conduct.  But non-party subsidiaries that are not controlled by the Company are not before the Court in this action.  See Doctor's Assocs., Inc. v. Reinert & Duree, P.C., 191 F.3d 297, 304-05 (2d Cir. 1999) (holding that a non-party corporate entity not controlled by the party before the Court could not be included within scope of an injunction).  Accordingly, American Express respectfully submits that the Court should adopt the definition of "American Express" set forth in Section I.3 of its Proposed Final Judgment.

Similarly, with respect to the obligation that American Express provide notice to merchants of the Final Judgment, the Government insists on language stating "American Express shall give notice directly or cause notice in compliance with this Final Judgment to be given through non-party agents such as processors, External Sales Agents, OnePoint partners, or OptBlue partners".  (See Ex. B (Pls.' Proposed Final J.) § V.C.3.)  However, American Express cannot cause third-party agents that it does not control to provide notice (or do anything else).

40

Accordingly, American Express has proposed language stating: "For any Merchant that accepts American Express General Purpose Cards by virtue of contracts with third-party processors, such as External Sales Agents, OnePoint partners or OptBlue partners, American Express shall give notice in compliance with this Section IV.C either directly to the Merchant or by directing such Person to provide notice in compliance with this Section IV.C to the Merchant".  (See Ex. A (Defs.' Proposed Final J.) § IV.C.2.)  American Express's proposed language appropriately accounts for the concept of control while, at the same time, ensuring that proper notice will be provided to merchants of this Final Judgment.

III.    **THE COURT SHOULD REJECT THE GOVERNMENT'S ONEROUS AND UNNECESSARY NOTICE AND COMPLIANCE REQUESTS.**

    A.    <u>**The Court Should Adopt American Express's Compliance and Enforcement Procedures and Reject the Government's Onerous and Unnecessary Additional Procedures.**</u>

    American Express's Proposed Final Judgment provides reasonable compliance and enforcement procedures that are more than sufficient to ensure American Express's compliance with the Final Judgment.  (See Ex. A (Defs.' Proposed Final J.) § V.)  The Government, on the other hand, proposes a set of additional procedures that are onerous, unnecessary and unreasonable.  (See Ex. B (Pls.' Proposed Final J.) § VI.)

    <u>First</u>, the compliance provisions that American Express proposes, which are substantively identical to those contained in the Consent Decree, are more than sufficient to allow the Government to identify promptly any alleged violation of the Final Judgment. American Express's proposal includes requirements that American Express provide the Government with access to information and documents relating to American Express's compliance with the Final Judgment (which could include a written report, prepared at American Express's expense, summarizing the findings of an independent audit or analysis relating to

41

American Express's compliance with the Final Judgment) and third-party (e.g., merchant) reporting to the Government.  (See Ex. A (Defs.' Proposed Final J.) § V.)[18]  This is not a case in which the conduct at issue unfolded under the radar—to the contrary, the NDPs have been a conspicuous staple of American Express's business strategy for over a decade and an unambiguous feature of American Express's merchant contracts.  Plainly, any violation of the Final Judgment would be obvious to the affected merchant, which would have notice, incentive and the means to report any violation to the Government.  (See Ex. A (Defs.' Proposed Final J.) § V.E.)

    Second, the unstated premise underlying the Government's additional proposed compliance protocols is that American Express cannot be trusted to comply with the Court's Final Judgment.  That assumption is baseless.  American Express is fully capable and will have every incentive to comply with the Court's order, which will clearly delineate what conduct will and will not be permissible.  Any violation of the Final Judgment would subject American Express to significant adverse consequences—both judicially and with respect to the impact on its public perception and ordinary course business dealings.  Thus, any violation of the Final Judgment would be at American Express's own peril.  There is no basis for the Court to presume that the onerous procedures proposed by the Government are necessary to ensure American Express's compliance with this judgment given those risks and the lack of any evidence even suggesting that American Express would fail to comply with the Court's order.  See New York v. Microsoft, 224 F. Supp. 2d at 181 & n.79 (rejecting the plaintiff states' request for a compliance monitor because "[g]enerally, courts presume that parties will adhere to orders of the Court" and

---

[18] Of course, the Government's requests must be reasonable.  (Compare Ex. A (Defs.' Proposed Final J.) § V.B, with Ex. B (Pls.' Proposed Final J.) § VI.B.)

the "Plaintiffs have not directed this Court to any evidence that Microsoft has a history of non-compliance with judicial decrees").

Indeed, the compliance protocols proposed by the Government are unreasonable, punitive and overbroad.  For example, the Government improperly proposes that it be entitled to bar Company counsel from any interviews it conducts of American Express employees. (Compare Ex. B (Pls.' Proposed Final J.) § VI.A.2, with Ex. A (Defs.' Proposed Final J.) § V.A.2.)  In addition, the Government would require American Express to subject every employee who has direct contacts with merchants or who supervises employees who have direct contacts with merchants to undergo court-mandated training and annual certification of compliance.  (See Ex. B (Pls.' Proposed Final J.) § VI.E.)  American Express has thousands of employees who, from time to time, have direct contact with merchants or who supervise employees who, from time to time, have direct contact with merchants.  American Express is in the best position—and, as noted, has every incentive—to ensure that the appropriate employees receive the training necessary to ensure compliance with the Final Judgment.  See New York v. Microsoft, 224 F. Supp. 2d at 183 (expressing "concern" with the breadth of, and striking, "the particular aspect of Plaintiffs' remedy proposal requiring the compliance officer to deliver a copy of the order of remedy in this case to, and obtain a certification of understanding and compliance from, 'each officer, director, and Manager, and each platform software developer and employee involved in relations with OEMs'" because there was little justification in the record "for requiring each such employee to certify compliance with the remedial decree in this case and risk contempt for violation of the decree"; "[f]ar more appropriate is to charge Microsoft's directors and officers with ensuring that their business strategy, as implemented by their subordinates in the corporate structure, does not violate the Court's remedial decree.").

The Government also proposes that American Express be required to provide the Government with thirty days' advanced notice before American Express enters into an agreement with a merchant that "restricts, limits, or restrains how the Merchant accepts, processes, promotes, or encourages" the use of non-American Express payment forms.  (See Ex. B (Pls.' Proposed Final J.) § V.H.)  This proposal is overly broad in that it extends to payment forms, such as debit, that are outside the Court's relevant antitrust market, and thus, this proposal is not related to the competitive harm found by the Court.  It should be rejected on that basis alone.  (See supra Section II.A.2.)  In addition, under both parties' proposals, American Express is allowed to negotiate some limits on merchants' acceptance of, and steering to, other GPCC cards.  (See Ex. B (Pls.' Proposed Final J.) §§ IV.B.1, IV.B.3, IV.B.4.)  It is unreasonable and unnecessary to require American Express to give the Government advance notice before it can enter into agreements that will be expressly permitted by the Final Judgment.  Any argument that such notice is necessary to ensure American Express's compliance with the Final Judgment is unavailing.  The existing compliance obligations from the Consent Decree—to which American Express has agreed—are sufficient.

Third, subjecting American Express to the compliance procedures that the Government proposes would be unprecedented under the circumstances present here.  There were no compliance provisions at all in the United States v. Visa Final Judgment, (see Ex. E (Final J., United States v. Visa)), and the Consent Decree with Visa and MasterCard in this case does not contain similar compliance obligations to the onerous and unnecessary ones that the Government seeks to impose on American Express, (see Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc. (DX5826)) § VI).  The Consent Decree does not require annual compliance and antitrust training of Visa or MasterCard employees as the Government proposes

44

here.  (See Ex. D (Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc. (DX5826)) § VI.)  In

fact, American Express is not aware of any case in which a court, absent agreement of the

parties, imposed similar compliance obligations to the ones that the Government proposes here in

a case like this one, which does not include allegations of criminal conduct, intentional

malfeasance or collusion.  Compare United States v. Apple, Inc., 992 F. Supp. 2d 263, 268

(S.D.N.Y. 2014) (imposing, inter alia, an external compliance monitor where the defendant was

adjudged liable for organizing a horizontal conspiracy and the court found "a blatant and

aggressive disregard at Apple for the requirements of the law"), with Liability Decision at 4, 34-

35 n.7 (explaining that the anticompetitive effects found by the Court to be caused by American

Express's NDPs were not "'obvious'" and that it did not reach its liability decision "easily").

        In fact, the only other cases that the Government has raised with American

Express to support its compliance proposals here are United States v. Bazaarvoice, Inc., No.

3:13-cv-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) and United States v. Nat'l

Ass'n of Realtors, No. 1:05-cv-05140, 2008 WL 5411637 (N.D. Ill. Nov. 18, 2008).  These cases

undermine, rather than support, the Government's position.  The Bazaarvoice Final Judgment is

a post-trial, post-liability stipulated final judgment entered in an unlawful merger case under

Section 7 of the Clayton Act, in which the parties consented to the creation of an internal

antitrust compliance monitor and annual employee "briefing" and certification only after the

court suspected that the defendant had intentionally and inconspicuously attempted to undermine

the relief imposed in the initial final judgment.  See Third Amended Final J., United States v.

Bazaarvoice, Inc., No. 3:13-cv-00133-WHO (N.D. Cal. Dec. 2, 2014), Dkt. No. 286.[19]  The final

_____

[19] See also Consent Motion to Enter Third Amended [Proposed] Final J., Dkt. no. 286, at 3,
United States v. Bazaarvoice, Inc., No. 3:13-cv-00133-WHO, 2014 WL 203966 (N.D. Cal. Dec.
1, 2014) ("Pursuant to the April 24, 2014 proposed Final Judgment, and following approval of

judgment that was entered in National Association of Realtors is also a stipulated final judgment

in which the consented-to compliance provisions were justified by, inter alia, the decentralized

nature of the defendant entity and the fact that the challenged conduct was directly and

intentionally exclusory.  See Final Judgment, Nat. Ass'n of Realtors, No. 5-cv-05140, Dkt. 243-

3, at 1; see also Am. Complaint, Nat. Ass'n of Realtors, No. 5-cv-05140, Dkt. 243-3, ¶¶ 1, 11.

As explained above, neither of those circumstances—consent or intentional and inconspicuous

wrongdoing—are present here.

　　　　　Thus, American Express respectfully submits that the Court should reject the

punitive, unnecessary and unworkable additional compliance obligations that the Government

seeks in Section VI of its Proposed Final Judgment.

**B.    The Court Should Adopt American Express's Proposed Written Merchant Notification Provisions.**

　　　　　American Express and the Government largely agree on the substance of the

written communication that will be sent to merchants in order to notify them of the Final

Judgment.  There is no disagreement that American Express should be required to provide

written notification to merchants: (i) notifying them of the Final Judgment; (ii) notifying them

―――――――――――――――

the United States, Bazaarvoice divested the PowerReviews assets to Viewpoints, Inc. in a transaction that closed on July 2, 2014.  At the end of July 2014, the United States became aware there was a question whether Bazaarvoice was improperly continuing to use certain PowerReviews technology that the proposed Final Judgment required it to divest. Bazaarvoice stopped the conduct in question as soon as the United States raised its concerns, and each party investigated what happened. While Bazaarvoice maintained that its conduct was consistent with its obligations under the Court's order, the United States was concerned that the lack of timely communication between Bazaarvoice and the United States led to an investigation and dispute that could have been avoided by a greater focus from the company on its compliance obligations. As a means of fully resolving this matter, the United States and Bazaarvoice have agreed to modify the proposed Final Judgment to require Bazaarvoice to appoint an internal compliance officer to oversee the company's efforts to comply with the Final Judgment and the antitrust laws.")

that they are no longer restricted in engaging in any of the practices enumerated in the Final Judgment; (iii) notifying them of the specific rules changes made pursuant to the Final Judgment; and (iv) notifying them that American Express will not enforce any provision that is disallowed as a result of the Final Judgment. (See Ex. A (Defs.' Proposed Final J.) § IV.C.) These written notification requirements are more than sufficient to accomplish the sole purpose of the written notification provision in the Final Judgment—to inform merchants about the Final Judgment and the conduct that they can and cannot engage in as a result of the Final Judgment.[20]

Nonetheless, the Government also proposes to require American Express to encourage merchants to steer and make gratuitous statements that it was found to have violated the law. (See, e.g., Ex. B (Pls.' Proposed Final J.) §§ V.C.3, V.F.) American Express objects to the inclusion of these additional requirements. American Express has no obligation to encourage merchants to steer against its Cards beyond informing merchants they may do so (which is accomplished by American Express's proposed notification requirements). The Government's proposals are, simply put, facially punitive. See Int'l Salt, 332 U.S. at 401; see also Hartford-Empire, 323 U.S. at 409.[21]

---

[20] While it is plainly appropriate for the Government to comment on the form of notice to merchants, requiring the Government's approval is unnecessary. (Compare Ex. A (Defs.' Proposed Final J.) § IV.C, with Ex. B (Pls.' Proposed Final J.) § V.C.) Similarly, while American Express must make reasonable efforts to provide merchants with notice, it cannot be required to ensure that every single one of its more than three million merchants actually receive notice. (Compare Ex. A (Defs.' Proposed Final J.) § IV.C, with Ex. B (Pls.' Proposed Final J.) § V.C.)

[21] Moreover, to the extent the Government proposes that American Express notify merchants that they can engage in conduct that, for reasons explained herein, American Express should be entitled to prevent under the Final Judgment, American Express of course objects to the inclusion of such language (in other words, the specific language of the notification provision should reflect and be based on the provisions in the Final Judgment, not the provisions contained in the Government's proposal).

The Government has also proposed unreasonable and inconsistent deadlines for American Express to actually change its NDPs and confirm to the Government that it has taken the appropriate steps to put merchants on notice of those changes.

First, the Government proposes that American Express be required to "delete, discontinue and cease" to enforce the NDPs on or before the Effective Date of the Final Judgment, except as permitted under the Final Judgment.  (See Ex. B (Pls.' Final J.) § V.A.)  American Express, on the other hand, proposes that it should have up to thirty days after the Effective Date to repeal or modify the NDPs, except as permitted under the Final Judgment.  (See Ex. A (Defs.' Proposed Final J.) § IV.A.)  American Express's proposal reflects the reality that the NDPs cannot be "deleted and discontinued" without actually sending notice to merchants of the changes in the NDPs.  That process of sending notice to more than three million merchants requires a reasonable amount of time once the Effective Date occurs in the event that the Government prevails on appeal and any stay that might be granted be either this Court or the Second Circuit expires.  Accordingly, American Express respectfully submits that the Court should adopt Section § IV.A of its Proposed Final Judgment.

Second, while both parties agree that American Express should provide the Government with an affidavit confirming the steps it took to change the NDPs consistent with the Final Judgment and provide notice to merchants of those changes, the Government proposes a deadline for doing so that is inconsistent with the other terms of its own Proposed Final Judgment.   Specifically, the Government proposes that American Express confirm to it the steps American Express took to notify merchants of changes to the NDPs no later than ten business days after the Effective Date.  (See Ex. B (Pls.' Proposed Final J.) § V.G.)  But the Government separately proposes that American Express furnish it with its proposed notice to merchants

48

within the same ten business days of the Effective Date and that American Express give notice to merchants no later than five days <u>after</u> receiving the Government's consent to the proposed notice.  (<u>See</u> Ex. B (Pls.' Proposed Final J.) § V.C.)  Thus, under the Government's proposal, American Express would be required to provide the Government with an affidavit confirming the steps it took to notify merchants well <u>before</u> any such notice would be given, even under the Government's formulation.  That makes no sense.  Accordingly, American Express respectfully submits that the Court should adopt Sections IV.A, IV.C and IV.D of its Proposed Final Judgment.

      C.      <u>The Court Should Not Regulate the Specific Language of American Express's Contracts.</u>

        American Express objects to the Government's unnecessary proposal to include specific changes to the language of American Express's contracts in the Final Judgment. American Express will be subject to the Final Judgment that is entered in this case and, as explained above, will have every incentive to ensure that it remains in compliance with that order.  American Express has able transactional counsel who are in the best position to draft the specific language that would be necessary to effectuate the Court's order while protecting American Express's legitimate business interests.  Moreover, the Government will have an opportunity to review American Express's NDPs and can bring any concerns or suggested changes to American Express's attention for remediation, or, in the highly unlikely event the Government believes judicial relief may be warranted, it is free to seek such relief.  The alternative approach proposed by the Government is akin to regulation and is completely unnecessary to implement the Court's Liability Decision.  Indeed, American Express has not found any precedent in which a Court unilaterally made specific, wide-ranging edits to a firm's contractual language as part of a final judgment in a Section 1 case.  For example, in <u>United</u>

States v. Visa, the final judgment did not specify any changes to the language of Visa's and MasterCard's bank contracts and rather left it to Visa and MasterCard to come up with the modifications to their contractual language that would bring their bank agreements into compliance with the order.  (See Ex. E (Final J., United States v. Visa).)  And, although the Consent Decree does contain specific changes to Visa's and MasterCard's merchant agreements, the decree is a consented-to agreement that was extensively negotiated by Visa and MasterCard, and thus, reflects their considered input.

Including specific changes to the language of the NDPs in the Final Judgment also would impose unreasonable and inefficient burdens on American Express and the Court.  In particular, because the specific language would be part of an injunction that could last as long as ten years, American Express would have to seek leave of the Court any time it wanted to make any modifications to that language.  American Express would have no other choice, as making even small modifications without the Court's permission potentially could result in a finding of non-compliance—even with respect to provisions that are not at issue in this case.  (See, e.g., Ex. B (Pls.' Proposed Final J.) § V.B.3.)

Finally, even if the Court were to conclude that it is appropriate to regulate the specific language of American Express's contracts as part of the Final Judgment, it is premature for the parties to propose such language now since the parties do not yet have a final judgment to which American Express's NDPs will need to conform.  Thus, American Express proposes that, at a minimum, the Court defer ruling on the issue of what specific changes should be made to American Express's NDPs to bring them in compliance with the Final Judgment until after that Final Judgment is entered.

## CONCLUSION

For the foregoing reasons, American Express respectfully requests that the Court enter American Express's Proposed Final Judgment and Order Entering Injunction.  American Express also reserves all rights to respond to the Government's Proposed Final Judgment and supporting brief by filing a responsive brief and/or requesting a hearing.

March 23, 2015

Respectfully submitted,

/s/ Evan R. Chesler

Evan R. Chesler
(echesler@cravath.com)
Peter T. Barbur
(pbarbur@cravath.com)
Kevin J. Orsini
(korsini@cravath.com)
Members of the Firm

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Donald L. Flexner
(dflexner@bsfllp.com)
Philip C. Korologos
(pkorologos@bsfllp.com)
Eric J. Brenner
(ebrenner@bsfllp.com)

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Counsel for Defendants American Express Company and American Express Travel Related Services Company, Inc.*

51