UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, et al.,
    Plaintiffs

v.

AMERICAN EXPRESS CO., et al.,
    Defendants

---

**PLAINTIFFS' REPLY
MEMORANDUM IN SUPPORT
OF PROPOSED
FINAL JUDGMENT AND
REMEDIAL ORDER
AS TO THE AMERICAN
EXPRESS DEFENDANTS**

No. 10-CV-04496 (NGG)

**Table of Contents**

I.      INTRODUCTION. ...............................................................................................1

II.     CONTRARY TO AMEX'S CLAIMS, PLAINTIFFS' PROPOSED JUDGMENT
        IS WELL WITHIN THE POWER OF THE COURT ........................................................2

        A.      An antitrust remedy must "pry open" the market to competition. ................................2

        B.      Amex misapprehends the distinction between consent judgments and
                litigated judgments.................................................................................4

III.    THE PROPOSED JUDGMENT IS GROUNDED IN THE COURT'S
        FINDINGS AND OTHER FACTS PROVED AT TRIAL. ............................................4

        A.      Amex's Proposal improperly seeks to continue Amex's control of competition. .........4

                1.      Amex's Proposal improperly imposes price conditions to limit
                        merchant steering. .....................................................................5

                2.      Amex's Proposal improperly blocks general steering by allowing steering
                        only on a transaction-by-transaction basis. ...........................................6

                3.      Amex's Proposal improperly blocks steering to other payment forms...................6

        B.      Amex misunderstands the provision concerning disparagement...................................9

IV.     AMEX'S PROPOSED SPECIAL PERMISSIONS FOR ITSELF ARE
        UNWARRANTED. ...........................................................................................10

        A.      Amex's proposal for special permission to terminate merchants for steering
                would allow Amex effectively to reinstitute its restrictions on competition. ..............10

        B.      Amex's special "marketing" exception would undermine effective relief ................13

V.      AMEX REJECTS, MISUNDERSTANDS, OR MISCHARACTERIZES
        REASONABLE PROPOSALS TO ENSURE COMPLIANCE.......................................15

VI.     PLAINTIFFS' PROPOSED TIMING PROVISIONS ARE APPROPRIATE..................19

VII.    OTHER ISSUES..............................................................................................19

VIII.   CONCLUSION..............................................................................................20

## Table of Authorities

<u>Cases</u>

*Boyce Motor Lines, Inc. v. United States*,
  341 U.S. 337 (1952).................................................................................... 12

*Bristol-Myers Co. v. FTC*,
  738 F.2d 554 (2d Cir. 1984)......................................................................... 3

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972).................................................................................2-3

*FTC v. Colgate-Palmolive Co.*,
  380 U.S. 374 (1965).................................................................................. 12

*FTC v. National Lead Co.*,
  352 U.S. 419 (1957).................................................................................. 11

*Hartford-Empire Co. v. United States*,
  323 U.S. 386 (1945)................................................................................3, 9

*Int'l Boxing Club of N.Y., Inc. v. United States*,
  358 U.S. 242 (1959).................................................................................... 9

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947)......................................................................... passim

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978).................................................................................. 11

*Paramount Film Distrib. Corp. v. Vill. Theatre*,
  228 F.2d 721 (10th Cir. 1955) .................................................................... 2

*Society for Good Will to Retarded Children, Inc. v. Cuomo*,
  737 F.2d 1239 (2d Cir. 1984)...................................................................... 3

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................11-12

*United States v. Bausch & Lomb Co.*,
  321 U.S. 707 (1944).................................................................................. 11

*United States v. Colgate & Co.*,
  250 U.S. 300 (1910).................................................................................. 10

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)......................................................................... 9

*United States v. Dentsply Int'l, Inc.*,
  No. Civ. A. 99-005, 2006 WL 2612167 (D. Del. April 26, 2006)...................................9, 12, 19

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961).............................................................................................................12

*United States v. Glaxo Group Ltd.*,
  410 U.S. 52 (1973)...............................................................................................................11

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995)..............................................................................................4

*United States v. Paradise*,
  480 U.S. 149 (1987).........................................................................................................10-11

*United States v. Topa Equities (V.I.), Ltd.*,
  No. 1994-179, 1995 WL 481368 (D.V.I. July 14, 1995).......................................................12

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)....................................................................................9

*Waldman Pub. Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994)......................................................................................................3

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)................................................................................................................8

## Court Judgments

Final Judgment, *United States v. Airline Tariff Publ'g Co.* (D.D.C. Nov. 1, 1993)....................18

Final Judgment, *United States v. Alex Brown & Sons, Inc.*, 1997 WL 314390
  (S.D.N.Y. April 24, 1997) ....................................................................................................18

Final Judgment, *United States v. Am. Bar Ass'n* (D.D.C. June 25, 1996)....................................18

Final Judgment, *United States v. Am. Stock Exch.*, (D.D.C. Dec. 6, 2000) .................................17

Final Judgment, *United States v. Apple* (S.D.N.Y. Aug. 12, 2013)
  (settlement with Macmillan)..................................................................................................17

Final Judgment, *United States v. Apple*, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013) ..........18-19

Final Judgment, *United States v. City of Stillwell* (E.D. Okla. Nov. 5, 1998) .............................18

Final Judgment, *United States v. Comcast Corp.* (D.D.C. Sept. 1, 2011) ...................................17

Final Judgment, *United States v. Consolidated Multiple Listing Serv., Inc.*
  (D.S.C. Aug. 27, 2009) ........................................................................................................16

iii

Final Judgment, *United States v. Dairy Farmers of America*, 2000 WL 33200552
(E.D. Pa. Nov. 3, 2000)............................................................................................ 18

Final Judgment, *United States v. eBay* (N.D. Cal. Sept. 2, 2014) ................................ 17

Final Judgment, *United States v. Ecast, Inc.* (D.D.C. Dec. 16, 2005) ......................... 18

Final Judgment, *United States v. Flakeboard America Ltd*. (N.D. Cal. Feb. 2, 2015) ................ 18

Final Judgment, *United States v. Gemstar-TV Guide Int'l, Inc.*, 2003 WL 21799949
(D.D.C. July 11, 2003)........................................................................................... 18

Final Judgment, *United States v. Google Inc. & ITA Software, Inc*. (D.D.C. Oct. 5, 2011) ........ 17

Amended Final Judgment, *United States v. Ky. Real Estate Comm'n*,
2005 WL 6415125 (W.D. Ky. Nov. 17, 2005) .................................................. 16, 18

Final Judgment, *United States v. Nat'l Ass'n of Realtors* (N.D. Ill. Nov. 18, 2008)............. 16, 17

Final Judgment, *United States v. Norsk Hydro USA Inc*. (M.D. Fla. May 18, 1998).................. 18

Final Judgment, *United States v. Ticketmaster Entm't, Inc*. (D.D.C. July 30, 2010) .................. 17

Final Judgment, *United States v. United Reg'l Health Care Sys*.
(N.D. Tex. Sept. 29, 2011)....................................................................................... 17

Final Judgment, *United States v. Verizon Commc'ns Inc*. (D.D.C. Aug. 13, 2013).................... 17

Final Judgment, *United States v. Women's Hosp. Found*., 1996 WL 634211
(M.D. La. Sept. 11, 1996) ...................................................................................... 16

## I.       INTRODUCTION.

American Express ("Amex") asks the Court to adopt a Final Judgment providing incomplete relief and failing to address the harm established at trial and detailed in the Court's Decision.  Memorandum in Support (ECF Nos. 623 & 624) ("Amex Mem.").  Even though the Court was clear that "[f]ashioning appropriate relief in this case will require certain of the provisions of the NDPs to be excised entirely," Scheduling Order at 2 (ECF No. 620), and even though Visa and MasterCard agreed to Final Judgments containing the revised text of their rules, Amex has rejected any judgment that imposes wording changes to its rules.  Amex has thus effectively rejected the Court's invitation to participate in a discussion of "how American Express's merchant regulations might be rewritten so as to satisfy American Express's interests and yet comport with the Sherman Act." *Id.*  This is unfortunate, because any restrictions that Amex imposes on merchant steering will effectively establish the rules of the road for all general purpose card networks.  *See* Decision at 30 ("Importantly, the NDPs inhibit steering even when American Express is not mentioned, resulting in the restraints' effects being inflicted across the GPCC industry.").

Amex characterizes Plaintiffs' Proposed Judgment—largely identical to the Visa and MasterCard consent judgment, with adaptations to Amex's specific business structure—as "punitive" and "onerous."  But Plaintiffs' Proposed Judgment, which is well grounded in facts developed at trial, offers a reasonable approach to ending the antitrust violation found by this Court, preventing a recurrence of Amex's violation, and restoring competition to the market, including ensuring that Amex can be a vigorous competitor.  Amex's Proposal would satisfy none of these requirements of an antitrust remedy and should be rejected.[1]

---

[1] Exhibit 1 shows where each provision of the two proposed judgments is discussed.

## II.    CONTRARY TO AMEX'S CLAIMS, PLAINTIFFS' PROPOSED JUDGMENT IS WELL WITHIN THE POWER OF THE COURT.

### A.    An antitrust remedy must "pry open" the market to competition.

An antitrust remedy must "pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947).  Amex reads too much into case law stating that "an injunction 'should not go further than to put the parties in the position they would enjoy' if no antitrust violation had existed."  Amex Mem. at 6 (quoting *Paramount Film Distrib. Corp. v. Vill. Theatre*, 228 F.2d 721, 727 (10th Cir. 1955) (rejecting a remedy that would have put plaintiff theatre chain in a *better* position than if the violation had not occurred)).  Plaintiffs' proposal to eliminate Amex's unlawful NDPs is the logical first step toward establishing market conditions as "if no antitrust violation had existed." But it "is not a correct statement of the law" to suggest that "violators may not be required to do more than return the market to the *status quo ante*."  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972) (internal citation omitted).   "Rather, the relief must be directed to that which is necessary and appropriate in the public interest *to eliminate the effects* of the [violation], or which will *cure the ill effects* of the illegal conduct, and *assure the public freedom from* its continuance.'"  *Id.* (citations and internal quotation marks omitted) (emphasis in original).  The additional provisions proposed by Plaintiffs—a clear statement that Amex may not block merchant steering as well as reporting and compliance obligations—represent reasonable and essential means to achieve an effective remedy.

Amex suggests that the Court's chief consideration in determining the appropriate remedy is to assure that it go no further than absolutely necessary to address the precise antitrust violation found.  Amex Mem. at 5-7.  But to restore competition and ensure that a violation does not recur, the Court has broad power to enjoin acts that are of the same type or class as those

2

found unlawful.  *See* Plaintiffs' Memorandum at 2-3 (ECF No. 622) ("Plaintiffs' Mem."); *see also Bristol-Myers Co. v. FTC*, 738 F.2d 554, 561 (2d Cir. 1984) (holding that a remedy may "extend[] beyond the precise illegal conduct found," and approving a remedial order extending to all sixty of defendant's products although the violation found involved just two of them); *Int'l Salt*, 332 U.S. at 400 ("When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.").

Amex cites *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1251 (2d Cir. 1984) (quoted in *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)), for the proposition that injunctive relief "should be narrowly tailored to fit the specific legal violations alleged." *Society for Good Will*, however, relies for that proposition on *Hartford-Empire Co. v. United States*, 323 U.S. 386, 409-10 (1945), an antitrust case expressly recognizing that an appropriate remedy can limit otherwise lawful conduct on the part of the defendant:  "This is not to say that a decree need deal only with the exact type of acts found to have been committed or that the court should not, in framing its decree, resolve all doubts in favor of the Government, or may not prohibit acts which in another setting would be unobjectionable." *Id.*

As Amex notes, the remedy should fit the violation, Amex Mem. at 5-7, but Amex misapprehends the implications of this proposition.  When courts declare that antitrust remedies should "eliminate the effects" of the violation, *Ford Motor*, 405 U.S. at 573 n.8, and restore competitive conditions, they are merely elaborating the proposition that the remedy should fit the violation.  Amex's proposed overly narrow remedy would ***not*** fit the violation because it would neither eliminate its effects nor prevent its reinstitution via an "untraveled road."

3

**B.      Amex misapprehends the distinction between consent judgments and litigated judgments.**

Amex argues that the Court should not use the Visa/MC Judgment as a model in crafting its remedy.  That judgment was consented to, and Amex suggests that consent judgments are expected to have broader relief than a litigated judgment.  Amex Mem. at 7.  Actually, Amex has matters backwards.  A settlement is often a compromise, and thus may encompass *less* relief than a litigated judgment.  Amex quotes the United States' reference to the "greater flexibility in approving consent decrees than [imposing a litigated judgment]" but omits the next sentence, which explains that a court may approve a consent judgment "even if it falls short of the remedy the court would impose on its own."  Response of Pl. United States to Public Comments on the Proposed Final J. (ECF. No. 119-1), at 10;  *cf.* Amex Mem. at 7 (quoting partially).  Indeed, "when a consent decree is brought to a district judge, because it is a settlement, there are no *findings* that the defendant has actually engaged in illegal practices.  It is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460-61 (D.C. Cir. 1995) (emphasis in original).

**III.      THE PROPOSED JUDGMENT IS GROUNDED IN THE COURT'S FINDINGS AND OTHER FACTS PROVED AT TRIAL.**

**A.      Amex's Proposal improperly seeks to continue Amex's control of competition.**

The theory of Plaintiffs' case was that merchants should be permitted to steer to enable free and open competition at the point of sale.  Plaintiffs' Proposed Judgment hews to that bedrock antitrust principle.  Amex's proposal, in contrast, seeks affirmatively to restrict point-of-sale competition, much as it has unlawfully done for many years.  Amex would (1) impose a price restriction on merchant steering (only to "less-expensive" general purpose cards), (2) prohibit merchants from adopting general steering toward a particular network, and (3) block steering to other forms of payment.  *See* Plaintiffs' Mem. at 7-14.  Amex's narrow proposed

4

relief flouts the Court's holding that "the law does not permit American Express to decide on behalf of the entire market which legitimate forms of interbrand competition should be available and which should not."  Decision at 136.  Plaintiffs' Proposed Judgment provides to merchants the freedom to determine how best to use steering to promote competition and to reduce their payment costs.  Only by allowing merchants, rather than Amex, to make these important decisions can competition be restored.

> 1. **Amex's Proposal improperly imposes price conditions to limit merchant steering.**

Plaintiffs' Proposed Judgment allows merchants the freedom to consider and market test a range of potential steering options, provided they do not mischaracterize or disparage Amex's products.  Amex's Proposal limits merchant steering solely to instances when the steered-to card is less expensive according to a formula Amex would impose.

Amex wrongly asserts that the violation found by the Court was merely preventing steering to less expensive cards, Amex Mem. at 8.  While a key manifestation of harm to the competitive process was merchants' inability to steer to less expensive cards, the unlawful conduct was the restriction on competition at the point of sale more generally.  *See* Decision at 110 (criticizing "the harm done to the competitive process by Amex's rules against merchant steering"); *see also id.* at 136 (condemning "suppressing competition on the merchant side of the GPCC platform").  Amex's NDPs were unlawful because they enabled "all four networks to raise their swipe fees more easily and more profitably than would have been possible were merchants permitted to influence their customers' payment decisions," *id.* at 111, and because they "inhibit[ed] the development of several proposed merchant-owned payment solutions," *id.* at 115.  The Court recognized that  "[p]roviding merchants the freedom to participate in their customers' payment decisions will foster greater interbrand competition among the GPCC

networks and restore downward pressure on their merchant prices," and "enhance [merchants'] bargaining position relative to American Express and its competitor networks, placing additional downward competitive pressure on rates." *Id.* at 118-19.  The Court further recognized that some merchants might want to steer to higher priced cards, such as Amex, if it "actually offers premium value to its merchants." *Id.* at 141; *see id*. at 129-30 n.50 (noting that merchants could be "economically incentivized to steer toward American Express—for example, due to lower discount rates or *other remuneration*") (italicization added).  Amex's Proposal to allow it to impose a price test on steering is inconsistent with the Court's Decision and unnecessarily impedes effective relief.

      **2.**      **Amex's Proposal improperly blocks general steering by allowing steering only on a transaction-by-transaction basis.**

Plaintiffs' Proposed Judgment allows merchants to devise their own steering programs, including general or category steering to a network.  Amex proposes that steering be permitted only when a price comparison "for the particular transaction" shows that the Amex card is more expensive.  Amex Mem. at 8.  But the Court's Decision clearly envisioned general network steering, *see* Decision at 29-30, 32, 104-06, 120-21, and it clearly contemplated network-level comparisons, *see* quotations from Decision in Amex Mem. at 10 ("to use their lowest cost supplier"; "to lower-cost credit or charge card networks"; "steer volume to less expensive networks" (emphasis in Amex Mem.)).

      **3.**      **Amex's Proposal improperly blocks steering to other payment forms.**

Plaintiffs' Proposed Judgment does not allow Amex to maintain restrictions on merchant steering to any form of payment.  Amex's Proposal would allow it to continue its limits on steering to payment products other than GPCC cards.

Amex relies upon the Court's finding that relevant market is limited to GPCC cards to insist that it can continue its restrictions on steering to other payment forms.  As explained in our opening memorandum, Amex is incorrect both legally and factually.  Plaintiffs' Mem. at 12-14. First, a relevant market limited to GPCC cards does not imply that there is no competition from out-of-market payment forms, such as debit.  *See* Pl. Proposed Concl. of Law at 22-23 (ECF No. 602).[2]

Second, the Complaint, the trial record, and the Decision all noted the anticompetitive effect of impeding steering to other forms of payment.[3]  Plaintiffs' Mem. at 12-13; Decision at 49 (one choice for a merchant "faced with an increase in the price . . . [is to] attempt to steer its customers to other forms of payment"), at 59 (merchants may use debit rates "as a negotiating tactic" seeking a lower rate); Tr. at 487:18-489:20 (Satkowski/Enterprise) ("We contacted a number of customers to determine whether they would be willing to use a *different form of payment* . . . . [but] too many corporate customers [did not want to] pay[] with a different credit card or a *direct bill method of payment*." (emphasis added)); Tr. at 1269:21-1270:24 (Kimmet/Home Depot) (using PayPal is a way to "outsource that steering," including to ACH); Tr. at 2472:9-14 (Priebe/Southwest) ("If we had the ability to project the debit rates and show the

---

[2] The relevant market is limited to GPCC network services because the market must be defined "from the merchant's perspective."  Decision at 53-54.  But different payment products "compete[] to some degree for share of consumers' wallets," *id*. at 8-9, and for that reason merchants might want to steer some customers to debit cards or other payment products.  *See* Tr. at 6633:23-6634:14 (Katz) ("[T]hey clearly are substitutes but it is a question of degree and they're not close enough [to be in the relevant market].").

[3] See Decision at 25-27 (quoting and defining NDPs, including restrictions on steering to "Other Payment Products").  Amex defines "Other Payment Product" as "[a]ny charge, credit, debit, stored value, prepaid, or smart cards, account access devices, or other payment cards, services, or products other than the [Amex] Card."  PX0001.

differential, I think that's something we would consider.").[4]  And one of the anticompetitive

harms caused by the NDPs has been to "stifle innovation."  Decision at 115-16.  Among the

stifled innovations was MCX, a "new payment platform," *id.* at 116, and "not necessarily a credit

device or debit device, but . . . a payment product that both protects data and lowers our cost,"

Tr. at 2433:12-24 (Priebe/Southwest).  The Court found that development of MCX was

"impeded by restrictions on merchant steering."  *Id.* at 116.  More generally, the Court found that

"American Express's anti-steering rules—and those previously maintained by Visa and

MasterCard—are responsible for impeding development of novel payment solutions that would

have injected or potentially may inject greater diversification into the network services industry."

*Id.* at 116.

 Third, the Court "has broad power to restrain acts which are of the same type or class as

unlawful acts which the court has found to have been committed," *Zenith Radio Corp. v.*

*Hazeltine Research, Inc*., 395 U.S. 100, 132 (1969), and to prevent a defendant from pursuing

"untraveled paths" to restrain competition, *Int'l Salt*, 332 U.S. at 400.  Plaintiffs' Mem. at 2-3;

*supra* at II.A.

Amex alleges that an antitrust remedy cannot extend beyond the court's recognized

market, Amex Mem. at 5-7, 17-20, but there is nothing improper about relief that encompasses

products outside the defined relevant market, Plaintiffs' Mem. at 12-14.  Courts have a

---

[4] Amex cites non-record evidence – an excerpt from Dr. Katz's deposition concerning the "but for" world in his analysis.  This whole line of argument is irrelevant because the Court found, based on all the evidence, that "[u]nderpinning [the Court's] 'but for' world lies a determination that, without Amex's contractual restraints, merchants actually are likely to steer customers between *various forms of payment* or GPCC networks."  Decision at 122 (emphasis added).  As for Amex's attempt to revisit questions it decided not to ask at trial, we note that the Amex Memorandum's description of Dr. Katz's deposition testimony fails to mention his testimony that there would be "beneficial effects" from ending the rule against steering to debit.  Dep. Tr. at 354:10-355:11 (Katz).  Amex examined Dr. Katz about the "but-for world" at trial, but not on this issue. Tr. at 4177:23-4186:20 (Katz).

responsibility to restore competition and prevent inhibition of future competition. *Hartford-Empire Co. v. United States*, 323 U.S. 386, 417-18 (1945) (ordering the lower court to limit several aspects of its injunction but specifically directing the injunction to cover future inventions and not just currently competing machines). Courts do order remedies going beyond the boundaries of the defined antitrust market. *See United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 408 (S.D.N.Y. 2001) ("[I]ncluding debit as a necessary part of the remedy does not put it in the same product market with general purpose cards."). *Compare United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187-88 (3d Cir. 2005) (finding that the relevant market is artificial teeth) *with United States v. Dentsply Int'l, Inc.*, No. Civ. A. 99-005, 2006 WL 2612167, at *1 (D. Del. Apr. 26, 2006) (enjoining Dentsply from conditioning "sale of its teeth or any other product"); *cf. Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 262 (1959) (violation involved "championship bouts" but remedy extended to a "prohibition against exclusive contracts applying to all professional boxing contests").

Finally, the Visa/MC Judgment protects steering to other forms of payment. By introducing divergence between the remedies applicable to Amex and those applicable to its rivals, Amex's Proposal would add confusion and deter merchant steering.

## B.    Amex misunderstands the provision concerning disparagement.

Amex misinterprets Plaintiffs' Proposed Judgment § IV.C to allow Amex to bar mischaracterization of its card only if the mischaracterization is additionally "disparaging." That is not the intention of Plaintiffs' proposed provision. Plaintiffs' Proposed Judgment includes "mischaracterization" as a category of "disparagement" as a convenience and to keep the Amex provisions reasonably parallel to those governing Visa and MasterCard. The intention is that Amex can prohibit all "mischaracterization," not only a subset of mischaracterization ("disparaging mischaracterization"). We are aware of no actual dispute between the parties on

9

this issue and thus no bar to adopting Plaintiffs' Proposed Judgment.  But  Plaintiffs would have

no objection to revising § IV.C of Plaintiffs' Proposed Judgment to refer to "disparaging <u>or</u>

<u>mischaracterizing</u> its Brand, including . . . ."

## IV. AMEX'S PROPOSED SPECIAL PERMISSIONS FOR ITSELF ARE UNWARRANTED.

### A. Amex's proposal for special permission to terminate merchants for steering would allow Amex effectively to reinstitute its restrictions on competition.

Amex asks the Court for carte blanche to terminate merchants for engaging in the very

types of steering that the judgment explicitly permits. But that would fundamentally undermine

the effectiveness of the decree.  Plaintiffs' Mem. at 14-16.  Plaintiffs are asking the Court to

prohibit Amex from having a rule or practice that impedes steering.  Plaintiffs do not suggest that

Amex could not terminate a steering merchant for, e.g., fraud.  But in order to ensure that Amex

does not implement a prohibited practice of impeding steering by a policy of terminations,

Plaintiffs seek monitoring of Amex's terminations to prevent Amex from frustrating the

accomplishment of the judgment's objectives.  Amex's counter-proposal—that the Court should

go out of its way to authorize for Amex the unchecked ability to terminate merchants who

engage in protected steering—is not supported by the law or the record at trial.

Citing *United States v. Colgate & Co*., 250 U.S. 300 (1910), Amex asserts a "right not to

. . . do business with a merchant that chooses to steer."  Amex Mem. at 26.  But even if antitrust

law normally would not interfere with Amex's ability to set the terms on which it does business,

the Court's ruling that Amex violated that law places Amex in a different position.  "The law

violator who would oppose a remedy imposed against him as itself a violation of the law does

not stand in the same position as an innocent party; those whom the court has found in the wrong

may not oppose a remedy on the ground that it would constitute a wrong if leveled at a non-

participant in the litigation." *United States v. Paradise*, 480 U.S. 149, 193 n.3 (1987) (citing

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. at 697-98, and *Int'l Salt Co.*, 332 U.S. at 400-01).  The Supreme Court has held that the remedy in an antitrust case can lawfully restrict First Amendment rights, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 697-98, and patent rights, *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 59-60 (1973) (stating that "reasonable-royalty licensing" is a "well-established form[] of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated").  If patent rights and the Freedom of Speech rights can be modified in order to ensure effective relief once an antitrust violation has been found, Amex's alleged unfettered right to terminate merchants at will can also give way.

Amex cites *United States v. Bausch & Lomb Co.*, 321 U.S. 707, 728 (1944), for the proposition that remedial provisions should not "interfere with ordinary commercial practices." But in that case the Supreme Court also observed that, once the defendant's "distribution system" was shown to be affected by contracting provisions found to be illegal, "otherwise valid" contracts "should be cancelled, along with the invalid arrangements, in order that the ground may be cleansed effectually from the vice of the former illegality."  *Id*. at 724; *see also id.* at 726 (emphasizing "equity's authority to use quite drastic measures to achieve freedom from the influence of the unlawful restraint of trade").  The Supreme Court has subsequently cited the *Bausch & Lomb* remedy in support of its observation that "decrees often suppress a lawful device when it is used to carry out an unlawful purpose."  *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 430 (1957).

Amex argues at length that *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir 2000), is not on point because the court upheld the injunction only because refusals to deal were part of the unlawful conduct.  Amex Mem. at 29.  But Amex ignores the fact that its termination of

merchants for noncompliance with the NDPs – thus, its refusal to deal with them – was part of its unlawful conduct.  Decision at 31-32 & n.6; Tr. at 4491:6-18, 4514:14-19 (Chenault/Amex). Plaintiffs rely on *Toys "R" Us* for the valid proposition that antitrust remedies can limit how a defendant "exercis[es] its unilateral judgment."  Plaintiffs' Mem. at 15 (citing 221 F.3d at 940). Indeed, the law is clear that, after finding antitrust violations, the court is "required[] to decree relief effective to redress the violations,"  *United States v. E.I. du Pont de Nemours & Co*., 366 U.S. 316, 326 (1961), and "effectively pry open to competition a market that has been closed by defendants' illegal restraints," *Int'l Salt Co.*, 332 U.S.  at 401.  To provide adequate relief, those principles clearly authorize restrictions on Amex's alleged right to terminate merchants for any reason.[5]  *See* Final Judgment § I.B, *United States v. Dentsply Int'l, Inc.*, No. 99-005, 2006 WL 2612167 (D. Del. Apr. 26, 2006) (prohibiting dealer terminations to enforce the policy the court found unlawful); *United States v. Topa Equities (V.I.), Ltd*., No. 1994-179, 1995 WL 481368, at *2 (D.V.I. July 14, 1995) (enjoining defendant from "[r]efusing to deal with any retailer because that retailer deals with another wholesaler").

Moreover, Amex's arguments here are fundamentally at odds with its request to this Court in MDL 2221 for approval of a settlement with a provision that "American Express will not terminate or refuse to renew the card acceptance agreement of any merchant solely as a consequence of such merchant imposing surcharges in compliance with this Class Settlement

---

[5] Amex objects that it may terminate merchants (who happen to be steering) for non-steering related reasons, and thus runs the risk of being penalized for acceptable conduct.  The Supreme Court in *FTC v. Colgate-Palmolive Co*., 380 U.S. 374, 393 (1965), rejected a similar objection, where defendants complained that the remedial order may penalize them for inadvertently crossing the line from acceptable to prohibited behavior; the Court observed that because the "crucial terms of the present order . . . are as specific as the circumstances will permit," "it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Id.* (quoting *Boyce Motor Lines, Inc. v. United States*, 341 U.S. 337, 340 (1952)).

Agreement or declining to accept an American Express-Branded Traditional Debit Card in compliance with this Class Settlement Agreement."  Class Settlement Agreement, *In re American Express Anti-Steering Rules Antitrust Litig.*, No. MDL 2221-NGG-RER, ¶ 10 (ECF No. 306-2).

## B.    Amex's special "marketing" exception would undermine effective relief.

Amex's proposed special exception for marketing agreements could be applied broadly to reinstate its NDPs.  Plaintiffs' Mem. at 16-17.  Plaintiffs agree that Amex should be allowed to agree to limit steering during a marketing promotion with a merchant, and Plaintiffs' carve-out for individually negotiated agreements permits exactly that, with adequate protections to ensure it does not become a loophole to reinstate the NDPs. *See* Plaintiffs' Proposed Judgment § IV.B.3. Amex's extra carve-out to bar steering upon receipt of vague marketing benefits would be unnecessary and problematic.

First, while it claims this clause is designed to prevent free riding, Amex can prevent almost all free riding without this special exception in its Final Judgment.  For example, many common forms of marketing (such as rewards, rebates and discounts) are tied to Amex card use and therefore are not subject to free riding.  Decision at 147; *see, e.g.*, Tr. at 1700:1-1701:7 (Dale/Sprint).  No special provision is warranted.

Second, Amex's proposed exception is so vague and broad—encompassing "certain benefits, programs or services, including marketing benefits"—that it could be used as a loophole to block steering widely across the merchant community.  For example, if Amex provided token marketing funds, or even unsolicited free analytics, it might argue that this exception justifies a steering prohibition by that merchant.  It would not be difficult for Amex to

expand this "exception" to exempt most Amex-accepting merchants from the remedy without even providing meaningful benefits to the merchants.

Third, Amex's proposed clause seeks the Court's explicit blessing to set two prices for card acceptance in connection with these undefined benefits—a "higher fee" for merchants that exercise their right to steer to Amex's competitors, and a lower fee for those that do not.  Amex Proposal, § III.B.6.  While nothing stops Amex from charging separate fees for marketing services, Amex is effectively asking for advance approval of a system whereby it uses its market power to impose a high "steering-allowed price" while offering to maintain the current price for merchants that take its new NDPs plus some limited marketing benefits.  This could be a method of reinstituting its NDPs.

Fourth, Amex's proposed marketing clause also applies broadly to its current contracts, including contracts spanning years into the future.  Amex Mem. at 25 n.14.  Under Amex's Proposal, it could force existing merchants to choose either (1) continuing to abide by the NDPs in order to continue access to marketing funds that the merchant may have considered as part of its overall net price of card acceptance, or (2) suffering a sudden price increase.  Amex's Proposal § III.B.6.  *See* Tr. at 418:4-8; 453:1-9 (Robinson/Ikea) (to determine the effective rate Ikea pays to Amex, Ikea nets out the Building Business Bonus funds Amex pays to it).  Amex justifies this proposed clause based on a lone sentence in the Court's Decision rejecting its free-riding defense.  Amex Mem. at 23-26; Decision at 146-47.  While the Court recognized Amex's "capacity to end free riding by a specific merchant" by "ending the specific marketing campaign or even terminating the merchant's acceptance agreement," Amex ignores the Court's observation that these measures would apply to a "limited number of merchants."  *See* Decision at 146-149 n.62.  Amex's broad proposed carve-out could be used to exclude large numbers of

14

current Amex-accepting merchants from the remedy, and thus is inconsistent with the Court's

decision to end Amex's NDPs.   To the extent Amex wants to link new steering limitations to

marketing promotions, the separate individual negotiation clause allows it to do so.

**V.      AMEX REJECTS, MISUNDERSTANDS, OR MISCHARACTERIZES
         REASONABLE PROPOSALS TO ENSURE COMPLIANCE.**

Plaintiffs propose reasonable compliance provisions that will allow the Court to ensure

that the relief embodied in its Final Judgment will be effectuated.   Amex characterizes these

proposals as "punitive" or "onerous."   As the trial made clear, the Final Judgment will be a

change for Amex, its cardholders, and merchants that take credit cards.   Under these

circumstances, it is not unreasonable or unusual to require, as Plaintiffs have proposed, that a

defendant who has been found to violate the antitrust laws be required to notify those affected by

the anticompetitive conduct of the change in policies and practices (the merchant notice), to

inform the Department of Justice of activities that could undermine the effectiveness of the relief

(the reports of rules changes and merchant terminations), and to adopt limited internal

compliance procedures (the Chief Compliance Officer's responsibilities).   Indeed, Amex and its

subsidiaries have agreed to far more extensive compliance provisions in another context.[6]

First, Plaintiffs propose that Amex notify merchants of their freedom to steer.   Plaintiffs'

Proposed Judgment § V.C.   Merchants' rights to steer will change significantly under the Final

---

[6] Consent Order, Order for Restitution, and Order to Pay Civil Money Penalty, *In re American Express Travel Related Servs. Co.,* No. 2012-CFPB-0004, ¶¶ 7, 9, *available at* http://files.consumerfinance.gov/f/2012-CFPB-0004-American-Express-Travel-Related-Services-Company-Inc.-Consent-Order.pdf  (requiring Amex to retain an independent certified accounting firm, approved by the CFPB, "to determine compliance with" the restitution plan, and to submit quarterly "written progress reports" concerning compliance, with a certification by the chairman of the board); Joint Consent Order, Joint Order for Restitution, and Joint Order to Pay Civil Money Penalty, *In re American Express Centurion Bank*, No. 2012-CFPB-0002, ¶¶ 22-37, available at http://files.consumerfinance.gov/f/2012-CFPB-0002-American-Express-Centurion-Consent-Order.pdf (requiring "a comprehensive written compliance program," "an effective training program," an independent third party "Compliance Program Consultant," an independent third party "Management Consultant, "and "independent audits" of compliance).

Judgment.  It is important that they be notified, and notified effectively.  Plaintiffs' Proposed

Judgment thus requires that Amex draft a notification that includes a "plain language"

explanation of merchants' freedom to steer, and that it submit the proposed notification to the

Department of Justice for approval before distributing it to merchants.  Amex refuses to include a

"plain language" description of the change, much less to accept Department of Justice approval

rights for the notification.[7]  In short, Amex wants unfettered control of the messaging to

merchants about what the Court's Final Judgment allows them to do.  Under Amex's proposal,

nothing would stop it from simply tacking the merchant notification of steering rights onto a

series of "fine print" addenda to a monthly statement.  The Court should ensure that the millions

of merchants whose rights are affected receive meaningful notice.  Notification provisions of this

type are not unusual in antitrust judgments.[8]

    Second, Plaintiffs' Proposed Judgment would require Amex to report to Plaintiffs rules

changes to ensure that it does not introduce restrictions on merchant steering through new rules,

Proposed Judgment § V.H, and to report on merchant terminations to ensure that Amex is not

using its ability to terminate merchants to circumvent its prohibition on interference with

---

[7] Amex did not engage with plaintiffs on the text of a plain language notification, but simply
returned its own draft with all such provisions stricken.

[8] Visa/MC Judgment § V.E (require acquiring banks to provide Department of Justice-approved
notification of rules changes to all merchants); Final Judgment § V.H, *United States v.
Consolidated Multiple Listing Serv., Inc.* (D.S.C. Aug. 27, 2009) (provide copies of judgment
and revised rules to all MLS members and each previous applicant for membership); Final
Judgment § V.I, *United States v. Nat'l Ass'n of Realtors* (N.D. Ill. Nov. 18, 2008) (provide copy
of judgment and revised policy on its website and publish text in Realtor magazine); Amended
Final Judgment § VI & Appendix A, *United States v. Ky. Real Estate Comm'n*, 2005 WL
6415125 (W.D. Ky. Nov. 17, 2005) (after rules changes, notify suspended brokers of their
reinstatement and brokers under investigation that they have been cleared, publish Department of
Justice-approved notification of rules change in its newsletter, and distribute Department of
Justice-approved letter to new broker licensees); Final Judgment § V, *United States v. Women's
Hosp. Found.*, 1996 WL 634211 (M.D. La. Sept. 11, 1996) (notify physicians and payers that
they may negotiate independently and without involvement of defendant).

merchant steering activity, Proposed Judgment §§ V.E-V.F.  Amex suggests that no reporting

requirements are needed because it is impossible that it would violate the Final Judgment "in a

manner that would not be easily detected by merchants and the Government."  Amex Mem. at 2.

But given that Amex has interactions with millions of merchants, many of them quite small, that

position is unrealistic.  Reporting requirements are a common feature in antitrust remedies.[9]

       Third, Plaintiffs' Proposed Judgment would require Amex's Chief Compliance Officer, a

current employee of the company,[10] to provide a copy of the Final Judgment to Amex's

merchant-facing employees, to ensure that those employees are trained in the requirements of the

Final Judgment, and to receive and respond to communications from Amex employees

concerning potential violations of the Final Judgment.  Plaintiffs' Proposed Judgment § VI.E.

---

[9] Final Judgment § V.G-H, *United States v. Nat'l Ass'n of Realtors* (N.D. Ill. Nov. 18, 2008); Final Judgment § N, *United States v. Google Inc. & ITA Software, Inc.* (D.D.C. Oct. 5, 2011); Final Judgment §§ IV.I-J, N, *United States v. Comcast Corp.* (D.D.C. Sept. 1, 2011); Final Judgment § VI.B, VII.B, *United States v. eBay,* (N.D. Cal. Sept. 2, 2014) (requires 5 years of reports identifying any contracts entered containing certain provisions and any violation or potential violation of the Judgment); Final Judgment § VII.H, *United States v. Apple* (S.D.N.Y. Aug. 12, 2013) (settlement with Macmillan) (quarterly production of documents alleging non-compliance with judgment; quarterly log of specified communications; and annual reporting requirement "as to the fact and manner of . . . compliance with [the Judgment]"); Final Judgment § VIII, *United States v. Am. Stock Exch,* (D.D.C. Dec. 6, 2000) (requiring defendants to submit "each request . . . to list an option and what action, if any, was taken"); Final Judgment § VII.D, *United States v. United Reg'l Health Care Sys.* (N.D. Tex. Sept. 29, 2011) (requiring defendants to submit a report discussing "any new or revised agreement with any Commercial Health Insurer . . . within fourteen days from the date the agreement is executed"); Final Judgment § X.C, *United States v. Ticketmaster Entm't, Inc.* (D.D.C. July 30, 2010) ("deliver . . . an affidavit describing any revised or amended agreements . . . [15] calendar days prior to the effective date . . . and Defendants shall not implement any amended agreement if the United States . . . objects . . . ."); Final Judgment §§ VI.C-VI.D & Appendix A, *United States v. Verizon Commc'ns Inc.* (D.D.C. Aug. 13, 2013) ("Within ten (10) calendar days of executing any amendment or modification to the Commercial Agreements or the JOE Agreement, any Defendant that is a party to the amended or modified agreement shall furnish to the United States and the State of New York a copy of such amendment or modification, along with a narrative explanation of the purpose and effect of such amendment or modification.").

[10] Amex itself envisioned the Compliance Officer having responsibilities regarding the Final Judgment because the Officer is referenced in Amex's Proposal § V.E.

Amex calls these provisions "onerous" or "punitive," Amex Mem. at 2, 41, 43, but the duties assigned to Amex's Chief Compliance Officer are reasonably designed to ensure that Amex ends its well-established practices for detection and suppression of steering and replaces them with a company-wide understanding that Amex cannot interfere with merchants' freedom to steer.  As the trial established, Amex has hundreds of employees who interact with merchants, while Visa and MasterCard do so mainly through acquirers.  The record established Amex's substantial efforts to define merchant steering as "disparagement" and to suppress it.  *See* Decision at 31. Old habits die hard.  Thus, it is reasonable to impose a plan to reverse the effects of these engrained practices at Amex.

Contrary to Amex's suggestion that compliance programs of this nature are reserved for only the most egregious of violations, *see* Amex. Mem. at 45,[11] compliance requirements are not uncommon in antitrust decrees.[12]

---

[11]  The responsibilities assigned to Amex's Chief Compliance Officer under Plaintiffs' Proposed Judgment differ dramatically from those assigned to the External Compliance Monitor adopted in *United States v. Apple*. In *Apple*, the court appointed an external monitor to evaluate and, if necessary, propose changes to the defendant's antitrust compliance and training programs.  *See* Final Judgment § VI, *United States v. Apple*, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013).  Here, Amex's Chief Compliance Officer, a current Amex employee, is responsible for ensuring that Amex's employees learn about, understand, and raise issues concerning compliance with the Final Judgment.

[12] See Plantiff's Mem. at 32 n.7; Final Judgment § VIII, *United States v. Am. Bar Ass'n* (D.D.C. June 25, 1996); Amended Final Judgment § VIII.A, *United States v. Ky. Real Estate Comm'n,* 2005 WL 6415125 (W.D. Ky. Nov. 17, 2005);  Final Judgment, *United States v. Alex Brown & Sons, Inc*., 1997 WL 314390, at *4-6 (S.D.N.Y. Apr. 24, 1997) (requiring defendants to appoint an antitrust compliance officer and implement a detailed antitrust compliance program including semi-annual briefing of multiple, non-board member employees); Final Judgment § IX, *United States v. Flakeboard America Ltd*. (N.D. Cal. Feb. 2, 2015); Final Judgment § VI, *United States v. City of Stillwell* (E.D. Okla. Nov. 5, 1998); Final Judgment § VI, *United States v. Norsk Hydro USA Inc*. (M.D. Fla. May 18, 1998); Final Judgment § V, *United States v. Ecast, Inc*. (D.D.C. Dec. 16, 2005); Final Judgment § VI, *United States v. Airline Tariff Publ'g Co.* (D.D.C. Nov. 1, 1993); Final Judgment, *United States v. Gemstar-TV Guide Int'l, Inc.,* 2003 WL 21799949, at *3-4 (D.D.C. July 11, 2003); Final Judgment, *United States v. Dairy Farmers of America*, 2000 WL 33200552, at *5-6 (E.D. Pa. Nov. 3, 2000).

## VI.   PLAINTIFFS' PROPOSED TIMING PROVISIONS ARE APPROPRIATE.

 **Effective date, § VII.A**.  There is a dispute over the effective date, 30 days versus 90 days after entry, and whether a stay application resets the period.  Thirty days—particularly after entry of a judgment following years of litigation—has been long enough for other antitrust remedies involving changes in business practice and creation of a compliance program.  *See United States v. Dentsply Int'l, Inc*., No. Civ.A. 99-005, 2006 WL 2612167, at *5 (D. Del. April 26, 2006) (effective date 30 days after entry of the Final Judgment); Final Judgment § VIII.A, *United States v. Apple*, No. 12-CV-2826, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013).  The Visa/MC Judgment has no separate effective date provision, but it imposes obligations as early as five business days after entry, *see* § V.A-C.

 **Notice re disclosure of confidential materials, § VI.D**.   Regarding the provision for advance notice for disclosure of materials designated confidential, Plaintiffs believe 10 business days notice is sufficient in the event information may be disclosed in a judgment enforcement action.  Such enforcement could plausibly require quick action, e.g., an announced new rule that would violate the Final Judgment.

## VII.   OTHER ISSUES.

 **Definition of "American Express"/control, § II.B**.  Plaintiffs have no objection to adding "controlled" before "subsidiaries."

 **Definition of "Issuing bank," § II.L**.  Plaintiffs have no objection to Amex's proposed language.

 **Definition of "Rule," § II.S.**  Amex proposes to modify "Rule" with "in connection with accepting General Purpose Cards."  Plaintiffs object because what matters is whether the rule has the effect of impeding merchant steering, no matter in what form the rule is imposed, or what title it is given.

19

**Notice to merchants through acquirers, § V.C.3**.  Plaintiffs see little difference between "causing" and "directing" notice, but do not object to Amex's proposed language.

**Access interviews/counsel, § VI.A.2.**  Plaintiffs have no objection to striking the word "individual" modifying the counsel who may be present in Plaintiffs' interviews.

**VIII.     CONCLUSION.**

Amex's Proposal is not a serious attempt to remedy the wrongs that the Court found in its Decision.  It should be rejected, and Plaintiffs' Proposed Judgment should be entered.


Respectfully submitted,

Dated: April 1, 2015

> **U.S. DEPARTMENT OF JUSTICE**
>
> /s/Craig W. Conrath
> Craig W. Conrath
> Mark H. Hamer
> Joseph P. Vardner
> Antitrust Division
> 450 Fifth Street, NW, Suite 4000
> Washington, DC 20530
> Tel: (202) 532-4562
> Fax: (202) 307-9952
> ***Counsel for Plaintiff United States of America***
>
> **OFFICE OF THE ATTORNEY GENERAL**
> **State of Ohio**
> /s/Mitchell L. Gentile
> Mitchell L. Gentile
> 615 West Superior Ave, 11th Floor
> Cleveland, OH 44113
> Tel: (216) 787-5820
> ***Counsel for State of Ohio and on behalf of all***
> ***Plaintiff States***

20