UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, et al.,
                Plaintiffs

       v.

AMERICAN EXPRESS CO., et al.,
                Defendants

**No. 10-CV-04496 (NGG) (RER)**
**ECF Case**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
PROPOSED FINAL JUDGMENT AND ORDER ENTERING INJUNCTION**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
     New York, NY 10019
       (212) 474-1000

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
BOIES, SCHILLER & FLEXNER LLP
   575 Lexington Avenue
     New York, NY 10022
       (212) 446-2300

*Attorneys for Defendants*

April 1, 2015

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ............................................................................................................1

I.    THE COURT SHOULD ENJOIN AMEX FROM ENFORCING ONLY THOSE
      RESTRICTIONS ON STEERING THAT IT FOUND ACTUALLY HARMED
      COMPETITION IN THE RELEVANT MARKET. .............................................1

      A.    Merchant Steering Should Be Limited to Lower Cost GPCC Cards.......................1

      B.    Merchant Steering Should Be Limited to GPCC Cards.............................................7

II.   THERE IS NO BASIS OR NEED TO REGULATE THE SPECIFIC
      LANGUAGE OF AMEX'S MERCHANT CONTRACTS....................................9

III.  AMEX'S PROPOSED FINAL JUDGMENT DOES NOT CREATE ANY SO-
      CALLED "LOOPHOLES"...................................................................................10

      A.    Amex Should Not Be Compelled to Do Business With a Steering
            Merchant. ................................................................................................10

      B.    Amex Should Be Entitled to Prevent Free-Riding on Its Merchant
            Benefits. ..................................................................................................13

      C.    Amex's Proposed Required Conduct Section Does Not Create a
            "Loophole"...............................................................................................14

IV.   THE GOVERNMENT'S PROPOSED FINAL JUDGMENT WOULD
      IMPROPERLY PENALIZE AMEX FOR LITIGATING THIS CASE...........................15

      A.    The Government's Additional Merchant Notice Proposals Should Be
            Rejected...................................................................................................15

      B.    The Court Should Reject the Government's Onerous and Unnecessary
            Additional Compliance Procedures. ................................................................16

V.    THE GOVERNMENT'S REMAINING ARGUMENTS ARE UNAVAILING. ............17

      A.    Amex Should Be Entitled to Require Merchants That Steer to Also
            Indicate Amex Acceptance at the Point of Sale......................................................17

      B.    The Court Should Adopt Amex's Definition of "Merchant"................................18

      C.    Amex Should Be Entitled to Reasonable Advance Notice....................................19

      D.    Amex Should Be Permitted Individually to Negotiate Exclusive Steering
            Agreements in the Same Way as All of the Other GPCC Networks. ....................20

      E.    The Final Judgment Should Confirm Amex's Right to Steer Card
            Members to Merchants That Do Not Steer............................................................20

CONCLUSION.........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bd. of Trade of Chi. v. United States, 246 U.S. 231 (1918)..............................................3

CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74 (2d Cir. 1999) ..............................3

City of New York v. Grp. Health Inc., 649 F.3d 151 (2d Cir. 2011).................................7

City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011).............2, 9

E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23 (2d Cir. 2006) ....................3, 4

Educ. Testing Servs. v. Katzman, 793 F.2d 533 (3d Cir. 1986)........................................3

FTC v. Indiana Federation of Dentists, 476 U.S. 447 (1986)...........................................2

FTC v. Nat'l Lead Co., 352 U.S. 419 (1957)...................................................................12

Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485 (2d Cir. 2004) ...............7

Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561 (7th Cir. 1951) ........................19

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978) ..............................12

Paramount Film Distrib. Corp. v. Vill. Theatre, 228 F.2d 721 (10th Cir. 1955) ...........19

Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733 (2d Cir. 1994) .................................3, 4, 10

Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000) ................................................11

United States v. Colgate & Co., 250 U.S. 300 (1910) .....................................................11

United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005)...........................12, 17

United States v. E.I. du Ponte de Nemours & Co., 366 U.S. 316 (1961) .......................11

United States v. Microsoft, 253 F.3d 34, 77 (D.C. Cir. 2001).......................................17

United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001)...........7, 9, 12

Wilder v. Bernstein, 645 F. Supp. 1292 (S.D.N.Y. 1986) ................................................2

Amex respectfully submits this Reply Memorandum of Law in opposition to the Government's Memorandum in Support of Proposed Final Judgment and Remedial Order as to the Amex Defendants (the "Government's Opening Memorandum" or "Pls.' Op. Br.").[1]

## PRELIMINARY STATEMENT

In an effort to convince the Court to adopt its proposed final judgment and reject Amex's proposal, the Government relies on inapposite authority, manufactures artificial "hurdles", misstates Amex's proposals and suggests that Amex cannot be trusted to comply with the Final Judgment.  The Government's arguments are without merit.  Amex respectfully submits that the Court should adopt its Proposed Final Judgment, which directly flows from the Court's Liability Decision and the relevant law on remedies.

## ARGUMENT

**I.    THE COURT SHOULD ENJOIN AMEX FROM ENFORCING ONLY THOSE RESTRICTIONS ON STEERING THAT IT FOUND ACTUALLY HARMED COMPETITION IN THE RELEVANT MARKET.**

### A.    <u>Merchant Steering Should Be Limited to Lower Cost GPCC Cards.</u>

The Government argues that a merchant must have unfettered freedom to steer to whatever payment forms or networks it chooses using any metric that the merchant deems "reasonable", (Pls.' Op. Br. at 6-12), and that "[u]nder the antitrust laws, it is not for Amex to dictate the conditions or terms under which a merchant may steer to a competing network", (<u>id.</u> at 8).  However, as the Government has recognized, the Final Judgment must "flow" from the theory of competitive harm found and be "no broader than necessary to cure the effects of the harm caused by the violation" in the relevant market.  (Defs.' Op. Br. at 5.)

Put simply, the Government did not establish—and the Court did not find during

---

[1] All defined terms have the same meaning as in Amex's Opening Memorandum of Law ("Amex's Opening Memorandum" or "Defs.' Op. Br.").

the liability phase of this case—that merchant steering to higher cost GPCC cards is necessary to redress the competitive harm found by the Court in the Liability Decision.  (Id. at 10.)  In its Opening Memorandum, Amex set forth the reasons why a remedy that does not limit steering to those GPCC cards that actually cost less than Amex neither "flow[s]" from, nor has a basis in, the Government's theory of the case or the Court's Liability Decision.  (Id. at 8-17.)  Amex also demonstrated that any other approach would lead to significant competitive harm.  (Id.)  The Government's arguments to the contrary fail.

First, it is immaterial that the Consent Decree allows steering to more expensive GPCC cards and other payment forms.  The law is clear, as both the Court and Government have recognized, that "the Court's power to approve the terms of a settlement or consent decree is broader than it would be to fashion its own injunctive remedy after a trial on the merits".  See Wilder v. Bernstein, 645 F. Supp. 1292, 1326 n.24 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988) (citation omitted); (see also Defs.' Op. Br. at 7).  "The fact that other defendants were willing to settle voluntarily with the [Government] on essentially the same terms as those included in the [Government's proposed] injunction[] does not tend to prove, let alone itself establish, that the injunction[] compl[ies] with the Federal Rules and comport[s] with due process."  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 146 (2d Cir. 2011).  Thus, as a matter of law, the existence of the negotiated terms of the Visa and MasterCard Consent Decree cannot justify imposing those same restrictions on Amex.

Second, the fact that merchants may wish to steer in ways beyond what Amex proposes or would be permitted under the Visa and MasterCard Consent Decree is irrelevant.  As the Court is aware, all vertical restraints, by their very nature, restrain some form of competition, including, commonly, interbrand competition.  See E&L Consulting, Ltd. v. Doman Indus. Ltd.,

472 F.3d 23, 29 (2d Cir. 2006); see also Bd. of Trade of Chi. v. United States, 246 U.S. 231, 238 (1918); CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999). Thus, a vertical restraint cannot be deemed to violate the antitrust laws without a sufficient showing of anticompetitive effects beyond the restraint itself. See E&L Consulting, 472 F.3d at 29.

In the remedial context, equitable relief must go no further than necessary to redress the competitive harm giving rise to the defendant's liability. See Educ. Testing Servs. v. Katzman, 793 F.2d 533, 545 (3d Cir. 1986) (holding that an injunction "cannot be broader than necessary to restrain the unlawful conduct" (citing NAACP v. Claiborne Hardware Co., 458 U.S. 886, 924 & n. 67 (1982))); see also Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 739, 749-51 (2d Cir. 1994) (vacating, in part, a permanent injunction that was entered against the defendant following a bench trial and adjudication of liability under the Lanham Act because the injunction entered by the district court was "'broader than necessary to cure the effects of the harm caused'", and therefore, improperly impaired the defendant's legitimate business interests).[2]

The dispositive question here is not whether merchants would prefer to be free of all vertical restrictions on steering, nor what the Government's Complaint alleged, but instead whether the specific vertical restrictions that the Government proposes to enjoin have actually been found by the Court to harm competition. For example, it goes without saying that the Final Judgment could not address the provisions of the NDPs addressing surcharging since they were beyond the scope of the Court's Liability Decision. It is equally the case, however, that there was no finding by the Court that competition between GPCC networks would be enhanced if

---

[2] FTC v. Indiana Federation of Dentists, 476 U.S. 447 (1986) does not hold otherwise. That was a case involving a horizontal conspiracy in which the Supreme Court enjoined only the restraint that it had found to cause competitive harm in the relevant market—namely, the policy among members of a professional association to refuse to submit X-rays to dental insurers. Id. at 448-49, 451-52, 465. Here, on the other hand, the Government seeks to enjoin conduct that has not been found by the Court to have caused adverse competitive effects in the relevant market.

merchants were permitted to steer from Amex to more expensive GPCC cards.  The only harm to competition that the Court found was in the context of steering to lower cost GPCC cards, and the Government never sought any broader finding or introduced evidence that could have supported one.  (Defs.' Op. Br. at 9-10.)  On this record, we submit that it would be error to enjoin Amex from maintaining vertical restrictions that have not been found to be anticompetitive.  See Sterling Drug, 14 F.3d at 739; see also E&L Consulting, 472 F.3d at 29.

Indeed, the only argument the Government now asserts to claim that steering to more expensive GPCC cards would be procompetitive is that merchants might want to steer to more expensive cards for "non-price" reasons.  (Pls.' Op. Br. at 10.)  However, the Court did not hold, because the Government did not prove, that limitations on steering for undefined "non-price" reasons have harmed competition.[3]  Equally unavailing is the Government's suggestion that Amex's opposition to non-price steering is somehow inconsistent with its position that merchants value the non-price benefits and services that it offers them.  Notwithstanding evidence of that value, the sole basis of the Court's finding of anticompetitive effects was that Amex's NDPs prevented steering to lower cost cards.[4]

Third, the Government's suggestion that merchants would be unable to do the price comparison required under Amex's proposal is inconsistent with its trial arguments, the Liability Decision and even its Opening Memorandum.  In its Opening Memorandum, the

---

[3] The Government cites to a single page of the Liability Decision (page 95) at which the Court discusses testimony about features of the Amex network that, in the Court's view, have contributed to the coverage gap.  (Id.)  This discussion—in the context of market power—does not supply the basis for an injunction prohibiting Amex from maintaining provisions governing merchant steering other than to lower cost alternatives.  (See Defs.' Op. Br. at 20 n.9.)

[4] The Government claims that Amex's Official Card partnerships—like its arrangement with Universal Studios—would be prohibited under Amex's proposal.  (See Pls.' Op. Br. at 11-12.)  However, Amex does not object to these under the existing NDPs, (see Trial Tr. 788:3-17 (Quagliata/Amex)), and would not under the Final Judgment.

Government states, as it argued during trial, that merchants <u>can</u> compare the costs of GPCC cards, but then says that Amex cannot require them to make that calculation.  (<u>See</u> Pls.' Op. Br. at 9.)  Again, this misses the point.  The relevant question is not what Amex can make merchants do.  The question is whether enjoining Amex from establishing reasonable protections that would limit steering in this tailored way is necessary to redress the competitive harm found by the Court.  It is not, for all of the reasons set forth in Amex's Opening Memorandum.  (<u>See</u> Defs.' Op. Br. at 8-17.)

        In any event, the Government's Proposed Final Judgment seeks to enable merchants to "communicat[e]" to customers the "reasonably estimated (<u>including, e.g., average</u>) or actual costs incurred by the Merchant" when a customer uses a particular brand or type of GPCC card or form of payment or the relative costs of using any of those payment forms, including by "posting the relative costs of different modes of payment".  (<u>See</u> Pls.' Op. Br. at 6-7 (emphasis in original).)  Indeed, the Government contends that preventing merchants from posting signage based on average costs would "undermine[]" the Court's remedy by "effectively imped[ing] many forms of steering that the Court discussed favorably in its Decision".  (<u>Id.</u> at 11.)  However, the Government's position that merchants must be allowed to post their costs of GPCC acceptance can be reconciled with the Court's explicit recognition of Amex's right to prohibit merchants from posting inaccurate price comparisons, (Liability Decision at 142), only if the unstated premise of the Government's proposal is that a merchant must calculate and include any applicable flat fees when it is communicating its costs of card acceptance for steering purposes.  Thus, even under the Government's proposal, a merchant must account for any flat fees in a "reasonable" way.  (<u>See</u> Pls.' Op. Br. at 7, 9-10.)  The Government's objection, therefore, fails since the allocation issue is not one of Amex's making but, instead, a market

reality present even under the Government's proposal.

The "reasonable" way that merchants (and/or their acquirers) would be able to accurately account for any pro-rata annual fee allocation would be, for example, by using the prior year's annual charge volume. The need for this flexible definition arises from the risk that networks will (and have demonstrated a propensity to) undermine the Court's intended remedial goals by implementing a pricing structure involving high fixed fees and low variable fees that mislead merchants into believing that they are paying a lower price to accept a particular card or network than they actually are. (<u>See</u> Defs.' Op. Br. at 11 n.5, 15.)[5]

<u>Fourth</u>, the Government fails to offer any justification for what it calls "General Steering" to any payment card or payment form without regard to whether it is lower cost or is in the market defined by the Court in the Liability Decision. (<u>See</u> Pls.' Op. Br. at 11-12.) The trial record is clear that a merchant with an <u>average</u> Visa or MasterCard cost of acceptance below Amex will often pay more to accept particular <u>types</u> of Visa or MasterCard GPCC cards than Amex Cards. (<u>See</u> Defs.' Op. Br. at 11-12.) Rejecting a lower cost card steering requirement would fail to account for this reality. Such a result would harm, not enhance, competition. (<u>Id.</u> at 11, 13-16.) The Government's argument that this requirement would stifle some steering, such as "We Prefer Visa" signs, misses the point. Expressions of merchant preference were supported by the Government at trial <u>as a means of enabling</u> merchants to steer to lower cost cards. That is what Amex's Proposed Final Judgment does.

---

[5] The Government also claims that Amex's definition of "All-in Merchant Fee" must be rejected because it does not include certain payments to merchants. There is irony to this objection, as including such payments would make the calculation more complex, and the Government's basic objection is that Amex's proposals are too complicated. (<u>See</u> Pls.' Op. Br. at 9-11.) In any event, such payments have been excluded from the definition of "All-in Merchant Fee" for <u>all</u> networks and, thus, will not have any distortive effect. If anything, this penalizes Amex, since it is Amex, rather than the other networks, that actually negotiates with merchants and actually makes such payments. (<u>See</u> Liability Decision at 18-19, 96-97.)

B.       **Merchant Steering Should Be Limited to GPCC Cards.**

The Government proposes that merchants be permitted to steer to whatever payment forms they want based on the assertion that more choice is better.  But, as noted above, that is not the standard and is legally insufficient.  The question is whether enjoining Amex from enforcing NDPs that limit steering to payment forms other than GPCC is tethered to the Court's Liability Decision.  It is not.

First, the entire point of defining a relevant antitrust product market is to assess the competitive effects of a challenged restraint.  See City of New York v. Grp. Health Inc., 649 F.3d 151, 155 (2d Cir. 2011); see also Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 496, 508 (2d Cir. 2004).  The Government acknowledges that the purpose of an antitrust remedy must be to: (i) "pry open to competition a market that has been closed by defendants' illegal restraints"; (ii) "restore competition in the market"; and (iii) "'unfetter a market from anticompetitive conduct'".  (Pls.' Op. Br. at 2-3 (emphasis added) (citation omitted).)  The Government also asserts that the Final Judgment must not "perpetuate the market impediments that this Court found unlawful".  (Id. at 5 (emphasis added).)  The market defined by the Court here is a GPCC-based market, the sole site of harm found by the Court.  (Liability Decision at 45-61, 100-01, 127.)  As established by the cases that the Government cites, that is the only market to which the injunction can apply.  The only case the Government cites to the contrary is United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001).  There, the court found (it appears erroneously) that "the future of credit card products will be built on, and dependent upon, debit functionality"; thus, "[c]redit cards that do not also have debit functionality will fall by the wayside".  Id. at 408.  Here, there is no support in the Liability Decision or the record for the proposition that including debit (or any other payment form outside the relevant market defined by the Court) in the proposed relief would be necessary to remedy the competitive harm

identified by the Court in the Liability Decision.  In fact, the Government's expert rejected this very proposition when asked about it during his deposition.  (Defs.' Op. Br. at 19-20 & nn.8-9.)

Second, the Government argues that the fact that Visa and MasterCard agreed under the Consent Decree to permit steering to payment forms outside of the relevant market defined by the Court requires that Amex be enjoined from maintaining steering restrictions with respect to those products, and that Amex has "no basis for demanding the right" to "block" that type of steering.  (See Pls.' Op. Br. at 13.)  Again, that misses the point and turns the standard for an injunction on its head.  At issue is not whether Amex is entitled to preserve that right, but rather whether the Court found in the Liability Decision that a restriction on steering to those payment forms has harmed competition.  It did not.  It does not suffice, as the Government argues, to allege as much in a complaint or to point to merchants who testified that they want to steer in this way, nor is it sufficient to rely on the fact that the Consent Decree allows for this type of steering.  (Id. at 12-13.)

Third, the Government asserts that limiting steering to GPCC would chill merchant steering within GPCC, but fails to explain how that is true.  Nor could it, given the Court's liability findings.  In defining the relevant market, the Court found that both merchants and consumers view credit and debit as fundamentally different products for reasons unrelated to the NDPs.[6]  To cite just a few examples:

- "The following themes emerged from merchant testimony about the substitutability of debit and credit: (1) credit users and debit users represent different populations of customers; (2) certain customers need to access credit; (3) corporate cardholders generally want to use credit; (4) credit provides convenient security for certain purchases; and (5) a large price difference exists between credit and debit."  (Pls.' FOF ¶ 337.)

---

[6] The Government's expert conceded the same at his deposition, (see Dep. Tr. 339:7-339:21 (Katz/Government)), which is an adoptive admission that could be admitted at an evidentiary hearing, (see Defs.' Op. Br. at 19 n.8).

- "[W]ith regard to the cardholder side of the platform, product substitution at the point of sale is limited by the core functional differences between debit and GPCC cards", including the availability of float and "an array of ancillary benefits" associated with credit but not debit.  (Liability Decision at 56.)

- "[T]he functional differences between these two payment systems limit their interchangeability at the point of sale and affect customers' spending behaviors.  For example, many consumers compartmentalize or tailor their spending to some degree on their GPCC or debit cards depending on the type or size of a transaction."  (Id. at 56-57.)

- "Other merchants strongly prefer payment by credit and charge cards for reasons independent of cardholder demand, particularly when the merchant requires some form of security for a purchase."  (Id. at 58-59.)

Against these findings, there is no basis for the unsubstantiated claim that merchants would somehow be less able to steer between GPCC cards if they could not also steer to debit cards.

In sum, the Government falls far short of establishing that enjoining Amex's conduct with respect to those products is necessary to redress the harms caused by the NDPs according to the Court's analysis.  See Mickalis Pawn Shop, 645 F.3d at 144; see also DOJ Remedies Policy Guide at 3-4; Visa, 163 F. Supp. 2d at 408.[7]

## II.    THERE IS NO BASIS OR NEED TO REGULATE THE SPECIFIC LANGUAGE OF AMEX'S MERCHANT CONTRACTS.

The Government proposes that Amex be required in the Final Judgment to include specific changes to the language of its merchant contracts and contends that Amex's objection to this proposal "[d]isregards the Court's [d]ecision".  (Pls.' Op. Br. at 5-6.)  That is wrong.

First, the Government mischaracterizes Amex's position when it argues that by not including the specific wording of the post-Final Judgment merchant regulations in its

---

[7] It should also be noted that the testimony cited by the Government all involves steering among GPCC cards or to private label cards.  (See Pls.' Op. Br. at 12-13 (citing Liability Decision at 122).)  The latter is already permitted under the existing NDPs.  The Government also notes that Ikea experimented with steering to PIN debit, (id. at 13), but fails to note that Ikea's steering efforts were designed to shift spend from signature debit to PIN debit, not from GPCC to debit, (see Trial Tr. 445:13-446:17 (Robinson/Ikea)).

Proposed Final Judgment, Amex is refusing to make such changes to its NDPs. That is not true. Amex's Proposed Final Judgment requires it to repeal any rule that it would be prohibited from enforcing under the Final Judgment and to notify merchants of those rules changes. (See Ex. A (Defs.' Proposed Final J.) §§ IV.A, IV.C.)

Second, the Government's argument that Amex cannot be trusted to modify its NDPs in a manner consistent with the Final Judgment "in light of the litigated judgment against Amex", (Pls.' Op. Br. at 6), is baseless. Amex's opposition to the proposed de facto regulation of its merchant agreements is not an attempt to evade the requirements of the Final Judgment. See Sterling Drug, 14 F.3d at 750 (declining to issue a "broad [post-trial] injunction that would 'fence in'" the defendant where there was no evidence of the defendant's propensity or intent to be noncompliant). Rather, for the reasons set forth in Amex's Opening Memorandum, including specific contractual language in the Final Judgment would be unprecedented under the circumstances, as well as unnecessary, unduly burdensome and, at best, premature. (See Defs.' Op. Br. at 49-50.) The Government's proposal should be rejected.

## III.   AMEX'S PROPOSED FINAL JUDGMENT DOES NOT CREATE ANY SO-CALLED "LOOPHOLES".

### A.   Amex Should Not Be Compelled to Do Business With a Steering Merchant.

The Government argues that allowing Amex to exercise its fundamental right not to do or continue to do business with a steering merchant would be a "loophole" that would allow it to evade the restrictions of the Final Judgment. (See Pls.' Op. Br. at 14.) The Government also proposes that Amex be required to provide the Government with notice relating to terminations or possible terminations of steering merchants—regardless of the actual reason for the termination. (Id. at 30-31.) The Government's attempt to regulate who Amex can and cannot do business with is overreaching and inconsistent with the law.

First, the Government's contention that Amex can be compelled to do business with another party it may not desire to do business with, in this case, a steering merchant, overreaches, mischaracterizes the law and ignores the substantial and unwarranted burdens its proposal would place on the Company's ability to operate in the regulated, high risk credit card industry.  The Government does not deny that the right of a supplier, acting unilaterally, to choose its distributors is fundamental, nor can it:  Decades of Section 1 jurisprudence have established and reaffirmed this principle, going back to United States v. Colgate & Co., 250 U.S. 300 (1910).  Instead, the Government argues that the Court can and should abridge this fundamental right because other courts have crafted remedies that have limited a defendant's "exercise of liberties that [they] might otherwise enjoy".  (Pls.' Op. Br. at 15-16.)  Yet the Government cites only one case—Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000)—in which a court approved a remedy for a Section 1 violation that prevented a supplier from refusing to deal with its distributors.  That case has no application here.  As explained in Amex's Opening Memorandum, the Seventh Circuit in that decision affirmed the FTC's remedy specifically because "refusals to deal were the means TRU used to accomplish" the antitrust violation.  Id. at 940.  And even with those facts, the court recognized that the question was a "close[] call" and that its affirmation of the FTC's "choice of remedy" was based entirely on the lenient abuse of discretion standard that governed its review, under which the court has "no warrant to set [the FTC's] remedy aside" unless it "has no reasonable relation to the unlawful practices found to exist".  Id. (citation omitted).  (Of course, that could not be the case since the conduct involved refusals to deal.)  Thus, Toys "R" Us does not support the Government's attempt to abridge Amex's right unilaterally to choose its business partners.

The other cases cited by the Government are also inapposite, each involving

remedies addressing horizontal collusion, unlawful acquisitions or anticompetitive monopoly—

all conduct with respect to which the Colgate principle of protecting the right of a distributor,

acting unilaterally, to choose its suppliers has no relevance.  See United States v. E.I. du Ponte de

Nemours & Co., 366 U.S. 316, 332 (1961) (holding that divestiture of stock acquired in violation

of the Sherman and Clayton Acts was appropriate); FTC v. Nat'l Lead Co., 352 U.S. 419, 422,

429-30 (1957) (finding that where defendants conspired to set prices using a complex and

"highly artificial" zoning system "in utter disregard of law", it was appropriate for the remedy to

restrict the defendants' ability to set prices that were uniform with the prices set by co-

conspirators and were set according to the zoning system that was developed through collusion);

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697 (1978) (finding that where

members of a professional association conspired to suppress competitive bidding, a remedy

prohibiting the association from "adopting any official opinion, policy statement, or guideline

stating or implying that competitive bidding is unethical" was appropriate despite defendants'

claim that the remedy infringed their free speech rights); Visa, 163 F. Supp. 2d at 408-09

(allowing banks for a limited period to rescind dedication agreements in order to issue cards on

Discover or Amex networks after years of collusion by the defendants through the exclusionary

rules to foreclose Amex and Discover from issuing cards through any member bank); United

States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005) (involving a monopolist that used

exclusive dealing arrangements as a means of maintaining its monopoly).

       Second, the Government's claim that Amex's termination rights should be

restricted because it purportedly could use them to achieve the same result as the NDPs ignores

both market realities and the clear holding of Colgate and its progeny.  There is no evidence in

the record supporting that claim, and ample evidence refuting it, including extensive evidence

showing the detrimental effects that merchant attrition has on consumer perceptions of Amex's coverage and value, which are particularly meaningful to Amex given its coverage gap.[8] The law is also clear that Amex may exercise its fundamental right to deal with whom it chooses in the absence of actual or tacit collusion or a claim of monopolization.  (Defs.' Op. Br. at 26-30.)

Third, the Government argues that notice relating to terminations or possible terminations is required because "[t]rial evidence showed that Amex used termination and threats of termination to enforce its NDPs".  (Pls.' Op. Br. at 30.)  To the contrary, Amex is entitled to choose the merchants that it will and will not allow to accept its Cards, and therefore, respectfully submits that it should not be obligated to provide notice relating to terminations or possible terminations.  (See Defs.' Op. Br. at 31.)  And, even if the Court were to prohibit Amex from exercising this fundamental right in the Final Judgment, there is no need to require Amex to provide notice to the Government of merchant terminations because there is no evidence that the Company would violate this Court's orders.  (Id. at 29-31.)  Moreover, the Government's notice proposals are untenable for the independent reason that they would impede Amex's ability to terminate any merchant that happened to be engaged in steering—even if steering is not the reason for termination—thereby potentially subjecting Amex to liability under numerous statutes and regulations.  (Id.)

B.    **Amex Should Be Entitled to Prevent Free-Riding on Its Merchant Benefits.**

The Government argues that Amex should not be permitted to treat steering merchants differently from non-steering merchants with respect to the pricing for, or provision

---

[8] (See Liability Decision at 77 ("This is not to suggest, however, that merchant defection is something Amex takes lightly; losing a merchant hurts the network's bottom line as the merchant presumably also has loyal customers and, perhaps more importantly, risks spillover effects at other acceptance locations."); see also Defs.' FOF ¶ 130; Liability Decision at 142 (noting that "[Amex] plainly faces a number of structural challenges in this market", including its discretionary nature and its coverage gap).)

of, ancillary benefits and services.  (Pls.' Op. Br. at 16-17.)  Effectively, the Government proposes that Amex should be forced to provide ancillary benefits and services to merchants that are free-riding on its significant investments in those benefits and services.  (Id.)  This proposal should be rejected.

First, in its effort to convince the Court that Amex's legitimate concern about free-riding on ancillary benefits and services is in fact just an effort to maintain its NDPs, the Government argues that Amex could increase its discount rate by 10% and then offer the merchant a lower price as a "benefit" to coerce the merchant into agreeing to NDPs.  (Id. at 17.)  The Government is wrong; that approach would not be permitted under Amex's proposal.  The relevant language is limited to benefits and services that are ancillary to card acceptance.  (See Defs.' Op. Br. at 23-25.)  Thus, Amex would not be permitted, under its proposal, to simply set two different price points for acceptance to "coerce" merchants to agree to NDPs.

Second, the Government contends that the carve-out allowing Amex to negotiate exclusive steering arrangements is sufficient to allow it to vindicate its right to prevent merchant free-riding.  (See Pls.' Op. Br. at 17.)  That is not so.  There is no basis to limit Amex's right to prevent free-riding on investments in ancillary services only to those situations where Amex can convince a merchant to steer towards it.  That is not what the Court concluded when it found in the Liability Decision that Amex would be able to prevent merchant free-riding under any remedial order.  (See Liability Decision at 146-47.)  The Court's finding, based on well-settled law, was that Amex should not be required to provide ancillary services to merchants that steer against it.  That is the protection Amex has proposed, and it should be adopted.

C.  **Amex's Proposed Required Conduct Section Does Not Create a "Loophole".**

Paragraph IV.A of Amex's Proposal Final Judgment states:  "Within thirty (30) days after the Effective Date of this Final Judgment, Amex shall delete, discontinue and cease to

enforce in the United States any Rule that it would be prohibited from adopting, maintaining or enforcing pursuant to Section III.A of this Final Judgment, subject to Section III.B." (Ex. A (Defs.' Proposed Final J.) § IV.A.) The Government argues that the inclusion of the qualifier— "subject to [the permitted conduct section]" is an attempt by Amex to undermine the entirety of the Final Judgment. (Pls.' Op. Br. at 17-18.) That is wrong. Amex's proposal confirms that Amex will be prohibited from maintaining rules that limit steering in the broad category of ways set forth in the "prohibited conduct" section of the Final Judgment. The qualifier simply provides that Amex will be able to adopt and enforce rules that relate to steering where such rights are specifically and explicitly provided to it under the Final Judgment. (See Ex. A (Defs.' Proposed Final J.) § IV.A.) Even the Government's proposed final judgment allows Amex certain rights to limit steering. (See Pls.' Op. Br. at 22-28.) Thus, there is no basis to reject the language proposed by Amex in Section IV.A of its Proposed Final Judgment.

## IV.   THE GOVERNMENT'S PROPOSED FINAL JUDGMENT WOULD IMPROPERLY PENALIZE AMEX FOR LITIGATING THIS CASE.

### A.   The Government's Additional Merchant Notice Proposals Should Be Rejected.

The Government proposes that Amex be required to <u>encourage</u> merchants to steer and make gratuitous statements that it was found to have violated the law (in addition to notifying merchants of any rules changes and that it will not enforce any rules prohibited under the Final Judgment, on which both parties agree). (Pls.' Op. Br. at 28-30.) The Government also proposes that Amex be required to do the impossible and confirm that every single one of its over three million merchants, including those who accept Amex Cards through third-party processors, actually receives notice. (See id. at 29.) Amex, on the other hand, proposes that it be required to make "reasonable efforts" to furnish the required notice and be required to direct (rather than cause) third-party processors to provide notice. (Defs.' Op. Br. at 40-41, 47 n.20.)

15

First, the Government argues that the "grudging nature of the merchant notification that Amex proposes underscores the need for a clear, specific notice provision in the Final Judgment". (Pls.' Op. Br. at 29-30.) There is nothing "grudging" about the notice that Amex proposes; that notice is substantively identical to the notice that the Government required from Visa and MasterCard as part of the Consent Decree, and therefore, the notice that the Court found to be in the public interest as part of the Tunney Act process. (See Pls.' Op. Br. Ex. 2 at 25-26.) The Government offers no other basis to justify requiring Amex to encourage merchants to steer or to announce that it was found to have violated "federal law", and there is none.

Second, the Government provides no reason why Amex should be uniquely penalized by subjecting it to unreasonable notice requirements. The Consent Decree requires only that Visa and MasterCard direct their acquiring banks to provide the required notice to merchants. (Id. at 26-27.) Amex is simply asking for the same obligation to be applied to it in those instances where, like Visa and MasterCard, the merchant has a relationship with a third-party acquirer, not the network.

B.   **The Court Should Reject the Government's Onerous and Unnecessary Additional Compliance Procedures.**

Amex's proposal includes reasonable compliance and enforcement protocols, including requirements that Amex provide the Government with access to information and documents relating to its compliance with the Final Judgment (including an audit prepared at Amex's expense) and third-party (e.g., merchant) reporting to the Government. (See Defs.' Op. Br. at 41-46.) The Government proposes additional, unnecessary and unworkable requirements, including mandatory training of and certification by thousands of Amex employees. (See id.)

First, the Government's assertions that Amex did not "seriously address important compliance and enforcement provisions" and proposed "No Meaningful Compliance

16

Requirements" in its Proposed Final Judgment, (Pls.' Op. Br. at 2, 33), are remarkable.  Amex's

proposed notice and compliance provisions are the <u>same</u> ones that the Government and the Court

determined were sufficient for Visa and MasterCard.  (<u>See</u> Defs.' Op. Br. at 44-45.)

      <u>Second</u>, the Government argues that its onerous and unnecessary additional

proposed compliance procedures are vital because Amex made efforts to enforce its NDPs

(including by training its employees as to the operation of those provisions) prior to the Court's

Liability Decision.  (<u>See</u> Pls.' Op. Br. at 33.)  The unstated premise underlying this argument is

that Amex will continue to make such efforts even after the Final Judgment becomes effective,

and that it cannot be trusted to comply with the Court's Final Judgment.  That assumption is

baseless.  As explained in Amex's Opening Memorandum, it will have every incentive to ensure

that its employees understand and comply with the Final Judgment, and it would be

unprecedented and improper under the circumstances to subject Amex to the unreasonable,

punitive and overbroad compliance protocols that the Government proposes. [9]

## V.  THE GOVERNMENT'S REMAINING ARGUMENTS ARE UNAVAILING.

    A.  **<u>Amex Should Be Entitled to Require Merchants That Steer to Also Indicate Amex Acceptance at the Point of Sale.</u>**

      As explained in Amex's Opening Memorandum, the trial record demonstrates that

steering away from Amex can cause consumer confusion about whether Amex is accepted.  (<u>See</u>

---

[9] The cases cited by the Government are inapposite.  (Pls.' Op. Br. at 32-33.)  <u>Bazaarvoice</u> and <u>National Association of Realtors</u> are inapposite for the reasons set forth in Amex's Opening Memorandum.  <u>Dentsply</u> is irrelevant for the reasons explained above and, even under the facts of <u>Dentsply</u>—an exclusive dealing case under Section 2—the required compliance protocols were less onerous than what the Government proposes here.  <u>See</u> Final Judgment, <u>Dentsply</u>, No. 99-005 § II, at 5-6 (not requiring formal training and certification protocols).  <u>United States v. Microsoft</u> is a <u>stipulated</u> modified final judgment in a Section 2 unlawful monopolization case involving a finding of intentional and wrongful exclusionary conduct—namely, threats of retaliation designed to exclude rivals.  <u>See</u> 253 F.3d 34, 77 (D.C. Cir. 2001).  <u>United States v. Nexstar Broadcasting Group, Inc.</u>, is a stipulated final judgment in a merger case brought under Section 7 of the Clayton Act that does not require any employee training or certification.

Defs.' Op. Br. at 22.)  Nonetheless, the Government argues that Amex should be enjoined from requiring merchants who choose to steer to also indicate their acceptance of Amex at the point of sale.  (See Pls.' Op. Br. at 18.)  That argument fails.

First, the Government contends that this proposal would require merchants that choose to steer verbally to also indicate, verbally, that they accept Amex.  (See Pls.' Op. Br. at 18.)  That is incorrect.  Amex, in the interest of accommodating merchant preferences, proposes that steering merchants should have a choice to indicate their acceptance of Amex Cards either verbally or through signage at the point of sale.  (See Ex. A (Defs.' Proposed Final J.) § III.B.5.)

Second, the Government suggests that requiring a merchant to display the Amex logo on an online or mobile payment page when a merchant elects to steer away from Amex on one of those platforms would have the same impact as restrictions on that merchant's ability to steer away from Amex.  (See Pls.' Op. Br. at 19.)  There is no basis under the Liability Decision, the evidence presented at trial or logic to support that suggestion.[10]

## B.    **The Court Should Adopt Amex's Definition of "Merchant".**

Amex proposes that the Final Judgment use the identical definition of "Merchant" that was used in the Consent Decree.  (Defs.' Op. Br. at 37-38.)  The Government, on the other hand, proposes that the definition of "Merchant" explicitly include merchants that facilitate transactions for traditional merchants, such as PayPal and Official Payments, because those entities are just like traditional merchants.  (Pls.' Op. Br. at 19-20.)  That is not true.  Amex considers those entities to be competitors, as the Government itself concedes.  (Id. at 12 (noting that PayPal and Square encourage customers to use debit and ACH); see also Trial Tr. 4456:8-4457:16 (Chenault/Amex).)  The Home Depot example, (Pls.' Op. Br. at 21), is a red herring.

---

[10] Amex already explained why the Court should adopt Section III.C of its Proposed Final Judgment.  (See Defs.' Op. Br. at 20-21.)  The Government's arguments to the contrary do not provide any adequate reason to reject Amex's proposal, so they are not addressed herein.

Home Depot relied on PayPal to steer on its behalf because Home Depot could not.  Once the Final Judgment becomes effective, Home Depot will be able to steer on its own.  Thus, there is no reason to require Amex (and possibly only Amex) to also allow its rivals to steer against it.

Moreover, Amex is particularly concerned that it would be subjected to a broader definition of "Merchant" than Visa and MasterCard, and therefore, be placed at a competitive disadvantage.  (Defs.' Op. Br. at 37-38.)  Despite being aware of this concern, the Government does nothing in its Opening Memorandum to either:  (i) confirm that the same definition is actually applicable to Visa and MasterCard under the Consent Decree; or (ii) explain why Amex should be subject to more significant limitations related to emerging payment forms than its larger competitors.   The Government's proposal should be rejected for this reason alone.  See Paramount Film Distrib. Corp. v. Vill. Theatre, 228 F.2d 721, 727 (10th Cir. 1955); see also Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 571 (7th Cir. 1951).

C.   **Amex Should Be Entitled to Reasonable Advance Notice.**

The Government contends that Amex's proposal for reasonable advance notice of merchant intent to begin steering should be rejected because that requirement would deter merchants from steering and would improperly provide Amex with "advance notice of [its] rivals' competitive moves".  (See Pls.' Op. Br. at 21-22.)  However, there is no evidence that requiring notice would be unduly burdensome, and certainly no evidence that it would be so burdensome that it would deter merchant steering.  Moreover, the Government's contentions that it would harm competition if Amex somehow learned that its rivals were taking steps to encourage merchant steering, (id. at 21-22), is at odds with its basic theory that steering is procompetitive precisely because it will cause the GPCC networks to compete for steering.

D.    **Amex Should Be Permitted Individually to Negotiate Exclusive Steering Agreements in the Same Way as All of the Other GPCC Networks.**

The Government argues that because Amex already negotiates acceptance agreements with its larger merchants, it must be subject to needless and vague restrictions on its ability to enter into exclusive steering agreements that are not contained in the Consent Decree. (See Pls.' Op. Br. at 25-28.)  That argument fails for three reasons.

First, the Government appears to be concerned that Amex will somehow use its existing acceptance agreements to reimpose NDPs.  That cannot happen because both parties' proposals specify that the exclusive steering agreement cannot be a condition of Card acceptance or be standard form and must include steering to Amex.  (See Defs.' Op. Br. at 32.)  Second, the point that Amex, unlike Visa and MasterCard, negotiates in the ordinary course has no bearing here.  The provision at issue requires negotiation.  Visa and MasterCard, just like Amex, must negotiate exclusive steering agreements, so the same negotiation "concern" applies to all three and the same language should apply.  Third, absent evidence or findings justifying more stringent requirements for Amex than its rivals, the Government's proposal does nothing other than improperly penalize and competitively disadvantage Amex.  (See id. at 33.)  The better approach, consistent with the law, would be to use identical language as in the Consent Decree.

E.    **The Final Judgment Should Confirm Amex's Right to Steer Card Members to Merchants That Do Not Steer.**

The Government concedes, as it must, that Amex has the right to encourage its Card Members to transact with merchants that provide its Card Members with welcome acceptance, but argues that this protection should not be included in the Final Judgment.  (See Pls.' Op. Br. at 28.)  Amex's proposal is intended to limit future disputes over the scope of the Final Judgment.  Since the Government agrees that Amex is entitled to exercise this right, it should be included in the Final Judgment.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Amex's Opening

Memorandum, Amex respectfully requests that the Court enter Amex's Proposed Final Judgment

and Order Entering Injunction.

April 1, 2015

Respectfully submitted,

/s/ Evan R. Chesler
Evan R. Chesler
(echesler@cravath.com)
Peter T. Barbur
(pbarbur@cravath.com)
Kevin J. Orsini
(korsini@cravath.com)
Members of the Firm

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Donald L. Flexner
(dflexner@bsfllp.com)
Philip C. Korologos
(pkorologos@bsfllp.com)
Eric J. Brenner
(ebrenner@bsfllp.com)

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Counsel for Defendants American Express*
*Company and American Express Travel*
*Related Services Company, Inc.*