UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA, *et al.*    :
    :
    Plaintiffs,    :
    :    No. 10-CV-4496 (NGG)(RER)
    v.    :
    :    **MERCHANTS' SUBMISSION**
AMERICAN EXPRESS CO., *et al.*    :
    :
    Defendants.    :
------------------------------------------------------------x

## I.    THE ORDER SHOULD EXPRESSLY PROTECT ALL STEERING THAT DOES NOT INVOLVE SURCHARGING OR DISPARAGING CONDUCT

Many of the nation's largest merchants and merchant trade associations (the

"Merchants")[1]—fierce competitors on nearly every other aspect of their business—have joined

together to respectfully submit these comments on the proposed final judgment and remedial

order (the "Order") that is the subject of competing proposals by the U.S. Department of Justice

and Plaintiff States (collectively the "Government") and American Express.

While the Merchants concur with virtually all of the Government's submissions and

would like the remedy to be implemented promptly, we propose several constructive revisions.

These revisions are designed to add specificity to the Order—including proposed definitions of

"surcharging" and "disparagement"—to help ensure that the Order is clear and effective.

The Merchants comprise some of the nation's largest and best known retailers from a

variety of merchant categories. They include five companies that testified at trial—Sears, Best

Buy, IKEA, OfficeMax, and Official Payments. The Merchants also include leading trade

associations with thousands of members collectively—the Retail Industry Leaders Association,

---

[1] The Merchants, some 70 companies and trade associations, are listed at the end of this submission.

312325.4

National Retail Federation, National Association of Convenience Stores, National Grocers Association, and National Restaurant Association.[2]

The Merchants laud the Court's rigorous February 29, 2015, decision (the "Decision") condemning American Express's Non-Discrimination rules, as well as the Government's efforts to jump-start inter-brand competition for merchant acceptance of network-branded credit and debit cards. We are concerned, however, that the Government's Proposed Order, ECF No. 621-1 (the "Proposed Order") does not sufficiently protect merchant steering to give merchants the flexibility they will need to spur competition in the highly concentrated payments industry. Merchants need flexibility because, given the diversity of the merchant community and the changing nature of retail competition, it is next to impossible to predict the evolution of steering techniques.

The Proposed Order would be clearer, and would more effectively foster competition, if it is revised to expressly state that all forms of steering—other than surcharging and disparagement—are protected. To achieve this, we propose that Section IV.A of the Proposed Order, which generally refers to protected steering "efforts," be modified to add the following sentence after the second sentence in that section: "This Final Judgment should also be interpreted to protect all such efforts with the exception of surcharging and disparaging conduct."

As discussed below, we also respectfully suggest that the Proposed Order expressly define "surcharging" and "disparaging" conduct, consistent with the Decision's discussion of

---

[2] Many of the Merchants filed objections to the proposed settlement in 11-MD-2221 and make these comments pursuant to the same motivation as guided their pending objections. The Merchants seek maximal flexibility to engage in the most effective and procompetitive steering—via differentiation that gives them the ability to play the networks off each other. The suggestions made in this submission are designed to help achieve that goal. By contrast, in addition to the other reasons the proposed settlement should be rejected, the regime of parity surcharging that would be imposed by the settlement would be incompatible with that goal and could undermine the remedy now being considered by the Court.

312325.4

those concepts, to ensure that merchants have the flexibility they need to spur competition in the future. Without such clarifying definitions, we are concerned that American Express may try to chill merchants' attempts to exercise their newfound freedom to steer by claiming that the Order allows it to bar forms of steering not expressly authorized by the Order because American Express considers them to be surcharging or disparagement. We propose definitions of these concepts below to cabin American Express's ability to undermine the Order by interpreting these terms broadly in a way that is inconsistent with the Decision.

Lastly, we respectfully offer two macro-level suggestions for the Court to consider in evaluating American Express's proposals.

First, we urge the Court to reject American Express's attempts to reinstate an unduly complicated and quasi-regulatory approach to its rules via the remedy. Consistent with our suggestions, the Proposed Order should be as simple as possible—merchants should be free to steer by whatever means to whatever forms of payment they choose, whatever their costs or attributes, subject only to narrowly tailored exclusions for surcharging and disparagement.

Second, American Express should not be permitted to use its market power—which this Court found underpins American Express's use of anticompetitive Non-Discrimination rules—to inflict the same harm to competition via other means. Critically, merchant steering would have to reach some critical mass before it could exercise any restraining impact on this market power. Against that backdrop, American Express has made proposals in the guise of maintaining its competitive prerogatives that, in reality, are designed to exploit its continuing power to achieve these improper ends. Those proposals include the ability to retaliate against steering merchants with tactics such as termination and punishing them through price discrimination or targeted

312325.4

marketing programs that favor non-steering merchants. As these tactics all depend on American Express's market power to block steering, they should not be permitted under the Order.

## II. THE ORDER SHOULD DEFINE "SURCHARGING" TO BE CONSISTENT WITH THE DECISION

The Decision clearly mandates that American Express should be enjoined from prohibiting all forms of steering, including differential discounting across multiple brands. Decision at 29 ("Steering among the various card brands could be accomplished by offering discounts or other monetary incentives to customers who pay with a particular type of card" or by employing other steering techniques). The Decision contemplates a variety of steering techniques with one important exception here—the steering may not include the imposition of a fee or premium on consumers that pay with American Express cards. Decision at 26.

The Merchants are concerned, however, that the Proposed Order does not limit the potential implications of this exclusion by defining "surcharging" and distinguishing it from the discounting and related steering at the center of the Decision and the Government's case. To ensure the remedy is most effective, the Merchants' respectfully suggest that the Order include a clarifying definition.

### A. Merchants Need Maximal Flexibility to Employ a Variety of Steering Techniques

As several courts have recently noted, surcharging and discounting are sometimes economically similar and can, at times, be difficult to distinguish in practice and effect. *See Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430, 436 (S.D.N.Y. 2013) (noting that "[i]n terms of their immediate economic consequences, surcharges and discounts are merely different labels for the same thing—a price difference between" different forms of payment), *appeal pending* (argued Mar. 5, 2015); *Italian Colors Rest. v. Harris*, No. 14-cv-00604(MCE)(DAD), 2015 WL 1405507, at \*2, \*9-10 (E.D. Cal. Mar. 26, 2015). Without a clear

4

definition of surcharging, there is a risk that discounting may be incorrectly labeled as surcharging by American Express.

This risk may be especially acute when merchants apply differential discounting across multiple networks based on their relative prices, particularly in online or digital formats where merchants can easily communicate such price differences. For example, a merchant could list different prices based on brand or card type, with transactions made with certain cards having a lower price. In fact, if the Order effectively jump-starts competition as intended, merchants could implement discounts across multiple network brands. Such discounts could vary by brand, or the same discount could be implemented across multiple brands. If American Express maintains its high-cost strategy, it is possible that merchants could discount across various brands while charging consumers the regular, non-discounted price for using American Express.

Given the increasing prominence of online and digital formats, as well as some merchants' ability to use creative forms of discounting at the traditional point of sale, we are concerned that American Express may seek to block such conduct by enforcing rules against surcharging to bar merchants from discounting. This would have a chilling effect on merchant willingness to take advantage of the discounting relief set forth in the remedy and would substantially weaken the Order.

This concern is heightened by the fact that the Proposed Order excludes "any past, present, or future Rule concerning surcharges" and "any Rule involving surcharging" from the remedy. Proposed Order ¶ 4 at 13, ¶ C at 21. While the Court has the broad remedial authority to address rules against surcharging as a practice closely related to the restraints found to be anticompetitive, the Proposed Order's exclusion of surcharging is proper given the Court's recognition that the Government did not challenge American Express's Section 3.2 to the extent

312325.4

that "it prohibits merchants from imposing 'fees' when accepting American Express cards that

are not 'imposed equally on all Other Payment Products,' except for ACH, cash, or check."

Decision at 26. If American Express is permitted to bar surcharging, but is enjoined from

barring discounting and other forms of steering, it is critical for merchants that the Order simply

and effectively distinguish surcharging from other forms of steering.

## B. The Merchants' Proposed Definition of "Surcharging"

The Merchants propose that the following definition of "surcharging" be added to the

Definitions section of the Proposed Order:

> "Surcharging" means a Merchant's imposition on a customer of a specified fee, in
> addition to the list, stated or standard price of any goods or services, when the
> customer uses an American Express card. For the avoidance of doubt, "surcharging"
> does not include differential pricing that offers customers discounts (including
> different discounts) for particular Brands or Types of General Purpose Cards, or other
> Forms of Payment, regardless of whether the discount is offered before or after the
> Customer's initial presentation of a specific General Purpose Card.

This definition of surcharging would forestall any argument by American Express that

the Order's exclusion of surcharging is any broader than the Decision's description of

surcharging. Moreover, it will make clear that perhaps the most effective implementation of the

Proposed Order—the implementation of discounts across multiple brands or payment forms

online—is permissible steering conduct protected by the Proposed Order.[3]

---

[3] In making this suggestion, we are mindful that American Express's rule against surcharging
was not among the restraints considered by the Court's Decision. The Merchants are not
suggesting that the Order bar American Express from maintaining rules prohibiting surcharging,
even though such an order would best ensure the effectiveness of the remedy by giving
merchants complete flexibility to use any form of pricing to differentiate between networks. As
the Government notes, antitrust remedies must "pry open to competition a market that has been
closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401
(1947). As such, "the relief must be directed to that which is necessary and appropriate in the
public interest to eliminate the effects of the [violation]," or "which will cure the ill effects of the
illegal conduct, and assure the public freedom from its continuance." *Ford Motor Co. v. United
States*, 405 U.S. 562, 573 n.8 (1972) (internal quotations omitted); *see also Bristol-Myers Co. v.
FTC*, 738 F.2d 554, 561 (2d Cir. 1984) (remedy can "extend[] beyond the precise illegal conduct

312325.4

This definition will also give merchants more clarity about the practices they can use without fear of facing the enforcement of American Express rules against surcharging. This approach will minimize, if not eliminate, the potential chilling effect that American Express's rules against surcharging might have on merchant willingness to take advantage of the Order.

## C. The Order Should Also Make Clear That Discounting Across Multiple Networks Is Protected

The Merchants also suggest that the categories of protected steering listed in Section IV.A be revised to make clear that steering across multiple networks is protected by the Order. Paragraphs 1 to 7 of Section IV.A bar American Express from prohibiting merchants from various types of steering customers toward use of "a particular Brand or Type of General Purpose Card, a particular Form of Payment, or a Brand or Type of General Purpose Card or a Form of Payment . . . ." This language should be revised to expressly refer to steering techniques that encompass multiple cards or other forms of payment. This clarification could be accomplished by simply adding the words "one or more" and changing references to forms of payment in paragraphs 1 to 7 from the singular to the plural. This would change these references to "one or more a particular Brands or Types of General Purpose Cards, a particular Forms of Payment, or a Brands or Types of General Purpose Cards or a Forms of Payment . . . ." (Additions underlined and deletions marked by strikethroughs.)

The Merchants suggest these clarifications to promote the competition the Court found so sorely needed in the highly concentrated payments industry.

---

found"). To the extent the Court concludes that, given the close relationship between surcharging and discounting, merchant willingness to discount could be chilled by American Express rules barring surcharging, the Court has the remedial authority to bar all American Express rules that restrain merchants' ability to differentiate among networks through pricing, including via surcharging.

312325.4

## III. THE ORDER SHOULD DEFINE "DISPARAGING" TO BE CONSISTENT WITH THE DECISION

The other conduct that the Proposed Order excludes from the scope of the remedy—prohibitions on "disparaging" the American Express Brand—should also be as clearly described in the Order as it is in the Decision. As is clear from the Decision, American Express should not be permitted to interpret "disparagement" to include practices that do not involve either a deliberately false or misleading statement, or a refusal at the point of sale if the consumer insists on paying with American Express after the merchant attempts to steer the transaction.

Similar to the Decision's treatment of American Express's rule prohibiting surcharging, the Decision carves out American Express's prohibition of disparaging conduct—conduct that mischaracterizes the American Express Card or harms its business or Brand—from the scope of the remedy. Decision at 26. The Decision makes clear that the type of disparaging conduct that American Express should be permitted to prohibit consists of "unfair denigration and discrimination at the point of sale," including "posting a sign purporting to show the networks' relative costs that is inaccurate or that mischaracterizes the relative cost of American Express, refusing to accept an Amex card when presented at the point of sale, or disparaging American Express to the merchants' customers." Decision at 142. Thus, the Decision contemplates that the only conduct that American Express may prohibit involves some element of falsity by a merchant or a merchant's 'bait and switch' refusal to accept American Express for a particular transaction at the point of sale despite holding itself out as generally accepting the brand.

The Proposed Order, however, is less clear than the Decision in describing the type of conduct that American Express is permitted to prohibit as "disparaging." The Proposed Order expressly excludes from the scope of its prohibitions American Express rules and agreements:

312325.4

that prohibit Merchants from disparaging its Brand, including (1) mischaracterizing American Express General Purpose Cards, or (2) *engaging in activities that harm American Express's business or its Brand.* For the avoidance of doubt, American Express shall not prohibit, prevent, or restrain a Merchant from engaging in any of the practices enumerated in Section IV.A [which lists eight types of steering practices that American Express may not prohibit] of this Final Judgment on the grounds that American Express believes or asserts that one or more of such practices disparage its Brand, including by mischaracterizing its General Purpose Cards or harming its business or Brand.

Proposed Order ¶ C at 7 (emphasis added).

Instead of defining "disparaging," the Proposed Order gives two examples of disparaging conduct, the second of which is "engaging in any activities that harm American Express's business or its Brand." Unfortunately, without any definition of "disparaging" that limits the conduct that can be included under that term, American Express could potentially take an overly expansive view of "activities that harm American Express's business or its Brand." We are particularly concerned that, consistent with the position it took at trial, American Express may contend that any attempt by a merchant to steer a consumer that initially presents an American Express card to another form of payment constitutes an act of disparagement.

To protect against that, we propose that Section IV.A.5 be amended to make clear that American Express cannot maintain or enforce any Rule that bars merchants from expressing a preference, for any reason, for a Brand or Type of General Purpose Card or a particular Form of Payment other than the American Express card after the consumer initially presents an American Express card. If the language "other than the General Purpose Card the Customer initially presents" is added to the end of Section IV.A.5, it will make clear that American Express cannot bar such steering by characterizing it as disparagement.

That said, without a narrowly tailored definition of "disparagement," the Proposed Order will not fully address the problem. If the Proposed Order is not revised to define "disparaging," American Express may seek to take advantage of the current wording by prohibiting—as

9

312325.4

"harming its business or its Brand"—all forms of steering with the exception of the practices

enumerated (in a non-exclusive list) in Section IV.A.  We respectfully urge the Court to guard

against that outcome by including a statement that all forms of steering that are not surcharging

or disparagement are expressly protected, and by including narrowly tailored definitions of both

concepts in the Proposed Order.

Once merchants have the freedom to steer, they are likely to devise novel ways of

steering that are not listed among the enumerated forms of steering in Section IV.A of the

Proposed Order.  As a result, merchants should have complete freedom to express a preference

for other forms of payment for any reason once consumers present an American Express card.

Such real-world examples could include requesting other forms of payment when an American

Express card fails to read when first swiped, because key-entered transactions may be more

costly or fraud prone.  Such a preference should not be characterized as disparagement, and only

if the consumer insists on using her American Express card after the merchant attempts to steer

the transaction should the merchant be required to accept it.

A clear-sighted approach that protects all forms of steering that do not involve

surcharging or disparagement fully accords with the Decision, which cited American Express's

use of its anti-steering rules to impede both "novel forms of steering" and the "development of

novel payment solutions."  Decision at 116.  Moreover, permitting American Express to argue

that it may bar any form of steering that is not enumerated in Section IV.A could also undermine

the effectiveness of Section IV.A.8, which seeks to protect all "other practices substantially

equivalent" to the steering practices described in the previous sections of Section IV.A.  Given

the scope of the Decision's endorsement of steering practices—including "novel payment

solutions" that American Express might otherwise chill—the Order should leave no room for

10

American Express to argue that, with a few specified exceptions, it may generally prohibit all forms of steering as harmful to its business or Brand.

To effectively implement the remedy contemplated by the Decision, the Order should set forth a definition of "disparaging" to remove any risk it could be given any broader meaning than it has in the Decision. The "disparagement" that the Decision contemplates may properly be prohibited is comparable to the disparagement actionable under the Lanham Act, particularly with respect to the element of falsity. The Merchants, therefore, propose that the Order adopt a definition of "disparaging" based on the Decision's discussion of disparaging conduct, and on section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. 1125(a)(1)(B). We propose that the following definition of "disparaging" be added to the Definitions section of the Proposed Order:

> "Disparaging" means a Merchant's false or misleading description or representation of fact that misrepresents the nature, characteristics or qualities of any General Purpose Card bearing American Express's Brand, American Express's business or its Brand. For the avoidance of doubt, "disparaging" does not include any conduct of a Merchant that does not involve either (a) a false or misleading statement of fact, (b) an opinion that denigrates American Express, or (c) a refusal to accept an American Express card when presented at the point of sale.

This definition of "disparaging" would allow American Express to prohibit the types of conduct identified by the Decision as being proper candidates for prohibition by American Express. It would leave American Express free to prohibit merchants from making false statements about American Express or refusing to accept particular American Express transactions at the point of sale. However, this definition would preclude American Express from interpreting the Order's carve-out for disparaging conduct as any broader than the Decision's description of that conduct.

Importantly, this definition would also help prevent American Express from seeking to evade the Order by claiming that it may prohibit merchants from making truthful comparisons of

11

American Express and its competitors because it views such truthful comparisons to be harmful to its business or Brand.

## IV. AMERICAN EXPRESS'S PROPOSALS SHOULD BE REJECTED

The Merchants concur with the Government's reply to American Express's proposals. Accordingly, we limit our comments concerning American Express's proposals to two big-picture points to assist the Court's evaluation of American Express's proposals.

First, American Express's proposals attempt to perpetuate the payments industry's well-worn tradition of burdening merchants' ability to steer with unduly and unnecessarily complicated provisions designed to make it hard for merchants to understand when they can and cannot steer. The Government explains why American Express's position, if endorsed by the Court, will undermine the remedy. From the Merchants' perspective, this type of private regulation of their conduct by entities that have market power over them is precisely the conduct that the Order should stop in its tracks. American Express seeks to regulate merchant steering by placing various restrictions—only to "less expensive" cards, no general steering, only to competing general purpose credit cards—that have no real purpose other than to make steering harder to implement and far less likely to occur.

Consider American Express's attempt to make the remedy unduly complicated by limiting steering to so-called lower-cost cards. American Express's self-serving definition of "All-In-Merchant Fee" ignores critical issues—such as fraud losses and chargebacks—which merchants use to ascertain the relative costs of various forms of payment. Even more fundamentally, in an increasingly digital world, merchants are acutely sensitive to attributes of various payment cards beyond their transaction fees. For example, merchants are increasingly concerned about whether particular networks allow them to maintain their control over the data

12

312325.4

surrounding who is conducting transactions in their stores.  We offer this example not to burden

the Court with the complexities of mobile payments, but to make a simple, critical point.  The

remedy should not be limited to American Express's static (and self-serving) definition of costs.

Competition is ever evolving, and the reasons why merchants might favor one brand or payment

type over another may change over time.  Given this reality, the Order should protect merchants'

freedom to steer for whatever reason they see fit in straightforward terms, subject only to defined

exclusions for surcharging and disparagement.  The Order should be crafted with that animating

principle in mind, and attempts to burden it with unnecessary complexity and quasi-regulatory

features, which only give American Express avenues to subvert it, should be rejected.

Second, American Express should not be permitted to use its market power, which will

continue unabated for at least some period of time even after the Order goes into effect, to block

merchant steering by other means.  For this reason, American Express's attempt to preserve its

supposed right to terminate merchants for steering should be rejected.  We agree with the

Government that this argument is particularly brazen given the record evidence that American

Express used this threat as a club to gain merchant adherence to its anticompetitive rules.  There

is ample support, as set forth by the Government, for restraining American Express from

engaging in this conduct.

American Express's argument also should fail because it distorts the law.  American

Express does not have a right under *Colgate* to terminate merchants to perpetuate its ability to

maintain anticompetitive rules.  To the contrary, the *Colgate* doctrine, which sets forth a firm's

presumptive right to choose with whom it does business, is limited to refusals to deal that are not

designed to acquire monopoly power. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)

("In the absence of any purpose to create or maintain a monopoly, the act does not restrict the

long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal . . . .").  If the refusal to deal is designed to harm competition (or to acquire monopoly power), it is not protected under *Colgate*.[4]

American Express's attempt to enshrine its ability to use marketing programs or differential pricing to punish merchants that steer should be rejected for similar reasons. American Express is actually asking the Court to authorize it to use its market power to prevent merchants from exercising steering rights guaranteed by the Order.  Only an entity with market power could use price discrimination in this fashion.  And only an entity with market power could drive volume through marketing programs to merchants that have not steered.  If anything, the latter carve-out is an attempt by American Express to use its supracompetitive revenues to chill merchant steering through marketing programs that are designed to punish merchants that have steered by driving volume to their competitors that have not steered.  We urge the Court to reject these carve-outs to ensure that American Express's market power not be exploited to vitiate the remedy from ever becoming effective.

---

[4] To the extent American Express attempts to distinguish this aspect of *Colgate* because it speaks to monopolization, that distinction should be rejected.  In fact, *Colgate* itself makes clear (in the sentence preceding the quotation above) that the limiting principle it intended to create for a firm's unilateral right to choose with whom it deals applies to conduct that harms competition irrespective of whether it creates a monopoly.  "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade."  250 U.S. at 307.  From an antitrust doctrine perspective, it makes no sense to permit a refusal to deal that harms competition in violation of Section 1, while condemning the same conduct if it creates a monopoly in violation of Section 2. There is no support for that distinction and American Express can offer none.

312325.4

## V.    CONCLUSION

To ensure that the remedy effectively prohibits the anticompetitive restraints found by the

Decision, the Court should revise the Proposed Order to clarify that all steering by Merchants is

protected other than clearly defined "surcharging" and "disparaging" conduct.

Dated:  April 10, 2015                                                Respectfully submitted,

CONSTANTINE CANNON LLP

By:_____/s_____
     Jeffrey I. Shinder
     Gary J. Malone
     A. Owen Glist
335 Madison Avenue
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

*Counsel for 7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports + Outdoors; Alimentation
Couche-Tard, Inc.; Amazon.com, Inc., American Eagle Outfitters, Inc.; Ashley Furniture
Industries, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Beall's, Inc.;
Best Buy Co. Inc.; Boscov's, Inc.; Brookshire Grocery Company; Buc-ee's Ltd.; The Buckle,
Inc.; The Children's Place Retail Stores, Inc.; Coborn's Incorporated; Cracker Barrel Old
Country Store, Inc.; D'Agostino Supermarkets, Inc.; David's Bridal, Inc.; Dillard's, Inc.; Drury
Hotels Company, LLC; Express, LLC; Foot Locker, Inc.; The Gap Inc.; HMSHost Corporation;
Kwik Trip, Inc.; Lowe's Companies, Inc.; Marathon Petroleum Company LP; Martin's Super
Markets, Inc.; Michaels Stores, Inc.; Mills Motor, Inc., Mills Auto Enterprises, Inc., Willmar
Motors, LLC, Mills Auto Center, Inc., Fleet and Farm of Alexandria, Inc., Fleet Wholesale
Supply of Fergus Falls, Inc., Fleet and Farm of Green Bay, Inc., Fleet and Farm of Menomonie,
Inc., Mills Fleet Farm, Inc., Fleet and Farm of Manitowoc, Inc., Fleet and Farm of Plymouth,
Inc., Fleet and Farm Supply Company of West Bend, Inc., Fleet and Farm of Waupaca, Inc.,
Mills E-Commerce Enterprises, Inc., Brainerd Lively Auto, LLC; National Association of
Convenience Stores (NACS); National Grocers Association (NGA); National Restaurant
Association (NRA); Official Payments Corporation; Pacific Sunwear of California, Inc.; Panda
Restaurant Group, Inc.; P.C. Richard & Son, Inc.; PetSmart, Inc.; Recreational Equipment, Inc.
(REI); Republic Services, Inc.; Retail Industry Leaders Association (RILA); Sears Holdings
Corporation; Speedway LLC; Stein Mart, Inc.; Swarovski U.S. Holding Limited; Wal-Mart
Stores, Inc.; The William Carter Company; Whole Foods Market Group, Inc., Whole Foods
Market Rocky Mountain/Southwest, L.P., Whole Foods Market California, Inc., Mrs. Gooch's
Natural Food Markets, Inc., Whole Food Company, Whole Foods Market Pacific Northwest,
Inc., WFM-WO, Inc., WFM Northern Nevada, Inc., WFM Hawaii, Inc., WFM Southern Nevada,
Inc.,  and YUM! Brands, Inc.*

312325.4

VORYS, SATER, SEYMOUR AND PEASE LLP

By: _____/s_____
       Michael J. Canter
52 East Gay Street
Columbus, Ohio 43215
Telephone: 614.464.6237
Email: mjcanter@vorys.com

*Counsel for National Retail Federation, Target Corporation; Macy's, Inc.; Kohl's Corporation; The TJX Companies, Inc.; Staples, Inc.; Office Depot, Inc.; L Brands, Inc.; Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.; Ascena Retail Group, Inc.; Abercrombie & Fitch Co.; OfficeMax Incorporated; Saks Incorporated; The Bon-Ton Stores, Inc.; Chico's FAS, Inc.; Luxottica U.S. Holdings Corp, American Signature, Inc.; and Lord & Taylor Acquisitions, Inc.*

312325.4