UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA, et al.,

                                   Plaintiffs,

                -against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

                              Defendants.
--------------------------------------------------------------------X

**MEMORANDUM**

**10-CV-4496 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

## I.   INTRODUCTION

Following a lengthy bench trial, the court issued Findings of Fact and Conclusions of Law (the "Decision") on February 19, 2015, finding that the Non-Discrimination Provisions (the "NDPs") maintained by American Express Company and American Express Travel Related Services Company (collectively, "Defendants," "American Express," or "Amex") constitute an unlawful restraint on trade under Section 1 of the Sherman Act, 15 U.S.C. § 1.  (Decision (Dkt. 619).)  Pursuant to a Scheduling Order also issued on February 19, 2015 ("Scheduling Order") (Dkt. 620), the parties made submissions to the court concerning the proper scope of permanent injunctive relief in this case.  (See Joint Submission as to Remedy ("Joint Submission") (Dkt. 621); Pls.' Mem. in Supp. of Proposed Final J. ("Gov't's Br.") (Dkt. 622); Defs.' Mem. of Law in Supp. of Defs.' Proposed Final J. ("Defs.' Br.") (Dkt. 623); Pls.' Reply Mem. in Supp. of Proposed Final J. ("Gov't's Reply") (Dkt. 626); Defs.' Reply Mem. of Law in Further Supp. of Defs.' Proposed Final J. ("Defs.' Reply") (Dkt. 627).)  The Government and Defendants each submitted proposed remedial orders (see Gov't's Proposed J. (Joint Submission,

App. 1 (Dkt. 621-1)); Defs.' Proposed J. (Joint Submission, App. 2 (Dkt. 621-2))), as well as an appendix reflecting a comparison of the two proposals (see Joint Submission, App. 3 (Dkt. 621-3)).  In addition, the court granted leave to two sets of non-party merchants and to merchant Southwest Airlines to submit comments concerning the proposed remedy.  (See Not. by Non-Party Merchants Concerning Proposed Remedy (Dkt. 631); Not. by Class Pls. in 11-MD-2211 (E.D.N.Y.) Concerning Gov't's Proposed J. (Dkt. 634); Not. by Southwest Airlines Regarding Proposed Relief (Dkt. 635).)  With leave of court, American Express and the Government each filed consolidated responses to the three merchant comments.  (See Pls.' Mem. in Reply to Non-Party Filings Regarding Remedy (Dkt. 636); Resp. of Defs. to Non-Party Comments (Dkt. 637).)

Having considered the submissions, including the specific remedies proposed by the Government and American Express, and on the basis of the well-developed factual record introduced during the trial, the Court issues this Memorandum to explain certain of the provisions contained in the Order Entering Permanent Injunction as to the American Express Defendants (the "Permanent Injunction") that the court enters concurrently with this Memorandum.

As the court has explained on numerous occasions, the court believes that given the complexity of the general purpose credit and charge card network services industry, "the parties themselves are likely best equipped to determine how American Express's merchant regulations might be rewritten so as to satisfy American Express's interests and yet comport with the Sherman Act." (Scheduling Order at 2.)  The court therefore encouraged the parties to jointly propose a remedy.  (See id. at 1-3.)  Unfortunately, as demonstrated by the competing proposed orders, the parties have reached only limited common ground.  Thus, the court must resolve

numerous disputes, concerning both core and collateral issues.  This Memorandum explains the

reasoning behind the court's resolution of the parties' core disputes.[1]

    As discussed more fully below, with some exceptions and with certain modifications, the

court generally adopts proposals made by the Government and rejects competing proposals made

by Defendants.  Although the court invited American Express to play an active role in the

construction of the Permanent Injunction, American Express's core proposals were, considering

the record before the court, too narrow or unwieldy to effectuate the remedial objectives of a

permanent injunction under the Sherman Act.  Through its proposals, American Express would

have the court ignore the Supreme Court's guidance in the antitrust context that:

> [t]he District Court is not obliged to assume, contrary to common
> experience, that a violator of the antitrust laws will relinquish the
> fruits of his violation more completely than the court requires him
> to do.  And advantages already in hand may be held by methods
> more subtle and informed, and more difficult to prove, than those
> which, in the first place, win a market.  When the purpose to
> restrain trade appears from a clear violation of law, it is not
> necessary that all of the untraveled roads to that end be left open
> and that only the worn one be closed.

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 698 (1978) (quoting Int'l Salt Co. v.

United States, 332 U.S. 392, 400 (1947)).

    The Permanent Injunction is designed to eliminate the consequences of Defendants' past

violation of the Sherman Act and to encourage a functional and fair market in the future.  It is

---

[1]  This Memorandum does not provide a detailed explanation for the court's resolution of less significant disputes
between the parties.  These include the court's adoption of the Government's proposed definition of "Merchant"
(see Permanent Injunction § I.M), adoption of the Government's proposed provision authorizing exclusive-steering
agreements between Amex and merchants under certain circumstances (see Permanent Injunction §§ III.B.3, IV.D),
adoption (as modified by the court) of American Express's proposed provision confirming its right to steer
cardholders toward particular merchants (see Permanent Injunction § III.B.6), adoption (as modified by the court) of
the Government's proposed provisions governing notice to merchants of the court's Decision and Permanent
Injunction (see Permanent Injunction § IV.C), rejection of American Express's proposed definition of "Rule" (see
Defs.' Proposed J. § I.22), rejection of American Express's proposed provision regarding marketing benefits and
other services (see Defs.' Proposed J. § III.B.6), and rejection of American Express's proposal that would have
required merchants engaging in steering to provide notice to Amex (see Defs.' Proposed J. § III.B.9).  Finally, the
court notes that while it has drawn largely from the parties' proposals, it has also made its own additions and
subtractions to the language, including adjustments to certain time periods.

structured to clarify which rights merchants now have, and confirms which powers American Express retains. The Permanent Injunction contains detailed notice provisions to ensure that Amex-accepting merchants receive notification of the changes to the NDPs and of their nascent ability to steer customers toward particular credit card brands. It also contains thorough compliance provisions to guarantee that American Express meets its obligations and changes its perception of and response to steering by merchants. The court does not seek to punish Defendants or to impose punitive terms upon them, and the court is cognizant of the fact that the implementation of the Permanent Injunction will require Defendants to expend significant efforts and to alter the ways in which they engage with merchants. This result flows from the findings contained in the court's Decision, and is a result that the Sherman Act is designed to provide.

## II.    LEGAL STANDARD

In an antitrust case, "courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities." United States v. Parke, Davis & Co., 362 U.S. 29, 48 (1960). An antitrust remedy should "pry open to competition a market that has been closed by defendants' illegal restraints." Int'l Salt Co. v. United States, 332 U.S. 392, 401 (1947), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006). The remedy should seek "both to avoid a recurrence of the violation and to eliminate its consequences," Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697 (1978), and to "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance," United States v. U.S. Gypsum Co., 340 U.S. 76, 88 (1950). See also Ford Motor Co. v. United States, 405 U.S. 562, 573 (1972) ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" (quoting United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 326 (1956))). The relief ordered

should be based "on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" United States v. Microsoft Corp., 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 653(b) (1996)). The punishment of a defendant for its prior transgressions is not, however, a proper remedial purpose. See, e.g., Hartford-Empire Co. v. United States, 323 U.S. 386, 409 (1945) ("[W]e may not impose penalties in the guise of preventing future violations."). Thus, the remedy should not "adopt overly regulatory requirements which involve the judiciary in the intricacies of business management." New York v. Microsoft Corp., 224 F. Supp. 2d 76, 100 (D.D.C. 2002) (citing United States v. Paramount Pictures, 334 U.S. 131, 163 (1948)), aff'd sub. nom Massachusetts v. Microsoft Corp., 373 F.3d 1199 (D.C. Cir. 2004).

Absent an adequate remedy in an antitrust case, the Government may have "won a lawsuit [but] lost a cause." Int'l Salt, 332 U.S. at 491. Accordingly, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." Int'l Salt, 332 U.S. at 400-01. It "is entirely appropriate" for an antitrust remedy to "go[] beyond a simple proscription against the precise conduct previously pursued." Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 698. A district court thus has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'" Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 132 (1969) (quoting N.L.R.B. v. Express Publ'g Co., 312 U.S. 426, 435 (1941)). "[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all

doubts as to the remedy are to be resolved in its favor." F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 171 (2004) (quoting E.I. du Pont de Nemours, 366 U.S. at 334)).

More generally, as Defendants emphasize in their submissions, a court entering a permanent injunction in any case must not misuse its equitable powers under Rule 65 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 65(d); City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir. 2011) ("Although a district court has 'a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct,' it is nonetheless 'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'" (quoting Forschner Grp., Inc. v. Arrow Trading Co., 124 F.3d 402, 206 (2d Cir. 1997))). While the Second Circuit has warned, generally, that "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity," Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994) (citation omitted), in the antitrust context, the Supreme Court has made clear that a court issuing an antitrust remedy is authorized to constrain a defendant's otherwise protected conduct, see, e.g., Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 697-98 ("In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations."); F.T.C. v. Nat'l Lead Co., 352 U.S. 419, 430 (1957) ("[D]ecrees often suppress a lawful device when it is used to carry out an unlawful purpose.").

## III.     DISCUSSION

The court now turns to the core disputes between the parties concerning the scope of the Permanent Injunction.  Although the parties have agreed on certain definitions and provisions, the most significant aspects of the remedy require judicial resolution.

### A.     The NDPs

In its Scheduling Order, the court invited the parties to propose new language for the NDPs, noting that "[f]ashioning appropriate relief in this case will require certain of the provisions in the NDPs to be excised entirely," while "[i]t may be possible . . . for other challenged clauses to be revised, amended, or recharacterized in such a way that considers the interests of both Plaintiffs and Defendants."  (Scheduling Order at 2.)  The Government's proposed judgment not only identifies language that, in the Government's view, must be excised, but also proposes affirmative contractual language informing merchants of their right to engage in steering.  (See Gov't's Proposed J. § V.B.)  American Express, on the other hand, argues that the Government's proposal to include specific changes to the contractual language is "unnecessary," since "American Express will be subject to the Final Judgment that is entered in this case and . . . will have every incentive to ensure that it remains in compliance with that order."  (Defs.' Br. at 49.)  American Express further argues that its "able transactional counsel," and not the court or the Government, "are in the best position to draft the specific language that would be necessary to effectuate the Court's order while protecting American Express's legitimate business interests."  (Id.; see also id. ("American Express has not found any precedent in which a Court unilaterally made specific, wide-ranging edits to a firm's contractual language as part of a final judgment in a Section 1 case.").)

The court agrees in part with the Government and in part with Defendants.  After years of litigation between the parties (in addition to ongoing litigation between American Express and non-party merchants), a remedy that does not identify specific contractual language that is no longer enforceable merely kicks the can down the proverbial road.  The Permanent Injunction must, at a minimum, identify the language currently contained in the NDPs rendered unenforceable by the court's Decision.  Thus, in § IV.B of the Permanent Injunction, the court identifies language, currently contained in the NDPs, that is no longer enforceable.

The court does not, however, find it appropriate, for lack of a better phrase, to put words into American Express's mouth.  Thus, the Permanent Injunction does not mandate Amex to include specific language in its contracts with merchants.  (Compare, e.g., Permanent Injunction § IV.B.2 (striking unenforceable language), with Gov't's Proposed J. § V.B.2 (proposing that Amex include affirmative language in contracts notifying merchants of their right to steer and providing examples of such steering).)  Other provisions of the Permanent Injunction ensure that (1) merchants will be aware of their rights, and (2) American Express will not undermine the remedy by including improper or overly restrictive language in its revised contracts.  First, all merchants will receive ample notice of the court's Decision and Permanent Injunction (see Permanent Injunction § IV.C), and any merchant that is terminated by Amex or threatened with termination will receive additional notice (see Permanent Injunction § IV.F).  Second, whenever American Express plans to implement changes to the way it regulates merchants' acceptance of other brands of credit cards or of debit cards, it must provide notice to the Government.  (See Permanent Injunction § IV.H.)

In one, limited context, the court does include specific language that American Express may include in its contracts with merchants without violating the terms of the Permanent

Injunction.  (<u>See</u> Permanent Injunction § IV.B.4.)  Pursuant to § III.B.5 of the Permanent

Injunction, American Express remains authorized to require a merchant engaged in steering to

indicate, in a limited manner, its acceptance of American Express.  <u>See also</u> <u>infra</u> Part III.D.1.

Thus, where the NDPs before required all merchants communicating payment methods to

customers to "display [Amex] Marks according to [its] guidelines and as prominently and in the

same manner as any Other Payment Products," Amex's merchant contracts can still (if Amex

chooses) require merchants that engage in steering to "post limited signage at the point of sale

(including online or on mobile services) or store entry or communicate orally that the Merchants

accept [Amex]."  (<u>See</u> Permanent Injunction § IV.B.4.)  As discussed in more detail below, this

language strikes an appropriate balance between allowing merchants to effectively steer, and

protecting Defendants' legitimate interest in requiring merchants who steer away from Amex to

at least inform customers that they also accept American Express.[2]  As with other provisions of

its merchant contracts, Amex is authorized to instead draft alternative language that comports

with the Permanent Injunction, upon notice to the Government.  (<u>See</u> Permanent Injunction

§ IV.H.)  The court includes affirmative contractual language in § IV.B.4 to provide the parties a

"safe harbor" of acceptable language concerning merchant signage and oral communications.

### B.     Boundaries of Permitted Steering

The parties sharply dispute the boundaries of permitted merchant steering.  American

Express argues that, based on the court's Decision and the trial record, steering should be

allowed only to a "Less Expensive General Purpose Card," as determined on a transaction-by-

transaction basis.  In other words, under Amex's proposal, steering would be allowed only if the

merchant—using a calculation of "All-In Merchant Fee" supplied by Defendants—determines

---

[2]  In addition, the court did not strike from the NDPs language that makes clear that American Express can require all merchants to indicate their acceptance of Amex whenever a customer affirmatively asks what forms of payment are accepted.

that for the particular transaction, accepting the customer's particular non-Amex-branded credit card would cost the merchant less money.  In addition, under Amex's proposal, the Permanent Injunction would not protect a merchant's right to steer to products outside of credit and charge card products, including debit cards.  In response, the Government argues that Amex's "Less Expensive Card" and transaction-based approach would undermine the remedy and allow Defendants, rather than merchants, to determine when a merchant may steer.  In addition, the Government argues that although the court's Decision held that the relevant market for purposes of its market power analysis excludes debit cards, allowing steering only between general purpose credit and charge cards "would only deter merchants from engaging in steering in the first place, including steering among general purpose cards, and would hinder restoration of competition among general purpose card networks."  (Gov't's Br. at 14.)  Accordingly, the Government proposes a remedy that would allow steering to any "Form of Payment," a term defined by the Government to include cash, check, debit, "or any other means by which Customers pay for goods or services."  (See Gov't's Proposed J. § II.I.)

For the reasons discussed below, the court rejects American Express's proposals that steering be permitted only on a transaction-by-transaction basis and only to a "Less Expensive General Purpose Card."  In addition, although the court agrees that the implementation of an effective remedy in this case must allow a merchant to steer, in certain circumstances, to brands of debit, the court rejects the Government's overly broad proposal that the remedy also protect steering to other forms of payment, such as cash and check.[3]

---

[3]  Of course, other sources of law outside of the scope of the Permanent Injunction, such as the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, may protect certain forms of steering to certain forms of payment.  (See generally Decision at 30-31.)

1.     Amex's "Less Expensive General Purpose Card" Proposal

Amex argues that the "Decision—and the Government's entire theory of competitive effects—is premised on the theory that merchants need the ability to steer to lower cost [general purpose credit and charge] cards to enhance competition among the [general purpose credit and charge] card networks for merchant business." (Defs.' Br. at 9.)  While true that in most instances, rational merchants will want to steer customers toward credit cards that cost them less money to accept, it is not American Express's right to perform such a calculation, or to force merchants to make such a calculation on the basis of American Express's pre-defined terms.  The trial record demonstrated that merchants are able to make price comparisons, and that certain merchants care about non-price features, such as speed of pay or treatment of refunds.  In other words, as the court noted in its Decision, "the law does not permit American Express to decide on behalf of the entire market which legitimate forms of interbrand competition should be available and which should not."  (Decision at 136.)  Cf. F.T.C. v. Ind. Fed'n of Dentists, 476 U.S. 447, 482 (1986) ("The [defendant] is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.").[4]

2.     Amex's Transaction-Based Approach

In tandem with its "Less Expensive General Purpose Card" proposal, Amex posits that "the only way to ensure that merchants are steering to lower cost cards, and thereby acting in a manner consistent with the Court's . . . Decision, is to require that the cost comparison be done at the transaction level." (Defs.' Br. at 11.)  Again, Amex seeks to continue its control of merchant decision-making, rather than to allow merchants to decide what is best for themselves.  It is the merchant's prerogative to determine whether to steer on a general, brand level (and increase its

---

[4]  If American Express believes that merchants and/or consumers do not understand the true relative costs of accepting Amex credit cards compared to other credit cards, it is of course permitted to educate merchants and consumers.

own costs for those transactions where it happens to steer to a particular Visa card that ultimately

costs more to accept than the customer's Amex card), or whether to steer on a transactional basis.

The trial record and the Decision include many examples of general, brand-specific steering, and

a limitation on steering to the level of a specific, anticipated transaction would severely

undermine the remedy.

3.    Steering to Debit Brands

The parties dispute whether American Express should be permitted to bar merchants from

steering customers toward debit cards and other forms of payment, such as cash and check.

American Express argues that, "consistent with the Court's market definition findings, . . . the

conduct that the Court's remedy should redress has nothing to do with non-[general purpose

credit card] payment forms," such as debit.  (Defs.' Br. at 17, 19.)  The Government responds

that "Amex has no basis for demanding the right, unavailable to Visa or MasterCard, to block

merchants from attempting to steer customers to payment forms outside the relevant market,

including to particular brands of those payment forms."  (Gov't Br. at 13.)

As reflected in § III.A of the Permanent Injunction, the court has determined that in order

to implement an effective remedy in this case—in other words, "to allow Merchants to attempt to

influence the General Purpose Cards that a Customer uses by providing choices and information

in a competitive market"—merchants must be allowed to steer toward particular brands of debit

cards, in addition to steering between brands of credit cards.  (Permanent Injunction § III.A.)

The Permanent Injunction does not, however, expressly protect steering to other forms of

payment, such as cash and check, although other sources of law provide such protection in

certain circumstances.

The court acknowledges, as Amex emphasizes, that it determined in its Decision that debit and credit network services comprise separate markets.  (See Decision at 37-61.)  However, the mere fact that debit cards are not part of the general purpose credit and charge card network services market does not mean that the court lacks the power to include brands of debit cards within the scope of the Permanent Injunction.  In tailoring the terms of the remedy to this particular case, a pragmatic approach is necessary.  The fact of the matter is that the major brands of credit cards (such as Visa and MasterCard) also sponsor debit cards—it is therefore impossible for merchants to effectively steer between brands of credit without the authority to, in certain cases, in effect steer a customer toward a debit card.  Under American Express's proposal, a merchant would be constrained to state that it "prefers Visa credit cards," or that customers who use "MasterCard credit cards" receive an upgrade.  But a merchant may want to steer by stating simply that it "prefers Visa," or that customers who use a "MasterCard" receive an upgrade, or even by prominently displaying just the Discover logo.  Excluding brands of debit cards from the scope of the permitted steering would chill merchant steering and could render illusory the rights provided by the Permanent Injunction.  Thus, Amex cannot prohibit a merchant from posting a sign stating that it prefers a particular brand, where that brand name encompasses both credit and debit cards.[5]

Finally, the court expressly does not include brands of debit cards within the scope of § III.A.7 of the Permanent Injunction.  Thus, while a merchant has the right under the Permanent Injunction to communicate to customers the cost of accepting American Express, or the relative

---

[5]  This is not the first case in which an antitrust injunction has covered a product not within the relevant market. See, e.g., Int'l Boxing Club of N.Y. v. United States, 358 U.S. 242, 262 (1959) (upholding injunction that "went beyond the relevant market which has been considered for purposes of determining the Sherman Act violations," because "the relief [] must be broader than the [relevant market] because the evil to be remedied is broader." (internal quotation marks and alterations omitted)).  Indeed, debit was included within the terms of the injunction in the Visa litigation, even though the court, like this one, determined that credit and debit comprised separate markets. See United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 408 (S.D.N.Y. 2001) ("Moreover, including debit as a necessary part of the remedy does not put it in the same product market with general purpose cards.").

costs of accepting different brands of credit cards (and the merchant may do so on an average, rather than transaction-specific, basis), American Express <u>can</u> prohibit merchants from including costs associated with acceptance of debit cards in this calculation, since blending the costs of accepting credit cards and debit cards would likely overstate the difference between the merchant's overall cost of accepting American Express and its cost of accepting other brands, such as Visa and MasterCard, that have both credit and debit cards.  (<u>See</u> Permanent Injunction § III.A.7; Defs.' Br. at 16-17.)

### C.    Termination of Merchants Engaged in Steering

Defendants seek an express provision in the Permanent Injunction that would "confirm . . . that American Express is entitled to exercise its right not to do or continue to do business with a merchant that chooses to steer Card Members away from its Cards."  (Defs.' Br. at 26; <u>see also</u> Defs.' Proposed J. § III.B.8.)  American Express relies on <u>United States v. Colgate & Co.</u>, in which the Supreme Court stated that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  250 U.S. 300, 307 (1910); <u>see also, e.g.</u>, <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." (citing <u>Colgate</u>, 250 U.S. at 307)); <u>United States v. Bausch & Lomb Optical Co.</u>, 321 U.S. 707, 728-29 (1944) ("But in no instance has [Congress] indicated an intention to interfere with ordinary commercial practices.  In a business, such as [defendant's], which deals in a specialty of a luxury or near-luxury character, the right to select its customers may well be the most essential factor in the maintenance of the highest standards of service.").

The Government responds that allowing American Express to terminate a merchant who opts to lawfully steer would amount to "explicit Court authorization" for Amex "to achieve the same anticompetitive objective that the Court condemned in its Decision." (Gov't's Br. at 14.) Even where the Supreme Court has recognized the Colgate doctrine, the Government argues, it has also described the breadth of the district court's equitable power and the authority of the district court to take "action [that] reasonably tends to dissipate the restraints and prevent evasions." Bausch & Lomb, 321 U.S. at 726.

The court recognizes that, in the abstract, Defendants' argument is appealing. But it would be an absurd result if the Colgate doctrine completely suppressed the district court's authority under the Sherman Act to issue appropriate relief, and thereby authorized Amex to continue, through its market power and a non-contractual "refusal to deal," the very practice deemed unlawful in the court's Decision.

In its Decision, the court concluded that one of American Express's core business practices—the maintenance and enforcement of the NDPs—violated the Sherman Act. Thus, American Express is not similarly situated to the general "manufacturer" or "trader" described in Colgate, and does not enjoy the same presumptive rights. In other words:

> The law violator who would oppose a remedy imposed against him as itself a violation of the law does not stand in the same position as an innocent party; those whom the court has found in the wrong may not oppose a remedy on the ground that it would constitute a wrong if leveled at a non-participant in the litigation. "In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying" the violations.

United States v. Paradise, 480 U.S. 149, 193 n.3 (1987) (quoting Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 697-98). Thus, a district court has discretion under the Sherman Act "to decree relief

effective to redress the violations, whatever the adverse effect of such a decree on private interests." E.I. du Pont de Nemours, 366 U.S. at 326; see also Nat'l Lead, 352 U.S. at 430 ("[D]ecrees often suppress a lawful device when it is used to carry out an unlawful purpose."). Indeed, the Supreme Court has previously approved of antitrust remedies that restricted a violator's rights, including First Amendment rights, see Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 698, and patent rights, see United States v. Glaxo Grp. Ltd., 410 U.S. 52, 58-60 (1973) (holding that district court properly limited defendant's patent rights in antitrust injunction).

Here, the court found that the existence and enforcement of the NDPs was an anticompetitive restraint on trade; Colgate cannot stand for the proposition that a firm's ordinary right to refuse to deal is sacrosanct under circumstances where that firm could use its market power to impose the same exact harm on competition. Moreover, in its Decision, the court found that cardholder insistence significantly limits a merchant's ability to cease acceptance of American Express (see Decision at 71-78), and that Amex has actively monitored merchant activity and enforced the NDPs, including terminating merchants for steering (see id. at 31-32). In this particular case, and based on American Express's prior willingness to stop merchant steering at all costs, granting Amex's request for an unconditional right to refuse to deal would make the Government's vindication of the public's rights entirely illusory. Cf. Int'l Salt, 332 U.S. at 401 ("A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints. If [an antitrust] decree accomplishes less than that, the Government has won a lawsuit and lost a cause.")

The court also finds persuasive the reasoning of Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000), although, as Defendants note, there are differences between that case and this one. Like this case, which the court has previously described as "not fit[ting] neatly into the

standard taxonomy of federal antitrust law" (Decision at 34), Toys "R" Us involved a

complicated series of vertical and horizontal agreements, in which Toys "R" Us (a traditional

retailer) attempted to influence the business activities of toy manufacturers and the relationships

between toy manufacturers and discount retailers.  221 F.3d at 930-35.  An administrative law

judge entered a remedy that, inter alia, prohibited Toys "R" Us from "refusing to purchase toys

and related products from a supplier because, in whole or in part, that supplier offered to sell or

sold toys and related products to any toy discounter."  See id. at 939.  Toys "R" Us argued to the

administrative law judge (and again on appeal to the Seventh Circuit) that the remedy "trampled

on its ability to exercise its rights under Colgate to choose unilaterally the companies with which

it wanted to deal."  Id. at 934.  The Seventh Circuit rejected this argument, explaining that

"unilateral actions of the sort protected by Monsanto and Colgate are not the same thing as a

retailer's request to the manufacturer to change the latter's business practice."  Id. at 939.  In

other words, the remedial order barred Toys "R" Us from "tell[ing] the manufacturer what to

do," but still permitted Toys "R" Us "to decide which toys it want[ed] to carry and which ones to

drop, based on business considerations such as the expected popularity of the item."  Id. at 939-

40.  In addition, the Seventh Circuit explained that a remedial provision barring Toys "R" Us

from refusing to deal with suppliers that also sold their products to discounters was proper under

Colgate, since "[t]hese refusals to deal were the means [Toys "R" Us] used to accomplish the

unlawful result, and as such, they are subject to regulation."  Id. at 939, 940 (citing Nat'l

Lead, 352 U.S. at 425).

     Here, given Amex's market power, cardholder insistence, and Amex's prior enforcement

of the NDPs, and given the court's "obligation, once a violation of the antitrust laws has been

established, to protect the public from a continuation of the harmful and unlawful activities,"

Parke, Davis & Co., 362 U.S. at 48, the court agrees with the Seventh Circuit's reasoning in

Toys "R" Us that a remedial order can, in this particular circumstance, limit a violator's right to

refuse to deal without running afoul of Colgate.  Of course, like Toys "R" Us, American Express

remains free to terminate a merchant for reasons other than merchant steering; but, consistent

with the court's findings that Amex has violated the Sherman Act, it is not free to dictate

merchants' business practices (and perpetuate the status quo of merchants not engaging in

steering) by threatening to refuse to deal with merchants who exercise their rights pursuant to the

Permanent Injunction.  Accordingly, the Permanent Injunction does not contain the provision

American Express seeks.

In addition, Amex is concerned that it will risk violating the Permanent Injunction if it

terminates a steering merchant for a reason other than steering; it also contends that a

requirement of pre-termination notice to the Government is contrary to a public policy that

favors termination of merchants engaged in illegal activities.  (See, e.g., Defs.' Br. at 29-30 n.15

("If American Express faces a contempt proceeding every time it cancels a merchant that also

happens to be steering, American Express would uniquely be penalized for exercising

cancellation rights even when cancellation would be required by law, regulation or prudent

business judgment.").)  The court is confident, however, that under the modified notice and

reporting requirements imposed by the Permanent Injunction, Amex maintains its ability to

terminate merchants for reasons other than steering, including where required by other applicable

law.  (See Permanent Injunction §§ IV.E (requiring quarterly reporting by Amex to Government

of all terminations or suspensions and the reasoning for the actions), IV.F (requiring notice from

Amex to any merchant it terminates or threatens with termination).)  The court has rejected the

Government's proposal that Amex give advanced notice to the Government whenever it plans to

18

threaten or terminate a merchant that is engaged in steering, no matter the reason for the

termination.  (Compare Permanent Injunction § IV.F, with Gov't's Proposed J. § V.F.)

D.     **Additional Clarifications**

1.     Visa and MasterCard Consent Decree

The parties dispute the significance of the Visa and MasterCard Consent Decree

previously entered in this case.  (See Final J. as to Defs. MasterCard Int'l Inc. and Visa Inc.

("Consent Decree") (Dkt. 143).)  Amex argues that because a court has greater flexibility in

approving a proposed consent decree, "while withholding rights from American Express that

were granted to Visa and MasterCard in the Consent Decree in this case would be

inappropriately punitive, the fact that the decree with Visa and MasterCard includes certain

restrictions on their activity cannot, on its own, form the basis for imposing those same

restrictions on American Express."  (Defs.' Br. at 7.)  The Government, on the other hand, argues

that "[a] settlement is often a compromise, and thus may encompass less relief than a litigated

judgment."  (Gov't's Reply at 4 (emphasis in original).)  In other words, "when a consent decree

is brought to a district judge, because it is a settlement, there are no findings that the defendant

has actually engaged in illegal practices.  It is therefore inappropriate for the judge to measure

the remedies in the decree as if they were fashioned after trial."  United States v. Microsoft

Corp., 56 F.3d 1448, 1460-61 (D.C. Cir. 1995) (emphasis in original).

The court appreciates that in their submissions, both parties noted where their proposals

parallel or differ from the Consent Decree, and the justifications for those parallels or

differences.  (See, e.g., Gov't's Br., Ex. 2 (table comparing each provision of the parties'

proposed judgments to the Consent Decree); Defs.' Br. at 41 (arguing that compliance provisions

from the Consent Decree are sufficient).)  While the court recognizes the interplay between the

Permanent Injunction and the Consent Decree, it also recognizes that the Permanent Injunction must be based on the evidence submitted at trial. The court further recognizes that American Express's business model differs in important ways from that of Visa and MasterCard. Thus, the Permanent Injunction parallels the Consent Decree in some respects, and deviates from the Consent Decree in other respects. The fact that the Permanent Injunction contains a provision that Amex opposes because it does not appear in the Consent Decree does not render such a provision "punitive" (see Defs.' Br. at 37); the fact that the Permanent Injunction contains a provision not in the Consent Decree that the Government opposes does not mean that Amex is inequitably granted rights not available to Visa and MasterCard (see, e.g., Gov't's Br. at 5 ("Thus, the judgment should not provide Amex with opportunities to restrict steering in ways Visa and MasterCard cannot and thus perpetuate the market impediments that this Court found unlawful.")).

2.    Communicating Acceptance of Amex

As discussed above, see supra Part III.A, American Express has a legitimate interest in requiring that merchants who steer customers away from Amex cards also communicate to those customers that they accept American Express. The Government argues that Amex should only be allowed to require such a communication where the merchant otherwise communicates to customers which brands it accepts (for example, on a small display at the point of sale indicating all brands accepted). Where a merchant only communicates its preference for certain brands (for example, a sign at the point of sale stating that a merchant prefers Visa, or a sign at the point of sale offering a discount to customers who use a MasterCard, but nothing more), the Government appears to argue that Amex cannot compel a merchant to communicate, in some way, that it also accepts American Express.

The purpose of the Permanent Injunction is not to mislead consumers into believing that a particular merchant that chooses to engage in steering does not, in fact, accept American Express.  Rather, as the court explained in the Decision, the removal of the NDPs should increase the flow of truthful information between merchants and customers.  (See Decision at 30.)  Thus, at the threshold, the court agrees with Defendants that they should have the authority to require merchants that engage in steering to also communicate to customers that they accept American Express.  Similarly, the court does not agree with the Government that a provision protecting Amex's ability to enforce signage rules is "unnecessary" and gives Amex an "undue influence with merchant steering."  (Gov't's Br. at 18.)

Under § III.B.5 of the Permanent Injunction, American Express has authority to impose signage requirements, but this authority is limited, and in no event is Amex authorized to use rules concerning signage or other merchant communications regarding Amex acceptance to deter or undermine the efficacy of merchant steering.  (Permanent Injunction § III.B.5.)  Accordingly, at most, Defendants can require that merchants post signage at the point of sale (including online or on mobile services) or store entry or communicate orally that they accept American Express.  For example, Amex cannot compel a merchant to do more than post a sticker at the point of sale or store entry indicating all accepted brands, including the preferred brand(s).  The power to require anything greater would chill efforts by merchants to steer, and would dilute the effectiveness of steering (for example, it would go too far if a rule required merchants engaging in steering to place an Amex logo on the actual sign attempting to influence customer choice).  With respect to online or mobile transactions, the court rejects American Express's proposal that it "shall be entitled to require that the signage indicating American Express acceptance must appear at the earliest point within the payment path at which any such practice occurs."  (Defs.'

Proposed J. § III.B.6.)  Like traditional merchants (who, under the Permanent Injunction, can indicate their acceptance of Amex at the point of sale or store entry), online and mobile merchants that choose to steer are entitled to determine the appropriate way of reasonably communicating their acceptance of American Express, so long as they communicate to customers at some point in the process that they, in fact, accept American Express.

Finally, as discussed above, under § IV.H of the Permanent Injunction, American Express must give notice to the Government of any changes to its rules governing merchants' acceptance of other credit card brands or debit cards before implementation of those rules.  Thus, the Government will be on notice should American Express take a position regarding signage that is contrary to the terms of the Permanent Injunction and this Memorandum, and will be able to seek relief from this court should the Government believe American Express has done so.

3.   <u>Disparagement and Surcharging</u>

The parties agree that Defendants should retain the right to prohibit merchants from disparaging or mischaracterizing the Amex brand, but disagree on remedial language. Defendants seek a provision that permits them to adopt rules that "prohibit Merchants from disparaging or mischaracterizing its Brand or making untrue statements about American Express or the Merchant's All-In Merchant Fee for accepting American Express General Purpose Cards." (Defs.' Proposed J. § III.C.)  The Government proposes that Amex be permitted only to "prohibit Merchants from disparaging its Brand, including (1) mischaracterizing American Express General Purpose Cards, or (2) engaging in activities that harm American Express's business or its Brand."  (Gov't's Proposed J. § IV.C.)  The Non-Party Merchants go further, proposing that the Permanent Injunction expressly define "disparaging" so that Amex cannot take the future position that novel forms of steering not expressly included in the Permanent Injunction are, in

fact, activities that "harm American Express's business or its Brand." (Non-Party Merchants' Comment at 9-10.)

In § III.C of the Permanent Injunction, the court clarifies that Amex is permitted to enforce both rules that prohibit merchants from disparaging its brand and rules that prohibit merchants from mischaracterizing its brand. (Permanent Injunction § III.C.) Included within the umbrella of "mischaracterization" are rules that prohibit merchants from making untrue statements about Amex, or untrue statements about the merchant's cost for accepting American Express credit cards or other credit cards, or untrue statements about the relative costs of accepting the cards of different brands. (Permanent Injunction § III.C.) The court does not adopt the Non-Party Merchants' proposal to define "disparaging," as what conduct constitutes disparagement was not part of the trial in this case. However, the Permanent Injunction does include language, for the avoidance of any doubt, providing that engaging in authorized steering practices—including a merchant communicating the reasonably estimated (including average) cost incurred when a customer uses a particular brand of credit card—cannot constitute a practice that "disparages," "mischaracterizes," or "harms" the Amex brand. (See Permanent Injunction § III.C.) The court is confident that the parties and merchants will understand the conduct captured by the concepts of disparagement and mischaracterization. And the Permanent Injunction includes mechanisms for a merchant to file a complaint with the Government should that merchant believe that Defendants are taking an overly broad view of these concepts. (See Permanent Injunction §§ IV.F, V.F.)

Similarly, the court does not adopt the Non-Party Merchants' proposal to define the concept of "surcharges." The court is confident that merchants will understand the difference

between a discount and a surcharge, and the definition of surcharging was not part of the trial in this case.

        4.    <u>Timing</u>

Considering that this is a permanent injunction entered after a full trial, the court rejects American Express's proposal that it have the later of (a) 90 days from the date of entry of the Permanent Injunction, or (b) 90 days following the expiration of any stay of the Permanent Injunction entered by this court or an appellate court, to implement the required changes to its business.  (<u>See</u> Defs.' Proposed J. § I.9.)  Rather, in the Permanent Injunction, the court orders that within the later of 30 days from the date of entry of the Permanent Injunction, or 30 following the expiration of a stay, Amex (a) cease to engage in the Prohibited Conduct and (b) commence the Required Conduct and notice/compliance requirements.  (<u>See, e.g.</u>, Permanent Injunction §§ I.G, III.A, IV.A.)  The 30-day period of implementation gives Defendants ample time to seek an additional stay of the Permanent Injunction, while also providing that, absent a stay, the process of remedying the instant antitrust violation will begin in earnest.

The court agrees with the Government that a ten-year termination provision (with the possibility for one-year extensions) is appropriate, and rejects Defendants' proposal that would terminate the Permanent Injunction upon the adoption of rules by Visa and MasterCard that prohibit forms of steering authorized by the Permanent Injunction.  (<u>Compare</u> Permanent Injunction § VI.C, <u>with</u> Defs.' Proposed J. § VI.C.)  If circumstances change, and/or if upon the expiration of the Consent Decree Visa and MasterCard attempt to again bar merchant steering, Amex can, consistent with the Permanent Injunction, seek relief from this court.  (<u>See</u> Permanent Injunction § VI.A (reserving the court's jurisdiction over the Permanent Injunction and authorizing the parties to seek further orders or modifications).)

### E.      Compliance Provisions

Finally, the Government proposes significant compliance provisions, arguing that "Amex should be required to devote as least as much attention to monitoring compliance with the Final Judgment as it did to monitoring merchants' compliance with its anticompetitive restraints." (Gov't Br. at 33.)  Defendants respond that the "onerous, unnecessary, and unreasonable" compliance provisions are punitive and premised on the Government's "baseless" assumption that "American Express cannot be trusted to comply with the Court's Final Judgment."  (Defs.' Br. at 41, 42.)  Defendants propose compliance provisions that parallel those in the Consent Decree, but nothing more.

The court agrees with the Government; considering American Express's previous, aggressive enforcement of the NDPs, and certain of the positions that it took at trial, robust compliance provisions are necessary to ensure that Amex complies with the Permanent Injunction.  It is not yet clear to the court whether American Express has a positive compliance attitude, particularly in light of its unwillingness to agree to some of the Government's more modest proposals.  Contrary to Defendants' argument, compliance provisions are not reserved only for antitrust violators who engaged in criminal, intentional, or malfeasant conduct.  (See Defs.' Br. at 45; Gov't's Reply at 18 & n.12.)  For a company of the size of American Express, the compliance provisions included in the Permanent Injunction are not overly costly or burdensome—for example, the court has not appointed an independent, external monitor, although it certainly has the authority to do so.  In addition, should Defendants (or the Government, for that matter) believe that the compliance provisions are unworkable, or require adjustments once implemented, they are permitted under the Permanent Injunction to seek modifications from the court.

## IV.   CONCLUSION

As set forth above, and as embodied in the court's separate Order Entering Permanent Injunction as to the American Express Defendants, the court adopts many of the proposals made by the Government with respect to the proper scope of injunctive relief in this case, with some exceptions, and with certain modifications.

SO ORDERED.

s/ Nicholas G. Garaufis

Dated: Brooklyn, New York
      April 30, 2015

NICHOLAS G. GARAUFIS
United States District Judge