UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES, *et al.*,

Plaintiffs

v.

AMERICAN EXPRESS CO., *et al.*,

Defendants

NO. 10-CV-04496 (NGG) (RER)
ECF CASE

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO STAY PENDING APPEAL**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Attorneys for Defendants*

May 1, 2015

**TABLE OF CONTENTS**

INTRODUCTION .........................................................................................................1

ARGUMENT ..............................................................................................................3

     I.     AMERICAN EXPRESS WOULD SUFFER IRREPARABLE HARM
           ABSENT A STAY....................................................................................5

     II.    AMERICAN EXPRESS HAS A SUBSTANTIAL POSSIBILITY OF
           SUCCESS ON APPEAL. ......................................................................11

     III.   A STAY OF THE INJUNCTION WILL NOT HARM A PARTY OR
           THE PUBLIC INTEREST......................................................................16

CONCLUSION.........................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

A2P SMS Antitrust Litig.,
  No. 12-cv-2656, 2014 WL 4247744 (S.D.N.Y. Aug. 27, 2014)............................2, 11, 12, 14

Amara v. CIGNA Corp.,
  559 F. Supp. 2d 192 (D. Conn. 2008) ......................................................................................12

Bates v. Jones,
  958 F. Supp. 1446 (N.D. Cal. 1997) ........................................................................................12

Brady v. Nat'l Football League,
  640 F.3d 785 (8th Cir. 2011) ..............................................................................................10, 11

Brenntag Int'l Chems., Inc. v. Bank of India,
  175 F.3d 245 (2d Cir. 1999).......................................................................................................5

Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,
  598 F.3d 30 (2d Cir. 2010)........................................................................................................11

Concrete Co. v. MMC Holdings, Inc.,
  201 F. Supp. 2d 1192 (M.D. Ala. 2001) ..................................................................................18

E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,
  637 F.3d 435 (4th Cir. 2011) ....................................................................................................15

Empresa Cubana del Tabaco v. Culbro Corp.,
  No. 97-cv-8399, 2004 WL 925615 (S.D.N.Y. Apr. 30, 2004) ..................................................9

Estate of Heiser v. Deutsche Bank Trust Co. Ams.,
  No. 11-cv-1608, 2012 WL 2865485 (S.D.N.Y. July 10, 2012)................................................11

Exxon Corp. v. Esso Worker's Union, Inc.,
  963 F. Supp. 58 (D. Mass. 1997) .............................................................................................12

Flo & Eddie, Inc. v. Sirius XM Radio Inc.,
  No. 13-cv-5784, 2015 WL 585641 (S.D.N.Y. Feb. 10, 2015) .................................................17

Gulf Ins. Co. v. Rockwood Programs, Inc.,
  No. 05-cv-2394, 2005 WL 735970 (S.D.N.Y. Mar. 21, 2005)............................................6, 10

In re Los Angeles Dodgers LLC,
  45 B.R. 18 (D. Del. 2011)...........................................................................................................9

In re Workers' Comp. Refund,
    851 F. Supp. 1399 (D. Minn. 1994).........................................................................12, 13

Kidder, Peabody & Co. v. Maxus Energy Corp.,
    925 F.2d 556 (2d Cir. 1991)...................................................................................4

LaRouche v. Kezer,
    20 F.3d 68 (2d Cir. 1994) .....................................................................................11

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007)..............................................................................................14

MasterCard Int'l, Inc. v. Fed'n Internationale de Football Ass'n,
    464 F. Supp. 2d 246 (S.D.N.Y. 2006)..................................................................9

Mohammed v. Reno,
    309 F.3d 95 (2d Cir. 2002)...................................................................................4, 5

Nken v. Holder,
    556 U.S. 418 (2009)..............................................................................................4, 5, 16

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
    124 F.3d 430 (3d Cir. 1997).................................................................................15, 16

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393 (2d Cir. 2004).................................................................................8, 9

Reuters Ltd. v. United Press Int'l, Inc.,
    903 F.2d 904 (2d Cir. 1990).................................................................................4

Safeco Ins. Co. of Am. v. M.E.S., Inc.,
    No. 09-cv-3312, 2010 WL 5437208 (E.D.N.Y. Dec. 17, 2010).........................4

Seneca Nation of Indians v. Paterson,
    No. 10-cv-687, 2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ..................16, 17, 18

Simon Prop. Grp., Inc. v. Taubman Ctrs., Inc.,
    262 F. Supp. 2d 794 (E.D. Mich. 2003)..............................................................12

Stein Indus., Inc. v. Jarco Indus., Inc.,
    934 F.Supp. 55 (E.D.N.Y. 1996) .........................................................................9

Stuller, Inc. v. Steak N Shake Enters., Inc.,
    695 F.3d 676 (7th Cir. 2012) ...............................................................................6, 7

Tom Doherty Assocs. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1995) .....................................................................................4

United States v. Am. Soc'y of Composers, Authors and Publishers,
  Civ. No. 13-95, 1991 WL 501864 (S.D.N.Y. Oct. 3, 1991)................................................4, 13

United States v. New York City Bd. of Educ.,
  620 F. Supp. 2d 413 (E.D.N.Y. 2009) ...............................................................................4, 11

United States v. Visa,
  344 F.3d 229 (2d Cir. 2003)....................................................................................................14

United States v. Visa,
  No. 98-cv-7076, 2002 WL 638537 (S.D.N.Y. Feb. 7, 2002) .......................2, 3, 10, 12, 16, 19

Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
  559 F.2d 841 (D.C. Cir. 1977) ...................................................................................................6

**Rules**

Fed. R. Civ. P. 62 ...................................................................................................3, 4, 5, 16

## INTRODUCTION

For decades, NDPs have been a staple of American Express's business model and merchant agreements.  On February 19, 2015, the Court issued its liability decision, ruling that the NDPs violate Section 1 of the Sherman Act.  (Dkt. 619.)  On April 30, 2015, the Court issued its Order entering a Permanent Injunction, along with a Memorandum opinion supporting that Order and the Judgment.  (Dkts. 638, 639, 640.)

American Express respectfully disagrees with the Court's liability decision and remedial order and will appeal them promptly.  In the meantime, the Court's injunction is set to take effect in 30 days—well before the Second Circuit will have had an opportunity to rule on American Express's appeal.  And, as the Court has recognized, once operative, the injunction will bring about fundamental changes to an industry that is highly "complex" and "a critical component of commerce in the United States".  (Liability Decision at 4.)  In fact, it was the "various complexities in this case" that led the Court to recognize that the answer to the question of whether the NDPs are anticompetitive was not "obvious".  (Id. at 33-34 n.7.)

The injunction will have a significant impact on American Express's business model and its relationships with millions of Card Members and merchants.  These fundamental changes to American Express's business, once implemented, cannot be reversed—if at all— without causing confusion to American Express's customers and imposing substantial and unrecoverable costs on American Express.  Given the broad impact that the injunction will have on this highly complex and critically important area of U.S. commerce and on American Express's business—along with the possibility that the Court's liability decision or remedial order might be reversed, in whole or in part, on appeal—American Express respectfully submits that a stay of the injunction pending the outcome of American Express's appeal is appropriate and necessary.

<u>First</u>, there is a significant risk that American Express will suffer irreparable harm absent a stay.  As the Court found in its liability decision, once the injunction takes effect, American Express will have to make significant changes to its business model and its merchant and Card Member relationships in an effort to "adapt" to a world without NDPs.  The governing law establishes that such "adaptation" of a company's business model to changed market circumstances is precisely the type of harm that is irreparable and warrants a stay.  So too is the potential loss of market share and goodwill, which, without a stay, is a significant risk for American Express, particularly given the network effects the Court recognized are prevalent in this market.  In fact, the court in <u>United States v. Visa</u> found irreparable harm likely, and issued a stay of its injunction pending Visa and MasterCard's appeal of its decision, specifically because of the risk that, absent a stay, Visa and MasterCard might lose charge volume and bank relationships to American Express and Discover while the appeal was pending.  No. 98-cv-7076, 2002 WL 638537, at *1 (S.D.N.Y. Feb. 7, 2002).  (<u>Infra</u> at § I.)

<u>Second</u>, American Express has a substantial possibility of success on appeal from the Court's liability and remedial orders.  As courts have made clear, to satisfy this factor, American Express need not convince the Court that American Express is likely to succeed on the merits of its appeal.  Such a standard would "require the district court to find that its own order is likely to be reversed—a standard that for practical purposes is rarely going to be satisfied".  <u>In re A2P SMS Antitrust Litig.</u>, No. 12-cv-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014).  Rather, as the court in <u>Visa</u> explained, a stay can be warranted even if the court is "fully confident in its Decision" where the appeal involves "substantial legal issues and a complex industry", or issues on which there is no directly controlling precedent.  2002 WL 638537, at *1.  Here, American Express's appeal will raise substantial, non-"obvious" legal and economic issues

relating to a "complex" industry that affects a "critical component of commerce in the United States". (Liability Decision at 4.)  Accordingly, this factor weighs strongly in favor of staying the judgment pending the appeal.  (Infra at § II.)

Third, a stay would not cause injury to other parties or to the public interest. Given that networks have utilized NDPs for decades and the Government did not initiate an investigation of them until 2007—and then took another three years to file this suit—we submit that maintaining the status quo during the relatively short period of time while American Express's appeal is pending would not harm the public interest.  In fact, the public interest would be disserved by allowing the injunction to take effect during the pendency of American Express's appeal because of the confusion and costs that would follow from market participants (merchants, consumers, banks and networks) modifying their conduct and expectations to a world without NDPs and then, if the judgment is reversed or altered, having to re-modify their conduct and expectations to conform to the ruling on appeal.  American Express is willing to work with the Government to expedite the briefing schedule of that appeal in the Second Circuit, as was done in United States v. Visa.  This further supports entry of the stay.  (Infra at § III.)

In sum, it is critical for both American Express and the industry at large for there to be finality in this case before the sweeping changes contemplated by the Court's liability and remedial orders take effect.  Accordingly, and as explained in more detailed below, we respectfully request that the Court grant American Express's motion for a stay pending its appeal pursuant to Federal Rule of Civil Procedure 62(c).

## ARGUMENT

Federal Rule of Civil Procedure 62(c) provides district courts with the power to enter a stay of an injunction pending the disposition of an appeal from a final judgment.  Fed. R. Civ. P. 62.  The power to issue a stay pending appeal is within the court's inherent power to

control its docket, and numerous courts in the Second Circuit have granted stays of a permanent injunction during the pendency of the movant's appeal.  See, e.g., Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 33 (2d Cir. 1995); Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 906-07 (2d Cir. 1990); United States v. Am. Soc'y of Composers, Authors and Publishers, Civ. No. 13-95, 1991 WL 501864, *1 (S.D.N.Y. Oct. 3, 1991).

In determining whether to grant a Rule 62(c) motion for a stay pending appeal, courts consider the following three factors:  (i) whether the movant will suffer irreparable injury absent a stay, (ii) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (iii) whether the interests of other parties or the public will be adversely affected.[1]  United States v. New York City Bd. of Educ., 620 F. Supp. 2d 413, 416 (E.D.N.Y. 2009).  These factors are all "interrelated, such that 'more of one excuses less of the other'".  Id. (quoting Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002)).  "[T]he court must weigh the factors in light of the purpose of a Rule 62(c) stay, which is to maintain the status quo" during the pendency of the appeal.  Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09-cv-3312, 2010 WL 5437208, at *10 (E.D.N.Y. Dec. 17, 2010) (citing Kidder, Peabody & Co. v. Maxus Energy Corp., 925 F.2d 556, 565 (2d Cir. 1991)).  Courts have also noted that the standard for a stay is similar to—but less demanding than—the standard for preliminary injunctions.  Mohammed, 309 F.3d at 100 n.6; see also Nken, 556 U.S. at 434 (noting similarity in the standards).

---

[1] Although sometimes addressed as separate factors, when the Government is a party, the factors looking to whether there would be harm to a party or to the public interest if the stay is granted merge.  Nken v. Holder, 556 U.S. 418, 435 (2009).

## I.   AMERICAN EXPRESS WOULD SUFFER IRREPARABLE HARM ABSENT A STAY.

For the purpose of a Rule 62(c) motion to stay pending an appeal, irreparable harm exists where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied". Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999). Here, American Express would suffer a number of forms of irreparable harm absent a stay pending its appeal.

First, if and when the injunction takes effect, American Express will be forced to make substantial changes to its business model and its merchant and Card Member relationships as it attempts to adapt to a world without the NDPs. Today, American Express operates a "spend-centric" business model under which it uses a significant percentage of the discount revenue it earns on the merchant side of the market to support the generous benefits and services on the cardholder side of the market in order to stimulate demand for the products and services offered by American Express-accepting merchants. (See Liability Decision at 19-21.) According to the Government and the Court, however, American Express will have to significantly alter its business model to try to "adapt" to a world where merchants can steer against its cards. (Liability Decision at 139; Pls. Post-Trial Br. (Dkt. 606) at 42.)

For example, according to the Court, American Express might respond to steering by entering new relationships with "anchor" merchants in key industries, launching new initiatives to steer Card Members from "non-friendly merchants", increasing Card Member benefits or changing its marketing programs to a "fee-for-service" offering to prevent free-riding. (Liability Decision at 138-39.) The Court also noted that American Express "faces a number of structural challenges in this market" that it will have to address in a world without NDPs. (Id.

at 142.)  The Court also found that American Express may need to change the way it prices its card products to consumers.  (Id. at 139-40.)

American Express continues to believe that it will be unable to sustain the types of "adaptations" contemplated by the Government and the Court's ruling while competing effectively on both sides of the market, but even if the Court's findings are correct and such efforts are sustainable, the fact that American Express will have to make these changes to the way it has operated its business for years—and incur significant costs in doing so—while its appeal is pending is exactly the type of irreparable harm that courts have held justify a stay.  See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977) (granting stay pending appeal from permanent injunction on the ground that the injunction would force a change in defendant's business model, which constituted irreparable harm); Gulf Ins. Co. v. Rockwood Programs, Inc., No. 05-cv-2394, 2005 WL 735970, at *2 (S.D.N.Y. Mar. 21, 2005) ("[D]isruptions of ordinary business can constitute irreparable injury.").

In Stuller, Inc. v. Steak N Shake Enterprises, Inc., 695 F.3d 676, 680 (7th Cir. 2012), the Seventh Circuit affirmed the district court's conclusion that a restaurant franchise operator would suffer irreparable harm if it were required to change its policy from setting its own menu prices independent of the franchisor, as it had been doing for decades, to using the prices set by the franchisor during the pendency of a lawsuit challenging the franchisor's ability to impose a uniform pricing policy on franchises.  The franchisor opposed the motion on the ground that the operator would not suffer irreparable harm absent the preliminary injunction because it could just revert back to its pricing policy if it won the lawsuit.  The district court and Seventh Circuit disagreed, finding that the operator proved irreparable harm by showing that the new policy "would be a significant change to its business model and that it would negatively

6

affect its revenue".  Id.  Here, American Express faces a similar harm as the operator in Stuller—elimination of the NDPs, a staple of American Express's card business for years, constitutes a "significant change to its business model" that will require American Express to attempt to "adapt" that model in order to compete effectively in the post-judgment world.

    Second, there is a significant risk that, absent a stay, American Express will lose market share, revenue and customer goodwill if merchants begin to steer their customers to rival credit card networks pending the appeal.  American Express's experience with the "We Prefer Visa" campaign underscores the significance of these risks.  As the record demonstrates, almost immediately after it got off the ground, the "We Prefer Visa" campaign caused American Express to experience a precipitous loss of charge volume as consumers stopped using American Express at merchants participating in the campaign, as well as at merchants more broadly as a result of network effects and the adverse impact that steering has on consumer perceptions of American Express's coverage.  (See DX7828-50 (indicating American Express's dramatic share loss following implementation of the campaign); PX0084 at '544-50 (Visa internal tracking study reporting that campaign has a significant impact on consumers' views about American Express's network, including that consumer perceptions of Amex as the "Best Overall Card" fell from 18 percent to 11 percent and that, even in Amex's traditional area of strength, "Business T&E", consumer perceptions of Amex as the "Best Card" fell from 55 percent to 40 percent); DX1792 at '001 (reporting that "Visa preference messages appear to negatively affect [Card Members'] perceptions of Amex coverage"); (see also Liability Decision at 104-05 (noting that Visa's campaign was "markedly successful at shifting spend to Visa's network")).)

    Indeed, as American Express's rivals conceded in their testimony and documents—and as was the case for Visa in connection with its "We Prefer" campaign—the

very purpose of a steering campaign aimed at American Express was to shift share away from American Express Cards and reduce consumer expectations about American Express's coverage. (See PX0132 at '876-79 (Visa board minutes describing how campaigns could "capitalize on American Express vulnerabilities"); Pls. Proposed Findings of Fact (Dkt. 600-1) at ¶¶ 83-84 (describing Visa materials that encouraged merchants to shift sales volume "from American Express to Visa" and the reaction by some merchants including a "well-publicized protest" by a Boston-area restaurant); Liability Decision at 22-23 (noting that Visa's and MasterCard's campaigns "highlighted American Express's perceived and actual competitive disadvantages in the marketplace—specifically, Amex's smaller merchant acceptance networks, consumers' resulting perceptions of the utility and value of Amex's card products, and the network's significantly higher discount rates to merchants"); Trial Tr. at 3245:19-3246:15 (Biornstad / MasterCard) (testifying that "American Express's share of Travelocity's business [was] significantly larger than [MasterCard's]" and that MasterCard implemented a preference program with Travelocity in order to shift that volume to MasterCard); Trial Tr. at 927:14-930:13 (Hochschild / Discover) (describing how steering campaigns can create a "negative customer experience, impacting the perception of your [the network's] product, the perception of your brand, the likelihood [consumers] would continue to use [your card]").)

Such a loss of charge volume and the adverse effects on consumers' perceptions of American Express's coverage and brand constitute irreparable harm.  See, e.g., Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) ("Loss of . . . business opportunities" cannot be translated "'with any precision [into an] amount of monetary loss'" and therefore irreparably harms a company (quoting Register.com, Inc. v. Verio, Inc., 126 F. Supp. 2d 238, 248 (S.D.N.Y. 2000))); In re Los Angeles Dodgers LLC, 465 B.R. 18, 35-36 (D. Del. 2011) (granting stay

pending appeal because the loss of unique business opportunities and negotiation leverage constituted irreparable harm); MasterCard Int'l, Inc. v. Fed'n Internationale de Football Ass'n., 464 F. Supp. 2d 246, 301 (S.D.N.Y. 2006) (loss of "a significant competitive advantage" and "indeterminate existing and prospective goodwill" constituted irreparable harm), vacated in part on other grounds, 239 F. App'x 625 (2d Cir. 2007); Empresa Cubana del Tabaco v. Culbro Corp., No. 97-cv-8399, 2004 WL 925615, at *2 (S.D.N.Y. Apr. 30, 2004) (the loss of market share "has been held to constitute irreparable harm"); Stein Indus., Inc. v. Jarco Indus., Inc., 934 F.Supp. 55, 58 (E.D.N.Y. 1996) ("loss of a product's market amounts to irreparable harm because the market share is not easily recovered.").

Third, once the injunction becomes effective, American Express's contracts with hundreds of large merchants—covering billions of dollars in commerce—will be impacted. These multi-faceted, custom agreements with American Express's largest merchants are the product of vigorous give-and-take negotiations between the parties, often spanning months or years, and typically include non-standard, negotiated NDPs, marketing funds, growth incentives and various other highly customized terms. The injunction, once effective, will immediately and materially modify the contractual rights of American Express and its large merchant partners, including by nullifying the negotiated non-standard NDPs. This could result in substantial disruption of the structure of the business relationship between American Express and its merchant customers, especially if the rights and obligations of the parties are again materially altered as a result of American Express's appeal. Such disruption, which can be avoided entirely or mitigated if American Express prevails in whole or part on appeal, alone constitutes irreparable harm and justifies a stay. See, e.g., Gulf Ins. Co., 2005 WL 735970, at *2.

Each of these damaging effects on American Express's network constitutes irreparable harm even if these effects could be viewed as procompetitive.  See Visa, 2002 WL 638537, at *1.  Indeed, it could hardly be otherwise, since the purpose of the stay is to preserve American Express's right to appeal the court's conclusion that competition would be enhanced by the elimination of the NDPs.  In the Visa case, Visa and MasterCard argued that they would be irreparably harmed absent a stay of the court's injunction pending their appeal because the injunction required Visa and MasterCard to modify their bank dedication agreements to allow banks to partner with and move volume to American Express and Discover cards.  The Government claimed that this argument was invalid because the Visa court, in its liability decision, found that eliminating the dedication agreements would benefit competition precisely because they would allow banks to partner with American Express and Discover, and would result in Visa and MasterCard share loss unless Visa and MasterCard competed more vigorously to retain the banks' business.  In other words, the effects that Visa and MasterCard pointed to as potentially irreparable harm were the same effects the court found were procompetitive and justified allowing banks to rescind the dedication agreements.  The Visa court rejected the Government's position, finding that Visa and MasterCard had "demonstrated they may suffer irreparable harm should this court decline to issue a stay" because of the "potentially irreversible consequences of [the provision] of the Final Judgment [that] permits member banks to rescind dedication agreements".  2002 WL 638537, at *1; see Brady v. Nat'l Football League, 640 F.3d 785, 792-94 (8th Cir. 2011) (reversing district court and granting stay pending appeal on the ground that the NFL would suffer irreparable harm if unable to enforce a lockout of league

10

players during the appeal even though the district court had found the lockout to violate the antitrust laws).[2]

In sum, the evidence in the record and the Court's liability findings make clear that American Express is likely to suffer irreparable harm if the Court's injunction takes effect during the pendency of its appeal. Accordingly, this factor weighs heavily in favor of granting American Express's motion for a stay.

## II.  AMERICAN EXPRESS HAS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON APPEAL.

A party seeking a stay pending appeal in the Second Circuit must show "a substantial possibility, although less than a likelihood, of success on appeal". United States v. New York City Bd. of Educ., 620 F. Supp. 2d 413, 416 (E.D.N.Y. 2009) (quoting LaRouche v. Kezer, 20 F.3d 68, 72 (2d Cir. 1994)). This standard is to be judged "with liberality", Estate of Heiser v. Deutsche Bank Trust Co. Ams., No. 11-cv-1608, 2012 WL 2865485, at *3 (S.D.N.Y. July 10, 2012), aff'd, 2012 WL 5039065 (S.D.N.Y. Oct. 17, 2012), and the Second Circuit has held that it can be satisfied by a showing that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief". Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35, 38 (2d Cir. 2010); see also A2P SMS Antitrust Litig., 2014 WL 4247744, at *2 n.2 (applying Citigroup to a motion for a stay pending appeal).

The "serious questions" standard "is particularly appropriate when a district court is asked to stay its own order"; "under such circumstances, the court has already determined that

---

[2] In United States v. Visa, American Express opposed defendants' motion for a stay pending appeal. As did the Government, American Express argued there that any potential harms suffered by Visa and MasterCard would only be the result of activity that the court had found to be procompetitive. In granting the stay, the court rejected this argument made by both the Government and American Express.

the applicant failed to succeed on the merits" and "[a]sking the district court to then find that the

movant is likely to succeed on the merits on appeal would require the district court to find that its

own order is likely to be reversed—a standard that for practical purposes is rarely going to be

satisfied".  A2P SMS Antitrust Litig., 2014 WL 4247744, at *2.  Accordingly, American

Express's burden is not to persuade the Court of the likelihood its decision will be reversed on

appeal.  Rather, the "serious questions" standard may be met where "there is no controlling

Supreme Court or Second Circuit precedent on point and the only available guiding precedent

does not cut decisively in either direction", id. at *2, or the case involves substantial and

complex issues, see, e.g., Visa, 2002 WL 638537, at *1 (granting stay despite having "full[]

confiden[ce] in its Decision" where the case involved "substantial legal issues and a complex

industry").

   Indeed, numerous courts have stayed injunctions pending appeal because of the

complexity or uncertainty of the relevant legal issues.  See, e.g., Amara v. CIGNA Corp., 559

F. Supp. 2d 192, 222 (D. Conn. 2008) ("In light of the complexity of the issues and the weighty

interests at stake, as well as the possibility that some or all of this opinion . . . may be reversed on

appeal, the Court believes that a stay is appropriate."), aff'd, 348 F. App'x 627 (2d Cir. 2009),

vacated on other grounds, 131 S. Ct. 1866 (2011); Simon Prop. Grp., Inc. v. Taubman Ctrs., Inc.,

262 F. Supp. 2d 794, 798 (E.D. Mich. 2003)  (granting stay of order enjoining shareholders from

voting shares where Defendants "raised serious legal questions . . . which have yet to be clearly

addressed"); Exxon Corp. v. Esso Worker's Union, Inc., 963 F. Supp. 58, 59-60 (D. Mass. 1997)

(granting stay because question at issue was unclear); Bates v. Jones, 958 F. Supp. 1446, 1471-

72 (N.D. Cal. 1997) (granting stay because issue on appeal was one of first impression),

judgment rev'd on the merits en banc, 131 F.3d 843 (9th Cir. 1997); In re Workers' Comp.

Refund, 851 F. Supp. 1399, 1401-03 (D. Minn. 1994) (granting a stay where "question presented . . . [was] not wholly without doubt", even though public interest and balance of harms favored denial of the stay); Am. Soc'y of Composers, Authors & Publishers, 1991 WL 501864, at *1 (granting a stay where, although the court did not view Defendant as likely to prevail on appeal, "the appeal [did] raise substantial issues").  We submit that American Express satisfies this standard here, as the Court's decision raises a number of "serious questions" that will need to be addressed on appeal, a few of which are discussed below.

        First, the Court's liability decision raises a number of serious and novel questions relating to the appropriate standard and methodology for assessing a vertical restraint in a two-sided market under the rule of reason.  The Court found that GPCC networks such as American Express are often referred to as "two-sided 'transaction markets'" in which "the two sides of the platform are brought together to consummate a single, simultaneous transaction, and the products provided by the platform are consumed in fixed proportions by the consumer and merchant", that there is a "symbiotic relationship between the two sides", and that "in order to compete effectively, networks must account for the interdependence between the demands of each side of the platform and strike a profit-maximizing balance between the two".  (Liability Decision at 12-13.)  Based on these observations, the Court found that "due consideration must be given to the competitive dynamics on both sides", while repeatedly noting the "various complexities" involved in assessing the competitive effects of the NDPs.  (Id. at 13-14, 33-34 n.7.)  According to the Court, those competitive effects are not "obvious" and the Court concluded that there is an absence of controlling authority concerning exactly how competitive effects must be analyzed in a two-sided market.  (Id. at 33-34 n.7, 135.)  As a result, the Second Circuit will need to resolve the serious and complex question of how properly to account for issues of market definition,

market power and competitive effects in a two-sided market such as this, where the restraint at issue directly and simultaneously impacts both sides of the market.

Second, and relatedly, the Court's liability decision raises serious questions about the proper use of pricing evidence in a two-sided market. Those questions include which "price" is the proper price to assess, what the relevant two-sided price is and how that price and the margins related to it can and must be measured. Unlike in Visa where the Second Circuit held that the Exclusionary Rules were a horizontal conspiracy among 20,000 competing banks to boycott American Express and Discover, see United States v. Visa, 344 F.3d 229, 242 (2d Cir. 2003), there is no evidence that the NDPs were the product of a horizontal cartel that excluded competitors and, instead, the Court's findings regarding price are central to its resolution of the liability issues here. Cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 892-93 (2007) (identifying principal anticompetitive potential of vertical restraints as the facilitation of cartelization). Against this background—and in light of the lack of controlling precedent regarding the proper application of rule-of-reason analysis to vertical restraints in a two-sided market—it cannot be said that "the only available guiding precedent" cuts decisively in favor of the Court's decision. A2P SMS Antitrust Litig., 2014 WL 4247744, at *2.

Third, the Court's conclusion that American Express possesses antitrust market power raises other serious questions for appeal. In particular, the Court found that American Express's market share standing alone would be insufficient to support a finding of market power, but then concluded that this share is "amplif[ied] [by] cardholder insistence". (Liability Decision at 71.) American Express will argue on appeal that this "insistence" is fundamentally different from the ubiquity identified by the Visa decisions as supporting the determination that Visa and MasterCard possess market power. To the contrary, unlike the ubiquity enjoyed by the

14

dominant networks in Visa, the loyalty of American Express's customers is not durable.  Instead, when Card Members experience an effective price increase through a loss in Card Member benefits provided by American Express, that loyalty diminishes, and American Express's business is eroded as those Card Members switch to competitors.  (See DX6402 at '799 (projecting a loss of over $1 billion in charge volume attributed to the exit of Continental Airlines from Membership Rewards).)

Fourth, there are serious questions that will be raised on appeal about whether the relevant market should include debit cards.  While it is true that the court in United States v. Visa did not include debit within the relevant markets defined in that case, it is American Express's position that the evidence demonstrates a significant shift in consumer behavior since that decision that establishes that debit cards should be included within the relevant market.  (See Mem. & Order Regarding Mots. in Limine (Dkt. 510) at 26-27 ("Given the reasoning and authority relied upon by Amex's experts, it is at least conceivable that market conditions and customer behavior may have changed since the United States v. Visa decisions such that the relevant antitrust market could now be different.")); see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 446 (4th Cir. 2011) ("[O]ne must look at the commercial realities to define the relevant market.").  Moreover, in defining the market to exclude debit, the Court assumed the existence of the NDPs, (Liability Decision at 49-50), which is in tension with the law of at least one other circuit, see Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3d Cir. 1997) ("A court making a relevant market determination looks not to the contractual restraint assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general.").  Particularly given the significance of the market definition question to the analysis of market

power and competitive effects, this is an additional serious question that the Second Circuit will need to address in the specific context of the Court's findings in this case.

In sum, although the Court may be "fully confident in its Decision", American Express's appeal involves "substantial legal issues and a complex industry", which weighs heavily in favor of a stay.  Visa, 2002 WL 638537, at *1.

## III.    A STAY OF THE INJUNCTION WILL NOT HARM A PARTY OR THE PUBLIC INTEREST.

The final two factors courts consider in deciding whether to grant a Rule 62(c) motion to stay a judgment pending appeal are whether there would be harm to any party or to the public interest if the stay is granted.  Nken, 556 U.S. at 434.  As noted above, when the Government is a party, these two factors merge.  See id. at 435.

Courts in this Circuit have held that injury to a party or to the public interest is unlikely to be a concern where the government has permitted the activity at issue to continue for a long time before taking action against it, and thus, in such cases, it is appropriate to preserve the status quo by granting a stay.  For example, in Seneca Nation of Indians v. Paterson, the State of New York sought to begin collecting cigarette taxes from cigarette retailers in the territory of the Seneca Nation.  No. 10-cv-687A, 2010 WL 4027795, at *1 (W.D.N.Y. Oct. 14, 2010).  Although the district court denied the plaintiffs' request for a preliminary injunction, it nonetheless stayed the state's attempt to collect taxes during plaintiff's appeal of its decision in large part because of the state's "lengthy prior history of forbearance" from collecting those taxes.  Id. at *3.  The court explained that because "New York voluntarily chose to forebear collection of cigarette taxes from Indian retailers for many years", the court did "not believe that the minimal, additional delay pending appeal will cause substantial injury".  Id.; see also Flo & Eddie, Inc. v. Sirius XM Radio Inc., No. 13-cv-5784, 2015 WL 585641, at *4 (S.D.N.Y. Feb. 10,

16

2015) (granting stay of proceedings pending interlocutory appeal because plaintiff's decision to "tolerate[]" the challenged behavior "for decades" lessened any harm plaintiff would feel during the stay).  Here, the Government has likewise exhibited a "lengthy history of forbearance", and thus a stay is appropriate.

        As the Court noted in its Liability Decision, "limitations on merchant steering have existed in Amex's card acceptance agreements in one form or another since the 1950s". (Liability Decision at 23.)  The Court further observed that "[i]n the late 1980s and early 1990s", following Visa's execution of its "We Prefer Visa" campaigns, American Express "bolstered its NDPs to ensure that merchants could not state a preference for any GPCC card network other than American Express, and simultaneously intensified its efforts to enforce these provisions when it detected merchant steering."  (Id.; see also Pls. Post-Trial Br. at 1 ("Each network has long prohibited . . . steering . . . .").)  By that time, American Express was engaging in the precise conduct that is at issue in this case, yet it wasn't until 2007—over two decades later— that the Government began its investigation into this matter, and it took another three years for the Government to file this lawsuit.  Indeed, in the period between the "We Prefer Visa" campaign and the commencement of the Government's investigation, the Government called Mr. Chenault as a witness in the case against Visa and MasterCard to testify about the virtues of the very business model which the Government challenges here.  And in the years since the investigation began, the Government chose to engage in extensive and lengthy discovery twice— once during its three-year pre-suit investigation, and again after it filed suit—demanding and obtaining production of millions of pages of documents and depositions of scores of American

Express and third-party witnesses.[3]  All in all, over <u>25 years</u> have elapsed between the time that American Express "bolstered its NDPs" while "intensif[ying] its efforts to enforce" them and the Court ordered the injunctive relief that the Government now claims must be implemented immediately.

On the other hand, there could be significant adverse consequences for consumers, merchants and other networks, in addition to American Express, if the Court declines to issue a stay and its decision is subsequently reversed or its injunction materially modified on appeal.  The Court's opinion is very clear that the injunction, once implemented, will "disrupt[] the competitive landscape" in this "concentrated, complex market".  (Liability Decision at 141.) There will be substantial disruption for participants in this highly complex industry if these changes are ushered in by operation of the Court's injunction and then, not long thereafter, reversed as a result of American Express's appeal.  Avoiding this disruption by granting a temporary stay of the injunction would serve the interests of third parties and the industry at large, and thus weighs in favor of a stay.  <u>See</u> <u>Concrete Co. v. MMC Holdings, Inc.</u>, 201 F. Supp. 2d 1192, 1195 (M.D. Ala. 2001) (stating that the public interest favors the court's granting of a stay in light of the "disruption that might otherwise ensue" in the absence of a stay); <u>Seneca Nation</u>, 2010 WL 4027795, at *3 (stating that, particularly in contentious and consequential cases, the public interest favors preserving the status quo pending appeal).

Finally, to ensure that a temporary stay would not delay the final resolution of this case any longer than necessary, American Express is willing to work with the Government to expedite the briefing schedule of the appeal in the Second Circuit.  In granting a stay in <u>Visa</u>, the

---

[3] This delay is all the more glaring given that the events making up one cornerstone of the Government's case—the purported prevention of Discover's "low cost" strategy—took place in the late 1990s, that is, roughly a decade before the Government filed suit.  (<u>See</u> Pls. FOF ¶¶ 62-68 (describing Discover's "low cost" strategy).)

court noted that Visa's "stated desire to cooperate with the Government in seeking expedited treatment of any appeal" served to decrease any possibility that the public interest would be disserved by a stay.  See Visa, 2002 WL 638537 at *2.  The same is true here.

## CONCLUSION

For the foregoing reasons, American Express respectfully submits that the balance of the equities weighs in its favor, and it requests that this Court enter a stay of its judgment during the pendency of American Express's appeal.

May 1, 2015

Respectfully submitted,

*/s/ Evan R. Chesler*
Evan R. Chesler
(echesler@cravath.com)
Peter T. Barbur
(pbarbur@cravath.com)
Kevin J. Orsini
(korsini@cravath.com)
Members of the Firm

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Donald L. Flexner
(dflexner@bsfllp.com)
Philip C. Korologos
(pkorologos@bsfllp.com)
Eric J. Brenner
(ebrenner@bsfllp.com)

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Counsel for Defendants American Express Company and American Express Travel Related Services Company, Inc.*

20