UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

   UNITED STATES OF AMERICA, et al.,

                        Plaintiffs,                **MEMORANDUM & ORDER**

         -against-                     **10-CV-4496 (NGG) (RER)**

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

                       Defendants.
--------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Following a bench trial and the issuance of its Findings of Fact and Conclusions of Law,

the court entered a Permanent Injunction and Judgment in favor of Plaintiffs United States of

America and the attorneys general of seventeen states, prohibiting Defendants American Express

Company and American Express Travel Related Services Company (collectively, "Defendants,"

"American Express," or "Amex") from enforcing certain parts of the Non-Discrimination

Provisions ("NDPs") contained in Amex's contracts with merchants.  (See Findings of Fact and

Conclusions of Law ("Decision") (Dkt. 619); Order Entering Permanent Injunction as to the

American Express Defendants ("Permanent Injunction") (Dkt. 638); J. (Dkt. 640).)  Now before

the court is Defendants' motion for a stay of the Permanent Injunction pending appeal.  (See Not.

of Defs.' Mot. to Stay Pending Appeal (Dkt. 641).)

      For the reasons set forth below, Defendants' motion for a stay pending appeal is

DENIED; however, the court sua sponte enters a temporary stay of the Permanent Injunction for

a period of 30 days from the date of entry of this Memorandum and Order in order for

Defendants to seek a stay pending appeal from the Second Circuit.

## I.      PRELIMINARY STATEMENT

The court reaches its determination upon an analysis of the issues Defendants will raise

on appeal, any irreparable harm that may befall Defendants in the absence of an indefinite stay

pending appeal, and the continued harm to the public (including harm to the merchants who seek

relief from Amex's unlawful contractual provisions) should the court issue a stay pending

appeal.  On balance, taking into consideration the well-developed factual record in this case and

the parties' submissions on this motion, the court concludes that a stay of the Permanent

Injunction pending Defendants' appeal is not warranted.

As the court has previously explained, "courts have an obligation, once a violation of the

antitrust laws has been established, to protect the public from a continuation of the harmful and

unlawful activities."  United States v. Parke, Davis & Co., 362 U.S. 29, 48 (1960).  A key theme

permeating Defendants' memoranda in support of their motion is that absent a stay, competition

will enter the market during the pendency of the appeal, and this period of competition will

irreparably harm Amex if the court's Decision is ultimately reversed.  But as American Express

itself argued in opposition to a stay of the final judgment pending appeal in United States v.

Visa, "[i]ncreased competition is not harm; it is one of the core values that the antitrust laws

promote.  The answer to increased competition is . . .  to provide competition in return.  It is not

to eliminate the competition by rule or, in this instance, through a stay pending appeal."  (Mem.

of American Express as Amicus Curiae in Opp'n to Defs.' Mots. for a Stay Pending Appeal,

United States v. Visa U.S.A., Inc., No. 98-CV-7076 (BSJ) (S.D.N.Y. Jan. 14, 2002), 2002

WL 32496022, at *7.)

The remainder of Amex's arguments concerning the harm that it may sustain absent a

stay—for example, that it will need to make changes to its business model and renegotiate

contracts with hundreds of large merchants—are outweighed by the significant, continued harm to merchants and to other members of the public that would be caused by Amex's unabated enforcement of the NDPs during the pendency of its anticipated appeal, a period that could last several years.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 62(c), a district court may, in its discretion, enter a stay of an injunction pending the disposition of an appeal from a final judgment.  Fed. R. Civ. P. 62(c).  However, "[a] stay is not a matter of right, even if irreparable injury might otherwise result."  Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)).  "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of" the court's discretion.  Id. at 433-34.

"To determine whether a stay of an order pending appeal is appropriate, a court must evaluate the following factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).

The first factor (likelihood of success on the merits) is satisfied where the applicant can show that there are "'serious questions' going to the merits of the dispute."[1]  In re A2P SMS

---

[1]  Courts in this circuit have also applied a standard that the stay applicant must only demonstrate "a substantial possibility, although less than a likelihood, of success on appeal."  See United States v. N.Y.C. Bd. of Educ., 620 F. Supp. 2d 413, 416 (E.D.N.Y. 2009) (quoting LaRouche v. Kezer, 20 F.3d 68, 72 (2d Cir. 1994)).  The court treats these standards as analogous, and notes, as other courts have, that

> [a] "serious questions" standard is particularly appropriate when a district court is asked to stay its own order; under such circumstances, the court has already determined that the applicant failed to succeed on the merits.  Asking the district court to then find that the movant is likely to succeed on the merits on appeal

Antitrust Litig., No. 12-CV-2656 (AJN), 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014)

(quoting Citigroup Global Mkts. Inc. v. VCG Special Opportunities Master Fund, Ltd., 598

F.3d 30, 35 (2d Cir. 2010)).  Where the Government is a party, the third factor (harm to other

parties interested in the proceeding) and the fourth factor (harm to the public interest) typically

merge.  See Nken, 556 U.S. at 435; see also United States v. Apple Inc., 992 F. Supp. 2d 263,

278 (S.D.N.Y. 2014).

The four "factors are interrelated, such that 'more of one excuses less of the other.'"

United States v. N.Y.C. Bd. of Educ., 620 F. Supp. 2d 413, 416 (E.D.N.Y. 2009) (quoting

Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002)); see also Apple, 992 F. Supp. 2d at 278

("These factors operate as a 'sliding scale' where '[t]he necessary "level" or "degree" of

possibility of success will vary according to the court's assessment of the other stay factors . . .

[and] [t]he probability of success that must be demonstrated is inversely proportional to the

amount of irreparable injury [the applicant] will suffer absent the stay.'" (quoting Thapa v.

Gonzales, 460 F.3d 323, 334 (2d Cir. 2006))).  Generally, the applicant's likelihood of success

on the merits and irreparable harm to the applicant absent a stay "are the most critical" factors in

determining whether one is appropriate.  Nken, 556 U.S. at 434.  Finally, the court should

"weigh the factors in light of the purpose of a stay pending appeal, which is to maintain the

status quo."  Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09-CV-3312 (ARR) (ALC), 2010

---

would require the district court to find that its own order is likely to be
reversed—a standard that for practical purposes is rarely going to be satisfied.

In re A2P SMS Antitrust Litig., No. 12-CV-2656 (AJN), 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014).
Courts have also observed that the factors governing a stay pending appeal tend to overlap with the traditional
factors governing a motion for a preliminary injunction.  See Nken, 556 U.S. at 428 ("A stay pending appeal
certainly has some functional overlap with an injunction, particularly a preliminary one."); see also Citigroup Global
Mkts. Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (explaining that movant
can obtain a preliminary injunction by showing either a likelihood of success on the merits, or "sufficiently serious
questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly
toward the party requesting the preliminary relief").

WL 5437208, at *10 (E.D.N.Y. Dec. 17, 2010) (citing <u>Kidder, Peabody & Co. v. Maxus Energy Corp.</u>, 925 F.2d 556, 565 (2d Cir. 1991)).

## III.   DISCUSSION

The court now applies each of the factors outlined above.  On balance, application of the factors does not warrant entry of a stay pending appeal.

### A.    "Serious Questions" on the Merits

As a threshold issue, the court agrees with American Express that this is a complex case. (<u>See</u> Defs.' Mem. of Law in Supp. of Mot. to Stay Pending Appeal ("Defs.' Mem.") (Dkt. 642) at 12 ("Indeed, numerous courts have stayed injunctions pending appeal because of the complexity or uncertainty of the relevant legal issues." (citing cases)); Defs.' Reply Mem. of Law in Supp. of Mot. to Stay Pending Appeal ("Defs.' Reply") (Dkt. 661) at 10 ("American Express respectfully asks the Court to consider that its liability conclusion, grappling as it does with complex legal issues in a complex industry, might be wrong.").)  However, in one way or another, all antitrust enforcement actions are complex; yet, not every antitrust action in which a plaintiff wins at trial is an appropriate candidate for a stay pending appeal.[2]  Accordingly, the court turns to the specific arguments Amex identifies as serious questions going to the merits of its anticipated appeal.

First, Defendants argue that this case raises "a number of serious and novel questions relating to the appropriate standard and methodology for assessing a vertical restraint in a two-sided market under the rule of reason."  (Defs.' Mem. at 13.)  Although the court previously

---

[2]  American Express also relies on the court's prior statement that "the various complexities in this case preclude a finding that the anticompetitive effects flowing from the NDPs are 'obvious.'"  (Decision at 33-34 n.7; <u>see also</u> Defs.' Mem. at 1.)  But the court made that statement during a discussion of the relevant legal standard, determining that a "quick look" or truncated rule of reason analysis was not appropriate in this particular antitrust case (<u>see</u> Decision at 33-34 n.7), and <u>not</u> in reaching its ultimate conclusion that the Government proved "that American Express's Non-Discrimination Provisions have imposed actual, concrete harms on competition in the credit and charge card network services market" (<u>id.</u> at 127).

observed that the Second Circuit has not expressly considered whether a court can weigh "the relative gains and losses to interbrand competition in two separate, yet interrelated, markets that together comprise a single two-sided platform" (Decision at 135), it also held that even if such cross-balancing is appropriate, "Defendants have failed to establish that the NDPs are reasonably necessary to robust competition on the cardholder side of the GPCC [general purpose credit and charge] platform, or that any such gains offset the harm done in the network services market" (id.). In other words, the court both (1) applied the standard rule of reason analysis, in spite of Defendants' urging that this particular market requires a novel form of analysis (see id. at 134 ("In asserting this defense, American Express would also require the court to balance the restraints' pro-competitive effect in a separate, though intertwined, antitrust market against their anticompetitive effect on the merchant side of the GPCC platform, a proposition for which Defendants cite no legal authority.")), and (2) determined as a factual matter that Amex's proposed novel form of antitrust analysis would not lead to a different result.[3]

Second, and relatedly, American Express argues that this case "raises serious questions about the proper use of pricing evidence in a two-sided market." (Defs.' Mem. at 14.) Defendants ignore that the court did analyze their proposed pricing theory, but determined that

---

[3] Moreover, this court is not the first to confront antitrust liability in a complex or two-sided market and to subsequently deny a request for a stay. See, e.g., United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y. 2013) (finding, after multi-week bench trial, that defendant conspired to raise the retail price of e-books, and creating independent monitorship), motion for partial stay denied, 992 F. Supp. 2d 263 (S.D.N.Y. 2014), stay denied, Nos. 13-3741, 14-60, 14-61, 2014 WL 1623734 (2d Cir. Feb. 10, 2014); In re Realcomp II Ltd., No. 9320, 2007 WL 6936319 (F.T.C. Oct. 30, 2009) (finding Section 1 violation in two-sided market), motion for partial stay denied, 2010 WL 5576189 (F.T.C. Jan. 7, 2010), pet. denied, Realcomp II Ltd. v. F.T.C., 635 F.3d 815 (6th Cir. 2011), cert. denied, 132 S. Ct. 400 (2011).

The fact that, according to Amex, "[t]his is the first decision in the Second Circuit in at least the last 25 years in which a vertical restraint has been found unlawful under the rule of reason, and the first ever Section 1 vertical, non-price case where the restraint found unlawful was used by a firm with less than 30 percent of the defined market" (Defs.' Reply at 1) does not, on its own, mean that there are serious questions going to the merits. Notably, American Express does not identify any Second Circuit precedent from this same 25-year period that specifically renders the court's judgment more vulnerable to reversal on appeal.

Amex's calculations were "flawed in a number of respects," and ultimately rejected the methodology employed by Defendants' expert.  (See Decision at 91-93.)  Again, American Express is free to argue on appeal that the court analyzed the evidence incorrectly, but this does not render the argument a serious question going to the merits.

Third, Defendants dispute the court's finding that Amex possesses antitrust market power, noting that the court held that "Amex's market share alone likely would not suffice to prove market power by a preponderance of the evidence were it not for the amplifying effect of cardholder insistence."  (Decision at 71.)  Amex attempts to distinguish the finding in the Visa litigation that insistence precluded merchants from dropping acceptance of either Visa or MasterCard, arguing that "the loyalty of American Express's customers is not durable."  (Defs.' Mem. at 15.)  This argument, however, is simply a quarrel with the court's factual findings[4] concerning Amex cardholder insistence, including evidence that "American Express itself [] expressly recognizes, quantifies, and leverages the loyalty of its cardholders in its business dealings with merchants."  (Decision at 72.)  In addition, in reaching its legal and factual determinations regarding Amex's market power, the court applied Visa, a controlling Second Circuit antitrust precedent involving the same industry at issue here.  See generally United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003).  Accordingly, Amex's possession of market power is not a serious question going to the merits.

---

[4] This argument, like others made by American Express, likely is subject to clear error review on appeal to the Second Circuit.  See, e.g., Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001) ("[M]arket definition is a deeply fact-intensive inquiry."); Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 569 (2d Cir. 1990) ("Like many matters of fact, the competitiveness of a market and the market power of a seller may be ascertained with the aid of expert opinions, whose persuasive force is itself a factual matter within the purview of the fact-finder."); accord Gordon v. Lewistown Hosp., 423 F.3d 184, 211 (3d Cir. 2005) ("Determination of market power is a determination of fact; therefore we review the District Court's conclusions to determine if they are clearly erroneous."); United States v. Rockford Memorial Corp., 898 F.2d 1278, 1285 (7th Cir. 1990) (Posner, J.) (explaining that with respect to market definition, an appellate court is "bound to review the [district] judge's determination under the deferential 'clearly erroneous' standard").

Fourth, Amex argues that although the Second Circuit excluded debit cards from the relevant antitrust market in <u>Visa</u> (as this court did in its Decision), "the evidence demonstrates a significant shift in consumer behavior since [the <u>Visa</u>] decision that establishes that debit cards should be included within the relevant market."  (Defs.' Mem. at 15.)  American Express, however, made this argument during the trial, but, based on the evidence presented, the court rejected it.  (<u>See</u> Decision at 46 ("Contrary to American Express's position at trial, the significant rise in spending among U.S. consumers on debit cards over the past decade has not rendered obsolete the determination in <u>Visa</u> that debit cards and GPCC cards, as well as their associated acceptance services, belong to separate antitrust markets.").)  Here, Defendants "simply repeat[] objections and arguments that already have been considered by this Court over the years of litigation [and] during trial."  <u>Malarkey v. Texaco, Inc.</u>, 794 F. Supp. 1248, 1250 (S.D.N.Y. 1992); <u>see also id.</u> ("Thus, although defendant has provided a list of issues it wishes to raise before the Court of Appeals, it has not made the required 'strong showing that [it] is likely to succeed on the merits.'" (quoting <u>Hilton v. Braunskill</u>, 481 U.S. 770, 776 (1987))).[5]

This court recognizes that in <u>Visa</u>, the district court, "[w]hile fully confident in its Decision," acknowledged that the case "involve[ed] substantial legal issues and a complex industry."  2002 WL 638537, at *1.  But at the time that Judge Jones granted a stay pending appeal, she did not have before her the benefit of the Second Circuit's subsequent affirmance of

---

[5]  The court is not persuaded by Defendants' argument that the court's market definition analysis is in tension with the Third Circuit's analysis in <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430 (3d Cir. 1997).  There, the Third Circuit stated that "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general."  <u>Id.</u> at 438.  As explained at length in the Decision, the court determined that debit network services are not reasonably interchangeable with GPCC network services based upon the well-developed evidence before it.  (<u>See</u> Decision at 45-61.)  For example, the court found "that the functional differences between these two payment systems limit their interchangeability at the point of sale" (<u>id.</u> at 56), and that "the testimony elicited at trial suggests that merchants are sensitive to the spending preferences and credit-insistence of their customer base and, as a result, do not view debit network services as an economically viable substitute for GPCC networks services given the revenue that presumably would be lost to their credit-accepting competitors" (<u>id.</u> at 58).

the final judgment in that very case.  This court, unlike the court in Visa, does have the benefit of

a recent decision from the Second Circuit concerning antitrust liability in the GPCC industry.[6]

The court does not seek to disparage Defendants' anticipated arguments on appeal—it

recognizes, as it does in any case before it, that the losing party in the district court may

ultimately prevail on appeal.  But, in the court's view, although Defendants certainly have

arguments to raise on appeal, they have failed to identify, in the aggregate, serious questions

going to the merits.  In any event, as discussed below, this case also differs from Visa in

significant ways that affect the balancing of equities.  Accordingly, even if certain of

Defendants' arguments implicate serious questions going to the merits, they have failed to show

that the balance of equities tips decidedly in their favor.  See, e.g., In re A2P SMS Antitrust

Litig., No. 12-CV-2656 (AJN), 2014 WL 4247744, at *5 (S.D.N.Y. Aug. 27, 2014) (agreeing

that there were serious questions going to the merits of defendants' anticipated appeal, but

declining to issue a stay where "the balance of hardships [did] not tip decidedly in Defendants'

favor, and a stay [would] only modestly serve the public interest"); Canterbury Liquors & Pantry

v. Sullivan, 999 F. Supp. 144, 150-52 (D. Mass. 1998) (denying stay in antitrust case where

defendant identified "a sufficiently serious legal issue" but where the other equitable factors

favored denial of a stay).

**B.      Irreparable Harm to Defendants Absent a Stay Pending Appeal**

American Express argues that it would suffer irreparable harm absent a stay of the

Permanent Injunction pending its appeal.  While the Permanent Injunction will certainly require

American Express to change some of its business practices going forward, and the

---

[6] In addition, the Visa district court noted that "many of [its] critical factual findings did not require credibility
determinations, and therefore may be treated with less deference by the Court of Appeals than findings that do
involve credibility assessments." Id.  Here, a number of the court's findings of fact were based upon credibility
determinations.  (See, e.g., Decision at 88 ("[T]he court is hesitant to rely on the self-interested statements of
Defendants' executives absent some form of documentation.").)

implementation thereof may impose certain costs on American Express, the court concludes that any harm to American Express during the pendency of the appeal (even if irreparable, a premise the court doubts) does not outweigh the substantial harm that would enure to third parties and the public interest.

As noted above, the court starts from the premise that increased competition in the GPCC network services market alone—the relief sought by the Government and the intended effect of the Permanent Injunction in this case—cannot qualify as irreparable harm.  See, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 n.3 (D.C. Cir. 1977) ("The mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact."); Costco Wholesale Corp. v. Hoen, No. 04-CV-360, 2006 WL 2645183, at *5 (W.D. Wash. Sept. 14, 2006) ("The Court recognizes that enjoining the challenged restraints will . . . likely result in greater competition in the marketplace.  However, '[t]he mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact.'" (quoting Holiday Tours, 559 F.2d at 843 n.3)); Canterbury Liquors & Pantry v. Sullivan, 999 F. Supp. 144, 150 (D. Mass. 1998) (denying motion for stay pending appeal and noting that defendant and its members would be required "to engage in non-discriminatory price competition" during pendency of appeal); see also supra Part I.  Indeed, if it were, every permanent injunction in every antitrust case would be subject to an automatic stay where the defendant planned to appeal.  Accordingly, the court turns to American Express's more specific arguments.

First, Amex argues that the Permanent Injunction will require it "to make substantial changes to its business model and its merchant and Card Member relationships as it attempts to adapt to a world without NDPs."  (Defs.' Mem. at 5.)  Amex has not demonstrated, however, that

10

should it change its business practices during the pendency of an appeal, it will be unable to put the genie back in the bottle should this court be reversed.  Indeed, if American Express chooses to enter into new merchant agreements during the pendency of the appeal, it can substantively build a potential reversal by the Second Circuit into such agreements, for example, by automatically reverting to the prior regime should the Second Circuit reverse.  And while the invalidation of the bulk of the NDPs does add a new form of potential merchant steering into the equation, Amex has prior experience with various other forms of merchant steering (such as those authorized by the Durbin Amendment, or those related to co-brand arrangements).  Conforming to the terms of the Permanent Injunction is not the type of wholesale commercial transformation that has justified a stay pending appeal in other cases, such as restructuring an entire business.  See, e.g., Holiday Tours, 559 F.2d at 843 (granting stay where implementation of a permanent injunction would lead to defendant's "destruction in its current form as a provider of bus tours"); see also Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (holding that a preliminary injunction is appropriate where lost profits "are of such magnitude as to threaten the viability of [the] business[]"); Auto. Elec. Serv. Corp. v. Ass'n of Auto. Aftermarket Distribs., 747 F. Supp. 1483, 1514 (E.D.N.Y. 1990) (granting permanent injunction where absent injunction, plaintiff would lose one-third of gross sales and "may have to terminate its business").[7]

---

[7] Defendants also rely on the Seventh Circuit's reasoning in Stuller, Inc. v. Steak N Shake Enterprises, Inc., for the proposition that a company's forced implementation of "a significant change to its business model [] that [] would negatively affect its revenue, possibly even to a considerable extent" can constitute irreparable harm.  695 F.3d 676, 680 (7th Cir. 2012).  But in Stuller, the Seventh Circuit also explained that a preliminary injunction was necessary because the defendant-franchisor would have likely terminated the plaintiff-franchisee's franchise in the absence of a preliminary injunction—the very type of transformational change that supported a finding of irreparable harm in Holiday Tours, Petereit, and Automotive Electric Service Corp.  See id. at 676-79.  Here, Amex has made clear that it does not argue that the irreparable injury it would suffer absent a stay is that it would "cease to exist."  (See Defs.' Reply at 4.)

Indeed, based on the factual record developed at trial, the court rejected American Express's argument that the implementation of the Permanent Injunction will somehow cause its ultimate demise.  The court heard conflicting testimony from Amex executives and its experts concerning Amex's future—including a prediction by the CEO of Amex that "if the NDPs are eliminated [Amex] will not survive as a company."  (See Decision at 137.)  Ultimately, the court found that "Defendants have presented no expert testimony, financial analysis, or other direct evidence establishing that without its NDPs it will, in fact, be unable to adapt its business to a more competitive market and will instead cease to be an effective competitor in the GPCC industry."  (Id.)  Contrary to Defendants' arguments, adapting to a world in which merchants are authorized to steer between brands of credit cards during the pendency of the appeal is not irreparable harm.

Second, Defendants argue that there is a significant risk that absent a stay, Amex "will lose market share, revenue and customer goodwill if merchants begin to steer their customers to rival credit card networks pending the appeal."  (Defs.' Mem. at 7.)  According to American Express, this, in turn, would lead to a loss of charge volume and reduce consumer expectations about American Express's coverage.  (Id. at 8-9.)  Defendants' argument on this point has some merit, as courts in this circuit have considered loss of market share and goodwill in their determinations of irreparable harm.  See, e.g., Register.com v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) (affirming preliminary injunction in breach of contract case where defendants' actions "would cause [plaintiff] irreparable harm through loss of reputation, good will, and business opportunities"); Muze, Inc. v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) (granting preliminary injunction in licensing dispute where "the harm to [plaintiff's] market position and reputation [would be] both actual and imminent"); Stein Indus.,

Inc. v. Jarco Indus., Inc., 934 F. Supp. 55, 58 (E.D.N.Y. 1996) (granting preliminary injunction in patent infringement case where defendant's sale of alleged infringing product would cause loss of original product's market and irreparable harm "because the market share is not easily recovered").

Although Amex's prediction of diminished market share is somewhat speculative, see, e.g., Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011) ("It is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent . . . ." (internal quotation marks and citation omitted)), the court recognizes that should the Second Circuit reverse, steering that occurs during the pendency of the appeal may have a negative impact on Amex's business.  However, the record reflects that American Express has survived (and in some ways prospered during) merchant steering reforms in other jurisdictions (see Decision at 138 n.56), and has already identified ways to mitigate potential merchant steering, such as engaging with merchants to better explain the benefits of accepting American Express, targeting high-visibility "Anchor" merchants with its own steering programs, and reducing the network's discount rate in industries where steering is more likely to occur (see id. at 138-39).  Ultimately, while the court finds that American Express could suffer some economic harm due to merchant steering during the pendency of the appeal, the court also believes that Amex can mitigate that harm (if it, in fact, appears likely to occur), and that the harm will not result in its demise or a substantial loss of market share.

Third, American Express argues that the Permanent Injunction "will immediately and materially modify the contractual rights of American Express and its large merchant partners," resulting in "substantial disruption of the structure of the business relationship between American Express and its merchant customers, especially if the rights and obligations of the

parties are again materially altered as a result of American Express's appeal."[8]  (Defs.' Mem. at 9.)  This prophecy is overblown.  The Permanent Injunction declares certain aspects of the NDPs unenforceable, but it does not force Amex to renegotiate contracts during the pendency of an appeal, and it does not add new, affirmative language to Amex's merchant agreements.  (See Apr. 30, 2015, Mem. (Dkt. 639) at 8; Permanent Injunction § IV.B; see also  Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Stay Pending Appeal ("Gov't's Mem.") (Dkt. 658) at 10 ("These consequences are overstated.  Amex can implement the Permanent Injunction reforms by notifying the contracting parties that it will not enforce the NDPs that constitute the violation; the Permanent Injunction provides a mechanism for this.  And Amex can reform its contracts to comply with the Permanent Injunction while protecting itself by negotiating clauses providing for reversion to the original terms . . . [if] the court of appeals reverses.").)  Moreover, as American Express's "large merchant partners" are intimately aware of this case and the anticipated appeal—indeed, dozens of merchants and trade associates have filed briefs opposing American Express's stay request—American Express will be capable of reaffirming its power to stop merchant steering should the Second Circuit rule in favor of Amex.[9]  And these large merchants can perform their own analysis to determine whether it is in their interest to commence steering now, when there is a chance of reversal on appeal.

---

[8]  American Express also argues, without support, that absent a stay, it will "have to fundamentally restructure . . . millions of Card Member relationships."  (Defs.' Reply at 4.)  The court is not aware of any provisions of the Permanent Injunction that would require Amex to change the way it interacts with its cardholders during the pendency of the appeal; rather, the relief in the Permanent Injunction relates to the contractual relationship between Amex and Amex-accepting merchants.  It is up to Amex to decide whether, and/or how, to change the way it interacts with cardholders during the pendency of the appeal.

[9]  There is no factual basis for Amex's speculative representation that the changes imposed by the Permanent Injunction, "once implemented, cannot be reversed—if at all—without causing confusion to American Express's customers [merchants] and imposing substantial and unrecoverable costs on American Express."  (Defs.' Mem. at 1.)

Finally, the court again recognizes that the Visa district court granted a stay pending

appeal, and noted that the defendants there "demonstrated they may suffer irreparable harm

should this court decline to issue a stay."  2002 WL 638537, at *1.  In Visa, the remedy

authorized issuing banks for the first time to issue credit cards to consumers over networks other

than Visa and MasterCard.  According to the court, the issuance of these cards was "potentially

irreversible," even if the Second Circuit reversed the district court's decision.  Id.  This concern

is not present in this case, however.  As discussed above, American Express has failed to show

that should merchants begin to engage in steering during the pendency of the appeal, Amex will

be unable to re-impose the contractual NDPs on merchants should the Second Circuit reverse.[10]

### C.    Substantial Harm to Interested Parties and the Public if a Stay Is Entered

Defendants argue that a stay will cause little harm to any third parties or to the public

interest.  The court, however, disagrees, and finds that this factor weighs strongly in the

Government's favor.

First, Amex argues that "where the government has permitted the activity at issue to

continue for a long time before taking action against it," injury to a party or the public interest "is

unlikely to be a concern."  (Defs.' Mem. at 16.)  But the cases Defendants cite do not stand for

such a broad proposition.  In Seneca Nation of Indians v. Paterson, for example, the district court

noted in enjoining the enforcement of a new state tax law that there was a "lengthy prior history

of forbearance" by the state, but it also explained that a stay was necessary for at least three

significant reasons: to prevent a potential infringement on tribal sovereignty; to avoid the

potential loss "of an entire economy that currently supports many of [the tribes'] members and

---

[10]  American Express argues that the Government makes many of the same arguments here that Judge Jones rejected in Visa.  (See Defs.' Reply at 3-4.)  While that may be so, the court notes that unlike American Express, who as a third party actively opposed a stay in Visa for many of the same reasons the Government opposes one here, the Government has not flip-flopped its position in the intervening decade.

services"; and to avoid potential violence by preserving the status quo.  No. 10-CV-687A (RJA),

2010 WL 4027795, at *2-3 (N.D.N.Y. Oct. 14, 2010).  And in Flo & Eddie, Inc. v. Sirius XM

Radio Inc., the district court entered a stay of the case in the district court during the pendency of

an interlocutory appeal, because the Second Circuit's resolution of the "critically important

controlling question of law" identified by the district court would have a major impact on the

litigation going forward.  No. 13-CV-5784 (CM), 2015 WL 585641, at *2, *4 (S.D.N.Y.

Feb. 10, 2015).  While the court noted in granting the stay that the plaintiff had "tolerated" the

defendant's alleged unlawful actions "for decades" before bringing suit, it also made clear that if

the plaintiff were to prevail on appeal of the interlocutory order, it would not lose "a dime's

worth of potential damages by holding up until the legal issue [was] resolved."  Id. at *4.  Here,

however, there exists no "critically important controlling question of law," and the issue is a stay

of a litigated final judgment, not a stay in the district court during the pendency of an

interlocutory appeal.

That the NDPs were in existence for a period of years before the Government ultimately

brought its case does not render a stay in the public interest.  (See also Gov't Mem. at 13 ("The

fact that Amex has an extensive history of imposing anticompetitive restraints does not

demonstrate that the harm to merchants and their customers does not exist, or should be

discounted.").)  Nor do the facts that this litigation included a pre-suit investigation and lengthy

pre-trial practice; if anything, the deliberateness of the parties' approach to this case (and the full

trial on the merits, including the court's resolution of many contested factual issues) supports a

finding that a stay pending appeal is not appropriate.

Second—and in contradiction to submissions made to this court by a diverse and

significant set of merchants—Amex argues that reversal or material modification of the remedy

by the Second Circuit in the absence of a stay could cause "significant adverse consequences for consumers, merchants and other networks." (Defs.' Mem. at 18.) However, the interested parties that Amex claims will be harmed by a stay—merchants—overwhelmingly oppose it.[11] (See The Home Depot U.S.A., Inc.'s Resp. in Opp'n to Defs.' Mot. to Stay Pending Appeal (Dkt. 654) at 5 ("Along with other merchants, Home Depot would like to see the long-awaited remedy begin without further delay."); Mem. of Southwest Airlines Co. in Opp'n to Defs.' Mot. to Stay Injunction Pending Appeal (Dkt. 655) at 2 ("Southwest anticipates it would be able to achieve major cost savings and create greater value for its customers if it could steer customers to lower cost forms of payment."); Individual Merchant Pls.' Br. in Opp'n to Defs.' Mot. to Stay Pending Appeal (Dkt. 656-1) at 6 ("Once the Injunction becomes effective, Walgreens, Kroger, Spirit, Burlington, and other merchants are prepared to take steps to use their experience with steering, and with generating competition through steering, to achieve more competitive prices for their credit card acceptance."); Other Merchants' Submission in Supp. of Opp'n to Defs.' Mot. for a Stay Pending Appeal (Dkt. 657) at 4 ("[M]erchants are interested in testing the Court's remedy to introduce some much needed competition into the payments industry . . . .").) In arguing for a stay, Amex again suggests that it knows what is best for merchants. (Cf. Decision at 136 ("[T]he law does not permit American Express to decide on behalf of the entire market which legitimate forms of interbrand competition should be available and which should not.").)

Finally, the public interest favors enjoining Amex's unlawful practices now. Cf. F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 726 (D.C. Cir. 2001) (explaining that there is a "public interest

---

[11] These merchants have significant experience with Amex's use of the NDPs to stifle competition and preserve or impose higher fees. (See, e.g., Decision at 76 (discussing Walgreen's inability either to drop acceptance of Amex or negotiate lower fees); id. at 79-83 (describing Amex's "Value Recapture" initiative to increase merchant fees across industry segments); id. at 119 (discussing merchant efforts to remove NDPs from agreements with Amex).) If the Permanent Injunction is stayed, the court has no doubt that American Express will continue to use the NDPs to its advantage as much as possible during the pendency of its anticipated appeal.

in effective enforcement of the antitrust laws").  Indeed, the court has previously described its

broad discretion under the Sherman Act to remedy the negative consequences caused by an

antitrust violation and to prevent recurrence of the violation.  (See Apr. 30, 2015, Mem. at 4-6.)

A lengthy stay pending appeal would necessarily prevent the court from performing this

function.[12]  See, e.g., Malarkey v. Texaco, Inc., 794 F. Supp. 1248, 1251 (S.D.N.Y. 1992)

(denying motion to stay equitable relief in employment discrimination case pending appeal,

because "to acquiesce in further delays after ten years of litigation would be to make this Court

an instrument for further frustrating instead of promoting the aim of the statute").

*       *       *

On balance, the application of the factors here does not justify a stay pending appeal.

While Amex has identified issues that it will raise on appeal, it has not shown that there are

sufficiently serious questions going to the merits that make this antitrust case unique.  Of more

significance, no matter the complexity of the case, American Express has not shown that the

balance of equities tips decidedly in its favor.  Indeed, Amex has already demonstrated during

trial that it is adept at anticipating and dealing with changes in the business environment in which

it operates—this will be no different.  While American Express has speculated that the denial of

a stay may cause it to lose market power, the implementation of the Permanent Injunction during

the pendency of the appeal does not threaten Amex's existence, nor require a transformative

change—rather, Amex simply must adjust one of its business practices to be compliant with the

antitrust law.  Most significantly, a stay would not serve the public interest, and would continue

to negatively, and substantially, affect merchants across the country.

---

[12]  The court appreciates that American Express offered to seek an expedited briefing schedule in the Second Circuit
so that a stay "would not delay the final resolution of this case any longer than necessary."  (Defs.' Mem. at 18.)
However, whether the Second Circuit agrees to expedite the appeal is out of this court's control.

## IV.   CONCLUSION

As set forth above, Defendants' motion to stay pending appeal is DENIED.  However, in

order to permit Defendants to seek a stay pending appeal from the Second Circuit, the court sua

sponte enters a temporary stay of the Permanent Injunction for a period of 30 days from the date

of entry of this Memorandum and Order.[13]  See Rodriguez v. DeBuono, 175 F.3d 227, 235-36

(2d Cir. 1998) ("[B]rief stays for a matter of days are frequently issued when a district court

denies an open-ended stay pending appeal.  They give the appellate court an opportunity to

decide whether an additional stay and an expedited appeal should be granted.").

SO ORDERED.

/s/ Nicholas G. Garaufis

Dated: Brooklyn, New York
      May **19**, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

[13]  The 30-day stay is in addition to a 30-day implementation period already built into the Permanent Injunction.
(See Permanent Injunction ¶ I.G ("'Effective Date' means the later of: (i) thirty (30) days following the date of entry
of this Permanent Injunction; or (ii) thirty (30) days following the expiration of any stay of this Permanent
Injunction entered by this court or any appellate court of competent jurisdiction.").)  Accordingly, in the absence of
a subsequent stay, and upon the expiration of this court's 30-day stay, Defendants will still have 30 days to cease
enforcement of the unlawful provisions contained in the NDPs.

19